IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-01921-RMR-MDB

DR. ANUJ PEDDADA

    Plaintiff,

v.

CATHOLIC HEALTH INITIATIVES COLORADO D/B/A CENTURA HEALTH-PENROSE-ST. FRANCIS HEALTH SERVICES; and,
COMMONSPIRIT HEALTH FOUNDATION D/B/A COMMONSPIRIT HEALTH

    Defendants.

---

**PLAINTIFF'S RESPONSE TO MOTION TO DISMISS
WRONGFUL DISCHARGE CLAIM [ECF NO. 21]**

---

This employment case arises from the retaliatory decision by Defendants Centura Health and CommonSpirit Health to terminate Plaintiff Dr. Anuj Peddada just days after he disclosed a disability, requested an accommodation, and reported patient safety concerns. Defendants did so after Dr. Peddada spent twenty years working at their hospital, saving the lives of countless cancer patients. Among other claims, Dr. Peddada asserts a state-law claim for wrongful discharge in violation of public policy. *See* Compl., ECF No. 1, ¶¶ 193-207. Defendants move to dismiss only that one claim. *See* Mot. at 5. In doing so, Defendants erroneously argue that they never employed Dr. Peddada, therefore he cannot satisfy the first element of the claim. *Id*. at 3-4. Relatedly, they argue that because Dr. Peddada engaged in protected activities prior to his first day of in-house employment, he also cannot sustain the claim. *Id.* at 5. Because Dr. Peddada sufficiently alleged his employment with Defendants, and because he has articulated two cognizable theories to

support his claim, including that the public policy exception to at-will employment covers other retaliatory acts other than just discharge, an argument Defendants fail to address, Defendants' Motion must be denied.

## RELEVANT FACTUAL ALLEGATIONS IN THE COMPLAINT

In 1999, Dr. Peddada, a board-certified radiation oncologist, opened a private practice and entered an exclusive contract to provide services at Penrose Cancer Center, which is managed and operated by Defendants.  Compl. ¶¶ 2-5, 14-24.  Dr. Peddada went on to work at Penrose for the next twenty years, saving countless lives, earning numerous accolades, building a significant referral network, and serving as Penrose's Medical Director, among several other achievements.  *Id*. ¶¶ 14-60.  Defendants valued Dr. Peddada's success so much that they placed his image on several advertising billboards.  *Id*. ¶ 59.

Nevertheless, in December of 2021, Defendants informed Dr. Peddada that they would not be renewing the exclusive contract with his practice upon expiration the following year.  *Id*. ¶ 70. Instead, Defendants encouraged Dr. Peddada to close the practice and work for Defendants in-house as an employee, offering him assurances that if he applied for the position, they would hire him.  *Id*. ¶¶ 71-76.  Based on Defendants' assurances, Dr. Peddada applied for the position in the early months of 2022.  *Id*. ¶¶ 77.  "On April 5, 2022, Centura **extended Dr. Peddada an offer of employment** for the Penrose position," and "[o]n April 12, 2022, Dr. Peddada **accepted said offer of employment**."  *Id*. ¶¶ 78-79 (emphasis added).  The binding employment contract contained a start date of July 1, 2022, a covenant not to practice medicine in any other capacity, and the pay structure, among all other material terms.  *Id*. ¶ 80.

Simultaneous to Dr. Peddada's transition from private practice to in-house employment,

he realized he was experiencing several psychological, physiological, and physical symptoms characteristic of physician burnout. *Id*. ¶¶ 66-67, 83. As a result of his condition, he was suddenly making abnormal medical errors, receiving complaints atypical of his stellar career, and having extreme difficulty performing previously simple tasks at work and at home. *Id*. ¶¶ 81-87.

Dr. Peddada disclosed his condition to Defendants for the first time on April 16, 2022, four days after he accepted Defendants' valid offer of employment. *Id*. ¶ 85. And over the next ten days, Dr. Peddada made additional disclosures to Defendants via written communications and in meetings; provided Defendants with documentation of his condition; requested that Defendants provide him with an accommodation in the form of a temporary three-month medical leave (at the direction of his physician); and reported to Defendants that if he continued to work unaccommodated, he would be risking more medical errors and ultimately the safety of his patients. *Id*. ¶¶ 86-96. The intended three-month medical leave from May to July of 2022 meant that Dr. Peddada would delay his start date to August of 2022, a one-month delay. *Id*. ¶¶ 97-98.

