**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:23-cv-01921-NYW-MDB

DR. ANUJ PEDDADA

      Plaintiff,

v.

CATHOLIC HEALTH INITIATIVES COLORADO FORMERLY D/B/A CENTURA
HEALTH-PENROSE-ST. FRANCIS HEALTH SERVICES; and,
COMMONSPIRIT HEALTH

      Defendants.

---

**FIRST AMENDED COMPLAINT AND JURY DEMAND**

---

Plaintiff Dr. Anuj Peddada by and through counsel Iris Halpern, Qusair Mohamedbhai, Omeed Azmoudeh, and Crist Whitney of RATHOD | MOHAMEDBHAI LLC, respectfully alleges in his Complaint and Jury Demand as follows:

**NATURE OF THE ACTION**

The American Medical Association has reported on the harrowing impact of the COVID-19 pandemic and what is oftentimes colloquially referred to as "physician burnout" citing, for example, a 2021 Mayo Clinic study in which more than 20,000 respondents across one hundred twenty-four institutions across the country reported burnout, overwhelming workload, fear of infection, anxiety, or depression due to COVID-19 and the number of years they have been in practice. Burnout, and the physical and

1

psychological conditions giving rise to it, is a major factor in the mass exodus of physicians from the medical profession this country has recently witnessed.

Since 1999, Dr. Anuj Peddada provided services as a board-certified radiation oncologist with Catholic Health Initiatives Colorado ("CHIC"), doing business during the time relevant to this action as Centura Health-Penrose-St. Francis Health Services ("Centura"). In February of 2019, CHIC became a subsidiary of CommonSpirit Health ("CommonSpirit"), and CHIC and CommonSpirit (collectively, "Defendants") formed a joint-employer and/or integrated enterprise relationship with respect to the conduct alleged herein.

For decades, Dr. Peddada provided cancer treatment at CHIC's Penrose Cancer Center ("Penrose"), saving countless lives and pioneering cutting-edge cancer treatment programs. But, in April of 2022, just after Defendants convinced Dr. Peddada to shutter his private practice and come in-house, Dr. Peddada disclosed that he was suffering from physiological and psychological symptoms corresponding with physician burnout. Mere days after requesting medical leave and supplying medical documentation, Defendants suddenly retracted their employment offer – including the employment contract which Dr. Peddada had already signed – and refused to hire/terminated Dr. Peddada, leaving his patients afloat, and devastating his career.

This is a lawsuit brought under the Americans with Disabilities Act, the Rehabilitation Act of 1973, and state law to vindicate Dr. Peddada's rights and

2

ensure that doctors are treated with the same care and compassion they treat their patients. No physician should ever have to face the Hobson's choice of ensuring the highest standard of quality care for his patients or sacrificing his beloved, hard-earned, career.

## I.    JURISDICTION, VENUE, AND PARTIES

1.    Plaintiff Dr. Anuj Peddada, during all times relevant to this action, was domiciled and worked in the State of Colorado.

2.    Defendant Catholic Health Initiatives Colorado ("CHIC") formerly d/b/a Centura Health-Penrose-St. Francis Health Services ("Centura") is a Colorado corporation duly registered with the Colorado Secretary of State that did, during all times relevant to this action, do business in Colorado, including managing Penrose and St. Francis Hospitals.

3.    After the filing of the original Complaint, Defendant CHIC ceased doing business as Centura, necessitating clarification and revision to the Complaint.

4.    Defendant CommonSpirit Health ("CommonSpirit"), a foreign corporation duly registered with the Colorado Secretary of State,  is the parent company to Defendant CHIC formerly d/b/a Centura.

5.    The relevant corporate history between the Defendants is as follows.

a. In or around 1996, CHIC and Portercare Adventist Health System ("PAHS") entered into a joint venture to form, and became the sole members of, Centura.

3

b.  CHIC and PAHS formed Centura for the purpose of jointly managing and operating hospitals that CHIC and PAHS separately owned.

c.  In that regard, around the same time, CHIC began doing business as Centura in the management and operation of Penrose, St. Francis, and other hospitals owned by CHIC.

d.  On or around February 1, 2019, CHIC's national entity and another hospital system, Dignity Health, created CommonSpirit.

e.  Upon the formation of CommonSpirit, CHIC was still doing business as Centura.

f.  However, the purpose of CommonSpirit Health was not to sit as a mere holding company to CHIC d/b/a Centura.

g.  Instead, there are significant indicia that CommonSpirit and CHIC d/b/a Centura formed a joint-employer relationship and/or an integrated enterprise relationship with respect to the management and operation of the hospitals owned by CHIC d/b/a Centura, including Penrose and St. Francis. Such indicia include:

i.  In its own public statement announcing the formation of CommonSpirit on February 1, 2019, CommonSpirit represented itself publicly as being comprised of "approximately 150,000 employees and 25,000 physicians and advanced practice clinicians" across 142 hospitals, including CHIC's Penrose and St. Francis Hospitals.

4

ii.        In that same public statement, CommonSpirit explained that its express purpose was to "operate[]" the hospitals owned by the affiliate entities, including CHIC's Penrose and St. Francis Hospitals. Specifically, CommonSpirit Health explained that it would be "retaining and recruiting" the relevant workforce, implementing various policy goals, and engaging in several other operational efforts.

iii.        In that same public statement, CommonSpirit explained that two CEOs from the affiliate entities—CHIC's national entity and Dignity Health—would leave their respective positions to become joint CEOs of CommonSpirit. That is, the most significant decisionmakers, including with respect to the conditions of employment across all hospitals, became the lead executives of CommonSpirit.

iv.        CommonSpirit maintains policies, mission statements, and other corporate annunciations of corporate purpose that are directed at the management and operation of hospitals. For instance, the mission statements on CommonSpirit Health's website refer to "health equity," "improving population health," "innovating care," and other similar statements. These are statements clearly indicative of an intent to exercise far more than nominal control over its hospitals, including Penrose and St. Francis.

