**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:23-cv-01921-NYW-MDB

DR. ANUJ PEDDADA,

        Plaintiff,

v.

CATHOLIC HEALTH INITIATIVES COLORADO d/b/a
CENTURA HEALTH-PENROSE-ST. FRANCIS HEALTH SERVICES; and
COMMONSPIRIT HEALTH,

        Defendants.

---

**RENEWED MOTION FOR SUMMARY JUDGMENT**

---

**TABLE OF CONTENTS**

**Certification Re: Use of Generative Artificial Intelligence for Drafting** ......................... iii

**BACKGROUND** ................................................................................................... 1

**STATEMENT OF UNDISPUTED MATERIAL FACTS ("SUMF")** ....................................... 1

> Peddada Never Committed To Employment But Wanted To Continue Negotiations Three Months Later If Other Job Opportunities Did Not Materialize .................................................................................................... 1

> Despite Being Told Refusing To Communicate Was Unacceptable, Peddada Refused To Communicate About Potential Employment With Penrose ..................... 6

> Peddada's Excuses for Not Communicating With Penrose Are Untrue ..................... 8

- *First Excuse: My Doctor Advised Me Not To Communicate About The Job Offer* ............................................................................................... 8

- *Second Excuse: I Was Not Checking Emails* ........................................................ 9

- *Third Excuse: I Wasn't Capable Of Reviewing The New PEA Due To Physician Burnout* ................................................................................. 10

> While Negotiations And Penrose's Offer Of Employment Were Pending, Peddada Kept Exploring Other Work Opportunities ................................................. 13

> Peddada's Claimed Condition Of Burnout Was Short Lived .................................... 14

> Peddada's Refusal To Communicate And Accept Employment Caused Penrose To Withdraw The Offer ........................................................................... 15

**ARGUMENT** ...................................................................................................... 17

I. COMMONSPIRIT HEALTH SHOULD BE DISMISSED DUE TO TOTAL NON-INVOLVEMENT ................................................................................................ 17

II. ALL DISABILITY-RELATED CLAIMS SHOULD BE DISMISSED ........................... 18

A. *Peddada Did Not Have A Disability And Certainly Not Any Impairment That Inhibited Him From Communicating* ..................................................... 18

B. *Because Peddada Never Committed To Employment, He Was Not A Qualified Individual* ................................................................................. 21

C. *Being On Medical Leave Does Not Entitle An Applicant To Refuse To Communicate: Refusal To Communicate Is A Legitimate Non-Discriminatory Reason To Withdraw An Offer*.................................................. 22

III. ALL REMAINING CLAIMS SHOULD ALSO BE DISMISSED................................ 26

A. *The Eighth Claim (Wrongful Discharge) Should Be Dismissed, Because Peddada Was Never Employed Or Discharged*................................................ 26

B. *The Ninth Claim (Unjust Enrichment) Should Be Dismissed, Because It Is Not Unjust To Decline To Hire An Applicant Who Refuses To Communicate.* ....................................................................................... 27

C. *The Tenth Claim (Civil Conspiracy) Should Be Dismissed, Because Peddada's Employment Offer Was Withdrawn Due To Noncommunication, Not Disability* ............................................................................... 27

**CONCLUSION** ......................................................................................... **28**

## Certification Re: Use of Generative Artificial Intelligence for Drafting

The undersigned counsel certifies/certify that generative artificial intelligence was not used to draft this filing.

Dated: February 19, 2026

**HALL, RENDER, KILLIAN, HEATH & LYMAN, P.C.**

By: *s/ Melvin B. Sabey*
Melvin B. Sabey

By: *s/ Mark L. Sabey*
Mark L. Sabey

By: *s/ M. Brian Sabey*
M. Brian Sabey

By: *s/ Lindsay K. McManus*
Lindsay K. McManus

iii

Defendants Catholic Health Initiatives Colorado d/b/a Centura Health-Penrose-St. Francis Health Services and CommonSpirit Health (collectively, "Penrose") by and through counsel, hereby submit their Motion for Summary Judgment, as follows:

## BACKGROUND

Dr. Peddada is a radiation oncologist who worked hard for many years and reaped the benefits of that hard work. His wife, Chitra, testified that they share retirement/investment accounts with assets currently valued at $14 million that generate, at an average of eight percent interest, over $1 million each year in income. Chitra Peddada Depo. ("CPD") 73:7-18; 92:17-22. Chitra also testified that Peddada worked "[e]asily 10, 12, 14" hours per day for "at least 23 [years]" and that "[h]e was happy doing it. He enjoyed it immensely." CPD 65:13—67:1. Unfortunately, his type A personality and demanding work hours resulted in a recurring problem of difficulties in partner and staff relationships. First Amended Complaint [ECF 50-2] ("FAC") ¶ 86; Koval Decl. ("KD") ¶¶ 3-5; Weller Decl. ("WD") ¶¶ 4-5; Depo. of Alan Monroe ("Monroe") 55:1—57:16, 56:8-20; 105:22—111:24; 174:25—176:1.

## STATEMENT OF UNDISPUTED MATERIAL FACTS ("SUMF")

➢ **Peddada Never Committed To Employment But Wanted To Continue Negotiations Three Months Later If Other Job Opportunities Did Not Materialize**

1.    Peddada held medical staff privileges at Penrose Hospital and, with his partner, Dr. Alan Monroe, provided radiation oncology services in Penrose's Cancer Care Center as an independent contractor through his private practice, Radiation Oncology, PC ("ROPC"). FAC ¶¶ 24-25.

2.    Near the end of 2021, the ROPC partnership became broken, and for six to eight months Peddada refused to speak to Dr. Monroe. *See* Anuj Peddada Depo. Vol. 1 ("PD1") 21:7—22:3; Anuj Peddada Depo. Vol. 2 ("PD2") 158:17-19; KD ¶¶ 5-6; WD ¶ 5. So,

Penrose offered to terminate its professional services agreement with ROPC, hire Peddada and Monroe as employees, and then separate them at two different facilities. PD1 22:12-20, 23:7—24:1; FAC ¶¶ 74-75.

3.    Dr. Kathpal, a physician recently hired by ROPC pursuant to a recruitment loan from Penrose to ROPC, also left ROPC during this time frame, which gave rise to a loan repayment obligation that Peddada knew had to be resolved for Penrose to comply with Stark and Anti-Kickback obligations. PD1 Ex. 1 (Physician Recruitment Agreement); FAC ¶¶ 66-68; PD1 25:9—27:2, 29:3-23; KD ¶ 7; WD ¶ 15.

4.    The parties never agreed to repayment settlement terms, because Peddada "didn't like the terms of [the] repayment" and thought the loan should be forgiven in exchange for the goodwill of ROPC, but Penrose proposed forgiveness over 5 years of employment of Peddada and Monroe. PD1 28:8-18, 29:3-13; KD ¶¶ 8-9; PD1 Exs. 6 and 7.

5.    During employment negotiations, Penrose sent Peddada and Monroe discussion drafts of the Physician Employment Agreement ("PEA") on April 5, 2022, with employment to begin on July 1, 2022. PD1 Ex. 13; Monroe Ex. 27; FAC ¶ 85.

