Docusign Envelope ID: ED5824EF-03C5-4DB6-AA71-442CBFECD608

# DECLARATION OF JEFFREY ALBERT, M.D.

I, Jeffrey Albert, M.D., certify that the following Declaration is based on my personal knowledge and is factually accurate.

1. In September of 2021, through Centura's management, I became employed by Catholic Health Initiatives Colorado ("CHIC") as Enterprise Medical Director of Radiation Oncology and Integrated Cancer Care for all Catholic and Adventist hospitals across Colorado and western Kansas, including Penrose Hospital in Colorado Springs and its Cancer Care Center where Dr. Peddada provided medical services through his own private practice.

2. Centura Health was a nonprofit organization that managed and operated hospitals owned by CHIC and Portercare Adventist Health System ("PAHS") in Colorado and Kansas. The Catholic and Adventist parent organizations of CHIC and PAHS were not involved in the day-to-day management or operation of these Centura hospitals.

3. In 2019, Catholic Health Initiatives, the parent of CHIC, merged with Dignity Health to become CommonSpirit Health ("CSH"). However, based on my personal experience starting in 2021, Centura continued to jointly manage and operate CHIC's and PAHS's hospitals. The only thing that changed is that CHIC's parent organization became bigger, but it had no significant impact on operations at the local level.

4. During my tenure, CHIC hospitals continued to be managed and operated by Centura Health along with the PAHS hospitals during the entire time of Dr. Peddada's relationship with CHIC and thereafter until August 1, 2023. I have personal knowledge that CSH did not manage or operate Centura Health or CHIC hospitals prior to August 1, 2023. I did not even know, interact with or have any working relationship with a single person at CSH during the time period of Peddada's relationship with CHIC.

5. The Professional Services Agreement that defined the relationship between the parties to this action for many years was between Radiation Oncology PC ("ROPC") and Catholic Health Initiatives Colorado ("CHIC"). **Attachment 1.** Contracts entered into by Centura Health were often in the name of the entity that owned the hospital assets, in this case, CHIC. The proposed employment agreement at issue was between Dr. Peddada and CHIC. **Attachment 2.** I was involved from the beginning of the decision to bring Dr. Peddada and his partner on as employees because conflict in their partnership was becoming more and more disruptive. Dr. Peddada's employment application (**Attachment 3**) was on a Centura Health form. I was involved throughout the process of making an offer of employment (which necessarily included a loan repayment agreement) and was involved in the decision to withdraw Dr. Peddada's offer of employment when he refused to communicate an acceptance or rejection of the offer for three months. The individuals who decided to withdraw the offer—specifically, Sam Weller and myself—were both Centura Health or CHIC employees at the time, not employees of CSH. CSH had no involvement in that decision or in any aspect of Dr. Peddada's contractual relationship with CHIC. CSH did not provide any input and did not exercise any oversight or control over his potential employment.

Docusign Envelope ID: ED5824EF-03C5-4DB6-AA71-442CBFECD608

6.  During the time that Centura Health was managing and operating CHIC hospitals, CSH had no involvement in physician contracting or employment policies and practices. Centura Health was responsible for managing those functions for CHIC. Prior to August 1, 2023, any statement made generally by CSH about managing hospitals under its auspices did not apply to CHIC hospitals that were under management of Centura Health. On August 1, 2023, the PAHS and CHIC hospitals and facilities being jointly managed by Centura Health began a process of disaffiliation. With disaffiliation, Centura Health no longer managed CHIC and PAHS facilities. The PAHS hospitals and facilities began to be managed and operated on their own under the auspices of Advent Health. From the disaffiliation forward, CHIC took over the management and operation of CHIC hospitals and facilities. CHIC remains a subsidiary organization to CSH, and the facilities owned and operated by CHIC in Colorado, Kansas and Utah are now referred to as the "Mountain Region" of CommonSpirit Health.

7.  In a press release[1] on August 1, 2023, as shown in **Attachment 4,** CSH announced on its website:

    > (CHICAGO) – August 1, 2023 – CommonSpirit Health, one of the largest faith-based, non-profit health systems in the U.S., is now directly managing 20 hospitals and more than 240 care sites in Colorado, Kansas, and Utah. These facilities had previously been managed by Centura Health.

8.  August l, 2023 is well over one year after May 10, 2022, the date Dr. Peddada's offer of prospective employment was withdrawn. CSH had no involvement in that decision or any other aspect of Dr. Peddada's relationship with CHIC. CSH had no dealings with Dr. Peddada, his practice, ROPC, or with the allegations related to the various claims in this case.

9.  Today, I remain employed by CHIC, but in a new role as Executive Medical Director of Oncology for the Mountain Region of CommonSpirit Health.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

This Declaration was executed on  2/17/2026  in the County of El Paso, State of Colorado.

Signed by:

*Jeffrey Albert, MD, MPH*

Jeffrey Albert, M.D.

---

[1] https://www.mountain.commonspirit.org/news/commonspirit-health-directly-manage-facilities-colorado-kansas-utah#:~:text=Stories,CommonSpirit%20Health%20to%20Directly%20Manage%20Facilities%20in%20Colorado%2C%20Kansas%2C%20Utah,Salt%20Lake%2C%20Salt%20Lake%20City

# EXCLUSIVE
# PROFESSIONAL SERVICES AGREEMENT
# FOR
# RADIATION ONCOLOGY SERVICES

**THIS PROFESSIONAL SERVICES AGREEMENT** (this "Agreement") is entered into on the later of the parties' dates of signature set forth below ("Effective Date"), by and between Catholic Health Initiatives Colorado, a Colorado nonprofit corporation, doing business as **Centura Health-Penrose-St. Francis Health Services**("Hospital"), a Colorado nonprofit corporation managed and operated by Centura Health Corporation, a Colorado nonprofit corporation ("Centura"), and **Radiation Oncology, P.C.**, a Colorado professional corporation ("Group").

## INTRODUCTION

WHEREAS, Hospital owns and operates acute care hospitals located at 2222 North Nevada Avenue, Colorado Springs, Colorado and 6001 East Woodmen Road, Colorado Springs, Colorado, in which it provides radiation oncology services to the community ("Hospital Services"); and

WHEREAS, Group is a medical professional corporation that employs physicians and non-physician practitioners with the qualifications, expertise and experience to provide professional radiation oncology services for Hospital; and

WHEREAS, Hospital, in furtherance of its charitable mission and with the intention of providing a community benefit, desires to contract with Group to provide professional radiation oncology services to patients in order to improve the availability of quality professional medical services to the community served by Hospital; and

NOW, THEREFORE, in consideration of the mutual covenants and conditions as expressed herein, the parties agree as follows:

## ARTICLE I
## ENGAGEMENT; EXCLUSIVITY

**Section 1.01. Hospital Determination**.  Hospital has determined that it is in the best interest of Hospital, its patients, its Medical Staff, and the community which it serves to enter into an exclusive agreement with a group of physicians who are properly licensed, qualified and trained to perform the professional services for radiation oncology required by Hospital on an exclusive basis and that entering into such an agreement will improve patient care; permit more efficient purchasing, selection, use and maintenance of equipment and facilities; ensure full time availability of sufficient, properly licensed, qualified and trained physicians to provide the services that an exclusive agreement will ensure standardization of procedures, centralized administration of services, increase efficiency, and provide the physicians with incentives to maintain their professional skills and keep current on new procedures and developments in radiation oncology by ensuring that physicians perform sufficient procedures to maintain their proficiency.

1

**ATTACHMENT 1**

**Section 1.02. Exclusive Engagement of Group**. Hospital hereby engages Group on an exclusive basis and Group hereby accepts such engagement to provide all professional services and certain administrative services to and for all inpatient, consultative and outpatient radiation oncology services at the Hospital in accordance with the terms and conditions of this Agreement (collectively, the "Services"). During the term of this Agreement and any renewals thereof, Group shall have the exclusive right and responsibility for the provision of the Services. Hospital will not cause or permit any other persons or entities to provide any such Services, except as permitted under this Agreement. Hospital agrees that so long as Group is not in default and Hospital is not confronted with any emergency, disaster, or other circumstance beyond its control, imposing additional and unanticipated demands for the Services upon it, Hospital will utilize Group as its exclusive provider of Services, during the term of this Agreement.

**Section 1.03. Medical Staff Privileges**. In consideration for Hospital executing this Agreement with Group, and in furtherance of its determination that the Hospital Services should be staffed exclusively by one group under an exclusive agreement, Group does hereby agree that at the time of termination of this Agreement the Medical Staff privileges of Physicians (as defined in Section 2.01 below) and Allied Health Professional Staff ("AHP Staff") privileges of NPPs (as defined in Section 2.01 below) to perform the Services at Hospital will be terminated and in the case where the Group terminates the employment of an individual Physician or NPP, the individual Physician's or NPP's privileges to perform the Services at Hospital will be terminated and he or she may not thereafter be entitled to perform any radiation oncology services at Hospital. Group further agrees, for itself and the Physicians and NPPs, that if at the time of termination of this Agreement for any reason they have not entered into a new or additional agreement with Hospital, then, and in that event, they will, within 24 hours of receipt of a written request from Hospital, require the Physicians and NPPs to resign from the Medical Staff/AHP Staff of Hospital and relinquish all Medical Staff/AHP Staff privileges at Hospital for radiation oncology services, and agree that these provisions are contractual and not subject to any appeal provided for in the Medical Staff Bylaws or AHP Staff Bylaws. Group acknowledges that the Agreement set forth in this Section 1.03 is an essential inducement to Hospital in entering into this Agreement, and Hospital would not enter into this Agreement without the provisions set forth in this Section 1.03. Group represents that all Physicians and NPPs are aware of this provision and in agreement with its terms. Group agrees to provide Hospital an original copy of an acknowledgment by Physicians and NPPs of the provisions of this Agreement and a waiver of any claim by such Physicians and NPPs with respect to the loss of Medical Staff/AHP Staff privileges pursuant to the terms of this Agreement. In the event the Group fails to obtain such acknowledgment and waiver, Group agrees to hold Hospital harmless and indemnify Hospital against any claims made against Hospital by any individual Physician or NPP as a result of losing Medical Staff/AHP Staff privileges pursuant to this Agreement.

**Section 1.04. Surrender of Premises**. Group agrees that at the time of the termination of this Agreement it will, within 24 hours of the effective date of said termination, release and vacate all facilities of Hospital which it has occupied or made use of during the term of this Agreement, will surrender the possession thereof to Hospital, and will not interfere with the use of said premises by other physicians.

**Section 1.05. No Restriction**. In the event of the termination of this Agreement, it is expressly understood that Hospital will be under no restriction of any kind or nature whatsoever,

4841-0291-5869.1                                                                        RAD-PSF-080415

direct or implied, with respect to its right and ability to employ or enter into any agreement with any physician formerly employed by or in any manner associated with Group at the time of termination or any prior time.

## ARTICLE II
## GROUP SERVICES AND DUTIES

**Section 2.01. Professional Services**. Group, through the physicians identified herein and approved to provide services hereunder as set forth below (the "Physicians") and the non-physician practitioners identified herein and approved to provide services hereunder as set forth below (the "NPPs") and further set forth in Exhibit A, shall provide all professional radiation oncology services required at the Hospital for the Hospital Services, including inpatient, consultative, and outpatient services necessary for patient care (the "Professional Services"), on a 24 hours a day, seven days a week, 365 days per year (366 days each leap year) basis in accordance with currently approved methods and practices and as defined by the terms of this Agreement. The parties shall from time to time review the requirements of Hospital for radiation oncology services required by this agreement and shall extend their best efforts to agree upon the number of full or part time Physicians who are necessary to provide it with the services required by this Agreement. In addition, Group shall provide a first call radiation oncology coverage for emergency cases, twenty-four (24) hours a day, seven (7) days a week, fifty-two (52) weeks per year, including holidays.

**Section 2.02. Intentionally omitted.**

**Section 2.03. Qualifications of Physicians and NPPs**. Throughout the term of this Agreement, Group shall ensure that:

(a)    Each Physician shall:

(i)    Have been approved by Hospital. The physicians listed on **Exhibit A** hereto have been approved by Hospital and are "Physicians" hereunder. The parties may amend **Exhibit A** to add or delete Physicians as necessary from time to time and in accordance with this Agreement;

(ii)    Maintain an unrestricted license to practice medicine in the State of Colorado;

(iii)    Be a member in good standing of the Hospital's Medical Staff and, if specified as necessary to perform services under this Agreement, be a member in good standing at one or more additional facilities as designated by Hospital, with status in the active category with appropriate clinical privileges;

(iv)    Be board-certified or board-eligible in Radiation Oncology. Any physician who is board-eligible shall become board-certified within the time frame required under the Medical Staff Bylaws;

3

(v)    Maintain participating provider status with Medicare and Medicaid programs and not have been deemed excluded from participation in any federally funded health care program, including but not limited to Medicare and Medicaid;

(vi)    Maintain the insurance required by Section 9.04 of this Agreement; and

(vii)    Maintain an unrestricted federal DEA registration and any applicable state permit.

(b)    Each NPP shall:

(i)    Have been approved by Hospital.  The NPPs listed on **Exhibit A** hereto have been approved by Hospital as of the date of this Agreement.  The parties may amend **Exhibit A** to add or delete an NPP as necessary from time-to-time and in accordance with this Agreement;

(ii)    Maintain an unrestricted license to practice his or her profession, as applicable, in the State of Colorado;

(iii)    Have allied health privileges at the Hospital with status in the active category with appropriate clinical privileges;

(iv)    Not have been deemed excluded from participation in any federally funded health care program, including Medicare or Medicaid;

(v)    Maintain the insurance required by Section 9.04 of this Agreement; and

(vi)    If applicable, maintain an unrestricted federal DEA registration and any applicable state permit.

(c)    In addition, with respect to the NPPs:

(i)    If applicable, Group shall provide to Hospital upon request documentation that the NPPs have performed the services for which Hospital reimburses Group, including, but not limited to, such time records as Group may keep regarding the NPPs.

(ii)    Physicians shall provide physician supervision of each of the NPP who is a physician assistant, and shall enter into a collaborative practice agreement with each of the NPPs who is an advanced practice registered nurse as may be required under Colorado licensing laws, and will provide such supervision of the NPP as may be required under the regulations, rules or guidelines of any federal health care program including, but not limited to, the Medicare program, or private insurance plan.

4

(iii)    Except as set forth herein, Group shall have sole authority to discipline, promote, lay off, discharge or take any other employment-related actions with respect to the NPPs, provided that Group shall use its best efforts to give Hospital reasonable notice prior to terminating the employment of NPPs.

(iv)    As an inducement to Hospital to enter into this Agreement, Group represents, warrants and covenants that Group has complied and will continue to comply in all material respects with all applicable federal, state and local laws, rules, regulations and ordinances applicable to the NPPs, their employment by Group, and their performance of services for Hospital, including, without limitation, those relating to wages, hours, payment of social security, withholding and other taxes, workers' compensation insurance, labor and employment relations and employment discrimination.

**Section 2.04. Failure To Meet Qualifications**.    Except as otherwise set forth below, Group shall notify Hospital within three business days if any Physician or NPP no longer meets any of the foregoing requirements of Section 2.03.  Group shall use reasonable efforts to ensure that it is aware of any failure of a Physician or NPP to meet any such requirements.  Group shall, from time to time, upon request, furnish Hospital and the Medical Staff appropriate documentation to show compliance with the qualifications set forth in Section 2.03 of this Agreement.  If any Physician or NPP fails to fulfill the qualifications set forth in Section 2.03, Group shall immediately exclude such Physician or NPP from the performance of the Services pursuant to this Agreement until such time as he or she again fulfills such requirements and, where applicable, is reinstated in accordance with the provisions of the Medical Staff Bylaws or AHP Staff Bylaws; provided, however, Group shall be required to replace any such removed Physician or NPP to the extent necessary in order that Group may fully perform the Services contemplated pursuant to this Agreement.

(a)    In addition, Group shall immediately notify Hospital in writing of any of the following events:

(i)    Any investigation or pending investigation of Group or any Physician or NPP with regard to concerns related to professional services or alleged crimes of moral turpitude;

(ii)    Any indictment or conviction of Group or any Physician or NPP for any criminal misdemeanor or felony charge;

(iii)    Any sanction imposed on Group or any Physician or NPP by any government agency;

(iv)    Any disciplinary action taken by a state or federal agency, professional board or association, or health care entity with regard to Group or any Physician or NPP; or

(v)    Any cancellation, termination, restriction or limitation of coverage issued by Group's insurance carrier that could affect Group's coverage for services provided under this Agreement.

5

4841-0291-5869.1                                                              RAD-PSF-080415

(b)  In the event Hospital is concerned about potential impairment of or diversion of controlled substances by any Physician or NPP, upon request by Hospital, Group shall require any Physician or NPP designated by Hospital to undergo immediate blood screening or urinalysis and Group shall be responsible for costs associated with such blood screening or urinalysis.

**Section 2.05. Performance Reviews**.  Group shall provide Hospital with such information as Hospital may reasonably request for and shall participate fully in any review of the Services provided hereunder.  Hospital may use a variety of methods to evaluate Group's performance, including, without limitation, the following:

(a)  Direct observation of the provision of services;

(b)  Audit of documentation, including medical records associated with services and records submitted by Group regarding services;

(c)  Review of incident reports and risk management activities;

(d)  Review of reports submitted by Group;

(e)  Collection and review of data related to the efficacy of services; and

(f)  Input from Hospital staff and patients, including patient satisfaction studies.

In the event Hospital determines that Group's performance of services does not meet Hospital's reasonable expectations, Group shall cooperate with Hospital's plan for performance improvement, which may include increased monitoring of services, consultation with Group, provision of training to Physicians or NPPs, and other elements as Hospital and Group may jointly determine.

**Section 2.06. Charitable Care**.  Group acknowledges that Hospital is to be operated in a manner that furthers charitable purposes by promoting health for a broad cross section of the community and in compliance with the standards articulated by the Internal Revenue Service for tax exempt health care organizations.  Group further acknowledges that the duty to provide the Services in furtherance of charitable purposes shall override any duty to maximize Hospital's profits.  Group shall provide the Services in compliance with Hospital's charity care policies and Hospital's stated mission and purpose and consistent with Hospital (a) providing quality health services to all patients needing such services without regard to race, creed, color, religion, national origin, disability, gender, sexual orientation, insurance coverage or ability to pay, and (b) promoting Hospital's charity care policies to the community.

**Section 2.07. Performance Compliance**.  Group will not provide the Services in a manner that will (a) jeopardize the federal tax-exempt status of Hospital or any of its affiliated tax-exempt entities under Section 501(c)(3) of the Code, (b) violate any covenants or regulations applicable with respect to tax-exempt bonds issued by Hospital or any affiliate thereof, (c) result in the application of the anti-referral prohibitions in 42 U.S.C. Section 1395nn (the "Stark Law"), 42 U.S.C. Section 1320a 7b(b) (the "Anti-Kickback Statute"), or similar provisions of state law

6

to any referrals to Hospital or any affiliate thereof or (d) violate any other federal or state law or regulation applicable to Hospital, Group, or the services provided hereunder. The Services will be provided in compliance with the bylaws and governing documents of Hospital (the "Hospital Bylaws") and its Medical Staff, and to the extent applicable, the standards of the Joint Commission, the Colorado Department of Public Health and Environment, the United States Department of Health and Human Services and any other applicable accrediting, regulating or licensing agencies or boards.

Section 2.08. Interpersonal Skills. Group, Physicians, and NPPs are expected to conduct activities in a manner that supports the mission and values of the Hospital and enables the delivery of quality and efficient patient care. Group, Physicians and NPPs shall act in a courteous and respectful manner toward all medical staff members and all Hospital staff and, furthermore, shall comply with all policies designed to prevent and eliminate disruptive physician conduct. Further, Group's, Physicians' and NPPs' conduct during the term of this Agreement shall at all times be ethical and conducive to effective patient care and the efficient management of the Hospital, and shall reflect positively upon the reputation of the Hospital among its staff, patients and the Community. Group agrees to comply with and cause Physicians and NPPs to comply with Hospital's integrity and citizenship policies.

Section 2.09. No Limit/Reduction of Care. In providing services hereunder, Group, Physicians and NPPs certify that they shall always place the patient's best interests first, and shall not take any action, collectively or individually, designed or intended to limit, reduce or withhold care from patients, including Medicare or Medicaid beneficiaries.

