**<u>Declaration of Eric Koval</u>**

1. I am currently the Director of Oncology Service Line for Montrose Regional Health. I was the Director of Regional Oncology Services for Centura Health covering the Colorado Springs and Pueblo areas from September of 2019 to August of 2022.

2. The care provider for the Oncology Center at Penrose Hospital was Radiation Oncology PC (ROPC), a medical practice in which Anuj Peddada and Alan Monroe were partners. In 2021, ROPC hired Madeera Kathpal, and Penrose provided funding to ROPC under a Physician Recruitment agreement which included a repayment obligation that would be forgiven over time if Dr. Kathpal remained in the community for the designated time period.

3. Numerous times over the years staff members had complained about the way Dr. Peddada treated them. There was a reported long history of him being an old school, crabby, difficult physician to work with. He was great with referring physicians and patients, and he was clinically razor sharp. He was a productive physician who worked a lot and made good money for himself and the hospital. So Penrose just put up with him for a long time.

4. But, eventually under my watch it became apparent that we needed to help Dr. Peddada change. There was far too much turnover, largely because Peddada was hard to work with. We were losing staff because of his behavior. Management decided we could not take it any longer without repercussion, so I started documenting complaints and having nurses fill out Midas reports for egregious misconduct. I talked with Dr. Peddada a number of times, and told him that he was so aggressive that he did not even realize that his conduct was completely inappropriate. We started trying to make big shifts in his behavior in the clinic, and it got everyone's attention hoping for relief from Dr. Peddada's abuse.

5. In late 2021, things were getting ugly within ROPC and it became clear that the physicians of ROPC (Peddada, Monroe, and Kathpal) no longer wanted to practice together. They were all good clinicians, but were not getting along. Dr. Peddada was even ignoring and refusing to talk with his partner Dr. Monroe, which I felt was both immature and unreasonable.

6. Given this critical break in the partnership at ROPC, Centura decided to seek an employment relationship with the doctors so that it could separate Peddada and Monroe at different facilities and yet keep them working within Centura. Initially, it looked like all three doctors were going to be employed, but then things deteriorated quickly with Kathpal and later with Peddada, and Monroe was the only one who ended up being employed by Centura.

7. There was discussion early on about the loan repayment obligation of ROPC if Kathpal left, and we explored how that should be handled as part of initial negotiations. Everybody, including the doctors, understood that loan repayment or forgiveness had to

be addressed and resolved by formal agreement; otherwise, the physician employment agreements of Peddada and Monroe (the two partners of ROPC) would create serious compliance problems for Centura.

8. Eventually, the legal team told us that we could incorporate a loan forgiveness provision in the employment agreements of Peddada and Monroe, which would avoid the need for ROPC to repay out of pocket.

9. I personally had several conversations with Peddada about this. He seemed to be very negative and resistant to any language that spoke to a repayment obligation if he did not remain employed by Centura.

10. The discussions about employment started in earnest in December of 2021 and January of 2022. The agreement with ROPC was extended for a month so that it would expire at the end of June 2022, and the transition to employment would take place then. As time went on, I was more and more anxious to get employment agreements in place because we had to have signed agreements in order to start payor credentialling for the physicians which usually takes 90 to 100 days to complete.

11. Since the Oncology Center had never employed physicians previously, I was not familiar with Centura's normal process for entering into physician employment agreements. I only knew that Jeff Albert and Sam Weller were the ones with authority to negotiate a contract with the doctors.

12. After Physician Employment Agreements were distributed to the group, I had Peddada come into my office to sign the agreement and I let the team know that he had signed. The next day, I was informed by Sam Weller that the agreement was incomplete because the legal team had not yet inserted the provisions regarding loan forgiveness.

13. When I asked Peddada to sign the agreement, I was unaware that loan repayment had not yet been included and that it was only a discussion draft that was not ready for signature. It was decided that we would withdraw the agreement Peddada had signed, and send him a new agreement that incorporated loan forgiveness/repayment. Within the next day or two, I told Peddada that the agreement was incomplete and we were going to need a signature on a new agreement.

