Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

CASE NUMBER 1:23-cv-01921-NYW-MDB

_____

DR. ANUJ PEDDADA,

Plaintiff,

v.

CATHOLIC HEALTH INITIATIVES COLORADO

dba CENTURA HEALTH - PENROSE-ST. FRANCIS

HEALTH SERVICES,

Defendant(s).

----------------------------------------------------------

DR. JEFFREY ALBERT

December 12, 2024

----------------------------------------------------------

Pursuant to Notice, and Fed. R. Civ. P.30(B)(6) the Zoom deposition of Dr. Jeffrey Albert, was taken on behalf of the plaintiff by his attorneys of RATHOD MOHAMEDBHAI, LLC on December 12, 2024 beginning at the hour of 8:30 a.m. MST reported by Ruth Collins of Magna Legal Services, 866 624-6221.



Page 2

APPEARANCES

FOR THE PLAINTIFF:

Omeed Azmoudeh, Esq.

RATHOD MOHAMEDBHAI, LLC
2701 Lawrence Street, Suite 100
Denver, CO  80205

ih@rmlawyers.com

FOR THE DEFENDANT:

Mark Sabey, Esq.
Lindsay McManus, Esq.
HALL RENDER KILLIAN  HEATH
 & LYMAN, P.C.
999 17th Street, Suite 800
Denver, CO  80202
303 802 1299

lmcmanus@hallrender.com

Page 3

INDEX

Examination by Mr. Azmoudeh............... Page 4

EXHIBITS

| Number | Description | Page |
| --- | --- | --- |
| Ex. 2 | PCP Dr. Record | 121 |
| Ex. 11 | Email (leave) | 94 |
| Ex. 12 | letter | 116 |
| Ex. 13 | Rescission letter | 127 |
| Ex. 21 | Email | 97 |
| Ex. 40 | Email | 73 |
| Ex. 42 | Email | 76 |
| Ex. 44 | Email  4/22  4/23 | 90 |
| Ex. 57 | Email 4/27  4/28 | 106 |
| Ex. 59 | Medical leave reques | 114 |
| EX. 66 | Text messages | 79 |
| Ex. 70 | 2nd Amended (30)(B)(6) | 8 |
| EX. 71 | Penrose 3rd Supplemental | 15 |
| Ex. 72 | Centura Policies | 30 |
| Ex. 73 | PSA agreement | 57 |
| Ex. 74 | letter | 59 |
| Ex. 75 | CHPE agreement | 85 |
| Ex. 76 | Emails | 112 |
| Ex. 77 | Interrogatories | 148 |
| Ex. 78 | Affirmative defenses | 147 |
| Ex. 79 | Request to produce | 149 |

Page 4

P-R-O-C-E-E-D-I-N-G-S

MR. AZMOUDEH:  My name is Omeed Azmoudeh from RATHOD MOHAMEDBHAI on behalf of the plaintiff Dr. Anuji Pedadda.

MR. SABEY:  And I am Mark Sabey on behalf of the defendants, Penrose Hospital.  And I have got with me here Lindsay McManus, who is not screen but is here also for the deposition.

DR. JEFFREY ALBERT, first having been duly sworn, on oath testified as follows:

EXAMINATION

BY MR. MOHAMEDBHAI:

Q.  Good morning, Dr. Albert.  Could you start by just stating your full name for the record?

A.  Yes.  Jeffrey Albert.

Q.  And is that Dr. Jeffrey Albert?

A.  Yeah, Dr. Jeffrey Albert.

Q.  Okay.  I'm going to call you Dr. Albert today just to keep the formality but you should feel free to call me Omeed.  And you and I are going to spend the day together.  And I understand that you have some prior commitment this evening.  Is that true?

A.  I do, yeah.  My wife has a commitment.  So I am on child care duty.

Page 5

Q.  What time do you need to be done here by?

A.  I think some time, say 4:30 and 5:00.  If, for some reason we are close, you know, we can try to keep it moving or.

Q.  Okay.  I will do my best to respect that. Today I am going to put down some ground rules for both you and I, most of these are because we are over Zoom and there is a court reporter.  And this isn't the most natural way to communicate with each other.

When I am asking a question or when you are giving a response, let's do our best to let each other finish what's coming out of our mouth and so we are not getting criss-crossed.  Does that make sense?

A.  Yeah.

Q.  And you are doing a good job already but nodding your head and shaking your head no, don't appear well on the record, so if you have a yes or no, just make sure to articulate that answer.

A.  Will do.

Q.  Mr. Sabey will make objections today throughout the day, and that's another good reason to slow down when I am asking questions and give a pause. But unless he instructs you not to answer, he is going to lodge the objection, and you should go ahead and still answer.  Does that make sense?



MAGNA
LEGAL SERVICES

Page 6

A. Yes.

Q. And I will just sort of randomly feel like now is a good time for a break, and say let's take a break, but if you need a break for some reason or other just ask for it. And unless there is a question pending, which I will probably ask you to answer before we go on that break, I don't have an issue with taking extra breaks. Okay?

A. Sounds good.

Q. You just took an oath. What is your understanding of that oath?

A. That I am legally obligated to tell the truth, to the best of my knowledge.

Q. Dr. Albert, is there any reason such a health condition or a medication or substance that would cause you not to be able to tell the truth today?

A. No.

Q. Any of those same things, health conditions medications, substances, other than time, I recognize that I am going to be talking about some things that happened a couple of years ago, any of those health conditions, medications or substances that would impair your memory?

A. No.

Q. Dr. Albert, I am going to be using the word

Page 7

Centura today. Do you understand that that refers to Catholic Health Initiatives Colorado, which formerly doing business as Centura Health Penrose St. Francis?

A. Yes, I am aware.

Q. Okay. And the vast majority of the questions I am going to ask today are dealing with the time period approximately the end of 2021, through the first, the spring of 2022. Does that make sense to you?

A. It does.

Q. During that time period what was your position at Centura?

A. I was the enterprise medical director of radiation oncology and integrated cancer care.

Q. Can you tell me just a little bit about enterprise medical director for radiation oncology?

A. Yeah. So I was the medical director responsible for the radiation oncology component of the cancer program for the company of Centura, so for the enterprise.

Q. So what hospitals were within your purview in that role?

A. It would have been all Centura facilities including the Catholic hospitals as well as the Advent health hospitals across all of our facilities across Colorado and western Kansas at the time.

Page 8

Q. Can you put a number on how many hospitals that is?

A. I believe we were 20.

Q. And what is your position today?

A. So I am now in the role of executive medical director of oncology. So the -- I am formally, along with my administrator Diane Carter responsible for the cancer program for the mountain region of Common Spirit, you know, what was formerly Centura.

Q. Is the mountain region different than Colorado and western Kansas?

A. So it is slightly different. And so when Centura disaffiliated, Advent Health spun off their five hospitals in the Denver Metro, and were absorbed back into the Advent Health organization for management purposes. At the same time Common Spirit acquired five new facilities in Utah, so the footprint is still 20 hospitals, but it is now Colorado, western Kansas and Utah.

Q. Mark, am I correct, I am starting at Exhibit 70 today?

MR. SABEY: Yes.

Q. (By Mr. Azmoudeh) All right. Dr. Albert, throughout the day I am going to be sending you exhibits in the chat.

Page 9

A. Okay.

Q. That way you can just open them up on your computer and take a look at them.

A. Sounds good.

Q. Can you all hear this? There is some leaf blowing going on outside my office, do you hear it?

A. I don't.

(Exhibit 70 identified.)

Q. I am going to share with you what's been newly marked as Exhibit 70. Let me know when you have that open.

A. I have got it.

Q. Do you see at the top, Dr. Albert, follow along with me if you could. It says Plaintiff's Second Amended Notice of Rule 30 (b)(6) deposition of Defendant. Do you see that?

A. I do.

Q. Have you seen a version of this notice, either the first the amended or the second amended?

A. I have.

Q. When did you first see a version of this document?

A. It was sent to me by our counsel probably a month or two ago.

Q. And, Dr. Albert, I want to draw your attention

3 (Pages 6 to 9)



MAGNA
LEGAL SERVICES

Page 10

just to the first page, where it says that plaintiff Dr. Anuj Peddada will take the deposition of the officers, directors, managing agent or representatives of the Centura having knowledge and sufficient information to testify concerning the topics listed below.

Do you see that?

A. I do.

Q. Okay. Do you understand that you have been designated by Centura to testify on their behalf?

A. I do.

Q. Okay. What does that mean to you?

A. So I am speaking, not just for myself, but with respect to the organization as the official representative with knowledge of these events from the company.

Q. So throughout the day I am going to be questions about the what the company thinks about things. And what the company did. Does that make some sense to you?

A. Yes.

Q. Do you feel as though you are prepared to testify on all of the topics then listed in this document?

A. I do.

Page 11

Q. I am going to go out of order throughout the day. Bear with me. The first topic I want to discuss is roughly topic 7. Do you want take a quick look at that and refresh your memory?

A. Okay.

Q. What did you do to prepare for this topic?

A. So I went, along with our counsel, I went through and reviewed, you know, each of these questions so I understood what they meant along with a lot of the discovery documents and communications that were had to refresh my mind. At least I don't remember, or I didn't remember a lot of these details, but having read through all of those things, I feel I have a good recollection of it now.

Q. Do you think you sort of went topic by topic and reviewed documents corresponding to those topics or was it a little more holistic than that?

A. Probably a little of both.

Q. Okay. About how many documents would you guess you reviewed in that process?

A. There were PDFs of many documents together, I would say probably representing several hundred pages.

Q. Focusing on topic 6, and I'll start with the process of employing physicians. During the time period we discussed which employees were responsible for the

Page 12

the employment process for physicians? And let's focus on at Penrose.

A. You said topic 6. You meant 7, correct?

Q. 7.

A. Okay. So by physicians, you mean radiation oncologists or physicians in general?

Q. Why don't we start with the physicians in general?

A. So physicians, employed physicians are employed through Centura Medical Group at that time. And so the corresponding medical director for a given specialty along with medical group leadership would be responsible for extending employment offers as well as management and oversight for those positions.

Q. So with respect to radiation oncology, there would have been the medical director for radiation oncology, and then who specifically would that medical director have worked with in engaging in that process?

A. Yes. So the person with the most direct oversight of that would have been the vice president of physician alignment who was Sam Weller.

Q. Who was the medical director at the time for radiation oncology?

A. Me.

Q. Can you just discuss briefly the distinct

Page 13

roles, if they were distinct or how they overlapped between you and Mr. Weller in the process of employing physicians?

A. Yes. So there really, there is a large team. It wouldn't have just very been the two of us. We were the two probably most directly accountable. And so we would go through a process of posting a job, interviewing physicians, taking input from the group collectively including staff, other physicians, medical group leaders above myself would select a candidate for a position, extend a kind of informal non binding term sheet, progressed toward the process of a contract.

There would be communications from both of us, from both Sam and I with that position and that process. Very often, either one of us could extend the offer. I tended to be the one to extend the offer, but, again, Sam sometimes would -- could do that as well. He handled a lot of the administrative pieces, working with the contract team. And we together would work with legal and compliance.

And you know, once an employment contract would be signed, then Jason Taja who was the CEO of the medical group at the time would then sign the contract to make it a binding contract. And the physician would, as of becoming employed, the physician would be

4 (Pages 10 to 13)



Page 14

reporting to me. So I was in that role for radiation oncologists to be considered the hiring manager.

Q. You mentioned that there was some input gathered from staff in that process. What staff and what types of input?

A. It would depend on who the candidate had engaged with in the course of their interview.

Q. Would there be any discussion with the chief of staff at Penrose?

A. To make an employment offer, typically not.

Q. I think you mentioned that you would serve as the hiring manager once the physician was employed. What does that mean?

A. That the physicians would report to me from an HR standpoint.

Q. And what types of communications would you be having at that point?

A. I mean, so you know, periodic meetings, one on one, touch base meetings, I would be the person they come to with problems or issues. And I could help them resolve. Performance evaluations, you know, signing off on a reimbursement and other HR functions.

(Exhibit 71 identified.)

Q. I want to show you, Dr. Albert, a different exhibit. I am going to shared with you what has been

Page 15

marked as Exhibit 71.

A. I have it open.

Q. Do you see at the top, Dr. Albert, it says Penrose's Third Supplemental Objections and Answers to Plaintiff's First Set of Interrogatories?

A. Yes.

Q. Have you reviewed this document?

A. I don't think so.

Q. I will represent to you that --

A. No, no. I am looking through it now. This doesn't look familiar to me.

Q. Do you know what an interrogatory is Dr. Albert?

A. I don't.

Q. Okay. I will represent to you that an interrogatory is, in a lawsuit, a written question that requires the other side to provide a written response. So these are Dr. Pedadda's written questions to Centura. Does that make some sense?

A. Understood.

Q. If you look at page 4 --

A. Okay.

Q. Do you see Interrogatory number 2?

A. I do.

Q. And I want you to go all the way to the

Page 16

bottom, and it says, if you could read along with me at the bottom of page 4, the following persons were decision-makers in the decision to withdraw Dr. Pedadda's offer of employment, Eric Koval, Sam Weller and Jason Tacha.

Do you see that?

A. I do.

Q. Earlier we discussed the people involved in the employment process were generally, you, Dr. Albert, as well as Mr. Weller. How are these people, Mr. Koval and Mr. Tacha also involved in that process?

A. So Jason Tacha, I believe, Sam Weller reported to Jason. And so Jason would have been the CEO for medical group ultimately responsible for the enterprise. Sam Weller would have been his representative in this case, much like I was the radiation oncology medical director, but then Dennis Kraus was the executive medical director of oncology, and was the person to whom I reported. He would have also been involved in this decision.

Eric Koval was our director of the cancer program for that region. And so Eric wouldn't have had any formal oversight of these physicians, and by decision-maker, I mean I guess it depends on what you mean by decision-maker. But I would have strongly

Page 17

valued and considered Eric as a partner in the decision-making process because he was our eyes and ears at Penrose. The person to whom all of the staff reported, and who was ultimately responsible for the performance of the cancer center. And so he would have been intimately involved in any of the decision-making processes.

Q. It strikes me that you are not listed as a decision-maker in this decision; is that accurate?

A. I don't think that is accurate. I would say I was a decision-maker.

MR. SABEY: Omeed, we will amend our Answer.

MR. AZMOUDEH: Sure. Thanks, Mark.

Q. (By Mr. Azmoudeh) Dr. Albert, I am not accusing anybody of dishonesty here. I just want to be clear on who is doing what.

A. Thank you.

Q. During the time period we are discussing today some of the physicians who practiced medicine at Penrose were not employed by Centura, is that accurate?

A. Correct.

Q. And those physicians, some of them, were practicing medicine at Penrose pursuant to maybe a contract that Penrose had a physician group on a physician individually; is that accurate?



Page 18

A. Correct.

Q. So during the time period that we are discussing, which Centura employees were responsible for the oversight of those contracts with private physicians or private physician groups?

A. So that would also be the physician alignment group, so Sam Weller would have been responsible for that. And then all way all up to Dr. Scott Lichtenberger, who was the head of the physician alignment group.

Q. I have not heard that phrase before. Is that a way to sum up all of the people that you and I have been discussing this morning, the physician alignment group?

A. Yeah. That was Centura's language for the piece of the organization that was responsible for all, essentially, all physician relationships, both employed and non employed.

Q. So if we use the physician alignment group today, is it fair that at least in the context of radiation oncology, that would include you, Mr. Weller, Mr. Koval, Mr. Tacha, and anyone else?

A. Technically, no. Eric Koval and I and Dennis Kraus would have been considered part of the oncology service line.

Page 19

I apologize that the structure is, it is a bit confusing. But, yeah, so if you refer to -- I am trying to think what would apply to both the potential employment relationship as well as the PSA contracts, I think you can say physician alignment group and that can represent those of us in the enterprise that served those functions.

Q. Okay. I may use that from time to time today or I may just say names because that a little complicated.

A. Yeah, sounds good.

Q. Go through, if you could for me, the names of those people again who would have had oversight over the physician contracting process. And if you could just describe what their roles generally were?

A. Yeah. So the person who would ultimately approve and sign off on physician contracts, and I do have an addition as I am thinking through it. So Scott -- Dr. Scott Lichtenberger was the head of physician alignment group, would ultimately be the person responsible for driving and approving these things. Sam Weller would have been again VP representative doing most of the work and direct interfacing, in what we call the greater Colorado Kansas operating group which included Penrose.

Page 20

There is also these PSA agreements were typically with facilities, and would also be signed by the facility CEO, so Dr. Bryant Earling, who was the CEO at Penrose at the time, was also very involved in the process.

Q. And throughout the time period that we have been discussing which Centura employees were responsible for or involved in the process of evaluating a physician with staff privileges at Penrose, if that physician were to make a request for medical leave.

A. Clarify, you are talking about a non employed private physician?

Q. Can we put an employment aside for a second and just talk about if somebody were to request leave from the medical staff?

A. In general, yeah. So there would be a formal process that would go to the chief of staff, who was Caryn Baldauf at the time. The CMO, Bill Plauth, would have been also, ordinarily wouldn't be involved in this, just given that role.

Q. Does Dr. Baldauf have any responsibility, whether formal or informal, with respect to the employment of the physicians or the oversight of contracts with unemployed physicians?

A. Not to my knowledge. Certainly not within the

Page 21

oncology program.

Q. Formal rules aside, does she have channels of communication to those sets of people?

MR. SABEY: Object to the form.

A. Yes, I wouldn't know.

Q. (By Mr. Azmoudeh) So this question is directed towards Centura, and all of these are. Does Centura have any open channels of communication between the chief of staff and the individuals involved in the process of employing physicians and those involved in the oversight of contracts with private physicians?

A. Yeah. So these people may work together, right, and they may know each other but we are very careful to draw a fine line between the employment relationship and priviledging, credentialing medical staff issues. And so anybody in that role would know that there is not to be interaction, crossing the line between those two things.

Q. Well, you mentioned that Dr. Plauth had some involvement should a physician request a medical leave from the medical staff. What is Dr. Plauth's involvement?

A. Yeah. As the chief medical officer he is responsible, you know, for, you know, quality, safety and as a executive member of the hospital, you know, the



Page 22

general care provided there. And so, he like most CMOs was very aware and involved with the physicians at his facility, such they would view him as a resource, and so he wouldn't necessarily be involved. But, for example, Dr. Plauth was someone who Dr. Pedadda felt comfortable reaching out to in that capacity.

Q. Dr. Plauth described himself as the liaison between physicians who have staff privileges and the administration at Centura.

Does Centura agree with that characterization?

A. I think that is a good characterization, yeah.

(Exhibit 12 identified.)

Q. I'd like to pause. I am going to share with you what has been previously marked as Exhibit 12. Let me know when you have it open.

A. I got it.

Q. Okay. I want you to focus for now, Dr. Albert, on the second page of Exhibit 12, which is excerpt from the by-laws. Do you see that?

A. I do.

Q. Do these by-laws represent, in Centura's view, the process by which a physician requests a medical leave or a leave of absence from the medical staff at Penrose?

A. Just browsing the document. Yes, this looks

Page 23

like our typical process.

Q. I draw your attention to 6.G 3 to start. And I think you discussed earlier that the chief of staff was Dr. Baldauf, is that correct?

A. Correct.

Q. And if a physician from the radiation oncology department requested a medical leave, this by-law 3 says that Dr. Baldauf will consult with the relevant department chair. Who would have been that relevant department department chair?

A. So for medical staff purposes, radiation oncology got bundled into, at different hospitals, to different groups. It was often, you know, the chair of medicine or someone along those lines. I -- department chair. Yeah, I would say that, I do not know who that individual was at Penrose, but radiation oncology is a small specialty and would often get lumped into the department of medicine at most of our hospitals.

Q. Do you, maybe you answered this already, but do you know who the department chair of medicine was at Penrose at the time?

A. I don't recall.

Q. In 6.G 3 of the by-laws, it says that the chief of staff and the relevant department chair shall consult.

Page 24

What is Centura's understanding of what they are to consult on?

A. Sorry. Which number is that?

Q. Sorry. Dr. Albert, it's the same paragraph 6.23?

A. I don't know what that means.

Q. Did you review this by-law in preparing for today's deposition?

A. I did. I read through it.

Q. You don't know who the department chair is, you don't know what the chief of staff and the department chair are consulting on? Is that fair?

A. Well, the chief of staff would be consulting on the, you know, the criteria for a leave of absence, to the best of their ability. I understand this to mean that they can, you know, they may consult with the department chair. The department chair of medicine ordinarily would not, you know, would not always be the best person to consult for radiation oncologists because radiation oncology is kind of peripheral to the department of medicine.

Q. What does Centura believe the criteria is that the chief of staff should be considering in this process?

A. I mean per, it would be per the letter of the

Page 25

by-laws.

Q. If you look at, Dr. Albert, the bottom of these, this excerpt of the by-laws paragraph 9. Do you see that?

A. Yes.

Q. And it says leave of absence is a matter of courtesy, not of right, in the event that it is determined that an individual has not demonstrated good cause for leave, or where a request for extension is not granted, the determination shall be final with no recourse to a hearing and appeal.

Do you see that?

A. I do.

Q. Is good cause the criteria that the chief of staff is to consider in deciding whether to grant a request for leave?

A. Per the by-laws, yes.

Q. Do you, does Centura have any further guidance on what good cause means?

A. I am not aware of any specific guidance. I think it is more just taking all of the facts into consideration.

Q. If the request is for a medical leave, what might be some of the facts that Centura would expect the chief of staff to consider?

7 (Pages 22 to 25)



Page 26

MR. SABEY: Object to the form.

A. Per number 6 in the by-laws, you know, an appropriate report from the individual's health care practitioner stating that they are physical and or mentally incapable of resuming practice safely and exercising the medical privileges that they have requested.

Q. So paragraph 6 is about reinstatement; is that accurate?

A. Oh, that's correct, yeah. That is reinstatement.

Q. But what I am hearing is whether to initially grant the leave might be a similar analysis, is this physician fit to physically and mentally capable of resuming a hospital practice and safely exercising the clinical privileges. Is that fair?

MR. SABEY: Object to the form.

A. Correct. And you know, further up even in number 2, if they're away from responsibilities longer than 30 days, and the reason is related to their physical and mental health or otherwise their ability to care for patients safely and competently, it may trigger an automatic medical leave of absence. That is the other expressing similar sentiment as the criteria for reinstatement.

Page 27

Q. Dr. Albert, I'll draw your attention to paragraph 4. The first sentence says: During the leave of absence, the individual shall not exercise any clinical privileges.

Why is that?

A. Presumably -- presumably, if the individual is on leave, they would not be, you know, that's a formal leave from the medical staff, at which point they would not be authorized to undergo clinical privileges or perform clinical privileges.

Q. Is it also because in some cases as we discussed a moment ago, the physician is not capable for some physical or mental reason of safely practicing medicine?

A. Correct. If those reasons were related to physical or mental health, you know, that would imply that during that leave that individual would not be able to safely or competently practice medicine.

Q. And then the second sentence in paragraph 4 says: In addition, the individual shall be excused from all medical staff responsibilities, for example, meeting attendance, committee service, emergency service complications during this period.

Do you see that?

A. I do.

Page 28

Q. Why is that?

A. For the same reasons.

Q. Which were?

A. That, you know, while on leave, if for reasons of mental or physical health, they would not be able to safely or competently practice those medical staff responsibilities.

Q. They would not be able to possibly safely or competently attend meetings?

A. With respect to their medical staff responsibilities.

Q. They would not be able to safely or competently provide services to certain committees?

A. Correct.

Q. When are these by-laws -- well, actually let me just back up for a second.

Dr. Albert, these by-laws are, this is just an excerpt of a much longer set of by-laws, correct?

A. Correct.

Q. Without showing you the entire list, I just want to ask, when are the set full set of by-laws provided to physicians who practice medicine at Penrose?

A. At the time of granting of medical staff privileges.

Q. Does it come alongside a training module or

Page 29

hand out summarizing them, or what is the message when the by-laws are delivered?

A. I don't know the specifics or recall the specifics of that.

Q. Are there any trainings that Centura provides on the by-laws to Centura to physicians who are practicing medicine at Centura?

A. So the by-laws are available to physicians at all times. You know, to my knowledge there is not specific training on interpreting the by-laws. I think if a physician had questions or concerns about that they would talk to the chief of staff. And then that person is an omni-present available resource in the facility.

Q. Dr. Albert, I want you to return to Exhibit 70. Let me know when you are there.

A. Okay.

Q. And I draw -- I will draw your attention to topic number 8. Do you see that?

A. Yes.

Q. What did you do to prepare for this topic?

A. So we reviewed kind of the accessibility and availability of these trainings.

Q. What about policies?

A. Can you -- I am not sure what the question is.

Q. Did you review any policies that Centura

8 (Pages 26 to 29)



Page 30

maintains related to discrimination, harassment or retaliation based on disability?

A. Yes. I am familiar with those policies and am required to review them annually.

(Exhibit 72 identified.)

Q. I am going to show you, Dr. Albert, what is going to be marked as Exhibit 72. Okay. Let me know when you have Exhibit 72 open.

A. Got it.

Q. Are you familiar with -- well, take a moment to take just a glance through these, and let me know if you are familiar with these policies?

A. Yes. I am familiar.

Q. A second ago we discussed policies related to discrimination, harassment, and retaliation, you mentioned that you reviewed the policies annually.

Are these the policies that you reviewed?

A. Yes.

Q. Do you know who authors these policies?

A. Human resources. I don't know the individual.

Q. What is the purpose for you to review them annually?

A. As you know as a leader in the organization familiarity with all appropriate laws, compliance, regulations, you know, to be to be legally compliant.

Page 31

Q. Do you offer any input after you review these policies on whether they should be modified in anyway?

A. Not typically.

Q. I want to focus, Dr. Albert, on the first policy. This policy title, Americans with Disability Act amendments act, ADAAA.

Do you see that one?

A. Sorry. Are you looking at step 1? Where are you looking?

Q. So at the very top of Exhibit 72, you see it says policy title?

A. Oh, yes. Yeah.

Q. So I am focusing on that policy.

A. Got it.

Q. To summarize this policy, would you agree that this policy is about the steps by which an employee of Centura can request and potentially obtain an accommodation?

A. Correct.

Q. And there is, according to this policy, five steps in that process?

A. Correct.

Q. And at the end there is an Attachment A, which is, as I understand it, a form that the employee seeking the accommodation can fill out with their manager, and

Page 32

human resources. Do you see that? Is that accurate?

A. Yes.

Q. This policy is also about -- sorry. Scratch that.

This policy throughout references the term disability. Does Centura offer any definition of what a disability is under this policy?

A. I am not familiar with that other than as it would be designed under the law.

Q. What is Centura's understanding of the disability under the law?

MR. SABEY: Object to form and foundation.

A. I couldn't speak to that.

Q. (By Mr. Azmoudeh) To be clear, Centura cannot speak to the definition of disability under the law?

MR. SABEY: Again, I object. It calls for a legal conclusion.

A. Yeah, I would -- to answer that question I would need to defer to our legal team.

Q. (By Mr. Azmoudeh) This policy also -- draw your attention to the first paragraph under statement of policy, do you see in the middle of the first paragraph it says Centura does not discriminate against qualified job applicants and associates.

Do you see that?

Page 33

A. I do.

Q. So this policy applies in Centura's view to both qualified applicants and associates. Is that accurate?

A. Correct.

Q. And at the end of that paragraph, or later in that same sentence, it says that Centura does not discriminate against qualified job applicants and associates with known physical or disabilities in any employment practice, including recruitment and hiring, as two of the examples.

Do you see that?

A. Yes.

Q. Does that further indicate that this policy applies to both qualified applicants as well as associates?

A. Correct.

Q. And Centura agrees, sorry, just to be clear, Centura agrees that this policy applies to both qualified applicants and associates in any employment practice including recruitment and hiring?

A. Yes.

Q. I want to draw your attention to the bottom of this page under step one for procedure.

Do you see that?



Page 34

A.  I do.

Q.  Do you see how there is two types under step one.  One is for request for non leave related accommodation, and two, is request to leave accommodation?

A.  Yes.  I see those.

Q.  In those policies Centura is describing, two different types of accommodations, one being non leave types, and leave types.  Is that accurate?

A.  Yes.

Q.  So under this policy Centura understands that leave can be a form of an accommodation for a disabled associate or qualified applicant.  Is that true?

A.  Yes.  That's what it says.

Q.  I want to draw your attention to, Dr. Albert, sometimes in the bottom right of these documents, you will see what we call a Bates label.  And this document says PSF Pedadda and it has a number.

Do you see that?

A.  I do.

Q.  Sometimes I may refer to that number just so you and I on the same page quite literally.  I am going to draw your attention to PSF Pedadda 461.  And let me know when you are there.

A.  I am there.

Page 35

Q.  You are very quick.

Do you see under definitions, the first sentence says, reasonable accommodation, any change or adjustment to a job or work environment that permits a qualified applicant or associate with a disability to participate in the job application process.

Do you see that?

A.  Yes.

Q.  Is that something that Centura strives to do, to provide reasonable accommodations where appropriate to allow a qualified applicant with a disability to participate in the job application process?

A.  Yes.

Q.  Do you see at the end of that same sentence, that same paragraph, excuse me, an employer is required to provide a reasonable accommodation to a qualified applicant or associate with a disability, unless the employer can show that the accommodation would be an undue hardship that would require significant difficulty or expense.

Do you see that?

A.  Yes.

Q.  Is that Centura's understanding of an undue hardship?

A.  It is.

Page 36

Q.  And so under this policy, Centura is stating that it is required to provide reasonable accommodations to qualified applicants should that accommodation permit them to participate in the job application process, unless that reasonable accommodation would result in an undue burden.  Is that fair?

A.  Yes.

Q.  I reviewed this policy a few times, Dr. Albert, and I don't see anything about Centura discussing whether it is appropriate to interfere with a reasonable accommodation that has been granted.

Does Centura have any opinions on interference with accommodations that have been granted?

MR. SABEY:  Object to form and foundation.

A.  I am not sure what you are asking.

Q.  (By Mr. Azmoudeh) Yeah.  So maybe you can indulge me with a hypothetical, so I can ask a question to it.

If a Centura employee, who is in a wheelchair, obtains a special desk to accommodate their working environment, does Centura have any opinions on whether it would be appropriate to take that desk away at a whim?

A.  I mean, you know, I mean, according to this, that would be denying an accommodation in the absence of

Page 37

an undue hardship.  And so my opinion is something like that would not be allowed.

Q.  Thank you for indulging me in that hypothetical.

When does Centura first share this policy with associates, as that term is used in this policy?

A.  As part of the on boarding training.

Q.  What is the on boarding training related to this policy look like?

A.  So there a series of what we call learn modules related to all kinds of corporate compliance programs that all associates are required to complete upon employment. It is an online training module.

Q.  Any other regular period in which this policy is introduced or refreshed to associates?

A.  Yes.  So there is annual compliance training that includes all required trainings, such as this, the associates are required to complete.

Q.  So to sum it up, there is training on the on boarding on the policy, and then annual training on the same, is that fair?

A.  Correct.

Q.  Any other time in which associates would take a look at this policy as part of some regular Centura programming?


MAGNA
LEGAL SERVICES

Page 38

A.  All policies are available to all associates at all times.  I mean, so if an associate were to review this, and have a question, you know, or a clarification that they were to seek, you know we won't require them to wait until the following year.  They would consult the HR representative.  And they are available at all times to help.

Q.  Would Mr. Tacha have reviewed this policy when he was on boarded or a version of this policy when he was on boarded as an employee of Centura?

A.  He would have been required to do that, yes.

Q.  As well with Mr. Taja have perform the annual trainings related to this policy?

A.  Correct.

Q.  And how about, let's take all of them together, Mr. Weller, Mr. Koval and you, Dr. Albert, would you review this policy upon on boarding?

A.  Yes.

Q.  And all three of those people, would they participate in the annual trainings related to this policy?

A.  Yes.

Q.  Is this policy shared with qualified applicants?

A.  I am not sure.

Page 39

Q.  Okay.  Earlier, Dr. Albert, we looked at by-laws requesting leave from the medical staff.

Do you remember that?

A.  Yes.

Q.  If a physician employed by Centura is granted medical leave under the by-laws, do they also need to request medical leave under this policy?

A.  In general, they would, as opposed to a non employed physician an employed physician would be responsible for going through the formal HR process.

Q.  You said in general they would.  Is it true in practice that physicians actually go through -- physicians employed by Centura actually go through both avenues to finalize the leave?

A.  In practice they would go through the HR process, and in that process would include formal application for medical staff leave.  So, yes an employed physician would go through both of those avenues as parts of the same general process.

Q.  Is this the primary Centura policy related to discrimination, harassment or retaliation based on disability?

A.  Yes.

Q.  Are there any others that are significant in Centura's view related to discrimination, harassment or

Page 40

retaliation based on disability?

A.  Not that I am aware of.

Q.  In general, is there any other training that Centura offers or requires of its associates related to discrimination, harassment and retaliation that we haven't discussed already?

A.  No.

Q.  I am going to have you, Dr. Albert, to go back to Exhibit 70.

A.  Okay.

Q.  Do you see, Dr. Albert, topic 9?

A.  Yes.

Q.  Okay.  What did you do to prepare for this topic?

A.  The same.  You know, review policies, procedures, and this is our standard, also part of our standard training.

Q.  Okay.  Does Centura maintain a formal policy related to Stark law and that statute or other related laws?

A.  Yes.

MR. AZMOUDEH:  Mark, have we been produced that?

MR. SABEY:  Don't know, off the top of my head.

Page 41

MR. AZMOUDEH:  Okay.  I don't know if I have seen it.  If it is there, maybe I missed it, but let's take a --

Q.  (By Mr. Azmoudeh) Well, let me ask this, Dr. Albert:  In preparing for today's deposition, did you review that policy?

A.  I did not.

Q.  Okay.  Do you recall seeing it in any of the materials that you took a look at?

A.  Yeah.  Give me a second.  That specific policy, I can't recall having seen that in the prep materials.

Q.  Let me just ask, is the, we discussed earlier with the disability discrimination policy that is provided to employees or associates at the on boarding stage.  Is that true for the Stark law and the kick-back statute policy?

A.  It is.  It is provided at the on boarding stage and as part of the annual compliance training.

Q.  Okay.

MR. SABEY:  Do you have the Integrity Manual?

MR. AZMOUDEH:  I don't know, Mark, you guys have funny names for everything.

MR. SABEY:  Well, I am assuming we have provided the Integrity Manual to you.  If not, I am

11 (Pages 38 to 41)




Page 42

happy to provide it.

MR. AZMOUDEH: All right. Is that just a handbook?

MR. SABEY: Yeah. Sort of a compliance-related handbook.

MR. AZMOUDEH: Okay. I don't know that I have seen that. Maybe that would be helpful or maybe I did and I just glossed over it.

Q. (By Mr. Azmoudeh) Could you help me here, Dr. Albert? What does Centura expect its associates to understand about just generally about Stark law and the kick-back statute?

A. Yeah. Just the seriousness of these, their implications for legal compliance, the, you know, that to ensure that folks within the organization don't accidentally violate these statutes that would jeopardize, you know, our ability to, you know, to maintain, you know, federal, to be able to participate in federal health care programs.

Q. What about the actual contents of what is and isn't a potential violation, mistake or not, of the statute?

Is there any expectations that associates understand the contents of those laws?

A. There is. An annual training I can just

Page 43

recall from the most recess time I did it, the annual training included examples of, like, hey, this would be allowed, this wouldn't be allowed, to ensure that everyone is familiar with what wouldn't be allowed, and also where some of those gray areas might be where they recommended that you consult your compliance officer.

Q. Why don't we take a quick break, Dr. Albert, maybe ten minutes. Is that all right?

A. Yeah, sounds good.

(Off record at 9:55 a.m.)

(Back on the record.)

Q. Dr. Albert, I want to draw your attention back to the Exhibit 70?

A. I have it.

Q. Do you see topic number 2?

A. Yep.

Q. What did you do to prepare for this topic?

A. I reviewed, you know, with our counsel what these things all mean to make sure I was familiar with the facts that are pertinent to this case, and then reviewed documentation that was provided, some E-mail and HR stuff, and a packet that was provided surrounding complaints about Dr. Pedadda.

Q. Why don't we focus on the period, let's say 1999 to 2021. Does that period make sense to you?

Page 44

A. Yes.

Q. Okay. Why is that?

That was a bad question. Sorry.

Did Dr. Pedadda practice medicine at Penrose at least between 1999 and 2021?

A. Yes.

Q. Can you just tell me the different roles Dr. Pedadda had at Penrose between those years as best you know them?

A. Yeah. So he was one of the partner of Radiation Oncology PC. He was a physician practiciing in, you know, at Penrose as a radiation oncologist.

Q. Did he ever hold any medical director positions?

A. Yeah. I looked into this, and I could not find a formal medical director agreement for Dr. Pedadda signifying that he would have been considered the medical director of radiation oncology. I saw reference to that in there, and I have not seen that agreement.

Q. Did he hold any other roles as far as Centura is aware of?

A. Not that I am aware of.

Q. What was Centura's oversight of Dr. Pedadda as a practicing physician at Penrose?

What did that generally look like?

Page 45

A. I mean, so his duties, you know, as a physician were to practice in accordance with medical staff by-laws and provide the services outlined in the PSA between Penrose and Radiology Oncology, PC.

Q. When you say PSA, what do you mean?

A. The Physicians Services Agreement, Professional Services Agreement.

Q. Is there any significant differences in the oversight that Centura exercises over -- exercised over Dr. Pedadda versus the oversight that Centura exercised over physicians who are practicing --

A. No. I am sorry.

Q. It is a long question. I know you know where I am going but, I will just restate it.

Any differences in the level of oversight that Centura exercised over Dr. Pedadda versus the oversight that Centura exercised over physicians who practice medicine at Penrose and also had a formal employment agreements with Centura?

A. Yes. So this the difference would be employed physicians were also subject to the terms of their employment contract as well as, you know, the HR oversight, as any associate of the organization would, which is, that would be additional oversight beyond that of a private practice physician.



Page 46

Q. One of the things you mentioned earlier was looking over Dr. Pedadda's, I guess I will call it personnel fire, is that fair?

