Page 1

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF COLORADO

Case No. 1:23-CV-01921-NYW-MDB

DR. ANUJ PEDDADA,

        Plaintiff,

vs.

CATHOLIC HEALTH INITIATIVES COLORADO d/b/a CENTURA
HEALTH-PENROSE-ST. FRANCIS HEALTH SERVICES,

        Defendant.

_____

DEPOSITION OF CARYN BALDAUF, M.D.
September 23, 2024

_____

APPEARANCES:

ON BEHALF OF THE PLAINTIFF:
        OMEED AZMOUDEH, ESQ.
        CRIST WHITNEY, ESQ.
        Rahod|Mohamedbhai, LLC
        2701 Lawrence Street, Suite 100
        Denver, Colorado  80205
        Phone: 303-578-4400
        Email: oa@rmlawyers.com
               cw@rmlawyers.com

ON BEHALF OF THE DEFENDANT:
        MARK L. SABEY, ESQ.
        LINDSAY K. McMANUS, ESQ.
        Hall Render Killian Heath & Lyman, P.C.
        999 Seventeenth Street, Suite 800
        Denver, Colorado  80202
        Phone: 303-801-3538
        Email: marksabey@hallrender.com
               lmcmanus@hallrender.com


MAGNA LEGAL SERVICES
866-624-6221
www.MagnaLS.com



Page 2

PURSUANT TO WRITTEN NOTICE and the appropriate Rules of Civil Procedure, the deposition of CARYN BALDAUF, M.D., called for examination by the Plaintiff, was taken at the offices of Rathod|Mohamedbhai, LLC, 2701 Lawrence Street, Suite 100, Denver, Colorado, commencing at 10:04 a.m. on September 23, 2024, before Bonnie Carpenter Johnshoy, CSR, RPR, CRR.

I N D E X
EXAMINATION:                                PAGE
  By Mr. Azmoudeh                              3
EXHIBITS:                                   PAGE
Exhibit 10   6/13/22 email from Anuj Peddada,      84
            M.D. to Caryn Baldauf, M.D.
            Peddada 000395
Exhibit 11   4/25/22 email from Anuj Peddada,      88
            M.D., to Alan Monroe, M.D.
            Peddada 000002
Exhibit 12   5/5/22 letter from Caryn Baldauf,     92
            M.D. to Anuj Peddada, M.D.
            Peddada 000004 and 5
Exhibit 13   5/9/22 letter from Jason Tacha to    114
            Anuj Peddada, M.D.
            Peddada 000006 through 9

Page 3

P R O C E E D I N G S

CARYN BALDAUF, M.D.,

having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. AZMOUDEH:

Q. Could you state your name for the record.

A. Caryn Baldauf.

Q. Is it Dr. Caryn Baldauf?

A. Yes.

Q. Okay. I'm going to call you Dr. Baldauf today. Is that all right?

A. Yes.

Q. Okay. My name is Omeed Azmoudeh. I represent the plaintiff in this matter, whose name is Dr. Anuj Peddada.

Before you and I start chatting for a whole day -- which is sort of abnormal, but we're going to get through it -- there's some ground rules that I want to go over with you, just to make her life easier, our life easier, and to make things go smoothly.

The first thing is that you just took an oath with Bonnie. Do you remember that?

A. Yes.

Q. Okay. What is your understanding of the

Page 4

oath that you just took?

A. That I'm to tell truth to the best of my knowledge that I can --

Q. Okay.

A. -- on the things that I remember.

Q. Yeah. And when I conduct depos, I really try not -- I'm not going to hide the ball from you today. I'm not going to get you with gotcha moments. It's not the goal that you might have seen on TV. I'm going to just put things out there and try to get your honest opinions, your recollection of certain facts. And in return, I ask that you kind of do the same with me.

We're not here to play games or, you know, screw around with questions on semantics and things like that. Is that a fair -- is that a fair ask?

A. Yes.

Q. Okay. Thank you. One thing that you've already started to do very well is wait for each other to finish questions and answers, just to make her life easier. Does that make sense?

A. Yes.

Q. Okay. And another thing that you've already done very well is nodding and shaking your head don't appear well on the record. So yeses and nos all day.

Page 5

A. Yes.

Q. If I ask a question -- sometimes I ask bad questions because I'm a lawyer and my brain is -- has too many words in it. If I ask a bad question and you don't understand it, just tell me. If you don't understand a question and you answer, I'm just going to assume that you understood the question. Okay?

A. Okay.

Q. Your attorney -- I think Lindsay today -- is going to be making objections throughout the day. Probably a lot. And it's -- it's an odd way for us to talk. But ordinarily, absent some pretty unique circumstances, I'm going to ask a question, she's going to lodge an objection, and then you're still going to answer the question. Okay?

A. Uh-huh.

Q. Anything you've talked about with your attorneys, I'm going to do my best to stay away from. They will let me know if I get too close. But anything -- any advice you received from your attorneys is going to be off topic for today. Okay?

A. Okay.

Q. And then we'll take breaks periodically. We're scheduled for a full day. I tend to do one around 10:30, I tend to do one at lunch, and then maybe try to



2 (Pages 2 to 5)

Page 6

power through the afternoon. But if you need one in advance of that, just let me know. Okay?

A. Okay.

Q. Any reasons today -- health condition, medications, substances -- that would cause you not to be able to respond fully and truthfully to my questions?

A. No.

Q. Okay. Anything -- same -- same categories of things. Anything like that that would impair your memory?

A. No.

Q. Other than time, I suppose, might impair your memory?

A. That's true.

Q. Dr. Baldauf, have you ever had your deposition taken before?

A. No.

Q. Okay. You thought about it for a second.

A. Yes. Because I've been in court.

Q. Okay.

A. But --

Q. What were you in court for?

A. Patient-related things.

Q. Okay. Was it a trial?

A. Yes.

Page 7

Q. Was it a public trial?

A. Yes. I was via phone, so -- yes. But I was from my office.

Q. Okay. Was it a patient at Penrose Medical Center?

A. No.

Q. Okay. What hospital was the patient in?

A. It was my clinic. I was a fact witness.

Q. Oh. What was your clinic?

A. Colorado Springs Health Partners. It was a partnership that I was in prior to becoming employed.

Q. Okay. Understood. Did you meet with anyone in preparation for your deposition today?

A. Yes.

Q. Just your attorneys?

A. Yes.

Q. Okay. How many times did you meet with your attorneys?

A. Twice.

Q. And is one of the meetings that you had with your attorneys the one you just had outside this conference room?

A. No.

Q. Okay. So you met with your attorneys twice before today?

Page 8

A. Correct.

Q. Which attorneys were present for each meeting?

A. Just the two here.

Q. Okay. How long was each meeting?

A. The first meeting was scheduled for an hour. Probably 30 -- it only took 30 minutes. And the second one, probably similar. Scheduled for an hour, maybe took 45.

Q. Okay. Did you review any documents as part of either of those meetings?

A. Yes.

Q. Okay. Which documents, if you recall?

A. The credentials manual and a few emails.

Q. Okay. What were your take-aways from those emails?

A. I think -- it helped remember -- it helped spark my memory of the situation, probably.

Q. What were the emails about?

A. Primarily, they were from the time when his leave was granted, so the request for the leave.

Q. Okay.

A. That was in the -- included in it.

Q. Do you remember among who the conversations were in those emails?

Page 9

A. Myself, Dr. Peddada, and Dr. Plauth.

Q. Okay. Putting maybe preparation aside, have you had any casual conversations with anyone about today's deposition?

A. No.

Q. Any reason for that?

A. Any reason for not having conversations? I live by myself with two 8-year-olds.

Q. Okay.

A. They didn't have much comment on it.

Q. Fair enough. I appreciate that. I wanted to start with some of your sort of -- let's call it pre-Centura background --

A. Okay.

Q. -- maybe starting with your undergraduate degree. Can you just walk me through your education history?

A. Sure. So my undergraduate degree was from Johns-Hopkins. I took a year in between undergraduate and medical school to work for -- as an organic chemist for DuPont Merck Pharmaceuticals. Then I went to Duke for medical school. Then University of Michigan for internal medicine residency.

Then I moved out to Denver. Worked in Denver for a period and was working on a masters in public

MAGNA
LEGAL SERVICES

Page 10

health.  Then moved to Colorado Springs and worked for Colorado Springs Health Partners.

Q.   Let me break down the -- what was your undergraduate degree in?

A.   Chemistry.

Q.   Okay.  Did you have a sense that you might want to go to medical school?

A.   Sure.  Sort of.

Q.   Why sort of?

A.   I honestly thought I would do -- work for a pharmaceutical company so -- in a medical capacity, so medical school was not with the intent of being a doctor, taking care of patients.

Q.   And then why did you end up deciding on medical school?

A.   Still, it was more for the M.D. with the intention of doing something different.  It was in medical school that I realized how much I love interacting with patients, so then decided to go more towards the practicing physician side of things.

Q.   And then you said you worked for a little bit after residency.  Were you working, practicing medicine, or something else?

A.   Yes.  Practicing medicine.

Q.   Okay.  And then at the same time you were

Page 11

practicing medicine, you were also getting your master's in public health?

A.   Yes.

Q.   Okay.  What was your reason for getting the master's in public health?

A.   That's a great question.  In hindsight, I'm not really sure.  At the time, it was to do research.

Q.   What kind of research sparked your interest?

A.   Population health type things.  But I was actually interested in transplant research, so outcomes of liver transplants.

Q.   Pretty patient-focused?

A.   Yes.

Q.   Okay.

A.   Entirely.

Q.   In -- in -- yeah.  Go ahead.

A.   Sorry.  I should probably say I just finished an MBA, as well.

Q.   Okay.

A.   And again, I have no idea why anymore.

Q.   Congratulations.

A.   I think it sets up that I'm probably not that smart.

Q.   Smarter than I.  Certainly, more degrees

Page 12

than I.

As part of that master's of public health, the curriculum, did it include anything about sort of the -- the working conditions that doctors face, the statistics on turnover, you know, anything along that line?

A.   No.

Q.   Okay.  I'm just saying in law school, for example, I know there's a big discussion about we're all alcoholics and we all leave the profession in a couple years.  There's not a discussion about that?

A.   The message in public health isn't geared towards physicians or even about physicians.  It's about population health, so it would be talking about, you know, whether or not there's alcoholics in the community or stuff like that.

Q.   What about in medical school?  Is there that kind of discussion?

A.   Not that I recall.

Q.   Okay.  Let me define a term.  When I use the word "Centura" today, do you understand I'm referring to Centura Health-Penrose-St. Francis Health Services?

A.   I do now.

Q.   Okay.  Do you know what that entity is?

A.   That entity -- which?

Page 13

Q.   The Centura Health-Penrose-St. Francis Health Services.

A.   Yes.

Q.   Okay.  What is it to you, if you could just describe it?

A.   From the business perspective?

Q.   Yes.

A.   So it was a joint venture between AdventHealth and CommonSpirit, Penrose being on the CommonSpirit side of that.  So, essentially, a management company, if you will.

Q.   Okay.  My understanding is it was a joint venture between AdventHealth and Colorado Health Initiatives.  Sorry.  Catholic.

A.   Catholic.  Catholic Health Initiatives and Dignity merged to become CommonSpirit.

Q.   Okay.

A.   So it just depends on when you look in the timeline.

Q.   Okay.  We will get into that -- a little bit of corporate history later, which will bore your socks off.  So for now, let's just assume and agree that Centura is the Centura Health-Penrose.  And it's the joint venture; right?

A.   Yes.



Page 14

Q. Okay. And you're aware that -- I think you already sort of just touched on it, but you're aware in August of 2023, Centura, the joint venture, went away?

A. Yes.

Q. Okay. So can you -- stepping back again, can you walk me through your career up until you working for Centura?

A. Starting like in Colorado Springs?

Q. Yeah. Start there.

A. Okay. So in Colorado Springs, I joined a practice that was a multi-specialty private practice. I did, primarily, outpatient with a small amount of inpatient, so I would do five weeks of outpatient internal medicine and then a week of inpatient hospitalist work. So that was starting in roughly 2008, I think.

I did that for a period and then -- I'm trying to think times -- I think probably around 2013, switched over to inpatient only medicine.

Then our practice was sold to DaVita, who then sold to Optum, but that sale was not finalized because, I think, of some trade issues, whatever. Monopoly issues concerns.

Anyway, so -- so, technically, I never worked for Optum is trying I'm to get at. I only worked for DaVita, and then DaVita negotiated with the hospital

Page 15

for us to become employed physicians.

Q. So in about what year did you become employed?

A. That would have been, I think, 2014. No. Wait. That's not right. 2017.

Q. So you were at the practice in Colorado Springs, let's say, between 2008 and 2017, and maybe between 2013 and 2017, there was an owner of that practice and that was DaVita; is that fair?

A. I'm not sure of the timing of the DaVita partnership. I don't think it was -- it might have been that long.

Q. Okay.

A. It seemed longer than it was.

Q. And in 2017, you start as a physician for Centura?

A. Yes.

Q. Okay. What kind of physician were you there?

A. Hospitalist.

Q. Okay. Just generally describe to me what a hospitalist is.

A. We see all the patients admitted to the hospital, essentially. And only in the hospital setting. So I don't have my own patient panel. I only round on

Page 16

patients that are admitted and for, basically, almost all of the patients in the -- that are needing medicine.

Q. Did you have a specialty for what types of patients might come in that you might be drawn towards or assigned to?

A. No. But it's medicine versus -- well, I say pen medicine, but medicine versus surgery or trauma. So the medicine patients would go more towards me. So if you have a pneumonia, you come to me. If you were in a car accident, you go to trauma. If you have a car accident and pneumonia, you probably come to me.

Q. And then if one of your clients suddenly needs surgery -- or your patients suddenly needs surgery, you might call a surgeon --

A. I would call a consultant.

Q. Okay.

THE COURT REPORTER: Can you let him finish the question?

THE DEPONENT: Oh, I'm sorry.

Q. (By Mr. Azmoudeh) It's an unnatural way to speak, I know.

And when you say "consultant," what does that mean?

A. It would be a specialist in, usually, another field.

Page 17

Q. But a -- a doctor, presumably?

A. Yes.

Q. Okay. You held that role, the hospitalist, as an employee for Centura from 2017 until when?

A. Now. Currently.

Q. Okay.

A. With the caveat being, of course, after Centura broke up, that I'm still with CommonSpirit, so one of the parent companies.

Q. Did you sign a new employment agreement at that sort of transition period?

A. No.

Q. So you still have the same employment agreement?

A. Yes.

Q. Okay. Did you ever take on any other roles at Centura while practicing as a hospitalist?

A. Yes.

Q. Okay. What other roles did you take on?

A. Many. So I served as -- initially as the site lead for the hospitalist program, so that would have been over Penrose and St. Francis alone for the hospitalists.

And then I moved into a regional medical director role, so managing the hospitalist programs in

**MAGNA**
LEGAL SERVICES

Page 18

that -- outside-of-Denver hospitalists for Centura. So that's on the employment side.

On the hospital side, I served as a member of the credentials committee. Eventually as the chair of the credentials committee. I served as a member of MEC as a hospitalist representative, and then, eventually, as the president of the medical staff.

Q. Okay. Thanks. Let's -- let's -- maybe we'll focus on the employment -- the employment positions.

A. Sure.

Q. The site lead position, when do you think you took that one on?

A. That would have been -- it was -- right at the start of my employment, and I think that would have been the fall of 2017.

Q. Okay. And then when did you broaden the scope of that similar work to become the regional medical director?

A. It was just months after that, really. Like about -- within four to six months.

Q. Okay. So maybe -- maybe 2018?

A. Yeah. Early. Uh-huh.

Q. And do you still have that role, the regional medical director?

A. No.

Page 19

Q. Okay. What is your current role?

A. I'm a physician informaticist.

Q. What was the second word?

A. Informaticist. Don't make me spell it because I can't spell out loud.

Q. You don't have to spell it, but maybe describe to me what a physician informaticist is.

A. So we're a group of doctors that help design and implement the electronic health record in ways that help physicians do their jobs more usefully and safely.

Q. Okay. At some point, I saw a reference to you being the medical staff president.

A. Yes. So medical staff president and chief of staff, just like the Centura-Penrose thing, are kind of interchangeable.

Q. Okay. Are those interchangeable with regional medical director, as well?

A. No.

Q. Okay. So when did you take on the -- the medical staff president/chief of staff role?

A. January of 2022.

Q. Do you still hold that role?

A. No.

Q. When did you stop?

Page 20

A. December of 2023. It's a two-year term.

Q. What do you find more satisfying: The practice of medicine or some of these leadership roles?

A. Both.

Q. What is satisfying about -- let's focus on maybe this regional medical director and the medical staff chief of staff role. What's satisfying about that work?

A. Well, they're very different, so the -- the medical staff president, the enjoyment from that comes from being the representative of other fellow physicians and knowing -- and having the ability, I should say, to practice that position or hold that position fairly and trying to treat medical staff members fairly.

Q. What do you mean by you're their representative? What does that entail?

A. It's an elected position, so ...

Q. And then, you know, when we elect a president, we expect them to do a variety of things that they ordinarily don't do.

A. Right.

Q. What do the physicians expect of you when they elect you?

A. It's hard to categorize all physicians into one group. But those that would know of the position, it's to represent their interest, either in cooperation --

Page 21

cooperation or sometimes in opposition to the executive team --

Q. And the executive --

A. At the hospital.

Q. -- the executive team during that period January 2022 to December of 2023 --

A. Uh-huh.

Q. -- would have been, I suppose, Centura until August of 2023 and then CommonSpirit after that?

A. Yes.

Q. Is that fair?

MS. McMANUS: Object to foundation.

Q. (By Mr. Azmoudeh) Okay. We'll go through it later. In any event, whoever the executive team is at that time, sometimes, you're working cooperatively with them and sometimes you're working in opposition with them?

A. Yes.

Q. Can you think of -- and I'm going to ask you for some examples about this role. For now, let's -- if I could ask you to put anything aside that you know about Dr. Peddada or his circumstances and just focus or other things. Does that make sense?

A. Sure.

Q. Can you think of some examples in which, during your tenure as medical staff president/chief of

MAGNA
LEGAL SERVICES

Page 22

staff in which you worked on behalf of the physicians in opposition to the executive team?

A. During my second year, there was a lot of concern, particularly by our surgical departments, on the flow of the operating rooms and in particular, there was an administrative mandate that travelers not be used in those -- in any setting, actually, which goes against a surgeon's desire to practice medicine.

Q. Let's break that down a little bit. You used a word I'm unfamiliar with. Did you say travelers?

A. Yes. So as a result of COVID, a lot of temporary -- temporary physicians, so for-hire physicians, nurses, tech, all kinds of things.

Q. So what was the complaint about some of these temporary workers?

A. They cost more. So the -- you know, the hospital didn't want to pay for a traveler -- traveling physicians because they cost more and the physicians want to, you know, operate and make money, and so there's a little bit of conflict there.

Q. And so the physicians in general, their position and the one that you were representing to the executive team was we need to spend a little bit more on temporary staff and the -- and the executive team wasn't willing to do that?

Page 23

A. Yes.

Q. Okay. How did that resolve?

A. It -- there wasn't one single resolution. It was different answers at different times. So, initially, that was the absolute mandate.

I think, eventually, the hospital realized that it's not profitable as a hospital to not have your operating rooms functional, so, eventually, they did allow some travelers.

Q. What facts did you -- do you recall, if you recall, representing to the executive team about the -- the operating rooms aren't operational or functional if you all continue with this mandate?

A. One in particular was that we were still transferring patients in for things like gallbladder surgeries that sometimes would take, you know, four days later. So along those lines.

Q. This is a -- you just struck my memory. My mother just had an experience recently for a gallbladder surgery that took five days.

A. Yes.

Q. Our whole family was frustrated.

A. It's very complicated.

Q. Was that a frequent point of tension, from your perspective as the medical staff president, between

Page 24

the physicians and the executive team about the executive team wanting to cut costs in ways that the physicians didn't believe were appropriate?

A. Yes.

Q. I'm going to just keep diving into this medical staff president role. And I think we can agree when I say "medical staff president," we're also referring to chief of staff all day?

A. Yes.

Q. Okay. If you had to give a job description of the various duties, how would you do that?

A. So the -- the easy regular ones -- not saying easy, but the regular ones are running the medical executive committee meeting, which is of the department heads and the executive team, which is something that's outlined in the bylaws, what some of the components of that meetings are. A lot of it is approving policies, et cetera, and then resolving issues like the one we just talked about.

I also have, then, oversight over multiple of the other hospital committees, so quality, quality of patient safety, credentials, citizenship, peer review, et cetera.

I was -- I lost my train of thought. Sorry.

Page 25

Q. That's okay.

A. Oh, the irregular pieces. So the irregular pieces are if physicians on the medical staff have issues of substance use, things like that, that would come to my attention, as well.

Q. We can categorize those maybe broadly as sort of personnel issues?

A. Yes.

Q. Okay. And then what do you ordinarily and what is your responsibility -- let me rephrase that.

What is your responsibility with respect to personnel issues as they come up?

A. It depends on the specific personnel issue and employment status, to some degree.

Q. Okay. Let's use the alcoholism trouble. Some of the -- physicians having trouble with alcohol. What do you do?

A. So, again, it's a little tricky, depending on the situation, but the main issue would be whether or not they're safe to practice at that time. And then there may or may not be a referral to CPHP, as well, as part of that. So it would be whether or not they can maintain privileges.

Q. And then do you also raise the issue or the potential courses of action with -- during the EC

**MAGNA**
LEGAL SERVICES

Page 26

meetings, the executive committee meetings?

A. During MEC, yes.

Q. What is MEC?

A. So it's medical executive committee.

Q. Fair. Are you allotted some formal time to speak at those meetings in which to sort of raise here are the physicians' demands, you know?

A. I run meetings, so I have all the time I want.

Q. Do you provide performance evaluations in that role to any of the physicians?

A. Not specifically, no.

Q. What do you mean by "not specifically"?

A. Peer review has OPPEs and FPPEs, which are ongoing professional reviews or focused -- focused professional reviews, so I would have oversight of those. I wasn't necessarily doing them at that time.

Q. I imagine as also a doctor at the hospital, you've been on several peer review panels and things like that?

A. Yes.

Q. Okay. What hospitals did this role cover, the medical staff president role?

A. Penrose, Penrose-St. Francis, which, again, is complicated, the relationship, and then, eventually,

Page 27

St. Francis-Interquest as it was opened.

Q. Did you have anybody in that role that you considered to be supervisors of what you were doing?

A. Well, the board would be, technically, advisory. Dr. Plauth would be maybe in an advisory role, but the board would be the final supervisor, I guess.

Q. What's Dr. Plauth's full name?

A. Dr. William Plauth.

Q. And what is Dr. William Plauth's role at Centura?

A. The chief medical officer for Penrose-St. Francis.

Q. And then I suppose the folks that you supervise -- and maybe represent is a better word -- all the physicians?

A. Correct. Both employed and affiliated.

Q. And then do you also supervise and represent other staff?

A. Only a few special circumstances. It's really primarily -- I think first assists for surgeries are in a special category, but otherwise, no.

Q. First assists are not doctors?

A. No.

Q. Okay. What are they?

A. First assists.

Page 28

Q. What was their training?

A. It would be -- you know, I honestly don't know, but they're, essentially, a second set of hands for the surgeon, so they have this kind of quasi status on the medical staff where they have some of the protections, but not all of them.

Q. When I go to the dentist, sometimes a dental tech flosses my teeth. Is that --

A. Similar.

Q. Okay. Again, I'm just going to ask you some examples about this role. As I ask you for examples, hopefully, you can put aside Dr. Peddada for the time being. Is that okay?

A. Yes.

Q. Okay. Thanks. If you don't provide performance evaluations, do you still provide -- is there sort of a mechanism by which you provide informal feedback to physicians, if necessary?

A. Not in that role, no.

Q. Okay. In what role?

A. As the medical director.

Q. And then in the medical director role, do you provide performance evaluations?

A. Yes.

Q. Okay. Is that to other physicians?

Page 29

A. Yes.

Q. And those are outside the peer review process?

A. Yes.

Q. Okay. What are -- actually, let me ask this just to close an open loop here. Are you still in the regional medical director role?

A. No.

Q. Okay. When did that end?

A. Before -- the winter of -- let me think -- winter of 2022.

Q. Is that when you became the physician --

A. Informaticist.

Q. Informaticist?

A. There was a small gap in between the end of that position and the physician informaticist role where I practiced clinically 100 percent.

Q. When you provide performance evaluations in the medical director role, what's the format? What do those look like?

A. That's going to be difficult to answer. I have -- as the medical director, there was a layer of leadership below, which was the site leads of the various hospitals. So most of that would be more informal feedback.

MAGNA
LEGAL SERVICES

Page 30

Q. And you might advise the site leads what you think about the physicians that they're overseeing?

A. Occasionally. If an issue -- if there was -- if there was -- if there was a more significant issue, meaning something that led to, you know, documented conversations, that sort of thing, that, I would be heavily involved in.

Q. And then you used to be a site lead. So when you were a site lead, did you provide performance evaluations?

A. It was a very brief time and we were just trying to keep the ship afloat, quite frankly. So no.

Q. What is -- why were you trying to keep the ship afloat?

A. Our group had just been acquired by the hospital, and so we were probably at 50 percent of the physicians needed to run the group.

So there was a lot of work involved in credentialing and, you know, orienting temporary physicians that were filling in.

Q. Have you seen -- I mean, are you aware of the formal performance reviews that site leads now use?

A. Not now.

Q. Oh, okay. What about have you seen the format of the performance evaluations that site leads have

Page 31

ever used at least while you've been at Centura?

A. I don't think there's been -- to my knowledge, I don't think there's been formal requested reviews --

Q. Okay.

A. -- of like -- of the -- on the employment side.

Q. So on the employment side, what I'm hearing is mostly informal feedback, if -- if anything?

A. Correct.

Q. And then if something becomes very significant, it might go to the peer review process anyways?

A. Peer -- yeah. The peer review is separate, though. That's on hospital -- that's on the hospital side, so that involves all of the medical staff. That's not an employment issue.

Q. Okay. In the medical staff president/chief of staff role, do you have any role in scheduling or moving assignments around or anything like that?

A. No.

Q. Okay. Do you have any role in hiring physicians?

A. No.

Q. Do you have any role in -- in providing

Page 32

feedback to the -- the executive committee or the other executives in the board as to where the areas of need might be?

A. There's no formal role. That is something that is typically raised, so if there's a need for more anesthesiologists or we see that there's number of anesthesiologists that are retiring, that would be something that would come up in MEC.

Q. And I guess we discussed earlier an example in which your -- and when I say "role" -- let me rephrase. When I say "role," I just mean part of your daily activities. I don't necessarily mean a title. Is that understood?

A. No.

Q. Okay. So maybe I'll use a different word. Why don't I just say part of your work.

A. Also unclear.

Q. Also unclear.

A. You'd have to say part of my work as medical staff president because the two are very separate.

Q. Okay. Then I'll do that. So as part of your work as medical staff president, you don't have any role -- well, let me rephrase that.

As part of your work as medical staff president, you don't participate in physician scheduling

Page 33

or assignments?

A. No.

Q. Okay. And then, as part of your work as medical staff president, you will provide some insight as to where areas of need are for hiring new physicians or vacancies; is that fair?

A. To some degree, yes.

Q. Okay.

A. It's fair, but only to some degree do I provide -- it's -- it's -- it's not a -- I have no involvement in the hiring or where they're going to put them or who they're going to hire, so it might just be directing attention, I guess, would be the better way to put it.

Q. And the -- the way you might know where to direct attention is because you're getting feedback from the physicians who are on the ground?

A. Correct.

Q. Okay. As part of your work as the medical staff president, do you do any work when an employee requests a leave of absence?

A. Yes.

Q. Okay. What does that work look like?

A. It's outlined in the -- it's outlined in the credentials manual, so if the leave is requested less

MAGNA
LEGAL SERVICES

Page 34

than 30 days, then it's at the discretion of the medical staff president. If it's greater than that, I believe it goes through a committee.

Q. If the duration of the leave --

A. If the request is less -- is submitted greater than 30 days in advance.

Q. And who is the committee?

A. I would have to check the credentials policy.

Q. Okay. Is that the same committee that you're having meetings with? That you're running meetings?

A. Like I said, I don't know which committee it is.

Q. There are many committees at Centura?

A. Yes.

Q. Okay. And so for requests for leave that are 30 days or shorter, you have final authority on whether that request is granted or not?

A. Yes.

Q. And then requests for leave that are longer, the committee, which we're going to agree we don't have exactly an idea of who it is, but -- they make the final decision; correct?

MS. McMANUS: Object to the form.

Page 35

A. Yes. Oh, I just don't know. I'm just not 100 percent sure if it has to go through credentials before MEC, but it would go before MEC, a leave that was requested that long.

Q. (By Mr. Azmoudeh) Okay. Do you -- if an employee requests leave that's longer than 30 days, do you still provide some feedback or some thoughts to the MEC about whether they should or should not grant it?

A. There's -- I think we're confusing two different things. So there's an issue of requesting leave that has a 30-day kind of marker on it and then there's the issue of restoring -- reinstating someone -- excuse me -- after leave, and those are different.

Q. Okay.

A. But 30 days is kind of in both of those, so it can be easy to confuse.

Q. So maybe reexplain to me -- this is me being dull. Reexplain to me when -- what role you have or what work you perform with respect to when an employee comes to request leave and what work the MEC performs when an employee comes to request leave.

A. On the requesting side, the credentialing policy outlines that if the request is made with less than 30 days' notice, it's at the discretion of the president of the medical staff. If there is greater than 30 days'

Page 36

notice, again, I believe that it goes to the MEC. I just don't know -- it probably doesn't stop at credentials. It probably goes straight to MEC.

Q. So the medical staff president gets to make the decision when the -- the person requesting leave, there's more exigency within 30 days of them taking the leave, that's when the medical staff president will step in?

A. As I read the credentials manual, yes.

Q. When there's a request for leave that comes with less exigency -- meaning I don't need to take the leave until two months from now -- that's when the MEC would decide?

A. Correct.

Q. Okay. Now I'm following. Thank you.

Is there any division of who gets to make a decision based on how long the leave is?

