IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-01921-NYW-MDB

_____

VIDEO-RECORDED DEPOSITION OF:  ERIC KOVAL
        CONFIDENTIAL & NON-CONFIDENTIAL
            NOVEMBER 14, 2024 2024

_____

DR. ANUJ PEDDADA,

PLAINTIFF,

V.

CATHOLIC HEALTH INITIATIVES COLORADO D/B/A CENTURA
HEALTH-PENROSE-ST. FRANCIS HEALTH SERVICES,

DEFENDANTS.

_____

        PURSUANT TO NOTICE AND AGREEMENT, THE
VIDEO-RECORDED DEPOSITION OF ERIC KOVAL, was taken on
behalf of the Defendant via Zoom, on November 14, 2024,
at 10:00 a.m., before Patricia "Annie"
Burnett-Anderson, Certified Shorthand Reporter and
Notary Public within Colorado.



Page 2

A P P E A R A N C E S
For the Plaintiff:    MELVIN B. SABEY
LINDSAY K. MCMANUS
Hall, Render, Killian, Heath &
Lyman, P.C.
999 17th Street
Suite 800
Denver, CO 80202

For the Defendant:    IRIS HALPERN
Rathod | Mohamedbhai LLC
2701 Lawrence Street
Suite 100
Denver, CO 80202

Page 4

THE REPORTER:  Do all parties stipulate that the court reporter may swear in the witness via videoconference?

MR. HALPERN:  Yes.

MS. MCMANUS:  Yes.

WHEREUPON, the following proceedings were taken pursuant to the Colorado Rules of Civil Procedure.

ERIC KOVAL,
having been sworn to tell the truth, testified as follows:

EXAMINATION

BY MS. HALPERN:

Q.  So, Mr. Koval, my name is Iris Halpern.  I'm an attorney for Dr. Peddada.  I'm just going to go over a couple of rules of the road with you for the deposition today, but, first, could you state your full name for the record.

A.  Eric Koval.

Q.  Can you spell that?

A.  E-r-i-c, K-o-v, like Victor,-a-l.

Q.  Thanks.  Have you ever been deposed before, Mr. Koval?

A.  No.

Q.  Have you ever been a party in a lawsuit?

Page 3

I N D E X
EXAMINATION OF ERIC KOVAL:                    PAGE
November 14, 2024
Examination by Ms. Halpern                 4

INITIAL
DEPOSITION EXHIBITS:              REFERENCE

Exhibit 37  Email                 88

Exhibit 38  Email                 93

Exhibit 39  Email                 105

Exhibit 40  Email                 109

Exhibit 41  Email                 121

Exhibit 42  Email                 125

Exhibit 43  Email                 161

Exhibit 44  Email                 180

CONFIDENTIAL PORTIONS:
Page 34, Line 13 - Page 35, Line 13

Page 5

A.  No.

Q.  Okay.  Well, the basic rules of the deposition -- and please feel free to ask me if you have any questions as well -- is you have to articulate your answers.  No shaking your head because the court reporter has to capture everything we're saying on the record.

My usual admonition, which applies more to me than the deponent most of the time, is to wait for each other to finish speaking.  I know I tend to talk over people, my whole family does, but it makes it really difficult for the court reporter.  So we're going to try our best to let the other -- other person finish before speaking.

You know, if you need a restroom break today, just feel free to ask, obviously.  And, you know, other than that, it is pretty straightforward.

Do you have any questions?

A.  No.

Q.  Okay.  So during the deposition, your lawyer may object.  That does not mean that you don't answer the question, they're just preserving their objections for later on, trial, et cetera.  That's just kind of how our processes go.  So unless you're specifically instructed not answer a question, you can go ahead and



2 (Pages 2 to 5)

Page 6

answer not withstanding the objection that your attorneys are making on the record. Okay?

A. Okay.

Q. So you just took an oath to tell the truth. I assume you're an honest person?

A. I am.

Q. Okay. Any medications or medical conditions that impair your ability to remember, to be able to remember everyth- -- you know, to remember fully what happened?

A. No.

Q. Any reason at all you can think of that you cannot answer truthfully and fully today?

A. No.

Q. Okay. What did you do to prepare for today's deposition? And when I ask you that, I'm not asking to actually disclose what your attorneys told you, but just whether you met with them, documents reviewed, any witnesses you talked to, et cetera.

A. I met with Mark and Lindsay.

Q. Okay. When did you do that, Mr. Koval?

A. The other day -- which I forget which day it is all of a sudden -- but we met the other -- we met in the last couple of days.

Q. Was that in person or on Zoom?

Page 7

A. Via Teams.

Q. And how long did you meet with Mark and Lindsay?

A. About an hour or so.

Q. Did you review any documents, any emails or anything like that?

A. I reviewed my declaration statements that I made previously.

Q. Okay. Anything else?

A. No.

Q. Is that the first time you met with lawyers in this lawsuit?

A. Mark is the first lawyer I met with in this lawsuit, yes.

Q. Okay. And when did you first meet Mark?

A. Via phone when he asked for my declaration.

Q. Did you talk to any lawyers about any of Dr. Peddada's claims prior to the point of providing a declaration?

MS. MCMANUS: We would just object to the extent that it would disclose attorney-client information, Eric.

MS. HALPERN: I'm not -- I don't believe I asked for what you were saying. I just said "Did you meet any other attorneys?"

Page 8

MS. MCMANUS: Oh, did you meet. Okay.

MS. HALPERN: Yeah.

A. No, I did not meet any other attorneys.

Q. (BY MS. HALPERN) At any point in time prior to that point regarding Dr. Peddada's claims?

A. No.

Q. Did you talk to any non-attorneys, like any of your coworkers or anything when you were drafting that declaration?

A. No.

Q. Did you talk to anyone else in preparation for your deposition today?

A. No.

Q. I'm going to ask you -- I'm going to change topics just a little bit and ask you about your education and job history.

A. Okay.

Q. Can you walk me through your educational background, please, Mr. Koval.

A. I graduated from nursing school. I'm assuming beyond grade schools?

Q. Yeah.

A. Graduated nursing school in '97 with a Bachelor of Science Degree, then graduated with my MBA in 2014, I think it was.

Page 9

Q. And where did you get your nursing school BA?

A. My nursing school BA was from Houston Baptist University in Houston.

Q. Okay. And your MBA?

A. My MBA was from the University of Victoria/Houston.

Q. Okay. I take it you're from Houston?

A. Pretty much, yeah, that's where I grew up.

Q. And when did you get your MBA?

A. It was 2014, I think, is when I finally finished it.

Q. And why did you transition from nursing to an MBA?

A. I didn't leave nursing, I just chose to get my masters in more of the business side of thing than the clinical side of things.

Q. Did you want to stay in the -- kind of the medical field after getting the MBA? Was that the intent?

A. Correct.

Q. And did you specialize in anything in your MBA? Did you have any kind of specialities?

A. I did not.

Q. So it wasn't kind of specific to staying in the healthcare field?



Page 10

A.   No.  I didn't get an MHA, I just got a run-of-the-mill MBA.

Q.   And what did you do after you received your MBA?

A.   I was employed at MD Anderson Physician's Network during that time, and I have stayed employed with them.

Q.   While you were going and obtaining your MBA, you mean?

A.   Correct.

Q.   Okay.  What type of practice was that?

A.   It was a consulting practice, essentially. It was a -- we managed -- Physician's Network was a subsidiary company of UT MD Anderson that managed partnerships -- MD Anderson-related partnerships around the nation.

I was on a quality team, so we did -- the work that I specifically did was clinical quality around chemotherapy and things of that nature, around oncology.

Q.   Okay.  And how did that -- how did your MBA bear on that role, that quality care control role?

A.   It helped me with my relationships with other companies, but it was -- it was an indirect relationship at that time.  It wasn't a one for one,

Page 11

you know, it wasn't hard MBA work that I was doing. I was still doing mainly clinical quality work.

Q.   Okay.  And what did -- what -- what did you do after that?  Just walk me through your kind of job history.

A.   Okay.  So aft- -- you mean after the MD Anderson work?

Q.   Yes.

A.   After the MD Anderson work, I joined Centura in September of 2019.  That's when I joined Centura as the -- as the director of oncology.

Q.   2019?

A.   Correct.  In September of '19.

Q.   Okay.  And where are you today?

A.   I'm in Montrose today -- at Montrose Regional Health as the director of oncology.

Q.   Were there any positions in between your hire at Centura and Montrose Regional Health?

A.   No.

Q.   And is Montrose Regional Health an independent hospital?  Or is it part of CommonSpirit?

A.   Independent.

Q.   When did you start that position?

A.   I started that in September of '22.

Q.   Okay.

Page 12

A.   Got a September theme going.

Q.   And why did you take on the position at Montrose Regional Health?

A.   I was looking to move to a smaller community and smaller organization.

Q.   Is that the big hospital in Montrose?

A.   No.  We have 75 beds.

Q.   Okay.  I know Montrose well.  I see that hospital down there too, so I spent a lot of time there.

Okay.  So tell me about your tenure at Centura.  What positions did you hold, where, et cetera?

A.   I was the service line director for oncology.

Q.   And what does a service line director for oncology do?  What does that position do?

A.   I had the clinical staff, essentially, reporting up to me.

Q.   Okay.

A.   Which was -- the way we were structured there, that was the nurse navigator team for oncology and the radiation -- the radiation support personnel for the nurses and radiation therapists.

Q.   And what about physicians?

A.   No physicians reported to me.

Page 13

Q.   Okay.  Who did they report to?

A.   They were at -- in Colorado Springs, as physicians at that time, were in a provider service agreement, so they didn't report to anybody at the hospital per se.

Q.   Okay.

A.   They were their own private practice.

Q.   And when you say you were the director, what operations or facilities did you supervise or manage?

A.   That would have been the Penrose Hospital and St. Francis Hospital in Colorado Springs.

Q.   Why did you take the position with Centura after Anderson?

A.   I was interested in getting back to more patient care type -- being closer to the patients.  The work that I did at MD Anderson had me removed from patient experience.

Q.   Okay.  And I assume that required a move to Colorado?

A.   It did.

Q.   And where did you move to?  Colorado Springs?

A.   Correct; yes.

Q.   What were some of your job duties?  You told me you were kind of overseeing nursing and clinical staff, but what were you actual duties as the director?



Page 14

A.   My primary role was to keep our productivity, meaning staffing productivity, nursing staff, radiation therapist staff productive to our work volumes.  And helping -- helping the management team that I had under me maintain sort of staff morale and working through those types of day-to-day issues.

Q.   How did that intersect with your MBA, if at all?

A.   Staffing productivity was about understanding how clinical demands intersect with the financial needs of the hospital.

Q.   So in that position, you've kind of given me a broad, you know, broad overview of what your purpose was as the director, but what did your day-to-day look like?

A.   A lot of it was during COVID.

Q.   It was a little --

A.   Yeah.  Day-to-day looked like designing work flows for how we kept the clinic rooms clean, whether that was a treatment room or a clinic exam room; how we could set up -- how would could set up clinic visits that were safe for everyone and meaningful for an oncology patient.

We were, you know, that -- you summarize it in a sense, and it sounds like "Well, what else?"

Page 15

It is amazingly complicated it seems like. So that was a lot of our day-to-day.

Also, looking at a period of time when clinic volumes were shifting and how you would manage throughput, keeping rooms clean in between visits.  So in a normal situation, patients -- like say on treatment -- might be back, to back, to back, to back.

Well, in the era of COVID, which was really my tenure there, we had to lengthen those visits.  So we had to lengthen clinic days, we had to change people's work schedule, and things like that.

So that was a lot of my day-to-day is working through those complications.  How do we keep -- how do we keep the day going when maybe we're also keeping -- there were periods of time when we were executing protocols on how you could keep half the staff working from home and then only having half the staff in and sort of creating these alternate schedules because oncology isn't truly a work-from-home environment.  You had to come up with very -- you had to come up with a lot of interim policies, if you will, or protocols to manage that because it wasn't very typical, and it took a lot of effort.

Q.   So it sounded like it was a difficult time at Penrose and St. Francis?

Page 16

A.   Yeah.  It was lots of fun.  Lots of challenges to figure out.

Q.   And how did that impact kind of the oncology department's finances while you were there?  And by "it," I mean COVID.

A.   We were able to -- we were able to maintain our business.  It was just really a function of how we got it through day-to-day.

Q.   And was there a time, you know, when your day-to-day responsibilities as the director of oncology at Centura kind of changed during your three-year tenure there?  Or was it really taken up by negotiating COVID the whole entire time?

A.   Yeah.  I mean, I would say during -- because of the time frame that I was there, it was, you know, it was pretty much that.  It was pretty much managing all of those kind of workflow issues centered around patient management and controlling infection and whatnot while I was there.

Q.   And how many direct reports did you have as the director at Centura of oncology in Penrose and St. Francis?

A.   Shoot.  Off the top of my head, I want say it was north of 50.  All of a sudden, I can't really remember exactly the count.

Page 17

Q.   But it was, you know --

A.   It wasn't three.

Q.   Huh?

A.   It wasn't three people.

Q.   It was quite a few?

A.   Yeah.

Q.   And you said you wanted to, you know, relocate to a smaller setting, which is why you moved to Montrose?

A.   Correct.

Q.   What motivated that decision or that desire?

A.   I was interested in an independent hospital and a smaller community.  I had moved from Houston, and Colorado Springs was turning into Houston, and I wasn't interested in that anymore.

I had been looking at ideas.  My wife and I had been looking at options for living in smaller towns one day, and didn't really go out searching.  Montrose found me through a recruiter, and when I looked -- kind of looked it over and thought "Well, why not now," since that's where my head was going anyway.  So I took a leap of faith and came out here.

Q.   And what are your -- I think you might have told me your position at Montrose Regional Health, but if you could just remind me.



Page 18

A. I'm the oncology director here.

Q. Okay. And what do your job duties entail at Montrose Regional Health as director of oncology?

A. I oversee medical oncology at our facility here. So we have the medical oncology clinic, and we have the infusion clinic where people get their actual treatment, so I oversee those aspects.

Q. And how does that intersect at all with your MBA training, if at all?

A. Here, I have responsibilities for overseeing the budget aspect of -- of our work.

Q. Did that occur at Centura as well or no?

A. Not as detailed.

Q. And when you were at Centura, could you -- did you have kind of the powers to hire or discipline? You know, what managerial powers did you have?

A. I -- for my -- for my nursing and radiation staff, I had disciplinary and hiring authority. My managers as well did.

Q. Okay. Who were you managers when you were at Centura?

A. I had Teresa Labovich, and I had -- I had Natalie Meyers. Early on it was Shelly, and I just forgot Shelly's last name.

Page 19

Q. I'm not very good at names either.

A. Yeah. It will come to me in a minute.

Q. And kind of the power to terminate as well?

A. I had the -- I had the power to suggest that. That termination went through a fairly detailed HR process, I guess you would call it. I couldn't terminate people through unanimous power or decision authority.

Q. Okay. And can you describe that process for me please, the termination process as you understood it when you were at Centura.

A. I mean, it would require you to have documentation on individuals not meeting the -- meeting their work standards that they were held to. And as you document that and put people on a corrective action plan, then you -- if they're not improving, then you would go through that process.

It was a -- Centura had what was called a Just Culture. So there was a very defined algorithm, if you will, to go through to make sure that people were not just using their own personal biases or retaliating against individuals and whatnot.

So if a discussion with a particular staff member was going down that pathway, you always had an HR representative with you, and you walked through this

Page 20

Just Culture algorithm to make sure that you were making are the right choices along the way.

Q. So this is the first time I have kind of heard of this "Just Culture." Can you explain what the that algorithm is to me that you are mentioning in more detail? What's the algorithm?

A. It's a -- I don't have it memorized verbatim, but, essentially, you can image "If then statements" in sort of a Excel statement where if this particular situation is met, then you go down this pathway. If it is not met, then you go down another pathway and so on,

It branchs out, and it will branch out in ways that will lead you to theoretically just conclusions so that you are -- it is helping individual -- it is helping leaders filter out potential biases that they might have.

Q. And this is, like, a written template you're referring to?

A. Yes.

Q. Okay. And it kind of -- it sounds to me, and correct me if I'm wrong, that it is almost a progressive discipline policy? Or is it somehow different that a progressive discipline policy?

MS. MCMANUS: Object to the form.

A. I'm not aware of a progressive discipline

Page 21

policy. I'm not familiar with that term with what that is.

Q. (BY MS. HALPERN) Okay. So with the Just Culture, did you ever have to walk through that with an employee?

A. With an employee, I did.

Q. Okay. Could you tell me a little bit about that. I'm just trying to flush out the details of this discipline policy.

A. Well, we sat at the -- we had an employee that had disciplinary concerns, and they -- we sat at the -- sat at a table with an HR representative, and we walked through that.

I met with her initially privately at first, and then -- and then, once we walked through it together, then we sat with the employee and walked through that course with the employee.

Q. Okay. Without needing to provide the name of the employee, what was the disciplinary issue that you're recalling?

A. The disciplinary issue was theft of food from the cafeteria.

Q. Okay. And tell me about -- specifically, did you meet with HR before speaking with the employee or after speaking with the employee?



6 (Pages 18 to 21)

Page 22

A. I met with HR before because I -- it was -- because they notified me. It wasn't -- so technically, I met before them; they informed me of the event.

I didn't know the guy was stealing from the cafeteria.

Q. Okay. And then you said you met with the employee and that HR was present?

A. Correct.

Q. What do you recall about the conversation you had with the employee in terms of the steps you had to take according to this Just Culture or discipline policy?

A. I recall that the conversation was a hard conversation to tell somebody that they've been caught stealing.

Q. And what happened after that under this algorithm?

A. The algorithm for stealing led us to termination.

Q. So that individual was terminated?

A. Correct.

Q. Any other times that you recall either suggesting or implementing a termination while you were at Centura as the director of oncology?

A. No.

Page 23

Q. Any other time you recall having to discipline a direct report short of termination while you were the director of oncology at Centura?

A. Short of, yes.

Q. Again, could you give me a couple examples? Again, I don't need names of the employees. But...

A. We had a nurse that was not meeting attendance requirements.

Q. Okay. And what happened as part of her discipline process?

A. We -- so going down that sort of same algorithm, we put her on a corrective action plan, set our expectations around attendance, and we moved through that process.

At some point during her corrective action plan, the employee decided to take employment on her own will at another location.

Q. Okay. So she resigned?

A. She resigned.

Q. Any other examples of time you had to engage in the just discipline procedures to discipline a direct report short of termination?

A. No.

Q. Did Centura, when you were the director, have kind of verbal warnings or written discipline? Or was

Page 24

it just corrective action -- corrective action plans?

A. Well, I mean, that's a part of a corrective action plan, those verbal warnings and things like that, those are all part of corrective action plans.

Q. Okay. Were there steps that you were supposed to engage in when contemplating discipline while you were at Centura?

A. We routinely engaged HR with employees on matters of -- that had employees involved.

I say "routinely," it wasn't that routine, fortunately.

Q. I guess when I hear "corrective action plan," I thought of it as performance improvement plan. Does that come at a later stage, after a verbal or written warning? Or --

A. Yeah.

Q. -- does that imply that it was part of that?

A. Correct. So if you -- it's not uncommon to have a friendly conversation with a direct report initially. And then beyond that, you would -- you would escalate to a performance improvement plan or corrective action plan.

Q. Okay. And you recall having to do that once with the nurse who was tardy?

A. Correct.

Page 25

Q. Okay. And friendly conversations, were those documented, the friendly conversations that you had just referred to?

A. Not typically.

Q. Okay. Can you give me some examples of some friendly conversations to -- friendly conversations that you had with direct reports about their performance or rule violations?

A. The one with the nurse that was -- had attendance issues, I mean, those are fairly short. You just say "Hey, what's going on. You have attendance problems, you know, we need to, you know, straighten up a little bit here."

And that's about that simple.

Q. Okay. Any other examples you can think of where you engaged in a conversation like that with a direct report?

A. No.

Q. And did you get any training on this -- and I'm sorry. Am I referring to it correctly, Just...

A. Just Culture.

Q. Just Culture. Okay. Did you get any training on this Just Culture discipline process when you were on boarded at Centura?

A. Not at the time of onboarding. It came

MAGNA
LEGAL SERVICES

Page 26

that -- it was an initiative that came at a later point.

Q. Do you recall when that took place?

A. Not specifically. I remember just the -- there were some email trainings, if you will, memos that went out.

Q. Okay. And did you receive any training at all when you were onboarded as the director of oncology at Centura in 2019?

A. Yes, there was an onboarding session.

Q. Okay. What do you recall about that?

A. Man, that was a long time ago. I recall going through pretty routine handbook stuff, mission-vision value-type conversations. Then you kind of learn the various aspects of where to log in to get what type of information; pretty high-level kind of corporate onboarding.

Q. Okay. Did you get any training in kind of employment laws?

A. Not specifically.

Q. Nothing on, like, discrimination, harassment?

A. I don't recall getting specific training on that. We did annual -- you do these annual web-based educations about, you know, that are -- that you do every year when you're -- now that I'm remembering that

Page 27

piece, I guess you would call that training.

Because every year you go through and kind of take little Quizlets on what is discrimination, what is, you know, the various laws around these types of issues and whatnot.

Q. So are those like, computer-generated?

A. Computer-based learning, yeah.

Q. And what do you recall about any training you received -- computer-based training you received on employment discrimination or harassment laws?

A. The content would go over things that would constitute -- the elements that would constitute discrimination and retaliation, and things of that nature.

Q. Do you remember that in any context? Was it sex, race, like sexual harassment?

A. It would talk about discrimination as far as sex, race, disabilities, the -- any other special needs, and things like that. It would kind of help you understand and those types of things.

Q. Okay. What do you recall in terms of training about disability specifically?

A. Specifically, the trainings tend to focus on the fact that disabilities are -- I guess you would call it "protected class," and that under certain

Page 28

circumstances, disabilities are not a reason for discrimination.

Q. Did you -- do you recall if you received any requests for accommodation while you were at Centura?

A. I'm sorry, you broke up for a second. I didn't hear that question.

Q. Do you recall receiving any specific training at all on how to respond to requests for accommodation when you were at Centura?

A. No, I don't -- I don't recall getting a specific training on responding for a request of accommodations. I don't recall. I might have. I've worked in some corporate areas for a while. I might have gotten some somewhere along the way, but I don't recall a specific instance there. I'm sorry.

Q. Okay. Are you familiar with what Centura's policy was in terms of how to -- how to provide accommodation to employees with disabilities?

MS. MCMANUS: Object to foundation.

A. I -- I can't remember the exact policy at this point.

Q. (BY MS. HALPERN) While you were the director of oncology, did you ever receive any requests for accommodation --

A. No.

Page 29

Q. -- while you were at Centura?

A. No.

Q. Did anyone disclose having a disability to you while you were the director of oncology at Centura?

A. No.

Q. Do you know -- you know, what is your definition of disability from your training?

MS. MCMANUS: Object to the foundation.

A. My definition of disability would just be simply anything that is -- makes a person's life experience a -- atypical for what we generally accept as normal.

Q. Do you have any concept about what an accommodation is for a disability from your training at Centura?

MS. MCMANUS: Object to foundation.

A. I understand what an accommodation is.

Q. (BY MS. HALPERN) Okay. Could you let me know how you conceptualize or define it?

A. If I were to have to make an accommodation, it's about creating a situation where you can allow a person with a particular disability perform a job duty within, you know, within my area of oversight if it is -- if that accommodations can, in fact, be met.

Q. And when you were at Centura, are you

MAGNA
LEGAL SERVICES

Page 30

familiar with how an employee could request an accommodation for disability?

A. I don't remember how that request process worked.

Q. Do you know if you received any training on that while you were at Centura?

A. No. I -- my default answer would have been "We need to call HR."

Q. But you don't recall receiving any training on how to -- to walk and then play through requesting an accommodation?

A. Correct. We had HR that would go through those things. The particulars of requesting an accommodation were not in the scope of my work. I would have deferred that work to an HR representative.

Q. Did any of your direct reports at Centura ask for extended medical leave?

A. We had a -- we had an employee that had an injury during spring break that ended up on a medical leave, as I recall.

Q. Okay. Can you tell me what you recall about that situation?

A. She fell off a golf cart and hit her head and had a bad head injury. It was taking some time for her to heal, and so she had a -- she had medical leave.

Page 31

Q. What was her position?

A. She was a -- she was essentially an administrative assistant in our genetic counseling department.

Q. Did she request medical leave from you? How did she go about doing that?

A. She didn't request it from me. I was made aware of it. I believe she went through my manager and was referred to HR and was on the medical leave there.

Q. And who was your manager at the time at Centura?

A. That would have been Teresa Labovich that she reported to.

Q. And do you recall how long this individual was out on medical leave?

A. I don't recall. I do know it ended where she ended up resigning her position. She never fully recovered, if you will, and ended up resigning in her position there.

Q. So she never returned?

A. She never -- she decided not return.

Q. Did you attempt to contact this administrative assistant while she was out on medical leave?

A. No. I -- we -- we just -- we only took

Page 32

updates from her passively as she -- as she communicated to us.

Q. I'm sorry, just some clarification. What do you mean by "took updates passively"?

A. You asked if we reached out to her. We did not reach out to her. She reached out to us. She communicated back to us to give us progress reports on her condition.

Q. Did you attempt to reach out to her to discuss any work while she was out on medical leave?

A. Not that I recall.

Q. Did you expect her to be available to discuss any work while she was out on medical leave?

A. Once she was out on medical leave, no.

Q. Okay.

A. Did I miss something?

Q. Maybe. I said, "Did you expect her to be available to discuss work while she was out on medical leave?"

And then you said "While she was out on medical leave."

A. Oh. No. Well, she was communicating back to us to let us know what her progress was, so we were getting active updates from her there. So those expectations were met.

Page 33

We -- we knew where -- we knew where we stood with her. We knew what her -- how her recovery was going.

In this case it was a physical injury, so there was -- there was, you know, recovery to consider, and so we were getting those updates from her.

Q. Slightly different question, though. Did you expect her to be available to discuss work, any work-related -- any work related to her administrative assistant position while she was out on medical leave?

A. Only to the context of when we expected her to return.

Q. So you didn't try to reach out to her to discuss any of her work, you just shifted that to someone else? What did you do?

A. Correct. Her workload was absorbed by other staff members.

Q. And in your training under the -- in your training about kind of disability discrimination and accommodations, do you recall ever, you know, would you -- would you think that medical leave was an accommodation, an appropriate accommodations in some cases?

A. Yes.

Q. Okay. Why is that? Where do you get that

MAGNA
LEGAL SERVICES

Page 34

understanding from?  Let me rephrase that.

A.  Well, medical leave is -- I mean, I'm not an expert, but it seems to be well-defined in our legal environment.  You hear about it as a manager and director, and you know that medical leave is something that we afford people.  It is something that we've considered to be generally appropriate to offer people.

Q.  Okay.  And other than this administrative assistant, has anyone ever asked for, for example, family medical leave under the Family Medical Leave Act when you were the director at Centura to report it to you?

(The following portion was deemed confidential.)

A.  No.  I think Teresa had a surgery where she just used straight PTO.  I know we're kind of parsing it here, but I don't think she used family medical leave.  I think she was just using her PTO there, so, no.

Q.  Do you know how long Teresa was out for?

A.  I can't recall.  It was a couple weeks, maybe.

MS. MCMANUS:  I'm just going to jump in here quickly, Eric.  Let's just not speak with particular names.

Page 35

MS. HALPERN:  We can subject that to confidentiality.

MS. MCMANUS:  Okay.  Can we do that, Iris, that section?

MR. HALPERN:  Sometimes a name is going to -- I might have to ask names, but, I mean, if it's a medical thing, I don't mind just designating that confidential.

MS. MCMANUS:  Okay.  If we have your agreement to that, why don't we do that portion.  Thank you.

MR. HALPERN:  Yeah.

(This concludes the confidential portion.)

Q.  (BY MS. HALPERN) Okay.  So any other examples you can think of where someone was out on medical leave?

A.  No.

Q.  And did you get any training kind of on -- when you were getting onboarded -- well, let me take a step back.

Do you have any training at all on, like, Stark laws or kickbacks -- Anti-Kickback laws?

A.  Nothing that I would designate as training.

Q.  Okay.  So what do you mean by that, just kind of informal knowledge?

Page 36

A.  Correct.

Q.  And what do you know about that subject?

A.  I have -- I have some awareness that there are laws out there to help ensure that we're not -- that business agreements aren't actually, you know, behind-the-scenes kickback agreements.

That's -- I don't know the intricacies of how it all works; I know they're out there.

Q.  So is that the extent of your knowledge?

A.  Pretty much.

Q.  Have you ever had any kind of role in reviewing contracts to ensure that they're -- they comply with Stark or Anti-Kickback laws?

A.  That wouldn't be my role in a contract review, no.

Q.  Okay.  Any other information you know on that subject?

A.  No.

Q.  You didn't receive any formal training on it?

A.  No.

Q.  I want to change topics a little the bit.  So we talked about kind of some of the training you received at Centura, et cetera.  I'm going to ask you a little bit about understanding the corporate structure of Centura when you joined in 2019.

Page 37

Do you have any understanding of who, you know, what Catholic Health Initiatives of Colorado is?

A.  Broadly understand that they were the corporate entity of -- for Centura.

Q.  What do you mean by "broadly"?

A.  Meaning they were -- I knew that that was what, you know, Centura was the brand name that CHI used in the Colorado market.

Q.  And so you referred to Catholic Health Initiatives of Colorado as CHIC?

A.  I -- I used to just call it CHI.

Q.  CHI.  Okay.  So if I use CHI for this deposition, you'll know what I'm referring to?

A.  Yes.

Q.  Okay.

MS. MCMANUS:  We would object to that, Iris, just because they're different entities.

MR. HALPERN:  CHI is a different entity than CHIC?

MS. MCMANUS:  Correct.

MR. HALPERN:  Okay.  But that's what he referred to it as.  I'm just trying to come up with a way that I don't have to say Catholic Health Initiatives of Colorado every single time I ask anything.

10 (Pages 34 to 37)

Page 38

MS. MCMANUS: I think CHIC is fine.

MR. HALPERN: Okay. Well, it is kind of up to the deponent.

Q. (BY MS. HALPERN) But, Mr. Koval, if I say "CHIC," will you know what I'm referring to for this deposition?

A. For this deposition, as we just walked through, I can understand what you mean by CHIC.

Q. But you referred to it as CHI?

A. I was clarifying how I refer to it, yeah, historically.

Q. Did you have to refer to CHI a lot while you were working at Centura?

A. No.

Q. Who -- who issued your -- your salary, your W-2s when you were at Centura?

A. Centura. Centura -- is it Centura? Yeah. Centura.

Q. Do you know who administered the benefits to you and other employees, what corporate entity?

A. I think it was Centura.

Q. Okay. Do you -- and you may not have the answers to all of these, so that's okay. I'm just kind of asking more broadly in terms of what your understanding is in terms of -- do you know what CHIC's

Page 39

relationship was to Penrose when you were at Centura in 2019?

A. Penrose was one of the hospitals of the Centura brand. Penrose was the common name.

Q. Okay. Do you know what the relationship between CHIC and Centura was in 2019? What was your understanding -- let me ask it that way.

What was your understanding of the relationship between CHIC and Centura?

A. My understanding was CHIC was the over-arching organization or the corporate -- the corporate entity over that; over Centura or that Centura fed into.

Q. Okay. And do you know who CommonSpirit is?

A. I know they're a -- they're a corporate healthcare company.

Q. Did you have any understanding when you were working for Centura about what the relationship between Centura and CommonSpirit was?

A. Not very detailed.

Q. How about CommonSpirit and CHIC?

A. Not detailed.

Q. Did you even hear about CommonSpirit while -- when you worked at Centura?

A. Yes.

Page 40

Q. In what context?

A. I understood that they were higher up in the food chain, if you will. They were very much in the background. You didn't hear about CommonSpirit much.

Q. Okay. Did you hear anything about CommonSpirit's corporate relationship to CHIC?

A. No.

Q. How about CommonSpirit's relationship to Penrose?

A. No.

Q. Did that change at any point in time while you were working for Centura until you left in September 2022?

A. No.

Q. Centura was in place kind of the entire time that you worked?

A. Correct.

Q. And you think you were paid by Centura?

A. Correct.

Q. Can you talk to me about how the HR function -- let me rephrase that.

When you were with Centura, was there kind of a centralized human resources or was it hospital to hospital?

A. We had --

Page 41

MS. MCMANUS: Objection to foundation.

A. We had hospital-based HR. And then towards that -- somewhere closer to the end of my tenure there, there was some centralization of HR that was taking place.

Q. Can you describe that centralization process to me of HR when were at Centura?

A. The focus was on hiring input for staff, and making job offers, and to get a centralized team to help manage the -- the various applications for employment that existed.

Q. Okay. And do you have any understanding of who -- who ran that centralized HR? Was it Centura?

A. I mean, yeah, it was Centura.

Q. Okay. Was that the same -- do you know -- what were you told about this centralized HR by Centura? Was it just for Colorado? Was it for other states as well? I'm sorry, I'm sneezing.

A. It's okay. Well, my focus was on Colorado.

Q. Okay. How did you learn about the centralization of HR?

A. I believe it was through email communication.

Q. Was there a portal, like a portal that employees used to communicate with HR? How do they communicate with them?

MAGNA
LEGAL SERVICES

Page 42

A.  Typically it was phone calls.  You would call.  I don't recall a portal.  I think we just had a phone number we called.

Q.  Okay.  And if an employee -- like, did you ever check in on your benefits, 401K, healthcare?  Was that -- how did you follow those benefits?

A.  Those were on your employee timecard sort of space.  That was a web-based platform.

Q.  That's kind of what I meant by portal.  Can you tell me about your web-based platform at Centura?

A.  I honestly don't have a recollection of what that looks like.

Q.  Do you know where the centralized HR -- where they were located when you were at Centura when they centralized?

A.  I don't know where they were located.  I think they were located up in Denver.  We had some, you know, we had some staff at the hospital.

Q.  And your understanding is that all of HR was run by Centura at the time?

A.  Correct.

Q.  Okay.  Was any HR functions managed by CHIC when you were at Centura?

MS. MCMANUS:  Object to foundation.

A.  I don't know.

Page 43

Q.  (BY MS. HALPERN)  That you're aware of?

A.  Correct, that I'm aware of.  I don't know if there was a division between the two.

Q.  But what was your understanding?  What was your understanding of who ran HR?

A.  I always said Centura.

Q.  Okay.  And what was your email address when you were working for Centura?

A.  Probably -- it was probably something like EKoval@Centurahealth.com or something like that.

Q.  But it was Centura Health?

A.  I believe it was CenturaHealth.com was the tag on at the time.

Q.  And you said that you reviewed some -- that you had personnel policies and had received -- during onboarding -- some kind of overview of personnel policies.

How were those -- how could you access those personnel policies when you were at Centura?

A.  Policies were either available through a web search or through contacting an HR representative.

Q.  And you also said that you got some training on, like, mission and vision when you were onboarded at Centura?

A.  Yes.

Page 44

Q.  What do you recall about that?

A.  I recall there was a focus on the idea that mission and vision drove the ethics of the company.

Q.  Do you know where the mission and vision came from?  Like, who created that mission and vision?

A.  I don't know who created it.

Q.  And the personnel policies, do you recall ever reviewing those personnel policies?

A.  At times you would look through that.

Q.  Do you recall -- or do you have any knowledge of who produced those personnel policies?

A.  Not specifically.

Q.  Were you at -- so you were not at Centura -- well, this is a double negative.

So you left Centura before it ceased to operate; is that correct?

A.  That is correct.

Q.  Okay.  And do you know anything about the process by which Centura ceased to operate?

A.  No.

Q.  Do you know anything about the entities that emerged out of that corporate dissolution?

A.  No.

Q.  Do you currently -- in Montrose, do you have any relationships or contacts at CHIC?

Page 45

A.  No.

Q.  How about CommonSpirit?

A.  No.

Q.  How about Penrose?

A.  No.

Q.  Do you communicate with anyone from any of those three entities now that you're in Montrose?

A.  I have friends that I left behind in Colorado Springs.

Q.  Did they tell you anything about this corporate dissolution of Centura?

A.  No.

Q.  Did they tell you anything about kind of restructuring of the -- let me scratch that.

Did they tell you anything about who operates Penrose now?

A.  No.

Q.  Do you know who operates Penrose now?

A.  I know through news that CommonSpirit seems to have been the name that -- through healthcare news, I believe, CommonSpirit has sort of taken over and is renaming everything CommonSpirit.

Q.  Okay.  Are you familiar, from your contacts or any other source, about the relationship with CommonSpirit and CHIC today?

12 (Pages 42 to 45)

Page 46

A.  No, I haven't kept up with that.

Q.  Okay.  Do you see need to take a short break at all or are you good?

A.  Maybe I'll get up and walk around for a minute.

Q.  Yeah.  Just because we're going to switch topics.

A.  Okay.

MS. HALPERN:  Do you guys want, like, a ten-minuter?

THE REPORTER:  Ten works for me.  Thank you.

(Recess taken, 11:11 a.m. to 11:30 a.m.)

Q.  (BY MS. HALPERN) Okay.  All right.  So, Mr. Koval, we just took a, like, I don't know, 15-minute break, 10 to 15-minute break.  Is there anything you want to change about your testimony from earlier?

A.  No.

Q.  Okay.  I do have a quick question I thought of, and I'm neutral as to the answer, but I do want to figure this out.

MR. HALPERN:  Lindsay, are you guys maintaining there is attorney-client privilege with Mr. Koval now even though he does not work for CommonSpirit?

Page 47

MS. MCMANUS:  Yes, we are.

MR. HALPERN:  Okay.  On what basis?

MS. MCMANUS:  He is a former executive.

MR. HALPERN:  Well, I mean, that's not covered under the rule.  I'm not going to push it, but is there any other reason other than he is a former executive?  Former executives are not covered by privilege.

MS. MCMANUS:  We've -- we've agreed to represent him, Iris.

MR. HALPERN:  Do you have a representation -- written representation agreement?

MS. MCMANUS:  I don't believe we do.

MR. HALPERN:  You discussed conflict of interest with him and given him a conflict of interest agreement?

MS. MCMANUS:  We're not going to talk about what we've talked about with him and what we haven't.

MR. HALPERN:  Okay.  I'm just trying to maintain and figure out why.  Did you get a declaration with him after he left Centura?

MS. MCMANUS:  I mean, again, that's...

MR. HALPERN:  That's not privilege; that's a date.

MS. MCMANUS:  Oh, I'm sorry.  You said when?

Page 48

MR. HALPERN:  Yes.

MS. MCMANUS:  When did we get the declaration?

MR. HALPERN:  I'm just confirming you got the declaration from Mr. Koval after he left Centura.

MS. MCMANUS:  I would have to look at the date of the declaration, but whatever the date is on the declaration and if it's past his date.  I think it's past his date of employment.

MR. HALPERN:  Okay.  And are you maintaining that you'll be able to ask our witnesses, like Dr. Peddada's brother and wife about our communications with them?

MS. MCMANUS:  Are you representing them?

MR. HALPERN:  Sure.  I'll go talk to them about representation.  It seems like you guys just created a representation deal with him right now too.

MS. MCMANUS:  I'm sorry, I don't know what you mean by that.

MR. HALPERN:  I'm just saying -- making sure it goes both ways.  That's it.

MS. MCMANUS:  Well, you would have to represent him or her.

MR. HALPERN:  We'll go ahead and talk to them about representation.  It's just going to have to be a

Page 49

two-sided thing.

MS. MCMANUS:  No.  That's -- I mean, if you -- if that's your, you know, decision that you make to go represent them, then that's up to you.

MS. HALPERN:  Okay.  I'm just asking if you're anticipating that this be reciprocated.  That's it.

MS. MCMANUS:  I just don't know what you mean by "reciprocated."  I mean, if you go represent his wife and his brother, that's up to you.

MR. HALPERN:  I'm just saying the attorney-client privilege does not cover just randomly your discussions with former executives.

So I'm just making sure that the relationship is going to be reciprocated, and you will not -- if we represent them -- be asking about our communications with them.  That's all.

MS. MCMANUS:  Yeah, if they say that you're representing them, then, of course, we couldn't ask them about your communications.

MR. HALPERN:  Okay.  I'm just making sure.

Q.  (BY MS. HALPERN) All right.  Dr. Koval, did you sign that declaration that you're referring to earlier after you left Centura?  I'm just getting that down for the record.

MAGNA
LEGAL SERVICES

Page 50

A.   Can I make a clarification?

Q.   Sure.

A.   You referred to me as "Dr. Koval."

Q.   Oh, sorry.  Mr. Koval, I apologize.  I know that.  I did remember that for most of this deposition.

A.   I signed the declaration, I believe, in October of '23.

Q.   Okay.  And so you told me about the -- the times that you've communicated with the attorneys.  Are there any other times that you've communicated with any attorneys on this case?

A.   No.

Q.   Okay.  And are you represented in this case by any attorneys?

A.   I'm not sure I -- I'm not sure I understand the question.

Q.   Did you hire any attorneys to represent you?  Are you represented?  Are you legally represented in this case?

A.   I didn't hire an attorney.

Q.   Sign any contracts with any attorney?

A.   No.

Q.   Okay.

A.   No.

Q.   Do you know -- I'm going to change topics

Page 51

here.

Do you know who Dr. Anuj Peddada is?  And I'm assuming you know the answer to this, but I'm just setting the stage.

A.   Yes.

Q.   Okay.  Who is Dr. Anuj Peddada?

A.   The Dr. Anuj Peddada that I know is a -- at the time I knew him, was a licensed radiation oncologist in Colorado Springs.

Q.   And when did you know Dr. Anuj Peddada?

A.   I knew him during my time of employment at Centura.

Q.   Okay.  When did you first meet Dr. Anuj Peddada?  Do you recall?

A.   I first met him during my interview process.  It would have been in the -- whatever month or so leading up to my actual employment in September of '19.  I don't have an exact date.

Q.   What do you recall about that first interview or meeting with Dr. Peddada?

A.   Energy and --

Q.   I'm sorry, you faded out there a little bit.  I didn't hear you for a --

A.   I remember the conversation having a high energy to it, and him asking me direct questions about

Page 52

my oncology background.

Q.   Okay.  Do you remember anything else about that initial interview?  Who else was there?

A.   It was an all-day panel interview.  I can't recall if I was alone with Peddada at the time I met him or if some of the other management team was there.

Q.   Okay.  And what did you think of it?  What impression did you get of Dr. Peddada when you first met him?

A.   I got the impression that he was very high energy.

Q.   Okay.  Any other impressions?

A.   Not -- not specifically.  I mean...

Q.   Did you think your interview with him went well?

A.   I did.

Q.   Why is that?  What do you recall?

A.   I remember answering his questions.

Q.   Okay.  And how -- how long did you work with Dr. Peddada when you were at Centura?

A.   That would have been right about three years.

Q.   And how would you describe Dr. Peddada from those three -- three years?

A.   He was very intense and many times challenging to work with.

Page 53

Q.   Okay.  Could you explain that to me?  Why was he challenging to work with?

A.   He had frequent episodes of being unprofessional with other staff.

Q.   Okay.  Can you tell me everything you remember about that?

A.   He -- in a -- he would tend to be rude towards the radiation nursing staff.

Q.   Is that the entire time that you worked with Dr. Peddada at Centura?

A.   I would say yes.

Q.   Do you recall any specific complaints?

A.   There were episodes where he was condescending to the staff, would -- and would be, you know, aggressively rude, I guess you would say, to the staff.

Q.   Okay.  Do you have any specific instances that you recall personally observing?

A.   There were -- the specifics that I had were -- because I wasn't out on the floor -- were reports back, and with the staff being, you know, feeling very concerned about the level of, you know, I guess, the level of condensation -- that he would just be very condescending towards the nursing staff in particular.  The nursing staff really struggled with

MAGNA
LEGAL SERVICES

Page 54

that.

Q. You said you were not on the floor. What do you mean by that?

A. That's a -- that's a nursing phrase. It's meaning I wasn't rooming the patients at the time. I would maybe be in my office taking care of whatever I was taking care of. I wasn't out on the clinic floor.

Q. Okay. So did you have -- let me break that down a little bit. Did you personally observe any conduct by Dr. Peddada that you felt you needed to discuss with him?

A. There were times in meetings where his level of agitation was very apparent in making other people in the meeting feel like it was -- he was the most important person in the room rather than anybody else.

Q. Did you ever have a conversation with Dr. Peddada about that observation of yours?

A. Yes.

Q. Okay. Tell me about that.

A. There was a time when I was -- that we talked after hours, after clinic was done, where I would have to help him understand that his -- his approach was often rude or seen as, like I said, condescending to people, and that he needed to learn to rein that in and behave in a more professional manner around -- around

Page 55

other staff.

Q. Was it just the two of you during this conversation?

A. As I recall.

Q. What did Dr. Peddada say in response?

A. He said, "I agree" or something to that effect.

Q. Okay. Do you remember anything else that Dr. Peddada said to you at that time during this conversation?

A. I have some recollection that he was making awareness of the fact that he was trying to change his inappropriate behavior with staff.

Q. Anything else you recall from that conversation?

A. No.

Q. Do you recall any other conversations with Dr. Peddada about any conduct -- any conduct that you felt was, you know, condescending or disrespectful? Any other conversations about that?

A. No, I don't recall.

Q. Is it just the one?

A. There is the one that I have -- I have -- I have that -- I have that one conversation that I'm thinking of and a follow-up basically off of the same

Page 56

topic.

Q. Okay.

A. It was basically just that. It's like: How are we doing? You're still kind of -- you're edgy, you're being rude, you're not treating people right. What's going on?

Q. So this is a second conversation, a follow-up conversation?

A. Correct.

Q. What did Dr. Peddada say in response to your follow-up?

A. At that time -- I don't remember what he said. I remember him being -- I have a memory of him being a little bit put out, but I don't remember what he said.

Q. Okay. Anything else you remember from this follow-up conversation?

A. No.

Q. All right. So now I'm going to turn to complaints. You said you had had received some complaints.

Do you recall any complaints in specific that you received about any, you know, conduct by Dr. Peddada from staff?

A. My staff, my -- the nursing staff was very

Page 57

concerned about the work -- the nature of the work environment, that he was challenging to work with, and my nursing staff was concerned about turnover related to his behavior.

Q. Okay. Who -- do you recall who, if anyone, approached you about that concern?

A. My manager would have approached me.

Q. And that -- that would be whom?

A. Are we okay to use names?

Q. Yeah. Before that was a health -- like a medical issue. So we tend to keep medical conditions kind of confidential.

A. Okay. Teresa was my nursing manager, Teresa Labovich.

Q. So do you recall Teresa actually having a conversation with you about the concerns that you just mentioned?

A. Yes.

Q. Okay. Tell me about that. Was it one or more than one conversation?

A. It would have been a -- it would have been a couple of times, and it was about nursing turnover. We talked about nursing turnover as a general rule. I don't remember the specifics of the conversation.

Q. Okay. Did anyone else talk to you about any

MAGNA
LEGAL SERVICES

Page 58

complaints about Dr. Peddada?

A. Those concerns came up through chain of command, so I heard them through Teresa.

Q. Okay. And what do you recall? Just discussing turnover, potential reasons for turnover?

A. Correct.

Q. Anything else that you recall discussing with Teresa about Dr. Peddada?

A. No.

Q. Did you have any separate conversations with Dr. Peddada about the concerns Teresa raised?

A. Those would have been what I talked about a minute ago.

Q. So just that one conversation and the follow-up conversation?

A. Correct.

Q. Do you know if Teresa spoke with Dr. Peddada at all about her concerns?

A. I don't recall.

Q. Do you know -- did you hear any other complaints about Dr. Peddada while you worked with him?

A. No.

Q. What did you hear about his performance as an actual physician?

A. As a physician, he had a good reputation.

Page 59

Q. What -- what does that mean, "a good reputation"?

A. Professionally no one doubted his clinical judgment.

Q. Did you ever speak with any of his patients at all about his -- about his performance?

A. I did not. No.

Q. Did anyone discuss with you any other performance issues with Dr. Peddada?

A. No.

Q. From your personal observation -- let me change that.

Did you have an opportunity to frequently interact with Dr. Peddada, for example, on a daily or weekly basis?

A. Yes.

Q. And how was your relationship with him?

A. It was good.

Q. What was your role in working with Dr. Peddada?

A. He was -- it was kind of hands off, I guess. He wasn't my employee, but he used my staff. So it was understanding what ROPC needed out of Rad-On (phonetic) PC. It was understanding what Rad-On PC needed out of my staff, which we were all Centura employees.

Page 60

And he -- he used our staff to get his work done, so it was just building and maintaining those relationships and what they -- what they needed to function.

Q. Okay. And let me ask this in a bit of a different way.

How did Dr. Peddada fit into your -- I don't know if you -- how did Dr. Peddada fit in working with your team in oncology? Like, how did he work with you?

MS. MCMANUS: Object to the form.

Q. (BY MS. HALPERN) That probably wasn't the easiest question, so let me try to rephrase that.

What was the extent of your interactions with Dr. Peddada?

A. Again, just verifying that we had the staff that he needed on any given day.

Q. And you said that you -- how often were you interacting with him when you were working together?

A. We talked probably every day to some extent. Maybe it was just a "Hey, how are you doing today?"

Or maybe it was something different.

Q. And you described your relationship with Dr. Peddada as good. Did you personally ever observe his care with patients?

A. No.

Page 61

Q. Why -- why would you characterize your professional relationship with Dr. Peddada as good? What did you find was good about it?

A. I felt like we had a -- an open relationship.

Q. So you thought he was honest and communicative?

A. Yes.

Q. Did you ever have any problems communicating with Dr. Peddada?

A. No.

Q. Did you find him dependable?

A. Not always.

Q. Okay. Could you explain that to me?

A. He would be -- I'm trying to find the right words. Sometimes he just was -- he was hard to nail down. He was very high energy, and even though I -- overall I said our relationship was good, he was hard to nail down. He was -- he -- that's -- so I couldn't always get -- couldn't always get his full attention.

Q. Okay. So that's what you mean when you said you didn't always find him dependable, you could not always get his full attention?

A. I would say I couldn't always get his full attention. That's really the phrase I'm looking for.

MAGNA
LEGAL SERVICES

Page 62

Q. Did -- did he have any attendance issues?

A. He -- he liked to -- he liked to keep his -- he liked to manipulate his schedule. When I said my relationship was about making sure we had the staff that he needed on any given time, sometimes his personal schedule was hard to -- hard to match with our staffing protocols that we had at Centura.

Q. What does that mean?

A. If that qualifies as attendance issue, I don't know. But he...

Q. Did he come to work when he was scheduled to come to work?

A. Yes.

Q. What do you mean by his "personal schedule"? Is that when he was working? When he was scheduled to work, he --

A. When he was not working.

Q. And I'm trying to find out what that means. Like, he gets to -- how did Dr. Peddada's schedule work when he was working with you?

A. He would like to take various vacations or work -- work erratic days at times, which made it challenging to schedule patients and schedule treatments.

Q. Okay. And how does that schedule -- how did

Page 63

you learn about his -- his schedule?

A. I mean, it was -- it wasn't a matter of learning about it. It was a part of our everyday -- it was just our everyday schedule.

Q. How was the schedule determined when you were working with Dr. Peddada?

A. There were some set agreements on when certain treatments would happen. I can't remember the rhythm of all those various days at this time, though.

Q. Well, that's okay. I'm just trying to figure out because you brought up this issue around, like, when he provided treatment, and that it was hard for Centura sometimes to staff that. And I'm wondering how that came about.

How did he get to set that schedule, if he did?

A. Well, he was a private practice physician.

Q. Uh-huh. Did he coordinate his -- his schedule at all with -- with you? Or was it someone else at Centura?

A. He coordinated the schedule with the office, with my team.

Q. Was there anyone specific he communicated with about his schedule?

A. Natalie Meyers was over the schedule

Page 64

predominantly.

Q. And anything else you recall about Dr. Peddada's performance? For example, when he was working with you at Centura?

A. No.

Q. Any other complaints other than the ones we discussed?

A. No.

Q. Was Dr. Peddada -- other than you kind of informally talking to Dr. Peddada, did you know if Centura took any other steps to respond to concerns about Dr. Peddada's interactions with staff?

A. No, I don't know what -- if there were other steps taken.

Q. Did your talk to HR about Dr. Peddada?

A. We used -- we used our safety event reporting system to document those concerns. It's called Midas is called the product.

Q. Okay. Is that some sort of communications with HR?

A. It's not HR-specific. It's hospital log safety concerns.

Q. Where does that go after you document a concern?

A. Those are routed according to the type of

Page 65

safety concerns. So in this case, HR would have -- HR or medical staff relations, leadership above my head would take on some of those issues.

Q. Do you know if that happened here with Dr. Peddada?

A. I don't know specifically what happened after some of those -- some of those cases were documented. I did not get communication back down to me on some of those things.

Q. Anything else you recall about your work relationship with Dr. Peddada?

A. No.

Q. Did you have any role -- like, what do you recall about kind of the break up of ROPC?

A. My recollection was that the physicians, meaning Peddada, Monroe, and Kathpal decided that they didn't get along any longer. That that was their private practice.

Q. And how did you find out about that?

A. Through -- through the physicians.

Q. Did you speak with Dr. Peddada at all about the break up of ROPC?

A. A small amount, yes.

Q. Okay. What do you recall about those conversations?



17 (Pages 62 to 65)

Page 66

A.  Not a lot.  I just recall asking, is this the -- I have some recollection of asking if this really -- is this really going to happen?  Are you guys really going to do this?

I don't -- I don't have any real specific information, no.

Q.  Do you recall why Dr. Peddada said ROPC was breaking up to you?

A.  No.  Those were -- those were personal -- personal conversations that they kept in ROPC.

Q.  How about -- do you know who Dr. Alan Monroe is?

A.  Yes.

Q.  Who is he?

A.  He is a radiation oncologist in Colorado Springs, as far as I know.

Q.  Did you work with Dr. Monroe at all while you were at Centura?

A.  Yes.

Q.  How frequently did you interact with Dr. Monroe?

A.  Similar to Dr. Peddada, he was in our office space.

Q.  And did you discuss ROPC's break up with Dr. Monroe?

Page 67

A.  Only similarly to Dr. Peddada, asking him, "Is this really going to happen?"

Q.  Do you recall what he said in response to any of those inquiries?

A.  I don't have a -- I don't recall some of those conversations, no.

Q.  How would you characterize your professional relationship with Dr. Monroe when you were working at Centura?

A.  I felt like we had a good relationship as well.

Q.  Any -- any complaints you ever received about Dr. Monroe?

A.  Nothing stands out, that I recall.

Q.  What about his -- kind of his performance with patients?  Did you have any understanding about that?

A.  My understanding was that he was a respected radiation oncologist as well.

Q.  And did you have any cause to speak with Dr. Monroe about any performance issues or complaints?

A.  No, I did not with Dr. Monroe.

Q.  And did you have any role in the decision to bring Drs. Peddada and Monroe in-house to Centura?

A.  No, not -- not really.  I wasn't in the

Page 68

periphery of those conversations.

Q.  Do you recall ever discussing with anyone else at Centura the hiring of Dr. Monroe or Dr. Peddada?

A.  Those conversations happened with the physician leadership team.

Q.  Okay.  What do you recall about that?

A.  My recollection is those were conversations about maintaining continuity of care.  They were existing physician, and it made sense for many levels to keep them on.

Q.  What were those reasons?  Why did it make sense in those conversations?

A.  Because those were -- they were already seeing our patient population.

Q.  Anything else that you recall discussing about hiring Dr. Peddada and Dr. Monroe?

A.  Not specifically, no.

Q.  Do you recall having any conversations about where each of them would work?

A.  No.  We -- I mean, they were at Penrose and St. Francis, so we were -- that was, you know, the assumption would be that they would cover the same as they had covered when they were ROPC.

Q.  How did -- do you recall if you were part of

Page 69

the -- well, let me rephrase that.

Do you recall any discussions about determining where each of them would work once they were hired, whether at Penrose or St. Francis?

A.  We hadn't gotten to that point in the conversation about how the -- how the clinics would get -- how the -- how we would expand.

Because at that time, the -- there was expansion going on with radiation also being added to St. Francis, and we hadn't really vetted out all of the particulars on that.

Q.  Did Drs. Peddada and Monroe bring the same skill sets to Centura?

A.  Dr. Peddada had a focus an prostate, which made him -- which was probably a differentiator between him and Dr. Monroe.  Dr. Monroe liked to treat breast cancer, which probably differentiated him to some extent from Dr. Peddada.

But you have to understand that radiation oncology in the community is still largely a broad specialty.  You don't get the same degree of hyper-speciality that you see in surgeons.

So they -- but in this case, we had enough case volume -- specific case volume in these diseases that those were kind of some of their lanes that they

MAGNA
LEGAL SERVICES

Page 70

landed in. But otherwise they were pretty equal, I would say.

Q. Okay. And you said you didn't really have a role in hiring Dr. Peddada and Monroe?

A. Correct.

Q. Did you have an input into those decisions?

A. I was a part of the conversations out of professional courtesy.

Q. Do you remember any of those conversations where you provided some input?

A. Like I said earlier, my -- I recall having the, you know, having the comment that it made sense for them to be here because of the continuity of care.

Q. Did you have any concerns about hiring Dr. Peddada or Dr. Monroe?

A. We had the concerns about Dr. Peddada's behavior with staff that was still an unresolved issue.

Q. Okay. Did you discuss that during the hiring process with anyone at Centura?

A. Those were some of the conversations.

Q. Okay. With whom did you have those conversations?

A. Jeff Albert, as I recall, Dr. Jeff Albert.

Q. Anyone else?

A. No. No. I don't think so. I think that was

Page 71

the -- the only one where -- that I -- that I was engaged with.

Q. Okay. Do you recall what Jeff Albert said in response to your concerns?

A. I don't have a specific recollection of what was said.

Q. Did you have any involvement in hiring Drs. Peddada and Monroe?

A. No.

Q. Do you know who the final decision makers were in terms of extending them offers of employment?

A. It would have been a team of doctors or maybe part of the medical staff folks. I don't know where that exact -- to be honest -- where the exact final decision would have laid.

Q. I'm going to try to do this really quickly. Do you ever recall Dr. Monroe being disappointed about the offer that Centura made him for employment?

A. I remember there were -- there were counter offers and whatnot going on. I can't remember the specifics about some of the offer details. But I remember they were, you know, very vaguely remember there were counteroffers or counters, I should say, to the offer that was made, but I don't remember the specifics.

Page 72

Q. Do you recall if that with was with Dr. Monroe or Dr. Peddada or both?

A. I know the break up of ROPC was -- was -- created an atmosphere around those negotiations, but I can't recall the specifics of what was going on there.

Q. Uh-huh. And what do you mean by "created an atmosphere"?

A. Well, the private practice was breaking up.

Q. And the atmosphere around the negotiations? I guess I just don't understand the connection.

A. Well, Dr. Monroe and Dr. Peddada were not communicating to one another.

Q. So they were equally not talking with each other?

A. I don't know about that. I don't know -- I wasn't measuring who was making more effort or not. I know they weren't talking to each other.

Q. Okay. And how did that impact negotiations?

A. It made negotiations difficult.

Q. Okay. I think I probably have a couple references to that, but I want to ask and see how this works. It's always a little bit difficult online, but I emailed, and I believe Lindsay emailed you as well, a bunch of documents.

A. Okay.

Page 73

MS. MCMANUS: Yeah. Eric, I forwarded those along to you.

THE DEPONENT: Okay.

MS. HALPERN: Can we go off the record for one second?

(Recess taken, 12:14 p.m. to 1:05 p.m.)

Q. (BY MS. HALPERN) Mr. Koval, we just went on a lunch break for 40 minutes.

Do you have anything you want to change about your testimony from this morning?

A. No.

Q. Okay. Did you have -- so we've had an opportunity to work out all of our exhibit issues, so thank you for your patience.

But I would like to introduce to you now -- let me just kind of refresh your memory. I think before we left off for lunch, I was asking you kind of if you had a role in hiring Dr. Peddada and Monroe, and what you recall about some conversations around the time that Centura offered them employment as direct hires.

Does that refresh your recollection a little bit?

A. Yes.

Q. Okay. Great. So I want to introduce to you

MAGNA
LEGAL SERVICES

Page 74

what has previously been designated in this litigation as Deposition Exhibit Number 17 in the documents that have been sent to you, which should be labeled S17 or start with that.

(Deposition Exhibit 17 was referenced.)

A.   Okay.

Q.   (BY MS. HALPERN)  Do you see that?

A.   Yes.

Q.   Could you open that up for me.

A.   Okay.

Q.   Okay.  Mr. Koval, like I said, this -- this document here, PSF Peddada 0119, that's the Bates Number in the right-hand corner, has previously been introduced as Exhibit 17.

Have you -- take a minute to look at it. Have you seen Exhibit 17 before?

A.   I'm looking at it now.  And I've -- I've looked through them, you know, a little bit.

Q.   What do you mean by "them"?  I think you only have one exhibit in front of you right now.

A.   Yeah.  I'm looking at Exhibit 17 right now on my phone.

Q.   Okay.  Are you familiar with Exhibit 17?  If it's easier for you to see, you can draw it up on your computer screen as well, I think.

Page 75

A.   It's easy enough for me to see here.  I mean, I have -- I have remote familiarity with it.

Is that what you're asking me?

Q.   Right.  Is that your email address from when you worked at Centura at the -- in the --

A.   Yes, that is -- that is -- I'm one of the recipients on this email.

Q.   Okay.  Does reviewing Exhibit 17 refresh your recollection at all about whether Dr. Monroe had any concerns or complaints when Centura extended him an employment offer?

A.   Yeah.  I had -- it brings back some memories around some of those conversations.

Q.   Okay.  Great.  Can you -- now that you've seen Exhibit 17, let me know about what you recall around Dr. Monroe's concerns or complaints when Centura offered him -- extended him an offer of employment?

A.   I think I recall Dr. Monroe possibly having some concerns that St. Francis was a new location for radiation, and was he going to be busy enough up there.

I don't -- I can't remember exactly why he thought -- why he was concerned about doing most of his work up at St. Francis, though.  I think it had to do just that it was a new location.  He was used to being at a very busy location.

Page 76

Q.   So were both Drs. Monroe and Peddada working out of Penrose before -- when they were operating ROPC?

A.   They were -- before St. Francis was open, yes -- excuse me -- because that was our only cite of service, our only -- for Colorado Springs.

And then once St. Francis opened, and ROPC was still intact, they would -- everyone would kind of rotate through up at St. Francis.

Q.   Do you recall why you -- why Centura offered the position at St. Francis to Dr. Monroe, but offered the position at Penrose to Dr. Peddada?

A.   I don't recall exactly why we picked one location over the other.  I have recollection that Monroe -- that we felt like Monroe and Peddada's relationship, you know, they were still -- there was still tension between them with the break up of ROPC, and there was a desire from Dr. Albert to have some space between them.

I can't remember exactly why we picked one location over the other, though, to be honest.  I don't...

Q.   Do you recall if both Drs. Peddada and Monroe both applied for the Penrose location?

A.   As I recall, the position wasn't -- the application wasn't for a location.  Location assignment

Page 77

was going to fall under Dr. Albert's discretion as the medical director for radiation oncology.  And it was, as I recall, it was going to be up to him as to where a particular physician would physically sit on any given day.

Q.   Do you recall if both Drs. Peddada and Monroe expressed a preference to work at Penrose?

A.   I know that both of them liked one of the pieces of technology at Penrose.  There was a CyberKnife tool -- it's called CyberKnife, a particular type of radiation technology, and both of them liked that tool.  They worked on RV models, and they wanted to be able to do -- have patients on that, so that they could collect revenue off of doing those assignments there.

Q.   And then if you go further down on Exhibit 17, it appears that Dr. Kathpal also submitted an application for -- at least what Mr. Albert is referring to as the Penrose position.

Do you see that?

A.   I believe she did officially apply.  Did she officially apply or did she retract?

Are you referencing Sam -- the comment to Sam regarding the forgivable loan for Dr. Kathpal?

Q.   I'm going to ask you about that last

MAGNA
LEGAL SERVICES

Page 78

paragraph, then I'm going to end up talking about the paragraph right above it, which starts with: "All, I am going to follow up with Dr. Kathpal today or tomorrow to let her know the plan, and that she is welcome to keep her application in for the Penrose position."

Do you see that, the first line in the third paragraph?

A.  Yeah.  That's -- and: "From what I've heard so far, I speculate she may withdraw her application and accept one of her other..."

And I think that's what she ended up doing. I mean, ultimately, she did.  At the time that this was being written back in March of '22, I believe she was being recruited by a place out in North Carolina as well.

Q.   Just a little bit to make sure the record is clear.  Do you know who Dr. Kathpal is?

A.   Yes.

Q.   And what is Dr. Kathpal's full name?

A.   Madeera Kathpal.

Q.   And how do you know Dr. Kathpal?

A.   She was one of -- she was hired by Rad-On PC as a third radiation oncologist.

Q.   And did you ever work with Dr. Kathpal?

Page 79

A.  I did.

Q.   And how would you describe your professional relationship with Dr. Kathpal?

A.   Not good.

Q.   Why?

A.   She was argumentative.

Q.   Any other complaints or concerns with Dr. Kathpal?

A.   She was never happy about working in a corporate environment, and that was always kind of an issue with her.  I don't know if she -- I don't know what happened, you know.  Obviously she hired on with Rad-On PC, but she was working in Centura.  She just never seemed to be happy about that.

And she, you know, she -- she just had -- I can't remember -- I can't quote her, I just remember her griping a lot about -- about working at Centura. Griped a lot that I couldn't make -- like, I couldn't get her enough staff.  She blamed that on me.  It's like, well, we have staffing policies, and productivity policies, and metrics that we follow to justify the types of staff that we have, and things like that.

She complained about the build at St. Francis.  And while that was built before she was around, she didn't have any input in it.  And, you

Page 80

know, you don't just rebuild a building because they didn't meet her particular specs.  She interviewed in that building; she knew what she was getting into.

She was just challenging to work with.

Q.   Any complaints from employees about Dr. Kathpal?

A.   Similar complaints that she was frustrated a lot with -- with Centura, and that she would gripe a lot about that.  Kind of be just generally unpleasant about -- to work with because she would be complaining.

Q.   Did you ever have to speak with her about that informally?

A.   I did.  I had to speak with her -- similar to speaking with Dr. Peddada -- I had to speak with her on occasion as well.

Q.   Okay.  And further down in Paragraph 3, I just want -- what does ASTRO mean?  I see, like, an abbreviation there.  Do you know what that means?

A.   ASTRO is the American Society for Therapeutic Radiation Oncology or something.  It's the professional group for radiation oncologists.

Q.   And do you know if Centura ever extended an actual offer of employment to Dr. Kathpal?

A.   No.  I don't think -- I think she retracted before -- as I recall, she -- an actual offer was not

Page 81

extended to her.

Q.   Because she retracted; right?

A.   She retracted, yeah.  She decided to not -- and I remember having some conversations with her about that as she was deciding to be employed with Centura or not.

I remember having a conversation with her that she didn't like working with Centura as an employee of Rad-On PC, how would she like being an actual employee of Centura.  It -- the math wasn't calculating for me, and so her and I had some candid conversations around that.

And I guess -- and then ultimately, she had -- I think she went onto Duke.  She had an offer to Duke in North Carolina, so it's hard to walk away from that.

Q.   Okay.  And then you had kind of been reading from the fourth paragraph there below.

A.   Uh-huh.

Q.   Well, let me just ask you about the last sentence of the third paragraph: "Eric and I will be the ones to initially screen applicants."

A.   Yes.

Q.   So what was -- kind of what was your role in screening applicants?



Page 82

A.  I would do -- to help Dr. Albert get through the process, I kind of had that first high-level conversation.  I would have -- whenever we get an applicant -- I forget how I got notified that we had an applicant, to be honest with you.

Wherever it was on the web or whoever was managing that, I would get notification that the applicant was there.  I would get the information about the applicant.  I would reach out to the applicant, and say, "Hey, we've got your -- we've got your application.  Are you interested?"

Because at the time, radiation oncology, there was a lot of applicants in the radiation oncology pool, and docs are pretty notorious for fishing the whole ocean at the same time.  And so that's your first question is like "Are you really interested in Colorado Springs or were you just -- did some recruiter just throw your name out there and I happened to catch it?"

So that's the first question you ask, and then you find out "No.  It's legit.  I'm totally interested in Colorado Springs."

And so my role as a service line director is I have about a 10, maybe 15-minute conversation with them; tell them about the landscape of Colorado Springs -- the hospital landscape of Colorado Springs;

Page 83

tell them a little bit about, you know, what the nursing support looked like; what the radiation therapy support looked like; what the nurse navigation support looks like.

Because that's what docs want to know.  Taking care of the disease and taking care of the patient is going to be a pretty similar sort of experience where they go on.

And so what they want to know when they're shopping for places to work is what's my team under -- what is my team sort of under me going to look like.  And so that was my role is helping them understand who they were applying to, and seeing if they were still interested.

And then I would make sure that, from my perspective, that they were -- seemed legitimately interested and whatnot.  So it was essentially a screening call.

And then I would say, "Okay.  Dr. Albert, this one looks like a good candidate."  Or "No, this other candidate didn't pan out for whatever reason," and I would push that on.

And then there would be more detailed clinical interviews with the docs that I wasn't necessarily part of because that's not my area of

Page 84

expertise is clinical decision-making for treatments and things like that.

So, yes, I would just do a quick screening of the docs.

Q.  And is that the process when Centura extended offers to Drs. Peddada and Monroe?  Did you also interview other applicants when they applied?  Or was there a different process for them?

A.  Yeah.  Well, they had a longstanding relationship with us.  So you go through -- you have those applicants out; you're looking at -- it's -- there is sort of this assumption, if you will, in the background that with -- in this case, Monroe and Peddada with their longstanding relationship with the hospital -- that they were going to accept an offer.

Going through some of the details of the contract, and them getting used to the idea of not being self-employed anymore, and those kinds of things notwithstanding; getting through that, there was an assumption that these were just going to be sort of a pretty smooth transition.

But also knowing that something could be -- that there could be a change of heart, we did interview for other applicants as well.  There was always a, you know, it was always totally above board.  Even though

Page 85

it was Monroe and Peddada's job to lose, essentially, it was always about board.  We interviewed other candidates.  We were growing too, so we needed other candidates.  And Kathpal decided to leave, so we had that position to backfill as well.

So, yeah.  So we went through that.

Q.  Okay.  And then in this last paragraph, you were talking about:  "Sam, re: the forgivable loan for Dr. Kathpal's recruitment assistance, I have informed both Dr. Peddada and Dr. Monroe about this, and they responded favorably."

What is that referring to, that first sentence in Paragraph 4 of Exhibit 17?

A.  Sam, regarding the -- that's Jeff saying that -- referencing the loan that was extended to Rad-On PC to bring Dr. Kathpal on board.  The recruitment assistance was a dollar amount that was fronted by Rad-On PC by Centura to help cover her while her volumes increased and she was self-sustainable.

Q.  Okay.  And do you recall any conversation -- were you part of any conversations with Dr. Peddada or Dr. Monroe about this forgivable loan?

A.  I was a part of it in the sense that I kind of helped -- had to help keep that kind of top of mind as they were going through the process of contracting



Page 86

with Centura because that was one of the key elements of the contract was how to get that.

Because she hadn't been in market long enough, as I recall, to consider the loan forgiven, so there was sort of an outstanding balance that had to be covered and paid back. Otherwise it would have violated compliance laws for us extending -- us, Centura, extending that money to them.

Q. But were you involved in any conversations with them about the loan?

A. Like I said, it was just to keep it on top of mind that they had to -- the details of those conversations were ultimately, as I recall, with Sam and Dr. Albert in this case. They were kind of getting into the weeds on that.

And since I had -- they weren't physically -- I had the physical proximity to the two doctors, so I had the pleasure of being the one to say "Hey, guys. Don't forget about it. It's still an issue out there. Its got to be addressed."

Q. So what do you remember about those conversations with Dr. Peddada or Dr. Monroe about addressing the loan?

A. I remember having those -- some reminders going out. I can't remember exactly how many times I

Page 87

had to remind them that these were sort of open conversations and whatnot. I remember it being sort of a, you know, a little bit of a spur in the contract. They weren't really happy with it, but it was what it was. They accepted money upfront, and then they -- and then when the plans weren't working out the way they thought they were, they got -- they seemed to be unhappy about the idea of having to pay it back.

Q. So you're referring to "they." Was that both Dr. Peddada and Dr. Monroe?

A. Yeah. I mean, initially. Ultimately I think Dr. Monroe came to terms with it.

Q. Do you recall any specific conversations with either of them about --

A. I don't remember.

Q. -- paying back the loan?

A. I don't remember a detailed conversation that I had. Like I said, I was mostly the reminder guy. I wasn't the one getting into the weeds on it.

Q. Okay. Do you recall whether Dr. Monroe said anything to you about any concerns with paying back the loan?

A. I don't remember specifically. I'm -- I'm sure he made comments to me, but I -- I don't remember exactly what they were at this point in time.

Page 88

Q. Same questions about Dr. Peddada. Do you recall any specific conversation where he said anything to you about concerns with paying back the loan?

A. Again, I think they were generally not happy with the idea of it and were just -- they were trying to work out the details and trying to decide if this was going to be a deal breaker for them or not.

Q. By "them," you mean both Dr. Peddada and Dr. Monroe?

A. Yes.

Q. And then have you ever had to talk to any other, you know, employees about loans while you were at Centura?

A. No. No. No. It was a very new experience for me.

Q. Okay. Let me ask you -- I think this is going to be designated as Depo Exhibit 33, which would be a new deposition exhibit.

(Deposition Exhibit 33 was marked.)

Q. (BY MS. HALPERN) I'm going to ask you to open the email I informally -- I informally named Email re Monroe Offer.

And I know some of them are named very similar to each other, but that's because I was pulling them fast and just trying to give them different names.

Page 89

So it would be Emails re Monroe Offer. The court reporter will be introducing that as Exhibit 33. The Bates number on the first page in the right-hand corner is going to be PSF-Peddada-0918

A. So this is emails regarding Monroe offer?

Q. Yes.

A. Okay.

Q. And if you look in the right-hand corner, I just want to make sure we're all looking at the same document. It is going to say: "PSF-Peddada-0918." Do you see that?

A. In what corner?

Q. In the right-hand bottom corner --

A. Got it. Got it. PSF-Peddada-0918.

Q. Right. Those are called Bates Numbers. Well, actually for the reason that we're going through them now is to make sure everyone is looking at the same document.

A. Okay.

Q. So that -- do you have that two-page document open?

A. I've got it open.

Q. Okay. Mr. Koval, the court reporter is designating this exhibit starting with PSF-0918 as Exhibit 33.



Page 90

Do you have Exhibit 33 open before you?

A. Yes.

Q. After briefly reviewing it, and you can take a second to do so, do you recognize Exhibit 33?

A. It has some -- I have some recollection of it.

Q. And is that your email address, EricKoval@Centura.org?

A. It appears that my email address is imbedded in here, yes.

Q. If you turn to the second page of Exhibit 33, that looks like the email that you and I just discussed that was previously introduced as Exhibit 17; is that right?

A. Yes.

Q. But the first page of Exhibit 33 looks like some follow up from that email that we just discussed in Exhibit 17; right?

A. That's what it's looking like.

Q. Okay. So you told me a little bit that looking at that last email that was Exhibit 17 refreshed your recollection.

Do you know what Mr. Weller is referring to? And I'm looking at the first page of Exhibit 33, that one paragraph email at the top. Do you see that?

Page 91

A. Yes.

Q. Do you know what he might be referring to? Or what did you understand him to be referring to when he said: "We can send the offers electronically, but we'll need to adjust to add income guarantee assistance for Kathpal"?

Do you have an understanding of what that means?

A. Give me a second to read.

It looks like he is talking, again, about the loan forgiveness in there.

Q. Do you recall any conversations around this email? Or...

A. No. No, not specifically. I mean, I'm reading the email now, but I don't -- I couldn't have pulled this up spontaneously without sitting here looking at this email.

Q. Did you have any role in talking to Drs. Monroe and Peddada about their contracts?

A. My -- my role was simply to just keep them, you know, keep it top of mind, checking their emails and things like that because they were clinicians, and they're in the clinics seeing patients and whatnot. They're not administrators living in their email inbox and whatnot.

Page 92

So my primary role was just making sure they had -- that they were -- that I was helping facilitate timely responses to these things.

Q. How did you come to understand what your role would be in facilitating kind of the timely discussion about these contracts?

A. I mean, my understanding in chain of command, I was the director. My reports were the -- were my nursing staff and therapy staff. My chain -- I did not have immediate responsibility over relationships with non-employed physicians.

Q. Did anyone instruct you to be following up, I guess, with Drs. Monroe and Peddada?

A. Not specifically. They just -- it was understood that I was in the clinic, and that I would kind of help facilitate some of this.

Q. And you had no role in drafting any of their -- any of the contracts --

A. No.

Q. -- that Drs. Monroe or Peddada had to sign; right?

A. No. No.

Q. No input?

A. No.

Q. Okay. Let me ask you -- you can close

Page 93

Exhibit 33. I'm going to ask you to open the document called Emails Monroe Koval re Offer.

A. Okay.

Q. The right-hand corner Bates number is PSF-Peddada-0290 on the first page.

A. Got it.

Q. Okay. Mr. Koval, the court reporter is going to be designating the document you just opened that starts with Bates Number PSF-Peddada-0920 as Exhibit 34.

(Deposition Exhibit 34 was marked.)

A. Okay.

Q. (BY MS. HALPERN) Do you have Exhibit 34 before you?

A. Yes.

Q. Okay. What is Exhibit 34?

A. It's an email from Dr. Monroe.

Q. And take a moment to review it all. And, you know, I just want to confirm, you know, your -- your email address there, Koval@Centura.org is on Exhibit 34; right?

A. That's right.

Q. Do you recall receiving the emails in Exhibit 34?

A. I'm seeing it now, but, again, I don't think

MAGNA
LEGAL SERVICES

Page 94

I -- this wouldn't have popped up in my memory spontaneously. I'm reading this now, and it's --

Q. That's okay. I'm seeing if it refreshes your recollection.

A. Yeah, it refreshes some of my recollection.

Q. Okay. What do you recall about conversations with Dr. Monroe about the position that he had been offered at St. Francis?

A. I think this is one of those -- like we talked about earlier, I think this is in reference to the fact that he -- I don't think he was immediately satisfied with going to St. Francis.

Q. Did you speak with Dr. Monroe directly about his unhappiness with being assigned to St. Francis? Does this help --

A. Yeah. I remember him -- I remember having a conversation with him about that. I have some recollection that, yeah, he just -- he wasn't happy about it. And I don't remember what we -- what conclusion -- if we even came to a conclusion about it.

I just -- I remember him just voicing concern that he preferred being at Penrose. I know he lived in the Broadmoor area and St. Francis was an extra whatever few mile push up the road. And, you know, it was stuff like that. I don't --

Page 95

Q. If you look at the second page of Exhibit 34.

A. Okay.

Q. Mr. Monroe -- Dr. Monroe in that first paragraph talks about: "This is effective moral leadership and I thought it served as a better model for a way forward in our current issue than appeasement and separation."

Do you have any understanding about what he is referring to there?

A. I'm sorry. I lost where you landed.

When they say "he was listening to a podcast," and -- I mean, I don't know -- I don't know what was in his head.

Q. Well, no. And if you don't, that's okay. I'm saying, do you have any understanding, maybe from a conversations with him or how you interpreted that, but do you know what he was referring to when he says that he thought that was a better model for a way forward in our current issue than appeasement and separation?

A. I don't recall.

Q. And reading this email here in the second page of Exhibit 34, doesn't refresh your recollection about the conversation or anything to that effect?

A. I have a very faint memory of this conversation.

Page 96

Q. And the next sentence, which is the first sentence in that last paragraph here, it says: "I understand from Eric that Peddada is ready to reconnect (now that he has 'won')."

Do you understand what Dr. Monroe is referring to there since it looks like he spoke with you?

A. That -- that now that he has won is that comment about the fact that Peddada is being slated to work at Penrose mostly, and he -- and Monroe was being slated to work at St. Francis mostly.

Q. And --

A. I think Monroe -- Monroe viewed that as a win for Peddada.

Q. And does reading Exhibit 34 at all refresh your recollection on why Centura opted to give Dr. Peddada the assignment at Penrose, but Dr. Monroe the assignment at St. Francis?

A. No. I honestly can't recall what the -- what the final decision point was of why we picked one over the other.

Q. Okay. And then after that, Dr. Monroe refers to: "You raise the expectation bar and hold both of us accountable to appropriate, compassionate behavior with consequences. I am fine with some additional cool down

Page 97

period (though 8 months seems like it should be enough) and I am fine starting fresh on building up St. Francis for some months, but my ask is that you both consider the merits of this idea and consider ways that we might reintegrate the group as a whole."

Do you know what Dr. Monroe is referring to there?

A. Again, I think it has to do with the division of labor between St. Francis and Penrose. St. Francis being a growth location, which was likely going to be slower; and Penrose being a busier location.

These guys are basically paid commission. Penrose was going to be the busier location, hence the bigger paycheck. St. Francis was going to be slower, theoretically, get less RVUs. I don't know if you're familiar with that term, Relative Value Units. It's basically the medical equivalent of commission for physicians. And I think he felt like Dr. Peddada was going to get a bigger paycheck than he was.

Q. Was Dr. Peddada expected to get a bigger paycheck based on RVUs at Penrose than Dr. Monroe at St. Francis?

MS. MCMANUS: Object to foundation.

A. Well, Penrose was busier than St. Francis at the time.



Page 98

Q. (BY MS. HALPERN) So you would anticipate that Dr. Peddada would receive more compensation under those circumstances than Dr. Monroe?

A. It's logical to follow that train of thought.

Q. And did you discuss an expectation bar and accountability at all with Dr. Monroe?

A. Not specifically that I recall. I mean, around this time their relationship was pretty intense. I -- I have a vague recollection of asking for them to keep the temperature down between -- that was between the two of them, so that it wouldn't overflow onto the staff and affect staff relationships. And I felt like Monroe did a better job of it than Peddada.

Q. Okay. Do you know why tensions were so high between the two of them at that time?

A. It was their relationship. The way I understood it, their relationship and the tensions in their relationship predated me by many, many years, as far as the tension goes.

They were partners for 12-something years, and I understood that they kind of had a roller coaster relationship during that time. And I came along, essentially, at the tail end of it.

Q. And does this Exhibit 34 refresh your recollection on any conversation you had with

Page 99

Dr. Monroe that Dr. Peddada was ready to reconnect?

A. Yeah. Yeah. I mean, we were -- again, we were trying to have those conversations, and I think they were -- it was hit and miss. But there were some conversations that, you know, if they were going to both accept employment opportunities at Centura, that they would -- you know, it wasn't like they were going to break up their practice and go their separate ways.

They were looking at being employees that had to cover the same patient population while Jeff was getting creative about keeping them physically separated as much as possible. The reality was is they were going to have to still be peers.

And so I have some -- again, some remote memories that, you know, that they were trying. They were thinking they were going to try, and I don't know -- I don't know how genuine it was. But...

Q. To try to reconnect?

A. Uh-huh.

Q. Is that a "yes"? Sorry, no headshakes.

A. Oh. About reconnecting, yeah. I don't know how -- sorry. I went with a head shake. You told me not to do that.

I don't know how genuine the efforts were to

Page 100

reconnect.

Q. Do you recall any conversation with Dr. Peddada about his willingness to reconnect with Dr. Monroe?

A. I have -- I remember those were topics of conversations. I don't remember exactly what I said. I think I was probably putting on my -- whatever, my counselor hat. I was -- you know, they weren't my employees, but they were -- they worked in my house essentially.

And I remember -- I have memories of just asking, you know, to -- like I think like I said earlier, to keep the temperatures down, you know, can we -- are we going to be able to make this work or not.

Q. And my understanding is you had those conversations, at least from Exhibit 34, with both Dr. Peddada and Dr. Monroe because Dr. Monroe is referring to a conversation you had with Peddada. And it sounds like he is saying that you reported back to him on your conversation with Peddada; is that right?

A. Yeah. Yes.

Q. Okay. You know, last chance I get to ask you, but given Exhibit 34, do you remember any specific conversation with Dr. Peddada about his willingness to reconnect or any conversation -- or this conversation

Page 101

with Dr. Monroe where he is indicating that you communicated that Dr. Peddada was ready to reconnect?

A. I remember them by theme only. I don't remember specifically what we talked about. But I know that we had conversations about how we're all going to be a family again.

If we're going to go -- if we're all going to be employees, how is Rad-On PC going to dissolve under these conditions, and how are we all going to still be able to be-- work together again. But I don't recall exactly what I said in those conversations.

Q. Yeah. I don't need exact. I know it's hard after a number of years. I'm just trying to see if you remember either of these conversations that are kind of being referred to in Exhibit 34?

A. Yeah. I remember that they happened by theme, like I said.

Q. So you do you recall speaking with Dr. Peddada that he was ready to reconnect with Dr. Monroe?

A. Yes.

Q. And you do recall Dr. Monroe expressing the feelings that he felt like Dr. Peddada had won, and that he was fine with some additional cool down period?

A. Yes.

MAGNA
LEGAL SERVICES

Page 102

Q.  Anything else you remember about either of those conversations?

A.  No.  I mean, I remember -- I guess I remember at this time that it felt like things were going to be moving forward.  You know, it looks like -- you know, this was sort of late March time frame, and it was feeling like even though there was, you know, a lot of water under the bridge, you know, with their break up and everything, that -- like, that things were going to move forward, you know.

We had -- so I was -- I -- I seem to recall feeling optimistic at this time frame, if not exhausted, but otherwise optimistic.

Q.  Let me bring your attention to the first page of Exhibit 34.

A.  Okay.

Q.  There is a short message from you that says: "Thank you for your insight Dr. Monroe.  I appreciate the introspection and agree we'll need to sit down as group at some point in the near future."

Do you recall kind of having any subsequent sit-down group after receiving Dr. Monroe's email below?

A.  No, I don't remember what -- what definitive action I actually took based on that response.

Page 103

Q.  Okay.  And then the message above on being with Krista Tippet, do you have any idea what that is referring to?  I know it's from Dr. Monroe, but I just don't -- I have no idea what that is.

A.  I think that's the podcast he was referring to.

Q.  Okay.

A.  That was the name of the podcast, as I recall.

Q.  Okay.  And then it says here that doctor -- in the first sentence there, Dr. Monroe says he needs to flush out the major logistical issues before he can decide on the offer that is on the table.  I was offered a job that I didn't apply for if you go back to my cover letter.

Does that refresh your recollection at all if there was separate, you know, job postings for the Penrose versus St. Francis oncology --

A.  I do not recall that there were separate job postings.

Q.  Okay.

A.  That's not how I remember it.  I know he was -- Monroe was, again, a little bit weird about getting told that hey, he would be at the St. Francis location, but I don't recall that Centura actually

Page 104

spelled out different locations.

It was a -- it was sort of a market approach.  Dr. Albert was, as I recall, was taking what we kind of call a market strategy of saying "I need this many physicians to cover this geographic area."

And he wasn't -- in our postings, he wasn't getting in the weeds about you're applying to be in this hospital or this hospital; you're applying to be in this market space.

Q.  Colorado Springs, basically?

A.  Yeah.

Q.  Okay.  Makes sense.  But do you recall -- does this help you recall that Dr. Monroe -- and I think you've probably already confirmed this -- specifically requested to be at Penrose?

A.  I know that he had -- that he liked the idea of being at Penrose.  I didn't see his offer -- or his -- I don't recall his cover letter --

Q.  Okay.

A.  -- to be in the app.  Because I didn't see the -- like, I didn't see the applications, the physician applications in the system.  I kind of got them after the fact somehow.  But anyway...

Q.  Any other conversations you remember with Dr. Monroe about his displeasure at being assigned to

Page 105

St. Francis?

A.  Not that we haven't already addressed, no.

Q.  Okay.

MS. HALPERN:  All right.  So that was Exhibit 34?

THE REPORTER:  Yes.

THE DEPONENT:  I believe so.

Q.  (BY MS. HALPERN) Okay.  I've got another exhibit to ask you about, which is going to be document Emails re Stop Loan Dist. Drs. Peddada Monroe-3.  The Bates number in the right-hand corner is going to be PSF-Peddada-0923 on the first page.

Do you have that open, Mr. Koval?

A.  No, I don't.  Oh, Emails regarding stop loan distributions?

Q.  Yeah.

A.  There we go.  And what's our...

Q.  The Bates number on the right bottom-hand corner is PSF-Peddada-0923.  Can you see that?

A.  Got it.

Q.  Perfect.  Thank you so much.

So, Mr. Koval, the court reporter is going to be designating this document as Exhibit 35.

(Deposition Exhibit 35 was marked.)

Q.  (BY MS. HALPERN) It starts with

MAGNA
LEGAL SERVICES

Page 106

PSF-Peddada-0923.  Do you have that open before you?

A.  Yes.

Q.  Do you recognize Exhibit 35 after taking a moment to review it?

A.  I recognize it, yes.

Q.  Is that your email address, EricKoval@Centura.org, imbedded in these email messages?

A.  Yeah.  That was -- that was my Centura email address.

Q.  And just -- I know I keep asking you about this, but it is just to create a clear record that you have a basis of knowledge for these emails.  Okay?

A.  I understand.

Q.  Okay.  I know it probably seems a little repetitive.

So, Mr. Koval, I am just -- because you, at the top of Exhibit 35, say that you have confirmation from both Drs. Monroe and Peddada to stop Centura's subsidy loan distribution.

A.  Yes.

Q.  Do you recall having conversations with either of them about stopping Centura subsidy loan distribution?

A.  Based on this email, I remember that this was

Page 107

the -- I mean, this was the email confirmation that they were good with ending those distributions because we were -- the organization was moving towards an employment agreement with them.

And I think by this time, late March -- probably have to do more email forensics -- but there might have already been an understanding that Kathpal was going to be -- I don't know if it was confirmed yet or not -- that she was going to -- going to North Carolina.  But this was just basically saying "Yep, it's time to stop those distributions."

Q.  So since you're still providing subsidy loan distribution to Drs. Monroe and Peddada for Dr. Kathpal's salary up until this time?

MS. MCMANUS:  Object to foundation.

A.  That's my understanding.  Those payments were still occurring.

Q.  (BY MS. HALPERN)  But they -- they then ceased is what this email is indicating?

A.  They stopped, yeah, because the -- because the agreement that -- we were working on different agreements.  They knew that we were going to -- we were kind of heading down towards the idea of, you know, that there was going to be repayment, so why continue to take loan money that I'm going to have to pay back.

Page 108

So they wanted to stop that loan.

Q.  Makes sense.  And do you recall speaking to Dr. Peddada about needing to start paying back the loan?

A.  Yeah.  Well, yes, I --

MS. MCMANUS:  Sorry, Eric.  Object to the form of the question.

A.  Yes, there were.

Q.  (BY MS. HALPERN)  I can rephrase it if you need me to.

A.  I mean, if you -- I think I understand.  You want to know if there was conversation with Dr. Peddada that he had to pay back this loan.

Q.  And then I'm going to ask you the same thing about Dr. Monroe, yeah.

A.  Yes.  Rad-On PC knew that they took a loan out from Centura, and that that loan had to be repaid.

Q.  Do you know any kind of -- other than what you already described to me, any specific conversations about that?

A.  I don't have a -- a specific conversation that stands out the in mind.  I know that there were -- they were topics of conversations throughout this period of team, but there is not one conversation in particular that stands out to me.

Page 109

Q.  And have you already described to me what you recall about those conversations?  Any -- you had earlier said they were both kind of unhappy initially with the terms for paying back?

A.  Yes, they were.

Q.  Any -- so other than the ones you've already talked to me about, any other conversations you recall?

A.  No.  No, I don't have any others.

Q.  Okay.  You can close that one up.

I'm now going to -- and you've probably already told me quite a bit about this, but just to see if this refreshes your recollection, I'm going to ask you to open the Difficult Hires Email.  The Bates Number in the corner on the right-hand side of the first page is PSF-Peddada-1001.

A.  Yes.

Q.  Okay.  Mr. Koval, the court reporter is designating the document before you as Exhibit 36.  Take a minute to review it.

(Deposition Exhibit 36 was marked.)

Q.  (BY MS. HALPERN)  Have you seen Exhibit 36 before?

A.  I -- (Connectivity/audio issue.)

THE REPORTER:  I'm sorry.  That answer cut out.  Could you please repeat it.

MAGNA
LEGAL SERVICES

Page 110

A.  I have recollection of this.

Q.  (BY MS. HALPERN)  Okay.  And that's your email address, EricKoval@Centura.org, imbedded in these email messages?

A.  Correct.

Q.  Okay.  Do you recall any additional conversations after seeing Exhibit 35 -- 36, sorry -- Exhibit 36 about the process for hiring Drs. Monroe and Peddada and the tensions between them?

It seems like -- okay.  Do you remember any other conversations about the difficulty to hire the two of them at once, Drs. Peddada and Monroe, other than the ones you've already talked to me about?

A.  No.  This -- this email, it looks like I was stepping out.  There is an email where I kind of got some numerical bullet points.  It looks like I'm stepping out the process of getting through it, but it doesn't -- I don't have any real additional comments about what I said.

Q.  And let me just ask you about a couple questions I have about things that are being referred to.

A.  Okay.

Q.  If you look at PSF-Peddada-1002, which is the second page of this three-page exhibit that is

Page 111

Exhibit 36 --

A.  Okay.

Q.  -- you state that Dr. Albert and myself had a productive conversation with Drs. Peddada and Monroe last ending with an agreement to move forward with extending our PSA to Jul. 1, 2022.

What is that referring to?

A.  That is the reference to whatever the -- whenever the PSA was set to expire it looks like to me.

Q.  What is a PSA?  Sorry.

A.  Provider Service Agreement.  So that's what Rad-On PC -- that's what described and Lindsay and Mark can probably speak to it more eloquently.  But that's what we call the agreement that a hospital has with a non-employed physician; we have what is called a provider service agreement.  And so it looks like we were extending that to July of '22.

I don't remember what the -- I know what the extent we must have expired at because that would allow them to keep working while we were putting together the employment agreement.

Q.  And do you -- do you -- what was the impact on the department's operation by -- this is going to -- let me rephrase that.

Page 112

Was there any impact on the operation of the department of oncology for extending the PSA agreement until July 1, 2022?

A.  Having coverage through July would allow us to stay functional moving towards employment.  It would allow us to keep seeing patients.

Q.  Was there a limit on how many times a PSA could be extended?

MS. MCMANUS:  Object to foundation.

A.  Not that I'm aware of.  I mean, the limit would be:  Does the company exist?  Does Rad- -- in the context of this conversation, does Rad-On PC still exhibit.  If the -- if the managing partners of Rad-On PC dissolve their company, there wouldn't be anything to PSA with.

Q.  Okay.  And do you recall this meeting with Drs. Peddada and Monroe discussing extending the PSA?

A.  Not specifically.  I mean, I see the email here, and I know it must have happened, but I don't have a real specific recollection of it.

Q.  You don't recall why you said it was a productive conversation?

A.  I probably would have -- I probably mentioned productive because this is in that time frame, if you look at the dates, where the two gentlemen were not

Page 113

always most collegial to each other.  So we must have had them in the same room or something.

Q.  Okay.  And you had them in the same room and disaster did not occur?

A.  Yeah.  I suppose.

Q.  Just seeing what you remember.  Do you remember anything else?

A.  No, I don't.  I think we were -- at the time, we were just working out the logistics.  Again, coming back to earlier comments, you know, this -- it was -- these positions were for Monroe and Peddada to walk away from, so we were just ironing out the logistics of how we can successfully dissolve Rad-On PC into a smooth baton toss into employment.

Because we have to -- payers care, you know, there is a lot of time constraints around the transition.  You can't just -- payers, being insurance companies, don't really care about it being Alan Monroe or Anuj Peddada.  They care who is billing.  Is it Rad-On PC billing or is it Centura billing.

And it's just -- there is a lot of -- it takes that -- that transition takes 90, 100, 120 days to -- just the bureaucracy to get through and transition and say "Hey, you might recognize these names, but they're going to billing under a different

29 (Pages 110 to 113)

MAGNA
LEGAL SERVICES

Page 114

entity now."

So we were having to work through a lot of logistics to make the transition be smooth.

Q. And the next sentence, you said, "I have reached out to Dr. Peddada this morning to remind him his signature on the extension agreement is still required and will see him personally this afternoon."

Do you recall having a conversation with Dr. Peddada separately about extending the PSA to July 1, 2022?

A. Not specifically, but this is -- I think earlier this morning I said he is hard to pin down. This is a good example. It looks like I was making a comment that I was trying to remind him that we've got business to take care of.

Q. You recall that for sure? Or is that what you're kind of just...

A. I mean, this is what I said in this email here.

Q. Okay. Getting it from the email.

A. I've reached out to Peddada this morning to remind him his signature on the extension is still required.

Q. Anything else you remember about that?

A. No.

Page 115

Q. Okay. Above that message, it says: "Thanks Eric. Not interested in taking on locums costs."

What is locums?

A. Locums are an interim physician coverage.

Q. Okay. Is it expensive?

A. Very expensive as a general rule, yeah. It is contracted fees, and that's why Dr. Erling said he wasn't interested in taking on locums costs.

Q. Do you recall having any conversation about locums costs Mr. Erling?

A. Well, in the context of this bridge plan; right. So if Rad-On PC insisted that their practice were to dissolve ahead of us being able to get a -- get an employment agreement with them, then who would be responsible for providing the locums or physician coverage if there were any gaps in the physician coverage there.

And so not -- didn't have to have many conversations with Dr. Erling. You can tell by his email that he -- he was a CEO for a reason.

Q. So he just said it would get done?

A. That's right.

Q. Okay. And right above that on the first page, I don't know if you would know, but I just have a couple questions about what Mr. Albert is referring to

Page 116

in this kind of technical paragraph here.

Do you know what legal and compliance issues he might have been referring to in that first sentence? Are you aware of any?

A. I don't know what legal compliance issues. I --

Q. You don't know?

A. I don't -- I don't know. The only thing I can -- like I said, there is lot of logistics with closing down a practice and starting an employed and converting it or starting a new employed practice from scratch. So it looks like Dr. Albert was making a case that there might have to be some locums coverage.

Q. And that's what we just discussed, if there is any gap between the end of ROPC's operation and Drs. Monroe and Peddada coming in house as employees?

A. Correct. And Dr. Albert had more horsepower than I did, so -- organizationally.

Q. And then what -- do you know what Albert is referring to when he says, "The onboarding team we are likely looking at Sept 1st at the earliest (October 1 may be more realistic unless we're lucky with no hiccups.)"

Do you know what he is referring to there?

A. Onboarding is the phrase that is used to get

Page 117

payer credentialing taken care of. That 90 to 120-day gap, we call that onboarding.

Q. Okay. And that was the 90 to 120-day gap you just des- -- like window that he just talked about a few minutes earlier?

A. Yes.

Q. And what does 3.5 FTE worth of radiation oncologists? Do you know what that is referring to, that 3.5 FTE?

A. 3.5 FTE on our volumes means that we need three-and-a-half full-time physicians to cover the volume in whichever area he was talking about. 3.5 FTE full-time equivalent. FTE is a full-time equivalent, 40 hours a week, 80 hours a pay period. So 3.5 would be three-and-a-half people.

Q. And because Centura had not hired a third physician yet, Albert is saying that the locums cost would be partially offset?

MS. MCMANUS: Object to foundation.

Q. (BY MS. HALPERN) Is that your understanding of it?

A. That appears to be what he is making the case.

Q. And that after that, he says: "We also have leads on some locums physicians outside of agencies

MAGNA
LEGAL SERVICES

Page 118

that may be cheaper."

Have you worked with any physicians, like contract physicians that aren't locums while you were at Centura?

A. No.

Q. Just locums?

A. No. I mean, the physicians I worked with were Monroe and Peddada and Kathpal.

Q. Did you, in your department, ever have locums fill in for anyone?

A. There was a point in time there right before I was exiting, and I believe Rad-On PC picked up some of the locums coverage because there was a gap in some coverage going on there as we were coming to -- as these contracts were all coming to a head here.

I can't remember. There weren't many. There was a little bit of coverage there. I think it might have been after Kathpal left. I'm having a hard time remembering that when it happened.

Q. So you don't recall whether you had or had not worked with any locums physicians while you were at Centura?

A. There was a -- there was a locums there covering -- I believe it was Kathpal's spot there, and I forget the gentlemen's name. I'm looking into space

Page 119

trying to remember his name. I can't remember his name.

Q. Do you recall for how long you had that locums coverage?

A. Not -- it wasn't a long period of time. And then I was -- I think I was close to leaving myself by then. My tenure there was coming -- by this point in time, was coming to an end as well.

Q. How soon after these emails did you leave? You said September 2022?

A. It was September, yeah. I actually -- that's -- sorry. September is when I started here. I left Centura in mid-August.

Q. Do you recall if the locums physician was still there when you left in mid-August of 2022?

A. I can't remember. I can't remember --

Q. You can't remember. Okay.

A. -- all of a sudden. I'll probably remember tonight.

Q. Okay. Okay. All right. And we talked about Drs. Monroe and Peddada kind of being combative with each other; right?

A. We did.

Q. Okay. Anything else you want to tell me about that?

Page 120

A. No.

Q. Okay. All right. So -- okay. So that was Exhibit 36.

THE REPORTER: Can we take a quick break? I have a bloody nose.

MR. HALPERN: Sure. Oh, Lord. Yes. Yes. Deal with the bloody nose.

(Recess taken, 2:30 p.m. to 2:34 p.m.)

Q. (BY MS. HALPERN) So we're back on the record after a short break.

Mr. Koval, anything you want to change about your earlier testimony?

A. No.

Q. I'm going to continue asking you a little bit about kind of the process of hiring Drs. Peddada and Monroe, but switching topics a little bit to kind of their employment agreements and conversations you had surrounding their employment agreements. Okay?

A. Okay.

Q. So do you recall meeting with Dr. Peddada to sign his employment?

A. I recall having those conversations that it was -- we had reached a point in time where signatures were required, yeah.

Q. Okay. And let me just ask you really

Page 121

quickly. I'm going to introduce one more exhibit relating to what you just said earlier about the PSA and then go to this topic. My bad.

MR. HALPERN: I think we're on Exhibit 37 now; right?

THE REPORTER: Yes.

Q. (BY MS. HALPERN) Okay. Mr. Koval, can you open Email Exclusive Contract.

Do you see that the right-hand corner is PSF-Peddada-0999?

(Deposition Exhibit 37 was marked.)

Q. (BY MS. HALPERN) Do you see that? Did you get that open?

A. I got it. 0999.

Q. Perfect. So, Mr. Koval, the court reporter is designating the document before you as Exhibit 37, Bates Number on the first page in the right-hand corner is PSF-Peddada-0999.

Do you recognize Exhibit 37?

A. It's familiar to me, looking at it.

Q. What is Exhibit 37?

A. It looks like a reminder to sign his contract.

Q. And on the first page there, you have a brief message to Dr. Peddada talking about a conversation you

MAGNA
LEGAL SERVICES

Page 122

had the night before.  I just want to ask if you recall if that was the conversation referred to in an earlier email where you met with Drs. Monroe and Peddada or if this is a different conversation?

A.  It's probably a part of that cluster of conversations.  I don't know how -- I don't remember the sequence of how these conversations all teed up because they're all in the same time frame.

Q.  So looking at Exhibit 37 doesn't kind of refresh your election at all?

A.  It doesn't refresh my memory exactly how all of these touch points happened.

Q.  Do you recall what you were referring to when you say: "Thank you for your engaging conversation and commitment to the cancer program"?

A.  That must be in reference to how I felt we had a productive conversation.  And this was, you know.  So...

Q.  And you said you were feeling optimistic at that time?

A.  At this point in time, it looks like I was.

Q.  Okay.  And this is the -- the one-month extension?  Is that what this signature is for, for the PSA to July 1 st?

A.  This is the extension to July 1st.

Page 123

Q.   And you didn't have any role in drafting the actual contract; right?

A.  No, I don't draft the contracts.  No.

Q.  All right.  Let me flip back to where I was going to go, which is talking to you about the employment contract.  Okay?

You can close that Exhibit 37.

A.  Okay.

Q.  Okay.  So you were telling me that you recall some conversations and reached out to Peddada to sign his employment agreement.

Can you tell me what you remember about that process?

A.  Similar is this extension we just looked at, my role is to sort of usher the -- usher things along.

Q.  Okay.  And do you -- do any particular conversations you've had with Dr. Peddada about his employment contract stand out to you?

A.  The ones -- the conversations around employment, again, had to do with the loan -- having to repay the loan.

Q.  Do you recall any specific conversations around signing the employment contract, though, with Dr. Peddada?

A.  I don't know if I have specific quotes of a

Page 124

conversation.  I just know that we were -- we were, you know, air quotes, working on it, trying to, you know, trying to get the deal done.

Q.  How about with Dr. Monroe?  Do you recall any conversations with Dr. Monroe about signing his employment agreement?

A.  Yeah.  We had similar conversations -- or I had similar conversations with him as well.

Q.  Did you ever have any difficulties reaching Dr. Peddada to talk about signing his employment contract?

A.  Ultimately I did, yes.

Q.  Okay.  Tell me about that.

A.  When he had gone out for a vacation around this time frame -- around this late April time frame -- and then somewhere during that time frame, he decided to stop talking.  That's why I had said earlier, there was sort of an abrupt change in mood from -- I thought things were being productive at one minute, and then almost in a matter of days it felt like he decided to quit talking about his contract. And he just -- he stopped talking to us.

Q.  Okay.  And you said you recall that Dr. Peddada was on vacation when he stopped talking to you about the contract?

Page 125

A.  Yes.  That's about the time that conversations came to a halt somewhere in there.

Q.  Were you aware that he was on medical leave at that time?

A.  Not at the time that he was on vacation.  The idea -- he wasn't on medical leave at the time he was on vacation.

Q.  Okay.  Prior to him going on -- prior to Dr. Peddada going on vacation, did you have any problems communicating with Dr. Peddada about his employment contract?

A.  No, other than having to remind him about things.

Q.  Okay.  Can you open Email re Offer Koval to Peddada Contract, which is -- I believe I left one word off there.  I believe it is Email re Offer Koval to Peddada Contract with attachments.

Oh, dear.  I have a lot of similarly named emails, so I apologize for that, but we'll just go through all of them.

If you could open Email re Offer Koval to Peddada Contract Response the Bates in the corner of that is going to be on the first page. PSF-Peddada-0958.

A.  Okay.  I've got 0958 open.

32 (Pages 122 to 125)

MAGNA
LEGAL SERVICES

Page 126

Q.  The document before you is going to be designated Exhibit 38 by the court reporter.
(Deposition Exhibit 38 was marked.)
Q.  (BY MS. HALPERN)  Right-hand corner PSF-Peddada-0958.  Do you have that open, Mr. Koval?
A.  I do.
Q.  And do you recall seeing Exhibit 38 before? And you can take a second to review it.
A.  These look to be very brief conversations I'm having with Dr. Peddada.
Q.  Okay.
A.  Have some similarity to me.
Q.  Do you recall the conversation that is being referred to in Exhibit 38?
A.  It looks like I'm reminding him about a contract.
Q.  Okay.  If you look at the first page of Exhibit 38, do you recall the meeting that Dr. Peddada is referring to having with you at 12:30 on Monday -- or April 11, 2022?
A.  Not specifically, I don't.  It looks like we were orchestrating a face-to-face conversation, but I don't -- I don't have a specific memory of that.
Q.  Okay.  Let's start at the last page of Exhibit 38 and try to -- to walk-through and see if any

Page 127

of this kind of jogs your memory.
A.  Okay.
Q.  Okay.  Who is Lanetta Dixon?
A.  I think she was -- I can't remember who she -- I didn't work with her specifically.  I think she was in physician contracting or something like that.  I don't work -- she was what I call a behind-the-scenes person.  I can't remember who she was specifically.
Q.  It look like she first emails you letting you know that Dr. Peddada accepted the physician position on April 5, 2022?
A.  That's what this email says.
Q.  And then that same day, you forward a -- an employment contract to Dr. Peddada; is that right?
A.  That's what it looks like.
Q.  Do you recall doing that?
A.  Yeah.  I remember I was facilitating some of these steps along the way.
Q.  Did you speak with Dr. Peddada after attaching this employment contract for signature?
A.  I don't know if I had a conversation with him immediately after.
Q.  Does it refresh your recollection if you did or didn't?

Page 128

A.  I don't recall, no.  I mean, I have these email chains going back and forth here, but I don't recall if we talked in person.
Q.  Okay.  How about above, you email Dr. Peddada asking if he has any outstanding concerns and indicating that Centura would like to address those as quickly as possible to ensure they stay on target for July 1 effective date.  Do you see that?
A.  Yes.
Q.  And do you recall if Dr. Peddada expressed any concerns or questions to you about the employment application that you sent him?
A.  I don't recall at this point in time that he had concerns.  I think -- it looks like I was just coaching him along to stay timely with the process and not let things slip away.  That's what -- that's what it looks like my language was guiding him towards.
Q.  Do you recall if you did have any sperate conversations outside of this email chain that he expressed any concerns about his employment contract to you?
A.  I think there were always these outstanding concerns.  I don't think at this point in time the repayment piece was fully resolved.
Q.  Did you recall him talking to you up until

Page 129

this point in time -- this up April 11 time frame -- about the loan repayment?
A.  Other than high-level conversations, I don't have a specific memory of a conversation about that.
Q.  What do you mean by "high-level"?
A.  That loan -- that loan repayment was still going to be part of the ultimate agreement there, like we've talked about.
Q.  Do you recall when that first came up?
A.  When it first came up?  Well --
Q.  You know, around -- approximately.  I understand you probably don't have exact time.
A.  That would have been back.  Just because I've been reading these emails, I think that would have been back in that March time frame when all of those were...
Q.  Anything outside of these loan repayment conversations we've discussed that Dr. Peddada flagged to you about concerns with his employment agreement?
A.  No.
Q.  And do you recall at any point in time meeting with Dr. Peddada to sign his employment contract?
A.  I don't remember when we would have met.  I don't -- I don't remember when we would have met, necessarily.  I know we were having -- I was pushing



33 (Pages 126 to 129)

Page 130

these emails along.

Q. Does looking at Exhibit 38, like the first page, at all jog your memory?

A. It looks like we were trying to convene on this Monday to meet.

Q. But you don't remember the actual --

A. I don't remember the actual -- I don't remember the actual meeting, no. I mean, I'm sitting here reading these emails.

Q. But you have no memory? I'm just making sure you remember from your own independent memory. You don't remember the actual meeting?

A. That is correct.

Q. Okay. All right. If you could open Email re Offer Koval -- Koval to Peddada with Attachment. Bates Number corner on the right-hand side is PSF-Peddada-0939. Do you see that?

A. Okay.

Q. Mr. Koval, the court reporter is designating this as Exhibit 39.

(Deposition Exhibit 39 was marked.)

Q. (BY MS. HALPERN) Have you seen Exhibit 39 before? Take a minute to look at it.

A. It looks like I'm still trying to remind him about getting signatures at -- it has -- it has a

Page 131

familiarity to me.

Q. And the messages are similar to what we reviewed in Exhibit 38; is that right?

A. They appear to be.

Q. But in this email, the actual attachment you sent Dr. Peddada is included. Do you see that?

A. Yes.

Q. Do you recall meeting with Dr. Peddada to sign the exhibits in exhibit -- the employment contract in Exhibit 39?

A. It's not -- it looks like I'm pushing -- it looks like I'm kind of trying to wrap things up. It looks like I'm concerned about the 60 days it's going to take to get things moved along, and I'm trying to secure, you know, getting him to maybe sit down and get an agreement together.

Q. The agreement attached to this exhibit, Exhibit 39, is the agreement that you sent to Dr. Peddada to sign; is that right?

MS. MCMANUS: Object to foundation.

Q. (BY MS. HALPERN) Go ahead. You can answer.

A. I mean, that's what it looks like.

Q. Any reason to think that's not the contract that you sent Dr. Peddada to sign?

A. No.

Page 132

Q. And when you sent Dr. Peddada his contract, did you indicate to him that this was the final contract for him to sign?

A. It doesn't look like I indicated that this was a final.

Q. Did you indicate that this was a draft of the agreement that he had to sign?

A. It doesn't look like I spoke to that.

Q. Did you believe this was the employment contract that Dr. Peddada had to sign when you sent it to him on April 11th?

A. It looks like it.

Q. And that was your understanding as well, that this was the employment contract that Dr. Peddada had to sign for Centura?

A. Yes.

Q. And you were aware of no changes that needed to be made to the contract at the time that you sent that to Dr. Peddada to sign?

A. At the time, no.

Q. Did you have -- did he -- did you have any conversation with him about any changes that might need to happen to the contract that you're asking him to sign in Exhibit 39?

A. Not on -- not at this time.

Page 133

Q. And I'm going to ask you to open Koval Email with Signed Peddada Contract. Bates number at the bottom is 0961.

MS. MCMANUS: Hey, Iris, could you tell me the name of the email one more time?

MR. HALPERN: Yes. It is Koval Email with Signed Peddada contract.

MS. MCMANUS: Okay. Thank you.

MS. HALPERN: Bates number in the corner is PSF-Peddada-0961.

A. For some reason, I cannot find it. Offer -- email offer.

Q. (BY MS. HALPERN) It is Koval -- it starts with your last name -- Email with Signed Peddada Contract. The -- well, the "with" is just a W.

A. 0961?

Q. I'm sorry, I didn't hear you. I think you faded out a little there.

A. 0961 is the Bates number?

Q. 0961, exactly.

A. Okay.

Q. Mr. Koval, the court reporter is going to designate the document before you as Exhibit 40.

(Deposition Exhibit 40 was marked.)

A. Okay.

MAGNA
LEGAL SERVICES

Page 134

Q. (BY MS. HALPERN) Bates number in the corner PSF-Peddada-0961.

Do you have Exhibit 40 before you?

A. I do.

Q. Do you recognize Exhibit 40?

A. This looks like -- like I'm sending Sam a copy of Dr. Peddada's signature.

Q. On his employment contract?

A. Yes. It's a physician -- it's a physician employment agreement document.

Q. And do you recall sending Sam, Mr. Weller, Dr. Peddada's signed employment contract on April 12, 2022?

A. I don't remember the date off the top of my head, but that's when I sent it in the email, yeah.

Q. Any of this jogging any memory about conversations you had with Dr. Peddada about signing this employment agreement?

A. It looks like I got a physician employment agreement in front of him, and have a signature on there. And it looks like I got it -- got it to -- or sent it to Sam.

Q. Do you recall the conversation you had with him when you got him to sign it -- Dr. Peddada to sign the employment agreement?

Page 135

A. Not specifically. I don't recall the conversation.

Q. Do you recall meeting with Dr. Peddada at all?

A. I must have.

Q. But you don't recall doing so?

A. I actually don't. I don't remember this moment in time.

Q. Okay.

A. I mean, but there -- it all happened.

Q. Okay. And when you emailed the copy of the physician employment agreement in Exhibit 40 to Mr. Weller, was your understanding that this was the final employment agreement that Dr. Peddada had to sign?

MS. MCMANUS: Object to foundation.

A. I understood this to be a physician employment agreement. I -- that's what I understood.

Q. (BY MS. HALPERN) Was the physician employment -- did you understand to be the physician employment agreement that Dr. Peddada had to sign?

A. Yes.

Q. Were you aware of any other employment agreement that Dr. Peddada was going to have to sign?

A. Not specifically.

Page 136

Q. Do you recall having a discussion about the employment agreement that Dr. Peddada signed in Exhibit 40 with anyone else prior to the date that he signed it?

MS. MCMANUS: Object to form.

A. I'm not sure I understand the question.

Q. (BY MS. HALPERN) Did you review this employment agreement with anyone prior to getting Dr. Peddada to sign it?

A. No. Again, my role wasn't necessary reviewing contracts. It was facilitating.

Q. Did anyone prior to Dr. Peddada signing the employment contract in Exhibit 40 indicate to you that this was not the final employment contract that he was going to have to sign?

A. Not that I'm aware of.

Q. And you obtained this agreement signature on the agreement in Exhibit 40 prior to Dr. Peddada going on vacation?

A. That's what the dates look like.

Q. Is that what you recall?

A. Yes.

Q. Did you have any role in approving Dr. Peddada's vacation or leave?

A. No. No. He is a private physician.

Page 137

Q. How were you made aware that Dr. Peddada was going to be on vacation?

A. Well, he communicates with our scheduling staff to let us know that he is taking a vacation, and we plan clinic accordingly when they're on vacations.

Q. Do you know -- do you recall when you first found out that he was going to go on vacation or no?

A. Not specifically. Vacations are routinely planned pretty far in advance because clinic schedules are -- require a fair amount of advance notice, so I'm sure this vacation was sort of on the books for a long period of time before. That's just how vacations are usually planned, months in advance.

Q. And in your position at Centura as a director, did you have any role in approving anyone else's vacation leave?

A. Yeah. I had some role in approving my manager's vacations.

Q. And what -- what role was that?

A. Simply that. If they asked for PTO, I signed off on it.

Q. So you physically signed off on PTO requests?

A. Yeah. It was -- I can't even remember what it looked like, but it was just -- it is not so much a physical sign off as it's just conversation that hey,

35 (Pages 134 to 137)

Page 138

I'm going to be out of the office this week.

And then when time cards come around, there is -- time cards are digital, and there is PTO listed out in there, and I sign off on the time cards.

Q. Okay. But you approved for your manager's -- when you were at Centura -- sorry.

You approved at Centura for your managers' PTO time before they took it?.

A. That's correct.

Q. And then it got integrated into the schedule so they could be off?

A. Correct.

Q. And did you contact your managers when they were off on vacation leave frequently?

A. Not on vacation, no.

Q. And did you ever contact your managers when they were on pre-approved vacation?

A. I'm sure there were times if something came up and they had a unique piece of information that I need, I'm sure I reached out to them. I can't imagine that I hadn't.

Q. Do you recall any specific times doing it?

A. I -- I don't have -- I don't know that I have a specific recollection, but I'm sure if we needed to know, like, where a particular file was or something

Page 139

like that, we would reach out to -- reach out to them. "Hey, sorry to bother you on your vacation, but it seems like you're the only one that knows where this is."

Q. Did you ever discipline or terminate anyone while they were on vacation leave for not responding to a potential inquiry from you?

A. No. That situation never occurred.

Q. Do you recall any time that you did actually try to reach out to one of your managers while they were on a vacation?

A. I just answered that. I don't think -- I can't recall a specific, but I know it has happened.

Q. And did you try to -- let me ask you a little bit about the medical leave.

What do you recall about Doctor -- not medical leave, vacation. What do you recall about Dr. Peddada's vacation leave? When did that occur?

A. I recall that he went on a mountain biking trip.

Q. And do you recall trying to reach Dr. Peddada when he was on vacation?

A. I have some recollection that there were some edits to the contract that had been circulated that needed to be corrected, and we were trying to reach him

Page 140

during vacation.

Q. And did you personally try to reach him?

A. Yeah.

Q. While he was on vacation?

A. Yeah. And then we were also interviewing. It looks like I probably messaged him.

Q. Started interviewing? Interviewing for what?

A. We were still -- we were interviewing physicians still at the time. We were interviewing for the Number 3 spot that Kathpal was leaving behind.

Q. And when you recall trying to reach Dr. Peddada, that was when he was on vacation. He wasn't on medical leave yet?

A. He was on vacation.

Q. Okay. And did you speak with Dr. Peddada before he went on vacation about being available to -- for you to reach out to?

A. Yes. Because we were looking -- because he actually did -- he was out of town at the -- when one of the interviews occurred. There was an overlap with one of the interviews.

Q. What do you recall telling Dr. Peddada before he went on vacation about needing to be available while he was on vacation?

A. I didn't tell him he needed to be available.

Page 141

I simply asked how the interview went that he had that I wasn't apart of.

Q. I might be a little bit confused. Was he part of that interview?

A. He had interviewed with a physician that was looking -- that was looking to be a part of the team at Penrose.

Q. Okay.

A. Or in Colorado Springs, rather.

Q. Okay. And when did that interview take place? Before he went on vacation?

A. The -- it looks like, based on a text message, that it was around the 25th of April.

Q. Are you looking at a text message on your phone?

A. No. I'm look at my declaration.

Q. Oh, Okay. So you're reading something. Because I'm trying to figure out what you're looking at.

A. Yeah.

Q. Can I ask you, though, to put that declaration down. I'm trying to get your independent recollection.

A. Okay. Fair enough.

Q. If you want me to introduce that down the

MAGNA
LEGAL SERVICES

Page 142

road, I'm happy to do that to refresh your recollection, but I'm trying to get your independent recollection, not just you reading from a declaration.

A. So my independent recollection is that there was a lot of moving pieces with all -- with Rad-On PC dissolving, them contributing to the interview process for new employees. Because, again, it was sort of a given that they -- that Monroe and Peddada were going to come on as employed physicians, but we were needing their input on interviews that were ongoing.

Q. Okay. Can I ask you a quick backup question? Have you been referring to your declaration at other points in time during this deposition?

A. No.

Q. Okay. So you just pulled it up now? When did you pull it up?

A. Well, just now. I mean, I was having that -- because it was about that vacation piece.

Q. Okay. So let's put that back down. And from your independent memory -- I just want to clarify -- you understood Dr. Peddada to be on vacation when you were trying to reach him about a change in the contract; is that right?

A. That is correct.

Q. And as far as you were aware, he was not on

Page 143

medical leave at that time?

A. That is correct.

Q. Okay. And you were telling me that -- and that's from your own independent recollection, not from reading the declaration?

A. That's correct.

Q. And you were telling me that while Dr. Peddada was out on vacation, you spoke with him about an interview. Is that -- am I getting the order of things right?

A. Correct.

Q. And what do you recall about reaching him to speak about this interview?

A. I just simply was asking him what his opinion was. It wasn't a super detailed conversation because he was on vacation, and I was trying to keep it short and sweet. I wanted to know his opinion. I was anxious to know his opinion, but I was keeping it short and sweet.

Q. What do you remember about that conversation?

A. I remember that he seemed to like the candidate, and that was -- that's all I remember.

Q. And the interview that you're referring to for that third physician in the oncology department, that interview took place before he was on vacation?

Page 144

He was still in Colorado Springs?

MS. MCMANUS: Object to the form.

A. Yeah. I believe the interview was a phone call.

Q. (BY MS. HALPERN) Okay. All right. My apologies.

A. Because that's why I wasn't there. He had a separate phone call with this candidate while I was away.

Q. Okay. And then you followed up with Dr. Peddada to get his opinion?

A. Yes.

Q. And what did you say in response to Dr. Peddada's opinion of the candidate?

A. I recall that he had a positive opinion, and I probably said something to the effect of "great." Again, I was keeping it pretty short and sweet.

Q. Did you discuss anything else with Dr. Peddada on that phone call?

A. Not that I'm aware of.

Q. Did you discuss that you might need to reach out to him again while he was on vacation?

A. No. No. I was trying to leave him alone.

Q. Okay. Did you -- how long was this conversation with Dr. Peddada on the phone?

Page 145

A. It was very short.

Q. Like a minute or two?

A. I think it was text messages, to be honest with you. It wasn't even -- I don't know that it was -- I don't think we were talking.

Q. Okay. So you don't remember a phone conversation, you remember text messaging?

A. Correct.

Q. Okay. And do you have any of those text messages to this day?

A. No. I've got a new phone now, and my texts are all gone.

Q. And what do you recall next about trying to reach Dr. Peddada while he was, in your words, on vacation?

A. The next thing I remember after that, because I -- I was trying to leave him alone, is getting an email at some point in his vacation. I think it was fairly early in what was supposed to be a vacation where he told us that he was going to "convert his vacation," I guess is what you would say. I can't remember the words he used, but he was going to be on medical leave, and that he wasn't going to return for 90 days. And so...

Q. Did you try to reach him about that? What --

MAGNA
LEGAL SERVICES

Page 146

A.   The only thing that I tried -- I tried -- personally, I tried to reach him because somewhere along that point in time we also -- there was some discovery in the group that we needed to make a change that the contract -- that the employment agreement document that he signed remained incomplete because there was an awareness that there was some key language around the loan forgiveness that was not inserted in the contract.  And so that was incomplete, and that that needed to be tuned up.

And I had -- I recall having some sort of attempt to reach him, and then that was -- and then that was it.  And that's, I think, the last time I ever talked to the gentleman or made even an attempt to communicate with him.

Q.   Okay.  And do you recall if you got that notice you were referring to about medical leave before or after your attempts to reach him about the contract?

A.   It would have been before that because that's why it was a big deal.  It was -- he was making his declaration that, you know, he was wanting to take a medical leave, and I knew there were outstanding business concerns with the -- with whether he was going to accept employment at Centura or not before.  So I wanted to reach out to him.

Page 147

Q.   So as you recall it, you found out while he was on vacation that -- that he would be taking three months of medical leave?

A.   Correct.

Q.   And then you tried to contact him about the changes in contract?  Is that -- am I getting the order right?

A.   Correct.

Q.   And who did you hear from that Dr. Peddada was taking medical leave?

A.   I believe we heard it from him.  He sent the email to a few of us.

Q.   Do you recall having any conversations with Dr. Monroe about his employment contract?

A.   That would have been similar to the conversations I would have had with Dr. Peddada.

Q.   And did you -- did you think that there -- well, let me just do this.

Let me just open up -- can you open up Email re -- Emails Koval re Small Edit, which I think in the right-hand corner is PSF-Peddada-0988.

A.   0988.  Okay.

Q.   Mr. Koval, the court reporter is going to be handing you -- is not going to be handing you.  Is going to be designating a document before you as

Page 148

Exhibits 41 --

A.   Okay.

(Deposition Exhibit 41 was marked.)

Q.   (BY MS. HALPERN)  -- starting with PSF-Peddada-0988.  Do you have that open before you?

A.   I do.

Q.   Okay.  Have you seen the second, third, fourth, fifth messages in Exhibit 41?  So all but the top message?

A.   It has some familiarity to me.

Q.   And that's your email address, EricKoval@Centura.org?

A.   Yes.

Q.   Do you recall reaching out to Dr. Monroe about a small edit being made to the employment contract?

A.   I don't have a spontaneous memory about it, no.

Q.   You don't have any independent memory outside of this email about speaking with Dr. Monroe about a small edit to the employment contract he had to sign?

A.   Not necessarily.  I mean, getting through physician contracts is always a back-and-forth effort, so this would have just been par for the course.  There is nothing particularly -- nothing particular that

Page 149

stands out with me.

Q.   So when other employment contract agreements that you've had a role in obtaining, negotiations were pretty common?

A.   Yes.  Edits and red lines in physician contracts are common.

Q.   Okay.  And in that second message there, you talk about a small edit.  What edit are you referring to that is the second message, first sentence?

A.   Which one were you asking me about again? I'm sorry.

Q.   Sure.  The second message on the first page of Exhibit 41, it is coming from you and going to Alan Monroe with CC to Jeffrey Albert.

A.   Okay.

Q.   And you say:  "Dr. Monroe, I just got word there is a small edit being made to the employment contract with language pointing towards the loan forgiveness of Dr. Kathpal's salary."

Do you see that?

A.   Yes, I see that.

Q.   Okay.  So you characterized the revision to the employment contract that we reviewed earlier as a small edit; is that right?

A.   That's what it looks like I'm doing.



Page 150

Q.   So you didn't characterize it as a significant edit?

A.   It looks like I'm saying that the loan -- that there is going to be a brief statement in the body of the contract that points towards the loan forgiveness -- the need for paying back the loan.

Q.   And you felt that was a small edit to the contract?

A.   It looks like I did.  It looks like I said that there:  "Small edit being made to the language pointing towards the loan forgiveness of Kathpal's salary."

Q.   And it was your understanding that the actual loan forgiveness agreement was always going to be separate from the agreement -- from the employment agreement?

MS. MCMANUS:  Object to foundation.

A.   I don't -- I don't have any different opinion than what I wrote on this day.

Q.   (BY MS. HALPERN)  So according to Exhibit 41, it was your understanding that the loan forgiveness agreement was going to be a separate agreement from the employment contract?

A.   That's what it looks like I said.

Q.   Do you recall discussing with anyone at

Page 151

Centura that the loan forgiveness agreements was going to be separate from the employment?

A.   I don't know exactly who I talked to.  We were talking to different people during this time frame.

Q.   Do you recall any conversations you actually had on the subject of there being two different agreements:  One, for loan forgiveness.  And one that was the employment contract for Dr. Monroe and Dr. Peddada?

A.   I recall there were conversations about how to get that language into their contracts, you know, how to get it in there.  But that's -- and structurally how it was going to actually end up looking, I wasn't really driving that ship.  I was just trying to be open to the docs as best as I could.

Q.   Sure.  Do you recall hearing from anyone else about the separation of these two agreements?

A.   No.

Q.   Even if you were not the driving force?

A.   No.  I don't -- I don't remember.

Q.   And you characterize the edit to the employment contract as small; is that right?

A.   I did.

MS. MCMANUS:  Hey, Iris, could we take a

Page 152

quick break?

MR. HALPERN:  Okay.

MS. MCMANUS:  Sorry, I have to use the restroom.

MR. HALPERN:  Five minutes.

MS. MCMANUS:  That's great.  Thank you.

MR. HALPERN:  Okay.

(Recess taken, 3:28 p.m. to 3:33 p.m.)

Q.   (BY MS. HALPERN)  All right.  We're back on the record after a short break, Mr. Koval.

Anything you want to change about your testimony from earlier?

A.   No.

Q.   Okay.  So I was asking you about Exhibit 41, and we were on the first page of Exhibit 41.  And I wanted to draw your attention to kind of your last line in you email to Mr. -- to Dr. Monroe, which is that you realized he was reviewing the contract -- employment contract with a lawyer; is that right?

A.   I'm sorry.  I was reading.  What did you ask me?

Q.   I was just actually kind of bringing your attention to that line.

A.   Okay.

Q.   But then I -- to make it a question, I kind

Page 153

of said "Is that right?  Do you see that line?"

A.   I see the line.

Q.   Okay.  Great.  So were you aware that Dr. Monroe was reviewing the employment contract with an attorney at the time you sent this email message on the first page of Exhibit 41 to him?

A.   I have some recollection that they were reviewing with legal assistance.

Q.   Did you in any way impose a deadline on Dr. Monroe to get back to you or respond and sign the email?

A.   I wasn't imposing deadlines, no.

Q.   Did you impose any deadline at any point on Dr. Peddada that you made him aware of to respond and sign the new employment contract with the small edit you referred to?

A.   No.  I -- it wasn't my authority to impose deadlines.

Q.   But you didn't communicate a deadline to either Dr. Monroe or Dr. Peddada --

A.   No, that was --

Q.   -- for signing the revised employment contract?

A.   That would have been out of my scope of authority.

MAGNA
LEGAL SERVICES

Page 154

Q.   And I think below that on the second page of Exhibit 41, Dr. Monroe is making certain requests of you.

Do you recall how you responded to the requests that he is making in -- in that first message on the top of the second page of Exhibit 41?

A.   Looks like he was just concerned about the way she kind of structured things clinically there.  I don't remember what I told him.

Q.   Do you remember any conversations with him about the contents of this email on the second page of exhibit -- at the top of the second page of Exhibit 41?

A.   Not specifically.  I'm sure we were probably brainstorming together on how he would prefer to see some of the support staff structured versus the way Kathpal had it setup, but I don't have a specific recollection of that conversation.

Q.   Did you make any of the changes that he is recommending?

A.   I -- I don't remember making any changes.

Q.   And do you know what he might be referring to when he says, "As I move towards the 5th stage of acceptance"?

A.   I don't know specifically what he is referencing there.

Page 155

Q.   Okay.  I'm going to ask you to open Koval Weller Email re Peddada Contract.  The Bates on the bottom right-hand corner of the page is PSF-Peddada-0985.

A.   Got it.

Q.   Okay.  Mr. Koval, the court reporter is going to be designating the document before you as Exhibit 42.  Right hand corner PSF-Peddada-0985.

(Deposition Exhibit 42 was marked.)

Q.   (BY MS. HALPERN)  Do you have Exhibit 42 open before you?

A.   I do.

Q.   Do you recognize Exhibit 42?

A.   It has some -- some familiarity to me.

Q.   And how is it familiar to you?

A.   It has to do with the edit and the language for loan forgiveness.

Q.   Is the small edit you were referring to in the Exhibit 41 that we just discussed?

A.   That would be that, yes.  That would be the edit and getting that in there.

Q.   And that's your email there at EricKoval@Centura.org?

A.   Yes.

Q.   And on the last page of Exhibit 42, the last

Page 156

message in this chain, you indicate to Sam, Mr. Weller, that Dr. Peddada has printed and signed his employment contract; is that right?

A.   Yes.

Q.   And you held onto the original?  Do you recall if you held on to it to have a copy of the original?

A.   I said I had a copy of the original if needed in this email.  I don't know where -- I don't know what happened to that particular signature after this date.

Q.   Okay.  And at the time you emailed -- you sent this email message out on April 12 at 2:15, it was your impression that that was the final employment contract that Dr. Peddada had to sign for Centura?

A.   Well, by the time this conversation is going on, I'm seeing that --

Q.   Well, I'll ask you about the message above.  I'm just asking you about 2:58.

A.   At 2:58, I said "Here was his signature."

Q.   And at that time, you understood that to be the final employment contract that Dr. Peddada had to sign for Centura?

A.   Yes.

Q.   Okay.  And then above, it looks like Mr. Weller responds to you and says:  "We were planning

Page 157

to adjust the employment agreement."

Do you see that?

A.   I do.

Q.   Okay.  Do you recall any conversation with Mr. Weller specifically about the change to the employment agreement?  Or is this the extent of the communications you had about that small edit?

A.   These communications were through email like this, yes.  I don't recall having any other detailed conversation with Sam.

Q.   So you don't -- you don't believe you had any other conversations with Sam outside of the emails?

A.   No, I don't think so.

Q.   Okay.  And above that on Exhibit 42, you respond to Mr. Weller that -- that you were under the impression that would be a separate agreement for employment.

Do you recall sending this email out on April 12 at 3:48?

A.   Yes.

Q.   I'm sorry?

A.   Yes.

Q.   You do.  Okay.  Have you -- you know, have you ever sent an employment agreement out to an employee that included any loan language or loan

MAGNA
LEGAL SERVICES

Page 158

forgiveness agreement in the actual employment
contract?
    A.  I have very little experience with -- this is
my first time ever doing physician agreements.
    Q.  And I think you said it was the only time
that you've had to do it was with Drs. Monroe and
Peddada.  Is that true?
    A.  Yeah.  And it's the only time ever, actually.
I've never had a -- I've never been in a situation with
loan forgiveness.
    Q.  Do you recall why you were under the
impression that there would be separate -- that the
loan forgiveness agreements would be separate -- or the
loan repayment -- sorry.
        How do you want to refer to it?  The loan
forgiveness?  The loan repayment agreement?
        (Connectivity/audio issue.)
    Q.  (BY MS. HALPERN)  We can't hear you for some
reason.
    A.  I don't know what drove me to have that -- to
come to that conclusion.  I can't recall.
        There must have been some conversations going
on, but I don't -- I didn't just come up with that out
of thin air, but I don't recall.
    Q.  Okay.  And because I didn't actually finish

Page 159

the sentence, I'm just going to finish the question.
Your answer will be the same.
        But, you know, where did the get the
impression that the loan forgiveness agreement would
would be separate from the employment contract?
    A.  I don't remember how I came to that
conclusion.
    Q.  Okay.  Does reviewing Exhibit 42 refresh your
recollection about any conversations you had outside of
email about the relationship between the employment
agreement and the loan forgiveness agreement that
Drs. Monroe and Drs. -- Drs. Monroe and Peddada had to
sign?
    A.  I had some recollection that we -- that there
were some conversations that the signatures -- that
Dr. Peddada's signature wasn't -- essentially an
incomplete document, and that that wasn't going to be
accepted and pushed through for full completion.
    Q.  Was that after this chain of emails found in
Exhibit 42?
    A.  Yeah.  It would have been in these
immediate -- in this immediate time frame.  It would
have been -- oh, wait.  We got signatures -- yeah, we
got a signature.  And then it's not -- because it, you
know, and I will -- I can't recall this spontaneously,

Page 160

but it looks like we were catching it a little bit
before Monroe signed, and then we had to kind of pump
the brakes.
    Q.  And is the exchange in Exhibit 42 the first
time you learned that there was going to be a small
edit to the employment contract referring to the loan
forgiveness agreement?
    A.  I'm sorry.  Repeat that.
    Q.  And I think I said and are the emails here
contained in Exhibit 42 the first time you found out
that there was going to be a small edit to the
employment contract to refer to the separate loan
forgiveness agreement?
    A.  Yes.  This -- it -- it looks like this is
when I'm just finding this out myself too.
    Q.  So that's a "yes"?
    A.  Yes.
    Q.  And what did you do after receiving the chain
of emails in Exhibit 42?
    A.  It looks like I'm gearing up to talk to the
docs that we -- that we needed to get these edits
prepared before kind of pushing them through for
signatures.
    Q.  Okay.  But when you asked:  "When do you
expect the terms of the loan forgiveness to be ready,"

Page 161

do you recall what you did after that?  Did you try to
immediately reach out to Dr. Peddada?
    A.  I'm sure I did.  It looks like I have -- I'm
sure I reached out to both physicians probably in very
close proximity to these emails.
    Q.  Okay.  And you're saying, "I'm sure I did."
I'm just trying to get your independent recollection.
Do you recall what you did --
    A.  I don't.
    Q.  -- after asking about when the terms of the
loan forgiveness were going to be ready?
    A.  I don't remember the exact conversation I
had, but I --
    Q.  Do you remember what were your efforts were
to reach Dr. Peddada, if you made any?
    A.  Not specifically I don't at this point in
time.
    Q.  Can you please open Email Chain about EE
Contracts Drs. Peddada and Monroe, which is
PSF-Peddada-0853.
    A.  0853?
    Q.  0853.  Okay.  Mr. Koval, the doc -- the court
reporter is going to designate the document before you
as Exhibit 43.
        (Deposition Exhibit 43 was marked.)

MAGNA
LEGAL SERVICES

Page 162

A.  Okay.

Q.  (BY MS. HALPERN) Bottom right-hand corner, start first page is PSF-Peddada-0853.

Do you have that open before you?

A.  I do.

Q.  Okay.  Do you recognize the email messages, the 3rd, 4th, 5th, 6th, 7th, 8th, 9th, 10th, 11th, 12th, 13th -- let me define this a little different.

I think it's easier to just say, do you recognize -- in Exhibit 43 before you, do you recognize the email messages, other than the top three messages on the first page?  And you can take a minute to review.

A.  I have seven pages on my document.

Q.  That's right.  So I -- instead of me going through the seven pages, I said, except for the first three where you are not CC'd to the email messages, do you recall this email chain found in Exhibit 43?

A.  I think I was CC'd as a courtesy on some of that stuff, I think, and I probably didn't pay much attention to it.

Q.  Okay.  And you email address is EricKoval@Centura.org?

A.  That's my email.

Q.  Couple questions.  Do you know who

Page 163

Dr. Lichtenberger is?

A.  He was -- he was one of the physician leaders.  I forget what position he was in specifically at this point.

Q.  Do you know why Centura needed Dr. Lichtenberger's approval before finalizing the employment contracts with Drs. Peddada and Monroe?

A.  That must have been where he was in the food chain.  I can't recall what his exact title was.

Q.  Do you know who Tom is?

A.  I don't recall by first name only who Tom is.

Q.  Do you know who JB is?  I see a John Byron Dirishin, but I don't know if that's the JB that's being referred to.

A.  These might have been some corporate people that I didn't interact with much, so I don't really -- I don't really know them.

Q.  And if you don't know who they are, you don't know who they are.  I'm just trying to see what you do know.  Do you know who JB is?

A.  I don't who they are.

Q.  Okay.  And you don't know who Tom is?

A.  Not by first name.

Q.  And you don't have any understanding of why they needed to approve the employment contracts before

Page 164

they went out to Peddada and Monroe?

A.  I can only presume that that's where they lived in the food chain.  But, again, I don't remember who these people are.

Q.  Do you know who Scott is?

A.  I think Scott was Dr. Lichtenberger's first name.

Q.  And this email chain in Exhibit 43 is -- takes place at the end of March, March 24, 2022.  Do you -- March 15 through March 24th.  Do you see that?

A.  Yes.

Q.  So in this week of communication over Drs. Monroe and Peddada's employment contracts, nobody referred to the loan forgiveness contracts?

MS. MCMANUS:  Object to foundation.

A.  I don't remember.

Q.  (BY MS. HALPERN)  Do you recall?

A.  I don't remember.

Q.  With you?

A.  I don't remember.  Not with me.

Q.  Is there a -- you probably already answered this, but was there any kind of rush to get Drs. Peddada and Monroe to sign their employment contracts?

Page 165

A.  (Connectivity/Audio Issue.)

THE REPORTER:  I'm sorry.  I can't hear your answer.

MR. HALPERN:  Sometimes when you lean back --

THE DEPONENT:  I'm sorry.  I changed rooms because my wife is going to be coming home any minute now and the acoustics are bad.  I apologize.

A.  No, I don't -- I don't think there was a rush.  There were time sensitivities as we've discussed in the context of, you know, transitioning between the PSA and being employed.  And, you know, that was kind of where I lived in the food chain was letting -- you know, helping people have an understanding of, you know, how long it takes to get the gears shifted and things like that.  But I wouldn't say that that was creating a -- a rush on getting people signed.

Q.  (BY MS. HALPERN)  Okay.  And before I turn over to another topic because I know you're probably getting tired of talking about contracts.

Have you told me everything you can recall about your conversations with Drs. Peddada and Monroe about signing their employment contracts?

A.  Everything I know was that we were, you know, we were just needing their signatures so that we could -- because it took their signatures for us to

MAGNA
LEGAL SERVICES

Page 166

move forward with what -- remember that phrase "onboarding."

So we couldn't get onboarding going until we had signatures. And that was kind of what I was focused on because those are the things that I could control and lean into. So those were the things that were of imminent importance to me and my team because we had a clinic to run.

Q. That is helpful information to know, but my question was slightly different.

Do you recall any other conversations with Dr. Peddada or Dr. Monroe including about the concern you just raised?

A. No, not any other conversations. No.

Q. Other than the ones we've discussed?

A. Correct. Correct.

Q. Okay. Same question about the loan forgiveness agreement.

Do you recall any additional conversations with other individuals at Centura or Drs. Peddada and Monroe about the -- their loan forgiveness contracts?

MS. MCMANUS: Object to the form.

A. The only conversations we had were that it had to get into, you know, it was language that needed to be in the contract.

Page 167

Q. (BY MS. HALPERN) And that was the small-edit emails that we talked about?

A. That's correct.

Q. Any other conversations?

A. No.

Q. And you said you tried to reach out to Dr. Peddada while he was on vacation, and I'm going to ask about that a little separately, but I don't want have to repeat this since you kind of already brought it up.

What were your efforts to reach out to Dr. Peddada to sign this new employment contract while he was on vacation?

A. I recall sending him a text message to -- because that was after -- my memory is that vacation started, everything was basically as good as it could be given the tumultuous events that got us to this point before he took off on vacation. So I was a little bit jealous that he was on a mountain biking vacation, but I was trying to leave him alone.

And then after the -- after the email came out that he was wanting to convert essentially his vacation into medical leave, it was just a brief attempt by text to connect that we had a loose end to contend with with the signatures that were still

Page 168

outstanding.

And then that -- and then that was the extent of my conversation with him or an attempt to communicate with him.

Q. How many text messages did you send him?

A. Just that one.

Q. And did you try to reach out by telephone to reach Dr. Peddada --

A. No.

Q. -- while he was on vacation?

A. No.

Q. Do you know if anyone else tried to reach out to him by phone?

A. My understanding was that Dr. Plauth and Dr. Albert were trying to connect with him, but I don't have first-hand -- I wasn't in the room when that was happening, so to speak. But that's my understanding of the events.

Q. Did you get the understanding of the events afterwards? Or was that contemporaneous to when you were trying to reach Dr. Peddada?

A. I think it was all happening pretty much on the same day.

Q. And beside the one text message, did you ever attempt to warn Peddada that you -- that Centura needed

Page 169

to reach him?

A. No.

Q. And in those text messages, did you -- text message -- singular. Sorry. Did you indicate to Dr. Peddada that if Centura was not able to reach him that day, that it would rescind his job offer?

A. That wasn't my role.

Q. But did you do so?

A. I did not.

Q. Okay. Did you impose a deadline on Dr. Peddada to contact you back?

A. No.

Q. Any other conversations that you can recall about anything relating to the loan forgiveness or employment contracts with Drs. Monroe and Dr. Peddada?

A. Not that I haven't discussed already.

Q. Okay. Were you involved in any way with getting Dr. Monroe's signature on his loan forgiveness agreement?

A. That became -- that's -- no. Because that all went out there -- that all went electronically.

Q. Did you send it out electronically? Or did someone else?

A. That got pushed out through a different department.



Page 170

Q.  Were you even aware of when Dr. Monroe signed his final employment agreement?

A.  I would have been made aware of it.  I can't recall it off the top of my head, but somebody would have made an announcement that all the electronic signatures were obtained.

Q.  Do you recall if Dr. Monroe had signed the revised employment agreement before Dr. Peddada had his job offer rescinded?

A.  I don't remember the timeline.

Q.  So you don't recall?

A.  I don't recall.

Q.  Did anyone discuss with you rescinding Dr. Peddada's job offer?

A.  At that point in time there was a -- there was a point in time --

Q.  You faded out at the beginning of your answer.  I'm really sorry.  What did you say?

A.  There was a point in time when Dr. Peddada was essentially not communicating to the Centura team.  And there was informal chatter, I guess you would call it, amongst people that I recall hearing "What does that mean?  What does this mean?  Where are we going with this?  He is not -- he is not talking to his anymore."

Page 171

Q.  Okay.  When did this -- who engaged in this chatter?

A.  Dr. Albert was a part of it, and I believe Sam Weller was a part of it, and I don't know who else.  Those were the two people that I talked to that were a part of sort of the contracting process, if you will.  Some of the other people that were engaged, I didn't necessary connect with in my role.

Q.  Were these verbal conversations or through email or text?

A.  They would have been verbal conversations.

Q.  Okay.  Can you describe to me the conversations that you do recall about rescinding Dr. Peddada's employment offer?

A.  We had a -- I mean, the way I recall it is that we had an incomplete employment agreement and there was the sense that Dr. Peddada decided to stop talking to us.  And, you know, what does that mean?

So that -- that's where I was -- that was -- whenever I was in the room, that was sort of direction of the -- the conversations.  I don't know if there were others that happened.

Q.  How many conversations do you recall having with -- you said it was with Albert and Weller?

A.  Yeah.  Maybe once or twice.

Page 172

Q.  Okay.  Over the span of how long of a period of time?  A day?  Two days?

A.  It would have been sometime after -- after we -- at some point in time, we realized Dr. Peddada decided to stop talking to us.  And then it would -- those conversations would have happened a day or so after that -- after we came to that conclusion.

Q.  Okay.  And you think it was one or two conversations?  Did you have them in person?  Over the phone?

A.  I recall them being in person.  I recall Sam and Jeff coming around the hospital.

Q.  And do you recall anything specific that Sam said to you, Mr. Weller?

A.  No.  I don't have any quotes, no.

Q.  Do you recall your response to Mr. Weller?

A.  I -- I recall, like as to this day, I was curious what --

Q.  You're sounding very quite.  I'm sorry.

A.  I recall, like I do this day, I was curious why he quit talking to us.

Q.  And how long -- how about Dr. Albert, do you recall what he said to you?

A.  I don't recall specifically what he said, no.

Q.  And your response to him?

Page 173

A.  No, I don't --

Q.  And you think these conversations took place a day after you tried to -- a day or two after you tried to reach out to Dr. Peddada and were unable to reach him?

A.  I don't know when they happened, but at some point in time, we realized Dr. Peddada was not going to -- had stopped talking to us.  I can't recall if a week had passed or what, but at some point in time we realized that he decided he was going to walk away from Centura.  And we -- and, you know, we were trying to regroup and figure out what that meant for the team.

Q.  And at that point in time, did you believe that Dr. Peddada was on vacation or that he was on medical leave?

A.  I knew he was on vacation, and that he was working on trying to define a medical leave with ROPC and med staff.

Q.  But it was your understanding that he wasn't yet on medical leave?

A.  That's correct.

Q.  And I think I had asked if you -- did you share an opinion within anyone, whether Mr. Weller or Mr. Albert, about whether Dr. Peddada's employment offer should be rescinded?



Page 174

A. Not at that time, no.

Q. Did you express that -- did you express any position at all on Dr. Peddada's employment offer?

A. I was concerned that he wasn't communicating. I was concerned that the effort to reconnect with Dr. Monroe was still a very fresh wound. And then he -- then during the course of his vacation, somehow decided that he was going to stop communicating to everyone. I did feel like that was a red flag that things were maybe not healing like we thought they would be.

Q. Did you express a position, though, to Dr. Albert or -- is it Mr. Weller or Dr. Weller?

A. Mr.

Q. Mr. Weller. Did you express an opinion to either of them on whether Dr. Peddada's employment offer should be rescinded?

A. No.

Q. To anyone did you express an opinion?

A. No. (Connectivity/Audio Issue.)

Q. I'm sorry?

A. My opinion was just about the behavior of not communicating with us.

Q. Okay. Did you talk to anyone about that opinion other than the one or two conversations that

Page 175

you just had said happened with Dr. Albert and Mr. Weller?

A. Correct. And that was it.

Q. I'm sorry. Were there any other conversations? I missed that.

A. No.

Q. With anyone?

A. Correct.

Q. With Mr. -- Dr. Monroe, for example?

A. No. No. This was -- these were contract conversations and you -- those conversations are very contained conversations.

Q. Did you have any other concerns with Dr. Peddada at that time?

A. Other than what I just expressed, no.

Q. Other than what you just expressed?

A. Yeah. Just the lack of communication, that was enough of a concern. That was -- that was my primary concern at that time.

Q. Okay. And why did you think it was a problem that he was not communicating to you while -- that Dr. Peddada was not communicating while he was on vacation?

A. Because he had an open contract.

Q. And what was the concern there?

Page 176

A. To -- I mean, you can't have loose ends when we've got -- I mean, at least -- just like I expressed earlier this morning, people have an obligation -- whether they're on vacation or leave -- they have some obligation to let leadership know where they stand.

Maybe you don't have to -- maybe there is not a need to completely finish duties or whatever, but you have an obligation to let people know that you're out there and alive and willing to communicate, and he completely shut down. He just left us isolated with zero communication at all.

Q. Do you know if he was communicating with anyone else about his leave --

A. I have no --

Q. -- and employment at Centura at that time?

A. I have no idea.

Q. And did you have any other concerns other than the concern you just voiced about obligations to keep people updated about where you're at?

A. Did I have other concerns?

Q. Any other concerns with his -- with your inability to communicate with him?

A. Not at that time, no.

Q. And when you say, "Not at that time," what do you mean by that?

Page 177

A. Well, I -- I mean, that was my concern that he wasn't in the office. He wasn't -- that's all I needed from him. I just needed him to talk to us and he wasn't.

Q. So any other concerns? I'm just -- any other concerns about the lack of communication during Dr. Peddada's vacation?

A. No.

Q. And do you recall when Dr. Peddada first disclosed to you that he had a medical condition he was suffering from?

A. It was -- it was somewhere in that April time frame when the email came out. I forget the exact date, but it was while he was on vacation. Whatever the dates were that he left, he emailed us on a -- I don't now. He emailed us sometime, at the beginning of a week, I believe it was.

Because I remember me and my clinical staff were then making arrangements for coverage on how we were going to cover the clinic. He was a very productive physician, and we got relatively short notice that he wasn't going to be returning for three months.

We had a lot of patients left to cover.

Q. Do you recall Dr. Peddada emailing you or

MAGNA
LEGAL SERVICES

Page 178

speaking with you about kind of any medical conditions prior to his being on vacation?

A. Prior, no.

Q. And what do you recall from when he emailed you about needing medical leave? Do you recall the reason?

A. I recall that it was stress related, and he needed to take -- and that he was looking to take the time off to deal with whatever he was defining as stress.

Q. Did you have any conversations with him about that stress?

A. I did not because that was after that is when the communications stopped.

Q. Did you discuss his stress, as you call it, with anyone else at Centura?

A. Only in the context that we were going to be covering clinic for the next 90 days.

Q. Any other conversations you had about his medical leave with anyone at Centura?

A. No.

Q. Do you know what -- have you ever heard of physician burnout?

A. Yes, I'm familiar with that phrase.

Q. Okay. What does that phrase mean to you?

Page 179

A. It means that physicians are fatigued from making medical decisions.

Q. Any -- anything else? How are you familiar with the concept of physician burnout?

A. It's a buzz word that gets thrown around. Medical people get burnout from taking care of people, taking care of sick people.

Q. Do you -- have you read any research on it or any --

A. No, I've actually not read any -- not done any research, not gone to any seminars.

Q. Do you have any kind of formal understanding of what burnout it is?

A. As in being formally educated in it?

Q. Right.

A. No.

Q. So you're kind of talking about it in a layman's capacity?

A. For me, correct; yes.

Q. And have you had any discussions about burnout -- did you discuss burnout at all with respect to Dr. Peddada with any of your colleagues?

A. No. Again, not until after he sent the email that he was wanting leave, and then we were -- we were focused on covering the clinic. We weren't focused on

Page 180

talking to Dr. Peddada, we were focused on covering the clinic.

Q. Would you please open Email Peddada Doctor Call Response. It's going to be Email Peddada PSF-Peddada-1018 in the bottom corner.

A. What was the generic name on it? Email Peddada...

Q. Doctor Call Response.

A. Email Doctor Call Response.

Q. Bottom right-hand corner is PSF-Peddada-1018.

A. 1088. Got it.

MR. HALPERN: And, Patricia, I feel really bad. What was the last numbered exhibit?

THE REPORTER: The last one was 43. This will be 44.

Q. (BY MS. HALPERN) Okay. Mr. Koval, the court reporter is going to designate the document in front of you as Exhibit 44. PSF-Peddada-1018 in the bottom right-hand corner.

(Deposition Exhibit 44 was marked.)

A. Okay.

Q. (BY MS. HALPERN) Have you seen Exhibit 44 before?

A. It has some -- I have some recollection of it, I believe.

Page 181

Q. Okay. From where do you have that recollection?

A. I mean, if I'm reading it, I know there was -- there was talk about, you know, when these -- this really select audience here about Dr. Peddada and what to do with his medical leave. I mean, I don't -- I don't recall all of these emails, though, just spontaneously, again.

Q. Well, let me ask you this: You have been referring to an email where you said you first found out that Dr. Peddada --

A. There wasn't --

Q. -- had a medical condition. Is this that email?

A. I don't think so. I thought there was an email that came from -- I thought -- and I don't see it in any of these, but I thought I remembered seeing an email from Dr. Peddada himself saying that he was going to be -- I thought that's how he notified us that he was going to be taking leave. But I don't -- I don't see it here. I don't see the ones that -- these all seem to be after the fact.

Q. Okay.

A. I don't know. Maybe my memory is wrong.

Q. No, that's okay. I'll try to find if any of

MAGNA
LEGAL SERVICES

Page 182

the ones that -- can you open what has been previously designated as Exhibit 5. We'll just -- we'll try to figure it out.

Or you might be referring to what has previously been designated as Exhibit 11. That might be the one.

A. Yeah. I think this is the one that is in my memory.

Q. Exhibit 11?

A. Yes, Exhibit 11.

Q. Okay. I'm going to ask you to close Exhibit 5 then, and talk to me about Exhibit 11, just to be clear.

So the document before you has been previously designated as Exhibit 11 by the court reporters. Is this the email that you have been referring to where Dr. Peddada requested medical leave?

A. Yes.

MS. MCMANUS: Object to form.

Q. (BY MS. HALPERN) Okay. What -- do you recall having any conversations after receiving this email in Exhibit 11 from Dr. Peddada? Who did you speak with about -- about that?

A. I would have spoken -- after this, I would have spoken to Dr. Monroe and my clinic managers about

Page 183

the potential for covering the clinic in his absence.

Q. And what do you recall about those conversations?

A. I recall that they were -- that they were stressful because we got short notice that he is going to be -- that he was going to be out for three months, and we had -- and this email came in on a Monday evening.

So we would have had, you know, we would have had whatever. We probably had -- whatever his vacation time frame was wouldn't have been an issue because that would have already been squared away. But whenever he was originally slated to come back from vacation, we would have needed to figured out how we're going to see all the patients.

Q. And is that the first time you have been put in a situation where you had to find coverage for an extended period of time for a physician?

A. Yes.

Q. Has that happened since your time at Centura?

A. No.

Q. So this is the only time kind of in your career where you've had to find a way to distribute work for -- for three months?

A. Yeah. Under these circumstances, correct.

Page 184

Q. Okay. And you characterize that as stressful?

A. Yes.

Q. How so?

A. Because setting up clinic appointments takes a lot of advance notice with the team, especially oncology treatment. They, you know, it doesn't -- they're not simple, little clinic visits. They have to do with patients that are on treatment. And, you know, the workload is delegated between any number of clinics, and this one was divided up between three people.

So looking at how we were going to push Dr. Peddada's work, you know, onto Dr. Kathpal and Dr. Monroe, and then what were the -- you know, was there going to be the need to hire in additional sort or temporary help and things like that.

All those types of things go through your head when you get this sort of notification. It's different than when a physician retires or resigns with advanced notice, you know, very typical physician contracts have 90 and even 180 days out clauses because it takes that much time to figure out how to -- how to backfill.

So when you get, you know, when you get

Page 185

something like this, and you want to -- obviously you're respecting somebody's need for medical leave, it's still stressful on the team to have, you know, now it's like "Okay, now you have got a physician that you're worried about because they just declared a medical leave, and you've got his clinic that you're worried about and how your going to get that backfilled.

Q. Okay. And did -- did you have any concerns that Dr. Peddada wouldn't return after those three months?

A. Not -- not at this time, I didn't. No.

Q. And when did you first have that concern? Is that what you discussed earlier when you said you were having problems communicating with him?

A. Yeah. At some point in time when he wouldn't even have the most basic touch base with our medical leadership, I -- you know, my brain starts going to places that -- wait a second. What's going on here?

This doesn't -- even under -- even under the auspices of medical leave, it is not like he was incapacitated, you know, it was not like he was intubated and in a hospital and couldn't communicate for himself. He went completely radio silent.

And, you know, at that point in time you have

MAGNA
LEGAL SERVICES

Page 186

to start speculating "What else is going on here"?

Q. What were you speculating what else was going on?

A. Well, my speculation was that he was -- at some point in time, and I don't know exactly when I started feeling this way, but I started feeling like he was going to walk away from his contract offer, his offer of employment. It was...

Q. Why did you think that?

A. Because he wasn't talking to us. He wasn't even -- he wasn't even taking a minute to say "Hey, I'm still here. I just need to breathe."

He wasn't giving any inkling that he was even remotely interested in us. He just simply shut us down and quit talking to us.

Q. And is the only reason you got that suspicion the lack of communication while he was on vacation?

A. Well, then there was other things that started popping up, you know, it -- everyone starts getting curious. There was information that circulated that people saw that his house was put it on the market for sale.

And then you just start getting these -- then you start thinking "What?"

He is supposedly on medical leave and now

Page 187

people are reporting that they're seeing his house is up for sale, and he in the middle of these contract negotiations with us?

Is he -- it sure looked like he was getting ready to take off and leave us, you know, leave us behind.

Q. Is there a time you didn't believe he was on medical leave?

A. What's that?

Q. At that time you didn't believe he was on medical leave, that he was faking it?

A. No. I didn't say he was faking it.

Q. Okay.

A. I said that there were other indicators that were looking like he was leveraging his time off to take care of other issues, and he wasn't communicating with us about his contract.

But he was apparently communicating with a realtor to put his house on the market.

I mean -- and then if you don't -- if you don't have any communication otherwise, and you have a business to run, there is going to be people making decisions, you know, to run the business.

Q. Any other reasons at that time you thought that Dr. Peddada was not going to return to Centura?

Page 188

A. No. No. I mean, it was, you know, the complete radio silence, the information that we're getting, you know, that you see secondhand in the community.

And then -- and then just continued no eff- -- no effort to communicate back to Dr. Albert or Dr. Plauth, I believe, was trying to -- I believe those two were trying to reach out to him.

I was honoring chain of command at that point and letting them have those conversations or attempted conversations.

Q. Did you discuss your speculations or concerns with anyone else at Centura that Dr. Peddada would not be returning after medical leave?

A. I discussed that with Jeff.

Q. Anyone else?

A. No. My conversation was with Jeff.

Q. Okay. What do you recall about that conversation? What did Jeff say there?

A. I think I have -- I seem to recall that he felt that those were reasonable indicators that Dr. Peddada might not be interested in talking with us anymore about an employment agreement.

Q. Did anyone bring up that he had signed the previous employment agreement without any of these

Page 189

problems?

A. I'm not sure I understand the question.

Q. Well, he had signed employment agreement that you had provided him that we discussed earlier?

A. Correct.

Q. And there had not been any problems there; right?

A. That's correct. But then information was circulated that that signature was incomplete and was now essentially void. So there was no -- there was were still no completely finished agreements.

Q. So I guess my question is a little bit different than that. I understand that's your understanding, but did anyone bring up the fact that he had signed the version -- the last version of the employment agreement that at that time you both thought was final without any of these problems, you didn't have problems with him getting that signature?

MS. MCMANUS: Object to the form.

A. I did not have problems at that time.

Q. (BY MS. HALPERN) But was that discussed when you were talking about the attempt to reach out to Dr. Peddada while, as you characterize it, he was on vacation?

A. I don't recall if that specific element was



48 (Pages 186 to 189)

Page 190

brought up as a comparison, no. I can't remember that.

Q. And there was one small edit, according to you, in that new contract?

A. That's correct.

Q. And that made you think he was going to walk away from working at Centura?

A. That is not what --

Q. I'm sorry. I can't hear you.

A. That's not what made me think that. It was his lack of communication that made me think that.

Q. Okay. And we've discussed kind of all the reasons you thought he might not be returning to Centura after requesting leave; is that right?

A. Correct.

Q. Did anyone have any other speculations, reasons, concerns --

MS. MCMANUS: Object to the foundation.

Q. (BY MS. HALPERN) -- that were communicated to you?

A. Not that I recall.

Q. Did anyone else at Centura, in your conversations with them, talk about any other adverse impacts on the department as a result of not being able to communicate with Dr. Peddada while he was on vacation to get that employment contract signed right

Page 191

then?

MS. MCMANUS: Object to form.

A. I'm not sure I understand the question, to be fair.

Q. (BY MS. HALPERN) Sure. I can rephrase it. I'm just saying, did anyone else communicate to you additional concerns with -- with not being able to communicate with Dr. Peddada about the new employment contract while he was on vacation?

A. Not that I recall specifically. I'm sure we started again because of all the cascading effects of get, you know, you can't move forward until you have ink on the paper.

I'm sure we must have had conversations about the longer it takes to get ink on the paper, the longer it is going to complete the onboarding process. I'm sure we were having those conversation, but --

Q. Do you recall any of those conversations?

A. I don't have a specific recollection of that conversation, no. I mean, I can't imagine they weren't happening.

Q. Anything else that you recall discussing after receiving Exhibit 11, with anyone?

A. After receiving Exhibit 11 --

Q. That's right.

Page 192

A. -- to be fair, the main focus was getting clinic covered because that -- it became a clinical concern. It was, you know, it was -- it was a big deal to have to cover that like that.

Q. Did you question or have any questions about what disability Dr. Peddada was referring to in Exhibit 11?

A. I didn't -- I didn't really question the disability. I was trying to take the disability on good faith and honor that as best as I could.

Q. My question was a little bit different. Did you have understanding of what the disability was when you received Exhibit 11?

A. Oh. Just -- go ahead, Lindsay.

MS. MCMANUS: I just was going to object to the form and foundation. Go ahead.

A. I understood it to be stress.

Q. (BY MS. HALPERN) Do you recall anyone having any discussions around Dr. Peddada's mental health after, you know, at the end of April in 2022?

A. I did not -- here is how I remember it: I was not personally involved in any mental health conversations. I have a memory of seeing an email where Dr. Peddada was concerned that mental health rumors were going around, but me and my management team

Page 193

were working to make sure that wasn't the case.

And I never witnessed it either. That was never -- there was never any -- that never happened.

Q. Did anyone discuss with you kind of any medical diagnoses or medical evaluations of Dr. Peddada relating to his disability referred to in Exhibit 11?

A. No, not specifically. Again, I was -- the way I remember it is we were just trying to honor -- honor it in good faith.

Q. Did anyone ask what the disability he was referring to was?

MS. MCMANUS: Object to form.

MS. HALPERN: You're right. That you're aware.

Q. (BY MS. HALPERN) Are you aware of anyone inquiring into what the disability was that Dr. Peddada was referring to in Exhibit 11?

A. No.

Q. And did Dr. Peddada have any conversations with you before vacation where he indicated that he needed several months off to recharge?

A. No. He had -- the only conversation he had with me was your typical pre-vacation conversation that we all had. I'm really looking forward to this vacation, you know, we had a very run-of-the-mill kind

MAGNA
LEGAL SERVICES

Page 194

of conversation.

We personally -- we had a personal connection where we both really enjoyed mountain biking, and we talked a little bit about -- I can't remember where he went specifically, but he went to some mountain biking destination. That's what we talked about.

Q. And so you don't recall any meeting with Dr. Albert, Monroe, and yourself with Mr. -- Dr. Peddada during which time he informed you that he needed some time off to recharge and described symptoms of exhaustion?

A. I don't recall having a group meeting to that effect, no.

Q. Do you know if that meeting occurred and you just don't recall it? Or are you sure that meeting did not occur?

A. I can't recall one way or the other.

Q. So it may not have occurred, and it may not have?

A. It could have. I mean, physicians, nurses all get burned out. We talk about stress and workload all the time. It is sort of a part of your monthly conversations with each other.

Q. And when you received Exhibit 11, not withstanding Exhibit 11, your understanding is that

Page 195

Dr. Peddada was actually still out on vacation until May 1st?

A. That's correct.

Q. And that his medical leave would only start on May 1st?

A. That's how I -- yes, that's how I read it.

Q. Do you know if -- did anyone ever tell you if they followed up on Dr. Peddada's offer to commit -- his offer to obtain a medical examination by a independent physician?

A. I'm sorry. Repeat that.

Q. Do you know if any anyone took Dr. Peddada up on his offer to submit to a medical examination by a independent physician?

A. I -- I don't know if he did ever have an independent examination or not. I seem to recall Dr. Albert was having some conversations because we -- you know, even though we were stressed out about the scenario and everything around it, I think, you know, there in these immediate days we were all really generally concerned about what is going on.

Q. So what do you recall Jeff talking about?

A. I think he was just -- I think he was just trying to figure out -- get in touch with his physician maybe.

Page 196

But, again, when it comes to medical leave and things like that, you have to start when you --- you have to be riley careful about how you have those conversations in a corporate environment. And that was -- he was not my direct report. He was not my employee.

My role was getting clinic covered, and I don't ask questions. I just know that I've got a -- I've got a situation where I got to get clinic covered. And you just can't be out there chatting it up and spreading rumors. That's just not how you run a business.

Q. Sure. No. I understand. I'm just asking if Jeff communicated to you anything about, you know, an independent medical examination or reaching out to Dr. Peddada's doctor?

A. I don't remember a specific conversation in that regard.

Q. Okay. I was asking you, I think, about Exhibit 44. If you can flip back to that. It was kind of newly introduced. PSF-Peddada-1018.

A. What exhibit was it?

Q. It's Exhibit 44, PSF-Peddada-1018. It is called Email Peddada Doctor Call Response.

A. (Connectivity/Audio Issue.)

Page 197

Q. I can't hear you. Sorry. I don't know how that happens. You're talking, and somehow the computer is not picking it up.

Do you see Exhibit 44?

A. I have in the past, and all of a sudden I'm not seeing it. The one with Doctor...

Q. Email Peddada Doctor --

A. Dr. Plauth?

Q. Email Peddada Doctor Call Response.

A. I have Exhibit 5, Email William Plauth.

Q. My naming of exhibits could probably be improved upon.

It's -- it is Email, Peddada is the second word in it, Doctor. So I think that might be the only one that says, "Doctor" in it.

A. Oh. Doctor Call Response?

Q. Yes. So I believe the court reporter designated this as Exhibit 44 just before we kind of got sidetracked a little bit and went to Exhibit 11 because I was trying to figure out what email you were if referring to.

A. Okay. 1018.

Q. Yes. 1018 on the bottom right-hand corner.

A. Okay.

Q. So Exhibit 44, we were talking about that for

MAGNA
LEGAL SERVICES

Page 198

a minute. And really what I want to do is have you read it and look at the dates because the dates here precede the email we just discussed in Exhibit 11, which is April '22.

So I'm wondering if this refreshes your recollection on any conversations you had prior to April 25th when you received this email in Exhibit 11 from Dr. Peddada?

A. Not really. My memory is that he just needed to take a vacation and that this was not something that was...

Q. And you are CC'd on the email chains in Exhibit 44; is that right?

A. I am.

Q. And it looks like, at least at that point in time, you understand or at least you had notice that Dr. Peddada had complained about extreme stress and was being referred to Dr. Thompson; is that right?

A. Yeah, that's what it looks like.

Q. And then Jeff says: "We really appreciate your help and also recognized his need for a break and readjustment."

Do you have any understanding about what Mr. Albert is referring to in that sentence?

A. No. I don't know what break and

Page 199

readjustment -- again, it looks like -- it looks like what I -- it looks like we were talking about maybe extending this to a three-week break here.

Q. Do you have any independent recollection of talking about --

A. I don't remember that piece. I don't remember that piece at all.

Q. Okay.

A. (Connectivity/Audio issue.)

THE REPORTER: That answer cut out again. Could you please repeat it?

A. That detail escapes me, the three-week break.

Q. (BY MS. HALPERN) And then above that: "Dennis Kraus."

Who was that?

A. He was one of the physician leaders at the corporate level. I believe he was a medical director for the oncology service line for Centura. I forget his exact title at the time.

Q. Did he work in Colorado? Was he outside of Colorado?

A. He worked in Colorado. He was in Denver, I believe.

Q. He says: "Hopefully cooler heads will prevail with some time."

Page 200

Do you have any understanding what he means by that?

A. I don't know what he means.

Q. Do you know what he could possibly be referring to?

A. Likely still the stress simmering down between Peddada and Monroe.

Q. And in the second message here from Mr. Albert, you're saying you don't remember discussing giving a three-week break.

Did you mean that to both Dr. Monroe and Dr. Peddada?

A. No. I had kind of forgotten about it. It probably got superseded by the email that came a few days after this that he was going to take 90 days off.

This little -- this detail about all of them taking a break escaped me. You know, it kind of rings a bell a little bit as a continue to read it, but, yeah, it kind of...

Q. Do you recall discussing with anyone on this email chain in Exhibit 44, trying to set aside three weeks for Drs. Monroe and Dr. -- Drs. Monroe and Peddada to take off?

A. Not independent recollection. I'm sure I would have -- me and my clinic managers would have had

Page 201

to have been figuring out schedules to make it happen.

Q. Do you know if that -- if that's referring to three weeks for Dr. Peddada or for both Drs. Peddada and Monroe?

You might not recall, I'm just trying to figure it out.

A. I don't remember.

Q. Okay. Do you recall any discussions with Dr. Monroe about covering for Dr. Peddada if, you know, for -- for while he was on vacation?

A. Those would have been -- at the time, those would have been what I called routine conversations. Meaning, you have one of the physicians taking off for vacation, and so, yeah, there would have been conversations about covering clinic.

Q. And do you recall talking with Dr. Monroe, if you did have a conversation with him, about making sure that there was coverage while Dr. Peddada was on vacation?

A. On vacation. I don't have the specific conversation on the top of my head. But, you know, and it also likely would are happened, to be honest, more with Natalie who was more in control of -- my business manager -- who was more in control with the schedule itself there.

MAGNA
LEGAL SERVICES

Page 202

Q. Okay.

A. So that might be why I don't have a good memory of it.

Q. Okay. Did you talk Dr. Monroe at all about coverage after Dr. Peddada informed you that he was taking 90-days medical leave on April 25th?

A. I -- I have a faint memory of, you know, talking with him that we were going to have to figure out a way to, you know, to disburse the workload between him and Dr. Kathpal. I don't remember what the exact conclusions we came up with were at the time.

Q. Do you recall what Dr. Monroe's response was to having to cover -- to provide coverage for Dr. Peddada while he was out for three months?

A. No. I mean, my memory is me, Dr. Monroe and our managers were all just, you know, equally worried and a little bit stressed that vacation turned into 90-day medical leave on short notice.

It's like "Okay. What are we going to do?"

But I don't recall any specific comments.

Q. And seeing the email chain in Exhibit 44, does that at all refresh your recollection on whether you spoke with Dr. Peddada a little bit earlier kind of about some of the -- the stress he was feeling and the physical manifestations?

Page 203

A. No. Other than, like I said, he was really looking forward to this vacation. I know he was really looking forward to this vacation.

Q. Did he tell you why he was looking forward to it so much?

A. Well, just because, you know, it was -- there was a lot going on when -- the time frame that ROPC decided to blow up and then go into an employment agreement. So he had a lot -- we all did. And so he was just looking forward to taking that break.

Q. And you described that conversation to me earlier?

A. Yes. That's the one where we just talked about mountain biking. We were changing the subject. We were trying not to talk about work. We were -- as I recall. I don't -- again, I remember being jealous that he was taking a mountain biking trip.

Q. And at that time you thought it was just going to be for, like, a week?

A. That's what I thought. I can't remember if it was a one-week or two-week vacation. But it was just a -- an otherwise routine vacation.

Q. And let me ask you to open what's been previously designated as Exhibit 5. So it should be -- and we're getting close to the end. I know it

Page 204

has been a little slow. It somehow goes a little slower when you're dealing with exhibits on Zoom.

But can I ask you to open up Exhibit 5. That's email from William Plauth. Do you see that?

A. I'm open, yes.

Q. Have you seen Exhibit 5 before, the email messages in Exhibit 5?

A. The emails have some, you know, they ring a bell.

Q. Who is William Plauth?

A. He was our chief medical officer in Colorado Springs at the time.

Q. So kind of where was he on the chain of command?

A. So he and Dr. Erling were our local leadership in Colorado Springs.

Q. And kind of what were his job duties?

A. As chief medical officer, he would have been -- he would have had primary oversight with physician engagement, quality and compliances, and -- yeah, quality and compliance and physician engagement. Probably a handful of other things, but those would have been his big responsibilities.

Q. Can you go to the last page of Exhibit 5, and then we'll move up.

Page 205

It's exhibit -- the last page -- so really the last two pages because it is one policy. I just wanted to ask you about it. So if you could turn to 00393 and 000394.

A. Okay.

Q. What is the credentials policy, if you know?

A. I'm sorry. What?

Q. What is the credentials policy, if you know. Because it is says here: "I have copied a key section of the credentials policy."

A. I don't have immediate familiarity with this. I wasn't involved in position credentialing directly, so I don't have the these policies on the top of my mind.

Q. Okay. Leaves of Absence. Can you look at that policy and let me know if it is familiar to you at all.

A. It is not specifically familiar to me, no.

Q. Is it any different than what you understanding was for the leaves of absence for, you know, for you --

MS. MCMANUS: Object to the form.

Q. (BY MS. HALPERN) -- when you were working at Centura?

A. I don't recall. I don't have a lot of

MAGNA
LEGAL SERVICES

Page 206

intermit knowledge in leaves of absence, so I don't -- I can't comment one way or the other on leaves of absence, unfortunately.

Q. Let me rephrase that. Did you know if this leave policy applied to you when you were working at Centura?

A. I knew if I needed one, I would have to go look for it.

Q. Okay. That's fine.

A. Yeah.

Q. So you weren't kind of familiar because you didn't actually try to take an extended leave?

A. No, I have never taken one myself, and very little experience with them.

Q. So you're not sure if this is similar to the one that applied to you?

A. I have no comparative.

Q. Okay. Fair enough. Do you remember -- I'll just ask you on the first page of Exhibit 5.

Do you recall if any meeting took place to discuss Dr. Peddada's request for leave?

A. I don't recall. Again, I think by this point in time I defaulted to chain of command. Me and my team were focussed on the clinic itself, and I was

Page 207

letting Dr. Plauth and Dr. Albert handle this.

I might have been CC'd on some emails incidentally or out of respect, but I wasn't -- I wasn't engaged in any of his leave conversations.

Q. Okay. So you guessed where I was going.

So you, at least, were not involved in any discussions regarding Dr. Peddada's request for three months of medical leave?

A. No. Not at all.

Q. Did anyone report it back to you -- whether it was Mr. Albert or, you know, Mr. Plauth -- did any of them report back to you about any meeting that they had with Dr. Peddada about the implications of his extended medical leave request?

A. No. No. I don't -- no. There was no formal report back to me about his medical leave.

Q. Or about a conversation they had with him about the implications his medical leave would have on the practice?

A. No. No. I mean, again, the implications that we were dealing with at the time were just covering the clinic.

Q. Right. I understand that's what you were concerned with. I'm just seeing if anyone had any other conversations with you about what they thought

Page 208

the implications were going to be of his medical leave?

A. There was no concern about the medical leave itself. We were just -- we were -- yeah, there was no concern about the leave it itself.

Q. Did you have a conversation about that with someone?

A. No. We were just moving forward.

Q. And I understand that that's what you were doing. I'm actually asking a slightly separate conversation [sic] about conversations you had?

A. No.

Q. Versus what your concerns or nonconcerns were?

A. No.

Q. Okay. So no one at Centura reported that they had met with Dr. Peddada to discuss the implications of his leave to you?

A. No.

Q. And can you open what has been previously designated as Exhibit 19.

Have you seen Exhibit 19?

A. Let me turn the light on here real quick. Hold on.

Q. And I'm really almost done.

A. No, we're good. I just realized I'm sitting

Page 209

in the dark all of a sudden.

Q. All right. So we have Exhibit 19 open. Do you have that before you, Mr. Koval?

A. I've got it open.

Q. Okay. Do you recall getting an email from Dr. Monroe emailing Dr. Peddada talking about complication to the practice. Do you recall getting this email?

A. I don't recall this email specifically, but this is in line with what I've been talking about.

We were all concerned about how we were going to get the clinic covered. Now we had a clinic we were worried about, and a doc that we were worried about.

Q. And follow-up question. Do you recall speaking with Dr. Monroe or anyone on this email about actual conversation you had?

A. No. About -- and about -- about Dr. Peddada?

Q. About the implications to the practice given Dr. Peddada's request for extended medical leave?

A. So, yeah. The implications to the practice at this time were just getting coverage in place so we --

Q. I understand that. I'm asking a slightly different question. I'm asking if you recall any conversations about that concern with Dr. Monroe?

MAGNA
LEGAL SERVICES

Page 210

A.  Well, we would have had to be talking with Dr. Monroe about what is an appropriate -- how many more patients could he see, how many more patients could Dr. Kathpal see.

I don't remember the details of how those conversations went, but it becomes a math problem, essentially.  You've got X number of patients coming through your office every single day, and you go from having three providers to two providers.

And then you have -- and then you've got the need that, you know, Rad-On PC is likely going to have to find locums coverage help offset.  Because they can only cover that for so long before, you know, before they fatigue as well.

So I'm sure we were having those conversations about "Okay.  What is this all going to look like?"

"How are we going to divvy up the days?"

"Who can we bump out?"

"Who is not really on' -- we call it on treatment -- 'who is not on treatment anymore, and they're just routine follow ups that we bump further out into the future because they can get away with not being seen?"

I'm sure we had all those conversations at

Page 211

that time, and Dr. Monroe --

(Simultaneous speakers.)

Q.  -- discuss hiring additional assistance during Dr. Peddada's extended medical leave?

A.  We would have been having conversations about having additional assistance coverage if that was necessary or not.  I can't remember.

Q.  Okay.  That's what I was going to ask you.  I mean, it sounds like -- assuming you had this conversation, but do you remember any independently?

A.  I can't remember what we actually landed on, what kind of coverage stuff that we landed on now.

Because it was all kind of blending in with the -- there was this now, but it was also blending in with the -- with just what was otherwise routine transition of, you know, Rad-On PC to employment.

So then it all kind of got muddied together, and now my memory -- I can't -- I can't recall where one ended and one begins now.

Q.  And Dr. Monroe in this Exhibit 19 talks about mental health.  Do you recall any conversations -- does that refresh your recollection about any conversations you had about Dr. Peddada's mental health at this time?

A.  That was the -- I think the only time that I recall seeing the phrase "mental health" being used.

Page 212

And I think that was -- there was another email out there that we're -- I think Dr. Peddada had replied to that email:  "Not happy with the phrase 'mental health.'"

But no one else ever talked about it and used that phrase outside of that email there.  And I --

Q.  Do you know where that might have come from?

A.  -- I never heard Dr. Monroe use that phrase out loud.

Q.  And you didn't hear anyone else refer to Dr. Peddada's at Centura or anyone else at Centura refer to Dr. Peddada's mental health this whole entire time?

A.  No, I did not.

Q.  And so let's talk about then what has previously been introduced as Exhibit 31.  You'll not have Exhibit 31 there, but you'll see an email -- I'm sorry, a document that says:  "Previously Introduced Response to Peddada Complaint."

Do you see that?

(Deposition Exhibit 31 was referenced.)

A.  Not quite yet.

Q.  That's okay.

A.  Previously Introduced Response.

Q.  Over the break I found out that this was

Page 213

previously introduced as Exhibit 31, so we do have a number for it.

The Bates number in the corner is going to be 1024.  Do you see that?

A.  Yes.

Q.  Okay.  Can you take a look at Exhibit 31 and let me know if you recognize it.

A.  I don't specifically recognize it, but the messaging is consistent.  I think what I've been saying, that when that word -- that Dr. Peddada was not happy with that one email from Monroe.  And we -- I was talking to my leadership team that we don't -- it's not about whatever diagnosis it is, it's about him being on leave, and -- and that's it.

Q.  Okay.  So I think you probably jumped ahead a little bit.  I was going to ask about any meeting you had because in response to Dr. Peddada's email, you state that you, Natalie, Teresa, Drs. Monroe and Kathpal all met this afternoon and discussed using neutral language.  So I think that's what you describe here.  What do you remember from that meeting?

A.  I remember -- I don't remember it being a meeting.  Obviously it was a meeting because I said it here that it was.  But -- but I just remember that we all -- that I was sort of driving -- and I believe

**MAGNA**
**LEGAL SERVICES**

Page 214

Natalie too -- was driving the fact that when you have a medical leave, you're not focused on the diagnosis, you're just focused on supporting the need for medical leave, period.

And that's -- that's what you -- that's what you talk about. And that's what neutral is. Neutral is medical leave.

Q. Okay. And you don't recall actually having a meeting, though?

A. I don't remember the meeting. I guess we probably just -- we probably just had a powwow. We probably just had a group gathering at some point and just...

Q. You're saying, "probably." I'm just trying to get your own independent recollection.

A. I don't have an independent recollection other than what I wrote in that email there.

Q. So you're assuming the meeting took place because you're reading the email?

A. I'm assuming it took place.

Q. Is there -- but you have no independent recollection of meeting with the individuals named in --

A. That's correct.

Q. -- Exhibit 31? Okay.

Page 215

I'll wrap this particular topic up. Do you remember any other conversations -- conversations that you haven't described to me about Dr. Peddada's medical condition?

A. No.

Q. Did anyone discussion with you the need to accommodate Dr. Peddada's disability?

MS. MCMANUS: Object to form.

Q. (BY MS. HALPERN) Let me rephrase it this way: Did anyone talk to you about -- I think we talked about this. Did anyone kind of describe Dr. Peddada's situation as one involving a disability?

A. Other than what we've seen and know that he was going to take the day -- the extended period of time off, that was the -- those were the accommodations that we were prepared to make.

Q. Okay. Did you -- I'm just asking about conversations. So any other conversations that you haven't already described to me --

A. No. No other conversations. No additional conversations.

Q. Okay. And then can you let me know all the conver- -- when did you find out that Centura had rescinded Dr. Peddada's employment offer?

A. I -- I forget the exact date that that

Page 216

transpired.

Q. How did you learn about the decision to rescind his --

A. I think there was email traffic going around.

Q. And did you have any conversations specifically about rescinding Dr. Peddada's employment with anyone at Centura?

A. The conversation with Jeff that I talked about earlier where --

Q. Any other ones?

A. No additional ones.

Q. Okay. How about -- did you at any point in time come to understand that Centura decided not to extend -- reextend an offer of employment to Dr. Peddada even after he responded to notice of his employment offer being rescinded?

MS. MCMANUS: Object to the form.

A. I think, again, there was some email traffic that was going around, but I had no separate conversations about that.

Q. (BY MS. HALPERN) I'm going to -- I don't know what this one is. I have to send one more exhibit out because I think it will help. Let me just do this.

THE DEPONENT: While you're sending that out, can I take three minutes?

Page 217

MR. HALPERN: Yes.

(Recess taken, 5:19 p.m. to 5:25 p.m.)

Q. (BY MS. HALPERN) All right. Mr. Koval, I think this will be the last exhibit I ask you about. I know you're probably getting tired. I have provided you what has been previously designated as Exhibit 7. Do you have Exhibit 7 open?

(Deposition Exhibit 7 was referenced.)

A. I do.

Q. (BY MS. HALPERN) If you could scroll through Exhibit 7. Are you familiar with the email chain and letter that are found in Exhibit 7?

A. Yeah. I have some memories of --

Q. Can you, I think, lean forward.

A. Yeah. I have some memory of when this -- I think at this point in time, I believe, when this kind of happened.

Q. Okay. And your email address is there, EricKoval@Centura.org?

A. Yes.

Q. Okay. What is your memory about when the letter rescinding Dr. Peddada's job offer was sent to him? What is your memory of that?

A. It -- the memory was just that at some point in time -- and I don't recall what in particular was



55 (Pages 214 to 217)

Page 218

the trigger -- but at some point in time there was a decision made that the lack of communication had gone on too long, and that the offer would be rescinded, and that that communication was then sent out to Dr. Peddada.

Q. Okay. And you've told me everything you remember about your conversations about rescinding Dr. Peddada's job offer earlier in this deposition; is that right?

A. Correct.

Q. There are no others that you can think of after looking at this email chain in Exhibit 7?

A. No. This is -- this appears to be reiterating the fact that there was a lack of communication and various people's attempts, including my attempt, to reach out to him.

So I don't have anything additional to add. I don't have any other independent memory.

Q. Exhibit 7 doesn't appear to kind of generally discuss a lack of communication. It seems to be specifically regarding executing the new contract with the small edit; is that right?

A. I'm reading a paragraph on that first --

Q. Well, from your own memory. Let me rephrase that.

Page 219

What do you recall being the concerns with the communication, and does that at all jive with what you remember?

A. The communication -- the concerns of the communication was that it wasn't there. There was no communication. It was that simple.

Q. And did anyone try to reach out -- did you try -- okay.

Are you aware of anyone, including yourself, reaching out to Dr. Peddada to communicate with him while he was on vacation for any reason other than the employment contract?

A. No. That was what we were trying to communicate to him about was the employment contract.

Q. Did anyone talk to him -- for example, did you reach out to him at all about a -- a loan forgiveness contract while he was on vacation?

A. No. I -- no, not specifically.

Q. And what -- do you recall reading Dr. Peddada's response on page 3 of Exhibit 7, which is also 00008.

A. I -- I mean, I don't really have an independent recollection of this. I'm reading the email, and I have -- my memory is that once the -- once the offer was rescinded, my memory was that all of a

Page 220

sudden Dr. Peddada, who had been -- had no response to us at all -- all of a sudden woke up and decided to start replying to us.

That's how I remember it. If I didn't have any emails in front of me, that's how I remember it.

Q. But you don't remember what -- independently what Dr. Peddada said in responding to you, you just generally get the feeling that he responded?

A. That's correct.

Q. You don't recall Dr. Peddada saying anything about there being a mistake because he thought he had executed his employment contract already?

A. No. No. I don't recall that. I remember -- my memory is that going into vacation, if you will, he knew he was going into vacation with an incomplete contract. So I don't -- I don't remember there being -- having some idea that there was mistake.

Q. Okay. Where did you get the impression that Dr. Peddada knew that he had an incomplete contract before --

A. We were having those conversations earlier that -- when we were talking about the -- the edit.

Q. The emails on the 26th of April?

A. What's that?

Q. The emails on the 26th of April?

Page 221

A. I think they were before that. When were we with were we talking about the edit?

Q. Small Edit Email, if you want to open that. I believe that was Exhibit 41.

Do you have that one open?

A. I don't yet.

Q. Okay. Yeah. I was off on the date. It looks like April 12th you emailed Dr. Monroe about the small edit.

A. Yeah. And that was the time frame that I, you know, that those -- that that kind of conversation was going on there. I mean, I wouldn't -- again, the emails make your memory different.

Q. Yeah. Do you recall talking to Dr. Peddada -- did you have a conversation with him that his employment contract was --

A. I have some --

Q. -- going to be revised?

A. I have a vague recollection of having to talk with both the physicians that the contract that was -- that first version of the contract needed to be edited and that was not going to be the contract moving forward.

We had to get the payback language or a reference to the payback language in the contract.



Page 222

Q. Okay. And do you have any reason to believe that it took place other than on -- outside of the time frame that is mentioned on Exhibit 41, which is April 12th?

A. It would have happened around that time frame. I don't know exactly when it did.

Q. And what do you recall from talking to Dr. Peddada about that, if you did?

A. I can't remember what was said specifically.

Q. Do you recall his response?

A. I don't recall what he said to me.

Q. Do you recall actually meeting with him to discuss that his contract was going to be revised?

A. I have a -- I have a -- I have a memory of -- of standing in our conference room with the docs talking about the loan forgiveness still being an issue that had to get in the -- into the contracts, but that's about all I remember.

Q. Do you remember if you talked to them about that getting into a loan forgiveness contract or into their employment contract?

A. I -- I don't remember exactly what words I used. Because, again, I wasn't the one drafting the contracts themselves. I was just, you know, facilitating the process and helping them understand

Page 223

that one way or the other that language was going to get in front of them.

Q. And is that the meeting I think we discussed earlier where you said you had met with both of them and were optimistic?

A. I don't know that -- I know -- I don't remember there. I think the optimistic meeting was just the fact that I had the two of them in the same room at the same time.

Q. But I can't find it from earlier. I thought we had discussed that conversation earlier, but I'm going to have a hard time finding the exhibit now.

So you recall meeting with the two -- with both Drs. Monroe and Dr. Peddada. You don't recall if you mentioned the employment contract, but you did mention that there was going to be some sort of language that still had -- that they were still going to have to agree to about the loan repayment?

A. Yes.

MS. MCMANUS: Object to the form.

Q. (BY MS. HALPERN) That was a "yes"?

A. Yes.

Q. Okay. And do you have any recollection of the date? Do you think --

A. No.

Page 224

Q. Okay. So going back to Exhibit 7, you know, reading this today, do you have any reason to believe that Dr. Peddada was lying when he said he thought there was a mistake and that he already executed his contract, his employment contract?

A. I don't -- I don't really speculate what is in his head.

Q. I'm just saying, do you have any reason to believe that he is being dishonest there?

A. It didn't seem -- it didn't seem reasonable at the time to think that -- to being surprised.

Q. Be surprised about what?

A. About saying that there is a mistake. It seemed unreasonable at the time. There was -- even if I can't remember all the exact details of every single conversation that was going on around the contracts, there was a lot of conversations that were happening. Some I was a part of; some I was not.

Loan forgiveness was a major talking point around the final agreements. And then to turn -- you know, to essentially not talk to us for many days on end -- and then all of a sudden wake up and say "Oh, wait. There is a mistake. I don't know what is going on."

It didn't seem -- it didn't seem reasonable.

Page 225

Q. So you don't believe Dr. Peddada in this email message in Exhibit 7?

A. I don't.

MS. MCMANUS: Iris, are we about finished?

MR. HALPERN: Yeah, we are. A couple clean-up questions.

Q. (BY MS. HALPERN) All right.

And then in this Exhibit 7 when Dr. Peddada said he reviewed the contracts with you, we've talked about that meeting; right?

A. Yes.

Q. You told me everything you remembered about that whole signing the first contract?

A. From my independent memory, yes.

Q. Great. And do you agree with the decision to rescind Dr. Peddada's employment offer knowing what you do today?

A. Yes.

Q. And not reextending a new one knowing what you know today?

A. Yes.

Q. Would you have done anything differently before rescinding his job offer?

A. No.

Q. Have you talked about Dr. Peddada's lawsuit

MAGNA
LEGAL SERVICES

Page 226

with anyone but the attorneys since a time where his job offer was rescinded by Centura?

A. No.

Q. Any of the other witnesses? Have you talked to Monroe or Albert or anyone else?

A. No.

Q. Did you talk to Mr. Weller at all about any of Dr. Peddada's claims?

A. No.

Q. Did you have any conversations with anyone of them following the decision to rescind his job offer with any of the other employees at Centura?

A. No.

Q. Did you discuss anything in Exhibit 7 after -- after that email chain occurred? Did you guys have any discussions about ending Dr. Peddada's employment with Centura?

MS. MCMANUS: Object to the form.

A. We discussed coverage, but it was still -- it was a continuation of coverage needs.

Q. (BY MS. HALPERN) Okay. Any other conversations at all about Dr. Peddada after he was -- his job offer was rescinded --

A. No.

Q. -- with anyone at Centura?

Page 227

A. No.

Q. Nothing at all? No talking about his patients -- no sharing information with his patients?

A. No. No. That's -- no.

Q. You didn't say "Dr. Peddada is no longer working here. This is where he might be or how to reach him," to his patients?

A. We did not have a contact for him. We would have told patients that we're getting rescheduled.

At some point, we would have had the conversations with patients that he wasn't working at Penrose anymore. But other than a very abbreviated sort of conversation like that, we wouldn't have had any -- we wouldn't have had any conversations.

Q. And you didn't talk with anybody at Centura about, you know, Dr. Peddada's past work for the organization?

A. What do you mean by "past work"?

Q. Past work. Like, you know, the years he, as ROPC, worked for Centura?

A. No. I mean, I don't -- I don't know what I would have talked about his past work about.

Q. Did you hear anyone express any regret or doubt about the decision made to rescind Dr. Peddada's employment offer?

Page 228

A. No. The only -- again, it was about coverage. It really boiled down to that. It was coverage. It was -- that is what everyone's focus had on.

Q. So the answer to my original question was "No. No one expressed any regret or concerns --

A. No.

Q. -- for Dr. Peddada"?

A. No.

Q. Okay. I think that is -- is there anything else you want to add? This is my last opportunity today. Is there anything that you would like to add regarding kind of the subjects we spoke about today?

A. No, I don't have anything else to add.

Q. Okay. Anything about your testimony you want to change?

A. No.

MS. HALPERN: Okay. I think that's it for me. I don't know if your lawyers have any questions.

MS. MCMANUS: Nothing from us.

THE REPORTER: Before we go off the record, I do need to get the orders for the transcript. Just electronic copies?

MR. HALPERN: Just electronic copy, please.

MS. MCMANUS: Same for us.

Page 229

THE REPORTER: And reading and signing?

MS. MCMANUS: Yes. If you could send it to us, that would be great.

THE REPORTER: Okay. Thank you.

WHEREUPON, the within proceedings were concluded at the approximate hour of 5:47 p.m. on the 14th day of November, 2024.

* * * * * *

MAGNA
LEGAL SERVICES

Page 230

CERTIFICATION OF DEPONENT

I, ERIC KOVAL, do hereby certify that I have read the above and foregoing deposition and that the same is a true and accurate transcription of my testimony, except for attached amendments, if any.

Amendments attached    ( ) Yes    ( ) No

_____
ERIC KOVAL

The signature above of ERIC KOVAL, was subscribed and sworn to before me in the county of _____, state of Colorado, this _____ day of _____, 2025.

_____
Notary Public
My commission expires

Page 231

REPORTER'S CERTIFICATE

STATE OF COLORADO        )
                         )   ss.
CITY AND COUNTY OF DENVER )

I, PATRICIA BURNETT-ANDERSON, Professional Court Reporter and Notary Public, State of Colorado, do hereby certify that previous to the commencement of the examination, the said ERIC KOVAL was duly sworn by me to testify to the truth in relation to the matters in controversy between the parties hereto; that the said deposition was taken in machine shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form, consisting of 231 pages herein; that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.  I further certify that I am not employed by, related to, nor of counsel for any of the parties herein, nor otherwise interested in the outcome of this litigation.

IN WITNESS WHEREOF, I have affixed my signature and seal this 5th day of January 2025.

My commission expires August 1, 2027.

_____
Patricia Burnett-Anderson
Professional Court Reporter



59 (Pages 230 to 231)

Page 1

**A**

**abbreviated**
227:12
**abbreviation**
80:18
**ability**
6:8
**able**
6:8 16:6,6 48:11
77:13 100:14
101:10 115:13
169:5 190:23 191:7
**abrupt**
124:18
**absence**
183:1 205:15,20
206:1,3
**absorbed**
33:16
**accept**
29:11 78:11 84:15
99:6 146:24
**acceptance**
154:23
**accepted**
87:5 127:11 159:18
**access**
43:18
**accommodate**
215:7
**accommodation**
28:4,8,18,24 29:14
29:17,20 30:2,11,14
33:22
**accommodations**
28:12 29:24 33:20,22
215:15
**accountability**
98:6
**accountable**
96:24
**accurate**
230:5
**acoustics**
165:7

**Act**
34:10
**action**
1:3 19:15 23:12,15
24:1,1,3,4,12,22
102:25
**active**
32:24
**actual**
13:25 18:6 51:17
58:24 80:23,25
81:10 123:2 130:6,7
130:8,12 131:5
150:13 158:1
209:16
**add**
91:5 218:17 228:11
228:12,14
**added**
69:9
**additional**
96:25 101:24 110:6
110:18 166:19
184:16 191:7 211:3
211:6 215:20
216:11 218:17
**address**
43:7 75:4 90:7,9
93:20 106:6,10
110:3 128:6 148:11
162:22 217:18
**addressed**
86:20 105:2
**addressing**
86:23
**adjust**
91:5 157:1
**administered**
38:19
**administrative**
31:3,23 33:9 34:8
**administrators**
91:24
**admonition**
5:8
**advance**

137:9,10,13 184:6
**advanced**
184:21
**adverse**
190:22
**affect**
98:12
**affixed**
231:19
**afford**
34:6
**aforesaid**
231:12
**aft**
11:6
**afternoon**
114:7 213:19
**agencies**
117:25
**aggressively**
53:15
**agitation**
54:13
**ago**
26:12 58:13
**agree**
55:6 102:19 223:18
225:15
**agreed**
47:9
**agreement**
1:16 13:4 35:10
47:12,16 107:4,21
111:5,12,15,17,22
112:2 114:6 115:14
123:11 124:6 129:7
129:18 131:16,17
131:18 132:7
134:10,18,20,25
135:12,14,18,21,24
136:2,8,17,18 146:5
150:14,15,16,22,22
157:1,6,16,24 158:1
158:16 159:4,11,11
160:7,13 166:18
169:19 170:2,8

171:16 188:23,25
189:3,16 203:9
**agreements**
36:5,6 63:7 107:22
120:17,18 149:2
151:1,8,18 158:4,13
189:11 224:20
**ahead**
5:25 48:24 115:13
131:21 192:14,16
213:15
**air**
124:2 158:24
**Alan**
66:11 113:18 149:13
**Albert**
70:23,23 71:3 76:17
77:18 82:1 83:19
86:14 104:3 111:3
115:25 116:12,17
116:19 117:17
149:14 168:15
171:3,24 172:22
173:24 174:13
175:1 188:7 194:8
195:17 198:24
200:9 207:1,11
226:5
**Albert's**
77:1
**algorithm**
19:19 20:1,5,6 22:17
22:18 23:12
**alive**
176:9
**allow**
29:21 111:20 112:4,6
**all-day**
52:4
**alternate**
15:18
**amazingly**
15:1
**amendments**
230:6,7
**American**



80:19
**amount**
 65:23 85:17 137:10
**Anderson**
 10:5,14 11:7,9 13:13
   13:16
**Anderson-related**
 10:15
**Annie**
 1:17
**announcement**
 170:5
**annual**
 26:23,23
**answer**
 5:21,25 6:1,13 30:7
   46:20 51:3 109:24
   131:21 159:2 165:3
   170:18 199:10
   228:5
**answered**
 139:12 164:22
**answering**
 52:18
**answers**
 5:5 38:23
**anticipate**
 98:1
**anticipating**
 49:6
**Anti-Kickback**
 35:22 36:13
**Anuj**
 1:9 51:2,6,7,10,13
   113:19
**anxious**
 143:18
**anybody**
 13:4 54:15 227:15
**anymore**
 17:15 84:18 170:25
   188:23 210:21
   227:12
**anyway**
 17:21 104:23
**apart**

141:2
**apologies**
 144:6
**apologize**
 50:4 125:19 165:7
**app**
 104:20
**apparent**
 54:13
**apparently**
 187:18
**appear**
 131:4 218:19
**appears**
 77:17 90:9 117:22
   218:13
**appeasement**
 95:6,19
**applicant**
 82:4,5,8,9,9
**applicants**
 81:22,25 82:13 84:7
   84:11,24
**application**
 76:25 77:18 78:5,10
   82:11 128:12
**applications**
 41:10 104:21,22
**applied**
 76:23 84:7 206:5,16
**applies**
 5:8
**apply**
 77:21,22 103:14
**applying**
 83:13 104:7,8
**appointments**
 184:5
**appreciate**
 102:18 198:20
**approach**
 54:22 104:2
**approached**
 57:6,7
**appropriate**
 33:22 34:7 96:24

 210:2
**approval**
 163:6
**approve**
 163:25
**approved**
 138:5,7
**approving**
 136:23 137:15,17
**approximate**
 229:6
**approximately**
 129:11
**April**
 124:15 126:20
   127:12 129:1
   132:11 134:13
   141:13 156:12
   157:19 177:12
   192:20 198:4,7
   202:6 220:23,25
   221:8 222:3
**area**
 29:23 83:25 94:23
   104:5 117:12
**areas**
 28:13
**argumentative**
 79:6
**arrangements**
 177:19
**articulate**
 5:4
**aside**
 200:21
**asked**
 7:16,24 32:5 34:9
   137:20 141:1
   160:24 173:22
   231:15
**asking**
 6:16 38:24 49:5,16
   51:25 66:1,2 67:1
   73:17 75:3 98:9
   100:12 106:11
   120:14 128:5

 132:23 143:14
   149:10 152:14
   156:18 161:10
   196:13,19 208:9
   209:23,24 215:17
**aspect**
 18:11
**aspects**
 18:7 26:15
**assigned**
 94:14 104:25
**assignment**
 76:25 96:17,18
**assignments**
 77:14
**assistance**
 85:9,17 91:5 153:8
   211:3,6
**assistant**
 31:3,23 33:10 34:9
**assume**
 6:5 13:18
**assuming**
 8:21 51:3 211:9
   214:18,20
**assumption**
 68:23 84:12,20
**ASTRO**
 80:17,19
**atmosphere**
 72:4,7,9
**attached**
 131:17 230:6,7
**attaching**
 127:21
**attachment**
 130:15 131:5
**attachments**
 125:17
**attempt**
 31:22 32:9 146:12,14
   167:24 168:3,25
   189:22 218:16
**attempted**
 188:10
**attempts**



146:18 218:15
**attendance**
23:8,13 25:10,11
62:1,9
**attention**
61:20,23,25 102:14
152:16,23 162:21
**attorney**
4:15 50:20,21 153:5
**attorneys**
6:2,17 7:25 8:3 50:9
50:11,14,17 226:1
**attorney-client**
7:21 46:23 49:12
**atypical**
29:11
**audience**
181:5
**August**
231:21
**auspices**
185:21
**authority**
18:19 19:8 153:17,25
**available**
32:12,18 33:8 43:20
140:16,23,25
**aware**
20:25 31:8 43:1,2
112:10 116:4 125:3
132:17 135:23
136:16 137:1
142:25 144:20
153:3,14 170:1,3
193:14,15 219:9
**awareness**
36:3 55:12 146:7
**a-l**
4:21
**a.m**
1:17 46:12,12

**B**

**B**
2:1
**BA**

9:1,2
**Bachelor**
8:24
**back**
13:14 15:7,7,7,7 32:7
32:22 35:20 53:21
65:8 75:12 78:14
86:6 87:8,16,21
88:3 100:19 103:14
107:25 108:3,13
109:4 113:10 120:9
123:4 128:2 129:13
129:15 142:19
150:6 152:9 153:10
165:4 169:11
183:13 188:6
196:20 207:10,12
207:16 224:1
**backfill**
85:5 184:24
**backfilled**
185:8
**background**
8:19 40:4 52:1 84:13
**backup**
142:11
**back-and-forth**
148:23
**bad**
30:24 121:3 165:7
180:13
**balance**
86:5
**Baptist**
9:2
**bar**
96:23 98:5
**base**
185:17
**based**
97:21 102:25 106:25
141:12
**basic**
5:2 185:17
**basically**
55:25 56:3 97:12,17

104:10 107:10
167:16
**basis**
47:2 59:15 106:13
**Bates**
74:12 89:3,15 93:4,9
105:11,18 109:13
121:17 125:22
130:15 133:2,9,19
134:1 155:2 213:3
**baton**
113:14
**bear**
10:22
**beds**
12:7
**beginning**
170:17 177:16
**begins**
211:19
**behalf**
1:17
**behave**
54:25
**behavior**
55:13 57:4 70:17
96:24 174:22
**behind-the-scenes**
36:6 127:8
**believe**
7:23 31:8 41:22
43:12 45:21 47:13
50:6 72:23 77:21
78:14 105:7 118:12
118:24 125:15,16
132:9 144:3 147:11
157:11 171:3
173:13 177:17
180:25 187:7,10
188:7,8 197:17
199:17,23 213:25
217:16 221:4 222:1
224:2,9 225:1
**bell**
200:18 204:9
**benefits**

38:19 42:5,6
**best**
5:13 151:16 192:10
**better**
95:5,18 98:13
**beyond**
8:21 24:20
**biases**
19:21 20:16
**big**
12:6 146:20 192:3
204:23
**bigger**
97:14,19,20
**biking**
139:19 167:19 194:3
194:5 203:14,17
**billing**
113:19,20,20,25
**bit**
8:15 21:7 25:13
36:21,24 51:22 54:9
56:14 60:5 72:22
73:23 74:18 78:17
83:1 87:3 90:20
103:23 109:11
118:17 120:14,16
139:15 141:3 160:1
167:19 189:12
192:11 194:4
197:19 200:18
202:17,23 213:16
**blamed**
79:19
**blending**
211:13,14
**bloody**
120:5,7
**blow**
203:8
**board**
84:25 85:2,16
**boarded**
25:24
**body**
150:5



**boiled**
228:2
**books**
137:11
**bother**
139:2
**bottom**
89:13 133:3 155:3
162:2 180:5,10,18
197:23
**bottom-hand**
105:18
**brain**
185:18
**brainstorming**
154:14
**brakes**
160:3
**branch**
20:12
**branchs**
20:12
**brand**
37:7 39:4
**break**
5:15 30:19 46:2,15
46:15 54:8 65:14,22
66:24 72:3 73:8
76:16 99:8 102:8
120:4,10 152:1,10
198:21,25 199:3,12
200:10,17 203:10
212:25
**breaker**
88:7
**breaking**
66:8 72:8
**breast**
69:16
**breathe**
186:12
**bridge**
102:8 115:11
**brief**
121:24 126:9 150:4
167:23

**briefly**
90:3
**bring**
67:24 69:12 85:16
102:14 188:24
189:14
**bringing**
152:22
**brings**
75:12
**broad**
14:13,13 69:20
**broadly**
37:3,5 38:24
**Broadmoor**
94:23
**broke**
28:5
**brother**
48:12 49:10
**brought**
63:11 167:9 190:1
**budget**
18:11
**build**
79:23
**building**
60:2 80:1,3 97:2
**built**
79:24
**bullet**
110:16
**bump**
210:19,22
**bunch**
72:24
**bureaucracy**
113:23
**burned**
194:21
**Burnett-Anderson**
1:18 231:5,24
**burnout**
178:23 179:4,6,13,21
179:21
**busier**

97:11,13,24
**business**
9:15 16:7 36:5
114:15 146:23
187:22,23 196:12
201:23
**busy**
75:20,25
**buzz**
179:5
**Byron**
163:12

---

**C**

**C**
2:1
**cafeteria**
21:22 22:5
**calculating**
81:11
**call**
19:6 27:1,25 30:8
37:11 42:2 83:18
104:4 111:15 117:2
127:7 144:4,8,19
170:21 178:15
180:4,8,9 196:24
197:9,16 210:20
**called**
19:18 42:3 64:17,18
77:10 89:15 93:2
111:16 196:24
201:12
**calls**
42:1
**cancer**
69:17 122:15
**candid**
81:11
**candidate**
83:20,21 143:22
144:8,14
**candidates**
85:3,4
**capacity**
179:18

**capture**
5:6
**cards**
138:2,3,4
**care**
10:22 13:15 54:6,7
60:24 68:9 70:13
83:6,6 113:15,18,19
114:15 117:1 179:6
179:7 187:16
**career**
183:23
**careful**
196:3
**Carolina**
78:15 81:15 107:10
**cart**
30:23
**cascading**
191:11
**case**
33:4 50:11,13,19
65:1 69:23,24,24
84:13 86:14 116:12
117:23 193:1
**cases**
33:23 65:7
**catch**
82:18
**catching**
160:1
**Catholic**
1:12 37:2,9,23
**caught**
22:14
**cause**
67:20
**CC**
149:14
**CC'd**
162:17,19 198:12
207:2
**ceased**
44:15,19 107:19
**centered**
16:17



centralization
41:4,6,21
centralized
40:23 41:9,13,16
42:13,15
Centura
1:12 11:9,10,18
12:12 13:12 16:11
16:21 18:12,14,22
19:11,18 22:24 23:3
23:24 24:7 25:24
26:9 28:4,9 29:1,4
29:15,25 30:6,16
31:11 34:11 36:23
36:25 37:4,7 38:13
38:16,17,17,17,18
38:21 39:1,4,6,9,12
39:13,18,19,24
40:12,15,18,22 41:7
41:13,14,17 42:10
42:14,20,23 43:6,8
43:11,19,24 44:14
44:15,19 45:11
47:21 48:5 49:24
51:12 52:20 53:10
59:25 62:7 63:13,20
64:4,11 66:18 67:9
67:24 68:3 69:13
70:19 71:18 73:20
75:5,10,16 76:9
79:13,17 80:8,22
81:6,8,10 84:5
85:18 86:1,8 88:13
96:16 99:6 103:25
106:9,23 108:17
113:20 117:16
118:4,22 119:13
128:6 132:15
137:14 138:6,7
146:24 151:1
156:14,22 163:5
166:20 168:25
169:5 170:20
173:11 176:15
178:16,20 183:20
187:25 188:13

190:6,13,21 199:18
205:24 206:6
208:15 212:11,11
215:23 216:7,13
226:2,12,17,25
227:15,20
CenturaHealth.com
43:12
Centura's
28:16
Centura's
106:19
CEO
115:20
certain
27:25 63:8 154:2
CERTIFICATE
231:1
CERTIFICATION
230:1
Certified
1:18
certify
230:3 231:7,16
cetera
5:23 6:19 12:13
36:23
chain
40:3 58:2 92:7,9
128:19 156:1
159:19 160:18
161:18 162:18
163:9 164:3,8
165:12 188:9
200:21 202:21
204:13 206:24
217:11 218:12
226:15
chains
128:2 198:12
challenges
16:2
challenging
52:25 53:2 57:2
62:23 80:4
chance

100:22
change
8:14 15:10 36:21
40:11 46:16 50:25
55:12 59:12 73:9
84:23 120:11
124:18 142:22
146:4 152:11 157:5
228:16
changed
16:11 165:5
changes
132:17,22 147:6
154:18,20
changing
203:14
characterize
61:1 67:7 150:1
151:22 184:1
189:23
characterized
149:22
chatter
170:21 171:2
chatting
196:10
cheaper
118:1
check
42:5
checking
91:21
chemotherapy
10:19
CHI
37:7,11,12,12,18
38:9,12
CHIC
37:10,19 38:1,5,8
39:6,9,10,21 40:6
42:22 44:25 45:25
CHIC's
38:25
chief
204:11,18
choices

20:2
chose
9:14
circulated
139:24 186:20 189:9
circumstances
28:1 98:3 183:25
cite
76:4
CITY
231:4
Civil
1:3 4:7
claims
7:18 8:5 226:8
clarification
32:3 50:1
clarify
142:21
clarifying
38:10
class
27:25
clauses
184:22
clean
14:19 15:5
clean-up
225:6
clear
78:18 106:12 182:13
clinic
14:19,20,21 15:3,10
18:5,6 54:7,21
92:15 137:5,9 166:8
177:20 178:18
179:25 180:2
182:25 183:1 184:5
184:8 185:6 192:2
196:7,9 200:25
201:15 206:25
207:22 209:12,12
clinical
9:16 10:18 11:2
12:17 13:24 14:10
59:3 83:24 84:1



177:18 192:2

**clinically**
154:8

**clinicians**
91:22

**clinics**
69:6 91:23 184:11

**close**
92:25 109:9 119:6
123:7 161:5 182:11
203:25

**closer**
13:15 41:3

**closing**
116:10

**cluster**
122:5

**coaching**
128:15

**coaster**
98:21

**colleagues**
179:22

**collect**
77:14

**collegial**
113:1

**Colorado**
1:2,12,18 4:7 13:2,11
13:19,21 17:14 37:2
37:8,10,24 41:17,19
45:8 51:9 66:15
76:5 82:16,21,24,25
104:10 141:9 144:1
199:20,21,22
204:11,16 230:14
231:2,6

**combative**
119:21

**come**
15:20,20 19:2 24:14
37:22 62:11,12 92:4
138:2 142:9 158:21
158:23 183:13
212:7 216:13

**comes**

196:1

**coming**
113:9 116:16 118:14
118:15 119:7,8
149:13 165:6
172:12 210:7

**command**
58:3 92:7 188:9
204:14 206:24

**commencement**
231:7

**comment**
70:12 77:23 96:9
114:14 206:2

**comments**
87:24 110:18 113:10
202:20

**commission**
97:12,17 230:18
231:21

**commit**
195:8

**commitment**
122:15

**common**
39:4 149:4,6

**CommonSpirit**
11:21 39:14,19,21,23
40:4 45:2,19,21,22
45:25 46:25

**CommonSpirit's**
40:6,8

**communicate**
41:24,25 45:6 146:15
153:19 168:4 176:9
176:22 185:23
188:6 190:24 191:6
191:8 219:10,14

**communicated**
32:2,7 50:9,10 63:23
101:2 190:18
196:14

**communicates**
137:3

**communicating**
32:22 61:8 72:12

125:10 170:20
174:4,8,23 175:21
175:22 176:12
185:15 187:16,18

**communication**
41:22 65:8 164:13
175:17 176:11
177:6 186:17
187:21 190:10
218:2,4,15,20 219:2
219:4,5,6

**communications**
48:12 49:16,20 64:19
157:7,8 178:14

**communicative**
61:6

**community**
12:4 17:13 69:20
188:4

**companies**
10:24 113:18

**company**
10:14 39:16 44:3
112:11,14

**comparative**
206:17

**comparison**
190:1

**compassionate**
96:24

**compensation**
98:2

**complained**
79:23 198:17

**complaining**
80:10

**Complaint**
212:19

**complaints**
53:12 56:20,21,22
58:1,21 64:6 67:12
67:21 75:10,16 79:7
80:5,7

**complete**
188:2 191:16

**completely**

176:7,10 185:24
189:11

**completion**
159:18

**compliance**
86:7 116:2,5 204:21

**compliances**
204:20

**complicated**
15:1

**complication**
209:7

**complications**
15:13

**comply**
36:13

**computer**
74:25 197:2

**computer-based**
27:7,9

**computer-generated**
27:6

**concept**
29:13 179:4

**conceptualize**
29:19

**concern**
57:6 64:24 94:21
166:12 175:18,19
175:25 176:18
177:1 185:13 192:3
208:2,4 209:25

**concerned**
53:22 57:1,3 75:22
131:13 154:7 174:4
174:5 192:24
195:21 207:24
209:11

**concerns**
21:11 57:16 58:2,11
58:18 64:11,17,22
65:1 70:14,16 71:4
75:10,16,19 79:7
87:21 88:3 128:5,11
128:14,20,23
129:18 146:23



175:13 176:17,20
176:21 177:5,6
185:9 188:12
190:16 191:7
208:12 219:1,4
228:6
**concluded**
229:6
**concludes**
35:13
**conclusion**
94:20,20 158:21
159:7 172:7
**conclusions**
20:14 202:11
**condensation**
53:23
**condescending**
53:14,24 54:23 55:19
**condition**
32:8 177:10 181:13
215:4
**conditions**
6:7 57:11 101:9
178:1
**conduct**
54:10 55:18,18 56:23
**conference**
222:15
**confidential**
1:6 3:16 34:14 35:8
35:13 57:12
**confidentiality**
35:2
**confirm**
93:19
**confirmation**
106:18 107:1
**confirmed**
104:14 107:8
**confirming**
48:4
**conflict**
47:14,15
**confused**
141:3

**connect**
167:24 168:15 171:8
**connection**
72:10 194:2
**Connectivity/audio**
109:23 158:17 165:1
174:20 196:25
199:9
**consequences**
96:25
**consider**
33:5 86:4 97:3,4
**considered**
34:7
**consistent**
213:9
**consisting**
231:13
**constitute**
27:12,12
**constraints**
113:16
**consulting**
10:12
**contact**
31:22 138:13,16
147:5 169:11 227:8
**contacting**
43:21
**contacts**
44:25 45:23
**contained**
160:10 175:12
**contemplating**
24:6
**contemporaneous**
168:20
**contend**
167:25
**content**
27:11
**contents**
154:11
**context**
27:15 33:11 40:1
112:12 115:11

165:10 178:17
**continuation**
226:20
**continue**
107:24 120:14
200:18
**continued**
188:5
**continuity**
68:9 70:13
**contract**
36:14 84:17 86:2
87:3 118:3 121:8,23
123:2,6,18,23
124:11,21,25
125:11,15,17,22
126:16 127:15,21
128:20 129:22
131:9,23 132:1,3,10
132:14,18,23 133:2
133:7,15 134:8,12
136:13,14 139:24
142:23 146:5,9,18
147:6,14 148:16,21
149:2,18,23 150:5,8
150:23 151:9,23
152:18,19 153:4,15
153:23 155:2 156:3
156:14,21 158:2
159:5 160:6,12
166:25 167:12
175:10,24 186:7
187:2,17 190:3,25
191:9 218:21
219:12,14,17
220:12,16,19
221:16,20,21,22,25
222:13,20,21
223:15 224:5,5
225:13
**contracted**
115:7
**contracting**
85:25 127:6 171:6
**contracts**
36:12 50:21 91:19

92:6,18 118:15
123:3 136:11
148:23 149:6
151:12 161:19
163:7,25 164:14,15
164:25 165:19,22
166:21 169:15
184:22 222:17,24
224:16 225:9
**contributing**
142:6
**control**
10:22 166:6 201:23
201:24
**controlling**
16:18
**controversy**
231:10
**convene**
130:4
**conver**
215:23
**conversation**
22:9,13,14 24:19
25:16 51:24 54:16
55:3,10,15,24 56:7
56:8,17 57:16,20,24
58:14,15 69:6 81:7
82:3,23 85:21 87:17
88:2 94:17 95:23,25
98:25 100:2,18,20
100:24,25,25
108:12,21,24 111:4
112:12,22 114:8
115:9 121:25 122:2
122:4,14,17 124:1
126:13,22 127:22
129:4 132:22
134:23 135:2
137:25 143:15,20
144:25 145:7
154:17 156:15
157:4,10 161:12
168:3 188:17,19
191:17,20 193:22
193:23 194:1



MAGNA
LEGAL SERVICES

196:17 201:17,21
203:11 207:17
208:5,10 209:16
211:10 216:8
221:11,15 223:11
224:16 227:13
**conversations**
25:1,2,6,6 26:14
55:17,20 58:10
65:25 66:10 67:6
68:1,5,8,13,19 70:7
70:9,20,22 73:19
75:13 81:4,12 85:21
86:9,13,22 87:2,13
91:12 94:6 95:16
99:3,5 100:6,16
101:5,11,14 102:2
104:24 106:22
108:19,23 109:2,7
110:7,11 115:19
120:17,22 122:6,7
123:10,17,19,22
124:5,7,8 125:2
126:9 128:19 129:3
129:17 134:17
147:13,16 151:6,11
154:10 157:12
158:22 159:9,15
165:21 166:11,14
166:19,23 167:4
169:13 171:9,11,13
171:21,23 172:6,9
173:2 174:25 175:5
175:11,11,12
178:11,19 182:21
183:3 188:10,11
190:22 191:14,18
192:23 193:19
194:23 195:17
196:4 198:6 201:12
201:15 207:4,25
208:10 209:25
210:6,16,25 211:5
211:21,22 215:2,2
215:18,18,20,21
216:5,20 218:7

220:21 224:17
226:10,22 227:11
227:14
**convert**
145:20 167:22
**converting**
116:11
**cool**
96:25 101:24
**cooler**
199:24
**coordinate**
63:18
**coordinated**
63:21
**copied**
205:9
**copies**
228:23
**copy**
134:7 135:11 156:6,8
228:24
**corner**
74:13 89:3,8,12,13
93:4 105:11,19
109:14 121:9,17
125:22 126:4
130:16 133:9 134:1
147:21 155:3,8
162:2 180:5,10,19
197:23 213:3
**corporate**
26:17 28:13 36:24
37:4 38:20 39:11,12
39:15 40:6 44:22
45:11 79:10 163:15
196:4 199:17
**correct**
9:20 10:10 11:13
13:22 17:10 20:21
22:8,21 24:18,25
30:12 33:16 36:1
37:20 40:17,19
42:21 43:2 44:16,17
56:9 58:6,16 70:5
110:5 116:17

130:13 138:9,12
142:24 143:2,6,11
145:8 147:4,8
166:16,16 167:3
173:21 175:3,8
179:19 183:25
189:5,8 190:4,14
195:3 214:24
218:10 220:9
**corrected**
139:25
**corrective**
19:15 23:12,15 24:1
24:1,2,4,12,22
**correctly**
25:20
**cost**
117:17
**costs**
115:2,8,10
**counsel**
231:17
**counseling**
31:3
**counselor**
100:8
**count**
16:25
**counter**
71:19
**counteroffers**
71:23
**counters**
71:23
**county**
230:13 231:4
**couple**
4:16 6:24 23:5 34:21
57:22 72:20 110:20
115:25 162:25
225:5
**course**
21:17 49:19 148:24
174:7
**court**
1:1 4:2 5:5,12 89:1

89:23 93:7 105:22
109:17 121:15
126:2 130:19
133:22 147:23
155:6 161:22
180:16 182:15
197:17 231:6,24
**courtesy**
70:8 162:19
**cover**
49:12 68:23 85:18
99:10 103:15 104:5
104:18 117:11
177:20,24 192:4
202:13 210:13
**coverage**
112:4 115:4,16,17
116:13 118:13,14
118:17 119:4
177:19 183:17
201:18 202:5,13
209:21 210:12
211:6,12 226:19,20
228:2,3
**covered**
47:5,7 68:24 86:6
192:2 196:7,9
209:12
**covering**
118:24 178:18
179:25 180:1 183:1
201:9,15 207:22
**COVID**
14:16 15:8 16:5,13
**coworkers**
8:8
**create**
106:12
**created**
44:5,6 48:17 72:4,6
**creating**
15:18 29:21 165:16
**creative**
99:11
**credentialing**
117:1 205:12



**credentials**
205:6,8,10
**Culture**
19:19 20:1,4 21:4
22:11 25:21,22,23
**curious**
172:18,20 186:20
**current**
95:6,19
**currently**
44:24
**cut**
109:24 199:10
**CyberKnife**
77:10,10

**D**

**D**
3:1
**daily**
59:14
**dark**
209:1
**date**
47:24 48:7,7,8,9
51:18 128:8 134:14
136:3 156:10
177:14 215:25
221:7 223:24
**dates**
112:25 136:20
177:15 198:2,2
**day**
6:22,22 15:14 17:18
60:16,19 77:5
127:14 145:10
150:19 168:23
169:6 172:2,6,17,20
173:3,3 210:8
215:14 229:7
230:14 231:20
**days**
6:24 15:10 62:22
63:9 113:22 124:20
131:13 145:24
172:2 178:18

184:22 195:20
200:15,15 210:18
224:21
**day-to-day**
14:6,14,18 15:2,12
16:8,10
**deadline**
153:9,13,19 169:10
**deadlines**
153:12,18
**deal**
48:17 88:7 120:7
124:3 146:20 178:9
192:3
**dealing**
204:2 207:21
**dear**
125:18
**decide**
88:6 103:13
**decided**
23:16 31:21 65:16
81:3 85:4 124:17,21
171:17 172:5
173:10 174:8 203:8
216:13 220:2
**deciding**
81:5
**decision**
17:11 19:7 49:3
67:23 71:10,15
96:20 216:2 218:2
225:15 226:11
227:24
**decisions**
70:6 179:2 187:23
**decision-making**
84:1
**declaration**
7:7,16,19 8:9 47:20
48:3,5,7,8 49:23
50:6 141:16,22
142:3,12 143:5
146:21
**declared**
185:5

**deemed**
34:13
**default**
30:7
**defaulted**
206:24
**Defendant**
1:17 2:5
**DEFENDANTS**
1:14
**deferred**
30:15
**define**
29:19 162:8 173:17
**defined**
19:19
**defining**
178:9
**definition**
29:7,9
**definitive**
102:24
**degree**
8:24 69:21
**delegated**
184:10
**demands**
14:10
**Dennis**
199:14
**Denver**
2:4,7 42:17 199:22
231:4
**department**
31:4 112:2 118:9
143:24 169:25
190:23
**department's**
16:4 111:24
**dependable**
61:11,22
**Depo**
88:17
**deponent**
5:9 38:3 73:3 105:7
165:5 216:24 230:1

**deposed**
4:22
**deposition**
1:5,16 3:5 4:17 5:3
5:20 6:16 8:12
37:13 38:6,7 50:5
74:2,5 88:18,19
93:11 105:24
109:20 121:11
126:3 130:21
133:24 142:13
148:3 155:9 161:25
180:20 212:21
217:8 218:8 230:4
231:11
**des**
117:4
**describe**
19:9 41:6 52:22 79:2
171:12 213:20
215:11
**described**
60:22 108:19 109:1
111:13 194:10
203:11 215:3,19
**designate**
35:23 133:23 161:23
180:17
**designated**
74:1 88:17 126:2
182:2,5,15 197:18
203:24 208:20
217:6
**designating**
35:7 89:24 93:8
105:23 109:18
121:16 130:19
147:25 155:7
**designing**
14:18
**desire**
17:11 76:17
**destination**
194:6
**detail**
20:6 199:12 200:16


MAGNA
LEGAL SERVICES

**detailed**
18:13 19:5 39:20,22
  83:23 87:17 143:15
  157:9
**details**
21:8 71:21 84:16
  86:12 88:6 210:5
  224:15
**determined**
63:5
**determining**
69:3
**diagnoses**
193:5
**diagnosis**
213:13 214:2
**different**
20:23 33:7 37:17,18
  60:6,21 84:8 88:25
  104:1 107:21
  113:25 122:4
  150:18 151:4,7
  162:8 166:10
  169:24 184:20
  189:13 192:11
  205:19 209:24
  221:13
**differentiated**
69:17
**differentiator**
69:15
**differently**
225:22
**difficult**
5:12 15:24 72:19,22
  109:13
**difficulties**
124:9
**difficulty**
110:11
**digital**
138:3
**direct**
16:20 23:2,22 24:19
  25:7,17 30:16 51:25
  73:21 196:5

**direction**
171:21
**directly**
94:13 205:12
**director**
11:11,16 12:14,15
  13:8,25 14:14 16:10
  16:21 18:1,3 22:24
  23:3,24 26:8 28:22
  29:4 34:5,11 77:2
  82:22 92:8 137:15
  199:17
**Dirishin**
163:13
**disabilities**
27:18,24 28:1,18
**disability**
27:22 29:3,7,9,14,22
  30:2 33:19 192:6,9
  192:9,12 193:6,10
  193:16 215:7,12
**disappointed**
71:17
**disaster**
113:4
**disburse**
202:9
**disciplinary**
18:19 21:11,19,21
**discipline**
18:16 20:22,23,25
  21:9 22:11 23:2,10
  23:21,21,25 24:6
  25:23 139:5
**disclose**
6:17 7:21 29:3
**disclosed**
177:10
**discovery**
146:4
**discretion**
77:1
**discrimination**
26:21 27:3,10,13,17
  28:2 33:19
**discuss**

32:10,12,18 33:8,14
  54:11 59:8 66:24
  70:18 98:5 144:18
  144:21 170:13
  178:15 179:21
  188:12 193:4
  206:22 208:16
  211:3 218:20
  222:13 226:14
**discussed**
47:14 64:7 90:12,17
  116:14 129:17
  155:19 165:9
  166:15 169:16
  185:14 188:15
  189:4,21 190:11
  198:3 213:19 223:3
  223:11 226:19
**discussing**
58:5,7 68:2,16
  112:17 150:25
  191:22 200:9,20
**discussion**
19:23 92:5 136:1
  215:6
**discussions**
49:13 69:2 179:20
  192:19 201:8 207:7
  226:16
**disease**
83:6
**diseases**
69:24
**dishonest**
224:9
**displeasure**
104:25
**disrespectful**
55:19
**dissolution**
44:22 45:11
**dissolve**
101:8 112:14 113:13
  115:13
**dissolving**
142:6

**Dist**
105:10
**distribute**
183:23
**distribution**
106:20,24 107:13
**distributions**
105:15 107:2,11
**DISTRICT**
1:1,2
**divided**
184:11
**division**
43:3 97:8
**divvy**
210:18
**Dixon**
127:3
**doc**
161:22 209:13
**docs**
82:14 83:5,24 84:4
  151:16 160:21
  222:15
**doctor**
103:10 139:16 180:3
  180:8,9 196:16,24
  197:6,7,9,14,15,16
**doctors**
71:12 86:18
**document**
19:15 64:17,23 74:12
  89:10,18,20 93:1,8
  105:9,23 109:18
  121:16 126:1
  133:23 134:10
  146:6 147:25 155:7
  159:17 161:23
  162:14 180:17
  182:14 212:18
**documentation**
19:13
**documented**
25:2 65:7
**documents**
6:18 7:5 72:24 74:2



**doing**
11:1,2 31:6 56:4
60:20 75:22 77:14
78:12 127:17 135:6
138:22 149:25
158:4 208:9
**dollar**
85:17
**double**
44:14
**doubt**
227:24
**doubted**
59:3
**Dr**
1:9 4:15 7:18 8:5
48:12 49:22 50:3
51:2,6,7,10,13,20
52:8,20,22 53:10
54:10,17 55:5,9,18
56:10,24 58:1,8,11
58:17,21 59:9,14,20
60:7,8,14,23 61:2,9
62:19 63:6 64:3,9
64:10,12,15 65:5,11
65:21 66:7,11,17,21
66:22,25 67:1,8,13
67:21,22 68:3,4,17
68:17 69:14,16,16
69:18 70:4,15,15,16
70:23 71:17 72:2,2
72:11,11 73:18 75:9
75:16,18 76:10,11
76:17 77:1,17,24
78:3,18,20,22,25
79:3,8 80:6,14,23
82:1 83:19 85:9,10
85:10,16,22,22
86:14,22,22 87:10
87:10,12,20 88:1,8
88:9 93:17 94:7,13
95:3 96:5,17,17,22
97:6,18,20,21 98:2
98:3,6 99:1,1 100:3
100:4,17,17,17,24
101:1,2,19,20,22,23

102:18,22 103:3,11
104:3,13,25 107:14
108:3,12,15 111:3
114:5,9 115:7,19
116:12,17 120:20
121:25 123:17,24
124:4,5,10,24 125:9
125:10 126:10,18
127:11,15,20 128:4
128:10 129:17,21
131:6,8,19,24 132:1
132:10,14,19 134:7
134:12,17,24 135:3
135:14,21,24 136:2
136:9,12,18,24
137:1 139:18,21
140:12,15,22
142:21 143:8
144:11,14,19,25
145:14 147:9,14,16
148:14,20 149:16
149:19 151:9,10
152:17 153:4,10,14
153:20,20 154:2
156:2,14,21 159:16
161:2,15 163:1,6
164:6 166:12,12
167:7,12 168:8,14
168:15,21 169:5,11
169:15,18 170:1,7,8
170:14,19 171:3,14
171:17 172:4,22
173:4,7,14,24 174:3
174:6,13,13,16
175:1,9,14,22 177:7
177:9,25 179:22
180:1 181:6,11,18
182:17,22,25
184:14,14,15
185:10 187:25
188:7,7,13,22
189:23 190:24
191:8 192:6,19,24
193:5,16,19 194:8,9
195:1,8,12,17
196:16 197:8 198:8

198:17,18 200:11
200:12,22 201:3,9,9
201:16,18 202:4,5
202:10,12,14,15,23
204:15 206:22
207:1,1,7,13 208:16
209:6,6,15,17,19,25
210:2,4 211:1,4,20
211:23 212:2,8,11
212:12 213:10,17
215:3,7,11,24 216:6
216:15 217:22
218:5,8 219:10,20
220:1,7,10,19 221:8
221:15 222:8
223:14 224:3 225:1
225:8,16,25 226:8
226:16,22 227:5,16
227:24 228:8
**draft**
123:3 132:6
**drafting**
8:8 92:17 123:1
222:23
**draw**
74:24 152:16
**driving**
151:15,20 213:25
214:1
**drove**
44:3 158:20
**Drs**
67:24 69:12 71:8
76:1,22 77:6 84:6
91:19 92:13,20
105:10 106:19
107:13 110:9,12
111:4 112:17
116:16 119:21
120:15 122:3 158:6
159:12,12,12
161:19 163:7
164:14,24 165:21
166:20 169:15
200:22,22 201:3
213:18 223:14

**Duke**
81:14,15
**duly**
231:8
**duties**
13:23,25 18:2 176:7
204:17
**duty**
29:22
**D/B/A**
1:12

──────────────
E
──────────────
**E**
2:1,1 3:1
**earlier**
46:17 49:24 70:11
94:10 100:13 109:3
113:10 114:12
117:5 120:12 121:2
122:2 124:18
149:23 152:12
176:3 185:14 189:4
202:23 203:12
216:9 218:8 220:21
223:4,10,11
**earliest**
116:21
**early**
18:24 145:19
**easier**
74:24 162:9
**easiest**
60:12
**easy**
75:1
**edgy**
56:4
**edit**
147:20 148:15,21
149:8,8,17,24 150:2
150:7,10 151:22
153:15 155:16,18
155:21 157:7 160:6
160:11 190:2
218:22 220:22



**221:2,3,9**
**edited**
 221:22
**edits**
 139:24 149:5 160:21
**educated**
 179:14
**education**
 8:16
**educational**
 8:18
**educations**
 26:24
**EE**
 161:18
**eff**
 188:6
**effect**
 55:7 95:23 144:16
   194:13
**effective**
 95:4 128:8
**effects**
 191:11
**effort**
 15:23 72:16 148:23
   174:5 188:6
**efforts**
 99:25 161:14 167:11
**either**
 19:1 22:22 43:20
   87:14 101:14 102:1
   106:23 153:20
   174:16 193:2
**EKoval@Centura...**
 43:10
**election**
 122:10
**electronic**
 170:5 228:23,24
**electronically**
 91:4 169:21,22
**element**
 189:25
**elements**
 27:12 86:1

**eloquently**
 111:14
**else's**
 137:16
**email**
 3:6,7,8,9,10,11,12,13
   26:5 41:22 43:7
   75:4,7 88:21,21
   90:7,9,12,17,21,25
   91:13,15,17,24
   93:17,20 95:21
   102:22 106:6,7,9,25
   107:1,6,19 109:13
   110:3,4,14,15
   112:18 114:18,20
   115:20 121:8 122:3
   125:14,16,21
   127:13 128:2,4,19
   130:14 131:5 133:1
   133:5,6,12,14
   134:15 145:18
   147:12,19 148:11
   148:20 152:17
   153:5,11 154:11
   155:2,22 156:9,12
   157:8,18 159:10
   161:18 162:6,11,17
   162:18,22,24 164:8
   167:21 171:10
   177:13 179:23
   180:3,4,6,9 181:10
   181:14,16,18
   182:16,22 183:7
   192:23 196:24
   197:7,9,10,13,20
   198:3,7,12 200:14
   200:21 202:21
   204:4,6 209:5,8,9
   209:15 212:2,3,6,17
   213:11,17 214:17
   214:19 216:4,18
   217:11,18 218:12
   219:24 221:3 225:2
   226:15
**emailed**
 72:23,23 135:11

   156:11 177:15,16
   178:4 221:8
**emailing**
 177:25 209:6
**emails**
 7:5 89:1,5 91:21 93:2
   93:23 105:10,14
   106:13 119:9
   125:19 127:10
   129:14 130:1,9
   147:20 157:12
   159:19 160:9,19
   161:5 167:2 181:7
   204:8 207:2 220:5
   220:23,25 221:13
**emerged**
 44:22
**employed**
 10:5,6 81:5 116:10
   116:11 142:9
   165:11 231:16
**employee**
 21:5,6,10,16,17,19
   21:24,25 22:7,10
   23:16 30:1,18 42:4
   42:7 59:22 81:9,10
   157:25 196:6
**employees**
 23:6 24:8,9 28:18
   38:20 41:24 59:25
   80:5 88:12 99:9
   100:9 101:8 116:16
   142:7 226:12
**employment**
 23:16 26:19 27:10
   41:11 48:9 51:11,17
   71:11,18 73:20
   75:11,17 80:23 99:6
   107:4 111:22 112:5
   113:14 115:14
   120:17,18,21 123:6
   123:11,18,20,23
   124:6,10 125:11
   127:15,21 128:11
   128:20 129:18,21
   131:9 132:9,14

   134:8,10,12,18,19
   134:25 135:12,14
   135:18,20,21,23
   136:2,8,13,14 146:5
   146:24 147:14
   148:15,21 149:2,17
   149:23 150:15,23
   151:2,9,23 152:18
   153:4,15,22 156:2
   156:13,21 157:1,6
   157:17,24 158:1
   159:5,10 160:6,12
   163:7,25 164:14,24
   165:22 167:12
   169:15 170:2,8
   171:14,16 173:24
   174:3,16 176:15
   186:8 188:23,25
   189:3,16 190:25
   191:9 203:8 211:16
   215:24 216:6,14,16
   219:12,14 220:12
   221:16 222:21
   223:15 224:5
   225:16 226:17
   227:25
**ended**
 30:19 31:16,17,18
   78:12 211:19
**ends**
 176:1
**energy**
 51:21,25 52:11 61:16
**engage**
 23:20 24:6
**engaged**
 24:8 25:16 71:2
   171:1,7 207:4
**engagement**
 204:20,22
**engaging**
 122:14
**enjoyed**
 194:3
**ensure**
 36:4,12 128:7



entail
18:2
entire
16:13 40:15 53:9
212:12
entities
37:17 44:21 45:7
entity
37:4,18 38:20 39:12
114:1
environment
15:19 34:4 57:2
79:10 196:4
episodes
53:3,13
equal
70:1
equally
72:13 202:16
equivalent
97:17 117:13,13
era
15:8
Eric
1:5,16 3:1 4:9,19
7:22 34:24 73:1
81:21 96:3 108:6
115:2 230:3,10,12
231:8
EricKoval@Centu...
90:8 106:7 110:3
148:12 155:23
162:23 217:19
Erling
115:7,10,19 204:15
erratic
62:22
escalate
24:21
escaped
200:17
escapes
199:12
especially
184:6
essentially

10:12 12:17 20:8
31:2 83:17 85:1
98:23 100:10
159:16 167:22
170:20 189:10
210:7 224:21
et
5:23 6:19 12:12
36:23
ethics
44:3
evaluations
193:5
evening
183:8
event
22:3 64:16
events
167:17 168:18,19
everyday
63:3,4
everyone's
228:3
everyth
6:9
exact
28:20 51:18 71:14,14
101:12 129:12
161:12 163:9
177:13 199:19
202:11 215:25
224:15
exactly
16:25 75:21 76:12,19
86:25 87:25 100:6
101:11 122:11
133:20 151:3 186:5
222:6,22
exam
14:20
examination
3:1,3 4:12 195:9,13
195:16 196:15
231:8
example
34:9 59:14 64:3

114:13 175:9
219:15
examples
23:5,20 25:5,15
35:15
Excel
20:9
exchange
160:4
Exclusive
121:8
excuse
76:4
executed
220:12 224:4
executing
15:15 218:21
executive
47:3,7
executives
47:7 49:13
exhausted
102:13
exhaustion
194:11
exhibit
3:6,7,8,9,10,11,12,13
73:13 74:2,5,14,16
74:20,21,23 75:8,15
77:17 85:13 88:17
88:18,19 89:2,24,25
90:1,4,11,13,16,18
90:21,24 93:1,10,11
93:13,16,21,24 95:1
95:22 96:15 98:24
100:16,23 101:15
102:15 105:5,9,23
105:24 106:3,18
109:18,20,21 110:7
110:8,25 111:1
112:13 120:3 121:1
121:4,11,16,19,21
122:9 123:7 126:2,3
126:7,14,18,25
130:2,20,21,22
131:3,9,10,17,18

132:24 133:23,24
134:3,5 135:12
136:3,13,18 148:3,8
149:13 150:20
152:14,15 153:6
154:2,6,12,12 155:7
155:9,10,13,19,25
157:14 159:8,20
160:4,10,19 161:24
161:25 162:10,18
164:8 180:13,18,20
180:22 182:2,5,9,10
182:12,12,15,22
191:23,24 192:7,13
193:6,17 194:24,25
196:20,22,23 197:4
197:10,18,19,25
198:3,7,13 200:21
202:21 203:24
204:3,6,7,24 205:1
206:20 208:20,21
209:2 211:20
212:16,17,21 213:1
213:6 214:25
216:22 217:4,6,7,8
217:11,12 218:12
218:19 219:20
221:4 222:3 223:12
224:1 225:2,8
226:14
exhibits
3:5 131:9 148:1
197:11 204:2
exist
112:11
existed
41:11
existing
68:10
exiting
118:12
expand
69:7
expansion
69:9
expect



32:12,17 33:8
160:25
**expectation**
96:23 98:5
**expectations**
23:13 32:25
**expected**
33:11 97:20
**expensive**
115:5,6
**experience**
13:17 29:11 83:8
88:14 158:3 206:14
**expert**
34:3
**expertise**
84:1
**expire**
111:9
**expired**
111:20
**expires**
230:18 231:21
**explain**
20:4 53:1 61:13
**express**
174:2,2,12,15,19
227:23
**expressed**
77:7 128:10,20
175:15,16 176:2
228:6
**expressing**
101:22
**extend**
216:14
**extended**
30:17 75:10,17 80:22
81:1 84:5 85:15
112:8 183:18
206:12 207:14
209:19 211:4
215:14
**extending**
71:11 86:7,8 111:6
111:18 112:2,17

114:9 199:3
**extension**
114:6,22 122:23,25
123:14
**extent**
7:21 36:9 60:13,19
69:18 111:20 157:6
168:2
**extra**
94:23
**extreme**
198:17
**E-r-i-c**
4:21

---
**F**
---

**face-to-face**
126:22
**facilitate**
92:2,16
**facilitating**
92:5 127:18 136:11
222:25
**facilities**
13:9
**facility**
18:4
**fact**
27:24 29:24 55:12
94:11 96:9 104:23
181:22 189:14
214:1 218:14 223:8
**faded**
51:22 133:18 170:17
**faint**
95:24 202:7
**fair**
137:10 141:24 191:4
192:1 206:18
**fairly**
19:5 25:10 145:19
**faith**
17:22 192:10 193:9
**faking**
187:11,12
**fall**

77:1
**familiar**
21:1 28:16 30:1
45:23 74:23 97:16
121:20 155:15
178:24 179:3
205:16,18 206:11
217:11
**familiarity**
75:2 131:1 148:10
155:14 205:11
**family**
5:11 34:10,10,17
101:6
**far**
27:17 66:16 78:10
98:19 137:9 142:25
**fast**
88:25
**fatigue**
210:14
**fatigued**
179:1
**favorably**
85:11
**fed**
39:13
**feel**
5:3,16 54:14 174:9
180:12
**feeling**
53:22 102:7,12
122:19 186:6,6
202:24 220:8
**feelings**
101:23
**fees**
115:7
**fell**
30:23
**felt**
54:10 55:19 61:4
67:10 76:14 97:18
98:12 101:23 102:4
122:16 124:20
150:7 188:21

**field**
9:18,25
**fifth**
148:8
**figure**
16:2 46:21 47:20
63:10 141:18
173:12 182:3
184:23 195:24
197:20 201:6 202:8
**figured**
183:14
**figuring**
201:1
**file**
138:25
**fill**
118:10
**filter**
20:15
**final**
71:10,14 96:20 132:2
132:5 135:14
136:14 156:13,21
170:2 189:17
224:20
**finalizing**
163:6
**finally**
9:10
**finances**
16:4
**financial**
14:10
**find**
61:3,11,14,22 62:18
65:19 82:20 133:11
181:25 183:17,23
210:12 215:23
223:10
**finding**
160:15 223:12
**fine**
38:1 96:25 97:2
101:24 206:9
**finish**


MAGNA
LEGAL SERVICES

176:7
**finished**
 9:11 189:11 225:4
**first**
 4:17 7:11,13,15 20:3
   21:14 51:13,15,19
   52:8 78:7 82:2,15
   82:19 85:12 89:3
   90:16,24 93:5 95:3
   96:1 102:14 103:11
   105:12 109:15
   115:23 116:3
   121:17,24 125:23
   126:17 127:10
   129:9,10 130:2
   137:6 149:9,12
   152:15 153:6 154:5
   158:4 160:4,10
   162:3,12,16 163:11
   163:23 164:6 177:9
   181:10 183:16
   185:13 206:19
   218:23 221:21
   225:13
**first-hand**
 168:16
**fishing**
 82:14
**fit**
 60:7,8
**Five**
 152:5
**flag**
 174:9
**flagged**
 129:17
**flip**
 123:4 196:20
**floor**
 53:20 54:2,7
**flows**
 14:19
**flush**
 21:8 103:12
**focus**
 27:23 41:8,19 44:2

69:14 192:1 228:3
**focused**
 166:5 179:25,25
   180:1 214:2,3
**focussed**
 206:25
**folks**
 71:13
**follow**
 42:6 78:3 79:21
   90:17 98:4 210:22
**followed**
 144:10 195:8
**following**
 4:6 34:13 92:12
   226:11
**follows**
 4:11
**follow-up**
 55:25 56:7,11,17
   58:15 209:14
**food**
 21:21 40:3 163:8
   164:3 165:12
**force**
 151:20
**foregoing**
 230:4 231:14
**forensics**
 107:6
**forget**
 6:22 82:4 86:19
   118:25 163:3
   177:13 199:18
   215:25
**forgivable**
 77:24 85:8,22
**forgiven**
 86:4
**forgiveness**
 91:11 146:8 149:19
   150:6,11,14,21
   151:1,8 155:17
   158:1,10,13,16
   159:4,11 160:7,13
   160:25 161:11

164:15 166:18,21
   169:14,18 219:17
   222:16,20 224:19
**forgot**
 18:25
**forgotten**
 200:13
**form**
 20:24 60:10 108:7
   136:5 144:2 166:22
   182:19 189:19
   191:2 192:16
   193:12 205:22
   215:8 216:17
   223:20 226:18
   231:13
**formal**
 36:19 179:12 207:15
**formally**
 179:14
**former**
 47:3,6,7 49:13
**forth**
 128:2
**fortunately**
 24:11
**forward**
 95:6,18 102:5,10
   111:5 127:14 166:1
   191:12 193:24
   203:2,3,4,10 208:7
   217:14 221:23
**forwarded**
 73:1
**found**
 17:19 137:7 147:1
   159:19 160:10
   162:18 181:10
   212:25 217:12
**foundation**
 28:19 29:8,16 41:1
   42:24 97:23 107:15
   112:9 117:19
   131:20 135:16
   150:17 164:16
   190:17 192:16

**fourth**
 81:18 148:8
**frame**
 16:15 102:6,12
   112:24 122:8
   124:15,16,16 129:1
   129:15 151:5
   159:22 177:13
   183:11 203:7
   221:10 222:3,6
**Francis**
 1:13 13:11 15:25
   16:22 68:22 69:4,10
   75:19,23 76:3,6,8
   76:10 79:24 94:8,12
   94:14,23 96:11,18
   97:2,9,9,14,22,24
   103:18,24 105:1
**free**
 5:3,16
**frequent**
 53:3
**frequently**
 59:13 66:20 138:14
**fresh**
 97:2 174:6
**friendly**
 24:19 25:1,2,6,6
**friends**
 45:8
**front**
 74:20 134:20 180:17
   220:5 223:2
**fronted**
 85:18
**frustrated**
 80:7
**FTE**
 117:7,9,10,12,13
**full**
 4:17 61:19,23,24
   78:20 159:18
**fully**
 6:9,13 31:17 128:24
**full-time**
 117:11,13,13



**fun**
16:1
**function**
16:7 40:21 60:4
**functional**
112:5
**functions**
42:22
**further**
77:16 80:16 210:22
231:15
**future**
102:20 210:23

**G**

**gap**
116:15 117:2,3
118:13
**gaps**
115:16
**gathering**
214:12
**gearing**
160:20
**gears**
165:14
**general**
57:23 115:6
**generally**
29:11 34:7 80:9 88:4
195:21 218:19
220:8
**generic**
180:6
**genetic**
31:3
**gentleman**
146:14
**gentlemen**
112:25
**gentlemen's**
118:25
**genuine**
99:17,25
**geographic**
104:5

**getting**
9:18 13:14 26:22
28:10 32:24 33:6
35:19 49:24 80:3
84:17,19 86:14
87:19 99:11 103:24
104:7 110:17
114:20 130:25
131:15 136:8 143:9
145:17 147:6
148:22 155:21
165:16,19 169:18
186:20,23 187:4
188:3 189:18 192:1
196:7 203:25 209:5
209:7,21 217:5
222:20 227:9
**give**
23:5 25:5 32:7 88:25
91:9 96:16
**given**
14:12 47:15 60:16
62:5 77:4 100:23
142:8 167:17
209:18 231:15
**giving**
186:13 200:10
**go**
4:15 5:24,25 17:18
19:17,20 20:10,11
27:2,11 30:12 31:6
48:15,24 49:4,9
64:23 73:4 77:16
83:8 84:10 99:8
101:7 103:14
105:17 121:3 123:5
125:19 131:21
137:7 184:18
192:14,16 203:8
204:24 206:7 210:8
228:21
**goes**
48:21 98:19 204:1
**going**
4:15 5:12 8:14,14
10:8 12:1 15:14

17:21 19:24 23:11
25:11 26:13 33:3
34:23 35:5 36:23
46:6 47:5,17 48:25
49:15 50:25 56:6,19
66:3,4 67:2 69:9
71:16,20 72:5 75:20
77:1,3,25 78:1,3
83:7,11 84:15,16,20
85:25 86:25 88:7,17
88:20 89:4,10,16
93:1,7 94:12 97:10
97:13,14,19 99:5,7
99:13,16 100:14
101:5,7,7,8,9 102:4
102:9 105:9,11,22
107:8,9,9,22,24,25
108:14 109:10,12
111:25 113:25
118:14 120:14
121:1 123:5 125:8,9
125:23 126:1 128:2
129:7 131:13 133:1
133:22 135:24
136:15,18 137:2,7
138:1 142:8 145:20
145:22,23 146:23
147:23,24,25
149:13 150:4,14,22
151:1,14 155:1,6
156:15 158:22
159:1,17 160:5,11
161:11,23 162:15
165:6 166:3 167:7
170:23 173:8,10
174:8 177:20,22
178:17 180:4,17
181:18,20 182:11
183:5,6,14 184:13
184:16 185:7,18,19
186:1,2,7 187:22,25
190:5 191:16
192:15,25 195:21
200:15 202:8,19
203:7,19 207:5
208:1 209:11

210:11,16,18 211:8
213:3,16 215:14
216:4,19,21 220:14
220:15 221:12,18
221:22 222:13
223:1,12,16,17
224:1,16,23
**golf**
30:23
**good**
19:1 46:3 58:25 59:1
59:18 60:23 61:2,3
61:17 67:10 79:4
83:20 107:2 114:13
167:16 192:10
193:9 202:2 208:25
**gotten**
28:14 69:5
**grade**
8:21
**graduated**
8:20,23,24
**great**
73:25 75:14 144:16
152:6 153:3 225:15
229:3
**grew**
9:8
**gripe**
80:8
**Griped**
79:18
**griping**
79:17
**group**
80:21 97:5 102:20,22
146:4 194:12
214:12
**growing**
85:3
**growth**
97:10
**guarantee**
91:5
**guess**
19:6 24:12 27:1,24



53:15,23 59:21
72:10 81:13 92:13
102:3 145:21
170:21 189:12
214:10
**guessed**
207:5
**guiding**
128:17
**guy**
22:4 87:18
**guys**
46:9,22 48:16 66:3
86:19 97:12 226:15

---

**H**

**half**
15:16,17
**Hall**
2:2
**Halpern**
2:5 3:3 4:4,13,14
7:23 8:2,4 21:3
28:22 29:18 35:1,5
35:12,14 37:18,21
38:2,4 43:1 46:9,13
46:22 47:2,4,11,14
47:19,23 48:1,4,10
48:15,20,24 49:5,11
49:21,22 60:11 73:4
73:7 74:7 88:20
93:13 98:1 105:4,8
105:25 107:18
108:9 109:21 110:2
117:20 120:6,9
121:4,7,12 126:4
130:22 131:21
133:6,9,13 134:1
135:19 136:7 144:5
148:4 150:20 152:2
152:5,7,9 155:10
158:18 162:2
164:18 165:4,17
167:1 180:12,16,22
182:20 189:21
190:18 191:5

192:18 193:13,15
199:13 205:23
215:9 216:21 217:1
217:3,10 223:21
225:5,7 226:21
228:18,24
**halt**
125:2
**hand**
155:8
**handbook**
26:13
**handful**
204:22
**handing**
147:24,24
**handle**
207:1
**hands**
59:21
**happen**
63:8 66:3 67:2
132:23 201:1
**happened**
6:10 22:16 23:9 65:4
65:6 68:5 79:12
82:18 101:16
112:19 118:19
122:12 135:10
139:13 156:10
171:22 172:6 173:6
175:1 183:20 193:3
201:22 217:17
222:5
**happening**
168:17,22 191:21
224:17
**happens**
197:2
**happy**
79:9,14 87:4 88:4
94:18 142:1 212:3
213:11
**harassment**
26:21 27:10,16
**hard**

11:1 22:13 61:15,18
62:6,6 63:12 81:15
101:12 114:12
118:18 223:12
**hat**
100:8
**head**
5:5 16:23 17:21
30:23,24 65:2 95:13
99:23 118:15
134:15 170:4
184:19 201:21
224:7
**heading**
107:23
**heads**
199:24
**headshakes**
99:21
**heal**
30:25
**healing**
174:10
**health**
1:12,13 11:16,18,20
12:3 17:24 18:3
37:2,9,23 43:11
57:10 192:19,22,24
211:21,23,25 212:4
212:12
**healthcare**
9:25 39:16 42:5
45:20
**HEALTH-PENRO...**
1:13
**hear**
24:12 28:6 34:4
39:23 40:4,5 51:23
58:20,23 133:17
147:9 158:18 165:2
190:8 197:1 212:10
227:23
**heard**
20:4 58:3 78:9
147:11 178:22
212:8

**hearing**
151:17 170:22
**heart**
84:23
**Heath**
2:2
**held**
19:14 156:5,6
**help**
27:19 36:4 41:10
54:22 82:1 85:18,24
92:16 94:15 104:13
184:17 198:21
210:12 216:23
**helped**
10:23 85:24
**helpful**
166:9
**helping**
14:4,4 20:14,15
83:12 92:2 165:13
222:25
**hereto**
231:10
**hey**
25:11 60:20 82:10
86:19 103:24
113:24 133:4
137:25 139:2
151:25 186:11
**hiccups**
116:23
**high**
51:24 52:10 61:16
98:14
**higher**
40:2
**high-level**
26:16 82:2 129:3,5
**hire**
11:17 18:15 50:17,20
110:11 184:16
**hired**
69:4 78:23 79:12
117:16
**hires**



73:21 109:13
**hiring**
 18:19 41:8 68:3,17
   70:4,14,18 71:7
   73:18 110:8 120:15
   211:3
**historically**
 38:11
**history**
 8:16 11:5
**hit**
 30:23 99:4
**hold**
 12:12 96:23 208:23
**home**
 15:17 165:6
**honest**
 6:5 61:5 71:14 76:20
   82:5 145:3 201:22
**honestly**
 42:11 96:19
**honor**
 192:10 193:9,9
**honoring**
 188:9
**Hopefully**
 199:24
**horsepower**
 116:17
**hospital**
 11:21 12:6,9 13:5,10
   13:11 14:11 17:12
   40:23,24 42:18
   64:21 82:25 84:15
   104:8,8 111:15
   172:12 185:23
**hospitals**
 39:3
**hospital-based**
 41:2
**hour**
 7:4 229:6
**hours**
 54:21 117:14,14
**house**
 100:9 116:16 186:21

187:1,19
**Houston**
 9:2,3,7 17:13,14
**HR**
 19:5,25 21:12,24
   22:1,7 24:8 30:8,12
   30:15 31:9 40:20
   41:2,4,7,13,16,21
   41:24 42:13,19,22
   43:5,21 64:15,20
   65:1,1
**HR-specific**
 64:21
**Huh**
 17:3
**human**
 40:23
**hyper-speciality**
 69:22

---

**I**

**idea**
 44:2 84:17 87:8 88:5
   97:4 103:2,4 104:16
   107:23 125:6
   176:16 220:17
**ideas**
 17:16
**image**
 20:8
**imagine**
 138:20 191:20
**imbedded**
 90:9 106:7 110:3
**immediate**
 92:10 159:22,22
   195:20 205:11
**immediately**
 94:11 127:23 161:2
**imminent**
 166:7
**impact**
 16:3 72:18 111:23
   112:1
**impacts**
 190:23

**impair**
 6:8
**implementing**
 22:23
**implications**
 207:13,18,20 208:1
   208:17 209:18,20
**imply**
 24:17
**importance**
 166:7
**important**
 54:15
**impose**
 153:9,13,17 169:10
**imposing**
 153:12
**impression**
 52:8,10 156:13
   157:16 158:12
   159:4 220:18
**impressions**
 52:12
**improved**
 197:12
**improvement**
 24:13,21
**improving**
 19:16
**inability**
 176:22
**inappropriate**
 55:13
**inbox**
 91:24
**incapacitated**
 185:22
**incidentally**
 207:3
**included**
 131:6 157:25
**including**
 166:12 218:15 219:9
**income**
 91:5
**incomplete**

146:6,9 159:17
   171:16 189:9
   220:16,19
**increased**
 85:19
**independent**
 11:21,22 17:12
   130:11 141:22
   142:2,4,20 143:4
   148:19 161:7
   195:10,14,16
   196:15 199:4
   200:24 214:15,16
   214:21 218:18
   219:23 225:14
**independently**
 211:10 220:6
**indicate**
 132:2,6 136:13 156:1
   169:4
**indicated**
 132:4 193:20
**indicating**
 101:1 107:19 128:6
**indicators**
 187:14 188:21
**indirect**
 10:24
**individual**
 20:15 22:20 31:14
**individuals**
 19:13,22 166:20
   214:22
**infection**
 16:18
**informal**
 35:25 170:21
**informally**
 64:10 80:12 88:21,21
**information**
 7:22 26:16 36:16
   66:6 82:8 138:19
   166:9 186:20 188:2
   189:8 227:3
**informed**
 22:3 85:9 194:9



MAGNA
LEGAL SERVICES

202:5

**infusion**
18:6

**initial**
3:5 52:3

**initially**
21:14 24:20 81:22
87:11 109:3

**initiative**
26:1

**Initiatives**
1:12 37:2,10,24

**injury**
30:19,24 33:4

**ink**
191:13,15

**inkling**
186:13

**input**
41:8 70:6,10 79:25
92:23 142:10

**inquiries**
67:4

**inquiring**
193:16

**inquiry**
139:7

**inserted**
146:8

**insight**
102:18

**insisted**
115:12

**instance**
28:15

**instances**
53:17

**instruct**
92:12

**instructed**
5:25

**insurance**
113:17

**intact**
76:7

**integrated**

138:10

**intense**
52:24 98:8

**intent**
9:19

**interact**
59:14 66:20 163:16

**interacting**
60:18

**interactions**
60:13 64:12

**interest**
47:15,15

**interested**
13:14 17:12,15 82:11
82:16,21 83:14,17
115:2,8 186:14
188:22 231:18

**interim**
15:21 115:4

**intermit**
206:1

**interpreted**
95:16

**intersect**
14:7,10 18:8

**interview**
51:15,19 52:3,4,14
84:7,23 141:1,4,10
142:6 143:9,13,23
143:25 144:3

**interviewed**
80:2 85:2 141:5

**interviewing**
140:5,7,7,8,9

**interviews**
83:24 140:20,21
142:10

**intricacies**
36:7

**introduce**
73:15,25 121:1
141:25

**introduced**
74:14 90:13 196:21
212:16,18,24 213:1

**introducing**
89:2

**introspection**
102:19

**intubated**
185:23

**involved**
24:9 86:9 169:17
192:22 205:12
207:6

**involvement**
71:7

**involving**
215:12

**in-house**
67:24

**Iris**
2:5 4:14 35:3 37:16
47:10 133:4 151:25
225:4

**ironing**
113:12

**isolated**
176:10

**issue**
21:19,21 57:11 62:9
63:11 70:17 79:11
86:20 95:6,19
109:23 158:17
165:1 174:20
183:11 196:25
199:9 222:16

**issued**
38:15

**issues**
14:6 16:17 25:10
27:5 59:9 62:1 65:3
67:21 73:13 103:12
116:2,5 187:16

_____

**J**
_____

**January**
231:20

**JB**
163:12,13,20

**jealous**

167:19 203:16

**Jeff**
70:23,23 71:3 85:14
99:10 172:12
188:15,17,19
195:22 196:14
198:20 216:8

**Jeffrey**
149:14

**jive**
219:2

**job**
8:16 11:4 13:23 18:2
29:22 41:9 85:1
98:13 103:14,17,19
169:6 170:9,14
204:17 217:22
218:8 225:23 226:2
226:11,23

**jog**
130:3

**jogging**
134:16

**jogs**
127:1

**John**
163:12

**joined**
11:9,10 36:25

**judgment**
59:4

**Jul**
111:6

**July**
111:18 112:3,4
114:10 122:24,25
128:8

**jump**
34:23

**jumped**
213:15

**justify**
79:21

_____

**K**
_____

**K**



2:2
**Kathpal**
65:16 77:17,24 78:3
78:18,21,22,25 79:3
79:8 80:6,23 85:4
85:16 91:6 107:7
118:8,18 140:10
154:16 184:14
202:10 210:4
213:19
**Kathpal's**
78:20 85:9 107:14
118:24 149:19
150:11
**keep**
14:1 15:13,14,16
57:11 62:2 68:11
78:5 85:24 86:11
91:20,21 98:10
100:13 106:11
111:21 112:6
143:16 176:19
**keeping**
15:5,14 99:11 143:18
144:17
**kept**
14:19 46:1 66:10
**key**
86:1 146:7 205:9
**kickback**
36:6
**kickbacks**
35:22
**Killian**
2:2
**kind**
5:23 9:17,22,24 11:4
13:24 14:12 16:3,11
16:17 17:19 18:15
19:3 20:3,20 23:25
26:14,16,18 27:2,19
33:19 34:16 35:18
35:24 36:11,22 38:2
38:23 40:15,22 42:9
43:16 45:13 56:4
57:12 59:21 64:9

65:14 67:15 69:25
73:16,18 76:7 79:10
80:9 81:17,24 82:2
85:23,24 86:14 92:5
92:16 98:21 101:14
102:21 104:3,22
107:23 108:18
109:3 110:15
114:17 116:1
119:21 120:15,16
122:9 127:1 131:12
152:16,22,25 154:8
160:2,22 164:23
165:11 166:4 167:9
178:1 179:12,17
183:22 190:11
193:4,25 196:20
197:18 200:13,17
200:19 202:23
204:13,17 206:11
211:12,13,17
215:11 217:16
218:19 221:11
228:13
**kinds**
84:18
**knew**
33:1,1,2 37:6 51:8,11
80:3 107:22 108:16
146:22 173:16
206:7 220:15,19
**know**
5:10,15,16 6:9 11:1
12:8 14:13,24 16:9
16:15 17:1,7 18:16
22:4 25:12,12 26:24
27:4 29:6,6,19,23
30:5 31:16 32:23
33:5,20 34:5,16,20
36:2,6,7,8,16 37:2,7
37:13 38:5,19,25
39:5,14,15 41:16
42:13,16,18,25 43:2
44:4,6,18,21 45:18
45:19 46:14 48:18
49:3,8 50:4,25 51:2

51:3,7,10 53:15,21
53:22 55:19 56:23
58:17,20 60:8 62:10
64:10,13 65:4,6
66:11,16 68:22
70:12 71:10,13,22
72:3,15,15,17 74:18
75:15 76:15 77:8
78:4,18,22 79:11,11
79:12,15 80:1,18,22
83:1,5,9 84:25 87:3
88:12,23 90:23 91:2
91:21 93:19,19
94:22,24 95:12,12
95:17 97:6,15 98:14
99:5,7,15,17,17,22
99:25 100:8,12,13
100:22 101:4,12
102:5,5,7,8,10
103:3,17,22 104:16
106:11,15 107:8,23
108:12,18,22
111:19 112:19
113:10,15 115:24
115:24 116:2,5,7,8
116:19,24 117:8
122:6,17 123:25
124:1,2,2 127:11,22
129:11,25 131:15
137:4,6 138:23,25
139:13 143:17,18
145:4 146:21 151:3
151:12 154:21,24
156:9,9 157:23
158:20 159:3,25
162:25 163:5,10,12
163:13,17,18,19,20
163:20,22 164:5
165:10,11,13,14,18
165:23,23 166:9,24
168:12 171:4,18,21
173:6,11 176:5,8,12
178:22 181:3,4,24
183:9 184:7,10,14
184:15,21,25 185:3
185:18,22,25 186:5

186:19 187:5,23
188:1,3 191:12
192:3,20 193:25
194:14 195:7,12,15
195:18,20 196:8,14
197:1 198:25 200:3
200:4,17 201:2,9,21
202:7,9,16 203:2,6
203:25 204:8 205:6
205:8,16,21 206:4
207:11 210:11,13
211:16 212:7 213:7
215:13,22 216:22
217:5 221:11 222:6
222:24 223:6,6
224:1,21,23 225:20
227:16,19,21
228:19
**knowing**
84:22 225:16,19
**knowledge**
35:25 36:9 44:10
106:13 206:1
**knows**
139:3
**Koval**
1:5,16 3:1 4:9,14,19
4:23 6:21 8:19 38:4
46:14,24 48:5 49:22
50:3,4 73:7 74:11
89:23 93:2,7 105:13
105:22 106:17
109:17 120:11
121:7,15 125:14,16
125:21 126:5
130:15,15,19 133:1
133:6,13,22 147:20
147:23 152:10
155:1,6 161:22
180:16 209:3 217:3
230:3,10,12 231:8
**Koval@Centura.org**
93:20
**Kraus**
199:14
**Krista**


MAGNA
LEGAL SERVICES

103:2
**K-o-v**
4:21

**L**

**labeled**
74:3
**labor**
97:9
**Labovich**
18:23 31:12 57:14
**lack**
175:17 177:6 186:17
190:10 218:2,14,20
**laid**
71:15
**landed**
70:1 95:10 211:11,12
**landscape**
82:24,25
**lanes**
69:25
**Lanetta**
127:3
**language**
128:17 146:7 149:18
150:10 151:12
155:16 157:25
166:24 213:20
221:24,25 223:1,17
**largely**
69:20
**late**
102:6 107:5 124:15
**Lawrence**
2:6
**laws**
26:19 27:4,10 35:22
35:22 36:4,13 86:7
**lawsuit**
4:25 7:12,14 225:25
**lawyer**
5:20 7:13 152:19
**lawyers**
7:11,17 228:19
**layman's**

179:18
**lead**
20:13
**leaders**
20:15 163:3 199:16
**leadership**
65:2 68:6 95:5 176:5
185:18 204:16
213:12
**leading**
51:17
**leads**
117:25
**lean**
165:4 166:6 217:14
**leap**
17:22
**learn**
26:15 41:20 54:24
63:1 216:2
**learned**
160:5
**learning**
27:7 63:3
**leave**
9:14 30:17,20,25
31:5,9,15,24 32:10
32:13,14,19,21
33:10,21 34:2,5,10
34:10,18 35:16 85:4
119:9 125:3,6
136:24 137:16
138:14 139:6,15,17
139:18 140:13
143:1 144:23
145:17,23 146:17
146:22 147:3,10
167:20,23 173:15
173:17,20 176:4,13
178:5,20 179:24
181:6,20 182:17
185:2,6,21 186:25
187:5,5,8,11 188:14
190:13 195:4 196:1
202:6,18 206:5,12
206:22 207:4,8,14

207:16,18 208:1,2,4
208:17 209:19
211:4 213:14 214:2
214:4,7
**leaves**
205:15,20 206:1,2
**leaving**
119:6 140:10
**led**
22:18
**left**
40:12 44:15 45:8
47:21 48:5 49:24
73:17 118:18
119:13,15 125:15
176:10 177:15,24
**legal**
34:3 116:2,5 153:8
**legally**
50:18
**legit**
82:20
**legitimately**
83:16
**lengthen**
15:9,10
**letter**
103:15 104:18
217:12,22
**letting**
127:10 165:12
188:10 207:1
**let's**
34:24 126:24 142:19
212:15
**level**
53:22,23 54:12
199:17
**levels**
68:10
**leveraging**
187:15
**licensed**
51:8
**Lichtenberger**
163:1

**Lichtenberger's**
163:6 164:6
**life**
29:10
**light**
208:22
**liked**
62:2,2,3 69:16 77:8
77:11 104:16
**limit**
112:7,10
**Lindsay**
2:2 6:20 7:3 46:22
72:23 111:13
192:14
**line**
3:17,17 12:14,15
78:7 82:22 152:16
152:23 153:1,2
199:18 209:10
**lines**
149:5
**listed**
138:3
**listening**
95:11
**litigation**
74:1 231:18
**little**
8:15 14:17 21:7
25:13 27:3 36:21,24
51:22 54:9 56:14
72:22 73:22 74:18
78:17 83:1 87:3
90:20 103:23
106:15 118:17
120:14,16 133:18
139:14 141:3 158:3
160:1 162:8 167:8
167:19 184:8
189:12 192:11
194:4 197:19
200:16,18 202:17
202:23 204:1,1
206:14 213:16
**lived**


MAGNA
LEGAL SERVICES

94:22 164:3 165:12
**living**
17:17 91:24
**LLC**
2:6
**loan**
77:24 85:8,15,22
86:4,10,23 87:16,22
88:3 91:11 105:10
105:14 106:20,23
107:12,25 108:1,4
108:13,16,17
123:20,21 129:2,6,6
129:16 146:8
149:18 150:4,5,6,11
150:14,21 151:1,8
155:17 157:25,25
158:10,13,14,15,16
159:4,11 160:6,12
160:25 161:11
164:15 166:17,21
169:14,18 219:16
222:16,20 223:18
224:19
**loans**
88:12
**local**
204:15
**located**
42:14,16,17
**location**
23:17 75:19,24,25
76:13,20,23,25,25
97:10,11,13 103:25
**locations**
104:1
**locums**
115:2,3,4,8,10,15
116:13 117:17,25
118:3,6,9,13,21,23
119:4,14 210:12
**log**
26:15 64:21
**logical**
98:4
**logistical**

103:12
**logistics**
113:9,13 114:3 116:9
**long**
7:2 26:12 31:14
34:20 52:19 86:3
119:3,5 137:11
144:24 165:14
172:1,22 210:13
218:3
**longer**
65:17 191:15,15
227:5
**longstanding**
84:9,14
**look**
14:14 44:9 48:6
74:15 83:11 89:8
95:1 110:24 112:25
126:9,17 127:10
130:23 132:4,8
136:20 141:16
198:2 205:15 206:8
210:17 213:6
**looked**
14:18 17:19,20 74:18
83:2,3 123:14
137:24 187:4
**looking**
12:4 15:3 17:16,17
61:25 74:17,21
84:11 89:9,17 90:19
90:21,24 91:17 99:9
116:21 118:25
121:20 122:9 130:2
140:18 141:6,6,14
141:18 151:14
178:8 184:13
187:15 193:24
203:2,3,4,10 218:12
**looks**
42:12 83:4,20 90:12
90:16 91:10 96:6
102:5 110:14,16
111:9,17 114:13
116:12 121:22

122:21 126:15,21
127:16 128:14,17
130:4,24 131:11,12
131:13,22 132:12
134:6,19,21 140:6
141:12 149:25
150:3,9,9,24 154:7
156:24 160:1,14,20
161:3 198:15,19
199:1,1,2 221:8
**loose**
167:24 176:1
**Lord**
120:6
**lose**
85:1
**lost**
95:10
**lot**
12:9 14:16 15:2,12
15:21,23 38:12 66:1
79:17,18 80:8,9
82:13 102:7 113:16
113:21 114:2 116:9
125:18 142:5
177:24 184:6 203:7
203:9 205:25
224:17
**lots**
16:1,1
**loud**
212:9
**lucky**
116:22
**lunch**
73:8,17
**lying**
224:3
**Lyman**
2:3

———————————
**M**
———————————
**machine**
231:11
**Madeera**
78:21

**main**
192:1
**maintain**
14:5 16:6 47:20
**maintaining**
46:23 48:10 60:2
68:9
**major**
103:12 224:19
**makers**
71:10
**making**
6:2 20:2 41:9 48:20
49:14,21 54:13
55:11 62:4 72:16
92:1 114:13 116:12
117:22 130:10
146:20 154:2,5,20
177:19 179:2
187:22 201:17
**Man**
26:12
**manage**
13:9 15:4,22 41:10
**managed**
10:13,14 42:22
**management**
14:4 16:18 52:6
192:25
**manager**
31:8,10 34:4 57:7,13
201:24
**managerial**
18:16
**managers**
18:20,21 138:7,13,16
139:10 182:25
200:25 202:16
**manager's**
137:18 138:6
**managing**
16:16 82:7 112:13
**manifestations**
202:25
**manipulate**
62:3



**manner**
54:25
**March**
78:14 102:6 107:5
129:15 164:9,9,10
164:10
**Mark**
6:20 7:2,13,15
111:13
**marked**
88:19 93:11 105:24
109:20 121:11
126:3 130:21
133:24 148:3 155:9
161:25 180:20
**market**
37:8 86:3 104:2,4,9
186:21 187:19
**masters**
9:15
**match**
62:6
**math**
81:10 210:6
**matter**
63:2 124:20
**matters**
24:9 231:9
**MBA**
8:24 9:4,5,9,13,18,22
10:2,4,8,21 11:1
14:7 18:9
**MCMANUS**
2:2 4:5 7:20 8:1
20:24 28:19 29:8,16
34:23 35:3,9 37:16
37:20 38:1 41:1
42:24 47:1,3,9,13
47:17,22,25 48:2,6
48:14,18,22 49:2,8
49:18 60:10 73:1
97:23 107:15 108:6
112:9 117:19
131:20 133:4,8
135:16 136:5 144:2
150:17 151:25

152:3,6 164:16
166:22 182:19
189:19 190:17
191:2 192:15
193:12 205:22
215:8 216:17
223:20 225:4
226:18 228:20,25
229:2
**MD**
10:5,14,15 11:6,9
13:16
**mean**
5:21 10:9 11:6 16:5
16:14 19:12 24:2
25:10 32:4 34:2
35:6,24 37:5 38:8
41:14 47:4,22 48:19
49:2,8,9 52:13 54:3
59:1 61:21 62:8,14
63:2 68:21 72:6
74:19 75:1 78:13
80:17 87:11 88:8
91:14 92:7 95:12
98:7 99:2 102:3
107:1 108:11
112:10,18 114:18
118:7 128:1 129:5
130:8 131:22
135:10 142:17
148:22 170:23,23
171:15,18 176:1,2
176:25 177:1
178:25 181:3,7
187:20 188:1
191:20 194:20
200:11 202:15
207:20 211:9
219:22 221:12
227:18,21
**meaning**
14:2 37:6 54:5 65:16
201:13
**meaningful**
14:22
**means**

62:18 80:18 91:8
117:10 179:1 200:1
200:3
**meant**
42:9 173:12
**measuring**
72:16
**med**
173:18
**medical**
6:7 9:18 18:4,5 30:17
30:19,25 31:5,9,15
31:23 32:10,13,14
32:18,21 33:10,21
34:2,5,10,10,17
35:7,16 57:11,11
65:2 71:13 77:2
97:17 125:3,6
139:15,17 140:13
143:1 145:23
146:17,22 147:3,10
167:23 173:15,17
173:20 177:10
178:1,5,20 179:2,6
181:6,13 182:17
185:2,6,17,21
186:25 187:8,11
188:14 193:5,5
195:4,9,13 196:1,15
199:17 202:6,18
204:11,18 207:8,14
207:16,18 208:1,2
209:19 211:4 214:2
214:3,7 215:3
**medications**
6:7
**meet**
7:2,15,25 8:1,3 21:24
51:13 80:2 130:5
**meeting**
19:13,13 23:7 51:20
54:14 112:16
120:20 126:18
129:21 130:8,12
131:8 135:3 194:7
194:12,14,15

206:21 207:12
213:16,21,23,23
214:9,10,18,22
222:12 223:3,7,13
225:10
**meetings**
54:12
**MELVIN**
2:1
**member**
19:24
**members**
33:17
**memories**
75:12 99:15 100:11
217:13
**memorized**
20:7
**memory**
56:13 73:16 94:1
95:24 122:11
126:23 127:1 129:4
130:3,10,11 134:16
142:20 148:17,19
167:15 181:24
182:8 192:23 198:9
202:3,7,15 211:18
217:15,21,23,24
218:18,24 219:24
219:25 220:14
221:13 222:14
225:14
**memos**
26:6
**mental**
192:19,22,24 211:21
211:23,25 212:4,12
**mention**
223:16
**mentioned**
57:17 112:23 222:3
223:15
**mentioning**
20:5
**merits**
97:4


MAGNA
LEGAL SERVICES

**message**
102:17 103:1 115:1
121:25 141:13,14
148:9 149:7,9,12
153:5 154:5 156:1
156:12,17 167:14
168:24 169:4 200:8
225:2
**messaged**
140:6
**messages**
106:8 110:4 131:2
145:3,10 148:8
162:6,11,11,17
168:5 169:3 204:7
**messaging**
145:7 213:9
**met**
6:18,20,23,23 7:11
7:13 20:10,11 21:14
22:1,3,6 29:24
32:25 51:15 52:5,9
122:3 129:23,24
208:16 213:19
223:4
**metrics**
79:21
**Meyers**
18:24 63:25
**MHA**
10:1
**Midas**
64:17
**middle**
187:2
**mid-August**
119:13,15
**mile**
94:24
**mind**
35:7 85:24 86:12
91:21 108:22
205:14
**minute**
19:2 46:5 58:13
74:15 109:19

124:20 130:23
145:2 162:12 165:6
186:11 198:1
**minutes**
73:8 117:5 152:5
216:25
**missed**
175:5
**mission**
43:23 44:3,4,5
**mission-vision**
26:14
**mistake**
220:11,17 224:4,13
224:23
**model**
95:5,18
**models**
77:12
**Mohamedbhai**
2:6
**moment**
93:18 106:4 135:8
**Monday**
126:19 130:5 183:7
**money**
86:8 87:5 107:25
**Monroe**
65:16 66:11,17,21,25
67:8,13,21,22,24
68:3,17 69:12,16,16
70:4,15 71:8,17
72:2,11 73:19 75:9
75:18 76:1,10,14,14
76:22 77:6 84:6,13
85:1,10,22 86:22
87:10,12,20 88:9,22
89:1,5 91:19 92:13
92:20 93:2,17 94:7
94:13 95:3,3 96:5
96:10,13,13,17,22
97:6,21 98:3,6,13
99:1 100:4,17,17
101:1,20,22 102:18
103:3,11,23 104:13
104:25 106:19

107:13 108:15
110:9,12 111:4
112:17 113:11,18
116:16 118:8
119:21 120:16
122:3 124:4,5 142:8
147:14 148:14,20
149:14,16 151:9
152:17 153:4,10,20
154:2 158:6 159:12
159:12 160:2
161:19 163:7 164:1
164:14,24 165:21
166:12,21 169:15
170:1,7 174:6 175:9
182:25 184:15
194:8 200:7,11,22
200:22 201:4,9,16
202:4,15 209:6,15
209:25 210:2 211:1
211:20 212:8
213:11,18 221:8
223:14 226:5
**Monroe's**
75:16 102:22 169:18
202:12
**Monroe-3**
105:10
**month**
51:16
**monthly**
194:22
**months**
97:1,3 137:13 147:3
177:23 183:6,24
185:11 193:21
202:14 207:8
**Montrose**
11:15,15,18,20 12:3
12:6,8 17:9,18,24
18:3 44:24 45:7
**mood**
124:18
**moral**
95:4
**morale**

14:5
**morning**
73:10 114:5,12,21
176:3
**motivated**
17:11
**mountain**
139:19 167:19 194:3
194:5 203:14,17
**move**
12:4 13:18,21 102:10
111:5 154:22 166:1
191:12 204:25
**moved**
17:8,13 23:13 131:14
**moving**
102:5 107:3 112:5
142:5 208:7 221:22
**muddied**
211:17

_____
N
_____
**N**
2:1 3:1
**nail**
61:15,18
**name**
4:14,18 18:25 21:18
35:5 37:7 39:4
45:20 78:20 82:18
103:8 118:25 119:1
119:2 133:5,14
163:11,23 164:7
180:6
**named**
88:21,23 125:18
214:22
**names**
19:1 23:6 34:25 35:6
57:9 88:25 113:25
**naming**
197:11
**Natalie**
18:24 63:25 201:23
213:18 214:1
**nation**



10:16
**nature**
10:19 27:14 57:1
**navigation**
83:3
**navigator**
12:21
**near**
102:20
**necessarily**
83:25 129:25 148:22
**necessary**
136:10 171:8 211:7
**need**
5:15 23:6 25:12 30:8
46:2 91:5 101:12
102:19 104:4
108:10 117:10
132:22 138:20
144:21 150:6 176:7
184:16 185:2
186:12 198:21
210:11 214:3 215:6
228:22
**needed**
54:10,24 59:23,24
60:3,16 62:5 85:3
132:17 138:24
139:25 140:25
146:4,10 156:8
160:21 163:5,25
166:24 168:25
177:3,3 178:8
183:14 193:21
194:10 198:9 206:7
221:21
**needing**
21:18 108:3 140:23
142:9 165:24 178:5
**needs**
14:10 27:19 103:11
226:20
**negative**
44:14
**negotiating**
16:12

**negotiations**
72:4,9,18,19 149:3
187:3
**Network**
10:6,13
**neutral**
46:20 213:20 214:6,6
**never**
31:17,20,21 79:9,14
139:8 158:9,9 193:2
193:3,3,3 206:13
212:8
**new**
75:19,24 88:14,18
116:11 142:7
145:11 153:15
167:12 190:3 191:8
218:21 225:19
**newly**
196:21
**news**
45:19,20
**night**
122:1
**nonconcerns**
208:12
**non-attorneys**
8:7
**NON-CONFIDEN...**
1:6
**non-employed**
92:11 111:16
**normal**
15:6 29:12
**north**
16:24 78:15 81:15
107:9
**nose**
120:5,7
**Notary**
1:18 230:18 231:6
**notice**
1:16 137:10 146:17
177:22 183:5 184:6
184:21 198:16
202:18 216:15

**notification**
82:7 184:19
**notified**
22:2 82:4 181:19
**notorious**
82:14
**notwithstanding**
84:19
**November**
1:6,17 3:2 229:7
**number**
42:3 74:2,13 89:3
93:4,9 101:13
105:11,18 109:14
121:17 130:16
133:2,9,19 134:1
140:10 184:11
210:7 213:2,3
**numbered**
180:13
**Numbers**
89:15
**numerical**
110:16
**nurse**
12:21 23:7 24:24
25:9 83:3
**nurses**
12:23 194:20
**nursing**
8:20,23 9:1,2,12,14
13:24 14:2 18:18
53:8,24,25 54:4
56:25 57:3,13,22,23
83:2 92:9

---

**O**

**oath**
6:4
**object**
5:21 7:20 20:24
28:19 29:8,16 37:16
42:24 60:10 97:23
107:15 108:6 112:9
117:19 131:20
135:16 136:5 144:2

150:17 164:16
166:22 182:19
189:19 190:17
191:2 192:15
193:12 205:22
215:8 216:17
223:20 226:18
**objection**
6:1 41:1
**objections**
5:22
**obligation**
176:3,5,8
**obligations**
176:18
**observation**
54:17 59:11
**observe**
54:9 60:23
**observing**
53:18
**obtain**
195:9
**obtained**
136:17 170:6
**obtaining**
10:8 149:3
**obviously**
5:16 79:12 185:1
213:23
**occasion**
80:15
**occur**
18:12 113:4 139:18
194:16
**occurred**
139:8 140:20 194:14
194:18 226:15
**occurring**
107:17
**ocean**
82:15
**October**
50:7 116:21
**offer**
34:7 71:18,21,24



75:11,17 80:23,25
81:14 84:15 88:22
89:1,5 93:2 103:13
104:17 125:14,16
125:21 130:15
133:11,12 169:6
170:9,14 171:14
173:25 174:3,17
186:7,8 195:8,9,13
215:24 216:14,16
217:22 218:3,8
219:25 225:16,23
226:2,11,23 227:25

**offered**
73:20 75:17 76:9,10
94:8 103:14

**offers**
41:9 71:11,20 84:6
91:4

**office**
54:6 63:21 66:22
138:1 177:2 210:8

**officer**
204:11,18

**officially**
77:21,22

**offset**
117:18 210:12

**oh**
8:1 32:22 47:25 50:4
99:22 105:14 120:6
125:18 141:17
159:23 192:14
197:16 224:22

**okay**
5:2,20 6:2,3,7,15,21
7:9,15 8:1,17 9:4,7
10:11,21 11:3,6,14
11:25 12:8,11,19
13:1,6,18 18:2,21
19:9 20:20 21:3,7
21:18,23 22:6 23:9
23:18 24:5,23 25:1
25:5,15,22 26:7,11
26:18 27:21 28:16
29:18 30:21 32:15

33:25 34:8 35:3,9
35:14,24 36:16
37:12,15,21 38:2,22
38:23 39:5,14 40:5
41:12,15,19,20 42:4
42:22 43:7 44:18
45:23 46:2,8,13,19
47:2,19 48:10 49:5
49:21 50:8,13,23
51:6,13 52:2,7,12
52:19 53:1,5,17
54:8,19 55:8 56:2
56:16 57:5,9,13,19
57:25 58:4 60:5
61:13,21 62:25
63:10 64:19 65:24
68:7 70:3,18,21
71:3 72:18,20,25
73:3,12,25 74:6,10
74:11,23 75:8,14
80:16 81:17 83:19
85:7,20 87:20 88:16
89:7,19,23 90:20
92:25 93:3,7,12,16
94:3,6 95:2,14
96:22 98:14 100:22
102:16 103:1,7,10
103:21 104:12,19
105:3,8 106:13,15
109:9,17 110:2,6,10
110:23 111:2
112:16 113:3
114:20 115:1,5,23
117:3 119:17,20,20
119:24 120:2,2,18
120:19,25 121:7
122:22 123:6,8,9,16
124:13,23 125:8,14
125:25 126:11,17
126:24 127:2,3
128:4 130:14,18
133:8,21,25 135:9
135:11 138:5
140:15 141:8,10,17
141:24 142:11,15
142:19 143:3 144:5

144:10,24 145:6,9
146:16 147:22
148:2,7 149:7,15,22
152:2,7,14,24 153:3
155:1,6 156:11,24
157:4,14,23 158:25
159:8 160:24 161:6
161:22 162:1,6,22
163:22 165:17
166:17 169:10,17
171:1,12 172:1,8
174:24 175:20
178:25 180:16,21
181:1,23,25 182:11
182:20 184:1 185:4
185:9 187:13
188:18 190:11
196:19 197:22,24
199:8 201:8 202:1,4
202:19 205:5,15
206:9,18 207:5
208:15 209:5
210:16 211:8
212:23 213:6,15
214:8,25 215:17,22
216:12 217:18,21
218:6 219:8 220:18
221:7 222:1 223:23
224:1 226:21
228:10,15,18 229:4

**onboarded**
26:8 35:19 43:23

**onboarding**
25:25 26:10,17 43:16
116:20,25 117:2
166:2,3 191:16

**once**
21:15 24:23 32:14
69:3 76:6 110:12
171:25 219:24,24

**oncologist**
51:9 66:15 67:19
78:24

**oncologists**
80:21 117:8

**oncology**

10:20 11:11,16 12:14
12:16,21 14:23
15:19 16:3,10,21
18:1,3,4,5 22:24
23:3 26:8 28:23
29:4 52:1 60:9
69:20 77:2 80:20
82:12,13 103:18
112:2 143:24 184:7
199:18

**ones**
64:6 81:22 109:6
110:13 123:19
166:15 181:21
182:1 216:10,11

**one-month**
122:22

**one-week**
203:21

**ongoing**
142:10

**online**
72:22

**open**
61:4 74:9 76:3 87:1
88:21 89:21,22 90:1
93:1 105:13 106:1
109:13 121:8,13
125:14,21,25 126:5
130:14 133:1
147:19,19 148:5
151:15 155:1,10
161:18 162:4
175:24 180:3 182:1
203:23 204:3,5
208:19 209:2,4
217:7 221:3,5

**opened**
76:6 93:8

**operate**
44:16,19

**operates**
45:15,18

**operating**
76:2

**operation**



111:24 112:1
116:15
**operations**
13:9
**opinion**
143:14,17,18 144:11
144:14,15 150:18
173:23 174:15,19
174:22,25
**opportunities**
99:6
**opportunity**
59:13 73:13 228:11
**opted**
96:16
**optimistic**
102:12,13 122:19
223:5,7
**options**
17:17
**orchestrating**
126:22
**order**
143:9 147:6
**orders**
228:22
**organization**
12:5 39:11 107:3
227:17
**organizationally**
116:18
**original**
156:5,7,8 228:5
**originally**
183:13
**outcome**
231:18
**outside**
117:25 128:19
129:16 148:19
157:12 159:9
199:20 212:6 222:2
**outstanding**
86:5 128:5,22 146:22
168:1
**overall**

61:17
**overflow**
98:11
**overlap**
140:20
**oversee**
18:4,7
**overseeing**
13:24 18:10
**oversight**
29:23 204:19
**overview**
14:13 43:16
**over-arching**
39:11

───────────────
**P**
───────────────
**P**
2:1,1
**page**
3:1,17,17 89:3 90:11
90:16,24 93:5 95:1
95:22 102:14
105:12 109:15
110:25 115:24
121:17,24 125:23
126:17,24 130:3
149:12 152:15
153:6 154:1,6,11,12
155:3,25 162:3,12
204:24 205:1
206:19 219:20
**pages**
162:14,16 205:2
231:13
**paid**
40:18 86:6 97:12
**pan**
83:21
**panel**
52:4
**paper**
191:13,15
**par**
148:24
**paragraph**

78:1,2,8 80:16 81:18
81:21 85:7,13 90:25
95:4 96:2 116:1
218:23
**parsing**
34:16
**part**
11:21 23:9 24:2,4,17
63:3 68:25 70:7
71:13 83:25 85:21
85:23 122:5 129:7
141:4,6 171:3,4,6
194:22 224:18
**partially**
117:18
**particular**
19:23 20:9 29:22
34:24 53:25 77:4,10
80:2 108:25 123:16
138:25 148:25
156:10 215:1
217:25
**particularly**
148:25
**particulars**
30:13 69:11
**parties**
4:1 231:10,17
**partners**
98:20 112:13
**partnerships**
10:15,15
**party**
4:25
**passed**
173:9
**passively**
32:1,4
**pathway**
19:24 20:10,11
**patience**
73:14
**patient**
13:15,17 14:23 16:18
68:15 83:7 99:10
**patients**

13:15 15:6 54:5 59:5
60:24 62:23 67:16
77:13 91:23 112:6
177:24 183:15
184:9 210:3,3,7
227:3,3,7,9,11
**Patricia**
1:17 180:12 231:5,24
**pay**
87:8 107:25 108:13
117:14 162:20
**payback**
221:24,25
**paycheck**
97:14,19,21
**payer**
117:1
**payers**
113:15,17
**paying**
87:16,21 88:3 108:3
109:4 150:6
**payments**
107:16
**PC**
59:24,24 78:23 79:13
81:9 85:16,18 101:8
108:16 111:13
112:12,14 113:13
113:20 115:12
118:12 142:5
210:11 211:16
**Peddada**
1:9 4:15 51:2,6,7,10
51:14,20 52:5,8,20
52:22 53:10 54:10
54:17 55:5,9,18
56:10,24 58:1,8,11
58:17,21 59:9,14,20
60:7,8,14,23 61:2,9
63:6 64:9,10,15
65:5,11,16,21 66:7
66:22 67:1,24 68:4
68:17 69:12,14,18
70:4,15 71:8 72:2
72:11 73:18 74:12



80:14 84:6,14 85:10
85:22 86:22 87:10
88:1,8 91:19 92:13
92:20 96:3,9,14,17
97:18,20 98:2,13
99:1 100:3,17,18,20
100:24 101:2,19,23
105:10 106:19
107:13 108:3,12
110:9,12 111:4
112:17 113:11,19
114:5,9,21 116:16
118:8 119:21
120:15,20 121:25
122:3 123:10,17,24
124:10,24 125:9,10
125:15,17,22
126:10,18 127:11
127:15,20 128:4,10
129:17,21 130:15
131:6,8,19,24 132:1
132:10,14,19 133:2
133:7,14 134:17,24
135:3,14,21,24
136:2,9,12,18 137:1
139:21 140:12,15
140:22 142:8,21
143:8 144:11,19,25
145:14 147:9,16
151:10 153:14,20
155:2 156:2,14,21
158:7 159:12 161:2
161:15,19 163:7
164:1,24 165:21
166:12,20 167:7,12
168:8,21,25 169:5
169:11,15 170:8,19
171:17 172:4 173:4
173:7,14 175:14,22
177:9,25 179:22
180:1,3,4,7 181:6
181:11,18 182:17
182:22 185:10
187:25 188:13,22
189:23 190:24
191:8 192:6,24

193:5,16,19 194:9
195:1,12 196:24
197:7,9,13 198:8,17
200:7,12,23 201:3,3
201:9,18 202:5,14
202:23 207:13
208:16 209:6,17
212:2,19 213:10
216:15 218:5
219:10 220:1,7,10
220:19 221:15
222:8 223:14 224:3
225:1,8 226:22
227:5 228:8
**Peddada's**
 7:18 8:5 48:12 62:19
   64:3,12 70:16 76:14
   85:1 134:7,12
   136:24 139:18
   144:14 159:16
   164:14 170:14
   171:14 173:24
   174:3,16 177:7
   184:14 192:19
   195:8 196:16
   206:22 207:7
   209:19 211:4,23
   212:11,12 213:17
   215:3,7,11,24 216:6
   217:22 218:8
   219:20 225:16,25
   226:8,16 227:16,24
**peers**
 99:13
**Penrose**
 13:10 15:25 16:21
   39:1,3,4 40:9 45:4
   45:16,18 68:21 69:4
   76:2,11,23 77:7,9
   77:19 78:5 94:22
   96:10,17 97:9,11,13
   97:21,24 103:18
   104:15,17 141:7
   227:12
**people**
 5:11 17:4 18:6 19:7

19:15,20 34:6,7
54:13,24 56:5
117:15 151:4
163:15 164:4
165:13,16 170:22
171:5,7 176:3,8,19
179:6,6,7 184:12
186:21 187:1,22
**people's**
 15:11 218:15
**Perfect**
 105:21 121:15
**perform**
 29:22
**performance**
 24:13,21 25:8 58:23
   59:6,9 64:3 67:15
   67:21
**period**
 15:3 97:1 101:24
   108:24 117:14
   119:5 137:12 172:1
   183:18 214:4
   215:14
**periods**
 15:15
**periphery**
 68:1
**person**
 5:13 6:5,25 29:22
   54:15 127:8 128:3
   172:9,11
**personal**
 19:21 59:11 62:6,14
   66:9,10 194:2
**personally**
 53:18 54:9 60:23
   114:7 140:2 146:2
   192:22 194:2
**personnel**
 12:22 43:15,16,19
   44:7,8,11
**person's**
 29:10
**perspective**
 83:16

**phone**
 7:16 42:1,3 74:22
   141:15 144:3,8,19
   144:25 145:6,11
   168:13 172:10
**phonetic**
 59:23
**phrase**
 54:4 61:25 116:25
   166:1 178:24,25
   211:25 212:3,6,8
**physical**
 33:4 86:17 137:25
   202:25
**physically**
 77:4 86:17 99:11
   137:22
**physician**
 58:24,25 63:17 68:6
   68:10 77:4 104:22
   111:16 115:4,15,16
   117:17 119:14
   127:6,11 134:9,9,19
   135:12,17,19,20
   136:25 141:5
   143:24 148:23
   149:5 158:4 163:2
   177:21 178:23
   179:4 183:18
   184:20,21 185:4
   195:10,14,24
   199:16 204:20,21
**physicians**
 12:24,25 13:3 65:15
   65:20 92:11 97:18
   104:5 117:11,25
   118:2,3,7,21 140:9
   142:9 161:4 179:1
   194:20 201:13
   221:20
**Physician's**
 10:5,13
**picked**
 76:12,19 96:20
   118:12
**picking**



197:3
**piece**
 27:1 128:24 138:19
   142:18 199:6,7
**pieces**
 77:9 142:5
**pin**
 114:12
**place**
 26:3 40:15 41:5
   78:15 141:11
   143:25 164:9 173:2
   206:21 209:21
   214:18,20 222:2
   231:12
**places**
 83:10 185:19
**Plaintiff**
 1:10 2:1
**plan**
 19:16 23:12,16 24:3
   24:12,13,21,22 78:4
   115:11 137:5
**planned**
 137:9,13
**planning**
 156:25
**plans**
 24:1,4 87:6
**platform**
 42:8,10
**Plauth**
 168:14 188:7 197:8
   197:10 204:4,10
   207:1,11
**play**
 30:10
**please**
 5:3 8:19 19:10
   109:25 161:18
   180:3 199:11
   228:24
**pleasure**
 86:18
**podcast**
 95:12 103:5,8

**point**
 7:18 8:4,5 23:15 26:2
   28:21 40:11 69:5
   87:25 96:20 102:20
   118:11 119:7
   120:23 122:21
   128:13,23 129:1,20
   145:18 146:3
   153:13 161:16
   163:4 167:18
   170:15,16,19 172:4
   173:7,9,13 185:16
   185:25 186:5 188:9
   198:15 206:23
   214:12 216:12
   217:16,24 218:1
   224:19 227:10
**pointing**
 149:18 150:11
**points**
 110:16 122:12
   142:13 150:5
**policies**
 15:21 43:15,17,19,20
   44:7,8,11 79:20,21
   205:13
**policy**
 20:22,23 21:1,9
   22:12 28:17,20
   205:2,6,8,10,16
   206:5
**pool**
 82:14
**popped**
 94:1
**popping**
 186:19
**population**
 68:15 99:10
**portal**
 41:23,23 42:2,9
**portion**
 34:13 35:10,13
**PORTIONS**
 3:16
**position**

11:23 12:2,16 13:12
   14:12 17:24 31:1,17
   31:19 33:10 76:10
   76:11,24 77:19 78:6
   85:5 94:7 127:11
   137:14 163:3 174:3
   174:12 205:12
**positions**
 11:17 12:12 113:11
**positive**
 144:15
**possible**
 99:12 128:7
**possibly**
 75:18 200:4
**postings**
 103:17,20 104:6
**potential**
 20:16 58:5 139:7
   183:1
**power**
 19:3,4,7
**powers**
 18:15,16
**powwow**
 214:11
**practice**
 10:11,12 13:7 63:17
   65:18 72:8 99:8
   115:12 116:10,11
   207:19 209:7,18,20
**precede**
 198:3
**predated**
 98:18
**predominantly**
 64:1
**prefer**
 154:14
**preference**
 77:7
**preferred**
 94:22
**preparation**
 8:11
**prepare**

 6:15
**prepared**
 160:22 215:16
**present**
 22:7
**preserving**
 5:22
**presume**
 164:2
**pretty**
 5:17 9:8 16:16,16
   26:13,16 36:10 70:1
   82:14 83:7 84:21
   98:8 137:9 144:17
   149:4 168:22
**prevail**
 199:25
**previous**
 188:25 231:7
**previously**
 7:8 74:1,13 90:13
   182:1,5,15 203:24
   208:19 212:16,18
   212:24 213:1 217:6
**pre-approved**
 138:17
**pre-vacation**
 193:23
**primary**
 14:1 92:1 175:19
   204:19
**printed**
 156:2
**prior**
 7:18 8:4 125:8,8
   136:3,8,12,18 178:2
   178:3 198:6
**private**
 13:7 63:17 65:18
   72:8 136:25
**privately**
 21:14
**privilege**
 46:23 47:8,23 49:12
**probably**
 43:9,9 60:11,19



69:15,17 72:20
100:7 104:14
106:15 107:6
109:10 111:14
112:23,23 119:18
122:5 129:12 140:6
144:16 154:13
161:4 162:20
164:22 165:18
183:10 197:11
200:14 204:22
213:15 214:11,11
214:12,14 217:5
**problem**
 175:20 210:6
**problems**
 25:12 61:8 125:10
 185:15 189:1,6,17
 189:18,20
**Procedure**
 4:8
**procedures**
 23:21
**proceedings**
 4:6 229:5 231:15
**process**
 19:6,9,10,17 23:10
 23:14 25:23 30:3
 41:6 44:19 51:15
 70:19 82:2 84:5,8
 85:25 110:8,17
 120:15 123:13
 128:15 142:6 171:6
 191:16 222:25
**processes**
 5:24
**produced**
 44:11
**product**
 64:18
**productive**
 14:3 111:4 112:22,24
 122:17 124:19
 177:21
**productivity**
 14:1,2,9 79:20

**professional**
 54:25 61:2 67:7 70:8
 79:2 80:20 231:5,24
**Professionally**
 59:3
**program**
 122:15
**progress**
 32:7,23
**progressive**
 20:22,23,25
**prostate**
 69:14
**protected**
 27:25
**protocols**
 15:16,21 62:7
**provide**
 21:18 28:17 202:13
**provided**
 63:12 70:10 189:4
 217:5
**provider**
 13:3 111:12,17
**providers**
 210:9,9
**providing**
 7:18 107:12 115:15
**proximity**
 86:17 161:5
**PSA**
 111:6,9,11 112:2,7
 112:15,17 114:9
 121:2 122:24
 165:11
**PSF**
 74:12
**PSF-Peddada-0290**
 93:5
**PSF-Peddada-0853**
 161:20 162:3
**PSF-Peddada-0918**
 89:4,10,14
**PSF-Peddada-0920**
 93:9
**PSF-Peddada-0923**

105:12,19 106:1
**PSF-Peddada-0939**
 130:17
**PSF-Peddada-0958**
 125:24 126:5
**PSF-Peddada-0961**
 133:10 134:2
**PSF-Peddada-0985**
 155:4,8
**PSF-Peddada-0988**
 147:21 148:5
**PSF-Peddada-0999**
 121:10,18
**PSF-Peddada-1001**
 109:15
**PSF-Peddada-1002**
 110:24
**PSF-Peddada-1018**
 180:5,10,18 196:21
 196:23
**PSF-0918**
 89:24
**PTO**
 34:16,18 137:20,22
 138:3,8
**Public**
 1:18 230:18 231:6
**pull**
 142:16
**pulled**
 91:16 142:15
**pulling**
 88:24
**pump**
 160:2
**purpose**
 14:13
**pursuant**
 1:16 4:7
**push**
 47:5 83:22 94:24
 184:13
**pushed**
 159:18 169:24
**pushing**
 129:25 131:11

 160:22
**put**
 19:15 23:12 56:14
 141:21 142:19
 183:16 186:21
 187:19
**putting**
 100:7 111:21
**P.C**
 2:3
**p.m**
 73:6,6 120:8,8 152:8
 152:8 217:2,2 229:6

---

**Q**

**qualifies**
 62:9
**quality**
 10:17,18,22 11:2
 204:20,21
**question**
 5:22,25 28:6 33:7
 46:19 50:16 60:12
 82:16,19 108:7
 136:6 142:11
 152:25 159:1
 166:10,17 189:2,12
 191:3 192:5,8,11
 209:14,24 228:5
**questions**
 5:4,18 51:25 52:18
 88:1 110:21 115:25
 128:11 162:25
 192:5 196:8 225:6
 228:19 231:14
**quick**
 46:19 84:3 120:4
 142:11 152:1
 208:22
**quickly**
 34:24 71:16 121:1
 128:7
**quit**
 124:21 172:21
 186:15
**quite**


MAGNA
LEGAL SERVICES

17:5 109:11 172:19
212:22
**Quizlets**
27:3
**quote**
79:16
**quotes**
123:25 124:2 172:15

___

**R**

**R**
2:1
**race**
27:16,18
**Rad**
112:11
**radiation**
12:22,22,23 14:2
18:18 51:8 53:8
66:15 67:19 69:9,19
75:20 77:2,11 78:24
80:20,21 82:12,13
83:2 117:7
**radio**
185:24 188:2
**Rad-On**
59:23,24 78:23 79:13
81:9 85:16,18 101:8
108:16 111:13
112:12,13 113:13
113:20 115:12
118:12 142:5
210:11 211:16
**raise**
96:23
**raised**
58:11 166:13
**ran**
41:13 43:5
**randomly**
49:12
**Rathod**
2:6
**reach**
32:6,9 33:13 82:9
139:1,1,10,21,25

140:2,11,17 142:22
144:21 145:14,25
146:2,12,18,25
161:2,15 167:6,11
168:7,8,12,21 169:1
169:5 173:4,5 188:8
189:22 218:16
219:7,16 227:7
**reached**
32:5,6 114:5,21
120:23 123:10
138:20 161:4
**reaching**
124:9 143:12 148:14
196:15 219:10
**read**
91:9 179:8,10 195:6
198:2 200:18 230:4
**reading**
81:17 91:15 94:2
95:21 96:15 129:14
130:9 141:17 142:3
143:5 152:20 181:3
214:19 218:23
219:19,23 224:2
229:1
**readjustment**
198:22 199:1
**ready**
96:3 99:1 101:2,19
160:25 161:11
187:5
**real**
66:5 110:18 112:20
208:22
**realistic**
116:22
**reality**
99:12
**realized**
152:18 172:4 173:7
173:10 208:25
**really**
5:11 15:8 16:7,12,24
17:18 53:25 61:25
66:3,3,4 67:2,25

69:10 70:3 71:16
82:16 87:4 113:18
120:25 151:15
163:17,17 170:18
180:12 181:5 192:8
193:24 194:3
195:20 198:1,9,20
203:1,2 205:1
208:24 210:20
219:22 224:6 228:2
**realtor**
187:19
**reason**
6:12 28:1 47:6 83:21
89:16 115:20
131:23 133:11
158:19 178:6
186:16 219:11
222:1 224:2,8
**reasonable**
188:21 224:10,25
**reasons**
58:5 68:12 187:24
190:12,16
**rebuild**
80:1
**recall**
22:9,13,22 23:1
24:23 26:3,11,12,22
27:8,21 28:3,7,10
28:12,15 30:9,20,21
31:14,16 32:11
33:20 34:21 42:2
44:1,2,7,10 51:14
51:19 52:5,17 53:12
53:18 55:4,14,17,21
56:22 57:5,15 58:4
58:7,19 64:2 65:10
65:14,24 66:1,7
67:3,5,14 68:2,7,16
68:19,25 69:2 70:11
70:23 71:3,17 72:1
72:5 73:19 75:15,18
76:9,12,22,24 77:3
77:6 80:25 85:20
86:4,13 87:13,20

88:2 91:12 93:23
94:6 95:20 96:19
98:7 100:2 101:10
101:18,22 102:11
102:21 103:9,19,25
104:3,12,13,18
106:22 108:2 109:2
109:7 110:6 112:16
112:21 114:8,16
115:9 118:20 119:3
119:14 120:20,22
122:1,13 123:9,22
124:4,23 126:7,13
126:18 127:17
128:1,3,10,13,18,25
129:9,20 131:8
134:11,23 135:1,3,6
136:1,21 137:6
138:22 139:9,13,16
139:17,19,21
140:11,22 143:12
144:15 145:13
146:11,16 147:1,13
148:14 150:25
151:6,11,17 154:4
156:6 157:4,9,18
158:11,21,24
159:25 161:1,8
162:18 163:9,11
164:18 165:20
166:11,19 167:14
169:13 170:4,7,11
170:12,22 171:13
171:15,23 172:11
172:11,13,16,17,20
172:23,24 173:8
177:9,25 178:4,5,7
181:7 182:21 183:2
183:4 188:18,20
189:25 190:20
191:10,18,22
192:18 194:7,12,15
194:17 195:16,22
200:20 201:5,8,16
202:12,20 203:16
205:25 206:21,23



209:5,7,9,14,24
211:18,21,25 214:8
217:25 219:1,19
220:10,13 221:14
222:7,10,11,12
223:13,14
**recalling**
21:20
**receive**
26:7 28:23 36:19
98:2
**received**
10:3 27:9,9 28:3 30:5
36:23 43:15 56:20
56:23 67:12 192:13
194:24 198:7
**receiving**
28:7 30:9 93:23
102:22 160:18
182:21 191:23,24
**Recess**
46:12 73:6 120:8
152:8 217:2
**recharge**
193:21 194:10
**recipients**
75:7
**reciprocated**
49:6,9,15
**recognize**
90:4 106:3,5 113:24
121:19 134:5
155:13 162:6,10,10
213:7,8
**recognized**
198:21
**recollection**
42:11 55:11 65:15
66:2 68:8 71:5
73:22 75:9 76:13
90:5,22 94:4,5,18
95:22 96:16 98:9,25
103:16 109:12
110:1 112:20
127:24 138:24
139:23 141:23

142:2,3,4 143:4
153:7 154:17 159:9
159:14 161:7
180:24 181:2
191:19 198:6 199:4
200:24 202:22
211:22 214:15,16
214:22 219:23
221:19 223:23
**recommending**
154:19
**reconnect**
96:3 99:1,19 100:1,3
100:25 101:2,19
174:5
**reconnecting**
99:22
**record**
4:18 5:7 6:2 49:25
73:4 78:17 106:12
120:9 152:10
228:21
**recovered**
31:18
**recovery**
33:2,5
**recruited**
78:15
**recruiter**
17:19 82:17
**recruitment**
85:9,17
**red**
149:5 174:9
**reduced**
231:12
**reextend**
216:14
**reextending**
225:19
**refer**
38:10,12 158:15
160:12 212:10,12
**reference**
3:5 94:10 111:8
122:16 221:25

**referenced**
74:5 212:21 217:8
**references**
72:21
**referencing**
77:23 85:15 154:25
**referred**
25:3 31:9 37:9,22
38:9 50:3 101:15
110:21 122:2
126:14 153:16
163:14 164:15
193:6 198:18
**referring**
20:18 25:20 37:13
38:5 49:23 77:19
85:12 87:9 90:23
91:2,3 95:9,17 96:6
97:6 100:18 103:3,5
111:7 115:25 116:3
116:20,24 117:8
122:13 126:19
142:12 143:23
146:17 149:8
154:21 155:18
160:6 181:10 182:4
182:17 192:6
193:11,17 197:21
198:24 200:5 201:2
**refers**
96:22
**refresh**
73:16,22 75:8 95:22
96:15 98:24 103:16
122:10,11 127:24
142:1 159:8 202:22
211:22
**refreshed**
90:22
**refreshes**
94:3,5 109:12 198:5
**regard**
196:18
**regarding**
8:5 77:24 85:14 89:5
105:14 207:7

218:21 228:13
**Regional**
11:15,18,20 12:3
17:24 18:3
**regret**
227:23 228:6
**regroup**
173:12
**rein**
54:24
**reintegrate**
97:5
**reiterating**
218:14
**related**
33:9 57:3 178:7
231:16
**relating**
121:2 169:14 193:6
**relation**
231:9
**relations**
65:2
**relationship**
10:25 39:1,5,9,18
40:6,8 45:24 49:14
59:17 60:22 61:2,4
61:17 62:4 65:11
67:8,10 76:15 79:3
84:10,14 98:8,16,17
98:18,22 159:10
**relationships**
10:23 44:25 60:3
92:10 98:12
**Relative**
97:16
**relatively**
177:21
**relocate**
17:8
**remained**
146:6
**remember**
6:8,9,9 16:25 26:4
27:15 28:20 30:3
50:5 51:24 52:2,18



MAGNA
LEGAL SERVICES

53:6 55:8 56:12,13
56:14,16 57:24 63:8
70:9 71:19,20,22,22
71:24 75:21 76:19
79:16,16 81:4,7
86:21,24,25 87:2,15
87:17,23,24 94:16
94:16,19,21 100:5,6
100:11,23 101:3,4
101:14,16 102:1,3,3
102:24 103:22
104:24 106:25
110:10 111:19
113:6,7 114:24
118:16 119:1,1,16
119:16,17,18 122:6
123:12 127:4,8,18
129:23,24 130:6,7,8
130:11,12 134:14
135:7 137:23
143:20,21,22 145:6
145:7,16,22 151:21
154:9,10,20 159:6
161:12,14 164:3,17
164:19,21 166:1
170:10 177:18
190:1 192:21 193:8
194:4 196:17 199:6
199:7 200:9 201:7
202:10 203:16,20
206:19 210:5 211:7
211:10,11 213:21
213:22,22,24
214:10 215:2 218:7
219:3 220:4,5,6,14
220:16 222:9,18,19
222:22 223:7
224:15

**remembered**
181:17 225:12
**remembering**
26:25 118:19
**remind**
17:25 87:1 114:5,14
114:22 125:12
130:24

**reminder**
87:18 121:22
**reminders**
86:24
**reminding**
126:15
**remote**
75:2 99:14
**remotely**
186:14
**removed**
13:16
**renaming**
45:22
**Render**
2:2
**repaid**
108:17
**repay**
123:21
**repayment**
107:24 128:24 129:2
129:6,16 158:14,16
223:18
**repeat**
109:25 160:8 167:9
195:11 199:11
**repetitive**
106:16
**rephrase**
34:1 40:21 60:12
69:1 108:9 111:25
191:5 206:4 215:9
218:24
**replied**
212:3
**replying**
220:3
**report**
13:1,4 23:2,22 24:19
25:17 34:11 196:5
207:10,12,16
**reported**
12:25 31:13 100:19
208:15
**reporter**

1:18 4:1,2 5:6,12
46:11 89:2,23 93:7
105:6,22 109:17,24
120:4 121:6,15
126:2 130:19
133:22 147:23
155:6 161:23 165:2
180:14,17 197:17
199:10 228:21
229:1,4 231:6,24
**reporters**
182:16
**REPORTER'S**
231:1
**reporting**
12:18 64:16 187:1
**reports**
16:20 25:7 30:16
32:7 53:21 92:8
**represent**
47:10 48:23 49:4,9
49:16 50:17
**representation**
47:11,12 48:16,17,25
**representative**
19:25 21:12 30:15
43:21
**represented**
50:13,18,18
**representing**
48:14 49:19
**reputation**
58:25 59:2
**request**
28:11 30:1,3 31:5,7
206:22 207:7,14
209:19
**requested**
104:15 182:17
**requesting**
30:10,13 190:13
**requests**
28:4,8,23 137:22
154:2,5
**require**
19:12 137:10

**required**
13:18 114:7,23
120:24
**requirements**
23:8
**rescheduled**
227:9
**rescind**
169:6 216:3 225:16
226:11 227:24
**rescinded**
170:9 173:25 174:17
215:24 216:16
218:3 219:25 226:2
226:23
**rescinding**
170:13 171:13 216:6
217:22 218:7
225:23
**research**
179:8,11
**resigned**
23:18,19
**resigning**
31:17,18
**resigns**
184:20
**resolved**
128:24
**resources**
40:23
**respect**
179:21 207:3
**respected**
67:18
**respecting**
185:2
**respond**
28:8 64:11 153:10,14
157:15
**responded**
85:11 154:4 216:15
220:8
**responding**
28:11 139:6 220:7
**responds**


MAGNA
LEGAL SERVICES

156:25

**response**
55:5 56:10 67:3 71:4
102:25 125:22
144:13 172:16,25
180:4,8,9 196:24
197:9,16 202:12
212:19,24 213:17
219:20 220:1
222:10

**responses**
92:3

**responsibilities**
16:10 18:10 204:23

**responsibility**
92:10

**responsible**
115:15

**restroom**
5:15 152:4

**restructuring**
45:14

**result**
190:23

**retaliating**
19:22

**retaliation**
27:13

**retires**
184:20

**retract**
77:22

**retracted**
80:24 81:2,3

**return**
31:21 33:12 145:23
185:10 187:25

**returned**
31:20

**returning**
177:22 188:14
190:12

**revenue**
77:14

**review**
7:5 36:15 93:18

106:4 109:19 126:8
136:7 162:13

**reviewed**
6:18 7:7 43:14 131:3
149:23 225:9

**reviewing**
36:12 44:8 75:8 90:3
136:11 152:18
153:4,8 159:8

**revised**
153:22 170:8 221:18
222:13

**revision**
149:22

**rhythm**
63:9

**right**
20:2 46:13 48:17
49:22 52:21 56:5,19
61:14 74:20,21 75:4
78:2 81:2 89:15
90:14,18 92:21
93:21,22 100:20
105:4,18 115:12,22
115:23 118:11
119:20,22 120:2
121:5 123:2,4
127:15 130:14
131:3,19 142:23
143:10 144:5 147:7
149:24 151:23
152:9,19 153:1
155:8 156:3 162:15
179:15 189:7
190:13,25 191:25
193:13 198:13,18
207:23 209:2 217:3
218:9,22 225:7,10

**right-hand**
74:13 89:3,8,13 93:4
105:11 109:14
121:9,17 126:4
130:16 147:21
155:3 162:2 180:10
180:19 197:23

**riley**

196:3

**ring**
204:8

**rings**
200:17

**road**
4:16 94:24 142:1

**role**
10:22,22 14:1 36:11
36:14 59:19 65:13
67:23 70:4 73:18
81:24 82:22 83:12
91:18,20 92:1,4,17
123:1,15 136:10,23
137:15,17,19 149:3
169:7 171:8 196:7

**roller**
98:21

**room**
14:20,20 54:15 113:2
113:3 168:16
171:20 222:15
223:9

**rooming**
54:5

**rooms**
14:19 15:5 165:5

**ROPC**
59:23 65:14,22 66:7
66:10 68:24 72:3
76:2,6,16 173:17
203:7 227:20

**ROPC's**
66:24 116:15

**rotate**
76:8

**routed**
64:25

**routine**
24:10 26:13 201:12
203:22 210:22
211:15

**routinely**
24:8,10 137:8

**rude**
53:7,15 54:23 56:5

**rule**
25:8 47:5 57:23
115:6

**rules**
4:7,16 5:2

**rumors**
192:25 196:11

**run**
42:20 166:8 187:22
187:23 196:11

**run-of-the-mill**
10:2 193:25

**rush**
164:23 165:9,16

**RV**
77:12

**RVUs**
97:15,21

---

**S**

**S**
2:1

**SABEY**
2:1

**safe**
14:22

**safety**
64:16,22 65:1

**salary**
38:15 107:14 149:19
150:12

**sale**
186:22 187:2

**Sam**
77:23,23 85:8,14
86:13 134:6,11,22
156:1 157:10,12
171:4 172:11,13

**sat**
21:10,11,12,16

**satisfied**
94:12

**saw**
186:21

**saying**
5:6 7:24 48:20 49:11



85:14 95:15 100:19
104:4 107:10
117:17 150:3 161:6
181:18 191:6 200:9
213:10 214:14
220:10 224:8,13

**says**
95:17 96:2 102:17
103:10,11 115:1
116:20 117:24
127:13 154:22
156:25 197:15
198:20 199:24
205:9 212:18

**scenario**
195:19

**schedule**
15:11 62:3,6,14,19
62:23,23,25 63:1,4
63:5,15,19,21,24,25
138:10 201:24

**scheduled**
62:11,15

**schedules**
15:18 137:9 201:1

**scheduling**
137:3

**school**
8:20,23 9:1,2

**schools**
8:21

**Science**
8:24

**scope**
30:14 153:24

**Scott**
164:5,6

**scratch**
45:14 116:12

**screen**
74:25 81:22

**screening**
81:25 83:18 84:3

**scroll**
217:10

**se**

13:5

**seal**
231:20

**search**
43:21

**searching**
17:18

**second**
28:5 56:7 73:5 90:4
90:11 91:9 95:1,21
110:25 126:8 148:7
149:7,9,12 154:1,6
154:11,12 185:19
197:13 200:8

**secondhand**
188:3

**section**
35:4 205:9

**secure**
131:15

**see**
12:8 46:2 69:22
72:21 74:7,24 75:1
77:20 78:7 80:17
89:11 90:25 101:13
104:17,20,21
105:19 109:11
112:18 114:7 121:9
121:12 126:25
128:8 130:17 131:6
149:20,21 153:1,2
154:14 157:2
163:12,19 164:10
181:16,21,21
183:14 188:3 197:4
204:4 210:3,4
212:17,20 213:4

**seeing**
68:15 83:13 91:23
93:25 94:3 110:7
112:6 113:6 126:7
156:16 181:17
187:1 192:23 197:6
202:21 207:24
211:25

**seen**

54:23 74:16 75:15
109:21 130:22
148:7 180:22 204:6
208:21 210:24
215:13

**select**
181:5

**self-employed**
84:18

**self-sustainable**
85:19

**seminars**
179:11

**send**
91:4 168:5 169:22
216:22 229:2

**sending**
134:6,11 157:18
167:14 216:24

**sense**
14:25 68:10,13 70:12
85:23 104:12 108:2
171:17

**sensitivities**
165:9

**sent**
74:3 128:12 131:6,18
131:24 132:1,10,18
134:15,22 147:11
153:5 156:12
157:24 179:23
217:22 218:4

**sentence**
81:21 85:13 96:1,2
103:11 114:4 116:3
149:9 159:1 198:24

**separate**
58:10 99:8 103:17,19
144:8 150:15,22
151:2 157:16
158:12,13 159:5
160:12 208:9
216:19

**separated**
99:12

**separately**

114:9 167:8

**separation**
95:7,19 151:18

**Sept**
116:21

**September**
11:10,13,24 12:1
40:13 51:17 119:10
119:11,12

**sequence**
122:7

**served**
95:5

**service**
12:14,15 13:3 76:5
82:22 111:12,17
199:18

**SERVICES**
1:13

**session**
26:10

**set**
14:21,21 23:12 63:7
63:15 111:9 200:21

**sets**
69:13

**setting**
17:8 51:4 184:5

**setup**
154:16

**seven**
162:14,16

**sex**
27:16,18

**sexual**
27:16

**shake**
99:23

**shaking**
5:5

**share**
173:23

**sharing**
227:3

**Shelly**
18:24



**Shelly's**
18:25
**shifted**
33:14 165:14
**shifting**
15:4
**ship**
151:15
**Shoot**
16:23
**shopping**
83:10
**short**
23:2,4,22 25:10 46:2
102:17 120:10
143:16,18 144:17
145:1 152:10
177:21 183:5
202:18
**shorthand**
1:18 231:11
**shut**
176:10 186:14
**sic**
208:10
**sick**
179:7
**side**
9:15,16 109:14
130:16
**sidetracked**
197:19
**sign**
49:23 50:21 92:20
120:21 121:22
123:10 129:21
131:9,19,24 132:3,7
132:10,15,19,24
134:24,24 135:15
135:21,24 136:9,15
137:25 138:4
148:21 153:10,15
156:14,22 159:13
164:24 167:12
**signature**
114:6,22 122:23

127:21 134:7,20
136:17 156:10,19
159:16,24 169:18
189:9,18 230:12
231:20
**signatures**
120:23 130:25
159:15,23 160:23
165:24,25 166:4
167:25 170:6
**signed**
50:6 133:2,7,14
134:12 136:2,4
137:20,22 146:6
156:2 160:2 165:16
170:1,7 188:24
189:3,15 190:25
**significant**
150:2
**signing**
123:23 124:5,10
134:17 136:12
153:22 165:22
225:13 229:1
**silence**
188:2
**silent**
185:24
**similar**
66:22 80:7,13 83:7
88:24 123:14 124:7
124:8 131:2 147:15
206:15
**similarity**
126:12
**similarly**
67:1 125:18
**simmering**
200:6
**simple**
25:14 184:8 219:6
**simply**
29:10 91:20 137:20
141:1 143:14
186:14
**Simultaneous**

211:2
**single**
37:24 210:8 224:15
**singular**
169:4
**sit**
77:4 102:19 131:15
**sitting**
91:16 130:8 208:25
**situation**
15:6 20:10 29:21
30:22 139:8 158:9
183:17 196:9
215:12
**sit-down**
102:22
**skill**
69:13
**slated**
96:9,11 183:13
**slightly**
33:7 166:10 208:9
209:23
**slip**
128:16
**slow**
204:1
**slower**
97:11,14 204:2
**small**
65:23 147:20 148:15
148:21 149:8,17,24
150:7,10 151:23
153:15 155:18
157:7 160:5,11
190:2 218:22 221:3
221:9
**smaller**
12:4,5 17:8,13,17
**small-edit**
167:1
**smooth**
84:21 113:14 114:3
**sneezing**
41:18
**Society**

80:19
**somebody**
22:14 170:4
**somebody's**
185:2
**soon**
119:9
**sorry**
25:20 28:5,15 32:3
41:18 47:25 48:18
50:4 51:22 95:10
99:21,23 108:6
109:24 110:8
111:11 119:12
133:17 138:6 139:2
149:11 152:3,20
157:21 158:14
160:8 165:2,5 169:4
170:18 172:19
174:21 175:4 190:8
195:11 197:1 205:7
212:18
**sort**
14:5 15:18 20:9
23:11 42:7 45:21
64:19 83:7,11 84:12
84:20 86:5 87:1,2
102:6 104:2 123:15
124:18 137:11
142:7 146:11 171:6
171:20 184:16,19
194:22 213:25
223:16 227:13
**sounded**
15:24
**sounding**
172:19
**sounds**
14:25 20:20 100:19
211:9
**source**
45:24
**space**
42:8 66:23 76:18
104:9 118:25
**span**



MAGNA
LEGAL SERVICES

172:1

**speak**
34:24 59:5 65:21
67:20 80:11,13,14
94:13 111:14
127:20 140:15
143:13 168:17
182:23

**speakers**
211:2

**speaking**
5:10,14 21:24,25
80:14 101:18 108:2
148:20 178:1
209:15

**special**
27:18

**specialities**
9:22

**specialize**
9:21

**specialty**
69:21

**specific**
9:24 26:22 28:7,11
28:15 53:12,17
56:22 63:23 66:5
69:24 71:5 87:13
88:2 100:23 108:19
108:21 112:20
123:22,25 126:23
129:4 138:22,24
139:13 154:16
172:13 189:25
191:19 196:17
201:20 202:20

**specifically**
5:24 10:18 21:23
26:4,20 27:22,23
44:12 52:13 65:6
68:18 87:23 91:14
92:14 98:7 101:4
104:15 112:18
114:11 126:21
127:5,9 135:1,25
137:8 154:13,24

157:5 161:16 163:3
172:24 191:10
193:7 194:5 205:18
209:9 213:8 216:6
218:21 219:18
222:9

**specifics**
53:19 57:24 71:21,25
72:5

**specs**
80:2

**speculate**
78:10 224:6

**speculating**
186:1,2

**speculation**
186:4

**speculations**
188:12 190:15

**spell**
4:20

**spelled**
104:1

**spent**
12:9

**sperate**
128:18

**spoke**
58:17 96:6 132:8
143:8 202:23
228:13

**spoken**
182:24,25

**spontaneous**
148:17

**spontaneously**
91:16 94:2 159:25
181:8

**spot**
118:24 140:10

**spreading**
196:11

**spring**
30:19

**Springs**
13:2,11,21 17:14

45:9 51:9 66:16
76:5 82:17,21,25,25
104:10 141:9 144:1
204:12,16

**spur**
87:3

**squared**
183:12

**ss**
231:3

**st**
13:11 15:25 16:22
68:22 69:4,10 75:19
75:23 76:3,6,8,10
79:24 94:8,12,14,23
96:11,18 97:2,9,9
97:14,22,24 103:18
103:24 105:1
122:24

**staff**
12:17 13:25 14:2,3,5
15:16,17 18:19
19:23 33:17 41:8
42:18 53:4,8,14,16
53:21,24,25 55:1,13
56:24,25,25 57:3
59:22,25 60:1,15
62:5 63:13 64:12
65:2 70:17 71:13
79:19,22 92:9,9
98:12,12 137:4
154:15 173:18
177:18

**staffing**
14:2,9 62:7 79:20

**stage**
24:14 51:4 154:22

**stand**
123:18 176:5

**standards**
19:14

**standing**
222:15

**stands**
67:14 108:22,25
149:1

**Stark**
35:22 36:13

**start**
11:23 74:4 108:3
126:24 162:3 186:1
186:23,24 195:4
196:2 220:3

**started**
11:24 119:12 140:7
167:16 186:6,6,19
191:11

**starting**
89:24 97:2 116:10,11
148:4

**starts**
78:2 93:9 105:25
133:13 185:18
186:19

**state**
4:17 111:3 213:18
230:14 231:2,6

**statement**
20:9 150:4

**statements**
7:7 20:8

**states**
1:1 41:18

**stay**
9:17 112:5 128:7,15

**stayed**
10:6

**staying**
9:24

**stealing**
22:4,15,18

**step**
35:20

**stepping**
110:15,17

**steps**
22:10 24:5 64:11,14
127:19

**stipulate**
4:1

**stood**
33:1



**stop**
 105:10,14 106:19
   107:11 108:1
   124:17 171:17
   172:5 174:8
**stopped**
 107:20 124:22,24
   173:8 178:14
**stopping**
 106:23
**straight**
 34:16
**straighten**
 25:12
**straightforward**
 5:17
**strategy**
 104:4
**Street**
 2:3,6
**stress**
 178:7,10,12,15
   192:17 194:21
   198:17 200:6
   202:24
**stressed**
 195:18 202:17
**stressful**
 183:5 184:2 185:3
**structurally**
 151:13
**structure**
 36:24
**structured**
 12:20 154:8,15
**struggled**
 53:25
**stuff**
 26:13 94:25 162:20
   211:12
**subject**
 35:1 36:2,17 151:7
   203:14
**subjects**
 228:13
**submit**

 195:13
**submitted**
 77:17
**subscribed**
 230:12
**subsequent**
 102:21
**subsidiary**
 10:14
**subsidy**
 106:20,23 107:12
**successfully**
 113:13
**sudden**
 6:23 16:24 119:18
   197:5 209:1 220:1,2
   224:22
**suffering**
 177:11
**suggest**
 19:4
**suggesting**
 22:23
**Suite**
 2:4,7
**summarize**
 14:24
**super**
 143:15
**superseded**
 200:14
**supervise**
 13:9
**support**
 12:22 83:2,3,3
   154:15
**supporting**
 214:3
**suppose**
 113:5
**supposed**
 24:6 145:19
**supposedly**
 186:25
**sure**
 19:20 20:1 48:15,20

 49:14,21 50:2,15,15
 62:4 78:17 83:15
 87:24 89:9,17 92:1
 114:16 120:6
 130:10 136:6
 137:11 138:18,20
 138:24 149:12
 151:17 154:13
 161:3,4,6 187:4
 189:2 191:3,5,10,14
 191:17 193:1
 194:15 196:13
 200:24 201:17
 206:15 210:15,25
**surgeons**
 69:22
**surgery**
 34:15
**surprised**
 224:11,12
**surrounding**
 120:18
**suspicion**
 186:16
**swear**
 4:2
**sweet**
 143:17,19 144:17
**switch**
 46:6
**switching**
 120:16
**sworn**
 4:10 230:13 231:8
**symptoms**
 194:10
**system**
 64:17 104:22
**S17**
 74:3

——————————
**T**
——————————
**table**
 21:12 103:13
**tag**
 43:13

**tail**
 98:23
**take**
 9:7 12:2 13:12 22:11
   23:16 27:3 35:20
   46:2 62:21 65:3
   74:15 90:3 93:18
   107:25 109:19
   114:15 120:4 126:8
   130:23 131:14
   141:10 146:21
   151:25 162:12
   178:8,8 187:5,16
   192:9 198:10
   200:15,23 206:12
   213:6 215:14
   216:25
**taken**
 1:16 4:7 16:12 45:21
   46:12 64:14 73:6
   117:1 120:8 152:8
   206:13 217:2
   231:11
**takes**
 113:22,22 164:9
   165:14 184:5,23
   191:15
**talk**
 5:10 7:17 8:7,11
   27:17 40:20 47:17
   48:15,24 57:25
   64:15 88:11 124:10
   149:8 160:20
   174:24 177:3 181:4
   182:12 190:22
   194:21 202:4
   203:15 212:15
   214:6 215:10
   219:15 221:19
   224:21 226:7
   227:15
**talked**
 6:19 36:22 47:18
   54:20 57:23 58:12
   60:19 94:10 101:4
   109:7 110:13 117:4



119:20 128:3 129:8
146:14 151:3 167:2
171:5 194:4,6
203:13 212:5
215:10 216:8
222:19 225:9,25
226:4 227:22

**talking**
64:10 72:13,17 78:1
85:8 91:10,18
117:12 121:25
123:5 124:17,21,22
124:24 128:25
145:5 151:4 165:19
170:24 171:18
172:5,21 173:8
179:17 180:1
186:10,15 188:22
189:22 195:22
197:2,25 199:2,5
201:16 202:8 209:6
209:10 210:1
213:12 220:22
221:2,14 222:7,16
224:19 227:2

**talks**
95:4 211:20

**tardy**
24:24

**target**
128:7

**team**
10:17 12:21 14:4
41:9 52:6 60:9
63:22 68:6 71:12
83:10,11 108:24
116:20 141:6 166:7
170:20 173:12
184:6 185:3 192:25
206:25 213:12

**Teams**
7:1

**technical**
116:1

**technically**
22:2

**technology**
77:9,11

**teed**
122:7

**telephone**
168:7

**tell**
4:10 6:4 12:11 21:7
21:23 22:14 30:21
42:10 45:10,13,15
53:5 54:19 57:19
82:24 83:1 115:19
119:24 123:12
124:13 133:4
140:25 195:7 203:4

**telling**
123:9 140:22 143:3,7

**temperature**
98:10

**temperatures**
100:13

**template**
20:17

**temporary**
184:17

**Ten**
46:11

**tend**
5:10 27:23 53:7
57:11

**tension**
76:16 98:19

**tensions**
98:14,17 110:9

**tenure**
12:11 15:9 16:12
41:3 119:7

**ten-minuter**
46:10

**Teresa**
18:23 31:12 34:15,20
57:13,13,15 58:3,8
58:11,17 213:18

**term**
21:1 97:16

**terminate**

19:3,7 139:5

**terminated**
22:20

**termination**
19:5,10 22:19,23
23:2,22

**terms**
22:10 27:21 28:17
38:24,25 71:11
87:12 109:4 160:25
161:10

**testified**
4:10

**testify**
231:9

**testimony**
46:16 73:10 120:12
152:12 228:15
230:6 231:15

**text**
141:12,14 145:3,7,9
167:14,24 168:5,24
169:3,3 171:10

**texts**
145:11

**thank**
35:10 46:11 73:14
102:18 105:21
122:14 133:8 152:6
229:4

**Thanks**
4:22 115:1

**theft**
21:21

**theme**
12:1 101:3,17

**theoretically**
20:13 97:15

**Therapeutic**
80:19

**therapist**
14:3

**therapists**
12:23

**therapy**
83:2 92:9

**thin**
158:24

**thing**
9:15 35:7 49:1
108:14 116:8
145:16 146:1

**things**
9:16 10:19 15:11
24:3 27:11,13,19,20
30:13 65:9 79:22
84:2,18 91:22 92:3
102:4,9 110:21
123:15 124:19
125:13 128:16
131:12,14 143:10
154:8 165:15 166:5
166:6 174:10
184:17,18 186:18
196:2 204:22

**think**
6:12 8:25 9:10 17:23
25:15 33:21 34:15
34:17,18 35:15 38:1
38:21 40:18 42:2,17
48:8 52:7,14 70:25
70:25 72:20 73:17
74:19,25 75:18,23
78:12 80:24,24
81:14 87:11 88:4,16
93:25 94:9,10,11
96:13 97:8,18 99:3
100:7,12 103:5
104:14 107:5
108:11 113:8
114:11 118:17
119:6 121:4 127:4,5
128:14,22,23
129:14 131:23
133:17 139:12
145:3,5,18 146:13
147:17,20 154:1
157:13 158:5 160:9
162:9,19,20 164:6
165:8 168:22 172:8
173:2,22 175:20
181:15 182:7 186:9



188:20 190:5,9,10
195:19,23,23
196:19 197:14
206:23 211:24
212:1,2 213:9,15,20
215:10 216:4,18,23
217:4,14,16 218:11
221:1 223:3,7,24
224:11 228:10,18

**thinking**
55:25 99:16 186:24

**third**
78:7,24 81:21 117:16
143:24 148:7

**Thompson**
198:18

**thought**
17:20 24:13 46:19
61:5 75:22 87:7
95:5,18 98:4 124:19
174:10 181:15,16
181:17,19 187:24
189:16 190:12
203:18,20 207:25
220:11 223:10
224:3

**three**
17:2,4 45:7 52:21,23
52:23 147:2 162:11
162:17 177:22
183:6,24 184:12
185:10 200:21
201:3 202:14 207:7
210:9 216:25

**three-and-a-half**
117:11,15

**three-page**
110:25

**three-week**
199:3,12 200:10

**three-year**
16:11

**throughput**
15:5

**throw**
82:18

**thrown**
179:5

**time**
5:9 7:11 8:4 10:6,25
12:9 13:3 15:3,15
15:24 16:9,13,15
20:3 23:1,20 25:25
26:12 30:24 31:10
37:24 40:11,15
42:20 43:13 51:8,11
52:5 53:9 54:5,20
55:9 56:12 62:5
63:9 69:8 73:20
78:13 82:12,15
87:25 97:25 98:8,15
98:22 102:4,6,12
107:5,11,14 112:24
113:8,16 118:11,18
119:5,8 120:23
122:8,20,21 124:15
124:15,16 125:1,4,5
125:6 128:13,23
129:1,1,12,15,20
132:18,20,25 133:5
135:8 137:12 138:2
138:3,4,8 139:9
140:9 142:13 143:1
146:3,13 151:4
153:5 156:11,15,20
158:4,5,8 159:22
160:5,10 161:17
165:9 170:15,16,19
172:2,4 173:7,9,13
174:1 175:14,19
176:15,23,24
177:12 178:9
183:11,16,18,20,22
184:23 185:12,16
185:25 186:5 187:7
187:10,15,24
189:16,20 194:9,10
194:22 198:16
199:19,25 201:11
202:11 203:7,18
204:12 206:24
207:21 209:21

211:1,23,24 212:13
215:15 216:13
217:16,25 218:1
221:10 222:2,5
223:9,12 224:11,14
226:1 231:12

**timecard**
42:7

**timeline**
170:10

**timely**
92:3,5 128:15

**times**
22:22 44:9 50:9,10
52:24 54:12 57:22
62:22 86:25 112:7
138:18,22

**Tippet**
103:2

**tired**
165:19 217:5

**title**
163:9 199:19

**today**
4:17 5:15 6:13 8:12
11:14,15 45:25
60:20 78:3 224:2
225:17,20 228:12
228:13

**today's**
6:15

**told**
6:17 13:23 17:24
41:16 50:8 90:20
99:23 103:24
109:11 145:20
154:9 165:20 218:6
225:12 227:9

**Tom**
163:10,11,22

**tomorrow**
78:4

**tonight**
119:19

**tool**
77:10,12

**top**
16:23 85:24 86:11
90:25 91:21 106:18
134:14 148:9 154:6
154:12 162:11
170:4 201:21
205:13

**topic**
56:1 121:3 165:18
215:1

**topics**
8:15 36:21 46:7
50:25 100:5 108:23
120:16

**toss**
113:14

**totally**
82:20 84:25

**touch**
122:12 185:17
195:24

**town**
140:19

**towns**
17:17

**traffic**
216:4,18

**train**
98:4

**training**
18:9 25:19,23 26:7
26:18,22 27:1,8,9
27:22 28:7,11 29:7
29:14 30:5,9 33:18
33:19 35:18,21,23
36:19,22 43:22

**trainings**
26:5 27:23

**transcript**
228:22 231:14

**transcription**
230:5

**transition**
9:12 84:21 113:17,22
113:24 114:3
211:16



MAGNA
LEGAL SERVICES

transitioning
 165:10
transpired
 216:1
treat
 69:16
treating
 56:5
treatment
 14:20 15:7 18:7
    63:12 184:7,9
    210:21,21
treatments
 62:24 63:8 84:1
trial
 5:23
tried
 146:1,1,2 147:5
    167:6 168:12 173:3
    173:4
trigger
 218:1
trip
 139:20 203:17
true
 158:7 230:5 231:14
truly
 15:19
truth
 4:10 6:4 231:9
truthfully
 6:13
try
 5:13 33:13 60:12
    71:16 99:16,19
    126:25 139:10,14
    140:2 145:25 161:1
    168:7 181:25 182:2
    206:12 219:7,8
trying
 21:8 37:22 47:19
    55:12 61:14 62:18
    63:10 88:5,6,25
    99:3,15 101:13
    114:14 119:1 124:2
    124:3 130:4,24

131:12,14 139:21
 139:25 140:11
 141:18,22 142:2,22
 143:16 144:23
 145:13,17 151:15
 161:7 163:19
 167:20 168:15,21
 173:11,17 188:7,8
 192:9 193:8 195:24
 197:20 200:21
 201:5 203:15
 214:14 219:13
tumultuous
 167:17
tuned
 146:10
turn
 56:19 90:11 165:17
    205:3 208:22
    224:20
turned
 202:17
turning
 17:14
turnover
 57:3,22,23 58:5,5
twice
 171:25
two
 43:3 55:2 86:17
    98:11,15 110:12
    112:25 145:2 151:7
    151:18 171:5 172:2
    172:8 173:3 174:25
    188:8 205:2 210:9
    223:8,13
two-page
 89:20
two-sided
 49:1
two-week
 203:21
type
 10:11 13:15 26:16
    64:25 77:11
types

14:6 27:4,20 79:22
 184:18
typewritten
 231:13
typical
 15:22 184:21 193:23
typically
 25:4 42:1

――――――――――
U
――――――――――

Uh-huh
 63:18 72:6 81:19
    99:20
ultimate
 129:7
ultimately
 78:13 81:13 86:13
    87:11 124:12
unable
 173:4
unanimous
 19:7
uncommon
 24:18
understand
 27:20 29:17 37:3
    38:8 50:15 54:22
    69:19 72:10 83:13
    91:3 92:4 96:3,5
    106:14 108:11
    129:12 135:20
    136:6 189:2,13
    191:3 196:13
    198:16 207:23
    208:8 209:23
    216:13 222:25
understanding
 14:9 34:1 36:24 37:1
    38:25 39:7,8,10,17
    41:12 42:19 43:4,5
    59:23,24 67:16,18
    91:7 92:7 95:8,15
    100:15 107:7,16
    117:20 132:13
    135:13 150:13,21
    163:24 165:13

168:14,17,19
 173:19 179:12
 189:14 192:12
 194:25 198:23
 200:1 205:20
understood
 19:10 40:2 92:15
    98:17,21 135:17,18
    142:21 156:20
    192:17
unfortunately
 206:3
unhappiness
 94:14
unhappy
 87:8 109:3
unique
 138:19
UNITED
 1:1
Units
 97:16
University
 9:3,5
unpleasant
 80:9
unprofessional
 53:4
unreasonable
 224:14
unresolved
 70:17
updated
 176:19
updates
 32:1,4,24 33:6
upfront
 87:5
ups
 210:22
use
 37:12 57:9 152:3
    212:8
usher
 123:15,15
usual



5:8
**usually**
137:13
**UT**
10:14

---
**V**
---

**V**
1:11
**vacation**
124:14,24 125:5,7,9
136:19,24 137:2,4,7
137:11,16 138:14
138:15,17 139:2,6
139:11,17,18,22
140:1,4,12,14,16,23
140:24 141:11
142:18,21 143:8,16
143:25 144:22
145:15,18,19,21
147:2 167:7,13,16
167:18,20,23
168:10 173:14,16
174:7 175:23 176:4
177:7,14 178:2
183:10,13 186:17
189:24 190:25
191:9 193:20,25
195:1 198:10
201:10,14,19,20
202:17 203:2,3,21
203:22 219:11,17
220:14,15
**vacations**
62:21 137:5,8,12,18
**vague**
98:9 221:19
**vaguely**
71:22
**Value**
97:16
**value-type**
26:14
**various**
26:15 27:4 41:10
62:21 63:9 218:15

**verbal**
23:25 24:3,14 171:9
171:11
**verbatim**
20:7
**verifying**
60:15
**version**
189:15,15 221:21
**versus**
103:18 154:15
208:12
**vetted**
69:10
**Victor**
4:21
**Victoria/Houston**
9:6
**videoconference**
4:3
**VIDEO-RECORD...**
1:5,16
**viewed**
96:13
**violated**
86:7
**violations**
25:8
**vision**
43:23 44:3,4,5
**visits**
14:21 15:5,9 184:8
**voiced**
176:18
**voicing**
94:21
**void**
189:10
**volume**
69:24,24 117:12
**volumes**
14:3 15:4 85:19
117:10

---
**W**
---

**W**

133:15
**wait**
5:9 159:23 185:19
224:23
**wake**
224:22
**walk**
8:18 11:4 21:4 30:10
46:4 81:15 113:12
173:10 186:7 190:5
**walked**
19:25 21:13,15,16
38:7
**walk-through**
126:25
**want**
9:17 16:23 36:21
46:9,16,20 72:21
73:9,25 80:17 83:5
83:9 89:9 93:19
108:12 119:24
120:11 122:1
141:25 142:20
152:11 158:15
167:8 185:1 198:1
221:3 228:11,15
**wanted**
17:7 77:12 108:1
143:17 146:25
152:16 205:3
**wanting**
146:21 167:22
179:24
**warn**
168:25
**warning**
24:15
**warnings**
23:25 24:3
**wasn't**
9:24 10:25 11:1
15:22 17:2,4,14
22:2 24:10 53:20
54:5,7 59:22 60:11
63:2 67:25 72:16
76:24,25 81:10

83:24 87:19 94:18
99:7 104:6,6 115:8
119:5 125:6 136:10
140:13 141:2
143:15 144:7 145:4
145:23 151:14
153:12,17 159:16
159:17 168:16
169:7 173:19 174:4
177:2,2,4,22 181:12
186:10,10,11,13
187:16 193:1
205:12 207:3,4
219:5 222:23
227:11
**water**
102:8
**way**
12:20 20:2 28:14
37:23 39:7 60:6
87:6 95:6,18 98:16
127:19 153:9 154:8
154:15 169:17
171:15 183:23
186:6 193:8 194:17
202:9 206:2 215:10
223:1
**ways**
20:13 48:21 97:4
99:8
**web**
43:20 82:6
**web-based**
26:23 42:8,10
**weeds**
86:15 87:19 104:7
**week**
117:14 138:1 164:13
173:9 177:17
203:19
**weekly**
59:15
**weeks**
34:21 200:22 201:3
**weird**
103:23



**welcome**
78:5
**Weller**
90:23 134:11 135:13
  155:2 156:1,25
  157:5,15 171:4,24
  172:14,16 173:23
  174:13,13,15 175:2
  226:7
**well-defined**
34:3
**went**
19:5 26:6 31:8 52:14
  73:7 81:14 85:6
  99:23 139:19
  140:16,23 141:1,11
  164:1 169:21,21
  185:24 194:5,5
  197:19 210:6
**weren't**
72:17 86:16 87:4,6
  100:8 118:16
  179:25 191:20
  206:11
**we'll**
48:24 91:5 125:19
  182:2,2 204:25
**we're**
5:6,12 15:14 34:16
  36:4 46:6 47:17
  89:9,16 101:5,7,7
  116:22 120:9 121:4
  152:9 183:14 188:2
  203:25 208:25
  212:2 227:9
**we've**
34:6 47:9,9,18 73:12
  82:10,10 114:14
  129:8,17 165:9
  166:15 176:2
  190:11 215:13
  225:9
**we'll**
102:19
**whatnot**
16:19 19:22 27:5

71:20 83:17 87:2
  91:23,25
**WHEREOF**
231:19
**whichever**
117:12
**wife**
17:16 48:12 49:10
  165:6
**William**
197:10 204:4,10
**willing**
176:9
**willingness**
100:3,24
**win**
96:13
**window**
117:4
**withdraw**
78:10
**withstanding**
6:1 194:25
**witness**
4:2 231:19
**witnessed**
193:2
**witnesses**
6:19 48:11 226:4
**woke**
220:2
**won**
96:4,8 101:23
**wondering**
63:13 198:5
**word**
125:15 149:16 179:5
  197:14 213:10
**words**
61:15 145:14,22
  222:22
**work**
10:18 11:1,2,7,9
  13:16 14:3,18 15:11
  18:11 19:14 30:14
  30:15 32:10,13,18

33:8,9,14 46:24
  52:19,25 53:2 57:1
  57:1,2 60:1,9 62:11
  62:12,16,19,22,22
  65:10 66:17 68:20
  69:3 73:13 75:23
  77:7 78:25 80:4,10
  83:10 88:6 96:10,11
  100:14 101:10
  114:2 127:5,7
  183:24 184:14
  199:20 203:15
  227:16,18,19,22
**worked**
28:13 30:4 39:24
  40:16 53:9 58:21
  75:5 77:12 100:9
  118:2,7,21 199:22
  227:20
**workflow**
16:17
**working**
14:5 15:12,16 38:13
  39:18 40:12 43:8
  59:19 60:8,18 62:15
  62:17,20 63:6 64:4
  67:8 76:1 79:9,13
  79:17 81:8 87:6
  107:21 111:21
  113:9 124:2 173:17
  190:6 193:1 205:23
  206:5 227:6,11
**workload**
33:16 184:10 194:21
  202:9
**works**
36:8 46:11 72:22
**work-from-home**
15:19
**work-related**
33:9
**worried**
185:5,7 202:16
  209:13,13
**worth**
117:7

**wouldn't**
36:14 94:1 98:11
  112:14 165:15
  183:11 185:10,16
  221:12 227:13,14
**wound**
174:6
**wrap**
131:12 215:1
**written**
20:17 23:25 24:14
  47:12 78:14
**wrong**
20:21 181:24
**wrote**
150:19 214:17
**W-2s**
38:16

___

**X**

**X**
3:1 210:7

___

**Y**

**yeah**
8:2,22 9:8 14:18 16:1
  16:14 17:6 19:2
  24:16 27:7 35:12
  38:10,17 41:14 46:6
  49:18 57:10 73:1
  74:21 75:12 78:9
  81:3 84:9 85:6
  87:11 94:5,16,18
  99:2,2,22 100:21
  101:12,16 104:11
  105:16 106:9
  107:20 108:5,15
  113:5 115:6 119:11
  120:24 124:7
  127:18 134:15
  137:17,23 140:3,5
  141:20 144:3 158:8
  159:21,23 171:25
  175:17 182:7
  183:25 185:16
  198:19 200:19



201:14 204:21
206:10 208:3
209:20 217:13,15
221:7,10,14 225:5
**year**
26:25 27:2
**years**
52:21,23 98:18,20
101:13 227:19
**Yep**
107:10

---

**Z**

**zero**
176:11
**Zoom**
1:17 6:25 204:2

---

**0**

**00008**
219:21
**000394**
205:4
**00393**
205:4
**0119**
74:12
**0853**
161:21,22
**0958**
125:25
**0961**
133:3,16,19,20
**0988**
147:22
**0999**
121:14

---

**1**

**1**
111:6 112:3 114:10
116:21 122:24
128:8 231:21
**1st**
116:21 122:25 195:2
195:5

**1:05**
73:6
**1:23-cv-01921-NY...**
1:3
**10**
46:15 82:23
**10th**
162:7
**10:00**
1:17
**100**
2:7 113:22
**1018**
197:22,23
**1024**
213:4
**105**
3:8
**1088**
180:11
**109**
3:9
**11**
126:20 129:1 182:5,9
182:10,12,15,22
191:23,24 192:7,13
193:6,17 194:24,25
197:19 198:3,7
**11th**
132:11 162:7
**11:11**
46:12
**11:30**
46:12
**12**
134:13 156:12
157:19
**12th**
162:8 221:8 222:4
**12-something**
98:20
**12:14**
73:6
**12:30**
126:19
**120**

113:22
**120-day**
117:1,3
**121**
3:10
**125**
3:11
**13**
3:17,17
**13th**
162:8
**14**
1:6,17 3:2
**14th**
229:7
**15**
164:10
**15-minute**
46:15,15 82:23
**161**
3:12
**17**
74:2,5,14,16,21,23
75:8,15 77:17 85:13
90:13,18,21
**17th**
2:3
**180**
3:13 184:22
**19**
11:13 51:17 208:20
208:21 209:2
211:20

---

**2**

**2:15**
156:12
**2:30**
120:8
**2:34**
120:8
**2:58**
156:18,19
**2014**
8:25 9:10
**2019**

11:10,12 26:9 36:25
39:2,6
**2022**
40:13 111:6 112:3
114:10 119:10,15
126:20 127:12
134:13 164:9
192:20
**2024**
1:6,6,17 3:2 229:7
**2025**
230:15 231:20
**2027**
231:21
**22**
11:24 78:14 111:18
198:4
**23**
50:7
**231**
231:13
**24**
164:9
**24th**
164:10
**25th**
141:13 198:7 202:6
**26th**
220:23,25
**2701**
2:6

---

**3**

**3**
80:16 140:10 219:20
**3rd**
162:7
**3.5**
117:7,9,10,12,14
**3:28**
152:8
**3:33**
152:8
**3:48**
157:19
**31**



MAGNA
LEGAL SERVICES

212:16,17,21 213:1
213:6 214:25
**33**
88:17,19 89:2,25
90:1,4,11,16,24
93:1
**34**
3:17 93:10,11,13,16
93:21,24 95:1,22
96:15 98:24 100:16
100:23 101:15
102:15 105:5
**35**
3:17 105:23,24 106:3
106:18 110:7
**36**
109:18,20,21 110:7,8
111:1 120:3
**37**
3:6 121:4,11,16,19
121:21 122:9 123:7
**38**
3:7 126:2,3,7,14,18
126:25 130:2 131:3
**39**
3:8 130:20,21,22
131:10,18 132:24

_____
**4**
_____
**4**
3:3 85:13
**4th**
162:7
**40**
3:9 73:8 117:14
133:23,24 134:3,5
135:12 136:3,13,18
**401K**
42:5
**41**
3:10 148:1,3,8
149:13 150:20
152:14,15 153:6
154:2,6,12 155:19
221:4 222:3
**42**

3:11 155:8,9,10,13
155:25 157:14
159:8,20 160:4,10
160:19
**43**
3:12 161:24,25
162:10,18 164:8
180:14
**44**
3:13 180:15,18,20,22
196:20,23 197:4,18
197:25 198:13
200:21 202:21

_____
**5**
_____
**5**
127:12 182:2,12
197:10 203:24
204:3,6,7,24 206:20
**5th**
154:22 162:7 231:20
**5:19**
217:2
**5:25**
217:2
**5:47**
229:6
**50**
16:24

_____
**6**
_____
**6th**
162:7
**60**
131:13

_____
**7**
_____
**7**
217:6,7,8,11,12
218:12,19 219:20
224:1 225:2,8
226:14
**7th**
162:7
**75**
12:7

_____
**8**
_____
**8**
97:1
**8th**
162:7
**80**
117:14
**800**
2:4
**80202**
2:4,7
**88**
3:6

_____
**9**
_____
**9th**
162:7
**90**
113:22 117:1,3
145:24 178:18
184:22 200:15
**90-day**
202:18
**90-days**
202:6
**93**
3:7
**97**
8:23
**999**
2:3

