Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

CASE NUMBER 1:23-cv-01921-NYW-MDB

_____

DR. ANUJ PEDDADA,

                Plaintiff,

v.

CATHOLIC HEALTH INITIATIVES COLORADO
dba CENTURA HEALTH - PENROSE-ST. FRANCIS
HEALTH SERVICES,

                Defendant(s).
--------------------------------------------------------
DR. ALAN MONROE

October 30, 2024
--------------------------------------------------------

        Pursuant to Notice, and Fed. R. Civ. P. 30 the

    Zoom deposition of Dr. Alan Monroe, was taken on

    behalf of the plaintiff by his attorneys of Rathod

    MOHAMEDBHAI, LLC on October 30, 2024 beginning at

    the hour of 10:00 a.m. MST reported by Ruth Collins

    of Magna Legal Services, 866 624-6221.



Page 2

APPEARANCES

For the plaintiff:

 Crist Whitley, Esq.
 Iris Halpern, Esq.
 RATHOD MOHAMEDBHAI, LLC
 2701 Lawrence Street, Suite 100
 Denver, CO  80205

 ih@rmlawyers.com


For the defendant:

 Lindsay McManus, Esq.
 Mark Sabey, Esq.
 HALL RENDER KILLIAN  HEATH
  & LYMAN, P.C.
 999 17th Street, Suite 800
 Denver, CO  80202

 303 802 1299

 lmcmanus@hallrender.com

---

Page 3

INDEX
Examination by Mr. Whitley............... Page 4
Examination by Ms. Halpern............... Page 218

EXHIBITS

Ex. 15    PSF PEDDADA 00346            Page 128
 Recruitment Agreement
Ex. 16    PSF PEDDADA 0107            Page 144
Ex. 17    PSF PEDDADA 0119 Email        Page 149
Ex. 18    PSF PEDDADA 383  Email        Page 164
Ex. 19    PSF PEDDADA 000384 Email      Page 179
Ex. 20    PSF PEDDADA 0303 Email        Page 182
Ex. 21    PSF PEDDADA 0240            Page 186
Ex. 22    Discovery Responses          Page 194
Ex. 23    Defendant Responses          Page 196
Ex. 24    PSF PEDDADA 0742 Email        Page 199
Ex. 25    PSF PEDDADA  0988 -0990        Page 219
Ex. 26    PSF PEDDADA 0922 -0924        Page 222
Ex. 27    Monroe agreement            Page 231
Ex. 28    Email                Page 233
Ex. 29    PSF PEDDADA 0123 Email        Page 240
Ex. 30    Email                Page 240
Ex. 31    Response Peddada Complaint    Page 256
 PSF PEDDADA 0124

Ex. 32    PSF PEDDADA  1006 settlement    Pag33 258

---

Page 4

P-R-O-C-E-E-D-I-N-G-S
(October 30, 2024)
 MR. WHITNEY: Crist Whitney for Dr. Anuj Peddada.
 MS. MCMANUS:  Lindsay McManus and Mark Sabey on behalf of Penrose Hospital.
 DR. ALAN MONROE,
first having been duly sworn, on oath testified as follows:

EXAMINATION

BY MR. WHITNEY:

Q.   So while we are on the record, I just wanted to note that we just received some documents yesterday. It was like around 11:00.  And we haven't had a chance to review any of them.  And I don't think defense counsel has reviewed any either.  So we just want to reserve the right to reopen the deposition, after we have had the opportunity to review them.

 All right.  So good morning, Dr. Monroe.  How are you are doing today?

A.   I'm doing well.  How are you?

Q.   Not too bad.  Can you hear me good?

A.   Yes, I can hear you.

Q.   Okay.  So have you ever been deposed before?

A.   No, first time.

---

Page 5

Q.   Okay.  Good.  All right.  So just some ground rules really fast.  So all your answers must be verbal for the court reporter.  So if I ask a question and there is a yes or a no, don't just nod your head.  Just say yes or no.

 And then we don't want to go and talk over each other.  So I will ask a question, and then I will stop and then I will allow you to answer, just so it's a clean record for the court reporter.  And if you don't understand or hear a question, just let me know and I can easily repeat the question.

 And also remember that you are under oath and are required to answer all the questions truthfully.

A.   Yes.

Q.   And again, if you don't know something, it's fine just to say you don't know or you don't remember.

 Your attorney can make objections.  They are here with you, but these objections will just be for the record.  And even if your attorney objects to the question, you still have to answer the question, unless we are asking something that would be privileged.  In that case, they will instruct you not to answer the question.

A.   Okay.

Q.   Are you suffering from any illnesses that



Page 6

might affect your testimony today?

A. No.

Q. Okay. Are you on any medications?

A. No.

Q. And any reasons that you would not be able to be truthful today?

A. No.

Q. Thank you.

So have you ever been a witness in a case before?

A. No.

Q. Okay. And have you taken part in any cases relating to a doctor being terminated at Centura?

A. No.

Q. How about any other cases related to a doctor being terminated?

A. No.

Q. Okay. Have you personally ever been sued before?

A. No.

Q. And what is your understanding of the reasons why you are being deposed today?

A. My understanding is that there is a claim about a disability and wrongful termination.

Q. Okay. And then other than the lawyers

Page 7

representing Centura, have you spoken with anyone about Dr. Peddada's termination?

A. You mean recently or --

Q. At all?

A. At all? I had an attorney --

MS. MCMANUS: Object to form.

A. I had my own counsel back when we were dissolving our corporation.

Q. Okay. Go ahead, Doctor.

A. I had an attorney when we were dissolving our corporation, but I can't remember anyone else that I spoke to.

Q. Okay. And when was that?

A. That would have been November or December of 2021, probably.

Q. Okay. But you guys didn't talk about the termination since it was 2021? Correct?

MS. MCMANUS: Object to the form of question.

A. Yeah, it was unrelated to the current termination. So, no, I didn't talk to anybody.

MS. MCMANUS: Hey, Dr. Monroe, I just wanted to say, if you could just pause before you answer so that will give us the time to make our objections if we have any. I wanted to reserve -- I object to the form on that question. Okay?

Page 8

A. Understand. I speak and think quickly. My apologies.

MS. MCMANUS: No problem. No problem. It's very natural.

Q. (By Mr. Whitney) And then other than the lawyers representing Centura, have you spoken with anyone else about the lawsuit?

A. No.

Q. Okay. And what did you do today to prepare for today's deposition?

A. I didn't do anything today really. I just drove to work, and talked to my nurse. I did speak with my counsel for a short time, like an eight o'clock zoom meeting, and then that was it.

Q. Okay. And not just today, but what did you do to prepare for the deposition?

A. I had a meeting with Lindsay and Mark last week.

Q. Okay.

A. I forget the date we spoke. I think it was last Wednesday.

Q. All right. And did you review any documents?

A. I looked through some old documents, E-mails and such, and some handwritten notes. Yeah.

Q. Okay. Have you reviewed the transcripts of

Page 9

Dr. Peddada's deposition?

A. No, I didn't have access to them.

Q. Okay. And have you reviewed any of the other deposition transcripts from Dr. Thompson, or Jason Taja?

A. No. Those weren't made available.

Q. All right. How about for Karen Waldoff?

A. Yeah.

Q. Okay. Have you reviewed any of the discovery responses in this case?

A. What do you mean by discovery responses?

Q. So we sent over discovery requests to defendant Centura. Have you reviewed any of them?

A. I still don't understand what you're -- I have some E-mails that had, like, some contacts on them, and E-mails and things.

Q. Okay. But nothing as far as discovery?

A. Yeah. I am sorry. I am not familiar with the term discovery.

Q. That's fine. Have you reviewed any recordings?

A. No.

Q. Okay. Have you reviewed any policies?

A. No.

Q. Okay. And you said you met with the Centura attorneys?



3 (Pages 6 to 9)

Page 10

A. Yes, I did.

Q. Okay. And when did you say that was? I know you --

A. Last week.

Q. Last week. Okay. And how long did you guys meet?

A. Maybe hour and a half or so. I can't remember exactly.

Q. Okay. And did you meet with anyone else?

A. No.

Q. All right. So I'd like to get a better understanding of your background and your training. So where are you from?

A. I am from Kentucky.

Q. Wow. All right. What part of Kentucky?

A. Bowling Green.

Q. Bowling Green. Is that --

A. Mannequin, that area, southern Kentucky.

Q. All right. Is there a university there? I know that state. I am thinking it is based on a university.

A. Most people think of Bowling Green University, but that's in Ohio. Western Kentucky University.

Q. All right. All right. And what brought you to Colorado?

Page 11

A. Pretty much the job to be honest.

Q. Had you been here before the job?

A. I had. I visited Colorado growing up as a a lot. My dad had lived in Colorado for a few years when I was in high school and college.

Q. All right. So you said you came out for the job. How long have you been here in Colorado?

A. I was hired in 2006 by Dr. Peddada.

Q. All right. So you were hired by Dr. Peddada in 2006. Did you interview with Dr. Peddada for the position?

A. I did.

Q. All right. Tell me about that experience.

A. It was at our national meeting ASTRO, in 2005 that we met.

Q. You met in 2005?

A. Probably the fall of 2005.

Q. Okay.

A. I was living in Chicago at the time.

Q. All right. I will come back to that. Where did you go to undergrad?

A. Went to Duke University.

Q. And when was that?

A. 1991 through 1995.

Q. All right. And what did you get your degree

Page 12

in?

A. In physics.

Q. All right. And where did you go to medical school?

A. I went to Virginia Commonwealth University, also known as Medical College of Virginia at the time.

Q. Virginia Commonwealth?

A. Richmond, Virginia.

Q. Oh, yeah. I lived there.

A. No way.

Q. Yeah I did. I lived down by the Wal-Mart on Forest Hill Drive. I am sure they didn't have that when you were there. I was there for about a year. I wasn't a big fan. I was like, I was there and then I had to go. It wasn't one of my favorite cities. But I am familiar with VCU.

And when did you get your medical degree?

A. 2000.

Q. And was there a particular degree that you got from the medical school?

A. A doctor of medicine, I think. It's on my wall. Hang on. I don't see it.

Q. And did you complete any additional education or training specific to radiation oncology?

A. Yes. I did a residency.

Page 13

Q. Okay. And where was that?

A. University of Florida.

Q. Okay. Can you tell me a little of your experience during your residency?

A. Sure. It was a busy program, saw a lot of patients, had fantastic mentors. I had a generally good experience in residency. Quite a variety of cases, and met all of my numbers.

Q. All right. And when was this? When was your residency?

A. There was an internship before you start your residency. And I started my internship in 2000-2001. Started my radiation residency in 2001, completed in 2005.

Q. So the internship and the residency between 2001 and 2005?

A. Yes.

Q. Is that common, a four-year residency?

A. Yes.

Q. Okay. And did you complete any fellowships or anything?

A. They are not commonly done in our field. I did not do one.

Q. Okay. And how long have you been a radiation oncologist?



4 (Pages 10 to 13)

Page 14

A. I have been a radiation oncologist since I graduated in 2005 from my residency.

Q. 19 years?

A. 19 years, yeah.

Q. All right. And what made you want to do that work?

A. I wanted to help people, and I had a background in physics, and it seemed like an interesting and good approach. I used my physics degree to help people. It worked out.

Q. And can you describe what a radiation oncologist does?

A. Sure. They take care of patients with cancer using ionizing radiation to treat tumors, and also benign conditions.

Q. Okay. All right. So I am going to ask you pretty broad question here. Would you be able to summarize your work experience, including like any significant positions you've held and where you've worked?

A. Sure. I worked two places in my life primarily. Actually, I worked in Chicago for one year, at Rush University. That was from 2005 to 2006. During that time my wife was getting a fellowship in Chicago, and we were matched there esentially. So I found a job.

Page 15

And I took this job in Colorado Springs in 2006 with Dr. Peddada. We did cover Parker Hospital for a short time. And so I was working at Parker in Denver some time. I can't remember the exact years but between 2010 and 2017, something in there.

Q. And you were working where? I'm sorry?

A. Parker Hospital, Parker.

Q. Colorado?

A. Yeah. In Colorado, but I was still working here as well at the same time, just covering two centers.

Q. Okay. And that was with Dr. Peddada?

A. Yeah. He was covering up there well. We had a third partner, Dr. Tanner.

Q. Okay. Are you still in contact with Dr. Tanner?

A. We text occasionally, but nothing serious.

Q. Okay. Was he a radiology oncologist as well?

A. He is.

Q. Okay. Do you know where he is located?

A. I think he is still in Parker.

Q. And what was his first name?

A. Andrew.

Q. And the first one, you said was Rush University?

Page 16

A. Yeah, Rush in Chicago.

Q. And that was 2006? Actually, that was before that time?

A. Yeah. It was like July, 2005 through June of 2006, so the one year between my completion of residency and my starting here.

Q. Okay. And then you met Dr. Peddada?

A. Yes.

Q. Okay. Now do you have any specific areas of expertise or specialization within radiation oncology?

A. I enjoy treating head and neck cancer. I have probably published the most articles in that field. But I have published articles in most of the primary disease sites. So I consider myself a generalist in radiation.

Q. Sure. So the head and neck field. You said you have published a number of articles.

Can you tell me some of the stuff you published?

A. Yeah, I am publishing something currently on trigeminal neuralgia using cyber knife. I've published things on breast cancer, lymphoma, head and neck cancer, prostate cancer.

Q. Okay. And where were these published?

A. Various medical journals. I can get you a copy of my CV, if it's important to you.

Page 17

Q. How about an example of some of those journals?

A. So Practical Radiation Oncology, Something called the Red Journal, which is our major International Journal of Radiation Biology, Oncology and Physics. I published in -- I can look over. I have got them on a shelf here, maybe I can see them. One called Head and Neck. Those kinds of journals.

Q. Okay. Do you remember when you published your first one?

A. It would have been in residency, probably 2002.

Q. 2002. Okay. Do you remember where it was published?

A. I think it was published in Head and Neck.

Q. Okay.

A. About aesthesio blastoma. My apologies to the transcriptionist on that.

Q. Okay. Are you a member of any professional organizations related to oncology or radiation therapy?

A. ASTRO, which is our major organization.

Q. Can you tell me a little bit about ASTRO? I've never heard of that.

A. ASTRO is our national organization for radiation oncologists and physicists and people related



Page 18

to the field of radiation oncology.

Q. Do you go regularly?

A. Do we do what?

Q. Do you guys meet?

A. Yeah. There's an annual meeting of ASTRO, where we present, you know, all current data is presented.

Q. Any other ones?

A. I am trying to think if I have any other current. I can't think of any other things. I guess the ABR, American Board of Radiology. I am current on that.

Q. Was that ABR or --

A. American Board of Radiology, which is our licensing board. I kind of have to stay up on that because of the license.

Q. Okay. Do you know if Dr. Peddada was a member of ASTRO?

A. He went to the meetings and so I would assumed he was.

Q. How about ABR?

A. Again, I think he was credentialed, so I think he would have had to have been.

Q. Did you have any leadership roles in any of those organizations?

Page 19

A. No, not that I can think of. They are usually reserved for the academics, you know, in our field. I was a private practice doc so.

Q. Okay. What's the difference between the academics and the private practice?

A. Academics is usually at an academic medical center teaching residents and things. Private practice is treating people in the community setting, like Penrose.

Q. So like Colorado law professors versus actual lawyers out there?

A. I would guess, yeah.

Q. Okay. All right. So have you contributed to any research or publications in the field of radiation oncology?

A. Yeah. That's what we were talking about, all those articles that I published.

Q. So those are just based on research and everything?

A. Yes, I have contributed to research.

Q. Okay. And so the research would be like on head and neck and in that relevant field?

A. Yeah. Like I say, I published in most of the fields of radiation oncology. Head and neck was probably the most prominent one.

Page 20

Q. And have you participated in any, like, noteworthy conferences or workshops during your professional career?

A. I've presented at the national ASTRO meeting before.

Q. And when was that?

A. Probably 2006. I have also presented at some other smaller meetings, like there's a head and neck meeting that Astro puts on. That would have been, I don't know exact dates, but those are on my CV.

Yeah, along the years we would go and present. Dr. Peddada did the same when he was at the meetings.

Q. Have you done recently?

A. I haven't presented the oral arguments, oral presentations recently, but I did put a paper through that was accepted I think a couple of weeks ago. It hasn't come out yet in press, but it's been accepted, so I am continuing to contribute to the field.

Q. All right. Over the years how many conferences would you say you have, you know, you have participated in?

A. I try to go to a conference at least every other year, I would say. So Dr. Peddada and I would alternate going to the conferences because there was just two of us and somebody had to be in the clinic.

Page 21

Q. All right. And so -- I am sorry.

A. So we did flip-flop on those. We did go together when we were interviewing people for our position obviously.

Q. Okay. And when you participated, was that speaking engagements or just attending?

A. Mostly attending, but like I say, I have presented at some, I think the last time I presented ASTRO orally was in 2006. I had probably a poster at some point along the way there as well, if I am not mistaken.

Q. Do you remember the last time Dr. Peddada presented at ASTRO?

A. I don't.

Q. Do you know if it was recently at all?

A. I can't recall. Sorry.

Q. Have you ever received any professional awards?

A. I can't think of any, like, specific awards. I can call up my CV if you would like and look but --

Q. All right. So we were talking about how you met Dr. Peddada. So I will actually go into that a little bit more here.

Could you describe how you met Dr. Peddada?

A. You mean in person?

**MAGNA**
**LEGAL SERVICES**

Page 22

Q. Yeah.

A. I think it was at that ASTRO meeting in 2005 which happened to be in Denver.

Q. So at the ASTRO meeting in 2005. So you said in person. Did you guys talk before you met?

A. Yeah. We had spoken, I believe, on the phone. And I obviously had applied, you know, in writing for the job.

Q. Okay. Could you describe -- could you describe that? How you applied for the position?

A. I don't remember which website it was on. It might have been on the ACR, American College of Radiology website. I had been on the ASTRO website. Generally, you attach, you know, your CV and you fill out some information and send it off.

Q. Okay. So Dr. Peddada was in private practice at this time?

A. Yes, he was.

Q. All right. And he was looking for, like, just a doctor to work with him?

A. Yeah. He had somebody who was retiring.

Q. Okay. And was the doctor retiring, was that his partner or --

A. It was. Dr. Jack Schiller.

Q. Thank you. So when you met Dr. Peddada at the

Page 23

ASTRO meeting in 2005, what was the interaction like?

A. It was cordial,, we had a breakfast together, I believe, talked about the meeting and talked about the job. And it was like an interview, you know.

Q. That is what I was going to ask. So was it an interview or was it like an interview?

A. I think it was an interview.

Q. Okay. Well, then how do you think it went?

A. I got the job.

Q. So then it went well?

A. Yes.

Q. Okay. I'll hold off on that.

What was your impression of Dr. Peddada when when you met him.

A. Seemed like a knowledgeable doctor. Somebody, you know, that I could see myself working for, so I took the job.

Q. Okay. Good. All right. So let me ask, why did you see yourself being able to work for him?

A. Like I said, he was knowledgeable. I didn't want to go to a private practice where people were not keeping up with the literature. And I felt like Dr. Peddada did a really good job of keeping up with the literature, and the job was in a desirable location.

Q. Colorado?

Page 24

A. Colorado.

Q. All right.

A. Rocky Mountains.

Q. That's definitely desirable. So you said Dr. Peddada kept up with the reading. Is that uncommon or would that be common?

A. I think you have look at every practice and make that decision. You know, I don't know how common it is because I didn't really interview with a lot of places.

Q. Yeah. Okay. So you have known Dr. Peddada 19 years now, correct? You said 2005?

A. Yes.

Q. Now before you saw the job application, had you heard of him before then?

A. No.

Q. So after you found out about the job application, did you do any research on him at all?

A. I did some research on the job. He actually invited me to come down to see the practice. So I took a day off from the ASTRO meeting and rented a car, and drove down, and met with Dr. Schiller I believe that day and met some of the staff. And it seemed like a nice place to be.

Q. Okay.

Page 25

A. I think he was impressed that I took the initiative to rent a car and drive down. He told me later that that was one of the selling points on hiring me.

Q. And that was from Chicago to Colorado?

A. No, no. From Denver. The meeting was in Denver. Chicago would have been a real test.

Q. Okay. And where were you driving from?

A. From Denver.

Q. Oh, Denver to Colorado Springs?

A. Yeah. Yeah. It was in the middle of our national meeting. I gave up a day, and he was impressed.

Q. All right. Good. So after you started working with him, and this was in Colorado Springs, correct?

A. Yes.

Q. Okay. So after you started working with him in Colorado Springs, what did you hear about Dr. Peddada, like in the medical community?

A. People seemed to have a good reputation. He had a good reputation in town, I would say. People thought he was a hard worker.

Q. All right. And you guys have been working together like say, 16, 17 years?

MAGNA
LEGAL SERVICES

Page 26

A.  That's right.

Q.  What type of relationship did you guys develop in the beginning?

A.  In the beginning, I think it was mostly favorable.

Q.  Okay.

A.  I saw him as a potential mentor and asked his advice on a lot of cases and things.

Q.  What type of advice would you ask him?

A.  Share cases maybe, if I wasn't sure about how to treat a patient, we would run things past each other. I think he did it to me too, which showed a level of respect for my training and willingness to keep up with the current literature.  So we had a good working relationship the first couple of years.

Q.  Okay.  Now, was your relationship in the beginning, was it friendship or was it strictly professional?

A.  I don't know how to answer that because I think there were times we would go out and do things as friends, and there was certainly more time that we would spend in clinic together.  So probably some combination of those.

Q.  All right.  It is a good response.  I can see that. So as a doctor, and I just want to say in the

Page 27

beginning again, within, you know, the first first couple of years, were you impressed with him as a doctor?

A.  Yeah.

Q.  Okay.  And you would say he was knowledgeable as a doctor?

A.  Yes.

Q.  Okay.  And again, he had a solid reputation in the medical community?

A.  He did.

Q.  Okay.  And when you met Dr. Peddada, you were pretty much in the beginning of your career, correct?

A.  Yeah, other than the one year I spent at Rush. Yeah, getting established.

Q.  And where was Dr. Peddada at in his career?

A.  I think his birthday is '63 or '64, so he is ten years ahead of me roughly.  Something like that.

Q.  All right.  So I was talking about the beginning of your relationship with Dr. Peddada.  Would it be fair to say that Dr. Peddada's reputation as a doctor improved over the years?

A.  I guess you could say that it improved.  I don't know.  You mean from my standpoint or from other people's standpoint?

Q.  Let's start with your standpoint, and I will

Page 28

ask about others.

A.  Okay.  From my standpoint, did he get better over the years?  He was good from the beginning, and he was good later is what I would say.  I mean he kept up with the literature.

Q.  And how would you say his reputation was in the medical community?

A.  I think it was solid.  People saw him as intelligent, and sent him cases.  We worked together. We had a busy practice, I am sure you saw.

Q.  Yes,  I did.  And I will ask you about that -- I will ask you about that later.

So as his partner, I imagine you are aware of the awards he has received?

A.  I'm not aware.

Q.  Okay.  So you don't know whether he received any awards over the years?

A.  Oh, I think there was something the first year I was here, where he was honored with a dinner.  I can't remember what the context was though.  The first year, or second year maybe.

Q.  Do you know what the award was in that first or second year?

A.  I just said I didn't know.

Q.  Okay.  All right.

Page 29

A.  Or maybe that was Dr. Schiller., I can't remember.  I am sorry.  It's been a long time.

Q.  That is fine.   Are you aware that Centura used Dr. Peddada's image on billboards and advertising materials?

A.  Yes, I am.

Q.  And what did you think of that?

A.  Thought it made sense.

Q.  Okay.  And why did it make sense?

A.  Because he was one of the two doctors here and they were trying to advertise.

Q.  Okay.  And you said one of the two, so you would be the other?

A.  Yeah, actually one of three at one point Dr. Tanner was here as well.  But I think he was seen as the guy who was senior, so it made sense to put the senior guy in the advertising.

Q.  Is that why they didn't choose you?

A.  I don't know.

Q.  Because he was senior?

A.  Yeah. I don't know.

Q.  So was Dr. Peddada popular within the medical community there?

A.  I think so.

Q.  Okay.  Did you ever have any issues with his

**MAGNA**
**LEGAL SERVICES**

Page 30

popularity?

A. No.

Q. When you say his popularity, was he good for the business?

A. Popularity would be good for the business.

Q. Is that a yes?

A. Yes.

Q. I am not sure if I asked you this already. Are you aware if Dr. Peddada had spoken at any national conferences or any international conferences?

A. I think he did speak at some. Yeah, I don't remember the details. But I remember him speaking at some conferences. Now that you said international, it might have been something given to South America. I can't remember.

Q. Do you remember anything about the South American one?

A. No. You just jogged my memory by saying international, before that I had no recollection.

Q. Okay. And are you aware that Dr. Peddada published clinical research in peer-reviewed medical journals?

A. Yeah. We were coauthors on quite of a few of them.

Q. I think I noticed that. Do you remember any

Page 31

of the ones that you guys coauthored?

A. I remember -- yeah, I mean, you want like the titles or --

Q. If you remember them.

A. I can look them up on my CV.

Q. I think I saw in your CV. I just wondered if you remembered off the top of your head.

A. We published in Head and Neck and Algia. We published on prostate size being a predictor for toxicity in relation to HDR. We published on community experiences in the radiation for Head and Neck. We published on cyber knife radiosurgery for trigeminal neuralgia.

Q. Can you talk a little bit about that last one, the cyber knife?

A. What about that one?

Q. Yeah.

A. It was a case report on the toxicity.

Q. You said the toxicity of, what?

A. Toxicity from a radiosurgical treatment, unexpected, and it was reported in the literature.

Q. Okay. So this is pretty much new ground-breaking work?

A. I thought we were doing pretty good work. Yeah. We published interesting things. It has got to

Page 32

be kind of novel to get through the peer-reviewed process. Right?

Q. Yeah, I was thinking that. What was it like to work with him as far as, you know, writing for medical journals?

A. We would write on our off time for the most part.

Q. Okay. And were you guys, like, working together or were you guys working separately and putting it together?

A. We generally working separately on things.

Q. Okay. And then just coming together to compile everything?

A. Yeah.

Q. All right. So when you started working with Dr. Peddada, you were working for him, correct?

A. Yes. It was a three-year partnership.

Q. Can you describe that? What does that mean, a three-year partnership?

A. I was paid a salary. And then if I do a good job at the end of three years, I become a full partner.

Q. Okay.

A. I was employed you could say.

Q. Got it. And how much were you employed by Dr. Peddada? How much did you make salary, if you

Page 33

remember?

A. I don't remember actually.

Q. All right. That was awhile ago. So it's 19 years ago?

A. Yeah.

Q. All right.

A. Whatever it was, you know, it was around the going rate at the time, as I recall.

Q. And so if you started with Dr. Peddada in 2006. Actually I would ask you that, do you remember when you became a partner?

A. It would have been 2009.

Q. 2009. Okay. And how was that decision made?

A. It made by Dr. Peddada.

Q. Okay. And was based on you said a three-year partnership track?

A. That was what our contract said, my employment contract, said that I would be eligible. And I suppose he found my work satisfactory and made me partner.

Q. All right. So in other words, if your work was not up to par, he would have had the power to say you guys would not be partners?

A. That's right.

Q. And why did you decide to become partners were Dr. Peddada?



Page 34

A. I was comfortable in Colorado Springs. I liked my job at the time. It's a substantial pay raise when you become a partner, as you might know.

Q. Okay. I would say that. So comfortable, liked your job and pay.

Now before Dr. Peddada, had you ever considered partnering with any other doctor?

A. No.

Q. Why not?

A. Because I accepted that partnership, and we were partners until the practice dissolved. I never formally interviewed with any other job.

Q. And you said at this point, Dr. Schiller had retired, correct?

A. That's right. I think he retired in 2006 I believe.

Q. Okay. And so by the time you became partner, he was already three years gone?

A. Yeah, that's right.

Q. Okay. And when your employment started back in 2006, what was the name of the practice?

A. Radiation Oncology, PC.

Q. Okay. So it was still a PC?

A. Yeah.

Q. And you first started practicing with

Page 35

Dr. Peddada in Colorado Springs?

A. That's right.

Q. And could you describe a little bit of that time when you guys were working in Parker?

A. The Parker time, I wish I could tell you of the year. I am sorry. But there was a new center that had opened, and Dr. Peddada and I were asked to help cover it while they were getting started.

Q. Do you remember how long that lasted?

A. I want to say like 18 months or two years, maybe. Not 100 percent sure.

Q. Okay. I am going to go back ROPC. And around the time where you started working as an employee, could you describe what an average day would have been like for you?

A. Sure. Generally, we would see patients from about 8:00 until about 5:00, a variety of consults and treatment visits, follow up visits, the typical kind of things you do in a practice of radiation oncology.

Q. Okay. How many patients would you say you guys would see on average in a day?

A. I would usually see, I guess it was probably four or five new consults most days would be average. And then, you know, we would see consults. There was one that was called the on-treatment day, when you would

Page 36

see the patients that were currently under treatment, and this one day this could be 30, 40, 50 people on treatment. And we would see all of them. And if your partner was gone or if we were both here, I would see mine and he would see his. That kind of thing.

Q. So how many hours would you say you were putting in?

A. 8:00 to 5:00, or 5:30 probably. And there was often some meetings till 7:00, so maybe up to 10 or 11 hours a day.

Q. So is that common for a practice to see five patients in a day?

A. Five new consults a day? Sometimes it was much more, and sometimes it was less. That is my estimate. But, yeah, I don't really know what's common in other practices. This was pretty much like the first practice that I joined, outside of the academic year at Rush. I think we would be considered a busy practice.

Q. And as an employer, how was Dr. Peddada's temper?

A. As an employer, how was temperament?

Q. Working for him? Yeah.

A. I would say it was usually good.

Q. Okay. Were there times where he was not good?

A. We had a complicated relationship. There were

Page 37

times where personally we didn't get along.

Q. That was in the beginning? Like in 2006, around that time?

A. Yeah. During my three years of being an employee there were times we didn't get along.

Q. How come you didn't get along?

A. That was a long time ago. I don't remember the specific details, but things come up, you know, at work.

Q. Okay. How about an example of something that might have come up at work that you guys would have had a conflict?

A. I think our first major maybe significant disagreement was over finances. So he basically called me in to ask for additional money that I wasn't prepared to come up with for covering expenses. And so, I seemed to think it was related to medical insurance or something. And I was under the impression that he would be covering my medical insurance. And at one point he kind of, had the accountant ask me for a substantial amount of money to cover that. I felt like that was a big surprise for somebody in their first year or second year. And I didn't have an easy way to come up with those funds.

Q. Do you remember how much you had to come up

MAGNA
LEGAL SERVICES

Page 38

with?

A. I think it was like 10 percent of my salary or something like that. I was making 250,000, maybe 25,000. I don't remember the details. Something like that.

Q. All right.

A. Just getting started, I didn't have a big nest egg at the time.

Q. That is completely understandable.

How about anything else beside finances?

A. I can't remember specific details but --

Q. All right. Any, like, conflicts regarding, like, patient care or anything?

A. Back in the earlier years, I don't remember specific conflicts in patient care, no. And quite often, you know, we took a fair bit of time off. And so I would be covering his patients while he was gone. He would be covering mine while I was gone. We only overlapped when we weren't off so.

Q. Okay. So you guys took significant time off?

A. I felt like it was a pretty good vacation schedule, yeah.

Q. Okay. So how often would you go on vacation during those early years?

A. I feel like we were taking 20 to 21 days off

Page 39

per quarter, and sometimes even more.

Q. So three weeks out of every three months?

A. Yeah, almost every two months.

Q. It is a good work life balance?

A. Pretty good.

Q. Okay.

A. And more time off than when I was in academics that's for sure.

Q. I can see that.

A. And we honestly maintained a similar schedule for quite a while, a long time.

Q. All right. And so that means you guys were able to work together as far as coordinating those vacation times?

A. That's right.

Q. Did you guys ever take off like, any other times beside vacation? Like, how would that work?

A. We basically talk --

Q. I'm sorry. That was a sloppy question.

A. You can repeat.

Q. Did you guys have to take any other time off besides the vacation?

A. We took days during the week off as well, so I guess you would consider those a vacation day during the week, but we weren't going out of town.

Page 40

Q. Okay. Was there any ever any issues about taking time off, that you can remember?

Let me ask this better. That was a sloppy question too.

So during those three years you were an employee, was there ever any issues taking the time off?

A. If there were we negotiated together and come up with a solution. You know, there was nothing that I remember. I covered him. He covered me.

Q. Yeah. So how about over the years through the partnership, was there ever any issues taking time off?

A. Again, we worked together. We came up with schedules.

Q. Okay.

A. Not until toward the very, very end.

Q. Got it. But nothing before the very end? No kind of issues taking time off?

A. What kind of issues do you mean by that I guess?

Q. Any kind of conflict?

A. Where he would take time or he didn't want me take time off?

Q. Yeah. Let's start there and then I will follow up.

A. No. I think we generally respected each

Page 41

other's time off and worked together as best we could.

Q. And was there there ever a time where one of you needed to take time off and the other couldn't cover?

A. No.

Q. Okay.

A. And I generally kind of deferred to him the first three years of this, so like Christmas or whatever, spring break, I tried to give him the benefit because he had younger kids. Later when his kids were gone, and I needed spring break, he did the same.

Q. Okay. All right. That was my next question. As the practice moved forward did you guys ever have any conflicts taking time off?

A. Nothing major.

Q. Okay. And how did the practice find patients?

A. Generally there are doctors that are supportive of our practice, and they would call and send us patients.

Q. So you said from other doctors?

A. Yes, relying on surgery and medical oncologists other doctors because we rarely see the patients first. Radiation oncology is a field that comes in last after surgery, or after diagnosis. There are times where we are the first person, don't get me

MAGNA
LEGAL SERVICES

Page 42

wrong, but more often than not, we are getting referrals from someone else.

Q. So those referrals would be based on reputation?

A. In part, yes.

MS. MCMANUS: Objection, foundation.

Q. (By Mr. Whitney) And did the practice have to advertise at all?

A. If we did, I don't remember specifically.

Q. Okay. How about once you became a partner and as the years went by?

A. Probably the biggest advertising was done by the hospital for the cyber unit, which came along I think in 2009 or 2010.

Q. Do you remember how the hospital advertised?

A. They had a very slick television commercial. I remember that.

Q. Were you in it?

A. No. It was based upon a fancy automobile commercials where they showed the car close up, and they were showing the cyber knife close up. I think they actually won some advertising award. It was pretty awesome.

Q. Oh, wow, okay. Was Dr. Peddada in the commercial at all?

Page 43

A. No. It was voice over with just the pictures of the cyber knife. Yeah, I loved it though. We thought it was just great.

Q. And how did that commercial help your practice?

A. Raised awareness in the community about the cyber knife.

Q. And that was 2009, so you were already a partner at this point, right?

A. Yeah. The cyber knife took some planning, so some of the discussions had started before my partnership. And I think there was even some money giving to the planning, sort of like a directorship.

Q. All right. That was my next question.

A. When you brought that up it reminded me of one somewhat contentious, Dr. Peddada didn't keep my directorship around the time, for awhile when I was coming into partnership, so the money that I thought I was going to be getting for that directorship, I seemed to recall him holding.

Q. So describe what the directorship is?

A. Directorship is a payment for, like, working on the project. It's somewhat like a payment for your input on what needs to happen. I think he also had a directorship, if I am not mistaken.

Page 44

Q. And he was the only one with access to the money from the directorship?

A. Well, he controlled the money in the sense that he was the managing partner of our practice and I was just an employee.

Q. And where did that money came from?

A. It came from probably the hospital or the third party -- third party people who brought the machine into the clinic with us. I don't remember exactly.

Q. And who paid for the slick commercial?

A. Probably the cyber tech and the hospital. I don't know. And I think, you know, we had a little disagreement about how that money would be counted, I suppose. He saw it as income into the practice, which, you know, I could see that I guess.

Q. Okay. And that was what that about, the conflict about where the money should come from?

A. Yes. And I can't remember how it was resolved to be perfectly honest with you. I don't know if it went to the partnership or not.

Q. Yeah. I was going to ask that. Do you know if it went into the partnership?

A. I can't remember. I am sorry.

Q. Okay.

Page 45

A. I did get the directorship after I became partner.

Q. So that would have been shortly after?

A. Yeah. Right in there. And it was a small supplement to the salary, not a big amount, but probably something.

Q. Okay. One thing I didn't tell you, if you need to take a break at all, like you need to take a bathroom break, or go get a drink, just let me know. If I have a pressing line of questioning, I will just finish my line of questioning, and then we can take a break. So just chime in whenever you feel like you need to take a break.

A. I am trying to drink less water today so we can to get through it.

Q. I don't want you to do that. I don't think that would be healthy for you. So feel free, if you have a drink water and you have to go.

A. I understand. I will stay hydrated.

Q. All right. So when you first became partners in 2009, could you describe the roles and responsibilities of each partner?

A. The roles and the responsibilities, we were both seeing patients in clinic. We were both performing similar types of jobs, with the exception of prostate



Page 46

cancer. Dr. Peddada had a very strong interest in prostate cancer. And from the beginning of my time here, he decided that he was going to do the vast majority of the prostate cancer.

Q. Okay. Was there anything that you did that he didn't do?

A. That I did that he didn't do?

Q. Just like similar as to how he mainly did prostate?

A. No. I would just pick up the other pieces, you know, whatever was available. Often the prostate would fill up a lot his schedule, and so I would see the other business that came in.

Q. Okay. And how were those roles determined?

A. I think he decided that he wanted to see the prostate business, more or less exclusively. And I didn't have a lot of say because I wasn't partner at the time, right? So like --

Q. But when you were a partner. I am --

A. Yeah, when I was partner he had a three year experience running the practice that way, so he kept it that way.

Q. Okay. Did you ever have any problem with that at all?

A. Yeah. Later when our numbers were not as

Page 47

equal, and I felt like he was struggling to keep up with, you know, the hefty workload. I made offers and suggestions that maybe I could try to see some of the prostate patients.

Q. And what did he say?

A. He didn't feel like that was a good idea. He felt like he had such a relationship with the urologists, and he didn't want to give up that business.

Q. Okay. And did any of those roles change over time?

A. Which? Specifically, what are you talking about?

Q. You know, the roles and responsibilities that you described, like as far as like the prostate, and what you did and what he did?

A. No. The prostate was the only thing that was kind of more exclusive to one person, and otherwise our roles were just to see whatever referrals came in.

Q. So since he was a partner before you, and brought you in, was there a power imbalance there?

A. I think there always is in that situation.

Q. Okay. Could you describe that a little bit? And I don't know, I just -- I am asking based on what you were telling me.

A. He was the president of our professional

Page 48

corporation, and I think he, you know, rightly so, he saw himself as the partner and me as an employee for the first three years.

Q. How about when you were partners? Did you still feel that power imbalance?

A. Not overtly, most of the time I would say.

Q. Okay. So you said not overtly. How about covertly?

A. I felt there were times where it was a bit of he would put it in my face a little bit that he was busier than me. And there were requests for additional compensation that we can get into along the way, despite the contracts that didn't stipulate that. So, yeah, there was some of that.

Q. Okay. So was he busier than you?

A. He was busier than me.

Q. And why was that?

A. Well, for first three years, when you come into a the practice you don't know anybody in town. So there is period of ramp up, as one factor. The second factor was, like, the prostate cancer business. That's about a third of what any radiation oncology practice sees. And if all of that is going to one person, it is going to be hard for the other person to probably keep up and maintain an equal case load.

Page 49

Q. Two questions, how much of the practice, and I am only referring to when you were partners, how much of the practice was prostate care?

A. My guess it was in that 30 percent range. I don't know exactly. That is a typical load and range and he saw prostate patients fairly regularly.

Q. Okay. And --

A. And as a result, I saw more of the breast cancer just because that's the second most common diagnosis.

Q. And so how much would you say the practice was for the breast cancer?

A. Oh, maybe 20 to 30 percent, I don't know exactly.

Q. And was Dr. Peddada also seeing breast cancer patients as well?

A. Yes.

Q. So the breast cancer patients were not exclusive to you?

A. They were not.

Q. Okay. So I am going to ask that question I asked a second ago about the power imbalance. Did you feel a power imbalance over the years while you were a partner there?

A. I did.

MAGNA
LEGAL SERVICES

Page 50

Q. Okay. Could you describe that a little bit more? Just when you were a partner, not the years when you were an employee.

A. So I think Dr. Peddada takes a lot of pride in his work, which I always admired, but he also would let you know when he was working harder.

Q. And how would he do that?

A. He would say it. He would say I am working harder. And he would sometimes come to me and ask for compensation for that. That happened at least two or three times, that I can recall.

Q. So according to you, was he working harder?

A. He was seeing more patients than me. There were times -- we looked at our RBUs every year. And during the middle part of my time with him, which would have been maybe 2015 to 2017, in that time frame. He would usually be a couple percentage higher in the RBUs.

As COVID came along, and those numbers spread out more. He was probably up to 9 or 10 percent more RBUs. And that prompted me, of course, to talk about the prostate business and see if I could help out and try to get more of those, take some of the burden off of him.

Q. I want to come to what you just said, but first I want to ask about, what are RBUs?

Page 51

A. RBUs are an objective measure of the work that you are doing that are used for billing, primarily.

Q. Okay. And let's go back to what you just said about, so I guess you finally confronted him about wanting to do more prostate work?

A. Yeah. In 2019 or 2020, somewhere in there.

Q. This was recently?

A. Recently, yeah.

Q. During the practice?

A. Yeah. I mean during the early parts of my partnership, it was kind of an unwritten rule that he was going to see more of the prostate and I was going to fill in the other work. And we made that work.

Q. Okay.

A. When Dr. Tanner joined our practice, he liked doing prostate surgery therapy in his prior job, and had asked Dr. Peddada if he could do some of that, and I don't know that Dr. Tanner either, was able to get into the prostate business.

Q. And so in 2019 you went to Dr. Peddada to say that you wanted to do more of the prostate work?

A. I don't remember the date. I am sorry. It might have been 2020.

Q. Safe to say towards the end of the practice that you probably went to him?

Page 52

A. Yes.

Q. Did you ever go to him before that?

A. And ask about the prostate business? No. I identified the prostate as the primary problem at that point as to why there was an inequality in the work in the RBUs.

Q. And when you went to him what did he say about that?

A. I don't think he was terribly supportive of me seeing the prostate business.

Q. Did he say that?

A. I don't recall. I didn't see the prostate business I am sure of that. There were efforts, you know, to get the front office to try to give me some of those. At least I offered to kind of give the verbiage for our front office for people who called in. And he was not supportive of that. He felt like if somebody was making referral directly to him, that it should come directly to him.

Q. Did you feel the same way if someone was making a referral to you that it should go to you?

A. No. I actually had more of an idea that in a partnership, you should keep the business even, particularly if there are some people that are, you know, if you are saying that you are not doing enough

Page 53

work, then that person should be able to benefit from the partnership. If there are unassigned patients being called, or even if Dr. Peddada was very busy, I would say, you know, if your problem is that I am not busy enough maybe some of those patients could have come to me to help take the burden off. And I was making those offers to be available.

Q. So was there any other disagreements about the roles and responsibilities besides the prostate?

A. Other than prostate you said?

Q. Yeah.

A. We had spats along the way about various things. I remember there was a disagreement on my 40th birthday.

Q. On your birthday?

A. Yeah. I was trying to get out for my 40th birthday party, and asked to get out a little bit early, half an hour or hour, and Dr. Peddada was in a bad mood that day. And he decided that he would not let me do that. And we had a disagreement on that.

Q. And this was while you were a partner?

A. Yes.

Q. What would have happened if you just left?

A. It would have been pretty bad. I don't abandon my patients.



Page 54

Q.  Okay.  Did you ever speak to Dr. Peddada after that day?  Go ahead.

A.  Yeah, I wrote him an E-mail the next day because there was an altercation, I mean he basically called me a spoiled child in the presence of my nurses. And I felt that that fairly disrespectful thing to do so I called him out on it in an E-mail.

Q.  How did he respond to the E-mail?

A.  I think he let it sit for a few days, and eventually responded but I don't remember what his response was.  I don't think he wrote back.

Q.  How long ago was this?

A.  March of 2013. In that E-mail I told him that I felt like he was quick to anger a lot, so I have must have been noticing things in the clinic.  And then I told him also at the same time that I wasn't the only one, that staff had been noticing that he was quick to anger.

And in that E-mail I offered, I suggested that he should think about meditation or anger management classes.  So that wasn't the first time that -- and we are going to talk about that a lot -- but that would have been the first time that I saw signs that were troublesome, up until that point that he was very upset and angry.

Page 55

Q.  So was it ever resolved, this issue, your 40th birthday?

A.  I think I stayed to the end of the shift.  I don't remember.  I did go to my 40th birthday party that night.  I was pretty stressed to have my partner yell at me across the clinic.  So it was not the best birthday I've ever had.  I had a few people coming to town. I was trying to get home to help my wife set up for it.

Q.  How did you respond when he yelled at you? Did you yell back?

A.  No, not that I recall.  I was shocked.  I had never been treated that way in a clinic setting before. I think I was just shaking to be honest.

Q.  Was that the first time he had ever done that?

A.  In public, yeah.  I don't know if there were instances in private before.

Q.  Has he done that since then?

A.  Has he yelled at me in public?

Q.  Yeah.

A.  Not that I can recall.

Q.  Okay.  So that was a one time situation where he yelled at you.  Did you guys ever speak about that or did it just --

A.  We did.  We worked it out later.  I told him that I wouldn't be treated disrespectfully in front of

Page 56

my coworkers and colleagues.

Q.  Okay.  Perfect.

A.  I said I wouldn't tolerate that.

Q.  And what did he say?

A.  He must have agreed that that wasn't appropriate because like I say he never yelled in public again that I recall.

Q.  Okay.  How about any other disagreements that the two of you had?  So I got the prostate one and then I got the 40th birthday one.

A.  The biggest disagreements we had, honestly, were about him coming to me when we had an agreement in the contract that said we were splitting money equally. And he would come to me at the end of the year.  At least twice where he would say I have been working harder, I want compensation, additional compensation beyond what the contract said.

That happened when Dr. Tanner was part of our practice, and it happened again after Dr. Tanner had left, and he and I were just practicing, the two of us.

Q.  How did that make you feel?

A.  I felt like it was unfair to come back and ask for additional compensation.  He actually asked for it retroactively.  Well, in Dr. Tanner's situation, meaning he was asking at the end of the year, hoping to

Page 57

include the RBUs for that entire year, which had been under another contract that said we would split it equally.  We actually gave in that first time.

We gave him, Dr. Tanner and I agreed to give more money than the contract was written for.

Q.  And why did you guys give in?

A.  I think he pursued it very aggressively, and to some degree I felt a little bullied, even though I was his  partner, and I shouldn't have.  Dr. Tanner, why did Dr. Tanner give in? I can't speak to that.

Q.  Okay.  So how many times did that happen?

A.  Twice that I can recall vividly.  And then a third time, right before the breakup of our practice, which I am sure we will get to.

The spring of '22 was another request for additional money.

Q.  And his explanation for this was that he was just working harder than everyone else?

A.  Yeah.

Q.  And was he?  Working harder?

A.  Yeah, I would say that he had more business at the time. Sometimes it was small amount of work. Sometimes it was a moderate amount.

Q.  So while the two of you were partners, did you ever have any issues were Dr. Peddada not fulfilling his



Page 58

roles or responsibility?

A.   No.  He was a good doctor.

Q.   Okay.

A.   I take that back there was one time.

Q.   Okay.  Explain.

A.   There was a case where he had received a phone call for inpatient at the end of the day, and he decided that it was late in the day, and he was busy.  And so he handed that case off me to following day.  And I saw the case.  This would have been probably 2019 or so, 2020.  I am not sure exactly.

Anyway I saw the case.  I worked the patient up.  The patient had some additional imaging that pending.  And I was going away for a few days.  And I asked him to look in on that imaging.

When I got back, he told me that he didn't know about the results of it.  And there was a finding that needed to be addressed.  And he basically said Dr. Monroe will deal with this when he is back, when he saw the patient.  And to some degree, it delayed care.  That was an unusual thing, but this was later, and, you know, I think he was more emotionally labile and having a hard time.

Q.   And that was 2019?

A.   Yeah.  I think so, something around there,

Page 59

give or take a year.

Q.   Were there any other issues that you can think of?

A.   He took good care of patients in general, I would say.  I definitely heard about issues from patients.  Patients were shared for those on treat visits, and I would see his people.  And they would sometimes complain about his curtness, and stating that he didn't have time for them, or this or that.

Q.   When was this?

A.   I don't know.

Q.   Are you saying that he was rude to patients, Dr. Peddada?

A.   I am saying patients complained to me about his rudeness.

Q.   Was there any specific examples of that?

A.   There were in the beginning surveys that were done by the hospital, wrote in comments to that effect.  Yeah.  That were available.  Other than that --

Q.   Do you know when the patients would have wrote into the hospital about Dr. Peddada's rudeness?

A.   I don't know exactly when, no.  We looked at those surveys periodically or quarterly.  So sometime -- sometime in the late 20-teens.

I remember one other event, just I thinking

Page 60

about things.  When I came back being gone for a week, I heard people say they didn't want to see him again because of his interactions in the on treatment visit.  And that that's a hard thing to do, because I mean, somebody has to see the patient every week.  So they were basically saying they didn't want me to go on vacation.

Q.   So you are saying the patients didn't want to see Dr. Peddada?

A.   Three patients told me they didn't want to see him again, when I came back from one vacation.

Q.   And did they give you any reason?

A.   Something to the effect that he was curt or rude or disinterested or something like that.  I don't remember the specifics.

Q.   Okay. But nothing regarding patient care, just his personality?

A.   I consider that part of patient care, to be honest.

Q.   Okay.  Now did Dr. Peddada ever have any issues with you not fulfilling your roles and responsibilities?

A.   Not that I am aware of.

Q.   Okay.  Could you just explain one more time why Dr. Peddada yelled at you that one time?

Page 61

A.   I think he was -- he didn't want me to take off an hour early or so to go set up for my birthday party.

Q.   Okay.  I just have he yelled at.  That's okay.

A.   If I dive a little deeper, it might be that he wasn't invited to it.

Q.   Why didn't you invite him?

A.   Because I only had four or five families coming over, and people from out of city or state, family friends.  I don't know if he was upset that I didn't invite him, admitting that it was just close friends, or what but I don't know.

Q.   So basically just for family, the party?

A.   Family and friends.

Q.   Okay.

A.   I had my college roommates were coming.

Q.   So in 2013, Dr. Peddada, you wouldn't have considered him a friend?

A.   I didn't say that. I would have considered him a friend to some degree but he didn't make my top five invited to my birthday party.

Q.   Okay.  All right.

A.   I consider you a friend, but I am not probably going to invite you to my party.

Q.   I guess I didn't have to get a gift.

MAGNA
LEGAL SERVICES

Page 62

All right.  So could you explain the financial arrangements between you and Dr. Peddada?

A.  I can do my best.  It varied quite a bit during the time of our partnership.

Q.  Okay.

A.  Starting in 2009 when I became a partner, it was a, I believe it was 50/50 split, the revenues, with one exception.  That exception was a specific type of prostate treatment, a specific radiation therapy.  And there was a request upon my becoming a partner that I exclusively purchase some ultrasound equipment that would allow him to do that procedure.

And so I wasn't to share in any of that until I paid off the ultrasound equipment.  After which point, I think it became 50/50.  And that was a $72,000 piece of equipment.

Q.  And how long did that take you to pay off?

A.  I don't remember but it probably took some time because, again, I didn't have a big nest egg built up after three years of salary.  I don't know.  I don't know if borrowed money.  I can't remember exactly where I came up with that.

Q.  Do you know how he came up with the money?

A.  Which money?

Q.  For the ultrasound?

Page 63

A.  He didn't.  He asked me to purchase the entire thing.

Q.  Oh, okay.  So you would purchase it and then --

A.  He would use it.

Q.  Okay.

A.  And this was sort of way to maybe balance out the fact that I wasn't seeing prostate, I assume.  That was my impression of it.

Q.  Okay.  But aside from the prostate, was everything equal, 50/50?

A.  Things were 50/50 at that point, yes.

Q.  Okay.  And did that ever depend on the amount of patients that you guys were seeing?

A.  No.  Not that I am aware of.  I mean, it became productivity later obviously.  The way I joined the practice as a partner, was that it was going to be a 50/50 split, with the exception of that prostate business.

Q.  Now did the financial side of the practice, did that ever influence the decisions the two of you guys made regarding patient care?

A.  No.  At least for me, it never did.  I respect him enough to say that I don't think would affect patient care.

Page 64

Q.  Okay.  And how did you guys make sure that that never happened?

A.  We peer reviewed each other, and looked at each other's cases.  It's an important part of any radiation practice, looking over the other's person's shoulder and making sure they are not doing inappropriate things, making sure they are keeping up with the literature, things like that.  Part of being a good partner.

Q.  So on average, what, would you --

(Computer audio cutting out.)

Q.  So on average, how much would you say the practice made in the beginning years of the partnership?

A.  I would, I think I was probably making around 6 or 700,000.  And he was making the same.  So we were probably bringing in a million and a half dollars, would be my guess.  We had other expenses.  We had a billing person at the time.

Q.  And that was in the beginning?

A.  Yeah.

Q.  That's pretty good.

A.  We had Sharon, in Denver.  She was great.  She was our only major expense.

Q.  Say that last part again.

A.  She was our only major expense.  I guess an

Page 65

employee.  I don't know if she was technically an employee.  We paid her based upon the amount of billing that she did.

Q.  And who was this?

A.  Her name was what Sharon Pierce.

Q.  And what was her role?

A.  She was, like, clinical office supporting, billing.

Q.  Okay.  So one 1.2 around the beginning years.  Did that increase over time?

A.  No.  I think it was more.  I think it was probably 1.5.

Q.  And did you guys become more profitable over time?

A.  I think our numbers went up every year from 2006 until about 2013 honestly.  I remember an administrator trying to taking credit for it, and I said, hey, that is also when I came.

Q.  What administrator was trying to take credit?

A.  You know how it is.  Right?

Q.  Do you know which administrator tried to take credit?

A.  Dennis Bruens.  It was in a slide show because I think he and I came at the same time.  And so he had this nice graph that showed it rose every year from '06



17 (Pages 62 to 65)

Page 66

to 2013. I asked about it later. He thought he deserved some credit for doing the crafting of it.

Q. So who was this administrator?

A. His name was Dennis Bruens, B-R-U-E-N-S. He was the administrator when I started here at Penrose. He was here for, I would estimate, seven or ten years.

Q. So was he serious or was he joking?

A. He was just joking about it.

Q. Oh, okay. All right.

A. But just to say the business did go up. He asked me about whether we had made more money, which is what I remember. That it went up every year so were doing well.

Q. All right. How about after 2013? Was there a decline or --

A. You know there was -- eventually you can't expect growth every year. We eventually plateaued. Our competition --

(Zoom screen froze.)

A. I said it went up an down a little bit in those years after.

Q. Okay. So you said the competition, who was the competition?

A. Predominately UC Health, Memorial. We also some issues with the prostate business, where the

Page 67

urologists bought their own center and started keeping their own business on their own radiation centers, which is a common thing in our field. I wish I could tell you when that happened, but it was sometime in the mid 2010 to 2020 time frame I would say.

Q. So after -- the urologists, were they with UC Health or they with --

A. They were independent. Some third party.

Q. So how much of a decline after they started to keep their own business?

A. It was variable. Sometimes it was maybe 20 percent down, sometimes it was 60 percent down. Dr. Peddada, you know, tried his best to find other ways to get prostate patients in, and kept the prostate program going reasonably well.

Q. And do you know how he was able to do that?

A. I assume he was networking, you know, outside of that group that owned their own center, talking to the other docs.

Q. Did you ever help him with the network?

A. Yeah, not with the prostate specifically, but with other fields, yes.

Q. And how did you guys network?

A. We would often, a lot of times it is, like, personal stuff at lunch, go have lunch together in the

Page 68

cafeteria, and try to talk to whatever docs were there. Networking is about being friendly to some degree and telling people that you are available. We both did that.

Q. How was Dr. Peddada at networking?

A. I would give him an A. I learned my networking skills by observing him.

Q. And how would the two of you discuss the financial nature of the practice?

Did you guys have meetings?

A. No. I wish we had. It was not a set meeting time. Something that I kind wanted and should have brought up probably a little more honestly.

Q. Did you ever bring that up to him?

A. I did at some point, asking for more regular meetings. Yeah, I can't remember exactly when, but we had that discussion.

Q. And what did he have to say?

A. I think he generally agreed in principle, but we never really had a set time after that to talk.

You also asked when we had meetings when there was disagreements. He was coming to me, asking for more compensation was kind of when the meetings would occur in that relationship.

Q. So had you ever received any loans from the

Page 69

hospital in the past?

A. If you are referring to Dr. Kathpal's settlement? Is that what you are referring to?

Q. How about before that?

A. No. I don't recall any loans but there may have been. Do you have access to something you are thinking of, or --

Q. No. I am just asking.

A. I can't remember receiving a loan from the hospital.

Q. So besides the prostate arrangement that you guys had, did you have any other financial disagreements with Dr. Peddada?

A. I never necessarily came to him with specific disagreements. I think that I -- he came to me with these disagreements about me not being as productive as him and asking for more money. That is what I remember mostly.

There was one issue where he kind of verbally promised me a bonus, told me I was doing a great job and then didn't pay a bonus. He expressed some regret about not keeping his word on that, but we worked that out.

Q. And when was this?

A. Before I became partner.

Q. Okay. And did you eventually get that bonus?

Page 70

A. No. I didn't get a specific bonus. No. I think he paid some of my expenses that were in question. I know we talked about the medical expenses. We kind of did that in lieu of a bonus.

Q. All right. So you said that Dr. Peddada had some disagreements with you for not being as productive. How did you guys resolve that, those disagreement?

A. So the first time I can remember was when Dr. Tanner was in our practice as well. We went out to a restaurant and discussed the RBUs. And Dr. Peddada pitched this proposal where, you know, there were three of us. And we should have been making about 33 percent of RBUs roughly. I think he was something like 38, and I was 32, and Dr. Tanner was 27 or something in that range. So he was requesting additional funding from us, despite the fact that the contract said we should be paid equally. And he was pretty insistent about it, and we did give in that year.

Q. So Dr. Tanner, that's guy from Parker, if I remember right?

A. He was our partner at the time.

Q. So what happened with Dr. Tanner?

A. Dr. Tanner was brought in as a partner from day one, because he had been in the community working at Rocky Mountain Cancer Center, and the hospital had

Page 71

basically, had a single, or two medical oncologists there that had to compete with Rocky Mountain Cancer Center in medical oncology. And Dr. Tanner had done radiation oncology. So at some point, maybe in 2011, something in that ballpark, the hospital reached an agreement with Rocky Mountain where they would basically shut down their medical oncology practice in favor, and Rocky Mountain agreed to not pursue radiation services, and be sent to Penrose. And then Dr. Tanner was, you know, obviously employed by them at the time. They wanted to make sure he was taken care of. And so part of that arrangement was that he would come into our practice. And so he was with our practice for three or four years, I believe, something like that.

Q. What happened when he left? I am sorry. Why did he leave?

A. I think he left because he felt some of these pressures to -- the productivity stuff, to be perfectly honest.

Q. What was the issue with the productivity?

A. That he was lowest at the time. And I think he felt some degree of pressure, that and asking for money retroactively kind of things.

Q. Did he have that pressure whole time he was partner?

Page 72

A. I don't recall that he was there the whole time. I think we had a couple of good years when we were all getting along, and things were good.

Q. So towards the end where he was having those pressures, how was he dealing with it?

A. I don't know.

Q. Do you know if he ever confronted you or Dr. Peddada about productivity?

A. We had that meeting that I told you. I think he felt, he probably felt he was being treated unfairly, how he was least productive and he was asking for more money.

Again, I was pretty close to 33 percent. So I was giving up some money, but not a lot.

Q. Why was he the least productivity?

A. I think whenever you add a new partner you have to expect there is going to be some ramp up time for that business. Dr. Tanner was a good doctor but maybe networked a little less than Dr. Peddada and maybe a little less than me.

Q. Any other disagreements, financial disagreements with Dr. Peddada?

A. So we came to another a similar type story when he and I were, after Dr. Tanner left the practice. I think this was end of 2015, if I am not mistaken,

Page 73

where we had been -- we had gone back to splitting things equally for a little while, and noticed that there was a discrepancy in the business. And at the end of 2015 asked me the same kind of thing again, for additional compensation to cover the fact that he was working harder.

Q. And when was this?

A. End of 2015, if I am not mistaken.

Q. And how was that resolved?

A. I told him that I didn't feel like retroactive changes to the contract were something that I could live with, but I did agree to productivity after we had multiple discussions. And in 2016, we changed our practice and that was a component of our pay that was productivity based.

Q. So you said the contract between the two of you was changed?

A. Yeah. There was an addendum of some sort.

Q. And when was this this?

A. 2016, if I am not mistaken. I am going on memory here. Sorry.

Q. And instead of everything being equal, it became you said productivity based?

A. It was complicated model. There was a $250,000 salary that was equal, and then there was a



Page 74

branch point for the rest of the money, where some of it was split equally, some of it was still based on RBUs.

Q. Okay. How did you feel about that?

A. It was compromise I was willing to make because I did see that he was working a bit harder. I didn't want to have it applied retroactively. You know we had a deal. I am the kind of person that if you have got a deal, you should stick with the deal, unless there are extenuating circumstances. And when he came to me at the end of the year, the whole year asking for additional money, and I felt like that was unfair.

Q. So would you say that the partnership with Dr. Peddada was successful?

A. Financially is what I was talking about.

Q. Okay. So it was financially successful?

A. I think we both were doing very well. And it was mostly good on a personal level. You know, we had periods here and there where it wasn't good. And we can get into some of that. But on a day-to-day basis, we you know, we treated each other reasonably well. We talked football. We did all of the kind of things that you would consider a friend.

We only ran into problems -- we mostly ran into problems when it came down to money, and his requests for additional money. That's where I noticed

Page 75

the biggest problems. And I'm kind of a law and order kind of guy. If I sign a contract, I kind of feel like that's how the compensation should have gone. He was kind of loose with his different interpretation of those things, and felt like we should be able to change them.

Q. Okay. And you felt opposite of that?

A. I did. I feel like if you sign a contract, that's what it should be.

Q. Okay.

A. You know, barring extenuating circumstances, something unusual. That's why contracts exist. And I think told him that once. It's like, you know, all these discussions about money, that's why contracts exist, so people don't have these arguments.

Q. Okay. So on average how much revenue would you say the practice made annually towards the end of the partnership?

A. Probably between 1.5 and 2 million. There may have been some years where we were a little above 2 million.

Q. Okay. So better than before? Okay. Would you say that, it was better than earlier years?

A. Yeah, when we talked about the graphs. Yeah.

Q. Now how much revenue would you say ROPC

Page 76

brought into Centura?

A. I don't really have a good understanding of how much the technical fees were, but it was more than the professional by some orders of magnitude. It was quite a bit. I think we were both valuable to Centura.

Q. So you would say like a substantial amount of revenue?

A. I think so. I mean I recall certain administrators saying often in the black. And we were helping run the hospital because of our productivity.

Q. Okay. And is it true that you had a lot of patients with you at ROPC?

A. Can you repeat that?

Q. Is it true that you had a lot of patients at ROPC?

A. Yes.

Q. And how about Dr. Peddada, would it be true that he had a lot of patients as well?

A. We both had a lot of patients. We were both very busy.

Q. And so based on your number of patients, you brought a lot of value to Centura?

A. I think we both did.

Q. Okay. Dr. Peddada as well?

A. Yes.

Page 77

Q. And Dr. Peddada, he was a popular doctor and well known in the field, correct?

A. He was well known, yes.

Q. So what benefits, or if you can describe it at least, what benefits has the hospital received as a result of Dr. Peddada's reputation?

A. I think --

MS. MCMANUS: Object to foundation.

A. Sorry.

Q. (By Mr. Whitney) You can answer.

A. Okay. I think financially the hospital benefitted from our practice. We were a successful practice.

Q. And if Dr. Peddada moved in house into Centura, those patients that he had would have remained with him? Correct?

MS. MCMANUS: Object to foundation.

A. I don't know that the patient belonged to anybody per se. If they were treated in our practice at Penrose before he was brought in, they would have probably been treated at Penrose if he was brought in as an employee. If that answers your question. Same thing for my patients.

Q. (By Mr. Whitney) Okay. Do you know what happened to Dr. Peddada's patients after Centura



Page 78

withdrew the offer?

A. I ended up caring for quite a few of them. A lot of them are on treatment still.

Q. All right. I want to go back a little bit to the early years of your practice. And I may have asked -- I may have asked this.

How many hours a day would you say you were working during the --

A. Yeah, you did ask, and I think I estimated 10 to 11.

Q. Okay. I did ask.

A. Not every day obviously, because we had a lot of time off like I told you. We probably averaged working four days a week times that, so 45 to 50 hours. I would guess, most weeks. Something in that ballpark.

Q. And what would happen if, say, like, one of the partner's workload was heavy? Would the other partner come in and pick up the slack?

A. If I could have. Dr. Peddada was kind of protective of his patients a lot of times, and a lot of my offers to help out, he said, I got this.

Q. Well, how about for you then? Like, when your workload was heavy, would he ever come in and help out?

A. I didn't ask him to because he was a little busier than me. So it wouldn't be reasonable for me to

Page 79

to ask somebody who is a little busier to help me with my workload.

Q. Okay. So you guys really didn't help each other with the workload?

A. We would split it when the other person was out, like I say. So if you have 30 patients under treatment, I would see them all in the on treatment visits when he was gone.

Q. And do you feel like the workload was ever too much to handle?

A. For me?

Q. Yeah.

A. Yeah. It was busy.

Q. How did you handle it?

A. The best I could, spent longer hours, tried to get efficient. I became very efficient at this job.

Q. And had the workload increased or decreased over the years?

A. It increased from 2006 to about 2013, '14. Every year we had more patients under beam, and from that point, it was more level.

Q. And how about after 2013 and '14? Did it just keep ramping up?

A. No. It would bounce around. Some years up, some years down, as I recall. Part of that was UC

Page 80

Health was coming on line. Memorial had just been a private hospital that we had been competing with. And UC Health bought them, and they got more business, and took away some of ours. And part of that was also the prostate center, like we talked about, taking away some of our prostate business.

Q. Did you ever have to take -- and this was over the years through the partnership, have you ever had to take sick leave?

A. I think I took one sick day within that 15 years. It was the day my daughter was born, I was scheduled to work, and I was planning on coming back right after wife delivered because Dr. Peddada had requested that day off. Fortunately, we had an 18-inch snow storm and that was the one day that we closed the department. It was the day my daughter was born.

Q. When was that?

A. It was 2006.

Q. Oh, man. Your daughter was born during that terrible snow storm?

A. Yeah, my wife went into labor because of the atmospheric drop, and we had 18 inches of snow. I got to spend the day off to spend with my daughter because Mother Nature intervened.

Q. Okay.

Page 81

A. Yeah, I was sick maybe one day is all. The same for Peddada. The guy, you know, he worked through colds and this and that. He did break his leg at one point, and took a little time I think. But he was even in here, rolling around on a cart with a broken leg.

Q. Sounds like you guys were really dedicated.

A. I think we both cared about our patients. I think we were both good doctors. Yeah. We were dedicated.

Q. So you are standing on very few sick days for Dr. Peddada, very few sick days for you. Did either one of you ever have to take, like, any extended time away from work?

A. No. If we did, we built it into our vacation request time. So I think the longest any of us gone, he might have had a two week vacation where he went to India and Bali and such. I think I might have had a two weeks vacation to do the same. My in-laws are Indian so.

Q. So never really any problems like having to take off if you needed?

A. No, in retrospect, thank God, because we didn't have a back up plan, other than the other person just working every day.

Q. So did you guys promote, like, the work life



Page 82

balance?

A.   We did in the sense of taking time off.  I think we both prioritized having a lot of time off to our recharge our batteries during that time off.

Q.   Okay.

A.   When we were here, we both worked hard, and we took time off. That was our work life balance, the best we could do.

Q.   And why did you think that was necessary?

A.   Because this is a stressful job.  You have got people's lives in your hands.

Q.   Do you feel like the time off, kind of relieved the stress?

A.   It would help.  You would come back and you'd have as much to do as when you left, unfortunately sometimes. It would be right back at you.

(Reporter asking for break after two hours on record.)

Q.   That's exactly what I was going to ask Dr. Monroe.  Are you ready for a a quick break?

A.   Yeah, sure.

Q.   All right.  So you guys want to take, like, 10 or 15?

MS. MCMANUS: That sounds great.

(Break taken, off record.)

Page 83

Q.   (By Mr. Whitney) Dr. Monroe, please do remember you are under oath.

A.   Yes, sir.

Q.   All right.  So what I had failed to do earlier, you are aware that Centura is now Common Spirit, correct?

A.   Yes.

Q.   All right.  So I have been referring to Centura the whole time.  I just wanted to make sure that was clear.  When you were in practice it was Centura, correct?

A.   That's right.

Q.   Okay.  So I will be referring to Centura, but when I do refer to Centura, after this deposition, I will be referring to the entity that we now call Common Spirit.  Okay?  Just to make that clear?

MS. MCMANUS: Crist, we would object to that.

MR. WHITNEY: Okay.  That is on the record.

MS. MCMANUS: Yeah, because Common Spirit didn't have any involvement --

MR. WHITNEY: No, no, no.  I am just saying Centura.  I am going to be referring to Centura.  So he may think Common Spirit but I will referring to Centura, just so there is no confusion.

MS. MCMANUS: I still don't -- sorry.  Can you

Page 84

clarify?

MR. WHITNEY: I thought I did.

MS. MCMANUS: So --

MR. WHITNEY: What's your objection?   You are saying that -- I don't understand the objection.

MS. MCMANUS: Well, at the time that everything occurred, it was Centura.

MR. WHITNEY: Yeah, that's what I just said.

MS. MCMANUS: So, so I just don't know why you brought up Common Spirit.

MR. WHITNEY: Just in case that there is any kind of confusion that I am referring to Centura the whole time.  I am not going to mention anything about Common Spirit.

MS. MCMANUS: Okay.

MR. WHITNEY: Okay?  Just to make sure that's clear?

MS. MCMANUS: Sure.

A.   The assumption is when you are talking about administration, it was Centura.

Q.   (By Mr. Whitney)  Yeah, I just wanted to make sure that was clear.

So can you describe the nature of the relationship between ROPC and Centura?

A.   The nature was that we had a professional

Page 85

services agreement to provide professional services for patients, and they would be the entity that performed the technical services.

Q.   Can you describe what you mean by technical services?

A.   There's components of a radiation oncology charge that is professional, and part that is technical. Technical is the things like treatment delivery and versus professional is things like consultation.  Our practice filled the professional component for that.

Q.   And then Centura dealt more with the technical side?

A.   That's right.

Q.   And --

A.   With the exception of the cyber knife, which I am sure -- so there's a JV with the cyber knife.  We can talk about that, if that's necessary, but I didn't want to leave that out.

Q.   All right.  Can you elaborate on that portion?

A.   Yeah, there's a JV, a joint venture between Dr. Peddada, myself, three other physicians, and the hospital, whereby we do get some of the technical revenue for radiation surgery patients, radiation with the cyber knife.

Q.   And who are those other doctors?

Page 86

A.  Like I said, Reiner, Dr. John Stauberbourg. Dr. Andrew Tanner.  I think that is it.

Q.  And what was cyber knife?

A.  Cyber knife is a device that delivers radio surgical treatment, which means the treatment is highly precise, high dose.

Q.  And is that through Centura at all?  Or is that supplemented?

A.  Yeah.  Centura was a part of the joint venture.  To complicate matters even more, there was a third party initially that eventually got bought out. That was called Sila Tech.  And they were a company that brought these technologies to practices.

Q.  And do you know when ROPC had entered into that relationship with Centura?  Not cyber knife, just in general.

A.  Just in general, it predated myself. I don't know exactly.  I think Dr. Schiller started the group, if I am not mistaken, many years ago.

Q.  Do you know how ROPC started?

A.  To some degree there was two docs, Dr. Schiller and a guy named Dr. Bentley Kersey.  And they were practicing, in sort of like in the '80s I assume.

Dr. Schiller actually did his residency here

Page 87

at Penrose.  There was a residency program way back in the '50's, '60s, '70s.  And so he was one of the last residents of Penrose, and he started a practice.  And then I belive probably there was a PSA or something at point practicing medicine here.

Q.  And then could you describe the financial relationship between ROPC and Centura?

A.  Predominantly it was split billing, so the financial pieces were split.  They did the technical and we did the professional.  They were medical directorships as well, as I recall.  Dr. Peddada was medical director, so he secured a contract for that.

Q.  And could you describe how that works with Dr. Peddada as the medical director?

A.  It was kind of his personal business.  I mean I know that he had some kind of contract with them to be, you know, to kind of be the guy that the administration would come to.  I think it was on the order of $50,000 a year or something.  I don't know.  I could be wrong about that.

Q.  Do you know anything about his role?  Like, what he had to do?

A.  Kind of be a liaison to talk about things for our practice with them predominately.

Q.  And could you describe how the relationship

Page 88

with Centura impacts patient care, or any of the decisions you guys would make as far as treating patients?

A.  That is an awfully broad question.  I don't really understand what you are getting at there. Sorry.

Q.  Let's just start with the first part.

A.  Okay.

Q.  How did the relationship with Centura impact any patient care?

A.  I mean, I don't know that it did that much.  I mean, I made decisions on each patient, based upon what I thought was best for them, and came up with treatment plans that involved the equipment that Centura owned.  I guess they were involved in that manner.

Q.  So then would you say no involvement really?

A.  I guess the manner I just discussed, in the way they were collecting technical fees off of my clinical decisions.  So there was some relationship there.

But first and foremost, you know, I took the Hippocratic Oath, and that's important thing to me.  And I always tried to do what was the very best for my patients.  And if that meant billing something lower to do what I felt was right, then Centura may not have made as much money, I did that in these cases.

Page 89

Q.  Now how often did the practice need to communicate with the hospital regarding any patient care?

A.  You mean, we didn't have set meetings that I remember.  Dr. Bruen's office was right down the hall. We would stop in and talk to him regularly.

If Dr. Peddada had a formal meeting with him, I didn't know about it.

We did have to do things, like, we would have meetings from time to time about how we can get more business. We would both give our suggestions in those meetings. It was then called the physician advisory board.  And they brought in doctors from our, the various specialties that sent patients in.  And we would kind of brain storm this to build our practice, those kind of things.

Q.  Okay.  And are there any specific policies or procedures that govern your relationship between -- govern the relationship between ROPC and Centura?

A.  There is a contract of professional services agreement contract.

Q.  Okay.  Anything else?

A.  There is goodwill, I suppose.

Q.  I am sorry.  What did you say?

A.  Goodwill.  I mean you want to do a good job

MAGNA
LEGAL SERVICES

Page 90

for them, and you work with them.

Q. Okay. And are there any specific policies or procedures with Centura that ROPC had to follow?

A. There's things spelled out in the professional service agreement.

Q. Now do you know if there has ever been any disputes or disagreements between ROPC and Centura?

A. I am trying to think if we had any disputes along the way. I can't remember anything. It was, they basically, every couple of years, would come to get a new PSA. Dr. Peddada would sign it as the president of the corporation.

Q. You said every few years?

A. Every two to three years as I recall.

Q. Was there ever any disagreements about that?

A. Not that I am aware of. I man, we always, they would kind of remind us it was time. They would send us the contract. We had no intentions of breaking it and going elsewhere and doing our own things. So we always signed it and stayed on and worked with Centura.

Of course, I am will sure we get to the date of when the practice terminated. I guess it was somewhat of a discrepancy.

Q. And who ensured compliance with, like, the government regulations regarding patient care and

Page 91

safety?

A. We were involved with things like ASTRO has a Newt, where we put in cases, as far as like for safety things. There is like a Midas report, if there was an issue with patient care, that we would report. Those kind of things.

Q. So ASTRO, I am sorry. What was that again?

A. I can't remember the name of it. It was like, there is a mechanism where you can put in your, like, near misses and things like that and then they go into a nationwide data base. And it's for patient safety to try to learn some things that could have happened bad.

Q. And then other than that, is it the practice of Centura that insures that you guys are in compliance with government regulations?

A. Yeah. We were covered by, like, state radiation safety stuff. That kind of stuff was then massed by Centura physicists here, since I was here. It was our responsibility to keep up our medical licenses and our CTE and those kind of things. So our practice handled that.

Q. Okay.

A. If I am interpreting what you mean by policies and procedures and regulations. I think that's what you are asking.

Page 92

Q. Yeah. All right. So I want to introduce the first exhibit. And I believe they sent you a couple of exhibits that I sent over.

A. Do you know which E-mail you used, because I don't see it on my work E-mail?

MS. MCMANUS: The other one.

A. My Yahoo account?

MS. MCMANUS: Yes.

A. So then I have to get my Ipad out.

MR. WHITNEY: The work E-mail keeps bouncing back for us when we attach documents.

A. Sounds like and I-T problem.

MS. MCMANUS: I think so.

A. Let me call up my other E-mail then. Okay. I got something from Lindsay. Is that it?

MS. MCMANUS: That should be it.

A. Okay. Which one am I looking at here?

(Exhibit 14 identified.)

Q. (By Mr. Whitney) So the document I will be referring to, it will say Peddada and then it will say 000285 - 308.

A. Okay.

Q. This will be marked as Exhibit 14.

A. It says it's downloading. I am sorry.

Q. Let me know when it's done.

Page 93

A. Okay. It's picking and choosing which one to download. And it's deciding that the one we want to talk about is not the highest priority. Sorry.

Yeah. Most of the other ones are downloaded. Almost done. Okay. Got it.

Q. Still downloading?

A. Yeah. Almost there. Okay. Got it.

Q. All right. Good. Give me a quick second to look at that.

A. Okay. It looks like an exclusive professional service agreement for radiation oncology services.

Q. Yes. Have you seen that before, correct?

A. Probably. Peddada usually signed these. And I would get an E-mail later with signatures on it. So I think I probably have seen it. I don't see my signature on it, but okay. We can talk about it. I will figure it out.

Q. All right. So I am going to direct you to page 5 of this document.

A. Which section are we talking?

Q. It's Section 1.02, exclusive engagement of group.

A. I see it.

Q. Could you just read through that really fast?

A. Sure. Okay.

Page 94

Q.  Could you just explain to me what that means?
A.  It means that --
MS. MCMANUS: Objection to foundation.
A.  I would interpret that this is that the group was going to provide all of the services and were going to be loyal.  We are not going to go out and do things at other hospitals.  And we are not bring in other people to do what we do.
Q.  (By Mr. Whitney) Okay.  And then I would like you to move down to Section 1.03.
A.  Okay.
Q.  And if you can just skim through that or --
A.  I am not a good skimmer.  I usually try to read.
Q.  Okay.  Gotcha, so if you can read that part.  It is a little longer.
A.  You want me to read it all.
Q.  Yeah.  If you can.
A.  Okay.  Sure.  Okay.
I must confess that I am not very good at reading legal things.  They are usually hard for me to understand.  Yeah, my discipline is that, you know, the group needs to be able to be on medical staff to provide services.  If something happens to staff --
Q.  So did you understand what you were reading

Page 95

there?
A.  I mean, yeah.  I think so, pretty well.  I think you guys write the same way they make us write on consent pages.
Q.  No doubt.  So what do these medical staff privileges include?
A.  You have to be on medical staff.  You have to go, you know, pass a board of acceptance before you can practice at a hospital.  That is what it means to have medical staff privileges.
Q.  And who oversees the performance of doctors with privileges at the hospital?
A.  There is usually an elected doctor or an assigned doctor who is in charge of that, like, somebody a head of the medical committee, I think.  A medical executive committee leader.  I think that is who it is.  And I kind of applied for privileges back in '06, and just kind of renewed.  So I didn't ever run into an issue with it.  So I never thought about it too much.
Q.  So when the practice was winding down, do you know who that person was?
A.  I don't actually.  It might been have been Karen, Karen Vogel.
Q.  So I read in there that privileges could be revoked.  How do these privileges, how can these

Page 96

privileges be revoked?
MS. MCMANUS: Object to foundation.
A.  There are usually things written in contracts that stipulate that.  I never ran into those issues.  I never had reason to think about having my privileges revoked.  It seems like, you know, if abandoned your patients, if you show up drunk, those kinds of things, you know.
Q.  And do you know how medical staff privileges at the hospital, how that impacts your practice?
A.  If you don't get on your medical staff, you are not allowed to practice is my impression.  But there may be a probationary period.  I don't know.  Like I said, I never really ran into that issue, so.
Q.  And are there hospital policies that you need to follow as part of your medical staff privileges?
A.  There are.  I have always just tried to practice the best medicine I can and be as good of a person as I can.  And that has always covered me on all of the stipulations.  I can't actually sit here recite what they are to you for that reason.
Q.  Do you have any examples of any policies that you would have had to follow?
A.  You have keep your license active, I believe and things like that.  That is the one I did have to get

Page 97

involved with because I have to review it every couple of years.
Q.  All right.  So I going to have you move down it is going to be .05.  And on the bottom of that page, you will see where it says Peddada 000293.  And it's the section entitled performance reviews.
A.  Okay.
Q.  And could you just read through that really fast?
A.  Sure.  Okay.
Q.  Okay.  And are you familiar with any of the performance reviews?
A.  I don't remember there being a formal performance review.  If there was one, Dr. Peddada was president, and he might have met with Dr. Bruens and given or taken those kinds of reviews.  I am not sure.
Q.  Do you know if your performance was ever reviewed?
A.  I would hope so, based on the contract.  But I don't remember being told there was ever an issue with my performance, so.
Q.  Okay.  Did you ever have to sign a performance review?
A.  If I did, I don't remember it.
Q.  Do you know if ROPC had ever failed a

MAGNA
LEGAL SERVICES

Page 98

performance review?

A. Not that I am aware of.

Q. And so this exclusive agreement meant that you couldn't work with other hospitals, correct?

MS. MCMANUS: Object to foundation.

A. That was my understanding, we were providing exclusive services to Penrose, unless Parker was part of Centura. Right? I think it was.

(Mr. Whitney lost zoom connection.)

Q. Sorry about that. I got kicked out.

A. No worries. That's the nature of zoom, right?

Q. Yes, it is.

All right. So I was asking exclusive agreement meant that you couldn't work with other hospital, correct?

A. Yeah. I think these things are put in so you don't go work at Memorial across town and compete with Centura. That is my impression.

Q. Okay. And did you do any independent work that wasn't related to Centura for any other hospital?

A. No. We covered calls from Memorial. That was the only time that we might have saw one or two patients in my 10 or 15 years on call. It was kind of an agreement that had been in place long before I got here. A small number of docs in town that we shared each

Page 99

others calls. That went away, after I signed on as an employee doc.

Q. And how about Dr. Peddada, did he ever do any independent work that you know of?

A. Independent work for, like, another hospital or something? Is that what you mean?

Q. Not Centura, or not another hospital, just independent?

MS. MCMANUS: Object to form.

A. I don't recall him working for the hospitals for sure. He might have given some lectures or something like that for some compensation. He did something like that.

Q. (By Mr. Whitney) Okay.

A. Trainings or something or other.

Q. Have I ever asked this before? As far as ROPC, did you have guys have regular meetings?

A. No.

Q. No. I think I did ask that.

A. In some regards I wish we would have. It might have helped with some of these misunderstandings.

Q. Okay. How did you guys communicate usually?

A. Usually in person, by phone, by E-mail, different ways.

Q. You said in person or by phone?

Page 100

A. Yeah. E-mail and text sometimes.

Q. Did you ever have any trouble communicating with Dr. Peddada?

A. He could be sometimes hard to approach, I would say.

Q. Can you explain that?

A. I think it was related to that power differential or the prestige differential that we discussed. So if I had a complaint, I sometimes felt like it wasn't always fully addressed right off the bat, without me having to come back and bring it up. And that caused some frustration for me.

Q. Okay. Any other trouble communicating with him?

A. Not like technical issues. No. I mean.

Q. Okay. So basically when you are saying you had trouble communicating, it was about a particular issue, but not that he wasn't responding to you?

A. He would sometimes wait a little bit, which is I think you respect somebody's right not to respond right away. But we generally would get back together and talk about it. Sometimes agree. Sometimes disagree.

Q. So did Dr. Peddada ever have a problem in the past communicating with Centura?

Page 101

MR. MCMANUS: Object to foundation.

A. Not that I am aware of.

Q. (By Mr. Whitney) And how did you guys regularly communicate?

A. By talking, by phone, by text, by E-mail. If that's what you mean.

Q. Okay. And was that like a work E-mail?

A. Sometimes. Sometimes personal.

Q. And what was the personal E-mail?

A. My Yahoo account.

Q. And how often did you guys communicate on the Yahoo accounts?

A. Not very often, I would say. I mean we were right next to each other, we usually would deal with things verbally I would say. His office I can touch right now. It is right over there. I would use E-mail when I wanted to spelled out my points though.

Q. Which we usually do, gives us enough time to actually think an issue through?

A. Dr. Peddada and I communicated differently, I would say. On a personality test I was a blue and he was a red. And he would sometimes, you know, say things very quickly that, or sometimes emotional. And I was more of a cautious, kind of think it through, write it down, formulate my ideas as I am writing kind of guy.

MAGNA
LEGAL SERVICES

Page 102

Q. Did that make it difficult to communicate with him?

A. When we did those personality tests, they actually gave us a thing that said this could be a source of issue for you, for people who are red versus blues, how you communicate. So, yeah, I would say so.

Q. All right. Well, did Dr. Peddada ever ignore an E-mail from you?

A. Yeah.

Q. Can you tell me about that?

A. In about September of '21 until present, he kind of went in ex-communication with me, and you know, wouldn't respond when I talked to him in the hallways, stopped responding to a lot of E-mails.

Q. How about before September, 2021?

A. I don't recall. I don't think so. I think he usually would respond okay.

Q. Did he ever ignore any text messages from you?

A. Possibly. I don't recall.

Q. Did ever ignore phone calls from you?

A. You mean like not answer them?

Q. Yeah.

A. I don't know.

Q. Then also not just call back?

A. I don't recall any of that.

Page 103

Q. And you said this changed over time, like after September, 2021?

A. Yes.

Q. Okay. I asked you a little bit about this before about your relationship with the Dr. Peddada. Did you guys socialize outside of work, aside from your birthday party?

A. Sometimes. Yes.

Q. Okay.

A. Occasionally get together, and watch football game or something.

Q. How often would you guys do that?

A. A few times a year. Sometimes they were like journal clubs with other doctors. We would see each other in passing.

Q. And how were those interactions?

A. I mean those were obviously times when we friendly, so they were good.

Q. Okay. Did you know Dr. Peddada's wife?

A. I did.

Q. Okay. What is your impression of her?

A. It was nice.

Q. Okay.

A. Dr. Peddada's mom and my mother-in-law knew each other in India.

Page 104

Q. Oh, wow.

A. They were in dance lessons or something together in India, believe it or not.

Q. Oh, that's a small world.

A. And then I go through Kentucky. I marry an Indian woman from the same state that he grew up in. And the next thing you know, our mother-in-laws are friends, his mother and my mother-in-law.

Q. Did that happen before you met him?

A. Oh, yeah. I mean they grew up together as kids, and they are like 70s now.

Q. And so you happened to meet her before you met Dr. Peddada?

A. I mean I was married to my wife when I took the job, yeah.

Q. Huh, it's a very small world.

A. I think it probably helped me get the job maybe being a --

Q. Okay. How about Dr. Peddada's brother, Dr. Abhinand Peddada? Do you know him?

A. I met him once a couple of times at meetings. Anuji and Abhinand and I had dinner at ASTRO once.

Q. Okay. And what was your impression of him?

A. Nice guy as well, smart.

Q. And he is a doctor as well, right?

Page 105

A. Radiation oncologist.

Q. Okay.

A. Never met his younger brother.

Q. Is his younger brother also a --

A. He is in medicine, not in radiation.
(Overlapping speaking.)

Q. I am sorry. I asked was he a doctor as well?

A. He was a doctor, but not a radiology oncologist.

Q. And did Dr. Peddada, Abhinand Peddada, did he ever have anything to do with ROPC, the practice?

A. No.

Q. Okay. What was your impression of him as a doctor?

A. It wasn't really based upon much. I never saw his skills. Met him once.

Q. Okay. Do you know anything about the relationship between Dr. Peddada and his brother?

A. I don't. I think they got along fairly well. He would talk about his brother occasionally but nothing that sticks out to me really.

Q. So before each of the two of you signed agreements to move in-house and close down ROPC, I understand that you and Dr. Peddada had stopped communicating. Is that true?

MAGNA
LEGAL SERVICES

Page 106

A.  Dr. Peddada had stopped communicating with me, is how I would put it.  I kept trying.

Q.  Okay.  So what did you do when you said you kept trying?

A.  I would try to talk to him in the hallways because we were still at Penrose seeing patients, sometimes along side each other.

Q.  Okay.  So why were you guys not communicating?

A.  Long story.  Are you ready?

Q.  Yes.  That what I came here for today.

A.  Yeah.  I figured.

It involves Dr. Kathpal, someone we haven't really talked about much.  But the long and short of it, and you ask more details about it.  But what led up to it, there was a zoom meeting at the early part of September, first or second probably.  We were trying to figure out divvying up work with Dr. Kathpal, myself, Dr. Peddada, who would be where.

It was a meeting that ended with him becoming very angry, and making some verbal threats.  And after that, cutting off communications eventually.

Q.  Why did the meeting turn contentious?

A.  I don't think -- I was -- it was probably had something to do with the fact that Dr. Peddada felt like Dr. Kathpal was not going a good job.  I felt like he

Page 107

wasn't giving her much of a chance because she had only been there for a short time.  I requested some performance review stuff for her before, because he was saying things like, I don't think she is going to make it.

And I felt like that was jumping to a conclusion without really giving her a chance to really prove herself.  So we had disagreements over Dr. Kathpal's performance.

Q.  Do you think she was doing a good job?

A.  I think she was doing a good job by the standards of the radiation oncology community, yeah.  Dr. Peddada I think had high standards and maybe disagreed with that.

Q.  Did he express why she wasn't doing a good job?

A.  He felt like she had taken over St. Francis and was making too many changes.  He is very much in favor of doing things kind of his way.  And I was compliant and did a lot of things his way along the way.  And I think she was more of a fresh out, newer and different generation.

Q.  So did they not get along?

A.  At times.

Q.  Were they ever rude to each other?

Page 108

A.  At times.

Q.  How so?

A.  Usually not in front of me so, I don't know.  You'd have to ask him.

Q.  Okay.  Sorry.

A.  But on this occasion Dr. Peddada probably felt like I was defending her more than I should have been.  I think he is very big into loyalty.  And I was into fairness.  And that led to a disagreement where he said he no longer respected me, which was very hurtful.

Q.  And this was all about just because you felt she was qualified?  I am sorry, not qualified, but doing a good job?

A.  He brought her in as partner.  We had vetted her.  It had only been a few weeks and he was already talking about her not making it.  And I felt like we should give her a fair shake.

Q.  And did he say he didn't respect you in that meeting with the two of you then?

A.  He did.

Q.  Did you say --

A.  I am sorry. Go ahead.

Q.  Did you say anything to him to cause that?

A.  I must have defended Dr. Kathpal and I don't think he appreciated it. That is all I remember.  I

Page 109

never said anything personal, that I remember, derogatory toward him in that meeting.  Just before he hung up, he said I am going to look at our contract and find a way to cut you out, referring to me, and he said you may not be working in this town soon.

And I remember those vividly because I wrote them down right after the meeting.  They felt like bullying and they felt like threats.

Q.  And that was a phone call?

A.  It was a zoom call with Dr. Kathpal and Dr. Peddada and myself.

Q.  Did you ever send him a follow-up E-mail about that?

A.  I might have.  I don't recall.

Q.  If you did send him an E-mail, would it have been on the work E-mail or the personal one?

A.  Could have been either.

Q.  And what did you say to him after he told you that?

A.  He abruptly hung up the phone after saying that, and that was the last time we formally spoke.  Dr. Kathpal was still on the line and she said I can't believe I just heard what I heard.

Q.  So at the last meeting that you had?  Correct?

A.  That's right.  Centura forced a meeting in

MAGNA
LEGAL SERVICES

Page 110

December of that year to try to figure out how we were going to switch from our practice. So I did speak with him briefly again at the meeting in December.

Q. And when was this? Do you recall?

A. This was the first part of September, first or second. As I recall it was over the Labor Day weekend, but I am not 100 percent sure on that.

Q. And you said when you saw him around the hospital you would attempt to talk to him?

A. I would.

Q. And then what would happen?

A. He would usually turn away.

Q. Without saying a word?

A. Yeah, often.

Q. Did you ever call him?

A. I can't recall if I did.

Q. Did you ever send him a text message?

A. My feelings were pretty hurt. I didn't reach out to him at the time. He didn't reach out to me. There were no apologies, nothing. This is when the silent period began.

Q. You said your feelings were hurt by what he said?

A. He told me he didn't respect me. That was pretty hurtful.

Page 111

Q. I'm sorry. How come you tried to talk to him when you saw him in the hospital?

A. Because eventually, we were working together. We had to eventually try to work out these issues. And I knew it wasn't a long term plan to just practice alongside each other not communicating.

Q. How long did it take for you to stop reaching out to him as well?

A. I think I continued periodically until, at least until we met again in December, and Centura tried mediating a meeting. I would say I tried several times in October, November.

Q. Did you ever go knock on his door to his office and then sit down and talk to him?

A. No. That would not have been welcomed.

Q. How do you know that?

A. Because of his demeanor. When he faced me in the hall, it was always very roughly and intimidating.

Q. So rough and intimidating how?

A. Just the way you can get verbal clues from the way somebody looks at you. That was my impression, also the fact he said I don't respect you, hung up on me and hadn't communicated and never tried to call me. That's a pretty not too subtle hint. Right?

Q. So how many times did you approach him and try

Page 112

to talk to him?

A. I don't recall. Several.

Q. In the past you guys seemed to resolve your differences. Did you know at this point that the differences wouldn't be resolved?

A. I did not know that.

Q. You didn't know?

A. No. There always a chance. I am an optimist. I believe things can be resolved. Sometimes time.

Q. Okay. And if you wanted to resolve this, did you think be he would have gotten up and walked out of the office and left you there?

A. That was a possibility.

Q. And so before that December meeting you talking about with Centura, you guys never discussed why you weren't talking to each other?

A. It was pretty clear why we weren't talking to each other. He told me on the phone that he didn't respect me, that he was going to look in the contract and find a way to cut me out, and that I may not be working there soon.

Q. Did either of you attempt to resolve this matter?

A. Yes. I went and tried to speak with him on several occasions over the next several months. I

Page 113

actually approached HR with an inquiry as to whether I had any rights about bullying in the work place and conflicting work place and they told me that because I was in a private practice, they didn't want to have anything to do with it.

I was trying to get him to be open to communications. So that was one of my methods of trying to force some level of communication.

Q. So when did you decide to stop reaching out to him?

A. I don't know that I ever necessarily did decide to stop. I think that it trailed off after I was, you know, not responded to over multiple attempts. Eventually we had to break up our practice in some way. We had to do the legal groundwork. And so, he was not responding to me. And I had to find some way to get him to communicate. And so I had to hire an attorney to send him a letter asking for mediation to get those things done. That would have been approximately November, 2021.

Q. So that was you that made that decision to break up the --

A. No. He already had a lawyer at the time. And so I was getting a lawyer, so that our lawyers could talk and get us in the same room and communicate.

MAGNA
LEGAL SERVICES

Page 114

Eventually that isn't how it worked out.  Centura got involved and brokered us having a meeting in December that I mentioned.

Q.  Then how did you know he had a lawyer?

A.  I don't recall.  I think they may have reached out to me at some point.  I am not sure.

Q.  Did they reach out via E-mail, phone?

A.  I don't remember.  That's a tough one.  I knew that he had a lawyer, maybe administration told me.  I am not sure.  I hate to speculate.

Q.  So you are saying three months of no communication.  Has that ever happened before in your practice?

A.  No.  It was shocking.

Q.  And you are saying this was all over Dr. Kathpal?

A.  I don't know for sure what was all over but that was the final thing that we spoke about.  It was over the threats made to me as well.  I felt that it was a personal attack.

Q.  When you approached him in the halls at the hospital, did you ever bring that up to him?

A.  I said, hey, can we talk, and I was ignored.

Q.  Did you guys ever have any conversations about any patients during this time?

Page 115

A.  No.  And we should have been.  We should have been doing peer review together, and patient care was being compromised in my opinion because of his desire not to communicate with me.

Q.  But you had a desire to communicate with him?

A.  I felt that there -- if you are going to have a practice together you have to be talking to that person.  This is why Centura eventually got in and decided that Radiation Oncology, PC was not a viable option for them and that we would have to be employed.  They knew about the lack of communication.

Q.  And so you obtained a lawyer to --

A.  To help break up my practice when that became apparent.  I had also been threatened, as you heard me saying.  I felt that I might need to be defended.  I didn't know what he was getting at, but I didn't want to take any chances.

Q.  And so based on what he said to you, you decided to go get the attorney?

A.  I don't remember.  It was somewhat later.  It was when I knew that I needed to break up my practice.  I think I made the first contacts with attorneys in October or November.  I had to go through about four firms because they all had conflicts with Dr. Peddada.  And I eventually found somebody.

Page 116

Q.  And aside from that discussion with Dr. Kathpal, Dr. Peddada never reached out to you to tell you he wanted to break up the firm, or the practice?

A.  No.  You mean after the --

Q.  After that zoom call?

A.  No.  We didn't have any communication, like I said.

Q.  Okay.

A.  Not until much later, you know, the following spring, I started getting some E-mails and texts, which are -- I have seen part of this.

Q.  Now did you -- did Dr. Peddada stop talking to you, or did he stop talking to everyone?

A.  He still spoke to staff because he would have had to do his job.  I don't think he spoke to Dr. Kathpal but I don't know for sure.  Dr. Kathpal and I continued to do peer review together because somebody needed to take care of the patients, you know, in that manner.  At least peer reviewed our own stuff.  I don't know if his stuff was being reviewed or not.

Q.  Did you tell anyone at Centura about the lack of communication between you and Dr. Peddada?

A.  I did.

Q.  Okay.  And when did you tell them this?

Page 117

A.  Shortly afterwards, within the next month or so I would guess.

Q.  So a month later?

A.  No.  Within that month.  I don't know exactly.  It was probably within a few days.  Shocking time in my life.  It was a lot of stress.  I would have gone to whomever to try to sort it out.

Q.  So some time in September?

A.  Yep.  I know I went to inquire about the HR thing to try to get him to talk within just a few days, and I was shot down.  And I went, certainly to our administration, probably, Dr. Plauth, at some point in there.  P-L-A-U-T-H.

Q.  So when did you talk to Dr. Plauth about not communicating with Dr. Peddada?

A.  Some time in the fall of that year, but I don't really know exactly when.

Q.  And was that by phone call or an E-mail?

A.  It was in person, and by E-mail and also we had a couple of conversations.  I remember going to his office once and talking for awhile.

Q.  All right.  What did you tell him?

A.  I told him that we were not communicating.  Our practice was in a bad position because of that, and patients were suffering.  And just, you know, that led

MAGNA
LEGAL SERVICES

Page 118

to the decision to offer us employment separate from the PC.

Q.   Okay.  When did you talk to Dr. Plauth?

A.   You asked me that, and I said I don't remember, but I said it was in the fall.

Q.   I did ask you that.  I'm sorry.
This was all in the fall of 2021?

A.   As far as I recall, yes.

Q.   Okay.  And you said this was like a very stressful time?

A.   Yes, sir.  Very much.

Q.   Okay.  How was the practice before this conversation with Dr. Kathpal, because this is during, like, the COVID years, so how was the practice?

A.   Let me think, this was the fall of '21.

Q.   So like a year later?

A.   18 months after COVID started. Right?

Q.   Uh-huh, yes.

A.   So how was the practice over those 18 months?

Q.   Yes.

A.   The history of the COVID with our practice is that when COVID initially hit, we were running at a pretty standard volume for the time.  And immediately guidelines came out about who should be treated, who could wait until after the worst of the epidemic was

Page 119

over.  So it resulted in quite a drop in the number of patients that we were treating each day.

Q.   Okay.

A.   We were following guidelines that were put out by national, you know, national associations and such.

Q.   So you were seeing less patients during this time?

A.   The practice as a whole was.  Yeah, we both were.  We were remote some days.  You know, nobody knew what heck was going on with COVID, right?  So, we obviously finished up with the people who had to be, and then lower risk patients, benign conditions, people who could wait a few months, we were putting off.

Q.   Okay.  So just a pretty basic question.  How did that impact the practice?

A.   Oh, it hurt our bottom line, I am sure.  We were treating less patients.  Yeah.

Q.   And was the workload lighter?

A.   The workload was lighter.

Q.   Okay.  And when did that start to pick up?

A.   Slowly, probably after -- I mean, certainly, it affected us for three or four months, I would say. And then by the fall of '20, we were starting to think about adding more people back in.  That is my best recollection.

Page 120

Q.   Okay.  So between -- and I just want to -- so like the beginning of COVID, until you guys wound everything down, was that a more stressful time than usual?

A.   Was COVID a more stressful time than usual? Yes.

Q.   It's a basic question.

A.   For the whole country.

Q.   Yeah.  Okay.  And how were you coping with the stress?

A.   I had taken up meditation, which I found to be very useful in my own life.  And I still do to some degree.  Although, I was really into it then.

Q.   Is that when you first started or were you always doing that?

A.   I had been meditating before that.  But, you know, that was a key stressor for the whole country, like I say.  And that is how I dealt with it, plus I relied on my family.  I had a great wife, three kids. The one upside to not being as busy is I was home all those months after COVID, that's for sure.

Q.   Did you have any personal issues with your family during this time?  Or was everything good?

A.   It was pretty good.  I mean, the kids were going to remote learning.

Page 121

Q.   How was that?  Because I remember how that was for me.  And it was even more stressful because now they were there.  And I had to watch them, making sure the camera was on, and making sure they were listening.

A.   That was my experience, yes.   It was fine. We got through it, like everybody else, just another added stressor.

Q.   Does you notice yourself experiencing any mental strain?

A.   Oh, yeah.

Q.   Could you describe that just a little bit?

A.   I had been experiencing intermittent strain since probably 2012.  You know when Dr. Peddada's -- that is kind of one of the earlier times when I first noticed his personality becoming more abrupt and abrasive.
There was the birthday thing in '13, we talked about, the requests for compensation.  Yeah.  It was a stressful time to be his partner, magnified by the COVID thing to some degree, I would say --

Q.   Okay.  How about --

A.   -- by those involved.

Q.   How about Dr. Peddada?  Did you ever notice him being more stressful than usual during --

A.   Absolutely.  Absolutely.  On that E-mail the

MAGNA
LEGAL SERVICES

Page 122

day after my birthday, I told him he should pursue anger management counseling or mediation because I had noticed a big change in his stress level and ability to cope. So this would have been after the birthday with Dr. Peddada.

Q. That was 2013. How about during the COVID years?

A. COVID years, I imagine it would have been very stressful for him. We were seeing less patients. And he was also home more than he normally would have been. So I don't know, you know, the balance of that.

Not that I wanted COVID but looking back, I did get to spend more time with my family. It wasn't all bad. I imagine he experienced something similar.

Q. Did you ever notice or hear anything about any issues that he was having with his family?

A. His family? No. I think he got along. I think his kids, you know, he had teenage kids a few years before I had teenage kids. And we would talk about that from time to time. I don't know if you have any teenage kids, but, yeah, they can be stressful.

Q. Yeah. I do. I have two. Yeah, they are very stressful.

A. Mine are better than the most, I feel like. So they spared me some of the that.

Page 123

Q. Did you ever have any disputes with Dr. Peddada during those COVID years, and aside from Dr. Kathpal?

A. No. The Dr. Kathpal thing was probably the biggest that I recall. Disputes -- there was, yeah, I guess there was. I had made some requests to try to get my RBUs higher because he had come back again complaining about the differential in workload. So there were meeting in 2020, 2019, which was before COVID. Things where I was trying to get the front office to have a different script where if he was booked out for multiple weeks, and I was available where they might offer my services to get patients in quicker. And it was all about patient care. Those were generally blocked by Dr. Peddada, kind of territorial about the patients to some degree, in my opinion.

Q. Were you ever territorial about yours?

A. No. Not that I am aware of.

Q. Do you feel that you were able to be territorial?

A. I could have been.

Q. Okay. When was the decision made to bring in Dr. Kathpal?

A. I think we interviewed in 2019 for the first time. 2018 or 2019, we were looking to add somebody to

Page 124

our practice. Dr. Kathpal's dates would have been -- when was she there, she was there like summer '21 to summer of '22, which means we would have recruited her probably late '20. I am guessing. But we had had a whole year where we had been looking for another partner prior to that, and had gone to ASTRO together recruiting.

Q. How come you guys were looking for another partner?

A. I think it was just the thought the workload was substantial. We thought we had enough business to bring on another partner.

Q. And did you guys make that decision together to bring her in?

A. We did.

Q. Okay. And how was that decision made?

A. We interviewed her. We talked to her on the phone. We looked at her CV. I talked to somebody who had trained with her in residency.

Q. All right. And could you describe the process of integrating her into the practice?

A. It was at same time that we were starting to kind of man St. Francis in there so it was complicated. There was suddenly now three doctors in two sites, whereas it had always been two doctors at one site. So

Page 125

I would say that was complicated.

Q. Okay. And why was that complicated?

A. Logistically.

Q. Okay. Could you just explain that a little bit more? I am not very familiar with hospital work, so.

A. Yeah. So you have to decide on schedules. You have to decide who is going to be at one center versus the other. One of these centers was brand new, and not seeing a lot of patients and the other is the established Penrose where we had been. So there was things to consider about patient load, time in the clinic, mentoring for Dr. Kathpal. Those kinds of things. There was a lot of moving pieces trying to figure out who goes where.

Q. Okay. So remember you were telling me about, I think it was Dr. Tanner where his RBUs, I think is what you said, was like at 27 percent?

A. It was the lowest of the three of us and it was the 20s. Yes.

Q. How was Dr. Kathpal's RBUs?

A. They were low as well, but I don't recall. Again we were talking, I mean, she had just started when this -- I think she started in July of '21 if I am not mistaken. And by September the communication breakdown had occurred. And so I don't know that we had those

MAGNA
LEGAL SERVICES

Page 126

kind of robust analyses of her RBUs like we would have in the past when we were speaking.

Q. And so she was only in the practice for, did you say three months?

A. When? When we stopped communicating?

Q. No. With Dr. Kathpal. How long was she in the practice?

A. I think it was a year, if I am not mistaken.

Q. Okay. So I am going to, before -- actually we should probably break for lunch.

I think that would be good idea because I am going to go into longer line of question. Would be that okay? I want definitely make sure we get to 12:30.

MS. MCMANUS: Yeah. That is fine.

MR. WHITNEY: All right. Good. So we will come back at about 1:00. Sound good?

MS. MCMANUS: Sounds great.

MR. WHITNEY: Thank you. We are off the record.

(A lunch break was taken.)

Q. (By Mr. Whitney) All right. So we are back on the record. And just a reminder that you are under oath?

A. Yes, sir.

Q. So, yeah. I wanted to stop you before we went

Page 127

to lunch because I was going to ask you to pull up one of our next exhibits.

A. Okay. Let me back into back in my E-mail here.

Q. Yes.

A. What am I looking for?

Q. Yeah. And it's going to say Peddada 000346?

A. Position recruitment agreement?

Q. Yes.

A. Got it.

Q. And so you know what that is?

A. Yes, I think so. This is the agreement made to help support Dr. Kathpal's salary, if I am not mistaken.

Q. And would that be an accurate and fair representation of that agreement?

A. You mean, what I just said or --

Q. Yeah. Is that -- is it a good representation of the agreement?

A. I agree with myself. Yes.

Q. All right. So I want to turn your attention to, I think that's page 2, 1.3.

A. Okay.

Q. And it says repayment obligation?

A. I see it.

Page 128

(Exhibit 15 identified.)

Q. Would you mind reading that briefly? Exhibit 15.

A. I read the 131 and 132.

Q. All right. Give me a second. I am having an issue with my -- One second, the problem with having two screens. There we go.

Okay. So did you get a chance to read that through?

A. I read 1.3. Is that the one you wanted?

Q. Yeah, 1.3.1 and 1.3.2?

A. Yes.

Q. And would you be able to explain to me what means in your own words?

A. Sure. So the group is basically agreeing to repay this loan that the hospital had given us to help bring Dr. Kathpal on.

Q. Okay.

A. Yes.

Q. Now does that agreement state how long this repayment obligation to the hospital would be?

MS. MCMANUS: Objection to foundation.

(Reporter stopping proceedings, overlapping speaking.)

Q. I am sorry. You guys were talking over each

Page 129

other.

MS. MCMANUS: Sorry. Object to foundation.

A. My answer was not in the two paragraphs that I am reading here. I didn't read --

Q. Okay. Perfect. Now was there a negotiation process involved in the recruitment agreement?

A. Yes, there was.

Q. Okay. Could you describe that for me?

A. We met with the hospital, we explained that it requires some additional funds to bring somebody on who is not going to be busy right away. The hospital felt like it was still worthy of adding to our practice. And we negotiated this assistance with paying Dr. Kathpal's salary.

Q. Now did you or about Dr. Peddada ever express any concerns with the agreement?

A. I don't recall that I had any concerns about it. I don't think he did either.

Q. Okay. How about Dr. Peddada, did he ever express any concerns to you about it?

A. I don't remember any. You mean while we were negotiating it?

Q. Yes.

A. No. I think we felt like it was reasonable and fair.

MAGNA
LEGAL SERVICES

Page 130

Q. All right. So I want to turn your attention to 2.6?

A. Okay.

Q. So it's going to be at the bottom of page 4 here.

A. Okay.

Q. And then if you can just read that through, and I am going to ask just a couple of questions about that.

A. My copy goes from 1.14 to 3.1. I don't know if 2.6 is out of order or, that is kind of weird.

Q. You said it jumps from what?

A. It goes from 1.14 on page 5, and then it goes page 6 is 3.1 article 3. I don't think I have Section 2 in this looks like.

Are we talking about 000346 - 365.

Q. We are actually on Peddada 000349. And actually -- hold on. Oh, I am sorry. It is 000348. So it will be the on third page, one you go down.

A. I must have opened the wrong one. Sorry. Let me find what you are talking about.

So, no. I only got the one attachment, 346 - 365, the recruitment agreement.

Q. Yeah, and if you open that.

A. I see 2.6 now. It was just out of order.

Page 131

Somebody scanned the pages, so it is page 4, and it should have been after page 5, or 3.

Q. Yeah. I just noticed that now. Okay.

A. I am with you.

Q. Yeah, so it is on the bottom of Peddada 000340, so you if you can read that Section 2.6?

A. The placement, that one?

Q. Yes.

A. Okay.

Q. Okay. Could you explain what that provision means?

A. That sounds to me like if the person that we hire leaves early, the we are going to negotiate in good faith to figure out a solution.

Q. Did you ever have to negotiate for a replacement of Dr. Kathpal?

A. Dr. Kathpal stayed on until after July, and so the practice had broken up by the time she left.

Q. Okay. All right. I am going to turn your attention to 3.1. Give me one second here. That is going to be on top of page 5 of that, and it's Peddada 000350. So the top of that page.

A. I have different type. Mine says Peddada 000346 - 365. We are talking about the same contract?

Q. Yes. And within that document. So the same

Page 132

document.

A. I see. Each page has it's own thing. Got it 350. Got it.

Q. And then at the top it will be 3.1 repayment.

A. Yes, I see it.

Q. If you can just read that really fast.

A. Okay.

Q. All right. And could you tell me what that means in your own words?

A. Sure. It says, that I am going to be a promissory note, which is loan note, and we are going to be charged 1 percent interest. And it says that we should, principle along with interest shall be repaid within 36 months, so a 36 monthly period, monthly installments.

Q. So three years?

A. Yep.

Q. All right. And then I am going to move down to article 4, which is the next page. It will be under Peddada 000351.

A. I see it.

Q. Okay. And would you be able to read that section also?

A. Sure. Okay.

Q. All right. And can you explain what that

Page 133

means, that provision means?

A. So essentially if Dr. Kathpal and the group remains in full compliance that the hospital will seek to forgive the money owed back.

Q. Okay. And does that provision state when this loan would be forgiven?

A. Let me look again here.

I don't see any dates on it or a time for it.

Q. So, no dates?

A. Upon the occurrence of any event described, at the end of the cure period. I guess the cure period is three years, maybe. Sorry. I don't really understand it fully.

MS. MCMANUS: I don't object to foundation.

Q. (By Mr. Whitney) And then I will have you go to page 12?

A. Okay.

Q. Which will be at the bottom you see Peddada 000357.

A. Okay. The signature page?

Q. Yes?

A. Yes.

Q. It is signed by Dr. Peddada and Dr. Kathpal. Correct?

A. And Dr. Erling. Yes.

**MAGNA**
LEGAL SERVICES

Page 134

Q. And, Dr. Erling, E-R-L-I-N-G. Now, Dr. Monroe, did you ever have to sign this agreement yourself?

A. I think I must have. Yeah. I mean, actually I don't know. I signed the other agreements to take on the -- when Dr. Kathpal left. I don't know if I signed the actual first one. I don't see my signature on this page. So I am guessing there. Dr. Peddada would often sign on behalf of the corporation.

Q. Okay. That was my next question. Okay. So even though you didn't sign, you are still bound by this agreement, correct?

A. Yeah. It was with Radiation Oncology, PC, so I believe that's right.

Q. Did you have any conversations with anyone at Centura about the loan repayment?

A. What time are we talking now?

Q. Around this time, when it was signed?

A. If we did, it was minor kind of stuff. It was -- everybody was kind of agreeing that this would be a good thing for them to support bringing her on. We agreed that it was a reasonable deal to help us out.

I don't remember us getting to much into the weeds about repayment and such.

I think he might be frozen. He is not

Page 135

blinking at all.

We are not hearing you, Mr. Whitney.

(Mr. Whitney disconnected from zoom connection.)

Q. Okay. So we are still, I was asking you before, did you have any conversations with anyone at Centura about the loan payment. And yeah, I was going to ask first during the time you were with ROPC?

A. I just remember negotiating it with Dr. Peddada on the practice's behalf, but I don't remember anything specifically beyond that.

Q. And who did you have the discussion with besides Dr. Peddada?

A. Probably would have been Eric Coval at the time, if I am not mistaken.

Q. And when you had the conversation with Eric Coval, was Dr. Peddada present as well?

A. Yeah. I wouldn't have spoken about it on my own for sure.

Q. Now what happened if you decide you are not going to pay back that loan? What would happen?

MS. MCMANUS: Object to foundation.

A. Probably says something in this contract. I don't know exactly. I can try to read through it, and find it, if you want.

Page 136

Q. (By Mr. Whitney) Do you know off the top of your head like what would happen?

A. No.

Q. Okay. Do you know if that's even an option?

A. What's that? Not repaying?

Q. Not repaying it?

A. No. Generally contracts are meant to be followed.

Q. Okay. And you have been an employee there at Centura for two years now, correct?

A. Just over.

Q. Okay. And has your portion of the loan been forgiven?

A. I signed an agreement to slowly pay back the loan. I think it's five years. So probably about half of it has been paid back.

Q. Okay. Do you know when it would forgiven?

A. Five years after I signed it.

Q. Okay. And would it have to be paid back in full, or how does that --

A. By that point all of the monthly forgiveness payments would have been taken care of. It is set up in such a way that a portion came off, by the time you are done, there was nothing left.

Q. Okay. What is your -- what do you know about

Page 137

the Stark law?

A. The Stark law is a federal law that prevents doctors from taking kickbacks and bribes, if I am not mistaken.

Q. Okay. And can you explain that a little bit more, like what kickbacks are?

A. Kickbacks are like inducements to do something, financial, but not always, probably.

Q. All right. And how about anti kickback laws? Or what do you know about that?

A. I would have thought it was the same thing as Stark, but I don't know.

Q. Okay. So Centura informed you that it wouldn't renew the exclusive contract for ROPC to perform medical services, correct?

A. Yes, as part of them hiring us. Is that what you mean?

Q. Yeah.

A. Yeah, that's right.

Q. Can you tell me when this occurred?

A. I don't recall exactly. It probably would have been the spring or winter of -- we were kind of negotiating in the December of '21 so maybe a month or so after that would be my guess. I can't remember exactly when we all settled on the deal. I know I

MAGNA
LEGAL SERVICES

Page 138

applied for my job in February. So probably some time between December and February would be my guess.

Q. And did they give you a reason why the contract would not be renewed?

A. They certainly implied it was because we were not communicating, and they felt like they weren't getting the services they should be getting. And they felt employing us each would be a better way to go.

Q. Why were they not getting the services?

A. Because we were not getting along, and Dr. Peddada was not willing to communicate with me.

Q. Was there any decline in, like, patient care?

A. You mean objectively?

Q. Just actually, like, was there any decline in the patient care?

A. It is hard for me to answer that because I wasn't doing peer review on Dr. Peddada. He stopped coming. I know that Dr. Kathpal and I were still peer reviewing and we were giving good care of patients. And his patients were getting good care but I don't have a way of knowing.

Q. Did you ever hear anything that would indicate that there was a decline in patient care from Dr. Peddada?

A. I didn't hear anything from Dr. Peddada.

Page 139

Q. About Dr. Peddada, I should say. I am sorry.

A. I didn't -- I wasn't really seeing his patients very often because quite often they had us separated. One of us was at St. Francis and one was at Penrose, so I think Dr. Kathpal was seeing more of his on treatments.

Q. In that meeting that you had in December, did Centura indicate that there was any kind of decline in patient care?

A. I don't recall.

Q. Okay. How about any decline in the revenue coming?

A. I don't recall any discussion about that either.

Q. Okay. So it was just because you two weren't talking?

A. I don't know if that was just it but was one of the main reasons was my take on it.

Q. Do you know any other reason?

A. No. You'd have to ask them why. I was still hoping to keep a practice. It was a profitable practice. And I was willing to be hired, but it wasn't my first choice.

Q. Okay. And how did it feel when Centura informed you that it would not renew the contract?

Page 140

A. It made a lot of the sense because of what they had been saying about hiring us instead.

Q. And why did it make sense?

A. Because they said they wanted to hire us and they said we would have to break ties with my old group in order to hire us.

Q. And they were hiring you just because you guys weren't on speaking terms?

A. I think that was part of it I assume.

Q. Did you have any --

A. We were trying to mediate, right? And so they felt like they had reached a point where they were running out of good options and they offered employment to each of us as a solution is how I would say it.

Q. Did you have hesitation about it?

A. Yeah.

Q. What hesitations did you have about it?

A. Well, it had been three months since I had spoken to him. I wasn't sure that I could, you know, easily work alongside of somebody that had treated me that way.

Ultimately, I decided that if I was at a different site, it probably would work out and we would eventually patch up our differences, but I still needed to apply.

Page 141

Q. And were you relieved at all?

A. When?

Q. When they told you that they weren't going to renew the contract? Centura?

A. I wouldn't say I was relieved.

Q. Okay. How would you describe how you felt?

A. Conflicted.

Q. And why did you feel conflicted?

A. On the one hand I had this practice for many years and it had worked well for some reasonable portion of the time. So I was sad to see that go.

Doctors like autonomy. At a practice you have more autonomy than when you are hired. So that was against being hired. The for being hired was that there would be more accountability for Dr. Peddada if there was somebody else other than just he and I on the board. Centura would have to deal with his behavior.

Q. Okay. And so Dr. Peddada was in this meeting in December?

A. Yes.

Q. Okay. Did you say anything about Centura not renewing the contract in that meeting?

A. I don't remember. I don't have the minutes from that. I think it was a meeting just to explore all of the options. That might have been the first time I

MAGNA
LEGAL SERVICES

Page 142

heard that they were moving forward with employment. I am not 100 percent sure, but they did talk about it before that.

Q.  And is it true that Centura informed you that after the contract expired, that it intended to hire one full time employee at Penrose and then one at St. Francis?

A.  I thought there was going to be three employees.  But I am not 100 percent sure.  I thought there were going to be two at Penrose and one at St. Francis but.  Because we were thinking about bringing on a third person into our own practice and I think they were going along with our staffing requests, but I am not 100 percent sure.

Q.  You said you were bringing on another person?

A.  Yeah.  Remember we had been recruiting since 2019 to bring a third person on.

Q.  And that was Dr. Kathpal?

A.  Eventually that became Dr. Kathpal.  Yeah.  And that was to some degree trying to cover two centers, right?  I mean it's easy to have to two docs cover one center, but when you add a second center, if you ever want to take a day off, you have to have a third doc.

Q.  Okay.  And is it true that Centura encouraged all three of the ROPC doctors to apply for the

Page 143

positions, including Dr. Peddada?

A.  They encouraged me to apply.  I think they encouraged both the others to on apply.

Q.  And can you describe the process closing down your office practice and then moving to in-house?

A.  Like I said, I got the lawyer to help look into what was required.  There was not too much that needed to be done.  Fortunately, we had the billing person that I told you about.  We had to kind of give her notice.  I had closed down a bank account at one point.  It was mostly like, how are you going to handle the accounts receivable coming in and that kind of stuff.

Q.  Okay.  Was there any legal requirements you had to satisfy when closing the practice?

MS. MCMANUS: Object to foundation.

A.  I am sure there must have been.  Most contract spell out that kind of thing.  I remember fairly recently.

Q.  Okay.  And what discussions did you have with Dr. Peddada about about closing down the practice?

A.  Again, I tried reach him to have those discussions, and had to avoid it.  That is why I got lawyer involved.  We never really had that much in the way of discussions.  It was handled by my lawyer and his

Page 144

lawyer for the most part.

(Exhibit 16 identified.)

Q.  I want to introduce another exhibit.  And I believe this will be Exhibit 16.

A.  Okay.

Q.  It's going to -- I am going to give you the numbers here.

A.  It looks like it might have generated like, previews on some of these.  So not all of them are still showing up as a PDF.  But tell me what it is about and I can find it.

Q.  Okay.  So it will be under PSF Peddada 0107 - 13.

A.  I see it.

Q.  Okay.  And then if you can, pull that up.

A.  Yeah.  Intake form?

Q.  Yes.

A.  Got it.

Q.  And if you scroll through this, I just want to know if you've ever seen that before?

A.  No.  I've never seen this before.

Q.  Okay.  So I just want to start under where it says under summary of requests?

A.  Okay.

Q.  First it states, and this is under PSF Peddada

Page 145

0109.  And it says the request is to move from exclusive relationship with Radiation Oncology, PC, and it states Monroe, Peddada and Kathpal and move into an employee relationship.

Is that accurate?

A.  That is what it says.

Q.  Okay.  And then it says request.  Do you know who was making that request?

A.  I am looking for word request.  No, I don't know who exactly who that was.  I would assume that it was administration.

Q.  Okay.  Who in the administration?

MS. MCMANUS:  Object to foundation.

A.  I don't know.  Brian Erling was CEO.  It might have been him.

Q.  (By Mr. Anderson)  Well, above here it says Samuel Weller?

A.  Oh, he was a tech guy, as I recall.

Q.  I'm sorry?

A.  I think he was the guy who did the contracts, or something. I don't -- I interacted with Mr. Weller once or twice only.

Q.  Okay.  Then it states Dr. Monroe will be based on SFH, so I am guessing that's St. Francis.

Is that correct?  Is that St. Francis?

MAGNA
LEGAL SERVICES

Page 146

A.  That is correct.

Q.  Okay.  And Dr. Peddada will be based at Penrose.

A.  The date, I see is 24 January 2022.  Is that correct?

Q.  Yes.

A.  Okay.  Well, then I am surprised to see that because I hadn't yet applied.  And when I did apply in February, it was only for Penrose.  It is a little surprising to see that I was already being pushed some place.

Q.  So you didn't know about that at all?

A.  No.

Q.  Do you know who made that decision to place the two of you in those locations?

MS. MCMANUS: Object to foundation.

A.  No, I thought that decision came in like, March.  That is when I was actually told where I was going by Dr. Albers and Dr. Kraus.

Q.  (By Mr. Whitney)  Did you have a particular preference in where you wanted to go?

A.  I did.

Q.  And what was that?

A.  I preferred Penrose because I lived nearby and St. Francis was a far drive for me.

Page 147

Q.  Okay.  Any other reason?

A.  Yes.  St. Francis was not very busy, and all of my docs and support staff and everything that I had been with for 15 years were at Penrose.  Dr. Peddada, I think felt the same way, he called St. Francis a doc in the box or something at one point to me.

Q.  A doc in the box?

A.  Yeah.  It's a derogatory for a place that doesn't have all of the facilities.  Penrose had the Cyber Knife.  They had the surgeons' lounge, of all that.

Q.  Okay.  So St. Francis, in other words, was not as good as Penrose?

A.  In my opinion, at the time, yeah.  Now I think it's pretty similar to be pretty honest, after a couple of years it's built up and the numbers are very similar.

Q.  Where are you at now?

A.  Penrose.

Q.  You are at Penrose.  Okay.

A.  I do cover St. Francis some but mostly Dr. Camberg is out there.

Q.  Okay.  It then states, the two have been long-standing members of the medical staff and highly productive.  Monroe, and they spelled your name wrong there, but Monroe 81st percentile, and Peddada 90th

Page 148

percentile.  What do those percentiles mean?

A.  It's the first time I've seen them.  I don't know.  I mean, it must have been some snapshot in time where they looked at how productive we were with RBUs.  But those, as I told you before there was times when I was 2 percent off him, and there was times where I was 9 or 10 percent.  So they chose the 9 percentile.

Q.  Do you know how they are determined?  Those percentiles?

A.  I don't.  But I would assume it's RBUs.

MS. MCMANUS:  I object to foundation.

Q.  (By Mr. Whitney)  And do you know who came up with those measurements?

MS. MCMANUS: Object to foundation.

A.  I do not.

Q.  (By Mr. Whitney)  And do you know why he would be higher?

A.  Just for the reasons we have been talking about this morning.

Q.  The RBUs?

A.  The prostate business exclusively driven towards him. But 81st is nothing to sneeze at.  I will take it.

Q.  No.  That is not at all.

(Exhibit 17 identified.)

Page 149

Q.  Okay.  So I am going to introduce Exhibit 17.  And this is going to be Peddada.  And you will see there it says PSF Peddada 0119.  And -- well, I actually will wait for you to pull it up.

A.  So, unfortunately, the way my E-mail is showing up, it is actually a small document.  It shows the entire thing in the screen here. And so I don't see the name of the file when that happens.  The ones that didn't automatically open, I don't see that title.

MS. MCMANUS:  Hey, Crist, could you repeat what the Bates label or which exhibit this is?

I am sorry.

MR. WHITNEY:  This is Exhibit 17, PSF - Peddada - 0119.

MS. MCMANUS:  Thank you.

A.  Does one of these open?  Automatically open here?

Q.  Yeah, it's a small document.  It's just one E-mail in there.

A.  That's fine.  What is it?

Q.  It's PSF --

A.  No, no.  What's the E-mail title?  What's it look like so I can find it.  Because again, once it opens, I don't see the title of the file.

Dr. Albers?

**MAGNA**
LEGAL SERVICES

Page 150

Q. Oh, yeah, from Dr. Albers.

A. Please forgive the long E-mail. That one?

Q. Let's see -- yes. That's it.

A. Got it. I am with you.

Q. Have you ever seen that before? That E-mail?

A. No, I do not see this before.

Q. All right. So Dr. Alber states, we just spoke with Dr. Monroe and while he is disappointed to be offered St. Francis. Is that true?

A. Yeah. I was disappointed. I was hoping to be at Penrose.

Q. Okay. And when did they offer you that?

A. That very day because I had been on spring break the week before and as soon as I got back Jeff Albert called me told I was going to St. Francis. When I applied, I had applied specifically for Penrose. I told him I wasn't necessarily interested in going to St. Francis. That was a month and a half before. I was kind of considering what the offer was, and I decided to do it but --

Q. Why were you offered St. Francis instead of Penrose?

A. You'd have to ask Dr. Albert that. When I asked him that, he said was multi-factoral. So I don't know what make means exactly.

Page 151

Q. And do you know who made that decision? Was that Dr. Albert?

A. He was the one who zoom called me that day and told me and him and Dr. Kraus were both on that call.

Q. And then you will see in the second paragraph --

A. Okay.

Q. Or is that the third? That's technically the third, where it says Dr. Peddada would be at the Penrose location.

A. Yes. I see it.

Q. Okay. How did you feel about that? Knowing that Dr. Peddada would be going to Penrose?

MS. MCMANUS: Object to foundation.

Q. (By Mr. Whitney) I am just asking how he felt about it.

A. I guess, I assume that if I was at St. Francis he would be at Penrose. I didn't really give it much thought.

Q. Did you that bother you at all that Dr. Peddada would be going to Penrose?

A. It didn't bother me that he would be going there. I was bothered that I had applied for Penrose and was given St. Francis. But it was pretty clear that they were not going to put us at the same place.

Page 152

Q. It then states in the last paragraph, and you will see where it says, Sam.

A. Yes.

Q. It says, Sam, re: The forgivable loan for Dr. Kathpal's recruitment assistance, I have informed both Dr. Peddada and Dr. Monroe of this, and they respond favorably.

Did you respond favorably?

A. I think so. Yeah. He must be referring to the repayment agreement, if I am not mistaken, but, yeah, I agreed to that.

Q. Okay. And any reason to believe now based on Dr. Albert's words that Dr. Peddada did not respond favorably?

A. No, it says in the text here that he did respond favorably.

Q. Okay. How would you describe Dr. Peddada's work ethic?

A. His work ethic?

Q. Yes.

A. I think he worked very hard.

Q. Do you have any examples of Dr. Peddada's work ethic?

A. For years he was seeing lots of patients. He was busy. Yeah.

Page 153

Q. Have you ever known Dr. Peddada to not follow established medical ethics or standards?

A. I don't know of any breaches in medical ethics. No.

Q. And how would Dr. Peddada usually respond or treat medical staff?

A. Variably.

Q. I am sorry?

A. Variably.

Q. What do you mean by variably?

A. What I mean by that is that he had moods that he would get into where he would treat them very poorly at times. At other times he would treat them very well and joke around with them and be happy.

Q. And when you say he treated them poorly, can you give me an example?

A. He would yell at staff from time to time. He would berate them, if they did something wrong, those kind of things.

Q. Did that happen often that they did something wrong?

A. Define often. I mean it happened enough. Yeah.

Q. How did you treat medical staff when they did something wrong?

MAGNA
LEGAL SERVICES

Page 154

A.  I'd like to think I treated them very well, and handled myself professionally in the time I was here.

Q.  Okay.  Do you have any examples of when the medical staff did something wrong, and you had to confront them about it?

A.  Typically, it would be, maybe a therapist didn't fulfill something, I don't know.  I don't have any specifics.  But it would be things like if somebody wasn't doing their job to the best of their ability and caused some issue, you would have to go confront them and try to figure out why they had not done the best job.

Q.  And how would you do that?

A.  My preferred way to do it was to, you know, bring them into my office and have a discussion, ask what happened and ask them with respect to that.  Try to figure out what happened, what we could do better next time.

Q.  Would that be time consuming at all?

A.  Sometimes, yeah.

Q.  Was Dr. Peddada, was he difficult to work with?

A.  At times.

Q.  Aside from some of the examples you gave, do

Page 155

you have any others where he was difficult to work with?

A.  He was very moody is all I can remember, and you would never, like, know how he was going to respond at times.  I don't have specifics in mind.  Sorry.

Q.  Did you ever tell him about that?

A.  Yeah. I mean we talked about anger management back on that E-mail the second of March, 2013.  And along the way, there had been instances where he had treated staff poorly.  And I told him he needed to stop doing that because it was going to compromise our PC.  And it's just not the right thing to do.  People deserve to be treated with respect.

Q.  And you said that was that 2013 E-mail?

A.  That is one thing I can remember, like, in writing but I told him this verbally along the way over the next 5 to 7 years.

Q.  Now, over the years as a business partner, did Dr. Peddada ever call in, like, to many times sick?

A.  No.

Q.  Any unexplained absences?

A.  No.

Q.  And any time you questioned his reliability?

A.  No.  He was reliable.

Q.  Before 2022, had Dr. Peddada ever received any patient complaints?

Page 156

A.  Yes.

Q.  Can you tell me about those?

A.  I don't have details but he told about two episodes where HR gotten involved, I think in 2017.  I don't know if those were patient or staff complaints.  Maybe a combination of both.

Q.  And where would those complaints have gone?

A.  Where would they have gone?

Q.  Yeah.  So --

(Overlapping conversation.)

Q.  So if I wanted to find that, where would I look for that?

MS. MCMANUS: Objection, foundation.

A.  Penrose has an HR department.  I would guess they keep records.

Q.  (By Mr. Whitney)  Has Dr. Peddada ever faced any allegations of malpractice?

A.  Not that I am aware of.

Q.  I asked you earlier about the performance reviews from, that Centura perform?  Does Centura have any kind of, like, disciplinary policies?

A.  I am sure they do, written some place, but I don't recall seeing them.

Q.  So do you know if they ever disciplined Dr. Peddada for the way he allegedly treated staff?

Page 157

A.  I do remember him doing an online course.  I don't know if it was voluntary or involuntary.  But it was around the time of the HR complaints.  He told me about it, is the only way I know.

Q.  And can Centura, discipline a doctor if they are not performing adequately?

A.  I would think they would hold that right in any contract they would sign.

Q.  Now are you aware of staff complaints about -- against Dr. Peddada in 2022?

A.  2022, I am thinking back.

Q.  Just bring up the last year that he was on?

A.  Yeah.  You know we were kind of separated by space and communication.  So I think there were some, but I can't remember details.  I am sorry.

Q.  So in 2022, nursing staff filed several complaints against Dr. Peddada for discourteous and disrespectful behavior.

Have you ever heard anything like that?

A.  That sounds familiar.  I didn't know the timing but, yeah, I can imagine.

Q.  What did you hear about that?

A.  Not that much to be perfectly honest.  I think people were trying to be diplomatic and not say he said she said between the two of us.

MAGNA
LEGAL SERVICES

Page 158

Q. And was that like Dr. Peddada to be discourteous and disrespectful to staff?

A. It had happened in the past.

Q. And that's the 2017 incident you were referring to?

A. Yes. Yeah, and probably some others, yeah.

Q. Do you have any other examples besides the 2017?

A. I can't remember any off the top of my head but --

Q. And are you aware of a complaint by a patient's daughter that Dr. Peddada was rude to her?

A. I don't know the specific patient's daughter, but those kind of things had been brought up in the community assessments of how we were doing as doctors. And during those meetings, I saw complaints from patients about him being discourteous. Yes.

Q. What assessments are you talking about?

A. Those are like patient questionnaires that are given out after the end of a course of treatment. And then we are actually scored on them. The hospital uses the scores for some sort of quality metric, I believe. We would once a quarter get together and look them at them. And they would have, you know, direct quotes, comments from the patients that they filled out on the

Page 159

questionnaires.

Q. And do you know if the hospital keeps those?

A. I don't know.

Q. Do you know where I would find those?

A. No.

Q. So during the early months of 2022 when you did see Dr. Peddada, did he seem like he was very much on edge?

A. Yes. I would say the end of 2021 as well, very much on edge.

Q. Was that common for Dr. Peddada to be an edge like that?

A. At times, but this had lasted a lot longer than most of his previous times that he was on edge.

Q. Did you ever say that to him?

A. We weren't communicating at the time.

Q. Did you notice anything like that before you stopped communicating with him?

A. That he was on edge?

Q. Yeah.

A. Periodically, like just the times we talked about.

Q. Periodically, but not like he was after you guys stopped communicating?

A. I would say he had those same kind of episodes

Page 160

but they wouldn't last as long. They would last a few days sometimes. And it was usually over some adverse interaction with a patient or staff.

Q. And how many hours were you working during the early months of 2022?

A. 50, I guess. I don't know.

Q. 50 a week?

A. Something like that.

Q. And how about Dr. Peddada?

A. 2022, I wasn't really at the same place, so I don't know.

Q. Would it surprise you that he was working over 60 hours a week?

A. Wouldn't surprise me.

Q. Was that common for him?

A. I think it was pretty common.

Q. Would you say that is a lot of hours for a doctor to work?

A. 60 hours a week?

Q. Yeah.

A. It is a lot. It would be enough to -- you'd feel stressed if you worked 60 hours.

Q. Have you ever known Dr. Peddada to make any medical errors?

A. I mean in peer review we always, there would

Page 161

be times where you would find some contouring error, and you would point it out. And that is the whole purpose of peer review. So we both made errors at times, and we would hopefully that catch them in that process. That is what that is all about. So, yeah, we all make mistakes.

Q. Have you ever known him to miss anything, as far as a medical error, like any kind of oversight on his part?

MS. MCMANUS: Object to form.

Q. (By Mr. Whitney) Let me ask that a little better.

Have you ever noticed Dr. Peddada to overlook anything as far as a patient goes?

A. I feel like there were times but I can't think of any specific instances. I am sure you have follow up.

Q. So when Dr. Peddada was rude to medical staff, and when you learned about it, what did you say to Dr. Peddada?

A. I told him that it was potentially going to compromise our practice. And I encouraged him to treat people more nicely.

Q. Okay. And was it said to him in an E-mail or in person?



41 (Pages 158 to 161)

Page 162

A. It would have been in person. And he acknowledged as I recall that he needed to make changes and do better.

Q. When did he acknowledge that?

A. Right after I said he needed to work on these things.

Q. He didn't acknowledge that in an E-mail or anything?

A. I don't recall.

Q. Just in person?

A. Yeah.

Q. So in 2022, Dr. Peddada expressed that he was having difficulty concentrating and difficulty sleeping. Did he ever express anything like that to you before?

A. Not that I can recall.

Q. And you guys weren't talking at all in 2022 so he never expressed that to you at that time?

A. That's right.

Q. Okay. And Dr. Peddada also said he was experiencing excessive stress and frequent bouts of anger. Did he ever express anything like that to you while you were partners?

A. He did.

Q. Okay. Can you explain what he said and when?

A. He told me that he was stress, I guess. And

Page 163

then the anger piece was related to the things that we have talking about, his outbursts.

I was stressed as well. It was a busy practice. COVID was going on. It was a stressful time.

Q. Did you ever experience like excessive stress and frequent bouts of anger?

A. I would say I experienced a lot of stress. I don't think I let it to the get to the point of anger. At least, I would hope I didn't, and my staff would be the ones to answer that question better than me probably. But I don't feel like I was angry.

Q. Okay. So Dr. Peddada also stated he was feeling depressed and unable to pay attention to detail. Does that sound like Dr. Peddada? Did seem like the Dr. Peddada you knew before you stopped talking?

A. He didn't seem depressed for most of my career with him, I would say.

Q. And how about his inability to pay attention to detail? Does that sound like the Dr. Peddada you know, or knew I should say?

A. He was pretty good with --

MS. MCMANUS: Object to form.

A. I said he was pretty good with details. He would miss something on peer review like we talked

Page 164

about. But he was generally a good doctor, guys.

Q. Have you ever known a doctor that suffered those types of work-related symptoms?

A. Somebody that was suffering from depression and inability to concentrate, or somebody with stress and anger? All those?

Q. Yes.

A. Dr. Peddada was the only doc that I was around a lot. I wouldn't, if one my colleague's patients was going through that, I probably wouldn't know to be honest.

(Exhibit 18 identified.)

Q. All right. So I going to produce the next exhibit. I think we are on Exhibit 18. And it is going to be titled Peddada 000383.

A. Okay. I see it.

Q. You will see the label at the top, it says needs attention.

A. Yes.

Q. Okay. And do you know what that is?

A. Do you know what what is?

Q. That E-mail there?

A. Yes.

Q. Have you seen that before?

A. Yes.

Page 165

Q. And could you tell me what that is?

A. This is him telling me that he is requesting disability for reasons of health.

Q. Okay.

A. For three months starting on May first.

Q. And is that a fair and accurate representation of that E-mail that you have seen before?

A. Yes.

Q. Okay. So when you read that the first time what were you thinking?

A. I was thinking that he was in a bad place.

Q. Okay. Did you think it was something serious?

A. I had to take his word for it. I didn't know for sure, because we hadn't been communicating. The timing was a little different to me. It would have been nice to have been given some more notice.

Q. Do you think that was something he would make up?

A. Make up what?

Q. Is that something that he would fabricate?

A. No. I don't have any reason to think he would fabricate that he was needing time away.

Q. Okay.

A. We had just been talking about his stress. I think he would have tied it to that.

Page 166

Q. You had kind of been telling him that for a while? Correct?

A. Say that again?

MS. MCMANUS: Object to form.

Q. (By Mr. Whitney ) You had been telling him this for awhile?

MS. MCMANUS: Object --

A. Telling him what?

Q. (By Mr. Whitney) About his stress?

A. He was telling me about it.

Q. Did you reach out to Dr. Peddada after you read this?

A. I did.

Q. And how did you reach out to him?

A. I E-mailed him.

Q. You E-mailed him. Okay. And what did you say in the E-mail?

A. Hold on. Let me scroll down and I will find it. I think I said something like this is pretty short notice. It put me in a tough spot. But if you really feel like you need time away, your best interests, I think you should take care of yourself.

Q. Now the E-mail states here, and he is speaking to you here. If you wish to obtain a medical examination by an independent physician at the expense

Page 167

of ROPC, pursuant to the agreement, please arrange for this examination, and I will cooperate in scheduling.

Do you see that there at the end?

A. I do.

Q. Okay. Did you ever get an independent physician?

A. I did not.

Q. How come?

A. Because I assumed that they would find evidence of stress, and I assumed that that was what he was referring to.

Q. But he did put disability for reasons of health. You automatically thought stress?

A. I did.

Q. Has it ever happened during your partnership where one of the partners needed to get an independent physician?

A. No.

Q. Have you ever recommended a patient of yours to take medical leave?

A. A patient of mine take medical leave?

Q. Yes.

A. Oh, you mean somebody who I am treating?

Q. People you are treating.

A. People will bring you disability forms from

Page 168

time to time. I would sign them if I felt like it was reasonable.

Q. Okay. And what do you recommend a patient do while they are on medical leave?

A. Try to get help from a trained professional usually. If it is something like stress, I guess I would say. Kind of depends on what they are on leave for. If they broke their leg, you go get your leg fixed.

Q. Okay. So if it is for something like stress, do they work while they medical leave?

MS. MCMANUS: Object to foundation.

A. It would depend on how severe I suppose.

Q. (By Mr. Whitney) Let's say it was severe. How much do you think they should work?

MS. MCMANUS: Objection to foundation.

A. I have no idea.

MS. MCMANUS: I objected to the foundation there.

MR. WHITNEY: Oh, sure.

MS. MCMANUS: Thank you.

A. I will be slower. Sorry.

MS. MCMANUS: No problem.

Q. (By Mr. Whitney) Have you ever known a doctor to have an offer for employment retracted while they

Page 169

were on medical leave?

A. No.

Q. Okay. And do you feel it is appropriate for a hospital employee to expect a doctor to consistently communicate while they are on medical leave?

MS. MCMANUS: Object to foundation.

A. Depends on the situation.

Q. (By Mr. Whitney) What situation would they -- should they communicate?

A. I think it is always good to communicate honestly, but I guess if somebody was catatonic or something and they couldn't and they shouldn't. I don't know.

Q. And if they have work related stress, should they continue to communicate with the hospital?

A. I have work related stress and I was communicating with the hospital.

MS. MCMANUS: Objection.

Q. (By Mr. Whitney) Were you on medical leave?

A. No, I was not.

Q. So if you had noted Dr. Peddada in the earlier years of your practice struggling with burn out, what would you have done?

A. When he demonstrated anger, I told him to pursue anger management classes and meditation. I

MAGNA
LEGAL SERVICES

Page 170

suggested, we actually had a burn out specialist come to the hospital in 2017 or 2018. And I suggested he go see that guy and spend some time with him. Wayne Sateel was his name.

Q. What was his name?

A. Wayne Sateel. He is a like a doc who travels the country giving talks about burn out. I had gone to him and I thought the guy was great. I don't think Peddada went to it.

Q. You said he didn't go to that?

A. I don't remember seeing him there. And I told him about the guy. And I said he should look him up, because I was noticing some signs of burn out even then.

Q. Why do think he didn't go?

A. He decided not to, I don't know. It is just a mind program, maybe it he thought that was sufficient through HR.

Q. Okay. Do you believe there is a stigma in the field about doctors struggling with mental health issues?

A. Yes and no. I think there is some, but I think it has also become something that people are much more talking about in society and health issues. So I would say it is probably not as best as it was 10 or 15 years ago, but there still some stigma, yeah.

Page 171

Q. Are you familiar with any doctors in your past that have disclosed mental health problems with their employer?

A. No.

Q. Are you aware of any further discussions about stigma in the medical profession?

A. Can you repeat that?

Q. Are you aware of any further discussions about the stigma of mental health issues in the medical profession?

A. I think the broader discussions were happening at these things like Centura brought in Dr. Sateel to give that lecture. Yeah, there has been education provided and assistance that was tried to be given.

Dr. Thompson, the psychiatrist, ran a program for struggling docs that Dr. Peddada and I both completed.

Q. Could you tell me about that?

A. It was a peer mentoring project. We spent several days learning how to help people out if they came to you with a problem.

Q. Did you find that effective?

A. Not really.

Q. How come?

A. I was never called upon by anybody to help.

Page 172

Q. Okay. Have you done any research on that, like mental health issues, as far as helping?

How do you personally feel about that?

Q. About?

Q. About the stigma surrounding mental health issues for doctors?

A. I wish there wasn't a stigma. I think people should feel free to treat it as any other illness and get the help they need.

Q. Have you ever struggled with mental health at all?

A. I think I have had periods of anxiety related to work place stress for sure. I was never diagnosed, never treated, but yeah, I felt anxious myself. I didn't sleep well for some periods of time.

Q. Sure.

A. I had digestive issues for a little while, yeah.

Q. Any difficulty concentrating?

A. Not to the point that it affected my job, I don't believe.

Q. Okay. And what did you do about it? I remember you said meditated. Did you do anything else?

A. Talked to my family. They are a great support system. It is very important to have a good support

Page 173

system I feel.

Q. Are you aware of any discussions about burn out in the medical profession?

A. It's hot topic these days, right? Yeah, we even had Dr. Sateel come and give a talk about it, so yes, I was aware.

Q. What discussions have you heard aside from Dr. Sateel?

A. What discussions have I heard? There might have been like grand rounds or something like that maybe, about that. I think there was something at some point.

Q. I'm sorry. You said grand rounds?

A. Grand rounds, like, you know, they do lectures for docs. There was one on burn out maybe.

Q. And what is your understanding of what burn out is?

A. I don't really know that there is a formal definition. If there is, it's not one I've ever seen.

Q. What would be your definition?

A. General burn out means just what it describes. You are starting to get burned out. You are starting to feel like the stress is getting to you of your job, and you feel like you are struggling. That's what I describe burn out.



Page 174

Q. And what about the impact of COVID 19 on the potential burn out? Could you tell me about that?

A. Yeah. I would imagine it exacerbated burn out. It was a stressful time in it's own right and would add to whatever somebody had going on.

Q. When did you first hear that Dr. Peddada was asking for medical leave?

A. With that E-mail I believe.

Q. That was first time you heard of it?

A. Yeah, pretty sure, because it came as a big surprise to me. He was on vacation that full week. I thought he was going to come back the following week. He made a schedule where he was set to, and when he sent that E-mail, I was suddenly facing covering the next three months by myself.

Q. And what was the reason you heard for Dr. Peddada needing leave?

A. The only thing he said was his health. I made the assumption that it was stress related but he never said that to me.

Q. Okay. And you didn't hear that from anyone? It was directly from Dr. Peddada?

A. That E-mail that we just looked at was the first time that I heard that. Yeah.

Q. I am not sure if I asked this or not, but what

Page 175

was your initial response when you heard that he needed leave?

A. Panic because I knew I was going to be doing a lot of work by myself and we were pretty busy. Empathy for Peddada to some degree, because, like I say, I don't -- I didn't know how bad it was. I had some suspicions about the timing of it coming up because I know he had been burned out for a long time.

Any time you see someone suffering, you have some degree of empathy for them.

Q. Okay. You said suspicion, what suspicion did you have?

A. Well, this dates back to a February E-mail, where he, for the third or fourth time in his career, he had asked for additional compensation for doing extra work. And I offered to work with him to even up the work load as an alternative. And he basically turned down that option and said, well, I guess we will need lawyers, so another threat against my employment.

Another request for additional money for work done. And so with that in mind, when he asked for time off, that just happened to be the exact three months that our practice was still going to be intact, I assumed that this was somewhat nefarious and he was trying to get the money he had asked for to be perfectly

Page 176

honest.

Q. And when did you guys have that conversation about him asking for money again?

A. It was in an E-mail in the middle of February but.

Q. Do you still have that E-mail?

A. I do have that E-mail, or at least I have a screen capture of it. I am not sure what version of it I have. Whenever you are threatened with a lawsuit, you tend to hang onto things.

Q. And that was in February of 2022?

A. 14 February 2022.

Q. On Valentine's Day?

A. Yes, sir. Valentine's.

Q. Okay. Did you have any conversations with anyone about Dr. Peddada need to take leave?

A. Conversations about his need to take leave? I don't recall. I mean I certainly let people know he was stressed at the time. I don't recall specific things about him taking a leave the first thing I found out ways leave was that E-mail we talked about.

Q. Who did you talk to about Dr. Peddada being stressed?

A. This goes back years, so I have been trying for many years to try to even up the work load to help

Page 177

with stress level of been meeting pretty much all of the administrators we talked about where I offered to change the /STREPD office to try to equalize the work load some. I made offers to him without a whole lot of success on that. I talked to, yeah, pretty much everybody in the administration letting them know their was a problem. I was trying to get some help for him and for myself.

Q. And how did the department respond?

A. Not to my satisfaction. Nothing was changed. The plans, the work front office never materialized.

Q. What do you think they should have done?

A. I think that if the partners coming with plans to help people everybody should have seen that it was a good things and taken the plans to take some of the stress off of him.

Q. Did you have any conversations with anyone at the hospital after you received that E-mail?

A. Did I have conversations with anyone at the hospital?

Q. Yeah?

A. I have conversation with people all day long at the hospital.

Q. I mean about the E-mail of Dr. Peddada E-mail saying that he needed leave. Did you have conversations

MAGNA
LEGAL SERVICES

Page 178

with anyone at the hospital after that?

A. I am sure I did. I don't recall specifically but, yeah, I had been pounding the drum for years that he needed help.

Q. Do you know who you spoke to at all about that?

A. Yeah. I would have spoken to Natalie Myers and Shelly Adams, Eric Koval, probably Dr. Plauth, Dr. Erling, probably Jeff Albert. I talked to a lot of people trying to -- letting them know we had some problems that needed addressing. And I don't think they ever adequately addressed.

Q. And you spoke to them about you spoke to them about this after you received that E-mail from Dr. Peddada?

A. Before and after is my recollection. I don't know if I did after. I certainly let them know about it before. I am sure I did.

Q. Do you remember what any of this responses were?

A. Often it was to kind of acknowledge that there was a problem but never really make a concrete plan to fix it.

(Exhibit 19 identified.)

Q. Okay. I am will going to introduce the next

Page 179

exhibit. I believe this is Exhibit 19. And this one will be, in that list it will be Peddada 000384.

A. Yes.

Q. Okay. Then you also see at the top, it says needs attention?

A. It was a reply to his E-mail that's why it says that.

Q. Yep.

A. Just a minute ago. Yeah.

Q. So you already know what this is?

A. Yeah.

Q. And this is an accurate representation of your response?

A. Yes. I typed this E-mail.

Q. All right. So you say is a here, the short notice that you have given complicates our practice substantially.

Do you see that?

A. I do.

Q. Okay. So what type of notice should Dr. Peddada have given?

A. Ideally if he knew that he had stress that was building to the point of needing three months off, I don't think that would have hurt over just the weekend, so if he would have at least given me some weeks or

Page 180

months or whatever to come up with a contingency plans while he was out. That was what I referring to in terms of complicating the practice.

MS. HALPERN: If I may just jump in, I am letting everyone know I am joining. My name is Iris Halpern, just for the record.

MR. WHITNEY: Hi, Iris.

Q. (By Mr. Whitney) All right. So when you guys usually took vacations for time off, how much notice did you guys usually give each other?

A. A lot. We would make our schedules three to four months in advance. Sometimes more. We made them a quarter at a time, so they were usually, as we were starting one quarter, we were starting to think about days off for the next quarter.

Q. Okay. So was this written down in your agreement, like how long you guys should give each other notice?

A. Not that I am aware of. Just a courtesy.

Q. I also see that you wrote down here that it complicates the practice?

A. Yes.

Q. Could you explain that for me? How it complicates the practice?

A. Yeah. I mean his patients had no idea of this

Page 181

so I was going to have to go to each of them and explain he was out, that I would be taking care of them for the next number of months. He had patients booked and scheduled, that we would have to replan and reschedule onto my schedule. I was pretty booked myself and so we were trying to put in two doctors' worth of load into my schedule. That week was not fun, let me tell you. And the weeks to follow to be perfectly honest.

Q. Tell me more about how that week was going.

A. Highly, highly stressful. Probably the most, second most stressful week of my life, I would say.

Q. Okay. You then said, but if you feel that your mental health needs this type of attention, I am supportive of anything that will help you get better.

Do you see where you say that?

A. I agree. Despite our issues along the way personality-wise and not withstanding, I still cared for Dr. Peddada, and I still do care for Dr. Peddada. And I wanted him to take the time he needed to get better.

I wish he had given me more notice, for sure. But when it came out this way and this is how it was going to be, he needed to get better.

Q. And how did you know it was his mental health?

A. I made that assumption from the stress we have been talking about.

MAGNA
LEGAL SERVICES

Page 182

Q.  And here you say this type of attention.  What type of attention were you referring to?

A.  I guess I didn't really have anything specific in mind, but, you know, I was willing to let him have time off and cover the practice to get the help he needed.  And I didn't know what that actually would look like.  I am not a psychiatrist.  I wasn't even privy to his diagnosis.  So I was just kind of giving a broad open statement of support to be honest.

Q.  You were supportive of him taking leave?

A.  I had to be.  He told he was going to.  He had the right to in our contract, and on some level, I still liked the man.

(Exhibit 20 identified.)

Q.  All right.  So I going to introduce Exhibit 20.  And on your list there, it will say Peddada 0303.

A.  It is a short E-mail that might be open already.

Q.  Hold on.  Let me check on that.

A.  If it is, please talk to Dr. Monroe, I have that one.  It's the next thing on the list.

Q.  I think that is it.  Hold on.  Yeah.  That is it. The one that says, please talk to Dr. --

A.  Yeah.  I see it.

Q.  That will be Exhibit 20.  Have you seen that

Page 183

E-mail before?

A.  I saw it this morning maybe.  I can't remember.  Maybe over lunch, while I was looking at the documents.  I haven't seen it.  I don't remember seeing it back on the 26th of April of 2022, for sure.

Q.  Okay.  So I represent that's an E-mail that Dr. Peddada sent over to Dr. Plauth, Dr.   And Mr. Koval.  And E-mail states, please talk Dr. Monroe ASAP and advise him to be careful with the language he is using.  I never said I have a mental health issue.  I only said I have a health issue, necessitating a medical leave of absence.

A.  He needs to be careful not to be slanderous.

Q.  Yes.

A.  I will finish it up to you.

Q.  So did he ever say that he had a mental health issue?

A.  No.

Q.  Okay.  Well, if not why did you send that E-mail to him about that, if he didn't say that?

A.  I was offering some support for what I assumed was a stress-related leave, which would I consider to be a mental health issue.  But you are right.  I did make an assumption.  He never said he had a mental health issue.

Page 184

Q.  Did you feel you were being slanderous?

A.  I looked the definition of slanderous up this morning, and it says, saying something that you know to be false, that is false that is harmful to somebody else.

So, no, I don't think that meets the definition of slanderous by any stretch.

Q.  Do you feel Dr. Peddada was over exaggerating?

MS. MCMANUS:  Object to form.

A.  Yeah, what are we --

Q.  (By Mr. Whitney)  Let me clarify.

Do you feel he was over exaggerating saying that you are slanderous?  I will start with that one first.

A.  I thought that seemed like there was going to be legal battle coming because that's the kind of word you don't use in passing conversations.

Q.  Okay.  And do you feel Dr. Peddada was over exaggerating his --

A.  You are asking me questions about this E-mail then, and I didn't see it then.  I just told you I saw it today for the first time, so I didn't know he was calling me slanderous.

Q.  Do you feel like he was over exaggerating his need for leave, medical leave?

Page 185

A.  I some had suspicions about the timing.  But I wouldn't say that I had suspicions about the need for a leave.  He did seem quite stressed.  He seemed stressed for many months or even years.  And so for it to come out the week before the three months of termination of our practice seemed a little suspicious to me.

Q.  Okay.  Could you just explain that a little bit more, the suspicion?

A.  Well, the way this worked is that there had been an extension signed to admit us to cover our practice through July first.  The initial had been June first.  Dr. Peddada signed that with Dr. Erling committing us to another month.  So I knew that there was three months coming up.  He made this request for additional money, which I had I was not interested in working with.  I offered instead to help him out on the equalization of the consults.  And he threatened a lawsuit at that point.  So I my assumption was that he was going to find some way to get additional money out of me.  And that by sticking me here by myself for three months, that would fulfill some of those goals.  I was a little bit suspicion of the timing.  Yeah.

While at the same time recognizing that mental health was a big deal.  He was a former friend and I wanted him to get help.  So I was quite conflicted.

Page 186

I was also facing, as I told you, one of the more stressful weeks of my life. So that is where the background of all of this comes in.

(Exhibit 21 identified.)

Q. Okay. I am going to introduce, and I believe this is Exhibit 21. And you will see there where it says Peddada 0240, PSF Peddada 0240.

A. Give me a second.

Q. Take your time.

A. I am not seeing it, Crist. I am not seeing it.

Q. Yeah, it's 0248. It should be, I think it is one right before the last one I sent.

A. Right before the last one. Is it an E-mail?

Q. Yes.

A. Okay. Is it from Dr. Albert?

Q. Yes.

A. Okay.

Q. It's a short one.

A. I see a -- let me see if I can -- I see it now. Yeah. Okay. I gotcha.

Q. All right. So you know what that is there?

A. Looks like an E-mail from Dr. Albert, Shauna Gulley and Scott Lichenberger, is that the one?

Q. Yeah. Have you ever seen this E-mail before?

Page 187

A. No.

Q. Okay. So you see it is an E-mail from Dr. Albert to Shawnna Golding and Dr. Scott Lichtenberg. Do you know who they are?

A. I know Shawna Golding is administration. I don't know Scott Lichtenberger.

Crist, I think this is probably going to be a lengthy questioning of it and I have to use the bathroom.

Q. Whenever you have to --

(Overlapping speaking.)

(Off the record for a short break.)

MS. HALPERN: Lindsay, real quickly, I was trying to think of a compromise so we don't have to reopen the deposition, while Crist was taking the deposition, I had a few minutes to look through the documents you guys produced last night. So if you are amenable, I think we can finish today, and not reopen it. But I would have to jump on and ask about some of these exhibits, these letters and E-mails, because Crist hasn't had a chance to look at them.

MS. MCMANUS: Yeah, that's fine, Iris. Thank you.

MR. WHITNEY: And I haven't had a chance to look at anything.

Page 188

Q. (By Mr. Whitney) All right. Exhibit 21. Peddada 0248.

A. Okay.

Q. Do you have that pulled up there?

A. I do.

Q. So here in the third paragraph, and this is on April 27th, by the way. Do you see that up at the top?

A. I do.

Q. So in the third paragraph of the E-mail, it states we are very sensitive to the position of the physician's mental health needs. And I would like to hear directly from Anuji before jumping to any conclusion. Unfortunately, Alan believes this is an attempt by Anuji to stick to him while he still can.

Do you see that there?

A. I do.

Q. Okay. Did you say this to Dr. Albert?

A. I probably implied something like that. We talked about that before the break, where I felt like the timing was highly suspicion. That's what he was referring to I believe.

Q. So what you do you mean, stick it to you?

A. To try to get some additional compensation, try to get me work all of the hours for the last three

Page 189

months.

Q. Why would he want to stick it to you though?

A. Well, because he had asked for compensation. He had threatened a lawsuit in E-mail exchanges back in February, like we talked about. I had offered to help even up the workload and he declined that offer. He said we needed lawyers. I felt like he was coming back to me looking for more money like he had done several times before in his career, like we talked about this morning.

Q. So you didn't believe this had anything to do with his mental health?

A. I didn't know enough about it to say for sure. He wasn't -- the entirety of our converation about his mental health was the E-mail he sent me.

I had seen that he was burned out. So it was reasonable to assume that he may have a mental health issue. The severity, I guess, became the question and timing of why now.

Q. Did you think Dr. Peddada was lying about his need to take leave?

A. I did not think he was lying.

Q. Okay. And just to clarify his need for leave like you thought he would be sticking it to you because you had to work longer?

MAGNA
LEGAL SERVICES

Page 190

A. I just felt like, you know, with a known three-month duration left, and he happened to give the E-mail while on vacation, right before the three-month kick-in, after having asked me for additional financial compensation, it all just added to his way of getting something extra out of me before the practice closed down. Maybe I was wrong, but that is how I read it.

Q. So the E-mail goes on to say that you sent a follow up E-mail to me and Brian this afternoon indicating that he may not sign his contract, if we still plan to have Anuji in the practice.

Did you say that to Dr. Albert?

A. Probably. I think at this point I was pretty done with all of the back and forth and chaos of working with Dr. Peddada. And if, I was not willing to work in the same practice anymore after this very stress week. That's right.

Q. Why would you not sign the contract if Centura --

A. I planned to find employment elsewhere. That's why.

Q. Say that again.

A. I would have left town and found employment elsewhere. I was at that point.

Q. Wouldn't you guys have been at separate

Page 191

locations?

A. It hadn't mattered for the last six months honestly.

Q. I'm sorry?

A. It hadn't really mattered that much for the previous six months. I had convinced myself that I could make it work with him in one place and me at the other, but the stress of that week convinced me otherwise.

Q. So would be fair to say that at this point in time you really just didn't like Dr. Peddada?

A. I think that week I was very frustrated with the circumstances. I was under a lot of stress. He wasn't my favorite person that week. That is right. I still cared about him as a person or I wouldn't have made the offer in the E-mail the previous day to be honest with you. So I was conflicted. 18 years is a long time.

Q. Say that again?

A. 18 years long time to know somebody.

Q. Yeah. The E-mail also states you thought Dr. Peddada would never come back.

Did you say that to Dr. Albert?

A. Quite possibly.

Q. Why --

Page 192

A. I am not going to disagree with you. I thought that he might be making plans to go elsewhere.

Q. Why did you think that?

A. A couple of reasons, two concrete ones is that a few months before, he had come into the symmetry where we do a lot our treatment planning. And he had pulled down some posters that had been up of his for many, many years. And my symmetry staff noticed that and asked if Dr. Peddada was leaving. And I said I didn't know.

Number two, he just didn't take a lot of interest in the summer schedule. I guess we make these things months in advance. We had always -- this had always been a big, a lot of discussions. And he was kind of didn't seem interested. So I thought for those two reasons that he might not be coming back.

Q. Did you think that his need for medical leave had anything to do with that?

A. I didn't make that specific assessment myself. I was just basing it on those other circumstantial things that I had noticed.

Q. So at this time you thought he was going to leave. And before he left, he would stick it to you? Is that what you were thinking?

A. That must have been what I was thinking at the time, yeah.

Page 193

Q. And if he didn't return, where would he go?

A. Get another job. I don't know.

Q. And if you didn't sign the contract, where would you have gone?

A. I would have probably tried to see if I could get on at another place in the area. Or I would have expanded my search to radiology oncology throughout the country and moved.

Q. Now if you didn't sign the contract, how would that have impacted Centura?

A. If I didn't or if he didn't?

Q. If you didn't.

A. If I didn't sign the contract at this point I suspect they would have had to filled my position with a locums doctor for awhile, and eventually with a permanent solution.

Q. And would that have also been the same for Dr. Peddada?

A. Yes. In fact, that's what happened.

Q. Have you ever, and I asked you this earlier in the deposition, have you seen any of Centura's discovery responses in this case?

A. And I didn't -- I wasn't familiar with the term discovery response.

Q. Okay. So usually, you know, we ask some

MAGNA
LEGAL SERVICES

Page 194

questions of the defendant and it's a legal obligation to respond. So I am just going to pull up our discovery requests, and that's going to be Exhibit 22. And I'll direct you where to find it.

A. Okay.

(Exhibit 22 identified.)

Q. So you are going to see where it says 20.4 815 defendant's responses.

A. I see it, yeah.

Q. Okay. So if you can pull that up?

A. Sure.

Q. And then I will turn your attention to, it's going to be page 5 of this document. And instead of having you read, I actually read it on the record.

A. Okay.

Q. Have you ever seen this before?

A. No.

Q. Okay. So it says here, interrogatory number 3. Describe all aspects of defendant's loan to the HR Radiation Oncology PC and ROPC's founders for Madeera Kathpal's employment, including the original terms of loan, and modification of those terms, including dates such modifications were made and debt repayment, including dates such demands were made, changes to repayment options, such as repayment plan, including

Page 195

dates such changes were made, calculations of payment and interest, including dates such calculations were made, and any terms of loan forgiveness; and if such terms were satisfied by any of the parties, including on what dates such terms were satisfied, and identify any documents or communications discussing the same.

A. I see it.

Q. Have you ever read that before?

A. No.

Q. Did you help craft the response to that request?

A. No.

Q. Okay. So I am going to turn your attention now to Interrogatory Number 5. And I will just briefly read this interrogatory here.

It says describe each significant conversation defendants had about loan repayment for Radiation Oncology PC or ROPC's founders, including the identities involved, what was discussed, the date such discussions took place, and the identity of any documents or communications capturing or referring to such conversations.

Have you ever read that before?

A. No.

Q. Did you help craft that response?

Page 196

A. No.

Q. And I am going have you look down a little bit under the response. And it says, Penrose had the following conversations about loan repayment.

And if you look down it mentions all of the different conversations that they had.

A. I see.

Q. Now I've asked you earlier if you've had any conversation with Penrose or Centura regarding loan repayment and you said you had.

Is there any reason you are communications with Centura were not included in this response?

MS. MCMANUS: Object to foundation.

A. I am not sure. I seem to remember that it was part of the negotiations on the contract, that there would be separate contract about the loan negotiations, but I don't recall those.

(Exhibit 23 identified.)

Q. All right. So I am going to introduce Exhibit 23.

A. Okay.

Q. And it is going to be the one that says 2024, August 1st, defendant's responses. So it should be the one, I think, right before it.

A. I see it.

Page 197

Q. Okay. So if you can pull that up.

A. Okay.

Q. And you will see at the top it says defendant's second supplemental objections and responses to the plaintiff's first set of requests for production of documents.

A. Okay.

Q. All right. So have you ever seen this before?

A. No.

Q. You don't know what that is at all?

A. No.

Q. Okay. So I will represent to you that those are defendant Centura's discovery responses to our requests for production. And I just want to turn your attention to request for production number 5.

I will get the page number for you. It is going to be on page 5 of 7.

A. I see it.

Q. Okay. And here it says, request for request production number 5, all documents, communications about loans, gifts or money owed by Radiation Oncology, PC or ROPC's founders, including discussions about the loans or gifts, forgiveness of such debts, calculations of such debts, the terms and conditions of collection or forgiveness, and any legal implications for collecting

MAGNA
LEGAL SERVICES

Page 198

such debt or failing to do so.

Do you see where it says that?

A. I do.

Q. Okay. Have you ever read that before?

A. No.

Q. Did you produce all of the documents that you had in response to that request?

A. It was not requested of me. Are you talking about my lawyers?

Q. Did you have to produce any documents to that?

A. No. I wasn't -- nobody ever requested any documents.

Q. Okay. That's fine.

I am going to turn your attention to request for production number 6?

A. Okay.

Q. This one states all documents, communications about the applications of, decision for hire and the process of transitioning ROPC's founders from contractors to in-house employees, including negotiations, terms and conditions of employment, mention of salary or benefits, paperwork required by Human Resources, internal references to ROPC's founders and Human Resources information systems, discussions of forgiveness or collection of debt, employment contracts,

Page 199

including drafts and other aspects of hiring and transitioning ROPC's founders on to staff.

Do you see where it says that?

A. I do.

Q. Okay. Have you ever read that before?

A. No.

Q. And did you produce all of the documents that you had in response to that request?

A. This request was not made to me. This was made to Centura. I was not named on the suit.

Q. Did you have to produce any documents? Or did you produce any documents?

A. Nobody ever asked me for any documents. I mean, I didn't give anything. I believe, I think Centura might have last week asked for some stuff. So yeah. I gave them an E-mail or two. This was back in August. But no not at the time.

(Exhibit 24 identified.)

Q. Oh, right.

Okay. So I am going to introduce Exhibit 24. And I will give you the number for it in one second. This one is going to be PSF Peddada 0742. And that will be Exhibit 24.

A. Can you read the number one more time?

Q. PSF Peddada 0742.

Page 200

A. Okay. I see it.

Q. Okay. Do you have it pulled up there?

A. I do.

Q. All right. And do you know what that is?

A. This is an employment agreement with Centura. It would have been the contract.

Q. Okay. And would that be an accurate and fair representation of the employment agreement?

A. Yes.

Q. And you can read through it, if you need to.

A. I will trust you.

Q. All right. Okay. Now this agreement states that you signed a promissory note. Is that correct?

A. I believe that is correct, yes. In relation to Dr. Kathpal's recruitment.

Q. That's what I was going to ask. Why you did you sign it? Why did you sign the agreement?

A. That is what I signed it for, for the recruitment money.

Q. Now do you remember when you signed that promissory note?

A. I don't.

Q. Okay. I am going to scroll down. And I am going to -- I believe the promissory note is also in here.

Page 201

A. I am looking here. I found my signature. Okay. May 16, 2022 I signed the contract. Yeah. I don't know.

Q. All right. So I will direct you to page 12.

A. Okay.

Q. And do you see your signature there?

A. Yes. I do.

Q. Okay. All right. And I am going to go -- okay. So I want to direct your attention to page 3.

A. Okay.

Q. And it's titled, Article 2, compensation.

A. I see it.

Q. All right. So I see the amount of $129,939.75. And is that for your half of the recruitment agreement?

A. Yes, it is.

Q. And under 2.2, it states, hospital agrees that provided physician remains employed by hospital on the payment date under the promissory note, hospital will forgive the payment date on such date.

Do you see where it says that?

A. Yes.

Q. Okay. Could you describe what that means?

A. My understanding of what I signed is that every month this amount would be reduced by $2165



Page 202

roughly. And that if you equate that out to five years of being here with the company, that takes the balance down to zero.

Q. Okay. And what date is the provision referring to?

A. I would assume it's the five years in advance. I don't have the promissory note in front of me.

Q. And according to this provision, if the physician is no longer employed, then there is no hope that this payment due will be forgiven.

Is that correct?

MS. MCMANUS: Object to foundation and form.

A. Where does that say that?

Q. (By Mr. Whitley) I have it here. Hold on.

A. Is it in this contract or promissory note somewhere?

Q. Yeah, it says, provided physician remains employed by hospital on the payment date under the promissory note. It says there.

A. Okay.

Q. What does that mean?

A. Would you repeat the question?

Q. Yeah. So it says, hospital agrees that provided physician remains employed by hospital on payment date, under the promissory note, hospital will

Page 203

forgive the payment due upon such date.

A. Okay.

Q. What does that mean?

A. So I think, as long as you are still employed, and I assume that date means like every two weeks. I don't know, that they would forgive the amount that would have been collected.

Q. Okay. So I want to go the last page again with your signature. That is going to be on page 12.

A. Okay.

Q. So it shows that you signed the agreement on May 16, 2022. Is that accurate?

A. Yes.

Q. Okay. How long did it take, how long did it take you from the time you received the agreement until the day you signed the agreement?

A. Probably would have received the agreement in April, and then this is May, so five weeks, six weeks, something like that.

Q. So you received it in April?

A. I think that's right.

Q. And so it took you five weeks to sign?

A. You know typically with a contract you have your lawyer look at it. You read it, think about it.

Q. Okay did Centura ever rush you into signing

Page 204

the agreement?

A. There was some expediency in the sense that we needed to get something in place to take care of the clinic, but they didn't rush me.

Q. And can you describe communications you had with Centura during the time the offer was extended?

A. Communications in regards to --

Q. Yeah. This agreement?

A. I think I just told them I was looking into it with my lawyer. I was intending to sign. I wanted to look at the details.

Q. Now when did you learn about the retraction of Dr. Peddada's offer?

A. The first I heard that there was consideration of this was on that Wednesday the 27th of April. I don't know actually when it was -- the retraction itself was more of a contractual thing, but there was a discussion is referenced in Dr. Albert's E-mail. It came come up that administration was giving serious thought to not bringing him on.

Q. So on April 27th?

A. That is correct.

Q. And who told you this?

A. It was said during the meeting, but I can't remember which of the people at the meeting said it.

Page 205

Q. Who was in that meeting?

A. It says on the E-mail here, Brian Erling, Bill Kraus, me and Eric Koval, and I guess Jeff Albert would have been there because he wrote it.

Q. What were you told in that meeting?

A. Just what I said, that they were giving strong consideration not to bringing him back.

Q. And what was the reasons for that?

A. There was, they were having a hard time getting ahold of him from I understand. They felt, you know, like he should have been communicating with them over that few days. He was not returning phone calls.

Q. So the day after that -- hold on one second, make sure I have got the right date on that.

Yeah. So that was the day after he responded to your E-mail about his mental health, you guys had that meeting?

A. Probably, yeah. So two days after he sent his notification about going out.

Q. So when the retraction was made, were you aware that he was on pre-approved medical leave?

A. I mean who approved? My practice, I guess had kind of approved it when I didn't pursue the additional investigations that he offered. So I kind of verbally said, if you need help, go get help. So I guess that's

Page 206

probably the day that his leave started with Radiation Oncology PC, right? So --

Q. And so when the retraction was made you were aware that he was on medical leave?

A. Yes.

Q. Okay. I see. Do you think it was okay for them to retract the offer to Dr. Peddada while he was on medical leave like that?

A. That's a judgment call. They had to decide, you know, if he was impaired, you know, if he was going to be a good partner. There was a lot of things that went into it.

Q. Did you think it was okay though?

A. Do I think it was okay. It's always better to pause, and let people explain. They hadn't heard from him for a few days, and I think they were angry about that.

You know, could they have waited a few more days, I don't know when they actually retracted their offer. But they were thinking about it at this point at least. Maybe they --

Q. Do you know why they retracted it?

A. I don't. I think it had something to do with the lack of communication, the questions over whether they would be able to get all of the things signed

Page 207

before he needed to come back. You know, I wasn't really privy to most of those discussions. I was head down, trying to survive what was a terribly busy week, where I was taking care of everybody on short notice.

Q. One second. I want to go back to one of those interrogatory questions.

A. Okay.

Q. So I am going to refer you back to Exhibit 22. And it was the first --

A. Are we on the first or the second?

Q. The first discovery responses.

A. So 8-1-2024? That one?

Q. Yes. No. I'm sorry. It is 8-15.

A. 8-15. First one talked about was the second one?

Q. Yes.

A. Okay. And where are we going?

Q. Okay. I am just going to read the question here. So it is says here, describe each and every reason for ending Dr. Peddada's employment with defendants, including the date the decision was first made, and identify the decision makers and all communications in which the end of his employment was discussed.

A. Okay.

Page 208

Q. Then I am going to go to its response. This is Centura's response. It says Peddada's offer was employment was withdrawn because he refused to communicate about the offer of employment that was sent to him. Given his history of poor work relationships and refusals to communicate, this new refusal destroyed the hope of effective communication and a productive working relationship as an employee.

Peddada never communicated regarding his offer of respective employment with Penrose until after his offer of employment was withdrawn on May 9, 2022.

A. Okay.

Q. What do you think of that?

A. I think it sounds like --

MS. MCMANUS: Object to the form.

A. -- sounds like he was given until May 9th to respond, and it sounds like he didn't. And they felt like they needed to move on, would be what my impression is of what you just read.

Q. Yeah, I didn't read anything that he was given a date. I just said until after his offer of employment was withdrawn on May 9th.

A. Okay.

Q. That's it.

A. I misheard you.

Page 209

Q. Do you think any of that was fair?

A. I think giving him a little bit more than two weeks to reply, I think that seems pretty fair.

Q. And you guys were discussing in the April 22nd meeting, already retracting the offer?

A. There was some talk about that. Yeah, there was.

Q. And that was for --

A. I wasn't sure if I could take it seriously or not. That's why I think I said to them, like I need to know what's going on, guys, because if you are bringing him back, I decided I can no longer work with him.

Q. And for lack of communication, a day or two after he said he needed medical leave?

A. That is what they had said. Yeah.

Q. Okay. And as you see there in the response, the offer was retracted on May 9th, correct?

A. Yeah. I don't have it open anymore, but I'll take what you are saying on the E-mail.

Q. Okay. And as we have established already, you signed your agreement a week later, correct? After his offer was withdrawn?

A. The 16th of May. Yes.

Q. Yes. Okay. How come you waited a week until after Dr. Peddada's agreement was retracted to sign your



Page 210

agreement?

A. It had to do with my lawyer looking it over. I don't recall.

Q. No other reason?

A. Not that I can recall. I didn't know when Dr. Peddada's offer had been retracted. So I wasn't waiting on that, if that's what you are getting at.

Q. When did you find out that it was retracted?

A. When you just read the date. I had no idea. I had never heard that before when it was retracted. I knew that he, you know, obviously he wasn't signed on. I hadn't know about this for a long time, but --

Q. Yeah, when did you find out?

A. That he wasn't coming back?

Q. Yeah.

A. I don't know actually. Formally, I don't know. Certainly I found out that they were strongly thinking about not bringing him back, like I just a few minutes ago, on the 27th of April.

Q. So you knew it was in the cards?

A. It seemed like it was in the cards.

Q. But you don't know, you don't remember when you found out?

A. No.

Q. Now what would the impact have been on Centura

Page 211

if they were able to reach Dr. Peddada, say, a few weeks later?

MS MCMANUS: Object to foundation.

A. Impact on Centura, you said?

Q. Yeah.

A. It would have delayed, you know, setting up all the things we needed to do, like credentialing and all those kind of things. It wouldn't have been catastrophic but it would have been negative.

Q. But nothing catastrophic?

A. I don't think so. I mean --

MS. MCMANUS: Objection, foundation.

A. -- nowadays they say it takes 90 days to get somebody on credentials and all of that. And we were bumping up against that for sure. They wanted to make a move with people they could count on.

Q. And what would the impact have been on Centura if Dr. Peddada had worked or continued to work as a contractor for another month before coming in-house?

MS. MCMANUS: Object to foundation.

A. Which month are we talking? Come back in August or something?

Q. (By Mr. Whitley) Let's say he came back June first?

MS. MCMANUS: Same objection.

Page 212

A. What effect would it have had on Centura you said?

Q. (By Mr. Whitney) Yes.

A. They would have had to have another contract to put that in place, I suppose, would have been negotiations about salaries and benefits and yada, yada.

Q. Centura had already pushed the start date back a month, right?

A. Yeah. So Peddada had signed with Dr. Erling an agreement to push the start date back from June first to July first, without very much input from me. I don't recall being involved.

Q. And how did the fact that they pushed the start date back, how that impact Centura?

A. Gave them more time.

MS. MCMANUS: Object to foundation.

Q. (By Mr. Whitney) And how did that impact you?

A. Well, it committed me to another month of covering the clinic and Radiation Oncology, PC, which would not have been a big deal if Dr. Peddada and I both had been working here. But with him being out on leave, it meant that I was going to be seeing all of the patients by myself for a whole additional month that I wasn't planning on.

Q. All right. So --

Page 213

A. Not taking vacation, not having time off, those kind of things.

Q. So then, a pretty basic question, did that hurt anyone, pushing the date back?

A. I would say that it hurt me. I had to actually change some vacation plans.

Q. Was there --

A. He had asked for three weeks off in June as well. And I was willing to go along with that. So I was going to be working a lot either way.

Q. Did you ever get to take your vacation?

A. I took my vacation in early June when the hospital actually was nice enough to get me a locums doc to cover.

Q. Could they have done that while Dr. Peddada was on leave?

A. They could have, I suppose, yeah.

Q. Okay. And was there a financial impact by pushing back the start date?

MS. MCMAUS: Objection to foundation.

A. On whom?

Q. On both? On both you and Centura?

A. On me, I was, yeah, I made more money in private practice than I did when I became employed. And on Centura, I don't know what the implication would have

54 (Pages 210 to 213)

Page 214

been, to be perfectly honest.

Q. Was there an impact on patients at all pushing the start date back?

A. I wouldn't say that there was.

Q. Okay. So what would the impact have been on Centura if they just waited until Dr. Peddada returned from leave?

MS. MCMANUS: Object to foundation.

A. If they had waited to do to what? To sign his contract until he returned, or start him on --

Q. Yes. Yes. Or just, what would the impact have been if they just waited for him to return to have him sign the agreement?

A. Sign the agreement in July, they would have been a huge impact because then we would have had to start the credentialing process. It would have delayed things by months. If you want somebody to start on July first, you have got to start doing credentialing by April or May, is what I have been told.

Q. And so if he would have gotten, by June, he could have started by August, so it takes two months?

A. I don't deal with credentialing, you know. That's what the hospital addresses.

Q. All right. So what is your current role at Centura?

Page 215

A. I am employed by them. Or Common Spirit. We agreed that was the agreement.

Q. Yeah. Could you describe what your average day looks like now at Centura?

A. Sure. I do very much similar work to what I was doing before. I see consults. I see follow ups. I do treatment planning. I see on treatment patients.

Q. I am going to ask a quick question about the promissory note. Do you remember if you signed that before or after you signed your employment contract?

A. I don't recall the sequence. There is probably a signature stamped on them to tell you that.

Q. Okay. And I think I might have asked this before. Are you working at Penrose or are you working at St. Francis?

A. Mostly Penrose but I cover St. Francis for certain needs.

Q. And again we covered if Dr. Peddada would have been there, he would have been at Penrose, and you would have been at St. Francis?

A. That was a decision Dr. Albert had made, yes.

Q. And how has the hospital treated you since you became an employee?

A. They've been generally good to me.

Q. How about the administrative staff? How have

Page 216

they treated you?

A. They treated me well.

Q. Anything you dislike about the position there at Centura?

A. Every job has its ups and downs. Nothing big though.

Q. All right. Anything you dislike? Any examples?

A. No. It is very similar to what I was doing before.

Q. Okay.

A. The staff is all the same, my therapists, my nurses, the patient's diagnoses. I am doing the same work.

Q. Would you say you were happier at Centura or were you happier at ORPC?

A. I think it depends on when at ORPC. So I think there were times when things were going well, and then we were making more money. I was doing better. I was happy then.

And then there were times when I was pretty miserable, and Peddada was having some issues getting along with people. I would say I am happier now here. So it depends on when you ask. It depends on the circumstances.

Page 217

Q. Sure. And are you still working with Dr. Albert and Dr. Plauth?

A. Dr. Plauth is no longer here. Dr. Albert is still employed by Common Spirit over the group, yeah.

Q. And how is relationship with Dr. Albert?

A. I think it's fine. I honestly don't see him very much. He is in Denver exclusively almost, and can't remember the last time I saw him at a meeting. It might have been six months or nine months.

Q. How about Sam Weller and Eric Koval?

A. I never really knew Sam Weller at all, and Eric Koval eventually left for another job, and I haven't kept in touch with him.

Q. And has the move in-house been better than private practice with Dr. Peddada?

A. Better in some ways. Worse in others.

Q. Okay. How has it been better?

A. Collegiality is better with my new partners.

Q. Okay. And how has it been worse?

A. Financially, I make less money.

Q. All right. That was my last question.

Did you have any questions you wanted to ask, Lindsay?

MS. HALPERN: Let me jump in. You want me to do that? How do we send the exhibit and let me know if

MAGNA
LEGAL SERVICES

Page 218

you have them.

MS. MCMANUS: Iris, if you just want to send them to me, and I will forward them to Dr. Monroe.

MS. HALPERN: And for the court reporter, I don't have your E-mail, what is it?

(Providing E-mail.)

MS. HALPERN: And I did not catch what numbers were or the next number on the exhibits? 25. Okay.

Doctor -- I am sorry do you need guys need a camera? I didn't think about that. You need a camera? Give me one minute.

EXAMINATION

BY MS. HALPERN:

Q. All right. Dr. Monroe, thank you. Sorry, I am a little disjointed. And I am going to have pause a little bit because as you know, I did not actually hear the whole deposition. So if I've ask you something that has already been answered in depth, please let me know.

I just getting it on the record, we reached an agreement, the parties reached an agreement so we don't have to reopen your deposition, and are allowing me to ask you some questions about some documents. So that's kind of why we are going to jump around a little bit. Okay?

I am not -- I am not going take these in any

Page 219

particular order, so this may be disjointed.

But if you could pull up what is called the loan forgiveness. Well, let's start with the locums coverage. I have them out of order. Sorry. I didn't number them. Let me see the order in here.

A. So is that something you are sending to Lindsay to send to me?

MS. MCMANUS: Dr. Monroe, I just got it from Iris so it's coming. I are just forwarded it to you. It might be a moment because there's a couple of PDFs.

A. Okay.

Q. (By Ms. Halpern) Let me know when you have those.

A. It just came up. It is now loading on my computer, so just a moment. Okay.

(Exhibit 25 identified.)

Q. All right. So, Dr. Monroe, I am going to ask you to open what will be labeled as Exhibit 25. I kind of manually titled it, attorney review E-mail. Just for your reference, it is PSF Peddada 0988 through 990.

A. What was the title of it again?

Q. This one is attorney review E-mail.

A. Attorney review. Okay. I see it. Got it.

Q. So, Dr. Monroe, this is going to be designated as Exhibit 25. And I would ask you to take a look at.

Page 220

Have you ever seen Exhibit 25 before?

A. I haven't seen it before. I mean I wrote it obviously, but I haven't seen it recently.

Q. Okay. But take a look at those two pages. Do you recall having been a participant in this E-mail chain?

A. Yes, I do.

Q. Okay. And that's your E-mail right there, Alan Monroe to Centura dot org?

A. Yes.

Q. Okay. So you were referring earlier to reviewing an agreement with your attorney, is that right? I think I just caught the tail end getting on.

A. Yes, a different attorney. Not this one.

Q. Not this one. So who is that attorney?

A. He was a guy that was -- Dr. Peddada and I both had kind of used a little bit I think for getting Dr. Kathpal's agreements together. I think that's where he came in. Our attorney had retired after like 10 or 15 years, so we had to go find somebody new and that was Terry.

Q. Right. And on PFS Peddada, I am trying to get the Bates number. I am sorry. On the first page of this, Exhibit 25, do you see the kind of first conversation where you say Terry, see below. You can

Page 221

hold off until you get back?

A. Yes.

Q. What are you referring to there?

A. I don't know. It's been a long time. I guess that means refer -- what date is this? This is 13 April, so this must have been looking at the employment agreement that Centura had E-mailed me.

Q. And do you see the sentence where you say they were talking about five years repayment loan?

A. I do.

Q. What are you referring to there?

A. That was to Dr. Kathpal's assistance repayment, the money they had given.

Q. And did you discuss with Crist all the conversations you can recall around negotiations over that term, repayment term, those repayment terms?

A. I am sorry. Would you repeat that?

Q. Yeah. So the five year loan, that is referring to repayment?

A. Yes. That's right.

Q. Then I just asked, did you ever discuss with Crist all the conversations you had with Centura at that time about the five year forgivable loan terms?

A. Yeah. We talked about it as part of the whole process of signing up, and doing, you know, the

MAGNA
LEGAL SERVICES

Page 222

employment agreement. Crist and I did touch on that though.

Q. Okay. Did you have any specific negotiations or discussions about the five year term?

A. No. I did not. I more or less accepted it as it was presented.

Q. And you don't recall having any conversations or discussions about the five year forgivable loan?

A. I don't. No.

Q. Okay. Let me see if this other exhibit maybe assists. Can you open up what I imagine is the next E-mail, loan forgiveness terms E-mail. That is PSF Peddada 0922 -- 0922 to 0924?

A. Yep.

(Exhibit 26 identified.)

Q. All right. I am going to have the court reporter mark this as Exhibit 26.

Have you seen Exhibit 26 before, Dr. Monroe?

A. I have not seen it since 2022 when I sent it.

Q. Is that your E-mail address?

A. Yeah. I haven't seen it recently, but, yeah, this is my E-mail.

Q. Okay. And you are talking to Debra Helton. Who is that?

A. She is an accountant.

Page 223

Q. For who?

A. For our practice, for our Cyberknife, LLC. I think that's her two primary roles.

Q. Okay. So why were you talking to her about your employment terms?

A. Just because they had some bearing on my accounting.

Q. Okay. And your first, I am hearing was the five year forgivable loan, sounds like she sent that exhibit to you.

What are you referring to there on the first page of Exhibit 26?

A. In retrospect, kind of a bad joke.

Q. What did you feel about the five year term?

A. It seemed like a long time to tie me up, but because if I left I had to pay money.

Q. Have you ever been put in a situation like that before? And again I did not catch most of the deposition with Crist, so if you already talked about this let me know.

But have you ever received this kind of a loan before?

A. I had never.

Q. So this was your first one?

A. As far as I can recall, yes.

Page 224

Q. Okay. And do you remember any conversations what, or who, what you were referring to?

A. Must have been discussions with administration I am guessing. I don't know.

Q. Do you recall any conversations about the terms of repayment that you might have had with Centura?

A. This would have been March 30th I see, so that would have been in the time where we were discussing my employment agreement. And it must have come up during those discussions that there would be a repayment for that Dr. Kathpal assistance. Yeah.

Q. So you are saying, must have, and I assume that's true. I am just asking from your memory, if it jogs it at all, if you had any conversations with anyone at Centura?

A. Sorry. I don't remember a specific. I don't remember a specific conversation. Sorry.

Q. Okay. Do you remember ever trying to get a longer or shorter term loan --

A. No.

Q. -- forgiveness?

A. No. I didn't think it was negotiable.

Q. Okay. I am going to introduce what has been designated or will be designated Exhibit 27 by the court reporter, that's the locum's coverage E-mail.

Page 225

And, Dr. Monroe, I apologize. I am not sure if I cut off kind of E-mail, this is on the first page or not. While you look at that, can you let me know if you have ever seen the E-mail, Exhibit 27?

MS. MCMANUS: Hey, Iris, I just want to let you know too, Crist introduced this one as Exhibit 17.

MS. HALPERN: Oh, he did already?

MS. MCMANUS: Yes.

Q. (By Ms. Halpern) Okay. I mean if you have already been asked questions about it.

I guess my one question about it had been, at the end of -- and this is also Exhibit 17, so I will just refer to it as Exhibit 17. And we will make it, and, you know, we can discuss 27 after that. Is that all right?

A. Yes.

Q. The next exhibit.

A. Remind me again, 17 which one was that just in general?

MS. HALPERN: You are on mute, Chris.

MR. WHITNEY: I am going to look it up.

MS. MCMANUS: I have got it right here just so you know. It is from Jeff Albert on March 28, 2022 at 12:53 p.m. to Eric Koval, Sam Weller, Dennis Kraus, Tim Osterholm and Kathryn Bishop. And the first line, says,

MAGNA
LEGAL SERVICES

Page 226

please forgive long E-mail.

A. Okay. That helps me.

MR. WHITNEY: PSF Pedadda 0119.

Q. (By Ms. Halpern) I was going to ask you about that kind of that third to last sentence there that says, they know they will likely need one or two months of locums help for coverage if they intend to take any time off.

Did you discuss that line at all with Crist earlier?

MR. WHITNEY: No.

A. No. We didn't talk about needing locums.

Q. (By Ms. Halpern) Okay. What exactly is that referring to? Did they ever talk to you about taking time off and getting locums coverage?

A. I mean I had a schedule already preset before all this went down where I had some vacation requests. And you know with going from three doctors down to two, and having two sites, you are not going to have any time off unless you get some locums coverage in. That's what that was referring to.

Q. Okay. Do you remember any conversations with anyone at Centura about coverage for your time off?

A. Yeah. They helped me to sign a contract with a locums doc as I recall.

Page 227

Q. How does that work exactly?

A. I was so busy in clinic, I didn't have time to look into the logistics of it, so I assigned my office manager to call a locums company and let them know we would have needs between May and July.

Q. So what is locums, it's just a staffing?

A. Locums is like, yeah, it is usually an older doctor who doesn't have a permanent position but they come in for a set number of time to help staff.

Q. And how often, when you were at Centura, before it became Common Spirit, how often was locums used as a service there?

A. So when Dr. Peddada and I were in practice as Radiation Oncology PC, we never used a locums.

Q. When you were there, but when you became an employee, did you --

A. We started in early June because I had this vacation planned the first week of June, so that was, I believe, the first time a locum doc came.

Q. To replace you. But what about just your observations around the hospital you were working at?

A. So before that person came in to replace me for my vacation, Dr. Kathpal was at St. Francis every day and I was at Penrose every day. We were --

(Simultaneous speaking.)

Page 228

Q. Okay. So let me just rephrase that. So not just when you started at Centura, but, you know, you observed any other use of locums while you were employed at Centura?

A. So yes, since my employment we have used locums. That's right.

Q. How often?

A. I think the doc that we hired wasn't able to start until November. So there was quite a bit of time in August, September. Dr. Kathpal, I forget exactly when she left, but there was a gap there. And we got in locums to staff St. Francis while I was at Penrose.

Q. Okay. And would you be aware of any other doctors outside of your, kind of your job, would you be aware of any use of locums for any other doctors?

A. Within radiation oncology?

Q. Not within radiation oncology, just in general?

A. I don't know about other people's practices, and how often they use them, if that's what you mean.

Q. Okay. So you had coverage while you were on vacation?

A. That's right.

Q. And then there were two months, two or three months of coverage when there was a gap because

Page 229

Dr. Kathpal left?

A. Yes.

Q. Any other times?

A. We used it occasionally since then, not as much. A day here or there, maybe a week.

Q. Is it difficult to gain assistance through locums?

A. Can be. Usually getting an older doc who is not quite as experienced with your practices, and I think it costs the hospital quite a bit of money, and there is some push back on using them more than necessary.

Q. Okay. But you said you had to sign to get one. What was that possibly?

A. It was a contract with a company. I think it was Weatherby Locums that used. I had to sign agreeing to pay them.

Q. And who paid them? You or --

A. Radiation Oncology, PC. Yeah, I paid them through the practice.

Q. ROPC's practice?

A. Yes.

Q. Do you recall how much you had to pay?

A. I don't actually. I kind of left it up to my office manager to settle those bills. I was just trying

MAGNA
LEGAL SERVICES

Page 230

to stay alive.

Q. Okay. So do you recall having any actual conversations with Centura about getting that coverage?

A. Like I said, I did rely on them, to help find the company because I just didn't have enough time at the end of the day.

Q. Do you recall a note telling Dr. Peddada if he wanted time off, that he had to get locums coverage, if he wanted time off before you started employment?

A. I think I went to them about the locums coverage. I don't recall them coming to me about it.

Q. Okay. So they know that you will need one or two nights of locums coverage in order to take any time off.

Does that jog your memory on any conversations you might have had?

A. Yeah, I am sure in the logistically planning, we must have discussed the fact we would need three doctors to adequately run two centers.

Q. Do you recall that conversation?

A. Not specifically, but we had a lot of conversations about logistics, after Peddada left. So, yeah, I could imagine.

Q. Including the use of locums?

A. Yeah, locums were going to be a part of it.

Page 231

You can't get somebody in permanent that quickly.

(Exhibit 27 identified.)

Q. Okay. I am going to turn to what now will be designated as Exhibit 27, which is just Monroe original agreement. Has this already -- I don't think it has already been introduced, but we will see.

A. We saw Peddada's version of it, not mine. This is the one I signed.

Q. That's what I thought.

A. Yeah.

MS. MCMANUS: Iris, Exhibit 24 is Dr. Monroe's employment agreement.

MS. HALPERN: This is not the signed one. I don't recall seeing that before, but this has something about from the E-mail sentence. Let me just take a moment to look through the one. You said it was titled Monroe original?

MS. MCMANUS: Yeah.

(Exhibit 27 identified.)

Q. So, Dr. Monroe, this is the one that got admitted as Exhibit 27?

A. Okay.

Q. It is PSF Peddada 0860 through 0870. Could you take a look at Exhibit 27 and look through it and see if you've ever seen it before?

Page 232

A. Yeah, it is looks like Centura boiler plate template, some details put in for the practice.

MS. HALPERN: We recanted on 27 because it had been introduced in a different format earlier in the 17. So we left just Exhibit 17 when people get the exhibit. I think this number 27 now.

Does that make sense?

Q. (By Ms. Halpern) All right. Dr. Monroe, this is going to be designated Exhibit 27.

Can you flip to end of 27, the last page?

A. Yes. I will find it.

Q. Do you see your name on the last page? Does that help trigger your memory if you have ever seen Exhibit 27 before?

A. Yes. I believe I've seen it.

Q. When did you first see Exhibit 27? Do you recall?

A. I think they E-mailed me a version of this some time in April was the first time I saw it. April, '22.

Q. Okay. Do you recall having any conversations around Exhibit 27 with anyone at Centura?

A. I think they might have gave it to me for review and I passed it on to my lawyer per that other E-mail.

Page 233

Q. And did they indicate to you this was the final agreement?

A. I don't remember that.

Q. Did you provide a copy of this to your attorney?

A. I think they already had it. I don't really have an attorney.

Q. Let me see if this helps. I believe --

A. I did give it to Terry. I think, yeah, that's Terry --

Q. Yes.

A. Yeah. Yeah. I think sent it on to Terry. That's the one we were talking about where I said hold off looking at it.

(Exhibit 28 identified.)

Q. And that's exactly what I was going to say so we can designate that as Exhibit 28. If you can put both of these together, because they kind of seem like they refer to each other.

It's Monroe reviewing with attorney E-mail. That's going to be Exhibit 28.

Dr. Monroe, have you seen Exhibit 28 before?

A. That's the E-mail that we are looking at, the contract.

Q. No, it's the E-mail to Terry.

MAGNA
LEGAL SERVICES

Page 234

A. Sorry. I lost it. The E-mail to Terry. We looked at it a few minutes ago, right? Is that the one, attorney review E-mail. That one?

Q. Monroe reviewing with attorney E-mail.

A. Okay, hold on.

Q. It's different. I was labelling it. It is similar names.

A. Just opened it. Okay. That's my E-mail. That's me.

Q. All right. So, Dr. Monoe, have you seen Exhibit 28 before, which is PSF Peddada 0995 through 998?

A. I am sorry. Did you ask a question?

Q. Have you seen it before?

A. Yeah. I have seen it.

Q. Okay. That's your E-mail address, Alan Monroe@Centura.org?

A. Yes.

Q. And so you provided this to Terry?

A. Yep.

Q. Why did you do that?

A. It's pretty standard to have an attorney review a contract before you sign it. That's why.

Q. Okay. And is the contract, the contract in Exhibit 27?

Page 235

A. I would assume so. I don't see an attachment on this set of E-mails. But, yeah, I would assume that was it.

Q. Well, it says in line images: Image 001 png; image 002.png.

A. Okay. Yeah, that's only the contract I remember getting from Centura was the one we looked at.

Q. And you tell, at the bottom of the first page, to the top of the second page of Exhibit 28, tell the attorney to hold off reviewing until you get back, because there is going to be change to the contract.

Is that true?

A. Yes.

Q. So did that catch you by surprise? You didn't know that they were going to change the contract when you originally got the contract to Terry?

A. I assume I was somewhat surprised. I told him to hold off when I told him to look at it before. But I don't remember exactly. I assume that was in relation to the Kathpal repayment part being added.

Q. Okay. And it says on that first page of Exhibit 28, should be soon, they want to get us signed and started by July first.

What are you referring to?

A. Probably talking about should be soon, meaning

Page 236

like you should be able to look at this soon because the hospital wanted to get everything squared away and get the credentialing process going so we could start in July.

Q. Did they tell you when they were going to get you the amended agreement, after you got the original agreement, and were told hold up?

A. I don't recall them giving me a date.

Q. Did they tell you there was a date by which you should sign the agreement?

A. No. There was not like a specific date. They were just in a hurry to get it so they had enough time to do the credentialing is what I remember.

Q. It looked like it is about 8 or 9 pages. Before you were told that there was going to be a change in your employment contract, according to the timeline I am seeing in PSF Peddada 0996 to 995. Is that --

A. It's possible. Yeah.

Q. Is that what you recall?

A. Eight days between me getting the initial contract and then getting the contract with the Kathpal addition? Is that what you mean?

Q. You know eight or nine.

A. Yes. So that sounds probably about right. I don't know for sure.

Page 237

Q. Okay. And so you never did sign Exhibit 28?

A. No.

Q. Exhibit 28.

A. I see that says Eric Koval actually suggested that I tell my lawyer to hold off in the E-mail on April 12, 2022.

Q. You gave Exhibit 27 to your lawyer to review thinking that was the final contract?

A. I don't recall that being -- I don't recall exactly the timeline for when I got the change.

Q. I didn't ask you about the timeline. Sorry about that. I was asking about the timeline before, but if you look at Exhibit 27 --

A. That was the attachment that I sent to my lawyer, that's right.

Q. -- to review, that was your final?

A. Whether it was the final or not, there was obviously some talk here about there being an addition to it. I probably told him to hold off looking at it because I didn't think it was the final.

Q. So that was after you heard that there wasn't a final. When you received Exhibit 27, you were told it was a final agreement?

A. I don't recall that either actually.

Q. Okay. What do you recall?

MAGNA
LEGAL SERVICES

Page 238

A. I am looking at an E-mail here that is helping jog my memory. It's from Eric on April 12th saying since your lawyer is reviewing your employment contract, I wanted to let you know so you can tell him or her to hold for the moment.

And it talks about the loan forgiveness agreement will be a separate agreement. So it sounds like I knew that there would be a separate addition to the contract on the 12th of April.

Q. Do you recall having a conversation around that?

A. I don't recall the conversation because I think it was the E-mail that I am looking right now. Page 2 of the one we have open.

Q. That's right on April 12th?

A. April. Yeah, it says Tuesday, April 12th at 4:08 p.m.

Q. And it says, I just saw where there is a small edit being made.

Is that what you are referring to?

A. Yes.

Q. Do you remember any conversations around that?

A. I don't remember conversations. I think I got my first contract from them on, like, the 8th of April. And I sent it out to Terry, and so he wanted my lawyer

Page 239

to pause so I didn't have to pay additional legal fees, because it wasn't final. So I appreciated that.

Q. All right. So just to clear that up, when you got the original contract, Exhibit 27, you thought that was the final contract and then you found out on the 12th, that it was not?

A. That's what I am seeing on this E-mail. That what I recall, yes.

Q. And is that what you recall?

A. Yes.

Q. You could use the E-mail to jog your memory? I am just trying to --

A. I could have, yeah, that's true. But I remember there being some discussion about adding in the Kathpal agreement into the employment.

Q. And that was going to be a separate agreement?

A. Yes.

Q. Right? Do you remember who you spoke with about that on April 12th?

A. It would have been one of the members of the administration, probably either Eric or Jeff Albert.

Q. You're saying it would have been. Do actually recall that?

A. I don't.

Q. So you don't recall a conversation that you

Page 240

had with this E-mail, Exhibit 27?

A. I also see Jeff's cc'd on the E-mail, so Jeff was involved so.

Q. I am trying to ask for your memory though.

A. Yeah. I don't remember.

Q. I asked what you remember. I am just trying to see what you remember.

A. Yeah. I don't remember the specifics about the addition of that, no, to the employment agreement.

(Exhibit 29 and 30 identified.)

Q. All right. So I am going to ask you about, I guess this is going to be Exhibit 29, looks like it is an E-mail follow up. Actually you open that E-mail, first there, which is the coming back E-mail, and then the not coming E-mail follow up, Exhibit 30.

A. Yep. I see it.

Q. All right. So let's start with Exhibit 29 which is PSF Peddada 0123.

Dr. Monroe, have you seen Exhibit 29 before?

A. Yes, it looks like my E-mail.

Q. What is Exhibit 29?

A. E-mail chain to Dr. Kathpal. Is that what we are looking at?

Q. Yes. I think they are both, I think, between you and Dr. Kathpal.

Page 241

A. Okay.

Q. But I just want to make sure we are looking at the same one.

A. I opened the one called Monroe, the not coming back E-mail follow-up. Is that the one?

Q. No. Then there is also a not coming back E-mail.

A. The first one is?

Q. The not coming back E-mail.

A. Okay.

Q. And there is a not coming back E-mail follow up.

A. So my lap -- my Ipad here opens small E-mails, and I don't see the title of the file when that happens. So the one open right below it that I am assuming is what you are talking about between Kath --

Q. Yes. The line I am referring to as, I believe we are on Exhibit 29 is PSF Peddada 1023.

A. 1023. I see that stamped at the bottom. Yeah, okay. I gotcha.

Q. All right. Dr. Monroe, have you seen Exhibit 29 before?

A. Yeah, this part of my E-mails.

Q. And I am just going to ask you about a couple of things you say in it. So the first thing I am going

MAGNA
LEGAL SERVICES

Page 242

to ask you about is they are trying push through a contract with no specific time off. I don't think that makes sense anymore.

What were you referring to there? And you can take your time to read E-mail.

(Reporter stopping proceedings. Simultaneous speaking.)

A. Okay. Sorry.

I am going to read the one below so I understand what my response to the contracts was.

Q. Yeah. That's what I said, feel free to take your time to read it from the bottom up.

A. From the bottom up. Let me go all the way down then. That makes sense. Just a second.

Okay. I got it.

Q. Okay. So what are you referring to there when you say they were trying to push through the contract with no specific time off written in. I don't think that makes sense any more?

A. Yeah. What I meant by that, is that this initial contract that was sent to me to review with my lawyer didn't have a number of weeks off. So I was wasn't ready to sign a contract that didn't talk about time off more specifically.

Q. Time off for you more specifically?

Page 243

A. I was used to -- the contracts I had signed was a set number of days, or whatever. I wasn't familiar with Centura's boiler plate contract that kind of leaves that vague. And so I thought that that actually had been some sort of an error, by them not putting in time off into a contract.

Q. So it was your contract that you are referring to there?

A. I think so. Yeah.

Q. Okay. Just checking. And it says they don't make sure have negotiation edge now, dot dot dot, seriously. What's that referring to there?

A. Just all the chaos that was going on, and that we didn't know who was going to be where. They didn't know if I was coming back or not. I didn't know if I was coming back or not. And so I felt like they should be answer my requests for specifics on time off.

Q. What do you mean, they didn't know if you were coming back?

A. I had indicated after, you know, after the events earlier in that week, on the 25th when Dr. Peddada sent his note, before that we had talked about with Crist, just, you know, if we were going to work side-by-side at different places.

When that happened, I felt like there was too

Page 244

much chaos. And I couldn't necessarily trust that this was going to be a good set up for me. And I was questioning whether I was going to leave at that point.

Q. Okay. And had you had those conversations with anyone at Centura?

A. Oh, yeah. They knew I was considering leaving.

Q. And do you know what Dr. Kathpal was referring to when she says, but I also agree that he is not coming back?

A. I think Crist and I discussed some of this. There was some indications that he had given, you know, that he was not -- he wasn't as engaged in making the schedules. He had taken down some of his personal property from the department. And staff had questioned that as maybe a sign that he was leaving.

Q. And then Dr. Kathpal says hopefully someone will set a deadline for the contract signing, and we can have an answer before June.

What did you understand that to mean?

A. Just that we needed to get on with who was going to be staffing the clinic, and we needed to make, you know, the necessary accommodations with credentialing and all of that. And there was a bit of a time crunch for getting some of this done.

Page 245

Q. Did you have a discussion with anyone about setting a deadline for Dr. Peddada at Centura for Dr. Peddada to sign his employment agreement?

A. I did not.

Q. Do you know if Dr. Kathpal did?

A. Did Dr. Kathpal? I am not aware. She didn't tell me that.

Q. You didn't discuss that?

A. No.

Q. Okay. And you did not ask about a deadline that you were asked to sign your employment contract by, is that right?

A. No. There was no deadline, just the general sense that the sooner the better for getting all this done.

(Exhibit 30 identified.)

Q. Okay. And let's go to the next one, the next E-mail, which is Exhibit 30.

This one is the one that says not coming back E-mail follow up.

A. Okay.

Q. This is Exhibit 30. It is PSF Peddada 1026 to 1027. Dr. Monroe, have you seen Exhibit 30 before?

A. Yes. This is my E-mail.

Q. Okay. And you can take a minute to read it.



Page 246

I am going to ask you about it. So if you need to read it from the bottom up. You know, feel free to read it, so you can familiarize yourself with this E-mail chain.

A. Okay. Okay.

Q. So if you could go to the top of the first page of Exhibit 30. And it's this is part here. I am just going to ask you, you say, I am getting the impression they are done, but I need to hear it before I commit long term.

What are you referring to there?

A. The sense that I was no longer interested in working in same place as Peddada. They had told me at the meeting on the 27th that they were not planning on bringing him back, but they were not definitive. And so I was waiting to hear whether he was coming back so I could decide whether I would sign on or not.

Q. You say impression that they are done, so you are referring to Centura employing Dr. Peddada?

A. Yes. Well, based upon my conversation where they said they were not interested in bringing him back. That was what I was referring to.

Q. Okay. And then you say, no way I am staying if he is welcomed him back with open arms.

Did you indicate that to anyone at Centura that you were planning on leaving if Dr. Peddada

Page 247

returned?

A. Yes. I don't think I was quite that direct with them. But I said I need to know if you are going to bring him back because it is going to affect what I do. The implication would be that I was going to walk.

Q. Okay. Do you recall who you told that to?

A. Yeah. There was an E-mail to probably Jeff Albert.

Q. Okay. Did you do that by E-mail?

A. Say again?

Q. You think you did it by E-mail?

A. Yes.

Q. Any verbal conversations?

A. On the 28th I don't recall any, around the time of the E-mail. I talked to them on the 27th with Dr. Erling and all those guys.

Q. Okay. And you told Crist about that conversation already?

A. Yeah. We discussed that.

Q. Okay. And then so circle back on the locums, that is what you are referring to when you had locums cover you when you were on vacation?

A. Yeah, because Dr. Kathpal was also affected and we needed locums coverage.

Q. You say, we shouldn't kill ourselves over a

Page 248

problem he created.

What problem are you referring to?

A. The staffing, the immediate staffing issue when he left.

Q. So you think Dr. Peddada created that problem when he took medical leave?

A. I think he created a problem for us, in the sense that we had to now find staffing.

Q. You say we should plan typical vacation time as close we can. What are you referring to there?

A. I guess I meant as close as we can to the actual time so they have time to set up the locums.

Q. Okay. And then I am going to go down a little bit to Dr. Kathpal's message under yours.

A. Okay.

Q. Dr. Kathpal says, does it say anywhere in the contract that he has full rein over decisions like that and it only takes his signature to reinforce.

Do you have any understanding? How did you interpret that? What did you think that meant?

A. Well, yeah, if you look at the E-mail, it is referring to his extension of our contract to cover the month of July.

Q. Okay. And then Dr. Kathpal says, he hasn't signed his contract yet, right? Did they mention

Page 249

anything about a deadline? I hope they are mad and done placating him.

What was Dr. Kathpal referring to there? Do you understand?

A. Yeah. There some confusion about whether Peddada had signed his contract when we had that meeting on the 27th. I think they had a partially signed contract and not a full contract or something.

Q. Did they mention anything to you about the deadline in the meeting?

A. There was no mention of a deadline that I recall.

Q. Did you initiate a deadline?

A. I never initiated a deadline.

Q. And did you mention a possibility of putting a deadline on it to anyone at Centura?

A. No.

Q. And why would they be mad, if you know, in the response to the conversation with Centura?

A. Trying to read Madeera's mind, I would suspect that it was because he pulled out of our clinic with short notice. And I think that's what she was referring to.

Q. Okay. And then after that, in this message below the one we just discussed on the first page --

MAGNA
LEGAL SERVICES

Page 250

A.   Uh-huh.

Q.   -- you say basically he set up the corporation to be on the hook for coverage and then decided to claim a disability, justified or not.  It's a pattern of behavior that shouldn't surprise me, but is still so disappointing.

What are you referring to there?

A.   So there was a lot of discussion with Crist about this before you joined, but many times over my career he would come back when we had an agreement for compensation, and he had asked for additional monies outside of the agreement.  And so that was what I was referring to.

Q.   But it said --

A.   I felt like he was using the last three months to make me work for three months, and he would get paid for that time.  And this was a way of him getting compensation in some way.

Q.   Okay.  So you meant claiming that he had a disability?

A.   I was really, I mean that he knew that claimed a disability because he had sent me the E-mail about it at that point.  But I was talking more about him leaving the clinic on short notice and having set up our practice to cover the last three months.  That's what I

Page 251

talking about.

Q.   And what do you mean by justified or not, to claim a disability justified or not?

A.   I didn't have any information about his disability.  He had only E-mailed me that he was going out for health reasons at the request of his primary doctor or something.  And so I didn't know anything about the disability.  That's why I said justified or not.

Q.   Have you ever -- and if you discussed -- have you ever had any training on the Americans with Disabilities Act?

A.   I've never really looked into it.  No.

Q.   No one has trained you on it?

A.   No. I might have had -- you know, you do all of those, like, trainings before you start a job and there was probably something about it on there, yeah.

Q.   Do you recall actually doing some training on ADA?

A.   Yeah.  No, I remember seeing something about it.  Yeah.

Q.   Okay.  What do you recall?

A.   Reading some passages and answering some questions, but --

Q.   Do you remember what the passages were about?

Page 252

A.   No, I don't.  Sorry.  It was like hours and hours of stuff that you do when you come on to a job.

Q.   When did you take this training?

A.   Probably July I would guess.  June or July, before I started my job with Common Spirit Centura.

Q.   Okay.  But this was more recent then?

A.   This was after this, yeah.  So had I looked at the ADA stuff when these E-mails were going on, probably I wouldn't have had a real reason to know anything about the specifics of ADA.

Q.   Yeah.  I just didn't know if you received any understandings or had any understanding about accommodations or --

A.   Yeah.  Not that I can recall.  I mean I certainly think disability is an important issue.  And it isn't because I wasn't interested.  It was just that I didn't have a reason to look into it.

Q.   Okay.  But did Centura train you on it?

A.   When I took my employee job, they did.  Yeah.  I remember answering, I think they had something in the on boarding.  There was like a week of stuff that you do all those things on line.  And there was some stuff about Disabilities Act in there I believe.

Q.   Was that the one you were just referring to for Common Spirit, or was there another one?

Page 253

A.   No.  The one when I joined -- I didn't join Common Spirit.  I joined Centura because common Spirit took over later, right.  So it would have been Centura, sometime around the time I started my employment I think.

Q.   Okay.  Any other training that you can think of that you might have taken on the Americans with Disabilities Act?

A.   Not that I can recall.

Q.   So what was your understanding being justified claiming disability, your understanding?

A.   I wasn't really in a position to make a judgment on whether it was justified or not.  I simply put that in there because I didn't know what his disability claim was.

Q.   Okay.  And then you asked, I have another call with my lawyer Friday afternoon, maybe you can run this past your sister for an opinion.

What are you referring to there?

A.   Dr. Kathpal's sister was an attorney.

Q.   Okay.  So what is the this?

This, are you referring to your employment contract, Dr. Peddada's disability leave?

What are you referring to?

A.   Yeah, I don't know.  I wasn't very specific in

MAGNA
LEGAL SERVICES

Page 254

the E-mail. I don't really recall what that was specifically in all of this.

Q. When you say, I am not sure they will honor his employment agreement. That's referring to Dr. Peddada?

A. Yes.

Q. Is that also discussed in the meeting the day before on the 27th, or I guess it's that day?

A. This says 4:37 so this would have been after that meeting.

Q. Is that what you are referring to when you said I am not sure they will honor his employment agreement?

A. Yeah. Because they had said in that meeting, which I think was over lunch, that they were not planning on bringing him back, and that they were not sure whether the contract had been signed. There was a lot of questions. That's what I was referring to.

Q. And when you say as he seems to be giving me the middle finger on his way out the door.

Please explain that.

A. I kind of explained that to Crist already. I felt like he was trying to get money out of me. He had made a request for money in an E-mail in February. He had threatened a lawsuit against me, all these kind of

Page 255

things. And then the timing of the whole thing, setting it up, it felt like he was trying to get extra money from me on his way out the door.

Q. You didn't really think he had a disability?

A. I didn't -- I wasn't in a position to know what his disability was he was even claiming.

(Simultaneous speaking.)

Q. Okay. But you thought he took time off to try to get back at you?

A. I thought that there was a motivation potentially because of what he had said, and I felt like the timing was suspicious because I had seen him have stress problems for many, many years. And so why does it all of a sudden come up on the Monday of the week that he happens to be off right before the three months that ended our practice. So, yeah, I was suspicious.

Q. And on the last page, the second page of this exhibit you say, he has set up us for a cluster.

I assume you referring to a cluster fuck, right?

A. I don't know if I could curse on this, but yes.

Q. Yeah. It's okay. We love curses.

So what are you referring to there, the same thing?

Page 256

A. Just the whole, like, mess at the clinic. Right? Like, I am now by myself at Penrose managing 50 patients by myself, with no back up.

Q. You were really upset that week, I heard.

A. That was a pretty stressful week, number two in my life. Yes.

Q. And then let's turn to -- almost done here.

A. Okay.

(Exhibit 31 identified.)

Q. Response Peddada Complaint, that would be Exhibit 31.

A. What's the number on it? The PSF number.

Q. Yeah. I am trying to look at it here. Exhibit 31 is going to be PSF Peddada 1024.

A. Got it.

Q. And you haven't seen this E-mail, and I am asking you if have seen it, but I don't believe you are carbon copies to it but --

A. No. I have not seen it before. I think last week maybe I saw it.

Q. So you did see last week?

A. Either that -- I might have seen it at lunch day. I was looking through -- No, I don't know, slanderous. No, I don't know that I actually saw this before. Certainly not before today, I can tell you that

Page 257

much.

Q. Okay. I am going to just refer to first message there from Dr. Koval. Not sure when this language may have been used, but myself, Natalie, Teresa, Drs. Monroe and Kathpal all met this afternoon and discussed using neutral language in our messaging.

Did you discuss that meeting with Crist already?

A. I don't think we did talk about that.

Q. Okay. What -- do you recall having this meeting or did that not happen?

A. If Eric says it happened, I have no reason to think it didn't. I don't -- I mean that was a very, very busy week. I don't specifically remember the meeting where we were told to use neutral language, but I could imagine where that would have been appropriate for him to say.

Q. But from your personal knowledge, do you recall actually having a meeting where you discussed neutral language in messaging?

A. There were so many meetings that week about logistics, I think probably there was something said by Eric during one of those logistic meetings about needing to keep this professional, and et cetera. So, yeah, I think Eric did say that.

**MAGNA**
LEGAL SERVICES

Page 258

Q. Do you recall him saying that? I am just trying to see what you remember.

A. Yeah, I seem to recall that.

Q. Okay. Do you remember anything else about that meeting or that discussion?

A. I think I agreed to try use neutral language and be appropriate.

Q. Do you -- had you been a referring to Dr. Peddada's mental health condition before that?

A. I had written him an E-mail where I said, you know, whatever you need to -- if you are having a mental issue, I want you to take whatever steps you need to get it taken care of.

I think he took some exception with the fact that I jumped from health condition to mental health issue, but it was based upon, as we discussed previously, you know, years of stress and burn out kind of stuff. So I made that assumption.

(Exhibit 32 identified.)

Q. Okay. And that's about all the questions. This is last one I am going to ask you about. This is out of order, so I apologize. This going to be Exhibit 32, I believe.

A. Okay.

Q. So if you can open settlement PSF Peddada

Page 259

1006. Do you have that open, Dr. Monroe?

A. I am looking now. 1006?

Q. Uh-huh.

A. I found it.

Q. Okay. This is going to be Exhibit 32 I think.

Dr. Monroe, have you seen Exhibit 32 before?

A. Yes. It is my E-mail. I'll claim this one.

Q. And it's referring to this five year repayment term?

A. Yep.

Q. Okay. Now it says per HIPPA, the hospital claims that they cannot waive this.

What are you referring to there?

A. I think if they give a doctor something of monetary value it violates HIPPA, not HIPPA, but maybe I meant Stark.

Q. Okay. Do you recall any conversations about discussing any laws that were -- that might be violated, that might be violated in this first agreement?

A. I don't. Just the fact that they couldn't just write it off. It would be an inducement or something.

Q. Do you recall conversations where you discussed Stark or HIPPA?

A. Yeah, I remember talking to Terry through this

Page 260

E-mail about this issue. I remember this E-mail.

Q. Yeah, I am asking it's a little different question. Do you remember any conversations with Centura about it?

A. Oh, no, no, I don't.

Q. Okay. I don't have any additional questions for you. Thanks so much for being willing to kind of go through the last set of E-mails at the last second. I appreciate it.

A. Thanks for getting it all done in one day. I appreciate it as well.

MS. MCMANUS: Nothing from us.

I would Jeff I do not want a copy.

MS. HALPERN: I just want an E-tran for now. I do not want a paper copy.

REPORTER: To you, Ms. Halpern?

MS. HALPERN: Crist and I are in the same office, so sure.

MR. WHITNEY: Either way.

REPORTER: How about you Ms. McManus.

MS. MCMANUS: We will do an E, as well. And then if you want to send the read and sign to us, that would be great.

(Proceedings concluded at 4:32 p.m.)

Page 261

JURAT PAGE

I, ALAN MONROE, M.D., do hereby certify that I have read the foregoing transcript and that the same and accompanying amendment sheets, if any, constitute a true, and complete record of my testimony given at said time and place, except for the corrections noted.

_____
Signature of deponent

( )No amendments      ( )Amendments attached

Subscribed and sworn to before me, the Undersigned Notary Public in and for the State of _____, by said witness, _____ on this _____ day of _____ 2024.

_____
Notary Public

MAGNA
LEGAL SERVICES

Page 262

Page 263

C-E-R-T-I-F-I-C-A-T-E

STATE OF COLORADO

COUNTY OF GUNNISON

I, Ruth E. Collins, Certified Shorthand Reporter within and for the State of Colorado, certify that the above-named witness was sworn, that the deposition of ALAN MONROE, M.D. was taken in machine shorthand and thereafter transcribed; that it is true and correct;

And that it was taken on October 30, 2024 in Gunnison County, State of Colorado pursuant to Notice and Agreement by ZOOM video teleconference, and that said witness has requested to read and sign the deposition transcript;

That I am not an attorney for nor relative of any of said parties or otherwise interested in the event of said action.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal this 13th day of November, 2024.

_____

Ruth E. Collins, CSR

## A

**a.m**
 1:19
**abandon**
 53:25
**abandoned**
 96:6
**Abhinand**
 104:20,22 105:10
**ability**
 122:3 154:10
**able**
 6:5 14:17 23:19
   39:13 51:18 53:1
   67:16 75:5 94:23
   123:19 128:13
   132:22 206:25
   211:1 228:8 236:1
**above-named**
 263:6
**ABR**
 18:11,13,21
**abrasive**
 121:16
**abrupt**
 121:15
**abruptly**
 109:20
**absence**
 183:12
**absences**
 155:20
**Absolutely**
 121:25,25
**academic**
 19:6 36:17
**academics**
 19:2,5,6 39:7
**acceptance**
 95:8
**accepted**
 20:16,17 34:10 222:5
**access**
 9:2 44:1 69:6
**accommodations**

 244:23 252:13
**accompanying**
 261:6
**account**
 92:7 101:10 143:10
**accountability**
 141:15
**accountant**
 37:20 222:25
**accounting**
 223:7
**accounts**
 101:12 143:12
**accurate**
 127:15 145:5 165:6
   179:12 200:7
   203:12
**acknowledge**
 162:4,7 178:21
**acknowledged**
 162:2
**ACR**
 22:12
**Act**
 251:12 252:23 253:8
**action**
 263:18
**active**
 96:24
**actual**
 19:10 134:7 230:2
   248:12
**ADA**
 251:19 252:8,10
**Adams**
 178:8
**add**
 72:16 123:25 142:22
   174:5
**added**
 121:7 190:5 235:20
**addendum**
 73:18
**adding**
 119:24 129:12
   239:14

**addition**
 236:22 237:18 238:8
   240:9
**additional**
 12:23 37:15 48:11
   56:16,23 57:16
   58:13 70:15 73:5
   74:11,25 129:10
   175:15,20 185:15
   185:19 188:24
   190:4 205:23
   212:23 239:1
   250:11 260:6
**address**
 222:20 234:16
**addressed**
 58:18 100:10 178:12
**addresses**
 214:23
**addressing**
 178:11
**adequately**
 157:6 178:12 230:19
**administration**
 84:20 87:18 114:9
   117:12 145:11,12
   177:6 187:5 204:19
   224:3 239:21
**administrative**
 215:25
**administrator**
 65:17,19,21 66:3,5
**administrators**
 76:9 177:2
**admired**
 50:5
**admit**
 185:10
**admitted**
 231:21
**admitting**
 61:11
**advance**
 180:12 192:12 202:6
**adverse**
 160:2

**advertise**
 29:11 42:8
**advertised**
 42:15
**advertising**
 29:4,17 42:12,22
**advice**
 26:8,9
**advise**
 183:9
**advisory**
 89:12
**aesthesio**
 17:17
**affect**
 6:1 63:24 247:4
**afternoon**
 190:9 253:17 257:5
**aggressively**
 57:7
**ago**
 20:16 33:3,4 37:7
   49:22 54:12 86:19
   170:25 179:9
   210:19 234:2
**agree**
 73:12 100:22 127:20
   181:16 244:9
**agreed**
 56:5 57:4 68:19 71:8
   134:22 152:11
   215:2 258:6
**agreeing**
 128:15 134:20
   229:16
**agreement**
 3:6,18 56:12 71:6
   85:1 89:21 90:5
   93:11 98:3,14,24
   127:8,12,16,19
   128:20 129:6,16
   130:23 134:2,12
   136:14 152:10
   167:1 180:17 200:5
   200:8,12,17 201:15
   203:11,15,16,17



204:1,8 209:21,25
210:1 212:10
214:13,14 215:2
218:20,20 220:12
221:7 222:1 224:9
231:5,12 233:2
236:6,7,10 237:23
238:7,7 239:15,16
240:9 245:3 250:10
250:12 254:4,13
259:19 263:12
**agreements**
105:23 134:5 220:18
**agrees**
201:17 202:23
**ahead**
7:9 27:17 54:2
108:22
**ahold**
205:10
**Alan**
1:12,16 4:7 188:14
220:9 234:16 261:4
263:7
**Alber**
150:7
**Albers**
146:19 149:25 150:1
**Albert**
150:15,23 151:2
178:9 186:16,23
187:3 188:18
190:12 191:23
205:3 215:21 217:2
217:3,5 225:23
239:21 247:8
**Albert's**
152:13 204:18
**Algia**
31:8
**alive**
230:1
**allegations**
156:17
**allegedly**
156:25

**allow**
5:8 62:12
**allowed**
96:12
**allowing**
218:21
**alongside**
111:6 140:20
**altercation**
54:4
**alternate**
20:24
**alternative**
175:17
**amenable**
187:18
**amended**
236:6
**amendment**
261:6
**amendments**
261:13,13
**America**
30:14
**American**
18:11,14 22:12 30:17
**Americans**
251:11 253:7
**amount**
37:21 45:5 57:22,23
63:13 65:2 76:6
201:13,25 203:6
**analyses**
126:1
**Anderson**
145:16
**Andrew**
15:23 86:2
**anger**
54:14,18,20 122:1
155:6 162:21 163:1
163:6,8 164:6
169:24,25
**angry**
54:25 106:20 163:11
206:16

**annual**
18:5
**annually**
75:16
**answer**
5:8,13,20,22 7:22
26:19 77:10 102:21
129:3 138:16
163:10 243:17
244:19
**answered**
218:18
**answering**
251:23 252:20
**answers**
5:2 77:22
**anti**
137:9
**Anuj**
1:6 4:3
**Anuji**
104:22 188:13,15
190:11
**anxiety**
172:12
**anxious**
172:14
**anybody**
7:20 48:19 77:19
171:25
**anymore**
190:16 209:18 242:3
**Anyway**
58:12
**apologies**
8:2 17:17 110:20
**apologize**
225:1 258:22
**apparent**
115:14
**APPEARANCES**
2:2
**application**
24:14,18
**applications**
198:18

**applied**
22:7,10 74:6 95:17
138:1 146:8 150:16
150:16 151:23
**apply**
140:25 142:25 143:2
143:3 146:8
**appreciate**
260:9,11
**appreciated**
108:25 239:2
**approach**
14:9 100:4 111:25
**approached**
113:1 114:21
**appropriate**
56:6 169:3 257:16
258:7
**approved**
205:22,23
**approximately**
113:19
**April**
183:5 188:7 203:18
203:20 204:15,21
209:4 210:19
214:19 221:6
232:19,19 237:5
238:2,9,15,16,16,24
239:19
**area**
10:18 193:6
**areas**
16:9
**arguments**
20:14 75:14
**arms**
246:23
**arrange**
167:1
**arrangement**
69:11 71:12
**arrangements**
62:2
**article**
130:14 132:19



201:11
**articles**
16:12,13,16 19:17
**ASAP**
183:8
**aside**
63:10 103:6 116:1
123:2 154:25 173:7
**asked**
26:7 30:8 35:7 49:22
51:17 53:17 56:23
58:15 63:1 66:1,11
68:21 73:4 78:5,6
99:16 103:4 105:7
118:4 150:24
156:19 174:25
175:15,21,25 189:3
190:4 192:8 193:20
196:8 199:13,15
213:8 215:13
221:21 225:10
240:6 245:11
250:11 253:16
**asking**
5:21 47:23 56:25
68:15,22 69:8,17
71:22 72:11 74:10
82:17 91:25 98:13
113:18 135:5
151:15 174:7 176:3
184:20 224:13
237:12 256:17
260:2
**aspects**
194:19 199:1
**assessment**
192:18
**assessments**
158:15,18
**assigned**
95:14 227:3
**assistance**
129:13 152:5 171:14
221:12 224:11
229:6
**assists**

222:11
**associations**
119:5
**assume**
63:8 67:17 86:24
140:9 145:10
148:10 151:17
189:17 202:6 203:5
224:12 235:1,2,17
235:19 255:19
**assumed**
18:19 167:9,10
175:24 183:21
**assuming**
241:15
**assumption**
84:19 174:19 181:24
183:24 185:18
258:18
**Astro**
11:14 17:21,22,24
18:5,18 20:4,9 21:9
21:13 22:2,4,13
23:1 24:21 91:2,7
104:22 124:6
**atmospheric**
80:22
**attach**
22:14 92:11
**attached**
261:13
**attachment**
130:22 235:1 237:14
**attack**
114:20
**attempt**
110:9 112:22 188:15
**attempts**
113:13
**attending**
21:6,7
**attention**
127:21 130:1 131:20
163:13,19 164:18
179:5 181:13 182:1
182:2 194:12

195:13 197:15
198:14 201:9
**attorney**
5:17,19 7:5,10
113:17 115:19
219:19,22,23
220:12,14,15,19
233:5,7,20 234:3,4
234:22 235:10
253:20 263:16
**attorneys**
1:17 9:25 115:22
**audio**
64:11
**August**
196:23 199:16
211:22 214:21
228:10
**automatically**
149:9,16 167:13
**automobile**
42:19
**autonomy**
141:12,13
**available**
9:5 46:11 53:7 59:19
68:3 123:12
**average**
35:14,21,23 64:10,12
75:15 215:3
**averaged**
78:13
**avoid**
143:23
**award**
28:22 42:22
**awards**
21:18,19 28:14,17
**aware**
28:13,15 29:3 30:9
30:20 60:23 63:15
83:5 90:16 98:2
101:2 123:18
156:18 157:9
158:11 171:5,8
173:2,6 180:19

205:21 206:4
228:13,15 245:6
**awareness**
43:6
**awesome**
42:23
**awfully**
88:4
**awhile**
33:3 43:17 117:21
166:6 193:15

---

**B**
**B-R-U-E-N-S**
66:4
**back**
7:7 11:20 34:20
35:12 38:14 51:3
54:11 55:10 56:22
58:4,16,19 60:1,11
73:1 78:4 80:12
81:23 82:14,16 87:1
92:11 95:17 100:11
100:21 102:24
119:24 122:12
123:7 126:16,21
127:3,3 133:4
135:21 136:14,16
136:19 150:14
155:7 157:11
174:12 175:13
176:24 183:5 189:4
189:7 190:14
191:22 192:15
199:16 205:7 207:1
207:5,8 209:12
210:14,18 211:21
211:23 212:7,10,14
213:4,19 214:3
221:1 229:11
235:10 240:14
241:5,6,9,11 243:15
243:16,19 244:10
245:19 246:14,15
246:20,23 247:4,20
250:10 254:16



255:9 256:3
**background**
10:12 14:8 186:3
**bad**
4:22 53:18,24 91:12
117:24 122:14
165:11 175:6
223:13
**balance**
39:4 63:7 82:1,7
122:11 202:2
**Bali**
81:17
**ballpark**
71:5 78:15
**bank**
143:10
**barring**
75:10
**base**
91:11
**based**
10:20 19:18 33:15
42:3,19 47:23 65:2
73:15,23 74:2 76:21
88:11 97:19 105:15
115:18 145:23
146:2 152:12
246:19 258:16
**basic**
119:14 120:7 213:3
**basically**
37:14 39:18 54:4
58:18 60:6 61:13
71:1,6 90:10 100:16
128:15 175:17
250:2
**basing**
192:19
**basis**
74:19
**bat**
100:10
**Bates**
149:11 220:23
**bathroom**

45:9 187:9
**batteries**
82:4
**battle**
184:16
**beam**
79:20
**bearing**
223:6
**becoming**
62:10 106:19 121:15
**began**
110:21
**beginning**
1:18 26:3,4,17 27:1
27:12,19 28:3 37:2
46:2 59:17 64:13,19
65:9 120:2
**behalf**
1:17 4:6 134:9
135:10
**behavior**
141:17 157:18 250:5
**believe**
22:6 23:3 24:22
34:16 62:7 71:14
92:2 96:24 104:3
109:23 112:9
134:14 144:4
152:12 158:22
170:18 172:21
174:8 179:1 186:5
188:22 189:11
199:14 200:14,24
227:19 232:15
233:8 241:17
252:23 256:17
258:23
**believes**
188:14
**belive**
87:4
**belonged**
77:18
**benefit**
41:9 53:1

**benefits**
77:4,5 198:22 212:6
**benefitted**
77:12
**benign**
14:15 119:12
**Bentley**
86:22
**berate**
153:18
**best**
41:1 55:6 62:3 67:13
79:15 82:7 88:12,22
96:18 119:24
154:10,12 166:21
170:24
**better**
10:11 28:2 40:3
75:21,22 122:24
138:8 154:18
161:12 162:3
163:10 181:14,19
181:22 206:14
216:19 217:14,16
217:17,18 245:14
**beyond**
56:17 135:11
**big**
12:14 37:22 38:7
45:5 62:19 108:8
122:3 174:10
185:24 192:13
212:20 216:5
**biggest**
42:12 56:11 75:1
123:5
**Bill**
205:2
**billboards**
29:4
**billing**
51:2 64:17 65:2,8
87:8 88:23 143:8
**bills**
229:25
**Biology**

17:5
**birthday**
27:16 53:14,15,17
55:2,4,6 56:10 61:2
61:21 103:7 121:17
122:1,4
**Bishop**
225:25
**bit**
17:22 21:23 31:14
35:3 38:16 47:22
48:9,10 50:1 53:17
62:3 66:20 74:5
76:5 78:4 100:19
103:4 121:11 125:4
137:5 185:8,22
196:2 209:2 218:16
218:23 220:17
228:9 229:10
244:24 248:14
**black**
76:9
**blastoma**
17:17
**blinking**
135:1
**blocked**
123:15
**blue**
101:21
**blues**
102:6
**board**
18:11,14,15 89:13
95:8 141:16
**boarding**
252:21
**boiler**
232:1 243:3
**bonus**
69:20,21,25 70:1,4
**booked**
123:11 181:3,5
**born**
80:11,16,19
**borrowed**


MAGNA
LEGAL SERVICES

62:21
**bother**
151:20,22
**bothered**
151:23
**bottom**
97:4 119:16 130:4
131:5 133:18 235:8
241:19 242:12,13
246:2
**bought**
67:1 80:3 86:11
**bounce**
79:24
**bouncing**
92:10
**bound**
134:11
**bouts**
162:20 163:6
**Bowling**
10:16,17,22
**box**
147:6,7
**brain**
89:15
**branch**
74:1
**brand**
125:8
**breaches**
153:3
**break**
41:9,11 45:8,9,12,13
81:3 82:17,20,25
113:14,22 115:13
115:21 116:3
126:10,20 140:5
150:14 187:12
188:20
**breakdown**
125:24
**breakfast**
23:2
**breaking**
90:18

**breakup**
57:13
**breast**
16:21 49:8,12,15,18
**Brian**
145:14 190:9 205:2
**bribes**
137:3
**briefly**
110:3 128:2 195:14
**bring**
68:14 94:7 100:11
114:22 123:22
124:12,14 128:17
129:10 142:17
154:16 157:12
167:25 247:4
**bringing**
64:16 134:21 142:11
142:15 204:20
205:7 209:11
210:18 246:14,20
254:16
**broad**
14:17 88:4 182:8
**broader**
171:11
**broke**
168:8
**broken**
81:5 131:18
**brokered**
114:2
**brother**
104:19 105:3,4,18,20
**brought**
10:24 43:15 44:8
47:20 68:13 70:23
76:1,22 77:20,21
84:10 86:13 89:13
108:14 158:14
171:12
**Bruen's**
89:5
**Bruens**
65:23 66:4 97:15

**build**
89:15
**building**
179:23
**built**
62:19 81:14 147:16
**bullied**
57:8
**bullying**
109:8 113:2
**bumping**
211:15
**burden**
50:22 53:6
**burn**
169:22 170:1,7,13
173:2,15,16,21,25
174:2,3 258:17
**burned**
173:22 175:8 189:16
**busier**
48:11,15,16 78:25
79:1
**business**
30:4,5 46:13,16 47:8
48:21 50:21 51:19
52:3,10,13,23 57:21
63:19 66:10,25 67:2
67:10 72:18 73:3
80:3,6 87:15 89:11
124:11 148:21
155:17
**busy**
13:5 28:10 36:18
53:3,4 58:8 76:20
79:13 120:20
129:11 147:2
152:25 163:3 175:4
207:3 227:2 257:14

**— C —**
**C-E-R-T-I-F-I-C-...**
263:1
**cafeteria**
68:1
**calculations**

195:1,2 197:23
**call**
21:20 41:18 58:7
83:15 92:14 98:23
102:24 109:9,10
110:15 111:23
116:6 117:18 151:4
155:18 206:9 227:4
253:16
**called**
17:4,7 35:25 37:14
52:16 53:3 54:5,7
86:12 89:12 147:5
150:15 151:3
171:25 219:2 241:4
**calling**
184:23
**calls**
98:21 99:1 102:20
205:12
**Camberg**
147:21
**camera**
121:4 218:10,10
**cancer**
14:13 16:11,21,21,22
46:1,2,4 48:21 49:9
49:12,15,18 70:25
71:2
**capture**
176:8
**capturing**
195:21
**car**
24:21 25:2 42:20
**carbon**
256:18
**cards**
210:20,21
**care**
14:13 38:13,15 49:3
58:20 59:4 60:16,18
63:22,25 71:11 88:1
88:9 89:3 90:25
91:5 115:2 116:19
123:14 136:22


MAGNA
LEGAL SERVICES

138:12,15,19,20,23
139:9 166:22 181:2
181:18 204:3 207:4
258:13
**cared**
81:7 181:17 191:15
**career**
20:3 27:12,15 163:17
175:14 189:9
250:10
**careful**
183:9,13
**caring**
78:2
**cart**
81:5
**case**
1:3 5:22 6:9 9:9
31:18 48:25 58:6,9
58:10,12 84:11
193:22
**cases**
6:12,15 13:7 26:8,10
28:9 64:4 88:25
91:3
**catastrophic**
211:9,10
**catatonic**
169:11
**catch**
161:4 218:7 223:18
235:14
**CATHOLIC**
1:9
**caught**
220:13
**cause**
108:23
**caused**
100:12 154:11
**cautious**
101:24
**cc'd**
240:2
**center**
19:7 35:6 67:1,18

70:25 71:3 80:5
125:7 142:22,22
**centers**
15:11 67:2 125:8
142:20 230:19
**Centura**
1:9 6:13 7:1 8:6 9:12
9:24 29:3 76:1,5,22
77:15,25 83:5,9,10
83:13,14,22,22,23
84:7,12,20,24 85:11
86:7,9,15 87:7 88:1
88:8,13,24 89:19
90:3,7,20 91:14,18
98:8,18,20 99:7
100:25 109:25
111:10 112:15
114:1 115:8 116:22
134:16 135:7
136:10 137:13
139:8,24 141:4,17
141:21 142:4,24
156:20,20 157:5
171:12 190:18
193:10 196:9,12
199:10,14 200:5
203:25 204:6
210:25 211:4,17
212:1,7,14 213:22
213:25 214:6,25
215:4 216:4,15
220:9 221:7,22
224:6,15 226:23
227:10 228:2,4
230:3 232:1,22
235:7 244:5 245:2
246:18,24 249:16
249:19 252:5,18
253:2,3 260:4
**Centura's**
193:21 197:13 208:2
243:3
**CEO**
145:14
**certain**
76:8 215:17

**certainly**
26:21 117:11 119:21
138:5 176:18
178:17 210:17
252:15 256:25
**Certified**
263:4
**certify**
261:4 263:6
**cetera**
257:24
**chain**
220:6 240:22 246:3
**chance**
4:14 107:1,7 112:8
128:8 187:21,24
**chances**
115:17
**change**
47:9 75:5 122:3
177:2 213:6 235:11
235:15 236:15
237:10
**changed**
73:13,17 103:1
177:10
**changes**
73:11 107:18 162:2
194:24 195:1
**chaos**
190:14 243:13 244:1
**charge**
85:7 95:14
**charged**
132:12
**check**
182:19
**checking**
243:10
**Chicago**
11:19 14:22,24 16:1
25:5,7
**child**
54:5
**chime**
45:12

**choice**
139:23
**choose**
29:18
**choosing**
93:1
**chose**
148:7
**Chris**
225:20
**Christmas**
41:8
**circle**
247:20
**circumstances**
74:9 75:10 191:13
216:25
**circumstantial**
192:19
**cities**
12:15
**city**
61:9
**Civ**
1:15
**claim**
6:23 250:3 251:3
253:15 259:7
**claimed**
250:21
**claiming**
250:19 253:11 255:6
**claims**
259:12
**clarify**
84:1 184:11 189:23
**classes**
54:21 169:25
**clean**
5:9
**clear**
83:10,16 84:17,22
112:17 151:24
239:3
**clinic**
20:25 26:22 44:9



45:24 54:15 55:6,12
125:12 204:4
212:19 227:2
244:22 249:21
250:24 256:1
**clinical**
30:21 65:7 88:18
**close**
42:20,21 61:11 72:13
105:23 248:10,11
**closed**
80:15 143:10 190:6
**closing**
143:4,15,21
**clubs**
103:14
**clues**
111:20
**cluster**
255:18,19
**coauthored**
31:1
**coauthors**
30:23
**colds**
81:3
**colleague's**
164:9
**colleagues**
56:1
**collected**
203:7
**collecting**
88:17 197:25
**collection**
197:24 198:25
**college**
11:5 12:6 22:12
61:16
**Collegiality**
217:18
**Collins**
1:19 263:4,23
**Colorado**
1:2,9 10:25 11:3,4,7
15:1,8,9 19:10

23:25 24:1 25:5,10
25:15,19 34:1 35:1
263:2,5,11
**combination**
26:22 156:6
**come**
11:20 20:17 24:20
37:6,8,11,16,23,25
40:7 44:18 48:18
50:9,24 52:18 53:5
56:14,22 71:12
78:18,23 82:14
87:18 90:10 100:11
111:1 123:7 124:8
126:16 167:8 170:1
171:24 173:5
174:12 180:1 185:4
191:22 192:5
204:18 207:1
209:24 211:21
224:10 227:9
250:10 252:2
255:14
**comes**
41:24 186:3
**comfortable**
34:1,4
**coming**
32:12 43:18 55:7
56:12 61:9,16 68:22
80:1,12 138:18
139:12 143:12
175:7 177:13
184:16 185:14
189:7 192:15
210:14 211:19
219:9 230:11
240:14,15 241:4,6,9
241:11 243:15,16
243:19 244:9
245:19 246:15
**comments**
59:18 158:25
**commercial**
42:16,25 43:4 44:11
**commercials**

42:20
**commit**
246:9
**committed**
212:18
**committee**
95:15,16
**committing**
185:13
**common**
13:18 24:6,8 36:11
36:15 49:9 67:3
83:5,15,19,23 84:10
84:14 159:11
160:15,16 215:1
217:4 227:11 252:5
252:25 253:2,2
**commonly**
13:22
**Commonwealth**
12:5,7
**communicate**
89:2 99:22 101:4,11
102:1,6 113:17,25
115:4,5 138:11
169:5,9,10,15 208:4
208:6
**communicated**
101:20 111:23 208:9
**communicating**
100:2,13,17,25
105:25 106:1,8
111:6 117:15,23
126:5 138:6 159:16
159:18,24 165:14
169:17 205:11
**communication**
113:8 114:12 115:11
116:7,23 125:24
157:14 206:24
208:7 209:13
**communications**
106:21 113:7 195:6
195:21 196:11
197:20 198:17
204:5,7 207:23

**community**
19:8 25:20 27:9 28:7
29:23 31:10 43:6
70:24 107:12
158:15
**company**
86:12 202:2 227:4
229:15 230:5
**compensation**
48:12 50:10 56:16,16
56:23 68:23 73:5
75:3 99:12 121:18
175:15 188:24
189:3 190:5 201:11
250:11,18
**compete**
71:2 98:17
**competing**
80:2
**competition**
66:18,22,23
**compile**
32:13
**complain**
59:8
**complained**
59:14
**complaining**
123:8
**complaint**
3:22 100:9 158:11
256:10
**complaints**
155:25 156:5,7 157:3
157:9,17 158:16
**complete**
12:23 13:20 261:7
**completed**
13:13 171:17
**completely**
38:9
**completion**
16:5
**compliance**
90:24 91:14 133:3
**compliant**



MAGNA
LEGAL SERVICES

107:20
**complicate**
86:10
**complicated**
36:25 73:24 124:23
125:1,2
**complicates**
179:16 180:21,24
**complicating**
180:3
**component**
73:14 85:10
**components**
85:6
**compromise**
74:4 155:10 161:22
187:14
**compromised**
115:3
**computer**
64:11 219:15
**concentrate**
164:5
**concentrating**
162:13 172:19
**concerns**
129:16,17,20
**concluded**
260:24
**conclusion**
107:7 188:14
**concrete**
178:22 192:4
**condition**
258:9,15
**conditions**
14:15 119:12 197:24
198:21
**conference**
20:22
**conferences**
20:2,20,24 30:10,10
30:13
**confess**
94:20
**conflict**

37:12 40:20 44:18
**conflicted**
141:7,8 185:25
191:17
**conflicting**
113:3
**conflicts**
38:12,15 41:14
115:24
**confront**
154:6,11
**confronted**
51:4 72:7
**confusion**
83:24 84:12 249:5
**connection**
98:9 135:4
**consent**
95:4
**consider**
16:14 39:24 60:18
61:23 74:22 125:11
183:22
**consideration**
204:14 205:7
**considered**
34:7 36:18 61:18,19
**considering**
150:19 244:6
**consistently**
169:4
**constitute**
261:7
**consultation**
85:9
**consults**
35:17,23,24 36:13
185:17 215:6
**consuming**
154:20
**contact**
15:15
**contacts**
9:14 115:22
**contentious**
43:16 106:22

**context**
28:20
**contingency**
180:1
**continue**
169:15
**continued**
111:9 116:18 211:18
**continuing**
20:18
**contouring**
161:1
**contract**
33:17,18 56:13,17
57:2,5 70:16 73:11
73:16 75:2,7 87:12
87:16 89:20,21
90:18 97:19 109:3
112:19 131:24
135:23 137:14
138:4 139:25 141:4
141:22 142:5
143:17 157:8
182:12 190:10,18
193:3,9,13 196:15
196:16 200:6 201:2
202:15 203:23
212:4 214:10
215:10 226:24
229:15 233:24
234:23,24,24 235:6
235:11,15,16
236:16,21,21 237:8
238:3,9,24 239:4,5
242:2,17,21,23
243:3,6,7 244:18
245:11 248:17,22
248:25 249:6,8,8
253:23 254:17
**contractor**
211:19
**contractors**
198:20
**contracts**
48:13 75:11,13 96:3
136:7 145:20

198:25 242:10
243:1
**contractual**
204:17
**contribute**
20:18
**contributed**
19:13,20
**controlled**
44:3
**converation**
189:14
**conversation**
118:13 135:16
156:10 176:2
177:22 195:16
196:9 220:25
224:17 230:20
238:10,12 239:25
246:19 247:18
249:19
**conversations**
114:24 117:20
134:15 135:6
176:15,17 177:17
177:19,25 184:17
195:22 196:4,6
221:15,22 222:7
224:1,5,14 226:22
230:3,15,22 232:21
238:22,23 244:4
247:13 259:17,23
260:3
**convinced**
191:6,8
**cooperate**
167:2
**coordinating**
39:13
**cope**
122:3
**copies**
256:18
**coping**
120:9
**copy**


MAGNA
LEGAL SERVICES

16:25 130:10 233:4
260:13,15
**cordial**
23:2
**corporation**
7:8,11 48:1 90:12
134:9 250:2
**correct**
7:17 24:12 25:16
27:12 32:16 34:14
77:2,16 83:6,11
93:12 98:4,15
109:24 133:24
134:12 136:10
137:15 145:25
146:1,5 166:2
200:13,14 202:11
204:22 209:17,21
263:9
**corrections**
261:9
**costs**
229:10
**counsel**
4:16 7:7 8:13
**counseling**
122:2
**count**
211:16
**counted**
44:14
**country**
120:8,17 170:7 193:8
**County**
263:3,11
**couple**
20:16 26:15 27:2
50:17 72:2 90:10
92:2 97:1 104:21
117:20 130:8
147:15 192:4
219:10 241:24
**course**
50:20 90:21 157:1
158:20
**court**

1:1 5:3,9 218:4
222:16 224:24
**courtesy**
180:19
**Coval**
135:14,17
**cover**
15:2 35:8 37:21 41:4
73:5 142:20,21
147:20 182:5
185:10 213:14
215:16 247:22
248:22 250:25
**coverage**
219:4 224:25 226:7
226:15,20,23
228:21,25 230:3,8
230:11,13 247:24
250:3
**covered**
40:9,9 91:16 96:19
98:21 215:18
**covering**
15:10,13 37:16,19
38:17,18 174:14
212:19
**covertly**
48:8
**COVID**
50:18 118:14,17,21
118:22 119:10
120:2,5,21 121:19
122:6,8,12 123:2,10
163:4 174:1
**coworkers**
56:1
**craft**
195:10,25
**crafting**
66:2
**created**
248:1,5,7
**credentialed**
18:22
**credentialing**
211:7 214:16,18,22

236:3,13 244:24
**credentials**
211:14
**credit**
65:17,19,22 66:2
**Crist**
2:3 4:3 83:17 149:10
186:10 187:7,15,20
221:14,22 222:1
223:19 225:6 226:9
243:23 244:11
247:17 250:8
254:22 257:7
260:17
**crunch**
244:25
**CSR**
263:23
**CTE**
91:20
**cure**
133:11,11
**current**
7:19 18:6,10,11
26:14 214:24
**currently**
16:19 36:1
**curse**
255:21
**curses**
255:23
**curt**
60:13
**curtness**
59:8
**cut**
109:4 112:20 225:2
**cutting**
64:11 106:21
**CV**
16:25 20:10 21:20
22:14 31:5,6 124:18
**cyber**
16:20 31:12,15 42:13
42:21 43:2,7,10
44:12 85:15,16,24

86:3,4,15 147:10
**Cyberknife**
223:2

_____

**D**
_____

**dad**
11:4
**dance**
104:2
**data**
18:6 91:11
**date**
8:20 51:22 90:21
146:4 195:19
201:19,20,20 202:4
202:18,25 203:1,5
205:14 207:21
208:21 210:9 212:7
212:10,14 213:4,19
214:3 221:5 236:8,9
236:11
**dates**
20:10 124:1 133:8,9
175:13 194:22,24
195:1,2,5
**daughter**
80:11,16,19,23
158:12,13
**day**
24:21,22 25:12 35:14
35:21,25 36:2,10,12
36:13 39:24 53:19
54:2,3 58:7,8,9
70:24 78:7,12 80:10
80:11,14,15,16,23
81:1,24 110:6 119:2
122:1 142:23
150:13 151:3
176:13 177:22
191:16 203:16
205:13,15 206:1
209:13 215:4
227:24,24 229:5
230:6 254:7,8
256:23 260:10
261:18 263:20



**day-to-day**
74:19
**days**
35:23 38:25 39:23
54:9 58:14 78:14
81:10,11 117:5,10
119:9 160:2 171:20
173:4 180:15
205:12,18 206:16
206:19 211:13
236:20 243:2
**dba**
1:9
**deadline**
244:18 245:2,10,13
249:1,10,11,13,14
249:16
**deal**
58:19 74:7,8,8
101:14 134:22
137:25 141:17
185:24 212:20
214:22
**dealing**
72:5
**dealt**
85:11 120:18
**Debra**
222:23
**debt**
194:23 198:1,25
**debts**
197:23,24
**December**
7:14 110:1,3 111:10
112:14 114:2
137:23 138:2 139:7
141:19
**decide**
33:24 113:9,12 125:6
125:7 135:20 206:9
246:16
**decided**
46:3,15 53:19 58:7
115:9,19 140:22
150:19 170:15

209:12 250:3
**deciding**
93:2
**decision**
24:8 33:13 113:21
118:1 123:22
124:13,16 146:14
146:17 151:1
198:18 207:21,22
215:21
**decisions**
63:21 88:2,11,18
248:17
**decline**
66:15 67:9 138:12,14
138:23 139:8,11
**declined**
189:6
**decreased**
79:17
**dedicated**
81:6,9
**deeper**
61:5
**defendant**
2:10 3:14 9:12 194:1
197:13
**defendant's**
194:8,19 196:23
197:4
**Defendant(s)**
1:11
**defendants**
195:17 207:21
**defended**
108:24 115:15
**defending**
108:7
**defense**
4:15
**deferred**
41:7
**Define**
153:22
**definitely**
24:4 59:5 126:13

**definition**
173:19,20 184:2,7
**definitive**
246:14
**degree**
11:25 12:17,19 14:9
57:8 58:20 61:20
68:2 71:22 86:21
120:13 121:20
123:16 142:20
175:5,10
**delayed**
58:20 211:6 214:16
**delivered**
80:13
**delivers**
86:4
**delivery**
85:8
**demands**
194:24
**demeanor**
111:17
**demonstrated**
169:24
**Dennis**
65:23 66:4 225:24
**Denver**
2:5,13 15:3 22:3 25:6
25:7,9,10 64:22
217:7
**department**
80:16 156:14 177:9
244:15
**depend**
63:13 168:13
**depends**
168:7 169:7 216:17
216:24,24
**deponent**
261:11
**deposed**
4:24 6:22
**deposition**
1:16 4:17 8:10,16 9:1
9:4 83:14 187:15,16

193:21 218:17,21
223:19 263:7,14
**depressed**
163:13,17
**depression**
164:4
**depth**
218:18
**derogatory**
109:2 147:8
**describe**
14:11 21:24 22:9,10
32:18 35:3,14 43:21
45:21 47:22 50:1
77:4 84:23 85:4
87:6,13,25 121:11
124:20 129:8 141:6
143:4 152:17
173:25 194:19
195:16 201:23
204:5 207:19 215:3
**described**
47:14 133:10
**describes**
173:21
**deserve**
155:11
**deserved**
66:2
**designate**
233:17
**designated**
219:24 224:24,24
231:4 232:9
**desirable**
23:24 24:4
**desire**
115:3,5
**despite**
48:12 70:16 181:16
**destroyed**
208:6
**detail**
163:13,20
**details**
30:12 37:8 38:4,11


MAGNA
LEGAL SERVICES

106:14 156:3
157:15 163:24
204:11 232:2
**determined**
46:14 148:8
**develop**
26:2
**device**
86:4
**diagnosed**
172:13
**diagnoses**
216:13
**diagnosis**
41:24 49:10 182:8
**difference**
19:4
**differences**
112:4,5 140:24
**different**
75:4 99:24 107:22
123:11 131:23
140:23 165:15
196:6 220:14 232:4
234:6 243:24 260:2
**differential**
100:8,8 123:8
**differently**
101:20
**difficult**
102:1 154:22 155:1
229:6
**difficulty**
162:13,13 172:19
**digestive**
172:17
**dinner**
28:19 104:22
**diplomatic**
157:24
**direct**
93:18 158:24 194:4
201:4,9 247:2
**directly**
52:18,19 174:22
188:13

**director**
87:12,14
**directorship**
43:13,17,19,21,22,25
44:2 45:1
**directorships**
87:11
**Disabilities**
251:12 252:23 253:8
**disability**
6:24 165:3 167:12,25
250:4,20,22 251:3,5
251:8 252:15
253:11,15,23 255:4
255:6
**disagree**
100:23 192:1
**disagreed**
107:14
**disagreement**
37:14 44:14 53:13,20
70:7 108:9
**disagreements**
53:8 56:8,11 68:22
69:12,15,16 70:6
72:21,22 90:7,15
107:8
**disappointed**
150:8,10
**disappointing**
250:6
**disciplinary**
156:21
**discipline**
94:22 157:5
**disciplined**
156:24
**disclosed**
171:2
**disconnected**
135:3
**discourteous**
157:17 158:2,17
**discovery**
3:13 9:8,10,11,16,18
193:21,24 194:2

197:13 207:11
**discrepancy**
73:3 90:23
**discuss**
68:8 221:14,21
225:14 226:9 245:8
257:7
**discussed**
70:10 88:16 100:9
112:15 195:19
207:24 230:18
244:11 247:19
249:25 251:10
254:7 257:6,19
258:16 259:24
**discussing**
195:6 209:4 224:9
259:18
**discussion**
68:17 116:1 135:12
139:13 154:16
204:17 239:14
245:1 250:8 258:5
**discussions**
43:11 73:13 75:13
143:20,23,25 171:5
171:8,11 173:2,7,9
192:13 195:19
197:22 198:24
207:2 222:4,8 224:3
224:10
**disease**
16:13
**disinterested**
60:14
**disjointed**
218:15 219:1
**dislike**
216:3,7
**disputes**
90:7,8 123:1,5
**disrespectful**
54:6 157:18 158:2
**disrespectfully**
55:25
**dissolved**

34:11
**dissolving**
7:8,10
**DISTRICT**
1:1,2
**dive**
61:5
**divvying**
106:17
**doc**
19:3 99:2 142:23
147:5,7 164:8 170:6
213:13 226:25
227:19 228:8 229:8
**docs**
67:19 68:1 86:21
98:25 142:21 147:3
171:16 173:15
**doctor**
6:13,15 7:9 12:21
22:20,22 23:15
26:25 27:3,6,21
34:7 58:2 72:18
77:1 95:13,14
104:25 105:7,8,14
157:5 160:18 164:1
164:2 168:24 169:4
193:15 218:9 227:8
251:7 259:14
**doctors**
29:10 41:17,20,22
81:8 85:25 89:13
95:11 103:14
124:24,25 137:3
141:12 142:25
158:15 170:19
171:1 172:6 226:18
228:14,15 230:19
**doctors'**
181:6
**document**
92:19 93:19 131:25
132:1 149:6,18
194:13
**documents**
4:13 8:22,23 92:11



MAGNA
LEGAL SERVICES

183:4 187:17 195:6
195:20 197:6,20
198:6,10,12,17
199:7,11,12,13
218:22
**doing**
 4:20,21 31:24 51:2
 51:16 52:25 64:6
 66:2,13 69:20 74:16
 90:19 107:10,11,15
 107:19 108:12
 115:2 120:15
 138:17 154:10
 155:10 157:1
 158:15 175:3,15
 214:18 215:6 216:9
 216:13,19 221:25
 251:18
**dollars**
 64:16
**door**
 111:13 254:20 255:3
**dose**
 86:6
**dot**
 220:9 243:11,11,11
**doubt**
 95:5
**download**
 93:2
**downloaded**
 93:4
**downloading**
 92:24 93:6
**downs**
 216:5
**Dr**
 1:6,12,16 4:3,7,19
 7:2,21 9:1,4 11:8,9
 11:10 15:2,12,14,16
 16:7 18:17 20:12,23
 21:12,22,24 22:16
 22:24,25 23:13,23
 24:5,11,22 25:20
 27:11,15,19,20 29:1
 29:4,15,22 30:9,20

32:16,25 33:9,14,25
34:6,13 35:1,7
36:19 42:24 43:16
46:1 49:15 50:4
51:15,17,18,20 53:3
53:18 54:1 56:18,19
56:24 57:4,9,10,25
58:19 59:13,21 60:9
60:20,25 61:17 62:2
67:13 68:5 69:2,13
70:5,9,10,14,19,22
70:23 71:3,9 72:8
72:18,19,22,24
74:13 76:17,24 77:1
77:6,14,25 78:19
80:13 81:11 82:20
83:1 85:21 86:1,2
86:18,22,22,25
87:11,14 89:5,7
90:11 97:14,15 99:3
100:3,24 101:20
102:7 103:5,19,24
104:13,19,20
105:10,18,24 106:1
106:12,17,18,24,25
107:8,13 108:6,24
109:10,11,22
114:15 115:24
116:2,2,13,17,17,23
117:12,14,15 118:3
118:13 121:13,23
122:4 123:2,3,4,15
123:23 124:1
125:12,16,20 126:6
127:13 128:17
129:13,15,19
131:16,17 133:2,23
133:23,25 134:1,2,6
134:8 135:10,13,17
138:11,17,18,24,25
139:1,5 141:15,18
142:18,19 143:1,21
145:23 146:2,19,19
147:4,21 149:25
150:1,7,8,23 151:2
151:4,9,13,21 152:5

152:6,6,13,13,17,22
153:1,5 154:22
155:18,24 156:16
156:25 157:10,17
158:1,12 159:7,11
160:9,23 161:13,18
161:20 162:12,19
163:12,14,15,20
164:8 166:11
169:21 171:12,15
171:16 173:5,7
174:6,17,22 176:16
176:22 177:24
178:8,9,15 179:21
181:18,18 182:20
182:23 183:7,7,7,8
184:8,18 185:12,12
186:16,23 187:2,3
188:18 189:20
190:12,15 191:11
191:22,23 192:9
193:18 200:15
204:13,18 206:7
207:20 209:25
210:6 211:1,18
212:9,20 213:15
214:6 215:18,21
217:2,2,3,3,5,15
218:3,14 219:8,17
219:24 220:16,18
221:12 222:18
224:11 225:1
227:13,23 228:10
229:1 230:7 231:11
231:20 232:8
233:22 234:10
240:19,22,25
241:21 243:22
244:8,17 245:2,3,5
245:6,23 246:18,25
247:16,23 248:5,14
248:16,24 249:3
253:20,23 254:5
257:3 258:9 259:1,6
**drafts**
 199:1

**drink**
 45:9,14,18
**drive**
 12:12 25:2 146:25
**driven**
 148:21
**driving**
 25:8
**drop**
 80:22 119:1
**drove**
 8:12 24:22
**Drs**
 257:5
**drum**
 178:3
**drunk**
 96:7
**due**
 202:10 203:1
**Duke**
 11:22
**duly**
 4:8
**duration**
 190:2

_____
E
_____
**E**
 260:21 263:4,23
**E-mail**
 54:3,7,8,13,19 92:4,5
 92:10,14 93:14
 99:23 100:1 101:5,7
 101:9,16 102:8
 109:12,15,16 114:7
 117:18,19 121:25
 127:3 149:5,19,22
 150:2,5 155:7,13
 161:24 162:7
 164:22 165:7
 166:17,23 174:8,14
 174:23 175:13
 176:4,6,7,21 177:18
 177:24,24 178:14
 179:6,14 182:17



183:1,6,8,20 184:20
186:14,23,25 187:2
188:10 189:4,15
190:3,8,9 191:16,21
199:16 204:18
205:2,16 209:19
218:5,6 219:19,22
220:5,8 222:12,12
222:20,22 224:25
225:2,4 226:1
231:15 232:25
233:20,23,25 234:1
234:3,4,8,16 237:5
238:1,13 239:7,11
240:1,2,13,13,14,15
240:20,22 241:5,7,9
241:11 242:5
245:18,20,24 246:3
247:7,9,11,15
248:21 250:22
254:1,24 256:16
258:10 259:7 260:1
260:1

**E-mailed**
166:15,16 221:7
232:18 251:5

**E-mails**
8:23 9:14,15 102:14
116:11 187:20
235:2 241:13,23
252:8 260:8

**E-R-L-I-N-G**
134:1

**E-tran**
260:14

**earlier**
38:14 75:22 83:5
121:14 156:19
169:21 193:20
196:8 220:11
226:10 232:4
243:21

**early**
38:24 51:10 53:17
61:2 78:5 106:15
131:13 159:6 160:5

213:12 227:17

**easily**
5:11 140:20

**easy**
37:23 142:21

**edge**
159:8,10,11,14,19
243:11

**edit**
238:19

**education**
12:23 171:13

**effect**
59:18 60:13 212:1

**effective**
171:22 208:7

**efficient**
79:16,16

**efforts**
52:13

**egg**
38:8 62:19

**eight**
8:13 236:20,23

**either**
4:16 51:18 81:11
109:17 112:22
129:18 139:14
213:10 237:24
239:21 256:22
260:19

**elaborate**
85:19

**elected**
95:13

**eligible**
33:18

**Email**
3:8,9,10,11,15,19,20
3:21

**emotional**
101:23

**emotionally**
58:22

**empathy**
175:4,10

**employed**
32:23,24 71:10
115:10 201:18
202:9,18,24 203:4
213:24 215:1 217:4
228:3

**employee**
35:13 37:5 40:6 44:5
48:2 50:3 65:1,2
77:22 99:2 136:9
142:6 145:3 169:4
208:8 215:23
227:16 252:19

**employees**
142:9 198:20

**employer**
36:19,21 171:3

**employing**
138:8 246:18

**employment**
33:17 34:20 118:1
140:13 142:1
168:25 175:19
190:20,23 194:21
198:21,25 200:5,8
207:20,23 208:3,4
208:10,11,21
215:10 221:6 222:1
223:5 224:9 228:5
230:9 231:12
236:16 238:3
239:15 240:9 245:3
245:11 253:4,22
254:4,12

**encouraged**
142:24 143:2,3
161:22

**ended**
78:2 106:19 255:16

**engaged**
244:13

**engagement**
93:21

**engagements**
21:6

**enjoy**

16:11

**ensured**
90:24

**entered**
86:14

**entire**
57:1 63:1 149:7

**entirety**
189:14

**entitled**
97:6

**entity**
83:15 85:2

**epidemic**
118:25

**episodes**
156:4 159:25

**equal**
47:1 48:25 63:11
73:22,25

**equalization**
185:17

**equalize**
177:3

**equally**
56:13 57:3 70:17
73:2 74:2

**equate**
202:1

**equipment**
62:11,14,16 88:13

**Eric**
135:14,16 178:8
205:3 217:10,12
225:24 237:4 238:2
239:21 257:12,23
257:25

**Erling**
133:25 134:1 145:14
178:9 185:12 205:2
212:9 247:16

**error**
161:1,8 243:5

**errors**
160:24 161:3

**esentially**



MAGNA
LEGAL SERVICES

14:25

**Esq**
2:3,4,11,11

**essentially**
133:2

**established**
27:14 125:10 153:2
209:20

**estimate**
36:15 66:6

**estimated**
78:9

**et**
257:24

**ethic**
152:18,19,23

**ethics**
153:2,4

**event**
59:25 133:10 263:18

**events**
243:21

**eventually**
54:10 66:16,17 69:25
86:11 106:21 111:3
111:4 113:14 114:1
115:8,25 140:24
142:19 193:15
217:12

**everybody**
121:6 134:20 177:6
177:14 207:4

**evidence**
167:10

**Ex**
3:5,7,8,9,10,11,12,13
3:14,15,16,17,18,19
3:20,21,22,23

**ex-communication**
102:12

**exacerbated**
174:3

**exact**
15:4 20:10 175:22

**exactly**
10:8 44:10 49:5,14

58:11 59:22 62:21
68:16 82:19 86:18
117:4,17 135:24
137:21,25 145:10
150:25 226:13
227:1 228:10
233:16 235:19
237:10

**exaggerating**
184:8,12,19,24

**examination**
3:2,3 4:10 166:25
167:2 218:12

**example**
17:1 37:10 153:16

**examples**
59:16 96:22 152:22
154:4,25 158:7
216:8

**exception**
45:25 62:8,8 63:18
85:15 258:14

**excessive**
162:20 163:5

**exchanges**
189:4

**exclusive**
47:17 49:19 93:10,21
98:3,7,13 137:14
145:1

**exclusively**
46:16 62:11 148:21
217:7

**executive**
95:16

**exhibit**
92:2,18,23 128:1,2
144:2,3,4 148:25
149:1,11,13 164:12
164:14,14 178:24
179:1,1 182:14,15
182:25 186:4,6
188:1 194:3,6
196:18,19 199:18
199:20,23 207:8
217:25 219:16,18

219:25 220:1,24
222:10,15,17,18
223:10,12 224:24
225:4,6,12,13,17
231:2,4,11,19,21,24
232:5,5,9,14,16,22
233:15,17,21,22
234:11,25 235:9,22
237:1,3,7,13,22
239:4 240:1,10,12
240:15,17,19,21
241:18,21 245:16
245:18,22,23 246:6
255:18 256:9,11,13
258:19,22 259:5,6

**exhibits**
3:4 92:3 127:2
187:20 218:8

**exist**
75:11,14

**expanded**
193:7

**expect**
66:17 72:17 169:4

**expediency**
204:2

**expense**
64:23,25 166:25

**expenses**
37:16 64:17 70:2,3

**experience**
11:13 13:4,7 14:18
46:21 121:5 163:5

**experienced**
122:14 163:7 229:9

**experiences**
31:11

**experiencing**
121:8,12 162:20

**expertise**
16:10

**expired**
142:5

**explain**
58:5 60:24 62:1 94:1
100:6 125:4 128:13

131:10 132:25
137:5 162:24
180:23 181:1 185:7
206:15 254:21

**explained**
129:9 254:22

**explanation**
57:17

**explore**
141:24

**express**
107:15 129:15,20
162:14,21

**expressed**
69:21 162:12,17

**extended**
81:12 204:6

**extension**
185:10 248:22

**extenuating**
74:9 75:10

**extra**
175:15 190:6 255:2

---

**F**

**fabricate**
165:20,22

**face**
48:10

**faced**
111:17 156:16

**facilities**
147:9

**facing**
174:14 186:1

**fact**
63:8 70:16 73:5
106:24 111:22
193:19 212:13
230:18 258:14
259:20

**factor**
48:20,21

**failed**
83:4 97:25

**failing**


MAGNA
LEGAL SERVICES

198:1

**fair**
27:20 38:16 108:17
127:15 129:25
165:6 191:10 200:7
209:1,3

**fairly**
49:6 54:6 105:19
143:18

**fairness**
108:9

**faith**
131:14

**fall**
11:17 117:16 118:5,7
118:15 119:23

**false**
184:4,4

**familiar**
9:17 12:16 97:11
125:5 157:20 171:1
193:23 243:3

**familiarize**
246:3

**families**
61:8

**family**
61:10,13,14 120:19
120:23 122:13,16
122:17 172:24

**fan**
12:14

**fancy**
42:19

**fantastic**
13:6

**far**
9:16 32:4 39:13
47:14 88:2 91:3
99:16 118:8 146:25
161:8,14 172:2
223:25

**fast**
5:2 93:24 97:9 132:6

**favor**
71:7 107:19

**favorable**
26:5

**favorably**
152:7,8,14,16

**favorite**
12:15 191:14

**February**
138:1,2 146:9 175:13
176:4,11,12 189:5
254:24

**Fed**
1:15

**federal**
137:2

**feel**
38:25 45:12,17 47:6
48:5 49:23 52:20
56:21 73:10 74:3
75:2,7 79:9 82:12
122:24 123:19
139:24 141:8
151:12 160:22
161:15 163:11
166:21 169:3 172:3
172:8 173:1,23,24
181:12 184:1,8,12
184:18,24 223:14
242:11 246:2

**feeling**
163:13

**feelings**
110:18,22

**fees**
76:3 88:17 239:1

**fellowship**
14:24

**fellowships**
13:20

**felt**
23:22 37:21 38:21
47:1,7 48:9 52:17
54:6,14 56:22 57:8
71:17,22 72:10,10
74:11 75:5,6 88:24
100:9 106:24,25
107:6,17 108:6,11

108:16 109:7,8
114:19 115:6,15
129:11,24 138:6,8
140:12 141:6 147:5
151:15 168:1
172:14 188:20
189:7 190:1 205:10
208:17 243:16,25
250:15 254:23
255:2,11

**field**
13:22 16:12,15 18:1
19:2,14,22 20:18
41:23 67:3 77:2
170:19

**fields**
19:24 67:22

**figure**
93:16 106:17 110:1
125:14 131:14
154:12,18

**figured**
106:11

**file**
149:8,24 241:14

**filed**
157:16

**fill**
22:14 46:12 51:13

**filled**
85:10 158:25 193:14

**final**
114:18 233:2 237:8
237:16,17,20,22,23
239:2,5

**finally**
51:4

**finances**
37:14 38:10

**financial**
62:1 63:20 68:9
69:12 72:21 87:6,9
137:8 190:4 213:18

**financially**
74:14,15 77:11
217:20

**find**
41:16 67:13 109:4
112:20 113:16
130:21 135:25
144:11 149:23
156:11 159:4 161:1
166:18 167:9
171:22 185:19
190:20 194:4 210:8
210:13 220:20
230:4 232:11 248:8

**finding**
58:17

**fine**
5:16 9:19 29:3 121:5
126:14 149:20
187:22 198:13
217:6

**finger**
254:20

**finish**
45:11 183:15 187:18

**finished**
119:11

**firm**
116:3

**firms**
115:24

**first**
4:8,25 15:22,24
17:10 26:15 27:1,1
28:18,20,22 34:25
36:16 37:13,22 41:8
41:23,25 45:20 48:3
48:18 50:25 54:21
54:23 55:14 57:3
70:8 88:6,20 92:2
106:16 110:5,5
115:22 120:14
121:14 123:24
134:7 135:8 139:23
141:25 144:25
148:2 165:5,9 174:6
174:9,24 176:20
184:14,22 185:11
185:12 197:5



204:14 207:9,10,11
207:14,21 211:24
212:10,11 214:18
220:23,24 223:8,11
223:24 225:2,25
227:18,19 232:16
232:19 235:8,21,23
238:24 240:14
241:8,25 246:5
249:25 257:2
259:19
**five**
35:23 36:11,13 61:8
61:20 136:15,18
202:1,6 203:18,22
221:9,18,23 222:4,8
223:9,14 259:8
**fix**
178:23
**fixed**
168:9
**flip**
232:10
**flip-flop**
21:2
**Florida**
13:2
**follow**
35:18 40:24 90:3
96:16,23 153:1
161:16 181:8 190:9
215:6 240:13,15
241:11 245:20
**follow-up**
109:12 241:5
**followed**
136:8
**following**
58:9 116:10 119:4
174:12 196:4
**follows**
4:9
**football**
74:21 103:10
**force**
113:8

**forced**
109:25
**foregoing**
261:5
**foremost**
88:20
**Forest**
12:12
**forget**
8:20 228:10
**forgivable**
152:4 221:23 222:8
223:9
**forgive**
133:4 150:2 201:20
203:1,6 226:1
**forgiven**
133:6 136:13,17
202:10
**forgiveness**
136:21 195:3 197:23
197:25 198:25
219:3 222:12
224:21 238:6
**form**
7:6,18,24 99:9
144:16 161:10
163:23 166:4 184:9
202:12 208:15
**formal**
89:7 97:13 173:18
**formally**
34:12 109:21 210:16
**format**
232:4
**former**
185:24
**forms**
167:25
**formulate**
101:25
**forth**
190:14
**Fortunately**
80:14 143:8
**forward**

41:13 142:1 218:3
**forwarded**
219:9
**found**
14:25 24:17 33:19
115:25 120:11
176:20 190:23
201:1 210:17,23
239:5 259:4
**foundation**
42:6 77:8,17 94:3
96:2 98:5 101:1
128:22 129:2
133:14 135:22
143:16 145:13
146:16 148:11,14
151:14 156:13
168:12,16,18 169:6
196:13 202:12
211:3,12,20 212:16
213:20 214:8
**founders**
194:20 195:18
197:22 198:19,23
199:2
**four**
35:23 61:8 71:14
78:14 115:23
119:22 180:12
**four-year**
13:18
**fourth**
175:14
**frame**
50:16 67:5
**Francis**
1:9 107:17 124:23
139:4 142:7,11
145:24,25 146:25
147:2,5,12,20 150:9
150:15,18,21
151:17,24 215:15
215:16,20 227:23
228:12
**free**
45:17 172:8 242:11

246:2
**frequent**
162:20 163:6
**fresh**
107:21
**Friday**
253:17
**friend**
61:18,20,23 74:22
185:24
**friendly**
68:2 103:18
**friends**
26:21 61:10,12,14
104:8
**friendship**
26:17
**front**
52:14,16 55:25 108:3
123:10 177:11
202:7
**froze**
66:19
**frozen**
134:25
**frustrated**
191:12
**frustration**
100:12
**fuck**
255:19
**fulfill**
154:8 185:21
**fulfilling**
57:25 60:21
**full**
32:21 133:3 136:20
142:6 174:11
248:17 249:8
**fully**
100:10 133:13
**fun**
181:7
**funding**
70:15
**funds**



37:24 129:10
**further**
171:5,8

---
**G**
---
**gain**
229:6
**game**
103:11
**gap**
228:11,25
**general**
59:4 86:16,17 173:21
225:19 228:18
245:13
**generalist**
16:14
**generally**
13:6 22:14 32:11
35:16 40:25 41:7,17
68:19 100:21
123:14 136:7 164:1
215:24
**generated**
144:8
**generation**
107:22
**getting**
14:24 27:14 35:8
38:7 42:1 43:19
72:3 88:5 113:24
115:16 116:11
134:23 138:7,7,9,10
138:20 173:23
190:5 205:10 210:7
216:22 218:19
220:13,17 226:15
229:8 230:3 235:7
236:20,21 244:25
245:14 246:7
250:17 260:10
**gift**
61:25
**gifts**
197:21,23
**give**

7:23 41:9 47:8 52:14
52:15 57:4,6,10
59:1 60:12 68:6
70:18 89:11 93:8
108:17 128:5
131:20 138:3 143:9
144:6 151:18
153:16 171:13
173:5 180:10,17
186:8 190:2 199:14
199:21 218:11
233:9 259:14
**given**
30:14 97:16 99:11
128:16 151:24
158:20 165:16
171:14 179:16,21
179:25 181:20
208:5,16,20 221:13
244:12 261:8
**gives**
101:18
**giving**
43:13 72:14 107:1,7
138:19 170:7 182:8
204:19 205:6 209:2
236:8 254:19
**go**
5:6 7:9 11:21 12:3,15
18:2 20:11,22 21:2
21:22 23:21 26:20
35:12 38:23 45:9,18
51:3 52:2,21 54:2
55:4 60:6 61:2
66:10 67:25 78:4
91:10 94:6 95:8
98:17 104:5 108:22
111:13 115:19,23
126:12 128:7
130:19 133:15
138:8 141:11
146:21 154:11
168:8 170:2,10,14
181:1 192:2 193:1
201:8 203:8 205:25
207:5 208:1 213:9

220:20 242:13
245:17 246:5
248:13 260:7
**goals**
185:21
**God**
81:22
**goes**
125:14 130:10,13,13
161:14 176:24
190:8
**going**
14:16 20:24 23:5
33:8 35:12 39:25
43:19 44:22 46:3
48:23,24 49:21
51:12,12 54:22
58:14 61:24 63:17
67:15 72:17 73:20
82:19 83:22 84:13
90:19 93:18 94:5,5
94:6 97:3,4 106:25
107:4 109:3 110:2
112:19 115:6
117:20 119:10
120:25 125:7 126:9
126:12 127:1,7
129:11 130:4,8
131:13,19,21
132:10,11,18 135:7
135:21 141:3 142:8
142:10,13 143:11
144:6,6 146:19
149:1,2 150:15,17
151:13,21,22,25
155:3,10 161:21
163:4 164:10,13,14
174:5,12 175:3,23
178:25 181:1,9,22
182:11,15 184:15
185:19 186:5 187:7
192:1,21 194:2,3,7
194:13 195:13
196:2,19,22 197:17
198:14 199:20,22
200:16,23,24 201:8

203:9 205:19
206:10 207:8,17,18
208:1 209:11
212:22 213:10
215:8 216:18
218:15,23,25
219:17,24 222:16
224:23 225:21
226:4,18,19 230:25
231:3 232:9 233:16
233:21 235:11,15
236:3,5,15 239:16
240:11,12 241:24
241:25 242:9
243:13,14,23 244:2
244:3,22 246:1,7
247:3,4,5 248:13
251:5 252:8 256:14
257:2 258:21,22
259:5
**Golding**
187:3,5
**good**
4:19,22 5:1 13:6 14:9
23:18,23 25:14,21
25:22 26:14,24 28:3
28:4 30:3,5 31:24
32:20 36:23,24
38:21 39:4,5 47:6
58:2 59:4 64:9,21
72:2,3,18 74:17,18
76:2 81:8 89:25
93:8 94:13,20 96:18
103:18 106:25
107:10,11,15
108:13 120:23,24
126:11,15,16
127:18 131:13
134:21 138:19,20
140:13 147:13
163:22,24 164:1
169:10 172:25
177:15 206:11
215:24 244:2
**goodwill**
89:23,25



gotcha
94:15 186:21 241:20
gotten
112:11 156:4 214:20
govern
89:18,19
government
90:25 91:15
graduated
14:2
grand
173:10,13,14
graph
65:25
graphs
75:24
great
43:3 64:22 69:20
82:24 120:19
126:17 170:8
172:24 260:23
Green
10:16,17,22
grew
104:6,10
ground
5:1
ground-breaking
31:23
groundwork
113:15
group
67:18 86:18 93:22
94:4,23 128:15
133:2 140:5 217:4
growing
11:3
growth
66:17
guess
18:10 19:12 27:22
35:22 39:24 40:19
44:16 49:4 51:4
61:25 64:17,25
78:15 88:14,16
90:22 117:2 123:6

133:11 137:24
138:2 151:17
156:14 160:6
162:25 168:6
169:11 175:18
182:3 189:18
192:11 205:3,22,25
221:4 225:11
240:12 248:11
252:4 254:8
guessing
124:4 134:8 145:24
224:4
guidelines
118:24 119:4
Gulley
186:24
Gunnison
263:3,11
guy
29:16,17 70:19 75:2
81:2 86:22 87:17
101:25 104:24
145:18,20 170:3,8
170:12 220:16
guys
7:16 10:5 18:4 22:5
25:24 26:2 31:1
32:8,9 33:22 35:4
35:21 37:11 38:20
39:12,16,21 41:13
55:22 57:6 63:14,22
64:1 65:13 67:23
68:10 69:12 70:7
79:3 81:6,25 82:22
88:2 91:14 95:3
99:17,22 101:3,11
103:6,12 106:8
112:3,15 114:24
120:2 124:8,13
128:25 140:7
159:24 162:16
164:1 176:2 180:8
180:10,17 187:17
190:25 205:16
209:4,11 218:9

247:16

———————————
**H**
———————————

half
10:7 53:18 64:16
136:15 150:18
201:14
hall
2:12 89:5 111:18
halls
114:21
hallways
102:13 106:5
Halpern
2:4 3:3 180:4,6
187:13 217:24
218:4,7,13 219:12
225:7,9,20 226:4,13
231:13 232:3,8
260:14,16,17
hand
141:9 263:20
handed
58:9
handle
79:10,14 143:11
handled
91:21 143:25 154:2
hands
82:11
handwritten
8:24
hang
12:22 176:10
happen
43:24 57:11 78:16
104:9 110:11
135:21 136:2
153:20 257:11
happened
22:3 50:10 53:23
56:18,19 64:2 67:4
70:22 71:15 77:25
91:12 104:12
114:12 135:20
153:22 154:17,18

158:3 167:15
175:22 190:2
193:19 243:25
257:12
happening
171:11
happens
94:24 149:8 241:14
255:15
happier
216:15,16,23
happy
153:14 216:20
hard
25:23 48:24 58:23
60:4 82:6 94:21
100:4 138:16
152:21 205:9
harder
50:6,9,12 56:16
57:18,20 73:6 74:5
harmful
184:4
hate
114:10
HDR
31:10
head
5:4 16:11,15,21 17:7
17:15 19:22,24 20:8
31:7,8,11 95:15
136:2 158:9 207:2
health
1:9,9,10 66:24 67:7
80:1,3 165:3 167:13
170:19,23 171:2,9
172:2,5,10 174:18
181:13,23 183:10
183:11,16,23,24
185:24 188:12
189:12,15,17
205:16 251:6 258:9
258:15,15
healthy
45:17
hear



4:22,23 5:10 25:19
122:15 138:22,25
157:22 174:6,21
188:13 218:16
246:8,15
**heard**
17:23 24:15 59:5
60:2 109:23,23
115:14 142:1
157:19 173:7,9
174:9,16,24 175:1
204:14 206:15
210:10 237:21
256:4
**hearing**
135:2 223:8
**HEATH**
2:12
**heavy**
78:17,23
**heck**
119:10
**hefty**
47:2
**held**
14:19
**help**
14:7,9 35:7 43:4
50:21 53:6 55:8
67:20 78:21,23 79:1
79:3 82:14 115:13
127:13 128:16
134:22 143:6 168:5
171:20,25 172:9
176:25 177:7,14
178:4 181:14 182:5
185:16,25 189:5
195:10,25 205:25
205:25 226:7 227:9
230:4 232:13
**helped**
99:21 104:17 226:24
**helping**
76:10 172:2 238:1
**helps**
226:2 233:8

**Helton**
222:23
**hereunto**
263:19
**hesitation**
140:15
**hesitations**
140:17
**hey**
7:21 65:18 114:23
149:10 225:5
**Hi**
180:7
**high**
11:5 86:6 107:13
**higher**
50:17 123:7 148:17
**highest**
93:3
**highly**
86:5 147:23 181:10
181:10 188:21
**Hill**
12:12
**hint**
111:24
**HIPPA**
259:11,15,15,24
**Hippocratic**
88:21
**hire**
113:17 131:13 140:4
140:6 142:5 198:18
**hired**
11:8,9 139:22 141:13
141:14,14 228:8
**hiring**
25:3 137:16 140:2,7
199:1
**history**
118:21 208:5
**hit**
118:22
**hold**
23:12 130:18 157:7
166:18 182:19,22

202:14 205:13
221:1 233:13 234:5
235:10,18 236:7
237:5,19 238:5
**holding**
43:20
**home**
55:8 120:20 122:10
**honest**
11:1 44:20 55:13
60:19 71:19 147:15
157:23 164:11
176:1 181:8 182:9
191:17 214:1
**honestly**
39:10 56:11 65:16
68:13 169:11 191:3
217:6
**honor**
254:3,12
**honored**
28:19
**hook**
250:3
**hope**
97:19 163:9 202:9
208:7 249:1
**hopefully**
161:4 244:17
**hoping**
56:25 139:21 150:10
**hospital**
4:6 15:2,7 42:13,15
44:7,12 59:18,21
69:1,10 70:25 71:5
76:10 77:5,11 80:2
85:22 89:2 95:9,12
96:10,15 98:15,20
99:5,7 110:9 111:2
114:22 125:5
128:16,21 129:9,11
133:3 158:21 159:2
169:4,15,17 170:2
177:18,20,23 178:1
201:17,18,19
202:18,23,24,25

213:13 214:23
215:22 227:21
229:10 236:2
259:11
**hospitals**
94:7 98:4 99:10
**hot**
173:4
**hour**
1:19 10:7 53:18,18
61:2
**hours**
36:6,10 78:7,14
79:15 82:17 160:4
160:13,17,19,22
188:25 252:1,2
**house**
77:14
**HR**
113:1 117:9 156:4,14
157:3 170:17
194:19
**huge**
214:15
**Huh**
104:16
**Human**
198:23,24
**hung**
109:3,20 111:22
**hurry**
236:12
**hurt**
110:18,22 119:16
179:24 213:4,5
**hurtful**
108:10 110:25
**hydrated**
45:19

---

**I**

**I-T**
92:12
**idea**
47:6 52:22 126:11
168:17 180:25



210:9
**Ideally**
179:22
**ideas**
101:25
**identified**
52:4 92:18 128:1
144:2 148:25
164:12 178:24
182:14 186:4 194:6
196:18 199:18
219:16 222:15
231:2,19 233:15
240:10 245:16
256:9 258:19
**identify**
195:5 207:22
**identities**
195:18
**identity**
195:20
**ignore**
102:7,18,20
**ignored**
114:23
**ih@rmlawyers.com**
2:6
**illness**
172:8
**illnesses**
5:25
**image**
29:4 235:4,5
**images**
235:4
**imagine**
28:13 122:8,14
157:21 174:3
222:11 230:23
257:16
**imaging**
58:13,15
**imbalance**
47:20 48:5 49:22,23
**immediate**
248:3

**immediately**
118:23
**impact**
88:8 119:15 174:1
210:25 211:4,17
212:14,17 213:18
214:2,5,11,15
**impacted**
193:10
**impacts**
88:1 96:10
**impaired**
206:10
**implication**
213:25 247:5
**implications**
197:25
**implied**
138:5 188:19
**important**
16:25 64:4 88:21
172:25 252:15
**impressed**
25:1,13 27:2
**impression**
23:13 37:18 63:9
96:12 98:18 103:21
104:23 105:13
111:21 208:18
246:8,17
**improved**
27:21,22
**in-house**
105:23 143:5 198:20
211:19 217:14
**in-laws**
81:18
**inability**
163:19 164:5
**inappropriate**
64:7
**inches**
80:22
**incident**
158:4
**include**

57:1 95:6
**included**
196:12
**including**
14:18 143:1 194:21
194:22,24,25 195:2
195:4,18 197:22
198:20 199:1
207:21 230:24
**income**
44:15
**increase**
65:10
**increased**
79:17,19
**independent**
67:8 98:19 99:4,5,8
166:25 167:5,16
**INDEX**
3:1
**India**
81:17 103:25 104:3
**Indian**
81:18 104:6
**indicate**
138:22 139:8 233:1
246:24
**indicated**
243:20
**indicating**
190:10
**indications**
244:12
**inducement**
259:21
**inducements**
137:7
**inequality**
52:5
**influence**
63:21
**information**
22:15 198:24 251:4
**informed**
137:13 139:25 142:4
152:5

**initial**
175:1 185:11 236:20
242:21
**initially**
86:11 118:22
**initiate**
249:13
**initiated**
249:14
**initiative**
25:2
**INITIATIVES**
1:9
**inpatient**
58:7
**input**
43:24 212:11
**inquire**
117:9
**inquiry**
113:1
**insistent**
70:17
**installments**
132:15
**instances**
55:16 155:8 161:16
**instruct**
5:22
**insurance**
37:17,19
**insures**
91:14
**intact**
175:23
**Intake**
144:16
**integrating**
124:21
**intelligent**
28:9
**intend**
226:7
**intended**
142:5
**intending**


MAGNA
LEGAL SERVICES

204:10
**intentions**
90:18
**interacted**
145:21
**interaction**
23:1 160:3
**interactions**
60:3 103:16
**interest**
46:1 132:12,13
192:11 195:2
**interested**
150:17 185:15
192:14 246:11,20
252:16 263:18
**interesting**
14:8 31:25
**interests**
166:21
**intermittent**
121:12
**internal**
198:23
**international**
17:4 30:10,13,19
**internship**
13:11,12,15
**interpret**
94:4 248:20
**interpretation**
75:4
**interpreting**
91:23
**interrogatory**
194:18 195:14,15
207:6
**intervened**
80:24
**interview**
11:10 23:4,6,6,7 24:9
**interviewed**
34:12 123:24 124:17
**interviewing**
21:3
**intimidating**

111:18,19
**introduce**
92:1 144:3 149:1
178:25 182:15
186:5 196:19
199:20 224:23
**introduced**
225:6 231:6 232:4
**investigations**
205:24
**invite**
61:7,11,24
**invited**
24:20 61:6,21
**involuntary**
157:2
**involved**
88:13,14 91:2 97:1
114:2 121:22 129:6
143:24 156:4
195:19 212:12
240:3
**involvement**
83:20 88:15
**involves**
106:12
**ionizing**
14:14
**Ipad**
92:9 241:13
**Iris**
2:4 180:5,7 187:22
218:2 219:9 225:5
231:11
**issue**
55:1 69:19 71:20
91:5 95:19 96:14
97:20 100:18
101:19 102:5 128:6
154:11 183:10,11
183:17,23,25
189:18 248:3
252:15 258:12,16
260:1
**issues**
29:25 40:1,6,11,17

40:18 57:25 59:2,5
60:21 66:25 96:4
100:15 111:4
120:22 122:16
170:20,23 171:9
172:2,6,17 181:16
216:22

─────────────
**J**
─────────────

**Jack**
22:24
**January**
146:4
**Jason**
9:4
**Jeff**
150:14 178:9 205:3
225:23 239:21
240:2 247:7 260:13
**Jeff's**
240:2
**job**
11:1,2,7 14:25 15:1
22:8 23:4,9,17,23
23:24 24:14,17,19
32:21 34:2,5,12
51:16 69:20 79:16
82:10 89:25 104:15
104:17 106:25
107:10,11,16
108:13 116:16
138:1 154:10,13
172:20 173:23
193:2 216:5 217:12
228:14 251:16
252:2,5,19
**jobs**
45:25
**jog**
230:15 238:2 239:11
**jogged**
30:18
**jogs**
224:14
**John**
86:1

**join**
253:1
**joined**
36:17 51:15 63:16
250:9 253:1,2
**joining**
180:5
**joint**
85:20 86:9
**joke**
153:14 223:13
**joking**
66:7,8
**journal**
17:4,5 103:14
**journals**
16:24 17:2,8 30:22
32:5
**judgment**
206:9 253:13
**July**
16:4 125:23 131:17
185:11 212:11
214:14,17 227:5
235:23 236:4
248:23 252:4,4
**jump**
180:4 187:19 217:24
218:23
**jumped**
258:15
**jumping**
107:6 188:13
**jumps**
130:12
**June**
16:4 185:11 211:23
212:10 213:8,12
214:20 227:17,18
244:19 252:4
**JURAT**
261:3
**justified**
250:4 251:2,3,8
253:10,13
**JV**



85:16,20

**K**

**Karen**
9:6 95:23,23
**Kath**
241:16
**Kathpal**
106:12,17,25 108:24
109:10,22 114:16
116:2,17,17 118:13
123:3,4,23 125:12
126:6 128:17
131:16,17 133:2,23
134:6 138:18 139:5
142:18,19 145:3
224:11 227:23
228:10 229:1
235:20 236:21
239:15 240:22,25
244:8,17 245:5,6
247:23 248:16,24
249:3 257:5
**Kathpal's**
69:2 107:9 124:1
125:20 127:13
129:13 152:5
194:21 200:15
220:18 221:12
248:14 253:20
**Kathryn**
225:25
**keep**
26:13 43:16 47:1
48:24 52:23 67:10
79:23 91:19 96:24
139:21 156:15
257:24
**keeping**
23:22,23 64:7 67:1
69:22
**keeps**
92:10 159:2
**Kentucky**
10:14,15,18,23 104:5
**kept**

24:5 28:4 46:21
67:14 106:2,4
217:13
**Kersey**
86:22
**key**
120:17
**kick-in**
190:4
**kickback**
137:9
**kickbacks**
137:3,6,7
**kicked**
98:10
**kids**
41:10,10 104:11
120:19,24 122:18
122:18,19,21
**kill**
247:25
**KILLIAN**
2:12
**kind**
18:15 32:1 35:18
36:5 37:20 40:17,18
40:20 41:7 47:17
51:11 52:15 68:12
68:23 69:19 70:3
71:23 73:4 74:7,21
75:1,2,2,4 78:19
82:12 84:12 87:15
87:16,17,23 89:15
89:16 90:17 91:6,17
91:20 95:17,18
98:23 101:24,25
102:12 107:19
121:14 123:15
124:23 126:1
130:11 134:19,20
137:22 139:8 143:9
143:12,18 150:19
153:19 156:21
157:13 158:14
159:25 161:8 166:1
168:7 178:21 182:8

184:16 192:14
205:23,24 211:8
213:2 218:23
219:18 220:17,24
223:13,21 225:2
226:5 228:14
229:24 233:18
243:3 254:22,25
258:17 260:7
**kinds**
17:8 96:7 97:16
125:12
**knew**
103:24 111:5 114:9
115:11,21 119:9
163:15,21 175:3
179:22 185:13
210:11,20 217:11
238:8 244:6 250:21
**knife**
16:20 31:12,15 42:21
43:2,7,10 85:15,16
85:24 86:3,4,15
147:10
**knock**
111:13
**know**
5:10,15,16 10:2,20
15:20 18:6,17 19:2
20:10,20 21:15 22:7
22:14 23:4,16 24:8
24:8 26:19 27:1,23
28:16,22,24 29:19
29:21 32:5 33:7
34:3 35:24 36:15
37:8 38:16 40:8
44:13,13,16,20,22
45:9 46:11 47:2,13
47:23 48:1,19 49:5
49:13 50:6 51:18
52:14,25 53:4 55:15
58:17,22 59:11,20
59:22 61:10,12
62:20,21,23 65:1,20
65:21 66:16 67:13
67:16,17 70:3,11

71:10 72:6,7 74:6
74:17,20 75:10,12
77:18,24 81:2 84:9
86:14,18,20 87:16
87:17,19,21 88:10
88:20 89:8 90:6
92:4,25 94:22 95:8
95:21 96:6,8,9,13
97:17,25 99:4
101:22 102:12,23
103:19 104:7,20
105:17 108:3
111:16 112:4,6,7
113:11,13 114:4,17
115:16 116:10,17
116:19,21 117:4,9
117:17,25 119:5,9
120:17 121:13
122:11,11,18,20
125:25 127:11
130:10 134:5,6
135:24 136:1,4,17
136:25 137:10,12
137:25 138:18
139:17,19 140:19
144:20 145:7,10,14
146:12,14 148:3,8
148:12,16 150:25
151:1 153:3 154:8
154:15 155:3 156:5
156:24 157:2,4,13
157:20 158:13,24
159:2,3,4 160:6,11
163:21 164:10,20
164:21 165:13
169:13 170:15
173:14,18 175:6,7
176:18 177:6 178:5
178:10,17,17
179:10 180:5
181:23 182:4,6
184:3,22 186:22
187:4,5,6 189:13
190:1 191:20 192:9
193:2,25 197:10
200:4 201:3 203:6



203:23 204:16
205:11 206:10,10
206:18,19,22 207:1
209:11 210:5,11,12
210:16,17,22 211:6
213:25 214:22
217:25 218:16,18
219:12 221:4,25
223:20 224:4 225:3
225:6,14,23 226:6
226:18 227:4 228:2
228:19 230:12
235:15 236:23,25
238:4 243:14,15,15
243:18,20,23 244:8
244:12,23 245:5
246:2 247:3 249:18
251:7,15 252:9,11
253:14,25 255:5,21
256:23,24 258:11
258:17

**knowing**
138:21 151:12
**knowledge**
257:18
**knowledgeable**
23:15,20 27:5
**known**
12:6 24:11 77:2,3
153:1 160:23 161:7
164:2 168:24 190:1
**Koval**
178:8 183:8 205:3
217:10,12 225:24
237:4 257:3
**Kraus**
146:19 151:4 205:3
225:24

---
**L**
---

**label**
149:11 164:17
**labeled**
219:18
**labelling**
234:6

**labile**
58:22
**labor**
80:21 110:6
**lack**
115:11 116:22
206:24 209:13
**language**
183:9 257:4,6,15,20
258:6
**lap**
241:13
**lasted**
35:9 159:13
**late**
58:8 59:24 124:4
**law**
19:10 75:1 137:1,2,2
**Lawrence**
2:5
**laws**
137:9 259:18
**lawsuit**
8:7 176:9 185:18
189:4 254:25
**lawyer**
113:23,24 114:4,9
115:12 143:6,24,25
144:1 203:24
204:10 210:2
232:24 237:5,7,15
238:3,25 242:22
253:17
**lawyers**
6:25 8:6 19:11
113:24 175:19
189:7 198:9
**leader**
95:16
**leadership**
18:24
**learn**
91:12 204:12
**learned**
68:6 161:19
**learning**

120:25 171:20
**leave**
71:16 80:9 85:18
167:20,21 168:4,7
168:11 169:1,5,19
174:7,17 175:2
176:16,17,20,21
177:25 182:10
183:12,22 184:25
184:25 185:3
189:21,23 192:16
192:22 205:21
206:1,4,8 209:14
212:22 213:16
214:7 244:3 248:6
253:23
**leaves**
131:13 243:4
**leaving**
192:9 244:7,16
246:25 250:23
**lecture**
171:13
**lectures**
99:11 173:14
**led**
106:14 108:9 117:25
**left**
53:23 56:20 71:15,17
72:24 82:15 112:12
131:18 134:6
136:24 190:2,23
192:22 217:12
223:16 228:11
229:1,24 230:22
232:5 248:4
**leg**
81:3,5 168:8,8
**legal**
1:20 94:21 113:15
143:14 184:16
194:1 197:25 239:1
**lengthy**
187:8
**lessons**
104:2

**let's**
27:25 40:23 51:3
88:6 150:3 168:14
211:23 219:3
240:17 245:17
256:7
**letter**
113:18
**letters**
187:20
**letting**
177:6 178:10 180:5
**level**
26:12 74:17 79:21
113:8 122:3 177:1
182:12
**liaison**
87:23
**license**
18:16 96:24
**licenses**
91:19
**licensing**
18:15
**Lichenberger**
186:24
**Lichtenberg**
187:3
**Lichtenberger**
187:6
**lieu**
70:4
**life**
14:21 39:4 81:25
82:7 117:6 120:12
181:11 186:2 256:6
**lighter**
119:18,19
**liked**
34:2,4 51:15 182:13
**Lindsay**
2:11 4:5 8:17 92:15
187:13 217:23
219:7
**line**
45:10,11 80:1 109:22



MAGNA
LEGAL SERVICES

**list**
119:16 126:12
225:25 226:9 235:4
241:17 252:22
**list**
179:2 182:16,21
**listening**
121:4
**literature**
23:22,24 26:14 28:5
31:21 64:8
**little**
13:3 17:22 21:23
31:14 35:3 44:13
47:22 48:10 50:1
53:17 57:8 61:5
66:20 68:13 72:19
72:20 73:2 75:19
78:4,24 79:1 81:4
94:16 100:19 103:4
121:11 125:4 137:5
146:9 161:11
165:15 172:17
185:6,7,22 196:2
209:2 218:15,16,23
220:17 248:13
260:2
**live**
73:11
**lived**
11:4 12:9,11 146:24
**lives**
82:11
**living**
11:19
**LLC**
1:18 2:4 223:2
**lmcmanus@hallre...**
2:16
**load**
48:25 49:5 125:11
175:17 176:25
177:3 181:6
**loading**
219:14
**loan**
69:9 128:16 132:11

133:6 134:16 135:7
135:21 136:12,15
152:4 194:19,22
195:3,17 196:4,9,16
219:3 221:9,18,23
222:8,12 223:9,21
224:19 238:6
**loans**
68:25 69:5 197:21,22
**located**
15:20
**location**
23:24 151:10
**locations**
146:15 191:1
**locum**
227:19
**locum's**
224:25
**locums**
193:15 213:13 219:3
226:7,12,15,20,25
227:4,6,7,11,14
228:3,6,12,15 229:7
229:16 230:8,10,13
230:24,25 247:20
247:21,24 248:12
**logistic**
257:23
**logistically**
125:3 230:17
**logistics**
227:3 230:22 257:22
**long**
10:5 11:7 13:24 29:2
35:9 37:7 39:11
54:12 62:17 98:24
106:9,13 111:5,7
126:6 128:20 150:2
160:1 175:8 177:22
180:17 191:18,20
203:4,14,14 210:12
221:4 223:15 226:1
246:9
**long-standing**
147:23

**longer**
79:15 94:16 108:10
126:12 159:13
189:25 202:9
209:12 217:3
224:19 246:11
**longest**
81:15
**look**
17:6 21:20 24:7 31:5
58:15 93:9 109:3
112:19 133:7 143:6
149:23 156:12
158:23 170:12
182:6 187:16,21,25
196:2,5 203:24
204:11 219:25
220:4 225:3,21
227:3 231:16,24,24
235:18 236:1
237:13 248:21
252:17 256:13
**looked**
8:23 50:14 59:22
64:3 124:18 148:4
174:23 184:2 234:2
235:7 236:14
251:13 252:7
**looking**
22:19 64:5 92:17
122:12 123:25
124:5,8 127:6 145:9
183:3 189:8 201:1
204:9 210:2 221:6
233:14,23 237:19
238:1,13 240:23
241:2 256:23 259:2
**looks**
93:10 111:21 130:15
144:8 186:23 215:4
232:1 240:12,20
**loose**
75:4
**lost**
98:9 234:1
**lot**

11:4 13:5 24:9 26:8
46:12,17 50:4 54:14
54:22 67:24 72:14
76:11,14,18,19,22
78:3,12,20,20 82:3
102:14 107:20
117:6 125:9,13
140:1 159:13
160:17,21 163:7
164:9 175:4 177:4
178:9 180:11
191:13 192:6,10,13
206:11 213:10
230:21 250:8
254:18
**lots**
152:24
**lounge**
147:10
**love**
255:23
**loved**
43:2
**low**
125:21
**lower**
88:23 119:12
**lowest**
71:21 125:18
**loyal**
94:6
**loyalty**
108:8
**lunch**
67:25,25 126:10,20
127:1 183:3 254:15
256:22
**lying**
189:20,22
**LYMAN**
2:12
**lymphoma**
16:21

_____
**M**
_____
**M.D**



261:4 263:7

**machine**
44:9 263:8

**mad**
249:1,18

**Madeera**
194:20

**Madeera's**
249:20

**Magna**
1:20

**magnified**
121:19

**magnitude**
76:4

**main**
139:18

**maintain**
48:25

**maintained**
39:10

**major**
17:4,21 37:13 41:15
64:23,25

**majority**
46:4

**makers**
207:22

**making**
38:3 52:18,21 53:6
64:6,7,14,15 70:12
106:20 107:18
108:16 121:3,4
145:8 192:2 216:19
244:13

**malpractice**
156:17

**man**
80:19 90:16 124:23
182:13

**management**
54:20 122:2 155:6
169:25

**manager**
227:4 229:25

**managing**

44:4 256:2

**Mannequin**
10:18

**manner**
88:14,16 116:20

**manually**
219:19

**March**
54:13 146:18 155:7
224:7 225:23

**mark**
2:11 4:5 8:17 222:17

**marked**
92:23

**married**
104:14

**marry**
104:5

**massed**
91:18

**matched**
14:25

**materialized**
177:11

**materials**
29:5

**matter**
112:23

**mattered**
191:2,5

**matters**
86:10

**McManus**
2:11 4:5,5 7:6,18,21
8:3 42:6 77:8,17
82:24 83:17,19,25
84:3,6,9,15,18 92:6
92:8,13,16 94:3
96:2 98:5 99:9
101:1 126:14,17
128:22 129:2
133:14 135:22
143:16 145:13
146:16 148:11,14
149:10,15 151:14
156:13 161:10

163:23 166:4,7
168:12,16,18,21,23
169:6,18 184:9
187:22 196:13
202:12 208:15
211:3,12,20,25
212:16 214:8 218:2
219:8 225:5,8,22
231:11,18 260:12
260:20,21

**MCMAUS**
213:20

**mean**
7:3 9:10 21:25 27:23
28:4 31:2 32:18
40:18 51:10 54:4
60:4 63:15 76:8
85:4 87:15 88:10,11
89:4,25 91:23 95:2
99:6 100:15 101:6
101:13 102:21
103:17 104:10,14
116:5 119:21
120:24 125:22
127:17 129:21
134:4 137:17
138:13 142:21
148:1,3 153:10,11
153:22 155:6
160:25 167:23
176:18 177:24
180:25 188:23
199:14 202:21
203:3 205:22
211:11 220:2 225:9
226:16 228:20
236:22 243:18
244:20 250:21
251:2 252:14
257:13

**meaning**
56:25 235:25

**means**
39:12 86:5 94:1,2
95:9 124:3 128:14
131:11 132:9 133:1

133:1 150:25
173:21 201:23
203:5 221:5

**meant**
88:23 98:3,14 136:7
212:22 242:20
248:11,20 250:19
259:16

**measure**
51:1

**measurements**
148:13

**mechanism**
91:9

**mediate**
140:11

**mediating**
111:11

**mediation**
113:18 122:2

**medical**
12:3,6,17,20 16:24
19:6 25:20 27:9
28:7 29:22 30:21
32:5 37:17,19 41:21
70:3 71:1,3,7 87:10
87:12,14 91:19
94:23 95:5,7,10,15
95:15 96:9,11,16
137:15 147:23
153:2,3,6,24 154:5
160:24 161:8,18
166:24 167:20,21
168:4,11 169:1,5,19
171:6,9 173:3 174:7
183:11 184:25
192:16 205:21
206:4,8 209:14
248:6

**medications**
6:3

**medicine**
12:21 87:5 96:18
105:5

**meditated**
172:23



**meditating**
120:16
**meditation**
54:20 120:11 169:25
**meet**
10:6,9 18:4 104:12
**meeting**
8:14,17 11:14 18:5
20:4,9 22:2,4 23:1,3
24:21 25:6,12 68:11
72:9 89:7 106:15,19
106:22 108:19
109:2,7,24,25 110:3
111:11 112:14
114:2 123:9 139:7
141:18,22,24 177:1
204:24,25 205:1,5
205:17 209:5 217:8
246:13 249:6,10
254:7,10,14 257:7
257:11,15,19 258:5
**meetings**
18:19 20:8,12 36:9
68:10,16,21,23 89:4
89:10,12 99:17
104:21 158:16
257:21,23
**meets**
184:6
**member**
17:19 18:17
**members**
147:23 239:20
**Memorial**
66:24 80:1 98:17,21
**memory**
30:18 73:21 224:13
230:15 232:13
238:2 239:11 240:4
**mental**
121:9 170:19 171:2,9
172:2,5,10 181:13
181:23 183:10,16
183:23,24 185:23
188:12 189:12,15
189:17 205:16

258:9,12,15
**mention**
84:13 198:22 248:25
249:9,11,15
**mentioned**
114:3
**mentions**
196:5
**mentor**
26:7
**mentoring**
125:12 171:19
**mentors**
13:6
**mess**
256:1
**message**
110:17 248:14
249:24 257:3
**messages**
102:18
**messaging**
257:6,20
**met**
9:24 11:15,16 13:8
16:7 21:22,24 22:5
22:25 23:14 24:22
24:23 27:11 97:15
104:9,12,21 105:3
105:16 111:10
129:9 257:5
**methods**
113:7
**metric**
158:22
**mid**
67:4
**Midas**
91:4
**middle**
25:11 50:15 176:4
254:20
**million**
64:16 75:18,20
**mind**
128:2 155:4 170:16

175:21 182:4
249:20
**mine**
36:5 38:18 122:24
131:23 167:21
231:7
**minor**
134:19
**minute**
179:9 218:11 245:25
**minutes**
141:23 187:16
210:19 234:2
**miserable**
216:22
**misheard**
208:25
**misses**
91:10
**mistaken**
21:11 43:25 72:25
73:8,20 86:19
125:24 126:8
127:14 135:15
137:4 152:10
**mistakes**
161:6
**misunderstandings**
99:21
**model**
73:24
**moderate**
57:23
**modification**
194:22
**modifications**
194:23
**MOHAMEDBHAI**
1:18 2:4
**mom**
103:24
**moment**
219:10,15 231:16
238:5
**Monday**
255:14

**monetary**
259:15
**money**
37:15,21 43:12,18
44:2,3,6,14,18
56:13 57:5,16 62:21
62:23,24 66:11
69:17 71:23 72:12
72:14 74:1,11,24,25
75:13 88:25 133:4
175:20,25 176:3
185:15,19 189:8
197:21 200:19
213:23 216:19
217:20 221:13
223:16 229:10
254:23,24 255:2
**monies**
250:11
**Monoe**
234:10
**Monroe**
1:12,16 3:18 4:7,19
7:21 58:19 82:20
83:1 134:2 145:3,23
147:24,25 150:8
152:6 182:20 183:8
218:3,14 219:8,17
219:24 220:9
222:18 225:1 231:4
231:17,20 232:8
233:20,22 234:4
240:19 241:4,21
245:23 257:5 259:1
259:6 261:4 263:7
**Monroe's**
231:11
**Monroe@Centura....**
234:17
**month**
117:1,3,4 137:23
150:18 185:13
201:25 211:19,21
212:8,18,23 248:23
**monthly**
132:14,14 136:21



months
35:10 39:2,3 112:25
   114:11 118:17,19
   119:13,22 120:21
   126:4 132:14
   140:18 159:6 160:5
   165:5 174:15
   175:22 179:23
   180:1,12 181:3
   185:4,5,14,21 189:1
   191:2,6 192:5,12
   214:17,21 217:9,9
   226:6 228:24,25
   250:15,16,25
   255:15
mood
53:18
moods
153:11
moody
155:2
morning
4:19 148:19 183:2
   184:3 189:10
mother
80:24 104:8
mother-in-law
103:24 104:8
mother-in-laws
104:7
motivation
255:10
Mountain
70:25 71:2,6,8
Mountains
24:3
move
94:10 97:3 105:23
   132:18 145:1,3
   208:18 211:16
   217:14
moved
41:13 77:14 193:8
moving
125:13 142:1 143:5
MST

1:19
multi-factoral
150:24
multiple
73:13 113:13 123:12
mute
225:20
Myers
178:7

N

name
15:22 34:21 65:5
   66:4 91:8 147:24
   149:8 170:4,5 180:5
   232:12
named
86:22 199:10
names
234:7
Natalie
178:7 257:4
national
11:14 17:24 20:4
   25:12 30:9 119:5,5
nationwide
91:11
natural
8:4
nature
68:9 80:24 84:23,25
   98:11
near
91:10
nearby
146:24
necessarily
69:14 113:11 150:17
   244:1
necessary
82:9 85:17 229:12
   244:23
necessitating
183:11
neck
16:11,15,21 17:8,15

19:22,24 20:8 31:8
   31:11
need
45:8,8,12 89:1 96:15
   115:15 166:21
   172:9 175:18
   176:16,17 184:25
   185:2 189:21,23
   192:16 200:10
   205:25 209:10
   218:9,9,10 226:6
   230:12,18 246:1,8
   247:3 258:11,12
needed
41:3,11 58:18 81:21
   115:21 116:19
   140:24 143:8 155:9
   162:2,5 167:16
   175:1 177:25 178:4
   178:11 181:19,22
   182:6 189:7 204:3
   207:1 208:18
   209:14 211:7
   244:21,22 247:24
needing
165:22 174:17
   179:23 226:12
   257:23
needs
43:24 94:23 164:18
   179:5 181:13
   183:13 188:12
   215:17 227:5
nefarious
175:24
negative
211:9
negotiable
224:22
negotiate
131:13,15
negotiated
40:7 129:13
negotiating
129:22 135:9 137:23
negotiation

129:5 243:11
negotiations
196:15,16 198:21
   212:6 221:15 222:3
nest
38:7 62:19
network
67:20,23
networked
72:19
networking
67:17 68:2,5,7
neuralgia
16:20 31:13
neutral
257:6,15,20 258:6
never
17:23 34:11 55:12
   56:6 63:23 64:2
   68:20 69:14 81:20
   95:19 96:4,5,14
   105:3,15 109:1
   111:23 112:15
   116:2 143:24
   144:21 155:3
   162:17 171:25
   172:13,14 174:19
   177:11 178:22
   183:10,24 191:22
   208:9 210:10
   217:11 223:23
   227:14 237:1
   249:14 251:13
new
31:22 35:6,23 36:13
   72:16 90:11 125:8
   208:6 217:18
   220:20
newer
107:21
Newt
91:3
nice
24:23 65:25 103:22
   104:24 165:16
   213:13



**nicely**
161:23
**night**
55:5 187:17
**nights**
230:13
**nine**
217:9 236:23
**nod**
5:4
**normally**
122:10
**Notary**
261:16,21
**note**
4:13 132:11,11
200:13,21,24
201:19 202:7,15,19
202:25 215:9 230:7
243:22
**noted**
169:21 261:9
**notes**
8:24
**noteworthy**
20:2
**notice**
1:15 121:8,23 122:15
143:10 159:17
165:16 166:20
179:16,20 180:9,18
181:20 207:4
249:22 250:24
263:12
**noticed**
30:25 73:2 74:25
121:15 122:2 131:3
161:13 192:8,20
**noticing**
54:15,17 170:13
**notification**
205:19
**novel**
32:1
**November**
7:14 111:12 113:20

115:23 228:9
263:21
**nowadays**
211:13
**number**
1:3 16:16 76:21
98:25 119:1 181:3
192:10 194:18
195:14 197:15,16
197:20 198:15
199:21,24 218:8
219:5 220:23 227:9
232:6 242:22 243:2
256:5,12,12
**numbers**
13:8 46:25 50:18
65:15 144:7 147:16
218:7
**nurse**
8:12
**nurses**
54:5 216:13
**nursing**
157:16

———————————

**O**

**o'clock**
8:13
**oath**
4:8 5:12 83:2 88:21
126:23
**object**
7:6,18,24 77:8,17
83:17 96:2 98:5
99:9 101:1 129:2
133:14 135:22
143:16 145:13
146:16 148:11,14
151:14 161:10
163:23 166:4,7
168:12 169:6 184:9
196:13 202:12
208:15 211:3,20
212:16 214:8
**objected**
168:18

**objection**
42:6 84:4,5 94:3
128:22 156:13
168:16 169:18
211:12,25 213:20
**objections**
5:17,18 7:23 197:4
**objective**
51:1
**objectively**
138:13
**objects**
5:19
**obligation**
127:24 128:21 194:1
**observations**
227:21
**observed**
228:3
**observing**
68:7
**obtain**
166:24
**obtained**
115:12
**obviously**
21:4 22:7 63:16
71:10 78:12 103:17
119:11 210:11
220:3 237:18
**occasion**
108:6
**occasionally**
15:17 103:10 105:20
229:4
**occasions**
112:25
**occur**
68:23
**occurred**
84:7 125:25 137:20
**occurrence**
133:10
**October**
1:13,18 4:2 111:12
115:23 263:10

**offer**
78:1 118:1 123:13
150:12,19 168:25
189:6 191:16 204:6
204:13 206:7,20
208:2,4,9,11,21
209:5,17,22 210:6
**offered**
52:15 54:19 140:13
150:9,21 175:16
177:2 185:16 189:5
205:24
**offering**
183:21
**offers**
47:2 53:7 78:21
177:4
**office**
52:14,16 65:7 89:5
101:15 111:14
112:12 117:21
123:11 143:5
154:16 177:3,11
227:3 229:25
260:18
**official**
263:20
**Oh**
12:9 25:10 28:18
42:24 49:13 63:3
66:9 80:19 104:1,4
104:10 119:16
121:10 130:18
145:18 150:1
167:23 168:20
199:19 225:7 244:6
260:5
**Ohio**
10:23
**okay**
4:24 5:1,24 6:3,12,18
6:25 7:9,13,16,25
8:9,15,19,25 9:3,8
9:16,22,24 10:2,5,9
11:18 13:1,3,20,24
14:16 15:12,15,18



15:20 16:7,9,23
17:9,13,16,19 18:17
19:4,13,21 21:5
22:9,16,22 23:8,12
23:18 24:11,25 25:8
25:18 26:6,16 27:5
27:8,11 28:2,16,25
29:9,12,25 30:20
31:22 32:8,12,22
33:13,15 34:4,17,20
34:23 35:12,20
36:24 37:10 38:20
38:23 39:6 40:1,14
41:6,12,16 42:10,24
44:17,25 45:7 46:5
46:14,23 47:9,22
48:7,15 49:7,21
50:1 51:3,14 54:1
55:21 56:2,8 57:11
58:3,5 60:16,20,24
61:4,4,15,22 62:5
63:3,6,10,13 64:1
65:9 66:9,22 69:25
74:3,15 75:6,9,15
75:21,21 76:11,24
77:11,24 78:11 79:3
80:25 82:5 83:13,16
83:18 84:15,16 88:7
89:17,22 90:2 91:22
92:14,17,22 93:1,5
93:7,10,16,25 94:9
94:11,15,19,19 97:7
97:10,11,22 98:19
99:14,22 100:13,16
101:7 102:17 103:4
103:9,19,21,23
104:19,23 105:2,13
105:17 106:3,8
108:5 112:10 116:9
116:25 118:3,9,12
119:3,14,20 120:1,9
121:21 123:22
124:16 125:2,4,15
126:9,13 127:3,23
128:8,18 129:5,8,19
130:3,6 131:3,9,10

131:19 132:7,22,24
133:5,17,20 134:10
134:10 135:5 136:4
136:9,12,17,19,25
137:5,13 139:11,15
139:24 141:6,18,21
142:24 143:14,20
144:5,12,15,22,24
145:7,12,23 146:2,7
147:1,12,19,22
149:1 150:12 151:7
151:12 152:12,17
154:4 161:24
162:19,24 163:12
164:16,20 165:4,9
165:12,23 166:16
167:5 168:3,10
169:3 170:18 172:1
172:22 174:21
175:11 176:15
178:25 179:4,20
180:16 181:12
183:6,19 184:18
185:7 186:5,16,18
186:21 187:2 188:3
188:18 189:23
193:25 194:5,10,15
194:18 195:13
196:21 197:1,2,7,12
197:19 198:4,13,16
199:5,20 200:1,2,7
200:12,23 201:2,5,8
201:9,10,23 202:4
202:20 203:2,8,10
203:14,25 206:6,6
206:13,14 207:7,17
207:18,25 208:12
208:23 209:16,20
209:24 213:18
214:5 215:13
216:11 217:17,19
218:8,24 219:11,15
219:23 220:4,8,11
222:3,10,23 223:4,8
224:1,18,23 225:9
226:2,13,22 228:1

228:13,21 229:13
230:2,12 231:3,22
232:21 234:5,8,16
234:24 235:6,21
237:1,25 241:1,10
241:20 242:8,15,16
243:10 244:4
245:10,17,21,25
246:4,4,22 247:6,9
247:17,20 248:13
248:15,24 249:24
250:19 251:22
252:6,18 253:6,16
253:21 255:8,23
256:8 257:2,10
258:4,20,24 259:5
259:11,17 260:6

**old**
8:23 140:5

**older**
227:7 229:8

**on-treatment**
35:25

**once**
42:10 75:12 104:21
104:22 105:16
117:21 145:22
149:23 158:23

**oncologist**
13:25 14:1,12 15:18
105:1,9

**oncologists**
17:25 41:22 71:1

**oncology**
12:24 16:10 17:3,5
17:20 18:1 19:15,24
34:22 35:19 41:23
48:22 71:3,4,7 85:6
93:11 107:12 115:9
134:13 145:2 193:7
194:20 195:18
197:21 206:2
212:19 227:14
228:16,17 229:19

**ones**
18:8 31:1 93:4 149:8

163:10 192:4

**online**
157:1

**open**
113:6 130:24 149:9
149:16,16 182:9,17
209:18 219:18
222:11 238:14
240:13 241:15
246:23 258:25
259:1

**opened**
35:7 130:20 234:8
241:4

**opens**
149:24 241:13

**opinion**
115:3 123:16 147:14
253:18

**opportunity**
4:18

**opposite**
75:6

**optimist**
112:8

**option**
115:10 136:4 175:18

**options**
140:13 141:25
194:25

**oral**
20:14,14

**orally**
21:9

**order**
75:1 87:19 130:11,25
140:6 219:1,4,5
230:13 258:22

**orders**
76:4

**org**
220:9

**organization**
17:21,24

**organizations**
17:20 18:25


MAGNA
LEGAL SERVICES

original
194:21 231:4,17
236:6 239:4
originally
235:16
ORPC
216:16,17
Osterholm
225:25
other's
41:1 64:4,5
outbursts
163:2
outside
36:17 67:17 103:6
228:14 250:12
overlapped
38:19
overlapping
105:6 128:23 156:10
187:11
overlook
161:13
oversees
95:11
oversight
161:8
overtly
48:6,7
owed
133:4 197:21
owned
67:18 88:13

**P**

P
1:15
P-L-A-U-T-H
117:13
P-R-O-C-E-E-D-I-...
4:1
P.C
2:12
p.m
225:24 238:17
260:24

Pag33
3:23
page
3:2,3,5,7,8,9,10,11
3:12,13,14,15,16,17
3:18,19,20,21,22
93:19 97:4 127:22
130:4,13,14,19
131:1,2,21,22 132:2
132:19 133:16,20
134:8 194:13
197:16,17 201:4,9
203:8,9 220:23
223:12 225:2
232:10,12 235:8,9
235:21 238:14
246:6 249:25
255:17,17 261:3
pages
95:4 131:1 220:4
236:14
paid
32:20 44:11 62:14
65:2 70:2,17 136:16
136:19 229:18,19
250:16
Panic
175:3
paper
20:15 260:15
paperwork
198:22
par
33:21
paragraph
151:5 152:1 188:6,10
paragraphs
129:3
Parker
15:2,3,7,7,21 35:4,5
70:19 98:7
part
6:12 10:15 32:7 42:5
50:15 56:18 60:18
64:4,8,24 71:11
79:25 80:4 85:7

86:9 88:6 94:15
96:16 98:7 106:15
110:5 116:12
137:16 140:9 144:1
161:9 196:15
221:24 230:25
235:20 241:23
246:6
partially
249:7
participant
220:5
participated
20:1,21 21:5
particular
12:19 100:17 146:20
219:1
particularly
52:24
parties
195:4 218:20 263:17
partner
15:14 22:23 28:13
32:21 33:11,19 34:3
34:17 36:4 42:10
43:9 44:4 45:2,22
46:17,19,20 47:19
48:2 49:24 50:2
53:21 55:5 57:9
62:6,10 63:17 64:9
69:24 70:21,23
71:25 72:16 78:18
108:14 121:19
124:5,9,12 155:17
206:11
partner's
78:17
partnering
34:7
partners
33:22,24 34:11 45:20
48:4 49:2 57:24
162:22 167:16
177:13 217:18
partnership
32:17,19 33:16 34:10

40:11 43:12,18
44:21,23 51:11
52:23 53:2 62:4
64:13 74:12 75:17
80:8 167:15
parts
51:10
party
44:8,8 53:17 55:4
61:3,13,21,24 67:8
86:11 103:7
pass
95:8
passages
251:23,25
passed
232:24
passing
103:15 184:17
patch
140:24
patient
26:11 38:13,15 58:12
58:13,20 60:5,16,18
63:22,25 77:18 88:1
88:9,11 89:2 90:25
91:5,11 115:2
123:14 125:11
138:12,15,23 139:9
155:25 156:5
158:19 160:3
161:14 167:19,21
168:3
patient's
158:12,13 216:13
patients
13:6 14:13 35:16,20
36:1,12 38:17 41:16
41:19,23 45:24 47:4
49:6,16,18 50:13
53:2,5,25 59:4,6,6
59:12,14,20 60:8,10
63:14 67:14 76:12
76:14,18,19,21
77:15,23,25 78:20
79:6,20 81:7 85:2



85:23 88:3,23 89:14
96:7 98:22 106:6
114:25 116:19
117:25 119:2,6,12
119:17 122:9
123:13,16 125:9
138:19,20 139:3
152:24 158:17,25
164:9 180:25 181:3
212:23 214:2 215:7
256:3

**pattern**
250:4

**pause**
7:22 206:15 218:15
239:1

**pay**
34:2,5 62:17 69:21
73:14 135:21
136:14 163:13,19
223:16 229:17,23
239:1

**paying**
129:13

**payment**
43:22,23 135:7 195:1
201:19,20 202:10
202:18,25 203:1

**payments**
136:22

**PC**
34:22,23 115:9 118:2
134:13 145:2
155:10 194:20
195:18 197:21
206:2 212:19
227:14 229:19

**PDF**
144:10

**PDFs**
219:10

**Pedadda**
226:3

**Peddada**
1:6 3:5,7,8,9,10,11
3:12,15,16,17,20,22

3:22,23 4:4 11:8,9
11:10 15:2,12 16:7
18:17 20:12,23
21:12,22,24 22:16
22:25 23:13,23 24:5
24:11 25:20 27:11
27:15,19 29:22 30:9
30:20 32:16,25 33:9
33:14,25 34:6 35:1
35:7 42:24 43:16
46:1 49:15 50:4
51:17,20 53:3,18
54:1 57:25 59:13
60:9,20,25 61:17
62:2 67:13 68:5
69:13 70:5,10 72:8
72:19,22 74:13
76:17,24 77:1,14
78:19 80:13 81:2,11
85:21 87:11,14 89:7
90:11 92:20 93:13
97:5,14 99:3 100:3
100:24 101:20
102:7 103:5 104:13
104:20 105:10,10
105:18,24 106:1,18
106:24 107:13
108:6 109:11
115:24 116:2,13,23
117:15 121:23
122:5 123:2,15
127:7 129:15,19
130:17 131:5,21,23
132:20 133:18,23
134:8 135:10,13,17
138:11,17,24,25
139:1 141:15,18
143:1,21 144:12,25
145:3 146:2 147:4
147:25 149:2,3,14
151:9,13,21 152:6
152:13 153:1,5
154:22 155:18,24
156:16,25 157:10
157:17 158:1,12
159:7,11 160:9,23

161:13,18,20
162:12,19 163:12
163:14,15,20 164:8
164:15 166:11
169:21 170:9
171:16 174:6,17,22
175:5 176:16,22
177:24 178:15
179:2,21 181:18,18
182:16 183:7 184:8
184:18 185:12
186:7,7 188:2
189:20 190:15
191:11,22 192:9
193:18 199:22,25
206:7 208:9 211:1
211:18 212:9,20
213:15 214:6
215:18 216:22
217:15 219:20
220:16,22 222:13
227:13 230:7,22
231:23 234:11
236:17 240:18
241:18 243:22
245:2,3,22 246:12
246:18,25 248:5
249:6 254:5 256:10
256:14 258:25

**Peddada's**
7:2 9:1 27:20 29:4
36:19 59:21 77:6,25
103:19,24 104:19
121:13 152:17,22
204:13 207:20
208:2 209:25 210:6
231:7 253:23 258:9

**peer**
64:3 115:2 116:18,20
138:17,18 160:25
161:3 163:25
171:19

**peer-reviewed**
30:21 32:1

**pending**
58:14

**Penrose**
4:6 19:9 66:5 71:9
77:20,21 87:1,3
98:7 106:6 125:10
139:5 142:6,10
146:3,9,24 147:4,9
147:13,18,19
150:11,16,22 151:9
151:13,18,21,23
156:14 196:3,9
208:10 215:14,16
215:19 227:24
228:12 256:2

**PENROSE-ST**
1:9

**people**
10:22 14:7,10 17:25
19:8 21:3 23:21
25:21,22 28:8 36:2
44:8 52:16,24 55:7
59:7 60:2 61:9 68:3
75:14 94:8 102:5
119:11,12,24
155:11 157:24
161:23 167:24,25
170:22 171:20
172:7 176:18
177:14,22 178:10
204:25 206:15
211:16 216:23
232:5

**people's**
27:24 82:11 228:19

**percent**
35:11 38:2 49:4,13
50:19 67:12,12
70:12 72:13 110:7
125:17 132:12
142:2,9,14 148:6,7

**percentage**
50:17

**percentile**
147:25 148:1,7

**percentiles**
148:1,9

**Perfect**



56:2 129:5
**perfectly**
44:20 71:18 157:23
175:25 181:8 214:1
**perform**
137:15 156:20
**performance**
95:11 97:6,12,14,17
97:21,22 98:1 107:3
107:9 156:19
**performed**
85:2
**performing**
45:24 157:6
**period**
48:20 96:13 110:21
132:14 133:11,11
**periodically**
59:23 111:9 159:21
159:23
**periods**
74:18 172:12,15
**permanent**
193:16 227:8 231:1
**person**
21:25 22:5 41:25
47:17 48:23,24 53:1
64:18 74:7 79:5
81:23 95:21 96:19
99:23,25 115:8
117:19 131:12
142:12,15,17 143:9
161:25 162:1,10
191:14,15 227:22
**person's**
64:5
**personal**
67:25 74:17 87:15
101:8,9 109:1,16
114:20 120:22
244:14 257:18
**personality**
60:17 101:21 102:3
121:15
**personality-wise**
181:17

**personally**
6:18 37:1 172:3
**PFS**
220:22
**phone**
22:6 58:6 99:23,25
101:5 102:20 109:9
109:20 112:18
114:7 117:18
124:18 205:12
**physician**
89:12 166:25 167:6
167:17 201:18
202:9,17,24
**physician's**
188:12
**physicians**
85:21
**physicists**
17:25 91:18
**physics**
12:2 14:8,9 17:5
**pick**
46:10 78:18 119:20
**picking**
93:1
**pictures**
43:1
**piece**
62:15 163:1
**pieces**
46:10 87:9 125:13
**Pierce**
65:5
**pitched**
70:11
**placating**
249:2
**place**
24:24 98:24 113:2,3
146:11,14 147:8
151:25 156:22
160:10 165:11
172:13 191:7 193:6
195:20 204:3 212:5
246:12 261:8

**placement**
131:7
**places**
14:21 24:10 243:24
**plaintiff**
1:7,17 2:3
**plaintiff's**
197:5
**plan**
81:23 111:5 178:22
190:11 194:25
248:9
**planned**
190:20 227:18
**planning**
43:10,13 80:12 192:6
212:24 215:7
230:17 246:13,25
254:16
**plans**
88:13 177:11,13,15
180:1 192:2 213:6
**plate**
232:1 243:3
**plateaued**
66:17
**Plauth**
117:12,14 118:3
178:8 183:7 217:2,3
**please**
83:1 150:2 167:1
182:20,23 183:8
218:18 226:1
254:21
**plus**
120:18
**png**
235:4
**point**
21:10 29:14 34:13
37:19 43:9 52:5
54:24 62:14 63:12
68:15 71:4 74:1
79:21 81:4 87:5
112:4 114:6 117:12
136:21 140:12

143:11 147:6 161:2
163:8 172:20
173:12 179:23
185:18 190:13,24
191:10 193:13
206:20 244:3
250:23
**points**
25:3 101:17
**policies**
9:22 89:17 90:2
91:23 96:15,22
156:21
**poor**
208:5
**poorly**
153:12,15 155:9
**popular**
29:22 77:1
**popularity**
30:1,3,5
**portion**
85:19 136:12,23
141:10
**position**
11:11 21:4 22:10
117:24 127:8
188:11 193:14
216:3 227:8 253:12
255:5
**positions**
14:19 143:1
**possibility**
112:13 249:15
**possible**
236:18
**possibly**
102:19 191:24
229:14
**poster**
21:9
**posters**
192:7
**potential**
26:7 174:2
**potentially**



161:21 255:11

**pounding**
 178:3

**power**
 33:21 47:20 48:5
  49:22,23 100:7

**Practical**
 17:3

**practice**
 19:3,5,7 22:16 23:21
  24:7,20 28:10 34:11
  34:21 35:19 36:11
  36:17,18 41:13,16
  41:18 42:7 43:5
  44:4,15 46:21 48:19
  48:22 49:1,3,11
  51:9,15,24 56:19
  57:13 63:17,20 64:5
  64:13 68:9 70:9
  71:7,13,13 72:24
  73:14 75:16 77:12
  77:13,19 78:5 83:10
  85:10 87:3,24 89:1
  89:15 90:22 91:13
  91:20 95:9,20 96:10
  96:12,18 105:11
  110:2 111:5 113:4
  113:14 114:13
  115:7,13,21 116:4
  117:24 118:12,14
  118:19,21 119:8,15
  124:1,21 126:3,7
  129:12 131:18
  139:21,22 141:9,12
  142:12 143:5,15,21
  161:22 163:4
  169:22 175:23
  179:16 180:3,21,24
  182:5 185:6,11
  190:6,11,16 205:22
  213:24 217:15
  223:2 227:13
  229:20,21 232:2
  250:25 255:16

**practice's**
 135:10

**practices**
 36:16 86:13 228:19
  229:9

**practicing**
 34:25 56:20 86:23
  87:5

**pre-approved**
 205:21

**precise**
 86:6

**predated**
 86:17

**predictor**
 31:9

**Predominantly**
 87:8

**predominately**
 66:24 87:24

**preference**
 146:21

**preferred**
 146:24 154:15

**prepare**
 8:9,16

**prepared**
 37:15

**presence**
 54:5

**present**
 18:6 20:11 102:11
  135:17

**presentations**
 20:15

**presented**
 18:7 20:4,7,14 21:8,8
  21:13 222:6

**preset**
 226:16

**president**
 47:25 90:11 97:15

**press**
 20:17

**pressing**
 45:10

**pressure**
 71:22,24

**pressures**
 71:18 72:5

**prestige**
 100:8

**pretty**
 11:1 14:17 27:12
  31:22,24 36:16
  38:21 39:5 42:22
  53:24 55:5 64:21
  70:17 72:13 95:2
  110:18,25 111:24
  112:17 118:23
  119:14 120:24
  147:15,15 151:24
  160:16 163:22,24
  166:19 174:10
  175:4 177:1,5 181:5
  190:13 209:3 213:3
  216:21 234:22
  256:5

**prevents**
 137:2

**previews**
 144:9

**previous**
 159:14 191:6,16

**previously**
 258:17

**pride**
 50:4

**primarily**
 14:22 51:2

**primary**
 16:13 52:4 223:3
  251:6

**principle**
 68:19 132:13

**prior**
 51:16 124:6

**prioritized**
 82:3

**priority**
 93:3

**private**
 19:3,5,7 22:16 23:21
  55:16 80:2 113:4

 213:24 217:15

**privileged**
 5:21

**privileges**
 95:6,10,12,17,24,25
  96:1,5,9,16

**privy**
 182:7 207:2

**probably**
 7:15 11:17 16:12
  17:11 19:25 20:7
  21:9 26:22 35:22
  36:8 42:12 44:7,12
  45:5 48:24 50:19
  51:25 58:10 61:23
  62:18 64:14,16
  65:12 68:13 72:10
  75:18 77:21 78:13
  87:4 93:13,15
  104:17 106:16,23
  108:6 117:5,12
  119:21 121:13
  123:4 124:4 126:10
  135:14,23 136:15
  137:8,21 138:1
  140:23 158:6
  163:11 164:10
  170:24 178:8,9
  181:10 187:7
  188:19 190:13
  193:5 203:17
  205:18 206:1
  215:12 235:25
  236:24 237:19
  239:21 247:7
  251:17 252:4,8
  257:22

**probationary**
 96:13

**problem**
 8:3,3 46:23 52:4 53:4
  92:12 100:24 128:6
  168:23 171:21
  177:7 178:22 248:1
  248:2,5,7

**problems**



MAGNA
LEGAL SERVICES

74:23,24 75:1 81:20
171:2 178:11
255:13
**procedure**
62:12
**procedures**
89:18 90:3 91:24
**proceedings**
128:23 242:6 260:24
**process**
32:2 124:20 129:6
143:4 161:4 198:19
214:16 221:25
236:3
**produce**
164:13 198:6,10
199:7,11,12
**produced**
187:17
**production**
197:5,14,15,20
198:15
**productive**
69:16 70:6 72:11
147:24 148:4 208:7
**productivity**
63:16 71:18,20 72:8
72:15 73:12,15,23
76:10
**profession**
171:6,10 173:3
**professional**
17:19 20:3 21:17
26:18 47:25 76:4
84:25 85:1,7,9,10
87:10 89:20 90:4
93:10 168:5 257:24
**professionally**
154:2
**professors**
19:10
**profitable**
65:13 139:21
**program**
13:5 67:15 87:1
170:16 171:15

**project**
43:23 171:19
**prominent**
19:25
**promised**
69:20
**promissory**
132:11 200:13,21,24
201:19 202:7,15,19
202:25 215:9
**promote**
81:25
**prompted**
50:20
**property**
244:15
**proposal**
70:11
**prostate**
16:22 31:9 45:25
46:2,4,9,11,16 47:4
47:14,16 48:21 49:3
49:6 50:21 51:5,12
51:16,19,21 52:3,4
52:10,12 53:9,10
56:9 62:9 63:8,10
63:18 66:25 67:14
67:14,21 69:11 80:5
80:6 148:21
**protective**
78:20
**prove**
107:8
**provide**
85:1 94:5,23 233:4
**provided**
171:14 201:18
202:17,24 234:19
**providing**
98:6 218:6
**provision**
131:10 133:1,5 202:4
202:8
**PSA**
87:4 90:11
**PSF**

3:5,7,8,9,10,11,12,15
3:16,17,20,22,23
144:12,25 149:3,13
149:21 186:7
199:22,25 219:20
222:12 226:3
231:23 234:11
236:17 240:18
241:18 245:22
256:12,14 258:25
**psychiatrist**
171:15 182:7
**public**
55:15,18 56:6 261:16
261:21
**publications**
19:14
**published**
16:12,13,16,18,20,23
17:6,9,14,15 19:17
19:23 30:21 31:8,9
31:10,12,25
**publishing**
16:19
**pull**
127:1 144:15 149:4
194:2,10 197:1
219:2
**pulled**
188:4 192:6 200:2
249:21
**purchase**
62:11 63:1,3
**purpose**
161:2
**pursuant**
1:15 167:1 263:12
**pursue**
71:8 122:1 169:25
205:23
**pursued**
57:7
**push**
212:10 229:11 242:1
242:17
**pushed**

146:10 212:7,13
**pushing**
213:4,19 214:2
**put**
20:15 29:16 48:10
91:3,9 98:16 106:2
119:4 151:25
166:20 167:12
181:6 212:5 223:17
232:2 233:17
253:14
**puts**
20:9
**putting**
32:9 36:7 119:13
243:6 249:15

---

**Q**

**qualified**
108:12,12
**quality**
158:22
**quarter**
39:1 158:23 180:13
180:14,15
**quarterly**
59:23
**question**
5:3,7,10,11,20,20,23
7:18,25 14:17 39:19
40:4 41:12 43:14
49:21 70:2 77:22
88:4 119:14 120:7
126:12 134:10
163:10 189:18
202:22 207:18
213:3 215:8 217:21
225:11 234:13
260:3
**questioned**
155:22 244:15
**questioning**
45:10,11 187:8 244:3
**questionnaires**
158:19 159:1
**questions**


MAGNA
LEGAL SERVICES

5:13 49:1 130:8
184:20 194:1
206:24 207:6
217:22 218:22
225:10 251:24
254:18 258:20
260:6
**quick**
54:14,17 82:20 93:8
215:8
**quicker**
123:13
**quickly**
8:1 101:23 187:13
231:1
**quite**
13:7 30:23 38:15
39:11 62:3 76:5
78:2 119:1 139:3
185:3,25 191:24
228:9 229:9,10
247:2
**quotes**
158:24

———————
**R**
———————
**R**
1:15
**radiation**
12:24 13:13,24 14:1
14:11,14 16:10,14
17:3,5,20,25 18:1
19:14,24 31:11
34:22 35:19 41:23
48:22 62:9 64:5
67:2 71:4,8 85:6,23
85:23 91:17 93:11
105:1,5 107:12
115:9 134:13 145:2
194:20 195:17
197:21 206:1
212:19 227:14
228:16,17 229:19
**radio**
86:4
**radiology**

15:18 18:11,14 22:13
105:8 193:7
**radiosurgery**
31:12
**radiosurgical**
31:20
**raise**
34:2
**Raised**
43:6
**ramp**
48:20 72:17
**ramping**
79:23
**ran**
74:23,23 96:4,14
171:15
**range**
49:4,5 70:15
**rarely**
41:22
**rate**
33:8
**Rathod**
1:17 2:4
**RBUs**
50:14,17,20,25 51:1
52:6 57:1 70:10,13
74:2 123:7 125:16
125:20 126:1 148:4
148:10,20
**reach**
110:18,19 114:7
143:22 166:11,14
211:1
**reached**
71:5 114:5 116:2
140:12 218:19,20
**reaching**
111:7 113:9
**read**
93:24 94:14,15,17
95:24 97:8 128:4,8
128:10 129:4 130:7
131:6 132:6,22
135:24 165:9

166:12 190:7
194:14,14 195:8,15
195:23 198:4 199:5
199:24 200:10
203:24 207:18
208:19,20 210:9
242:5,9,12 245:25
246:1,2 249:20
260:22 261:5
263:14
**reading**
24:5 94:21,25 128:2
129:4 251:23
**ready**
82:20 106:9 242:23
**real**
25:7 187:13 252:9
**really**
5:2 8:11 23:23 24:9
36:15 68:20 76:2
79:3 81:6,20 88:5
88:15 93:24 96:14
97:8 105:15,21
106:13 107:7,7
117:17 120:13
132:6 133:12 139:2
143:24 151:18
160:10 166:20
171:23 173:18
178:22 182:3 191:5
191:11 207:2
217:11 233:6
250:21 251:13
253:12 254:1 255:4
256:4
**reason**
60:12 96:5,21 138:3
139:19 147:1
152:12 165:21
174:16 196:11
207:20 210:4 252:9
252:17 257:12
**reasonable**
78:25 129:24 134:22
141:10 168:2
189:17

**reasonably**
67:15 74:20
**reasons**
6:5,21 139:18 148:18
165:3 167:12 192:4
192:15 205:8 251:6
**recall**
21:16 33:8 43:20
50:11 52:12 55:11
55:20 56:7 57:12
69:5 72:1 76:8
79:25 87:11 90:14
99:10 102:16,19,25
109:14 110:4,6,16
112:2 114:5 118:8
123:5 125:21
129:17 137:21
139:10,13 145:18
156:23 162:2,9,15
176:18,19 178:2
196:17 210:3,5
212:12 215:11
220:5 221:15 222:7
223:25 224:5
226:25 229:23
230:2,7,11,20
231:14 232:17,21
236:8,19 237:9,9,24
237:25 238:10,12
239:8,9,23,25 247:6
247:14 249:12
251:18,22 252:14
253:9 254:1 257:10
257:19 258:1,3
259:17,23
**recanted**
232:3
**receivable**
143:12
**received**
4:13 21:17 28:14,16
58:6 68:25 77:5
155:24 177:18
178:14 203:15,17
203:20 223:21
237:22 252:11



receiving
69:9
recharge
82:4
recite
96:20
recognizing
185:23
recollection
30:19 119:25 178:16
recommend
168:3
recommended
167:19
record
4:12 5:9,19 82:18,25
83:18 126:19,22
180:6 187:12
194:14 218:19
261:7
recordings
9:20
records
156:15
recruited
124:3
recruiting
124:7 142:16
recruitment
3:6 127:8 129:6
130:23 152:5
200:15,19 201:15
red
17:4 101:22 102:5
reduced
201:25
refer
83:14 207:8 221:5
225:13 233:19
257:2
reference
219:20
referenced
204:18
references
198:23

referral
52:18,21
referrals
42:1,3 47:18
referring
49:2 69:2,3 83:8,13
83:15,22,23 84:12
92:20 109:4 152:9
158:5 167:11 180:2
182:2 188:22
195:21 202:5
220:11 221:3,11,19
223:11 224:2
226:14,21 235:24
238:20 241:17
242:4,16 243:7,12
244:8 246:10,18,21
247:21 248:2,10,22
249:3,22 250:7,13
252:24 253:19,22
253:24 254:4,11,18
255:19,24 258:8
259:8,13
refusal
208:6
refusals
208:6
refused
208:3
regarding
38:12 60:16 63:22
89:2 90:25 196:9
208:9
regards
99:20 204:7
regret
69:21
regular
68:15 99:17
regularly
18:2 49:6 89:6 101:4
regulations
90:25 91:15,24
rein
248:17
Reiner

86:1
reinforce
248:18
related
6:15 17:20,25 37:17
98:20 100:7 163:1
169:14,16 172:12
174:19
relating
6:13
relation
31:10 200:14 235:19
relationship
26:2,15,16 27:19
36:25 47:7 68:24
84:24 86:15 87:7,25
88:8,18 89:18,19
103:5 105:18 145:2
145:4 208:8 217:5
relationships
208:5
relative
263:17
relevant
19:22
reliability
155:22
reliable
155:23
relied
120:19
relieved
82:13 141:1,5
rely
230:4
relying
41:21
remained
77:15
remains
133:3 201:18 202:17
202:24
remember
5:12,16 7:11 10:7
15:4 17:9,13 21:12
22:11 28:20 29:2

30:12,12,15,16,25
31:2,4 33:1,2,10
35:9 37:7,25 38:4
38:11,14 40:2,9
42:9,15,17 44:9,19
44:24 51:22 53:13
54:10 55:4 59:25
60:15 62:18,21
65:16 66:12 68:16
69:9,17 70:8,20
83:2 89:5 90:9 91:8
97:13,20,24 108:25
109:1,6 114:8
115:20 117:20
118:5 121:1 125:15
129:21 134:23
135:9,11 137:24
141:23 142:16
143:18 155:2,14
157:1,15 158:9
170:11 172:23
178:19 183:3,4
196:14 200:20
204:25 210:22
215:9 217:8 224:1
224:16,17,18
226:22 233:3 235:7
235:19 236:13
238:22,23 239:14
239:18 240:5,6,7,8
251:20,25 252:20
257:14 258:2,4
259:25 260:1,3
remembered
31:7
remind
90:17 225:18
reminded
43:15
reminder
126:22
remote
119:9 120:25
RENDER
2:12
renew



137:14 139:25
141:4
**renewed**
95:18 138:4
**renewing**
141:22
**rent**
25:2
**rented**
24:21
**reopen**
4:17 187:15,18
218:21
**repaid**
132:13
**repay**
128:16
**repaying**
136:5,6
**repayment**
127:24 128:21 132:4
134:16,24 152:10
194:23,25,25
195:17 196:4,10
221:9,13,16,16,19
224:6,11 235:20
259:8
**repeat**
5:11 39:20 76:13
149:10 171:7
202:22 221:17
**rephrase**
228:1
**replace**
227:20,22
**replacement**
131:16
**replan**
181:4
**reply**
179:6 209:3
**report**
31:18 91:4,5
**reported**
1:19 31:21
**reporter**

5:3,9 82:17 128:23
218:4 222:17
224:25 242:6
260:16,20 263:5
**represent**
183:6 197:12
**representation**
127:16,18 165:6
179:12 200:8
**representing**
7:1 8:6
**reputation**
25:21,22 27:8,20
28:6 42:4 77:6
**request**
57:15 62:10 81:15
145:1,7,8,9 175:20
185:14 195:11
197:15,19,19 198:7
198:14 199:8,9
251:6 254:24
**requested**
80:14 107:2 198:8,11
263:14
**requesting**
70:15 165:2
**requests**
9:11 48:11 74:25
121:18 123:6
142:13 144:23
194:3 197:5,14
226:17 243:17
**required**
5:13 143:7 198:22
**requirements**
143:14
**requires**
129:10
**reschedule**
181:4
**research**
19:14,18,20,21 24:18
24:19 30:21 172:1
**reserve**
4:17 7:24
**reserved**

19:2
**residency**
12:25 13:4,7,10,12
13:13,15,18 14:2
16:5 17:11 86:25
87:1 124:19
**residents**
19:7 87:3
**resolve**
70:7 112:3,10,22
**resolved**
44:19 55:1 73:9
112:5,9
**Resources**
198:23,24
**respect**
26:13 63:23 100:20
108:18 110:24
111:22 112:19
154:17 155:12
**respected**
40:25 108:10
**respective**
208:10
**respond**
54:8 55:9 100:20
102:13,17 152:7,8
152:13,16 153:5
155:3 177:9 194:2
208:17
**responded**
54:10 113:13 205:15
**responding**
100:18 102:14
113:16
**response**
3:22 26:24 54:11
175:1 179:13
193:24 195:10,25
196:3,12 198:7
199:8 208:1,2
209:16 242:10
249:19 256:10
**responses**
3:13,14 9:9,10
178:19 193:22

194:8 196:23 197:4
197:13 207:11
**responsibilities**
45:22,23 47:13 53:9
60:22
**responsibility**
58:1 91:19
**rest**
74:1
**restaurant**
70:10
**result**
49:8 77:6
**resulted**
119:1
**results**
58:17
**retired**
34:14,15 220:19
**retiring**
22:21,22
**retract**
206:7
**retracted**
168:25 206:19,22
209:17,25 210:6,8
210:10
**retracting**
209:5
**retraction**
204:12,16 205:20
206:3
**retroactive**
73:10
**retroactively**
56:24 71:23 74:6
**retrospect**
81:22 223:13
**return**
193:1 214:12
**returned**
214:6,10 247:1
**returning**
205:12
**revenue**
75:15,25 76:7 85:23



**revenues**
62:7
**review**
4:15,18 8:22 97:1,14
  97:23 98:1 107:3
  115:2 116:18
  138:17 160:25
  161:3 163:25
  219:19,22,23
  232:24 234:3,23
  237:7,16 242:21
**reviewed**
4:16 8:25 9:3,8,12,19
  9:22 64:3 97:18
  116:20,21
**reviewing**
138:19 220:12
  233:20 234:4
  235:10 238:3
**reviews**
97:6,12,16 156:20
**revoked**
95:25 96:1,6
**Richmond**
12:8
**right**
4:17,19 5:1 8:22 9:6
  10:11,15,19,24,24
  11:6,9,13,20,25
  12:3 13:9 14:5,16
  19:13 20:19 21:1,21
  22:19 23:18 24:2
  25:14,24 26:1,24
  27:18 28:25 32:2,15
  33:3,6,20,23 34:15
  34:19 35:2 38:6,12
  39:12,15 41:12 43:9
  43:14 45:4,20 46:18
  57:13 61:22 62:1
  65:20 66:9,14 70:5
  70:20 78:4 80:13
  82:16,22 83:4,8,12
  85:13,19 88:24 89:5
  92:1 93:8,18 97:3
  98:8,11,13 100:10
  100:20,21 101:14

101:16,16 102:7
104:25 109:7,25
111:24 117:22
118:17 119:10
124:20 126:15,21
127:21 128:5
129:11 130:1
131:19 132:8,18,25
134:14 137:9,19
140:11 142:21
150:7 155:11 157:7
162:5,18 164:13
173:4 174:4 179:15
180:8 182:12,15
183:23 186:13,14
186:22 188:1 190:3
190:17 191:14
196:19,24 197:8
199:19 200:4,12
201:4,8,13 203:21
205:14 206:2 212:8
212:25 214:24
216:7 217:21
218:14 219:17
220:8,13,22 221:20
222:16 225:15,22
228:6,23 232:8
234:2,10 236:24
237:15 238:13,15
239:3,18 240:11,17
241:15,21 245:12
248:25 253:3
255:15,20 256:2
**rightly**
48:1
**rights**
113:2
**risk**
119:12
**robust**
126:1
**Rocky**
24:3 70:25 71:2,6,8
**role**
65:6 87:21 214:24
**roles**

18:24 45:21,23 46:14
  47:9,13,18 53:9
  58:1 60:21 223:3
**rolling**
81:5
**room**
113:25
**roommates**
61:16
**ROPC**
35:12 75:25 76:12,15
  84:24 86:14,20 87:7
  89:19 90:3,7 97:25
  99:17 105:11,23
  135:8 137:14
  142:25 167:1
**ROPC's**
194:20 195:18
  197:22 198:19,23
  199:2 229:21
**rose**
65:25
**rough**
111:19
**roughly**
27:17 70:13 111:18
  202:1
**rounds**
173:10,13,14
**rude**
59:12 60:14 107:25
  158:12 161:18
**rudeness**
59:15,21
**rule**
51:11
**rules**
5:2
**run**
26:11 76:10 95:18
  230:19 253:17
**running**
46:21 118:22 140:13
**rush**
14:23 15:24 16:1
  27:13 36:18 203:25

204:4
**Ruth**
1:19 263:4,23

_____
**S**
_____

**Sabey**
2:11 4:5
**sad**
141:11
**Safe**
51:24
**safety**
91:1,3,11,17
**salaries**
212:6
**salary**
32:20,25 38:2 45:5
  62:20 73:25 127:13
  129:14 198:22
**Sam**
152:2,4 217:10,11
  225:24
**Samuel**
145:17
**Sateel**
170:3,6 171:12 173:5
  173:8
**satisfaction**
177:10
**satisfactory**
33:19
**satisfied**
195:4,5
**satisfy**
143:15
**saw**
13:5 24:14 26:7 28:8
  28:10 31:6 44:15
  48:2 49:6,8 54:23
  58:9,12,20 98:22
  105:15 110:8 111:2
  158:16 183:2
  184:21 217:8 231:7
  232:19 238:18
  256:20,24
**saying**



30:18 52:25 59:12 59:14 60:6,8 76:9 83:21 84:5 100:16 107:4 109:20 110:13 114:11,15 115:15 140:2 177:25 184:3,12 209:19 224:12 238:2 239:22 258:1

**says**
92:24 97:5 127:24 131:23 132:10,12 135:23 144:23 145:1,6,7,16 149:3 151:9 152:2,4,15 164:17 179:4,7 182:23 184:3 186:7 194:7,18 195:16 196:3,22 197:3,19 198:2 199:3 201:21 202:17,19,23 205:2 207:19 208:2 225:25 226:6 235:4 235:21 237:4 238:16,18 243:10 244:9,17 245:19 248:16,24 254:9 257:12 259:11

**scanned**
131:1

**schedule**
38:22 39:10 46:12 174:13 181:5,7 192:11 226:16

**scheduled**
80:12 181:4

**schedules**
40:13 125:6 180:11 244:14

**scheduling**
167:2

**Schiller**
22:24 24:22 29:1 34:13 86:18,22,25

**school**
11:5 12:4,20

**scored**
158:21

**scores**
158:22

**Scott**
186:24 187:3,6

**screen**
66:19 149:7 176:8

**screens**
128:7

**script**
123:11

**scroll**
144:19 166:18 200:23

**se**
77:19

**seal**
263:20

**search**
193:7

**second**
28:21,23 37:22 48:20 49:9,22 93:8 106:16 110:6 128:5,6 131:20 142:22 151:5 155:7 181:11 186:8 197:4 199:21 205:13 207:5,10,14 235:9 242:14 255:17 260:8

**section**
93:20,21 94:10 97:6 130:14 131:6 132:23

**secured**
87:12

**see**
12:22 17:7 23:16,19 24:20 26:24 35:16 35:21,22,24 36:1,3 36:4,5,11 39:9 41:22 44:16 46:12 46:15 47:3,18 50:21 51:12 52:12 59:7 60:2,5,9,10 74:5

79:7 92:5 93:15,23 97:5 103:14 127:25 130:25 132:2,5,21 133:8,18 134:7 141:11 144:14 146:4,7,10 149:2,7 149:9,24 150:3,6 151:5,11 152:2 159:7 164:16,17 167:3 170:2 175:9 179:4,18 180:20 181:15 182:24 184:21 186:6,20,20 186:20 187:2 188:7 188:16 193:5 194:7 194:9 195:7 196:7 196:25 197:3,18 198:2 199:3 200:1 201:6,12,13,21 206:6 209:16 215:6 215:6,7 217:6 219:5 219:23 220:24,25 221:8 222:10 224:7 231:6,25 232:12,16 233:8 235:1 237:4 240:2,7,16 241:14 241:19 256:21 258:2

**seeing**
45:24 49:15 50:13 52:10 63:8,14 106:6 119:6 122:9 125:9 139:2,5 152:24 156:23 170:11 183:4 186:10,10 212:22 231:14 236:17 239:7 251:20

**seek**
133:3

**seen**
29:15 93:12,15 116:12 144:20,21 148:2 150:5 164:24 165:7 173:19 177:14 182:25

183:4 186:25 189:16 193:21 194:16 197:8 220:1 220:2,3 222:18,19 222:21 225:4 231:25 232:13,15 233:22 234:10,14 234:15 240:19 241:21 245:23 255:12 256:16,17 256:19,22 259:6

**sees**
48:23

**selling**
25:3

**send**
22:15 41:18 90:18 109:12,15 110:17 113:18 183:19 217:25 218:2 219:7 260:22

**sending**
219:6

**senior**
29:16,17,20

**sense**
29:8,9,16 44:3 82:2 140:1,3 204:2 232:7 242:3,14,19 245:14 246:11 248:8

**sensitive**
188:11

**sent**
9:11 28:9 71:9 89:14 92:2,3 174:13 183:7 186:13 189:15 190:8 205:18 208:4 222:19 223:9 233:12 237:14 238:25 242:21 243:22 250:22

**sentence**
221:8 226:5 231:15

**separate**
118:1 190:25 196:16 238:7,8 239:16



separated
139:4 157:13
separately
32:9,11
September
102:11,15 103:2
106:16 110:5 117:8
125:24 228:10
sequence
215:11
serious
15:17 66:7 165:12
204:19
seriously
209:9 243:12
service
90:5 93:11 227:12
services
1:10,20 71:8 85:1,1,3
85:5 89:20 93:11
94:5,24 98:7 123:13
137:15 138:7,9
set
55:8 61:2 68:11,20
89:4 136:22 174:13
197:5 227:9 235:2
243:2 244:2,18
248:12 250:2,24
255:18 260:8
263:19
setting
19:8 55:12 211:6
245:2 255:1
settle
229:25
settled
137:25
settlement
3:23 69:3 258:25
seven
66:6
severe
168:13,14
severity
189:18
SFH

145:24
shake
108:17
shaking
55:13
share
26:10 62:13
shared
59:6 98:25
Sharon
64:22 65:5
Shauna
186:23
Shawna
187:5
Shawnna
187:3
sheets,if
261:6
shelf
17:7
Shelly
178:8
shift
55:3
shocked
55:11
shocking
114:14 117:5
short
8:13 15:2 106:13
107:2 166:19
179:15 182:17
186:19 187:12
207:4 249:22
250:24
shorter
224:19
shorthand
263:4,8
shortly
45:3 117:1
shot
117:11
shoulder
64:6

show
65:23 96:7
showed
26:12 42:20 65:25
showing
42:21 144:10 149:6
shows
149:6 203:11
shut
71:7
sick
80:9,10 81:1,10,11
155:18
side
63:20 85:12 106:7
side-by-side
243:24
sign
75:2,7 90:11 97:22
134:2,9,11 157:8
168:1 190:10,18
193:3,9,13 200:17
200:17 203:22
204:10 209:25
214:9,13,14 226:24
229:13,16 234:23
236:10 237:1
242:23 244:16
245:3,11 246:16
260:22 263:14
signature
93:15 133:20 134:7
201:1,6 203:9
215:12 248:18
261:11
signatures
93:14
signed
90:20 93:13 99:1
105:22 133:23
134:5,6,18 136:14
136:18 185:10,12
200:13,18,20 201:2
201:24 203:11,16
206:25 209:21
210:11 212:9 215:9

215:10 231:8,13
235:22 243:1
248:25 249:6,7
254:17
significant
14:19 37:13 38:20
195:16
signing
203:25 221:25
244:18
signs
54:23 170:13
Sila
86:12
silent
110:21
similar
39:10 45:25 46:8
72:23 122:14
147:15,16 215:5
216:9 234:7
simply
253:13
Simultaneous
227:25 242:6 255:7
single
71:1
sir
83:3 118:11 126:24
176:14
sister
253:18,20
sit
54:9 96:20 111:14
site
124:25 140:23
sites
16:14 124:24 226:19
situation
47:21 55:21 56:24
169:7,8 223:17
six
191:2,6 203:18 217:9
size
31:9
skills


MAGNA
LEGAL SERVICES

68:7 105:16

**skim**
94:12

**skimmer**
94:13

**slack**
78:18

**slanderous**
183:13 184:1,2,7,13
184:23 256:24

**sleep**
172:15

**sleeping**
162:13

**slick**
42:16 44:11

**slide**
65:23

**sloppy**
39:19 40:3

**slower**
168:22

**slowly**
119:21 136:14

**small**
45:4 57:22 98:25
104:4,16 149:6,18
238:18 241:13

**smaller**
20:8

**smart**
104:24

**snapshot**
148:3

**sneeze**
148:22

**snow**
80:15,20,22

**socialize**
103:6

**society**
170:23

**solid**
27:8 28:8

**solution**
40:8 131:14 140:14

193:16

**somebody**
20:25 22:21 23:15
37:22 52:17 60:5
79:1 95:14 111:21
115:25 116:18
123:25 124:18
129:10 131:1
140:20 141:16
154:9 164:4,5
167:23 169:11
174:5 184:4 191:20
211:14 214:17
220:20 231:1

**somebody's**
100:20

**somewhat**
43:16,23 90:23
115:20 175:24
235:17

**soon**
109:5 112:21 150:14
235:22,25 236:1

**sooner**
245:14

**sorry**
9:17 15:6 21:1,16
29:2 35:6 39:19
44:24 51:22 71:15
73:21 77:9 83:25
88:5 89:24 91:7
92:24 93:3 98:10
105:7 108:5,12,22
111:1 118:6 128:25
129:2 130:18,20
133:12 139:1
145:19 149:12
153:8 155:4 157:15
168:22 173:13
191:4 207:13 218:9
218:14 219:4
220:23 221:17
224:16,17 234:1,13
237:11 242:8 252:1

**sort**
43:13 63:7 73:18

86:23 117:7 158:22
243:5

**sound**
126:16 163:14,20

**sounds**
81:6 82:24 92:12
126:17 131:12
157:20 208:14,16
208:17 223:9
236:24 238:7

**source**
102:5

**South**
30:14,16

**southern**
10:18

**space**
157:14

**spared**
122:25

**spats**
53:12

**speak**
8:1,12 30:11 54:1
55:22 57:10 110:2
112:24

**speaking**
21:6 30:12 105:6
126:2 128:24 140:8
166:23 187:11
227:25 242:7 255:7

**specialist**
170:1

**specialization**
16:10

**specialties**
89:14

**specific**
12:24 16:9 21:19
37:8 38:11,15 59:16
62:8,9 69:14 70:1
89:17 90:2 158:13
161:16 176:19
182:3 192:18 222:3
224:16,17 236:11
242:2,18 253:25

**specifically**
42:9 47:11 67:21
135:11 150:16
178:2 230:21
242:24,25 254:2
257:14

**specifics**
60:15 154:9 155:4
240:8 243:17
252:10

**speculate**
114:10

**spell**
143:18

**spelled**
90:4 101:17 147:24

**spend**
26:22 80:23,23
122:13 170:3

**spent**
27:13 79:15 171:19

**Spirit**
83:6,16,19,23 84:10
84:14 215:1 217:4
227:11 252:5,25
253:2,2

**split**
57:2 62:7 63:18 74:2
79:5 87:8,9

**splitting**
56:13 73:1

**spoiled**
54:5

**spoke**
7:12 8:20 109:21
114:18 116:15,16
150:7 178:5,13,13
239:18

**spoken**
7:1 8:6 22:6 30:9
135:18 140:19
178:7

**spot**
166:20

**spread**
50:18



MAGNA
LEGAL SERVICES

**spring**
41:9,11 57:15 116:11
137:22 150:13
**Springs**
15:1 25:10,15,19
34:1 35:1
**squared**
236:2
**St**
107:17 124:23 139:4
142:6,10 145:24,25
146:25 147:2,5,12
147:20 150:9,15,17
150:21 151:17,24
215:15,16,20
227:23 228:12
**staff**
24:23 54:17 94:23,24
95:5,7,10 96:9,11
96:16 116:15 147:3
147:23 153:6,17,24
154:5 155:9 156:5
156:25 157:9,16
158:2 160:3 161:18
163:9 192:8 199:2
215:25 216:12
227:9 228:12
244:15
**staffing**
142:13 227:6 244:22
248:3,3,8
**stamped**
215:12 241:19
**standard**
118:23 234:22
**standards**
107:12,13 153:2
**standing**
81:10
**standpoint**
27:23,24,25 28:2
**Stark**
137:1,2,12 259:16,24
**start**
13:11 27:25 40:23
88:6 119:20 144:22

184:13 212:7,10,14
213:19 214:3,10,16
214:17,18 219:3
228:9 236:3 240:17
251:16
**started**
13:12,13 25:14,18
32:15 33:9 34:20,25
35:8,13 38:7 43:11
66:5 67:1,9 86:18
86:20 87:3 116:11
118:17 120:14
125:22,23 206:1
214:21 227:17
228:2 230:9 235:23
252:5 253:4
**starting**
16:6 62:6 119:23
124:22 165:5
173:22,22 180:14
180:14
**state**
10:20 61:9 91:16
104:6 128:20 133:5
261:16 263:2,5,11
**stated**
163:12
**statement**
182:9
**states**
1:1 144:25 145:2,23
147:22 150:7 152:1
166:23 183:8
188:11 191:21
198:17 200:12
201:17
**stating**
59:8
**Stauberbourg**
86:1
**stay**
18:15 45:19 230:1
**stayed**
55:3 90:20 131:17
**staying**
246:22

**steps**
258:12
**stick**
74:8 188:15,23 189:2
192:22
**sticking**
185:20 189:24
**sticks**
105:21
**stigma**
170:18,25 171:6,9
172:5,7
**stipulate**
48:13 96:4
**stipulations**
96:20
**stop**
5:8 89:6 111:7 113:9
113:12 116:13,14
126:25 155:9
**stopped**
102:14 105:24 106:1
126:5 138:17
159:18,24 163:15
**stopping**
128:23 242:6
**storm**
80:15,20 89:15
**story**
72:23 106:9
**strain**
121:9,12
**Street**
2:5,13
**STREPD**
177:3
**stress**
82:13 117:6 120:10
122:3 162:20,25
163:5,7 164:5
165:24 166:9
167:10,13 168:6,10
169:14,16 172:13
173:23 174:19
177:1,16 179:22
181:24 190:16

191:8,13 255:13
258:17
**stress-related**
183:22
**stressed**
55:5 160:22 163:3
176:19,23 185:3,3
**stressful**
82:10 118:10 120:3,5
121:2,19,24 122:9
122:21,23 163:4
174:4 181:10,11
186:2 256:5
**stressor**
120:17 121:7
**stretch**
184:7
**strictly**
26:17
**strong**
46:1 205:6
**strongly**
210:17
**struggled**
172:10
**struggling**
47:1 169:22 170:19
171:16 173:24
**stuff**
16:17 67:25 71:18
91:17,17 107:3
116:20,21 134:19
143:13 199:15
252:2,8,21,22
258:18
**Subscribed**
261:15
**substantial**
34:2 37:20 76:6
124:11
**substantially**
179:17
**subtle**
111:24
**success**
177:5


MAGNA
LEGAL SERVICES

**successful**
74:13,15 77:12
**sudden**
255:14
**suddenly**
124:24 174:14
**sued**
6:18
**suffered**
164:2
**suffering**
5:25 117:25 164:4
175:9
**sufficient**
170:16
**suggested**
54:19 170:1,2 237:4
**suggestions**
47:3 89:11
**suit**
199:10
**Suite**
2:5,13
**summarize**
14:18
**summary**
144:23
**summer**
124:2,3 192:11
**supplement**
45:5
**supplemental**
197:4
**supplemented**
86:8
**support**
127:13 134:21 147:3
172:24,25 182:9
183:21
**supporting**
65:7
**supportive**
41:18 52:9,17 181:14
182:10
**suppose**
33:18 44:15 89:23

168:13 212:5
213:17
**sure**
12:12 13:5 14:13,21
16:15 26:10 28:10
30:8 35:11,16 39:8
52:13 57:14 58:11
64:1,6,7 71:11
82:21 83:9 84:16,18
84:22 85:16 90:21
93:25 94:19 97:10
97:16 99:11 110:7
114:6,10,17 116:17
119:16 120:21
121:3,4 126:13
128:15 132:10,24
135:19 140:19
142:2,9,14 143:17
156:22 161:16
165:14 168:20
172:13,16 174:10
174:25 176:8 178:2
178:18 181:20
183:5 189:13
194:11 196:14
205:14 209:9
211:15 215:5 217:1
225:1 230:17
236:25 241:2
243:11 254:3,12,17
257:3 260:18
**surgeons'**
147:10
**surgery**
41:21,24 51:16 85:23
**surgical**
86:5
**surprise**
37:22 160:12,14
174:11 235:14
250:5
**surprised**
146:7 235:17
**surprising**
146:10
**surrounding**

172:5
**surveys**
59:17,23
**survive**
207:3
**suspect**
193:14 249:20
**suspicion**
175:11,11 185:8,22
188:21
**suspicions**
175:6 185:1,2
**suspicious**
185:6 255:12,16
**switch**
110:2
**sworn**
4:8 261:15 263:6
**symmetry**
192:5,8
**symptoms**
164:3
**system**
172:25 173:1
**systems**
198:24

———————————
**T**
———————————
**tail**
220:13
**Taja**
9:4
**take**
14:13 39:16,21 40:21
40:22 41:3 45:8,8
45:11,13 50:22 53:6
58:4 59:1 61:1
62:17 65:19,21 80:7
80:9 81:12,21 82:22
111:7 115:17
116:19 134:5
139:18 142:23
148:23 165:13
166:22 167:20,21
176:16,17 177:15
181:19 186:9

189:21 192:10
203:14,15 204:3
209:9,19 213:11
218:25 219:25
220:4 226:7 230:13
231:15,24 242:5,11
245:25 252:3
258:12
**taken**
1:16 6:12 71:11
82:25 97:16 107:17
120:11 126:20
136:22 177:15
244:14 253:7
258:13 263:8,10
**takes**
50:4 202:2 211:13
214:21 248:18
**talk**
5:6 7:16,20 22:5
31:14 39:18 50:20
54:22 68:1,20 85:17
87:23 89:6 93:3,16
100:22 105:20
106:5 110:9 111:1
111:14 112:1
113:25 114:23
117:10,14 118:3
122:19 142:2 173:5
176:22 182:20,23
183:8 209:6 226:12
226:14 237:18
242:23 257:9
**talked**
8:12 23:3,3 70:3
74:21 75:24 80:5
102:13 106:13
121:17 124:17,18
155:6 159:21
163:25 172:24
176:21 177:2,5
178:9 188:20 189:5
189:9 207:14
221:24 223:19
243:22 247:15
**talking**


**MAGNA**
**LEGAL SERVICES**

19:16 21:21 27:18
47:11 67:18 74:14
84:19 93:20 101:5
108:16 112:15,16
112:17 115:7
116:13,14 117:21
125:22 128:25
130:16,21 131:24
134:17 139:16
148:18 158:18
162:16 163:2,16
165:24 170:23
181:25 198:8
211:21 221:9
222:23 223:4
233:13 235:25
241:16 250:23
251:1 259:25

**talks**
170:7 238:6

**Tanner**
15:14,16 29:15 51:15
51:18 56:18,19 57:4
57:9,10 70:9,14,19
70:22,23 71:3,9
72:18,24 86:2
125:16

**Tanner's**
56:24

**teaching**
19:7

**tech**
44:12 86:12 145:18

**technical**
76:3 85:3,4,7,8,11,22
87:9 88:17 100:15

**technically**
65:1 151:8

**technologies**
86:13

**teenage**
122:18,19,21

**teleconference**
263:13

**television**
42:16

**tell**
11:13 13:3 16:17
17:22 35:5 45:7
67:3 102:10 116:3
116:22,25 117:22
132:8 137:20
144:10 155:5 156:2
165:1 171:18 174:2
181:7,9 215:12
235:8,9 236:5,9
237:5 238:4 245:7
256:25

**telling**
47:24 68:3 125:15
165:2 166:1,5,8,10
230:7

**temper**
36:20

**temperament**
36:21

**template**
232:2

**ten**
27:17 66:6

**tend**
176:10

**Teresa**
257:5

**term**
9:18 111:5 193:24
221:16,16 222:4
223:14 224:19
246:9 259:9

**terminated**
6:13,16 90:22

**termination**
6:24 7:2,17,20 185:5

**terms**
140:8 180:2 194:21
194:22 195:3,4,5
197:24 198:21
221:16,23 222:12
223:5 224:6

**terrible**
80:20

**terribly**

52:9 207:3

**territorial**
123:15,17,20

**Terry**
220:21,25 233:9,10
233:12,25 234:1,19
235:16 238:25
259:25

**test**
25:7 101:21

**testified**
4:8

**testimony**
6:1 261:8

**tests**
102:3

**text**
15:17 100:1 101:5
102:18 110:17
152:15

**texts**
116:11

**thank**
6:8 22:25 81:22
126:18 149:15
168:21 187:22
218:14

**Thanks**
260:7,10

**therapist**
154:7

**therapists**
216:12

**therapy**
17:20 51:16 62:9

**thing**
36:5 45:7 47:16 54:6
58:21 60:4 63:2
67:3 73:4 77:23
88:21 102:4 104:7
114:18 117:10
121:17,20 123:4
132:2 134:21
137:11 143:18
149:7 155:11,14
174:18 176:20

182:21 204:17
241:25 255:1,25

**things**
9:15 16:21 18:10
19:7 26:8,11,20
31:25 32:11 35:19
37:8 53:13 54:15
60:1 63:12 64:7,8
71:23 72:3 73:2
74:21 75:5 85:8,9
87:23 89:9,16 90:4
90:19 91:2,4,6,10
91:12,20 94:6,21
96:3,7,25 98:16
101:15,22 107:4,19
107:20 112:9
113:19 123:10
125:11,13 153:19
154:9 158:14 162:6
163:1 171:12
176:10,19 177:15
192:12,20 206:11
206:25 211:7,8
213:2 214:17
216:18 241:25
252:22 255:1

**think**
4:15 8:1,20 10:22
12:21 15:21 17:15
18:9,10,22,22 19:1
20:16 21:8,19 22:2
23:7,8 24:7 25:1
26:4,12,20 27:16
28:8,18 29:7,15,24
30:11,25 31:6 34:15
36:18 37:13,17 38:2
40:25 42:14,21
43:12,24 44:13
45:16 46:15 47:21
48:1 50:4 52:9 54:9
54:11,20 55:3,13
57:7 58:22,25 59:2
61:1 62:15 63:24
64:14 65:11,11,15
65:24 68:19 69:15
70:2,13 71:17,21



72:2,9,16,25 74:16
75:12 76:5,8,23
77:7,11 78:9 80:10
81:4,7,8,15,17 82:3
82:9 83:23 86:2,18
87:18 90:8 91:24
92:13 93:15 95:2,3
95:15,16 96:5 98:8
98:16 99:19 100:7
100:20 101:19,24
102:16,16 104:17
105:19 106:23
107:4,10,11,13,21
108:8,25 111:9
112:11 113:12
114:5 115:22
116:16 118:15
119:23 122:17,18
123:24 124:10
125:16,16,23 126:8
126:11 127:12,22
129:18,24 130:14
134:4,25 136:15
139:5 140:9 141:24
142:12 143:2
145:20 147:5,14
152:9,21 154:1
156:4 157:7,14,23
160:16 161:15
163:8 164:14
165:12,17,21,25
166:19,22 168:15
169:10 170:8,14,21
170:22 171:11
172:7,12 173:11
177:12,13 178:11
179:24 180:14
182:22 184:6
186:12 187:7,14,18
189:20,22 190:13
191:12 192:3,16
196:24 199:14
203:4,21,24 204:9
206:6,13,14,16,23
208:13,14 209:1,2,3
209:10 211:11

215:13 216:17,18
217:6 218:10
220:13,17,18 223:3
224:22 228:8
229:10,15 230:10
231:5 232:6,18,23
233:6,9,12 237:20
238:13,23 240:24
240:24 242:2,18
243:9 244:11 247:2
247:11 248:5,7,20
249:7,22 252:15,20
253:5,6 254:15
255:4 256:19 257:9
257:13,22,25 258:6
258:14 259:5,14

**thinking**
10:20 32:3 59:25
69:7 142:11 157:11
165:10,11 192:23
192:24 206:20
210:18 237:8

**third**
15:14 44:8,8 48:22
57:13 67:8 86:11
130:19 142:12,17
142:23 151:8,9
175:14 188:6,10
226:5

**Thompson**
9:4 171:15

**thought**
25:23 29:8 31:24
43:3,18 66:1 84:2
88:12 95:19 124:10
124:11 137:11
142:8,9 146:17
151:19 167:13
170:8,16 174:12
184:15 189:24
191:21 192:2,14,21
204:19 231:9 239:4
243:4 255:8,10

**threat**
175:19

**threatened**

115:14 176:9 185:17
189:4 254:25

**threats**
106:20 109:8 114:19

**three**
29:14 32:21 34:18
37:4 39:2,2 40:5
41:8 46:20 48:3,18
50:11 60:10 62:20
70:11 71:13 85:21
90:14 114:11
119:22 120:19
124:24 125:18
126:4 132:16
133:12 140:18
142:8,25 165:5
174:15 175:22
179:23 180:11
185:5,14,20 188:25
213:8 226:18
228:24 230:18
250:15,16,25
255:15

**three-month**
190:2,3

**three-year**
32:17,19 33:15

**tie**
223:15

**tied**
165:25

**ties**
140:5

**till**
36:9

**Tim**
225:24

**time**
4:25 7:23 8:13 11:19
12:6 14:24 15:3,4
15:10 16:3 21:8,12
22:17 26:21 29:2
32:6 33:8 34:2,17
35:4,5,13 37:3,7
38:8,16,20 39:7,11
39:21 40:2,6,11,17

40:21,22 41:1,2,3
41:14 43:17 46:2,18
47:10 48:6 50:15,16
54:16,21,23 55:14
55:21 57:3,13,22
58:4,23 59:9 60:24
60:25 62:4,19 64:18
65:10,14,24 67:5
68:12,20 70:8,21
71:10,21,24 72:2,17
78:13 81:4,12,15
82:2,3,4,7,12 83:9
84:6,13 89:10,10
90:17 98:22 101:18
103:1 107:2 109:21
110:19 112:9
113:23 114:25
117:5,8,16 118:10
118:23 119:7 120:3
120:5,23 121:19
122:13,20,20
123:25 124:22
125:11 131:18
133:8 134:17,18
135:8,15 136:23
138:1 141:11,25
142:6 147:14 148:2
148:3 153:17,17
154:2,19,20 155:22
157:3 159:16
162:17 163:4 165:9
165:22 166:21
168:1,1 170:3
172:15 174:4,9,24
175:8,9,14,21
176:19 180:9,13
181:19 182:5
184:22 185:23
186:9 191:11,18,20
192:21,25 199:17
199:24 203:15
204:6 205:9 210:12
212:15 213:1 217:8
221:4,23 223:15
224:8 226:8,15,19
226:23 227:2,9,19



228:9 230:5,8,9,13
232:19,19 236:12
242:2,5,12,18,24,25
243:6,17 244:25
247:15 248:9,12,12
250:17 253:4 255:8
261:8
**timeline**
236:16 237:10,11,12
**times**
26:20 36:24 37:1,5
39:14,17 41:25 48:9
50:11,14 57:11
67:24 78:14,20
103:13,17 104:21
107:24 108:1
111:11,25 121:14
148:5,6 153:13,13
154:24 155:4,18
159:13,14,21 161:1
161:3,15 189:9
216:18,21 229:3
250:9
**timing**
157:21 165:15 175:7
185:1,22 188:21
189:19 255:1,12
**title**
149:9,22,24 219:21
241:14
**titled**
164:15 201:11
219:19 231:16
**titles**
31:3
**today**
4:20 6:1,6,22 8:9,11
8:15 45:14 106:10
184:22 187:18
256:25
**today's**
8:10
**told**
25:2 54:13,16 55:24
58:16 60:10 69:20
72:9 73:10 75:12

78:13 97:20 109:18
110:24 112:18
113:3 114:9 117:23
122:1 141:3 143:9
146:18 148:5
150:15,17 151:4
155:9,15 156:3
157:3 161:21
162:25 169:24
170:11 182:11
184:21 186:1 204:9
204:23 205:5
214:19 235:17,18
236:7,15 237:19,22
246:12 247:6,17
257:15
**tolerate**
56:3
**top**
31:7 61:20 131:21,22
132:4 136:1 158:9
164:17 179:4 188:8
197:3 235:9 246:5
**topic**
173:4
**touch**
101:15 217:13 222:1
**tough**
114:8 166:20
**town**
25:22 39:25 48:19
55:7 98:17,25 109:5
190:23
**toxicity**
31:10,18,19,20
**track**
33:16
**trailed**
113:12
**train**
252:18
**trained**
124:19 168:5 251:14
**training**
10:12 12:24 26:13
251:11,18 252:3

253:6
**trainings**
99:15 251:16
**transcribed**
263:9
**transcript**
261:5 263:15
**transcriptionist**
17:18
**transcripts**
8:25 9:4
**transitioning**
198:19 199:2
**travels**
170:6
**treat**
14:14 26:11 59:6
153:6,12,13,24
161:22 172:8
**treated**
55:12,25 72:10 74:20
77:19,21 118:24
140:20 153:15
154:1 155:9,12
156:25 172:14
215:22 216:1,2
**treating**
16:11 19:8 88:2
119:2,17 167:23,24
**treatment**
31:20 35:18 36:1,3
60:3 62:9 78:3 79:7
79:7 85:8 86:5,5
88:12 158:20 192:6
215:7,7
**treatments**
139:6
**tried**
41:9 65:21 67:13
79:15 88:22 96:17
111:1,10,11,23
112:24 143:22
171:14 193:5
**trigeminal**
16:20 31:12
**trigger**

232:13
**trouble**
100:2,13,17
**troublesome**
54:24
**true**
76:11,14,17 105:25
142:4,24 150:9
224:13 235:12
239:13 261:7 263:9
**trust**
200:11 244:1
**truthful**
6:6
**truthfully**
5:13
**try**
20:22 47:3 50:22
52:14 68:1 91:12
94:13 106:5 110:1
111:4,25 117:7,10
123:6 135:24
154:12,17 168:5
176:25 177:3
188:24,25 255:8
258:6
**trying**
18:9 29:11 45:14
53:16 55:8 65:17,19
90:8 106:2,4,16
113:6,7 123:10
125:13 140:11
142:20 157:24
175:25 176:24
177:7 178:10 181:6
187:14 207:3
220:22 224:18
229:25 239:12
240:4,6 242:1,17
249:20 254:23
255:2 256:13 258:2
**Tuesday**
238:16
**tumors**
14:14
**turn**


MAGNA
LEGAL SERVICES

106:22 110:12
127:21 130:1
131:19 194:12
195:13 197:14
198:14 231:3 256:7
**turned**
175:17
**twice**
56:15 57:12 145:22
**two**
14:21 15:10 20:25
29:10,12 35:10 39:3
49:1 50:10 56:9,20
57:24 63:21 68:8
71:1 73:16 81:16,17
82:17 86:21 90:14
98:22 105:22
108:19 122:22
124:24,25 128:6
129:3 136:10
139:15 142:10,20
142:21 146:15
147:22 156:3
157:25 181:6 192:4
192:10,15 199:16
203:5 205:18 209:2
209:13 214:21
220:4 223:3 226:6
226:18,19 228:24
228:24 230:13,19
256:5
**type**
26:2,9 62:8 72:23
131:23 179:20
181:13 182:1,2
**typed**
179:14
**types**
45:25 164:3
**typical**
35:18 49:5 248:9
**typically**
154:7 203:23

—————— **U** ——————

**UC**

66:24 67:6 79:25
80:3
**Uh-huh**
118:18 250:1 259:3
**Ultimately**
140:22
**ultrasound**
62:11,14,25
**unable**
163:13
**unassigned**
53:2
**uncommon**
24:5
**undergrad**
11:21
**Undersigned**
261:16
**understand**
5:10 8:1 9:13 45:19
84:5 88:5 94:22,25
105:24 133:12
205:10 242:10
244:20 249:4
**understandable**
38:9
**understanding**
6:21,23 10:12 76:2
98:6 173:16 201:24
248:19 252:12
253:10,11
**understandings**
252:12
**unexpected**
31:21
**unexplained**
155:20
**unfair**
56:22 74:11
**unfairly**
72:10
**unfortunately**
82:15 149:5 188:14
**unit**
42:13
**UNITED**

1:1
**university**
10:19,21,22,23 11:22
12:5 13:2 14:23
15:25
**unrelated**
7:19
**unusual**
58:21 75:11
**unwritten**
51:11
**ups**
215:6 216:5
**upset**
54:24 61:10 256:4
**upside**
120:20
**urologists**
47:8 67:1,6
**use**
63:5 101:16 184:17
187:8 228:3,15,20
230:24 239:11
257:15 258:6
**useful**
120:12
**uses**
158:21
**usual**
120:4,5 121:24
**usually**
19:1,6 35:22 36:23
50:17 93:13 94:13
94:21 95:13 96:3
99:22,23 101:14,18
102:17 108:3
110:12 153:5 160:2
168:6 180:9,10,13
193:25 227:7 229:8

—————— **V** ——————

**v**
1:8
**vacation**
38:21,23 39:14,17,22
39:24 60:7,11 81:14

81:16,18 174:11
190:3 213:1,6,11,12
226:17 227:18,23
228:22 247:22
248:9
**vacations**
180:9
**vague**
243:4
**Valentine's**
176:13,14
**valuable**
76:5
**value**
76:22 259:15
**variable**
67:11
**variably**
153:7,9,10
**varied**
62:3
**variety**
13:7 35:17
**various**
16:24 53:12 89:14
**vast**
46:3
**VCU**
12:16
**venture**
85:20 86:10
**verbal**
5:2 106:20 111:20
247:13
**verbally**
69:19 101:15 155:15
205:24
**verbiage**
52:15
**version**
176:8 231:7 232:18
**versus**
19:10 85:9 102:5
125:8
**vetted**
108:14



**viable**
115:9
**video**
263:12
**violated**
259:18,19
**violates**
259:15
**Virginia**
12:5,6,7,8
**visit**
60:3
**visited**
11:3
**visits**
35:18,18 59:7 79:8
**vividly**
57:12 109:6
**Vogel**
95:23
**voice**
43:1
**volume**
118:23
**voluntary**
157:2

---

**W**

**wait**
100:19 118:25
119:13 149:4
**waited**
206:18 209:24 214:6
214:9,12
**waiting**
210:7 246:15
**waive**
259:12
**Wal-Mart**
12:11
**Waldoff**
9:6
**walk**
247:5
**walked**
112:11

**wall**
12:22
**want**
4:16 5:6 14:5 23:21
26:25 31:2 35:10
40:21 45:16 47:8
50:24,25 56:16 60:2
60:6,8,10 61:1 74:6
78:4 82:22 85:17
89:25 92:1 93:2
94:17 113:4 115:16
120:1 126:13
127:21 130:1
135:25 142:23
144:3,19,22 189:2
197:14 201:9 203:8
207:5 214:17
217:24 218:2 225:5
235:22 241:2
258:12 260:13,14
260:15,22
**wanted**
4:12 7:21,24 14:7
46:15 51:21 68:12
71:11 83:9 84:21
101:17 112:10
116:3 122:12
126:25 128:10
140:4 146:21
156:11 181:19
185:25 204:10
211:15 217:22
230:8,9 236:2 238:4
238:25
**wanting**
51:5
**wasn't**
12:13,15 26:10 37:15
46:17 54:16,21 56:5
61:6 62:13 63:8
74:18 98:20 100:10
100:18 105:15
107:1,15 111:5
122:13 138:17
139:2,22 140:19
150:17 154:10

160:10 172:7 182:7
189:14 191:14
193:23 198:11
207:1 209:9 210:6
210:11,14 212:24
228:8 237:21 239:2
242:23 243:2
244:13 252:16
253:12,25 255:5
**watch**
103:10 121:3
**water**
45:14,18
**way**
12:10 21:10 37:23
46:21,22 48:12
52:20 53:12 55:12
63:7,16 87:1 88:17
90:9 95:3 107:19,20
107:20 109:4
111:20,21 112:20
113:14,16 136:23
138:8,21 140:21
143:25 147:5 149:5
154:15 155:8,15
156:25 157:4
181:16,21 185:9,19
188:7 190:5 213:10
242:13 246:22
250:17,18 254:20
255:3 260:19
**Wayne**
170:3,6
**ways**
67:13 99:24 176:21
217:16
**Weatherby**
229:16
**website**
22:11,13,13
**Wednesday**
8:21 204:15
**weeds**
134:24
**week**
8:18 10:4,5 39:23,25

60:1,5 78:14 81:16
150:14 160:7,13,19
174:11,12 181:7,9
181:11 185:5
190:16 191:8,12,14
199:15 207:3
209:21,24 227:18
229:5 243:21
252:21 255:14
256:4,5,20,21
257:14,21
**weekend**
110:6 179:24
**weeks**
20:16 39:2 78:15
81:18 108:15
123:12 179:25
181:8 186:2 203:5
203:18,18,22 209:3
211:1 213:8 242:22
**weird**
130:11
**welcomed**
111:15 246:23
**Weller**
145:17,21 217:10,11
225:24
**went**
11:22 12:5 18:19
23:8,10 42:11 44:21
44:23 51:20,25 52:7
65:15 66:12,20 70:9
80:21 81:16 99:1
102:12 112:24
117:9,11 126:25
170:9 206:12
226:17 230:10
**weren't**
9:5 38:19 39:25
112:16,17 138:6
139:15 140:8 141:3
159:16 162:16
**Western**
10:23
**WHEREOF**
263:19



**Whitley**
2:3 3:2 202:14
  211:23
**Whitney**
4:3,3,11 8:5 42:7
  77:10,24 83:1,18,21
  84:2,4,8,11,16,21
  92:10,19 94:9 98:9
  99:14 101:3 126:15
  126:18,21 133:15
  135:2,3 136:1
  146:20 148:12,16
  149:13 151:15
  156:16 161:11
  166:5,9 168:14,20
  168:24 169:8,19
  180:7,8 184:11
  187:24 188:1 212:3
  212:17 225:21
  226:3,11 260:19
**wife**
14:24 55:8 80:13,21
  103:19 104:14
  120:19
**willing**
74:4 138:11 139:22
  182:4 190:15 213:9
  260:7
**willingness**
26:13
**winding**
95:20
**winter**
137:22
**wish**
35:5 67:3 68:11
  99:20 166:24 172:7
  181:20
**withdrawn**
208:3,11,22 209:22
**withdrew**
78:1
**withstanding**
181:17
**witness**
6:9 261:17 263:6,13

263:19
**woman**
104:6
**won**
42:22
**wondered**
31:6
**word**
69:22 110:13 145:9
  165:13 184:16
**words**
33:20 128:14 132:9
  147:12 152:13
**work**
8:12 14:6,18 22:20
  23:19 31:23,24 32:4
  33:19,20 37:9,11
  39:4,13,17 50:5
  51:1,5,13,13,21
  52:5 53:1 57:22
  80:12 81:13,25 82:7
  90:1 92:5,10 98:4
  98:14,17,19 99:4,5
  101:7 103:6 106:17
  109:16 111:4 113:2
  113:3 125:5 140:20
  140:23 152:18,19
  152:22 154:22
  155:1 160:18 162:5
  168:11,15 169:14
  169:16 172:13
  175:4,16,16,17,20
  176:25 177:3,11
  188:25 189:25
  190:15 191:7 208:5
  209:12 211:18
  215:5 216:14 227:1
  243:24 250:16
**work-related**
164:3
**worked**
14:10,20,21,22 28:9
  40:12 41:1 55:24
  58:12 69:22 81:2
  82:6 90:20 114:1
  141:10 152:21

160:22 185:9
  211:18
**worker**
25:23
**working**
15:3,6,9 23:16 25:15
  25:18,24 26:14 32:8
  32:9,11,15,16 35:4
  35:13 36:22 43:22
  50:6,8,12 56:15
  57:18,20 70:24 73:6
  74:5 78:8,14 81:24
  99:10 109:5 111:3
  112:21 160:4,12
  185:16 190:14
  208:8 212:21
  213:10 215:14,14
  217:1 227:21
  246:12
**workload**
47:2 78:17,23 79:2,4
  79:9,17 119:18,19
  123:8 124:10 189:6
**works**
87:13
**workshops**
20:2
**world**
104:4,16
**worries**
98:11
**worse**
217:16,19
**worst**
118:25
**worth**
181:6
**worthy**
129:12
**wouldn't**
55:25 56:3 61:17
  78:25 102:13 112:5
  135:18 137:14
  141:5 160:1,14
  164:9,10 185:2
  190:25 191:15

211:8 214:4 252:9
**wound**
120:2
**wow**
10:15 42:24 104:1
**write**
32:6 95:3,3 101:24
  259:21
**writing**
22:7 32:5 101:25
  155:15
**written**
57:5 96:3 156:22
  180:16 242:18
  258:10
**wrong**
42:1 87:20 130:20
  147:24 153:18,21
  153:25 154:5 190:7
**wrongful**
6:24
**wrote**
54:3,11 59:18,20
  109:6 180:20 205:4
  220:2

-----
**X**
-----

-----
**Y**
-----
**yada**
212:6,6
**Yahoo**
92:7 101:10,12
**yeah**
7:19 8:24 9:7,17 12:9
  12:11 14:4 15:9,13
  16:1,4,19 18:5
  19:12,16,23 20:11
  22:1,6,21 24:11
  25:11,11 27:4,13,14
  29:14,21 30:11,23
  31:2,17,25 32:3,14
  33:5 34:19,24 36:15
  36:22 37:4 38:22
  39:3 40:10,23 43:2
  43:10 44:22 45:4



46:20,25 48:13 51:6
51:8,10 53:11,16
54:3 55:15,19 57:19
57:21 58:25 59:19
64:20 67:21 68:16
73:18 75:24,24 78:9
79:12,13 80:21 81:1
81:8 82:21 83:19
84:8,21 85:20 86:9
91:16 92:1 93:4,7
94:18,22 95:2 98:16
100:1 102:6,9,22
104:10,15 106:11
107:12 110:14
119:8,17 120:9
121:10,18 122:21
122:22,22 123:5
125:6 126:14,25
127:7,18 128:11
130:24 131:3,5
134:4,13 135:7,18
137:18,19 140:16
142:16,19 144:16
147:8,14 149:18
150:1,10 152:9,11
152:25 153:23
154:21 155:6 156:9
157:13,21 158:6,6
159:20 160:20
161:5 162:11
170:25 171:13
172:14,18 173:4
174:3,10,24 177:5
177:21 178:3,7
179:9,11 180:25
182:22,24 184:10
185:22 186:12,21
186:25 187:22
191:21 192:25
194:9 199:15 201:2
202:17,23 204:8
205:15,18 208:20
209:6,15,18 210:13
210:15 211:5 212:9
213:17,23 215:3
217:4 221:18,24

222:21,21 224:11
226:24 227:7
229:19 230:17,23
230:25 231:10,18
232:1 233:9,12,12
234:15 235:2,6
236:18 238:16
239:13 240:5,8
241:19,23 242:11
242:20 243:9 244:6
247:7,19,23 248:21
249:5 251:17,20,21
252:7,11,14,19
253:25 254:14
255:16,23 256:13
257:24 258:3
259:25 260:2
**year**
12:13 14:22 16:5
20:23 27:13 28:18
28:20,21,23 35:6
36:17 37:22,23
46:20 50:14 56:14
56:25 57:1 59:1
65:15,25 66:12,17
70:18 74:10,10
79:20 87:19 103:13
110:1 117:16
118:16 124:5 126:8
157:12 221:18,23
222:4,8 223:9,14
259:8
**years**
11:4 14:3,4 15:4
20:11,19 24:12
25:25 26:15 27:2,17
27:21 28:3,17 32:21
33:4 34:18 35:10
37:4 38:14,24 40:5
40:10 41:8 42:11
48:3,18 49:23 50:2
62:20 64:13 65:9
66:6,21 71:14 72:2
75:19,23 78:5 79:18
79:24,25 80:8,11
86:19 90:10,13,14

97:2 98:23 118:14
122:7,8,19 123:2
132:16 133:12
136:10,15,18
141:10 147:4,16
152:24 155:16,17
169:22 170:25
176:24,25 178:3
185:4 191:17,20
192:8 202:1,6
220:20 221:9
255:13 258:17
**yell**
55:5,10 153:17
**yelled**
55:9,18,22 56:6
60:25 61:4
**Yep**
117:9 132:17 179:8
222:14 234:20
240:16 259:10
**yesterday**
4:13
**younger**
41:10 105:3,4

——————————————
**Z**
——————————————
**zero**
202:3
**zoom**
1:16 8:13 66:19 98:9
98:11 106:15
109:10 116:6 135:3
151:3 263:12

——————————————
**0**
——————————————
**000285**
92:21
**000293**
97:5
**000340**
131:6
**000346**
127:7 130:16 131:24
**000348**
130:18

**000349**
130:17
**000350**
131:22
**000351**
132:20
**000357**
133:19
**000383**
164:15
**000384**
3:10 179:2
**001**
235:4
**002.png**
235:5
**00346**
3:5
**0107**
3:7 144:12
**0109**
145:1
**0119**
3:8 149:3,14 226:3
**0123**
3:20 240:18
**0124**
3:22
**0240**
3:12 186:7,7
**0248**
186:12 188:2
**0303**
3:11 182:16
**05**
97:4
**06**
65:25 95:17
**0742**
3:15 199:22,25
**0860**
231:23
**0870**
231:23
**0922**
3:17 222:13,13



**0924**
 3:17 222:13
**0988**
 3:16 219:20
**0990**
 3:16
**0995**
 234:11
**0996**
 236:17

_____
**1**
**1**
 132:12
**1.02**
 93:21
**1.03**
 94:10
**1.14**
 130:10,13
**1.2**
 65:9
**1.3**
 127:22 128:10
**1.3.1**
 128:11
**1.3.2**
 128:11
**1.5**
 65:12 75:18
**1:00**
 126:16
**1:23-cv-01921-NY...**
 1:3
**10**
 36:9 38:2 50:19 78:9
  82:22 98:23 148:7
  170:24 220:19
**10:00**
 1:19
**100**
 2:5 35:11 110:7
  142:2,9,14
**1006**
 3:23 259:1,2
**1023**

 241:18,19
**1024**
 256:14
**1026**
 245:22
**1027**
 245:23
**11**
 36:10 78:10
**11:00**
 4:14
**12**
 133:16 201:4 203:9
  237:6
**12:30**
 126:13
**12:53**
 225:24
**128**
 3:5
**129,939.75**
 201:14
**1299**
 2:14
**12th**
 238:2,9,15,16 239:6
  239:19
**13**
 121:17 144:13 221:5
**131**
 128:4
**132**
 128:4
**13th**
 263:20
**14**
 79:19,22 92:18,23
  176:12
**144**
 3:7
**149**
 3:8
**15**
 3:5 80:10 82:23
  98:23 128:1,3 147:4
  170:24 220:20

**16**
 3:7 25:25 144:2,4
  201:2 203:12
**164**
 3:9
**16th**
 209:23
**17**
 3:8 25:25 148:25
  149:1,13 225:6,12
  225:13,18 232:4,5
**179**
 3:10
**17th**
 2:13
**18**
 3:9 35:10 80:22
  118:17,19 164:12
  164:14 191:17,20
**18-inch**
 80:14
**182**
 3:11
**186**
 3:12
**19**
 3:10 14:3,4 24:11
  33:3 174:1 178:24
  179:1
**194**
 3:13
**196**
 3:14
**199**
 3:15
**1991**
 11:24
**1995**
 11:24
**1st**
 196:23

_____
**2**
**2**
 75:18,19 127:22
  130:14 148:6

  201:11 238:14
**2.2**
 201:17
**2.6**
 130:2,11,25 131:6
**20**
 3:11 38:25 49:13
  67:11 119:23 124:4
  182:14,16,25
**20-teens**
 59:24
**20.4**
 194:7
**2000**
 12:18
**2000-2001**
 13:12
**2001**
 13:13,16
**2002**
 17:12,13
**2005**
 11:14,16,17 13:14,16
  14:2,23 16:4 22:2,4
  23:1 24:12
**2006**
 11:8,10 14:23 15:1
  16:2,5 20:7 21:9
  33:10 34:15,21 37:2
  65:16 79:19 80:18
**2009**
 33:12,13 42:14 43:8
  45:21 62:6
**2010**
 15:4 42:14 67:4
**2011**
 71:4
**2012**
 121:13
**2013**
 54:13 61:17 65:16
  66:1,14 79:19,22
  122:6 155:7,13
**2015**
 50:16 72:25 73:4,8
**2016**



73:13,20
**2017**
15:5 50:16 156:4
158:4,8 170:2
**2018**
123:25 170:2
**2019**
51:6,20 58:10,24
123:9,24,25 142:17
**2020**
51:6,23 58:10 67:5
123:9
**2021**
7:15,17 102:15 103:2
113:20 118:7 159:9
**2022**
146:4 155:24 157:10
157:11,16 159:6
160:5,10 162:12,16
176:11,12 183:5
201:2 203:12
208:11 222:19
225:23 237:6
**2024**
1:13,18 4:2 196:22
261:18 263:11,21
**20s**
125:19
**21**
3:12 38:25 102:11
118:15 124:2
125:23 137:23
186:4,6 188:1
**2165**
201:25
**218**
3:3
**219**
3:16
**22**
3:13 57:15 124:3
194:3,6 207:8
232:20
**222**
3:17
**22nd**

209:4
**23**
3:14 196:18,20
**231**
3:18
**233**
3:19
**24**
3:15 146:4 199:18,20
199:23 231:11
**240**
3:20,21
**25**
3:16 218:8 219:16,18
219:25 220:1,24
**25,000**
38:4
**250,000**
38:3 73:25
**256**
3:22
**258**
3:23
**25th**
243:21
**26**
3:17 222:15,17,18
223:12
**26th**
183:5
**27**
3:18 70:14 125:17
224:24 225:4,14
231:2,4,19,21,24
232:3,6,9,10,14,16
232:22 234:25
237:7,13,22 239:4
240:1
**2701**
2:5
**27th**
188:7 204:15,21
210:19 246:13
247:15 249:7 254:8
**28**
3:19 225:23 233:15

233:17,21,22
234:11 235:9,22
237:1,3
**28th**
247:14
**29**
3:20 240:10,12,17,19
240:21 241:18,22

---
**3**
---

**3**
130:14 131:2 194:19
201:9
**3.1**
130:10,14 131:20
132:4
**30**
1:13,15,18 3:21 4:2
36:2 49:4,13 79:6
240:10,15 245:16
245:18,22,23 246:6
263:10
**303**
2:14
**308**
92:21
**30th**
224:7
**31**
3:22 256:9,11,14
**32**
3:23 70:14 258:19,23
259:5,6
**33**
70:12 72:13
**346**
130:22
**350**
132:3
**36**
132:14,14
**365**
130:16,23 131:24
**38**
70:13
**383**

3:9

---
**4**
---

**4**
3:2 130:4 131:1
132:19
**4:08**
238:17
**4:32**
260:24
**4:37**
254:9
**40**
36:2
**40th**
53:13,16 55:1,4
56:10
**45**
78:14

---
**5**
---

**5**
93:19 130:13 131:2
131:21 155:16
194:13 195:14
197:15,17,20
**5:00**
35:17 36:8
**5:30**
36:8
**50**
36:2 78:14 160:6,7
256:2
**50's**
87:2
**50,000**
87:19
**50/50**
62:7,15 63:11,12,18

---
**6**
---

**6**
64:15 130:14 198:15
**60**
67:12 160:13,19,22
**60s**


MAGNA
LEGAL SERVICES

87:2
**624-6221**
1:20
**63**
27:16
**64**
27:16

---

**7**

**7**
155:16 197:17
**7:00**
36:9
**700,000**
64:15
**70s**
87:2 104:11
**72,000**
62:15

---

**8**

**8**
236:14
**8-1-2024**
207:12
**8-15**
207:13,14
**8:00**
35:17 36:8
**800**
2:13
**802**
2:14
**80202**
2:13
**80205**
2:5
**80s**
86:23
**815**
194:7
**81st**
147:25 148:22
**866**
1:20
**8th**

238:24

---

**9**

**9**
50:19 148:6,7 208:11
236:14
**90**
211:13
**90th**
147:25
**990**
219:20
**995**
236:17
**998**
234:12
**999**
2:13
**9th**
208:16,22 209:17

