IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-01921-NYW-MDB

_____

VIDEO-RECORDED DEPOSITION OF:  MICHAEL F. MYERS, M.D.

DECEMBER 16, 2024

_____

DR. ANUJ PEDDADA,

PLAINTIFF,

V.

CATHOLIC HEALTH INITIATIVES COLORADO D/B/A CENTURA
HEALTH-PENROSE-ST. FRANCIS HEALTH SERVICES,

DEFENDANTS.

_____


            PURSUANT TO NOTICE AND AGREEMENT, THE
VIDEO-RECORDED DEPOSITION OF MICHAEL F. MYERS, M.D.,
was taken on behalf of the Defendant via Zoom, on
December 16, 2024 at 10:00 a.m., before Patricia
"Annie" Burnett-Anderson, Certified Shorthand Reporter
and Notary Public within Colorado.



Page 2

A P P E A R A N C E S

For the Plaintiff:     MELVIN B. SABEY
                       LINDSAY K. MCMANUS
                       Hall, Render, Killian, Heath &
                       Lyman, P.C.
                       999 17th Street
                       Suite 800
                       Denver, CO 80202

For the Defendant:     OMEED AZMOUDEH
                       Rathod | Mohamedbhai LLC
                       2701 Lawrence Street
                       Suite 100
                       Denver, CO 80202

Videographer:          Randy Young

Page 3

I N D E X

EXAMINATION OF MICHAEL F. MYERS, M.D.:                     PAGE
 December 16, 2024
By Mr. Sabey


                    INITIAL
  DEPOSITION EXHIBITS:                    REFERENCE
Exhibit 2C  Dr. Selagamsetty Medical Record         52
Exhibit 55  CPHP Records                  50
Exhibit 56A  Text Messages                160
Exhibit 59A  7.30.24 Dr. Myers Expert Report        46
Exhibit 61  Email to  Alan Monroe         52
Exhibit 66  Text Messages                 101
Exhibit 87  Michael Myer's Curriculum Vitae     12
Exhibit 88  2.1.23 Myers Report           45
Exhibit 89  Emails                96
Exhibit 90  Emails                97
Exhibit 91  Emails- Minutes from June 1 Forward     97
        Meeting

Exhibit 92  Dr. Myers Notes Interview with Dr. Peddada  123
        1.9.2023
Exhibit 93  Dr. Myers Notes Interview with Dr. Peddada  124
        7.26.24

Exhibit 94  Cureus Article - Thomas Reith       126

        (Deposition exhibits were marked by Mr. Sabey.)

Page 4

THE VIDEOGRAPHER:  This marks the beginning of Media Number 1 of Volume 1 of the virtual Zoom deposition of Michael Myers, MD, taken on behalf of the attorneys for defendants in the matter of Dr. Anuj Peddada, Plaintiff vs. Catholic Health Initiatives Colorado, et al., Defendants.  Case number 1:23-cv-01921-NYW-MDB in the US District Court for the District of Colorado.

This deposition is being held remotely via videoconference on December 16, 2024.  The videographer today is Randy A. Young, and the court reporter is Patricia Burnett-Anderson, who are on behalf of Magna Legal Services.

We are going on the record now, and the time is 10:01 a.m. Mountain Time.

Will Counsel please state your appearance for the record and state who you represent.

MR. SABEY:  Mel Sabey, appearing on behalf of the Defendants in the action.

MR. AZMOUDEH:  Omeed Azmoudeh on behalf of Plaintiff, Dr. Anuj Peddada.

THE VIDEOGRAPHER:  Thank you.  If there are no stipulations, will the court reporter please swear in the witness.

WHEREUPON, the following proceedings were

Page 5

taken pursuant to the Colorado Rules of Civil Procedure.

MICHAEL F. MYERS, M.D., having been sworn to tell the truth, testified as follows:

EXAMINATION

BY MR. SABEY:

Q.  Dr. Myers, will you please begin by stating your full name.

A.  Yes.  Michael Myers.  And it is spelled, M-y-e-r-s is my -- is the spelling of my surname.

Q.  Thank you.  I'm assuming, Dr. Myers, that giving a deposition is something you're very familiar with?

A.  Well, yes and no.  I have given depositions before, but -- but not -- but not many.

Q.  Okay.  What is your estimated how many depositions you've given?

A.  Two.

Q.  Two?

A.  (The witness nodded.)

Q.  Okay.  Have you testified in court previously?

A.  No.

Q.  Okay.  When was the last time you gave a



Page 6

deposition?

A.  I think it was about seven years ago.

Q.  Okay.  All right.  Well, let me begin then by kind of outlining the process for the deposition.

This deposition is being taken for all purposes under the rules for which depositions may be used, but the primary purpose of this deposition is to give us the opportunity to receive information from you that relates to the case.

And you've just tooken an oath -- you've just taken an oath to tell the truth, the whole truth, and nothing but the truth.  And we will be relying as this case moves forward on the testimony you give in this deposition, so it is important that you testify in a way that is complete, truthful, honest, and accurate.  Will you do that?

A.  Yes.

Q.  I'm sorry, I can't hear you.

A.  I'm sorry.  What's the question?  "Will you do that"?

Q.  Yes.

A.  I will.

Q.  I want you to take as much time as you need to fully exhaust your memory on the subject of

Page 7

each question that I ask you.  Will you do that?

A.  I will.

Q.  The purpose of this deposition is to obtain your testimony, not the testimony from the attorney that hired you.  The attorney, Mr...

MR. AZMOUDEH:  Azmoudeh.

MR. SABEY:  Mr. Azmoudeh, thank you.

Q.  (BY MR. SABEY)  Mr. Azmoudeh cannot help you to answer the questions I ask.  There may be times when he will object to a question, and he does that to preserve the objection in the event that this deposition might be introduced in court.  If it is, then the court would rule at the objection at that time.

The local federal rules prohibit him from making an objection that gives you information or suggests an answer.

So if he objects to a question, unless he instructs you not to answer it on the basis of some privilege, which I don't think would happen here, you must go ahead and answer the question.  Will you do that?

Q.  Okay.  Do you have any documents or information in front of you relating to this case?

A.  I do.  I have my file here.

Page 8

Q.  And what is included in it?

A.  So I have the most recent report, which is dated July the 30th, 2024; and I also have my rough notes from my interviews with Dr. Peddada on two occasions.  And those are the ones that were -- they were photocopied and sent to Mr. Azmoudeh.

Q.  Okay.  And is there anything else you have with you?

A.  Yes.  And then I have the original -- I've got the -- let me just see what it is actually called.  I have the --

Q.  Do you have the February 1, 2023, original report?

A.  Is that the -- in the United States District Court for the District of Colorado Complaint and Jury Demand?

Q.  Oh.  Oh.  No.  Okay.  So you have the Complaint?

A.  Yes, I have that.  And I also have -- I have the copy of the CPA, the Colorado Committee for Physician Health, that record.

Q.  Okay.  Maybe we can short-circuit this.  Do you have all of the things that were listed as materials reviewed in your report?

A.  Yes.

Page 9

Q.  Okay.  All right.  That's fine.  Anything else?

A.  No.  The only other things are just some references that I cited in the -- in the report of July the 30th, 2024.

Q.  Okay.  A couple more things about depositions.  Thank you for checking that.

Depositions are time-limited.  Because we have limited time, I'm going to ask you to answer the questions that I ask you directly.  Then, if I need further elaboration, I will ask for that.

So in order to allow me to move through the things that I need to ask you as quickly as possible, will you answer the questions I ask directly and then wait for me to ask for elaboration if I need it?

A.  I will.

Q.  Most of the questions that I will be asking you can be answered initially by a yes or no.  So after you do that, I will ask for elaboration if I need it.

Additionally, Mr. Azmoudeh will have the opportunity to ask you questions if he feels elaboration is needed.  And it's easy to forget that, so if I interrupt and tell you I don't need

MAGNA
LEGAL SERVICES

Page 10

elaboration, I'm not trying to be rude, I'm just trying to move the process along.  Is that okay?

A.  Thank you.  Yes.

Q.  And finally, the court reporter will only be able to accurately record verbal responses.  So shaking or nodding of your head doesn't record, so it's important that your responses be verbal.  Will you do that?

A.  I will.  Thank you.

Q.  Okay.  I want to ask you to begin with some questions about the issue of integrity.  For some people, integrity is a matter of commitment and character; they always tell the truth.

For the second kind of people, it is a situational issue.  Sometimes they tell the truth, but when it serves their purposes, sometimes they do not tell the truth.  They tell one story at one time, and then if they think it will benefit them, their story changes, and they tell something different.  You can't really trust what they say because you don't really know whether this time they're telling the truth.

Which kind of -- which of those two kinds of persons are you?

A.  Would you repeat the question?

Q.  Sure.  For some people, integrity is a

Page 11

matter of commitment and character; they always tell the truth.

For the second kind of people, it is situational issue; sometimes they tell the truth and sometimes they do not.

That's sort of the short version of the question.  Which of those two kinds of people are you?

A.  The question is directed at me?

Q.  Yes.

A.  Oh.  Okay.  So this is not one with a yes or no.

Q.  I'm just asking:  Are you the kind of person that always tells the truth?

A.  Yes.

Q.  Another kind of integrity is doing what you say you will do.  Do you agree with that?

A.  Yes.

Q.  Do you -- and do you have that kind of integrity also, that you do what they say you will do?

A.  Yes.

Q.  Okay.  There are two reasons that I ask you to agree to the conditions that we discussed regarding this deposition.

The first is to make the deposition go more smoothly and more quickly.  The second is that it

Page 12

will be a very real test of that second kind of integrity.  It will show whether you do the things you said you would do.

Now, I would like to begin by looking at what has been marked as Exhibit 87, and that is your curriculum vitae, which was attached to your various reports.

So now, Lindsay McManus who is with me and helping me do this -- mostly because I don't have the technical capacity to do it -- she will put that exhibit in chat.  Okay?

A.  Okay.

(Deposition Exhibit 87 was referenced.)

Q.  (BY MR. SABEY) can you -- will you tell me when you see Exhibit 87 in your chat, Dr. Myers?

A.  I'm looking right now.

Q.  Okay.

A.  Yes, I do, I see it.

Q.  Okay.  And is that a copy of your CV that accurately and comprehensively represents your background and experience?

A.  I'm just opening it now.

Q.  Okay.

A.  Yes, it is.

Q.  In reviewing your CV, I -- I noted on

Page 13

page 13 of your CV that you have some extensive editorial experience and responsibilities for various journals, books, and publications in your field of expertise.  Do you see that?

A.  I'm just -- I'm just trying to get to that now.  Page 13?

Q.  Yes.

A.  I have it here on the side.  I'm trying to figure out a way of expanding it.

Q.  I'm not going to be asking you a lot of detailed questions, but more general questions about your editorial responsibilities that are listed.

A.  I'm just opening it here.  Okay.  Now I can see it.

Q.  So --

A.  Yeah.  Mr. Sabey, can you remind me what page it was?

Q.  Yes.  Page 13.

A.  Page 13, yes.

Q.  The page numbers are at the top under your name and curriculum vitae.

A.  I'm there now.

Q.  Okay.  So does this page accurately represent your extensive editorial experience?

A.  Yes.

Page 14

Q. And responsibilities?

A. Yes.

Q. Okay. Are the journals and books and other publications for which you provided editorial services, serious, authoritative, and intellectually rigorous peer-review publications?

A. I'm -- I'm sorry, I'm just going to have to just do one thing here. If I -- this has to do with my hearing aids. I need to just turn up the volume.

Q. No problem. I have the same issue.

A. Okay. May I ask if you will repeat the question.

Q. Sure. Sure. Are the journals, books, and other publications for which you have provided editorial services serious, authoritative, and intellectually rigorous peer-review publications?

A. Yes, they are. Those are ones that -- I don't know what the word would be. Ad hoc or an occasional request of a particular journal for me to review a manuscript.

Q. Okay.

A. Yes.

Q. What purpose does peer review of manuscripts fulfill?

Page 15

A. Well, peer review of manuscripts enables other individuals in the field to critically review a manuscript that is then subject to -- I would say -- well, both the current and historical knowledge of the subject matter of that particular manuscript, if we're talking specifically -- like the first part, manuscript reviewer as opposed to book reviewer.

Q. Okay. When you review manuscripts for potential inclusion in, for example, one of the journals --

A. Yes.

Q. -- for which you listed you're a manuscript reviewer --

A. Yes.

Q. -- what do you do?

A. Well, I read the journal -- the manuscript carefully. I usually put it aside for a few hours, maybe even longer, a day, because I sometimes find that maybe I give more thought to the content. I return to it; usually make notes, and that's even today when we do these reviews digitally.

I obviously go through the research methodology to see if it meets the criteria of what is to be expected in this particular journal because each of them will have their guidelines. For those, for

Page 16

instance, where I find the methodology particularly challenging, I usually tick off, but I would recommend another reviewer with more experience than myself to comment on the methodology of the paper.

And then it depends. Most journals today ask specific questions that they require of the reviewer, and those would be the ones that I would answer.

Some require a narrative, which I will provide as well, and then usually, we're given three or four options: Recommend publication, recommend with revisions, recommend -- or hold with recommendation for revisions.

And if there is a fourth or fifth, it would be rejection.

Q. Okay. Are there occasions where this omission contains evidence that its author is not very rigorous or is unduly biased in his or her hypothesis in the manuscript?

A. Yes.

Q. Examples of that might include: Failure to organize or carry out research in a thorough way, ignoring data or evidence that contradicts the hypothesis, accepting data or information from one who has bias without challenging its accuracy, or reaching

Page 17

conclusions that are not as supported by or are even contradicted by the evidence, and, perhaps, additional forms of lack of academic rigor and intellectual honesty; right?

A. Yes.

Q. Now, I would like to explore your standards of excellence.

How many instances of those kinds of lack of rigor or intellectual honesty would you tolerate in your review before you would conclude that it is not reliable or worthy of inclusion in a serious publication?

A. I tend to -- well, let me preface my response by saying this: That -- actually, let me just -- I'm just going to close that so that I can come back to seeing you. Okay? I prefer that.

It depends too, on the journal. Once with that get what I would call a strict initial -- I'm being colloquial -- glance by the editor. They're pretty careful about what they send out for review. I find, though, that some journals don't.

And so some of the things that I've been asked to review are -- require a lot of work and have not really been vetted. And those are ones that are usually pretty easy to do in terms of -- it's either



Page 18

complete rejection or one that I would say review again after major revisions.

Q. Okay. So if you found that there were -- there was evidence of the kinds of lack of academic rigor and intellectual honesty, you wouldn't recommend publication if there was even one of those?

A. No.

Q. Is that correct?

A. That's correct; yes.

Q. And do you perceive your role as an expert witness as any less serious or any less demanding of thoroughness, rigor, and intellectual honesty?

A. Do I perceive my role as an expert witness -- are you -- I mean, if there -- are you asking me: Would I include myself in terms of a high standard?

Q. Yes.

A. Yes. My answer would be "yes."

Q. The same high standard that you would include for -- or that you would attach to a publication of a -- of a manuscript and a journal?

A. Yes.

Q. Now, you have been a treating physician

Page 19

for, I'm guessing, all of your medical career. Is that true?

A. Yes.

Q. And it seems, from reviewing your CV, that you have -- you have perhaps, particularly more recently in your career, devoted much of your attention to physicians, and that you really strive to help physicians in their healthcare matters. Is that true?

A. Yes.

Q. When you are a treating physician and a patient comes to you seeking medical help and treatment and advice, is it your practice to accept the information they give you at face value and assume that it is accurate and honest?

A. Not always.

Q. Okay. And why not?

A. Let me preface my response to this by saying I'm no longer in private practice. Although, having said that, I do have one patient in my private practice, but I retired from my private practice in 2013. So that's 11 years ago, coming up 12.

What I do, though, is I do independent medical evaluations on physicians for our committee on physician health, much like -- it's akin to the

Page 20

Colorado Physician Health Program, so I do independent medical evaluations there.

Now, with that preamble, I always take into consideration -- you used the word "integrity" earlier. I'm always thinking about integrity as well of the individual that I am assessing.

Q. Okay. Okay. And let me -- and you're saying that in the context of the kind of work that you have been doing since 2011; is that right?

A. Oh. Well, I've been doing independent medical evaluations longer.

Q. Okay.

A. I started doing that work in 2010.

Q. Okay. Let me just ask you for a moment to reflect on a circumstance that was not an IME kind of work or expert witness kind of work, but where you simply have a patient coming to you who is -- who is seeking medical help, treatment, and advice.

Is it, in that situation, more usual to accept the information they give you at face value and assume that it is accurate and honest?

MR. AZMOUDEH: Object to form.

Q. (BY MR. SABEY) You can answer now. He objected, but you just go ahead and answer.

A. Oh. There is a difference between those

Page 21

two situations. Because when somebody comes to me in a sense voluntarily; that they're the ones that have knocked on my door, so to speak, or have called me, they're almost always self-referred.

Although, having said that, though, sometimes -- if I can be colloquial -- they have felt that they have a gun to your head.

Q. Okay.

A. Meaning sometimes -- and, again, to use a little humor -- that they're there because their wife insists on this, and if they don't oblige, she is leaving, something like that.

Q. Okay. Sure.

A. So, but again, that is very different than when I'm assessing someone for the CPH, our Committee for Physician Health, this is somebody who requires an independent medical evaluation.

And so first of all, not always, but often, they're -- they're quite guarded at first and nervous about that because my report is very different, of course. I will not be their treating physician, and I make all of that clear, et cetera, et cetera. I always hope I meet -- I don't know if I'm giving too much information.

Q. No. I did -- I asked you kind of an



Page 22

open-ended question, so I think that's fine.

A. Okay.

Q. Maybe I can refine it a little bit. So it sounds to me like you're -- the way you analyze information you receive from the patient is impacted by the context so that you would treat the statements of an individual who is voluntarily seeking your help and advice came to you, and there would be a greater basis for assuming that what they have said to you is accurate and honest; is that correct?

A. Yes. And if I could just add, I can usually, not always, but get a flavor of that, if not in the first few minutes, but certainly by the end of the -- what I would call the intake visit.

Are they really here because they're a suffering individual? Or is there -- we have a term called "secondary gain." They're looking for something.

Q. Okay. And in the case of the plaintiff, they have a different motivation, as in this case, seeking millions of dollars, and you don't have the same basis for assuming accuracy that you need to probe, and test, and question, and challenge; is that right?

MR. AZMOUDEH: Object to form and

Page 23

foundation.

Q. (BY MR. SABEY) Doctor, when Mr. Azmoudeh makes an objection, you don't need to do anything other than just let him finish his objection, and then you can answer.

A. Oh. Well, I'm sorry. Okay.

Q. That's okay.

A. I was waiting for you to respond. I'm sorry.

Q. Do you want me to restate the question?

A. Would you, please.

Q. Yes. And then in the future, when he objects, just -- you don't need to do anything but go ahead and answer; unless he instructs you otherwise.

In the case of a plaintiff in a lawsuit, they have a different motivation, as in this case, millions of dollars that they are seeking, and you don't have the same basis for assuming accuracy, and you need to probe, and test, question, and challenge; right?

MR. AZMOUDEH: Object to form and foundation.

A. Yeah. I'm -- I would say -- I'm struggling with a yes or no to that question because it

Page 24

seems -- and I don't mean this as an attack -- but it seems assumptive, especially with terms like "millions of dollars."

But, by the way, that wasn't something I either -- I either asked Dr. Peddada about or even assumed.

Q. (BY MR. SABEY) Okay. Okay. So let's take that -- that fact out of the question and just -- I think you've -- you've already testified that someone who comes to you for care and treatment, you need to evaluate differently because there is a different motivation. Is that accurate?

A. Yes, it would be. Unless it's like what I described maybe two questions ago. If by the end of the visit, I've got an uneasy feeling here that something seems to be going on. Say I learn in that first visit that they have been reported to the licensing bar.

Q. Yes.

A. And that didn't come out of the chief complaint, which is: I'm depressed. I want to kill myself.

Q. Yeah. Okay. How did you review -- how did you view your role in this case, the role that you should take as an expert in this case: As an advocate

Page 25

who selectively looks for information to support his client's case?

Or more as a scientist physician who diligently seeks out and objectively analyzes all available information and asks the tough questions and challenges the premises of his client's case?

A. If it's an either/or --

Q. Yeah.

A. -- my response is the latter.

Q. Okay. Would you agree that an expert who digs deeply for evidence that supports his client's position and shallowly for evidence that is contrary to his client's position, is more of an advocate than a reliable expert; right?

MR. AZMOUDEH: Object to form.

A. Yeah. There's a lot in that statement.

Q. (BY MR. SABEY) Would you like me to re- -- repeat it?

A. Yeah, would you?

Q. Would you agree that an expert who digs deeply for evidence that supports his client's position and shallowly for evidence that is contrary to his client's position, is more of an advocate than a reliable expert?

MR. AZMOUDEH: Object to form. Same



Page 26

objection.

A. Yes.

Q. (BY MR. SABEY) Would you also agree that an expert who, when faced with evidence that is contrary to his client's position, chooses to ignore it or discount it rather than modifying his opinions is more of an advocate than a reliable expert?

MR. AZMOUDEH: Object to form.

A. Instead of -- I was going to request that you restate the question, but could you also -- could you attempt to break that down into chunks?

Q. (BY MR. SABEY) Okay. Yep. So my question is: Would you agree that an expert who encounters and is faced with evidence that is contrary to his client's position and then chooses to ignore it or discount it rather than modifying his opinions is more of an advocate than a reliable expert?

MR. AZMOUDEH: Object to form.

A. I'm going to respond with I don't know.

Q. (BY MR. SABEY) Okay. Do you think that a reliable expert has an obligation when faced with information that is contrary to his client's position and perhaps to the opinions that have been reached previously as an obligation if he wants to be a reliable expert to consider that and modify his

Page 27

opinion if required?

A. Yes.

Q. Okay. Let's -- let me ask who first contacted you about involvement in this case?

A. I'm pretty sure it was Mr. Azmoudeh from the firm.

Q. Okay. So you were hired not to provide care and treatment to Dr. Peddada but to assist his attorneys as an expert witness in this case; right?

A. That's correct.

Q. Okay. When you had your Zoom interview of Dr. Peddada on January 9, 2023, that was the first time you had spoken to Dr. Peddada; right?

A. Yes.

Q. How many times did you meet or talk with Dr. Peddada's attorneys before issuing your first report?

A. I'm not certain. I could look that up. Maybe three -- three times.

Q. Okay.

A. Are you -- and are you asking: Was it about my interviewing Dr. Peddada? Or was it more of a general question?

Q. A general question.

A. I would say perhaps three, three times.

Page 28

Q. Okay. And you said you could -- you would look -- you could look that up. What would you look to if that were -- it's not right now.

A. Okay.

Q. But if it were important to know exactly how many times you spoke to them, how would you determine that? How would you look that up?

A. In the file or eve- -- probably more specifically in my invoice.

Q. Okay. So you submitted invoices to the attorney's office, and it would reflect what you did?

A. Yes.

Q. Okay. And do you recall when, approximately, you were first contacted by Mr. Azmoudeh?

A. I can tell you.

Q. Okay.

A. December the 13th, 2022.

Q. Okay. And was that a -- was that a telephone conversation you had with him?

A. Yes. Now, there might have been an email first.

Q. Okay.

A. But I'm not sure. I would have to look that up.

Page 29

Q. Okay. I assume that if there was an email, it didn't contain any substantive information?

A. Yes. Yes.

Q. Okay. I'm just recognizing, Dr. Myers, I asked you a question that was sort of in the negative, so let me just -- just so that it is not ambiguous.

Did the initial email, if there was one, contain any substantive information?

A. No. If there was -- yeah. I'm not -- I'm not used to people sending emails with substantive information in them.

Q. Okay. Okay. So in your initial conversation with Mr. Azmoudeh, what was discussed?

MR. AZMOUDEH: Object. Object. Hold on. I'm going to object on the basis of privilege. If there are questions about facts or data or compensation or the other exception that is provided around Rule 26, you can ask those.

But asking an open-ended question about what was discussed between an expert and an attorney is privileged. Do you want to refine that, Mel, for me?

MR. SABEY: I'll refine it. Yeah. Thanks, Omeed. I'll refine that.

Q. (BY MR. SABEY) What facts or data were

MAGNA
LEGAL SERVICES

Page 30

given to you during that initial conversation?

A. He gave me a bit of background for the case. I think that Mr. Azmoudeh also mentioned how he got my name.

Q. And what did he tell you about that?

A. Pardon me?

Q. What did he tell you about that?

A. Yes. Well, just that my name was suggested by somebody else who works in the field of physician health.

Q. Do you recall who?

A. Dr. Jessi Gold.

Q. Okay. And were you familiar with Dr. Jessi Gold before that?

A. Yes.

Q. Okay. All right. What other information factually did he give you in that initial conversation?

A. That he was a radiologist, that there was some information that he was burning out. There had been some complaints by staff -- a couple of complaints about him -- and that he -- that he had made a mistake, but caught it without any harm being, you know, to the patient.

That he was -- Dr. Peddada was a Type A

Page 31

personality, a hard worker; that had been in Colorado Springs for a number of years. That he felt slandered.

Q. Anything else that you recall?

A. No.

Q. Okay. Are you referring to notes of that telephone conversation you had with Mr. Omeed?

A. I had some -- yes, some rough notes here.

Q. Okay.

A. There was remediation. There was going to be an attempt at remediation in a few months.

Q. Okay.

A. And that he would -- he would mail me.

Q. Okay. And he was going to mail some documents to you?

A. Yes.

Q. Okay. And are the documents that he mailed to you the documents that are listed in your February 1st --

A. Yes.

Q. -- report?

A. Yes.

Q. Okay. And were there any other documents that you had received from him at the time you issued your February 2023 report?

Page 32

A. No.

Q. Okay. How many additional times did you meet with the attorneys? You indicated that you met with -- with them, and I assume it was by remote meetings, telephone conferences, and conference calls; is that right?

A. It might have been telephone. There was no Zoom. There was no virtual meeting, no.

Q. Okay. So the only communications you had between the time that you were first contacted and issuing your report were perhaps three telephone conferences or calls. And were they all with Mr. Omeed -- I mean with Mr. Azmoudeh?

A. Through the entire time of my involvement?

Q. Yes.

A. There was one time -- so when -- there was a request -- it was when I was on vacation, and there was a request from Ms. Halpern.

Q. Okay.

A. That would have been last summer.

Q. Okay.

A. And she explained that they needed more of me, if I could provide that, and gave me a little bit of an idea what the timeline was.

Page 33

Q. Okay. But -- but there there -- was there anything substantive, any substantive information you obtained from Ms. Halpern?

A. No.

Q. Okay. So other than the estimated three times that you spoke to Mr. Azmoudeh prior to issuing your 2023 report, did you have any other communications with him or anyone from his law firm between the time you issued your first report and your second?

A. No.

Q. And your second report indicates that, in the materials reviewed section, that you did not receive any other documents between the first and the second except for the copy of the original complaint and the first amended complaint. Is that accurate?

A. Let me just see. Yeah. The jury demand was the additional report that I received.

Q. Okay.

A. That was it.

Q. Okay. At page 3 of your second report, the first item is: Complaint. And then the 7th item is: Complaint and Jury Demand, July 27, 2023.

Do you see that?

A. I see Complaint. Number 1?

9 (Pages 30 to 33)

Page 34

Q. Yes.

A. To charge of discrimination.

Q. Yes, that's it. So the Complaint, what is listed as Number 1, is a document that did not appear as a material reviewed in your February 2023 report, and the same is true of Number 7, Complaint and Jury Demand which I believe was a -- was an amended complaint.

Other than Number 1 and Number 7, the rest of them were -- and -- and the updated Zoom interview. So 1, 7, and 8 were new items?

A. Yes.

Q. Okay. All right. And did you receive any other additional documents besides 1, 7, and 8 that are listed in materials reviewed in your 2024 report?

A. No.

Q. Okay. Did you at any time ask to see any other documents?

A. No.

Q. Who did you speak to besides Dr. Peddada's attorneys and Dr. Peddada himself?

A. I spoke to his wife.

Q. Okay. And anyone else?

A. No.

Page 35

Q. Did you ask to speak to anyone else?

A. No.

Q. Okay. When you spoke to Dr. Peddada, what questions did you ask him?

A. Are you talking about the first time I spoke with him?

Q. Yes. Let's start there.

A. Okay. January the 9th, 2023.

Q. Okay.

A. Well, I spoke to him like I spoke to any new patient. I asked him to tell me about his situation.

Q. Okay.

A. And depending on, you know, what they do, questions build on that.

Q. Okay. So you listened to him describe his situation?

A. Uh-huh.

Q. What other -- generally speaking, what other kinds of questions did you ask him?

A. Well, after getting an elaboration on -- you -- you -- I'd like to ask this question. You -- do you have copies of my notes?

Q. Yes?

A. Okay.

Page 36

Q. I do.

A. Okay. So after -- it is almost a PTSD experience. Feels like that. I came back to that. I wanted to hear him talk more and give more background, and so he did.

Q. Okay. Maybe -- let me just short-circuit this a little bit.

A. Okay.

Q. I do have copies of the notes, of both interviews that you conducted with him.

A. Okay.

Q. And let me just ask this as a starting point: Do those notes accurately contain the substance of your two interviews with Dr. Peddada?

MR. AZMOUDEH: Object to form.

A. Well, I -- I feel they accurately contain what -- how -- how I conducted my time with him and his responses.

Q. (BY MR. SABEY) Okay.

A. But --

Q. When you spoke to Dr. Peddada, did he describe to you the work he did at the Penrose Cancer Center?

A. I'm sorry. What about the Cancer Center?

Q. When you spoke to Dr. Peddada in that

Page 37

first interview, did he describe to you the work that he did at the Penrose Cancer Center?

A. Yes.

Q. Okay. And what did he explain that he did? And it doesn't -- not in great detail, but just what was the nature of his work?

A. Well, a lot of it had to do with his -- the story of having coming -- when he came to Colorado Springs, and -- as a radiation oncologist, and that he came with the goal -- I'm not sure if this is accurately reflected in my notes, though -- of really making the center there state of the art as best it could be for a smaller city.

Remember, he had trained in California and also worked there, also worked in Texas. But I think he felt that -- my sense was he was ambitious to expand it and make it, you know, more of a -- these are my words -- one-stop shop.

Like in terms of, you know, when -- when -- I think when ambitious individuals come to a smaller center and see that maybe this is a center where we can expand services here so that people don't have to, you know, drive to the largest metropolitan -- I guess in this case maybe Denver -- if we can provide more. That was the sense that I got.

Page 38

Q. Okay.

A. The actual specifics of his work, all I really knew about that was his work with prostate disease, breast cancer, and I think there was a third one as well of a type -- a type of radiation oncology.

Q. Okay. So you understood that he was engaged on a daily basis of caring and treating patients --

A. Yes.

Q. -- who were -- who were experiencing the challenges of cancer of various forms?

A. Yes.

Q. And his work involved -- his daily duties involved meeting with patients, providing care to those patients, and treating those patients. Is that accurate?

A. Yes.

Q. Okay. Have you been asked to do any additional work in your expert witness role after this deposition?

A. You mean forthcoming, something forthcoming?

Q. Yes.

A. No.

Q. Okay. Will you advise me if you are so I

Page 39

can determine if I need to seek additional discovery?

A. Yes.

Q. Now, the federal rules require experts to submit reports containing the opinions to be expressed and the basis and reason therefore.

Do your two expert reports comply with that rule?

A. There was a bit of a breakup in the -- in these --

Q. The audio?

A. Yes.

Q. Okay. I'll just repeat it. Thank you for telling me that.

The federal rules -- court rules require experts to submit reports containing the opinions to be expressed and the basis and reasons therefore.

Do your expert reports comply with that rule?

A. Yes.

Q. Before you issued a report and expressed your opinions, did you fully evaluate the circumstances?

A. Before I...

Q. Issued a report and expressed your opinions, did you fully evaluate the circumstances?

Page 40

MR. AZMOUDEH: Object to form.

A. I'm -- I'm going to have to ask you to repeat it again, if you would, please.

Q. (BY MR. SABEY) No problem. Before you issued a report and expressed your opinions, did you fully evaluate the circumstances related to the report?

A. Evaluate the circumstance. You mean the expectations of a report?

Q. Oh, no. No. I'm sorry, I can see your confusion.

No. I'm saying: Before you issued an expert report, did you fully evaluate the circumstances and the facts which were the basis of the opinions you expressed in your report?

A. Yes.

Q. Before you issue a report, do you make certain that you've reviewed the relevant information that is available?

A. I reviewed all relevant information available me.

Q. Okay. So that means you reviewed the things that were given to you --

A. Yes.

Q. -- by the attorneys?

Page 41

A. Yes.

Q. Okay. So your reports that you issued accurately reflected the information that you reviewed in addition to the conclusions that you have reached?

A. Yes.

Q. Okay. And that is for each of the reports that you issued: The February 1, '23 report and the July 30th, '24 report; correct?

A. Yes.

Q. Will you just briefly take us through what steps you took prior to February 1, '23, when you prepared your expert review, beyond what you already testified to. Is there anything else you did other than review the documents listed and the materials reviewed, and speak to counsel for Dr. Peddada, and speak to him and to his wife?

A. I -- no. I'm sorry. Are you talking about the February 1, 2023 report?

Q. Yes.

A. All right. That was based on -- that was based on my, you know, the evidence that I -- that I had before -- before me.

Q. And did you talk to Dr. Peddada's attorneys in order to determine what his medical condition was?

MAGNA
LEGAL SERVICES

Page 42

A. I -- I think -- I just -- I'm struggling with the question because I don't know if it is quite as black and white as that. So please repeat it.

Q. Okay. Did you talk to Dr. Peddada's attorneys in order to determine what his medical condition was?

A. No.

Q. Okay. Why not?

A. Okay. That gives me a chance to say -- Mr. Azmoudeh might have mentioned some things about the way his client was feeling, but that's -- but that's not -- I mean, that's fine.

But I didn't feel, for instance, that I was either interviewing Mr. Azmoudeh, nor would I do that anyway; I just don't feel it is appropriate. And nor do I feel that anything that he had to say was at variance to what I learned.

Q. Okay. Okay. So you recognize that he didn't have the -- the expertise to answer that question?

A. That's right; yes.

Q. Okay. Who did you talk to about Dr. Peddada's medical condition?

A. No one.

Q. Okay.

Page 43

A. Let me -- sorry. Can I add to that?

Q. Sure.

A. When I met with his wife, I met with him alone -- sorry. I met with her alone at the end.

Q. And that was a -- a -- you talked to her for a few minutes, I think you said?

A. Yes. Because I wanted -- I wanted to hear her observations.

Q. Okay.

A. Then I met with them briefly together.

Q. Okay.

A. So that -- that's -- and I was, you know, gathering information.

Q. Okay. And that was at the end of the time when you had interviewed Dr. Peddada alone; correct?

A. That's correct.

Q. And the time when you spoke to his wife and to them together was a few minutes at the end of your first interview; correct?

A. That's right.

Q. Okay. What questions did you ask her?

A. I wanted to get her view of him and how -- and I can look at my notes of what she -- what she had to say, what she observed.

Page 44

She told me, you know, more about his character, that he was -- that he was a workaholic, that medicine was his whole life, that that had been stressful at times because of the -- I can't remember if she used the term "boundary" or not.

But being a physician herself, I got the sense that she respected him tremendously for his dedication. But yet, also being his spouse, despite the fact being a physician herself, it had been tough at times and hard for her and for the children.

Q. Uh-huh.

A. But she went on to say, though, how when they would have family vacations or when he would do things with the children one-on-one, that that time was very special, and he really, really made up for that.

And the kids -- I got the sense that the kids really understood as best they could, that their father was a very committed physician.

And I've heard that story over the years from so many family members of doctors.

Q. Okay. So the information that you gathered from that initial interview mostly with Dr. Peddada and also with his wife, supported the opinion that you wrote on February 1, 2023; right?

Page 45

A. Yes.

Q. Was there anything that you learned in that interview that you withheld from your report because you thought it would be damaging to Dr. Peddada's case?

A. No.

Q. And did you have any other reason to withhold anything from your report?

A. No.

Q. So your report accurately and truthfully contains a truthful account of the substance of your investigations and your conclusions at the time you issued your February 1, 2023, report?

A. Yes.

Q. Okay. And now, I would like to have Lindsay put into the chat what is marked as Exhibit 88, and just have you confirm that that is the February 2023 report that you have been testifying about.

Tell me when you see that in your chat.

(Deposition Exhibit 88 was referenced.)

A. I do. I'm just looking to make sure that it is there in its entirety.

Q. Okay. Now, I will tell you that I believe that your CV was attached to it, and it is not

12 (Pages 42 to 45)

Page 46

attached to 88 simply because of its volume.

A. Yes, that's my report of February the 1st, 2023.

Q. Okay. And we've already identified as Exhibit 87 the CV that was attached; correct?

A. I think that might have been a more recent version of my CV because it is dated July --

Q. You're right?

A. July 2024.

Q. Okay. I apologize. You're correct.

A. Yep.

Q. All right. Now, in -- in both of your reports, you list six items or six questions that you were asked to address. And let's -- let's go to those six questions in your July 30th, 2024, report, which is Exhibit 59A.

And I'll ask Lindsay to share that also now condescension.

(Deposition Exhibit 59A was referenced.)

A. Yes. I have it.

Q. (BY MR. SABEY) Okay. If you will please turn to page 3, you'll see under the heading: Issues. The issues or questions on which you were asked to opine; is that correct?

A. That's correct.

Page 47

Q. Okay. And the sixth -- the sixth question on which you were asked to opine was whether Dr. Peddada's conditions substantially impaired any major life activity.

Now that question, it seems, would normally require a physical examination and thorough assessment of the patient's body systems.

Did you not do that because you could rely on the two assessments that you reference at Numbers 3 and 4 of the materials reviewed on page 3 of your report?

MR. AZMOUDEH: Object to form and foundation.

Q. (BY MR. SABEY) That is, you had an intake assessment of Dr. Peddada by his primary care physician, Dr. Munni Selagamsetty.

And I will tell you that Dr. Peddada, I think, and perhaps others in this case, have referred by the shorthand, Dr. Setty. Do you recall him referring to her as Dr. Setty?

A. The way I answer came from my review of her medical record as well as the CPH, Colorado.

Q. Yes. Okay. And is it okay with you if we use the term "Dr. Setty" to refer to his primary care physician in this deposition?

Page 48

A. That's okay.

Q. You'll know who we're referring to; right?

A. Yes. Yes.

Q. Okay. Okay. So because you had Items 3 and 4, you had a thorough intake assessment of Dr. Peddada by his primary care physician, and you had an extensive report from Colorado Physician Health Program, you did not -- you could rely on those assessments, and you didn't actually need to conduct what normally would require a physical examination and thorough assessment of the patient's body systems so forth; is that accurate?

MR. AZMOUDEH: Object to form and foundation.

Q. (BY MR. SABEY) You can answer.

A. I -- let me just see. I'm trying to remember when I...

Q. Maybe I can help a little. If you look at Exhibit 88, your initial report, you had the intake assessment as Number 2 in the materials reviewed, and you had the CPH report as Number 3 in the materials reviewed.

And so you had those from the beginning of this case; is that right?

Page 49

A. Yes.

Q. And so you could rely on those two documents for detailed assessment of his condition; correct?

MR. AZMOUDEH: Object to form and foundation.

A. Yes.

Q. (BY MR. SABEY) Did you have any reason to quarrel with or dispute anything that was in Dr. Setty's medical record?

A. No. No, I didn't.

Q. You weren't actually in his presence in person during either of your interviews; right?

A. No, I wasn't present.

Q. And so you didn't do what Dr. Setty did: Take a medical history, review symptoms, check vitals, and give him a medicine exam; right?

A. No.

Q. That was correct?

A. Yes, that was correct. I didn't do the -- do those.

Q. There was nothing that you were in a position to say that Dr. Setty was wrong about or had overlooked?

MR. AZMOUDEH: Object to form.

MAGNA
LEGAL SERVICES

Page 50

A. Actually, no. The answer to that is "no." I thought that her assessment was actually very good and reflected, I think, good primary care principles. Although, I'm not a primary care physician myself.

Q. (BY MR. SABEY) Yeah.

A. But I thought it was really quite, you know, quite thorough, her evaluation of him.

Q. You would trust her as a thorough, careful primary care physician?

A. As reflected in the notes --

Q. Yes.

A. -- that I reviewed.

Q. Okay. The second assessment that you reference in your report was the full assessment by CPHP and its psychiatrists; right?

A. Yes.

Q. And that was -- I'm going have Lindsay put up Exhibit 55.

(Deposition Exhibit 55 was referenced.)

Q. Okay. Tell me when you see that in your chat.

A. Yes, I have it open here.

Q. Okay. That Exhibit 55 was a very extensive assessment as reflected in the 43-page

Page 51

Exhibit 55 document; correct?

A. Yes.

Q. And did you have reason to quarrel with or dispute anything in that document?

A. No.

Q. There was nothing in that assessment that you were in the position to say was wrong or overlooked?

A. No.

Q. Okay. And so because you -- you weren't in a position to conduct the kind of thorough medical assessment of his condition, you relied on the assessment of his personal physician and a thorough CPHP assessment by those who were in that position; right?

MR. AZMOUDEH: Object to form and foundation.

A. Correct; yes.

Q. (BY MR. SABEY) Did you ever speak to Dr. Setty or anyone involved in the CPHP evaluation?

A. No. No, I did not.

Q. Okay. Did you ever speak to any of Dr. Peddada's colleagues with whom he had worked or with any of the staff that he had worked with?

A. No. I saw the -- and it's mentioned

Page 52

there. His colleague, Brianna -- I'm blocking on her last name -- was a colleague that provided collateral information to Colorado CPH.

Q. But you didn't talk to her directly?

A. No.

Q. Okay. All right. I would like to you to look at Exhibit 61, which is -- which Lindsay will put up in your chat, and you can tell me when you've got that.

(Deposition Exhibit 61 was referenced.)

A. Okay. I'm just opening it now.

Q. Actually, Dr. Myers, I realize that I have not had you identify Dr. Setty's medical records. So before we go to that, I'm going to ask Lindsay to put up Exhibit 2C just to confirm that this is the medical record for which you have testified.

(Deposition Exhibit 2C was referenced.)

Q. (BY MR. SABEY) Do you have that one?

A. I do. And, in fact, I'm just looking at it now.

Q. Okay.

A. Yes, this is what I reviewed.

Q. Okay. Now we'll go to Exhibit 61.

(Deposition Exhibit 61 was referenced.)

Q. (BY MR. SABEY) Do you have that one in

Page 53

front of you?

A. I do, uh-huh.

Q. Okay. This is the document that Dr. Peddada sent to his partner, Dr. Monroe, advising him of his intention to take a three-month leave of absence from ROPC, that's Radiation Oncology, PC. Have you seen that document before?

A. I have, yes.

MR. AZMOUDEH: Object to form.

Q. (BY MR SABEY) okay.

MR. AZMOUDEH: I'm sorry. I missed the answer. What was the answer?

MR. SABEY: He said I have seen it.

A. Yes, the answer is yes.

Q. (BY MR. SABEY) Okay. And have you -- would you please read that.

A. Alan, pursuant --

Q. I'm sorry, I didn't mean to read it out loud. Just read through it and make sure you know what's in it. Okay? And you tell me when you've finished reading it.

A. Okay. I have read it.

Q. Okay. Is it your understanding that taking a three-month leave of absence was something Dr. Peddada had already planned to do before he went

MAGNA
LEGAL SERVICES

Page 54

to see Dr. Setty?  Or that he did it, as stated in his email: "At the instruction of my personal physician for reasons of disability"?

A.   The latter.

Q.   Okay.  Would you agree that the issue of when Dr. Peddada took a three-month leave of absence from his work is a very central issue in this case; right?

MR. AZMOUDEH:  Object to form and foundation.

A.   Please reword the question.

Q.   (BY MR. SABEY)  You would agree that the issue of why Dr. Peddada took a three-month leave of absence from his work is a very central issue in this case?  I mean, you've been retained to provide an opinion about whether Dr. Peddada was suffering from a disability and needed a three-month leave of absence; right?

A.   Yes.

Q.   And what did you do to investigate that question?

A.   I don't think I really did anything to investigate it.  I read -- I'm sorry.  I read the records, and I knew that he, from the records that he hadn't been feeling well, so I felt he did the prudent

Page 55

thing of going to his primary care physician.

And as you may recall, I think that was proceeded by a phone call the night before from Dr. Peddada to his primary care doctor about the either seriousness or urgency of this.

Q.   Okay.

A.   She saw him the next day if I remember the chronology correctly.

Q.   Okay.

A.   And authorized his taking a three-month leave of absence.

Q.   Okay.  And so -- and was there anything else you did to investigate that question other than reviewing that material?

A.   Well, when I interviewed him, he -- we talked about that.  He mentioned it.

Q.   Okay.

A.   I can't remember if -- I think it came up when I saw his wife as well.

Q.   Okay.  Anything else?

A.   No.  I don't think -- I don't think there was any other -- well, there was also -- it was also in the Colorado notes too --

Q.   Yes.

A.   -- of the PHP notes.

Page 56

Q.   All right.  So anything else?

A.   No.

Q.   Okay.  You are aware, aren't you, that after receiving on April 26, 2022, the final version of the physician employment agreement from Centura, Dr. Peddada was not willing to talk to anyone from Centura about those agreements until his three-month leave of absence expired on August 1, 2022?

MR. AZMOUDEH:  Object to form and foundation.

A.   I'm not -- I'm not -- I -- that's not a question I can answer.

Q.   (BY MR. SABEY)  Okay.  Did anyone tell you that that was the fact?  That is, that he was sent a final version of the physician employment agreement on April 26, 2022, after having been sent a lump -- a settlement agreement regarding a recruitment loan repayment, and that his response to receipt of those was that he was not willing to talk with anyone from Centura about those agreements until his three-month leave expired on August 1, 2022?

MR. AZMOUDEH:  Object to form and foundation.

A.   Yeah, I don't know any -- I don't know that -- that part.

Page 57

What I do know is that it was received.  I mean, you all know this.  I'm not telling you anything you don't know.

Is that he thought the original agreement was in place.  Then he went on vacation.  And apparently, it was sent, even though he had the away thing on your -- your professional email or whatever while he was away, it was sent, and he didn't -- that was his reason for not knowing until he got back.  And then, to my knowledge, was quite shocked.

Q.   Okay.  So that's what he -- that's what Dr. Peddada reported to you?

A.   Reported to me, and I think was also -- it was also in the Colorado CPH notes too that he had reported to them.

Q.   Okay.  Dr. Peddada's position in this litigation as to why he would not speak to Centura until after his three-month leave expired, is that his condition made him unable to perform work activities for three months and that his personal physician told him that he needed to take three months off and not do any work-related activities.

Does -- that's consistent with what Dr. Peddada told you?

15 (Pages 54 to 57)

MAGNA
LEGAL SERVICES

Page 58

A. Yes.

Q. And does your opinion support that position?

A. It does. I felt that his primary care physician was basically practicing good primary care in that.

Q. Is it your belief that Dr. Peddada went to Dr. Setty because he sincerely was seeking help for the condition of exhaustion or burnout, and he wanted her help to address and overcome that condition?

A. Yes.

Q. Would you expect if that was true, that he would follow her directions and suggestions so that he could overcome the problem?

MR. AZMOUDEH: Object to form.

A. Yes and no. Because -- and the reason I say that -- I mean, I realize that's not a proper answer, "yes and no," but if I could explain.

If you look at her notes, you can see that she was also worried about anxiety and depression and prescribed -- I don't know if he actually picked up the medication, Lexapro, which is a medication that is used for anxiety and depression for him to take.

To my knowledge, he didn't take it.

Q. (BY MR. SABEY) Okay.

Page 59

A. But I can also add that that doesn't surprise me, and I don't see that as not being a good patient or non-compliance.

Q. Dr. Myers, somehow we've had a glitch here, so I couldn't hear anything you said after "that doesn't surprise me."

A. Okay.

Q. And I still can't hear you.

A. Okay. Are you able to hear me now?

Q. Now I can.

A. Okay. I'm sorry.

MR. AZMOUDEH: Now if I could ask. I heard it all, and I'm curious if the court reporter heard it at all?

THE REPORTER: I got it I think, yep.

Q. (BY MR. SABEY) Okay. So for whatever, I didn't, so I will have to just ask you, if you don't mind or maybe I can tell you what I understood. And that is that you recognize that Dr. Setty prescribed medications that you believe Dr. Peddada did not take, and you said that that doesn't surprise you.

And if added more to that, I would appreciate it if you would repeat that.

A. Yes. And the reason why it doesn't surprise me is that this isn't unusual.

Page 60

I'm sorry. Let me just take a sip of water.

Q. Yes.

A. That I think that Dr. Peddada, like most physicians, at least -- and I'm basing this on my vast experience of looking after so many doctors over the years. Unless medication is really essential, they prefer to not take medication and to get some help, some support.

And that's why my hunch was that I think he realized he needed time away from work, which was prescribed, you know, by his primary care physician, and, you know, and he began to feel better.

Q. Okay. What is your understanding of the directions and suggestions that Dr. Setty gave to him?

A. My understanding is that that is proper care for a primary care physician advocating for her patient.

Q. Okay. And what specific directions and suggestions did she give him?

MR. AZMOUDEH: Object to the form.

A. Well, one was to take time away. And I think that there has been -- and that's where the three months came up, that that's what she recommended, which is in the ballpark, by the way.

Page 61

There is a tendency, I think, sometimes for us who are the practitioners looking after doctors to minimize the time away.

Q. (BY MR. SABEY) Okay.

A. And because that's all got to do with how some doctors, first of all, don't want to take any time off at all. He realized he needed time off.

Too often they think that they need more -- they need less time than what we recommend.

Q. Okay.

A. That's why I say three months is really in the ballpark.

Q. Okay. So what you've told me is that she prescribes some medication, and she told him that he needed to take three months off?

A. Yes, but if I could --

Q. And is there anything else specifically that you understand she told him?

A. Yes.

Q. What is it?

A. I mean, if I looked at the record, I think she also mentioned that he should get a psychiatric assessment. And that's when -- I'm trying to remember the name of the doctor, but she was in a conflict of interest, the psychiatrist that he spoke



Page 62

to or was referred to, and couldn't assess him. Then she or perhaps another group, suggested the Colorado Physician Health Program.

Q. Okay.

A. Which was very good advice.

Q. Was there anything else that -- that Dr. Setty instructed Dr. Peddada to do that is supportive of your opinions and conclusions?

MR. AZMOUDEH: Object to form.

A. I'm trying to remember. Can I have a minute to look at this?

Q. (BY MR. SABEY) Sure.

A. I'm trying to remember which one it is? Is it 61?

Q. Are you talking about Dr. Setty's medical record? That is 2C.

A. 2C?

Q. Yes.

A. Let me just open it.

Q. Okay.

A. Yes. The other thing was the essential hypertension.

I remember now because he did have a time when his blood pressure was higher. Prior to this, he told me he was overweight, he hadn't been exercising,

Page 63

and he preferred not to take an antihypertensive, but to do two things: Be more careful and stringent with his diet as well as to get back to exercising. And that is, you know, imbedded here as well, that she, you know, picked that up.

And what else did it say? Yeah. Return four to five weeks to follow up on the -- the hypertension, HTN, and clinical burnout.

Q. Okay.

A. By the way, I might add too. This is where I thought her adding something -- situational anxiety disorder -- is where I think that was, I think -- that was the reason why she was thinking of a low dose -- I'm speculating -- a low dose of Lexapro.

Q. Okay.

A. With Ativan, if necessary.

Q. Was -- you've indicated that Dr. Peddada -- you believe, did not follow her directions relative to medication; is that right?

MR. AZMOUDEH: Object to form.

A. Well, first of all, I'm not sure how -- it doesn't -- it's not reflected in the notes, for instance, that she was emphatic about it.

Q. (BY MR. SABEY) Okay.

A. I mean, if the language was such that I

Page 64

was, you know, quite worried about him. Even though he was not suicidal, I really wanted him to take the Lexapro, or he seemed to pushback or something, or he refused or something. It didn't have that tone.

Q. Okay. But it is your understanding that he did not take any medication that she prescribed; is that right?

A. I would have to look at my notes because I probably asked him when I -- when I met with him.

Q. Okay. But your best recollection right now is that he did not want to take any medication?

A. Right.

Q. Okay. Other than that, is it your understanding that he was diligent in following through on Dr. Setty's directions and suggestions?

A. Yes.

MR. AZMOUDEH: Object to form.

Q. (BY MR. SABEY) Okay. If you learned that after receiving her approval of the three-month leave of absence he was seeking, he ignored the directions and suggestions that he had received from her, what would that lead you to conclude?

MR. AZMOUDEH: Object to form.

A. Well, it sounds to me, given the information I've been given, it sounds hypothetical.

Page 65

Q. (BY MR. SABEY) Okay. And that is a hypothetical question. If you learned that after her approval of the three-month leave he was seeking, he ignored the directions and suggestions he received from her, what would that lead you to conclude?

MR. AZMOUDEH: Object to form.

A. I -- I can't answer that unless I -- if I felt there was -- there was more there. Because this gets into the whole integrity thing.

Q. (BY MR. SABEY) It does, yes, yes. Both his integrity and yours.

So my question is: If you -- and this is a hypothetical -- but if you learned that she advised him to do certain things, and he ignored them after he got his three-month leave approved, what would that cause you objectively to conclude?

A. I think in your hypothetical example, though, I would need to know some consequences of ignoring the doctor's advice. For instance, if he -- oh, I don't know, descended into alcoholism or left his wife, or was a -- was picked up for violence or something, I mean, I guess I would think: Oh, my gosh, you know, that -- yeah. Then --

Q. And that's certainly not included in this hypothetical at all.



Page 66

My question is: Given the circumstances he was in, if -- if he didn't do -- and I understand that you have an explanation for why he might not have taken the medication, but if he didn't do the other things she said he should do, he got his three-month leave of absence approved, and he then didn't do the things she said he should do, what would you conclude from that?

MR. AZMOUDEH: Object to form.

A. Yeah. I can't -- I can't answer that because I think I come from -- I come from decades of looking after physicians where the matters are often not black and white, especially when a physician becomes a patient.

For many doctors, it's a very foreign experience. They hate being patients.

Q. Sure.

A. And -- and if they kind of struggle along, in other words, don't take advice, well, I would weight all of that and think, you know, do I need to build a relationship with this person.

Q. Okay. Let me -- let me -- let me be a little more specific then.

You understand that doctor -- your understanding is that Dr. Setty told Dr. Peddada that

Page 67

he needed to refrain from doing any work activities for three-months; correct?

A. Medical work.

Q. Okay.

A. That's my understanding. Medical work.

Q. What do you mean by that?

A. Practicing medicine.

Q. Okay.

A. Which is a very -- it sets -- it sets -- because that's the occupation that he is trained in.

Q. So --

A. And because --

Q. So to the best of your understanding, he has never told you that he was told he should not have anything to do with work, that is he shouldn't communicate with anybody about his work, that he shouldn't engage in any discussion of terms of employment, or things like that.

He didn't ever tell you that that's what -- that's what he was told?

A. No. But think what you're describing is so black and white that, again, all I can do is speculate. But I don't imagine that she meant that you're not to even discuss your work or if one of your patients calls you because they're feeling they don't

Page 68

have anybody to look after them, then I don't want you to answer their question because that would be practicing medicine.

I, you know, this is a man, you know, that has been practicing for so long and was used to taking calls when he was on vacation --

Q. Okay. And --

A. -- and out with his family, you know.

Q. So let me be sure I understand what you believe he was not supposed to do during this three-month leave that was approved by Dr. Setty.

A. My hunch, I mean, all I can do is maybe speculate. If he were my patient, and I didn't want him practicing medicine --

Q. Okay. Now -- and I'm really not asking you to speculate about what you would do if he were your patient.

A. Okay.

Q. What is your understanding of what Dr. Setty told him not to do?

MR. AZMOUDEH: Object to form.

A. I don't think I can answer that because I wasn't, you know, I have her notes, but I wasn't in the office.

Q. (BY MR. SABEY) Okay. Okay. So that's

Page 69

something you don't have an opinion about?

A. Well, except, though, you seem to be saying that he engaged in some sort of work-related activity, and --

Q. Yes. And I'm wanting to know what you understand he was directed by his physician not to do.

MR. AZMOUDEH: Object to form.

A. Yeah. And that's the part I don't know.

Q. (BY MR. SABEY) Okay. What did you understand about the circumstances of the ROPC business that he and Dr. Monroe were in at the time of the email that he sent, Exhibit 61?

A. I didn't know what to make of that.

Q. Okay.

A. If their relationship had become strained.

Q. Yes. In fact, were you aware that they hadn't spoken to each other for eight months?

A. Yes. I have that somewhere in my notes.

Q. Okay. You understood that because of the circumstances of their failed relationship, that the contract with ROPC was coming to an end, and it would wind down his -- it would wind down the business of ROPC; right?

A. Correct; yes.



18 (Pages 66 to 69)

Page 70

Q. And what did you understand to be the contractual provisions between Dr. Peddada and Dr. Monroe relating to compensation?

A. I'd answer that I don't know.

Q. And --

A. What I do know is that he was worried that -- and it's reflected in the notes -- that Dr. Monroe was possibly -- had used the term "mental breakdown" or "mental illness" or something, and I think he felt betrayed over that.

Q. Okay.

A. Or that people might be talking about him.

And he is very sensitive. As you know, psychiatric illness, burnout, everything, there is a sensitivity.

Q. Okay. And -- and Dr. -- Dr. Peddada denied that he had any mental breakdown or mental illness; right?

A. No, I wouldn't say that. I think he was admitting to mental stress, and that's why he went for help.

Q. Okay.

A. But I think this is private and confidential. I think he -- it was his perception or

Page 71

worry, I don't know which it was, that Dr. Monroe had perhaps betrayed that confidentiality or trust.

Q. Okay. What is your understanding of the relative wRVUs as between Dr. Peddada and Dr. Monroe?

A. I'm not sure of the specifics, but I do remember him saying that his were, like, anywhere from three times higher than average.

Q. Okay.

A. Again, reflected --

Q. Did he indicate to you that he felt that that was not fair?

A. One thing that I remember that he felt wasn't fair -- I'm not sure if I'm accurate on this. There was some -- it's in -- it's in one of the reports as to whether or not he was expected to pay back a loan for hiring somebody that he felt Dr. Monroe had not had to pay back money.

Q. Okay.

A. And so why --

Q. That's a different question. But he told you that he thought that it wasn't fair for him to have to pay back the loan?

A. Either he told me that or I read it somewhere in -- in the -- one of the files.

Q. What did you understand to be the

Page 72

contractual provisions between Dr. Peddada and Dr. Monroe in their ROPC business relating to taking a leave of absence?

MR. AZMOUDEH: Object to form.

A. I don't --

Q. (BY MR. SABEY) Were you aware that he had -- that there were provisions that allowed him to take a leave of absence from ROPC for circumstances of disability?

A. No.

Q. Okay. Do you have any awareness of how long the leave of absence could be?

A. No.

Q. I assume from the discussion with you about the fact that Dr. Peddada and Dr. Monroe had not spoken to each other for eight months, you accurately concluded that they did not have the fondest feelings for each other; right?

A. I can't speak for each other, but -- but, you know, because I don't know Dr. Monroe and I didn't speak with him. But it certainly -- there was certainly that feeling on the part of Dr. Peddada.

Q. Okay.

A. And also, if I remember correctly, I think that that had changed. I think initially -- I'm

Page 73

trying to remember. I think initially, I think, Dr. Peddada was more senior, and I think their relationship at one time had been, you know, much, much better where they were able to work out their differences.

But things had -- things had really soured.

Q. Okay. I think we need to kind of return to what we agreed to and kind of focus a little on the questions and direct answers.

I -- I want to ask you for a minute to -- and to suppose -- I want to suggest to you a hypothetical and ask you to tell me what evidence you had to convince me that this hypothetical is not right. Okay?

The hypothetical is this: Suppose that Dr. Peddada wanted to take some time off for some vacations that he wanted to take. And he knew that ROPC would not have any money left at the end of the contract with Penrose. He knew that he had a right to take a three-month leave of absence, and still be paid. He knew that if he did, Dr. Monroe, his partner of whom he was not fond, would be stuck with the burden.

So he went to Dr. Setty and told her that

MAGNA
LEGAL SERVICES

Page 74

he needed to take three months off to recharge, and she agreed to write the order he requested. That allowed him to take the vacations he wanted to take, to get paid while he did it, and to stick it to his partner in the process.

Tell me what evidence you have to tell me the hypothesis I just gave you is wrong.

MR. AZMOUDEH: Object to form and foundation.

A. Mr. Sabey, in all due respect, I really can't. I really can't answer that.

Q. (BY MR. SABEY) Okay. All right. Are there elements of that hypothetical that you have evidence to cause you to say "I know that is not accurate in this case"?

MR. AZMOUDEH: Object to form and foundation. Mel, he is not going to answer the question.

MR. SABEY: No. This is a different question.

MR. AZMOUDEH: Okay.

Q. (BY MR. SABEY) Are there elements of hypothetical that you can say "I know that is not accurate"?

MR. AZMOUDEH: Object to form and

Page 75

foundation.

A. No, I -- I can't answer it.

Q. (BY MR. SABEY) Okay. Okay. Let's talk about -- we've talked about the initial, and the -- the initial 2003 report and the -- the final 2000 -- 2023 report, and the 2024 reports.

Did you receive a new assignment modifying the scope of your review or the questions that were asked -- that you were asked to address between Report 1 and Report 2?

A. Yes.

Q. Was the new assignment to simply update your report by interviewing Dr. Peddada again and to see how he was doing at the later time?

A. Well, no. But this is -- this is when I learned, though, that the suit was about discrimination.

Q. Okay.

A. And the ADA.

Q. Okay. So what was the nature of the revised assignment if it changed from the time you did the first report and the second?

A. To pay attention to that, as to really what -- in fact, that explains question Number 6.

Page 76

Q. Okay. And so between the first report and the second report, you were given the -- the initial and amended complaints to review; is that right?

A. What was I given to review? The --

Q. We talked earlier about Items 1 and 7 were the new documents you received.

A. And the Complaint.

Q. Number 8 was the interview you did with Dr. Peddada; correct?

A. Yeah. It was the Complaint, which was a new document.

Q. Okay. And both 1 and 7 were complaints. 1 being the initial one, and 7 being the amended one. Is that accurate?

A. Uh-huh.

MR. AZMOUDEH: Mel. Mel, I'm sorry to interrupt. I just want to make sure your record is clear.

I actually don't -- July 27, 2023. Can we look back really quick at the e-file? I'm pretty sure that that's just the Complaint. I.

Think you have -- I think Dr. Myers may have a duplicate on his listing of the materials reviewed. I'm not sure he ever received the amended

Page 77

complaint because that wasn't filed until this year, I think.

MR. SABEY: Oh. I mean, I appreciate that. So the only complaint that he received was the July 27, 2023, complaint. Is that accurate?

THE DEPONENT: I have a complaint dated July 25, 2024.

MR. SABEY: Omeed, is that the amended complaint?

THE DEPONENT: I'm sorry. I'm sorry. That was my review of it. I'm trying to -- I'm sorry. I'm trying to look back as to the charge of discrimination.

Q. (BY MR. SABEY) You had the charge of discrimination when you did your initial report.

A. Okay. Okay.

Q. And then you had a complaint. And I had the impression from looking at materials reviewed, 1 and 7 on your final report, that there were two different complaints?

A. Yes. I'm sorry. Yeah. What I have is the -- at the top it is Document 1, filed July 27, '23.

Q. Okay.

A. Page -- it was page 1 to 36 pages.

MAGNA
LEGAL SERVICES

Page 78

Q.   Okay.  So is that the only complaint that you have reviewed ever in this case?

A.   Yes.

Q.   Okay.

MR. SABEY:  Then, Omeed, I appreciate the clarification.  That resolves something that I did not understand.

MR. AZMOUDEH:  Yeah.

Q.   (BY MR. SABEY)  Okay.  So between the first and second report, you received from the attorneys a copy of the Complaint they had filed in the case; correct?

A.   Yes.

Q.   And you were directed to -- to evaluate or to -- to change your report with attention to discrimination and then revise your report based on what you reviewed in the Complaint and a further interview of Dr. Peddada; is that right?  Is that accurate?

A.   There is a lot in there.  I would say updated my report.

Q.   Yes. You --

A.   No.  Wait.

Q.   -- attempted to update your report?

A.   Yes.

Page 79

Q.   With attention to what was in the Complaint?

A.   That's correct.

Q.   Okay.  And any other directions you were given besides those?

A.   No.

Q.   Okay.  Did your task as a medical expert change?

A.   Well, from the standpoint of question Number 6: Did Dr. Peddada's conditions eventually impair any major life activities such as:  Sleeping, thinking, concentrating or communicating.

Q.   Okay.  And you understood that issue to be -- to be in response to a discrimination case?

A.   Yes.  Yes.

Q.   The second time you did the report; correct?

A.   Yes.

Q.   Right.  But -- but my question is:  Did your task as a medical expert, not an evaluator of discrimination, but as a medical expert, did your task change?

A.   Please repeat the question.

Q.   Did your task as a medical expert change between the time you did the first report and the

Page 80

second report?

A.   Well, it changed -- yes.  The answer would be yes.

Q.   Okay.  Let's -- and you referred to -- to question Number 6.  If you look at those, I -- it appears to me, quickly reading, that 6 didn't change between the first and the second report.  Am I wrong about that?

A.   I don't think -- I don't think it was asked in the first.

Q.   Well, let's -- if you'll turn to -- to your -- your February 1, '23, report and look at page 3.

A.   I'm sorry.  I'm sorry.  It was -- it was there.  I'm sorry.

Q.   Okay.  So you were directed to review the Complaint and basically revise -- to address that in your second report?

MR. AZMOUDEH:  Object to form.

A.   (The witness nodded.)

Q.   (BY MR. SABEY)  You're nodding your head "yes"; is that correct?

A.   I'm sorry.  Would you please -- I was looking at my -- would you just repeat the question again.

Page 81

Q.   You were directed to review the Complaint and revise your response to Number 6 in -- in connection with what you saw in the Complaint, which now you recognized was discrimination.

A.   Hang on.  Just give me a moment, please.

Now -- I'm sorry.  Now that I've read this, would you please repeat the question one more time?

Q.   Yeah.  You've already testified that the attorneys sent you the Complaint, and that that complaint caused you to recognize that -- that this was about discrimination; correct?

A.   Yes.

Q.   And that you were directed to review the Complaint and revise the response to Issue 6 in the issues that were presented to you; is that right?

A.   Yes.

Q.   Okay.  And who did you talk to between report Number 1 and report Number 2?

And just so it's clear, I'm referring to your report Number 1 as the 2023 report and report Number 2 as the 2024 report.

Who did you talk to between those two reports?

A.   So I spoke to -- I spoke to Mr. --

MAGNA
LEGAL SERVICES

Page 82

Mr. Azmoudeh.

Q. And anybody else?

A. I'm trying to remember if I actually spoke with Ms. Halpern or if we communicated by email. I'm sorry, I can't remember.

Q. Okay. Did you --

A. And, of course, I spoke with Dr. Peddada again.

Q. Okay. Anyone else?

A. I don't -- I don't think so.

Q. Your billing records would reflect who you spoke to and when; correct?

A. Yes.

Q. Okay. Do you have those in your presence?

A. Uh-huh.

Q. Would you just quickly look for the time frame between February 1 of 2023 and July 30 of 2024, and tell us who you spoke to and when?

A. In my billing record, there is a gap between January 19, 2023, and July 25, 2024.

Q. Okay. So nothing happened in that time period related to your involvement in --

A. Right.

Q. Okay. And so when did you speak to

Page 83

Mr. Azmoudeh?

A. I'm sorry for this delay. I have -- July 25, 2024.

Q. Okay. And -- and then the next day, you had a Zoom interview with Dr. Peddada; correct?

A. Just a second.

Q. Did you say "yes"?

A. I'm sorry. July 26th.

Q. Okay. And did you -- when did -- did -- no.

When you spoke to Mr. Azmoudeh, did he then send you electronically the Complaint that you were to review?

A. Yes, but it might have been earlier. I just found an email.

Q. Okay. What is the -- what is the email?

MR. AZMOUDEH: Hold on.

MR. SABEY: Well, I'll ask him who it's from.

MR. AZMOUDEH: There we go. Thank you.

Q. (BY MR. SABEY) Who is the email from?

A. I'm sorry. I was just reading. You asked me who was the email from?

Q. Yes.

A. From Iris Halpern. July the 11th.

Page 84

Q. July the 11th.

A. It's early than when I spoke, yeah, to Mr. Azmoudeh.

Q. Was anything attached to the email?

A. There was nothing attached, no.

Q. What factual information does the email give you?

A. That I had spoken -- Ms. Halpern said that I had --

MR. AZMOUDEH: Well, hold on. Mel, can you ask what factual information about the case. I mean, every communication from attorney has some factual communication, but that doesn't mean it's right.

MR. SABEY: Yes.

Q. (BY MR. SABEY) What factual information about this case does the email from Ms. Halpern give you?

A. Okay. She wrote that I had spoken with a colleague of hers a year ago for preliminary report -- oh. Sorry, there was an attachment. Which was my original report from 2023.

Q. Okay.

A. I guess that was to jog my memory.

Q. Okay. And what other factual

Page 85

information --

(Simultaneous speakers.)

A. We were unable to resolve the case before litigation, and they were hoping to enter into additional contract for you to supplement your earlier report.

Q. Okay.

A. And then she added that we have some updated materials, like the Complaint, and you may want to talk to Dr. Peddada. Let us know if you're available to update the report. The current deadline is about three-weeks from now.

I was on vacation at the time.

Q. Okay. Okay. Is there anything else in that -- in that email that was sent to you by Ms. Halpern?

A. No, there isn't.

Q. All right. So then you spoke to Mr. Azmoudeh on the 25th. I gather that would be after your return from vacation?

A. Yes.

Q. Okay. And then the next --

A. That was at my request because I gave the dates --

MR. AZMOUDEH: Hold on. Sorry. Our --

MAGNA
LEGAL SERVICES

Page 86

we're just dangerously close to our communications, so I'm just -- I have to sort of jump in here and there.

But whatever we talked about, unless it is from a question from Mel that is properly phrased, I'm just going to cut this line off. We're very close.

Q. (BY MR. SABEY) Okay. So after you -- you indicated that at your request, you indicated you would be on vacation. And you came home from vacation when?

A. July 25th.

Q. Okay. And on that date, you spoke to Mr. Azmoudeh, and you've, I think, gave us an indication what that discussion was. And then the next day you conducted a Zoom interview with Dr. Peddada; correct?

A. Correct.

Q. And between the first and second reports, did you talk to anyone other than the attorneys for Dr. Peddada and the Zoom interview with Dr. Peddada on the 26th?

A. No. No.

Q. And did you review any additional documents between Report 1 and Report 2 except for the Complaint that was filed by the attorneys?

Page 87

A. No.

Q. You recognized that that complaint filed by Dr. Peddada's attorneys was filed by attorneys who are advocates for his position and are seeking money from the Defendants for Dr. Peddada and themselves; right?

A. Would you please repeat the question.

Q. You recognize that the Complaint was a document written by Dr. Peddada's attorneys, and that they are advocates for his position, and that they are seeking money for him and for themselves; right?

MR. AZMOUDEH: Object to form.

A. I don't think that was in -- in the -- in the thing that they're seeking money for him and for themselves.

Q. (BY MR. SABEY) Well, are you aware that the attorneys are representing him on a contingent fee?

A. No.

MR. AZMOUDEH: Object to form.

Q. (BY MR. SABEY) Assuming that that's the case, you would agree that they're seeking money for him and for themselves; correct?

MR. AZMOUDEH: Object to form.

A. If that's the case, yes.

Page 88

Q. (BY MR. SABEY) Okay. And -- and you recognize that they have no medical or psychiatric training, to your knowledge, do they?

A. No, they do not, to my knowledge.

Q. And what was the purpose -- well, in your second report, you make several references to statements in the Complaint; correct?

A. Yes.

Q. Did you assume that the allegations of the Complaint were true and accurate?

A. Yes.

Q. Did you do any investigation of any of the allegations of the Complaint before including them in your report?

A. No.

Q. You knew that Dr. Peddada was a partner in and employed by ROPC, which had a contract with Penrose during the many years for which he was providing services to patients at Penrose; right?

A. Yes.

Q. And you did understand, I think, according to your previous testimony, that in response to the acrimony between Dr. Peddada and his partners, there was going to be a change in the relationships between the hospital and the doctors; right?

Page 89

A. I knew that, yes.

Q. And you understood that in order to become employed by Penrose, the doctors who had been employed by ROPC would each need to enter into a contract with Penrose that would specify the date on which they would become Centura employees; right?

MR. AZMOUDEH: Object to foundation.

A. What I -- all I -- I don't know if this is accurate. All I knew was that with the dissolution of the partnership, Penrose was going to -- there was going to be two positions with three people competing for the two positions. And according to Dr. Peddada, it looked as if he was going to be given a particular one.

Q. (BY MR. SABEY) Okay. And --

A. Have a meeting that he had with people or whatever, which then didn't happen.

Q. Okay. And so -- but you understood that he would need to be -- to sign an agreement with Centura to be an employee of Penrose, whereas he had not been an employee with Penrose during all the years he had provided services there?

A. Yes.

MR. AZMOUDEH: Object to form.

Q. (BY MR. SABEY) And you -- on page 11 of

MAGNA
LEGAL SERVICES

Page 90

your second report, you write that Dr. Peddada was asked to sign a duplicative agreement. And I just want to make sure I understand what you mean by that.

You understood, I gather, that he was asked to sign the same contract again after he had already signed it once, and that Penrose unreasonably withdrew the contract when he refused to sign the same contract a second time; is that right?

A. No.

MR. AZMOUDEH: Object to form.

Q. (BY MR. SABEY) Tell me what your understanding was.

A. Let's just go back a second. Can you tell me on page 11 what you were reading and quoting?

Q. One second. Let me find that. On page 11, in the third line from the bottom of the first paragraph. The first word in the line is "program." Do you see that?

A. The one on page 11?

Q. No. On page 11, we're looking at the first paragraph.

A. Oh, I'm sorry. Okay.

Q. That carries over from page 10, and on the third line from the bottom of that paragraph, do you see the word "program" at the beginning of the

Page 91

line?

Let's make sure we're tracking here. You're looking at Exhibit 59A, the July 30th, 2024; right?

A. Yes, I am, and I'm on page 11.

Q. Okay. And now the beginning of that page begins with the word "criteria"?

A. Yes.

Q. Now, go down to the third line from the bottom of that paragraph. And do you see the word "program"?

A. Yes.

Q. Okay. Right after the word "program," it says: "The time-sensitive duplicative offer was not read and signed by Dr. Peddada as he was on vacation."

Do you see that sentence?

A. I do, yes. I'm following now, yes.

Q. Now, so you understood that he was asked to sign the same contract again after he had already signed it once; is that right? The duplicative offer.

A. Well, what I do know is that he thought that -- I think he thought this is odd that he had already signed it. But then, I remember there was some other thing that they said it was null and void because of something.

Page 92

Was that -- maybe this is the connection to the loan that hadn't been paid off or something like that that was --

Q. Okay.

A. I must admit that I -- there was so many technical type details like that, that, you know, I didn't -- I didn't kind of dig into all of -- all of that and question.

I mean, I didn't feel -- I didn't know that that was kind of part of my job.

Q. Okay. So what you reported was simply what Dr. Peddada told you?

A. Yes.

Q. Okay.

A. Or within the Complaint or something, yeah.

Q. Okay. So you didn't do anything to investigate any of those issues, that you accepted what was in the Complaint and what he told you?

A. Yes; that's right.

Q. Okay. Did you ask any questions about those things?

A. No.

Q. Okay. So did you understand that the parties were in the process of finalizing the

Page 93

contractual relationships between Dr. Peddada and Centura when he took his leave?

A. No.

Q. Okay. And it sounds like you were aware that, at least at that time, the parties still needed to address the recruitment loan repayment issue that had arose out of the loan made to ROPC when Dr. Kathpal joined that practice; right?

A. No. I think I only learned of that reading about this after he got back from vacation and was told -- I don't know if I'm quoting this accurately -- that that contract wasn't -- that he had signed, wasn't acceptable.

Q. Okay. So -- and he told you that -- that they had sent something to him, but he didn't read it because he was on vacation?

A. That's correct.

Q. Okay. Okay. As a -- as a physician, are you aware of the need of hospitals and physicians to be careful in terms of the federal legislation that governs the kind of compensation that can and cannot be paid to physicians who have a relationship with the hospital?

A. No, I'm not familiar.

Q. Do you know anything about Stark or



Page 94

Anti-kickback laws?

A. No.

Q. Okay.

MR. AZMOUDEH: Mel, can we take a break when you get a chance? Sorry.

MR. SABEY: Okay.

Q. (BY MR. SABEY) And that's not something you asked about or explored or investigated in any way?

A. No.

Q. Okay. Just a few more things and then -- and then we'll take a break.

MR. AZMOUDEH: Thanks.

Q. (BY MR. SABEY) Dr. Peddada apparently indicated to you that he -- he -- that there was an issue surrounding that repayment, first of all; correct?

A. Either -- I'm not sure if he told me that or if I read it in the report.

Q. Okay. In the Complaint you mean?

A. Yes, in the Complaint.

Q. Okay. And he expressed to you his concern about or desire to avoid repayment --

A. No.

Q. -- that the hospital was seeking?

Page 95

A. No.

Q. No.

MR. SABEY: Okay. Should we take a five-minute break?

MR. AZMOUDEH: Can I get 10? I have to make a phone call. Not to Dr. Myers, to a client.

MR. SABEY: Okay. Yeah, as long as you're not talking to Dr. Myers, I don't mind taking ten minutes. That's fine. Thank you.

THE VIDEOGRAPHER: Okay. We are off the record at 12:26.

(Recess taken, 12:26 p.m. to 12:39 p.m.)

THE VIDEOGRAPHER: We are back on record at 12:39.

Q. (BY MR. SABEY) Okay. Dr. Myers, we have just taken a ten-minute, approximately, break. Have you spoken to anyone or received any communication from anyone during this break?

A. No, I have not.

Q. Okay. I would like to backtrack just a little bit. Earlier in the deposition I asked you if it was your understanding that Dr. Peddada had -- had already planned to take vacations and then went to his doctor, Setty, or that he had stated in his email to his partner that he took the leave of absence at the

Page 96

instruction of his physician for reasons of disability, and you indicated it was the latter.

You're not aware of the fact that he was planning to take time off for some significant vacations when he went to Dr. Setty?

MR. AZMOUDEH: Object to form and foundation.

A. What I recall is that the -- that the one-week vacation was planned -- was already planned in advance.

Q. (BY MR. SABEY) Okay. And that's all you're aware of?

A. That's correct.

Q. Okay. Let's -- I'm going to have Lindsay put up Exhibit 89. Let me know when you have that.

(Deposition Exhibit 89 was referenced.)

A. Okay. I have it open.

Q. (BY MR. SABEY) And you will see in the email from Dr. Peddada on May 10th, in the last paragraph, first line, it says: "I was out of my office for my scheduled vacation 4/21 to 4/30."

That's what you're referring to; correct?

A. Yes. Yes.

Q. Okay. Now, let's look at Exhibit Number 90, which Lindsay will put up.

Page 97

(Deposition Exhibit 90 was referenced.)

Q. (BY MR. SABEY) Do you have 90 in front of you

A. I do. It just opened, yes, uh-huh.

Q. Okay. Good. And I'll direct your attention to item -- well, first of all, this is an email at that time that constituted -- under the subject "Minutes" from the June 1 forward meeting -- June 1 forward meeting --and it was sent on April 20, 2022. Do you see that?

A. I do.

Q. And I'll direct your attention to Item 3B. And do you see that it says: "Peddada off 6/6/22 - 6/26/22. Return to clinic 6/27/22."

Do you see that?

A. I see that.

Q. That would indicate that he was intending to be off for 20 or 21 days in June; correct?

MR. AZMOUDEH: Object to form and foundation.

A. Yes.

Q. (BY MR. SABEY) All right. Now, if you'll look at Exhibit 91, which Lindsay will send to you.

(Deposition Exhibit 91 was referenced.)

MAGNA
LEGAL SERVICES

Page 98

A.  I have it open.

Q.  (BY MR. SABEY)  Okay.  And Dr. Peddada, also on April 20th, sends an email at the bottom of Exhibit 91 that indicates that he is planning to be out of the country from 7/7/22 through 7/22/22?

Do you see that?

A.  I do.

Q.  And all those were before he went to visit Dr. Setty; correct?

A.  I'm trying to remember the dates.  Hang on.

Q.  In Exhibit 2C, it says:  "Visit time --

A.  It's April 22nd.

Q.  Right.  So he already had planned to be gone most of that three months before he went to see Dr. Setty; correct?

MR. AZMOUDEH:  Object to form.

A.  Well, as a -- I'm seeing this email for the first time.  Yes, I see that.

Q.  (BY MR. SABEY)  So that was information you didn't have at any time when you wrote your reports; correct?

A.  Correct.  I'm pretty sure I haven't seen this.

Q.  Okay.  Okay.  Let me go back to where we

Page 99

were when we took a break.

You indicated that you were at least aware of the issue that the parties need to address the recruitment loan that the -- that had been made to ROPC when Dr. Kathpal joined ROPC.  You're aware of that?

A.  When doctor who joined ROPC?

Q.  Dr. Kathpal was the third doctor that was --

A.  Yes.  Yes.  That's the doctor where it didn't work out?

Q.  Yeah.  I think certain -- that's what Dr. Peddada told you that didn't work out very well; right?

A.  Okay.  Okay.

Q.  Is that right?

A.  If I -- I don't think I -- I'm not sure if I put her name in down here.

Q.  Right.  But he told you that the other doctor that they recruited to join them, things didn't work out well?

A.  That's correct.

Q.  Okay.  And -- but you were not told about the necessity of addressing that recruitment loan in order to comply with fed statutes; correct?

Page 100

MR. AZMOUDEH:  Object to form and foundation.

A.  Please repeat the question, Mr. Sabey.

Q.  (BY MR. SABEY)  You were not told about the necessity of addressing the recruitment loan in order to --

(Simultaneous speakers.)

A.  I'm sorry.  Yeah.  The audio was breaking up again just a little bit.  If you could --

Q.  I'll try again.  You were not told about the necessity to address the recruitment loan in order to comply with federal statutes; correct?

A.  Correct.

Q.  Were you aware of the fact that Dr. Peddada had repeatedly expressed his desire to avoid any obligation to make the required repayment, either in money or years of service, in order you to avoid the repayment?

MR. AZMOUDEH:  Object to the form and foundation.

A.  I'm not aware of that.

Q.  (BY MR. SABEY)  Okay.  Were you aware of the fact that Dr. Peddada and Centura had exchanged correspondence in early April of 2022 confirming that those issues needed to be addressed in conjunction

Page 101

with the plan to employ Dr. Peddada?

MR. AZMOUDEH:  Object to form. Foundation.

A.  I'm not aware.

Q.  (BY MR. SABEY)  Okay.  Would you look at Exhibit 66, which Lindsay see will just put up.

(Deposition Exhibit 66 was referenced.)

Q.  (BY MR. SABEY)  Do you see Exhibit 66?

A.  I do.

Q.  Okay.  And do you see that the -- there is discussion -- the last sentence.

A.  There is a square that begins with:  "Hi, Jeff."  It's hard to read.  Is that --

Q.  No.  Let's go down to the next -- the bottom communication and look at the last sentence: "Just working out whether to do the recruitment assistance loan as part of the contract or a separate addendum later."

Do you see that?

A.  I do.

Q.  Okay.  And that was dated April 5th; correct?

A.  It's dated April the 5th; correct.

Q.  And in light of that document, do you have any basis to refute the fact that the parties

**MAGNA**
**LEGAL SERVICES**

26 (Pages 98 to 101)

Page 102

were discussing and needed to address the recruitment assistance loan as part of the contract or a separate addendum?

MR. AZMOUDEH: Object to form and foundation.

A. I'm trying to figure out who -- who is -- this correspondence is.

Q. (BY MR. SABEY) Well, I'll represent to you that it is between Jeff Albert, a Centura representative, and Dr. Peddada.

A. But what I'm seeing at the bottom then: "Sorry. Thought I had responded."

Those are the words of Dr. Peddada?

Q. No. That's Jeff Albert.

A. Oh.

Q. Yeah. The -- the -- you see the first one is kind of in gray and hard to read, that's --

A. Yes, I can see --

Q. -- do you see that?

A. I can see that it is now signed: "Thanks, Anuj."

Q. Yeah. So that was Dr. Peddada that sent that, and the other is Jeff Albert.

So my question is: Do you have any evidence to refute the fact that Dr. Peddada and

Page 103

Centura had discussed on April 5th the necessity of working out the recruitment assistance loan as part of the contractor or a separate addendum?

A. Well, it sounds like, just as I read this, that they were in communication.

Q. Yes. About that issue?

A. Yes. Because it says "recruitment assistance loan."

Q. Yes. Okay. But you had never seen that exchange before; correct?

A. Before we move -- can you give me a minute to just check because there was something -- here, just bear with me.

Q. Are you looking to see if you have that document in your --

A. Yes.

Q. -- file?

A. Yes, I am. I don't have that document.

Q. If you had, I assume it would be listed in the materials reviewed; right?

A. Yes.

Q. Okay. Were you aware of the fact that Centura sent an initial draft of the agreement that did not yet contain any reference to the repayment obligation, and --

Page 104

MR. AZMOUDEH: Object to form.

Q. (BY MR. SABEY) -- that the --

MR. AZMOUDEH: Sorry, Mel.

MR. SABEY: I'll start over.

Q. (BY MR. SABEY) Were you aware of the fact that Centura sent an initial draft of the agreement that did not yet contain any reference to the repayment obligation and did not have the usual DocuSign setup and that Dr. Peddada just quickly manually signed that one and sent it back to Centura? Were you wear of that?

A. No.

MR. AZMOUDEH: Object to form.

A. No.

Q. (BY MR. SABEY) Okay. Were you aware of the fact that after Centura sent the recruitment repayment settlement agreement to Dr. Peddada and sent him complete physician employment agreement that included reference to the repayment obligations, Dr. Peddada refused to sign either agreement and refused to discuss any of the pending employment issues until he finished his leave on August 1st, 2022?

MR. AZMOUDEH: Object to form.

A. No.

Page 105

Q. (BY MR. SABEY) I think you have already answered this, but I think you do not have any factual basis to conclude that Dr. Setty told Dr. Peddada not to communicate about the settlement agreement or his perspective employment at Penrose for a period of three months; is that right?

A. No, I don't have any information.

Q. Okay. Now, assuming that that's accurate, do you believe that it was reasonable for Dr. Peddada to unilaterally announce that he was taking a three-month leave, and that he would not communicate with Centura about whether or not he would sign the settlement agreement or the physician employment agreement and become an employee of Centura?

MR. AZMOUDEH: Object to form.

A. I'm going to have to ask you to repeat, if you would. Sorry.

Q. (BY MR. SABEY) That's fine. Do you believe that it was reasonable for Dr. Peddada to unilaterally announce that he was taking a three-month leave of absence, and -- which is the important part -- that he would not communicate with Centura about whether or not he would sign the settlement agreement or the physician employment agreement and become an

MAGNA
LEGAL SERVICES

Page 106

employee of Centura?

MR. AZMOUDEH:  Same objection.

A.  So was there -- did you use the word "reasonable"?

Q.  (BY MR. SABEY)  Yes.  Would it have been reasonable to say "I'm not going to discuss that with you for three months"?

MR. AZMOUDEH:  Object to form.

A.  Well, yes.  See, I think what you're asking is --

Q.  (BY MR. SABEY)  Let me back up maybe and ask you this.  You said earlier that you understood Setty only to say that you shouldn't be involved in patient care.  Is that accurate?

A.  Yes.

MR. AZMOUDEH:  Object to form.

Q.  (BY MR. SABEY)  Now, my question is:  Do you think it was reasonable for you to say "For this three months when I'm on absence, I'm not going to talk to you about this.  I'm not going to communicate with you about whether or not I will sign the agreements that you have sent to me?"

Do you think that was reasonable?

MR. AZMOUDEH:  Same objection.

A.  Without -- without more information about

Page 107

his mental condition, it's -- it's hard to answer it.

Q.  (BY MR. SABEY)  Okay.

A.  I wish I could -- okay.

Q.  Okay.  Well, let me ask it this way, let's trade sides for just a minute.  Do you think it was reasonable for Centura to expect a response to expect that he would at least tell them whether he was going to become an employee?

MR. AZMOUDEH:  Object to form.

Q.  (BY MR. SABEY)  Rather than say "I won't even talk to you about that for three months," do you think that was reasonable for Centura to expect that?

A.  You're -- okay.  It's hard to answer this "yes" or "no."  But the way you framed that question, could -- could they expect that?  Yes.

However, it feels to me that -- I don't know how to explain this.  There are situations when a individual is impaired; not only should they not be working because they are a threat to their patients, but their judgment is off.

They can't be making major decisions about their employment now or future or whatever, but that sentiment is buttressed, though, when and if they have the -- the medical evidence of somebody looking after them.

Page 108

Q.  So what you're saying is, if Dr. Setty had said "No, you shouldn't even be -- you shouldn't even be communicating anything about your employment relationships," then you would say that would be buttressed by the opinion of the person who was looking after them; is that correct?

MR. AZMOUDEH:  Object to form.

A.  Yes.  Yes.  Because, again, you know, I wasn't in the office, but if she was concerned about his judgment in general.

Q.  (BY MR. SABEY)  So if she had said that, then you would say "I think then it was reasonable not to do that?"

A.  Yes, but also to communicate that to them.

Q.  So he should have communicated that to them if that was a fact?

A.  Because it explains -- it explains a lot.

Q.  Okay.

A.  Otherwise, I think they -- they -- I don't know, they could maybe question his sincerity or something, I don't know.

Q.  Okay.  So you evaluated him for whether or not he should be providing patient care, not whether or not he could be making those types of

Page 109

decisions regarding employment; is that right?

MR. AZMOUDEH:  Object to form.

Q.  (BY MR. SABEY)  The answer was?

A.  Yes.

Q.  Okay.  I gather that you -- you can't understand why Centura would need to know whether or not he was going to become an employee and be able to provide patient care starting on August 1, 2022, well in advance of his start date; right?

A.  I'm sorry.  I'm sorry.  Would you repeat that?

Q.  Yeah.  I think you indicated earlier that you understand why it was reasonable for Centura to need to know whether or not he was going to become an employee and be available to provide patient care starting on August 1, 2022, well in advance of his start date; correct?

A.  I mean, well, on this -- I can't speak for them either, though --

Q.  Okay.

A.  -- because I don't know how they do business.  But I can imagine some places, they're not going to wait for three months.

Q.  And why?

A.  Well, perhaps it could be just the way

MAGNA
LEGAL SERVICES

Page 110

they do business.  They need to fill that position or something like that.

Q.  Sure.  Sure.  And do you know how long -- how long it takes to get a physician credentialed with federal and private payers?

A.  It takes a while.

Q.  I mean, it takes months, not weeks; right?

A.  Yes.  Well, except, though, he is not -- he is not out of state, for instance.  So, I mean, and he was a known entity.  So perhaps credentially that had worked in one setting, might work -- I don't know.

Q.  Okay.  So other than what you already testified about, that is information you didn't have?

A.  That's correct.

Q.  And didn't ask for?

A.  I didn't ask.

Q.  Yep.  Did Centura, to your knowledge, ever tell Dr. Peddada that he could not complete his full leave of absence?

A.  That he could not complete his leave of absence?

Q.  Yes, his full leave of absence?

A.  Well, what I heard -- what I read is that he was terminated.

Page 111

Q.  Okay.  Well, let's talk about that for a minute.  You already testified that you understood he was working for ROPC and that Centura was not his employer and that the issue was:  Would he sign an agreement and become an employee of Centura; correct?

A.  Correct.

Q.  So when you say "terminated," isn't it more accurate to say that his -- the preliminary offer to employ him was withdrawn after -- after they hadn't reached agreement on the loan repayment issues, and he took a leave of absence and said he wouldn't talk to them; correct?

A.  Well, that part I didn't know about, that -- to quote you, that he wouldn't talk to them.

Q.  Well, let me just tell you.  He doesn't dispute that.

MR. AZMOUDEH:  Whoa.  Object to form.

MR. SABEY:  Well, okay.

Q.  (BY MR. SABEY)  Okay.  Assuming for a minute that that's accurate, that he said "I'm not going to talk to you about that until -- I'm taking a three-month leave; and I'm not going to talk to you about it"?

A.  Well, if it's said like -- like using that tone of voice and those words that you just used,

Page 112

Mr. Sabey, that sounds rather -- I don't know, defiant or even hostile.

I can't imagine speaking to a prospective employer like that.  I mean, it sounds like --

(Simultaneous speakers.)

Q.  (BY MR. SABEY)  And you can't imagine doing that because you wouldn't expect you would have an employment offer continuing; right?

A.  Well, also, again, if an individual is -- if an individual is not well, then I can see them, you know, saying "but I had, you know, medical support, that I can't engage in employment negotiation or whatever until the end of my medical leave and I get clearance."

Q.  Okay.  But you understand that is not something that he said in this case?

MR. AZMOUDEH:  Object to form and foundation.

A.  No.  I'm just going by what you've disclosed.

Q.  (BY MR. SABEY)  Okay.  We are going to look at Exhibit 91 that's in the chat.

A.  Yes, I have it.

Q.  (BY MR. SABEY)  Okay.  Do you see at the -- we looked at this before where Dr. Peddada is

Page 113

saying that he is planning on being off.  Now, this is before he has talked to his doctor, Dr. Setty, he is planning on being off on 7/22/22 through 7/22/22(sic).  Do you see that?

A.  I do.

Q.  And do you see the response of Eric Koval above saying:  This will fall in the period of time where it is a Centura clinic, and that they were prepared to have Locums on board so that they wouldn't be an issue for Dr. Peddada.

Do you see that?

A.  I do see that.

Q.  And that was written at a time when they were already expecting to reach a -- reach an agreement with him, obviously --

MR. AZMOUDEH:  Object to form and foundation.

Q.  (BY MR. SABEY)  -- correct?

A.  April 20th?

Q.  Yes.  And that was before he ever told them that he was not going to communicate with them during his medical leave because he hadn't even seen Dr. Setty by that time.  Do you recognize that?

A.  I do.

Q.  Now, in terms of your consideration of

MAGNA
LEGAL SERVICES

Page 114

the reasonableness of Dr. Peddada's position and Centura's, let me add some additional information that Centura did have. Are you aware that during the time period surrounding and including his leave, Dr. Peddada was looking for jobs with other hospitals?

MR. AZMOUDEH: Object to form and foundation.

Q. (BY MR. SABEY) Are you aware of that?

A. No.

Q. That's information that you didn't have?

MR. AZMOUDEH: Object to form and foundation.

A. No.

Q. (BY MR. SABEY) Is it correct that that's information you did not have?

A. Correct.

Q. And Dr. Peddada didn't tell you that?

MR. AZMOUDEH: Object to form and foundation.

Q. (BY MR. SABEY) Correct?

A. No.

Q. Because I ended that with "correct" and you said "no," it's going to be ambiguous. Is it true that Dr. Peddada did not tell you that?

MR. AZMOUDEH: Object to form and

Page 115

foundation.

A. Not that I recall.

Q. (BY MR. SABEY) Okay. Are you aware that during April of 2022, the Peddadas had put their home on the market for sale?

MR. AZMOUDEH: Object to form and foundation.

A. What I am aware of, based on what Dr. Peddada told me, but I'm not sure if they had already put their home on the market or they were planning to because they were going to size down.

Q. (BY MR. SABEY) Okay. All right. So you don't have a basis to dispute in April of it 2022 that the Peddadas had put their home on the market; is that correct?

A. I don't have a dispute with that.

Q. Okay. How do you think those two pieces of information would have influenced Centura's willingness to sit and wait for three months to learn whether or not he was going to sign the agreements and become an employee when they would also have to wait for a period of months to get him credentialed on payer panels?

MR. AZMOUDEH: Object to form and foundation.

Page 116

A. It sounds like you're asking me to -- to speculate about Centura.

Q. (BY MR. SABEY) Well, I'm asking you, you're a -- you're a -- the expert that is proffered by Dr. Peddada's team. And so I'm just asking you, do you -- do you think with those pieces of information and all else they received and in the absence of receiving any indication that he --

A. Mr. Sabey, it sounds like your question, though, again, this is out of due respect, could be answered really by -- by anyone.

Q. Yes.

A. As to -- with those kinds of facts, you know, might they be weary or something.

Q. But you're saying that anybody will recognize that?

A. Well, as put by you, I don't feel it is in my bailiwick as an expert witness to, you know, to make a, you know, to answer.

Q. Okay. Well, let me ask you. Are you going to testify that you concluded that Dr. Peddada was disabled?

A. What do you mean by "disabled"?

Q. Under the terms of the discrimination and

Page 117

ADA laws, are you going to testify that you believe he was disabled?

A. It's -- it's -- it's got to do with discrimination that -- it was his perception, as reported to me and to Dr. Gunderson as well at the Committee for Physician Health, you may remember from those notes where they engaged -- and he asked for advice with regard to legal counsel and there was several counsels listed.

At that point, he -- when he was being assessed by the Committee for Physician Health, he talked about being terminated and that this was, well, unexpected and wrong. And based on, as reported to me, based on not accepting that this is a man with a condition.

Q. Okay. And is it -- is it your -- is it your opinion that Centura failed to fulfill its obligation to recognize that he was disabled and failed to accommodate him?

MR. AZMOUDEH: Object to form.

A. Again, as reflected in the notes and my interview with him, that's the way it appeared.

Q. (BY MR. SABEY) That's what he told you?

A. Yes.

Q. Okay.

MAGNA
LEGAL SERVICES

Page 118

A. Okay. But also, if I could -- as a qualifier -- on the short-term. Like long-term disability, no.

Q. Okay. Okay. Yeah. In other words, this -- this was not a lasting condition?

A. Not a lasting condition, no. Burnout, by definition --

Q. Okay.

A. -- is employment related.

Q. Okay. Now, because disability issues involve the reasonableness of party's conduct, I raise the question with you, if the -- if an applicant for employment had said to Centura "I'm not going to sign the agreements that you have tendered to me, and I'm not going to talk to you about it until I'm finished with my leave."

And if that same employer had known that he was looking for employment elsewhere and that his home was on the market, you know, and those are all factors that you were not aware of when you wrote your opinion, but I'm asking you, assuming that those are accurate factors, and that the evidence supports that, I gather that your -- your honest feeling is that it was not unreasonable for them to say "We can't wait for you for three months to tell us whether you're

Page 119

employed, especially when you're looking jobs elsewhere and your house is on the market."

MR. AZMOUDEH: Object. Form and foundation.

A. As put by -- as just with what have you encountered now --

Q. (BY MR. SABEY) Yes.

A. -- you are right. With all that kind of detail, yes, it's -- they were not -- with that kind of detail, they were not being unreasonable at all. But I have no evidence that conversations like that occurred.

Q. (BY MR. SABEY) Okay That's fair. That's fair. You can only act on what has been told to you by Dr. Peddada and his counsel.

On July 26, 2024, you interviewed Dr. Peddada for a second time; right?

A. Yes.

Q. And Exhibit 59A, your second report, that contains anything relevant from your second interview; is that right?

A. That's correct, it does.

Q. And it contains an update on what Dr. Peddada had been doing in the last 18 months?

Page 120

A. Yes.

Q. Okay. Based on that interview, is it your conclusion that his overall condition was better or worse than his overall condition at the time the offer to become an employee at Penrose was withdrawn?

A. Well, a little bit better, but far from being resolved. Because, as he describes in there, he still feels very traumatized about that.

Q. Okay.

A. And as he -- as I say in there, he is grieving, he can't find equivalent employment, just part-time work, et cetera, et cetera. And the second loss, his wife is not able to get the kind of work that she once enjoyed --

Q. Okay.

A. -- in Colorado Springs.

Q. All right. In -- in your -- in your assignment, you were asked to provide opinions in six areas beginning with your explanation of what you refer to as "burnout;" correct?

A. Correct.

Q. And in your expert report, you cite to various publications and articles regarding burnout. Are the publication and articles that you chose to include in your report credible, reliable,

Page 121

publications written by individuals who are experts on this subject?

A. Yes.

Q. And on page 4 of 59A -- let's see, can we share that page of 59A. Do you see that, Doctor?

A. I do.

Q. Well, just a minute.

A. Page 4? I have it up.

Q. Okay. On page 4, you state: Burnout is completely stress-related and related to work.

MR. AZMOUDEH: Are you meaning to share your screen?

MR. SABEY: Yes.

MR. AZMOUDEH: Okay. Sorry. We haven't done that all day, so I was worried.

MR. SABEY: Yes. Thank you, but, yes.

Q. (BY MR. SABEY) You state that burnout is completely stress-related and related to work, and you state that it can happen to anyone in a work situation with unrelenting demands and where the worker has no or compromised personal agency or autonomy.

Is what you stated there true?

A. Yes.

Q. After that, your report identifies symptoms of burnout that are highlighted on pages 4

MAGNA
LEGAL SERVICES

Page 122

and 5, and Lindsey is going to share that.

And those include: Clinical depression, thoughts of suicide, post-traumatic stress disorder, anxiety disorders.

And then on page 9, you reference another symptom, apparently. And that is -- that is: Self-medicating with alcohol, stimulants, tranquilizers, or narcotics; is that right?

A. That's right.

Q. And are there any other symptoms that you left out of your report?

A. No. That pretty well covers the range.

Q. Okay. And your expert opinion is that Dr. Peddada's condition was the result of the long hours he worked and the stress associated with his work; is that right?

A. Yes.

Q. And your expert opinion supports Dr. Peddada's position that he had a disability that made him unable to engage in -- at least in patient care work activities for three months?

MR. AZMOUDEH: Object to form and foundation.

Q. (BY MR. SABEY) Is that right?

A. Yes. I'm trying -- you are where?

Page 123

Q. I'm not reading from anything.

A. Okay.

Q. I'm saying your expert opinion supports Dr. Peddada's condition that he had a disability that made him unable to engage in work activities for three months; right?

A. Yes.

Q. Now, I would like you to look a moment at Exhibit 92, and that will be on chat.

(Deposition Exhibit 92 was referenced.)

A. I don't see it in the chat yet.

Q. (BY MR. SABEY) It's still loading.

A. There it is. I got it.

Q. Okay. And let me just ask: Is Exhibit 92 a copy of the notes you made during your interview of Dr. Peddada on January 9, 2023?

A. Yes.

Q. Okay. And I would like to turn to page 9 of those notes.

A. Okay.

Q. If you can do that.

A. Okay.

Q. And are you on page 9?

A. I am on page 9, yes.

Q. Okay. And now, down at the bottom, it

Page 124

looks to me like you -- in the last two lines, are quoting something that Dr. Peddada said to you. He said, "I don't use burnout. I use exhaustion."

Do you see that?

A. Yeah. That's a -- I don't have it -- in fact, I don't have it properly quoted, but that is a quote from him.

Q. Okay. So you were telling him you thought he had burnout, and he said, "I don't use burnout. I use exhaustion"?

A. Yeah, it might not have been quite as direct as that, but I think he was saying he doesn't like the term burnout so much.

Q. He thinks what he has is exhaustion?

A. Yes. Again, it is probably wrapped up in stigma.

Q. Okay. And if you will look at 93, please. And I'll have Lindsey put that into chat.

(Deposition Exhibit 93 was referenced.)

Q. (BY MR. SABEY) Do you have that?

A. I do.

Q. Okay. And all I want to ask you is: Are these the notes you made on July 26, 2024?

A. That's correct.

Q. And these accurately reflect those

Page 125

communications on that day?

A. That's right; yes.

Q. Okay. All right. I'm finished with those.

Are there scientific diagnostic classifications that are supported by medical research and evidence as reported in peer-review medical journals?

A. About burnout?

Q. No. No. I'm speaking generally, generically.

A. Could you repeat the question, Mr. Sabey?

Q. Yeah. Maybe -- maybe -- are there scientific diagnostic classifications that are supported by medical research and evidence and that are considered standard in medical practice and are found in the DSM5 classification tool?

A. Burnout is not in. It's in --

Q. No, that's not my question. My question is: Are there scientific diagnostic classifications that are supported by medical research and evidence and are found in the DSM5 classification tool?

A. Yes.

Q. Okay. And that tool is supported by generally accepted medical research, evidence, and

MAGNA
LEGAL SERVICES

Page 126

medical professional consensus in the United States; right?

A. Correct; yes.

Q. And I'd like you to look at Exhibit 94.

(Deposition Exhibit 94 was referenced.)

Q. (BY MR. SABEY) Exhibit 94 is a -- an article by Thomas Raith, R-a-i-t-h. Is that pronounced -- did I pronounce that correctly?

A. Raith.

Q. Raith. Okay. In a publication called Cureus; is that correct?

A. Is it C-r-u-s?

Q. C-u-r-e-u-s.

A. Yeah. That's a Yale publication, I think. I'm just trying to find it.

Q. Okay. On page 4 and 5 of the Thomas Raith article -- you reference the Thomas Raith article in your report --

A. Yes.

Q. -- and you state that the diagnosis of burnout remains controversial and is not accepted in DSM5 classification; right?

A. Yes.

Q. And does that article fairly characterize in the highlighted sections on pages 4 and 5, the

Page 127

reasons why the diagnosis is controversial and not recognized in the DSM5?

A. Is this the part that is highlighted in yellow?

Q. Yes.

A. Right. I have it up, yes.

Q. Does that fairly characterize the reasons why the diagnosis is controversial and not recognized in the DSM5?

A. You know, I haven't been part of the DSM5 revision committees, but this, obviously, could be one reason or that.

Q. Okay.

A. Yeah.

Q. Okay. On page 12 of your report, which is 59A.

A. Okay. I have that open.

Q. Okay. Just one second. Okay. Just to make it easier to identify the things I'm asking about,
it's -- it's -- Lindsey is bringing it up on the -- sharing her screen.

A. Oh.

Q. Okay. On page 12 of your report, you identify in response to question 6, life activities

Page 128

that you concluded were impaired. And you related to the suggestion that Dr. Peddada's sleep may not have been as restful and restorative as usual. Would you read the highlighted activities included in your identification?

A. You mean, here: It also suggested his movements?

Q. Yes.

A. Yeah. Like standing, walking, lifting, and bending were adversely affected by his tiredness.

Q. And what other activities that are highlighted?

A. Yes. Reading, learning new things, communicating, eating, grooming, bathing, dressing, thinking, concentration.

Q. Okay. What is your understanding of how many hours per week Dr. Peddada was working before taking his leave of absence?

A. I -- I think I read 75.

Q. Okay. Who would best be able to confirm that number?

A. I'm sorry. How would we confirm?

Q. No. Who would best be able to tell you how many hours a week he was working at the time he took his leave?

Page 129

A. I'm trying to remember whether I got that from him or one of the documents or from his wife.

Q. Okay.

A. And I think it's -- if I remember correctly, it was 75 in one spot, and I think 60 in another spot.

Q. Okay. Would you turn in Exhibit 55 -- Exhibit 55 is the CPHP report.

A. Okay.

Q. Do you recognize that?

A. Yes, I do.

Q. Okay. And I would like you to go to the page that has on the bottom -- you'll see in the bottom right-hand of all the pages there is a number.

A. Yes.

Q. Peddada 00481.

A. Okay. I got it.

Q. Okay. And this is recounting the self-referral or call-in that Dr. Peddada made to CPHP. Do you recognize that?

A. Yes, I do. Yes.

Q. Okay. And now, would you read at the end of the second line what he -- what he reported to CPHP in terms of his working. He is what?

A. I'm sorry. Where are you reading from

MAGNA
LEGAL SERVICES

Page 130

now?

Q. We're in the appointment information.

A. Yes, I got that.

Q. At the end of the second line, it says: He is currently working.

It goes on to the next line. Do you see that?

A. Yes, I do.

Q. He is currently working 15 hours per day, six days a week. Do you see that?

A. Yes, I see that.

Q. And that was reported by Dr. Peddada?

A. That's correct.

Q. Would that be probably the most accurate reflection? Is he in the best position of anybody to know how much he is working?

A. I think so.

Q. And so he reports working 15 hours a day, 6 days a week. How many hours a week is that?

A. 90.

Q. 90. And you've indicated you were aware of the characterization both by himself and his wife that he was a workaholic; right?

A. Right; yes.

Q. And so let me ask you. Would it surprise

Page 131

you at all that a person who averaged 90 hours of work a week would feel tired or worn out or not feel like waking up to go to work some of the time, would that surprise you?

A. No, it does not surprise me.

Q. That's what you would expect, wouldn't you?

A. Yes.

Q. And that fact would not cause you to conclude that the person had a disability, would it?

MR. AZMOUDEH: Object to form and foundation.

Q. (BY MR. SABEY) The fact that they were tired some of the time or worn out some of the time?

MR. AZMOUDEH: Object to form and foundation.

Q. (BY MR. SABEY) When they were working 90 hours a week, that wouldn't cause you to believe they had a disability, would it?

MR. AZMOUDEH: Object form and foundation.

A. I can't answer that question, but I can pose a question to you that might help to clarify.

Q. (BY MR. SABEY) Well, I'll let you do it this time.

Page 132

A. Okay. Do you mean disability because -- are you inferring he brought this on himself?

Q. I'm not -- I'm not -- I'm not raising -- I'm not attributing any fault, I'm just saying --

A. Okay.

Q. -- he -- the fact that somebody is working 90 hours a week, is tired some of the time or --

A. Or even most of the time.

Q. Yeah. Or feeling tired or worn out, that wouldn't indicate they have a disability because they feel tired or worn out some of the time; right?

MR. AZMOUDEH: Object to form and foundation.

Q. (BY MR. SABEY) I mean, that's what you would expect an ordinary person to feel if they were doing that; right?

A. Yes.

Q. And -- and so those responses that you reference there were found in Exhibit 55. Just a minute. Okay. If you'll turn to Peddada 488 in Exhibit 55.

A. 488?

Q. Yes.

A. Okay. I have it.

Page 133

Q. Okay. And you see at the -- under the electronic intake heading on the left side in blue and go down to: Did you feel worn out?

Do you see that? Near the bottom.

A. Hang on. Was it under substance abuse or what?

Q. No. Start at the top where you see --

A. I got it, yes. I'm sorry. You did you feel worn out.

Q. And skip down and did you feel tired?

A. Yes.

Q. And his response was: Some of the time; right?

A. Right.

Q. And so on page 12 of your report, 59A, you take those responses to suggest that Dr. Peddada had sleep disturbance problems and then further to suggest by extension that the activities of daily living that you listed earlier were adversely affected; right?

A. Right; yes.

Q. Now, you testified earlier that your initial report in February of 2023 was accurate and honest. And I'd like to turn to that report, which is Exhibit 95. No. No. I'm sorry. It's Exhibit --

Page 134

isn't it 88?  Yeah, it's Exhibit 88.

A.  Okay.

Q.  All right.  And if you will turn to the section that begins with heading
Six:  Did Dr. Peddada's condition substantially impair any major life activities?

Do you see that?

A.  I'm there, yes.  Uh-huh.

Q.  Okay.  Now, in your February 1, 2023, Exhibit 88 report, let me read the first sentence: Dr. Peddada did not mention to me that his sleep affected his condition, nor' -- moving to page 12 -- 'nor did I read about sleep disturbance in the notes of Dr. Selagamsetty or the Colorado PHP report."

Did I read that correctly?

A.  Yes, you did.

Q.  And you took that out of your report when you authored Exhibit 59A; correct?

A.  Correct.

Q.  Okay.  But that sentence that you wrote in your initial report was not a fabrication of the truth, was it?

A.  No.  I --

Q.  It was correct?  It was true?

MR. AZMOUDEH:  Hold on, Mel.  Let him

Page 135

answer.

Q.  (BY MR. SABEY)  Was the sentence that you took from your initial report a true statement?

A.  The sentence that I removed from my...

Q.  Initial report was a true statement?

A.  Now that I look at it, it wasn't true.

Q.  What?

A.  And the reason I say that is that we just reviewed the CPH statement where his sleep -- sorry. I thought that I -- I thought I read just now, on the C -- the Colorado Physician that his sleep was or not?

Q.  No.

A.  Okay.  Okay.  Well, then...

Q.  When you wrote --

A.  I thought I made a mistake, that's what I'm saying.

Q.  Yeah.  But when you wrote this, it was accurate; right, that first sentence?

A.  Yes.

Q.  Okay.  So that true sentence confirms the following facts regarding your three sources of information:  Number 1:  Dr. Peddada did not mention to you any sleep disturbance.

Number 2:  You did not read anything

Page 136

about sleep disturbance in the notes of Dr. Setty who examined him and whose thorough evaluation supported his leave of absence.

And, Number 3:  You did not read anything about sleep disturbance in the notes of the CPH report that was generated after its extensive evaluation.

Right?

A.  Right.

MR. AZMOUDEH:  Object -- sorry.  Too late.

Q.  (BY MR. SABEY)  Did any of those sources specifically identify that Dr. Peddada had difficulty moving, standing, walking, lifting, or bending in their reports?

A.  No.  I -- as you can see, I said "by extension" in my report.

Q.  Okay.  Exactly.  Did any of these sources specifically identify that Dr. P had difficulty reading, learning new things, or communicating?

A.  I don't have it in front of me, but I think the answer is "no."

Q.  You're right.  Did any of those three sources identify specify that Dr. Peddada avoided eating, grooming, bathing, or dressing or that he was unable to perform those functions without the

Page 137

assistance of others?

A.  No.

Q.  Not only do none of those sources indicate adverse impact on the activities you identified, but also numerous of those sources specifically deny such impact.

Let's start with Dr. Peddada's own statement, Exhibit 55.  In the intake form filled out by Dr. Peddada, if you'll turn to page --

A.  I have it.

Q.  -- 486.

A.  Is it -- is it page 5 of 9?

Q.  No.  3 of 9.  At the bottom, it says: 486.

A.  I have it.

Q.  Okay.  Dr. Peddada responded to inquiries about his health and activities.  He indicated, first, that his general health is excellent.

Do you see that?

A.  I do.

Q.  And in the ten activities -- the ten-item list of activities, which include a number of the activities identified as adversely affected in your report, he states that his health does not limit those activities with the words:  No, not at all.

MAGNA
LEGAL SERVICES

Page 138

Right?

A. I see those, yes.

Q. Dr. Setty's medical record, in contrast to your suggested impact on his ability to communicate, reports that he understands questions and responds appropriately?

A. Yes.

Q. The CPHP report, Exhibit 55, at page 500, that's Peddada 500 at the bottom. Tell me when you get there.

A. I'm sorry. What is the exhibit again?

Q. Exhibit 55, the CPHP report.

A. Yep. And, I'm sorry, what page at the bottom?

Q. Bottom of page 500.

A. 500. Okay. I have it.

Q. Okay. This page recounts an interview with Chitra Peddada, Dr. Peddada's spouse; right?

A. Yes; uh-huh.

Q. And it reports that she stated that she has no concerns for anxiety, depression, or mood swings. She denied any medical issues, interpersonal concerns, memory/cognition issues, prescribing problems, boundary issues, or communication issues; right?

Page 139

A. I see that.

Q. And now skip over two more pages to 502, the CPHP report recounts an interview with Brianna McDevit --

A. Yes.

Q. -- a colleague that you referenced earlier; right?

A. That's correct.

Q. And she reports that she is absolutely familiar with his work as a physician. And she says -- and the CPHP says: BM has no concerns for anxiety, depression, or mood swings. She never saw something like a mental breakdown, and she denied any substance abuse concerns, medical issues, interpersonal concerns, memory/cognition issues, and communication issues; right?

A. Right. I read that.

Q. And Dr. Setty was also interviewed by CPHP. And on page 503, she said she has no concerns regarding Dr. Peddada's ability to practice medicine safely; right?

A. I read that, yes.

Q. Okay. So you had all of this information at your fingertips; right?

A. Right.

Page 140

Q. Did you read it and consider it?

A. I did.

Q. Okay. But in reaching your conclusions, which by your own language were generated by suggestion and by extension, you identified activities as adversely affected that were categorically denied by those who knew him best, and observed him, lived with him, and worked with him, and by himself.

You discount all of those actual observations and assessments in favor of the following reasoning: After first admitting that none of the sources of information said anything about sleep disturbance, you state, "He responded some of the time to the questions: Did you feel worn out and did you feel tired.

'These responses suggest that Dr. Peddada's sleep may not have been as restful and restorative as usual. It also suggests that his movements, like standing, walking, lifting, and bending, were adversely affected by his tiredness and continues by extension when a person is feeling so tired and worn out, they have difficulty reading, learning new things and communication.

All activities of daily activity, like eating, grooming, bathing, and dressing can take

Page 141

profound effort and are avoided altogether or require the assistance of others."

Dr. Myers, would you honestly agree to publish that kind of reasoning in a professional journal for which you were an editor --

MR. AZMOUDEH: Object to form.

Q. (BY MR. SABEY) -- making the reasoning that ignores the actual observations of those who know him and proceeds by a response of being worn out or tired some of the time, to conclude that all of those activities are affected by daily living, would you publish that in or journal?

MR. AZMOUDEH: Object to form.

Q. (BY MR. SABEY) Honestly?

A. Well, as -- as put like that, as black and white, no. No, I wouldn't. But --

Q. I want to ask you a question based on --

MR. AZMOUDEH: Hold on, Mel. He was about to -- he had a but there.

MR. SABEY: You can ask him questions if you'd like, Omeed.

MR. AZMOUDEH: Okay.

Q. (BY MR. SABEY) I want to you a question based on your general knowledge of the science of psychiatry. What kinds of events are most damaging to

Page 142

an individual's psychological and emotional well-being?

A. What kind of events?

Q. Yes.

A. In psychiatry?

Q. Yes. What kind of events in an individual's experience are most damaging to their psychological and emotional well-being?

MR. AZMOUDEH: Object to form and foundation.

A. I'm -- I guess I'm not -- I'm not sure if -- the relevance of your question.

Q. (BY MR. SABEY) I'm just wondering about your general experience. What kind of things in a person emotionally and psychologically most -- most hard?

A. Well, there could be a number of things. You could be diagnosed with schizophrenia; you could suffer a severe trauma. I work in the area of suicide, and when somebody losses someone to suicide, that's one of the, you know, most profound forms of trauma, especially if nobody saw it coming.

Q. Yep.

A. All kind of -- that's a fair -- yeah.

Q. In order of seriousness of the impact on

Page 143

an individual's psychological and emotional well-being, which would typically be more serious: The loss of the relationship of a spouse or a child through an untimely or unexpected death, but particularly by suicide, I'm guessing? Or the loss of an anticipated employment relationship through the unexpected termination or withdrawal of an offer of employment?

A. That's awfully hard to quantify because it depends so much on the individual.

Q. Okay.

A. There are individuals who lose a pet who can go into a profound grief reaction sometimes of psychotic proportions.

Q. Okay.

A. But that's not going to be the average pet owner.

Q. Yes. Okay. Fair enough. So you would have a hard time responding to that question just generally speaking?

A. Yes.

Q. Okay. Do you have the opinion that prior to the issues that gave rise to this case, Dr. Peddada was living a lifestyle that was healthy and balanced?

A. No.

Page 144

Q. What indications did you find in the information you reviewed that supported the view that he was not living a healthy and balanced life?

A. Well, because of -- first of all, what I heard from him, what I read in the reports -- the medical reports -- as well as his own personal testimony of working, you know, a huge number of hours per week and what seemed to be putting his patient care before his own health and which he even sort of admitted to that time when he -- his blood pressure was up. So he cut back work for a little while, lost weight, exercised more.

Q. What suffered because of the imbalance in his life?

A. What's that?

Q. What suffered in his life because he was working so much?

A. I think what suffered was his just overall resilience. That's when he noticed, like, the symptoms we've been hearing about, the fatigue, but also the near misses. And there were complaints about his demeanor in the workplace.

Q. Okay. Let's pause there for a minute and let me ask you: What do you know about the new misses? What occurred and what happened?

Page 145

A. Only what he mentioned to me.

Q. Just that those things occurred?

A. Yeah. One was with regard to radiation/oncology that he ordered the treatment on the wrong side of the body.

Q. Okay. And when did that occur? Do you know?

A. I'm not exactly sure. I could look that up. But it was in that time frame of the nine months or so leading up to April of the year that he, you know, kind of, you know, realized "I got to get help here."

Q. Okay. And what do you know about the issues with staff complaints about his treatment of them?

A. I think most of them were at that time, although there was an earlier one. I can't remember if it was a few years earlier that he was upset about it, and that's the one when he registered for a resilience course through the Mayo Clinic --

Q. Okay.

A. -- because he felt he needed to learn better ways of dealing with the stress.

Q. Okay. Do you -- do you know when the more -- more recent ones occurred after he had done

MAGNA
LEGAL SERVICES

Page 146

that?

A. You mean the -- the concerns that, you know, from the staff?

Q. Yes.

A. As far as I know, they were all pretty close to that time.

Q. When he registered for the resilience course?

A. No. No. No. I'm talking about the ones that were more proximal to the time when he -- it was in April --

Q. Okay.

A. -- when he --

Q. Did all the information you received about them -- about those issues, did the detail you had make it into your report so it's understandable what those events were?

A. I was never able to get a lot of detail.

Q. Okay.

A. He even said that he wasn't provided much detail.

Q. Okay. Did you -- what did you do to investigate those issues of the staff complaints and the near miss thing?

A. I didn't.

Page 147

Q. Okay. Why was Dr. Peddada working so much?

MR. AZMOUDEH: Object to form.

A. I can only explain that on basis of his being sort of an old-fashioned doctor --

Q. Okay.

A. -- who, I think from the time he was a child, always wanted to be a doctor. He has two brothers who are physicians as well. I don't know it has anything to do with being first-generation American, being a good student, ambitious.

Q. You don't really know why he worked so much?

A. I just saw it more that he didn't do a very good job of turning people away or saying no, setting boundaries, or setting limits on his life.

Q. Yeah.

A. And also, his wife had, you know, kind of counseled him about that as well. I think it was just hard for him.

Q. Okay. Working long hours generated large wRVU numbers for Dr. Peddada, which produced a large income also; right?

A. Working that hard?

Q. Yes.

Page 148

A. It would produce a large income, I would imagine.

Q. Are you aware the Peddadas have amassed a nest egg of $14 million that is earning 8 percent interest which produces over $1 million a year?

A. No, I am not.

Q. You don't have any contrary evidence, do you?

A. No.

Q. That's a fact that Dr. Peddada never told you and a fact that your investigation did not uncover; right?

A. Correct; yes.

Q. And on page 4 of your report, you state that burnout is completely stress-related and related to work. And then you state that it, "Can happen to anyone in a work situation with unrelenting demands and where the worker has no or compromised personal agency or autonomy."

Did you believe that the hours that Dr. Peddada worked were anything other than his choice?

A. I'm just going to say good question.

Q. Do you have any evidence that -- that the hours he worked were anything other than his choice?

Page 149

A. No. I don't have.

Q. Okay.

A. But having said that, though, I have no idea what the on-call responsibilities were, how much the doctors shared that, whether he took extra calls because there are doctors who certainly burn out because there is such a shortage.

Q. Yeah. But that's something you didn't investigate further?

A. No.

Q. Okay. And you didn't talk to Dr. Monroe or Dr. Kathpal, did you?

A. No.

Q. Suppose you had, and that you had learned that they wanted to work more hours and earn more money, but Dr. Peddada wouldn't let them, how would that have impacted your conclusions?

MR. AZMOUDEH: Object to form and foundation.

A. It would have impacted it.

Q. (BY MR. SABEY) Yeah. Then you would know that he was choosing to do this; right?

MR. AZMOUDEH: Object to form and foundation.

A. (The witness nodded.)

38 (Pages 146 to 149)

Page 150

Q. (BY MR. SABEY) "Yes"? You nodded your head.

A. Yes. I'm sorry.

Q. That's okay. Did you talk to Dr. Peddada's wife, Chitra, about the work schedule that he kept and why he kept it?

A. No.

Q. Suppose you had, and that she told you that for 23 years he has worked very long hours, and he is happy doing it, and he enjoyed it immensely, how would that have impacted your conclusions?

A. Well, that's -- that's sort of what I inferred.

Q. Okay.

A. That he loved being a doctor, you know, whatever all of that means. I mean, some -- it's a -- it's a form of getting attention.

Q. Okay. How many people do you know -- let me back up.

Does the fact that someone wants to make lots of money and so works lots of hours cause you to reach the medical conclusion that he meets the criteria to conclude that he is disabled?

MR. AZMOUDEH: Object to form and foundation.

Page 151

A. I don't have experience for that.

Q. (BY MR. SABEY) So you don't have a basis to conclude he is disabled because he works lots of hours and makes lots of money; right?

A. No.

Q. Okay. How many people do you know that could work up to 90 hours per week for decades?

A. Not a lot.

Q. Yeah. Dr. Peddada, apparently, has a rare and unusual strength and capacity that he could do so for so many years. Do you agree?

MR. AZMOUDEH: Object to form and foundation.

A. Probably the minority, given his age. You know, doctors at an earlier career stage, they work those kind of -- as you know, it's required during training.

But in the early career years, a lot of doctors will work those hours because they're paying off student loans or something like that.

Q. Uh-huh.

A. But most doctors, when they reach their middle years, especially ones of which there is a lot of pull or technical expertise, that they really -- they need to cut back.

Page 152

Q. Yeah. Yeah. So in that respect, he is unusual in terms of his strength and capacity; right?

MR. AZMOUDEH: Object to form and foundation.

A. Yeah. I think it depends on the community and the culture. I mean, there -- there are doctors my age who are working unbelievable hours. I don't know how they're doing it.

Q. (BY MR. SABEY) I agree. And he would be one of them.

MR. AZMOUDEH: Object to form.

Q. (BY MR. SABEY) But he is not the average doctor in terms of his capacity and strength for working those kinds of hours for decades; right?

A. No, not the average.

Q. Now, you have stated that his burnout or exhaustion was entirely caused by the work he was doing; right?

A. Yes.

Q. Do you have any reason to believe that he would not be able to work 40 hours a week without any problems with no exhaustion and no burnout?

A. Repeat the question, please.

Q. Do you have any reason to believe that Dr. Peddada would not have been able to work 40-hour

Page 153

weeks without any problems with no exhaustion and no burnout?

A. There is a lot of negatives in there, but if you're saying -- I would say yes.

Q. He could do that, he could work 40 hours a week without exhaustion or burnout; correct?

A. That's correct.

Q. And would you have the same response for 50 or even 60-hour weeks?

A. It varies. See, this is where having what is called personal agency and that's -- there is another form where doctors burnout because they don't have a voice.

Q. Yeah. Let me just ask: Do you have any evidence that Dr. Peddada didn't have a voice, that he had no agency?

A. No.

Q. At what rate of hours per week do you believe he would have been susceptible to exhaustion or burnout?

A. I can't.

Q. No opinion on that?

A. Yeah. No opinion.

Q. Okay. When did Dr. Peddada's exhaustion or burnout end?

MAGNA
LEGAL SERVICES

Page 154

A. Did you just say: When did it end?

Q. Yes.

A. From what I know, it's by the -- by the -- over the summer months he was feeling a lot better. Except with this -- but then he was jobless.

Q. Yeah. Okay. But -- but so the question is: When did it end? Is that something you considered or investigated?

A. I mean, it's a good question. When he -- he was given a -- the green light from CPH or the Colorado Physician Health Program after three months.

Q. Okay. But --

A. The duration of those three months.

Q. So you're confident that it certainly ended by then; right?

A. Yeah.

Q. Okay.

A. And again, this is speculative, but had none of this occurred, he had a job to go to, but, you know, now it is all so complicated, but my thought is that he would be fit and ready to do it, to do the work.

Q. Okay. But did you -- did you, as part of your evaluation, determine when his burnout ended or his exhaustion ended?

Page 155

A. No.

Q. Okay. Did you know what he was doing during the week after the doctor said he approved his three-month leave?

A. I know that he -- he took that one-week vacation.

Q. And do you know what he was doing?

A. No. I'm not sure. I remember reading something about Mexico and then later the three-week trip to Italy.

Q. Okay. Suppose you had investigated that and learned he was on a mountain biking trip in Moab, Utah during that week after he met with Dr. Setty, that he was mountain biking over some very challenging trails and rock formations, do you have any indication or would you assume that he was experiencing any impairment of any activity of daily living during that week when he was mountain biking in Moab?

A. Well, no, but I didn't ask about it. But given his history, though, of mountain biking, I would imagine that this is maybe a good thing. But I would expect he wouldn't be at his usual level of fitness or number of hours spent or altitude or all those sorts of things.

Q. You didn't investigate that, though, did

Page 156

you?

A. No.

Q. You would not assume that he was unable in any way to move, stand, walk, lift, bent, think, communicate, concentrate, eat, groom, bathe, or dress without the assistance of others during that week, would you?

A. Well, now, when you -- yes, that's right.

Q. So you would not have assumed that he couldn't do those things; right?

A. I would not have assumed or assumed he could?

Q. You're saying you would have assumed that he could do those things; correct?

Dr. Myers, during the week that he was mountain biking in Moab, Utah, you would assume he could move, stand, walk, lift, bend --

A. Oh, yes.

Q. -- communicate, concentrate?

A. I'm sorry, yes.

Q. He could do all those things in that list; right?

A. Yes.

Q. Do you know what he was doing the week after his mountain biking trip?

Page 157

A. No.

Q. You didn't investigate that question and he didn't tell you; is that right?

A. Correct.

Q. Do you have any basis to know at any time between his Moab mountain biking trip and your second interview with Dr. Peddada, that he was unable in any way to move, stand, walk, lift, bend, think, communicate, concentrate, eat, groom, bathe, or dress without the assistance of others?

A. No.

Q. What indications did you find in the information you reviewed that supported the view that after his relationship with Penrose ended, his relationship with his wife and children improved?

A. In my -- I'm trying to remember when I interviewed her in relation to this, but she said it was a little bit better at that point because he -- he wasn't working those hours, and the communication had improved a bit with her as well as with the children.

Q. Okay.

THE REPORTER: Could we take a break again soon?

MR. SABEY: Okay.

THE REPORTER: I just need five or ten

40 (Pages 154 to 157)

5666666656666666666666666666666

**Page 158**

minutes again.

THE VIDEOGRAPHER: Okay. We are off record at 2:13.

(Recess taken, 2:13 p.m. to 2:31 p.m.)

THE VIDEOGRAPHER: We are back on the record at 2:31.

MR. SABEY: Thank you.

Q. (BY MR. SABEY) Dr. Myers, have you had any communication with anyone during the break?

A. No, I haven't.

Q. Okay. You earlier confirmed your expert opinion supports Dr. Peddada's position that he had a disability that made him unable to engage in work activities for three months. But I think you qualified that by saying: Only patient care activities.

Is that right?

A. Yes. I'm sorry. Yes.

Q. Okay. And if Dr. Peddada is taking the position that he had a disability that prohibited him from even communicating with Centura for three months, your opinion would not support that, would it?

A. If it prevented him from communicating --

Q. Okay. Do you want me to ask the question again?

**Page 159**

A. Yes, please.

Q. If Dr. Peddada is taking the position that he had a disability that prevented him from communicating with Centura for a period of three months, your expert opinion would not support that, would it?

A. Right. Yes.

Q. And I -- because I have a -- you would agree that your opinion would not support that. Is that true?

A. Yes.

Q. Suppose that you learn that Dr. Peddada actually did engage in work activities that were not patient care activities during the three months after Dr. Setty approved his three-month leave, that would give further explanation and support for the fact that -- that your opinion would not support his position; right?

MR. AZMOUDEH: Object to form.

Q. (BY MR. SABEY) Let me redo that question.

You've testified that your opinion would not support the position that Dr. Peddada would be unable to engage in work activities outside of patient care?

**Page 160**

A. Yes.

Q. And so if there were examples of him actually doing those kind of work activities outside of patient care during the three months, that would support your rationale for not being able to include those kind of activities in what he could not do; right?

A. Yes, it would if I had some details. I don't have any clinical detail.

Q. Okay. Okay. Let's -- let's turn to Exhibit 56A. Once that's up, let me know and I'll give you a predicate for my question.

(Deposition Exhibit 56A was referenced.)

Q. (BY MR. SABEY) Okay. Have you got Exhibit 56A now, Doctor?

A. Yes, I do.

Q. Okay. I want you to assume that Dr. Peddada's position is that he could not communicate with Centura. Because of his disability, he could not communicate with them regarding work issues, including communicating with them about his contract and signing the documents that had been sent to him.

Now, I would like you to look at 56A, and I will tell you that this is a message to Dennis

**Page 161**

Carter on June 6, 2022. And I'll ask you to assume the fact that Dennis Carter is a radiation/oncologist and partner in Rocky Mountain Cancer Centers, an entity that provides the kind of services that Dr. Peddada was providing through ROPC.

A. Okay. Yes.

Q. And this is -- if you look at the bottom of the second page, you'll see that this is an email or text message from Anuj, Dr. Peddada, to Dennis Carter. Do you see that?

A. I do, yes.

Q. And will you just take a moment and review that, and then I'll ask you some questions.

A. Okay. It ends with -- it ends with the word "mutually"?

Q. Yes. And then it goes over -- if you go over to the second page. Go over to the second page of exhibit --

A. Okay.

Q. And then there is a little repeat, and then you can read the rest.

A. Okay. I've read it.

Q. Okay. Now, if Dr. Peddada takes the position that he could not communicate with Centura about potential employment opportunities, and after

MAGNA
LEGAL SERVICES

Page 162

reading that, you would have to conclude that he was not disabled in terms of an inability to communicate about employment opportunities, that he could actually do those activities, but that he selectively chose which of those activities he wanted to do and which ones he did not; right?

MR. AZMOUDEH: Object to form and foundation.

A. Yes.

Q. (BY MR. SABEY) Now, I want to give you a series of hypotheticals. I want to ask you to assume that you have -- you have spoken to Dr. Setty, which I understand you did not, and that she told you that the leave duration of three months came from Dr. Peddada, not from her. How would that impact your -- your view of this case?

MR. AZMOUDEH: Object to form and foundation.

A. Well, it would.

Q. (BY MR. SABEY) In what way?

A. Well, because it sounds as if she would just be acquiescing or rubber-stamping his wishes or what he feels he needs. And she is the -- even though they're both doctors, she is the treating physician, and he is the patient.

Page 163

Q. Suppose that you had talked to Dr. Setty, and she told you she had not diagnosed Dr. Peddada to have any disability, how would that impact your opinions?

MR. AZMOUDEH: Object to form and foundation.

A. So if Dr. Setty -- the hypothetical would be that she had counselled him not to accept any disability?

Q. No. No. No. No. I'm sorry. No. Suppose you spoken to her, and she said "I did not diagnosis Dr. Peddada to have any disability."

MR. AZMOUDEH: Object to form.

Q. (BY MR. SABEY) She didn't ever reach that diagnosis?

MR. AZMOUDEH: Object to form and foundation.

A. Okay. Well, I guess what I would want to know is what did you find, what were you findings.

Q. Okay. Suppose she said that she didn't have any concerns regarding his physical health or memory or cognition --

MR. AZMOUDEH: Object to form foundation.

Q. (BY MR. SABEY) -- and she had no concerns about his ability to practice medicine

Page 164

safely?

MR. AZMOUDEH: Object to form and foundation. Do you have those communications, Mel, that you want to show us, or...

MR. SABEY: I'm just asking. This is a hypothetical.

MR. AZMOUDEH: Right.

A. Except, though, it is a hypothetical that doesn't fit with the subjective responsibility thing that he -- well, first of all, both the subjective and objective that he was perceived to be different in the workplace, irritable, there were complaints about him, and plus his subjective sense is: I'm not my usual self.

Q. Okay. Okay. But you don't conclude that somebody who is irritable in the workplace has a disability; right?

MR. AZMOUDEH: Object to form and foundation.

A. Not necessarily, but I would need to assess that in my -- in the overall assessment of the individual. I would want to know what else.

Q. (BY MR. SABEY) Okay. Suppose that you had asked his wife Chitra about his work-related activities during his leave and you learned that while

Page 165

on vacation in Italy during the time he was on his three-month leave and supposedly unable to participate in work activities, he was not taking a break to enjoy the sites, but was answering phone calls from other physicians or patients. How would that impact your view about his alleged disability?

MR. AZMOUDEH: Object to form foundation.

A. Well, first of all, I would be concerned that he is not really using the time properly to heal and that -- and that he is, you know, still practicing medicine.

If she tempered that by saying, you know, I'm trying, and he is not doing as much as he was in week two, and we're now into week four or something, so I think we're making progress, I would be encouraged by that.

But still I would -- I think I would have one of two thoughts. One that, you know, she has a -- should be clear about those boundaries with him. And secondly, if I was involved at all or if I was a consultant, I would say: Look, somebody needs to speak to this man. He is not -- he is not doing this well enough on his own. He needs an update from, you know, a treating person.

Q. Okay. You -- I think you indicated

MAGNA
LEGAL SERVICES

Page 166

earlier that physicians typically have a person come in and, you know, review, reassess when they're out on disability, you know, midcourse; right?

A. They have to be, yes.

Q. Yes. And do you have any evidence that Dr. Peddada followed that instruction to come in and be reassessed?

A. No.

Q. In the entire three months, that didn't happen to your knowledge?

MR. AZMOUDEH: Object to form and foundation.

A. With the exception, though, of going back to the Colorado Physician Health Program. I don't know how many times he went. I read at one point something about six weeks that I think Dr. Gunderson had written that and then -- so over a three-month period for at least two visits before they discharged him.

Q. (BY MR. SABEY) Yeah. But with regard to the trip to Italy, the fact that he was not taking a break to enjoy the sites and was answering phone calls from other physician or patients, would certainly confirm that he did not have a condition that impacted his ability to do those kind of work activities;

Page 167

right?

MR. AZMOUDEH: Object to form and foundation.

A. That's correct.

Q. (BY MR. SABEY) You testified earlier that your report identifies symptoms of burnout that include: Clinical depress, thoughts of suicide, post-traumatic stress disorder, anxiety disorders, self-medicating with alcohol, stimulants, tranquilizers, or narcotics; right?

A. Yes. But I need to qualify that. Burnout itself has characteristics, but because there is such overlap with all the things you just listed, this is where getting a proper assessment really comes in to rule those things out.

And as you noticed, she did ask those questions. The Colorado -- they did as well in terms of, you know, degree of anxiety, depression, any suicidal and substance use, all of that.

Q. But isn't it true that no physician who has examined him in person for the purpose of care and treatment diagnosed him with having any of those conditions?

A. That is correct.

MR. AZMOUDEH: Object to form and

Page 168

foundation.

A. Except -- except when he told me, though, that he said this feels like PTSD. So -- but that's all in response to "being terminated."

Q. Okay.

A. It wasn't a pre-existing condition, if I can add that.

Q. But then -- but that was just a comment that Dr. Peddada made to you and no physician who has examined him has concluded that he has PTSD even though it might have felt -- even though he said that's what it might have felt like; correct?

A. That's correct, to my knowledge.

Q. Isn't it true that almost every professional may experience stress and burnout when the demands are high and they may feel they need a break?

A. It's not as clear as that.

Q. Okay. It's not uncommon if they are feeling that an employee may feel the stress of the work environment and feel like they need a break?

A. Well, yes, but I just need to qualify that. Because, you know, we physicians seem to be proud of our work ethic and many doctors say: Look, I am used to overwork. I don't have a problem with

Page 169

working hard. I've been working hard for decades, and I'm not burned out. I get tired. I get some rest on the weekends and stuff like that.

It's more of this demoralization that they feel, that their work is not valued and all the symptoms that I described there that characterize burnout. And that's the qualitative difference between just exhaustion. But would they both like a break? Of course.

Q. Sure. Sure. Okay. But you don't have any indication that Dr. Peddada's employer was imposing on him a requirement to work the kind of hours he was working; correct?

A. Correct.

MR. SABEY: Okay. I'm just going to take a minute and I'll be right back.

THE VIDEOGRAPHER: Off record? Did you want to go off record?

MR. SABEY: I think I'll just be not too long.

(Pause in the proceedings.)

MR. SABEY: Okay. I'm back.

Q. (BY MR. SABEY) Dr. Myers, we have been told that the plaintiff does not intend to have you testify about any emotional distress that Dr. Peddada

MAGNA
LEGAL SERVICES

Page 170

may or may not have experienced. Is that consistent with your understanding that you do not intend to express any opinions about the emotional impact of -- of these things?

MR. AZMOUDEH: Object to form and foundation.

A. What I expressed is that I was prepared -- or preparing for this deposition which, it was my understanding, was really a result of my report.

Q. (BY MR. SABEY) Yes. And so you don't intend -- your report does not address the issue of whatever emotional distress or emotional impact on Dr. Peddada; correct?

MR. AZMOUDEH: Object to form and foundation.

A. Well, yes, going forward, yeah. I mean, I don't, you know, I -- it's my understanding that my involvement in this case ends with the deposition.

Q. (BY MR. SABEY) Okay. So you -- you do not at present have any opinion about -- or you're not at this point in time prepared to offer any testimony about the emotional impact of the events that occurred in this case on Dr. Peddada; correct?

A. Other than what we've talked about is, you know, what's reported.

Page 171

Q. Okay. All right. Just a minute. I need to then review something.

(Pause in the proceedings.)

MR. SABEY: Just bear with me for a little bit. I want to determine if we can sort of avoid an issue about which I'll need to question you. So just give me a few more minutes.

(Pause in the proceedings.)

MR. SABEY: All right. Okay. Maybe you can help me here, I'm reading from a response your firm filed in response to the IME motion and it says: Plaintiff does not claim that Defendant's actions cautioned any specific psychiatric injury, has not seen a psychiatrist or therapist for any specific psychiatric injury, and does not intend to rely on expert testimony to bolster any specific psychiatric injury.

Is that your position?

MR. AZMOUDEH: Precisely. Any specific psychiatric injury. So I think Dr. Myers can testify to what he learned during his interviews with Dr. Peddada about, you know, I'm looking at page -- for example -- 12 of his report. Things like: It is hurtful.

But Dr. Myers will not be testifying as

Page 172

part of any specific psychiatric injury. He will not testify that Dr. Peddada has been diagnosed with PTSD as a result of the defendant conduct or that Dr. Peddada has been diagnosed with depression as a result of defendant's conduct.

But I think it's fair game for Dr. Myers, particularly since we lost that motion and your expert just conducted a similar evaluation and can rebut all those things with her own findings.

Yeah. Dr. Myers -- it is fair game for him to testify regarding his communications with Dr. Peddada which were fresh at the time of the first interview at least.

MR. SABEY: So I want to be sure that I understand the boundaries. You're saying he won't testify to any specific psychiatric injury, but if he says he was hurt emotionally, that seems to me to be as specific as may be needed.

MR. AZMOUDEH: Yeah. Maybe -- maybe the ambiguity there is "any diagnosis," that would have been a better way to describe it. But that's our -- that's our intent. And that's the way the cases read. I mean, the cases that are cited there are discussing diagnoses.

MR. SABEY: Okay. Are you -- are you

Page 173

intending to have him testify that he experienced emotional distress over and above what a reasonable person would suffer from being terminated or having an offer of employment withdrawn?

MR. AZMOUDEH: No. And, in fact, I'll just go forward. I'll take that next step and say all that testimony will come from Dr. Peddada.

MR. SABEY: Okay.

Q. (BY MR. SABEY) So then given what you've just heard, Dr. Myers, do you understand that you will not be testifying about emotional impact or injury upon Dr. Peddada?

A. Yes, I do.

Q. Okay. And you're willing to limit your testimony, if you do testify, in that way?

A. Yes, I am, sir.

Q. Dr. Myers, at the beginning of the deposition, I asked you if you agree to do certain things in the deposition. Did you do the things you said you would do at the beginning of the deposition?

A. Yes.

MR. SABEY: I have no further questions. Thank you very much for your willingness to testify.

THE DEPONENT: You too.



Page 174

MR. AZMOUDEH:  I have a few questions, Dr. Myers.

THE DEPONENT:  Okay.

EXAMINATION

BY MR. AZMOUDEH:

Q.  I may be jumping around here and there because I don't want to spend too much of your time. So I just want to address a few of the questions that you were asked today.  They may feel out of order, but I appreciate you bearing with me.

A.  Sure.

Q.  There was a line of questioning that you were asked today that was indicating that Dr. Peddada has been faking his physician burnout and associated symptoms this entire time and that really the motivation for all of this, apparently, was to stick it to his partner, Dr. Monroe, and to go on some vacations that he had preplanned prior to his -- his meeting and his visit to Dr. Setty.

Do you remember that line of questions?

A.  I do.

MR. SABEY:  Object to form.

Q.  (BY MR. AZMOUDEH) Dr. Myers, in your interactions with Dr. Peddada, do you think that Dr. Peddada faked his physician burnout and associated

Page 175

symptoms in all of this?

A.  In my interactions with him, no.

Q.  And one of the very strong indications that this was genuine was that Dr. Peddada made an emergency call to his primary care physician at 9:00 p.m. right after, as he describes, making some mistakes in patient care and recognizing them just short of causing patient harm.

MR. SABEY:  Object to the form.

Q.  (BY MR. AZMOUDEH)  Do you remember that?

A.  I do.

Q.  Does that indicate to you that Dr. Peddada seemed genuine in his reports regarding his condition?

A.  Well, no.  He seemed distressed and proactive in terms of seeking help.

Q.  One of the other indications that Dr. Peddada has been genuine is that he was recognizing changes in himself that he reported to Dr. Setty.  Would that be fair too?

A.  Yes.

Q.  Okay.  And we looked at those preplanned vacations that Doctor -- or sorry -- that Mel showed you earlier in some emails.  Is it possible that Dr. Peddada was, at that time, before speaking to his

Page 176

physician and getting advice on what he should do, was maybe thinking to himself:  I need a break, and I should schedule some things out to the future to maybe self-medicate some of the symptoms that he was already feeling?

MR. SABEY:  Objection.  Calls for speculation.

A.  Well, see, all I can recall is that that first vacation was booked already ahead of time.  I learned about the others, you know, kind of after the fact of reading that he had been to Italy.

But as you were still in communication today, that had been booked sometime earlier as well. But we don't have any dates on that.  I mean, if that had been booked, say, nine months earlier or something like that, he might have been, I don't know, feeling, you know, not so distressed or something at that time but yet still might have found himself looking forward to it.

All I had to go on was, you know, what he was feeling at that time.

Q.  (BY MR. AZMOUDEH)  I'll put it a different way Dr. Myers.

Does the fact that he had some preplanned vacations necessarily mean that he was faking all of

Page 177

this and just intending to get time off to go on preplanned vacations?

A.  Not necessarily, no.

Q.  Right.  And that would seem a pretty extreme measure to go on some vacations, to lie to his own primary care physician about what he was experiencing, to lie to his own partner, to everyone else that he was working with, to falsify his request for medical leave to the clinical staff, the medical staff handling staffing privileges, those would seem like some pretty extreme measures just to go on a preplanned vacation, would you agree with that?

A.  Yes, I do.

MR. SABEY:  Object to form.

Q.  (BY MR. AZMOUDEH)  And probably the more likely speculation, or the one that I think you came to based on your interviews with Dr. Peddada, and based on the medical records that were produced by Dr. Peddada's primary care physician, is that he was actually experiencing the symptoms; right?

A.  Yes.

Q.  There was a separate line of questioning today -- a lot of time spent on whether Dr. Peddada could have communicated with Centura during the three-month leave.  Do you remember those

MAGNA
LEGAL SERVICES

Page 178

communications?

A. I do.

Q. One important distinction is whether Dr. Peddada could have had those communications versus whether he would have been impaired in those communications or whether it would have been difficult to have those communications.

Would you agree with me on that?

A. There is several options in there, it sounds like.

Q. Let's start with the first one which is: Isn't there a distinction between being capable of having those communications versus being impaired had he tried to have them?

A. Well, yes, with regard to that dichotomy, it would seem like even -- I mean, if he was impaired at that time, you know, you generally shouldn't be having conversations like that, period.

And I would think that even his wife would play in on that and try to counsel him. Look, Dear, let's not make any decisions about this until you're out of this. Until you're, you know, feeling your old self again.

Q. And we looked a little bit at the time frames -- well, actually, let me back up.

Page 179

You have not been asked to opine, and you don't have any opinions in your report, of whether Dr. Peddada acted reasonably in the employment negotiations; correct?

A. That's correct.

Q. But today you learned that Centura believes Dr. Peddada was acting completely unreasonably during those employment negotiations, even defiant during those employment negotiations.

Do you remember that line of questioning?

A. I do.

MR. SABEY: I object to the form. You have misstated it.

MR. AZMOUDEH: Well, thanks, Mel. I kept all my objections for the most part form and foundation today. We went through 900 hypotheticals, so let me have my time to shine if you will.

Q. (BY MR. AZMOUDEH) And in that time frame that we looked at, Dr. Myers, when those employment negotiations were ongoing, it was in April of 2022 into May of 2022.

Do you remember seeing that time frame?

A. Yes.

Q. That's the same time frame that Dr. Peddada had an emergency call to his primary care

Page 180

physician, the same time frame that Dr. Peddada was requesting a medical leave to the medical staff, the same time frame that Dr. Peddada -- in others communications that we did not show you today -- was telling doctors at Centura: At the advice of my physician, I cannot have communications about these employment -- about this employment agreement.

There is significant overlap, would you agree with me, in the employment negotiations as well as the time frame with which Dr. Peddada was experiencing what I would think is the height of his physician burnout. Is that fair?

A. Yes. It seems like there was overlap.

Q. When a physician is at the height of his physician burnout, are you surprised to learn, even under Centura's theory, that that physician might have trouble communicating as effectively or as nicely or as meaningfully about a significant issue -- as defendant's appositive, it runs the potential risk of violating federal laws -- are you surprised to learn that that physician at the height of his symptoms would not be able to communicate effectively about those issues?

A. No. You're right. If that was going on in that same timeline, yes, it would seem like that it

Page 181

is very high-level stuff to be trying to negotiate on or make decisions on.

I need to ask you, in one of your -- you added "on medical advice," but I didn't know that. Or was that a hypothetical?

Q. Let's look, Mr. Myers, at Exhibit 2C.

Q. Let me know when you have 2C up.

A. I will. I'm looking for it in the chat, but I don't see it.

Q. Sorry. I can reshare it.

A. I see it now. This is a medical record?

Q. Yes. This is Dr. Setty's medical record following her visit with Dr. Peddada. Do you see that?

A. I'm just opening it now. Yes, I see it.

Q. Okay. So earlier you had been asked whether Dr. Setty, in her recommendation that Dr. Peddada take a medical leave, whether Dr. Setty's recommendation recommended that Dr. Peddada refrain from all work or just patient care. Do you remember that?

A. Yes.

Q. Okay. And at times, you had said: I understood it to be just patient care. And then at other times you said: Well, I wasn't there for those

**MAGNA**
LEGAL SERVICES

Page 182

conversations, so I don't exactly know the scope of what she was recommending.

Do you remember that?

A. Yes.

Q. And it's true that you were not there for these conversations to hear exactly what Dr. Setty was saying?

A. Yes.

Q. And certainly you weren't in her mind to know what she was recommending precisely?

A. Right.

Q. And what we can glean what Dr. Setty was intending is exclusively from her report and perhaps her own testimony; correct?

A. Correct.

Q. And you have not been presented today with any testimony from Dr. Setty. Fair?

A. Correct.

Q. Okay. And then if we look at Dr. Setty's report, there is a number -- several different references to all aspects of Dr. Peddada's work, and we'll go through some of them.

Starting at the very first line underneath 57-year-old male in bold, that first paragraph. These are very general findings:

Page 183

Complaints of going through severe anxiety, unable to think, and afraid to go to work, having total apathy in terms of going to work, feeling fully burnt out in terms of work-related issues.

Do you see that?

A. I do.

Q. Does that say anything about Dr. Peddada only struggling with the provision of medical care?

A. No.

Q. It seems much broader than that; right?

A. That's right. Due to work-related issues.

Q. And then further down, Dr. Peddada is even describing to Dr. Setty. He states that the unfortunate event that led to the termination of a 50-year-long relationship between Penrose Hospital and Radiation Oncology PC has been devastating for him and an all-time low for him.

Do you see that?

A. I do.

Q. That has really almost nothing to do with medical care; right?

A. Yes.

Q. Dr. Peddada seems to be complaining that, in fact, what is stressing him out seemingly the most

Page 184

is all of the contracts, and employment issues, and exchanging of agreements, and ending of agreements, and extending of agreements.

Would you agree with me on that?

MR. SABEY: Object to the form of the question.

A. Well, yes. No. I mean, we don't have -- we don't have that kind of detail. He mentions here he misses the camaraderie of his office staff. That's important.

He hasn't extended the -- he hasn't been going to the tumor board meetings. His wife even mentioned that to me.

Q. (BY MR. AZMOUDEH) And I'll just focus on that second one for now. The termination of a 50-year-long relationship between Penrose Hospital and Radiation Oncology PC. Do you see that one?

A. Yes, I do.

Q. That's not about a tough interaction with a patient, that's about corporate relationships; correct?

A. Well, it's about the system.

Q. Which is, again, much broader than just patient care?

A. Right. There is a typo there too. It

Page 185

has negatively impacted both his professional and personal life.

Q. You mentioned earlier: He has not attended any of the exciting tumor board meetings.

What are, to the best of your knowledge, tumor board meetings?

A. Yeah. Those are interdisciplinary rounds generally where they get opinions from all kinds of specialists in cancer. For instance, so you would have medical oncology, surgical oncology, radiation oncology, perhaps, depending on the -- on the body. If it is a breast thing, they would have a breast surgeon, those kind of things.

They are -- I think the descriptor is correct, "exciting." And, in fact, patients living with cancer prefer something like this as well because they feel that it's the meeting of the minds. And that it's -- it's kind of high-level specialists weighing in on what's the best treatment plan for this patient at this time.

Q. And, again, not specifically related to one particular patient or another. This is a sort of a learning environment for doctors?

A. It is. It is. Yeah, because other

MAGNA
LEGAL SERVICES

Page 186

doctors would be presenting their cases too.

Q. And you also noted: He is afraid to speak to any staff in fear of being construed as rude or angry.

Again, another example that Dr. Setty is pointing out that is just Dr. Peddada's ability to interact with his colleagues about something as simple as: Can you hand me that knife?

I know that detail is not in there, but certainly speaking with staff is not about one particular patient and the medical care provided to them. Is that fair?

A. Well, yes. See, what I thought of that, I remember this: He is afraid to speak for fear of being -- that's because I think he had been written up a couple of times. And when you're already feeling responsible or guilty, it does make you feel like you're walking on eggshells because you do feel kind of close to the edge.

And I'm not surprised that, you know, he said that to Dr. Setty, you know, that he is kind of nervous, you know, because he doesn't want to get written up again.

Q. And yet that nervousness is not just Dr. Peddada's ability to just step into the OR and do

Page 187

his job, that's every day at work; correct?

A. Yeah. I don't know if it is every day. But it's an interaction, it is an interpersonal thing, it says something about the tone of the workplace or the temperature of the workplace, that kind of thing.

Q. So we got on this topic because I was asking: There was a lot of time spent on whether Dr. Peddada could have communicated with Centura during his three-month leave.

Do you remember me asking you about that?

A. Yes.

Q. And based on even just this record alone, there appears to be challenges for Dr. Peddada in communicating with Centura or interacting with Centura about a number of things outside of just patient care; right?

MR. SABEY: Object to form of the question.

A. I think what this is an example of is something you hear about and read about in other situations where independent practice groups merge, you know, with another entity for whatever reason it might be.

And, you know, it is a mixed blessing at times and sometimes they're not so happy because they

Page 188

do feel that they're giving up autonomy. But yet on the other hand, they feel, though, that maybe this is going to be better in some ways, either they'll be salaried or something like that, it might be a better lifestyle or things like that. So I've heard both ends of this from people.

Q. Earlier you were asked whether you had any evidence of no agency. Do you remember that?

A. Well, I think that would speak there. I mean, in his complaints to Dr. Setty, it sounds as if he is having to kind of shift from being -- I don't know if you call it King of the Castle or whatever it might be. And, you know, this is a problem for many physicians as they get older, period.

Because the next generation is very, very different in that regard, and sometimes there is clashing there. But I'm not going to use this to educate about that.

But I'm just saying it can be -- it can be tougher for a physician who have been used to a certain way of practicing, and now they're having to shift into something else.

Q. So, I guess, earlier you had been asked whether there was any evidence of no agency, and I think your answer was: I don't have any evidence.

Page 189

According to what you just testified to, the very act of becoming -- transitioning from private practice and merging with private practice would be an example of the loss of some agency. Would you agree?

A. I would agree.

MR. SABEY: Object to the form.

Q. (BY MR. AZMOUDEH) Another example of some of maybe the lack of agency that Dr. Peddada might have been experiencing was, again, precisely the fact that Centura was trying to negotiate that exact relationship at the exact same time that he was requesting leave.

Is that another example of feeling like some agency is going away?

MR. SABEY: Object to form and foundation.

A. Well, it certainly could be, you know, if he is not feeling -- feeling his usual self.

See, what we don't have -- I wish we had more detail on things like that because when doctors can express that, they just -- they just say: Look, I can't -- I can't even follow things as quickly as I usually do. I've kind of lost my confidence in a way, you know. I think I'll get it back. I'm hoping to get it back.

MAGNA
LEGAL SERVICES

Page 190

And those -- those are the kinds of things that all doctors pay attention to while looking after other doctors, that you want them to pause.

Q. (BY MR. AZMOUDEH) Did you see any communications today from Centura saying: Why don't we put a pause on those employment negotiations to allow you, Dr. Peddada, to feel more like yourself?

A. No. No, I didn't.

Q. Do you think those would have been maybe an important step to take right around this time frame for Centura?

MR. SABEY: Object to the form of the question and foundation.

A. I think this was the same argument in my report, you know, as I learned from interviewing him, his wife, and also the Colorado CPH report, and Dr. Setty's as well, that's why I -- I felt that he wasn't -- it didn't feel -- it didn't feel friendly.

Q. Earlier, you were asked whether any physician had made a finding of anxiety or any other specific mental health disorder, and your answer was no. Do you remember that?

A. Well, I don't remember it quite as black and white as that. But I know that I did mention that we do have that in Dr. Setty's report. She mentions

Page 191

anxiety and depression. Because remember when we talked about that, that was my supposition as to why she prescribed the Lexapro.

Q. Right. If you look at 2C, at the very top, she says: 57-year-old with Indian origin comes in with severe anxiety "burnout."

Do you see that?

A. Just one sec. Yes. Go ahead.

Q. Did you see that at the top where she says: 57-year-old male of Indian origin comes in with severe anxiety "burnout"?

A. Yes.

Q. So is that a physician making a finding that Dr. Peddada has anxiety?

A. No. It is anxiety. Severe anxiety/"burnout." I'm not sure -- when I read that, I didn't know -- have you -- I don't know if either of you have heard of "white coat anxiety." That's when people get nervous going to see their doctor, but it usually refers to high blood pressure.

So once you get them calmed down and you take blood pressure again, they're fine. So I didn't know if she was -- so I wasn't exactly sure what "coat" meant.

Q. Let's go to the diagnostic studies.

Page 192

A. I know it goes down there where you see she mentions anxiety and depression.

Q. And moderately severe burnout?

A. Yeah.

Q. Okay. So a physician did assess Dr. Peddada contemporaneous to his experience with symptoms and make diagnoses for anxiety and burnout minimally, those two?

A. That's correct. And that's when -- in Number 4, that's when you read the situational anxiety disorder. So that's why she mentioned there the low does Lexapro and also what we call PRN, Ativan as necessary.

Q. What is Ativan for?

A. It's a tranquilizer for anxiety.

Q. Does it also help you sleep?

A. It can, yes.

Q. Would someone with anxiety need help sleeping?

A. Yeah. We don't tend to always sort of use -- it is called a benzodiazapine. There is other things that we use more for sleep because Ativan -- that's why she said "for the short-term," because it can be habit forming.

So I think what she means is just while

Page 193

he is in this crisis and gets onto leave, if he needs something, then the Ativan 0.5 would help. Because even a low does of Lexapro, this medication can take up to a minimum of a week to three weeks to begin working. So she was probably thinking if he takes the Lexapro, until then, if he needs something, the Ativan would help.

Q. There is a different line of questioning today indicating that Dr. Peddada was a workaholic, that he chose his 60 to 90-hour work schedule because of money. Do you remember those -- do you remember those questions?

A. I do.

Q. And do you also remember that the question, you know, this would be expected -- these symptoms would be expected of anybody who has put themselves in that position by choice?

A. I do.

Q. Does it matter why he got there or how he got there? Or does it matter that at this point in April of 2022 he is experiencing the symptoms and needs help?

A. Yes.

MR. SABEY: Object to the form of the question.



Page 194

A. If your question is: Does it matter? No. It doesn't matter.

The point is you have got a suffering individual sitting in your office. And whether or not you're thinking, you know, this guy is a workaholic, you're still wanting to provide initial care and comfort and treatment. And then talk about the lifestyle that, you know.

Once the individual gets feeling a little bit better, that's why you say: Look, you are going to have to cut back or you're going to be sitting here again in six months or something like that.

But you can't shame the individual.

Q. There was a related question that, you know, that pointed to how long Dr. Peddada had kept up this -- this work schedule. And the question indicated: Well, it seemed that Dr. Peddada was fit for this work schedule, that he has got sort of an above-average capacity to handle it.

Do you remember those?

A. I do.

Q. Well, clearly as of April 2022, he could no longer handle it; right?

A. Correct; yes.

Q. I want to look at your report, the July

Page 195

30th, 2024, report.

A. What's the number?

Q. That's a good question.

MR. AZMOUDEH: Mel, can you help me out.

MR. SABEY: 59A.

MR. AZMOUDEH: 59A.

A. Okay. I have it.

Q. Okay. If you go to page -- I'll just ask it.

There was a series of questions that first -- the first part of the questions made a challenge to the reliability of your finding with respect to whether Dr. Peddada was struggling with sleep.

Do you remember that?

A. I do, yes.

Q. And one of the basis that challenged that finding that Dr. Peddada was struggling with sleep was that Dr. Peddada didn't mention it to you.

Do you remember that?

A. I do.

Q. Okay. If we look back at Dr. Peddada's visit to Dr. Setty, he frequently uses the word -- he frequently complains that he is exhausted.

Do you remember that?

Page 196

A. Yes.

Q. In your professional opinion, would that indicate at least some challenges with sleep?

A. It can.

Q. The second part of the line of questioning to you, Dr. Myers, was that: Well, the way you have written your report is that if he is not struggling with sleep, then he must not be impaired in any of these other major life activities.

Do you remember that?

MR. SABEY: Object to the form.

A. Yes, I do.

Q. (BY MR. AZMOUDEH) Is it necessarily true that the only way Dr. Peddada was struggling with some of those daily activities was if he was struggling with sleep?

A. No, that's not true.

Q. He could have been struggling with some of those daily activities even if he was getting eight hours a night; right?

A. That's right.

Q. Okay. So maybe your -- would you agree with me that maybe your report doesn't make that abundantly clear that you could be struggling with these daily activities irrespective of sleep?

Page 197

Would you agree with me that your report is maybe a little ambiguous at that point?

MR. SABEY: Object to the form.

A. Yes.

Q. (BY MR. AZMOUDEH) Could you explain to me how -- let's start with thinking -- how what you know about Dr. Peddada at the time, how that could have affected his thinking?

MR. SABEY: I'm going to object to lines of questioning that raise positions not asserted by the witness in his report.

MR. AZMOUDEH: I think you expanded it here. You -- you -- yeah, I think you expanded it here, so I'm going to fix it.

MR. SABEY: No, I didn't expand it. I talked about what was in his report.

MR. AZMOUDEH: Right. But the clear implication from your questions was that it was impossible that Dr. Peddada could have been struggling with daily activities other than through sleep.

And what I've just learned, through your questioning, is that Dr. Myers maybe wrote somewhat ambiguously that that was true, and he is going to correct it if you'll allow me the time.

MR. SABEY: Well, no. He -- I didn't

MAGNA
LEGAL SERVICES

Page 198

suggest that at all. I just looked at what he wrote. I quoted directly from his report.

MR. AZMOUDEH: But you offered the implication that without the sleep connection, that those daily activities could not have been affected; right?

MR. SABEY: That's not at all what I offered.

MR. AZMOUDEH: Well, we can deal with that at trial. Can I get the testimony on the record and we can deal with that at trial?

MR. SABEY: Well, I object to a line of questioning that expands what he didn't include in his report.

Q. (BY MR. AZMOUDEH) Dr. Myers, am I asking you to clarify something that is in your report?

A. Is that a question?

Q. Yes.

A. Go ahead.

Q. Am I -- it was a basic -- am I asking you to clarify something that is in your report?

MR. SABEY: Objection. He can't know what you're asking for.

Q. (BY MR. AZMOUDEH) So, Dr. Myers, I had asked you a second ago whether sleep was the only

Page 199

connection to major life activities, daily activities.

Do you remember that?

A. Yes.

Q. And I indicated to you that somebody reading your report, including Mel, could draw the conclusion from some of those statements that that is the only way to get to daily major activities.

Do you remember that?

A. Yes.

Q. Okay. And I'm asking you now if you could just clarify for us: Is sleep or lack there of the only way in which all Dr. Peddada may have had impairments to daily activities?

A. No, it isn't.

Q. Okay. Can you offer us some more information as to how Dr. Peddada might have been experiencing some impairment in his daily activities without even reference to the word "sleep"?

A. Okay. Well -- oh. Okay. Well, what I was -- I was going to offer something about sleep.

Q. Sure. Start there.

A. Okay. What I was just going to say is: Even if he wasn't having sleep difficulty, in other words getting off to sleep, staying asleep, awakening, he could be so exhausted when he comes home that he is

Page 200

completely used up, hardly eats dinner, then goes to his den to do patient reports, and then that his wife looks at and notices within five minutes he is fast asleep at his desk.

I've seen doctors like that, and then they sleep the whole night, half -- half at their desk. They get up early in the morning because they're trying to get caught up, they go to work. So technically they're sleeping maybe six hours or something like that. Which they say that's not bad, that sort of thing, but it's not restful sleep, it's not restorative.

Because all they're doing is working and having this kind of -- not -- not necessarily restful, restorative sleep. So that could just be one example.

Q. And Dr. Peddada wouldn't necessarily know the quality of his sleep without running tests on himself; correct?

A. Well, that's right. I mean, if you order sleep studies, then, of course that would --

Q. But nonetheless, when Dr. Peddada saw Dr. Setty, he tells Dr. Setty -- he complains to Dr. Setty of severe anxiety, unable to think, afraid to go to work, having total apathy in terms of going to work, feeling completely burnt out due to

Page 201

work-related issues.

But maybe that is caused by sleep or maybe not. Dr. Peddada wouldn't know in that moment; right?

A. Right.

Q. But that doesn't mean that he is not experiencing those symptoms; right?

A. No, it doesn't. I mean, when -- when people just maybe have one symptom or two symptoms, that's when they get what we call hypertrophy.

The first thing they say is: My sleep is a mess. I can't get to sleep, you know, they you just go on and they're exhausted, but they can't sleep.

But if it were like that, I think that Dr. Setty would have been clearer about that. I mean, we're showing both in her clinical notes as well as her prescribing. She would have prescribed, I think, something specific for sleep because it is one of the most worrisome symptoms in people.

We worry about it constantly in people are very depressed and suicidal. He doesn't have those things so -- except a milder depression. But...

Q. You were asked: Well, Dr. Peddada is mountain biking, so he must be able to perform daily functions.

MAGNA
LEGAL SERVICES

Page 202

Do you remember that?

A. I do.

Q. I'm going to ask two things about that. One, you were not asked to assess whether Dr. Peddada could or could not perform daily activities; correct? Your opinion was about whether his ability to perform daily activities was impaired.

Do you remember that?

A. Yes.

Q. Okay. So whether he could or could not ride a mountain bike down a trial was irrelevant to your question of whether he was impaired. Is that true?

MR. SABEY: Object to the form.

A. Can you repeat it.

Q. (BY MR. AZMOUDEH) I'll put it a different way.

He could have been riding his mountain bike down trails impaired; right?

A. Well, technically, yes.

Q. And given the timeline, that is likely true given that at the time he was experiencing anxiety, unable to think, afraid of going to work, total apathy in terms of going to work, and feeling completely burnt out; right?

Page 203

MR. SABEY: Object to the form of the question and foundation.

A. Yes. I was going say "yes," but if on the other hand he was so ill and riding his bike like that, I would hope that somebody would be concerned that he is at risk of going off a mountainside or something like that or falling or, you know, breaking bones or getting a concussion or something.

Q. (BY MR. AZMOUDEH) And he probably shouldn't have been mountain biking in that condition, in your opinion?

MR. SABEY: Object to the form.

Q. (BY MR. AZMOUDEH) What was the answer, Dr. Myers?

A. I said "correct."

Q. And also, Dr. Myers, of everything we've been talking about with respect to Dr. Peddada and the symptoms that he was experiencing as you put in your report, those things flowed from work; correct?

A. Correct.

Q. And so maybe his symptoms aren't triggered as heavily when he is on a relaxing mountain bike trip in the mountains of Moab; right?

A. What did you say about that? On that setting, what would happen?

Page 204

Q. Perhaps his symptoms might not have been triggered so heavily or if at all in the mountains of Moab riding his mountain bike with family and friends?

A. That's right. See, especially if people have a go-to sort of thing that they say: Look, the only thing that makes me feel half normal these days is swimming or dancing or something. The rest of the time, I feel like a complete wreck, wash-over, whatever.

And there is sometimes even surprise that that has been preserved because it is something that they have been doing for a long time. He already said that mountain biking is very, very important to him, and that's one of the sad things that he is missing about Colorado.

MR. AZMOUDEH: Okay. That's all I have, Dr. Myers. Thank you.

THE DEPONENT: Sure.

EXAMINATION

BY MR. SABEY:

Q. Dr. Myers, I earlier asked -- well, first of all, despite the questions that Mr. Azmoudeh has asked you, do you withdraw any of the testimony you gave to my direct questions?

A. Do I withdraw it?

Page 205

Q. Yes. Did you answer my questions honestly?

A. I answered your questions to the best of my ability.

Q. Okay. And honestly; right?

A. Yes. Yeah. Honestly, yes.

Q. Okay. And you testified that the report that you submitted, 59A, was an accurate, complete, and thorough account of the opinions you have reached and on which you would testify; correct?

A. Correct; yes.

Q. Okay. And your report nowhere says that you reached the conclusion that Dr. Peddada was impaired in his ability to communicate with others in -- in negotiations about contracts; right?

A. Right.

Q. And you didn't reach that conclusion and it is nowhere in your report; correct?

A. Correct.

Q. And your conclusion in terms of his abilities was limited, and your conclusion about any kind of disability was limited to patient care issues in the -- in the hospital environment; correct?

A. Or the medical environment or --

Q. Yes.

MAGNA
LEGAL SERVICES

Page 206

A.  -- patient care.  Yes.

Q.  Okay.  And, for example, tumor board meetings, those are exclusively surrounding patient care issues; correct?

A.  Correct.

Q.  And when you testified that no physician had -- had diagnosed Dr. Peddada with a number of issues -- let me see if I can clarify that.

It is true that no physician ever concluded that he met any of the standard requirements for a DSM5 diagnosis of any issue; correct?

MR. AZMOUDEH:  Object to form.  That is not what was asked earlier.

A.  Acute situational anxiety diagnosed by Dr. Setty, maybe not those exact words, but something to that effect is in the DSM.  Is in the diagnostic classification.

Q.  (BY MR. SABEY)  But you didn't ever conclude and report in your report that he was suffering from that?

A.  No, I didn't.

Q.  Or from any other DSM5 diagnosis; correct?

A.  Correct.

Q.  Only burnout?

Page 207

A.  Correct.

Q.  And that's the limited scope of your -- of your work and your report, burnout?

A.  Yes.

Q.  Okay.  You don't have an opinion about any -- anything that you would call a disability other than burnout?

A.  Correct.

Q.  You don't intend to testify about anything like that?

A.  Correct.

MR. SABEY:  No further questions.  Thank you for your time.  Appreciate it.

MR. AZMOUDEH:  Thank you, Mel.

THE VIDEOGRAPHER:  Hang on.

Patricia, do you have anything you need to put on the record?

THE REPORTER:  Yep.  Before we go off the record, I need to get the orders for the transcript.  Just electronic?

MR. AZMOUDEH:  Just electronic for me, and can I get a copy of the errata sheet for Dr. Myers first?

THE REPORTER:  Yeah.  What do you mean "first," I guess?

Page 208

MR. AZMOUDEH:  Not first.  First was the wrong word, I get that.

THE REPORTER:  You will handle reading and signing?

MR. AZMOUDEH:  Yes.

THE VIDEOGRAPHER:  Do you need a video, Azmoudeh?

MR. AZMOUDEH:  Oh, sorry, I heard Bob.  I was like, I'm not sure there is a Bob here.

No.  For now I just need the e-transcript.

THE VIDEOGRAPHER:  Okay.

Is there anything else that needs to go on the record?

THE REPORTER:  Mr. Sabey, could I get your order?

MR. SABEY:  Electronic is fine for me, and we don't need the video at this time.

THE VIDEOGRAPHER:  Okay.

THE REPORTER:  Thank you.

THE VIDEOGRAPHER:  Anything else that needs to go on the record?

THE REPORTER:  I don't think so.

THE VIDEOGRAPHER:  Okay.  With that, we are all finished at 3:46, and this concludes Volume 1

Page 209

of Michael Myers, MD.  Today's deposition consists of three media files, which will be retained with Magna Legal Services, whose office is located at 1635 Market Street in Philadelphia, Pennsylvania.

Thank you very much, everyone.

WHEREUPON, the within proceedings were concluded at the approximate hour of 3:47 p.m. on the 16th day of December, 2024.

*    *    *    *    *    *

MAGNA
LEGAL SERVICES

Page 210

CERTIFICATION OF DEPONENT

I, MICHAEL F. MYERS, M.D., do hereby certify that I have read the above and foregoing deposition and that the same is a true and accurate transcription of my testimony, except for attached amendments, if any.

Amendments attached     ( ) Yes ( ) No

_____
MICHAEL F. MYERS, M.D.

The signature above of MICHAEL F. MYERS, M.D., was subscribed and sworn to before me in the county of _____, state of Colorado, this _____ day of _____, 2025.

_____
Notary Public
My commission expires

Page 211

REPORTER'S CERTIFICATE
STATE OF COLORADO        )
               )   ss.
CITY AND COUNTY OF DENVER )

I, PATRICIA BURNETT-ANDERSON, Professional Court Reporter and Notary Public, State of Colorado, do hereby certify that previous to the commencement of the examination, the said MICHAEL F. MYERS, M.D. was duly sworn by me to testify to the truth in relation to the matters in controversy between the parties hereto; that the said deposition was taken in machine shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form, consisting of 211 pages herein; that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.  I further certify that I am not employed by, related to, nor of counsel for any of the parties herein, nor otherwise interested in the outcome of this litigation.

IN WITNESS WHEREOF, I have affixed my signature and seal this 9th day of January, 2025.

My commission expires August 1, 2027.

_____
Patricia Burnett-Anderson
Professional Court Reporter



54 (Pages 210 to 211)

**A**

**abilities**
205:21
**ability**
138:4 139:20 163:25
166:25 186:6,25
202:6 205:4,14
**able**
10:5 59:9 73:4 109:7
120:13 128:20,23
146:18 152:21,25
160:5 180:22
201:24
**above-average**
194:19
**absence**
53:6,24 54:6,14,17
55:11 56:8 64:20
66:6 72:3,8,12
73:21 95:25 105:22
106:19 110:20,22
110:23 111:11
116:8 128:18 136:3
**absolutely**
139:9
**abundantly**
196:24
**abuse**
133:5 139:14
**academic**
17:3 18:4
**accept**
19:13 20:20 163:8
**acceptable**
93:13
**accepted**
92:18 125:25 126:21
**accepting**
16:24 117:14
**accommodate**
117:19
**account**
45:11 205:9
**accuracy**
16:25 22:22 23:18

**accurate**
6:17 19:15 20:21
22:10 24:12 33:16
38:16 48:13 71:13
74:15,24 76:15 77:5
78:19 88:10 89:9
105:9 106:14 111:8
111:20 118:22
130:14 133:23
135:19 205:8 210:5
**accurately**
10:5 12:20 13:23
36:13,16 37:11 41:3
45:10 72:16 93:12
124:25
**acquiescing**
162:22
**acrimony**
88:23
**act**
119:14 189:2
**acted**
179:3
**acting**
179:7
**action**
1:3 4:19
**actions**
171:12
**activities**
57:20,23 67:1 79:11
122:21 123:5
127:25 128:4,11
133:18 134:6 137:4
137:17,21,22,23,25
140:5,24 141:11
158:14,16 159:13
159:14,24 160:3,6
162:4,5 164:25
165:3 166:25 196:9
196:15,19,25
197:20 198:5 199:1
199:1,7,13,17 202:5
202:7
**activity**
47:4 69:4 140:24

155:17
**actual**
38:2 140:9 141:8
**Acute**
206:14
**Ad**
14:19
**ADA**
75:20 117:1
**add**
22:11 43:1 59:1
63:10 114:2 168:7
**added**
59:22 85:8 181:4
**addendum**
101:18 102:3 103:3
**adding**
63:11
**addition**
41:4
**additional**
17:2 32:2 33:18
34:14 38:19 39:1
85:5 86:23 114:2
**Additionally**
9:22
**address**
46:14 58:10 75:9
80:17 93:6 99:3
100:11 102:1
170:11 174:8
**addressed**
100:25
**addressing**
99:24 100:5
**admit**
92:5
**admitted**
144:10
**admitting**
70:21 140:11
**advance**
96:10 109:9,16
**adverse**
137:4
**adversely**

128:10 133:19
137:23 140:6,20
**advice**
19:13 20:18 22:8
62:5 65:19 66:19
117:8 176:1 180:5
181:4
**advise**
38:25
**advised**
65:13
**advising**
53:4
**advocate**
24:25 25:13,23 26:7
26:17
**advocates**
87:4,10
**advocating**
60:17
**affixed**
211:20
**aforesaid**
211:12
**afraid**
183:2 186:2,14
200:23 202:23
**age**
151:14 152:7
**agency**
121:21 148:19
153:11,16 188:8,24
189:4,8,14
**ago**
6:2 19:22 24:14
84:20 198:25
**agree**
11:16,22 25:10,20
26:3,13 54:5,12
87:22 141:3 151:11
152:9 159:9 173:18
177:12 178:8 180:9
184:4 189:4,5
196:22 197:1
**agreed**
73:9 74:2



**agreement**
 1:15 56:5,15,17 57:4
   89:19 90:2 103:23
   104:7,17,18,20
   105:4,13,14,24,25
   111:5,10 113:15
   180:7
**agreements**
 56:7,20 106:22
   115:20 118:14
   184:2,2,3
**ahead**
 7:21 20:24 23:14
   176:9 191:8 198:19
**aids**
 14:9
**akin**
 19:25
**al**
 4:6
**Alan**
 3:11 53:17
**Albert**
 102:9,14,23
**alcohol**
 122:7 167:9
**alcoholism**
 65:20
**allegations**
 88:9,13
**alleged**
 165:6
**allow**
 9:12 190:7 197:24
**allowed**
 72:7 74:3
**all-time**
 183:18
**altitude**
 155:23
**altogether**
 141:1
**amassed**
 148:3
**ambiguity**
 172:20

**ambiguous**
 29:6 114:23 197:2
**ambiguously**
 197:23
**ambitious**
 37:16,20 147:11
**amended**
 33:16 34:8 76:3,14
   76:25 77:8
**amendments**
 210:7,8
**American**
 147:11
**analyze**
 22:4
**analyzes**
 25:4
**angry**
 186:4
**Annie**
 1:17
**announce**
 105:10,21
**answer**
 7:9,17,19,21 9:9,14
   16:8 18:19 20:23,24
   23:5,14 42:19 47:21
   48:16 50:1 53:12,12
   53:14 56:12 58:18
   65:7 66:10 68:2,22
   70:4 74:11,17 75:2
   80:2 107:1,13 109:3
   116:20 131:22
   135:1 136:21
   188:25 190:21
   203:13 205:1
**answered**
 9:19 105:2 116:12
   205:3
**answering**
 165:4 166:22
**answers**
 73:10
**anticipated**
 143:6
**antihypertensive**

 63:1
**Anti-kickback**
 94:1
**Anuj**
 1:8 4:5,21 102:21
   161:9
**anxiety**
 58:20,23 63:12 122:4
   138:21 139:12
   167:8,18 183:1
   190:20 191:1,6,11
   191:14,15,16,18
   192:2,7,10,15,18
   200:23 202:23
   206:14
**anybody**
 67:16 68:1 82:2
   116:16 130:15
   193:16
**anyway**
 42:15
**apathy**
 183:2 200:24 202:24
**apologize**
 46:10
**apparently**
 57:6 94:14 122:6
   151:9 174:16
**appear**
 34:5
**appearance**
 4:16
**appeared**
 117:22
**appearing**
 4:18
**appears**
 80:6 187:13
**applicant**
 118:12
**appointment**
 130:2
**appositive**
 180:19
**appreciate**
 59:23 77:3 78:5

   174:10 207:13
**appropriate**
 42:15
**appropriately**
 138:6
**approval**
 64:19 65:3
**approved**
 65:15 66:6 68:11
   155:3 159:15
**approximate**
 209:7
**approximately**
 28:14 95:16
**April**
 56:4,16 97:9 98:3,13
   100:24 101:21,23
   103:1 113:19 115:4
   115:13 145:10
   146:11 179:20
   193:21 194:22
**area**
 142:19
**areas**
 120:19
**argument**
 190:14
**arose**
 93:7
**art**
 37:12
**article**
 3:21 126:7,17,18,24
**articles**
 120:23,24
**aside**
 15:17
**asked**
 17:23 21:25 24:5
   29:5 35:11 38:18
   46:14,23 47:2 64:9
   75:9,9 80:10 83:23
   90:2,5 91:18 94:8
   95:21 117:7 120:18
   164:24 173:18
   174:9,13 179:1



181:16 188:7,23
190:19 198:25
201:23 202:4
204:21,23 206:13
211:15
**asking**
9:19 11:12 13:10
18:16 27:21 29:19
68:15 106:10 116:1
116:3,6 118:21
127:19 164:5 187:7
187:10 198:15,20
198:23 199:10
**asks**
25:5
**asleep**
199:24 200:4
**aspects**
182:21
**asserted**
197:10
**assess**
62:1 164:21 192:5
202:4
**assessed**
117:11
**assessing**
20:6 21:15
**assessment**
47:7,15 48:6,12,21
49:3 50:2,14,15,25
51:6,12,13,14 61:23
164:21 167:14
**assessments**
47:9 48:10 140:10
**assignment**
75:7,13,22 120:18
**assist**
27:8
**assistance**
101:17 102:2 103:2,8
137:1 141:2 156:6
157:10
**associated**
122:15 174:14,25
**assume**

19:14 20:21 29:1
32:4 72:14 88:9
103:19 155:16
156:3,16 160:17
161:1 162:11
**assumed**
24:6 156:9,11,11,13
**assuming**
5:12 22:9,22 23:18
87:21 105:8 111:19
118:21
**assumptive**
24:2
**Ativan**
63:16 192:12,14,22
193:2,6
**attach**
18:21
**attached**
12:6 45:25 46:1,5
84:4,5 210:6,8
**attachment**
84:21
**attack**
24:1
**attempt**
26:11 31:11
**attempted**
78:24
**attended**
185:4
**attention**
19:7 75:24 78:15
79:1 97:6,12 150:17
190:2
**attorney**
7:5,5 29:20 84:12
**attorneys**
4:4 27:9,16 32:3
34:22 40:25 41:24
42:5 78:11 81:10
86:19,25 87:3,3,9
87:17
**attorney's**
28:11
**attributing**

132:4
**audio**
39:10 100:8
**August**
56:8,21 104:22 109:8
109:16 211:22
**author**
16:17
**authored**
134:18
**authoritative**
14:5,16
**authorized**
55:10
**autonomy**
121:21 148:19 188:1
**available**
25:5 40:19,21 85:11
109:15
**average**
71:7 143:16 152:12
152:15
**averaged**
131:1
**avoid**
94:23 100:16,18
171:6
**avoided**
136:23 141:1
**awakening**
199:24
**aware**
56:3 69:17 72:6
87:16 93:4,19 96:3
96:12 99:3,5 100:14
100:21,22 101:4
103:22 104:5,15
114:3,8 115:3,8
118:20 130:21
148:3
**awareness**
72:11
**awfully**
143:9
**Azmoudeh**
2:5 4:20,20 7:6,6,7,8

8:6 9:22 20:22
22:25 23:2,21 25:15
25:25 26:8,18 27:5
28:15 29:13,14 30:3
32:13 33:6 36:15
40:1 42:10,14 47:12
48:14 49:5,25 51:16
53:9,11 54:9 56:9
56:22 58:15 59:12
60:21 62:9 63:20
64:17,23 65:6 66:9
68:21 69:7 72:4
74:8,16,21,25 76:17
78:8 80:19 82:1
83:1,11,17,20 84:3
84:10 85:19,25
86:13 87:12,20,24
89:7,24 90:10 94:4
94:13 95:5 96:6
97:19 98:17 100:1
100:19 101:2 102:4
104:1,3,13,24
105:16 106:2,8,16
106:24 107:9 108:7
109:2 111:17
112:17 113:16
114:6,11,18,25
115:6,24 117:20
119:3 121:11,14
122:22 131:11,15
131:20 132:13
134:25 136:9 141:6
141:13,18,22 142:9
147:3 149:18,23
150:24 151:12
152:3,11 159:19
162:7,17 163:5,13
163:16,23 164:2,7
164:18 165:7
166:11 167:2,25
170:5,14 171:19
172:19 173:5 174:1
174:5,23 175:10
176:22 177:15
179:14,18 184:14
189:7 190:4 195:4,6



196:13 197:5,12,17
198:3,9,15,24
202:16 203:9,13
204:16,22 206:12
207:14,21 208:1,5,7
208:8

**a.m**
1:17 4:15

**B**

**B**
2:1
**back**
17:16 36:3 57:10
63:3 71:16,17,22
76:21 77:12 90:13
93:10 95:13 98:25
104:10 106:11
144:11 150:19
151:25 158:5
166:13 169:16,22
178:25 189:24,25
194:11 195:22
**background**
12:21 30:2 36:4
**backtrack**
95:20
**bad**
200:10
**bailiwick**
116:19
**balanced**
143:24 144:3
**ballpark**
60:25 61:12
**bar**
24:18
**based**
41:20,21 78:16 115:8
117:13,14 120:2
141:17,24 177:17
177:18 187:12
**basic**
198:20
**basically**
58:5 80:17

**basing**
60:5
**basis**
7:19 22:9,22 23:18
29:15 38:7 39:5,16
40:14 101:25 105:3
115:13 147:4 151:2
157:5 195:17
**bathe**
156:5 157:9
**bathing**
128:14 136:24
140:25
**bear**
103:13 171:4
**bearing**
174:10
**becoming**
189:2
**began**
60:13
**beginning**
4:2 48:24 90:25 91:6
120:19 173:17,20
**begins**
91:7 101:12 134:4
**behalf**
1:16 4:3,13,19,20
**belief**
58:7
**believe**
34:7 45:25 59:20
63:18 68:10 105:9
105:20 117:1
131:18 148:20
152:20,24 153:19
**believes**
179:7
**bend**
156:17 157:8
**bending**
128:10 136:13
140:20
**benefit**
10:18
**bent**

156:4
**benzodiazapine**
192:21
**best**
37:12 44:18 64:10
67:13 128:20,23
130:15 140:7 185:5
185:20 205:3
**betrayed**
70:10 71:2
**better**
60:13 73:4 120:3,6
145:23 154:4
157:18 172:21
188:3,4 194:10
**beyond**
41:12
**bias**
16:25
**biased**
16:18
**bike**
202:11,19 203:4,23
204:3
**biking**
155:12,14,18,20
156:16,25 157:6
201:24 203:10
204:13
**billing**
82:11,20
**bit**
22:3 30:2 32:25 36:7
39:8 95:21 100:9
120:6 157:18,20
171:5 178:24
194:10
**black**
42:3 66:13 67:22
141:15 190:23
**blessing**
187:24
**blocking**
52:1
**blood**
62:24 144:10 191:20

191:22
**blue**
133:2
**BM**
139:11
**board**
113:9 184:12 185:4,6
206:2
**Bob**
208:8,9
**body**
47:7 48:12 145:5
185:11
**bold**
182:24
**bolster**
171:16
**bones**
203:8
**book**
15:7
**booked**
176:9,13,15
**books**
13:3 14:3,14
**bottom**
90:16,24 91:10 98:3
101:15 102:11
123:25 129:13,14
133:4 137:13 138:9
138:14,15 161:7
**boundaries**
147:16 165:19
172:15
**boundary**
44:5 138:24
**break**
26:11 94:4,12 95:4
95:16,18 99:1
157:22 158:9 165:3
166:22 168:17,21
169:9 176:2
**breakdown**
70:9,18 139:13
**breaking**
100:8 203:7


MAGNA
LEGAL SERVICES

**breakup**
39:8
**breast**
38:4 185:12,12
**Brianna**
52:1 139:3
**briefly**
41:10 43:10
**bringing**
127:21
**broader**
183:10 184:23
**brothers**
147:9
**brought**
132:2
**build**
35:15 66:21
**burden**
73:24
**burn**
149:6
**burned**
169:2
**Burnett-Anderson**
1:17 4:12 211:4,23
**burning**
30:20
**burnout**
58:9 63:8 70:15
118:6 120:20,23
121:9,17,25 124:3,9
124:10,13 125:9,18
126:21 148:15
152:16,22 153:2,6
153:12,20,25
154:24 167:6,12
168:15 169:7
174:14,25 180:12
180:15 191:6,11,16
192:3,7 206:25
207:3,7
**burnt**
183:3 200:25 202:25
**business**
69:11,23 72:2 109:22

110:1
**buttressed**
107:23 108:5

---

**C**

**C**
2:1 135:11
**California**
37:14
**call**
17:18 22:14 55:3
95:6 175:5 179:25
188:12 192:12
201:10 207:6
**called**
8:11 21:3 22:17
126:10 153:11
192:21
**calls**
32:5,12 67:25 68:6
149:5 165:4 166:22
176:6
**call-in**
129:19
**calmed**
191:21
**camaraderie**
184:9
**cancer**
36:22,24 37:2 38:4
38:11 161:3 185:9
185:16
**capable**
178:12
**capacity**
12:10 151:10 152:2
152:13 194:19
**care**
24:10 27:8 38:14
47:15,25 48:7 50:3
50:4,10 55:1,4 58:4
58:5 60:12,17,17
106:14 108:24
109:8,15 122:21
144:9 158:15
159:14,25 160:4

167:21 175:5,7
177:6,19 179:25
181:20,24 183:8,22
184:24 186:11
187:15 194:6
205:22 206:1,4
**career**
19:1,6 151:15,18
**careful**
17:20 50:10 63:2
93:20
**carefully**
15:17
**caring**
38:7
**carries**
90:23
**carry**
16:22
**Carter**
161:1,2,10
**case**
4:6 6:10,14 7:24
22:19,20 23:15,16
24:24,25 25:2,6
27:4,9 30:3 37:24
45:5 47:18 48:25
54:7,15 74:15 78:2
78:12 79:14 84:11
84:17 85:3 87:22,25
112:16 143:23
162:16 170:18,23
**cases**
172:22,23 186:1
**Castle**
188:12
**categorically**
140:6
**Catholic**
1:12 4:5
**caught**
30:23 200:8
**cause**
65:16 74:14 131:9,18
150:21
**caused**

81:11 152:17 201:2
**causing**
175:8
**cautioned**
171:13
**center**
36:23,24 37:2,12,21
37:21
**Centers**
161:3
**central**
54:7,14
**Centura**
1:12 56:5,7,20 57:18
89:6,20 93:2 100:23
102:9 103:1,23
104:6,10,16 105:12
105:15,23 106:1
107:6,12 109:6,13
110:18 111:3,5
113:8 114:3 116:2
117:17 118:13
158:21 159:4
160:19 161:24
177:24 179:6 180:5
187:8,14,14 189:10
190:5,11
**Centura's**
114:2 115:18 180:16
**certain**
27:18 40:18 65:14
99:12 173:18
188:21
**certainly**
22:13 65:24 72:21,22
149:6 154:14
166:23 182:9
186:10 189:17
**CERTIFICATE**
211:1
**CERTIFICATION**
210:1
**Certified**
1:17
**certify**
210:4 211:6,16



cetera
 21:22,23 120:12,12
challenge
 22:23 23:19 195:12
challenged
 195:17
challenges
 25:6 38:11 187:13
   196:3
challenging
 16:2,25 155:14
chance
 42:9 94:5
change
 78:15 79:8,22,24
   80:6 88:24
changed
 72:25 75:22 80:2
changes
 10:19 175:19
character
 10:13 11:1 44:2
characteristics
 167:12
characterization
 130:22
characterize
 126:24 127:7 169:6
charge
 34:2 77:12,14
chat
 12:11,15 45:16,20
   50:22 52:8 112:22
   123:9,11 124:18
   181:8
check
 49:16 103:12
checking
 9:7
chief
 24:20
child
 143:3 147:8
children
 44:10,14 157:15,20
Chitra

138:18 150:5 164:24
choice
 148:22,25 193:17
chooses
 26:5,15
choosing
 149:22
chose
 120:24 162:4 193:10
chronology
 55:8
chunks
 26:11
circumstance
 20:15 40:8
circumstances
 39:22,25 40:6,14
   66:1 69:10,21 72:8
cite
 120:22
cited
 9:4 172:23
city
 37:13 211:2
Civil
 1:3 5:1
claim
 171:12
clarification
 78:6
clarify
 131:23 198:16,21
   199:11 206:8
clashing
 188:17
classification
 125:17,22 126:22
   206:17
classifications
 125:6,14,20
clear
 21:22 76:19 81:20
   165:19 168:18
   196:24 197:17
clearance
 112:14

clearer
 201:15
clearly
 194:22
client
 42:11 95:6
client's
 25:2,6,11,13,21,23
   26:5,15,22
clinic
 97:14 113:8 145:20
clinical
 63:8 122:2 160:9
   167:7 177:9 201:16
close
 17:15 86:1,6 146:6
   186:19
coat
 191:18,24
cognition
 163:22
collateral
 52:2
colleague
 52:1,2 84:20 139:6
colleagues
 51:23 186:7
colloquial
 17:19 21:6
Colorado
 1:2,12,18 4:6,8 5:1
   8:15,20 20:1 31:1
   37:8 47:22 48:8
   52:3 55:23 57:15
   62:2 120:16 134:14
   135:11 154:11
   166:14 167:17
   190:16 204:15
   210:15 211:1,6
come
 17:16 24:20 37:20
   66:11,11 166:1,6
   173:7
comes
 19:12 21:1 24:10
   167:14 191:5,10

 199:25
comfort
 194:7
coming
 19:22 20:17 37:8
   69:22 142:22
commencement
 211:7
comment
 16:4 168:8
commission
 210:19 211:22
commitment
 10:12 11:1
committed
 44:19
committee
 8:20 19:24 21:16
   117:6,11
committees
 127:11
communicate
 67:16 105:4,12,23
   106:20 108:14
   113:21 138:5 156:5
   156:19 157:9
   160:19,20 161:24
   162:2 180:22
   205:14
communicated
 82:4 108:16 177:24
   187:8
communicating
 79:12 108:3 128:14
   136:19 158:21,23
   159:4 160:21
   180:17 187:14
communication
 84:12,13 95:17
   101:15 103:5
   138:24 139:16
   140:23 157:19
   158:9 176:12
communications
 32:9 33:8 86:1 125:1
   164:3 172:11 178:1


MAGNA
LEGAL SERVICES

178:4,6,7,13 180:4 180:6 190:5

**community**
152:6

**compensation**
29:17 70:3 93:21

**competing**
89:11

**complaining**
183:24

**complains**
195:24 200:22

**complaint**
8:15,18 24:21 33:15 33:16,22,23,25 34:3 34:6,8 76:8,11,22 77:1,4,5,6,9,17 78:1 78:11,17 79:2 80:17 81:1,3,10,11,15 83:12 85:9 86:25 87:2,8 88:7,10,13 92:15,19 94:20,21

**complaints**
30:21,22 76:3,13 77:20 144:21 145:14 146:23 164:12 183:1 188:10

**complete**
6:16 18:1 104:18 110:19,21 204:8 205:8

**completely**
121:10,18 148:15 179:7 200:1,25 202:25

**complicated**
154:20

**comply**
39:6,17 99:25 100:12

**comprehensively**
12:20

**compromised**
121:21 148:18

**concentrate**
156:5,19 157:9

**concentrating**
79:12

**concentration**
128:15

**concern**
94:23

**concerned**
108:9 165:8 203:5

**concerns**
138:21,23 139:11,14 139:15,19 146:2 163:21,25

**conclude**
17:10 64:22 65:5,16 66:7 105:3 131:10 141:10 150:23 151:3 162:1 164:15 206:19

**concluded**
72:17 116:22 128:1 168:10 206:10 209:7

**concludes**
208:25

**conclusion**
120:3 150:22 199:6 205:13,17,20,21

**conclusions**
17:1 41:4 45:12 62:8 140:3 149:17 150:11

**concussion**
203:8

**condescension**
46:18

**condition**
41:25 42:6,23 49:3 51:12 57:20 58:9,10 107:1 117:15 118:5 118:6 120:3,4 122:14 123:4 134:5 134:12 166:24 168:6 175:14 203:10

**conditions**
11:22 47:3 79:10

167:23

**conduct**
48:10 51:11 118:11 172:3,5

**conducted**
36:10,17 86:15 172:8

**conference**
32:5

**conferences**
32:5,12

**confidence**
189:23

**confident**
154:14

**confidential**
70:25

**confidentiality**
71:2

**confirm**
45:17 52:15 128:20 128:22 166:24

**confirmed**
158:11

**confirming**
100:24

**confirms**
135:21

**conflict**
61:25

**confusion**
40:11

**conjunction**
100:25

**connection**
81:3 92:1 198:4 199:1

**consensus**
126:1

**consequences**
65:18

**consider**
26:25 140:1

**consideration**
20:4 113:25

**considered**
125:16 154:8

**consistent**
57:24 170:1

**consisting**
211:13

**consists**
209:1

**constantly**
201:20

**constituted**
97:7

**construed**
186:3

**consultant**
165:21

**contacted**
27:4 28:14 32:10

**contain**
29:2,8 36:13,16 103:24 104:7

**containing**
39:4,15

**contains**
16:17 45:11 119:21 119:24

**contemporaneous**
192:6

**content**
15:20

**context**
20:8 22:6

**contingent**
87:17

**continues**
140:21

**continuing**
112:8

**contract**
69:22 73:20 85:5 88:17 89:5 90:5,7,8 91:19 93:12 101:17 102:2 160:22

**contractor**
103:3

**contracts**
184:1 205:15

**contractual**


MAGNA
LEGAL SERVICES

70:2 72:1 93:1
**contradicted**
 17:2
**contradicts**
 16:23
**contrary**
 25:12,22 26:5,14,22
  148:7
**contrast**
 138:3
**controversial**
 126:21 127:1,8
**controversy**
 211:9
**conversation**
 28:20 29:13 30:1,18
  31:7
**conversations**
 119:11 178:18 182:1
  182:6
**convince**
 73:14
**copies**
 35:23 36:9
**copy**
 8:20 12:19 33:15
  78:11 123:15
  207:22
**corporate**
 184:20
**correct**
 18:8,9 22:10 27:10
  41:8 43:16,17,20
  46:5,10,24,25 49:4
  49:19,20 51:1,18
  67:2 69:25 76:10
  78:12 79:3,17 80:22
  81:12 82:12 83:5
  86:16,17 87:23 88:7
  93:17 94:17 96:13
  96:22 97:18 98:9,16
  98:22,23 99:22,25
  100:12,13 101:22
  101:23 103:10
  108:6 109:17
  110:15 111:5,6,12

113:18 114:14,16
114:20,22 115:15
119:23 120:20,21
124:24 126:3,11
130:13 134:18,19
134:24 139:8
148:13 153:6,7
156:14 157:4 167:4
167:24 168:12,13
169:13,14 170:13
170:23 179:4,5
182:14,15,18
184:21 185:15
187:1 192:9 194:24
197:24 200:18
202:5 203:15,19,20
205:10,11,18,19,23
206:4,5,11,23,24
207:1,8,11
**correctly**
 55:8 72:24 126:8
  129:5 134:15
**correspondence**
 100:24 102:7
**counsel**
 4:16 41:15 117:8
  119:16 178:20
  211:17
**counseled**
 147:19
**counselled**
 163:8
**counsels**
 117:9
**country**
 98:5
**county**
 210:15 211:2
**couple**
 9:6 30:21 186:16
**course**
 21:21 82:7 145:20
  146:8 169:9 200:20
**court**
 1:1 4:7,11,23 5:22
  7:12,13 8:15 10:4

 39:14 59:13 211:5
  211:24
**covers**
 122:12
**CPA**
 8:20
**CPH**
 21:15 47:22 48:22
  52:3 57:15 135:9
  136:5 154:10
  190:16
**CPHP**
 3:8 50:16 51:14,20
  129:8,20,23 138:8
  138:12 139:3,11,19
**credentialed**
 110:4 115:22
**credentially**
 110:11
**credible**
 120:25
**crisis**
 193:1
**criteria**
 15:23 91:7 150:23
**critically**
 15:2
**culture**
 152:6
**Cureus**
 3:21 126:11
**curious**
 59:13
**current**
 15:4 85:11
**currently**
 130:5,9
**curriculum**
 3:13 12:6 13:21
**cut**
 86:5 144:11 151:25
  194:11
**CV**
 12:19,25 13:1 19:4
  45:25 46:5,7
**C-r-u-s**

 126:12
**C-u-r-e-u-s**
 126:13

___

## D

**D**
 3:1
**daily**
 38:7,13 133:18
  140:24 141:11
  155:17 196:15,19
  196:25 197:20
  198:5 199:1,7,13,17
  201:24 202:5,7
**damaging**
 45:4 141:25 142:7
**dancing**
 204:7
**dangerously**
 86:1
**data**
 16:23,24 29:16,25
**date**
 86:12 89:5 109:9,17
**dated**
 8:3 46:7 77:6 101:21
  101:23
**dates**
 85:24 98:10 176:14
**day**
 15:18 55:7 83:4
  86:15 121:15 125:1
  130:9,18 187:1,2
  209:8 210:16
  211:21
**days**
 97:18 130:10,19
  204:6
**deadline**
 85:11
**deal**
 198:9,11
**dealing**
 145:23
**Dear**
 178:21


**MAGNA**
**LEGAL SERVICES**

death
143:4
decades
66:11 151:7 152:14
169:1
December
1:6,17 3:2 4:10 28:18
209:8
decisions
107:21 109:1 178:21
181:2
dedication
44:8
deeply
25:11,21
defendant
1:16 2:5 172:3
defendants
1:13 4:4,6,19 87:5
defendant's
171:12 172:5 180:19
defiant
112:1 179:9
definition
118:7
degree
167:18
delay
83:2
demand
8:16 33:17,23 34:7
demanding
18:12
demands
121:20 148:17
168:16
demeanor
144:22
demoralization
169:4
den
200:2
denied
70:18 138:22 139:13
140:6
Dennis

160:25 161:2,9
Denver
2:4,7 37:24 211:2
deny
137:6
depending
35:14 185:11
depends
16:5 17:17 143:10
152:5
DEPONENT
77:6,10 173:25 174:3
204:18 210:1
deposition
1:5,16 3:6,23 4:3,9
5:13 6:1,5,6,8,15
7:3,12 11:23,24
12:13 38:20 45:21
46:19 47:25 50:20
52:10,17,24 95:21
96:16 97:1,25 101:7
123:10 124:19
126:5 160:13 170:8
170:18 173:18,19
173:20 209:1 210:5
211:10
depositions
5:16,18 6:7 9:7,8
depress
167:7
depressed
24:21 201:21
depression
58:20,23 122:2
138:21 139:12
167:18 172:4 191:1
192:2 201:22
descended
65:20
describe
35:16 36:22 37:1
172:21
described
24:14 169:6
describes
120:7 175:6

describing
67:21 183:14
descriptor
185:14
desire
94:23 100:15
desk
200:4,7
despite
44:8 204:22
detail
37:5 119:9,10 146:15
146:18,21 160:9
184:8 186:9 189:20
detailed
13:11 49:3
details
92:6 160:8
determine
28:7 39:1 41:24 42:5
154:24 171:5
devastating
183:17
devoted
19:6
diagnosed
142:18 163:2 167:22
172:2,4 206:7,14
diagnoses
172:24 192:7
diagnosis
126:20 127:1,8
163:12,15 172:20
206:11,22
diagnostic
125:5,14,20 191:25
206:16
dichotomy
178:15
diet
63:3
difference
20:25 169:7
differences
73:5
different

10:19 21:14,21 22:20
23:16 24:12 71:20
74:19 77:20 164:11
176:23 182:20
188:16 193:8
202:17
differently
24:11
difficult
178:6
difficulty
136:12,18 140:22
199:23
dig
92:7
digitally
15:21
digs
25:11,20
diligent
64:14
diligently
25:4
dinner
200:1
direct
73:10 97:5,12 124:12
204:24
directed
11:8 69:6 78:14
80:16 81:1,14
directions
58:13 60:15,19 63:19
64:15,21 65:4 79:4
directly
9:10,14 52:4 198:2
disability
54:3,17 72:9 96:2
118:3,10 122:19
123:4 131:10,19
132:1,11 158:13,20
159:3 160:19 163:3
163:9,12 164:17
165:6 166:3 205:22
207:6
disabled



116:23,24 117:2,18
150:23 151:3 162:2
**discharged**
166:18
**disclosed**
112:20
**discount**
26:6,16 140:9
**discovery**
39:1
**discrimination**
34:2 75:18 77:13,15
78:16 79:14,21 81:4
81:12 116:25 117:4
**discuss**
67:24 104:21 106:6
**discussed**
11:22 29:13,20 103:1
**discussing**
102:1 172:23
**discussion**
67:17 72:14 86:14
101:11
**disease**
38:4
**disorder**
63:12 122:3 167:8
190:21 192:11
**disorders**
122:4 167:8
**dispute**
49:9 51:4 111:16
115:13,16
**dissolution**
89:9
**distinction**
178:3,12
**distress**
169:25 170:12 173:2
**distressed**
175:15 176:17
**District**
1:1,2 4:7,8 8:15,15
**disturbance**
133:17 134:13
135:24 136:1,5

140:13
**doctor**
23:2 55:4 61:24
66:24 95:24 99:7,8
99:10,20 113:2
121:5 147:5,8
150:15 152:13
155:3 160:15
175:23 191:19
**doctors**
44:21 60:6 61:2,6
66:15 88:25 89:3
149:5,6 151:15,19
151:22 152:7
153:12 162:24
168:24 180:5
185:24 186:1
189:20 190:2,3
200:5
**doctor's**
65:19
**document**
34:4 51:1,4 53:3,7
76:12 77:22 87:9
101:24 103:15,18
**documents**
7:23 31:15,17,18,23
33:14 34:14,19
41:14 49:3 76:7
86:24 129:2 160:22
**DocuSign**
104:9
**doing**
11:15 20:9,10,13
67:1 75:15 112:7
119:25 132:17
150:10 152:8,18
155:2,7 156:24
160:3 165:13,22
200:13 204:12
**dollars**
22:21 23:17 24:3
**door**
21:3
**dose**
63:14,14

**Dr**
1:8 3:7,10,18,18,20
3:20 4:4,21 5:8,12
8:4 12:15 24:5 27:8
27:12,13,16,22 29:4
30:12,13,25 34:22
34:22 35:3 36:14,21
36:25 41:15,23 42:4
42:23 43:15 44:24
45:4 47:3,15,16,17
47:19,20,24 48:7
49:10,15,23 51:20
51:23 52:12,13 53:4
53:4,25 54:1,6,13
54:16 55:4 56:6
57:13,17,25 58:7,8
59:4,19,20 60:4,15
62:7,7,15 63:18
64:15 66:25,25
68:11,20 69:11 70:2
70:3,8,17,17 71:1,4
71:4,17 72:1,2,15
72:15,20,22 73:2,17
73:22,25 75:14
76:10,23 78:18
79:10 82:7 83:5
85:10 86:16,20,20
87:3,5,9 88:16,23
89:12 90:1 91:15
92:12 93:1,8 94:14
95:6,8,15,22 96:5
96:19 98:2,9,16
99:5,8,13 100:15,23
101:1 102:10,13,22
102:25 104:9,17,20
105:3,3,10,20 108:1
110:19 112:25
113:2,10,23 114:1,5
114:17,24 115:9
116:6,22 117:5
119:16,18,25
122:14,19 123:4,16
124:2 128:2,17
129:19 130:12
133:16 134:5,11,14
135:23 136:1,12,18

136:23 137:7,9,16
138:3,18 139:18,20
140:17 141:3
143:23 147:1,22
148:10,21 149:11
149:12,16 150:5
151:9 152:25
153:15,24 155:13
156:15 157:7 158:8
158:12,19 159:2,12
159:15,23 160:18
161:5,9,23 162:12
162:14 163:1,2,7,12
166:6,16 168:9
169:11,23,25
170:13,23 171:20
171:22,25 172:2,4,6
172:10,12 173:7,10
173:12,17 174:2,13
174:17,19,23,24,25
175:4,13,18,19,25
176:23 177:17,19
177:23 178:4 179:3
179:7,19,25 180:1,3
180:10 181:12,13
181:17,18,18,19
182:6,12,17,19,21
183:7,13,14,24
186:5,6,21,25 187:7
187:13 188:10
189:8 190:7,17,25
191:14 192:6 193:9
194:15,17 195:13
195:18,19,22,23
196:6,14 197:7,19
197:22 198:15,24
199:12,16 200:16
200:21,22,22,23
201:3,15,23 202:4
203:14,16,17
204:17,21 205:13
206:7,15 207:22
**draft**
103:23 104:6
**draw**
199:5



**dress**
 156:5 157:9
**dressing**
 128:14 136:24
   140:25
**drive**
 37:23
**DSM**
 206:16
**DSM5**
 125:17,22 126:22
   127:2,9,10 206:11
   206:22
**due**
 74:10 116:11 183:11
   200:25
**duly**
 211:8
**duplicate**
 76:24
**duplicative**
 90:2 91:14,20
**duration**
 154:13 162:14
**duties**
 38:13
**D/B/A**
 1:12

_____

**E**
_____
**E**
 2:1,1 3:1
**earlier**
 20:5 76:6 83:14 85:5
   95:21 106:12
   109:12 133:19,22
   139:7 145:17,18
   151:15 158:11
   166:1 167:5 175:24
   176:13,15 181:16
   185:3 188:7,23
   190:19 204:21
   206:13
**early**
 84:2 100:24 151:18
   200:7

**earn**
 149:15
**earning**
 148:4
**easier**
 127:19
**easy**
 9:24 17:25
**eat**
 156:5 157:9
**eating**
 128:14 136:24
   140:25
**eats**
 200:1
**edge**
 186:19
**editor**
 17:19 141:5
**editorial**
 13:2,12,24 14:4,16
**educate**
 188:18
**effect**
 206:16
**effectively**
 180:17,22
**effort**
 141:1
**egg**
 148:4
**eggshells**
 186:18
**eight**
 69:18 72:16 196:19
**either**
 17:25 24:5,5 42:14
   49:13 55:5 71:23
   94:18 100:17
   104:20 109:19
   188:3 191:17
**either/or**
 25:7
**elaboration**
 9:11,15,20,24 10:1
   35:21

**electronic**
 133:2 207:20,21
   208:17
**electronically**
 83:12
**elements**
 74:13,22
**email**
 3:11 28:21 29:2,7
   54:2 57:8 69:12
   82:4 83:15,16,21,23
   84:4,6,17 85:15
   95:24 96:19 97:7
   98:3,18 161:8
**emails**
 3:15,16,17 29:10
   175:24
**emergency**
 175:5 179:25
**emotional**
 142:1,8 143:1 169:25
   170:3,12,12,22
   173:2,11
**emotionally**
 142:15 172:17
**emphatic**
 63:23
**employ**
 101:1 111:9
**employed**
 88:17 89:3,4 119:1
   211:16
**employee**
 89:20,21 105:14
   106:1 107:8 109:7
   109:15 111:5
   115:21 120:5
   168:20
**employees**
 89:6
**employer**
 111:4 112:4 118:17
   169:11
**employment**
 56:5,15 67:18 104:18
   104:21 105:5,14,25

 107:22 108:3 109:1
   112:8,12 118:9,13
   118:18 120:11
   143:6,8 161:25
   162:3 173:4 179:3,8
   179:9,19 180:7,7,9
   184:1 190:6
**enables**
 15:1
**encountered**
 119:6
**encounters**
 26:14
**encouraged**
 165:16
**ended**
 114:22 154:15,24,25
   157:14
**ends**
 161:14,14 170:18
   188:6
**engage**
 67:17 112:12 122:20
   123:5 158:13
   159:13,24
**engaged**
 38:7 69:3 117:7
**enjoy**
 165:3 166:22
**enjoyed**
 120:14 150:10
**enter**
 85:4 89:4
**entire**
 32:14 166:9 174:15
**entirely**
 152:17
**entirety**
 45:23
**entity**
 110:11 161:4 187:22
**environment**
 168:21 185:24
   205:23,24
**equivalent**
 120:11


MAGNA
LEGAL SERVICES

**Eric**
113:6
**errata**
207:22
**especially**
24:2 66:13 119:1
142:22 151:23
204:4
**essential**
60:7 62:21
**estimated**
5:17 33:5
**et**
4:6 21:22,22 120:12
120:12
**ethic**
168:24
**evaluate**
24:11 39:21,25 40:6
40:8,13 78:14
**evaluated**
108:23
**evaluation**
21:17 50:8 51:20
136:2,6 154:24
172:8
**evaluations**
19:24 20:2,11
**evaluator**
79:20
**eve**
28:8
**event**
7:11 183:15
**events**
141:25 142:3,6
146:17 170:22
**eventually**
79:10
**evidence**
16:17,23 17:2 18:4
25:11,12,21,22 26:4
26:14 41:21 73:13
74:6,14 102:25
107:24 118:22
119:11 125:7,15,21

125:25 148:7,24
153:15 166:5 188:8
188:24,25
**exact**
189:10,11 206:15
**exactly**
28:5 136:17 145:8
182:1,6 191:23
**exam**
49:17
**examination**
3:1 5:6 47:6 48:11
174:4 204:19 211:7
**examined**
136:2 167:21 168:10
**example**
15:9 65:17 171:23
186:5 187:19 189:4
189:7,13 200:15
206:2
**examples**
16:21 160:2
**excellence**
17:7
**excellent**
137:18
**exception**
29:17 166:13
**exchange**
103:10
**exchanged**
100:23
**exchanging**
184:2
**exciting**
185:4,15
**exclusively**
182:13 206:3
**exercised**
144:12
**exercising**
62:25 63:3
**exhaust**
6:25
**exhausted**
195:24 199:25

201:13
**exhaustion**
58:9 124:3,10,14
152:17,22 153:1,6
153:19,24 154:25
169:8
**exhibit**
3:7,8,9,10,11,12,13
3:14,15,16,17,18,20
3:21 12:5,11,13,15
45:17,21 46:5,16,19
48:20 50:19,20,24
51:1 52:7,10,15,17
52:23,24 69:12 91:3
96:15,16,24 97:1,23
97:25 98:4,12 101:6
101:7,8 112:22
119:20 123:9,10,15
124:19 126:4,5,6
129:7,8 132:20,22
133:25,25 134:1,10
134:18 137:8 138:8
138:11,12 160:11
160:13,15 161:18
181:6
**exhibits**
3:6,23
**expand**
37:17,22 197:15
**expanded**
197:12,13
**expanding**
13:9
**expands**
198:13
**expect**
58:12 107:6,7,12,15
112:7 131:6 132:16
155:22
**expectations**
40:9
**expected**
15:24 71:15 193:15
193:16
**expecting**
113:14

**experience**
12:21 13:2,24 16:3
36:3 60:6 66:16
142:7,14 151:1
168:15 192:6
**experienced**
170:1 173:1
**experiencing**
38:10 155:16 177:7
177:20 180:11
189:9 193:21
199:17 201:7
202:22 203:18
**expert**
3:10 18:11,14 20:16
24:25 25:10,14,20
25:24 26:4,7,13,17
26:21,25 27:9 29:20
38:19 39:6,17 40:13
41:12 79:7,20,21,24
116:4,19 120:22
122:13,18 123:3
158:11 159:5
171:16 172:7
**expertise**
13:4 42:19 151:24
**experts**
39:3,15 121:1
**expired**
56:8,21 57:19
**expires**
210:19 211:22
**explain**
37:4 58:18 107:17
147:4 197:5
**explained**
32:23
**explains**
75:25 108:18,18
**explanation**
66:3 120:19 159:16
**explore**
17:6
**explored**
94:8
**express**



170:3 189:21
**expressed**
39:4,16,20,24 40:5
40:15 94:22 100:15
170:7
**extended**
184:11
**extending**
184:3
**extension**
133:18 136:16 140:5
140:21
**extensive**
13:1,24 48:8 50:25
136:6
**extra**
149:5
**extreme**
177:5,11
**e-file**
76:21
**e-transcript**
208:11

---

**F**

**F**
1:5,16 3:1 5:3 210:3
210:11,13 211:7
**fabrication**
134:21
**face**
19:14 20:20
**faced**
26:4,14,21
**fact**
24:8 44:9 52:19
56:14 69:17 72:15
75:25 96:3 100:14
100:23 101:25
102:25 103:22
104:6,16 108:17
124:6 131:9,13
132:6 148:10,11
150:20 159:16
161:2 166:21 173:5
176:11,24 183:25

185:15 189:10
**factors**
118:20,22
**facts**
29:16,25 40:14
116:14 135:22
**factual**
84:6,11,13,16,25
105:2
**factually**
30:17
**failed**
69:21 117:17,19
**Failure**
16:21
**fair**
71:11,13,21 119:13
119:14 142:24
143:18 172:6,10
175:20 180:12
182:17 186:12
**fairly**
126:24 127:7
**faked**
174:25
**faking**
174:14 176:25
**fall**
113:7
**falling**
203:7
**falsify**
177:8
**familiar**
5:13 30:13 93:24
139:10
**family**
44:13,21 68:8 204:3
**far**
120:6 146:5
**fast**
200:3
**father**
44:19
**fatigue**
144:20

**fault**
132:4
**favor**
140:10
**fear**
186:3,14
**February**
8:12 31:19,25 34:5
41:7,11,18 44:25
45:13,18 46:3 80:12
82:18 133:23 134:9
**fed**
99:25
**federal**
7:15 39:3,14 93:20
100:12 110:5
180:20
**fee**
87:18
**feel**
36:16 42:13,15,16
60:13 92:9 116:18
131:2,2 132:12,16
133:3,9,10 140:14
140:15 168:16,20
168:21 169:5 174:9
185:17 186:17,18
188:1,2 190:7,18,18
204:6,8
**feeling**
24:15 42:11 54:25
67:25 72:22 118:23
132:10 140:21
154:4 168:20 176:5
176:16,21 178:22
183:3 186:16
189:13,18,18 194:9
200:25 202:24
**feelings**
72:17
**feels**
9:23 36:3 107:16
120:8 162:23 168:3
**felt**
21:6 31:2 37:16
54:25 58:4 65:8

70:10 71:10,12,16
145:22 168:11,12
190:17
**field**
13:3 15:2 30:9
**fifth**
16:14
**figure**
13:9 102:6
**file**
7:25 28:8 103:17
**filed**
77:1,22 78:11 86:25
87:2,3 171:11
**files**
71:24 209:2
**fill**
110:1
**filled**
137:8
**final**
56:4,15 75:5 77:19
**finalizing**
92:25
**finally**
10:4
**find**
15:19 16:1 17:21
90:15 120:11
126:15 144:1
157:12 163:19
**finding**
190:20 191:13
195:12,18
**findings**
163:19 172:9 182:25
**fine**
9:1 22:1 42:12 95:9
105:19 191:22
208:17
**fingertips**
139:24
**finish**
23:4
**finished**
53:21 104:22 118:15



125:3 208:25
**firm**
27:6 33:8 171:11
**first**
11:24 15:6 21:18,19
22:13 24:17 27:3,12
27:16 28:14,22
32:10 33:9,14,16,22
35:5 37:1 43:20
61:6 63:21 75:23
76:1 78:10 79:25
80:7,10 86:18 90:16
90:17,21 94:16
96:20 97:6 98:19
102:16 134:10
135:19 137:17
140:11 144:4
164:10 165:8
172:12 176:9
178:11 182:23,24
195:11,11 201:11
204:21 207:23,25
208:1,1
**first-generation**
147:10
**fit**
154:21 164:9 194:17
**fitness**
155:22
**five**
63:7 157:25 200:3
**five-minute**
95:4
**fix**
197:14
**flavor**
22:12
**flowed**
203:19
**focus**
73:9 184:14
**follow**
58:13 63:7,18 189:22
**followed**
166:6
**following**

4:25 64:14 91:17
135:22 140:10
181:13
**follows**
5:5
**fond**
73:23
**fondest**
72:17
**foregoing**
210:4 211:14
**foreign**
66:15
**forget**
9:24
**form**
20:22 22:25 23:21
25:15,25 26:8,18
36:15 40:1 47:12
48:14 49:5,25 51:16
53:9 54:9 56:9,22
58:15 60:21 62:9
63:20 64:17,23 65:6
66:9 68:21 69:7
72:4 74:8,16,25
80:19 87:12,20,24
89:24 90:10 96:6
97:19 98:17 100:1
100:19 101:2 102:4
104:1,13,24 105:16
106:8,16 107:9
108:7 109:2 111:17
112:17 113:16
114:6,11,18,25
115:6,24 117:20
119:3 122:22
131:11,15,20
132:13 137:8 141:6
141:13 142:9 147:3
149:18,23 150:17
150:24 151:12
152:3,11 153:12
159:19 162:7,17
163:5,13,16,23
164:2,18 165:7
166:11 167:2,25

170:5,14 174:22
175:9 177:14
179:12,15 184:5
187:17 189:6,15
190:12 193:24
196:11 197:3
202:14 203:1,12
206:12 211:13
**formations**
155:15
**forming**
192:24
**forms**
17:3 38:11 142:21
**forth**
48:13
**forthcoming**
38:21,22
**forward**
3:17 6:14 97:8,9
170:16 173:6
176:18
**found**
18:3 83:15 125:17,22
132:20 176:18
**foundation**
23:1,22 47:13 48:15
49:6 51:17 54:10
56:10,23 74:9,17
75:1 89:7 96:7
97:20 100:2,20
101:3 102:5 112:18
113:17 114:7,12,19
115:1,7,25 119:4
122:23 131:12,16
131:21 132:14
142:10 149:19,24
150:25 151:13
152:4 162:8,18
163:6,17,23 164:3
164:19 165:7
166:12 167:3 168:1
170:6,15 179:16
189:16 190:13
203:2
**four**

16:11 63:7 165:14
**fourth**
16:14
**frame**
82:18 145:9 179:18
179:22,24 180:1,3
180:10 190:10
**framed**
107:14
**frames**
178:25
**FRANCIS**
1:12
**frequently**
195:23,24
**fresh**
172:12
**friendly**
190:18
**friends**
204:3
**front**
7:24 53:1 97:2
136:20
**fulfill**
14:25 117:17
**full**
5:9 50:15 110:20,23
**fully**
6:25 39:21,25 40:6
40:13 183:3
**functions**
136:25 201:25
**further**
9:11 78:17 133:17
149:9 159:16
173:22 183:13
207:12 211:16
**future**
23:12 107:22 176:3

---

**G**

**gain**
22:17
**game**
172:6,10



gap
82:20
gather
85:19 90:4 109:5
118:23
gathered
44:23
gathering
43:13
general
13:11 27:23,24
108:10 137:18
141:24 142:14
182:25
generally
35:19 125:10,25
143:20 178:17
185:8
generated
136:6 140:4 147:21
generation
188:15
generically
125:11
genuine
175:4,13,18
getting
35:21 150:17 167:14
176:1 196:19
199:24 203:8
give
6:9,14 15:19 19:14
20:20 30:17 36:4
49:17 60:20 81:5
84:7,17 103:11
159:16 160:12
162:10 171:7
given
5:15,18 16:10 30:1
40:23 64:24,25 66:1
76:2,5 79:5 89:13
151:14 154:10
155:20 173:9
202:21,22 211:15
gives
7:16 42:9

giving
5:13 21:24 188:1
glance
17:19
glean
182:12
glitch
59:4
go
7:21 11:24 15:22
20:24 23:13 46:14
52:14,23 83:20
90:13 91:9 98:25
101:14 129:12
131:3 133:3 143:13
154:19 161:16,17
169:18 173:6
174:17 176:20
177:1,5,11 182:22
183:2 191:8,25
195:8 198:19 200:8
200:24 201:13
207:18 208:13,22
goal
37:10
goes
130:6 161:16 192:1
200:1
going
4:14 9:9 13:10 14:7
17:15 24:16 26:9,19
29:15 31:10,14 40:2
50:18 52:14 55:1
74:17 86:5 88:24
89:10,11,13 96:14
105:17 106:6,19,20
107:8 109:7,14,23
111:21,22 112:19
112:21 113:21
114:23 115:11,20
116:22 117:1
118:13,15 122:1
143:16 148:23
166:13 169:15
170:16 180:24
183:1,3 184:12

188:3,17 189:14
191:19 194:10,11
197:9,14,23 199:20
199:22 200:24
202:3,23,24 203:3,6
Gold
30:12,14
good
50:3,3 58:5 59:2 62:5
97:5 147:11,15
148:23 154:9
155:21 195:3
gosh
65:23
governs
93:21
go-to
204:5
gray
102:17
great
37:5
greater
22:8
green
154:10
grief
143:13
grieving
120:11
groom
156:5 157:9
grooming
128:14 136:24
140:25
group
62:2
groups
187:21
guarded
21:19
guess
37:24 65:22 84:24
142:11 163:18
188:23 207:25
guessing

19:1 143:5
guidelines
15:25
guilty
186:17
gun
21:7
Gunderson
117:5 166:16
guy
194:5

_____

H

habit
192:24
half
200:6,6 204:6
Hall
2:2
Halpern
32:19 33:3 82:4
83:25 84:8,17 85:16
hand
186:8 188:2 203:4
handle
194:19,23 208:3
handling
177:10
Hang
81:5 98:10 133:5
207:15
happen
7:20 89:17 121:19
148:16 166:10
203:25
happened
82:22 144:25
happy
150:10 187:25
hard
31:1 44:10 101:13
102:17 107:1,13
142:16 143:9,19
147:20,24 169:1,1
harm
30:23 175:8


MAGNA
LEGAL SERVICES

**hate**
 66:16
**head**
 10:6 21:7 80:21
   150:2
**heading**
 46:22 133:2 134:4
**heal**
 165:9
**health**
 1:12,12 4:5 8:21
   19:25 20:1 21:16
   30:10 48:8 62:3
   117:6,11 137:17,18
   137:24 144:9
   154:11 163:21
   166:14 190:21
**healthcare**
 19:8
**healthy**
 143:24 144:3
**HEALTH-PENRO...**
 1:12
**hear**
 6:19 36:4 43:8 59:5,8
   59:9 182:6 187:20
**heard**
 44:20 59:13,14
   110:24 144:5
   173:10 188:5
   191:18 208:8
**hearing**
 14:9 144:20
**Heath**
 2:2
**heavily**
 203:22 204:2
**height**
 180:11,14,21
**held**
 4:9
**help**
 7:8 19:8,12 20:18
   22:7 48:19 58:8,10
   60:8 70:22 131:23
   145:11 171:10

 175:16 192:16,18
 193:2,7,22 195:4
**helping**
 12:9
**hereto**
 211:10
**Hi**
 101:12
**high**
 18:16,20 168:16
   191:20
**higher**
 62:24 71:7
**highlighted**
 121:25 126:25 127:3
   128:4,12
**high-level**
 181:1 185:19
**hired**
 7:5 27:7
**hiring**
 71:16
**historical**
 15:4
**history**
 49:16 155:20
**hoc**
 14:19
**hold**
 16:12 29:14 83:17
   84:10 85:25 134:25
   141:18
**home**
 86:9 115:4,10,14
   118:19 199:25
**honest**
 6:16 19:15 20:21
   22:10 118:23
   133:24
**honestly**
 141:3,14 205:2,5,6
**honesty**
 17:4,9 18:5,13
**hope**
 21:23 203:5
**hoping**

 85:4 189:24
**hospital**
 88:25 93:23 94:25
   183:16 184:16
   205:23
**hospitals**
 93:19 114:5
**hostile**
 112:2
**hour**
 209:7
**hours**
 15:18 122:15 128:17
   128:24 130:9,18,19
   131:1,18 132:7
   144:7 147:21
   148:20,25 149:15
   150:9,21 151:4,7,19
   152:7,14,21 153:5
   153:18 155:23
   157:19 169:13
   196:20 200:9
**house**
 119:2
**HTN**
 63:8
**huge**
 144:7
**humor**
 21:10
**hunch**
 60:10 68:12
**hurt**
 172:17
**hurtful**
 171:24
**hypertension**
 62:22 63:8
**hypertrophy**
 201:10
**hypothesis**
 16:18,24 74:7
**hypothetical**
 64:25 65:2,13,17,25
   73:13,14,16 74:13
   74:23 163:7 164:6,8

   181:5
**hypotheticals**
 162:11 179:16

_____

**I**

**idea**
 32:25 149:4
**identification**
 128:5
**identified**
 46:4 137:5,23 140:5
**identifies**
 121:24 167:6
**identify**
 52:13 127:19,25
   136:12,18,23
**ignore**
 26:5,15
**ignored**
 64:20 65:4,14
**ignores**
 141:8
**ignoring**
 16:23 65:19
**ill**
 203:4
**illness**
 70:9,15,19
**imagine**
 67:23 109:22 112:3,6
   148:2 155:21
**imbalance**
 144:13
**imbedded**
 63:4
**IME**
 20:15 171:11
**immensely**
 150:10
**impact**
 137:4,6 138:4 142:25
   162:15 163:3 165:5
   170:3,12,22 173:11
**impacted**
 22:5 149:17,20
   150:11 166:24


MAGNA
LEGAL SERVICES

185:1
**impair**
79:11 134:5
**impaired**
47:3 107:18 128:1
178:5,13,16 196:8
202:7,12,19 205:14
**impairment**
155:17 199:17
**impairments**
199:13
**implication**
197:18 198:4
**important**
6:15 10:7 28:5
105:22 178:3
184:10 190:10
204:13
**imposing**
169:12
**impossible**
197:19
**impression**
77:18
**improved**
157:15,20
**inability**
162:2
**include**
16:21 18:16,21
120:25 122:2
137:22 160:5 167:7
198:13
**included**
8:1 65:24 104:19
128:4
**including**
88:13 114:4 160:21
199:5
**inclusion**
15:9 17:11
**income**
147:23 148:1
**independent**
19:23 20:1,10 21:17
187:21

**Indian**
191:5,10
**indicate**
71:10 97:17 132:11
137:4 175:12 196:3
**indicated**
32:3 63:17 86:8,8
94:15 96:2 99:2
109:12 130:21
137:17 165:25
194:17 199:4
**indicates**
33:12 98:4
**indicating**
174:13 193:9
**indication**
86:14 116:9 155:15
169:11
**indications**
144:1 157:12 175:3
175:17
**individual**
20:6 22:7,16 107:18
112:9,10 143:10
164:22 194:4,9,13
**individuals**
15:2 37:20 121:1
143:12
**individual's**
142:1,7 143:1
**inferred**
150:13
**inferring**
132:2
**influenced**
115:18
**information**
6:9 7:16,24 16:24
19:14 20:20 21:24
22:5 25:1,5 26:22
29:2,8,11 30:16,20
33:2 40:18,20 41:3
43:13 44:22 52:3
64:25 84:6,11,16
85:1 98:20 105:7
106:25 110:14

114:2,10,15 115:18
116:7 130:2 135:23
139:23 140:12
144:2 146:14
157:13 199:16
**initial**
3:5 17:18 29:7,12
30:1,17 44:23 48:20
75:4,5 76:3,14
77:15 103:23 104:6
133:23 134:21
135:3,5 194:6
**initially**
9:19 72:25 73:1
**Initiatives**
1:12 4:6
**injury**
171:13,15,17,20
172:1,16 173:11
**inquiries**
137:16
**insists**
21:11
**instance**
16:1 42:13 63:23
65:19 110:10 185:9
**instances**
17:8
**instructed**
62:7
**instruction**
54:2 96:1 166:6
**instructs**
7:19 23:14
**intake**
22:14 47:15 48:6,20
133:2 137:8
**integrity**
10:11,12,25 11:15,19
12:2 20:4,5 65:9,11
**intellectual**
17:3,9 18:5,12
**intellectually**
14:5,17
**intend**
169:24 170:2,11

171:15 207:9
**intending**
97:17 173:1 177:1
182:13
**intent**
172:22
**intention**
53:5
**interact**
186:7
**interacting**
187:14
**interaction**
184:19 187:3
**interactions**
174:24 175:2
**interdisciplinary**
185:7
**interest**
61:25 148:5
**interested**
211:18
**interpersonal**
138:22 139:15 187:3
**interrupt**
9:25 76:18
**interview**
3:18,20 27:11 34:11
37:1 43:20 44:23
45:3 76:9 78:18
83:5 86:15,20
117:22 119:21
120:2 123:16
138:17 139:3 157:7
172:13
**interviewed**
43:15 55:15 119:17
139:18 157:17
**interviewing**
27:22 42:14 75:14
190:15
**interviews**
8:4 36:10,14 49:13
171:21 177:17
**introduced**
7:12



**investigate**
54:20,23 55:13 92:18
  146:23 149:9
  155:25 157:2
**investigated**
94:8 154:8 155:11
**investigation**
88:12 148:11
**investigations**
45:12
**invoice**
28:9
**invoices**
28:10
**involve**
118:11
**involved**
38:13,14 51:20
  106:13 165:20
**involvement**
27:4 32:15 82:23
  170:18
**Iris**
83:25
**irrelevant**
202:11
**irrespective**
196:25
**irritable**
164:12,16
**issue**
10:11,15 11:4 14:11
  40:17 54:5,7,13,14
  79:13 81:15 93:6
  94:16 99:3 103:6
  111:4 113:10
  170:11 171:6
  180:18 206:11
**issued**
31:24 33:9 39:20,24
  40:5,12 41:2,7
  45:13
**issues**
46:22,23 81:16 92:18
  100:25 104:22
  111:10 118:10

138:22,23,24,24
139:14,15,16
143:23 145:14
146:15,23 160:21
180:23 183:4,12
184:1 201:1 205:22
206:4,8
**issuing**
27:16 32:11 33:6
**Italy**
155:10 165:1 166:21
  176:11
**item**
33:22,22 97:6,13
**items**
34:11 46:13 48:5
  76:6

_____

**J**

**January**
27:12 35:8 82:21
  123:16 211:21
**Jeff**
101:13 102:9,14,23
**Jessi**
30:12,14
**job**
92:10 147:15 154:19
  187:1
**jobless**
154:5
**jobs**
114:5 119:1
**jog**
84:24
**join**
99:20
**joined**
93:8 99:5,7
**journal**
14:20 15:16,24 17:17
  18:23 141:5,12
**journals**
13:3 14:3,14 15:10
  16:5 17:21 125:8
**judgment**

107:20 108:10
**July**
8:3 9:5 33:23 41:8
  46:7,9,15 76:20
  77:5,7,22 82:18,21
  83:3,8,25 84:1
  86:11 91:3 119:17
  124:23 194:25
**jump**
86:2
**jumping**
174:6
**June**
3:17 97:8,9,18 161:1
**jury**
8:16 33:17,23 34:7

_____

**K**

**K**
2:2
**Kathpal**
93:8 99:5,8 149:12
**kept**
150:6,6 179:14
  194:15
**kids**
44:17,18
**kill**
24:21
**Killian**
2:2
**kind**
6:4 10:14,22 11:3,12
  11:15,18 12:1 20:8
  20:15,16 21:25
  51:11 66:18 73:8,9
  92:7,10 93:21
  102:17 119:8,9
  120:13 141:4 142:3
  142:6,14,24 145:11
  147:18 151:16
  160:3,6 161:4
  166:25 169:12
  176:10 184:8
  185:13,19 186:18
  186:21 187:5

188:11 189:23
200:14 205:22
**kinds**
10:22 11:7 17:8 18:4
  35:20 116:14
  141:25 152:14
  185:8 190:1
**King**
188:12
**knew**
38:3 54:24 73:18,20
  73:22 88:16 89:1,9
  140:7
**knife**
186:8
**knocked**
21:3
**know**
10:21 14:19 21:23
  26:19 28:5 30:24
  35:14 37:17,19,23
  41:21 42:2 43:12
  44:1 48:2 50:8
  53:19 56:24,24 57:1
  57:2,3 58:21 60:12
  60:13 63:4,5 64:1
  65:18,20,23 66:20
  68:4,4,8,23 69:5,8
  69:13 70:4,6,14
  71:1 72:20,20 73:3
  74:14,23 85:10 89:8
  91:21 92:6,9 93:11
  93:25 96:15 107:17
  108:8,21,22 109:6
  109:14,21 110:3,12
  111:13 112:1,11,11
  116:15,19,20
  118:19 127:10
  130:16 141:8
  142:21 144:7,24
  145:7,11,11,13,24
  146:3,5 147:9,12,18
  149:22 150:15,18
  151:6,15,16 152:8
  154:3,20 155:2,5,7
  156:24 157:5



160:11 163:19
164:22 165:10,12
165:18,24 166:2,3
166:15 167:18
168:23 170:17,25
171:22 176:10,16
176:17,20 178:17
178:22 181:4,7
182:1,10 186:9,20
186:21,22 187:2,22
187:24 188:12,13
189:17,24 190:15
190:24 191:17,17
191:23 192:1
193:15 194:5,8,15
197:7 198:22
200:16 201:3,12
203:7

**knowing**
57:10

**knowledge**
15:4 57:11 58:24
88:3,4 110:18
141:24 166:10
168:13 185:5

**known**
110:11 118:17

**Koval**
113:6

---

**L**

**lack**
17:3,8 18:4 189:8
199:11

**language**
63:25 140:4

**large**
147:21,22 148:1

**largest**
37:23

**lasting**
118:5,6

**late**
136:10

**law**
33:8

**Lawrence**
2:6

**laws**
94:1 117:1 180:20

**lawsuit**
23:15

**lead**
64:22 65:5

**leading**
145:10

**learn**
24:16 115:19 145:22
159:12 180:15,20

**learned**
42:17 45:2 64:18
65:2,13 75:17 93:9
149:14 155:12
164:25 171:21
176:10 179:6
190:15 197:21

**learning**
128:13 136:19
140:23 185:24

**leave**
53:5,24 54:6,13,17
55:11 56:8,21 57:19
64:20 65:3,15 66:6
68:11 72:3,8,12
73:21 93:2 95:25
104:22 105:11,22
110:20,21,23
111:11,22 112:13
113:22 114:4
118:16 128:18,25
136:3 155:4 159:15
162:14 164:25
165:2 177:9,25
180:2 181:18 187:9
189:12 193:1

**leaving**
21:12

**led**
183:15

**left**
65:20 73:19 122:11
133:2

**legal**
4:13 117:8 209:3

**legislation**
93:20

**let's**
24:7 27:3 35:7 46:14
46:14 75:3 80:4,11
90:13 91:2 96:14,24
101:14 107:5 111:1
121:4 137:7 144:23
160:10,10 178:11
178:21 181:6
191:25 197:6

**level**
155:22

**Lexapro**
58:22 63:14 64:3
191:3 192:12 193:3
193:6

**licensing**
24:18

**lie**
177:5,7

**life**
44:3 47:4 79:11
127:25 134:6 144:3
144:14,16 147:16
185:2 196:9 199:1

**lifestyle**
143:24 188:5 194:8

**lift**
156:4,17 157:8

**lifting**
128:9 136:13 140:19

**light**
101:24 154:10

**limit**
137:24 173:14

**limited**
9:9 205:21,22 207:2

**limits**
147:16

**Lindsay**
2:2 12:8 45:16 46:17
50:18 52:7,14 96:14
96:25 97:23 101:6

**Lindsey**
122:1 124:18 127:21

**line**
86:5 90:16,17,24
91:1,9 96:20 129:23
130:4,6 174:12,20
177:22 179:10
182:23 193:8 196:5
198:12

**lines**
124:1 197:9

**list**
46:13 137:22 156:22

**listed**
8:23 13:12 15:12
31:18 34:4,15 41:14
103:19 117:9
133:19 167:13

**listened**
35:16

**listing**
76:24

**litigation**
57:18 85:4 211:19

**little**
21:10 22:3 32:24
36:7 48:19 66:23
73:9 95:21 100:9
120:6 144:11
157:18 161:20
171:5 178:24 194:9
197:2

**lived**
140:7

**living**
133:19 141:11
143:24 144:3
155:17 185:15

**LLC**
2:6

**loading**
123:12

**loan**
56:17 71:16,22 92:2
93:6,7 99:4,24
100:5,11 101:17



102:2 103:2,8 111:10

**loans**
151:20

**local**
7:15

**located**
209:3

**Locums**
113:9

**long**
68:5 72:12 95:7 110:3,4 122:14 147:21 150:9 169:20 194:15 204:12

**longer**
15:18 19:19 20:11 194:23

**long-term**
118:2

**look**
27:18 28:2,2,3,7,24 43:24 48:19 52:7 58:19 62:11 64:8 68:1 76:21 77:12 80:5,12 82:17 96:24 97:23 101:5,15 112:22 123:8 124:17 126:4 135:6 145:8 160:24 161:7 165:21 168:24 178:20 181:6 182:19 189:21 191:4 194:10,25 195:22 204:5

**looked**
61:21 89:13 112:25 175:22 178:24 179:19 198:1

**looking**
12:4,16 22:17 45:22 52:19 60:6 61:2 66:12 77:18 80:24 90:20 91:3 103:14 107:24 108:6 114:5

118:18 119:1 171:22 176:18 181:8 190:2

**looks**
25:1 124:1 200:3

**lose**
143:12

**loss**
120:13 143:3,5 189:4

**losses**
142:20

**lost**
144:11 172:7 189:23

**lot**
13:10 17:23 25:16 37:7 78:20 108:18 146:18 151:8,18,23 153:3 154:4 177:23 187:7

**lots**
150:21,21 151:3,4

**loud**
53:19

**loved**
150:15

**low**
63:14,14 183:18 192:11 193:3

**lump**
56:16

**Lyman**
2:3

---

**M**

**machine**
211:11

**Magna**
4:13 209:2

**mail**
31:13,14

**mailed**
31:18

**major**
18:2 47:4 79:11 107:21 134:6 196:9 199:1,7

**making**
7:16 37:12 107:21 108:25 141:7 165:15 175:6 191:13

**male**
182:24 191:10

**man**
68:4 117:14 165:22

**manually**
104:10

**manuscript**
14:21 15:3,5,7,13,17 16:19 18:23

**manuscripts**
14:25 15:1,8

**marked**
3:23 12:5 45:16

**market**
115:5,10,14 118:19 119:2 209:3

**marks**
4:1

**material**
34:5 55:14

**materials**
8:24 33:13 34:15 41:14 47:10 48:21 48:22 76:24 77:18 85:9 103:20

**matter**
4:4 10:12 11:1 15:5 193:19,20 194:1,2

**matters**
19:8 66:12 211:9

**Mayo**
145:20

**McDevit**
139:4

**McManus**
2:2 12:8

**MD**
4:3 209:1

**mean**
18:15 24:1 32:13 38:21 40:8 42:12

53:18 54:15 57:2 58:17 61:21 63:25 65:22 67:6 68:12 77:3 84:12,13 90:3 92:9 94:20 109:18 110:7,10 112:4 116:24 128:6 132:1 132:15 146:2 150:16 152:6 154:9 170:16 172:23 176:14,25 178:16 184:7 188:10 200:19 201:6,8,15 207:24

**meaning**
21:9 121:11

**meaningfully**
180:18

**means**
40:22 150:16 192:25

**meant**
67:23 191:24

**measure**
177:5

**measures**
177:11

**media**
4:2 209:2

**medical**
3:7 19:1,12,24 20:2 20:11,18 21:17 41:24 42:5,23 47:22 49:10,16 51:11 52:13,16 62:15 67:3 67:5 79:7,20,21,24 88:2 107:24 112:11 112:13 113:22 125:6,7,15,16,21,25 126:1 138:3,22 139:14 144:6 150:22 177:9,9,18 180:2,2 181:4,11,12 181:18 183:8,22 185:10 186:11 205:24

**medication**



58:22,22 60:7,8
61:14 63:19 64:6,11
66:4 193:3
**medications**
59:20
**medicine**
44:3 49:17 67:7 68:3
68:14 139:20
163:25 165:11
**meet**
21:23 27:15 32:3
**meeting**
3:17 32:8 38:14
89:16 97:8,9 174:19
185:17
**meetings**
32:5 184:12 185:4,6
206:3
**meets**
15:23 150:22
**Mel**
4:18 29:21 74:17
76:17,17 84:10 86:4
94:4 104:3 134:25
141:18 164:3
175:23 179:14
195:4 199:5 207:14
**MELVIN**
2:1
**members**
44:21
**memory**
6:25 84:24 163:22
**memory/cognition**
138:23 139:15
**mental**
70:8,9,18,18,21
107:1 139:13
190:21
**mention**
134:11 135:23
190:24 195:19
**mentioned**
30:3 42:10 51:25
55:16 61:22 145:1
184:13 185:3

192:11
**mentions**
184:8 190:25 192:2
**merge**
187:21
**merging**
189:3
**mess**
201:12
**message**
160:25 161:9
**Messages**
3:9,12
**met**
32:3 43:3,3,4,10 64:9
155:13 206:10
**methodology**
15:23 16:1,4
**metropolitan**
37:23
**Mexico**
155:9
**Michael**
1:5,16 3:1,13 4:3 5:3
5:10 209:1 210:3,11
210:13 211:7
**midcourse**
166:3
**middle**
151:23
**milder**
201:22
**million**
148:4,5
**millions**
22:21 23:17 24:2
**mind**
59:18 95:8 182:9
**minds**
185:17
**minimally**
192:8
**minimize**
61:3
**minimum**
193:4

**minority**
151:14
**minute**
62:11 73:11 103:12
107:5 111:2,20
121:7 132:21
144:23 169:16
171:1
**minutes**
3:17 22:13 43:6,19
95:9 97:8 158:1
171:7 200:3
**missed**
53:11
**misses**
144:21,25 184:9
**missing**
204:14
**misstated**
179:13
**mistake**
30:23 135:16
**mistakes**
175:7
**mixed**
187:24
**Moab**
155:12,18 156:16
157:6 203:23 204:3
**moderately**
192:3
**modify**
26:25
**modifying**
26:6,16 75:8
**Mohamedbhai**
2:6
**moment**
20:14 81:5 123:8
161:12 201:3
**money**
71:17 73:19 87:4,11
87:14,22 100:17
149:16 150:21
151:4 193:11
**Monroe**

3:11 53:4 69:11 70:3
70:8 71:1,4,17 72:2
72:15,20 73:22
149:11 174:17
**months**
31:11 57:21,22 60:24
61:11,15 69:18
72:16 74:1 98:15
105:6 106:7,19
107:11 109:23
110:7 115:19,22
118:25 119:25
122:21 123:6 145:9
154:4,11,13 158:14
158:21 159:5,14
160:4 162:14 166:9
176:15 194:12
**mood**
138:21 139:12
**morning**
200:7
**motion**
171:11 172:7
**motivation**
22:20 23:16 24:12
174:16
**mountain**
4:15 155:12,14,18,20
156:16,25 157:6
161:3 201:24
202:11,18 203:10
203:22 204:3,13
**mountains**
203:23 204:2
**mountainside**
203:6
**move**
9:12 10:2 103:11
156:4,17 157:8
**movements**
128:7 140:19
**moves**
6:14
**moving**
134:12 136:13
**Munni**



MAGNA
LEGAL SERVICES

47:16
**mutually**
161:15
**Myers**
1:5,16 3:1,10,14,18
3:20 4:3 5:3,8,10,12
12:15 29:4 52:12
59:4 76:23 95:6,8
95:15 141:3 156:15
158:8 169:23
171:20,25 172:6,10
173:10,17 174:2,23
176:23 179:19
181:6 196:6 197:22
198:15,24 203:14
203:16 204:17,21
207:22 209:1 210:3
210:11,13 211:8
**Myer's**
3:13
**M-y-e-r-s**
5:11
**M.D**
1:5,16 3:1 5:3 210:3
210:11,14 211:8

---

**N**

**N**
2:1 3:1
**name**
5:9 13:21 30:4,8 52:2
61:24 99:18
**narcotics**
122:8 167:10
**narrative**
16:9
**nature**
37:6 75:21
**near**
133:4 144:21 146:24
**necessarily**
164:20 176:25 177:3
196:13 200:14,16
**necessary**
63:16 192:13
**necessity**

99:24 100:5,11 103:1
**need**
6:25 9:10,13,15,21
9:25 14:9 22:22
23:3,13,19 24:11
39:1 48:10 61:8,9
65:18 66:21 73:8
89:4,19 93:19 99:3
109:6,14 110:1
151:25 157:25
164:20 167:11
168:16,21,22 171:1
171:6 176:2 181:3
192:18 207:16,19
208:6,10,18
**needed**
9:24 32:23 54:17
57:22 60:11 61:7,15
67:1 74:1 93:5
100:25 102:1
145:22 172:18
**needs**
162:23 165:21,23
193:1,6,22 208:13
208:22
**negative**
29:5
**negatively**
185:1
**negatives**
153:3
**negotiate**
181:1 189:10
**negotiation**
112:12
**negotiations**
179:4,8,9,20 180:9
190:6 205:15
**nervous**
21:20 186:22 191:19
**nervousness**
186:24
**nest**
148:4
**never**
67:14 103:9 139:12

146:18 148:10
**new**
34:11 35:11 75:7,13
76:7,12 128:13
136:19 140:23
144:24
**nicely**
180:17
**night**
55:3 196:20 200:6
**nine**
145:9 176:15
**nodded**
5:21 80:20 149:25
150:1
**nodding**
10:6 80:21
**non-compliance**
59:3
**normal**
204:6
**normally**
47:6 48:11
**Notary**
1:18 210:19 211:5
**noted**
12:25 186:2
**notes**
3:18,20 8:4 15:20
31:6,8 35:23 36:9
36:13 37:11 43:24
50:11 55:23,25
57:15 58:19 63:22
64:8 68:23 69:19
70:7 117:7,21
123:15,19 124:23
134:14 136:1,5
201:16
**NOTICE**
1:15
**noticed**
144:19 167:16
**notices**
200:3
**null**
91:24

**number**
4:2,6 31:2 33:25 34:4
34:6,9,9 48:21,22
75:25 76:9 79:10
80:5 81:2,19,19,21
81:22 96:25 128:21
129:14 135:23,25
136:4 137:22
142:17 144:7
155:23 182:20
187:15 192:10
195:2 206:7
**numbers**
13:20 47:10 147:22
**numerous**
137:5

---

**O**

**oath**
6:11,12
**object**
7:10 20:22 22:25
23:21 25:15,25 26:8
26:18 29:14,14,15
36:15 40:1 47:12
48:14 49:5,25 51:16
53:9 54:9 56:9,22
58:15 60:21 62:9
63:20 64:17,23 65:6
66:9 68:21 69:7
72:4 74:8,16,25
80:19 87:12,20,24
89:7,24 90:10 96:6
97:19 98:17 100:1
100:19 101:2 102:4
104:1,13,24 105:16
106:8,16 107:9
108:7 109:2 111:17
112:17 113:16
114:6,11,18,25
115:6,24 117:20
119:3 122:22
131:11,15,20
132:13 136:9 141:6
141:13 142:9 147:3
149:18,23 150:24



151:12 152:3,11
159:19 162:7,17
163:5,13,16,23
164:2,18 165:7
166:11 167:2,25
170:5,14 174:22
175:9 177:14
179:12 184:5
187:17 189:6,15
190:12 193:24
196:11 197:3,9
198:12 202:14
203:1,12 206:12
**objected**
20:24
**objection**
7:11,13,16 23:3,4
26:1 106:2,24 176:6
198:22
**objections**
179:15
**objective**
164:11
**objectively**
25:4 65:16
**objects**
7:18 23:13
**obligation**
26:21,24 100:16
103:25 104:8
117:18
**obligations**
104:19
**oblige**
21:11
**observations**
43:8 140:10 141:8
**observed**
43:25 140:7
**obtain**
7:4
**obtained**
33:3
**obviously**
15:22 113:15 127:11
**occasional**

14:20
**occasions**
8:5 16:16
**occupation**
67:10
**occur**
145:6
**occurred**
119:12 144:25 145:2
145:25 154:19
170:22
**odd**
91:22
**offer**
91:14,20 111:8 112:8
120:5 143:7 170:21
173:4 199:15,20
**offered**
198:3,8
**office**
28:11 68:24 96:21
108:9 184:9 194:4
209:3
**oh**
8:17,17 11:10 20:10
20:25 23:6 40:10
65:20,22 77:3 84:21
90:22 102:15
127:23 156:18
199:19 208:8
**okay**
5:17,22,25 6:3 7:23
8:7,17,22 9:1,6 10:2
10:10 11:10,21
12:11,12,17,19,23
13:13,23 14:3,12,22
15:8 16:16 17:16
18:3 19:17 20:7,7
20:12,14 21:8,13
22:2,19 23:6,7 24:7
24:7,23 25:10 26:12
26:20 27:3,7,11,20
28:1,4,10,13,17,19
28:23 29:1,4,12,12
30:13,16 31:6,9,12
31:14,17,23 32:2,9

32:20,22 33:1,5,19
33:21 34:13,18,24
35:3,8,9,13,16,25
36:2,6,8,11,19 37:4
38:1,6,18,25 39:12
40:22 41:2,6 42:4,8
42:9,18,18,22,25
43:9,11,14,22 44:22
45:15,24 46:4,10,21
47:1,23,23 48:1,5,5
50:14,21,24 51:10
51:22 52:6,11,21,23
53:3,10,15,20,22,23
54:5 55:6,9,12,17
55:20 56:3,13 57:12
57:17 58:25 59:7,9
59:11,16 60:14,19
61:4,10,13 62:4,20
63:9,15,24 64:5,10
64:13,18 65:1 66:22
67:4,8 68:7,15,18
68:25,25 69:9,14,20
70:11,17,23 71:3,8
71:18 72:11,23 73:8
73:15 74:12,21 75:3
75:3,19,21 76:1,13
77:16,16,24 78:1,4
78:9 79:4,7,13 80:4
80:16 81:18 82:6,9
82:14,22,25 83:4,9
83:16 84:19,23,25
85:7,14,14,22 86:7
86:12 88:1 89:15,18
90:22 91:6,13 92:4
92:11,14,17,21,24
93:4,14,18,18 94:3
94:6,11,20,22 95:3
95:7,10,15,20 96:11
96:14,17,24 97:5
98:2,25,25 99:15,15
99:23 100:22 101:5
101:10,21 103:9,22
104:15 105:8 107:2
107:3,4,13 108:19
108:23 109:5,20
110:13 111:1,18,19

112:15,21,24 115:3
115:12,17 116:21
117:16,25 118:1,4,4
118:8,10 119:13
120:2,9,15 121:9,14
122:13 123:2,14,18
123:20,22,25 124:8
124:17,22 125:3,24
126:10,16 127:13
127:15,17,18,18,24
128:16,20 129:3,7,9
129:12,17,18,22
132:1,5,21,25 133:1
134:2,9,20 135:14
135:14,21 136:17
137:16 138:16,17
139:23 140:3
141:22 143:11,15
143:18,22 144:23
145:6,13,21,24
146:12,19,22 147:1
147:6,21 149:2,11
150:4,14,18 151:6
153:24 154:6,12,17
154:23 155:2,11
157:21,24 158:2,11
158:19,24 160:10
160:10,14,17 161:6
161:14,19,22,23
163:18,20 164:15
164:15,23 165:25
168:5,19 169:10,15
169:22 170:19
171:1,9 172:25
173:8,14 174:3
175:22 181:16,23
182:19 192:5 195:7
195:8,22 196:22
199:10,15,19,19,22
202:10 204:16
205:5,7,12 206:2
207:5 208:12,19,24
**old**
178:23
**older**
188:14



**old-fashioned**
147:5
**Omeed**
2:5 4:20 29:24 31:7
32:13 77:8 78:5
141:21
**omission**
16:17
**once**
17:17 90:6 91:20
120:14 160:11
191:21 194:9
**oncologist**
37:9
**oncology**
38:5 53:6 183:17
184:17 185:10,10
185:11
**ones**
8:5 14:18 16:7 17:24
21:2 145:25 146:9
151:23 162:6
**one-on-one**
44:14
**one-stop**
37:18
**one-week**
96:9 155:5
**ongoing**
179:20
**on-call**
149:4
**open**
50:23 62:19 96:17
98:1 127:17
**opened**
97:4
**opening**
12:22 13:13 52:11
181:15
**open-ended**
22:1 29:19
**opine**
46:24 47:2 179:1
**opinion**
27:1 44:25 54:16

58:2 69:1 108:5
117:17 118:21
122:13,18 123:3
143:22 153:22,23
158:12,22 159:5,9
159:17,22 170:20
196:2 202:6 203:11
207:5
**opinions**
26:6,16,23 39:4,15
39:21,25 40:5,15
62:8 120:18 163:4
170:3 179:2 185:8
205:9
**opportunities**
161:25 162:3
**opportunity**
6:9 9:23
**opposed**
15:7
**options**
16:11 178:9
**order**
9:12 41:24 42:5 74:2
89:2 99:25 100:6,11
100:17 142:25
174:9 200:19
208:16
**ordered**
145:4
**orders**
207:19
**ordinary**
132:16
**organize**
16:22
**origin**
191:5,10
**original**
8:9,13 33:15 57:4
84:22
**outcome**
211:18
**outlining**
6:4
**outside**

159:24 160:3 187:15
**overall**
120:3,4 144:19
164:21
**overcome**
58:10,14
**overlap**
167:13 180:8,13
**overlooked**
49:24 51:8
**overweight**
62:25
**overwork**
168:25
**owner**
143:17

---

**P**

**P**
2:1,1 136:18
**page**
3:1 13:1,6,17,18,19
13:20,23 33:21
46:22 47:10 77:25
77:25 80:12 89:25
90:14,15,19,20,23
91:5,6 121:4,5,8,9
122:5 123:18,23,24
126:16 127:15,24
129:13 133:15
134:12 137:9,12
138:8,13,15,17
139:19 148:14
161:8,17,17 171:22
195:9
**pages**
77:25 121:25 126:25
129:14 139:2
211:13
**paid**
73:22 74:4 92:2
93:22
**panels**
115:23
**paper**
16:4

**paragraph**
90:17,21,24 91:10
96:20 182:25
**Pardon**
30:6
**part**
15:6 56:25 69:8
72:22 92:10 101:17
102:2 103:2 105:22
111:13 127:3,10
154:23 172:1
179:15 195:11
196:5
**participate**
165:2
**particular**
14:20 15:5,24 89:13
185:23 186:11
**particularly**
16:1 19:5 143:5
172:7
**parties**
92:25 93:5 99:3
101:25 211:10,17
**partner**
53:4 73:22 74:5
88:16 95:25 161:3
174:17 177:7
**partners**
88:23
**partnership**
89:10
**party's**
118:11
**part-time**
120:12
**patient**
19:12,20 20:17 22:5
30:24 35:11 59:3
60:18 66:14 68:13
68:17 106:14
108:24 109:8,15
122:20 144:8
158:15 159:14,24
160:4 162:25 175:7
175:8 181:20,24



**patients**
38:8,14,15,15 66:16 67:25 88:19 107:19 165:5 166:23 185:15
**patient's**
47:7 48:12
**Patricia**
1:17 4:12 207:16 211:4,23
**pause**
144:23 169:21 171:3 171:8 190:3,6
**pay**
71:15,17,22 75:24 190:2
**payer**
115:23
**payers**
110:5
**paying**
151:19
**PC**
53:6 183:17 184:17
**Peddada**
1:8 3:18,20 4:5,21 8:4 24:5 27:8,12,13 27:22 30:25 34:22 35:3 36:14,21,25 41:15 43:15 44:24 47:15,17 48:7 53:4 53:25 54:6,13,16 55:4 56:6 57:13,25 58:7 59:20 60:4 62:7 63:18 66:25 70:2,17 71:4 72:1 72:15,22 73:2,17 75:14 76:10 78:18 82:7 83:5 85:10 86:16,20,20 87:5 88:16,23 89:12 90:1 91:15 92:12 93:1

184:20,24 185:20 185:23 186:11 187:15 200:2 205:22 206:1,3

94:14 95:22 96:19 97:13 98:2 99:13 100:15,23 101:1 102:10,13,22,25 104:9,17,20 105:3 105:10,20 110:19 112:25 113:10 114:5,17,24 115:9 116:22 119:16,18 119:25 123:16 124:2 128:17 129:16,19 130:12 132:21 133:16 134:11 135:23 136:12,23 137:9,16 138:9,18 143:23 147:1,22 148:10,21 149:16 151:9 152:25 153:15 157:7 158:19 159:2 159:12,23 161:5,9 161:23 162:14 163:2,12 166:6 168:9 169:25 170:13,23 171:22 172:2,4,12 173:7,12 174:13,24,25 175:4 175:13,18,25 177:17,23 178:4 179:3,7,25 180:1,3 180:10 181:13,18 181:19 183:7,13,24 187:8,13 189:8 190:7 191:14 192:6 193:9 194:15,17 195:13,18,19 196:14 197:7,19 199:12,16 200:16 200:21 201:3,23 202:4 203:17 205:13 206:7
**Peddadas**
115:4,14 148:3
**Peddada's**
27:16 34:22 41:23 42:4,23 45:5 47:3

51:23 57:17 79:10 87:3,9 114:1 116:6 122:14,19 123:4 128:2 134:5 137:7 138:18 139:20 140:17 150:5 153:24 158:12 160:18 169:11 177:19 182:21 186:6,25 195:22
**peer**
14:24 15:1
**peer-review**
14:6,17 125:7
**pending**
104:21
**Pennsylvania**
209:4
**Penrose**
36:22 37:2 73:20 88:18,19 89:3,5,10 89:20,21 90:6 105:5 120:5 157:14 183:16 184:16
**people**
10:12,14,25 11:3,7 29:10 37:22 70:12 89:11,16 147:15 150:18 151:6 188:6 191:19 201:9,19,20 204:4
**perceive**
18:10,14
**perceived**
164:11
**percent**
148:4
**perception**
70:25 117:4
**perform**
57:20 136:25 201:24 202:5,6
**period**
82:23 105:5 113:7 114:4 115:22 159:4 166:18 178:18

188:14
**person**
11:13 49:13 66:21 108:5 131:1,10 132:16 140:21 142:15 165:24 166:1 167:21 173:3
**personal**
51:13 54:2 57:21 121:21 144:6 148:18 153:11 185:2
**personality**
31:1
**persons**
10:23
**perspective**
105:5
**pet**
143:12,17
**Philadelphia**
209:4
**phone**
55:3 95:6 165:4 166:22
**photocopied**
8:6
**PHP**
55:25 134:14
**phrased**
86:4
**physical**
47:6 48:11 163:21
**physician**
8:21 18:25 19:11,25 20:1 21:16,22 25:3 30:10 44:6,9,19 47:16,25 48:7,8 50:5,10 51:13 54:2 55:1 56:5,15 57:21 58:5 60:12,17 62:3 66:13 69:6 93:18 96:1 104:18 105:13 105:25 110:4 117:6 117:11 135:11 139:10 154:11


MAGNA
LEGAL SERVICES

162:24 166:14,23
167:20 168:9
174:14,25 175:5
176:1 177:6,19
180:1,6,12,14,15,16
180:21 188:20
190:20 191:13
192:5 206:6,9

**physicians**
19:7,8,24 60:5 66:12
93:19,22 147:9
165:5 166:1 168:23
188:14

**picked**
58:21 63:5 65:21

**pieces**
115:17 116:7

**place**
57:5 211:12

**places**
109:22

**plaintiff**
1:9 2:1 4:5,21 22:19
23:15 169:24
171:12

**plan**
101:1 185:20

**planned**
53:25 95:23 96:9,9
98:14

**planning**
96:4 98:4 113:1,3
115:11

**play**
178:20

**please**
4:16,23 5:8 23:11
40:3 42:3 46:21
53:16 54:11 79:23
80:23 81:5,7 87:7
100:3 124:18
152:23 159:1

**plus**
164:13

**point**
36:13 117:10 157:18

166:15 170:21
193:20 194:3 197:2

**pointed**
194:15

**pointing**
186:6

**pose**
131:23

**position**
25:12,13,22,23 26:5
26:15,22 49:23 51:7
51:11,14 57:17 58:3
87:4,10 110:1 114:1
122:19 130:15
158:12,20 159:2,18
159:23 160:18
161:24 171:18
193:17

**positions**
89:11,12 197:10

**possible**
9:14 175:24

**possibly**
70:8

**post-traumatic**
122:3 167:8

**potential**
15:9 161:25 180:19

**practice**
19:13,19,21,21 93:8
125:16 139:20
163:25 187:21
189:3,3

**practicing**
58:5 67:7 68:3,5,14
165:10 188:21

**practitioners**
61:2

**preamble**
20:3

**precisely**
171:19 182:10 189:9

**predicate**
160:12

**preface**
17:13 19:18

**prefer**
17:16 60:8 185:16

**preferred**
63:1

**preliminary**
84:20 111:8

**premises**
25:6

**prepared**
41:12 113:9 170:7,21

**preparing**
170:8

**preplanned**
174:18 175:22
176:24 177:2,12

**prescribed**
58:21 59:19 60:12
64:6 191:3 201:17

**prescribes**
61:14

**prescribing**
138:23 201:17

**presence**
49:12 82:15

**present**
49:14 170:20

**presented**
81:16 182:16

**presenting**
186:1

**preserve**
7:11

**preserved**
204:11

**pressure**
62:24 144:10 191:20
191:22

**pretty**
17:20,25 27:5 76:21
98:23 122:12 146:5
177:4,11

**prevented**
158:23 159:3

**previous**
88:22 211:6

**previously**

5:23 26:24

**pre-existing**
168:6

**primary**
6:8 47:15,24 48:7
50:3,4,10 55:1,4
58:4,5 60:12,17
175:5 177:6,19
179:25

**principles**
50:4

**prior**
33:6 41:11 62:24
143:22 174:18

**private**
19:19,20,21 70:24
110:5 189:2,3

**privilege**
7:20 29:15

**privileged**
29:21

**privileges**
177:10

**PRN**
192:12

**proactive**
175:16

**probably**
28:8 64:9 124:15
130:14 151:14
177:15 193:5 203:9

**probe**
22:23 23:19

**problem**
14:11 40:4 58:14
168:25 188:13

**problems**
133:17 138:24
152:22 153:1

**Procedure**
5:2

**proceeded**
55:3

**proceedings**
4:25 169:21 171:3,8
209:6 211:15


MAGNA
LEGAL SERVICES

proceeds
141:9
process
6:4 10:2 74:5 92:25
produce
148:1
produced
147:22 177:18
produces
148:5
professional
57:8 126:1 141:4
168:15 185:1 196:2
211:5,24
proffered
116:4
profound
141:1 142:21 143:13
program
20:1 48:9 62:3 90:17
90:25 91:11,13
154:11 166:14
progress
165:15
prohibit
7:15
prohibited
158:20
pronounce
126:8
pronounced
126:8
proper
58:17 60:16 167:14
properly
86:4 124:6 165:9
proportions
143:14
prospective
112:3
prostate
38:3
proud
168:24
provide
16:10 27:7 32:24

37:25 54:15 109:8
109:15 120:18
194:6
provided
14:4,15 29:17 52:2
89:22 146:20
186:11
provides
161:4
providing
38:14 88:19 108:24
161:5
provision
183:8
provisions
70:2 72:1,7
proximal
146:10
prudent
54:25
psychiatric
61:23 70:15 88:2
171:13,15,16,20
172:1,16
psychiatrist
61:25 171:14
psychiatrists
50:16
psychiatry
141:25 142:5
psychological
142:1,8 143:1
psychologically
142:15
psychotic
143:14
PTSD
36:2 168:3,10 172:2
Public
1:18 210:19 211:5
publication
16:11 17:12 18:6,22
120:24 126:10,14
publications
13:3 14:4,6,15,17
120:23 121:1

publish
141:4,12
pull
151:24
purpose
6:8 7:3 14:24 88:5
167:21
purposes
6:7 10:16
pursuant
1:15 5:1 53:17
pushback
64:3
put
12:10 15:17 45:16
50:19 52:7,15 96:15
96:25 99:18 101:6
115:4,10,14 116:18
119:5 124:18
141:15 176:22
190:6 193:16
202:16 203:18
207:17
putting
144:8
P.C
2:3
p.m
95:12,12 158:4,4
175:6 209:7

_____ Q _____

qualified
158:15
qualifier
118:2
qualify
167:11 168:22
qualitative
169:7
quality
200:17
quantify
143:9
quarrel
49:9 51:3

question
6:20 7:1,10,18,21
10:24 11:7,8 14:13
22:1,23 23:10,19,24
24:8 26:10,13 27:23
27:24 29:5,19 35:22
42:2,20 47:2,5
54:11,21 55:13
56:12 65:2,12 66:1
68:2 71:20 74:18,20
75:25 79:9,19,23
80:5,24 81:7 86:4
87:7 92:8 100:3
102:24 106:17
107:14 108:21
116:10 118:12
125:12,19,19
127:25 131:22,23
141:17,23 142:12
143:19 148:23
152:23 154:6,9
157:2 158:24
159:21 160:12
171:6 184:6 187:18
190:13 193:15,25
194:1,14,16 195:3
198:17 202:12
203:2
questioning
174:12 177:22
179:10 193:8 196:6
197:10,22 198:13
questions
7:9 9:10,14,18,23
10:11 13:11,11 16:6
24:14 25:5 29:16
35:4,15,20 43:22
46:13,15,23 73:10
75:8 92:21 138:5
140:14 141:20
161:13 167:17
173:22 174:1,8,20
193:12 195:10,11
197:18 204:22,24
205:1,3 207:12
211:14


MAGNA
LEGAL SERVICES

quick
76:21
quickly
9:13 11:25 80:6
82:17 104:9 189:22
quite
21:19 42:2 50:7,8
57:11 64:1 124:11
190:23
quote
111:14 124:7
quoted
124:6 198:2
quoting
90:14 93:11 124:2

**R**

R
2:1
radiation
37:9 38:5 53:6
183:17 184:17
185:10
radiation/oncologist
161:2
radiation/oncology
145:4
radiologist
30:19
raise
118:11 197:10
raising
132:3
Raith
126:7,9,10,17,17
Randy
2:8 4:11
range
122:12
rare
151:10
rate
153:18
Rathod
2:6
rationale

160:5
reach
113:14,14 150:22
151:22 163:14
205:17
reached
26:23 41:4 111:10
205:9,13
reaching
16:25 140:3
reaction
143:13
read
15:16 53:16,18,19,22
54:23,23 71:23 81:6
91:15 93:15 94:19
101:13 102:17
103:4 110:24 128:4
128:19 129:22
134:10,13,15
135:10,25 136:4
139:17,22 140:1
144:5 161:21,22
166:15 172:22
187:20 191:16
192:10 210:4
reading
53:21 80:6 83:22
90:14 93:10 123:1
128:13 129:25
136:19 140:22
155:8 162:1 171:10
176:11 199:5 208:3
ready
154:21
real
12:1
realize
52:12 58:17
realized
60:11 61:7 145:11
really
10:20,20 17:24 19:7
22:15 37:11 38:3
44:15,15,18 50:7
54:22 60:7 61:11

64:2 68:15 73:6
74:10,11 75:24
76:21 116:12
147:12 151:24
165:9 167:14 170:9
174:15 183:21
reason
39:5 45:7 49:8 51:3
57:10 58:16 59:24
63:13 127:12 135:8
152:20,24 187:22
reasonable
105:9,20 106:4,6,18
106:23 107:6,12
108:12 109:13
173:2
reasonableness
114:1 118:11
reasonably
179:3
reasoning
140:11 141:4,7
reasons
11:21 39:16 54:3
96:1 127:1,7
reassess
166:2
reassessed
166:7
rebut
172:8
recall
28:13 30:11 31:4
47:19 55:2 96:8
115:2 176:8
receipt
56:18
receive
6:9 22:5 33:14 34:13
75:7
received
31:24 33:18 57:1
64:21 65:4 76:7,25
77:4 78:10 95:17
116:8 146:14
receiving

56:4 64:19 116:9
Recess
95:12 158:4
recharge
74:1
recognize
42:18 59:19 81:11
87:8 88:2 113:23
116:17 117:18
129:10,20
recognized
81:4 87:2 127:2,8
recognizing
29:4 175:7,19
recollection
64:10
recommend
16:2,11,11,12 18:5
61:9
recommendation
16:13 181:17,19
recommended
60:25 181:19
recommending
182:2,10
record
3:7 4:14,17 8:21 10:5
10:6 47:22 49:10
52:16 61:21 62:16
76:18 82:20 95:11
95:13 138:3 158:3,6
169:17,18 181:11
181:12 187:12
198:10 207:17,19
208:14,22
records
3:8 52:13 54:24,24
82:11 177:18
recounting
129:18
recounts
138:17 139:3
recruited
99:20
recruitment
56:17 93:6 99:4,24



100:5,11 101:16
102:1 103:2,7
104:16
**redo**
159:20
**reduced**
211:12
**refer**
47:24 120:20
**reference**
3:6 47:9 50:15
103:24 104:7,19
122:5 126:17
132:20 199:18
**referenced**
12:13 45:21 46:19
50:20 52:10,17,24
96:16 97:1,25 101:7
123:10 124:19
126:5 139:6 160:13
**references**
9:4 88:6 182:21
**referred**
47:18 62:1 80:4
**referring**
31:6 47:20 48:2
81:20 96:22
**refers**
191:20
**refine**
22:3 29:21,23,24
**reflect**
20:15 28:11 82:11
124:25
**reflected**
37:11 41:3 50:3,11
50:25 63:22 70:7
71:9 117:21
**reflection**
130:15
**refrain**
67:1 181:19
**refused**
64:4 90:7 104:20,21
**refute**
101:25 102:25

**regard**
117:8 145:3 166:20
178:15 188:16
**regarding**
11:23 56:17 109:1
120:23 135:22
139:20 160:20
163:21 172:11
175:13
**registered**
145:19 146:7
**Reith**
3:21
**rejection**
16:15 18:1
**related**
40:6 82:23 118:9
121:10,18 128:1
148:15 185:22
194:14 211:16
**relates**
6:10
**relating**
7:24 70:3 72:2
**relation**
157:17 211:9
**relationship**
66:21 69:15,21 73:3
93:22 143:3,6
157:14,15 183:16
184:16 189:11
**relationships**
88:24 93:1 108:4
184:20
**relative**
63:19 71:4
**relaxing**
203:22
**relevance**
142:12
**relevant**
40:18,20 119:21
**reliability**
195:12
**reliable**
17:11 25:14,24 26:7

26:17,21,25 120:25
**relied**
51:12
**rely**
47:9 48:9 49:2
171:15
**relying**
6:13
**remains**
126:21
**remediation**
31:10,11
**remember**
37:14 44:4 48:18
55:7,18 61:24 62:10
62:13,23 71:6,12
72:24 73:1 82:3,5
91:23 98:10 117:6
129:1,4 145:17
155:8 157:16
174:20 175:10
177:25 179:10,22
181:20 182:3
186:14 187:10
188:8 190:22,23
191:1 193:11,11,14
194:20 195:15,20
195:25 196:10
199:2,8 202:1,8
**remind**
13:16
**remote**
32:4
**remotely**
4:9
**removed**
135:4
**Render**
2:2
**repayment**
56:18 93:6 94:16,23
100:16,18 103:24
104:8,17,19 111:10
**repeat**
10:24 14:12 25:18
39:12 40:3 42:3

59:23 79:23 80:24
81:7 87:7 100:3
105:17 109:10
125:12 152:23
161:20 202:15
**repeatedly**
100:15
**report**
3:10,14 8:2,13,24 9:4
21:20 27:17 31:21
31:25 32:11 33:7,9
33:12,18,21 34:6,16
39:20,24 40:5,7,9
40:13,15,17 41:7,8
41:18 45:3,8,10,13
45:18 46:2,15 47:11
48:8,20,22 50:15
75:5,6,11,11,14,23
76:1,2 77:15,19
78:10,15,16,21,24
79:16,25 80:1,7,12
80:18 81:19,19,21
81:21,21,22 84:20
84:22 85:6,11 86:24
86:24 88:6,14 90:1
94:19 119:20
120:22,25 121:24
122:11 126:18
127:15,24 129:8
133:15,23,24
134:10,14,17,21
135:3,5 136:5,16
137:24 138:8,12
139:3 146:16
148:14 167:6 170:9
170:11 171:23
179:2 182:13,20
190:15,16,25
194:25 195:1 196:7
196:23 197:1,11,16
198:2,14,16,21
199:5 203:19 205:7
205:12,18 206:19
206:19 207:3
**reported**
24:17 57:13,14,16



MAGNA
LEGAL SERVICES

92:11 117:5,13
125:7 129:23
130:12 170:25
175:19
**reporter**
1:17 4:12,23 10:4
59:13,15 157:22,25
207:18,24 208:3,15
208:20,23 211:5,24
**REPORTER'S**
211:1
**reports**
12:7 39:4,6,15,17
41:2,7 46:13 71:15
75:6 81:24 86:18
98:22 130:18
136:14 138:5,20
139:9 144:5,6
175:13 200:2
**represent**
4:17 13:24 102:8
**representative**
102:10
**representing**
87:17
**represents**
12:20
**request**
14:20 26:9 32:18,19
85:23 86:8 177:8
**requested**
74:2
**requesting**
180:2 189:12
**require**
16:6,9 17:23 39:3,14
47:6 48:11 141:1
**required**
27:1 100:16 151:16
**requirement**
169:12
**requirements**
206:10
**requires**
21:17
**research**

15:22 16:22 125:6,15
125:21,25
**reshare**
181:10
**resilience**
144:19 145:20 146:7
**resolve**
85:3
**resolved**
120:7
**resolves**
78:6
**respect**
74:10 116:11 152:1
195:13 203:17
**respected**
44:7
**respond**
23:8 26:19
**responded**
102:12 137:16
140:13
**responding**
143:19
**responds**
138:6
**response**
17:14 19:18 25:9
56:18 79:14 81:2,15
88:22 107:6 113:6
127:25 133:12
141:9 153:8 168:4
171:10,11
**responses**
10:5,7 36:18 132:19
133:16 140:16
**responsibilities**
13:2,12 14:1 149:4
**responsibility**
164:9
**responsible**
186:17
**rest**
34:10 161:21 169:2
204:7
**restate**

23:10 26:10
**restful**
128:3 140:17 200:11
200:14
**restorative**
128:3 140:18 200:12
200:15
**result**
122:14 170:9 172:3,5
**retained**
54:15 209:2
**retired**
19:21
**return**
15:20 63:6 73:8
85:20 97:14
**review**
14:21,24 15:1,2,8
17:10,20,23 18:1
24:23 41:12,14
47:21 49:16 75:8
76:3,5 77:11 80:16
81:1,14 83:13 86:23
161:13 166:2 171:2
**reviewed**
8:24 33:13 34:5,15
40:18,20,22 41:3,15
47:10 48:21,23
50:13 52:22 76:25
77:18 78:2,17
103:20 135:9 144:2
157:13
**reviewer**
15:7,7,13 16:3,7
**reviewing**
12:25 19:4 55:14
**reviews**
15:21
**revise**
78:16 80:17 81:2,15
**revised**
75:22
**revision**
127:11
**revisions**
16:12,13 18:2

**reword**
54:11
**ride**
202:11
**riding**
202:18 203:4 204:3
**right**
6:3 9:1 12:16 17:4
20:9 22:24 23:20
25:14 27:9,13 28:3
30:16 32:6 34:13
41:20 42:21 43:21
44:25 46:8,12 48:3
48:25 49:13,17
50:16 51:15 52:6
54:8,18 56:1 63:19
64:7,10,12 69:24
70:19 72:18 73:15
73:20 74:12 76:4
78:18 79:19 81:16
82:24 84:14 85:18
87:6,11 88:19,25
89:6 90:8 91:4,13
91:20 92:20 93:8
97:22 98:14 99:14
99:16,19 103:20
105:6 109:1,9 110:8
112:8 115:12 119:8
119:18,22 120:17
122:8,9,16,24 123:6
125:2,3 126:2,22
127:6 130:23,24
132:12,17 133:13
133:14,20,21 134:3
135:19 136:7,8,22
138:1,18,25 139:7
139:16,17,21,24,25
147:23 148:12
149:22 151:4 152:2
152:14,18 154:15
156:8,10,22 157:3
158:17 159:7,18
160:7 162:6 164:7
164:17 166:3 167:1
167:10 169:16
171:1,9 175:6 177:4



177:20 180:24 182:11 183:10,11 183:22 184:25 187:16 190:10 191:4 194:23 196:20,21 197:17 198:6 200:19 201:4 201:5,7 202:19,25 203:23 204:4 205:5 205:15,16

**right-hand**
129:14

**rigor**
17:3,9 18:5,12

**rigorous**
14:6,17 16:18

**rise**
143:23

**risk**
180:19 203:6

**rock**
155:15

**Rocky**
161:3

**role**
18:10,14 24:24,24 38:19

**ROPC**
53:6 69:10,22,24 72:2,8 73:19 88:17 89:4 93:7 99:5,5,7 111:3 161:5

**rough**
8:3 31:8

**rounds**
185:7

**rubber-stamping**
162:22

**rude**
10:1 186:3

**rule**
7:13 29:18 39:7,18 167:15

**rules**
5:1 6:7 7:15 39:3,14 39:14

**running**
200:17

**runs**
180:19

**R-a-i-t-h**
126:7

—————————

**S**

**S**
2:1

**Sabey**
2:1 3:3,23 4:18,18 5:7 7:7,8 12:14 13:16 20:23 23:2 24:7 25:17 26:3,12 26:20 29:23,25 36:19 40:4 46:21 47:14 48:16 49:8 50:6 51:19 52:18,25 53:10,13,15 54:12 56:13 58:25 59:16 61:4 62:12 63:24 64:18 65:1,10 68:25 69:9 72:6 74:10,12 74:19,22 75:3 77:3 77:8,14 78:5,9 80:21 83:18,21 84:15,16 86:7 87:16 87:21 88:1 89:15,25 90:11 94:6,7,14 95:3,7,15 96:11,18 97:2,22 98:2,20 100:3,4,22 101:5,8 102:8 104:2,4,5,15 105:1,19 106:5,11 106:17 107:2,10 108:11 109:3 111:18,19 112:1,6 112:21,24 113:18 114:8,14,20 115:3 115:12 116:3,10 117:23 119:7,13 121:13,16,17 122:24 123:12 124:20 125:12 126:6 131:13,17,24

132:15 135:2 136:11 141:7,14,20 141:23 142:13 149:21 150:1 151:2 152:9,12 157:24 158:7,8 159:20 160:14 162:10,20 163:14,24 164:5,23 166:20 167:5 169:15,19,22,23 170:10,19 171:4,9 172:14,25 173:8,9 173:22 174:22 175:9 176:6 177:14 179:12 184:5 187:17 189:6,15 190:12 193:24 195:5 196:11 197:3 197:9,15,25 198:7 198:12,22 202:14 203:1,12 204:20 206:18 207:12 208:15,17

**sad**
204:14

**safely**
139:21 164:1

**salaried**
188:4

**sale**
115:5

**saw**
51:25 55:7,19 81:3 139:12 142:22 147:14 200:21

**saying**
17:14 19:19 20:8 40:12 69:3 71:6 108:1 112:11 113:1 113:7 116:16 123:3 124:12 132:4 135:17 147:15 153:4 156:13 158:15 165:12 172:15 182:7 188:19 190:5

**says**
91:14 96:20 97:13 98:12 103:7 130:4 137:13 139:11,11 171:11 172:17 187:4 191:5,10 205:12

**schedule**
150:5 176:3 193:10 194:16,18

**scheduled**
96:21

**schizophrenia**
142:18

**science**
141:24

**scientific**
125:5,14,20

**scientist**
25:3

**scope**
75:8 182:1 207:2

**screen**
121:12 127:22

**seal**
211:21

**sec**
191:8

**second**
10:14 11:3,25 12:1 33:10,12,15,21 50:14 75:23 76:2 78:10 79:16 80:1,7 80:18 83:6 86:18 88:6 90:1,8,13,15 119:18,20,21 120:12 127:18 129:23 130:4 157:6 161:8,17,17 184:15 196:5 198:25

**secondary**
22:17

**secondly**
165:20

**section**
33:13 134:4



sections
 126:25
see
 8:10 12:15,18 13:4
   13:14 15:23 33:17
   33:24,25 34:18
   37:21 40:10 45:20
   46:22 48:17 50:21
   54:1 58:19 59:2
   75:15 90:18,25
   91:10,16 96:18
   97:10,13,15,16 98:6
   98:15,19 101:6,8,10
   101:19 102:16,18
   102:19,20 103:14
   106:9 112:10,24
   113:4,6,11,12 121:4
   121:5 123:11 124:4
   129:13 130:6,10,11
   133:1,4,7 134:7
   136:15 137:19
   138:2 139:1 153:10
   161:8,10 176:8
   181:9,11,13,15
   183:5,19 184:17
   186:13 189:19
   190:4 191:7,9,19
   192:1 204:4 206:8
seeing
 17:16 98:18 102:11
   179:22
seek
 39:1
seeking
 19:12 20:18 22:7,21
   23:17 58:8 64:20
   65:3 87:4,11,14,22
   94:25 175:16
seeks
 25:4
seemingly
 183:25
seen
 53:7,13 98:23 103:9
   113:22 171:14
   200:5

Selagamsetty
 3:7 47:16 134:14
selectively
 25:1 162:4
self
 164:14 178:23
   189:18
self-medicate
 176:4
self-medicating
 122:7 167:9
self-referral
 129:19
self-referred
 21:4
send
 17:20 83:12 97:23
sending
 29:10
sends
 98:3
senior
 73:2
sense
 21:2 37:16,25 44:7
   44:17 164:13
sensitive
 70:14
sensitivity
 70:16
sent
 8:6 53:4 56:14,16
   57:6,9 69:12 81:10
   85:15 93:15 97:9
   102:22 103:23
   104:6,10,16,17
   106:22 160:22
sentence
 91:16 101:11,15
   134:10,20 135:2,4
   135:19,21
sentiment
 107:23
separate
 101:17 102:2 103:3
   177:22

series
 162:11 195:10
serious
 14:5,16 17:11 18:11
   143:2
seriousness
 55:5 142:25
serves
 10:16
service
 100:17
services
 1:12 4:13 14:5,16
   37:22 88:19 89:22
   161:4 209:3
sets
 67:9,9
setting
 110:12 147:16,16
   203:25
settlement
 56:17 104:17 105:4
   105:13,24
Setty
 47:19,20,24 49:15,23
   51:20 54:1 58:8
   59:19 60:15 62:7
   66:25 68:11,20
   73:25 95:24 96:5
   98:9,16 105:3
   106:13 108:1 113:2
   113:23 136:1
   139:18 155:13
   159:15 162:12
   163:1,7 174:19
   175:20 181:17
   182:6,12,17 183:14
   186:5,21 188:10
   195:23 200:22,22
   200:23 201:15
   206:15
Setty's
 49:10 52:13 62:15
   64:15 138:3 181:12
   181:18 182:19
   190:17,25

setup
 104:9
seven
 6:2
severe
 142:19 183:1 191:6
   191:11,15 192:3
   200:23
shaking
 10:6
shallowly
 25:12,22
shame
 194:13
share
 46:17 121:5,11 122:1
shared
 149:5
sharing
 127:22
sheet
 207:22
shift
 188:11,22
shine
 179:17
shocked
 57:11
shop
 37:18
short
 11:6 175:8
shortage
 149:7
shorthand
 1:17 47:19 211:11
short-circuit
 8:22 36:6
short-term
 118:2 192:23
show
 12:2 164:4 180:4
showed
 175:23
showing
 201:16



side
 13:8 133:2 145:5
sides
 107:5
sign
 89:19 90:2,5,7 91:19
    104:20 105:13,24
    106:21 111:4
    115:20 118:13
signature
 210:13 211:21
signed
 90:6 91:15,20,23
    93:13 102:20
    104:10
significant
 96:4 180:8,18
signing
 160:22 208:4
similar
 172:8
simple
 186:7
simply
 20:17 46:1 75:13
    92:11
Simultaneous
 85:2 100:7 112:5
sincerely
 58:8
sincerity
 108:21
sip
 60:1
sir
 173:16
sit
 115:19
sites
 165:4 166:22
sitting
 194:4,11
situation
 20:19 35:12,17
    121:19 148:17
situational

10:15 11:4 63:11
    192:10 206:14
situations
 21:1 107:17 187:21
six
 46:13,13,15 120:18
    130:10 134:5
    166:16 194:12
    200:9
sixth
 47:1,1
size
 115:11
skip
 133:10 139:2
slandered
 31:3
sleep
 128:2 133:17 134:11
    134:13 135:9,11,24
    136:1,5 140:12,17
    192:16,22 195:14
    195:18 196:3,8,16
    196:25 197:20
    198:4,25 199:11,18
    199:20,23,24 200:6
    200:11,15,17,20
    201:2,11,12,13,18
sleeping
 79:11 192:19 200:9
smaller
 37:13,21
smoothly
 11:25
somebody
 21:1,16 30:9 71:16
    107:24 132:6
    142:20 164:16
    165:21 199:4 203:5
somewhat
 197:22
soon
 157:23
sorry
 6:19,20 14:7 23:6,9
    36:24 40:10 41:17

43:1,4 53:11,18
    54:23 59:11 60:1
    76:17 77:10,10,11
    77:21 80:14,14,15
    80:23 81:6 82:5
    83:2,8,22 84:21
    85:25 90:22 94:5
    100:8 102:12 104:3
    105:18 109:10,10
    121:14 128:22
    129:25 133:8,25
    135:9 136:9 138:11
    138:13 150:3
    156:20 158:18
    163:10 175:23
    181:10 208:8
sort
 11:6 29:5 69:3 86:2
    144:9 147:5 150:12
    171:5 185:23
    192:20 194:18
    200:11 204:5
sorts
 155:23
sounds
 22:4 64:24,25 93:4
    103:4 112:1,4 116:1
    116:10 162:21
    178:10 188:10
sources
 135:22 136:11,17,23
    137:3,5 140:12
soured
 73:7
speak
 21:3 34:21 35:1
    41:15,16 51:19,22
    57:18 72:19,21
    82:25 109:18
    165:22 186:3,14
    188:9
speakers
 85:2 100:7 112:5
speaking
 35:19 112:3 125:10
    143:20 175:25

186:10
special
 44:15
specialists
 185:9,19
specific
 16:6 60:19 66:23
    171:13,14,16,19
    172:1,16,18 190:21
    201:18
specifically
 15:6 28:9 61:17
    136:12,18 137:6
    185:22
specifics
 38:2 71:5
specify
 89:5 136:23
speculate
 67:23 68:13,16 116:2
speculating
 63:14
speculation
 176:7 177:16
speculative
 154:18
spelled
 5:10
spelling
 5:11
spend
 174:7
spent
 155:23 177:23 187:7
spoke
 28:6 33:6 34:23 35:3
    35:6,10,10 36:21,25
    43:18 61:25 81:25
    81:25 82:4,7,12,19
    83:11 84:2 85:18
    86:12
spoken
 27:13 69:18 72:16
    84:8,19 95:17
    162:12 163:11
spot



MAGNA
LEGAL SERVICES

129:5,6
**spouse**
44:8 138:18 143:3
**Springs**
31:2 37:9 120:16
**square**
101:12
**ss**
211:2
**staff**
30:21 51:24 145:14
146:3,23 177:9,10
180:2 184:9 186:3
186:10
**staffing**
177:10
**stage**
151:15
**stand**
156:4,17 157:8
**standard**
18:17,20 125:16
206:10
**standards**
17:7
**standing**
128:9 136:13 140:19
**standpoint**
79:9
**Stark**
93:25
**start**
35:7 104:4 109:9,17
133:7 137:7 178:11
197:6 199:21
**started**
20:13
**starting**
36:12 109:8,16
182:23
**state**
4:16,17 37:12 110:10
121:9,17,19 126:20
140:13 148:14,16
210:15 211:1,5
**stated**

54:1 95:24 121:22
138:20 152:16
**statement**
25:16 135:3,5,9
137:8
**statements**
22:6 88:7 199:6
**states**
1:1 8:14 126:1
137:24 183:14
**stating**
5:9
**statutes**
99:25 100:12
**staying**
199:24
**step**
173:6 186:25 190:10
**steps**
41:11
**stick**
74:4 174:16
**stigma**
124:16
**stimulants**
122:7 167:9
**stipulations**
4:23
**story**
10:17,18 37:8 44:20
**strained**
69:16
**Street**
2:3,6 209:4
**strength**
151:10 152:2,13
**stress**
70:21 122:3,15
145:23 167:8
168:15,20
**stressful**
44:4
**stressing**
183:25
**stress-related**
121:10,18 148:15

**strict**
17:18
**stringent**
63:2
**strive**
19:7
**strong**
175:3
**struggle**
66:18
**struggling**
23:24 42:1 183:8
195:13,18 196:8,14
196:15,18,24
197:19
**stuck**
73:23
**student**
147:11 151:20
**studies**
191:25 200:20
**stuff**
169:3 181:1
**subject**
6:25 15:3,5 97:8
121:2
**subjective**
164:9,10,13
**submit**
39:4,15
**submitted**
28:10 205:8
**subscribed**
210:14
**substance**
36:14 45:11 133:5
139:14 167:19
**substantially**
47:3 134:5
**substantive**
29:2,8,10 33:2,2
**suffer**
142:19 173:3
**suffered**
144:13,16,18
**suffering**

22:16 54:16 194:3
206:20
**suggest**
73:12 133:16,18
140:16 198:1
**suggested**
30:9 62:2 128:6
138:4
**suggestion**
128:2 140:5
**suggestions**
58:13 60:15,20 64:15
64:21 65:4
**suggests**
7:17 140:18
**suicidal**
64:2 167:19 201:21
**suicide**
122:3 142:20,20
143:5 167:7
**suit**
75:17
**Suite**
2:4,7
**summer**
32:21 154:4
**supplement**
85:5
**support**
25:1 58:2 60:9
112:11 158:22
159:5,9,16,17,23
160:5
**supported**
17:1 44:24 125:6,15
125:21,24 136:2
144:2 157:13
**supportive**
62:8
**supports**
25:11,21 118:22
122:18 123:3
158:12
**suppose**
73:12,16 149:14
150:8 155:11


MAGNA
LEGAL SERVICES

159:12 163:1,11,20
164:23
**supposed**
68:10
**supposedly**
165:2
**supposition**
191:2
**sure**
10:25 14:14,14 21:13
27:5 28:24 37:10
43:2 45:22 53:19
62:12 63:21 66:17
68:9 71:5,13 76:18
76:22,25 90:3 91:2
94:18 98:23 99:17
110:3,3 115:9
142:11 145:8 155:8
169:10,10 172:14
174:11 191:16,23
199:21 204:18
208:9
**surgeon**
185:13
**surgical**
185:10
**surname**
5:11
**surprise**
59:2,6,21,25 130:25
131:4,5 204:10
**surprised**
180:15,20 186:20
**surrounding**
94:16 114:4 206:3
**susceptible**
153:19
**swear**
4:24
**swimming**
204:7
**swings**
138:22 139:12
**sworn**
5:4 210:14 211:8
**symptom**

122:6 201:9
**symptoms**
49:16 121:25 122:10
144:20 167:6 169:6
174:15 175:1 176:4
177:20 180:21
192:7 193:16,21
201:7,9,19 203:18
203:21 204:1
**system**
184:22
**systems**
47:7 48:12

---

**T**

**take**
6:24 20:3 24:8,25
41:10 49:16 53:5
57:22 58:23,24
59:20 60:1,8,22
61:6,15 63:1 64:2,6
64:11 66:19 72:8
73:17,18,21 74:1,3
74:3 94:4,12 95:3
95:23 96:4 133:16
140:25 157:22
161:12 169:15
173:6 181:18
190:10 191:22
193:3
**taken**
1:16 4:3 5:1 6:6,12
66:4 95:12,16 158:4
211:11
**takes**
110:4,6,7 161:23
193:5
**talk**
27:15 36:4 41:23
42:4,22 52:4 56:6
56:19 75:3 81:18,23
85:10 86:19 106:20
107:11 111:1,11,14
111:21,22 118:15
149:11 150:4 194:7
**talked**

43:5 55:16 75:4 76:6
86:3 113:2 117:12
163:1 170:24 191:2
197:16
**talking**
15:6 35:5 41:17
62:15 70:12 95:8
146:9 203:17
**task**
79:7,20,21,24
**team**
116:6
**technical**
12:10 92:6 151:24
**technically**
200:9 202:20
**telephone**
28:20 31:7 32:5,7,11
**tell**
5:4 6:12 9:25 10:13
10:15,17,17,19 11:1
11:4 12:14 28:16
30:5,7 35:11 45:20
45:24 47:17 50:21
52:8 53:20 56:13
59:18 67:19 73:13
74:6,6 82:19 90:11
90:14 107:7 110:19
111:15 114:17,24
118:25 128:23
138:9 157:3 160:25
**telling**
10:21 39:13 57:2
124:8 180:5
**tells**
11:13 200:22
**temperature**
187:5
**tempered**
165:12
**ten**
95:9 137:21 157:25
**tend**
17:13 192:20
**tendency**
61:1

**tendered**
118:14
**ten-item**
137:21
**ten-minute**
95:16
**term**
22:16 44:5 47:24
70:8 124:13
**terminated**
110:25 111:7 117:12
168:4 173:3
**termination**
143:7 183:15 184:15
**terms**
17:25 18:16 24:2
37:19 67:17 93:20
113:25 116:25
129:24 152:2,13
162:2 167:17
175:16 183:3,4
200:24 202:24
205:20
**test**
12:1 22:23 23:19
**testified**
5:4,22 24:9 41:13
52:16 81:9 110:14
111:2 133:22
159:22 167:5 189:1
205:7 206:6
**testify**
6:15 116:22 117:1
169:25 171:20
172:2,11,16 173:1
173:15,24 205:10
207:9 211:8
**testifying**
45:18 171:25 173:11
**testimony**
6:14 7:4,4 88:22
144:7 170:21
171:16 173:7,15
182:14,17 198:10
204:23 210:6
211:15


MAGNA
LEGAL SERVICES

**tests**
 200:17
**Texas**
 37:15
**text**
 3:9,12 161:9
**thank**
 4:22 5:12 7:7 9:7
   10:3,9 39:12 83:20
   95:9 121:16 158:7
   173:23 204:17
   207:12,14 208:20
   209:5
**thanks**
 29:24 94:13 102:21
   179:14
**theory**
 180:16
**therapist**
 171:14
**thing**
 14:8 55:1 57:7 62:21
   65:9 71:12 87:14
   91:24 146:24
   155:21 164:9
   185:12 187:3,5
   200:11 201:11
   204:5,6
**things**
 8:23 9:3,6,13 12:2
   17:22 40:23 42:10
   44:14 63:2 65:14
   66:5,7 67:18 73:6,6
   92:22 94:11 99:20
   127:19 128:13
   136:19 140:23
   142:14,17 145:2
   155:24 156:10,14
   156:21 167:13,15
   170:4 171:23 172:9
   173:19,19 176:3
   185:13 187:15
   188:5 189:20,22
   190:2 192:22
   201:22 202:3
   203:19 204:14

**think**
 6:2 7:20 10:18 22:1
   24:9 26:20 30:3
   37:16,20 38:4 42:1
   43:6 46:6 47:18
   50:3 54:22 55:2,18
   55:21,21 57:14
   59:15 60:4,10,23
   61:1,8,22 63:12,13
   65:17,22 66:11,20
   67:21 68:22 70:10
   70:20,24,25 72:25
   72:25 73:1,1,2,8
   76:23,23 77:2 80:9
   80:9 82:10 86:13
   87:13 88:21 91:22
   93:9 99:12,17 105:1
   105:2 106:9,18,23
   107:5,12 108:12,20
   109:12 115:17
   116:7 124:12
   126:15 128:19
   129:4,5 130:17
   136:21 144:18
   145:16 147:7,19
   152:5 156:4 157:8
   158:14 165:15,17
   165:25 166:16
   169:19 171:20
   172:6 174:24
   177:16 178:19
   180:11 183:2
   185:14 186:15
   187:19 188:9,25
   189:24 190:9,14
   192:25 197:12,13
   200:23 201:14,17
   202:23 208:23
**thinking**
 20:5 63:13 79:12
   128:15 176:2 193:5
   194:5 197:6,8
**thinks**
 124:14
**third**
 38:4 90:16,24 91:9

  99:8
**Thomas**
 3:21 126:7,16,17
**thorough**
 16:22 47:6 48:6,12
   50:8,9 51:11,13
   136:2 205:9
**thoroughness**
 18:12
**thought**
 15:19 45:4 50:2,7
   57:4 63:11 71:21
   91:21,22 102:12
   124:9 135:10,10,16
   154:20 186:13
**thoughts**
 122:3 165:18 167:7
**threat**
 107:19
**three**
 16:10 27:19,19,25,25
   32:11 33:5 57:21,22
   60:24 61:11,15 71:7
   74:1 89:11 98:15
   105:6 106:7,19
   107:11 109:23
   115:19 118:25
   122:21 123:5
   135:22 136:22
   154:11,13 158:14
   158:21 159:4,14
   160:4 162:14 166:9
   193:4 209:2
**three-month**
 53:5,24 54:6,13,17
   55:10 56:7,20 57:19
   64:19 65:3,15 66:5
   68:11 73:21 105:11
   105:21 111:22
   155:4 159:15 165:2
   166:17 177:25
   187:9
**three-months**
 67:2
**three-week**
 155:10

**three-weeks**
 85:12
**tick**
 16:2
**time**
 4:15,15 5:25 6:24
   7:14 9:9 10:17,21
   27:13 31:24 32:10
   32:14,17 33:9 34:18
   35:5 36:17 43:15,18
   44:14 45:12 60:11
   60:22 61:3,7,7,9
   62:23 69:11 73:3,17
   75:15,22 79:16,25
   81:8 82:17,22 85:13
   90:8 93:5 96:4 97:7
   98:12,19,21 113:7
   113:13,23 114:3
   119:18 120:4
   128:24 131:3,14,14
   131:25 132:7,9,12
   133:12 140:13
   141:10 143:19
   144:10 145:9,16
   146:6,10 147:7
   157:5 165:1,9
   170:21 172:12
   174:7,15 175:25
   176:9,17,21 177:1
   177:23 178:17,24
   179:17,18,22,24
   180:1,3,10 185:21
   187:7 189:11
   190:10 197:7,24
   202:22 204:8,12
   207:13 208:18
   211:11
**timeline**
 32:25 180:25 202:21
**times**
 7:9 27:15,19,25 28:6
   32:2 33:6 44:4,10
   71:7 166:15 181:23
   181:25 186:16
   187:25
**time-limited**



9:8

**time-sensitive**
91:14

**tired**
131:2,14 132:7,10,12
133:10 140:15,22
141:10 169:2

**tiredness**
128:10 140:20

**today**
4:11 15:21 16:5
174:9,13 176:13
177:23 179:6,16
180:4 182:16 190:5
193:9

**Today's**
209:1

**told**
44:1 57:21,25 61:13
61:14,18 62:25
66:25 67:14,14,20
68:20 71:20,23
73:25 92:12,19
93:11,14 94:18
99:13,19,23 100:4
100:10 105:3
113:20 115:9
117:23 119:14
148:10 150:8
162:13 163:2 168:2
169:24

**tolerate**
17:9

**tone**
64:4 111:25 187:4

**tooken**
6:11

**tool**
125:17,22,24

**top**
13:20 77:22 133:7
191:5,9

**topic**
187:6

**total**
183:2 200:24 202:24

**tough**
25:5 44:9 184:19

**tougher**
188:20

**tracking**
91:2

**trade**
107:5

**trails**
155:15 202:19

**trained**
37:14 67:10

**training**
88:3 151:17

**tranquilizer**
192:15

**tranquilizers**
122:8 167:10

**transcript**
207:19 211:14

**transcription**
210:6

**transitioning**
189:2

**trauma**
142:19,22

**traumatized**
120:8

**treat**
22:6

**treating**
18:25 19:11 21:21
38:7,15 162:24
165:24

**treatment**
19:13 20:18 24:10
27:8 145:4,14
167:22 185:20
194:7

**tremendously**
44:7

**trial**
198:10,11 202:11

**tried**
178:14

**triggered**

203:22 204:2

**trip**
155:10,12 156:25
157:6 166:21
203:23

**trouble**
180:17

**true**
19:2,9 34:6 58:12
88:10 114:23
121:22 134:24
135:3,5,6,21 159:10
167:20 168:14
182:5 196:13,17
197:23 202:13,22
206:9 210:5 211:14

**trust**
10:20 50:9 71:2

**truth**
5:4 6:12,12,13 10:13
10:15,17,21 11:2,4
11:13 134:22 211:9

**truthful**
6:16 45:11

**truthfully**
45:10

**try**
100:10 178:20

**trying**
10:1,2 13:5,8 48:17
61:23 62:10,13 73:1
77:11,12 82:3 98:10
102:6 122:25
126:15 129:1
157:16 165:13
181:1 189:10 200:8

**tumor**
184:12 185:4,6 206:2

**turn**
14:9 46:22 80:11
123:18 129:7
132:21 133:24
134:3 137:9 160:10

**turning**
147:15

**two**

5:19,20 8:4 10:22
11:7,21 21:1 24:14
36:14 39:6 47:9
49:2 63:2 77:19
81:23 89:11,12
115:17 124:1 139:2
147:8 165:14,18
166:18 192:8 201:9
202:3

**type**
30:25 38:5,5 92:6

**types**
108:25

**typewritten**
211:13

**typically**
143:2 166:1

**typo**
184:25

---

**U**

**uh-huh**
35:18 44:11 53:2
76:16 82:16 97:4
134:8 138:19
151:21

**unable**
57:20 85:3 122:20
123:5 136:25 156:3
157:7 158:13
159:24 165:2 183:1
200:23 202:23

**unbelievable**
152:7

**uncommon**
168:19

**uncover**
148:12

**underneath**
182:24

**understand**
61:18 66:2,24 68:9
69:6,10 70:1 71:25
78:7 88:21 90:3
92:24 109:6,13
112:15 162:13



172:15 173:10
**understandable**
146:16
**understanding**
53:23 60:14,16 64:5
64:14 66:25 67:5,13
68:19 71:3 90:12
95:22 128:16 170:2
170:9,17
**understands**
138:5
**understood**
38:6 44:18 59:18
69:20 79:13 89:2,18
90:4 91:18 106:12
111:2 181:24
**unduly**
16:18
**uneasy**
24:15
**unexpected**
117:13 143:4,7
**unfortunate**
183:15
**unilaterally**
105:10,21
**United**
1:1 8:14 126:1
**unreasonable**
118:24 119:10
**unreasonably**
90:6 179:8
**unrelenting**
121:20 148:17
**untimely**
143:4
**unusual**
59:25 151:10 152:2
**update**
75:13 78:24 85:11
119:24 165:23
**updated**
34:10 78:21 85:9
**upset**
145:18
**urgency**

55:5
**use**
21:9 47:24 106:3
124:3,3,9,10 167:19
188:17 192:21,22
**uses**
195:23
**usual**
20:19 104:8 128:3
140:18 155:22
164:13 189:18
**usually**
15:17,20 16:2,10
17:25 22:12 189:23
191:20
**Utah**
155:13 156:16

— **V** —
**V**
1:10
**vacation**
32:18 57:5 68:6
85:13,20 86:9,9
91:15 93:10,16 96:9
96:21 155:6 165:1
176:9 177:12
**vacations**
44:13 73:18 74:3
95:23 96:5 174:18
175:23 176:25
177:2,5
**value**
19:14 20:20
**valued**
169:5
**variance**
42:17
**varies**
153:10
**various**
12:6 13:2 38:11
120:23
**vast**
60:5
**verbal**

10:5,7
**version**
11:6 46:7 56:4,15
**versus**
178:4,13
**vetted**
17:24
**video**
208:6,18
**videoconference**
4:10
**videographer**
2:8 4:1,11,22 95:10
95:13 158:2,5
169:17 207:15
208:6,12,19,21,24
**VIDEO-RECORD...**
1:5,16
**view**
24:24 43:23 144:2
157:13 162:15
165:6
**violating**
180:20
**violence**
65:21
**virtual**
4:2 32:8
**visit**
22:14 24:15,17 98:9
98:12 174:19
181:13 195:23
**visits**
166:18
**vitae**
3:13 12:6 13:21
**vitals**
49:16
**voice**
111:25 153:13,15
**void**
91:24
**volume**
4:2 14:10 46:1
208:25
**voluntarily**

21:2 22:7
**vs**
4:5

— **W** —
**wait**
9:15 78:23 109:23
115:19,21 118:24
**waiting**
23:8
**waking**
131:3
**walk**
156:4,17 157:8
**walking**
128:9 136:13 140:19
186:18
**want**
6:24 10:10 23:10
24:21 29:21 61:6
64:11 68:1,13 73:11
73:12 76:18 85:10
90:3 124:22 141:17
141:23 158:24
160:17 162:10,11
163:18 164:4,22
169:18 171:5
172:14 174:7,8
186:22 190:3
194:25
**wanted**
36:4 43:7,7,23 58:9
64:2 73:17,18 74:3
147:8 149:15 162:5
**wanting**
69:5 194:6
**wants**
26:24 150:20
**wash-over**
204:8
**wasn't**
24:4 49:14 68:23,23
71:13,21 77:1 93:12
93:13 108:9 135:6
146:20 157:19
168:6 181:25



190:18 191:23
199:23
**water**
60:2
**way**
6:16 13:9 16:22 22:4
24:4 42:11 47:21
60:25 63:10 94:9
107:4,14 109:25
117:22 156:4 157:8
162:20 172:21,22
173:15 176:23
188:21 189:23
196:7,14 199:7,12
202:17
**ways**
145:23 188:3
**wear**
104:11
**weary**
116:15
**week**
128:17,24 130:10,19
130:19 131:2,18
132:7 144:8 151:7
152:21 153:6,18
155:3,13,18 156:6
156:15,24 165:14
165:14 193:4
**weekends**
169:3
**weeks**
63:7 110:7 153:1,9
166:16 193:4
**weighing**
185:19
**weight**
66:20 144:12
**well-being**
142:2,8 143:2
**went**
44:12 53:25 57:5
58:7 70:21 73:25
95:23 96:5 98:8,15
166:15 179:16
**weren't**

49:12 51:10 182:9
**we'll**
52:23 94:12 182:22
**we're**
15:6 16:10 48:2 86:1
86:5 90:20 91:2
130:2 165:14,15
201:16
**we've**
46:4 59:4 75:4
144:20 170:24
203:16
**WHEREOF**
211:20
**white**
42:3 66:13 67:22
141:16 190:24
191:18
**Whoa**
111:17
**wife**
21:10 34:23 41:16
43:3,18 44:24 55:19
65:21 120:13 129:2
130:22 147:18
150:5 157:15
164:24 178:19
184:12 190:16
200:2
**willing**
56:6,19 173:14
**willingness**
115:19 173:23
**wind**
69:23,23
**wish**
107:3 189:19
**wishes**
162:22
**withdraw**
204:23,25
**withdrawal**
143:7
**withdrawn**
111:9 120:5 173:4
**withdrew**

90:7
**withheld**
45:3
**withhold**
45:8
**witness**
4:24 5:21 18:11,15
20:16 27:9 38:19
80:20 116:19
149:25 197:11
211:20
**wondering**
142:13
**word**
14:19 20:4 90:17,25
91:7,10,13 106:3
161:15 195:23
199:18 208:2
**words**
37:18 66:19 102:13
111:25 118:4
137:25 199:24
206:15
**work**
17:23 20:8,13,16,16
36:22 37:1,6 38:2,3
38:13,19 54:7,14
57:20 60:11 67:1,3
67:5,15,16,24 73:4
99:11,13,21 110:12
120:12,13 121:10
121:18,19 122:16
122:21 123:5 131:1
131:3 139:10
142:19 144:11
148:16,17 149:15
150:5 151:7,16,19
152:17,21,25 153:5
154:22 158:13
159:13,24 160:3,20
165:3 166:25
168:21,24 169:5,12
181:20 182:21
183:2,3 187:1
193:10 194:16,18
200:8,24,25 202:23

202:24 203:19
207:3
**workaholic**
44:2 130:23 193:9
194:5
**worked**
37:15,15 51:23,24
110:12 122:15
140:8 147:12
148:21,25 150:9
**worker**
31:1 121:20 148:18
**working**
101:16 103:2 107:19
111:3 128:17,24
129:24 130:5,9,16
130:18 131:17
132:7 144:7,17
147:1,21,24 152:7
152:14 157:19
169:1,1,13 177:8
193:5 200:13
**workplace**
144:22 164:12,16
187:4,5
**works**
30:9 150:21 151:3
**work-related**
57:23 69:3 164:24
183:4,11 201:1
**worn**
131:2,14 132:10,12
133:3,9 140:14,22
141:9
**worried**
58:20 64:1 70:6
121:15
**worrisome**
201:19
**worry**
71:1 201:20
**worse**
120:4
**worthy**
17:11
**wouldn't**


**MAGNA**
**LEGAL SERVICES**

18:5 70:20 111:11
111:14 112:7 113:9
131:6,18 132:11
141:16 149:16
155:22 200:16
201:3
**wrapped**
124:15
**wreck**
204:8
**write**
74:2 90:1
**written**
87:9 113:13 121:1
166:17 186:15,23
196:7
**wrong**
49:23 51:7 74:7 80:7
117:13 145:5 208:2
**wrote**
44:25 84:19 98:21
118:20 134:20
135:15,18 197:22
198:1
**wRVU**
147:22
**wRVUs**
71:4

---
**X**
---
**X**
3:1

---
**Y**
---
**Yale**
126:14
**yeah**
13:16 23:23 24:23
25:8,16,19 29:9,23
33:17 50:6 56:24
63:6 65:23 66:10
69:8 76:11 77:21
78:8 81:9 84:2
92:16 95:7 99:12
100:8 102:16,22
109:12 118:4 124:5

124:11 125:13
126:14 127:14
128:9 132:10 134:1
135:18 142:24
145:3 147:17 149:8
149:21 151:9 152:1
152:1,5 153:14,23
154:6,16 166:20
170:16 172:10,19
185:7,25 187:2
192:4,20 197:13
205:6 207:24
**year**
77:1 84:20 145:10
148:5
**years**
6:2 19:22 31:2 44:20
60:7 88:18 89:21
100:17 145:18
150:9 151:11,18,23
**yellow**
127:4
**yep**
26:12 46:11 59:15
110:18 138:13
142:23 207:18
**Young**
2:8 4:11

---
**Z**
---
**Zoom**
1:16 4:3 27:11 32:8
34:10 83:5 86:15,20

---
**$**
---
**$1**
148:5
**$14**
148:4

---
**0**
---
**0.5**
193:2
**00481**
129:16

---
**1**
---
**1**
3:17 4:2,2 8:12 33:25
34:4,9,11,14 41:7
41:11,18 44:25
45:13 56:8,21 75:11
76:6,13,14 77:18,22
77:25 80:12 81:19
81:21 82:18 86:24
97:8,9 109:8,16
134:9 135:23
208:25 211:22
**1st**
31:19 46:3 104:22
**1.9.2023**
3:19
**1:23-cv-01921-NY...**
1:3 4:7
**10**
90:23 95:5
**10th**
96:19
**10:00**
1:17
**10:01**
4:15
**100**
2:7
**101**
3:12
**11**
19:22 89:25 90:14,16
90:19,20 91:5
**11th**
83:25 84:1
**12**
3:13 19:22 127:15,24
133:15 134:13
171:23
**12:26**
95:11,12
**12:39**
95:12,14
**123**
3:18

**124**
3:20
**126**
3:21
**13**
13:1,6,18,19
**13th**
28:18
**15**
130:9,18
**16**
1:6,17 3:2 4:10
**16th**
209:8
**160**
3:9
**1635**
209:3
**17th**
2:3
**18**
119:25
**19**
82:21

---
**2**
---
**2**
48:21 75:11 81:19,22
86:24 135:25
**2C**
3:7 52:15,17 62:16
62:17 98:12 181:6,7
191:4
**2.1.23**
3:14
**2:13**
158:3,4
**2:31**
158:4,6
**20**
97:9,18
**20th**
98:3 113:19
**2000**
75:5
**2003**



75:5
**2010**
20:13
**2011**
20:9
**2013**
19:22
**2022**
28:18 56:4,8,16,21
97:10 100:24
104:23 109:8,16
115:4,13 161:1
179:20,21 193:21
194:22
**2023**
8:12 27:12 31:25
33:7,23 34:5 35:8
41:18 44:25 45:13
45:18 46:3 75:6
76:20 77:5 81:21
82:18,21 84:22
123:16 133:23
134:9
**2024**
1:6,17 3:2 4:10 8:3
9:5 34:15 46:9,15
75:6 77:7 81:22
82:18,21 83:3 91:3
119:17 124:23
195:1 209:8
**2025**
210:16 211:21
**2027**
211:22
**21**
97:18
**211**
211:13
**22nd**
98:13
**23**
41:7,11 77:23 80:12
150:9
**24**
41:8
**25**

77:7 82:21 83:3
**25th**
85:19 86:11
**26**
29:18 56:4,16 119:17
124:23
**26th**
83:8 86:21
**27**
33:23 76:20 77:5,22
**2701**
2:6

—————— **3** ——————

**3**
33:21 46:22 47:10,10
48:5,22 80:13 136:4
137:13
**3B**
97:13
**3:46**
208:25
**3:47**
209:7
**30**
82:18
**30th**
8:3 9:5 41:8 46:15
91:3 195:1
**36**
77:25

—————— **4** ——————

**4**
47:10 48:6 121:4,8,9
121:25 126:16,25
148:14 192:10
**4/21**
96:21
**4/30**
96:21
**40**
152:21 153:5
**40-hour**
152:25
**43-page**

50:25
**45**
3:14
**46**
3:10
**486**
137:11,14
**488**
132:21,23

—————— **5** ——————

**5**
122:1 126:16,25
137:12
**5th**
101:21,23 103:1
**50**
3:8 153:9
**50-year-long**
183:16 184:16
**500**
138:8,9,15,16
**502**
139:2
**503**
139:19
**52**
3:7,11
**55**
3:8 50:19,20,24 51:1
129:7,8 132:20,22
137:8 138:8,12
**56A**
3:9 160:11,13,15,24
**57-year-old**
182:24 191:5,10
**59A**
3:10 46:16,19 91:3
119:20 121:4,5
127:16 133:15
134:18 195:5,6
205:8

—————— **6** ——————

**6**
75:25 79:10 80:5,6

81:2,15 127:25
130:19 161:1
**6/26/22**
97:14
**6/27/22**
97:14
**6/6/22**
97:14
**60**
129:5 193:10
**60-hour**
153:9
**61**
3:11 52:7,10,23,24
62:14 69:12
**66**
3:12 101:6,7,8

—————— **7** ——————

**7**
34:6,9,11,14 76:6,13
76:14 77:19
**7th**
33:22
**7.26.24**
3:20
**7.30.24**
3:10
**7/22/22**
98:5 113:3
**7/22/22(sic)**
113:3
**7/7/22**
98:5
**75**
128:19 129:5

—————— **8** ——————

**8**
34:11,14 76:9 148:4
**800**
2:4
**80202**
2:4,7
**87**
3:13 12:5,13,15 46:5



**88**
 3:14 45:17,21 46:1
   48:20 134:1,1,10
**89**
 3:15 96:15,16

**9**

**9**
 27:12 122:5 123:16
   123:18,23,24
   137:12,13
**9th**
 35:8 211:21
**9:00**
 175:5
**90**
 3:16 96:25 97:1,2
   130:20,21 131:1,17
   132:7 151:7
**90-hour**
 193:10
**900**
 179:16
**91**
 3:17 97:23,25 98:4
   112:22
**92**
 3:18 123:9,10,15
**93**
 3:20 124:17,19
**94**
 3:21 126:4,5,6
**95**
 133:25
**96**
 3:15
**97**
 3:16,17
**999**
 2:3

