Page 1

_____

ANUJ PEDDADA, M.D.

v.

CATHOLIC HEALTH INITIATIVES COLORADO,
d/b/a CENTURA HEALTH

_____

VIDEOTAPED DEPOSITION OF ANUJ PEDDADA
JANUARY 19, 2023

_____

APPEARANCES:

For Centura Health:

MARK SABEY, ESQ.
Hall Render Killian Heath & Lyman, P.C.
999 17th Street, Suite 800
Denver, Colorado 80202

For ANUJ PEDDADA:

IRIS HALPERN, ESQ.
QUSAIR MOHAMEDBHAI, ESQ.
Rathod Mohamedbhai, LLC
2701 Lawrence Street, Suite 100
Denver, Colorado 80205
303-578-4400
ih@rmlawyers.com

ALSO PRESENT:  Victor Sieff, Videographer



Page 2

Videotaped Deposition of ANUJ PEDDADA, the Witness herein, called by CENTURA HEALTH in the above-entitled matter on Thursday, January 19, 2023, commencing at the hour of 1:10 p.m., at 999 17th Street, Denver, Colorado, before Theresa L. Mendez, a Registered Professional Reporter and Notary Public for the state of Colorado, said deposition being taken pursuant to Notice.

_____

Page 3

I N D E X
EXAMINATION OF ANUJ PEDDADA:          PAGE
January 19, 2023

ANUJ PEDDADA                    5

INITIAL
EXHIBITS:     DESCRIPTION          REFERENCE

Exhibit 1    Physician recruitment agreement    13
Exhibit 2    Charge of discrimination          17
Exhibit 3    Citizenship committee redacted    19
             document - unmarked per Mr. Sabey

Exhibit 4    E-mail sent to ^Alan Monroe       35

Exhibit 5    Professional services agreement   36
             between Mr. Peddada and Radiation
             Oncology, P.C.

Exhibit 6    Recruitment loan settlement       50
             agreement
Exhibit 7    Agreement                         54
Exhibit 8    Audit report/summary              55
Exhibit 9    Text Messages                     58
Exhibit 10   E-mail 4/27/2022                  59
Exhibit 11   E-mail 4/28/2022, 4/27/2022       60
Exhibit 12   Employment Application for        67
             Centura

Exhibit 13   Agreement                         69

Exhibit 14   April 12, 2022 signatures to      74
             Radiation Oncology, P.C.

Page 4

NUMBER       EXHIBITS (continued.)       PAGE

Exhibit 15   Voluntary Self-Identification of   76
             Disability form
Exhibit 16   Zillow house for sale listing 11   77
             El Encanto Dr. Colorado Springs,
             CO 80906
Exhibit 17   Colorado Secretary of State        77
             Summary document details for Anuj
             Peddada, MD, LLC, formed in June
             of 2022

Exhibit 18   Statement of Change Changing the   79
             Registered Agent Information
Exhibit 19   Statement of Correction            80
             Correcting the Registered Agent
             Information
Exhibit 20   Letter dated May 5, 2022 from      80
             Caryn Baldauf

             (Exhibits indexed and attached to
original and copy transcripts.)

       INFORMATION TO BE PROVIDED

          PAGE      LINE
           79        17

Page 5

P R O C E E D I N G S

THE VIDEOGRAPHER: Okay. We're on the record at 1:10 p.m., to take the deposition of Dr. Anuj Peddada in the matter of Anuj Peddada, MD versus Catholic Health Initiatives of Colorado.

Today is January 19, 2023. We're located at 999 Seventeenth Street, Suite 800, in Denver, Colorado. The videographer is Victor Sieff and the court reporter is Theresa Mendez, both of Magna Legal Services.

Will counsel and all parties present state their appearances and whom they represent.

MR. SABEY: Mark Sabey appearing on behalf of whoever the defendant is, Catholic Health Initiatives of Colorado, I think.

MS. HALPERN: Iris Halpern and Qusair Mohamedbhai on behalf of Dr. Anuj Peddada.

THE VIDEOGRAPHER: Can our court reporter please swear in the witness.

Whereupon,

ANUJ PEDDADA,
the witness having been first duly sworn, was examined and testified on his oath as follows:

EXAMINATION
BY MR. SABEY:



Page 6

Q.  Dr. Peddada, thank you for being here today.  Have you been deposed before?
A.  A long time ago.
Q.  How many times have you been deposed?
A.  Once.
Q.  And what kind of a case?
A.  It was a business matter.
Q.  Can you be more specific, please.
A.  Between my business partners -- business partners.
Q.  Okay.  And what was the dispute?
A.  Financial billings that was resolved.
Q.  And what was the disagreement about financial billings?
A.  My billings that were coming in through Medicare take 90 days to be collected.  And they kept the receipts of those billings and were supposed to return it to me, and that wasn't done.
Q.  Okay.
A.  That was resolved.
Q.  Okay.  Now, you just took an oath to tell the truth and the whole truth, and we're going to be relying as this case moves forward on the testimony you give in this deposition, so it's important that you testify in a way that is complete, truthful,

Page 7

honest and accurate.
Will you do that?
A.  I agree.
Q.  The purpose of this deposition is to get your testimony, not your attorneys, and so they -- your attorneys can't help you answer questions.
Do you understand that?
A.  I do.
Q.  Okay.  There may be times when your attorney will object to a question.  That happens just to preserve the objection, but unless there's some claim of privilege, you can proceed to answer the question.
Do you understand?
A.  I understand.
Q.  Now, because I've only got a limited amount of time to question you in this deposition.  I'm going to ask you to answer the questions I ask you directly.  Then if I need further elaboration or clarification or background, I will ask for it.
And additionally, your attorney will have an opportunity to ask you questions, so in order to allow things to move along quickly, I need to ask you to answer the questions I ask directly and then wait for me to ask for elaboration, if I need it.

Page 8

Will you do that?
A.  Yes.
Q.  Some witnesses don't understand that a deposition is not your time to tell your story or argue your case or make a point that you really want to make.  There's no judge here.  There's no jury here.  And it's easy to forget that.
So if I interrupt to tell you that I don't need elaboration, I'm not trying to be rude.  I'm just trying to move the process along.
And again, your attorney can ask for elaboration if -- it's a he and a she -- if he or she chooses to do so after my time for questioning is expired; is that fair?
A.  Yes.
Q.  We will follow sort of the court practice of taking a midafternoon break, where you can get drinks and use the restroom, and will all of that be okay for you?
A.  Yes.
Q.  And finally, the court reporter will only be able to answer -- oh, I'm sorry, will only be able to arcuately record verbal responses.
Shaking or nodding your head does not record very well, so it's important that your

Page 9

responses be verbal.
Will you do that?
A.  Yes.
Q.  Again, that's an easy one to forgot because that's not the way we do normal conversations so I may remind you by saying something like, is that a yes, and have you answer verbally?
A.  Okay.
Q.  One other preliminary matter, are you under the influence of any medication, drugs, alcohol or any other substance that would impair your ability to fully and accurately participate in this deposition?
A.  No.
Q.  Are you in good mental, physical and emotional health today?
A.  Yes.
Q.  Are you currently under the care of any doctor, therapist or care provider of any kind?
A.  My primary physician only.
Q.  And are you under care for any particular condition with your primary care physician?
A.  A general health.
Q.  Okay.  You don't have a condition that would preclude you from sitting uninterrupted for two hours or so in a courtroom proceeding or in this

Page 10

deposition?

A. No.

Q. Okay. Let's begin. So what did you do to prepare for this deposition?

A. Just reviewed my notes that I made to myself about things that occurred.

Q. Anything else?

A. Nothing specifically.

(Court reporter asked the witness to keep his voice up.)

THE WITNESS: Nothing specifically except for just reviewing what's happened.

Q. (BY MR. SABEY) Did you meet with your attorneys?

A. Yes. I met with my attorneys.

Q. And how much time did you spend with your attorneys to prepare for the deposition?

A. It wasn't to specifically meet to prepare for the deposition, but I did meet with them to talk about this deposition for about 30 minutes.

Q. Okay. Did you do anything else to prepare?

A. Nothing I can think of.

Q. So Radiation Oncology, P.C. or ROPC is a professional corporation in which you and Dr. Monroe are the only two partners, correct?

Page 11

A. That's correct.

Q. And who is on your board of directors?

A. Just he and I. It's a two-man practice.

Q. Okay. And ROPC is a legal entity but it has no brain, no ability to make decisions except through its partners, correct?

A. Correct.

Q. And how does ROPC generate revenues?

A. Our billings that Dr. Monroe and I submit.

Q. And how are the profits dispersed or distributed?

A. Evenly.

Q. And you and Dr. Monroe were taking home about $800,000 per year in salary and profits from ROPC alone, correct?

A. That's approximation, yes.

Q. And does the corporation own any assets?

A. Not that I can think of.

Q. And Dr. Kathpal was not a partner, correct?

A. No.

Q. Correct?

A. Correct. No. She was not a partner.

Q. And she was not paid a hundred percent of her revenue that her work produced?

MS. HALPERN: Object to form.

Page 12

MR. SABEY: Yeah. Let me restate that. Thank you.

Q. (BY MR. SABEY) She didn't take home all of the revenue that her work produced, correct?

MS. HALPERN: Object to form.

THE WITNESS: She was paid a salary.

Q. (BY MR. SABEY) Right. And what I'm asking then, did the income that was generated to ROPC for her work, exceed the amount she was paid in salary?

A. No.

Q. And was she working full time?

A. She was employed as a full-time doctor.

Q. And how much income did she generate?

A. I don't know that looking -- I don't know that.

Q. Okay. Okay. So we can get all the detailed documents later and come up with a precise number. But what's your estimate your best estimate?

MS. HALPERN: Object to form.

THE VIDEOGRAPHER: Do you have a mic on?

MS. HALPERN: I do. Is it just not --

THE VIDEOGRAPHER: It just is off.

MS. HALPERN: Object to form.

THE VIDEOGRAPHER: I gotcha. Sorry for the interruption.

Page 13

THE WITNESS: I didn't understand the question so ask me again.

Q. (BY MR. SABEY) I was just saying, while you might not know the exact amount of income that she generated, can you give me your best estimate?

A. I wouldn't have a good way to do that. But taking a wild guess, I don't know that.

Q. You got to have some idea, right, it's more than $10 --

MS. HALPERN: Object to form.

MR. SABEY: -- less than 2 million --

THE WITNESS: I really don't know. We have RVU numbers that you probably have access to them. That will tell you the answer to that question.

Q. (BY MR. SABEY) Okay.

(Exhibit Number 1 was marked for identification.)

Q. (BY MR. SABEY) I would like you to look at this physician recruitment agreement that's marked as Exhibit 1. Is this Dr. Kathpal's recruitment agreement?

MS. HALPERN: Object to form.

THE WITNESS: It looks like it is.

Q. (BY MR. SABEY) Okay. And in this agreement, if you just turn to the second page



Page 14

paragraph 1.3.1, it says group agrees to repay any and all amounts due to hospital under the note that have not been repaid and/or forgiven.

Did I read that correctly?

A. Yes.

Q. And if you turn to page 4 of the agreement.

A. (The witness complied.)

Q. The subsidy loan consists of 12 monthly payments of just under $29,000; is that correct?

A. That's correct.

Q. And then if you turn to the employment agreement, which is Exhibit B near the end.

A. (The witness complied.)

Q. It says, basically page 1 of the Exhibit B, under paragraph 5, it says that her annual salary was $360,000 per year; is that correct?

A. That's correct.

Q. And so roughly the subsidy payments that were made under the agreement covered her salary?

A. That's correct.

Q. So that means that Penrose St. Frances Health Services paid her salary basically, through this agreement?

A. Yes.

Q. And was she paid any more than her salary?

Page 15

A. She was given a hundred thousand dollar bonus, sign-on bonus.

Q. Okay. Anything else?

A. I can't think of anything else.

Q. Okay. Now, you understood that under this agreement if Dr. Kathpal left the community this would trigger a loan repayment obligation for ROPC, correct?

A. That's correct.

Q. And was it your intention when you signed this agreement to operate within the bounds of the law?

A. Yes.

MS. HALPERN: Object to form.

Q. (BY MR. SABEY) So you did not intend and it was not within the parties' contemplation that you were going to do something illegal, correct?

MS. HALPERN: Object to form.

Q. (BY MR. SABEY) Correct?

A. I don't understand the question. When you say "object to form," I don't understand what that means.

Q. You can ignore that. It's the form of my question.

A. Okay.

Page 16

Q. And that's what I was telling you at the beginning, when your attorney objects you just proceed, unless your attorney tells you not to answer.

A. Okay. Ask the question again. I'm sorry.

Q. No. It's fine. So you did not intend and it was not within the parties' contemplation that you were going to do something illegal?

MS. HALPERN: Object to form.

THE WITNESS: Correct.

Q. (BY MR. SABEY) And you understand that when hospitals pay money to physicians there are some strict laws including Stark and anti-kickback statutes and strict regulatory requirements about how that's done, correct?

A. That's correct.

MS. HALPERN: Object to form.

Q. (BY MR. SABEY) And when you left Texas you had to repay some recruitment funds yourself, right?

A. I, because -- yes.

Q. And so you're aware that physicians and hospitals are required to take seriously the legal constraints around physician compensation?

A. Yes.

Q. And do you understand that if a hospital or

Page 17

its executives violate those laws there are potentially serious consequences, including possible criminal prosecution?

A. Yes.

MS. HALPERN: Objection.

(Exhibit Number 2 was marked for identification.)

Q. (BY MR. SABEY) Show you Exhibit 2. Is this your charge of discrimination?

A. Yes, it is.

Q. And did you sign this charge under penalty of perjury?

A. Yes.

Q. Did you review this carefully to ensure that it was accurate before you signed it?

A. Yes.

Q. And did you prepare this by yourself or did you have professional help in preparing it?

A. I had help.

Q. Who helped you?

A. My legal team.

Q. Who is your legal team?

A. Omeed -- I don't know Omeed's last name -- and Iris. I don't know Omeed's last name.

Q. So an attorney in the law firm of Rathod

MAGNA
LEGAL SERVICES

Page 18

Mohamedbhai?

A. Correct.

Q. So Omeed and Iris? Okay.

And when did you first talk with any attorney about your relationship with Centura?

MS. HALPERN: Object to form.

THE WITNESS: Can you restate the question again one more time, please.

Q. (BY MR. SABEY) I'm just asking you, when did you first talk with any attorney about your relationship with Centura?

A. Very immediately after receiving a letter from Centura.

Q. What letter?

A. A letter saying that they didn't renew my offer, job offer.

Q. Not before that time?

A. Not before. I was already engaged with a lawyer regarding my practice to dissolve the practice.

Q. Okay. And when did you decide to dissolve the practice?

A. That was a decision the hospital made for us that we would no longer contract with Radiation Oncology, P.C.

Page 19

Q. So when did you retain an attorney to help you with dissolving the practice?

A. As soon as the hospital notified us that it would not renew the contract.

Q. Okay. I'd like you to look at paragraph 10 in the charge, Exhibit 2.

A. (The witness complied.)

Q. It says:

"Integrating Dr. Kathpal into the practice was difficult. Initially Centura intended for her to be the primary doctor at St. Frances, but she received several HR related complaints early into her employment which put ROPC in a difficult position."

Did I read that correctly?

A. That's correct.

Q. And is that a true statement?

A. That's a true statement.

Q. Okay. We're going to be referring to this document again and again.

(Exhibit Number 3 was marked for identification.)

Q. (BY MR. SABEY) Now, this is a citizenship committee redacted document, and it's redacted

Page 20

because of the peer review privilege. The unredacted part is purely factual information about a lunch meeting you had with Dr. Kabongo in late March 2022. So you're already aware of these facts and we're not disclosing anything that you don't already know.

MS. HALPERN: Object to form.

Q. (BY MR. SABEY) In fact, now that I think about it, can I see that document? We're not going to introduce it as an exhibit. I shouldn't have marked it.

THE COURT REPORTER: Do you want me to take 3 out?

MR. SABEY: Yes.

Q. (BY MR. SABEY) Do you recall this lunch meeting independent of this document?

A. Yes. I recall this lunch meeting.

Q. Now, it says, the addition of another partner -- referring to Dr. Kathpal, I'm thinking maybe meant another doctor -- prior to this event did not help, but it brought more tension professionalism has not been practiced. Is that --

A. I don't understand that term. I don't know what this means.

Q. Did you talk to him about Dr. Kathpal and that it wasn't working out?

Page 21

A. It was a woman, Kabongo -- yes, we did talk about this one, yes.

(Court reporter asked for clarification.)

THE WITNESS: He had the name.

MR. SABEY: The name is Kabongo. K-A-B-O-N-G-O.

Q. (BY MR. SABEY) And then -- so you did talk to Dr. Kabongo about the troubles you were having with Dr. Kathpal?

A. Yes. The meeting about the committee discussion, yes.

Q. Okay. And it said, it says here:

"He is aware of the tension that is in the office since they decided to dissolve the practice six months. He has not spoken to his partner during this time."

Did I read that correctly?

A. That's correct.

Q. And did you tell that to Dr. Kabongo?

A. Yes.

Q. So you weren't speaking to Dr. Monroe during that time?

A. He and I were not speaking at this time.

Q. So in the last part of 2021, is it fair to say that there was a lot of tension and your



Page 22

partnership with Dr. Monroe was very broken?

MS. HALPERN: Object to form.

THE WITNESS: That would be true.

Q. (BY MR. SABEY) And it's also very clear, I'll tell you from the communications and the documentation that neither Dr. Kathpal or Dr. Monroe wanted to practice with you any longer.

Were you aware of that fact?

MS. HALPERN: Object to form.

THE WITNESS: I was not aware of that fact, but there was tension.

