Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-01921-NYW-MDB

----------------------------------------------------------

IN-PERSON and VIDEOCONFERENCE
and VIDEOTAPED DEPOSITION OF:

ANUJ PEDDADA, MD - 12/10/2024 - Volume II

----------------------------------------------------------

ANUJ PEDDADA, MD,

Plaintiff,

V.

CATHOLIC HEALTH INITIATIVES COLORADO d/b/a CENTURA
HEALTH-PENROSE ST. FRANCIS HEALTH SERVICES,

Defendant.

----------------------------------------------------------

                    The deposition of ANUJ PEDDADA, MD

was taken by the Defendants on December 10, 2024,

commencing at the hour of 10:52 a.m. Mountain Time,

before ROSIE STAHL, Shorthand Reporter and Notary

Public within and for the State of Colorado.



Page 2

IN-PERSON AND REMOTE
APPEARANCES

For the Plaintiff:

IRIS HALPERN, ESQ. (In Person)
CRIST WHITNEY, ESQ. (In Person)
RATHOD | MOHAMEDBHAI LLC
2701 Lawrence Street, Suite 100
Denver, CO 80202
Ph. 303-578-4400
Ih@rmlawyers.com
Cw@rmlawyers.com

For the Defendant:

MARK L. SABEY, ESQ. (In Person)
LINDSAY K. MCMANUS, ESQ. (In Person)
HALL, RENDER, KILLIAN, HEATH & LYMAN, P.C.
999 17th Street, Suite 800
Denver, CO 80202
Ph. 303-801-3538
Marksabey@hallrender.com
Lmcmanus@hallrender.com

Also Present:

Julie Butcher - Videographer (In Person)
Rosie Stahl - Court Reporter (Remote)
Anuj Peddada, MD - Deponent (In Person)

Page 3

I N D E X
EXAMINATION OF ANUJ PEDDADA, MD:     PAGE
December 10, 2024

By Mr. Sabey          6
By Ms. Halpern       207
By Mr. Sabey         214

DEPOSITION EXHIBITS:          INITIAL
                    REFERENCE

Exhibit 56A  06/06/22 Text Messages    Page 22
   to Dennis Carter (Bates
   Peddada 1330-1331)

Exhibit 57A  06/14 Texts from       Page 23
   between Peddada and
   Russ

Exhibit 58A  Email:  From Peddada to   Page 25
   Steinberg, 04/24/24,
   Re:  Exploring
   Opportunities to
   Provide Coverage for
   Practices (Bates
   Peddada 1369)

Exhibit 59A  Expert Review by Myers    Page 52
   of Peddada, 07/30/24
   (Bates None)

Exhibit 60  First Amended Complaint  Page 55
   and Jury Demand

Exhibit 61  Email:  From Peddada to  Page 60
   Monroe, Re:  Needs
   Attention, 04/25/22
   (Bates Peddada 2)

Exhibit 62  Email:  From Peddada to  Page 61
   Baldauf, 05/22/22, Re:
   Dr. Peddada's Request
   for Medical Leave
   (Bates Peddada 3)

Page 4

Exhibit 63  Plaintiff's Response to  Page 109
   Defendant's Motion for
   Summary Judgement

Exhibit 64  Excerpts from        Page 110
   Plaintiff's Response to
   Defendant's Motion for
   Summary Judgement (No
   Bates)

Exhibit 65  Email:  From Yin to      Page 121
   Peddada, 05/05/22, Re:
   Leave of Absence (Bates
   PSF-Peddada 308-1481)

Exhibit 66  04/05 Text Messages,     Page 128
   between Peddada and
   Jeff (Bates Peddada
   366)

Exhibit 67  Email:  From Peddada to  Page 137
   Peddada, Re:  Your
   thoughts on this letter
   I want to address with
   admin, 04/18/22 (Bates
   None)

Exhibit 68  Text Messages:  04/18    Page 145
   with Jeff (Bates
   Peddada 1)

Exhibit 69  Centura - Physician      Page 172
   Employment Agreement,
   04/12/22 (Bates
   PSF-Peddada
   0124-000439)

Page 5

DECEMBER 10, 2024, 10:53 A.M. MOUNTAIN TIME
P R O C E E D I N G S

THE VIDEOGRAPHER:  We are now on the record.  This begins the continued deposition of Dr. Anuj Peddada in the matter of Dr. Anuj Peddada vs. Catholic Health Initiatives Colorado the Centura Health, doing business as Penrose-St. Francis Health Services, being heard in the United States District Court for the District of Colorado.

Today's date is December 10th, 2024, and the time on the record is 10:53 a.m.

This deposition is being taken at Hall, Render, Killian, Heath & Lyman, located at 999 17th Street in Denver, Colorado.

The videographer is Julie Butcher of Magna Legal Services, and our court reporter is Rosie Stahl of Magna Legal Services.

Will counsel and all present parties please state their appearances and whom they represent.

MS. HALPERN:  Iris Halpern, and to my right is Crist Whitney.  We represent the plaintiff, Dr. Anuj Peddada.



Page 6

MR. SABEY: Mark Sabey appearing on behalf of Penrose, and Lindsay McManus will be joining us later.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

ANUJ PEDDADA,

Being first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. SABEY:

Q    All right. Good morning, Dr. Peddada.

A    Good morning.

Q    Thank you for being here today.

A    Yes.

Q    So you just took an oath to tell the truth, the whole truth and nothing but the truth, right?

A    That's correct.

Q    And we'll be relying, as this case moves forward, on the testimony you give in this deposition so it's important that you testify in a way that is complete, truthful, honest and accurate. Will you do that?

A    Yes.

Page 7

Q    And I want you to take as much time as you need to fully exhaust your memory on the subject of each question that I ask you. Will you do that?

A    Yes, I will.

Q    And if after this deposition concludes, you realize that an answer that you gave here today was inaccurate or incomplete or misleading in any way, will you inform me of that fact through your attorney?

A    Yes, I will.

Q    Okay. Are you under the influence of any medication, drugs, alcohol or any other substance that would impair your ability to fully and accurately participate in this deposition?

A    No.

Q    Are you in good mental, physical and emotional health today?

A    Yes.

Q    Are you currently under the care of any doctor, therapist or care provider of any kind?

A    Yes, for my hypertension only.

Q    Okay. And how long have you been under care for the hypertension?

A    For approximately a year

Page 8

medication-wise, probably approximately a year.

Q    Okay. Has there been any significant change in your health since August of 2022?

A    General health, no.

Q    Any other --

A    Mental health, I mean, from the process that occurred. Ongoing I've had some issues.

Q    Okay. Tell me what those issues are.

A    It's been ongoing for probably 18 months prior to that. Maybe 12 to 18 months before, just stress from work.

Q    Stress from work?

A    Stress from work that manifested in many ways during that time frame.

Q    Okay. But since then, since August of '24 at the end of your leave -- I mean, August of '22 at the end of your leave, have you had any significant changes in your health?

A    Overall health, no, but still the symptoms that I've been complaining of, difficulty with my -- with my stamina and stuff has still been gradually getting better, but overall it has been

Page 9

getting better since August.

Q    Okay. Anything else?

A    Not that I can think of.

Q    Okay. Would you please describe your work history since May 10th of 2022?

A    I've been providing basically locum services for different clinics.

Q    Let's go chronologically. After May 10th of 2022, what was the first work that you did?

A    I provided that information. I don't recall exactly, but I think it was in Sacramento, California for Kaiser Permanente Medical Group doing locums coverage.

Q    Did you do some pro bono or nonprofit work around that time?

A    I can't recall, no.

Q    Okay. So Kaiser Permanente. Tell me about that job.

A    It was a radiation oncology coverage of a practice that was free-standing center providing a full array of radiation oncology services.

Q    Okay. And how much did you work there?



3 (Pages 6 to 9)

Page 10

A    For one week, maybe a week and half.
Q    And when was that roughly?
A    So I gave those dates.  I don't remember exactly.  I think -- it might have been December, November, December, that time frame.
Q    Okay.
A    Of 2022, yes.
Q    Okay.
A    I provided a list of all that.  I don't -- if you have that, I can look at that.
Q    I don't think we have that.
MS. HALPERN:  You do.  It's in the interrogatory responses.
MR. SABEY:  Okay.
THE DEPONENT:  I provided an entire list of every date that I worked.
MS. HALPERN:  It's in the interrogatory responses.
THE DEPONENT:  If I have that, I can refresh or, you know.
BY MR. SABEY:
Q    Okay.  Okay.  Then just describe generally how your -- without going into detail every job, how has your employment or your work as an independent contractor changed over time since

Page 11

that first job?
MS. HALPERN:  Object to form.
THE DEPONENT:  It's been -- my work as a locums doctor is defined by the person who hired me.  So most times they want coverage that's -- some are limited to reviewing films only.  Some are allowing me to see follow-up examination patients.
So it matters which job that I took.  So in general, they're varied by which job I take.
BY MR. SABEY:
Q    Okay.  And have you been increasing the amount of work that you've had over time?
A    I'm trying to.  I would like to work and it's -- I'm trying to get as many dates as I can get.
Q    Are you wanting to work full-time?
A    I would like to, yes.
Q    So have you ever limited your search for employment or your request for employment to part-time work?
MS. HALPERN:  Object to form.
THE DEPONENT:  If there's an opportunity for part-time work to get in the door, I'm open to trying that.

Page 12

BY MR. SABEY:
Q    Okay.
A    So I didn't -- maybe ask the question again.  I didn't really understand the question.
Q    That's fine.
But if you had an opportunity for full-time work, you would have taken that rather than part-time?
A    I prefer full-time if I can get it.
Q    Okay.  I'd like to understand your income from the CK Leasing.
A    Yes.
Q    CyberKnife.  What's your percentage of ownership?
A    I have nine shares.  If I recall percentage wise, maybe 19 percent.
Q    Okay.  And you receive distributions how often from that?
A    Typically quarterly, but the hospital has been lax with that, so we've had some that were longer than a quarter.
Q    The hospital -- what hospital?
A    Penrose Hospital.
Q    So they're the ones who give you the

Page 13

distributions from CK Leasing?
A    The check actually says CK Leasing on it, but it's -- the main shareholder of that is Penrose or Centura.
Q    Okay.  Is your distribution impacted by your use of the CyberKnife machine?
A    No.
Q    And how did you come to have an interest in KC Leasing [sic]?
A    I really wasn't interested in CK Leasing.  I liked doing radiosurgery.  I brought that technology to town, and we had an old accelerator in the department that was being not used.  So the hospital of my leadership agreed to buy a piece of equipment for that accelerator called an MLC, multileaf collimator, for $100,000.
They put that in the machine.  I developed the practice around that.  We got very busy with CyberKnife -- or radiosurgery is the term.  So the hospital approached me and said, we're open to buying you a piece of equipment that can do exclusively radiosurgery.
There were two main conventions, Gamma Knife and CyberKnife, and I'm not -- I don't believe in investing in equipment.  I think there's

**MAGNA**
LEGAL SERVICES

Page 14

potential issues with that for physician ownership, but the hospital said they would not purchase the equipment unless I become part of an investing group of this.

So they recruited another group of investors called Atlantic -- I can't remember their -- Aceletech. So Aceletech and the hospital formed the CK Leasing and invited doctors to participate. So many doctors in the community actually wrote a check to be part of this.

And then something changed that they would not allow doctors who were not radiation oncologists to be a part of this. So myself and Monroe were the only two physicians at that time that were the part of CK Leasing.

Do you want me to continue?

When CK Leasing broke up -- after several years, that company that came, Aceletech, they needed to pull out of the deal. They wanted leave. So additional shares became available.

So the CEO or CFO at that time, Jamie Smith, approached me and said, Anuj, you guys have done very well with this CK Leasing, why don't you just buy the additional shares.

Like I said, I don't think we really

Page 15

should be owning shares in equipment. So I opened up those shares for other doctors who are radiation oncologists at other communities who would potentially participate and actually treat patients using the machine. Dr. Stageberg down in Pueblo, Dr. Reiner at Porter Hospital in Denver.

So we opened it up to -- so other physicians have ownership now.

Q    Okay.

A    Does that answer your question?

Q    Yeah, I think so.

And you and Dr. Monroe are still shareholders?

A    Yes. I have not sold my shares yet. They have not asked for that.

Q    Okay. So if you had become employed -- so Dr. Monroe is an employee of Penrose at this point, and he still owned shares. If you had become employed, did you have to divest yourself of your interest in CK4 Leasing?

A    We never really discussed that in great detail. I think there was some time that the machine is coming to age or end of life they call it. I think it's "next year is end of life" means we're not going to continue that machine. So there

Page 16

was going to be some discussion about that.

Q    Has a decision been made that it will be shut down?

A    I don't know.

MS. HALPERN:  Object to form.

THE DEPONENT:  I don't know. There's a meeting today that was scheduled to talk more about these kind of things, but I had this conflicted meeting.

But it's going to come to end of life by the company that manufactures the machine. They're no longer -- they already -- actually, the published data had been given out where they're no longer going to service the machine whatsoever. So it'll be years to go to third party to try to get it fixed. So it will probably come to end of life. BY MR. SABEY:

Q    We just don't know at this point?

A    Within a year or two I think. We can look up that. There's a date for that. But whether hospital continues to own it and hire other people outside the company to fix it, I don't know. I'm not privy to that. I've not heard.

Q    Okay. And do you have a dispute with Penrose related to CK Leasing?

Page 17

A    Actually, yes. Something came up recently where I was asked in this board meeting, myself and Dr. Monroe, there's some payment that has changed recently, what they were paying previously, and that's come into question.

So they asked a third-party law firm to at least talk to us about it and nothing -- I had meeting with them about -- representing the physician side of it. It was about a 20-minute pro -- it was a free meeting for us to explore it, and I've never heard anything else about it.

Q    When they say "they" -- who told you to talk to an attorney?

A    When we had a board meeting, the CK -- there -- the partners of the CK, the physician group, said we need to look into this, we're not getting paid for what we were getting paid for before so we still have to explore this. There's no -- there was no threat of a lawsuit or anything. It was to explore whether this was actually correct.

Q    Okay.

A    One more thing since you did bring that up. The reason that happened was the -- someone reviewed -- I can't -- from the Centura



5 (Pages 14 to 17)

Page 18

side. There's new administration that have come in place. They've reviewed the original agreement we had and their lawyers, the Centura lawyers -- or what's it called now? CommonSpirit lawyers said that this payment that we've been getting may not be accurate, we need to stop that payment, the additional payment we're getting.

And that's what triggered the CK Leasing group to say let's look and make sure this is correct.

Q    Okay. All right. I'd like to show you what's been marked as Exhibit 56. Do you recognize that document?

A    Let me look at it for a second. Yes, I remember it --

Q    Okay.

A    -- now that I've seen it.

Q    Is this a text message that you sent to Dennis Carter on June 6th, 2022?

A    That's what the screen shows. I think that's right. I don't remember for a fact but yes.

Q    Okay. And who is Dennis Carter?

A    I don't know him. He was a medical oncologist that used to work in Colorado Springs,

Page 19

gave me his name. And he is the -- I guess the lead radiation oncologist for Rocky Mountain Cancer Centers.

Q    And is everything you said to Dennis in Exhibit 56 accurate and truthful?

A    Yes, I think so.

Q    Okay. And it says you were going to be out of town -- it says, "I am currently out of town through 6-15-22." Where were you out of town?

A    I'm sorry, I don't remember that.

Q    And did you meet with Dennis after 6-15-22?

A    We never met.

Q    And why didn't you ever meet?

A    I texted and he never -- we never set up a final date to meet. He never followed up.

Q    Okay. And did you follow up with him?

A    I think so, and I didn't want to be a nuisance. I called his cell number and left a voicemail.

Q    Okay.

A    Several times, I think.

Q    So if you had found a mutually beneficial model to continue practicing

Page 20

high-quality, patient-centric medicine, could you have done so at that time?

MS. HALPERN:  Object to form.

THE DEPONENT:  If I could have found that, yeah, I would have been able to.

BY MR. SABEY:

Q    Okay.

A    Not in June but, you know, I was on -- when I finished my medical leave, I would have been able to do it.

Q    And if he had offered you a job, you would have taken it?

A    If it would have started after my time of my medical leave, yes.

Q    Okay. So if he had offered you a job in July --

MS. HALPERN:  Can I ask a really quick question? I think we might be at Exhibit 58, not 56. I just want to make sure everything is ready -- like accurate for the record. That's what we're trying to check. You said this was 56. I don't want to overlap.

MR. SABEY:  I think this is what we have but --

MS. HALPERN:  Do you want to start

Page 21

at 58 even if there's a blank? It's not that --

MR. SABEY:  No, I don't because I've got all my exhibits numbered. If there's a --

MS. HALPERN:  Does Magna have it? Because we've been both using Magna.

MR. SABEY:  I don't know. If we have to, we'll call it 56A.

MS. HALPERN:  Okay.

MR. SABEY:  If that's -- does that work?

MS. HALPERN:  Okay. That's fine.

MR. SABEY:  Did you say 56 and 57 overlap?

MS. HALPERN:  No. I mean, we're fine. We've got your -- we'll take your suggestion. We're just trying to get everything ironed out.

MR. SABEY:  I get it. I know. Because we were so rushed, I didn't have time to --

MS. HALPERN:  No problem.

MR. SABEY:  There's going to be some duplicates here too.

MS. HALPERN:  That's okay. No problem.

(Discussion had.)

Page 22

(Exhibit 56A was marked for identification.)

BY MR. SABEY:

Q    Okay.  I'd like to explore with you the positions you have sought since rescinding your -- since the rescinding of your employment offer?

MS. HALPERN:  Just put an A on that.  Sorry.  Go ahead.

BY MR. SABEY:

Q    So when did you first start applying for jobs or looking for job opportunities?

A    This may have been the very first one because I was read this carefully and I want to explore with him potential work because at this time I've received my letter that I lost my job.

Q    Yeah.

A    So it hit me -- I didn't expect that to happen.  So it hit me so I was very anxious to get work, at least have something down the road for work.

Q    Okay.

A    So this is probably the first one.

Q    Okay.

A    I don't -- at the level of

Page 23

experience that I have and my stature, we don't actually go on and fill out applications to every job.  Usually you have contacts.  Your people tell you about jobs.  So that's how I got -- I go through a friend to contact Dennis.

So I gave a list of all the jobs and places and people that I contacted.  Do you have that that can refresh my memory?  I provided all that.

MS. HALPERN:  That would be in the interrogatory responses.

THE DEPONENT:  Otherwise, I can try again what you're asking me to try do by memory, but I actually wrote it down for you.

BY MR. SABEY:

Q    Okay.  So when did you start considering yourself a part-time doctor?

A    I don't ever consider myself a part-time doctor.  I'm a full-time doctor, but unfortunately I don't have full-time work.

Q    So -- okay.  I'd like you to look at look at Exhibit 57A.

(Exhibit 57A marked for identification.)

BY MR. SABEY:

Page 24

Q    Okay.  Is this a text message that you sent to someone named Russ?

A    Yes.

Q    And who is Russ?

A    He's a friend of mine.  He's a radiation oncologist.

Q    What's his last name?

A    Omizo.  I don't know how to spell it.  It's a Hawaiian name.  Omizo.  I can get that for you later.

Q    Okay.  So in this message you're acknowledging that they were posting for a new full-time doc.  Do you see that in the first -- the second paragraph, first sentence?

A    Yes, I do.

Q    Okay.  And then it says, "Any chance there's interest in a part-time doc like me, or even consistent comprehensive coverage for all vacations or other needs?  Just checking."  Did I read that correctly?

A    Yes, you did.

Q    So you told Russ that you were only interested in part-time work; is that correct?

MS. HALPERN:  Object to form.

THE DEPONENT:  In this text message,

Page 25

yes, but we had conversations prior to this.

BY MR. SABEY:

Q    Prior to this?

A    Yes, this text message.

Q    Okay.  So why did you tell him that you wanted a part-time doctor position?

A    Because Russ told me in their search for a full-time doc, they're looking for a junior doctor.  They're looking for someone right out of residency or one-year experience, not 27 years experience.  So I was hoping to get my foot in the door with him doing any kind of work.

Q    Okay.

A    They would see the value I would bring to the table and hopefully convert me to a full-time job.  That's the hope.

Q    I'd like you to look at Exhibit 58A.

(Exhibit 58A marked for identification.)

BY MR. SABEY:

Q    Is this a text that you sent to Michael Steinberg on April 24, 2024, at 8:14 a.m.?

A    Let me look at this.  That's what it's stamped, yes.

Q    And who is Michael Steinberg?

Page 26

A    He's my old partner in Santa Monica, California.

Q    Okay.  And is everything you said to Michael in Exhibit 58 accurate and truthful?

A    Let me read it.  Yes, it looks correct.

Q    Okay.  I'd like to point you to the second paragraph and follow along as I read the second sentence.  "I've decided" -- no.  "After taking some time to reflect and explore possibilities, I have decided that I would like to work part-time providing seamless comprehensive coverage to practices."

Did I read that correctly?

A    That's correct.

Q    So you decided at this point that you only wanted part-time work?

MS. HALPERN:  Object to form.

THE DEPONENT:  No.  Mike is another friend of mine and we spoke before this text, and he knows me very well and it's to get my foot in the door again.  It's the UCLA system.  There were no job postings for them at that time.

BY MR. SABEY:

Q    It says, "What sets me apart is my

Page 27

ability" -- this is the bottom of that paragraph.  "What sets me apart is my ability to offer services directly through my LLC without using a locums agency, and with my flexibility, I'm prepared to commit to up to 24 weeks per year?"

Did I read that correctly?

A    That's correct.

Q    What is your LLC?

A    It's my name at Anuj Peddada M.D., LLC that was created.

Q    And when you have performed work, it's been through your LLC?

A    Not always.

Q    When has -- when do you use the LLC and when do you not use it?

A    So when I -- when someone contacts me, a locums agency that represents me, they use their -- they employee me through them, and then if I look for work on my own, I can use my LLC.

Q    Okay.

A    So if you're represented by a locums agency, you have to be represented by them.

Q    Okay.  So other than when you're using a locums agency, you've worked through your LLC exclusively?

Page 28

A    Correct.  Sorry.  I said that -- spoken correctly.  At the Kaiser situation, they did not -- they just use a direct -- they don't use a locums agency.  That was a job I got because of my connections with the Kaiser network.  So they have their own system.  I don't know -- I'm considered somewhat of an employee for them.

Q    Okay.

A    So it's not the LLC for the Kaiser.

Q    And how many weeks or months have you worked for Kaiser?

A    Only a week and a half.

Q    Total?

A    Yeah, I went there extensive credentialing for them.  I only had a week and half for work.

Q    And where was that located?

A    Sacramento.

Q    And when was that?

A    That was again the very early -- very early part of my --

Q    Okay.  Near the end of the email, it says, "Thank you for considering my interest in working with you again."

A    Yes.

Page 29

Q    You had worked with Michael Steinberg previously?

A    He was -- he employed me as my first job out of my training program, and he made me a partner and I -- I worked with him.

Q    Okay.  And what was the outcome of this email?

A    He put me in touch -- he's the chairman of UCLA, and he put me in touch with some other people and basically very little came out of it.  He was appeasing me.  He's my friend.  I don't know what happened.  Nothing really came of it.  They were trying to work on a contract to do some coverage, but nothing came of it.

Q    Okay.  So what locations have you performed work in since leaving Penrose?

A    Primarily in Denver.

Q    Denver?

A    Primarily in Denver.

Q    And where have you worked in Denver?

A    The CyberKnife Center in Denver, Anova Cancer Center.

Q    Okay.  And how much do you work there?

A    It's been less recently because

MAGNA
LEGAL SERVICES

Page 30

they've hired -- you know, they don't -- my need has been less for them so about a week a month on average.

Q    And before that, it was more than a week a month?

A    No.  It's diminishing now more so.

Q    And why is it diminishing?

A    The workload is not there --

Q    Are you aware --

A    -- for coverage.

Q    Sorry.

A    For coverage.

Q    And are you aware that demand for oncology services has been decreasing over time?

MS. HALPERN:  Object to form.

THE DEPONENT:  I'm not aware of that.

BY MR. SABEY:

Q    You're not aware that there's been a change in practice so that there are fewer treatments needed by cancer patients that they've -- instead of having a course of 20 treatments, for example, they now recommend five treatments, something like that?

MS. HALPERN:  Object to form.

Page 31

THE DEPONENT:  I've been practicing that way for years.  It's not a new standard of practice for me, limited number of treatments.  I never had long course treatments.  I didn't know that impacted doctors.  I wasn't aware of that.  That makes sense.

BY MR. SABEY:

Q    Okay.  You're aware that UCHealth opened a competing cancer center competing with Penrose?

MS. HALPERN:  Object to form.

THE DEPONENT:  No, that's not something recent.  I mean, that's been --

BY MR. SABEY:

Q    I know.

A    Yeah, I mean, I was -- I've been in Colorado Springs since 1999 so I'm aware of it.  They were actually Memorial Hospital.  They got purchased by UCHealth.  So they're now competitors for years.

Q    Oh, right.

A    I thought something new developed it.  I didn't know that.

Q    No, I'm just saying -- in one of your emails, you say they hired three oncology

Page 32

doctors at UCHealth.

A    I don't recall that.  If you show it to me, I can look.

Q    Okay.  And did you provide tax returns from your LLC, Anuj Peddada M.D., LLC?

A    I don't remember if I was asked for that.  If I were, I would have provided that.  I don't recall.  I provided the income.

Q    Okay.  Have you experienced any physician burnout subsequent to July of 2022?

A    July of 2022.  It's been an ongoing -- I don't think it's a day that developed burnout.  I think it's been a process.  It's been going on for months before that.

Q    But I'm asking about subsequent to your -- you know, you had a leave request through August 1st of 2022, and I'm asking subsequently to August 1st of 2022, have you experienced any physician burnout?

A    I feel like I'm not having all the severity of the symptoms I was having if that's what you're asking.

Q    Okay.  But have you experienced physician burnout since then?

A    Not really.  I don't think so.

Page 33

Q    Okay.  Have you experienced any symptoms of physician burnout after the end of July of 2022?

A    The symptoms of -- I don't remember July specifically, but, you know, after my medical leave, which was in August, at the beginning of August, end of July, beginning August, things had gotten much better.

Q    Okay.  Since the beginning of August of 2022, have you ever been exhausted or stressed?

A    Much -- I think we all get stressed to some extent, but nothing like it was before.

Q    Okay.  And since May of 2022, have you ever been worried about your ability to support yourself and your wife, including to have food and shelter and money for entertainment and vacations?

MS. HALPERN:  Object to form.

THE DEPONENT:  No.

BY MR. SABEY:

Q    When was the first time you ever heard of the organization CommonSpirit?

A    Probably a year before I left, probably.

Q    And did you ever have any interactions with anyone at CommonSpirit during

MAGNA
LEGAL SERVICES

Page 34

your time working in the Penrose Cancer Center?

MS. HALPERN: Object to form.

THE DEPONENT: I mean, I met with different people, administrative, but I don't know who they represented.

BY MR. SABEY:

Q So you don't know of anybody from CommonSpirit that you met with?

MS. HALPERN: Object to form.

THE DEPONENT: Not that I know if they weren't tied to CommonSpirit, I don't recall that.

BY MR. SABEY:

Q But you knew that the administrators you met with were Centura administrators, right?

MS. HALPERN: Object to form.

THE DEPONENT: Well, the CEO, for example, came to my department to meet me and shake my hand and bring people there. I don't know who they are. I don't know -- I didn't ask them if they were CommonSpirit or not. I'm busy in clinic.

BY MR. SABEY:

Q Okay. So there's nobody that you know of that was from CommonSpirit that you met?

MS. HALPERN: Object to form.

Page 35

THE DEPONENT: Yeah, I don't recall.

BY MR. SABEY:

Q Okay. I want to ask you about your role as a father during the time that you were a partner in ROPC. What did you think your role as a father should be? I'm sorry. I should say a husband and father. What did you think your role as a husband and father should be during the time that you were working for ROPC?

MS. HALPERN: Object to form.

THE DEPONENT: I'm not really understanding the question. Has -- my role as a father and husband has nothing to do with how -- with ROPC. It's what I consider being a father, provider, protection of the family, taking care of them.

BY MR. SABEY:

Q Okay. Anything else?

A I mean, you want to be a companion to your wife. You want to be supportive of her. I want to take care of my kids. I want to provide a good education for them. I want to make sure they're well taken care of, secure.

Q Yeah. And did you fulfill that role when you were a partner at ROPC?

Page 36

A I think so for the most part.

Q Okay. And did you take your family on vacations each summer?

A I don't know about summers. We took family vacations, yes.

Q Okay. What are some of the family vacations that you can recall?

A To Phoenix, Arizona, to Florida. I mean, Hawaii, to India.

Q Okay. Where did you go in Florida?

A The Keys.

Q Did you take your family skiing in the winter?

A They're not skiers, but we have went up to Vail to go ski.

Q You went to ski, but you're not skiers?

A Myself and my son. My wife and my daughter really don't like skiing. You said family but --

Q Oh, gotcha. Okay. So you'd go skiing with your son?

A Yes.

Q Up at Vail?

A Yes. Or Breckenridge. We're not

Page 37

limited to Vail, but we ski, yes.

Q And how many vacations each year did you typically take?

A During when?

Q During the time that you were a partner of ROPC.

A I mean, can you ask the question one more time? I'm sorry.

Q Yeah. I'm just trying to get an idea of how many vacations you took per year.

A Probably six, eight.

Q So would you agree that the frontline medical providers during the COVID epidemic were the emergency room doctors, internal medicine doctors, ICU doctors and respiratory therapists?

MS. HALPERN: Object to form.

THE DEPONENT: I think doctors who were doing their job during that time were all frontline doctors. I mean, we were working. Cancer patients I think -- oncologists are frontline doctors. You can't stop a cancer treatment on a patient. You have to still show up and do work. So you asked my opinion. That's my opinion.



10 (Pages 34 to 37)

Page 38

BY MR. SABEY:

Q    So you think you were just as much involved in treating COVID patients as those other doctors I mentioned?

A    No.

MS. HALPERN:  Object to form.

THE DEPONENT:  COVID -- in the COVID crisis, it wasn't -- people were still needing medical care.  So I was still providing medical care.  Some patients did have COVID.  We had to diagnose them.  We had to send them to the ER for admission so we were we still managing patients.

So I consider myself a frontline doctor in those terms.

BY MR. SABEY:

Q    But you didn't treat COVID as a medical condition?

A    No.

Q    And if patients called up to ask for a treatment of COVID, where would you have sent them?

A    If they needed treatment for COVID, to the hospital, to the ER.

Q    Okay.  You wouldn't have treated them at your office?

Page 39

A    No.  Radiation, we don't use it for COVID management.

Q    Right.  Okay.  And your clinic actually would tell patients they couldn't come in if they had COVID, right?

A    Potentially.  You don't want to infect someone else.

Q    Right.  Okay.

And do you know of a patient that you ever treated with COVID?

A    Probably unknowingly we may have treated several people who were infected with COVID and didn't know it.  But knowingly, yeah, we actually we did have one or two patients that we took some pretty severe precautions if they had COVID and treated them still with a lot of isolation protocols.

Q    Okay.  So in your first deposition -- it seems like a long time ago.

MS. HALPERN:  It was a long time ago.

BY MR. SABEY:

Q    We reviewed a lot of agreements with Penrose that you had signed on behalf of ROPC.  I don't know what it was, 10 or 12 or something.

Page 40

A    Okay.

Q    What kind of agreements did you sign for ROPC?

A    Typically our contract to provide exclusive services for radiation services so that was renewed every two or three years if I recall.

Q    Okay.  What other kinds of contracts would you sign?

A    That's the main one.  I can't think of a lot of ones that represented between us and the hospital.

Q    Okay.  And were you uncomfortable with reviewing and signing those kinds of documents?

A    Not in the past.

Q    That didn't stress you out?

A    No.

Q    And did you use attorneys when you felt uncomfortable about signing legal documents?

A    We did have an attorney for the practice for -- and he retired.  And at the very last year of our ROPC, we didn't have a corporate attorney.

Q    Who was the attorney you had?

A    Garth Nicholls.

Page 41

Q    Okay.

A    He was the previous attorney before I joined the practice.  We just continued with him.

Q    Okay.

A    So yes, we had him review documents if there was a question.

Q    Okay.  Did your physician burnout impair your reading abilities at all?

A    It impaired -- you know, I didn't make a diagnosis of burnout on my own.  It was my primary physician from the things that she learned from me, but yes, I think it made it more challenging to comprehend some of the things that I was doing.

Q    And do you take the task of interviewing other physicians seriously when you're considering them for potential work with the Penrose Cancer Center?

A    I would take it seriously, yes.

Q    And do you believe it's important for you to be of sound mind when you interview physicians?

A    If I interview a physician, yes, I would have to be of sound mind, yes.

Q    Okay.  Was there ever a time that



11 (Pages 38 to 41)

Page 42

you conducted an interview of a physician you weren't competent to do so?

A    I don't think so if it was an interview that I conducted.

Q    Okay.

A    I don't -- maybe not a conversation, but an interview, yes, I felt -- I'd have to be competent to do that.

Q    And when you interviewed Dr. Hornick, were you fully competent to complete that task?

A    I don't consider the discussion with her an interview.  It was a --

Q    When you talked with her by telephone, were you competent to complete that task?

A    I did a -- I had a conversation. I'm going to clarify to understand your question.

Q    Yeah.

A    There was not an interview on my end.  It was more of a conversation to see if it was worth bringing her down for an interview.

Q    Okay.  And did you feel like you were competent, fully competent to complete that task?

Page 43

A    I think so.  She did the mainly talking and I thought she was fine to bring out for an interview.

Q    Okay.  So -- okay.  I want to call your attention to the physician employment agreement that was sent to you by email on April 26th of 2022, the one that referenced the recruitment settlement agreement.

MS. HALPERN:  Object to form.

BY MR. SABEY:

Q    Are you with me on which agreement we're talking about?

A    No.

Q    Okay.  So on April 26, 2022, you received an email that had a physician employment agreement attached to it.

A    Okay.

Q    Okay?  And that agreement referenced the -- you know, the recruitment settlement agreement.  Okay?

A    I'm unaware of that.

Q    Okay.  It's true though that you were not willing to talk to anybody from Centura about those agreements until your three-month leave expired on August 1st of 2022, correct?

Page 44

MS. HALPERN:  Object to form.

THE DEPONENT:  You know, that was a time when I had my medical leave started at the height of what I felt was the worst part of my state.

BY MR. SABEY:

Q    So your answer is yes?

A    So ask the question again.  I'm sorry.

Q    Yeah.  So you weren't willing to talk with anyone from Centura about those agreements until your three-month leave expired on August 1st of 2022?

MS. HALPERN:  Object to form.

THE DEPONENT:  I didn't think I could have a detailed conversation with them about my employment, my -- whatever you're asking about at that time.

BY MR. SABEY:

Q    So your answer is that you were not willing to talk with them during that time period?

A    Yeah, unless I felt -- I got my doctor's approval to say it's fine to do that.

Q    And you never got that, right?

A    No.  She said I needed a break from

Page 45

everything.

Q    Okay.  And if I correctly understand your position as to why you weren't willing to talk to them, it was that your condition made you unable to perform work activities for three months and your personal physician told you on April 22nd of 2022 that you needed to take three months off and not do any work-related activities; is that right?

A    She did say not to do work-related activities, that's correct.

Q    And that's why you wouldn't talk with -- talk about the agreement?

MS. HALPERN:  Object to form.

THE DEPONENT:  I don't remember talking -- asking me to talk about an agreement, but just talking in general, yes, about work-related issues.

BY MR. SABEY:

Q    Okay.  And did you feel it was important to -- that it was so important to follow your physician's directions that you couldn't even talk to anyone from Centura about or review the employment documents that were sent to you on April 26th of 2022?

MS. HALPERN:  Object to form.



12 (Pages 42 to 45)

Page 46

THE DEPONENT:  I don't remember that document being sent to me.

BY MR. SABEY:

Q    Did Dr. Setty tell you that the only work activity that you needed to avoid was anything that might relate to the terms of your future employment or was it a blanket prohibition?

MS. HALPERN:  Object to form.

THE DEPONENT:  She just did not want me taking care of patients at that time or doing work-related activity like that.

BY MR. SABEY:

Q    Okay.  So it was a blanket prohibition of work-related activity?

A    Yes.  I mean, she didn't want me working in the clinic at that time and doing my work.

Q    Okay.  And did you use Dr. Setty's directions selectively just to avoid dealing with the employment and repayment issues?

MS. HALPERN:  Object to form.

THE DEPONENT:  No, I don't think so.

BY MR. SABEY:

Q    So from the time Dr. Setty gave you the direction to avoid any work-related activities,

Page 47

you faithfully complied with her directions?

A    I'd try the best I could.  I didn't see patients during those three months.

Q    Okay.  And did you talk about contractual issues related to your employment during that time period?

A    Not that I can recall.

Q    Does it -- in your opinion, does it make someone disabled to need rest after intense physical or mental exertion?

MS. HALPERN:  Object to form.

THE DEPONENT:  Please ask that one more time.

BY MR. SABEY:

Q    Does it make someone disabled to need rest after intense physical or mental exertion?

MS. HALPERN:  Object to form again.

THE DEPONENT:  I don't think so.

BY MR. SABEY:

Q    That's just part of what a healthy body needs, correct?

A    Correct.

Q    And similarly, healthy employees without any mental illness or disability sometimes

Page 48

need mental health breaks, correct?

MS. HALPERN:  Object to form.

THE DEPONENT:  I think that's why people take vacations, yes.

BY MR. SABEY:

Q    Yeah.  I'd like to show you Exhibit 54.

MS. HALPERN:  This is one that's been introduced before?  Is that why you're calling it Exhibit 54?

MR. SABEY:  Yeah.  Yeah.

BY MR. SABEY:

Q    On April 26th, 2022, you sent this email, right?

A    This is -- this says the 27th.

Q    I'm sorry, the bottom.  Let's look at the bottom one.  So at the bottom of Exhibit 54, there's an email from you to Bill Plauth and Eric Koval.  Do you see that?

A    Yes.

Q    And that's April 26th?

A    That's correct.

Q    At 3:52 p.m.?

A    That's correct.

Q    And you remember sending this email?

Page 49

A    I don't remember it, but I did send this email.

Q    Okay.  Was it your intention to make any misrepresentation of facts or create any false impressions in sending this email?

MS. HALPERN:  Object to form.

THE DEPONENT:  No.  I was not trying to be -- I didn't understand the question.  Was I trying to be untruthful are you saying or something?

BY MR. SABEY:

Q    Yeah.  Were you trying to misrepresent any facts or create any false impressions?

A    No.  I was being very clear what I said here.

Q    And were your statements in this email true and accurate?

A    Let me read the statement, make sure I understand what you're asking me.

Yes, that's accurate.

Q    Okay.  So you cautioned Dr. Monroe -- you cautioned that Dr. Monroe should not say that you had a mental health issue; is that correct?



Page 50

A    That is correct.

Q    And is it true that you never had a mental health issue?

A    No.

MS. HALPERN:  Object to form.

THE DEPONENT:  I was worried about him spreading the rumor that he -- I did learn later from several patients that he said I had a nervous breakdown and telling that to my peers.  So I wanted to caution him to be careful.  It's a health issue.  He didn't need to make that public. That's private.

I sent to letter to him as a partner that I needed a leave, and he put out mental health issue out there.  So it could be very devastating to my career if he says that to patients and to peers.

BY MR. SABEY:

Q    Well, this isn't him saying it to a patient, is it?

A    Yeah, he's saying it right here.  He did say it to patients actually.

Q    Who did he say that to?

A    I don't know, but I can -- he has said that.  It's gotten back to me that he has said

Page 51

that I had a nervous breakdown.

Q    One time?

A    To several referring doctors.

Q    Who?

A    I can try to recall that, but I don't recall right at the moment.

Q    You don't remember any of the doctors' names?

A    Yeah, I know the doctors' names, but --

Q    Okay.  What are their names?

A    Well, they're not involved in this lawsuit.  It has nothing to do with them.

Q    No.  I need to know the names of the doctors who you're saying said this to you.

A    Dr. Chris Oliver, ENT physician in Denver.

Q    Anybody else?

A    That's the one I can remember clearly.

Q    Okay.  And what did he say to you?

A    He said that a patient of his he referred to him saw Dr. Monroe and Dr. Monroe said that I had a nervous breakdown.

Q    Okay.  Any others?

Page 52

A    That's the one that comes clear to me because Dr. Oliver only refers patients to me and because I was not there, Dr. Monroe saw the patient and told the patient that.  The patient told that to Dr. Oliver.

Q    And that was when he was an employee of ROPC?

A    I don't remember that.  It's when after -- when I was on my leave.  That was why I wrote this.  I didn't want him spreading to peers or to patients that I had a mental issue.

Q    I'd like you to look at what's been marked as Exhibit 59A, right?

(Exhibit 59A marked for identification.)

MS. HALPERN:  Can I ask if this has been produced to us before?

MR. SABEY:  It's --

MS. HALPERN:  Oh, it's our expert report.  Okay.  Sorry.  I just didn't see a Bates number on it.

MR. SABEY:  I'm pretty sure you have it.

BY MR. SABEY:

Q    I'll represent to you that this

Page 53

Exhibit 59 is a -- your expert's report and the expert's name is Michael F. Myers, MD.  Have you seen this before?

A    Yep.  Yes I have.

Q    Okay.  On page 3 of that report, it lists six issues.  First of all, let me ask you, have you read this report before?

A    Very peripherally.  I didn't spend a lot of time on this report.

Q    Why didn't you?

MS. HALPERN:  Object to form.

THE DEPONENT:  Well, I just really -- I just did not.

BY MR. SABEY:

Q    That's not an answer.  I'm asking why you didn't.

A    I don't know why I didn't.  I just didn't.  Thinking about my burnout and all this stuff really -- it's difficult for me to go back to those things.  That's probably why.

Q    Okay.  So you haven't read this?

A    I have peripherally reviewed it.  I haven't read it in great detail.

Q    Okay.  Would you take time to review this report then?

MAGNA
LEGAL SERVICES

Page 54

A    Sure.  Is there a certain area you want me to focus on?  There's a lot of background information.

Q    I'm just going to ask you if there's things you disagree with in there.

A    I think I've perused it pretty good.

Q    Okay.  So have you read the report in full now?

A    Yes.

Q    And so Dr. Myer said that he was going to address six issues and then went through and addressed each of those issues.  Do you agree with Dr. Myer's conclusions with respect to each of those six issues?

MS. HALPERN:  Object to form.

THE DEPONENT:  I think so, for the most part.

BY MR. SABEY:

Q    Is there anything you disagree with?

A    I didn't really see anything that was glaringly incorrect.

Q    Okay.  Then do you really believe that you would have been sufficiently recovered after three months of leave to return to full-time work as an employee of Penrose and perform well?

Page 55

A    I thought so.  I never had any previous issues prior to this.

Q    And do you believe that you would have resumed the 60-plus hour work weeks you had for most of your career?

A    I don't know what would have happened with a new employment model.  They really do schedule patients, and they made changes in the private practice model completely.  They basically schedule patients.  You're not earning referrals anymore.

Q    Let me ask a different question.  Do you believe you could have resumed your 60 plus hour work weeks that you had most of your career if that would have been what was expected?

A    Yes, I think so for the most part.

Q    Okay.  I'd like you to look at Exhibit 60.

(Exhibit 60 marked for identification.)

BY MR. SABEY:

Q    This is your -- the first amended complaint that was filed by your attorneys.  Are you familiar with this document?

A    It may have been sent to me.  I

Page 56

don't -- I think I've looked at it before.

Q    Okay.  Let's look at paragraphs 115 through 122.  Would you just read those and let me know -- it's all of page 24.

A    Page 24.

Q    Will you just read that one page and let me know when you've finished?

A    Yes, I read the page.

Q    Okay.  So this page alleges that after you returned from a prescheduled vacation, that you emailed Drs. Plauth and Baldauf regarding your requested leave, and I quote, reiterating that his primary care physician had both diagnosed him with a medical condition and recommended the medical leave, and that Dr. -- and then on -- in 122 -- so 121 said what I just quoted.  And then Dr. Thompson had confirmed the diagnosis in 122.

Did I read those two statements correctly?

MS. HALPERN:  Object to form.

THE DEPONENT:  So you read 17 through 20 is what you read?

BY MR. SABEY:

Q    No, no.  Okay.  Let's go to -- I should have been more clear.

Page 57

A    Yeah, it was confusing.

Q    I apologize.  Let's go to 121.  The last part of that, it says that you emailed Drs. Plauth and Baldauf --

A    Okay.

Q    -- a request for medical leave, quote, reiterating that his primary physician had both diagnosed him with a medical condition and recommended the medical leave.  Did I read that correctly?

A    That's right.

Q    And then 122, it says, "In the email, Dr. Peddada also stated again that Dr. Thompson had confirmed the diagnosis."

A    That's correct.

Q    Okay.  So the use of singular articles, "a" in 121 and "the" in 122 implies that there was a single diagnosis that your primary care physician and Dr. Thompson both agreed upon, correct?

MS. HALPERN:  Object to form.

THE DEPONENT:  They agreed that I had physician burnout, yes.  Dr. Thompson told me that.

BY MR. SABEY:



15 (Pages 54 to 57)

Page 58

Q   Okay.  And according to Dr. Myer's expert report on page 10, it says, "His doctor concluded that he had moderately severe burnout related entirely to his work situation."  Correct?

A   That's correct.

Q   Okay.  And the doctor referred to there is Dr. Selagamsetty or Dr. Setty?

A   Dr. Setty, yeah.

Q   Okay.  And do you agree that your burnout was related entirely to your work situation?

A   I mean, I didn't make the diagnosis, but yeah, I think that's the main contributing factor, yes.

Q   Okay.  And Dr. -- I'll call her Setty rather than Selagamsetty but --

A   That's what I call her.

Q   Yeah.  But Dr. Setty expressed that your burnout was, quote, moderately severe.  Do you agree with that also?

A   I don't recall her saying that.  But yes, that's what he wrote in his report.  But it was severe, I would say, yes.

Q   But she didn't say -- she said moderately severe.  Do you agree with that?

Page 59

A   I guess that's what she diagnosed me with, yes.

Q   As opposed to highly severe?

MS. HALPERN:  Object to form.

THE DEPONENT:  Again, I didn't make the diagnosis.  She did.  She wrote that in her report.  I didn't see her report and I agree with that.

BY MR. SABEY:

Q   Okay.  So why was it only moderately severe as opposed to highly severe?

MS. HALPERN:  Object to form.

THE DEPONENT:  I don't know, but Dr. Thompson and Dr. Setty were asking if I had any thoughts of suicide and I said no.  So maybe that's what makes the distinction.  I don't know.  I'm not a psychiatrist.  I did not have suicidal ideation.

BY MR. SABEY:

Q   Okay.  But the diagnosis that your primary care physician and Dr. Thompson both agreed upon was burnout?

A   That's my understanding.

Q   Okay.  We'll come back to Exhibit 60 repeatedly so you can just hang onto it there.

I'd like you to show you Exhibit 61.

Page 60

(Exhibit 61 marked for identification.)

BY MR. SABEY:

Q   Okay.  Do you recognize this email?

A   Yes, I do.

Q   And this is an email you sent to Alan Monroe and copied Dr. Plauth and Eric Koval?

A   That's correct.

Q   And this document is a written notice of leave, not a request for leave.  Would you agree?

MS. HALPERN:  Object to form.

THE DEPONENT:  So this -- I'm sorry, ask the question again.

BY MR. SABEY:

Q   So this is a notice of leave, not a request for leave?  I mean, you're announcing that you're exercising a contractual right under Section 11 of your professional services agreement with ROPC, correct?

A   So I'm not employed -- was not employed by the -- this is a note to Alan saying that I -- my doctor's recommending I take a leave and I want to take my leave.  It's a notice to him.

Q   Yeah, okay.  It's a notice that

Page 61

you're taking a leave?

A   Yes.

Q   Okay.  It's not a request to him, is it okay with you if I take a leave, right?

A   I think it's -- I don't know.  It's to say that I'm going to be taking a leave, yes.

Q   Okay.

A   My doctor's recommendation.

Q   Right.  Okay.  I'd like you to look at Exhibit 62.

(Exhibit 62 marked for identification.)

BY MR. SABEY:

Q   Do you recognize this document?

A   Yes.

Q   Is this an email that you sent on May 2nd of 2022 to Dr. Baldauf?

A   That's correct.

Q   And this email by contrast is written as a request, correct?

A   That's correct.

Q   Other than through this email, did you in any other way ask Penrose for any sort of an accommodation?

MS. HALPERN:  Object to form.

**MAGNA**
LEGAL SERVICES

Page 62

THE DEPONENT: This email -- I was asked -- I spoke with Dr. -- in my email that I wrote here, it says, "Thank you for taking time for discussing." She's the one who asked me to write it in a letter format to formally request a leave. I didn't -- I've never taken a leave before in my life.

BY MR. SABEY:

Q    Right. But my question was that other than this email, Exhibit 62, did you in any other way ask Penrose for any sort of accommodation?

MS. HALPERN: Object to form; same objection.

THE DEPONENT: This is my only notice to Penrose that I need -- I'm requesting a medical leave because Dr. Baldauf asked me to do this. Like I said, I never have taken a medical leave. I've never taken a day of sick leave. I never missed a day of work for sick. So I didn't know what the process was.

So in this email, I wrote, "Thank you for your time discussing my medical leave." And I did this per her policy. She said, per staff policy, please write me an email saying that you

Page 63

need -- ask for medical leave and I'll approve it.

BY MR. SABEY:

Q    Right. Okay. But my question is different.

A    Does that answer your question?

Q    No.

A    I don't understand your question.

Q    My question is other than through this email, did you in any way ask Penrose for any sort of accommodation?

MS. HALPERN: Object to form.

BY MR. SABEY:

Q    Other than this request.

MS. HALPERN: Object to form.

THE DEPONENT: This was my first formal request for a leave, written request.

BY MR. SABEY:

Q    And so is the answer no, that you didn't request in another way an accommodation?

MS. HALPERN: Object to form.

THE DEPONENT: I don't recall, no.

BY MR. SABEY:

Q    Okay. In this email you mentioned exhaustion and physician burnout as the diagnosis leading to the recommendation to take a leave. Do

Page 64

you see that?

A    Yes, I do.

Q    And do you see those as two things or one thing?

A    I'm not an expert in burnout, but I think they all tie together.

Q    Okay. So you probably wouldn't have physician burnout unless there was also exhaustion, is that you're saying?

MS. HALPERN: Object to form.

THE DEPONENT: I don't make these diagnoses so I'm not really sure. There may be physician burnout that doesn't have exhaustion in someone. And I don't know.

BY MR. SABEY:

Q    Okay.

A    I'm speaking for myself, what my condition was.

Q    And it was physician burnout?

A    Yes, and exhaustion.

Q    But do you see those as two separate things?

A    I think they all tie together in my opinion.

Q    Okay. You see them as essentially

Page 65

one thing, one problem?

A    I'm not making the diagnosis, but I think these are what my doctor diagnosed, and I think it makes sense.

Q    Okay. In this email you don't describe your exhaustion and burnout as a disability nor do you mention the Americans with Disabilities Act or the concept of an accommodation, correct?

A    No.

Q    Is that correct?

A    Correct, I did not.

Q    Did you ever file any paperwork or send any email or do anything else to attempt to change the diagnosis that was the basis for your leave request?

MS. HALPERN: Object to form.

THE DEPONENT: One more time, please.

BY MR. SABEY:

Q    Yeah. Did you ever file any paperwork or send any email or do anything else to attempt to change the diagnosis that was the basis for your leave request?

A    No.



17 (Pages 62 to 65)

Page 66

MS. HALPERN:  Same objection.

BY MR. SABEY:

Q    And do you have any -- did anyone at Penrose have any reason to think that you were disabled in any other way?

MS. HALPERN:  Object to form.

THE DEPONENT:  When?

BY MR. SABEY:

Q    At this time.

A    I mean, they didn't -- I didn't -- most people don't know they have burnout.  I recognized it because I made a medical error that could have been very bad for a patient.  So that's how I was diagnosed.

Q    Okay.  But other than burnout, my question is did anyone at Penrose have any reason to think you were disabled in any other way?

MS. HALPERN:  Object to form.

BY MR. SABEY:

Q    Other than physician burnout.

MS. HALPERN:  Object to form.

THE DEPONENT:  I guess they could have thought I had some other disability.

BY MR. SABEY:

Q    What?

Page 67

A    Not being myself, not thinking clearly, forgetting some things at work and looking back.  I do a lot of procedures.  It wasn't -- so you're asking a hypothetical.  I don't know.  I'm guessing.  You're having me guess.

Q    Okay.

A    So I'm trying to guess.

Q    So exhaustion and burnout is the only diagnosis you ever communicated in support of your request for leave, correct?

A    My doctor diagnosed these two things and I asked that for my reason for my leave, yes.

Q    Okay.

A    If that's what you're asking me.

Q    So that's the only diagnosis that you ever communicated in support of your request for a leave?

A    Correct.  I'm restating that I'm just using what the doctor diagnosed.  They wanted a letter saying that you need to ask for a leave.

Q    Right.

A    So I put in what they asked me to put in.

Q    Okay.

A    So I was instructed by Dr. Baldauf

Page 68

to say you need to put a short letter together saying why you want this leave and what your doctor said, and I put that in the email.

Q    Okay.  The complaint you filed in this case asserts, it's at paragraph 89, that you were working over 60 hours per week.  Okay?

And then Dr. Myer's report claims that in the months leading up to your medical leave you worked 75-plus hours per week.

Can you explain that discrepancy?

A    I don't know.  I work -- I think anyone who knows me and probably depositions I work hard.  So I don't really count the number of hours a week, but I would say easily 65, 70 is not unrealistic.

The discrepancy may be just a -- I don't know why there's a discrepancy, but it's many hours.  Over 60 hours a week for the last 22 years.  I don't know if that answers your question.  I don't know why the discrepancy.

Q    Okay.  Well, so from your --

A    A lot of times I do things that I don't maybe -- I'm always at work.  I mean, I work a lot when I do my job.  I go home and I'm reading for the next day's cases.  Is that really work or

Page 69

is that reading?  I don't know.  I don't think it's a huge discrepancy.

Q    Well, it's 15 hours a week.

A    I would probably even work more than that.  Maybe I've worked more than that during my regular career.

Q    Okay.  So --

A    So I don't think it's a huge discrepancy, no.

Q    Well, I'm assuming you're the only one who told both your attorneys and Dr. Myer how much you worked?

A    I may have estimated.  I didn't sit down and work out each day how much I worked like an hourly worker, but I typically work over 60 hours a week very easily.

Q    Okay.  So you may have told your attorneys over --

MS. HALPERN:  Object to form.  Don't answer that question.  That's attorney-client.

BY MR. SABEY:

Q    But you told Dr. Myer 75 plus hours per week?

A    Yeah, that could be accurate.  That's not unreasonable.



Page 70

Q   Okay.  In that same paragraph, paragraph 89 to your complaint, it says that you were as much as two times as productive as similarly situated physicians in terms of RVUs.

A   Which one?

Q   Paragraph 89.

A   Paragraph 89.  Yes.  What was the question?

Q   I'm just saying is it accurate what it says there that you were --

A   Yes.

Q   -- as much as two times as productive as similarly situated physicians in terms of RVUs?

A   Yeah.  RVUs are a number that gauges work and the numbers signify that about --

Q   Right.  And how do you estimate that you were as much as two times as productive as similarly situated physicians?

A   The RVUs.

Q   Okay.  And so would it be true to say that for every hour you worked, you had gotten more done than most physicians?

A   I don't know.  I don't know what other physicians do.  I mean, I'm busy doing my job

Page 71

so I don't know.  But RVUs are what's used to measure your work units.  That's just an objective number.

Q   But it's based on what you did --

A   Correct, that day.

Q   -- during your time?

MS. HALPERN:  You want to slow down and let him finish your question before you answer.

THE DEPONENT:  Okay.

BY MR. SABEY:

Q   So it's based on the tasks that you accomplished during a given day?

A   I'm not an expert on RVUs.  I'm a physician.  I practice.  But the RVUs are assigned to different work components you do.  So when I'm doing a procedure, when I'm putting a needle between your prostate and your rectum and putting gel in there, it has a higher RVU than me and you having a talk for five minutes about your nausea.

Q   Sure.

A   So they rate that.  So it's not just the time.  It's the level of complexity, the level of danger involved in the procedure.  So those are all equated into the RVUs.

So my work RVUs were double most

Page 72

average, meaning I do a lot of complex work.  It doesn't just mean that I'm working in that hour.

Q   I see.  Okay.  And do you think it would be accurate to characterize your high productivity in part because of a fast pace of work?

A   No.  A lot of my productivity is because of work that I did, so a lot of those complex procedures I mentioned.  So I did basically 90 plus percent of the acoustic neuromas or the trigeminal neuralgias.  I did 100 percent of the prostate brachytherapy and the fiducial placements of needles and gel in your rectum.

So those are very high RVUs, skewed numbers.

Q   Okay.

A   So it's not just I'm seeing quickly pace.  It's the complexity of the work that I do.

Q   Okay.  And so would you disagree that you tend to work more efficiently or faster than other radiation oncologists?

MS. HALPERN:  Object to form.

THE DEPONENT:  I don't know.  I only work with one other radiational oncologist, Dr. Monroe.  And we work pretty similarly for the

Page 73

most part, but I do more of a complex work.

BY MR. SABEY:

Q   Okay.  And so you also have a lot on your plate, I guess?

A   I'm sorry, we all have a lot on our plate.  What do you mean by that?

Q   I'm just saying you had a lot to do, a lot that needed to be done, more than Dr. Monroe?

A   I don't know.  I mean, my daily schedule was more complex, that's a fact.  I do more high risk procedures than Dr. Monroe.  Is that what you're asking me?

Q   No.  I'm just trying to get a sense. I don't know --

A   Yes.

Q   -- why your RVUs were so much higher than Dr. Monroe's.  Can you explain that?

MS. HALPERN:  Object to form.

THE DEPONENT:  So I did the best I could.  I think it's because of the work that I did.  Is it fair or not fair?  It pays more for the ones that you do that are higher value to your RVU for the complexity of the case.

So that's what drives RVU.  It's not the -- if Dr. Monroe and I both saw ten patients in



Page 74

consultation, the RVUs would be identical. But it's the level of work. It's the complexity of the work that makes the RVUs higher things.

So things that are higher risk, more cognitive skills required are higher RVUs.

BY MR. SABEY:

Q    Okay. So you described working long hours, and you also talked about that you were stressed about work-related conflict with Dr. Monroe, and the termination and winding down of ROPC, correct?

A    That's correct.

Q    So it was long hours, stressful work situation that caused your burnout?

A    I don't know what caused the burnout, but it's a multitude of things. I think it's the work, the complexity of the work, the problem with Dr. Monroe, the hiring of the new physician, trying to train her into our method of practice, setting up a new department that was asked of us.

And one of the biggest things was losing a 50-year-old practice. ROPC has been in existence 25 years before me, and it ended with us. Those all had some impact on this probably to some

Page 75

extent.

Q    Okay. Do most -- is it true that most doctors don't work the level of hours, the 60, 75 plus hours per week that you did?

A    I don't -- when you say most doctors, I don't know. There's rules put in place now that doctors can't work more than 90 hours a week, and the training -- there's some -- it used to be 100 hours and now it's down to 90 or 80. So there's many doctors that work very hard. I don't know about everyone.

Many doctors -- like dermatologists, they work only six hours a day. I just don't know. You say most doctors. I don't know what that means.

Q    How about most radiation oncologists, do you think most of them work at the number of hours that you did?

MS. HALPERN: Object to form.

THE DEPONENT: Well, I don't know. All I only know is Dr. Monroe, and he and I kept pretty similar hours. He may have had a few less hours than me, but we worked pretty similar hours.

BY MR. SABEY:

Q    Okay. Do you think that an average

Page 76

doctor working those kind of hours and under the circumstances of conflict and transition that you were experienced -- that you would have experienced burnout, too?

MS. HALPERN: Object to form.

THE DEPONENT: I don't know. I'd be guessing. I don't really know.

BY MR. SABEY:

Q    Do you think the average doctor would have lasted longer, as long, or less long before burning out compared to you?

MS. HALPERN: Object to form.

THE DEPONENT: Like I said, I'm really trying to answer your question. I just don't know what an average doctor means. I consider myself an above average doctor. I mean -- so I don't know. I've been working this way for 20 -- my whole -- I've been working this way since the time I went to medical school. So it's nothing new to me. I've worked hard my whole life.

BY MR. SABEY:

Q    Okay.

A    This is not different than what I've done in my medical school years or residency years.

Q    Okay. So there's no legal or other

Page 77

requirement that forces doctors to work such long hours or so many RVUs, is there?

A    There's no rules about -- there's rules that limit the number of hours in the training years.

Q    So a doctor usually has the freedom to work less hours if they chose to?

MS. HALPERN: Object to form.

THE DEPONENT: In our practice we did because we were -- you know, we were working together and we just made sure we had coverage of everything.

BY MR. SABEY:

Q    Okay. And do you think doctors should have the freedom to work fewer hours or fewer RVUs?

MS. HALPERN: Object to form.

THE DEPONENT: I don't really -- I mean, I'm trying to answer your question to best -- I don't really understand. Hospitals have metrics. They want you to work a certain amount, otherwise you're not being productive to them if you're an employed doctor. You have to meet a certain threshold RVU.

That's not saying you have to do

Page 78

things, but they want to show that you're actually showing up to work and doing something. So there is some -- there are some -- to answer your question, I don't know that answer. I mean, I've worked the way I've done -- Monroe and I have worked the way we've done successfully for the last 20 years.

BY MR. SABEY:

Q    Okay. And -- yeah. So I guess my -- I recognize that that's the way you've worked, but I'm asking your opinion as to whether doctors should have the freedom to work less if they choose to?

MS. HALPERN: Object to form.

BY MR. SABEY:

Q    You talked about a threshold, right? That's sort of a base threshold to justify the base salary, and then RVUs above that increases compensation, correct?

A    Correct.

Q    And do you think doctors should have the flexibility to work wherever they want to between the threshold and the level that you were working, for example?

MS. HALPERN: Object to form.

Page 79

THE DEPONENT: I mean, should they have the freedom, is that what the question is?

BY MR. SABEY:

Q    Yeah.

A    Yeah, you should have the freedom.

Q    Okay. And you could have chosen to work fewer hours and fewer RVUs, correct?

A    I could have, yes.

Q    Okay. So why did you choose to work as hard as you did?

A    You know, I don't know. I've always worked hard, as I've said. So I didn't -- I didn't think I was working excessively. That's the way I worked.

Q    Okay. Do you know who made the decision to rescind your offer of employment at Penrose?

A    I received a letter by mail I think around the 10th of May. I can't remember the exact date. And it was signed by someone I don't know. If you give me his name, I'd remember it. It was written not by Dennis, not by anyone in these emails. It was someone who's not been on these emails.

Q    Jason Taha (phonetic)?

Page 80

A    That's it.

Q    Yeah. So I'll represent to you that the decision makers were Jeff Albert and Sam Weller. Do you have reason to dispute that?

MS. HALPERN: Object to form.

THE DEPONENT: No, I don't.

BY MR. SABEY:

Q    Okay. I'd like you to turn to paragraph 147 in the amended complaint. Okay. Let me just read that.

A    Okay.

Q    It says, "That same day Dr. Peddada notified Centura that he would not sign the agreement or back pay the debt given that Centura had revoked my offer of employment and retaliation for my request for a short leave of absence, and that he was considering my legal options for this unlawful discrimination and retaliation." Did I read that correctly?

A    What's the date are we talking about? I'm trying to understand this.

Q    May 13th apparently.

MS. HALPERN: Yeah, you can read before and after the paragraphs if you need the context.

Page 81

THE DEPONENT: I don't really remember this, but -- I don't remember that time frame. But yes. You were asking me to say is this statement correct?

BY MR. SABEY:

Q    Yes. Is that statement correct?

A    Yes.

MS. HALPERN: In paragraph 147? Sorry. There's been a couple --

THE DEPONENT: Yes. Paragraph 147, yes.

BY MR. SABEY:

Q    Paragraph 147. Okay?

And does this paragraph accurately set forth the action that you took that you now claim was protected by the ADA?

A    Yes.

MS. HALPERN: Object to form.

THE DEPONENT: Yes, I agree.

BY MR. SABEY:

Q    Okay. So requesting a short leave of absence is the reason you believe you were discriminated against and retaliated against?

A    Yes.

Q    It wasn't based on your age or your



Page 82

race or your nationality or your gender or any protected characteristic?

A    I don't think so.

Q    Or for any other reason other than requesting a short leave of absence?

MS. HALPERN:  Object to form.

THE DEPONENT:  Yeah, I think that's the reason.

BY MR. SABEY:

Q    Okay.  And you were never an employee of Penrose, correct?

A    I signed a letter saying that I was going to become an employee, that contract, whenever Eric came to my office and we signed that contract.  Is that what you're asking me?

Q    I'm asking you if you ever actually became an employee of Penrose.

MS. HALPERN:  Object to form.

THE DEPONENT:  I don't know.  I signed a contract saying I was going to become an employee, yes.

BY MR. SABEY:

Q    You were going to become an employee on July 1st, correct?

A    That's correct.  I don't know how

Page 83

that works because in that time frame, they were already working on stopping my Medicare billing under my ROPC and converted that to Centura.  So at that point I thought I was already employed. That's how I interpreted it because I would not be -- because at the end of that, they told us the date of our termination of our ROPC.  They already had to have everything in place.  That's why they asked for an extension of that a little bit longer to get that Medicare billing through.  It was already in the process.

Q    Right.  You were billing through ROPC through July 1st, correct?

A    I think -- I'm not sure.  That's what I'm saying.  They were converting our billing to the hospital billing.  I don't know what day that would actually change over.  The process of the applications to do the Medicare billing were started well before that.

Q    For sure.

A    I don't know the day that's going to actually change.  I don't know.

Q    You're talking about the credentialing process?

A    Correct.  Actually saying you are

Page 84

now going to bill Medicare through this organization anymore, we signed that piece of paper, I don't remember the date.

Q    Okay.  So if I represent to you that that transition was going to happen on July 1st, you were going to become an employee on July 1st, do you have any basis to dispute that?

A    No.

MS. HALPERN:  Object to form.

BY MR. SABEY:

Q    I beg your pardon?

A    I don't think so, no.

Q    Okay.  Well, you --

A    I was talking about the billing.  I thought that's what you were asking me about, you know.

Q    What I'm asking then is -- it's just your answer was a little ambiguous.

A    Let's go back to it again.

Q    Yeah, I'm sorry.  What I'm saying is if I represent to you that you became an employee on July 1st of 2022, you would have become an employee July 1st of 2022 under the agreement, do you have any basis to dispute that?

MS. HALPERN:  Object to form.

Page 85

THE DEPONENT:  No, I don't think so.

BY MR. SABEY:

Q    Okay.  And do you have any idea who specifically was involved in the decision to grant your leave request?

A    Dr. Baldauf I think is -- I'm guessing.  She asked me to write the letter to her. There must be some committee that looks at that.  I don't know.

Q    So you don't have any idea who specifically granted it?

A    No, I don't.  Baldauf is what she told me.  I mean, she was the chief of staff.

Q    Okay.  I'd like to show you what's been marked as Exhibit 55.  We can move that up if we need to.

MS. HALPERN:  We will -- we already have a -- yeah, this is 55 pre-introduced, right?

MR. SABEY:  Probably yes.

MS. HALPERN: Okay.

BY MR. SABEY:

Q    This document consists of the CPHP report, its investigation and evaluation.  Have you seen this document before?

A    I don't recall seeing this.

MAGNA
LEGAL SERVICES

Page 86

Q    Did you have any reason to doubt the integrity or professional competence of the people you worked with at CPHP?

A    No, I have no reason to doubt that.

Q    And did you find them to be competent and credible professionals?

A    Yes.

Q    So you've never previously reviewed this document?

A    I don't remember seeing this document ever.  There's a bunch -- you mean like all of them or just this first -- I've never seen this.

Q    None of it?

A    I didn't look through the whole thing.

MS. HALPERN:  Take your time and look at it.

THE DEPONENT:  Yeah, it's been awhile since I've seen any of -- I don't remember this first page.  I don't know what this is, but these other pages I think were the part of the intake you have to do to be part of this.  Yeah, it's been several -- two and a half years.

BY MR. SABEY:

Page 87

Q    So you don't have any reason to doubt that that accurately reflects the process and conclusions related to CPHP's evaluation?

A    No.

MS. HALPERN:  Could you just refer to him what you're referring to in the exhibit?

MR. SABEY:  I'm just asking him about the whole thing.

MS. HALPERN:  Yeah, but -- I'm going to object to form.

BY MR. SABEY:

Q    So my question is, do you have any reason to doubt that this accurately reflects the process and conclusions related to CPHP's evaluation?

A    No, I don't have any reason to doubt that.

Q    Okay.  Now if you'd turn to page 481 and 482.

A    481?

Q    Yeah.  See on the bottom it says Peddada and it has numbers?

A    Okay.  I didn't see that.  Okay.

Q    Okay.  This is the first page of the -- page -- oh, I'm sorry.  Let's see.  So 481

Page 88

and 482, it's the CPHP referral form.

A    Okay.

Q    And this shows that you self-referred to CPHP.  Do you see that?

A    Yes.

Q    And did you do that by telephone?

A    I don't remember if it was by something on their log-in or by phone.  I don't remember.

Q    Okay.  And does this referral form contain an accurate report of your self-referral?

A    Let me read it.  I think that's reasonably accurate.  It says prior practice 27 years.  I think it was less than that.  It was 22 years or 23 years, yeah.

Q    So my question then is does this -- other than that exception of the number of years in practice, does the CPHP referral form on pages 481 and 482 contain an accurate report of your self-referral?

MS. HALPERN:  Object to form.

THE DEPONENT:  I think it does, yeah.  I didn't type this.  Someone must have taken it on intake.  It must have been a phone call now that we've gotten this.  Someone heard it and just

Page 89

transcribed what they heard.

BY MR. SABEY:

Q    Okay.  And my question is does it seem accurate to you?

A    It seems overall accurate.

Q    Okay.  Now I'd like you to turn to page 484.  Now, this is the first page of -- I'll wait for you to get there.  Okay.  This is first page of the electronic intake form that goes to page 492.

A    Okay.

Q    Are the responses in the intake form the responses you entered into the form?  Let me just ask you, do you recall filling out that form?

A    I must have.  It was a computer form it looks like.

Q    Okay.  And you wouldn't have intentionally given any inaccurate information to CPHP?

A    Not that I know.  Not willingly.

Q    Okay.  Did anyone else make entries or assist you in responding to this form?

A    I don't think so.

Q    So are your responses --

A    I'm trying to read through them.



Page 90

Q    Okay.  You got through 492?
A    492, yes.
Q    And are your responses on pages 484 through 492 honest and accurate?
A    Yeah, I don't know how -- this is the time when I was already suffering from my conditions.  I did the best I could.  This is a tedious form to fill out on a computer, clicking through and reading all this stuff.
Q    Well, as you sit here today, do the responses strike you as true and accurate?
A    For the most part.  There are some things that I probably would have -- I saw something that I didn't -- overall, yes, the answers were accurate.
Q    Okay.
A    There was something I saw. . .
Q    So you saw something you might have answered slightly differently?
A    I'm even having -- this is one question on 487.  The problem with work or other daily activities -- even this question is still hard to process for me.  Past four weeks due to emotional health.  I said cut down on the amount of time you spent on work.  You see, I don't really

Page 91

understand the question even now.  I guess I kept working through it.  That's what I'm thinking.
It says did you quit -- I think what I'm understanding this question to mean is did you cut back your work because of your emotional thing.  I just kept -- no.  I just kept working.
Q    Okay.
A    That's not the answer I gave.  I think --
Q    That makes sense to me.  I think that's the correct answer.  Okay.  Good.
Anything else that you noticed as inaccurate?
A    On this part that I filled in you mean?
Q    Yeah.
A    I didn't see anything that was glaring.
Q    Did you ask for any assistance in completing this form?
A    No.
Q    Okay.  Anything else that you noticed that's inaccurate?
A    Not really.
Q    Okay.  Pages 496 through 498 of

Page 92

Exhibit 55 contain the case notes and intake case management note.  And then page 504 is a record of a Zoom meeting you had on June 28th of 2022.  Do you see that?
A    Yes.  Where is the record of the Zoom meeting?
Q    On --
A    498?
Q    No.  It's on 504.
A    Okay.
Q    Okay.  Were you honest and accurate in all of your communications with CPHP?
A    I tried to be, yes.
Q    Is there anything inaccurate about what you told CPHP that is recorded on those pages?
MS. HALPERN:  Object to form.
THE DEPONENT:  I can read through the pages now if you need.
BY MR. SABEY:
Q    That's fine.
A    What pages was it?  From --
Q    496 through 498 and then page 504.
MS. HALPERN:  Can we do them one at a time just to break them up?
BY MR. SABEY:

Page 93

Q    Just let me know once you have reviewed those -- the first three pages, 496 through 498.
A    Do you have a pen that I can mark so I can remember?  498, okay.
Q    Yeah.  So is there anything inaccurate about what you told CPHP that's reported on these pages?
MS. HALPERN:  I'm going to object to form.
THE DEPONENT:  There's several things.  It says, "He recently decided to take a 90-day leave."  I didn't decide.  It was a medical -- they transcribed that as saying -- that reads to me that I just wanted to take a leave.  I don't agree with that.
BY MR. SABEY:
Q    Okay.  Anything else?
A    Also here it says that he's considering returning to work part-time consulting.  He's considering -- something about a sabbatical, I'm on a sabbatical, which I don't -- sabbatical generally means when you're an academic physician, you take time out to go research another area of interest and not do your daily normal activities.

Page 94

You just don't -- doing something -- in our field of medicine, if I took a sabbatical, I'd go learn a new procedure and be doing that for six months, not practicing day-to-day medicine like I have. This is not a sabbatical. I took a medical leave so I don't agree with that statement. I don't agree with --

Q    So you would never have used the term sabbatical for what you were seeking?

A    No, I never used that. That term is an academic in my mind. It means that you're taking time off to go doing something that's also in this field of work.

Q    Okay.

A    It's kind of what I interpret that to mean.

So I was going to get a California license. I already have a California license. It may have been a mistranscription. I've had that since 1990.

Q    Okay.

A    So there's some little things like that that are -- someone transcribed.

Q    Anything else that strikes you as inaccurate?

Page 95

A    Yeah, nothing else really, I mean, jumps out at me, no.

Q    Okay. Now let's look at page 504 now. And just to be clear, 5956 is referring to you, correct?

MS. HALPERN: Object to form.

THE DEPONENT: I don't know. I'm guessing it is.

BY MR. SABEY:

Q    Okay.

A    Does it say that somewhere specifically?

Q    It's just clear that that's what's happening. I don't know. They must use a number to refer to the people that are working.

A    I'm assuming that's what that is.

Q    Yeah. Okay. I mean, you don't dispute that you have had these conversations with CPHP?

A    No.

Q    Okay. I'll just point you to page 476 where it has the client number 5956 and your name on the front of it.

A    Okay. Over on this page?

Q    Is there anything inaccurate about

Page 96

what you told CPHP that's recorded on page 504?

MS. HALPERN: Object to form.

THE DEPONENT: Not that I can -- not that I see that's a major, no.

BY MR. SABEY:

Q    Well, is there anything that seems inaccurate to you?

A    I don't see anything that's an error.

Q    Okay. Now CPHP interviewed your wife Chitra and your colleague Brianna McDevitt. Do you trust that both of them gave CPHP honest and accurate information?

A    Yes.

Q    Now, Dr. Myer, your expert report, in his notes of an interview with you on January 9th of 2023, he quotes you as saying, "I don't use burnout. I use exhaustion."

Was that statement a response to him telling you that he thought you were experiencing burnout?

MS. HALPERN: Object to form.

THE DEPONENT: I don't recall that. I don't remember.

BY MR. SABEY:

Page 97

Q    Do you dispute that you said that to him?

MS. HALPERN: Object to form.

THE DEPONENT: I don't remember saying that. I don't know. If it's -- is it written somewhere that I said that? Then I wouldn't object to it, no.

BY MR. SABEY:

Q    Yes. Okay.

A    And I don't self-diagnose myself like I said.

Q    And are you aware that Dr. Myer's opinion is that your condition was the result of the long hours you worked and the stress associated with your work?

A    Reading his report, my conclusion was it was many contributing factors. It included all of these changes in my job, losing my contract, working hard. All of those things are contributing factors, not one thing.

Q    But it was basically the long hours you worked and the stress associated with all of those factors?

A    Probably -- if he wrote that that's his opinion, that's correct.



25 (Pages 94 to 97)

Page 98

Q    Okay.  And do you agree with his opinion?

A    I don't -- yeah, I agree with his opinion, but I've worked long hours my entire life. I didn't burn out -- I wasn't burned out 20 years ago, you know.

Q    So as -- since you're someone who has never actually been employed by Penrose, you may or may not be aware that there was a specific process for Centura employees to request ADA accommodations or Family and Medical Leave leaves. Were you aware of that, that there's a specific process?

A    No.

MS. HALPERN:  Object to form.

THE DEPONENT:  I was not aware of that.

BY MR. SABEY:

Q    Okay.  No awareness at all?

A    None.

Q    Okay.  Do you have any basis to dispute that there was a formal process?

A    I'm not aware of it, so I would not dispute it.  I didn't know it was a thing.  I didn't know I had to write that letter formally to

Page 99

say I need a leave.  I did that on recommendation by Dr. Baldauf.

Q    So if a witness from Penrose were to testify that there is such a process for employees and that you never engaged in it, would you have any basis to disagree?

A    No.

MS. HALPERN:  Object to form.

BY MR. SABEY:

Q    In fact, you never even mentioned the Americans with Disabilities Act or asserted that you had a disability requiring an accommodation in any of your communications before your employment offer was rescinded, did you?

A    The two letters I wrote were the ones you showed me.  Yes.

Q    So your answer is that you did not?

A    No, I did not.  I focused on the issue at hand, which was I was burnt out.

Q    Okay.  And you never did mention the Americans with Disabilities Act, correct?

A    Specifically in that email, no.

Q    And you never asserted that you had a disability requiring accommodation, did you?

MS. HALPERN:  Object to form.

Page 100

THE DEPONENT:  I didn't use those term -- I didn't use that terminology.

BY MR. SABEY:

Q    Okay.  And prior to learning that your employment offer had been rescinded, you never communicated a belief that your rights were being violated, did you?

A    I didn't expect to be terminated.  I didn't know that.  I was asking for a leave and I thought they granted my leave.  So my thinking -- my thought was I was coming back to work after my leave.

Q    So with respect to the persons who decided to rescind your offer of employment, would you please describe what you sincerely think was their internal narrative that impelled them to make that decision?

MS. HALPERN:  Object to form.

THE DEPONENT:  So you want me to take a guess of what I think happened?

BY MR. SABEY:

Q    I want to know what you think was their motivation.

A    Right, so that is guessing.  I don't know what's in their head, correct?  So you want me

Page 101

to guess to the best of my ability what their motivation was?

Q    Sure.  Based on whatever you think, yeah.

A    I'm taking a guess.  You're asking me to take a guess.  So my thinking is that when someone -- if the word got out that I have some kind of mental illness or something, it could be very bad for the practice.  And there's severe competition in that town, UCHealth and Penrose, and having me back potentially could be a liability for them.  I don't know.

I was very -- it makes no sense to me because I'm a very productive physician, so I can only think that, the liability that I would carry with them.  I told you that.  I mentioned that already, you know, the word was out that I had a nervous breakdown or something like this.

Q    What's your factual basis to support that you -- your belief that their motivation was improper?

MS. HALPERN:  Object to form.

THE DEPONENT:  You asked me to take a guess on what they wanted to do.  That's what my guess was based on the fact that -- that's why I

MAGNA
LEGAL SERVICES

Page 102

wrote that comment to Monroe to be careful of this language. Mental -- unfortunately mental illness is a bad --

BY MR. SABEY:

Q    And do you have any factual basis to believe that Sam Weller and Jeff Albert were motivated by those considerations?

MS. HALPERN:  Object to form.

THE DEPONENT:  I don't have -- you asked me to take a guess on what I thought their motivation was, and I gave it to you.  I don't have any factual basis.  I have no letter from them.

MR. SABEY:  Okay.  All right.  Do you think it's time for a quick break?

MS. HALPERN:  Sure.

THE VIDEOGRAPHER:  The time is 12:58.  We are off the record.

(A break was taken from 12:57 p.m. to 1:16 p.m.)

THE VIDEOGRAPHER:  The time is 1:16 p.m.  We are back on the record.

BY MR. SABEY:

Q    Okay.  I'd like you to look at that document that you're looking at right now, Exhibit 55.  And if you'd turn to page 498, the top

Page 103

paragraph.

MS. HALPERN:  498?

MR. SABEY:  Yep.

BY MR. SABEY:

Q    Are you there, 498?

A    Yes.

Q    Top paragraph.  Now, I'm going to read starting in the middle of the fourth line from the top.  "While he was on medical leave, Centura let him go.  He says Centura sent an email about his new contract to his work email which was not monitored."  Did I read that correctly?

A    Yes.

Q    So you're talking about the contract -- the new contract that was sent to your work email while you were on vacation, correct?

A    Yes.

Q    And it says Centura sent it to your work email, which was not monitored.  So you were not checking your emails while on vacation, correct?

A    Not regularly.

Q    Okay.  So the day you received the agreement, the -- April 26th, you didn't deal with any emails from Centura because you were on

Page 104

vacation?

A    I was on medical leave, and I had my cell phone, didn't have a computer.  So I don't remember dealing with any emails, no.

Q    You think it's unlikely that you were addressing emails then?

A    Yes, unlikely.

Q    Okay.  Because you weren't monitoring your work email, correct?

A    Let me see what I wrote here.

Q    Do you want me to read it again?

A    No.  Yes, that's correct.

Q    Okay.  Now, is it the job of a physician to get comfortable with the diagnosis that a patient is requesting or to independently assess the medical condition and make a diagnosis?

MS. HALPERN:  Object to form.

THE DEPONENT:  Can you ask that again more simply?  What's the question?

BY MR. SABEY:

Q    Yeah.  Is it the job of a physician to try to get comfortable with a diagnosis that a patient is requesting or is it the job of a physician to independently assess the medical condition and make a diagnosis?

Page 105

A    It's the job of the physician to make the diagnosis.

Q    Not to try to get comfortable with what the patients wants -- what the patient wants the diagnosis to be?

A    There are many patients who probably think they have all kinds of diseases and the doctor tells them what they have.

Q    Okay.  So you'd agree with me then that it's not appropriate for a physician to try to support a patient's desired diagnosis rather than just look at the facts and give a diagnosis, correct?

A    We don't do that.  If someone comes to me and says, "I've got pancreatic cancer," I test them and make sure they really have it.

Q    Now, you understand that when your attorneys make statements to the court in this case, when they file documents with the court, that they have an obligation as officers of the court and under the Rules of Civil Procedure to make sure their factual statements are accurate?

MS. HALPERN:  Object to form.

BY MR. SABEY:

Q    Do you understand that?



Page 106

A    Yes.
Q    Okay.  So I want to show you some statements made by your attorneys on your behalf and see if they seem factually accurate to you.  Okay?  So let's look at Exhibit 60.  That's the amended complaint that your attorneys filed on your behalf, correct?
A    Correct.
Q    And did you review that carefully before it was filed?
A    I reviewed it, yes.
Q    And did you ensure that the statements in the amended complaint were factually accurate?
A    I reviewed the document.  I thought it was correct.
Q    Okay.  I want you to turn to paragraphs 111 through 114.  That's on page 23 of the amended complaint.  Do you see that?
A    Yes.
Q    Would you read those over and let me know when you're done?
A    Yes, I read those.
Q    Okay.  Are those statements in paragraphs 111 through 114 accurate?

Page 107

A    They're accurate.
Q    Okay.  Reviewing paragraph 112, do you remember receiving that text message from Dr. Plauth?
A    I don't know if it was a text message or a phone call.  I remember something about this, yes.
Q    Okay.  So you knew on April 27th, 2022, that Penrose had emailed you a new employment contract, correct?
MS. HALPERN:  Object to form.
THE DEPONENT:  I thought it was -- I mean, I don't know if it was a new contract.  I've signed a contract, maybe the executed contract.  I don't know what it was.
BY MR. SABEY:
Q    That wasn't my question.
A    Okay.  What is the question?
Q    So it says in paragraph 112, "That same day Dr. Plauth also texted Dr. Peddada asking to discuss the new employment contract that Centura had emailed to Dr. Peddada the afternoon before."  Did I read that correctly?
A    You did.
Q    Okay.  So the question is you

Page 108

received that text from Dr. Plauth asking you to discuss the new employment that Centura had emailed to you the afternoon before, correct?
A    Correct.
Q    Okay.  And so you knew on April 27th, 2022 that Penrose had emailed you a new employment contract?
MS. HALPERN:  Object to form.
THE DEPONENT:  I signed a contract.  I don't know -- they sent me a contract.  I don't know if it was a new contract.  I don't remember the verbiage.  But yes, it says I received a contract.
Q    Well, no.  It says he emailed you to discuss the new employment contract.
A    Yeah, I don't remember the new part of it, but yeah, I think employment contract, which I had signed earlier.  That's what I thought.
Q    What did you think when you received that text message?  Did you think why are they sending me a new contract?
A    I didn't really think much about it.  I mean, I didn't know what to make of it.
Q    Did you ask anybody at Penrose why they sent you a new employment agreement?

Page 109

A    No.
MS. HALPERN:  Object to form.
THE DEPONENT:  I did not.
BY MR. SABEY:
Q    You're not disputing the accuracy of paragraph 112, are you?
A    I don't remember a new employment contract.  I guess it's accurate.  I don't know.
Q    Okay.  Now I want you to look at Exhibit 63.
(Exhibit 63 marked for identification.)
BY MR. SABEY:
Q    Which is your response to Penrose's motion for summary judgment.  Do you see that?
A    Yes.
Q    And have you seen this before?
A    Yes.
Q    And did you review this carefully before it was filed?
A    Yes.
Q    And did you ensure that the statements in this response that was filed on your behalf were factually accurate?
A    I did the best I could, yes.

MAGNA
LEGAL SERVICES

Page 110

Q    Okay.  Now I want you to look at Exhibit 64.

(Exhibit 64 marked for identification.)

BY MR. SABEY:

Q    Which I'll represent to you are excerpts from your response to Penrose's motion for summary judgment.

MS. HALPERN:  I'm sorry, what is this?  Did you guys just type this up?

MR. SABEY:  Yeah, we copied it out of Exhibit 63.

MS. HALPERN:  Well, I'm objecting.  This hasn't been produced to us and it hasn't -- we haven't had a chance to review it.

MR. SABEY:  It's just a demonstrative exhibit.

MS. HALPERN:  That's fine.  I'm still objecting.

MR. SABEY:  Yeah, that's fine.

BY MR. SABEY:

Q    So these are excerpts from this --

MS. HALPERN:  Object to form.

BY MR. SABEY:

Q    -- document that your attorney has

Page 111

filed on your behalf.  And again, I would remind you that statements made by your attorneys on your behalf are expected by the court and the other parties to be factually accurate.  Okay?

Would you read this document over and let me know if you think those statements are factually accurate?

MS. HALPERN:  Object to form.

THE DEPONENT:  Yeah, I've read that.

BY MR. SABEY:

Q    I beg your pardon?

A    Yes, I finished reading it.

Q    Okay.  Are those statements by your attorneys on your behalf accurate?

A    Yes.

Q    I want you to look at the second sentence in the first paragraph, and I'll read that to you.  "However, it is untrue that Dr. Selagamsetty did not restrict his communications with CHIC."

A    Is that CHIP?

Q    I beg your pardon?

A    Is that CHIP?

Q    No.  CHIC.  It stands for Catholic Health Initiative Colorado.

Page 112

MR. SABEY:  What's that?

MS. HALPERN:  Yeah, yeah, clarification.

MR. SABEY:  Okay.

BY MR. SABEY:

Q    So basically because it's a double negative, what it's saying that Dr. Selagamsetty said he did restrict your communications with CHIC, correct?

A    Yes.  She just said not to engage.  She said take time off, you're burnt out.

Q    Right.  Okay.  And is it true that Dr. Setty told you that you shouldn't communicate with CHIC?

A    She said not -- she said, "You're burnt out."  I don't remember exactly if she said don't engage anything.  Take time off from all the stressors you have.

Q    Okay.

A    That includes work.

Q    Okay.  So the last sentence of the first paragraph says -- I'm sorry.  It says, "Because of this, Dr. Peddada only communicated with CHIC about his time off, which was necessary for his mental health, and no other matters."  Did

Page 113

I read that correctly?

A    Yes.

Q    And is that a true statement?

A    I mean, I had to let them know that I was going to take time off, yes.

Q    But is it a true statement that -- that you communicated with CHIC about your time off and no other matters?

A    No other matters, I mean -- yeah, my -- that -- this exhibit says what I communicated with them telling them I'm taking time off for health reasons.

Q    I'm just asking you is that statement, is that last sentence accurate?

A    Yes, that's accurate.

Q    Okay.  I'd like to turn to paragraph 2 now.  It says, "Dr. Peddada did not forcefully express that he was unwilling to discuss the physician employment agreement, PEA, but calmly told Dr. Plauth that while on medical leave, he planned to act on the advice of his doctor which recommended that he takes three months away from work."

So this conversation happened after Dr. Plauth sent you that email and text message

MAGNA
LEGAL SERVICES

Page 114

saying "we need to talk," right?

A    I can't remember if it was email and text message, but it was one of those, yes.

Q    Well, your complaint says that --

A    Okay.  Whichever it was.  Yeah, I don't remember.  It's been two and a half years.  So the answer. . .

Q    So is it true that you calmly told Dr. Plauth that you were unwilling to discuss the physician employment agreement because you planned to act on the advice of your doctor while on medical leave?

A    Yes, that's true.

Q    Okay.  And did you understand from your appointment with Dr. Setty that your medical condition was such that you shouldn't be reviewing and signing legal documents that came from Centura?

A    She didn't specifically say that, but she said, you know, you're burnt out and be careful and take time off and rejuvenate.

Q    So that was your understanding --

A    Yes.

Q    -- from the appointment with Dr. Setty that you shouldn't be reviewing and signing legal documents that came from Centura?

Page 115

A    Anything that required significant comprehension effort, yes.

Q    Okay.  Now let's go to paragraph 3.  Let me read that.  "Dr. Peddada did not speak with anyone at Penrose about the PEA, or physician employment agreement, because he was on medical leave and his doctor told him that he needed a break from the stresses of work."  Did I read that correctly?

A    Yes.  I've already signed it and I thought it was finished.

Q    And is it true that you didn't speak to anyone at Penrose about the physician employment agreement because you were on medical leave?

A    Yes.

Q    Okay.  This paragraph talks about you needing a break from the stresses of work.  And did that mean to you that you could not be reviewing and signing legal documents?

A    Yes.

Q    Okay.  Paragraph 4 talks about your PCP recommending you take three months off work and that this meant you should not communicate with Penrose about the loan repayment obligation while on medical leave.  Do you agree that that statement

Page 116

is factually accurate?

A    Let me read that again.  Yes, I agree with that statement.

Q    So you agree that your PCP recommending that you take three months off work meant that you should not communicate with Penrose about the loan repayment obligation while on medical leave, correct?

A    Yes.  Yes.

Q    Okay.  Paragraph 5 says, "Dr. Peddada never read the new PEA at the recommendation of his PCP."  Do you see that?

A    Yes.

Q    Did I read that correctly?

A    Yes.

Q    And so did your PCP recommend you not read the new physician employment agreement?

A    She said that I was not cognitively completely there, and I meant -- that's what I interpreted that to mean, yes.  She said not to engage and so I followed her instruction.

Q    So is it your understanding that you should refuse to talk to Penrose about the new physician employment agreement during your three months of medical leave?

Page 117

MS. HALPERN:  Object to form.

THE DEPONENT:  Can you ask the question again?

BY MR. SABEY:

Q    Yeah?

Was it your understanding that based on your PCP's recommendation that you should refuse to talk to Penrose about the new physician employment agreement during your thee months of medical leave?

MS. HALPERN:  Object to form.

THE DEPONENT:  I wouldn't put it that way as refused to.  She said, recommended not -- to stay away from work-related activities for the time being.  She didn't say refuse.

BY MR. SABEY:

Q    Well, I'm asking you what your understanding was, not what she said.

A    She didn't say --

Q    So was it your understanding that you shouldn't talk to Penrose --

A    Yes.

Q    -- about the employment agreement during that three months?

A    About contractual things,

MAGNA
LEGAL SERVICES

Page 118

work-related things, yeah, not during those three months.

THE REPORTER: Can you say your answer again?

THE DEPONENT: Not to be engaging in discussions of contractual or -- during my leave.

BY MR. SABEY:

Q    Then paragraph 6 says, "Dr. Peddada's proposed start date was August 1st, 2022. Defendant could have continued negotiations with Dr. Peddada once he returned from leave." Did I read that correctly?

A    Yes.

Q    And so is it accurate that you were unwilling to continue negotiations about both the settlement agreement and the new physician employment agreement until after August 1st, 2022?

MS. HALPERN: Object to form.

THE DEPONENT: It was on my physician's recommendation. I wanted to wait until my medical leave was over, feel better, and could deal with all of these issues.

BY MR. SABEY:

Q    Okay. So your answer is yes?

A    Yes.

Page 119

Q    And that's what you told Dr. Plauth, correct?

MS. HALPERN: Object to form.

THE DEPONENT: I don't remember exactly, but yes.

BY MR. SABEY:

Q    Okay. Okay. Let's go back to Exhibit 60 now. I'd like to read the first part of paragraph 114. Just let me know once you're there. Are you there now?

A    Yes.

Q    Okay. "Dr. Peddada did not closely review or respond to emails while he was on his prescheduled vacation and medical leave." Did I read that correctly?

A    Yes.

Q    So is it true that you did not closely review or respond to any emails related to your medical staff privileges or employment at Penrose while on your vacation and medical leave other than those involving your medical leave?

A    Correct.

Q    And is it your testimony that on April 22, 2022, Dr. Setty told you that your medical condition was such that you should not be

Page 120

addressing any work-related issues such as reviewing documents and signing them during your vacation and medical leave?

MS. HALPERN: Object to form.

THE DEPONENT: It was my understanding that I was -- I had clinical burnout and not to engage in those activities, yes.

BY MR. SABEY:

Q    Okay. And so you didn't engage in those activities, correct?

A    Correct.

Q    So setting your efforts to obtain medical leave aside, did you just single out your settlement agreement and physician employment agreement for differential treatment?

MS. HALPERN: Object to form.

THE DEPONENT: Ask the question again.

BY MR. SABEY:

Q    Setting aside your efforts to obtain a medical leave, did you just single out the settlement agreement and physician employment agreement for differential treatment not to discuss them?

A    No.

Page 121

MS. HALPERN: Same objection.

THE DEPONENT: No.

BY MR. SABEY:

Q    No?

A    I thought the physician agreement was already completed when I signed it with Eric. I didn't -- I thought it was a finally done deal. I didn't understand that.

Q    Again, setting aside the medical leave, you didn't ignore the settlement agreement and physician employment agreement while you were reviewing and signing other legal documents?

A    I wasn't signing other legal documents at that time.

Q    Okay. I want you to look at Exhibit 65.

(Exhibit 65 marked for identification.)

BY MR. SABEY:

Q    This is an email chain about disability leave. And you felt like it was okay to communicate about your leave, correct?

A    Yes.

Q    Does this set of documents seem complete to you of the -- like a complete set of



Page 122

your communications about your medical leave?

MS. HALPERN: I'm going to object to form.

THE DEPONENT: I'm sorry, what was the question?

BY MR. SABEY:

Q My question is does this seem like a complete set of the communications that you had in order to obtain your medical leave -- or related to your medical leave?

MS. HALPERN: Same objection.

THE DEPONENT: I think so. It's been two and a half years, but I think that's -- I can't remember, but that looks reasonable. It's two and a half years ago. I don't know what I --

BY MR. SABEY:

Q Right. But nothing seems to be missing to you?

A I mean, a lot of your questions are very absolute so I don't know that. I mean, I'm trying to recall from memory two and a half years ago. This looks reasonable.

Q Okay.

A I'm not sure if it's completely comprehensive. I don't know.

Page 123

Q So basically what we're talking about is you notified Alan, your partner at ROPC, that you were going to be taking a leave under the disability provision of your contract, right?

A Correct.

Q Then Alan responded to you. You responded to him telling him to be careful in the language he was using.

A Correct.

Q Then Eric Koval said, yeah, we're being careful to use neutral language, correct?

A I don't recall seeing that one, but yeah, I see that now. I don't recall seeing that neutral language comment, but I see that today.

Q You don't dispute it?

A No, I don't dispute it.

Q Okay. And then we've got the email from Dr. Plauth saying how you request a leave of absence from the medical staff. Do you recall that?

A Yeah. I'm not disputing it.

Q And then you said, wait, are you saying my medical leave of absence is being denied? Do you remember that?

A I don't remember that. I'm not

Page 124

refuting these documents. I don't remember them.

Q Okay. And then he said, no, I'm just letting you know the medical staff process. Then --

MS. HALPERN: Is there a question here?

THE DEPONENT: I'm confused.

BY MR. SABEY:

Q Well, I'm going through this. I'm just wanting him to focus on it and tell me is there anything that seems to be missing?

A No. The only thing I remember is --

MS. HALPERN: Asked and answered.

THE DEPONENT: -- Dr. Plauth didn't even think this was an issue. Initially when -- I can't remember a hundred percent. You can check with him. That this was not even an issue because it has nothing to do with the staff. And then he called me back and said, yeah, you need to go through this process.

BY MR. SABEY:

Q Right.

A He initially thought he needed to file this formal paperwork. Then he said yeah, you do need to.

Page 125

Q Okay. All right. And then -- and then you do recall that your leave was granted on May 5th --

A Yes.

Q -- of 2022.

Okay. So my question is anything seem to be missing from that?

MS. HALPERN: Object to form.

THE DEPONENT: I don't know. I don't think so.

BY MR. SABEY:

Q Okay. Are you aware of any other documentation that you had to fill out to request a leave or to obtain a leave from the medical staff?

A I don't recall.

Q You're not aware of anything?

A No.

Q Okay. So you got that email from Bill Plauth saying that you need to request a leave, and then you sent a leave request to Dr. Baldauf, correct?

A Correct.

Q Okay. And you were responding to leave-related email messages; is that right?

A Yes, that's what it sounds like.

MAGNA
LEGAL SERVICES

Page 126

Q   Okay.  So you -- you weren't monitoring other emails, but you were monitoring leave-related emails and responding to those, correct?

A   Yes.  It was my medical leave, yes.

Q   Okay.  So how did you determine whether a message was leave related or not?

A   I don't know.  Maybe it was in the -- was it in the subject or something?  I don't know.

Q   So are you saying you were monitoring your work email to the extent that you could tell whether an email was leave related or not.

A   No.  Or maybe Plauth said, I'm going to send you an email.  I don't know how I remembered to check my email if it was --

THE REPORTER:  Can you say that again?

THE DEPONENT:  I don't recall monitoring my work email.

BY MR. SABEY:

Q   So how did you respond to these emails about your leave?

A   I don't know.  Maybe I can see where

Page 127

they were emailed to.  It's been quite some time.  I don't remember exactly.  I probably had notifications on, and it dinged me and I looked quickly at what it was on a cell phone.  It could be that.

Q   Okay.  So you'd screen each email enough to decide whether it was leave related or not, and then you could respond to leave-related emails?

A   I don't know what the volume of emails I was getting during that time, probably very few.  So it probably was easy.  Let me -- I don't know -- I don't like guessing.  I don't remember.  It's been two and a half years.

Q   Right.  It's obvious that you were receiving and responding to emails related to the leave, correct?

A   Right.  You're asking me that.  That's what it shows here, correct.  I agree with you.

Q   Okay.  And so the only way you could do that was checking your emails, correct?

A   I just -- I don't know.  I just don't want to guess of why -- how I was -- you're asking me how do you know, how did you know

Page 128

which -- I don't remember.  Maybe a notification went off, I looked quickly, and said yes, I need to answer this.  I don't recall.

Q   You'd have to be doing something like to know if it was an email about your leave, correct?

A   Yeah, I don't know.  I don't know why I responded to these specific ones.

Q   Okay.  Was anybody else managing your emails at that time?

A   No.

Q   Look at Exhibit 66.

(Exhibit 66 marked for identification.)

BY MR. SABEY:

Q   Do you recognize this document?

A   No.  Let me look at it.  The top part is very hard to read.

Q   It's hard to read.  Do you want me to read that out loud?

A   Yes.

Q   "Hi, Jeff.  I received an email with a link that basically was like the application that I initially filled out.  Can you check and see where we are with the contract?  Please let me know

Page 129

if I need to do anything else.  Thanks, Anuj."

A   Okay.

Q   Does that seem correct?

A   It seems correct.

Q   And this was April 5th at 7:57 a.m.?

MS. HALPERN:  Could we just clarify the year?

THE DEPONENT:  It doesn't say.

MR. SABEY:  2022 it would have been.

BY MR. SABEY:

Q   You would agree with that, right?  It had to be 2022?

A   Yes, it had to be.

Q   And then you responded, "Sorry, I thought" -- I mean, sorry, Jeff Albert responded to you and said, "Sorry, I thought I had responded to do you this morning.  I touched base with Eric and Sam, and it looks like Eric sent you the actual copy.  Just working out whether to do the recruitment assistance loan as part of the contract or a later separate" -- or "a separate addendum later."  Do you see that?

A   Yes.

Q   So this email told you that the recruitment assistance loan was going to be dealt

MAGNA
LEGAL SERVICES

Page 130

with either as part of the contract or a separate addendum to the contract later, correct?

MS. HALPERN: And it was a text message, not an email, I think.

THE DEPONENT: Text message.

BY MR. SABEY:

Q    Thank you.

A    It's not really clear even now. It says, "He sent you the contract. Just working out whether do recruitment as part of the" -- he already sent me the contract. Wasn't there already some language in there about that? I don't remember.

Q    Right. But he was telling you that they were trying to decide whether to do it to deal with the recruitment assistance loan as part of the contract or a separate addendum later, correct?

A    That's what he said in here, yes.

Q    Okay. I'd like you to look at Exhibit 2C.

MS. HALPERN: Wait. I'm sorry, Exhibit 2C?

MR. SABEY: Yeah, that's what it was marked. Confidential, yeah.

MS. HALPERN: So is it Exhibit 2 and

Page 131

just designated confidential or is it Exhibit 2C?

VOICE: It was 2C.

MS. HALPERN: Okay.

BY MR. SABEY:

Q    So Exhibit 2C, is that your medical record from your office visit with Dr. Setty on April 22, 2022?

A    It looks like it.

MS. HALPERN: You can take your time to review it.

THE DEPONENT: Okay.

BY MR. SABEY:

Q    I'd like you to look under the first line of History of Present Illness, and it talks about you calling her at 9:00 p.m. on the 21st of April of 2022, correct?

A    Correct.

Q    And did you call her at that time?

A    If she said that, yes.

Q    And since April 22nd of 2022 when you had this appointment, have you spoken to or met with Dr. Setty again?

A    I don't recall, no.

Q    You don't recall?

A    I don't think I met with her after

Page 132

that initial appointment.

Q    Okay. So the answer is no, you didn't?

A    Yes, I did not.

Q    Okay. I'd like you to look at page 8 of 9. It says up at the top here. It's not really -- it starts on page 5 of 9. So do you see page 8 of 9?

A    Yes.

Q    And under Diagnostic Studies, the first line says, "Moderately severe burnout related entirely to his work situation."

A    Okay.

Q    And do you agree that your condition was related entirely to your work situation?

A    I'm not the doctor on the case, but I think it's a big contributing -- overwhelming contributing factor.

Q    So you agree with this?

A    Yes.

Q    Okay. Now, did you suggest a three-month leave or did Dr. Setty come up with the duration of three months for your leave?

A    I don't -- I didn't diagnose myself. I don't tell her what the treatment is.

Page 133

Q    So you're saying she came up with it, not you?

A    Yeah. What was your question again?

Q    I'm asking you did you suggest the three-month leave, or did Dr. Setty come up with the duration of three months for your leave?

A    She's my doctor. She came up with the diagnosis and treatment.

Q    So you're saying you did not suggest a three-month leave?

A    Yes. I said that she said that I need to take three months leave.

Q    Okay.

A    Correct.

Q    Did she tell you that there was flexibility on the amount of leave, or did she tell you that three months off would definitely be the proper amount of time off?

A    She said, take -- you have physician burnout and I would recommend three months leave.

Q    Okay. Did she ever tell you that a shorter time than three months might be acceptable for your leave if you were doing better?

A    She said, you have burnout and I would recommend three months leave. We didn't get

MAGNA
LEGAL SERVICES

Page 134

into more than that.  That's what she recommended, and I accepted that.

Q    And did she ask you to follow up with her and -- let's look at the last page of this document.  It says, "RTC, return to clinic, four to five weeks to follow up" --

MS. HALPERN:  I'm sorry, is this page 8 of 9?

MR. SABEY:  Yes.  No.  9 of 9.

MS. HALPERN:  Okay.

BY MR. SABEY:

Q    Third line down from top, do you see that?

A    Yes, I see that.

Q    RTC four to five weeks to follow up on HTN and clinical burnout.  Do you see that?

A    Yes.

Q    What does RTC mean?

A    Return to clinic.

Q    And then what is HTN?

A    Hypertension.

Q    And -- okay, clinical burnout.

So did she recommend that you return in four to five weeks to follow up?

A    On this document.  I never received

Page 135

an appointment or a phone call from their office.

Q    Okay.  Did she tell you that you should follow up in four to five weeks?

A    I don't recall that.

Q    Okay.  You didn't go back in --

A    I did not go back.  I did not receive an appointment or anything.

Q    Okay.  Was Dr. Setty a specialist in physician burnout?

A    Not that I know of.

Q    And did you ask her if she had any experience with physician burnout?

A    No.  I went to see her as a doctor because I had an emergency crisis.  I thought I was having a crisis and she did the diagnosis and workup.

Q    Did she refer you to Di Thompson?

A    She did.

Q    Okay.  She also offered you medication for depression, anxiety and hypertension which you declined, correct?

A    I don't recall that, but I don't think I took any medication from her.

Q    Okay.  And did you ask her if she would be comfortable diagnosing you with physician

Page 136

burnout?

A    I never asked her that.

Q    You didn't ask her to diagnose you with physician burnout?

A    Ask the question again.  I'm sorry.

Q    Did you ask her to diagnose you with physician burnout?

A    No.

Q    Did you suggest to her or did she suggest to you that you had physician burnout?

A    She is my doctor.  She gave me a diagnosis of physician burnout.

Q    I'd like you to look at what's been marked as Exhibit 67.

MS. HALPERN:  Can I also ask about this just because just I don't see any Bates numbers at the bottom.  Was this produced to us in the past --

MR. SABEY:  Yeah.  This was in --

MS. HALPERN:  -- and just missing Bates?

MR. SABEY:  Yeah, it's missing Bates.  It was produced in -- it was covered in Abanon's (phonetic) deposition.

MS. HALPERN:  Okay.

Page 137

(Exhibit 67 marked for identification.)

MR. SABEY:  Sorry, we should have gotten a copy with the Bates number, but I don't know why it's not.

MS. HALPERN:  Can I ask if this was the same version that was there?  Because -- can you pull it up?  I don't know why it's looking a little different.  It doesn't have any heading like the forensic information.

MR. SABEY:  What's the number, 67?

(Discussion held off the record.)

MR. SABEY:  Okay.  Let's move forward then.

BY MR. SABEY:

Q    Do you recognize this document?

A    I mean, I don't recognize it, but it says I wrote it.  I wrote it, yes.

Q    This is an email that you sent to your brother on April 18th of 2022 at 9:45 a.m.?

A    Okay.

MS. HALPERN:  Oh, okay.  That they hadn't produced before, that's why there's no Bates?  Okay.

Yes, could you give the Bates

Page 138

number?

MS. McMANUS: Yeah, of course. It's PSF-Peddada-1032 --

THE REPORTER: I can't hear her.

MR. SABEY: Yeah, it's PSF-Peddada-1032 to 1033.

MS. HALPERN: Okay.

BY MR. SABEY:

Q Okay. So do you agree that you sent this message --

A Yes.

Q -- to your brother?

A Yes.

Q These were your thoughts on a letter that you wanted to address with administration?

A Yes.

Q And were you being -- trying to be accurate and honest in your communication with your brother or was the communication you were proposing for administration?

MS. HALPERN: Object to form.

THE DEPONENT: It says, "I want your thoughts on this." This is not a final letter. I just -- I wrote something, and I wanted to see what he thought of.

Page 139

BY MR. SABEY:

Q Yeah.

A So yes. I mean, what was the question?

Q I mean, just when you wrote this, were you trying to be accurate?

A Yes.

Q Okay. I'd like you to look at Exhibit 5. Do you see -- sorry, before we go on from Exhibit 67, do you see that you were stating that you needed a six- to eight-week sabbatical from your daily duties?

A Yes.

Q And you were proposing in your email to your brother that you would, you know, after his review send this to administration?

A Was there is question?

Q Yeah. Is that accurate?

A Yes.

Q This is what you were proposing to send to administration?

A From my recollection analysis, yeah, I wanted to address this with administration and to who, it may have been Jeff Albert is what I was thinking.

Page 140

Q Yeah, don't draw on the exhibits.

MS. HALPERN: Why?

MR. SABEY: I just don't -- because we should have a clean copy.

MS. HALPERN: I mean, some of these he intentionally did because there was errors and stuff like that so I think that should be on the record.

THE DEPONENT: You watched me mark the other ones and you didn't say anything so. . .

MR. SABEY: That's fine.

BY MR. SABEY:

Q So this is your professional services agreement between you and ROPC, correct, Exhibit 5?

A Yes.

Q And did that agreement provide you with a right to take a sabbatical leave whenever you felt stressed or were having relationship difficulties with your partner?

A I don't know. I'd have to read through the whole thing and see.

Q You don't recall that being an option, do you?

MS. HALPERN: Object to form.

Page 141

THE DEPONENT: Can you ask that question again?

BY MR. SABEY:

Q Yeah.

Did this agreement, Exhibit 5, give you the right to take a sabbatical leave whenever you felt stressed or were having relationship difficulties with your partner?

A I'd have to read through the whole contract. I don't know.

Q Do you think it did? Do you remember that being part of the --

A Arbitration. I don't remember that being specifically addressed in here.

Q Okay. So if you decided to take a sabbatical leave for two months, to not work for two months, how would affect your compensation?

A I don't know. I'd have to look at this and see. But I -- I guess my RVUs would still have been generated. Payments come in 90 days after your billing so I would still be getting part of that, yes.

Q But if you didn't work for two months, then you wouldn't be generating RVUs and that would eventually affect your compensation,

MAGNA
LEGAL SERVICES

Page 142

correct?

A    Down the road, yes.

Q    Okay.  All right.  I'll show you what's been marked as Exhibit 48.  Do you -- this is an email from your attorney Paul Lewis that you sent to your brother, correct?

A    Yes, this says that, yes.  On the -- what's the date?  Okay.

Q    I beg your pardon?

A    I was just looking at the date.

Q    Okay.  So this is an email dated April 25th, 2022 from Paul Lewis to you, and then on that same date the email being forward to your brother, correct?

A    It looks like that, yes.

Q    Okay.  And when did you first engage the services of Paul Lewis?

A    When Radiation Oncology PC was being dismantled, we didn't have a lawyer for the law firm so we both engaged independent lawyers.  That's when I engaged him.

Q    Okay.

A    At the time of the dissolution of the ROPC.

Q    Once you knew that ROPC was being

Page 143

dissolved --

A    Was told it was not going to be renewed, we both hired lawyers, yes.

Q    So that would have been in January of 2022, roughly?

A    I don't remember the date, but yes, probably January.

Q    Okay.  And so he represented you, not your partner?

A    Yes.  He had his own lawyer.  I had my own lawyer.  Correct.

Q    And Paul Lewis didn't represent your brother, right?

A    I don't think they know each other.  No.

Q    So the answer to right --

A    No.

Q    -- is yes?

A    He doesn't represent him.

Q    Doesn't represent him.  Okay.  So apparently your attorney, Paul Lewis, reviewed the professional services agreement between you and ROPC, correct?

A    Correct.

Q    And do you know when you sent that

Page 144

to him, probably --

A    He's had that from day one because we were going to dissolve this corporation.

Q    Okay.  So I assume sometime prior to April 25, 2022, you sent your PAS with ROPC, your agreement with ROPC to your attorney to have him review it and see what your rights and options were under the agreement?

A    When the -- when we decided we're going to terminate the relationship, that ROPC is going to dissolve, I engaged the services of Mr. Lewis who asked for all the contracts, like every lawyer does, for my corporation, our contract with the hospitals.  So he had all of those documents, correct.

Q    Okay.  Now, when did you first focus on the disability leave language in your contract with ROPC?

A    Mr. Lewis is my lawyer, so when we knew I was -- he wanted to make sure there was no -- he wanted -- he constructed the letter for me based on me telling him my doctor recommended a medical leave.  So he wrote the letter for me.  This is lawyer language.

Q    So your attorney Paul Lewis proposed

Page 145

language that fit within your rights under that agreement?

A    Yeah, he helped write the letter for me.

Q    Okay.  I'd like you to look at Exhibit 68.  Is this a text message that you sent to Jeff Albert on April 16th of 2022?

(Exhibit 68 marked for identification.)

THE DEPONENT:  April 18th it says.

BY MR. SABEY:

Q    Oh.

A    I don't know what the date is.  It says April 18th on mine.

Q    Yes.  Okay.  Your complaint -- your amended complaint at paragraph 90, if you'd look at that.

A    Oh, the date's not showing here.  This is his response.

Q    Right.

A    Sorry.  I may have sent the 16th.  That's correct.  I don't see it on here.

Q    Okay.  I'd like you to look at Exhibit 46.

A    I can't read this.  This is small.

MAGNA
LEGAL SERVICES

Page 146

Q    Yeah, it's pretty tiny.

Are these text messages that were exchanged between you and your brother?

A    I really can't tell what I'm looking at here to be honest.  Where does it say -- I mean, it's very small print.

Q    It is.  Your brother produced this document.

A    Okay.  Then I have to believe it is then.

Q    Okay.  So at the top of the exhibit it looks like a listing for a home on Realtor.com in Palm Springs for $5.75 million.

A    Yep.

Q    Then you reviewed it and said "incredible setting/build."  Do you see that?

A    Yeah, that's my -- I don't know if I responded to that, but if you're saying that, yes.  I can't really tell what this is, who wrote what.

Q    Yeah.

A    It's confusing.

Q    The blue side is your brother.  The gray side is you.

A    Okay.  Then I said that.  I see it.

Q    Okay.  What was the context for that

Page 147

email exchange about that property?

A    I don't remember.  It's been so long ago, but my brother is a real estate magnate.  He has a lot of real estate.  He sells and buys.  He bought a place in Palm Springs.  Maybe that's one of the things he was looking at.  I don't know.

Q    Okay.

A    He has a home there right now that he bought probably over two years ago.  He loves looking at real estate, and I give him Kkudos.

Q    Did he buy this property?

A    I don't -- I don't know which one he bought.  I don't know how much he paid for it.  We don't really share our finances.  He collects cars.  He -- I don't know if that's the one he bought.

Q    Okay.

A    I can't tell by the picture.  It's cut off.  But I think it is from the landscaping.

Q    Okay.  Below that on April 16th, it shows that you sent the same WRVU numbers that you sent to Jeff Albert to your brother.  Is that right?

A    It looks like it, yes.

Q    What was the context for that email?

A    I don't remember at this point.

Page 148

It's been two and a half years.  He and I are both radiation oncologists and maybe it was -- what was the date of this?

Q    April 16th.

A    Maybe -- I don't remember.  I hate to guess.  I don't remember what the context.  It doesn't give me information here to help me remember that.

Q    Did you talk to your brother about how you were working way more than the other doctors?

A    He's known that for -- I mean, since I started practicing.  I've always worked more than the other doctors.

Q    Okay.  So why would you be sending this to him on April 16th?

A    I don't remember.  I hate to take a guess at this stage.  I don't remember.

Q    Well, look at the message to the -- that you sent to Jeff Albert.  Does that refresh your memory as to what issues you were dealing with?

A    I wrote right here I need some time to recharge.

Q    Yeah.

Page 149

A    I'm sorry, what's the question?

Q    So you were using this report on RVUs as support for your need to recharge?

A    It may be one of the factors.  I don't remember the details of it.  That is -- the RVUs speak for themselves, yes.

Q    Okay.

A    It could be -- I don't know if it was compensation.  There was nothing about that.

Q    Okay.  Did you discuss these numbers with your brother?

A    I don't -- in an email.  It looks like you showed me in a text message I did.

Q    Okay.  Then the next message is from your brother.  He says to you, "Did you talk to Michael about your upcoming meeting?"  And then you said, "No.  I didn't want to bother him this Easter Sunday."  That's on April 17th.

A    Okay.

Q    Do you know who Michael is?

A    That's my brother's partner.

Q    Okay.  And what was the upcoming meeting?

A    It's this meeting here that we're talking about for the meeting -- it was a meeting

MAGNA
LEGAL SERVICES

Page 150

about our new work flows with the new doctor and time off and all of those things.

Q   Okay.  And why would you be talking to your brother's partner about the upcoming meeting?

A   I don't remember now.  My brother was his partner and wanted me to get his thoughts maybe.

Q   Okay.

A   He's their main doctor in their practice.

Q   Michael is?

A   Yeah.

Q   Oh, so both of your brothers are radiation oncologists?  I mean --

A   My brother --

THE REPORTER:  Say your question again.

BY MR. SABEY:

Q   So I'm asking, were you brother and Michael both radiation oncologists?

A   Michael works with my brother, and he's the main radiation oncologist at that practice.  He's the senior partner in that practice.

Page 151

Q   Michael is?

A   Yes.

Q   Okay.

A   So my brother probably wanted me to talk to him.  I don't remember.  I don't like trying to guess.

Q   Okay.  All right.  Then on April 19th your brother sent you an article about risks and using Puerto Rico as a tax haven.  Do you see that?

A   Yep.

Q   What was the context of that email?

A   I remember that.  My neighbor moved to Puerto Rico because they didn't want to pay taxes anymore.  And I told him, and he goes, "That's not a good strategy."  But he's done it and he's very happy actually.

Q   Okay.

A   He went to his daughter's million dollar wedding in India so he's avoiding taxes.  I'm not into that.  He's a -- and he's a businessman, not a doctor.

Q   Okay.

A   That's the exchange there.  I remember that one.

Page 152

Q   Yeah.  Okay.  Then on April 21st at 6:56 p.m., you said to your brother, "Let me know when you have a few minutes to talk."  Do you see that?

A   Yes.

Q   And then he said, "Having dinner.  We'll call you in about 30 minutes."  You said, "No worries."

A   Where is that?  Is that right here?

Q   Yeah.

A   Okay.  You can read it to me.  That's fine.  What's the question?

Q   So he said, "Having dinner.  Will call you in 30 minutes."  So it looks like you spoke to him at 7:30 or something.  Do you recall talking to your brother that night?  That was the night before you called Dr. Setty.

A   I don't recall talking to him about that.  I talk to him almost every day, every other day.

Q   Okay.  So you -- on the 21st at 9:00 p.m., you called Dr. Setty?

A   If -- yeah.

Q   Presumably after talking with your brother?

Page 153

A   It was the same day?

Q   Yeah.

A   Okay.  Yeah, he may have said, "Call your doctor."  I don't remember the conversation.

Q   And then the next -- and you had 12:10 p.m. appointment the next day on April 22nd.

A   She must have given me that appointment, yes.

Q   Yeah.  And that's what her -- the medical note says is the appointment was at 12:10 p.m.  I mean -- yeah, 12:10 p.m.  Does that seem right?

A   That sounds right.

Q   Okay.  So prior to that appointment with Dr. Setty, on the morning of April 22nd at 6:39 a.m. your brother texted you to tell you that you were welcome to come out and visit them in Reno any time and destress.

Then you responded, "Thanks.  I'm going to take a break for eight weeks.  My PCP feels very comfortable making the diagnosis that I have physician burnout."

Do you see that?

A   What day is that?  I don't remember.

Q   That's the 22nd in the morning.

MAGNA
LEGAL SERVICES

Page 154

A   Okay.  I don't know.  I don't remember that.  Okay.

Q   So you talked to your doctor about a physician burnout diagnosis the night before you saw her?

A   Was this before my appointment?

Q   Yeah.

A   So yes.  I mean, she called me -- I don't remember the conversation we had, but I did call her at 9:00 p.m. at night and told her what was going on.

Q   Okay.  So is that statement in this email based on your conversation the night before with Dr. Setty?

A   It must have be that she was worried about me having physician -- I don't remember this.

Q   Okay.

A   So it must be.  I wouldn't have made -- I don't know how else we could get to that.  She interviewed me on the phone just to make sure I wasn't suicidal or something.

Q   Right.

So she evaluated you in early afternoon at 12:10 p.m. on April 22nd to see if she could support the diagnosis that you two had

Page 155

discussed the night before, correct?

MS. HALPERN:  Object to form.

THE DEPONENT:  Does it say I discussed it, or she feels she wants to make that -- she thinks she's making that diagnosis?

BY MR. SABEY:

Q   I'm just asking you.

A   I don't know.  I'm letting her make the diagnosis.  She must have given me that terminology that night, that I'm worried about physician burnout.  4.

Q   Okay.

A   She wasn't worried that I was suicidal.  That's the main concern she had.

Q   Okay.  So she evaluated you in the afternoon on April 22nd.  You had talked about the diagnosis of physician burnout the night before, and then you went in and she evaluated you to see if that diagnosis was supportable, correct?

MS. HALPERN:  Object to form.

THE DEPONENT:  I called her the night before.  She -- what I remember the conversation, she asked a lot of questions about harming yourself and all of these kind of things.  I said no, that's not the -- she asked some

Page 156

questions, and I think she said to me, "I'm worried you have physician burnout."

So I wrote that in the text.  I don't remember that.  And then I met with her and she evaluated me the next day.

BY MR. SABEY:

Q   So you don't have any recollection of what was actually said in that phone call?

A   I don't remember anything about that phone call except that she was really asking a lot of questions about harming myself and things like that.

Q   Okay.  And you don't remember anything else?

A   I don't recall anything about that.

Q   Okay.

A   I never -- I don't recall.  You know, that was a late call.

Q   Okay.  Then it shows that on April 25th you texted your brother at 10:00 a.m. saying you wanted to talk about some things.  Do you see that?  It says, "No problem.  I just wanted to talk about some things."

A   Yeah, I can't read it, but I believe you.

Page 157

Q   Okay.  Then at 11:02 a.m. you sent him Exhibit 48, which is the proposed language for the disability leave?

A   Okay.

Q   Is that right?

A   I don't remember, but yes, if that's what the dates show.

Q   Okay.  What has your income been in the year 2024?  How much have you earned so far this year?

A   I don't have that right on the -- I gave that information to my lawyer, I mean, my dates of --

Q   We haven't seen anything about 2024.

A   I included it.  I don't know if income was on there.  I gave the dates of work.  I may be mistaken.  I gave the dates of work.  If we have the dates of work, I can estimate what it is roughly if you want that right now.  I would say probably about $180,000 maybe.

Q   Okay.

A   I'm guessing.  That's a guess.

Q   Yeah, it's a guess.  Okay.  What about 2023?

A   Maybe 190,000, 200,000.

MAGNA
LEGAL SERVICES

Page 158

Q   Okay.

A   250 it could be.  There's a range. I don't remember.  I did give a breakdown, but I don't know if I included 2024.  I gave you guys a breakdown of how much I earned.  I don't remember.

MS. HALPERN:  And is that the interrogatory responses?  I'm sorry, our computer is going to die.

MR. SABEY:  Yeah, we'll sort it out.

BY MR. SABEY:

Q   So you and Dr. Monroe had difficulties for like the last year of ROPC at least but for a very long time, correct?

A   It's -- I mean, it was a very good working relationship, but there were periods that were -- that were tough that we worked through.

Q   But the last year you -- I mean, the last eight months you weren't even talking to him.

A   Correct.  Six to eight months.  I don't remember the exact time frame but it was --

Q   But you were just not communicating?

A   Neither one of us were talking to each other.

Q   Okay.  What were the disagreements about?  Why -- why so unhappy with each other that

Page 159

you weren't even communicating?

A   Maybe a multitude of things.  I don't remember right off, but I can tell you what I kind of remember.  We recruited a new doctor, Dr. Kathpal.  And she was instructed by both myself and Monroe to do certain -- when you go to a practice, there are different ways of doing something.  In many ways there's not a right way or wrong way. There are many ways of doing things.

We have a system in place.  And we met with her and went over how we want things done in terms of nomenclature, how you name things, how you order things.

Q   So you and Dr. Monroe were in agreement about that?

A   We were in agreement and I delivered the message to Dr. Kathpal.

Q   Okay.

A   Dr. Kathpal did none of those things that we asked for, exactly the opposite.  And so Dr. Monroe is more of a quiet loner type of person. I'm more of an extroverted person.  That's just who we are.

So he asked me to go talk to her, and I did.  In doing that, you also cause problems

Page 160

with the other doctors.  Now they didn't like messenger being the one telling them what is going on.  So that caused some of the issues.

We had a -- so that was a major discussion, major problem with how we Kathpal.  He would not tell her when something was wrong, but he would tell me to tell her.  I would tell her.  So that was one problem.

Two, we had a partner's meeting that he brought Kathpal to.  I remember this being one of the major issues.  And she's not a partner. She's an employee, not even -- she's been on a partnership track for three years.  He brought her to the meeting.

And at the meeting, they both said that I need to share my referrals with them.  And I made it clear that I honor the referring -- these are not my referrals to share.  If a referring doctor contacts me and wants me to see their family member, I just can't send them off to Dr. Monroe and Kathpal.  That didn't go over well this year in the referrals.  That was one of the crux -- I don't remember the details about it.  It escalated from there.

Q   Wasn't there a disagreement about

Page 161

you wanted to be paid more because you were -- had more RVUs?

A   No.  We did a new -- actually, we did a brand new contract that said that we would not make a differential between us in terms of pay.

Q   Right.  But then you kept complaining about that you were working way more but not getting paid more.

A   I don't remember that being the major issue that was the fight about.

Q   You don't think you ever had that disagreement?

A   I don't know if I had that disagreement or not, but that was not the major issue.

Q   So --

A   If it -- for the past 18 years, I shared my income with Dr. Monroe evenly.

Q   And you were upset about that?

A   No.  We did that for years without a problem.  I would have terminated much earlier if we had been having problems with that.

Q   So I'm still not seeing what the disagreement is about from your side.  Why were you not talking to Dr. Monroe?

Page 162

A    I don't know.  We had an argument about something.  I don't remember the details of it now.  He didn't talk to me.  I didn't talk to him.  It was very easy because we could both be at different centers.  We didn't have to face each other.

Q    So you have no idea what this big disagreement was about?

MS. HALPERN:  Object to form.

THE DEPONENT:  Like we're saying, I don't this there was one disagreement.  It was multiple things, including the work flow of this doctor didn't fit in.

BY MR. SABEY:

Q    So were Drs. Monroe and Kathpal not competent to handle the referrals?

MS. HALPERN:  Object to form.

THE DEPONENT:  Dr. Monroe was probably competent.  Dr. Kathpal probably was not.

BY MR. SABEY:

Q    So was there any reason why you couldn't send some of the patients to Dr. Monroe?

A    Yeah, the referring doctors don't like Dr. Monroe.  And they made that clear.  They direct the referrals to me.  It's not to the --

Page 163

there are referrals that come to our practice that say radiation oncology.  There are ones that say Dr. Peddada, Dr. Monroe.  Directed referrals.

Q    But you -- he saw some of your patients.  I mean, you covered for each other, right?

A    Consultations you're asking me about.  Those are consultations.

Q    Okay.  So -- but you could -- he could see your patients and you could see his patients, correct?

A    On emergency coverage, yes.  We didn't cover -- we took care of our own patients.

Q    You didn't ever treat his patients?

A    What does that mean?

Q    I don't know.  I'm not a doctor.

A    So I don't understand the question.

Q    So --

A    Years past we covered each other's patients.  In the more recent past, we had independent patients.

Q    You're saying that none of the doctors liked Dr. Monroe?

A    I didn't say that.  I said many doctors that referred directly to me didn't like

Page 164

Dr. Monroe.

Q    And why did they say they didn't like him?

A    He's had email exchanges with them, and he can share that with you.  You may want to talk to him about it where he's been arguments with them about cases and they felt he was very condescending.

So I had to call him and the referring doctor together and try to work it out for our practice sake.  That's happened over the years probably ten times.

Q    Okay.  So over ten years, that's one a year?

A    I don't remember the number, but we've had it happen enough that -- these are referring doctors.  If they're not referred to us, they're referred to UCHealth.  We want to keep it to our practice.

Q    That wasn't even close to a majority of the patients.  That was a majority of the referrals?

A    I don't understand the question.

Q    I'm saying, if there was one doctor a year who had a blowup with Dr. Monroe, you had

Page 165

some too with people, right?

A    No, I didn't have any with the referring doctors.

Q    Never?

A    I don't recall.  I don't like the word "never."  I don't recall that happening, but this was a common occurrence with Dr. Monroe, meaning you don't -- like you said, you don't understand the practice of medicine.  Let me educate you a little bit about it.

We don't have 500 referring doctors like primary care doctors.  We're specialists.  That's why this is a hardship to me.  So you have only a handful, maybe eight doctors, nine doctors that refer the patients to your clinic.  So one out of a nine is a big percent or two out of a nine is a big percent.

Yes, that's in general.  There may be other ones that send one referral too, but the lion's share of referrals, that's a -- 90 percent, 80 percent come from doctors.

Q    And who are the doctors that refer to you?

A    It's been two and a half years.  I haven't had any referrals from them.

MAGNA
LEGAL SERVICES

Page 166

Q    I'm not asking you for names.  I mean, what kinds of doctors --
A    Brain doctors.
Q    -- refer to you.
A    The neurotologists only refer to me.  That's the acoustics and trigeminal neurologists.  The head and neck surgeons, the majority like referring to me.  The breast surgeons, Dr. McDevitt, and them mostly refer to me.
        You know, I don't know.  Most doctors like referring to me.  If I couldn't get them in my clinic without a three week, they would get put on Dr. Monroe's schedule.  He was acceptable.  He wasn't unacceptable.  They preferred --
Q    Okay.  So it was okay.  It was acceptable for somebody who got referred by a doctor to you for Dr. Monroe to see that person?
A    Yes.
Q    Okay.  So if you wanted to, you could have evened things up?
A    No.  We tried that several times, and it was difficult.
Q    Tell me more about that.  Trying it in what way?

Page 167

A    So the EMT doctors, for example, I said, "I'm going to share my referrals," and I did.  And as soon as we started doing that, they said, "I want you to see the patient.  The patients prefer seeing you."
        Dr. Galloway, for example, he can -- he's a big head and neck surgeon.  You're asking questions that are in the past.  I don't remember exactly, but this was the common theme.  So Monroe mostly got his referrals the ones that couldn't get in with me in a timely manner.
Q    And you're saying what, 90 percent of the patients were referred specifically to you and they didn't -- there was a preference expressed for you over Dr. Monroe?
A    I don't remember saying 90 percent.  I said 90 percent of the referrals come from --
Q    I'm just asking what the percentage would be.
A    It's just a high number you threw out that I didn't know.  I wanted to make sure I didn't say that.
Q    No, you didn't say that.
A    I would say it's about probably 60 percent to me, 30 -- 20 percent to Monroe and

Page 168

20 percent didn't matter who they went to.  I'd say 60 percent were referred to me directly.
Q    Okay.
A    60 percent to me, roughly 20 percent to the practice and 20 percent named Dr. Monroe specifically.
Q    Do you have any documentation of -- related to doctors who found Dr. Monroe condescending or difficult or whatever?
A    There should be an email -- if you do an email search of Dr. Monroe's emails, you'll find that.  I can think of one right off the bat, Dr. Matt Blum.
Q    Dr. Matt Blum?
A    Blum.  He left the system though.
Q    B-l-u-m?
A    B-l-u-m.  Dr. Pikaart.  He left UCHealth.  All these doctors left UCHealth, by the way.  Dr. -- those are two right off the bat I can remember very heated exchanges.
Q    Any others?
A    If you give me time, I can think about it and try to give a few names.  Dr. Jim Young, medical oncologist, major referring doctor.
Q    Okay.

Page 169

A    We resolved these with me mediating and getting it worked out because it would be to my interest too.  It's our practice.  It wasn't my practice.  It was our practice.
Q    Okay.  Any others?
A    Jeff James is another one I can think of.  I can think of multiple more if you want me to come up with the names.
Q    Sure.
A    I don't want to do it this minute.  We can work on it.  I get back to you on that, give it some thought.
        MS. HALPERN:  I mean, he's given you four names.  If he comes up with another one, he says there might be more.
        THE DEPONENT:  Let me just -- let's just take a pause and I'll think about it real hard and I'll give you the names.  So let's write them down.
        One is Dr. Dirk Pikaart.  Dirk Pikaart is one.  He's is G1 oncologist.  He left Penrose system.  Him and Monroe hated each other because of patient care issues and complaints.
        Number two was Matt Blum.  He's a thoracic surgeon, lung surgeon.  They had a big

**MAGNA**
LEGAL SERVICES

Page 170

argument about some email exchange that was heated.

Jim Young was a medical oncologist I worked with who found Alan to be very condescending and did not like what he told the patient. It contradicted what he said. So that was three.

Like who else. Those are three major referring doctors. Let me just -- oh, Dr. Theolyn Price, thoracic surgeon who left the system. She and Dr. Monroe got in a fight at a tumor board and she quit referring to him and asked me to only see the patients.

Let me just give you a few more now that you're giving me time to think. Theolyn Price.

Those are four key referring doctors I can think of right off the top that come to mind. I can come up with other ones if you -- if you want me to spend another half hour, I can come up with it if that's helpful.

BY MR. SABEY:

Q    Well, if you think of some, you can always send to me --

A    But if it's really critical right now, I want to help you with what you need. If you give me 30 minutes, we can take a recess, I'll

Page 171

think about them and write them down. Do you want me to do that?

I think I can come up with three more names. I think there were seven people. In my mind, seven is -- I think there's about three more I can think of if you just give me a few more minutes.

Q    So you're not saying that out of the nine primary referring doctors, seven of them didn't like him?

A    No. I said -- let's make sure we got what I said correctly. So in general, we have major -- I'm guesstimating, nine major referring doctors. These doctors have come and gone. It wasn't seven people didn't want to refer to Monroe. It happened one year this person was -- so it happened over the years of my working with Dr. Monroe, we've had issues with him getting along with other doctors.

Q    Okay.

A    Do you want me to think of others in 30 minutes?

Q    No. Let's keep going for a bit, and we can decide.

A    Okay.

Page 172

Q    69.

(Exhibit 69 marked for identification.)

BY MR. SABEY:

Q    I'd like to show you what's been marked as Exhibit 69. Now, this one is two copies of a physician -- discussion draft of a physician employment agreement. If you could turn back to PSF-Peddada-134. Do you see your signature on that page?

A    Yes, I do.

Q    And you signed that on April 11th of 2022, correct?

A    That's what it says, yes.

Q    Any reason to dispute that?

A    I don't think so.

Q    Okay. Then if you'd go to the back, the last page of this exhibit, the same agreement you signed on 4-12-2022. Do you see that?

A    Yes.

Q    Do you know why that happened, why you signed it on the 11th and the 12th?

A    I don't recall. At one time I think I even signed it on the computer when Eric came to my office and I was middle of clinic. He asked me

Page 173

to get online and we did it online too, so I don't remember. I don't know what date that was, if it was electronic, I signed it electronically with Eric. To answer your question, I don't remember.

Q    Have you produced that to us, an electronically signed copy?

A    It would be in the Centura system. I just remember Eric coming to my office on one of these days saying we need to get this signature done. He was very happy I signed it. I don't remember the day. Maybe it was this.

Q    So you're saying you signed it three different times. Why would that be?

A    No, I didn't say that. I said I don't remember signing this even twice. You're showing me that I did. But I remember Eric being present one of the times. Maybe I'm confused. Maybe Eric had me -- he was here signing with me here. It's been two and a half years.

Q    So no idea why you would have signed it on both the 11th and the 12th?

MS. HALPERN: Object to form.

THE DEPONENT: I don't remember why unless -- the only person I could think, Eric was very much involved in the contract. Eric was my

MAGNA
LEGAL SERVICES

Page 174

direct person dealing with signing the contract. And I remember he said, okay, great, we're done. He was very excited that I signed it and was done with it.

BY MR. SABEY:

Q   Okay.  So at one point we got the message that you had replaced your income through your attorney's office and then there was a back-peddling from that.  Can you help us understand that?

MS. HALPERN:  Object to form.

THE DEPONENT:  I didn't understand the question to begin with.  What do you mean?

BY MR. SABEY:

Q   We got the message that you had, you know, been able to find employment to replace your income.

MS. HALPERN:  Object to form.  What are you even referring to?  I'm sorry, you're talking about what I said to you?

MR. SABEY:  Not you, no.

THE DEPONENT:  I'm confused.  Was it Mr. Lewis?

MS. HALPERN:  You have to clarify this a little bit.

Page 175

BY MR. SABEY:

Q   I'm just asking, did you -- did you ever get a job that could have replaced your income?

MS. HALPERN:  Object to form.

THE DEPONENT:  Since this happened?

BY MR. SABEY:

Q   Yeah.

A   No.  But who's the lawyer?  Is he talking about Paul Lewis?

MS. HALPERN:  And what are you talking about?

THE DEPONENT:  I'm confused by what he's asking.  You said they, your lawyer.

MS. HALPERN:  I'm going to say this assumes facts not in evidence.

MR. SABEY:  Yeah, that's fair.

THE DEPONENT:  I want to do the best.

(Simultaneous speakers.)

THE DEPONENT:  You asked me -- the questions didn't make sense to me.

BY MR. SABEY:

Q   I'm just asking if you -- you know, we were told that you had replaced your income.

Page 176

MS. HALPERN:  Object to form.

BY MR. SABEY:

Q   And so I'm just asking was there any factual basis for that?

A   I don't understand your question. No, I don't know how to answer that question.  No, I didn't -- if you asked did I replace my income, no.

Q   Did you ever accept a job that looked like it might?

MS. HALPERN:  Object to form.

THE DEPONENT:  I was not offered a job to replace my income, no.

BY MR. SABEY:

Q   All right.

MS. HALPERN:  Could I just ask what this exhibit number was?

MR. SABEY:  69.

MS. HALPERN:  The physician employment agreement, which is PSF-Peddada-0124. Well, I mean it seems like there's -- there's different agreements here and they're not -- well they're different Bates numbers too.

MR. SABEY:  Yes.

MS. HALPERN:  So scratch the Bates

Page 177

numbers.

BY MR. SABEY:

Q   Okay.  So I noticed in your expert's report that you've told your expert that you're facing some age discrimination in California; is that true?

A   Where is that written?

Q   Oh, I --

A   Yeah.  I mean, I don't remember that from that, but there's been age discrimination for sure.

Q   And what's the factual basis for that?

A   I'm not a lawyer so please -- is there a piece of paper saying that?  What does that mean?

Q   I'm just asking you why do you believe that you've been terminated -- that you've been discriminated against on the basis of age?

A   I've been -- I spoke to people and they said your age is an issue.

Q   Who told you that?

A   I don't recall that, but I've talked to many people about jobs.  So the one issue they want a young doctor.  I don't know if that means

MAGNA
LEGAL SERVICES

Page 178

age or not. They want a young doctor out of residency one year or two years. I'm a senior physician with nearly 30 years of experience.

Q    Okay.

A    That's my factual --

Q    And who has told you that?

A    I don't recall, but jobs that I've looked at, they're looking for a younger partner, not a senior partner.

Q    How many times have you been told that?

A    Several times.

Q    Like how many?

A    I don't know. Four or five times.

Q    You've been told four or five times --

A    Looking for a younger partner.

Q    -- that we're looking for a younger partner?

A    Yes.

Q    Have you filed any age discrimination claims or EEOC charge on the basis of those age discrimination events?

A    No. Those were on a conversation that I had with friends of mine who were looking

Page 179

for -- who may be expanding and looking for someone who's a junior level partner right now. So I don't consider that, you know, not a --

Q    What reasons would they be looking for a junior partner?

A    I don't know. You'd have to ask them.

Q    They didn't tell you why?

A    No. But people in general -- I don't want to guess. I don't know why. People who are older probably will not work -- you're asking me -- I want to make sure I'm clear on this. I'm guessing. People who are older will not work as long and they can have someone who can continue the practice for 20, 30 years. That's my only guess, someone who can be there longer.

Q    But nobody has ever told you that?

A    No.

Q    Have you tried to mitigate your damages by sending a letter from your lawyers saying age discrimination is not permitted?

MS. HALPERN: Object to form.

THE DEPONENT: Have I sent a letter to --

BY MR. SABEY:

Page 180

Q    Have you sent a letter to these people who are saying we want young doctors, have you sent a letter to them saying that age discrimination is not permitted?

A    Maybe I misspoke. I said this was -- this was a conversation between me and other senior doctors who I know in the country who I'm reaching out to them soliciting work wanting to get a job with them. They're saying we're not looking for someone, if we do, we're looking for someone who is younger and starting a career.

So I didn't think I was appropriate to send a letter to my friend threatening with a lawsuit. It's not my -- that's not how I approach things.

Q    Okay. I'd like you to look at this document, Exhibit 55, at page 39. Let's see.

MS. HALPERN: Maybe read it by the Bates number.

MR. SABEY: 504 maybe. Yeah, 504.

BY MR. SABEY:

Q    Let me know once you're there.

A    I am.

Q    The bottom of the second sentence, the reporting that you said, he is -- it says, "He

Page 181

is convinced that there was motivation to get rid of him" --

MS. HALPERN: At the bottom of the second paragraph? I'm sorry, you said at the bottom of the second sentence.

MR. SABEY: I'm sorry, second paragraph. Yeah, I apologize.

BY MR. SABEY:

Q    Do you see that last sentence in the second paragraph says, "He is convinced that there was motivation to get rid of him so his practice partner could take the job." Did you say that?

A    Yes.

Q    And did you say that?

A    I don't remember saying that. I must have said it if they wrote it down, but I don't remember that.

MS. HALPERN: Object to form.

BY MR. SABEY:

Q    Is it your position that they wanted to get rid of you, that Penrose wanted to get rid of you so that Alan Monroe could take your job?

A    I don't think so because they didn't offer him the job at Penrose. They offered it to me.

MAGNA
LEGAL SERVICES

Page 182

Q   Okay.

A   We keep referring to this document quite a bit. I mean, this document was something that I had to fill out. I don't remember the details of this document. We go to this a lot. I want to just make sure we're clear on this. When I was going to sign up with this Colorado Health Physicians Group, they said before I can meet their psychiatrist to talk about my thing, I had to fill out this online form.

So a lot of these things you keep referring to are basically autopopulated. You don't get to really fill out the answers they way you exactly want. Some of those questions you had me earlier respond to don't really make sense to me.

Q   Okay.

A   I mean, do you want me to give you an example of that?

Q   Sure.

A   I thought about this. Have you ever -- here, go to page 488, and it says, "Have you ever felt so down that nothing could cheer you up?" These kind of -- I don't remember putting none of the time, some of the time. These are

Page 183

auto -- yeah, sometimes I'm down and a slice of pizza makes me feel a little bit better. Nothing -- so I don't like these.

So I don't know how this was actually done. I must have filled this out on a computer rapidly to get to the psychiatrist. You keep asking me -- you asked me once before on the record are you sure this is accurate. I don't know this legal jargon that you're using as lawyers. It's basically I did the best I could.

Q   Yeah, this is not a -- what we're talking about right now is not a -- it's a Zoom interview, not a --

A   Correct, but this --

Q   -- drop-down menu.

A   But we went to this thing a lot. I want to make sure I clear that up from earlier discussions because you went to this quite a bit.

Q   Okay. So are you aware of any evidence of a conspiracy or agreement between Penrose and Dr. Monroe?

A   No. I think you asked me if this statement was correct. I don't remember saying that statement to be honest. I mean, it was transcribed. It's --

Page 184

MS. HALPERN: I'm going to object to form. This isn't his language.

THE DEPONENT: I mean, someone wrote something after they interviewed me. They summarized my visit.

BY MR. SABEY:

Q   Well, okay. Let me ask you, do you think there was motivation to get rid of you so that Alan Monroe could take your job?

A   I don't think so. I mean, the motivation is more clear now. I think it was the state of me having a mental health issue and they want to bring me back and take a risk with patients.

Q   And are you suggesting that CPHP just made that up?

MS. HALPERN: Object to form.

THE DEPONENT: No, I didn't say that. I just don't remember how they -- this is an interview with me I guess by phone or -- what does it say what the form was? Was it a phone interview?

BY MR. SABEY:

Q   A Zoom interview.

A   I'm sorry, what page was this on --

Page 185

were we on?

MS. HALPERN: 504.

THE DEPONENT: Yeah, it's a Zoom interview so I don't think they -- we had a discussion on Zoom, and afterwards they summarized the visit I think is my guessing of it. And I don't think it's completely -- I don't remember saying that specifically.

BY MR. SABEY:

Q   You don't have any reason that CPHP would have to not be truthful or accurate?

A   No, I don't --

MS. HALPERN: Object to form.

THE DEPONENT: They may have just summarized the visit in language I don't use. I'm not saying they're --

BY MR. SABEY:

Q   You're not saying they're what?

A   I don't know how to -- I don't remember making this statement. This is not a statement that I made, but it may have been some summary of my visit. They gathered all the information I had. I don't remember.

Q   You don't remember whether you made that statement or not?

MAGNA
LEGAL SERVICES

Page 186

MS. HALPERN: Object to form.

THE DEPONENT: I don't remember making that exact statement, yeah.

MR. SABEY: Let's take a break. Let's see, what time is it now?

THE VIDEOGRAPHER: Let me take us off the record. The time is 2:50. We are off the record.

(A break was taken from 2:50 p.m. to 3:06 p.m.)

THE VIDEOGRAPHER: The time is 3:06 p.m. We are back on the record.

BY MR. SABEY:

Q    Okay. Has your income been sufficient since 2022 to the present to cover your expenses and put a little away?

A    No.

MS. HALPERN: Object to form.

THE DEPONENT: The answer is no.

BY MR. SABEY:

Q    So what expenses have you not been able to cover?

A    And the question -- you're asking me if that's enough income to cover my expenses and put away. We haven't been putting away anything.

Page 187

We've been just living off of it, spending it, paying the taxes and making due with it.

Q    Okay.

A    Getting by, not putting away like I was before.

Q    But you're still putting some away?

A    No. Very little.

Q    Okay. Your wife testified that you have $14 million in a retirement account, and she also testified that there's eight -- there's a return of about 8 percent per year roughly on that account. Is that accurate?

A    She handles my finances. That's about right.

Q    Okay. So that means you're bringing in on that account over a million dollars every year; is that correct?

MS. HALPERN: Object to form.

THE DEPONENT: I don't have a calculator, but that sounds about right. But it's invested, yes.

BY MR. SABEY:

Q    Okay. Your friends who you said that you've talked to and they said we don't want you, we want a younger doctor, who are those

Page 188

friends? What are their names?

A    So first of all, I don't -- I didn't like the way you phrased that. I mean, I think I've called friends and they said they're looking for younger associating. Russ Omizo is one of them.

Q    Who?

A    Russ Omizo.

Q    Russ Omizo?

A    Yeah.

Q    Who else?

A    Michael. That's kind of my brother's partner. I looked for -- to join my brother's practice, too, and they're looking for a younger associate, not for a senior physician.

Mike Steinberg, our old chairman. He basically said they're recruiting a new -- if they're looking, they're going to look for a new young associate to put out in outlying centers. Just three I can think of.

Q    Okay.

A    On that same thought, when you told me to think of those, another doctor that's very important to put down for Dr. Monroe didn't get along with, I don't have his name but I'll get it

Page 189

to you, he's a -- this is a very important one. He basically cut off all referrals to the practice. He wouldn't even refer to me because of Monroe's -- he and Monroe had a heated exchange on email and even a letter that said I'm never going to refer a patient to your practice ever again.

He is a DO, and I'll get the name for you. He's a skin doctor, very prominent in our town.

Q    Okay.

A    I want to bring that up. You told me to give you the names. That's a very critical one. He cut off complete referrals to our practice and sent everything to the competing practice from that point on.

Q    And you said there was a letter?

A    Letters exchanged between he and Monroe, very heated.

Q    Okay. Is that true for the others too?

A    I don't know that, but that one I know for a fact.

Q    Okay. Can you provide those to us?

A    I didn't get it. They're between Monroe and him, but Monroe showed it to me.

**MAGNA**
LEGAL SERVICES

Page 190

Q   Okay.
A   There were emails I think so he should be able to produce that for you. And that hurt our practice. He quit referring completely to our practice.
Q   Okay. Anybody else?
A   And I know that because this doctor also called me and told me, Anuj, I like you, but I'm sorry, I'm not going to refer to your practice anymore.
Q   Okay.
A   That's another one I just thought of. I'll give you the name, but he's a skin doctor, a DO, not an MD, but equivalent as they call them. And he owns his own skin -- a very large skin practice in town. He's not employed. He's self-employed, a big skin practice. I just wanted to bring that. I told you I'd give you some more names.
Q   Okay. So those three people are the ones who told you that they're looking for younger doctors?
A   In conversations with doctors that I called looking for work, those three specifically said they're looking for younger -- they're looking

Page 191

for junior associates. I didn't say younger. I used the phrase, the accurate term looking for a junior associate, fresh out of residency or one or two years out.
Q   Okay.
A   That's what they use, the term one or two years out of residency.
Q   Anybody other than those three?
A   If I had my list of the names of the people I provided you guys with, the jobs I searched for, I can try to remember.
Q   Okay.
A   I provided the name of all the jobs I looked at with the names --
MS. HALPERN: I think it's in the interrogatory responses.
THE DEPONENT: Yeah. And I work on those which ones were looking for junior partners.
MS. HALPERN: Was it the text message you referred to at the beginning of the --
THE DEPONENT: That guy didn't -- no, he didn't respond back to me. Dennis Carter didn't even respond back.
BY MR. SABEY:
Q   When you talked about your physician

Page 192

burnout, I think we established that it was all related to causes from work, but there might have some waffling. Were there any contributing causes to your physician burnout that were not work related?
A   Not that I can really think of.
Q   Okay. You're contemplating a move to Denver now?
A   I don't know. We're having -- we temporarily relocated to San Diego and --
Q   Why -- I'm sorry. Go ahead.
A   My wife is a physician as well, and she had to give up her practice in Colorado Springs because I didn't want to live there. I really had a hard time being there. It brought back a lot -- my whole identity was my work, my job there, and I didn't want -- for some reason, I just had a hard time. Anxiety was piqued whenever I was there. I don't even go biking there anymore.
So she saw that we can't live apart so she had to give up her job. San Diego was chosen, I don't know why. I wanted somewhere warm to get away from the place. We've never lived in San Diego. We chose a place, did an Airbnb.
She did look for work there. I

Page 193

looked for work there. There's no work there in California, literally none. And her job, she's the concierge doctor. All the jobs there are for primary care medicine are basically corporate jobs like CommonSpirit, these big companies. She doesn't want that. She wants to be independent like she was in Colorado Springs.
So the job -- she's done work for two or three doctors who are concierge doctors and they love her, they want her, but they can't afford her. They barely make the bills. So she has reached back out to people in Denver, and she's actually going to look for jobs here in Denver.
Q   And she -- doesn't she have an offer her?
A   She had an offer, yeah. She got -- she met, she had a very good interview. She's meeting with the ladies today actually at the practice. A verbal offer was given to her.
Q   Okay. And if she accepts that job, you'll move back to Denver?
A   Yeah. She's done a lot for me over the last 20 some years. I'm going to -- I don't really want to be back in Colorado. I still have feelings about when I come here and work and I

MAGNA
LEGAL SERVICES

Page 194

leave, but I'll have to move here, yes. I'll support her.

Q    Have you received any offers for full-time employment?

A    No.

Q    And have you received any offers for part-time employment?

A    No.

Q    So the only offers you've received are locum tenens work?

A    Yes, coverage practices.

Q    Is that different than locums?

A    Same thing basically.

Q    Your brother told us that you collect watches. Is that accurate?

A    It's true, yes. Since I was -- I've been a watch person since I was six years old.

Q    Yeah? Tell me about that. Tell me about your watch collection.

A    What do you want to know about them? What specifically?

Q    How many watches are in your collection?

A    Probably eight to ten watches I think.

Page 195

Q    Ten watches?

A    Maybe eight or ten. I don't remember. I haven't looked at them in awhile.

Q    Okay.

A    Because a lot of them, they're mechanical. They're just not functioning. They're in a box.

Q    Okay. What's the most expensive watch you have that you've collected?

A    It probably an MB&F. MB&F.

Q    Okay. And what's that?

A    It's a watch.

Q    How much is that watch worth?

A    Watch prices fluctuate. The watch market is down very low, probably 30 percent down. Maybe a hundred thousand dollars. I don't know.

Q    Okay. What -- how many watches do you have that are of that --

A    One. That value?

Q    Yeah, that value.

A    That's my grail piece.

Q    Okay. And what's the next -- value of the next lowest watch?

A    You're asking about watches. I don't buy watches for value. I buy them because of

Page 196

their significance, mechanically or why they are what they are. They happen to be -- they happen to appreciate actual like stocks. So if you buy the right watch, it will appreciate.

Q    Okay.

A    So Journe, F.B. Journe is my next most valuable watch. It may be a hundred thousand dollars also, but I purchased it for $20,000.

Q    Okay.

A    So I don't sell -- it has zero value because I'm not going to sell my watches. I'm not a watch flipper. I collect them and I appreciate what they are.

Q    Okay.

A    So there are watches in my collection that I may have paid 20 or $30,000. They're worth 80 or 90,000 to a collector if I wanted to sell them, but I'm not going to sell them.

Q    Okay. And how many watches do you have that are worth 20,000 or more?

A    Of the eight or nine watches I have, probably five are, and four are probably 10,000 or less.

Q    Okay.

Page 197

A    I mean, I bought them at a significant point of my life. I don't -- I bought one when I became a resident. When I finished my residency, I bought a $2,000 watch. I cherish it. It's not worth more, but it's my watch.

Q    Yeah.

A    When I finished my residency, I bought a Rolex. Everyone buys a Rolex. That watch I bought for $2,800, it's worth $44,000 today. Stainless steel. It's a stainless steel Daytona, Zenith movement. Since you want to know about watches, I love talking about watches.

Q    Yeah.

A    When I went to my hometown store, it was in a cabinet, and it's right there. I liked this watch. I bought it, $2,800. When I came back to LA, there was all these articles about the Daytona stainless steel Rolex. So it became the hottest watch to get. Everyone wants to get one. I just got one because I wanted a watch from my hometown dealer.

Well, now you can't get that watch. If you go to a jewelry shop today and say I want a Daytona, they're going to put you on a waiting list for two, three, four years. So my watch, if I want

MAGNA
LEGAL SERVICES

Page 198

to sell it, looking at the secondary market and magazines that I read, it's worth about $44,000 today. But I'm not going to sell it because it means something to me. It's means that year I finished my residency.

Q   Gotcha.

A   So that's how I collect watches. They signify a time stamp when I bought it and why I bought it.

Q   Okay.

A   That's ended since my jobs have been gone, yes. That hobby has ended. I mean collecting more, adding more to my collection right now.

Q   Yeah. Do you have your text messages going back to 2021?

A   I don't delete text messages, but it should be there.

Q   Okay. So you've got messages going back that far?

A   Ask me again. So on a phone, my text messages?

Q   Yeah.

A   I mean, yeah, it must be. They're all there electronically, I think.

Page 199

Q   Okay. And have you reviewed all those for production purposes to -- I mean, to respond to our discovery requests.

A   No, I've not.

Q   Okay. And have you given them to your attorneys to review?

A   I gave my phones to them to do whatever they need to do.

Q   Okay. And your text messages -- I mean, your emails would be the same?

A   Correct.

Q   Your personal emails all the way back to --

A   Yes. I was -- just the last one was Yahoo, which was a hard one to work with, and I gave it to Crist the other day.

Q   Okay. Explain to me.

A   A Yahoo account that I don't use very much, but they wanted -- they wanted me to give you 2020 until present or whatever 2020. So I gave that. It wasn't very many when you click it.

Q   Okay. And do you have more than one phone?

A   No. I use only one phone. I've been using it for years.

Page 200

Q   Okay. So you've been working part-time since you --

A   I'm sorry. I don't have the same phone. The same phone number. The phone has changed, but the number has been the same for the last 20 years.

Q   Okay. Yep.
So you've been working part-time ever since you left Penrose doing locums work basically from then to the present; is that correct?

A   That's what I've been relegated to now, yes.

Q   Have you seen any benefits from working part-time rather than working the 60, 75 plus hours a week?

A   No. I've never worried about -- I'm doing work to keep my mind active, but the question was am I seeing a benefit from doing that?

Q   Yeah, from working part-time. Family relationships, health?

A   Well, definitely, I mean, there's more time on my hands, but I don't find it gratifying at all professionally. I don't enjoy the work I'm doing. I'm doing it. I can get it

Page 201

through, but I'm not stimulated like I used to be, the complexity of the cases.

Q   Okay. So the work is less gratifying. Does it improve your family relationships to have more free time?

A   I have more time with my wife, yes. I'm spending more time with her.

Q   And children?

A   Children are out of state so not as much, but yes, it's better relationships with them.

Q   Okay. So your family relationships have improved because of part-time work?

A   No, not because of part-time work because I'm just not working as much.

Q   Okay.

A   Nothing dramatically got better in terms of my relationship. I've never had a bad relationship with my kids or my wife.

Q   Okay. And you're able to work out more consistently, go to yoga classes, go biking, those kinds of things?

A   Well, when I took that rest/leave, I didn't know -- I didn't -- I didn't -- I did things that I could try to recharge myself, and from what I read, yoga is supposed to help. I don't know.

MAGNA
LEGAL SERVICES

Page 202

I'm from India. I don't know yoga. I've tried it. I've tried Pilates. I tried -- I'm trying things mindfulness trying to do those things.

Q    Yeah.

A    Am I back to doing that now? Not as often.

Q    Tell me more about that.

A    I mean, I'm just like -- I mean, like everyone else, I don't like to work out every day. I don't work out as much as I want to because I just don't enjoy gyms.

Q    Yeah. So what do you do with your spare time?

A    I don't have a lot of spare time. The spare time I basically have I basically try to read. I try to -- I think -- I mean, I try -- I'm more introspective looking at myself as a person, trying to see how I can improve myself.

I read a lot of good books. I just read a book by Peter Attia, Outlive, which is a really phenomenal book. I would recommend strongly to everyone here. It talks about, you know, how -- not long -- how to live longer but how to actually have Albert health span, how to make the time here available better.

Page 203

He's the best medical writer ever to have written a book. So I just finished reading that about a week ago. So I've been reading more news. I've never read news before. I never had time for the newspaper. I've never had an interest in finance, zero.

My wife handles everything financially so I knew zero about my financial status. So now I'm trying to make myself more knowledgeable about that. So that's how I spend my time.

Q    Okay.

A    And traveling for work.

Q    Okay.

A    That's a big part of my day. When you travel, it's very much stressful these days to travel.

MR. SABEY: Okay. I think we'll -- I'd like to reserve the right to reconvene after we get discovery, if necessary, as the judge ordered, but I understand. I'm not asking you to consent at this point.

MS. HALPERN: Right. No, I mean, I understood what she said, if something comes up that you weren't able to ask about before.

Page 204

MR. SABEY: Right.

THE DEPONENT: You know, this is a formal meeting. I wonder if I can make one other comment if it's okay.

BY MR. SABEY:

Q    Sure.

A    When you asked about calling Dr. Setty that night at 9:00 p.m., it brought back a really bad flashback to me. I wanted to share that with you why I called her at 9:00 a night.

I made a -- I pride -- I'm not good at very many things, but I'm very good as a physician, and I'm very -- if you were my patient, I will never take secondary information. I will go get the primary information myself. So many doctors get an MRI report. They read the MRI report. I can actually look at the MRI myself and review it.

So that day I performed -- I made a medical error. I actually contoured on someone's brain case the wrong target, that if it were delivered would have catastrophic.

It would have been -- our field is held differently. In internal medicine, if you get the wrong pill prescribed to you and it didn't hurt

Page 205

you, it's okay. If I give you one extra dose of radiation, one centigrade, it is a lawsuit automatically.

So we're held to a very high level. When that mistake was made together with the angry issues I had with the nurse and all the other things that happened, I thought there was something really wrong with me because I don't make those kind of errors.

There are many doctors who just work through this and just continue making errors. I don't want to be one of those people. So patient safety is very important. We started a program when I was there called Royals. It's an incident reporting system that many doctors now use. We're the earliest adopters because of my leadership that we put that in.

So any little thing that goes on, it can be trivial, it can be a nurse telling me the wrong person's name, we'll put it in the computer to show that it happened. So that really shook me when that happened to me. And I called her and I said this is what's happened, I'm really scared, what's going on with my brain.

Q    Okay.

MAGNA
LEGAL SERVICES

Page 206

A    And she focused on suicide issues. That's what she focused on.

Q    And so you called Dr. Setty.

A    Yeah.

Q    Do you have any reason to question Dr. Setty's honesty or integrity?

A    None whatsoever.  I don't know her personally.  She's my physician, and that's how I know her.  There's -- so I don't have any reason to question her.  I think she has a very high level of integrity in my opinion.  She's a very good -- I chose her because she's the smartest -- from what I heard from other patients, she's one of the smarter internal medicine doctors in town.  That's why I chose her.

Q    Okay.

A    But the office doesn't run the smoothest obviously.

Q    But what?

A    The office doesn't -- I didn't get follow-up visits.  Their office may not run as smooth as I would like it to.

Q    All right.  Thank you.

MS. HALPERN:  All right.  I just have a couple clean-up questions on one exhibit.

Page 207

EXAMINATION
BY MS. HALPERN:

Q    Dr. Peddada, could you please turn to Exhibit 55.

A    Yes.

Q    So I think you testified earlier that we had not shown you Exhibit 55 before.  This was the first time you were seeing it?

A    I've never seen this except -- I think I remembered when I saw some of these files, I must have done it on a computer intake.

Q    Okay.  But you haven't seen Exhibit 55 before?  You've never had a chance to review it?

A    I've never seen this exhibit.

Q    Okay.  And I believe you were trying to explain to Mr. Sabey partway through your deposition kind of some of your concerns you had with Exhibit 55.  Do you recall that?

A    Yes.

Q    And I know he asked you to review I believe it was Peddada-000483 through 492.  Are you there?

A    Yep.

Q    And do you recall reviewing this

Page 208

with -- when Mr. Sabey told you to do so?

A    Yes.  I looked at it quickly, yes.

Q    And that was the first time you had seen it?

A    Yes.

Q    Could you please take a few more minutes to look at it again and make sure you're looking at it closely and go through and see if there's anything that you think is inaccurate about it and that you would like to talk about, discuss?

A    As I mentioned, I remember filling this out pretty quickly because before this form was filled out, I had a phone call with the Colorado Health Physicians Group, and they said you have to do this intake form in order to get you to see the psychiatrist.  So I filled it out.

So I lot of these, as I mentioned to Mr. Sabey, a lot of these questions are really pretty much you have to click yes or no, true or false. It's a very quick thing.  So it doesn't really get to the core of -- the point of this was to get you to talk to the psychiatrist.  It wasn't meant to be all your complaints or your symptoms.

So I don't think these really represent perfectly my answers.  Like I pointed out

Page 209

that one question where it says, have you ever felt so down that nothing could cheer you up?  I mean, these questions are very vague and hard to really give a clear answer that represents what I want to say.

So all of these kind of, you know -- have you ever had a spell or attack of sudden you felt frightened, anxious?  Yeah, I mean, I've been anxious for a -- I've even stated I had nurse complaints.  I got to a point where I was scared to come to the department.  I thought someone was going to complain about me.  I was very anxious about walking on eggshells.  I brought that up.

So these things don't give you a chance to write all these answers thoroughly.  It was meant to be an intake just to get you to the psychiatrist.  Have you ever had a period of a month or more where you felt worried?  Yes, I've been anxious and worried for the whole time, the last four months talking.  There was a lot of stress in the department.

So these questions really are not easy to answer on a computer format.  In your lifetime, have you ever had two weeks or more where every day you felt sad?  Yes, I was -- I'm very --

MAGNA
LEGAL SERVICES

Page 210

I like to talk, as you can tell in these depositions. In tumor boards, I like to be outspoken. I quit going to tumor boards some because I just didn't want to wake up to go to tumor board. That's so uncharacteristic of the person I was.

Have you ever had -- have you ever had two weeks where you lost interest? Yeah, I didn't have interest in work, meaning I loved going to work. The happiness of my work was diminished because of all the stress we were going through.

So these questions really are easy to just kind of click through to get to the -- the way that the clerk, whoever I spoke to at this place, their message to me was get this done quickly and we'll get you scheduled with her ASAP. Because I said I'm really having an issue.

So I don't know if that answers what you're asking me.

Q    It is. I would just like you to go through -- since this is the first time that you've seen this today, go through those pages one more time and see if there's -- kind of you brought up some examples. If there's anything else you think isn't -- you weren't able to capture when filling

Page 211

in this kind of introductory, you know, information before having your appointment or whatever you would call it.

A    Do I need to write this?

Q    This is the depo so I'm sorry, I would ask you to do that.

A    So go through each of these questions and --

Q    Well, why don't you review it and see if there's something like the examples you just gave us, if you would just go through those pages and see if there's anything else you think you would like to explain or expound upon or that you think is inaccurate or doesn't capture kind of what you were going through at the time.

A    Again, I really don't remember clicking through -- I mean, all these questions, I mean, do they really represent -- have you felt worn out? Some of the time. Yeah, I felt --

Q    Can you refer us to what page you're at?

A    I'm sorry. 488.

Q    Okay.

A    This rapid intake form where you said some of the time, none of the time, these

Page 212

really don't capture what you're feeling. I mean, you feel worn out some of the time. Yeah, this time, it was a very big part of my life I felt worn out in my work-related life.

Have you felt tired? Yeah, I was tired, exhausted. I used the term exhausted all the time because I felt like not going to do things. I didn't have the -- I became very apathetic about a lot of these things.

Q    Okay.

A    Substance, no, that's -- in the past 12 months have you had 12 drinks of any kind. Those drug things are pretty clear-cut yes or no.

Well, this is blatantly wrong. I filled out here I am seeking --

Q    I'm sorry, what page are you referring to?

A    490.

Q    Okay.

A    Treatment evaluation, I'm seeking evaluation or treatment at this time because of health problems. It says false. Well, mental health is a health problem.

Q    Okay. And -- go ahead. Sorry.

Page 213

A    That's it. Health problems, it says false. Maybe I interpreted at that time it being like a heart disease or something like that.

I'm worn -- I don't know about you, but I'm worn out. I don't see anything else in here. My point is, these don't capture the exact -- they're just a quick inventory to get you to talk to the psychiatrist. They're not meant to be the end all in my opinion from what I'm reading there.

Q    And when you filled in this information that we've been looking at in Exhibit 55, what do you recall about the form? Do you recall if you were able to type any explanations or if you just had certain options that you could choose and you couldn't really do anything beyond that?

A    Honestly, I don't remember the form at all. I think it was on the computer quickly online, and I was probably in a rush to do it. I was really interested in talking to the physician. So I rushed to do this, put in what I needed to put in. I don't remember. There may have been a place. I just don't see it. I don't remember seeing the answers like this shown to me. I may

MAGNA
LEGAL SERVICES

Page 214

have.  I don't know.

MS. HALPERN:  That's all the questions that I have.

EXAMINATION

BY MR. SABEY:

Q    Let me ask a follow-up question. When you were -- or a couple of follow-up questions.  When you were filling in that form, were you even trying to be accurate?

A    Yes, I was trying to be the most accurate I could be but I rushed because I spoke to a clerk first.

Q    Okay.  I understand but did you --

MS. HALPERN:  Well, he's answering. Hold on.  Go ahead.

THE DEPONENT:  So the process of getting this form filled out was calling and talking to a clerk.  I don't remember -- and she said, you have to go online and become a client of ours and sign up -- I had to sign something so say I was going to be.  So I did that.  And I filled out the form the best I could at the time.

I was trying to do it rapidly because I really wanted to talk to a psychiatrist. So like many of us when we fill out computer forms,

Page 215

we rush through things sometimes.

BY MR. SABEY:

Q    So you prioritized speed over truth over accuracy?

MS. HALPERN:  Object to form.

THE DEPONENT:  I don't like the way you're putting that.  I don't think I was trying to be deceitful.  I was trying to get to see the doctors.  I quickly answered the questions the best I could at the time.

BY MR. SABEY:

Q    So you were trying to answer accurately?

A    I was trying to answer as I could. But, again, I didn't really understand some of these questions very clearly obviously.  I said -- since you brought it up, let's go back to that one question, which is a very good example of what I mean.  Where is that -- it says you're seeking health --

MS. HALPERN:  Can you identify the page you're looking at?

THE DEPONENT:  Yeah, I'm going to find it.  It's not one that glaringly tells me this.  I wasn't trying to be deceitful, but it says

Page 216

evaluation and treatment.  I am seeking evaluation and treatment at this time because of -- and I said none of these.  Occupational problems, yes, work issues.  It said no health problem.  Well, I was having a health problem.

So this means was I trying to lie to say -- no, I wasn't having a health problem?  I think I was getting through it maybe talking to that clerk upfront may have kind of made me -- it painted me to have to fill this form out.

BY MR. SABEY:

Q    Okay.  Did you ever reach out to Dr. Setty for a follow-up visit?

A    I don't recall doing that.

Q    Okay.

A    I followed up with Sheila Bee, who's an internal medicine doctor, who is the one -- Sheila Bee is a physician that I reached out to who basically is a friend.  She has a course for wellness, and so I reached out to her one time and just talked about things.

Q    When was that?

A    I don't know.  After my visits with Dr. Setty and all of that.

Q    Did you enter into a physician --

Page 217

A    No.  Just a friendship just talking. She was -- she kind of sat with me and we talked.

Q    Well, who is she?  What is she?

A    She's an internal medicine physician, a friend of my wife's.

Q    Okay.

A    She does lifestyle medicine.  She's a specialist in lifestyle medicine.

Q    Okay.  So you reached out to her?

A    Yeah, I reached out to her.

Q    To receive care.

A    Just to talk to her.  No medication. Just talk to her and have her for counseling visit.

Q    So you went to her for counseling?

A    Yeah.  I called her once and just -- they didn't -- she didn't charge me.  She didn't bill me.  She met me as a friend, as a friend, and we talked about things as a doctor.

Q    So one visit?

A    Yes.

Q    Not more?

A    No, just one visit.

Q    Okay.  And why did you call her?

A    Because she's the one who was initially involved in the course that I took, that

MAGNA
LEGAL SERVICES

Page 218

Harvard course for stress management. She is the champion of that. So I did that course. When I was doing it, looking back now, I was going through burnout now looking back.

I was taking that course and really not absorbing anything I was getting out of that course. I was crying -- in a way, I was crying for help when I look back.

When that course came across my desk, my wife didn't want -- this is my friend wife -- this is my wife's friend and she's offering this course, and I saw that I wanted to take this course, and I took the course with her.

And so later I reached out to her to say and just said, hey, can I talk to you as a friend to friend, and we talked one time.

Q    And what did you talk to her about?

A    About just how I'm doing, I'm trying to cope with all this. And she goes, you're doing the right thing, keep reflecting and do the meditation, self-awareness, do all the things you need to do, take rest and --

Q    So she said you were doing okay, didn't need to --

A    She said I'm -- she said I'm

Page 219

doing -- she said, "You're doing fine." Yeah, she goes, yeah, you need to keep doing what you're doing.

Q    Okay.

A    That's why I met with a friend. If she thought there was something wrong, that I'm not doing right, that I would sought other opinions.

Q    Okay.

A    And I did disclose that I did go get a medical executive physical at Mayo Clinic and to that physician I did tell him about the situation, and he had to me do a Zoom meeting with one of -- they want to generate business at Mayo Clinic so they had me do a visit with counselor, and I did that and that was useful, one visit with them.

Q    Okay.

A    I think we have records of that. If was for mental health -- it was counseling, that's what it was.

Q    So the discovery in this case, we haven't received anything about mental health counseling or treatment.

MS. HALPERN:  I think we identified the Mayo Clinic.

THE DEPONENT:  I only had one mental

Page 220

health counseling. Officially it was Mayo Clinic, and it was a Zoom meeting. This friend, Sheila, that I just volunteered to you, that I met her as a friend. It was not a doctor/patient relationship. She didn't bill me. I wanted to talk to her and make sure she thought -- I respected her because I did that course through her program, that Harvard course.

BY MR. SABEY:

Q    So you answered that your physician burnout was a mental health issue?

A    Pardon me?

Q    You answered that your physician burnout was a mental health issue?

A    It obviously is, but I didn't want Monroe spreading that nervous breakdown like I told you he did, and I gave you the doctor he told that to -- the patient told that to a doctor.

Q    And --

A    Anxiety and all these things.

Q    So he didn't say anything that was untrue?

A    Who?

Q    Dr. Monroe.

MS. HALPERN:  Object to form.

Page 221

BY MR. SABEY:

Q    When he said that -- to you, if you are having a mental health issue, I support you, and you responded to say be careful about slandering me. I mean, it's not a -- it wasn't an untrue statement.

MS. HALPERN:  Object to form.

THE DEPONENT:  I don't think it's an untrue statement, but I know Dr. Monroe and he did exactly what I was worried about, I warned him not to do. He slandered me by telling a patient that I had a nervous breakdown.

And how do I know that? The referring doctor who refers to me, Chris Oliver, told me, hey, what's going on with you? I've heard through a patient that you had nervous breakdown.

BY MR. SABEY:

Q    Did the patient tell you? Did you talk to the patient?

A    No. I just told you how it happened. So what happened was a patient was referred to me and I was no longer practicing at Penrose. So that patient ended by default seeing Dr. Monroe, and Dr. Monroe volunteered to this patient that I had nervous breakdown.

Page 222

The patient contacted the referring doctor, who thought I was seeing the patient, and told him -- he called me immediately -- or I don't know how he got ahold of me and he told me this was said. So I was worried about slandering me.

Q   Yeah, but you accused him of slander before that ever happened, right?

A   I didn't accuse him of slander. I said be careful with your words. Did I say that?

Q   You said he needs to be careful not to be slanderous.

A   I didn't say he is. I said be careful not to be slanderous.

Q   Okay.

A   In my understanding of the English language, that means not to be, not that you are. Don't be slanderous.

Q   Anything else?

A   And my fear was validated. He did do this.

Q   Okay. Nothing further.

A   Yeah, my fear was validated.

THE VIDEOGRAPHER: Anything else?

MR. SABEY: No.

THE VIDEOGRAPHER: This will

Page 223

conclude the deposition of Dr. Anuj Peddada. The time is 3:41 p.m. Mountain Time. We are off the record.

(The deposition concluded at 3:41 p.m.)

Page 224

REPORTER CERTIFICATE

I, ROSANNE M. STAHL, Shorthand Reporter and Notary Public within and for the State of Colorado, do hereby certify that previous to the commencement of the testimony, the said ANJU PEDDADA, MD was sworn by me to testify to the truth in relation to the matters in controversy between the said parties so far as he should be interrogated concerning the same; that the said deposition was taken in stenograph by me at the time and place aforesaid and was thereafter reduced to typewritten form; that the foregoing is a true and correct transcript of my stenographic notes thereof; and that Deposition Exhibits 56A, 57A, 58A, 59A and 60-69 were marked and used in the interrogation.

I further certify that I am not employed by, related to, nor counsel for any of the parties herein, nor otherwise interested in the event of this action.

IN WITNESS WHEREOF, I have affixed my signature and seal this 8th day of January, 2025.

_____
Rosanne M. Stahl
Notary Public
P.O. Box 464
Kremmling, CO 80459

MY COMMISSION EXPIRES: 04/13/26



**A**

**Abanon's**
136:24
**abilities**
41:8
**ability**
7:14 27:1,2 33:14
101:1
**able**
20:5,10 174:16
186:22 190:3
201:19 203:25
210:25 213:14
**absence**
4:7 80:16 81:22 82:5
123:19,23
**absolute**
122:20
**absorbing**
218:6
**academic**
93:23 94:11
**accelerator**
13:13,15
**accept**
176:9
**acceptable**
133:22 166:14,17
**accepted**
134:2
**accepts**
193:20
**accommodation**
61:24 62:12 63:10,19
65:9 99:13,24
**accommodations**
98:11
**accomplished**
71:12
**account**
187:9,12,16 199:18
**accuracy**
109:5 215:4
**accurate**
6:24 18:6 19:5 20:20

26:4 49:18,21 69:24
70:9 72:4 88:11,13
88:19 89:4,5 90:4
90:11,15 92:11
96:13 105:22 106:4
106:14,25 107:1
109:8,24 111:4,7,14
113:14,15 116:1
118:14 138:18
139:6,18 183:8
185:11 187:12
191:2 194:15 214:9
214:11
**accurately**
7:15 81:14 87:2,13
215:13
**accuse**
222:8
**accused**
222:6
**Aceletech**
14:7,7,18
**acknowledging**
24:12
**acoustic**
72:10
**acoustics**
166:6
**act**
65:8 99:11,21 113:21
114:11
**action**
1:2 81:15 224:11
**active**
200:18
**activities**
45:5,8,10 46:25
90:22 93:25 117:14
120:7,10
**activity**
46:5,11,14
**actual**
129:18 196:3
**ADA**
81:16 98:10
**addendum**

129:21 130:2,17
**adding**
198:13
**additional**
14:20,24 18:7
**address**
4:12 54:11 138:15
139:23
**addressed**
54:12 141:14
**addressing**
104:6 120:1
**admin**
4:13
**administration**
18:1 138:15,20
139:16,21,23
**administrative**
34:4
**administrators**
34:14,15
**admission**
38:12
**adopters**
205:16
**advice**
113:21 114:11
**affect**
141:17,25
**affixed**
224:12
**afford**
193:10
**aforesaid**
224:7
**afternoon**
107:22 108:3 154:24
155:16
**age**
15:23 81:25 177:5,10
177:19,21 178:1,21
178:23 179:21
180:3
**agency**
27:4,17,22,24 28:4
**ago**

39:19,21 98:6 122:15
122:22 147:3,9
203:3
**agree**
37:12 54:12 58:9,20
58:25 59:7 60:11
81:19 93:16 94:6,7
98:1,3 105:9 115:25
116:3,4 127:19
129:11 132:14,19
138:9
**agreed**
13:14 57:19,22 59:20
**agreement**
4:17 18:2 43:6,8,11
43:16,18,20 45:12
45:15 60:19 80:14
84:23 103:24
108:25 113:19
114:10 115:6,14
116:17,24 117:9,23
118:16,17 120:14
120:15,22,23 121:5
121:10,11 140:14
140:17 141:5
143:22 144:6,8
145:2 159:15,16
172:8,18 176:20
183:20
**agreements**
39:23 40:2 43:24
44:12 176:22
**ahead**
22:9 192:11 212:25
214:15
**ahold**
222:4
**Airbnb**
192:24
**Alan**
60:7,22 123:2,6
170:3 181:22 184:9
**Albert**
80:3 102:6 129:15
139:24 145:7
147:21 148:20



202:24
**alcohol**
7:13
**alleges**
56:9
**allow**
14:12
**allowing**
11:7
**ambiguous**
84:18
**amended**
3:18 55:22 80:9
106:6,13,19 145:16
**Americans**
65:7 99:11,21
**amount**
11:13 77:21 90:24
133:16,18
**analysis**
139:22
**angry**
205:5
**ANJU**
224:4
**announcing**
60:17
**Anova**
29:22
**answer**
7:7 15:10 44:7,20
53:15 63:5,18 69:20
71:8 76:14 77:19
78:3,4 84:18 91:8
91:11 99:17 114:7
118:4,24 128:3
132:2 143:16 173:4
176:6 186:19 209:4
209:23 215:12,14
**answered**
90:19 124:13 215:9
220:10,13
**answering**
214:14
**answers**
68:19 90:15 182:13

208:25 209:15
210:18 213:25
**Anuj**
1:6,8,15 2:18 3:2 5:6
5:6,25 6:6 14:22
27:9 32:5 129:1
190:8 223:1
**anxiety**
135:20 192:18
220:20
**anxious**
22:19 209:8,9,12,19
**anybody**
34:7 43:23 51:18
108:24 128:9 190:6
191:8
**anymore**
55:11 84:2 151:15
190:10 192:19
**apart**
26:25 27:2 192:20
**apathetic**
212:9
**apologize**
57:2 181:7
**apparently**
80:22 143:21
**appearances**
2:2 5:21
**appearing**
6:1
**appeasing**
29:11
**application**
128:23
**applications**
23:2 83:18
**applying**
22:11
**appointment**
114:15,23 131:21
132:1 135:1,7 153:6
153:8,10,14 154:6
211:2
**appreciate**
196:3,4,12

**approach**
180:14
**approached**
13:20 14:22
**appropriate**
105:10 180:12
**approval**
44:23
**approve**
63:1
**approximately**
7:25 8:1
**April**
25:22 43:7,14 45:6
45:24 48:13,21
103:24 107:8 108:6
119:24 129:5 131:7
131:16,20 137:20
142:12 144:5 145:7
145:10,14 147:19
148:4,16 149:18
151:8 152:1 153:6
153:15 154:24
155:16 156:20
172:12
**Arbitration**
141:13
**area**
54:1 93:24
**argument**
162:1 170:1
**arguments**
164:6
**Arizona**
36:8
**array**
9:22
**article**
151:8
**articles**
57:17 197:17
**ASAP**
210:16
**aside**
120:13,20 121:9
**asked**

15:15 17:2,6 32:6
37:24 62:2,4,17
67:12,22 74:21 83:9
85:7 101:23 102:10
124:13 136:2
144:12 155:23,25
159:20,24 170:10
172:25 175:21
176:7 183:7,22
204:7 207:21
**asking**
23:13 32:15,17,22
44:17 45:15 49:20
53:15 59:14 67:4,14
73:12 78:11 81:3
82:15,16 84:15,17
87:7 100:9 101:5
107:20 108:1
113:13 117:17
127:18,25 133:4
150:20 155:7
156:10 163:7 166:1
167:7,18 175:2,14
175:24 176:3
177:17 179:11
183:7 186:23
195:24 203:21
210:19
**asserted**
99:11,23
**asserts**
68:5
**assess**
104:16,24
**assigned**
71:14
**assist**
89:22
**assistance**
91:19 129:20,25
130:16
**associate**
188:15,19 191:3
**associated**
97:14,22
**associates**


MAGNA
LEGAL SERVICES

191:1
**associating**
188:5
**assume**
144:4
**assumes**
175:16
**assuming**
69:10 95:16
**Atlantic**
14:6
**attached**
43:16
**attack**
209:7
**attempt**
65:14,23
**attention**
3:21 43:5
**Attia**
202:20
**attorney**
7:10 17:13 40:20,23
40:24 41:2 110:25
142:5 143:21 144:6
144:25
**attorneys**
40:18 55:23 69:11,18
105:18 106:3,6
111:2,14 199:6
**attorney's**
174:8
**attorney-client**
69:20
**August**
8:3,18,19 9:1 32:17
32:18 33:6,7,7,9
43:25 44:13 118:9
118:17
**auto**
183:1
**automatically**
205:3
**autopopulated**
182:12
**available**

14:20 202:25
**average**
30:3 72:1 75:25 76:9
76:15,16
**avoid**
46:5,19,25
**avoiding**
151:20
**aware**
30:9,13,16,19 31:5,8
31:17 97:12 98:9,12
98:16,23 125:12,16
183:19
**awareness**
98:19
**awhile**
86:20 195:3
**a.m**
1:17 5:1,13 25:22
129:5 137:20
153:16 156:20
157:1

---
**B**
---

**back**
50:25 53:19 59:23
67:3 80:14 84:19
91:5 100:11 101:11
102:21 119:7
124:19 135:5,6
169:11 172:8,17
184:13 186:12
191:22,23 192:15
193:12,21,24
197:16 198:16,20
199:13 202:5 204:8
215:17 218:3,4,8
**background**
54:2
**back-peddling**
174:9
**bad**
66:13 101:9 102:3
201:17 204:9
**Baldauf**
3:23 56:11 57:4

61:17 62:17 67:25
85:6,12 99:2 125:21
**barely**
193:11
**base**
78:17,17 129:17
**based**
71:4,11 81:25 101:3
101:25 117:6
144:22 154:13
**basically**
9:6 29:10 55:9 72:9
97:21 112:6 123:1
128:23 182:12
183:10 188:17
189:2 193:4 194:13
200:10 202:15,15
216:19
**basis**
65:15,23 84:7,24
98:21 99:6 101:19
102:5,12 176:4
177:12,19 178:22
**bat**
168:12,19
**Bates**
3:9,15,17,21,24 4:5,7
4:9,13,15,17 52:20
136:16,21,23 137:4
137:24,25 176:23
176:25 180:19
**Bee**
216:16,18
**beg**
84:11 111:11,22
142:9
**beginning**
33:6,7,9 191:20
**begins**
5:5
**behalf**
6:2 39:24 106:3,7
109:24 111:1,3,14
**belief**
100:6 101:20
**believe**

13:25 41:20 54:22
55:3,13 81:22 102:6
146:9 156:24
177:18 207:16,22
**beneficial**
19:25
**benefit**
200:19
**benefits**
200:14
**best**
47:2 73:19 77:19
90:7 101:1 109:25
175:19 183:10
203:1 214:22 215:9
**better**
8:25 9:1 33:8 118:21
133:23 183:2
201:10,16 202:25
**beyond**
213:17
**big**
132:17 162:7 165:16
165:17 167:7
169:25 190:17
193:5 203:15 212:3
**biggest**
74:22
**biking**
192:19 201:20
**bill**
48:18 84:1 125:19
217:17 220:5
**billing**
83:2,10,12,15,16,18
84:14 141:21
**bills**
193:11
**bit**
83:9 165:10 171:23
174:25 182:3 183:2
183:18
**blank**
21:1
**blanket**
46:7,13



MAGNA
LEGAL SERVICES

**blatantly**
212:15
**blowup**
164:25
**blue**
146:22
**Blum**
168:13,14,15 169:24
**board**
17:2,14 170:10 210:5
**boards**
210:2,3
**body**
47:22
**bono**
9:15
**book**
202:20,21 203:2
**books**
202:19
**bother**
149:17
**bottom**
27:1 48:16,17,17
87:21 136:17
180:24 181:3,5
**bought**
147:5,9,13,15 197:1
197:2,4,8,9,16
198:8,9
**box**
195:7 224:17
**brachytherapy**
72:12
**brain**
166:3 204:21 205:24
**brand**
161:4
**break**
44:25 92:24 102:14
102:18 115:8,17
153:20 186:4,9
**breakdown**
50:9 51:1,24 101:18
158:3,5 220:16
221:12,16,25

**breaks**
48:1
**breast**
166:8
**Breckenridge**
36:25
**Brianna**
96:11
**bring**
17:23 25:15 34:19
43:2 184:13 189:11
190:18
**bringing**
42:22 187:15
**broke**
14:17
**brother**
137:20 138:12,19
139:15 142:6,14
143:13 146:3,7,22
147:3,21 148:9
149:11,15 150:6,16
150:20,22 151:4,8
152:2,16,25 153:16
156:20 194:14
**brothers**
150:14
**brother's**
149:21 150:4 188:13
188:14
**brought**
13:11 160:10,13
192:15 204:8
209:13 210:23
215:17
**bunch**
86:11
**burn**
98:5
**burned**
98:5
**burning**
76:11
**burnout**
32:10,13,19,24 33:2
41:7,10 53:18 57:23

58:3,10,19 59:21
63:24 64:5,8,13,19
65:6 66:11,15,20
67:8 74:14,16 76:4
96:18,21 120:6
132:11 133:20,24
134:16,22 135:9,12
136:1,4,7,10,12
153:22 154:4
155:11,17 156:2
192:1,4 218:4
220:11,14
**burnt**
99:19 112:11,16
114:19
**business**
5:8 219:13
**businessman**
151:22
**busy**
13:19 34:21 70:25
**Butcher**
2:17 5:17
**buy**
13:15 14:24 147:11
195:25,25 196:3
**buying**
13:21
**buys**
147:4 197:8
**B-l-u-m**
168:16,17

_____
C
_____

**C**
5:2
**cabinet**
197:15
**calculator**
187:20
**California**
9:13 26:2 94:17,18
177:5 193:2
**call**
15:23 21:7 43:4
58:15,17 88:24

107:6 131:18 135:1
152:7,14 153:3
154:10 156:8,10,18
164:9 190:15
208:13 211:3
217:23
**called**
13:16 14:6 18:4
19:20 38:19 124:19
152:17,22 154:8
155:21 188:4 190:8
190:24 204:10
205:14,22 206:3
217:15 222:3
**calling**
48:9 131:15 204:7
214:17
**calmly**
113:19 114:8
**cancer**
19:2 29:22 30:21
31:9 34:1 37:21,22
41:18 105:15
**capture**
210:25 211:14 212:1
213:6
**care**
7:20,21,24 35:15,21
35:23 38:9,10 46:10
56:13 57:18 59:20
163:13 165:12
169:23 193:4
217:11
**career**
50:16 55:5,14 69:6
180:11
**careful**
50:10 102:1 114:20
123:7,11 221:4
222:9,10,13
**carefully**
22:14 106:9 109:19
**carry**
101:16
**cars**
147:14


MAGNA
LEGAL SERVICES

Carter
3:9 18:19,23 191:22
case
6:20 68:5 73:23 92:1
92:1 105:19 132:16
204:21 219:20
cases
68:25 164:7 201:2
catastrophic
204:22
Catholic
1:11 5:7 111:24
cause
159:25
caused
74:14,15 160:3
causes
192:2,3
caution
50:10
cautioned
49:22,23
cell
19:20 104:3 127:4
center
9:21 29:21,22 31:9
34:1 41:18
centers
19:3 162:5 188:19
centigrade
205:2
Centura
1:11 4:16 5:8 13:4
17:25 18:3 34:15
43:23 44:11 45:22
80:13,14 83:3 98:10
103:9,10,18,25
107:21 108:2
114:17,25 173:7
CEO
14:21 34:17
certain
54:1 77:21,23 159:6
213:15
CERTIFICATE
224:1

certify
224:3,10
CFO
14:21
chain
121:20
chairman
29:9 188:16
challenging
41:13
champion
218:2
chance
24:16 110:15 207:13
209:15
change
8:3 30:20 65:15,23
83:17,22
changed
10:25 14:11 17:4
200:5
changes
8:21 55:8 97:18
characteristic
82:2
characterize
72:4
charge
178:22 217:16
check
13:2 14:10 20:21
124:16 126:17
128:24
checking
24:19 103:20 127:22
cheer
182:23 209:2
cherish
197:4
CHIC
111:20,24 112:8,14
112:24 113:7
chief
85:13
children
201:8,9

CHIP
111:21,23
Chitra
96:11
choose
78:13 79:9 213:16
chose
77:7 192:24 206:12
206:15
chosen
79:6 192:22
Chris
51:16 221:14
chronologically
9:8
circumstances
76:2
Civil
1:2 105:21
CK
12:12 13:1,2,10 14:8
14:15,17,23 16:25
17:14,15 18:9
CK4
15:20
claim
81:16
claims
68:7 178:22
clarification
112:3
clarify
42:18 129:6 174:24
classes
201:20
clean
140:4
clean-up
206:25
clear
49:15 52:1 56:25
95:4,13 130:8
160:17 162:24
179:12 182:6
183:17 184:11
209:4

clearly
51:20 67:2 215:16
clear-cut
212:14
clerk
210:14 214:12,18
216:9
click
199:21 208:19
210:13
clicking
90:8 211:17
client
95:22 214:19
clinic
34:21 39:3 46:16
134:5,19 165:15
166:12 172:25
219:10,13,24 220:1
clinical
120:6 134:16,22
clinics
9:7
close
164:20
closely
119:12,18 208:8
cognitive
74:5
cognitively
116:18
colleague
96:11
collect
194:15 196:12 198:7
collected
195:9
collecting
198:13
collection
194:19,23 196:16
198:13
collector
196:17
collects
147:14


MAGNA
LEGAL SERVICES

**collimator**
13:16
**Colorado**
1:1,11,19 5:7,11,16
18:25 31:17 111:25
182:7 192:13 193:7
193:24 208:14
224:3
**come**
13:8 16:10,16 17:5
18:1 39:4 59:23
132:22 133:5
141:20 153:17
163:1 165:21
167:17 169:8
170:16,17,18 171:3
171:14 193:25
209:11
**comes**
52:1 105:14 169:14
203:24
**comfortable**
104:14,22 105:3
135:25 153:21
**coming**
15:23 100:11 173:8
**commencement**
224:4
**commencing**
1:17
**comment**
102:1 123:14 204:4
**COMMISSION**
224:20
**commit**
27:5
**committee**
85:8
**common**
165:7 167:9
**CommonSpirit**
18:4 33:21,25 34:8
34:11,21,24 193:5
**communicate**
112:13 115:23 116:6
121:22

**communicated**
67:9,16 100:6 112:23
113:7,10
**communicating**
158:21 159:1
**communication**
138:18,19
**communications**
92:12 99:13 111:20
112:8 122:1,8
**communities**
15:3
**community**
14:9
**companies**
193:5
**companion**
35:19
**company**
14:18 16:11,22
**compared**
76:11
**compensation**
78:19 141:17,25
149:9
**competence**
86:2
**competent**
42:2,8,10,15,24,24
86:6 162:16,19
**competing**
31:9,9 189:14
**competition**
101:10
**competitors**
31:19
**complain**
209:12
**complaining**
8:23 161:7
**complaint**
3:18 55:23 68:4 70:2
80:9 106:6,13,19
114:4 145:15,16
**complaints**
169:23 208:23

209:10
**complete**
6:23 42:10,15,24
121:25,25 122:8
189:13
**completed**
121:6
**completely**
55:9 116:19 122:24
185:7 190:4
**completing**
91:20
**complex**
72:1,9 73:1,10
**complexity**
71:22 72:18 73:23
74:2,17 201:2
**complied**
47:1
**components**
71:15
**comprehend**
41:13
**comprehension**
115:2
**comprehensive**
24:18 26:12 122:25
**computer**
89:15 90:8 104:3
158:7 172:24 183:6
205:20 207:11
209:23 213:19
214:25
**concept**
65:8
**concern**
155:14
**concerning**
224:6
**concerns**
207:18
**concierge**
193:3,9
**conclude**
223:1
**concluded**

58:3 223:4
**concludes**
7:7
**conclusion**
97:16
**conclusions**
54:13 87:3,14
**condescending**
164:8 168:9 170:3
**condition**
38:17 45:4 56:14
57:8 64:18 97:13
104:16,25 114:16
119:25 132:14
**conditions**
90:7
**conducted**
42:1,4
**confidential**
130:24 131:1
**confirmed**
56:17 57:14
**conflict**
74:9 76:2
**conflicted**
16:9
**confused**
124:7 173:17 174:22
175:13
**confusing**
57:1 146:21
**connections**
28:5
**consent**
203:21
**consider**
23:18 35:14 38:13
42:12 76:16 179:3
**considerations**
102:7
**considered**
28:7
**considering**
23:17 28:23 41:17
80:17 93:20,21
**consistent**



24:18
**consistently**
201:20
**consists**
85:22
**conspiracy**
183:20
**constructed**
144:21
**consultation**
74:1
**consultations**
163:7,8
**consulting**
93:20
**contact**
23:5
**contacted**
23:7 222:1
**contacts**
23:3 27:16 160:19
**contain**
88:11,19 92:1
**contemplating**
192:7
**context**
80:25 146:25 147:24
148:6 151:12
**continue**
14:16 15:25 19:25
118:15 179:14
205:11
**continued**
5:5 41:3 118:10
**continues**
16:21
**contoured**
204:20
**contract**
29:13 40:4 82:13,15
82:20 97:18 103:11
103:15,15 107:10
107:13,14,14,21
108:7,9,10,11,13,15
108:17,21 109:8
123:4 128:25

129:20 130:1,2,9,11
130:17 141:10
144:13,17 161:4
173:25 174:1
**contractor**
10:25
**contracts**
40:7 144:12
**contractual**
47:5 60:18 117:25
118:6
**contradicted**
170:5
**contrast**
61:19
**contributing**
58:13 97:17,19
132:17,18 192:3
**controversy**
224:5
**conventions**
13:23
**conversation**
42:6,17,21 44:16
113:24 153:4 154:9
154:13 155:23
178:24 180:6
**conversations**
25:1 95:18 190:23
**convert**
25:15
**converted**
83:3
**converting**
83:15
**convinced**
181:1,10
**cope**
218:19
**copied**
60:7 110:11
**copies**
172:6
**copy**
129:19 137:4 140:4
173:6

**core**
208:21
**corporate**
40:22 193:4
**corporation**
144:3,13
**correct**
6:19 17:21 18:10
24:23 26:6,15 27:7
28:1 43:25 45:10
47:22,23 48:1,22,24
49:25 50:1 57:15,20
58:4,5 60:8,20
61:18,20,21 65:9,11
65:12 67:10,18 71:5
74:11,12 78:19,20
79:7 81:4,6 82:11
82:24,25 83:13,25
91:11 95:5 97:25
99:21 100:25
103:16,21 104:9,12
105:13 106:7,8,16
107:10 108:3,4
112:9 116:8 119:2
119:22 120:10,11
121:22 123:5,9,11
125:21,22 126:4
127:17,19,22 128:6
129:3,4 130:2,17
131:16,17 133:14
135:21 140:14
142:1,6,14 143:11
143:23,24 144:15
145:22 155:1,19
158:13,19 163:11
172:13 183:14,23
187:17 199:11
200:11 224:8
**correctly**
24:20 26:14 27:6
28:2 45:2 56:19
57:10 80:19 103:12
107:23 113:1 115:9
116:14 118:12
119:15 171:12
**counsel**

5:20 224:10
**counseling**
217:13,14 219:18,22
220:1
**counselor**
219:14
**count**
68:13
**country**
180:7
**couple**
81:9 206:25 214:7
**course**
30:22 31:4 138:2
216:19 217:25
218:1,2,5,7,9,12,13
218:13 220:7,8
**court**
1:1 2:17 5:10,18 6:4
105:18,19,20 111:3
**cover**
163:13 186:15,22,24
**coverage**
3:14 9:14,20 11:5
24:18 26:13 29:14
30:10,12 77:11
163:12 194:11
**covered**
136:23 163:5,19
**COVID**
37:13 38:3,7,7,10,16
38:20,22 39:2,5,10
39:12,16
**CPHP**
85:22 86:3 88:1,4,18
89:19 92:12,15 93:7
95:19 96:1,10,12
184:15 185:10
**CPHP's**
87:3,14
**create**
49:4,13
**created**
27:10
**credentialing**
28:15 83:24



credible
86:6
crisis
38:8 135:14,15
Crist
2:5 5:24 199:16
critical
170:23 189:12
crux
160:22
crying
218:7,7
currently
7:20 19:8
cut
90:24 91:5 147:18
189:2,13
Cw@rmlawyers.co...
2:8
CyberKnife
12:14 13:6,19,24
29:21

D

D
3:1 5:2
daily
73:9 90:22 93:25
139:12
damages
179:20
danger
71:23
data
16:13
date
5:12 10:16 16:20
19:16 79:20 80:20
83:7 84:3 118:9
142:8,10,13 143:6
145:13 148:3 173:2
dated
142:11
dates
10:3 11:15 157:7,13
157:16,17,18

date's
145:18
daughter
36:19
daughter's
151:19
day
32:12 62:19,20 69:14
71:5,12 75:13 80:12
83:16,21 103:23
107:20 144:2
152:19,20 153:1,6
153:24 156:5
173:11 199:16
202:10 203:15
204:19 209:25
224:12
days
141:20 173:9 203:16
Daytona
197:10,18,24
day's
68:25
day-to-day
94:4
deal
14:19 103:24 118:22
121:7 130:15
dealer
197:21
dealing
46:19 104:4 148:21
174:1
dealt
129:25
debt
80:14
deceitful
215:8,25
December
1:16 3:2 5:1,12 10:5
10:5
decide
93:13 127:7 130:15
171:24
decided

26:9,11,16 93:12
100:14 141:15
144:9
decision
16:2 79:16 80:3 85:4
100:17
declined
135:21
decreasing
30:14
default
221:23
Defendant
1:12 2:10 118:10
Defendants
1:16
Defendant's
4:1,4
defined
11:4
definitely
133:17 200:22
delete
198:17
delivered
159:16 204:22
demand
3:19 30:13
demonstrative
110:17
denied
123:23
Dennis
3:9 18:19,23 19:4,11
23:5 79:22 191:22
Denver
2:6,13 5:16 15:6
29:17,18,19,20,21
51:17 192:8 193:12
193:13,21
department
13:13 34:18 74:20
209:11,21
depo
211:5
Deponent

2:18 10:15,19 11:3
11:23 16:6 20:4
23:12 24:25 26:19
30:16 31:1,12 33:18
34:3,10,17 35:1,11
37:18 38:7 44:2,15
45:14 46:1,9,22
47:12,19 48:3 49:7
50:6 53:12 54:16
56:21 57:22 59:5,13
60:13 62:1,15 63:15
63:21 64:11 65:18
66:7,22 71:9 72:23
73:19 75:20 76:6,13
77:9,18 79:1 80:6
81:1,10,19 82:7,19
85:1 86:19 88:22
92:17 93:11 95:7
96:3,23 97:4 98:16
100:1,19 101:23
102:9 104:18
107:12 108:9 109:3
111:9 117:2,12
118:5,19 119:4
120:5,17 121:2
122:4,12 124:7,14
125:9 126:20 129:8
130:5 131:11
138:22 140:9 141:1
145:10 155:3,21
162:10,18 169:16
173:23 174:12,22
175:6,13,18,21
176:12 179:23
184:3,18 185:3,14
186:2,19 187:19
191:17,21 204:2
214:16 215:6,23
219:25 221:8
deposition
1:5,15 3:6 5:5,14
6:22 7:6,15 39:19
136:24 207:18
223:1,4 224:6,8
depositions
68:12 210:2



**depression**
135:20
**dermatologists**
75:12
**describe**
9:4 10:22 65:6
100:15
**described**
74:7
**designated**
131:1
**desired**
105:11
**desk**
218:10
**destress**
153:18
**detail**
10:23 15:22 53:23
**detailed**
44:16
**details**
149:5 160:23 162:2
182:5
**determine**
126:6
**devastating**
50:15
**developed**
13:18 31:22 32:12
**Di**
135:17
**diagnose**
38:11 132:24 136:3,6
**diagnosed**
56:13 57:8 59:1 65:3
66:14 67:11,19
**diagnoses**
64:12
**diagnosing**
135:25
**diagnosis**
41:10 56:17 57:14,18
58:12 59:6,19 63:24
65:2,15,23 67:9,15
104:14,16,22,25

105:2,5,11,12 133:8
135:15 136:12
153:21 154:4,25
155:5,9,17,19
**Diagnostic**
132:10
**die**
158:8
**Diego**
192:10,21,24
**different**
9:7 34:4 55:12 63:4
71:15 76:23 137:9
159:7 162:5 173:13
176:22,23 194:12
**differential**
120:15,23 161:5
**differently**
90:19 204:24
**difficult**
53:19 166:23 168:9
**difficulties**
140:20 141:8 158:12
**difficulty**
8:23
**diminished**
210:10
**diminishing**
30:6,7
**dinged**
127:3
**dinner**
152:6,13
**direct**
28:3 162:25 174:1
**Directed**
163:3
**direction**
46:25
**directions**
45:21 46:19 47:1
**directly**
27:3 163:25 168:2
**Dirk**
169:20,20
**Disabilities**

65:8 99:11,21
**disability**
47:25 65:7 66:23
99:12,24 121:21
123:4 144:17 157:3
**disabled**
47:9,15 66:5,17
**disagree**
54:5,19 72:19 99:6
**disagreement**
160:25 161:12,14,24
162:8,11
**disagreements**
158:24
**disclose**
219:9
**discovery**
199:3 203:20 219:20
**discrepancy**
68:10,16,17,20 69:2
69:9
**discriminated**
81:23 177:19
**discrimination**
80:18 177:5,10
178:22,23 179:21
180:4
**discuss**
107:21 108:2,15
113:18 114:9
120:23 149:10
208:10
**discussed**
15:21 155:1,4
**discussing**
62:4,23
**discussion**
16:1 21:25 42:12
137:12 160:5 172:7
185:5
**discussions**
118:6 183:18
**disease**
213:3
**diseases**
105:7

**dismantled**
142:19
**dispute**
16:24 80:4 84:7,24
95:18 97:1 98:22,24
123:15,16 172:15
**disputing**
109:5 123:21
**dissolution**
142:23
**dissolve**
144:3,11
**dissolved**
143:1
**distinction**
59:16
**distribution**
13:5
**distributions**
12:18 13:1
**District**
1:1,1 5:10,10
**divest**
15:19
**doc**
24:13,17 25:8
**doctor**
7:21 11:4 23:17,19
23:19 25:6,9 38:14
58:2,6 65:3 67:11
67:19 68:2 76:1,9
76:15,16 77:6,23
105:8 113:21
114:11 115:7
132:16 133:7
135:13 136:11
144:22 150:1,10
151:22 153:4 154:3
159:4 160:19
162:13 163:16
164:10,24 166:18
168:24 177:25
178:1 187:25
188:23 189:8 190:7
190:14 193:3
216:17 217:18



220:17,18 221:14
222:2
**doctors**
14:8,9,12 15:2 31:5
32:1 37:14,15,15,18
37:20,22 38:4 51:3
51:8,9,15 75:3,6,7
75:10,12,14 77:1,14
78:12,21 148:11,14
160:1 162:23
163:23,25 164:17
165:3,11,12,14,14
165:21,22 166:2,3
166:11 167:1 168:8
168:18 170:7,15
171:9,14,14,19
180:2,7 190:22,23
193:9,9 204:16
205:10,15 206:14
215:9
**doctor's**
44:23 60:23 61:8
**doctor/patient**
220:4
**document**
18:13 46:2 55:24
60:9 61:14 85:22,24
86:9,11 102:24
106:15 110:25
111:5 128:16 134:5
134:25 137:16
146:8 180:17 182:2
182:3,5
**documentation**
125:13 168:7
**documents**
40:14,19 41:5 45:23
105:19 114:17,25
115:19 120:2
121:12,14,24 124:1
144:14
**doing**
5:8 9:14 13:11 25:12
37:19 41:14 46:10
46:16 70:25 71:16
78:2 94:1,3,12

128:4 133:23 159:7
159:9,25 167:3
200:9,18,19,25,25
202:5 216:14 218:3
218:18,19,23 219:1
219:1,2,3,7
**dollar**
151:20
**dollars**
187:16 195:16 196:8
**door**
11:24 25:12 26:22
**dose**
205:1
**double**
71:25 112:6
**doubt**
86:1,4 87:2,13,16
**Dr**
3:23 5:6,6,25 6:11
15:5,6,12,17 17:3
42:9 46:4,18,24
49:23,23 51:16,23
51:23 52:2,3,5
54:10,13 56:15,17
57:13,13,19,23 58:1
58:7,7,8,15,18
59:14,14,20 60:7
61:17 62:2,17 67:25
68:7 69:11,22 72:25
73:8,11,17,25 74:10
74:18 75:21 80:12
85:6 96:15 97:12
99:2 107:3,20,20,22
108:1 111:19 112:7
112:13,23 113:17
113:20,25 114:9,15
114:24 115:4
116:11 118:9,11
119:1,12,24 123:18
124:14 125:20
131:6,22 132:22
133:5 135:8 152:17
152:22 153:15
154:14 158:11
159:4,14,17,19,21

160:20 161:18,25
162:18,19,22,24
163:3,3,23 164:1,25
165:7 166:8,13,18
167:6,15 168:5,8,11
168:13,14,17,19,23
169:20 170:7,9
171:18 183:21
188:24 204:7 206:3
206:6 207:3 216:13
216:24 220:24
221:9,24,24 223:1
**draft**
172:7
**dramatically**
201:16
**draw**
140:1
**drinks**
212:12
**drives**
73:24
**drop-down**
183:15
**Drs**
56:11 57:3 162:15
**drug**
212:13
**drugs**
7:13
**due**
90:23 187:2
**duly**
6:7
**duplicates**
21:22
**duration**
132:23 133:6
**duties**
139:12
**d/b/a**
1:11

——————————————
E
——————————————
**E**
3:1 5:2,2

**earlier**
108:18 161:21
182:15 183:17
207:6
**earliest**
205:16
**early**
28:20,21 154:23
**earned**
157:9 158:5
**earning**
55:10
**easily**
68:14 69:16
**Easter**
149:17
**easy**
127:12 162:4 209:23
210:12
**educate**
165:10
**education**
35:22
**EEOC**
178:22
**efficiently**
72:20
**effort**
115:2
**efforts**
120:12,20
**eggshells**
209:13
**eight**
37:11 153:20 158:18
158:19 165:14
187:10 194:24
195:2 196:22
**eight-week**
139:11
**either**
130:1
**electronic**
89:9 173:3
**electronically**
173:3,6 198:25


MAGNA
LEGAL SERVICES

**email**
3:12,20,22 4:6,11
    28:22 29:7 43:6,15
    48:14,18,25 49:2,5
    49:18 57:13 60:4,6
    61:16,19,22 62:1,2
    62:10,22,25 63:9,23
    65:5,14,22 68:3
    99:22 103:10,11,16
    103:19 104:9
    113:25 114:2
    121:20 123:17
    125:18,24 126:12
    126:13,16,17,21
    127:6 128:5,22
    129:24 130:4
    137:19 139:14
    142:5,11,13 147:1
    147:24 149:12
    151:12 154:13
    164:4 168:10,11
    170:1 189:4
**emailed**
56:11 57:3 107:9,22
    108:2,6,14 127:1
**emails**
31:25 79:23,24
    103:20,25 104:4,6
    119:13,18 126:2,3
    126:24 127:9,11,16
    127:22 128:10
    168:11 190:2
    199:10,12
**emergency**
37:14 135:14 163:12
**emotional**
7:18 90:24 91:5
**employed**
15:17,19 29:3 60:21
    60:22 77:23 83:4
    98:8 190:16 224:10
**employee**
15:17 27:18 28:7
    52:6 54:25 82:11,13
    82:17,21,23 84:6,21
    84:23 160:12

**employees**
47:24 98:10 99:4
**employment**
4:17 10:24 11:20,20
    22:6 43:5,15 44:17
    45:23 46:7,20 47:5
    55:7 79:16 80:15
    99:14 100:5,14
    107:9,21 108:2,7,15
    108:17,25 109:7
    113:19 114:10
    115:6,13 116:17,24
    117:9,23 118:17
    119:19 120:14,22
    121:11 172:8
    174:16 176:20
    194:4,7
**EMT**
167:1
**ended**
74:24 198:11,12
    221:23
**engage**
112:10,17 116:21
    120:7,9 142:16
**engaged**
99:5 142:20,21
    144:11
**engaging**
118:5
**English**
222:15
**enjoy**
200:24 202:11
**ensure**
106:12 109:22
**ENT**
51:16
**enter**
216:25
**entered**
89:13
**entertainment**
33:16
**entire**
10:15 98:4

**entirely**
58:4,10 132:12,15
**entries**
89:21
**epidemic**
37:14
**equated**
71:24
**equipment**
13:15,21,25 14:3
    15:1
**equivalent**
190:14
**ER**
38:11,23
**Eric**
48:18 60:7 82:14
    121:6 123:10
    129:17,18 172:24
    173:4,8,16,18,24,25
**error**
66:12 96:9 204:20
**errors**
140:6 205:9,11
**escalated**
160:23
**ESQ**
2:4,5,11,11
**essentially**
64:25
**established**
192:1
**estate**
147:3,4,10
**estimate**
70:17 157:18
**estimated**
69:13
**evaluated**
154:23 155:15,18
    156:5
**evaluation**
85:23 87:3,15 212:21
    212:22 216:1,1
**evened**
166:21

**evenly**
161:18
**event**
224:11
**events**
178:23
**eventually**
141:25
**evidence**
175:16 183:20
**exact**
79:19 158:20 186:3
    213:7
**exactly**
9:12 10:4 112:16
    119:5 127:2 159:20
    167:9 182:14
    221:10
**examination**
3:2 6:9 11:7 207:1
    214:4
**examined**
6:7
**example**
30:23 34:18 78:24
    167:1,6 182:19
    215:18
**examples**
210:24 211:10
**exception**
88:17
**excerpts**
4:3 110:7,22
**excessively**
79:13
**exchange**
147:1 151:24 170:1
    189:4
**exchanged**
146:3 189:17
**exchanges**
164:4 168:20
**excited**
174:3
**exclusive**
40:5



MAGNA
LEGAL SERVICES

exclusively
13:22 27:25
executed
107:14
executive
219:10
exercising
60:18
exertion
47:10,17
exhaust
7:2
exhausted
33:10 212:6,6
exhaustion
63:24 64:8,13,20
  65:6 67:8 96:18
exhibit
3:8,10,12,16,18,20
  3:22 4:1,3,6,8,11,14
  4:16 18:12 19:5
  20:18 22:1 23:22,23
  25:17,18 26:4 48:7
  48:10,17 52:13,14
  53:1 55:18,19 59:23
  59:25 60:1 61:10,11
  62:10 85:15 87:6
  92:1 102:25 106:5
  109:10,11 110:2,3
  110:12,17 113:10
  119:8 121:16,17
  128:12,13 130:20
  130:22,25 131:1,5
  136:14 137:1 139:9
  139:10 140:15
  141:5 142:4 145:6,8
  145:24 146:11
  157:2 172:2,6,18
  176:17 180:17
  206:25 207:4,7,13
  207:15,19 213:13
exhibits
3:6 21:3 140:1 224:8
existence
74:24
expanding

179:1
expect
22:18 100:8
expected
55:15 111:3
expenses
186:16,21,24
expensive
195:8
experience
23:1 25:10,11 135:12
  178:3
experienced
32:9,18,23 33:1 76:3
  76:3
experiencing
96:20
expert
3:16 52:19 58:2 64:5
  71:13 96:15 177:4
expert's
53:1,2 177:3
expired
43:25 44:12
EXPIRES
224:20
explain
68:10 73:17 199:17
  207:17 211:13
explanations
213:15
explore
17:10,18,20 22:4,15
  26:10
Exploring
3:13
expound
211:13
express
113:18
expressed
58:18 167:14
extension
83:9
extensive
28:14

extent
33:12 75:1 126:12
extra
205:1
extroverted
159:22

———————
F
———————
F
53:2
face
162:5
facing
177:5
fact
7:10 18:21 73:10
  99:10 101:25
  189:22
factor
58:14 132:18
factors
97:17,20,23 149:4
facts
49:4,13 105:12
  175:16
factual
101:19 102:5,12
  105:22 176:4
  177:12 178:5
factually
106:4,13 109:24
  111:4,7 116:1
fair
73:21,21 175:17
faithfully
47:1
false
49:4,13 208:20
  212:23 213:2
familiar
55:24
family
35:15 36:2,5,6,12,19
  98:11 160:19
  200:21 201:4,11
far

157:9 198:20 224:5
fast
72:5
faster
72:20
father
35:4,6,7,8,13,14
fear
222:19,22
feel
32:20 42:23 45:19
  118:21 183:2 212:2
feeling
212:1
feelings
193:25
feels
153:21 155:4
felt
40:19 42:7 44:4,22
  121:21 140:19
  141:7 164:7 182:23
  209:1,8,18,25
  211:18,19 212:3,5,7
fewer
30:20 77:15,16 79:7
  79:7
fiducial
72:12
field
94:2,13 204:23
fight
161:10 170:9
file
65:13,21 105:19
  124:24
filed
55:23 68:4 106:6,10
  109:20,23 111:1
  178:21
files
207:10
fill
23:2 90:8 125:13
  182:4,9,13 214:25
  216:10



**filled**
 91:14 128:24 183:5
   208:13,16 212:16
   213:11 214:17,21
**filling**
 89:14 208:11 210:25
   214:8
**films**
 11:6
**final**
 19:16 138:23
**finally**
 121:7
**finance**
 203:6
**finances**
 147:14 187:13
**financial**
 203:8
**financially**
 203:8
**find**
 86:5 168:12 174:16
   200:23 215:24
**fine**
 12:6 21:11,15 43:2
   44:23 92:20 110:18
   110:20 140:11
   152:12 219:1
**finish**
 71:8
**finished**
 20:9 56:7 111:12
   115:11 197:3,7
   198:5 203:2
**firm**
 17:6 142:20
**first**
 3:18 6:7 9:9 11:1
   22:11,13,23 24:13
   24:14 29:3 33:20
   39:18 53:6 55:22
   63:15 86:12,21
   87:24 89:7,8 93:2
   111:17 112:22
   119:8 131:13

 132:11 142:16
   144:16 188:2 207:8
   208:3 210:21
   214:12
**fit**
 145:1 162:13
**five**
 30:23 71:19 134:6,15
   134:24 135:3
   178:14,15 196:23
**fix**
 16:22
**fixed**
 16:16
**flashback**
 204:9
**flexibility**
 27:4 78:22 133:16
**flipper**
 196:12
**Florida**
 36:8,10
**flow**
 162:12
**flows**
 150:1
**fluctuate**
 195:14
**focus**
 54:2 124:10 144:16
**focused**
 99:18 206:1,2
**follow**
 19:17 26:8 45:20
   134:3,6,15,24 135:3
**followed**
 19:16 116:21 216:16
**follows**
 6:8
**follow-up**
 11:7 206:21 214:6,7
   216:13
**food**
 33:15
**foot**
 25:11 26:21

**forcefully**
 113:18
**forces**
 77:1
**foregoing**
 224:7
**forensic**
 137:10
**forgetting**
 67:2
**form**
 11:2,22 16:5 20:3
   24:24 26:18 30:15
   30:25 31:11 33:17
   34:2,9,16,25 35:10
   37:17 38:6 43:9
   44:1,14 45:13,25
   46:8,21 47:11,18
   48:2 49:6 50:5
   53:11 54:15 56:20
   57:21 59:4,12 60:12
   61:25 62:13 63:11
   63:14,20 64:10
   65:17 66:6,18,21
   69:19 72:22 73:18
   75:19 76:5,12 77:8
   77:17 78:14,25 80:5
   81:18 82:6,18 84:9
   84:25 87:10 88:1,10
   88:18,21 89:9,12,13
   89:14,15,22 90:8
   91:20 92:16 93:10
   95:6 96:2,22 97:3
   98:15 99:8,25
   100:18 101:22
   102:8 104:17
   105:23 107:11
   108:8 109:2 110:23
   111:8 117:1,11
   118:18 119:3 120:4
   120:16 122:3 125:8
   138:21 140:25
   155:2,20 162:9,17
   173:22 174:11,18
   175:5 176:1,11
   179:22 181:18

 182:10 184:2,17,21
   185:13 186:1,18
   187:18 208:12,15
   211:24 213:13,18
   214:8,17,22 215:5
   216:10 220:25
   221:7 224:7
**formal**
 63:16 98:22 124:24
   204:3
**formally**
 62:5 98:25
**format**
 62:5 209:23
**formed**
 14:8
**forms**
 214:25
**forth**
 81:15
**forward**
 6:21 137:14 142:13
**found**
 19:24 20:4 168:8
   170:3
**four**
 90:23 134:5,15,24
   135:3 169:14
   170:15 178:14,15
   196:23 197:25
   209:20
**fourth**
 103:8
**frame**
 8:17 10:5 81:3 83:1
   158:20
**Francis**
 1:11 5:9
**free**
 17:10 201:5
**freedom**
 77:6,15 78:12 79:2,5
**free-standing**
 9:21
**fresh**
 191:3



**friend**
23:5 24:5 26:20
   29:11 180:13
   216:19 217:5,17,17
   218:10,11,16,16
   219:5 220:2,4
**friends**
178:25 187:23 188:1
   188:4
**friendship**
217:1
**frightened**
209:8
**front**
95:23
**frontline**
37:13,20,22 38:13
**fulfill**
35:24
**full**
9:22 54:8
**fully**
7:2,14 42:10,24
**full-time**
11:17 12:8,10 23:19
   23:20 24:13 25:8,16
   54:24 194:4
**functioning**
195:6
**further**
222:21 224:10
**future**
46:6
**F.B**
196:6

──────────
        **G**
──────────
**G**
5:2
**Galloway**
167:6
**Gamma**
13:24
**Garth**
40:25
**gathered**

185:22
**gauges**
70:15
**gel**
71:18 72:13
**gender**
82:1
**general**
8:5 11:10 45:16
   165:18 171:12
   179:9
**generally**
10:23 93:23
**generate**
219:13
**generated**
141:20
**generating**
141:24
**getting**
8:25 9:1 17:17,17
   18:5,7 127:11
   141:21 161:8 169:2
   171:18 187:4
   214:17 216:8 218:6
**give**
6:21 12:25 79:21
   105:12 137:25
   141:5 147:10 148:7
   158:3 168:22,23
   169:11,18 170:12
   170:25 171:6
   182:18 189:12
   190:13,18 192:13
   192:21 199:20
   205:1 209:4,14
**given**
16:13 71:12 80:14
   89:18 153:7 155:9
   169:13 193:19
   199:5
**giving**
170:13
**glaring**
91:18
**glaringly**

54:21 215:24
**go**
9:8 16:15 22:9 23:2,4
   36:10,15,21 53:19
   56:24 57:2 68:24
   84:19 93:24 94:3,12
   103:10 115:3 119:7
   124:19 135:5,6
   139:9 159:6,24
   160:21 172:17
   182:5,22 192:11,19
   197:23 201:20,20
   204:14 208:8 210:4
   210:20,22 211:7,11
   212:25 214:15,19
   215:17 219:9
**goes**
89:9 151:15 205:18
   218:19 219:2
**going**
10:23 15:25 16:1,10
   16:14 19:7 21:21
   32:14 42:18 54:4,11
   61:6 82:13,20,23
   83:21 84:1,5,6 87:9
   93:9 94:17 103:7
   113:5 122:2 123:3
   124:9 126:15
   129:25 143:2 144:3
   144:10,11 153:20
   154:11 158:8 160:2
   167:2 171:23
   175:15 182:7 184:1
   188:18 189:5 190:9
   193:13,23 196:11
   196:18 197:24
   198:3,16,19 205:24
   209:12 210:3,9,11
   211:15 212:7
   214:21 215:23
   218:3 221:15
**good**
6:11,13 7:17 35:22
   54:6 91:11 151:16
   158:14 193:17
   202:19 204:11,12

206:11 215:18
**gotcha**
36:21 198:6
**gotten**
33:8 50:25 70:22
   88:25 137:4
**gradually**
8:25
**grail**
195:21
**grant**
85:4
**granted**
85:11 100:10 125:2
**gratifying**
200:24 201:4
**gray**
146:23
**great**
15:22 53:23 174:2
**group**
9:14 14:4,5 17:16
   18:9 182:8 208:14
**guess**
19:1 59:1 66:22 67:5
   67:7 73:4 78:9 91:1
   100:20 101:1,5,6,24
   101:25 102:10
   109:8 127:24
   141:19 148:6,18
   151:6 157:22,23
   179:10,15 184:20
**guessing**
67:5 76:7 85:7 95:8
   100:24 127:13
   157:22 179:13
   185:6
**guesstimating**
171:13
**guy**
191:21
**guys**
14:22 110:10 158:4
   191:10
**gyms**
202:11



**G1**
169:21

**H**

**half**
10:1 28:12,15 86:24
114:6 122:13,15,21
127:14 148:1
165:24 170:18
173:19
**Hall**
2:12 5:15
**Halpern**
2:4 3:4 5:23,23 10:12
10:17 11:2,22 16:5
20:3,17,25 21:4,8
21:11,14,20,23 22:8
23:10 24:24 26:18
30:15,25 31:11
33:17 34:2,9,16,25
35:10 37:17 38:6
39:20 43:9 44:1,14
45:13,25 46:8,21
47:11,18 48:2,8
49:6 50:5 52:16,19
53:11 54:15 56:20
57:21 59:4,12 60:12
61:25 62:13 63:11
63:14,20 64:10
65:17 66:1,6,18,21
69:19 71:7 72:22
73:18 75:19 76:5,12
77:8,17 78:14,25
80:5,23 81:8,18
82:6,18 84:9,25
85:17,20 86:17 87:5
87:9 88:21 92:16,23
93:9 95:6 96:2,22
97:3 98:15 99:8,25
100:18 101:22
102:8,15 103:2
104:17 105:23
107:11 108:8 109:2
110:9,13,18,23
111:8 112:2 117:1
117:11 118:18

119:3 120:4,16
121:1 122:2,11
124:5,13 125:8
129:6 130:3,21,25
131:3,9 134:7,10
136:15,20,25 137:6
137:22 138:7,21
140:2,5,25 155:2,20
158:6 162:9,17
169:13 173:22
174:11,18,24 175:5
175:11,15 176:1,11
176:16,19,25
179:22 180:18
181:3,18 184:1,17
185:2,13 186:1,18
187:18 191:15,19
203:23 206:24
207:2 214:2,14
215:5,21 219:23
220:25 221:7
**hand**
34:19 99:19
**handful**
165:14
**handle**
162:16
**handles**
187:13 203:7
**hands**
200:23
**hang**
59:24
**happen**
22:19 84:5 164:16
196:2,2
**happened**
17:24 29:12 55:7
100:20 113:24
164:11 171:16,17
172:21 175:6 205:7
205:21,22,23
221:21,21 222:7
**happening**
95:14 165:6
**happiness**

210:10
**happy**
151:17 173:10
**hard**
68:13 75:10 76:20
79:10,12 90:23
97:19 128:18,19
169:17 192:15,17
199:15 209:3
**hardship**
165:13
**harming**
155:24 156:11
**Harvard**
218:1 220:7
**hate**
148:5,17
**hated**
169:22
**haven**
151:9
**Hawaii**
36:9
**Hawaiian**
24:9
**head**
100:25 166:7 167:7
**heading**
137:9
**health**
1:11,11 5:7,8,9 7:18
8:3,5,7,21,22 48:1
49:24 50:3,11,14
90:24 111:25
112:25 113:12
182:7 184:12
200:21 202:24
208:14 212:23,24
212:24 213:1
215:20 216:4,5,7
219:18,21 220:1,11
220:14 221:3
**healthy**
47:21,24
**HEALTH-PENRO...**
1:11

**hear**
138:4
**heard**
5:9 16:23 17:11
33:21 88:25 89:1
206:13 221:15
**heart**
213:3
**heated**
168:20 170:1 189:4
189:18
**Heath**
2:12 5:15
**height**
44:4
**held**
137:12 204:24 205:4
**help**
148:7 170:24 174:9
201:25 218:8
**helped**
145:3
**helpful**
170:19
**hey**
218:15 221:15
**Hi**
128:22
**high**
72:4,14 73:11 167:20
205:4 206:10
**higher**
71:18 73:16,22 74:3
74:4,5
**highly**
59:3,11
**high-quality**
20:1
**hire**
16:21
**hired**
11:5 30:1 31:25
143:3
**hiring**
74:18
**history**



9:5 131:14
**hit**
22:18,19
**hobby**
198:12
**Hold**
214:15
**home**
68:24 146:12 147:8
**hometown**
197:14,21
**honest**
6:23 90:4 92:11
96:12 138:18 146:5
183:24
**Honestly**
213:18
**honesty**
206:6
**honor**
160:17
**hope**
25:16
**hopefully**
25:15
**hoping**
25:11
**Hornick**
42:10
**hospital**
12:21,23,23,24 13:14
13:20 14:2,7 15:6
16:21 31:18 38:23
40:11 83:16
**hospitals**
77:20 144:14
**hottest**
197:19
**hour**
1:17 55:4,14 70:22
72:2 170:18
**hourly**
69:15
**hours**
68:6,9,13,18,18 69:3
69:16,22 74:8,13

75:3,4,7,9,13,18,22
75:23,23 76:1 77:2
77:4,7,15 79:7
97:14,21 98:4
200:16
**HTN**
134:16,20
**huge**
69:2,8
**hundred**
124:16 195:16 196:7
**hurt**
190:4 204:25
**husband**
35:7,8,13
**hypertension**
7:22,24 134:21
135:20
**hypothetical**
67:4

_____
        **I**
_____

**ICU**
37:15
**idea**
37:10 85:3,10 162:7
173:20
**ideation**
59:17
**identical**
74:1
**identification**
22:2 23:24 25:19
52:15 55:20 60:2
61:12 109:12 110:4
121:18 128:14
137:2 145:9 172:3
**identified**
219:23
**identify**
215:21
**identity**
192:16
**ignore**
121:10
**Ih@rmlawyers.com**

2:7
**II**
1:6
**illness**
47:25 101:8 102:2
131:14
**immediately**
222:3
**impact**
74:25
**impacted**
13:5 31:5
**impair**
7:14 41:8
**impaired**
41:9
**impelled**
100:16
**implies**
57:17
**important**
6:22 41:20 45:20,20
188:24 189:1
205:13
**impressions**
49:5,14
**improper**
101:21
**improve**
201:4 202:18
**improved**
201:12
**inaccurate**
7:8 89:18 91:13,23
92:14 93:7 94:25
95:25 96:7 208:9
211:14
**incident**
205:14
**included**
97:17 157:15 158:4
**includes**
112:20
**including**
33:15 162:12
**income**

12:12 32:8 157:8,16
161:18 174:7,17
175:4,25 176:7,13
186:14,24
**incomplete**
7:8
**incorrect**
54:21
**increases**
78:18
**increasing**
11:12
**incredible**
146:16
**independent**
10:25 142:20 163:21
193:6
**independently**
104:15,24
**India**
36:9 151:20 202:1
**infect**
39:7
**infected**
39:12
**influence**
7:12
**inform**
7:9
**information**
9:11 54:3 89:18
96:13 137:10 148:7
157:12 185:23
204:14,15 211:1
213:12
**initial**
3:6 132:1
**initially**
124:15,23 128:24
217:25
**Initiative**
111:25
**Initiatives**
1:11 5:7
**instructed**
67:25 159:5



**instruction**
116:21
**intake**
86:23 88:24 89:9,12
92:1 207:11 208:15
209:16 211:24
**integrity**
86:2 206:6,11
**intense**
47:9,16
**intention**
49:3
**intentionally**
89:18 140:6
**interactions**
33:25
**interest**
13:9 15:20 24:17
28:23 93:25 169:3
203:5 210:8,9
**interested**
13:10 24:23 213:21
224:11
**internal**
37:14 100:16 204:24
206:14 216:17
217:4
**interpret**
94:15
**interpreted**
83:5 116:20 213:2
**interrogated**
224:6
**interrogation**
224:9
**interrogatory**
10:13,18 23:11 158:7
191:16
**interview**
41:21,23 42:1,4,7,13
42:20,22 43:3 96:16
183:13 184:20,22
184:24 185:4
193:17
**interviewed**
42:9 96:10 154:20

184:4
**interviewing**
41:16
**introduced**
48:9
**introductory**
211:1
**introspective**
202:17
**inventory**
213:7
**invested**
187:21
**investigation**
85:23
**investing**
13:25 14:3
**investors**
14:6
**invited**
14:8
**involved**
38:3 51:12 71:23
85:4 173:25 217:25
**involving**
119:21
**IN-PERSON**
1:4 2:1
**Iris**
2:4 5:23
**ironed**
21:17
**isolation**
39:17
**issue**
49:24 50:3,11,15
52:11 99:19 124:15
124:17 161:10,15
177:21,24 184:12
210:17 220:11,14
221:3
**issues**
8:9,10 14:1 45:17
46:20 47:5 53:6
54:11,12,14 55:2
118:22 120:1

148:21 160:3,11
169:23 171:18
205:6 206:1 216:4
**it'll**
16:15

———————————
**J**
———————————

**James**
169:6
**Jamie**
14:22
**January**
96:17 143:4,7 224:12
**jargon**
183:9
**Jason**
79:25
**Jeff**
4:9,15 80:3 102:6
128:22 129:15
139:24 145:7
147:21 148:20
169:6
**jewelry**
197:23
**Jim**
168:23 170:2
**job**
9:19 10:24 11:1,9,10
20:11,16 22:12,16
23:3 25:16 26:23
28:4 29:4 37:19
68:24 70:25 97:18
104:13,21,23 105:1
175:3 176:9,13
180:9 181:12,22,24
184:9 192:16,21
193:2,8,20
**jobs**
22:12 23:4,6 177:24
178:7 191:10,13
193:3,4,13 198:11
**join**
188:13
**joined**
41:3

**joining**
6:3
**Journe**
196:6,6
**judge**
203:20
**Judgement**
4:2,4
**judgment**
109:15 110:8
**Julie**
2:17 5:17
**July**
20:16 32:10,11 33:2
33:5,7 82:24 83:13
84:5,6,22,23
**jumps**
95:2
**June**
18:19 20:8 92:3
**junior**
25:8 179:2,5 191:1,3
191:18
**Jury**
3:19
**justify**
78:17

———————————
**K**
———————————

**K**
2:11
**Kaiser**
9:13,18 28:2,5,9,11
**Kathpal**
159:5,17,19 160:5,10
160:21 162:15,19
**KC**
13:9
**keep**
164:18 171:23 182:2
182:11 183:7
200:18 218:20
219:2
**kept**
75:21 91:1,6,6 161:6
**key**



170:15

**Keys**
36:11

**kids**
35:21 201:18

**Killian**
2:12 5:15

**kind**
7:21 16:8 25:12 40:2
76:1 94:15 101:8
155:24 159:4
182:24 188:12
205:9 207:18 209:6
210:13,23 211:1,14
212:12 216:9 217:2

**kinds**
40:7,13 105:7 166:2
201:21

**Kkudos**
147:10

**knew**
34:14 107:8 108:5
142:25 144:20
203:8

**Knife**
13:24

**know**
10:20 16:4,6,18,22
18:24 20:8 21:6,18
24:8 28:6 29:12
30:1 31:4,15,23
32:16 33:5 34:4,7
34:10,19,20,24 36:4
39:9,13,25 41:9
43:19 44:2 50:24
51:9,14 53:17 55:6
56:4,7 59:13,16
61:5 62:21 64:14
66:11 67:4 68:11,17
68:19,20 69:1 70:24
70:24 71:1 72:23
73:9,14 74:15 75:6
75:11,13,14,20,21
76:6,7,15,17 77:10
78:4 79:11,11,15,20
82:19,25 83:16,21

83:22 84:16 85:9
86:21 89:20 90:5
93:1 95:7,14 97:5
98:6,24,25 100:9,22
100:25 101:12,17
106:22 107:5,13,15
108:10,11,23 109:8
111:6 113:4 114:19
119:9 122:15,20,25
124:3 125:9 126:8
126:10,16,25
127:10,13,23,25,25
128:5,7,7,25 135:10
137:5,8 139:15
140:21 141:10,18
143:14,25 145:13
146:17 147:6,12,13
147:15 149:8,20
152:2 154:1,19
155:8 156:18
157:15 158:4
161:13 162:1
163:16 166:10,10
167:21 172:21
173:2 174:16
175:24 176:6
177:25 178:14
179:3,6,10 180:7,22
183:4,8 185:19
189:21,22 190:7
192:9,22 194:20
195:16 197:11
201:23,25 202:1,22
204:2 206:7,9
207:21 209:6
210:18 211:1 213:4
214:1 216:23 221:9
221:13 222:4

**knowingly**
39:13

**knowledgeable**
203:10

**known**
148:12

**knows**
26:21 68:12

**Koval**
48:19 60:7 123:10

**Kremmling**
224:18

---

**L**

**L**
2:11

**LA**
197:17

**ladies**
193:18

**landscaping**
147:18

**language**
102:2 123:8,11,14
130:12 144:17,24
145:1 157:2 184:2
185:15 222:16

**large**
190:16

**lasted**
76:10

**late**
156:18

**law**
17:6 142:19

**Lawrence**
2:6

**lawsuit**
17:19 51:13 180:14
205:2

**lawyer**
142:19 143:10,11
144:13,19,24
157:12 175:9,14
177:14

**lawyers**
18:3,3,4 142:20
143:3 179:20 183:9

**lax**
12:21

**lead**
19:2

**leadership**
13:14 205:16

**leading**
63:25 68:8

**learn**
50:7 94:3

**learned**
41:11

**learning**
100:4

**Leasing**
12:12 13:1,2,9,11
14:8,15,17,23 15:20
16:25 18:9

**leave**
3:24 4:7 8:19,20
14:20 20:9,14 32:16
33:6 43:24 44:3,12
50:14 52:9 54:24
56:12,15 57:6,9
60:10,10,16,17,23
60:24 61:1,4,6 62:5
62:6,17,19,19,23
63:1,16,25 65:16,24
67:10,12,17,20 68:2
68:8 80:16 81:21
82:5 85:5 93:13,15
94:6 98:11 99:1
100:9,10,12 103:9
104:2 113:20
114:12 115:7,14,25
116:8,25 117:10
118:6,11,21 119:14
119:20,21 120:3,13
120:21 121:10,21
121:22 122:1,9,10
123:3,18,23 125:2
125:14,14,20,20
126:5,7,13,24 127:7
127:17 128:5
132:22,23 133:5,6
133:10,12,16,20,23
133:25 140:18
141:6,16 144:17,23
157:3 194:1

**leaves**
98:11

**leave-related**


MAGNA
LEGAL SERVICES

125:24 126:3 127:8

**leaving**
29:16
**left**
19:20 33:22 168:15
168:17,18 169:21
170:8 200:9
**legal**
5:18,19 40:19 76:25
80:17 114:17,25
115:19 121:12,13
183:9
**letter**
4:12 22:16 50:13
62:5 67:20 68:1
79:18 82:12 85:7
98:25 102:12
138:14,23 144:21
144:23 145:3
179:20,23 180:1,3
180:13 189:5,16
**letters**
99:15 189:17
**letting**
124:3 155:8
**let's**
9:8 18:9 48:16 56:2
56:24 57:2 84:19
87:25 95:3 106:5
115:3 119:7 134:4
137:13 169:16,18
171:11,23 180:17
186:4,5 215:17
**level**
22:25 71:22,22 74:2
75:3 78:23 179:2
205:4 206:10
**Lewis**
142:5,12,17 143:12
143:22 144:12,19
144:25 174:23
175:10
**liability**
101:11,15
**license**
94:18,18

**lie**
216:6
**life**
15:23,24 16:11,16
62:7 76:20 98:4
197:2 212:3,4
**lifestyle**
217:7,8
**lifetime**
209:24
**liked**
13:11 163:23 197:15
**limit**
77:4
**limited**
11:6,19 31:3 37:1
**Lindsay**
2:11 6:2
**line**
103:8 131:14 132:11
134:12
**link**
128:23
**lion's**
165:20
**list**
10:9,16 23:6 191:9
197:24
**listing**
146:12
**lists**
53:6
**literally**
193:2
**little**
29:10 83:9 84:18
94:22 137:9 165:10
174:25 183:2
186:16 187:7
205:18
**live**
192:14,20 202:23
**lived**
192:23
**living**
187:1

**LLC**
2:5 27:3,8,10,12,14
27:19,25 28:9 32:5
32:5
**Lmcmanus@hallr...**
2:14
**loan**
115:24 116:7 129:20
129:25 130:16
**located**
5:15 28:17
**locations**
29:15
**locum**
9:6 194:10
**locums**
9:14 11:4 27:3,17,21
27:24 28:4 194:12
200:9
**log-in**
88:8
**loner**
159:21
**long**
7:23 31:4 39:19,20
74:7,13 76:10,10
77:1 97:14,21 98:4
147:2 158:13
179:14 202:23
**longer**
12:22 16:12,14 76:10
83:9 179:16 202:23
221:22
**look**
10:10 16:20 17:16
18:9,14 23:21,22
25:17,23 27:19 32:3
48:16 52:12 55:17
56:2 61:9 86:15,18
95:3 102:23 105:12
106:5 109:9 110:1
111:16 121:15
128:12,17 130:19
131:13 132:5 134:4
136:13 139:8
141:18 145:5,16,23

148:19 180:16
188:18 192:25
193:13 204:17
208:7 218:8
**looked**
56:1 127:3 128:2
176:10 178:8
188:13 191:14
193:1 195:3 208:2
**looking**
22:12 25:8,9 67:2
102:24 137:8
142:10 146:4 147:6
147:10 178:8,17,18
178:25 179:1,4
180:9,10 188:4,14
188:18 190:21,24
190:25,25 191:2,18
198:1 202:17 208:8
213:12 215:22
218:3,4
**looks**
26:5 85:8 89:16
122:14,22 129:18
131:8 142:15
146:12 147:23
149:12 152:14
**losing**
74:23 97:18
**lost**
22:16 210:8
**lot**
39:16,23 40:10 53:9
54:2 67:3 68:22,24
72:1,7,8 73:3,5,7,8
122:19 147:4
155:23 156:10
182:5,11 183:16
192:15 193:22
195:5 202:14,19
208:17,18 209:20
212:9
**loud**
128:20
**love**
193:10 197:12



Page 20

**loved**
210:9
**loves**
147:9
**low**
195:15
**lowest**
195:23
**lung**
169:25
**Lyman**
2:12 5:15

**M**

**M**
224:2,16
**machine**
13:6,17 15:5,23,25
16:11,14
**magazines**
198:2
**Magna**
5:18,19 21:4,5
**magnate**
147:3
**mail**
79:18
**main**
13:3,23 40:9 58:13
150:10,23 155:14
**major**
96:4 160:4,5,11
161:10,14 168:24
170:7 171:13,13
**majority**
164:20,21 166:7
**makers**
80:3
**making**
65:2 153:21 155:5
185:20 186:3 187:2
205:11
**management**
39:2 92:2 218:1
**managing**
38:12 128:9

**manifested**
8:16
**manner**
167:11
**manufactures**
16:11
**mark**
2:11 6:1 93:4 140:9
**marked**
18:12 22:1 23:23
25:18 52:13,14
55:19 60:1 61:11
85:15 109:11 110:3
121:17 128:13
130:24 136:14
137:1 142:4 145:8
172:2,6 224:9
**market**
195:15 198:1
**Marksabey@hallr...**
2:14
**Matt**
168:13,14 169:24
**matter**
5:6 168:1
**matters**
11:9 112:25 113:8,9
224:5
**Mayo**
219:10,13,24 220:1
**MB&F**
195:10,10
**McDevitt**
96:11 166:9
**McManus**
2:11 6:2 138:2
**MD**
1:6,8,15 2:18 3:2
53:2 190:14 224:4
**mean**
8:7,19 21:14 31:13
31:16 34:3 35:19
36:9 37:7,20 46:15
58:12 60:17 66:10
68:23 70:25 72:2
73:6,9 76:16 77:19

78:4 79:1 85:13
86:11 91:4,15 94:16
95:1,17 107:13
108:23 113:4,9
115:18 116:20
122:19,20 129:15
134:18 137:17
139:3,5 140:5 146:5
148:12 150:15
153:11 154:8
157:12 158:14,17
163:5,15 166:2
169:13 174:13
176:21 177:9,16
182:3,18 183:24
184:3,10 188:3
197:1 198:12,24
199:2,10 200:22
202:8,8,16 203:23
209:2,8 211:17,18
212:1 215:19 221:5
**meaning**
72:1 165:8 210:9
**means**
15:24 75:15 76:15
93:23 94:11 177:25
187:15 198:4,4
216:6 222:16
**meant**
115:23 116:6,19
208:23 209:16
213:8
**measure**
71:2
**mechanical**
195:6
**mechanically**
196:1
**mediating**
169:1
**medical**
3:24 9:14 18:24 20:9
20:14 33:5 37:13
38:9,9,17 44:3
56:14,15 57:6,8,9
62:17,18,23 63:1

66:12 68:8 76:19,24
93:14 94:6 98:11
103:9 104:2,16,24
113:20 114:12,15
115:6,14,25 116:8
116:25 117:10
118:21 119:14,19
119:20,21,25 120:3
120:13,21 121:9
122:1,9,10 123:19
123:23 124:3
125:14 126:5 131:5
144:23 153:10
168:24 170:2 203:1
204:20 219:10
**Medicare**
83:2,10,18 84:1
**medication**
7:13 135:20,23
217:12
**medication-wise**
8:1
**medicine**
20:1 37:15 94:2,4
165:9 193:4 204:24
206:14 216:17
217:4,7,8
**meditation**
218:21
**meet**
19:11,14,16 34:18
77:23 182:8
**meeting**
16:7,9 17:2,8,10,14
92:3,6 149:16,23,24
149:25,25 150:5
160:9,14,15 193:18
204:3 219:12 220:2
**member**
160:20
**Memorial**
31:18
**memory**
7:2 23:8,13 122:21
148:21
**mental**



7:17 8:7 47:10,16
47:25 48:1 49:24
50:3,14 52:11 101:8
102:2,2 112:25
184:12 212:23
219:18,21,25
220:11,14 221:3
**mention**
65:7 99:20
**mentioned**
38:4 63:23 72:9
99:10 101:16
208:11,17
**menu**
183:15
**message**
18:18 24:1,11,25
25:4 107:3,6 108:20
113:25 114:3 126:7
130:4,5 138:10
145:6 148:19
149:13,14 159:17
174:7,15 191:20
210:15
**messages**
3:8 4:8,14 125:24
146:2 198:16,17,19
198:22 199:9
**messenger**
160:2
**met**
19:13 34:3,8,15,24
131:21,25 156:4
159:11 193:17
217:17 219:5 220:3
**method**
74:19
**metrics**
77:20
**Michael**
25:22,25 26:4 29:1
53:2 149:16,20
150:12,21,22 151:1
188:12
**middle**
103:8 172:25

**Mike**
26:19 188:16
**million**
146:13 151:19 187:9
187:16
**mind**
41:21,24 94:11
170:16 171:5
200:18
**mindfulness**
202:3
**mine**
24:5 26:20 145:14
178:25
**minute**
169:10
**minutes**
71:19 152:3,7,14
170:25 171:7,22
208:7
**misleading**
7:9
**misrepresent**
49:13
**misrepresentation**
49:4
**missed**
62:20
**missing**
122:18 124:11 125:7
136:20,22
**misspoke**
180:5
**mistake**
205:5
**mistaken**
157:17
**mistranscription**
94:19
**mitigate**
179:19
**MLC**
13:16
**model**
19:25 55:7,9
**moderately**

58:3,19,25 59:10
132:11
**MOHAMEDBHAI**
2:5
**moment**
51:6
**money**
33:16
**Monica**
26:1
**monitored**
103:12,19
**monitoring**
104:9 126:2,2,12,21
**Monroe**
3:20 14:14 15:12,17
17:3 49:23,23 51:23
51:23 52:3 60:7
72:25 73:8,11,25
74:10,18 75:21 78:5
102:1 158:11 159:6
159:14,21 160:20
161:18,25 162:15
162:18,22,24 163:3
163:23 164:1,25
165:7 166:18 167:9
167:15,25 168:5,8
169:22 170:9
171:15,18 181:22
183:21 184:9
188:24 189:4,18,25
189:25 220:16,24
221:9,24,24
**Monroe's**
73:17 166:13 168:11
189:3
**month**
30:2,5 209:18
**months**
8:13,13 28:10 32:14
45:5,7 47:3 54:24
68:8 94:4 113:22
115:22 116:5,25
117:9,24 118:2
132:23 133:6,12,17
133:20,22,25

141:16,17,24
158:18,19 209:20
212:12
**morning**
6:11,13 129:17
153:15,25
**motion**
4:1,4 109:15 110:7
**motivated**
102:7
**motivation**
100:23 101:2,20
102:11 181:1,11
184:8,11
**Mountain**
1:17 5:1 19:2 223:2
**move**
85:15 137:13 192:7
193:21 194:1
**moved**
151:13
**movement**
197:11
**moves**
6:21
**MRI**
204:16,16,17
**multileaf**
13:16
**multiple**
162:12 169:7
**multitude**
74:16 159:2
**mutually**
19:24
**Myer**
54:10 69:11,22 96:15
**Myers**
3:16 53:2
**Myer's**
54:13 58:1 68:7
97:12
**M.D**
27:9 32:5

---
**N**
---


MAGNA
LEGAL SERVICES

**N**
3:1 5:2
**name**
19:1 24:7,9 27:9 53:2
79:21 95:23 159:12
188:25 189:7
190:13 191:13
205:20
**named**
24:2 168:5
**names**
51:8,9,11,14 166:1
168:23 169:8,14,18
171:4 188:1 189:12
190:19 191:9,14
**narrative**
100:16
**nationality**
82:1
**nausea**
71:19
**Near**
28:22
**nearly**
178:3
**necessary**
112:24 203:20
**neck**
166:7 167:7
**need**
7:2 17:16 18:6 30:1
47:9,16 48:1 50:11
51:14 62:16 63:1
67:20 68:1 80:24
85:16 92:18 99:1
114:1 124:19,25
125:19 128:2 129:1
133:12 148:23
149:3 160:16
170:24 173:9 199:8
211:4 218:22,24
219:2
**needed**
14:19 30:21 38:22
44:25 45:7 46:5
50:14 73:8 115:7

124:23 139:11
213:22
**needing**
38:8 115:17
**needle**
71:16
**needles**
72:13
**needs**
3:20 24:19 47:22
222:10
**negative**
112:7
**negotiations**
118:10,15
**neighbor**
151:13
**Neither**
158:22
**nervous**
50:9 51:1,24 101:18
220:16 221:12,16
221:25
**network**
28:5
**neuralgias**
72:11
**neurologists**
166:6
**neuromas**
72:10
**neurotologists**
166:5
**neutral**
123:11,14
**never**
15:21 17:11 19:13,15
19:15,16 31:4 44:24
50:2 55:1 62:6,18
62:19,20 82:10 86:8
86:12 94:8,10 98:8
99:5,10,20,23 100:5
116:11 134:25
136:2 156:17 165:4
165:6 189:5 192:23
200:17 201:17

203:4,4,5 204:14
207:9,13,15
**new**
18:1 24:12 31:2,22
55:7 74:18,20 76:20
94:3 103:11,15
107:9,13,21 108:2,6
108:11,15,16,21,25
109:7 116:11,17,23
117:8 118:16 150:1
150:1 159:4 161:3,4
188:17,18
**news**
203:4,4
**newspaper**
203:5
**Nicholls**
40:25
**night**
152:16,17 154:4,10
154:13 155:1,10,17
155:22 204:8,10
**nine**
12:16 165:14,16,16
171:9,13 196:22
**nomenclature**
159:12
**nonprofit**
9:16
**normal**
93:25
**Notary**
1:18 224:3,17
**note**
60:22 92:2 153:10
**notes**
92:1 96:16 224:8
**notice**
60:10,16,24,25 62:16
**noticed**
91:12,23 177:3
**notification**
128:1
**notifications**
127:3
**notified**

80:13 123:2
**November**
10:5
**nuisance**
19:20
**number**
19:20 31:3 52:21
68:13 70:15 71:3
75:18 77:4 88:17
95:14,22 137:4,11
138:1 164:15
167:20 169:24
176:17 180:19
200:4,5
**numbered**
21:3
**numbers**
70:16 72:15 87:22
136:17 147:20
149:10 176:23
177:1
**nurse**
205:6,19 209:9

---

**O**

**O**
5:2
**oath**
6:16
**object**
11:2,22 16:5 20:3
24:24 26:18 30:15
30:25 31:11 33:17
34:2,9,16,25 35:10
37:17 38:6 43:9
44:1,14 45:13,25
46:8,21 47:11,18
48:2 49:6 50:5
53:11 54:15 56:20
57:21 59:4,12 60:12
61:25 62:13 63:11
63:14,20 64:10
65:17 66:6,18,21
69:19 72:22 73:18
75:19 76:5,12 77:8
77:17 78:14,25 80:5



81:18 82:6,18 84:9
84:25 87:10 88:21
92:16 93:9 95:6
96:2,22 97:3,7
98:15 99:8,25
100:18 101:22
102:8 104:17
105:23 107:11
108:8 109:2 110:23
111:8 117:1,11
118:18 119:3 120:4
120:16 122:2 125:8
138:21 140:25
155:2,20 162:9,17
173:22 174:11,18
175:5 176:1,11
179:22 181:18
184:1,17 185:13
186:1,18 187:18
215:5 220:25 221:7

**objecting**
110:13,19

**objection**
62:14 66:1 121:1
122:11

**objective**
71:2

**obligation**
105:20 115:24 116:7

**obtain**
120:12,20 122:9
125:14

**obvious**
127:15

**obviously**
206:18 215:16
220:15

**Occupational**
216:3

**occurred**
8:8

**occurrence**
165:7

**offer**
22:7 27:2 79:16
80:15 99:14 100:5

100:14 181:24
193:14,16,19

**offered**
20:11,15 135:19
176:12 181:24

**offering**
218:11

**offers**
194:3,6,9

**office**
38:25 82:14 131:6
135:1 172:25 173:8
174:8 206:17,20,21

**officers**
105:20

**Officially**
220:1

**oh**
31:21 36:21 52:19
87:25 137:22
145:12,18 150:14
170:7 177:8

**okay**
7:12,23 8:2,10,18 9:2
9:4,18,24 10:6,8,14
10:22,22 11:12 12:2
12:11,18 13:5 15:9
15:16 16:24 17:22
18:11,16,23 19:7,17
19:22 20:7,15 21:8
21:11,23 22:4,22,24
23:16,21 24:1,11,16
25:5,13 26:3,7
27:20,23 28:8,22
29:6,15,23 31:8
32:4,9,23 33:1,9,13
34:23 35:3,18 36:2
36:6,10,21 38:24
39:3,8,18 40:1,7,12
41:1,4,7,25 42:5,23
43:4,4,14,17,18,20
43:22 45:2,19 46:13
46:18 47:4 49:3,22
51:11,21,25 52:20
53:5,21,24 54:7,22
55:17 56:2,9,24

57:5,16 58:1,6,9,15
59:10,19,23 60:4,25
61:3,4,7,9 63:3,23
64:7,16,25 65:5
66:15 67:6,13,24
68:4,6,21 69:7,17
70:1,21 71:9 72:3
72:16,19 73:3 74:7
75:2,25 76:22,25
77:14 78:9 79:6,9
79:15 80:8,9,11
81:13,21 82:10 84:4
84:13 85:3,14,20
87:18,23,23,24 88:2
88:10 89:3,6,8,11
89:17,21 90:1,16
91:7,11,22,25 92:10
92:11 93:5,18 94:14
94:21 95:3,10,17,21
95:24 96:10 97:9
98:1,19,21 99:20
100:4 102:13,23
103:23 104:8,13
105:9 106:2,5,17,24
107:2,8,18,25 108:5
109:9 110:1 111:4
111:13 112:4,12,19
112:21 113:16
114:5,14 115:3,16
115:21 116:10
118:24 119:7,7,12
120:9 121:15,21
122:23 123:17
124:2 125:1,6,12,18
125:23 126:1,6
127:6,21 128:9
129:2 130:19 131:3
131:11 132:2,5,13
132:21 133:13,21
134:10,22 135:2,5,8
135:19,24 136:25
137:13,21,22,24
138:7,9 139:8
141:15 142:3,8,11
142:16,22 143:8,20
144:4,16 145:5,15

145:23 146:9,11,24
146:25 147:7,16,19
148:15 149:7,10,14
149:19,22 150:3,9
151:3,7,18,23 152:1
152:11,21 153:3,14
154:1,2,12,17
155:12,15 156:13
156:16,19 157:1,4,8
157:21,23 158:1,24
159:18 163:9
164:13 166:16,16
166:20 168:3,25
169:5 171:20,25
172:17 174:2,6
177:3 178:4 180:16
182:1,17 183:19
184:7 186:14 187:3
187:8,15,23 188:21
189:10,19,23 190:1
190:6,11,20 191:5
191:12 192:7
193:20 195:4,8,11
195:17,22 196:5,9
196:14,20,25
198:10,19 199:1,5,9
199:17,22 200:1,7
201:3,11,15,19
203:12,14,18 204:4
205:1,25 206:16
207:12,16 211:23
212:10,20,25
214:13 216:12,15
217:6,9,23 218:23
219:4,8,16 222:14
222:21

**old**
13:12 26:1 188:16
194:17

**older**
179:11,13

**Oliver**
51:16 52:2,5 221:14

**Omizo**
24:8,9 188:5,8,9

**once**


MAGNA
LEGAL SERVICES

93:1 118:11 119:9
142:25 180:22
183:7 217:15
**oncologist**
18:25 19:2 24:6
72:24 150:23
168:24 169:21
170:2
**oncologists**
14:13 15:3 37:21
72:21 75:17 148:2
150:15,21
**oncology**
9:20,22 30:14 31:25
142:18 163:2
**ones**
12:25 40:10 73:22
99:16 128:8 140:10
163:2 165:19
167:10 170:17
190:21 191:18
**one-year**
25:10
**ongoing**
8:8,12 32:12
**online**
173:1,1 182:10
213:20 214:19
**open**
11:25 13:21
**opened**
15:1,7 31:9
**opinion**
37:24,25 47:8 64:24
78:11 97:13,25 98:2
98:4 206:11 213:9
**opinions**
219:7
**opportunities**
3:14 22:12
**opportunity**
11:24 12:7
**opposed**
59:3,11
**opposite**
159:20

**option**
140:24
**options**
80:17 144:7 213:15
**order**
122:9 159:13 208:15
**ordered**
203:20
**organization**
33:21 84:2
**original**
18:2
**other's**
163:19
**outcome**
29:6
**Outlive**
202:20
**outlying**
188:19
**outside**
16:22
**outspoken**
210:3
**overall**
8:22,25 89:5 90:14
**overlap**
20:22 21:13
**overwhelming**
132:17
**owned**
15:18
**ownership**
12:15 14:1 15:8
**owning**
15:1
**owns**
190:15

___

**P**

___

**P**
5:2
**pace**
72:5,18
**page**
3:2,8,10,12,16,18,20

3:22 4:1,3,6,8,11,14
4:16 53:5 56:4,5,6,8
56:9 58:2 86:21
87:18,24,25 89:7,7
89:9,10 92:2,22
95:3,22,24 96:1
102:25 106:18
132:6,7,8 134:4,8
172:10,18 180:17
182:22 184:25
211:20 212:17
215:22
**pages**
86:22 88:18 90:3
91:25 92:15,18,21
93:2,8 210:22
211:11
**paid**
17:17,17 147:13
161:1,8 196:16
**painted**
216:10
**Palm**
146:13 147:5
**pancreatic**
105:15
**paper**
84:3 177:15
**paperwork**
65:13,22 124:24
**paragraph**
24:14 26:8 27:1 68:5
70:1,2,6,7 80:9 81:8
81:10,13,14 103:1,7
107:2,19 109:6
111:17 112:22
113:17 115:3,16,21
116:10 118:8 119:9
145:16 181:4,7,10
**paragraphs**
56:2 80:24 106:18,25
**pardon**
84:11 111:11,22
142:9 220:12
**part**
14:3,10,13,15 28:21

36:1 44:4 47:21
54:17 55:16 57:3
72:5 73:1 86:22,23
90:12 91:14 108:16
119:8 128:18
129:20 130:1,10,16
141:12,21 203:15
212:3
**participate**
7:15 14:9 15:4
**parties**
5:20 111:4 224:5,11
**partner**
26:1 29:5 35:5,25
37:6 50:13 123:2
140:20 141:8 143:9
149:21 150:4,7,24
160:11 178:8,9,17
178:19 179:2,5
181:12 188:13
**partners**
17:15 191:18
**partnership**
160:13
**partner's**
160:9
**partway**
207:17
**party**
16:15
**part-time**
11:21,24 12:9 23:17
23:19 24:17,23 25:6
26:12,17 93:20
194:7 200:2,8,15,20
201:12,13
**PAS**
144:5
**patient**
37:23 39:9 50:20
51:22 52:4,4,4
66:13 104:15,23
105:4 167:4 169:23
170:4 189:6 204:13
205:12 220:18
221:11,16,18,19,21


MAGNA
LEGAL SERVICES

221:23,25 222:1,2
**patients**
11:8 15:4 30:21
37:21 38:3,10,12,19
39:4,14 46:10 47:3
50:8,16,22 52:2,11
55:8,10 73:25 105:4
105:6 162:22 163:5
163:10,11,13,14,20
163:21 164:21
165:15 167:4,13
170:11 184:14
206:13
**patient's**
105:11
**patient-centric**
20:1
**Paul**
142:5,12,17 143:12
143:21 144:25
175:10
**pause**
169:17
**pay**
80:14 151:14 161:5
**paying**
17:4 187:2
**payment**
17:3 18:5,6,7
**Payments**
141:20
**pays**
73:21
**PC**
142:18
**PCP**
115:22 116:4,12,16
153:20
**PCP's**
117:7
**PEA**
113:19 115:5 116:11
**Peddada**
1:6,8,15 2:18 3:2,9
3:11,12,15,17,20,21
3:22,24 4:6,9,9,11

4:11,15 5:6,6,25 6:6
6:12 27:9 32:5
57:13 80:12 87:22
107:20,22 112:23
113:17 115:4
116:11 118:11
119:12 163:3 207:3
223:1 224:4
**Peddada's**
3:23 118:9
**Peddada-000483**
207:22
**peers**
50:9,17 52:10
**pen**
93:4
**Penrose**
6:2 12:24 13:4 15:17
16:25 29:16 31:10
34:1 39:24 41:18
54:25 61:23 62:11
62:16 63:9 66:4,16
79:17 82:11,17 98:8
99:3 101:10 107:9
108:6,24 115:5,13
115:24 116:6,23
117:8,21 119:20
169:22 181:21,24
183:21 200:9
221:23
**Penrose's**
109:14 110:7
**Penrose-St**
5:9
**people**
16:22 23:3,7 29:10
34:4,19 38:8 39:12
48:4 66:11 86:2
95:15 165:1 171:4
171:15 177:20,24
179:9,10,13 180:2
190:20 191:10
193:12 205:12
**percent**
12:17 72:10,11
124:16 165:16,17

165:20,21 167:12
167:16,17,25,25
168:1,2,4,4,5
187:11 195:15
**percentage**
12:14,17 167:18
**perfectly**
208:25
**perform**
45:5 54:25
**performed**
27:11 29:16 204:19
**period**
44:21 47:6 209:17
**periods**
158:15
**peripherally**
53:8,22
**Permanente**
9:13,18
**permitted**
179:21 180:4
**person**
2:4,5,11,11,17,18
11:4 159:21,22
166:18 171:16
173:24 174:1
194:17 202:17
210:6
**personal**
45:6 199:12
**personally**
206:8
**persons**
100:13
**person's**
205:20
**perused**
54:6
**Peter**
202:20
**Ph**
2:7,13
**phenomenal**
202:21
**Phoenix**

36:8
**phone**
88:8,24 104:3 107:6
127:4 135:1 154:20
156:8,10 184:20,21
198:21 199:23,24
200:4,4,4 208:13
**phones**
199:7
**phonetic**
79:25 136:24
**phrase**
191:2
**phrased**
188:3
**physical**
7:17 47:10,16 219:10
**physician**
4:16 14:1 17:9,15
32:10,19,24 33:2
41:7,11,23 42:1
43:5,15 45:6 51:16
56:13 57:7,19,23
59:20 63:24 64:8,13
64:19 66:20 71:14
74:19 93:23 101:14
104:14,21,24 105:1
105:10 113:19
114:10 115:5,13
116:17,24 117:8
118:16 120:14,22
121:5,11 133:19
135:9,12,25 136:4,7
136:10,12 153:22
154:4,16 155:11,17
156:2 172:7,7
176:19 178:3
188:15 191:25
192:4,12 204:13
206:8 213:21
216:18,25 217:5
219:11 220:10,13
**physicians**
14:14 15:8 41:16,22
70:4,13,19,23,25
182:8 208:14



physician's
45:21 118:20
picture
147:17
piece
13:15,21 84:2 177:15
195:21
Pikaart
168:17 169:20,21
Pilates
202:2
pill
204:25
piqued
192:18
pizza
183:2
place
18:2 75:6 83:8 147:5
159:10 192:23,24
210:15 213:24
224:7
placements
72:12
places
23:7
plaintiff
1:9 2:3 5:25
Plaintiff's
4:1,3
planned
113:21 114:10
plate
73:4,6
Plauth
48:18 56:11 57:4
60:7 107:4,20 108:1
113:20,25 114:9
119:1 123:18
124:14 125:19
126:15
please
5:21 6:5 9:4 47:12
62:25 65:19 100:15
128:25 177:14
207:3 208:6

plus
55:13 69:22 72:10
75:4 200:16
point
15:18 16:18 26:7,16
83:4 95:21 147:25
174:6 189:15 197:2
203:22 208:21
209:10 213:6
pointed
208:25
policy
62:24,25
Porter
15:6
position
25:6 45:3 181:20
positions
22:5
possibilities
26:11
posting
24:12
postings
26:23
potential
14:1 22:15 41:17
potentially
15:4 39:6 101:11
practice
9:21 13:18 30:20
31:3 40:21 41:3
55:9 71:14 74:20,23
77:9 88:13,18 101:9
150:11,24,25 159:6
163:1 164:11,19
165:9 168:5 169:3,4
169:4 179:15
181:11 188:14
189:2,6,13,14 190:4
190:5,9,16,17
192:13 193:19
practices
3:15 26:13 194:11
practicing
19:25 31:1 94:4

148:13 221:22
precautions
39:15
prefer
12:10 167:4
preference
167:14
preferred
166:15
prepared
27:4
prescheduled
56:10 119:14
prescribed
204:25
present
2:16 5:20 131:14
173:17 186:15
199:20 200:10
Presumably
152:24
pretty
39:15 52:22 54:6
72:25 75:22,23
146:1 208:12,19
212:13
previous
41:2 55:2 224:3
previously
17:5 29:2 86:8
pre-introduced
85:18
Price
170:8,14
prices
195:14
pride
204:11
Primarily
29:17,19
primary
41:11 56:13 57:7,18
59:20 165:12 171:9
193:4 204:15
print
146:6

prior
8:13 25:1,3 55:2
88:13 100:4 144:4
153:14
prioritized
215:3
private
50:12 55:9
privileges
119:19
privy
16:23
pro
9:15 17:9
probably
8:1,12 16:16 22:23
33:22,23 37:11
39:11 53:20 64:7
68:12 69:4 74:25
85:19 90:13 97:24
105:6 127:2,11,12
143:7 144:1 147:9
151:4 157:20
162:19,19 164:12
167:24 179:11
194:24 195:10,15
196:23,23 213:20
problem
21:20,24 65:1 74:18
90:21 156:22 160:5
160:8 161:21
212:24 216:4,5,7
problems
159:25 161:22
212:23 213:1 216:3
procedure
71:16,23 94:3 105:21
procedures
67:3 72:9 73:11
process
8:8 32:13 62:21
83:11,17,24 87:2,14
90:23 98:10,13,22
99:4 124:3,20
214:16
produce



190:3

**produced**
52:17 110:14 136:17
136:23 137:23
146:7 173:5

**production**
199:2

**productive**
70:3,13,18 77:22
101:14

**productivity**
72:5,7

**professional**
60:19 86:2 140:13
143:22

**professionally**
200:24

**professionals**
86:6

**program**
29:4 205:13 220:7

**prohibition**
46:7,14

**prominent**
189:8

**proper**
133:18

**property**
147:1,11

**proposed**
118:9 144:25 157:2

**proposing**
138:19 139:14,20

**prostate**
71:17 72:12

**protected**
81:16 82:2

**protection**
35:15

**protocols**
39:17

**provide**
3:14 32:4 35:21 40:4
140:17 189:23

**provided**
9:11 10:9,15 23:8

32:7,8 191:10,13

**provider**
7:21 35:15

**providers**
37:13

**providing**
9:6,22 26:12 38:9

**provision**
123:4

**PSF-Peddada**
4:7,18

**PSF-Peddada-0124**
176:20

**PSF-Peddada-1032**
138:3,6

**PSF-Peddada-134**
172:9

**psychiatrist**
59:17 182:9 183:6
208:16,22 209:17
213:8 214:24

**public**
1:19 50:11 224:3,17

**published**
16:13

**Pueblo**
15:5

**Puerto**
151:9,14

**pull**
14:19 137:8

**purchase**
14:2

**purchased**
31:19 196:8

**purposes**
199:2

**put**
13:17 22:8 29:8,9
50:14 67:22,23 68:1
68:3 75:6 117:12
166:13 186:16,25
188:19,24 197:24
205:17,20 213:22
213:22

**putting**

71:16,17 182:24
186:25 187:4,6
215:7

**P.C**
2:12

**p.m**
48:23 102:18,19,21
131:15 152:2,22
153:6,11,11 154:10
154:24 186:9,10,12
204:8 223:2,5

**P.O**
224:17

---
**Q**
---

**quarter**
12:22

**quarterly**
12:20

**question**
7:3 12:4,5 15:10 17:5
20:18 35:12 37:7
41:6 42:18 44:8
49:8 55:12 60:14
62:9 63:3,5,7,8
66:16 68:19 69:20
70:8 71:8 76:14
77:19 78:4 79:2
87:12 88:16 89:3
90:21,22 91:1,4
104:19 107:17,18
107:25 117:3
120:17 122:5,7
124:5 125:6 133:3
136:5 139:4,17
141:2 149:1 150:17
152:12 163:17
164:23 173:4
174:13 176:5,6
186:23 200:18
206:5,10 209:1
214:6 215:18

**questions**
122:19 155:23 156:1
156:11 167:8
175:22 182:14

206:25 208:18
209:3,22 210:12
211:8,17 214:3,8
215:9,16

**quick**
20:18 102:14 208:20
213:7

**quickly**
72:17 127:4 128:2
208:2,12 210:16
213:19 215:9

**quiet**
159:21

**quit**
91:3 170:10 190:4
210:3

**quite**
127:1 182:3 183:18

**quote**
56:12 57:7 58:19

**quoted**
56:16

**quotes**
96:17

---
**R**
---

**R**
5:2

**race**
82:1

**radiation**
9:20,22 14:12 15:2
19:2 24:6 39:1 40:5
72:21 75:16 142:18
148:2 150:15,21,23
163:2 205:2

**radiational**
72:24

**radiosurgery**
13:11,19,22

**range**
158:2

**rapid**
211:24

**rapidly**
183:6 214:23



rate
 71:21
**RATHOD**
 2:5
**reach**
 216:12
**reached**
 193:12 216:18,20
   217:9,10 218:14
**reaching**
 180:8
**read**
 22:14 24:20 26:5,8
   26:14 27:6 49:19
   53:7,21,23 54:7
   56:3,6,8,18,21,22
   57:9 80:10,19,23
   88:12 89:25 92:17
   103:8,12 104:11
   106:21,23 107:23
   111:5,9,17 113:1
   115:4,8 116:2,11,14
   116:17 118:12
   119:8,15 128:18,19
   128:20 140:21
   141:9 145:25
   152:11 156:24
   180:18 198:2
   201:25 202:16,19
   202:20 203:4
   204:16
**reading**
 41:8 68:24 69:1 90:9
   97:16 111:12 203:2
   203:3 213:9
**reads**
 93:15
**ready**
 20:20
**real**
 147:3,4,10 169:17
**realize**
 7:7
**really**
 12:4 13:10 14:25
   15:21 20:17 29:12

32:25 35:11 36:19
53:13,19 54:20,22
55:7 64:12 68:13,25
76:7,14 77:18,20
81:1 90:25 91:24
95:1 105:16 108:22
130:8 132:7 146:4
146:19 147:14
156:10 170:23
182:13,15 192:6,14
193:24 202:21
204:9 205:8,21,23
208:18,21,24 209:3
209:22 210:12,17
211:16,18 212:1
213:16,21 214:24
215:15 218:5
**Realtor.com**
 146:12
**reason**
 17:24 66:4,16 67:12
   80:4 81:22 82:4,8
   86:1,4 87:1,13,16
   162:21 172:15
   185:10 192:17
   206:5,9
**reasonable**
 122:14,22
**reasonably**
 88:13
**reasons**
 113:12 179:4
**recall**
 9:12,17 12:16 32:2,8
   34:11 35:1 36:7
   40:6 47:7 51:5,6
   58:21 63:21 85:25
   89:14 96:23 122:21
   123:12,13,19 125:2
   125:15 126:20
   128:3 131:23,24
   135:4,22 140:23
   152:15,18 156:15
   156:17 165:5,6
   172:23 177:23
   178:7 207:19,25

 213:13,14 216:14
**receive**
 12:18 135:7 217:11
**received**
 22:16 43:15 79:18
   103:23 108:1,12,19
   128:22 134:25
   194:3,6,9 219:21
**receiving**
 107:3 127:16
**recess**
 170:25
**recharge**
 148:24 149:3 201:24
**recognize**
 18:13 60:4 61:14
   78:10 128:16
   137:16,17
**recognized**
 66:12
**recollection**
 139:22 156:7
**recommend**
 30:23 116:16 133:20
   133:25 134:23
   202:21
**recommendation**
 61:8 63:25 99:1
   116:12 117:7
   118:20
**recommended**
 56:14 57:9 113:22
   117:13 134:1
   144:22
**recommending**
 60:23 115:22 116:5
**reconvene**
 203:19
**record**
 5:5,13 20:20 92:2,5
   102:17,21 131:6
   137:12 140:8 183:8
   186:7,8,12 223:3
**recorded**
 92:15 96:1
**records**

 219:17
**recovered**
 54:23
**recruited**
 14:5 159:4
**recruiting**
 188:17
**recruitment**
 43:8,19 129:20,25
   130:10,16
**rectum**
 71:17 72:13
**reduced**
 224:7
**refer**
 87:5 95:15 135:17
   165:15,22 166:4,5,9
   171:15 189:3,5
   190:9 211:20
**REFERENCE**
 3:7
**referenced**
 43:7,18
**referral**
 88:1,10,18 165:19
**referrals**
 55:10 160:16,18,22
   162:16,25 163:1,3
   164:22 165:20,25
   167:2,10,17 189:2
   189:13
**referred**
 51:23 58:6 163:25
   164:17,18 166:17
   167:13 168:2
   191:20 221:22
**referring**
 51:3 87:6 95:4
   160:17,18 162:23
   164:10,17 165:3,11
   166:8,11 168:24
   170:7,10,15 171:9
   171:13 174:19
   182:2,12 190:4
   212:18 221:14
   222:1



refers
52:2 221:14
reflect
26:10
reflecting
218:20
reflects
87:2,13
refresh
10:20 23:8 148:20
refuse
116:23 117:7,15
refused
117:13
refuting
124:1
regarding
56:11
regular
69:6
regularly
103:22
Reiner
15:6
reiterating
56:12 57:7
rejuvenate
114:20
relate
46:6
related
16:25 47:5 58:4,10
87:3,14 119:18
122:9 126:7,13
127:7,16 132:11,15
168:8 192:2,5
224:10
relation
224:5
relationship
140:19 141:7 144:10
158:15 201:17,18
220:4
relationships
200:21 201:5,10,11
relegated

200:12
relocated
192:10
relying
6:20
remember
10:4 14:6 18:15,21
19:10 32:6 33:4
45:14 46:1 48:25
49:1 51:7,19 52:8
79:19,21 81:2,2
84:3 86:10,20 88:7
88:9 93:5 96:24
97:4 104:4 107:3,6
108:11,16 109:7
112:16 114:2,6
119:4 122:14
123:24,25 124:1,12
124:16 127:2,14
128:1 130:13
141:12,13 143:6
147:2,25 148:5,6,8
148:17,18 149:5
150:6 151:5,13,25
153:4,24 154:2,9,16
155:22 156:4,9,13
157:6 158:3,5,20
159:3,4 160:10,23
161:9 162:2 164:15
167:8,16 168:20
173:2,4,8,11,15,16
173:23 174:2 177:9
181:15,17 182:4,24
183:23 184:19
185:7,20,23,24
186:2 191:11 195:3
208:11 211:16
213:18,23,24
214:18
remembered
126:17 207:10
remind
111:1
Remote
2:1,17
Render

2:12 5:15
renewed
40:6 143:3
Reno
153:17
repayment
46:20 115:24 116:7
repeatedly
59:24
replace
174:16 176:7,13
replaced
174:7 175:3,25
report
52:20 53:1,5,7,9,25
54:7 58:2,22 59:7,7
68:7 85:23 88:11,19
96:15 97:16 149:2
177:4 204:16,17
reported
93:7
reporter
1:18 2:17 5:18 6:5
118:3 126:18 138:4
150:17 224:1,3
reporting
180:25 205:15
represent
5:22,24 52:25 80:2
84:4,21 110:6
143:12,19,20
208:25 211:18
represented
27:21,22 34:5 40:10
143:8
representing
17:8
represents
27:17 209:4
request
3:23 11:20 32:16
57:6 60:10,17 61:3
61:20 62:5 63:13,16
63:16,19 65:16,24
67:10,16 80:16 85:5
98:10 123:18

125:13,19,20
requested
56:12
requesting
62:16 81:21 82:5
104:15,23
requests
199:3
required
74:5 115:1
requirement
77:1
requiring
99:12,24
rescind
79:16 100:14
rescinded
99:14 100:5
rescinding
22:5,6
research
93:24
reserve
203:19
residency
25:10 76:24 178:2
191:3,7 197:4,7
198:5
resident
197:3
resolved
169:1
respect
54:13 100:13
respected
220:6
respiratory
37:15
respond
119:13,18 126:23
127:8 182:15
191:22,23 199:3
responded
123:6,7 128:8 129:14
129:15,16 146:18
153:19 221:4


MAGNA
LEGAL SERVICES

responding
89:22 125:23 126:3
127:16
response
4:1,3 96:19 109:14
109:23 110:7
145:19
responses
10:13,18 23:11 89:12
89:13,24 90:3,11
158:7 191:16
rest
47:9,16 218:22
restating
67:18
restrict
111:19 112:8
rest/leave
201:22
result
97:13
resumed
55:4,13
retaliated
81:23
retaliation
80:15,18
retired
40:21
retirement
187:9
return
54:24 134:5,19,23
187:11
returned
56:10 118:11
returning
93:20
returns
32:5
review
3:16 41:5 45:22
53:24 106:9 109:19
110:15 119:13,18
131:10 139:16
144:7 199:6 204:18

207:14,21 211:9
reviewed
17:25 18:2 39:23
53:22 86:8 93:2
106:11,15 143:22
146:15 199:1
reviewing
11:6 40:13 107:2
114:16,24 115:19
120:2 121:12
207:25
revoked
80:15
Rico
151:9,14
rid
181:1,11,21,21 184:8
right
5:24 6:11,18 18:11
18:21 25:9 31:21
34:15 39:3,5,8
44:24 45:8 48:14
50:21 51:6 52:13
57:11 60:18 61:4,9
62:9 63:3 67:21
70:17 78:16 83:12
85:18 100:24
102:13,24 112:12
114:1 122:17 123:4
124:22 125:1,24
127:15,18 129:11
130:14 140:18
141:6 142:3 143:13
143:16 145:20
147:8,22 148:23
151:7 152:9 153:12
153:13 154:22
157:5,11,19 159:3,8
161:6 163:6 165:1
168:12,19 170:16
170:23 176:15
179:2 183:12
187:14,20 196:4
197:15 198:13
203:19,23 204:1
206:23,24 218:20

219:7 222:7
rights
100:6 144:7 145:1
risk
73:11 74:4 184:13
risks
151:9
road
22:20 142:2
Rocky
19:2
role
35:4,5,7,12,24
Rolex
197:8,8,18
room
37:14
ROPC
35:5,9,14,25 37:6
39:24 40:3,22 52:7
60:20 74:11,23 83:3
83:7,13 123:2
140:14 142:24,25
143:23 144:5,6,10
144:18 158:12
Rosanne
224:2,16
Rosie
1:18 2:17 5:19
roughly
10:2 143:5 157:19
168:4 187:11
Royals
205:14
RTC
134:5,15,18
rules
75:6 77:3,4 105:21
rumor
50:7
run
206:17,21
rush
213:20 215:1
rushed
21:19 213:22 214:11

Russ
3:11 24:2,4,22 25:7
188:5,8,9
RVU
71:18 73:22,24 77:24
RVUs
70:4,14,15,20 71:1
71:13,14,24,25
72:14 73:16 74:1,3
74:5 77:2,16 78:18
79:7 141:19,24
149:3,6 161:2

_____
S
_____
S
5:2
sabbatical
93:21,22,22 94:2,5,9
139:11 140:18
141:6,16
Sabey
2:11 3:3,4 6:1,1,10
10:14,21 11:11 12:1
16:17 20:6,23 21:2
21:6,9,12,18,21
22:3,10 23:15,25
25:2,20 26:24 30:18
31:7,14 33:19 34:6
34:13,22 35:2,17
38:1,15 39:22 43:10
44:6,19 45:18 46:3
46:12,23 47:14,20
48:5,11,12 49:11
50:18 52:18,22,24
53:14 54:18 55:21
56:23 57:25 59:9,18
60:3,15 61:13 62:8
63:2,12,17,22 64:15
65:20 66:2,8,19,24
69:21 71:10 73:2
74:6 75:24 76:8,21
77:13 78:8,15 79:3
80:7 81:5,12,20
82:9,22 84:10 85:2
85:19,21 86:25 87:7
87:11 89:2 92:19,25



93:17 95:9 96:5,25
97:8 98:18 99:9
100:3,21 102:4,13
102:22 103:3,4
104:20 105:24
107:16 109:4,13
110:5,11,16,20,21
110:24 111:10
112:1,4,5 117:4,16
118:7,23 119:6
120:8,19 121:3,19
122:6,16 124:8,21
125:11 126:22
128:15 129:9,10
130:6,23 131:4,12
134:9,11 136:19,22
137:3,11,13,15
138:5,8 139:1 140:3
140:11,12 141:3
145:11 150:19
155:6 156:6 158:9
158:10 162:14,20
170:20 172:4 174:5
174:14,21 175:1,7
175:17,23 176:2,14
176:18,24 177:2
179:25 180:20,21
181:6,8,19 184:6,23
185:9,17 186:4,13
186:20 187:22
191:24 203:18
204:1,5 207:17
208:1,18 214:5
215:2,11 216:11
220:9 221:1,17
222:24

**Sacramento**
9:13 28:18
**sad**
209:25
**safety**
205:13
**sake**
164:11
**salary**
78:18

**Sam**
80:3 102:6 129:18
**San**
192:10,21,24
**Santa**
26:1
**sat**
217:2
**saw**
51:23 52:3 73:25
90:13,17,18 154:5
163:4 192:20
207:10 218:12
**saying**
31:24 49:9 50:19,21
51:15 58:21 60:22
62:25 64:9 67:20
68:2 70:9 73:7
77:25 82:12,20
83:15,25 84:20
93:14 96:17 97:5
112:7 114:1 123:18
123:23 125:19
126:11 133:1,9
146:18 156:21
162:10 163:22
164:24 167:12,16
171:8 173:9,12
177:15 179:21
180:2,3,9 181:15
183:23 185:8,16,18
**says**
13:2 19:7,8 24:16
26:25 28:23 48:15
50:16 57:3,12 58:2
62:3 70:2,10 80:12
87:21 88:13 91:3
93:12,19 103:10,18
105:15 107:19
108:12,14 112:22
112:22 113:10,17
114:4 116:10 118:8
130:9 132:6,11
134:5 137:18
138:22 142:7
145:10,14 149:15

153:10 156:22
169:15 172:14
180:25 181:10
182:22 209:1
212:23 213:1
215:19,25
**scared**
205:23 209:10
**schedule**
55:8,10 73:10 166:13
**scheduled**
16:7 210:16
**school**
76:19,24
**scratch**
176:25
**screen**
18:20 127:6
**seal**
224:12
**seamless**
26:12
**search**
11:19 25:7 168:11
**searched**
191:11
**second**
18:14 24:14 26:8,9
111:16 180:24
181:4,5,6,10
**secondary**
198:1 204:14
**Section**
60:19
**secure**
35:23
**see**
11:7 24:13 25:14
42:21 47:3 48:19
52:20 54:20 59:7
64:1,3,21,25 72:3
87:21,23,25 88:4
90:25 91:17 92:4
96:4,8 104:10 106:4
106:19 109:15
116:12 123:13,14

126:25 128:24
129:22 132:7
134:12,14,16
135:13 136:16
138:24 139:9,10
140:22 141:19
144:7 145:22
146:16,24 151:10
152:3 153:23
154:24 155:18
156:22 160:19
163:10,10 166:18
167:4 170:11 172:9
172:19 180:17
181:9 186:5 202:18
208:8,16 210:23
211:10,12 213:5,24
215:8
**seeing**
72:17 85:25 86:10
123:12,13 161:23
167:5 200:19 207:8
213:25 221:23
222:2
**seeking**
94:9 212:16,21
215:19 216:1
**seen**
18:17 53:3 85:24
86:12,20 109:17
157:14 200:14
207:9,12,15 208:4
210:22
**Selagamsetty**
58:7,16 111:19 112:7
**selectively**
46:19
**self-awareness**
218:21
**self-diagnose**
97:10
**self-employed**
190:17
**self-referral**
88:11,20
**self-referred**



88:4

**sell**
196:10,11,18,18
198:1,3

**sells**
147:4

**send**
38:11 49:1 65:14,22
126:16 139:16,21
160:20 162:22
165:19 170:22
180:13

**sending**
48:25 49:5 108:21
148:15 179:20

**senior**
150:24 178:2,9 180:7
188:15

**sense**
31:6 65:4 73:13
91:10 101:13
175:22 182:15

**sent**
18:18 24:2 25:21
38:20 43:6 45:23
46:2 48:13 50:13
55:25 60:6 61:16
103:10,15,18
108:10,25 113:25
125:20 129:18
130:9,11 137:19
138:9 142:6 143:25
144:5 145:6,21
147:20,21 148:20
151:8 157:1 179:23
180:1,3 189:14

**sentence**
24:14 26:9 111:17
112:21 113:14
180:24 181:5,9

**separate**
64:21 129:21,21
130:1,17

**seriously**
41:16,19

**service**

16:14

**services**
1:11 5:9,18,19 9:7,23
27:2 30:14 40:5,5
60:19 140:14
142:17 143:22
144:11

**set**
19:16 81:15 121:24
121:25 122:8

**sets**
26:25 27:2

**setting**
74:20 120:12,20
121:9

**setting/build**
146:16

**settlement**
43:8,19 118:16
120:14,22 121:10

**Setty**
46:4,24 58:7,8,16,18
59:14 112:13
114:15,24 119:24
131:6,22 132:22
133:5 135:8 152:17
152:22 153:15
154:14 204:8 206:3
216:13,24

**Setty's**
46:18 206:6

**seven**
171:4,5,9,15

**severe**
39:15 58:3,19,23,25
59:3,11,11 101:9
132:11

**severity**
32:21

**shake**
34:18

**share**
147:14 160:16,18
164:5 165:20 167:2
204:9

**shared**

161:18

**shareholder**
13:3

**shareholders**
15:13

**shares**
12:16 14:20,24 15:1
15:2,14,18

**Sheila**
216:16,18 220:2

**shelter**
33:16

**shook**
205:21

**shop**
197:23

**short**
68:1 80:16 81:21
82:5

**shorter**
133:22

**Shorthand**
1:18 224:2

**show**
18:11 32:2 37:23
48:6 59:25 78:1
85:14 106:2 142:3
157:7 172:5 205:21

**showed**
99:16 149:13 189:25

**showing**
78:2 145:18 173:16

**shown**
207:7 213:25

**shows**
18:20 88:3 127:19
147:20 156:19

**shut**
16:3

**sic**
13:9

**sick**
62:19,20

**side**
17:9 18:1 146:22,23
161:24

**sign**
40:2,8 80:13 182:7
214:20,20

**signature**
172:9 173:9 224:12

**signed**
39:24 79:20 82:12,14
82:20 84:2 107:14
108:9,18 115:10
121:6 172:12,19,22
172:24 173:3,6,10
173:12,20 174:3

**significance**
196:1

**significant**
8:3,21 115:1 197:2

**signify**
70:16 198:8

**signing**
40:13,19 114:17,25
115:19 120:2
121:12,13 173:15
173:18 174:1

**similar**
75:22,23

**similarly**
47:24 70:4,13,19
72:25

**simply**
104:19

**Simultaneous**
175:20

**sincerely**
100:15

**single**
57:18 120:13,21

**singular**
57:16

**sit**
69:13 90:10

**situated**
70:4,13,19

**situation**
28:2 58:4,11 74:14
132:12,15 219:11

**six**



37:11 53:6 54:11,14
75:13 94:4 139:11
158:19 194:17
**skewed**
72:14
**ski**
36:15,16 37:1
**skiers**
36:14,17
**skiing**
36:12,19,22
**skills**
74:5
**skin**
189:8 190:13,15,16
190:17
**slander**
222:6,8
**slandered**
221:11
**slandering**
221:5 222:5
**slanderous**
222:11,13,17
**slice**
183:1
**slightly**
90:19
**slow**
71:7
**small**
145:25 146:6
**smarter**
206:13
**smartest**
206:12
**Smith**
14:22
**smooth**
206:22
**smoothest**
206:18
**sold**
15:14
**soliciting**
180:8

**somebody**
166:17
**someone's**
204:20
**somewhat**
28:7
**son**
36:18,22
**soon**
167:3
**sorry**
19:10 22:9 28:1
30:11 35:6 37:8
44:9 48:16 52:20
60:13 73:5 81:9
84:20 87:25 110:9
112:22 122:4
129:14,15,16
130:21 134:7 136:5
137:3 139:9 145:21
149:1 158:7 174:19
181:4,6 184:25
190:9 192:11 200:3
211:5,22 212:17,25
**sort**
61:23 62:11 63:10
78:17 158:9
**sought**
22:5 219:7
**sound**
41:21,24
**sounds**
125:25 153:13
187:20
**span**
202:24
**spare**
202:13,14,15
**speak**
115:4,12 149:6
**speakers**
175:20
**speaking**
64:17
**specialist**
135:8 217:8

**specialists**
165:12
**specific**
98:9,12 128:8
**specifically**
33:5 85:4,11 95:12
99:22 114:18
141:14 167:13
168:6 185:8 190:24
194:21
**speed**
215:3
**spell**
24:8 209:7
**spend**
53:8 170:18 203:10
**spending**
187:1 201:7
**spent**
90:25
**spoke**
26:20 62:2 152:15
177:20 210:14
214:11
**spoken**
28:2 131:21
**spreading**
50:7 52:10 220:16
**Springs**
18:25 31:17 146:13
147:5 192:13 193:7
**ST**
1:11
**staff**
62:24 85:13 119:19
123:19 124:3,18
125:14
**stage**
148:18
**Stageberg**
15:5
**Stahl**
1:18 2:17 5:19 224:2
224:16
**stainless**
197:10,10,18

**stamina**
8:24
**stamp**
198:8
**stamped**
25:24
**standard**
31:2
**stands**
111:24
**start**
20:25 22:11 23:16
118:9
**started**
20:13 44:3 83:19
148:13 167:3
205:13
**starting**
103:8 180:11
**starts**
132:7
**state**
1:19 5:21 44:5
184:12 201:9 224:3
**stated**
57:13 209:9
**statement**
49:19 81:4,6 94:6
96:19 113:3,6,14
115:25 116:3
154:12 183:23,24
185:20,21,25 186:3
221:6,9
**statements**
49:17 56:18 105:18
105:22 106:3,13,24
109:23 111:2,6,13
**States**
1:1 5:10
**stating**
139:10
**stature**
23:1
**status**
203:9
**stay**



117:14
**steel**
 197:10,10,18
**Steinberg**
 3:13 25:22,25 29:2
   188:16
**stenograph**
 224:6
**stenographic**
 224:8
**stimulated**
 201:1
**stocks**
 196:3
**stop**
 18:6 37:22
**stopping**
 83:2
**store**
 197:14
**strategy**
 151:16
**Street**
 2:6,12 5:16
**stress**
 8:14,15,16 40:16
   97:14,22 209:21
   210:11 218:1
**stressed**
 33:10,11 74:9 140:19
   141:7
**stresses**
 115:8,17
**stressful**
 74:13 203:16
**stressors**
 112:18
**strike**
 90:11
**strikes**
 94:24
**strongly**
 202:21
**Studies**
 132:10
**stuff**

8:24 53:19 90:9
   140:7
**subject**
 7:3 126:9
**subsequent**
 32:10,15
**subsequently**
 32:17
**substance**
 7:14 212:11
**successfully**
 78:6
**sudden**
 209:7
**suffering**
 90:6
**sufficient**
 186:15
**sufficiently**
 54:23
**suggest**
 132:21 133:4,9 136:9
   136:10
**suggesting**
 184:15
**suggestion**
 21:16
**suicidal**
 59:17 154:21 155:14
**suicide**
 59:15 206:1
**Suite**
 2:6,12
**summarized**
 184:5 185:5,15
**summary**
 4:2,4 109:15 110:8
   185:22
**summer**
 36:3
**summers**
 36:4
**Sunday**
 149:18
**support**
 33:14 67:9,16 101:19

105:11 149:3
   154:25 194:2 221:3
**supportable**
 155:19
**supportive**
 35:20
**supposed**
 201:25
**sure**
 18:9 20:19 35:22
   49:19 52:22 54:1
   64:12 71:20 77:11
   83:14,20 101:3
   102:15 105:16,21
   122:24 144:20
   154:20 167:21
   169:9 171:11
   177:11 179:12
   182:6,20 183:8,17
   204:6 208:7 220:6
**surgeon**
 167:7 169:25,25
   170:8
**surgeons**
 166:7,8
**swear**
 6:5
**sworn**
 6:7 224:4
**symptoms**
 8:23 32:21 33:2,4
   208:23
**system**
 26:22 28:6 159:10
   168:15 169:22
   170:9 173:7 205:15

---
**T**

---
**table**
 25:15
**Taha**
 79:25
**take**
 7:1 11:10 21:15
   35:21 36:2,12 37:3
   41:15,19 45:7 48:4

53:24 60:23,24 61:4
 63:25 86:17 93:12
 93:15,24 100:20
 101:6,23 102:10
 112:11,17 113:5
 114:20 115:22
 116:5 131:9 133:12
 133:19 140:18
 141:6,15 148:17
 153:20 169:17
 170:25 181:12,22
 184:9,13 186:4,6
 204:14 208:6
 218:12,22
**taken**
 1:16 5:14 12:8 20:12
   35:23 62:6,18,19
   88:23 102:18 186:9
   224:6
**takes**
 113:22
**talk**
 16:7 17:7,13 43:23
   44:11,21 45:3,11,12
   45:15,22 47:4 71:19
   114:1 116:23 117:8
   117:21 148:9
   149:15 151:5 152:3
   152:19 156:21,23
   159:24 162:3,3
   164:6 182:9 208:10
   208:22 210:1 213:8
   214:24 217:12,13
   218:15,17 220:5
   221:19
**talked**
 42:14 74:8 78:16
   154:3 155:16
   177:23 187:24
   191:25 216:21
   217:2,18 218:16
**talking**
 43:2,12 45:15,16
   80:20 83:23 84:14
   103:14 123:1
   149:25 150:3


**MAGNA**
**LEGAL SERVICES**

152:16,18,24
158:18,22 161:25
174:20 175:10,12
183:12 197:12
209:20 213:21
214:18 216:8 217:1
**talks**
115:16,21 131:14
202:22
**target**
204:21
**task**
41:15 42:11,16,25
**tasks**
71:11
**tax**
32:4 151:9
**taxes**
151:15,20 187:2
**technology**
13:12
**tedious**
90:8
**telephone**
42:15 88:6
**tell**
6:16 8:10 9:18 23:3
25:5 39:4 46:4
124:10 126:13
132:25 133:15,16
133:21 135:2 146:4
146:19 147:17
153:16 159:3 160:6
160:7,7,7 166:24
179:8 194:18,18
202:7 210:1 219:11
221:18
**telling**
50:9 96:20 113:11
123:7 130:14
144:22 160:2
205:19 221:11
**tells**
105:8 215:24
**temporarily**
192:10

**ten**
73:25 164:12,13
194:24 195:1,2
**tend**
72:20
**tenens**
194:10
**term**
13:20 94:9,10 100:2
191:2,6 212:6
**terminate**
144:10
**terminated**
100:8 161:21 177:18
**termination**
74:10 83:7
**terminology**
100:2 155:10
**terms**
38:14 46:6 70:4,14
159:12 161:5
201:17
**test**
105:16
**testified**
6:7 187:8,10 207:6
**testify**
6:22 99:4 224:4
**testimony**
6:21 119:23 224:4
**text**
3:8 4:8,14 18:18 24:1
24:25 25:4,21 26:20
107:3,5 108:1,20
113:25 114:3 130:3
130:5 145:6 146:2
149:13 156:3
191:19 198:15,17
198:22 199:9
**texted**
19:15 107:20 153:16
156:20
**Texts**
3:10
**Thank**
6:14 28:23 62:3,22

130:7 206:23
**Thanks**
129:1 153:19
**thee**
117:9
**theme**
167:9
**Theolyn**
170:8,13
**therapist**
7:21
**therapists**
37:16
**thereof**
224:8
**thing**
17:23 64:4 65:1
86:16 87:8 91:5
97:20 98:24 124:12
140:22 182:9
183:16 194:13
205:18 208:20
218:20
**things**
16:8 33:7 41:11,13
53:20 54:5 64:3,22
67:2,11 68:22 74:3
74:4,16,22 78:1
90:13 93:12 94:22
97:19 117:25 118:1
147:6 150:2 155:24
156:11,21,23 159:2
159:9,11,12,13,19
162:12 166:21
180:15 182:11
201:21,23 202:2,3
204:12 205:7
209:14 212:8,9,13
215:1 216:21
217:18 218:21
220:20
**think**
9:3,12 10:4,11 13:25
14:25 15:11,22,24
16:19 18:21 19:6,19
19:23 20:18,23

32:12,13,25 33:11
35:5,7 36:1 37:18
37:21 38:2 40:9
41:12 42:3 43:1
44:15 46:22 47:19
48:3 54:6,16 55:16
56:1 58:13 61:5
64:6,23 65:3,4 66:4
66:17 68:11 69:1,8
72:3 73:20 74:16
75:17,25 76:9 77:14
78:21 79:13,18 82:3
82:7 83:14 84:12
85:1,6 86:22 88:12
88:14,22 89:23 91:3
91:9,10 100:15,20
100:22 101:3,15
102:14 104:5 105:7
108:17,19,20,22
111:6 122:12,13
124:15 125:10
130:4 131:25
132:17 135:23
140:7 141:11
143:14 147:18
156:1 161:11
168:12,22 169:7,7
169:17 170:13,16
170:21 171:1,3,4,5
171:6,21 172:16,23
173:24 180:12
181:23 183:22
184:8,10,11 185:4,6
185:7 188:3,20,23
190:2 191:15 192:1
192:6 194:25
198:25 202:16
203:18 206:10
207:6,10 208:9,24
210:24 211:12,14
213:19 215:7 216:8
219:17,23 221:8
**thinking**
53:18 67:1 91:2
100:10 101:6
139:25



**thinks**
155:5
**third**
16:15 134:12
**third-party**
17:6
**Thompson**
56:17 57:14,19,23
59:14,20 135:17
**thoracic**
169:25 170:8
**thoroughly**
209:15
**thought**
31:22 43:2 55:1
66:23 83:4 84:15
96:20 100:10,11
102:10 106:15
107:12 108:18
115:11 121:5,7
124:23 129:15,16
135:14 138:25
169:12 182:21
188:22 190:12
205:7 209:11 219:6
220:6 222:2
**thoughts**
4:12 59:15 138:14,23
150:7
**thousand**
195:16 196:7
**threat**
17:19
**threatening**
180:13
**three**
31:25 40:6 45:5,7
47:3 54:24 93:2
113:22 115:22
116:5,24 117:24
118:1 132:23 133:6
133:12,17,20,22,25
160:13 166:12
170:5,6 171:3,5
173:12 188:20
190:20,24 191:8

193:9 197:25
**three-month**
43:24 44:12 132:22
133:5,10
**threshold**
77:24 78:16,17,23
**threw**
167:20
**tie**
64:6,23
**tied**
34:11
**time**
1:17 5:1,13 7:1 8:17
9:16 10:5,25 11:13
14:14,21 15:22 20:2
20:14 21:19 22:16
26:10,23 30:14
33:20 34:1 35:4,8
37:5,8,19 39:19,20
41:25 44:3,18,21
46:10,16,24 47:6,13
51:2 53:9,24 62:3
62:23 65:18 66:9
71:6,22 76:19 81:2
83:1 86:17 90:6,25
92:24 93:24 94:12
102:14,16,20
112:11,17,24 113:5
113:7,11 114:20
117:15 121:14
127:1,11 128:10
131:9,18 133:18,22
142:23 148:23
150:2 153:18
158:13,20 168:22
170:13 172:23
182:25,25 186:5,7
186:11 192:15,18
198:8 200:23 201:5
201:6,7 202:13,14
202:15,24 203:5,11
207:8 208:3 209:19
210:21,23 211:15
211:19,25,25 212:2
212:3,7,22 213:2

214:22 215:10
216:2,20 218:16
223:2,2 224:7
**timely**
167:11
**times**
11:5 19:23 68:22
70:3,12,18 164:12
166:22 173:13,17
178:10,12,14,16
**tiny**
146:1
**tired**
212:5,6
**today**
6:14 7:8,18 16:7
90:10 123:14
193:18 197:9,23
198:3 210:22
**Today's**
5:12
**told**
17:12 24:22 25:7
45:6 52:4,5 57:23
69:11,17,22 83:6
85:13 92:15 93:7
96:1 101:16 112:13
113:20 114:8 115:7
119:1,24 129:24
143:2 151:15
154:10 170:4
175:25 177:4,22
178:6,10,15 179:17
188:22 189:11
190:8,18,21 194:14
208:1 220:16,17,18
221:15,20 222:3,4
**top**
102:25 103:7,9
128:17 132:6
134:12 146:11
170:16
**Total**
28:13
**touch**
29:8,9

**touched**
129:17
**tough**
158:16
**town**
13:12 19:8,9,9
101:10 189:9
190:16 206:14
**track**
160:13
**train**
74:19
**training**
29:4 75:8 77:5
**transcribed**
89:1 93:14 94:23
183:25
**transcript**
224:8
**transition**
76:2 84:5
**travel**
203:16,17
**traveling**
203:13
**treat**
15:4 38:16 163:14
**treated**
38:24 39:10,12,16
**treating**
38:3
**treatment**
37:23 38:20,22
120:15,23 132:25
133:8 212:21,22
216:1,2 219:22
**treatments**
30:21,23,24 31:3,4
**tried**
92:13 166:22 179:19
202:1,2,2
**trigeminal**
72:11 166:6
**triggered**
18:8
**trivial**



205:19
**true**
43:22 49:18 50:2
70:21 75:2 90:11
112:12 113:3,6
114:8,13 115:12
119:17 177:6
189:19 194:16
208:19 224:7
**trust**
96:12
**truth**
6:17,17,17 215:3
224:4
**truthful**
6:23 19:5 26:4
185:11
**try**
16:15 23:12,13 47:2
51:5 104:22 105:3
105:10 164:10
168:23 191:11
201:24 202:15,16
202:16
**trying**
11:14,15,25 20:21
21:16 29:13 37:9
49:7,9,12 67:7
73:13 74:19 76:14
77:19 80:21 89:25
122:21 130:15
138:17 139:6 151:6
166:24 202:2,3,18
203:9 207:16 214:9
214:10,23 215:7,8
215:12,14,25 216:6
218:18
**tumor**
170:10 210:2,3,5
**turn**
80:8 87:18 89:6
102:25 106:17
113:16 172:8 207:3
**twice**
173:15
**two**

13:23 14:14 16:19
39:14 40:6 56:18
64:3,21 67:11 70:3
70:12,18 86:24
99:15 114:6 122:13
122:15,21 127:14
141:16,17,23 147:9
148:1 154:25 160:9
165:16,24 168:19
169:24 172:6
173:19 178:2 191:4
191:7 193:9 197:25
209:24 210:8
**type**
88:23 110:10 159:21
213:14
**typewritten**
224:7
**typically**
12:20 37:3 40:4
69:15

___

### U

**UCHealth**
31:8,19 32:1 101:10
164:18 168:18,18
**UCLA**
26:22 29:9
**unable**
45:4
**unacceptable**
166:14
**unaware**
43:21
**uncharacteristic**
210:5
**uncomfortable**
40:12,19
**understand**
12:4,11 42:18 45:2
49:8,20 63:7 77:20
80:21 91:1 105:17
105:25 114:14
121:8 163:17
164:23 165:9
174:10,12 176:5

203:21 214:13
215:15
**understanding**
35:12 59:22 91:4
114:21 116:22
117:6,18,20 120:6
222:15
**understood**
203:24
**unfortunately**
23:20 102:2
**unhappy**
158:25
**United**
1:1 5:10
**units**
71:2
**unknowingly**
39:11
**unlawful**
80:18
**unrealistic**
68:15
**unreasonable**
69:25
**untrue**
111:18 220:22 221:6
221:9
**untruthful**
49:9
**unwilling**
113:18 114:9 118:15
**upcoming**
149:16,22 150:4
**upfront**
216:9
**upset**
161:19
**use**
13:6 27:14,15,17,19
28:3,3 39:1 40:18
46:18 57:16 95:14
96:18,18 100:1,2
123:11 185:15
191:6 199:18,24
205:15

**useful**
219:15
**usually**
23:3 77:6

___

### V

**V**
1:10
**vacation**
56:10 103:16,20
104:1 119:14,20
120:3
**vacations**
24:19 33:16 36:3,5,7
37:2,10 48:4
**vague**
209:3
**Vail**
36:15,24 37:1
**validated**
222:19,22
**valuable**
196:7
**value**
25:14 73:22 195:19
195:20,22,25
196:10
**varied**
11:10
**verbal**
193:19
**verbiage**
108:12
**version**
137:7
**VIDEOCONFER...**
1:4
**videographer**
2:17 5:4,17 6:4
102:16,20 186:6,11
222:23,25
**VIDEOTAPED**
1:5
**violated**
100:7
**visit**



131:6 153:17 184:5 185:6,15,22 216:13 217:13,19,22 219:14,15

**visits**
206:21 216:23

**VOICE**
131:2

**voicemail**
19:21

**volume**
1:6 127:10

**volunteered**
220:3 221:24

**vs**
5:7

___

**W**

**waffling**
192:3

**wait**
89:8 118:20 123:22 130:21

**waiting**
197:24

**wake**
210:4

**walking**
209:13

**want**
4:12 7:1 11:5 14:16 19:19 20:19,22,25 22:14 35:3,19,20,21 35:21,22 39:6 43:4 46:9,15 52:10 54:2 60:24 68:2 71:7 77:21 78:1,22 100:19,22,25 104:11 106:2,17 109:9 110:1 111:16 121:15 127:24 128:19 138:22 149:17 151:14 157:19 159:11 164:5,18 167:4 169:7,10 170:17,24

171:1,15,21 175:18 177:25 178:1 179:10,12 180:2 182:6,14,18 183:17 184:13 187:24,25 189:11 192:14,17 193:6,10,24 194:20 197:11,23,25 202:10 205:12 209:4 210:4 218:10 219:13 220:15

**wanted**
14:19 25:6 26:17 50:10 67:19 93:15 101:24 118:20 138:15,24 139:23 144:20,21 150:7 151:4 156:21,22 161:1 166:20 167:21 181:20,21 190:18 192:22 196:18 197:20 199:19,19 204:9 214:24 218:12 220:5

**wanting**
11:17 124:10 180:8

**wants**
105:4,4 155:4 160:19 193:6 197:19

**warm**
192:22

**warned**
221:10

**wasn't**
13:10 31:5 38:8 67:3 81:25 98:5 107:17 121:13 130:11 154:21 155:13 160:25 164:20 166:14 169:3 171:15 199:21 208:22 215:25 216:7 221:5

**watch**
194:17,19 195:9,12

195:13,14,14,23 196:4,7,12 197:4,5 197:8,16,19,20,22 197:25

**watched**
140:9

**watches**
194:15,22,24 195:1 195:17,24,25 196:11,15,20,22 197:12,12 198:7

**way**
6:23 7:9 31:2 61:23 62:11 63:9,19 66:5 66:17 76:17,18 78:5 78:6,10 79:13 117:13 127:21 148:10 159:8,8 161:7 166:25 168:19 182:13 188:3 199:12 210:14 215:6 218:7

**ways**
8:17 159:7,8,9

**wedding**
151:20

**week**
10:1,1 28:12,15 30:2 30:5 68:6,9,14,18 69:3,16,23 75:4,8 166:12 200:16 203:3

**weeks**
27:5 28:10 55:4,14 90:23 134:6,15,24 135:3 153:20 209:24 210:8

**welcome**
153:17

**Weller**
80:4 102:6

**wellness**
216:20

**went**
28:14 36:14,16 54:11 76:19 128:2 135:13

151:19 155:18 159:11 168:1 183:16,18 197:14 217:14

**weren't**
34:11 42:2 44:10 45:3 104:8 126:1 158:18 159:1 203:25 210:25

**we'll**
6:20 21:7,15 59:23 152:7 158:9 203:18 205:20 210:16

**we're**
13:21 15:25 17:16 18:7 20:21 21:14,16 36:25 43:12 123:1 123:10 144:9 149:24 162:10 165:12 174:2 178:18 180:9,10 182:6 183:11 192:9 205:4,15

**we've**
12:21 18:5 21:5,15 78:6 88:25 123:17 164:16 171:18 187:1 192:23 213:12

**whatsoever**
16:14 206:7

**WHEREOF**
224:12

**Whichever**
114:5

**Whitney**
2:5 5:24

**wife**
33:15 35:20 36:18 96:11 187:8 192:12 201:6,18 203:7 218:10,11

**wife's**
217:5 218:11

**willing**
43:23 44:10,21 45:3



**willingly**
89:20
**winding**
74:10
**winter**
36:13
**wise**
12:17
**witness**
6:5 99:3 224:12
**wonder**
204:3
**word**
101:7,17 165:6
**words**
222:9
**work**
8:14,15,16 9:5,9,16
9:24 10:24 11:3,13
11:14,17,21,24 12:8
18:25 21:10 22:15
22:20,21 23:20
24:23 25:12 26:12
26:17 27:11,19
28:16 29:13,16,23
37:24 41:17 45:5
46:5,17 54:25 55:4
55:14 58:4,10 62:20
67:2 68:11,12,23,23
68:25 69:4,14,15
70:16 71:2,15,25
72:1,6,8,18,20,24
72:25 73:1,20 74:2
74:3,13,17,17 75:3
75:7,10,13,17 77:1
77:7,15,21 78:2,12
78:22 79:7,9 90:21
90:25 91:5 93:20
94:13 97:15 100:11
103:11,16,19 104:9
112:20 113:23
115:8,17,22 116:5
126:12,21 132:12
132:15 141:16,23
150:1 157:16,17,18
162:12 164:10

169:11 179:11,13
180:8 190:24
191:17 192:2,4,16
192:25 193:1,1,8,25
194:10 199:15
200:9,18,25 201:3
201:12,13,19 202:9
202:10 203:13
205:10 210:9,10,10
216:3
**worked**
10:16 27:24 28:11
29:1,5,20 68:9 69:5
69:12,14 70:22
75:23 76:20 78:5,6
78:11 79:12,14 86:3
97:14,22 98:4
148:13 158:16
169:2 170:3
**worker**
69:15
**working**
28:24 34:1 35:9
37:20 46:16 68:6
72:2 74:7 76:1,17
76:18 77:10 78:24
79:13 83:2 91:2,6
95:15 97:19 129:19
130:9 148:10
158:15 161:7
171:17 200:1,8,15
200:15,20 201:14
**workload**
30:8
**works**
83:1 150:22
**workup**
135:16
**work-related**
45:8,9,17 46:11,14
46:25 74:9 117:14
118:1 120:1 212:4
**worn**
211:19 212:2,3 213:4
213:5
**worried**

33:14 50:6 154:15
155:10,13 156:1
200:17 209:18,19
221:10 222:5
**worries**
152:8
**worst**
44:4
**worth**
42:22 195:13 196:17
196:21 197:5,9
198:2
**wouldn't**
38:24 45:11 64:7
89:17 97:7 117:12
141:24 154:18
189:3
**write**
62:4,25 85:7 98:25
145:3 169:18 171:1
209:15 211:4
**writer**
203:1
**written**
60:9 61:20 63:16
79:22 97:6 177:7
203:2
**wrong**
159:8 160:6 204:21
204:25 205:8,20
212:15 219:6
**wrote**
14:10 23:14 52:10
58:22 59:6 62:3,22
97:24 99:15 102:1
104:10 137:18,18
138:24 139:5
144:23 146:19
148:23 156:3
181:16 184:3
**WRVU**
147:20

---
**X**

**X**
3:1

---
**Y**

**Yahoo**
199:15,18
**yeah**
15:11 20:5 22:17
28:14 31:16 35:1,24
37:9 39:13 42:19
44:10,22 48:6,11,11
49:12 50:21 51:9
57:1 58:8,13,18
60:25 65:21 69:24
70:15 78:9 79:4,5
80:2,23 82:7 84:20
85:18 86:19,23 87:9
87:21 88:15,23 90:5
91:16 93:6 95:1,17
98:3 101:4 104:21
108:16,17 110:11
110:20 111:9 112:2
112:2 113:9 114:5
117:5 118:1 123:10
123:13,21 124:19
124:24 128:7
130:23,24 133:3
136:19,22 138:2,5
139:2,18,22 140:1
141:4 145:3 146:1
146:17,20 148:25
150:13 152:1,10,23
153:2,3,9,11 154:7
156:24 157:23
158:9 162:23 175:8
175:17 177:9
180:20 181:7 183:1
183:11 185:3 186:3
188:10 191:17
193:16,22 194:18
195:20 197:6,13
198:15,23,24
200:20 202:4,12
206:4 209:8 210:8
211:19 212:2,5
215:23 217:10,15
219:1,2 222:6,22
**year**



7:25 8:1 15:24 16:19 27:5 33:22 37:2,10 40:22 129:7 157:9,10 158:12,17 160:21 164:14,25 171:16 178:2 187:11,17 198:4

**years**
14:18 16:15 25:10 31:2,20 40:6 68:18 74:24 76:24,24 77:5 78:7 86:24 88:14,15 88:15,17 98:5 114:6 122:13,15,21 127:14 147:9 148:1 160:13 161:17,20 163:19 164:12,13 165:24 171:17 173:19 178:2,3 179:15 191:4,7 193:23 194:17 197:25 199:25 200:6

**Yep**
53:4 103:3 146:14 151:11 200:7 207:24

**Yin**
4:6

**yoga**
201:20,25 202:1

**young**
168:24 170:2 177:25 178:1 180:2 188:19

**younger**
178:8,17,18 180:11 187:25 188:5,15 190:21,25 191:1

---
**Z**

**Zenith**
197:11

**zero**
196:10 203:6,8

**Zoom**
92:3,6 183:12 184:24

185:3,5 219:12 220:2

---
**$**

**$100,000**
13:16

**$14**
187:9

**$180,000**
157:20

**$2,000**
197:4

**$2,800**
197:9,16

**$20,000**
196:8

**$30,000**
196:16

**$44,000**
197:9 198:2

**$5.75**
146:13

---
**0**

**0124-000439**
4:18

**04/05**
4:8

**04/12/22**
4:17

**04/13/26**
224:20

**04/18**
4:14

**04/18/22**
4:13

**04/24/24**
3:13

**04/25/22**
3:21

**05/05/22**
4:6

**05/22/22**
3:23

**06/06/22**
3:8

**06/14**
3:10

**07/30/24**
3:17

---
**1**

**1**
4:15

**1st**
32:17,18 43:25 44:13 82:24 83:13 84:5,6 84:22,23 118:9,17

**1:16**
102:19,21

**1:23-cv-01921-NY...**
1:2

**10**
1:16 3:2 5:1 39:25 58:2

**10th**
5:12 9:5,9 79:19

**10,000**
196:23

**10:00**
156:20

**10:52**
1:17

**10:53**
5:1,13

**100**
2:6 72:11 75:9

**1033**
138:6

**109**
4:1

**11**
60:19

**11th**
172:12,22 173:21

**11:02**
157:1

**110**
4:3

**111**
106:18,25

**112**

107:2,19 109:6

**114**
106:18,25 119:9

**115**
56:2

**12**
8:13 39:25 212:12,12

**12th**
172:22 173:21

**12/10/2024**
1:6

**12:10**
153:6,11,11 154:24

**12:57**
102:18

**12:58**
102:17

**121**
4:6 56:16 57:2,17

**122**
56:3,16,17 57:12,17

**128**
4:8

**13th**
80:22

**1330-1331**
3:9

**1369**
3:15

**137**
4:11

**145**
4:14

**147**
80:9 81:8,10,13

**15**
69:3

**16th**
145:7,21 147:19 148:4,16

**17**
56:21

**17th**
2:12 5:16 149:18

**172**
4:16



**18**
 8:13,13 161:17
**18th**
 137:20 145:10,14
**19**
 12:17
**19th**
 151:8
**190,000**
 157:25
**1990**
 94:20
**1999**
 31:17

---

**2**

**2**
 3:21 113:17 130:25
**2C**
 130:20,22 131:1,2,5
**2nd**
 61:17
**2:50**
 186:7,9
**20**
 30:22 56:22 76:18
  78:7 98:5 167:25
  168:1,4,5 179:15
  193:23 196:16
  200:6
**20,000**
 196:21
**20-minute**
 17:9
**200,000**
 157:25
**2020**
 199:20,20
**2021**
 198:16
**2022**
 8:4 9:5,9 10:7 18:19
  32:10,11,17,18 33:3
  33:10,13 43:7,14,25
  44:13 45:7,24 48:13
  61:17 84:22,23 92:3

 107:9 108:6 118:10
 118:17 119:24
 125:5 129:9,12
 131:7,16,20 137:20
 142:12 143:5 144:5
 145:7 172:13
 186:15
**2023**
 96:17 157:24
**2024**
 1:16 3:2 5:1,12 25:22
  157:9,14 158:4
**2025**
 224:13
**207**
 3:4
**21st**
 131:15 152:1,21
**214**
 3:4
**22**
 3:8 8:20 68:18 88:15
  119:24 131:7
**22nd**
 45:6 131:20 153:6,15
  153:25 154:24
  155:16
**23**
 3:10 88:15 106:18
**24**
 8:19 25:22 27:5 56:4
  56:5
**25**
 3:12 74:24 144:5
**25th**
 142:12 156:20
**250**
 158:2
**26**
 43:14
**26th**
 43:7 45:24 48:13,21
  103:24
**27**
 25:10 88:14
**27th**

 48:15 107:8 108:6
**2701**
 2:6
**28th**
 92:3

---

**3**

**3**
 3:24 53:5 115:3
**3:06**
 186:10,11
**3:41**
 223:2,4
**3:52**
 48:23
**30**
 152:7,14 167:25
  170:25 171:22
  178:3 179:15
  195:15
**303-578-4400**
 2:7
**303-801-3538**
 2:13
**308-1481**
 4:7
**366**
 4:10
**39**
 180:17

---

**4**

**4**
 115:21 155:11
**4-12-2022**
 172:19
**46**
 145:24
**464**
 224:17
**476**
 95:22
**48**
 142:4 157:2
**481**
 87:18,20,25 88:18

**482**
 87:19 88:1,19
**484**
 89:7 90:3
**487**
 90:21
**488**
 182:22 211:22
**490**
 212:19
**492**
 89:10 90:1,2,4
  207:22
**496**
 91:25 92:22 93:2
**498**
 91:25 92:8,22 93:3,5
  102:25 103:2,5

---

**5**

**5**
 116:10 132:7 139:9
  140:15 141:5
**5th**
 125:3 129:5
**50-year-old**
 74:23
**500**
 165:11
**504**
 92:2,9,22 95:3 96:1
  180:20,20 185:2
**52**
 3:16
**54**
 48:7,10,17
**55**
 3:18 85:15,18 92:1
  102:25 180:17
  207:4,7,13,19
  213:13
**56**
 18:12 19:5 20:19,21
  21:12
**56A**
 3:8 21:7 22:1 224:8



**57**
21:12
**57A**
3:10 23:22,23 224:8
**58**
20:18 21:1 26:4
**58A**
3:12 25:17,18 224:9
**59**
53:1
**59A**
3:16 52:13,14 224:9
**5956**
95:4,22

---
**6**

**6**
3:3 118:8
**6th**
18:19
**6-15-22**
19:9,12
**6:39**
153:16
**6:56**
152:2
**60**
3:18,20 55:13,18,19
59:23 68:6,18 69:16
75:3 106:5 119:8
167:25 168:2,4
200:15
**60-plus**
55:4
**60-69**
224:9
**61**
3:20,22 59:25 60:1
**62**
3:22 61:10,11 62:10
**63**
4:1 109:10,11 110:12
**64**
4:3 110:2,3
**65**
4:6 68:14 121:16,17

**66**
4:8 128:12,13
**67**
4:11 136:14 137:1,11
139:10
**68**
4:14 145:6,8
**69**
4:16 172:1,2,6
176:18

---
**7**

**7:30**
152:15
**7:57**
129:5
**70**
68:14
**75**
69:22 75:4 200:15
**75-plus**
68:9

---
**8**

**8**
132:6,8 134:8 187:11
**8th**
224:12
**8:14**
25:22
**80**
75:9 165:21 196:17
**800**
2:12
**80202**
2:6,13
**80459**
224:18
**89**
68:5 70:2,6,7

---
**9**

**9**
132:6,7,8 134:8,9,9
**9th**
96:17

**9:00**
131:15 152:22
154:10 204:8,10
**9:45**
137:20
**90**
72:10 75:7,9 141:20
145:16 165:20
167:12,16,17
**90,000**
196:17
**90-day**
93:13
**999**
2:12 5:16

