Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

DR. ANUJ PEDDADA,

       Plaintiff,           CIVIL ACTIO:
                                 1:23-CV-01921-NYW-MDB
vs.

CATHOLIC HEALTH
INITIATIVES COLORADO
d/b/a CENTURA
HEALTH-PENROSE-
ST. FRANCIS HEALTH
SERVICES,

       Defendants.


| | |
|---|---|
| DEPOSITION OF: | Dr. William Plauth |
| DATE TAKEN: | December 6, 2024 |
| TIME: | 12:00 p.m. |
| PLACE: | By Videoconference |
| REPORTED BY: | Wanda Jackson<br>Notary Public |



Page 2

APPEARING ON BEHALF OF DEFENDANT:

OMEED AZMOUDEH, ESQUIRE
Rathod Mohamedbhai, LLC
2701 Lawrence Street
Denver, Colorado  80205
APPEARING ON BEHALF OF PLAINTIFF:
MARK SABEY, ESQUIRE
Hall, Render, Killian, Heath & Lyman, PC
999 17th Street
Denver, Colorado 80202

Page 3

TESTIMONY OF DR. WILLIAM PLAUTH
    Direct Examination by Mr. Azmoudeh          4
CERTIFICATE OF OATH                            109
CERTIFICATE OF REPORTER                        110

                     EXHIBITS
                    (Retained)

Exhibit 40          Employment agreement     49
Exhibit 44          E-mails            55
Exhibit 64          Employment agreement     64
Exhibit 71          E-mail           71
Exhibit 58          E-mail           79
Exhibit 59          E-mail           79

Page 4

DR. WILLIAM PLAUTH
the witness, being first duly sworn for and in his own
behalf, was examined and testified upon his oath as
follows:
          DIRECT EXAMINATION
BY MR. AZMOUDEH:
    Q    Good morning, Dr. Plauth.
    A    Good morning.
    Q    Could you start by stating your full name for the
record?
    A    Yes.  It is Dr. William Henry Plauth, III.  I go
by Bill.
    Q    Thank you.  I am going to call you Dr. Plauth
today?
    A    That is fine.
    Q    My name is Omeed Azmoudeh and I represent the
Plaintiff in this lawsuit, Dr. Peddada.  You should feel
free to call me Omeed today.
         And before we get going, I want to chat about
some ground rules.  Most of them are to make our lives
easier as we go through the day and to make Wanda's life
easier.  Zoom depositions can get clunky at times.
         My first ground rule is because we are on
zoom it is important that we wait for each other to finish
the questions and response.  So I will wait for you all

Page 5

day as long as you wait for me.
         Does that make sense?
    A    Yes, it does.
    Q    Especially on zoom nodding, uh-huh, things like
that don't come out, so if you could give me yes or no all
day to those questions, audible responses.
         Does that make sense?
    A    I understand.
    Q    Okay.  And because I am a lawyer sometimes I ask
confusing questions, bad questions.  It is me being a bad
lawyers.  It is not you not speaking English.
         If I ask a bad question, will you make sure
to ask me how to clarify it?
    A    Yes, I will.
    Q    And Mark Sabey is going to make objections
throughout the day, which is another reason for us to sort
of pause between our exchanges to allow him time to do
that.
         Ordinarily, if he does that, you still have
to answer the question that is pending unless he
specifically instructs you not to.
         Does that make sense?
    A    Yes.
    Q    And we will take breaks every hour or so.  But if
you need one, go ahead and ask for it.



Page 6

If there is a question pending, I will probably ask you to answer that question before we take a break.

Does that make sense?

A   Yes.

Q   And you just took an oath.

Do you understand that oath?

A   Yes.

Q   What does that oath generally mean to you?

A   That I will answer truthfully and as accurately as I can.

Q   Okay.  Is there any reason, Dr. Plauth, today, any health condition or medication or any other substance that would cause you not to be able to respond accurately and truthfully?

A   No.

Q   Any of those same things, health conditions, medications, substances, other than time, I understand time, but any of those health conditions, medications, substances that would impair your memory about some of the questions I may ask today?

A   No.

Q   Okay.  Doctor, have you ever had your deposition taken before?

A   Yes.

Page 7

Q   How many times?

A   I would say at least twice that I can recall.

Q   Can you just describe to me the circumstances under those two that you recall?

A   One was related to a physician issue on behalf of Centura with a different hospital within Centura.

And then the other was related to Christus Saint Vincent on a different matter.  I don't recall exactly what that was.

Q   Okay.  Let's start with the first one.

Is the other Centura Hospital Centura Mercy?

A   Yes.

Q   Okay.  Without naming names, what was generally the nature of the physician's issue?

A   A physician was suing Centura as well as myself for posting or related to his objections related to restrictions of practice and reporting to the state national practitioner data bank report.

Q   Is posting a term of art or let me ask --

A   I don't understand.

Q   I appreciate that.

Can you just explain to me what posting his practice restrictions means?

I don't understand that.

A   Well, the national practitioner data bank that is

Page 8

where you are required to post certain concerns related to quality of practice, and this was related to something like -- related to that.

Q   Okay.  And, generally, this physician objected because he or she believed it should not have been posted?

A   Right.

Q   How did that matter resolve?

A   I believe he settled with no fault on our side.

Q   And then you described another circumstance at Saint Vincent in New Mexico?

A   Yes.  Christus was the parent organization.  The specific hospital was Saint Vincent in Santa Fe, New Mexico.

Q   Do you remember anything around the circumstances underlying that lawsuit?

A   I am sure it will come back to me, but I really don't right now.

Q   Maybe I will come back to it later.

Are you represented by Mark Sabey and the Law Firm of Hall and Render?

A   In regards to my fulfilling my responsibilities on behalf of Centura in my leadership role.  Yes.

Q   After you left Centura -- well, let me ask you.

At some point you stopped working at Centura, is that fair?

Page 9

A   Yes.

Q   Did you sign another or a written agreement for representation after you left and stopped working for Centura?

A   I think the only thing that I signed related to this was that if issues arose in the future that pertains to things I might have awareness to, that I would be willing to testify on behalf of Centura.

Q   Did you meet with anyone in preparation for your deposition today?

A   Yes.

Q   Who did you meet with?

A   Mark Sabey and his partner.

Q   How many times did you meet with Mark Sabey and his partner?

A   Two this past week by zoom or teams and then Mark and I had coordinated timing of things through text and communications.

Q   How long were each of those two meetings?

A   I think both were scheduled for an hour, probably lasted about forty minutes for both.

Q   Okay.  During either of those two meetings or at any time did you review any documents in preparation for today's deposition?

A   Yes.

MAGNA
LEGAL SERVICES

Page 10

Q   Do you recall which documents you reviewed?
A   A series of E-mails that were sent to me.
Q   What do you recall about those E-mails?
A   They involved communication between different people, parties to the matter within Centura and Dr. Peddada.
Q   Putting preparation aside, have you had any casual conversations with anyone about your deposition in this lawsuit?
A   I just know that another colleague of mine, Sam Weller, was undergoing a deposition, and that was it. No further discussion on it.
Q   Do you work with Mr. Weller now?
A   I do.
Q   And that is at Renown?
A   Yes.
Q   What is your relationship to Mr. Weller now at Renown?
A   We are both direct reports of the CEO.  He is the chief executive officer of one of our hospitals, the South Meadows Medical Office.  I am the chief medical officer for the system.
Q   For the entire Renown system?
A   Correct.
Q   How many hospitals is that?

Page 11

A   Technically, three.  Regional, an in-patient rehab in South Meadows, and you will see a children's hospital, but it is a hospital within that regional hospital.
Q   And, Doctor, I don't want to waste a ton of time today on your background.  I have done my own snooping on your Linked-In.  I will go through it with you.
Would you say your Linked-In is fairly up to date and accurate on your work history?
A   Yes.  I probably last updated it April of last year or so.
Q   Okay.  You haven't had any new positions since April of last year?
A   Correct.
Q   From 1992 to 1996 is it accurate that you obtained a medical degree from Emory University?
A   Yes.
Q   Why did you choose to go to medical school, Dr. Plauth?
A   Ultimately, I considered it a calling.  My family came from medicine.  I resisted for a while.  Once I decided to pursue it, it was the best choice I had ever made.
Q   How many doctors are in your family?
A   How far out?

Page 12

Q   Why don't we do your immediate family, your siblings and your parents?
A   Three.
Q   And then what about -- Dr. Plauth, are you married?
A   I am.
Q   Is your spouse a doctor as well?
A   She is a retired critical care nurse.
Q   You said that deciding to become a physician was ultimately the best decision you ever made.
What considerations go into that opinion about your career?
A   I love helping people.  I love the relationships with patients.  It is very fulfilling.  And while practicing, I did well.
Q   Do you mean financially well?
A   No.  Sorry, not at all.  I was a good doctor in taking care of patients.
Q   From 1996 to 2000 I think you were a resident and then a chief resident at University of California San Francisco?
A   Correct.
Q   Was that through some sort of match program?
A   It is a normal residency for which there is a match in the beginning as you apply to be an intern.

Page 13

Q   Did you choose or apply to the University of California San Francisco for any particular reason?
A   Two reasons.  My family of physicians had done most of their practice in New England.  And my choice was mainly Harvard or The University of California San Francisco.  And my mentors recommended trying something new and that they thought the world of UCSF, so I choose that.
Q   From 2000 to 2013 you served a number of roles at Christus Saint Vincent in New Mexico, is that accurate?
A   Yes.
Q   One of those roles was as a hospitalist and as a palliative care physician, is that accurate?
A   Yes.
Q   Why palliative care?
A   One, I love it.  The main focus of palliative care is on individuals, quality of life factors.  And so you are tailoring someone's care to what matters most to them.
Q   At some point while at Saint Vincent you took on the chief of staff role, is that accurate?
A   Correct.
Q   Also, you took on the medical director of clinic informatics position, is that correct?
A   Correct.

**MAGNA**
LEGAL SERVICES

Page 14

Q   Doctor, are there other people in the room with you?

A   No.  It is just out -- actually, wrong camera. It is just outside my closed door.

Q   Thank you.  Okay.

And then from 2007 until 2009 you got a masters of medical management at Carnegie Melon, is that accurate?

A   Correct.

Q   And then in 2012 through 2013 you served as the acting chief medical officer for Christus Saint Vincent, is that accurate?

A   Accurate except without the title.  I was offered the title.  I declined that because it was also chief of staff.  I did not think that would be appropriate.  But I fulfilled the duties of the chief medical officer in regards to medical staff and quality.

Q   What were the circumstances under which you came to start performing those duties?

A   The previous chief medical officer was let go or fired I think within two or three months of my becoming the chief of staff.

Q   Was that a natural progression that the chief of staff would serve in that role if there was a vacancy?

A   No.

Page 15

Q   Did you apply?

A   No.

Q   How did you -- how were you selected?

A   The CEO asked me if I would be willing to serve in that capacity.

Q   Stepping back for one second.

Why did you obtain the masters in medical management from Carnegie Mellon?

A   I wanted to learn more about the business of medicine.  My hospitalist group I had been a part of split and I wanted to help understand that better.

Q   Was that a -- let me ask you this.

Did you take time away from your work at Saint Vincent to go get that degree?

A   No.  It was predominantly remote.  I believe scheduled or materialized as five onsite visits, but I did that concurrently.

Q   From 2014 through 2019 you served as the chief medical officer for Centura Mercy in Durango, Colorado, is that accurate?

A   Yes.

Q   What were the circumstances under which you came into that position?

A   I applied for that position.

Q   Why were you at that time applying for executive

Page 16

medical positions?

A   Because I had come to the end of my chief of staff year and I had been as you see wearing multiple hats.  And I did not want to continue to try to balance my clinical care and leadership role.  I wanted to pursue the leadership.

Q   Is there anything in particular that drew you towards these leadership roles?

A   What I often share is having grown up in a family of doctors with my father, in particular, realized how challenging the practice of medicine can be.  I like helping people find -- make it easier, ease of practice to help support physicians and taking care of patients.

Q   Okay.  What about your father's experience brought that to mind?

A   He just practiced many years with his pediatric cardiothoracic surgeon that he worked with and just the challenges they had putting together a practice, essentially from scratch down at Emory.

Q   One of the notes I saw on your Linked-In was that you worked on a program while the CMO of Centura Mercy called the Link Program.

Does that ring a bell?

A   Yes.

Q   Does Link stand for Life Interruptions Need

Page 17

Kindness?

A   Yes.

Q   What was that program?

A   It was a program focused predominantly on high utilizers of the emergency department.  It was similar to a program that we had at Saint Vincent hospital in Santa Fe.

That may have been referenced as the Hugs Program where we supported patients by identifying the root cause of the problems that they were having to help them be successful.

Q   Okay.  You mentioned earlier that one of the things that interested you about these leadership roles is helping to work with physicians through challenges of practicing medicine.

Can you put those challenges into some buckets for me and describe what they might be generally?

A   Certainly, the regulatory requirements, the challenges from complex patient issues of which many times you have little control.

Q   What about just the time spent at work?

Is that something that you help physicians deal with as part of their practice?

A   Yes.  In regards to wellness or trying to minimize those nonvalue added things that require someone

MAGNA
LEGAL SERVICES

Page 18

to spend more time at work and less time directly taking care of patients.  That would be a reference back to the regulatory things.

Q   In August of 2019 through January of 2023 you served as the chief medical officer for Centura Penrose Saint Francis, is that correct?

A   Yes.

Q   And then in April of 2023 through the present you transitioned to the chief medical officer of Renown, is that correct?

A   Correct.

Q   Okay.  Does -- do you still have any practice of medicine?

Do you still see patients in these roles?

A   Not as a clinician.  I will speak to patients in my administrative capacity.

Q   What does that look like?

A   If there is a complaint by a patient, I will talk to the patient to better understand to see what we can do to help resolve the issue and look into the issue.

And if warranted, to keep it from happening again or help people navigate complex issues that they are facing.

Q   I have read several of your E-mails, Doctor, in this lawsuit, and in your signature while you are at

Page 19

Centura Penrose you had a statement that says, I am on a mission to promote collegial professionalism with compassion and humor, is that accurate?

A   Yes.

Q   What does that -- can you expound upon that statement?

A   Forgive me.  I am just scrolling down to it.

What was the first part of it again?

Q   I am on a mission to promote collegial professionalism with compassion and humor?

A   The collegial professionalism, the practice of medicine is much better as a team for that.  And we can all benefit from lessons learned from colleagues as well as patients and families and others for that.

I believe all medicine needs to be compassionate as a part of my career in palliative care and then also find humor helps offset some of the stress related to situations.

Q   Does the compassion extend to physicians as well that you work with?

A   Yes.  Absolutely.

Q   Okay.  Are you a funny guy?

A   No, not as funny as I wish.

Q   Now, I want to focus on your time as the chief medical officer at Centura Penrose.

Page 20

Could you just describe the buckets of responsibilities that you had in that role?

A   I oversaw the medical staff, the functioning of the medical staff and medical staff services.  I also oversaw care management or case management.  And I oversaw the quality department, which also had regulatory over site responsibilities.

Q   Start with overseeing staff and the functioning of the medical staff.

What did that look like in your daily work?

A   Coordinating with the different medical staff leaders, particularly, the chief of staff or president of the medical staff, the leaders of the specific medical staff committees such as peered review credentials.  And I worked with the different department leaders or individual physicians as issues would arise.

Q   Who did you report to in that position?

A   Dr. Brian Erling.  He was the chief executive officer.

Q   Were you the conduit between maybe the physician staff, the medical staff and some of the administrative executives?

A   Yes.  The chief medical officers frequently referred to as a liaison.

Q   What about care management?

Page 21

What did that look like in your daily activities?

A   Care management focused on discharge planning, making sure that patients are able to be discharged to a safe environment with the equipment that they need.

Also, a part of the responsibility is utilization review, which is looking at coding of hospitalizations, length of stay, appropriateness of care.

Q   Who would flag for you that a particular patient may need extra review from you on any of these issues?

A   It could come from any source.  So if it is a quality, it could come from a patient or a family complaint.  It could come from a caregiver themselves.

It could come from the quality department looking at trends.  Care management, if there is a challenge on someone's discharge, they could ask for any involvement and help.

Q   Did the role require you to examine needs within the physician's staff and whether there were hiring decisions to be made?

Let me put it a different way.

Did you have to identify whether there was a need for more physicians within the staff as part of your duties?

A   It would not be a specific responsibility, but I

MAGNA
LEGAL SERVICES

Page 22

would be included in some discussions of, you know, to give my own opinion of that.

Q   Because you have the lay of the land.

You have got the closest view of the lay of the land amongst the physicians, is that fair?

A   I can't compare it with others, but I certainly have a good vision of the services provided within the hospital.

Q   If there was a hiring process ongoing with respect to a physician, do you have any specific roles with respect to the hiring process?

A   No.  I might be involved in interviews, but not always.  And most of the hiring was done by Centura Health Physician Group, which was a different entity, and I did not have a role in that group.

Q   You had no role, for example, in the drafting or negotiating of employment agreements?

A   I certainly did not play a role in any of the drafting.  I think I had weighed in with my opinion on things with orthopaedic trauma one time.

Q   In the role as chief medical officer is it any of your responsibility to make employment decisions, things like firing, putting on performance improvement plans, transfers, scheduling, staffing, that kind of thing?

A   Question of clarification.

Page 23

Are you just referring to physicians or anyone?

Q   Let's start with physicians.

A   No.  I don't believe I was.

Q   Did you participate in any trainings on equal employment laws?

A   I don't recall.  I may have.  We would have a lot of orientation, but I don't recall.

Q   Did you have any -- over time -- let me ask you this way.

Over time have you developed any familiarity with equal employment laws?

A   Yes.

Q   What are the general sources where you have developed that familiality from?

A   Regulatory modules, lectures, discussions with counsel for orientation.

Q   What are regulatory modules?

A   It is common each year organizations are required to undergo regulatory modules, learning modules, and that is frequently where a lot of things like that are shared and required.

Q   Can you give me a different word for modules?

I am trying to paint a picture in my mind what this is exactly.

Page 24

A   Oh, it is online learning.  And frequently we just call them learn modules for particularly a power point and sometimes with voice over.

Q   And then lectures, are you referring to lectures put on by our employers through the years or is this sort of outside credit lectures or both?

A   Typically, it would have been coordinated by employers many times with outside counsel or outside vendors.  (Inaudible) Springer and -- Springer, that is the main one that comes to mind that I have sat through sessions of theirs.

Q   Is that a HR firm?

A   No.  They are a medical staff, you know, expert -- essentially a lawyer firm that focuses on medical staffs and healthcare.

Q   Does your familiarity with equal employment laws include The Americans With Disabilities Act?

A   Yes.

Q   What is your general understanding of The Americans With Disabilities Act?

A   That you need to make appropriate accommodations and you can't fire or not hire someone because of a specific disability.

Q   So your view of the -- I will call it the ADA.

Does that make sense to you?

Page 25

A   Yes.

Q   That those afforded the protections under the ADA include both current employees and also applicants?

MR. SABEY:  Object to foundation.

A   Yes.  That would be my understanding.

BY MR. AZMOUDEH:

Q   You said a fair accommodation.

What or how do you define what an accommodation is?

MR. SABEY:  Object to foundation.

MR. AZMOUDEH:  What is the basis for that objection?

MR. SABEY:  Well, you are asking him about the meaning of legal terms and legal issues.

MR. AZMOUDEH:  He said he is familiar with the concept.  I am just asking for his understanding.  I am not asking for the right answer.

Will you withdraw your objection?

MR. SABEY:  No, but you can proceed.

BY MR. AZMOUDEH:

Q   Doctor, what is your understanding of an accommodation?

A   My understanding is a reasonable accommodation, and I would look to the statutes for that and guidance.

Q   If you didn't have the statutes in front of you,



7 (Pages 22 to 25)

Page 26

and someone asked you like I have today, what a reasonable accommodation might be, could you provide some examples of what a reasonable accomodation might be?

MR. SABEY: Same objection.

A   Yes. I would ask for specific examples.

BY MR. AZMOUDEH:

Q   You also mentioned disability.

What is your understanding of that term?

A   It would be based on the disabilities defined by the statutes.

Q   When you were at Centura Penrose serving as chief medical officer, did you have any specific role in the process by which staff members could request leaves of absence?

A   Yes.

Q   What was your role?

A   In regards to nonphysicians if someone reported to me, they would go through HR to request a leave of absence, but HR would keep me in the loop and interview me, you know, for that.

In regards to the medical staff I would work with medical staff leadership, the chief of staff credentials and ultimately present to the board a request of leave of absences.

Q   And when you say medical staff, you are referring

Page 27

to physicians?

A   Yes. Physicians that are on the medical staff.

Q   If a medical staff member goes on leave, do you have any role with respect to that medical staff member?

A   I may depending on why they went on leave of absence. And then certainly as someone applies to come back onto staff, I would be a part of those discussions.

Q   Let's start with while they are on leave.

What factors might way in favor of being involved or not involved in the medical staff who is on leave?

A   It would only really be in the very beginning. I can only think of one case where we were helping make sure that they had got in contact with the right care providers to provide the care they needed.

Q   Are you thinking of the Plaintiff in this case?

A   No.

Q   So where necessary you serve as a point of contact for a medical staff member who is on leave?

A   In general, the only time I would interact with them is if they had specific questions for that or if they had reached out to me.

Q   Is leave in your view an understanding of an accommodation and accommodation?

A   Can you rephrase that?

Page 28

Q   Sure.

Based on your understanding of the term accommodation, do you consider leave to be a form of accommodation?

A   I don't think so.

Q   Why not?

A   People can take a leave for multiple reasons. They can take a leave because they are going on sabbatical. They want to do other things.