Rather than accommodate Dr. Peddada, Defendants retaliated against him. On April 26, 2022, Defendants emailed Dr. Peddada a new offer of employment, which purported to "void" the earlier-executed agreement. *Id*. ¶¶ 104-05. At the same time, Defendants needlessly pressed Dr. Peddada to make more disclosures regarding his disability, submit more documentation, and request his leave in a variety of additional forums. *Id*. ¶¶ 106-19. Defendants made these redundant and confusing requests despite knowing that Dr. Peddada's disability made even simple tasks very difficult. *Id*. ¶¶ 104-119. Dr. Peddada obliged, but on May 10, 2022, Defendants informed Dr. Peddada that he had purportedly "declined employment" by not signing the unexpected new employment contract they sent him on April 26, 2022. *Id*. ¶ 120. Defendants also

decided they would not be "extending a revised offer of employment." *Id.* ¶ 121. These assertions took Dr. Peddada by surprise, since he had already accepted a valid offer of employment and did not believe that he needed to satisfy any additional preconditions (such as signing a *second* employment agreement) before becoming an employee. *Id.* ¶¶ 123-42.

As alleged in Dr. Peddada's Eighth Claim for Relief, by unilaterally voiding an executed employment agreement and foreclosing any additional negotiations, Defendants terminated Dr. Peddada's employment (or alternatively, denied him the opportunity to work). *See, e.g.*, *id.* ¶ 204. Dr. Peddada further alleges that the purpose of Defendants' conduct was to punish or otherwise retaliate against him for good faith self-reporting conduct, which has caused immense economic and noneconomic damage to Dr. Peddada. *Id.* ¶ 194, 205.

## **LEGAL STANDARD**

In deciding a motion to dismiss, courts must "assume the truth of all well-pleaded facts in the complaint, and draw all reasonable inferences therefrom in the light most favorable to the plaintiff[]."[1] *Dias v. City and County of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009). In that light, a complaint survives "if it alleges a plausible claim for relief—that is, the factual allegations must be enough to raise a right to relief above the speculative level." *Id.* (quotation marks and

---

[1] As a preliminary matter, in deciding their Motion to Dismiss, Defendants' version of the facts is not before the Court and must be disregarded. Except in narrow circumstances, which no Parties contend are present here, "the sufficiency of a complaint must rest on its contents alone[.]" *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010). Nevertheless, Defendants begin their Motion to Dismiss with two pages of General Background simply repeating their statement of defenses from the Scheduling Order. *Compare* Mot. at 1-2 *with* Prop. Scheduling Order [ECF No. 14], at 4-6. Amongst other statements, in the Factual Background of the Motion, Defendants assert that only certain employees have authority to enter binding agreements on behalf of Defendants. *See* Mot. at 7 ("let alone by the needed Penrose signatory, Jason Tacha."). None of this is relevant at the motion to dismiss phase, let along substantiated or supported by anything currently on the record. Simply put, Defendants' unsupported allegations have no place in the analysis at bar.

citations omitted). The plausibility standard "does not require that [the] [p]laintiff establish a prima facie case in the complaint." *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012). "And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (quotations omitted).  "[G]ranting a motion to dismiss is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Dias*, 567 F.3d at 1178.

## ARGUMENT

**I.   The Complaint States a Claim for Wrongful Discharge in Violation of Public Policy Because Defendants Did In Fact Employ Dr. Peddada.**

Colorado law creates a broad vehicle for wrongful discharge claims where employers contravene a clear mandate of public policy. *See Martin Marietta Corp. v. Lorenz*, 823 P.2d 100, 107 (Colo. 1992).  Sources of public policy include statutes or other sources such as a professional code of conduct.  *See Brown v. Premier Roofing, LLC*, 173 F. Supp. 3d 1181, 1185 (D. Colo. 2016).  Here, Dr. Peddada primarily relies on Colorado's statutory protection for whistleblowers in the patient care setting, which expressly prohibits healthcare providers from taking "any disciplinary action against a healthcare worker in retaliation for making a good faith report or disclosure." C.R.S. § 8-2-123(2)(a).  In turn, "'[g]ood faith report or disclosure' means a report regarding patient safety information or quality of patient care[.]" *Id.* § 8-2-123(1)(b).