v.     In its own public statement describing financial results on October 4, 2019, CommonSpirit again explained that it "operates" the hospitals of its affiliate entities, including Penrose and St. Francis. Further, CommonSpirit explained that in FY2019, it had "transition[ed] to a new operating model, a single credit structure, and a comprehensive performance-improvement plan," had "centralized" key hospital functions, including "quality and patient safety, contracting, and information technology," and had engaged in other operational efforts.

vi.     Beginning in 2019 and through the present, the CommonSpirit website (not any CHIC website) was held out as the umbrella provider for Penrose and St. Francis. Applicants had to apply to work at any facility or service owned by CHIC though CommonSpirit. CHIC has not had a website since 2019 and has no web presence whatsoever.

vii.     Today, CommonSpirit Health's logo and signage alone physically identify each health facility or service owned by CHIC to the public. There is no indication to the public that CHIC owns or operates any facilities or services.

viii.     Effective August 1, 2023, CHIC and PAHS made a significant operational change by ending the decades-long joint venture in Centura, meaning that CHIC would no longer be doing business as Centura. On the same date, CommonSpirit became the sole member of CHIC.

6

ix.    In its own public statement from August 1, 2023, CommonSpirit announced the end of the joint venture and did not credit CHIC for the decades of partnership with PAHS. Instead, CommonSpirit explained that "CommonSpirit Health and [PAHS] have worked together … for 27 years." Again, CommonSpirit was holding itself out to the public as having operated CHIC's hospitals, even for periods prior to CommonSpirit's own existence.

x.    Courts have even begun to treat CommonSpirit as the operative entity for all matters related to CHIC or its national entity. For instance, the District of Nebraska certified an FLSA class on behalf of certain analysts against "CommonSpirit Health and/or its predecessors Catholic Health Initiatives and/or Dignity Health." *Mahoney v. CommonSpirit Health*, No. 8:21CV23, 2021 WL 5907929,  at *6 (D. Neb. Dec. 14, 2021). The class representative in that case confirmed that her job duties involved "adding hospital staff information to the [database], auditing the user database, working with human resources to add users to the system, [and] updating doctor and nurse profiles," which required "the application of company policies and procedures created by [CommonSpirit] management." *Id.* at *1; *see also Walkinshaw v. St. Elizabeth Reg. Med. Cntr.*, 428 F.Supp.3d 171, 178-179 (D. Neb. Dec. 20, 2019) (where a nurse alleged class FLSA violations against Catholic Health Initiatives Nebraska

and CommonSpirit, denying CommonSpirit's motion to dismiss and finding personal jurisdiction over CommonSpirit because of its involvement in the nurse's conditions of employment); *CommonSpirit Health v. Healthtrust Purchasing Grp., L.P.*, No. 3:21-cv-00460, 2022 WL 1432553, at *1 (M.D. Tenn. May 5, 2022) (where CommonSpirit was a plaintiff, order regarding CommonSpirit's motion to dismiss counterclaims, in which CommonSpirit did not challenge CHIC being described as its "predecessor"); *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1163 (6th Cir. 2022) ("[Plaintiff] once worked for Catholic Health Initiatives, now known as CommonSpirit Health, one of the largest healthcare providers in the United States.").

6.      Based on the corporate history, where Dr. Peddada alleges facts herein against CHIC d/b/a Centura, Dr. Peddada alleges those facts in light of the formation of the joint-employer and/or integrated enterprise relationship between CHIC d/b/a Centura and CommonSpirit in February of 2019.

7.      Also based on the corporate history, where Dr. Peddada alleges facts herein against Centura, Dr. Peddada alleges those facts with the understanding that CHIC was doing business as Centura until August 1, 2023.

8.      Subject-matter jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331, 1337, and 1343. This Action is authorized and instituted pursuant to 42 U.S.C. §§ 2000e-5(f) through (k) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 12117(a) of the Americans with Disabilities Act which incorporates Title VII's enforcement

8

provisions, 29 U.S.C. §794a of the Rehabilitation Act of 1973 which incorporates Title VII's enforcement provisions, and pursuant to 42 U.S.C. § 1981a.

9.      Jurisdiction over Plaintiff's state law claim is proper under 28 U.S.C. § 1367(a) because it is so related to Plaintiff's claims arising under federal law that it forms part of the same case or controversy.

10.      Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). The events and omissions alleged herein occurred within the State of Colorado. At the time of the events and omissions giving rise to this litigation, all the parties resided or conducted business in Colorado.

## II.    ADMINISTRATIVE EXHAUSTION

11.      Plaintiff timely dual-filed a charge of discrimination with the Colorado Civil Rights Division and United States Equal Employment Opportunity Commission on September 21, 2022, alleging violations of the Colorado Anti-Discrimination Act and Americans with Disabilities Act.

12.      The Charge of Discrimination included allegations of discrimination based on disability, retaliation, and interference.

13.      The EEOC issued Plaintiff a Notice of Right to Sue dated May 1, 2023.

14.      Plaintiff files this action within ninety (90) days of receiving his Notice of Right to Sue.

15.      Other than Plaintiff's Americans with Disabilities Act claims, his remaining claims do not require administrative exhaustion.

### III.    FACTUAL ALLEGATIONS

### Dr. Peddada's Lifesaving Career and Tenure With Centura

16.    Dr. Anuj Peddada is a board-certified radiation oncologist.

17.    A radiation oncologist is a specialized physician who is trained in the use of highly specialized and unique radiation regimes in the treatment of cancer.

18.    In 1990, Dr. Peddada graduated with a Doctor of Medicine ("M.D.") from Louisiana State University School of Medicine.

19.    Dr. Peddada performed his residency, serving as Chief Resident, Department of Radiation Oncology, at Southern California Kaiser Permanente Medical Center in Los Angeles, California.

20.    During residency, Dr. Peddada received an American College of Radiation Oncology Fellowship Award, which funded his time at Memorial Sloan Kettering Cancer Center and the Fox Chase Cancer Center.

21.    Dr. Peddada then worked as a Staff Radiation Oncologist in Kaiser's Department of Radiation Oncology, and after that entered private practice with Cancer Care Consultants in Northridge, California.

22.    After practicing privately, Texas Tech University School of Medicine and St. Mary's Hospital recruited Dr. Peddada to work for them, after which, Dr. Peddada moved to Colorado to work at Penrose Cancer Center.