6.    Peddada was on notice that the discussion draft would not be complete and executable until an addendum or amendment was added to address the loan repayment. PD1 25:19-27:2, 29:3-23; Albert 82:3—83:14; KD ¶¶ 7-9; WD ¶¶ 9, 12. On April 5, 2022, Peddada and Dr. Jeff Albert engaged in the following text exchange: Peddada: "Hi Jeff… Can you check and see where we are with the contract? Please let me know if I need to do anything else. Thanks Anuj." Albert responded: "… I touched base with Eric and Sam, and it looks like Eric sent you the actual copy. Just working out whether to do the recruitment assistance loan as part of the contract or a separate addendum later." PD2 Ex. 66; PD2 128:12—130:18 (confirming exchange).

2

7.      Despite being aware that the agreement wording related to loan resolution was still being worked out, Peddada signed an incomplete printout of the discussion draft on April 11 and 12, 2022, for a reason which Peddada was unable or unwilling to explain. PD2 Ex. 69; PD2 172:5-23. Penrose did not sign the incomplete agreement[1] and informed Peddada that he would be receiving the complete PEA by email for electronic signature. KD ¶¶ 12-13; WD ¶ 12; Koval Depo. 221:14-223:2; *See also* Koval Depo. Ex. 41 (communicating the same to Dr. Monroe).

8.      Thereafter, Penrose 1) revised the proposed PEA so that it reflected that loan repayment would be forgiven over five years of employment and 2) prepared a separate Loan Settlement Agreement. PD1 Exs. 6 and 7; KD ¶¶ 13-14; WD ¶¶ 10-12. Identical agreements were offered to Dr. Monroe which he accepted and signed. Monroe Exs. 24, 32.

9.      Because physician credentialing with payors takes 90 to 100 days and cannot be started without a signed agreement, it was urgent that Peddada commit to employment and sign the agreements soon so that Penrose could move forward with its plans. KD ¶ 10; WD ¶ 17.

10.     On April 16 and 19, 2022, there were communications between Peddada and the cancer team about Peddada's need for a recharge break or leave before starting employment. On April 18, 2022, Peddada sent his brother a draft letter to Penrose requesting a six-to-eight-week sabbatical. Jeff Albert 30(b)(6) Depo. ("Albert"), Ex. 21 ("Anuj mentioned he'd like a break before beginning employment. Alan graciously agreed to allow Anuj to take three weeks off in June and cover for him."); FAC at 90, 91; PD2 Exs. 67, 68.

---

[1] Peddada admitted in his deposition the following: "Q: So you would agree with me that one party sign[ing] an agreement does not make it effective unless both parties are in full agreement with the terms? . . . A: I guess that's correct, yeah." PD1 53:4-10.

11.     During this time period, Peddada was consulting with his attorney about his rights and options under his employment agreement with ROPC, which permitted him, if disabled, to take a paid leave of up to three months. PD2 142:16—145:4; PD1 Ex. 5, § 11.

12.     On April 21, 2022, Penrose sent Peddada the Loan Settlement Agreement. KD ¶ 14; WD ¶ 14; PD1 Ex. 8; PD1 55:15—56:15. He viewed the email that same day at 8:04 PM, as well as on April 26 at 8:01 PM, and May 1 at 11:14 AM. PD1 Ex. 8; PD1 55:15—56:15.

13.     An hour later, on April 21 at 9 PM, Peddada called his wife's colleague, Dr. Munni Selagamsetty, whom he was seeing for cosmetic PRP treatments and who had zero physician burnout experience (not a single patient), to explore whether she could support a diagnosis of physician burnout. Depo. of Munni Selegamsetty ("Setty") 14:25—15:12, 40:7—42:11, Ex. 106; PD2 152:21-23; PD2 Ex. 2C at p.1. Early the next morning, on April 22, he texted his brother saying he would be taking an eight-week break because "My PCP [f]eels very comfortable making the diagnosis that I have [p]hysician burnout." PD2 Ex. 46.

14.     However, later that day, Peddada asked Dr. Setty to diagnose him as needing three months rather than eight weeks of medical leave (i.e., the longest amount of time possible under the paid disability leave provision of his ROPC agreement). The notes from the office visit state that Peddada:

> … does feel a need to recharged [sic] and change his perspective and to return back to a productive work in the next 3 months. He feels that if he only can get a 3 month reprieve from work, and the stressful situation therein, he will be able to regroup and regain his enthusiasm to work on the new contract that he would have it after next 3 months."

PD2 Ex. 2C. Consistent with her office visit notes, Dr. Setty has confirmed that it was Peddada, not she, who suggested the duration of 3 months for his leave. Setty 13:9—14:13.

4

Peddada also testified that "[s]he agreed with [him]" that he "needed some time off." PD1 35:5-8. Dr. Setty is not a lie detector and is not a mental health professional; she simply trusted whatever Peddada told her, supported his request for leave, and referred him to a psychiatrist, Dr. Di Thompson (Centura's Medical Director of Well-Being), to provide any needed mental health treatment, which he never pursued. Setty 14:3—16:3, 154:19—155:7, 156:6-7; Depo. of Diane Thompson 20:13—21:19, 62:11-19, 63:17—64:22, 67:22—68:3, 71:12-23.

15.    On April 25, 2022, Peddada announced that he would be taking a three-month medical leave through August 1, 2022, which was approved by ROPC (Peddada's practice and employer) on April 26 and by the Penrose Medical Staff (not his employer, but responsible for medical staff privileges and call schedules) on May 5, 2022. FAC ¶ 100; PD1 Ex. 4; Monroe Ex. 19 (ROPC approval); PD1 Ex. 20 (medical staff approval). Short-term "burnout" or "exhaustion" exclusively caused by work-related issues is the only "disability" that Peddada asserts in this case. PD2 59:19-22, 67:8-12; 192:3-6; Setty 16:15-24.

16.    **After** Peddada's leave requests and announcement of a three-month medical leave, Penrose proceeded with his offer of employment. On April 26, 2022, Penrose sent him the revised PEA that referenced the loan repayment obligation and also sent a payor credentialing packet to Peddada for signature.[2] PD1 Ex. 8 (audit trail); PD1 55:15—56:15; KD ¶ 17; WD ¶ 16; Skinner Decl. ¶ 3. Peddada was unhappy with the proposed loan resolution and never agreed to the terms of the PEA and Loan Settlement Agreement. PD1 28:8-12, 52:19-53:3, 56:19-57:17.

---

[2] If Peddada had signed the PEA, his employment would have begun on July 1, 2022, but he would not have performed services until after his medical leave ended (anticipated for August 1, 2022), which was fine with Penrose, and was the most efficient way to move forward. See KD ¶16; WD ¶ 13.

5

17.     Peddada admitted he neither accepted the agreements nor spoke to anyone at Centura about them (PD1 56:19-57:17) and that he refused to communicate about them during the 3-month term of his medical leave:

Q:      And so is it accurate that you were unwilling to continue negotiations about both the settlement agreement and the new physician employment agreement until after August 1st, 2022?
A:       It was on my physician's recommendation. I wanted to wait until my medical leave was over, feel better, and could deal with all of these issues.
Q:      Okay. So your answer is yes?
A:      Yes.