Section 2.10. Quality Improvement/Risk Management. Group will actively pursue quality improvements in Group's areas of responsibility under this Agreement and assist with and actively participate in Hospital risk management program, activities, and initiatives, quality improvement programs, utilization management and patient safety activities as requested by Hospital. Group and its Physicians and NPPs will adopt and maintain a patient and customer service philosophy not inconsistent with Hospital's philosophy as advanced in its quality improvement plan, patient safety plan, and customer service training, as such are reasonably communicated to Group. Subject to the requirements of Group's liability carrier, Group and its Physicians and NPPs shall cooperate with the Hospital Risk Manager in responding to any potential or actual malpractice risks or patient complaints. Upon the request of Hospital, Group will write off patient charges as may be deemed necessary by Hospital in responding to a potential or actual malpractice risk, or patient complaint, provided that the requested action would not pose a risk of violating any applicable fraud and abuse laws or billing regulation, and subject to the requirements of Group's professional liability carrier.

Section 2.11. Hospital Authority. Notwithstanding anything herein to the contrary, Group recognizes that the Hospital Board shall at all times exercise control over the assets and operation of Hospital. By entering into this Agreement, Hospital does not delegate to Group any of the powers, duties and responsibilities required to be retained by the Hospital Board under law (including all certificates and licenses issued under authority of law for operation of the Hospital Services). Hospital shall be the holder of all licenses, accreditation certificates and contracts which such Hospital obtains and shall be the "provider" within the meaning of all third party contracts for the Hospital Services.

4841-0291-5869.1                                                                                          RAD-PSF-080415

**Section 2.12. Use of Premises**.  Group shall instruct Physicians and NPPs to use the Hospital's premises provided for use by Group hereunder solely for the Services.  No part of the premises shall be used at any time by Group for the general practice of medicine unless a separate agreement is reached by the parties to that effect providing for fair market value compensation to Hospital for space and services, if any, provided.

**Section 2.13. Use of Hospital Systems**.  In fulfilling Group's duties and responsibilities under this Agreement, Group shall exclusively utilize Hospital's information technology systems, and shall do so in the manner specified by Hospital.  Hospital's specifications will include, but may not be limited to, all requirements established by the government for meaningful use.  Any exceptions to this requirement to use Hospital's systems must be approved in writing by the Hospital Chief Information Officer ("CIO").  Group shall also receive written approval from the Hospital CIO before placing any patient data in a system that is not an approved, standard Hospital system.  Group shall comply with all Hospital and Centura policies relating to information technology systems, and cooperate with Hospital and Centura in the operation of such systems or the provision of access to data stored on such systems.  Failure to comply with this paragraph may result in immediate termination of this Agreement.

**Section 2.14. Community Outreach**.  Group agrees to cooperate at the reasonable request of Hospital and in a reasonable manner in familiarizing and educating members of the medical community with the Hospital Services.

**Section 2.15. Professional Clinical Judgment**.  Hospital acknowledges its requests of Group are based on Group's Physicians' professional expertise and clinical experience.  Hospital is not responsible for Group's Physicians' professional clinical judgment.

**ARTICLE III**
**STATUS OF CONTRACTOR/BENEFITS**

**Section 3.01. Status of Group**.  **IT IS EXPRESSLY ACKNOWLEDGED BY THE PARTIES HERETO THAT GROUP IS AN INDEPENDENT CONTRACTOR WITH RESPECT TO HOSPITAL AND NOTHING IN THIS AGREEMENT IS INTENDED NOR SHALL BE CONSTRUED TO CREATE BETWEEN HOSPITAL AND GROUP AN EMPLOYER/EMPLOYEE RELATIONSHIP, A JOINT VENTURE RELATIONSHIP, OR A LEASE OR LANDLORD/TENANT RELATIONSHIP, OR TO ALLOW HOSPITAL TO EXERCISE CONTROL OR DIRECTION OVER THE MANNER OR METHOD BY WHICH GROUP PROVIDES THE SERVICES THAT ARE THE SUBJECT MATTER OF THIS AGREEMENT, PROVIDED, ALWAYS, THAT THE SERVICES TO BE PROVIDED HEREUNDER BY GROUP SHALL BE PROVIDED IN A MANNER CONSISTENT WITH THE PROFESSIONAL STANDARDS GOVERNING SUCH SERVICES AND THE PROVISIONS OF THIS AGREEMENT. FOR PURPOSES OF COLORADO REVISED STATUTES § 8-40-202 AND 8-70-115, THE GROUP IS FREE FROM CONTROL AND DIRECTION IN THE PERFORMANCE OF THE SERVICE HEREUNDER AND IS CUSTOMARILY ENGAGED IN THE INDEPENDENT BUSINESS RELATED TO THE SERVICES PERFORMED. THE HOSPITAL DOES NOT REQUIRE THAT THE GROUP PERFORM SUCH SERVICES EXCLUSIVELY FOR THE HOSPITAL, HOSPITAL WILL NOT OVERSEE THE**

8

4841-0291-5869.1                                                                    RAD-PSF-080415

ACTUAL WORK OR INSTRUCT THE GROUP AS TO HOW THE WORK WILL BE PERFORMED.  HOSPITAL WILL NOT TERMINATE THE WORK OF THE GROUP DURING THE CONTRACT PERIOD UNLESS AS PROVIDED BY THE TERMS IN THIS AGREEMENT.  HOSPITAL WILL NOT PROVIDE MORE THAN MINIMAL TRAINING FOR THE GROUP.  HOSPITAL WILL NOT PROVIDE TOOLS OR BENEFITS TO THE GROUP OTHER THAN MATERIALS AND EQUIPMENT AS DESCRIBED IN THIS AGREEMENT. HOSPITAL WILL NOT DICTATE THE TIME OF PERFORMANCE OTHER THAN IN ACCORDANCE WITH A MUTUALLY AGREEABLE RANGE OF WORK HOURS, AS SET FORTH HEREIN.  HOSPITAL SHALL PAY GROUP BY MAKING CHECKS PAYABLE TO THE GROUP. HOSPITAL AND GROUP SHALL MAINTAIN THEIR SEPARATE BUSINESS OPERATIONS.  GROUP UNDERSTANDS AND AGREES THAT (a) HOSPITAL WILL NOT PAY OR WITHHOLD ON BEHALF OF GROUP ANY SUMS FOR INCOME TAX, UNEMPLOYMENT INSURANCE, SOCIAL SECURITY, OR ANY OTHER WITHHOLDING PURSUANT TO ANY LAW OR REQUIREMENT OF ANY GOVERNMENTAL BODY RELATING TO GROUP, AND (b) ALL OF SUCH PAYMENTS AND WITHHOLDINGS ARE THE SOLE RESPONSIBILITY OF GROUP. GROUP HEREBY AGREES TO PAY ANY AND ALL TAXES TO WHICH COMPENSATION HEREUNDER MAY BE SUBJECT.  GROUP FURTHER AGREES TO INDEMNIFY AND HOLD HOSPITAL HARMLESS FROM ANY LIABILITY RESULTING FROM GROUP'S FAILURE TO COMPLY WITH THE RESPONSIBILITIES CONTAINED IN THIS SECTION.  IN THE EVENT THE INTERNAL REVENUE SERVICE SHOULD QUESTION OR CHALLENGE THE INDEPENDENT CONTRACTOR STATUS OF GROUP WITH RESPECT TO HOSPITAL, THE PARTIES HERETO MUTUALLY AGREE THAT BOTH GROUP AND HOSPITAL SHALL HAVE THE RIGHT TO PARTICIPATE IN ANY DISCUSSION OR NEGOTIATION OCCURRING WITH THE INTERNAL REVENUE SERVICE, IRRESPECTIVE OF WHOM OR BY WHOM SUCH DISCUSSIONS OR NEGOTIATIONS ARE INITIATED.

**Section 3.02.  Ineligibility as Independent Group**.  Group, Physicians and NPPs shall not be eligible to participate in Hospital's benefits plans such as health, dental and disability insurance or any other benefits which Hospital in its sole discretion may offer to employees from time to time since Group is an independent contractor for all purposes stated herein and contemplated by the parties to this Agreement.

**ARTICLE IV**
**CONFIDENTIALITY; RESTRICTIVE COVENANT**

**Section 4.01.  Confidentiality**.  The Parties agree and acknowledge that as a result of the Services being provided by Group pursuant to this Agreement, Group will receive a significant amount of confidential and proprietary business information from Hospital including and related to its strategic planning for the Hospital Services.  In recognition of the unique role Group and its Physicians and NPPs will play with respect to the operation of the Hospital Services, Group agrees and shall cause the Physicians and NPPs to agree and covenant with Hospital that Group shall at all times maintain in strictest confidence all confidential, proprietary business or financial information of Hospital that is exchanged, shared with or otherwise disclosed to Group in the

9

discharge of the duties set forth in this Agreement and all work plans, quality initiatives, and other process improvement documents, schedules, or reports collectively or individually developed by the Parties for the purpose of implementing this Agreement ("Confidential Information"). Group further agrees and covenants that it will not disclose to any third parties any of the Confidential Information that it receives from Hospital for any reason whatsoever unless required by law or compelled by legal process. Upon termination of this Agreement, Group shall return to Hospital all Confidential Information in its possession, whether in written, electronic or other form. Group shall not be deemed to have breached the foregoing covenants with respect to disclosure of any Confidential Information if the Confidential Information is already generally available to the public through a source other than Group. Group agrees and shall cause its shareholders, employees and independent contractors having access to Confidential Information to agree that Confidential Information is owned by Hospital and no exchange of such Confidential Information by Hospital with Group or its shareholders, employees or independent contractors shall constitute a transfer of ownership. In addition to the confidentiality obligations under this Section, Group agrees and shall cause its shareholders, employees and independent contractors having access to such materials to agree that all work plans, quality initiatives, and other process improvement documents, schedules, or reports collectively or individually developed by the Parties for the purpose of implementing this Agreement comprise the intellectual property of Hospital ("Hospital Property"). Group and its shareholders, employees and independent contractors shall not use such Hospital Property in the performance of any service to a third party. Hospital hereby agrees that Group shall have the qualified right to disseminate Confidential Information to the Group's shareholders, employees and agents, and also the shareholders, shareholders, employees and agents of the Group's shareholders, as Group reasonably deems necessary in order to perform its duties hereunder, and provided that Group takes reasonable measures to cause the recipients to maintain the confidentiality of the Confidential Information.

**Section 4.02. Injunctive Relief.** Group agrees that the remedy at law for any breach of Section 4.01 shall be inadequate and Hospital may be entitled to injunctive relief without the necessity of proving irreparable harm, in addition to any other rights Hospital may have.

**Section 4.03. Restrictive Covenant.** During the term of this Agreement, including any renewal terms thereof, and for a period of twelve (12) months thereafter, neither Group nor any Physician shall, directly or indirectly, (a) own an interest in, or provide administrative services to, or (b) receive compensation for professional services including, but not limited to, direct patient care and call coverage services from a hospital or health system within El Paso County, Colorado that provides radiation oncology services and that is not an Affiliate of Hospital (a "Competing Hospital"). This restriction includes, without limitation, entering into any of the following types of arrangements or engaging in any of the following activities with a Competing Hospital: a management arrangement, clinical direction, medical direction, call coverage, hospital/physician strategic planning and a hospital/physician clinical joint venture. Notwithstanding the foregoing, this restriction shall not include any of the following: (i) physician professional services for which Group bills payers directly (i.e., does not reassign or cause its Physicians and NPPS to reassign billings to a Competing Hospital); and (ii) medical staff membership, or activities required of physicians generally for medical staff membership, at any hospital or health system; and (iii) a coverage arrangement approved in writing in advance by the Hospital. For purposes of this Section, an "Affiliate" shall mean with respect to Hospital

10

any entity that is managed or operated by Centura. In the event of a violation of this Section, Hospital shall be entitled to liquidated damages equal to One Hundred Fifty Thousand Dollars ($150,000) ("Liquidated Damages"), which the parties agree is reasonable, and, in addition, any damages resulting from such competition that Hospital can establish in excess of the Liquidated Damages.

**Section 4.04. Equitable Reform**. In the event that any of the restrictions in this Article is determined by a court of competent jurisdiction to exceed geographic or other limitations permitted by applicable law, then such restrictive covenant shall be reformed to the maximum geographic or other limitations held reasonable and enforceable by such court.

## ARTICLE V
## HOSPITAL'S RIGHTS AND RESPONSIBILITIES

**Section 5.01. Billing and Collection for Hospital Services**. Hospital shall have the sole authority and responsibility for billing, collecting and retaining the income for the facility services rendered to Hospital patients. Hospital shall be solely responsible for setting charges for technical services and use of equipment and supplies in connection with the provision of the Hospital Services. Such charges may be changed from time to time by Hospital in its sole discretion.

**Section 5.02. Space, Supplies, Services, Staff**. Hospital shall provide Group with such space, equipment, supplies, services and staff as Hospital shall determine in consultation with Group to be reasonably necessary for the performance of Group's obligations under this Agreement. In no event shall Group use such space, fixtures, staff and supplies for its own use, other than in providing the Services under this Agreement.

**Section 5.03. Communications and Intellectual Property**.

(a) Hospital shall have the right to review and approve all external communications regarding the Hospital Services, the Services or this Agreement, including press releases, oral or written interviews or statements to the press, community members and third party payors. Group shall not make use of the name of Hospital or its trademarks, except in the performance of duties under this Agreement, except with the express permission of the Hospital.

(b) Hospital shall own and hold exclusive copyright and license rights to any intellectual property including all written materials, policies, procedures, practice protocols, manuals, and written or electronic materials of any kind created, stored or published by Group on behalf of Hospital while performing the Services under this Agreement, provided, however, that all works of authorship and all developments made, conceived, created, discovered, invented or reduced to practice for Group's own purposes and using the Group's own resources and without using the intellectual property or other resources of Hospital are and shall remain the sole and absolute property of the Group.

**Section 5.04. Ownership of Medical Records**. Patients receiving services hereunder are patients of Hospital. All medical records of such patients shall be and remain the property of Hospital and shall be maintained in accordance with applicable state and federal laws and

11

regulations and in conformity with Hospital's bylaws, rules, regulations, policies and procedures. Group shall have full access to such medical records, including such records maintained in its electronic health record system, during and after the term of this Agreement as permitted by law.

### ARTICLE VI
### COMPENSATION

**Section 6.01. Professional Services.** The parties agree that Group shall not be compensated by Hospital for Professional Services.

**Section 6.02. Intentionally omitted.**

**Section 6.03. Billing of Professional Fees.** Except as otherwise provided herein, Group may directly bill patients or their third party insurers for the Professional Services provided by Group under this Agreement. For purposes of this Agreement, services shall constitute "professional services" to the extent that such services are personally furnished for an individual patient by a Physician or NPP pursuant to the terms of this Agreement, ordinarily require performance by a physician or NPP, and contribute directly to the diagnosis or treatment of an individual patient. Except as otherwise set forth herein, responsibility for billing and collection of professional fees and charges shall reside solely with Group and Group shall bear the risk of non-payment thereof. Such billings shall include both direct billings and billings to third party payors. Group shall not include in any bill or charge to patients or third parties any cost or overhead amount of Hospital. Group shall provide all of Group's own data processing, clerical, and administrative services that may be necessary for the billing of charges for the Professional Services furnished pursuant to the terms of this Agreement. Group agrees that Group's charges for the Professional Services rendered to patients hereunder shall conform at all times to reasonable, generally recognized standards in the applicable regional community for charges for comparable radiation oncology services.

**Section 6.04. Insurance Contracts.** Hospital and Group acknowledge that Hospital is and will become a party to a number of service agreements with insurance, PPOs, HMOs, and other third party payors, and that in order for the parties to work together harmoniously, it is necessary that Group have and maintain agreements with the identical PPOs, HMOs and other third party payors with whom Hospital has such agreements so that patient care is not interrupted nor jeopardized, and that neither the patient nor Hospital are penalized financially by virtue of Group not having similar agreements and arrangements. Group and Hospital each acknowledge there are numerous Third-Party Payors in the Hospital Service Area, but that a majority of Hospital patients may come from a Core Payor Practice (defined as 80%) of the non-governmental volume of the Hospital). As a condition this Agreement, Group shall participate and enter into an agreement with the Core Payor Practice as semiannually identified in writing by Hospital. Group shall use its best efforts to have termination dates with the Core Payor Practice consistent with the termination dates of the Hospital agreements. Upon notification of a change in the Core Payor Practice, Group shall use its best efforts to meet the obligations to contract with the newly identified Core Payor at prevailing market rates within 60 days from receipt of notification. Group and Hospital recognize the importance of working cooperatively to avoid confusion or untoward circumstances involving third-party contracting. Therefore, Hospital shall promptly notify the Group of third-party contracting circumstances that require

immediate attention. Thereafter, designated representatives from each party will diligently and promptly pursue appropriate resolution, but in no event more than 30 days from the date of notice. If after the 30-day resolution period Group is unable or fails to enter into agreements with the Core Payor Group, and if Hospital in its reasonable discretion determines that Group's failure to enter into such agreements will interrupt or jeopardize patient care, Hospital may: (a) contract with other physicians to provide Services, as reasonably needed to serve the health plan members of the Core Payor Practice with whom the Group failed to contract; and/or (b) terminate this Agreement by providing Group 30 days' written notice. Group agrees that it will separately negotiate and make a good faith attempt to enter into service agreements with the identical insurance, PPOs, and/or HMOs and other third party payors, with which Hospital has or is attempting such agreements. Such service agreements shall be at the then prevailing market rate as is being accepted by similar providers or paid by payors for similar agreements. Group further agrees to contract with or cooperate in contracting with medical groups or IPAs which are affiliated with Hospital for managed care contracting purposes to ensure appropriate and uninterrupted patient care. If Group is unable or fails to enter into service agreements or cooperate with medical groups or IPAs, as described above, and if Hospital, in its reasonable discretion, determines that Group's failure to cooperate or enter into a service agreement will interrupt or jeopardize patient care, Hospital will have the option to either: (i) contract with other physician(s) to provide Services; or (ii) terminate this Agreement by giving Group 30 days' written notice of termination. Hospital shall have the responsibility of notifying Group of the PPOs, HMOs and other third party payors with whom it is negotiating in order to permit Group to enter into negotiations with the PPOs, HMOs and third party payors for the provision of Services. Where appropriate, as reasonably determined by Hospital, Group will negotiate jointly with Hospital for some or all of the agreements described above.

## ARTICLE VII
## TERM OF AGREEMENT

**Section 7.01. Term**. The term of this Agreement shall be for a period of two years, commencing on the Effective Date. Each one-year period of this Agreement beginning on the Effective Date or on anniversary thereof shall be a "Contract Year." This Agreement may be extended for additional one-year terms after the initial two-year term, upon mutual written agreement of the parties, and each such renewal term shall be a "Contract Year."

**Section 7.02. Termination**.

(a) This Agreement may be terminated by either party without cause or penalty at any time by either party providing 180 days' advance written notice.

(b) This Agreement may be terminated under the circumstances described as permitting such termination in Sections 6.03, 7.06 and 8.05.

**Section 7.03. Termination by Group**. Group may terminate this Agreement for cause prior to the end of a term upon the occurrence of any one or more of the following:

(a) If Hospital shall default in the performance of any material covenant, agreement, term or provision of this Agreement, or if Hospital shall knowingly engage in

13

4841-0291-5869.1                                                                    RAD-PSF-080415

any fraudulent practice or willful misconduct, and such default shall continue for a period of 30 days after written notice to Hospital from Group stating the specific default (unless Hospital commences to diligently pursue correction if such default is of a nature that cannot be reasonably corrected within said 30-day period);

(b)     If the facilities necessary to provide the Services or any portion thereof shall be damaged or destroyed, or if any of the Hospital Services shall be rendered incapable of normal operation, by fire or other casualty, and if Hospital fails to commence repairing, restoring, rebuilding or replacing any such damage or destruction within 30 days after such fire or other casualty, or fails to complete such work within a reasonable period of time;

(c)     If Hospital shall apply for or consent to the appointment of a receiver, trustee or liquidator of Hospital or of all or a substantial part of its assets, file a voluntary petition in bankruptcy or admit in writing its inability to pay its debts as they come due, make a general assignment for the benefit of creditors, file a petition or an answer seeking reorganization or arrangement with creditors of Hospital, or file an involuntary petition under any state or federal reorganization, insolvency, arrangement, bankruptcy or other debtor relief provision, and such petition is not dismissed within 30 days;

(d)     If, through no fault of Group, any license necessary for the operation of the Hospital or any of its Hospital Services, or both, is at any time suspended, terminated or revoked; or

(e)     If Hospital shall fail to make payment to Group when such payment becomes due and payable hereunder and does not make such payment within 30 days after receiving written notice of such failure from Group (provided that such notice and cure period shall only be available once during any six-month period).