14. On Thursday April 21, 2022, Peddada was sent a Radiation Oncology Recruitment Settlement Agreement which addressed loan repayment/forgiveness. On Tuesday April 26, 2022, Peddada was sent a new Employment Agreement which was almost identical to the one he had signed but it included loan forgiveness over a five year period and referenced the Recruitment Settlement Agreement. In the days leading up to April 26, 2022, Peddada had been communicating with me about work-related matters. But after he received and viewed the email with the revised employment agreement, he refused to communicate further about his employment and loan repayment/forgiveness.

15. For example, on Saturday, April 23, 2022, Peddada had a telephone interview with Dr. Wernick, a candidate for the third open radiation oncology position. On Monday, April 25 at 9:17 AM, while Dr. Peddada was on a biking vacation, he and I exchanged text messages about the interview. Dr. Peddada responded promptly and did not assert that he could not communicate about work-related matters.

16. Later that day, at 6 pm, I received an email from Peddada stating that he would be taking a medical leave for 90 days starting on May 1, 2022. His original start date as an employee of Centura would have been July 1, 2022, and his medical leave would move the start date back only a month. Starting a month later simply meant that Centura would have to pay for locums coverage for one month, but the expense was minimal compared to the financial benefits to Centura of the long term employment agreement with Peddada. Centura granted a 90-day medical leave to Peddada.

17. On April 26, 2022, after being informed of his need for a leave, Centura proceeded with the hiring of Peddada by sending him an employment agreement to accept and sign.

18. On April 27, 2022, after Peddada had received and viewed the new employment agreement, I texted him: "Do you have a minute to talk?" to which he never responded. A screen shot of the text messages between me and Peddada is included at Attachment A.

19. After Peddada refused to respond to my text message, later that day, Dr. Plauth sent an email stating, in essence, that Peddada had called him to say that he was adamantly refusing to talk about his employment relationship with Centura while on his medical leave and that he would not be obligated to talk while he was still a "private physician." So, it became quite clear that Peddada was refusing to discuss his employment relationship and repayment obligation for at least the next two months and probably for the next three months. Dr. Plauth reported that he told Peddada that "not talking with us is not an option as it impacts the practice and his potential employment." Yet, Peddada continued his refusal to communicate and did not contact me, Sam Weller or Jeff Albert to discuss the emails with attached agreements we had sent to him and that he had viewed. Peddada persisted in his refusal to communicate about his employment-related contracts during the two weeks following the 26th of April. There was not one word from him. He did not accept the offer of employment we had sent to him.

20. This refusal to communicate was seriously problematic for a number of reasons. Peddada had refused to communicate with his partner, Dr. Monroe for months, and it did not bode well for a good employment relationship that he was already refusing to communicate with us, his prospective employer, for months. In an adult, professional setting, refusal to communicate is completely unacceptable and extremely troubling.

21. We did not have a fully signed agreement and could not proceed with payor credentialing for Dr. Peddada in its absence. Without an agreement regarding loan repayment or forgiveness, we could not proceed to employ Dr. Peddada due to compliance concerns.

22. Although it did not require any out-of-pocket payment from him, Peddada had been very negative about the loan forgiveness period of five years that would require him to make a partial repayment if he did not remain employed within Centura for five years. This made us wonder if he was truly committed to working in the community long term.

23. Then we discovered that he had put up his home for sale, which added to the impression that Peddada might be wanting to leave sometime soon.

24. Without Peddada's willingness to communicate, there was no way to resolve these questions and concerns with him.

25. We were receiving excellent applicants for the open radiation oncology position left open by Dr. Kathpal, so it became apparent that Centura would have some options if it did not proceed with Peddada.

26. Ultimately, the difficulties caused by Peddada's refusal to communicate made us decide to withdraw his offer of employment and proceed with another candidate. He had been a difficult doctor over the years, and his refusal to communicate at this crucial juncture made it impossible for us to proceed with his hiring, and it accentuated his negatives in our minds.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

This Declaration was executed on the _11_ day of October, 2023, in Montrose, Colorado.

_____
Eric Koval

**Attachment A**