A. Yeah. Similar content.

Q. In that file, there are certain documents reflecting Centura's, I guess, involvement with Dr. Pedadda through Centura HR, such as like investigations and responses to complaints.

Do you remember seeing those?

A. Yes.

Q. Okay. So is it fair that Centura HR doesn't exercise oversight over physicians like Dr. Pedadda, who don't have an employment agreement?

A. That's correct.

Q. Let me ask a better question. Sorry.

I think a second ago you said that a difference between employed physicians versus private physicians is that Centura's HR exercises oversight over the employed physicians.

I guess what I am getting at is, it appears to me that Centura HR exercises oversight over all types of physicians, including Dr. Pedadda?

A. So my understanding of those documents, as I read them, I am very familiar with many of the cultural issues, you know, within the department. With

Page 47

Dr. Pedadda, I am personally aware of that from discussions I had with Eric Koval and others in the department. I read, you know, those documents for the first time. I saw some of those HR, specific HR complaints. Upon review of those, I wouldn't have necessarily known all of those details before. But my understanding from those documents was the HR process was initiated by employees within the department, who are subject to HR oversight.

And that the answer that they were receiving from the HR team was that HR did not have oversight over non employed physicians, you know, and that that would need to go through those who had, you know, oversight of his agreement, and, you know, medical staff.

So I guess to answer that in a shorter way, so no, I am not aware of any specific action or oversight that HR would have exerted over Dr. Pedadda.

Q. So let's use an example. You are aware of the 2017 investigation?

A. I am not sure what you are referring to. If you could --

Q. Yeah. It is going to be a big document, but -- you know what, we are going to come back to this question later. So I can pull the document during a break just so I can understand what's going on to review

Page 48

it.

Let me ask a question. You mentioned that, I think, one of the ways that Centura could actually exercise oversight over Dr. Pedadda, if they thought it was appropriate to take some remedial action, was to go to the people who managed the contract.

Did I restate that accurately?

A. There would be two different avenues here. If it were in violation of the terms of the contract, right, then it would be the physician alignment group that would have oversight over that.

If it were, you know, general conduct as a physician practicing in the facility, that would be the medical staff process.

Q. That's the process through, like, the MEC?

A. Yeah. Correct. So that would be the primary probably analogous process as going through HR for an employed person.

Q. Okay. So you described a moment ago some cultural challenges and some complaints that you reviewed in the personnel file that you are familiar with. Is that accurate?

A. Yes.

Q. Did any of those, can we call them performance deficiencies? Is that a fair way to say it?

Page 49

A. Yeah, it is.

Q. Okay. Did any of those performance deficiencies ever result in the physician alignment group taking any formal action with respect to the professional services agreement?

A. Not to my knowledge.

Q. Did any of those performance deficiencies ever result in any formal action taken by the medical executive committee, the MEC?

A. So you had referenced the 2017 investigation, and I think I am -- I think I am remembering what you are talking about. But there was -- there was a recommendation that came out of that. And like I said, I was not in the organization. I reviewed a whole bunch of documents. And so I don't know all of the specifics but there was a recommendation that came out of that at that time that Dr. Pedadda was to attend some type of communication course, along with follow up with both within the medical staff team to kind of document understanding and behavioral change.

I do not know the specifics that have. I'd have to pull up that document to remind myself.

Q. We can pull up the document up later, but just off the top of your head, do you remember if the recommendation came from the MEC or HR?

13 (Pages 46 to 49)

LEGAL SERVICES

Page 50

A.  I don't.  I'd have to look it up.

Q.  Although there were recommendations to take courses and some follow up, were there ever any restrictions placed on Dr. Pedadda's ability to practice?

A.  Not to my knowledge.

Q.  Just within the concept, Dr. Albert, what is Centura's understanding of physician burn out?

A.  Yeah.  So physician burn out is something that, you know, obviously has accelerated, you know, post pandemic, and is something that we take very seriously.  It's something that, you know, I personally take very seriously.  You know, Shauna Gulley, who I report to, is also passionate on this topic.  We have a medical director of physician wellness in place.  But I mean burn out is a sort of a syndrome reaction that is this triad of emotional exhaustion, depersonalization, and lack lack of a feeling of accomplishment that is characteristic of physicians who are, you know, at a point in their career where they are feeling those symptoms..

Q.  So it is a triad of exhaustion, depersonalization, and what was the third part of the triangle?

A.  Like feelings of, like, lack of accomplishment

Page 51

is the definition, to my understanding, the definition of burn out.

Q.  Can you talk more about depersonalization what is that term?

A.  I like to, like I said, I am not an expert on this topic but that's, you know, the feeling of, you know, physicians who, you know, it is almost like out of body experience, where, you know,  maybe you aren't as emotionally as invested in patients, you know, as you normally would be.  So you know, you may, you know, lack empathy, or, you know, not -- as a physician, right, you connect with your patients, you meet them where they are at, you approach them with empathy and understanding.  Depersonalization is a sort of like being removed from that connection.

Q.  Does Centura understand that this triad of symptoms or experiences, does Centura understand that the triad would be things that a physician would experience only in the provision of patient care?

A.  Yes.  I am not a burn out expert.  I would, if I were getting into something like on this level of detail I would consult Dr. Diane Thompson, our medical director for wellness.

Q.  Today, Dr. Albert, you are speaking on behalf of Centura so in some sense we have to assume you have

Page 52

the benefit of Dr. Thompson's expertise.

MR. SABEY:  I am going object to the characterization.  It's not an obligation of a 30(b)(6) witness.

Q.  (By Mr. Azmoudeh) So I will ask it a different way.  Well, I will leave it at that actually.

In Centura's understanding can physicians diagnose physician's burn out?

A.  So I mean in our understanding it is not a medical diagnosis.

Q.  Where does that understanding come from?

A.  It is not listed as a condition in the DSM manual.

Q.  Do you know what DSM stands for?

A.  Diagnostic -- I don't know the acronym. Diagnostic, something, Manual.

Q.  We discussed earlier a policy that used the term disability.  Do you remember that?

A.  I do.

Q.  Does Centura believe that physician burn out could qualify as a disability as Centura defines that term?

A.  So that term is broadly defined.  You know, I would, in a situation like that, I mean burn out can cause you know again stress, anxiety, other things.

Page 53

There are circumstances in which that could qualify as a disability to our knowledge.

Q.  You mentioned Shauna Gulley.  Did I say that right?

A.  Yes.

Q.  Is she a doctor?

A.  She is.

Q.  So what is Dr. Gulley's title, if you know it?

A.  Presently or during this period of time?

Q.  During this period of time.

A.  So she was the chief clinical officer for Centura.

Q.  I think you mentioned that Dr. Gulley has a real interest in burn out or a passion for burn out.  I don't want to put words in your mouth, but there was some connection between Dr. Gulley and the concept of burn out.

Can you help me connect those dots?

A.  Yes.  So, you know, she is presently my -- so I know her well but, and I would say the same is true for me, I think there is a sensitivity and compassion around what physicians go through, and in training, careers, particularly, you know, in the pandemic and post pandemic era, in the practice of medicine today.  I think she is an individual who is particularly sensitive

14 (Pages 50 to 53)

MAGNA
LEGAL SERVICES

Page 54

or compassionate on that topic and conducts the medical group accordingly.

Q. As an organization, does Centura share a sensitivity and compassion with physicians who maybe experiencing physician burn out?

A. Yes, absolutely.

Q. I think you mentioned earlier that there is a wellness program at Centura, and can you describe the wellness and any other formal programs targeted towards physician burn out?

A. Yeah. So there is a -- so all of this or not all, most of this would fall under the purview of Dr. Diane Thompson. Her role is specifically to be this resource utilized by many for, you know, as, you know, for counseling, for support, for someone to connect them with other appropriate resources, depending on what their particular issue was. Dr. Thompson offers peer coaching as a way to expand, you know, the access points. It is usually only one person in a large organization, offers peer coaching to physicians, to all physicians andphysician leaders who are interested to been able to serve as a closer resource to other physicians within the organization.

Q. Does Dr. Diane Thompson form a formal doctor patient relationship with the physicians when she sees

Page 55

them?

A. I am not -- I don't know.

MR. SABEY: Objection, foundation.

Q. (By Mr. Azmoudeh) Outside of programs, does Centura host or sponsor, let's say, any kind of lectures or publish any articles related to physician burn out?

A. Yes. There have been events and different things organized over the years. I could not, off the top of my head, recall specifics.

Q. We discussed earlier some annual trainings. Is physician burn out a concept that appears in any way in those annual trainings?

A. I have not memorized all those trainings. I don't recall.

Q. I am going to turn your attention to Exhibit 70. And then I want to draw your attention to topic 1. Let me know when you have had a chance to look at that.

A. Okay.

Q. Do you understand that PSA that refers to the professional services agreement between ROPC and Centura?

A. I do.

Q. Okay. Just generally what were some Centura's views of the respective obligations under the PSA?

Page 56

A. Yeah, so I mean the physicians are required to, you know, maintain a Colorado medical license, remain in good standing with the medical staff services department, provide clinical care and coverage for the Penrose Cancer Center. That would be the general obligations.

Q. And in exchange what did Centura provide to ROPC?

A. Staff support, exclusivity, so not bringing on any other radiation oncologists to provide care in the hospital. Those would be the primary.

Q. Suppose access as to facility would be another one?

A. Yeah. Yeah. Centura would provide access to the facility for the practice of radiation oncology, correct.

Q. Give me one second. There is a noise outside my office. Sorry. Sorry about that.

I want to show you -- are you ready, Dr. Albert? Sorry.

A. Yeah.

Q. We have our holiday party today, so spirits are up.

A. Yeah. That is on the air.

(Exhibit 73 identified.)

Page 57

Q. I want to show you what is going to be marked as Exhibit 73.

A. Okay.

Q. Are you familiar with this document?

A. I am.

Q. Okay. As you understand it or as Centura understands it, there was an original professional services agreement many years ago that was sort of periodically reviewed and extended. Is that fair?

A. Correct.

Q. And if you look at this document, Exhibit 73, under recitals, it says hospital group -- hospital and group previously entered an into an exclusive professional services agreement for radiation oncology services dated June 19, 2017. The agreement expired on June 18, 2019.

Do you see that?

A. I do.

Q. Okay. So prior to this agreement, the prior version of the PSA had been signed on June 19, 2017. Is that accurate?

A. I don't know but presumably based on what this says.

Q. And also based on what this says, that that earlier agreement expired on June 18, 2019. Correct?



Page 58

A. Correct.

Q. And then based on what this says, it says that the parties have continued to operate under the terms and conditions of the agreement from the date of expiration through the effective date of this addendum. Do you see that?

A. Yes.

Q. Okay. And then if you look at the bottom of this Exhibit 72 -- I am sorry, 73, do you see that this agreement was signed in May and June of 2020? Do you see that?

A. I do.

Q. Okay. So based on what we just read, it appears there was a lapse between June, 2019 and June 2020, where there was not a signed agreement in place. Is that fair?

A. Correct.

Q. Do you know why there wasn't a signed agreement in place for that full year?

A. I don't know why in this case.

Q. Did it seem just like a honest mistake?

A. Yeah. It happens, you know, from time to time that when there are hospital has a lot of the PSA agreements, they may not sign, with a long standing group, it is basically does these two or three year

Page 59

extensions, that sometimes they don't get around to it until after the agreement has expired. Both parties kind of continue to work together in good faith. And so I don't know but it seems reasonable that this could have just been a honest mistake and they didn't review it in time.

Q. It looks like it was corrected a full year approximately after the earlier agreement expired. Do you see that?

A. Correct. Yes, I do.

(Exhibit 74 identified.)

Q. I want to share with you what has been marked or what will be marked as Exhibit 74. Let me know when you have Exhibit 74 open.

A. I have got it.

Q. Have you seen this letter, signed letter before?

A. I have.

Q. And is it accurate to say that this letter indicates that the PSA would be expiring on June first, sorry, excuse me, on July 1, 2022?

(Reporter did not hear answer.)

A. I said correct.

Q. This, Dr. Albert, this extension was part and parcel with a discussion that Centura was having with

Page 60

the members of ROPC about employment, is that accurate?

A. It is.

Q. Okay. Can you just discuss the circumstances surrounding the conversations, Centura conversation regarding the employment of the members of ROPC?

A. Sorry. Are you saying with respect to this one month extension, or what is the question?

Q. I will ask another question. Sorry. When did the conversation start at Centura regarding whether or not to employ the members of ROPC?

A. It would have been not long after me joining the organization, so late 2021.

Q. Okay. Did your joining the organization have anything to do with that, or is that just kind of how you have blocked off in your mind?

A. Oh, that is just how I have it block off in any mind. I recall this being one of the issues as I was kind of learning the region, one of the issues that we delve into relatively early on after I got here. My arrival had nothing to do with the initiation of those conversations.

Q. Who was involved in these conversations, let's say, starting with December or late 2021?

A. It would be Eric Koval, Dr. Pedadda, Dr. Monroe, myself, Dr. Kraus, Dr. Gulley to whom

Page 61

Dr. Kraus reported at the time. Those would have been, oh and then Kathy Bishop was our oncology administrator to whom Eric Koval reported as the other member of the leadership team, in the service line who would have been involved in those conversations. That is the primary group.

Q. How about Mr. Weller?

A. He would have been involved in the conversations, once we reached the point of discussing options for employment, but like initial conversations with the physicians, wouldn't necessarily have involved Sam Weller.

Q. What did the initial conversations with the physicians look like?

A. So in discussions, you know, in surveying, right, the region, finding out, you know, how things were going, I met and spoke with the physicians many times about what I could do to help them in my role. And they, it was very clear that that partnership had become broken. And so the physicians basically looked to us to try to help mediate the fractured partnership in some way, and that is how these conversations began in earnest.

Q. Did Centura have an understanding as to why the partnership was broken or struggling?

16 (Pages 58 to 61)

Page 62

A. Yeah. So it was difficult to ascertain. There was a lot of animosity within that partnership. I remember many times having to actually meet with them separately, because Dr. Pedadda was not willing to engage with Dr. Monroe initially at that time. And so, you know, we were playing a lot of hearing one side, hearing the other side, trying to figure out what would have been going on here.

The only facts that were very -- initially very clear to me were they had stopped communicating. Dr. Pedadda was not attending the regular peer review quality meetings. They were not communicating. And Dr. Pedadda was not willing to communicate with Dr. Monroe even regarding issues pertinent to patient care. And you know that lead to this downward spiral in the partnership.

And so how that began, how did the relationship between these two long time partners start to go south, in the first place, the Centura team was never fully clear on that.

Q. Did the Centura team become aware of whether there had been any similar issues, let's call it 20 years prior, that these two were partners?

A. Yes. So each of them would characterize, each of them being Dr. Monroe and Dr. Pedadda, would

Page 63

characterize there was always a strain in the relationship. And they each had their own way of describing that, but that they had always remained cordial and collegial. And it was really only, you know, in that period of time, you know, that relatively short period of time leading to up to these decisions, you know, in the prior year or so that it seemed like the downward acceleration of this relationship had occurred.

Q. Does Centura place responsibility on Dr. Pedadda exclusively for this final downward acceleration?

A. Centura doesn't place responsibility on either one of them. It was a broken partnership.

Q. Mutual animosity, is that fair?

A. I would say that's fair. Yes.

Q. And at that some point I think you mentioned that that discussion around the partnership transformed into a discussion around employment. Can you help me understand how the conversation got to employment?

A. Yes. So the -- both physicians expressed a desire to continue practicing with us at Penrose or Penrose St. Francis.

They, you know, were both, I would say, jockeying for position for, you know, wanting to be

Page 64

viewed favorably with respect to being able to stay in some capacity. We had a conversations around, you know, I believe they both asked could we help mediate the partnership between the two of them. And we said, you know, no. That is not our role as the hospital.

We said we would be happy to work, you know, as long as you are able to continue to, if you are ability to repair this relationship, we could renew the PSA. And they both made it clear that that relationship was not going to be repaired. And so they were saying things like, we are going to dissolve the practice.

They were asking if we would be willing to engage in a PSA with both of them separately. You know, from a practical standpoint, that is not reasonable, and that not practical for the operation of the department.

And so we said, you know, if you would both like to remain here, and you would both like to remain practicing here in this community with us, you know, the preliminary way that we would be able to accomplish that would be through an employment relationship where we could employ each of you. You would be partners in practice, not, you know, not in the business. And we felt in talking through it with them, we felt that would be the best way to maintain continuity of care in the

Page 65

practice, while allowing some of these, you know, while being able to have the opportunity to repair this relationship fracture to ensure it wouldn't impact patient care.

Q. Do you know about when that possibility was presented to Dr. Monroe and Dr. Pedadda?

A. This was through the winter of 2021-2022. I wouldn't be able to recall which months.

Q. If I could pull it up, I will represent to you that Mr. Weller requested the establishment of physicians, the physicians in January of 2021, 2022, excuse me. Does that sound about right?

A. That sounds correct.

Q. There was some, you mentioned earlier jockeying for positions. There was also, I think some jockeying for locations as between Penrose and St. Francis. What do you remember about that.

A. There was. So Penrose was the higher volume center. It was the more established center. St. Francis was the new center that had just recently opened had much lower volume, was much further from home for both of these physicians and was viewed as the less favorable or less desirable of the two.

So one of the ideas that we came up with in this process to help kind of remediate this situation

17 (Pages 62 to 65)

MAGNA
LEGAL SERVICES

Page 66

was to place one of them at Penrose, and one of them at St. Francis, to operate, you know, almost semi-independently. And again, there would still be an expectation they would participate in quality assurance and peer review processes together, cover it each other on call, those sorts of things. But the thought was that if we able to separate them for a period of time in day-to-day practice while kind of tensions resolved, they could get back to caring for patients and worry less about the relationship, right, and all of emotion that had become attached to that practice, that we could start the practice that way, and then potentially over time, you know, look at bringing Dr. Monroe, say splitting his time between Penrose and St. Francis and bringing him back into Penrose while we could hire a third physician. So is that sufficient?

Q. More than sufficient. I appreciate it. Why did -- well, is it accurate that ultimately Centura would offer the Penrose position to Dr. Pedadda?

A. Correct.

Q. Why did Dr. Pedadda get the offer for the more favorable, more established position?

A. So there were several reasons for that. One, Dr. Monroe throughout this process was generally more flexible, and our primary desire was to maintain

Page 67

continuity in the practice as best we could to minimize disruption in the program. And so there was some feeling, among the group at Centura, that putting Dr. Monroe, that Dr. Monroe would be more willing to play ball, if you will, and or to try to remediate the situation, be willing to go to St. Francis.

Dr. Pedadda also saw more patients, and he was the higher volume physician of the two. Penrose was a higher volume center. There was a general understanding and appreciation of how hard Dr. Pedadda worked. They were both, you know, very good physicians providing good patient care. But when it came to parsing out who was going to go where, there was sort of a, an unwritten agreement also with Dr. Monroe there would be a good faith attempt over time to bring him back in part or in whole to Penrose eventually in the year or so to fellow.

Q. One of the reasons was Dr. Pedadda worked harder, in summary?

A. I don't know that I would characterize it as worked harder. He certainly generated more, you know, more RVUs. He saw more patients than Dr. Monroe.

Q. Were there any considerations of Dr. Pedadda's referral networks?

A. I am not sure what you mean by referral network.

Page 68

Q. As I understand it, radiology oncology doctors much of their practice is treating patients that are referred to them by some other specialists who identified the cancer or something to that effect. You just don't walk into a radiation oncologist doctor's practice?

A. Correct. Nearly all patients would follow that pattern.

Q. So my question was, well, in that pattern, that means that there are doctors out in the world, in Colorado Springs, maybe the greater mountain area, who are encountering referring physicians or patients who need radiation oncology expertise. And those doctors at times are thinking either Dr. Monroe, Dr. Pedadda, or some other radiation oncology physician that they can refer to. And so my question is did Centura's decision to offer Dr. Pedadda a position at Penrose, did that at all take into account, you know, the frequency or likelihood that other physicians would be referring patients to Dr. Pedadda?

A. Yeah. I would say no. That in particular was not taken into account. These this two physicians were in the same practice. Right? It was a practice that had exclusively to practice that specialty at Penrose Cancer Center and St. Francis by extension and St.

Page 69

Francis, so the vast majority of these referrals would be coming from physicians who are already tied into our system. So, for example, the Rocky Mountain Cancer's medical oncologists who are basically right next door on our campus, leasing that space, would refer their patients to the radiation oncologists downstairs. Right.

And many of these surgeon were employed or exclusively contracted surgeons who would then, who are also the other preliminary referral source for primary oncologists operating and practicing at our facility. And so, you know, I, in my experience working with both employed and non employed physicians across, you knoe, multiple hospitals and multiple health systems, the flow of those patients, for that kind of an alignment, is generally going to go to whoever your radiation oncologist is, unless there was, you know, some major issue with that radiation oncologist, which we would then try to rectify.

But I would not characterize that as Dr. Pedadda's referral network. I would characterize it as this is the Penrose Cancer Program and the Radiation Oncology PC practice within that program.

Q. Understood. Are you aware that Centura used Dr. Pedadda's image on a billboard?

18 (Pages 66 to 69)



Page 70

A. I am. I recall seeing an image on a board in front of the building at one point.

Q. Do you have any idea why Centura made the decision to use Dr. Pedadda's image on a billboard?

A. I don't. You know, there are many physicians and associates across the organization utilized on these, these likeness were utilize to further our name recognition. I wouldn't know why someone in particular chose Dr. Pedadda.

Q. I think you said, I mean, one possibility might be to further your name recognition, right?

A. I mean a general brand awareness campaign for any Centura marketing is what I meant.

Q. Understood. We talked earlier about what we described as some of the deficiencies in Dr. Pedadda's personnel file. Do you remember that?

A. Yes.

Q. Did any of those deficiencies, were those considered in deciding whether to offer employment to Dr. Pedadda?

A. They were.

Q. Okay. In what ways?

A. So, you know, it had become, it had been brought to my awareness during this same period of time, right, the December to April, '21 to '22 period of time,

Page 71

that there were a lot of staff who were frustrated with Dr. Pedadda, and how he had a tendency to treat staff and being generally difficult to work with and increasingly difficult to work with during that period of time.

Q. So Centura made the decision to hire him or offer him employment at Penrose? Help me understand that.

A. Yeah. There was one of many things under consideration. Right. He was a good physician, him and Dr. Monroe. Like I have already said, they were both good physicians in good standing. There were a lot of physicians who are difficult to work with. Right.

As I was peeling back the layers, having very serious conversations with Dr. Pedadda and Dr. Monroe around the culture of the department and the deterioration of that culture over time made it clear that any employment agreement would be subject to conducting themselves in a professional manner, treating staff and patients with respect, treating each other with respect. And Dr. Pedadda was generally agreeable to that, would often in a very relatable and sympathetic way, would say, you know, say things like, you know, I have just been really busy. You know, I will continue to work on this. He was generally when confronted with

Page 72

these things, he would generally express remorse. And in my experience, you know, how physicians respond to those conversations gives you an indication, right, whether there is opportunity for improvement. So I made it clear. You know, Eric Koval and his team, at the cancer center, had some reservations about this.

And, you know, I had heard there were several staff members who threatened to leave if Dr. Pedadda was kept on. Dr. Monroe had threatened to leave, if Dr. Pedadda was kept on. And so, it's a long story. It is complicated. Right?

And so we felt at the time, you know, that we, you know, we would have the opportunity, you know, an employed physician could be put on a performance improvement plan. Right? And I sort of made this clear to Eric and others. And I believe there is even an E-mail in the discovery that says, hey, Dr. Albert, understand what's going on, is willing to help mediate this, you know, moving forward. So I was willing to give him a chance.

Q. Is these deficiencies in his personnel file and some of these cultural challenges or communication challenges you were discussing ultimately were not significant enough to preclude Centura from making an offer of employment to Dr. Pedadda. Is that fair?

Page 73

MR. SABEY: Object to the form of the question.

A. So they were not sufficient to preclude offering employment. They did complicate the decision and made the decision not an easy one.

(Exhibit 40 identified.)

Q. Dr. Albert, I am going to share with you what has been marked as Exhibit 40.

A. I have got it.

Q. Okay. Are you familiar with this document?

A. I am.

Q. Okay. This is an E-mail from Eric Koval to a number of different people. And it says in this E-mail, April 12th, Sam, Dr. Pedadda didn't sign his employment contract. Here is a copy of the original if needed.

Are you following me with that?

A. Yes.

Q. This is the first offer of employment that Centura extended to Dr. Pedadda which is attached to Mr. Koval's E-mail; is that correct?

MR. SABEY: Object to the form.

MR. AZMOUDEH: What's the basis, Mark?

MR. SABEY: You called it an offer. It is a legal term that has specific meaning. It doesn't apply to a discussion draft.

19 (Pages 70 to 73)



Page 74

Q. (By Mr. Azmoudeh) Okay. All right. Dr. Albert from Mr. Koval's E-mail here, at least at the time that Mr. Koval sent this E-mail does it appear that Mr. Koval believed this was a discussion draft?

A. I don't know what Eric would have believed at that time. From the E-mail, it appeared that he was confused.

Q. We discussed earlier that Centura had made the decision to extend an offer of employment to Dr. Pedadda, or had sort of finalize its intentions with respect to the employment route with regards to January of 2021. Do you know why there was a 3-month delay in between those discussions materializing and this employment agreement?

A. So our typical process would be to get the physicians approved, right? And then go through the whole pro forma creation and business plan piece, and then it would go to physician control and a committee called the PACK committee to make, to approve the physicians.

And, you know, once that happens you would then start recruiting for a physician. Right? In this case we had folks in mind we were going to try to convert into employment. And then once you have

Page 75

candidates identified, you present a term sheet to those candidates. And then once you have general agreement to proceed with the contract, then you would request the contract. And that could take four to six weeks or longer to get one of those contracts back from the legal team. Don't get me started with that frustration on that time line. And then you would receive a contract.

And then very often you review that contract, and make changes. And at this time in the history of the organization, they hadn't -- we didn't have a structure for radiation oncology employment. We were moving in that direction here, but, like, so we didn't have already have a template for what this was supposed to look like from a comp model standpoint and everything else. So again, this process would typically take several months in any circumstances. This was complicated by, additionally our desire to try to do right by these two physicians, who, you know, kind of respecting their long standing relationship with the organization. If we could try to find some way to roll in a forgiveable loan for the position recruitment assistant that had been provided to them as a gesture of goodwill. So that would have added a whole another layer of meetings with our compliance team and others that could have easily added a month or longer.

Page 76

So actually when you say, like, three months, that is actually not an unreasonable time. That is expeditious by our standards.

(Exhibit 42 identified.)

Q. Yeah. That is a lot to do in three months. I am going to share with you what has been marked as Exhibit 42.

Do you already have it open?

A. All right. I have got it.

Q. If you go to bottom of Exhibit 42, do you see this is the the the same, the start of the same E-mail chain I just showed you.

A. I see that.

Q. Okay. I just want to -- we discussed earlier Mr. Koval being a decision-maker with respect to this employment process, correct? So I am not trying to trip you up here.

A. Yeah. Yeah. Formal versus informal, you know, I would say he was informal decision-maker in this process.

Q. Is Centura aware that Mr. Koval visited Dr. Pedadda in person and helped him sign that employment agreement that we just looked at?

A. We became aware of it when he received that communication from Eric.

Page 77

Q. Okay. And in this E-mail chain, on April 12 at 3:48 p.m., Mr. Koval says, ahh, I was under the impression that that would be a separate agreement from employment.

Do you see that?

A. Yes.

Q. I think earlier you said that Mr. Koval must have been confused?

A. Correct. Yeah.

Q. Can you describe for me briefly the confusion that's going on here?

A. So, yeah, as the cancer center director, right, Eric would have accustomed to kind of being involved in all discussions and goings on in the department. He has, you know, a representative of the organization, was often involved in many of communications with the physicians, because he was the one who was physically there. So Eric might see these docs 10 or 20 times before I might see them the next time in person. Right? So he had a tenancy to be around more.

He was not in a position to formally extend an offer in his role. So I think he was probably just to the best of his ability and good faith, trying to, you know, help expedite this process by discussing and

MAGNA
LEGAL SERVICES

Page 78

reviewing questions. Also Dr. Pedadda and Dr. Monroe would have come to Eric specifically with many questions and out of the desire to be helpful, Eric probably would have done his best or referred to them to us for more specific details.

And so, when he took that, you know, I think that particular communication makes it clear that Eric in his role wouldn't understand the necessity from a compliance standpoint to tie a loan forgiveness provision like that into an employment agreement, because that would have all have to be considered under unfair market analysis.

Q.   You are aware that Dr. Pedadda did sign that first employment agreement that we were looking at, correct?

A.   Yeah, I became aware from Eric's communication.

Q.   Okay. And I think you just discussed that Eric, I am sorry, Mr. Koval would not have been aware that there was some other agreement that needed to be signed to be in compliance.

Does Centura know whether Dr. Pedadda would have understood anything about the need for a second agreement at the time Mr. Koval visited Dr. Pedadda to help him sign the employment agreement?

Page 79

A.   Yeah. So I had had multiple communications with Dr. Pedadda personally about the settlement agreement. And so I believe he would have been well aware of that from many communications.

(Exhibit 66 identified.)

Q.   I am going to show you what had been marked as Exhibit 66.

A.   I have got it.

Q.   Okay. Do you see that these are text messages? I will represent to you that these are text messages are from Dr. Pedadda's cell phone. Do you have any reason to dispute that?

A.   No.

Q.   Okay. And Dr. Pedadda's text at the top and its dated, says, can you check see where we are with the contracts? Do you see that?

A.   Yes. Yes. It is a little fuzzy.

Q.   And then on April 5th, you responded, and you say, I touched base with Eric, and Sam. It lookd like Eric sent you a copy, the actual copy.

Do you see that?

A.   Yeah.

Q.   Kind of seems like in this moment, you are telling Eric to handle, Mr. Koval to handle the contract?

Page 80

MR. SABEY:  Object to the form.

A.   Yeah. I don't interpret that that way. I interpret that acknowledging that Eric sent it to him, not that we asked Eric to send it to him.

Q.   But you didn't say in the text message, the one that Eric sent to you the draft discussion, correct?

A.   I don't use that term, but I say just working out whether to do the assistance as part of the contract or a separate addendum later, which I would argue implies that it was a discussion draft.

Q.   Do you know if you told Eric that?

A.   I don't recall.

Q.   Probably not, right, because Eric went to Dr. Pedadda's office and had him sign the contract. Right?

A.   Again, I don't recall.

Q.   I want to go back, if you could keep 66 open for me though. I want to go back to 42.

A.   Okay. I have got that too.

Q.   And then April 12th, there is E-mail from Sam Weller where he says, it is but we are adding language in the employment contract that points to it. We will see what Jennifer says.

Do you see that?

A.   Yes.

Q.   So Mr. Weller is saying that Centura is going

Page 81

to add language in the employment contract that points to another agreement regarding the loan. Is that fair?

A.   Yeah. Often, we would package those together as a separate, as a addendum or as a separate agreement within the same contract packet.

Q.   So if you look back at your text message on 66, you said just working out whether to do the recruitment assistance loan as part of the contract or a separate addendum later.

Do you see that?

A.   Yep.

Q.   Those are not really an or situation, right? It was both. There was going to be a contract with the reference to the recruitment assistance loan and also an addendum, right?

A.   Well, I think we were trying to figure out from a compliance standpoint whether or not those needed to be together. This is why it was a discussion draft. We were working out whether those needed to be together, or if it could be a separate addendum later.

Reading this, my interpretation is that we were likely consulting with our compliance team at the time and hadn't yet finalized our decision.

Q.   And so when you sent this text message to Dr. Pedadda you weren't sure exactly how it would look?



Page 82

Right? The package?

A. Correct. Yeah, I read it that way.

Q. And when Dr. Pedadda decided to sign the first employment agreement, nobody had offered him any instructions as to exactly how it would work, correct?

A. We had discussed, he and I had discussed several times what we expected, what we expected the terms of that agreement to look like. For example, you know, A, a 5-year, a pro rated 5-year pay back provision if he were to leave the organization.

I recall very distinctly conversations with him about that because his behavior was odd.

Q. So my question was just more specific. When Dr. Pedadda signed, decided to sign the first employment agreement, he did not receive any instructions as to precisely what terms would appear where, not the substance of those terms, but whether the employment contract would include terms related to the loan or whether there would be a separate addendum related to the loan?

Nobody had instructed Dr. Pedadda how exactly that would look?

MS. SABEY: Object to the form.

A. We instructed him that that was going to need to be part of the agreement, and he knew that. He was

Page 83

uncomfortable with the agreement. And several times had stated or intimated that he was, you know, may not be willing to sign such an agreement.

Q. From a compliance perspective was it Centura's view that it was actually necessary to include a provision in the employment contract that simply points to another agreement?

A. So again, at that time we were working out those details because pointing to another agreement that wasn't linked to that agreement, right, you know, that would be signed at a later time, I think understanding whether, you know, the compliance of something like that is what we were working through at this exact time, which is why I said that.

Q. And ultimately though Centura would issue a second employment agreement that added a term that pointed to another addendum, is that right?

A. I wouldn't call it a second employment agreement. This initial discussion draft was circulated because the physicians had asked to see the terms of the contract. We do this all the time. We will even send like skeleton contract without their names on them, right? So the physician can see the terms and have their attorney start to review it.

There was a desire for expediency here given

Page 84

the fact that as of July 1, that practice, may or may not even exist anymore, you know, to our knowledge. So we needed coverage for the cancer center. So we -- there was a desire for expediency in getting this done. And so, you know, it would have made a lot of sense for us to offer a discussion draft so that the physicians could start to review that, and not delay potentially by week, you know, signing a contract that they hadn't already had an opportunity to review some of the basic terms.

And, Dr. Pedadda, you know, had -- was making -- wasn't clear as to whether he would intend to even sign an employment contract around this point in time. And so I think our desire was to present that discussion draft to keep things moving.

Q. Can you look back at Exhibit 40 for me?

Can you look at that? I will just call it PSF Peddada 962 to 972. Do you see that?

A. Yes.

Q. Does it say draft anywhere?

A. Not that I see.

Q. And it includes the signatory names, right, for Dr. Pedadda and Dr. Tacha?

A. It does.

Q. And you mentioned earlier why it was unclear

Page 85

whether Dr. Pedadda was going to be signing an employment agreement. He signed this agreement, correct?

A. I think that it appears that he physically signed it over those kind of wonky characters that would indicate an E-signature. And so he, I mean, which is not our standard process, but it appears he typically signed this piece of paper.

(Exhibit 75 identified.)

Q. I am going to show you what's going to be marked as Exhibit 75.

A. I have got it.

Q. Do you see at the top it says new CHPE employment agreement for Dr. Anuj Pedadda?

A. Yes.

Q. I have got a lot of objections, and sort of pushed back on calling the original agreement a first employment agreement. It seems to me like Centura was even calling the second employment agreement a new employment agreement.

Is that accurate?

A. I mean, yeah, the word new is used at the top. You know, I don't know why the contract person, probably just to signify that it was the one that included the full, you know, settlement, reference to the settlement

MAGNA
LEGAL SERVICES

Page 86

agreement in it.   But I don't know that that specifies, you know, probably that it is just, that it wasn't confused with the original draft.

We very often will have several back and forths with some of these agreements as modifications are made by legal.  And it wouldn't atypical for them to say something like, new or revised or something along those lines just to signify that it contains the discussed changes.

Q.   You see that, according to sort of this meda-data tracker.  Do you understand what I mean by meda-data?

A.   Yes.

Q.   According to this tracker, it was sent to Dr. Pedadda on April 26th?

A.   Yes.

Q.   And then the E-mails we looked at earlier started with Mr. Koval saying Dr. Pedadda signed.  I don't want to put words in his mouth.  Let me get it right.

The E-mails we looked at earlier in which Mr. Koval said Dr. Pedadda printed and signed his employment contract.  Those were on April 12, 2022?

A.   Yes.

Q.   Is that accurate?

Page 87

A.   Yes.

Q.   Do you know what was going on in the two weeks before or in the two weeks between Mr. Koval's E-mail and sending out Dr. Pedadda, the new employment agreement?

A.   It would have been working out the details of the settlement agreement.  That was the final thing that we needed to finalize the contract.

Q.   Do you know if, during that period, anybody told Dr. Pedadda that what he had signed was, in Centura's view, a draft?

A.   We were in constant communication about this with both physicians.  And so he, you know, he would have because Sam's first reaction to Eric saying that was that we haven't finalized the settlement agreement. And so the settlement agreement had been sent to Pedadda, which he had also viewed.  I believe that there is tracking data that show that as well.

And so, you know, he, when I think he and I had multiple conversations, multiple or many conversations about this settlement agreement.  That again, I would characterize that as his reaction was odd.  And so I distinctly remember talking through this. And he was sort of disputing that the terms of the settlement agreement and whether he wanted to sign it.

Page 88

We were having conversations around him saying he didn't want the settlement agreement.  That he would rather just write us a check, which I thought was a strange thing to say because we were offering him free money, right, you know, within the confines of FMD and compliance, right?  We were offering him as a gesture of goodwill forgiving this as a condition of employment. And there was really no downside to him accepting this, because the worse thing was he would have owed the same money he owed us anyway if he left within the first year.

So I am confident that he would have been well aware of this from the many conversations that we were having over those several weeks.

Q.   My question was a little bit narrower.  I appreciate that though.  Did Centura tell Dr. Pedadda that the agreement he signed on April 12 -- let me rephrase.  Let me say it again.  Sorry.

Before, in the time intervening between April 12th and April 26th, when Centura sent Dr. Pedadda this new employment agreement, did Centura or anyone from Center tell Dr. Pedadda you have sign a draft agreement?

A.   Yes.  We discussed it.  That was not the final, that was not the final contract.  And that we were required from our compliance team to have that as

Page 89

part of our agreement, so he would have been aware of that.

Q.   And those would have be in-person conversations or E-mails or texts or --

A.   Gosh, potentially all of the above. Certainly, you know, by phone. I don't recall which days I may have physically gone down there, or, you know, Eric might have had those discussions with him.  But it would have been in-person or by phone.  It would not have been via E-mail.

Q.   All right.   Want to take a quick break?

A.   Sure.

Q.   Let's do ten minutes.

A.   Sound good.  Do we want to do -- you know, I would like to request a lunch break at some point.  Do we want to do 10 now and then lunch in a bit, or take a slightly longer break.  I am comfortable either way, how do you all feel?