A. I don't believe so, no.

Q. Okay.

A. The -- the length of the leave matters more on reinstatement of privileges.

Q. And who makes the decision to reinstate privileges?

A. It goes through three separate committees. So the formal way of describing it is the credentialing

Page 37

committee makes a recommendation to the MEC, which makes a recommendation to the board, but the board is the final approval for reinstatement of privileges.

Q. And how does an employee for Centura go about requesting leave?

A. Are you requesting leave from Centura or requesting leave from the medical staff?

Q. Let's start with the medical staff.

A. That would be that same process that we just talked about.

Q. And then from Centura?

A. I would assume that would be through the HR type -- through a manager person.

Q. And when you say that as medical staff president, you do work with respect to these leaves and making decisions about requests for leave, I'm understanding that what you're referring to is just on the privileges side of things. Is that right?

A. It's just on the hospital privileges side, yes.

Q. Okay. If one of those physicians -- let's use physicians as an example -- who has privileges at the hospital has requested leave and it's been granted, what becomes your role while the leave is ongoing?

A. It depends on the nature of the leave and



10 (Pages 34 to 37)

Page 38

the requirements of the leave.

Q. Okay.

A. So if there's -- if it's -- for most leaves, there really isn't a leave because they are essentially -- they are separate of the hospital and then they come back to request reinstatement with whatever and then explain whatever happened during their leave period, so there's really no relationship there.

Q. Is it -- I mean, are you intentional about sort of leaving that physician who has privileges, who's on leave -- are you intentional about leaving them alone and letting them enjoy their leave?

MS. McMANUS: Object to the form.

A. Yeah. It's more -- it's just not a concern. It's not my job to follow up on someone's leave. What they're -- you know. In that -- in that specific one where that's -- there's not conditions with the leave.

Q. (By Mr. Azmoudeh) Okay. What kind of conditions have you observed that have been placed on various leaves?

A. Sometimes there's a requirement to report to CPHP as part of the reinstatement process, primarily.

Q. And if that's a requirement, are you the point of contact with the physician who's on leave?

A. The physician is always welcome to reach

Page 39

out to me.

Q. What if a physician goes on leave and somebody else from Centura -- they're an employee at Centura -- starts to try to put them on the schedule to come in to work? Is it your part of your work to sort of make sure that the leave goes without interference?

MS. McMANUS: Object to the form.

A. Yeah. I don't have anything to do with scheduling. My role in that situation would only be to let the medical staff know that -- that there's been a change in the staffing.

Q. (By Mr. Azmoudeh) Do you -- as a matter of course, if a physician goes on leave, do you send out any sort of Centura-wide emails, or do you notify anyone about the leave?

A. The process would be to notify members of the MEC if it relates to -- so both of the leave and then also, of course, if there's a coverage issue created by the leave.

Q. What is the content of the communication in which you notify the MEC about the leave?

A. It would be -- it would be at the meeting.

Q. Okay. And have you had to do that before?

A. Yes.

Q. Okay. What was the -- if you recall, what

Page 40

did you tell the MEC?

A. That we -- that there was an issue -- so -- I need clarification. Regarding the position or regarding the staffing?

Q. Staffing.

MR. SABEY: We need to talk about MEC meetings and confidentiality.

THE DEPONENT: Okay.

MR. SABEY: There are peer review privileges that relate to peer review processes. So if you're asking about the substance of what happened at a -- a peer review meeting, then I'd have to object and instruct the witness not to answer.

MR. AZMOUDEH: Okay. What I understand my question to be eliciting is not about the subject of what the employee did or didn't do and how the peer review committee, which I -- also, I don't understand this MEC committee to be the peer review committee. I understand my question to be eliciting what is the notification that the MEC receives about an employee who's on leave. That's not --

MR. SABEY: The MEC is a peer review committee. It's covered by the peer review privilege.

MR. AZMOUDEH: Okay. But the process by which she's talking about this employee is on leave,

Page 41

here's what you all should do doesn't seem to me to have anything to do with the review of the employee work.

I'm not asking about the substance of how the employee did or didn't perform their job and what they did wrong. What I'm asking is what's the notification that the MEC receives; right?

MR. SABEY: Well, but communications in an MEC meeting are privileged.

MR. AZMOUDEH: Don't they have to relate to the -- the quality concern?

MR. SABEY: Well, that's sort of the overall purpose of the MEC, for sure. And all of the things we're talking about do relate to whether they have -- have an impact on privileges.

A. I think a general answer would be that you would -- if you were going to a hospital, you would want the people at the hospital to know whether or not a surgeon was present if you needed a surgery. That's the nature of what the MEC would be notified.

MR. AZMOUDEH: Okay. Your objection is noted. I can stay away from it for now. If it becomes important, maybe we'll deal with it afterwards.

MR. SABEY: That's fine. Yeah. As we're going through it, yeah.

Q. (By Mr. Azmoudeh) What about if physicians



Page 42

need an accommodation on the practice side? Do they come to you as medical staff director -- president and say, "I need an accommodation"?

MR. SABEY: Object to the form.

A. I have never had that happen.

Q. (By Mr. Azmoudeh) Okay. If somebody did, is that within the work that you would perform?

A. Probably not.

Q. Okay. Where would they go?

A. To the -- to whoever their employer is.

Q. Okay. Do you have an understanding of the term "physician burnout"?

A. Yes.

Q. Okay. What is your understanding?

A. Some understanding of just of categorize -- a category of challenges specific to physicians and the nature of our position and the multiple pressures put on the physician.

Q. In your opinion, what are those pressures?

A. They can be from trying to do the right thing, pressures of dealing with insurance companies, pressures of dealing with lawsuits and attorneys, pressures of dealing with regulations, pressures of dealing with administration. And all of that, you know, while you're trying to take care of a person.

Page 43

Q. What are the pressures that a physician might feel from administration?

A. Well, for example, to go back to the surgery example, they might have restrictions on who is -- how busy the OR's are. They also don't have any say in who the personnel are and if a -- a surgical personnel makes a mistake, you could ultimately be responsible for that in, again, an attorney setting, so ...

Q. And I guess the flip side of not providing enough travelers is that the physicians have to cover that extra work; is that fair?

A. No. That's not fair.

Q. Okay. What happens?

A. They don't operate. Someone stays in the hospital four days for a gallbladder.

Q. Which I know to be true. How did you come to that understanding of physician burnout?

A. Probably first at a -- like a lecture that was sponsored by the hospital -- well, actually, I can't say. It was either sponsored by the hospital or the medical staff. I don't know which.

Q. Do you remember who presented at that lecture?

A. The first one might have been David Diamond. Dr. Diamond.

Page 44

Q. And was there a second one?

A. This is going back several years, but there was a -- I believe there was a second presenter. It was at the Pinery, but I don't recall his name. And I might have those events mixed up.

Q. Any sense of what years those presentations were?

A. It'd probably be more in the 2014-2015 time frame.

Q. And what was the gist or what were your take-aways from those presentations, other than your understanding of what physician burnout is?

A. The -- the main -- the main thing that I took away from it is it's a nonlinear relationship to workload.

Q. What does that mean?

A. That it's not like you work -- some people work a lot and never experience burnout. Some people work a little and can experience burnout. That it's not -- not a -- again, a linear relationship between the two.

Q. So there's no sort of objective way to say this person -- there's no way this person is suffering physician -- from physician burnout because this person wasn't working that much? That wouldn't be a fair thing to say?

Page 45

A. That would not be a fair thing to say.

Q. Okay. And in -- still true on the flip side? There would be -- it would not be fair to say that this physician must be burned out because they're working so darn much?

A. Correct.

Q. Okay. Based on your understanding of physician burnout, can a doctor diagnose physician burnout?

A. "Doctor" is a very broad term.

Q. Any -- any doctors that you place under the umbrella of the broad term "doctors."

A. Honestly, I am not familiar with diagnostic criteria for burnout or -- from that -- from that standpoint.

Q. Do you know that diagnostic criteria exists somewhere out in the ether?

A. No.

Q. Oh, okay. Do you have any sense for what the symptoms of physician burnout are?

A. Ones that probably were mentioned in these -- the series were -- the main ones that hit home are related to depersonalization with regards to patients.

Q. Do you also believe that it's perhaps depersonalization with the folks that you're working with?

MAGNA
LEGAL SERVICES

Page 46

A.  Yes.

Q.  Was there any conversation at those lectures or that you gleaned from any other source about how physician burnout might affect one's ability to perform just daily activities, like sleep, thinking, communicating, things like that?

A.  Yes.  I believe the subject of one of the first of the two talks -- one of them focused a little bit on the marriage and so difficulties relating to your spouse in the context of being a physician.

Q.  Medical marriage, I assume, means a doctor married to another --

A.  Anybody else.

Q.  Anybody else.  Okay.  We'll adopt that as the lawyer marriage, and I'll tell my wife about it. She'll appreciate that there's a term for what she goes through every day.

A.  But it is -- I mean, the nature of our work is unpredictable at times and you are talking about people's lives, and so sometimes family kind of has to come second to that.  So it is a challenging thing to negotiate at times.

Q.  As you understand physician burnout -- I suppose you just covered it.  We'll strike that.

Again, putting aside Dr. Peddada, are you

Page 47

aware or -- were you aware -- let me rephrase that question.  That's horrible question.

Putting aside Dr. Peddada, did you encounter any scenarios in which a physician practicing at Penrose or St. Francis sought leave or another accommodation for physician burnout?

A.  I'm not aware of any physician that sought leave for physician burnout.  Again, being unaware of diagnostic criteria for it, I'll take it away from the term of burnout or the diagnosis of burnout, but if there is anyone that is having difficulty with interpersonal relationships, that might be someone that I would refer to Di Thompson to try to address that before it becomes an issue where they have other issues.

Q.  Okay.  That's not a leave; right?  That's a --

A.  No.  It's not even a -- a -- a forced recommendation.  It's usually just making them aware of her services.

Q.  What about are you aware of any scenario in which an employee at those hospitals sought leave for a mental health illness?

A.  Again, employee -- the -- we have to be clear about the context.

Q.  Let me rephrase it.  Are you aware of any

Page 48

situation in which a physician practicing at those hospitals sought leave for a mental health illness?

MS. McMANUS:  Object to the form.

A.  Yes.

MR. SABEY:  And we're potentially infringing upon privilege here because you're asking about a privileged process.  The application from the medical staff for a leave and the process that that -- that follows, that is all a confidential privileged process.

MR. AZMOUDEH:  Under what?

MR. SABEY:  Under the Colorado peer review statute and the Healthcare Quality Improvement Act.

MR. AZMOUDEH:  This is not a -- first off, there's been no discussion of peer review, so I don't -- I'm not sure about that one.

MR. SABEY:  Well, but you're saying a request for medical leave from the medical staff, and that is always a peer review process.

MR. AZMOUDEH:  Really?

MR. SABEY:  Yes.

MR. AZMOUDEH:  Well, we'll sit on that one, too.

Q.  (By Mr. Azmoudeh)  Why don't I keep it out of anyone's specific circumstances.  If a physician practicing at those hospitals requests a leave for a

Page 49

mental health illness, what would you do?

A.  If a physician requests a leave for any medical illness, it -- there would be a -- if they're requesting the leave, again, consideration to the timing of the leave, so just to say -- again, if it's less than a 30-day request, that would fall in one bucket.  If it's a greater-than-30-day notification, it would fall in another bucket.

Again, the request for the leave may or may not trigger other requests, but the real request comes on when they -- when someone would try to be reinstated, so that may be accompanied by -- in particular, we want to know that they are safe to practice, so an assessment of ability in some manner by an independent party.

Q.  In your role as medical staff president, do you perform any work to deliver training to those physicians that you oversee?

A.  In the medical staff president, I'm not overseeing physicians.

Q.  Okay.  What are you doing?  What's a better word I can use today?

A.  It's -- there just isn't.  That's -- that's not the job.

Q.  What is your relationship to physicians, then, in the medical staff president role?

MAGNA
LEGAL SERVICES

Page 50

A. Again, as their representative.

Q. Okay. So as the representative of physicians in the medical staff president role, do you deliver any training to the physicians?

A. No.

Q. Okay. I promise I'm not trying to --

A. No. I think it's just -- it's hard -- it's important -- the distinctions are important.

Q. Okay. Fair.

A. I don't provide training on surgery or anything like that, either.

Q. In your -- are you aware that Dr. Peddada, for many years, was a partner in a practice group called Radiation Oncology, PC?

A. I am only aware of -- I've only been made aware of the exact nature of the partnership as part of this process.

Q. Okay. What have you learned about the nature of the partnership?

MS. McMANUS: I'm just going to intervene really quickly. Any communications you had with counsel are privileged, and so I'm instructing you not to talk about those conversations.

Q. (By Mr. Azmoudeh) Okay. Understood. Were you aware, while Dr. Peddada was prac -- let me ask this:

Page 51

Dr. Peddada had privileges at Penrose; is that fair?

A. Yes.

Q. And while he was a practicing physician at Penrose with privileges, he was not an employee of Centura; correct?

A. Correct.

Q. And did you --

A. To my knowledge.

Q. Okay. Did you understand -- while Dr. Peddada was a physician with privileges at Penrose, did you understand that he was employed by or worked for another practice group?

A. I would have made that assumption because he didn't work for himself solely, so some entity is involved, but the nature of the ownership or partnership, I would not necessarily be aware of and, certainly, for him, I was not.

Q. Can we --

A. I'm saying that, because, you know, there's probably 30 different practices that have some type of relationship with the hospital. So it's just the -- it's -- it's both too many and not really my business to know.

Q. As medical staff president, did you just view all of them as these are the physicians who practice

Page 52

at this hospital and have privileges?

A. I'm not sure I understand the question.

Q. Yeah. I guess did it matter to you and you being able to perform your work as medical staff president whether this physician practicing at Penrose was employed by Centura or this physician practicing at Penrose was employed by some private practice group? Did it matter to you? Did it change your work?

MS. McMANUS: Object to the form.

A. Yeah. No is the general answer, unless the employment side was going to handle an issue.

Q. (By Mr. Azmoudeh) Okay.

A. So, for example, if, on the employment side, someone was fired, that takes it out of me having to deal with it.

Q. Understood. You would still say that you represent, in your position as medical staff president, those physicians practicing at Penrose, regardless of whether they were employed by Centura or from a private practice?

A. Yes.

Q. Okay. And if a physician practicing at Penrose who was not employed by Centura had some issue that they needed your representation on, you would still take it in the same way that you might take an issue

Page 53

brought to you by a physician who was employed by Centura?

A. No. Probably not.

Q. What would be different?

A. The who of it is a little bit different because there's a practice -- the practice of Centura -- it's kind of too broad of a question, really, to answer.

Q. Okay. So let's use the example from earlier. Not provide travelers.

A. When you -- let me be clear. When you say treating it the same, it's like treating your kids the same. It's not exactly always the same, but generally the same.

Q. They come with different challenges.

A. Correct.

Q. Let's use the example that we were talking about earlier, providing Travelers. Who -- who raised that issue originally with you?

A. It would -- it was actually a -- it wasn't brought up necessarily, at first, in a formal setting. It would have been in a series of just conversations among the medical staff, and then the -- I believe it was the trauma department chair as well as the head of the chair of surgery.

Q. Did it affect -- did the issue that they were raising with you affect physicians employed by

MAGNA
LEGAL SERVICES

Page 54

Centura in the same ways that it might have affected physicians who were in private practice groups, practicing medicine at the hospitals?

A. Yes. There are very few employed surgeons, but yes.

Q. Okay. So in that scenario, I guess, just -- my question is -- well, I'll put it this way: There are some instances, then, in which your representation of physicians doesn't really change? It doesn't really change what you're going to do on behalf of those physicians, whether they're employed by Centura or private practice physicians practicing at the hospitals?

A. Yes.

Q. Okay. And that would be an example in which it doesn't change your work?

A. Correct.

Q. Okay. I guess a -- to put a line on it, if Dr. Peddada had come to you and said, In our office over at ROPC, we don't have enough computers at the desks, you might say in response, That's not a hospital problem, that's not a you practicing at the hospital problem, you deal with that on your own?

MS. McMANUS: Object to foundation.

A. Yeah. Actually, I wouldn't know because I don't know in his situation what the agreement was with

Page 55

the hospital. I actually think that the hospital maintained his office, so it might somewhat fall under that.

Q. (By Mr. Azmoudeh) And so that's important, I guess, is -- outside of your role -- what is important to your role is how the hospital or Centura have agreed that this physician is going to practice at the -- at the hospital; is that fair?

A. I believe so, yes.

Q. Okay. Are you happy in your position as -- let me actually rephrase that.

In that medical staff president, did you enjoy that work?

A. Yes.

Q. Okay. What was enjoyable about it?

A. I think exactly that. Again, going back to I -- I hope that I am fair in -- again, I -- I hope -- I like to believe that I am more fair as well as pragmatic in some of these dealings. And so I hope that I represent the physicians in -- in the way that they appreciate and felt treated fairly.

Q. Was that work meaningful to you?

A. Yes. And let me give a similar example. I don't like telling people that someone is going to die for -- you know, but I know I do that work well and so I

Page 56

enjoy doing it because I know -- I want the person on the other side to experience the job being done well.

It's very similar in the medical staff milieu, that I want our physicians to be represented well. It can be difficult work.

Q. Sometimes you have to deliver hard truths, I suppose?

A. Sure.

Q. Okay. Did you have any complaints about the position as medical staff president?

A. Complaints in what way?

Q. Oh --

A. Complaints of my work or complaints of the work?

Q. You know, no workplace is perfect; right? I have complaints about my bosses, the coffee is cold, things like that. I'm just asking you did you have any complaints going to work every day? Were there any common complaints that you had in your mind about the work as medical staff president?

A. Well, Centura, as a whole, severed their relationship. We'll just say that -- with the CEO and the CMO that we're talking about right now, and replaced it with a different administrative staff, so that's a challenge, and that would be, certainly, something I

Page 57

complained about.

Q. And was that occurring while you were medical staff president?

A. Yes.

Q. Okay. What were the dates, roughly, of that process?

A. It would have been -- it's after this issue, but it -- August of 2022 was when Dr. Brian Erling, the CEO, left his relationship, left his position as CEO. I believe Dr. Plauth left his position January of 2023.

Q. What was the first CEO's name you said?

A. Erling. Brian Erling.

Q. Okay.

MR. SABEY: Take a break sometime soon?

MR. AZMOUDEH: Sure. Want to take a break? Let's do 5 minutes? Is that okay?

MR. SABEY: Yeah. Great.

(Recess taken, 11:10 a.m. to 11:18 a.m.)

Q. (By Mr. Azmoudeh) I'm going to ask you about some facts. If you have no clue about them, just tell me that.

Are you aware that Dr. Peddada's private practice we discussed, ROPC, Radiation Oncology, hired Dr. Madeera Kathpal in 2021?

A. Yes.

MAGNA
LEGAL SERVICES

Page 58

Q.   Were you aware of that when it was happening?

A.   No.

Q.   You just became aware of it when?

A.   I would become aware of it when she applied for privileges.

Q.   Okay.  What do you recall about those circumstances?

A.   That's really -- from a formal standpoint, that's all.

Q.   Anything from an informal standpoint?

A.   Not necessary -- no.

Q.   So you didn't just -- I'm just going to cross some T's off.  You didn't have any role in the process of ROPC hiring Dr. Kathpal?

A.   No.

Q.   Okay.  Did you have any role in any discussions with Dr. Peddada about the need to hire Dr. Kathpal?

A.   No.  Only after fact.

Q.   Okay.  When were those discussions?

A.   I had one discussion for him shortly before he applied for leave, and he referred to her hiring in that discussion, I believe.  But in real time, no.

Q.   Okay. Okay.  We'll return to that.  I'm

Page 59

going to put that aside for a second.

Do you know about when Dr. Peddada started working at Penrose?

A.   No.

Q.   Okay.  I'm going to represent to you that it was about 1999.  Does that seem accurate?

A.   I would have no way of knowing anything before I started, so:

Q.   No reason to dispute 1999?

A.   No.

Q.   Okay.  And certainly, Dr. Peddada was there when you arrived at Penrose in -- let me get this date right, so give me a moment -- when you arrived at Penrose sometime in 2017?

A.   Well, no.  Because my initial employment that I was talking about with CPHP had a role at Penrose, so I was working in the hospital as an affiliate, not as an employee in around 2008.

Q.   Let me just ask you this then:  When was the first time you met Dr. Peddada?

A.   I would assume it's around then.  I mean, we're a very social medical staff.  I think that's one of the better things.  So I -- I'm sure at some point in those early times, I would have met him either in the cafeteria or potentially doing a consultation.

Page 60

Q.   And when did you -- well, I'll ask this: What were -- if you can recall, your first impressions of Dr. Peddada?

A.   I don't recall my first impressions.

Q.   When did you --

A.   Just to say, I'm one person starting in a medical staff of 700, so sure.  I wouldn't even know a name.

Q.   There's a -- maybe 50 people in this building.  I don't know everybody's name, so ...

A.   Right.

Q.   Was there a period in which you began working alongside Dr. Peddada as a hospitalist or in any other role at Centura or Penrose or St. Francis?

A.   So after making the move to being a full-time hospitalist, so after -- so that's the period that I would remember more kind of hospital work just to say because it was, I know, the work.  And certainly, after -- it's complex, the initial relationship with oncology as a whole, so I'm not talking about Radiation Oncology, but oncology as a whole and, really, medical oncology is that -- prior to us becoming employees by Centura, the hospitalist group typically did not admit the oncology patients.  They were admitted by RMCC, Rocky Mountain Cancer Center.

Page 61

When we became an employed group, I actually worked with RMCC in order to change that relationship so we did admit their patients.  Once we started admitting their patients, then I would have had more significant professional interaction with Dr. Peddada.

Q.   What was the purpose of having RMCC admit patients to the hospitalists first before going straight to the oncology group?

A.   To -- it's similar to -- it's why hospitals exist.  It's to allow other specialties to do their specialty and not focus on other things.

Q.   Okay.  And you started working with Dr. Peddada in a more professional setting because, as I understand it, you began, I'm sure at times, referring some of those patients to the oncology group and maybe sometimes to the Radiation Oncology folks?

A.   Yes.

Q.   Okay.  What do you recall kind of about your interactions with Dr. Peddada during that time period?

A.   I really don't -- and I -- and I truly do mean this.  I really don't have very specific interactions with it.  It's usually one piece of the puzzle.  And, especially, in radiation oncology, it's, you know, part of


MAGNA
LEGAL SERVICES

Page 62

the treatment plan kind of thing. So I don't have, necessarily, really strong recollections because it's going to be a few patients and one piece of a very complex thing.

Q. Okay.

A. And I guess I should maybe even qualify that further. Even though I'm admitting the patient, the medical oncologist is likely more communicating with the radiation oncologist, so that's the other piece of it.

Q. Did you -- actually, I'm going to ask this: So, of course, you know that this lawsuit is about the circumstances towards the end of Dr. Peddada's practicing medicine at Penrose; is that fair?

A. I read the complaint.

Q. Okay. I'm going to ask you to sort of put aside the very tail end of the last couple months and focus on events before that. Aside from referring patients to the oncology department and maybe some tangential communications that you might have had with Dr. Peddada, in what other capacities would you have worked with Dr. Peddada over the years?

A. Worked with, none. You know, I, you know, could say that he -- he and Dr. Monroe, for a long time, walked to the cafeteria together. They don't eat in the doctors' lounge typically ever, I think, actually. But

Page 63

that would be about it.

Q. Why don't they eat in the doctors' lounge, if you're aware?

A. I'm not aware. They eat the food. They take it -- I'm assuming they take it back to their office. We all have different patterns.

Q. That's true. Why are you having -- I mean, do you recall -- strike that question.

So it sounds like -- well, what about this: When you became medical staff president and aside from any interactions you might have had with Dr. Peddada during those tail -- tail month-ends of his work at Penrose, did you have any interactions with him before that as medical staff president?

A. Not in the role of medical staff president, meaning that he didn't come before MEC, as far as I'm aware, he didn't come -- come in front of any other committees in that way and didn't serve on any committees, so no.

Q. Okay.

A. So, really, all of my interactions were of a social nature outside of, you know, again, potentially patient interactions, but those are, you know, mediated more by the medical oncologist.

Q. Okay. Let's focus on, then, just some of

Page 64

the social interactions. We're talking about workplace social; is that fair?

A. Yes.

Q. Did you have any relationship with Dr. Peddada -- a social relationship with Dr. Peddada outside the workplace?

A. No. I always wanted to see his house because I heard it was very nice, but that never happened.

Q. Fair. Did you, through those social interactions, form any opinions about what Dr. Peddada was like?

A. What he was like, like from a personality standpoint? Put -- potentially just from -- like I said, he didn't necessarily socialize in the same way that some people do. That didn't really stand out. It was just that I passed him all the time.

Interests, yes, because, again, he had an interest in modern homes and I was building a home at the time, so we talked about those things, so -- I was aware of some of his interests, I guess.

Q. A fairly surface level; is that fair?

A. Yes.

Q. Okay. What about Dr. Peddada's reputation? I'm just going to ask for your understanding of his reputation. If you have no understanding of his

Page 65

reputation about various things, just tell me to kick rocks and we'll move on.

Did you have -- did you form any opinions about Dr. Peddada's reputation regarding the care that he provided to patients?

A. Not in particular, no.

Q. Was it -- were there general opinions that you formed?

A. Just to say that it didn't either positively or negatively raise any concerns or notice, so they were neutral.

Q. I suppose that could be good for a doctor if they're not --

A. Yes.

Q. Okay. Any personal observations or opinions that you formed about his reputation regarding his bedside manner?

A. No.

Q. Same question regarding his ability to communicate and interact with nonphysician staff, people like nurses and techs.

A. No.

Q. Same question about his reputation regarding his ability to work with other doctors.

A. Again, no, for the same reason, that I



17 (Pages 62 to 65)

Page 66

don't think I heard anything extremely out of the ordinary either direction.

Q. Are you aware of whether Dr. Peddada held leadership roles either at the hospitals or at Centura?

A. During the time that I was involved in the various committees, he was not on any of the committees.

Q. Are you aware now whether Dr. Peddada was at any point a leader in any capacity on behalf of the hospitals or Centura?

A. No. I'm not aware.

Q. In all your interactions with Dr. Peddada, work-related, did you have any criticisms of Dr. Peddada?

A. Again, we're being clear that we're excluding the tail end, so no.

Q. Were you ever responsible for providing performance evaluations to Dr. Peddada?

A. In a specific situation, no. But every physician falls under the peer review process for OPPEs which are ongoing performance evaluations, so, from that standpoint, I would have purview over that. Was I directly involved? Not really.

So just to describe the process, all physicians are evaluated for certain things, depending on their specialty. It might be mortality, it might be infections, that kind of thing. That's an ongoing thing

Page 67

and that's a routine process as part of peer.

Q. Another part of peer is less routine. Is that fair? Can you describe maybe the less routine part of peer review that goes on when there's a, for example, never event or something like that?

A. So the general process would be a complaint would be made. A complaint can be made by a member of the staff, another physician, a patient, a patient's family member. That gets reviewed by the chair of the peer committee. And depending on the -- the nature of the complaint, I guess I can say, that can go in front of the peer rearview committee and then they make an evaluation.

Q. Do you recall or did you observe any instance in which there was such a complaint against Dr. Peddada?

MR. SABEY: Again, complaints in peer review are also privileged.

MR. AZMOUDEH: It's pretty related to this case; right?

MR. SABEY: It doesn't -- that doesn't waive a privilege.

MR. AZMOUDEH: Okay.

MR. SABEY: So if there were, you know, complaints that initiated a peer review process, the complaint would be privileged.

Page 68

MR. AZMOUDEH: Okay. Over lunch, let's talk about this some more. I can give you some authority, and we'll sort that question out.

Just to build a record, I think the categories of questions in which you've instructed the witness not to answer are questions regarding complaints against Dr. Peddada, questions regarding the process by which physicians request leave -- physicians who are practicing at the hospital request leave. We'll leave it there for now.

MR. SABEY: The -- I'm not objecting to the process by which physicians request leave. Just specifics.

MR. AZMOUDEH: Well, that was my question earlier. We'll get into -- let's talk about it over lunch.

MR. SABEY: Sounds good.

MR. AZMOUDEH: Okay. You can object. I'm not sure if this falls in the category as I see it right now.

Q. (By Mr. Azmoudeh) Did you ever provide informal feedback to Dr. Peddada?

A. No.

Q. Are you aware of any lawsuits against Dr. Peddada, while he was practicing medicine, in

Page 69

connection with his practice of medicine?

A. I would be made aware of those, but I do not recall one way or another. So that's part of the credentialing process, but that would go through -- we would be made aware of that in general, but I don't recall.

Q. Anything you want to add just -- I mean, what was your opinion of Dr. Peddada?

A. It really was more in a social setting. And I think we have to understand the context of what he does is, primarily, in the outpatient setting, so -- really, it was more in the social realm of things. He's not someone that I interact with as frequently as perhaps like a trauma surgeon or something like that.

Q. If I was to ask these same set of questions -- to which person would I ask these same set of questions at Centura who would have a better sense for how Dr. Peddada performed his job, how good his bedside manner was, things like that?

MS. McMANUS: Object to foundation.

A. So bedside manner, are you referring to the actual bedside inpatient, or are you referring to his interactions with patients in general, which would be more his clinic?

Q. (By Mr. Azmoudeh) The first one.



18 (Pages 66 to 69)

Page 70

A. Okay. So the -- the inpatient -- on the inpatient side, potentially, if I wanted to know -- let me just -- if I wanted to know how someone interacts with patients, I would ask their bedside nurse.

Q. Oh. That's creative. Any physicians that you would ask for a second opinion?

A. Oftentimes, physicians don't observe each other at the bedside, so you might hear a rumor about a patient, but that would be kind of where it would be.

Q. Did you ever hear any rumors about Dr. Peddada?

A. No.

Q. Okay. Now I'm going to go forward again.

A. Sorry. Let me clarify. About his bedside manner in the hospital, no.

Q. Okay. What about other rumors about anything? We can put aside maybe the tail end of his practice at Penrose.

A. Yeah. Not really.

Q. Not really?

A. Well, I think -- again, it's hard to define "tail end" as far as that goes. I think, eventually, there became a rumor about his relationship with Dr. Monroe, but that would be it.