Q. (BY MR. SABEY) Okay. So basically because your partnership was broken, a decision was made to transition to an employment model and to separate you and Dr. Monroe at two different facilities. You at Penrose and Dr. Monroe at St. Frances Hospital?

MS. HALPERN: Object to form.

THE WITNESS: That's correct.

Q. (BY MR. SABEY) Beg your pardon?

A. That's correct.

Q. So this is Exhibit 3. Would you hand me that other exhibit back? Thank you.

MS. HALPERN: I thought we didn't mark it as an exhibit.

MR. SABEY: We didn't. This is it. It's

Page 23

just used -- it was just used for refreshing recollection. Okay. So 3...

Q. (BY MR. SABEY) So this was addressing that issue. Sam Weller was seeking permission for that transition from an independent practice to an employment model, and so he says:

"The request is to move from an exclusive relationship with ROPC and move into an employed relationship. The initial request is to open two employment positions with shortly after opening a position for a third position. Likely case, Dr. Monroe will be based at SFH, and Dr. Peddada will be based at Penrose."

Did you understand at this time that that was the plan?

MS. HALPERN: Object to form.

THE WITNESS: I've never seen this --

Q. (BY MR. SABEY) I'm not suggesting you have. I'm just showing you that this idea that we needed to change was moving forward at this point.

A. It was moving forward in January, yes.

Q. Okay. And they had talked to you about this?

Page 24

A. They had a meeting with both of us, yes.

Q. Okay. And the outcome, I mean, Dr. Kathpal isn't mentioned specifically in here as far as what her new employment, if anything, would be.

What did you understand about what her position might be or was the -- what was the intent about Dr. Kathpal?

MS. HALPERN: Object to form.

THE WITNESS: Administration business said they're not going to keep her.

Q. (BY MR. SABEY) And was that based on your and Dr. Monroe's relationship with her that wasn't going well?

MS. HALPERN: Object to form.

THE WITNESS: I don't want to guess on this, but they did not want to keep her. Administration did not want to keep her.

Q. (BY MR. SABEY) You would agree that you didn't want to keep her either, correct?

A. Correct.

Q. You didn't --

A. Correct. I did not want to practice with her.

Q. Okay. And, Dr. Monroe, do you know whether he wanted to practice with her?

Page 25

A. He and I were not speaking so I don't know what his position was.

(Court reporter asked for clarification.)

Q. (BY MR. SABEY) Sorry. That's in normal conversation we tend to jump in when we know what the question is. So just take your time. Let me finish my question even though its slow sometimes and then you can answer.

And everybody involved knew that if Dr. Kathpal left the community ROPC would have a repayment obligation?

A. I don't know who you mean by everybody, but yes.

Q. You and Dr. Monroe, in particular?

A. Correct.

Q. And so did the Centura folks you were dealing with?

MS. HALPERN: Object to form.

THE WITNESS: There was a -- it was known there was a repayment and there was some decision to decide what the best way to work before with that as it wasn't completely clear.

Q. (BY MR. SABEY) Right.

A. The terms.

Q. Right. Okay. So you knew there would be a



Page 26

repayment obligation if Dr. Kathpal was leaving around this time in January and you started talking about it and trying to figure out how to make that happen?

A. That's correct.

Q. Okay. Fair to say that at some point, it became clear that Dr. Kathpal was leaving and this would trigger the loan repayment obligation for ROPC?

A. That is correct.

Q. And the amount of the repayment obligation was around $260,000?

A. I think that's correct.

Q. But rather than forcing ROPC to come up with that money, Centura was trying to help find another option that would be less burdensome for ROPC and still be in compliance with legal requirements?

MS. HALPERN: Object to form.

THE WITNESS: That's correct.

Q. (BY MR. SABEY) So the Centura folks hustled around trying to find a way to help you and Dr. Monroe avoid having to pay it back out of pocket?

A. That's correct.

Q. How many discussions did you have with any person at Centura about how you and Centura were going to resolve the loan repayment issue?

Page 27

A. Probably three or four. I don't exactly recall; multiple.

Q. And who did you discuss that with?

A. Eric Koval and Jeff Albert are the two main people I spoke to about it.

Q. And as part of the transition from an independent practice to employment, did you ever tell Centura that you were willing to enter into an agreement to pay back the loan or enter into a loan forgiveness agreement?

A. I never told them we had contractually Kath Pal's agreement if there was language to that effect.

Q. Right. I mean what you're saying is that under Kath Pal's agreement when she left, there would be a repayment obligation that ROPC had, correct?

A. Correct.

Q. And what I'm asking is, with regard to that repayment obligation, did you ever tell Centura that you were willing to enter into an agreement to pay back the loan or to enter into a loan forgiveness agreement?

A. No. I never did say that. There was a point of -- that's what the discussions were about you were asking me about. We had three or four meetings about this.

Page 28

Q. Okay. Did you make any notes or memos or recordings regarding those conversations?

A. No.

Q. Do you remember them verbatim?

MS. HALPERN: Object to form.

THE WITNESS: I don't remember any conversations verbatim.

Q. (BY MR. SABEY) Right. What do you remember about what was said?

A. That I didn't like the terms of that repayment. There are other options we should look at.

Q. What other options did you want them to look at?

A. When they closed Radiation Oncology, P.C., there's a value to the goodwill that we brought to the table. And I said that should be valued, and they were looking into that.

Q. And do you recall that there was some delay while Centura was waiting for a fair market value determination and a legal assessment of what terms would be legal?

A. I don't recall any delay specifically. I don't recall any delay specifically.

Q. Okay. But you knew they were trying to

Page 29

work through it and figure out what the options were?

A. Yes, yes. They were working through it.

Q. And do you recall having a conversation with Jeff Albert in late March of 2022, in which he brought you the good news, or at least I think he thought it was good news, that Centura found a way to resolve the repayment obligation without ROPC having to pay the money out of pocket?

A. Yes. I recall that conversation.

Q. And did he tell you that there was an option for loan forgiveness in conjunction with your ongoing employment?

A. Yes, he did.

Q. And do you understand that if the repayment obligation was not resolved in a manner that both served the community and kept your total compensation within fair market value, Centura would have a compliance problem?

A. Yes.

Q. Do you understand that ignoring ROPC's repayment obligation would be considered by the authorities to be a form of compensation to you?

A. Yes.

Q. And do understand that if you did not make arrangements to resolve the repayment obligations

MAGNA
LEGAL SERVICES

Page 30

either through out-of-pocket payment or through a forgiveness agreement, Centura could not legally employ you?

A. I wasn't aware of that.

Q. Do you understand that as a matter of law, the position employment agreement that you signed on April 1, 2022, could not be legally signed by Centura until the repayment issue was resolved?

MS. HALPERN: Object to form.

THE WITNESS: I was not aware of that. They never told that to me.

Q. (BY MR. SABEY) Eventually Centura decided the best way to do this legally was to have two interrelated agreements. They sent you a recruitment loan settlement agreement and also a revised employment agreement that included a loan forgiveness provision, correct?

MS. HALPERN: Object to form.

THE WITNESS: I did not receive that. I was on medical leave. It may have been sent to me then.

Q. (BY MR. SABEY) You're saying you never saw those agreements?

A. Never. I had them e-mailed to me, never really studied them in detail, no.

Page 31

Q. Did you view them? Did you...

A. It was an E-scribe document. I don't remember recall reading and signing it, no.

Q. You didn't read and sign it?

A. No. I was on medical leave when they sent that.

Q. I'd like you to look at the charge, which is Exhibit 2, and paragraph 26, which relates to the revised employment agreement?

A. Yeah.

MS. HALPERN: Which paragraph?

MR. SABEY: 26.

Q. (BY MR. SABEY) And basically, it essentially says that Centura sent it to you on the 26th of April, but you did not respond because you were on a scheduled vacation with automatic replies enabled, correct?

A. Correct.

Q. So you didn't respond because you were on vacation and not checking your e-mails?

A. No. I was on medical leave --

Q. You were on medical leave on April 26th?

A. I was on vacation, but I already had filed for my medical leave on the 25th.

Q. Okay. So were you on medical leave or on

Page 32

vacation on the 26th?

A. I was on medical leave.

(Court reporter asked parties to not talk over each other.)

Q. (BY MR. SABEY) Okay. I'd like you to look at paragraph 14 in the charge.

A. (The witness complied.)

Q. Paragraph 14 talks about complaints about your discourteous and disrespectful behavior in February and March of 2022, correct?

A. Correct.

Q. And paragraph 15 says that this discourteous and respectful behavior was temporary and uncharacteristic; is that correct?

A. That's correct.

Q. Is that a truthful statement?

A. That's a truthful statement.

Q. So when you say temporary and uncharacteristic. Do you mean that the discourteous and disrespectful behavior was definitely not a persistent problem that was characteristic of you over time?

MS. HALPERN: Object to form.

THE WITNESS: Do you want me to restate your question to make sure I understand this

Page 33

correctly?

Q. (BY MR. SABEY) Yes.

A. Yes. It is not my nature to be disrespectful or discourteous to any technical or nursing staff; that's correct.

Q. And so you're saying that discourteous and disrespectful behavior was definitely not a persistent problem for you and a characteristic of you over time?

A. That's absolutely correct.

Q. Okay. You have worked many years with Centura employees, correct?

A. That's correct.

Q. And were you sensitive to and concerned about the employees you worked with who needed medical leaves?

A. Yes.

Q. And were you ever communicative enough with the staff to hear about the process for Centura employees who seek a medical leave through UNUM the third parties Centura uses to process and approve medical leaves?

A. I'm not aware of that.

Q. So you were never even aware that Centura uses UNUM to approve medical leave?

**MAGNA** ◉
LEGAL SERVICES

Page 34

A.   No.  I did not know that.

Q.   I would like you to look at paragraph 24 of the charge.

A.   (The witness complied.)

Q.   Is says that you requested an urgent evaluation by your primary care physician.  Who was your primary care physician?

A.   Dr. Setty, S-E-T-T-Y.

Q.   And first name?

A.   It's a very long name.  I don't...

Q.   Okay.  And is that a male or female?

A.   She's a female.

Q.   And what's her specialty?

A.   Internal medicine.

Q.   And did she tell you that you were currently hypertensive and severely stressed?

A.   Yes, she did.

Q.   Did she prescribe and medications for you?

A.   She prescribed a antihypertensive agent and a antianxiety medicine.

Q.   And did she suggest ongoing treatment or give you specific instructions about things you should be doing?

A.   Yes, she did.

Q.   What did she...

Page 35

A.   She told me to contact Di Thompson, who is a psychiatrist who works at Centura, and I did that.

Q.   Okay.  Anything else that she told you you should do?

A.   She said I should take three months off for patient safety reasons.  She agreed with me.

Q.   Did she agree with you?

A.   She agreed that I needed some time off.

Q.   Did she give you specific instructions about any things that you should not do?

A.   I don't recall anything specific.

Q.   Nothing at all?  No prohibitions?

A.   I don't recall.

Q.   Okay.  Did you feel it was important to follow your physician's instructions carefully?

A.   Yes.

Q.   And did you follow them carefully?

A.   I think I did.

(Exhibit Number 4 was marked for identification.)

Q.   (BY MR. SABEY)  I'd like you to look at Exhibit 4.

A.   Yes.

Q.   I'm sorry.  I gave you the marked one.  I should have given that to him.  Thanks.  This is an

Page 36

e-mail that you sent to your partner, Alan Monroe, about a medical leave, correct?

A.   Yes.  That's correct.

Q.   And it says Exhibit 10 at the top in handwriting.  Is that your handwriting?

A.   Yes, it is.

Q.   And this was an exhibit for what?

A.   For my recollection of what time course of what happened.

Q.   So this was not for a proceeding, exhibit for a proceeding?

A.   No.  It's not for a proceeding.

Q.   Just the description that you gave to somebody with exhibits attached?

A.   Yes.

Q.   Who did you give it to?

A.   To my legal team.

Q.   Now, the first sentence in your e-mail refers to the professional services agreement between you and Radiation Oncology, P.C., Section 11, correct?

A.   That's correct.

Q.   So let's go to that contract.

(Exhibit Number 5 was marked for identification.)

Page 37

Q.   (BY MR. SABEY)  Okay.  The document that is marked as Exhibit 5, is that the agreement you were referring to?

A.   That's correct.

Q.   If you turn to page 3.

A.   (The witness complied.)

Q.   Under paragraph 11, Disability, it says:
    "During any period in which the employee
    is absent from work as a result of
    personal injury, sickness, incapacity or
    other disability, the corporation will
    continue to pay to such employee his full
    base salary and other compensation, in
    the same amount and manor as such
    compensation was paid in the period
    immediately preceding such a disability
    for a period of the first three months of
    such disability during any 12-month
    period."
    Did I read that correctly?

A.   That's correct.

Q.   And then starting at the very bottom line of page 3 and going onto page 4.
    "Upon returning to full-time employment,
    after any disability, provided that the

**MAGNA** ◉
LEGAL SERVICES

Page 38

employee has not been terminated, the employee's compensation shall be his full base salary and other compensation paid hereunder prior to disability. However, any compensation payments made to employee by the corporation during the employee's disability shall be deemed an advance to the employee and repaid from future profit distribution payments made to the employee starting with the first distributions made after the end of disability."

Did I read that correctly?

A. That's correct.

Q. So while you were on leave, there would be no revenue being generated by you, correct?

A. That's correct.

Q. And you also understood that since you would not be treating patients, ROPC would have to pay for locums coverage to help cover patients, correct?

A. That's correct.

Q. So basically, expenses would be increased and ROPC's account receivables would be decreased, correct?

Page 39

A. That's correct.

Q. Then once you and Dr. Monroe started employment in July in his case or August in your case, there would be no money being generated at all for ROPC, correct?

A. That's correct.

Q. And after a very short period of time, other than some small straggling ARs, ROPC would have no profit distributions for you to use to repay your advances of three months' full salary, correct?

A. I don't know what the accounts receivable would be, if it would cover that or not. I don't know.

Q. Have you used any profit distributions from ROPC to repay the advanced ROPC provided during your medical leave?

A. No.

Q. I didn't think so.

A. The corporation's been dissolved.

Q. The contract gave your partner the right to require an independent exam, correct?

A. That's correct.

Q. And the last sentence of your e-mail in Exhibit 4, you told your partner if you wish to obtain a medical examination by an independent

Page 40

physician at the expense of Radiation Oncology, P.C., pursuant to the agreement, please arrange for this examination and I will cooperate with scheduling.

Did I read that correctly?

MS. HALPERN: Slight objection. There's a word in scheduling that was scheduling. That's fine.

THE WITNESS: That's correct.

Q. (BY MR. SABEY) So you were just making sure that your partner knew he had the right to require an independent exam?

A. That's correct.

Q. This e-mail also refers to your personal physician. Is Dr. Setty the personal physician you were referring to?

A. That's correct.

Q. And is Dr. Setty also a personal friend?

A. No. I do not socialize with her.

Q. Is she a neighbor?

A. She is not a neighbor. I don't know her any more than as a professional. I've only seen her as a doctor.

(Court reporter asked for clarification.)

THE WITNESS: I've never seen her outside of a clinical examination. I'm not -- I don't socialize with her.

Page 41

Q. (BY MR. SABEY) So your personal physician told you that you needed to be off work and not see patients for three months, correct?

A. That's correct.

Q. And in your e-mail, it says that:

"Please be advised that beginning May 1, 2022, and continuing for a period of three months, I will be absent from work on disability, for reasons of health."

A. That's correct.

Q. Did I read that correctly?

So according to this, your medical leave started May 1, 2022; is that accurate?

A. I'm not understanding the question.

MS. HALPERN: Object to form.

THE WITNESS: It's a statement.

Q. (BY MR. SABEY) The question is: Did your medical leave start on May 1, 2022, like it says in Exhibit 4 in your e-mail?

A. My medical leave began the day I saw my doctor, my physician who said I needed medical leave; that is correct.

Q. Which is correct?

A. My medical leave started the day my physician told me to take a medical leave.



11 (Pages 38 to 41)

Page 42

Q. So why did you tell him that it would begin May 1, 2022?

A. Because I didn't have patients schedule before then.

Q. Because you were on vacation?

A. I was on time off, yes, scheduled time off us doctors take.

Q. Yeah. Okay.

A. So that is correct, May 1st.

Q. So did your personal physician say, you don't need a medical leave right now on April 22nd, but you will need a medical leave in a week or so starting on May 1st?

MS. HALPERN: Object to form.

THE WITNESS: Starting the medical leave, the day I saw her, she said you need time off.

Q. (BY MR. SABEY) Okay. But she said you needed three months of time off?

A. Correct.

Q. So by starting on May 1st -- so you were on vacation and off work from April 25th through the 30th, correct?

MS. HALPERN: Object to form.

THE WITNESS: The 25th through the 30th; that is correct.

Page 43

Q. (BY MR. SABEY) You were on a mountain biking trip?

A. Correct. So I wasn't seeing patients during that time.

Q. Right. And so from a medical perspective is being off work due to vacation any different from being off work for a medical leave?

MS. HALPERN: Object to form.

THE WITNESS: The question one more time, please.

Q. (BY MR. SABEY) Yeah. From a medical perspective, is being off work for vacation any different than being off work for a medical leave?

MS. HALPERN: Object to form.

THE WITNESS: Yes. I think there is a difference.

Q. (BY MR. SABEY) What's the difference?

A. In one situation you're seeing patients you can endanger; one, you're not seeing patients.

Q. (BY MR. SABEY) No. If you're on vacation, you're not seeing patients?

A. Correct. So I can't hurt any patients. I'm not seeing patients on vacation.

Q. Right. Okay. So being on medical leave you're not seeing patients, you're not working?

Page 44

A. Correct.

Q. On vacation you're not seeing patients and you're not working?

A. That's correct.

Q. Okay. So they're the same?

A. I don't really understand the question. Yes I'm not seeing patients. My doctor advised me not to see patients. So I don't know -- three months.