Q   If a person takes a leave because of a disability based on your understanding of those terms, would the leave be an accommodation?

A   I just don't see it in that light.

Q   Did you have any role while serving as chief medical officer at Centura Penrose, did you have a role in training any other staff members?

A   I certainly helped train and educate physicians on high reliability patient safety for that. That would be an example.

Q   What is high reliability patient safety?

A   It is the pursuit of zero preventable harm and taking the lessons learned from high risk, but relatively safe industry such as nuclear and aviation and applying that to the health care setting.

Q   I will try to break some of those terms down.

Page 29

What is zero preventable harm?

A   In healthcare because patients are complex, their care is complex, there will be complications despite the very best of care. When we are talking about -- and that would be considered a known complication.

When we talk about zero preventable harm are things that really should not have occurred because of errors or mistakes that then lead to injure or an adverse event for a patient trying to prevent those.

Q   Is it fair to characterize that training as related to the quality of care being provided at the hospital?

A   Certainly a part of it.

Q   Do you provide any other types of training unrelated to the quality of care being provided?

A   More for medical staff leaders, just regulatory environment credentials, bylaws, that kind of education.

Q   Okay. What regulations come to mind as part of those on which you have trained medical staff members?

A   CMS, joint commission requirements.

Q   What does CMS stand for?

A   Centers Of Medicaid And Medicare Services.

Q   And what is the joint commission?

A   They are a proxy for the CMS for enforcing or ensuring their standards are met.

**MAGNA**
LEGAL SERVICES

8 (Pages 26 to 29)

Page 30

Q    Okay.  Do you provide any training to staff members on equal employment laws?

A    No.  I do not.

Q    Some of the physicians who provided medical care at Penrose or Saint Francis while you were serving as chief medical officer were not employed by Centura, is that fair?

A    Yes.

Q    Okay.  Those physicians still, though, had medical staff privileges, is that fair?

A    Correct.  When I oversaw medical staff, it was agnostic as to employment.

Q    Were there any material differences in the way that you were operating with respect to employed physicians versus physicians employed by some other entity or not employed by any entity at all?

A    No.  I don't believe so.

Q    Why did you move from Centura to Renown?

A    A better opportunity, and I was let go by Centura.

Q    Let's start with better opportunity.
     What was better about Renown?

A    I loved the fact that as a nonprofit it is locally owned.  Everything we do gets reinvested directly back into the community.

Page 31

Q    On the flip side.
     Does nationally owned bother you in any way?

A    It does not bother me, but it is more challenging at times to try to champion the needs of your local community.

Q    Would that also include championing the needs of your local physicians?

A    It could.

Q    You also said you were let go.
     What were the circumstances under which you were let go?

A    It was during the process of reorganization and so I was let go with a severance agreement.

Q    What was your favorite part of your job as chief medical officer for Centura Penrose?

A    To have a chance to really help people, whether it was patient, physician or other.

Q    What was your least favorite?

A    Probably dealing with complaints.

Q    Okay.  From patients or physicians?

A    More often patients because if anything they might have been harmed and that was a -- that was always hard to deal with.

Q    One thing I deal with in my practice is my clients becoming Google lawyers.

Page 32

Does that happen in hospitals, patients becoming Google doctors?

A    Yes.

Q    Is that something that you deal with frequently?

A    Rarely.  More commonly we would hear that from doctors talking about patients that they have seen.

Q    Were there any other -- let me ask this.
     Would you describe that as a common complaint among physicians?

A    No.

Q    What were the common complaints, if any, among the physicians that you heard while you were working as chief medical officer at Centura Penrose?

A    Probably the most common were dealing with the issues dealing with Covid during those years.

Q    Anything along the lines of what you described earlier regarding locally owned versus nationally owned?

A    Some.

Q    Can you tell me more about that?

A    An example would be different supplies or surgical equipment and what options we would have.

Q    Did the physicians want something more expensive and the national entity wanted something cheaper?

A    Not necessarily -- well, probably less expensive.

MR. SABEY:  Object to the question and the form

Page 33

of the question.

A    But looking for supplies that are on contract but might be different than what they were used to using.

BY MS. AZMOUDEH:

Q    Was it a part of your job in circumstances like that to try and give the physicians a voice to the national entities?

A    Yes.

Q    Was that an important part of your job in your view?

A    It is important -- it was definitely an important part.  It was a relatively small part.

Q    Doctor, just as a concept what is your understanding of the phrase, physician burnout?

A    It can be caused from a host of circumstances where -- I don't want to state using its title burnout, but people experiencing the significant stress related to the practice of medicine that can come from a variety of reasons.

Q    Is detachment from work maybe a part of something that is associated with the concept of physician burnout?

MR. SABEY:  Object to the form and foundation.

A    I refer to detachment in that description, yes.

BY MR. AZMOUDEH:

Q    What have you heard?

MAGNA
LEGAL SERVICES

Page 34

A    That could be a sign of burnout.

Q    How are you thinking of the word detachment?

A    Detachment from patients, from not having compassion towards patients, starting to lose that.

Q    What about detachment from staff and your daily dealings at work outside of patient care?

A    I am not so familiar with that in that content.

Q    So in your view if there is any detachment associated with physician burnout, it is just detachment from patient care?

A    I am not limiting it.  I have just heard it referenced as a potential part or sign of burnout.

Q    Do you see how maybe the concept could include detachment from all parts of work?

A    Yes.  I could see that.

Q    Okay.  Your understanding of physician burnout, how did you come to that understanding?

A    Certainly hearing about it, reading about it, working along side my colleagues either clinically or in my leadership roles.

Q    What types of materials have you read in which you learned about the concept of physician burnout?

A    Certainly, I have read articles.  I have participated in or attended seminars, for lack of a better term, conferences that spoke to that.

Page 35

We also had our own wellness program and pure coaching program at Penrose, so there were frequent discussions.  We also had discussions within Centura on that.

Q    Let's start with articles.

What types of articles are we talking about?

A    I don't recall.  It could be both business. It could be medical journals.  It could be regular news.

Q    Have you come across a body of literature on physician burnout?

A    I know there exists such a body of literature. I don't pursue that or regularly go to that.

Q    Seminars, any seminars jump out in your mind or lectures at any seminars in reference to physician burnout?

A    It was before my time at Penrose, but I know that Penrose had sponsored a national leader physician to come and speak to the staff.  I believe I listened in on one of those or at least read articles from that person related to that.

Q    Do you remember the name of that person?

A    I don't.

Q    What were your key take away's?

A    My understanding of it was, one, it is real. It can also involve family and trying to figure out how

Page 36

best to support one another in those areas.

Q    When you say it can involve family, what does that mean?

A    It can involve, you know, spouses.  Yes.

Q    I will ask it a different way.

Are you saying someone can be burned out from their spouse or that the symptoms can affect their relationship with their spouses or maybe both?

A    I was going to say neither, that they would be likely aware or the spouses also, you know, deal with a lot of the challenges of medicine.

Q    You mentioned that it was discussed a lot frequently at Centura.

Give me some context for those discussions.

A    I would not necessarily characterize it as frequently, but it was certainly discussed.  I don't recall specific discussions, but within our chief medical officer groups, we might discuss it at that time.

Q    What was the general nature of those discussions?

A    Frequently, how are we helping deal with that and people experiencing that and hearing complaints.

Q    How were you helping people deal with that?

A    Specifically at Penrose, as I alluded to with the coaching peer program, we had an extensive program of developing those peer coaches and provided that support.

Page 37

Then as I mentioned, ease of practice, trying to look at how we can help electronic medical records or other things to provide a better environment.

Q    The second part of that conversation is were people experiencing it.

In your experience as chief medical officer at Centura Penrose what was your gage whether the physicians were experiencing burnout?

A    I would say it is relatively common for people to experience some degree of burnout at some point in their career.

So when I say common, it would not be unusual that it would -- the topic was coming up, but not that -- not necessarily widespread, just to try to clarify that.

Q    Based on your understanding of the concept of physician burnout, is it diagnosable by a doctor or a psychiatrist or some other form of doctor?

MR. SABEY:  Object to foundation.

A    I really don't know.

BY MR. AZMOUDEH:

Q    You said that it is not unusual that physicians experience some level of physician burnout.

Is it fair to say there might be different levels of burnout that a physician could experience?

A    Sure.

MAGNA
LEGAL SERVICES

Page 38

Q   Depending on the level, as you understand the concept, could a physician burnout affect work performance for a physician?

A   Yes.

Q   In what ways?

A   They could be less attentive, not do as well, and to your point of or phrase earlier of potential detachment.

Q   Would that be -- well, strike that.

Could it affect their communication skills?

MR. SABEY:  Object to foundation.

A   It could affect their communication.

BY MR. AZMOUDEH:

Q   In what ways?

MR. SABEY:  Same objection.

A   They might communicate just differently, you know, than they would if they were not experiencing it at that time.  They might be more short.

BY MR. AZMOUDEH:

Q   Do you understand there to be either in the literature or from any of the seminars that you have attended or the ones you have described today or your discussions at Centura, do you understand there to be any connections between physicians working through Covid 19 and occurrences of physician burnout?

Page 39

A   I don't recall it from those.  But overall I do believe that it was -- that physician burnout was more likely during that period of time.

Q   Why do you think that is?

A   The most common example I would say would be in the intensive care units of just how many patients were coming in that they could not ultimately help.

Q   Was there, and in all hospital context, was there some, at least some that you sensed, some fear of the unknown about what was going on with Covid 19?

MR. SABEY:  Object to the form.

A   I would say that there was definitely anxiety before the vaccines became available.

BY MR. AZMOUDEH:

Q   Have you ever led any trainings related -- I will put it a different way.

Have you written any articles or papers or given any lectures or led any trainings related to the topic of physician burnout?

A   No.

MR. AZMOUDEH:  Do you want to take a break or do you want to keep going?

THE WITNESS:  I am good.

BY MR. AZMOUDEH:

Q   Okay.  Just for some background even if you did

Page 40

not know it while you were serving as the chief medical officer for Centura Penrose, and I am just asking you now, are you aware that Dr. Peddada began practicing medicine at Penrose in or about 1999?

A   I wouldn't know the date, but I certainly knew he had been there for many years.

Q   And then are you aware that Dr. Peddada stopped practicing medicine at Penrose in 2022?

A   I was reminded that from the E-mails.

Q   And then throughout those many years are you aware again now or then that Dr. Peddada was a partner at a private practice called Radiation Oncology, PC?

A   Yes.

Q   And I am going to use ROPC today to shorthand that.

Does that make sense to you?

A   Yes.

Q   Are you aware generally that this lawsuit the allegations in this lawsuit are about the tail end of Dr. Peddada's practice at Penrose?

A   That is my understanding.

Q   Okay.  For the time being I want you to put away that tail end.

Does that make sense?

A   No.

Page 41

Q   I will add more to the question.

A   No worries.

Q   Okay.  I am going to ask you some questions about Dr. Peddada and for the time being I will ask you to put aside any events that you recall regarding the tail end of his practice of medicine at Penrose.

Does that make sense?

A   I understand the ask.

Q   And you will do your best --

A   And if I can't, I will let you know why.

Q   Thank you.

How did you first meet Dr. Peddada?

A   I don't recall.

Q   Let me ask you this.

Did you know him before you began serving as chief medical officer for Centura Penrose?

A   No.

Q   So in the role at Centura Mercy his name never came up in front of you in any way?

A   Not that I recall.

Q   What would have been your working relationship to Dr. Peddada while you were serving as the chief medical officer for Centura Penrose?

A   It would have been in his capacity as a medical staff member.

MAGNA
LEGAL SERVICES

Page 42

Q   Do you recall how frequently you encounter him at work?

A   Very uncommonly.

Q   In what settings would you encounter him, if you did?

A   I remember meeting him and seeing him at a reception for his new partner.  I think it was Ken Apoloe (phonetic).  I know I had met him before that.  I met him at a celebration of the history of radiation oncology at Penrose at an event.

And then I had some interactions towards the, you know, the end of his time that I would say likely were all kind of related.  I may run into him in the hallway or at the coffee bar.

Q   Okay.  What were your earliest opinions about Dr. Peddada?

A   He just had an excellent reputation as a physician and very hard working, driven and very successful.

Q   Did that excellent reputation extend to as you understood his reputation the care that he provided to patients?

A   Correct.

Q   Okay.  Can you expound upon that at all?

A   I would not be able to give specifics, but that

Page 43

reputation would come from people referring to him and being very confident in his care.

Q   Did you have any understanding of his reputation, if he had one, regarding his bedside manner?

A   I was not aware of things until more of the end.

Q   Same question with respect to his interactions with coworkers.

A   The exact same.  And in that regard because the vast majority of the care that he provided was outpatient, we would have little interaction or overlap in that area.

Q   Okay.  Did you provide any from of evaluations, like annual performance evaluations to Dr. Peddada?

A   No.

Q   Did you provide those types of things to any physicians at Centura?

A   Only some of the contractual related medical staff leadership, like annual evaluation of the chief of staff.  That is a regulatory requirement.

Q   For the quality and the performance of a physician, as I understand your role, your intervention results from events or complaints or something to that effect, is that fair?

A   Yes.

Q   Do you have any relationship with Dr. Peddada outside of work?

Page 44

A   No.

Q   Anything else you can think of that stands out in your mind outside of the tail end of Dr. Peddada's practice of medicine at Penrose about your working relationship with Dr. Peddada?

A   No.

Q   Do you remember any conversations with other doctors who I think you described it as were confident referring him patients?

Do you remember any of those specific conversations?

A   No.

Q   But you got that impression from somewhere?

A   Yes.

Q   Now, I do want to move forward to the tail end of things.

So all of that can come back in your mind, if that is fair?

A   Yes, it is.

Q   Were you aware at the time while you were serving as chief medical officer for Centura Penrose that ROPC hired Dr. Madeera Kathpal?

A   No, and I apologize.  Yes, I was, and I apologize.  I referred to it as Coffpal (sic), but it was Kathpal that I was referring to.

Page 45

Q   That is what I thought.  Thank you for that clarification.

Do you recall that being in about 2021?

A   I don't recall the date.

Q   Okay.  I will represent to you it occurred in 2021.

Do you have any reason --

A   That sounds appropriate.

Q   Okay.  What do you recall just about that process, if anything, of hiring Dr. Kathpal?

A   I really just remember the cocktail reception and meeting her.

Q   So you did not have any role in the process by which ROPC hired her?

A   I don't think so.  I don't recall if I interviewed her.  I may have.  I honestly don't recall.

Q   Are you aware that Centura Penrose provided a recruitment assistance loan to ROPC to hire Dr. Kathpal?

A   I think I was only aware of that after everything played out in an E-mail review.

Q   Do you recall any discussions about why there would need to be or why they were hiring an additional doctor in this area?

A   Not specifically, other than I just know it was busy.

MAGNA
LEGAL SERVICES

Page 46

Q   Okay.  I should be more clear.

Dr. Kathpal was another radiation oncologist, is that right?

A   Yes.

Q   So the radiation oncology department at the time was busy?

A   Yes.

Q   Okay.  Do you recall anything -- well, let me ask you a different question actually.

Did you meet Dr. Kathpal at the cocktail party?

A   Yes.

Q   What were your impressions of Dr. Kathpal?

A   She seemed nice and pleasant.

Q   What was the atmosphere, the mood of the cocktail party, as you remember it?

A   It was positive, but very few people.  I showed up kind of early, a little too early.

Q   It wasn't a blockbuster party?

A   Not by the time I left.  I did not stay long.

Q   Why did you go?

A   Just to welcome a new member and to show support for the program.

Q   What do you recall about Dr. Kathpal's practice of medicine at Penrose Saint Francis?

Page 47

A   I really don't recall anything.

Q   Does she still work there as far as you are aware?

A   As far as I am aware, no.  She left in 2022, I believe.

Q   While she was practicing medicine at Centura Saint Francis, did you come aware of any patient complaints, staff complaints, anything like that with respect to Dr. Kathpal?

A   The only thing I recall hearing, and I don't remember who I heard it from, it was in some of the discussions with either Dr. Monroe or Dr. Peddada that they had differing opinions of her effectiveness.

Q   Do you recall what those opinions were as they were communicated to you?

A   All I recall is someone was much less of a fan of her than the other.  I don't recall which way it landed.

MR. AZMOUDEH:  I am about to go into a pretty lengthy chapter.  Let's take a quick break, maybe ten minutes, and come back.

THE WITNESS:  Sounds good.

MR. AZMOUDEH:  Thank you.

(Whereupon, a brief break was taken.)

MR. AZMOUDEH:  Back on the record.

Page 48

BY MR. AZMOUDEH:

Q   Towards the end of 2021 Centura began discussing the possibility of employing Dr. Peddada as a physician.

Do you recall those circumstances?

A   I was aware at some point there was a discussion of employing Dr. Peddada and Dr. Monroe.  The timing of which I was aware of it, I don't know.

Q   Was your relationship with Dr. Monroe any different than it was with Dr. Peddada?

A   No.

Q   To summarize, you infrequently see Dr. Monroe at work?

A   Correct.  I think I see him less than Dr. Peddada.

Q   Did you have any understanding about in this time frame about their relationship, the relationship between Dr. Monroe and Dr. Peddada?

A   From the review of the E-mails and my recollection I don't think I understood their relationship really until 2022 and about the same time frame of the E-mails.

Q   So as I understood it, you did not have any role in let's say the decisionmaking process on whether or not to employ Dr. Peddada and Dr. Monroe in 2021?

A   Correct.

Page 49

Q   I want to show you -- throughout the day I am going to show you documents.

A   Okay.

Q   I will put them into context and label them for you and things like that.  I think the easiest way to share them with you is to put them in the chat.

A   Okay.

Q   And you can download them.

So, Dr. Plauth, do you see Exhibit 40 in the chat (indicating)?

(Thereupon, Exhibit 40 was marked for identification.)

A   Yes.  I am in the process of downloading.  I have it now.

BY MR. AZMOUDEH:

Q   Take a second to familiarize yourself with this document and let me know when you are relatively familiar.

A   Do I read the physician employment agreement?

Q   You don't have to read the entire physician employment agreement.

A   Thank you.

Q   Is that a pretty long agreement?

A   Looks kind of standard.

Q   Does it have a lot of legalese in it?

A   Okay.  I have gone through it.

13 (Pages 46 to 49)

MAGNA
LEGAL SERVICES

Page 50

Q    Start at the E-mail at the top of Exhibit 40.
Okay.  Have you -- well, let me ask you this.
Who was Eric Koval to you at the time?
A    I forget his -- actually, he was the director of oncology services.
Q    What was that role in your view?
A    He was the administrative leader over oncology and specifically radiation oncology.
Q    And did you have any working relationship with Mr. Koval around this time?
A    Only as far as needing another leader on the administrative team.
Q    Would you interact with Mr. Koval in certain scenarios?
A    Around this timeframe in 2022 he had shared some complaints that ultimately I got involved in one of two of them with him, but I was not his main partner to go to person in these things.
Q    What was the general nature of those complaints?
A    One of them was related to staff complaints and then I believe another one was related to a family -- I think it was a family member of the patient.  It may have been the patient herself.
Q    Who were the complainants complaining about?
A    They were complaining about Dr. Peddada and his

Page 51

interactions.
Q    And what do you recall about what you did about those complaints?
A    At one point I met with Dr. Peddada.  I can't recall if I met with him alone or with Dr. Baldauf.  I think it was Dr. Baldauf as chief of staff just to share the complaint and to address it with him.
Q    What was the outcome of that -- of those circumstances?
A    As I recall, he acknowledged the situation.  I provided some coaching and also talked about some wellness opportunities.
Q    Did this cause you serious concern about Dr. Peddada?
A    It caused me concern, not serious concern.
Q    Did you feel as though the circumstances had come to a conclusion after your coaching and referral to some of the wellness program tools?
A    Could you rephrase that?
Q    Sure.
Was there anything left for you to do after your meetings with Dr. Peddada?
A    Not on my side.
Q    As I think we were discussing, that was your first meaningful interaction with Mr. Koval, is that

Page 52

right?
A    No.  In other leadership orientation type things I would interact with Eric Koval.
Q    What were the leadership type things that you interact with Dr. Koval during --
A    I don't recall, but occasionally we would have meetings about the different administrative leaders.
A good example, in some of our Covid safety huddles, you know, he would be there and I would be there, those kinds of things or instant command type of events.
Q    Earlier you said the CMO is often described as the liaison.
Would Dr. Koval be one of the persons who you would serve as a liaison?
A    Much less so.
Q    Who are the people that would come to your mind if on one end of the liaison is staff and physicians, physician staff, on the other end, who is on the other end in your mind as you are serving as chief medical officer at Centura Penrose?
A    Vast majority of times it would be the executives of Penrose Saint Francis or executives of Centura.
Q    Any names come to mind?
A    At Penrose Saint Francis is our leadership with Dr. Erling, our chief operating officer, Kevin Culliman

Page 53

(phonetic) at the time, myself, Patrick Ballard, chief financial officer.
Q    How about Dr. Jeffrey Albert?
A    He was more at the system level and on the employment side.
Q    Would he be a potential candidate to sit on the other side of the liaison work?
A    No.  No.  He is more separate.  My liaisons of the medical staff are the leadership of Penrose Saint Francis Centura.
Q    How about Samuel Weller at the time?
A    No.
Q    What was his role at the time?
A    I forget his title.  He oversaw I believe a lot of physician contracting coordinated with physician groups in the larger region and actually a couple of other regions.
Q    How about Jason Taha (phonetic)?
A    I remember the name.
Can you remind me his position?
Q    Without looking at documents, I don't remember his exact position.
A    I believe he was in the employed group, but very few interactions.
Q    We will discuss him more later, but from what I



14 (Pages 50 to 53)

Page 54

am hearing, very little interactions with Mr. Taha?