The public policy considerations inspiring Colorado's healthcare worker whistleblower statute are readily apparent.  When the law first passed in 2007, the legislature noted in the bill's declaration that:

> Patient safety is of paramount importance in the delivery of health care to Colorado

> citizens. A patient is at his or her safest when a health care worker has the right to speak out on the patient's behalf without fear of reprisal…It is a violation of public policy in the state of Colorado for a health care worker to be fired or penalized for fulfilling his or her professional obligations.

Chap. 67, Sec.1, Sessions Law of Colorado 2007.[2]

In Dr. Peddada's Eighth Claim for Relief, he alleges that Defendants terminated his employment in retaliation for his good faith reports regarding patient safety – namely, the potential for his own medical condition to result in treatment errors if unmanaged. Compl. ¶¶ 193-207. Specifically, Dr. Peddada alleges in his Complaint that just days after disclosing his physician burnout and expressing concern that the condition would deteriorate patient care and create a risk of medical errors, Defendants unilaterally rescinded his position and voided a binding employment agreement. *Id*. Notably, Defendants do not dispute that Dr. Peddada's patient safety report falls within the scope of the activities the Colorado legislature sought to encourage and protect in passing C.R.S. § 8-2-123, nor that Dr. Peddada has alleged insufficient facts to evidence his good faith in making the report. Likewise, Defendants do not argue that Dr. Peddada has failed to allege sufficient circumstances suggesting retaliatory motive.

Rather, the core of Defendants' argument is that they never employed Dr. Peddada because either their agents failed to sign the employment agreement Defendants extended him or because his employment was cancelled before his "potential start date." Mot. at 5. In no uncertain terms, however, the Complaint alleges that Defendants did employ Dr. Peddada, extending him an offer of employment on April 5, 2022, which Dr. Peddada accepted on April 12, 2022, but which they unliterally rescinded in retaliation for his engaging in protected activities. Compl. ¶¶ 78-79.

---

[2] *Available at* https://leg.colorado.gov/sites/default/files/images/olls/2007a_sl_67.pdf

6

In Colorado, "[a] contract is formed when one party makes an offer and the other accepts it, and the agreement is supported by consideration." *Sumerel v. Goodyear Tire & Rubber Co.*, 232 P.3d 128, 133 (Colo. App. 2009). Dr. Peddada's Complaint alleges that Defendants' offer of employment had all the material terms of an employment contract and appeared contingent only upon Dr. Peddada's acceptance. Compl. ¶¶ 80, 123-42; *cf. Sumerel*, 232 P.3d at 133 (there is no valid offer where recipient "knows or has reason to know that the person making the purported offer does not intend to conclude a bargain until he has made a further manifestation of assent") (quotations omitted). Finally, the Complaint alleges that by unilaterally rescinding and voiding the employment agreement, Defendants terminated Dr. Peddada's employment. Compl. ¶ 204. Defendants apparently overlook these allegations when they assert that Dr. Peddada was not employed or subsequently discharged.

Relatedly, Defendants argue that Dr. Peddada raised patient safety concerns prior to his potential start date and therefore is not covered by the unlawful discharge in violation of public policy tort. Mot. at 5. In doing so, Defendants cite Colorado Jury Instruction Chapter 31:13 for the proposition that a plaintiff must exercise a right "during the course of employment." *Id*. For the reasons as those discussed above, this argument too lacks merit. Dr. Peddada was in fact employed. But additionally, Defendants cite no support for the proposition that the first day of work is the dispositive factor for determining whether an employer/employee relationship exists. Nor do they explain why Dr. Peddada's ongoing work for Defendants prior to signing the agreement in question and transitioning in-house does not result in the type of employment relationship protected under the public policy tort exception to at-will employment.

When defining course of employment in other contexts, Colorado law considers "the

7

totality of the circumstances" to determine whether there is a sufficient nexus between the employment and a statute's legal protections.  *City of Brighton v. Rodriguez*, 318 P.3d 496, 501 (Colo. 2014) (considering "course of employment" in the workers compensation context).  Here, Dr. Peddada raised patient care concerns after working for decades at the hospital owned and managed by Defendants, and after he accepted and signed a valid agreement bringing his longstanding working relationship with Defendants in house, *supra*.  His concerns related to patient safety, and thus related squarely to his role as a doctor working with Defendants first through his practice and then as an in-house employee.  And he directed his concerns to Defendants, the entities responsible for and capable of taking remedial action (*i.e.*, Dr. Peddada did not direct reports to unrelated third parties). To ignore all of these circumstances and focus only on Dr. Peddada's start date is far too formalistic of an approach given the serious public policy and interests at stake.  Because the Complaint alleges that Dr. Peddada was an employee engaged in cognizable protected activity, there are sufficient allegations to support a claim for wrongful discharge in violation of public policy and Defendants' Motion must be rejected.