23.    Thereafter, Dr. Peddada cemented his relationship with CHIC, which, as mentioned above, did business as Centura until August of 2023. .

10

24.     Dr. Peddada owned a practice group, Radiation Oncology PC ("ROPC"), and brought on another doctor, Dr. Alan Monroe, who was made an equal partner.

25.     ROPC contracted exclusively to provide services to Centura at Penrose Cancer Center, in Colorado Springs.

26.     Dr. Peddada worked exclusively at Penrose from 1999 to 2022 and was the Medical Director for the radiation oncology department for over fifteen years.

27.     Over the course of the two plus decades Dr. Peddada practiced at Penrose, he was instrumental in helping to establish several novel and successful treatment programs at the center, including a prostate brachytherapy program, breast brachytherapy program, stereotactic radiosurgery program, and stereotactic radiotherapy program.

28.     Dr. Peddada saved the lives of countless cancer patients.

29.     Dr. Peddada's reputation was such that patients came to him from across the country to receive treatment.

30.     He also trained many physicians to perform complex procedures.

31.     One patient, a radiation therapist herself, who was diagnosed with late-stage cervical cancer and given little chance of surviving more than five years, but has now been living for more than ten, raved that Dr. Peddada provided her with "excellent," "caring," and "compassionate" care, and that she chose Dr. Peddada because of her insight into the field and because he came "recommended" by other radiation therapy professionals at Penrose.

11

32.     This female patient also attested to Dr. Peddada's dedication to his patients. According to her experience, Dr. Peddada came in on his scheduled day off to perform a highly specialized procedure that no other physicians with his skill set were available to do.

33.     In his two plus decades with Centura, Dr. Peddada called in sick only once, and even then, it was just for one day. He cared so much about his patients that he almost never took time off.

34.     Other patients noticed his dedication. One woman, whose husband survived prostate cancer almost twenty years after receiving care from Dr. Peddada, confirmed that Dr. Peddada was a "workaholic," who was willing to see her husband at any time, even when Dr. Peddada was not on the clock.

35.     This same woman continues to refer friends to Dr. Peddada because of the high quality of care he gave her husband.

36.     A third patient, a male diagnosed with bladder cancer, found Dr. Peddada after his daughter-in-law, an anesthesiologist, recommended him. This male patient observed that "Dr. Peddada's research skills and factual knowledge are off the charts." According to the patient, he believes he would be dead absent the medical care he received from Dr. Peddada.

37.     A fourth patient, a female diagnosed with Stage 4 inflammatory breast cancer, underwent multiple cyberknife operations while under Dr. Peddada's care, as well as radiation treatment. Although her prognosis was poor when she was first diagnosed,

she remains alive today due to Dr. Peddada's vigilance and skill. According to her, "Dr. Peddada was phenomenal. He was one of the best doctors I have ever had."

38.    A fifth patient, who was under Dr. Peddada's care until Centura ended relations, observed that "everyone I talked to spoke of Dr. Peddada in the highest regard…[and that] Dr. Peddada was absolutely fabulous." The female patient furthermore stated that, "all the patients I spoke to love him, thought the world of him, and highly recommend him."

39.    These are only a few of the patients singing Dr. Peddada's praises, but there are many more.

40.    Centura is well-aware of the uniquely positive reputation and skill set Dr. Peddada brought to the organization.

41.    Centura valued Dr. Peddada's work for the organization and the patients who were under his care.

42.    In the two decades Dr. Peddada worked for Centura, not only did Dr. Peddada earn the love and respect of his patients, but was equally praised by many of his colleagues, including those with whom he worked at Penrose.

43.    One nurse, who worked with Dr. Peddada for eleven years, observed that, "Dr. Peddada was at the forefront of treatment for prostate cancer, [and that he] is one of the best doctors in the country for prostate cancer treatment." According to the nurse, "Dr. Peddada is the most intelligent and best overall physician I have ever worked with," and that he "loved working with him."

13

44.     Another doctor, a breast-surgeon who worked with Dr. Peddada at Penrose, stated that eighty percent of her patients worked with Dr. Peddada, and she found him to be "incredible," "one of the smartest persons I have ever worked with," and "incredibly smart," commending him for teaching her much about radiation and noting that patients "adored" and "loved him." She further noted that "Dr. Peddada was very active in reaching out to other doctors and teaching them his techniques in radiation seed implants, and partial breast radiation," and that Dr. Peddada was "always at the leading edge…up to date…and would always teach others."

45.     A third doctor who practiced as a urologist with Dr. Peddada for 22 years noted that, "when my patients needed a radiation oncologist, I referred them to Dr. Peddada [because] I would want him to take care of myself, my family, or anyone I cared about if they needed a radiation oncologist…Dr. Peddada is an honorable man who works extremely diligently… [and] I would recommend Dr. Peddada over any other radiation oncologist in the Colorado Springs area and the world, for that matter."

46.     A fourth doctor, a urologist from Pueblo, confirmed that he has referred twenty to twenty-five patients to Dr. Peddada because his patients "always have a very positive experience with him, and he was the top doctor in the area for that specialty."

47.     Another board-certified radiation oncologist who worked alongside Dr. Peddada for years observed that Dr. Peddada "is an excellent doctor…[his] knowledge and medicinal expertise is a great strength. Dr. Peddada is an honorable man who works extremely diligently."

14

48.     These are but some of the accolades shared by some of his colleagues who worked with Dr. Peddada over the years.

49.     At Centura, numerous organizations asked Dr. Peddada, as a forefront expert in his field, to speak at national and international conferences, and Dr. Peddada published clinical research in countless peer-reviewed medical journals.

50.     While at Penrose, Dr. Peddada presented at over forty conferences and published nearly twenty-five research papers.

51.     Dr. Peddada received the "Sword of Hope Award" from the American Cancer Society.

52.     Dr. Peddada has been recognized as one of the top doctors in Colorado Springs by several different published independent sources based on patient input, including multiple times in Colorado Springs Magazine.