PD2 118:14-25.

➤ **Despite Being Told Refusing To Communicate Was Unacceptable, Peddada Refused To Communicate About Potential Employment With Penrose**

18.     Peddada testified that on April 27, 2022, while on vacation, he "receiv[ed] a text from Mr. Koval asking to talk with [him], the day after [he] received the new [complete] employment agreement." PD1 57:18-23; PD1 Ex. 9.

19.     He did not respond and did not speak with Mr. Koval about the PEA, although two days earlier, on April 25, while already on vacation, he had responded to Koval's text message about his recent interview with a physician. PD1 57:18-58:7; KD ¶¶ 14-15, 18; PD1 Ex. 9.

20.     Then, on April 27, 2022, Dr. Plauth emailed Peddada about the need to discuss his request and the implications to the practice "ASAP" (PD1 Ex. 10) and texted him asking to discuss the PEA that had been emailed the day before. FAC ¶¶ 111-112.

21.     Peddada called Plauth but expressed forcefully that he was unwilling to discuss the PEA while on his three-month medical leave. Plauth's email record of that

6

conversation (PD1 Ex. 11), which Peddada does not dispute (PD1 60:18—62:17), informed the executive team at Penrose that:

> [Peddada] reached out to me to say that he did not need to talk. He is acting on the advice of his physician who said that he was hypertensive and severely stressed and needed to take a break. He was quite aggressive in "not needing to talk" as he is following her advice . . . I shared that not talking with us is not an option as it impacts the practice and his potential employment . . . He also stated that while still a private physician he would not be obligated to talk.

22.     Despite Peddada telling Penrose he would not talk to them, Penrose gave him additional time to reconsider and sign the agreement, and a reminder email was sent on May 1, 2022: "Reminder: Waiting for you to sign New CHPG Employment Agreement for Dr. Anuj Peddada." Ex. A. The email also stated: "If there is any reason you will not or cannot take action, please contact your dyad leaders or CHPGContractsAdmin@Centura.Org." *Id.*

23.     Peddada admits that he told Plauth that he was "unwilling to discuss the physician employment agreement because [he] planned to act on the advice of [his] doctor while on medical leave." PD2 114:8-13. When subsequently asked in his deposition whether Dr. Setty specifically instructed him not to review and sign legal documents that came from Penrose, Peddada admitted that Dr. Setty did not do so, "but she said, you know, you're burnt out and be careful and take time off and rejuvenate." PD2 114:14-20.

24.     Despite receiving the warning from Dr. Plauth that "not talking with us is not an option" (SUMF ¶ 21), Peddada admits that he did not speak to anyone at Penrose about the PEA that was being offered for the next two weeks, nor was he willing to do so until after August 1, 2022, when his medical leave ended. PD1 56:19—57:17 ("…Q: You just didn't communicate about [the PEA] with anybody at Centura? A: That's correct."); PD2 118:14-25 (admitting he was unwilling to continue negotiations about both agreements until after August

7

1, 2022); PD2 114:8-13 (same); PD2 112:21—113:15 (admitting that he communicated with Penrose about his time off and no other matters).

25.    Due to Peddada's refusal to communicate and commit to employment, Penrose reconsidered it's offer and cancelled the PEA in DocuSign on May 5, 2022 (PD1 Ex. 8 at p. 3) which prevented Peddada from signing while Penrose considered options. Penrose then informed Peddada on May 10, 2022 that the offer was withdrawn.  Albert Ex. 13.

> **Peddada's Excuses for Not Communicating With Penrose Are Untrue**

- ***First Excuse: My Doctor Advised Me Not To Communicate About The Job Offer***

26.    In his conversation with Plauth, Peddada said he was following the advice of his physician in refusing to talk about his employment with Penrose. PD1 Ex. 11; PD1 60:18—62:17. Although this position was repeated again and again in Peddada's briefing[3], the statement was not true. Dr. Setty testified under oath that she did not tell or instruct Dr. Peddada that he could not communicate with people at Penrose Hospital or Centura Health about an employment or loan agreement or any other arrangements for him to start working as an employee. Setty 23:16—24:20.  She did not tell or instruct Dr. Peddada that there was anything he could not or should not do while on leave, and she found no medical basis for any restriction of normal life activities." *Id*.

27.    Peddada admitted that Dr. Setty did not restrict him from communicating with Penrose. PD1 34:21—35:13 ("Q: Did [Dr. Setty] give you specific instructions about any things that you should not do? A: I don't recall anything specific."); *see also* SUMF ¶ 23.

---

[3] E.g., Doc. 75 at p. 4 ("it is untrue that Dr. Selagamsetty did not restrict his communications with CHIC") and p. 9 ("Dr. Peddada never read the new PEA at the recommendation of his PCP"). *See also* SUMF ¶ 23.

8

- ***Second Excuse: I Was Not Checking Emails***

28.     When, due to Peddada's refusal to communicate and commit to employment, his offer was withdrawn on May 10, 2022, Peddada objected that he was on vacation from 4/23-4/30 with his email auto-reply turned on.[4] Albert Ex. 13 at p. 3. When asked about the new PEA that was emailed to him on April 26, 2022, Peddada testified: "I did not receive that. I was on medical leave. It may have been sent to me then." PD1 30:15-21.

> Q. So are you telling me that you didn't view these documents while you were on medical leave?
> A. Correct. It was one of the e-mail titles. It said new contract, something like that.
> Q. Okay. So the e-mail title said new contract --
> A. I can't remember exactly.
> Q. -- and you viewed it?
> A. No.
> Q. You didn't view it, you didn't open the e-mail?
> A. No. I was on medical leave. I was answering e-mails that were pertinent to my medical condition.
> Q. Okay. So you didn't open this e-mail?
> A. I do not recall opening this e-mail.

PD1 54:21—55:11.

29.     So Peddada admitted only that he saw an email with a title about his new contract. Then, he was confronted with the contract audit trail (a computer-generated record of when he opened and viewed the document) that demonstrates, and is undisputed, that Peddada **actually viewed** the Loan Settlement Agreement and the new PEA **before 9 pm** on the evening of April 26th. PD1 55:15—56:15; PD1 Ex. 8 (audit report). The actual subject line on the email with his new PEA was: "Signature requested on 'New CHPG Employment

---

[4] His email did not, however, "explain why he did not reach out in the ten days after his vacation had ended." WD ¶ 25.

Agreement for Dr. Anuj Peddada'" with a prominent blue link button on the first page entitled "Review and Sign." Ex. B.

30.    On April 26, 2022, the same date that Peddada received the new PEA, Peddada received another "Review and Sign" email with the payor credentialing packet needed for his anticipated employment. Skinner Decl. ¶ 3 and Document A attached thereto. He opened the email, clicked on the link and then completed and signed his Initial Application for payor credentialing and 17 pages of legal documents that very day, demonstrating his awareness of and responsiveness to incoming emails that were not about his medical leave. *Id.* Therefore, it is simply not true that Peddada was not checking his emails and had not seen the PEA.