**Section 7.04. Termination by Hospital**.  Hospital may terminate this Agreement, for cause in the case of Section 7.04(a), (b), or (c), prior to the end of a term upon the occurrence of any one or more of the following:

(a)     If Group shall default in the performance of any material covenant, agreement, term or provision of this Agreement,  and such default shall continue for a period of 30 days after written notice to Group from Hospital stating the specific default (unless Group begins to diligently pursue correction if such default is of a nature that cannot be reasonably corrected within said 30-day period);

(b)     If Group shall knowingly engage in any fraudulent practice or willful misconduct;

(c)     If Group shall apply for or consent to the appointment of a receiver, trustee, or liquidator of Group or of all or a substantial part of its assets, file a voluntary petition in bankruptcy, admit in writing its inability to pay its debts as they come due, make general assignment for the benefit of creditors, file a petition or an answer seeking reorganization or arrangement with creditors of Group in an involuntary petition under

14

any state or federal reorganization, insolvency, arrangement, bankruptcy or other debtor relief provision, and such petition is not dismissed within 30 days;

(d) If the facilities necessary to provide the Services or any portion thereof shall be damaged or destroyed, or if any Hospital Services shall be rendered incapable of normal operation, by fire or other casualty, and if Hospital determines in good faith that repairing, restoring, rebuilding or replacing any such damage or destruction is not in the best interest of Hospital; or

(e) If any license necessary for the operation of the Hospital or any of its Hospital Services, or both, is at any time suspended, terminated or revoked.

**Section 7.05. Obligations Upon Termination.** In the event of any termination under the terms of this Agreement, Group shall cooperate with and assist Hospital in the orderly and efficient transfer of all services to a successor or successors, as requested, prior to the termination date.

Upon termination, Group shall surrender to Hospital all documents and records in its possession relating to the Services provided hereunder. Group shall not retain any copies of any such documents or records except such documents and records as shall be necessary to perform its obligations or to provide substantiation to taxing and regulatory authorities having jurisdiction over it. Under no circumstances shall Group provide copies of any records or documents relating to the Service to any third parties, nor shall Group or any Affiliate of Group use any records or documents relating to the Services or the Hospital Services, in the operation of any other facility without the prior written consent of Hospital.

Group shall also return to Hospital any equipment or other items owned by Hospital and in the possession of Group.

The parties agree that, in the event this Agreement is terminated for any reason during the first 12 months of the original term, they shall not enter into another arrangement for substantially the same items or services effective prior to the end of the first Contract Year unless to do so would not result in the applicability of restrictions on referrals contained in 42 U.S.C. § 1395nn.

Upon termination of this Agreement, neither party shall have any further obligations hereunder except for (a) obligations accruing prior to the date of termination and (b) obligations, promises, or covenants contained herein which are expressly made to extend beyond the term of this Agreement, including, without limitation, any indemnification and insurance obligations.

**Section 7.06. Jeopardy.** Notwithstanding anything herein to the contrary, in the event the performance by either party hereto of any term, covenant, condition or provision of this Agreement shall jeopardize the licensure of a Hospital or any other Centura-owned or operated entity, the participation of a Hospital or any other Centura-owned or operated entity or of Group in, or the payment or reimbursement from, the Medicare program, state sponsored Medicaid program, or other governmental reimbursement or payment programs, or the full accreditation by any state or nationally recognized accrediting organization of a Hospital or any other Centura-owned or operated entity, or the tax-exempt status of any Centura-owned or operated entity, any

15

of Hospital's property or financings (or the interest income thereon, as applicable) or the property or financing of any Centura-owned or operated entity, or if for any other reason said performance would be in violation of any statute or ordinance, or be otherwise deemed illegal, be deemed unethical by any recognized body, agency, or association in the medical fields with respect to either party, or result in the application of the Stark Law to any referrals to Hospital or any other Centura-owned or operated entity, the parties shall immediately upon notice by either party to the other initiate negotiations in good faith to resolve the matter through amendments to this Agreement. If the parties are unable to resolve the matter within 30 days thereafter, either party may, at its option, terminate this Agreement without cause effective on or after the date of notice.

## ARTICLE VIII
## COMPLIANCE

**Section 8.01. Compliance**. Group agrees to conduct its activities in accordance with all laws and regulations applicable to the services required hereunder. Group shall comply with Hospital's Corporate Compliance Program with respect to the provision of such services and participate in compliance training as directed by Hospital from time to time.

**Section 8.02. HIPAA Compliance**. Each Party agrees that it will comply in all material respects with all federal and state mandated statutes, regulations, rules or orders applicable to privacy, security and electronic transactions, including without limitation, regulations promulgated under Title 11 Subtitle F of the Health Insurance Portability and Accountability Act (Public Law 104-191) ("HIPAA") and statutory provisions contained in, and regulations promulgated under, Title XIII of the American Recovery and Reinvestment Act of 2009. Furthermore, the Parties shall promptly amend the Agreement to conform with any new or revised legislation, rules and regulations to which Hospital is subject now or in the future that relates to the privacy or security of health information (collectively, "Privacy and Security Laws") to ensure that Hospital is at all times in conformance with all Privacy and Security Laws. Group shall comply with the business associate agreement with Hospital attached hereto as **Exhibit E**.

**Section 8.03. Conflicts of Interest**. Group shall disclose to Hospital any situation that may result in a conflict between the interests of Group and/or its physician owners and Group's duties hereunder, including, without limitation, any ownership interest in, or compensation relationship with, a vendor or other entity with respect to which Group is advising Hospital by Group, any physician owner thereof, or any entity owned in whole or in part by Group physician owners.

**Section 8.04. Notices of Violations**. In the event Hospital or Group, as the case may be (the "Notified Party"), receives written notice of a violation, an alleged violation (or any findings relating thereto) (a "Violation Notice") of any law, rule, regulation, ordinance or other obligation imposed by any federal, local or other governmental or quasi-governmental regulatory authority, regarding Hospital, the operation of Hospital, the Hospital Services or Group's rights hereunder with respect to the Hospital Services, then (a) the Notified Party shall provide written notice to the other Party of the Violation Notice within five business days of such Notified Party's receipt of same; (b) Group shall take any and all actions reasonably necessary to correct the violation or

16

4841-0291-5869.1                                                                RAD-PSF-080415

alleged violation (and/or any findings of same) set forth in the Violation Notice; and (c) Group shall take any and all additional reasonable actions or steps necessary to attempt to prevent a recurrence of the events giving rise to such violation or alleged violation (or findings).  Group shall notify Hospital, in writing, when such corrective actions have been taken, and shall provide to Hospital the documentation received by Group (from the authority delivering such Violation Notice) evidencing that such corrective actions have been taken

**Section 8.05.  Exclusion From Medicare or Medicaid.**

(a)     Each Party hereby represents and warrants that such Party and, in the case of Group, each of its shareholders, agents, employees or contractors providing services hereunder is not and at no time has been excluded from participation in any federally funded health care program, including Medicare and Medicaid.  Each Party hereby agrees to immediately notify the other of any threatened, proposed or actual exclusion of such Party or, in the case of Group, any of its shareholders, agents, employees or contractors from any federally funded health care program, including Medicare and Medicaid.  In the event of any such exclusion from participation in any federally funded health care program during the term of this Agreement, or if at any time after the Commencement Date it is determined that a Party is in breach of the requirements contained in this Section, the other Party shall have the right to immediately terminate this Agreement as of the effective date of such exclusion or breach.  Notwithstanding the foregoing, the exclusion of a shareholder, employee, agent or contractor of Group will not give Hospital the right to terminate this Agreement if Group immediately removes the excluded shareholder, employee, agent or contractor from ownership in Group (if applicable), ensures that such person at no time thereafter provides any services under this Agreement, and continues to provide all of the required services hereunder in compliance with this Agreement.

(b)     Each Party shall indemnify and hold harmless the other Party against all actions, claims, demands and liabilities, and against all loss, damage, costs and expenses, including reasonable attorneys' fees, arising directly or indirectly, out of any violation of this Section by such Party, or due to the exclusion of such Party, or any of its shareholders, or employees from a federally funded health care program, including Medicare or Medicaid.

**Section 8.06.  Physician Compensation.**  Group represents and warrants that it shall not make any payments to physicians or immediate family members of a physician that vary with, or otherwise reflect, the volume of value of referrals or other business generated by the physician for Hospital or any affiliate thereof.

**ARTICLE IX**
**LIABILITIES AND INSURANCE**

**Section 9.01.  Responsibility for Claims.**

(a)     Hospital will be solely liable for any and all claims, costs and expenses (including reasonable attorneys' fees) arising from or out of any negligent act, reckless

17

act or omission of Hospital or of its agents or employees in the performance of its obligations under this Agreement.

(b)    Group will be solely liable for any and all claims, costs and expenses (including reasonable attorneys' fees) arising from or out of any negligent act, reckless act or omission of Group or of its agents, employees or contractors, including the Physicians and NPPs, in the performance of its obligations under this Agreement.

**Section 9.02.  Asserted Claims**.  Each party will notify the other of any assertion or claim arising out of its obligations under this Agreement made by a third party within 15 days of receiving notice of such assertion or claim.  To the extent allowable under the terms of each party's respective insurance policies, the parties will cooperate in the defense of any third party claim through joint representation by mutually acceptable counsel.  However, each party will have the right to take any and all actions that party believes necessary to protect its legal interests.

**Section 9.03.  Insurance**.  To the extent a provision in this Article IX would cause otherwise available insurance coverage to be unavailable, this Article IX will not apply.

**Section 9.04.  Group Insurance**.  Group shall, at its sole cost and expense, procure, keep and maintain throughout the term of this Agreement, insurance coverage in the minimum amounts of: $1,000,000 per occurrence and $3,000,000 annual aggregate for commercial general liability.  Throughout the term of this Agreement, Group shall maintain professional liability insurance for itself and its physicians and non-physician practitioners with limits of not less than $1,000,000 per claim and $3,000,000 in the aggregate, workers' compensation insurance and other mandatory statutory insurance relating to its employees.  Upon termination of this Agreement, Group shall continue the insurance coverage in the amounts stated above, with a non-advancing retroactive date or purchase tail coverage for professional malpractice alleged to have occurred during the term of this Agreement, as applicable.  Group shall give Hospital evidence of the foregoing insurance before rendering services hereunder and on an annual basis thereafter.  Group shall immediately notify Hospital, in writing, of any termination, cancellation or reduction of such coverage or any failure to renew such coverage during the term of this Agreement.

**Section 9.05.  Hospital Insurance**.  Hospital shall, at its sole cost and expense, procure, keep and maintain throughout the term of this Agreement, insurance coverage in the minimum amounts of $1,000,000 per occurrence and $3,000,000 annual aggregate for professional liability and $1,000,000 per occurrence and $2,000,000 annual aggregate for commercial general liability.  Hospital shall also maintain in full force and effect all required workers' compensation mandated by the State of Colorado, as applicable.  Hospital may meet its obligations under this Section 9.05 through self-insurance or a captive insurance company.

4841-0291-5869.1    RAD-PSF-080415

**ARTICLE X**
**MISCELLANEOUS**

**Section 10.01. Representations and Warranties of the Parties.** Each party represents and warrants to the other parties hereto that:

(a)  Such party is duly organized, validly existing and in good standing under the laws of the State of Colorado with qualification to do business in the State of Colorado.

(b)  Such party is authorized to enter into this Agreement by all necessary and proper action, and this Agreement has been duly and validly executed and delivered by such party and is a legal, valid and binding agreement of such party, enforceable against it in accordance with its terms.

(c)  Neither the execution and delivery of this Agreement by such party nor the performance of its obligations hereunder will (i) constitute a breach or a default under (A) its organizational documents, (B) any applicable law, or any applicable rule, judgment, order, writ, injunction or decree of any court, (C) any applicable rule or regulation of any administrative agency or other governmental authority or (D) any agreement, indenture, instrument or contract to which it is now a party or by which it is bound; (ii) result in a default (or give rise to any right of termination, cancellation or acceleration) under any of the terms, conditions or provisions of any note, bond, mortgage, indenture, agreement, lease or other instrument or obligation to which it is a party or by which it is bound, except for such defaults (or rights of termination, cancellation or acceleration) as to which requisite waivers or consents have been obtained; or (iii) violate any order, writ, injunction or decree applicable to it or any of its assets, excluding from the foregoing clauses (i) and (ii) such defaults, rights and violations which, in the aggregate, would not have a material adverse effect on its business, operations or financial condition.

(d)  Such party is not required to submit any notice, report or other filings or registration with any governmental or regulatory authority in connection with the execution, delivery or performance of this Agreement or to obtain any waiver, consent, approval or authorization by or from any governmental or regulatory authority in such connection.

**Section 10.02. Dispute Resolution Procedure.** If a dispute arises relating to this Agreement and cannot be resolved through informal negotiation between the parties, then the parties will first proceed in good faith to submit the matter to mediation. Either party may request mediation by notifying the other party in writing of its desire to submit the matter to mediation. Within 10 business days following notice of intent to proceed to mediation, the parties shall jointly select, appoint and arrange to meet with an impartial person who can mediate and facilitate the parties toward a resolution using an informal and confidential process. The mediator cannot impose binding decisions on the parties. The parties must agree to the terms of any settlement arising out of the mediation process in order for such agreement to become binding. The parties will share equally in the cost of such mediation, regardless of the outcome

19

of the process. The mediation, unless otherwise agreed, shall terminate if the parties have not been able to resolve the dispute within 30 calendar days from the date when mediation meetings began. Upon such termination, either party may pursue any and all remedies available at law or at equity.

**Section 10.03. Notices**. All notices required or permitted hereunder shall be given in writing by hand delivery, by express delivery, or by registered or certified U.S. mail, postage prepaid, as follows:

|                |                                                                                                      |
|----------------|------------------------------------------------------------------------------------------------------|
| If to Hospital: | Centura Health-Penrose-St. Francis Health Services<br>2222 N. Nevada Avenue<br>Colorado Springs, CO  80907 |
| With a copy to: | General Counsel<br>Centura Health Corporation<br>188 Inverness Drive West, Suite 500<br>Englewood, CO  80112 |
| If to Group:   | Radiation Oncology, P.C.<br>2222 N. Nevada Avenue<br>Colorado Springs, CO  80907<br>Attention: _____ |

or to such other address or to such other person as may be designated by notice given from time to time during the term hereof by one party to the other. Any notice hereunder shall be deemed given upon delivery or refusal of delivery, or if given by mail, two business days after depositing with the U.S. Postal Service in the manner described above.

**Section 10.04. Assignment**. Group shall not have the right to assign its rights or delegate its duties hereunder to any party unless it first obtains the written consent of Hospital, which Hospital may grant or deny in Hospital' sole and absolute discretion.

**Section 10.05. Successors and Assigns**. This Agreement and the rights, privileges, duties and obligations of the parties hereunder, to the extent assignable or delegable, shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assignees.

**Section 10.06. Amendments**. This Agreement may be amended at any time by mutual agreement of the parties without additional consideration, provided that before any amendment shall become effective, it shall be reduced to writing and signed by each of the parties.

**Section 10.07. Governing Law**. This Agreement shall be governed by and construed in accordance with the laws of the State of Colorado applicable to agreements made and to be performed wholly within that state, irrespective of such state's choice-of-law principles.

**Section 10.08. Integration**. This Agreement, along with its recitals and Exhibits, which are hereby incorporated by reference, constitutes the entire agreement between the parties with respect to its subject matter. This Agreement supersedes all previous agreements between or

20

among the parties with respect to its subject matter. There are no agreements, representations or warranties between or among the parties other than those set forth in this Agreement or the documents and agreements referred to in this Agreement.

**Section 10.09. Severability**. Subject to Section 7.06, if any term of this Agreement shall to any extent be invalid and unenforceable, the remainder of this Agreement shall not be affected thereby, and each term of this Agreement shall be enforced to the extent permitted by law.

**Section 10.10. Waiver**. All waivers of rights, powers and remedies by a party to this Agreement must be in writing. No delay, omission or failure by a party to exercise any right, power or remedy to which a party may be entitled shall impair any such right, power or remedy, nor shall such be construed as a release by a party of such right, power or remedy or as a waiver of or acquiescence in any such action, unless such action shall have been cured in accordance with the terms of this Agreement. A waiver by a party of any right, power or remedy in any one instance shall not constitute a waiver of the same or any other right, power or remedy in any other instance.

**Section 10.11. Medicare Access to Books and Records**. If and to the extent required by Section 1395x(v)(1)(I) of Title 42 of the United States Code, until the expiration of four years after the termination of this Agreement, each party shall make available, upon written request by the Secretary of the Department of Health and Human Services, or upon request by the Comptroller General of the United States General Accounting Office, or any of their duly authorized representatives, a copy of this Agreement and such books, documents and records as are necessary to certify the nature and extent of the costs of the services provided by such party under this Agreement. Each party further agrees that in the event such party carries out any of its duties under this Agreement through a subcontract with a related organization with a value or cost of $10,000 or more over a 12-month period, such subcontract shall contain a provision requiring the related organization to make available until the expiration of four years after the furnishing of such services pursuant to such subcontract upon written request to the Secretary of the United States Department of Health and Human Services, or upon request to the Comptroller General of the United States General Accounting Office, or any of their duly authorized representatives, a copy of such subcontract and such books, documents and records of such organization as are necessary to verify the nature and extent of such costs.

**Section 10.12. No Third Party Rights**. This Agreement has been made and is made solely for the benefit of the parties hereto and their respective successors and permitted assigns. Nothing in this Agreement is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties to it and their respective successors and permitted assigns. Nothing in this Agreement is intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement.

**Section 10.13. Headings**. The subject headings of the sections and paragraphs of this Agreement are included for purposes of convenience only and shall not affect the construction or interpretation of any of its provisions. Throughout this Agreement, the singular shall include the plural, the plural shall include the singular, and the masculine and neuter shall include the feminine, wherever the context so requires.

4841-0291-5869.1                                                                                    RAD-PSF-080415

**Section 10.14.  Electronic Disposition of Document (Scanning and Photocopies)**.  The parties hereto agree and stipulate that the original of this document, including the signature page, may be scanned and stored in a computer database or similar device, and that any printout or other output readable by sight, the reproduction of which is shown to accurately reproduce the original of this document, may be used for any purpose just as if it were the original, including proof of the content of the original writing.

**Section 10.15.  Master List**.  **Exhibit B** lists other agreements, if any, for items and services between the parties or between Hospital or other Centura-managed hospitals and any Physician employed by or who has an ownership interest in Group or any immediate family member (i.e., a spouse; a natural or adoptive parent, child or sibling; a stepparent, stepchild, stepbrother or stepsister; a father-in-law, mother-in-law, son-in-law, daughter-in-law, brother-in-law or sister-in-law; a grandparent or grandchild; a spouse of a grandparent or grandchild) of any such Physician.  These agreements are cross-referenced for purposes of 42 U.S.C. Section 1395nn.  The parties shall update **Exhibit B** as necessary to keep it current.  **Exhibit B** is the Attestation, signed by Group.  Centura Health, on behalf of Hospital, maintains a master list of contracts that is updated centrally and available for review by the Secretary of the Department of Health and Human Services upon request.  The master list is maintained in a manner that preserves the historical records of contracts.  The master list of contracts references all separate agreements between Hospital and Group, or between Hospital and any physician owners of Group or their immediate family members (as defined in 42 C.F.R. § 411.351), in a manner that is intended to conform to the requirements of 42 C.F.R. § 411.357(d)(ii).

**Section 10.16.  Religious Directives**.  In performing Services pursuant to this Agreement, Group and the Physicians and NPPs shall at all times abide by the Ethical and Religious Directives for Catholic Health Care Services, as promulgated by the United States Conference of Catholic Bishops, in the performance of their duties pursuant to this Agreement.

Remainder of page intentionally left blank; signatures on next page

22

4841-0291-5869.1

RAD-PSF-080415

IN WITNESS WHEREOF, each of the parties hereto has duly executed this Agreement as of the day and year set forth below.

**CATHOLIC HEALTH INITIATIVES COLORADO dba CENTURA HEALTH-PENROSE-ST. FRANCIS HEALTH SERVICES**

_____

Margaret D. Sabin
Chief Executive Officer
Date: _____ 6/19/17 _____

**RADIATION ONCOLOGY, P.C.**

_____

Name: _____
Title: _____
Date: _____ 5/15/17 _____

**CENTURA HEALTH CORPORATION**
_Approved As To Form_:
Sarah Radunsky
Associate General Counsel

23

A-1

## EXHIBIT A

## APPROVED PHYSICIANS AND NPPS

:

**Physicians**:
Anuj Peddada, M.D.
Alan Monroe, M.D.

**NPPs**:
none

A-1

RAD-PSF-080415

## EXHIBIT B

## AGREEMENTS/ATTESTATION

Group hereby certifies:

1.      The list of the agreements below is a complete list of all agreements entered into between Group or Physicians (or immediate family members of Physicians) and any Centura hospital to provide services to that Centura hospital.

2.      Group will notify Hospital and/or Centura should Group or any Physician (or immediate family members of a Physician) enter into another such agreement.

Signature _____

Title _____

Printed Name _A. PEDDTOT_

Date _6/15/17_

*Alan Monroe*

**Agreements with Centura hospitals:**

Name of Agreement        Date(s)

_CK Colorado Springs — Present_

B-1

RAD-PSF-080415

 Centura Health.