Q.   We will do it now. Since we started early, why don't we do your lunch break now.

(A lunch break was taken for 35 minutes, resume at 11:50)

Q.   (By Mr. Azmoudeh) So we are back on the record.

Dr. Albert, just a reminder you are here today



Page 90

testifying on behalf of Centura. You still understand that?

A. Yes.

(Exhibit 44 identified.)

Q. I want to show you what's been previously marked as Exhibit 44.

A. Okay.

Q. Have you seen these E-mails before?

A. Yes.

Q. Okay. These E-mails are dated beginning on April 22nd and April -- and ending on April 23rd; is that fair?

A. Yes.

Q. What does Centura draw from these E-mails if anything?

MR. SABEY: Object to the form.

A. I am just reading it to familiarize myself with them again. Just acknowledging some of the conversations that came about regarding Dr. Pedadda's, you know, state of stress and burn out and some of the considerations that surrounded that from Dr. Plauth, myself, Dr. Pedadda, and Dr. Kraus.

A. So at the start of this E-mail chain Dr. Plauth sent an E-mail to you, to Dr. Kraus, to Mr. Koval and few others, but it says he received a call

Page 91

from Dr. Pedadda's PCP, do you see that?

A. Yes.

Q. And then he says, Dr. Plauth says, Dr. Pedadda shared his extreme stress, needed to take a break, not a risk. What did Centura interpret not a risk to mean?

A. Yeah, I wasn't totally sure that what that meant personally. There are subsequent follow up E-mails I think that clarified it. Any time someone is talking about something like extreme stress or any sort of mental health issues like that, you generally want to make sure that person is not imminently a harm to themselves or others. And so I interpret that as Dr. Plauth's shorthand to indicate that.

Q. And then your response to Dr. Plauth says we really appreciate your help and also appreciate his need to take a break and readjustment.

Do you see that?

A. Yes.

Q. Where was the sources of information that were coming to you indicating that there was a need for a break and readjustment?

A. Dr. Pedadda himself.

Q. Okay. When do you recall roughly whether it was several conversations, one conversation? Give me the circumstances.

Page 92

A. Yeah. I would say several conversations over the period of a couple of months.

Q. And those would have been before this April 22, E-mail from Dr. Plauth saying I just a call from Dr. Pedadda's PCP?

A. Correct. Well before.

Q. What was the nature of the conversations with Dr. Pedadda before this E-mail from Dr. Plauth?

A. Yeah. So as we were discussing coming on for employment, the timing of that, the timing of the dissolution of the ROPC practice. And how we were going as to navigate that transition without any breaks in patient care, Dr. Pedadda was not -- was not clearly stating his intentions at any point. And so we weren't sure, you know, what would have been acceptable to him as a start date.

You know, he had conveyed to me several times, you know, that he, from this whole process, and to be honest, I wouldn't have known whether that was solely due to work. Or what their -- and I believe there was a component of stress due the breakdown and the fracturing of the partnership that was always causing -- this long standing partnership was also causing him a great deal of stress.

He had expressed that, and said, gosh, I have

Page 93

got vacation plans but I think I need a break. He, you know, articulated that he was feeling stressed and burned out. And I state here, that I could sort of help to broker a conversation, I guess that is probably the right term, Eric and I were in the meeting. Me, Eric, Dr. Monroe, Dr. Pedadda and I sort of brokered a conversation, getting Dr. Monroe to agree to cover for three weeks to give Dr. Pedadda a longer break than his initial vacation as planned prior to coming on as employees, and in recognition of being able to give him a readjustment period.

Q. In any of those prior conversations had Dr. Pedadda mentioned that he was seeing his primary care physician to deal with any of the stress?

A. I don't recall him ever specifically telling me that.

Q. Is it possible that this was the first time from Dr. Plauth's E-mail that Centura would have become aware that Dr. Pedadda was seeing a primary care physician about the stress?

A. Yeah. It is possible that could have been the first time. I can't recall personally knowing or seeing any documentation prior to that.

A. Did it that change the conversation at all in Centura's view?

**MAGNA**
**LEGAL SERVICES**

Page 94

A. I mean, certainly, you know, certainly someone seeking care from a physician, you know, substantiates, you know, the claim of feeling stressed and burned out.

Again, I am particularly, you know, compassionate around the topic of burn out. I wouldn't even necessarily feel -- I would take someone's word for it. I wouldn't necessarily feel like I would need to consult their physician, but certainly, I mean, that kind of corroborates the seriousness of it if he felt compelled to see a physician. I think, from our viewpoint, that would weigh in on discussions and options that we would provide.

(Exhibit 11 identified.)

Q. I want to show you what had been marked previously as Exhibit 11.

A. All right.

Q. Have you seen this E-mail before?

A. I have.

Q. Okay. What was Centura's understanding of circumstances surrounding this E-mail?

A. That Dr. Pedadda, you know, was declaring his intent to take a three-month leave.

Q. And declaring his intent to take a three-month leave from where?

A. Well, this agreement says to take a leave from

Page 95

the practice.

Q. The practice being Radiology Oncology, PC?

A. Correct, yes.

Q. And by implication, if he were to take that leave from Radiation ONcology, PC, Centura would -- did Centura understand that that meant that Dr. Pedadda would not be practicing medicine at Penrose?

A. Yeah. So declaring leave from the practice, is declaring official leave from the medical staff. There is a separate process for declaring leave from the medical staff, that is, you know, outlined right in the leave discussion we previously reviewed.

Q. So based on this E-mail Centura at this point is not understanding that Dr. Pedadda requesting leave from this the medical staff? Is that fair?

A. Correct. Yeah. That doesn't state that.

Q. Okay. But Centura does understand from this E-mail that Dr. Pedadda is intending to take a leave from ROPC because of the disability for reasons of health.

Do you see that?

A. Yes.

Q. And does Centura understand that at this time?

A. Yes.

Q. And does Centura also understand that this

Page 96

leave was at the instruction of the Dr. Pedadda's personal physician. Do you see that?

A. Correct.

Q. Is that accurate to what Centura understood?

A. Yes.

Q. At the time did Centura have any reason to doubt that Dr. Pedadda was intending to take a leave -- well, let me ask a different question.

At the time, did Centura have any reason to question the genuineness of Dr. Pedadda's E-mail?

A. You know, Dr. Pedadda, during this whole period of time had been -- it was our belief that he wasn't engaging with us in good faith. It felt like what he was telling us and we were seeing, it was kind of a moving target. It's obviously, in general, we were somewhat suspicious regarding his intentions with us moving forward, however, you know he is a physician and a professional. And so I would not question his genuineness with respect to something like a mental health diagnosis, or, or, you know, evaluation by a physician.

Q. I just want to draw your attention to this Exhibit 11. Do you see the subject line is, needs attention?

A. Yes.

Page 97

(Exhibit 21 identified.)

Q. Okay. Just keep that in your brain, if you could, for me. I am going to share with you what's been marked as Exhibit 21.

A. Okay.

Q. You wrote this E-mail, correct?

A. Yes.

Q. So you are familiar with this E-mail?

A. I am.

Q. Do you see the subject line of the E-mail is forward needs attention?

A. Yes.

Q. Do you have any reason to doubt that you were forwarding Exhibit 11 that we just looked at?

A. I have no reason to doubt that.

Q. Do you think that that's true, you were forwarding that E-mail?

A. It appears that way from the subject line.

Q. I think we talked about Shauna Gulley earlier talked, Dr. Shauna Gulley and, and Dr. Scott Lichtenberger, earlier but could you just tell me why you sent this E-mail to Drs. Gulley and Dr. Lichtenberger?

A. Yeah. You know I think another reason, one other thing I'd like to add. I can't tell from this



MAGNA
LEGAL SERVICES

Page 98

whether I would have just forwarded the E-mail for convenience sake, and then deleted. I will often delete the subject matter below if I don't think it is relevant or necessary. If I am sure whether or not the particular E-mail would have continued that information or whether it was just simply me forwarding. I can't tell.

Q. I am sorry. I don't mean interrupt to you. I'm sorry. I try not to do that, but just to follow up on that point. Maybe this helps you remember, your first paragraph, the first full paragraph, you say I had a meeting today with some people regarding the E-mail below.

A. So, so, yeah. That is why I probably forwarded the E-mail. Thank you.

Q. Okay. Go ahead?

A. So, yeah. You had asked why I would have sent this E-mail to these people, is that correct?

Q. That is the question. Correct.

A. Okay. So these would have been the two senior leaders in the organization to whom this all rolled up. So any time there is a, you know, some sensitive or contentious issue, we often will consult these people. Shauna Gulley was responsible as chief clinical officer. The oncology service line physician leadership team all

Page 99

were forwarded through her. So ultimately she would have been up the chain to where these physicians would have reported.

And so, you know, ultimately the whole accountability over Dr. Kraus and myself. Scott Lichtenberger as the head of the physician alignment group was sort of the peer of Dr. Gulley in level of the organization. But he was responsible for the physician enterprise comprising both employed and non employed physician agreements. So these would have been two members of our executive leadership team who would have been most important to make aware of serious issues regarding physicians.

Q. Why did the -- why did Dr. Lichtenberger, who was, one of his role was with respect to the employment process, why did he need to know about this issue?

A. Let me review the E-mail again.

So there is a discussion of Alan, Dr. Monroe questioning the validity of Dr. Pedadda signing on his behalf regarding the PSA extension, which was an important thing be we were trying to put in place to protect those two physicians from a coverage standpoint during this transition.

And then I actually outline that below, talking about locums coverage. You know, this would

Page 100

make sense to notify both of them of issues pertinent to both, the issues surrounding Radiation Oncology, PC, as well as the employment. Both Dr. Lichtenberger and Dr. Gulley would have wanted to be made aware of something like this.

Q. In the sentence in here, it says, unfortunately Alan believes this is an attempt by Anuj to stick it to him while he still can.

What does that mean?

A. Yeah. So, and again, I make it clear here that I am not jumping to conclusion here based solely on what Dr. Monroe says, but in between the time of Dr. Pedadda sending that notice on April 25th and then subsequent E-mail on April 27th, in conversations with Dr. Monroe he made it clear that he felt, and that he had previously been suspicious that Dr. Pedadda was looking for a way to get back at him, due to some, whatever it was that caused the build up resentment and animosity over time.

And so, he, you know, you say did Centura, you asked previously, did Centura have any reason to question, you know, the validity of Dr. Pedadda's claim and notice. You know, we did not specifically but Dr. Monroe did. And he felt that this was, you know, an attempt by Dr. Pedadda to sort of, what this would have

Page 101

done would have had Dr. Monroe taking on increased call and increased share and burden of covering the practice while Dr. Pedadda was gone. And if it went over into, beyond the time that Radiation Oncology, PC existed which the proposed leave did by a month, or the practice existed to provide those services to the hospital by a month, then Dr. Monroe would not, you know, would not necessarily be compensated for that time. And it was always a bickering back and forth between the two of them. By stick it to him, I am saying that Dr. Monroe is suspicious of Dr. Pedadda's motives and feels that he was trying to force additional work on him, as a way of kind of getting him back, so to speak.

Q. And, you are right, at least according to your statement, it appears that Centura was not going to buy Alan's, Dr. Monroe's theories in that moment, without finding more. Is that fair?

A. Correct. Absolutely, any circumstance something as sensitive as this, we would not jump to that conclusion without talking to Dr. Pedadda and getting it from him.

Q. He also says he also thinks that Anuj may never come back. I think you are referring to Dr. Monroe thinks that, is that correct?

A. Correct.

26 (Pages 98 to 101)



Page 102

Q. Would you put that in the same category as Dr. Monroe's theories, that Centura was not willing to buy in that moment without more?

A. So we were hearing, and again, we don't make decisions based on rumors and speculation amongst our staff, but Colorado Springing is a community where these folks all talk. And so he had heard from multiple people, not just Dr. Monroe, that Dr. Pedadda was potentially never intending to join us, that he may have been looking elsewhere, or wasn't interested in employment relationship. And with Dr. Pedadda not shooting straight, so to speak, with us on some of the these conversations, you know, you certainly think about those things when you are hearing that from other physicians and staff, who Dr. Pedadda interacts with on a daily basis.

Q. Help me understand. I think you said you don't want to sort of go by gossip among staff, but you were hearing some gossip about Dr. Pedadda maybe never coming back, so was Centura buying it or not buying it, I guess is my question?

A. We didn't have enough information to know whether or not to buy it. And so, you know, ongoing dialogue with Dr. Pedadda, you know, any other data that we gather in the coming weeks, you know, week or two

Page 103

whatever the time frame was, would help us. You know, if Dr. Pedadda, when asked directly what his intentions are, would not answer, which happened repeatedly, we used the best available information that we have.

Q. Was Dr. Pedadda's signature on the first employment agreement one of the data point that was considered?

A. Yes.

Q. How did that factor in?

A. So that was the first time in the months and months of discussion that we felt that he maybe did have an intention to stay with us. Up until that time, you know, we were starting to feel like he was not in this with us.

And so part of, you know, Eric's jubilation in that E-mail, hey, great news, Dr. Pedadda signed, I think was around the fact that up until that date, we really had no indication what his intentions were. But I think the ongoing dialog between April 11th and April 27th with Dr. Pedadda started to call that into question.

Q. Is there a silence in the air, there is a growing concern among the team that Anuj might not be the right fit for the group.

What did you mean by that?

Page 104

A. Yeah. So again, you know, at this point I am around six months or so into my role here in this organization. And in gathering information and learning more from Eric, Theresa Lapovich and others, who were our boots on the ground down in the Springs, you know, learning about staff, you know, I learned more and more about some of these issues, and the way that Dr. Pedadda was treating staff. There had been multiple staff members who had expressed their intent to quit if Dr. Pedadda were to stay, which, obviously is going to draw my attention, right, trying to find out what they mean by that, and why they felt that way.

And so seeing not only the breakdown in the relationship between Dr. Monroe and Dr. Pedadda, Dr. Pedadda refusal for months and months to, you know, communicate important patient care issues. And now, again, just adding layers onto the story, you know, learning his kind of lack of clarity and lack of being straight forward in his communications with us, started to make us wonder, you know, whether this practice situation was going to be one that he would desire for himself, and that he would be the right fit for this kinds of cohesive practice group that we were looking to form.

Q. Did Dr. Pedadda ever tell Centura that he did

Page 105

not intend to work as an employee at Penrose?

A. He never told us one way or the other.

Q. This growing concern, did Dr. Pedadda'd E-mail and needs attention E-mail, did that contribute to the growing concern?

A. Absolutely. You are saying his April 25th E-mail, that E-mail leave, is that the E-mail you are referring to?

Q. Yes.

A. Absolutely not. I think the physician's willingness to acknowledge those sort of concerns is noble, and that would not have factored in in any way.

Q. Why is it noble?

A. The culture of our field has far too long, you know, celebrated stoicism and, you know, workaholism and, you know, kind of through training, you know, sucking it up and dealing with it. And it's really only been in recent years that I feel like the field collectively has started to embrace the importance of recognizing mental health concerns and issues like burn out.

And so I think I have seen a lot of physicians struggle with a willingness to accept and admit they are dealing with this. I know -- I know it can be very hard to admit. And so, I think a physician who is willing to



Page 106

be vulnerable and express that, I think I would consider that to be positive characteristic and a quality.

(Exhibit 57 identified.)

Q. I will share what has previously been marked as 57.

A. All right. I have got it.

Q. Sorry. My computer just decided to update Adobe.

Okay. Have you seen these E-mails before?

A. I have.

Q. And this E-mail is dated approximately between April 27th and April 28th. Do you see that?

A. Yes.

Q. And to situate kind of the time line, bear with me -- April 27th as we discussed earlier was a day after Centura extended the new employment contract to Dr. Pedadda. Do you remember that?

A. Yes.

Q. And so as of these dates, or as these E-mails on April 27th and April 28th, there is an outstanding employment offer to Dr. Pedadda?

A. Right.

Q. Does Centura dispute that that is a final employment offer?

A. The one on the table at this time we don't

Page 107

dispute that.

Q. Do you see Dr. Plauth's E-mail an April 28th that starts with that is fine?

A. Yes.

Q. Okay. And Dr. Plauth says we should separate out the wellness/medstaff from the practice/employment. Do you see that?

A. Yeah.

Q. Does Centura agree with that?

A. Yes.

Q. Okay. And why?

A. So, you know, medical staff privileges are separate from the employment, right. And many physicians who are on medstaff that are not employed, many who aren't, so those two elements remain, you know, from a compliance standpoint, remain separate. And my interpretation of this is that Dr. Plauth as the CMO and, again, the liaison, if you will, was sort of just reminding everybody that those are two separate issues.

Q. And Dr. Pedadda is one person, right?

A. Correct.

Q. And on the wellness medstaff side of things, he is expressing some challenges with his mental health to be physician burn out. Right?

A. Correct.

Page 108

Q. So why does Centura believe that the people making employment decisions should not be aware of the wellness of the mental health or the burn out of Dr. Pedadda?

A. I don't know that he is saying should not be made aware. I think he is saying there needs to be an understanding that these are two separate processes.

Q. So does Centura believe that the people in the making the employment decisions, the decision-makers on that side should be aware of the wellness of Dr. Pedadda?

A. Well, I guess that depends. I mean, when you say wellness, but if this is a confidential kind of medical staff disclosure, maybe, maybe not. But Dr. Pedadda cc'd Eric Koval on that initial notice E-mail making this Centura service line team aware. And personally and in personal conversations disclosed that information to myself and several others.

Q. So by this point at least on April 27th, based on Dr. Pedadda's initial notice, the needs attention E-mail, as well as prior conversations, Centura is aware that Dr. Pedadda is complaining of some condition, some mental health issue that he is dealing with? Correct?

A. Yeah. Correct. I wouldn't say complaining. I would say declaring or notifying us.

Page 109

Q. At the beginning of this set of E-mails Dr. Plauth says on April 27th, Jeff, Dr. Pedadda should be calling you.

Do you see that?

A. Yes.

Q. Did he call you?

A. I do not recall. I don't recall having a discussion with him during this whole period of time, including during this week, you know, which one he was not yet on, you know, the leave that he had declared, he was not regularly communicating with us. He was sporadically and selectively communicating with us, but he was not regularly communicating.

Q. But you don't recall on April 27th, following receipt of this E-mail from Dr. Plauth, that Dr. Pedadda called you and said something like, hey, I just got off the phone with Dr. Plauth. He told me to call you. You don't recall that specific phone call coming out of this E-mail?

A. I don't recall that conversation.

Q. Do you recall if you called Dr. Pedadda, after receiving Dr. Plauth's E-mail?

A. I don't. At that time, I tend to be very cautious about contacting physicians when they are on vacation. I don't want people to feel like they are

28 (Pages 106 to 109)



Page 110

always on. He made me aware he was on a mountain biking trip in Milan. And I think there is nothing worse than getting peppered with a bunch of work messages while you are on a run or a bike ride or something.

But I thought he would calling me, my presumption was, he would be calling me at a time when it was convenient for him.

Q. But Centura sent him the second employment offer while he was on vacation, right?

A. I believe so. I'd have to go back and look at the week. I don't recall if that specific day his vacation had started or not. It would have been right around the beginning of the week or the prior week.

Q. Throughout these E-mails, there is a statement by you, I remain disappointed by how he is handling this. There is a statement from Dr. Plauth saying that this is the wrong way to approach this. And also another statement from Dr. Plauth saying that we will offer different approaches, but he lacks the insight to likely consider.

Would you agree with me these are statments kind of criticizing the way Dr. Pedadda is acting, communicating, and even thinking in this E-mail?

A. That was several questions. I think it speaks to his lack of communication, and his refusal to

Page 111

communicate specifically about his employment, and his selective communication with us, dodging those questions. And so I was disappointed in the fact that he was refusing to communicate about his employment and that is what that is in reference to, or his prospective employment.

Q. Does Centura agree that -- well, I should say it this way: Does Centura also take issue with the way that Dr. Pedadda was communicating about his prospective employment?

A. Yes. I mean Centura would take issue with anybody failing to communicate about employment during a contracting process.

Q. Does it matter to Centura in any way that Dr. Pedadda is also telling Centura that he is severely stressed and needs a break?

A. Define what you mean by does it matter? With respect to what?

Q. As to Centura I think we just agreed to this is taking issue with the way that Dr. Pedadda is communicating regarding his employment, okay?

A. That's right.

Q. Okay. So when Centura takes issue with that, does it consider whether -- does it factor into its criticism of Dr. Pedadda that Dr. Pedadda is also

Page 112

telling Centura he is severely stressed and needs a break?

A. No. I don't think it would factor into any criticism whatsoever. If anything it would probably result in us extending him a bit of grace, recognizing that he was going through a tough time.

(Exhibit 76 identified.)

Q. I am going to show you what is going to be marked as Exhibit 76. Have you seen these E-mails?

A. I am taking a look. Yes.

Q. I will scroll to the bottom, Dr. Plauth's E-mail from April 27th. Do you see that?

A. It is the 27th. Oh, there we go. Yeah.

Q. These are the by-laws that you and I discussed earlier about how to request leave for the medical staff?

I am sorry. Let's do that one more time. We crossed a little bit. These are the by-laws that we discussed earlier regarding how a member of the medical staff requests leave?

A. Yes.

Q. And Dr. Plauth in those E-mails is providing those by-laws to Dr. Pedadda in an effort to get him to go through that process. Is that correct?

A. Correct.

Page 113

Q. Okay. And then further along in the E-mails you see that Dr. Plauth ultimately sets up a meeting for May 2, 2022?

A. Yes.

Q. Do you know who attended that meeting?

A. I don't. From the E-mail it appears to be Dr. Plauth, Dr. Pedadda, and Dr. Baldauf.

Q. Do you remember any of the initial conversations about this set of E-mails?

A. No, I don't. I was not involved in this process. With respect to the medical staff leave Dr. Plauth recommended my involvement as it pertains to this outstanding offer of employment, but I was not in that meeting nor was I aware of where he was in the medical staff leave process.

Q. We discussed earlier that Dr. Plauth and Dr. Baldauf, and Dr. Baldauf was chief of staff, is the decision-makers with respect to medical leave. Is that accurate?

A. Correct.

Q. So Centura as an organization is aware that instructions on medical leave are being sent out to Dr. Pedadda, that there has been now been a meeting scheduled, and attended and the by decision-makers regarding request for medical leave? Centura as an

29 (Pages 110 to 113)

MAGNA
LEGAL SERVICES

Page 114

organization is aware that all of that is going on?

A. Yeah. Correct. Because part of that process would include evaluating implications on the practice and so Centura was aware at that point.

(Exhibit 59 identified.)

Q. I am going to show you what has been marked as Exhibit 59.

A. Okay. I have it.

Q. Does Centura dispute that is a valid request for medical leave under the by-laws that we reviewed today?

A. It appears to be a valid request.

Q. And within that valid request Dr. Pedadda explains that the basis is having been diagnosed as having exhaustion, physician burn out by his primary care physician?

A. Correct.

Q. Does, at the time, does Centura have any reason to doubt whether Dr. Peddada had been diagnosed with having exhaustion and physician burn out by his primary care physician?

A. One of the reason to doubt that, again burn out is not a medical diagnosis, but we would have no reason to believe that that was not the assessment coming from his primary care physician, and I think that

Page 115

was stated truthfully.

Q. Can doctors diagnose conditions that, let's focus on mental health conditions. Can doctors diagnose mental health conditions that don't exist in the DSM-V?

MR. SABEY: Object, form and foundation.

A. This is not my area of expertise. I am a radiation oncologist. You know, whether something is a condition or a syndrome or a, you know, something they were dealing with, I wouldn't know the terminology.

Q. So regardless of whether this is a diagnosis of a condition, a syndrome or a what ever, whatever else other terminology, Centura is aware at this point that Dr. Pedadda is experiencing physician burn out.

Is that fair enough?

A. Correct.

Q. Okay. And as we discussed early physician burn out is, according to Centura's understanding, is a triad of detachment, feelings of lack of accomplishment and exhaustion, right?

A. Right.

Q. You kind of agree with that. Right?

A. Correct, yes.

Q. And I think we also discussed earlier in Centura's view of disability is possible that physician burn out satisfies that definition of disability. Is

Page 116

that correct?

MR. SABEY: Object to foundation.

A. It would depend on the circumstances. Disability is a broad term but it certainly could. It certainly could apply.

(Exhibit 12 identified.)

Q. I want to show you what has been marked previously as Exhibit 12.

A. Okay. I have it up.

Q. Have you seen this letter before?

A. Yeah. I believe we reviewed part of this earlier on in the deposition.

Q. You are correct. Now we are reviewing the first half. Thank you. By this letter is the effect of this letter, Centura os approving Dr. Pedadda's medical leave?

A. Correct.

Q. And earlier we discussed that if there was a granting of a medical leave that indicated that Centura had decided that a physician cannot practice medicine safely and competently, correct?

MR. SABEY: Object to the form and foundation.

MR. AZMOUDEH: What is the basis? We talk about this earlier.

MR. SABEY: You want to know the basis for the

Page 117

objection?

MR. AZMOUDEH: Yes.

MR. SABEY: That Centura doesn't, as an organization, does not determine medical questions like that, regarding a specific physician.

MR. AZMOUDEH: All right.

Q. (By Mr. Azmoudeh) Dr. Albert, do you remember we discussed earlier about what good cause meant under the by-laws?

A. Yes.

Q. AND do you remember earlier we discussed THAT if there had been a finding of good cause, what that meant or that Centura had determined that a physician could not competently and safely practice medicine.

Do you recall that conversation?

A. Correct. Yeah, the by-laws state for reasons of physical or mental health or otherwise, their ability to care for patients safely and competently.

Q. And so by making a determination here that Dr. Pedadda, to grant Dr. Pedadda's medical leave, Centura is making the determination that Dr. Pedadda cannot competently and safely provide medical care?

A. Well, in granting his request, and again, I have not personally been involved in medical staff determinations like this before, I have not had that



MAGNA
LEGAL SERVICES

Page 118

role. They, you know, he -- it is acknowledging his declaration that he feels he needs a leave for reasons of health as he states. And so does it mean that under no circumstances could he, you know, safely and competently provide care to patients, no. But it is acknowledging due to his physical and mental health his leave is being granted.

So I don't know. I don't know that it says only if you are not able to care for patients safely and competently. I mean, leave could be granted on the condition that somebody was experiencing a physical or mental health issue, that may not render them incapable of taking care of patients, but it is something that is needed for their own health.

Q. Centura can deny requests for medical leave, correct?

A. Correct.

Q. They did not deny this request for medical leave, correct?

A. Correct.

Q. I guess, help me understand this, because the by-laws say that, you know, the chief of staff and the department chair head consult and make a determination and all of the language in the by-laws is filled with cannot, the physician safely and competently practice

Page 119

medicine. And now what I am kind of hearing is that that Centura can decide to grant a medical leave for, I am not sure what reason.

Do you see my confusion a little bit what's going on here? Help me understand.

A. Yeah. You know, we didn't have full, you know, we had a no and something from what I am reading a conversation between Dr. Setty and Dr. Plauth. He was, throughout this process, referred I believe by Dr. Baldauf to CPHP for assessment and was to undergo that assessment in the first 30 days of his leave. So I think the leave request was granted, but it appears to be under the condition of undergoing that assessment. But I don't know that we had that determination at that point.

Q. Why couldn't you just let Dr. Pedadda, you know, say no your leave is denied until we make that determination?

A. Yeah. It was a strange circumstance because Dr. Pedadda, prior to requesting leave, sort of made a one-sided announcement of leave, while he was out of the office, sort of stating that his intent was to piggy-back that leave onto his planned vacation. And so I don't know. I can't speak to what went into Dr. Baldauf's decision-making processes, you know, any

Page 120

further than that.

Q. Did you prepare to testify on this topic today? Did you?

A. On what topic?

Q. This would be topic 4.

A. Yes.

Q. Did you speak with Dr. Baldauf about her decision-making process?

A. I did not.

Q. And you don't know whether Centura made a determination in granting the leave, whether Dr. Pedadda was safe to competently treat patients?

A. Yeah. I think ordinarily you would -- I mean he is requesting leave. You would err on the side of caution. If you are not sure whether or not he is able to safely and competently care for patients, he requested a leave as of a specific date, you know, you know, you would err on the side of caution and grant the leave, pending a further assessment. I think that is a very reasonable decision from reading the documents. That appears to be what Dr. Baldauf did.

Q. So at a minimum I think we can agree that Centura believed or had a concern that it was possible that Dr. Pedadda could not competently and safely treat patient?

Page 121

A. Yeah, yes.

Q. Why couldn't Centura not take Dr. Setty's, Dr. Pedadda's primary care physician, why could Centura not take Dr. Setty's recommendation as sufficient for the necessity of the leave?

A. Well, from my understanding of what Dr. Setty shared, you know, regarding exhaustion and burn out, there is no, there is no clear declaration there that would compromise his ability to practice medicine safely. And so, you know, without a without an official, or without a more detail assessment or diagnosis, it would be difficult to ascertain that from that limited communication.

(Exhibit 2 identified.)

Q. I am going to show you what has been marked as Exhibit 2.

A. Okay. I have got it.

Q. Do you see the top paragraph, 57 year old male of Indian origin?

A. Yeah.

Q. This 57 year old male of Indian origin who comes in after emergency call to my personal cell at 9:00 p.m. the night before with complaints of going through severe anxiety, unable to think, and afraid to go to work, having total apathy in terms of going to

31 (Pages 118 to 121)


MAGNA
LEGAL SERVICES

Page 122

work, and feeling totally burned out related to workload issues. Do you see that?

A. Yes.

Q. A physician saying that about their patient is not enough for Centura to determine whether Dr. Pedadda was able to competently treat patients?

MR. SABEY: Object to the foundation.

A. So again, he was referred to CPHP for formal assessment because this what they do, to facilitate in these circumstances. This is not, you know, to my knowledge, this is not, you know, Dr. Setty's area of expertise. And again, nor is it mine.

MR. SABEY: I also need to object because your question assumes that this document was given to Centura.

MR. AZMOUDEH: I appreciate no speaking objections, Mark.

Q. (By Mr. Azmoudeh) I will return back to Exhibit 12, the make up letter. Let me know when you are there there.

A. Got it.

Q. So at this time on May 12th, there is an outstanding employment offer to Dr. Pedadda, correct?

A. Yes.

Q. Okay. At minimum, under the ADA policy that

Page 123

we looked at earlier, Dr. Pedadda is a qualified applicant. Would you agree with me?

A. Yes.

Q. Did Dr. Pedadda share the ADA policy with Dr. Pedadda at the same time that it granted Dr. Pedadda medical leave?

A. So you said did Dr. Pedadda share that with Dr. Pedadda.

Q. Sorry. Did Centura share that policy, that ADA policy with Dr. Pedadda at the same time Centura granted Dr. Pedadda's medical leave.

A. I don't know. I have not seen documentation of that.

Q. You don't have any reason to believe it wasn't shared. Is that fair?

A. That is fair.

Q. This is a qualified applicant that Centura knows is dealing with some medical issue, one of the characteristics, and that qualified applicant does not know how to formally request an accommodation during the hiring phase?

MR. SABEY: Object to the form and foundation.

A. Yeah. I wouldn't know what Dr. Pedadda did or didn't know.

Q. (By Mr. Azmoudeh) Did Centura provide -- you

Page 124

know Centura not provide the policy. Did Centura provide him with any additional instructions on how to request the accommodations during the hiring phase?

A. I am not sure what you mean by accommodation.

Q. Centura maintains a policy that sets forth how to request accommodations, correct?

A. Yes.

Q. And we discussed earlier that that policy applies to qualified applicants and associates, right?

A. Yes.

Q. So I am asking, first I asked did Centura share that policy with Dr. Pedadda as a qualified applicant at the time?

A. Yeah. Not that I am aware.

Q. And I asked separately, did Centura offer any other information, outside the policy as to how Dr. Pedadda could request an accommodation during the hiring process?

A. So, Dr. Plauth, you know, reiterated to Dr. Pedadda, and I believe we have evidence to that effect, that he reach out to me and have a conversation. You know, presumably that could have been to request an accommodations, if we are talking about additional time et cetera, to consider an employment agreement. But he was not, Dr. Pedadda was not communicating with us about

Page 125

his employment.

Q. If you go back to that E-mail that you are referring to -- let me find the number. I apologize. 57. Do you see that?

A. Yes.

Q. So Dr. Plauth relays he reached out to me saying that he did not need to talk. He was acting on the advice of his physician. He said he was hypertensive and severely stressed and needed to take a break. He was quite aggressive in not needing to talk as he is following her advice.

Do you see that?

A. Yes.

Q. Is that Dr. Pedadda not saying I need a bit of space in these negotiations?

A. I interpret this to mean he did not need to talk. I interpret this to mean that he feels that at this time he doesn't need to engage with us. Right? And you know, I don't know. This is stating that his physician suggested that he not talk with a prospective employer about his employment, that doesn't -- that doesn't. I don't follow that. That doesn't make sense to me.

Q. Centura wouldn't view that as an accommodation request to delay or slow down the employment



Page 126

negotiations that were ongoing at the time?

A. It doesn't state that.

Q. Dr. Pedadda had a pattern over a number of months of an unwillingness to talk about some of his employment terms, and this is consistent with that pattern. And, you know, not needing to talk is a very vague term. I would not call it a request for an accommodation.

Q. Does Centura consider whether that pattern was precisely because of the burn out and extreme stress and exhaustion that Dr. Pedadda was explaining in obtaining medical leave for?

A. I mean, yes, all of those things would have been under consideration in the process.

Q. But that is not why Centura believes he wasn't talking. His burn out and stress was not why Centura believes he was not talking. There was some other reason?

MR. SABEY: Object to foundation.

A. No. Again, he had not been talking to his own partner about important patient care issues. And I think in his words, I think at least ten months. And so we can't speculate as to why he was or was not doing that over that period of time when, you know, the first we had heard he had ever went to see a physician was

Page 127

this one.

(Exhibit 13 identified.)

Q. I am going as to share with you what has been marked as Exhibit 13.

A. Okay.

Q. Have you seen this letter before?

A. I have.

Q. What is Centura's understanding of the effect of this letter?

A. That the employment offer was being -- was being rescinded.

Q. In other words, this is refusal to hire for that position?

A. Yeah. It was acknowledgement of his refusal to sign, and due to, you know, his lack of communicating with us regarding his employment, that it was not going to continue extending the offer.

Q. Can you list for me all of the reasons why Centura rescinded the job offer?

A. I will be comprehensive. I don't know if I could, you know, immediately say every one but his refusal to communicate with us about his employment, not just after his declaration of leave, but really in the weeks leading up to that. His failure to acknowledge or accept the settlement agreement was required as part of

Page 128

the extension of employment. His behavior around these discussions and unwillingness to, you know, proceed informally in signing the contract and not answering inquiries regarding it. You know, his, you know, I would characterize that process as maybe the straw that broke the camel's back.

I had explained he had good qualities, a physician in good standing, but was a strain on the environment and culture of the entire department. And so we were -- this was already a close decision whether or not to extend the offer in the first place. And his failure to effectively communicate with us in our opinion, engage with us in good faith in these discussions sort of pushed the organization over the edge, and allowed us to conclude that we were going to consider other candidates.

Q. Was there any discussion -- well, let me ask this actually. All of those things that you just described, were those discussed in real time?

A. Define real time.

Q. So I would say in the days leading up to May 9, this letter going out?

A. Yes.

Q. Among those discussions was there any mention of Stark or anti-kickback statute?

Page 129

A. Only as it would pertain to the necessity of the settlement agreement being tied into the compensation part of the contract. The acknowledgment of that, which I think had been established by that point, that was the primary discussion around those areas, from a compliance standpoint.

Q. When did Centura make the decision to rescind the job offer?

A. It would have been, you know, in the days leading up to that notice being sent.

Q. What were the particular reasons why the decision was made on that day or set of days?

A. As I stated, you know, this was an ongoing evolution of this process. The, you know, multiple attempts to connect with Dr. Pedadda, his failure to engage with us. As I previously mentioned, there was some sense of expediency in recognizing to treat patients, we have to have physician coverage. And we had, you know, again, he was increasingly vague about his future intentions with us.

We were starting to go through the interviewing process for that third spot. We had good -- we had candidates available. The privileging and credentialing process takes minimum of 90 days, we asked for 120. And we are now into May. As of July, we are

33 (Pages 126 to 129)



MAGNA
LEGAL SERVICES

Page 130

not going to have anybody anymore for coverage in the clinic. And so for the reasons of continuity in the department and patient care we needed to move forward one way or the other with some expediency.

Q. Couldn't Centura have just extended the PSA for few more months, and operated that what way?

A. So even that one month extension was starting to be questioned by Dr. Monroe. And we negotiated that one month extension with them out of recognition that if ROPC didn't exist, Dr. Kathpal wouldn't necessarily need to complete her a 90-day notice, which would have put us in a world of hurt from a coverage standpoint. Right?

And so in order to sort of keep her under that obligation, we had to keep ROPC, and to extend it beyond that. I mean, that could have been done but Dr. Monroe was willing to proceeding with engaging with employment. And you know, that wasn't felt to be the best decision for the future of the practice.

There was also -- I thought of something else. There was also reluctance on the part of both of those physicians to extend beyond that, because extending the PSA would put them on the hook for locums coverage, would put ROPC practice on the hook for paying for, you know, locums coverage is 3, $4,000 a day. If they were employed, then Centura would have been on the hook for

Page 131

that locums coverage.

So I think it was one of these if we are going in that direction, let's get it done sooner than later. That was another point of contention, in negotiating that one month extension of PSA.

Q. Did Centura seem to take any issue -- let me ask it a different way.

Did Centura have any concerns with the compliance with ADA by rescinding a job offer four days after granting that same person medical leave?

A. Well, the job offer was extended one day after Dr. Pedadda gave us that initial notice. And so, you know, that, you know, in looking back at the time line, you know, I think shows that that was not a factor in extending the offer to begin with. And so the timing of what it took to go through the formal medical leave process, I think, you know, part of the reason why this discussion evolved, you know, the full team of the senior leaders was ensuring that nobody had any concerns, you know, from a legal standpoint. And that is, you know, probably weighted, you know, until that escalation, you know, that you saw me send. Certainly, we are, again, we are certainly very sensitive to these things. And it was felt, because that never weighted into the decision-making at all.