Q. Okay. We'll get into that later, so let's

Page 71

put a pin in that for now.

I was discussing with you a little while ago Dr. Kathpal, and I don't remember exactly where we left off. I think I do. But what I heard earlier is no role in hiring her?

A. Correct.

Q. You only came to know her after she was hired and was applying for privileges at the hospital?

A. Correct.

Q. What did you think about it when you met her?

A. Well, I have to be clear. I didn't come to know. I came to know of her through the credentialing process. I don't believe I ever met her.

Q. Through the credentialing process, you saw a packet with her name on it?

A. Yeah.

Q. And that credentialing packet might say things like I have not been terminated during a pending investigation somewhere else; right?

A. I think the specifics to her would come under privilege, but let me back it up and say the credentialing process in general, you would submit a packet that would include prior issues, employment, lawsuits, whatever that would go in front of the

Page 72

committee.

Again, to put it in context, I think between credentialing and recredentialing, we probably credential -- well, probably 70 physicians a month, so she didn't -- it -- it's very rare that someone gets attention, due to the volume.

Q. Understood. Do you recall anything about what happened with Dr. Kathpal's work at -- at the hospitals?

A. No. The only thing I heard about her work was from Dr. Peddada.

Q. Okay. When did you hear that?

A. Just prior to him requesting leave, and then in the complaint.

Q. Okay. So we'll get into that. Did you become aware of any -- did you become aware of any complaints about Dr. Kathpal's interactions with other staff?

A. No.

Q. Okay. Do you know how Dr. Kathpal's -- well, let me ask this: Does Dr. Kathpal still work at Penrose?

A. I don't believe so, no.

Q. Okay. Do you have any idea of why she stopped working at Penrose?

Page 73

A. No.

Q. You don't have any idea about the circumstances under which she stopped working at Penrose?

A. Only what he told me.

Q. And "he" is Dr --

A. Dr. Peddada.

Q. -- Peddada?

THE COURT REPORTER: Can you let him finish?

THE DEPONENT: Sorry.

Q. (By Mr. Azmoudeh) Were you aware at the time that -- let's say in about the end of 2021, that there was discussion about Dr. Peddada closing ROPC and becoming an employee for Centura.

A. Can you ask the question again?

Q. Yeah. So at some point, we discussed earlier that Dr. Peddada was practicing medicine at Penrose while he was a partner at ROPC.

A. Uh-huh.

Q. At some point -- I think it was towards the end of 2021 -- there was a discussion about shifting that arrangement around --

A. Uh-huh.

Q. -- and having Dr. Peddada become an in-house employee or in-house physician. Were you at all

19 (Pages 70 to 73)

MAGNA
LEGAL SERVICES

Page 74

involved in those discussions?

A. I was not involved in those discussions. At some point, I heard it more on a rumor basis, but not involved in the discussions in any way.

Q. Do you recall who you heard the rumor basis from?

A. Not at all.

Q. Okay. Was that the extent of what you might have learned from the rumor, that he's come in-house, or was there anything else?

A. I think -- let me -- let me rephrase it. My interest in that would only be from the curiosity standpoint of the hospital's relationships with physician practices. Dr. Peddada really didn't play into it at all.

Q. Okay. What was the --

A. Just I'm always interested -- sorry.

Q. No. Go ahead.

A. I'm -- I'm just always -- that's an interest of mine, in the business relationships. Just as a personal interest.

Q. Okay. What interested you about that?

A. Well, I think the business of medicine is fascinating. It's complicated. I like complex problems.

Q. And this was sort of a puzzle piece in that complex problem of how does Centura manage all the various

Page 75

physicians who practice at Penrose?

A. That practice at Penrose and just oncology in general because it's different throughout the system.

Q. As you heard that possibility, did you have any reaction to it?

A. It's a little -- again, a little hard to characterize. So reaction just from the standpoint of I have a general reaction, I'll just say, to whether or not there's a group that's operating on a private practice level versus an employee level and how that impacts the other practices in the hospital and the care delivery. So from that standpoint.

Q. What is that view?

A. It's -- it's more just watching the market, you know. So it's just knowing this is kind of where Centura is going with what their thinking is on something. So, you know, whether or not they bring like medical oncology in-house or radiation oncology in-house, just from that standpoint.

I know they were employing Radiation Oncology in Pueblo. I think they employed them at Mercy in Durango. So is that the direction they're heading at Penrose? That's about it.

Q. From a bystander perspective, did that strike you as a sensible thing to do?

Page 76

A. From whose standpoint?

Q. From your perspective.

A. From whose standpoint? The hospital or Dr. Peddada's?

Q. That's a good question. The hospital.

A. Of course. Anytime they can move anything in-house, they get more revenue.

Q. Okay. And that -- that's the goal for a hospital corporation?

A. Correct.

MS. McMANUS: Object to foundation.

A. Maybe not ultimately.

MS. McMANUS: Object to foundation.

Q. (By Mr. Azmoudeh) Centura, I believe, was a nonprofit foundation?

A. Correct.

Q. And so it's not specifically their aim to generate revenues?

A. Correct.

Q. However --

A. However --

Q. -- even a nonprofit has an eye towards what's going to benefit their financial position; right?

A. Correct. Our aim would be to provide good healthcare, and in order to do that, we have to, you know,

Page 77

be able to pay for goods and services, so yes.

Q. And in this regard, bringing radiation oncologists in-house is a sensible thing to do because it will ultimately result in more revenue for the nonprofit and allow them to better provide patient care?

MS. McMANUS: Object to foundation.

A. Yeah. I wouldn't know in the specifics of that situation in -- in general, there are some advantages on the revenue side, but there -- but to say on the personnel or relationships with different practice, that's much more complex.

Q. That's fair. And you didn't form any specific opinions about Dr. Peddada and bringing that particular practice in-house as to whether that would be a sensible thing?

A. No. I was really, like I said, only aware of it more on a -- on a rumor-type situation.

Q. Okay.

A. And maybe let me clarify that. I'm not involved with the contract negotiations with any of the groups that are PSA or otherwise, whatever. So it's just not in my realm.

Q. Okay. That was going to be one of my questions. Just for the record, can you define PSA?

A. Gosh. As soon as I said that, I'm -- it's

MAGNA
LEGAL SERVICES

Page 78

just the nature of the business relationship. Gosh, I can't remember what the letters stand for.

Q. Physician service agreement?

A. I think.

Q. Professional?

A. Professional service agreement. It's the type of contract and what they provide or don't.

Q. Just -- PSA means professional service agreement?

A. As best as I can say --

Q. Okay. Thanks.

A. -- without looking it up.

Q. We discussed Dr. Alan Monroe earlier. Do you know who Dr. Alan Monroe is?

A. Yes.

Q. Okay. Were you aware at the time -- let's say before Dr. Peddada left Penrose and before any of this lawsuit was filed, were you aware at the time that Dr. Monroe and Dr. Peddada were partners at ROPC?

A. Yes. I was aware that they worked together. Again, I didn't know necessarily their situation.

Q. But you knew they had some working relationship?

A. There was some working relationship, yes.

Page 79

Q. Okay. What were your impressions of Dr. Monroe? And we'll use kind of all the same general categories that we just talked about for Dr. Peddada. Did you form any opinions about Dr. Monroe over time?

A. Yeah. It's really similar. The answers are really very similar, that really no -- I knew even less of him in social situations -- in social situations, not for any particular reason. Just I think he's probably more introverted.

Q. Well, that would be a reason in which you might not encounter him in social settings; is that fair?

A. Sure. Or I might not talk to him extensively in a social setting, yes.

Q. Were you -- did you also become aware, maybe through a rumor or another source, that there was a discussion about bringing Dr. Monroe to become an employee at Centura around the same time that you heard the rumors about Dr. Peddada?

A. It was really just the rumor was more specific to -- more general to Radiation Oncology than to either one of them in particular.

Q. Okay. So it -- the rumor grouped in both of them if they were performing radiation oncology?

A. Correct.

Q. And your opinion of whether that was going

Page 80

to be a sensible idea is the same as for Dr. Peddada, which, as I understand it, in general, it's a good idea to bring Radiation Oncology in-house, but I don't know in particular about these folks?

A. Correct.

Q. Okay. Did you hear anything through the rumor mill or through another source about the relationship between Dr. Monroe and Dr. Peddada?

A. I think that would be very difficult to put a timeline on. I -- I definitely didn't know much about the relationship until towards the end kind of -- towards the end, before Dr. Peddada asked for the leave. I think that that stirred up questions about their relationship that I really was unaware of.

Q. What questions were you hearing being asked about their relationship?

A. Just there was a rumor that they didn't care for each other very much, and that was surprising.

Q. Why was it surprising?

A. Because they walked together to the cafeteria every day.

Q. Was -- was any part of that rumor, at least as you understood it, that, you know, Dr. Peddada's the one breaking down this relationship or was it a -- let me ask that question.

Page 81

Was that a part of the rumor that you heard?

A. I think I only heard of that as -- after things really fell apart. I heard first that they -- primarily, of Dr. Peddada's potential role in it only from him.

Q. I missed that last piece.

A. Only from him. So he's the one who told me, I think. The -- the -- the -- what I know of their relationship came first initial -- from him. And it was at the very end.

Q. Okay. I am about to get into sort of the thick of things. Do you want to take a lunch break now, or do you want to do lunch around 1? It's mostly up to you, honestly.

A. I'm fine for later. Yeah.

Q. Is that okay? All right. We'll keep going.

At some point, did you become aware that Dr. Peddada was complaining that he was experiencing physician burnout?

A. From him, yes.

Q. Okay. Was that -- when do you think you first learned from him that he was experiencing physician burnout?



Page 82

A. It was probably in -- looking at the dates that are presented from the other information, it probably was in April of that last year.

Q. Okay.

A. I think it was -- yeah. It would have had to be 2022.

Q. Tell me what you recall about that period.

A. It's not -- leading up to the conversation that I had with Dr. Peddada, I think it was a week or two before he filed the leave. I don't think I had -- repeat the question again. Sorry.

Q. Just what do you recall about Dr. Peddada's conversations with you and about experiencing physician burnout?

A. Yes. So I don't think I had any suspicion, knowledge, anything of an issue of burnout until hearing it directly from him.

Q. Okay. And then what did you hear from him?

A. Not -- I'm not sure if I heard the term "burnout" or not, but more specifically about how much he was working and -- and that that was creating stress in his life.

Q. What was your reaction?

A. I believe I told him maybe work less.

Q. But we discussed earlier that that's

Page 83

nonlinear to how much you work and how much you --

A. But we weren't talking about burnout. We were talking about stress from working too much.

Q. For Dr. Peddada is what you're saying?

A. Correct.

Q. Okay. Got it. That's very smart.

A. Sorry?

Q. Very smart.

A. I mean, it's different.

Q. Do you think that stress is linear? It goes up and down with how much you work?

A. Stress may be nonlinear. But free time, you know, is by default, yes. So I think you need a certain amount of free time in your life just in general, and he was the one saying I'm working too much, so it's just a natural reaction to say if you're working too much, the obvious answer is work less.

Q. Was this a -- are you -- are you describing to me one meeting with Dr. Peddada currently?

A. Yes.

Q. Okay. Was this an in-person meeting?

A. It was in person.

Q. Was anybody else in attendance?

A. No.

Q. Okay. How did the conversation go forward

Page 84

after that?

A. Can you clarify?

Q. Yeah. He tells you I'm stressed, at least as you recall it, from working too much. You tell him maybe try working less. How does the meeting go forward from there?

A. The meeting encompassed really all the things in your complaint -- in his complaint -- excuse me. He -- you know, he was the one telling me about just the nature of his relationship with Dr. Monroe. He raised an issue of -- some vacation issue that he had with Dr. Monroe. He talked about how much -- quite frankly, he was talking how much he was making, how much he was working, how important he was to Penrose. That's the nature of the conversation.

Q. Maybe we can put a date on this meeting. I think --

I'm going to show you what's going to be marked Exhibit 10. She is going to mark it.

A. Okay.

(Exhibit 10 was marked.)

Q. So, Dr. Baldauf, I've just showed you what's been marked as Exhibit 10. In that bottom right of the document, in litigation, in a lawsuit, both sides present things and they assign what's called a Bates

Page 85

number. So at the bottom there, you see it says Peddada 000395? Do you see that?

A. Oh, at the bottom, yes.

Q. Okay.

A. Sorry. I'm distracted by the sticker.

Q. So I'll probably use that Bates number to identify documents today.

A. Okay.

Q. Just take a second to review this document. Is it fair that this is a document from Dr. Peddada to you on May 2nd, 2022?

A. Yes.

Q. Do you recall this email?

A. Yes.

Q. Okay. And this email, at the start of it, Dr. Peddada says, "Thank you for your time this morning discussing my medical leave."

He seems to be referencing an earlier discussion from the day; is that fair?

A. Yes.

Q. Is this the same meeting that you were just discussing with me?

A. No.

Q. Okay. So there was an earlier meeting to this one?

MAGNA
LEGAL SERVICES

Page 86

A. Correct.

Q. Okay. So how much earlier would you guess that that earlier meeting happened?

A. I would guess weeks, and I think meeting might be -- it was more a discussion. A meeting among people, yes, but that's what --

Q. So if this meeting that's being referenced in the email is on May 2nd, maybe yours was somewhere during like the week of April 20th?

A. It was sometime in April. Yes.

Q. So let's focus, then, on the April meeting. Did you take any steps -- well, what did you do in response to the meeting? Anything?

A. I don't recall. From specific steps, no.

Q. When you had that first meeting in April with Dr. Peddada, did you -- well, we'll call it a discussion. That discussion with Dr. Peddada in April in which he explained, as you described it, kind of all of the background in the complaint that he filed --

A. Uh-huh.

Q. -- did you have that discussion with Dr. Peddada in your role as medical staff president, speaking with a physician that you represent?

A. I would say it's probably both from -- from the medical staff president, yes, that I was -- I don't

Page 87

remember who raised the concern or who even asked for the meeting, but it was -- I was checking in on a medical staff member in that capacity. Also, of course, it would have been on a -- on a friendly basis, as well.

Q. Did you -- I think I heard earlier no steps were taken after the meeting in response to the discussion in April?

A. Not that I can recall.

Q. Okay. And then we just looked at Exhibit 10, which has this meeting on -- or at least appears to have occurred on May 2nd. Do you recall anything about the time in between your first discussion with Dr. Peddada and this meeting?

A. Can you ask more specifically?

Q. Yeah. Did you have any conversations with anyone about what Dr. Peddada had explained to you during the first discussion?

A. In -- in general, no. Because, you know, I -- I viewed that, really, as a confidential conversation. You know, just from that standpoint. So no. Prior to this, though, I did -- I believe -- well, I mean, in setting up even this, I did hear from Dr. Plauth that the request was made for the leave. So -- so yes to that part.

Q. Okay. I think I can put even more dates on

Page 88

this for you to help you put some things into context. I'm going to show you what's been marked as Exhibit -- what's going to be marked as Exhibit 11.

(Exhibit 11 was marked.)

Q. Just let me know when you've had a chance to look it over.

A. Yes. Okay.

Q. Is it fair that this is an email from Dr. Peddada to Dr. Monroe, cc'ing Dr. Koval and Dr. Plauth on April 25th, 2022?

A. That's what the title says, yes.

Q. Okay. Have you seen this email before?

A. No.

Q. Okay. You mentioned earlier that you received word from Dr. Plauth that a request for leave had been made.

Is -- is this consistent with the timeline on which you heard from Dr. Plauth?

A. Potentially. I mean, it's roughly.

Q. What else did Dr. Plauth explain to you in saying that a request for leave has been made, if anything?

A. I believe that was really all. I think there is another email of, again, the separation of the employment from the medical staff piece. And so just that

Page 89

the requests had been made on the medical -- the -- the request needed to come on the medical staff side.

Q. Okay. And you view this as a request on the employment side, which was, in your view, not through Centura; is that fair?

MS. McMANUS: Object to foundation.

A. Yeah. I can only gain what it's about by reading it.

Q. (By Mr. Azmoudeh) Yeah. Yeah. That's what I'm asking.

A. Yeah.

Q. This looks like it's a request directed to Radiation Oncology, PC, which is not Centura; right?

A. Correct.

Q. Okay. And so there was a discussion with Dr. Plauth -- it was an email -- I'll represent to you that that's true -- about Dr. Peddada, you also need to make a request through the privileges side.

A. Correct.

Q. Okay.

A. Or that that's really our only concern with it, really. I mean, again, him cc'ing them on this, there's a question to why.

Q. Well, why do you think he did?

A. I don't know.

MAGNA
LEGAL SERVICES

Page 90

Q. Do you think it may have had to do with the fact that he practices medicine at Penrose?

A. Again, I don't know. This is a request from his employer, so I don't know why he involved them.

Q. If he takes leave from his employer, he's probably not going to be practicing medicine at Penrose; correct?

MS. McMANUS: Object to foundation.

A. No. That's actually very incorrect. You can practice in any capacity, whether or not you're employed by someone or not.

Q. (By Mr. Azmoudeh) Okay. But if he wanted to have leave from -- well, let me ask this: Are you aware whether Dr. Peddada practiced medicine anywhere else?

A. I am not aware.

Q. Okay. Would you have any reason to dispute if I told you that he only practiced medicine at Penrose during this period?

A. Again, I'm not aware, so I have no reason to dispute it.

Q. So if he wanted leave from the practice of medicine, he would have to go and request leave from you or the MEC?

A. If he wanted a leave of absence from his

Page 91

practice at the hospital, he would request leave from me.

Q. Okay. And I -- what I'm representing to you is that he wasn't permitted to practice anywhere else. So the only place he could practice medicine for -- at is Penrose, and if he wants a break from that, he has to ask you for leave?

A. But you're telling me that now. There's no way for me to know in real time whether or not that's the case, and, really, plenty of people in our community have privileges in other places. I don't know that he doesn't have privileges at Memorial, for example.

Q. Okay. Understood. At some point, he did request leave from you; correct?

A. Yes.

Q. Okay. And is that -- if you go back to Exhibit 10, is this email referencing a meeting in which he requested leave from you first verbally?

A. Yes.

Q. During a meeting; correct?

A. Yes.

Q. Who was in attendance at that meeting?

A. Myself and Dr. Plauth and Dr. Peddada.

Q. Do you recall what happened during the meeting?

A. It was -- my recollection of the meeting

Page 92

was that -- that he had asked for the leave. The process was explained to him of that we needed a written request. I believe we went over the general aspects of both the request for the leave as well as the reinstatement process.

Q. Did you all talk at all or did Dr. Peddada volunteer at all the condition that he was experiencing?

A. Again, I don't think -- I don't know that the specific term "burnout" was used. I'm not -- I don't know that specific piece. I know he was requesting leave. I believe he mentioned the support of his primary care physician for the leave.

Q. Okay. I'm going to -- again, I'm not trying to hide the ball from you here. Maybe this will refresh your recollection on this issue. This is Exhibit 12. It's going to be marked as 12.

(Exhibit 12 was marked.)

Q. Let me know when you've had a second to look over this. Let's just focus on the first page for now, if you could.

A. Uh-huh. Okay.

Q. Okay. Do you see -- is it fair to say that this is a letter from you to Dr. Peddada?

A. Yes.

Q. Okay. And this letter is dated May 5,

Page 93

2022?

A. Yes.

Q. Okay. If you look in the -- the sort of big paragraph in the middle, there's a sentence that starts with, "As you cite"?

A. Yes.

Q. And it says, "As you cite that this leave is for health reasons relating to burnout and exhaustion." Do you see that?

A. Yes.

Q. Okay. Does that help you remember whether Dr. Peddada was bringing up burnout?

A. No. Because he mentions burnout and exhaustion in the request on May 2nd, so that's where it's mentioned for sure.

Q. Okay. But it's possible that he might have raised it at the meeting? You're just not sure?

A. Yes.

Q. Okay. Back to the meeting. Remind me again what was happening at the meeting. I'm sorry.

A. We were discussing the request for leave and the policy -- the credentials manual policy was described to him about the nature -- the request for leave, the timing of the leave, who grants the leave, and the request eventually for return of privileges.



24 (Pages 90 to 93)

Page 94

Q. If you look at Exhibit 12, there's a second page to Exhibit 12.

A. Yes.

Q. When you say you were discussing policies during the meeting with Dr. Peddada, is this what you're referring to?

A. Yes.

Q. Is this, at the bottom right, labeled Peddada 5?

A. Yes.

Q. Okay. Did Dr. Peddada express any disagreement -- disagreement with what you were telling him?

A. I don't know what -- no. There's -- it's a -- it's a policy, so I don't think he -- I don't think he objected to the policy. The policy is what it is.

Q. Okay. And you mentioned earlier that he might have brought up a visit with his primary care physician. Do you remember that?

A. Yes.

Q. Okay. Do you remember anything specific about that part of the conversation?

A. No. The -- my understanding of the request was the 90 days, that it was brought up by his primary care physician, and then there was really no more

Page 95

substance to the request, actually.

Q. What do you mean by "no more substance to the request"?

A. He didn't say anything about what he was doing with the 90 days, why it was 90 days.

Q. Is that ordinarily something an employee brings up, what they're going to do on their leave?

A. Yes.

Q. What would you have wanted to know from Dr. Peddada that he didn't share with you about his leave?

A. What -- what he was going to do during the leave. You know, just in general speaking -- again, taking it to a different example, if someone's asking for -- again, we're talking about an extraordinary leave -- that's the definition of less than 30 days' request -- and so I would want to know what he is doing in general terms to be able to eventually re -- ask for reinstatement.

Q. Did you ask --

A. Because I want him to get to that point.

Q. Did you ask him any questions to that effect?

A. I'm not sure.

Q. Do you have any reason to doubt, if you had asked those questions, that he would have told you?

Page 96

A. I don't know.

Q. Did you have any reason to doubt that what Dr. Peddada was saying -- that he was stressed and that maybe he also brought up physician burnout -- let me just ask a different question.

Did you have -- did you have any feeling of skepticism about Dr. Peddada's complaints in his request?

A. From this conversation, no, because there was not much. From the prior conversation I had with him, I was skeptical almost -- about a lot of what he said.

Q. Okay. What parts of what he said during the first meeting in April were you skeptical about?

A. How much he was working, how little leave he was taking, how much time -- I mean, it was -- I guess I should just say I was skeptical over all of it because it was all one-sided accounts, and so I didn't have anything to back it up.

Q. Was Dr. Plauth at least -- based on your impression, also skeptical about maybe some of the representations that Dr. Peddada was making?

A. No. Because these were -- these were -- the content of the conversations are entirely different, so Dr. Plauth wasn't present for the -- yeah.

Q. You -- I think we discussed that you had at least -- you had gotten some information from Dr. Plauth

Page 97

that Dr. Peddada had requested leave from ROPC. You had that discussion with Dr. Plauth; correct?

A. No. It was -- it was really more that he was asking for leave and the medical staff part of it. I don't know who he would have asked for leave at the time on the other side.

Q. Okay. Did you do anything to determine whether there were circumstances to support your skepticism about how much Dr. Peddada was working and how he was feeling and maybe his representations about the relationship with Dr. Monroe?

A. Not to that specifically. To address the issue of skepticism on the -- whether or not a medical leave was the right thing, I guess, we did -- I did request for the CPHP evaluation, and that was a piece of it.

Q. Okay. Is that practice that -- is that part of the -- you make a decision about whether to grant or deny a leave; right?

A. Yes.

Q. What goes into that decision, generally, when an employee asks -- when a physician practicing at the hospital asks for leave?

A. It's very uncommon -- so I think I have to start with that piece -- to ask on the -- on the medical

Page 98

staff side for leave.  So, typically, there is a discussion about, you know, why -- just in general terms, why a leave is needed and then the timeline and plan for return.  But the timeline isn't something that's granted by the medical staff at all.

Q.  Who grants the timeline?

A.  No one.  It's -- a -- I mean, it's really more the reinstatement piece.  So it's on their decision.

Q.  Understood.  Let's go back to -- actually, let's move forward a little bit.  So you have the meeting with Dr. Peddada in which he requests the leave and you tell him please submit this in writing.  Is that sort of the conclusion of the meeting?

A.  Correct.

Q.  Okay.  I'm going to show you -- let's go back to Exhibit 10.

A.  Okay.

Q.  Is this the request in writing for a leave of absence from practicing medicine at Penrose?

A.  Yes.

Q.  What did you do when you received this email?

A.  I believe that there was -- that I had a discussion with Dr. Betsy Kleiner, who is the chair of medicine, and then we were in agreement to request the

Page 99

leave, and I believe, after that, I emailed him back, approving the leave.

Q.  Did you express any of the skepticism to Dr. Kleiner about some of Dr. Peddada's representations?

A.  Not of his -- the -- not of the representations.  I think more of the plan for leave.  Some skepticism of that.

Q.  What was the substance of that discussion?

A.  Again, the unusual request of a 90-day leave without, you know, any indication of structure and of the approver of the leave.

Q.  Was there any discussion --

A.  Let me back that up.  The -- his reported medical oversight of the leave -- meaning his primary care physician -- that's the -- that's not typical for a mental health leave of any sort.

Q.  Why is it not typical?

A.  Because it's not really in the purview of -- of an outpatient physician.  They don't -- we don't -- for mental health-type leaves, we don't manage the -- from a -- an in-depth standpoint.  It's like I don't manage an oncology plan from an in-depth standpoint.  I would make a referral to an oncologist to do that.

Q.  Do you know the name of Dr. Peddada's primary care physician?

Page 100

A.  I believe that's in the privileged conversation.  Is that --

Q.  Dr. Peddada -- they will lodge objections if they need to.  They're pretty darn good at it.  Dr. Peddada -- I can --

A.  I only know it now.

Q.  Okay.  That's just a fact.  I can represent to you, if you want to avoid any discussions with them, her name is -- I'm going butcher this -- Dr. Munni Selagamsetti.

A.  Yes.  She goes by Dr. Munni Setti.

Q.  Do you know Dr. Munni Setti?

A.  Yes.

Q.  How do you know Dr. Munni Setti?

A.  She practices -- she did practice in the hospital setting as well as the outpatient setting.

Q.  And you do not believe that Dr. Setti is necessarily the right person for the job to decide what's the appropriate amount of leave for Dr. Peddada in those circumstances?

A.  I do not believe she is the correct person.

Q.  Okay.  Do you think that she's the right person to make a diagnosis as to whether Dr. Peddada's experiencing physician burnout?

A.  I'm not sure.  I don't know her background.

Page 101

I don't know her background on that or her knowledge of burnout, so I don't know, but my concern as -- as -- and again, and why the CPHP referral is here is that I felt that there needed to be both -- an independent third party for both exit and return.

Q.  Okay.  Did you have any -- what I'm -- go ahead.

A.  Sorry.  And they would -- CPHP would make recommendations on things to enable him to return.

Q.  Okay.  What I'm hearing is just a concern about whether this is an effective path forward for Dr. Peddada.  Is that an effective path in terms of getting, you know -- having him heal and be able to return to duty and care for patients and do it safely?  Is that the concern?

A.  Yes.

Q.  Was there any concern that Dr. Peddada had ulterior motives in making this complaint and requesting leave?

A.  I don't believe that that should accompany the decision to make a request for leave.  It's not -- I'm not acting as a physician in this role, and so that's really how I approach this was more from a -- a request for leave was asked for.  I'm not going to question that, but I am going to ask for supporting information --



Page 102

Q. Okay.

A. -- being the CPHP referral.

Q. If you could turn back to 12 -- Exhibit 12, well, actually, let me close the loop for a second.

So after the meeting with Dr. Peddada on May 2nd, you have some conversations with Dr. Kleiner?

A. Yes.

Q. Okay. And the -- does anything else strike you or you recall from that conversation with Dr. Kleiner?

A. No.

Q. Okay. Any other conversations about Dr. Peddada's request for leave between, let's say, that meeting on May 2nd and your issuance of the letter on May 5th?

A. No.

Q. Did you speak with Dr. Plauth?

A. Not that I recall.

Q. Okay.

A. Outside of the day of the meeting, May 2nd.

Q. Did Dr. Plauth have anything to add on May 2nd during the meeting with Dr. Peddada?

A. I am sure there was. I don't recall the nature of it, however.

Q. Was the take-away that he had some of the same maybe skepticisms about the path going forward that

Page 103

he shared with you?

MS. McMANUS: Object to form.

A. Again, I don't know how the specific issue was raised as I had skepticism about just -- just, again, the -- the need for him to have a path forward.

Q. (By Mr. Azmoudeh) Did you think maybe there was less time that could accomplish the same goal or maybe there was something in particular he could do during the leave that you didn't think was there? What were you thinking could be added to this structure and plan?

A. Generally speaking, I think if someone has an issue or a diagnosis, they have a treatment plan. And that wasn't shared. And it's fine for him not to share it, per se, but I believe there should have been a plan. And again, that's -- that's where CPHP comes into play is they mediate that, so I don't have to know the nature of it, just that there is one.

Q. Let's go back to Exhibit 12, your letter from May 5th. Something that strikes me as odd in this letter, Dr. Baldauf, is that nowhere in it do you say I am granting the leave. There are no magic words in here, I am granting leave. Do you agree with me about that? Maybe take a minute to read through it.

A. Correct.

Q. Is that what you intended, that you were

Page 104

granting the leave?

A. I honestly am not sure because, again, the -- the CPHP component was significant.

Q. Uh-huh.

A. So -- and again, the nature of the -- it's -- it's kind of a binary, you grant the leave or not. Not the extent of it. So I can say for sure that I was granting -- and again, the 30 days also comes into mind because if it's less than 30 days, it's not actually even a leave, I believe. The request for the time away.

So there was a component of trying to get information in that period of time.

Q. Okay. I'm also not sure what exactly was the function of this letter, other than what -- as you said, which is to schedule the CPHP work, but there's things in here that indicate to me that leave has been granted. And you can tell me whether you agree or disagree.

In the second sentence of the first paragraph, you say, "As outlined, the request for reinstatement must be accompanied by an appropriate report" and so forth. Do you see that part?