Q. So your three months of being off work already started on April 25th?

A. I don't really understand. That was scheduled vacation where I wasn't seeing patients, correct.

Q. Right. So it started not seeing patients, not working on April 25th?

A. Yes, that's correct.

Q. So from a medical perspective, what you did was take an extra week off work more than what the doctor ordered?

MS. HALPERN: Object to form.

THE WITNESS: I'm not really sure. When you have medical leave, my doctor advised me to take a medical leave. I took the medical leave.

Q. (BY MR. SABEY) Right.

Page 45

A. It coincided with the week I was already off. Is that what your question is?

Q. Yeah. But you didn't cut it off at the back end.

A. I didn't --

Q. You didn't take a week off of the back end because you started a week early?

A. I didn't really give it that much thought to be honest about what the exact date it ended. It was three months she said.

Q. But you told them not three months from May 25th, which is what your doctor ordered. You told them you were going through --

A. August.

Q. -- through the end -- through the beginning of August?

MR. MOHAMEDBHAI: Are you really using your time for this? You don't get to complain about time when you are wasting time.

THE WITNESS: I don't really understand this --

MS. HALPERN: You're also testifying for him. You could just ask him how could you have had medical leave and vacation time at the same time.

MR. MOHAMEDBHAI: Don't argue about wasted

12 (Pages 42 to 45)

MAGNA
LEGAL SERVICES

Page 46

time when you are wasting time about this.

MR. SABEY: Gotcha.

Q. (BY MR. SABEY) And did your physician tell you that it was her medical opinion that your kind of burnout always takes at least three months to resolve itself and it medically never gets any better before three months?

MS. HALPERN: Object to form.

THE WITNESS: I don't understand -- her best opinion was you need to take three months off and be reevaluated.

Q. (BY MR. SABEY) Did you tell your personal physician that you had three months of medical leave available under your contract with ROPC?

A. Never brought that up to her.

Q. So since your contract said that you have up to three months of fully paid leave, your doctor conveniently told you that your leave should not start --

MS. HALPERN: Object to form.

Q. (BY MR. SABEY) -- that your leave?

MS. HALPERN: This is silly.

Q. (BY MR. SABEY) -- was the precise amount of leave you needed was three months?

MS. HALPERN: He has asked and answered

Page 47

this. If you want to just ask him what his doctor said.

MR. SABEY: I get to formulate my questions.

MS. HALPERN: We get to object. He's asked and answered this about twenty times.

MR. SABEY: This is a talking objection.

THE WITNESS: Can you ask the question again very clearly so I understand it?

Q. (BY MR. SABEY) Yes.

A. Because you're making a statement, part of it, I want to understand the question.

Q. Well, you can tell me if you disagree with it if it comes out as a statement to you.

A. Okay.

Q. So are you telling me, it's your testimony that you never told your doctor that you had three months leave available?

A. Correct.

Q. And your doctor just pulled out of the air, three months is the amount of time you need for medical leave?

A. I don't know her profession medical opinion. She told me give me three months of leave, yes.

Page 48

Q. Okay.

A. She didn't have privy to my contract.

Q. That seems more conveniently contractual than medical to me.

MS. HALPERN: Okay. Object to form.

MR. SABEY: It's not a question.

MS. HALPERN: No. That wasn't a question. That was you testifying. You don't get to testify for him in a deposition.

THE WITNESS: You allowed your opinion --

MR. MOHAMEDBHAI: Let's stop. We're taking a break.

MS. HALPERN: Yeah. This is silly. You can't just testify for him.

MR. MOHAMEDBHAI: We're taking a break.

MS. HALPERN: We're allowed to take a break.

(Whereupon, Ms. Halpern laughs.)

MR. SABEY: No. I'm in the middle of a line of questioning.

MS. HALPERN: Too bad.

MR. MOHAMEDBHAI: Taking a break. I need to use the restroom. I want to talk to the doctor.

(Whereupon, a recess was taken at 2:01 p.m.)

Page 49

(Whereupon, the proceedings resumed at 2:12 p.m.)

THE VIDEOGRAPHER: The time is 2:12 p.m. Back on the record.

Q. (BY MR. SABEY) So just to be clear, you understood that when you told Eric Koval, in the e-mail that you were taking a leave -- Eric Koval and Bill Plauth were both copied on that e-mail about your medical leave, correct?

A. That's correct.

Q. And Bill Plauth was for the medical staff and Eric Koval was for the clinic basically?

A. That's correct.

Q. Okay. And did you ever -- I mean you, assuming you entered into an employment relationship starting July 1st of 2022, you had become subject to Centura's medical leave policies for its employees, correct?

A. I'm not sure.

Q. Did you ever review Centura's medical leave policies or do anything to address the medical leave you were taking during the first month of your proposed employment?

A. No.

Q. Did you ever ask for a leave or submit a



Page 50

leave request to UNUM or make any effort to engage in an interactive process about that leave with your potential future employer?

MS. HALPERN: Object to form.

THE WITNESS: No.

Q. (BY MR. SABEY) You just told Eric Koval that you were taking leave, period?

MS. HALPERN: Object to form.

THE WITNESS: I sent the e-mail.

Q. (BY MR. SABEY) Yes. Okay. All right. I would like you to look at Exhibit 7.

(Exhibit Number 6 was marked for identification.)

Q. (BY MR. SABEY) Okay. So I would like you to look at Exhibit 6. This is the recruitment loan settlement agreement. And do you admit that this agreement was e-mailed to you on April 22nd?

MS. HALPERN: Object to form.

THE WITNESS: I did -- to my Centura e-mail, yes.

Q. (BY MR. SABEY) I'd like you to look at page 4.

A. (The witness complied.)

Q. You see that it's already got signatures on it of Brian Erling CEO and Scott Licktenberger the

Page 51

group president of Physician Alignment, correct?

A. That's the first time I'm seeing this, yes.

Q. Are you telling me you've never seen this?

A. I've never opened the document.

Q. So tell me what you did open.

MS. HALPERN: Object to form.

THE WITNESS: I'm not sure what your question's asking.

Q. (BY MR. SABEY) So you received this in a e-mail; is that correct?

A. That's correct.

Q. And what did the e-mail say?

A. I didn't open the e-mail.

Q. Oh, you didn't open the e-mail?

A. Because I didn't open this attachment. I never read this statement.

Q. Okay. There's an attachment would be opening the e-mail and then clicking on the attachment, correct?

A. Correct.

Q. So did you open the e-mail?

A. Did not open this attachment.

Q. Okay. But you opened the e-mail?

A. I don't recall. I was on medical leave.

Q. I'm just asking you a simple question. Did

Page 52

you open the e-mail?

MS. HALPERN: Do you have an e-mail to refresh his recollection?

Q. (BY MR. SABEY) Did you open the e-mail?

A. I don't recall.

Q. And Why didn't you open the exhibit the attachment?

A. I don't recall opening this e-mail.

Q. I beg your pardon?

A. I don't recall opening the e-mail.

Q. Okay. So you're saying you know that you got an e-mail, but is it your testimony that you don't know if you ever opened the e-mail?

A. That's correct.

Q. You know who it was from?

A. I can't recall.

Q. It was from Centura.

A. I don't know who sent it. I don't know.

Q. Did you ever agree to the terms of this agreement that was signed by two Centura people?

A. No.

MS. HALPERN: Object to form.

THE WITNESS: The answer is no.

Q. (BY MR. SABEY) And did you ever agree to its terms?

Page 53

MS. HALPERN: Object to form.

THE WITNESS: Never agreed to these terms, no.

Q. (BY MR. SABEY) So you would agree with me that one party signed an agreement does not make it effective unless both parties are in full agreement with the terms?

MS. HALPERN: Object to form.

Q. (BY MR. SABEY) Correct?

A. I guess that's correct, yeah.

Q. And would you also agree based on your experience with contracts that sometimes parties exchange a draft agreement for discussion purposes?

A. It's labeled draft, I guess.

Q. Are you saying you've never seen a draft agreement exchanged that wasn't labeled draft?

A. I'm not sure where you're going with this. I don't know.

Q. Okay. What did these signatures indicate to you?

A. I just saw them today -- this -- and I signed it.

Q. What does that mean to you?

MS. HALPERN: Object to form.

THE WITNESS: They approve this document.

MAGNA
LEGAL SERVICES

Page 54

Q.  (BY MR. SABEY)  You would agree that this document is not fully executed, correct?

A.  Correct.

(Exhibit Number 7 was marked for identification.)

Q.  (BY MR. SABEY)  Okay.  Now, I would like you to look at Exhibit 7.  Do you admit that this agreement was e-mailed to you on April 26th, like it says in your charge?

A.  Yes.

Q.  And you suggested earlier that you may not have been on top of your e-mail's while you were on vacation.  But you became aware of those e-mails at some point, correct?

A.  Correct.

Q.  When did you first view those e-mails?

A.  When I went on medical leave I print my e-mail as not being monitored.  So I did not review every e-mail that was coming through that when I was off medical leave.

Q.  So are you telling me that you didn't view these documents while you were on medical leave?

A.  Correct.  It was one of the e-mail titles. It said new contract, something like that.

Q.  Okay.  So the e-mail title said new

Page 55

contract --

A.  I can't remember exactly.

Q.  -- and you viewed it?

A.  No.

Q.  You didn't view it, you didn't open the e-mail?

A.  No.  I was on medical leave.  I was answering e-mails that were pertinent (ph) to my medical condition.

Q.  Okay.  So you didn't open this e-mail?

A.  I do not recall opening this e-mail.

Q.  Okay.

(Exhibit Number 8 was marked for identification.)

Q.  (BY MR. SABEY)  I'd like to show you Exhibit 8, which is the audit report for those two documents.  The first page is a summary of the times that you show up in the audit of the documents.  The audit reports are attached.

MS. HALPERN:  Yeah.  Object to form -- I mean, the exhibit.

Q.  (BY MR. SABEY)  Do you have any factual basis to dispute that you viewed these e-mails with these two contracts on the days and times indicated in the audit report?

Page 56

MS. HALPERN:  Object to form.

THE WITNESS:  I don't recall.

Q.  (BY MR. SABEY)  So you don't have any factual basis to dispute when it says that you viewed the e-mail on those dates that you actually did that?

MS. HALPERN:  Object to form.

THE WITNESS:  Can you ask the question again?

Q.  (BY MR. SABEY)  Yes.

Do you have any factual basis to dispute that these numbers on the first page, these times and dates that you opened these documents -- I mean, that you viewed the e-mails, do you have any factual basis to dispute the accuracy of that first page?

A.  No.

MS. HALPERN:  Object to form.

Q.  (BY MR. SABEY)  I beg your pardon?

A.  No.  I don't have any --

Q.  And you never discussed either of these contracts with anybody at Centura between the dates you viewed the e-mails and May 9th of 2022, correct?

MS. HALPERN:  Object to form.

THE WITNESS:  I'm trying to recall.  No.  I don't think I did.

Q.  (BY MR. SABEY)  You didn't discuss them

Page 57

with anybody at Centura?

A.  The contract, no.

Q.  Either of those two contracts?

A.  No.

Q.  You didn't ask why they had sent them?

A.  Did not, no, I did not.

Q.  And you didn't accept or reject those contracts?

A.  Correct.

Q.  You just didn't communicate about them at all with anybody at Centura?

A.  I was on medical leave.

Q.  Would you answer the question?

A.  The question was?

Q.  You just didn't communicate about them with anybody at Centura?

A.  That's correct.

Q.  Okay.  Do you recall receiving a text from Eric Koval on April 27, 2022, asking to talk with you, the day after you received the new employment agreement?

A.  I don't recall -- I recall getting a text from Eric Koval.  I don't know what it said.

Q.  And you didn't respond to that text, did you?



Page 58

A.  No.

Q.  Did you call him?

A.  I tried calling.

Q.  I beg your pardon?

A.  No.

Q.  Why did you not respond to him?

A.  I can't remember.

(Exhibit Number 9 was marked for identification.)

Q.  (BY MR. SABEY)  I'd like to show you what's been marked as Exhibit 9.

So you communicated with Eric Koval about work readily on the 25th of April, correct?

A.  I can't remember, but I remember -- I don't dispute this.

Q.  You don't dispute it?

A.  No.

Q.  Okay.  So on the 25th of April, he sent you a text saying, Good morning, Dr. Peddada, how did your call with Dr. Wernick go, up or down?  Thumbs up or thumbs down, correct?

A.  Correct.

Q.  And when was that call with Dr. Wernick?

A.  Saturday the 23rd.

Q.  Okay.  After your appointment with your

Page 59

doctor on the 22nd --

A.  I was driving.

Q.  Okay.  And you responded to him.  Then on April 27th said you haven't been up to talk.  Do you see that?

A.  Yes.

Q.  And there was no response.

A.  Yep.

Q.  After you received and opened the e-mail with the new contract, you stopped responding to him, correct?

A.  I don't recall.

(Exhibit Number 10 was marked for identification.)

Q.  (BY MR. SABEY)  So Dr. Plauth.  Is that how you say his name, Plauth or Plout?

A.  Plauth.

Q.  Sent you an e-mail on April 27, '22, saying we need to talk, correct?

A.  Correct.

Q.  And do you recall receiving this e-mail that I handed you and is marked Exhibit 10?

A.  Yes.

Q.  Okay.  And after that, you called him by phone and had a phone conversation with him that he

Page 60

recorded and summarized in writing.  I'm going to show you his summary.  But first, do you remember that such a conversation took place on April 27, 2022?

A.  Yes.  The conversation with Dr. Plauth, yes.

Q.  Okay.  And did you make any record of that call?

A.  No.

Q.  And I assume again you don't remember it verbatim, word for word?

A.  No.

Q.  I beg your pardon?

A.  Do not.

Q.  Okay.

(Exhibit Number 11 was marked for identification.)

Q.  (BY MR. SABEY)  I'm handing you Exhibit 11.  I'm going to go to the second page of the e-mail about the conversation on April 27th.  And I'm just going to read this:

"Jeff, Dr. Peddada should be calling you.  He reached out to me to say that he did not need to talk.  He is acting on the advice of his physician who said that he

Page 61

was hypertensive and severely stressed and needed to take a break.  He was quite aggressive in not needing to talk, as he is following her advice.  My advice, which was to find a better life balance, et cetera, I shared that not talking with us is not an option as it impacts the practice and his potential employment.  Then he said he would call you directly and hung up.  He also stated, while still a private physician, he would not be obligated to talk."

Did I read that correctly?

MS. HALPERN:  Object to form.

THE WITNESS:  You read it correctly.  I don't remember any of that conversation.

Q.  (BY MR. SABEY)  Does that seem like a fair summary of the call to you?

MS. HALPERN:  Object to form.

THE WITNESS:  No.  Does not.

Q.  (BY MR. SABEY)  You're saying that didn't happen?

A.  You said fair summary, no.

Q.  What do you disagree with about that?  I mean, first of all, do you remember this call?

MAGNA
LEGAL SERVICES

Page 62

A. I remember the conversation but not the details.

Q. Okay. All you're saying is you don't remember all these details?

A. I do not remember the details of the conversation, except that he wanted me to talk to Di Thompson.

Q. Okay. Anything else that you remember?

A. No.

Q. Nothing else?

A. Nothing else.

Q. Okay. So you don't have any factual basis then to dispute the accuracy of his summary of the conversation?

MS. HALPERN: Object to form.

Q. (BY MR. SABEY) Is that correct?

A. Correct.

Q. And do you have any factual basis to dispute that this e-mail was sent to those to whom it was addressed?

MS. HALPERN: Object to form. He's not on these e-mails.

THE WITNESS: I don't know. I don't know.

Q. (BY MR. SABEY) I'm asking you a question though. Do you have any factual basis --

Page 63

MS. HALPERN: He can't authenticate a document he's never seen and is not CC'd to.

MR. SABEY: I'm not asking him to authenticate it. Listen to the question.

MS. HALPERN: I have. You said do you have any reason to believe that it got sent. He would not know that.

Q. (BY MR. SABEY) No. That's not what I'm saying. I'm saying, do you have any factual basis to dispute that this e-mail was sent to those to whom it was addressed?

A. I have no way to know that.

MS. HALPERN: Object to form.

Q. (BY MR. SABEY) Okay. So you don't have a factual basis to dispute it?

MS. HALPERN: Object to form.

THE WITNESS: Correct.

Q. (BY MR. SABEY) Okay. Did you call Jeff Albert?

A. Yes.

Q. You testified?

A. I did call Jeff Albert not on this date.

Q. Okay. When did you call him?

A. I can't remember the exact date. I did call him, no, he did not answer.

Page 64

Q. So you never talked to him?

A. No.

Q. What was Eric Koval's position at Centura?

A. Director of Radiation Oncology.

Q. And prior to 2022, had the Penrose -- I'm sorry -- you called it Radiation Oncology. What's the clinic called?

A. Oncology Department.

Q. Okay. So prior to 2022, had the Penrose Radiation Oncology Department that he managed, ever have employed physicians?

A. No.

Q. To your knowledge, had Eric Koval ever gone through Centura's process for hiring physicians before 2022?

A. Not that I know of.

Q. So with you and Dr. Monroe, it was his first time through the process likely?

A. I don't know. I don't know what his history is.

Q. Right. But during the time you were there, he would never have had any reason to enter into contracts with physicians because there were none in the department, correct?

MS. HALPERN: Object to form.

Page 65

THE WITNESS: Penrose, yes, he did not.