A   Yes.  I think I met him at a reception.

Q   In this Exhibit 40 we looked at do you see Mr. Koval saying Dr. Peddada printed and signed his employment contract?

Do you see that in his e-mail (indicating)?

A   Yes.

Q   Did you have any role in sending the employment agreement, overseeing the printing or the signing?

A   No.

Q   Do you recall any discussions that you would have been a part of about the printing and the signing and the sending of the employment agreement?

A   No.  I probably would have heard that it had gotten signed at some point, but that is it.

Q   And if you had heard that, who would have told you?

A   Well, it probably would have come from either Dr. Erling, maybe, Eric Koval.  Those would be the main people that I would interact with.

Q   At the time did you have Mr. Koval's cell phone number in your phone?

A   I probably did.

Q   Do you recall when this -- around this time that is listed in the E-mail, April of 2022, do you recall any

Page 55

conversations about whether this was the final version of the employment agreement?

A   I wouldn't have been privy to that.

Q   Anything else that you can recall about Centura sending out this agreement?

A   No.

Q   Okay.  Let me ask you this.

Based on this E-mail and this agreement, which is dated -- the E-mail is dated April 12th of 2022, just building a timeline.

You are aware now that in April of 2022 there are ongoing discussions about Dr. Peddada becoming an employee of Centura?

A   In April of 2022.

Q   I will close Exhibit 40 and I have just put Exhibit 44 in the chat.

(Thereupon, Exhibit 44 was marked for identification.)

BY MR. AZMOUDEH:

Q   Do you see that (indicating)?

A   I do and I am downloading it.  I have it open.

Q   Take a moment to familiarize yourself with this document and let me know when you are ready to chat about it.

A   Okay.

Page 56

Q   Do you remember this set of E-mails (indicating)?

A   I do.

Q   Okay.  I will draw your attention, first, Dr. Plauth, to your E-mail from February 22nd of 2022 at 4:01 p.m.

Do you see that one (indicating)?

A   Yes.

MR. SABEY:  Objection to the form.  It says April.

MR. AZMOUDEH:  What did I say?

MR. SABEY:  You said February.

THE WITNESS:  Oh, I did not catch it.

MR. AZMOUDEH:  Thank you.

BY MR. AZMOUDEH:

Q   Doctor, to make a clear record here, I am talking about an E-mail that you sent on April 22nd of 2022 at 4:01 p.m.

Do you see that E-mail (indicating)?

A   Yes.

Q   And at the top of that E-mail you write, I just received a call from Dr. Peddada's PCP.

Do you see that (indicating)?

A   Yes.

Q   What is PCP?

A   Primary care provider.

Page 57

Q   Do you recall that phone call that is being referenced in the E-mail?

A   I remember receiving it and just slightly.

Q   What do you recall about that phone call?

A   I just remember receiving a call.  I believe his primary care provider was a lady and she was -- just said that he had stress and that was about it.

From reading my E-mail I would have asked if he was at risk to himself given the description of stress and the answer was no that I was relaying.

Q   In your e-mail you write, not a risk.

Are you referring to not a risk to himself?

A   Correct.

Q   Okay.  And that is, Doctor, this is not a potential suicide, correct?

A   Correct.  That is what I would have been referring to.

Q   Did you think you would have inquired about anything else regarding the information that the primary care physician was relying to you?

A   I don't recall asking many questions.  I would just take the report by their professional opinion and what they were recommending.

Q   What did you think when you got that call?

A   I thought it was in usual that I was getting a

15 (Pages 54 to 57)

Page 58

direct call.

Q   Unusual in what way?

A   I don't recall getting direct calls from other physicians, physicians requesting leaves.  Normally it would be a part of a request for a leave of absence, a more formal process.

Q   Do you know the name of that primary care physician?

A   I was aware of the name.  I don't believe I had ever met her before.

Q   Does Dr. Munni Selagamsetty ring a bell?

A   Yes.

Q   Does people call or have you heard people call her Dr. Setty?

A   I have heard that.

Q   Did you have any relationship to Dr. Setty?

A   No, not at all.

Q   When you say you have heard people -- I don't exactly remember what you said.  You were somehow familiar with Dr. Setty in the past.

Is that only through this lawsuit and these facts or did you have an independent understanding of who Dr. Setty was?

A   I think you asked me if I was familiar with her being referred to as Dr. Setty and that is what I was

Page 59

aware of.

Q   Is that only from this case or have you heard other people call her that?

A   It probably would have been in relationship to this case or maybe Dr. Peddada.

Q   You said at the bottom of your E-mail, he is going on vacation for a week and hopefully will be doing better.  If not, we may need help sooner than later.

What did you mean if not, we may need help sooner than later?

A   I believe I am referring to the PCP sharing that he was under extreme stress.  And just as the E-mail says, that if he is still experiencing that extreme stress after vacation, then he may need some help.

And that is why I referred him to Dr. Thompson, but she was our -- probably was not her title, but medical director of wellness.

Q   So when you say, we may need help, what you are intending to say or the meaning of that is you may need help with his circumstances, is that what you are getting at?

A   Um, let me reread it.  I would say, yes.  And in relationship to who the E-mail was sent to, may need their help on the practice side.

Q   What does that mean?

Page 60

A   It could be coverage issues or other things to help decrease that extreme stress.

Q   Why does Dr. Albert need to know about this -- these circumstances?

A   Because he was ultimately responsible for the radiation oncology practice and the coordination of care.

Q   Then same for Koval.

Why does he need to be aware of these circumstances?

A   Because he is the director of that area.

Q   Do you recall having any conversations with any of these people listed on the -- that you sent this E-mail to outside of this E-mail right around this time when you got the phone call from Dr. Setty?

A   I don't recall specifically.

Q   If you look up an E-mail, the one from Jeffrey Albert on April 22nd, the same day at 4:38 p.m., do you see that one (indicating)?

A   Yes.

Q   In that E-mail do you see Dr. Albert discussing additionally we have figured out a way to get him a three week break in June before they officially come on as employees.

Do you see that (indicating)?

A   Yes.

Page 61

Q   Okay.  Do you think by that point you would have understood there was an employment discussion going on?

A   Yes, I do.

Q   Do you recall any conversations that -- around these E-mails about whether the call from Dr. Setty and the employment discussions were at all needed to be considered in tandem?

A   No.

Q   You can close 44.  And I have 11 open or what has been previously marked as Exhibit 11.

Take a minute to familiarize yourself with this E-mail and let me know when you have had a chance to do that.

A   I want to confirm Exhibit 11 on the document itself at the top it says 10.

Q   At the bottom right do you see it says 11 (indicating)?

A   Yes, I do.  Thank you.  Okay.

Q   Do you recall this E-mail?

A   Yes.  I have seen this.

Q   This E-mail is dated April 25th, 2022?

A   Correct.

Q   This would have been about three days after you got the call from Dr. Setty?

A   Correct.

16 (Pages 58 to 61)

Page 62

Q   How did you interpret this E-mail in the moment as best you can recall?

A   As I recall and in my capacity, I was concerned about the leave of absence and whether or not we had approved that.

Q   What about Dr. Peddada's complaint of a disability?

Do you have any opinions about that?

A   I don't know what the disability would be.

Q   Did you not make any connection between this E-mail and the call you had just gotten from Dr. Setty a couple of days before?

A   In that call I did not hear anything about a disability.

Q   In this E-mail Dr. Peddada also says, I am undertaking this leave at the instruction of my personal physician.

Did you put that together with the call that he had just gotten from Dr. Setty?

A   I understand how he was putting it together.

Q   How do you think he was putting it together?

A   That she was telling him that he needed to take a leave.

Q   Do you remember forming any initial impressions about his request and his complaint of a disability?

Page 63

A   I don't remember anything about a disability. I know his complaint and talking about a potential leave. I believe there are other E-mails we will go over that discusses that.

Q   So prior to this E-mail you had never heard or seen the word disability come out of Dr. Peddada's mouth or his physician, is that fair?

A   I believe so.

Q   And based on this E-mail you had never heard the word physician burnout come out of Dr. Peddada's mouth or his primary care physician, is that fair?

A   Yes.  That is fair.

Q   And then this E-mail is probably or let me rephrase.

This E-mail is the first time that you understood Dr. Peddada was seeking a leave?

A   I don't recall.  I would have to look at the other E-mails that I know we will discuss.

Q   You don't remember any other conversations prior to this E-mail about, you know, with Dr. Peddada or his primary care physician specifically about a leave, is that fair?

A   That is fair.

Q   You can put away Exhibit 11.

MR. AZMOUDEH:  I just shared with you what has

Page 64

been newly marked as 56.

(Thereupon, Exhibit 56 was marked for identification.)

BY MR. AZMOUDEH:

Q   Do you see that indicating (indicating)?

A   It is downloading and I have it now.

Q   Have you seen this document before, Dr. Plauth (indicating)?

A   I have not.

Q   I want to draw your attention to -- well, the very top of the document.

Do you see that it says new CHPG employment agreement for Dr. Peddada?

A   I do.

Q   We looked earlier at an employment agreement that Centura sent to him around April 12th?

A   Yes, that you displayed.

Q   And now it appears we are looking at a new version of that being sent to him.

Do you understand that?

A   Yes, I do.

Q   Do you see about a third of the way down there is a line in this Exhibit 56 that says, document E-mailed to Dr. Peddada for signature on April 26th of 2022 (indicating)?

Page 65

A   At 5:30 p.m., yes.

Q   Okay.  As you understand the time line, Dr. Peddada would have been on vacation on that date, correct?

A   I don't recall.

Q   I think in the E-mail -- sorry.

A   I was just saying I don't recall what the days of his vacation were.

Q   I will paraphrase the E-mail.

It says he has got a week off for vacation and hopefully he is better after that.

Do you remember that?

A   Yes.  I am just trying to pull it up because I thought he was going on, not necessarily that he was on it.

Q   That is fair, and this is besides the point anyway.  I will focus on why I have this open.

Did you know anything about a second agreement being sent to Dr. Peddada or a new employment agreement?

A   No.  I did not.

Q   Do you recall any conversations about a second document going out to Dr. Peddada?

A   No.

Q   And I think as we discussed earlier the people

MAGNA
LEGAL SERVICES

Page 66

who would have been involved in the process would have been minimally Dr. Koval, is that fair?

A    Maybe.  I would think certainly Sam Weller.

Q    And I think you described Dr. Albert as he works on employment matters, so he probably would have been involved?

A    Agreed.

Q    And Mr. Koval sent the first one.
So I will represent to you that he was involved in some capacity.

A    I will expect that.

Q    And the timeline on this ask is April 26th.
This would have come one day after Dr. Peddada cc'd you on that E-mail complaining of the disability and requesting a leave, is that fair?

A    Okay.

Q    Did you have any conversations about the connection between those two things?

A    No.

Q    We can agree at least based on this document, Exhibit 56, as of April 26th of 2022 there is a document outstanding for Dr. Peddada sent from Mr. Weller regarding Dr. Peddada's employment with Centura, is that fair?

MR. SABEY:  Object to foundation.

A    Since I am not familiar, all I know is the

Page 67

document was E-mailed for signature.

BY MR. AZMOUDEH:

Q    At the top it says new CHPG employment agreement, right?

A    Correct.

Q    So I will ask again just for timeline purposes.
We can agree that by April 26th, 2022 there is a new employment agreement sent to Dr. Peddada for signature as Exhibit 56 says?

A    That would be my understanding from what you are describing.

Q    Okay.  Exhibit 56.
I just shared with you what has been previously marked as Exhibit 21.  Let me know when you have opened that and familiarized yourself with that document.

A    It is open.  I just need a second to look at it. Okay.

Q    Do you see at the top of Exhibit 21 this is an E-mail drafted by Dr. Albert.  He says, I had a meeting today with several people including you.
Do you see that (indicating)?

A    Yes.

Q    Do you recall that meeting?

A    Not specifically.

Page 68

Q    Can you refresh your memory from this document what might have been discussed at that meeting?

A    With the other E-mails I am sure we will discuss, it is about what he had communicated from -- and the discussion also from his primary care provider.

Q    When you say what he had communicated --

A    Sorry.  What Dr. Peddada had communicated.

Q    And you don't remember anything from that meeting?

A    No, I don't, other than what would be here.

Q    You see in here Dr. Albert has a line that says, FYI, Alan has verbally accepted but not officially signed before we sign the agreement to include the loan and the sentence goes on?

A    Yes.

Q    Dr. Albert is referring to the employment discussions that you and I just discussed were ongoing at the time, is that right?

MR. SABEY:  Object to foundation.

A    That is how I interrupted it.

BY MR. AZMOUDEH:

Q    Do you know if Mr. Albert brought that up during your meeting?

A    No.  I don't recall that at all.

Q    And to be clear -- well, let me actually do one

Page 69

thing.
Do you still have Exhibit 11 in front of you?

A    I have it.

Q    Okay.  Do you see the subject line in the E-mail is needs attention (indicating)?

A    Yes.

Q    Then go back to Exhibit 21.
Do you see the subject line in the E-mail needs attention (indicating)?

A    Yes.

Q    So when Dr. Albert says in this E-mail, I had a meeting today with certain people regarding the E-mail below, the E-mail below that he is talking about is Exhibit 11, correct?

MR. SABEY:  Object to foundation.

A    Yes.  I don't know.

BY MR. AZMOUDEH:

Q    So in Dr. Albert's E-mail the subject line is forward needs attention.
So it is very likely the E-mail he forwarded has the subject line needs attention, is that fair?

A    Yes.

Q    Is that your general understanding of how E-mail subject lines work?

A    Yes.

MAGNA
LEGAL SERVICES

Page 70

Q   And in the E-mail that he forwarded is Exhibit 11 which has the subject line, needs attention?

A   Yes.

Q   Okay.  So based on Dr. Albert's E-mail Exhibit 21 saying we had a meeting this morning discussing Exhibit 11, the meeting would have been about the contents of Exhibit 11, is that fair?

MR. SABEY:  Object to foundation.

A   Seems reasonable.

BY MR. AZMOUDEH:

Q   Okay.  You don't have any reason to dispute that Dr. Albert was saying he had a meeting about a certain E-mail, but that meeting was actually about surgery tools, right?

A   Yes.

Q   Okay.  And so if that meeting was about Exhibit 11, then that meeting would have been about a fair guess or an educated assumption that meeting would have been about Dr. Peddada's description of a disability?

MR. SABEY:  Object to form.

A   Yes.  I don't recall that.

BY MR. AZMOUDEH:

Q   Is that a fair reading of these documents, that is what that meeting would have been about since you can't recall what the meeting was about?

Page 71

Is that a fair reading of those documents that that is what that meeting would have been about?

MR. SABEY:  Same objection.

A   Yeah.  I am not sure that it is.  I mean, he is talking about the leave.  I think that is what it would be about.

BY MR. AZMOUDEH:

Q   Okay.  So minimally the meeting on April 27th that Dr. Albert is referencing would have been about a leave?

A   I suspect to.

Q   Okay.  I will have you close out of that one, out of 21.  I am going to show you what I am marking now as Exhibit 57.

(Thereupon, Exhibit 57 was marked for identification.)

BY MR. AZMOUDEH:

Q   And I have it open.  Take your time and familiarize yourself with this document.

A   Okay.

Q   Okay.  And I will start at the very bottom, Dr. Plauth, with an E-mail that you sent on April 27th, 2022 at 5:27 p.m.

Do you see that (indicating)?

A   Yes.

Page 72

Q   Based on your reading of this E-mail you understand at the time that there is an employment -- there is a discussion regarding Dr. Peddada's employment, is that fair?

A   Right.

Q   You say -- sorry.

In your next E-mail a little bit further up on April 28th for the following day at 5:52 p.m. you say, Dr. Plauth, we should separate out the wellness med staff from the practice employment.

Do you see that (indicating)?

A   Correct.

Q   Why do you say that?

A   Because we are handling those separately and I am responsible on the medical staff side, the leave request.

Q   I guess, why are you handling them separately?

A   Because I am not involved in the employment side of it and they are different discussions.

Q   In what ways are they different discussions?

A   The leave of absence is something that is requested on the medical staff side with a different approval process that does not involve employment and that would be my role along with the chief of staff reference.

Q   Do you think that the people involved with the

Page 73

practice employment issues should be aware of the wellness issues?

A   As it affects the practice, yes.

Q   But you are saying here we should separate it.

A   Separate out the employment and, you know, the leave of absence, if we grant it.

Q   But, generally, do you think those people working on the employment side should be aware of what is going on on the leave of absence side?

A   As it pertains to the practice and the care of the practice, yes.  They should be aware of that.

Q   What about just as it pertains to the wellness of the physician, do you think that the people working on the employment side should be aware of the wellness of the physician?

MR. SABEY:  Object to the form.

A   I am not sure.

Can you restate that?

BY MR. AZMOUDEH:

Q   Okay.  So in your E-mail you say there is the wellness/med staff issues should be separated from the practice employment issues.

And I asked you whether you agree with that and you said I think yes because one has to do with patient care and quality and the other has to do with



Page 74

employment.

And I am asking you a more specific question now, which is putting patient care aside, what about physician wellness?

A   I think awareness is reasonable.  But as far as the decisionmaking, let them make independent decisions.

Q   Just to restate it.

So you think the employment -- people working on the employment process should be aware of physician wellness, but that they should make their decisions independent of any physician wellness issues?

A   No.  In this context of the E-mails and the fact that Dr. Peddada had said that he was not willing to talk to folks and I was trying to get him to talk to the practice and those involved in employment was that he was combining the two.

And I was trying to coach him and help him that he needs to talk to both folks and that not talking was not an option.

Q   Do you understand how the wellness issues for Dr. Peddada might have affected his ability to handle the practice employment issues?

A   No.  I disagree with that.

Q   I am just asking if you do understand it.

You said -- your answer I think is you don't

Page 75

believe there is any connection?

MR. SABEY:  Objection to the form.

BY MR. AZMOUDEH:

Q   Let me restate that for you.

In your opinion Dr. Peddada's wellness issues did not relate to how he should handle himself with respect to the practice employment issues?

MR. SABEY:  Object to the form.

A   I am sorry.  State it again.

BY MR. AZMOUDEH:

Q   In your opinion Dr. Peddada's wellness issues should not affect how he behaves himself with respect to the practice employment issues?

A   It should not affect his discussions with the practice and employment.

Q   And my follow up question was do you see how Dr. Peddada might struggle with that ask?

A   Actually, no.

Q   Why not?

A   He was describing stress, and I don't see that as limiting his ability to arrange proper coverage for the practice, this patients, and discussions with those he is having employment discussions with.

Q   In that same E-mail on April 28th you say,

Page 76

overall unless suicidal, which he is not, this is the wrong way to approach this and is not supported.

Do you see that (indicating)?

A   Yes.

Q   Did you consider whether his severe stress was why he was approaching it in this way?

A   I understand why he was asking what he was asking.  And for the leave of absence there are requirements to submit a request, which I had shared with him either over the phone or in other E-mail communications that we had and there is a process.

And that he can't just automatically leave. It has to be approved.  It is not a right because there are considerations about patient coverage and practice coverage that needed to be taken into consideration.  It is not an unilateral decision.

Q   And in your view at the time he had bypassed some of those requirements or attempted to bypass some of those requirements, correct?

A   Correct.  He was just making a declaration.

Q   And based on this E-mail you were not exactly pleased with the way that he was going about that request, correct?

A   Correct.  I considered it unprofessional.

Q   Did you consider that his severe stress and the

Page 77

basis for which he was requesting that leave had anything to do with the way he was going about requesting leave?

A   From my other discussions with him I know he was referring to that, but did not rise to that level.

Q   His condition did not rise to the level in your view?

A   Not for immediate relief.

Q   I think we discussed earlier that you also in months previous in these communications dealt with a few patient complaints or I don't remember if they were all patient complaints, but a few complaints about against Dr. Peddada.

Do you remember that?

A   Yes.  I believe there were two.

Q   Did you make the connection between Dr. Peddada's behavior here and maybe what some of the patients were complaining about?

A   I would draw some connection, but I also understand from prior that that behavior was not necessarily all that unusual for him.  I had not had cause to have interactions with him before.

Q   Where did you get the impression that the substance of those complaints was not unusual for Dr. Peddada?

A   With talking with the practice.

MAGNA
LEGAL SERVICES

Page 78

Q   The ROPC or Centura?

A   The nurses within the practice.  I am not sure -- I assume they were Centura employees.

Q   Okay.  You can close 57.

Do you recall setting up a meeting on May 2nd of 2022 with Dr. Peddada, Dr. Baldauf and yourself?

A   I recall trying to in the E-mails allude to it, so that is familiar.  Whether or not we actually spoke, I don't recall.

Q   I will refresh your memory.

You sent out a zoom link for the morning of May 2nd.

Does that ring a bell?

A   Yes.

Q   Do you remember anything from that meeting?

A   If you can confirm from what you are aware, did we actually have the meeting?

Q   I will represent to you that there was a meeting, but it has not been clear to me over time whether you attended that meeting.  That is kind of what I am asking today.

Do you recall attending that meeting?

A   If I set it up, I would have attended.  I don't recall him calling in or whether he attended.  If we did, we talked about these same things.

Page 79

Q   Do you -- and I will help you, but let me just ask this.

Do you recall conversations with Dr. Baldauf around this time?

A   Yes.  She was chief of staff.

Q   What were the general nature of those conversations?

A   About -- being concerned about Dr. Peddada.  In my assessment that he was under stress, the reports and then him wanting to take a leave of absence.

Q   Why were you concerned about Dr. Peddada?

A   I am concerned about all of our physicians.

Q   Why were you concerned about Dr. Peddada in particular?

A   Well, the recent complaints and his stress and how he was conducting himself.