**II.      Alternatively, the Complaint States a Claim for Wrongful Withholding of Work in Violation of Public Policy.**

In the Motion, Defendants do not address Dr. Peddada's alternate theory that Defendants wrongfully denied him employment opportunities, withholding work, in violation of public policy. *See, e.g.*, Compl. ¶ 204 ("Defendants retracted their job offer…within weeks of these disclosures.").  As the Colorado Supreme Court articulated in the principal decision on the public policy exception, *Martin Marietta Corp. v. Lorenz*, the purpose of the tort is "to prohibit an employer from placing an employee in the position of keeping a job only by performing an illegal act, forsaking a public duty, or foregoing a job-related right or privilege." 823 P.2d at 109; *see also*

*Flores v. American Pharmaceutical Services, Inc.*, 994 P.2d 455, 458 (Colo. App. 1999) (public policy claims aim to dissuade employer misconduct "that affect[s] society at large … or strike[s] at the heart of a citizen's social rights, duties, and responsibilities").

It makes little sense to read Colorado's public policy exception to retaliatory retribution more narrowly than other anti-retaliation provisions commonly found in laws. Stated another way, it makes little sense to interpret Colorado's public policy exception as sanctioning an employer's refusal hire to, demote, deny promotion to, or deprive an individual of pay increases etc. because that individual complained about the safety of patients. The important deterrent function of Colorado's public policy exception is grounded in similar considerations as anti-retaliation provisions found in many other state and federal laws, namely, that the privileges and rights of employees are meaningless if such employees are unable to meaningfully enforce them without fear of adverse consequences. *See, e.g.*, *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006) (explaining that under Title VII "the antiretaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace…the employer's actions [need only] be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination."); *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 11-12 (2011) (explaining that the FLSA's anti-retaliation provision is intended to "prevent[] fear of economic retaliation from inducing workers quietly to accept substandard conditions") (citations omitted). Under all such other anti-retaliation provisions, employers may not engage in retaliatory adverse actions, including refusal to hire or employ an individual, merely because a prospective employee engages in protected activities. *See, e.g.*, 42 U.S.C. § 2000e-3 (Title VII's anti-retaliation provision prohibiting employers from "discriminat[ing] against any of his employees or applicants

9

for employment"); 42 U.S.C. § 12203(a) (ADA's anti-retaliation provision stating that "no person shall discriminate against any individual" because of protected activity); 29 U.S.C. § 215(a)(2) (FLSA's anti-retaliation provision prohibiting employers from "in any other manner discriminat[ing]" against workers who engage in protected activity); C.R.S. § 24-34-402(e)(IV) (CADA's anti-retaliation provision prohibiting employers from "discriminat[ing] against any person" because of their protected activity).

Indeed, one recent piece of legislation in Colorado explains the importance of protecting prospective employees if important public policy considerations are to be served. The Restrict Government Nondisclosure Agreements Act, for example, expressly states that "[a]ny provision in any contract or agreement that violates subsection (1)(a) of this section is *deemed to be against public policy*," and that, "[n]either a local government nor a department, an institution, or an agency of a local government shall take any materially adverse employment-related action, including, without limitation, *withdrawal of an offer of employment*…against an employee on the grounds that the employee does not enter into a contract or agreement deemed to be against public policy…" C.R.S. § 29-1-1601(b) (emphasis added).

Nowhere do Colorado's courts expressly or implicitly limit the reach of the public policy exception to unlawful discharge, nor do Defendants point to any legal authority suggesting as much. Indeed, the statute relied on by Dr. Peddada as the basis of his Eighth Claim – C.R.S. § 8-2-123 – defines prohibited retaliatory actions broadly, including **"any direct or indirect form of discipline or penalty, including, but not limited to dismissal, demotion, transfer, reassignment, … corrective action, reprimand, … withholding of work, … creating or tolerating a hostile work environment, or the threat of any such discipline or penalty."** C.R.S.

§ 8-2-123(1)(b).  There can be no dispute that Dr. Peddada sufficiently alleged that Defendants withheld work from him when they unilaterally voided a valid employment agreement and rescinded his employment. *See, e.g.*, Compl. ¶¶ 120-21.