53.     In all his years working for Penrose, Dr. Peddada never received a patient complaint.

54.     Dr. Peddada never faced a single allegation of medical malpractice.

55.     Dr. Peddada never received any documented written disciplinary actions.

56.     While at Centura, Dr. Peddada helped Penrose's patient care operations grow substantially. For example, at least in part, Penrose received certification from the American College of Radiology because of efforts by Dr. Peddada to ensure the center satisfied requisite standards, the first such certification that any program had received in the State of Colorado.

15

57. Similarly, Dr. Peddada was extensively involved in applying for and obtaining one of only twelve grants from the National Cancer Institute to help establish a community cancer nurse navigator program at Penrose.

58. When Dr. Peddada started with Penrose in 1999, Penrose employed approximately thirty employees.

59. Today, Penrose employes more than one hundred employees.

60. Penrose also enjoyed significant increases in the size of its market share and its referral network due to referrals made to Dr. Peddada.

61. Dr. Peddada's work became so synonymous with Penrose and its success that Centura placed Dr. Peddada's image on multiple Centura advertising billboards.

62. Before the end of his employment, approximately 75% of the referrals made to the Penrose radiation oncology department were named to Dr. Peddada specifically.

**Dr. Peddada is Recruited to Work In-House by Centura**

63. The aforementioned creation of CommonSpirit in February of 2019 was quickly followed by several significant operational changes, specifically at Penrose.

64. In 2020, Dr. Peddada was asked to drastically alter the scope of his practice, having not substantially changed his practice over the previous 20-plus years.

65. In 2020, Centura announced that in addition to ROPC's services to Penrose, Centura wanted ROPC to provide coverage to St. Francis Medical Center ("St. Francis") beginning July of 2021.

16

66.     ROPC required an additional physician if it was going to maintain the same high standard of care while covering two hospitals, so Centura provided ROPC with a recruitment assistance agreement at the end of 2020 to facilitate the hiring of the additional physician.

67.     The agreement was fully executed on January 12, 2021, and articulated the terms of any repayment obligation, to which Dr. Peddada agreed to and signed.

68.     In July of 2021, with those funds, ROPC hired Dr. Madeera Kathpal.

69.     Initially, Centura wanted Dr. Kathpal to serve as the primary doctor at St. Francis, but Dr. Kathpal received several human resources related complaints.

70.     Towards the end of 2021, in about September or October, Dr. Peddada became acutely aware of uncharacteristic feelings of melancholy and stress permeating in his life.

71.     The Covid-19 pandemic had been extremely difficult to weather, but still, Dr. Peddada had not missed a day of work, and despite the difficult and onerous conditions found across the stretched thin and stressed healthcare industry, Dr. Peddada continued to see his patients and care for them while navigating the additional burdens, fears, shortages, and traumas that defined the pandemic.

72.     Hoping to support himself, Dr. Peddada researched resources and identified a training course offered through Brigham and Harvard Universities teaching doctors stress management through a special resiliency training program.

17

73.    The program lasted eight weeks. Dr. Peddada completed it in October of 2021.

74.    In December 2021, Centura informed ROPC that it would not renew the exclusive contract for ROPC to perform medical services at Penrose and St. Francis once the contract expired on June 1, 2022.

75.    Instead, Centura explained that after the contract expired it intended to hire one full-time employee at Penrose and another at St. Francis.

76.    This was another significant change to Dr. Peddada's working relationship that arose shortly after the inception of CommonSpirit.

77.    Centura then encouraged all three of the ROPC doctors to apply for those positions, including Dr. Peddada.

78.    Although Dr. Peddada was hesitant to close his private practice, Centura administrators informed Dr. Peddada that he was favored for the position at Penrose because of his reputation, patient volume, and major referral patterns.

79.    In February of 2022, Centura presented Dr. Peddada with the general terms of an employment contract and described to him the income and benefits he could expect to receive if he came in-house.

80.    On or around March 3, 2022, Dr. Peddada met with Drs. Dennis Kraus and Jeffrey Albert, Centura's Chief of Oncology and Chief of Radiation Oncology respectively, regarding his future employment.

18

81.    Drs. Kraus and Albert made statements to the effect that if Dr. Peddada applied for the employment position at Penrose, Centura would hire him.

82.    Shortly after the meeting, Dr. Peddada applied for the Penrose position. Given Centura's assurances, Dr. Peddada did not apply for the St. Francis position.

83.    On April 5, 2022, Centura extended Dr. Peddada an offer of employment for the Penrose position.

84.    On April 12, 2022, Dr. Peddada accepted said offer of employment.

85.    The agreement provided that Dr. Peddada would begin work on a mutually agreed upon start date of July 1, 2022, that he was prohibited from practicing medicine in any capacity other than as an employee working on behalf of Centura, and that he would be paid according to Centura's Compensation Plan (with a base salary of $531,918).

**Dr. Peddada Observes Symptoms of Burnout or Other Mental Health Conditions**

86.    In February of 2022, before Centura extended Dr. Peddada a job-offer, nursing staff filed several complaints against Dr. Peddada for discourteous and disrespectful behavior, and the daughter of a patient complained that he had been rude to her.

87.    These complaints were unusual and described highly atypical behavior from Dr. Peddada.

88.    Dr. Peddada realized, perhaps as a result of his earlier volitional stress and resiliency training, that he was permanently feeling exhausted, and noted several other psychological, physiological, and physical symptoms characteristic of physician burnout,

19

including significant inability to concentrate, chronic sleeplessness, significant feelings of detachment and isolation, inordinate stress, frequent bouts of anger, lasting feelings of depression, and enduring inability to pay attention to detail. The symptoms bled not only into his work life but into her personal life, adversely impacting both extensively.

89. Dr. Peddada had been working over 60 hours per week, and based on hospital productivity measurements (*i.e.*, RVUs), he had been working as much as two-times the amount as similarly situated physicians.

90. On April 16, 2022, Dr. Peddada texted Dr. Albert that he needed "time to recharge" on a medical leave to coincide with a pre-planned vacation he had prior to onboarding in-house at Penrose.

91. On April 19, 2022, Dr. Peddada met with Dr. Albert, Dr. Monroe, and Director of Oncology at Centura, Eric Koval, during which time he again informed Centura that he would need several months off to recharge, describing his symptoms including exhaustion.