- ***Third Excuse: I Wasn't Capable Of Reviewing The New PEA Due To Physician Burnout***

31.    As indicated above, Peddada suggested that he was not capable of dealing with contract issues during his medical leave. SUMF ¶ 17. Peddada's counsel has also suggested that it would not be fair to expect a physician with burnout to review a contract and respond. *See, e.g.*, Thompson 104:20-23 ("Q: If someone -- if someone was on medical leave, should they have to go through an entire agreement like this, have to make a decision and negotiate while they are on medical leave?"). In addition to the fact that he filled out a detailed application and 17 pages of complex legal agreements on the very day that the PEA was sent to him (SUMF ¶ 30), Peddada's own expert on physician burnout, Dr. Myers, admits that he never concluded "that Dr. Peddada was impaired in his ability to communicate with others in . . . negotiations about contracts." Depo. of Michael Myers ("Myers") 205:12-19.

10

32.     In fact, Dr. Myers admitted that in his professional opinion, Peddada did not have a disability that prohibited him from communicating with Penrose for three months. Myers 158:11—159:11.

33.     Although Dr. Setty [5], Peddada's PCP, agreed that Peddada could use a break from work, she 1) did not diagnose him with any mental illness or disability, 2) had no concerns about his physical health, memory or cognition, and 3) had no doubts about his ability to practice medicine safely (which he did that afternoon and evening following their appointment). Setty 9:19—10:15, 21:14—22:3, 22:15-19, 44:7—47:2, Ex. 106. In her opinion, Peddada was fully capable of conducting all normal life activities, all of his normal bodily functions were unimpaired, and his burnout condition did not interfere with his ability to perform any major life activities or bodily functions such as breathing, sleeping, walking, working, communicating or thinking. *Id.* at 24:2-20. She offered him short-term medications to help with any hypertension or anxiety he was feeling, which he declined, opting to use instead self-relaxation techniques.   *Id*. at 19:8—20:11. Peddada did not return for the recommended follow-up visit. *Id*. at 20:12-25.

34.     On April 5, 2022, as part of his application for employment with Penrose, Peddada completed a voluntary self-identification of disability form stating that he had no disabilities. PD1 76:17—77:3 and Ex. 15.

35.     In the Electronic Intake Form that Peddada submitted to the Colorado Physician Health Program ("CPHP") on May 5, 2022, Peddada indicated that his general health is "excellent," and did not "at all" limit any of the ten listed activities of daily living. PD2 Ex. 55; PD2 85:14—90:15 (confirming the truth of these answers).

---

[5] PD2 206:5-7 ("Q: Do you have any reason to question Dr. Setty's honesty or integrity? A: None whatsoever.")

36.     Peddada's wife, Chitra, who is also a physician, testified that Peddada has never "been disabled by any mental health issues." CPD 118:1-5. In an interview with CPHP on June 1, 2022, she reported that she had no concerns for "anxiety, depression, or mood swings" for Peddada. CPD Ex. 55 at p. 35 (bates Peddada 000500). During this interview, she further denied "medical issues, interpersonal concerns, memory/cognition issues, prescribing problems, boundary issues, communication issues, or unethical behavior." *Id*. Chitra confirmed the truth of these statements during her deposition. CPD 132:11-25.

37.     Peddada insisted that he took his doctor's instructions seriously (PD1 35:14-18) and that he was on medical leave starting on April 22, 2022. PD1 41:1-25 ("My medical leave began the day I saw my doctor, my physician who said I needed medical leave.") Yet, immediately after his doctor's appointment, Peddada's behavior demonstrated that there was, in fact, no restriction on work-related communication or patient care for that matter. Peddada performed a procedure immediately after he visited Dr. Setty on April 22, 2022 and "didn't finish work until 10 pm" that day. PD2 Ex. 2C and Ex. C (texts between Peddada and Dr. Setty). He also communicated with and interviewed a doctor for potential employment on April 23, 2022. PD1 58:10-24; PD2 42:23-43:3 (admitting he was fully competent to complete this task). Further, without expressing any hesitation, on April 25, he communicated with Koval about the doctor interview. *See* PD1 Ex. 9. It was only after receiving the new PEA addressing loan repayment that he expressed an unwillingness to communicate with Penrose about work-related matters. KD ¶¶ 14-15.

38.     After reviewing Peddada's text messaging with potential employers other than Penrose, Peddada's expert, Dr. Myers, confirmed that he "was not disabled in terms of an inability to communicate about employment opportunities," but that "he selectively chose which of those activities he wanted to do and which ones he did not." Myers 161:23-162:9.

12

➢ **While Negotiations And Penrose's Offer Of Employment Were Pending, Peddada Kept Exploring Other Work Opportunities**

39.    Back in December 2021, when Penrose determined that it would not renew its PSA with ROPC, Peddada expressed hesitation about becoming employed: "I'm not sure I want to be employed." Ex. D.[6] Penrose knew this, and knew that Peddada "started considering other opportunities." Ex. E.

40.    On April 3 and 4, 2022, Peddada sent his CV to Stephen Wells, a OBGYN physician located in California, and stated he would "love to learn more about the opportunity." Ex. F.

41.    On April 6, 2022, the day after he received the discussion draft, Peddada expressed further concerns about becoming employed: "That is what I'm worried about. Being employed by centura [sic] and having to answer to nurses and administrators at a totally different level than previously when I was in private practice." Ex. G.

42.    Similarly, on April 9, 2022, Peddada texted Russ Omizo, stating "Not sure if I want to work in this environment. We are putting the house on the market." Ex. H.

43.    Although Peddada was refusing to communicate about potential employment with Penrose for three months, he was communicating with other potential employers during the time his offer from Penrose was pending. For example, on April 22, 2022 (the day of his office visit with Dr. Setty) and May 5, 2022, he was texting and emailing with Kirk McCarty (CEO) and Kerry Garrison (VP of Business Development for Surgery) at Sky Ridge Hospital

---

[6] Because some of the text messages produced by Peddada from his phone did not clearly identify the recipient or sender, Peddada's counsel sent a confidential list of the names and phone numbers associated with those text messages. Where text messages are referenced as exhibits to this motion, the sender or recipient is identified in the related fact statement based on that list. If questions arise, Penrose (or Peddada) can provide a copy of that confidential list to the Court upon request.

13

in Lone Tree, Colorado to "hear what [he] want[s] what [he] need[s] and [they] will see what [they] can do here at SkyRidge," "so that [they] can hear exactly what [Peddada is] looking for at this point in [his] career," and "to explore opportunities to potentially work together." Ex. I, Ex. J, Ex. K, respectively. In fact, they set up and attended an in-person meeting together on May 11, 2022, during the second week of his leave. Ex. J.[7]

44.    Penrose also knew that Peddada had put his home up for sale on May 5, 2022. KD ¶ 23; WD ¶ 23; PD1 Ex. 16 (home listing history). Apparently, Peddada was unwilling to commit to employment at Penrose, but was hoping that he could keep Penrose on the hook by means of a medical leave while exploring other opportunities.