## ADDENDUM NO. 1 TO
## EXCLUSIVE PROFESSIONAL SERVICES AGREEMENT
## FOR
## RADIATION ONCOLOGY SERVICES

**THIS ADDENDUM NO. 1 TO EXCLUSIVE PROFESSIONAL SERVICES AGREEMENT FOR RADIATION ONCOLOGY SERVICES** ("*Addendum*") is effective as of the later of the parties' dates of signature below ("*Effective Date*"), by and between Catholic Health Initiatives Colorado, a Colorado nonprofit corporation, doing business as **Centura Health-Penrose-St. Francis Health Services**("*Hospital*") and **Radiation Oncology, P.C.** ("*Group*").

### RECITALS

Hospital is managed and operated by Centura Health, a Colorado nonprofit corporation.

Hospital and Group previously entered into an Exclusive Professional Services Agreement for Radiation Oncology Services dated June 19, 2017 (the "*Agreement*"). The Agreement expired June 18, 2019 and the parties have continued to operate under the terms and conditions of the Agreement from the date of expiration through the Effective Date of this Addendum.

The parties desire to make modifications and amendments to the Agreement as further set forth herein.

All terms appearing in this Addendum in initial capital letters shall be defined terms carrying the meaning and definition as set forth in the Agreement.

**NOW, THEREFORE**, in consideration of the above-recited premises, the Agreement and mutual covenants and conditions set forth therein, the parties agree as follows:

**1.** The parties have agreed to extend the term of the Agreement two (2) years from the Effective Date.

**2.** Section 4.05 shall be inserted in the Agreement:

**Privacy and Data Security.** Group shall comply with all applicable privacy and data security laws and regulations including but not limited to the requirements of the Colorado Consumer Protection Act (Colorado Revised Statute 6-1-101 et. seq.) by taking appropriate steps to protect the Personal Information ("*PI*") and Personal Identifying Information ("*PII*"), as defined in the statute, from unauthorized access, acquisition, use, modification, disclosure or destruction. Group shall notify Centura of a suspected Security Incident, including any attempted or actual unauthorized acquisition of unencrypted computerized data that compromises security, confidentiality, or integrity of PII ("*Security Incident*") within five business days and cooperate with Centura to investigate the suspected Security Incident. Centura has sole discretion to determine whether a Security Incident reported by Group is a Security Breach ("*Security Breach*"), as defined in the applicable statute. In the case of a Security Breach, and upon Centura's written request, Group shall provide notice to affected Colorado Residents consistent with Centura requirements. Group, its agents, employees, or subcontractors, shall be liable, at its expense, for any and all

1

RAD-PSF-111419

 Centura Health.

claims, costs, and expenses, arising from and out of the acts or omissions of Group, its agents, employees, or subcontractors in the performance of its obligations under this Section. At Centura's written request, Group will defend Centura and its members, subsidiaries, affiliates, directors, trustees, officers, employees, agents and independent contractors, from and against any and all loss, cost, liability or expense (including costs and reasonable fees of attorneys and other professionals) arising out of or in connection with a Security Incident or Breach, including without limitation costs associated with the notification of individuals, media, and credit monitoring that are a result of such Security Incident or Breach.

3.      **Exhibit B** of the Agreement shall be replaced with the attached **Exhibit B**.

4.      All terms and conditions of the Agreement not amended, replaced or modified hereby shall remain in full force and effect as set forth in the Agreement. Accordingly, the terms of this Addendum shall control in the event of any conflict between the terms of this Addendum and the terms of the Agreement.

5.      This Addendum may be executed in counterparts which, when combined, shall constitute the entire Addendum among the parties.

*Signature Page to Follow*

2

RAD-PSF-111419

 Centura Health®

**IN WITNESS WHEREOF**, the parties have executed this Addendum on the day and year indicated below.

**CATHOLIC HEALTH INITIATIVES COLORADO dba CENTURA HEALTH- PENROSE-ST. FRANCIS HEALTH SERVICES**

Brian Erling, M.D.
Chief Executive Officer
Date: 5/28/2020

**RADIATION ONCOLOGY, P.C.**

Anuj Peddada (Jun 2, 2020 16:20 MDT)

Name: Anuj Peddada
Title: M.D.
Date: Jun 2, 2020

3

RAD-PSF-111419

 Centura Health®

## EXHIBIT B

## GROUP ATTESTATION

Group hereby certifies:

1.      The list of the agreements below is a complete list of all agreements entered into between Group or Physicians (or immediate family members of Physicians) and any Centura hospital to provide services to that Centura hospital.

2.      Group will notify Hospital and/or Centura should Group or any Physician (or immediate family members of a Physician) enter into another such agreement.

Signature: _____

Title: _____

Printed Name: _____

Date: _____

| Agreements with Centura hospitals: | |
|---|---|
| **Name of Agreement** | **Date(s)** |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

B-1

RAD-PSF-111419



## PHYSICIAN EMPLOYMENT AGREEMENT

**THIS PHYSICIAN EMPLOYMENT AGREEMENT** ("*Agreement*") is effective July 1, 2022 ("*Effective Date*"), by and between Catholic Health Initiatives Colorado, a Colorado nonprofit corporation doing business as **Centura Health- Penrose- St. Francis Health Services** ("*Hospital*"), and **Anuj Peddada, M.D.** ("*Physician*").

## RECITALS

Hospital is a 501(c)(3) tax-exempt organization and operated and managed by Centura Health Corporation, a Colorado nonprofit corporation ("*Centura*").

In furtherance of Hospital's charitable purposes and its operations, Hospital and Physician desire Physician to render medical services in the usual and customary manner of a physician in the practice of medicine ("*Services*") in the community served by Hospital ("*Community*") via an employment relationship.

Physician is board certified or board eligible in radiation oncology.

Whereas, Physician executed a Physician Employment Agreement dated on April 11, 2022. The Parties agree that the April 11, 2022, agreement is void.

**NOW, THEREFORE**, in consideration of the mutual promises and covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE 1
## TERM AND OBLIGATIONS OF PHYSICIAN

**1.1**    **Term**. This Agreement shall commence on the Effective Date and shall continue until terminated, as set forth herein ("*Term*").

**1.2**    **Employment Status**.  Physician shall provide Services as an employee and shall render such Services in such manner and at such times and locations as are reasonably determined by Hospital. Physician shall commence work on a date on or after the Effective Date that is mutually agreed upon between the parties ("*Start Date*").

**1.3**    **Professional Standards**.  As a condition precedent to any Hospital obligation to employ Physician, Physician shall, at least sixty (60) days prior to Start Date:

**1.3.1**   Obtain an unrestricted license to practice medicine in Colorado;

**1.3.2**   Obtain an unrestricted Drug Enforcement Administration ("*DEA*") registration;

**1.3.3**   Be board certified (or within a post-residency board-eligibility period) in Physician's specialty, by a board acceptable to Hospital;

**1.3.4**   Complete, to Hospital's satisfaction, any pre-employment screenings required by Hospital; and

ATTACHMENT 2



**1.3.5**   Be a member of the medical staff of Hospital ("***Medical Staff***") and obtain other clinical privileges at Hospital determined by Hospital.

**1.4**     **Medical Records**.  Physician shall complete appropriate medical record entries concerning all Services performed by Physician, in compliance with Hospital and Centura policies.  If Physician fails to do so, Hospital shall have the right to withhold compensation otherwise due Physician in accordance with Centura policy.

**1.5**     **Administrative Activities**.  Physician shall, as directed by Hospital, perform activities such as research, teaching, medical administrative duties, supervision of allied health care professionals, education of members of the Hospital's Medical Staff, personnel evaluation, business office oversight, vendor evaluation, equipment evaluation and other similar activities.

**1.6**     **Professional Fees**.  All revenue from all professional activities of the Physician pursuant to this Agreement shall belong solely to Hospital and is to be paid to Hospital.  Any such revenue received by Physician shall be promptly delivered or paid to Hospital without deduction.   Physician shall not directly bill and hereby irrevocably appoints Hospital as Physician's sole agent for billing and collection of fees for Services delivered hereunder and authorizes Hospital, or its agent, to take all action and execute all documents reasonably required for the collection of such revenue.  Hospital shall fix professional fee schedules.

Physician further agrees to participate in the ARRA Incentive Program for Meaningful Use of a Physician Practice Electronic Health Record or any similar program ("***EHR Program***").  In recognition that Hospital has expended substantial funding for development of the EHR Program and is entitled to receive physician incentive payments to offset costs incurred, Physician and Hospital agree that this Section 1.6 providing for assignment by Physician to Hospital for all payments received for Services performed by Physician shall include assignment of incentive payments received in connection with use of the EHR Program.  Notwithstanding the forgoing, Physician may retain incentive payments received by Physician after the Start Date and associated with Physician's use of an electronic health record prior to the Start Date.  In the event such incentive payments are received by Physician after the Start Date and are associated with an attestation period that begins before the Start Date and continues after the Start Date, Physician shall turn over all such incentive payments to Hospital and Hospital shall determine and pay to Physician the pro-rata portion of such incentive payments payable to Physician and associated with Physician's use of an electronic health record prior to the Start Date.  In the event Physician is required to refund to the Centers for Medicare and Medicaid Services ("***CMS***") any incentive payments received by Physician and associated with Physician's use of an electronic health record prior to the Start Date, all such refund payments shall be the sole responsibility of Physician, and Hospital shall not be responsible for making any such refund payments to CMS.

**1.7**     **No Right to Contract**.  Physician is not authorized to enter into any contract for or on behalf of Hospital without Hospital's specific and prior written consent, and Physician shall not: (i) represent to any third party that Physician is authorized to enter into any contract on Hospital's behalf; (ii) execute any contract; or (iii) attempt to bind Hospital to any obligation.

**1.8**     **Compliance with Policies, Laws and Accreditation Standards**.  During the Term, Physician shall comply with (i) state and federal laws and regulations; (ii) local ordinances, including , laws and regulations under the Medicare and Medicaid programs, and those related to with the Health Insurance Portability and Accountability Act of 1996; (iii) applicable standards, rules and regulations of the Hospital's Medicare professional review

2



organization, the Hospital's Medicare Administrative Contractor, third-party payors, The Joint Commission, and all other entities that exercise authority to regulate, administer, accredit, reimburse or otherwise set standards for the Hospital; and (iv) Centura, Hospital and Medical Staff policies and procedures.

**1.9　Participation in Managed Care and Insurance Plans**.  At least sixty (60) days prior to the Start Date, Physician agrees to provide Hospital with all information to complete payor credentialing requirements  before the Start Date.  If Physician fails to provide such information , Hospital may immediately terminate this Agreement.  If Hospital chooses not to terminate this Agreement, Hospital shall have no obligation to pay any compensation to Physician until Physician is fully credentialed with payors.

**1.10　Ethical and Religious Values of Centura Health Sponsors**.

**1.10.1**　When providing services related to Catholic Health Initiatives Colorado, Physician shall not provide any services or perform any procedures that are in violation of the *Ethical and Religious Directives for Catholic Health Care Services*, as promulgated by the United States Conference of Catholic Bishops, as amended from time to time and as interpreted by the local bishop.

**1.10.2**　When providing services related to PorterCare Adventist Health System, Physician shall not provide any services or perform any procedures that are in violation of the values and beliefs of the Seventh-day Adventist Church, outlined in *Advent Health System Mission and Management of an AHS Hospital*, as amended from time to time.

## ARTICLE 2
## COMPENSATION

**2.1　Compensation.**  Hospital will pay Physician compensation consistent with the applicable terms and provisions set forth in: (i) the Centura Compensation Plan; and (ii) pay summaries, job descriptions, or other applicable documents, as amended from time to time in Hospital's sole discretion.

**2.2　Loan.** The parties acknowledge Physician has signed a Promissory Note in the amount of $129,939.75, pursuant to which Physician agrees to make payments of $2,165.66 every two weeks until the Promissory Note is paid in full. Hospital agrees that, provided Physician remains employed by Hospital on a payment date under the Promissory Note, Hospital will forgive the payment due on such date.

## ARTICLE 3
## INSURANCE

**3.1**　Hospital shall obtain and maintain for Physician a claims-made policy of malpractice insurance covering professional actions or omissions by Physician and those under Physician's direction pursuant to and during the term of this Agreement, through self-insurance arrangements or through insurance companies licensed to do business in Colorado, with coverage in minimum amounts of One Million Dollars ($1,000,000.00) per claim and Three Million Dollars ($3,000,000.00) in the aggregate, or the minimum required by regulatory authorities, whichever is greater.  Hospital shall cover the cost of any tail coverage incurred, or arrange appropriate tail coverage, for Physician should Hospital or Physician terminate this Agreement without cause, or Physician terminate this Agreement for cause.

3



Except as otherwise provided in this Agreement, in the event Hospital terminates this Agreement for cause, Physician shall be responsible for the cost of obtaining professional liability tail insurance coverage.  If Physician fails to purchase appropriate tail coverage, Hospital may purchase such coverage on behalf of Physician and withhold from amounts due Physician hereunder the amount necessary to cover the cost of the tail insurance policy.  Upon termination of this Agreement due to Physician's death, permanent disability, or retirement from the practice of medicine, Hospital shall cover the cost of tail coverage.

**3.2**     Physician shall deliver promptly to Hospital, upon receipt, a copy of any notice of claim against Physician involving Physician's liability insurance or any adverse action, change or modification to the terms and conditions of Physician's insurance coverage.

**3.3**     Physician shall cooperate in filling out applications or other documents required to obtain the tail or other coverage, and Physician agrees to cooperate with Hospital in the defense of any such claim made against Physician or any claim made against Hospital.

**3.4**     If Hospital authorizes Physician to engage in professional or other services outside the scope of Physician's employment under this Agreement, Physician shall, at Physician's own cost and expense, purchase or otherwise acquire professional liability insurance coverage from a company acceptable to Hospital to cover the services outside the scope of Physician's employment, and shall provide Hospital with a Certificate of Insurance and the declaration page of such policy or policies evidencing such coverage.

**ARTICLE 4**
**TERMINATION**

**4.1**     **Termination Without Cause**.  Either party may terminate this Agreement for any reason or no reason upon providing the other party with at least ninety (90) days' prior written notice.  There shall be no duty or obligation to provide a reason for exercising this right.

>    **4.1.1**   During the period following such notice, and until the termination date, Physician shall continue to provide such Services and duties as Hospital may direct, and cooperate with efforts to reassign patients to other physician employees of Hospital.

>    **4.1.2**   Hospital may, in its sole discretion, terminate Physician's employment with less than ninety (90) days' notice and pay Physician in lieu of such notice a prorated amount equal to the wRVU or salary guarantee base compensation Physician earned during the prior ninety (90) days for providing Professional Services.  This payment in lieu of notice is contingent upon Physician's completion of any charting, recordkeeping or other clinical documentation to the satisfaction of Hospital.  Such termination shall be without liability except for any obligations that specifically survive termination of this Agreement and except for payments of compensation due Physician from Hospital or money due Hospital from Physician.

**4.2**     **Immediate Termination by Hospital for Cause**.  This Agreement may be terminated by Hospital, immediately, without liability if:

>    **4.2.1**   Physician is convicted (whether final or on appeal) of, or enters a plea of guilty or nolo contendere to, or becomes a party to a deferred prosecution agreement for, (i) a felony; or (ii) any crime involving moral turpitude, dishonesty, fraud, or unethical professional conduct.

4



**4.2.2**  Physician has a physical or mental disability that prevents Physician from performing the essential functions of the position, as determined by Hospital.  For example, Physician has unpredictable, unreliable, and erratic attendance; is a danger to self or others; is unable to provide a definitive return to work date after using a leave or leaves; has been on a leave for up to approximately one hundred eighty (180) consecutive days; fails to cooperate in the accommodation process; is ineligible for leave or additional leave under Hospital policy applicable to physicians and laws such as the Family Medical Leave Act and the Americans with Disabilities Act. Notwithstanding any other provision to the contrary, should the Hospital terminate the Agreement under this Section 4.2.2, then Hospital (and not Physician) shall be responsible for the costs of tail coverage.

**4.2.3**  Revocation, cancellation, restriction or suspension of Physician's DEA registration or license to practice medicine in any state, which, in the judgment of Hospital, prevents Physician from performing Services.

**4.2.4**  Termination, restriction, or suspension of Physician's Medical Staff membership and/or clinical privileges at any hospital.

**4.2.5**  If at any time, Hospital cannot obtain professional liability insurance coverage for Physician.

**4.2.6**  Physician is found by Hospital or Centura to have been dishonest, committed material acts of misconduct, violated any law or regulation or violated Hospital, Medical Staff, or Centura policy or procedure.

**4.2.7**  Physician is excluded from participation in any governmentally funded health care program including, but not limited to, Medicare, Medicaid, and TRICARE.

**4.3**     **Termination For Cause After Notice**.  This Agreement may be terminated by either party without liability to the terminating party resulting from such termination if either party commits any breach of the Agreement that has not been cured to non-breaching party's reasonable satisfaction following thirty (30) days' written notice, or that constitutes a breach of a type that the breaching party has already committed at least twice before, whether or not cured.  If such breach cannot be remedied within a thirty (30) day period, upon mutual agreement of the parties, the breaching party may have such additional time reasonably necessary to cure the breach and so long as the breaching party shall have commenced and shall thereafter proceed diligently to remedy the breach.

**4.4**     **Effect of Termination For Cause**. If Hospital terminates Physician's employment pursuant to Section 4.2 or 4.3, Physician's Medical Staff membership and clinical privileges at any Centura hospital will be terminated.  If Physician's Medical Staff membership and clinical privileges are terminated pursuant to this Section, Physician hereby waives any rights Physician may have to any hearing or appeal procedures prior to termination pursuant to the Medical Staff Bylaws, rules and regulations, or by operation of law.  Nothing in this Section prevents Physician from reapplying for Medical Staff membership and clinical privileges as a non-employed physician.

**4.5**     **Physician Payment of Money Owed to Hospital**.  In the event Physician owes Hospital any amount at any time, including as of the date of termination, Physician authorizes Centura and/or Hospital to withhold the maximum amount permitted by law, from the payment of any and all moneys otherwise due to Physician, whether in the form of wages, reimbursable expenses, bonuses, or any other payments otherwise due to Physician.  If these

5



withholdings are not sufficient to satisfy any obligation of Physician to Hospital in full, then the entire remaining balance shall become immediately due and payable with interest at the rate of five percent (5%) per year without notice to Physician or demand.  Physician shall pay all of Centura's and/or Hospital's attorney fees, legal expenses and costs associated with the collection of amounts due to Hospital from Physician.  This Section shall apply to any moneys owed by Physician to Hospital under this Agreement or otherwise.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES

**5.1** **Physician Not in Breach of Restrictive Covenants**.  Physician represents and warrants that, as of the Effective Date of this Agreement, Physician is not subject to or bound by any non-competition or other restrictive covenant that would prevent Physician from entering into this Agreement or that would interfere with Physician's performance of Services.

**5.2** **Fraud and Abuse**.  Physician and Hospital hereby represent to one another that they have not engaged in any and will not in the future engage in any activities that are prohibited by:

**5.2.1** Federal statutes relating to governmental health care programs;

**5.2.2** Any activities that would result in the creation of a financial relationship that would result in prohibition of referrals to Hospital or a related entity under 42 U.S.C. § 1395nn, or related state statutes or the regulations promulgated thereunder;

**5.2.3** Similar activities with respect to any third-party payors, including, but not limited to, knowingly making or causing to be made a false statement, representation or omission of a material fact: (i) in any application for a benefit or payment; (ii) for use in determining rights to any benefit or payment; or

**5.2.4** Knowingly soliciting or receiving, directly or indirectly, any compensation, in cash or in kind or offering to pay any compensation to a third person in exchange for (i) referring an individual to a person for the furnishing of any item or service for which payment may be made in whole or in part by a governmental health care program or (ii) either recommending or purchasing, leasing, ordering or arranging for any services or item for which payment may be made in whole or in part by a governmental health care program.

**5.3** **Applications**.  Physician and Hospital mutually represent and warrant that all material facts provided to and relied upon by the parties regarding employment with Hospital and Physician's application for clinical privileges are complete, correct, true and not misleading, and the parties will notify the other of any change in circumstances that may render any of such facts untrue or misleading.

**5.4** **Notification**.  Physician shall promptly notify Hospital of any investigation or formal administrative action by state or federal agencies affecting Physician and/or when any other facts or circumstances occur which could reasonably be expected to result in a change to, modification, suspension or revocation of Physician's license, DEA registration, medical staff membership or medical staff privileges at any hospital or any other facility at which Physician has such membership and/or privileges.