Page 132

And then we felt that we had good reason to do at that point given the failure to communicate. We did not have any concerns at that point withdrawing it.

Q. My question was a little more specific. I appreciate the background, but does Centura come from compliance with the ADA by rescinding a job offer to Dr. Pedadda, while he was on medical leave?

MR. SABEY: Object to form and foundation.

A. So in this circumstances, we don't see an issue with that, which is why we felt comfortable rescinding it. We didn't think that was a factor here.

Q. We talked earlier about the hypothetical, taking away an associate's desk because that associate needed it for, because of the associate was in a wheelchair. Do you remember that the special desk conversation?

A. Yes.

Q. I think you had said that basically taking away the special desk would be just like denying the accommodation. Is that fair?

A. Correct.

Q. Does rescinding a job offer to Dr. Pedadda while he was on medical leave essentially, just rescinding the medical leave?

MR. SABEY: Object to the form and foundation.

Page 133

A. So this is not, the medical leave and the potential employment are two completely separate issues, so he was not an associate at the time. You know, he was selectively communicating with us about some things and not others. And so, no, I would say that this was not the same as taking a special desk away from somebody with a wheelchair.

Q. (By Mr. Azmoudeh) We discussed earlier the policy applies for both the associate and qualified applicant, correct?

A. Yes.

Q. So whether he is an associate is sort of irrelevant to the question I asked. Maybe I get the same answer, but I will try again.

Does rescinding a job offer to Dr. Pedadda while he was on medical leave effectively deny Dr. Pedadda the medical leave?

A. He didn't request accommodations. He refused to communicate.

Q. So earlier we talked about the policy, Dr. Albert, and we discussed that the policy recognizes that there are two types of accommodations. One is leave and one is non leave type of accommodations.

Do you remember that?

A. Yes.

34 (Pages 130 to 133)


MAGNA
LEGAL SERVICES

Page 134

Q. So he did request an accommodation, correct? He requested a leave, which is accommodation under Centura's own policy, correct?

A. I'd have to go back and see if that is for associate or is that -- I would have to go back and review that policy again. I am not sure that it does.

Q. That policy we discussed earlier applies to both qualified applicants and associates?

A. The leave accommodation?

MR. SABEY: Object to form and foundation.

Q. (By Mr. Azmoudeh) The answer can be no, Dr. Albert. I will just ask it again. Does Centura view rescinding a job offer to Dr. Pedadda as a denial of the medical leave that he had just been granted?

Let me reask that. Sorry.

Again the answer could be no, Dr. Albert. Does Centura view the rescission of the job offer to Dr. Pedadda as a denial of his request for medical leave?

A. No. We did not view it that way.

Q. I am going to go back to Exhibit 13. I would like to you scroll down to -- again I am using the page number on the bottom right, Pedadda 8?

A. Okay.

Q. Do you see Dr. Pedadda's E-mail from May 10, at 6:00 p.m.?

Page 135

A. Yes.

Q. It says, there is a clear mistake regarding my executed contract. I reviewed the contract and all my questions addressed by Eric, on April 11, 2022 at 12:30. I recall leaving the breast room to speak with Eric to address my concerns. Eric came by office and I signed the contract on 4-12-2022 with Eric's assistance.

Do you see that?

A. Yes.

Q. How does Centura interpret that statement, those couple of sentences?

A. He is claiming that he believed that the contract had been executed. And then he left the breast room board to talk to Eric, and that he, you know, hand signed the contract in Eric's presence in his office the following day.

Q. Does Centura believe that Dr. Pedadda was -- I'll ask this first. Dr. Pedadda at least is claiming to be surprised by this May 9 notice, correct?

A. Correct.

Q. Does Centura believe that Dr. Pedadda is being disingenuous in his claim of being surprised about being --

A. Yes, yes.

Q. And why is that?

Page 136

A. As we previously discussed there were numerous conversations, you know, between 4-12 and this time, up until, particularly between 4-12 and 4-26 regarding the necessity of that settlement agreement which had been sent out to him, which he had viewed multiple times. He had viewed the second contract multiple times, two plus week prior to this E-mail.

And so in personal conversations I had with him, that Eric Koval had with him, and others, you know, he had articulated he was very aware that first contract was never executed. And so this E-mail appears to be disingenuous in that way as you stated.

Q. I think what you just described were in-person conversations with Dr. Pedadda that the original contract was not valid, and that there was a second contract. Was it all in-person conversations?

A. It could have been phone calls as well. I think I previously said there were a number of phone calls and in-person conversations. I couldn't tell you which one was which, but we talked through it with him more than once.

Q. Prior to May 9, 2022, did Centura by E-mail, text, in-person or otherwise communicate to Dr. Pedadda that if he did not sign the revised offer by May 9th, it would be rescinded?

Page 137

A. I don't believe there was a hard deadline communicated.

Q. If you look at Mr. Weller's E-mail on May 11, 2022, Pedadda 9, do you see that?

A. Which exhibit is this?

Q. Sorry. 13.

A. So Sam Weller from which date?

Q. May 11.

A. Yes.

Q. Do you see Mr. Weller's says, there were multiple attempts to reach you to determine whether you would accept the revised offer of employment and confirm your July 1, 2022 start date and to discuss these contracts with no response.

Do you see that?

A. Yes.

Q. Okay. And then, these efforts include Eric Koval's most recent attempt on April 27, 2022 via text requesting you to speak.

Do you see that?

A. Yes.

Q. Are you aware whether Centura instructed Mr. Koval to tell Dr. Pedadda that if he didn't sign the employment agreement by May 9, it would be rescinded?

A. I am not -- I don't know. I am not aware of

35 (Pages 134 to 137)


MAGNA
LEGAL SERVICES

Page 138

that.

Q. Earlier we looked at an E-mail in which Dr. Plauth said Dr. Pedadda would be calling you.

Do you remember that?

A. Yes.

Q. You had the ability to call Dr. Pedadda, correct?

A. Yes.

Q. Did you ever call him in between, well, I guess at any time and say, if you don't sign this agreement by May 9th, it is going to be rescinded?

A. No.

Q. Dr. Plauth had a meeting with Dr. Pedadda on May 2nd. Do you remember discussing that?

A. Yes. Yes.

Q. And that was about Dr. Pedadda's request for medical leave?

A. Yeah.

Q. Do you know if Dr. Plauth said anything to Dr. Pedadda about being there being an outstanding employment agreement, or that if Dr. Pedadda didn't sign it by May 9th, it would be resigned?

A. I don't know. And that wouldn't have be Dr. Plauth's role necessarily in that meeting.

Q. Well, Dr. Plauth served as the liaison between

Page 139

physician, staff and the administration, correct?

A. Correct.

Q. So that would have been maybe a good use of the liaison function to tell Dr. Pedadda, hey, while we are dealing the medical staff thing, I will remind you during this meeting while I have you in front of me, to go speak with Eric Koval or else they are going to resigned your employment agreement on May 9th?

A. I am not aware of what Dr. Plauth did or did not say in that meeting.

Q. Centura didn't instruct Dr. Plauth to connect the two processes during that meeting on May 2nd, is that fair?

A. Yeah, not to my knowledge.

Q. Did Dr. Baldauf issued a letter to Dr. Pedadda granting the medical leave on May 5th.

Do you remember that?

A. Yes.

Q. That letter is from Centura, correct?

A. I'd have to go back and look at the document, but if that is what it says.

Q. I don't want to put words in your mouth, so it is Exhibit 13. So -- I am sorry. It is not Exhibit 13 -- it is late in the day. It is Exhibit 12.

A. Yes.

Page 140

Q. Sorry let's try it again. That was my fault.

In Exhibit 12, Dr. Baldauf was sending a letter on behalf of Centura to Dr. Pedadda, correct?

A. Yes. I said yes.

Q. Did Centura instruct Dr. Baldauf to include a requirement in this letter that Dr. Pedadda was to meet with Centura regarding the employment agreement while he was on medical leave?

A. No.

Q. The letter has other requirements of Dr. Pedadda, correct, that he go see Colorado Physicians Health Program and have a good assessment?

A. Correct.

Q. Dr. Plauth also connected Dr. Pedadda with Dr. Diane Thompson, who is another Centura physician.

Do you remember that discussion?

A. Yes.

Q. Did Centura instruct Dr. Diane Thompson to communicate with Dr. Pedadda, hey, I need you to connect with Centura on employment matters in any way?

A. Not to my knowledge.

Q. This letter, Exhibit 13, the notice of rescission was sent by Mr. Weller -- well, it was E-mailed by Mr. Weller attaching a letter signed by Mr. Tacha, is that correct?

Page 141

A. I am sorry. Did you say Exhibit 3?

Q. Yes.**

A. Yes. That is correct.

Q. Do you know what Centura instructed Mr. Weller to communicate prior to this letter on May 9th in any way that Dr. Pedadda needed to communicate with Centura regarding employment or else the offer would be rescinded by May 9th?

A. Again, there was never -- there was never a affirmative date given.

Q. If did Mr. Tacha signed this letter do you know if it Mr. Tacha ever spoke with Dr. Pedadda about any of this?

A. I don't know whether they would have directly spoken to him or whether Sam Weller was his representative in those discussions.

Q. Are you aware of a single E-mail or text message or voicemail or something recorded in which Centura prior to this May 9th letter explained to Dr. Pedadda the confusion amongst the first and second contracts?

A. Sorry. Are you asking if it like if it we have specific documentation of that.

A. Yes.

Q. The question was, are you aware of any E-mail,

36 (Pages 138 to 141)



Page 142

text message or voice mail, anything recorded in which had Centura explained to Dr. Pedadda before this May 9th letter how to sort through the confusion regarding the first and second employment contracts?

A. Do we have documentation of that -- I don't know. It is possible. But I would need to go back and review all of those E-mails again.

Q. Sorry.

A. I am sorry. It is just as pause nothing comes to mind that would have been specifically E-mail as opposed to verbally communicated.

Yeah, I will go with that.

Can we take a restroom break?

Q. I have one more question. Can you get through it? Is that okay? It is a couple of questions. Why don't we take a break? Let's take a break. Ten minutes.

(A short break was taken in the proceedings.)

Q. Mr. Immediate? Dr. Albert, are you ready? I don't think I have too much left, but a little bit?

A. All right.

Q. Thank you for indulging me for the last several hours.

A. Yeah. Part of the job.

Q. Let me take you back to Exhibit 75 really

Page 143

quick. You still have that in front of you?

A. Let me pull it it up.

Q. Could you see that document cancelled by Robin Lane. Do you see that?

A. Yes.

Q. Was actually canceled on May 5th at 10:00 p.m. Do you see that?

A. Yes.

Q. That is five days earlier, four or five days earlier than Centura notified Dr. Pedadda rescinding the contract. Would you agree with me on that?

A. Yes.

Q. That's the exact same day that Centura also granted Dr. Pedadda medical leave?

A. Yes.

Q. Did anybody discuss that relationship that we're granting Dr. Pedadda medical leave and we are also rescinding his employment offer?

A. Yes. I wasn't aware of that timing. I, again, the folks in the contracting world and the making the decision on employment were not the same folks that were granting the medical leave. And so my belief is that that date is a coincidence and these discussions were just going be on in parallel.

Q. And those two folks who were working on

Page 144

various issues. They have a liaison and that liaison was Dr. Plauth? Right?

A. Correct.

Q. And he apparently did not bridge the gap for any reason?

A. I don't -- I don't recall. I don't believe so. Dr. Plauth was, as that liaison, instructing Dr. Pedadda to reach out to us to discuss employment, and when Dr. Pedadda said that he was not going to communication with us for the next three months, Dr. Plauth said that's not an option regarding employment. You need to. But I believe Dr. Plauth felt he was filling his obligation as that liaison by encouraging that communication.

Q. Dr. Plauth did not bridge the gap between those two groups with the specific information that Centura is granting Dr. Pedadda a medical leave, correct?

A. Not that exact date, not to my knowledge. No.

Q. Who is Robin Lane?

A. Robin Lane was the contract specialist. She is the one that would have responsible for drafting and sending out the contracts for signatures and providing that administrative support to the physician alignment group.

Page 145

Q. Does Centura ask Robin Lane to work normal business hours?

A. I wouldn't be aware of that.

Q. Does Centura have any reason, to your understanding on behalf of Centura, do you any reason to believe that Centura works the night shift? I'm sorry, that Robin Lane works the night shift, for instance?

A. No.

Q. Ms. Lane canceled this contract at 10:12 p.m. Any reason why it was so late at night?

A. I am reading 10:12 p.m. Greewich Mean Time, which would be like 1:00 or 2:00 in the afternoon Mountain Time.

Q. Is that what the GMT stands for?

A. Yes.

Q. I am going to do a quick Google if you don't mind.

A. Okay. Go for it.

Q. How do you know Greenwich Mean Time?

A. It's the UK, so it's just six or seven hours ahead of us. Seven, eight hours I guess, Mountain Time.

Q. That makes more sense. I am wondering why Ms. Lane is sending off E-mails in the evening but apparently she is not.

So why don't we do the math then together. I



MAGNA
LEGAL SERVICES

Page 146

just Googled what is the MT time right now and it said says 8:51 p.m. so that was about seven hours ahead. Does that sound accurate to you?

A. Yes.

Q. So it would be accurate then Ms. Lane sent this E-mail around 2:12 p.m.?

Let me restate that question. Does it seem accurate to Centura that Robin Lane canceled the contract at around 2:12 p.m.?

A. It would be 3:12.

Q. God, my math is bad. Let me try one more time. Is it accurate that Ms. Lane canceled this document at 3:12 p.m. on May 5, 2022?

A. At 3:12 Mountain Time, correct.

Q. Do you know who instructed Ms. Lane to cancel the contract, if anyone?

A. I don't know.

Q. Any reason that you are aware of why Centura would cancel the contract and not send out the letter until May 10th?

A. I can't think of a reason, and I don't recall.

(Exhibit 77 identified.)

Q. I am showing you what has been marked as Exhibit 77.

(Exhibit 78 identified.)

Page 147

Q. Okay. And we actually going to put 77 aside for a second. I am going to show you Exhibit 78 first.

A. Okay.

Q. Have you seen 78 before?

A. I reviewed a bunch of these legal looking documents, and I don't recall if I have seen this before. I am trying to browse through it.

Q. Okay.

MR. SABEY: Is there a question pending that he should be looking for?

Q. (By Mr. Azmoudeh) I am just asking if he reviewed this document before.

A. I don't think that I have reviewed this document.

Q. Okay. Maybe, could you turn to page 18 of the document?

A. Okay. I am there.

Q. You see where it says affirmative defenses?

A. Uh-huh.

Q. Do you see that number 2, the affirmative defense, it says plaintiff's claim were barred in whole or in part because plaintiff failed to mitigate damages.

Do you see that?

A. Yes.

Q. Do you know -- are you aware if there any

Page 148

other affirmative defenses that Centura is asserting in this lawsuit, other than those listed in 1 through 3?

A. I am not aware of any additional ones. I would have would to defer to our legal counsel.

Q. Could you pull up Exhibit 77 now for me?

A. Okay.

Q. Do you see on page, so these are -- do you remember earlier we talked about interrogatories?

A. Yes.

Q. Written questions by one side to the other?

A. Yes.

Q. If you look on page 3?

A. Okay.

Q. Do you see interrogatory number 9, it says describe in detail the material factual basis for each and every affirmative defense?

Do you see that?

A. Yes.

Q. And then do you see in the first supplemental answer at the bottom of page 3? Do you see that?

A. Yes.

Q. You see it says the factual basis supporting the failure to mitigate defenses in the exclusive possession of Dr. Pedadda.

Do you see that?

Page 149

A. Yes.

Q. Okay. Does Centura agree that the factual basis supporting the failure to mitigate defense information was in the exclusive possession of Dr. Pedadda?

A. Yes.

Q. Is Centura aware of any evidence that is outside the exclusive possession of Dr. Pedadda regarding the affirmative defense of failure to mitigate?

A. No, not to my knowledge.

(Exhibit 79 identified.)

Q. I am going to introduce Exhibit 79. Let me know when you have 79 open.

A. It isn't open in the chat yet.

Q. Oh, I am sorry. I didn't share it with you. Okay. That would be helpful.

A. It would. Okay. I have got it.

Q. Have you seen this document before?

A. I don't think so, no.

Q. Okay. I'll draw your attention to page -- well, actually, I'll give you some background. So interrogatories are written requests for written answers. Requests for production are written requests that a party produce something, a document or sometimes



Page 150

you can even request to inspect the land. It is to produce something, right?

A. Right.

Q. Does that make sense?

A. It does.

Q. So I will draw your attention to page 3.

A. Okay.

Q. Do you see the request for production number 8?

A. Yes.

Q. It says produce all documents and communications establishing a material factual basis for each and every affirmative defense, liability or damages that you might raise at trial.

Do you see that?

A. Yes.

Q. And the response is, the documents, and communications related to failure to mitigate damages would be in the possession of Dr. Pedadda.

Does Centura agree with that?

A. Yes.

Q. And the first supplemental response is Dr. Pedadda is in exclusive possession of documentation related to his effort to mitigate damages.

Do you see that?

Page 151

A. Yes.

Q. Is Centura in agreement that Dr. Pedadda is in exclusive possession of any evidence regarding the affirmative defense of failure to mitigate damages?

A. Yes.

Q. Based on what I have shown you, these exhibits indicate that Centura has taken the possession that everything in support of Centura's defense or failure to mitigate is in Dr. Pedadda's possession.

Would you agree with me on that?

A. We are getting into legal contents here. And I am not totally following you.

Q. So I had shown you earlier that affirmative defense that said failure to mitigate. Do you remember that?

A. Yeah.

Q. And I showed you a couple of requests from Dr. Pedadda to the defendant in this case saying, what is your evidence, what's the information you have regarding that defense, failure to mitigate.

Do you remember those requests?

A. Yes.

Q. And in response to all of those requests Centura has said, all of our information, facts, evidence, arguments, documents, those are in

Page 152

Dr. Pedadda's exclusive possession.

Do you remember that?

A. Yeah.

Q. Does Centura agree with that?

MR. SABEY: I will object to the foundation.

A. Yeah. Again, I would be speaking on behalf of Centura. This legal content. I'd have to defer that question to our legal counsel. I don't have the answer.

Q. (By Mr. Azmoudeh) Outside of these responses from Centura that I have shown you, is there anything else that you can tell me about Centura's basis for the failure to mitigate defense?

A. No, nothing I can tell you.

Q. Centura, we have been discussing it today, has been alive as an entity since the '90s. Are you aware of that?

A. Yes.

Q. Okay. And then Centura was the baby borne of Catholic Health Initiatives Colorado and Adventist Health System. Do you understand that to be true?

A. Yes.

Q. Okay. And those two entities formed this baby of Centura in the '90s. Are you aware that in 2019 Catholic Health Initiatives and another entity, Dignity Health, created a new entity called Common Spirit Health

Page 153

in 2019?

A. Yes.

Q. Okay. So, and the final question, you are aware that Centura ceased to exist in August of 2023? Is that right?

A. Correct.

Q. Okay. So for a period there between January of 2019 and August of 2023, Common Spirit was in existence, and so too was Centura. And that period spanned between 2019 and August of 2023. Is that kind of how you think about it?

A. Yeah, correct. August 1, 2023.

Q. I want to focus on that period first, the overlap between Centura and Common Spirit. First off, do you personally, when did you join Centura?

A. It was the fall of 2021. September -- September, maybe early October. I actually don't know my actual employment date.

Q. Okay. Between January of 2019 and August of 2023, in what ways did Common Spirit exercise control or oversight over Centura?

A. Yeah. So maybe I can just explain the entities, Centura and how Common Spirit factored into that to answer that question. So Centura was a joint operating agreement between Common Spirit Health and

MAGNA
LEGAL SERVICES

Page 154

Advent Health, right?  And they joined and became Common Spirit.  So those parent organizations, we call them sponsor organizations owned the assets, right, provided the capital for the facilities that they owned.  It was 15 Common Spirit Hospitals and Advent Health Hospitals that's what made up Centura.  So Centura was a holding company or the management company that operated these facilities on behalf of those two organizations.

Common Spirit had essentially no involvement, you know, in the day-to-day decision-making, the processes around this, I guess.

Your question -- can you repeat your question? It was control and oversight exhibited by Common Spirit, was that -- so ultimately the CEO of Centura answered to the Centura board and the Centura board was comprised of a proportionate number of representatives from Common Spirit Health and Advent Health, right?

So there were Common Spirit leaders on the Centura board to whom our CEO answered.  So the Common Spirit was not at all involved in managing or operating any of these facilities, or would not have been exercising any direct oversight or control over this situation.

Q.  Okay.  So between January of 2019 and August of 2023, the one connection between Common Spirit and

Page 155

Centura was that the Centura board was made up of some number of Common Spirit board members?

A.  Correct.

Q.  Those Common Spirit -- those members of Centura's board from Common Spirit exercised authority as board members of Centura, fair?

A.  Yes.

MR. SABEY: Object to foundation.

Q.  (By Mr. Azmoudeh) Do you know what authority the Centura board of directors had over Centura?

A.  I do not.  I don't know those specifics.

Q.  Do you know if the Centura board of directors who was made up of, at least in part, Common Spirit employees, do you know if that board of directors would fire the CEO?

MR. SABEY:  Object to foundation.

A.  I don't know.

Q.  (By Mr. Azmoudeh) How would you find out?

A.  I mean that's often the case in organizations and so I, you know, presumably that would be the case. I mean you could talk to senior leaders, you know, who would be familiar with the, you know, policies and procedures of the board, and what that relationship and process would have been to fire a CEO.

I mean I would have to consult those folks to

Page 156

even take a shot at that question.

Q.  I guess it's your understanding of what the board of directors authority was over Centura between January of 2019 and August of 2023 is only based on your understanding of what is customary for boards of directors to do with respect to corporations.  Is that fair?

A.  Correct.

Q.  What do you understand or other customary authorities that were boards of directors exercise over their organizations?

A.  I mean, you know, control of, you know, decision making, capital allocation, you know, there are a whole host of different things that a board could be involved in.  I wouldn't be able to speak to more details than that.

Q.  Could the board for Centura, between January of 2019 and August of 2023, reorganize the management structure, for instance?

A.  Of --

MR. SABEY:  Object to foundation.

A.  Yeah.  This is not my area of expertise.  I would be speculating.

Q.  (By Mr. Azmoudeh) Okay.  So I will return your attention to Exhibit 70.  Let me know when you are

Page 157

there.

A.  You previously sent it.

Q.  Yes.  Sorry.  It is from way earlier today.

A.  Thank you.  I have got it.

Q.  If you could turn to page 7 for me, and let me know when you are there.

A.  All right.  I am there.

Q.  Do you see that there two topics 10s?

A.  Yes.

Q.  Okay. I am going to refer you to the second topic 10, which I will call topic 10 B.

A.  Okay.

Q.  Do you see that it says Common Spirit's level of control and oversight exercised over defendant including over job duties and responsibilities, finances, staffing arrangements and policies and procedures.

Do you see that?

A.  Yes.

Q.  What did you do to prepare for that topic?

A.  So we had discussed with, you know, we reviewing this with our attorneys the role of Common Spirit in the day-to-day management of Centura.  And we are, you know, generally comfortable with the idea that Common Spirit was not involved in these, you know, job

40  (Pages 154 to 157)



Page 158

duties, responsibilities on a -- at this level.

Q. Okay. But today you testified that Common Spirit was serving as board members for Centura at the time. Correct?

A. Yeah, and owning many of the facilities.

Q. Okay. But you don't know what level of control or oversight results from Common Spirit's participation as board members for Centura.

That's the testimony today?

A. Yes, at my level. You know, at my level in the organization, I had no interaction with anybody from Common Spirit during that period of time.

Q. Yeah. So I appreciate that, Dr. Albert, I do. But the topic is, you know, in what ways does Common Spirit exercise control or oversight. And what I learned today was that Common Spirit has employees who are sitting on the board of Centura. And I would like to explore that. You know, what can they do as members of the board, what is their authority, what is their power, how do they exercise that?

And what I am hearing is you don't know?

A. I don't know. Correct.

MR. SABEY: I will object to the line of questioning. It doesn't say anything in the Rule 30 (b)(6) notice about board functioning. And Common

Page 159

Spirit is a confusing term as well because there are levels of Common Spirit.

MR. AZMOUDEH: I pretty sure it is defined at the top, Mark.

MR. SABEY: Well, let me look at that.

MR. AZMOUDEH: In any event I am not going to persuade you and you are not going to persuade me today, Mark. So build your record and we will go from there.

Anything else?

MR. SABEY: Well, it is just that Common Spirit Health is, so you have Catholic Health Initiatives. You Catholic Health Initiatives Colorado, and I don't think there was ever testimony that employees of Common Spirit sit on the board.

There are representatives appointed by people I think. But again, this doesn't didn't tell us to study board functioning, and who is on the board and how they are appointed and that sort of thing. So I don't think it is at all surprising that Dr. Albert is not prepared to discuss that level of detail about board functioning, and who actually appoints the board members and who they are and what they do.

Q. (By Mr. Azmoudeh) Okay. Dr. Albert, I want to draw your attention to topic, what I will call topic 10 A. Do you see that one?

Page 160

I am calling it 10 A but it is the first topic 10?

A. And this is back on the document 70 again?

Q. Correct.

A. Yes. Yeah, yeah.

Q. Can you just describe to me Centura's understanding of the -- department of employment of Dr. Plauth, Dr. Weller and Mr. Koval?

A. Yeah. So in that disaffiliation around that time, and leading up to that time, during that time the organization went through a number of reorgs. And so Dr. Plauth and Sam Weller both left with severance during that, or around that period of time. Eric Koval left voluntarily for another position. And I believe it was a promotional opportunity as a director of oncology service line for another health system that was where he wanted to live.

Q. How are the departures of Mr. Weller and Dr. Plauth classified by Centura?

A. I mean they left during a reorg. I am not sure what you mean by how it was classified.

Q. Well, what's the term I am looking for here, Mark? Organization reduction out?

MR. SABEY: Reduction in force?

Q. (By Mr. Azmoudeh) There we go. Yeah. A RIF,

Page 161

was this a RIF?

A. I don't know offhand how that was classified.

Q. Okay. Do you see topic 14 on Exhibit 70?

A. Yes.

Q. Does Centura provide you -- did Centura work-issued cell phones to employees?

A. Not to my knowledge. I don't know anyone who had one of those.

Q. So we reviewed some text messages today such as the ones between you and Dr. Pedadda. Would those have come from a personal cell phone?

A. Yes.

Q. Have you been asked to review and produce any text messages from your cell phone during this litigation?

MR. SABEY: I'd object to privileged communication.

MR. AZMOUDEH: That is a good objection. Good catch.

Q. (By Mr. Azmoudeh) Let me just ask this, Dr. Albert, have you produced any text messages from your personal cell phone in this litigation?

MR. SABEY: I will object to privileged action. I am just kidding. Go ahead.

A. Honestly this has been such a long period of



Page 162

time. We received a litigation hold. I was asked to review a lot of E-mails that I had sent and been sent and I have looked over a lot of text messages. I don't -- I don't specifically recall whether anyone asked me to provide those from my personal cell phone.

Q. Do you know if Centura has asked anybody else to produce documents from their personal cell phones?

A. Well --

MR. AZMOUDEH: Mark, you should have objected.

MR. SABEY: Same objection.

Q. (By Mr. Azmoudeh) We talked earlier about some of the decision making, for example. We talked about you, Mr. Koval, Dr. Weller and Mr. Tacha. Do you remember that?

A. Yes.

Q. Do you know if, other than you as we just discussed, do you know if any of the other people that I have just listed have produced text messages in this lawsuit?

A. I don't know.

Q. Dr. Albert, before I ask you to take off your Centura hat, are you comfortable with everything you said today on behalf of Centura? Are you comfortable with that also being your testimony on behalf of yourself individually?

Page 163

A. Yes.

Q. Okay. I am still going to ask you to take that hat off and testify with me for a little while individually.

A. Sure.

Q. I will tell the people outside my office to be quit. It is the holiday cheer again. One second.

Okay. Sorry.

With your individual hat on, I want to talk about the -- what you described as the draft discussion agreement, employment agreement, and then what Centura described as the new employment agreement. Just anything you want to add, any memories that stand out to you about the contracts issue?

A. What do you mean the contracts issue?

Q. We discussed a lot today about there being a draft discussion, a contract and then a second contract being sent to Dr. Pedadda. Anything along that time line, you know, April 11th through, say, April 27th? Anything there in jump out to you as burned in your memory?

A. Yeah. So another part of that circumstance that I think was relevant, in discussions with Dr. Pedadda, he would very openly be willing to discuss certain things and sort of selectively say that he

Page 164

wasn't willing to discuss other things. And the same with the settlement agreement. And so I would also say that there was a feel amongst, sentiment among the decision-making team in this process that he -- it seemed unusual that, again, he would sign over, by hand a bunch of characters that indicate that something that wasmeant to be electronically signed in the middle of a workday, you know, seeing patients and jumping between meetings, so hastily for somebody who had been so reluctant for months to ever state his intentions.

So I think there was a lot of suspicions as to why he was doing that. And in that process, you know, there was some speculation amongst us, and I think I shared the concern, that maybe in his mind he was thinking that was somehow going to get him out of the settlement agreement or something like that, so he was rushing to sign it.

And why he fought so hard to say, oh, I thought I did sign it. And that's is not why I need to sign the second one. So there was a lot of conversations, again, around his intentions. And he was being very inconsistent in his communication with us, making us question what his intentions were with us moving forward.

And so I think that, you know, I think that is

Page 165

maybe one piece of this discussion that I had the opportunity to touch on in my previous testimony.

Q. Putting aside some of the suspicion around his intention, was there any suspicion around that you had individually, about sort of Dr. Pedadda's compliance in April of 2022, about physician burn out and the need for the leave?

A. No. I will always take someone at their word when they say something like that. You know, anyone who is talking about something like burn out is entitled to benefit of the doubt, irrespective of any previous disagreements or tensions that may have been existed. And so I would say when I hear something like that, no, I take it them at their word and trust them.

Q. Why didn't that, when you started to learn about the burn out, why didn't that just -- hold on a minute, let pause everything, let's reset or let's find a way to recorrect with this guy. Why didn't that happen?

A. So we did. We did reconnect with him. You know I, I undertook, at the time, felt like a Herculean effort to get Dr. Monroe to see Dr. Pedadda's viewpoint and agree to work extra days to cover him for three full weeks in the middle of all this despite all of those kind of previously held feelings between the two of



Page 166

them. To me, that was a good faith effort to help, you know, to help broker this kind of fractured relationship in a way that resulted in Dr. Monroe giving Dr. Pedadda the benefit of the doubt. Even said, if this is a mental health concern for you, I am willing to cover. And I would not characterize that as saying you know, hey, let's hit pause and reconnect because of discussion of burn out. This was an ongoing discussion between him and I as well as him and several others.

Q. Prior to preparing today to the testify to behalf of Centura, I think we discussed that you had had some independent understanding of the ADA policy that we looked at throughout the day. You received it when you were on boarded and you participated in the annual training?

A. Correct.

Q. Do you have a -- did you have a general understanding of things like accommodations and leaves and undue hardship prior to preparing for the deposition today?

A. Yes.

Q. Did you have any personal views at the time when Centura rescinded the employment offer that, or did you have any concern, I should say, at the time when Centura rescinded the employment offer that there was

Page 167

some ADA problems?

A. I didn't interpret the situation as there being any ADA problems.

Q. Looking back now, do you think you should have done anything differently in this situation?

A. In, so any time in a situation like this, there could be shades of gray in any way, we always consult our HR and legal teams as we go through this process. And so I again, going through that situation like that, you know, was very much going through and under the advisement of those parts of our organization, recognizing I not an expert on ADA or anything else.

In retrospect, you know, I don't know. I don't know that I would have done anything differently. I might have fought harder about extending the offer to Dr. Peddada in the first place.

We might have, you know, we exhausted and worked through multiple different ways to reconcile that group, and felt like we had worked through that. I can't think of anything in this situation that I would have done differently.

Q. You know, of course, that this lawsuit by Dr. Pedadda is about losing, you know, his work opportunity at Penrose. Is that is that generally your understanding of what this lawsuit is about?

Page 168

A. Yes.

Q. Do you have any empathy, do you find any truth in anything that Dr. Pedadda is alleging in this lawsuit?

A. I mean, I have empathy anyone who is in a situation like this, right, when things don't work out in a group, somebody is established in the community. As a colleague and a human, I have empathy for anybody going through a difficult situation like this. You know, I think that is all I would say.

Q. At the time, what was your relationship with Mr. Tacha?

A. Colleagues in the organization.

Q. How often would you encounter him at work?

A. Not often. You know in medical group meetings, right, I mean medical group and leadership meetings. We weren't in regular communication on a daily or weekly basis.

Q. How would you describe his personality?

A. I honestly didn't know him that well to be able to characterize that.

Q. Any conversations with Mr. Tacha that are burned in your mind about any of these circumstances?

A. Good question. I can't recall if I directly discussed it with him or if Sam Weller was our go

Page 169

between. I don't recall.

Q. Let's go to Mr. Weller. What was your relationship to Mr. Weller during all of this?

A. So again, we were, you know, colleagues and partners from the two branches of the organization that were involved in this. So we were in pretty regular communication.

Q. What was Mr. Weller's personality like?

A. He was a very kind of follow the process, right? Like, as physician leader you learn to value your administrative partners on, you know, their understanding of the process and connecting the dots in the different parts of the organization. He seemed to be a very kind of direct, to the point, straight shooter.

Q. Any conversation with Mr. Weller about these circumstances burned in your mind?

A. Nothing outside the topics we have kind of discussed. No specific conversation with him stands out.

Q. Did you have a relationship with Mr. Weller outside the organization?

A. No.

Q. Do you still talk to Mr. Weller at all?

A. I don't.

Q. Mr. Koval, what was your relationship with Mr.

43 (Pages 166 to 169)

MAGNA
LEGAL SERVICES

Page 170

Koval at the time?

A. Same. So he was a member of our service line, you know. So, I mean, he was on my leadership team, right, with the oncology service line, our representative in southern Colorado, responsible for the cancer program. So he was our, he was our boots on the grounds, our eyes and ears in the medical force, you know, for our operations in Colorado Springs and Pueblo.

Q. What was his personality like?

A. Also a pretty straight forward guy. You know, he works obviously, had a lot of direct reports from a lot of front line staff. And so he was an operations-minded guy, you know, who was always thinking about, you know, how do we continue to make this work, how do we continue to make things work within the department. You know, also a nice guy, a very reasonable person.

Q. Do you still talk to Mr. Koval?

A. I don't.

Q. Dr. Plauth, how would you characterize your relationship with him at the time?

A. Yes. I, again, didn't know him particularly well. You have to remember I was relatively new to the organization over a very large geography at the time this was going down. So I got to know him through, you

Page 171

know, interactions like this. And, you know, through, you know, medical group meeting and medical staff meetings.

Q. Were these circumstances the most significant part of your work with Dr. Plauth, kind of around -- I will put it this way: Was it your first significant work with Dr. Plauth at the time?

A. Yeah. Yeah. I think it was.

Q. Do you still work with Dr. Plauth or see him?

A. No.

Q. Okay. I am going to take a five-minute break. I will probably be done. Give me five minutes.

A. All right. Sounds good.

(A short break was taken.)

Q. One short couple questions, and then I am done. Put your Centura hat back on for a second, if you could, Dr. Albert.

Today you, a couple different times, described Dr. Pedadda's behavior as odd in the months proceeding the rescission of his employment contract?

A. Yes.

Q. You gave me an example of Dr. Pedadda not wanting to talk about the loans forgiveness agreement, which I think in your words was free money, so it was especially odd that Dr. Pedadda didn't want to talk

Page 172

about that. Correct?

A. Correct.

Q. You also discussed that in the months preceding the recission of Dr. Pedadda's employment contract, Dr. Pedadda's behavior at work also was becoming increasingly odd, and even at times interruptive, interrupting to the work environment, correct?

A. Yeah, with respect to his conduct at work, I wouldn't say odd as much as I would say disruptive.

Q. Disruptive is the word I was looking for. There it is. You also said that, even in just communications between administration and Dr. Pedadda in other contexts, increasingly Dr. Pedadda was becoming difficult to communicate with in the months preceding rescission of his employment contract, correct?

A. Correct.

Q. On the declining free money from Centura, did that indicate to Centura that Dr. Pedadda in the months preceding the rescission of the contract wasn't comprehending things correctly?

A. It was not my interpretation that he wasn't comprehending it.

Q. In the months preceding the rescission of the contract, you also described Dr. Pedadda as engaging in,

Page 173

I mean, even potentially surreptitious conduct by hastily signing the first contract to avoid a loan obligation.

Do you remember that?

A. Yes.

Q. Had Centura ever before encountered Dr. Pedadda engaging in any similar ways?

MR. SABEY: Object to the form.

A. Can you repeat that question please?

Q. Yeah. So I mean, I was trying to find a word to characterize -- well, I will ask you. How would you characterize Dr. Pedadda, the theory that Dr. Pedadda was signing the contract on the 11th on paper, in order to avoid a loan obligation or a discussion about the loan agreement?

What word would you use to characterize that?

A. I would characterize his hastily signing, is that -- suspicious.

Q. Okay. Had Centura ever observed Dr. Pedadda engaging in suspicious conduct prior to that?

MR. SABEY: Object to foundation.

A. With respect to the prospective employment situation specifically or anything?

Q. (By Mr. Azmoudeh) Anything?

MR. SABEY: Again I object to the foundation.



Page 174

It wasn't part of the 30(b)(6) notice.

MR. AZMOUDEH: Dr. Pedadda's work performance was not part of the 30(b)(6) notice?

MR. SABEY: His work performance was.

Q. (By Mr. Azmoudeh) Okay. So, Dr. Albert, in your view of Dr. Pedadda's work performance was there any evidence in the past that Dr. Pedadda had been acting suspicious in his dealings at work?

A. So, you know, failure to engage in patient care and patient management conferences. You know, selective communication with us regarding, you know, maybe things that he felt he needed to talk about, but then ignoring things he didn't want to talk about, like the settlement agreement. You know, inconsistencies between, you know, for example, he took the time to do an interview with a prospective candidate at the exact same time that he was not willing to talk to us about his own prospective employment.