A. Yes.

Q. Okay. A request for reinstatement indicates that a leave has been granted; is that fair?

Page 105

A. Yes.

Q. And if Dr. Peddada or any other reasonable reader -- well, rephrase that question.

If you were reading this letter, you might think the leave has been granted. Is that fair?

A. I mean, I think that's hard to say because, as you point out, it doesn't say that, so ...

Q. Yeah. But we're going off context clues. Sometimes we have to read off context clues; correct?

A. Yes.

Q. And the second sentence in that first big paragraph is talking about the request for reinstatement; is that fair?

A. Yes.

Q. And indicates, based on context, that the leave has been granted?

A. Yes.

Q. There's another sentence, same paragraph. It's the sentence that we discussed earlier that starts with, "As you cite." It says, "As you cite that this leave is for health reasons relating to burnout and exhaustion" and so forth, it seems to appear that it's -- this letter is discussing a leave that exists. It's this leave.

Would you agree with me there?

MAGNA
LEGAL SERVICES

Page 106

A. Yes.

Q. Okay. So that indicates, again, that the leave request has been granted?

A. Yes.

Q. Okay. And then kind of the same thing at the very end of the big paragraph. It says, "Ultimately, we would need their clearance for you to return to duty."

Do you see that?

A. Yes.

Q. Okay. And that, again, indicates that the leave has been granted?

A. Yes.

Q. Okay. And I take your point, that it's possible that you were -- maybe you were just granting the leave for 30 days in anticipation of some of the CPHP work?

A. Yes.

Q. Okay. Well, let's say it doesn't say that in this letter; is that fair?

A. Yes.

Q. Okay. So it's equally possible that the request for three months, which was what Dr. Peddada put in his email to you, was granted?

A. No. Because I don't grant the time.

Q. Correct. You -- you grant a leave, and the

Page 107

only way that they come back is by reinstatement?

A. Correct.

Q. And the reinstatement is the bookend of the leave?

A. Correct.

Q. Okay. Are you aware that Dr. Peddada was ever reinstated to Penrose?

A. No.

Q. Okay. So kind of after this point, he's on leave and, certainly, events occur, but he was never reinstated at Penrose?

A. He never -- he never applied for reinstatement.

MR. AZMOUDEH: Okay. Lunch break? I need a lunch break.

MR. SABEY: How much longer do you have, do you think?

MR. AZMOUDEH: Maybe an hour and a half.

MR. SABEY: Okay.

MR. AZMOUDEH: Is that all right?

MR. SABEY: Yeah.

MR. AZMOUDEH: Let's go off the record.

(Recess taken, 12:24 p.m. to 1:35 p.m.)

Q. (By Mr. Azmoudeh) I think when we left off, Dr. Baldauf, we were talking about the CPHP

Page 108

instruction to Mr. -- Dr. Peddada; is that correct?

A. Yes.

Q. Okay. Was that -- did you provide any other instruction to Dr. Peddada about what he -- any tasks that he needed to perform during leave?

A. No. Needed to perform, no.

Q. Okay. Was there some that you recommended that he perform?

A. Just that he'd have -- that I suggested that he should think about a plan.

Q. Is that encompassed with your recommendation to do CPHP?

A. Yes.

Q. Okay. Did you give him any instruction about what he couldn't do during the leave?

A. No. I don't think so. The -- there are things that are outlined in the credentials policy that he can't do as far as like logging in and that kind of thing, but, otherwise, no.

Q. Do you recall those things off the top of your head?

A. I -- I mean, that's it. You get cut off from the computer system like when the leave starts, so you -- if there's anything that needs to be finished, you have to have it done before then. That might have been or

Page 109

should have been part of that conversation.

Q. Dr. Peddada being cut off from the computer system, he's being cut off from which computer system?

A. Sorry. Thank you. From the hospital's version of EPIC.

Q. What's EPIC?

A. How long do you have? That's, essentially, the nature of my job now.

MR. SABEY: That's a good question.

A. Yeah. There -- the overwhelming majority of hospitals use EPIC as their electronic health record, so it's, basically, charting, if you will.

Q. (By Mr. Azmoudeh) Okay.

A. So you cannot write in the chart when you don't have privileges.

Q. Does EPIC also house any, you know, internal or external communication methods that Dr. Peddada would have been using, you know, at the hospital? Like is there an email account on EPIC, as well?

A. No. It's all patient-specific things.

Q. Okay. Were there any other systems that you instructed -- or that the bylaws required that acquisition -- physicians on leave not have access to?

A. I think that's the only thing, and it doesn't, of course, mention EPIC specifically. It's just

MAGNA
LEGAL SERVICES

Page 110

more just records need to be completed before your leave starts.

Q. Okay. Was -- according to your understanding, was he forbidden from taking any vacations during the leave?

A. There's -- no. He was not forbidden from taking any vacations during leave.

Q. Did you provide him any instruction that he needed to continue working in any capacity during the leave?

A. No instruction.

Q. Okay. Is the instruction the opposite, that you shouldn't be working during the leave?

A. The only -- no. It's just that he doesn't have the ability to care for patients in the hospital. He doesn't have that privilege.

Q. Okay. If there are administrative tasks that need to be done through the hospital -- let's say there's a missing part of his credentialing packet that he needs to work on -- could he still work on something like that while he's on leave?

A. Yes. And I think that's outlined a little bit in the credentials manual.

Q. Okay. Great. But at least you did not instruct him -- scratch that question. There's no -- not

Page 111

going anywhere.

Q. Did anybody else provide any instructions to Dr. Peddada about what he could or couldn't do during the leave, as far as you're aware?

A. Not in any conversations I was in.

Q. Okay. Did anybody else provide any instructions to Dr. Peddada about what he needed to do during the leave, as far as you're aware?

A. Not that I'm aware of.

Q. Okay. The only instruction that you're aware of is the CPHP?

A. Correct.

Q. Okay. Did you provide any instruction to Dr. Peddada that he needed to be available by phone or email during the leave?

A. No.

Q. Are you aware of anybody else providing any instruction to Dr. Peddada that he needed to be available by phone or email during the leave?

A. Not that I'm aware of.

Q. So as far as you recall, Dr. Peddada goes on leave May 5th, 2022?

A. Yes.

Q. Okay. What happens after that?

A. I don't know.

Page 112

Q. Okay. Do you know anything about why Dr. Peddada stopped working at Penrose?

A. Why he stopped working long-term?

Q. Yes.

A. More from this case and reading MedScape kind of things, but not from -- again, he -- he, essentially, doesn't exist to us from a privilege standpoint until he tries to come back, so no.

Q. What's MedScape?

A. The physician news thing that -- it's -- that's about all I know about it.

Q. Is it a -- it's not run by Centura?

A. No.

Q. It's run -- I'm sorry?

A. No.

Q. Is it a news outlet?

A. I think so.

Q. Okay. What did you read, as far as you can recall, in the MedScape articles about Dr. Peddada?

A. That he was filing a lawsuit of the nature that we're talking about.

Q. Okay. What was your reaction to reading that?

A. It just -- that it wasn't true, the way that things were laid out in there.

Page 113

Q. What facts come to your mind when you think things aren't true as they are laid out there?

A. That the -- any contract pieces that had anything to do with any leave or burnout was just not true.

Q. Did you make any decisions with respect to any of the contract pieces?

A. No.

Q. Okay. So it's kind of hard to say whether it was true or not; is that fair?

A. I think from the timing, maybe, but ...

Q. What do you mean by "the timing"?

A. That's a little -- maybe that's not the best way to answer it. The -- from Dr. Peddada's account, the negotiations were not going well. That there was a lot of -- maybe not going well is a little bit more extreme, but that there were several issues that were kind of not resolved or that he had concerns about.

Q. How does that fit into the -- that -- I guess your earlier opinion?

A. Again -- and I'd have to look back at the article. It just didn't -- the timing, the sequence, and kind of how things were didn't -- didn't line up exactly with kind of where -- where I was with it, what I knew, and what he'd explained about the negotiations or

MAGNA
LEGAL SERVICES

Page 114

whatever.

Q. Okay. Let's try to recreate the timing a little bit.

A. Okay.

Q. And I think that's a fair answer if that's the answer, but let's try to recreate the timing a little bit.

I'm going to show you what's going to be marked as Exhibit 13.

(Exhibit 13 was marked.)

Q. Let's focus, Dr. Baldauf, if you could, on the first two pages of Exhibit 13, which is Peddada 6 through 7.

A. Uh-huh.

Q. Okay. I'm just going to ask you some basic questions first.

A. Sure.

Q. Who -- who is Mr. Tacha to you?

A. At the time -- let's see. I think he was the VP of primary care operations, I think. Or maybe -- anyway, he's on the operational side of leadership with Centura.

Q. Okay.

A. Sorry, I don't recall -- he had a couple different titles, I think, over time.

Page 115

Q. It looks like at the time based on Exhibit 13 --

A. Sorry.

Q. -- he was interim president.

A. I would -- I mean, that's what it says. The -- I'm trying to think of the timing. So it must have been after Vance McLarren left for the minute before they hired Scott Lichtenberger.

Q. So I take it as --

A. So that is -- so yes, that is correct.

Q. My understanding of what I'm hearing is that Vance McLarren used to be interim president of the Centura Health Physician Group.

A. He was president.

Q. Sorry. Excuse me.

A. Yeah.

Q. I'll -- I'll start over again then. You are correct. Vance McLarren was president of the Centura Health Physician Group for a brief moment. Mr. Tacha becomes interim president of the Centura Health Physician Group, and then there was a gentleman -- it wasn't clear to me who took over the role afterwards.

A. Yes. Scott Lichtenberger. I had forgotten that Jason was in that role temporarily.

Q. Was he unremarkable in that role or --

Page 116

A. No. He actually was quite good.

Q. Okay.

A. It just was a short time.

Q. Did you have -- so after -- well, let me ask this: At the top of Exhibit 13, you see this letter went out May 9th?

A. Yes.

Q. Okay. And then on the second page of Exhibit 13, which is Peddada 7, you see that Mr. Weller -- Mr. Samuel Weller, sent a cover email attaching this letter on May 10th, the next day after Mr. Tacha signed or dated the letter?

A. Yes.

Q. Okay. Between May 5th, the day you granted Dr. Peddada leave, and May 9 or 10th, did you have any conversations with either Mr. Tacha or Mr. Weller about this letter and what its --

A. No.

Q. Okay. Did they consult you? Did they reach out to you in any way that maybe you missed?

A. No.

Q. Did you have any other involvement in the process of this letter going out?

A. No. I didn't have any involvement at all.

Q. Okay. Let's try to get a timeline from

Page 117

these communications, if you could.

A. Uh-huh.

Q. You were discussing the timeline earlier, which I think is important. So we'll start with -- we'll start with Peddada 8. Do you see that?

A. Okay. Got it.

Q. Do you see an email from Dr. Peddada on May 10th at 6 p.m.?

A. Yes.

Q. Okay. In that email, Dr. Peddada says, "Sam, there's a clear mistake regarding my executed contract. I reviewed the contract and all my questions addressed by Eric on" May -- sorry -- April 11th, 2022, at 12:30.

Do you see that?

A. Uh-huh.

Q. Okay. And we're just going to go -- look, I know that you don't have firsthand observations about some of this stuff, but you have some opinions about the timeline. And so let's just go based on what these documents are indicating.

And the first piece of information that we have is that Dr. Peddada signed, at least according to these documents, some agreement regarding employment on April 11th, 2022, according to these documents?

**MAGNA**
LEGAL SERVICES

Page 118

MS. McMANUS:  Object to -- object to foundation.

Q.  (By Mr. Azmoudeh)  Do you see that?

A.  Yeah.  Can you repeat the question, though?

Q.  Sure.  So at least according to these documents --

A.  I'm sorry.

Q.  -- and the discussion that's going on in these emails, we're going to try to build a timeline.  Is that fair?

A.  That you're trying to build a timeline, yes.

Q.  Okay.  And the first piece of information I want to draw your attention to is Dr. Peddada's statement right here, which says, "I reviewed the contract and all my questions addressed by Eric on 4/11/2022."  And then in the last sentence of that paragraph, "Eric came by my office and I signed the contract on 4/12/2022 with Eric's assistance."

Do you see those sentences?

A.  Yes.

Q.  So that indicates, at least according to Dr. Peddada -- let me rephrase.

The subject of this email is "Letter regarding employment with Centura."

Page 119

Do you see that?

A.  Uh-huh.

Q.  And we discussed --

A.  Yes.

Q.  -- you knew generally that there was a discussion about Dr. Peddada becoming an employee for Centura?

A.  Yes.

Q.  Right.  So Dr. Peddada's email is indicating that he signed an employment agreement on April 12th, 2022.

A.  He is stating that he signed the agreement.

Q.  Okay.  And then I want you to turn to page 9.  This is Peddada 9.  And do you see this email from Sam Weller to Dr. Peddada on May 11 at 1:30 p.m.?

A.  Yes.

Q.  Okay.  And the next piece of the timeline, at least according to these documents, that I'd like to draw your attention to is in the first paragraph, the very last sentence.  It says, "The revised offer of employment was sent to you on April 26, 2022."

Do you see that?

A.  Yes.

Q.  Okay.  So it sounds like -- actually, go to the next paragraph.  Do you see it says -- sorry.  One

Page 120

more time.

The top of the first paragraph says, "Good afternoon, Dr. Peddada.  Thank you for your email and summary.  The original contract that you signed was not fully executed because it did not include material terms of employment addressing the repayment of the recruitment assistance loan and path for repayment."

Do you see that?

A.  Yes.

Q.  This -- does this match with what we read a moment ago that Dr. Peddada had at some point signed an employment agreement?

A.  I mean, you're asking me to interpret documents I had nothing to do with.  I don't really find the -- like, you know, I -- I just am uncomfortable kind of putting this all together for -- because this isn't stuff I have knowledge of.  I don't even want to have knowledge of it.

Q.  So earlier, you raised the timelines didn't match up with how Dr. Peddada's story was being told; right?

A.  The -- I think the specific piece was -- I'm just trying to think of kind of my reaction to the article, if that's kind of clearly it.  And I'm not sure because it's hard to separate what I knew at the time with

Page 121

what I know now.  So I'm not sure.

Q.  Okay.  I will offer you this:  Is it fair that you didn't have any firsthand observations about any of this stuff?

A.  Correct.

Q.  Okay.  So at trial, if somebody were to ask you, did Centura do everything right in this moment, sending out these emails, you would have no opinion on whether it was right or whether it was wrong or whether -- if -- all the procedures?

A.  Correct.  And I think I just have to go back to the conversation that I had with Dr. Peddada where he -- he expressed his -- some of his kind of perspective on how things were going from the -- from the contract.  And that's, I think, my knowledge of the whole issue in the first place.

And I think I've already said I didn't really trust what he was telling me.

Q.  Okay.  I actually don't --

A.  Not specifically about the contract.  The whole conversation, honestly.

Q.  I don't remember us talking about the contract, so let's dive into that for a second.  What did Dr. Peddada tell you, if you can recall, at that meeting about contracts and employment?

MAGNA
LEGAL SERVICES

Page 122

A.  That he was -- that they were negotiating employment and that he had some specific requests around keeping his number of speaking engagements.

Q.  Okay.  What didn't you believe about what Dr. Peddada was saying?

A.  That's not a typical thing that they would agree to.

Q.  It was the speaking engagements?

A.  The amount of time he needed off for those types of things.

Q.  Okay.  Was there any discussion -- did Dr. Peddada raise any discussion with you about loan repayment plans?

A.  No.  No.

Q.  Thanks.  So I guess to return to my -- my earlier question, that -- that -- Dr. Peddada, whether or not he could negotiate a contract that allowed for him enough time or too much time for speaking engagements, what does that have to do with skepticism about the timeline Dr. Peddada is presenting in the complaint?

MR. SABEY:  Object to the form.

MS. McMANUS:  Yeah.

Q.  (By Mr. Azmoudeh)  I can break it down.  Earlier, we said -- you said you read an article and you were skeptical about the timeline and you didn't believe

Page 123

him; right?

MS. McMANUS:  Object to form.

A.  I know.  I'm really trying to get to kind of what the pieces of it were.  And -- and I -- you know, I think that was it, but I just don't know.

Q.  (By Mr. Azmoudeh)  Okay.

A.  It's more that I just remember the visceral reaction to it, honestly.

Q.  What was your visceral reaction to it?

A.  Just that that's -- that there -- there -- I'll just go back to I had -- I wasn't -- in my conversations that I had one-on-one with Dr. Peddada, there -- they were -- I, in my head at the time, had questions about verifying anything he told me.  I don't know how else to explain that.  But it's just -- and that's just a piece of, you know, being around this type of -- not this type, but just any type of -- from like physician management, that kind of thing is that you don't generally believe one side of things.  You need to verify.

And it just seemed like there was a lot that needed to be verified from my discussion with him, and so I think that some pieces of that probably carried over as I was reading the article.

Q.  Okay.  So I guess I'll reask the question.  If somebody were to ask you at trial about term -- the

Page 124

decision to rescind the contract, the employment agreement, negotiations with the employment agreement, you wouldn't have any really firsthand observations about any of that?

A.  Correct.

Q.  Okay.  And you couldn't get up on the stand and testify I think we did things properly or I think we did things improperly?

A.  Correct.

Q.  Then I won't bother you with it today.

A.  Okay.

Q.  But I do have a related question.  One piece of the timeline that you were -- you were aware of -- so if you look at Exhibit 13, that's May 9th --

A.  Yes.

Q.  -- that's I think, as we discussed, four or five days, depending on whether you're looking at the letter or email -- four or five days into Dr. Peddada's leave.  Does that cause you any concern as the medical staff president responsible for representing physicians, including those that are on leave?

MS. McMANUS:  Object to form and foundation.

A.  Yeah.  I mean, again, his employment and his negotiations aren't kind of under my purview, and it's

Page 125

not also under my purview what he does or doesn't do on leave until he comes back.

Q.  (By Mr. Azmoudeh)  Can you empathize at all with Dr. Peddada?

MS. McMANUS:  Object to form.

A.  Too broad of a question.

Q.  (By Mr. Azmoudeh)  I'll ask this:  So the result of this letter was that Dr. Peddada stopped working at Penrose forever.  Is that as you understand it?

A.  I would say he's still eligible for privileges, so I can't say forever, but he's currently not working there.

Q.  Part of this letter is that he was not going to sign a physician employment agreement with the hospital, with Centura, and another part of this letter is that Centura would not be renewing the professional services agreement with Dr. Peddada to practice at the hospital in that capacity.

So, in some sense, would you agree with me that this is an end of his ability to practice medicine at Penrose for --

A.  No.

Q.  -- the foreseeable future?

A.  No.  Because he could open -- sorry.  No because he could open his own practice, do whatever.  From

MAGNA
LEGAL SERVICES

Page 126

that standpoint, he was still eligible for privileges. The whole two aren't tied together.

Q. Do you think that Centura would have allowed him to practice medicine at Penrose after this?

MS. McMANUS: Object to foundation.

A. I mean, Centura doesn't have, really, much ability over that piece. It's really a med staff issue and he's still -- again, is eligible for privileges.

Q. (By Mr. Azmoudeh) Okay. I'll ask him to reapply so he can practice medicine.

A. He can.

Q. The other question is this: I'll just -- I'll just be a little bit more broad. He lost -- he's no longer working at Penrose. We established that; right?

A. Correct.

Q. Okay. Don't worry about it. I'm not going to get into it, I guess.

You don't have any role in -- what's my question? I lost my train of thought.

Was the news ever delivered to you about any of this: These letters from Mr. Tacha and emails from Mr. Weller? Was that -- were you ever made aware of that by anyone?

A. Was there news delivered to me? No. I think the only piece that I knew is that, you know -- I'm

Page 127

trying to think if I need to work backward or not. I -- I do know that he eventually sought employment, I believe in Hawaii. I do know that Centura eventually hired other people.

And so, again, the question was did I know anything about the contract pieces? There was never any news delivered to me on that, no.

Q. Did you pick up any information about the contract pieces outside of conversations with your lawyers?

A. Say again. Sorry.

Q. Did you pick up any information about the contract pieces, this stuff, the letter with Mr. Tacha, outside of conversations with your lawyers from any other source other than your lawyers?

A. The specific contract negotiations, no. Just the -- that he wasn't going to be employed.

Q. Who gave you the message?

A. I have no idea. Yeah.

Q. Were there any reasons that you learned that Centura was stating that he wasn't going to be employed?

A. It was -- like I said, that they contracted with someone else, so that's -- I knew that piece.

Q. Were -- did you learn of anything related

Page 128

to that there were potential violations of Stark laws?

A. No.

Q. Did you learn anything related to that Dr. Peddada was refusing to repay any loans that he might have owed to the hospital?

A. I knew nothing about the loans until this deposition.

Q. Did you -- did you learn anything that part of Centura's reason for not making Dr. Peddada an employee was related to Dr. Peddada refusing to communicate with Centura?

A. I didn't know about the contract negotiations, so I wouldn't know why.

Q. Okay. It is accurate that Centura decided that Dr. Peddada would not become an employee while he was on medical leave that you granted from the practice? Is that fair?

MR. SABEY: Object to form. Foundation.

A. Yeah. I think, again, I don't grant the length of the leave, so it's -- I can't really speak to that.

Q. (By Mr. Azmoudeh) He hadn't been reinstated?

A. He hadn't requested reinstatement yet.

Q. So he was still on leave?

Page 129

A. Yes. According to the dates that you've -- of the -- what you've provided.

Q. Okay. So while Dr. Peddada was on leave, Centura made the decision, at least according to these dates, that he would not be an employee of Centura?

MR. SABEY: Object to foundation.

A. As he was -- had not requested reinstatement, he was on leave, and the date that -- from this is during that period, but that -- which is still ongoing, he has not requested any reinstatement.

Q. (By Mr. Azmoudeh) What did you describe to be your role with respect to physicians who were on leave?

A. That there isn't a role.

Q. Okay. One of the -- the ways that you described your role with respect to physicians was to make sure that they got fair outcomes. Do you remember that?

A. Uh-huh.

Q. Do you think it's fair for a physician who is on medical leave to have sort of employment decisions made about his future while he's on medical leave? Is that something you'd characterize as fair?

MS. McMANUS: Object to the form.

A. Yeah. Again, that's not -- when I'm saying fairness, it's in the -- what's in my control. And -- yeah.

MAGNA
LEGAL SERVICES

Page 130

Q. (By Mr. Azmoudeh) Okay. Are Mr. Tacha or Mr. Weller on the MEC?

A. No.

Q. Did you notify Mr. Tacha or Mr. Weller that Dr. Peddada was on medical leave from the practice?

A. No.

Q. Did you notify anyone who regularly communicates or works with Mr. Tacha or Mr. Weller that Dr. Peddada was on leave from the practice?

A. I don't think that's -- again, that question --

Q. Did you notify anyone who regularly works or communicates with Mr. Tacha or Mr. Weller about Dr. Peddada's leave?

A. I think you'd have to ask before to be clear on the question the -- the dates have to be really clear because the date that people on MEC were notified is after all of this. So I don't -- I don't know. Does that make sense?

Q. Uh-huh.

A. So I mean, if the question is are there people on MEC that communicate with other people in Centura, the answer is yes. But the communication to those members about this issue was after any of these dates involved. MEC meets on the third Tuesday of the

Page 131

month.

Q. I'm going to pull up a calendar just briefly so I can make that make sense --

A. Sure.

Q. -- just so I know. So for April of 2022, just my very quick research indicates to me that that was -- sorry. Scratch that.

For May of 2022, my very quick research indicates to me that that was May 19th. The third Thursday of every month. Does that sound about right?

A. That -- Tuesday.

Q. Tuesday.

A. Sorry.

Q. The MEC would have met on May 17th, 2022, because it meets on every third Tuesday of the month?

A. I'd have to -- I mean, I'd have to look at a calendar. Sorry. It doesn't sound actually right. It sounds like that's the second Tuesday. Maybe it is the third.

Q. It's an odd month, actually.

A. That's the problem. Always.

Q. You mentioned earlier that after Dr. Peddada -- or after a decision was made that Dr. Peddada would not be becoming an employee of Centura that Centura hired other doctors. Did Centura hire

Page 132

radiation oncologists?

A. Yes.

Q. Okay. Who were those radiation oncologists?

A. I hon -- I know Dr. Monroe was hired. I don't -- I know of -- I can describe him, but -- one of the other ones, and I think there was a third that I think is a female, but I'm sorry, I don't recall their names.

Q. Did you have any other conversations in that same time period about, you know, where is Dr. Peddada?

A. With whom?

Q. Anybody. Let's say anybody in the workplace.

A. I mean, did I hear conversations? Yes. Did I have? No.

Q. What conversations do you recall hearing?

A. I think just along the lines of exactly that. That he's no longer here.

Q. From those conversations, you didn't hear anything more specific about why he was no longer there?

A. I don't -- I don't believe so. I think there may have been some speculation just about the -- just that an agreement wasn't reached, but that's -- that's kind of about it.

Page 133

Q. Did anybody else -- well, I can't answer that -- I can't ask that question in this moment.

All right. I want to zoom out for a second and talk about something that's sort of been lurking all day -- CommonSpirit -- and do a little bit of corporate history --

A. Yes.

Q. -- and see if you understand it the same way I do. Is that fair?

A. Sure.

Q. Okay. So I think, as we discussed earlier this morning, Catholic Health Initiatives Colorado and PorterCare Adventist Health created Centura as a joint venture sometime in the nineties.

A. You know, I wouldn't know the exact name of which entities. I do believe it was CHI and I -- I didn't know what AdventHealth would go under, so ...

I know that in more -- broader terms. Not the actual contractual details.

Q. Okay. Are you aware that CHI, which is Catholic Health Initiatives -- there's a national entity for Catholic Health Initiatives?

A. Yes.

Q. Okay. Are you aware that Catholic Health Initiatives and another national hospital -- hospital,

MAGNA
LEGAL SERVICES

Page 134

Dignity Health, created the new entity called CommonSpirit Health?

A. Yes.

Q. And that was in January of 2019?

A. If you say so, yes.

Q. Okay. I'll represent to you that that's the way I'm thinking about it today.

A. Yes.

Q. So January of 2019, you are certainly a Centura employee by that point?

A. Yes.

Q. Okay. And I think you've already become -- you've already moved past site lead?

A. Yes.

Q. Okay. And you've become the regional medical director for a slightly broader scope of hospitals?

A. Yes.

Q. Okay. And you're also still a hospitalist?

A. Yes.

Q. Okay. Did you -- did the creation of CommonSpirit in January of 2019 have any effects on either of your roles?

A. No.

Q. Okay. Did it ever have any effect on --

Page 135

let's start with the hospitalist role?

A. I mean, sure. It -- I can't wear Centura clothes anymore. But that's the breakup. Not the CommonSpirit. You're asking the question again of CommonSpirit, of the merger, did that have any effect on me as a hospitalist again?

Q. Precisely.

A. I'll just say prior to the dissolution, disaffiliation, no.

Q. Okay. Did you all know that CommonSpirit was created and just -- it was just existing out there in the ether and you just didn't feel any effects or -- did you -- let me ask it a different way.

Did you even understand in January of 2019 that CommonSpirit had been created?

A. I -- so -- that CommonSpirit had been created? No. That Dignity and CHI -- that there was a merger, yes.

So there was somewhere I was going with this. But it was from -- it was a -- a rumor that I had heard from a case manager. Not rumor, but it was a news story that was related to me from a case manager.

I don't believe there was any -- I really don't believe there was any central communication about the merger via an email kind of thing from Centura.

Page 136

Q. Are you aware of whether -- scratch that question.

So one of the examples we discussed way earlier today was the not providing travelers and the mandate, and I think you said that that occurred during your tenure as medical staff director, which was January of 2022 to December of 2023. Is that fair?

A. Yes.

Q. Okay. Did you understand that that mandate came from Centura or CommonSpirit?

A. Centura -- neither are -- are people. So the mandate, as far as I'm aware, came from Peter Banko, the CEO for Centura. That's rumor. Not emailed.

Q. Was part of that rumor, that Peter Banko was at all receiving direction from CommonSpirit?

A. No. I mean, I wouldn't -- I wouldn't know. I don't know -- I think he was acting independently, in my opinion, but ...

Q. If you know, what was the purpose of creating CommonSpirit generally?

A. I don't know.

Q. Okay.

A. I mean, I assume it's economies of scale, but ...

Q. Are you aware -- well, let me ask this:

Page 137

Did you experience any changes in your practice -- so putting aside medical staff president, did you experience any changes in your practice as a result of the creation of CommonSpirit?

A. No.

Q. And then we discussed earlier that Centura ceased to exist in 2023?

A. Correct.

Q. Same question in all positions: Did you begin to experience any effects, any changes in your work as a result of Centura going away, other than you can't wear Centura clothes anymore?

A. Yes.

Q. Okay. What were those changes?

A. I mean, every single thing, from our email has changed, who I'm -- like who I'm employed by is changing, the -- we don't have Adventist Hospitals with us anymore. So, you know ...

Q. Okay.

A. I think our -- our vendor for the cafeteria, I believe, has changed as a result of it, too.

Q. New policies and procedures about everything, I imagine?

A. Slowly. So to some degree, there is, you know -- again, the goal is that economies of scale. So

Page 138

there's a goal for one CommonSpirit, that's very well known that they want to have most things running similarly.

Q. To -- to make it uniform with some of the other hospitals that CommonSpirit might operate?

A. Correct.

Q. Okay. One person we didn't talk about today was Eric Koval. Do you know him?

A. I really don't.

Q. Okay.

A. I mean, I know the name, that he works -- he worked for Centura in that time, but I don't know what his exact role was.

Q. Is he gone since then?

A. I don't know.

Q. We did talk about Mr. Tacha briefly, and you said he did a good job. What was Mr. Tacha doing before he became interim president, if you know?

A. He was the -- so, again, I don't know his exact title, but he was the head of operations for the primary care side. So -- it was split into specialty care and primary care, and so he was on the primary care side. And I point that out because I'm on the specialty side.

Q. Okay. Did you have any social interactions with him the same way that you might have had some social

Page 139

interactions with Dr. Peddada?