Q. (BY MR. SABEY) Okay. I'd like to go back to the e-mail I marked as exhibit 10.

The first e-mail that starts this chain is from you to Bill Plouth and Eric Koval, correct?

A. That's correct.

Q. And in that e-mail, you said please talk to Dr. Monroe ASAP and advise him to be careful with the language he's using. I never said I had a mental health issue. I only said, I have a health issue necessitating a medical leave of absence.

So it wasn't a mental health issue?

A. I said medical issue.

Q. No. I said -- you said, I never said I have a mental health issue. And my question is, so were you telling them it wasn't a mental health issue?

A. I have a health issue that's what I said. I wanted to clarify the language.

Q. But you objected to anybody saying this is a mental health issue?

A. Monroe's e-mail, I clearly said I didn't like the way he said that. So I made them aware of that.

Q. Okay. So my question is, was it a mental



Page 66

health issue?

A.  I'm not my own doctor.  My doctor said I have a health issue.  She didn't say mental health issue.  She just said you have a health issue.

Q.  Okay.  What was it?

A.  Physician -- she called it physician exhaustion due to physician burnout.  She called it that.  She didn't say I have a mental issue.

Q.  Okay.  Was it a physical issue for you?

MS. HALPERN:  Object to form.

THE WITNESS:  Yes, partially.

Q.  (BY MR. SABEY)  Partially, what else was it?

A.  Apathy, anger issues related to it.  There was a -- I couldn't focus and concentrate as much as I wanted to for patient safety issues.

Q.  So you don't have a name for the health condition for which you needed to leave?

A.  I didn't have a self-diagnosis.  I wanted to see my physician to see if there's something wrong.  And she diagnosed me.

Q.  And all she said is you have a health condition?

A.  I don't know if you have her record.  You can look at the record.

Page 67

Q.  I don't have a record.

A.  She said I had physician burnout.

Q.  Okay.  Okay.

(Exhibit Number 12 was marked for identification.)

Q.  (BY MR. SABEY)  I'd like to show you -- we are on 12.  I'd like to show you Exhibit 12.  Is this the employment application that you signed for a job at Centura?

A.  I think so.  Yes.

Q.  Okay.  So the last page it has your electronic signature?

A.  Yes.

Q.  And it says, by checking the box above, you're applying your signature and you agree to this applicant's statement?

A.  Correct.

Q.  Did you read the statement before agreeing to it and signing it?

A.  Yes.

Q.  Now, I don't want to go through and read -- so the last paragraph of this statement, I would like you to look at.

A.  (The witness complied.)

Q.  And it says that it basically describes

Page 68

at-will employment.  Would you agree with that?

A.  I don't know what at-will employment is, but...

Q.  Well, it explains it in here.  That's what it's for to explain to you what at-will employment is.

A.  Okay.

Q.  So after -- and basically at-will employment, as it explains there -- stay on that page though we're not done -- as it explains it there, basically you can be fired for no reason, any reason.

MS. HALPERN:  Except for an illegal one, like violating the ADA.

MR. SABEY:  Listen.  You don't have to be sighing and moaning as I go through -- I'm talking about the actual facts here that apply.

MS. HALPERN:  That's fine.

MR. SABEY:  So let's stop all the commentary.

MS. HALPERN:  This is a legal doctrine, so you're asking him if he understands at-will employment.

Q.  (BY MR. SABEY)  No, I'm not.  I'm asking him if he read this.  It explains that your employment at Centura would be "at will" with an

Page 69

exception, okay.

So first of all, you have to understand, that at-will employment means that you don't have any guarantee as far as a period of time.  You can be fired for any reason or no reason.  You can be fired without notice -- advanced notice, correct?

MS. HALPERN:  Object to form.

THE WITNESS:  Okay.

Q.  (BY MR. SABEY)  Okay.  Then it says, although conditions of my employment may change, this is the second to last sentence.  Although conditions of my employment may change, the "at will" term of my employment can only be changed in writing and signed by myself and the president of the company.

A.  Yes.

Q.  So you understood that if your employment agreement was going to be anything other than at-will employment, the president of the company had to sign that agreement, correct?

A.  Correct.

Q.  And you also understood that nobody else had authority to enter such an agreement, correct?

A.  Correct.

(Exhibit Number 13 was marked for identification.)

**MAGNA**
LEGAL SERVICES

Page 70

Q.  (BY MR. SABEY)  Did I give you two of them? Would you hand her one?

Okay.  Exhibit 13 -- did you read and understand this agreement before signing it?

A.  Yes.

Q.  I would like you to turn to the termination provision starting on page 4.

A.  (The witness complied.)

Q.  Would you agree that this provision says something different than at-will employment?

In other words, you get 90 days' notice, which is different than at-will employment.  Do you understand that that's different than at-will employment, correct?

MS. HALPERN:  Object to form.

THE WITNESS:  I think it says 90 days, yes.

Q.  (BY MR. SABEY) Okay.  So based on what you signed in your employment application, you knew that only the president could make such an agreement, correct?

A.  Didn't recall that -- that last statement in my application, I don't recall that but...

Q.  I would like you to turn to the end of the agreement.

A.  (The witness complied.)

Page 71

Q.  Is that your signature on page 11?

A.  Yes.

Q.  And who is the other authorized signer of the agreement?

A.  Jason Tacha.  I don't know who that is.

Q.  Interim President and Chief Executive Officer of Centura Health Physician Group, correct?

A.  Yeah.

Q.  So when you saw this, did you understand that it would be Jason Tacha who would provide final approval of the terms of the contract and sign for Centura?

A.  Yes.

Q.  So you would agree that this agreement was never fully executed, correct?

A.  I don't know.

Q.  Well, you've never seen a fully executed copy of this agreement, have you?

A.  What does "fully executed" mean?

Q.  Well, you told me the other agreement that was signed by Centura people was not fully executed because you didn't sign it.  I'm just asking you, was this fully executed?  Was it signed by both parties?

A.  I don't know if this was fully executed or not.  I don't know if it has the same -- I don't

Page 72

know.

Q.  Now, Eric Koval didn't tell you that he had the authority to sign the agreement, did he?

A.  We never spoke about it.

Q.  Okay.  And to your knowledge, did Mr. Tacha ever sign the agreement?

A.  I don't know.

Q.  Okay.  I would like you to turn to paragraph 1.8 of that agreement.

A.  (The witness complied.)

Q.  So paragraph 1.8 basically says that you would comply with laws and regulations, and you would also comply with those related with the Health Insurance Portability Act -- and I guess I'm going on to three.

You would comply with applicable standards rules and regulations of the hospital's Medicare professional review organization, the hospital's Medicare administrative contractor, third-party payers, the joint commission, and all other entities that exercise authority to regulate, administer accredit, reimburse or otherwise set standards for the hospital.

Did I read that correctly?

MS. HALPERN:  Object to form.

Page 73

THE WITNESS:  Yes.

Q.  (BY MR. SABEY)  So if Centura needed you to repay the Kathpal recruitment loan or sign the forgiveness agreement, in order to be in compliance with these things that you agreed to support.  This provision gave Centura the right to require you to take the steps necessary to avoid compliance issues, correct?

MS. HALPERN:  Object to form.

THE WITNESS:  I don't know.

Q.  (BY MR. SABEY)  I would like you to look at paragraph 8.6.

A.  (The witness complied.)

Q.  It says that this agreement embodies the entire agreement and understanding of the parties, with regard to the matters herein addressed and when fully executed shall supercede any and all prior agreements, prior and existing agreements, and goes on.

So did you understand that to mean that this agreement has to be fully executed before it becomes an effective agreement?

MS. HALPERN:  Object to form.

THE WITNESS:  I understood it to be fully executed.

MAGNA
LEGAL SERVICES

Page 74

Q. (BY MR. SABEY) What do you mean by that?

A. That my signature was fully executed, that's my understanding.

(Exhibit Number 14 was marked for identification.)

Q. (BY MR. SABEY) I'd like to show you Exhibit 14. This is a compilation of signature pages that you have signed in agreement's with Centura.

MS. HALPERN: I'm sorry. What is this? Is it a bunch of different --

Q. (BY MR. SABEY) These are all different last pages of contracts.

MS. HALPERN: But without the actual contracts?

MR. SABEY: Right. This is just the last page to show that Dr. Peddada has signed a bunch of contracts with Centura.

MS. HALPERN: I'm going to object based on --

MR. SABEY: That's fine. It's recorded. You don't need to say anything more.

Q. (BY MR. SABEY) So you do agree you signed a lot of agreements with Centura in the past?

A. Yes.

Q. And I would like you to go back to the

Page 75

agreement that you signed, Exhibit 13. The last page is the signature page and just ask you, do any of those agreements that you signed previously look like this one?

MS. HALPERN: Object to form.

THE WITNESS: The signature looks -- my signature looks the same.

Q. (BY MR. SABEY) No. Your signature does. I'm asking about the form that was provided to you?

A. Restate the question again, please.

Q. Do any of the agreements that you signed in the past with Centura, did any of them have these strange markings over the signature area?

A. Just parentheses. I don't know what those parentheses are. No.

Q. Okay. Do you know whether those markings over the signature spaces were there because the agreement had not been authorized for signature?

MS. HALPERN: Object to form.

Q. (BY MR. SABEY) Do you know?

A. No.

Q. Could you speak up?

A. I don't know what you're asking me.

Q. I'm asking you, do you know whether those, I don't know if they're parentheticals or what

Page 76

they're called, but do you know whether those indicate that the agreement has not been authorized for signature yet?

MS. HALPERN: Object to form.

THE WITNESS: I don't know what those mean.

Q. (BY MR. SABEY) Okay. Have you ever signed a Centura agreement with that kind of markings over the signature space before?

A. I don't recall.

Q. Did you wonder what those markings signified?

A. Not really.

Q. Didn't ask anybody?

A. No.

(Exhibit Number 15 was marked for identification.)

Q. (BY MR. SABEY) I'd like to show you what's been marked as Exhibit 15.

MS. HALPERN: Is this 14 or 15?

MR. SABEY: 15. 14 was the stack of signatures.

MS. HALPERN: Uh-huh.

Q. (BY MR. SABEY) Do you recall completing this form?

A. No.

Page 77

Q. Do you dispute that you completed it?

MS. HALPERN: Object to form.

THE WITNESS: No.

(Exhibit Number 16 was marked for identification.)

Q. (BY MR. SABEY) I'd like to show you what's been marked as Exhibit 16. This shows that your home was put up for sale on May 4th of 2022; is that correct?

A. Correct.

Q. And did you put your home up for sale because you were looking at an out-of-state opportunity?

A. No.

Q. Why did you put your home up for sale?

A. To downsize.

Q. Is the zestimate here of over $3 million seem like a reasonable estimate of the value of your home?

A. I don't know. It didn't sell. So I don't know what the value is.

Q. Right.

(Exhibit Number 17 was marked for identification.)

Q. (BY MR. SABEY) I'd like to show you what's



Page 78

been marked as Exhibit 17. This just shows from the Secretary of State's office that there's an Anuj Peddada, MD, LLC, that was formed in June of 2022.

A. Correct.

Q. Is that correct? And what does -- what are you doing under the name of that company?

A. Work, locums work.

Q. Locums work?

A. Yes.

Q. Okay. Do you do work under any other businesses, have other activities under any other businesses?

A. Not that I know of, no.

Q. And would you describe for me how the locums work is going? What are you doing there and...

A. Radiation Oncology locums work, practices.

Q. And how much are you working?

(Court reporter asked for clarification.)

THE WITNESS: Working, covering Radiation Oncology practices.

Q. (BY MR. SABEY) How much are you working?

A. Days, weeks. I'm not sure over what period of time? I'm not really understanding. I'm working.

Q. You're working basically full time?

Page 79

A. No.

Q. You get paid a higher rate for locums work than standard rates?

A. I don't know what standards rates are.

Q. I don't know either.

A. Yeah.

Q. How does pay for radiation oncologists work? Are locums' physicians paid at a higher rate?

A. Than?

Q. Than the physicians they're substituting for?

A. No. A lower rate.

Q. Okay. And if I needed to know how much you had been working and how much you have earned working locums, how would we go about finding that out?

A. I can provide that.

Q. Okay. That will be helpful.

(Information needed.)

(Exhibit Number 18 was marked for identification.)

Q. (BY MR. SABEY) So this is a changing of the registered agent that was filed by Deborah Helton, your accountant; is that correct?

A. Correct.

Q. And did you tell her to do this?

Page 80

A. What is this document?

Q. It's changing the registered agent information. It says that the registered agent name has changed to Centura Health for Radiation Oncology. Did you tell her to do that --

A. No.

Q. -- to change the registered agent to --

A. I don't recall having her do that. No.

Q. So do you think she just did it on her own?

A. I don't know who asked her to do that.

Q. Does that make sense to you?

A. No. It doesn't make any sense.

Q. I agree.

(Exhibit Number 19 was marked for identification.)

Q. (BY MR. SABEY) Exhibit 19 is a similar thing, where Deborah Helton changed the registered agent name to Centura Health. And are you confident that you didn't tell her to do this?

A. I'm confident I did not tell her to do either one of these.

Q. Okay.

(Exhibit Number 20 was marked for identification.)

Q. (BY MR. SABEY) Will you give that to your

Page 81

attorney, and I will mark this one. I would like you to look at Exhibit 20.

A. (The witness complied.)

Q. Did you receive this letter from Caryn Baldauf?

A. Yes.

Q. And they -- this letter informed you that your request for leave from the medical staff had been granted; is that correct?

A. That's correct.

Q. And it tells you to engage in the CPHP program to provide an assessment and recommendations for duration of leave. Did you do that?

A. Yes.

Q. And did they provide an assessment?

A. Yes.

Q. And what were their recommendations for duration of leave?

A. Three months.

Q. And it says, we would ask that you sign a release. Did you sign that release?

A. I don't recall. I was already involved in this before this letter.

Q. Oh, is that right? Tell me about that.

A. I was already involved in this.

MAGNA
LEGAL SERVICES

Page 82

Q. In other words, you had contacted CPHP before?

A. As recommended by Dr. Thompson.

Q. Okay. Yeah. Okay. So what happened with CPHP?

A. I'm not sure what you mean by that.

Q. How did it go with them?

A. It went very well.

Q. And did you get a release to return to full duty?

A. Yes, I did.

Q. From them? And did you ever go back to the medical staff at Centura and get your privileges reinstated?

A. No.

MR. MOHAMEDBHAI: Do you want to take a break?

MS. HALPERN: Do you need water?

MR. SABEY: We're getting pretty close to being done.

MR. MOHAMEDBHAI: Did you need something?

THE WITNESS: The last question, did you said did you go back to Centura to get your privileges?

Page 83

MR. SABEY: Oh, I guess should have -- I'm glad you brought that up. So...

MR. MOHAMEDBHAI: Did you want to modify your answer?

THE WITNESS: No. I want to keep my answer, but I --

Q. (BY MR. SABEY) So basically.

A. It's a closed department. You can't go back to get privileges.

Q. Okay. They told you you had to have a evaluation before you could restore your privileges?

A. It's a closed department. You cannot get your privileges.

Q. Okay. So what are your current career objectives?

A. I'm very energetic. I'm very engaged I want to work.

Q. And what do you want to do?

A. I want to practice radiation oncology.

Q. What you're doing as a locumist?

A. No. I would like to have a full-time job.

Q. Now, in your home, is yours a two-income home?

A. Yes.

Q. What does your wife do? What's her job?

Page 84

A. She's an internist.

Q. And what's your combined household income at this point?

MS. HALPERN: Object to form.

THE WITNESS: I don't know. She makes $90,000 a year added to whatever I make.

Q. (BY MR. SABEY) So would you agree that everyone has his or her own set of strengths and weaknesses?

MS. HALPERN: Object to form.

THE WITNESS: I don't know. I don't know how to answer that.

Q. (BY MR. SABEY) I'm just asking you. Do you think that people tend to have their own strengths and weaknesses?

A. Probably.

Q. How would you compare Dr. Monroe to you as far as strengths and weaknesses?

A. I'm not clear on the question. Yes. He has strengths and weaknesses.

Q. In compared to you, what are your strengths --

A. I have strengths and weaknesses. He has strengths and weaknesses.

Q. I know, but I want you to be more specific.

Page 85

What are his strengths and weaknesses as compared to you?

MS. HALPERN: Object to form.

THE WITNESS: His strengths are -- I guess his strength is his academic.

Q. (BY MR. SABEY) Okay. What are his weaknesses?

A. Difficulty to getting along with other physicians, referring physicians.

Q. And...

A. Building a practice.

Q. What would you generally tell other physicians and potential referral sources about Dr. Monroe?

A. He's a good doctor.

Q. Anything else?

A. No.

Q. So do you have any medical conditions at this time?

A. I don't know. Hypertension, probably.

Q. Was that an ongoing issue before?

A. No. It was not an ongoing issue.

Q. You said hypertension probably?

A. Correct. She diagnosed -- I'm working on my diet and exercise to see if I can beat that, that

MAGNA
LEGAL SERVICES

Page 86

was five years ago.

Q. Say that again, five years ago?

A. I don't have an ongoing condition right now, maybe hypertension.

Q. And 5 years ago, you had the same issue?

A. I had some weight, and she diagnosed hypertension and reassessed six months later my blood pressure was normal.

Q. What did you do in the meantime?

A. I lost weight. Exercised.

Q. Good for you. That's great.

MR. MOHAMEDBHAI: We should all do that.

MR. SABEY: Yeah. I keep trying.

THE WITNESS: I cut out salt to be honest. I really did.

Q. (BY MR. SABEY) That's the biggest thing salt?

A. So I did have an ongoing issue.

Q. Good. Have you had any other significant medical issues in the past ten years?

A. Yes. I had an ankle injury that required surgery.

Q. Anything else?

A. I went to work the day after the injury and worked. Did not have a day off.

Page 87

Q. Wow.

MR. MOHAMEDBHAI: Just answer the question.