MR. AZMOUDEH:  I am going to show you what is being marked as Exhibit 58.

(Thereupon, Exhibit 58 was marked for identification.)

MR. AZMOUDEH:  That is the wrong E-mail.  Sorry. We will get to that one.  I will delete that one so -- but I will leave that as Exhibit 58, but I will show you Exhibit 59 first (indicating).

(Thereupon, Exhibit 59 was marked for

Page 80

identification.)

A   Okay.  I have 59 open.

BY MR. AZMOUDEH:

Q   Take a second to familiarize yourself with that E-mail.

A   Okay.

Q   Do you see Dr. Peddada on May 2nd in his E-mail to Dr. Baldauf it says, thank you for your time this morning discussing my medical leave?

A   I do.

Q   That is probably referencing the meeting that you sent out a zoom link for?

A   I would assume.

What time was the meeting?

Q   I will represent that it was scheduled for 9:30 a.m.

A   Okay.  Gotcha.

Q   And I think earlier we were wondering whether Dr. Peddada had attended and it looks like he did attend this meeting, correct?

A   I don't -- I don't recall.  He may have attended that meeting.  Certainly, he is referencing that they discussed.  All I remember around the time was some frustration and that there were challenges of getting him to meet with the two of us.

Page 81

Q   And one of the frustrations was that he was not submitting a formal request to Dr. Baldauf?

A   That was one of the things to discuss, but to even discuss together.

Q   Right.

And this looks like a formal request for leave to Dr. Baldauf (indicating)?

A   Yes.

Q   And in it Dr. Peddada says, I have been diagnosed as having exhaustion, physician burnout by my primary physician and confirmed by Dr. Thompson.

Do you see that (indicating)?

A   Yes.

Q   Is this the first time that you had heard Dr. Peddada say he was diagnosed with physician burnout?

A   It may have been.

Q   Do you recall having any reactions to that?

A   No.

Q   What was your reaction to this E-mail generally?

A   It is a request for leave of absence that we had been asking him to submit.

Q   Based on according to Dr. Peddada a medical condition, correct?

A   I don't consider those necessarily medical conditions.



Page 82

Q   Why not?

A   I am not familiar with a diagnosis with exhaustion or physician burnout.

Q   You can close 59.

Let me show you -- let's go to 58, if you could, the one I shared earlier.

A   I have it.  Okay.

Q   Okay.  This is an E-mail from you to Erin Yaney (phonetic)?

A   Yes.  She was our director or manager of medical staff services.

Q   What was that again?

A   She was either the director or the manager.  I think her title was manager of medical staff services.

Q   What was her role, as you understood it?

A   She was the lead of medical staff services for Penrose and Saint Francis Hospitals overseeing credentialing, privileges, that information.

Q   And your E-mail indicates that the leave of absence was approved on May 5th of 2022, is that how you recall it?

A   Correct.

Q   Do you recall telling Mr. Koval about the leave of absence?

A   The request for it.  I am not sure on the

Page 83

approval of it.

Q   Do you think that is something that you would have done?

A   Probably, I mean, just because the physician would not be providing, you know, services in the practice.

Q   Was there any discussion about the leave of absence as you recall it in connection with Dr. Peddada's employment?

A   No.  I don't recall that.

Q   Do you recall if you told Dr. Albert about the leave of absence?

A   I would not be surprised in the same content of Eric Koval.

Q   How about Mr. Weller?

Would you have told him about the leave of absence?

A   Not necessarily.

Q   And then what about Mr. Taha, probably not?

A   Probably not.  I really did not know him.

Q   Do you recall any discussion around this time about the ADA?

A   No.

Q   Did you consult with your lawyers, and don't tell me what you talked about if you did.

Page 84

Did you consult with any of your lawyers around this time about Dr. Peddada's leave?

A   Are you saying or questioning in relationship to ADA?

Q   No.  No, just generally.

Did you consult with any of the lawyers about the request for leave?

A   Not that I recall.

Q   Okay.  Reopen 57, if you could.

A   Okay.

Q   Do you see at the very bottom of your E-mail on April 27th at 5:25 p.m. (indicating)?

A   Yes.

Q   You say, I shared that not talking with us is not an option as it impacts the practice and his potential employment.

Do you see that (indicating)?

A   Yes.

Q   Sorry.  Let me state it this way.  Let me add one little layer there.

Your E-mail is to Dr. Albert saying Dr. Peddada should be calling you, is that right?

A   Correct.

Q   So when you say here not talking to us, what you are saying is not talking to me, Dr. Plauth, and not

Page 85

talking to Dr. Albert is not an option, correct?

A   Yes.

Q   Because not talking to you could affect leave issues and not talking to Dr. Albert could affect employment issues, right?

A   Potentially, yes.

Q   And when Dr. Peddada is after May 5th on leave, is that still true not talking to you all is not an option because it could have impacts on his staffing privileges as well as his employment?

A   No.  So this was April 27th and before the leave was granted.  So not talking to us, not submitting the request for leave truly is not an option.  That is our process.  It is not a privilege.  There's due diligence for coverage of patients and alike.

As I recall, Dr. Peddada said he wasn't going to talk to anyone.  And I was telling him and he had mentioned -- I think he had mentioned his employment, well, you need to talk to, you know, Jeff and the practice.  It is not for me to talk to them on his behalf.

Q   And that is true even now that Dr. Peddada is on approved leave?

A   Yes.  The communication should be his.

Q   Why couldn't you be the liaison there?

A   That is on the medical staff side, not employment

MAGNA
LEGAL SERVICES

Page 86

side.

Q    But he is one of your physicians, right? He is practicing at the hospital?

A    But his employment is outside of the hospital. That is with CHPG.

Q    So in that moment you saw no need to serve as a liaison for Dr. Peddada with respect to the employment folks?

A    Yes.  That is not my purview.

Q    Earlier we talked about -- compassion was the word we talked about earlier.

Do you think you showed enough compassion in this moment?

A    Yes, I did.

Q    Okay.  In what ways?

A    I was trying to get him help.  I referred him to Dr. Thompson.  I had reached out to his practice to share that he was under stress.  We may need help in relieving that in some way for that and trying to help him navigate the medical staff process.

And ultimately we granted the leave and that was mainly because he had already made his own decision that he was not coming back.

Q    You said he was not coming back meaning indefinitely or what do you mean by that?

Page 87

A    He had self declared that his leave had started I believe for three months.

Q    Why not tell the employment folks this guy is going through something and show him a little extra grace?

A    I had shared that he had been -- that he was having stress and that that had been shared with us.  I wasn't involved in the other decisions.

Q    You knew they were going on, right?

A    Yes.  I was aware.

MR. SABEY:  Objection to form and foundation.

A    Yes.

BY MR. AZMOUDEH:

Q    I will ask it another way.

The other way is you did not see any need to ask the people working on the employment matters to show Dr. Peddada some grace knowing what you knew about his health at the time?

MR. SABEY:  Object to the form.

A    No.

BY MR. AZMOUDEH:

Q    Just so I have a clear record.

What was your answer, Doctor?

A    I said no.

Q    Okay.  You can close whatever you have open that we have been jumping back and forth a little bit.

Page 88

A    It was 57.

Q    Okay.  I am going to show you what has been marked previously as Exhibit 13.

MR. SABEY:  We are at 12:45.

What is the time looking like?

MR. AZMOUDEH:  I have maybe an hour or so, so do you want to take a ten or a fifteen break?  If you need twenty to get a snack and everyone can go on with our Fridays?

THE WITNESS:  I am fine with continuing.

MR. SABEY:  I am also worried about our Court Reporter if she needs a break.

COURT REPORTER:  Thank you for asking and I am fine with keeping on going.

MR. SABEY:  You are welcome.

BY MR. AZMOUDEH:

Q    Doctor, let me share with you Exhibit 13 and let me know when you have it up.

A    It is up.

Q    Take a moment to familiarize yourself with this document (indicating).

This is another one that might say different exhibits on the documents, but the one I am going off is the sticker.

A    No worries.

Page 89

Q    And I hate to do this to you, but I am going to show you something else.  I will keep you guessing today.

A    No worries.

Q    I will go to Exhibit 12.  I will go there first. Let me know when you have had a chance to review Exhibit 12.

A    Okay.

Q    My question about this document is pretty narrow. I think you and I discussed earlier what kind of leave this was.

From this document it looks like Centura is granting medical leave, correct (indicating)?

A    The medical staff is, yes.

Q    Yes.

With the letterhead from Centura, correct?

A    Correct, but it is the medical staff.

Q    Right.

And medical leave is granted when there is some underlying medical condition that requires the leave, correct?

A    It more properly should have read just leave of absence.

Q    Why more properly?

A    Because of the document that follows on the excerpt from the bylaws it all references leave of

MAGNA
LEGAL SERVICES

Page 90

absence. We normally don't make different distinctions. It is all just leave of absence.

Q Okay. You can agree that Dr. Peddada was saying it was a -- was requesting a leave because of a medical reason?

A That is what he was stating.

Q And Dr. Baldauf in this letter is referring Dr. Peddada to the Colorado Physicians Health Program, right?

A Correct.

Q And in making that referral Dr. Baldauf is suggesting that the Colorado Physicians Health Program provided an assessment and recommendations for creation of the leave to indicate when you can safely return, correct?

I am not trying to trip you up here. This indicates that at least Dr. Baldauf understood that this was a leave for medical purposes?

MR. SABEY: Object to form and foundation.

A That was the request. Reading this letter I do recall some of the discussions where it sounds familiar because the basis was on the exhaustion, the physician burnout that you had stated I believe his PCP as an internist.

BY MR. AZMOUDEH:

Q Could you restate that?

Page 91

A The request was to get more professional opinion.

Q Is it -- maybe a different way to think about it. So do you see in Dr. Baldauf's letter in the second sentence in the second paragraph she says, as outlined the request for reinstatement must be accompanied by an appropriate report from the individual's health care practitioner.

Do you see that sentence (indicating)?

A Yes.

Q Go down to the bylaws. Do you see 6.G6 (indicating)?

A Yes.

Q And 6.G6 says, if the leave of absence was for health reasons, their request for reinstatement must be accompanied by an appropriate report from the individual health care's practitioner indicating the individual is physical and/or mentally capable of resuming a hospital practice and safely exercising the clinical privileges requested.

Do you see that (indicating)?

A Yes.

Q That is the language that the letter is pulling from, correct?

A Correct.

Q So the letter is referencing a medical leave, is

Page 92

that right?

A He is requesting a leave of absence for medical reasons. And as such, if he is to return, he would need clearance for what he was stating was a medical reason. He would need a professional opinion. He can't just say I am better.

Q Were you aware of any conversations in this moment indicating that this was a leave of absence for some other reason other than health?

A Not that he had stated.

Q Did someone else state that to you?

A No.

Q So how did you come to the conclusion that -- well, I don't want to put words in your mouth. What was the other reason that you were thinking of that this leave of absence would have been for?

A That is purely what he was asking for. I had issues with it as I shared before what was the timing and the fact that he was declaring when he was out before officially approved.

Q Yes. But the timing and the abruptness, that does not -- that is not about what he was requesting the leave for. My question was narrower than that.

Page 93

Did you have any reason to believe that -- I will start with him, that he was requesting leave for a reason other than his health?

A No.

Q Okay. Did you have any reason to believe that -- strike that. Based on the bylaw we just read, 6, in conjunction with Dr. Baldauf's letter does it appear to you that Dr. Baldauf acting as chief of staff for Centura is granting the leave of absence because of health?

A On behalf of that premise, yes.

Q Because he requested it because of health?

A Correct.

Q And there was no finding that -- Dr. Baldauf, as far as you are aware, did not make a finding that the leave of absence should be granted for another reason, right?

A Correct.

Q So Dr. Baldauf was granting this leave of absence on behalf of Centura because of health, correct?

A On behalf of the medical staff, yes.

Q Okay. Now, let's go to Exhibit 13.

A Okay.

Q Do you see this letter is dated May 9th of 2022 (indicating)?

MAGNA
LEGAL SERVICES

Page 94

A   Yes.

Q   It is a letter signed by Jason Taha?

A   Yes.

Q   Do you know what this letter is?

A   I read it when you showed it earlier.

Q   Did you have any role in this letter going out?

A   Let me refresh myself.  I don't believe so whatsoever, no.

Q   Did Mr. Taha have any conversations with you about this letter?

A   I don't recall.

Q   Did Dr. Baldauf have any conversations with you about this letter?

A   I don't recall.

Q   Did Dr. Albert have any conversations with you about this letter?

A   I don't recall.

Q   Okay.  Do you know if knew Dr. Taha knew that Dr. Peddada was on leave when he issued this letter?

A   I would not be aware of that.

Q   Do you know if Mr. Koval knew that Dr. Peddada was on leave when this letter went out?

A   I believe we had already discussed the E-mails where he was copied on Dr. Peddada's statement that he was taking leave.

Page 95

Q   What do you understand to be the effect of this letter?

MR. SABEY:  Object to foundation and to form.

A   So he is being told that he was declined employment effective July 1st because he had not executed the documents.

BY MR. AZMOUDEH:

Q   Sorry.

Could you repeat that?

A   It is a letter as it states to acknowledge that he declined employment effective July 1st of 2022 by failing to executive the physician employment agreement sent to you on April 26th of 2022.

Q   And it says, hospital is not extending a revised offer of employment.

Do you see that (indicating)?

A   Yes.

Q   Do you read that to mean the possibility of employment is no longer available to Dr. Peddada at the hospital?

A   At this time, yes.

Q   And the basis from what we can glean from this letter, and I take it you were not involved in this.

A   Right.

Q   But the basis we can glean from this letter is

Page 96

that Dr. Peddada was not talking with the people involved in this process?

A   Correct, from the first paragraph.

Q   And Dr. Peddada was on leave at the time that this letter went out, correct?

A   From the medical staff, yes.

Q   And notwithstanding that leave in your opinion he should have been having a conversation with them about employment?

A   Yes.

MR. AZMOUDEH:  Why don't we take that ten minute break and I can wrap up in thirty or so minutes.  Thank you.  I appreciate your patience.

THE WITNESS:  No worries.  Thank you.

(Whereupon, a brief break was taken.)

MR. AZMOUDEH:  Back on the record.

BY MR. AZMOUDEH:

Q   Doctor, I want to zoom out a couple times briefly and then be done in a little bit and hopefully you can go and enjoy your weekend.

As we got a timeline earlier, you joined Centura Penrose in August of 2019 and before that you were at Centura Mercy, correct?

A   Yes.

Q   And are you aware in January of 2019 that a new

Page 97

entity was created called Common Spirit Health?

A   I don't know the timing, but, yes.  There was a change in I think it was Catholic Health Initiates to Common Spirit.

Q   I will represent to you that you have a little piece of that wrong, but I don't want to go through the whole corporate history.

A   Okay.

Q   I will bore you to sleep if we do that.

So I will represent to you that Common Spirit Health was created in January of 2019 while you were still at Centura Mercy.

Do you recall any changes in your working environment at that time or I guess before you left?

Do you recall any changes in your work environment that you accredited to Common Spirit?

A   No.

Q   While you were at Centura Mercy did you sign a new employment contract with Common Spirit?

A   I don't believe so.

Q   Do you know if -- where you got your payroll or benefits changed while you were at Centura Mercy?

A   I don't recall.  I don't recall any change.

Q   And then let's zoom forward to August of 2019 when you got to Centura Penrose.

MAGNA
LEGAL SERVICES

Page 98

I think we just agreed that when you got to Centura Penrose Common Spirit was already born in that moment, is that right?

A    Yes.

Q    When you got to Centura Penrose, did you sign -- was there an employment agreement with Centura or with Common Spirit?

A    I don't recall.

Q    Do you have a hunch?

A    I would have though it was Centura.

Q    Okay.  Do you remember when you were working at Centura Penrose anything about your job related to Common Spirit?

A    No.

Q    I am going to try to refresh your memory, and if the answer is still no, that is okay.

Any new executives that you started working with from Common Spirit?

A    No.

Q    Any directives, policies, changes in practice that flowed from Common Spirit?

A    No.

Q    Did you get any -- did you hear anything from the physicians that you were serving as the chief medical officer for, did you hear anything from the physicians

Page 99

indicating that Common Spirit had changed the practice at Penrose?

A    No.

Q    No discussion of something like new benchmarks?

A    No.  If I heard anything, I would have assumed it was just Centura.

Q    You and I discussed earlier about a good example of, you know, maybe some of the challenges working with a local versus a national organization might be different tools than the physicians are accustomed to using.

Do you remember that discussion?

A    Yes.

Q    Do you remember anything similar like that coming out of the physicians regarding Common Spirit Health?

A    Not Common Spirit.  The supply chain was Health Trust.

Q    Someone -- some entity would have been working with that supplier to purchase supplies for the hospital, right?

Do you know if it was Common Spirit or Centura?

A    I would have assumed it was Centura, but I might be mistaken.

Q    One of your roles at Centura Penrose that we discussed was doing the quality care process.

Page 100

Did Common Spirit have any involvement in that?

A    Not that I am aware of.

Q    Okay.  One of your other roles at Centura Penrose was just generally overseeing the physician staff.

In any way do you recall Common Spirit having any affect on that?

A    No, I don't.

Q    We discussed that you were let go in January of 2023 -- sorry or not.

It sounds like you like your new job better, but was that at all related to Common Spirit?

A    No.

Q    What was going on?

You called it a reorganization earlier.

What was that that was going on?

A    It was within the Centura leadership and leadership within Penrose Saint Francis as it would affect some changes in that leadership as well.

Q    Do you know if Common Spirit would have been behind some of those changes?

A    I wouldn't know.

Q    Okay.  What are your impressions today of Dr. Peddada's decision to request leave?

A    I think he went at it poorly as far as the timing

Page 101

of it.

Q    The timing, tell me more about that.

A    Just declaring it and being difficult to communicate with and to try to work through the normal process.

Q    And you don't offer him any grace on that front because of what he says he was experiencing?

MR. SABEY:  Object to the form.

A    Given what he had described, it did not rise to a level for such an immediate approval, so, no.  I do have issues with that.

BY MR. AZMOUDEH:

Q    In your view based on your understanding of what he described it also did not excuse his communication style?

A    Right.

Q    Did you think he was being disingenuous about what he was experiencing?

A    No.

Q    Okay.  Do you recall conversations with anyone else who -- in which there was a discussion about whether Dr. Peddada was being disingenuous about what he was experiencing?

A    No.  I did not.  There were no discussions about that.

**MAGNA**
LEGAL SERVICES

26 (Pages 98 to 101)

Page 102

Q   So in short you just -- you took what he was saying as truth generally regarding what he was experiencing.

You just didn't think it was serious enough to justify the way he was acting?

A   Correct, and the timing.  Involved in a leave of absence you are also concerned about patient care and coverage issues.

Q   Are you aware whether Dr. Peddada's leave jeopardized any patient care?

A   I don't.

Q   Do you remember there being any discussion that Dr. Peddada's leave ultimately resulted in any serious concerns regarding coverage?

A   I would say yes.  And that the practice provided the coverage needed with people having to fill in.

Q   So put differently, there was a concern about coverage, but it was appropriately addressed?

A   And others stepped up to fill that void.

Q   Do you recall any conversations with other people regarding the possibility that Dr. Peddada intended to take a leave and never come back?

A   Could you restate that or state it again?  I did not catch it all.

Q   Do you recall any conversations where the subject

Page 103

of the conversation was the possibility that Dr. Peddada intended to take a leave and never come back?

A   No.

Q   As far as you understood, Dr. Peddada intended to take a leave and then reapply for reinstatement at some point?

A   Right.  I took him at his word on that.

Q   Okay.  Are you aware that Dr. Peddada reported what he was feeling and requested leave almost immediately after he caught himself making mistakes in the patient care?

A   I was not aware of any mistakes.

Q   Okay.  I will represent to you that that is at least what Dr. Peddada says, that he reported what he was experiencing after he made a mistake in patient care.

Does that change the way you view the circumstances at all?

MR. SABEY:  Object to the form and foundation of that question.

A   Yes.  I just don't know that to be true.

BY MR. AZMOUDEH:

Q   I will represent to you that it is true.  Take it as a hypothetical.  I will restate it.

So assume that it is true that Dr. Peddada reported what he was experiencing in his health after

Page 104

catching himself making mistakes in patient care, does that alter the way that you are thinking about his circumstances?

MR. SABEY:  Same objection.

A   It would give more support for the request of leave of absence.  It doesn't necessarily mean that the immediacy was still justified.

BY MR. AZMOUDEH:

Q   Okay.  Why would he get more support for the leave of absence?

A   Because of impairing quality of care.

Q   Ultimately, that is what -- that is the most important thing to you as chief medical officer at Centura?

MR. SABEY:  Object to form.

A   I don't rank them.  That is my concern with a physician as well.

BY MR. AZMOUDEH:

Q   If that is true, that Dr. Peddada reported the way he was experiencing or requested leave after catching himself making mistakes in patient care, would you consider that to be a commendable act?

A   No.  I don't see it as commendable.

Q   Why not?

A   One, because he did not share any of it.

Page 105

Q   Is there a two?

A   I thought there might have been, but there wasn't.

Q   Do you watch the The Office, Doctor?

A   Both versions.

Q   Do you recall the episode in which Michael Scott says sometimes I start sentences and I don't actually know where they are going to end, but I keep going?

A   No.  I missed that, but I like that.

Q   Something to that effect, I hope I find my way to the end.

All right.  As we discussed earlier, that letter from Mr. Taha on May 9th ended Dr. Peddada's employment opportunity in your words at least for the time being at Centura Penrose.

What do you think about Centura doing that while Dr. Peddada was on leave?

A   I don't have issues with that.

Q   Based on your understanding of the ADA do you think Centura did all that it could to provide fair accommodations to Dr. Peddada?