Of course, most if not all the published decisions in Colorado implicate unlawful discharge. Discharge, after all, is the most common complaint by plaintiffs given the understandable reluctance of employees to bring lawsuits against their current employers.  For this reason, the sparse caselaw and jury instruction cited by Defendant do not stand for what Defendants claim. Neither *Kearl v. Portage Env't, Inc.* nor Colorado Jury Instruction 31:13 suggest that the *only* adverse action that the public policy exception prohibits is that of termination.  To the contrary, Colorado Jury Instruction 31:13, which Defendants cite, expressly recognizes "constructive" discharge as a possible basis for the unlawful discharge in violation of public policy claim. According to the instruction the third element of the claim a jury must decide is whether "[t]he defendant **(constructively)** discharged the plaintiff because the plaintiff (followed the [statute] [rule] [regulation]) (performed [his] [her] duty as a citizen) (exercised [his] [her] right or privilege as a worker)." But constructive discharge is not a discharge or termination of employment in the classic meaning of the word.  Instead, it essentially entails such a significant change in terms and conditions of employment or such severe harassment that a reasonable employee in the plaintiff's shoes would resign rather than continue to work under those conditions.  *See, e.g.*, *Montemayor v. Jacor Communications, Inc.*, 64 P.3d 916, 921 (Colo. App. 2002) (proving constructive discharge requires showing conditions "so difficult or intolerable that the employee has no other choice but to *resign*") (emphasis added and citations omitted);  *Green v. Donahoe*, 760 F.3d 1135, 1143 (10th Cir. 2014) (holding that an element of constructive discharge is "an employee's decision *to leave*")

11

(emphasis added and citations omitted).  Thus, even Colorado Jury Instruction 31:13 recognizes that conduct other than termination may give rise to a public policy tort claim.

In this case, there *is* a statutory provision authorizing Dr. Peddada's anti-retaliation claim for wrongful withholding of work.  To interpret the public policy exception so narrowly as to render the protections enumerated in C.R.S. § 8-2-123 meaningless conflicts with the stated intent of the legislature and significantly undermines the important public policy enshrined in that statute – the preservation of quality patient care.  Because the whistleblower statute authorizes a claim for retaliatory withholding of work—a claim that is well-recognized in other contexts and consistent with Colorado's public policy disfavoring employment retaliation in all forms—the Court should permit Dr. Peddada's alternate theory of recovery even if the Court finds he was not discharged.

## CONCLUSION

For reasons stated above, Plaintiff respectfully requests this Court outright **DENY** Defendants' Motion to Dismiss Wrongful Discharge Claim. There is no factual or legal basis for dismissing his Eight Claim at this early stage of litigation.  Alternatively, if the Court believes that the facts alleged by Plaintiff should be revised to reflect additional facts about the existence of an employment relationship, or if the Court wishes Plaintiff to clarify the verbiage that other adverse employment actions in addition to discharge have been identified as the basis of his Eighth Claim, then leave to amend should be granted. *See* Fed. R. Civ. P. 15(a) ("The court should freely give leave when justice so requires."); *Foman v. Davis*, 371 U.S. 178, 182 (1962) ("Rule 15(a) declares that leave to amend 'shall be freely given when justice so requires'; this mandate is to be heeded."). Plaintiff has not previously amended his Complaint and the changes sought would be technical and minor. Likewise, the Parties have yet to engage in any discovery; trial has not been set and the

soonest it can take place is 2025; and Defendants did not confer before filing their Motion, potentially allowing Plaintiff to make such minor revisions as would obviate the need for Defendants' Motion.

Dated: October 12, 2023.

                                                                                                                    RATHOD | MOHAMEDBHAI LLC

                                                                                                                    *s/ Iris Halpern*
                                                                                                                    Iris Halpern
Omeed Azmoudeh
Qusair Mohamedbhai
2701 Lawrence Street, Suite 100
Denver, Colorado 80205
(303) 578-4400
ih@rmlawyers.com
oa@rmlawyers.com
qm@rmlawyers.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of October 2023, the foregoing **PLAINTIFF'S RESPONSE TO MOTION TO DISMISS WRONGFUL DISCHARGE CLAIM [ECF NO. 21]** was filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

RATHOD | MOHAMEDBHAI LLC

*s/ Iris Halpern*
Iris Halpern