92. Dr. Peddada explained to Drs. Albert, Monroe, and Mr. Koval that he had physician burnout. Dr. Peddada further explained that he was having extreme difficulty performing previously simple tasks, such as interacting with colleagues, staff, and patients.

93. That same week, Dr. Peddada continued to struggle with uncharacteristic staff interactions. At about that same time, Dr. Peddada also caught himself before making two medical errors, something Dr. Peddada had never done before. First, he

20

submitted a patient treatment plan that was incomplete. Second, he performed an error in wrong site radiation planning which he quickly corrected.

94.    Although Dr. Peddada identified the medical errors before any patient treatment or adverse effects took place, Dr. Peddada was distressed, and knew he was struggling with some mental health issues and could not continue in this manner for the safety of his patients.

95.    On April 22, 2022, Dr. Peddada requested an urgent evaluation from his primary care physician, who formally diagnosed his symptoms as those associated with "physician burnout," and recommended that Dr. Peddada take three months of medical leave.

96.    The following day, April 23, 2022, Dr. Peddada embarked out of state on a pre-scheduled vacation. He had no client visits scheduled during the workweek of April 25th as a result.

97.    Centura was aware of the vacation and had pre-approved it.

98.    Dr. Peddada instituted an automatic away message on his email for the duration of the vacation, notifying emailers that he was unavailable.

99.    Dr. Peddada originally intended to return to work on May 2, 2022, the following Monday.

100.    On April 25, 2022, Dr. Peddada sent an email to Dr. Monroe, Mr. Koval, and to Chief Medical Officer at Centura, William Plauth, stating that, beginning on May 1, 2022, he would be "absent from work on disability for reasons of health."

21

101.    Dr. Peddada also made clear that he was taking this leave "at the instruction of my personal physician."

102.    Dr. Peddada's leave started several months before his first official day of work at Centura, which was set for July 1, 2022. He would have only needed to delay his start date by one month under the terms of his employment agreement.

103.    Dr. Peddada did, however, intend to continue working at Penrose through ROPC until his start date, which would no longer be possible due to his request for medical leave.

104.    On April 26, 2022, Dr. Monroe emailed Dr. Peddada, carbon-copying Dr. Plauth and Mr. Koval, referring to Dr. Peddada's "mental health needs."

105.    On April 26, 2022, Dr. Peddada sent a brief email to Drs. Plauth, Albert, and Mr. Koval requesting that Centura limit the language Dr. Monroe was using to describe Dr. Peddada's medical condition.

106.    By then, rumors had begun to spread at Penrose that Dr. Peddada had experienced "a nervous breakdown."

107.    Dr. Peddada became concerned that Centura was sharing his private medical information amongst employees, particularly Dr. Monroe.

108.    According to witnesses, Dr. Monroe had disclosed Dr. Peddada's medical information more broadly to other Centura staff, characterizing Dr. Peddada as suffering from a breakdown due to mental health issues.

22

109. On April 26, 2022, without any prior warning, Centura emailed Dr. Peddada a new employment agreement, even though Dr. Peddada had already signed the earlier written employment contract Centura had tendered him.

110. The new agreement specifically stated that the "Parties agree that the April 11, 2022, agreement is void."

111. On April 27, 2022, Dr. Plauth, carbon copying Dr. Albert and Mr. Koval, emailed Dr. Peddada insisting that Dr. Peddada reach out to them to talk further about his "request and implications to the practice ASAP."

112. That same day, Dr. Plauth also texted Dr. Peddada asking to discuss the new employment contract Centura had emailed Dr. Peddada the afternoon before. Dr. Plauth said nothing about any adverse consequences if Dr. Peddada failed to immediately drop what he was doing while on vacation and medical leave to return his call.

113. Dr. Peddada did not realize there was any urgency to the situation, particularly given that he had already executed his employment contract and was not made aware before his travels that any modifications or changes to the contract might arise.

114. Dr. Peddada did not closely review or respond to emails while he was on his pre-scheduled vacation and medical leave, other than those involving his urgent request for impending leave, nor did anyone at Centura warn him that failing to do so would result in any immediate adverse actions to his employment status.

115.   After he returned from his trip out of state, Dr. Peddada reached out to Mr. Koval and Dr. Albert. They did not respond to his call.

116.   On May 2, 2022, on recommendations from his primary physician, Dr. Peddada spoke with Dr. Diane Thompson, a psychiatrist serving as the Head of Physician Resiliency of Centura, who agreed that he was experiencing symptoms associated with physician burnout.

117.   On the same day, Dr. Peddada met with Drs. Plauth and Medical Staff President Caryn Baldauf regarding his request for medical leave.

118.   Drs. Plauth and Baldauf requested that Dr. Peddada submit a written request for medical leave, which he agreed to do.

119.   They also advised him to speak with Dr. Thompson.

120.   Dr. Peddada responded to Drs. Plauth and Baldauf by clarifying that he had already discussed with Dr. Thompson his medical condition and symptoms, and that Dr. Thompson had agreed with the evaluation of Dr. Peddada's primary care physician about the burnout diagnosis and need for short term medical leave.

121.   At the end of the day, in accordance with what he had discussed at the meeting, Dr. Peddada emailed Drs. Plauth and Baldauf yet another request for medical leave, reiterating that his primary care physician had both diagnosed him with a medical condition and recommended the medical leave.

122.   In the email, Dr. Peddada also stated again that Dr. Thompson had confirmed the diagnosis.

24

123.    On May 5, 2022, Dr. Baldauf sent Dr. Peddada a letter indicating that Centura had granted his request for leave and recommending that he be evaluated by a provider from the Colorado Physicians Health Program during the first thirty days of leave.

124.    Dr. Baldauf's letter further stated that this provider would be responsible for assessing whether Dr. Peddada would need any additional therapy during the leave, whether Dr. Peddada would need any extensions to the leave, and the appropriate time for reinstatement.

125.    Five days later, on May 10, 2022, Samuel Weller, Group Vice President of Physician Alignment of Centura, emailed Dr. Peddada another letter authored by Interim President of Centura Jason Tacha informing Dr. Peddada that he had purportedly "declined employment" by failing to sign the unexpected new employment contract sent to him on April 26, 2022, while Dr. Peddada had been on vacation and medical leave.