45.    At all relevant periods prior to Penrose's withdrawal of the offer, Peddada did not commit to employment, but remained exclusively employed by ROPC. PD1 36:18-37:4; PD1 Ex. 5 (Employment Agreement between Peddada and ROPC).

➢ **Peddada's Claimed Condition Of Burnout Was Short Lived**

46.    Peddada's "burnout" expert witness admitted that few physicians, if any, would have handled his grueling work schedule and partnership stresses any better than he did. Myers 130:25 – 132:18. Peddada denied having an opinion about whether the average

---

[7] Despite telling Penrose he would not speak about the employment offer for the duration of his 3 month medical leave, throughout that leave, Peddada reached out to numerous employers. *See, e.g.*, Ex. L (On May 17, 2022, Peddada texts: "I would like to consider opportunities through the UCH system. I'm interested in a part time position. Let me [k]now if you know of anything."); Ex. M (email correspondence on May 26-27, 2022, between Peddada and Weatherby Healthcare regarding starting a locums application. He also sent his CV and bio.; Ex. N (On June 2, 2022, Peddada emails Christopher Oliver at CU Anschutz stating "I would like to meet with you to see if we can find a mutually beneficial model that will allow me to continue practicing high quality patient centric medicine in a collegial environment. I look forward to meeting you to discuss this matter further. I am currently out of town through 6/15/22, and can meet anytime afterwards.") These are just a few examples.

doctor would have lasted as long as he did before burning out, but stated, "I consider myself an above average doctor." PD2 76:9-16.

47.    Regardless of its precise nature, Peddada's burnout was resolved well within the three-month period of his Penrose-approved leave. Myers 118:4-9 ("Not a lasting condition, no.") Myers 153:24 – 154:16 (confirming the alleged burnout would have been resolved by the end of the three months); PD2 32:15-25 (confirming he has not experienced physician burnout after August 1, 2022).

> **Peddada's Refusal To Communicate And Accept Employment Caused Penrose To Withdraw The Offer**

48.    Penrose withdrew Peddada's offer of employment on May 10, 2022 (WD ¶¶ 25-26) for the following reasons:

- "There were multiple attempts to reach [Peddada] to determine whether [he] would accept the revised offer of employment and confirm [his] July 1, 2022 start date and to discuss these contracts with no response." Albert Ex. 13 at p. 4.

- "In an adult, professional setting, refusal to communicate is completely unacceptable and extremely troubling." KD ¶ 20.

- "Peddada had refused to speak with his partner, Dr. Monroe, for many months, and now he was refusing to speak with his potential employer for three months. His workplace interactions had been troubling and difficult for a long time, but now the hopes of a productive working relationship seemed more and more remote." WD ¶ 22.

- "We did not have a fully signed agreement and could not proceed with payor credentialing for Dr. Peddada in its absence. Without an agreement regarding loan repayment or forgiveness, we could not proceed to employ Dr. Peddada due to compliance concerns." KD ¶ 21.

- "Although it did not require any out-of-pocket payment from him, Peddada had been very negative about the loan forgiveness period of five years that would require him to make a partial repayment if he did not remain employed within Centura for five years. This made us wonder if he was truly committed to working in the community long term. Then we discovered that he had put up his home for

15

sale, which added to the impression that Peddada might be wanting to leave sometime soon." KD ¶¶ 22-23; PD1 77:6-10; PD1 Ex. 16.

o "Without Peddada's willingness to communicate, there was no way to resolve these questions and concerns with him." KD ¶ 24.

o "We were receiving excellent applicants for the open radiation oncology position left open by Dr. Kathpal, so it became apparent that Centura would have some options if it did not proceed with Peddada." KD ¶ 25; see also WD ¶ 24.

o "Ultimately, the difficulties caused by Peddada's refusal to communicate made us decide to withdraw his offer of employment and proceed with another candidate. He had been a difficult doctor over the years, and his refusal to communicate at this crucial juncture made it impossible for us to proceed with his hiring, and it accentuated his negatives in our minds." KD ¶ 26.

o "As a result of [Peddada's] lack of communication and not executing the employment and settlement agreements, Centura provided [Peddada] notification concerning the status of [his] job offer." Albert Ex. 13 at p. 4.

49. CommonSpirit Health had nothing to do with Peddada's prospective employment, including the offer or its rescission. *See generally* Albert ¶¶ 2-8. Peddada was unaware of meeting or interacting with anyone from CommonSpirit. PD2 33:24 – 35:1.

50. Regarding Peddada telling Penrose that he wasn't going to talk about the employment offer until the end of the three-month leave, even Peddada's disability expert found his conduct completely inappropriate: "that sounds rather – I don't know, defiant or even hostile. I can't imagine speaking to a prospective employer like that." Myers 111:19-112:4.

51. At ECF 195, Magistrate Judge Braswell entered a spoliation order 1) finding that Peddada deleted 13 months of text messages during the critical timeframe with "intent to deprive" and that "Rule 37(e)(2) expressly authorizes severe sanctions," 2) addressing the possible sanction of "exclusion of certain evidence and/or an adverse inference" which could impact this motion, and 3) leaving the determination of sanctions beyond attorney fees to this

16

Court. *Id.* at pp. 11-12. Defendants are filing herewith a separate motion to determine the appropriate sanction.

## ARGUMENT

### I. COMMONSPIRIT HEALTH SHOULD BE DISMISSED DUE TO TOTAL NON-INVOLVEMENT

CommonSpirit Health ("CSH") should be released as a defendant and all claims against it dismissed, because it had no involvement in any decision involving Dr. Peddada and exercised no control over the entities or individuals involved in those decisions. Albert Decl. ¶¶ 2-8. Prior to the Centura breakup in August of 2023, "CSH had no involvement in physician contracting or employment policies and practices" at St. Francis or Penrose, because "Centura Health was responsible for managing those functions[.]" *Id.* ¶ 6. When Plaintiff's counsel, looking for CSH meddling or control, deposed seven Centura or CHIC administrators, each one's testimony demonstrated that CSH had no involvement or impact on them prior to the disaffiliation in August of 2023. Baldauf 134:21-135:18; Albert 153:19-154:23; Plauth 97:10-100:8; Tacha 16:22-17:11; Thompson 23:22-24:8; Weller 44:1-9; Koval 38:15-40:19; 41:12-14.

The one and only connection of CommonSpirit to this case is the fact that it is a "parent" company to Penrose. "It is 'a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation ... is not liable for the acts of its subsidiaries.'" *Cyprus Amax Mins. Co. v. TCI Pac. Commc'ns, LLC,* 28 F.4th 996, 1007 (10th Cir. 2022) citing *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (internal quotations omitted); see also *Skidmore, Owings & Merrill v. Canada Life Assur. Co.*, 907 F.2d 1026, 1027 (10th Cir. 1990) ("Absent circumstances justifying disregard of the corporate form, a parent company is treated as a legal entity separate from the subsidiary.").