6



**5.5** **Exclusion**.  Physician and Hospital each represent and warrant that they are not, and at no time have been, excluded from participation in any federally funded health care program, including Medicare and Medicaid.  Physician and Hospital each agree to immediately inform the other of any threatened, proposed or actual exclusion from any federally funded health care program, including Medicare and Medicaid.  In the event that either party is excluded from participation in any federally funded health care program during the Term of this Agreement, or if any time after the Effective Date it is determined that either party is in breach of this Section, this Agreement shall, as of the date of such exclusion or breach, automatically terminate.  Each party shall indemnify, defend and hold harmless the other against all actions, claims, demands and liabilities, and against all loss, damage, costs and expenses, including reasonable attorneys' fees, arising directly or indirectly out of any violation this Section by the indemnifying party, or due to the exclusion of the indemnifying party from a federally funded health care program, including Medicare and Medicaid.

**ARTICLE 6**
**CONFIDENTIALITY AND NONDISCLOSURE**

**6.1** **Proprietary Information**. Physician acknowledges that while performing Services Physician will come into possession of information relating to patient lists, referral sources, business plans, systems, financial data, trade secrets and other proprietary information of a material nature which is confidential to Hospital.  Physician shall keep such information confidential and not disclose it to any other person or entity without Hospital's prior written permission.

**6.2** **Confidentiality of Medical Records**.  All records relating to any patient of Hospital treated by Physician, whether classified as medical records, therapists' notes, business records or otherwise shall be confidential and shall be the sole property of Hospital.  Physician agrees not to remove such records upon the termination of his/her employment without the written consent of Hospital; provided, however, Physician shall be provided on a timely basis a full and complete copy of such patient records upon appropriate patient authorization or as required by law.  For all records so duplicated, Hospital reserves the right of full and complete access in any event of litigation or administrative proceedings arising after termination of Physician's employment.

**6.3** **Confidential Agreement**. The provisions of this Agreement shall be confidential in nature and neither party shall divulge any of the provisions of this Agreement to any third parties, except as necessary for Hospital and Centura business, or as may be required by law.

**6.4** **Work for Hire**. All works of authorship and all developments made, conceived, created, discovered, invented or reduced to practice in the performance of work performed hereunder for Hospital or at the direction of Hospital are and shall remain the sole and absolute property of Hospital.

**ARTICLE 7**
**PRACTICE IN THE COMMUNITY**

**7.1** **Providing Services Outside of Hospital**.  Physician agrees that, during the term of  this Agreement, Physician will not engage in the practice of medicine in competition with Hospital or Centura in an inpatient or outpatient setting, as an employee of a hospital or medical practice, or own or operate a medical practice or clinic or any other type of medical facility, directly or indirectly, whether as a stockholder, partner, investor (other than in a publicly held corporation in which Physician is not an officer, director or employee), sole

7



proprietor or practitioner, agent, employee, advisor or consultant.  Notwithstanding the foregoing, Physician may engage in activities such as presenting continuing medical education programs, providing consulting services, accepting speaking engagements, and retaining all income therefrom so long as Physician notifies Centura of such activities in advance, and so long as Centura and Hospital consent to such activities in advance and determine that Physician's participation in such activities: (i) does not negatively affect Physician's performance of services under this Agreement, including scheduling of such services; (ii) does not involve activities with a Competitor of Hospital, as defined below, or to Hospital's competitive disadvantage; (iii) does not violate Hospital's policies and standards, including standards and policies with regard to conflicts of interest and relationships with vendors and other third parties; and (iv) does not involve activities otherwise harmful to Hospital's charitable mission.  Except as provided for in this Section, Physician shall turn over to Hospital all revenues generated by Physician's professional activities, including fees, honoraria, and all other forms of professional compensation whatsoever, all of which shall belong exclusively to Hospital.

**7.2    Financial Interests Adverse to Hospital**. Hospital and Physician acknowledge and agree that Physician's financial interests in facilities competitive with Hospital may run contrary to Hospital's commitment to the Community.  Physician will fill a crucial professional role, providing oversight and supervision of those who provide medical services under his or her direction.  In addition, Physician will serve as professional staff, providing medical and strategic feedback and insight, to executive and management personnel.  Physician acknowledges that Physician will receive and use trade secrets and confidential information as set forth in Section 6 above.  Physician also acknowledges that Hospital will suffer damages, including but not limited to damages related to termination and competition, in the event that this Agreement terminates and Physician violates this Section. Accordingly, during the entire term of the Agreement and for one (1) year following termination of this Agreement (including expiration or the end of any continuation of employment with Hospital without a signed agreement, whichever is later), Physician will not, without Hospital's prior written consent (which it may grant, withhold, or condition in its sole discretion), directly or indirectly (including ownership by direct family members) have any financial interest in any hospital, surgery center, imaging center, outpatient therapy center, medical office, clinic or other facility that is competitive with any activity engaged in by Hospital, within a ten (10) -mile radius of Hospital or any Centura location at which Physician provided services during the term of this Agreement (collectively, "**Competitor(s)**").  For purposes of this Agreement, a "financial interest" includes, but is not limited to, any direct or indirect financial interest with a Competitor, whether as an employee, independent contractor, agent, joint venture partner, security holder (except for ownership of securities traded (i) on a recognized stock exchange in which quotations are published daily; or (ii) under an automated interdealer quotation system operated by the National Association of Securities Dealers), creditor, landlord or otherwise. Notwithstanding the foregoing, following the termination of this Agreement, Physician may own his/her private medical practice without violating this Section 7.

**7.3    Remedies for Violation**.  Hospital may enforce this Section 7 by any or all of the following methods, which are cumulative:

**7.3.1**  Hospital may seek specific performance or injunctive relief requiring Physician to abide by the requirements of this Section 7.  Physician acknowledges that a violation of the requirements of this Section 7 would produce substantial harm and injury to Hospital and that the amount of such damages may not be readily measurable in monetary terms.

8



**7.3.2**  Physician shall be responsible to compensate Hospital and/or Centura for damages related to violation of this Section, including past or future damages caused by Physician's termination or by competition, based on the following elements (to the extent not duplicative):

**7.3.2.1**  Lost profits and revenue;

**7.3.2.2**  Harm to goodwill;

**7.3.2.3**  Overhead expenses that Physician would have covered, including, continuing, fixed or semi-fixed and variable overhead expenses attributable directly or indirectly to Physician, including but not limited to expenses due to the unused capacity of the support staff and facilities caused by Physician's departure;

**7.3.2.4**  Expenses, lost time and lost revenue seeking and recruiting a replacement for Physician;

**7.3.2.5**  Time and expense required to secure and train a replacement physician regarding the business and operations;

**7.3.2.6**  Cost of locum tenens physicians or other coverage-related expenses that result from Physician's departure;

**7.3.2.7**  Hospital's cost of transferring patient records;

**7.3.2.8**  Hospital's costs and expense of enforcing the terms of this Section including but not limited to Hospital's attorneys' fees, experts and consultants' fees, court, court reporter, copying and related costs and expenses; and

**7.3.2.9**  In case of early termination, reimbursement of recruitment fees incurred recruiting Physician. Early termination is defined as termination prior to completing 24 months at Hospital under this Agreement.

**7.3.3**  The parties hereto agree and stipulate that Physician shall pay Hospital liquidated damages in an amount equal to 120 percent of the 37.5 percentile of the annual salary rate for Physician's specialty, as set forth in Centura's then-current physician compensation rates, and that such liquidated damages reasonably relate to the injury to be suffered as a result of the termination of this Agreement and/or Physician's violation of the requirements of Section 7 of this Agreement, including but not limited to, damages related to competition.  The parties further agree that this liquidated damages amount is reasonable, and that neither party shall challenge the reasonableness of such amount.  The parties hereto agree that this damages provision is not a penalty. If this liquidated damages provision, or amount, is deemed to be unenforceable by a court of law, for any reason, Hospital shall be entitled to recover actual damages as outlined above.

9



**ARTICLE 8**
**GENERAL COVENANTS AND CONDITIONS**

**8.1    Applicable Law**.  All questions concerning the validity or construction of this Agreement shall be determined in accordance with the laws of Colorado without regard to its conflicts of law principles.

**8.2    Assignment**.  This Agreement shall be assignable without Physician's consent by Hospital to any entity that controls, is controlled by, or is under common control with Hospital.  The rights of Physician hereunder are personal and shall not be assigned or transferred.

**8.3    Partial Invalidity**.  If any provision of this Agreement is held by a court to be invalid, void or unenforceable, the remaining provisions shall continue in full force and effect.

**8.4    Waiver of Breach**.  The waiver by a party of the breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach by either party.

**8.5    Third-Party Beneficiaries**.  The parties mutually intend  this Agreement is personal  for their exclusive benefit and that no unaffiliated individual or entity shall be a third-party beneficiary of this Agreement.

**8.6    Entire Agreement and Amendments**.  This Agreement embodies the entire agreement and understanding of the parties with regard to the matters herein addressed and, when fully executed, shall supersede any and all prior and existing agreements, either oral or in writing.  There are no promises, terms, conditions or obligations other than those contained herein.  This Agreement may be amended only by mutual written agreement of the parties. Notwithstanding the foregoing, the parties expressly agree that if Physician's prior employment agreement with Hospital includes any obligation by Physician to repay money to Hospital, such obligation shall survive the termination of such prior employment agreement.

**8.7    Release of Information**.  Physician hereby authorizes and consents to the release by Hospital of information concerning Physician's qualifications for staff appointment, membership, privileges, reappointment and any communication with respect to Physician including the credentials and qualifications and any disciplinary action, suspension or curtailment of Physician's privileges if contracts with any health maintenance organization or other third-party payor so require.  Physician releases the party providing such information, Centura, and Hospital from liability of every nature and kind arising out of the furnishing of such information.

**8.8    Notices**.  All notices required by the provisions of this Agreement must be in writing and must be served on the other party personally or by sending a letter properly addressed by certified mail, postage prepaid, or delivered by overnight delivery service with written proof of delivery to such party's last known address.  Notices delivered personally shall be deemed received upon actual receipt.  Mailed notices shall be deemed received three days after mailing.

**8.9    Electronic Disposition of Document (Scanning and Photocopies)**.  The parties hereto agree and stipulate that the original of this document, including the signature page, may be scanned and stored in a computer database or similar device, and that any printout or other output readable by sight, the reproduction of which is shown to accurately

10

*CO Standard Rev. 8/21*                                                                    PED-PSF-CHPG-012522



reproduce the original of this document, may be used for any purpose just as if it were the original, including proof of the content of the original writing.

*Signature Page To Follow*

11



IN WITNESS WHEREOF, the parties have executed this Agreement on the dates set forth below.

**CENTURA HEALTH CORPORATION**              **PHYSICIAN**

_____        _____

Jason M. Tacha                                           Anuj Peddada, M.D.
Interim President and Chief Executive Officer   Date:
Centura Health Physician Group
Date:

12



## Employment Agreement Summary

### General Background Information

| | |
|---|---|
| **Name:** Peddada, Anuj MD | **EAS Form Version #:** 1 |
| **Specialty:** Radiation Oncology | **Initial EAS Form Effective Date:** 7/1/2022 |
| **Hospital:** PSF  **Clinic Cost Center:** 565623 | **Version Effective Date:** 7/1/2022 |
| **Clinic Name:** PSF RADIATION ONCOLOGY | **Faculty Compensation Plan:** Yes: ◯  No: ◉ |

*Complete Section (C), skip Section (T)*

### (C) Clinical Position Summary

**Primary Clinical Role:**

Specialty: Radiation Oncology          Hard-to-Fill Premium (if applicable): -
FTE Status: 1.000
Model Type:

**Introductory Salary (*if applicable*) :**

Salary Amount: $ 531,918          Begins on Start Date
HTF Amount: -

**APP Oversight:**

Yes: ◯    No: ◉

### (A) Administrative Position Summary (CHPG Only)

Title: None          ... of          N/A
Admin FTE: -

### (T) Faculty Position Summary — Not Applicable

### (S) Special and Strategic Pay Summary

**Excess Call Summary:**

1. Facility: PSF     Specialty: No Call     Call Shift:
   First Call or Excess Call Paid:          Other Detail:

**Non-CHPG Administrative Position:**

Facility: PSF          Title: None
Admin FTE: -          Detail:

**Other Special Pay:**

| Other Category | Short Description |
|---|---|
| Starting Bonus | One-time payment of $40,000 due at first payroll following Start Date |

**Immigration Fee/Expense Payment:**     Yes: ◯     No: ◉

| Additional Comments: | **Physician will be eligible for productivity incentive of $56.16 for each WRVU produced in excess of 9,471 annually.** |
|---|---|

# Physician Compensation Plan

Centura Health Physician Group

Effective July 1, 2021

*We extend the healing ministry of Christ by caring for those who are ill and by nurturing the health of the people in our communities.*

centura.



# I.    Introduction

## A.    Rationale for Change

In an effort to develop a compensation plan that supports a high-performing physician enterprise, Centura Health Physician Group (CHPG) leadership has been exploring alternative compensation models that would position the organization for success as it pursues the goals outlined in its 2025 strategic plan.

Key reasons for pursuing the change included the following:

- To increase equitability and consistency while accommodating market realities across specialties and geographic regions the group operates in
- A desire to reward and recognize both clinical and nonclinical provider contributions
- Recognition that the delivery and financing of healthcare services are rapidly shifting toward alternative models that seek to accelerate the Triple Aim
- Improving the patient experience of care (including quality and satisfaction)
- Improving the health of populations
- Reducing the per capita cost of healthcare

## B.    Planning Approach

A physician-led compensation planning committee composed of clinical and administrative advisers was formed to review current physician compensation dynamics at CHPG and make recommendations regarding key aspects of a new plan. As part of the planning process, the committee engaged an independent third party, ECG, to provide subject matter expertise as well as project management support. A variety of established CHPG stakeholders and support services (e.g., Human Resources, Finance, Legal, Operations) were consulted regularly throughout the planning process to ensure maximum diligence and success. After the careful consideration of several different plan options, the compensation planning committee, CHPG Board, Centura Collaborative, and Centura Health Board of Directors have endorsed the new physician compensation plan described in this document (hereafter referred to as the "Compensation Plan").

## C.    Document Purpose

The purpose of this document is to summarize the key components of the Compensation Plan. Any terms and conditions in the employment agreement that conflict with those in this Compensation Plan will prevail.

This Compensation Plan applies to all employed CHPG physicians (MDs and DOs) working within a practice setting and certain hospital-based physicians for whom a specified service line compensation model is incorporated into this Compensation Plan.

1

The Compensation Plan is effective May 1, 2020. The Compensation Plan does not supersede any written Centura Health policies, and all physician employment agreements must be approved in accordance with Centura Health's established physician contracting policies. Any exceptions to the Compensation Plan will require approval through the standards established by the CHPG compensation and finance committees.

## D.  Guiding Principles and Objectives

At the onset of the planning process, the compensation planning committee developed a set of foundational principles and goals for the Compensation Plan. The guiding principles are shown in Figure 1, and the goals and principles are described in Table 1.



**Figure 1: Guiding Principles**



**Table 1: Guiding Principles and Goals**

| Guiding Principle | Goals |
|---|---|
| Provide market-competitive compensation levels. | Attract and retain valued providers. |
| Align compensation with organizational and strategic priorities (shared accountability). | • Achieve economically sustainable aggregate compensation levels.<br>• Incentivize individual, departmental, and/or organizational performance.<br>• Incorporate a model for value-based care and recognize nonclinical contributions.<br>• Prepare the organization to pursue innovative strategies included in healthcare reform. |
| Retain appropriate flexibility. | • Accommodate major departmental or regional differences.<br>• Fulfill strategic needs. |
| Be transparent and relatively simple. | • Improve enterprise-wide understanding of the Compensation Plan.<br>• Build organizational trust.<br>• Maintain a strong culture and provider loyalty.<br>• Facilitate plan administration. |
| Ensure compliance with FMV standards and regulatory guidance. | Align compensation levels with market benchmark sources. |

3



# II.    Clinical Compensation Models

## A. Introductory Salary

An introductory salary is typically provided for physicians new to market and who are developing their practices. It will be provided for a limited time, generally not to exceed two years. The introductory salary amount will account for physician experience, roles and responsibilities, ability to affect own clinical productivity, and market and mission. It will be based on physicians' clinical FTE status only and will not take into consideration medical director or administrative services provided to the organization. Physicians may choose to transition permanently onto one of the main compensation models described in the following sections before the introductory salary term period has elapsed. This change can occur during either the mid-year or end of year reconciliation period. This applies to physicians employed with Centura Health effective 1/1/20.

Physicians who have been employed with Centura Health effective prior to 1/1/20 and who are still on initial guarantee terms remain eligible for productivity compensation once the calculated production earnings exceed the guarantee amount.

## B. Overview of Model Types

Table 2 presents an overview of Primary Care, High-Volume (High-Risk), Low-Volume (Low-Risk) and Capacity Models. These do not apply to physicians on an introductory salary or the Faculty Compensation Model.

Table 2: Overview of Model Types

| Model Type | Specialty Type[1] |
|---|---|
| Primary Care Model | Single model for all primary care physicians |
| High-Volume (High-Risk) Model | Assigned to medical or surgical specialties in Denver and Colorado Springs |
| Low-Volume (Low-Risk) Model | Assigned to medical or surgical specialties outside Denver and Colorado Springs |
| Capacity Model[2] | Designed for coverage specialties that have little control over volume, including: Critical care, Hospice/palliative care, Hospitalist, Neurohospitalist, Radiology–neuro-interventional, Transplant surgery Urgent care |

---

[1]    For details on exceptions and specialty mapping, refer to appendices C and D.

[2]    Variations of the capacity model exist to meet the needs of the unique groups.

4



## C. Primary Care Model

This model uses a tiered productivity structure that aligns physician compensation with productivity measured by personally performed work relative value unit (WRVU) production. Compensation is calculated based on a physician's personally performed WRVUs multiplied by a compensation value, or a conversion factor, per WRVU. Productivity thresholds are prorated based on clinical FTE.

This model uses a tiered approach with 2 production thresholds. Within each tier, a different conversion factor is used to calculate the productivity compensation. Once physicians achieve WRVU Threshold 1, all tier one WRVUs are compensated at 100% of the conversion factor. Table 3 outlines the WRVU thresholds and conversion factor rates by tier, and Figure 2 presents an overview of the primary care compensation model.

**Table 3: Primary Care Productivity Tiers**

| Tier | WRVU Threshold | Conversion Factor |
|------|----------------|-------------------|
| Tier One | Below Threshold 1 | 93% of conversion factor |
| Tier Two | Between Threshold 1 & 2 | 100% of conversion factor |
| Tier Three | Above Threshold 2 | 105% of conversion factor |

**Figure 2: Primary Care Model Clinical Framework**





## D. High-Volume (High-Risk) Model

This model uses a tiered productivity structure that aligns physician compensation with productivity measured by WRVU production. Compensation is calculated based on a physician's personally performed WRVUs multiplied by a compensation value, or a conversion factor, per WRVU. Productivity thresholds are prorated based on clinical FTE.

This model uses a tiered approach with 2 production thresholds. Within each tier, a different conversion factor is used to calculate the productivity compensation. Once physicians achieve WRVU Threshold 1 productivity, all tier one WRVUs are compensated at 100% of the conversion factor. Table 4 outlines the WRVU thresholds and benchmark rates by tier, and Figure 3 presents an overview of the high-volume (high-risk) compensation model.

### Table 4: High Volume Productivity Tiers

| Tier | WRVU Threshold | Conversion Factor |
|---|---|---|
| Tier One | Below Threshold 1 | 90% of conversion factor |
| Tier Two | Between Threshold 1 & 2 | 100% of conversion factor |
| Tier Three | Above Threshold 2 | 103% of conversion factor |

### Figure 3: High Volume Model Clinical Framework





## E.  Low-Volume (Low-Risk) Model

This model uses a combined base and productivity compensation structure in order to provide a fixed level of income protection for medical and surgical specialists practicing in relatively lower volume markets.

**Base Compensation**: Physicians receive 90% of the specialty-specific base compensation. Base compensation levels are adjusted based on the physician's actual clinical FTE.

**Productivity Compensation**: Once a physician achieves the WRVU production threshold, they are compensated at 100% base compensation. For each WRVU a physician generates above the WRVU threshold, they are compensated at 60% of the conversion factor per WRVU. Productivity thresholds are prorated based on clinical FTE. Figure 4 presents a graphical overview of the low-volume (low-risk) compensation model.

**Figure 4: Low Volume Model Clinical Framework**





## F.   Capacity Model

### 1.   Capacity Model (Traditional)

This model uses a combined base and productivity compensation structure in order to provide a fixed level of income protection for capacity or coverage-based specialties, with a productivity incentive above median WRVU production levels.

**Base Compensation:** Physicians receive 100% of the specialty-specific base compensation. Base compensation levels are adjusted based on the physician's actual clinical FTE. Table 5 outlines the percentage of base compensation by specialty.