We found out, you know, right around the time that the offer was rescinded that his home was for sale on the market, without telling any of us what he was going to be doing, and saying that he had no obligation to communicate, or no intention of communicating with us for the next three months, knowing that somebody that's been a radiation oncologist for over 20 years Dr.

Page 175

Pedadda should have been well aware how disruptive that would have been to the patient care operation, as well as his role as a doctor. He had active patients on treatment who he was not willing to be coming back and continuing his ongoing care for, sort of abandoning those patients, without signing them off to Dr. Monroe because of refusal to communicate with Dr. Monroe.

I mean, all of that behavior collectively.

Q. So try to put some of that into buckets. Maybe it was some concern that Pedadda was abandoning patients, that Dr. Pedadda was being inconsistent in his communications with Centura, that Dr. Pedadda was outright refusing to really work with his partner whatsoever. All of those things that you just described to me, I think, occurred basically in 2021 and the early part of 2022, correct?

A. Correct. Again from what Dr. Monroe has said and I believe what Dr. Pedadda also said, the period of time they were not communicating, and he was not engaging some of these patient management conferences precedes the end of 2021. I believe I saw the term ten months or something in one of the documents.

Q. But prior to that, those sort of, would you agree with me that things in Dr. Pedadda's behavior appeared to be coalescing over time, getting worse and

Page 176

worse as 2021 went on into 2022?

A. Yeah. I think it is hard -- so it's hard to pars out how much of this would have been previous issues, right? He was somebody who had been characterized by his coworkers and partner as controlling, manipulative, you know, perhaps abusive in some ways in his relationship with Dr. Monroe, and bullying. And so it's hard to characterize how much of this was just those issues being brought to light versus necessarily his behavior having gotten worse.

My awareness of his behavior increased significantly over that period of time. But as I mentioned, as we kind of peeled back the layers, it became more and more clear that a lot of his behavior had been going on for quite some time.

MR. AZMOUDEH: Okay. I think I am done. Mark, do you have anything?

MR. SABEY: No. No questions for me.

MR. AZMOUDEH: Thank you, Dr. Albert. I appreciate your time.

DR. ALBERT: Thank you.

MR. AZMOUDEH: I would like electronic copies.

MR. SABEY: We will have an Etran.

(Deposition concluded at 3:00 p.m. MST.)

Page 177

JURAT PAGE.

I, JEFFREY ALBERT, M.D., do hereby certify that I have read the foregoing transcript and that the same and accompanying amendment sheets,if any, constitute a true, and complete record of my testimony given at said time and place, except for the corrections noted.

_____
Signature of deponent

(  )No amendments      (  )Amendments attached

Subscribed and sworn to before me, the Undersigned Notary Public in and for the State of _____, by said witness, _____ on this _____ day of _____ 2025.

_____
Notary Public

45 (Pages 174 to 177)




Page 178

C-E-R-T-I-F-I-C-A-T-E

STATE OF COLORADO

COUNTY OF GUNNISON

I, Ruth E. Collins, Certified Shorthand Reporter within and for the State of Colorado, certify that the above-named witness was sworn, that the deposition of JEFFREY ALBERT, M.D.  was taken in machine shorthand and thereafter transcribed; that it is true and correct;

And that it was taken on October 30, 2024 in Gunnison County, State of Colorado pursuant to Notice and Agreement by ZOOM video teleconference, and that said witness has requested to read and sign the deposition transcript;

That I am not an attorney for nor relative of any of said parties or otherwise interested in the event of said action.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal this 21th day of DECEMBER, 2024.

_____

Ruth E. Collins, CSR



**A**

**a.m**
1:19 43:10
**abandoning**
175:5,10
**ability**
24:15 26:21 42:17
50:4 64:8 77:24
117:18 121:9 138:6
**able**
6:16 27:17 28:5,8,12
42:18 54:22 64:1,7
64:20 65:2,8 66:7
93:10 118:9 120:15
122:6 156:15
168:21
**above-named**
178:6
**absence**
22:23 24:14 25:6
26:23 27:3 36:25
**absolutely**
54:6 101:18 105:6,10
**absorbed**
8:14
**abusive**
176:6
**accelerated**
50:10
**acceleration**
63:8,12
**accept**
105:23 127:25
137:12
**acceptable**
92:15
**accepting**
88:8
**access**
54:18 56:12,14
**accessibility**
29:21
**accidentally**
42:16
**accommodate**

36:20
**accommodation**
31:18,25 34:4,5,12
35:3,16,18 36:3,5
36:11,25 123:20
124:4,17 125:24
126:8 132:20 134:1
134:2,9
**accommodations**
34:8 35:10 36:2,13
124:3,6,23 133:18
133:22,23 166:18
**accompanying**
177:5
**accomplish**
64:20
**accomplishment**
50:18,25 115:18
**account**
68:18,22
**accountability**
99:5
**accountable**
13:6
**accurate**
17:9,10,20,25 26:9
32:1 33:4 34:9
48:22 57:21 59:19
60:1 66:18 85:21
86:25 96:4 113:19
146:3,5,8,12
**accurately**
48:7
**accusing**
17:15
**accustomed**
77:13
**acknowledge**
105:11 127:24
**acknowledgement**
127:14
**acknowledging**
80:3 90:18 118:1,6
**acknowledgment**
129:3
**acquired**

8:16
**acronym**
52:15
**act**
31:6,6
**acting**
110:22 125:7 174:8
**action**
47:16 48:5 49:4,8
161:23 178:18
**active**
175:3
**actual**
42:20 79:20 153:18
**ADA**
122:25 123:4,10
131:9 132:6 166:12
167:1,3,12
**ADAAA**
31:6
**add**
81:1 97:25 163:13
**added**
75:23,25 83:16
**addendum**
58:5 80:9 81:4,9,15
81:20 82:19 83:17
**adding**
80:20 104:17
**addition**
19:18 27:20
**additional**
45:24 101:12 124:2
124:23 148:3
**additionally**
75:17
**address**
135:6
**addressed**
135:4
**adjustment**
35:4
**administration**
22:9 139:1 172:13
**administrative**
13:18 144:24 169:11

**administrator**
8:7 61:2
**admit**
105:23,25
**Adobe**
106:8
**Advent**
7:23 8:13,15 154:1,5
154:17
**Adventist**
152:19
**advice**
125:8,11
**advisement**
167:11
**affirmative**
3:23 141:10 147:18
147:20 148:1,16
149:9 150:13 151:4
151:13
**afraid**
121:24
**afternoon**
145:12
**agent**
10:3
**aggressive**
125:10
**ago**
6:21 9:24 27:12
30:14 46:16 48:19
57:8
**agree**
22:10 31:15 93:7
107:9 110:21 111:7
115:21 120:22
123:2 143:11 149:2
150:20 151:10
152:4 165:23
175:24
**agreeable**
71:21
**agreed**
111:19
**agreement**
3:18,20 44:16,19



45:6,7 46:13 47:14
49:5 55:21 57:8,14
57:15,19,25 58:4,10
58:15,19 59:2,8
67:14 71:18 74:15
75:2 76:23 77:3
78:10,14,20,24,25
79:3 81:2,4 82:4,8
82:15,25 83:1,3,7,9
83:10,16,19 85:2,2
85:14,17,18,19,20
86:1 87:5,7,15,16
87:21,25 88:2,17,21
88:22 89:1 94:25
103:6 124:24
127:25 129:2 136:4
137:24 138:11,21
139:8 140:7 151:2
153:25 163:11,11
163:12 164:2,16
171:23 173:15
174:14 178:12
**agreements**
20:1 45:19 58:24
86:5 99:10
**agrees**
33:18,19
**ahead**
5:24 98:16 145:21
146:2 161:24
**ahh**
77:2
**air**
56:24 103:22
**Alan**
1:16 99:18 100:7
**Alan's**
101:16
**Albert**
1:12 4:9,14,16,17,18
4:19 6:14,25 8:23
9:13,25 14:24 15:3
15:13 16:9 17:14
22:17 24:4 25:2
27:1 28:17 29:14
30:6 31:4 34:15

36:9 38:16 39:1
40:8,11 41:5 42:10
43:7,12 50:7 51:24
56:20 59:24 72:17
73:7 74:2 89:25
117:7 133:21
134:12,16 142:19
158:13 159:19,23
161:21 162:21
171:17 174:5
176:19,21 177:3
178:7
**alignment**
12:21 18:6,10,13,19
19:5,20 48:10 49:3
69:15 99:6 144:24
**alive**
152:15
**alleging**
168:3
**allocation**
156:13
**allow**
35:11
**allowed**
37:2 43:3,3,4 128:15
**allowing**
65:1
**alongside**
28:25
**amend**
17:12
**amended**
3:15 9:15,19,19
**amendment**
177:5
**amendments**
31:6 177:12,12
**Americans**
31:5
**analogous**
48:17
**analysis**
26:13 78:12
**andphysician**
54:21

**animosity**
62:2 63:15 100:19
**announcement**
119:21
**annual**
37:16,20 38:12,20
41:19 42:25 43:1
55:11,13 166:14
**annually**
30:4,16,22
**answer**
5:18,23,25 6:6 17:12
32:18 47:10,15
59:22 103:3 133:14
134:11,16 148:20
152:8 153:24
**answered**
23:19 154:14,19
**answering**
128:3
**answers**
15:4 149:24
**anti-kickback**
128:25
**Anuj**
1:6 10:2 85:14 100:7
101:22 103:23
**Anuji**
4:3
**anxiety**
52:25 121:24
**anybody**
17:15 21:16 87:9
111:12 130:1
143:16 158:11
162:6 168:8
**anymore**
84:2 130:1
**anyway**
31:2 88:10
**apathy**
121:25
**apologize**
19:1 125:3
**apparently**
144:4 145:24

**appeal**
25:11
**appear**
5:16 74:4 82:16
**APPEARANCES**
2:2
**appeared**
74:7 175:25
**appears**
46:20 55:12 58:14
85:4,7 97:18 101:15
113:6 114:12
119:12 120:21
136:11
**applicant**
34:13 35:5,11,17
123:2,17,19 124:13
133:10
**applicants**
32:24 33:3,8,15,20
36:3 38:24 124:9
134:8
**application**
35:6,12 36:4 39:17
**applies**
33:2,15,19 124:9
133:9 134:7
**apply**
19:3 73:24 116:5
**appointed**
159:15,18
**appoints**
159:21
**appreciate**
66:17 88:16 91:15,15
122:16 132:5
158:13 176:20
**appreciation**
67:10
**approach**
51:13 110:17
**approaches**
110:19
**appropriate**
26:3 30:24 35:10
36:10,22 48:5 54:16



**approve**
19:17 74:20
**approved**
74:17
**approving**
19:21 116:15
**approximately**
7:7 59:8 106:11
**April**
70:25 73:14 77:1
79:18 80:19 86:15
86:23 88:17,19,20
90:11,11,11 92:3
100:13,14 103:19
103:19 105:6
106:12,12,15,20,20
107:2 108:19 109:2
109:14 112:12
135:4 137:18
163:19,19 165:6
**area**
68:11 115:6 122:11
156:22
**areas**
43:5 129:6
**argue**
80:9
**arguments**
151:25
**arrangements**
157:16
**arrival**
60:20
**articles**
55:6
**articulate**
5:18
**articulated**
93:2 136:10
**ascertain**
62:1 121:12
**aside**
20:13 21:2 147:1
165:3
**asked**
64:3 80:4 83:20

98:17 100:21 103:2
124:11,15 129:24
133:13 161:13
162:1,4,6
**asking**
5:10,22 36:15 64:12
124:11 141:22
147:11
**asserting**
148:1
**assessment**
114:24 119:10,11,13
120:19 121:11
122:9 140:12
**assets**
154:3
**assistance**
80:8 81:8,14 135:7
**assistant**
75:22
**associate**
34:13 35:5,17 38:2
45:23 132:13,14
133:3,9,12 134:5
**associate's**
132:13
**associates**
32:24 33:3,9,16,20
37:6,12,15,18,23
38:1 40:4 41:15
42:10,23 70:6 124:9
134:8
**assume**
51:25
**assumes**
122:14
**assuming**
41:24
**assurance**
66:4
**attached**
66:11 73:19 177:12
**attaching**
140:24
**Attachment**
31:23

**attempt**
67:15 100:7,25
137:18
**attempts**
129:15 137:11
**attend**
28:9 49:17
**attendance**
27:22
**attended**
113:5,24
**attending**
62:11
**attention**
9:25 23:2 27:1 29:17
32:21 33:23 34:15
34:23 43:12 55:16
55:17 96:22,24
97:11 104:11 105:4
108:20 149:21
150:6 156:25
159:24
**attorney**
83:24 178:16
**attorneys**
1:17 157:22
**atypical**
86:6
**August**
153:4,8,10,12,19
154:24 156:4,18
**authorities**
156:10
**authority**
155:5,9 156:3 158:19
**authorized**
27:9
**authors**
30:19
**automatic**
26:23
**availability**
29:22
**available**
29:8,13 38:1,6 103:4
129:23

**avenues**
39:14,19 48:8
**avoid**
173:2,14
**aware**
7:4 22:2 25:20 40:2
44:21,22 47:1,16,18
62:21 69:24 76:21
76:24 78:13,16,19
79:4 88:13 89:1
93:19 99:12 100:4
108:2,6,10,16,21
110:1 113:14,21
114:1,4 115:12
124:14 136:10
137:22,25 139:9
141:17,25 143:19
145:3 146:18
147:25 148:3 149:7
152:15,23 153:4
175:1
**awareness**
70:12,24 176:11
**Azmoudeh**
2:3 3:2 4:2,2 8:23
17:13,14 21:6 32:14
32:20 36:16 40:22
41:1,4,22 42:2,6,9
52:5 55:4 73:22
74:1 89:23 116:23
117:2,6,7 122:16,18
123:25 133:8
134:11 147:11
152:9 155:9,18
156:24 159:3,6,23
160:25 161:18,20
162:9,11 173:24
174:2,5 176:16,19
176:22

---
**B**
---
**b**
3:15 9:15 157:11
158:25
**baby**
152:18,22



back
8:14 28:16 40:8
43:11,12 47:23 66:9
66:15 67:15 71:14
75:5 80:16,17 81:6
82:9 84:16 85:17
86:4 89:23 100:17
101:9,13,23 102:20
110:10 122:18
125:2 128:6 131:13
134:4,5,20 139:20
142:6,25 160:3
167:4 171:16 175:4
176:13
background
132:5 149:22
bad
44:3 146:11
Baldauf
20:18,21 23:4,8
113:7,17,17 119:10
120:7,21 139:15
140:2,5
Baldauf's
119:25
ball
67:5
barred
147:21
base
14:19 79:19
based
30:2 39:21 40:1
57:22,24 58:2,13
95:13 100:11 102:5
108:19 151:6 156:4
basic
84:9
basically
58:25 61:20 69:4
132:18 175:15
basis
73:22 102:16 114:14
116:23,25 148:15
148:22 149:3
150:12 152:11

168:18
Bates
34:17
bear
11:2 106:14
becoming
13:25 172:6,14
began
61:22 62:17
beginning
1:19 90:10 109:1
110:13
behalf
1:17 4:3,5 10:10
51:24 90:1 99:20
140:3 145:5 152:6
154:8 162:23,24
166:11
behavior
82:12 128:1 171:19
172:5 175:8,24
176:10,11,14
behavioral
49:20
belief
96:12 143:22
believe
8:3 16:12 24:22
52:20 64:3 72:16
79:3 87:17 92:20
108:1,8 110:10
114:24 116:11
119:9 123:14
124:20 135:17,21
137:1 144:6,12
145:6 160:14
175:18,21
believed
74:4,6 120:23 135:12
believes
100:7 126:15,17
benefit
52:1 165:11 166:4
best
5:5,11 6:13 24:15,19
44:8 64:25 67:1

77:24 78:4 103:4
130:17
better
46:15
beyond
45:24 101:4 130:14
130:21
bickering
101:9
big
47:22
bike
110:4
biking
110:1
Bill
20:18
billboard
69:25 70:4
binding
13:11,24
Bishop
61:2
bit
7:14 19:1 88:15
89:16 112:5,18
119:4 125:14
142:20
block
60:16
blocked
60:15
blowing
9:6
board
70:1 135:14 154:15
154:15,19 155:1,2,5
155:6,10,12,14,23
156:3,14,17 158:3,8
158:17,19,25
159:14,17,17,20,21
boarded
38:9,10 166:14
boarding
37:7,8,20 38:17
41:15,18

boards
156:5,10
body
51:8
boots
104:5 170:6
borne
152:18
bottom
16:1,2 25:2 33:23
34:16 58:8 76:10
112:11 134:22
148:20
brain
97:2
branches
169:5
brand
70:12
break
6:3,4,4,7 43:7 47:25
89:11,15,17,20,21
91:4,16,21 93:1,8
111:16 112:2
125:10 142:13,16
142:16,18 171:11
171:14
breakdown
92:21 104:13
breaks
6:8 92:12
breast
135:5,13
bridge
144:4,15
briefly
12:25 77:10
bring
67:15
bringing
56:9 66:13,15
broad
116:4
broadly
52:23
broke



128:5

**broken**
61:20,25 63:14

**broker**
93:4 166:2

**brokered**
93:6

**brought**
70:24 176:9

**browse**
147:7

**browsing**
22:25

**Bryant**
20:3

**buckets**
175:9

**build**
100:18 159:8

**building**
70:2

**bullying**
176:8

**bunch**
49:14 110:3 147:5
164:6

**bundled**
23:12

**burden**
36:6 101:2

**burn**
50:8,9,16 51:2,20
52:8,20,24 53:14,14
53:17 54:5,10 55:7
55:12 90:20 94:5
105:20 107:24
108:3 114:15,20,22
115:13,17,25 121:7
126:10,16 165:6,10
165:16 166:8

**burned**
93:3 94:3 122:1
163:20 168:23
169:17

**business**
7:3 64:23 74:18

145:2

**busy**
71:24

**buy**
101:15 102:3,23

**buying**
102:20,20

**by-law**
23:7 24:7

**by-laws**
22:19,21 23:23 25:1
25:3,17 26:2 28:15
28:17,18,21 29:2,6
29:8,10 39:2,6 45:3
112:14,18,23
114:10 117:9,16
118:22,24

_____
**C**
_____

**C-E-R-T-I-F-I-C-...**
178:1

**call**
4:19,21 19:23 34:17
37:10 46:2 48:24
62:22 66:6 83:18
84:17 90:25 92:4
101:1 103:20 109:6
109:17,18 121:22
126:7 138:6,9 154:2
157:11 159:24

**called**
73:23 74:20 109:16
109:21 152:25

**calling**
85:17,19 109:3 110:5
110:6 138:3 160:1

**calls**
32:16 136:17,19

**camel's**
128:6

**campaign**
70:12

**campus**
69:5

**cancel**
146:15,19

**canceled**
143:6 145:9 146:8,12

**cancelled**
143:3

**cancer**
7:13,18 8:8 16:21
17:5 56:5 68:4,25
69:22 72:6 77:12
84:3 170:6

**Cancer's**
69:3

**candidate**
13:10 14:6 174:16

**candidates**
75:1,2 128:16 129:23

**capable**
26:14 27:12

**capacity**
22:6 64:2

**capital**
154:4 156:13

**care**
4:25 7:13 22:1 26:3
26:22 42:19 51:19
56:4,10 62:14 64:25
65:4 67:12 92:13
93:13,19 94:2
104:16 114:16,21
114:25 117:18,22
118:5,9,13 120:16
121:3 126:21 130:3
174:10 175:2,5

**career**
50:20

**careers**
53:23

**careful**
21:14

**caring**
66:9

**Carter**
8:7

**Caryn**
20:18

**case**
1:3 16:16 43:20

58:20 74:24 151:18
155:19,20

**cases**
27:11

**catch**
161:19

**category**
102:1

**Catholic**
1:9 7:2,23 152:19,24
159:11,12

**cause**
6:15 25:9,14,19
52:25 117:8,12

**caused**
100:18

**causing**
92:22,23

**caution**
120:15,18

**cautious**
109:24

**cc'd**
108:15

**ceased**
153:4

**celebrated**
105:15

**cell**
79:11 121:22 161:6
161:11,14,22 162:5
162:7

**center**
17:5 56:5 65:19,19
65:20 67:9 68:25
72:6 77:12 84:3
88:22

**Centura**
1:9 3:17 7:1,3,11,18
7:22 8:9,13 10:4,10
12:10 15:18 17:20
18:3 20:7 21:7,7
22:9,10 24:22 25:18
25:24 29:5,6,7,25
31:17 32:6,14,23
33:7,18,19 34:7,11



35:9 36:1,9,12,19
36:21 37:5,24 38:10
39:5,13,20 40:4,18
42:10 44:20 45:9,10
45:16,17,19 46:7,11
46:21 48:3 51:16,17
51:25 52:20,21
53:12 54:3,8 55:5
55:22 56:7,14 57:6
59:25 60:4,9 61:24
62:19,21 63:10,13
66:18 67:3 69:24
70:3,13 71:6 72:24
73:19 74:9 76:21
78:22 80:25 83:15
85:18 88:16,20,21
90:1,14 91:5 93:18
95:5,6,13,17,23,25
96:4,6,9 100:20,21
101:15 102:2,20
104:25 106:16,23
107:9 108:1,8,16,21
110:8 111:7,8,11,14
111:15,19,23 112:1
113:21,25 114:4,9
114:18 115:12
116:15,19 117:3,13
117:21 118:15
119:2 120:10,23
121:2,3 122:5,15
123:9,10,17,25
124:1,1,5,11,15
125:24 126:9,15,16
127:19 129:7 130:5
130:25 131:6,8
132:5 134:12,17
135:10,17,21
136:22 137:22
139:11,19 140:3,5,7
140:15,18,20 141:4
141:6,19 142:2
143:10,13 144:17
145:1,4,5,6 146:8
146:18 148:1 149:2
149:7 150:20 151:2
151:7,24 152:4,7,10

152:14,18,23 153:4
153:9,14,15,21,23
153:24 154:6,6,14
154:15,15,19 155:1
155:1,6,10,10,12
156:3,17 157:23
158:3,8,17 160:19
161:5,5 162:6,22,23
163:11 166:11,23
166:25 171:16
172:18,19 173:6,19
175:12
**Centura's**
 18:15 22:21 24:1
　32:10 33:2 35:23
　39:25 44:23 46:6,18
　50:8 52:7 55:24
　68:16 83:4 87:11
　93:25 94:19 115:17
　115:24 127:8 134:3
　151:8 152:11 155:5
　160:6
**CEO**
 13:22 16:13 20:3,3
　154:14,19 155:15
　155:24
**certain**
 28:13 46:5 163:25
**certainly**
 20:25 67:20 89:6
　94:1,1,8 102:13
　116:4,5 131:22,23
**Certified**
 178:4
**certify**
 177:3 178:6
**cetera**
 124:24
**chain**
 76:11 77:1 90:23
　99:2
**chair**
 23:9,10,13,15,20,24
　24:10,12,17,17
　118:23
**challenges**

48:20 72:22,23
　107:23
**chance**
 55:18 72:20
**change**
 35:3 49:20 93:24
**changes**
 75:9 86:9
**channels**
 21:2,8
**characteristic**
 50:19 106:2
**characteristics**
 123:19
**characterization**
 22:10,11 52:3
**characterize**
 62:24 63:1 67:19
　69:20,21 87:22
　128:5 166:6 168:21
　170:20 173:11,12
　173:16,17 176:8
**characterized**
 176:5
**characters**
 85:5 164:6
**chat**
 8:25 149:15
**check**
 79:15 88:3
**cheer**
 163:7
**chief**
 14:8 20:17 21:9,23
　23:3,24 24:11,13,23
　25:14,25 29:12
　53:11 98:24 113:17
　118:22
**child**
 4:25
**chose**
 70:9
**CHPE**
 3:20 85:13
**circulated**
 83:19

**circumstance**
 101:18 119:19
　163:22
**circumstances**
 53:1 60:3 75:16
　91:25 94:20 116:3
　118:4 122:10 132:9
　168:23 169:17
　171:4
**Civ**
 1:15
**claim**
 94:3 100:22 135:22
　147:21
**claiming**
 135:12,18
**clarification**
 38:3
**clarified**
 91:8
**Clarify**
 20:11
**clarity**
 104:18
**classified**
 160:19,21 161:2
**clear**
 17:16 32:14 33:18
　61:19 62:10,20 64:9
　71:17 72:5,15 78:7
　84:12 100:10,15
　121:8 135:2 176:14
**clearly**
 92:13
**clinic**
 130:2
**clinical**
 26:16 27:4,9,10
　53:11 56:4 98:24
**close**
 5:3 128:10
**closer**
 54:22
**CMO**
 20:18 107:17
**CMOs**



22:1
**coaching**
54:18,20
**coalescing**
175:25
**cohesive**
104:23
**coincidence**
143:23
**colleague**
168:8
**colleagues**
168:13 169:4
**collectively**
13:9 105:19 175:8
**collegial**
63:4
**Collins**
1:20 178:4,23
**Colorado**
1:2,9 7:2,25 8:10,18
19:24 56:2 68:11
102:6 140:11
152:19 159:12
170:5,8 178:2,5,11
**come**
14:20 28:25 47:23
52:11 78:2 101:23
132:5 161:11
**comes**
121:22 142:9
**comfortable**
22:5 89:17 132:10
157:24 162:22,23
**coming**
5:12 69:2 91:20 92:9
93:9 102:20,25
109:18 114:25
175:4
**commitment**
4:23,24
**committee**
27:22 49:9 74:19,20
**committees**
28:13
**Common**

8:8,16 152:25 153:8
153:14,20,23,25
154:1,5,9,13,16,18
154:19,25 155:2,4,5
155:13 157:13,22
157:25 158:2,7,12
158:14,16,25 159:2
159:10,14
**communicate**
5:9 62:13 104:16
111:1,4,12 127:22
128:12 132:2
133:19 136:23
140:19 141:5,6
172:15 174:23
175:7
**communicated**
137:2 142:11
**communicating**
62:10,12 109:11,12
109:13 110:23
111:9,21 124:25
127:15 133:4
174:23 175:19
**communication**
21:3,8 49:18 72:22
76:25 78:7,17 87:12
110:25 111:2
121:13 144:10,14
161:17 164:22
168:17 169:7
174:11
**communications**
11:10 13:13 14:16
77:17 79:1,4 104:19
150:12,18 172:13
175:12
**community**
64:19 102:6 168:7
**comp**
75:14
**company**
7:18 10:16,18,19
154:7,7
**compassion**
53:21 54:4

**compassionate**
54:1 94:5
**compelled**
94:10
**compensated**
101:8
**compensation**
129:3
**competently**
26:22 27:18 28:6,9
28:13 116:21
117:14,18,22 118:5
118:10,25 120:12
120:16,24 122:6
**complaining**
108:22,24
**complaints**
43:23 46:8 47:5
48:20 121:23
**complete**
37:12,18 130:11
177:6
**completely**
133:2
**compliance**
13:20 30:24 37:11,16
41:19 42:14 43:6
75:24 78:9,21 81:17
81:22 83:4,12 88:6
88:25 107:16 129:6
131:9 132:6 165:5
**compliance-related**
42:4
**compliant**
30:25
**complicate**
73:4
**complicated**
19:10 72:11 75:17
**complications**
27:23
**component**
7:17 92:21
**comprehending**
172:21,23
**comprehensive**

127:20
**comprised**
154:15
**comprising**
99:9
**compromise**
121:9
**computer**
9:3 106:7
**concept**
50:7 53:16 55:12
**concern**
103:23 105:3,5
120:23 164:14
166:5,24 175:10
**concerning**
10:5
**concerns**
29:11 105:11,20
131:8,20 132:3
135:6
**conclude**
128:15
**concluded**
176:24
**conclusion**
32:17 100:11 101:20
**condition**
6:15 52:12 88:7
108:22 115:8,11
118:11 119:13
**conditions**
6:18,22 58:4 115:2,3
115:4
**conduct**
48:12 172:9 173:1,20
**conducting**
71:19
**conducts**
54:1
**conferences**
174:10 175:20
**confident**
88:12
**confidential**
108:13



MAGNA
LEGAL SERVICES

confines
88:5
confirm
137:12
confronted
71:25
confused
74:8 77:8 86:3
confusing
19:2 159:1
confusion
77:10 119:4 141:20
142:3
connect
51:12 53:18 54:15
129:15 139:11
140:19
connected
140:14
connecting
169:12
connection
51:15 53:16 154:25
consider
25:15,25 106:1
110:20 111:24
124:24 126:9
128:16
consideration
25:22 71:10 126:14
considerations
67:22 90:21
considered
14:2 17:1 18:24
44:17 70:19 78:11
103:7
considering
24:23
consistent
126:5
constant
87:12
constitute
177:6
consult
23:8,25 24:2,16,19

38:5 43:6 51:22
94:8 98:23 118:23
155:25 167:8
consulting
24:12,13 81:22
contacting
109:24
contains
86:8
content
46:4 152:7
contention
131:4
contentious
98:23
contents
42:20,24 151:11
context
18:20
contexts
172:14
continue
59:3 63:22 64:7
71:24 127:17
170:14,15
continued
58:3 98:5
continuing
175:5
continuity
64:25 67:1 130:2
contract
13:12,19,21,23,24
17:24 45:22 48:6,9
73:15 75:3,4,7,8
79:25 80:8,14,21
81:1,5,8,13 82:18
83:6,21,22 84:8,13
85:23 86:23 87:8
88:24 106:16 128:3
129:3 135:3,3,7,13
135:15 136:6,10,15
136:16 143:11
144:21 145:9 146:9
146:16,19 163:17
163:17 171:20

172:5,16,20,25
173:2,13
contracted
69:9
contracting
19:14 111:13 143:20
contracts
18:4 19:4,17 20:24
21:11 75:5 79:16
137:14 141:21
142:4 144:23
163:14,15
contribute
105:4
control
74:19 153:20 154:13
154:22 156:12
157:14 158:7,15
controlling
176:6
convenience
98:2
convenient
110:7
conversation
60:4,9 63:20 91:24
93:4,7,24 109:20
117:15 119:8
124:21 132:16
169:16,19
conversations
60:4,21,22 61:5,9,10
61:13,22 64:2 71:15
72:3 82:11 87:20,21
88:1,13 89:4 90:19
91:24 92:1,7 93:12
100:14 102:13
108:17,21 113:9
136:2,8,14,16,19
164:21 168:22
convert
74:25
conveyed
92:17
copies
176:22

copy
73:15 79:20,20
cordial
63:4
corporate
37:11
corporations
156:6
correct
8:20 12:3 17:21 18:1
23:4,5 26:10,18
27:15 28:14,18,19
31:19,22 33:5,17
37:22 38:14 46:14
48:16 56:16 57:10
57:25 58:1,17 59:10
59:23 65:13 66:20
68:7 73:20 76:16
77:9 78:15 80:6
82:2,5 85:3 92:6
95:3,16 96:3 97:6
98:18,19 101:18,24
101:25 107:21,25
108:23,24 112:24
112:25 113:20
114:2,17 115:15,22
116:1,13,17,21
117:16 118:16,17
118:19,20 122:23
124:6 132:21
133:10 134:1,3
135:19,20 138:7
139:1,2,19 140:3,11
140:13,25 141:3
144:3,18 146:14
153:6,12 155:3
156:8 158:4,22
160:4 166:16 172:1
172:2,8,16,17
175:16,17 178:9
corrected
59:7
corrections
177:8
correctly
172:21



**corresponding**
11:16 12:11
**corroborates**
94:9
**counsel**
9:23 11:7 43:18
148:4 152:8
**counseling**
54:15
**County**
178:3,11
**couple**
6:21 92:2 135:11
142:15 151:17
171:15,18
**course**
14:7 49:18 167:22
**courses**
50:3
**court**
1:1 5:8
**courtesy**
25:7
**cover**
66:5 93:7 165:23
166:5
**coverage**
56:4 84:3 99:22,25
129:18 130:1,12,22
130:24 131:1
**covering**
101:2
**coworkers**
176:5
**CPHP**
119:10 122:8
**created**
152:25
**creation**
74:18
**credentialing**
21:15 129:24
**criss-crossed**
5:13
**criteria**
24:14,22 25:14 26:24

**criticism**
111:25 112:4
**criticizing**
110:22
**crossed**
112:18
**crossing**
21:17
**CSR**
178:23
**cultural**
46:24 48:20 72:22
**culture**
71:16,17 105:14
128:9
**customary**
156:5,9

---
**D**

**daily**
102:16 168:17
**damages**
147:22 150:13,18,24
151:4
**data**
87:18 102:24 103:6
**date**
58:4,5 92:16 103:17
120:17 137:7,13
141:10 143:23
144:19 153:18
**dated**
57:15 79:15 90:10
106:11
**dates**
106:19
**day**
4:21 5:21 8:24 10:17
11:2 106:15 110:11
129:12 130:24
131:11 135:16
139:24 143:13
166:13 177:17
178:20
**day-to-day**
66:8 154:10 157:23

**days**
26:20 89:6 119:11
128:21 129:9,12,24
131:9 143:9,9
165:23
**dba**
1:9
**deadline**
137:1
**deal**
92:23 93:14
**dealing**
7:6 105:17,24 108:23
115:9 123:18 139:5
**dealings**
174:8
**December**
1:13,18 60:23 70:25
178:21
**decide**
119:2
**decided**
82:3,14 106:7 116:20
**deciding**
25:15 70:19
**decision**
16:3,20 17:9 68:16
70:4 71:6 73:4,5
74:10 81:23 120:20
128:10 129:7,12
130:17 143:21
156:13 162:12
**decision-maker**
16:24,25 17:9,11
76:15,19
**decision-makers**
16:3 108:9 113:18,24
**decision-making**
17:2,6 119:25 120:8
131:25 154:10
164:4
**decisions**
63:6 102:5 108:2,9
**declaration**
118:2 121:8 127:23
**declared**

109:10
**declaring**
94:21,23 95:8,9,10
108:25
**declining**
172:18
**defendant**
2:10 9:16 151:18
157:14
**Defendant(s)**
1:11
**defendants**
4:6
**defense**
147:21 148:16 149:3
149:9 150:13 151:4
151:8,14,20 152:12
**defenses**
3:23 147:18 148:1,23
**defer**
32:19 148:4 152:7
**deficiencies**
48:25 49:3,7 70:15
70:18 72:21
**Define**
111:17 128:20
**defined**
52:23 159:3
**defines**
52:21
**definition**
32:6,15 51:1,1
115:25
**definitions**
35:2
**delay**
74:13 84:7 125:25
**delete**
98:2
**deleted**
98:2
**delivered**
29:2
**delve**
60:19
**demonstrated**


MAGNA
LEGAL SERVICES

25:8
**denial**
134:13,18
**denied**
119:17
**Dennis**
16:17 18:23
**Denver**
2:5,14 8:14
**deny**
118:15,18 133:16
**denying**
36:25 132:19
**department**
23:7,9,10,10,14,18
23:20,24 24:10,12
24:17,17,21 46:25
47:3,8 56:4 64:16
71:16 77:15 118:23
128:9 130:3 160:7
170:16
**departures**
160:18
**depend**
14:6 116:3
**depending**
54:16
**depends**
16:24 108:12
**depersonalization**
50:17,23 51:3,14
**deponent**
177:10
**deposition**
1:16 4:8 9:15 10:2
24:8 41:5 116:12
166:19 176:24
178:7,14
**describe**
19:15 54:8 77:10
148:15 160:6
168:19
**described**
22:7 48:19 70:15
128:19 136:13
163:10,12 171:18

172:25 175:14
**describing**
34:7 63:3
**Description**
3:4
**designated**
10:10
**designed**
32:9
**desirable**
65:23
**desire**
63:22 66:25 75:17
78:3 83:25 84:4,14
104:21
**desk**
36:20,22 132:13,15
132:19 133:6
**despite**
165:24
**detachment**
115:18
**detail**
51:22 121:11 148:15
159:20
**details**
11:12 47:6 78:5 83:9
87:6 156:16
**deterioration**
71:17
**determination**
25:10 117:19,21
118:23 119:14,18
120:11
**determinations**
117:25
**determine**
117:4 122:5 137:11
**determined**
25:8 117:13
**diagnose**
52:8 115:2,3
**diagnosed**
114:14,19
**diagnosis**
52:10 96:20 114:23

115:10 121:12
**Diagnostic**
52:15,16
**dialog**
103:19
**dialogue**
102:24
**Diane**
8:7 51:22 54:13,24
140:15,18
**difference**
45:20 46:17
**differences**
45:8,15
**different**
8:10,12 14:24 23:12
23:13 34:8 44:7
48:8 52:5 55:8
73:13 96:8 110:19
131:7 156:14
167:18 169:13
171:18
**differently**
167:5,14,21
**difficult**
62:1 71:3,4,13
121:12 168:9
172:15
**difficulty**
35:19
**Dignity**
152:24
**direct**
12:19 19:23 154:22
169:14 170:11
**directed**
21:6
**direction**
75:12 131:3
**directly**
13:6 103:2 141:14
168:24
**director**
7:12,15,16 8:6 12:11
12:16,18,22 16:17
16:18,21 44:13,16

44:18 50:15 51:23
77:12 160:15
**directors**
10:3 155:10,12,14
156:3,6,10
**disabilities**
33:9
**disability**
30:2 31:5 32:6,7,11
32:15 35:5,11,17
39:22 40:1 41:14
52:18,21 53:2 95:19
115:24,25 116:4
**disabled**
34:12
**disaffiliated**
8:13
**disaffiliation**
160:9
**disagreements**
165:12
**disappointed**
110:15 111:3
**disclosed**
108:17
**disclosure**
108:14
**discovery**
11:10 72:17
**discriminate**
32:23 33:8
**discrimination**
30:1,15 39:21,25
40:5 41:14
**discuss**
11:2 12:25 60:3
137:13 143:16
144:8 159:20
163:24 164:1
**discussed**
11:25 16:8 23:3
27:12 30:14 40:6
41:13 52:17 55:11
74:9 76:14 78:18
82:6,6 86:9 88:23
106:15 112:14,19