A. Yes.

Q. Okay. What was Mr. Tacha like?

A. He's a very nice gentleman, and I think very -- both sincere and family-oriented.

Q. What about Mr. Weller? What was he to your role while you were the medical staff president?

A. To my role as medical staff president, nothing. To the role as hospitalist, medical director, he was involved -- he was the operations person for the greater group, which is the things outside Denver. So hospitals that would have overlap, physicians that would have overlap.

Q. Did you know him at all from some social interactions?

A. Social, actually, probably no.

Q. Okay. Did you know him during work interactions?

A. Yes.

Q. Okay. What was Mr. Weller like?

A. I think he was good -- I mean, from a work perspective, I think he was good at negotiating complex agreements. That was my kind of interaction with him. I think he was a very good listener to some of the complexities as we kind of deal with these things.

Page 140

Q. Where did you gather the opinion that he was good at negotiating contract -- complex contracts?

A. In negotiations for St. Catherine's-Dodge City. And again, I don't know -- I might have the name of the hospital at the time not quite right, but that's what it's called now. There was a hospitalist contract out there that he helped negotiate.

Q. What was your role in those negotiations?

A. I was the medical director for hospital medicine. So my role is to make sure we can hire someone.

Q. Oh, you were hiring a hospitalist?

A. Correct.

Q. Okay.

A. And that wasn't -- a little bit more of a nonstandard approach. Agreement, I should say.

Q. In what ways was it nonstandard?

A. Because it's an incredibly rural hospital in a hard-to-recruit place, and so you just can't pay the same as Denver.

Q. Do you pay more or less?

A. That's kind of an interesting part of the question because they want to pay the same and that's the part that Sam Weller helped with is that they ended up paying more.

If you've ever been to that part of Kansas,

Page 141

you will know.

Q. You express no opinions on that.

A. Your nose probably does.

MR. SABEY: Not on the record.

Q. (By Mr. Azmoudeh) How about Dr. Monroe? Do you still talk to him?

A. I have -- I mean, I don't not talk to him. I've spoken to him just briefly one time, I think. Maybe that's not true. About patient issues, I speak to him occasionally.

Q. Okay. Did you ever speak with Dr. Monroe about this case?

A. Only to say -- not the case, but the MedScape article, I think there was a did you see that, and that was the end of the conversation.

Q. Do you remember what piece of the article you were referring to?

A. There was -- there was no piece of it referred to. It was just, like I said, that it was did you see that, yes, no, yes.

Q. How about Dr. Plauth? I think you mentioned earlier that he's no longer working at Penrose because he's no longer employed by Centura, which doesn't exist.

A. All of that is true.

MAGNA
LEGAL SERVICES

Page 142

Q.  Okay.  Do you still speak with Dr. Plauth?

A.  I don't know that -- I haven't spoken to him.  I had a text message exchange about a position in his -- in the organization that he works in now.

Q.  Did you and Dr. Plauth ever speak about this lawsuit?

A.  No.

Can we take a restroom break?  Is that --

MR. SABEY:  Yeah.

THE DEPONENT:  Is that okay?

MR. AZMOUDEH:  Yeah.  Off the record, please.

(Recess taken, 2:22 p.m. to 2:29 p.m.)

THE COURT REPORTER:  Do you want a copy of the deposition?

MS. McMANUS:  Yes, please.  Electronic.

THE COURT REPORTER:  Do you want copies of the exhibits?

MS. McMANUS:  No.  That's okay.

THE COURT REPORTER:  Will you handle signature?

MS. McMANUS:  Yes.  Yes, of course.

Q.  (By Mr. Azmoudeh)  Dr. Baldauf, I want to ask you, you explained to me earlier that in between the days you granted leave to Dr. Peddada and the day

Page 143

according to Exhibit 13 in which Centura decided or notified Dr. Peddada that -- that it had rejected his employment offer, in between those days, which were May 5 and May 9th or 10th, you did not have any discussions with the MEC about Dr. Peddada, about his leave, or about the rescission of the employment agreement?

A.  Correct.

Q.  Okay.  We're almost done, Dr. Baldauf.  Is there anything you want to add to the discussion today, or have we explored it all?

A.  I think you've covered pretty much all, yeah.

Q.  Okay.

MR. SABEY:  Good job, Omeed.

Q.  (By Mr. Azmoudeh)  Anything you want to clarify or change about what you said today?

A.  You know, I would.  It's on the piece of, again -- just to be clear, on the piece of Dr. Peddada's ability to work at Penrose again.  If he wanted to, he is eligible for privileges.  He could apply for privileges.  Apply as a sole physician, in another practice, however.  I could call on him for a consult for a patient if he did that.

Again, just to clarify the separation of privileges and employment, whether or not he's employed by

Page 144

Centura or not really doesn't affect his ability -- I shouldn't say it doesn't affect.  It doesn't prohibit his ability to practice.

Q.  Understood.  Thank you.  Were you accurate and honest with me today?

A.  Yes.

Q.  Okay.  Did you tell me everything you know about Dr. Peddada's performance in his working capacity?

A.  That's a little more -- a little trickier because everything I know encompasses quite a bit.  So I do think -- I'm trying to think of what I -- and -- ask the question again.

Q.  Have you told me everything that you know about Dr. Peddada's working performance, let's say, at Penrose?  And I think to add a layer to that question -- and I'm sure your attorneys will object to the form of this question, but I think, earlier, we discussed things like you hadn't formed many opinions about things like his bedside manner and his ability to provide good medical care.  It was mostly neutral.  You didn't hear anything bad or good, either way?

A.  Yes.  The issue is I can't -- I'm not sure I can say with confidence about issues that were brought up in privileged situations such as peer or citizenship.  That's the piece that kind of would be outside that.

Page 145

Q.  Well, citizenship is in a -- a public complaint and nobody has moved to restrict that piece.  There's an allegation in the complaint about interaction with nursing staff, I believe.  Does that ring any bells for you?

MR. SABEY:  Well, there are -- peer review can cover citizenship issues.  I don't know if that specific one was addressed by any peer review.

MR. AZMOUDEH:  It's been in the complaint for -- on the docket for months on end.  I think that might be waived.

MR. SABEY:  In the complaint?

MR. AZMOUDEH:  Yes.

MR. SABEY:  How is -- how are we waiving the privilege by what's stated in the complaint?

MR. AZMOUDEH:  I think you had to lodge your --

MR. SABEY:  Well, if it's something that Dr. Peddada knows, then I think he -- there's no privilege as to what he knows.

MR. AZMOUDEH:  Okay.  Let me ask the question.

Q.  (By Mr. Azmoudeh)  Did you have any formal role in any of the citizenship committee, if they exist -- any of their activities with respect to Dr. Peddada?



37 (Pages 142 to 145)

Page 146

MR. SABEY: Object on the grounds of privilege. You're asking if she had a role in a peer review committee; right?

MR. AZMOUDEH: In the same way that I might ask whether that's an attorney. Not -- not what did you do. I'm asking did your role encompass work in that process.

MS. McMANUS: With respect to -- with respect to what? Just generally?

MR. AZMOUDEH: Yeah.

A. Yeah. I think that's fine. It's -- you know, again, this is in the bylaws that the -- there is oversight -- and I use that term loosely -- of really all of the committees in the hospital. All of the med-type committees, of which citizenship is one of them, peer review, again, credentials, all of that included.

Q. (By Mr. Azmoudeh) I'll ask a different question. In any of the conversations that you've ever had, aside from those with your attorneys, did you ever hear that Dr. Peddada's involvement in citizenship committee activities was a reason for Centura rescinding his employment agreement?

A. Definitely not. And I don't know that I really am 100 percent aware of what of his involvement is with that. With citizenship committee.

Page 147

Q. Okay. Would you do anything different, looking back, with respect to Dr. Peddada and his request for leave and your granting of his leave?

A. Well, I might have been more clear in the letter. Again, I'm not sure. It's kind of odd that it was that way. In the granting of the leave, I don't believe I would do anything different.

Q. Would you do anything different in the few days in between your granting of the leave and the day that Centura rescinded his employment agreement?

A. No.

MR. AZMOUDEH: Okay. That's all I have for today.

MS. McMANUS: No questions for us.

MR. AZMOUDEH: Thanks, Doctor.

* * * * * * * * * *

(WHEREUPON, the foregoing deposition was concluded at the hour of 2:36 p.m. Total time on the record was 3 hours, 16 minutes.)

Page 148

I, CARYN BALDAUF, M.D., the deponent in the above deposition, do hereby acknowledge that I have read the foregoing transcript of my testimony, and state under oath that it, together with any attached Amendment to Deposition pages, constitutes my sworn testimony.

_____ I have made changes to my deposition

_____ I have NOT made any changes to my deposition

_____
CARYN BALDAUF, M.D.

Subscribed and sworn to before me this _____ day of _____, 20____.

My commission expires: _____.

_____
NOTARY PUBLIC

Page 149

CERTIFICATE OF DEPOSITION OFFICER
STATE OF COLORADO          )
CITY AND COUNTY OF DENVER    )

I, Bonnie Carpenter Johnshoy, a Registered Professional Reporter, commissioned to administer oaths, do hereby certify that previous to the commencement of the examination, the witness was duly sworn by me to testify to the truth in relation to matters in controversy between the said parties; that the said deposition was taken in stenotype by me at the time and place aforesaid and was thereafter reduced to typewritten form by me; and that the foregoing is a true and correct transcript of my stenotype notes thereof.

That I am not an attorney nor counsel nor in any way connected with any attorney or counsel for any of the parties to said action nor otherwise interested in the outcome of this action.

_____
Bonnie Carpenter Johnshoy
Registered Professional Reporter
Certified Shorthand Reporter
Certified Realtime Reporter

MAGNA
LEGAL SERVICES

**A**

**ability**
20:11 46:4 49:14
65:19,24 110:15
125:20 126:7
143:19 144:1,3,19
**able**
6:6 52:4 77:1 95:17
101:13
**abnormal**
3:18
**absence**
33:21 90:25 98:19
**absent**
5:12
**absolute**
23:5
**access**
109:23
**accident**
16:10,11
**accommodation**
42:1,3 47:6
**accompanied**
49:12 104:21
**accompany**
101:20
**accomplish**
103:7
**account**
109:19 113:14
**accounts**
96:16
**accurate**
59:6 128:14 144:4
**acknowledge**
148:2
**acquired**
30:15
**acquisition**
109:23
**Act**
48:12
**acting**
101:22 136:17

**action**
25:25 149:16,17
**activities**
32:12 46:5 145:25
146:21
**actual**
69:22 133:19
**add**
69:7 102:20 143:9
144:15
**added**
103:10
**address**
47:13 97:12
**addressed**
117:13 118:16 145:8
**addressing**
120:6
**administer**
149:5
**administration**
42:24 43:2
**administrative**
22:6 56:24 110:17
**admit**
60:23 61:3,7
**admitted**
15:23 16:1 60:24
**admitting**
61:4 62:7
**adopt**
46:14
**advance**
6:2 34:6
**advantages**
77:8
**AdventHealth**
13:9,13 133:17
**Adventist**
133:13 137:17
**advice**
5:20
**advise**
30:1
**advisory**
27:5,5

**affect**
46:4 53:24,25 144:1
144:2
**affiliate**
59:17
**affiliated**
27:16
**afloat**
30:12,14
**aforesaid**
149:11
**afternoon**
6:1 120:3
**ago**
71:3 120:11
**agree**
13:22 24:6 34:22
103:22 104:17
105:25 122:7
125:19
**agreed**
55:6
**agreement**
17:10,14 54:25 78:3
78:6,9 98:25 117:24
119:10,12 120:12
124:2,2 125:14,17
132:24 140:15
143:6 146:22
147:10
**agreements**
139:23
**ahead**
11:17 74:17 101:7
**aim**
76:17,24
**Alan**
2:14 78:13,14
**alcohol**
25:16
**alcoholics**
12:10,15
**alcoholism**
25:15
**allegation**
145:3

**allotted**
26:5
**allow**
23:8 61:11 77:5
**allowed**
122:17 126:4
**alongside**
60:13
**Amendment**
148:4
**amount**
14:12 83:14 100:19
122:9
**anesthesiologists**
32:6,7
**answer**
5:6,14 29:21 40:13
41:15 52:10 53:6
68:6 83:17 113:14
114:5,6 130:23
133:1
**answers**
4:19 23:4 79:5
**anticipation**
106:15
**Anuj**
1:4 2:12,14,16,18
3:16
**anybody**
27:2 46:13,14 83:23
111:2,6,17 132:13
132:13 133:1
**anymore**
11:21 135:3 137:12
137:18
**anyone's**
48:24
**Anytime**
76:6
**anyway**
14:23 114:21
**anyways**
31:13
**apart**
81:4
**appear**



4:24 105:22
**APPEARANCES**
1:12
**appears**
87:10
**application**
48:7
**applied**
58:5,23 107:12
**apply**
143:20,21
**applying**
71:8
**appreciate**
9:11 46:16 55:20
**approach**
101:23 140:15
**appropriate**
2:1 24:3 100:19
104:21
**approval**
37:3
**approver**
99:11
**approving**
24:17 99:2
**April**
82:3 86:9,10,11,15
86:17 87:7 88:10
96:12 117:13,25
119:11,21 131:5
**areas**
32:2 33:5
**arrangement**
73:22
**arrived**
59:12,13
**article**
113:22 120:24
122:24 123:23
141:14,16
**articles**
112:19
**aside**
9:2 21:20 28:12
46:25 47:3 59:1

62:16,17 63:10
70:17 137:2 146:19
**asked**
80:12,15 87:1 92:1
95:25 97:5 101:24
**asking**
40:11 41:3,5 48:6
56:17 89:10 95:13
97:4 120:13 135:4
146:2,6
**asks**
97:22,23
**aspects**
92:3
**assessment**
49:13
**assign**
84:25
**assigned**
16:5
**assignments**
31:20 33:1
**assistance**
118:19 120:7
**assists**
27:20,22,25
**assume**
5:6 13:22 37:12
46:11 59:21 136:23
**assuming**
63:5
**assumption**
51:13
**attached**
148:4
**attaching**
116:10
**attendance**
83:23 91:21
**attention**
25:5 33:13,16 72:6
118:14 119:19
**attorney**
5:9 43:8 146:5
149:14,15
**attorneys**

5:18,20 7:15,18,21
7:24 8:2 42:22
144:16 146:19
**August**
14:3 21:9 57:8
**authority**
34:18 68:2
**available**
111:14,18
**avoid**
100:8
**aware**
14:1,2 30:21 47:1,1,7
47:18,20,25 50:12
50:15,16,25 51:16
57:22 58:1,4,5 63:3
63:4,17 64:19 66:3
66:7,10 68:24 69:2
69:5 72:16,16 73:11
77:16 78:16,18,20
79:14 81:19 90:14
90:16,20 107:6
111:4,8,9,11,17,20
124:13 126:22
133:20,24 136:1,12
136:25 146:24
**Azmoudeh**
1:13 2:10 3:6,14
16:20 21:13 35:5
38:18 39:12 40:14
40:24 41:9,20,25
42:6 48:10,13,19,21
48:23 50:24 52:12
55:4 57:15,19 67:18
67:22 68:1,14,18,21
69:25 73:11 76:14
89:9 90:12 103:6
107:14,18,20,22,24
109:13 118:3
122:23 123:6 125:3
125:7 126:9 128:22
129:11 130:1 141:5
142:11,23 143:15
145:9,13,16,21,23
146:4,10,17 147:12
147:15

**a.m**
2:6 57:18,18

_____

**B**
_____

**back**
14:5 38:6 43:3 44:2
55:16 63:5 71:22
91:15 93:19 96:17
98:9,16 99:1,13
102:3 103:18 107:1
112:8 113:21
121:12 123:11
125:2 147:2
**background**
9:13 86:19 100:25
101:1
**backward**
127:1
**bad**
5:2,4 144:21
**Baldauf**
1:10 2:2,12,16 3:2,8
3:9,11 6:15 84:22
103:20 107:25
114:11 142:23
143:8 148:1,11
**ball**
4:7 92:14
**Banko**
136:12,14
**based**
36:17 45:7 96:18
105:15 115:1
117:20
**basic**
114:15
**basically**
16:1 109:12
**basis**
74:3,5 87:4
**Bates**
84:25 85:6
**becoming**
7:11 60:22 73:14
119:6 131:24
**bedside**



65:17 69:18,21,22
70:4,8,14 144:19
**began**
60:12 61:15
**behalf**
1:13,18 22:1 54:10
66:8
**believe**
24:3 34:2 36:1,18
44:3 45:24 46:7
53:21 55:9,18 57:10
58:24 71:14 72:23
76:14 82:24 87:21
88:23 92:3,11 98:23
99:1 100:1,17,21
101:20 103:14
104:10 122:4,25
123:19 127:2
132:22 133:16
135:23,24 137:21
145:4 147:7
**bells**
145:4
**benefit**
76:23
**best**
4:2 5:18 78:10
113:14
**Betsy**
98:24
**better**
27:14 33:13 49:20
59:23 69:17 77:5
**big**
12:9 93:4 105:11
106:6
**binary**
104:6
**bit**
10:22 13:21 22:9,20
22:23 46:8 53:4
98:10 110:23
113:16 114:3,7
126:13 133:5
140:14 144:10
**board**

27:4,6 32:2 37:2,2
**Bonnie**
2:6 3:23 149:4,20
**bookend**
107:3
**bore**
13:21
**bosses**
56:16
**bother**
124:10
**bottom**
84:23 85:1,3 94:8
**brain**
5:3
**break**
10:3 22:9 57:14,15
81:13 91:5 107:14
107:15 122:23
142:8
**breaking**
80:24
**breaks**
5:23
**breakup**
135:3
**Brian**
57:8,12
**brief**
30:11 115:19
**briefly**
131:3 138:16 141:8
**bring**
75:17 80:3
**bringing**
77:2,13 79:16 93:12
**brings**
95:7
**broad**
45:10,12 53:6 125:6
126:13
**broaden**
18:16
**broader**
133:18 134:16
**broadly**

25:6
**broke**
17:8
**brought**
53:1,19 94:18,24
96:4 144:23
**bucket**
49:6,8
**build**
68:4 118:9,11
**building**
60:10 64:18
**burned**
45:4
**burnout**
42:12 43:17 44:12,18
44:19,23 45:8,9,14
45:20 46:4,23 47:6
47:8,10,10 81:21,25
82:14,16,20 83:2
92:9 93:8,12,13
96:4 100:24 101:2
105:21 113:4
**business**
13:6 51:22 74:19,22
78:1
**busy**
43:5
**butcher**
100:9
**bylaws**
24:16 109:22 146:12
**bystander**
75:24

————————
**C**
————————
C
3:1
**cafeteria**
59:25 62:24 80:21
137:21
**calendar**
131:2,17
**call**
3:11 9:12 16:14,15
86:16 143:22

**called**
2:3 50:13 84:25
134:1 140:6
**Cancer**
60:25
**capacities**
62:20
**capacity**
10:11 66:8 87:3
90:10 110:9 125:18
144:8
**car**
16:10,10
**care**
10:13 42:25 65:4
75:11 77:5 80:18
92:11 94:18,25
99:14,25 101:14
110:15 114:20
138:21,21,22,22
144:20
**career**
14:6
**Carpenter**
2:6 149:4,20
**carried**
123:22
**Caryn**
1:10 2:2,12,16 3:2,8
3:9 148:1,11
**case**
1:3 67:19 91:9 112:5
135:21,22 141:12
141:13
**casual**
9:3
**categories**
6:8 68:5 79:3
**categorize**
20:23 25:6 42:15
**category**
27:21 42:16 68:19
**Catherine's-Dodge**
140:3
**Catholic**
1:7 13:14,15,15


MAGNA
LEGAL SERVICES

133:12,21,22,24

**cause**
6:5 124:19

**caveat**
17:7

**cc'ing**
88:9 89:22

**ceased**
137:7

**Center**
7:5 60:25

**central**
135:24

**Centura**
1:7 12:21,22 13:1,22
13:23 14:3,7 15:16
17:4,8,17 18:1 21:8
27:10 31:1 34:15
37:4,6,11 39:3,4
51:5 52:6,19,23
53:1,5 54:1,11 55:6
56:21 60:14,23 66:4
66:9 69:17 73:14
74:25 75:16 76:14
79:17 89:5,13
112:12 114:22
115:13,18,20
118:25 119:7 121:7
125:15,16 126:3,6
127:3,21 128:11,14
129:4,5 130:23
131:24,25,25
133:13 134:10
135:2,25 136:10,11
136:13 137:6,11,12
138:12 141:23
143:1 144:1 146:21
147:10

**Centura's**
128:9

**Centura-Penrose**
19:15

**Centura-wide**
39:14

**CEO**
56:22 57:9,9 136:13

**CEO's**
57:11

**certain**
4:11 66:23 83:14

**certainly**
11:25 51:16 56:25
59:11 60:18 107:10
134:9

**CERTIFICATE**
149:1

**Certified**
149:21,21

**certify**
149:6

**cetera**
24:18,23

**chair**
18:4 53:22,22 67:9
98:24

**challenge**
56:25

**challenges**
42:16 53:13

**challenging**
46:21

**chance**
88:5

**change**
39:11 52:8 54:9,10
54:15 61:2 143:16

**changed**
137:16,21

**changes**
137:1,3,10,14 148:6
148:7

**changing**
137:17

**characterize**
75:7 129:21

**chart**
109:14

**charting**
109:12

**chatting**
3:17

**check**

34:8

**checking**
87:2

**chemist**
9:20

**Chemistry**
10:5

**CHI**
133:16,20 135:17

**chief**
19:14 20:7 24:8
27:11

**circumstances**
5:13 21:21 27:19
48:24 58:8 62:12
73:3 97:8 100:20

**cite**
93:5,7 105:20,20

**citizenship**
24:22 144:24 145:1,7
145:24 146:15,20
146:25

**City**
140:4 149:3

**Civil**
2:2

**clarification**
40:3

**clarify**
70:14 77:19 84:2
143:16,24

**clear**
47:24 53:9 66:13
71:12 115:21
117:11 130:16,17
143:18 147:4

**clearance**
106:7

**clearly**
120:24

**clients**
16:12

**clinic**
7:8,9 69:24

**clinically**
29:17

**close**
5:19 29:6 102:4

**closing**
73:13

**clothes**
135:3 137:12

**clue**
57:20

**clues**
105:8,9

**CMO**
56:23

**coffee**
56:16

**cold**
56:16

**Colorado**
1:2,7,15,20 2:5 7:10
10:1,2 13:13 14:8
14:10 15:6 48:11
133:12 149:2

**come**
16:4,9,11 25:4,12
32:8 38:6 39:5 42:1
43:16 46:21 53:13
54:18 63:16,17,17
71:12,21 74:9 89:2
107:1 112:8 113:1

**comes**
20:9 35:20,21 36:10
49:10 103:15 104:8
125:2

**commencement**
149:6

**commencing**
2:5

**comment**
9:10

**commission**
148:16

**commissioned**
149:5

**committee**
18:4,5 24:14 26:1,4
32:1 34:3,7,10,13
34:22 37:1 40:17,18



40:18,23 67:10,12
72:1 145:24 146:3
146:21,25
**committees**
24:21 34:15 36:24
63:18,18 66:6,6
146:14,15
**common**
56:18
**CommonSpirit**
13:9,10,16 17:8 21:9
133:5 134:1,22
135:4,5,10,15,16
136:10,15,20 137:4
138:1,5
**communicate**
65:20 128:10 130:22
**communicates**
130:8,13
**communicating**
46:6 62:8
**communication**
39:20 109:17 130:23
135:24
**communications**
41:7 50:21 62:19
117:1
**community**
12:15 91:9
**companies**
17:9 42:21
**company**
10:11 13:11
**complained**
57:1
**complaining**
81:20
**complaint**
22:14 62:14 67:6,7
67:11,14,25 72:14
84:8,8 86:19 101:18
122:20 145:2,3,9,12
145:15
**complaints**
56:9,11,13,13,16,18
56:19 67:16,24 68:6

72:17 96:7
**completed**
110:1
**complex**
60:19 62:3 74:23,25
77:11 139:22 140:2
**complexities**
139:25
**complicated**
23:23 26:25 74:23
**component**
104:3,11
**components**
24:16
**computer**
108:23 109:2,3
**computers**
54:19
**concern**
22:4 38:15 41:10
87:1 89:21 101:2,10
101:15,17 124:19
**concerns**
14:22 65:10 113:18
**concluded**
147:18
**conclusion**
98:13
**condition**
6:4 92:7
**conditions**
12:4 38:17,19
**conduct**
4:6
**conference**
7:22
**confidence**
144:23
**confidential**
48:9 87:19
**confidentiality**
40:7
**conflict**
22:20
**confuse**
35:16

**confusing**
35:9
**Congratulations**
11:22
**connected**
149:15
**connection**
69:1
**consideration**
49:4
**considered**
27:3
**consistent**
88:17
**constitutes**
148:5
**consult**
116:19 143:22
**consultant**
16:15,22
**consultation**
59:25
**contact**
38:24
**content**
39:20 96:22
**context**
46:10 47:24 69:10
72:2 88:1 105:8,9
105:15
**continue**
23:13 110:9
**contract**
77:20 78:7 113:3,7
117:12,12 118:15
118:18 120:4
121:14,20,23
122:17 124:1 127:6
127:9,13,16 128:12
140:2,6
**contracted**
127:23
**contracts**
121:25 140:2
**contractual**
133:19

**control**
129:24
**controversy**
149:9
**conversation**
46:2 82:8 83:25
84:15 87:20 94:22
96:8,9 100:2 102:9
109:1 121:12,21
141:15
**conversations**
8:24 9:3,7 30:6 50:23
53:20 82:13 87:15
96:22 102:6,11
111:5 116:16
123:12 127:9,14
132:9,15,17,20
146:18
**cooperation**
20:25 21:1
**cooperatively**
21:15
**copies**
142:17
**copy**
142:14
**corporate**
13:21 133:5
**corporation**
76:9
**correct**
8:1 27:16 31:10
33:18 34:24 36:14
45:6 51:5,6 53:14
54:16 71:6,9 76:10
76:16,19,24 79:24
80:5 83:5 86:1
89:14,19 90:7 91:13
91:19 97:2 98:14
100:21 103:24
105:9 106:25 107:2
107:5 108:1 111:12
115:10,18 121:5,11
124:5,9 126:15
137:8 138:6 140:12
143:7 149:12



cost
 22:16,18
costs
 24:2
counsel
 50:21 149:14,15
COUNTY
 149:3
couple
 12:10 62:16 114:24
course
 17:7 39:13,18 62:11
   76:6 87:3 109:25
   142:22
courses
 25:25
court
 1:1 6:19,22 16:17
   73:8 142:14,17,20
cover
 26:22 43:10 116:10
   145:7
coverage
 39:18
covered
 40:23 46:24 143:11
COVID
 22:11
CPHP
 25:21 38:22 59:16
   97:15 101:3,8 102:2
   103:15 104:3,15
   106:15 107:25
   108:12 111:11
created
 39:18 133:13 134:1
   135:11,15,17
creating
 82:21 136:20
creation
 134:21 137:3
creative
 70:5
credential
 72:4
credentialing

30:19 35:22 36:25
   69:4 71:13,15,18,23
   72:3 110:19
credentials
 8:14 18:4,5 24:22
   33:25 34:8 35:2
   36:2,9 93:22 108:17
   110:23 146:16
CRIST
 1:14
criteria
 45:14,16 47:9
criticisms
 66:12
cross
 58:14
CRR
 2:7
CSR
 2:7
curiosity
 74:12
current
 19:1
currently
 17:5 83:19 125:11
curriculum
 12:3
cut
 24:2 108:22 109:2,3
cw@rmlawyers.com
 1:17

—————————————
D
—————————————
D
 2:8 3:1
daily
 32:11 46:5
darn
 45:5 100:4
date
 59:12 84:16 129:8
   130:17
dated
 92:25 116:12
dates

57:5 82:1 87:25
   129:1,5 130:16,25
David
 43:24
DaVita
 14:19,25,25 15:9,10
day
 3:18 4:25 5:10,24
   24:8 46:17 56:18
   80:21 85:19 102:19
   116:11,14 133:5
   142:25 147:9
   148:15
days
 23:16,20 34:1,6,18
   35:6,15,24,25 36:6
   43:15 94:24 95:5,5
   95:15 104:8,9
   106:15 124:17,18
   142:25 143:3 147:9
deal
 41:22 52:15 54:22
   139:25
dealing
 42:21,22,23,24
dealings
 55:19
December
 20:1 21:6 136:7
decide
 36:13 100:18
decided
 10:19 128:14 143:1
deciding
 10:14
decision
 34:24 36:5,17,22
   97:18,21 98:8
   101:21 124:1 129:4
   131:23
decisions
 37:16 113:6 129:19
default
 83:13
Defendant
 1:8,18

define
 12:20 70:21 77:24
definitely
 80:10 146:23
definition
 95:15
degree
 9:16,18 10:4 25:14
   33:7,9 137:24
degrees
 11:25
deliver
 49:16 50:4 56:6
delivered
 126:20,24 127:7
delivery
 75:11
demands
 26:7
dental
 28:8
dentist
 28:7
Denver
 1:15,20 2:5 9:24,25
   139:11 140:19
   149:3
deny
 97:19
department
 24:14 53:22 62:18
departments
 22:4
depending
 25:18 66:23 67:10
   124:17
depends
 13:18 25:13 37:25
depersonalization
 45:23,25
deponent
 16:19 40:8 73:10
   142:10 148:1
depos
 4:6
deposition


MAGNA
LEGAL SERVICES

1:10 2:2 6:16 7:13
9:4 128:7 142:15
147:17 148:2,5,6,7
149:1,10
**describe**
13:5 15:21 19:7
66:22 67:3 129:11
132:6
**described**
86:18 93:23 129:15
**describing**
36:25 83:18
**description**
24:10
**design**
19:9
**desire**
22:8
**desks**
54:19
**details**
133:19
**determine**
97:7
**Di**
47:13
**diagnose**
45:8
**diagnosis**
47:10 100:23 103:12
**diagnostic**
45:13,16 47:9
**Diamond**
43:25,25
**die**
55:24
**different**
10:17 20:8 23:4,4
32:15 35:10,13
51:20 53:3,4,13
56:24 63:6 75:3
77:10 83:9 95:13
96:5,22 114:25
135:13 146:17
147:1,7,8
**difficult**