Q. (BY MR. SABEY) So the only -- have you ever had any issues with burnout prior to this leave of absence that we're talking about in this case?

A. Burnout, no.

Q. Stress?

A. Nothing that affected my work.

Q. I think we may have answered this. I just want to make sure I know all of the medical providers who have treated your physician burnout?

A. Dr. Setty, Di Thompson, who interviewed me and Dr. Gunderson from the Colorado Health Physicians program.

Q. Anybody else?

A. That's it.

Q. Did you apply for a job in California?

A. Yes.

Q. And what happened with that job, that's the St. John's Medical Centre?

A. I applied for many jobs in California.

Q. Okay. And what did you tell John Stageburg about your professional plans?

A. I never spoke to him about it.

Q. Now, this deposition is in preparation for

Page 88

a mediation. And I'm assuming that you're hoping to resolve all the issues of liability between the parties; is that correct?

MS. HALPERN: Object to form.

THE WITNESS: I'm hopeful.

Q. (BY MR. SABEY) Yeah. And I assume you're hoping to resolve the issue of your half of ROPC loan repayment as well?

MS. HALPERN: Object to form.

THE WITNESS: That has nothing to do with this.

Q. (BY MR. SABEY) Oh, no, but I'm just asking.

A. I don't know. Dr. Monroe and I are not talking.

Q. You said Dr. Monroe and you are not talking?

A. No.

MR. SABEY: Okay. I have got no other questions.

MR. MOHAMEDBHAI: Okay. If you want to have a conversation with the man about mediation and things like that, I have no problem. He's an open -- he's a nice guy. You know there might times...

MS. HALPERN: Do you want this on the

Page 89

record?

MR. MOHAMEDBHAI: Let's go off the record.

THE VIDEOGRAPHER: The time is 3:08 p.m. This concludes the deposition. We're now going off the record.

MS. HALPERN: Next week for rough, no paper copy. Regular turn.

MR. SABEY: Rough, regular turn.

WHEREUPON, the within proceedings were concluded at the approximate hour of 3:08 p.m. on the 19th day of January, 2023.

* * * * * *

Page 90

ANUJ PEDDADA
January 19, 2023

ERRATA SHEET

In Re:  Anuj Peddada, M.D. v. Catholic Health
Initiatives Colorado, d/b/a Centura Health
I have read the foregoing 92 pages of the transcript
and wish to make the following changes:

PAGE(S) LINE(S)        REASON(S)

_____ ____  _____
_____ ____  _____
_____ ____  _____
_____ ____  _____
_____ ____  _____
_____ ____  _____
_____ ____  _____
_____ ____  _____
_____ ____  _____
_____ ____  _____
_____ ____  _____
_____ ____  _____
_____ ____  _____
_____ ____  _____
_____ ____  _____
_____ ____  _____
_____ ____  _____

Page 91

CERTIFICATION OF DEPONENT
I, ANUJ PEDDADA, do hereby certify that I
have read the above and foregoing deposition and that
the same is a true and accurate transcription of my
testimony, except for attached amendments, if any.
Amendments attached   ( ) Yes   ( ) No

_____
ANUJ PEDDADA

The signature above of ANUJ PEDDADA, was
subscribed and sworn to before me in the county of
_____, state of _____, this _____day of
_____, 2023.

_____
Notary Public

My commission expires

01/19/2023, (tlm)

Page 92

REPORTER'S CERTIFICATE
STATE OF COLORADO        )
) ss.
CITY AND COUNTY OF DENVER )
I, THERESA L. MENDEZ, Registered Professional
Reporter and Notary Public, State of Colorado, do
hereby certify that previous to the commencement of
the examination, the said ANUJ PEDDADA was duly sworn
by me to testify to the truth in relation to the
matters in controversy between the parties hereto;
That the said deposition was taken in machine
shorthand by me at the time and place aforesaid and
was thereafter reduced to typewritten form, consisting
of 92 pages herein; that the foregoing is a true
transcript of the questions asked, testimony given,
and proceedings had.
I further certify that I am not employed by,
related to, nor of counsel for any of the parties
herein, nor otherwise interested in the outcome of
this litigation.
IN WITNESS I, WHEREOF have affixed my signature
and seal this 18th day of February, 2023.
My commission expires September 21, 2025.

_____
Theresa L. Mendez, Registered Professional
Reporter and Notary Public



**A**

**ability**
9:11 11:5
**able**
8:22,22
**above-entitled**
2:3
**absence**
65:11 87:5
**absent**
37:9 41:8
**absolutely**
33:10
**academic**
85:5
**accept**
57:7
**access**
13:13
**account**
38:24
**accountant**
79:23
**accounts**
39:11
**accredit**
72:22
**accuracy**
56:14 62:13
**accurate**
7:1 17:15 41:13 91:4
**accurately**
9:12
**Act**
72:14
**acting**
60:24
**activities**
78:11
**actual**
68:16 74:13
**ADA**
68:13
**added**
84:6

**addition**
20:17
**additionally**
7:21
**address**
49:21
**addressed**
62:20 63:11 73:16
**addressing**
23:3
**administer**
72:21
**Administration**
24:9,17
**administrative**
72:19
**admit**
50:16 54:7
**advance**
38:8
**advanced**
39:15 69:6
**advances**
39:10
**advice**
60:25 61:4,4
**advise**
65:8
**advised**
41:6 44:7,23
**affixed**
92:20
**aforesaid**
92:11
**agent**
4:9,10 34:19 79:22
80:2,3,7,18
**aggressive**
61:3
**ago**
6:3 86:1,2,5
**agree**
7:3 24:18 35:7 52:19
52:24 53:4,11 54:1
67:15 68:1 70:9
71:14 74:22 80:13

84:7
**agreed**
35:6,8 53:2 73:5
**agreeing**
67:18
**agreement**
3:8,12,15,16,22
13:19,21,25 14:6,12
14:19,23 15:6,11
27:9,10,12,14,19,21
30:2,6,16,16 31:9
36:19 37:2 40:2
50:16,17 52:20 53:5
53:6,13,16 54:8
57:21 69:17,19,22
70:4,19,24 71:4,14
71:18,20 72:3,6,9
73:4,14,15,21,22
75:1,18 76:2,7
**agreements**
30:14,23 73:18,18
74:23 75:3,11
**agreement's**
74:8
**agrees**
14:1
**air**
47:20
**Alan**
3:11 36:1
**Albert**
27:4 29:4 63:19,22
**alcohol**
9:10
**Alignment**
51:1
**allow**
7:23
**allowed**
48:10,16
**amendments**
91:5,6
**amount**
7:16 12:9 13:4 26:10
37:14 46:23 47:21
**amounts**

14:2
**and/or**
14:3
**anger**
66:14
**ankle**
86:21
**annual**
14:15
**answer**
7:6,12,18,24 8:22 9:7
13:14 16:4 25:8
52:23 57:13 63:25
83:4,6 84:12 87:2
**answered**
46:25 47:6 87:9
**answering**
55:8
**antianxiety**
34:20
**antihypertensive**
34:19
**anti-kickback**
16:13
**Anuj**
1:2,7,14 2:1 3:2,4 4:6
5:4,4,17,21 78:2
90:2,4 91:2,8,11
92:7
**anybody**
56:20 57:1,11,16
65:20 76:13 87:15
**Apathy**
66:14
**appearances**
1:9 5:12
**appearing**
5:13
**applicable**
72:16
**applicant's**
67:16
**application**
3:21 67:8 70:18,22
**applied**
87:21



apply
68:16 87:17
applying
67:15
appointment
58:25
approval
71:11
approve
33:21,25 53:25
approximate
89:10
approximation
11:16
April
3:23 30:7 31:15,22
42:11,21 44:11,16
50:17 54:8 57:19
58:13,18 59:4,18
60:3,20
arcuately
8:23
area
75:13
argue
8:5 45:25
arrange
40:2
arrangements
29:25
ARs
39:8
ASAP
65:8
asked
10:9 21:3 25:3 32:3
40:22 46:25 47:5
78:19 80:10 92:14
asking
12:7 18:9 27:17,24
51:8,25 57:19 62:24
63:3 68:21,23 71:22
75:9,23,24 84:13
88:13
assessment
28:21 81:12,15

assets
11:17
assume
60:10 88:6
assuming
49:15 88:1
attached
4:13 36:14 55:19
91:5,6
attachment
51:15,17,19,22 52:7
attorney
7:10,21 8:11 16:2,3
17:25 18:5,10 19:1
81:1
attorneys
7:5,6 10:14,15,17
at-will
68:1,2,5,8,21 69:3,17
70:10,12,13
audit
3:17 55:16,18,19,25
August
39:3 45:14,16
authenticate
63:1,4
authorities
29:22
authority
69:22 72:3,21
authorized
71:3 75:18 76:2
automatic
31:16
available
46:14 47:18
avoid
26:21 73:7
aware
16:21 20:4 21:13
22:8,10 30:4,10
33:23,24 54:13
65:23

—————— B ——————

B

14:12,14
back
22:22 26:21 27:9,20
45:4,6 49:4 65:2
74:25 82:12,24 83:9
background
7:20
bad
48:21
balance
61:5
Baldauf
4:12 81:5
base
37:13 38:3
based
23:13,14 24:11 53:11
70:17 74:18
basically
14:14,22 22:12 31:13
38:23 49:12 67:25
68:8,11 72:11 78:25
83:7
basis
55:23 56:4,10,13
62:12,18,25 63:9,15
beat
85:25
beg
22:19 52:9 56:17
58:4 60:13
began
41:20
beginning
16:2 41:6 45:15
behalf
5:13,17
behavior
32:9,13,20 33:7
believe
63:6
best
12:18 13:5 25:21
30:13 46:10
better
46:6 61:5

biggest
86:16
biking
43:2
Bill
49:8,11 65:5
billings
6:12,14,15,17 11:9
blood
86:7
board
11:2
bonus
15:2,2
bottom
37:22
bounds
15:11
box
67:14
brain
11:5
break
8:17 48:12,15,17,22
61:2 82:17
Brian
50:25
broken
22:1,13
brought
20:20 28:16 29:5
46:15 83:2
Building
85:11
bunch
74:10,16
burdensome
26:15
burnout
46:5 66:7 67:2 87:4,6
87:11
business
6:7,9,9 24:9
businesses
78:11,12



**C**

**C**
5:1
**California**
87:17,21
**call**
58:2,20,23 60:8 61:9
61:18,25 63:18,22
63:23,25
**called**
2:2 59:24 64:6,7 66:6
66:7 76:1
**calling**
58:3 60:22
**care**
9:17,18,20,21 34:6,7
**career**
83:14
**careful**
65:8
**carefully**
17:14 35:15,17
**Caryn**
4:12 81:4
**case**
6:6,23 8:5 23:13 39:3
39:4 87:5
**Catholic**
1:4 5:5,14 90:4
**CC'd**
63:2
**Centre**
87:20
**Centura**
1:4,10 2:2 3:21 18:5
18:11,13 19:11
25:16 26:14,19,24
26:24 27:8,18 28:20
29:6,17 30:2,7,12
31:14 33:12,19,21
33:24 35:2 50:19
52:17,20 56:20 57:1
57:11,16 64:3 67:9
68:25 71:7,12,21
73:2,6 74:8,17,23

75:12 76:7 80:4,18
82:13,24 90:5
**Centura's**
49:17,20 64:14
**CEO**
50:25
**CERTIFICATE**
92:1
**CERTIFICATION**
91:1
**certify**
91:2 92:6,16
**cetera**
61:6
**chain**
65:4
**change**
4:8 23:22 69:10,12
80:7
**changed**
69:13 80:4,17
**changes**
90:6
**changing**
4:8 79:21 80:2
**characteristic**
32:21 33:8
**charge**
3:9 17:9,11 19:6 31:7
32:6 34:3 54:9
**checking**
31:20 67:14
**Chief**
71:6
**chooses**
8:13
**citizenship**
3:10 19:24
**CITY**
92:3
**claim**
7:12
**clarification**
7:20 21:3 25:3 40:22
78:19
**clarify**

65:19
**clear**
22:4 25:22 26:7 49:5
84:19
**clearly**
47:9 65:22
**clicking**
51:18
**clinic**
49:12 64:7
**clinical**
40:24
**close**
82:20
**closed**
28:15 83:8,12
**coincided**
45:1
**collected**
6:16
**Colorado**
1:4,13,17 2:5,7 4:4,6
5:5,8,15 87:13 90:5
92:2,5
**combined**
84:2
**come**
12:17 26:13
**comes**
47:14
**coming**
6:15 54:19
**commencement**
92:6
**commencing**
2:4
**commentary**
68:19
**commission**
72:20 91:17 92:22
**committee**
3:10 19:25 21:10
**communicate**
57:10,15
**communicated**
58:12

**communications**
22:5
**communicative**
33:18
**community**
15:6 25:10 29:16
**company**
69:14,18 78:6
**compare**
84:17
**compared**
84:21 85:1
**compensation**
16:23 29:16,22 37:13
37:15 38:2,3,5
**compilation**
74:7
**complain**
45:18
**complaints**
19:13 32:8
**complete**
6:25
**completed**
77:1
**completely**
25:22
**completing**
76:23
**compliance**
26:16 29:18 73:4,7
**complied**
14:7,13 19:7 32:7
34:4 37:6 50:23
67:24 70:8,25 72:10
73:13 81:3
**comply**
72:12,13,16
**concentrate**
66:15
**concerned**
33:14
**concluded**
89:10
**concludes**
89:4


MAGNA
LEGAL SERVICES

**condition**
9:21,23 55:9 66:18
66:23 86:3
**conditions**
69:10,11 85:18
**confident**
80:18,20
**conjunction**
29:11
**consequences**
17:2
**considered**
29:21
**consisting**
92:12
**consists**
14:8
**constraints**
16:23
**contact**
35:1
**contacted**
82:1
**contemplation**
15:16 16:7
**continue**
37:12
**continued**
4:1
**continuing**
41:7
**contract**
18:24 19:4 36:23
39:20 46:14,16 48:2
54:24 55:1 57:2
59:10 71:11
**contractor**
72:19
**contracts**
53:12 55:24 56:20
57:3,8 64:23 74:12
74:14,17
**contractual**
48:3
**contractually**
27:11

**controversy**
92:9
**conveniently**
46:18 48:3
**conversation**
25:5 29:3,9 59:25
60:3,5,20 61:16
62:1,6,14 88:22
**conversations**
9:5 28:2,7
**cooperate**
40:3
**copied**
49:8
**copy**
4:14 71:18 89:7
**corporation**
10:24 11:17 37:11
38:6
**corporation's**
39:19
**correct**
10:25 11:1,6,7,15,19
11:21,22 12:4 14:9
14:10,16,17,20 15:8
15:9,17,19 16:10,15
16:16 18:2 19:17
21:18 22:18,20
24:19,20,22 25:15
26:5,9,12,18,22
27:15,16 30:17
31:17,18 32:10,11
32:14,15 33:5,10,12
33:13 36:2,3,21,22
37:4,21 38:14,16,17
38:21,22,25 39:1,5
39:6,10,21,22 40:7
40:11,15 41:3,4,10
41:22,23 42:9,19,22
42:25 43:3,22 44:1
44:4,14,17 47:19
49:9,10,13,18 51:1
51:10,11,19,20
52:14 53:9,10 54:2
54:3,14,15,23 56:21
57:9,17 58:13,21,22

59:11,19,20 62:16
62:17 63:17 64:24
65:5,6 67:17 69:6
69:19,20,22,23
70:14,20 71:7,15
73:8 77:9,10 78:4,5
79:23,24 81:9,10
85:24 88:3
**Correcting**
4:10
**Correction**
4:10
**correctly**
14:4 19:16 21:17
33:1 37:20 38:13
40:4 41:11 61:13,15
72:24
**counsel**
5:11 92:17
**county**
91:12 92:3
**course**
36:8
**court**
5:9,18 8:16,21 10:9
20:11 21:3 25:3
32:3 40:22 78:19
**courtroom**
9:25
**cover**
38:20 39:12
**coverage**
38:20
**covered**
14:19
**covering**
78:20
**CPHP**
81:11 82:1,5
**criminal**
17:3
**current**
83:14
**currently**
9:17 34:16
**cut**

45:3 86:14

_____

**D**

**D**
3:1 5:1
**date**
45:9 63:22,24
**dated**
4:12
**dates**
56:5,12,20
**day**
41:20,24 42:16 57:20
86:24,25 89:11
91:13 92:21
**days**
6:16 55:24 70:11,16
78:23
**dealing**
25:17
**Deborah**
79:22 80:17
**decide**
18:21 25:21
**decided**
21:14 30:12
**decision**
18:23 22:13 25:20
**decisions**
11:5
**decreased**
38:24
**deemed**
38:7
**defendant**
5:14
**definitely**
32:20 33:7
**delay**
28:19,23,24
**Denver**
1:13,17 2:5 5:7 92:3
**department**
64:8,10,24 83:8,12
**DEPONENT**
91:1



**deposed**
6:2,4
**deposition**
1:7 2:1,8 5:3 6:24 7:4
7:17 8:4 9:12 10:1,4
10:17,19,20 48:9
87:25 89:4 91:3
92:10
**describe**
78:14
**describes**
67:25
**description**
3:6 36:13
**detail**
30:25
**detailed**
12:17
**details**
4:6 62:2,4,5
**determination**
28:21
**Di**
35:1 62:6 87:12
**diagnosed**
66:21 85:24 86:6
**diet**
85:25
**difference**
43:16,17
**different**
22:15 43:6,13 70:10
70:12,13 74:10,11
**difficult**
19:10,15
**Difficulty**
85:8
**directly**
7:19,24 61:9
**Director**
64:4
**directors**
11:2
**disability**
4:3 37:7,11,16,18,25
38:4,7,12 41:9