A   My understanding of the ADA is that it covers disabilities and I don't see nor am I aware of a disability.

Q   So in your view no accommodations were needed

MAGNA
LEGAL SERVICES

Page 106

here?

A   Not based on the statute or the regulations specific to that.

Q   I will put a finer point on it.  No disability here.

So, therefore, no need for an accommodation under the law in your view?

MR. SABEY:  Object to foundation.

A   I would concur with that.  And yet my understanding from the E-mails is that the practice had already tried to provide time off, additional time off, and were trying to address and tried to help.

BY MR. AZMOUDEH:

Q   Are you aware of the nature of Dr. Peddada's allegations in this complaint -- or sorry, in this lawsuit?

A   I believe so.

Q   What is your general understanding?

A   My understanding is that he is claiming that he signed an agreement or an employment offer early and that in essence that should have held.

Q   Are you aware that Dr. Peddada is also alleging that he did not receive a fair accommodation under the ADA?

Are you aware of that?

Page 107

A   I can't recall if I heard that or not.  It certainly did not stand out in my mind.

Q   Can you empathize at all with Dr. Peddada about why he would have filed this lawsuit?

A   Actually, no.

Q   Even true even though he worked at this hospital for two decades and then lost his opportunity to continue working at this hospital because he would not pick up the phone?

A   It is not as simple as not picking up a phone.

Q   What else is there in your view?

A   He walked out of the practice.  He did not talk with folks to help provide coverage.  As we pointed out, he was in discussions about employment.  He did not talk to anyone.  I had advised him to talk.  It just doesn't make sense to me.

Q   Okay.  Looking back now, would you have done anything differently in this situation?

A   I would say no.

Q   Do you think Centura should have done anything differently in this situation?

A   No.

Q   Anything else you want to add about anything we have talked about today?

A   No.  I think we have covered it.

Page 108

Q   Anything you want to clarify or change about what you said today?

A   No.  I do not.

Q   Were you accurate and honest in answering my questions today?

A   Yes, I was.

MR. AZMOUDEH:  Thank you for your time.

MR. SABEY:  Nothing from me.

MR. AZMOUDEH:  I am ordering.

MR. SABEY:  Then I will take a copy.

(Concluded at 3:30 p.m.)

Page 109

CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF HILLSBOROUGH

I, Wanda Jackson, the undersigned authority, certify that DR. WILLIAM PLAUTH personally appeared remotely before me and was duly sworn.

WITNESS my hand and official seal this 10th day of January 2025.

_Wanda Jackson_
Wanda Jackson
Notary Public, State of Florida
My commission expires 4/1/2027
Commission No. GG318277



Page 110

REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH

I, Wanda Jackson, Court Reporter, certify that I was authorized to and did stenographically report the deposition remotely, and that the transcript is a true record of the stenographic notes.

I further certify that I am not a relative, employee, or attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Dated this 10th day of January 2025.

_Wanda Jackson_
Wanda Jackson, Court Reporter
Notary Public, State of Florida
My commission expires 4/1/2027
Commission No. GG318277



**A**

**ability**
74:21 75:22
**able**
6:14 21:4 42:25
**abruptness**
92:23
**absence**
26:14,19 27:6 58:5
62:4 72:21 73:6,9
76:8 79:10 81:20
82:20,24 83:8,12,17
89:22 90:1,2 91:13
92:2,8,16 93:10,16
93:19 102:7 104:6
104:10
**absences**
26:24
**Absolutely**
19:21
**accepted**
68:12
**accommodation**
25:7,9,22,23 26:2
27:24,24 28:3,4,12
106:6,23
**accommodations**
24:21 105:21,25
**accomodation**
26:3
**accompanied**
91:5,15
**accredited**
97:16
**accurate**
11:9,15 13:10,13,21
14:8,12,13 15:20
19:3 108:4
**accurately**
6:10,14
**accustomed**
99:10
**acknowledge**
95:10
**acknowledged**

51:10
**act**
24:17,20 104:22
**acting**
14:11 93:9 102:5
**ACTIO**
1:5
**action**
110:15,16
**activities**
21:2
**ADA**
24:24 25:2 83:22
84:4 105:19,22
106:24
**add**
41:1 84:19 107:23
**added**
17:25
**additional**
45:22 106:11
**additionally**
60:21
**address**
51:7 106:12
**addressed**
102:18
**administrative**
18:16 20:21 50:7,12
52:7
**adverse**
29:8
**advised**
107:15
**affect**
36:7 38:2,10,12
75:13,15 85:3,4
100:7,18
**afforded**
25:2
**agnostic**
30:12
**agree**
66:20 67:7 73:23
90:3
**agreed**

66:7 98:1
**agreement**
3:11,12 9:2 31:13
49:18,20,22 54:9,13
55:2,5,8 64:13,15
65:19,20 67:3,8
68:13 95:12 98:6
106:20
**agreements**
22:17
**ahead**
5:25
**Alan**
68:12
**Albert**
53:3 60:3,17,20 66:4
67:20 68:11,16,22
69:11 70:12 71:9
83:11 84:21 85:1,4
94:15
**Albert's**
69:18 70:4
**alike**
85:15
**allegations**
40:19 106:15
**alleging**
106:22
**allow**
5:17
**allude**
78:7
**alluded**
36:23
**alter**
104:2
**Americans**
24:17,20
**and/or**
91:17
**annual**
43:12,17
**answer**
5:20 6:2,10 25:17
57:10 74:25 87:22
98:16

**answering**
108:4
**ANUJ**
1:4
**anxiety**
39:12
**anyway**
65:17
**Apoloe**
42:7
**apologize**
44:23,24
**appear**
93:8
**appeared**
109:10
**APPEARING**
2:1,5
**appears**
64:18
**applicants**
25:3
**applied**
15:24
**applies**
27:6
**apply**
12:25 13:1 15:1
**applying**
15:25 28:23
**appreciate**
7:21 96:13
**approach**
76:2
**approaching**
76:6
**appropriate**
14:15 24:21 45:8
91:6,15
**appropriately**
102:18
**appropriateness**
21:8
**approval**
72:23 83:1 101:10
**approved**


MAGNA
LEGAL SERVICES

62:5 76:13 82:20
85:22 92:21

**April**
11:10,13 18:8 54:25
55:9,11,14 56:9,16
60:17 61:21 64:16
64:24 66:12,21 67:7
71:8,22 72:8 75:25
84:12 85:11 95:13

**area**
43:10 45:23 60:10

**areas**
36:1

**arose**
9:6

**arrange**
75:22

**art**
7:19

**articles**
34:23 35:5,6,19
39:17

**aside**
10:7 41:5 74:3

**asked**
15:4 26:1 57:8 58:24
73:23

**asking**
25:13,16,17 40:2
57:21 74:2,24 76:7
76:8 78:20 81:21
88:13 92:18

**assessment**
79:9 90:13

**assistance**
45:18

**associated**
33:21 34:9

**assume**
78:3 80:13 103:24

**assumed**
99:5,22

**assumption**
70:18

**atmosphere**
46:15

**attempted**
76:18

**attend**
80:19

**attended**
34:24 38:22 78:20,23
78:24 80:19,21

**attending**
78:22

**attention**
56:3 64:10 69:5,9,19
69:21 70:2

**attentive**
38:6

**attorney**
110:13,15

**audible**
5:6

**August**
18:4 96:22 97:24

**authority**
109:9

**authorized**
110:9

**automatically**
76:12

**available**
39:13 95:19

**aviation**
28:23

**aware**
36:10 40:3,7,11,18
43:5 44:20 45:17,19
47:3,4,7 48:5,7
55:11 58:9 59:1
60:8 73:1,8,11,14
74:9 78:16 87:9
92:7 93:15 94:20
96:25 100:3 102:9
103:8,12 105:23
106:14,22,25

**awareness**
9:7 74:5

**away's**
35:23

**Azmoudeh**

2:2 3:2 4:6,16 25:6
25:11,15,20 26:6
33:4,24 37:20 38:13
38:19 39:14,21,24
47:19,23,25 48:1
49:15 55:19 56:10
56:13,14 63:25 64:4
67:2 68:21 69:17
70:10,22 71:7,17
73:19 75:3,11 79:17
79:21 80:3 87:12,20
88:6,16 90:24 95:7
96:11,16,17 101:12
103:21 104:8,18
106:13 108:7,9

**a.m**
80:16

_____

**B**

**back**
8:16,18 15:6 18:2
27:7 30:25 44:17
47:21,25 69:7 86:23
86:24 87:25 96:16
102:22 103:2
107:17

**background**
11:6 39:25

**bad**
5:10,10,12

**balance**
16:4

**Baldauf**
51:5,6 78:6 79:3 80:8
81:2,7 90:7,11,16
93:9,14,19 94:12

**Baldauf's**
91:3 93:8

**Ballard**
53:1

**bank**
7:18,25

**bar**
42:14

**based**
26:9 28:2,11 37:15

55:8 63:9 66:20
70:4 72:1 76:21
81:22 93:7 101:13
105:19 106:2

**basis**
25:11 77:1 90:21
95:22,25

**becoming**
14:21 31:25 32:2
55:12

**bedside**
43:4

**began**
40:3 41:15 48:2

**beginning**
12:25 27:12

**behalf**
2:1,5 4:3 7:5 8:22 9:8
85:20 93:11,20,21

**behaves**
75:13

**behavior**
77:16,19

**believe**
8:8 15:15 19:15 23:4
30:17 35:18 39:2
47:5 50:21 53:14,23
57:5 58:9 59:11
63:3,8 75:1 77:14
87:2 90:22 93:1,5
94:7,23 97:20
106:17

**believed**
8:5

**bell**
16:23 58:11 78:13

**benchmarks**
99:4

**benefit**
19:13

**benefits**
97:22

**best**
11:22 12:10 29:4
36:1 41:9 62:2

**better**



15:11 18:19 19:12 30:19,21,22 34:24 37:3 59:8 65:11 92:6 100:11
**Bill**
4:12
**bit**
72:7 87:25 96:19
**blockbuster**
46:19
**board**
26:23
**body**
35:9,11
**bore**
97:9
**born**
98:2
**bother**
31:2,3
**bottom**
59:6 61:16 71:21 84:11
**break**
6:3 28:25 39:21 47:20,24 60:22 88:7 88:12 96:12,15
**breaks**
5:24
**Brian**
20:18
**brief**
47:24 96:15
**briefly**
96:18
**brought**
16:15 68:22
**buckets**
17:17 20:1
**building**
55:10
**burned**
36:6
**burnout**
33:14,16,21 34:1,9 34:12,16,22 35:10

35:15 37:8,10,16,22 37:24 38:2,25 39:2 39:19 63:10 81:10 81:15 82:3 90:22
**business**
15:9 35:7
**busy**
45:25 46:6
**bylaw**
93:7
**bylaws**
29:17 89:25 91:10
**bypass**
76:18
**bypassed**
76:17

---
**C**
---
**California**
12:20 13:2,5
**call**
4:13,18 24:2,24 56:21 57:1,4,5,24 58:1,13,13 59:3 60:14 61:5,24 62:11 62:13,18
**called**
16:22 40:12 97:1 100:15
**calling**
11:20 78:24 84:22
**calls**
58:3
**camera**
14:3
**candidate**
53:6
**capable**
91:17
**capacity**
15:5 18:16 41:24 62:3 66:10
**cardiothoracic**
16:17
**care**
12:8,18 13:13,15,17

13:18 16:5,13 18:2 19:16 20:5,25 21:3 21:8,15 27:14,15 28:24 29:3,4,11,15 30:4 34:6,10 39:6 42:21 43:2,9 56:25 57:6,20 58:7 60:6 63:11,21 68:5 73:10 73:25 74:3 91:6 99:25 102:7,10 103:11,15 104:1,11 104:21
**career**
12:12 19:16 37:11
**caregiver**
21:13
**care's**
91:16
**Carnegie**
14:7 15:8
**case**
20:5 27:13,16 59:2,5
**casual**
10:8
**catch**
56:12 102:24
**catching**
104:1,20
**Catholic**
1:7 97:3
**caught**
103:10
**cause**
6:14 17:10 51:13 77:20
**caused**
33:15 51:15
**cc'd**
66:14
**celebration**
42:9
**cell**
54:21
**Centers**
29:22
**Centura**

1:8 7:6,6,11,11,15 8:22,23,24 9:4,8 10:5 15:19 16:21 18:5 19:1,25 22:13 26:11 28:15 30:6,18 30:20 31:15 32:13 35:3 36:13 37:7 38:23 40:2 41:16,18 41:23 43:15 44:21 45:17 47:6 48:2 52:20,22 53:10 55:4 55:13 64:16 66:23 78:1,3 89:11,15 93:9,20 96:22,23 97:12,18,22,25 98:2 98:5,6,10,12 99:6 99:21,22,24 100:4 100:17 104:14 105:15,16,20 107:20
**CEO**
10:19 15:4
**certain**
8:1 50:13 69:12 70:12
**certainly**
17:18 22:6,18 27:6 28:17 29:13 34:18 34:23 36:16 40:5 66:3 80:22 107:2
**CERTIFICATE**
3:2,3 109:1 110:1
**certify**
109:10 110:8,12
**chain**
99:15
**challenge**
21:16
**challenges**
16:18 17:14,16,19 36:11 80:24 99:8
**challenging**
16:11 31:3
**champion**
31:4
**championing**



31:6
**chance**
31:16 61:12 89:5
**change**
97:3,23 103:16 108:1
**changed**
97:22 99:1
**changes**
97:13,15 98:20
100:19,21
**chapter**
47:20
**characterize**
29:10 36:15
**chat**
4:19 49:6,10 55:16
55:23
**cheaper**
32:23
**chief**
10:20,21 12:20 13:21
14:11,14,16,20,22
14:23 15:18 16:2
18:5,9 19:24 20:12
20:18,23 22:21
26:11,22 28:14 30:6
31:14 32:13 36:17
37:6 40:1 41:16,22
43:17 44:21 51:6
52:19,25 53:1 72:24
79:5 93:9 98:24
104:13
**children's**
11:2
**choice**
11:22 13:4
**choose**
11:18 13:1,7
**CHPG**
64:12 67:3 86:5
**Christus**
7:7 8:11 13:10 14:11
**circumstance**
8:9
**circumstances**
7:3 8:14 14:18 15:22

31:10 33:5,15 48:4
51:9,16 59:20 60:4
60:9 103:17 104:3
**CIVIL**
1:5
**claiming**
106:19
**clarification**
22:25 45:2
**clarify**
5:13 37:14 108:1
**clear**
46:1 56:15 68:25
78:19 87:21
**clearance**
92:4
**clients**
31:25
**clinic**
13:23
**clinical**
16:5 91:18
**clinically**
34:19
**clinician**
18:15
**close**
55:15 61:9 71:12
78:4 82:4 87:24
**closed**
14:4
**closest**
22:4
**clunky**
4:22
**CMO**
16:21 52:11
**CMS**
29:20,21,24
**coach**
74:17
**coaches**
36:25
**coaching**
35:2 36:24 51:11,17
**cocktail**

45:11 46:10,15
**coding**
21:7
**coffee**
42:14
**Coffpal**
44:24
**colleague**
10:10
**colleagues**
19:13 34:19
**collegial**
19:2,9,11
**Colorado**
1:2,8 2:4,7 15:19
90:8,12
**combining**
74:16
**come**
5:5 8:16,18 16:2
21:11,12,13,14 27:6
29:18 33:18 34:17
35:9,17 43:1 44:17
47:7,21 51:16 52:16
52:23 54:18 60:22
63:6,10 66:13 92:13
102:22 103:2
**comes**
24:10
**coming**
37:13 39:7 86:23,24
99:13
**command**
52:10
**commendable**
104:22,23
**commission**
29:20,23 109:21,21
110:22,22
**committees**
20:14
**common**
23:19 32:8,11,14
37:9,12 39:5 97:1,4
97:10,16,19 98:2,7
98:12,18,21 99:1,14

99:15,20 100:1,6,12
100:20
**commonly**
32:5
**communicate**
38:16 101:4
**communicated**
47:15 68:4,6,7
**communication**
10:4 38:10,12 85:23
101:14
**communications**
9:18 76:11 77:9
**community**
30:25 31:5
**compare**
22:6
**compassion**
19:3,10,19 34:4
86:10,12
**compassionate**
19:16
**complainants**
50:24
**complaining**
50:24,25 66:14 77:17
**complaint**
18:18 21:13 32:8
51:7 62:6,25 63:2
106:15
**complaints**
31:19 32:11 36:21
43:21 47:8,8 50:16
50:19,20 51:3 77:10
77:11,11,23 79:15
**complex**
17:19 18:22 29:2,3
**complication**
29:5
**complications**
29:3
**concept**
25:16 33:13,21 34:13
34:22 37:15 38:2
**concern**
51:13,15,15 102:17



MAGNA
LEGAL SERVICES

104:16
**concerned**
62:3 79:8,11,12,13
102:7
**concerns**
8:1 102:14
**Concluded**
108:11
**conclusion**
51:17 92:13
**concur**
106:9
**concurrently**
15:17
**condition**
6:13 77:5 81:23
89:19
**conditions**
6:17,19 81:25
**conducting**
79:16
**conduit**
20:20
**conferences**
34:25
**confident**
43:2 44:8
**confirm**
61:14 78:16
**confirmed**
81:11
**confusing**
5:10
**conjunction**
93:8
**connected**
110:15
**connection**
62:10 66:18 75:1
77:15,18 83:8
**connections**
38:24
**consider**
28:3 76:5,25 81:24
104:22
**consideration**

76:15
**considerations**
12:11 76:14
**considered**
11:20 29:5 61:7
76:24
**consult**
83:24 84:1,6
**contact**
27:14,19
**content**
34:7 83:13
**contents**
70:6
**context**
36:14 39:8 49:4
74:12
**continue**
16:4 107:7
**continuing**
88:10
**contract**
33:2 54:5 97:19
**contracting**
53:15
**contractual**
43:16
**control**
17:20
**conversation**
37:4 96:8 103:1
**conversations**
10:8 44:7,11 55:1
60:11 61:4 63:19
65:22 66:17 79:3,7
92:7 94:9,12,15
101:20 102:20,25
**coordinated**
9:17 24:7 53:15
**Coordinating**
20:11
**coordination**
60:6
**copied**
94:24
**copy**

108:10
**corporate**
97:7
**correct**
10:24 11:14 12:22
13:22,24,25 14:9
18:6,10,11 30:11
42:23 48:13,25
57:13,15,16 61:22
61:25 65:4 67:5
69:14 72:12 76:19
76:20,23,24 80:20
81:23 82:22 84:23
85:1 89:12,15,16,20
90:10,14 91:23,24
93:13,18,20 96:3,5
96:23 102:6
**counsel**
23:17 24:8 110:13,15
**COUNTY**
109:5 110:4
**couple**
53:16 62:12 96:18
**Court**
1:1 88:11,13 110:8
110:21
**coverage**
60:1 75:22 76:14,15
85:15 102:8,14,16
102:18 107:13
**covered**
107:25
**covers**
105:22
**Covid**
32:15 38:24 39:10
52:8
**coworkers**
43:7
**created**
97:1,11
**creation**
90:13
**credentialing**
82:18
**credentials**

20:14 26:23 29:17
**credit**
24:6
**critical**
12:8
**Culliman**
52:25
**current**
25:3

---
**D**

**daily**
20:10 21:1 34:5
**data**
7:18,25
**date**
1:14 11:9 40:5 45:4
65:3
**dated**
55:9,9 61:21 93:24
110:17
**day**
4:21 5:1,6,16 49:1
60:17 66:13 72:8
109:12 110:17
**days**
61:23 62:12 65:7
**deal**
17:23 31:23,24 32:4
36:10,20,22
**dealing**
31:19 32:14,15
**dealings**
34:6
**dealt**
77:9
**decades**
107:7
**December**
1:14
**decided**
11:22
**deciding**
12:9
**decision**
12:10 76:16 86:22


MAGNA
LEGAL SERVICES

100:24
**decisionmaking**
48:23 74:6
**decisions**
21:20 22:22 74:6,10
87:7
**declaration**
76:20
**declared**
87:1
**declaring**
92:20 101:3
**declined**
14:14 95:4,11
**decrease**
60:2
**DEFENDANT**
2:1
**Defendants**
1:11
**define**
25:8
**defined**
26:9
**definitely**
33:11 39:12
**degree**
11:16 15:14 37:10
**delete**
79:22
**Denver**
2:4,7
**department**
17:5 20:6,15 21:14
46:5
**depending**
27:5 38:1
**deposition**
1:13 6:23 9:10,24
10:8,11 110:1,10
**depositions**
4:22
**describe**
7:3 17:17 20:1 32:8
**described**
8:9 32:16 38:22 44:8

52:11 66:4 101:9,14
**describing**
67:11 75:21
**description**
33:23 57:9 70:19
**despite**
29:3
**detachment**
33:20,23 34:2,3,5,8,9
34:14 38:8
**developed**
23:11,15
**developing**
36:25
**diagnosable**
37:16
**diagnosed**
81:9,15
**diagnosis**
82:2
**differences**
30:13
**different**
7:6,8 10:4 20:11,15
21:21 22:14 23:23
32:20 33:3 36:5
37:23 39:16 46:9
48:9 52:7 72:19,20
72:22 88:22 90:1
91:2 99:9
**differently**
38:16 102:17 107:18
107:21
**differing**
47:13
**difficult**
101:3
**diligence**
85:14
**direct**
3:2 4:5 10:19 58:1,3
**directives**
98:20
**directly**
18:1 30:24
**director**