126.    Mr. Tacha's letter on May 10, 2022, also unliterally stated that Centura would not be "extending a revised offer of employment."

127.    On May 11, after Dr. Peddada emailed Mr. Weller in response expressing confusion because he had already accepted and signed an employment contract, Mr. Weller stated that the employment offer Dr. Peddada had signed and accepted on April 12, 2022, was not "fully executed" because it lacked "material terms of employment."

128.    Dr. Peddada was confused about this assertion, given that the employment contract looked to be complete and had been presented to him as such by Centura at that time.

25

129.    Also, no one at any time prior to Mr. Tacha's email had indicated to Dr. Peddada that there were potential adverse ramifications for not reviewing the second employment agreement while he was absent on medical leave, despite the fact that he was in touch with management at Penrose upon his return from vacation.

130.    In his letter, Mr. Tacha claimed for the first time that the employment offer Dr. Peddada had accepted on April 12, 2022, was contingent upon Dr. Peddada agreeing to enter into an agreement to pay back the recruitment assistance associated with ROPC's hiring of Dr. Kathpal.

131.    Such loan obligations were supposed to be borne equally by Drs. Monroe and Peddada.

132.    This claim took Dr. Peddada by surprise given that he had always intended to satisfy the loan obligations.

133.    Dr. Peddada had already signed the recruitment assistance agreement and loan in December 2020 agreeing to pay back any obligations within a thirty-six-month term.

134.    Furthermore, that thirty-six-month term in the recruitment assistance agreement Dr. Peddada had already signed allowed for installment payments, and required that the first payments, if Centura did not forgive the debt altogether, would only need to begin one year after the start of his employment, which was set for July 1, 2022.

135.    However, in the interim, Centura had several times indicated to him that he would not need to pay back the loan if he worked for the organization.

136.    No one at Centura ever mentioned to Dr. Peddada that he needed to sign a second agreement guaranteeing to pay back the loan before he could enter into an employment contract with Centura.

137.    No one at Centura ever mentioned to Dr. Peddada that he needed to sign a second agreement guaranteeing to pay back the loan before he could begin employment with Centura.

138.    In fact, the exact opposite was true. Centura indicated multiple times that if Dr. Peddada worked for the organization, it might be able to extend loan forgiveness, and his original repayment terms in the recruitment agreement only took effect one year after he began employment.

139.    It was even more surprising given that Dr. Peddada had been engaged in ongoing conversations about the repayment of the loan just before Centura retracted its job offer/terminated Dr. Peddada's employment.

140.    In March of 2022, for example, Dr. Albert had come to Dr. Peddada and expressed to him that Centura had found a way to resolve the payment obligations without Dr. Peddada or ROPC having to pay the money out of pocket by extending loan forgiveness in conjunction with ongoing employment.

141.    Dr. Peddada had three or four separate meetings about his loan obligation repayments, including with Dr. Albert and Mr. Koval, before Centura retracted his job offer/terminated him.

142.    At no time did anyone mention to him prior to his request for medical leave that he needed to sign a new agreement with payback terms, let alone do so before he could enter into an employment contract to come work for Centura.

143.    In addition, the original physician recruitment agreement executed by Centura and himself stated that the loan might be forgiven, that the repayment period would begin twelve months after Dr. Peddada's agreed upon employment start date, and the repayment period from that date would last thirty-six months, ending on July 1, 2025.

144.    Up until May 11, 2022, Dr. Peddada never stated he would not pay back the loan obligations but had been in active conversations about how to do so and what the payback amount should be.

145.    On May 13, 2022, Centura emailed Dr. Peddada requesting he sign a settlement agreement in which he agree to sign a promissory note in his individual name for nearly $130,000 by July 31, 2022, and requiring him to waive all his legal claims against Centura in exchange for Centura agreeing not to bring claims against him.

146.    The agreement charged 1% interest and allowed him to make sixty monthly payments over time to satisfy the debt.

147.    That same day, Dr. Peddada notified Centura that he would not sign the agreement or pay back the debt given that Centura had "revoked my offer of employment in retaliation for my request for a short leave of absence," and that he was "considering my legal options for this unlawful discrimination and retaliation."

148.    Dr. Peddada went on to explain that he may have under other circumstances reached an accord on repayment with Centura, but that "the hospital has created significant financial hardship for me. Hence, even were I inclined to consider the hospital's request, my current and near-future financial situation caused by the hospital's unlawful behavior precludes."

149.    This was also the first time Dr. Peddada had ever stated that he would not pay back Centura for the recruitment advances owed by ROPC, particularly not on the abridged timeline foisted upon him right after Centura had ended his employment, violated his rights, and damaged his career and financial health.

150.    Dr. Peddada obtained counsel and filed a charge of discrimination with the Colorado Civil Rights Division and Equal Employment Opportunity Commission.

151.    After that, Centura refused to accept installment payments of the loan even though Dr. Peddada offered to begin making payments.

152.    Centura never made Dr. Monroe pay back any of the loan amount he owed on behalf of ROPC for Dr. Kathpal's employment.

153.    To this day Dr. Monroe has not paid Centura any money for his share of ROPC's loan amount.

154.    Dr. Monroe's loan obligations have been forgiven by Centura, just as they would have been for Dr. Peddada had Centura not refused to hire/terminated Dr. Peddada unlawfully.

155.    Despite the adverse consequences to Dr. Peddada's life and career, Centura then insisted on a lump sum payment totaling almost $150,000, including a high rate of interest, requiring Dr. Peddada to liquidate significant retirement savings after all he had done for the organization.

156.    Dr. Peddada paid back the entire principal amount of the loan.

157.    Centura never required such a lump payment from Dr. Monroe, who Centura stated could make installment payments if his debt was not forgiven, which, as stated before, Centura did forgive.

158.    The additional suffering and vindictive conduct Centura subjected Dr. Peddada to was in retaliation for Dr. Peddada attempting to enforce his rights to be free from discrimination in the workplace and part of a pattern of retaliation for his attempts to enjoy and enforce his rights.