17

## II.    ALL DISABILITY-RELATED CLAIMS SHOULD BE DISMISSED

### A. *Peddada Did Not Have A Disability And Certainly Not Any Impairment That Inhibited Him From Communicating*

#### 1.    *"Burnout" Related To Work Stress Is Not A Disability*

Short-term "burnout" or "exhaustion" related to overwork and the stresses associated with his changing work conditions is the only "disability" that Peddada asserts. SUMF ¶ 15. Burnout is arguably not even a legitimate clinical diagnosis, Myers Ex. 94; Myers 126:5 – 127:12. But assuming that it were, it is certainly not an ADA disability. A host of cases unitedly declare that work-related stress or anxiety, or any other potential impairment that is created or exacerbated by a particular work environment or a specific work situation does not qualify as a disability under the ADA, even if it results in work-related limitations.[8] There is no dispute that this is exactly what happened in this case. E.g., Myers 118:6-9 ("Burnout, by definition . . . is employment related."); SUMF ¶ 15 citing PD2 192:3-6 ("Q: Were there any contributing causes to your physician burnout that were not work related? A: Not that I can really think of."). In addition, it is instructive, though not controlling, that "[j]ob burnout and job fatigue do not constitute FMLA-qualifying medical conditions[.]" *Blake v. City of Montgomery, Alabama*, 492 F. Supp. 3d 1292, 1302 (M.D. Ala. 2020).

---

[8] *Gonzagowski v. Widnall*, 115 F.3d 744, 746–47 (10th Cir. 1997) ("The district court observed that Gonzagowski's mental impairment seems to be limited to and arise out of a specific stressful work situation. An impairment of such narrow scope does not qualify as a disability."); *Klute v. Shinseki*, 840 F. Supp. 2d 209, 217 (D.D.C. 2012); *Hamilton v. Schneider Nat'l Carriers, Inc.*, No. 1:17-CV-3264-MHC-JSA, 2019 WL 11553744, at *17 (N.D. Ga. Jan. 24, 2019); *Rooks v. Youth Dev., Inc.*, No. CIV 98-1300 LH/JHG, 1999 WL 35809378, at *3 (D.N.M. July 9, 1999); *Benson v. California Corr. Peace Officers Ass'n*, No. 2:08-CV-0886 JFM PS, 2010 WL 682285, at *8 (E.D. Cal. Feb. 24, 2010) (holding "work-related stress is not a recognized disability under the ADA"); *Matheson v. Virgin Islands Cmty. Bank, Corp.*, 297 F. Supp. 2d 819, 827 (D.V.I. 2003) (holding that generalized stress is not a disability for ADA purposes).

### 2. *Peddada's Disability Was A Temporary Impairment*

Where a condition is transitory (as Peddada's burnout certainly was), SUMF ¶ 46; *infra*, Subsection 4, it is presumed to not constitute an ADA disability. "Impairments that last only for a short period of time are typically not covered, although they may be covered if sufficiently severe." 29 C.F.R. § Pt. 1630, App. But case law takes off the table even severe work-related stress: A temporary inability to work based on acute work related stress does not establish the existence of a disability within the meaning of the ADA in the absence of evidence of "long-term or permanent impairment." *Hosea v. Donley*, 584 F. App'x 608, 611 (9th Cir. 2014). Similarly, the Tenth Circuit affirmed the district court's grant of summary judgment with respect to a holding that no evidence showed that alleged high blood pressure, depression, chronic back pain, chronic knee pain, and joint pain were "**anything but temporary conditions** or that they otherwise constitute physical or mental impairments that substantially limit one or more major life activities," and therefore these impairments were not ADA disabilities. *Skerce v. Torgeson Elec. Co.*, 852 F. App'x 357, 361 (10th Cir. 2021).[9]

---

[9] *See also Peterson v. Garmin Int'l, Inc.*, 833 F. Supp. 2d 1299, 1318-19 (D. Kan. 2011) (intermittent fecal incontinence over a 13-month period was not "anything more than a temporary impairment" and a six-month rotator cuff injury that was corrected through surgery was also a "temporary condition," and neither sufficed to constitute an ADA disability); *Guary v. Upstate Nat'l Bank,* 618 F.Supp.2d 272, 275 (W.D.N.Y.2009) (plaintiff's broken ankle, "which resulted in a single, twelve-week disability leave with no alleged physical limitations thereafter, is not a disability for purposes of the ADA or the parallel New York statute."); *Klamut v. California Highway Patrol*, No. 15-CV-02132-MEJ, 2015 WL 9024479, at *7 (N.D. Cal. Dec. 16, 2015) (citing case law about "temporary psychological impairment" and holding that a "psychotic episode secondary to sleep deprivation over a two-week period" does not suffice to plead an ADA disability); *Covington v. Union Mem'l Hosp.*, No. CV DKC 22-2655, 2024 WL 3784539, at *17, 19 (D. Md. Aug. 13, 2024) (holding that a psychological impairment arising from "present life circumstances" does not qualify as a disability, in part because the conditions of trouble sleeping and stress were "transitory and minor.")

### 3.  *Peddada Did Not Underperform In Any Major Life Activity Relative To The General Population*

Peddada's burnout did not "substantially limit[] the ability of [Peddada] to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). It is undisputed that very few physicians, to say nothing of the "general population," would have handled Peddada's voluntary grueling schedule and work stresses any better than he did. SUMF ¶ 45. His need for a mental health leave after working 60-90 hour weeks for decades and embarking on a major work transition does not indicate disability any more than does an ultramarathon runner needing recovery time after a race. Because he did not underperform in any major life activity relative to "the general population," he was not disabled for ADA purposes. 29 C.F.R. § 1630.2(j)(1)(ii).

### 4.  *Peddada Was Not Regarded As Disabled, Because (Among Other Reasons) His "Burnout" Was Transitory And Minor*

A plaintiff who is not actually disabled for ADA purposes might still recover under the ADA if the plaintiff is *regarded as* disabled. However, the presumption that transitory and minor conditions are not ADA disabilities becomes, in "regarded as" cases, conclusive: "transitory and minor" conditions are *per se* excluded as relevant ADA impairments in "regarded as" cases. 29 C.F.R. § 1630.2(g)(1)(iii). Further, the law gives a bright-line definition of "transitory": "For purposes of this section, 'transitory' is defined as lasting or expected to last six months or less." 29 C.F.R. § 1630.15(f). Here, Dr. Setty did not diagnose Peddada with any disability at all, much less a minor disability, and Dr. Myers was not a treating physician. SUMF ¶ 33. Whatever elements of physician burnout he may have been experiencing, they were quickly resolved by some rest and relaxation. Thus, his condition was minor. His "burnout" expert Dr. Myers confirmed—and he agreed—that his burnout

20

would have been and was in fact resolved within that three-month period, so it was also transitory. SUMF ¶ 46.