Table 5: Base Compensation Percentage of Base Compensation per FTE

| Specialty | Percentage of Base |
|---|---|
| Radiology–Neuro-Interventional | 100% |
| Surgery–Transplant | 100% |
| Hospice/Palliative Care | 100% |

**Productivity Compensation:** Once a physician achieves the WRVU production threshold, they are compensated at 20% of the conversion factor per WRVU. Productivity thresholds are prorated based on clinical FTE. Figure 5 provides a graphical overview of the traditional capacity model.

Figure 5: Capacity Model (Traditional) Clinical Framework



8



## 2. Capacity Model (Modified): Hospitalists

This model uses a combined base and productivity compensation structure that provides a fixed level of income protection for hospitalists with a productivity incentive for WRVU production above a pre-determined threshold.

**Base Shift Obligation:** A primary day coverage 1.0 clinical FTE is expected to work 180 12-hour shifts per year, or 2,160 hours per year. A primary nocturnist 1.0 clinical FTE is expected to work 144 12-hour shifts per year, or 1,728 hours per year. A night shift is any shift ending between 10pm and 8am. Shift obligations will be reconciled quarterly. A day coverage 1.0 clinical FTE is expected to complete 45 shifts per quarter, and a nocturnist 1.0 FTE is expected to complete 36 shifts per quarter. Additional shifts completed in one quarter do not carry over to subsequent quarters.

**Base Compensation:** The base compensation for a 1.0 clinical FTE will be 90% of the specialty-specific base compensation that includes the $20,000 value compensation. The effective day shift rate for a 1.0 FTE day coverage physician completing only day shifts is determined by dividing the base compensation amount by the base shift obligation for a day coverage physician. The effective night shift rate for a 1.0 FTE nocturnist completing only night shifts is determined by dividing the base compensation amount by the nocturnist base shift obligation.

**Productivity Compensation:** Once the Tier One WRVU productivity threshold is reached, physicians are eligible for a bonus equaling 10% of the base compensation per FTE. Both the Tier One WRVU threshold and the bonus amount are adjusted for actual clinical FTEs. For all WRVUs generated between the Tier Two and Tier Three WRVU productivity thresholds, physicians will be compensated a conversion factor equaling 75% of the 50th percentile compensation per WRVU rate. For all WRVUs generated above the Tier Three WRVU productivity threshold, physicians will be compensated a conversion factor equaling 22.5% of the 50th percentile compensation per WRVU rate. The Tier Two and Three threshold will be adjusted only for actual clinical FTE for full time physicians. The WRVU thresholds for primary nocturnist physicians will be reduced by 20%. Table 6 below outlines the WRVU thresholds and compensation rates.

### Table 6: Hospitalist Production Compensation

| Tier | WRVU Threshold | Compensation Rate |
|------|----------------|-------------------|
| Tier One | 50th Percentile | Bonus equaling 10% of 50th percentile compensation per FTE, prorated for clinical FTE |
| Tier Two | 60th Percentile | 75% of 50th percentile compensation per WRVU |
| Tier Three | 80th Percentile | 22.5 % of the 50th percentile compensation per WRVU |

9



**Additional Shifts Compensation:** Additional shifts will be compensated at $1,455 per day shift and $1820 per night shift.

**APP Back-Up Call**: Physicians will be compensated $100 per night for APP back-up call with an additional $120 per hour for day shift hours worked and $145 per hour for night shift hours worked.

Figure 6 provides a graphical overview of the day coverage hospitalist capacity model assuming a 1.0 clinical FTE.

**Figure 6: Capacity Model (Modified), Hospitalist Clinical Framework**



10



### 3.   Capacity Model (Modified): Critical Care–Intensivist (Level I)

This model uses a combined base and productivity compensation structure that provides a fixed level of income protection for critical care-intensivists with a productivity incentive for WRVU production above a pre-determined threshold.

**Base Shift Obligation:** A 1.0 clinical FTE is expected to work 156 12-hour shifts per year, or 1,872 hours per year. Shifts obligations will be reconciled quarterly. Additional shifts completed in one quarter do not carry over to subsequent quarters.

**Base Compensation**: The base compensation for a 1.0 clinical FTE will be 90% of the specialty-specific base compensation that includes the $20,000 value compensation. The effective shift rate is determined by dividing the base compensation by the base shift obligation.

**Productivity Compensation**: Once the Tier One WRVU productivity threshold is reached, physicians are eligible for a bonus equaling 10% of the base compensation prorated for clinical FTE. Physicians will also receive compensation per WRVU for productivity generated above the Tier Two WRVU productivity threshold. Productivity thresholds are prorated based on clinical FTE.

Table 7 outlines the WRVU thresholds and compensation rates.

**Table 7: Critical Care-Intensivist (Level I) Productivity Incentive**

| Tier | WRVU Threshold | Compensation Rate |
|---|---|---|
| Tier One | Minimum Threshold | Bonus equaling 10% base compensation per FTE, prorated for clinical FTE |
| Tier Two | Incentive Threshold | 60% of the conversion factor per WRVU |
| Tier Three | Maximum Threshold | 20% of the conversion factor per WRVU |

**Additional Shifts Compensation:**  Additional shifts will be compensated at $2,338 for an additional full shift and $1,169 for an additional half shift. There will be an hourly night shift differential of $54/hour. A night shift is one scheduled to be worked between 7pm and 7am.

11



**Figure 7: Capacity Model (Modified), Critical Care-Intensivist (Level 1) Clinical Framework**



## 4.  Capacity Model (Modified): Critical Care–Intensivist (Level II)

This model uses a combined base and productivity compensation structure that provides a fixed level of income protection for critical care-intensivists with a productivity incentive for WRVU production above a pre-determined threshold.

**Base Shift Obligation:** A 1.0 clinical FTE is expected to work 91 24-hour shifts per year, or 2,184 hours per year. Shifts obligations will be reconciled quarterly. Additional shifts completed in one quarter do not carry over to subsequent quarters.

**Base Compensation**: The base compensation for a 1.0 clinical FTE will be 90% of the specialty-specific base compensation that includes the $20,000 value compensation. The effective shift rate is determined by dividing the base compensation by the base shift obligation.

**Productivity Compensation**: Once the Tier One WRVU productivity threshold is reached, physicians are eligible for a bonus equaling 10% of the base compensation prorated for clinical FTE. Physicians will also receive compensation per WRVU for productivity generated above the Tier Two WRVU productivity threshold. Productivity thresholds are prorated based on clinical FTE.

Table 8 outlines the WRVU thresholds and compensation rates.



Table 8: Critical Care-Intensivist (Level II) Productivity Incentive

| Tier | WRVU Threshold | Compensation Rate |
|------|----------------|-------------------|
| Tier One | 50th Percentile | Bonus equaling 10% of 50th percentile compensation per FTE, prorated for clinical FTE |
| Tier Two | 60th Percentile | 60% of 50th percentile compensation per WRVU |
| Tier Three | 80th Percentile | 20% of 50th percentile compensation per WRVU |

**Additional Shifts Compensation:** Additional shifts will be compensated at $4,007 for an additional full shift and $2,003.50 for an additional half shift.

Figure 8: Capacity Model (Modified), Critical-Intensivist (Level II) Clinical Framework



## 5. Capacity Model (Modified): Neurohospitalist

This model uses a combined base and productivity compensation structure that provides a fixed level of income protection for neurohospitalists with a productivity incentive for WRVU production above a pre-determined threshold.

**Base Shift Obligation:** A 1.0 clinical FTE is expected to cover 168 24-hour shifts per year. Each shift consists of an average of 12 restricted on-site hours and 12 unrestricted call hours. Shifts obligations will be reconciled quarterly. A 1.0 clinical FTE is expected to complete 42 shifts per quarter. Additional shifts completed in one quarter do not carry over to subsequent quarters.

**Base Compensation:** The base compensation for a 1.0 clinical FTE will be $322,392 including the $20,000 value compensation. For a 1.0 FTE, this equates to $1,919 per shift.

13



**Productivity Compensation:** Physicians are compensated $50 per WRVU for any WRVUs above the production threshold. Productivity thresholds are prorated based on clinical FTE.

**Additional Shifts Compensation:** Additional shifts will be compensated at $1,919 per shift.

**Figure 9** provides a graphical overview of the neurohospitalist capacity model.

**Figure 9: Capacity Model (Modified), Neurohospitalist Clinical Framework**



## 6.   Capacity Model (Modified): OB/GYN: Laborist

A 1.0 clinical FTE is expected to complete 96 24-hour shifts per year. Shifts obligations will be reconciled quarterly. A 1.0 clinical FTE is expected to complete 24 shifts per quarter. Additional shifts completed in one quarter do not carry over to subsequent quarters.

Physicians will be compensated $3,600 per shift and will not be eligible for any productivity compensation.

## 7.   Capacity Model (Modified): Orthopedic Surgery - Trauma

This model uses a combined base and productivity compensation structure in order to provide a fixed level of income protection with a productivity incentive above median WRVU production levels. This model will be applied to physicians in this specialty whose ability to control their productivity is limited by market factors or practice dynamics.

14



**Base Compensation:** Physicians receive 90% of the specialty-specific base compensation. Base compensation levels are adjusted based on the physician's actual clinical FTE.

**Productivity Compensation**: Once Threshold 1 is reached, physicians are eligible for a bonus equaling 10% of the base compensation prorated for clinical FTE. Physicians will also receive compensation per WRVU for productivity generated above the Threshold 2. Productivity thresholds are prorated based on clinical FTE.

Table 9 outlines the WRVU thresholds and compensation rates.
Figure **10** provides a graphical overview of the Capacity Model (Modified): Orthopedic Surgery – Trauma.

**Table 9: Orthopedic Surgery - Trauma Productivity Compensation**

| Tier | WRVU Threshold | Compensation Rate |
|------|----------------|-------------------|
| Tier One | Threshold 1 (Minimum) | Bonus equaling 10% of base compensation, prorated per clinical FTE |
| Tier Two | Threshold 2 (Incentive) | 60% of the conversion factor per WRVU |

**Figure 10: Capacity Model (Modified), Orthopedic Surgery - Trauma Clinical Framework**



15



## 8.   Capacity Model (Modified): Hospice/Palliative Care

This model applies to outpatient-based Hospice/Palliative Care physicians and uses a combined base and productivity compensation structure in order to provide a fixed level of income protection with a productivity incentive above median WRVU production levels.

**Base Compensation:** Physicians receive 90% of the specialty-specific base compensation. Base compensation levels are adjusted based on the physician's actual clinical FTE.

**Productivity Compensation:** Once Threshold 1 is reached, physicians are eligible for a bonus equaling 10% of the base compensation prorated for clinical FTE. Physicians will also receive compensation per WRVU for productivity generated above Threshold 2. Productivity thresholds are prorated based on clinical FTE.

Table 10 outlines the WRVU thresholds and compensation rates. Figure 11 provides a graphical overview of the Capacity Model (Modified): Hospice/Palliative Care

### Table 10: Hospice/Palliative Care Production Compensation

| Tier | WRVU Threshold | Compensation Rate |
|---|---|---|
| Tier One | Threshold 1 (Minimum) | Bonus equaling 10% base compensation, prorated for clinical FTE |
| Tier Two | Threshold 2 (Incentive) | 60% of the conversion factor per WRVU |

### Figure 11: Capacity Model (Modified), Hospice/Palliative Care Clinical Framework



16



### 9. Capacity Model (Modified): Urgent Care

Physicians are compensated on a flat hourly rate established using the 37.5 percentile total cash compensation per FTE and assuming 2,080 hours constitutes full time. Physicians on this model are not eligible for a productivity component.

### 10. New Physicians on Capacity Models

For the first year of employment, new physicians on a capacity model have the option to be compensated at the full base compensation amount described in sections II.F.1-II.F.6 and the full shift rate for Capacity Model (Modified: Urgent Care). The value compensation component of the base compensation will not be at risk, and there will be no productivity compensation. New capacity physicians may choose to switch to the full models described in sections II.F.1-II.F.7 inclusive of the at-risk value-component and additional productivity compensation before the first year of employment concludes during the semi-annual reconciliation period.

17



## G. Value Compensation

Physicians compensation model described in sections II.C through II.F will have $20,000 per 1.0 clinical FTE will be at-risk. This at-risk/value portion will be withheld from compensation. Payments of the value compensation will be based on achievement of quality metrics and value standards. The measurement period runs on the calendar year cycle and quality payments will be made prior to March 30th of the following year.

Physicians on introductory salaries or the urgent care capacity model (II.F.9) do not have any at-risk value compensation. Physicians on initial guarantee salary terms effective prior to 1/1/2020 are grandfathered as eligible for an incremental quality bonus of $20,000 per 1.0 clinical FTE.

To qualify for value compensation, physicians must adhere to the following value standards:

➢ Be employed in an eligible position at the time of the quality payment. All withheld value compensation is forfeited if the provider terminates or transitions to a non-eligible position before the quality payment date.
➢ Be in good standing with Centura Health at the time of payment.
➢ Be employed by the midway point (July 1) of the measurement period. Physicians hired between July and December will not be subject to an at-risk value withhold for the initial measurement period.

The value component amount will be prorated for partial year participation based on the providers start date.

The individual components of the value compensation are identified in the Quality Incentive Plan updated annually.

18



## III.    Faculty Compensation Model

The Faculty Compensation Model applies to faculty in the St. Anthony North residency program and the St. Mary Corwin residency program. Faculty compensation will be determined by these factors:

- Individual levels of clinical, faculty administrative, and teaching FTEs
- Core vs adjunct professor designation (an adjunct professor is defined as one whose clinical FTE is greater than 0.5)
- Faculty title for administrative and teaching roles, respectively
  - **Assistant Professors** are faculty physicians who share residency teaching, advising and curriculum development responsibilities. Physicians with less than three years of experience will be compensated as an Assistant Professor 1, while physicians with three or more years of experience will be compensated as an Assistant Professor 2.
  - **Associate Professors** are faculty physicians with defined leadership roles in the programs and who assist with higher level program operations, as designated by the residency program. Physicians with fewer than five years of experience as an associate professor or associate program director level will be compensated as an Associate Professor 1, while physicians with five or more years of experience at the associate level will be compensated as an Associate Professor 2.  For faculty with experience outside of the Centura residency program, documentation of the previous position job description and time spent in the position will be evaluated.

## A.   Clinical Compensation

### 1.   Core Professors

Core faculty will be compensated with a combined base and productivity compensation.

**Base Compensation:** The FY22 Core base compensation amounts are shown in the table below. The base compensation amount will be prorated for clinical FTE.

| Title | Core Base Compensation |
|---|---|
| Assistant Professor One | $175,444 |
| Assistant Professor Two | $184,678 |
| Associate Professor One | $187,996 |
| Associate Professor One & Program Director | $197,859 |

**Productivity Compensation:** Each WRVU a physician generates above the WRVU threshold is compensated at 50% of FY22 Conversion Factor. Productivity thresholds are adjusted for actual clinical FTEs.



## 2. Adjunct Professors

An introductory salary is typically provided for physicians new to market and who are developing their practices. It will be provided for a limited time, generally not to exceed two years. The introductory salary amount will account for physician experience, roles and responsibilities, ability to affect own clinical productivity, and market and mission. It will be based on physicians' clinical FTE status only. Physicians on an introductory salary are not eligible for additional productivity compensation or value compensation.

Physicians not on an introductory salary are compensated using the primary care model as described in section II.C, with the exception that productivity thresholds are adjusted for actual clinical FTEs.

This model uses a tiered productivity structure that aligns physician compensation with productivity measured by personally performed work relative value unit (WRVU) production. Compensation is calculated based on a physician's personally performed WRVUs multiplied by a compensation value, or a conversion factor, per WRVU.

This model uses a tiered approach with 2 production thresholds. Within each tier, a different conversion factor is used to calculate the productivity compensation. Once physicians achieve WRVU Threshold 1, all tier one WRVUs are compensated at 100% of the conversion factor. Table 11 outlines the WRVU thresholds and conversion factor benchmark rates by tier.

### Table 11: Primary Care Productivity Tiers

| Tier | WRVU Threshold | Conversion Factor Benchmark Rate |
|---|---|---|
| Tier One | Below Threshold 1 | 93% of conversion factor |
| Tier Two | Between Threshold 1 & 2 | 100% of conversion factor |
| Tier Three | Above Threshold 2 | 105% of conversion factor |

## 3. Value Compensation

The clinical compensation will also include a value compensation portion. The value compensation structure is determined by the physician's role as an adjunct or core professor, with the exception of program directors. Program directors will not be eligible for the value-based compensation provision described below. The individual components of the value compensation are identified in the Quality Incentive Plan updated annually. Payments of the value compensation will be based on achievement of quality metrics and value standards listed in section II.G. The measurement period runs on the calendar year cycle and quality payments will be made prior to March 30th of the following year. The value component amount will be prorated for partial year participation based on the providers start date.



**Core Professors:** Core professors will have the opportunity to earn an incremental $5,000 for value-based compensation. This amount will be adjusted based on the physician's total FTE status (e.g., a 0.5 total FTE will have $2,500 at risk for value-based compensation).

**Adjunct Professors:** $20,000 of the total clinical compensation opportunity as described is allocated to at-risk value-based compensation. This amount will be adjusted based on the physician's clinical FTE status (e.g., a 0.5 clinical FTE will have $10,000 at risk for value-based compensation).

**Figure 12: Core Professor Clinical Framework**



21



**Figure 13: Adjunct Professor Clinical Framework**



## B. Administrative and Teaching Compensation

Faculty physicians who performed administrative and teaching roles will be compensated at a fixed amount based on their administrative and teaching FTEs and titles. Table 12 outlines the administrative and teaching compensation levels for a 1.0 FTE.

**Table 12: Administrative and Teaching Compensation per FTE**

| Title | Compensation Amount | Associated TCC |
|---|---|---|
| Assistant Professor One | $200,000 | n/a |
| Assistant Professor Two | $204,350 | Assistant professor TCC |
| Associate Professor One | $213,000 | n/a |
| Associate Professor Two | $217,600 | Associate professor TCC |
| Program Director | $240,950 | Associate professor TCC |

Compensation amounts are informed by an average of the prevailing MGMA DataDive Academic Compensation report for Family Medicine (with OB) and AAMC *Faculty Salary Report* for Family Medicine: General. Compensation amounts for assistant and associate professor one titles are approximately $4,000 below the compensation for the level two titles.

## C. Additional Compensation

**Call Compensation**

The compensation for core professors assumes a base call coverage expectation. For physicians participating in the call pool, the equivalent amount of call compensation for the required shifts, based

22



on the rates outlined below, will be deducted when calculating the annual draw. Call shifts will be compensated separately from the draw. Physicians are eligible for excess call compensation at the same rates.

The following call rates apply:

- Restricted Obstetrics and Medicine program call will be compensated at $800 per 12-hour restricted shift.
- Unrestricted Obstetrics and Medicine program call will be compensated at $350 per weeknight unrestricted shift.
- Inpatient attending call will be compensated at $500 per 12-hour shift and $1000 per 24-hour shift.
- Holiday inpatient attending call and restricted call will have a shift differential of $250 per 12-hour shift.
- Inpatient attending and restricted call during which no residents are available will have a shift differential of $100 per hour.

SAN core professors have the following base call expectations:

- Restricted program call: three weekends and 24 evening shifts per year.
- Inpatient attending call: three weekends per year.
- The Program Director will be expected to complete three weekend and 12 evening shifts for program call.

SMC core professors have the following base call expectations:

- Unrestricted program call: 32 shifts per year.
- Inpatient attending call: four weekends per year.

Core professors who opt out of call coverage will receive a deduction based on the base call amount that is prorated for total FTE.

**Weekend Game Coverage**
Weekend game coverage will be compensated at $75 per hour

**C-Section Compensation**
Physicians will be compensated $250 per c-section completed when not during call or scheduled work time

**SMC Hard to Recruit Compensation**
SMC Residency Program professors are eligible for a hard to recruit compensation of $20,000 for a 1.0 total FTE. This applies to both core and adjust professors.

23



## IV.    Administrative Compensation

This section applies only to administrative roles for CHPG. Medical directors and other administrative roles for Centura Health hospitals are outlined in section V.C.

## A.   CHPG Clinical Administrative Roles

CHPG clinical administrative roles (e.g., CHPG medical directors and physician site leads) require clinical judgment and will be compensated on specialty-specific hourly rates: primary care $140, hospitalist and other medical specialties: $150, surgical and procedural specialties: $175. See appendix B for specialty rate mapping.

### 1.   Hospitalist Site Lead

Hospitalist site lead FTE requirements will be dictated by the total number of hospitalist FTEs in the respective program. Site lead physicians will be compensated $150 per hour. Table 13 below illustrates the hospitalist site lead requirements by program size.