MAGNA
LEGAL SERVICES

113:16 115:16,23
116:18 117:8,11
124:8 128:19 133:8
133:21 134:7 136:1
157:21 162:17
163:16 166:11
168:25 169:19
172:3
**discussing**
17:18 18:3,13 20:7
36:10 61:9 72:23
77:25 92:9 138:14
152:14
**discussion**
14:8 59:25 63:18,19
73:25 74:4 80:6,10
81:18 83:19 84:6,14
95:12 99:18 103:11
109:8 128:17 129:5
131:18 140:16
163:10,17 165:1
166:7,8 173:14
**discussions**
47:2 61:15 74:14
77:14 89:8 94:11
128:2,14,24 141:16
143:23 163:23
**dishonesty**
17:15
**disingenuous**
135:22 136:12
**dispute**
79:12 106:23 107:1
114:9
**disputing**
87:24
**disruption**
67:2
**disruptive**
172:10,11 175:1
**dissolution**
92:11
**dissolve**
64:11
**distinct**
12:25 13:1

**distinctly**
82:11 87:23
**DISTRICT**
1:1,2
**docs**
77:19
**doctor**
53:6 54:24 175:3
**doctor's**
68:5
**doctors**
68:1,10,13 115:2,3
**document**
9:22 10:24 15:7
22:25 34:17 47:22
47:24 49:19,22,23
57:4,11 73:10
122:14 139:20
143:3 146:13
147:12,14,16
149:19,25 160:3
**documentation**
43:21 93:23 123:12
141:23 142:5
150:23
**documents**
11:10,16,19,21 34:16
46:5,23 47:3,7
49:15 120:20 147:6
150:11,17 151:25
162:7 175:22
**dodging**
111:2
**doing**
5:15 7:3 17:16 19:22
126:23 164:12
174:22
**door**
69:4
**dots**
53:18 169:12
**doubt**
96:7 97:13,15 114:19
114:22 165:11
166:4
**downside**

88:8
**downstairs**
69:6
**downward**
62:15 63:8,11
**Dr**
1:6,12,16 3:4 4:3,9
4:14,17,18,19 6:14
6:25 8:23 9:13,25
10:2 14:24 15:3,13
15:18 16:4,9 17:14
18:8 19:19 20:3,21
21:19,21 22:5,5,7
22:17 23:4,8 24:4
25:2 27:1 28:17
29:14 30:6 31:4
34:15 36:9 38:16
39:1 40:8,11 41:5
42:10 43:7,12,23
44:4,7,16,23 45:10
45:16 46:2,6,12,22
47:1,17 48:4 49:17
50:4,7 51:22,24
52:1 53:8,13,16
54:13,17,24 56:20
59:24 60:24,25,25
60:25 61:1 62:4,5
62:11,12,13,25,25
63:10 65:6,6 66:13
66:19,21,24 67:4,4
67:7,10,14,17,21,22
68:14,14,17,20
69:20,25 70:4,9,15
70:20 71:2,11,15,15
71:21 72:8,9,9,17
72:25 73:7,14,19
74:2,10 76:21 78:1
78:1,13,22,24 79:2
79:11,14 80:13
81:24 82:3,14,21
84:11,23,23 85:1,14
86:15,18,22 87:4,10
88:16,20,22 89:25
90:19,21,22,22,24
90:24 91:1,3,3,12
91:14,22 92:4,4,8,8

92:13 93:6,6,7,8,12
93:18,19 94:21 95:6
95:14,18 96:1,7,10
96:11 97:20,20,22
99:5,7,14,18,19
100:3,4,12,12,15,16
100:22,24,25 101:1
101:3,7,10,11,16,20
101:24 102:2,8,8,11
102:15,19,24 103:2
103:5,16,20 104:7,9
104:14,14,14,25
105:3 106:17,21
107:2,5,17,20 108:3
108:10,14,20,22
109:2,2,15,15,17,21
109:22 110:16,18
110:22 111:9,14,20
111:25,25 112:11
112:22,23 113:2,7,7
113:7,12,16,17,17
113:22 114:13,19
115:13 116:15
117:7,20,20,21
119:8,8,10,16,20,25
120:7,11,21,24
121:2,2,4,6 122:5
122:11,23 123:1,4,4
123:5,7,8,10,11,23
124:12,17,19,19,25
125:6,14 126:3,11
129:15 130:8,10,15
131:12 132:6,22
133:15,16,21
134:11,13,16,17,24
135:17,18,21
136:14,23 137:23
138:3,3,6,13,13,16
138:19,19,21,24,25
139:4,9,11,15,15
140:2,3,5,6,10,14
140:14,15,18,19
141:6,12,19 142:2
142:19 143:10,14
143:17 144:2,7,7,9
144:11,12,15,17



148:24 149:4,8
150:19,22 151:2,9
151:17 152:1
158:13 159:19,23
160:7,8,12,19
161:10,21 162:13
162:21 163:18,23
165:5,22,22 166:3,3
167:16,22 168:3
170:20 171:5,7,9,17
171:19,22,25 172:4
172:5,13,14,19,25
173:6,12,12,19
174:2,5,6,7,25
175:6,7,11,12,17,18
175:24 176:7,19,21

**draft**
73:25 74:5 80:6,10
81:18 83:19 84:6,15
84:20 86:3 87:11
88:22 163:10,17

**drafting**
144:22

**draw**
9:25 21:14 23:2 27:1
29:17,17 32:20
33:23 34:15,23
43:12 55:17 90:14
96:22 104:10
149:21 150:6
159:24

**driving**
19:21

**Drs**
97:22

**DSM**
52:12,14

**DSM-V**
115:4

**due**
92:20,21 100:17
118:6 127:15

**duly**
4:10

**duties**
45:1 157:15 158:1

**duty**
4:25

---

**E**

**E**
178:4,23

**E-mail**
43:21 72:17 73:12,13
73:20 74:2,3,7
76:11 77:1 80:19
87:3 89:10 90:23,24
92:4,8 93:18 94:17
94:20 95:13,18
96:10 97:6,8,10,17
97:22 98:1,5,12,15
98:18 99:17 100:14
103:16 105:3,4,7,7
105:7 106:11 107:2
108:15,21 109:15
109:19,22 110:23
112:12 113:6 125:2
134:24 136:7,11,22
137:3 138:2 141:17
141:25 142:10
146:6

**E-mailed**
140:24

**E-mails**
86:17,21 89:4 90:8
90:10,14 91:8 106:9
106:19 109:1
110:14 112:9,22
113:1,9 142:7
145:23 162:2

**E-signature**
85:6

**earlier**
16:8 23:3 39:1 41:13
46:1 52:17 54:7
55:11 57:25 59:8
65:14 70:14 74:9
76:14 77:7 84:25
86:17,21 97:19,21
106:15 112:15,19
113:16 115:23
116:12,18,24 117:8

117:11 123:1 124:8
132:12 133:8,20
134:7 138:2 143:9
143:10 148:8
151:13 157:3
162:11

**Earling**
20:3

**early**
60:19 89:19 115:16
153:17 175:15

**earnest**
61:23

**ears**
17:2 170:7

**easily**
75:25

**easy**
73:5

**edge**
128:15

**effect**
68:4 116:14 124:20
127:8

**effective**
58:5

**effectively**
128:12 133:16

**effort**
112:23 150:24
165:22 166:1

**efforts**
137:17

**eight**
145:21

**either**
9:18 13:15 63:13
68:14 89:17

**electronic**
176:22

**electronically**
164:7

**elements**
107:15

**Email**
3:5,8,9,10,11,12

**Emails**
3:21

**embrace**
105:19

**emergency**
27:22 121:22

**emotion**
66:10

**emotional**
50:17

**emotionally**
51:9

**empathy**
51:11,13 168:2,5,8

**employ**
60:10 64:22

**employed**
12:9,10 13:25 14:12
17:20 18:17,18
20:11 39:5,9,9,13
39:18 45:20 46:17
46:19 47:12 48:18
69:8,13,13 72:14
99:9,9 107:14
130:25

**employee**
31:16,24 36:19 38:10
105:1

**employees**
11:25 18:3 20:7
41:15 47:8 93:10
155:14 158:16
159:14 161:6

**employer**
35:15,18 125:21

**employing**
11:24 13:2 21:10

**employment**
12:1,13 13:21 14:10
16:4,9 19:4 20:13
20:23 21:14 33:10
33:20 37:13 45:18
45:22 46:13 60:1,5
61:10 63:19,20
64:21 70:19 71:7,18
72:25 73:4,14,18



74:10,12,15,25
75:11 76:16,22 77:4
78:10,14,25 80:21
81:1 82:4,14,17
83:6,16,18 84:13
85:2,14,18,19,20
86:22 87:4 88:7,21
92:10 99:15 100:3
102:11 103:6
106:16,21,24
107:13 108:2,9
110:8 111:1,4,6,10
111:12,21 113:13
122:23 124:24
125:1,21,25 126:5
127:10,16,22 128:1
130:16 133:2
137:12,24 138:21
139:8 140:7,20
141:7 142:4 143:18
143:21 144:8,12
153:18 160:7
163:11,12 166:23
166:25 171:20
172:4,16 173:22
174:18
**encounter**
168:14
**encountered**
173:6
**encountering**
68:12
**encouraging**
144:14
**engage**
62:5 64:13 125:18
128:13 129:16
174:9
**engaged**
14:7
**engaging**
12:18 96:13 130:16
172:25 173:7,20
175:20
**ensure**
42:15 43:3 65:3

**ensuring**
131:19
**entered**
57:13
**enterprise**
7:12,15,19 16:14
19:6 99:9
**entire**
28:20 128:9
**entities**
152:22 153:23
**entitled**
165:10
**entity**
152:15,24,25
**environment**
35:4 36:21 128:9
172:7
**era**
53:24
**Eric**
16:4,21,22 17:1
18:23 47:2 60:24
61:3 72:5,16 73:12
74:6 76:25 77:13,18
78:2,3,7,19 79:19
79:20,24 80:3,4,6
80:11,13 87:14 89:8
93:5,5 104:4 108:15
135:4,5,6,14 136:9
137:17 139:7
160:13
**Eric's**
78:16 103:15 135:7
135:15
**err**
120:14,18
**escalation**
131:22
**especially**
171:25
**Esq**
2:3,11,12
**essentially**
18:17 132:23 154:9
**established**

65:19 66:22 129:4
168:7
**establishing**
150:12
**establishment**
65:10
**et**
124:24
**Etran**
176:23
**evaluating**
20:8 114:3
**evaluation**
96:20
**evaluations**
14:21
**evening**
4:23 145:23
**event**
25:7 159:6 178:18
**events**
10:15 55:8
**eventually**
67:16
**everybody**
107:19
**evidence**
124:20 149:7 151:3
151:19,25 174:7
**evolution**
129:14
**evolved**
131:18
**Ex**
3:4,5,6,7,8,9,10,11
3:12,13,14,15,16,17
3:18,19,20,21,22,23
3:24
**exact**
83:13 143:13 144:19
174:16
**exactly**
81:25 82:5,21
**Examination**
3:2 4:12
**example**

22:4 27:21 47:18
69:3 82:8 162:12
171:22 174:15
**examples**
33:11 43:2
**excerpt**
22:18 25:3 28:18
**exchange**
56:7
**exclusive**
57:13 148:23 149:4,8
150:23 151:3 152:1
**exclusively**
63:11 68:24 69:9
**exclusivity**
56:9
**excuse**
35:15 59:21 65:12
**excused**
27:20
**executed**
135:3,13 136:11
**executive**
8:5 16:17 21:25 49:9
99:11
**exercise**
27:3 46:12 48:4
153:20 156:10
158:15,20
**exercised**
45:9,10,16,17 155:5
157:14
**exercises**
45:9 46:18,21
**exercising**
26:6,15 154:22
**exerted**
47:17
**exhausted**
167:17
**exhaustion**
50:17,22 114:15,20
115:19 121:7
126:11
**exhibit**
8:20 9:8,10 14:23,25



15:1 22:12,14,18
29:14 30:5,7,8
31:10 40:9 43:13
55:16 56:25 57:2,11
58:9 59:11,13,14
73:6,8 76:4,7,10
79:5,7 84:16 85:9
85:11 90:4,6 94:13
94:15 96:23 97:1,4
97:14 106:3 112:7,9
114:5,7 116:6,8
121:14,16 122:19
127:2,4 134:20
137:5 139:23,23,24
140:2,22 141:1
142:25 146:22,24
146:25 147:2 148:5
149:12,13 156:25
161:3
**exhibited**
154:13
**exhibits**
3:3 8:24 151:6
**exist**
84:2 115:4 130:10
153:4
**existed**
101:4,6 165:12
**existence**
153:9
**expand**
54:18
**expect**
25:24 42:10
**expectation**
66:4
**expectations**
42:23
**expected**
82:7,7
**expediency**
83:25 84:4 129:17
130:4
**expedite**
77:25
**expeditious**

76:3
**expense**
35:20
**experience**
51:8,19 69:12 72:2
**experiences**
51:17
**experiencing**
54:5 115:13 118:11
**expert**
51:5,20 167:12
**expertise**
52:1 68:13 115:6
122:12 156:22
**expiration**
58:5
**expired**
57:15,25 59:2,8
**expiring**
59:20
**explain**
153:22
**explained**
128:7 141:19 142:2
**explaining**
126:11
**explains**
114:14
**explore**
158:18
**express**
72:1 106:1
**expressed**
63:21 92:25 104:9
**expressing**
26:24 107:23
**extend**
13:11,15,16 74:10
77:22 128:11
130:14,21
**extended**
57:9 73:19 106:16
130:5 131:11
**extending**
12:13 112:5 127:17
130:21 131:15

167:15
**extension**
25:9 59:24 60:7
68:25 99:20 128:1
130:7,9 131:5
**extensions**
59:1
**extra**
6:8 165:23
**extreme**
91:4,9 126:10
**eyes**
17:2 170:7

———————————
**F**
———————————
**facilitate**
122:9
**facilities**
7:22,24 8:17 20:2
154:4,8,21 158:5
**facility**
20:3 22:3 29:13
48:13 56:12,15
69:11
**fact**
84:1 103:17 111:3
**factor**
103:9 111:24 112:3
131:14 132:11
**factored**
105:12 153:23
**facts**
25:21,24 43:20 62:9
151:24
**factual**
148:15,22 149:2
150:12
**failed**
147:22
**failing**
111:12
**failure**
127:24 128:12
129:15 132:2
148:23 149:3,9
150:18 151:4,8,14

151:20 152:12
174:9
**fair**
18:20 24:12 26:16
36:6 37:21 46:3,11
48:25 57:9 58:16
63:15,16 72:25 81:2
90:12 95:15 101:17
115:14 123:15,16
132:20 139:13
155:6 156:7
**faith**
59:3 67:15 77:24
96:13 128:13 166:1
**fall**
54:12 153:16
**familiar**
15:11 30:3,10,12,13
32:8 43:4,19 46:24
48:21 57:4 73:10
97:8 155:22
**familiarity**
30:24
**familiarize**
90:17
**far**
44:20 105:14
**fault**
140:1
**favorable**
65:23 66:22
**favorably**
64:1
**Fed**
1:15
**federal**
42:18,19
**feel**
4:20 6:2 10:22 11:13
89:18 94:6,7 103:13
105:18 109:25
164:3
**feeling**
50:18,20 51:6 67:3
93:2 94:3 122:1
**feelings**



MAGNA
LEGAL SERVICES

**feels**
50:25 115:18 165:25
101:11 118:2 125:17
**fellow**
67:16
**felt**
22:5 64:24,24 72:12
94:9 96:13 100:15
100:24 103:11
104:12 130:17
131:24 132:1,10
144:12 165:21
167:19 174:12
**field**
105:14,18
**figure**
62:7 81:16
**file**
46:5 48:21 70:16
72:21
**fill**
31:25
**filled**
118:24
**filling**
144:13
**final**
25:10 63:11 87:7
88:24,24 106:23
153:3
**finalize**
39:14 74:11 87:8
**finalized**
81:23 87:15
**finances**
157:16
**find**
44:16 75:20 104:11
125:3 155:18
165:17 168:2
173:10
**finding**
61:16 101:17 117:12
**fine**
21:14 107:3

**finish**
5:12
**fire**
46:3 155:15,24
**first**
4:10 7:7 9:19,21 10:1
11:2 15:5 27:2 31:4
32:21,22 35:2 37:5
47:4 59:20 62:19
73:18 78:14 82:3,14
85:17 87:14 88:10
93:17,22 98:11,11
103:5,10 116:14
119:11 124:11
126:24 128:11
135:18 136:10
141:20 142:4 147:2
148:19 150:22
153:13,14 160:1
167:16 171:6 173:2
**fit**
26:14 103:24 104:22
**five**
8:13,16 31:20 143:9
143:9 171:12
**five-minute**
171:11
**flexible**
66:25
**flow**
69:14
**FMD**
88:5
**focus**
12:1 22:17 31:4
43:24 115:3 153:13
**focusing**
11:23 31:13
**folks**
42:15 74:24 102:7
143:20,21,25
155:25
**follow**
9:13 49:18 50:3 68:7
91:7 98:9 125:22
169:9

**following**
16:2 38:5 73:16
109:14 125:11
135:16 151:12
**follows**
4:11
**footprint**
8:17
**force**
101:12 160:24 170:7
**foregoing**
177:4
**forgiveable**
75:21
**forgiveness**
78:9 171:23
**forgiving**
88:7
**form**
21:4 26:1,17 31:24
32:12 34:12 36:14
54:24 73:1,21 80:1
82:23 90:16 104:24
115:5 116:22
123:22 132:8,25
134:10 173:8
**forma**
74:18
**formal**
16:23 20:16,22 21:2
27:7 39:10,16 40:18
44:16 45:18 49:4,8
54:9,24 76:18 122:8
131:16
**formality**
4:20
**formally**
8:6 77:22 123:20
**formed**
152:22
**formerly**
7:2 8:9
**forth**
101:9 124:5
**forths**
86:5

**forward**
72:19 96:17 97:11
104:19 130:3
164:24 170:10
**forwarded**
98:1,15 99:1
**forwarding**
97:14,17 98:6
**fought**
164:18 167:15
**found**
174:19
**foundation**
32:12 36:14 55:3
115:5 116:2,22
122:7 123:22
126:19 132:8,25
134:10 152:5 155:8
155:16 156:21
173:21,25
**four**
75:4 131:9 143:9
**fracture**
65:3
**fractured**
61:21 166:2
**fracturing**
92:21
**frame**
103:1
**Francis**
1:9 7:3 63:23 65:17
65:20 66:2,14 67:6
68:25 69:1
**free**
4:20 88:4 171:24
172:18
**frequency**
68:18
**front**
70:2 139:6 143:1
170:12
**frustrated**
71:1
**frustration**
75:6



**full**
 4:15 28:21 58:19
   59:7 85:25 98:11
   119:6 131:18
   165:23
**fully**
 62:20
**function**
 139:4
**functioning**
 158:25 159:17,21
**functions**
 14:22 19:7
**funny**
 41:23
**further**
 25:18 26:18 33:14
   65:21 70:7,11 113:1
   120:1,19
**future**
 129:20 130:18
**fuzzy**
 79:17

---
**G**
---
**gap**
 144:4,15
**gather**
 102:25
**gathered**
 14:4
**gathering**
 104:3
**general**
 12:6,8 20:16 22:1
   39:8,11,19 40:3
   48:12 56:5 67:9
   70:12 75:2 96:15
   166:17
**generally**
 16:9 19:15 42:11
   44:25 55:24 66:24
   69:16 71:3,21,25
   72:1 91:10 157:24
   167:24
**generated**

 67:20
**genuineness**
 96:10,19
**geography**
 170:24
**gesture**
 75:22 88:6
**getting**
 5:13 46:20 51:21
   84:4 93:7 101:13,21
   110:3 151:11
   175:25
**give**
 5:22 41:10 56:17
   72:20 91:24 93:8,10
   149:22 171:12
**given**
 12:11 20:20 83:25
   122:14 132:2
   141:10 177:7
**gives**
 72:3
**giving**
 5:11 166:3
**glance**
 30:11
**glossed**
 42:8
**GMT**
 145:14
**go**
 5:24 6:7 11:1 13:7
   15:25 19:12 20:17
   39:12,13,15,18 40:8
   47:13 48:5 53:22
   62:19 67:6,13 69:16
   74:17,19 76:10
   80:16,17 98:16
   102:18 110:10
   112:13,24 121:25
   125:2 129:21
   131:16 134:4,5,20
   139:7,20 140:11
   142:6,12 145:18
   159:8 160:25
   161:24 167:8

   168:25 169:2
**God**
 146:11
**going**
 4:19,21 5:6,23 6:20
   6:25 7:6 8:24 9:6,9
   10:17 11:1 14:25
   22:13 30:6,7 34:22
   39:10 40:8 45:14
   47:22,23,25 48:17
   52:2 55:16 57:1
   61:17 62:8 64:10,11
   67:13 69:16 72:18
   73:7 74:24 76:6
   77:11 79:6 80:25
   81:13 82:24 85:1,10
   85:10 87:2 92:11
   97:3 101:15 104:10
   104:21 112:6,8,8
   114:1,6 119:5
   121:15,23,25 127:3
   127:16 128:15,22
   130:1 131:2 134:20
   138:11 139:7
   143:24 144:9
   145:16 147:1,2
   149:13 157:10
   159:6,7 163:2
   164:15 167:9,10
   168:9 170:25
   171:11 174:22
   176:15
**goings**
 77:14
**good**
 4:14 5:15,21 6:3,9
   9:4 11:13 19:11
   22:11 25:8,14,19
   43:9 56:3 59:3
   67:11,11,14 71:10
   71:12,12 77:24
   89:14 96:13 117:8
   117:12 128:7,8,13
   129:22 132:1 139:3
   140:12 161:18,18
   166:1 168:24

   171:13
**goodwill**
 75:23 88:7
**Google**
 145:16
**Googled**
 146:1
**gosh**
 89:5 92:25
**gossip**
 102:18,19
**gotten**
 176:10
**grace**
 112:5
**grant**
 25:15 26:13 117:20
   119:2 120:18
**granted**
 25:10 36:11,13 39:5
   118:7,10 119:12
   123:5,11 134:14
   143:14
**granting**
 28:23 116:19 117:23
   120:11 131:10
   139:16 143:17,22
   144:17
**gray**
 43:5 167:7
**great**
 92:23 103:16
**greater**
 19:24 68:11
**Greenwich**
 145:19
**Greewich**
 145:11
**ground**
 5:6 104:5
**grounds**
 170:7
**group**
 12:10,12 13:8,10,23
   16:14 17:24 18:7,10
   18:14,19 19:5,20,24



MAGNA
LEGAL SERVICES

48:10 49:4 54:2
57:12,13 58:25 61:6
67:3 99:7 103:24
104:23 144:25
167:19 168:7,15,16
171:2
**groups**
18:5 23:13 144:16
**growing**
103:23 105:3,5
**guess**
11:20 16:24 46:2,6
46:20 47:15 93:4
102:21 108:12
118:21 138:10
145:21 154:11
156:2
**guidance**
25:18,20
**Gulley**
50:13 53:3,13,16
60:25 97:19,20,22
98:24 99:7 100:4
**Gulley's**
53:8
**Gunnison**
178:3,11
**guy**
165:18 170:10,13,16
**guys**
41:22

**H**

**half**
116:14
**HALL**
2:12
**hand**
29:1 135:14 164:5
178:20
**handbook**
42:3,5
**handle**
79:24,24
**handled**
13:18

**handling**
110:15
**happen**
165:19
**happened**
6:21 103:3
**happens**
58:22 74:22
**happy**
42:1 64:6
**harassment**
30:1,15 39:21,25
40:5
**hard**
67:10 105:24 137:1
164:18 176:2,2,8
**harder**
67:18,20 167:15
**hardship**
35:19,24 37:1 166:19
**harm**
91:11
**hastily**
164:9 173:2,17
**hat**
162:22 163:3,9
171:16
**head**
5:16,16 18:9 19:19
40:25 49:24 55:10
99:6 118:23
**health**
1:9,9,10 6:14,18,21
7:2,3,24 8:13,15
26:3,21 27:16 28:5
42:19 69:14 91:10
95:20 96:20 105:20
107:23 108:3,23
115:3,4 117:17
118:3,6,12,14
140:12 152:19,20
152:24,25,25
153:25 154:1,5,17
154:17 159:11,11
159:12 160:16
166:5

**hear**
9:5,6 59:22 165:13
**heard**
18:11 72:7 102:7
126:25
**hearing**
25:11 26:12 62:6,7
102:4,14,19 119:1
158:21
**HEATH**
2:12
**held**
165:25
**help**
14:20 38:7 42:9
53:18 61:18,21
63:19 64:3 65:25
71:7 72:18 77:25
78:25 91:15 93:3
102:17 103:1
118:21 119:5 166:1
166:2
**helped**
76:22
**helpful**
42:7 78:3 149:17
**helps**
98:10
**Herculean**
165:21
**hereunto**
178:19
**hey**
43:2 72:17 103:16
109:16 139:4
140:19 166:7
**higher**
65:18 67:8,9
**hire**
66:15 71:6 127:12
**hiring**
14:2,12 33:10,21
123:21 124:3,18
**history**
75:9
**hit**

166:7
**hold**
44:13,20 162:1
165:16
**holding**
154:6
**holiday**
56:22 163:7
**holistic**
11:17
**home**
65:21 174:20
**honest**
58:21 59:5 92:19
**honestly**
161:25 168:20
**hook**
130:22,23,25
**hospital**
4:6 21:25 26:15
56:11 57:12,12
58:23 64:5 101:6
**hospitals**
7:20,23,24 8:1,14,18
23:12,18 69:14
154:5,5
**host**
55:5 156:14
**hour**
1:19
**hours**
142:23 145:2,20,21
146:2
**HR**
14:15,22 38:6 39:10
39:15 43:22 45:22
46:7,11,18,21 47:4
47:4,7,9,11,11,17
48:17 49:25 167:8
**human**
30:20 32:1 168:8
**hundred**
11:22
**hurt**
130:12
**hypertensive**



125:9
**hypothetical**
36:17 37:4 132:12

**I**

**idea**
70:3 157:24
**ideas**
65:24
**identified**
9:8 14:23 22:12 30:5
56:25 59:11 68:4
73:6 75:1 76:4 79:5
85:9 90:4 94:13
97:1 106:3 112:7
114:5 116:6 121:14
127:2 146:22,25
149:12
**ignoring**
174:13
**ih@rmlawyers.com**
2:6
**image**
69:25 70:1,4
**Immediate**
142:19
**immediately**
127:21
**imminently**
91:11
**impact**
65:3
**impair**
6:22
**implication**
95:4
**implications**
42:14 114:3
**implies**
80:10
**imply**
27:16
**importance**
105:19
**important**
99:12,21 104:16

126:21
**impression**
77:3
**improvement**
72:4,15
**in-person**
89:3,9 136:13,16,19
136:23
**incapable**
26:5 118:12
**include**
18:21 39:16 82:18
83:5 114:3 137:17
140:5
**included**
19:25 43:2 85:24
**includes**
37:17 84:22
**including**
7:23 13:9 33:10,21
46:22 109:9 157:15
**inconsistencies**
174:14
**inconsistent**
164:22 175:11
**increased**
101:1,2 176:11
**increasingly**
71:4 129:19 172:6,14
**independent**
166:12
**INDEX**
3:1
**Indian**
121:19,21
**indicate**
33:14 85:6 91:13
151:7 164:6 172:19
**indicated**
116:19
**indicates**
59:20
**indicating**
91:20
**indication**
72:3 103:18

**individual**
23:16 25:8 27:3,6,17
27:20 30:20 53:25
163:9
**individual's**
26:3
**individually**
17:25 162:25 163:4
165:5
**individuals**
21:9
**indulge**
36:17
**indulging**
37:3 142:22
**informal**
13:11 20:22 76:18,19
**informally**
128:3
**information**
10:5 91:19 98:5
102:22 103:4 104:3
108:18 124:16
144:16 149:4
151:19,24
**initial**
61:10,13 83:19 93:9
108:15,20 113:8
131:12
**initially**
26:12 62:5,9
**initiated**
47:8
**initiation**
60:20
**Initiatives**
1:9 7:2 152:19,24
159:12,12
**input**
13:8 14:3,5 31:1
**inquiries**
128:4
**insight**
110:19
**inspect**
150:1

**instance**
145:7 156:19
**instruct**
139:11 140:5,18
**instructed**
82:21,24 137:22
141:4 146:15
**instructing**
144:7
**instruction**
96:1
**instructions**
82:5,15 113:22 124:2
**instructs**
5:23
**integrated**
7:13
**Integrity**
41:21,25
**intend**
84:12 105:1
**intending**
95:18 96:7 102:9
**intent**
94:22,23 104:9
119:22
**intention**
103:12 165:4 174:23
**intentions**
74:11 92:14 96:16
103:2,18 129:20
164:10,21,23
**interaction**
21:17 158:11
**interactions**
171:1
**interacts**
102:15
**interest**
53:14
**interested**
54:21 102:10 178:18
**interfacing**
19:23
**interfere**
36:10



**interference**
36:12
**interpret**
80:2,3 91:5,12
125:16,17 135:10
167:2
**interpretation**
81:21 107:17 172:22
**interpreting**
29:10
**interrogatories**
3:22 15:5 148:8
149:23
**interrogatory**
15:12,16,23 148:14
**interrupt**
98:8
**interrupting**
172:7
**interruptive**
172:7
**intervening**
88:19
**interview**
14:7 174:16
**interviewing**
13:8 129:22
**intimated**
83:2
**intimately**
17:6
**introduce**
149:13
**introduced**
37:15
**invested**
51:9
**investigation**
47:19 49:10
**investigations**
46:7
**involved**
16:8,11,19 17:6 20:4
20:8,19 21:9,10
22:2,4 60:22 61:5,8
61:11 77:14,16

113:10 117:24
154:20 156:15
157:25 169:6
**involvement**
21:20,22 46:6 113:12
154:9
**irrelevant**
133:13
**irrespective**
165:11
**issue**
6:7 54:17 69:18
83:15 98:23 99:16
108:23 111:8,11,20
111:23 118:12
123:18 131:6
132:10 163:14,15
**issued**
139:15
**issues**
14:20 21:16 46:25
60:17,18 62:14,22
91:10 99:12 100:1,2
104:7,16 105:20
107:19 122:2
126:21 133:2 144:1
176:4,9

---

**J**

**January**
65:11 74:12 153:7,19
154:24 156:4,17
**Jason**
13:22 16:5,12,13,13
**Jeff**
109:2
**Jeffrey**
1:12 4:9,16,17,18
177:3 178:7
**Jennifer**
80:22
**jeopardize**
42:17
**job**
5:15 13:7 32:24 33:8
35:4,6,12 36:4

127:19 129:8 131:9
131:11 132:6,22
133:15 134:13,17
142:24 157:15,25
**jockeying**
63:25 65:15,16
**join**
102:9 153:15
**joined**
154:1
**joining**
60:11,13
**joint**
153:24
**jubilation**
103:15
**July**
59:21 84:1 129:25
137:13
**jump**
101:19 163:20
**jumping**
100:11 164:8
**June**
57:15,16,20,25 58:10
58:14,14 59:20
**JURAT**
177:2

---

**K**

**Kansas**
7:25 8:11,18 19:24
**Kathpal**
130:10
**Kathy**
61:2
**keep**
4:20 5:3 80:16 84:15
97:2 130:13,14
**kept**
72:9,10
**kick-back**
41:16 42:12
**kidding**
161:24
**KILLIAN**

2:12
**kind**
13:11 24:20 29:21
49:19 55:5 59:3
60:14,18 65:25 66:8
69:15 75:18 77:13
79:23 85:5 94:9
96:14 101:13
104:18 105:16
106:14 108:13
110:22 115:21
119:1 153:10
165:25 166:2 169:9
169:14,18 171:5
176:13
**kinds**
37:11 104:23
**knew**
82:25
**knoe**
69:13
**know**
5:3 8:9 9:10 11:8
13:21 14:18,21
15:12 21:5,13,16,24
21:24,25 22:15
23:13,15,20 24:6,10
24:11,14,16,18 26:2
26:18 27:7,16 28:4
29:3,9,15 30:7,11
30:19,20,23,25
34:24 36:24 38:3,4
40:15,24 41:1,22
42:6,14,17,17,18
43:18 44:9,12 45:1
45:13,13,22 46:25
47:3,12,13,14,23
48:12 49:15,21
50:10,10,12,13,19
51:6,7,7,8,9,10,10
51:11 52:14,15,23
52:25 53:8,19,20,23
54:14,14,18 55:2,18
56:2 57:22 58:18,20
58:22 59:4,13 61:15
61:16 62:6,15 63:5


MAGNA
LEGAL SERVICES

63:5,7,24,25 64:2,5
64:6,14,17,19,23
65:1,5 66:2,13
67:11,19,20 68:18
69:12,17 70:5,8,23
71:23,23,24 72:2,5
72:7,12,13,13,19
74:6,13,22 75:18
76:19 77:15,25 78:6
78:22 80:11 82:9
83:2,10,12 84:2,5,8
84:11 85:23,23,25
86:1,2 87:2,9,13,19
88:5 89:6,7,14
90:20 92:15,17,18
93:2 94:1,2,3,4,21
95:11 96:11,17,20
97:24 98:22 99:4,16
99:25 100:20,22,23
100:24 101:7
102:13,22,23,24,25
103:1,13,15 104:1,5
104:6,15,17,20
105:15,15,16,16,24
105:24 107:12,15
108:5 109:9,10
113:5 115:7,8,9
116:25 118:1,4,8,8
118:22 119:6,7,14
119:17,24,25
120:10,17,18 121:7
121:10 122:10,11
122:19 123:12,20
123:23,24 124:1,19
124:22 125:19,19
126:6,24 127:15,20
127:21 128:2,4,4
129:9,13,14,19
130:17,24 131:13
131:13,14,17,18,20
131:21,21,22 133:3
135:14 136:2,9
137:25 138:19,23
141:4,12,14 142:6
145:19 146:15,17
147:25 149:14

153:17 154:10
155:9,11,12,14,17
155:20,21,22
156:12,12,13,25
157:6,21,24,25
158:6,10,14,18,21
158:22 161:2,7
162:6,16,17,20
163:19 164:8,12,25
165:9,21 166:2,6
167:10,13,13,14,17
167:22,23 168:10
168:15,20 169:4,11
170:3,8,10,13,14,16
170:22,25 171:1,1,2
174:9,10,11,14,15
174:19 176:6

**knowing**
93:22 174:24
**knowledge**
6:13 10:4,15 20:25
29:9 49:6 50:6 53:2
84:2 122:11 139:14
140:21 144:19
149:11 161:7
**known**
33:9 47:6 92:19
**knows**
123:18
**Koval**
16:4,10,21 18:22,23
38:16 47:2 60:24
61:3 72:5 73:12
74:3,4 76:15,21
77:2,7 78:19,24
79:24 86:18,22
90:25 108:15 136:9
137:23 139:7 160:8
160:13 162:13
169:25 170:1,18
**Koval's**
73:20 74:2 87:3
137:18
**Kraus**
16:17 18:24 60:25
61:1 90:22,24 99:5



**L**

**label**
34:17
**lack**
50:18,18,25 51:10
104:18,18 110:25
115:18 127:15
**lacks**
110:19
**land**
150:1
**Lane**
143:4 144:20,21
145:1,7,9,23 146:5
146:8,12,15
**language**
18:15 80:20 81:1
118:24
**Lapovich**
104:4
**lapse**
58:14
**large**
13:4 54:19 170:24
**late**
60:12,23 139:24
145:10
**law**
32:9,11,15 40:19
41:16 42:11
**Lawrence**
2:5
**laws**
30:24 40:20 42:24
**lawsuit**
15:16 148:2 162:19
167:22,25 168:4
**layer**
75:24
**layers**
71:14 104:17 176:13
**lead**
62:15
**leader**
30:23 169:10

**leaders**
13:10 54:21 98:21
131:19 154:18
155:21
**leadership**
12:12 61:4 98:25
99:11 168:16 170:3
**leading**
63:6 127:24 128:21
129:10 160:10
**leaf**
9:5
**learn**
37:10 165:15 169:10
**learned**
104:6 158:16
**learning**
60:18 104:3,6,18
**leasing**
69:5
**leave**
3:5,13 20:10,14
21:20 22:23,23 23:7
24:14 25:6,9,16,23
26:13,23 27:2,7,8
27:17 28:4 34:3,4,8
34:9,12 39:2,6,7,14
39:17 52:6 72:8,9
82:10 94:22,24,25
95:5,8,9,10,12,14
95:18 96:1,7 101:5
105:7 109:10
112:15,20 113:11
113:15,18,22,25
114:10 116:16,19
117:20 118:2,7,10
118:15,19 119:2,11
119:12,17,20,21,23
120:11,14,17,19
121:5 123:6,11
126:12 127:23
131:10,16 132:7,23
132:24 133:1,16,17
133:23,23 134:2,9
134:14,18 138:17
139:16 140:8


MAGNA
LEGAL SERVICES

143:14,17,22
144:17 165:7
**leaves**
166:18
**leaving**
135:5
**lectures**
55:6
**left**
88:10 135:13 142:20
160:12,14,20
**legal**
1:20 13:20 32:17,19
42:14 73:24 75:5
86:6 131:20 147:5
148:4 151:11 152:7
152:8 167:8
**legally**
6:12 30:25
**let's**
5:11 6:3 12:1 38:15
41:2 43:24 47:18
55:5 60:22 62:22
89:13 112:17 115:2
131:3 140:1 142:16
165:17,17 166:7
169:2
**letter**
3:6,7,19 24:25 59:16
59:16,19 116:10,14
116:15 122:19
127:6,9 128:22
139:15,19 140:3,6
140:10,22,24 141:5
141:11,19 142:3
146:19
**level**
45:15 51:21 99:7
157:13 158:1,6,10
158:10 159:20
**levels**
159:2
**liability**
150:13
**liaison**
22:7 107:18 138:25