29:21 56:5 80:9
**difficulties**
46:9
**difficulty**
47:11
**Dignity**
13:16 134:1 135:17
**direct**
33:16
**directed**
89:12
**directing**
33:13
**direction**
66:2 75:22 136:15
**directly**
66:21 82:17
**director**
17:25 18:18,24 19:18
20:6 28:21,22 29:7
29:19,22 42:2
134:16 136:6 139:9
140:9
**disaffiliation**
135:9
**disagree**
104:18
**disagreement**
94:12,12
**discretion**
34:1 35:24
**discussed**
32:9 57:23 73:16
78:13 82:25 96:24
105:19 119:3
124:16 133:11
136:3 137:6 144:17
**discussing**
71:2 85:17,22 93:21
94:4 105:23 117:3
**discussion**
12:9,11,18 48:14
58:22,24 73:13,21
79:16 85:19 86:5,17
86:17,21 87:6,12,17
89:15 97:2 98:2,24

99:8,12 118:8 119:6
122:11,12 123:21
143:9
**discussions**
58:18,21 74:1,2,4
100:8 143:4
**dispute**
59:9 90:17,21
**dissolution**
135:8
**distinctions**
50:8
**distracted**
85:5
**DISTRICT**
1:1,2
**dive**
121:23
**diving**
24:5
**division**
36:16
**docket**
145:10
**doctor**
10:12 17:1 26:18
45:8,10 46:11 65:12
147:15
**doctors**
12:4 19:8 27:22
45:11,12 62:25 63:2
65:24 131:25
**document**
84:24 85:9,10
**documented**
30:5
**documents**
8:10,13 85:7 117:21
117:24,25 118:6
119:18 120:14
**doing**
10:17 26:17 27:3
49:20 56:1 59:25
95:5,16 138:17
**doubt**
95:24 96:2

**Dr**
1:4 3:9,11,16 6:15
9:1,1 21:21 27:5,7,8
27:9 28:12 43:25
46:25 47:3 50:12,25
51:1,9 54:18 57:8
57:10,22,24 58:15
58:18,19 59:2,11,20
60:3,13 61:5,14,20
62:12,19,21,23
63:11 64:5,5,10,23
65:4 66:3,7,11,12
66:16 67:15 68:7,22
68:25 69:8,18 70:11
70:24 71:3 72:8,11
72:17,20,21 73:5,6
73:13,17,24 74:14
76:3 77:13 78:13,14
78:17,19,19 79:2,3
79:4,16,18 80:1,8,8
80:12,23 81:5,20
82:9,12 83:4,19
84:10,12,22 85:10
85:16 86:16,17,22
87:12,16,22 88:9,9
88:9,9,15,18,20
89:16,17 90:14
91:22,22 92:6,23
93:12 94:5,11 95:10
96:3,7,18,20,23,25
97:1,2,9,11 98:11
98:24 99:4,4,24
100:3,4,9,11,12,14
100:17,19,23
101:11,17 102:5,6,9
102:12,16,20,21
103:20 105:2
106:22 107:6,25
108:1,4 109:2,17
111:3,7,14,18,21
112:2,19 113:14
114:11 116:15
117:7,10,23 118:14
118:23 119:6,9,15
120:3,11,20 121:12
121:24 122:5,12,16



122:20 123:12
124:18 125:4,8,17
128:4,9,10,15 129:3
130:5,9,14 131:23
131:24 132:5,11
139:1 141:5,11,21
142:1,5,23,25 143:2
143:5,8,18 144:8,14
145:19,25 146:20
147:2
**draw**
118:14 119:19
**drawn**
16:4
**due**
72:6
**Duke**
9:21
**dull**
35:18
**duly**
3:3 149:7
**DuPont**
9:21
**Durango**
75:22
**duration**
34:4
**duties**
24:11
**duty**
101:13 106:7
**d/b/a**
1:7

--- E ---

**E**
2:8 3:1,1
**earlier**
32:9 53:8,16 68:15
71:4 73:17 78:13
82:25 85:18,24 86:2
86:3 87:5 88:14
94:17 105:19
113:20 117:3
120:19 122:16,24

131:22 133:11
136:4 137:6 141:22
142:24 144:17
**early**
18:22 59:24
**easier**
3:20,21 4:20
**easy**
24:12,13 35:16
**eat**
62:24 63:2,4
**EC**
25:25
**economies**
136:23 137:25
**education**
9:16
**effect**
95:22 134:25 135:5
**effective**
101:11,12
**effects**
134:22 135:12
137:10
**either**
8:11 20:25 43:20
50:11 59:24 65:9
66:2,4 79:21 116:16
134:22 144:21
**elect**
20:17,22
**elected**
20:16
**electronic**
19:9 109:11 142:16
**eliciting**
40:15,19
**eligible**
125:10 126:1,8
143:20
**email**
1:16,21 2:12,14
85:13,15 86:8 88:8
88:12,24 89:16
91:16 98:22 106:23
109:19 111:15,19

116:10 117:7,10
118:24 119:9,14
120:3 124:18
135:25 137:15
**emailed**
99:1 136:13
**emails**
8:14,16,19,25 39:14
118:9 121:8 126:21
**empathize**
125:3
**employed**
7:11 15:1,3 27:16
51:11 52:5,7,19,23
53:1,25 54:4,11
61:1 75:21 90:11
127:17,22 137:16
141:23 143:25
**employee**
17:4 33:20 35:6,19
35:21 37:4 39:3
40:16,20,25 41:2,4
47:21,23 51:4 59:18
73:14,25 75:10
79:16 95:6 97:22
119:6 128:9,15
129:5 131:24
134:10
**employees**
60:22
**employer**
42:10 90:4,5
**employing**
75:20
**employment**
17:10,13 18:2,9,9,14
25:14 31:6,8,17
52:11,13 59:15
71:24 88:25 89:4
117:24 118:25
119:10,20 120:6,12
121:25 122:2 124:1
124:2,24 125:14
127:2 129:19 143:3
143:6,25 146:22
147:10

**enable**
101:9
**encompass**
146:6
**encompassed**
84:7 108:11
**encompasses**
144:10
**encounter**
47:4 79:11
**ended**
140:23
**engagements**
122:3,8,18
**enjoy**
38:12 55:13 56:1
**enjoyable**
55:15
**enjoyment**
20:9
**entail**
20:15
**entirely**
11:16 96:22
**entities**
133:16
**entity**
12:24,25 51:14
133:21 134:1
**EPIC**
109:5,6,11,16,19,25
**equally**
106:21
**Eric**
117:13 118:16,17
138:8
**Eric's**
118:18
**Erling**
57:8,12,12
**especially**
61:25
**ESQ**
1:13,14,18,19
**essentially**
13:10 15:24 28:3



38:5 109:7 112:7

**established**
126:14

**et**
24:17,22

**ether**
45:17 135:12

**evaluated**
66:23

**evaluation**
67:12 97:15

**evaluations**
26:10 28:16,23 29:18
30:10,25 66:16,19

**event**
21:14 67:5

**events**
44:5 62:17 107:10

**eventually**
18:4,6 23:6,8 26:25
70:22 93:25 95:17
127:2,3

**everybody's**
60:10

**exact**
50:16 133:15 138:13
138:20

**exactly**
34:23 53:11 55:16
71:3 104:13 113:23
132:18

**examination**
2:3,9 3:5 149:7

**examined**
3:3

**example**
12:9 32:9 37:22 43:3
43:4 52:13 53:7,15
54:14 55:23 67:4
91:11 95:13

**examples**
21:19,24 28:11,11
136:3

**exchange**
142:3

**excluding**

66:14

**excuse**
35:12 84:8 115:15

**executed**
117:11 120:5

**executive**
21:1,3,5,14 22:2,23
22:24 23:11 24:1,1
24:14,15 26:1,4
32:1

**executives**
32:2

**exhaustion**
93:8,14 105:22

**Exhibit**
2:12,14,16,18 84:19
84:21,23 87:9 88:2
88:3,4 91:16 92:15
92:17 94:1,2 98:16
102:3 103:18 114:9
114:10,12 115:1
116:5,9 124:14
143:1

**exhibits**
2:11 142:18

**exigency**
36:6,11

**exist**
61:11 112:7 137:7
141:24 145:24

**existing**
135:11

**exists**
45:16 105:23

**exit**
101:5

**expect**
20:18,21

**experience**
23:19 44:18,19 56:2
137:1,2,10

**experiencing**
81:20,24 82:13 92:7
100:24

**expires**
148:16

**explain**
38:7 88:20 123:15

**explained**
86:18 87:16 92:2
113:25 142:24

**explored**
143:10

**express**
94:11 99:3 141:2

**expressed**
121:13

**extensively**
79:13

**extent**
74:8 104:7

**external**
109:17

**extra**
43:11

**extraordinary**
95:14

**extreme**
113:17

**extremely**
66:1

**eye**
76:22

---

**F**

**face**
12:4

**fact**
7:8 58:20 90:2 100:7

**facts**
4:11 23:10 57:20
113:1

**fair**
4:15,15 9:11 15:9
21:11 26:5 33:6,9
43:11,12 44:24 45:1
45:3 50:9 51:1 55:8
55:17,18 62:13 64:2
64:9,21 67:3 77:12
79:11 85:10,19 88:8
89:5 92:22 104:25
105:5,13 106:19

113:10 114:5
118:10 121:2
128:17 129:16,18
129:21 133:9 136:7

**fairly**
20:12,13 55:21 64:21

**fairness**
129:24

**fall**
18:15 49:6,7 55:2

**falls**
66:18 68:19

**familiar**
45:13

**family**
23:22 46:20 67:8

**family-oriented**
139:5

**far**
63:16 70:22 108:18
111:4,8,21 112:18
136:12

**fascinating**
74:23

**feedback**
28:17 29:25 31:9
32:1 33:16 35:7
68:22

**feel**
43:2 135:12

**feeling**
96:6 97:10

**fell**
81:4

**fellow**
20:10

**felt**
55:21 101:3

**female**
132:8

**field**
16:25

**filed**
78:18 82:10 86:19

**filing**
112:20



**filling**
30:20
**final**
27:6 34:18,24 37:2
**finalized**
14:20
**financial**
76:23
**find**
20:2 120:14
**fine**
41:23 81:16 103:13
146:11
**finish**
4:19 16:17 73:9
**finished**
11:19 108:24
**fired**
52:14
**first**
3:3,22 8:6 27:20,22
27:25 43:18,24 46:8
48:13 53:19 57:11
59:20 60:2,4 61:8
69:25 81:4,10,24
86:15 87:12,17
91:17 92:19 96:12
104:19 105:11
114:12,16 117:22
118:13 119:19
120:2 121:16
**firsthand**
117:18 121:3 124:3
**fit**
113:19
**five**
14:13 23:20 124:17
124:18
**flip**
43:9 45:2
**flosses**
28:8
**flow**
22:5
**focus**
18:9 20:5 21:21

61:12 62:17 63:25
86:11 92:19 114:11
**focused**
26:15,15 46:8
**folks**
27:13 45:25 61:17
80:4
**follow**
38:15
**following**
36:15
**follows**
3:4 48:9
**food**
63:4
**forbidden**
110:4,6
**forced**
47:17
**foregoing**
147:17 148:3 149:12
**foreseeable**
125:23
**forever**
125:9,11
**forgotten**
115:23
**form**
34:25 38:13 39:7
42:4 48:3 52:9
64:10 65:3 77:12
79:4 103:2 122:21
123:2 124:22 125:5
128:18 129:22
144:16 149:12
**formal**
26:5 30:22 31:3 32:4
36:25 53:19 58:9
145:23
**format**
29:19 30:25
**formed**
65:8,16 144:18
**forth**
104:22 105:22
**forward**

70:13 83:25 84:5
98:10 101:11
102:25 103:5
**for-hire**
22:12
**foundation**
21:12 54:23 69:20
76:11,13,15 77:6
89:6 90:8 118:2
124:23 126:5
128:18 129:6
**four**
18:20 23:16 43:15
124:16,18
**FPPEs**
26:14
**frame**
44:9
**Francis**
1:7 12:22 13:1 17:22
26:24 27:12 47:5
60:14
**Francis-Interquest**
27:1
**frankly**
30:12 84:12
**free**
83:12,14
**frequent**
23:24
**frequently**
69:13
**friendly**
87:4
**front**
63:17 67:11 71:25
**frustrated**
23:22
**full**
5:24 27:7
**fully**
6:6 120:5
**full-time**
60:16
**function**
104:14

**functional**
23:8,12
**further**
62:7
**future**
125:23 129:20

───── G ─────

**G**
3:1
**gain**
89:7
**gallbladder**
23:15,19 43:15
**games**
4:13
**gap**
29:15
**gather**
140:1
**geared**
12:12
**general**
22:21 41:15 52:10
65:7 67:6 69:5,23
71:23 75:3,8 77:8
79:2,20 80:2 83:14
87:18 92:3 95:12,17
98:2
**generally**
15:21 53:11 97:21
103:11 119:5
123:19 136:20
146:9
**generate**
76:18
**gentleman**
115:21 139:4
**getting**
11:1,4 33:16 101:12
**gist**
44:10
**give**
24:10 55:23 59:13
68:2 108:14
**gleaned**



46:3
**go**
3:19,21 10:7,19
11:17 16:8,10 21:13
28:7 31:12 35:2,3
37:4 42:9 43:3
67:11 69:4 70:13
71:25 74:17 83:25
84:5 90:23 91:15
98:9,15 101:6
103:18 107:22
117:17,20 119:24
121:11 123:11
133:17
**goal**
4:9 76:8 103:7
137:25 138:1
**goes**
22:7 34:3 36:1,3,24
39:2,6,13 46:16
67:4 70:22 83:11
97:21 100:11
111:21
**going**
3:11,18 4:7,8,9 5:6
5:10,13,13,14,18,20
21:18 24:5 28:10
29:21 33:11,12
34:22 41:16,24 44:2
50:20 52:11 54:10
55:7,16,24 56:18
57:19 58:13 59:1,5
61:8 62:3,10,15
64:24 70:13 75:16
76:23 77:23 79:25
81:18 84:18,18,19
88:2,3 90:6 92:13
92:16 95:7,11 98:15
100:9 101:24,25
102:25 105:8 111:1
113:15,16 114:8,8
114:15 116:23
117:17 118:8,9
121:14 125:14
126:16 127:17,21
131:2 135:19

137:11
**good**
65:12 68:17 69:18
76:5,24 80:2 100:4
109:9 116:1 120:2
138:17 139:21,22
139:24 140:2
143:14 144:19,21
**goods**
77:1
**Gosh**
77:25 78:1
**gotcha**
4:8
**gotten**
96:25
**grant**
35:8 97:18 104:6
106:24,25 128:19
**granted**
8:21 34:19 37:23
98:4 104:17,25
105:5,16 106:3,11
106:23 116:14
128:16 142:25
**granting**
103:21,22 104:1,8
106:14 147:3,6,9
**grants**
93:24 98:6
**great**
11:6 57:17 110:24
**greater**
34:2,6 35:25 139:11
**greater-than-30-day**
49:7
**ground**
3:19 33:17
**grounds**
146:1
**group**
19:8 20:24 30:15,17
50:13 51:12 52:7
60:23 61:1,9,16
75:9 115:13,19,21
139:11

**grouped**
79:22
**groups**
54:2 77:21
**guess**
27:6 32:9 33:13 43:9
52:3 54:6,17 55:5
62:6 64:20 67:11
86:2,4 96:14 97:14
113:20 122:15
123:24 126:17

---

**H**

**half**
107:18
**Hall**
1:19
**handle**
52:11 142:20
**hands**
28:3
**happen**
42:5
**happened**
38:7 40:11 64:8 72:8
86:3 91:23
**happening**
58:2 93:20
**happens**
43:13 111:24
**happy**
55:10
**hard**
20:23 50:7 56:6
70:21 75:6 105:6
113:9 120:25
**hard-to-recruit**
140:18
**Hawaii**
127:3
**head**
4:23 53:22 108:21
123:13 138:20
**heading**
75:22
**heads**

24:15
**heal**
101:13
**health**
1:7,7 6:4 7:10 10:1,2
11:2,5,10 12:2,12
12:14,22 13:2,13,15
19:9 47:22 48:2
49:1 93:8 99:16
105:21 109:11
115:13,19,20
133:12,13,21,22,24
134:1,2
**healthcare**
48:12 76:25
**Health-Penrose**
13:23
**Health-Penrose-St**
1:7 12:22 13:1
**health-type**
99:20
**hear**
70:8,10 72:12 80:6
82:18 87:22 132:15
132:20 144:20
146:20
**heard**
64:8 66:1 71:4 72:10
74:3,5 75:4 79:17
81:2,3,4 82:19 87:5
88:18 135:21
**hearing**
31:8 80:15 82:16
101:10 115:11
132:17
**Heath**
1:19
**heavily**
30:7
**held**
17:3 66:3
**help**
19:8,10 88:1 93:11
**helped**
8:17,17 140:7,23
**hide**



4:7 92:14
**hindsight**
 11:6
**hire**
 33:12 58:18 131:25
  140:10
**hired**
 57:23 71:8 115:8
  127:3 131:25 132:5
**hiring**
 31:22 33:5,11 58:15
  58:23 71:5 140:11
**history**
 9:17 13:21 133:6
**hit**
 45:22
**hold**
 19:23 20:12
**home**
 45:22 64:18
**homes**
 64:18
**hon**
 132:5
**honest**
 4:10 144:5
**honestly**
 10:10 28:2 45:13
  81:15 104:2 121:21
  123:8
**hope**
 55:17,17,19
**hopefully**
 28:12
**horrible**
 47:2
**hospital**
 7:7 14:25 15:24,24
  18:3 21:4 22:17
  23:6,7 24:21 26:18
  30:16 31:15,15
  37:19,23 38:5 41:16
  41:17 43:15,19,20
  51:21 52:1 54:20,21
  55:1,1,6,8 59:17
  60:17 68:9 70:15

71:8 75:11 76:3,5,9
  91:1 97:23 100:16
  109:18 110:15,18
  125:15,18 128:5
  133:25,25 140:5,9
  140:17 146:14
**hospitalist**
 14:14 15:20,22 17:3
  17:17,21,25 18:6
  60:13,16,23 134:19
  135:1,6 139:9 140:6
  140:11
**hospitalists**
 17:23 18:1 61:8
**hospitals**
 26:22 29:24 47:21
  48:2,25 54:3,12
  61:10 66:4,9 72:9
  109:11 134:17
  137:17 138:5
  139:12
**hospital's**
 74:13 109:4
**hour**
 8:7,8 107:18 147:18
**hours**
 147:19
**house**
 64:7 109:16
**HR**
 37:12

---

**I**

**idea**
 11:21 34:23 72:24
  73:2 80:1,2 127:19
**identify**
 85:7
**illness**
 47:22 48:2 49:1,3
**imagine**
 26:18 137:23
**impact**
 41:14
**impacts**
 75:10

**impair**
 6:9,12
**implement**
 19:9
**important**
 41:22 50:8,8 55:4,5
  84:14 117:4
**impression**
 96:19
**impressions**
 60:2,4 79:1
**improperly**
 124:8
**Improvement**
 48:12
**include**
 12:3 71:24 120:5
**included**
 8:23 146:16
**including**
 124:21
**incorrect**
 90:9
**incredibly**
 140:17
**independent**
 49:14 101:4
**independently**
 136:17
**indicate**
 104:16
**indicates**
 104:25 105:15 106:2
  106:10 118:22
  131:6,9
**indicating**
 117:21 119:10
**indication**
 99:10
**infections**
 66:25
**informal**
 28:17 29:24 31:9
  58:11 68:22
**informaticist**
 19:2,4,7 29:13,14,16

**information**
 82:2 96:25 101:25
  104:12 117:22
  118:13 127:8,12
**infringing**
 48:6
**initial**
 59:15 60:19 81:10
**initially**
 17:20 23:5
**initiated**
 67:24
**Initiatives**
 1:7 13:14,15 133:12
  133:21,22,25
**inpatient**
 14:13,14,18 69:22
  70:1,2
**insight**
 33:4
**instance**
 67:14
**instances**
 54:8
**instruct**
 40:13 110:25
**instructed**
 68:5 109:22
**instructing**
 50:22
**instruction**
 108:1,4,14 110:8,11
  110:12 111:10,13
  111:18
**instructions**
 111:2,7
**insurance**
 42:21
**intended**
 103:25
**intent**
 10:12
**intention**
 10:17
**intentional**
 38:9,11


MAGNA
LEGAL SERVICES

**interact**
 65:20 69:13
**interacting**
 10:18
**interaction**
 61:5 139:23 145:3
**interactions**
 61:20,23 63:11,13,21
   63:23 64:1,10 66:11
   69:23 72:17 138:24
   139:1,15,18
**interacts**
 70:3
**interchangeable**
 19:16,17
**interest**
 11:9 20:25 64:18
   74:12,19,20
**interested**
 11:11 74:16,21
   149:16
**interesting**
 140:21
**interests**
 64:17,20
**interference**
 39:6
**interim**
 115:4,12,20 138:18
**internal**
 9:22 14:13 109:17
**interpersonal**
 47:11
**interpret**
 120:13
**intervene**
 50:20
**introverted**
 79:9
**investigation**
 71:20
**involved**
 30:7,18 51:15 66:5
   66:21 74:1,2,4
   77:20 90:4 130:25
   139:10

**involvement**
 33:11 116:22,24
   146:20,24
**involves**
 31:16
**in-depth**
 99:21,22
**in-house**
 73:25,25 74:10 75:18
   75:18 76:7 77:3,14
   80:3
**in-person**
 83:21
**irregular**
 25:2,2
**issuance**
 102:13
**issue**
 25:13,19,24 30:3,5
   31:17 35:10,12
   39:18 40:2 47:14
   52:11,23,25 53:17
   53:24 57:8 82:16
   84:11,11 92:15
   97:13 103:3,12
   121:15 126:7
   130:24 144:22
**issues**
 14:21,22 24:18 25:3
   25:7,12 47:14 71:24
   113:17 141:9
   144:23 145:7
**It'd**
 44:8

**J**

**January**
 19:22 21:6 57:10
   134:4,9,22 135:14
   136:6
**Jason**
 2:18 115:24
**job**
 24:10 38:15 41:4
   49:23 56:2 69:18
   100:18 109:8

 138:17 143:14
**jobs**
 19:10
**Johnshoy**
 2:7 149:4,20
**Johns-Hopkins**
 9:19
**joined**
 14:10
**joint**
 13:8,12,23 14:3
   133:13

**K**

**K**
 1:19
**Kansas**
 140:25
**Kathpal**
 57:24 58:15,19 71:3
   72:21
**Kathpal's**
 72:8,17,20
**keep**
 24:5 30:12,13 48:23
   81:17
**keeping**
 122:3
**kick**
 65:1
**kids**
 53:10
**Killian**
 1:19
**kind**
 4:12 11:8 12:18
   15:18 19:15 28:4
   35:11,15 38:18
   46:20 53:6 60:17
   61:19 62:1 66:25
   70:9 75:15 79:2
   80:11 86:18 104:6
   106:5 107:9 108:18
   112:6 113:9,17,23
   113:24 120:15,23
   120:24 121:13

 123:3,18 124:25
   132:25 135:25
   139:23,25 140:21
   144:25 147:5
**kinds**
 22:13
**Kleiner**
 98:24 99:4 102:6,9
**knew**
 78:23 79:6 113:24
   119:5 120:25
   126:25 127:24
   128:6
**know**
 4:13 5:19 6:2 12:5,9
   12:14,24 16:21
   20:17,24 21:20
   22:16,19 23:16 26:7
   28:2,3 30:5,19
   33:15 34:13 35:1
   36:2 38:16 39:10
   41:17 42:24 43:16
   43:21 45:16 49:13
   51:19,23 54:24,25
   55:25,25 56:1,15
   59:2 60:7,10,18
   61:25 62:11,22,22
   63:22,23 67:23 70:2
   70:3 71:7,13,13
   72:20 75:15,17,20
   76:25 77:7 78:14,21
   80:3,10,23 81:9
   83:13 84:9 87:18,20
   88:5 89:25 90:3,4
   91:8,10 92:8,10,10
   92:18 94:14 95:9,12
   95:16 96:1 97:5
   98:2 99:10,24 100:6
   100:12,14,25 101:1
   101:2,13 103:3,16
   109:16,18 111:25
   112:1,11 117:18
   120:15 121:1 123:3
   123:4,5,15,16
   126:25 127:2,3,5
   128:12,13 130:18



MAGNA
LEGAL SERVICES

131:5 132:5,6,10
133:15,15,17,18
135:10 136:16,17
136:19,21 137:18
137:25 138:8,11,12
138:15,18,19
139:14,17 140:4
141:1 142:2 143:17
144:7,10,13 145:7
146:12,23

**knowing**
20:11 59:7 75:15

**knowledge**
4:3 31:3 51:8 82:16
101:1 120:17,18
121:15

**known**
138:2

**knows**
145:19,20

**Koval**
88:9 138:8

---

**L**

**L**
1:18

**labeled**
94:8

**laid**
112:25 113:2

**law**
12:8

**Lawrence**
1:15 2:4

**laws**
128:1

**lawsuit**
62:11 78:18 84:24
112:20 142:6

**lawsuits**
42:22 68:24 71:25

**lawyer**
5:3 46:15

**lawyers**
127:10,14,15

**layer**

29:22 144:15

**lead**
17:21 18:11 30:8,9
134:13

**leader**
66:8

**leadership**
20:3 29:23 66:4
114:21

**leading**
82:8

**leads**
29:23 30:1,22,25

**learn**
127:25 128:3,8

**learned**
50:18 74:9 81:24
127:20

**leave**
8:21,21 12:10 33:21
33:25 34:4,17,21
35:3,6,10,13,20,21
36:5,7,10,12,17,20
37:5,6,7,16,23,24
37:25 38:1,4,7,11
38:12,15,17,24 39:2
39:6,13,15,17,19,21
40:20,25 47:5,8,15
47:21 48:2,8,17,25
49:2,4,5,9 58:23
68:8,9,9,12 72:13
80:12 82:10 85:17
87:23 88:15,21 90:5
90:13,22,23,25 91:1
91:6,13,17 92:1,4
92:10,12 93:7,21,24
93:24,24 95:7,10,12
95:15 96:13 97:1,4
97:5,14,19,23 98:1
98:3,11,18 99:1,2,6
99:10,11,14,16
100:19 101:19,21
101:24 102:12
103:9,21,22 104:1,6
104:10,16,25 105:5
105:16,21,23,24

106:3,11,15,25
107:4,10 108:5,15
108:23 109:23
110:1,5,7,10,13,21
111:4,8,15,19,22
113:4 116:15
124:19,21 125:2
128:16,20,25 129:3
129:8,12,19,20
130:5,9,14 142:25
143:5 147:3,3,6,9

**leaves**
37:15 38:4,20 99:20

**leaving**
38:10,11

**lecture**
43:18,23

**lectures**
46:3

**led**
30:5

**left**
57:9,9,10 71:4 78:17
107:24 115:7

**LEGAL**
1:24

**length**
36:20 128:20

**letter**
2:16,18 92:23,25
102:13 103:18,20
104:14 105:4,23
106:19 116:5,11,12
116:17,23 118:24
124:18 125:8,13,15
127:13 147:5

**letters**
78:2 126:21

**letting**
38:12

**let's**
9:12 13:22 15:7 18:8
18:8 20:5 21:19
22:9 25:15 37:8,21
53:7,15 57:16 63:25
68:1,15 70:25 73:12

78:16 86:11 92:19
98:9,10,15 102:12
103:18 106:18
107:22 110:18
114:2,6,11,19
116:25 117:20
121:23 132:13
135:1 144:14

**level**
64:21 75:10,10

**Lichtenberger**
115:8,23

**life**
3:20,20 4:19 82:22
83:14

**Lindsay**
1:19 5:9

**line**
12:6 54:17 113:23

**linear**
44:20 83:10

**lines**
23:17 132:18

**listener**
139:24

**litigation**
84:24

**little**
10:21 13:20 22:9,20
22:23 25:18 44:19
46:8 53:4 71:2 75:6
75:6 96:13 98:10
110:22 113:13,16
114:3,6 126:13
133:5 140:14 144:9
144:9

**live**
9:8

**liver**
11:12

**lives**
46:20

**LLC**
1:14 2:4

**lmcmanus@hallre...**
1:22



MAGNA
LEGAL SERVICES

**loan**
120:7 122:12
**loans**
128:4,6
**lodge**
5:14 100:3 145:16
**logging**
108:18
**long**
8:5 15:12 35:4 36:17
62:23 109:7
**longer**
15:14 34:22 35:6
107:16 126:14
132:19,21 141:22
141:23
**long-term**
112:3
**look**
13:18 29:20 33:23
88:6 92:19 93:3
94:1 113:21 117:17
124:14 131:16
**looked**
87:9
**looking**
78:12 82:1 124:17
147:2
**looks**
89:12 115:1
**loop**
29:6 102:4
**loosely**
146:13
**lost**
24:24 126:13,19
**lot**
5:11 22:3,11 24:17
30:18 44:18 96:10
113:16 123:20
**loud**
19:5
**lounge**
62:25 63:2
**love**
10:18

**lunch**
5:25 68:1,16 81:13
81:14 107:14,15
**lurking**
133:4
**Lyman**
1:19

_____
**M**
_____
**Madeera**
57:24
**magic**
103:21
**MAGNA**
1:24
**main**
25:19 44:13,13 45:22
**maintain**
25:22
**maintained**
55:2
**majority**
109:10
**making**
5:10 37:16 47:18
60:15 84:13 96:20
101:18 128:9
**manage**
74:25 99:20,22
**management**
13:10 123:18
**manager**
37:13 135:21,22
**managing**
17:25
**mandate**
22:6 23:5,13 136:5,9
136:12
**manner**
49:14 65:17 69:18,21
70:15 144:19
**manual**
8:14 33:25 36:9
93:22 110:23
**mark**
1:18 84:19