**disagree**
47:13 61:24
**disagreement**
6:13
**disclosing**
20:5
**discourteous**
32:9,13,19 33:4,6
**discrimination**
3:9 17:9
**discuss**
27:3 56:25
**discussed**
56:19
**discussion**
21:11 53:13
**discussions**
26:23 27:23
**dispersed**
11:10
**dispute**
6:11 55:23 56:4,10
56:14 58:15,16
62:13,19 63:10,15
77:1
**disrespectful**
32:9,20 33:4,7
**dissolve**
18:19,21 21:14
**dissolved**
39:19
**dissolving**
19:2
**distributed**
11:11
**distribution**
38:9
**distributions**
38:11 39:9,14
**doctor**
9:18 12:12 19:12
20:19 40:21 41:21
44:7,20,23 45:12
46:17 47:1,17,20
48:23 59:1 66:2,2
85:15

**doctors**
42:7
**doctrine**
68:20
**document**
3:10 4:6 19:21,25
20:8,15 31:2 37:1
51:4 53:25 54:2
63:2 80:1
**documentation**
22:6
**documents**
12:17 54:22 55:17,18
56:12
**doing**
34:23 78:6,15 83:20
**dollar**
15:1
**downsize**
77:16
**Dr**
4:4 5:4,17 6:1 10:24
11:9,13,19 13:20
15:6 19:9 20:3,18
20:24 21:8,9,19,21
22:1,6,6,15,16
23:13,14 24:2,7,12
24:24 25:10,14 26:1
26:7,21 34:8 39:2
40:13,16 58:19,20
58:23 59:15 60:5,22
64:17 65:8 74:16
82:3 84:17 85:14
87:12,13 88:14,16
**draft**
53:13,14,15,16
**drinks**
8:18
**driving**
59:2
**drugs**
9:10
**due**
14:2 43:6 66:7
**duly**
5:22 92:7

**duration**
81:13,18
**duty**
82:10
**d/b/a**
1:4 90:5

---
### E

**E**
3:1 5:1,1
**earlier**
54:11
**early**
19:14 45:7
**earned**
79:14
**easy**
8:7 9:4
**effect**
27:12
**effective**
53:6 73:22
**effort**
50:1
**either**
24:19 30:1 56:19
57:3 79:5 80:21
**El**
4:4
**elaboration**
7:19,25 8:9,12
**electronic**
67:12
**embodies**
73:14
**emotional**
9:15
**employ**
30:3
**employed**
12:12 23:9 64:11
92:16
**employee**
37:8,12 38:1,6,8,10
**employees**
33:12,15,20 49:17



MAGNA
LEGAL SERVICES

employee's
38:2,7
employer
50:3
employment
3:21 14:11 19:14
22:14 23:6,10 24:4
27:7 29:12 30:6,16
31:9 37:24 39:3
49:15,23 57:20 61:8
67:8 68:1,2,5,9,22
68:25 69:3,10,12,13
69:16,18 70:10,12
70:14,18
enabled
31:17
Encanto
4:4
endanger
43:19
ended
45:9
energetic
83:16
engage
50:1 81:11
engaged
18:18 83:16
ensure
17:14
enter
27:8,9,19,20 64:22
69:22
entered
49:15
entire
73:15
entities
72:20
entity
11:4
Eric
27:4 49:6,7,12 50:6
57:19,23 58:12 64:3
64:13 65:5 72:2
Erling

50:25
ERRATA
90:3
ESQ
1:11,15,15
essentially
31:14
estimate
12:18,18 13:5 77:18
et
61:6
evaluation
34:6 83:11
Evenly
11:12
event
20:20
Eventually
30:12
everybody
25:9,12
exact
13:4 45:9 63:24
exactly
27:1 55:2
exam
39:21 40:10
examination
3:2 5:24 39:25 40:3
40:24 92:7
examined
5:23
exceed
12:9
exception
69:1
exchange
53:13
exchanged
53:16
exclusive
23:7
executed
54:2 71:15,17,19,21
71:23,24 73:17,21
73:25 74:2

Executive
71:6
executives
17:1
exercise
72:21 85:25
Exercised
86:10
exhaustion
66:7
exhibit
3:8,9,10,11,12,14,16
3:17,18,19,20,21,22
3:23 4:2,4,6,8,10,12
13:16,20 14:12,14
17:6,8 19:6,22 20:9
22:21,22,24 31:8
35:19,22 36:4,7,10
36:24 37:2 39:24
41:19 50:11,12,15
52:6 54:4,7 55:13
55:16,21 58:8,11
59:13,22 60:16,18
65:3 67:4,7 69:24
70:3 74:4,7 75:1
76:15,18 77:4,7,23
78:1 79:19 80:14,16
80:23 81:2
exhibits
3:6 4:1,13 36:14
existing
73:18
expense
40:1
expenses
38:23
experience
53:12
expired
8:14
expires
91:17 92:22
explain
68:5
explains
68:4,9,10,24

extra
44:19
e-mail
3:11,19,20 36:1,18
39:23 40:12 41:5,19
49:7,8 50:9,20
51:10,12,13,14,18
51:21,23 52:1,2,4,8
52:10,12,13 54:18
54:19,23,25 55:6,10
55:11 56:5 59:9,18
59:21 60:19 62:19
63:10 65:3,4,7,22
e-mailed
30:24 50:17 54:8
e-mails
31:20 54:13,16 55:8
55:23 56:13,21
62:22
e-mail's
54:12
E-scribe
31:2

—————— F ——————

facilities
22:15
fact
20:7 22:8,10
facts
20:4 68:16
factual
20:2 55:22 56:4,10
56:13 62:12,18,25
63:9,15
fair
8:14 21:24 26:6
28:20 29:17 61:17
61:23
far
24:3 69:4 84:18
February
32:10 92:21
feel
35:14
female



34:11,12
**figure**
26:3 29:1
**filed**
31:23 79:22
**final**
71:10
**finally**
8:21
**financial**
6:12,14
**find**
26:14,20 61:5
**finding**
79:15
**fine**
16:6 40:6 68:17
74:20
**finish**
25:6
**fired**
68:11 69:5,5
**firm**
17:25
**first**
5:22 18:4,10 34:9
36:18 37:17 38:10
49:22 51:2 54:16
55:17 56:11,14 60:2
61:25 64:18 65:4
69:2
**five**
86:1,2
**focus**
66:15
**folks**
25:16 26:19
**follow**
8:16 35:15,17
**following**
61:4 90:6
**follows**
5:23
**forcing**
26:13
**foregoing**

90:6 91:3 92:13
**forget**
8:7
**forgiven**
14:3
**forgiveness**
27:10,20 29:11 30:2
30:17 73:4
**forgot**
9:4
**form**
4:3 11:25 12:5,19,23
13:10,22 15:14,18
15:21,23 16:9,17
18:6 20:6 22:2,9,17
23:18 24:8,14 25:18
26:17 28:5 29:22
30:9,18 32:23 41:15
42:14,23 43:8,14
44:21 46:8,20 48:5
50:4,8,18 51:6
52:22 53:1,8,24
55:20 56:1,6,16,22
61:14,19 62:15,21
63:13,16 64:25
66:10 69:7 70:15
72:25 73:9,23 75:5
75:9,19 76:4,24
77:2 84:4,10 85:3
88:4,9 92:12
**formed**
4:7 78:3
**formulate**
47:3
**forward**
6:23 23:22,23
**found**
29:6
**four**
27:1,24
**Frances**
14:21 19:12 22:16
**friend**
40:16
**full**
12:11 37:12 38:2

39:10 53:6 78:25
82:9
**fully**
9:12 46:17 54:2
71:15,17,19,21,23
71:24 73:17,21,24
74:2
**full-time**
12:12 37:24 83:21
**funds**
16:19
**further**
7:19 92:16
**future**
38:9 50:3

---

**G**

**G**
5:1
**general**
9:22
**generally**
85:12
**generate**
11:8 12:13
**generated**
12:8 13:5 38:16 39:4
**getting**
57:22 82:20 85:8
**give**
6:24 13:5 34:22 35:9
36:16 45:8 47:24
70:1 80:25
**given**
15:1 35:25 92:14
**glad**
83:2
**go**
36:23 58:20 60:19
65:2 67:21 68:15
74:25 79:15 82:7,12
82:24 83:8 89:2
**goes**
73:18
**going**
6:22 7:18 15:17 16:8

19:20 20:8 24:10,13
26:25 37:23 45:13
53:17 60:1,19,21
69:17 72:14 74:18
78:15 89:4
**good**
9:14 13:6 29:5,6
58:19 85:15 86:11
86:19
**goodwill**
28:16
**gotcha**
12:24 46:2
**granted**
81:9
**great**
86:11
**group**
14:1 51:1 71:7
**guarantee**
69:4
**guess**
13:7 24:15 53:10,14
72:14 83:1 85:4
**Gunderson**
87:13
**guy**
88:24

---

**H**

**half**
88:7
**Hall**
1:12
**Halpern**
1:15 5:16,16 11:25
12:5,19,21,23 13:10
13:22 15:14,18 16:9
16:17 17:5 18:6
20:6 22:2,9,17,23
23:18 24:8,14 25:18
26:17 28:5 30:9,18
31:11 32:23 40:5
41:15 42:14,23 43:8
43:14 44:21 45:22
46:8,20,22,25 47:5



48:5,7,13,16,18,21
50:4,8,18 51:6 52:2
52:22 53:1,8,24
55:20 56:1,6,16,22
61:14,19 62:15,21
63:1,5,13,16 64:25
66:10 68:12,17,20
69:7 70:15 72:25
73:9,23 74:9,13,18
75:5,19 76:4,19,22
77:2 82:19 84:4,10
85:3 88:4,9,25 89:6
**hand**
22:21 70:2
**handed**
59:22
**handing**
60:18
**handwriting**
36:5,5
**happen**
26:4 61:22
**happened**
10:12 36:9 82:4
87:19
**happens**
7:10
**head**
8:24
**health**
1:4,4,10 2:2 5:5,14
9:15,22 14:22 41:9
65:10,10,12,15,16
65:18,21 66:1,3,3,4
66:17,22 71:7 72:13
80:4,18 87:13 90:4
90:5
**hear**
33:19
**Heath**
1:12
**help**
7:6 17:18,19 19:1
20:20 26:14,20
38:20
**helped**

17:20
**helpful**
79:17
**Helton**
79:23 80:17
**hereto**
92:9
**hereunder**
38:4
**higher**
79:2,8
**hiring**
64:14
**history**
64:20
**home**
11:13 12:3 77:7,11
77:15,19 83:22,23
**honest**
7:1 45:9 86:14
**hopeful**
88:5
**hoping**
88:1,7
**hospital**
14:2 16:25 18:23
19:3 22:16 72:23
**hospitals**
16:12,22
**hospital's**
72:17,18
**hour**
2:4 89:10
**hours**
9:25
**house**
4:4
**household**
84:2
**HR**
19:13
**hundred**
11:23 15:1
**hung**
61:10
**hurt**

43:22
**hustled**
26:20
**hypertension**
85:20,23 86:4,7
**hypertensive**
34:16 61:1

---

**I**

**idea**
13:8 23:21
**identification**
13:17 17:7 19:23
35:20 36:25 50:13
54:5 55:14 58:9
59:14 60:17 67:5
69:25 74:5 76:16
77:5,24 79:20 80:15
80:24
**ignore**
15:23
**ignoring**
29:20
**ih@rmlawyers.com**
1:18
**illegal**
15:17 16:8 68:12
**immediately**
18:12 37:16
**impacts**
61:7
**impair**
9:11
**important**
6:24 8:25 35:14
**incapacity**
37:10
**included**
30:17
**including**
16:13 17:2
**income**
12:8,13 13:4 84:2
**increased**
38:23
**independent**

20:15 23:5 27:7
39:21,25 40:10
**indexed**
4:13
**indicate**
53:19 76:2
**indicated**
55:24
**influence**
9:10
**information**
4:9,11,15 20:2 79:18
80:3
**informed**
81:7
**initial**
3:6 23:9
**Initially**
19:10
**Initiatives**
1:4 5:5,15 90:5
**injury**
37:10 86:21,24
**instructions**
34:22 35:9,15
**Insurance**
72:14
**Integrating**
19:9
**intend**
15:15 16:6
**intended**
19:11
**intent**
24:6
**intention**
15:10
**interactive**
50:2
**interested**
92:18
**Interim**
71:6
**Internal**
34:14
**internist**



84:1

**interrelated**
30:14

**interrupt**
8:8

**interruption**
12:25

**interviewed**
87:12

**introduce**
20:9

**involved**
25:9 81:22,25

**Iris**
1:15 5:16 17:24 18:3

**issue**
23:4 26:25 30:8
65:10,10,12,13,15
65:17,18,21 66:1,3
66:4,4,8,9 85:21,22
86:5,18 88:7

**issues**
66:14,16 73:7 86:20
87:4 88:2

_____
**J**

**January**
1:7 2:3 3:2 5:6 23:23
26:2 89:11 90:2

**Jason**
71:5,10

**Jeff**
27:4 29:4 60:22
63:18,22

**job**
18:16 67:8 83:21,25
87:17,19

**jobs**
87:21

**John**
87:22

**John's**
87:20

**joint**
72:20

**judge**

8:6

**July**
39:3 49:16

**jump**
25:5

**June**
4:7 78:3

**jury**
8:6

_____
**K**

**Kabongo**
20:3 21:1,5,8,19

**Kath**
27:11,14

**Kathpal**
11:19 15:6 19:9
20:18,24 21:9 22:6
24:2,7 25:10 26:1,7
73:3

**Kathpal's**
13:20

**keep**
10:9 24:10,16,17,19
83:5 86:13

**kept**
6:16 29:16

**Killian**
1:12

**kind**
6:6 9:18 46:4 76:7

**knew**
25:9,25 28:25 40:9
70:18

**know**
12:14,14 13:4,7,12
17:23,24 20:5,22
24:24 25:1,5,12
34:1 39:11,13 40:19
44:8 47:23 52:11,13
52:15,18,18 53:18
57:23 62:23,23 63:7
63:12 64:16,19,19
66:24 68:2 71:5,16
71:24,25 72:1,7
73:10 75:14,16,20

75:23,24,25 76:1,5
77:20,21 78:13 79:4
79:5,13 80:10 84:5
84:11,11,25 85:20
87:10 88:14,24

**knowledge**
64:13 72:5

**known**
25:19

**Koval**
27:4 49:6,7,12 50:6
57:19,23 58:12
64:13 65:5 72:2

**Koval's**
64:3

**K-A-B-O-N-G-O**
21:6

_____
**L**

**L**
2:5 92:4,24

**labeled**
53:14,16

**language**
27:12 65:9,19

**late**
20:3 29:4

**laughs**
48:18

**law**
15:12 17:25 30:5

**Lawrence**
1:16

**laws**
16:13 17:1 72:12

**lawyer**
18:19

**leave**
30:20 31:5,21,22,24
31:25 32:2 33:20,25
36:2 38:15 39:16
41:12,18,20,21,24
41:25 42:11,12,15
43:7,13,24 44:23,24
44:24 45:24 46:13
46:17,18,21,24

47:18,22,24 49:7,9
49:17,20,21,25 50:1
50:2,7 51:24 54:17
54:20,22 55:7 57:12
65:11 66:18 81:8,13
81:18 87:4

**leaves**
33:16,22

**leaving**
26:1,7

**left**
15:6 16:18 25:10
27:14

**legal**
5:9 11:4 16:22 17:21
17:22 26:16 28:21
28:22 36:17 68:20

**legally**
30:2,7,13

**letter**
4:12 18:12,14,15
81:4,7,23

**let's**
10:3 36:23 48:11
68:18 89:2

**liability**
88:2

**Licktenberger**
50:25

**life**
61:5

**limited**
7:16

**line**
4:16 37:22 48:20

**LINE(S)**
90:7

**Listen**
63:4 68:14

**listing**
4:4

**litigation**
92:19

**LLC**
1:16 4:7 78:3

**loan**



MAGNA
LEGAL SERVICES

3:14 14:8 15:7 26:8
26:25 27:9,9,20,20
29:11 30:15,17
50:15 73:3 88:7
**located**
5:6
**locumist**
83:20
**locums**
38:20 78:7,8,15,17
79:2,8,15
**long**
6:3 34:10
**longer**
18:24 22:7
**look**
13:18 19:5 28:11,14
31:7 32:5 34:2
35:21 50:11,15,21
54:7 66:25 67:23
73:11 75:3 81:2
**looking**
12:14 28:18 77:12
**looks**
13:23 75:6,7
**lost**
86:10
**lot**
21:25 74:23
**lower**
79:12
**lunch**
20:2,14,16
**Lyman**
1:12

——————————
**M**
**machine**
92:10
**Magna**
5:9
**main**
27:4
**making**
40:8 47:11
**male**

34:11
**man**
88:22
**managed**
64:10
**manner**
29:15
**manor**
37:14
**March**
20:3 29:4 32:10
**mark**
1:11 5:13 22:23 81:1
**marked**
13:16,19 17:6 19:22
20:10 35:19,24
36:24 37:2 50:12
54:4 55:13 58:8,11
59:13,22 60:16 65:3
67:4 69:24 74:4
76:15,18 77:4,7,23
78:1 79:19 80:14,23
**market**
28:20 29:17
**markings**
75:13,16 76:7,10
**matter**
2:3 5:4 6:7 9:9 30:5
**matters**
73:16 92:9
**MD**
4:7 5:4 78:3
**mean**
24:2 25:12 27:13
32:19 49:14 53:23
55:21 56:12 61:25
71:19 73:20 74:1
76:5 82:6
**means**
14:21 15:22 20:23
69:3
**meant**
20:19
**mediation**
88:1,22
**medical**