13:23 50:4 59:17
60:10 82:10,13
**disabilities**
24:17,20 26:9 105:23
**disability**
24:23 26:7 28:10
62:7,9,14,25 63:1,6
66:15 70:19 105:24
106:4
**disagree**
74:23
**discharge**
21:3,16
**discharged**
21:4
**discuss**
36:18 53:25 63:18
68:3 81:3,4
**discussed**
36:12,16 65:25 68:2
68:17 77:8 80:23
89:9 94:23 99:7,25
100:9 105:12
**discusses**
63:4
**discussing**
48:2 51:24 60:20
70:5 80:9
**discussion**
10:12 48:5 61:2 68:5
72:3 83:7,21 99:4
99:11 101:21
102:12
**discussions**
22:1 23:16 27:7 35:3
35:3 36:14,17,19
38:23 45:21 47:12
54:11 55:12 61:6
68:17 72:19,20
75:15,23,24 77:3
90:20 101:24
107:14
**disingenuous**
101:17,22
**displayed**
64:17

**dispute**
70:11
**distinctions**
90:1
**DISTRICT**
1:1,2
**doctor**
6:23 11:5 12:7,17
14:1 18:24 25:21
33:13 37:16,17
45:23 56:15 57:14
87:22 88:17 96:18
105:4
**doctors**
11:24 16:10 32:2,6
44:8
**document**
49:17 55:23 61:14
64:7,11,23 65:23
66:20,21 67:1,16
68:1 71:19 88:21
89:8,11,24
**documents**
9:23 10:1 49:2 53:21
70:23 71:1 88:23
95:6
**doing**
59:7 99:25 105:16
**door**
14:4
**download**
49:8
**downloading**
49:13 55:21 64:6
**Dr**
1:4,13 3:1 4:1,7,11
4:13,17 6:12 10:6
11:19 12:4 20:18
40:3,7,11,20 41:4
41:12,22 42:16
43:12,24 44:3,5,22
45:10,18 46:2,10,13
46:24 47:9,12,12
48:3,6,6,8,9,11,14
48:17,17,24,24 49:9
50:25 51:4,5,6,14



51:22 52:5,13,25
53:3 54:4,19 55:12
56:4,21 58:11,14,16
58:20,23,25 59:5,16
60:3,14,20 61:5,24
62:6,11,15,19 63:6
63:10,16,20 64:7,13
64:24 65:3,19,23
66:2,4,14,22,23
67:8,20 68:7,11,16
69:11,18 70:4,12,19
71:9,22 72:3,9
74:13,21 75:5,12,18
77:12,15,24 78:6,6
79:3,8,11,13 80:7,8
80:19 81:2,7,9,11
81:15,22 83:8,11
84:2,21,22,25 85:1
85:4,7,16,21 86:7
86:17 87:16 90:3,7
90:8,11,16 91:3
93:8,9,14,19 94:12
94:15,18,19,21,24
95:19 96:1,4 100:24
101:22 102:9,13,21
103:1,4,8,14,24
104:19 105:13,17
105:21 106:14,22
107:3 109:10
**drafted**
 67:20
**drafting**
 22:16,19
**draw**
 56:3 64:10 77:18
**drew**
 16:7
**driven**
 42:18
**due**
 85:14
**duly**
 4:2 109:11
**Durango**
 15:19
**duties**

 14:16,19 21:24
**d/b/a**
 1:8

———————————
E
**earlier**
 17:12 32:17 38:7
   52:11 64:15 65:25
   77:8 80:18 82:6
   86:10,11 89:9 94:5
   96:21 99:7 100:15
   105:12
**earliest**
 42:15
**early**
 46:18,18 106:20
**ease**
 16:12 37:1
**easier**
 4:21,22 16:12
**easiest**
 49:5
**educate**
 28:17
**educated**
 70:18
**education**
 29:17
**effect**
 43:22 95:1 105:10
**effective**
 95:5,11
**effectiveness**
 47:13
**either**
 9:22 34:19 38:20
   47:12 54:18 76:10
   82:13
**electronic**
 37:2
**emergency**
 17:5
**Emory**
 11:16 16:19
**empathize**
 107:3

**employ**
 48:24
**employed**
 30:6,14,15,16 53:23
**employee**
 55:13 110:13,14
**employees**
 25:3 60:23 78:3
**employers**
 24:5,8
**employing**
 48:3,6
**employment**
 3:11,12 22:17,22
   23:6,12 24:16 30:2
   30:12 49:18,20 53:5
   54:5,8,13 55:2 61:2
   61:6 64:12,15 65:19
   66:5,23 67:3,8
   68:16 72:2,3,10,18
   72:23 73:1,5,8,14
   73:22 74:1,8,9,15
   74:22 75:7,14,16,24
   83:9 84:16 85:5,10
   85:18,25 86:4,7
   87:3,15 95:5,11,12
   95:15,19 96:9 97:19
   98:6 105:14 106:20
   107:14
**encounter**
 42:1,4
**ended**
 105:13
**enforcing**
 29:24
**England**
 13:4
**English**
 5:11
**enjoy**
 96:20
**ensuring**
 29:25
**entire**
 10:23 49:19
**entities**

 33:7
**entity**
 22:14 30:15,16 32:23
   97:1 99:17
**environment**
 21:5 29:17 37:3
   97:14,16
**episode**
 105:6
**equal**
 23:5,12 24:16 30:2
**equipment**
 21:5 32:21
**Eric**
 50:3 52:3 54:19
   83:14
**Erin**
 82:8
**Erling**
 20:18 52:25 54:19
**errors**
 29:8
**Especially**
 5:4
**ESQUIRE**
 2:2,6
**essence**
 106:21
**essentially**
 16:19 24:14
**evaluation**
 43:17
**evaluations**
 43:11,12
**event**
 29:9 42:10
**events**
 41:5 43:21 52:10
**exact**
 43:8 53:22
**exactly**
 7:9 23:25 58:19
   76:21
**Examination**
 3:2 4:5
**examine**



21:18
**examined**
4:3
**example**
22:16 28:19 32:20
39:5 52:8 99:7
**examples**
26:2,5
**excellent**
42:17,20
**excerpt**
89:25
**exchanges**
5:17
**excuse**
101:14
**executed**
95:5
**executive**
10:20 15:25 20:18
95:12
**executives**
20:22 52:21,22 98:17
**exercising**
91:18
**exhaustion**
81:10 82:3 90:21
**Exhibit**
3:11,12,12,13,13,14
49:9,11 50:1 54:3
55:15,16,17 61:10
61:14 63:24 64:2,23
66:21 67:9,12,14,19
69:2,7,14 70:1,4,5,7
70:17 71:14,15
79:18,19,23,24,25
88:3,17 89:4,5
93:22
**exhibits**
3:10 88:23
**exists**
35:11
**expect**
66:11
**expensive**
32:22,24

**experience**
16:14 37:6,10,22,24
**experiencing**
33:17 36:21 37:5,8
38:17 59:13 101:7
101:18,23 102:3
103:15,25 104:20
**expert**
24:14
**expires**
109:21 110:22
**explain**
7:22
**expound**
19:5 42:24
**extend**
19:19 42:20
**extending**
95:14
**extensive**
36:24
**extra**
21:10 87:4
**extreme**
59:12,13 60:2
**e-mail**
3:13,13,14 45:20
50:1 54:6,25 55:8,9
56:4,16,18,20 57:2
57:8,11 59:6,12,23
60:12,13,16,20
61:12,19,21 62:1,11
62:15 63:5,9,13,15
63:20 65:6,9 66:14
67:20 69:4,8,11,12
69:13,18,20,23 70:1
70:4,13 71:22 72:1
72:7 73:20 75:25
76:10,21 79:21 80:5
80:7 81:19 82:8,19
84:11,21
**E-mailed**
64:23 67:1
**E-mails**
3:12 10:2,3 18:24
40:9 48:18,21 56:1

61:5 63:3,18 68:3
74:12 78:7 94:23
106:10

—————————————
**F**
—————————————
**facing**
18:23
**fact**
30:23 74:12 92:20
**factors**
13:17 27:9
**facts**
58:22
**failing**
95:12
**fair**
8:25 22:5 25:7 29:10
30:7,10 37:23 43:22
44:18 63:7,11,12,22
63:23 65:16 66:2,15
66:23 69:21 70:7,17
70:23 71:1 72:4
105:20 106:23
**fairly**
11:8
**familiality**
23:15
**familiar**
25:15 34:7 49:17
58:19,24 66:25 78:8
82:2 90:20
**familiarity**
23:11 24:16
**familiarize**
49:16 55:22 61:11
71:19 80:4 88:20
**familiarized**
67:15
**families**
19:14
**family**
11:20,24 12:1 13:3
16:9 21:12 35:25
36:2 50:21,22
**fan**
47:16

**far**
11:25 47:2,4 50:11
74:5 93:15 100:25
103:4
**father**
16:10
**father's**
16:14
**fault**
8:8
**favor**
27:9
**favorite**
31:14,18
**Fe**
8:12 17:7
**fear**
39:9
**February**
56:4,11
**feel**
4:17 51:16
**feeling**
103:9
**fifteen**
88:7
**figure**
35:25
**figured**
60:21
**filed**
107:4
**fill**
102:16,19
**final**
55:1
**financial**
53:2
**financially**
12:16 110:16
**find**
16:12 19:17 105:10
**finding**
93:14,15
**fine**
4:15 88:10,14


MAGNA
LEGAL SERVICES

**finer**
106:4
**finish**
4:24
**fire**
24:22
**fired**
14:21
**firing**
22:23
**firm**
8:20 24:12,14
**first**
4:2,23 7:10 19:8
41:12 51:25 56:3
63:15 66:8 79:24
81:14 89:4 96:3
**five**
15:16
**flag**
21:9
**flip**
31:1
**Florida**
109:4,20 110:3,21
**flowed**
98:21
**focus**
13:16 19:24 65:17
**focused**
17:4 21:3
**focuses**
24:14
**folks**
74:14,18 86:8 87:3
107:13
**follow**
75:17
**following**
72:8
**follows**
4:4 89:24
**forget**
50:4 53:14
**Forgive**
19:7

**form**
28:3 32:25 33:22
37:17 39:11 56:8
70:20 73:16 75:2,8
87:10,18 90:18 95:3
101:8 103:18
104:15
**formal**
58:6 81:2,6
**forming**
62:24
**forth**
87:25
**forty**
9:21
**forward**
44:15 69:19 97:24
**forwarded**
69:20 70:1
**foundation**
25:4,10 33:22 37:18
38:11 66:24 68:19
69:15 70:8 87:10
90:18 95:3 103:18
106:8
**frame**
48:16,20
**Francis**
1:9 18:6 30:5 46:25
47:7 52:22,24 53:10
82:17 100:18
**Francisco**
12:21 13:2,6
**free**
4:18
**frequent**
35:2
**frequently**
20:23 23:21 24:1
32:4 36:13,16,20
42:1
**Fridays**
88:9
**front**
25:25 41:19 69:2
101:6

**frustration**
80:24
**frustrations**
81:1
**fulfilled**
14:16
**fulfilling**
8:21 12:14
**full**
4:9
**functioning**
20:3,8
**funny**
19:22,23
**further**
10:12 72:7 110:12
**future**
9:6
**FYI**
68:12

---

### G

**gage**
37:7
**general**
23:14 24:19 27:20
36:19 50:19 69:23
79:6 106:18
**generally**
6:9 7:13 8:4 17:17
40:18 73:7 81:19
84:5 100:5 102:2
**getting**
57:25 58:3 59:20
80:24
**GG318277**
109:21 110:22
**give**
5:5 22:2 23:23 33:6
36:14 42:25 104:5
**given**
39:18 57:9 101:9
**glean**
95:22,25
**go**
4:11,21 5:25 11:7,18

12:11 14:20 15:14
26:18 30:19 31:9,11
31:13 35:12 46:21
47:19 50:17 63:3
69:7 82:5 88:8 89:4
89:4 91:10 93:22
96:19 97:6 100:9
**goes**
27:3 68:14
**going**
4:13,19 5:15 28:8
36:9 39:10,22 40:14
41:3 49:2 59:7 61:2
65:14,23 71:13 73:8
76:22 77:2 79:17
85:16 87:4,8 88:2
88:14,23 89:1 94:6
98:15 100:14,16
105:8,8
**good**
4:7,8 12:17 22:7
39:23 47:22 52:8
99:7
**Google**
31:25 32:2
**Gotcha**
80:17
**gotten**
54:15 62:11,19
**grace**
87:4,16 101:6
**grant**
73:6
**granted**
85:12 86:21 89:18
93:16
**granting**
89:12 93:10,19
**ground**
4:20,23
**group**
15:10 22:14,15 53:23
**groups**
36:18 53:15
**grown**
16:9


MAGNA
LEGAL SERVICES

Page 10

**guess**
70:18 72:17 97:14
**guessing**
89:2
**guidance**
25:24
**guy**
19:22 87:3

**H**

**Hall**
2:6 8:20
**hallway**
42:13
**hand**
109:12
**handle**
74:21 75:6
**handling**
72:14,17
**happen**
32:1
**happening**
18:21
**hard**
31:23 42:18
**harm**
28:21 29:1,6
**harmed**
31:22
**Harvard**
13:5
**hate**
89:1
**hats**
16:4
**health**
1:7,9 6:13,17,19
22:13 28:24 87:17
90:8,12 91:6,14,16
92:9 93:3,10,12,20
97:1,3,11 99:14,15
103:25
**healthcare**
24:15 29:2
**HEALTH-PENRO...**

1:9
**hear**
32:5 62:13 98:23,25
**heard**
32:12 33:25 34:11
47:11 54:14,16
58:13,15,18 59:2
63:5,9 81:14 99:5
107:1
**hearing**
34:18 36:21 47:10
54:1
**Heath**
2:6
**held**
106:21
**help**
15:11 16:13 17:10,22
18:20,22 21:17
31:16 37:2 39:7
59:8,9,14,18,20,24
60:2 74:17 79:1
86:16,18,19 106:12
107:13
**helped**
28:17
**helping**
12:13 16:12 17:14
27:13 36:20,22
**helps**
19:17
**Henry**
4:11
**high**
17:4 28:18,20,22
**HILLSBOROUGH**
109:5 110:4
**hire**
24:22 45:18
**hired**
44:22 45:14
**hiring**
21:19 22:9,11,13
45:10,22
**history**
11:9 42:9 97:7

**honest**
108:4
**honestly**
45:16
**hope**
105:10
**hopefully**
59:7 65:11 96:19
**hospital**
7:6,11 8:12 11:3,3,4
17:6 22:8 29:12
39:8 86:3,4 91:17
95:14,20 99:18
107:6,8
**hospitalist**
13:12 15:10
**hospitalizations**
21:8
**hospitals**
10:20,25 32:1 82:17
**host**
33:15
**hour**
5:24 9:20 88:6
**HR**
24:12 26:18,19
**huddles**
52:9
**Hugs**
17:8
**humor**
19:3,10,17
**hunch**
98:9
**hypothetical**
103:23

**I**

**identification**
49:12 55:18 64:3
71:16 79:20 80:1
**identify**
21:22
**identifying**
17:9
**III**

4:11
**immediacy**
104:7
**immediate**
12:1 77:7 101:10
**immediately**
103:9
**impacts**
84:15 85:9
**impair**
6:20
**impairing**
104:11
**important**
4:24 33:9,11,11
104:13
**impression**
44:13 77:22
**impressions**
46:13 62:24 100:23
**improvement**
22:23
**Inaudible**
24:9
**include**
24:17 25:3 31:6
34:13 68:13
**included**
22:1
**including**
67:21
**indefinitely**
86:25
**independent**
58:22 74:6,11
**indicate**
90:14
**indicates**
82:19 90:16
**indicating**
49:10 54:6 55:20
56:1,6,18,22 60:18
60:24 61:17 64:5,5
64:8,25 67:22 69:5
69:9 71:24 72:11
76:3 79:24 81:7,12



84:12,17 88:21
89:12 91:8,11,16,20
92:8 93:25 95:16
99:1
**individual**
20:16 91:15,16
**individuals**
13:17
**individual's**
91:6
**industry**
28:23
**informatics**
13:24
**information**
57:19 82:18
**infrequently**
48:11
**initial**
62:24
**Initiates**
97:3
**INITIATIVES**
1:8
**injure**
29:8
**inquired**
57:18
**instant**
52:10
**instruction**
62:16
**instructs**
5:21
**intended**
102:21 103:2,4
**intending**
59:19
**intensive**
39:6
**interact**
27:20 50:13 52:3,5
54:20
**interaction**
43:10 51:25
**interactions**

42:11 43:6 51:1
53:24 54:1 77:21
**interested**
17:13 110:16
**intern**
12:25
**internist**
90:23
**interpret**
62:1
**interrupted**
68:20
**Interruptions**
16:25
**intervention**
43:20
**interview**
26:19
**interviewed**
45:16
**interviews**
22:12
**involve**
35:25 36:2,4 72:23
**involved**
10:4 22:12 27:10,10
50:16 66:1,6,10
72:18,25 74:15 87:7
95:23 96:1 102:6
**involvement**
21:17 100:1
**in-patient**
11:1
**issue**
7:5,14 18:20,20
**issued**
94:19
**issues**
9:6 17:19 18:22
20:16 21:10 25:14
32:15 60:1 73:1,2
73:21,22 74:11,20
74:22 75:5,7,12,14
85:4,5 92:19 101:11
102:8 105:18

**J**

**Jackson**
1:17 109:9,20 110:8
110:21
**January**
18:4 96:25 97:11
100:9 109:13
110:17
**Jason**
53:18 94:2
**Jeff**
85:19
**Jeffrey**
53:3 60:16
**jeopardized**
102:10
**job**
31:14 33:5,9 98:12
100:11
**joined**
96:21
**joint**
29:20,23
**journals**
35:8
**July**
95:5,11
**jump**
35:13
**jumping**
87:25
**June**
60:22
**justified**
104:7
**justify**
102:5

**K**

**Kathpal**
44:22,25 45:10,18
46:2,10,13 47:9
**Kathpal's**
46:24
**keep**

18:21 26:19 39:22
89:2 105:8
**keeping**
88:14
**Ken**
42:7
**Kevin**
52:25
**key**
35:23
**Killian**
2:6
**kind**
22:24 29:17 42:13
46:18 49:23 78:20
89:9
**Kindness**
17:1
**kinds**
52:10
**knew**
40:5 87:8,16 94:18
94:18,21
**know**
10:10 22:1 24:13
26:20 35:11,16 36:4
36:10 37:19 38:17
40:1,5 41:10,15
42:8,12 45:24 48:7
49:17 52:9 55:23
58:7 60:3 61:12
62:9 63:2,18,20
65:18 66:25 67:14
68:22 69:16 73:5
77:3 83:5,20 85:19
88:18 89:5 94:4,18
94:21 97:2,21 99:8
99:20 100:20,22
103:20 105:7
**knowing**
87:16
**known**
29:5
**Koval**
50:3,10,13 51:25
52:3,5,13 54:4,19



MAGNA
LEGAL SERVICES

60:7 66:2,8 82:23
83:14 94:21
**Koval's**
54:21

**L**

**label**
49:4
**lack**
34:24
**lady**
57:6
**land**
22:3,5
**landed**
47:18
**language**
91:22
**larger**
53:16
**lasted**
9:21
**law**
8:19 106:7
**Lawrence**
2:3
**laws**
23:6,12 24:16 30:2
**lawsuit**
4:17 8:15 10:9 18:25
40:18,19 58:21
106:16 107:4
**lawyer**
5:9 24:14
**lawyers**
5:11 31:25 83:24
84:1,6
**lay**
22:3,4
**layer**
84:20
**lead**
29:8 82:16
**leader**
35:17 50:7,11
**leaders**

20:12,13,15 29:16
52:7
**leadership**
8:22 16:5,6,8 17:13
26:22 34:20 43:17
52:2,4,24 53:9
100:17,18,19
**learn**
15:9 24:2
**learned**
19:13 28:22 34:22
**learning**
23:20 24:1
**leave**
26:18,24 27:3,5,8,11
27:19,23 28:3,7,8
28:10,12 58:5 62:4
62:16,23 63:2,16,21
66:15 71:5,10 72:15
72:21 73:6,9 76:8
76:12 77:1,2 79:10
79:23 80:9 81:7,20
82:19,23 83:7,12,16
84:2,7 85:3,7,11,13
85:22 86:21 87:1
89:9,12,18,19,21,25
90:2,4,14,17 91:13
91:25 92:2,8,16,24
93:2,10,16,19 94:19
94:22,25 96:4,7
100:24 102:6,9,13
102:22 103:2,5,9
104:6,10,20 105:17
**leaves**
26:13 58:4
**lectures**
23:16 24:4,4,6 35:14
39:18
**led**
39:15,18
**left**
8:23 9:3 46:20 47:4
51:21 97:14
**legal**
25:14,14
**legalese**

49:24
**length**
21:8
**lengthy**
47:20
**lessons**
19:13 28:22
**letter**
90:7,19 91:3,22,25
93:8,24 94:2,4,6,10
94:13,16,19,22 95:2
95:10,23,25 96:5
105:13
**letterhead**
89:15
**let's**
7:10 23:3 27:8 30:21
35:5 47:20 48:23
82:5 93:22 97:24
**level**
37:22 38:1 53:4 77:4
77:5 101:10
**levels**
37:24
**liaison**
20:24 52:12,14,17
53:7 85:24 86:7
**liaisons**
53:8
**life**
4:21 13:17 16:25
**light**
28:13
**limiting**
34:11 75:22
**line**
64:23 65:2 68:11
69:4,8,18,21 70:2
**lines**
32:16 69:24
**link**
16:22,25 78:11 80:12
**Linked-In**
11:7,8 16:20
**listed**
54:25 60:12