## IV.    CLAIMS FOR RELIEF

**FIRST, SECOND, AND THIRD CLAIMS FOR RELIEF**
**Disparate Treatment Based on Disability, Regarded as Disabled, or the Need to Provide an Accommodation Under the Americans with Disabilities Act**
**42 U.S.C. §§ 12112 (a) and (b)(5)(A)-(B)**

159.    Plaintiff hereby incorporates all the paragraphs of this Complaint as though fully incorporated herein.

160.    At all relevant times, Dr. Peddada was an individual with a disability, including an individual with a physical or mental impairment that substantially limits one or more major life activities, or being regarded as having such an impairment under 42

30

U.S.C. § 12102.

161.    At all relevant times, Dr. Peddada was qualified and able to perform the essential functions of the job, including without limitation, the position of radiation oncologist, with or without reasonable accommodation.

162.    Defendants denied Dr. Peddada employment opportunities because: (1) of his disability, (2) because they regarded him as disabled, and/or (3) because of the need to provide reasonable accommodation for his disabilities, in violation of Sections 102(a) and 102(b)(5)(A)-(B) of the ADA, 42 U.S.C. §§ 12112(a) and (b)(5)(A)-(B).

163.    The effect of the practices complained of in the foregoing paragraphs has been to deprive Dr. Peddada of equal employment opportunities because of his disabilities and/or because of the need to provide reasonable accommodation for his disabilities.

164.    The effects of the practices complained of in the paragraphs above have been to inflict emotional pain, suffering, and inconvenience upon Dr. Peddada and to deprive him of the financial and other benefits of working for Defendants.

165.    The unlawful employment practices complained of in the foregoing paragraphs were intentional.

166.    The unlawful employment practices complained of in the foregoing paragraphs were done with malice or reckless indifference to the federally protected rights of Dr. Peddada.

31

**FOURTH CLAIM FOR RELIEF**
**Denial of Reasonable Accommodation**
**42 U.S.C. § 12111(8)–(10)**

167.    Plaintiff hereby incorporates the preceding paragraphs of this Complaint as though fully incorporated herein.

168.    At all relevant times, Dr. Peddada was an individual with a disability under 42 U.S.C. § 12102.

169.    At all relevant times, Dr. Peddada was qualified and able to perform the essential functions of the job, including without limitation, the position of radiation oncologist, with or without reasonable accommodation.

170.    Dr. Peddada requested an accommodation for his medical conditions in the form of three months of medical leave.

171.    Dr. Peddada was covered under the ADA given that he had an offer of direct employment.

172.    Defendants retracted that offer and terminated the employment relationship with Dr. Peddada after he disclosed his disability and requested an accommodation.

173.    Dr. Peddada was never accommodated in that his employment with Defendants was terminated after he tried to take medical leave.

174.    Defendants failed to provide Dr. Peddada reasonable accommodations.

175.    Defendants denied Dr. Peddada employment opportunities because of his disability and/or because of his request for reasonable accommodations, in violation of 42 U.S.C. §§ 12111(8) – (10).

32

176.    The effect of the practices complained of in the foregoing paragraphs has been to deprive Dr. Peddada of equal employment opportunities because of his disabilities and/or because of the need to provide reasonable accommodation for his disabilities.

177.    The effects of the practices complained of in the paragraphs above have been to inflict emotional pain, suffering, and inconvenience upon Dr. Peddada and to deprive him of the financial and other benefits of working for Defendants.

178.    The unlawful employment practices complained of in the foregoing paragraphs were intentional.

179.    The unlawful employment practices complained of in the foregoing paragraphs were done with malice or reckless indifference to the federally protected rights of Dr. Peddada.

**FIFTH AND SIXTH CLAIMS FOR RELIEF**
**Retaliation and Interference Under the Americans with Disabilities Act**
**42 U.S.C. § 12203(a)-(b)**

180.    Plaintiff hereby incorporates all the paragraphs of this Complaint as though fully incorporated herein.

181.    At all relevant times, Dr. Peddada was qualified and able to perform the essential functions of the job, including, without limitation, the position of radiation oncologist, with or without reasonable accommodation.

182.    Dr. Peddada engaged in a protected activity by requesting reasonable accommodation.

183. Defendants retracted their job offer/terminated Dr. Peddada because of his disability and because he requested reasonable accommodation.

184. Defendants interfered with Dr. Peddada's exercise of the rights guaranteed her under the ADA.

185. Dr. Peddada never enjoyed the three months of medical leave accommodation he requested because of Defendants' interference.

186. Defendants also subjected Dr. Peddada to different terms and conditions in his debt repayment after he hired legal counsel and filed a charge of discrimination with the Colorado Civil Rights Division and Equal Employment Opportunity Commission.

187. The effect of the practices complained of in the foregoing paragraphs has been to deprive Dr. Peddada of equal employment opportunities because he requested and tried to use his reasonable request for accommodation for his disabilities.

188. The effects of the practices complained of in the paragraphs above have been to inflict emotional pain, suffering, and inconvenience upon Dr. Peddada and to deprive him of the financial and other benefits of working for Defendants.

189. The unlawful employment practices complained of in the foregoing paragraphs were intentional.

190. The unlawful employment practices complained of in the foregoing paragraphs were done with malice or reckless indifference to the federally protected rights of Dr. Peddada.

34

**SEVENTH CLAIM FOR RELIEF**
**Violations of Section 504 of the Rehabilitation Act**
**29 U.S.C. § 794**

191.    Plaintiff hereby incorporates the preceding paragraphs of this Complaint as though fully incorporated herein.

192.    At all relevant times, Dr. Peddada was an individual with a disability as defined by 29 U.S.C. § 794(20).

193.    At all relevant times, Defendants fall within the scope of "any program or activity receiving Federal financial assistance" as required by Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

194.    Defendants excluded Dr. Peddada from employment solely because of his disability.

195.    The effects of the practices complained of in the paragraphs above have been to inflict emotional pain, suffering, and inconvenience upon Dr. Peddada and to deprive him of the financial and other benefits of working for Defendants.