### B. Because Peddada Never Committed To Employment, He Was Not A Qualified Individual

To become an employee, Peddada had to be willing to enter into the written employment agreement that was sent to him. Under the ADA, only "qualified individual[s]" can assert a disability discrimination claim. Congress defined "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of <u>the employment position that such individual holds **or desires**</u>." 42 U.S.C. § 12111(8) (emphasis added). Peddada did not hold an employment position, and, if he did not want to accept the financial terms being offered to him as an employee, he did not "desire" the position either. Therefore, a prerequisite to any disability claim is a willingness to accept the financial terms of the position being offered in good faith. Without that, there can be no injury recognizable at law and no claim of disability discrimination. Since Peddada made it clear that he had not yet arrived at a decision on the financial terms offered, he was not a qualified individual. *See, e.g., EEOC v. N. Mem'l Health Care*, 908 F.3d 1098, 1103–04 (8th Cir. 2018) (emphasis added) ("There is no duty to accommodate an applicant or employee by hiring or transferring her into a position when she is **unwilling** . . . to perform one of its essential job functions.") The most essential and overarching job function and duty is to be and remain a loyal employee. There is no duty to accommodate a job applicant who is undecided or unwilling to become employed.

Peddada does not dispute that his loan repayment obligation was a valid contractual obligation, yet he expressed strong disagreement about Penrose's 5-year forgiveness proposal, which was accepted by his partner Monroe. SUMF ¶¶ 3-4, 8. The Response to

21

Penrose's prior motion for summary judgment states, "the parties were negotiating what [repayment] looked like (ECF 75, p. 3, RSUMF 6), and "Defendant could have continued negotiations with Peddada once he returned from leave [on August 1]" (ECF 75, p. 11, SADF 27). Peddada was unwilling to fully accept the burdens of the potential employment relationship, and yet expected Penrose to shoulder the burdens of that relationship. Peddada cannot have it both ways. Since he never expressed willingness to accept the financial terms being offered in the proposed written agreement, and wanted to continue negotiating financial terms, Peddada was not a qualified individual. Where there is active opposition to the proposed financial terms of employment (as opposed to requesting accommodations related to essential job functions of a job you have accepted), ADA protections do not apply. The ADA imposes no obligations related to negotiation of financial terms.

### C. Being On Medical Leave Does Not Entitle An Applicant To Refuse To Communicate: Refusal To Communicate Is A Legitimate Non-Discriminatory Reason To Withdraw An Offer

It is undisputed that Penrose reached out to Peddada by text, by email and telephone conversation in an effort to conclude the hiring process with a written agreement. SUMF ¶¶ 18, 20-22. Peddada rejected their attempts to do so, taking the position that "while still a private physician he would not be obligated to talk" to Penrose and that he didn't need to talk while on medical leave. SUMF ¶¶ 17, 21, 23-24.[10]

---

[10] Peddada has also tried claiming that the discussion draft he unilaterally executed constituted a binding agreement between him and Penrose such that he became an employee and was "terminated" when the offer was withdrawn. For the avoidance of doubt, Peddada has already admitted that an agreement is not effective unless both parties sign and are in full agreement with the terms. PD1 53:4-10. Additionally, if he truly thought there was an agreement in place, there wouldn't be any need to "continue negotiations about both the settlement agreement and the new physician employment agreement until after August 1st 2022." SUMF ¶ 17.

It is fundamental contract law that an offer can be withdrawn any time before it is accepted. *See, e.g., East-Larimer County Water Dist. v. Centric Corp.*, 693 P.2d 1019, 1021 (Colo. App. 1984) ("An offer to contract may be withdrawn at any time prior to acceptance.") When Penrose attempted to communicate with Peddada about his offer, Peddada adamantly refused to communicate, and used his medical leave as the reason he would not communicate. SUMF ¶¶ 17, 21, 23-24. Peddada admits that on April 22, 2022, his doctor agreed with him that, starting immediately, he should take three months off, but Peddada does not recall any other specific prohibitions. SUMF ¶¶ 14, 27. So Peddada's doctor did not prohibit Peddada from communicating with Penrose, and Peddada was not incapacitated to the point that he could not communicate about work-related matters. SUMF ¶¶ 26-27, 31-37. In fact, his actions proved the opposite, as admitted by Myers. SUMF ¶¶ 31, 32, 37. He was filling out other legal forms, communicating with Penrose about other work-related topics, and even talking with other potential employers while on leave, making it very clear that he was not disabled, but was instead selectively avoiding communicating about the offer. *See, e.g.*, SUMF ¶¶ 30-37, 42.

Being on medical leave does not entitle a job applicant to refuse to communicate about a job offer.[11] Peddada had no right to keep Penrose in limbo for three months, wondering whether Peddada would agree to the offered terms. Moreover, Peddada never

---

[11] It is undisputed that Peddada was sent the revised PEA after he announced his intention to take a three month leave, and that on April 27, 2022, he told Penrose he would not communicate about that job offer for the next three months (i.e., days before his leave was approved on May 5, 2022). He therefore was not on medical leave at the time he used it to justify his refusal to communicate, and medical leaves cannot be unilaterally declared by applicants or employees. *See, e.g.*, *Woodman v. Runyon*, 132 F.3d 1330, 1345 (10th Cir. 1997) ("The 'employee's initial request for an accommodation ... triggers the employer's obligation to participate in the interactive process.'") (citations omitted).

asked for—and Penrose and never agreed to—a three month leave for purposes of not having to communicate about the job offer. Even if he had, any such request would be entirely unreasonable.

EEOC guidance on Communication During Leave And Prior To Return To Work states: "The interactive process may continue even after an initial request for leave has been granted, particularly if the employee's request did not specify an exact or fairly specific return date . . ." (https://www.eeoc.gov/laws/guidance/employer-provided-leave-and-americans-disabilities-act). If an employer is entitled to communicate with an employee during a leave about a specific return date, surely a potential employer is entitled to communicate with an applicant about whether he is willing to become an employee and start work at the end of a medical leave. Peddada's refusal to communicate for three months about the employment agreement being offered violated the interactive process requirements of the ADA. *See Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1172 (10th Cir. 1999) ("The interactive process includes good-faith communications between the employer and employee.") (quoting *Beck v. University of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996) ("A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith."); *Albert v. Smith's Food & Drug Centers, Inc.*, 356 F.3d 1242, 1253 (10th Cir. 2004) ("Neither party may create or destroy liability by causing a breakdown of the interactive process.") Peddada's adamant refusal to communicate about the job offer during his 90-day leave bars his claims under the ADA and Rehabilitation Act.

Peddada's "hostile" and "defiant" refusal to communicate (Peddada's expert's words) makes it ludicrous to claim that his prospective employer was legally bound to move forward with employment. See SUMF ¶ 49. The fact that Penrose gave Peddada two weeks to

reconsider and start communicating was generous. The decision to withdraw the offer was the only logical option in response to Peddada's aggressive refusal to communicate. Penrose had to move forward. Since there was a legitimate non-discriminatory reason to withdraw the offer and Penrose honestly believed that reason and acted in good faith upon that belief, Peddada's wrongful or discriminatory action claims must fail.[12] *See Bacy v. Chickasaw Nation Indus., Inc.*, 854 F. App'x 944, 947 (10th Cir. 2021) citing *Stover v. Martinez*, 382 F.3d 1064, 1076 (10th Cir. 2004) ("In evaluating pretext, 'the relevant inquiry is not whether [the employer's] proffered reasons were wise, fair, or correct, but whether [the employer] honestly believed those reasons and acted in good faith upon those beliefs.'"); *DeWitt v. Southwestern Bell Telephone Company*, 845 F.3d 1299, 1307 (10th Cir. 2017) (same). Where there is no evidence to suggest that decision-makers did not honestly believe the reasons given for its conduct, there is no genuine issue of material fact and no support for pretext. *See id*. And, courts "may not second guess the business judgment of the employer." *DePaula v. Easter Seals*, 859 F.3d 957, 970 (10th Cir. 2017); see also *DeWitt* 845 F.3d at 1308 ("Our role is…