**Table 13: Hospitalist Site Lead Requirements by Program Size**

| Program FTEs | Site Lead FTEs |
|---|---|
| ≤6 | 0.1 FTEs |
| >6 and ≤15 | 0.2 FTEs |
| >15 and ≤25 | 0.3 FTEs |
| >25 and ≤35 | 0.4 FTEs |
| >36 | 0.5 FTEs |

### 2.   Neighborhood Site Leads

Neighborhood site leads will be compensated at $1000/month for all specialties.

### 3.   CHPG Management Council Compensation

CHPG Board members will be compensated with annual stipends at the following rates:

- Member: $8,000

## B. CHPG Non-clinical Administrative Roles

All CHPG administrative roles that do not require clinical judgment will be compensated at $125 per hour.



# V.    Special Compensation

## A.   Excess Call Pay

Compensation assumes a base non-restricted emergency room call coverage shift expectation of 7 shifts per month, paid on a monthly basis. For compensation purposes, 1 shift equals 24 hours. Physicians will receive a stipend based on specialty and facility burden for shifts above the base expectations. Rates will be maintained by CHPG Leadership and will be reviewed by Hospital Leadership and Corporate Responsibility.

Base shifts are those completed for physician's base facility and primary boarded specialty. Restricted labor deck coverage is not subject to the base shift expectation described above (i.e., labor deck coverage will be compensated for every shift). Back-up shift coverage is also not subject to the base shift expectation. A concurrent call shift (i.e. either multiple specialties covered at one facility or the same specialty covered at multiple facilities) that includes the base facility and primary boarded specialty will count towards the base shift expectation. However, concurrent call shifts taken before the base shift expectation has been met will be compensated a shift differential amount – the difference between the concurrent rate and the non-concurrent rate for the same specialty at the base facility.

The base shift expectation will also be prorated based on clinical FTE:

| Actual CFTE | Adjusted Monthly Base Call Expectation (shifts) |
|---|---|
| ≥0.8 | 7 |
| ≥0.6 and <0.8 | 6 |
| <0.6 | 4 |

25



## B.  APP Oversight Stipend

For the purposes of this section, "APP" means a nurse practitioner or physician assistant.

The following physicians are eligible for an annual oversight stipend of $6,000 per 1.0 FTE APP, not to exceed $10,000 in Colorado markets or $24,000 in Kansas markets for two or more APPs, when supervising either a nurse practitioner or a physician assistant. Regional oversight regulatory requirements vary by state law.

- Physicians practicing in a primary care clinic—specifically, family medicine, internal medicine, and pediatric medicine
- Endocrinology, neurology and medical oncology physicians based in Colorado
- OB/GYN and cardiology physicians based in Kansas.

To be eligible for the stipend, primary care APPs must be compensated in accordance with the APP compensation plan. Oversight responsibilities can be shared by up to a maximum of 2 physicians and each will get a portion of the FTE not to exceed the APPs clinical FTE.

The following oversight responsibilities are required to be eligible for the oversight stipend.

- ➢ A signed oversight form on file for each APP supervised.
- ➢ Review and co-sign charts where required or clinically indicated. Oversight of NP obtaining prescriptive authority.
- ➢ Oversight of clinical care which may include providing access care and shared responsibilities of patient panel.
- ➢ Physician is regularly available to provide timely assistance.
- ➢ Periodic evaluation to ensure a mutually productive relationship in delivering excellent patient care. Evaluation to be completed by site lead or medical director at the minimum on an annual basis.

## C.  Non-CHPG Administrative Compensation

Compensation terms for non-CHPG administrative roles, such as service line medical directors or medical staff officers, will be maintained by CHPG Leadership and will be reviewed by Hospital Leadership and Corporate Responsibility.

26



### D.  Recruitment Assistance

Recruitment assistance for new physicians can include student loan reimbursement, relocation expense reimbursement, and starting bonuses. Physicians who cease employment with Centura Health within three years will be responsible for a pro-rated repayment of all pre-paid recruitment assistance compensation. Student loan reimbursement and retention bonuses are paid at completion of a contract anniversary. If employment ceases before the required anniversary date the full payment is forfeited (not prorated).

### E.  Strategic Compensation

Strategic compensation supports specific programmatic or market needs, and currently includes but is not limited to the following compensation: payer incentive programs, KCUMB teaching, program directors, outreach, internal locums' coverage, chemotherapy supervision, and precepting for physicians not on the faculty compensation plan.

### F.  FullWell PDL Compensation

Providers will be compensated for 50% of the reimbursement for all accurately completed PDLs in the month after the passed PDL is received. Typical CHN reimbursement is $125 which would equate to a provider payment of $62.50 per PDL.

### G.  Other Special Pay

Other compensation may be provided as dictated by the market, service, leadership, and administrative needs of the practice or hospital. This may include hard-to-recruit adjustments by market and specialty as well as continuing employment bonuses, among others.

27



## VI.    Compensation Payments

All payments made in accordance with this Compensation Plan will be in accordance with Centura Health's general payroll policies and practices and will be subject to employment and other withholding taxes.

### A.  FTE Adjustments

FTE levels may be adjusted once per year with CHPG leadership approval during the budget season of January through March and will take effect on July 1. Adjustments to base and value compensation levels will be based on actual clinical FTEs. wRVU production target adjustments will be prorated according to the individual clinical FTEs.

FMLA leaves will lower the clinical FTE accordingly based on hours of time away. This will impact both the benchmarks and the value compensation. If Physician subsequently reduces Physician's FTE status, CHPG will review all additional compensation paid (not including Introductory Salary, Base Compensation or Productivity Compensation) to determine whether a pro rata portion must be repaid based on the change in FTE status.

### B.  Board Certifications

Physicians who have dual board certifications will be compensated with a blended conversion factor benchmark for productivity compensation, provided that both certifications apply to the same compensation model (e.g. physician is on the High-Volume Model). The blend will be calculated as a weighted average of the conversion factors for each specialty. The specific weighting of benchmarks will be unique to each physician's actual patient mix, as determined from an annual coding review.

### C.  Compensation Administration

 Physicians who receive an introductory salary will be paid the annual salary amount on a bi-weekly basis over the course of the year.

All other physicians will be paid a bi-weekly amount based on their estimated annual clinical and faculty compensation (including total value compensation), reduced by a percentage to minimize risk of overpayment. Reconciliation will occur semi-annually and may result in a prospective draw adjustment. The only exception is quarterly reconciliation and payout for additional shifts for hospitalists, critical care physicians and neurohospitalists. Reconciliation of hospitalist shifts will account for the actual mix of day and night shifts completed. Value compensation will be reconciled following the fiscal year conclusion.

### D.  Terminations

Upon notification of resignation or termination of a physician, CHPG:



- May reduce the biweekly draw received by the physician by a minimum of 25% in an effort to reduce the potential of overpayment of the physician.
- Shall calculate any pro rata amount of payments subject to repayment, which amount shall be deducted from the physician's remaining paychecks.

In the event the physician owes any amounts to Centura Health as of the physician's termination date, the physician shall immediately repay such amounts.

Upon termination of a physician's employment for any reason, including expiration of the employment agreement, CHPG shall reconcile the compensation actually paid to the physician with the production-based incentive compensation earned and any other compensation actually earned by the physician up to the date of termination, including a prorated portion of the APP oversight stipend, if applicable. In the event CHPG determines that the compensation paid to the physician is less than the production-based compensation and any other compensation actually earned by the physician, CHPG shall pay the physician the amounts owed within 90 days of the termination or expiration date. In the event CHPG determines that the compensation paid to the physician is more than the production-based compensation and any other compensation actually earned by the physician, the physician shall immediately pay back the amounts owed.



# VII. Compliance and Plan Administration

## A. FMV Considerations

Compensation arrangements for every employed physician within Centura Health will be consistent with FMV and will in no manner be tied to the volume or value of referrals to the healthcare system. Total compensation for all physicians will be measured against a blend of benchmarks from market surveys that may include MGMA, AMGA, SullivanCotter, or other nationally recognized physician surveys.

Total compensation (defined as all compensation from all Centura Health sources) for physicians will not exceed the following percentiles of compensation for similar physicians in accordance with the CHPG blended survey unless supported by an independent third party:

- Physicians receiving an introductory salary: 75th percentile
- Physicians not receiving an introductory salary: 90th percentile

An outside independent firm will be retained annually at plan year–end to evaluate and opine on the reasonableness of total compensation paid for those physicians earning above the 90th percentile of compensation for their specialty.

## B. Plan Changes and Revisions

Compensation levels and thresholds may be updated annually for each fiscal year based on the current definition of market, as detailed in VII.D. Changes to plan assumptions may occur annually with consideration given to market competitiveness, regulatory constraints (e.g., FMV, commercial reasonableness) and financial performance of the medical group and health system. This includes but may not be limited to the following elements:

1. Base compensation levels
2. WRVU incentive thresholds
3. Compensation per WRVU conversion factors
4. Value-based component
   a. Metric selection
   b. Scoring/evaluation criteria
   c. Compensation withhold amounts
   d. Domain weightings

## C. Relative Value Unit (RVU) Calculation and Maintenance

The Centers for Medicare & Medicaid Services (CMS) sets RVUs annually to indicate the amount of resources required to perform various medical services. Specifically, RVUs measure the time, effort, cost, and level of skill necessary to perform the service. This Compensation Plan will use the RVU values established by CMS to measure physician productivity for production-based compensation. However, CHPG reserves the right to determine when the CMS fee schedule will be updated within Centura



Health's EHR. These values are one component of the resource-based relative value scale used for determining physician payments for Medicare services. Work RVUs (WRVUs) are designated only for services that a physician personally performs and include physician effort only (i.e., excluding other office or ancillary personnel). Table 14 shows a sample set of Evaluation and Management (E&M) WRVU values from the 2021 CMS Physician Fee Schedule.

### Table 14: CPT & WRVU Sample Set

| CPT Code | CPT Description | 2021 WRVU Value |
|---|---|---|
| 99211 | Office/outpatient visit, est. | 0.18 |
| 99212 | Office/outpatient visit, est. | 0.70 |
| 99213 | Office/outpatient visit, est. | 1.30 |
| 99214 | Office/outpatient visit, est. | 1.92 |
| 99215 | Office/outpatient visit, est. | 2.80 |

Physicians are credited for WRVUs based on services performed and billed for a patient encounter that is attributable to that physician. All patient billing information is captured within the EHR billing system. A physician in the EHR system may be classified as a "service" or "billing" provider. For compensation and reporting purposes, only WRVUs for services attributable to the physician are counted toward a physician's production and compensation. Additionally, only services that are personally performed by that physician may be counted toward WRVU production for determining compensation.

RVUs have the following three components:

- Work RVU (WRVU)
- Practice Expense RVU
- Malpractice RVU

The total of the three components is referred to as total RVUs. Physician production and compensation is calculated only on the WRVU component, as WRVUs represent the personally performed work effort of the physician. Additionally, CMS publishes a regional adjustment to Medicare payments to account for differences in labor and other costs among regions. A specific Geographic Practice Cost Index (GPCI) is applicable to each RVU component. For provider production comparisons nationally across practices and industry groups, the GPCI is not applied to WRVU values.

Billing modifiers attached to a CPT/HCPCS code indicate a modification of services was performed from the standard use of the code. For example, modifier 50 means that a bilateral procedure was performed instead of a unilateral procedure, as indicated by the code without a modifier. The use of a modifier may increase or decrease the allowed amount for a particular procedure. The impact can be different for different payers. Within this Compensation Plan, CHPG will calculate WRVU adjustments for purposes of



determining production or compensation on certain modifiers. The adjustments will be based on Medicare payment policy and will apply to all services performed by the physician regardless of payer.

1. Policy and Guidelines
   a. **Work RVU Values**

WRVU values for each CPT/HCPCS–coded service will be based on published amounts from the final National Physician Fee Schedule Relative Value File published by CMS. If CMS establishes a zero value for the WRVU associated with a particular CPT/HCPCS code, it usually indicates that the procedure is "incident to" another procedure and the physician's work effort is captured within other procedures, or that the service is not typically personally performed by the physician, and therefore, no WRVU value is warranted on that code. The exception is unlisted procedure codes, which are CPT/HCPCS  service codes ending with a 99. These codes have no WRVU value assigned because they can be used to bill a variety of services that do not have a specific CPT/HCPCS code designation. For unlisted procedure codes, Centura Health Revenue Management, in consultation with CHPG clinical leadership, will review the procedures that are billed via unlisted procedure codes and will assign a WRVU value for the work, practice, and malpractice components based on like procedures that do have a value.

CPT/HCPCS procedure codes that are payer specific and are not reported within the CMS Physician Fee Schedule will be assigned a WRVU value based on like procedures that do have a value. Examples of these types of procedures are codes designated for use by Medicaid or workers' compensation only for their beneficiaries.

   b. **Effective Date for RVU Updates**

The CMS Physician Fee Schedule is typically updated on January 1 of each year, although CMS occasionally updates WRVU values within a calendar year to account for new services or service changes. CHPG will implement RVU values consistent with CMS on a date determined by CHPG in its sole discretion. CHPG reserves the right to adjust CMS values due to materiality, fairness and/or regulatory compliance on a prospective basis (not retroactive) within Centura Health's EHR system.

   c. **Crediting of WRVUs**

For ease in administration and consistency in reporting, WRVUs will be tracked and credited to physicians on a date-of-post basis rather than on a date-of-service basis. Procedure codes entered by a physician more than 30 days after date of service may not be credited to the physician for compensation purposes.

32

d.  **Application of GPCI Adjustment Factors**

RVU values will not be adjusted by the GPCI for the purposes of determining physician production or compensation amounts that are based on personally performed WRVUs. Any adjustment of compensation amounts based on regional cost differences will be assumed within the conversion factor used in the Compensation Plan.

e.  **Compensation Adjustments for Modifiers**

In calculating WRVU values for both production and compensation amounts, WRVU values will be adjusted for modifiers that impact the level of reimbursement received from Medicare and other third-party payers. Modifiers for which a WRVU adjustment will occur and the amount of the adjustment that will be applied to all volumes, regardless of payer, are summarized below.

**Table 15: Modifier Impact on WRVU Adjustments**

| Modifier | Description | Reimbursement and WRVU Adjustment |
|---|---|---|
|  | No modifier | 100.0% |
| 22 | Unusual procedural services | 125.0% |
| 24 | Unrelated E&M service by the same physician during postoperative period | 100.0% |
| 25 | A significant, separately identifiable E&M service | 100.0% |
| 26 | Professional component | 100.0% |
| 50 | Bilateral procedure | 150.0% |
| 51 | Multiple procedures | 50.0% |
| 52 | Reduced services | 50.0% |
| 53 | Discontinued procedure | 50.0% |
| 54 | Surgical care only | 70.0% |
| 55 | Post-op only | 20.0% |
| 56 | Pre-op only | 10.0% |
| 57 | Decision to perform surgery | 100.0% |
| 58 | Staged or related procedure or service by the same physician during the postoperative period | 100.0% |
| 59 | Distinct procedural service | 100.0% |
| 62 | Co-surgeon | 62.5% |
| 74 | Discounted ASC procedure | 50.0% |

33



| 76 | Repeat procedure | 70.0% |
|----|------------------|-------|
| 77 | Repeat procedure or service by another physician | 100.0% |
| 78 | Return to OR for related procedure post op | 70.0% |
| 79 | Unrelated procedure or service by the same physician during the postoperative period | 100.0% |
| 80 | Assistant surgeon | 16.0% |
| 81 | Minimum surgery assist | 16.0% |
| 82 | Assistant surgeon — no resident available | 16.0% |
| AS | Non-physician surgery assist | 16.0% |
| TC | Technical component | 0.0% |

WRVUs for CPT codes with multiple modifiers will be adjusted by multiplying the appropriate modifier adjustments consistent with third-party payer guidelines. For example, a bilateral procedure done in conjunction with multiple procedures (modifiers 50 and 51) will have a net adjustment of 75% (150% × 50% = 75%). CHPG will have responsibility for annual updates and maintenance of accurate WRVU values within the EHR system and monthly calculation of WRVUs applicable to each physician for personally performed services based on the guidelines established in this Compensation Plan.

### f.    Procedure Code Bundling

Certain procedures commonly performed together are often bundled by Medicare and other third-party payers for claim-adjudication purposes. Unbundling these procedures commonly performed together for billing purposes could have the effect of crediting CHPG physicians with WRVUs that will not be reimbursed by third-party payers. CHPG will follow CMS National Correct Coding Initiative rules when determining when to bill procedures that are commonly bundled by third-party payers. If some CHPG payers bundle certain procedure code combinations while others do not, CHPG will submit individual procedure codes on the claim and credit physicians with WRVUs based upon the applicable payer reimbursement rules.

### g.    Global Obstetrical Package Sharing

To promote collegiality and practice growth, sharing of global obstetrical package WRVUs will be an option according to the methodology developed among obstetrical physicians within a single practice on a monthly basis, so long as it meets CHPG's standards of fairness, as documented in Exhibit E.

## D.  Definition of Market

A key principle of this Compensation Plan is to ensure that physician compensation is market competitive. To ensure that physician compensation is competitive, the Compensation Plan uses benchmark data from a variety of surveys.



After extensive review of various compensation and productivity benchmark sources, CHPG's compensation committee selected three market surveys to serve as the basis of this Compensation Plan. The selection of these surveys was deemed to be appropriate and endorsed by ECG. These surveys are conducted annually, and their reports represent data from the prior year. Table 16 describes these surveys.

**Table 16: Market Benchmark Surveys**

| Survey | Characteristics |
|---|---|
| MGMA DataDive Provider Compensation report | » Data is compiled from approximately 87,000 providers nationwide. <br> » The survey is composed of medical groups of various sizes and complexities. <br> » National and regional breakdowns of the data are available. <br> » Online access to this report is usually available by mid-July. |
| AMGA *Medical Group Compensation and Productivity Survey* | » Data is compiled from approximately 101,000 providers nationwide. <br> » The survey is generally composed of larger multispecialty medical groups. <br> » National and regional breakdowns of the data are available. <br> » The survey report is usually available in August. |
| SullivanCotter *Physician Compensation and Productivity Survey Report* | » Data is compiled from approximately 195,000 providers nationwide. <br> » The survey is composed of large multispecialty groups. <br> » No regional breakdowns are available. <br> » The survey report is usually available in May. |

## E.  Calculation of Tables

The unprecedented changes in the CMS fee schedule, renders benchmark data unusable and warrants model specific adjustments to the comp plan, including the migration from leveraging benchmark data to leveraging compensation tables.  Thus, for the next 2-3 years until benchmarks can catch up to the recent CMS fee schedule changes, each comp model will be reviewed on an annual basis in conjunction with changes to reimbursement to determine the wRVU thresholds, TCC, and conversion factors for each specialty.  The compensation model tables used in this Compensation Plan are based on sustainable economics grounded on historical trends, the 2021 changes in the CMS fee schedule, and changes in reimbursement.  The tables will be updated annually; this is intended to ensure that CHPG maintains market-competitive compensation levels.

Three tables of metrics are calculated for use in this Compensation Plan:



- **Specialty-Specific TCC Compensation**
- **Specialty-Specific WRVU Thresholds**
- **Specialty-Specific Compensation per WRVU***: Also known as the specialty-specific clinical conversion factor (CCF).

In order to ensure continued market alignment, specialty-specific compensation, specialty-specific WRVU thresholds, and specialty-specific CCF values will be calculated on an annual basis prior to the start of a new plan year from the most recently calculated tables.