139:4 144:1,1,7,13
**license**
56:2
**Lichtenberger**
18:9 19:19 97:21,23
99:6,14 100:3
**light**
176:9
**likelihood**
68:19
**likeness**
70:7
**limited**
121:13
**Lindsay**
2:12 4:7
**line**
18:25 21:14,17 61:4
75:7 96:23 97:10,18
98:25 106:14
108:16 131:13
158:23 160:16
163:19 170:2,4,12
**lines**
23:14 86:8
**linked**
83:10
**list**
28:20 127:18
**listed**
10:5,23 17:8 52:12
148:2 162:18
**literally**
34:22
**litigation**
161:15,22 162:1
**little**
7:14 11:17,18 19:9
79:17 88:15 112:18
119:4 132:4 142:20
163:3
**live**
160:17
**LLC**
1:18 2:4
**lmcmanus@hallre...**

2:16
**loan**
75:21 78:9 81:2,8,14
82:18,20 173:2,14
173:15
**loans**
171:23
**locations**
65:16
**locums**
99:25 130:22,24
131:1
**lodge**
5:24
**long**
45:13 58:24 60:11
62:18 64:7 72:10
75:19 92:22 105:14
161:25
**longer**
26:19 28:18 75:5,25
89:17 93:8
**look**
9:3 11:3 15:11,21
25:2 37:9,24 41:9
44:25 50:1 55:18
57:11 58:8 61:14
66:13 75:14 81:6,25
82:8,22 84:16,17
110:10 112:10
137:3 139:20
148:12 159:5
**lookd**
79:19
**looked**
39:1 44:15 61:20
76:23 86:17,21
97:14 123:1 138:2
162:3 166:13
**looking**
15:10 31:8,9 46:2
78:14 100:17
102:10 104:23
131:13 147:5,10
160:22 167:4
172:11

**looks**
22:25 59:7
**losing**
167:23
**lot**
11:9,12 13:18 58:23
62:2,6 71:1,12 76:5
84:5 85:16 105:22
162:2,3 163:16
164:11,20 170:11
170:12 176:14
**lower**
65:21
**lumped**
23:17
**lunch**
89:15,16,20,21
**LYMAN**
2:13

--- M ---

**M.D**
177:3 178:7
**machine**
178:8
**Magna**
1:20
**mail**
142:1
**maintain**
40:18 42:18 56:2
64:25 66:25
**maintains**
30:1 124:5
**major**
69:17
**majority**
7:5 69:1
**making**
72:24 84:11 108:2,9
108:16 117:19,21
143:20 156:13
162:12 164:23
**male**
121:18,21
**managed**



48:6
**management**
 8:15 12:14 154:7
   156:18 157:23
   174:10 175:20
**manager**
 14:2,12 31:25
**managing**
 10:3 154:20
**manipulative**
 176:6
**manner**
 71:19
**manual**
 41:21,25 52:13,16
**Mark**
 2:11 4:5 8:20 17:13
   40:22 41:22 73:22
   122:17 159:4,8
   160:23 162:9
   176:17
**marked**
 9:10 15:1 22:14 30:7
   57:1 59:12,13 73:8
   76:6 79:6 85:11
   90:6 94:14 97:4
   106:4 112:9 114:6
   116:7 121:15 127:4
   146:23
**market**
 78:12 174:21
**marketing**
 70:13
**material**
 148:15 150:12
**materializing**
 74:14
**materials**
 41:9,12
**math**
 145:25 146:11
**matter**
 25:6 98:3 111:14,17
**matters**
 140:20
**McManus**

2:12 4:7
**mean**
 10:12 12:5 14:13,18
   16:24,25 24:16,25
   36:24,24 38:2 43:19
   45:1,5 50:16 52:9
   52:24 56:1 67:24
   70:10,12 85:6,22
   86:11 91:5 94:1,8
   98:8 100:9 103:25
   104:11 108:12
   111:11,17 118:3,10
   120:13 124:4
   125:16,17 126:13
   130:15 145:11,19
   155:19,21,25
   156:12 160:20,21
   163:15 168:5,16
   170:3 173:1,10
   175:8
**meaning**
 73:24
**means**
 24:6 25:19 68:10
**meant**
 11:9 12:3 70:13 91:7
   95:6 117:8,13
**MEC**
 48:15 49:9,25
**meda-data**
 86:11,12
**mediate**
 61:21 64:3 72:18
**medical**
 3:13 7:12,15,16 8:5
   12:10,11,12,16,17
   12:22 13:9,23 16:14
   16:16,18 20:10,15
   21:15,20,21,23
   22:22,23 23:7,11
   25:23 26:6,23 27:8
   27:21 28:6,10,23
   39:2,6,7,17 44:13
   44:16,18 45:2 47:14
   48:14 49:8,19 50:15
   51:22 52:10 54:1

56:2,3 69:4 95:9,11
   95:15 107:12
   108:14 112:15,19
   113:11,15,18,22,25
   114:10,23 116:15
   116:19 117:4,20,22
   117:24 118:15,18
   119:2 123:6,11,18
   126:12 131:10,16
   132:7,23,24 133:1
   133:16,17 134:14
   134:18 138:17
   139:5,16 140:8
   143:14,17,22
   144:17 168:15,16
   170:7 171:2,2
**medication**
 6:15
**medications**
 6:19,22
**medicine**
 17:19,23 23:14,18,20
   24:17,21 27:14,18
   28:22 29:7 44:4
   45:18 53:24 95:7
   116:20 117:14
   119:1 121:9
**medstaff**
 107:14,22
**meet**
 51:12 62:3 140:6
**meeting**
 27:21 93:5 98:12
   113:2,5,14,23
   138:13,24 139:6,10
   139:12 171:2
**meetings**
 14:18,19 28:9 62:12
   75:24 164:9 168:15
   168:16 171:3
**member**
 21:25 61:3 112:19
   170:2
**members**
 60:1,5,10 72:8 99:11
   104:9 155:2,4,6

158:3,8,18 159:21
**memories**
 163:13
**memorized**
 55:14
**memory**
 6:23 11:4 163:21
**mental**
 26:21 27:13,16 28:5
   91:10 96:19 105:20
   107:23 108:3,23
   115:3,4 117:17
   118:6,12 166:5
**mentally**
 26:5,14
**mention**
 128:24
**mentioned**
 14:3,11 21:19 30:16
   46:1 48:2 53:3,13
   54:7 63:17 65:14
   84:25 93:13 129:16
   176:13
**message**
 29:1 80:5 81:6,24
   141:18 142:1
**messages**
 3:14 79:10,11 110:3
   161:9,14,21 162:3
   162:18
**met**
 61:17
**Metro**
 8:14
**middle**
 32:22 164:7 165:24
**Milan**
 110:2
**mind**
 11:11 60:15,17 74:24
   142:10 145:17
   164:14 168:23
   169:17
**mine**
 122:12
**minimize**



67:1
**minimum**
120:22 122:25
129:24
**minute**
165:17
**minutes**
43:8 89:13,21 142:17
171:12
**missed**
41:2
**mistake**
42:21 58:21 59:5
135:2
**mitigate**
147:22 148:23 149:3
149:10 150:18,24
151:4,9,14,20
152:12
**model**
75:14
**modifications**
86:5
**modified**
31:2
**module**
28:25 37:13
**modules**
37:11
**MOHAMEDBHAI**
1:18 2:4 4:3,13
**moment**
27:12 30:10 48:19
79:23 101:16 102:3
**money**
88:4,10 171:24
172:18
**Monroe**
1:16 60:25 62:5,13
62:25 65:6 66:13,24
67:4,4,14,21 68:14
71:11,15 72:9 78:1
93:6,7 99:18 100:12
100:15,24 101:1,7
101:10,24 102:8
104:14 130:8,15

165:22 166:3 175:6
175:7,17 176:7
**Monroe's**
101:16 102:2
**month**
9:24 60:7 75:25
101:5,7 130:7,9
131:5
**months**
65:8 75:16 76:1,5
92:2 103:10,11
104:2,15,15 126:4
126:22 130:6
144:10 164:10
171:19 172:3,15,19
172:24 174:24
175:22
**morning**
4:14 18:13
**motives**
101:11
**mountain**
8:8,10 68:11 69:3
110:1 145:13,21
146:14
**mouth**
5:12 53:15 86:19
139:22
**move**
130:3
**moving**
5:4 72:19 75:12
84:15 96:15,17
164:24
**MST**
1:19 176:24
**MT**
146:1
**multiple**
69:14,14 79:1 87:20
87:20 102:7 104:8
129:14 136:5,6
137:11 167:18
**Mutual**
63:15

**N**

**name**
4:2,15 70:7,11
**names**
19:9,12 41:23 83:22
84:22
**narrower**
88:15
**natural**
5:9
**nature**
92:7
**navigate**
92:12
**Nearly**
68:7
**necessarily**
22:4 47:6 61:11 94:6
94:7 101:8 130:10
138:24 176:10
**necessary**
83:5 98:4
**necessity**
78:8 121:5 129:1
136:4
**need**
5:1 6:4 32:19 39:6
47:13 68:12 78:23
82:24 91:15,20 93:1
94:7 99:16 122:13
125:7,14,16,18
130:10 140:19
142:6 144:12
164:19 165:6
**needed**
73:15 78:20 81:17,19
84:3 87:8 91:4
118:14 125:9 130:3
132:14 141:6
174:12
**needing**
125:10 126:6
**needs**
96:23 97:11 105:4
108:6,20 111:16

112:1 118:2
**negotiated**
130:8
**negotiating**
131:4
**negotiations**
125:15 126:1
**network**
67:25 69:21
**networks**
67:23
**never**
62:20 101:23 102:9
102:19 105:2
131:24 136:11
141:9,9
**new**
8:17 65:20 85:13,19
85:22 86:7 87:4
88:21 106:16
152:25 163:12
170:23
**newly**
9:9
**news**
103:16
**nice**
170:16
**night**
121:23 145:6,7,10
**noble**
105:12,13
**nodding**
5:16
**noise**
56:17
**non**
13:11 18:18 20:11
34:3,8 39:8 47:12
69:13 99:9 133:23
**normal**
145:1
**normally**
51:10
**Notary**
177:15,20



**noted**
177:8
**notice**
1:15 9:15,18 100:13
100:23 108:15,20
129:10 130:11
131:12 135:19
140:22 158:25
174:1,3 178:12
**notified**
143:10
**notify**
100:1
**notifying**
108:25
**number**
1:3 3:4 8:1 15:23
24:3 26:2,19 29:18
34:18,21 43:15
73:13 125:3 126:3
134:22 136:18
147:20 148:14
150:8 154:16 155:2
160:11
**numerous**
136:1

**O**

**oath**
4:10 6:10,11
**object**
21:4 26:1,17 32:12
32:16 36:14 52:2
73:1,21 80:1 82:23
90:16 115:5 116:2
116:22 122:7,13
123:22 126:19
132:8,25 134:10
152:5 155:8,16
156:21 158:23
161:16,23 173:8,21
173:25
**objected**
162:9
**objection**
5:24 55:3 117:1

161:18 162:10
**objections**
5:20 15:4 85:16
122:17
**obligated**
6:12
**obligation**
52:3 130:14 144:13
173:3,14 174:22
**obligations**
55:25 56:6
**observed**
173:19
**obtain**
31:17
**obtaining**
126:11
**obtains**
36:20
**obviously**
50:10 96:15 104:10
170:11
**occurred**
63:9 175:15
**October**
153:17 178:10
**odd**
82:12 87:23 171:19
171:25 172:6,10
**offer**
13:15,16 14:10 16:4
31:1 32:6 66:19,21
68:17 70:19 71:7
72:25 73:18,23
74:10 77:23 84:6
106:21,24 110:9,19
113:13 122:23
124:15 127:10,17
127:19 128:11
129:8 131:9,11,15
132:6,22 133:15
134:13,17 136:24
137:12 141:7
143:18 166:23,25
167:15 174:20
**offered**

82:4
**offering**
73:4 88:4,6
**offers**
12:13 40:4 54:17,20
**offhand**
161:2
**office**
9:6 56:18 80:14
119:22 135:6,15
163:6
**officer**
21:23 43:6 53:11
98:24
**officers**
10:3
**official**
10:14 95:9 121:11
178:20
**oh**
26:10 31:12 60:16
61:2 112:13 149:16
164:18
**okay**
4:19 5:5 6:8 7:5 9:1
10:9,12 11:5,19
12:5 15:15,22 19:8
22:17 29:16 30:7
39:1 40:10,13,18
41:1,8,20 42:6 44:2
46:11 48:19 49:2
55:19,24 57:3,6,19
58:8,13 60:3,13
70:22 73:10,12 74:1
76:14 77:1 78:18
79:9,14 80:18 90:7
90:10 91:23 94:19
95:17 97:2,5 98:16
98:20 106:9 107:5
107:11 111:21,23
113:1 114:8 115:16
116:9 121:17
122:25 127:5
134:23 137:17
142:15 145:18
147:1,3,8,15,17

148:6,13 149:2,17
149:18,21 150:7
152:18,22 153:3,7
153:19 154:24
156:24 157:10,12
158:2,6 159:23
161:3 163:2,8
171:11 173:19
174:5 176:16
**old**
121:18,21
**Omeed**
2:3 4:2,21 17:12
**omni-present**
29:13
**once**
13:21 14:12 61:9
74:22,25 75:2
136:21
**oncologist**
44:12 68:5 69:17,18
115:7 174:25
**oncologists**
12:6 14:2 24:19
56:10 69:4,6,11
**oncology**
7:13,15,17 8:6 12:15
12:17,23 16:16,18
18:21,24 21:1 23:6
23:12,16 24:20
44:11,18 45:4 56:15
57:14 61:2 68:1,13
68:15 69:23 75:11
95:2,5 98:25 100:2
101:4 160:15 170:4
**one-sided**
119:21
**ones**
148:3 161:10
**ongoing**
102:23 103:19 126:1
129:13 166:8 175:5
**online**
37:13
**open**
9:2,11 15:2 21:8



22:15 30:8 59:14 76:8 80:16 149:14 149:15

**opened**
65:20

**openly**
163:24

**operate**
58:3 66:2

**operated**
130:6 154:7

**operating**
19:24 69:11 153:25 154:20

**operation**
64:15 175:2

**operations**
170:8

**operations-minded**
170:13

**opinion**
37:1 128:13

**opinions**
36:12,21

**opportunity**
65:2 72:4,13 84:9 160:15 165:2 167:23

**opposed**
39:8 142:11

**option**
144:11

**options**
61:10 94:12

**order**
11:1 130:13 173:13

**ordinarily**
20:19 24:18 120:13

**organization**
8:15 10:14 18:16 30:23 42:15 45:23 49:14 54:3,20,23 60:12,13 70:6 75:10 75:20 77:16 82:10 98:21 99:8 104:3 113:21 114:1 117:4

128:14 158:11 160:11,23 167:11 168:13 169:5,13,21 170:24

**organizations**
154:2,3,8 155:19 156:11

**organized**
55:9

**origin**
121:19,21

**original**
57:7 73:15 85:17 86:3 136:14

**os**
116:15

**outline**
99:24

**outlined**
45:3 95:11

**outright**
175:13

**outside**
9:6 55:4 56:17 124:16 149:8 152:9 163:6 169:18,21

**outstanding**
106:20 113:13 122:23 138:20

**overlap**
153:14

**overlapped**
13:1

**oversight**
12:14,20 16:23 18:4 19:13 20:23 21:11 44:23 45:9,10,15,16 45:23,24 46:12,18 46:21 47:9,11,13,16 48:4,11 153:21 154:13,22 157:14 158:7,15

**owed**
88:9,10

**owned**
154:3,4

**owning**
158:5

─────────── **P** ───────────

**P-R-O-C-E-E-D-I-...**
4:1

**P.30(B)(6)**
1:15

**P.C**
2:13

**p.m**
77:2 121:23 134:25 143:6 145:9,11 146:2,6,9,13 176:24

**PACK**
74:20

**package**
81:3 82:1

**packet**
43:22 81:5

**page**
3:2,4 10:1 15:21 16:2 22:18 33:24 34:22 134:21 147:15 148:7,12,20 149:21 150:6 157:5 177:2

**pages**
11:22

**pandemic**
50:11 53:23,24

**paper**
85:8 173:13

**paragraph**
24:4 25:3 26:8 27:2 27:19 32:21,22 33:6 35:15 98:11,11 121:18

**parallel**
143:24

**parcel**
59:25

**parent**
154:2

**pars**
176:3

**parsing**

67:12

**part**
18:24 37:7,24 40:16 41:19 50:23 59:24 67:15 80:8 81:8 82:25 89:1 103:15 114:2 116:11 127:25 129:3 130:20 131:17 142:24 147:22 155:13 163:22 171:5 174:1,3 175:16

**participate**
35:6,12 36:4 38:20 42:18 66:4

**participated**
166:14

**participation**
158:8

**particular**
54:17 68:21 70:8 78:7 98:5 129:11

**particularly**
53:23,25 94:4 136:3 170:22

**parties**
58:3 59:2 178:17

**partner**
17:1 44:10 126:21 175:13 176:5

**partners**
62:18,23 64:22 169:5 169:11

**partnership**
61:19,21,25 62:2,16 63:14,18 64:4 92:22 92:23

**parts**
39:19 167:11 169:13

**party**
56:22 149:25

**passion**
53:14

**passionate**
50:14



**patient**
51:19 54:25 62:14 65:4 67:12 92:13 104:16 120:25 122:4 126:21 130:3 174:9,10 175:2,20
**patients**
26:22 51:9,12 66:9 67:7,21 68:2,7,12 68:20 69:6,15 71:20 117:18 118:5,9,13 120:12,16 122:6 129:18 164:8 175:3 175:6,11
**pattern**
68:8,9 126:3,6,9
**pause**
5:22 22:13 142:9 165:17 166:7
**pay**
82:9
**paying**
130:23
**PC**
44:11 45:4 69:23 95:2,5 100:2 101:4
**PCP**
3:4 91:1 92:5
**PDFs**
11:21
**Pedadda**
4:4 22:5 34:18,23 43:23 44:4,8,16,23 45:10,16 46:7,12,22 47:1,17 48:4 49:17 60:24 62:4,11,13,25 63:11 65:6 66:19,21 67:7,10,17 68:14,17 68:20 70:9,20 71:2 71:15,21 72:8,10,25 73:14,19 74:11 76:22 78:1,13,22,24 79:2 81:25 82:3,14 82:21 84:11,23 85:1 85:14 86:15,18,22 87:4,10,17 88:16,20

88:22 90:22 91:3,22 92:8,13 93:6,8,13 93:19 94:21 95:6,14 95:18 96:7,11 99:19 100:13,16,25 101:3 101:20 102:8,11,15 102:19,24 103:2,16 103:20 104:7,10,14 104:15,25 106:17 106:21 107:20 108:4,11,15,22 109:2,15,21 110:22 111:9,15,20,25,25 112:23 113:7,23 114:13 115:13 117:20,21 119:16 119:20 120:11,24 122:5,23 123:1,4,5 123:5,7,8,10,23 124:12,17,20,25 125:14 126:3,11 129:15 131:12 132:7,22 133:15,17 134:13,18,22 135:17,18,21 136:14,23 137:4,23 138:3,6,13,20,21 139:4,15 140:3,6,11 140:14,19 141:6,12 141:20 142:2 143:10,14,17 144:8 144:9,17 148:24 149:5,8 150:19,23 151:2,18 161:10 163:18,24 166:3 167:23 168:3 171:22,25 172:13 172:14,19,25 173:7 173:12,12,19 174:7 175:1,10,11,12,18
**Pedadda'd**
105:3
**Pedadda's**
15:18 16:4 46:2 50:4 67:22 69:21,25 70:4 70:15 79:11,14

80:14 90:19 91:1 92:5 96:1,10 100:22 101:11 103:5 108:20 116:15 117:20 121:3 123:11 134:24 138:16 151:9 152:1 165:5,22 171:19 172:4,5 174:2,6 175:24
**Peddada**
1:6 10:2 84:18 114:19 167:16
**peeled**
176:13
**peeling**
71:14
**peer**
54:17,20 62:11 66:5 99:7
**pending**
6:6 120:19 147:9
**Penrose**
3:16 4:6 7:3 12:2 14:9 17:3,19,23,24 19:25 20:4,9 22:24 23:16,21 28:22 44:4 44:8,12,24 45:4,18 56:5 63:22,23 65:16 65:18 66:1,14,15,19 67:8,16 68:17,24 69:22 71:7 95:7 105:1 167:24
**Penrose's**
15:4
**PENROSE-ST**
1:9
**people**
16:8,10 18:12 19:13 21:3,12 38:19 48:6 73:13 98:12,18,23 102:8 108:1,8 109:25 159:15 162:17 163:6
**peppered**
110:3

**perform**
27:10 38:12
**performance**
14:21 17:5 48:24 49:2,7 72:14 174:2 174:4,6
**period**
7:6,10 11:24 17:18 18:2 20:6 27:23 37:14 43:24,25 53:9 53:10 63:5,6 66:7 70:24,25 71:4 87:9 92:2 93:11 96:12 109:8 126:24 153:7 153:9,13 158:12 160:13 161:25 175:18 176:12
**periodic**
14:18
**periodically**
57:9
**peripheral**
24:20
**permit**
36:3
**permits**
35:4
**person**
12:19 14:19 16:18 17:3 19:16,20 24:19 29:12 48:18 54:19 76:22 77:20 85:23 91:11 107:20 131:10 170:17
**personal**
96:2 108:17 121:22 136:8 161:11,22 162:5,7 166:22
**personality**
168:19 169:8 170:9
**personally**
47:1 50:12 79:2 91:7 93:22 108:17 117:24 153:15
**personnel**
46:3 48:21 70:16



72:21

**persons**
16:2

**perspective**
83:4

**persuade**
159:7,7

**pertain**
129:1

**pertains**
113:12

**pertinent**
43:20 62:14 100:1

**phase**
123:21 124:3

**phone**
79:11 89:6,9 109:17
109:18 136:17,18
161:11,14,22 162:5

**phones**
161:6 162:7

**phrase**
18:11

**physical**
26:4,21 27:13,16
28:5 33:9 117:17
118:6,11

**physically**
26:14 77:18 85:4
89:7

**physician**
12:21 13:24,25 14:12
17:24,25 18:5,6,9
18:13,17,19 19:5,14
19:17,19 20:8,9,12
21:20 22:22 23:6
26:14 27:12 29:11
39:5,9,9,18 44:11
44:24 45:2,25 48:10
48:13 49:3 50:8,9
50:15 51:11,18
52:20 54:5,10 55:6
55:12 66:16 67:8
68:15 71:10 72:14
74:19,23 83:23
93:14,20 94:2,8,10

96:2,17,21 98:25
99:6,8,10 105:25
107:24 114:15,16
114:20,21,25
115:13,16,24
116:20 117:5,13
118:25 121:3 122:4
125:8,20 126:25
128:8 129:18 139:1
140:15 144:24
165:6 169:10

**physician's**
52:8 105:10

**physicians**
11:24 12:1,5,6,7,9,9
13:3,8,9 14:14
16:23 17:19,22 18:4
20:23,24 21:10,11
22:2,8 28:22 29:6,8
39:12,13 45:6,11,17
45:21 46:12,17,18
46:19,22 47:12
50:19 51:7 52:7
53:22 54:4,20,21,23
54:25 56:1 61:11,14
61:17,20 63:21
65:11,11,22 67:11
68:12,19,22 69:2,13
70:5 71:12,13 72:2
74:17,21 75:18
77:17 83:20 84:6
87:13 99:2,13,22
102:15 105:22
107:14 109:24
130:21 140:11

**piece**
18:16 74:18 85:8
165:1

**pieces**
13:18

**piggy-back**
119:23

**place**
50:15 58:15,19 62:19
63:10,13 66:1 99:21
128:11 167:16

177:7

**placed**
50:4

**plaintiff**
1:7,17 2:3 4:3 10:1
147:22

**plaintiff's**
9:14 15:5 147:21

**plan**
72:15 74:18

**planned**
93:9 119:23

**plans**
93:1

**Plauth**
20:18 21:19 22:5,7
90:21,24 91:3,14
92:4,8 107:5,17
109:2,15,17 110:16
110:18 112:22
113:2,7,12,16 119:8
124:19 125:6 138:3
138:13,19,25 139:9
139:11 140:14
144:2,7,11,12,15
160:8,12,19 170:20
171:5,7,9

**Plauth's**
21:21 91:13 93:18
107:2 109:22
112:11 138:24

**play**
67:5

**playing**
62:6

**please**
173:9

**plus**
136:6

**point**
14:17 27:8 50:20
61:9 63:17 70:2
84:13 89:15 92:14
95:13 98:10 103:6
104:1 108:19 114:4
115:12 119:15

129:5 131:4 132:2,3
169:14

**pointed**
83:17

**pointing**
83:9

**points**
54:19 80:21 81:1
83:6

**policies**
3:17 29:23,25 30:3
30:12,14,16,17,19
31:2 34:7 38:1
40:15 155:22
157:16

**policy**
31:5,5,11,13,15,16
31:20 32:3,5,7,20
32:22 33:2,14,19
34:11 36:1,8 37:5,6
37:9,14,20,24 38:8
38:9,13,17,21,23
39:7,20 40:18 41:6
41:11,14,17 52:17
122:25 123:4,9,10
124:1,5,8,12,16
133:9,20,21 134:3,6
134:7 166:12

**position**
7:10 8:4 13:11,14
63:25 66:19,22
68:17 75:21 77:22
127:13 160:14

**positions**
12:14 44:14 65:15

**positive**
106:2

**possession**
148:24 149:4,8
150:19,23 151:3,7,9
152:1

**possibility**
65:5 70:10

**possible**
93:17,21 115:24
120:23 142:6



possibly
 28:8
post
 50:11 53:24
posting
 13:7
potential
 19:3 42:21 133:2
potentially
 31:17 66:12 84:7
   89:5 102:9 173:1
power
 158:20
practical
 64:14,15
practice
 26:5,15 27:18 28:6
   28:22 33:10,21
   39:12,15 44:4 45:2
   45:17,25 50:5 53:24
   56:15 64:11,23 65:1
   66:8,11,12 67:1
   68:2,6,23,23,24
   69:23 84:1 92:11
   95:1,2,8 101:2,5
   104:20,23 114:3
   116:20 117:14
   118:25 121:9
   130:18,23
practice/employme...
 107:6
practiced
 17:19
practiciing
 44:11
practicing
 17:23 27:13 29:7
   44:24 45:11 48:13
   63:22 64:19 69:11
   95:7
practitioner
 26:4
precedes
 175:21
preceding
 172:4,15,20,24

precisely
 82:16 126:10
preclude
 72:24 73:3
preliminary
 64:20 69:10
prep
 41:11
prepare
 11:6 29:20 40:13
   43:17 120:2 157:20
prepared
 10:22 159:20
preparing
 24:7 41:5 166:10,19
presence
 135:15
present
 75:1 84:14
presented
 65:6
presently
 53:9,19
president
 12:20
presumably
 27:6,6 57:22 124:22
   155:20
presumption
 110:6
pretty
 159:3 169:6 170:10
previous
 165:2,11 176:3
previously
 22:14 57:13 90:5
   94:15 95:12 100:16
   100:21 106:4 116:8
   129:16 136:1,18
   157:2 165:25
primary
 39:20 48:16 56:11
   61:5 66:25 69:10
   93:13,19 114:15,21
   114:25 121:3 129:5
printed

86:22
prior
 4:22 57:19,19 62:23
   63:7 93:9,12,23
   108:21 110:13
   119:20 136:7,22
   141:5,19 166:10,19
   173:20 175:23
private
 18:4,5 20:12 21:11
   45:25 46:17
priviledging
 21:15
privileged
 161:16,23
privileges
 20:9 22:8 26:6,16
   27:4,9,10 28:24
   107:12
privileging
 129:23
pro
 74:18 82:9
probably
 6:6 9:23 11:18,22
   13:6 48:17 77:23
   78:3 80:13 85:23
   86:2 93:4 98:14
   112:4 131:21
   171:12
problems
 14:20 167:1,3
procedure
 33:24
procedures
 40:16 155:23 157:17
proceed
 75:3 128:2
proceeding
 130:16 171:19
proceedings
 142:18
process
 11:20,24 12:1,18
   13:2,7,12,14 14:4
   16:9,11 17:2 19:14

20:5,8,17 21:10
 22:22 23:1 24:24
 31:21 35:6,12 36:4
 39:10,16,16,19 47:7
 48:14,15,17 65:25
 66:24 74:16 75:15
 76:16,20 77:25 85:7
 92:18 95:10 99:16
 111:13 112:24
 113:11,15 114:2
 119:9 120:8 124:18
 126:14 128:5
 129:14,22,24
 131:17 155:24
 164:4,12 167:9
 169:9,12
processes
 17:7 66:5 108:7
   119:25 139:12
   154:11
produce
 3:24 149:25 150:2,11
   161:13 162:7
produced
 40:22 161:21 162:18
production
 149:24 150:8
professional
 45:7 49:5 55:21 57:7
   57:14 71:19 96:18
program
 7:18 8:8 16:22 21:1
   54:8 67:2 69:22,23
   140:12 170:6
programming
 37:25
programs
 37:12 42:19 54:9
   55:4
progressed
 13:12
promotional
 160:15
proportionate
 154:16
proposed



101:5
**prospective**
111:5,9 125:20
173:22 174:16,18
**protect**
99:22
**provide**
15:17 28:13 35:10,16
36:2 42:1 45:3 56:4
56:7,10,14 94:12
101:6 117:22 118:5
123:25 124:1,2
161:5 162:5
**provided**
22:1 28:22 41:15,18
41:25 43:21,22
75:22 154:3
**provides**
29:5
**providing**
67:11 112:22 144:23
**provision**
51:19 78:10 82:9
83:6
**PSA**
3:18 19:4 20:1 45:4,5
55:20,25 57:20
58:23 59:20 64:9,13
99:20 130:5,22
131:5
**PSF**
34:18,23 84:17
**Public**
177:15,20
**publish**
55:6
**Pueblo**
170:8
**pull**
47:24 49:22,23 65:9
143:2 148:5
**purpose**
30:21
**purposes**
8:16 23:11
**pursuant**

1:15 17:23 178:12
**purview**
7:20 54:12
**pushed**
85:17 128:14
**put**
5:6 8:1 20:13 53:15
72:14 86:19 99:21
102:1 130:11,22,23
139:22 147:1 171:6
171:16 175:9
**putting**
67:3 165:3

—————————
**Q**
—————————
**qualified**
32:23 33:3,8,15,20
34:13 35:5,11,16
36:3 38:23 123:1,17
123:19 124:9,12
133:9 134:8
**qualify**
52:21 53:1
**qualities**
128:7
**quality**
21:24 62:12 66:4
106:2
**question**
5:10 6:5 15:16 21:6
29:24 32:18 36:17
38:3 44:3 45:13
46:15 47:24 48:2
60:7,8 68:9,16 73:2
82:13 88:15 96:8,10
96:18 98:19 100:22
102:21 103:21
122:14 132:4
133:13 141:25
142:14 146:7 147:9
152:8 153:3,24
154:12,12 156:1
164:23 168:24
173:9
**questioned**
130:8

**questioning**
99:19 158:24
**questions**
5:22 7:5 10:18 11:8
15:18 29:11 78:1,2
110:24 111:3 117:4
135:4 142:15
148:10 171:15
176:18
**quick**
11:3 35:1 43:7 89:11
143:1 145:16
**quit**
104:9 163:7
**quite**
34:22 125:10 176:15

—————————
**R**
—————————
**R**
1:15
**radiation**
7:13,15,17 12:5,15
12:16,23 14:1 16:16
18:21 23:6,11,16
24:19,20 44:11,12
44:18 56:10,15
57:14 68:5,13,15
69:6,16,18,22 75:11
95:5 100:2 101:4
115:7 174:25
**radiology**
45:4 68:1 95:2
**raise**
150:14
**randomly**
6:2
**rated**
82:9
**RATHOD**
1:18 2:4 4:3
**reach**
124:21 137:11 144:8
**reached**
61:9 125:6
**reaching**
22:6

**reaction**
50:16 87:14,22
**read**
11:12 16:1 24:9
46:24 47:3 58:13
82:2 177:4 178:14
**reading**
81:21 90:17 119:7
120:20 145:11
**readjustment**
91:16,21 93:11
**ready**
56:19 142:19
**real**
53:14 128:19,20
**really**
13:4 63:4 71:24
81:12 88:8 91:15
103:18 105:17
127:23 142:25
175:13
**reask**
134:15
**reason**
5:3,21 6:4,14 26:20
27:13 79:12 96:6,9
97:13,15,24 100:21
114:19,22,24 119:3
123:14 126:18
131:17 132:1 144:5
145:4,5,10 146:18
146:21
**reasonable**
35:3,10,16 36:2,5,11
59:4 64:15 120:20
170:17
**reasons**
27:15 28:2,4 66:23
67:17 95:19 117:16
118:2 127:18
129:11 130:2
**recall**
23:22 29:3 41:8,11
43:1 55:10,15 60:17
65:8 70:1 80:12,15
82:11 89:6 91:23


MAGNA
LEGAL SERVICES

93:15,22 109:7,7,14
109:18,20,21
110:11 117:15
135:5 144:6 146:21
147:6 162:4 168:24
169:1
**receipt**
109:15
**receive**
75:7 82:15
**received**
76:24 90:25 162:1
166:13
**receiving**
47:10 109:22
**recess**
43:1
**recission**
172:4
**recitals**
57:12
**recognition**
70:8,11 93:10 130:9
**recognize**
6:19
**recognizes**
133:21
**recognizing**
105:20 112:5 129:17
167:12
**recollection**
11:13
**recommendation**
49:13,16,25 121:4
**recommendations**
50:2
**recommended**
43:6 113:12
**reconcile**
167:18
**reconnect**
165:20 166:7
**record**
3:4 4:15 5:17 43:10
43:11 89:24 159:8
177:6

**recorded**
141:18 142:1
**recorrect**
165:18
**recourse**
25:11
**recruiting**
74:23
**recruitment**
33:10,21 75:21 81:8
81:14
**rectify**
69:19
**reduction**
160:23,24
**refer**
19:2 34:21 68:16
69:5 157:10
**reference**
44:18 81:14 85:25
111:5
**referenced**
49:10
**references**
32:5
**referral**
67:23,24 69:10,21
**referrals**
69:1
**referred**
68:3 78:4 119:9
122:8
**referring**
47:20 68:19 101:23
105:8 125:3
**refers**
7:1 55:20
**reflecting**
46:6
**refresh**
11:4,11
**refreshed**
37:15
**refusal**
104:15 110:25
127:12,14,22 175:7

**refused**
133:18
**refusing**
111:4 175:13
**regarding**
60:5,9 62:14 81:2
90:19 96:16 98:12
99:13,20 111:21
112:19 113:25
117:5 121:7 127:16
128:4 135:2 136:3
140:7 141:7 142:3
144:11 149:9 151:3
151:19 174:11
**regardless**
115:10
**regards**
74:12
**region**
8:8,10 16:22 60:18
61:16
**regular**
37:14,24 62:11
168:17 169:6
**regularly**
109:11,13
**regulations**
30:25
**reimbursement**
14:22
**reinstatement**
26:8,11,25
**reiterated**
124:19
**relatable**
71:22
**related**
26:20 27:15 30:1,14
34:3 37:8,11 38:13
38:20 39:20,25 40:4
40:19,19 55:6 82:18
82:19 122:1 150:18
150:24
**relationship**
19:4 21:15 54:25
62:18 63:2,8 64:8,9

64:21 65:3 66:10
75:19 102:11
104:14 143:16
155:23 166:2
168:11 169:3,20,25
170:21 176:7
**relationships**
18:17
**relative**
178:17
**relatively**
60:19 63:5 170:23
**relays**
125:6
**relevant**
23:8,9,24 98:3
163:23
**reluctance**
130:20
**reluctant**
164:10
**remain**
56:3 64:18,18 107:15
107:16 110:15
**remained**
63:3
**remedial**
48:5
**remediate**
65:25 67:5
**remember**
11:11,12 39:3 46:9
49:24 52:18 62:3
65:17 70:16 87:23
98:10 106:17 113:8
117:7,11 132:15
133:24 138:4,14
139:17 140:16
148:8 151:14,21
152:2 162:14
170:23 173:4
**remembering**
49:11
**remind**
49:22 139:5
**reminder**



89:25
**reminding**
 107:19
**remorse**
 72:1
**removed**
 51:14
**render**
 2:12 118:12
**renew**
 64:8
**reorg**
 160:20
**reorganize**
 156:18
**reorgs**
 160:11
**repair**
 64:8 65:2
**repaired**
 64:10
**repeat**
 154:12 173:9
**repeatedly**
 103:3
**rephrase**
 88:18
**report**
 14:14 26:3 50:14
**reported**
 1:19 16:12,19 17:4
  61:1,3 99:3
**reporter**
 5:8 59:22 178:5
**reporting**
 14:1
**reports**
 170:11
**represent**
 15:9,15 19:6 22:21
  65:9 79:10
**representative**
 10:15 16:15 19:22
  38:6 77:15 141:16
  170:5
**representatives**

10:3 154:16 159:15
**representing**
 11:22
**reques**
 3:13
**request**
 3:24 20:10,14 21:20
  25:9,16,23 31:17
  34:3,4 39:7 75:3
  89:15 112:15
  113:25 114:9,12,13
  117:23 118:18
  119:12 123:20
  124:3,6,17,22
  125:25 126:7
  133:18 134:1,18
  138:16 150:1,8
**requested**
 23:7 26:7 65:10
  120:17 134:2
  178:14
**requesting**
 39:2 95:14 119:20
  120:14 137:19
**requests**
 22:22 112:20 118:15
  149:23,24,24
  151:17,21,23
**require**
 35:19 38:4
**required**
 30:4 35:15 36:2
  37:12,17,18 38:11
  56:1 88:25 127:25
**requirement**
 140:6
**requirements**
 140:10
**requires**
 15:17 40:4
**rescind**
 129:7
**rescinded**
 127:11,19 136:25
  137:24 138:11
  141:8 166:23,25

174:20
**rescinding**
 131:9 132:6,11,22,24
  133:15 134:13
  143:10,18
**rescission**
 3:7 134:17 140:23
  171:20 172:16,20
  172:24
**resentment**
 100:18
**reservations**
 72:6
**reset**
 165:17
**resigned**
 138:22 139:8
**resolve**
 14:21
**resolved**
 66:8
**resource**
 22:3 29:13 54:14,22
**resources**
 30:20 32:1 54:16
**respect**
 5:5 10:14 12:15
  20:22 28:10 49:4
  60:6 64:1 71:20,21
  74:12 76:15 96:19
  99:15 111:18
  113:11,18 156:6
  172:9 173:22
**respecting**
 75:19
**respective**
 55:25
**respond**
 72:2
**responded**
 79:18
**response**
 5:11 15:17 91:14
  137:14 150:17,22
  151:23
**responses**