**marked**
84:19,21,23 88:2,3,4
92:16,17 114:9,10
**marker**
35:11
**market**
75:14
**marksabey@hallr...**
1:21
**marriage**
46:9,11,15
**married**
46:12
**masters**
9:25
**master's**
11:1,5 12:2
**match**
120:10,20
**material**
120:5
**matter**
3:15 39:12 52:3,7
**matters**
36:20 149:8
**MBA**
11:19
**McLarren**
115:7,12,18
**McMANUS**
1:19 21:12 34:25
38:13 39:7 48:3
50:20 52:9 54:23
69:20 76:11,13 77:6
89:6 90:8 103:2
118:1 122:22 123:2
124:22 125:5 126:5
129:22 142:16,19
142:22 146:8
147:14
**mean**
16:23 20:14 26:13
30:21 32:11,12 38:9
44:16 46:18 59:21
61:23 63:7 69:7
83:9 87:22 88:19

89:22 95:2 96:14
98:7 105:6 108:22
113:12 115:5
120:13 124:24
126:6 130:21
131:16 132:15
135:2 136:16,23
137:15 138:11
139:21 141:7
**meaning**
30:5 36:11 63:16
99:14
**meaningful**
55:22
**means**
46:11 78:8
**MEC**
18:5 26:2,3 32:8 35:3
35:3,7,20 36:1,3,12
37:1 39:17,21 40:1
40:6,17,20,22 41:6
41:8,12,19 63:16
90:24 130:2,17,22
130:25 131:14
143:5
**mechanism**
28:17
**med**
126:7
**mediate**
103:16
**mediated**
63:23
**medical**
7:4 9:20,22 10:7,11
10:12,15,17 12:17
17:24 18:7,17,24
19:13,14,18,21 20:6
20:6,9,13 21:25
23:25 24:6,7,13
25:3 26:4,23 27:11
28:5,21,22 29:7,19
29:22 31:16,18
32:20,22,24 33:4,19
34:1 35:25 36:4,7
37:7,8,14 39:10



42:2 43:21 46:11 48:7,17,17 49:3,15 49:18,25 50:3 51:24 52:4,17 53:21 55:12 56:3,10,20 57:3 59:22 60:7,21 62:8 63:10,13,15,24 75:17 85:17 86:22 86:25 87:2 88:25 89:1,2 97:4,13,25 98:5 99:14 124:19 128:16 129:19,20 130:5 134:16 136:6 137:2 139:7,8,9 140:9 144:19

**medications**
6:5
**medicine**
9:23 10:23,24 11:1 14:14,18 16:2,6,7,7 16:8 20:3 22:8 54:3 62:13 68:25 69:1 73:17 74:22 90:2,6 90:14,18,23 91:4 98:19,25 125:20 126:4,10 140:10
**MedScape**
112:5,9,19 141:14
**med-type**
146:14
**meet**
7:12,17
**meeting**
8:3,5,6 24:14 39:22 40:12 41:8 83:19,21 84:5,7,16 85:21,24 86:3,4,5,7,11,13,15 87:2,6,10,13 91:16 91:19,21,24,25 93:17,19,20 94:5 96:12 98:10,13 102:5,13,19,21 121:24
**meetings**
7:20 8:11 24:17 26:1 26:1,6,8 34:11,12

40:7
**meets**
130:25 131:15
**member**
18:3,5 67:7,9 87:3
**members**
20:13 39:16 130:24
**Memorial**
91:11
**memory**
6:10,13 8:18 23:18
**mental**
47:22 48:2 49:1 99:15,20
**mention**
109:25
**mentioned**
45:21 88:14 92:11 93:15 94:17 131:22 141:22
**mentions**
93:13
**Merck**
9:21
**Mercy**
75:21
**merged**
13:16
**merger**
135:5,18,25
**message**
12:12 127:18 142:3
**met**
7:24 59:20,24 71:10 71:14 131:14
**methods**
109:17
**Michigan**
9:22
**middle**
93:4
**milieu**
56:4
**mill**
80:7
**mind**

56:19 104:8 113:1
**mine**
74:19
**minute**
103:23 115:7
**minutes**
8:7 57:16 147:19
**missed**
81:7 116:20
**missing**
110:19
**mistake**
43:7 117:11
**mixed**
44:5
**modern**
64:18
**moment**
59:13 115:19 120:11 121:7 133:2
**moments**
4:8
**money**
22:19
**Monopoly**
14:22
**Monroe**
2:14 62:23 70:24 78:13,14,19 79:2,4 79:16 80:8 84:10,12 88:9 97:11 132:5 141:5,11
**month**
72:4 131:1,10,15,20
**months**
18:19,20 36:12 62:16 106:22 145:10
**month-ends**
63:12
**morning**
85:16 133:12
**mortality**
66:24
**mother**
23:19
**motives**

101:18
**Mountain**
60:25
**move**
60:15 65:2 76:6 98:10
**moved**
9:24 10:1 17:24 134:13 145:2
**moving**
31:20
**multiple**
24:20 42:17
**multi-specialty**
14:11
**Munni**
100:9,11,12,14
**M.D**
1:10 2:3,12,12,14,14 2:16,16,18 3:2 10:16 148:1,11

---

**N**

**N**
2:8 3:1
**name**
3:7,14,15 27:7 44:4 57:11 60:8,10 71:16 99:24 100:9 133:15 138:11 140:4
**names**
132:8
**national**
133:21,25
**natural**
83:16
**nature**
37:25 41:19 42:17 46:18 50:16,19 51:15 63:22 67:10 78:1 84:10,15 93:23 102:23 103:16 104:5 109:8 112:20
**necessarily**
26:17 32:12 51:16 53:19 62:2 64:14



78:21 100:18
**necessary**
28:18 58:12
**need**
6:1 22:23 32:2,5 33:5
36:11 40:3,6 42:1,3
58:18 83:13 89:17
100:4 103:5 106:7
107:14 110:1,18
123:19 127:1
**needed**
30:17 41:18 52:24
89:2 92:2 98:3
101:4 108:5,6 110:9
111:7,14,18 122:9
123:21
**needing**
16:2
**needs**
16:13,13 108:24
110:20
**negatively**
65:10
**negotiate**
46:22 122:17 140:7
**negotiated**
14:25
**negotiating**
122:1 139:22 140:2
**negotiations**
77:20 113:15,25
124:2,25 127:16
128:13 140:3,8
**neither**
136:11
**neutral**
65:11 144:20
**never**
14:23 42:5 44:18
64:8 67:5 107:10,12
107:12 127:6
**new**
17:10 33:5 134:1
137:22
**news**
112:10,16 126:20,24

127:7 135:21
**nice**
64:8 139:4
**nineties**
133:14
**nodding**
4:23
**nonlinear**
44:14 83:1,12
**nonphysician**
65:20
**nonprofit**
76:15,22 77:4
**nonstandard**
140:15,16
**nos**
4:24
**nose**
141:3
**NOTARY**
148:19
**noted**
41:21
**notes**
149:13
**notice**
2:1 35:24 36:1 65:10
**notification**
40:19 41:5 49:7
**notified**
41:19 130:17 143:2
**notify**
39:14,16,21 130:4,7
130:12
**number**
32:6 85:1,6 122:3
**nurse**
70:4
**nurses**
22:13 65:21
**nursing**
145:4

---
**O**
---
**O**
3:1

**oath**
3:23 4:1 148:4
**oaths**
149:5
**oa@rmlawyers.com**
1:16
**object**
21:12 34:25 38:13
39:7 40:12 42:4
48:3 52:9 54:23
68:18 69:20 76:11
76:13 77:6 89:6
90:8 103:2 118:1,1
122:21 123:2
124:22 125:5 126:5
128:18 129:6,22
144:16 146:1
**objected**
94:16
**objecting**
68:11
**objection**
5:14 41:20
**objections**
5:10 100:3
**objective**
44:21
**observations**
65:15 117:18 121:3
124:3
**observe**
67:13 70:7
**observed**
38:19
**obvious**
83:17
**occasionally**
30:3 141:10
**occur**
107:10
**occurred**
87:11 136:5
**occurring**
57:2
**odd**
5:11 103:19 131:20

147:5
**offer**
119:20 121:2 143:3
**office**
7:3 54:18 55:2 63:5
118:18
**officer**
27:11 149:1
**offices**
2:4
**Oftentimes**
70:7
**Oh**
7:9 16:19 25:2 30:24
35:1 45:19 56:12
70:5 85:3 140:11
**okay**
3:11,14,25 4:4,17,22
5:7,8,15,21,22 6:2,3
6:8,18,20,24 7:4,7
7:12,17,24 8:5,10
8:13,15,22 9:2,9,14
10:6,25 11:4,15,20
12:8,20,24 13:4,12
13:17,20 14:1,5,10
15:13,18,21 16:16
17:3,6,16,19 18:8
18:16,21 19:1,12,17
19:20 21:13 23:2
24:10 25:1,9,15
26:22 27:24 28:10
28:13,15,20,25 29:5
29:9 30:24 31:5,18
31:22 32:15,21 33:3
33:8,19,23 34:10,17
35:5,14 36:15,19
37:21 38:2,18 39:23
39:25 40:8,14,24
41:20 42:6,9,11,14
43:13 45:2,7,19
46:14 47:15 49:20
50:2,6,9,18,24 51:9
52:12,22 53:7 54:6
54:14,17 55:10,15
56:9 57:5,13,16
58:7,17,21,25,25



59:5,11 61:13,19
62:5,15 63:20,25
64:23 65:15 67:22
68:1,18 70:1,13,16
70:25 72:12,15,20
72:24 74:8,15,21
76:8 77:18,23 78:11
78:16 79:1,22 80:6
81:12,17,23 82:4,18
83:6,21,25 84:20
85:4,8,15,24 86:2
87:9,25 88:7,12,14
89:3,15,20 90:12,17
91:2,12,15 92:13,21
92:22,25 93:3,11,16
93:19 94:11,17,21
96:11 97:7,17 98:15
98:17 100:7,22
101:6,10 102:1,8,11
102:18 104:13,24
106:2,5,10,13,18,21
107:6,9,14,19 108:3
108:7,14 109:13,21
110:3,12,17,24
111:6,10,13,24
112:1,18,22 113:9
114:2,4,15,23 116:2
116:8,14,19,25
117:6,10,17 118:13
119:13,17,24 121:2
121:6,19 122:4,11
123:6,24 124:6,11
126:9,16 128:14
129:3,14 130:1
132:3 133:11,20,24
134:6,12,15,19,21
134:25 135:10
136:9,22 137:14,19
138:7,10,24 139:3
139:17,20 140:13
141:11 142:1,10,19
143:8,13 144:7
145:21 147:1,12
**Omeed**
 1:13 3:14 143:14
**Once**

 61:3
**oncologist**
 62:8,9 63:24 99:23
**oncologists**
 77:3 132:1,4
**oncology**
 50:14 57:23 60:20,21
   60:21,22,24 61:9,16
   61:17,25 62:18 75:2
   75:18,18,21 79:20
   79:23 80:3 89:13
   99:22
**ones**
 24:12,13 45:21,22
   132:7
**one's**
 46:4
**one-on-one**
 123:12
**one-sided**
 96:16
**ongoing**
 26:15 37:24 66:19,25
   129:10
**open**
 29:6 125:24,25
**opened**
 27:1
**operate**
 22:19 43:14 138:5
**operating**
 22:5 23:8,12 75:9
**operational**
 23:12 114:21
**operations**
 114:20 138:20
   139:10
**opinion**
 42:19 69:8 70:6
   79:25 113:20 121:8
   136:18 140:1
**opinions**
 4:11 64:10 65:3,7,16
   77:13 79:4 117:19
   141:2 144:18
**OPPEs**

 26:14 66:18
**opposite**
 110:12
**opposition**
 21:1,16 22:2
**Optum**
 14:20,24
**order**
 61:2 76:25
**ordinarily**
 5:12 20:19 25:9 95:6
**ordinary**
 66:1
**organic**
 9:20
**organization**
 142:4
**orienting**
 30:19
**original**
 120:4
**originally**
 53:17
**OR's**
 43:5
**outcome**
 149:17
**outcomes**
 11:11 129:16
**outlet**
 112:16
**outlined**
 24:16 33:24,24
   104:20 108:17
   110:22
**outlines**
 35:23
**outpatient**
 14:12,13 69:11 99:19
   100:16
**outside**
 7:21 29:2 55:5 63:22
   64:6 102:19 127:9
   127:14 139:11
   144:25
**outside-of-Denver**

 18:1
**overall**
 41:12
**overlap**
 139:12,13
**oversee**
 49:17
**overseeing**
 30:2 49:19
**oversight**
 24:20 26:16 99:14
   146:13
**overwhelming**
 109:10
**owed**
 128:5
**owner**
 15:8
**ownership**
 51:15

---
**P**
---
**P**
 3:1
**packet**
 71:16,18,24 110:19
**page**
 2:9,11 92:19 94:2
   116:8 119:13
**pages**
 114:12 148:5
**panel**
 15:25
**panels**
 26:19
**paragraph**
 93:4 104:20 105:12
   105:18 106:6
   118:17 119:19,25
   120:2
**parent**
 17:9
**part**
 8:10 12:2 25:21
   32:11,16,19,21,24
   33:3,19 38:22 39:5


MAGNA
LEGAL SERVICES

50:16 61:25 67:1,2
67:3 69:3 80:22
81:1 87:24 94:22
97:4,18 104:22
109:1 110:19
125:13,15 128:8
136:14 140:21,23
140:25
**participate**
32:25
**particular**
22:5 23:14 49:12
65:6 77:14 79:8,21
80:4 103:8
**particularly**
22:4
**parties**
149:9,16
**partner**
50:13 73:18
**partners**
7:10 10:2 78:19
**partnership**
7:11 15:11 50:16,19
51:15
**parts**
96:11
**party**
49:14 101:4
**passed**
64:16
**path**
101:11,12 102:25
103:5 120:7
**patient**
7:4,7 15:25 24:22
62:7 63:23 67:8
70:9 77:5 141:9
143:22
**patients**
10:13,19 15:23 16:1
16:2,4,8,13 23:15
45:23 60:24 61:3,4
61:8,16 62:3,18
65:5 69:23 70:4
101:14 110:15

**patient's**
67:8
**patient-focused**
11:13
**Patient-related**
6:23
**patient-specific**
109:20
**patterns**
63:6
**pay**
22:17 77:1 140:18,20
140:22
**paying**
140:24
**PC**
50:14 89:13
**Peddada**
1:4 2:12,13,14,15,16
2:17,18,19 3:16 9:1
21:21 28:12 46:25
47:3 50:12,25 51:1
51:10 54:18 58:18
59:2,11,20 60:3,13
61:6,14,20 62:20,21
63:11 64:5,5,10
66:3,7,11,12,16
67:15 68:7,22,25
69:8,18 70:11 72:11
73:6,7,13,17,24
74:14 77:13 78:17
78:19 79:3,18 80:1
80:8,12 81:20 82:9
83:4,19 85:1,10,16
86:16,17,22 87:12
87:16 88:9 89:17
90:14 91:22 92:6,23
93:12 94:5,9,11
95:10 96:3,20 97:1
97:9 98:11 100:3,5
100:19 101:12,17
102:5,21 105:2
106:22 107:6 108:1
108:4 109:2,18
111:3,7,14,18,21
112:2,19 114:12

116:9,15 117:5,7,10
117:23 118:23
119:6,14,15 120:3
120:11 121:12,24
122:5,12,16,20
123:12 125:4,8,17
128:4,9,10,15 129:3
130:5,9 131:23,24
132:11 139:1
142:25 143:2,5
145:19,25 147:2
**Peddada's**
57:22 62:12 64:23
65:4 76:4 80:23
81:5 82:12 96:7
99:4,24 100:23
102:12 113:14
118:14 119:9
120:20 124:18
130:14 143:18
144:8,14 146:20
**peer**
24:22 26:14,19 29:2
31:12,14,14 40:9,10
40:12,16,18,22,23
48:11,14,18 66:18
67:1,2,4,9,12,16,24
144:24 145:6,8
146:2,15
**pen**
16:7
**pending**
71:19
**Penrose**
7:4 13:9 17:22 26:24
47:5 51:1,4,10 52:5
52:6,18,23 59:3,12
59:13,16 60:14
62:13 63:12 70:18
72:22,25 73:3,18
75:1,2,23 78:17
84:14 90:2,6,18
91:5 98:19 107:7,11
112:2 125:9,21
126:4,14 141:22
143:19 144:15

**Penrose-St**
26:24 27:11
**people**
41:17 44:17,18 55:24
60:9 64:15 65:20
86:6 91:9 127:4
130:17,22,22
136:11
**people's**
46:20
**percent**
29:17 30:16 35:2
146:24
**perfect**
56:15
**perform**
35:19 41:4 42:7 46:5
49:16 52:4 108:5,6
108:8
**performance**
26:10 28:16,23 29:18
30:9,22,25 66:16,19
144:8,14
**performed**
69:18
**performing**
79:23
**performs**
35:20
**period**
9:25 14:16 17:11
21:5 38:7 60:12,16
61:21 82:7 90:19
104:12 129:9
132:10
**periodically**
5:23
**permitted**
91:3
**person**
36:5 37:13 42:25
44:22,22,23 56:1
60:6 69:16 83:22
100:18,21,23 138:7
139:10
**personal**



65:15 74:20
**personality**
64:12
**personnel**
25:7,12,13 43:6,6
77:10
**perspective**
13:6 23:25 75:24
76:2 121:13 139:22
**Peter**
136:12,14
**pharmaceutical**
10:11
**Pharmaceuticals**
9:21
**phone**
1:16,21 7:2 111:14
111:19
**physician**
10:20 15:15,18 19:2
19:7 29:12,16 32:25
38:10,24,25 39:2,13
42:12,18 43:1,17
44:12,23,23 45:4,8
45:8,20 46:4,10,23
47:4,6,7,8 48:1,24
49:2 51:3,10 52:5,6
52:22 53:1 55:7
66:18 67:8 73:25
74:13 78:3 81:21,24
82:13 86:23 92:12
94:19,25 96:4 97:22
99:15,19,25 100:24
101:22 112:10
115:13,19,20
123:18 125:14
129:18 143:21
**physicians**
12:13,13 15:1 19:10
20:10,21,23 22:1,12
22:12,18,18,21 24:1
24:2 25:3,16 26:7
26:11 27:15 28:18
28:25 30:2,17,20
31:23 33:5,17 37:21
37:22 41:25 42:16

43:10 49:17,19,24
50:3,4 51:25 52:18
53:25 54:2,9,11,12
55:20 56:4 66:23
68:8,8,12 70:5,7
72:4 75:1 109:23
124:20 129:12,15
139:12
**pick**
127:8,12
**piece**
61:24 62:3,9 74:24
81:7 88:25 92:10
97:15,25 98:8
117:22 118:13
119:17 120:22
123:16 124:13
126:7,25 127:24
141:16,18 143:17
143:18 144:25
145:2
**pieces**
25:2,3 113:3,7 123:4
123:22 127:6,9,13
**pin**
71:1
**Pinery**
44:4
**place**
45:11 91:4 121:16
140:18 149:11
**placed**
38:19
**places**
91:10
**plaintiff**
1:5,13 2:3 3:15
**plan**
62:1 98:3 99:6,22
103:10,12,14
108:10
**plans**
122:13
**Plauth**
9:1 27:5,8 57:10
87:22 88:9,15,18,20

89:16 91:22 96:18
96:23,25 97:2
102:16,20 141:21
142:1,5
**Plauth's**
27:7,9
**play**
4:13 74:14 103:15
**please**
98:12 142:12,16
**plenty**
91:9
**pneumonia**
16:9,11
**point**
19:12 23:24 38:24
59:23 66:8 73:16,20
74:3 81:19 91:12
95:20 105:7 106:13
107:9 120:11
134:10 138:23
**policies**
24:17 94:4 137:22
**policy**
34:9 35:23 93:22,22
94:15,16,16 108:17
**population**
11:10 12:14
**PorterCare**
133:13
**position**
18:11 20:12,12,16,24
22:22 29:16 40:3
42:17 52:17 55:10
56:10 57:9,10 76:23
142:3
**positions**
18:9 137:9
**positively**
65:10
**possibility**
75:4
**possible**
93:16 106:14,21
**potential**
25:25 81:5 128:1

**potentially**
48:5 59:25 63:22
64:13 70:2 88:19
**power**
6:1
**prac**
50:25
**practice**
14:11,11,19 15:6,8
20:3,12 22:8 25:20
42:1 49:13 50:13
51:12,25 52:7,20
53:5,5 54:2,12 55:7
57:23 69:1 70:18
75:1,2,9 77:10,14
90:10,22 91:1,3,4
97:17 100:15
125:17,20,25 126:4
126:10 128:16
130:5,9 137:1,3
143:21 144:3
**practiced**
29:17 90:14,18
**practices**
51:20 74:14 75:11
90:2 100:15
**practicing**
10:20,22,24 11:1
17:17 47:4 48:1,25
51:3 52:5,6,18,22
54:2,12,21 62:12
68:9,25 73:17 90:6
97:22 98:19
**pragmatic**
55:18
**Precisely**
135:7
**preparation**
7:13 9:2
**present**
8:2 41:18 84:25
96:23
**presentations**
44:6,11
**presented**
43:22 82:2



**presenter**
44:3
**presenting**
122:20
**president**
18:7 19:13,14 20:9
20:18 23:25 24:6,7
26:23 32:20,22,25
33:4,20 34:2 35:24
36:4,7 37:15 42:2
49:15,18,25 50:3
51:24 52:4,17 55:12
56:10,20 57:3 63:10
63:14,15 86:22,25
115:4,12,14,18,20
124:20 137:2
138:18 139:7,8
**president/chief**
19:21 21:25 31:18
**pressures**
42:17,19,21,22,23,23
43:1
**presumably**
17:1
**pretty**
5:12 11:13 67:18
100:4 143:11
**previous**
149:6
**pre-Centura**
9:13
**primarily**
8:20 14:12 27:20
38:22 69:11 81:5
**primary**
92:11 94:18,24 99:14
99:25 114:20
138:21,22,22
**prior**
7:11 60:22 71:24
72:13 87:21 96:9
135:8
**private**
14:11 52:7,19 54:2
54:12 57:22 75:9
**privilege**

40:23 48:6 67:21
71:22 110:16 112:7
145:15,19 146:2
**privileged**
41:8 48:7,9 50:22
67:17,25 100:1
144:24
**privileges**
25:23 36:21,23 37:3
37:18,19,22 38:10
40:10 41:14 51:1,4
51:10 52:1 58:6
71:8 89:18 91:10,11
93:25 109:15
125:11 126:1,8
143:20,20,25
**probably**
5:11 8:7,8,18 11:18
11:23 14:17 16:11
30:16 36:2,3 42:8
43:18 44:8 45:21
51:20 53:2 72:3,4
79:8 82:1,2 85:6
86:24 90:6 123:22
139:16 141:3
**problem**
54:20,21 74:25
131:21
**problems**
74:23
**Procedure**
2:2
**procedures**
121:10 137:22
**process**
29:3 31:12 37:9
38:22 39:16 40:24
48:7,8,9,18 50:17
57:6 58:15 66:18,22
67:1,6,24 68:7,12
69:4 71:14,15,23
92:1,5 116:23 146:7
**processes**
40:10
**profession**
12:10

**professional**
26:15,16 61:5,14
78:5,6,8 125:16
149:5,20
**profitable**
23:7
**program**
17:21
**programs**
17:25
**prohibit**
144:2
**promise**
50:6
**properly**
124:7
**protections**
28:5
**provide**
26:10 28:15,16,17,23
29:18 30:9 33:4,10
35:7 50:10 53:8
68:21 76:24 77:5
78:7 108:3 110:8
111:2,6,13 144:19
**provided**
65:5 129:2
**providing**
31:25 43:9 53:16
66:15 111:17 136:4
**PSA**
77:21,24 78:8
**public**
7:1 9:25 11:2,5 12:2
12:12 145:1 148:19
**Pueblo**
75:21
**pull**
131:2
**purpose**
41:12 61:7 136:19
**PURSUANT**
2:1
**purview**
66:20 99:18 124:25
125:1

**put**
4:10 21:20 28:12
33:11,14 39:4 42:17
54:7,17 59:1 62:15
64:13 70:17 71:1
72:2 80:9 84:16
87:25 88:1 106:22
**putting**
9:2 46:25 47:3
120:16 137:2
**puzzle**
61:24 74:24
**P.C**
1:19
**p.m**
107:23,23 117:8
119:15 142:13,13
147:18

_____
**Q**
_____

**qualify**
62:6
**quality**
24:21,21 41:10 48:12
**quasi**
28:4
**question**
5:2,4,6,7,13,15 11:6
16:18 40:15,19 47:2
47:2 52:2 53:6 54:7
63:8 65:19,23 68:3
68:14 73:15 76:5
80:25 82:11 89:23
96:5 101:24 105:3
109:9 110:25 118:4
122:16 123:24
124:12 125:6
126:12,19 127:5
130:11,16,21 133:2
135:4 136:2 137:9
140:22 144:12,15
144:17 145:22
146:18
**questions**
4:14,19 5:3 6:6 68:5
68:6,7 69:16,17



MAGNA
LEGAL SERVICES

77:24 80:13,15
95:21,25 114:16
117:12 118:16
123:14 147:14
**quick**
131:6,8
**quickly**
50:21
**quite**
30:12 84:12 116:1
140:5 144:10

**R**

**R**
3:1
**radiation**
50:14 57:23 60:20
61:17,25 62:9 75:18
75:20 77:2 79:20,23
80:3 89:13 132:1,3
**Rahod|Mohamedb...**
1:14
**raise**
25:24 26:6 65:10
122:12
**raised**
32:5 53:16 84:10
87:1 93:17 103:4
120:19
**raising**
53:25
**rare**
72:5
**Rathod|Mohamed...**
2:4
**reach**
38:25 116:20
**reached**
132:24
**reaction**
75:5,7,8 82:23 83:16
112:22 120:23
123:8,9
**read**
36:9 62:14 103:23
105:9 112:18

120:10 122:24
148:2
**reader**
105:3
**reading**
89:8 105:4 112:5,22
123:23
**real**
49:10 58:24 91:8
**realized**
10:18 23:6
**really**
4:6 11:7 18:19 27:20
38:4,8 48:19 50:21
51:22 53:6 54:9,10
58:9 60:21 61:22,23
62:2 63:21 64:15
66:21 69:9,12 70:19
70:20 74:14 77:16
79:5,6,6,19 80:14
81:4 84:7 87:19
88:23 89:21,22 91:9
94:25 97:3 98:7
99:18 101:23
120:14 121:18
123:3 124:3 126:6,7
128:20 130:16
135:23 138:9 144:1
146:13,24
**realm**
69:12 77:22
**Realtime**
149:21
**reapply**
126:10
**rearview**
67:12
**reask**
123:24
**reason**
9:6,7 11:4 59:9 65:25
79:8,10 90:17,20
95:24 96:2 128:9
146:21
**reasonable**
105:2

**reasons**
6:4 93:8 105:21
127:20
**recall**
8:13 12:19 23:10,11
39:25 44:4 58:7
60:2,4 61:19 63:8
67:13 69:3,6 72:7
74:5 82:7,12 84:4
85:13 86:14 87:8,11
91:23 102:9,17,22
108:20 111:21
112:19 114:24
121:24 132:8,17
**received**
5:20 88:15 98:21
**receives**
40:20 41:6
**receiving**
136:15
**Recess**
57:18 107:23 142:13
**recollection**
4:11 91:25 92:15
**recollections**
62:2
**recommendation**
37:1,2 47:18 108:12
**recommendations**
101:9
**recommended**
108:7
**record**
3:7 4:24 19:9 68:4
77:24 107:22
109:11 141:4
142:11 147:19
**records**
110:1
**recreate**
114:2,6
**recredentialing**
72:3
**recruitment**
120:6
**reduced**

149:11
**reexplain**
35:17,18
**refer**
47:12
**reference**
19:12
**referenced**
86:7
**referencing**
85:18 91:16
**referral**
25:21 99:23 101:3
102:2
**referred**
58:23 141:19
**referring**
12:21 24:7 37:17
61:15 62:17 69:21
69:22 94:6 141:17
**refresh**
92:15
**refusing**
128:4,10
**regard**
77:2
**regarding**
40:3,3 65:4,16,19,24
68:6,7 117:11,24
118:25
**regardless**
52:18
**regards**
45:23
**regional**
17:24 18:17,24 19:18
20:6 29:7 134:15
**Registered**
149:4,20
**regular**
24:12,13
**regularly**
130:7,12
**regulations**
42:23
**reinstate**


MAGNA
LEGAL SERVICES

36:22

**reinstated**
49:11 107:7,11
128:23

**reinstatement**
36:21 37:3 38:6,22
92:4 95:18 98:8
104:21,24 105:12
107:1,3,13 128:24
129:8,10

**reinstating**
35:12

**rejected**
143:2

**relate**
40:10 41:9,13

**related**
45:23 67:18 124:12
127:25 128:3,10
135:22

**relates**
39:17

**relating**
46:9 93:8 105:21

**relation**
149:8

**relationship**
26:25 38:8 44:14,20
49:24 51:21 56:22
57:9 60:19 61:3
64:4,5 70:23 78:1
78:24,25 80:8,11,13
80:16,24 81:10
84:10 97:11

**relationships**
47:12 74:13,19 77:10

**remember**
3:23 4:5 8:17,24
43:22 60:17 71:3
78:2 87:1 93:11
94:19,21 121:22
123:7 129:16
141:16

**Remind**
93:19

**Render**

1:19

**renewing**
125:16

**repay**
128:4

**repayment**
120:6,7 122:13

**repeat**
82:10 118:4

**rephrase**
25:10 32:10,23 47:1
47:25 55:11 74:11
105:3 118:23

**replaced**
56:23

**report**
38:21 104:22

**reported**
99:13

**Reporter**
16:17 73:8 142:14,17
142:20 149:5,20,21
149:21

**represent**
3:15 20:25 27:14,18
52:17 55:19 59:5
86:23 89:16 100:7
134:6

**representation**
52:24 54:9

**representations**
96:20 97:10 99:4,6

**representative**
18:6 20:10,15 50:1,2

**represented**
56:4

**representing**
22:22 23:11 91:2
124:20

**reputation**
64:23,25 65:1,4,16
65:23

**request**
8:21 34:5,19 35:20
35:21,23 36:10 38:6
48:17 49:6,9,10

68:8,9,12 87:23
88:15,21 89:2,3,12
89:18 90:3,23 91:1
91:13 92:2,4 93:14
93:21,23,25 94:23
95:1,3,16 96:7
97:15 98:18,25 99:9
101:21,23 102:12
104:10,20,24
105:12 106:3,22
147:2