30:20 31:5,21,22,24
31:25 32:2 33:16,20
33:22,25 36:2 39:16
39:25 41:12,18,20
41:21,24,25 42:11
42:12,15 43:5,7,11
43:13,24 44:18,23
44:24,24 45:24 46:4
46:13 47:22,23 48:4
49:9,11,17,20,21
51:24 54:17,20,22
55:7,9 57:12 65:11
65:13 81:8 82:13
85:18 86:20 87:10
87:20
**medically**
46:6
**Medicare**
6:16 72:17,19
**medication**
9:10
**medications**
34:18
**medicine**
34:14,20
**meet**
10:13,18,19
**meeting**
20:3,15,16 21:10
24:1
**meetings**
27:25
**memos**
28:1
**Mendez**
2:6 5:9 92:4,24
**mental**
9:14 65:9,12,15,16
65:21,25 66:3,8
**mentioned**
24:3
**Messages**
3:18
**met**
10:15
**mic**

12:20
**midafternoon**
8:17
**middle**
48:19
**million**
13:11 77:17
**minutes**
10:20
**moaning**
68:15
**model**
22:14 23:6
**modify**
83:3
**Mohamedbhai**
1:15,16 5:17 18:1
45:17,25 48:11,15
48:22 82:16,22 83:3
86:12 87:2 88:21
89:2
**money**
16:12 26:14 29:8
39:4
**monitored**
54:18
**Monroe**
3:11 10:24 11:9,13
21:21 22:1,6,15,16
23:13 24:24 25:14
26:21 36:1 39:2
64:17 65:8 84:17
85:14 88:14,16
**Monroe's**
24:12 65:22
**month**
49:22
**monthly**
14:8
**months**
21:15 35:5 37:17
39:10 41:3,8 42:18
44:9,10 45:10,11
46:5,7,10,13,17,24
47:18,21,24 81:19
86:7



**morning**
58:19
**mountain**
43:1
**move**
7:23 8:10 23:7,8
**moves**
6:23
**moving**
23:22,23
**multiple**
27:2
**M.D**
1:2 90:4

**N**

**N**
3:1 5:1
**name**
17:23,24 21:4,5 34:9
34:10 59:16 66:17
78:6 80:3,18
**nature**
33:3
**near**
14:12
**necessary**
73:7
**necessitating**
65:11
**need**
7:19,23,25 8:9 42:11
42:12,16 46:10
47:21 48:22 59:19
60:24 74:21 82:19
82:22
**needed**
23:22 33:15 35:8
41:2,21 42:18 46:24
61:2 66:18 73:2
79:13,18
**needing**
61:3
**neighbor**
40:18,19
**neither**

22:6
**never**
23:19 27:11,22 30:11
30:22,24,24 33:24
40:23 46:6,15 47:17
51:3,4,16 53:2,15
56:19 63:2 64:1,22
65:9,14 71:15,17
72:4 87:24
**new**
24:4 54:24,25 57:20
59:10
**news**
29:5,6
**nice**
88:24
**nodding**
8:24
**normal**
9:5 25:4 86:8
**Notary**
2:7 91:16 92:5,24
**note**
14:2
**notes**
10:5 28:1
**notice**
2:8 69:6,6 70:11
**notified**
19:3
**number**
4:1 12:18 13:16 17:6
19:22 35:19 36:24
50:12 54:4 55:13
58:8 59:13 60:16
67:4 69:24 74:4
76:15 77:4,23 79:19
80:14,23
**numbers**
13:13 56:11
**nursing**
33:5

**O**

**O**
5:1

**oath**
5:23 6:21
**object**
7:10 11:25 12:5,19
12:23 13:10,22
15:14,18,21 16:9,17
18:6 20:6 22:2,9,17
23:18 24:8,14 25:18
26:17 28:5 30:9,18
32:23 41:15 42:14
42:23 43:8,14 44:21
46:8,20 47:5 48:5
50:4,8,18 51:6
52:22 53:1,8,24
55:20 56:1,6,16,22
61:14,19 62:15,21
63:13,16 64:25
66:10 69:7 70:15
72:25 73:9,23 74:18
75:5,19 76:4 77:2
84:4,10 85:3 88:4,9
**objected**
65:20
**objection**
7:11 17:5 40:5 47:7
**objectives**
83:15
**objects**
16:2
**obligated**
61:12
**obligation**
15:7 25:11 26:1,8,10
27:15,18 29:7,15,21
**obligations**
29:25
**obtain**
39:25
**occurred**
10:6
**offer**
18:16,16
**office**
21:14 78:2
**Officer**
71:7

**oh**
8:22 51:14 81:24
83:1 88:12
**okay**
5:2 6:11,19,21 7:9
8:19 9:8,23 10:3,21
11:4 12:16,16 13:15
13:24 15:3,5,25
16:5 18:3,21 19:5
19:20 21:12 22:12
23:2,24 24:2,24
25:25 26:6 28:1,25
31:25 32:5 33:11
34:11 35:3,14 37:1
42:8,17 43:24 44:5
47:15 48:1,5 49:14
50:10,14 51:17,23
52:11 53:19 54:6,25
55:10,12 57:18
58:18,25 59:3,24
60:7,15 62:3,8,12
63:14,18,23 64:9
65:2,25 66:5,9 67:3
67:3,11 68:7 69:1,8
69:9 70:3,17 72:5,8
75:16 76:6 78:10
79:13,17 80:22 82:4
82:4 83:10,14 85:6
87:22 88:19,21
**Omeed**
17:23 18:3
**Omeed's**
17:23,24
**once**
6:5 39:2
**oncologists**
79:7
**oncology**
3:13,24 10:23 18:25
28:15 36:20 40:1
64:4,6,8,10 78:17
78:21 80:4 83:19
**ongoing**
29:12 34:21 85:21,22
86:3,18
**open**



23:10 51:5,13,14,15
51:21,22 52:1,4,6
55:5,10 88:23
**opened**
51:4,23 52:13 56:12
59:9
**opening**
23:11 51:18 52:8,10
55:11
**operate**
15:11
**opinion**
46:4,10 47:24 48:10
**opportunity**
7:22 77:13
**option**
26:15 29:11 61:7
**options**
28:11,13 29:1
**order**
7:22 73:4
**ordered**
44:20 45:12
**organization**
72:18
**original**
4:14
**outcome**
24:2 92:18
**outside**
40:23
**out-of-pocket**
30:1
**out-of-state**
77:12
**over$3**
77:17

---

**P**

**P**
5:1
**page**
3:2 4:1,16 13:25 14:6
14:14 37:5,23,23
50:22 55:17 56:11
56:14 60:19 67:11

68:9 70:7 71:1
74:16 75:1,2
**pages**
74:7,12 90:6 92:13
**PAGE(S)**
90:7
**paid**
11:23 12:6,9 14:22
14:25 37:15 38:3
46:17 79:2,8
**Pal's**
27:12,14
**paper**
89:6
**paragraph**
14:1,15 19:5 31:8,11
32:6,8,12 34:2 37:7
67:22 72:9,11 73:12
**pardon**
22:19 52:9 56:17
58:4 60:13
**parentheses**
75:14,15
**parentheticals**
75:25
**part**
20:2 21:24 27:6
47:11
**partially**
66:11,12
**participate**
9:12
**particular**
9:20 25:14
**parties**
5:11 15:16 16:7 32:3
33:21 53:6,12 71:23
73:15 88:3 92:9,17
**partner**
11:19,22 20:18 21:16
36:1 39:20,24 40:9
**partners**
6:9,10 10:25 11:6
**partnership**
22:1,13
**party**

53:5
**patient**
35:6 66:16
**patients**
38:19,20 41:3 42:3
43:3,18,19,21,22,23
43:25 44:2,7,8,13
44:15
**pay**
16:12 26:21 27:9,19
29:8 37:12 38:20
79:7
**payers**
72:20
**payment**
30:1
**payments**
14:9,18 38:5,9
**Peddada**
1:2,7,14 2:1 3:2,4,13
4:7 5:4,4,17,21 6:1
23:14 58:19 60:22
74:16 78:3 90:2,4
91:2,8,11 92:7
**peer**
20:1
**penalty**
17:11
**Penrose**
14:21 22:16 23:15
64:5,9 65:1
**people**
27:5 52:20 71:21
84:14
**percent**
11:23
**period**
37:8,15,17,19 39:7
41:7 50:7 69:4
78:23
**perjury**
17:12
**permission**
23:4
**persistent**
32:21 33:8

**person**
26:24
**personal**
37:10 40:12,13,16
41:1 42:10 46:12
**perspective**
43:5,12 44:18
**pertinent**
55:8
**ph**
55:8
**phone**
59:25,25
**physical**
9:14 66:9
**physician**
3:8 9:19,21 13:19
16:23 34:6,7 40:1
40:13,13 41:1,21,25
42:10 46:3,13 51:1
60:25 61:11 66:6,6
66:7,20 67:2 71:7
87:11
**physicians**
16:12,21 64:11,14,23
79:8,10 85:9,9,13
87:13
**physician's**
35:15
**place**
60:3 92:11
**plan**
23:17
**plans**
87:23
**Plauth**
49:8,11 59:15,16,17
60:5
**please**
5:19 6:8 18:8 40:2
41:6 43:10 65:7
75:10
**Plout**
59:16
**Plouth**
65:5



pocket
 26:21 29:8
point
 8:5 23:22 26:6 27:23
   54:14 84:3
policies
 49:17,21
Portability
 72:14
position
 19:15 23:12,12 24:6
   25:2 30:6 64:3
positions
 23:11
possible
 17:2
potential
 50:3 61:8 85:13
potentially
 17:2
practice
 8:16 11:3 18:19,20
   18:22 19:2,10 21:15
   22:7 23:5 24:22,25
   27:7 61:8 83:19
   85:11
practiced
 20:21
practices
 78:17,21
preceding
 37:16
precise
 12:17 46:23
preclude
 9:24
preliminary
 9:9
preparation
 87:25
prepare
 10:4,17,18,21 17:17
preparing
 17:18
prescribe
 34:18

prescribed
 34:19
present
 1:19 5:11
preserve
 7:11
president
 51:1 69:14,18 70:19
   71:6
pressure
 86:8
pretty
 82:20
previous
 92:6
previously
 75:3
primary
 9:19,21 19:12 34:6,7
print
 54:17
prior
 20:19 38:4 64:5,9
   73:17,18 87:4
private
 61:11
privilege
 7:12 20:1
privileges
 82:13,25 83:9,11,13
privy
 48:2
probably
 13:13 27:1 84:16
   85:20,23
problem
 29:18 32:21 33:8
   88:23
proceed
 7:12 16:3
proceeding
 9:25 36:10,11,12
proceedings
 49:1 89:9 92:15
process
 8:10 33:19,21 50:2

 64:14,18
produced
 11:24 12:4
profession
 47:23
professional
 2:6 3:12 10:24 17:18
   36:19 40:20 72:18
   87:23 92:4,24
professionalism
 20:21
profit
 38:9 39:9,14
profits
 11:10,14
program
 81:12 87:14
prohibitions
 35:12
proposed
 49:23
prosecution
 17:3
provide
 71:10 79:16 81:12,15
provided
 4:15 37:25 39:15
   75:9
provider
 9:18
providers
 87:10
provision
 30:17 70:7,9 73:6
psychiatrist
 35:2
Public
 2:7 91:16 92:5,24
pulled
 47:20
purely
 20:2
purpose
 7:4
purposes
 53:13

pursuant
 2:8 40:2
put
 19:14 77:8,11,15
P.C
 1:12 3:13,24 10:23
   18:25 28:15 36:20
   40:1
p.m
 2:4 5:3 48:25 49:2,3
   89:3,10

_____
          Q
question
 7:10,13,17 13:2,14
   15:20,24 16:5 18:7
   25:6,7 32:25 41:14
   41:17 43:9 44:6
   45:2 47:8,12 48:6,7
   51:25 56:7 57:13,14
   62:24 63:4 65:15,25
   75:10 82:23 84:19
   87:2
questioning
 8:13 48:20
questions
 7:6,18,22,24 47:4
   88:20 92:14
question's
 51:8
quickly
 7:23
quite
 61:2
Qusair
 1:15 5:16

_____
          R
R
 5:1
radiation
 3:13,24 10:23 18:24
   28:15 36:20 40:1
   64:4,6,10 78:17,20
   79:7 80:4 83:19
rate



79:2,8,12
**rates**
79:3,4
**Rathod**
1:16 17:25
**reached**
60:23
**read**
14:4 19:16 21:17
31:4 37:20 38:13
40:4 41:11 51:16
60:21 61:13,15
67:18,21 68:24 70:3
72:24 90:6 91:3
**readily**
58:13
**reading**
31:3
**really**
8:5 13:12 30:25 44:6
44:12,22 45:8,17,20
76:12 78:24 86:15
**reason**
63:6 64:22 68:11,11
69:5,5
**reasonable**
77:18
**reasons**
35:6 41:9
**REASON(S)**
90:7
**reassessed**
86:7
**recall**
20:14,16 27:2 28:19
28:23,24 29:3,9
31:3 35:11,13 51:24
52:5,8,10,16 55:11
56:2,23 57:18,22,22
59:12,21 70:21,22
76:9,23 80:8 81:22
**receipts**
6:17
**receivable**
39:11
**receivables**

38:24
**receive**
30:19 81:4
**received**
19:13 51:9 57:20
59:9
**receiving**
18:12 57:18 59:21
**recess**
48:24
**recollection**
23:2 36:8 52:3
**recommendations**
81:12,17
**recommended**
82:3
**record**
5:3 8:23,25 49:4 60:7
66:24,25 67:1 89:1
89:2,5
**recorded**
60:1 74:20
**recordings**
28:2
**recruitment**
3:8,14 13:19,20
16:19 30:15 50:15
73:3
**redacted**
3:10 19:25,25
**reduced**
92:12
**reevaluated**
46:11
**REFERENCE**
3:6
**referral**
85:13
**referring**
19:20 20:18 37:3
40:14 85:9
**refers**
36:19 40:12
**refresh**
52:3
**refreshing**

23:1
**regard**
27:17 73:16
**regarding**
18:19 28:2
**registered**
2:6 4:9,10 79:22 80:2
80:3,7,17 92:4,24
**regular**
89:7,8
**regulate**
72:21
**regulations**
72:12,17
**regulatory**
16:14
**reimburse**
72:22
**reinstated**
82:14
**reject**
57:7
**related**
19:13 66:14 72:13
92:17
**relates**
31:8
**relation**
92:8
**relationship**
18:5,11 23:8,9 24:12
49:15
**release**
81:21,21 82:9
**relying**
6:23
**remember**
28:4,6,9 31:3 55:2
58:7,14,14 60:2,10
61:16,25 62:1,4,5,8
63:24
**remind**
9:6
**Render**
1:12
**renew**

18:15 19:4
**repaid**
14:3 38:8
**repay**
14:1 16:19 39:9,15
73:3
**repayment**
15:7 25:11,20 26:1,8
26:10,25 27:15,18
28:11 29:7,14,21,25
30:8 88:8
**replies**
31:16
**report**
55:16,25
**reporter**
2:6 5:9,18 8:21 10:9
20:11 21:3 25:3
32:3 40:22 78:19
92:5,24
**REPORTER'S**
92:1
**reports**
55:19
**report/summary**
3:17
**represent**
5:12
**request**
23:7,10 50:1 81:8
**requested**
34:5
**require**
39:21 40:10 73:6
**required**
16:22 86:21
**requirements**
16:14 26:16
**resolve**
26:25 29:7,25 46:5
88:2,7
**resolved**
6:12,20 29:15 30:8
**respectful**
32:13
**respond**



31:15,19 57:24 58:6
**responded**
59:3
**responding**
59:10
**response**
59:7
**responses**
8:23 9:1
**restate**
12:1 18:7 32:24
75:10
**restore**
83:11
**restroom**
8:18 48:23
**result**
37:9
**resumed**
49:1
**retain**
19:1
**return**
6:18 82:9
**returning**
37:24
**revenue**
11:24 12:4 38:16
**revenues**
11:8
**review**
17:14 20:1 49:20
54:18 72:18
**reviewed**
10:5
**reviewing**
10:12
**revised**
30:16 31:9
**right**
12:7 13:8 16:19
25:23,25 27:13 28:8
39:20 40:9 42:11
43:5,24 44:15,25
50:10 64:21 73:6
74:15 77:22 81:24

86:3
**ROPC**
10:23 11:4,8,15 12:8
15:7 19:14 23:8
25:10 26:8,13,15
27:15 29:7 38:19
39:5,8,15,15 46:14
88:7
**ROPC's**
29:20 38:24
**rough**
89:6,8
**roughly**
14:18
**rude**
8:9
**rules**
72:17
**RVU**
13:13

_____
S
_____
**S**
5:1
**Sabey**
1:11 3:10 5:13,13,25
10:13 12:1,3,7 13:3
13:11,15,18,24
15:15,19 16:11,18
17:8 18:9 19:24
20:7,13,14 21:5,7
22:4,12,19,25 23:3
23:20 24:11,18 25:4
25:23 26:19 28:8
30:12,22 31:12,13
32:5 33:2 35:21
37:1 40:8 41:1,17
42:17 43:1,11,17,20
44:25 46:2,3,12,21
46:23 47:3,7,10
48:6,19 49:5 50:6
50:10,14,21 51:9
52:4,24 53:4,9 54:1
54:6 55:15,22 56:3
56:9,17,25 58:10
59:15 60:18 61:17