**listened**
35:18
**literature**
35:9,11 38:21
**little**
17:20 43:10 46:18
54:1 72:7 84:20
87:4,25 96:19 97:5
**lives**
4:20
**LLC**
2:3
**loan**
45:18 68:13
**local**
31:4,7 99:9
**locally**
30:24 32:17
**long**
5:1 9:19 46:20 49:22
**longer**
95:19
**look**
18:17,20 20:10 21:1
25:24 37:2 60:16
63:17 67:17
**looked**
54:3 64:15
**looking**
21:7,15 33:2 53:21
64:18 88:5 107:17
**looks**
49:23 80:19 81:6
89:11
**loop**
26:19
**lose**
34:4
**lost**
107:7
**lot**
23:7,21 36:11,12
49:24 53:14
**love**
12:13,13 13:16
**loved**



30:23
**Lyman**
2:6

**M**

**Madeera**
44:22
**main**
13:16 24:10 50:17
54:19
**majority**
43:9 52:21
**making**
21:4 76:20 90:11
103:10 104:1,21
**management**
14:7 15:8 20:5,5,25
21:3,15
**manager**
82:10,13,14
**manner**
43:4
**Mark**
2:6 5:15 8:19 9:13,14
9:16
**marked**
49:11 55:17 61:10
64:1,2 67:14 71:15
79:18,19,25 88:3
**marking**
71:13
**married**
12:5
**masters**
14:7 15:7
**match**
12:23,25
**material**
30:13
**materialized**
15:16
**materials**
34:21
**matter**
7:8 8:7 10:5
**matters**

13:18 66:5 87:15
**Meadows**
10:21 11:2
**mean**
6:9 12:16 36:3 59:9
59:25 71:4 83:4
86:25 95:18 104:6
**meaning**
25:14 59:19 86:24
**meaningful**
51:25
**means**
7:23
**med**
72:9
**Medicaid**
29:22
**medical**
10:21,21 11:16,18
13:23 14:7,11,16,17
14:20 15:7,19 16:1
18:5,9 19:25 20:3,4
20:4,9,11,13,13,21
20:23 22:21 24:13
24:15 26:12,21,22
26:25 27:2,3,4,10
27:19 28:15 29:16
29:19 30:4,6,10,11
31:15 32:13 35:8
36:17 37:2,6 40:1
41:16,22,24 43:16
44:21 52:19 53:9
59:17 72:15,22 80:9
81:22,24 82:10,14
82:16 85:25 86:20
89:12,13,16,18,19
90:4,17 91:25 92:2
92:4 93:21 96:6
98:24 104:13
**Medicare**
29:22
**medication**
6:13
**medications**
6:18,19
**medicine**

11:21 15:10 16:11
17:15 18:13 19:12
19:15 33:18 36:11
40:3,8 41:6 44:4
46:25 47:6
**meet**
9:9,12,14 41:12
46:10 80:25
**meeting**
42:6 45:12 67:20,24
68:2,9,23 69:12
70:5,6,12,13,16,17
70:18,24,25 71:2,8
78:5,15,17,18,20,22
80:11,14,20,22
**meetings**
9:19,22 51:22 52:7
**Mellon**
15:8
**Melon**
14:7
**member**
27:3,4,19 41:25
46:22 50:22
**members**
26:13 28:16 29:19
30:2
**memory**
6:20 68:1 78:10
98:15
**mentally**
91:17
**mentioned**
17:12 26:7 36:12
37:1 85:18,18
**mentors**
13:6
**Mercy**
7:11 15:19 16:21
41:18 96:23 97:12
97:18,22
**met**
29:25 42:8,8 51:4,5
54:2 58:10
**Mexico**
8:10,13 13:10

**Michael**
105:6
**mind**
16:15 23:24 24:10
29:18 35:13 44:3,17
52:16,19,23 107:2
**mine**
10:10
**minimally**
66:2 71:8
**minimize**
17:25
**minute**
61:11 96:11
**minutes**
9:21 47:21 96:12
**missed**
105:9
**mission**
19:2,9
**mistake**
103:15
**mistaken**
99:23
**mistakes**
29:8 103:10,12 104:1
104:21
**modules**
23:16,18,20,20,23
24:2
**Mohamedbhai**
2:3
**moment**
55:22 62:1 86:6,13
88:20 92:8 98:3
**Monroe**
47:12 48:6,8,11,17
48:24
**months**
14:21 77:9 87:2
**mood**
46:15
**morning**
4:7,8 70:5 78:11 80:9
**mouth**
63:6,10 92:14



MAGNA
LEGAL SERVICES

**move**
30:18 44:15
**multiple**
16:3 28:7
**Munni**
58:11

**N**

**name**
4:9,16 35:21 41:18
53:19 58:7,9
**names**
7:13 52:23
**naming**
7:13
**narrow**
89:8
**narrower**
92:25
**national**
7:18,25 32:23 33:7
35:17 99:9
**nationally**
31:2 32:17
**natural**
14:23
**nature**
7:14 36:19 50:19
79:6 106:14
**navigate**
18:22 86:19
**necessarily**
32:24 36:15 37:14
65:14 77:20 81:24
83:18 104:6
**necessary**
27:18
**need**
5:25 16:25 21:5,10
21:23 24:21 45:22
59:8,9,14,18,19,23
60:3,8 67:17 85:19
86:6,18 87:14 88:8
92:3,5 106:6
**needed**
27:15 61:6 62:22

76:15 102:16
105:25
**needing**
50:11
**needs**
19:15 21:18 31:4,6
69:5,9,19,21 70:2
74:18 88:12
**negotiating**
22:17
**neither**
36:9
**never**
41:18 63:5,9 102:22
103:2
**new**
8:10,12 11:12 13:4,7
13:10 42:7 46:22
64:12,18 65:19 67:3
67:8 96:25 97:19
98:17 99:4 100:11
**newly**
64:1
**news**
35:8
**nice**
46:14
**nodding**
5:4
**nonphysicians**
26:17
**nonprofit**
30:23
**nonvalue**
17:25
**normal**
12:24 101:4
**normally**
58:4 90:1
**Notary**
1:17 109:20 110:21
**notes**
16:20 110:11
**notwithstanding**
96:7
**nuclear**

28:23
**number**
13:9 54:22
**nurse**
12:8
**nurses**
78:2

**O**

**oath**
3:2 4:3 6:6,7,9 109:1
**Object**
25:4,10 32:25 33:22
37:18 38:11 39:11
66:24 68:19 69:15
70:8,20 73:16 75:8
87:18 90:18 95:3
101:8 103:18
104:15 106:8
**objected**
8:4
**objection**
25:12,18 26:4 38:15
56:8 71:3 75:2
87:10 104:4
**objections**
5:15 7:16
**obtain**
15:7
**obtained**
11:16
**occasionally**
52:6
**occurred**
29:7 45:5
**occurrences**
38:25
**offer**
95:15 101:6 106:20
**offered**
14:13
**Office**
10:21 105:4
**officer**
10:20,21 14:11,16,20
15:19 18:5,9 19:25

20:19 22:21 26:12
28:15 30:6 31:15
32:13 36:18 37:6
40:2 41:16,23 44:21
52:19,25 53:2 98:25
104:13
**officers**
20:23
**official**
109:12
**officially**
60:22 68:12 92:21
**offset**
19:17
**Oh**
24:1 56:12
**okay**
5:9 6:12,23 7:10,13
8:4 9:22 11:12 14:5
16:14 17:12 18:12
19:22 29:18 30:1,9
31:20 34:16 39:25
40:22 41:3 42:15,24
43:11 45:5,9 46:1,8
49:3,7,25 50:2 55:7
55:25 56:3 57:14
61:1,18 65:2 66:16
67:12,18 69:4 70:4
70:11,16 71:8,12,20
71:21 73:20 78:4
80:2,6,17 82:7,8
84:9,10 86:15 87:24
88:2 89:7 90:3 93:5
93:22,23 94:18 97:8
98:11,16 100:4,23
101:20 103:8,13
104:9 107:17
**Omeed**
2:2 4:16,18
**Once**
11:21
**oncologist**
46:2
**oncology**
40:12 42:9 46:5 50:5
50:7,8 60:6



**ones**
38:22
**ongoing**
22:9 55:12 68:17
**online**
24:1
**onsite**
15:16
**open**
55:21 61:9 65:17
67:17 71:18 80:2
87:24
**opened**
67:15
**operating**
30:14 52:25
**opinion**
12:11 22:2,19 57:22
75:5,12 91:1 92:5
96:7
**opinions**
42:15 47:13,14 62:8
**opportunities**
51:12
**opportunity**
30:19,21 105:14
107:7
**option**
74:19 84:15 85:1,8
85:13
**options**
32:21
**ordering**
108:9
**Ordinarily**
5:19
**organization**
8:11 99:9
**organizations**
23:19
**orientation**
23:8,17 52:2
**orthopaedic**
22:20
**outcome**
51:8

**outlined**
91:5
**outpatient**
43:9
**outside**
14:4 24:6,8,8 34:6
43:25 44:3 60:13
86:4
**outstanding**
66:22
**overall**
39:1 76:1
**overlap**
43:10
**oversaw**
20:3,5,5 30:11 53:14
**overseeing**
20:8 54:9 82:17
100:5
**owned**
30:24 31:2 32:17,17

_____

**P**

**paint**
23:24
**palliative**
13:13,15,16 19:16
**papers**
39:17
**paragraph**
91:4 96:3
**paraphrase**
65:9
**parent**
8:11
**parents**
12:2
**part**
15:10 17:23 19:8,16
21:6,23 27:7 29:13
29:18 31:14 33:5,9
33:12,12,20 34:12
37:4 54:12 58:5
**participate**
23:5
**participated**

**34:24**
**particular**
13:2 16:7,10 21:9
79:14
**particularly**
20:12 24:2
**parties**
10:5 110:13,14
**partner**
9:13,15 40:11 42:7
50:17
**parts**
34:14
**party**
46:11,16,19
**patience**
96:13
**patient**
17:19 18:18,19 21:9
21:12 28:18,20 29:9
31:17 34:6,10 47:7
50:22,23 73:25 74:3
76:14 77:10,11
102:7,10 103:10,15
104:1,21
**patients**
12:14,18 16:13 17:9
18:2,14,15 19:14
21:4 29:2 31:20,21
32:1,6 34:3,4 39:6
42:22 44:9 75:23
77:16 85:15
**Patrick**
53:1
**pause**
5:17
**payroll**
97:21
**PC**
2:6 40:12
**PCP**
56:21,24 59:11 90:22
**Peddada**
1:4 4:17 10:6 40:3,7
40:11 41:4,12,22
42:16 43:12,24 44:5

47:12 48:3,6,9,14
48:17,24 50:25 51:4
51:14,22 54:4 55:12
59:5 62:15 63:16,20
64:13,24 65:3,19,23
66:14,22 67:8 68:7
74:13,21 75:18
77:12,24 78:6 79:8
79:11,13 80:7,19
81:9,15,22 84:22
85:7,16,21 86:7
87:16 90:3,8 94:19
94:21 95:19 96:1,4
101:22 102:21
103:1,4,8,14,24
104:19 105:17,21
106:22 107:3
**Peddada's**
40:20 44:3 56:21
62:6 63:6,10 66:23
70:19 72:3 75:5,12
77:15 83:8 84:2
94:24 100:24 102:9
102:13 105:13
106:14
**pediatric**
16:16
**peer**
36:24,25
**peered**
20:14
**pending**
5:20 6:1
**Penrose**
18:5 19:1,25 26:11
28:15 30:5 31:15
32:13 35:2,16,17
36:23 37:7 40:2,4,8
40:20 41:6,16,23
42:10 44:4,21 45:17
46:25 52:20,22,24
53:9 82:17 96:22
97:25 98:2,5,12
99:2,24 100:4,18
105:15
**people**



10:5 12:13 14:1
16:12 18:22 28:7
31:16 33:17 36:21
36:22 37:5,9 43:1
46:17 52:16 54:20
58:13,13,18 59:3
60:12 65:25 67:21
69:12 72:25 73:7,13
74:8 87:15 96:1
102:16,20
**performance**
22:23 38:2 43:12,19
**performing**
14:19
**period**
39:3
**person**
28:10 35:19,21 50:18
**personal**
62:16
**personally**
109:10
**persons**
52:13
**pertains**
9:6 73:10,12
**phone**
54:21,22 57:1,4
60:14 76:10 107:9
107:10
**phonetic**
42:8 53:1,18 82:9
**phrase**
33:14 38:7
**physical**
91:17
**physician**
7:5,15 8:4 12:9 13:13
20:20 22:10,14
31:17 33:14,21 34:9
34:16,22 35:10,14
35:17 37:16,22,24
38:2,3,25 39:2,19
42:18 43:20 48:3
49:18,19 52:18
53:15,15 57:20 58:8

62:17 63:7,10,11,21
73:13,15 74:4,9,11
81:10,11,15 82:3
83:4 90:21 95:12
100:5 104:17
**physicians**
13:3 16:13 17:14,22
19:19 20:16 21:23
22:5 23:1,3 27:1,2
28:17 30:4,9,15,15
31:7,20 32:9,12,22
33:6 37:8,21 38:24
43:15 52:17 58:4,4
79:12 86:2 90:8,12
98:24,25 99:10,14
**physician's**
7:14 21:19
**pick**
107:8
**picking**
107:10
**picture**
23:24
**piece**
97:6
**PLACE**
1:16
**Plaintiff**
1:5 2:5 4:17 27:16
**planning**
21:3
**plans**
22:23
**Plauth**
1:13 3:1 4:1,7,11,13
6:12 11:19 12:4
49:9 56:4 64:7
71:22 72:9 84:25
109:10
**play**
22:18
**played**
45:20
**pleasant**
46:14
**pleased**

76:22
**point**
8:24 13:20 24:3
27:18 37:10 38:7
48:5 51:4 54:15
61:1 65:16 103:6
106:4
**pointed**
107:13
**policies**
98:20
**poorly**
100:25
**position**
13:24 15:23,24 20:17
53:20,22
**positions**
11:12 16:1
**positive**
46:17
**possibility**
48:3 95:18 102:21
103:1
**post**
8:1
**posted**
8:5
**posting**
7:16,19,22
**potential**
34:12 38:7 53:6
57:15 63:2 84:15
**Potentially**
85:6
**power**
24:2
**practice**
7:17,23 8:2 13:4
16:11,12,18 17:23
18:12 19:11 31:24
33:18 37:1 40:12,20
41:6 44:4 46:24
59:24 60:6 72:10
73:1,3,10,11,22
74:15,22 75:7,14,16
75:23 76:14 77:25

78:2 83:6 84:15
85:20 86:17 91:18
98:20 99:1 102:15
106:10 107:12
**practiced**
16:16
**practicing**
12:15 17:15 40:3,8
47:6 86:3
**practitioner**
7:18,25 91:7,16
**predominantly**
15:15 17:4
**premise**
93:11
**preparation**
9:9,23 10:7
**present**
18:8 26:23
**president**
20:12
**pretty**
47:20 49:22 89:8
**prevent**
29:9
**preventable**
28:21 29:1,6
**previous**
14:20 77:9
**previously**
61:10 67:14 88:3
**primary**
56:25 57:6,19 58:7
63:11,21 68:5 81:10
**printed**
54:4
**printing**
54:9,12
**prior**
63:5,19 77:19
**private**
40:12
**privilege**
85:14
**privileges**
30:10 82:18 85:9



91:18

**privy**
55:3

**probably**
6:2 9:20 11:10 31:19
32:14,24 54:14,18
54:23 59:4,16 63:13
66:5 80:11 83:4,19
83:20

**problems**
17:10

**proceed**
25:19

**process**
22:9,11 26:13 31:12
45:10,13 48:23
49:13 58:6 66:1
72:23 74:9 76:11
85:14 86:20 96:2
99:25 101:5

**professional**
57:22 91:1 92:5

**professionalism**
19:2,10,11

**program**
12:23 16:21,22 17:3
17:4,6,9 35:1,2
36:24,24 46:23
51:18 90:8,12

**progression**
14:23

**promote**
19:2,9

**proper**
75:22

**properly**
89:21,23

**protections**
25:2

**provide**
26:2 27:15 29:14
30:1 37:3 43:11,14
105:20 106:11
107:13

**provided**
22:7 29:11,15 30:4

36:25 42:21 43:9
45:17 51:11 90:13
102:15

**provider**
56:25 57:6 68:5

**providers**
27:15

**providing**
83:5

**proxy**
29:24

**psychiatrist**
37:17

**Public**
1:17 109:20 110:21

**pull**
65:13

**pulling**
91:22

**purchase**
99:18

**pure**
35:1

**purely**
92:18

**purposes**
67:6 90:17

**pursue**
11:22 16:5 35:12

**pursuit**
28:21

**purview**
86:9

**put**
17:16 21:21 24:5
39:16 40:22 41:4
49:4,6 55:15 62:18
63:24 92:14 102:17
106:4

**putting**
10:7 16:18 22:23
62:20,21 74:3

**p.m**
1:15 56:5,17 60:17
65:1 71:23 72:8
84:12 108:11

---

**Q**

**quality**
8:2 13:17 14:17 20:6
21:12,14 29:11,15
43:19 73:25 99:25
104:11

**question**
5:12,20 6:1,2 22:25
32:25 33:1 41:1
43:6 46:9 74:2
75:17 89:8 92:25
103:19

**questioning**
84:3

**questions**
4:25 5:6,10,10 6:21
27:21 41:3 57:21
108:5

**quick**
47:20

---

**R**

**radiation**
40:12 42:9 46:2,5
50:8 60:6

**rank**
104:16

**Rarely**
32:5

**Rathod**
2:3

**reached**
27:22 86:17

**reaction**
81:19

**reactions**
81:17

**read**
18:24 34:21,23 35:19
49:18,19 89:21 93:7
94:5 95:18

**reading**
34:18 57:8 70:23
71:1 72:1 90:19

**ready**

55:23

**real**
35:24

**realized**
16:10

**really**
8:16 27:12 29:7
31:16 37:19 45:11
47:1 48:20 83:20

**reapply**
103:5

**reason**
5:16 6:12 13:2 45:7
70:11 90:5 92:4,9
92:15 93:1,3,5,16

**reasonable**
25:23 26:1,3 70:9
74:5

**reasons**
13:3 28:7 33:19
91:14 92:3

**recall**
7:2,4,8 10:1,3 23:7,8
35:7 36:17 39:1
41:5,13,20 42:1
45:3,4,9,15,16,21
46:8,24 47:1,10,14
47:16,17 48:4 51:2
51:5,10 52:6 54:11
54:24,25 55:4 57:1
57:4,21 58:3 60:11
60:15 61:4,19 62:2
62:3 63:17 65:5,7
65:22 67:24 68:24
70:21,25 78:5,7,9
78:22,24 79:3 80:21
81:17 82:21,23 83:8
83:10,11,21 84:8
85:16 90:20 94:11
94:14,17 97:13,15
97:23,23 98:8 100:6
101:20 102:20,25
105:6 107:1

**receive**
106:23

**received**



MAGNA
LEGAL SERVICES

56:21
**receiving**
57:3,5
**reception**
42:7 45:11 54:2
**recollection**
48:19
**recommendations**
90:13
**recommended**
13:6
**recommending**
57:23
**record**
4:10 47:25 56:15
87:21 96:16 110:11
**records**
37:2
**recruitment**
45:18
**refer**
33:23
**reference**
18:2 35:14 72:24
**referenced**
17:8 34:12 57:2
**references**
89:25
**referencing**
71:9 80:11,22 91:25
**referral**
51:17 90:11
**referred**
20:24 44:24 58:25
59:15 86:16
**referring**
23:1 24:4 26:25 43:1
44:9,25 57:12,17
59:11 68:16 77:4
90:7
**refresh**
68:1 78:10 94:7
98:15
**regard**
43:8
**regarding**

32:17 41:5 43:4
57:19 66:22 69:12
72:3 99:14 102:2,14
102:21
**regards**
8:21 14:17 17:24
26:17,21
**region**
53:16
**regional**
11:1,3
**regions**
53:17
**regular**
35:8
**regularly**
35:12
**regulations**
29:18 106:2
**regulatory**
17:18 18:3 20:6
23:16,18,20 29:16
43:18
**rehab**
11:2
**reinstatement**
91:5,14 103:5
**reinvested**
30:24
**relate**
75:6
**related**
7:5,7,16,16 8:1,2,3
9:5 19:18 29:11
33:17 35:19 39:15
39:18 42:13 43:16
50:20,21 98:12
100:12
**relationship**
10:17 36:8 41:21
43:24 44:5 48:8,16
48:16,19 50:9 58:16
59:4,23 84:3
**relationships**
12:13
**relative**

110:12,14
**relatively**
28:22 33:12 37:9
49:17
**relaying**
57:10
**reliability**
28:18,20
**relief**
77:7
**relieving**
86:18
**relying**
57:20
**remember**
8:14 35:21 42:6 44:7
44:10 45:11 46:16
47:11 53:19,21 56:1
57:3,5 58:19 62:24
63:1,19 65:12 68:8
77:10,13 78:15
80:23 98:11 99:11
99:13 102:12
**remind**
53:20
**reminded**
40:9
**remote**
15:15
**remotely**
109:11 110:10
**Render**
2:6 8:20
**Renown**
10:15,18,23 18:9
30:18,22
**Reopen**
84:9
**reorganization**
31:12 100:15
**repeat**
95:9
**rephrase**
27:25 51:19 63:14
**report**
7:18 20:17 57:22