196.    The unlawful employment practices complained of in the foregoing paragraphs were intentional.

197.    The unlawful employment practices complained of in the foregoing paragraphs were done with malice or reckless indifference to the federally protected rights of Dr. Peddada.

**EIGHTH CLAIM FOR RELIEF**
**Wrongful Discharge in Violation of Public Policy**
**Colorado State Law**

198.    Plaintiff incorporates all of the paragraphs of this Complaint as though fully incorporated herein.

199.    Defendants punished or otherwise retaliated against Dr. Peddada for self-reporting conduct as part of his employment-related duties and reporting his inability to temporarily ensure patient safety and provide adequate patient care.

200.    The essence of the public-policy to at-will employment status is that an employee has a cognizable claim for wrongful discharge where the discharge contravenes a clear mandate of public policy.  *See Martin Marietta Corp. v. Lorenz*, 823 P.2d 100, 107 (Colo. 1992).

201.    Sources of public policy include statutes or other sources such as a professional code of conduct.  *See Brown v. Premier Roofing, LLC*, 173 F. Supp. 3d 1181, 1185 (D. Colo. 2016).

202.    Dr. Peddada expressed concerns about patient safety and quality of care because of his deteriorating symptoms resulting from a medical condition.

203.    Dr. Peddada's efforts to meet at least minimal standards of care for patients serve the public interest and this is reflected in Colorado's statutory protection for healthcare whistleblowers, C.R.S. § 8-2-123(2)(a), the Hippocratic Oath, and other sources.

204.    C.R.S. § 8-2-123(2)(a) expressly provides that health-care providers "shall not take disciplinary action against a healthcare worker in retaliation for making a good faith report or disclosure."

205.    "Disciplinary action" is defined as "any direct or indirect form of discipline or penalty, including, but not limited to, . . . corrective action, reprimand, admonishment, unsatisfactory or below standard work evaluation, . . . creating or tolerating a hostile work environment, or any threat of any such discipline or penalty."  C.R.S. § 8-2-123(1)(a).

206.    "Good faith report or disclosure" is defined as "a report regarding patient safety information or quality care that is made without malice or consideration of personal benefit that the health care worker making the report has reasonable cause to believe is true."  § 8-2-123(1)(d).

207.    The public has a strong interest in ensuring patients receive prompt, quality healthcare.

208.    Dr. Peddada was acting in the public interest when he reported a deterioration in potential care and the possibility of medical errors instead of concealing these concerns from Defendants.

209.    Defendants retracted their job offer/terminated Dr. Peddada within weeks of these disclosures.

210.    The effects of the practices complained of in the paragraphs above have been to inflict emotional pain, suffering, and inconvenience upon Dr. Peddada and to deprive him of the financial and other benefits of working for Defendants.

211.    The unlawful employment practices complained of in the foregoing paragraphs were intentional.

212.    Defendants conduct described herein was attended by circumstances of fraud, malice, or willful and wanton conduct.

## NINTH CLAIM FOR RELIEF
### Unjust Enrichment
### Colorado State Law

213.    Plaintiff incorporates all of the paragraphs of this Complaint as though fully incorporated herein.

214.    Defendants, by means of their assurances to him of direct employment, caused Dr. Peddada to wind down and shutter his private practice.

215.    In representing that Dr. Peddada would work for them, Defendants exploited Dr. Peddada's extensive patient base, referral network, and reputation to generate growth and profit.

216.    Defendants wrongfully refused to hire/terminated Dr. Peddada, but retained his patients, professional and referral networks, and other benefits Dr. Peddada brought to the organizations, while at the same time virtually deprived Dr. Peddada of any ability to work in the area.

217.    The effects of the practices complained of in the paragraphs above have been to unjustly enrich Defendants at Dr. Peddada's expense.

218.    The effect of the practices complained of in the paragraphs above has been to inflict emotional pain, suffering, and inconvenience upon Dr. Peddada and to deprive

him of the financial and other benefits of working for Defendants.

219.    The unlawful employment practices complained of in the foregoing paragraphs were intentional.

220.    Defendants conduct described herein was attended by circumstances of fraud, malice, or willful and wanton conduct.

## TENTH CLAIM FOR RELIEF
### Civil Conspiracy
### Colorado State Law

221.    Plaintiff incorporates all of the paragraphs of this Complaint as though fully incorporated herein.

222.    Defendants conspired with a third party, Dr. Alan Monroe, to retract the employment offer and/or terminate Dr. Peddada because of his disability, an unlawful goal.

223.    Such action was taken by Defendants, proximately causing significant financial damages and injuries that continue to this day.

224.    The effect of the practices complained of in the paragraphs above has been to inflict emotional pain, suffering, and inconvenience upon Dr. Peddada and to deprive him of the financial and other benefits of working for Defendants.

225.    The unlawful employment practices complained of in the foregoing paragraphs were intentional.

226.    Defendants conduct described herein was attended by circumstances of fraud, malice, or willful and wanton conduct.

39

## PRAYER FOR RELIEF

WHERFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, and award him all relief as allowed by law, including, but not limited to the following:

a. A declaration that Defendants violated Plaintiff's state and federal rights;

b. Actual economic damages as established at trial;

    a. Compensatory damages, including, but not limited to, those for past and future pecuniary and non-pecuniary losses, emotional distress, suffering, loss of reputation, humiliation, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;

    b. Punitive damages for all claims allowed by law in an amount to be determined at trial;

    c. Exemplary damages for all claims allowed by law in an amount to be determined at trial;

    d. Front pay in lieu of reinstatement;

    e. Pre-judgment and post-judgment interest at the highest lawful rate;

    f. A tax offset for any damages award;

    g. Attorneys' fees and costs; and

    h. Such further relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED: October 31, 2024

40

RATHOD | MOHAMEDBHAI LLC

*s/ Iris Halpern*
Iris Halpern
Qusair Mohamedbhai
Omeed Azmoudeh
Crist Whitney
2701 Lawrence Street, #100
Denver, CO 80205
Tel: (303) 578-4400
Fax: (303) 578-4401
ih@rmlawyers.com
qm@rmlawyers.com
oa@rmlawyers.com
cw@rmlawyers.com

ATTORNEYS FOR PLAINTIFF