---

[12] In addition, the fact that Penrose made the employment offer to Peddada after being notified of his three month leave refutes any intent to discriminate or refuse accommodation. Courts routinely dismiss ADA claims when the employer makes an offer to a candidate despite knowing that the candidate has a disability. *See, e.g.*, *Lambright v. Kidney Servs. of Ohio*, 998 F. Supp. 2d 676, 687 (S.D. Ohio 2014), aff'd sub nom. *Lambright v. Ohio Thrift Show & Sells*, No. 14-3238, 2014 WL 12972130 (6th Cir. Nov. 14, 2014) (finding "any specter of discriminatory animus is dispelled by the fact that [the employer] was aware of Plaintiff's disability from the very start of their communications, and still offered Plaintiff employment."); *Lorah v. Tetra Tech Inc.*, 541 F. Supp. 2d 629, 635 (D. Del. 2008) (granting motion to dismiss ADA claim based on the fact that the plaintiff "was hired despite informing defendant that she suffered from asthma."); *Palov v. Ikon Off. Sols., Inc.*, No. CIV.A. DKC 99-1650, 2001 WL 13238, at *5 (D. Md. Jan. 4, 2001), aff'd, 11 F. App'x 297 (4th Cir. 2001) (finding that the "order of [] actions" of inquiring about plaintiff's medical condition, and then, asking plaintiff to sign an employment agreement "does not support an inference of unlawful discrimination stemming from [defendant's] perception that [plaintiff] had a disability.")

not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments.")

## III.    ALL REMAINING CLAIMS SHOULD ALSO BE DISMISSED

If the Court accepts the admitted fact that Peddada refused to communicate and the uncontradicted sworn statements of Weller and Koval that Peddada's refusal was the reason for withdrawing the offer, Peddada's remaining state law claims also fail on that basis. Peddada's damages were caused by his own actions. The following additional reasons also support dismissal of the remaining claims.

### A. The Eighth Claim (Wrongful Discharge) Should Be Dismissed, Because Peddada Was Never Employed Or Discharged

It is not disputed that the terms of prospective employment at Penrose were still being negotiated when the job offer was withdrawn. SUMF ¶ 17 (confirming he was "unwilling to continue negotiations . . . until after August 1st, 2022"). At all relevant times, Penrose's only actual (as opposed to prospective) contractual relationship was with ROPC. SUMF ¶ 44. Other than a prospective employee, Peddada's only relationship with Penrose was as a credentialed member of the medical staff, which, it is well settled in Colorado, is not an employment relationship. *Lutfi, M.D. v. Brighton Community Hospital Ass'n*, 40 P.3d 51, 56-57 (Colo. App. 2001); *McPherson v. HCA-HealthOne, LLC.*, 202 F. Supp. 2d 1156, 1167–68 (D. Colo. 2002). Judge Braswell noted in her Courtroom Minutes [ECF 46, p. 2] that the Court was unwilling to stretch the tort of public policy wrongful discharge to cover a nonemployee. It remains true, therefore, that the first two elements of this tort are (1) employment by the defendant and (2) discharge by the defendant. *See Kearl v. Portage Environmental*, 205 P.3d 496, 499 (Colo. App. 2009). Because neither element is met, the claim should be dismissed.

26

**B. The Ninth Claim (Unjust Enrichment) Should Be Dismissed, Because It Is Not Unjust To Decline To Hire An Applicant Who Refuses To Communicate.**

This claim adds nothing legitimate to the disability-based claims. It merely supplies an equitable theory as a backup to the legal theories that are the focus of the case—but it is neither illegal nor unjust to decline to hire an employee who refuses to communicate about the terms of employment, insisting instead that he had a right to delay, for a period of three months, the time when he would negotiate and make a decision about accepting the terms offered. It was that refusal that resulted in withdrawal of the offer on which alleged unjust enrichment claim rests. Further, Peddada was already compensated—through his employment with ROPC—for his prior efforts that he claims resulted in enrichment to Penrose, which defeats his claim for further reimbursement. *See Tradesmen Int'l, Inc. v. U.S. Postal Serv.*, 234 F. Supp. 2d 1191, 1206 (D. Kan. 2002) (holding prior payment defeats unjust enrichment claim).

**C. The Tenth Claim (Civil Conspiracy) Should Be Dismissed, Because Peddada's Employment Offer Was Withdrawn Due To Noncommunication, Not Disability**

A civil conspiracy requires "a meeting of the minds" to commit "one or more unlawful overt acts." *Walker v. Van Laningham*, 148 P.3d 391, 396 (Colo. App. 2006). The unlawful plan alleged in the FAC was to "terminate Dr. Peddada because of his disability." FAC ¶ 222. For the reasons given in the Section II above, the intention to withdraw Peddada's employment offer arose due to his noncommunication, not his disability. In addition, during his deposition, Peddada testified as follows:

> Q: So are you aware of any evidence of a conspiracy or agreement between Penrose and Dr. Monroe?
> A: No.
> …

Q: Let me ask you, do you think there was motivation to get rid of you so that Alan Monroe could take your job?
A: I don't think so.

PD2 183:19-184:10.

## **CONCLUSION**

This is a simple case. Peddada was not disabled. He never became a qualified individual by committing to employment. Peddada's own PCP and expert witness testified that Peddada was not disabled and was not incapable of communicating with Penrose about his employment offer. His own actions demonstrated his capacity to respond to Penrose's offer of employment. Even if Peddada had been disabled, his refusal to communicate was not protected by disability law. Since Peddada's refusal to communicate is not protected and did not sit well with Penrose's management, Peddada's offer of employment was withdrawn for legitimate, non-discriminatory reasons, and this case should be dismissed with prejudice.

Respectfully submitted this 19th day of February, 2026.

**HALL, RENDER, KILLIAN, HEATH & LYMAN, P.C.**

By: *s/ Mark L. Sabey*
Melvin B. Sabey
Mark L. Sabey
Lindsay K. McManus
999 17th St Ste 800, Denver, CO 80202
(303) 801-3535 / melsabey@hallrender.com
(303) 801-3538 / marksabey@hallrender.com
(303) 802-1293 / lmcmanus@hallrender.com

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

The undersigned certifies that on February 19, 2026, the foregoing was electronically filed with the Clerk of the Court via CM/ECF, which will send notification of such filing to the parties on record:

Iris Halpern – ih@rmlawyers.com
Qusair Mohamedbhai – qm@rmlawyers.com
Omeed Azmoudeh – oa@rmlawyers.com
Crist Whitney – cw@rmlawyers.com
Matthew Cron – mc@rmlawyers.com

*s/ Crystal J. Sebastiani*
Crystal J. Sebastiani, Paralegal

29