## Appendix A: Draw Calculation Examples*

### Primary Care

*1.0 clinical FTE Family Medicine w/o OB, 70th percentile (5,683 WRVUs)*

| | |
|---|---|
| Tier One Productivity Compensation | $228,433 |
| Threshold Productivity Bonus | $17,206 |
| Tier Two Productivity Compensation | $29,008 |
| Tier Three Productivity compensation | $10,627 |
| Total Opportunity | $285,274 |
| | |
| Draw Percentage | 85% |
| Annual Draw Pay | $242,483 |
| Pay Period Draw Pay | $9,326 |
| | |
| Annual Reconciliation Amount | $42,791 |
| Total Annual Pay | $242,483 |

*1. Total opportunity includes $20,000 value compensation*
*2. Total annual pay assumes 100% of value measures met*

### Capacity (Traditional)

*1.0 clinical FTE Hospice/Palliative Care physician, 70th percentile (2,775 WRVUs)*

| | |
|---|---|
| Base Compensation | $232,417 |
| Productivity Compensation | $11,490 |
| Total Opportunity | $243,907 |
| | |
| Draw Percentage | 90% |
| Annual Draw Pay | $219,516 |
| Pay Period Draw Pay | $8,443 |
| | |
| Annual Reconciliation Amount | $24,391 |
| Total Annual Pay | $243,907 |

*1. Total opportunity includes $20,000 value compensation*
*2. Total annual pay assumes 100% of value measures met*



## Appendix B: CHPG Clinical Administrative Hourly Rates

| Specialty | Hourly Rate |
|---|---|
| Anesthesiology–pain management | $175 |
| Cardiology–invasive: interventional | $175 |
| Cardiology–noninvasive | $175 |
| Critical care–intensivist | $150 |
| Endocrinology/metabolism | $150 |
| Family medicine (with OB) | $140 |
| Family medicine (without OB) | $140 |
| Family medicine–sports medicine | $140 |
| Gastroenterology | $175 |
| Geriatrics | $140 |
| Hematology/oncology | $175 |
| Hospice/palliative care | $150 |
| Hospitalist–internal medicine | $150 |
| Infectious disease | $150 |
| Internal medicine–general | $140 |
| Mammography | $175 |
| Nephrology only | $150 |
| Neurohospitalist | $150 |
| Neurology | $150 |
| Neurology–epilepsy/EEG | $150 |
| OB/GYN–general | $175 |
| OB/GYN–gynecology (only) | $175 |
| OB/GYN–urogynecology | $175 |
| Occupational medicine | $150 |
| Orthopedic surgery–general | $175 |
| Orthopedic surgery–hand | $175 |
| Orthopedic surgery–hip and joint | $175 |
| Orthopedic surgery–sports medicine | $175 |



| | |
|---|---|
| Orthopedic surgery–trauma | $175 |
| Otorhinolaryngology | $175 |
| Pain management–nonanesthesia | $150 |
| Pediatrics–general | $140 |
| Pediatrics–internal medicine | $140 |
| Podiatry–general | $150 |
| Podiatry–surgery, foot and ankle | $175 |
| Psychiatry–general | $150 |
| Psychiatry–inpatient | $150 |
| Psychiatry–outpatient | $150 |
| Pulmonary medicine–general | $150 |
| Radiology–diagnostic | $175 |
| Radiology–interventional | $175 |
| Radiology–neuro-interventional | $175 |
| Radiology–neurological | $150 |
| Rheumatology | $150 |
| Surgery–breast | $175 |
| Surgery–colon and rectal | $175 |
| Surgery–general | $175 |
| Surgery–transplant | $175 |
| Urgent care | $140 |

39



## Appendix C: Model Types and Exceptions

| Model Type | Associated Specialties |
|---|---|
| Primary Care | All primary care specialties |
| High Volume (High Risk) | Medical and surgical specialties in Denver and Colorado Springs<br><br>**Exceptions for inclusion**<br>» Canon City specialties<br>  › Orthopedic surgery/nonsurgical<br>  › General surgery<br>» Kansas specialties<br>  › Orthopedic surgery<br>  › Otorhinolaryngology<br>  › General surgery<br>  › Cardiology: invasive - Interventional<br>  › Cardiology: noninvasive<br>  › Dermatology<br>  › OB/GYN<br>  › Podiatry–foot and ankle surgery<br>  › Radiology: Diagnostic<br>  › Radiology: Interventional<br>  › Urology<br>» Pueblo specialties<br>  › Gastroenterology<br>  › Orthopedic Surgery: General/sports medicine |
| Low Volume (Low Risk) | Medical or surgical specialties in markets outside Denver and Colorado Springs<br><br>**Exceptions for inclusion**<br>» General psychiatry in Denver and Colorado Springs<br>» Occupational medicine in all markets<br>» Outpatient psychiatry in Denver<br>» Neurology in Denver |
| Capacity Model (Traditional) | » Radiology: neuro-interventional<br>» Radiology: neurological<br>» Surgery–transplant<br>» Surgery–neurological (outside Denver only)<br>» Hospice/palliative care |



| Capacity Model (Modified): Hospitalist | Hospitalist–Internal Medicine |
|---|---|
| Capacity Model (Modified): Critical Care–Intensivist (Level I) | Critical care–intensivist who works 12-hour shifts |
| Capacity Model (Modified): Critical Care–Intensivist (Level II) | Critical care–intensivist who works 24-hour shifts |
| Capacity Model (Modified): Orthopedic Surgery - Trauma | Orthopedic Surgery - Trauma |
| Capacity Model (Modified): Hospice/Palliative Care | Outpatient Hospice/Palliative Care |
| Capacity Model (Modified): OB/GYN – Laborist | Laborists |
| Capacity Model (Modified): Neurohospitalist | Neurohospitalist |
| Capacity Model (Modified): Urgent Care | Urgent care |

## Appendix D: Specialty Model Groupings

| Coverage |
|---|
| Critical care–intensivist |
| Hospitalist–internal medicine |
| Hospice/palliative care |
| OB/GYN–laborist |
| Neurohospitalist |
| Radiology–neuro-interventional |
| Radiology: neurological |
| Surgery–transplant |
| Urgent care |
| **Primary Care** |
| Family medicine (with OB) |
| Family medicine (without OB) |
| Family medicine–sports medicine |
| Geriatrics |
| Internal medicine–general |
| Pediatrics–general |
| Pediatrics–internal medicine |
| **Medical** |

41



| |
| --- |
| Anesthesiology–pain management |
| Cardiology–noninvasive |
| Dermatology |
| Endocrinology/metabolism |
| Hematology/oncology |
| Infectious disease |
| Mammography |
| Nephrology |
| Neurology |
| Orthopedic (nonsurgical) |
| Occupational medicine |
| Pain management–nonanesthesia |
| Podiatry–general |
| Physiatry (physical medicine and rehabilitation) |
| Psychiatry–general |
| Psychiatry–outpatient |
| Psychiatry–inpatient |
| Pulmonary medicine–general |
| Radiation oncology |
| Radiology–diagnostic |
| Rheumatology |
| **Surgical** |
| Cardiology–invasive: interventional |
| Cardiology–invasive |
| Gastroenterology |
| OB/GYN–general |
| OB/GYN–gynecology (only) |
| OB/GYN–urogynecology |
| Orthopedic surgery–general |
| Orthopedic surgery–hand |



| |
|---|
| Orthopedic surgery–hip and joint |
| Orthopedic surgery–sports medicine |
| Orthopedic surgery–spine |
| Orthopedic surgery–trauma |
| Otorhinolaryngology |
| Podiatry–surgery, foot and ankle |
| Surgery–bariatric |
| Surgery–breast |
| Surgery–general |
| Surgery–neurological |
| Surgery–colon and rectal |
| Surgery–vascular (primary) |
| Urology |

43



# Appendix E: Obstetrical wRVU Sharing Policy

**Scope**
This policy applies to employed OBGYN physicians who are managed by Centura Health Physician Group (CHPG).

**Purpose**
To appropriately distribute labor and delivery wRVUs based on the practice having a shared patient pool or not. This is necessary due to global CPT codes done during delivery that capture both clinical and delivery components.

**OB Split Process (no patient pool)**
When a physician performs the delivery for another providers patient and a global delivery code is used the clinical portion of wRVUs will be removed from the delivering provider and given to the provider who saw the patient for pre-natal care. See below chart for delivery and clinical wRVU values of global CPT codes.

**OB Share Pool (shared patient pool)**
For participating physicians all wRVUs from labor and delivery codes will be pooled and distributed based on share percentage. The share percentage is calculated using equal weighting of the clinical FTE percentage and call share burden percentage.

Maintaining a clinical FTE, seeing OB patients in clinic, and participation in both practice day and evening call are required to be eligible for the share pool. The call share burden must be a minimum of a 0.5 FTE with any exceptions approved by DYAD and can only be changed bi-annually.

During FMLA the call share burden portion of the share can be maintained if call is made up before leaving or following the providers return. Clinical FTE percentage is 0 during the leave.

Newly hired physicians will join the pool with full call share burden and clinical FTE beginning at 0% of actual clinical FTE and increase by 25% of FTE every 3 months. After 1 year they will be a full participant in the share pool. In market providers joining pool due to transfer or becoming eligible will be reviewed for appropriateness based on expected ramp up.

The antepartum component of global codes will be added to the pool when locum, PRN, resident or other providers deliver patients of the group (when considered servicing provider only).

**Laborist Share Pool**
For laborist groups the clinical FTE percentage accounts for the full share. Only the antepartum component of L&D codes is added to pool. The delivery component is removed from the physicians entirely as this compensation is accounted for through the laborist FTE. All other aspects of the standard OB share apply to laborists.



**Global wRVU Values Example**

| CPT Codes | Description | Type | wRVU Value | Clinical Value |
|---|---|---|---|---|
| 59409 | Obstetrical care | Delivery Only | 14.37 | 0.00 |
| 59514 | Cesarean delivery only | Delivery Only | 16.13 | 0.00 |
| 59612 | Vbac delivery only | Delivery Only | 16.09 | 0.00 |
| 59620 | Attempted vbac delivery only | Delivery Only | 16.66 | 0.00 |
| 59414 | Deliver placenta | Delivery Only | 1.61 | 0.00 |
| 59410 | Obstetrical care | Delivery + Postpartum | 18.01 | 3.64 |
| 59515 | Cesarean delivery | Delivery + Postpartum | 21.47 | 5.34 |
| 59614 | Vbac care after delivery | Delivery + Postpartum | 19.73 | 3.64 |
| 59622 | Attempted vbac after care | Delivery + Postpartum | 22.00 | 5.34 |
| 59400 | Obstetrical care | GLOBAL | 32.16 | 17.79 |
| 59510 | Cesarean delivery | GLOBAL | 35.64 | 19.51 |
| 59610 | Vbac delivery | GLOBAL | 33.87 | 17.78 |
| 59618 | Attempted vbac delivery | GLOBAL | 36.16 | 19.50 |

**Share Percentage Calculation Example**

| | Clinical FTE | Call Burden | OB Share | Clinical Share % | Call Share % | OB Share Percentage |
|---|---|---|---|---|---|---|
| Physician A | 1.00 | 1.00 | 1.00 | 36% | 40% | 38% |
| Physician B | 1.00 | 0.50 | 0.75 | 36% | 20% | 28% |
| Physician C | 0.75 | 1.00 | 0.88 | 27% | 40% | 34% |
| **Total** | **2.75** | **2.5** | | **100%** | **100%** | **100%** |

# New CHPG Employment Agreement for Dr. Anuj Peddada

Final Audit Report                                         2022-05-05

| | |
|---|---|
| Created: | 2022-04-21 |
| By: | Robin Lane (RobinLane@Centura.Org) |
| Status: | Canceled / Declined |
| Transaction ID: | CBJCHBCAABAAfnIY1s3Qh88chZsuhv8b7d7pYCilmQ-5 |

## "New CHPG Employment Agreement for Dr. Anuj Peddada" History

📄 Document created by Robin Lane (RobinLane@Centura.Org)
2022-04-21 - 6:03:33 PM GMT- IP address: 66.97.162.12

✉️ Document emailed to Samuel Weller (samuelweller@centura.org) for approval
2022-04-21 - 6:04:23 PM GMT

📄 Email viewed by Samuel Weller (samuelweller@centura.org)
2022-04-21 - 6:06:27 PM GMT- IP address: 174.198.135.92

📄 Email viewed by Samuel Weller (samuelweller@centura.org)
2022-04-26 - 5:30:11 PM GMT- IP address: 119.12.194.30

✅ Document approved by Samuel Weller (samuelweller@centura.org)
Approval Date: 2022-04-26 - 5:30:54 PM GMT - Time Source: server- IP address: 66.97.162.14

✉️ Document emailed to Anuj Peddada (anujpeddada@centura.org) for signature
2022-04-26 - 5:30:56 PM GMT

📄 Email viewed by Anuj Peddada (anujpeddada@centura.org)
2022-04-27 - 2:01:03 AM GMT- IP address: 67.22.170.14

📄 Document canceled by Robin Lane (RobinLane@Centura.Org)
2022-05-05 - 10:12:08 PM GMT- IP address: 98.38.43.84


centura    Powered by Adobe Acrobat Sign



# EMPLOYMENT APPLICATION

Thank you for your interest in joining our team of incredible caregivers committed to the pursuit of whole person care and moving health forward through meaningful, inspired actions. Through our online application, you'll provide details about your unique skills, education and interests. These will be evaluated, along with the job openings and requirements for roles with Centura Health and our affiliates. Please provide complete information; an incomplete application may affect your consideration for employment.

As we match you with opportunities, you may be invited to complete a phone screen and online assessment to measure your experience and accomplishments, as well as your attitude and preferences about various work-related subjects.

---

**PERSONAL**

---

| First Name | Middle Name | Last Name |
|---|---|---|
| Anuj | | Peddada |

| Preferred Name | Other Names Known By |
|---|---|
| | |

**Current Address Information**

Current Address Line 1
11 el encanto drive

Apt/Suite/P.O. Box

| City | Country |
|---|---|
| colorado springs | US |

| State/Province | Zip |
|---|---|
| CO | 80906 |

**Phone Numbers**

Type
Mobile

| Number | Extension |
|---|---|
| 7196614193 | |

Will you now or in the future require Centura Health to commence ("sponsor") an immigration case in order to employ you (for example, H-1B or other employment-based immigration case)? This is sometimes called "sponsorship" for an employment-based visa.

☐ Yes  ☑ No

Are you at least 18 years old? (if no, you may be required to provide authorization to work)

☑ Yes  ☐ No

Do you have any relatives employed by this organization?

☐ Yes  ☑ No

Have you been in your current role for a minimum of 6 months?

ATTACHMENT 3

☑ Yes  ☐ No

Have you received any written warnings or been placed on a Performance Improvement Plan (PIP) within the last 6 months?

☐ Yes  ☑ No

Is your manager aware of your application?

☑ Yes  ☐ No

## EDUCATION

School/Institution Name
LSU School of medicine

| State | Country |
|---|---|
| LA | United States |

| Degree | Major/Area of Study | Did You Graduate |
|---|---|---|
| MD | Doctor of Medicine | Yes |

## Work Experience

Your current employment experience with Centura has pre-populated below. Please use the add more button to add in all additional appilicable experience for the role that you are applying for. If you are currently employed, please use today's date as your employment end date for your current employer.

Name of Employer
Centura

| City | Country | State/Province |
|---|---|---|
| Colorado Springs | United States | Colorado |

Your Job Title
Self employed contracted physician

| Start Date | End Date |
|---|---|
| 12/1/1999 | 6/1/2022 |

Description
please see CV for details.

## License/Certifications

List all current license(s)/certification(s), that are relevant to your application.

License/Certification Type
Medical Doctor

License/Certification Number
38130

| State Issued | Date Issued | Date Expired |
|---|---|---|
| CO | 8/18/1999 | 4/30/2023 |

## PLEASE READ EACH PARAGRAPH CAREFULLY BEFORE SIGNING

I certify that all of the information I submitted on this application and/or during the application process

(for example, during screenings and interviews) is true and complete. I understand that any false information or omissions will lead to the rejection of my application and/or withdrawal of a job offer, and if I am employed, discipline up to and including separation from employment at the time the false information or omissions are discovered.

I understand, where permissible under applicable state and local law and company policy, I will be subject to a pre-employment drug and health screen prior to my start date. Failure to complete or pass this screen will result in the withdrawal of this conditional offer. In addition, all Centura Health associates must be vaccinated for influenza annually (or provide a valid medical and/or religious exemption), regardless of facility or position held, to comply with state influenza vaccination requirements and the Centura Health Influenza Vaccination policy. All offers of employment are contingent upon successful completion of a pre-employment drug and health screen.

I understand, where permissible under applicable state and local law, I may be subject to a pre-employment background check after receiving a conditional offer of employment to investigate my criminal background and other matters related to my suitability for employment.

In compliance with the Federal Immigration Reform Act, I understand employment is contingent on my providing sufficient documentation necessary to establish my identity and eligibility to work in the United States.

If offered employment with Centura Health I may be terminated by myself or by the Company at any time for any reason, with or without cause, and with or without notice. Any contrary representations which may have been made or which may be made to me are/will be superseded by this condition. The "at will" nature of employment with Centura Health will constitute the entire agreement between myself and the Company concerning the duration of my employment and the circumstances under which I or the Company may terminate the employment relationship. No commitment or expectation shall operate to change my "at will" status. Although conditions of my employment may change, the "at will" term of my employment can only be changed in writing and signed by myself and the President of the Company. If offered a position within Centura Health, the terms described will be the terms of my employment where permissible under applicable state and local law and company policy.

☑ Signature

Anuj Peddada 2/23/2022 12:19 PM

By checking the box above you are applying your signature and you agree to this Applicant Statement.

**Stories and Newsroom**                                    Stories        Press Releases

# CommonSpirit Health to Directly Manage Facilities in Colorado, Kansas, Utah

August 1, 2023

(CHICAGO) – August 1, 2023 – CommonSpirit Health, one of the largest faith-based, non-profit health systems in the U.S., is now directly managing 20 hospitals and more than 240 care sites in Colorado, Kansas, and Utah. These facilities had previously been managed by Centura Health.

The hospitals that are now fully managed and operated by CommonSpirit Health are:

### Colorado

- Longmont United Hospital, Longmont
- Mercy Hospital, Durango
- OrthoColorado Hospital, Lakewood
- Penrose Hospital, Colorado Springs
- St. Anthony Hospital, Lakewood
- St. Anthony North Hospital, Westminster
- St. Anthony Summit Hospital, Frisco
- St. Elizabeth Hospital, Fort Morgan
- St. Francis Hospital, Colorado Springs
- St. Francis Hospital – Interquest, Colorado Springs
- St. Mary-Corwin Hospital, Pueblo
- St. Thomas More Hospital, Canon City

### Kansas

- Bob Wilson Memorial Hospital, Ulysses
- St. Catherine Hospital – Dodge City, Dodge City
- St. Catherine Hospital – Garden City, Garden City

### Utah

- Holy Cross Hospital – Davis, Layton
- Holy Cross Hospital – Jordan Valley West, West Valley City
- Holy Cross Hospital – Jordan Valley, West Jordan
- Holy Cross Hospital – Mountain Point, Lehi
- Holy Cross Hospital – Salt Lake, Salt Lake City

"We have been built on a strong foundation informed by a shared calling, deep faith in our founding congregations, compassion for one another, and quest for better," said Peter D. Banko, President of CommonSpirit's Colorado/Kansas/Utah Division.  "Today is our opportunity to write new chapters in our epic


ATTACHMENT 4

The Centura Health logo, brand and name associated with the
transition to CommonSpirit Health and will be retired over the
information and processes to schedule appointments will rem
immediate changes are expected to services provided.

"We have been a joint venture partner in these care sites for nearly 30 years, so we have a deep understanding of how important these care sites are in the communities they serve," said CommonSpirit Health Chief Operating Officer Marvin O'Quinn. "We are thrilled to now work even more closely to ensure that we are transforming care in the ways that matter most to our people and our communities so that our legacy of caring and humankindness can continue to grow."

For more information, visit Centura.org/CommonSpirit.

### 

**About CommonSpirit Health**

Inspired by faith. Driven by innovation. Powered by humankindness. CommonSpirit Health is building a healthier future for all through its integrated health services. As one of the nation's largest nonprofit Catholic healthcare organizations, CommonSpirit Health delivers more than 20 million patient encounters annually through more than 2,300 clinics, care sites and 137 hospital-based locations, in addition to its home-based services and virtual care offerings. CommonSpirit has more than 155,000 employees, 45,000 nurses and 25,000 physicians and advanced practice providers across 24 states and contributes more than $4 billion annually in charity care, community benefits and unreimbursed government programs. Together with our patients, physicians, partners, and communities, we are creating a more just, equitable, and innovative healthcare delivery system. Learn more at **commonspirit.org**.

## CommonSpirit Health Media Contact

**Lindsay Radford**

Email Us

Call Us: 720-215-9662

Find a Provider

Find a Location

Bill Pay

Careers

Patient Portal

CommonSpirit

Search for care near you

About

**About CommonSpirit**

**Our Care System**

**Community Impact**

**Stories & Newsroom**

**Volunteer**

**Contact Us**

Patient Tools

**Patient Portal**

**Billing & Financial Services**

**Financial Assistance & Hospital Discounted Care**

**Medical Records**

**All Patient Tools**

Careers & Education

**Working With Us**

**Explore Jobs & Careers**

**Residencies & Training Programs**

**Nursing**

Medical Professionals

**CommonSpirit Medical Group**

**Mountain Health Network**

**EpicCare Link**

Region Office
9100 E Mineral Cir
Centennial, CO 80112

CommonSpirit

Search for care near you

©2026 CommonSpirit Mount

**Language Assistance Services.** If you speak a language other than English, assist following languages:

**Español** | **Deutsch** | **Français** | **Tiếng Việt** | 繁體中文 | 한국어 | Русский | አማርኛ | العربية | नेपाली | **Tagalog** | 日本語 | فارسی | **Ɓàsɔ́ɔ̀-wùɖù-po-ny**ɔ̀ | **Igbo asusu** | **èdè Yorùbá** | ພາສາລາວ | **Hmoob** | **Kiswahili** | မြန်မာဘာသာ | **Soomaali**