46:8 152:9
**responsibilities**
 26:19 27:21 28:7,11
  157:15 158:1
**responsibility**
 20:21 63:10,13
**responsible**
 7:17 8:7 11:25 12:13
  16:14 17:4 18:3,7
  18:16 19:21 20:7
  21:24 39:10 98:24
  99:8 144:22 170:5
**restate**
 45:14 48:7 146:7
**restrictions**
 50:4
**restroom**
 142:13
**result**
 36:5 49:3,8 112:5
**resulted**
 166:3
**results**
 158:7
**resume**
 89:22
**resuming**
 26:5,15
**retaliation**
 30:2,15 39:21 40:1,5
**retrospect**
 167:13
**return**
 29:14 122:18 156:24
**review**
 24:7 29:25 30:4,21
  31:1 38:2,17 40:15
  41:6 47:5,25 59:5
  62:11 66:5 75:8
  83:24 84:7,9 99:17
  134:6 142:7 161:13
  162:2
**reviewed**
 11:8,16,20 15:7
  29:21 30:16,17 36:8
  38:8 43:18,21 48:21



49:14 57:9 95:12
114:10 116:11
135:3 147:5,12,13
161:9
**reviewing**
78:1 116:13 157:22
**revised**
86:7 136:24 137:12
**ride**
110:4
**RIF**
160:25 161:1
**right**
8:23 21:13 25:7
34:16 42:2 43:8
48:10 51:11 53:4
61:16 65:12 66:10
68:23 69:4,7 70:11
70:25 71:10,13 72:3
72:11,15 74:1,17,23
75:18 76:9 77:13,20
80:13,14 81:12,15
82:1 83:10,17,23
84:22 86:20 88:5,6
89:11 93:5 94:16
95:11 101:14
103:24 104:11,22
106:6,22 107:13,20
107:24 110:9,12
111:22 115:19,20
115:21 117:6 124:9
125:18 130:12
134:22 142:21
144:2 146:1 150:2,3
153:5 154:1,3,17
157:7 168:6,16
169:10 170:4
171:13 174:19
176:4
**risk**
91:5,5
**Robin**
143:3 144:20,21
145:1,7 146:8
**Rocky**
69:3

**role**
7:21 8:5 14:1 20:20
21:16 54:13 61:18
64:5 77:23 78:8
99:15 104:2 118:1
138:24 157:22
175:3
**roles**
13:1 19:15 44:7,20
**roll**
75:20
**rolled**
98:21
**room**
135:5,14
**ROPC**
55:21 56:8 60:1,5,10
92:11 95:19 130:10
130:14,23
**roughly**
11:3 91:23
**route**
74:12
**Rule**
9:15 158:24
**rules**
5:6 21:2
**rumors**
102:5
**run**
110:4
**rushing**
164:17
**Ruth**
1:20 178:4,23
**RVUs**
67:21

--- S ---
**Sabey**
2:11 4:5,5 5:20 8:22
17:12 21:4 26:1,17
32:12,16 36:14
40:24 41:21,24 42:4
52:2 55:3 73:1,21
73:23 80:1 82:23

90:16 115:5 116:2
116:22,25 117:3
122:7,13 123:22
126:19 132:8,25
134:10 147:9 152:5
155:8,16 156:21
158:23 159:5,10
160:24 161:16,23
162:10 173:8,21,25
174:4 176:18,23
**safe**
120:12
**safely**
26:5,15,22 27:13,18
28:6,8,12 116:21
117:14,18,22 118:4
118:9,25 120:16,24
121:10
**safety**
21:24
**sake**
98:2
**sale**
174:20
**Sam**
12:21 13:14,17 16:4
16:12,15 18:7 19:21
61:12 73:14 79:19
80:19 137:7 141:15
160:12 168:25
**Sam's**
87:14
**satisfies**
115:25
**saw**
44:18 47:4 67:7,21
131:22 175:21
**saying**
60:6 64:10 80:25
86:18 87:14 88:1
92:4 101:10 105:6
108:5,6 110:16,18
122:4 125:7,14
151:18 166:6
174:22
**says**

9:14 10:1 15:3 16:1
23:7,23 25:6 27:2
27:20 31:11 32:23
33:7 34:14,18 35:3
57:12,23,24 58:2,2
72:17 73:13 77:2
79:15 80:20,22
85:13 90:25 91:3,3
91:14 94:25 100:6
100:12 101:22
107:5 109:2 118:8
135:2 137:10
139:21 146:2
147:18,21 148:14
148:22 150:11
157:13
**scheduled**
113:24
**Scott**
18:8 19:18,19 97:20
99:5
**Scratch**
32:3
**screen**
4:7
**scroll**
112:11 134:21
**seal**
178:20
**second**
9:14,19 20:13 22:18
27:19 28:16 30:14
41:10 46:16 56:17
78:23 83:16,18
85:19 110:8 136:6
136:15 141:20
142:4 147:2 157:10
163:7,17 164:20
171:16
**see**
9:13,16,21 10:7 15:3
15:23 16:6 22:19
25:4,12 27:24 29:18
31:7,10 32:1,22,25
33:12,25 34:2,6,17
34:19 35:2,7,14,21



36:9 40:11 43:15
57:17 58:6,9,11
59:9 76:10,13 77:5
77:18,19 79:9,15,16
79:21 80:22,23
81:10 83:20,23
84:18,21 85:13
86:10 91:1,17 94:10
95:21 96:2,23 97:10
106:12 107:2,7
109:4 112:12 113:2
119:4 121:18 122:2
125:4,12 126:25
132:9 134:4,24
135:8 137:4,10,15
137:20 140:11
143:3,4,7 147:18,20
147:23 148:7,14,17
148:19,20,22,25
150:8,15,25 157:8
157:13,18 159:25
161:3 165:22 171:9
**seeing**
41:8 46:9 70:1 93:13
93:19,22 96:14
104:13 164:8
**seek**
38:4
**seeking**
31:24 94:2
**seen**
9:18 41:2,11 42:7
44:19 59:16 90:8
94:17 105:22 106:9
112:9 116:10
123:12 127:6 147:4
147:6 149:19
**sees**
54:25
**select**
13:10
**selective**
111:2 174:11
**selectively**
109:12 133:4 163:25
**semi-independently**

66:3
**send**
80:4 83:21 131:22
146:19
**sending**
8:24 87:4 100:13
140:2 144:23
145:23
**senior**
98:20 131:19 155:21
**sense**
5:13,25 7:8 10:20
15:19 43:25 51:25
84:5 100:1 125:22
129:17 145:22
150:4
**sensitive**
53:25 98:22 101:19
131:23
**sensitivity**
53:21 54:4
**sent**
9:23 74:3 79:20 80:3
80:6 81:24 86:14
87:16 88:20 90:24
97:22 98:17 110:8
113:22 129:10
136:5 140:23 146:5
157:2 162:2,2
163:18
**sentence**
27:2,19 33:7 35:3,14
100:6
**sentences**
135:11
**sentiment**
26:24 164:3
**separate**
66:7 77:3 80:9 81:4,4
81:9,20 82:19 95:10
107:5,13,16,19
108:7 133:2
**separately**
62:4 64:13 124:15
**September**
153:16,17

**series**
37:10
**serious**
71:15 99:12
**seriously**
50:12,13
**seriousness**
42:13 94:9
**serve**
14:11 54:22
**served**
19:6 138:25
**service**
18:25 27:22,22 61:4
98:25 108:16
160:16 170:2,4
**services**
1:10,20 28:13 45:3,6
45:7 49:5 55:21
56:3 57:8,14,15
101:6
**serving**
158:3
**set**
15:5 28:18,21,21
109:1 113:9 129:12
178:19
**sets**
21:3 113:2 124:5
**settlement**
79:2 85:25,25 87:7
87:15,16,21,25 88:2
127:25 129:2 136:4
164:2,16 174:14
**Setty**
119:8 121:6
**Setty's**
121:2,4 122:11
**seven**
145:20,21 146:2
**severance**
160:12
**severe**
121:24
**severely**
111:15 112:1 125:9

**shades**
167:7
**shaking**
5:16
**share**
9:9 22:13 37:5 54:3
59:12 73:7 76:6
97:3 101:2 106:4
123:4,7,9 124:12
127:3 149:16
**shared**
14:25 38:23 91:4
121:7 123:15
164:14
**Shauna**
50:13 53:3 97:19,20
98:24
**sheet**
13:12 75:1
**sheets,if**
177:5
**shift**
145:6,7
**shooter**
169:15
**shooting**
102:12
**short**
63:6 142:18 171:14
171:15
**shorter**
47:15
**shorthand**
91:13 178:4,8
**shot**
156:1
**show**
14:24 30:6 35:18
56:19 57:1 79:6
85:10 87:18 90:5
94:14 112:8 114:6
116:7 121:15 147:2
**showed**
76:12 151:17
**showing**
28:20 146:23



**shown**
 151:6,13 152:10
**shows**
 131:14
**side**
 15:17 62:6,7 107:22
   108:10 120:14,18
   148:10
**sign**
 13:23 19:17 58:24
   73:14 76:22 78:13
   78:25 80:14 82:3,14
   83:3 84:13 87:25
   88:22 127:15
   136:24 137:23
   138:10,21 164:5,17
   164:19,20 178:14
**signatory**
 84:22
**signature**
 103:5 177:10
**signatures**
 144:23
**signed**
 13:22 20:2 57:20
   58:10,15,18 59:16
   78:21 82:14 83:11
   85:2,5,8 86:18,22
   87:10 88:17 103:16
   135:6,15 140:24
   141:11 164:7
**significant**
 35:19 39:24 45:8
   72:24 171:4,6
**significantly**
 176:12
**signify**
 85:24 86:8
**signifying**
 44:17
**signing**
 14:21 84:8 85:1
   99:19 128:3 173:2
   173:13,17 175:6
**silence**
 103:22

**similar**
 26:13,24 46:4 62:22
   173:7
**simply**
 83:6 98:6
**single**
 141:17
**sit**
 159:14
**sitting**
 158:17
**situate**
 106:14
**situation**
 52:24 65:25 67:6
   81:12 104:21
   154:23 167:2,5,6,9
   167:20 168:6,9
   173:23
**six**
 75:4 104:2 145:20
**skeleton**
 83:22
**slightly**
 8:12 89:17
**slow**
 5:22 125:25
**small**
 23:17
**solely**
 92:19 100:11
**somebody**
 20:14 118:11 133:6
   164:9 168:7 174:24
   176:4
**someone's**
 94:6
**somewhat**
 96:16
**sooner**
 131:3
**sorry**
 24:3,4 31:8 32:3
   33:18 44:3 45:12
   46:15 56:18,18,20
   58:9 59:21 60:6,8

 78:19 88:18 98:8,9
 106:7 112:17 123:9
 134:15 137:6
 139:23 140:1 141:1
 141:22 142:8,9
 145:6 149:16 157:3
 163:8
**sort**
 6:2 11:15 42:4 50:16
   51:14 57:8 67:13
   72:15 74:11 85:16
   86:10 87:24 91:9
   93:3,6 99:7 100:25
   102:18 105:11
   107:18 119:20,22
   128:14 130:13
   133:12 142:3
   159:18 163:25
   165:5 175:5,23
**sorts**
 66:6
**sound**
 65:12 89:14 146:3
**sounds**
 6:9 9:4 19:11 43:9
   65:13 171:13
**source**
 69:10
**sources**
 91:19
**south**
 62:19
**southern**
 170:5
**space**
 69:5 125:15
**spanned**
 153:10
**speak**
 32:13,15 101:13
   102:12 119:24
   120:7 135:5 137:19
   139:7 156:15
**speaking**
 10:13 51:24 122:16
   152:6

**speaks**
 110:25
**special**
 36:20 132:15,19
   133:6
**specialist**
 144:21
**specialists**
 68:3
**specialty**
 12:12 23:17 68:24
**specific**
 25:20 29:10 41:10
   47:4,16 73:24 78:5
   82:13 109:18
   110:11 117:5
   120:17 132:4
   141:23 144:16
   169:19
**specifically**
 12:17 54:13 78:2
   93:15 100:23 111:1
   142:10 162:4
   173:23
**specifics**
 29:3,4 49:15,21
   55:10 155:11
**specifies**
 86:1
**speculate**
 126:23
**speculating**
 156:23
**speculation**
 102:5 164:13
**spend**
 4:21
**spiral**
 62:15
**Spirit**
 8:8,16 152:25 153:8
   153:14,20,23,25
   154:2,5,9,13,17,18
   154:20,25 155:2,4,5
   155:13 157:23,25
   158:3,12,15,16


MAGNA
LEGAL SERVICES

159:1,2,11,14
**Spirit's**
157:13 158:7
**spirits**
56:22
**splitting**
66:14
**spoke**
61:17 141:12
**spoken**
141:15
**sponsor**
55:5 154:3
**sporadically**
109:12
**spot**
129:22
**spring**
7:8
**Springing**
102:6
**Springs**
68:11 104:5 170:8
**spun**
8:13
**St**
7:3 63:23 65:16,19
66:2,14 67:6 68:25
68:25
**staff**
13:9 14:4,4,9 17:3
20:9,15,17 21:9,16
21:21 22:8,23 23:3
23:11,24 24:11,13
24:23 25:15,25 27:8
27:21 28:6,10,23
29:12 39:2,17 45:3
47:14 48:14 49:19
56:3,9 71:1,2,20
72:8 95:9,11,15
102:6,15,18 104:6,8
104:8 107:12
108:14 112:16,20
113:11,15,17
117:24 118:22
139:1,5 170:12

171:2
**staffing**
157:16
**stage**
41:16,19
**stand**
163:13
**standard**
40:16,17 85:7
**standards**
76:3
**standing**
56:3 58:24 71:12
75:19 92:23 128:8
**standpoint**
14:15 64:14 75:14
78:9 81:17 99:22
107:16 129:6
130:12 131:20
**stands**
52:14 145:14 169:19
**Stark**
40:19 41:16 42:11
128:25
**start**
4:14 11:23 12:7 23:2
60:9 62:18 66:12
74:23 76:11 83:24
84:7 90:23 92:16
137:13
**started**
75:6 86:18 89:19
103:20 104:19
105:19 110:12
165:15
**starting**
8:20 60:23 103:13
129:21 130:7
**starts**
107:3
**state**
90:20 93:3 95:16
117:16 126:2
164:10 177:15
178:2,5,11
**stated**

83:2 115:1 129:13
136:12
**statement**
32:21 101:15 110:14
110:16,18 135:10
**states**
1:1 118:3
**stating**
4:15 26:4 36:1 92:14
119:22 125:19
**statments**
110:21
**statute**
40:19 41:17 42:12,22
128:25
**statutes**
42:16
**stay**
64:1 103:12 104:10
**step**
31:8 33:24 34:2
**steps**
31:16,21
**stick**
100:8 101:10
**stoicism**
105:15
**stopped**
62:10
**story**
72:10 104:17
**straight**
102:12 104:19
169:14 170:10
**strain**
63:1 128:8
**strange**
88:3 119:19
**straw**
128:5
**Street**
2:5,13
**stress**
52:25 90:20 91:4,9
92:21,24 93:14,20
126:10,16

**stressed**
93:2 94:3 111:16
112:1 125:9
**strikes**
17:8
**strives**
35:9
**strongly**
16:25
**structure**
19:1 75:11 156:19
**struggle**
105:23
**struggling**
61:25
**study**
159:17
**stuff**
43:22
**subject**
45:21 47:9 71:18
96:23 97:10,18 98:3
**Subscribed**
177:14
**subsequent**
91:7 100:14
**substance**
6:15 82:17
**substances**
6:19,22
**substantiates**
94:2
**sucking**
105:17
**sufficient**
10:4 66:16,17 73:3
121:4
**suggested**
125:20
**Suite**
2:5,13
**sum**
18:12 37:19
**summarize**
31:15
**summarizing**



MAGNA
LEGAL SERVICES

29:1

**summary**
67:18

**supplemental**
3:16 15:4 148:19
150:22

**support**
54:15 56:9 144:24
151:8

**supporting**
148:22 149:3

**Suppose**
56:12

**supposed**
75:13

**sure**
5:18 17:13 29:24
36:15 38:25 43:19
47:20 67:24 81:25
89:12 91:6,11 92:15
98:4 119:3 120:15
124:4 134:6 159:3
160:21 163:5

**surgeon**
69:8

**surgeons**
69:9

**surprised**
135:19,22

**surprising**
159:19

**surreptitious**
173:1

**surrounded**
90:21

**surrounding**
43:22 60:4 94:20
100:2

**surveying**
61:15

**suspicion**
165:3,4

**suspicions**
164:11

**suspicious**
96:16 100:16 101:11

173:18,20 174:8

**sworn**
4:10 177:14 178:6

**sympathetic**
71:22

**symptoms**
50:21 51:17

**syndrome**
50:16 115:8,11

**system**
69:3 152:20 160:16

**systems**
69:14

_____

**T**

**table**
106:25

**Tacha**
16:5,11,12 18:22
38:8 84:23 140:25
141:11,12 162:13
168:12,22

**Taja**
13:22 38:12

**take**
6:3 9:3 10:2 11:3
30:10,11 36:22
37:23 38:15 41:3
43:7 48:5 50:2,11
50:13 68:18 75:4,15
89:11,16 91:4,16
94:6,22,23,25 95:4
95:18 96:7 111:8,11
121:2,4 125:9 131:6
142:13,16,16,25
156:1 162:21 163:2
165:8,14 171:11

**taken**
1:16 49:8 68:22
89:21 142:18 151:7
171:14 178:8,10

**takes**
111:23 129:24

**talk**
20:14 29:12 51:3
102:7 116:23 125:7

125:10,17,20 126:4
126:6 135:14
155:21 163:9
169:23 170:18
171:23,25 174:12
174:13,17

**talked**
70:14 97:19,20
132:12 133:20
136:20 148:8
162:11,12

**talking**
6:20 20:11 49:12
64:24 87:23 91:9
99:25 101:20
124:23 126:16,17
126:20 165:10

**target**
96:15

**targeted**
54:9

**team**
13:4,19 32:19 47:11
49:19 61:4 62:19,21
72:5 75:6,24 81:22
88:25 98:25 99:11
103:23 108:16
131:18 164:4 170:3

**teams**
167:8

**Technically**
18:23

**teleconference**
178:13

**tell**
6:12,16 7:14 44:7
88:16,22 97:21,25
98:7 104:25 136:19
137:23 139:4
152:11,13 159:16
163:6

**telling**
79:24 93:15 96:14
111:15 112:1
174:21

**template**

75:13

**ten**
43:8 89:13 126:22
142:16 175:21

**tenancy**
77:20

**tend**
109:23

**tended**
13:16

**tendency**
71:2

**tensions**
66:8 165:12

**term**
13:11 32:5 37:6 51:4
52:18,22,23 73:24
75:1 80:7 83:16
93:5 116:4 126:7
159:1 160:22
175:21

**terminology**
115:9,12

**terms**
45:21 48:9 58:3 82:8
82:16,17,18 83:20
83:23 84:10 87:24
121:25 126:5

**testified**
4:10 158:2

**testify**
10:5,10,23 120:2
163:3 166:10

**testifying**
90:1

**testimony**
158:9 159:13 162:24
165:2 177:7

**text**
3:14 79:9,10,14 80:5
81:6,24 136:23
137:18 141:17
142:1 161:9,14,21
162:3,18

**texts**
89:4


MAGNA
LEGAL SERVICES

**Thank**
 17:17 37:3 98:15
   116:14 142:22
   157:4 176:19,21
**Thanks**
 17:13
**theories**
 101:16 102:2
**theory**
 173:12
**Theresa**
 104:4
**thing**
 87:7 88:4,9 97:25
   99:21 139:5 159:18
**things**
 6:18,20 10:19 11:13
   19:21 21:18 43:19
   46:1 51:18 52:25
   55:9 61:16 64:11
   66:6 71:9,23 72:1
   84:15 102:14
   107:22 126:13
   128:18 131:24
   133:4 156:14
   163:25 164:1
   166:18 168:6
   170:15 172:21
   174:12,13 175:14
   175:24
**think**
 5:2 11:15 14:11 15:8
   17:10 19:3,5 22:11
   23:3 25:21 29:10
   46:16 48:3 49:11,11
   53:13,21,25 54:7
   63:17 65:15 70:10
   77:7,23 78:6,18
   81:16 83:11 84:14
   85:4 87:19 91:8
   93:1 94:10 97:16,19
   97:24 98:3 101:23
   102:13,17 103:17
   103:19 105:10,22
   105:25 106:1 108:6
   110:2,24 111:19

 112:3 114:25
   115:23 119:12
   120:13,19,22
   121:24 126:22,22
   129:4 131:2,14,17
   132:11,18 136:13
   136:18 142:20
   146:21 147:13
   149:20 153:11
   159:13,16,19
   163:23 164:11,13
   164:25,25 166:11
   167:4,20 168:10
   171:8,24 175:15
   176:2,16
**thinking**
 19:18 68:14 110:23
   164:15 170:13
**thinks**
 10:18 101:22,24
**third**
 15:4 50:23 66:16
   129:22
**Thompson**
 51:22 54:13,17,24
   140:15,18
**Thompson's**
 52:1
**thought**
 48:4 66:6 88:3 110:5
   130:19 164:19
**threatened**
 72:8,9
**three**
 38:19 58:25 76:1,5
   93:8 144:10 165:23
   174:24
**three-month**
 94:22,23
**tie**
 78:9
**tied**
 69:2 129:2
**time**
 5:1,2 6:3,19 7:6,10
   7:25 8:16 11:24

 12:10,22 13:23
   17:18 18:2 19:8,8
   20:4,6,18 23:21
   28:23 37:23 43:1
   47:4 49:17 53:9,10
   58:22,22 59:6 61:1
   62:5,18 63:5,6 66:7
   66:13,14 67:15
   70:24,25 71:5,17
   72:12 74:3,7 75:7,9
   76:2 77:20 78:24
   81:23 83:8,11,13,21
   84:13 88:19 91:8
   93:17,22 95:23 96:6
   96:9,12 98:22
   100:12,19 101:4,8
   103:1,10,12 106:14
   106:25 109:8,23
   110:6 112:6,17
   114:18 122:22
   123:5,10 124:13,23
   125:18 126:1,24
   128:19,20 131:13
   133:3 136:2 138:10
   145:11,13,19,21
   146:1,12,14 158:4
   158:12 160:10,10
   160:10,13 162:1
   163:18 165:21
   166:22,24 167:6
   168:11 170:1,21,24
   171:7 174:15,17,19
   175:19,25 176:12
   176:15,20 177:7
**times**
 29:9 36:8 38:2,7
   61:18 62:3 68:14
   77:19 82:7 83:1
   92:17 136:5,6
   171:18 172:6
**timing**
 92:10,10 131:15
   143:19
**title**
 31:5,11 53:8
**today**

 4:19 5:6,20 6:16 7:1
   7:6 8:4,21 17:18
   18:20 19:8 51:24
   53:24 56:22 89:25
   98:12 114:11 120:3
   152:14 157:3 158:2
   158:9,16 159:7
   161:9 162:23
   163:16 166:10,20
   171:18
**today's**
 24:8 41:5
**told**
 80:11 87:10 105:2
   109:17
**top**
 9:13 15:3 31:10
   40:24 49:24 55:10
   79:14 85:13,22
   121:18 159:4
**topic**
 11:2,3,6,15,15,23
   12:3 29:18,20 40:11
   40:14 43:15,17
   50:14 51:6 54:1
   55:17 94:5 120:2,4
   120:5 157:11,11,20
   158:14 159:24,24
   160:1 161:3
**topics**
 10:5,23 11:16 157:8
   169:18
**total**
 121:25
**totally**
 91:6 122:1 151:12
**touch**
 14:19 165:2
**touched**
 79:19
**tough**
 112:6
**tracker**
 86:11,14
**tracking**
 87:18



**training**
28:25 29:10 37:7,8
  37:13,16,19,20 40:3
  40:17 41:19 42:25
  43:2 53:22 105:16
  166:15
**trainings**
29:5,22 37:17 38:13
  38:20 55:11,13,14
**transcribed**
178:9
**transcript**
177:4 178:15
**transformed**
63:18
**transition**
92:12 99:23
**treat**
71:2 120:12,24 122:6
  129:17
**treating**
68:2 71:19,20 104:8
**treatment**
175:4
**triad**
50:17,22 51:16,18
  115:18
**trial**
150:14
**triangle**
50:24
**trigger**
26:22
**trip**
76:16 110:2
**true**
4:23 34:13 39:11
  41:16 53:20 97:16
  152:20 177:6 178:9
**trust**
165:14
**truth**
6:12,16 168:2
**truthfully**
115:1
**try**

5:3 61:21 67:5 69:19
  74:24 75:17,20 98:9
  133:14 140:1
  146:11 175:9
**trying**
19:2 62:7 76:16
  77:24 81:16 99:21
  101:12 104:11
  147:7 173:10
**turn**
55:16 147:15 157:5
**two**
9:24 13:5,6 21:18
  33:11 34:2,4,7 48:8
  58:25 62:18,23 64:4
  65:23 67:8 68:22
  75:18 87:2,3 98:20
  99:10,22 101:9
  102:25 107:15,19
  108:7 133:2,22
  136:6 139:12
  143:25 144:16
  152:22 154:8 157:8
  165:25 169:5
**type**
49:17 133:23
**types**
14:5,16 34:2,8,9,9
  46:21 133:22
**typical**
23:1 74:16
**typically**
14:10 20:2 31:3
  75:15 85:7

————— **U** —————

**Uh-huh**
147:19
**UK**
145:20
**ultimately**
16:14 17:4 19:16,20
  66:18 72:23 83:15
  99:1,4 113:2 154:14
**unable**
121:24

**unclear**
84:25
**uncomfortable**
83:1
**undergo**
27:9 119:10
**undergoing**
119:13
**Undersigned**
177:15
**understand**
4:22 7:1 10:9 24:15
  31:24 42:11,24
  47:25 51:16,17
  55:20 57:6 63:20
  68:1 71:7 72:18
  78:8 86:11 90:1
  95:6,17,23,25
  102:17 118:21
  119:5 152:20 156:9
**understanding**
6:11 24:1 32:10
  35:23 46:23 47:7
  49:20 50:8 51:1,13
  52:7,9,11 61:24
  67:9 83:11 94:19
  95:14 108:7 115:17
  121:6 127:8 145:5
  156:2,5 160:7
  166:12,18 167:25
  169:12
**understands**
34:11 57:7
**understood**
11:9 15:20 69:24
  70:14 78:23 96:4
**undertook**
165:21
**undue**
35:19,23 36:6 37:1
  166:19
**unemployed**
20:24
**unfair**
78:12
**unfortunately**

100:7
**UNITED**
1:1
**unreasonable**
76:2
**unusual**
164:5
**unwillingness**
126:4 128:2
**unwritten**
67:13
**update**
106:7
**use**
18:19 19:8 47:18
  70:4 80:7 139:3
  173:16
**usually**
54:19
**Utah**
8:17,19
**utilize**
70:7
**utilized**
54:14 70:6

————— **V** —————

**v**
1:8
**vacation**
93:1,9 109:25 110:9
  110:12 119:23
**vague**
126:7 129:19
**valid**
114:9,12,13 136:15
**validity**
99:19 100:22
**value**
169:10
**valued**
17:1
**various**
144:1
**vast**
7:5 69:1



verbally
 142:11
version
 9:18,21 38:9 57:20
versus
 45:10,16 46:17 76:18
   176:9
vice
 12:20
video
 178:12
view
 22:3,21 33:2 39:25
   83:5 87:11 93:25
   115:24 125:24
   134:12,17,19 174:6
viewed
 64:1 65:22 87:17
   136:5,6
viewpoint
 94:11 165:22
views
 55:25 166:22
violate
 42:16
violation
 42:21 48:9
visited
 76:21 78:24
voice
 142:1
voicemail
 141:18
volume
 65:18,21 67:8,9
voluntarily
 160:14
VP
 19:22
vulnerable
 106:1

_____
          W
_____
wait
 38:5
walk

68:5
want
 9:25 11:2,3 14:24
   15:25 17:15 22:17
   28:21 29:14 31:4
   33:23 34:15 43:12
   53:15 55:17 56:19
   57:1 59:12 76:14
   80:16,17 86:19 88:2
   89:11,14,16 90:5
   91:10 94:14 96:22
   102:18 109:25
   116:7,25 139:22
   153:13 159:23
   163:9,13 171:25
   174:13
wanted
 87:25 100:4 160:17
wanting
 63:25 171:23
wasmeant
 164:7
wasn't
 58:18 83:10 84:12
   86:2 91:6 96:13
   102:10 123:14
   126:15 130:17
   143:19 164:1
   172:20,22 174:1
way
 5:9 9:2 15:25 18:8,12
   47:15 48:25 52:6
   54:18 55:12 61:22
   63:2 64:20,25 66:12
   71:23 75:20 80:2
   82:2 89:17 97:18
   100:17 101:12
   104:7,12 105:2,12
   110:17,22 111:8,8
   111:14,20 130:4,6
   131:7 134:19
   136:12 140:20
   141:6 157:3 165:18
   166:3 167:7 171:6
ways
 48:3 70:22 153:20

158:14 167:18
   173:7 176:7
we're
 143:17
week
 84:8 102:25 109:9
   110:11,13,13 136:7
weekly
 168:17
weeks
 75:4 87:2,3 88:14
   93:8 102:25 127:24
   165:24
weigh
 94:11
weighted
 131:21,24
Weller
 12:21 13:2 16:5,10
   16:12,15 18:7,21
   19:22 38:16 61:7,12
   65:10 80:20,25
   137:7 140:23,24
   141:4,15 160:8,12
   160:18 162:13
   168:25 169:2,3,16
   169:20,23
Weller's
 137:3,10 169:8
wellness
 50:15 51:23 54:8,9
   107:22 108:3,10,13
wellness/medstaff
 107:6
went
 11:7,7,15 80:13
   101:3 119:24
   126:25 160:11
   176:1
weren't
 81:25 92:14 168:17
western
 7:25 8:11,18
whatsoever
 112:4 175:14
wheelchair

36:19 132:15 133:7
WHEREOF
 178:19
whim
 36:23
wife
 4:24
willing
 62:4,13 64:12 67:4,6
   72:18,19 83:3 102:2
   105:25 130:16
   163:24 164:1 166:5
   174:17 175:4
willingness
 105:11,23
winter
 65:7
withdraw
 16:3
withdrawing
 132:3
witness
 52:4 177:16 178:6,13
   178:19
wonder
 104:20
wondering
 145:22
wonky
 85:5
word
 6:25 85:22 94:6
   165:8,14 172:11
   173:10,16
words
 53:15 86:19 126:22
   127:12 139:22
   171:24
work
 13:19 19:23 21:12
   35:4 59:3 64:6 71:3
   71:4,13,25 82:5
   92:20 101:12 105:1
   110:3 121:25 122:1
   145:1 165:23
   167:23 168:6,14



170:14,15 171:5,7,9 172:5,7,9 174:2,4,6 174:8 175:13

**work-issued**
161:6

**workaholism**
105:15

**workday**
164:8

**worked**
12:18 67:10,17,20 167:18,19

**working**
13:18 36:20 69:12 80:7 81:7,19 83:8 83:13 87:6 143:25

**workload**
122:1

**works**
145:6,7 170:11

**world**
68:10 130:12 143:20

**worry**
66:9

**worse**
88:9 110:2 175:25 176:1,10

**wouldn't**
13:5 16:22 20:19 21:5 22:4 43:3,4 47:5 61:11 65:3,8 70:8 78:8 83:18 86:6 92:19 94:5,7 108:24 115:9 123:23 125:24 130:10 138:23 145:3 156:15 172:10

**write**
88:3

**written**
15:16,17,18 148:10 149:23,23,24

**wrong**
110:17

**wrote**

97:6

**X**

**Y**

**yeah**
4:18,24 5:14 7:16 18:15 19:2,11,16 20:16 21:12,23 22:11 23:15 26:10 31:12 32:18 36:16 41:10 42:4,13 43:9 44:10,15 46:4 47:22 48:16 49:1 50:9 54:11 56:1,14,14,21 56:24 58:22 62:1 68:21 71:9 76:5,18 76:18 77:9,12 78:16 79:1,22 80:2 81:3 82:2 85:22 91:6 92:1,9 93:21 95:8 95:16 97:24 98:14 98:17 100:10 104:1 107:8 108:24 112:13 114:2 116:11 117:16 119:6,19 120:13 121:1,20 123:23 124:14 127:14 138:18 139:14 142:12,24 151:16 152:3,6 153:12,22 156:22 158:5,13 160:5,5,9,25 163:22 171:8,8 172:9 173:10 176:2

**year**
38:5 58:19,25 59:7 63:7 67:16 88:11 121:18,21

**years**
6:21 44:8 55:9 57:8 62:23 105:18 174:25

**Yep**
43:16 81:11

**Z**

**Zoom**
1:16 5:7 178:12

**0**

**1**

**1**
31:8 55:17 59:21 84:1 137:13 148:2 153:12

**1:00**
145:12

**1:23-cv-01921-NY...**
1:3

**10**
77:19 89:16 134:24 157:11,11 159:24 160:1,2

**10:00**
143:6

**10:12**
145:9,11

**100**
2:5

**106**
3:12

**10s**
157:8

**10th**
146:20

**11**
3:5 94:13,15 96:23 97:14 135:4 137:3,8

**11:50**
89:22

**112**
3:21

**114**
3:13

**116**
3:6

**11th**
103:19 163:19 173:13

**12**

1:13,18 3:6 22:12,14 22:18 77:1 86:23 88:17 116:6,8 122:19 139:24 140:2

**12:30**
135:4

**120**
129:25

**121**
3:4

**127**
3:7

**1299**
2:15

**12th**
73:14 80:19 88:20 122:22

**13**
3:7 127:2,4 134:20 137:6 139:23,23 140:22

**14**
161:3

**147**
3:23

**148**
3:22

**149**
3:24

**15**
3:16 154:5

**17th**
2:13

**18**
57:16,25 147:15

**19**
57:15,20

**1999**
43:25 44:5

**2**

**2**
3:4 15:23 26:19 43:15 113:3 121:14 121:16 147:20



**2:00**
145:12
**2:12**
146:6,9
**20**
8:3,17 62:22 77:19
174:25
**2017**
47:19 49:10 57:15,20
**2019**
57:16,25 58:14
152:23 153:1,8,10
153:19 154:24
156:4,18
**2020**
58:10,15
**2021**
7:7 43:25 44:5 60:12
60:23 65:11 74:13
153:16 175:15,21
176:1
**2021-2022**
65:7
**2022**
7:8 59:21 65:11
86:23 113:3 135:4
136:22 137:4,13,18
146:13 165:6
175:16 176:1
**2023**
153:4,8,10,12,20
154:25 156:4,18
**2024**
1:13,18 178:11,21
**2025**
177:17
**21**
3:8 70:25 97:1,4
**21th**
178:20
**22**
70:25 92:4
**22nd**
90:11
**23rd**
90:11

**25th**
100:13 105:6
**26th**
86:15 88:20
**27**
137:18
**2701**
2:5
**27th**
100:14 103:20
106:12,15,20
108:19 109:2,14
112:12,13 163:19
**28th**
106:12,20 107:2
**2nd**
3:15 138:14 139:12

_____

**3**

**3**
23:2,7,23 130:24
141:1 148:2,12,20
150:6
**3-month**
74:13
**3:00**
176:24
**3:12**
146:10,13,14
**3:48**
77:2
**30**
3:15,17 9:15 26:20
119:11 158:24
178:10
**30(b)(6)**
52:3 174:1,3
**303**
2:15
**35**
89:21
**3rd**
3:16

_____

**4**

**4**

**3:2 15:21 16:2 27:2**
27:19 120:5
**4-12**
136:2,3
**4-12-2022**
135:7
**4-26**
136:3
**4,000**
130:24
**4/22**
3:11
**4/23**
3:11
**4/27**
3:12
**4/28**
3:12
**4:30**
5:2
**40**
3:9 73:6,8 84:16
**42**
3:10 76:4,7,10 80:17
**44**
3:11 90:4,6
**461**
34:23

_____

**5**

**5**
146:13
**5-year**
82:9,9
**5:00**
5:2
**57**
3:12,18 106:3,5
121:18,21 125:4
**59**
3:13,19 114:5,7
**5th**
79:18 139:16 143:6

_____

**6**

**6**

3:15 9:15 11:23 12:3
26:2,8 158:25
**6.23**
24:5
**6.G**
23:2,23
**6:00**
134:25
**624-6221**
1:20
**66**
3:14 79:5,7 80:16
81:7

_____

**7**

**7**
11:3 12:3,4 157:5
**70**
3:15 8:21 9:8,10
29:15 40:9 43:13
55:17 156:25 160:3
161:3
**71**
3:16 14:23 15:1
**72**
3:17 30:5,7,8 31:10
58:9
**73**
3:9,18 56:25 57:2,11
58:9
**74**
3:19 59:11,13,14
**75**
3:20 85:9,11 142:25
**76**
3:10,21 112:7,9
**77**
3:22 146:22,24 147:1
148:5
**78**
3:23 146:25 147:2,4
**79**
3:14,24 149:12,13,14

_____

**8**

**8**



3:15 29:18 134:22
150:9
**8:30**
1:19
**8:51**
146:2
**800**
2:13
**802**
2:15
**80202**
2:14
**80205**
2:5
**85**
3:20
**866**
1:20

**9**

**9**
25:3 40:11 128:22
135:19 136:22
137:4,24 148:14
**9:00**
121:23
**9:55**
43:10
**90**
3:11 129:24
**90-day**
130:11
**90s**
152:15,23
**94**
3:5
**962**
84:18
**97**
3:8
**972**
84:18
**999**
2:13
**9th**
136:24 138:11,22

139:8 141:5,8,19
142:2


MAGNA
LEGAL SERVICES