**requested**
31:3 33:25 35:4
37:23 91:17 97:1
128:24 129:7,10

**requesting**
35:10,22 36:5 37:5,6
37:7 49:4 72:13
92:10 101:18

**requests**
33:21 34:17,21 35:6
37:16 48:25 49:2,10
89:1 98:11 122:2

**required**
109:22

**requirement**
38:21,23

**requirements**
38:1

**rescind**
124:1

**rescinded**
147:10

**rescinding**
146:21

**rescission**
143:6

**research**
11:7,8,11 131:6,8

**residency**
9:23 10:22

**resolution**
23:3

**resolve**
23:2

**resolved**

113:18

**resolving**
24:18

**respect**
25:11 35:19 37:15
113:6 129:12,15
145:25 146:8,9
147:2

**respond**
6:6

**response**
54:20 86:13 87:6

**responsibility**
25:10,11

**responsible**
43:7 66:15 124:20

**restoring**
35:12

**restrict**
145:2

**restrictions**
43:4

**restroom**
142:8

**result**
22:11 77:4 125:8
137:3,11,21

**retiring**
32:7

**return**
4:12 58:25 93:25
98:4 101:5,9,13
106:7 122:15

**revenue**
76:7 77:4,9

**revenues**
76:18

**review**
8:10 24:22 26:14,19
29:2 31:12,14 40:9
40:10,12,16,18,22
40:23 41:2 48:11,14
48:18 66:18 67:4,17
67:24 85:9 145:6,8
146:3,16

**reviewed**



67:9 117:12 118:15
**reviews**
26:15,16 30:22 31:4
**revised**
119:20
**right**
3:12 13:24 15:5
18:13 20:20 37:18
41:6 42:20 47:15
56:15,23 59:13
60:11 67:19 68:19
71:20 76:23 81:17
84:23 89:13 94:8
97:14,19 100:18,22
107:20 118:15
119:9 120:21 121:7
121:9 123:1 126:14
131:10,17 133:3
140:5 146:3
**ring**
145:4
**RMCC**
60:24 61:2,7
**rocks**
65:2
**Rocky**
60:24
**role**
17:3,25 18:23 19:1
19:21,23 20:7 21:19
24:6 26:11,22,23
27:2,5,9 28:11,19
28:20,22 29:7,16,19
31:19,19,22,25 32:4
32:10,11,23 35:18
37:24 39:9 49:15,25
50:3 55:5,6 58:14
58:17 59:16 60:14
63:15 71:5 81:5
86:22 101:22
115:22,24,25
126:18 129:12,13
129:15 135:1
138:13 139:7,8,9
140:8,10 145:24
146:2,6

**roles**
17:16,19 20:3 66:4
134:23
**room**
7:22
**rooms**
22:5 23:8,12
**ROPC**
54:19 57:23 58:15
73:13,18 78:19 97:1
**roughly**
14:15 57:5 88:19
**round**
15:25
**routine**
67:1,2,3
**RPR**
2:7
**rules**
2:2 3:19
**rumor**
70:8,23 74:3,5,9
79:15,19,22 80:7,17
80:22 81:1 135:20
135:21 136:13,14
**rumors**
70:10,16 79:17
**rumor-type**
77:17
**run**
26:8 30:17 112:12,14
**running**
24:13 34:11 138:2
**rural**
140:17

---

**S**

**S**
3:1
**SABEY**
1:18 40:6,9,22 41:7
41:11,23 42:4 48:5
48:11,16,20 57:14
57:17 67:16,20,23
68:11,17 107:16,19
107:21 109:9

122:21 128:18
129:6 141:4 142:9
143:14 145:6,12,14
145:18 146:1
**safe**
25:20 49:13
**safely**
19:11 101:14
**safety**
24:22
**sale**
14:20
**Sam**
117:11 119:14
140:23
**Samuel**
116:10
**satisfying**
20:2,5,7
**saw**
19:12 71:15
**saying**
12:8 24:13 48:16
51:19 83:4,15 88:21
96:3 122:5 129:23
**says**
85:1,16 88:11 93:7
105:20 106:6 115:5
117:10 118:15
119:20,25 120:2
**scale**
136:23 137:25
**scenario**
47:20 54:6
**scenarios**
47:4
**schedule**
39:4 104:15
**scheduled**
5:24 8:6,8
**scheduling**
31:19 32:25 39:9
**school**
9:20,22 10:7,12,15
10:18 12:8,17
**scope**

18:17 134:16
**Scott**
115:8,23
**scratch**
110:25 131:7 136:1
**screw**
4:14
**se**
103:14
**second**
6:18 8:8 19:3 22:3
28:3 44:1,3 46:21
59:1 70:6 85:9
92:18 94:1 102:4
104:19 105:11
116:8 121:23
131:18 133:3
**see**
15:23 32:6 64:7
68:19 85:1,2 92:22
93:9 104:22 106:8
114:19 116:5,9
117:5,7,15 118:3,20
119:1,14,22,25
120:8 133:8 141:14
141:20
**seen**
4:9 30:21,24 88:12
**Selagamsetti**
100:10
**semantics**
4:14
**send**
39:13
**sending**
121:8
**sense**
4:20 10:6 21:22 44:6
45:19 69:17 125:19
130:19 131:3
**sensible**
75:25 77:3,15 80:1
**sent**
116:10 119:21
**sentence**
93:4 104:19 105:11



105:18,19 118:17
119:20

**sentences**
118:20

**separate**
31:14 32:20 36:24
38:5 120:25

**separation**
88:24 143:24

**September**
1:10 2:6

**sequence**
113:22

**series**
45:22 53:20

**serve**
63:18

**served**
17:20 18:3,5

**service**
78:3,6,8

**services**
1:7,24 12:22 13:2
47:19 77:1 125:17

**set**
28:3 69:15,16

**sets**
11:23

**Setti**
100:11,12,14,17

**setting**
15:24 22:7 43:8
53:19 61:14 69:9,11
79:13 87:22 100:16
100:16

**settings**
79:11

**Seventeenth**
1:20

**severed**
56:21

**shaking**
4:23

**share**
95:10 103:13

**shared**

103:1,13

**She'll**
46:16

**shifting**
73:21

**ship**
30:12,14

**short**
116:3

**shorter**
34:18

**Shorthand**
149:21

**shortly**
58:22

**show**
84:18 88:2 98:15
114:8

**showed**
84:22

**side**
10:20 13:10 18:2,3
31:7,8,16 35:22
37:18,19 42:1 43:9
45:3 52:11,14 56:2
70:2 77:9 89:2,4,18
97:6 98:1 114:21
123:19 138:21,22
138:23

**sides**
84:24

**sign**
17:10 125:14

**signature**
142:21

**signed**
116:11 117:23
118:18 119:10,12
120:4,11

**significant**
30:4 31:12 61:5
104:3

**similar**
8:8 18:17 28:9 55:23
56:3 61:10 79:5,6

**similarly**

138:3

**sincere**
139:5

**single**
23:3 137:15

**sit**
48:21

**site**
17:21 18:11 29:23
30:1,8,9,22,25
134:13

**situation**
8:18 25:19 39:9 48:1
54:25 66:17 77:8,17
78:22

**situations**
79:7,7 144:24

**six**
18:20

**skeptical**
96:10,12,15,19
122:25

**skepticism**
96:7 97:9,13 99:3,7
103:4 122:19

**skepticisms**
102:25

**sleep**
46:5

**slightly**
134:16

**Slowly**
137:24

**small**
14:12 29:15

**smart**
11:24 83:6,8

**Smarter**
11:25

**smoothly**
3:21

**social**
59:22 63:22 64:1,2,5
64:9 69:9,12 79:7,7
79:11,13 138:24,25
139:14,16

**socialize**
64:14

**socks**
13:21

**sold**
14:19,20

**sole**
143:21

**solely**
51:14

**somebody**
39:3 42:6 121:6
123:25

**someone's**
38:15 95:13

**somewhat**
55:2

**soon**
57:14 77:25

**sorry**
11:18 13:14 16:19
24:25 70:14 73:10
74:16 82:11 83:7
85:5 93:20 101:8
109:4 112:14
114:24 115:3,15
117:13 118:7
119:25 125:24
127:11 131:7,13,17
132:8

**sort**
3:18 9:12 10:8,9 12:3
14:2 17:11 25:7
26:6 28:17 30:6
38:10 39:5,14 41:11
44:21 62:15 68:3
74:24 81:12 93:3
98:12 99:16 129:19
133:4

**sought**
47:5,7,21 48:2 127:2

**sound**
131:10,17

**sounds**
63:9 68:17 119:24
131:18


MAGNA
LEGAL SERVICES

**source**
46:3 79:15 80:7
127:15
**spark**
8:18
**sparked**
11:8
**speak**
16:21 26:6 102:16
128:20 141:9,11
142:1,5
**speaking**
86:23 95:12 103:11
122:3,8,18
**special**
27:19,21
**specialist**
16:24
**specialties**
61:11
**specialty**
16:3 61:12 66:24
138:21,23
**specific**
25:13 38:16 42:16
48:24 61:23 66:17
77:13 79:20 86:14
92:9,10 94:21 103:3
120:22 122:2
127:16 132:21
145:8
**specifically**
26:12,13 76:17 82:20
87:14 97:12 109:25
121:20
**specifics**
68:13 71:21 77:7
**speculation**
132:23
**spell**
19:4,5,6
**spend**
22:23
**split**
138:21
**spoken**

141:8 142:2
**sponsored**
43:19,20
**spouse**
46:10
**Springs**
7:10 10:1,2 14:8,10
15:7
**St**
17:22 27:1 47:5
60:14 140:3
**staff**
18:7 19:13,14,15,21
19:21 20:6,7,9,13
21:25 22:1,24 23:25
24:6,7,8 25:3 26:23
27:18 28:5 31:16,18
31:19 32:20,22,24
33:4,20 34:2 35:25
36:4,7 37:7,8,14
39:10 42:2 43:21
48:8,17 49:15,18,25
50:3 51:24 52:4,17
53:21 55:12 56:3,10
56:20,24 57:3 59:22
60:7 63:10,14,15
65:20 67:8 72:18
86:22,25 87:3 88:25
89:2 97:4 98:1,5
124:20 126:7 136:6
137:2 139:7,8 145:4
**staffing**
39:11 40:4,5
**stand**
64:15 78:2 124:6
**standpoint**
45:15 58:9,11 64:13
66:20 74:13 75:7,12
75:19 76:1,3 87:20
99:21,22 112:8
126:1
**Stark**
128:1
**start**
3:17 9:12 14:9 15:15
18:14 37:8 85:15

97:25 115:17 117:4
117:5 135:1
**started**
4:18 59:2,8 61:4,13
**starting**
9:15 14:8,15 60:6
**starts**
39:4 93:5 105:19
108:23 110:2
**state**
3:7 148:3 149:2
**stated**
145:15
**statement**
118:14
**STATES**
1:1
**stating**
119:12 127:21
**statistics**
12:5
**status**
25:14 28:4
**statute**
48:12
**stay**
5:18 41:21
**stays**
43:14
**stenotype**
149:10,13
**step**
36:7
**stepping**
14:5
**steps**
86:12,14 87:5
**sticker**
85:5
**stirred**
80:13
**stop**
19:25 36:2
**stopped**
72:25 73:3 112:2,3
125:8

**story**
120:20 135:22
**straight**
36:3 61:8
**Street**
1:15,20 2:5
**stress**
82:21 83:3,10,12
**stressed**
84:3 96:3
**strike**
46:24 63:8 75:25
102:8
**strikes**
103:19
**strong**
62:2
**struck**
23:18
**structure**
99:10 103:10
**stuff**
12:16 117:19 120:17
121:4 127:13
**subject**
40:15 46:7 118:24
**submit**
71:23 98:12
**submitted**
34:5
**Subscribed**
148:14
**substance**
25:4 40:11 41:3 95:1
95:2 99:8
**substances**
6:5
**suddenly**
16:12,13
**suffering**
44:22
**suggested**
108:9
**Suite**
1:15,20 2:5
**summary**



120:4

**supervise**
27:14,17

**supervisor**
27:6

**supervisors**
27:3

**support**
92:11 97:8

**supporting**
101:25

**suppose**
6:12 21:8 27:13
46:24 56:7 65:12

**sure**
9:18 10:8 11:7 15:10
18:10 21:23 35:2
39:6 41:12 48:15
52:2 56:8 57:15
59:23 60:7 61:15
68:19 79:12 82:19
93:15,17 95:23
100:25 102:22
104:2,7,13 114:17
118:5 120:24 121:1
129:16 131:4
133:10 135:2
140:10 144:16,22
147:5

**surface**
64:21

**surgeon**
16:14 28:4 41:18
69:14

**surgeons**
54:4

**surgeon's**
22:8

**surgeries**
23:16 27:20

**surgery**
16:7,13,13 23:20
41:18 43:4 50:10
53:23

**surgical**
22:4 43:6

**surprising**
80:18,19

**suspicion**
82:15

**switched**
14:18

**sworn**
3:3 148:5,14 149:7

**symptoms**
45:20

**system**
75:3 108:23 109:3,3

**systems**
109:21

—————————————

**T**

**Tacha**
2:18 114:18 115:19
116:11,16 126:21
127:13 130:1,4,8,13
138:16,17 139:3

**tail**
62:16 63:12,12 66:14
70:17,22

**take**
5:23 17:16,19 19:20
23:16 36:11 42:25
47:9 52:25,25 57:14
57:15 63:5,5 81:13
85:9 86:12 103:23
106:13 115:9 142:8

**taken**
2:3 6:16 57:18 87:6
107:23 142:13
149:10

**takes**
52:14 90:5

**take-away**
102:24

**take-aways**
8:15 44:11

**talk**
5:12 40:6 50:22 68:2
68:15 79:12 92:6
133:4 138:7,16
141:6,7

**talked**
5:17 24:19 37:10
64:19 79:3 84:12

**talking**
12:14 40:25 41:13
46:19 53:15 56:23
59:16 60:20 64:1
83:2,3 84:13 95:14
105:12 107:25
112:21 121:22

**talks**
46:8

**tangential**
62:19

**tasks**
108:5 110:17

**team**
21:2,5,14 22:2,23,24
23:11 24:1,2,15

**tech**
22:13 28:8

**technically**
14:23 27:4

**techs**
65:21

**teeth**
28:8

**tell**
4:2 5:5 40:1 46:15
57:21 65:1 82:7
84:4 98:12 104:17
121:24 144:7

**telling**
55:24 84:9 91:7
94:12 121:18

**tells**
84:3

**temporarily**
115:24

**temporary**
22:12,12,15,24 30:19

**tend**
5:24,25

**tension**
23:24

**tenure**

21:25 136:6

**term**
12:20 20:1 42:12
45:10,12 46:16
47:10 82:19 92:9
123:25 146:13

**terminated**
71:19

**terms**
95:17 98:2 101:12
120:5 133:18

**testified**
3:3

**testify**
124:7 149:8

**testimony**
148:3,5

**text**
142:3

**Thank**
4:17 36:15 85:16
109:4 120:3 144:4

**Thanks**
18:8 28:15 78:11
122:15 147:15

**thereof**
149:13

**thick**
81:13

**thing**
3:22 4:17,22 19:15
30:6 42:21 44:13,24
45:1 46:21 62:1,4
66:25,25 72:10
75:25 77:3,15 97:14
106:5 108:18
109:24 112:10
122:6 123:18
135:25 137:15

**things**
3:21 4:5,10,14 6:9,23
10:20 11:10 20:18
21:22 22:13 23:15
25:4 26:19 35:10
37:18 41:13 46:6
56:17 59:23 61:12


MAGNA
LEGAL SERVICES

64:19 65:1 66:23
69:12,19 71:19 81:4
81:13 84:8,25 88:1
101:9 104:16
108:17,20 109:20
112:6,25 113:2,23
121:14 122:10
123:19 124:7,8
138:2 139:11,25
144:17,18

**think**
5:9 8:17 11:23 14:1
14:15,17,17,21 15:4
15:11 18:11,14
21:18,24 23:6 24:6
27:20 29:10 30:2
31:2,3 35:9 41:15
50:7 55:1,16 59:22
62:25 66:1 68:4
69:10 70:21,22 71:4
71:10,21 72:2 73:20
74:11,22 75:21 78:4
79:8 80:9,12 81:3,9
81:23 82:5,9,10,15
83:10,13 84:17 86:4
87:5,25 88:23 89:24
90:1 92:8 94:15,15
96:24 97:24 99:6
100:22 103:6,9,11
105:5,6 107:17,24
108:10,16 109:24
110:22 112:17
113:1,11 114:5,19
114:20,25 115:6
117:4 120:22,23
121:11,15,17 123:5
123:22 124:7,7,16
126:3,25 127:1
128:19 129:18
130:10,15 132:7,7
132:18,22 133:11
134:12 136:5,17
137:20 139:4,21,22
139:24 141:8,14,21
143:11 144:11,11
144:15,17 145:10

145:16,19 146:11

**thinking**
46:5 75:16 103:10
134:7

**third**
101:4 130:25 131:9
131:15,19 132:7

**Thompson**
47:13

**thought**
6:18 10:10 24:24
126:19

**thoughts**
35:7

**three**
36:24 106:22

**Thursday**
131:10

**tied**
126:2

**time**
6:12 8:20 10:25 11:7
21:15 25:20 26:5,8
26:17 28:12 30:11
44:8 58:24 59:20
61:20 62:23 64:16
64:19 66:5 73:12
78:16,18 79:4,17
83:12,14 85:16
87:12 91:8 96:14
97:5 103:7 104:10
104:12 106:24
114:19,25 115:1
116:3 120:1,25
122:9,18,18 123:13
132:10 138:12
140:5 141:8 147:18
149:10

**timeline**
13:19 80:10 88:17
98:3,4,6 116:25
117:3,20 118:9,11
119:17 122:20,25
124:13

**timelines**
120:19

**times**
7:17 14:17 23:4
46:19,22 59:24
61:15

**timing**
15:10 49:4 93:24
113:11,12,22 114:2
114:6 115:6

**title**
32:12 88:11 138:20

**titles**
114:25

**today**
3:12 4:7 5:9,21 6:4
7:13,25 12:21 49:21
85:7 124:10 134:7
136:4 138:8 143:9
143:16 144:5
147:13

**today's**
9:4

**told**
73:4 81:8 82:24
90:18 95:25 120:20
123:14 144:13

**top**
108:20 116:5 120:2

**topic**
5:21

**Total**
147:18

**touched**
14:2

**trade**
14:21

**train**
24:24 126:19

**training**
28:1 49:16 50:4,10

**transcript**
148:3 149:13

**transferring**
23:15

**transition**
17:11

**transplant**

11:11

**transplants**
11:12

**trauma**
16:7,10 53:22 69:14

**traveler**
22:17

**travelers**
22:6,10 23:9 43:10
53:8,16 136:4

**traveling**
22:17

**treat**
20:13

**treated**
55:21

**treating**
53:10,10

**treatment**
62:1 103:12

**trial**
6:24 7:1 121:6
123:25

**trickier**
144:9

**tricky**
25:18

**tries**
112:8

**trigger**
49:10

**trouble**
25:15,16

**true**
6:14 43:16 45:2 63:7
89:17 112:24 113:2
113:5,10 141:9,25
149:12

**truly**
61:22

**trust**
121:18

**truth**
4:2 149:8

**truthfully**
6:6


MAGNA
LEGAL SERVICES

**truths**
 56:6
**try**
 4:7,10 5:25 39:4
   47:13 49:11 84:5
   114:2,6 116:25
   118:9
**trying**
 14:17,24 20:13 30:12
   30:13 42:20,25 50:6
   92:14 104:11 115:6
   118:11 120:23
   123:3 127:1 144:11
**Tuesday**
 130:25 131:11,12,15
   131:18
**turn**
 102:3 119:13
**turnover**
 12:5
**TV**
 4:9
**twice**
 7:19,24
**two**
 8:4 9:8 32:20 35:9
   36:12 44:20 46:8
   82:9 114:12 126:2
**two-year**
 20:1
**type**
 11:10 37:13 51:20
   78:7 123:16,17,17
**types**
 16:3 122:10
**typewritten**
 149:11
**typical**
 99:15,17 122:6
**typically**
 32:5 60:23 62:25
   98:1
**T's**
 58:14

——————————
           **U**
——————————

**Uh-huh**
 5:16 18:22 21:7
   73:19,23 86:20
   92:21 104:4 114:14
   117:2,16 119:2
   129:17 130:20
**ulterior**
 101:18
**ultimately**
 43:7 76:12 77:4
   106:6
**umbrella**
 45:12
**unaware**
 47:8 80:14
**unclear**
 32:17,18
**uncomfortable**
 120:15
**uncommon**
 97:24
**undergraduate**
 9:15,18,19 10:4
**understand**
 5:5,5 12:21 40:14,17
   40:18 46:23 51:9,11
   52:2 61:15 69:10
   80:2 125:9 133:8
   135:14 136:9
**understanding**
 3:25 13:12 37:17
   42:11,14,15 43:17
   44:12 45:7 64:24,25
   94:23 110:4 115:11
**understood**
 5:7 7:12 32:13 50:24
   52:16 72:7 80:23
   91:12 98:9 144:4
**unfamiliar**
 22:10
**uniform**
 138:4
**unique**
 5:12
**UNITED**
 1:1

**University**
 9:22
**unnatural**
 16:20
**unpredictable**
 46:19
**unremarkable**
 115:25
**unusual**
 99:9
**use**
 12:20 25:4,15 30:22
   32:15 37:22 49:21
   53:7,15 79:2 85:6
   109:11 146:13
**usefully**
 19:10
**usually**
 16:24 47:18 61:24

——————————
           **V**
——————————

**vacancies**
 33:6
**vacation**
 84:11
**vacations**
 110:4,7
**Vance**
 115:7,12,18
**variety**
 20:18
**various**
 24:11 29:23 38:20
   65:1 66:6 74:25
**vendor**
 137:20
**venture**
 13:8,13,24 14:3
   133:14
**verbally**
 91:17
**verified**
 123:21
**verify**
 123:19
**verifying**

 123:14
**version**
 109:5
**versus**
 16:6,7 75:10
**view**
 51:25 75:13 89:3,4
**viewed**
 87:19
**violations**
 128:1
**visceral**
 123:7,9
**visit**
 94:18
**volume**
 72:6
**volunteer**
 92:7
**VP**
 114:20
**vs**
 1:6

——————————
           **W**
——————————

**wait**
 4:18 15:5
**waive**
 67:21
**waived**
 145:11
**waiving**
 145:14
**walk**
 9:16 14:6
**walked**
 62:24 80:20
**want**
 3:19 10:7 22:17,18
   26:9 41:16 49:12
   56:1,4 57:15 69:7
   81:13,14 95:16,20
   100:8 118:14
   119:13 120:17
   133:3 138:2 140:22
   142:14,17,23 143:9



143:15
**wanted**
9:11 64:7 70:2,3
90:12,22,25 95:9
143:19
**wanting**
24:2
**wants**
91:5
**wasn't**
22:24 23:3 26:17
44:24 53:18 91:3
96:23 103:13
112:24 115:21
123:11 127:17,21
132:24 140:14
**watching**
75:14
**way**
5:11 16:20 33:13,15
36:25 44:21,22
52:25 54:7 55:20
56:11 59:7 63:18
64:14 69:3 74:4
91:8 107:1 112:24
113:14 116:20
133:9 134:7 135:13
136:3 138:25
144:21 146:4 147:6
149:15
**ways**
19:9 24:2 54:1
129:14 140:16
**wear**
135:2 137:12
**week**
14:14 82:9 86:9
**weeks**
14:13 86:4
**welcome**
38:25
**Weller**
116:9,10,16 119:15
126:22 130:2,4,8,13
139:6,20 140:23
**went**

9:21 14:3 92:3 116:6
**weren't**
83:2
**we'll**
5:23 18:9 21:13
41:22 46:14,24
48:21 56:22 58:25
65:2 68:3,9,15
70:25 72:15 79:2
81:17 86:16 117:4,4
**we're**
3:18 4:13 5:24 12:9
19:8 24:7 34:22
35:9 41:13,23 48:5
56:23 59:22 64:1
66:13,13 95:14
105:8 112:21
117:17 118:9 143:8
**WHITNEY**
1:14
**wife**
46:15
**William**
27:8,9
**willing**
22:25
**winter**
29:10,11
**witness**
7:8 40:13 68:6 149:7
**word**
12:21 19:3 22:10
27:14 32:15 49:21
88:15
**words**
5:4 103:21
**work**
9:20 10:10 14:14
18:17 20:7 30:18
32:16,19,22,24 33:3
33:19,20,23 35:19
35:20 37:15 39:5,5
41:2 42:7 43:11
44:17,18,18 46:18
49:16 51:14 52:4,8
54:15 55:13,22,25

56:5,13,14,18,19
60:17,18 63:12
65:24 72:8,10,21
82:24 83:1,11,17
104:15 106:16
110:20,20 127:1
137:10 139:17,21
143:19 146:6
**worked**
9:24 10:1,21 14:24
14:24 22:1 51:11
61:2 62:20,22 78:20
138:12
**workers**
22:15
**working**
9:25 10:22 12:4 14:6
21:15,16 44:24 45:4
45:25 59:3,17 60:13
61:13 72:25 73:3
78:23,25 82:21 83:3
83:15,16 84:4,5,14
96:13 97:9 110:9,13
112:2,3 125:8,12
126:14 141:22
144:8,14
**workload**
44:15
**workplace**
56:15 64:1,6 132:14
**works**
130:8,12 138:11
142:4
**work-related**
66:12
**worry**
126:16
**wouldn't**
44:24 54:24 60:7
77:7 124:3 128:13
133:15 136:16,16
**write**
109:14
**writing**
98:12,18
**written**

2:1 92:2
**wrong**
41:5 121:9
**www.MagnaLS.com**
1:25

---
**X**
---
**X**
2:8

---
**Y**
---
**yeah**
4:6 11:17 14:9 18:22
31:14 38:14 39:8
41:23,24 52:3,10
54:24 57:17 70:19
71:17 73:16 77:7
79:5 81:16 82:5
84:3 87:15 89:7,9,9
89:11 96:23 105:8
107:21 109:10
115:16 118:4
122:22 124:24
127:19 128:19
129:23,25 142:9,11
143:12 146:10,11
**year**
9:19 15:2 22:3 82:3
**years**
12:11 44:2,6 50:13
62:21
**yeses**
4:24

---
**Z**
---
**zoom**
133:3

---
**0**
---
**000002**
2:15
**000004**
2:17
**000006**
2:19
**000395**



2:13 85:2

---

**1**

**1**
 81:14
**1:23-CV-01921-N...**
 1:3
**1:30**
 119:15
**1:35**
 107:23
**10**
 2:12 84:19,21,23
  87:10 91:16 98:16
**10th**
 116:11,15 117:8
  143:4
**10:04**
 2:5
**10:30**
 5:25
**100**
 1:15 2:5 29:17 35:2
  146:24
**11**
 2:14 88:3,4 119:15
**11th**
 117:13,25
**11:10**
 57:18
**11:18**
 57:18
**114**
 2:18
**12**
 2:16 92:16,16,17
  94:1,2 102:3,3
  103:18
**12th**
 119:11
**12:24**
 107:23
**12:30**
 117:14
**13**
 2:18 114:9,10,12

115:2 116:5,9
124:14 143:1
**16**
 147:19
**17th**
 131:14
**19th**
 131:9
**1999**
 59:6,9

---

**2**

**2nd**
 85:11 86:8 87:11
  93:14 102:6,13,19
  102:21
**2:22**
 142:13
**2:29**
 142:13
**2:36**
 147:18
**20**
 148:15
**20th**
 86:9
**2008**
 14:15 15:7 59:18
**2013**
 14:17 15:8
**2014**
 15:4
**2014-2015**
 44:8
**2017**
 15:5,7,8,15 17:4
  18:15 59:14
**2018**
 18:21
**2019**
 134:4,9,22 135:14
**2021**
 57:24 73:12,21
**2022**
 19:22 21:6 29:11
  57:8 82:6 85:11

88:10 93:1 111:22
117:13,25 119:11
119:21 131:5,8,14
136:7
**2023**
 14:3 20:1 21:6,9
  57:10 136:7 137:7
**2024**
 1:10 2:6
**23**
 1:10 2:6
**25th**
 88:10
**26**
 119:21
**2701**
 1:15 2:4

---

**3**

**3**
 2:10 147:19
**30**
 8:7,7 34:1,6,18 35:6
  35:15,24,25 36:6
  51:20 95:15 104:8,9
  106:15
**30-day**
 35:11 49:6
**303-578-4400**
 1:16
**303-801-3538**
 1:21

---

**4**

**4/11/2022**
 118:16
**4/12/2022**
 118:18
**4/25/22**
 2:14
**45**
 8:9

---

**5**

**5**
 2:17 57:16 92:25

94:9 143:3
**5th**
 102:14 103:19
  111:22 116:14
**5/5/22**
 2:16
**5/9/22**
 2:18
**50**
 30:16 60:9

---

**6**

**6**
 114:12 117:8
**6/13/22**
 2:12

---

**7**

**7**
 114:13 116:9
**70**
 72:4
**700**
 60:7

---

**8**

**8**
 117:5
**8-year-olds**
 9:8
**800**
 1:20
**80202**
 1:20
**80205**
 1:15
**84**
 2:12
**866-624-6221**
 1:24
**88**
 2:14

---

**9**

**9**
 2:19 116:15 119:14



119:14
**9th**
116:6 124:14 143:4
**90**
94:24 95:5,5
**90-day**
99:9
**92**
2:16
**999**
1:20