61:21 62:16,24 63:3
63:8,14,18 65:2
66:12 67:6 68:14,18
68:23 69:9 70:1,17
73:2,11 74:1,6,11
74:15,20,22 75:8,20
76:6,17,20,23 77:6
77:25 78:22 79:21
80:16,25 82:20 83:1
83:7 84:7,13 85:6
86:13,16 87:3 88:6
88:12,19 89:8
**safety**
35:6 66:16
**salary**
11:14 12:6,9 14:15
14:19,22,25 37:13
38:3 39:10
**sale**
4:4 77:8,11,15
**salt**
86:14,17
**Sam**
23:4
**Saturday**
58:24
**saw**
30:22 41:20 42:16
53:21 71:9
**saying**
9:6 13:3 18:15 27:13
30:22 33:6 52:11
53:15 58:19 59:18
61:21 62:3 63:9,9
65:20
**says**
14:1,14,15 19:8
20:17 21:12 23:6
31:14 32:12 34:5
36:4 37:7 41:5,18
54:9 56:4 67:14,25
69:9 70:9,16 72:11
73:14 80:3 81:20
**schedule**
42:3
**scheduled**

31:16 42:6 44:13
**scheduling**
40:3,6,6
**Scott**
50:25
**seal**
92:21
**second**
13:25 60:19 69:11
**Secretary**
4:6 78:2
**Section**
36:20
**see**
20:8 41:2 44:8 50:24
59:5 66:20,20 85:25
**seeing**
43:3,18,19,21,23,25
44:2,7,13,15 51:2
**seek**
33:20
**seeking**
23:4
**seen**
23:19 40:20,23 51:3
53:15 63:2 71:17
**self-diagnosis**
66:19
**Self-Identification**
4:2
**sell**
77:20
**sense**
80:11,12
**sensitive**
33:14
**sent**
3:11 30:15,20 31:5
31:14 36:1 50:9
52:18 57:5 58:18
59:18 62:19 63:6,10
**sentence**
36:18 39:23 69:11
**separate**
22:14
**September**



92:22
**serious**
17:2
**seriously**
16:22
**served**
29:16
**services**
3:12 5:10 14:22
36:19
**set**
72:22 84:8
**settlement**
3:14 30:15 50:16
**Setty**
34:8 40:13,16 87:12
**Seventeenth**
5:7
**severely**
34:16 61:1
**SFH**
23:13
**Shaking**
8:24
**shared**
61:6
**SHEET**
90:3
**short**
39:7
**shorthand**
92:11
**shortly**
23:11
**show**
17:8 55:15,18 58:10
60:2 67:6,7 74:6,16
76:17 77:6,25
**showing**
23:21
**shows**
77:7 78:1
**sickness**
37:10
**Sieff**
1:19 5:8

**sighing**
68:15
**sign**
17:11 31:4 69:18
71:11,22 72:3,6
73:3 81:20,21
**signature**
67:12,15 71:1 74:2,7
75:2,6,7,8,13,17,18
76:3,8 91:11 92:20
**signatures**
3:23 50:24 53:19
76:21
**signed**
15:10 17:15 30:6,7
52:20 53:5,22 67:8
69:13 70:18 71:21
71:23 74:8,16,22
75:1,3,11 76:6
**signer**
71:3
**significant**
86:19
**signified**
76:11
**signing**
31:3 67:19 70:4
**sign-on**
15:2
**silly**
46:22 48:13
**similar**
80:16
**simple**
51:25
**sitting**
9:24
**situation**
43:18
**six**
21:15 86:7
**Slight**
40:5
**slow**
25:7
**small**

39:8
**socialize**
40:17,25
**somebody**
36:14
**soon**
19:3
**sorry**
8:22 12:24 16:5 25:4
35:24 64:6 74:9
**sort**
8:16
**sources**
85:13
**space**
76:8
**spaces**
75:17
**speak**
75:22
**speaking**
21:21,23 25:1
**specialty**
34:13
**specific**
6:8 34:22 35:9,11
84:25
**specifically**
10:8,11,18 24:3
28:23,24
**spend**
10:16
**spoke**
27:5 72:4 87:24
**spoken**
21:16
**Springs**
4:4
**ss**
92:2
**St**
14:21 19:12 22:16
87:20
**stack**
76:20
**staff**

33:5,19 49:11 81:8
82:13
**Stageburg**
87:22
**standard**
79:3
**standards**
72:16,22 79:4
**Stark**
16:13
**start**
41:18 46:19
**started**
26:2 39:2 41:13,24
44:11,15 45:7
**starting**
37:22 38:10 42:13,15
42:20 49:16 70:7
**starts**
65:4
**state**
2:7 4:6 5:11 91:13
92:2,5
**stated**
61:10
**statement**
4:8,10 19:18,19
32:16,17 41:16
47:11,14 51:16
67:16,18,22 70:21
**State's**
78:2
**statutes**
16:14
**stay**
68:9
**steps**
73:7
**stop**
48:11 68:18
**stopped**
59:10
**story**
8:4
**straggling**
39:8



**strange**
 75:13
**Street**
 1:12,16 2:5 5:7
**strength**
 85:5
**strengths**
 84:8,15,18,20,22,23
   84:24 85:1,4
**Stress**
 87:7
**stressed**
 34:16 61:1
**strict**
 16:13,14
**studied**
 30:25
**subject**
 49:16
**submit**
 11:9 49:25
**subscribed**
 91:12
**subsidy**
 14:8,18
**substance**
 9:11
**substituting**
 79:10
**suggest**
 34:21
**suggested**
 54:11
**suggesting**
 23:20
**Suite**
 1:12,16 5:7
**summarized**
 60:1
**summary**
 4:6 55:17 60:2 61:18
   61:23 62:13
**supercede**
 73:17
**support**
 73:5

**supposed**
 6:17
**sure**
 32:25 40:9 44:22
   49:19 51:7 53:17
   78:23 82:6 87:10
**surgery**
 86:22
**swear**
 5:19
**sworn**
 5:22 91:12 92:7
**S-E-T-T-Y**
 34:8

———————————
T
———————————

**table**
 28:17
**Tacha**
 71:5,10 72:5
**take**
 5:3 6:16 12:3 16:22
   20:11 25:6 35:5
   41:25 42:7 44:19,23
   45:6 46:10 48:16
   61:2 73:7 82:16
**taken**
 2:8 48:24 92:10
**takes**
 46:5
**talk**
 10:19 18:4,10 20:24
   21:1,7 32:3 48:23
   57:19 59:4,19 60:24
   61:3,12 62:6 65:7
**talked**
 23:24 64:1
**talking**
 26:2 47:7 61:6 68:15
   87:5 88:15,17
**talks**
 32:8
**team**
 17:21,22 36:17
**technical**
 33:4

**tell**
 6:21 8:4,8 13:14
   21:19 22:5 27:7,18
   29:10 34:15 42:1
   46:3,12 47:13 51:5
   72:2 79:25 80:5,19
   80:20 81:24 85:12
   87:22
**telling**
 16:1 47:16 51:3
   54:21 65:16
**tells**
 16:3 81:11
**temporary**
 32:13,18
**ten**
 86:20
**tend**
 25:5 84:14
**tension**
 20:20 21:13,25 22:11
**term**
 20:22 69:12
**terminated**
 38:1
**termination**
 70:6
**terms**
 25:24 28:10,21 52:19
   52:25 53:2,7 71:11
**testified**
 5:23 63:21
**testify**
 6:25 48:8,14 92:8
**testifying**
 45:22 48:8
**testimony**
 6:23 7:5 47:16 52:12
   91:5 92:14
**Texas**
 16:18
**text**
 3:18 57:18,22,24
   58:19
**thank**
 6:1 12:2 22:22

**Thanks**
 35:25
**therapist**
 9:18
**Theresa**
 2:5 5:9 92:4,24
**thing**
 80:17 86:16
**things**
 7:23 10:6 34:22
   35:10 73:5 88:23
**think**
 5:15 10:22 11:18
   15:4 20:7 26:12
   29:5 35:18 39:18
   43:15 56:24 67:10
   70:16 80:9 84:14
   87:9
**thinking**
 20:19
**third**
 23:12 33:21
**third-party**
 72:19
**Thompson**
 35:1 62:7 82:3 87:12
**thought**
 22:23 29:6 45:8
**thousand**
 15:1
**three**
 27:1,24 35:5 37:17
   39:10 41:3,8 42:18
   44:8,10 45:10,11
   46:5,7,10,13,17,24
   47:17,21,24 72:15
   81:19
**thumbs**
 58:20,21
**Thursday**
 2:3
**time**
 6:3 7:17 8:4,13 10:16
   12:11 18:8,17 21:16
   21:22,23 23:16 25:6
   26:2 32:22 33:9


MAGNA
LEGAL SERVICES

35:8 36:8 39:7 42:6
42:6,16,18 43:4,9
45:18,18,19,24,24
46:1,1 47:21 49:3
51:2 64:18,21 69:4
78:24,25 85:19 89:3
92:11
**times**
6:4 7:9 47:6 55:17,24
56:11 88:24
**title**
54:25
**titles**
54:23
**tlm**
91:21
**today**
5:6 6:2 9:15 53:21
**told**
27:11 30:11 35:1,3
39:24 41:2,25 45:11
45:13 46:18 47:17
47:24 49:6 50:6
71:20 83:10
**top**
36:4 54:12
**total**
29:16
**transcript**
90:6 92:14
**transcription**
91:4
**transcripts**
4:14
**transition**
22:14 23:5 27:6
**treated**
87:11
**treating**
38:19
**treatment**
34:21
**tried**
58:3
**trigger**
15:7 26:8

**trip**
43:2
**troubles**
21:8
**true**
19:18,19 22:3 91:4
92:13
**truth**
6:22,22 92:8
**truthful**
6:25 32:16,17
**trying**
8:9,10 26:3,14,20
28:25 56:23 86:13
**turn**
13:25 14:6,11 37:5
70:6,23 72:8 89:7,8
**twenty**
47:6
**two**
9:24 10:25 22:15
23:10 27:4 30:13
52:20 55:16,24 57:3
70:1
**two-income**
83:22
**two-man**
11:3
**typewritten**
92:12

**U**

**Uh-huh**
76:22
**uncharacteristic**
32:14,19
**understand**
7:7,14,15 8:3 13:1
15:20,21 16:11,25
20:22 23:16 24:5
29:14,20,24 30:5
32:25 44:6,12 45:20
46:9 47:9,12 69:2
70:4,13 71:9 73:20
**understanding**
41:14 73:15 74:3

78:24
**understands**
68:21
**understood**
15:5 38:18 49:6
69:16,21 73:24
**uninterrupted**
9:24
**unmarked**
3:10
**unredacted**
20:1
**UNUM**
33:20,25 50:1
**urgent**
34:5
**use**
8:18 39:9 48:23
**uses**
33:21,25

**V**

**v**
1:3 90:4
**vacation**
31:16,20,23 32:1
42:5,21 43:6,12,20
43:23 44:2,13 45:24
54:13
**value**
28:16,20 29:17 77:18
77:21
**valued**
28:17
**verbal**
8:23 9:1
**verbally**
9:7
**verbatim**
28:4,7 60:11
**versus**
5:5
**Victor**
1:19 5:8
**videographer**
1:19 5:2,8,18 12:20

12:22,24 49:3 89:3
**Videotaped**
1:7 2:1
**view**
31:1 54:16,21 55:5
**viewed**
55:3,23 56:4,13,21
**violate**
17:1
**violating**
68:13
**voice**
10:10
**Voluntary**
4:2

**W**

**wait**
7:24
**waiting**
28:20
**want**
8:5 20:11 24:15,16
24:17,19,22 28:13
32:24 47:1,12 48:23
67:21 82:16 83:3,5
83:17,18,19 84:25
87:10 88:21,25
**wanted**
22:7 24:25 62:6
65:19 66:16,19
**wasn't**
6:18 10:18 20:25
24:12 25:22 30:4
43:3 44:13 48:7
53:16 65:12,16
**wasted**
45:25
**wasting**
45:19 46:1
**water**
82:19
**way**
6:25 9:5 13:6 25:21
26:20 29:6 30:13
63:12 65:23



weaknesses
84:9,15,18,20,23,24
  85:1,7
week
42:12 44:19 45:1,6,7
  89:6
weeks
78:23
weight
86:6,10
Weller
23:4
went
54:17 82:8 86:24
weren't
21:21
Wernick
58:20,23
we're
5:2,6 6:22 19:20 20:4
  20:8 48:11,15,16
  68:10 82:20 87:5
  89:4
WHEREOF
92:20
wife
83:25
wild
13:7
willing
27:8,19
wish
39:24 90:6
witness
2:2 5:19,22 10:9,11
  12:6 13:1,12,23
  14:7,13 16:10 18:7
  19:7 21:4 22:3,10
  22:18 23:19 24:9,15
  25:19 26:18 28:6
  30:10,19 32:7,24
  34:4 37:6 40:7,23
  41:16 42:15,24 43:9
  43:15 44:22 45:20
  46:9 47:8 48:10
  50:5,9,19,23 51:7

52:23 53:2,25 56:2
56:7,23 61:15,20
62:23 63:17 65:1
66:11 67:24 69:8
70:8,16,25 72:10
73:1,10,13,24 75:6
76:5 77:3 78:20
81:3 82:23 83:5
84:5,11 85:4 86:14
88:5,10 92:20
witnesses
8:3
woman
21:1
wonder
76:10
word
40:6 60:11,11
words
70:11 82:1
work
11:24 12:4,9 25:21
  29:1 37:9 41:2,8
  42:21 43:6,7,12,13
  44:10,19 58:13 78:7
  78:7,8,10,15,17
  79:2,8 83:17 86:24
  87:8
worked
33:11,15 86:25
working
12:11 20:25 29:2
  43:25 44:3,16 78:18
  78:20,22,24,25
  79:14,14 85:24
works
35:2
wouldn't
13:6
Wow
87:1
writing
60:1 69:13
wrong
66:21

| X |
|---|
X
  3:1

| Y |
|---|
yeah
 12:1 31:10 42:8
  43:11 45:3 48:13
  53:10 55:20 71:8
  79:6 82:4 86:13
  88:6
year
 11:14 14:16 84:6
years
 33:11 86:1,2,5,20
Yep
 59:8

| Z |
|---|
zestimate
 77:17
Zillow
 4:4

| $ |
|---|
$10
 13:9
$260,000
 26:11
$29,000
 14:9
$360,000
 14:16
$800,000
 11:14
$90,000
 84:6

| 0 |
|---|
01/19/2023
 91:21

| 1 |
|---|
1
 3:8 13:16,20 14:14
  30:7 41:6,13,18

  42:2
1st
 42:9,13,20 49:16
1.3.1
 14:1
1.8
 72:9,11
1:10
 2:4 5:3
10
 3:19 19:5 36:4 59:13
  59:22 65:3
100
 1:16
11
 3:20 4:4 36:20 37:7
  60:16,18 71:1
12
 3:21,23 14:8 67:4,7,7
12-month
 37:18
13
 3:8,22 69:24 70:3
  75:1
14
 3:23 32:6,8 74:4,7
  76:19,20
15
 4:2 32:12 76:15,18
  76:19,20
16
 4:4 77:4,7
17
 3:9 4:6,17 77:23 78:1
17th
 1:12 2:5
18
 4:8 79:19
18th
 92:21
19
 1:7 2:3 3:2,10 4:10
  5:6 80:14,16 90:2
19th
 89:11



**2**
**2**
 3:9 13:11 17:6,8 19:6
  31:8
**2:01**
 48:24
**2:12**
 49:1,3
**20**
 4:12 80:23 81:2
**2021**
 21:24
**2022**
 3:23 4:7,12 20:3 29:4
  30:7 32:10 41:7,13
  41:18 42:2 49:16
  56:21 57:19 60:4
  64:5,9,15 77:8 78:3
**2023**
 1:7 2:4 3:2 5:6 89:11
  90:2 91:14 92:21
**2025**
 92:22
**21**
 92:22
**22**
 59:18
**22nd**
 42:11 50:17 59:1
**23rd**
 58:24
**24**
 34:2
**25th**
 31:24 42:21,24 44:11
  44:16 45:12 58:13
  58:18
**26**
 31:8,12
**26th**
 31:15,22 32:1 54:8
**27**
 57:19 59:18 60:3
**27th**
 59:4 60:20

**2701**
 1:16

**3**
**3**
 3:10 19:22 20:12
  22:21 23:2 37:5,23
**3:08**
 89:3,10
**30**
 10:20
**30th**
 42:22,24
**303-578-4400**
 1:17
**35**
 3:11
**36**
 3:12

**4**
**4**
 3:11 14:6 35:19,22
  37:23 39:24 41:19
  50:22 70:7
**4th**
 77:8
**4/27/2022**
 3:19,20
**4/28/2022**
 3:20

**5**
**5**
 3:4,12 4:12 14:15
  36:24 37:2 86:5
**50**
 3:14
**54**
 3:16
**55**
 3:17
**58**
 3:18
**59**
 3:19

**6**
**6**
 3:14 50:12,15
**60**
 3:20
**67**
 3:21
**69**
 3:22

**7**
**7**
 3:16 50:11 54:4,7
**74**
 3:23
**76**
 4:2
**77**
 4:4,6
**79**
 4:8,17

**8**
**8**
 3:17 55:13,16
**8.6**
 73:12
**80**
 4:10,12
**800**
 1:12 5:7
**80202**
 1:13
**80205**
 1:17
**80906**
 4:5

**9**
**9**
 3:18 58:8,11
**9th**
 56:21
**90**
 6:16 70:11,16
**92**

 90:6 92:13
**999**
 1:12 2:4 5:7