91:6,15 110:9
**reported**
1:17 26:17 103:8,14
103:25 104:19
**Reporter**
3:3 88:12,13 110:8
110:21
**REPORTER'S**
110:1
**reporting**
7:17
**reports**
10:19 79:9
**represent**
4:16 45:5 66:9 78:18
80:15 97:5,10
103:13,22
**representation**
9:3
**represented**
8:19
**reputation**
42:17,20,21 43:1,3
**request**
26:13,18,23 58:5
62:25 72:16 76:9,22
81:2,6,20 82:25
84:7 85:13 90:19
91:1,5,14 100:24
104:5
**requested**
72:22 91:19 93:12
103:9 104:20
**requesting**
58:4 66:15 77:1,2
90:4 92:2,24 93:2
**require**
17:25 21:18
**required**
8:1 23:19,22
**requirement**
43:18
**requirements**
17:18 29:20 76:9,18
76:19
**requires**



89:19
**reread**
59:22
**residency**
12:24
**resident**
12:19,20
**resisted**
11:21
**resolve**
8:7 18:20
**respect**
22:10,11 27:4 30:14
43:6 47:9 75:7,13
86:7
**respond**
6:14
**response**
4:25
**responses**
5:6
**responsibilities**
8:21 20:2,7
**responsibility**
21:6,25 22:22
**responsible**
60:5 72:15
**restate**
73:18 74:7 75:4
90:25 102:23
103:23
**restrictions**
7:17,23
**resulted**
102:13
**results**
43:21
**resuming**
91:17
**Retained**
3:10
**retired**
12:8
**return**
90:14 92:3
**review**

9:23 20:14 21:7,10
45:20 48:18 89:5
**reviewed**
10:1
**revised**
95:14
**right**
8:6,17 25:17 27:14
46:3 52:1 60:13
61:16 67:4 68:18
70:14 72:5 76:13
81:5 84:22 85:5
86:2 87:8 89:17
90:9 92:1 93:17
95:24 98:3 99:19
101:16 103:7
105:12
**ring**
16:23 58:11 78:13
**rise**
77:4,5 101:9
**risk**
28:22 57:9,11,12
**role**
8:22 13:21 14:24
16:5 20:2 21:18
22:15,16,18,21
26:12,16 27:4 28:14
28:15 41:18 43:20
45:13 48:22 50:6
53:13 54:8 72:24
82:15 94:6
**roles**
13:9,12 16:8 17:13
18:14 22:10 34:20
99:24 100:4
**room**
14:1
**root**
17:10
**ROPC**
40:14 44:21 45:14,18
78:1
**rule**
4:23
**rules**

4:20
**run**
42:13

---
**S**
---

**sabbatical**
28:9
**Sabey**
2:6 5:15 8:19 9:13,14
25:4,10,13,19 26:4
32:25 33:22 37:18
38:11,15 39:11 56:8
56:11 66:24 68:19
69:15 70:8,20 71:3
73:16 75:2,8 87:10
87:18 88:4,11,15
90:18 95:3 101:8
103:18 104:4,15
106:8 108:8,10
**safe**
21:5 28:23
**safely**
90:14 91:18
**safety**
28:18,20 52:8
**Saint**
7:8 8:10,12 13:10,20
14:11 15:14 17:6
18:6 30:5 46:25
47:7 52:22,24 53:9
82:17 100:18
**Sam**
10:11 66:3
**Samuel**
53:11
**San**
12:20 13:2,5
**Santa**
8:12 17:7
**sat**
24:10
**saw**
16:20 86:6
**saying**
36:6 54:4 65:7 70:5
70:12 73:4 84:3,21

84:25 90:3 102:2
**says**
19:1 56:8 59:12
61:15,16 62:15
64:12,23 65:10 67:3
67:9,20 68:11 69:11
80:8 81:9 91:4,13
95:14 101:7 103:14
105:7
**scenarios**
50:14
**scheduled**
9:20 15:16 80:15
**scheduling**
22:24
**school**
11:18
**Scott**
105:6
**scratch**
16:19
**scrolling**
19:7
**seal**
109:12
**second**
15:6 37:4 49:16
65:18,22 67:17 80:4
91:4,4
**see**
11:2 16:3 18:14,19
28:13 34:13,15
48:11,13 49:9 54:3
54:6 55:20 56:6,18
56:22 60:18,20,24
61:16 64:5,12,22
67:19,22 68:11 69:4
69:8 71:24 72:11
75:17,21 76:3 80:7
81:12 84:11,17
87:14 91:3,8,11,20
93:24 95:16 104:23
105:23
**seeing**
42:6
**seeking**


MAGNA
LEGAL SERVICES

63:16
**seen**
 32:6 61:20 63:6 64:7
**Selagamsetty**
 58:11
**selected**
 15:3
**self**
 87:1
**seminars**
 34:24 35:13,13,14
  38:21
**sending**
 54:8,13 55:5
**sense**
 5:2,7,22 6:4 24:25
  40:16,24 41:7
  107:16
**sensed**
 39:9
**sent**
 10:2 56:16 59:23
  60:12 64:16,19
  65:19 66:8,22 67:8
  71:22 78:11 80:12
  95:13
**sentence**
 68:14 91:4,8
**sentences**
 105:7
**separate**
 53:8 72:9 73:4,5
**separated**
 73:21
**separately**
 72:14,17
**series**
 10:2
**serious**
 51:13,15 102:4,13
**serve**
 14:24 15:4 27:18
  52:14 86:6
**served**
 13:9 14:10 15:18
  18:5

**services**
 1:10 20:4 22:7 29:22
  50:5 82:11,14,16
  83:5
**serving**
 26:11 28:14 30:5
  40:1 41:15,22 44:20
  52:19 98:24
**sessions**
 24:11
**set**
 56:1 78:23
**setting**
 28:24 78:5
**settings**
 42:4
**settled**
 8:8
**Setty**
 58:14,16,20,23,25
  60:14 61:5,24 62:11
  62:19
**severance**
 31:13
**severe**
 76:5,25
**share**
 16:9 49:6 51:6 86:17
  88:17 104:25
**shared**
 23:21 50:15 63:25
  67:13 76:9 82:6
  84:14 87:5,6 92:19
**sharing**
 59:11
**short**
 38:18 102:1
**shorthand**
 40:14
**show**
 46:22 49:1,2 71:13
  79:17,23 82:5 87:4
  87:15 88:2 89:2
**showed**
 46:17 86:12 94:5
**siblings**

 12:2
**sic**
 44:24
**side**
 8:8 31:1 34:19 51:23
  53:5,7 59:24 72:15
  72:18,22 73:8,9,14
  85:25 86:1
**sign**
 9:2 34:1,12 68:13
  97:18 98:5
**signature**
 18:25 64:24 67:1,9
**signed**
 9:5 54:4,15 68:12
  94:2 106:20
**significant**
 33:17
**signing**
 54:9,12
**similar**
 17:5 99:13
**simple**
 107:10
**sit**
 53:6
**site**
 20:7
**situation**
 51:10 107:18,21
**situations**
 19:18
**skills**
 38:10
**sleep**
 97:9
**slightly**
 57:3
**small**
 33:12
**snack**
 88:8
**snooping**
 11:6
**someone's**
 13:18 21:16

**sooner**
 59:8,10
**sorry**
 12:17 65:6 68:7 72:6
  75:9 79:21 84:19
  95:8 100:10 106:15
**sort**
 5:16 12:23 24:5
**sounds**
 45:8 47:22 90:20
  100:11
**source**
 21:11
**sources**
 23:14
**South**
 10:20 11:2
**speak**
 18:15 35:18
**speaking**
 5:11
**specific**
 8:12 20:13 21:25
  22:10 24:23 26:5,12
  27:21 36:17 44:10
  74:2 106:3
**specifically**
 5:21 36:23 45:24
  50:8 60:15 63:21
  67:25
**specifics**
 42:25
**spend**
 18:1
**spent**
 17:21
**Spirit**
 97:1,4,10,16,19 98:2
  98:7,13,18,21 99:1
  99:14,15,20 100:1,6
  100:12,20
**split**
 15:10
**spoke**
 34:25 78:8
**sponsored**



sponsored
35:17
spouse
12:7 36:7
spouses
36:4,8,10
Springer
24:9,9
ST
1:9
staff
13:21 14:15,17,22,24
16:3 20:3,4,4,8,9,11
20:12,13,14,21,21
21:19,23 24:13
26:13,21,22,22,25
27:2,3,4,7,10,19
28:16 29:16,19 30:1
30:10,11 34:5 35:18
41:25 43:17,18 47:8
50:20 51:6 52:17,18
53:9 72:9,15,22,24
73:21 79:5 82:11,14
82:16 85:25 86:20
89:13,16 93:9,21
96:6 100:5
staffing
22:24 85:9
staffs
24:15
stand
16:25 29:21 107:2
standard
49:23
standards
29:25
stands
44:2
start
4:9 7:10 14:19 20:8
23:3 27:8 30:21
35:5 50:1 71:21
93:2 105:7
started
87:1 98:17
starting

34:4
state
7:17 33:16 75:9
84:19 92:11 102:23
109:4,20 110:3,21
stated
90:22 92:10
statement
19:1,6 94:24
states
1:1 95:10
stating
4:9 90:6 92:4
statute
106:2
statutes
25:24,25 26:10
stay
21:8 46:20
stenographic
110:11
stenographically
110:9
stepped
102:19
Stepping
15:6
sticker
88:24
stopped
8:24 9:3 40:7
Street
2:3,7
stress
19:17 33:17 57:7,9
59:12,13 60:2 75:21
76:5,25 79:9,15
86:18 87:6
strike
38:9 93:6
struggle
75:18
style
101:15
subject
69:4,8,18,21,24 70:2

102:25
submit
76:9 81:21
submitting
81:2 85:12
substance
6:13 77:23
substances
6:18,20
successful
17:11 42:19
suggesting
90:12
suicidal
76:1
suicide
57:15
suing
7:15
summarize
48:11
supplier
99:18
supplies
32:20 33:2 99:18
supply
99:15
support
16:13 36:1,25 46:22
104:5,9
supported
17:9 76:2
sure
5:12 8:16 21:4 27:14
28:1 37:25 51:20
68:3 71:4 73:17
78:2 82:25
surgeon
16:17
surgery
70:13
surgical
32:21
surprised
83:13
suspect

71:11
sworn
4:2 109:11
symptoms
36:7
system
10:22,23 53:4

_____

**T**

Taha
53:18 54:1 83:19
94:2,9,18 105:13
tail
40:19,23 41:5 44:3
44:15
tailoring
13:18
take
5:24 6:2 15:13 28:7,8
35:23 39:21 47:20
49:16 55:22 57:22
61:11 62:22 71:18
79:10 80:4 88:7,20
95:23 96:11 102:22
103:2,5,22 108:10
taken
1:14 6:24 47:24
76:15 96:15
takes
28:10
talk
18:18 29:6 74:13,14
74:18 85:17,19,20
107:12,14,15
talked
51:11 78:25 83:25
86:10,11 107:24
talking
29:4 32:6 35:6 56:15
63:2 69:13 71:5
74:18 77:25 84:14
84:24,25 85:1,3,4,8
85:12 96:1
tandem
61:7
team



19:12 50:12
**teams**
9:16
**Technically**
11:1
**tell**
32:19 83:24 87:3
101:2
**telling**
62:22 82:23 85:17
**ten**
47:21 88:7 96:11
**term**
7:19 26:8 28:2 34:25
**terms**
25:14 28:11,25
**testified**
4:3
**testify**
9:8
**TESTIMONY**
3:1
**text**
9:17
**thank**
4:13 14:5 41:11 45:1
47:23 49:21 56:13
61:18 80:8 88:13
96:13,14 108:7
**theirs**
24:11
**thing**
9:5 22:24 31:24
47:10 69:1 104:13
**things**
5:4 6:17 9:7,17 17:13
17:25 18:3 22:20,22
23:21 28:9 29:7
37:3 43:5,14 44:16
49:5 50:18 52:2,4
52:10 60:1 66:18
78:25 81:3
**think**
9:5,20 12:19 14:15
14:21 22:19 27:13
28:5 39:4 42:7 44:2

44:8 45:15,19 48:13
48:19 49:5 50:22
51:6,24 54:2 57:18
57:24 58:24 61:1
62:21 65:6,25 66:3
66:4 71:5 72:25
73:7,13,24 74:5,8
74:25 77:8 80:18
82:14 83:2 85:18
86:12 89:9 91:2
97:3 98:1 100:25
101:17 102:4
105:16,20 107:20
107:25
**thinking**
27:16 34:2 92:16
104:2
**third**
64:22
**thirty**
96:12
**Thompson**
59:16 81:11 86:17
**thought**
13:7 45:1 57:25
65:14 105:2
**three**
11:1 12:3 14:21
60:21 61:23 87:2
**time**
1:15 5:17 6:18,19
9:23 11:5 15:13,25
17:21 18:1,1 19:24
22:20 23:9,11 27:20
35:16 36:18 38:18
39:3 40:22 41:4
42:12 44:20 46:5,20
48:15,20 50:3,10
53:1,11,13 54:21,24
60:13 63:15 65:2
68:18 71:18 72:2
76:17 78:19 79:4
80:8,14,23 81:14
83:21 84:2 87:17
88:5 95:21 96:4
97:14 105:14

106:11,11 108:7
**timeframe**
50:15
**timeline**
55:10 66:12 67:6
96:21
**times**
4:22 7:1 9:14 17:19
24:8 31:4 52:21
96:18
**timing**
9:17 48:6 92:19,23
97:2 100:25 101:2
102:6
**title**
14:13,14 33:16 53:14
59:17 82:14
**today**
4:14,18 6:12,21 9:10
11:6 26:1 38:22
40:14 67:21 69:12
78:21 89:2 100:23
107:24 108:2,5
**today's**
9:24
**told**
54:16 83:11,16 95:4
**ton**
11:5
**tools**
51:18 70:13 99:10
**top**
50:1 56:20 61:15
64:11 67:3,19
**topic**
37:13 39:19
**train**
28:17
**trained**
29:19
**training**
28:16 29:10,14 30:1
**trainings**
23:5 39:15,18
**transcript**
110:10

**transfers**
22:24
**transitioned**
18:9
**trauma**
22:20
**trends**
21:15
**tried**
106:11,12
**trip**
90:15
**true**
85:8,21 103:20,22,24
104:19 107:6
110:10
**truly**
85:13
**Trust**
99:16
**truth**
102:2
**truthfully**
6:10,15
**try**
16:4 28:25 31:4 33:6
37:14 98:15 101:4
**trying**
13:6 17:24 23:24
29:9 35:25 37:1
65:13 74:14,17 78:7
86:16,19 90:15
106:12
**twenty**
88:8
**twice**
7:2
**two**
7:4 9:16,19,22 13:3
14:21 50:16 66:18
74:16 77:14 80:25
105:1 107:7
**type**
52:2,4,10
**types**
29:14 34:21 35:6


MAGNA
LEGAL SERVICES

43:14
**Typically**
24:7

**U**

**UCSF**
13:7
**uh-huh**
5:4
**ultimately**
11:20 12:10 26:23
39:7 50:16 60:5
86:21 102:13
104:12
**Um**
59:22
**uncommonly**
42:3
**undergo**
23:20
**undergoing**
10:11
**underlying**
8:15 89:19
**undersigned**
109:9
**understand**
5:8 6:7,18 7:20,24
15:11 18:19 38:1,20
38:23 41:8 43:20
62:20 64:20 65:2
72:2 74:20,24 76:7
77:19 95:1
**understanding**
24:19 25:5,16,21,23
26:8 27:23 28:2,11
33:14 34:16,17
35:24 37:15 40:21
43:3 48:15 58:22
67:10 69:23 101:13
105:19,22 106:10
106:18,19
**understood**
42:21 48:19,22 61:2
63:16 82:15 90:16
103:4

**undertaking**
62:16
**unilateral**
76:16
**UNITED**
1:1
**units**
39:6
**University**
11:16 12:20 13:1,5
**unknown**
39:10
**unprofessional**
76:24
**unrelated**
29:15
**unusual**
37:12,21 58:2 77:20
77:23
**updated**
11:10
**use**
40:14
**usual**
57:25
**utilization**
21:7
**utilizers**
17:5

**V**

**vacancy**
14:24
**vacation**
59:7,14 65:3,8,10
**vaccines**
39:13
**variety**
33:18
**vast**
43:9 52:21
**vendors**
24:9
**verbally**
68:12
**version**

55:1 64:19
**versions**
105:5
**versus**
30:15 32:17 99:9
**Videoconference**
1:16
**view**
22:4 24:24 27:23
33:10 34:8 50:6
76:17 77:6 101:13
103:16 105:25
106:7 107:11
**Vincent**
7:8 8:10,12 13:10,20
14:11 15:14 17:6
**vision**
22:7
**visits**
15:16
**voice**
24:3 33:6
**void**
102:19
**vs**
1:6

**W**

**wait**
4:24,25 5:1
**walked**
107:12
**Wanda**
1:17 109:9,20 110:8
110:21
**Wanda's**
4:21
**want**
4:19 11:5 16:4 19:24
28:9 32:22 33:16
39:21,22 40:22
44:15 49:1 61:14
64:10 88:7 92:14
96:18 97:6 107:23
108:1
**wanted**

15:9,11 16:5 32:23
**wanting**
79:10
**warranted**
18:21
**wasn't**
46:19 85:16 87:7
105:3
**waste**
11:5
**watch**
105:4
**way**
21:21 23:10 27:9
30:13 31:2 36:5
39:16 41:19 47:17
49:5 58:2 60:21
64:22 76:2,6,22
77:2 84:19 86:19
87:13,14 91:2 100:6
102:5 103:16 104:2
104:20 105:10
**ways**
38:5,14 72:20 86:15
**wearing**
16:3
**week**
9:16 59:7 60:22
65:10
**weekend**
96:20
**weighed**
22:19
**welcome**
46:22 88:15
**Weller**
10:11,13,17 53:11
66:3,22 83:15
**wellness**
17:24 35:1 51:11,18
59:17 72:9 73:1,12
73:14 74:4,10,11,20
75:5,12
**wellness/med**
73:21
**went**


MAGNA
LEGAL SERVICES

27:5 94:22 96:5
100:25
**whatsoever**
94:8
**widespread**
37:14
**William**
1:13 3:1 4:1,11
109:10
**willing**
9:8 15:4 74:13
**wish**
19:23
**withdraw**
25:18
**witness**
4:2 39:23 47:22
56:12 88:10 96:14
109:12
**wondering**
80:18
**word**
23:23 34:2 63:6,10
86:11 103:7
**words**
92:14 105:14
**work**
10:13 11:9 15:13
17:14,21 18:1 19:20
20:10 26:21 33:20
34:6,14 38:2 42:2
43:25 47:2 48:12
53:7 69:24 97:15
101:4
**worked**
16:17,21 20:15 107:6
**working**
8:24 9:3 32:12 34:19
38:24 41:21 42:18
44:4 50:9 73:7,13
74:8 87:15 97:13
98:11,17 99:8,17
107:8
**works**
66:4
**world**

13:7
**worried**
88:11
**worries**
41:2 88:25 89:3
96:14
**wouldn't**
40:5 55:3 100:22
**wrap**
96:12
**write**
56:20 57:11
**written**
9:2 39:17
**wrong**
14:3 76:2 79:21 97:6

———————— Y ————————

**Yaney**
82:8
**Yeah**
71:4
**year**
11:11,13 16:3 23:19
**years**
16:16 24:5 32:15
40:6,10

———————— Z ————————

**zero**
28:21 29:1,6
**zoom**
4:22,24 5:4 9:16
78:11 80:12 96:18
97:24

———————— 1 ————————

**1st**
95:5,11
**1:23-CV-01921-N...**
1:6
**10**
61:15
**10th**
109:12 110:17
**109**

3:2
**11**
61:9,10,14,16 63:24
69:2,14 70:1,6,7,17
**110**
3:3
**12**
89:4,6
**12th**
55:9 64:16
**12:00**
1:15
**12:45**
88:4
**13**
88:3,17 93:22
**17th**
2:7
**19**
38:24 39:10
**1992**
11:15
**1996**
11:15 12:19
**1999**
40:4

———————— 2 ————————

**2nd**
78:5,12 80:7
**2000**
12:19 13:9
**2007**
14:6
**2009**
14:6
**2012**
14:10
**2013**
13:9 14:10
**2014**
15:18
**2019**
15:18 18:4 96:22,25
97:11,24
**2021**

45:3,6 48:2,24
**2022**
40:8 47:4 48:20
50:15 54:25 55:9,11
55:14 56:4,16 61:21
64:24 66:21 67:7
71:23 78:6 82:20
93:24 95:11,13
**2023**
18:4,8 100:10
**2024**
1:14
**2025**
109:13 110:17
**21**
67:14,19 69:7 70:4
71:13
**22nd**
56:4,16 60:17
**25th**
61:21
**26th**
64:24 66:12,21 67:7
95:13
**27th**
71:8,22 84:12 85:11
**2701**
2:3
**28th**
72:8 75:25

———————— 3 ————————

**3:30**
108:11

———————— 4 ————————

**4**
3:2
**4/1/2027**
109:21 110:22
**4:01**
56:5,17
**4:38**
60:17
**40**
3:11 49:9,11 50:1



54:3 55:15
**44**
3:12 55:16,17 61:9
**49**
3:11

**5**

**5th**
82:20 85:7
**5:25**
84:12
**5:27**
71:23
**5:30**
65:1
**5:52**
72:8
**55**
3:12
**56**
64:1,2,23 66:21 67:9
67:12
**57**
71:14,15 78:4 84:9
88:1
**58**
3:13 79:18,19,23
82:5
**59**
3:14 79:24,25 80:2
82:4

**6**

**6**
1:14 93:7
**6.G6**
91:11,13
**64**
3:12,12

**7**

**71**
3:13,13
**79**
3:13,14

**8**

**80202**
2:7
**80205**
2:4

**9**

**9th**
93:24 105:13
**9:30**
80:15
**999**
2:7

