Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-01921-NYW-MDB

--------------------------------------------------------

VIDEOCONFERENCE AND VIDEOTAPED DEPOSITION OF:

MUNNI SELAGAMSETTY, MD - 01/16/2026

--------------------------------------------------------

DR. ANUJ PEDDADA,

Plaintiff,

V.

CATHOLIC HEALTH INITIATIVES COLORADO d/b/a CENTURA
HEALTH-PENROSE-ST. FRANCIS HEALTH SERVICES; and
COMMONSPIRIT HEALTH,

Defendants.

--------------------------------------------------------

        The deposition of MUNNI
SELAGAMSETTY, MD was taken by the Defendants on
January 16, 2026, commencing at the hour of 2:03
p.m. Mountain Time, before ROSIE STAHL, Shorthand
Reporter and Notary Public within and for the State
of Colorado.



Page 2

REMOTE
APPEARANCES

For the Plaintiff:

OMEED AZMOUDEH, ESQ.
QUSAIR MOHAMEDBHAI, ESQ.
RATHOD | MOHAMEDBHAI LLC
2701 Lawrence Street, Suite 100
Denver, CO 80202
Qm@rmlawyers.com
Oa@rmlawyers.com

For the Defendants:

MARK L. SABEY, ESQ.
LINDSAY K. MCMANUS, ESQ.
HALL, RENDER, KILLIAN, HEATH & LYMAN, P.C.
999 17th Street, Suite 800
Denver, CO 80202
Ph. 303-801-3535
Marksabey@hallrender.com
Lmcmanus@hallrender.com

Also Present:
Jeremy Werner
Brad Bissegger - Videographer

Page 3

I N D E X
EXAMINATION OF MUNNI SELAGAMSETTY, MD:     PAGE
JANUARY 16, 2026

By Mr. Sabey                5
By Mr. Azmoudeh            63
By Mr. Sabey             147
By Mr. Azmoudeh           171

DEPOSITION EXHIBITS:           INITIAL
                               REFERENCE

Exhibit 105   Certificate of Trade    Page 27
              Name: Internal Medicine
              of the Rockies,
              02/19/2003

Exhibit 106   Text Messages: Dr.      Page 40
              Selagamsetty and Dr.
              Peddada, 10/07/21
              (Bates Peddada_001246
              to Peddada_005613)

Exhibit 107   Email String: From      Page 47
              Peddada, to Monroe,
              04/25/22, Re: Needs
              Attention (Bates
              PSF-Peddada-1482 to
              PSF-Peddada-1484)

Exhibit 108   Excerpts of Deposition   Page 52
              of: Anuj Peddada, MD -
              12/10/2024 - Volume II

Exhibit 109   Declaration of Munni     Page 108
              Selagamsetty, MD
              11/21/24

Page 4

JANUARY 16, 2026, 2:06 P.M. MOUNTAIN TIME
P R O C E E D I N G S

THE VIDEOGRAPHER:  We are now on the record.  This begins the video deposition of Munni Selagamsetty, M.D., in the matter of Dr. Anuj Peddada versus Catholic Health Initiatives Colorado, et al., in the United States District Court, the District of Colorado, Civil Action Number 123-CV-01921-NYW-NDB.  Today is January 16th, 2026, and the time is 2:07 p.m. Mountain Standard Time.

This deposition is being taken via Zoom at the request of the defendants.  The videographer is Brad Bissegger of Magna Legal Services, and the court reporter is Rosie Stahl of Magna Legal Services.

Will counsel for the parties please state their appearances and whom they represent?

MR. SABEY:  Yeah, Mark Sabey and Lindsay McManus appearing on behalf of the defendants.

MR. AZMOUDEH:  And Omeed Azmoudeh, Qusair Mohamedbhai, and a clerk in our office, Jeremy Werner, on behalf of the plaintiff.

Page 5

THE VIDEOGRAPHER:  Thank you.  Will the court reporter please swear in the witness?

MUNNI SELAGAMSETTY, MD, being first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. SABEY:

Q    Okay.  Dr. Setty, thank you for making time for us this afternoon in your busy schedule.  Can you think of anything else you'd rather be doing on a Friday afternoon?

A    Continue to see my patients.

Q    Yeah.  Did you receive a subpoena for this deposition?

A    Yeah.  The -- yes.

Q    And so you understand that you're legally required to be here today and to answer questions, correct?

A    Yes.

Q    Okay.  So in his deposition and his charge of discrimination, Dr. Peddada stated that you were his PCP.  Was that statement accurate?

A    Yes.

Q    And does that stand for primary care physician or primary care provider or both?



Page 6

A    Could be both, but yeah.
Q    So you were his primary care physician?
A    Right.
Q    How often did you see Dr. Peddada when you were his PCP?
A    Not as often as I would like to have seen.
Q    I'm just -- you don't need to be specific, just getting a general idea.  You saw him from time to time?
A    Yeah, time to time is what I would say.
Q    Okay.  I'd like to show you what's been marked as Exhibit 55, and the way we're going to do that is Lindsay is going to put Exhibit 55 in the chat.  If you'll just open that up.
A    I have to open that one.  Okay.
Q    Click on the chat.
A    It says to save the PDF or something?
Q    Oh, you can click no, I think.
A    Cancel?
Q    Yeah, just go ahead and -- is it open now or not?

Page 7

A    No.  It tells me to save something. I'm not really good with this computer stuff, okay?
Q    Okay.
A    CPHP file PDF and I clicked onto it. It comes into my -- something called to save. Okay.  Now maybe I have to open it.  I don't know.
Q    Yeah, just click on it to open it.
A    Yeah, there it is.
Q    Okay.  Good.  So at the bottom right hand of the pages on that exhibit, there are Bates labeled numbers.  Do you see at the bottom of the first page it says Peddada 000466?
A    Yes, I see that.
Q    Okay.  If you'd turn to page 00053.
A    Oh, wow.  Okay.  000 what?
Q    00053.  I'm sorry, 503.
A    Oh, my God.  It's long.  Okay.  Oh, my goodness.  I'm at 483.
Q    At the top, it's got page numbers as well.  It's page 38.
A    I don't know.  Let me just scroll this up fast.
Q    Yeah, it's closer to the end.
A    500.  And you wanted me to do what?
Q    No.  000503.

Page 8

A    Yeah.  Okay.
Q    Okay.  You're there?
A    Which one is 503, the one on the top or the bottom?  The confidential thing?
Q    No.  It's the one at the bottom.
A    Okay.  The 5956?
Q    No.  So it should say Peddada 000503.
A    Okay.  Yes, I got it.
Q    Are you there?
A    Yes.
Q    Do you see your name at the top?
A    Yes.
Q    Okay.  Good.  We're on the right page then.  So this is a report from the Colorado Physicians Health Program, and -- that was -- that Dr. Peddada previously produced to us.  And do you recall that you spoke to a reviewer at CPHP who was working with Dr. Peddada?
A    Oh, gosh, I don't -- I don't know. I don't remember.
Q    Okay.  These are notes from a conversation with you.  So it says -- the first line says spoke with MS, which is your name, or your initials.  Explains CPHP and limits of

Page 9

confidentiality.  Then the next sentence says has been under care of MS.  So the 5956 is the physician's identifying number?
A    Uh-huh.
Q    So that's Dr. Peddada?
A    Okay.
Q    Has been under care of MS, under your care, who is PCP since 3-1-11.
A    I guess, yeah.
Q    Does that seem about right, that you've been Dr. Peddada's PCP since --
A    Yes.
Q    -- March 1st of 2011?
A    Yes, that was the first time I saw him.
Q    Okay.  Great.  Then down four lines or five lines from the bottom --
A    Uh-huh.
Q    -- it says MS has no concerns regarding physical health, memory or cognition.  Do you see that?
A    Yes.
Q    And is that what you told the reviewer?
A    That's what it says.



3 (Pages 6 to 9)

Page 10

Q   Okay.  You don't have any reason to dispute that?

A   No.

Q   You agree with that statement?

A   Yes.

Q   Okay.  And then the last entry there says, MS has no concerns regarding Peddada's, or 5956's, ability to practice medicine safely.  And then it adds, and he's anxious to get back to work.  I know that.  I think the break will have been helpful to him to recharge.

A   That's correct.

Q   Okay.  So those are accurate statements that you gave to CPHP?

A   Yes.

Q   Okay. We're done with that exhibit.  Now, I'd like you to turn to Exhibit 2C, which is the medical record of a visit with Dr. Peddada as a patient of yours on April 22nd of 2022.  So it's now in the chat so you can open that up now.

A   Okay.

MR. AZMOUDEH: Mark, sorry to interrupt.  Just for the record, are there -- I have a 2A, a 2C, a 2 -- are there any material

Page 11

differences from what you can tell?

MR. SABEY: I don't know.

MR. AZMOUDEH: Okay. We'll just go with 2C.

MR. SABEY: Yeah, we're doing 2C today.

BY MR. SABEY:

Q   Okay.  Do you have that open now?

A   Yes.

Q   Okay.  So at the top of that, it says Internal Medicine & Aesthetics of the Rockies.

A   Yes.

Q   Is that the name of your practice?

A   That's correct.

Q   And is that the correct address of your practice?

A   Yes, that's correct.

Q   And how long have you been practicing at that location?

A   2003.

Q   Okay.  The first paragraph -- so when -- I'm sorry.  When was the last time you saw Dr. Peddada as a patient?

A   That's the last time.

Q   Okay.  On April 22nd of 2022?

Page 12

A   Yes, in the office as a patient.

Q   Okay.  The first paragraph in the history of present illness, do you see that?

A   Yes.

Q   And the second line down, it says, "This is a 57-year-old male of Indian origin who comes in after an emergency call to my personal cell at 9:00 p.m. the night before."  Do you see that?

A   Yes.

Q   And does that first paragraph accurately describe the gist of the 9:00 p.m. call to you?

A   Yes.

Q   Now, there are a number of other notes under the history of present illness.  Are all of those notes statements that Dr. Peddada made to you at your office?

A   Yes.

Q   Okay.  Now, on page 2, starting the sixth line from the top.

A   Uh-huh.

Q   It starts with "he feels."  Do you see that?

A   Page 2.  "He feels" you said?

Page 13

Q   Yeah, "he feels that if" -- I just want to make sure we're at the right place.

A   Oh, I don't know where I am.  What are you looking at?

Q   It's still the history of present illness section but on the second page.

A   "He feels," yes, I got it.

Q   Okay.  Let me just read that to you.  "He feels that if only he can get a three-month reprieve from work and the stressful situation therein, he will be able to regroup and regain his enthusiasm to work on the new contract that he would have after the next three months."  Did I read that correctly?

A   Yes.

Q   And did he say that to you?

A   Yes.

Q   And did you suggest the three months to him or did he suggest the three months to you?

A   From the note, yes, he recommended that.  He said it would help him to regroup.

Q   Okay.  Are you sure you did not suggest that time period of three months?

A   I don't think so.

Q   And why not?

MAGNA
LEGAL SERVICES

Page 14

A    Because the way I wrote the sentence, it's like it's coming from him.

Q    Okay.  Would you ever automatically tell a patient that three months would be the proper amount of time off?

A    No.

Q    Why not?

A    Well, it's what the patient himself or herself feels the time that they would need to really help themselves, yes.  And it's the patient's, you know, feeling as to how much time they need.  Some of them say six months, and I just follow their -- their inner feelings, yes.

Q    Okay.  Did Dr. Peddada tell you why he felt that three months was the proper amount of time off from work?

A    No.

Q    Did Dr. Peddada tell you that he had available three months of paid medical or disability leave under the contract he had with his practice?

A    I wasn't aware of that at that time, not even now.  I don't know.  You're just saying that for the first time for me.

Q    Okay.  Are you a specialist in

Page 15

physician burnout or mental health issues?

A    No.

Q    Prior to this visit with Dr. Peddada, had you ever had any experience with a patient claiming physician burnout?

A    No.

Q    What about since then?

A    No.

Q    So this was the one and only instance for you as a physician to address a complaint of physician burnout?

A    That's correct.

Q    So what do you normally do when you don't have experience with a condition that a patient claims to be experiencing?

MR. AZMOUDEH:  Object to form.

BY MR. SABEY:

Q    You can answer?

A    I'll try my best to see the best person that they can see, usually a psychologist or a psychiatrist.

Q    Okay.  So did you refer Dr. Peddada to somebody with more experience?

A    At the time the person that I knew, yes.

Page 16

Q    Who did you refer him to?

A    Diana Thompson or Di Thompson, D. Thompson.

Q    Okay.  I'd like you to turn to page 4 now of that exhibit.

A    Okay.  Where are you looking?

Q    Under diagnostic studies.

A    Yeah, that was the wrong label.  Go ahead.

Q    What should the label have been?

A    Assessment and plan because it was a new EMR.  We didn't know where to put what.

Q    Okay.

A    Yeah.

Q    No worries.  So the first line states that Dr. Peddada's burnout, and I quote, related entirely to his work situation.  Do you see that?

A    Yes.

Q    And was that true?

A    Yes.

Q    So you were not aware of any causes other than his work situation?

A    That's correct.

Q    And a couple of lines down it

Page 17

said -- it says, "Patient will definitely benefit with this time interval away from work."  Do you see that?  Starting on the third line down in the middle.

A    Oh, the first paragraph?

Q    Yeah.

A    Yeah, yeah.  I got that, yes.

Q    Okay.  Was it your opinion that his condition of burnout would be resolved with just a brief break from his patient care responsibilities and no other treatment?

MR. AZMOUDEH:  Object to form. Sorry.

BY MR. SABEY:

Q    You can go ahead and answer?

A    Well, I had asked him to see Dr. Di Thompson also.

Q    Yeah.

A    I needed him to come back for followup.

Q    Okay.  But was it your opinion that his burnout would be resolved relatively quickly if he took a break?

A    That's what was told me by him.

Q    Okay.  The last sentence in what's



5 (Pages 14 to 17)

Page 18

numbered -- the paragraph numbered one that we've been going through, it says, "I did speak with William Plauth regarding this patient who recommended Diana Thompson to help evaluate the situation." Did I read that correctly?

A    Yes.

Q    And who was Bill Plauth?

A    He was the physician medical director at that time, if I remember, at Penrose Hospital.

Q    Okay. And did you speak with Bill Plauth about Dr. Peddada's medical condition and leave?

A    Just briefly because I needed to know where to send this man. I mean, I realized Di Thompson is the physician health CPHP person there.

Q    Yeah. Okay. And did Dr. Peddada authorize you to make that call to Bill Plauth?

A    Yes. I told him I'll be calling him.

Q    Okay. And did you also call Dr. Diana Thompson, or Di Thompson for short, and talk to her about Dr. Peddada's medical condition and leave?

A    I think I did. I don't remember

Page 19

exactly, but I think I did call her.

Q    And did Dr. Peddada authorize you to make that call?

A    Yes.

Q    And you said her position, she was over a physician wellness?

A    Yes, physician wellness.

Q    Okay. And does this note also reflect that you recommended to Dr. Peddada that he take various medications for hypertension and anxiety?

A    Yes, that's correct.

Q    And did Dr. Peddada have you write any prescriptions for him or did he decline those medications?

A    I think he declined because I don't remember sending any medicines.

Q    Okay. Now, at the bottom of page 4, do you see there's a line that's cut off?

A    Uh-huh.

Q    Do you have the record there with you?

A    Yes, I do.

Q    Can you tell us what that sentence -- that line says?

Page 20

A    The five, right? The five?

Q    Well, no. It's the third line under four.

A    Right.

Q    I don't know if it's -- yeah.

A    So that one says -- it says that I recommended to use low dose Lexapro superimposed with Ativan 0.5 milligrams at the time for short term; however, patient will return to follow up in four to six weeks and he would like to try his own self-relaxation measures.

Q    Okay. Now let's turn to the top of page 5. The last entry in that section, do you see where it says RTC?

A    Yeah.

Q    "RTC: Four to five weeks to follow up on HTN and clinical burnout."

A    That's correct.

Q    So you were recommending that Dr. Peddada return to your clinic for a follow-up in four to five weeks, correct?

A    Yes.

Q    And did Dr. Peddada return to your clinic as recommended?

A    No.

Page 21

Q    Do you regularly have patients who come to you seeking a leave from work under the Americans With Disabilities Act or the Family Medical Leave Act?

A    They do.

Q    And in those situations, do you normally complete formal paperwork about the nature and duration of the medical condition or disability?

A    Yes, I do.

Q    And did you ever complete such paperwork for Dr. Peddada?

A    Not that I know.

Q    Did you ever diagnose Dr. Peddada as having any disability?

MR. AZMOUDEH: Object to form.

THE DEPONENT: Nope.

BY MR. SABEY:

Q    Do you agree that needing a break due to work stress or burnout does not imply a mental illness or any other disability?

MR. AZMOUDEH: Object to form.

THE DEPONENT: I would agree.

BY MR. SABEY:

Q    Did you at the time of this visit or



Page 22

any other time have any concerns about Dr. Peddada's physical health, memory or cognition?

A   No.

Q   Did you at the time of this visit and all other times believe that Dr. Peddada was fully capable of treating patients?

A   Could you repeat that again?

Q   Yeah.

Did you at the time of this visit and at all other times believe that Dr. Peddada was fully capable of treating patients?

A   Yes. After, I mean, his proposed time off work perhaps, but he didn't come back for a follow-up.

Q   Okay. Did you ever at the time of this visit or any other time have any concerns or questions about Dr. Peddada's ability to practice medicine safely?

A   No.

MR. AZMOUDEH: Object to form.

BY MR. SABEY:

Q   What was the answer?

A   No, I did not doubt his capacity.

Q   Okay. During his leave, if he had been called in to help care for a patient, would

Page 23

you have been comfortable that he was capable of providing excellent care?

A   I'm not sure because he didn't come back for follow-up. I think he would be. I think he would be. He's a very intelligent physician.

Q   Based on your note of the April 22nd visit, did Dr. Peddada inform you that he was having any sleep issues?

A   Not that I outlined over there.

Q   Did you ever understand that he was having sleep issues?

A   He didn't mention that in that note.

Q   So if he had mentioned it, you would have included it in the note, right?

A   Yes.

Q   Did you ever tell or instruct Dr. Peddada that he could not communicate with people at Penrose Hospital or Centura Health about employment -- about an employment agreement, a loan repayment agreement or any other arrangements for him to start working as an employee?

A   No.

Q   Did you ever tell or instruct Dr. Peddada that there was anything he could not or should not do while on leave?

Page 24

A   No.

Q   Did you feel that he needed to have a medical restriction on any type of normal life activities?

A   No.

Q   Did you suggest any restriction on his normal life activities?

A   Not that I can see, no.

Q   From your evaluation of Dr. Peddada, did his burnout condition interfere with his ability to perform any major life activities or bodily functions such as breathing, sleeping, walking, working, communicating or thinking?

A   No.

Q   Was it your opinion based on your assessment as his PCP that Dr. Peddada was fully capable of conducting all normal life activities without interference and that all of his normal bodily functions were unimpaired?

A   Yeah.

Q   Okay. The last page of the assessment under -- I'm sorry, the last page of the document under the phrase assessment, do you see that section?

A   Yeah.

Page 25

Q   That includes some ICD-10 codes, correct?

A   That's correct.

Q   And would it be accurate to say that those codes are used to classify symptoms or conditions of patients?

A   Yes.

Q   And are those codes intended to address the issue of whether a patient's condition interferes with any specific life functions?

MR. AZMOUDEH: Object to form.

THE DEPONENT: No.

BY MR. SABEY:

Q   But you signed this document on the 28th of April?

A   Right.

Q   Correct?

A   That's correct.

Q   At 7:21 a.m. That was six days after the office visit, correct?

A   That's correct.

Q   Does that seem like the normal time period between an office visit and when you review and sign the medical record?

A   That's about sometimes the earliest



Page 26

I finish my notes.

Q    Yeah, I'm just wondering.  I don't know the answer.  Okay.  That doesn't strike you as unusual?

A    No.

Q    Okay.  We're finished with that document now.

So if you agree with a patient that it would be good to take some time off, is there one and only one medically appropriate time period if a physician is experiencing some kind of burnout or exhaustion?  Is there one specific time period of the amount of time you should take off?

A    Not that I know.  I don't treat these patients.

Q    Is there anything about Dr. Peddada's condition in your professional opinion that made a leave duration of less than three months automatically insufficient?

A    I wouldn't know.  No, I don't know.

Q    Okay.  So if he had come in asking for a leave of two months or one month, you would have been fine with that?

A    I would have been fine but provided I reassessed the patient at that time.

Page 27

Q    Yeah.  Okay.  So is it possible that his physician burnout could have been remedied through a one or two-month medical leave?

A    Could be.  I mean, I don't know.  He needs to get to see the person that really treats these patients.

Q    Okay.  Okay.  I'd like you to look at another document, Exhibit 105.

(Exhibit 105 was marked for identification.)

BY MR. SABEY:

Q    Okay.  It's up there.  So I just pulled this off the Secretary of State's website yesterday, and this is a document about your business.  So your entity name is -- how do you say your first name?  Munni?

A    Yeah.

Q    Munni Selagamsetty, MD, PC?

A    Yes.

Q    So your entity is a professional corporation?

A    I think, yes.

Q    Okay.  And then Internal Medicine of the Rockies is a trade name?

A    Yes.

Page 28

Q    Okay.  And is this an independent practice?

A    Yes.

Q    Who manages and operates your practice?

A    My husband.

Q    And how long have you been practicing medicine under that name?

A    I think 1996 maybe.  I don't know.  Maybe 2003.  I don't know.  I can't remember but --

Q    It's been awhile?

A    Yeah.  I've been on my own since '96 and in this particular building since 2003.

Q    Okay.

A    So I don't know what label my husband had at that time.

Q    Okay.  And has your practice ever been owned or operated by Centura Health, Catholic Health Initiatives Colorado, Penrose Hospital or CommonSpirit Health?

A    Never.

Q    Is Penrose Hospital the closest hospital to your practice?

A    No.

Q    What hospital is closer?

Page 29

A    Memorial Hospital Central.

Q    Okay.  Do you have medical staff privileges at Penrose Hospital so that you can admit and treat patients there?

A    Yes.

Q    And do you take call coverage occasionally as part of your medical staff privileges?

A    Yes.

Q    Do you have any other relationship with Penrose Hospital?

A    No.

Q    Dr. Setty, do you recall when I reached out to your office back in 2024 to explore either taking your deposition or receiving a sworn declaration from you in this case?

A    I guess so.

Q    And as opposed to sitting through a deposition, did you voluntarily agree to sign a declaration to provide the clarifications that we needed from you?

A    I must have, yes.

Q    Okay.  Before I interviewed you, I let you know that Dr. Peddada's counsel had already provided me with the medical record of Dr.

Page 30

Peddada's April 22nd, 2022, visit with you?

A    I think so, yes.

Q    So I will represent to you that I did receive your office's medical records related to Dr. Peddada's leave in the course of this lawsuit and not from your office.

A    No.

Q    Does that seem accurate to you?

A    Yes.

Q    So you've never provided my firm any of Dr. Peddada's medical records; is that correct?

A    Excuse me?

Q    So you've never provided my firm any of Dr. Peddada's medical records, correct?

A    I'm not understanding that question.

Q    I'm just saying, you didn't send me any medical records?

A    I don't know.  My husband also helps.

Q    You're not aware of your office sending me any medical records?

A    No, I don't think so.

Q    Yeah, no. I'll just represent to you that I got the medical records in the course of this lawsuit, not from your office.

Page 31

A    Yeah, that's what I gathered.  Yes.

Q    Okay.  So when I asked you questions about his medical record and you provided answers, did you disclose any new medical information about his condition or diagnosis that we did not already have?

A    Yeah, no.

Q    And do you recall me asking you about statements that Dr. Peddada or his attorneys made on public records filed in court?

A    I wouldn't remember that.

Q    Well, you remember I would say, Dr. Peddada said this and I'd ask you if that's true? Do you have any memory of that?

A    I honestly don't have memory, but I may have.

Q    Okay.  That's fine.

So in the process of obtaining your declaration, is it accurate that we interviewed you and then sent you notes of the interview for you to review?

A    You mean at this visit at this time?

Q    No.  When we -- when we did your declaration back in 2024.

A    Again, I did not review all of that.

Page 32

I can't remember.

Q    Okay.  Do you recall that you gave us corrections to what we -- that we read what we had written from our interview with you and that you gave us some corrections?

A    I did not review that either at this -- for this meeting.  I don't know where that information would be.

Q    Okay.  Well, let me just ask you this: Did you review the declaration carefully to ensure that -- you don't need to be looking for something now.

A    Yeah, because I just can't remember what happened in 2024.

Q    Yeah, I don't blame you.

When we sent you the declaration for your signature, did you review it carefully to ensure that everything stated in the declaration was accurate before you signed it?

A    Yeah, I would do so, yes.

Q    Okay.  And were you ever promised any money or other benefit in exchange for the declaration?

A    No.

Q    And were you coerced or threatened

Page 33

in any way to say things that were not accurate in your declaration?

A    No.

Q    Now, I'll represent to you that when the attorneys involved in this case were conferring about Dr. Peddada's motion to strike your declaration, Dr. Peddada's attorneys admitted that they had never reached out to talk with you --

MR. AZMOUDEH:  Object to form.

Q    -- because they just assumed that your testimony would be favorable.

MR. AZMOUDEH:  Object to form and foundation.

BY MR. SABEY:

Q    Are you aware -- have you ever talked with Dr. Peddada or his attorneys about the facts of this lawsuit?

A    I don't recollect, no.

Q    Okay.  And have they ever reached out to you in an effort to contact you?

A    I don't remember.

Q    Okay.  All right.  I'd like you to look now at Exhibit 67.  It's in the chat now.

A    Okay.

Q    Let me know once you have it open.

MAGNA
LEGAL SERVICES

Page 34

A    Yeah.

Q    Okay.  So this I'll represent to you is an email from Dr. Peddada to his brother, and it says at the top there, Subject:  Your thoughts on this letter I want to address with administration -- or admin.  Do you see that?

A    Yeah.

Q    And then it's got an attached document, which is page 2 of the exhibit.  Are you there?

A    Yes.

Q    Okay.  So Dr. Peddada is talking to his brother -- having his brother review this draft of a message that he's thinking of sending to administration.

A    Uh-huh.

Q    And at the top of the third paragraph, the last paragraph starting with "however," do you see that?

A    Yeah.

Q    So this is Dr. Peddada saying in a draft of a potential letter to administration, "However, I need time to recharge, change my perspective.  I need a six to eight-week sabbatical from my daily duties."  Do you see that?

Page 35

A    Yes.

Q    So at that point he was thinking of six to eight weeks off work would be enough to resolve his burnout.

A    Uh-huh.

Q    Do you see that?

A    Uh-huh.

Q    Okay.  Now, I'd like you to -- so you wrote in your medical record that Dr. Peddada comes in after an emergency call to my personal cell at 9:00 p.m. the night before.

A    Yeah.

Q    Right?

A    Yes.

Q    And do you know how he might have had your personal cell phone number?

A    Well, over the course of the professional relationship that we've had, we sometimes send patients to each other so then we do text, so that's how I have his number and my number to him.

Q    Okay.  So your visit with him started at 12:10 on the 22nd?

A    That's correct.

Q    So that phone call was at 9:00 p.m.

Page 36

on the 21st, correct?

A    Right.

Q    So apparently during that emergency call, you agreed to see Dr. Peddada the next day over your noon hour break?

A    Yes.

Q    Okay.  Now, after the 9:00 p.m. emergency call, Dr. Peddada sent a message to his brother about the 9:00 p.m. emergency call with you.  So I'd like you to look at what's been marked as Exhibit 46.  Is it up?

A    Yeah.

Q    Okay.  So if you go down, do you see April 22nd at 6:38 a.m.?

A    I don't see that.  I see this Puerto Rico thing.

Q    Okay.  Just below that a couple of more lines.  Right in the middle of the page it has a date.

A    Hold on.  Let me just -- the print is so small, I can't see it.  Okay.  What are you telling me now?

Q    Okay.  Are you at April 22nd entry there?

A    April 22nd, yeah.

Page 37

Q    Okay.  6:39 a.m.  So this is the same day as your visit?

A    Yes.

Q    And so Dr. Peddada emails -- or texts his brother and says, "Thanks.  I'm going to take a break for eight weeks.  My PCP feels very comfortable making the diagnosis that I have physician burnout."  Do you see that?

A    Okay.

Q    Did I read that correctly?

A    Yes.

Q    Okay.  So he's telling his brother about the emergency call because this is before your appointment?

A    Right.

Q    6:39 a.m.

A    Yeah, uh-huh.

Q    Do you have any reason to dispute the accuracy of what he said to his brother about the 9:00 p.m. emergency call?

A    I don't know what he spoke to him, but I guess he did.

Q    Yeah, but I'm asking is it accurate what he said in there?  He's telling you the upshot of his call with you.  He says, "I'm going to take

MAGNA
LEGAL SERVICES

Page 38

a break for eight weeks.  My PCP feels very comfortable making the diagnosis that I have physician burnout."

A    That's correct.

Q    And that's what you talked about in the 9:00 p.m. call?

A    I think so.

Q    Okay.  And so on that call, he was asking about a diagnosis to support an eight-week leave, not a three-month leave, correct?

A    Yeah.

Q    And your medical records software includes an audit trail function that would show every time anyone accessed or edited the medical record, correct?

A    It should.  Yeah, it should.

Q    Okay.  And on April 22nd, so we have clear evidence indicating that Dr. Peddada was going to ask you to support an eight-week leave --

A    Okay.

Q    -- at -- you know, at 6:39 in the morning.  That's what he said.

A    Uh-huh.

Q    Then on April 25th, we have emails between Dr. Peddada and his attorney, and on that

Page 39

same date between Dr. Peddada and his practice claiming the contractual right to a three-month disability leave based on his appointment with you.  So it went at some point from the morning of April 22nd when it was an eight-week leave to April 25th when he's asking for a three-month leave.

So my question to you is:  During his initial visit, did Dr. Peddada start out asking you to approve an eight-week leave and then contact you and ask you to make it a three-month leave?

A    I don't know.  Maybe he did.  I cannot remember.

Q    Do you remember having any communications with Dr. Peddada that caused you to edit or revise your medical record report in any way?

A    I can't remember, but he may have done because the three-month thing came from him.

Q    Okay.  Just one moment.  So yeah, I'm just trying to figure out why he's talking about an eight-week leave on the 22nd and then a three-month leave on the 25th.

A    Yeah.  That's about four more weeks.

Q    Yeah.  Does that seem strange to you?

Page 40

A    I just listen to my patients' gut feeling what they need.

Q    Okay.  So if he had called you and said, hey, let's change that from eight weeks to three months, you would have been okay with that?

A    Yeah.

Q    Okay.  All right.  Now I'd like you to look at Exhibit 106.

(Exhibit 106 was marked for identification.)

BY MR. SABEY:

Q    Let me know when you've got it up from the chat?

A    Yeah.

Q    Okay.  This page 1 of this exhibit is a text message from you to Chitra Peddada.

A    That's correct.

Q    You take a moment to read that over.

A    You want me to read it loud?

Q    No.  I just want you to review it.

A    That's fine.

Q    Okay.  Do you recall sending this message?

A    Yes.

Q    And why did you send it?

Page 41

A    I was at a conference at the Dana Point.  I don't know which year.  I think it was 2023 maybe.  I'm not sure.  And a couple of the physicians that were at the meeting mentioned her name, and I said oh, my God, how did you know this girl?  They said oh, no, we met her at whatever.  And I said, oh, my God, she was from Colorado.  I had no idea she was in San Diego.

Q    Okay.  So did you consider Chitra a friend?

A    She's a colleague.  She was a physician.  She herself is a physician.

Q    Okay.  All right.  Then if you turn to the next page and for the rest of the document these are text messages between you and Dr. Peddada?

A    Yes.

Q    And these are messages that Dr. Peddada has produced.  And to understand the time stamps on these, you have -- these are time stamped in -- with Greenwich Mean Time, and when it's Daylight Savings Time in Colorado, Greenwich Mean Time is six hours behind Colorado time.  So you have to -- you have to be able to do those calculations to figure out the exact time, and I

11 (Pages 38 to 41)

Page 42

just wanted you to be aware of that because we'll look at some of the specific times a little later.

Okay. So it looks like that first page is a number of appointments about -- I mean, a number of text messages about appointments with you.

A    Uh-huh.

Q    And, you know, it's saying does 10:30 work for you? Yes. Okay. See you then. And then there's one that says, I'll see you for my PRP at 9:30. What's that about?

A    This is a personal thing. I don't know whether I have permission from him to talk to you guys about it. I don't know.

Q    Okay.

MR. SABEY: Any objection?

MR. AZMOUDEH: I don't know what a PRP is either so if the witness isn't comfortable responding, then the witness isn't comfortable responding.

MR. SABEY: Well, I don't know what it is either.

BY MR. SABEY:

Q    Okay. Let's go on to the part that's most relevant to this lawsuit. So on

Page 43

page 2 -- or 3, sorry, of Exhibit 106, it has text messages on the date of your appointment, 4-22-2022. Do you see those?

A    4-22-2022. Okay.

Q    Okay. Are you there? Do you see some text messages -- three text messages exchanged --

A    Yes.

Q    -- on 4-22?

A    Yes.

Q    Okay. So you said that you -- after the emergency call, you said he could come in over your lunch hour?

A    Right.

Q    And then the first text message is from Dr. Peddada to you, and that's at 11:10 a.m., so six hours before the 5:10 p.m. --

A    Uh-huh.

Q    -- time stamp. So 11:10 a.m., so 50 minutes before his appointment with you. And it says, "Munni, I definitely want to see you today. Would the end of the day work better after 5:00 p.m.?" So he's wondering if you'd be willing to bump his appointment from your lunch hour to after 5:00, correct?

Page 44

A    Right.

Q    And then you responded to him at 11:33 and said, "The staff leave at 5:00 p.m." In other words, no, I can't move it to after 5:00, correct?

A    That's correct.

Q    And then you got a message from him at 12:06 p.m., and it says, "I'm in the waiting room. Thanks for seeing me on such short notice. Sorry, I have a procedure to perform at 1:00 p.m. Thanks."

Do you see that?

A    Yes.

Q    Okay. So if he had to be back to Penrose -- I assume that's what he was saying, I have a procedure at Penrose at 1:00 p.m.?

A    Uh-huh.

Q    So if he had to be back to Penrose in 54 minutes and ready to perform a procedure at 1:00 p.m. like he said in that text message, what did you understand he was telling you about when you needed to finish his appointment with you?

A    As soon as possible, I guess, but I don't know whether he went at that time. I have no idea.

Page 45

Q    Okay. So drive time from your office to Penrose would be 15 minutes or maybe a little more at the noon hour?

A    12 minutes is what I take usually.

Q    Okay. You're faster than Google Maps then. Do you have a lead foot?

A    (No audible response.)

Q    And that time would not be counting parking and walking time?

A    No.

Q    So what time would you have thought that he needed to leave?

A    He probably went late that day. I don't remember him leaving that quick. I cannot know the time.

Q    Okay. All right. So you think your appointment ended in time for him to get there by 1:00?

A    I'm not sure.

Q    Okay. And did you have concerns about him leaving your office and going to perform a procedure?

A    No.

Q    Okay. Okay. And then not only that, but the next text message to you is trying to



Page 46

get you to call Di Thompson.  That's the 4-25 one?

A    Uh-huh.

Q    And asking for her phone number?

A    Yeah.

Q    Okay.  Sorry.  So the second 4-25 message, it says, "I don't have her number," talking about Di Thompson.

A    Uh-huh.

Q    "I know you gave it to me, but I misplaced it.  Had a very long night Friday.  Didn't finish work until 10:00 p.m."

So what he's saying there is that on the day of your appointment on 4-22, not only did he have the 1:00 appointment back at Penrose, but he worked until -- didn't finish his work until 10:00 p.m.  Do you see that?

A    I guess so.  Yeah, the Friday.  I don't know the dates and all the days.

Q    Yeah, it was -- the Friday before was 4-22, the same day he saw you.

A    Ah, okay.

Q    And -- yeah.

So when you saw that, did you have concerns that he worked after leaving your office until 10:00 p.m.?

Page 47

A    No.  I mean, they work as late as they want to work.

Q    Yeah, okay.

A    I work until 1:00 sometimes.

Q    Yeah.  Yeah, don't we all?

Okay.  Then after that, there's a number of messages between you and Dr. Peddada, and he's trying to make sure that you called Di Thompson, right?

A    That's correct.

Q    And on 4-28, you said, "I just spoke with Di.  She said she will be happy to see you," that sort of thing?

A    Yes.

Q    And you gave him her cell phone number in case he didn't have it?

A    Yes.

Q    I'd like you to look now at Exhibit 107.

(Discussion had.)

(Exhibit 107 marked for identification.)

BY MR. SABEY:

Q    Okay.  Do you have that open?

A    Yes.

Page 48

Q    Okay.  I'd like you to go back in this chain of emails.  I don't think that was the right one here.  Okay.  Sorry.  The top email, it says this is an email from Dr. Peddada to Bill Plauth, right?

A    Uh-huh.

Q    And it's dated April 29th at 9:57 a.m., correct?

A    I guess, yes.

Q    Okay.  And it says, "Bill, I'm not understanding your email.  Are you saying that my medical leave of absence, which is strongly recommended by my physician, is being denied?"  Do you see that?

A    Yes.

Q    Okay.  Then if you'd look back at the previous exhibit, 106 --

A    Uh-huh.

Q    -- to the 4-29 text message to you.

A    4-29.  Okay.  All right.

Q    So he sent that at 9:57 a.m., so just a couple of minutes before 10:00, and then at 10:04, he texts you.  So he's got this concern wondering whether his medical leave that you recommended is being denied, and then he called you

Page 49

just a couple of minutes later.

MR. AZMOUDEH:  Object to form.

BY MR. SABEY:

Q    Do you see that?

A    I'm not able to track those minutes and all that stuff you're telling me.  So what is this, 4:29, 4:04 p.m.?

Q    Yeah.  4:04 p.m. but that's Greenwich Mean Time.  So that's six hours ahead.  So that makes it 10:04 a.m.

A    Okay.

Q    He sends an email at 9:57, and at 10:04 a.m. sent you a message, "Munni, are you free to talk briefly."  Do you see that?

A    Yes.

Q    Does that help you remember what the discussion was about on the 29th?

A    I wish I could remember.  I don't have that kind of a retrieval.

Q    Okay.  I just thought I'd ask.  Okay.

A    That's like, what, three years ago?

Q    Yeah.  Yeah.  No, I get it.  I get it.

Okay.  So Dr. Peddada's witness



13  (Pages 46 to 49)

Page 50

disclosures listed you as an expert in fact witness. And were you aware that they were listing you as a witness?

A    No.

Q    And did they ever talk with you about what you would say if you were called as a witness?

A    No. Who is the "they?"

Q    Dr. Peddada and his attorneys.

A    No. Geez.

Q    So let me just read for you what they said about your -- your knowledge that you would be -- have information on. "Dr. Munni Selagamsetty attended to Dr. Anuj Peddada's medical needs during times relevant to this case. Plaintiff may call on her to testify as a fact witness and as a nonretained expert -- medical expert. Dr. Selagamsetty possesses information about Dr. Peddada's medical conditions, disability, compensatory damages he has suffered as a result of his termination and other information relevant to the claims, defenses and damages in this case. She will testify to the nature of the medical conditions both with respect to his diagnosis of plaintiff, the nature of the medical conditions and

Page 51

their cause and management, the accommodations he requested, plaintiff's expected health outcomes and other matters of both fact witness and expert opinion."

Okay. So that's what he said -- what they listed in your witness disclosure. So despite the fact that Dr. Peddada listed you as an expert in fact witness, would it be accurate to say that neither Dr. Peddada nor his attorneys ever got in contact with you to explore what you would say if you were called as a witness?

A    That's correct.

Q    Now I want to go through a list of statements attributed to you by Dr. Peddada or his counsel on his behalf in this case and see if they seem factually accurate to you. So in response to a statement of fact in Penrose's motion for summary judgment asserting that you, Dr. Setty, did not restrict Dr. Peddada from communicating with CHIC, this is what the response was: On April 22nd, 2022, Dr. Peddada met with his primary care provider, PCP, Dr. Munni Selagamsetty; however, it is untrue that Dr. Selagamsetty did not restrict his communications with CHIC.

So we said you didn't restrict his

Page 52

communications. They say no, that's not true. And so I want to ask you, did you, as stated there, restrict his communications with Catholic Health Initiatives Colorado?

A    No, I don't know anything about this.

MR. AZMOUDEH: Object to form and foundation. It was simultaneous but. . .

BY MR. SABEY:

Q    Okay. Now I'd like you to look at Exhibit 108?

(Exhibit 108 was marked for identification.)

BY MR. SABEY:

Q    Is that up?

A    Okay.

Q    Okay. If you'd turn to page 116, it's just four pages in. Let me know once you're there. It's in the top right corner.

A    Yeah.

Q    Okay. Are you on page 116?

A    Uh-huh.

Q    Okay. Starting -- okay. So this is Dr. Peddada's deposition. So this is me asking questions. When it says A, that's me asking a

Page 53

question. When it's Q, that's Dr. Peddada responding to the question. Oh, sorry, I said that wrong. Q is the question. That makes more sense. Q is the question and A is the answer. Okay.

So starting with line 4, it says, "So you agree that" -- so what I'm doing is I'm asking him about statements made by his attorneys and asking Dr. Peddada whether he agreed with those statements.

A    Uh-huh.

Q    Okay. So I said, "So you agree that your PCP recommended that you take three months off work meant that you should not communicate with Penrose about loan repayment obligations while on medical leave, correct?"

And he says, "Yes."

Do you agree with Dr. Peddada, did his --

A    I don't know any of this stuff.

Q    Did his medical leave mean that he should not communicate with --

A    No. I don't --

Q    -- Penrose about his loan repayment obligations?

A    No.

MAGNA
LEGAL SERVICES

Page 54

Q    Okay.  Just continuing reading.
Okay.  Paragraph 5 says, "Dr. Peddada never read the new PEA," that's physician employment agreement, "at the recommendation of his PCP."  And I said, "Do you see that?"
He says, "Yes."
"Did I read that correctly?"
"Yes."
"And so did your PCP recommend that you not read the new physician employment agreement?"
And his -- Dr. Peddada's answer is, "She said that I was not cognitively completely there."
A    I don't remember any of this.
Q    "That what I interpreted that to mean yes, she said not to engage, so I followed her instructions."
MR. AZMOUDEH:  Object to form and foundation.
BY MR. SABEY:
Q    Did you say -- did you tell him that he was not cognitively there completely?
A    I don't recollect any of that.
Q    Okay.  Did you tell him that he

Page 55

shouldn't read his new physician employment agreement?
A    No.  I don't remember that at all.
Q    Would you have told him that?
A    No, I don't have that kind of expertise.
Q    And did you tell him not to engage with Penrose or Catholic Health Initiatives at all?
MR. AZMOUDEH:  Object to form and foundation.
THE DEPONENT:  Unfortunately, I can't recollect all of that conversation at all.
BY MR. SABEY:
Q    Would you ever tell a patient who's on a medical leave not to communicate with their employer?  Yeah, not to communicate with a prospective employer.
A    I would not do that.
Q    Okay.  Did he ever ask you to -- did Dr. Peddada ever ask you if he should avoid reading his new employment agreement?
A    I'm sorry, unfortunately, I can't remember any of that conversation, and I would not do that.
Q    Okay.  If he asked you if he could

Page 56

read his new employment agreement while on leave, what would you have said?
A    He probably needs legal counsel.  I don't know.  I would --
Q    If he asked you if he could read his employment agreement, would you say, sure, go ahead?
A    Yeah.
Q    Did he ever recommend that Dr. Peddada not read the new employment agreement?
MR. AZMOUDEH:  Object to form, foundation.
BY MR. SABEY:
Q    That's not something you would do, is it?
A    Yeah.
Q    Yes, meaning?  Let me repeat the question.
Did you ever recommend that Dr. Peddada not read the new employment agreement?
A    No.
MR. AZMOUDEH:  Object to form and foundation.
BY MR. SABEY:
Q    Go ahead and answer.

Page 57

A    No, I would not do that.
Q    And did you ever tell Dr. Peddada that he should not talk to Penrose about that agreement while on a medical leave?
MR. AZMOUDEH:  Object to form and foundation.
BY MR. SABEY:
Q    Would you do that?
A    No.
Q    Okay.  Did you -- okay.  Now let's look at page 118 of Dr. Peddada's deposition.
A    Okay.
Q    Starting with line 14, we're doing the same thing, asking him about statements that were made.  "And so is it accurate that you were unwilling to continue negotiations about both the settlement agreement and the new physician employment agreement until after August 1, 2022?"
And his answer is, "It was on my physician's recommendation.  I wanted to wait until my medical leave was over, feeling better, and could deal with all of these issues."
So my question is:  Did you ever recommend to Dr. Peddada that he cease all negotiations about his employment-related



Page 58

agreements until August 1st, 2022?

MR. AZMOUDEH: Object to form and foundation.

BY MR. SABEY:

Q You can answer.

A You know, unfortunately, I don't have any documentation of that conversation so I'm not sure -- I'm not sure whether this happened. I cannot be a hundred percent certain with all of these questions.

Q Yeah, but would you ever tell -- would you have ever told Dr. Peddada not to participate in negotiations over his new physician employment agreement and the settlement agreement until after August 1st?

MR. AZMOUDEH: Object to form and foundation.

BY MR. SABEY:

Q Would you ever do that?

A I probably wouldn't. I mean, when I look back, I wouldn't do that since I'm not legal counsel.

Q Would you ever tell him not to talk to a potential employer for three months?

MR. AZMOUDEH: Object to form and

Page 59

foundation.

BY MR. SABEY:

Q You don't need to be reading anything. Just look at me and answer the question. Would you ever tell a patient or would you have ever told Dr. Peddada not to communicate with a potential employer for three months?

A No.

Q Do you have that kind of authority to tell a patient not to --

A I don't. No, I don't.

Q Okay. Okay. Now, let's turn to page 119. Okay. We're at the bottom of the page starting with line 23, and then we'll go on to the next page.

A Okay.

Q Are you with me?

A Yes.

Q "Is it your testimony that on April 22nd, 2022, Dr. Setty told you that your medical condition was such that you should not be addressing any work-related issues such as reviewing documents and signing them during your vacation and medical leave?"

And then Dr. Peddada responded, "It

Page 60

was my understanding that I was -- I had clinical burnout and not to engage in those activities, yes."

So did you ever instruct Dr. Peddada not to address any work-related issues, not to review documents and not to sign any documents while on his leave?

MR. AZMOUDEH: Object to form and foundation.

THE DEPONENT: I do not remember, but yeah.

BY MR. SABEY:

Q Would you do that?

A I certainly would not do that.

Q Okay. So are you confident that you did not do that here?

A Like I said, I'm not sure. I don't have anything documented to this effect.

Q So are you confident that you did not tell Dr. Peddada not to -- not to communicate, not to engage in any work-related activities, not to review any documents, not to sign any documents?

A Gosh.

Q Would you do that?

A I certainly would not. I don't --

Page 61

I'm not a legal counsel so I -- or I'm not a psychiatrist or anything like that.

Q Okay.

A Unless he wanted to do it on his own. I don't know.

Q Yeah. If you had told him that, not to communicate, not to engage in any work activities, not to review any documents, not to sign any documents, that would be in your medical record, wouldn't it?

A Yes.

Q Okay. Do you find his assertion that because he was on medical leave, he was not supposed to communicate at all about any work-related matters about his potential future employment with Penrose, do you find that reasonable or unreasonable?

MR. AZMOUDEH: Object to form and foundation.

THE DEPONENT: From his perspective, it may be reasonable. I cannot really go back that far to see what --

BY MR. SABEY:

Q I didn't ask you what his perspective was. Is that the kind of thing you

16 (Pages 58 to 61)

Page 62

would ever do?

A    No.

Q    Do you think that's unreasonable to tell -- for Dr. Peddada to tell Penrose, yeah, I know we're in the middle of negotiating an employment agreement, but I'm on a medical leave now so I'm not going to talk to you until August 1st?  Does that seem reasonable to you?

MR. AZMOUDEH:  Object to form.

BY MR. SABEY:

Q    Would you do that?

MR. AZMOUDEH:  Object to form.

THE DEPONENT:  I don't know.  I don't know how to answer that question.  I probably wouldn't, but I don't know what transpired.

MR. SABEY:  Yeah.  Okay.  Okay. Give us just a minute here.  Do you want to take a five-minute break?

THE DEPONENT:  Sure.

THE VIDEOGRAPHER:  All right.  Off the record at 3:24 p.m.

(A break was taken from 3:24 p.m. to 3:39 p.m. Mountain Time.)

THE VIDEOGRAPHER:  Back on the record at 3:39 p.m.

Page 63

BY MR. SABEY:

Q    Dr. Setty, thank you for your time today.  One final question.  You told CPHP that you had no concerns regarding Dr. Peddada's physical health, his memory or cognition.  You've also told them that you had no concerns about his ability to practice medicine safely.  In your report, you reported no concerns about his communication abilities?

A    Yes.

Q    Given all of that, are you aware of any medical reason that would prevent Dr. Peddada from communicating with Penrose or Catholic Health Initiatives Colorado about employment, about a loan repayment agreement, and about any other work-related matters?  Are you aware of any medical reason that would prevent him from doing that?

A    No.

MR. SABEY:  Okay.  We don't have any more questions.

MR. AZMOUDEH:  Thanks, Mark.

EXAMINATION

BY MR. AZMOUDEH:

Q    Good afternoon, Dr. Setty?

A    Okay.  Good afternoon.

Page 64

Q    I, unfortunately, have some more questions this afternoon.

A    Of course.

Q    I represent Dr. Peddada Anuj along with my colleagues who are here, Qusair Mohamedbhai who you just spoke with, and then our clerk, Jeremy Werner.  He's a -- think of him like a resident. He's shadowing our office this semester to learn.

Thanks for your time.  I'm sure you did not want to get pulled into this.

A    Definitely not.

Q    And I'm not here to badger you.  I'm just here to ask you some questions, try to get a clearer picture of ultimately the truth and how Anuj was at that time, how he was feeling, what he was going through.  That's really what I want to know.

So I'm going to try to be methodical and go through some of the records.  I'm going to try to just ask you what your impressions were, and really I just want -- you know, none of us are physicians.  We have no idea what you all do on a daily basis.  We have no idea what you experience with patients every day.  You're not in trouble. I'm not here to accuse you of any wrongdoing.  I'm

Page 65

just here to learn, quite frankly, because we've never spoken before, you and I?

A    No.

Q    And you've spoken with -- early on with a paralegal from our office.  We were requesting records, but that was -- my goodness, that was probably five years ago now at this point, four or five years ago at this point.  With the attorneys, you have never spoken with us.

I also want to relay to you that Dr. Peddada, I mean, he appreciates you for -- and as we've seen in some of the records that you've been presented with today, you jumped to his help. He called you at 9:00 p.m., and then you saw him the next day in your office over the lunch break. And so I just want to relay to you that if you all haven't spoken, he still speaks highly of you and the care you provided him.

To start, go way back, Dr. Setty, you took a Hippocratic Oath when you became a physician.  Did you take that?

A    Yeah.

Q    Okay.  And you -- obviously, you take that oath seriously even through today?

A    Yeah, we do.

MAGNA
LEGAL SERVICES

Page 66

Q    When treating patients, you have a duty to exercise your independent medical judgment; is that true?

A    True.

Q    And that's why Dr. Peddada -- he's a doctor.  If he thought he could do all of this himself, he would have just treated himself, but that's why he came to you and what a privilege it was that he chose you to provide him care even though he's doctor, too, right?  Do you see that dynamic?

MR. SABEY:  Object to foundation.

BY MR. AZMOUDEH:

Q    Did you view it as a privilege to be able to care for another doctor, a colleague?

A    Most often.

Q    Sometimes not?

A    Sometimes not.

Q    Any particular reasons jump out to your mind why sometimes not?

A    No.

Q    I've represented lawyers in the past and I share that sentiment, sometimes.  I've even represented judges who are the best lawyers among us, and they have opinions and they have thoughts,

Page 67

right?

A    Yes, exactly.

Q    When treating patients, you have a duty -- your overarching duty is to do good by them?

A    That's correct.

Q    You have a duty to create truthful, accurate medical records?

A    Yes.

Q    And why are medical records important?

A    You know, right away, I mean, you document and you can't possibly remember what happened five years ago.

Q    Your memory is fresher when you make the medical record than it might be five years down the line?

A    Absolutely.

Q    And you as a practice when you make medical records, you create them truthfully and accurately to the best of your ability every single time?

A    Yes.

Q    You use a -- I think you use a transcriber?  I think one of the notes in one of

Page 68

the medical records in this case mentions you use a transcriber?

A    I think we just -- we just -- we only got the transcriber 2024 April.  I mean, the AI-based recording device.

Q    So at the bottom of the record that we've been looking at today, and you don't have to pull it up, I'll just read it to you.  It says, "This chart is documented via voice recognition software.  Every attempt is made" --

A    Right.

Q    So were you using the microphone that I see my doctor with?

A    Right.  The Dragon.  The Dragon.

Q    And I'm sorry, Dr. Setty, when normal humans talk, we do this, we cut each off other constantly.  In this setting, we have to talk like aliens and wait for each other to finish questions and answers.  So I'm going to ask just so it's clear and easy for our court reporter that we just let each other finish whatever we're saying before we play ping pong with the conversation.  Okay?

A    Sure.

Q    I'm asking you to be an alien today

Page 69

is my final request.

And so if something appears in the medical record, that one we've been looking at, you would have spoken it into, at least portions of it, into the Dragon, the transcribing device?

A    That's correct.

Q    And so when you're putting together this report into the Dragon, you're documenting at least in part what the patient is reporting to you; is that right?

A    That's correct.

Q    You're documenting your honest, independent, trained, experienced medical assessment of what's going on with the patient?  That's a piece of the medical record?

A    That's correct.

Q    You don't document things that aren't true or exaggerated, you document what comes to your independent medical judgment?

A    Yes.

Q    And I want to look at that medical record.  If you still have it up, fantastic.  It's Exhibit 2.  I think Mark shared with you 2C.

A    Yes.

Q    Do you still have it?

MAGNA
LEGAL SERVICES

Page 70

A    Yes.
Q    Okay.  Great.  So this first section, this history of present illness, this is -- these are symptoms that the patient, Dr. Peddada, is describing?
A    That's correct.
Q    This is your recording of the symptoms as the patient described them?
A    That's correct.
Q    And as Mark discussed with you earlier, the first paragraph might have been what he explained to you on the phone the night before this medical visit?
A    Yes.
Q    Okay.  And I'm not going to read -- and then the rest would have been stuff that -- symptoms that he would have described to you during the medical visit?
A    That's correct.
Q    Okay.  And I don't want to go through each of these, but just to set the stage a little bit about our conversation, your record states that Dr. Peddada complained of severe anxiety?
A    Uh-huh, yes.

Page 71

Q    Your record states that he was unable to think?
A    At that point, yes.
Q    Okay.  Your record states that he had total apathy in terms of going to work?
A    That's what he described.
Q    Right.  And what is apathy in your view?
A    He didn't have the enthusiasm.
Q    What about disinterested?
A    You could put it that way.
Q    Your record states that there were certain circumstances going on at work that were devastating to him and at an all-time low for him.
A    That's correct.
Q    Dr. Setty, you -- we can move away from the report for just a second.  I heard earlier that you had treated Dr. Peddada since 2011.  Is that about right?
A    That's his first visit in the chart, yes.
Q    Okay.  Had you known him before that visit?
A    Yes.
Q    How did you first meet Dr. Peddada,

Page 72

if you recall 15 years ago?
A    Brilliant guy, very smart.
Q    Brilliant guy?
A    Yep.
Q    Driven?
A    He is driven, yes.
Q    What about his patient care?
A    Excellent.  I sent several patients to him, and they had excellent care.
Q    Over the years several patients?
A    Yeah, I think so.  I can't remember now, but yes.
Q    Was that his reputation generally?
A    Yes.
Q    Honest guy?
A    Yes.
Q    Nice guy?
A    I guess.
Q    Maybe a little bit abrupt?
A    Maybe.  I don't know.  I was not his patient so. . .
Q    Were you friends or no?
A    I don't know that I would put it that way, but we were good colleagues, yes.
Q    Okay.  So it was mostly a

Page 73

professional relationship you had with Dr. Peddada?
A    Yes.
Q    And when I say Dr. Peddada, I know you know Chitra as well.  I'm, obviously, referring to Anuj.
A    Yes.
Q    And did you have a sense for how hard he worked?
A    Yes.
Q    What was that sense of?
A    He was there from the morning to even late in the night, took care of his patients and took care of the paperwork and all of that stuff, the usual stuff.
Q    And that was his baseline, that's how he operated on a daily basis, but here he comes to you in April of 2022, and it's a very different picture, right?
A    Uh-huh, yes.
Q    He says that -- your records state that he did not feel like waking up to go to work.
MR. SABEY:  Object to form.
THE DEPONENT:  At that point, yes.
BY MR. AZMOUDEH:
Q    And not feeling -- strike that.

19 (Pages 70 to 73)

Page 74

Excuse me.

Not feel like waking up to go to work, is that in your medical judgment, that's a depressive symptom?

MR. SABEY: Object to the foundation.

BY MR. AZMOUDEH:

Q   Here, I'll lay some, Dr. Setty, before you answer that question. You went to medical school?

A   I did.

Q   You've been practicing medicine for decades?

A   Yes.

Q   You practice as an internist, that's the primary practice?

A   Yes.

Q   Right?

A   Yes, yes.

Q   Internist, primarily you're doing internal organs and ailments, if I understand correctly?

A   That's correct.

Q   But patients present often with complex problems that sometimes bleed into mental

Page 75

health?

A   True.

Q   And you are familiar with the variety of mental health conditions that patients frequently might present with along with other ailments that you might be treating on a daily basis?

A   True.

Q   And depression is one that you've seen before, I imagine?

A   Yes.

Q   And it's one that you've likely studied?

A   Yes.

Q   This -- this thing that he complains of, not feel like waking up to go to work, that feeling of just sitting in bed and dreading getting up out of bed and going to work, that's a depression symptom?

MR. SABEY: Object to form.

BY MR. AZMOUDEH:

Q   You can answer?

A   Yes, he's anxious and -- yes.

Q   He's anxious, too, he said that. He said, I have severe anxiety?

Page 76

A   Yes.

Q   He says -- your record states that he says he was afraid that this may hurt the care he gives patients.

A   That's what I wrote.

Q   And he said that. You wrote that because he said that?

A   Yes. Yes.

Q   He's -- not only he doesn't feel like getting up to go to work, he says he's severely anxious, he has total apathy, and ultimately he is afraid that he may hurt the care he gives patients?

A   At that point, yes.

Q   Okay. The record states that he was afraid to speak to any of the staff?

A   Yes.

Q   And did Dr. Peddada tell you that he had made any specific medical errors at work?

A   Not that I know.

Q   Would it surprise you to learn that he did make two errors at work and caught them before he harmed any patients right around this time?

A   I don't recollect that.

Page 77

Q   Yeah. He may not have been all that willing to share that with you. That's -- I mean, for a physician, that's very hard to admit, I would imagine.

A   Yeah.

Q   Right. And so whether he told you about them or not is not necessarily whether they happened or not. But you don't remember him talking about that with you at all?

A   No, I don't.

Q   If it did happen, I mean, would that surprise you?

A   He is a very conscientious physician so I don't know. I'm not sure at what point in time that would have happened.

Q   Okay. Let's talk about the time thing. So a couple of times I asked you some of these questions and you said "at that time." I'm curious what you're thinking. What's on your mind when I say Dr. Peddada comes in and complains of severe anxiety, and you say, yes, at that time. What does that mean?

A   Yes, at that time when he explained those symptoms. Yes, at that time. I'm not sure what it would be after a follow-up, after

MAGNA
LEGAL SERVICES

Page 78

medications, after therapy, relaxation, whatever he said, and he needed to come back for follow-up.

Q    Sure.  We'll talk about the follow-up too but, I guess, let's rule something obvious out.  This isn't something that he experienced just at 9:00 p.m. and then just in your office the next day?

A    Right.

MR. SABEY:  Objection; foundation.

BY MR. AZMOUDEH:

Q    How would you expect these symptoms that he's complaining of to have developed over time and then slowly weaned off over time?

A    I think they developed over time.

Q    And then presumably they would wash away over time as well?

A    Hopefully so, yes.

Q    And so when you say "at that time" he's complaining of these symptoms, it could be -- it could have been a year, it could have been months, but it certainly wasn't, you know, one day, right?

A    No.

Q    This is a --

A    That's correct.

Page 79

Q    All right.  And then you did a -- further down in this medical record, you did a review of systems, an ROS.  Do you see that?

A    Yes.

Q    Okay.  And a review of systems, that's -- that's something that -- those are findings that you observed during the medical visit?

A    That's correct.

Q    Okay.  And your ROS, if you go to the psychiatric piece --

A    Uh-huh, yes.

Q    -- you recorded that -- and I'll just read the whole thing.  "Feels extremely nervous, anxious and irritable.  He has extreme sense of sadness, however, has not had any suicidal thought or ideations."

A    That's correct.

Q    Those are your findings?

A    That's correct.

Q    And then maybe help me understand one of your findings.  You also performed a physical exam, which is further down in that medical record.

A    Yes.

Page 80

Q    Okay.  And in the physical exam at the very top, general appearance, do you see that?

A    Yes.

Q    It says -- and again, the physical exam, these are your findings?

A    Yes.

Q    You found that Dr. Peddada presented as extremely anxious, agitated and pressured speech?

A    Yes, at that time.

Q    Okay.  And again, at that time is maybe months, maybe a year, not one day?

A    But that was at that time.

Q    That's true.  I see what you're saying.  At that time because you're looking at him in the office?

A    That's correct.

Q    Okay.  Understood.  That makes complete sense.

But you would expect, as a doctor, when he walks out of your office, he's not suddenly going to look extremely anxious, agitated or have pressured speech?  I mean, that's going to walk around with him after he leaves your office?

MR. SABEY:  Object to foundation.

Page 81

THE DEPONENT:  Not sure about that because physicians can, you know, change.  I mean, if he's going to see a patient, he's not going to -- you know, he's going to not show all of those effects.

BY MR. AZMOUDEH:

Q    I see.  So he was being -- he's not putting a cover up when he's with you.  He's being completely vulnerable and showing how he truly feels?

MR. SABEY:  Object to foundation and form.

BY MR. AZMOUDEH:

Q    What was the answer?

A    At that time, yes.

Q    Okay.  In that same physical exam, when you go to psychiatric towards the bottom of the physical exam --

A    I see.

Q    -- it says, "Patient is not suicidal, normal affect and mood."  How -- tell me -- explain to me how that squares up because, on the one hand, he's sort of extremely anxious and agitated, and then, on the other hand, it says normal affect.  What am I missing here?

Page 82

A     Well, I think I meant affect and mood consistent with what he came in with, but the normal apparently is not right.

Q     Okay.  It's -- it might be consistent with what he's presenting with but maybe not consistent with what the general public might seem or his baseline might be?

A     Yes, yes.

Q     Okay.  As part of your physical exam, you did -- you took vitals, and those are further up.  That's above the physical exam.

A     Yes.

Q     His pulse was 118.

A     Yes.

Q     I mean, do you recall if he walked into your office with 118 pulse every time he came to see you?  That seems very high to me.

A     Yes.  Yeah, we have two vitals on him, the first reading and the second reading.

Q     And I don't need you to look back. I'll ask it in a better way.  Adult male in their 50s walks into your office with a pulse of 118. That's elevated?

A     Yes.

Q     What does it usually take for an

Page 83

ordinary healthy adult in their 50s to get their pulse up to 118?

A     What do -- you mean -- if he's anxious, yes, his heart rate can go up.

Q     And if he wasn't anxious, he had to run a mile before he walked into your office, right?

A     That's correct.

Q     But he was just sitting in your office or standing?

A     Sitting down.

Q     We're almost done with this record and then, hopefully, we can just zoom out and just talk for a little bit.  Further down in the medical record -- actually, one more.  The blood pressure, 150/100.  That's elevated as well?

A     Yes.

Q     Okay.  Can you link that to his anxious state?

A     Yes.

Q     So both the heart rate and the high blood pressure flowed from extremely anxious, agitated, his state at the time?

A     That's correct.

Q     And then, Dr. Setty, then you did

Page 84

your job.  You gave a diagnoses.  And as I understood the discussion with Mark earlier, Mr. Sabey, there's a sort of a naming issue at the bottom here where there's diagnostic studies and assessment.  Tell me about that.

A     So this was a new EHR at that time with all of these subtitles, so physical exam, review of systems, and we did not have -- we did not know where to put this assessment and plan.  We had to redo that.

So we thought the assessment plan would have been -- the assessment would have been the diagnostic criteria and eventually then we got it reorganized where we put diagnostic studies as the x-rays, lab data and all of that stuff.  And then we did the assessment in the actual assessment and the coding went into a different place.

Q     Okay.  So when I would go to -- go ahead.

A     So this was -- we started this in January, February, and we were still trying to work with the vendor how to put my subtitles.

Q     Okay.  So maybe we can just work -- work out -- everything that's under diagnostic studies --

Page 85

A     Yeah, that exactly is assessment.

Q     -- that's your assessment?

A     Yes.

Q     And then the things that are under assessment --

A     Is the codes, is the coding and the procedures and procedural codes.

Q     Okay.  And the coding, that correlates with your assessment, right?  I mean, there's a match up?

A     That is correct, yes.

Q     Okay.  Let's go to what's listed diagnostic studies, but it's actually your assessment?

A     Assessment, yes.

Q     Okay.  You know, we're going to have all these same problems.  We're trying to use these AI --

A     It's terrible.

Q     Yeah.  So I'm sure we'll put our diagnostic studies in the wrong place soon.

You gave Dr. Peddada -- you made medical diagnoses with respect to Dr. Peddada at this time; is that fair?

A     Fair.



Page 86

Q    You diagnosed him with moderately severe burnout?

A    Yes.

Q    What is burnout in your mind?

A    Well, I'm not the best specialist to talk about it, but, yeah, in general, you know, when you go through all what he's gone through. I mean, the symptoms of burnout are basically fatigue, not interested in the job. And something must have triggered it, some interpersonal relations or staff issues. I mean, you know, and then you lose your interest, and some people recover in just a few months, some people take longer time. And it's an individual thing, and you need to see the right person for that.

Q    And lose interest, that's -- I mean, that's kind of what he's reporting, right, total apathy?

A    Yes.

Q    And burnout is -- I mean, in the medical profession, are you seeing the journals, the doctors, the professionals, I mean, everybody is talking about it?

MR. SABEY:  Object to foundation.

THE DEPONENT:  That's correct, yeah.

Page 87

BY MR. AZMOUDEH:

Q    I mean, what's the conversation look like from your perspective?

A    With my colleagues?

Q    No.  I mean, what's the conversation in the medical community look like about burnout?

A    We're tired of these insurance companies telling us what to do, what to code, they're forever always cutting off the reimbursements, you know, things like that.

Q    And you already have a hard job?

A    Yep.

Q    In the ten years past -- or ten or so years you've been treating Dr. Peddada, had he ever presented with symptoms that you would diagnose as moderately to severe burnout?

A    No, not until this time.

Q    You also diagnosed moderately severe situational anxiety disorder.

A    Yes.

Q    What is situational anxiety disorder?

A    It's what's going on in the current situation.  Like, some people come to me with a dog or a cat that's been killed or died or they had to

Page 88

put them down.  It's a situation that's creating anxiety and depression, mood disorders or some loss of person.  So that's a situation.  Not a primary, you know, prior existing like from the time they were teenagers or something to have depression and anxiety.  So it's a -- the anxiety that they developed over all of these issues.

Q    It has a trigger?

A    That's correct.

Q    And then what is anxiety?  We say it so much, but we often don't put a description to it.  What is anxiety?

A    Anxiety is a sense of feeling anxious basically and worried, and, you know, it can trigger high blood pressure, it can trigger tachycardia, fast heart rate, and that, again, adds to the anxious, anxiety feeling, like palpitations and stuff like that.  And sometimes it's difficult to -- it can affect your level of work and that's why we recommend medications to kind of get it under control or see somebody who can help you with it.

Q    Okay.  Worried is the underlying feeling?

A    That's correct, yes.

Page 89

Q    Is it fear?

A    Sometimes.

Q    Dr. Peddada reported fear?

A    I think he did, yes.

Q    Worry is really just another, I'm worried about this happening, I fear this happening.  It's hard to separate those two out?

A    I would say so.

Q    Have you heard, Dr. Setty, of the red, green, yellow system that doctors use sometimes in some systems?

A    I've not used it.

Q    Okay.  That's all right.  And then in the assessments where you assigned the codes, the first code related to your diagnosis is burnout, and you assigned an ICD code for that?

A    Yes.

Q    And what is an ICD code?

A    Oh, my God, bad stuff, but it's universal coding of all medical disorders.

Q    Wow, good luck.

A    Yeah.

Q    And then you assess adjustment disorder with mentioned anxiety and depressed mood,

MAGNA
LEGAL SERVICES

Page 90

and you also assigned an ICD code for that?

A    That's correct.

Q    Okay.  And at the top, you said moderately severe situational anxiety disorder, and then at the bottom it says adjustment disorder with mixed anxiety and depressed mood.  Is it all of those things?

A    Yes.  It's kind of hard to pick a specific code word for the specific words that you want to apply.  Sometimes we -- you just pick a code that's closest to what you're trying to say.

Q    An adjustment disorder kind of means situational?

A    Correct.  Kind of, yes.

Q    Okay.  It's you're having a hard time adjusting to something?

A    That's correct.

Q    Okay.  And so this line is to put it in -- attempt to put it in English, it's a situational issue and it's resulting in anxiety and depression?

A    Yes.

Q    Can you parse those out from burnout or is it all one big --

A    It's all one big thing.  It's all

Page 91

one big beautiful diagnosis.

Q    I get the beautiful.  It's funny, but Dr. Peddada at the time probably did not think this was beautiful, right?

A    No, it's not.  It's not.  I just was like -- I'm just tired of you guys asking these questions.

Q    I'll try to keep it moving.  You prescribed Lexapro?

A    I wanted to.

Q    Yeah, and you wanted to prescribe Ativan, too, right?

A    That's correct.

Q    And then those are respectively antidepressants and antianxiety medications?

A    That's correct.

Q    And we read a line earlier that we couldn't see in the record that Dr. Peddada said he wanted to try self-relaxation techniques or something similar?  Maybe read it to us again.

A    Hold on.  Yes.  He said he would return for follow-up -- no.  He would like to try his own self-relaxation measures rather than the medication.

Q    Is that uncommon -- oh, sorry.  Go

Page 92

ahead.

A    And that he would return for follow-up in four to six weeks, but he never did.

Q    Okay.  We'll talk about that, too, but to focus on the medication just for a second, I mean, patients frequently who present with mental health issues say, I don't want to try medication just yet, right?

MR. SABEY:  Object to foundation.

THE DEPONENT:  That's correct.

BY MR. AZMOUDEH:

Q    And the reason frequently patients offer that justification to you is because -- whether it's right or not -- these medications have a reputation for coming with some pretty serious side effects?

A    That's correct.

Q    And so Dr. Peddada's response, I mean, it's not out of the world.  And he's a doctor, he knows what the side effects of these medications are?

A    Yes.

Q    And even though Dr. Peddada didn't ask you to fill those medications, you only prescribed those medications because there was a

Page 93

real medical need for these medications?

A    Yes, and it was a low dose.

Q    And even a low dose, that can have potential side effects?

A    Not really though.  I have never seen, but he didn't want it anyway.

Q    So in his mind, there was the possibility, at least according to what he conveyed to you, there's a possibility that there would be side effects and I'm going to try my own self-relaxation measures?

A    Probably.

Q    If the patient doesn't need medication, you don't prescribe it?

A    No.  Yeah, that's correct.

Q    You also referred him to Dr. Di Thompson?

A    That's correct.

Q    And you said earlier because Dr. Di Thompson has more experience with burnout in these particular circumstances?

A    Absolutely.

Q    Okay.  But you have some.  I mean, we talked earlier, you are a doctor in a community where burnout is -- it's top of mind frequently?

MAGNA
LEGAL SERVICES

Page 94

A    Yeah, but I have not personally seen or treated to the entirety of that syndrome.

Q    You've treated adjustment disorders?

A    That's correct.

Q    Okay. You've treated anxiety and depression?

A    That's correct.

Q    And those are -- in this moment, they're all kind of blended together with burnout. So there's a piece of this that you're unfamiliar with, but this isn't like somebody coming in with -- I can't think of something that's so far outside where you just have to say no at the door, right?

A    Pretty much I did tell him to go see Dr. Di Thompson because I have really not treated a colleague with the burnout, and I was not comfortable. And that's why I asked him to see a psychiatrist and a wellness person at the hospital.

Q    You were comfortable enough to make diagnoses of what you could assess and what you were familiar with?

A    Absolutely.

Q    Okay. It's just if you're going to get the best care possible in this moment, let's go

Page 95

get you to a specialist?

A    That's correct.

Q    Okay. And, again, you're only referring Dr. Peddada because there's a real medical need for that referral?

A    That's correct.

Q    You also recommended, and I'll just read it. These are your words, "I would strongly recommend patient to take the next three months off to regroup and rejuvenate so that he could go back to work full-time with a very fruitful career in July of 2022." That was your recommendation?

A    In conversation with the patient, yes.

Q    Yeah, and that's okay. That's always true especially mental health, right, you have to be a facilitator to the care that they're going to receive?

A    That's correct.

Q    And you have to listen and pay attention to what the patient's specific needs are?

A    Yes, because he knows himself better.

Q    Whereas with -- if a patient walked in and said, I have cancer, I need chemo, you'd

Page 96

say, we need to check whether you have cancer before we start issuing you chemo. There's a little bit less collaboration in the physical injury world, I would imagine?

A    That's true.

Q    And you did ask him to follow up in four to five weeks?

A    Yes.

Q    Okay. But in those four to five weeks, did you know that he did go to see Dr. Di Thompson?

A    I -- yes, I think he did, but I don't have any feedback or a note from Di Thompson, what transpired over there, and what continuity of care he got over there.

Q    Right. Did you know in these four to five weeks that he also went to the Colorado Physicians Health Program, CPHP?

A    Not -- I don't have data to that. I don't know.

Q    Are you familiar with the CPHP?

A    Yes.

Q    What is it?

A    It's a program that the hospitals have where they will, you know, kind of review the

Page 97

symptoms and kind of maybe help with, you know, some measures to overcome those problems and get you back to your work.

Q    So --

A    I've never been there so I don't know what all they go on with that. All I know is that it helps people through burnouts and to regroup and recover some of the symptoms that they're going through.

Q    It's an avenue of receiving care?

A    Right.

Q    Also, the stressor, the trigger that we identified for these conditions was his work, right?

A    Yes.

Q    Are you aware that in early May of that same year, he lost all employment opportunity at Penrose, he's no longer working there?

A    Really?

Q    Right.

A    I'm not sure that I have that information on whether he reviewed that with me.

Q    Right. And if his trigger was work and he's also getting help from Di Thompson -- I don't know how frequently he's seeing with her, but

MAGNA
LEGAL SERVICES

Page 98

he did speak with her. He's also getting help CPHP. He no longer has that trigger. It's not a trigger anymore because he can't work there anymore. I mean, it kind of makes sense that he's not going to come back and say hey, Dr. Setty, I want you to check in on, you know, what we talked about four to five weeks ago.

Q    Why not?

Q    I guess he could have, but you could understand why he might not. He's gone and got the care that you recommended and the trigger is not there anymore.

MR. SABEY:  Object to foundation.

THE DEPONENT:  I did not know about that, number one, but he still has the blood pressure that he was supposed to come back and follow up.

BY MR. AZMOUDEH:

Q    I agree. He should have followed up about his blood pressure. I guess add another layer to that, he wasn't working at Penrose anymore. Do you know how long he'd worked at Penrose?

A    How long? Gosh, ever since he came into town.

Page 99

Q    Decades, right?

A    Yeah, probably, yes.

Q    Yes. So when he lost his working opportunity at Penrose, I mean, that's -- you would perceive your patient as going through a pretty significant life event in that moment?

MR. SABEY:  Object to form. Leading.

MR. AZMOUDEH:  That's not a proper deposition objection.

THE DEPONENT:  Would you repeat that again?

BY MR. AZMOUDEH:

Q    Sure. He's worked at Penrose for decades?

A    That's correct.

Q    And then he abruptly loses his employment and working opportunity at Penrose. As his doctor, if he came in and told you about that, you would perceive that to be a pretty significant life event?

A    I would, yes.

Q    And he's already scrambled in his mind at this time?

MR. SABEY:  Object to foundation and

Page 100

form.

BY MR. AZMOUDEH:

Q    I'll use the words he used. At this time he's already unable to think as he reports it?

A    Yeah.

Q    So it's -- I mean, it might make some sense that he, you know, okay, I have this CPHP, I don't need to schedule another thing about my hypertension or with Dr. Setty. I guess let me just ask this: The fact that he didn't come back to you, Dr. Setty, does that mean that all of this was made up?

A    I strongly wish not. I don't think so.

Q    That wouldn't be consistent with --

A    No.

Q    -- the person or the patient that you knew?

A    Yes.

Q    Your diagnoses, adjustment disorder, situational anxiety burnout, did I summarize those correctly?

A    That's correct.

Q    Why don't we put a finer point on that. Let's use the two, burnout and adjustment

Page 101

disorder with anxiety and depression.

A    Yes.

Q    All of those indicate, as we talked about earlier, that there's a trigger?

A    That's correct.

Q    And the trigger was work?

A    That's correct.

Q    And even with what he was explaining to you on the phone that night and then in the office the next day, he wasn't saying that the trigger was -- or at least you didn't understand the trigger to just be patient care. In fact, the trigger was all of these different things, these facets of his work that were going on at the time?

MR. SABEY:  Object to the form.

THE DEPONENT:  Yes.

BY MR. AZMOUDEH:

Q    Okay. I mean, we can look back. He says -- he states that the unfortunate event that has led to the termination of a 50-year long relationship between Penrose Hospital and Radiation Oncology PC has been devastating for him and an all-time low for him. I mean, that really has nothing to do with patient care, that's an administrative part of his work?

Page 102

A    That's what I understood at that time.

Q    And you talked to me earlier about, you know, what's causing physicians to be burnt out. It's not the patient care. That's the best part, right?

A    Yes.

Q    The hard part is everything else?

A    Yes.

Q    It's the coding. It's the dealing with the hospitals, with the insurance companies. It's all of the administrative stuff that's getting layered onto the job?

A    I strongly believe so.

Q    It's probably us lawyers, too, right?

A    I don't want to be in your world.

Q    Thanks. I don't want to be in yours either if that makes it any easier.

So when we say work is a trigger, that's not just patient care, it's all of -- it's that entire picture that we just painted?

A    Yes.

Q    And even though work and all of those facets of work are the trigger, that also

Page 103

doesn't mean that he's only experiencing the symptoms when he's physically at work?

MR. SABEY:  Object to form.

THE DEPONENT:  I'm not sure what he does other than that. I mean, the work was the main thing. I mean, he described that.

BY MR. AZMOUDEH:

Q    So he said -- he said to you -- ooh, actually I did want to ask you about this because I think there was -- he says -- it's that next sentence. It has negatively impacted both his professional and personal left. I'm assuming that meant "life." This is on the very first page of the medical record?

A    Yeah, but I didn't go into the other part of it though.

Q    Well, let's just -- in your experience, anxiety and depression, even when there's a trigger, it's hard to turn off anxiety and depression. I mean, it tends to fester with the patient, right?

A    In general, yes.

Q    Okay. And some level of stress, as we've discussed, I mean, everybody is stressed every day, and in particular, doctors are stressed

Page 104

in the medical profession?

A    Yes.

Q    But this was not stress. You did not diagnose Dr. Peddada with conditions, you did not diagnose Dr. Peddada with stress?

A    No.

Q    A couple of times you asked Dr. Peddada questions about whether he was suicidal or had suicidal ideations. I think you asked him that on the phone call the night before; is that correct?

A    I'm sure I did.

Q    Yeah, why are you sure you did?

A    Because he sounded anxious, and I -- you know, he needed -- he called me at 9:00 to ask for help.

Q    That's -- that's something that somebody on the brink of crisis does, calls their primary care physician at 9:00 p.m.?

A    Yes.

Q    I mean, you were worried about him?

A    Yes.

Q    Really worried?

A    I was worried about him, yes.

Q    This is an acute mental health issue

Page 105

that popped up for --

MR. SABEY:  Object to form.

BY MR. AZMOUDEH:

Q    This is an acute mental health issue that popped up for a doctor in the community who was your patient and you were worried about him?

A    That's correct.

Q    I want to do a comparison, Dr. Setty. We can put the records aside. I just want you to offer -- again, as I said in the beginning, I'm here to learn. And sometimes I think I might know things and sometimes I'm wrong, but I want to do a comparison about Dr. Peddada at his baseline as he was in the sort of ten years that you had been seeing him, and then Dr. Peddada in this moment where you've diagnosed him with burnout and adjustment disorder, depression and anxiety. Does that framework make sense?

A    Uh-huh.

Q    Okay.

A    Yes.

Q    Start with just his mind. I mean, it's -- it was harder for him in April of 2022 to think clearly?

MR. SABEY:  Object to foundation and

MAGNA
LEGAL SERVICES

Page 106

form.

THE DEPONENT: Yes, at that time.

BY MR. AZMOUDEH:

Q    Because anxiety and depression and adjustment disorder and burnout, those impact your thought processes?

A    Yes.

Q    Tell me about it. I mean, I have here written down and it could be completely wrong. It's harder to slow thought down, it's harder to focus, it's harder to process new information, but what else? I mean, what do you -- when you think I have this patient whose mind is over clocked with anxiety and depression, what in your professional experience is going on in that person's mind?

A    He's worried and he needs help, he wants help, and he recognizes that this is something that he needs help for.

Q    Are his thoughts racing?

MR. SABEY: Object to foundation.

THE DEPONENT: No. He was pretty, you know, orderly when he talked to me at that time.

BY MR. AZMOUDEH:

Q    Someone can present orderly, but,

Page 107

you know, you talked earlier about when he went to go see a patient, he could sort of put a cover up?

A    That's correct.

Q    So kind of given everything that you know and what he's saying out loud, in your personal experience, was it really calm in his mind at that time?

MR. SABEY: Object to foundation.

THE DEPONENT: He was anxious, as I mentioned, and pressured speech, but he was orderly. He was not rambling and he was not incoherent, and, you know, he was not at that level of total disarray that I had to call 911.

BY MR. AZMOUDEH:

Q    He hadn't entered a state of psychosis, for instance?

A    Exactly. Exactly.

Q    Okay. But he probably had trouble focusing on tasks?

MR. SABEY: Object to form and foundation.

THE DEPONENT: He was pretty focused on his symptoms. I mean, I did not say -- I don't know what he would do at work. I have no idea.

BY MR. AZMOUDEH:

Page 108

Q    Well, I mean, he told you, right? He said, I'm unable to think, afraid to go to work, having total apathy in terms of going to work. I mean, all of those feelings when you finally get to work in your professional opinion, if a patient is giving you those reports, I mean, that means that they're going to work with a mind that is racing, clouded?

A    That's correct, and that's why we recommended his time off work.

Q    Right. And then -- I mean, daily functioning. Again, let's use the framework as compared to how you had seen him in ten years past or so and then how you had seen him in April of 2022. Again, he's telling you -- I want to read it correctly, but he does not feel like waking up to go to work.

A    That's what he said.

Q    And so in your professional opinion, I mean, he's having more difficulty getting up and meeting his daily obligations?

MR. SABEY: Object to foundation.

THE DEPONENT: He felt that way, but I think he was still going.

BY MR. AZMOUDEH:

Page 109

Q    It's not whether he was doing it or not. I guess I'm just asking, was there -- was it difficult? You know, was it more difficult than as compared to his usual baseline?

MR. SABEY: Object to foundation.

THE DEPONENT: Yes.

BY MR. AZMOUDEH:

Q    So I'll restate the question because we got sort of jumbled there because we were talking like normal human beings, which is hard sometimes?

Would it have been more difficult for him to get up out of bed and engage in his daily responsibilities at that time?

MR. SABEY: Object to foundation.

THE DEPONENT: Yes, at that time.

BY MR. AZMOUDEH:

Q    And, Dr. Setty, I just want to be clear. I know we're putting you on edge with the questions and the objections. We're not suing you. We have no interest in your standard of care, how good or bad or fantastic or terrible you did. I truly just want to learn how you viewed our patient -- or your patient and our client in that moment. Okay? I'm really just trying to

MAGNA
LEGAL SERVICES

Page 110

understand?

Because when I see a medical record that says adjustment disorder, I have no idea what that means, right? And I'm trying to get a picture of what does a person in this state, you know, what are they going through, what's happening to them, right? That's what I'm asking.

With respect to kind of getting up and going to his daily responsibilities, he said to you that he had extreme sadness and total apathy at this time. I mean, those are indications that getting up and moving about life is more difficult at that time?

A     That's correct.

Q     And if he has a complete lack of interest, a complete unenthusiasm -- to use your word because I think it's a good one -- no more enthusiasm, no more passion, no more purpose in going to work, I mean, it's going to be difficult for him to deliver the same standard of care that he had been delivering as compared to his baseline?

MR. SABEY:  Object to foundation.

THE DEPONENT:  At that point, yes.

BY MR. AZMOUDEH:

Q     And I know you said you didn't

Page 111

really get into this topic of his personal life, but you're a doctor, you understand how these conditions might manifest in other parts of life outside of work. I mean, what would you expect to see for Dr. Peddada as he's presenting irritable, agitated, pressured speech, total apathy about work, unable to think? I mean, what would you expect is going on in the rest of his life?

MR. SABEY:  Object to foundation.

THE DEPONENT:  Well, I don't know because I've never been in that situation. So, basically, I would just kind of correlate with not wanting to do things at home, and I don't know whether his relationship with his kids and his wife, I don't know because, like I said, personally I've never been in that situation.

BY MR. AZMOUDEH:

Q     But based on your understanding of these conditions -- let's start with kind of doing things daily at his home. Let's say he had hail damage on his roof, and he needed to figure out whether they had coverage for the roof. He needed to deal with the adjustors. He needed to get a contractor out there. I mean, that's a daily task that's completely outside of his work, but in your

Page 112

experience, dealing with that task might be more difficult at this time to get motivated for it, to think clearly through?

A     Yes.

Q     You also mentioned relationships. I mean, if you're walking around life with an extreme sense of sadness, that's going to affect the way that you interact with your spouse, your partner or your children?

A     Agreed.

MR. SABEY:  Object to form.

BY MR. AZMOUDEH:

Q     And then communication, same comparison. I mean, had he -- he had reported irritability. You noticed he was agitated. That was a departure from the way that you'd seen him in the past; is that true?

A     True.

Q     And that's consistent with the diagnoses you gave him. I mean, anxiety, depression, burnout, that can make people more withdrawn in their social interactions?

A     Yes.

Q     That can make people more reactive, quick to sort of get defensive in their

Page 113

interactions?

A     In general, yes.

Q     They might avoid conversations for fear or anxiety about those conversations?

A     They could.

Q     And Dr. Peddada again reported that to you, he said he feels he's walking on egg shells when he goes to work. He is afraid to speak to any of the staff in fear of being construed as rude and angry. I mean, that's what he was feeling?

A     That's what he was feeling, yes.

Q     And so he's feeling the symptoms of anxiety and depression which is -- and burnout, which is I'm fearful of even having these basic conversations that I've had for 20 years?

MR. SABEY:  Object to form.

BY MR. AZMOUDEH:

Q     Maybe I asked a bad question. Did you understand my question?

A     No.

Q     All right. Fair. Thank you.

Suddenly routine interactions, like he's saying with nursing staff, he's afraid of those interactions?

A     Yes, that's what he said.



Page 114

Q    That's a departure from --

A    His normal.

Q    -- the way -- yeah, his normal.

And -- and it's not just what he said. I mean, it is consistent with the diagnoses that you gave him and what you observed during your visit with him?

A    That's correct.

Q    Dr. Setty, do you know what this lawsuit is about?

A    No.

Q    Do you know who's suing who?

A    No.

Q    When you had a meeting -- well, let me ask this: When did you first speak with Mark Sabey or -- actually, let me back up. Strike all of that.

So I'll represent to you that Mark Sabey, who just asked you questions earlier today, is from the law firm of Hall, Render, Killian, Heath & Lyman, PC. It's a law firm. I'll call it Hall Render. Mark Sabey has colleagues, some of whom are on the Zoom today. I'm going to refer to all of them as just "defense counsel." Okay?

A    Okay.

Page 115

Q    When did you first speak with defense counsel?

A    I just don't remember.

Q    You don't remember, okay. Do you know if they called you or they emailed you?

A    I'm not sure. I may have talked to them a few years ago. I don't remember exactly. I don't keep notes. I have not kept notes. I wish I did, but, you know, I don't have.

Q    You didn't contact them on your own initiative?

A    No. I won't even know who they are.

Q    Right. Do you know who they represent today?

A    The Penrose Hospital perhaps.

Q    It's also complicated for me, too, but I think, as I understand it -- I mean, when you spoke with them, do you remember if they introduced themselves to you and explained who they represented?

A    I'm sure they did because I can't remember, I'm sorry. Legal issues, lawyers, you know. I wish I had documented all of this. I have not.

Q    That's okay. So you don't -- you

Page 116

don't actually have any recollection of whether they explained who they were or who they represented at that time?

A    I'm sure they did because people -- I mean, there's no way I would talk to some random people.

Q    Okay. Do you know if they explained to you that Dr. Peddada was suing them?

A    I think so, yeah, probably.

Q    And, I mean, that kind of puts -- I mean, they have a job, right? If they represent the hospitals who are being sued by Dr. Peddada, their job is to defeat Dr. Peddada's lawsuit. Was that clear to you?

A    It's now.

Q    Okay. You don't remember them explaining kind of the posture, the adversity between them and Dr. Peddada at that time?

A    I don't. I'm sorry, I just don't. I don't know when --

THE DEPONENT: Mr. Sabey, do you know when we communicated?

BY MR. AZMOUDEH:

Q    Unfortunately, Dr Setty, Mr. Sabey can't answer questions at this time?

Page 117

A    I'm sorry.

Q    That's okay. Again, I wish we could talk like normal humans, but in this moment the rules say that I've got to ask questions. Maybe he can help us out later but. . .

So why don't we pull it up. I mean, in this very moment, what is your understanding of what's going on here?

A    I don't know why the lawsuit. I have not understood any of that stuff so. . .

Q    I mean, do you think that you're accused of doing anything wrong?

A    I hope not.

Q    Good. Yeah.

I want to -- you're certainly not -- you're not a defendant in this case. So you're not accused of doing anything wrong, and Dr. Peddada has not accused you of doing anything wrong in this lawsuit. So that's a correct way of thinking about it.

I want to show you something when I pull it up someday.

MR. AZMOUDEH: Mark, what exhibit are we on?

MR. SABEY: 108 was our last one.

MAGNA
LEGAL SERVICES

Page 118

MR. AZMOUDEH: Okay. So I'm 109.
(Exhibit 109 was marked for identification.)
BY MR. AZMOUDEH:
Q    Dr. Setty, I'm going to show you what's been marked as Exhibit 109.
A    Okay. Yeah.
Q    Okay. So this is what's called a declaration. Have you seen this before?
A    Yes.
Q    Okay. So defense counsel put this forward as something that they had created with you and that you signed as your testimony, and it's dated November 21st, 2024.
A    Yeah.
Q    Does that ring any bells about maybe when you spoke with them?
A    I'm sure. That's what it's showing.
Q    I mean, was it a sign this or we're going to take your deposition? I mean, how did this -- I mean, this wasn't that long ago. It was -- oh, I guess it was quite awhile ago, a year and a few months. Do you remember the conversation being sign this or we'll take your deposition? I mean, what comes to mind when you see this

Page 119

document?
A    I guess this is the questions that they asked and that's what I answered.
Q    But you didn't draft this?
A    No.
Q    And this isn't -- I mean, this looks like a legal document. This is the language you used, for example, when you were giving answers to questions?
A    That's correct.
Q    Okay. So let's just a little bit kind of going through it. Do you remember making any edits to what they ultimately proposed?
A    I don't remember.
Q    Okay.
A    I'm sorry.
Q    That's okay. And I'll offer you this: So this document has actually been stricken from the record so it's not even in evidence anymore. It's almost like it doesn't exist in our case at this point according to the Court and not for anything that you did, by the way. But I do want to just ask some questions about it and really ultimately try to get -- again, just learn from you what is actually in your mind and what you're

Page 120

thinking and how you view this situation. So we'll just use this as sort of a thing to work off of.
Can you go to paragraph 11?
A    Yeah.
Q    "At all times, including on April 22, 2022, I had no concerns regarding Dr. Peddada's physical health, memory or cognition." Did I read that?
A    Yes, you did.
Q    And Mark actually asked you a similar question earlier today and you kind of confirmed -- or you did confirm the same thing, right?
A    Yes.
Q    But that's not exactly accurate. I mean, let's start with physical, physical health. I mean, at that time he had hypertension, blood pressure, right?
A    At that day, yes.
Q    So that's a concern about Dr. Peddada's physical health?
A    Well, it's a reactionary thing at that point, and he's never had those things in the past.
Q    Okay. It's a reactionary thing to

Page 121

the burnout and adjustment disorder, anxiety, depression?
A    Yes, on that day, yes.
Q    Well, we said it wasn't that day, right? It's got to be something slightly longer than just that day because that's not how mental health works, right?
MR. SABEY: Object to form.
BY MR. AZMOUDEH:
Q    And look, it's okay. If you're reading this and there's something you want to clarify, that's what I'm hoping we can do today. And so it's not -- let's start with the "that day" thing. I thought we kind of got through that. I mean, it's mental health. It slowly moves in and then it slowly moves out. It's not a one day. Nobody has depression for one day as far as you're aware?
A    Okay.
Q    So when he presented to you on April 22, 2022, you diagnosed him with those disorders that we talked about -- those conditions, excuse me?
A    Yes.
Q    And so to say I had no concerns

MAGNA
LEGAL SERVICES

Page 122

regarding his memory or his cognition, that's not totally true?

MR. SABEY: Object to form.

BY MR. AZMOUDEH:

Q Right?

A He was going back to work that same day and he was capable of doing it, and he worked until 10:00 that night.

Q But that's kind of the thing, right, Dr. Setty, is that doctors with physician burnout just keep powering through it. That, from your perspective as a medical professional, is not a good idea, it's not advisable?

MR. SABEY: Object to form.

THE DEPONENT: Not advisable, but we do it anyway.

BY MR. AZMOUDEH:

Q Right, not advisable but you do it anyway. And you did with your diagnoses have concerns about his cognition. I mean, that's what those diagnoses are are impairments in his cognition?

MR. SABEY: Object to form.

THE DEPONENT: That's what he said and that's why I needed him to see a specialist.

Page 123

BY MR. AZMOUDEH:

Q The diagnoses you gave him are cognitive impairments?

MR. SABEY: Object to the form.

BY MR. AZMOUDEH:

Q Well, let me ask this: What does cognition mean?

A Cognition is being aware of your time, place and person and your thought process and appropriateness of answering of questions. That's what it is.

Q Okay. And we talked earlier that at this time his thought process was not as clear as compared to his baseline and so he has --

A Oh.

Q Dr. Setty, I'm going to zoom out for a second. So I'm going to do this for a couple of different statements. And it's okay if something in this statement is not actually how you feel about the truth. That's okay. But when I read a medical record that says you have adjustment disorder, you have burnout, and then I read a declaration that says, I had no concerns about his memory or cognition, something doesn't add up, something doesn't make sense. And I asked you

Page 124

early on, I said, do you make accurate medical records? Do you exercise your independent medical judgment? Do you take your job very seriously? So I'm inclined to believe that what was in the medical record is more accurate. It's a contemporaneous assessment of Dr. Peddada at that time. And it's your honest assessment. There was no litigation going on at the time, right?

And so what I'm asking you today, hey, maybe some of these statements aren't exactly capturing the full picture. It's okay, it's okay to say, yeah, you're right, that doesn't capture the full picture. That's not what my medical record reflects. That's not what my independent medical judgment showed at the time.

Does that make sense?

MR. SABEY: Object to the form.

BY MR. AZMOUDEH:

Q And if you want to tell me, you're wrong, I didn't have any concerns, then we can talk about it, and I may have questions, but those two things don't really add up in my mind. Do you see where I'm coming from?

A That's true.

Q Okay. So I'll ask. This statement,

Page 125

I had no concerns -- we'll start with physical health. That was -- I thought that was the easy one regarding Dr. Peddada's physical health. He has high blood pressure at the time, right?

A That's correct.

Q And that may be a concern about his physical health. Even if it's a symptom of something else, it's still manifesting as a physical manifestation?

A That's correct.

Q Okay. And you say, I have no concerns about his memory or cognition. That's hard for me, too, because you diagnosed him and you met him as he was presenting with all of these symptoms and these conditions which are necessarily conditions of the mind. And so I wonder, is that statement accurate?

A I think I only made that because he went back to work, and he was supposed to follow up and see Di Thompson and get some help.

Q His capability of going back to work doesn't necessarily speak to, you know, the quality of his work or the difficulty he would have in going to work, right? I mean, you can do it, you can, but that doesn't really necessarily say how

MAGNA
LEGAL SERVICES

Page 126

hard it is or whether you're going to be as good at it as you usually are?

A    True.  I mean, he did it.  He was doing it, and most of us do that.

Q    It seems like you're speaking from experience a little bit here?

A    No.

Q    No?

A    Well, when you're physically sick, you still come, take your medicines and you come and do your work, yes.

Q    But when you go to do your work, particularly in a state that Dr. Peddada was, it's going to be more difficult and it's not going to be the same quality.

MR. SABEY:  Object to form.

THE DEPONENT:  Excuse me.

MR. AZMOUDEH:  Why don't we take a break.  Let's take five minutes.

THE DEPONENT:  Yeah, I need to take this.

THE VIDEOGRAPHER:  Off the record at 4:51 p.m.

(A break was taken from 4:51 p.m. to 5:04 p.m. Mountain Time.)

Page 127

THE VIDEOGRAPHER:  Back on the record at 5:04 p.m.

BY MR. AZMOUDEH:

Q    I want to zoom out for a second.  I don't want to argue with you.  I have no interest in it.  I just want to tell you what this lawsuit is about for a moment.  So Anuj, Dr. Peddada, he alleges that he got this diagnosis, that he knew he was feeling what he was feeling, and that he went and sought a medical leave and he disclosed what he was feeling to his employers.  And in retaliation and in discrimination against what the law he alleges recognizes as a disability, they ended his working opportunity after 20 years at Penrose. That's -- that's what this case is about.  Okay?

Any of that familiar to you or no?

A    You know, I think he messaged me about that, if I remember, that he lost his job after this whole thing, right, after the visit that I had with him.

Q    Yeah.  And so he's in this lawsuit trying to prove, and we're his attorneys, that losing his job was against the law, that it was unlawful.  That's our task at trial.  And on the other side, that's defense counsel.  That's who you

Page 128

spoke with a little over a year ago.  They represent the hospitals, his former employers. Okay?

Does that make sense?

MR. SABEY:  Object to the form.

THE DEPONENT:  Yes.

BY MR. AZMOUDEH:

Q    And those what we call defendants, the hospitals, they've -- they've used that statement that you've provided to them to tell the court in their filings that there was no legal term disability here, that Dr. Peddada was just stressed?

A    I see.

Q    I'm not here to say were you lying. That's not what I'm here to do.  I'm here on behalf of Dr. Peddada to figure out what did you actually think, right?  Because when I look at this declaration, this doesn't even look like -- I mean, you didn't write it, right?

A    No, I did not.

Q    It doesn't even look -- this is a good example.  Paragraph 15, "I did not tell or instruct Dr. Peddada that he could not communicate with people at Penrose Hospital or Centura Health

Page 129

about an employment agreement or arrangements for him to start working as an employee."

You didn't even know about employment agreements, business transitions into employee.  That's not even something that you and Dr. Peddada were discussing at the time, right?

A    That's correct.

Q    Okay.  And so they're using this document as a sword against Dr. Peddada.  And when I look at this document, it doesn't seem to me like it accurately reflects what you actually think. That's just what I think.  Does that make sense?

MR. SABEY:  I'm going to object to that on form.

BY MR. AZMOUDEH:

Q    Am I making sense?

A    Yes.  I did tell him he needs to take the break.

Q    Right.  You did tell him he needs to take the break.  You offered him diagnoses.  You offered him referrals.  You offered him -- you told him he should follow up because in that moment you were concerned about him.  You had a real concern about his health, right?  You immediately prescribed him medications and he didn't take them,

MAGNA
LEGAL SERVICES

Page 130

but you prescribed them because in that moment, litigation aside, you were concerned about Dr. Peddada. Do I have that right?

A    That's correct.

Q    Okay. So when I read this, it's like what planet are we on, right? There are some lines in here that I just -- this is a good one. I did not -- sorry, hold on. Where is it? Okay. Number 9, "In this case, I did not diagnose Dr. Peddada to have any disability." You're not -- a disability, do you know that the disability has a specific legal meaning under the Americans with Disabilities Act?

A    Yes.

Q    Okay. How familiar are you with that?

A    Way back.

Q    Way back?

A    Yeah, way back, 20 years ago I was a disability evaluating physician. Yes, long time ago.

Q    And that's a specific role. Who did you work for when you performed that role?

A    It was a group practice. We were all disability evaluating physicians, but that was

Page 131

long time ago, and it was so burdensome that I didn't want to be anymore, yeah.

Q    Do you remember who would ask you to do the disability evaluations?

A    The employers, and the Family Medical Leave Act, that's what we fill all the time for the patients.

Q    Right. But in this case, Dr. Peddada was just coming to you for help, for care. He wasn't coming to you saying, hey, here's this disability paperwork, will you fill it out, right?

A    I did not fill out any papers.

Q    Right. And so when you say I did not diagnose Dr. Peddada to have any disability, that's kind of beside the point. You were diagnosing his mental condition at the time. You were diagnosing -- providing him with patient care at the time.

A    That's correct.

Q    Okay. And you did that and he thanks you for that and he's appreciative of that, but you can imagine when he saw this, he felt a little hurt. He said, I was vulnerable to that doctor, and I came to her in a time of need, and

Page 132

now I'm reading this, and she's saying she didn't have any concerns about my cognition. What --

MR. SABEY: I object to this line of questioning. If you have a question, ask it. You're badgering the witness.

MR. MOHAMEDBHAI: No, he's not, Mark. Let's not do your speaking objection, okay? Don't do that.

MR. SABEY: This is totally inappropriate, and I object to the form of this line of questioning.

MR. MOHAMEDBHAI: We didn't object to the intent of the lawyers were of Dr. Peddada. We didn't object to those things. Let's just take these depos. Okay?

MR. SABEY: Okay.

BY MR. AZMOUDEH:

Q    So when Dr. Peddada reads this, would you be surprised to learn that he felt a little hurt by this declaration? I'm sorry this is hard, Dr. Setty. I recognize this is hard, but it was hard for Dr. Peddada, too, and I'm just asking for a little bit of humanity here. You are his doctor?

MR. SABEY: Object to the form.

Page 133

BY MR. AZMOUDEH:

Q    So the question that is pending is would you be surprised to learn that Dr. Peddada felt a little bit hurt when he read this declaration?

A    The whole premise was that he was going to see Di Thompson and get help, and he was supposed to take time off work.

Q    Because he was experiencing something at the time?

MR. SABEY: Is there a question?

MR. AZMOUDEH: Yes.

BY MR. AZMOUDEH:

Q    The whole premise of the treatment was that he was going to go see a psychiatrist, and he was supposed to take leave from work because he was experiencing mental conditions at the time, in your opinion?

Why is this hard, Dr. Setty?

A    It's hard because he went back to work, and I did not know what point in time he went to seek help.

Q    Yeah, but you saw him at a specific time, and you made findings and you made diagnoses. And I recognize that, you know, he could have



34 (Pages 130 to 133)

Page 134

improved his outcomes by doing X, Y or Z, or he could have worsened his outcomes by doing X, Y or Z. But what I'm asking is when you saw him in that moment, you had concerns and you made diagnoses and that's why you made the recommendations that you did?

A   Yes.

Q   Okay. And so to say I had no concerns about his cognition, that's not fair. It's not fair to Dr. Peddada. It's not fair ultimately to what was in your own mind at the time?

MR. SABEY: Object to the form.

BY MR. AZMOUDEH:

Q   Let me put it a different way, Dr. Setty. If you truly had no concerns about Dr. Peddada's cognition at that time, you would have said, you don't need a leave. You don't need medication. I'm not going to diagnose you with anything. I need to treat your hypertension, get back to work?

MR. SABEY: Object to form.

BY MR. AZMOUDEH:

Q   Right?

A   I just wanted him to get the time

Page 135

off work because he was anxious, and, yes, he was concerned about having to go talk to his colleagues, and it was kind of hard for him.

Q   It was hard for him, it was. He reported that to you.

A   Yes.

Q   I guess -- I mean, these words "I had no concerns regarding physical health, memory or cognition," do you agree with that? I mean, do you agree with that?

Again, this isn't evidence. It's been stricken from the record. So do you agree with that statement?

MR. SABEY: Object to the form.

THE DEPONENT: I was concerned about his ability. That's the reason why I asked him to see -- I myself called Di Thompson so he could get help as soon as he can from that point.

BY MR. AZMOUDEH:

Q   His ability to do what?

A   The care of his patients or whatever was going on with his life.

Q   We discussed earlier that the trigger was work. So you had concerns about his ability to do all components of work?

Page 136

MR. SABEY: Object to the form.

THE DEPONENT: He reported difficulty working with his colleagues and his staff, but I didn't have any -- his clinical skills and his intelligence was fine as far as I could see, but his situational anxiety and all the components of that, that's the reason why I asked him to go to Di. I mean, I could have just done a referral and waited for a month to get a referral authorized.

BY MR. AZMOUDEH:

Q   So maybe we can -- cognition, in your mind, is kind of what we talked about earlier. A person with psychosis, you'd have concerns about their cognition, their ability to interpret reality?

A   Yeah, he wasn't there.

Q   Right.

A   Yes.

Q   So you had no concerns about cognition in that way?

A   Yes.

Q   But you did have concerns about his mental health?

A   He was anxious and depressed as you

Page 137

can see. That was what I have documented.

Q   Thank you, Doctor.

Earlier we talked -- Mark talked with you about employment agreements and how we were alleging that you instructed Dr. Peddada not to read employment agreements or loan forgiveness agreements. Do you remember that stuff?

A   That statement, yes, but I don't remember him telling me anything of that nature.

Q   Right. So you recommended a three-month leave from work, right?

A   That's correct.

Q   And when Dr. Peddada was explaining to you what work meant in his eyes at the time as we've talked about today, particularly in this setting where you're getting stressed to the level of burnout and anxiety and depression, work is not just patient care. It's all of the things that are layered on top of it.

So when you recommended, you need a leave from work, would you think it's a reasonable interpretation of that for Dr. Peddada to think, my doctor thinks I need to get out of there and not deal with all of that stuff?

A   That's correct to an extent, and I

MAGNA
LEGAL SERVICES

Page 138

needed support from Di Thompson and the psychiatric help.

Q   Yeah, you needed support. I mean, if he would have came to you and said, I've got a -- in this very moment in the state that I'm in, I need to negotiate a complex employment agreement, a loan forgiveness program, and a transition of a business that I've been running for two decades, would you have said, why don't we take a little break? Now is not the best time to be making those decisions?

MR. SABEY: Object to form.

THE DEPONENT: Like I said, I would need support for that because that's a huge undertaking and I don't know what kind of -- I don't know, what should I say, financial situation he was in. I have no idea. That's why I needed Di Thompson's expertise.

BY MR. AZMOUDEH:

Q   Okay. So in this lawsuit, the hospitals are saying that the reason they ended Dr. Peddada's employment responsibility -- the chief reason was that he stopped communicating, that he failed to communicate.

Is it, in your medical experience,

Page 139

unreasonable communication styles or decisions in relationships with your employer for a brief period, in your medical experience, wouldn't that be consistent with what Dr. Peddada was experiencing at the time?

MR. SABEY: Object to form and foundation.

THE DEPONENT: That's the support I needed from Di Thompson and them.

BY MR. AZMOUDEH:

Q   So I'm not asking whether you thought it was a good idea or not. I'm just asking as a general matter. You diagnosed Dr. Peddada with these conditions, and we talked earlier about the symptoms and what he was reporting. And the only new fact I'm presenting to you is that they're saying we fired him because -- or we didn't hire him because he failed to communicate. I presented that new fact to you.

And what I'm asking is fail to communicate, that could -- that could be consistent with everything that he's reporting to you?

MR. SABEY: Object to form and foundation.

THE DEPONENT: It could, but I'm not

Page 140

sure how capable -- I mean, I don't know the urgency of his -- the requirement for communications. I don't know. I think he said he turned off his messages or whatever. I have no idea.

BY MR. AZMOUDEH:

Q   Assume it was completely unreasonable. You would never do it. Other doctors wouldn't do it. Assume that. But also recall that when you see him just a couple weeks and while all of this is going on, he's reporting to you he's feeling total apathy about work, he's feeling deep senses of sadness, he's feeling afraid to speak with staff at work, all of these things. I'm not asking whether you would do it or whether it's reasonable. I'm just asking, in your medical experience, to do something unreasonable in communication, that's consistent with what you diagnosed him with and what he's presenting with in your office?

MR. SABEY: Object to form and foundation.

THE DEPONENT: I wish I spoke to him. I wish he came back to better understand, but I only have that one day of going through what he

Page 141

said, but I don't know what people would do if -- I don't know what I would do if I was in that situation.

BY MR. AZMOUDEH:

Q   But I'm asking for your professional judgment. You're a doctor, Dr. Setty. That's what you're bringing to our table today, and we're so thankful that you're here. But what we're asking is if a patient comes in and says total apathy, deep sense of sadness, and then you diagnose him with burnout and adjustment disorder, what I'm asking is communication challenges and failures to communicate, those are all consistent with what you observed?

A   Could be. Could be.

MR. SABEY: Object to the form and foundation.

THE DEPONENT: Could potentially be so.

BY MR. AZMOUDEH:

Q   Thank you, Doctor?

The comment that you had no concerns about Dr. Peddada's ability to practice medicine safely, do you agree with that statement, that you had no concerns at this time?



Page 142

A   Like I said, I needed support and I needed him to be seen right away since I was concerned in some ways and -- but he was going back to work and that's why I needed the support of Di Thompson. And that's what I'm trying to tell you. I'm not the best person. I'm not the specialist for diagnosing and managing burnout.

Q   Yeah, and if you had -- again, if you had no concerns, you wouldn't have done those things, sent him to a psychiatrist, recommended leave. Even if you just sent him to a psychiatrist, if you had no concerns, you would not have sent Dr. Peddada off to a specialist?

MR. SABEY:  Object to the form.

THE DEPONENT:  I was trying to help him in any way I can.

BY MR. AZMOUDEH:

Q   And he needed help?

MR. SABEY:  Omeed, can I ask how much longer you're going because I'm going to have some follow-up?

MR. AZMOUDEH:  10 or 15 minutes.

BY MR. AZMOUDEH:

Q   Dr. Setty, did Dr. Peddada need help at the time that you saw him?

Page 143

A   Yes.

Q   You were asked earlier about professional ties to Penrose. Do you remember Mark asking you those questions?

A   Yes.

Q   When I used to Google to try to find your office, it would show up as having some affiliation to CommonSpirit. What is that?

A   I admit patients there.

Q   Okay. So you show up on the website -- sorry, go ahead.

A   Depending on where the patient's insurance takes. So I go to both Memorial and Penrose, at least I used to go.

Q   Okay. Understood. So you --

A   We admitted patients to both the systems for the last 30 years.

Q   Okay. But now when I Google you, you're no longer listed as affiliated. Did that stop? You don't refer patients there anymore?

A   The hospitals take care of my patients, but I do have privileges at both the hospitals where I can admit and take care, but the hospitals take care of my patients because my outpatient practice is very busy so I do not

Page 144

physically see my own patients now anymore, but I can cover for my -- my ex-colleagues when they go out of town. I can put in a shift here and there, yes.

Q   Okay. Understood.

A   Because I want to keep my privileges, hospital privileges so I need to connect with both of them.

Q   You spoke with Dr. Plauth briefly during this ordeal. Do you recall that conversation, just that it happened?

A   It happened, but I don't know what.

Q   Did he present with any disability paperwork to fill out?

A   I don't think so.

Q   Did anybody from Centura, Penrose or CommonSpirit present you with any disability paperwork to fill out?

A   Not that I know.

Q   You were shown an email earlier in which Dr. Peddada referred to the leave as a sabbatical. Do you remember?

A   I would have to go back. What was that?

Q   He emailed his brother. He said,

Page 145

I'm thinking about taking a sabbatical.

A   Right. Can you put that back?

Q   Yeah.

MR. AZMOUDEH:  What number was that, Mark?

MR. SABEY:  I don't know off the top of my head, but you can go ahead and ask about it.

MR. AZMOUDEH:  67, yeah.

THE DEPONENT:  Yeah. 67.

BY MR. AZMOUDEH:

Q   Do you have that in front of you?

A   Yeah.

Q   So that's four days before he came to see you on April 18th? Sorry, the email is on April 18th, four days before he came to see you on April 22nd.

A   Right.

Q   And this was a draft letter to his brother, not to you.

A   Okay.

Q   Is that true? I mean, you've never seen this document before today?

A   No. Well, he may have sent -- I don't know. I'm just looking at it right now.

Q   Well, when he came into your office,

**MAGNA**
LEGAL SERVICES

Page 146

according to your medical records, was he looking for a sabbatical?

A    He didn't put it down as a sabbatical. He needed a break from his work.

Q    Sabbatical usually means to go do some academic endeavor.

A    Something different, yes.

Q    Doing something else related to the medical profession, that's not what Dr. Peddada was coming into your office to ask to do?

A    That's correct, yeah. I didn't -- he didn't use the word sabbatical.

Q    But you didn't use the word sabbatical. You all were talking about medical leave?

A    Yes.

Q    You wouldn't refer Dr. Peddada to a psychiatrist, prescribe him medications and make diagnoses about his mental health in order for him to take a sabbatical?

A    That's correct.

Q    Okay. There was some discussion earlier about, you know, he said six to eight weeks in this email. He said different lengths at different times. But your testimony is that when

Page 147

he came to see you, he said three months?

A    Yes.

Q    But ultimately, even if he's saying three months, it's your job to listen to the patient, as we talked about earlier, and to incorporate whether it makes sense in your independent medical judgment into your ultimate assessment and treatment?

A    Yes.

MR. SABEY:  Object to form and foundation.

THE DEPONENT:  Yes.

Did you have a question?

MR. AZMOUDEH:  No question. I'm just checking my notes to see if I have any more questions. I'm sorry. The silence in the air was nice for a few moments. All right. That's all I have.

EXAMINATION

BY MR. SABEY:

Q    All right. How are you doing?

A    Exhausted.

Q    I'm sure. I'm sure. Let's try and get through this quickly. Let me ask you a few questions now, and then we'll take a break and come

Page 148

back and finish.

I'd like you to look at Exhibit 55. This is the first document we looked at in the deposition. It was -- and it included your notes about an interview with you with CPHP. Do you have that?

A    Yeah.

Q    Okay. It's page 38 -- if you look at the number at the very top, it's page 38, top center.

A    Yes.

Q    Okay. Do you see down there the fourth bullet from the bottom, it says Munni Selagamsetty, or MS, has no concerns regarding physical health, memory or cognition. Do you see that?

A    Yes.

Q    There wasn't some attorney pressuring you to say that at that time, was there?

A    And I was talking to CPHP at that time? I don't remember.

Q    Yes. Yep.

A    At the hospital, CPHP? No, CPHP.

Q    The Colorado Physician Health Program?

Page 149

A    Yes.

Q    Yep. So you just volunteered that in response to their questions, right?

A    I don't know what question they asked, but it was basically what -- on the premise of the -- you know, his previous functioning.

Q    Yeah, makes sense.

A    And then, you know, at the time, he was not losing his memory. He was -- he was cognitive of what's going on, he was --

Q    Right.

A    So at that point in time, yes.

Q    Yeah. All I'm saying is that -- you based your comments on your visit with him on April 22nd, right? You never saw him again after that?

A    I did not see him after that.

Q    This is June 16th, and you're reporting based on your June -- I mean your May 20 -- April, sorry, April 22nd meeting with him; is that correct?

A    I don't know what context I said that, but yes, you know, he's a very brilliant man.

Q    Yeah.

A    And he had not lost his memory at

MAGNA

LEGAL SERVICES

Case No. 1:23-cv-01921-NYW-MDB    Document 208-57    filed 02/19/26    USDC Colorado
pg 39 of 83

Page 150

that point.

Q   He was still working at the -- on the day you saw him?

A   Yes.

Q   And so you didn't have any significant concerns about his physical health, his memory or his cognition at that time, correct?

A   He was going to take care of it.

Q   Right.  Well, for sure, like we all have to take care of our health, right?

A   And he was supposed to come back.  He was supposed to come back to follow up with the blood pressure and what --

Q   Right.  And it's a very good point.  You keep coming back to that, Dr. Setty, and it makes sense, right?  You saw him for maybe 25 minutes that day, right?

A   Probably.

Q   It was a very short visit.

MR. AZMOUDEH:  Object to form and foundation.

BY MR. SABEY:

Q   I mean, it couldn't have been more than 25 minutes or a half an hour because he had to get back to the hospital --

Page 151

MR. AZMOUDEH:  Object to form and foundation.

BY MR. SABEY:

Q   -- to do a procedure, right?

A   Yes.

Q   Okay.  The visit didn't start until 12:10.  So you saw him for a moment.  I mean, for a few minutes that day and that's what your medical record is based on, but you said, you know, to make an assessment, we're going to have to visit again soon.  You know, the fact that somebody has blood pressure at a certain level doesn't mean anything with one visit.  It could be a unique situation.  Same thing with heart rate.  Maybe he ran up the stairs because he was late getting there.  He arrived six minutes late for his appointment.

MR. AZMOUDEH:  Object to form and foundation.

BY MR. SABEY:

Q   Maybe he ran in from the car and he had a high heart rate.  You don't know that from one visit, right?

A   True to some extent.  True to some extent.  Yes, we need a couple meetings, and he was going to take care of it.

Page 152

Q   Yeah.  And you were okay with the fact that he had a procedure to do at 1:00 and that he worked until 10:00 p.m. that day, right?

A   After that, yes.  I knew that after that.

Q   Yeah.  So you felt like he was capable of doing that?

A   On that day, yes.

Q   I mean, you would have said otherwise if you thought he was going to be unsafe going back to work, wouldn't you?  Like, if somebody is drunk and they're about to go drive your car, you stop them and say, wait a minute.  If you thought he was going to go injure patients, you would have stopped him, wouldn't you?

MR. AZMOUDEH:  Object to form and foundation.

THE DEPONENT:  And that's what I'm saying, at that point time he -- you know, he was not psychotic.

BY MR. SABEY:

Q   Yeah.

A   So I'm only making these statements based on that particular point and he went back to work.  He was going to take care of all of these

Page 153

problems, and he was was supposed to come back for follow-up.

Q   Sure.  Yeah.  He's represented to us that he's never had a medical malpractice claim.

A   What's that?

Q   Dr. Peddada has represented to us that he's never had a medical malpractice claim, which would include any kind of patient safety issues.

MR. AZMOUDEH:  Object to form and foundation.

BY MR. SABEY:

Q   So that would include the 1:00 p.m. and the working until 10:00 p.m.  He went that day and didn't commit malpractice?

A   What's that?

Q   So he went back to work, he had a procedure at 1:00, he worked until 10:00 p.m.  You didn't have any indication that he committed malpractice that day, do you?

A   Not that I know of.

Q   Yeah.  So, you know, there was a lot of discussion about his real medical needs and -- but the truth is when a patient comes in and tells you what they're experiencing, you don't know if

39 (Pages 150 to 153)

Page 154

that's accurate or not, do you?

MR. AZMOUDEH: Object to form, foundation.

BY MR. SABEY:

Q    You don't -- you're not clairvoyant. You don't feel what they feel. There's not -- you don't hook them up to a machine and say, oh, yeah, this clearly shows that he's fearful, that he's anxious, that he's depressed, right? There's no objective test for that?

MR. AZMOUDEH: Object to form and foundation.

BY MR. SABEY:

Q    Isn't that right?

A    These are all very valid clinical situations that patients come to us. There is no -- a blood test to diagnose all of that. We all know that.

Q    Right. Yeah. It's a subjective kind of thing, not an objective thing. Like a heart rate, you can say that's objective. But if somebody comes in and says I'm experiencing this, you don't know. All you know is that they're claiming to experience it, right?

MR. AZMOUDEH: Object to form and

Page 155

foundation.

THE DEPONENT: For the most part, I trust my patients.

BY MR. SABEY:

Q    Right. Yeah. No, which you should.

A    99 percent of the time I believe in my patients.

Q    No, that makes sense. But it is a known possibility, right? There's a known phenomena of patients coming in seeking a medical leave on false pretenses?

MR. AZMOUDEH: Object to form and foundation.

BY MR. SABEY:

Q    You know that happens sometimes, right?

A    Rare in my practice. I -- like I said, I have been a disability evaluating physician, and I know the genuinity of patient's situations for sure, yes. There may be -- there may be a lot of malingering going on, but for the most part, no.

Q    You don't have any way to know whether a patient is malingering or whether they're sincere?

Page 156

MR. AZMOUDEH: Object to form and foundation.

BY MR. SABEY:

Q    Right? You're not a professional lie detector?

A    I'm not a lie detector, but I trust my patients' histories.

Q    Well, in this case, it was a, what, a ten-minute discussion where Dr. Peddada said what he was feeling?

MR. AZMOUDEH: Object to form and foundation.

THE DEPONENT: Well, he called the night before and expressed some of those things too, and that's why I called him back, yes. So it's not just a ten-minute thing.

BY MR. SABEY:

Q    Yeah?

A    And if he wasn't doing that, he wouldn't -- in some ways he wouldn't have called me in the middle of the night.

Q    Well -- so opposing counsel described this lawsuit to you and what -- it's true that Dr. Peddada wanted to take some vacation. He wanted a break before starting the new job that he

Page 157

was hoping to get, but it wasn't until he found out talking with his lawyer that if the -- you know, he asked for a sabbatical, which isn't a medical leave, it's a break. He could ask for a vacation, right?

A    I didn't see it as a vacation, but I don't know. I don't know.

Q    But you can get a break for those things. But once he focused on the fact, and there are emails, that once he focused on the fact that his contract with his partner provided for him not as -- he wasn't an employee of Centura or Penrose. Once he focused on the fact that if he had a disability, a medical reason for -- I think he had three months of paid leave, and all of a sudden it transitioned to a medical reason.

MR. AZMOUDEH: Object to form if that's a question.

BY MR. SABEY:

Q    And then, not only that, but he threw you under the bus by saying she told me, in essence, that I couldn't communicate with you. They're trying to say, are you going to become employed with us or not. They sent him an offer of employment after his medical leave started?

MAGNA
LEGAL SERVICES

Page 158

A   I'm sorry, I'm not able to follow all of this.

Q   I know. I'm just saying there's a whole other story here other than the retaliation picture that they painted. There's a whole other story.

MR. AZMOUDEH: Object to form if that's a question.

BY MR. SABEY:

Q   So then he tried to stop communicating. He was still looking for other jobs. He didn't want to commit to the new job that they offered him after he was on medical leave, and -- because he was still interviewing other places. He didn't want to commit. And they said, are you going to do it or not? We need to move forward. We need to do credentialing. We need an answer. And he said, I am not going to communicate with you because my doctor told me not to until August 1st.

A   I don't know. I --

Q   For three months. That's what he said. He threw you under the bus.

MR. AZMOUDEH: Object to form and foundation.

Page 159

BY MR. SABEY:

Q   So you don't -- so they're trying to create a sob story about Dr. Peddada, but basically he was taking advantage of his prior partner and he was taking advantage of you. He came to you because he wanted you to say he needed a medical leave so he could get the three months of paid leave and take the money out of the practice that was closing so that his partner wouldn't get the money, but he would.

A   I'm sorry, I'm not able to follow all of this.

Q   I know. I'm just saying there's a lot of -- there's a much deeper story here.

So you don't know whether Dr. Peddada was sincere in coming in to see you or whether he just wanted you to justify a medical leave under his contract with his partner, do you?

MR. AZMOUDEH: Object to form and foundation.

BY MR. SABEY:

Q   You don't know that, do you?

A   He was sincere in his symptoms. That's all I can say. I mean, his --

Q   Well, you don't know that, do you?

Page 160

You don't know --

MR. AZMOUDEH: Object to form. That's been asked and answered, Mark. Thanks. Move on.

MR. SABEY: Hey, I wasn't allowed to say that so you can't either.

BY MR. SABEY:

Q   So you don't know whether he was sincere or whether he was trying to get you to sign off on a three-month --

MR. MOHAMEDBHAI: Mark, who's badgering the witness right now? Take a look at yourself, man. Come on. It's late. She wants to go. Take a breath, Mark. Take a breath. Think.

MR. SABEY: Are you talking to me?

MR. MOHAMEDBHAI: Yeah.

MR. SABEY: Omeed badgered her endlessly and repeatedly for a long time.

BY MR. SABEY:

Q   So it's -- I appreciate that you're a person who trusts your patients. That's your default and that should be your default. As an attorney, I do the same thing. I think that's a good place to be, but sometimes my clients tell me things that aren't true, right? And you've had

Page 161

that experience from time to time recognizing that a patient who is coming for a disability certification was exaggerating, right?

A   Would he have seen the psychiatrist and followed through with all of that? I don't know. I mean, he was -- I mean, I trusted him. Genuine, he was genuine to me.

Q   Yeah. You perceived him as genuine, but you also referred him to others. If he had a real problem then, do you think he would have gotten follow-up care?

A   He saw Di Thompson. I don't know what transpired because I don't have any records from her.

Q   She didn't provide any medical care to him. We took her deposition. She didn't provide any medical care to him. He never followed up and got medical care.

MR. AZMOUDEH: Object to form and foundation.

BY MR. SABEY:

Q   So, basically, what he got from you is an authorization for a leave, and he didn't get anything else from you.

MR. AZMOUDEH: Object to form and

Page 162

foundation.
BY MR. SABEY:
Q He didn't get any prescriptions. He didn't get any follow-up care. He didn't get any treatment from those who have expertise to evaluate physician burnout.
A Did he go to CPHP?
Q Yeah. When he asked for a leave from the medical staff, they required him to go to CPHP to be evaluated and so he participated in that process of evaluation, and that's when they contacted you and asked you your impressions.
MR. AZMOUDEH: Object to form and foundation.
BY MR. SABEY:
Q So when you signed the declaration, you reviewed it carefully to ensure that it was accurate, didn't you?
MR. AZMOUDEH: Object to form and foundation.
BY MR. SABEY:
Q I mean, you signed that under penalty of perjury, right? Look at --
A I did the best I could at that point in time.

Page 163

Q Right. Would you sign something under penalty of perjury that you didn't think was accurate?
A I hope not.
Q Did you -- did you think this declaration was inaccurate when you signed it?
A At the time that I saw him and that he had been back to work, I mean, I just don't know. I don't know what to say. I don't even know how to answer that question.
Q Okay. Will you pull up the document? It's the document, the last exhibit. Are you there? It's your declaration.
A Yes. And then -- as I said, since it was my first experience dealing with burnout, I really wanted him to see Di Thompson and evaluation for mental health issues.
Q Yeah. Would you scroll to the bottom? Let's -- well, so first of all, it says, "I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief."
You weren't claiming to be irrefutable or have perfect knowledge, but you said "to the best of my knowledge, information and

Page 164

belief, this is accurate." Correct?
A That's what it says, yes.
Q And were you sincere when you signed that?
A Or what it said about mental experience and he needed just the three months to recuperate, yes, all of that is true.
Q Yeah. Let's go back to some of the paragraphs that you reviewed. Paragraph 11, so you didn't say that -- this was taken right out of your CPHP statement. This was something you said more than once. You said it in your declaration, but you also said it without -- yeah, on June 16th.
A Yes. At that point he was not psychotic. He was not somebody that I would call a 911.
Q Right. Right. Okay. I'm just saying --
A And I said that before too.
Q Yeah, it's not your -- it's not an inappropriate thing to say here. This is how you really felt. You said it to CPHP. That's why we included it in your declaration. We weren't trying to get you to say something that you weren't comfortable with. It's something that you

Page 165

volunteered.
So then you also said to CPHP right after that that you had no concerns about Dr. Peddada's ability to practice medicine safely. You said that CPHP too.
A Yes, after he gets his treatment with Di Thompson. And I'm assuming he saw Di Thompson soon after I spoke to her, and I had no idea she did not offer medicine until now.
Q Well, but you knew he was going back to see patients that day?
A Yes.
Q And you were comfortable with that?
A Yes, because he was not psychotic. I mean, that's what I said.
Q Yeah. Yeah. Now, paragraph 15, it says, "I did not tell or instruct Dr. Peddada that he could not communicate with people at Penrose Hospital or Centura Health about an employment agreement or arrangements for him to start working as an employee."
Now, opposing counsel tried to make it sound like we were trying to get you to testify about things you didn't know about. We put that in there because Dr. Peddada was saying that you told

Page 166

him not to communicate, and you told us that you did not tell him that. And you know whether you told him that or not. That's something you do know. You know whether you told him, and you said no, I didn't tell him that he couldn't communicate. Is that right?

A    I'm not able to recollect what I told -- I don't know. I can't remember what I told him or what I didn't tell him and what point in time. If I said that, I would have documented that in my note in any visit.

Q    Right, if you --

A    But I'm not sure.

Q    -- told him not to communicate --

A    I don't know. I have no idea. I can't recollect because this official language which I'm really not secure or I'm not comfortable with saying yes or no.

Q    Well, so at the time you signed this, you knew that you had not told him that he couldn't communicate? It wasn't in your medical record, right? You didn't put it in your notes that you told him not to communicate with Centura?

A    Right. I did not put it in my note because he didn't tell me anything about this.

Page 167

Q    Right. He didn't tell you about it.

A    At that time. Yes, at that time.

Q    Yeah. He didn't tell you about it and so you wouldn't have told him. And even if he had said, hey, should I communicate with Penrose or Centura Health, you wouldn't have -- you wouldn't have told him not to communicate with them. You testified to that earlier. That's something you would not do?

A    Yeah.

Q    Yeah. So you said in your note of the visit, which is Exhibit 2C -- do you have that up?

A    Yes.

Q    Okay. On the third page under psychiatric -- no. Under -- okay. Under the physical examination.

A    Yes.

Q    It says, "The patient is very pleasant, well-developed and well-nourished, extremely anxious, agitated with pressured speech. The patient is awake, alert, cooperative, understands questions and responds appropriately. The patient is groomed and dressed appropriately."
It seems like that would be the

Page 168

basis for you to conclude that he doesn't seem to have cognitive problems.

MR. AZMOUDEH: Object to form and foundation.

BY MR. SABEY:

Q    So -- so he could think and communicate on that date, right, April 22nd of 2022 when you saw him?

A    Yes.

Q    And he clearly did that when you were interviewing him? He was thinking and communicating well?

A    Yes.

Q    Responding appropriately? Okay.

A    Yes, it's just that one visit.

Q    Yeah. Yeah, I agree. So what do you mean by that? You can't really tell the whole picture by one visit, is that what you're saying?

A    On that visit on what was going on was -- I believed that was the truth.

Q    Right. But you understood that to really diagnose something more serious, he would need to have follow up and be seen by experts, correct?

MR. AZMOUDEH: Object to form and

Page 169

foundation.

BY MR. SABEY:

Q    That's why you referred him to Di Thompson, correct?

A    Yes.

Q    You wanted him to have a greater level of expertise to evaluate it?

A    Yes.

MR. AZMOUDEH: Can we go home, Mark?

MR. SABEY: That's what I'm trying to figure out.

BY MR. SABEY:

Q    So I assume you know a lot of physicians, and I know a lot of attorneys, who are able to work effectively even though they're experiencing some level of burnout and some level of anxiety and some level of depression.

MR. AZMOUDEH: Object to form and foundation.

BY MR. SABEY:

Q    Would that be accurate? Do you think that's true that there are a lot of doctors who experience some level of burnout, some level of anxiety, some level of depression, but are still able to practice and do practice?

MAGNA
LEGAL SERVICES

Page 170

A    Yes.

Q    So that doesn't disqualify them as attorneys or medical professions -- professionals if they have a medical condition like burnout or depression or anxiety, does it?

MR. AZMOUDEH:  Object to form and foundation.

THE DEPONENT:  Depending on the intensity of those symptoms.

BY MR. SABEY:

Q    Right.  And you weren't qualified to determine the intensity of Dr. Peddada's symptoms based on one brief interview, were you?

MR. AZMOUDEH:  Object to foundation.

BY MR. SABEY:

Q    I beg your pardon?

A    Yes, that's what I did for him.

Q    That's why you referred him?  Sorry. So you agree with the statement that you weren't qualified to assess the severity of his symptoms based on one brief interview, correct?

MR. AZMOUDEH:  Object to foundation.

BY MR. SABEY:

Q    And that's why you referred him; is that correct?

Page 171

A    That's correct.

MR. SABEY:  Okay.  I think we're through.

MR. AZMOUDEH:  Can I ask one follow-up?  Hey, Mark, can I ask one follow-up?

MR. SABEY:  Yeah.

MR. AZMOUDEH:  Thanks.  Just on that last point.

EXAMINATION

BY MR. AZMOUDEH:

Q    Dr. Setty, you are not qualified to provide the ongoing elevated level of care with respect to Dr. Peddada's conditions.  That's why you referred him --

A    That's correct.

Q    -- to Dr. Thompson?

A    Yes.

MR. AZMOUDEH:  Okay.  Thanks. That's all.

MR. SABEY:  All right.

THE VIDEOGRAPHER:  Omeed, did you need a copy of either the video or the transcript?

MR. AZMOUDEH:  No.  What do you mean?

THE VIDEOGRAPHER:  Did you need a

Page 172

copy of the video or transcript?

MR. AZMOUDEH:  Oh, I'm sorry, did I need a copy?  You know -- Dr. Setty, you can go.  I want to talk to them quickly just about billing. Thank you for your time.  I appreciate it.

(Discussion had.)

THE VIDEOGRAPHER:  This concludes today's deposition.  The time is 6:09 p.m.  The date is January 16th, 2026.  We're off the record.

(The video record concluded at 6:09 p.m. Mountain Time.)

THE REPORTER:  So, Omeed, you don't want to order a transcript?

MR. AMOUDEH:  We do.  Electronic only.

(The deposition concluded at 6:09 p.m.)

Page 173

REPORTER CERTIFICATE

I, ROSANNE M. STAHL, Shorthand Reporter and Notary Public within and for the State of Colorado, do hereby certify that previous to the commencement of the testimony, the said MUNNI SELAGAMSETTY, MD was sworn by me to testify to the truth in relation to the matters in controversy between the said parties so far as she should be interrogated concerning the same; that the said deposition was taken in stenograph by me at the time and place aforesaid and was thereafter reduced to typewritten form; that the foregoing is a true and correct transcript of my stenographic notes thereof; and that Deposition Exhibits 105-109 were marked in the interrogation.

I further certify that I am not employed by, related to, nor counsel for any of the parties herein, nor otherwise interested in the event of this action.

IN WITNESS WHEREOF, I have affixed my signature and seal this 29th day of January, 2026.

_____
Rosanne M. Stahl
Notary Public
P.O. Box 464
Kremmling, CO 80459

MY COMMISSION EXPIRES:  04/13/2026



MAGNA
LEGAL SERVICES

**A**

**abilities**
63:9
**ability**
10:8 22:17 24:11
63:6 67:21 135:16
135:20,25 136:15
141:23 165:4
**able**
13:11 41:24 49:5
66:15 158:1 159:11
166:7 169:15,25
**above**
82:11
**abrupt**
72:19
**abruptly**
99:17
**absence**
48:12
**Absolutely**
67:18 93:22 94:23
**academic**
146:6
**accessed**
38:14
**accommodations**
51:1
**according**
93:8 119:21 146:1
**accuracy**
37:19
**accurate**
5:22 10:13 25:4 30:8
31:19 32:19 33:1
37:23 51:8,16 57:15
67:8 120:15 124:1,5
125:17 154:1
162:18 163:3 164:1
169:21
**accurately**
12:12 67:21 129:11
**accuse**
64:25
**accused**

117:12,17,18
**Act**
21:3,4 130:13 131:6
**action**
1:2 4:9 173:11
**activities**
24:4,7,11,17 60:2,21
61:8
**actual**
84:16
**actually**
83:15 85:13 103:9
114:16 116:1
119:18,25 120:10
123:19 128:17
129:11
**acute**
104:25 105:4
**add**
98:20 123:24 124:22
**address**
11:15 15:10 25:9
34:5 60:5
**addressing**
59:22
**adds**
10:9 88:16
**adjusting**
90:16
**adjustment**
89:24 90:5,12 94:3
100:20,25 105:17
106:5 110:3 121:1
123:21 141:11
**adjustors**
111:23
**admin**
34:6
**administration**
34:6,15,22
**administrative**
101:25 102:12
**admit**
29:4 77:3 143:9,23
**admitted**
33:7 143:16

**adult**
82:21 83:1
**advantage**
159:4,5
**adversity**
116:17
**advisable**
122:13,15,18
**Aesthetics**
11:11
**affect**
81:21,25 82:1 88:19
112:7
**affiliated**
143:19
**affiliation**
143:8
**affixed**
173:11
**aforesaid**
173:7
**afraid**
76:3,12,16 108:2
113:8,23 140:13
**after**
12:7 13:13 22:12
25:20 35:10 36:7
43:11,22,25 44:4
46:24 47:6 57:18
58:15 77:25,25 78:1
80:24 127:14,19,19
149:15,17 152:4,4
157:25 158:13
165:3,6,8
**afternoon**
5:9,11 63:24,25 64:2
**again**
22:7 31:25 80:4,11
88:16 91:20 95:3
99:12 105:10
108:12,15 113:6
117:2 119:24
135:11 142:8
149:15 151:10
**against**
127:12,23 129:9

**agitated**
80:8,22 81:24 83:23
111:6 112:15
167:21
**ago**
49:22 65:7,8 67:14
72:1 98:7 115:7
118:21,22 128:1
130:19,21 131:1
**agree**
10:4 21:19,23 26:8
29:19 53:6,11,17
98:19 135:9,10,12
141:24 168:16
170:19
**agreed**
36:4 53:8 112:10
**agreement**
23:19,20 54:4,11
55:2,21 56:1,6,10
56:20 57:4,17,18
58:14,14 62:6 63:15
129:1 138:6 165:20
**agreements**
58:1 129:4 137:4,6,7
**Ah**
46:21
**ahead**
6:24 16:9 17:15 49:9
56:7,25 84:19 92:1
143:11 145:7
**AI**
85:18
**ailments**
74:21 75:6
**air**
147:16
**AI-based**
68:5
**al**
4:8
**alert**
167:22
**alien**
68:25
**aliens**



68:18

**all**
12:17 22:5,10 24:17
24:18 31:25 33:22
40:7 41:13 45:16
46:18 47:5 48:20
49:6 55:3,8,12,12
57:22,24 58:9 61:14
62:20 63:11 64:22
65:16 66:6 73:13
77:1,9 79:1 81:4
84:7,15 85:17 86:7
88:7 89:13,21 90:6
90:24,25,25 94:9
97:6,6,17 100:11
101:3,13 102:12,21
102:24 108:4
113:21 114:16,24
115:23 120:5
125:14 130:25
131:6 135:25 136:6
137:18,24 140:11
140:14 141:13
146:14 147:17,17
147:21 149:13
150:9 152:25
154:15,17,17,23
157:15 158:2
159:12,24 161:5
163:19 164:7
171:19,20

**alleges**
127:8,13

**alleging**
137:5

**allowed**
160:5

**all-time**
71:14 101:23

**almost**
83:12 119:20

**along**
64:4 75:5

**already**
29:24 31:5 87:11
99:23 100:4

**also**
2:15 17:17 18:21
19:8 30:18 63:5
65:10 79:22 87:18
90:1 93:16 95:7
96:17 97:12,24 98:1
102:25 112:5
115:16 140:9 161:9
164:13 165:2

**always**
87:9 95:16

**am**
13:3 81:25 129:16
158:18 173:9

**Americans**
21:3 130:13

**among**
66:24

**AMOUDEH**
172:14

**amount**
14:5,15 26:13

**an**
12:7 23:19,21 25:23
28:1 33:20 34:3,8
35:10 38:9,13,19
39:5,9,21 48:4
49:12 50:1 51:7
62:5 68:25 71:14
74:15 79:3 82:25
86:14 89:16,19 90:1
90:12 97:10 101:22
101:24 104:25
105:4 112:6 129:1,2
137:25 144:20
148:5 150:24
151:10 154:20
157:12,24 158:17
160:22 161:23
164:20 165:19,21

**angry**
113:10

**another**
27:8 66:15 89:5
98:20 100:8

**answer**

5:17 15:18 17:15
22:22 26:3 53:4
54:12 56:25 57:19
58:5 59:4 62:14
74:9 75:22 81:14
116:25 158:18
163:10

**answered**
119:3 160:3

**answering**
123:10

**answers**
31:3 68:19 119:8

**antianxiety**
91:15

**antidepressants**
91:15

**Anuj**
1:7 3:18 4:6 50:14
64:4,15 73:5 127:7

**anxiety**
19:11 70:24 75:25
77:21 87:19,21 88:2
88:6,6,10,12,13,17
89:25 90:4,6,20
94:5 100:21 101:1
103:18,19 105:17
106:4,14 112:20
113:4,13 121:1
136:6 137:17
169:17,24 170:5

**anxious**
10:9 75:23,24 76:11
79:15 80:8,22 81:23
83:4,5,19,22 88:14
88:17 104:14 107:9
135:1 136:25 154:9
167:21

**any**
10:1,25 15:4 16:22
19:14,17 21:15,21
22:1,1,16,16 23:8
23:20 24:3,6,11
25:10 29:10 30:10
30:13,17,21 31:4,14
32:22 33:1 37:18

39:13,15 42:16
53:19 54:15,24
55:23 58:7 59:22
60:5,6,21,22,22
61:7,8,9,14 63:12
63:15,16,19 64:25
66:19 76:16,19,23
79:16 96:13 102:19
113:8 116:1 117:10
118:16 119:13
124:20 127:16
130:10 131:13,15
132:2 136:4 142:16
144:13,17 147:15
150:5 153:8,19
155:23 161:13,15
161:17 162:3,4,4
166:11 173:10

**anybody**
144:16

**anymore**
98:3,4,12,22 119:20
131:2 143:20 144:1

**anyone**
38:14

**anything**
5:10 23:24 26:16
52:5 59:4 60:18
61:2 117:12,17,18
119:22 134:20
137:9 151:12
161:24 166:25

**anyway**
93:6 122:16,19

**apathy**
71:5,7 76:11 86:18
108:3 110:10 111:6
140:12 141:9

**apparently**
36:3 82:3

**appearance**
80:2

**appearances**
4:19

**appearing**
4:21



**appears**
69:2
**apply**
90:10
**appointment**
37:14 39:3 43:2,20
43:24 44:22 45:17
46:13,14 151:16
**appointments**
42:4,5
**appreciate**
160:20 172:5
**appreciates**
65:11
**appreciative**
131:22
**appropriate**
26:10
**appropriately**
167:23,24 168:14
**appropriateness**
123:10
**approve**
39:9
**April**
10:19 11:25 23:6
25:15 30:1 36:14,23
36:25 38:17,24 39:4
39:5 48:7 51:20
59:20 68:4 73:17
105:23 108:14
120:6 121:20
145:14,15,16
149:15,20,20 168:7
**are**
4:4 7:10 8:10,22
10:13,24,25 12:15
12:16 13:4,22 14:25
16:6 25:5,8 33:15
34:9 36:21,23 41:15
41:18,20 43:5 48:11
49:13 52:21 59:17
60:15,19 63:11,16
64:5,21 66:24 67:10
70:4 75:3 79:6,19
80:5 82:10 85:4

86:8,21 91:14 92:21
93:24 94:8 95:8,21
96:21 97:16 102:25
103:25 104:13
106:19 110:6,11
114:23 115:12
116:12 117:24
122:21,21 123:2
125:15 126:2 130:6
130:6,15 132:23
137:18 138:21
141:13 147:21
154:15 157:10,23
158:16 160:15
163:13 169:14,22
169:24 171:11
**aren't**
69:18 124:10 160:25
**argue**
127:5
**around**
76:23 80:24 112:6
**arrangements**
23:20 129:1 165:20
**arrived**
151:16
**as**
5:5 6:7,7,15 7:19
10:19 11:23 12:1
14:11 15:10 20:24
21:14 23:21 24:12
24:16 26:3 29:7,18
36:11 37:2 44:23,23
47:1,1 50:1,3,6,16
50:17,20 51:7,11
52:2 59:22 65:12
66:14 67:19 70:8,10
73:4 74:15 78:16
80:8,20 82:9 83:16
84:1,14 87:16 99:5
99:18 100:4 101:3
103:23 105:10,14
107:9 108:12 109:3
110:21 111:5 113:9
114:24 115:17
118:6,12,13 120:2

121:17,17 122:12
123:13,13 125:8,14
126:1,2 127:13
129:2,9 135:18,18
136:5,5,25 137:14
139:13 143:7,19
144:21 146:3 147:5
157:6,12 160:22
161:8 163:14
165:21 170:2 173:5
**aside**
105:9 130:2
**ask**
31:13 32:9 38:19
39:10 49:20 52:2
55:19,20 61:24
64:13,20 68:19
82:21 92:24 96:6
100:10 103:9
104:15 114:15
117:4 119:23 123:6
124:25 131:3 132:4
142:19 145:7
146:10 147:24
157:4 171:4,5
**asked**
17:16 31:2 55:25
56:5 77:17 94:18
104:7,9 113:18
114:19 119:3
120:10 123:25
135:16 136:7 143:2
149:5 157:3 160:3
162:8,12
**asking**
26:21 31:8 37:23
38:9 39:6,8 46:3
52:24,25 53:7,8
57:14 68:25 91:6
109:2 110:7 124:9
132:22 134:3
139:11,12,20
140:15,16 141:5,8
141:12 143:4
**asserting**
51:18

**assertion**
61:12
**assess**
89:24 94:21 170:20
**assessment**
16:11 24:16,22,23
69:14 84:5,9,11,12
84:16,16 85:1,2,5,9
85:14,15 124:6,7
147:8 151:10
**assessments**
89:14
**assigned**
89:15,16 90:1
**assume**
44:15 140:7,9 169:13
**assumed**
33:10
**assuming**
103:12 165:7
**Ativan**
20:8 91:12
**attached**
34:8
**attempt**
68:10 90:19
**attended**
50:14
**attention**
3:16 95:21
**attorney**
38:25 148:18 160:23
**attorneys**
31:9 33:5,7,16 50:9
51:9 53:7 65:9
127:22 169:14
170:3
**attributed**
51:14
**audible**
45:7
**audit**
38:13
**August**
57:18 58:1,15 62:8
158:20



**authority**
59:9
**authorization**
161:23
**authorize**
18:18 19:2
**authorized**
136:10
**automatically**
14:3 26:19
**available**
14:19
**avenue**
97:10
**avoid**
55:20 113:3
**awake**
167:22
**aware**
14:22 16:22 30:20
33:15 42:1 50:2
63:11,16 97:16
121:18 123:8
**away**
17:2 67:12 71:16
78:16 142:2
**awhile**
28:11 118:22
**a.m**
25:19 36:14 37:1,16
43:16,19 48:8,21
49:10,13

---

**B**

**back**
10:9 17:19 22:13
23:4 29:14 31:24
44:14,18 46:14 48:1
48:16 58:21 61:21
62:24 65:19 78:2
82:20 95:10 97:3
98:5,16 100:10
101:18 114:16
122:6 125:19,21
127:1 130:17,18,19
133:20 134:21

140:24 142:3
144:23 145:2 148:1
150:11,12,15,25
152:11,24 153:1,17
156:15 163:8 164:8
165:10
**bad**
89:20 109:22 113:18
**badger**
64:12
**badgered**
160:17
**badgering**
132:5 160:12
**based**
23:6 24:15 39:3
111:18 149:14,19
151:9 152:24
170:13,21
**baseline**
73:15 82:7 105:13
109:4 110:21
123:14
**basic**
113:14
**basically**
86:8 88:14 111:12
149:5 159:3 161:22
**basis**
64:23 73:16 75:7
168:1
**Bates**
3:13,16 7:10
**be**
5:11,17 6:1,9 13:11
14:4 15:15 17:9,22
18:19 23:4,5 25:4
26:9 27:4 32:8,11
33:11 35:3 41:24
42:1 43:23 44:14,18
45:2,8 47:12 50:13
51:8 58:9 59:3,21
61:9,21 64:18 66:14
67:16 68:25 75:6
77:25 78:19 82:4,7
93:9 95:17 99:20

100:15 101:12
102:4,17,18 106:9
109:18 110:19
112:1 121:5 125:6
126:1,14,14 131:2
132:19 133:3
138:10 139:4,21
141:15,15,18 142:2
151:13 152:10
155:20,21 160:22
160:24 162:10
163:23 167:25
168:23 169:21
173:5
**beautiful**
91:1,2,4
**became**
65:20
**because**
14:1 16:11 18:14
19:16 23:3 32:13
33:10 37:13 39:18
42:1 61:13 65:1
76:7 80:15 81:2,22
92:13,25 93:19
94:16 95:4,22 98:3
103:9 104:14 106:4
109:8,9 110:2,17
111:11,15 115:21
116:4 121:6 125:13
125:18 128:18
129:22 130:1 133:9
133:16,20 135:1
138:14 139:17,18
142:20 143:24
144:6 150:24
151:15 158:14,19
159:6 161:13
165:14,25 166:16
166:25
**become**
157:23
**bed**
75:17,18 109:13
**been**
6:15 9:2,7,11 10:10

11:18 16:10 18:2
22:25 23:1 26:23,24
27:2 28:7,11,12,18
36:10 40:5 65:13
68:7 69:3 70:11,16
74:12 77:1 78:20,20
84:12,12 87:14,25
97:5 101:22 105:15
109:12 110:21
111:11,16 118:6
119:18 135:12
138:8 150:23
155:18 160:3 163:8
**before**
1:18 12:8 29:23
32:19 35:11 37:13
43:17,20 46:19
48:22 65:2 68:22
70:12 71:22 74:9
75:10 76:23 83:6
96:2 104:10 118:9
145:13,15,22
156:14,25 164:19
**beg**
170:16
**beginning**
105:10
**begins**
4:5
**behalf**
4:21,25 51:15 128:16
**behind**
41:23
**being**
4:13 5:4 48:13,25
81:7,8 113:9 116:12
118:24 123:8
**beings**
109:10
**belief**
163:22 164:1
**believe**
22:5,10 102:14 124:4
155:6
**believed**
168:20


MAGNA
LEGAL SERVICES

**bells**
 118:16
**below**
 36:17
**benefit**
 17:1 32:22
**beside**
 131:16
**best**
 15:19,19 66:24 67:21
  86:5 94:25 102:5
  138:10 142:6
  162:24 163:21,25
**better**
 43:22 57:21 82:21
  95:23 140:24
**between**
 25:23 38:25 39:1
  41:15 47:7 101:21
  116:18 173:5
**big**
 90:24,25 91:1
**Bill**
 18:7,11,18 48:4,10
**billing**
 172:4
**Bissegger**
 2:16 4:15
**bit**
 70:22 72:19 83:14
  96:3 119:11 126:6
  132:23 133:4
**blame**
 32:15
**bleed**
 74:25
**blended**
 94:9
**blood**
 83:15,22 88:15 98:15
  98:20 120:17 125:4
  150:13 151:11
  154:17
**bodily**
 24:12,19
**both**

 5:25 6:1 50:24 51:3
  57:16 83:21 103:11
  143:13,16,22 144:8
**bottom**
 7:9,11 8:4,5 9:17
  19:18 59:13 68:6
  81:17 84:4 90:5
  148:13 163:19
**Box**
 173:17
**Brad**
 2:16 4:15
**break**
 10:10 17:10,23 21:19
  36:5 37:6 38:1
  62:18,22 65:15
  126:19,24 129:18
  129:20 138:10
  146:4 147:25
  156:25 157:4,8
**breath**
 160:14,14
**breathing**
 24:12
**brief**
 17:10 139:2 170:13
  170:21
**briefly**
 18:14 49:14 144:9
**brilliant**
 72:2,3 149:23
**bringing**
 141:7
**brink**
 104:18
**brother**
 34:3,13,13 36:9 37:5
  37:12,19 144:25
  145:19
**building**
 28:13
**bullet**
 148:13
**bump**
 43:24
**burdensome**

 131:1
**burnout**
 15:1,5,11 16:16 17:9
  17:22 20:17 21:20
  24:10 26:11 27:2
  35:4 37:8 38:3 60:2
  86:2,4,8,20 87:6,16
  89:16 90:23 93:20
  93:25 94:9,17
  100:21,25 105:16
  106:5 112:21
  113:13 121:1
  122:10 123:22
  137:17 141:11
  142:7 162:6 163:15
  169:16,23 170:4
**burnouts**
 97:7
**burnt**
 102:4
**bus**
 157:21 158:23
**business**
 27:15 129:4 138:8
**busy**
 5:9 143:25

---

**C**

**C**
 2:2 4:2
**calculations**
 41:25
**call**
 12:7,12 18:18,21
  19:1,3 29:6 35:10
  35:25 36:4,8,9
  37:13,20,25 38:6,8
  43:12 46:1 50:16
  104:10 107:13
  114:21 128:8
  164:15
**called**
 7:5 22:25 40:3 47:8
  48:25 50:6 51:11
  65:14 104:15 115:5
  118:8 135:17

 156:13,15,20
**calling**
 18:19
**calls**
 104:18
**calm**
 107:6
**came**
 39:18 66:8 82:2,16
  98:24 99:19 131:25
  138:4 140:24
  145:13,15,25 147:1
  159:5
**can**
 5:10 6:22 10:20 11:1
  13:9 15:18,20 17:15
  19:24 24:8 29:3
  58:5 71:16 75:22
  81:2 83:4,13,18
  84:23 88:15,15,19
  88:21 90:23 93:3
  101:18 105:9
  106:25 112:21,24
  117:5 120:3 121:12
  124:20 125:24,25
  131:23 135:18
  136:12 137:1
  142:16,19 143:23
  144:2,3 145:2,7
  154:21 157:8
  159:24 169:9 171:4
  171:5 172:3
**Cancel**
 6:23
**cancer**
 95:25 96:1
**cannot**
 39:12 45:14 58:9
  61:21
**can't**
 28:10 32:1,13 36:21
  39:17 44:4 55:12,22
  67:13 72:11 94:12
  98:3 115:21 116:25
  160:6 166:8,16
  168:17



MAGNA
LEGAL SERVICES

capability
125:21
capable
22:6,11 23:1 24:17
122:7 140:1 152:7
capacity
22:23
capture
124:12
capturing
124:11
car
151:20 152:13
care
5:24,25 6:2 9:2,7,8
17:10 22:25 23:2
51:21 65:18 66:9,15
72:7,9 73:12,13
76:3,12 94:25 95:17
96:15 97:10 98:11
101:12,24 102:5,21
104:19 109:21
110:20 131:10,18
135:21 137:18
143:21,23,24 150:8
150:10 151:25
152:25 161:11,15
161:17,18 162:4
171:12
career
95:11
carefully
32:10,17 162:17
case
29:16 33:5 47:16
50:15,22 51:15 68:1
117:16 119:21
127:15 130:9 131:8
156:8
cat
87:25
Catholic
1:10 4:7 28:18 52:3
55:8 63:13
caught
76:22

cause
51:1
caused
39:14
causes
16:22
causing
102:4
cease
57:24
cell
12:8 35:11,16 47:15
center
148:10
Central
29:1
Centura
1:10 23:18 28:18
128:25 144:16
157:12 165:19
166:23 167:6
certain
58:9 71:13 151:12
certainly
60:14,25 78:21
117:15
Certificate
3:9 173:1
certification
161:3
certify
173:3,9
chain
48:2
challenges
141:12
change
34:23 40:4 81:2
charge
5:21
chart
68:9 71:20
chat
6:17,19 10:20 33:23
40:13
check

96:1 98:6
checking
147:15
chemo
95:25 96:2
CHIC
51:19,24
chief
138:22
children
112:9
Chitra
40:16 41:9 73:4
chose
66:9
circumstances
71:13 93:21
Civil
1:2 4:9
claim
153:4,7
claiming
15:5 39:2 154:24
163:23
claims
15:15 50:22
clairvoyant
154:5
clarifications
29:20
clarify
121:12
classify
25:5
clear
38:18 68:20 109:19
116:14 123:13
clearer
64:14
clearly
105:24 112:3 154:8
168:10
clerk
4:24 64:6
click
6:19,22 7:7

clicked
7:4
client
109:24
clients
160:24
clinic
20:20,24
clinical
20:17 60:1 136:4
154:15
clocked
106:13
closer
7:23 28:25
closest
28:22 90:11
closing
159:9
clouded
108:8
CO
2:6,12 173:17
code
87:8 89:15,17,19
90:1,9,11
codes
25:1,5,8 85:6,7 89:15
coding
84:17 85:6,8 89:21
102:10
coerced
32:25
cognition
9:20 22:2 63:5 120:8
122:1,20,22 123:7,8
123:24 125:12
132:2 134:9,17
135:9 136:12,15,21
148:15 150:7
cognitive
123:3 149:10 168:2
cognitively
54:13,23
collaboration
96:3



colleague
41:11 66:15 94:17
colleagues
64:5 72:24 87:4
114:22 135:3 136:3
Colorado
1:1,10,20 4:8,9 8:15
28:19 41:7,22,23
52:4 63:14 96:17
148:24 173:3
come
17:19 21:2 22:13
23:3 26:21 43:12
78:2 87:24 98:5,16
100:10 126:10,10
147:25 150:11,12
153:1 154:16
160:13
comes
7:5 12:7 35:10 69:18
73:16 77:20 118:25
141:9 153:24
154:22
comfortable
23:1 37:7 38:2 42:18
42:19 94:18,20
164:25 165:13
166:17
coming
14:2 92:15 94:11
124:23 131:9,10
146:10 150:15
155:10 159:16
161:2
commencement
173:4
commencing
1:17
comment
141:22
comments
149:14
COMMISSION
173:20
commit
153:15 158:12,15

committed
153:19
CommonSpirit
1:11 28:20 143:8
144:17
communicate
23:17 53:13,21 55:15
55:16 59:6 60:20
61:7,14 128:24
138:24 139:18,21
141:13 157:22
158:18 165:18
166:1,5,14,21,23
167:5,7 168:7
communicated
116:22
communicating
24:13 51:19 63:13
138:23 158:11
168:12
communication
63:8 112:13 139:1
140:18 141:12
communications
39:14 51:24 52:1,3
140:3
community
87:6 93:24 105:5
companies
87:8 102:11
compared
108:13 109:4 110:21
123:14
comparison
105:8,13 112:14
compensatory
50:20
complained
70:23
complaining
78:12,19
complains
75:15 77:20
complaint
15:11
complete

21:7,11 80:19 110:15
110:16
completely
54:13,23 81:9 106:9
111:25 140:7
complex
74:25 138:6
complicated
115:16
components
135:25 136:7
computer
7:2
concern
48:23 120:20 125:6
129:23
concerned
129:23 130:2 135:2
135:15 142:3
concerning
173:6
concerns
9:19 10:7 22:1,16
45:20 46:24 63:4,6
63:8 120:6 121:25
122:20 123:23
124:20 125:1,12
132:2 134:4,9,16
135:8,24 136:14,20
136:23 141:22,25
142:9,12 148:14
150:6 165:3
conclude
168:1
concluded
172:10,16
concludes
172:7
condition
15:14 17:9 18:12,23
21:8 24:10 25:9
26:17 31:5 59:21
131:17 170:4
conditions
25:6 50:19,24,25
75:4 97:13 104:4

111:3,19 121:22
125:15,16 133:17
139:14 171:13
conducting
24:17
conference
41:1
conferring
33:5
confident
60:15,19
confidential
8:4
confidentiality
9:1
confirm
120:12
confirmed
120:12
connect
144:8
conscientious
77:13
consider
41:9
consistent
82:2,5,6 100:15
112:19 114:5 139:4
139:21 140:18
141:13
constantly
68:17
construed
113:9
contact
33:20 39:9 51:10
115:10
contacted
162:12
contemporaneous
124:6
context
149:22
continue
5:12 57:16
continuing


MAGNA
LEGAL SERVICES

54:1
**continuity**
96:14
**contract**
13:12 14:20 157:11
159:18
**contractor**
111:24
**contractual**
39:2
**control**
88:21
**controversy**
173:5
**conversation**
8:23 55:12,23 58:7
68:22 70:22 87:2,5
95:13 118:23
144:11
**conversations**
113:3,4,15
**conveyed**
93:8
**cooperative**
167:22
**copy**
171:22 172:1,3
**corner**
52:19
**corporation**
27:21
**correct**
5:18 10:12 11:14,15
11:17 15:12 16:24
19:12 20:18,21 25:2
25:3,17,18,20,21
30:11,14 35:24 36:1
38:4,10,15 40:17
43:25 44:5,6 47:10
48:8 51:12 53:15
67:6 69:6,11,16
70:6,9,19 71:15
74:23 78:25 79:9,18
79:20 80:17 83:8,24
85:11 86:25 88:9,25
90:2,14,17 91:13,16

92:10,17 93:15,18
94:4,7 95:2,6,19
99:16 100:23 101:5
101:7 104:11 105:7
107:3 108:9 110:14
114:8 117:19
119:10 125:5,10
129:7 130:4 131:20
137:12,25 146:11
146:21 149:21
150:7 163:21 164:1
168:24 169:4
170:21,25 171:1,15
173:8
**corrections**
32:3,5
**correctly**
13:14 18:5 37:10
54:7 74:22 100:22
108:16
**correlate**
111:12
**correlates**
85:9
**could**
6:1 22:7 23:17,24
27:2,4 43:12 49:18
55:25 56:5 57:22
66:6 71:11 78:19,20
78:20 94:21 95:10
98:9,9 106:9 107:2
113:5 117:2 128:24
133:25 134:2
135:17 136:5,8
139:21,21,25
141:15,15,18
151:13 157:4 159:7
162:24 165:18
168:6
**couldn't**
91:18 150:23 157:22
166:5,21
**counsel**
4:18 29:24 51:15
56:3 58:22 61:1
114:24 115:2

118:11 127:25
156:22 165:22
173:10
**counting**
45:8
**couple**
16:25 36:17 41:3
48:22 49:1 77:17
104:7 123:17
140:10 151:24
**course**
30:5,24 35:17 64:3
**court**
1:1 4:9,16 5:2 31:10
68:20 119:21
128:11
**cover**
81:8 107:2 144:2
**coverage**
29:6 111:22
**CPHP**
7:4 8:18,25 10:14
18:16 63:3 96:18,21
98:2 100:8 148:5,20
148:23,23 162:7,10
164:11,22 165:2,5
**create**
67:7,20 159:3
**created**
118:12
**creating**
88:1
**credentialing**
158:17
**crisis**
104:18
**criteria**
84:13
**curious**
77:19
**current**
87:23
**cut**
19:19 68:16
**cutting**
87:9

**D**

**D**
3:1 4:2 16:2
**daily**
34:25 64:23 73:16
75:6 108:11,21
109:14 110:9
111:20,24
**damage**
111:21
**damages**
50:20,22
**Dana**
41:1
**data**
84:15 96:19
**date**
36:19 39:1 43:2
168:7 172:9
**dated**
48:7 118:14
**dates**
46:18
**day**
36:4 37:2 43:22
45:13 46:13,20
64:24 65:15 78:7,21
80:12 101:10
103:25 120:19
121:3,4,6,13,16,17
122:7 140:25 150:3
150:17 151:8 152:3
152:8 153:14,20
165:11 173:12
**Daylight**
41:22
**days**
25:19 46:18 145:13
145:15
**deal**
57:22 111:23 137:24
**dealing**
102:10 112:1 163:15
**decades**
74:13 99:1,15 138:8


MAGNA
LEGAL SERVICES

**decisions**
138:11 139:1
**declaration**
3:20 29:16,20 31:19
31:24 32:10,16,18
32:23 33:2,7 118:9
123:23 128:19
132:20 133:5
162:16 163:6,13
164:12,23
**declare**
163:20
**decline**
19:14
**declined**
19:16
**deep**
140:13 141:10
**deeper**
159:14
**default**
160:22,22
**defeat**
116:13
**defendant**
117:16
**defendants**
1:12,16 2:9 4:14,22
128:8
**defense**
114:24 115:2 118:11
127:25
**defenses**
50:22
**defensive**
112:25
**definitely**
17:1 43:21 64:11
**deliver**
110:20
**delivering**
110:21
**denied**
48:13,25
**Denver**
2:6,12

**departure**
112:16 114:1
**Depending**
143:12 170:8
**DEPONENT**
21:17,23 25:12 55:11
60:10 61:20 62:13
62:19 73:23 81:1
86:25 92:10 98:14
99:11 101:16 103:4
106:2,21 107:9,22
108:23 109:6,16
110:23 111:10
116:21 122:15,24
126:17,20 128:6
135:15 136:2
138:13 139:8,25
140:23 141:18
142:15 145:9
147:12 152:18
155:2 156:13 170:8
**depos**
132:15
**deposition**
1:4,15 3:7,18 4:5,13
5:14,20 29:15,19
52:24 57:11 99:10
118:20,24 148:4
161:16 172:8,16
173:6,8
**depressed**
89:25 90:6 136:25
154:9
**depression**
75:9,19 88:2,5 90:21
94:6 101:1 103:18
103:20 105:17
106:4,14 112:21
113:13 121:2,17
137:17 169:17,24
170:5
**depressive**
74:4
**describe**
12:12
**described**

70:8,17 71:6 103:6
156:23
**describing**
70:5
**description**
88:11
**despite**
51:7
**detector**
156:5,6
**determine**
170:12
**devastating**
71:14 101:22
**developed**
78:12,14 88:7
**device**
68:5 69:5
**Di**
16:2 17:16 18:15,22
46:1,7 47:8,12
93:16,19 94:16
96:11,13 97:24
125:20 133:7
135:17 136:8 138:1
138:17 139:9 142:4
161:12 163:16
165:7,7 169:3
**diagnose**
21:14 87:16 104:4,5
130:10 131:15
134:19 141:10
154:17 168:22
**diagnosed**
86:1 87:18 105:16
121:21 125:13
139:13 140:19
**diagnoses**
84:1 85:23 94:21
100:20 112:20
114:5 122:19,21
123:2 129:20
133:24 134:4
146:19
**diagnosing**
131:17,18 142:7

**diagnosis**
31:5 37:7 38:2,9
50:24 89:16 91:1
127:8
**diagnostic**
16:7 84:4,13,14,24
85:13,21
**Diana**
16:2 18:4,22
**didn't**
16:12 22:13 23:3,12
30:16 46:11,15
47:16 51:25 61:24
71:9 92:23 93:6
100:10 101:11
103:15 110:25
115:10 119:4
124:20 128:20
129:3,25 131:2
132:1,12,14 136:4
139:17 146:3,11,12
146:13 150:5 151:6
153:15,19 157:6
158:12,15 161:15
161:16,23 162:3,4,4
162:18 163:2
164:10 165:24
166:5,9,22,25 167:1
167:3
**died**
87:25
**Diego**
41:8
**differences**
11:1
**different**
73:17 84:17 101:13
123:18 134:15
146:7,24,25
**difficult**
88:18 109:3,3,12
110:12,19 112:2
126:14
**difficulty**
108:20 125:23 136:3
**director**



MAGNA
LEGAL SERVICES

18:9
**Disabilities**
21:3 130:13
**disability**
14:20 21:9,15,21
39:3 50:19 127:13
128:12 130:10,11
130:12,20,25 131:4
131:11,15 144:13
144:17 155:18
157:14 161:2
**disarray**
107:13
**disclose**
31:4
**disclosed**
127:10
**disclosure**
51:6
**disclosures**
50:1
**discrimination**
5:21 127:12
**discussed**
70:10 103:24 135:23
**discussing**
129:6
**discussion**
47:20 49:17 84:2
146:22 153:23
156:9 172:6
**disinterested**
71:10
**disorder**
87:19,22 89:25 90:4
90:5,12 100:20
101:1 105:17 106:5
110:3 121:1 123:22
141:11
**disorders**
88:2 89:21 94:3
121:21
**dispute**
10:2 37:18
**disqualify**
170:2

**District**
1:1,1 4:8,9
**doctor**
66:6,10,15 68:13
80:20 92:20 93:24
99:19 105:5 111:2
131:25 132:24
137:2,23 141:6,21
158:19
**doctors**
86:22 89:10 103:25
122:10 140:9
169:22
**document**
24:23 25:14 26:7
27:8,14 34:9 41:14
67:13 69:17,18
119:1,7,18 129:9,10
145:22 148:3
163:12,12
**documentation**
58:7
**documented**
60:18 68:9 115:23
137:1 166:10
**documenting**
69:8,12
**documents**
59:23 60:6,6,22,22
61:8,9
**does**
5:24 9:10 12:11 19:8
21:20 25:22 30:8
39:24 42:8 49:16
62:8 77:22 82:25
100:11 103:5
104:18 105:17
108:16 110:5
118:16 123:6
124:16 128:4
129:12 170:5
**doesn't**
26:3 76:9 93:13
103:1 119:20
123:24,25 124:12
125:22,25 128:19

128:22 129:10
151:12 168:1 170:2
**dog**
87:24
**doing**
5:11 11:5 53:6 57:13
63:17 74:20 109:1
111:19 117:12,17
117:18 122:7 126:4
134:1,2 146:8
147:21 152:7
156:19
**done**
10:16 39:18 83:12
136:8 142:9
**door**
94:13
**dose**
20:7 93:2,3
**doubt**
22:23
**down**
9:16 12:5 16:25 17:3
36:13 67:16 79:2,23
83:11,14 88:1 106:9
106:10 146:3
148:12
**draft**
34:13,22 119:4
145:18
**Dragon**
68:14,14 69:5,8
**dreading**
75:17
**dressed**
167:24
**drive**
45:1 152:12
**driven**
72:5,6
**drunk**
152:12
**due**
21:20
**duly**
5:4

**duration**
21:8 26:18
**during**
22:24 36:3 39:7
50:15 59:23 70:17
79:7 114:6 144:10
**duties**
34:25
**duty**
66:2 67:4,4,7
**dynamic**
66:11
**d/b/a**
1:10

---

**E**

**E**
2:1,1,2,2 3:1 4:2,2
**each**
35:19 68:16,18,21
70:21
**earlier**
70:11 71:17 84:2
91:17 93:19,24
101:4 102:3 107:1
114:19 120:11
123:12 135:23
136:13 137:3
139:14 143:2
144:20 146:23
147:5 167:8
**earliest**
25:25
**early**
65:4 97:16 124:1
**easier**
102:19
**easy**
68:20 125:2
**edge**
109:19
**edit**
39:15
**edited**
38:14
**edits**



119:13
**effect**
60:18
**effectively**
169:15
**effects**
81:5 92:16,20 93:4
93:10
**effort**
33:20
**egg**
113:7
**EHR**
84:6
**eight**
35:3 37:6 38:1 40:4
146:23
**eight-week**
34:24 38:9,19 39:5,9
39:21
**either**
29:15 32:6 42:18,22
102:19 160:6
171:22
**Electronic**
172:14
**elevated**
82:23 83:16 171:12
**else**
5:10 102:8 106:12
125:8 146:8 161:24
**email**
3:14 34:3 48:3,4,11
49:12 144:20
145:14 146:24
**emailed**
115:5 144:25
**emails**
37:4 38:24 48:2
157:10
**emergency**
12:7 35:10 36:3,8,9
37:13,20 43:12
**employed**
157:24 173:10
**employee**

23:21 129:2,5 157:12
165:21
**employer**
55:16,17 58:24 59:7
139:2
**employers**
127:11 128:2 131:5
**employment**
23:19,19 54:3,10
55:1,21 56:1,6,10
56:20 57:18 58:14
61:16 62:6 63:14
97:17 99:18 129:1,4
137:4,6 138:6,22
157:25 165:19
**employment-related**
57:25
**EMR**
16:12
**end**
7:23 43:22
**endeavor**
146:6
**ended**
45:17 127:13 138:21
**endlessly**
160:18
**engage**
54:17 55:7 60:2,21
61:7 109:13
**English**
90:19
**enough**
35:3 94:20
**ensure**
32:11,18 162:17
**entered**
107:15
**enthusiasm**
13:12 71:9 110:18
**entire**
102:22
**entirely**
16:17
**entirety**
94:2

**entity**
27:15,20
**entry**
10:6 20:13 36:23
**errors**
76:19,22
**especially**
95:16
**ESQ**
2:4,5,10,10
**essence**
157:22
**et**
4:8
**evaluate**
18:4 162:5 169:7
**evaluated**
162:10
**evaluating**
130:20,25 155:18
**evaluation**
24:9 162:11 163:16
**evaluations**
131:4
**even**
14:23 65:24 66:9,23
73:12 92:23 93:3
101:8 102:24
103:18 113:14
115:12 119:19
125:7 128:19,22
129:3,5 142:11
147:3 163:9 167:4
169:15
**event**
99:6,21 101:19
173:11
**eventually**
84:13
**ever**
14:3 15:4 21:11,14
22:15 23:10,16,23
28:17 32:21 33:15
33:19 50:5 51:9
55:14,19,20 56:9,19
57:2,23 58:11,12,19

58:23 59:5,6 60:4
62:1 87:15 98:24
**every**
38:14 64:24 67:21
68:10 82:16 103:25
**everybody**
86:22 103:24
**everything**
32:18 84:24 102:8
107:4 139:22
**evidence**
38:18 119:19 135:11
**exact**
41:25
**exactly**
19:1 67:2 85:1
107:17,17 115:7
120:15 124:10
**exaggerated**
69:18
**exaggerating**
161:3
**exam**
79:23 80:1,5 81:16
81:18 82:10,11 84:7
**examination**
3:2 5:6 63:22 147:19
167:17 171:9
**examined**
5:4
**example**
119:8 128:23
**excellent**
23:2 72:8,9
**Excerpts**
3:18
**exchange**
32:22
**exchanged**
43:7
**excuse**
30:12 74:1 121:22
126:17
**exercise**
66:2 124:2
**Exhausted**


MAGNA
LEGAL SERVICES

147:22
**exhaustion**
26:12
**exhibit**
3:9,11,14,18,20 6:15
6:16 7:10 10:16,18
16:5 27:8,9 33:23
34:9 36:11 40:8,9
40:15 43:1 47:19,21
48:17 52:11,12
69:23 117:23 118:2
118:6 148:2 163:12
167:12
**Exhibits**
3:7 173:8
**exist**
119:20
**existing**
88:4
**expect**
78:11 80:20 111:4,8
**expected**
51:2
**experience**
15:4,14,23 64:23
93:20 103:18
106:15 107:6 112:1
126:6 138:25 139:3
140:17 154:24
161:1 163:15 164:6
169:23
**experienced**
69:13 78:6
**experiencing**
15:15 26:11 103:1
133:9,17 139:5
153:25 154:22
169:16
**expert**
50:1,17,18 51:3,8
**expertise**
55:6 138:18 162:5
169:7
**experts**
168:23
**EXPIRES**

173:20
**explain**
81:22
**explained**
70:12 77:23 115:19
116:2,7
**explaining**
101:8 116:17 137:13
**Explains**
8:25
**explore**
29:14 51:10
**expressed**
156:14
**extent**
137:25 151:23,24
**extreme**
79:15 110:10 112:6
**extremely**
79:14 80:8,22 81:23
83:22 167:21
**ex-colleagues**
144:2
**eyes**
137:14

_____
**F**
_____

**facets**
101:14 102:25
**facilitator**
95:17
**fact**
50:1,16 51:3,7,8,17
100:10 101:12
139:16,19 151:11
152:2 157:9,10,13
**facts**
33:17
**factually**
51:16
**fail**
139:20
**failed**
138:24 139:18
**failures**
141:12

**fair**
85:24,25 113:21
134:9,10,10
**false**
155:11
**familiar**
75:3 94:22 96:21
127:16 130:15
**Family**
21:3 131:5
**fantastic**
69:22 109:22
**far**
61:22 94:12 121:17
136:5 173:5
**fast**
7:22 88:16
**faster**
45:5
**fatigue**
86:9
**favorable**
33:11
**fear**
89:1,3,6 113:4,9
**fearful**
113:14 154:8
**February**
84:21
**feedback**
96:13
**feel**
24:2 73:21 74:2
75:16 76:9 108:16
123:19 154:6,6
**feeling**
14:11 40:2 57:21
64:15 73:25 75:17
88:13,17,24 113:10
113:11,12 127:9,9
127:11 140:12,13
140:13 156:10
**feelings**
14:13 108:4
**feels**
12:23,25 13:1,7,9

14:9 37:6 38:1
79:14 81:10 113:7
**felt**
14:15 108:23 131:23
132:19 133:4 152:6
164:22
**fester**
103:20
**few**
86:13 115:7 118:23
147:17,24 151:8
**figure**
39:20 41:25 111:21
128:17 169:11
**file**
7:4
**filed**
31:10
**filings**
128:11
**fill**
92:24 131:6,11,13
144:14,18
**final**
63:3 69:1
**finally**
108:4
**financial**
138:16
**find**
61:12,16 143:6
**findings**
79:7,19,22 80:5
133:24
**fine**
26:23,24 31:17 40:21
136:5
**finer**
100:24
**finish**
26:1 44:22 46:11,15
68:18,21 148:1
**finished**
26:6
**fired**
139:17



MAGNA
LEGAL SERVICES

**firm**
 30:10,13 114:20,21
**first**
 5:4 7:12 8:23 9:14
   11:21 12:2,11 14:24
   16:15 17:5 27:16
   42:3 43:15 70:2,11
   71:20,25 82:19
   89:15 103:13
   114:15 115:1 148:3
   163:15,19
**five**
 9:17 20:1,1,16,21
   65:7,8 67:14,16
   96:7,10,17 98:7
   126:19
**five-minute**
 62:18
**flowed**
 83:22
**focus**
 92:5 106:11
**focused**
 107:22 157:9,10,13
**focusing**
 107:19
**follow**
 14:13 20:9,16 96:6
   98:17 125:19
   129:22 150:12
   158:1 159:11
   168:23
**followed**
 54:17 98:19 161:5,17
**follows**
 5:5
**followup**
 17:20
**follow-up**
 20:20 22:14 23:4
   77:25 78:2,4 91:22
   92:3 142:21 153:2
   161:11 162:4 171:5
   171:5
**foot**
 45:6

**foregoing**
 163:21 173:7
**forever**
 87:9
**forgiveness**
 137:6 138:7
**form**
 15:16 17:12 21:16,22
   22:20 25:11 33:9,12
   49:2 52:7 54:19
   55:9 56:11,22 57:5
   58:2,16,25 60:8
   61:18 62:9,12 73:22
   75:20 81:12 99:7
   100:1 101:15 103:3
   105:2 106:1 107:20
   112:11 113:16
   121:8 122:3,14,23
   123:4 124:17
   126:16 128:5
   129:14 132:10,25
   134:13,22 135:14
   136:1 138:12 139:6
   139:23 140:21
   141:16 142:14
   147:10 150:20
   151:1,17 152:16
   153:10 154:2,11,25
   155:12 156:1,11
   157:17 158:7,24
   159:19 160:2
   161:19,25 162:13
   162:19 168:3,25
   169:18 170:6 173:7
**formal**
 21:7
**former**
 128:2
**forward**
 118:12 158:17
**found**
 80:7 157:1
**foundation**
 33:13 52:8 54:20
   55:10 56:12,23 57:6
   58:3,17 59:1 60:9

 61:19 66:12 74:6
 78:9 80:25 81:11
 86:24 92:9 98:13
 99:25 105:25
 106:20 107:8,21
 108:22 109:5,15
 110:22 111:9 139:7
 139:24 140:22
 141:17 147:11
 150:21 151:2,18
 152:17 153:11
 154:3,12 155:1,13
 156:2,12 158:25
 159:20 161:20
 162:1,14,20 168:4
 169:1,19 170:7,14
 170:22
**four**
 9:16 20:3,10,16,21
   39:23 52:18 65:8
   92:3 96:7,9,16 98:7
   145:13,15
**fourth**
 148:13
**framework**
 105:18 108:12
**FRANCIS**
 1:11
**frankly**
 65:1
**free**
 49:13
**frequently**
 75:5 92:6,12 93:25
   97:25
**fresher**
 67:15
**former**
 128:2
**Friday**
 5:11 46:10,17,19
**friend**
 41:10
**friends**
 72:22
**from**
 3:14 6:11 8:15,22
   9:17 11:1 12:21

 13:10,20 14:2,16
 17:2,10 21:2 24:9
 29:16,21 30:6,25
 32:4 34:3,25 39:4
 39:18 40:4,13,16
 41:7 42:13 43:16,24
 44:7 45:1 48:4
 51:19 61:20 62:22
 63:13,17 65:5 71:17
 73:11 83:22 87:3
 88:4 90:23 96:13
 97:24 112:16 114:1
 114:20 119:19,24
 122:11 124:23
 126:5,24 133:16
 135:12,18 137:11
 137:21 138:1 139:9
 144:16 146:4
 148:13 151:20,21
 161:1,14,22,24
 162:5,9
**front**
 145:11
**fruitful**
 95:11
**full**
 124:11,13
**fully**
 22:6,11 24:16
**full-time**
 95:11
**function**
 38:13
**functioning**
 108:12 149:6
**functions**
 24:12,19 25:10
**funny**
 91:2
**further**
 79:2,23 82:11 83:14
   173:9
**future**
 61:15

_____
_____ **G**



**G**
4:2
**gathered**
31:1
**gave**
10:14 32:2,5 46:9
47:15 84:1 85:22
112:20 114:6 123:2
**Geez**
50:10
**general**
6:10 80:2 82:6 86:6
103:22 113:2
139:13
**generally**
72:13
**genuine**
161:7,7,8
**genuinity**
155:19
**get**
10:9 13:9 27:5 45:17
46:1 49:23,23 64:10
64:13 83:1 88:20
91:2 94:25 95:1
97:2 108:4 109:13
110:4 111:1,23
112:2,25 119:24
125:20 133:7
134:20,25 135:17
136:9 137:23
147:24 150:25
157:1,8 159:7,9
160:9 161:23 162:3
162:4,4 164:24
165:23
**gets**
165:6
**getting**
6:10 75:17 76:10
97:24 98:1 102:12
108:20 110:8,12
137:16 151:15
**girl**
41:6
**gist**

12:12
**Give**
62:17
**given**
63:11 107:4
**gives**
76:4,13
**giving**
108:6 119:8
**go**
6:24 11:3 16:8 17:15
36:13 42:24 48:1
51:13 56:6,25 59:14
61:21 64:19 65:19
70:20 73:21 74:2
75:16 76:10 79:10
81:17 83:4 84:18,18
85:12 86:7 91:25
94:15,25 95:10
96:10 97:6 103:15
107:2 108:2,17
120:3 126:12
133:15 135:2 136:8
143:11,13,14 144:2
144:23 145:7 146:5
152:12,14 160:14
162:7,9 164:8 169:9
172:3
**God**
7:17 41:5,7 89:20
**goes**
113:8
**going**
6:15,16 18:2 37:5,25
38:19 45:21 62:7
64:16,18,19 68:19
69:14 70:15 71:5,13
75:18 80:22,23 81:3
81:3,4 85:16 87:23
93:10 94:24 95:18
97:9 98:5 99:5
101:14 106:15
108:3,7,24 110:6,9
110:19,19 111:8
112:7 114:23 117:8
118:5,20 119:12

122:6 123:16,17
124:8 125:21,24
126:1,14,14 129:13
133:7,15 134:19
135:22 140:11,25
142:3,20,20 149:10
150:8 151:10,25
152:10,11,14,25
155:21 157:23
158:16,18 165:10
168:19
**gone**
86:7 98:10
**good**
7:2,9 8:14 26:9 63:24
63:25 67:4 72:24
89:22 109:22
110:17 117:14
122:13 126:1
128:23 130:7
139:12 150:14
160:24
**goodness**
7:18 65:6
**Google**
45:5 143:6,18
**gosh**
8:20 60:23 98:24
**got**
7:19 8:9 13:7 17:7
30:24 34:8 40:12
44:7 48:23 51:9
68:4 84:13 96:15
98:10 109:9 117:4
121:5,14 127:8
138:4 161:18,22
**gotten**
161:11
**Great**
9:16 70:2
**greater**
169:6
**green**
89:10
**Greenwich**
41:21,22 49:9

**groomed**
167:24
**group**
130:24
**guess**
9:9 29:17 37:22
44:23 46:17 48:9
72:18 78:4 98:9,20
100:9 109:2 118:22
119:2 135:7
**gut**
40:1
**guy**
72:2,3,15,17
**guys**
42:14 91:6

---

**H**

**had**
14:18,20 15:4,4
17:16 22:24 23:13
26:21 28:16 29:24
32:4 33:8 35:16,18
40:3 41:8 44:14,18
46:10 47:20 60:1
61:6 63:4,6 71:5,18
71:22 72:9 73:1
76:19 79:16 83:5
84:10 87:14,25
104:9 105:14
107:13,18 108:13
108:14 110:10,21
111:20,22 112:14
112:14 113:15
114:14 115:23
118:12 120:6,17,23
121:25 123:23
125:1 127:20
129:23 134:4,8,16
135:8,24 136:20
141:22,25 142:8,9
142:12 149:25
150:24 151:21
152:2 153:4,7,17
157:13,14 160:25
161:9 163:8 165:3,8



166:20 167:5 172:6
**hadn't**
107:15
**hail**
111:20
**half**
150:24
**Hall**
2:11 114:20,22
**hand**
7:10 81:23,24
**happen**
77:11
**happened**
32:14 58:8 67:14
77:8,15 144:11,12
**happening**
89:6,7 110:6
**happens**
155:15
**happy**
47:12
**hard**
73:8 77:3 87:11 89:7
90:8,15 102:8
103:19 109:10
125:13 126:1
132:21,21,22
133:19,20 135:3,4
**harder**
105:23 106:10,10,11
**harmed**
76:23
**has**
9:1,7,19 10:7 28:17
36:18 41:19 43:1
50:20 76:11 79:15
79:16 88:8 93:20
98:2,15 101:20,22
101:23 103:11
110:15 114:22
117:18 119:18
121:17 123:14
125:4 130:12
148:14 151:11
153:6

**haven't**
65:17
**having**
21:15 23:8,11 34:13
39:13 90:15 108:3
108:20 113:14
135:2 143:7
**head**
145:7
**health**
1:10,11,11 4:7 8:16
9:20 15:1 18:16
22:2 23:18 28:18,19
28:20 51:2 52:3
55:8 63:5,13 75:1,4
92:7 95:16 96:18
104:25 105:4 120:7
120:16,21 121:7,15
125:2,3,7 128:25
129:24 135:8
136:24 146:19
148:15,24 150:6,10
163:17 165:19
167:6
**healthy**
83:1
**HEALTH-PENRO...**
1:11
**heard**
71:17 89:9
**heart**
83:4,21 88:16 151:14
151:21 154:21
**Heath**
2:11 114:21
**help**
13:21 14:10 18:4
22:25 49:16 65:13
79:21 88:21 97:1,24
98:1 104:16 106:16
106:17,18 117:5
125:20 131:9 133:7
133:22 135:18
138:2 142:15,18,24
**helpful**
10:11

**helps**
30:19 97:7
**her**
18:23 19:1,5 41:4,6
46:3,6 47:15 50:16
54:17 97:25 98:1
131:25 160:17
161:14,16 165:8
**here**
5:17 48:3 60:16
62:17 64:5,12,13,25
65:1 73:16 74:8
81:25 84:4 105:11
106:9 117:8 126:6
128:12,15,16,16
130:7 132:23 141:8
144:3 158:4 159:14
164:21
**hereby**
173:3
**herein**
173:10
**here's**
131:10
**herself**
14:9 41:12
**hey**
40:4 98:5 124:10
131:10 160:5 167:5
171:5
**he'd**
98:22
**he's**
10:9 23:5 34:14
37:12,24 39:6,20
43:23 46:12 47:8
48:23 64:7,8 66:5
66:10 75:23,24 76:9
76:10 78:12,19
80:21 81:3,3,4,7,8,8
81:23 82:5 83:3
86:7,17 92:19 97:18
97:24,25 98:1,4,10
99:14,23 100:4
103:1,2 106:16
107:5 108:15,20

111:5 113:7,12,23
113:23 120:23
127:21 131:22
132:6 139:22
140:11,12,12,13,19
147:3 149:23 153:3
153:4,7 154:8,8,9
**high**
82:17 83:21 88:15
125:4 151:21
**highly**
65:17
**himself**
14:8 66:7,7 95:22
**Hippocratic**
65:20
**hire**
139:17
**histories**
156:7
**history**
12:3,16 13:5 70:3
**hold**
36:20 91:21 130:8
**home**
111:13,20 169:9
**honest**
69:12 72:15 124:7
**honestly**
31:15
**hook**
154:7
**hope**
117:13 163:4
**hopefully**
78:17 83:13
**hoping**
121:12 157:1
**hospital**
18:10 23:18 28:19,22
28:23,25 29:1,3,11
94:19 101:21
115:15 128:25
144:7 148:23
150:25 165:19
**hospitals**


MAGNA
LEGAL SERVICES

96:24 102:11
116:12 128:2,9
138:21 143:21,23
143:24
**hour**
1:17 36:5 43:13,24
45:3 150:24
**hours**
41:23 43:17 49:9
**how**
6:5 11:18 14:11
27:15 28:7 35:15,20
41:5 62:14 64:14,15
71:25 73:7,16 78:11
81:9,21,22 84:22
97:25 98:22,24
108:13,14 109:21
109:23 111:2
118:20 120:1 121:6
123:19 125:25
130:15 137:4 140:1
142:19 147:21
163:10 164:21
**however**
20:9 34:19,23 51:22
79:16
**HTN**
20:17
**huge**
138:14
**human**
109:10
**humanity**
132:23
**humans**
68:16 117:3
**hundred**
58:9
**hurt**
76:3,12 131:24
132:20 133:4
**husband**
28:6,16 30:18
**hypertension**
19:10 100:9 120:17
134:20

**I**

**ICD**
89:16,19 90:1
**ICD-10**
25:1
**idea**
6:10 41:8 44:25
64:22,23 107:24
110:3 122:13
138:17 139:12
140:5 165:9 166:15
**ideations**
79:17 104:9
**identification**
27:10 40:10 47:22
52:13 118:3
**identified**
97:13
**identifying**
9:3
**if**
6:17 7:14 13:1,9
17:22 18:9 20:5
22:24 23:13 26:8,11
26:21 31:13 36:13
40:3 41:13 42:18
43:23 44:14,18
48:16 50:6 51:11,15
52:17 55:20,25,25
56:5,5 61:6 65:16
66:6 69:2,22 72:1
74:21 77:11 79:10
81:3 82:15 83:3,5
93:13 94:24 95:24
97:23 99:19 102:19
108:5 110:15 112:6
115:5,18 116:7,11
121:10 123:18
124:19 125:7
127:18 132:4
134:16 138:4 141:1
141:2,9 142:8,8,11
142:12 147:3,15
148:8 152:10,11,13
153:25 154:21

156:19 157:2,13,17
158:7 161:9 166:10
166:12 167:4 170:4
**II**
3:19
**illness**
12:3,16 13:6 21:21
70:3
**imagine**
75:10 77:4 96:4
131:23
**immediately**
129:24
**impact**
106:5
**impacted**
103:11
**impairments**
122:21 123:3
**imply**
21:20
**important**
67:11
**impressions**
64:20 162:12
**improved**
134:1
**inaccurate**
163:6
**inappropriate**
132:10 164:21
**inclined**
124:4
**include**
153:8,13
**included**
23:14 148:4 164:23
**includes**
25:1 38:13
**including**
120:5
**incoherent**
107:12
**incorporate**
147:6
**independent**

28:1 66:2 69:13,19
124:2,14 147:7
**Indian**
12:6
**indicate**
101:3
**indicating**
38:18
**indication**
153:19
**indications**
110:11
**individual**
86:14
**inform**
23:7
**information**
31:4 32:8 50:13,18
50:21 97:22 106:11
163:22,25
**initial**
3:7 39:8
**initials**
8:25
**initiative**
115:11
**Initiatives**
1:10 4:7 28:19 52:4
55:8 63:14
**injure**
152:14
**injury**
96:4
**inner**
14:13
**instance**
15:10 107:16
**instruct**
23:16,23 60:4 128:24
165:17
**instructed**
137:5
**instructions**
54:18
**insufficient**
26:19



insurance
87:7 102:11 143:13
intelligence
136:5
intelligent
23:5
intended
25:8
intensity
170:9,12
intent
132:13
interact
112:8
interactions
112:22 113:1,22,24
interest
86:12,16 109:21
110:16 127:5
interested
86:9 173:10
interfere
24:10
interference
24:18
interferes
25:10
internal
3:9 11:11 27:23
74:21
internist
74:15,20
interpersonal
86:10
interpret
136:15
interpretation
137:22
interpreted
54:16
interrogated
173:6
interrogation
173:9
interrupt
10:24

interval
17:2
interview
31:20 32:4 148:5
170:13,21
interviewed
29:23 31:19
interviewing
158:14 168:11
into
7:5 64:10 69:4,5,8
74:25 82:16,22 83:6
84:17 98:25 103:15
111:1 129:4 145:25
146:10 147:7
introduced
115:18
involved
33:5
irrefutable
163:24
irritability
112:15
irritable
79:15 111:5
isn't
42:18,19 78:5 94:11
119:6 135:11
154:14 157:3
issue
25:9 84:3 90:20
104:25 105:4
issues
15:1 23:8,11 57:22
59:22 60:5 86:11
88:7 92:7 115:22
153:9 163:17
issuing
96:2
I'd
6:14 10:17 16:4 27:7
31:13 33:22 35:8
36:10 40:7 47:18
48:1 49:20 52:10
148:2
I'll

15:19 18:19 30:23
33:4 34:2 42:10
68:8 74:8 79:13
82:21 91:8 95:7
100:3 109:8 114:18
114:21 119:17
124:25
I've
28:12 66:22,23 89:12
97:5 111:11,16
113:15 117:4 138:4
138:8

**J**

January
1:17 3:2 4:1,11 84:21
172:9 173:12
Jeremy
2:16 4:25 64:6
job
84:1 86:9 87:11
102:13 116:11,13
124:3 127:18,23
147:4 156:25
158:12
jobs
158:12
journals
86:21
judges
66:24
judgment
51:18 66:2 69:19
74:3 124:3,15 141:6
147:7
July
95:12
jumbled
109:9
jump
66:19
jumped
65:13
June
149:18,19 164:13
justification

92:13
justify
159:17

**K**

K
2:10
keep
91:8 115:8 122:11
144:6 150:15
kept
115:8
kids
111:14
killed
87:25
Killian
2:11 114:20
kind
26:11 49:19 55:5
59:9 61:25 86:17
88:20 90:8,12,14
94:9 96:25 97:1
98:4 107:4 110:8
111:12,19 116:10
116:17 119:12
120:11 121:14
122:9 131:16 135:3
136:13 138:15
153:8 154:20
knew
15:24 100:18 127:8
152:4 165:10
166:20
knowledge
50:12 163:22,24,25
known
71:22 155:9,9
knows
92:20 95:22
Kremmling
173:17

**L**

L
2:10



MAGNA
LEGAL SERVICES

lab
84:15
label
16:8,10 28:15
labeled
7:11
lack
110:15
language
119:7 166:16
last
10:6 11:22,24 17:25
20:13 24:21,22
34:18 117:25
143:17 163:12
171:8
late
45:13 47:1 73:12
151:15,16 160:13
later
42:2 49:1 117:5
law
114:20,21 127:12,23
Lawrence
2:6
lawsuit
30:6,25 33:17 42:25
114:10 116:13
117:9,19 127:6,21
138:20 156:23
lawyer
157:2
lawyers
66:22,24 102:15
115:22 132:13
lay
74:8
layer
98:21
layered
102:13 137:19
lead
45:6
Leading
99:8
learn

64:8 65:1 76:21
105:11 109:23
119:24 132:19
133:3
least
69:4,9 93:8 101:11
143:14
leave
14:20 18:13,24 21:2
21:4 22:24 23:25
26:18,22 27:3 30:5
38:10,10,19 39:3,5
39:6,9,10,21,22
44:3 45:12 48:12,24
53:15,20 55:15 56:1
57:4,21 59:24 60:7
61:13 62:6 127:10
131:6 133:16
134:18 137:11,21
142:11 144:21
146:15 155:11
157:4,15,25 158:13
159:7,8,18 161:23
162:8
leaves
80:24
leaving
45:14,21 46:24
led
101:20
left
103:12
legal
4:15,17 56:3 58:21
61:1 115:22 119:7
128:11 130:12
legally
5:17
lengths
146:24
less
26:18 96:3
let
7:21 13:8 29:24 32:9
33:25 36:20 40:12
50:11 52:18 56:17

68:21 100:9 114:14
114:16 123:6
134:15 147:24
letter
34:5,22 145:18
let's
20:12 40:4 42:24
57:10 59:12 77:16
78:4 85:12 94:25
100:25 103:17
108:12 111:19,20
119:11 120:16
121:13 126:19
132:7,14 147:23
163:19 164:8
level
88:19 103:23 107:12
137:16 151:12
169:7,16,16,17,23
169:23,24 171:12
Lexapro
20:7 91:9
lie
156:5,6
life
24:3,7,11,17 25:10
99:6,21 103:13
110:12 111:1,3,8
112:6 135:22
like
6:7,14 10:17 14:2
16:4 20:10 25:22
27:7 33:22 35:8
36:10 40:7 42:3
44:20 47:18 48:1
49:22 52:10 60:17
61:2 64:7 68:18
73:21 74:2 75:16
76:10 87:3,6,10,24
88:4,17,18 91:6,22
94:11 108:16
109:10 111:15
113:22 117:3 119:7
119:20 126:5
128:19 129:10
130:6 138:13 142:1

148:2 150:9 152:6
152:11 154:20
155:17 165:23
167:25 170:4
likely
75:12
limits
8:25
Lindsay
2:10 4:21 6:16
line
8:24 12:5,21 16:15
17:3 19:19,25 20:2
53:5 57:13 59:14
67:17 90:18 91:17
132:3,11
lines
9:16,17 16:25 36:18
130:7
link
83:18
list
51:13
listed
50:1 51:6,7 85:12
143:19
listen
40:1 95:20 147:4
listing
50:2
litigation
124:8 130:2
little
42:2 45:3 70:22
72:19 83:14 96:3
119:11 126:6 128:1
131:24 132:20,23
133:4 138:9
LLC
2:5
Lmcmanus@hallr...
2:13
loan
23:19 53:14,23 63:14
137:6 138:7
location



11:19

**long**
7:17 11:18 28:7
46:10 98:22,24
101:20 118:21
130:20 131:1
160:18

**longer**
86:14 97:18 98:2
121:5 142:20
143:19

**look**
27:7 33:23 36:10
40:8 42:2 47:18
48:16 52:10 57:11
58:21 59:4 69:21
80:22 82:20 87:2,6
101:18 121:10
128:18,19,22
129:10 148:2,8
160:12 162:23

**looked**
148:3

**looking**
13:4 16:6 32:11 68:7
69:3 80:15 145:24
146:1 158:11

**looks**
42:3 119:6

**lose**
86:12,16

**loses**
99:17

**losing**
127:23 149:9

**loss**
88:2

**lost**
97:17 99:3 127:18
149:25

**lot**
153:22 155:21
159:14 169:13,14
169:22

**loud**
40:19 107:5

**low**
20:7 71:14 93:2,3
101:23

**luck**
89:22

**lunch**
43:13,24 65:15

**lying**
128:15

**Lyman**
2:11 114:21

—————————————

### M

**M**
2:1 173:2,16

**machine**
154:7

**made**
12:17 26:18 31:10
53:7 57:15 68:10
76:19 85:22 100:12
125:18 133:24,24
134:4,5

**Magna**
4:15,17

**main**
103:6

**major**
24:11

**make**
13:2 18:18 19:3
39:10 47:8 67:15,19
76:22 94:20 100:6
105:18 112:21,24
123:25 124:1,16
128:4 129:12
146:18 151:9
165:22

**makes**
49:10 53:3 80:18
98:4 102:19 147:6
149:7 150:16 155:8

**making**
5:9 37:7 38:2 119:12
129:16 138:10
152:23

**male**
12:6 82:21

**malingering**
155:21,24

**malpractice**
153:4,7,15,20

**man**
18:15 149:23 160:13

**management**
51:1

**manages**
28:4

**managing**
142:7

**manifest**
111:3

**manifestation**
125:9

**manifesting**
125:8

**Maps**
45:6

**March**
9:13

**Mark**
2:10 4:20 10:23
63:21 69:23 70:10
84:2 114:15,18,22
117:23 120:10
132:7 137:3 143:3
145:5 160:3,11,14
169:9 171:5

**marked**
6:15 27:9 36:10 40:9
47:21 52:12 118:2,6
173:9

**Marksabey@hallr...**
2:13

**match**
85:10

**material**
10:25

**matter**
4:6 139:13

**matters**
51:3 61:15 63:16

173:5

**may**
31:16 39:17 50:16
61:21 76:3,12 77:1
97:16 115:6 124:21
125:6 145:23
149:19 155:20,21

**maybe**
7:6 28:9,10 39:11
41:3 45:2 72:19,20
79:21 80:12,12 82:5
84:23 91:20 97:1
113:18 117:4
118:16 124:10
136:12 150:16
151:14,20

**McManus**
2:10 4:21

**MD**
1:5,16 3:2,18,20 5:3
27:18 173:4

**me**
7:1,21,24 13:8 14:24
17:24 29:25 30:12
30:16,21 31:8 32:9
33:25 36:20,22
40:12,19 44:9 46:9
49:6 50:11 52:18,24
52:25 56:17 59:4,17
74:1 79:21 81:22,22
82:17 84:5 87:24
97:22 100:9 102:3
104:15 106:8,22
114:15,16 115:16
121:23 123:6
124:19 125:13
126:17 127:17
129:10 134:15
137:9 147:24
156:20 157:21
158:19 160:15,24
161:7 166:25 173:4
173:6

**meaning**
56:17 130:12

**means**



90:12 108:6 110:4
146:5
**meant**
53:13 82:1 103:13
137:14
**measures**
20:11 91:23 93:11
97:2
**medically**
26:10
**medication**
91:24 92:5,7 93:14
134:19
**medications**
19:10,15 78:1 88:20
91:15 92:14,21,24
92:25 93:1 129:25
146:18
**medicine**
3:9 10:8 11:11 22:18
27:23 28:8 63:7
74:12 141:23 165:4
165:9
**medicines**
19:17 126:10
**meet**
71:25
**meeting**
32:7 41:4 108:21
114:14 149:20
**meetings**
151:24
**Memorial**
29:1 143:13
**memory**
9:20 22:2 31:14,15
63:5 67:15 120:7
122:1 123:24
125:12 135:8
148:15 149:9,25
150:7
**mental**
15:1 21:21 74:25
75:4 92:6 95:16
104:25 105:4 121:6
121:15 131:17

133:17 136:24
146:19 163:17
164:5
**mention**
23:12
**mentioned**
23:13 41:4 89:25
107:10 112:5
**mentions**
68:1
**message**
34:14 36:8 40:16,23
43:15 44:7,20 45:25
46:6 48:19 49:13
**messaged**
127:17
**messages**
3:11 41:15,18 42:5
43:2,6,6 47:7 140:4
**met**
41:6 51:21 125:14
**methodical**
64:18
**microphone**
68:12
**middle**
17:4 36:18 62:5
156:21
**might**
35:15 67:16 70:11
75:5,6 82:4,6,7
98:10 100:6 105:11
111:3 112:1 113:3
**mile**
83:6
**milligrams**
20:8
**mind**
66:20 77:19 86:4
93:7,25 99:24
105:22 106:13,15
107:6 108:7 118:25
119:25 124:22
125:16 134:11
136:13
**minute**

62:17 152:13
**minutes**
43:20 44:19 45:2,4
48:22 49:1,5 126:19
142:22 150:17,24
151:8,16
**misplaced**
46:10
**missing**
81:25
**mixed**
90:6
**moderately**
86:1 87:16,18 90:4
**Mohamedbhai**
2:5,5 4:24 64:5 132:6
132:12 160:11,16
**moment**
39:19 40:18 94:8,25
99:6 105:16 109:25
117:3,7 127:7
129:22 130:1 134:4
138:5 151:7
**moments**
147:17
**money**
32:22 159:8,10
**Monroe**
3:15
**month**
26:22 136:9
**months**
13:13,18,19,23 14:4
14:12,15,19 26:19
26:22 40:5 53:12
58:24 59:7 78:21
80:12 86:13 95:9
118:23 147:1,4
157:15 158:22
159:7 164:6
**mood**
81:21 82:2 88:2
89:25 90:6
**more**
15:23 36:18 39:23
45:3 53:3 63:20

64:1 83:15 93:20
108:20 109:3,12
110:12,17,18,18
112:1,21,24 124:5
126:14 147:15
150:23 164:11
168:22
**morning**
38:22 39:4 73:11
**most**
42:25 66:16 126:4
155:2,22
**mostly**
72:25
**motion**
33:6 51:17
**motivated**
112:2
**Mountain**
1:18 4:1,12 62:23
126:25 172:11
**move**
44:4 71:16 158:16
160:4
**moves**
121:15,16
**moving**
91:8 110:12
**MS**
8:24 9:2,7,19 10:7
148:14
**much**
14:11 88:11 94:15
142:20 159:14
**Munni**
1:5,15 3:2,20 4:5 5:3
27:16,18 43:21
49:13 50:13 51:22
148:13 173:4
**must**
29:22 86:10
**my**
5:12 7:5,17,18 12:7
15:19 26:1 28:6,12
28:15 30:10,13,18
34:23,25 35:10,20


MAGNA
LEGAL SERVICES

37:6 38:1 39:7 40:1
41:5,7 42:10 48:11
48:13 57:19,21,23
60:1 64:5 65:6
68:13 69:1 84:22
87:4 89:20 93:10
100:9 113:19
124:13,14,22 132:2
137:22 143:21,24
143:24 144:1,2,2,6
145:7 147:15 155:3
155:7,17 156:7
158:19 160:24
163:15,21,25
166:11,24 173:8,12
173:20
**myself**
135:17
**M.D**
4:6

**N**

**N**
2:2 3:1 4:2
**name**
3:9 8:12,24 11:13
27:15,16,24 28:8
41:5
**naming**
84:3
**nature**
21:7 50:23,25 137:9
**necessarily**
77:7 125:15,22,25
**need**
6:9 14:9,12 32:11
34:23,24 40:2 59:3
82:20 86:15 93:1,13
95:5,25 96:1 100:8
126:20 131:25
134:18,18,20
137:20,23 138:6,14
142:24 144:7
151:24 158:16,17
158:17 168:23
171:22,25 172:3

**needed**
17:19 18:14 24:2
29:21 44:22 45:12
78:2 104:15 111:21
111:22,23 122:25
138:1,3,17 139:9
142:1,2,4,18 146:4
159:6 164:6
**needing**
21:19
**needs**
3:15 27:5 50:15 56:3
95:21 106:16,18
129:17,19 153:23
**negatively**
103:11
**negotiate**
138:6
**negotiating**
62:5
**negotiations**
57:16,25 58:13
**neither**
51:9
**nervous**
79:15
**never**
28:21 30:10,13 33:8
54:2 65:2,9 92:3
93:5 97:5 111:11,16
120:23 140:8
145:21 149:15
153:4,7 161:17
**new**
13:12 16:12 31:4
54:3,10 55:1,21
56:1,10,20 57:17
58:13 84:6 106:11
139:16,19 156:25
158:12
**next**
9:1 13:13 36:4 41:14
45:25 59:15 65:15
78:7 95:9 101:10
103:10
**nice**

72:17 147:17
**night**
12:8 35:11 46:10
70:12 73:12 101:9
104:10 122:8
156:14,21
**Nobody**
121:17
**none**
64:21
**nonretained**
50:17
**noon**
36:5 45:3
**Nope**
21:17
**nor**
51:9 173:10,10
**normal**
24:3,7,17,18 25:22
68:16 81:21,25 82:3
109:10 114:2,3
117:3
**normally**
15:13 21:7
**Notary**
1:19 173:3,16
**note**
13:20 19:8 23:6,12
23:14 96:13 166:11
166:24 167:11
**notes**
8:22 12:16,17 26:1
31:20 67:25 115:8,8
147:15 148:4
166:22 173:8
**nothing**
101:24
**notice**
44:9
**noticed**
112:15
**November**
118:14
**now**
4:4 6:25 7:6 10:17,20

10:21 11:8 12:15,20
14:23 16:5 19:18
20:12 26:7 32:12
33:4,23,23 35:8
36:7,22 40:7 47:18
51:13 52:10 57:10
59:12 62:7 65:7
72:12 116:15 132:1
138:10 143:18
144:1 145:24
147:25 160:12
165:9,16,22
**number**
4:10 9:3 12:15 35:16
35:20,20 42:4,5
46:3,6 47:7,16
98:15 130:9 145:4
148:9
**numbered**
18:1,1
**numbers**
7:11,19
**nursing**
113:23

**O**

**O**
2:1 4:2
**oath**
65:20,24
**Oa@rmlawyers.com**
2:7
**object**
15:16 17:12 21:16,22
22:20 25:11 33:9,12
49:2 52:7 54:19
55:9 56:11,22 57:5
58:2,16,25 60:8
61:18 62:9,12 66:12
73:22 74:5 75:20
80:25 81:11 86:24
92:9 98:13 99:7,25
101:15 103:3 105:2
105:25 106:20
107:8,20 108:22
109:5,15 110:22



111:9 112:11
113:16 121:8 122:3
122:14,23 123:4
124:17 126:16
128:5 129:13 132:3
132:10,12,14,25
134:13,22 135:14
136:1 138:12 139:6
139:23 140:21
141:16 142:14
147:10 150:20
151:1,17 152:16
153:10 154:2,11,25
155:12 156:1,11
157:17 158:7,24
159:19 160:2
161:19,25 162:13
162:19 168:3,25
169:18 170:6,14,22
**objection**
42:16 78:9 99:10
132:7
**objections**
109:20
**objective**
154:10,20,21
**obligations**
53:14,24 108:21
**observed**
79:7 114:6 141:14
**obtaining**
31:18
**obvious**
78:5
**obviously**
65:23 73:4
**occasionally**
29:7
**off**
14:5,16 19:19 22:13
26:9,13 27:13 35:3
53:12 62:20 68:16
78:13 87:9 95:9
103:19 108:10
120:2 126:22 133:8
135:1 140:4 142:13

145:6 160:10 172:9
**offer**
92:13 105:10 119:17
157:24 165:9
**offered**
129:20,21,21 158:13
**office**
4:24 12:1,18 25:20
25:23 29:14 30:6,20
30:25 45:2,21 46:24
64:8 65:5,15 78:7
80:16,21,24 82:16
82:22 83:6,10
101:10 140:20
143:7 145:25
146:10
**office's**
30:4
**official**
166:16
**often**
6:5,7 66:16 74:24
88:11
**oh**
6:22 7:15,17,17 8:20
13:3 17:5 41:5,6,7
53:2 89:20 91:25
118:22 123:15
154:7 172:2
**Omeed**
2:4 4:23 142:19
160:17 171:21
172:12
**once**
33:25 52:18 157:9,10
157:13 164:12
**Oncology**
101:22
**one**
6:18 8:3,3,5 15:9
18:1 20:6 26:10,10
26:12,22 27:3 39:19
42:10 46:1 48:3
63:3 67:25,25 69:3
75:9,12 78:21 79:22
80:12 81:23 83:15

90:24,25 91:1 98:15
110:17 117:25
121:16,17 125:3
130:7 140:25
151:13,22 168:15
168:18 170:13,21
171:4,5
**ongoing**
171:12
**only**
13:9 15:9 26:10
45:24 46:13 68:4
76:9 92:24 95:3
103:1 125:18
139:16 140:25
152:23 157:20
172:15
**onto**
7:4 102:13
**ooh**
103:8
**open**
6:17,18,25 7:6,7
10:21 11:8 33:25
47:24
**operated**
28:18 73:16
**operates**
28:4
**opinion**
17:8,21 24:15 26:17
51:4 108:5,19
133:18
**opinions**
66:25
**opportunity**
97:17 99:4,18 127:14
**opposed**
29:18
**opposing**
156:22 165:22
**ordeal**
144:10
**order**
146:19 172:13
**orderly**

106:22,25 107:11
**ordinary**
83:1
**organs**
74:21
**origin**
12:6
**other**
12:15 16:23 17:11
21:21 22:1,5,10,16
23:20 29:10 32:22
35:19 44:4 50:21
51:3 63:15 68:17,18
68:21 75:5 81:24
103:5,15 111:3
127:25 140:8 158:4
158:4,5,11,14
**others**
161:9
**otherwise**
152:10 173:10
**our**
4:24 32:4 64:6,8 65:5
68:20 70:22 85:20
109:23,24 117:25
119:20 127:24
141:7 150:10
**out**
29:14 33:8,20 39:8
39:20 41:25 66:19
75:18 78:5 80:21
83:13 84:24 89:7
90:23 92:19 102:5
107:5 109:13
111:21,24 117:5
121:16 123:16
127:4 128:17
131:11,13 137:23
144:3,14,18 157:1
159:8 164:10
169:11
**outcomes**
51:2 134:1,2
**outlined**
23:9
**outpatient**


MAGNA
LEGAL SERVICES

143:25
**outside**
 94:13 111:4,25
**over**
 19:6 23:9 35:17 36:5
   40:18 43:12 57:21
   58:13 65:15 72:10
   78:12,13,14,16 88:7
   96:14,15 106:13
   128:1
**overarching**
 67:4
**overcome**
 97:2
**own**
 20:10 28:12 61:5
   91:23 93:10 115:10
   134:11 144:1
**owned**
 28:18

_____
**P**
_____
**P**
 2:2,2 4:2
**page**
 3:2,9,11,14,18,20
   7:12,14,19,20 8:15
   12:20,25 13:6 16:5
   19:18 20:13 24:21
   24:22 34:9 36:18
   40:15 41:14 42:4
   43:1 52:17,21 57:11
   59:13,13,15 103:13
   148:8,9 167:15
**pages**
 7:10 52:18
**paid**
 14:19 157:15 159:7
**painted**
 102:22 158:5
**palpitations**
 88:17
**papers**
 131:13
**paperwork**
 21:7,12 73:13 131:11

144:14,18
**paragraph**
 11:21 12:2,11 17:5
   18:1 34:18,18 54:2
   70:11 120:3 128:23
   164:9 165:16
**paragraphs**
 164:9
**paralegal**
 65:5
**pardon**
 170:16
**parking**
 45:9
**parse**
 90:23
**part**
 29:7 42:24 69:9 82:9
   101:25 102:6,8
   103:16 155:2,22
**participate**
 58:13
**participated**
 162:10
**particular**
 28:13 66:19 93:21
   103:25 152:24
**particularly**
 126:13 137:15
**parties**
 4:18 173:5,10
**partner**
 112:8 157:11 159:4,9
   159:18
**parts**
 111:3
**passion**
 110:18
**past**
 66:22 87:13 108:13
   112:17 120:24
**patient**
 10:19 11:23 12:1
   14:4,8 15:5,15 17:1
   17:10 18:3 20:9
   22:25 26:8,25 55:14

59:5,10 69:9,14
 70:4,8 72:7,21 81:3
 81:20 93:13 95:9,13
 95:24 99:5 100:17
 101:12,24 102:5,21
 103:21 105:6
 106:13 107:2 108:5
 109:24,24 131:18
 137:18 141:9 147:5
 153:8,24 155:24
 161:2 167:19,22,24
**patients**
 5:12 21:1 22:6,11
   25:6 26:15 27:6
   29:4 35:19 40:1
   64:24 66:1 67:3
   72:8,10 73:12 74:24
   75:4 76:4,13,23
   92:6,12 131:7
   135:21 143:9,16,20
   143:22,24 144:1
   152:14 154:16
   155:3,7,10 156:7
   160:21 165:11
**patient's**
 14:11 25:9 95:21
   143:12 155:19
**pay**
 95:20
**PC**
 27:18 101:22 114:21
**PCP**
 5:22 6:6 9:8,11 24:16
   37:6 38:1 51:22
   53:12 54:4,9
**PDF**
 6:20 7:4
**PEA**
 54:3
**Peddada's**
 9:11 10:7 16:16
   18:12,23 22:2,17
   26:17 29:24 30:1,5
   30:11,14 33:6,7
   49:25 50:14,19
   52:24 54:12 57:11

63:4 92:18 116:13
 120:7,21 125:3
 134:17 138:22
 141:23 165:4
 170:12 171:13
**Peddada_001246**
 3:13
**Peddada_005613**
 3:13
**penalty**
 162:23 163:2,20
**pending**
 133:2
**Penrose**
 18:9 23:18 28:19,22
   29:3,11 44:15,16,18
   45:2 46:14 53:14,23
   55:8 57:3 61:16
   62:4 63:13 97:18
   98:21,23 99:4,14,18
   101:21 115:15
   127:14 128:25
   143:3,14 144:16
   157:12 165:18
   167:5
**Penrose's**
 51:17
**people**
 23:17 86:12,13 87:24
   97:7 112:21,24
   116:4,6 128:25
   141:1 165:18
**perceive**
 99:5,20
**perceived**
 161:8
**percent**
 58:9 155:6
**perfect**
 163:24
**perform**
 24:11 44:10,19 45:21
**performed**
 79:22 130:23
**perhaps**
 22:13 115:15



**period**
13:23 25:23 26:10,12
139:3
**perjury**
162:23 163:2,20
**permission**
42:13
**person**
15:20,24 18:16 27:5
86:15 88:3 94:19
100:17 110:5 123:9
136:14 142:6
160:21
**personal**
12:7 35:10,16 42:12
103:12 107:6 111:1
**personally**
94:1 111:15
**person's**
106:15
**perspective**
34:24 61:20,25 87:3
122:12
**Ph**
2:12
**phenomena**
155:10
**phone**
35:16,25 46:3 47:15
70:12 101:9 104:10
**phrase**
24:23
**physical**
9:20 22:2 63:4 79:23
80:1,4 81:16,18
82:9,11 84:7 96:3
120:7,16,16,21
125:1,3,7,9 135:8
148:15 150:6
167:17
**physically**
103:2 126:9 144:1
**physician**
5:25 6:3 15:1,5,10,11
18:8,16 19:6,7 23:5
26:11 27:2 37:8

38:3 41:12,12 48:13
54:3,10 55:1 57:17
58:13 65:21 77:3,13
104:19 122:10
130:20 148:24
155:19 162:6
**physicians**
8:16 41:4 64:22 81:2
96:18 102:4 130:25
169:14
**physician's**
9:3 57:20
**pick**
90:8,10
**picture**
64:14 73:18 102:22
110:4 124:11,13
158:5 168:18
**piece**
69:15 79:11 94:10
**ping**
68:22
**place**
13:2 84:17 85:21
123:9 160:24 173:7
**places**
158:15
**plaintiff**
1:8 2:3 4:25 50:16,25
**plaintiff's**
51:2
**plan**
16:11 84:9,11
**planet**
130:6
**Plauth**
18:3,7,12,18 48:5
144:9
**play**
68:22
**pleasant**
167:20
**please**
4:18 5:2
**point**
35:2 39:4 41:2 65:7,8

71:3 73:23 76:14
77:14 100:24
110:23 119:21
120:23 131:16
133:21 135:18
149:12 150:1,14
152:19,24 162:24
164:14 166:9 171:8
**pong**
68:22
**popped**
105:1,5
**portions**
69:4
**position**
19:5
**possesses**
50:18
**possibility**
93:8,9 155:9
**possible**
27:1 44:23 94:25
**possibly**
67:13
**posture**
116:17
**potential**
34:22 58:24 59:7
61:15 93:4
**potentially**
141:18
**powering**
122:11
**practice**
10:8 11:13,16 14:21
22:17 28:2,5,17,23
39:1 63:7 67:19
74:15,16 130:24
141:23 143:25
155:17 159:8 165:4
169:25,25
**practicing**
11:19 28:8 74:12
**premise**
133:6,14 149:5
**prescribe**

91:11 93:14 146:18
**prescribed**
91:9 92:25 129:25
130:1
**prescriptions**
19:14 162:3
**present**
2:15 12:3,16 13:5
70:3 74:24 75:5
92:6 106:25 144:13
144:17
**presented**
65:13 80:7 87:15
121:20 139:18
**presenting**
82:5 111:5 125:14
139:16 140:19
**pressure**
83:15,22 88:15 98:16
98:20 120:18 125:4
150:13 151:12
**pressured**
80:8,23 107:10 111:6
167:21
**pressuring**
148:19
**presumably**
78:15
**pretenses**
155:11
**pretty**
92:15 94:15 99:5,20
106:21 107:22
**prevent**
63:12,17
**previous**
48:17 149:6 173:3
**previously**
8:17
**primarily**
74:20
**primary**
5:24,25 6:2 51:21
74:16 88:3 104:19
**print**
36:20



**prior**
 15:3 88:4 159:4
**privilege**
 66:8,14
**privileges**
 29:3,8 143:22 144:7
    144:7
**probably**
 45:13 56:3 58:20
    62:14 65:7 91:3
    93:12 99:2 102:15
    107:18 116:9
    150:18
**problem**
 161:10
**problems**
 74:25 85:17 97:2
    153:1 168:2
**procedural**
 85:7
**procedure**
 44:10,16,19 45:22
    151:4 152:2 153:18
**procedures**
 85:7
**process**
 31:18 106:11 123:9
    123:13 162:11
**processes**
 106:6
**produced**
 8:17 41:19
**profession**
 86:21 104:1 146:9
**professional**
 26:17 27:20 35:18
    73:1 103:12 106:14
    108:5,19 122:12
    141:5 143:3 156:4
**professionals**
 86:22 170:3
**professions**
 170:3
**program**
 8:16 96:18,24 138:7
    148:25

**promised**
 32:21
**proper**
 14:5,15 99:9
**proposed**
 22:12 119:13
**prospective**
 55:17
**prove**
 127:22
**provide**
 29:20 66:9 161:15,17
    171:12
**provided**
 26:24 29:25 30:10,13
    31:3 65:18 128:10
    157:11
**provider**
 5:25 51:22
**providing**
 23:2 131:18
**PRP**
 42:11,18
**PSF-Peddada-1482**
 3:16
**PSF-Peddada-1484**
 3:17
**psychiatric**
 79:11 81:17 138:1
    167:16
**psychiatrist**
 15:21 61:2 94:19
    133:15 142:10,12
    146:18 161:4
**psychologist**
 15:20
**psychosis**
 107:16 136:14
**psychotic**
 152:20 164:15
    165:14
**public**
 1:19 31:10 82:6
    173:3,16
**Puerto**
 36:15

**pull**
 68:8 117:6,22 163:11
**pulled**
 27:13 64:10
**pulse**
 82:13,16,22 83:2
**purpose**
 110:18
**put**
 6:16 16:12 71:11
    72:23 84:9,14,22
    85:20 88:1,11 90:18
    90:19 100:24 105:9
    107:2 118:11
    134:15 144:3 145:2
    146:3 165:24
    166:22,24
**puts**
 116:10
**putting**
 69:7 81:8 109:19
**P.C**
 2:11
**p.m**
 1:18 4:1,11 12:8,12
    35:11,25 36:7,9
    37:20 38:6 43:17,23
    44:3,8,10,16,20
    46:11,16,25 49:7,8
    62:21,22,23,25
    65:14 78:6 104:19
    126:23,24,25 127:2
    152:3 153:13,14,18
    172:8,11,17
**P.O**
 173:17

**Q**

**Qm@rmlawyers.c...**
 2:7
**qualified**
 170:11,20 171:11
**quality**
 125:22 126:15
**question**
 30:15 39:7 53:1,2,3,4

 56:18 57:23 59:4
    62:14 63:3 74:9
    109:8 113:18,19
    120:11 132:4 133:2
    133:11 147:13,14
    149:4 157:18 158:8
    163:10
**questioning**
 132:4,11
**questions**
 5:18 22:17 31:2
    52:25 58:10 63:20
    64:2,13 68:19 77:18
    91:7 104:8 109:20
    114:19 116:25
    117:4 119:2,9,23
    123:10 124:21
    143:4 147:16,25
    149:3 167:23
**quick**
 45:14 112:25
**quickly**
 17:22 147:24 172:4
**quite**
 65:1 118:22
**quote**
 16:16
**Qusair**
 2:5 4:24 64:5

**R**

**R**
 2:1,2 4:2
**racing**
 106:19 108:7
**Radiation**
 101:21
**rambling**
 107:11
**ran**
 151:14,20
**random**
 116:5
**Rare**
 155:17
**rate**



MAGNA
LEGAL SERVICES

83:4,21 88:16
151:14,21 154:21
**rather**
5:11 91:23
**RATHOD**
2:5
**Re**
3:15
**reached**
29:14 33:8,19
**reactionary**
120:22,25
**reactive**
112:24
**read**
13:8,14 18:5 32:3
37:10 40:18,19
50:11 54:2,7,10
55:1 56:1,5,10,20
68:8 70:15 79:14
91:17,20 95:8
108:15 120:8
123:20,22 130:5
133:4 137:6
**reading**
54:1 55:20 59:3
82:19,19 121:11
132:1
**reads**
132:18
**ready**
44:19
**real**
93:1 95:4 129:23
153:23 161:10
**reality**
136:16
**realized**
18:15
**really**
7:2 14:10 27:5 61:21
64:16,21 89:5 93:5
94:16 97:19 101:23
104:23 107:6
109:25 111:1
119:23 124:22

125:25 163:16
164:22 166:17
168:17,22
**reason**
10:1 37:18 63:12,17
92:12 135:16 136:7
138:21,23 157:14
157:16
**reasonable**
61:17,21 62:8 137:21
140:16
**reasons**
66:19
**reassessed**
26:25
**recall**
8:18 29:13 31:8 32:2
40:22 72:1 82:15
140:10 144:10
**receive**
5:13 30:4 95:18
**receiving**
29:15 97:10
**recharge**
10:11 34:23
**recognition**
68:9
**recognize**
132:21 133:25
**recognizes**
106:17 127:13
**recognizing**
161:1
**recollect**
33:18 54:24 55:12
76:25 166:7,16
**recollection**
116:1
**recommend**
54:9 56:9,19 57:24
88:20 95:9
**recommendation**
54:4 57:20 95:12
**recommendations**
134:5
**recommended**

13:20 18:4 19:9 20:7
20:24 48:13,25
53:12 95:7 98:11
108:10 137:10,20
142:10
**recommending**
20:19
**record**
4:5 10:18,24 19:21
25:24 29:25 31:3
35:9 38:15 39:15
61:10 62:21,25
67:16 68:6 69:3,15
69:22 70:22 71:1,4
71:12 76:2,15 79:2
79:24 83:12,15
91:18 103:14 110:2
119:19 123:21
124:5,14 126:22
127:2 135:12 151:9
166:22 172:9,10
**recorded**
79:13
**recording**
68:5 70:7
**records**
30:4,11,14,17,21,24
31:10 38:12 64:19
65:6,12 67:8,10,20
68:1 73:20 105:9
124:2 146:1 161:13
**recover**
86:13 97:8
**recuperate**
164:7
**red**
89:10
**redo**
84:10
**reduced**
173:7
**refer**
15:22 16:1 114:23
143:20 146:17
**REFERENCE**
3:7

**referral**
95:5 136:9,9
**referrals**
129:21
**referred**
93:16 144:21 161:9
169:3 170:18,24
171:14
**referring**
73:4 95:4
**reflect**
19:9
**reflects**
124:14 129:11
**regain**
13:11
**regarding**
9:20 10:7 18:3 63:4
120:6 122:1 125:3
135:8 148:14
**regroup**
13:11,21 95:10 97:8
**regularly**
21:1
**reimbursements**
87:10
**rejuvenate**
95:10
**related**
16:17 30:4 89:15
146:8 173:10
**relation**
173:5
**relations**
86:11
**relationship**
29:10 35:18 73:1
101:21 111:14
**relationships**
112:5 139:2
**relatively**
17:22
**relaxation**
78:1
**relay**
65:10,16



**relevant**
42:25 50:15,21
**remedied**
27:2
**remember**
8:21 18:9,25 19:17
28:10 31:11,12 32:1
32:13 33:21 39:12
39:13,17 45:14
49:16,18 54:15 55:3
55:23 60:10 67:13
72:11 77:8 115:3,4
115:7,18,22 116:16
118:23 119:12,14
127:18 131:3 137:7
137:9 143:3 144:22
148:21 166:8
**Render**
2:11 114:20,22
**reorganized**
84:14
**repayment**
23:20 53:14,23 63:15
**repeat**
22:7 56:17 99:11
**repeatedly**
160:18
**report**
8:15 39:15 63:7 69:8
71:17
**reported**
63:8 89:3 112:14
113:6 135:5 136:2
**reporter**
1:19 4:16 5:2 68:20
172:12 173:1,3
**reporting**
69:9 86:17 139:15,22
140:11 149:19
**reports**
100:4 108:6
**represent**
4:19 30:3,23 33:4
34:2 64:4 114:18
115:14 116:11
128:2

**represented**
66:22,24 115:20
116:3 153:3,6
**reprieve**
13:10
**reputation**
72:13 92:15
**request**
4:14 69:1
**requested**
51:2
**requesting**
65:6
**required**
5:17 162:9
**requirement**
140:2
**resident**
64:7
**resolve**
35:4
**resolved**
17:9,22
**respect**
50:24 85:23 110:8
171:13
**respectively**
91:14
**responded**
44:2 59:25
**responding**
42:19,20 53:2 168:14
**responds**
167:23
**response**
45:7 51:16,20 92:18
149:3
**responsibilities**
17:10 109:14 110:9
**responsibility**
138:22
**rest**
41:14 70:16 111:8
**restate**
109:8
**restrict**

51:19,23,25 52:3
**restriction**
24:3,6
**result**
50:20
**resulting**
90:20
**retaliation**
127:11 158:4
**retrieval**
49:19
**return**
20:9,20,23 91:22
92:2
**review**
25:23 31:21,25 32:6
32:10,17 34:13
40:20 60:6,22 61:8
79:3,5 84:8 96:25
**reviewed**
97:22 162:17 164:9
**reviewer**
8:18 9:24
**reviewing**
59:23
**revise**
39:15
**Rico**
36:16
**ring**
118:16
**Rockies**
3:10 11:11 27:24
**role**
130:22,23
**roof**
111:21,22
**room**
44:9
**ROS**
79:3,10
**Rosanne**
173:2,16
**Rosie**
1:18 4:16
**routine**

113:22
**RTC**
20:14,16
**rude**
113:9
**rule**
78:4
**rules**
117:4
**run**
83:6
**running**
138:8

---

**S**

**S**
2:2 4:2
**sabbatical**
34:24 144:22 145:1
146:2,4,5,12,14,20
157:3
**sadness**
79:16 110:10 112:7
140:13 141:10
**safely**
10:8 22:18 63:7
141:24 165:4
**safety**
153:8
**said**
12:25 13:21 17:1
19:5 31:13 37:19,24
38:22 40:4 41:5,6,7
43:11,12 44:3,20
47:11,12 50:12 51:5
51:25 53:2,11 54:5
54:13,17 56:2 60:17
75:24,25 76:6,7
77:18 78:2 90:3
91:18,21 93:19
95:25 103:8,8
105:10 108:2,18
110:9,25 111:15
113:7,25 114:5
121:4 122:24 124:1
131:24 134:18



138:4,9,13 140:3
141:1 142:1 144:25
146:23,24 147:1
149:22 151:9 152:9
155:18 156:9
158:15,18,23
163:14,24 164:5,11
164:12,13,19,22
165:2,5,15 166:4,10
167:5,11 173:4,5,6
**same**
37:2 39:1 46:20
57:14 81:16 85:17
97:17 110:20
112:13 120:12
122:6 126:15
151:14 160:23
173:6
**San**
41:8
**save**
6:20 7:1,5
**Savings**
41:22
**saw**
6:10 9:14 11:22
46:20,23 65:14
131:23 133:23
134:3 142:25
149:15 150:3,16
151:7 161:12 163:7
165:7 168:8
**say**
6:13 8:7 13:16 14:12
25:4 27:15 31:12
33:1 50:6 51:8,10
52:1 54:22 56:6
73:3 77:20,21 78:18
88:10 89:8 90:11
92:7 94:13 96:1
98:5 102:20 107:23
111:20 117:4
121:25 124:12
125:11,25 128:15
131:14 134:8
138:16 148:19

152:13 154:7,21
157:23 159:6,24
160:6 163:9 164:10
164:21,24
**saying**
14:23 30:16 34:21
42:8 44:15 46:12
48:11 68:21 80:15
101:10 107:5
113:23 131:10
132:1 138:21
139:17 147:3
149:13 152:19
157:21 158:3
159:13 164:18
165:25 166:18
168:18
**says**
6:20 7:12 8:23,24 9:1
9:19,25 10:7 11:11
12:5 17:1 18:2
19:25 20:6,6,14
34:4 37:5,25 42:10
43:21 44:8 46:6
48:4,10 52:25 53:5
53:16 54:2,6 68:8
73:20 76:2,3,10
80:4 81:20,24 90:5
101:19 103:10
110:3 123:21,23
141:9 148:13
154:22 163:19
164:2 165:17
167:19
**schedule**
5:10 100:8
**school**
74:10
**scrambled**
99:23
**scroll**
7:21 163:18
**seal**
173:12
**second**
12:5 13:6 46:5 71:17

82:19 92:5 123:17
127:4
**Secretary**
27:13
**section**
13:6 20:13 24:24
70:3
**secure**
166:17
**see**
5:12 6:5 7:11,13 8:12
9:21 12:3,8,24
15:19,20 16:17 17:3
17:16 19:19 20:13
24:8,23 27:5 34:6
34:19,25 35:6 36:4
36:13,15,15,21 37:8
42:9,10 43:3,5,21
44:12 46:16 47:12
48:14 49:4,14 51:15
54:5 61:22 66:10
68:13 79:3 80:2,14
81:3,7,19 82:17
86:15 88:21 91:18
94:15,18 96:10
107:2 110:2 111:5
118:25 122:25
124:22 125:20
128:14 133:7,15
135:17 136:6 137:1
140:10 144:1
145:14,15 147:1,15
148:12,15 149:17
157:6 159:16
163:16 165:11
**seeing**
44:9 86:21 97:25
105:15
**seek**
133:22
**seeking**
21:2 155:10
**seem**
9:10 25:22 30:8
39:24 51:16 62:8
82:7 129:10 168:1

**seems**
82:17 126:5 167:25
**seen**
6:8 65:12 75:10 93:6
94:1 108:13,14
112:16 118:9 142:2
145:22 161:4
168:23
**Selagamsetty**
1:5,16 3:2,12,20 4:6
5:3 27:18 50:14,18
51:22,23 148:14
173:4
**self-relaxation**
20:11 91:19,23 93:11
**semester**
64:8
**send**
18:15 30:16 35:19
40:25
**sending**
19:17 30:21 34:14
40:22
**sends**
49:12
**sense**
53:3 73:7,10 79:16
80:19 88:13 98:4
100:7 105:18 112:7
123:25 124:16
128:4 129:12,16
141:10 147:6 149:7
150:16 155:8
**senses**
140:13
**sent**
31:20 32:16 36:8
48:21 49:13 72:8
142:10,11,13
145:23 157:24
**sentence**
9:1 14:2 17:25 19:25
103:11
**sentiment**
66:23
**separate**



89:7
**serious**
92:15 168:22
**seriously**
65:24 124:3
**Services**
1:11 4:16,17
**set**
70:21
**setting**
68:17 137:16
**settlement**
57:17 58:14
**Setty**
5:8 29:13 51:18
59:20 63:2,24 65:19
68:15 71:16 74:8
83:25 89:9 98:5
100:9,11 105:9
109:18 114:9
116:24 118:5
122:10 123:16
132:21 133:19
134:16 141:6
142:24 150:15
171:11 172:3
**several**
72:8,10
**severe**
70:23 75:25 77:21
86:2 87:16,18 90:4
**severely**
76:11
**severity**
170:20
**shadowing**
64:8
**share**
66:23 77:2
**shared**
69:23
**she**
19:5 41:7,8,11,12
47:12,12 50:22
54:13,17 132:1
157:21 160:13

161:15,16 165:9
173:5
**shells**
113:7
**she's**
41:11 132:1
**shift**
144:3
**short**
18:22 20:8 44:9
150:19
**Shorthand**
1:18 173:2
**should**
8:7 16:10 23:25
26:13 38:16,16
53:13,21 55:20 57:3
59:21 98:19 129:22
138:16 155:5
160:22 167:5 173:5
**shouldn't**
55:1
**show**
6:14 38:13 81:4
117:21 118:5 143:7
143:10
**showed**
124:15
**showing**
81:9 118:18
**shown**
144:20
**shows**
154:8
**sick**
126:9
**side**
92:16,20 93:4,10
127:25
**sign**
25:24 29:19 60:6,22
61:9 118:19,24
160:9 163:1
**signature**
32:17 173:12
**signed**

25:14 32:19 118:13
162:16,22 163:6
164:3 166:19
**significant**
99:6,20 150:6
**signing**
59:23
**silence**
147:16
**similar**
91:20 120:11
**simultaneous**
52:8
**since**
9:8,11 15:7 28:12,13
58:21 71:18 98:24
142:2 163:14
**sincere**
155:25 159:16,23
160:9 164:3
**single**
67:21
**sitting**
29:18 75:17 83:9,11
**situation**
13:10 16:17,23 18:5
87:24 88:1,3 111:11
111:16 120:1
138:16 141:3
151:13
**situational**
87:19,21 90:4,13,20
100:21 136:6
**situations**
21:6 154:16 155:20
**six**
14:12 20:10 25:19
34:24 35:3 41:23
43:17 49:9 92:3
146:23 151:16
**sixth**
12:21
**skills**
136:4
**sleep**
23:8,11

**sleeping**
24:12
**slightly**
121:5
**slow**
106:10
**slowly**
78:13 121:15,16
**small**
36:21
**smart**
72:2
**sob**
159:3
**social**
112:22
**software**
38:12 68:10
**some**
14:12 25:1 26:9,11
32:5 39:4 42:2 43:6
64:1,13,19 65:12
74:8 77:17 86:10,12
86:13 87:24 88:2
89:11 92:15 93:23
97:2,8 100:7 103:23
114:22 116:5
119:23 124:10
125:20 130:6 142:3
142:21 143:7 146:6
146:22 148:18
151:23,23 156:14
156:20,24 164:8
169:16,16,17,23,23
169:24
**somebody**
15:23 88:21 94:11
104:18 151:11
152:12 154:22
164:15
**someday**
117:22
**Someone**
106:25
**something**
6:21 7:1,5 32:12



56:14 69:2 78:4,5
79:6 86:9 88:5
90:16 91:20 94:12
104:17 106:18
117:21 118:12
121:5,11 123:18,24
123:25 125:8 129:5
133:10 140:17
146:7,8 163:1
164:11,24,25 166:3
167:8 168:22
**sometimes**
25:25 35:19 47:4
66:17,18,20,23
74:25 88:18 89:2,11
90:10 105:11,12
109:11 155:15
160:24
**soon**
44:23 85:21 135:18
151:11 165:8
**sorry**
7:16 10:23 11:22
17:13 24:22 43:1
44:10 46:5 48:3
53:2 55:22 68:15
91:25 115:22
116:19 117:1
119:16 130:8
132:20 143:11
145:14 147:16
149:20 158:1
159:11 170:18
172:2
**sort**
47:13 81:23 84:3
105:14 107:2 109:9
112:25 120:2
**sought**
127:10
**sound**
165:23
**sounded**
104:14
**speak**
18:2,11 76:16 98:1

113:8 114:15 115:1
125:22 140:14
**speaking**
126:5 132:7
**speaks**
65:17
**specialist**
14:25 86:5 95:1
122:25 142:6,13
**specific**
6:10 25:10 26:12
42:2 76:19 90:9,9
95:21 130:12,22
133:23
**speech**
80:9,23 107:10 111:6
167:21
**spoke**
8:18,24 37:21 47:11
64:6 115:18 118:17
128:1 140:23 144:9
165:8
**spoken**
65:2,4,9,17 69:4
**spouse**
112:8
**squares**
81:22
**staff**
29:2,7 44:3 76:16
86:11 113:9,23
136:4 140:14 162:9
**stage**
70:21
**Stahl**
1:18 4:16 173:2,16
**stairs**
151:15
**stamp**
43:19
**stamped**
41:20
**stamps**
41:20
**stand**
5:24

**standard**
4:12 109:21 110:20
**standing**
83:10
**start**
23:21 39:8 65:19
96:2 105:22 111:19
120:16 121:13
125:1 129:2 151:6
165:20
**started**
35:23 84:20 157:25
**starting**
12:20 17:3 34:18
52:23 53:5 57:13
59:14 156:25
**starts**
12:23
**state**
1:19 4:19 73:20
83:19,23 107:15
110:5 126:13 138:5
173:3
**stated**
5:21 32:18 52:2
**statement**
5:22 10:4 51:17
123:19 124:25
125:17 128:10
135:13 137:8
141:24 164:11
170:19
**statements**
10:14 12:17 31:9
51:14 53:7,9 57:14
123:18 124:10
152:23
**states**
1:1 4:8 16:16 70:23
71:1,4,12 76:2,15
101:19
**State's**
27:13
**stenograph**
173:6
**stenographic**

173:8
**still**
13:5 65:17 69:22,25
84:21 98:15 108:24
125:8 126:10 150:2
158:11,14 169:24
**stop**
143:20 152:13
158:10
**stopped**
138:23 152:15
**story**
158:4,6 159:3,14
**strange**
39:24
**Street**
2:6,11
**stress**
21:20 103:23 104:3,5
**stressed**
103:24,25 128:13
137:16
**stressful**
13:10
**stressor**
97:12
**stricken**
119:18 135:12
**strike**
26:3 33:6 73:25
114:16
**String**
3:14
**strongly**
48:12 95:8 100:13
102:14
**studied**
75:13
**studies**
16:7 84:4,14,25
85:13,21
**stuff**
7:2 49:6 53:19 70:16
73:14,14 84:15
88:18 89:20 102:12
117:10 137:7,24



**styles**
139:1
**Subject**
34:4
**subjective**
154:19
**subpoena**
5:13
**subtitles**
84:7,22
**such**
21:11 24:12 44:9
59:21,22
**sudden**
157:15
**suddenly**
80:21 113:22
**sued**
116:12
**suffered**
50:20
**suggest**
13:18,19,23 24:6
**suicidal**
79:16 81:21 104:8,9
**suing**
109:20 114:12 116:8
**Suite**
2:6,11
**summarize**
100:21
**summary**
51:17
**superimposed**
20:7
**support**
38:9,19 138:1,3,14
139:8 142:1,4
**supposed**
61:14 98:16 125:19
133:8,16 150:11,12
153:1
**sure**
13:2,22 23:3 41:3
45:19 47:8 56:6
58:8,8 60:17 62:19

64:9 68:24 77:14,24
78:3 81:1 85:20
97:21 99:14 103:4
104:12,13 115:6,21
116:4 118:18 140:1
147:23,23 150:9
153:3 155:20
166:13
**surprise**
76:21 77:12
**surprised**
132:19 133:3
**swear**
5:2
**sword**
129:9
**sworn**
5:4 29:15 173:4
**symptom**
74:4 75:19 125:7
**symptoms**
25:5 70:4,8,17 77:24
78:11,19 86:8 87:15
97:1,8 103:2 107:23
113:12 125:15
139:15 159:23
170:9,12,20
**syndrome**
94:2
**system**
89:10
**systems**
79:3,5 84:8 89:11
143:17

---

**T**

**T**
2:1
**table**
141:7
**tachycardia**
88:16
**take**
19:10 26:9,13 29:6
37:6,25 40:18 45:4
53:12 62:17 65:21

65:24 82:25 86:13
95:9 118:20,24
124:3 126:10,18,19
126:20 129:18,20
129:25 132:14
133:8,16 138:9
143:21,23,24
146:20 147:25
150:8,10 151:25
152:25 156:24
159:8 160:12,14,14
**taken**
1:16 4:13 62:22
126:24 164:10
173:6
**takes**
143:13
**taking**
29:15 145:1 159:4,5
**talk**
18:22 33:8 42:13
49:14 50:5 57:3
58:23 62:7 68:16,17
77:16 78:3 83:14
86:6 92:4 116:5
117:3 124:20 135:2
172:4
**talked**
33:16 38:5 93:24
98:6 101:3 102:3
106:22 107:1 115:6
121:22 123:12
136:13 137:3,3,15
139:14 147:5
**talking**
34:12 39:20 46:7
77:9 86:23 109:10
146:14 148:20
157:2 160:15
**task**
111:24 112:1 127:24
**tasks**
107:19
**techniques**
91:19
**teenagers**

88:5
**tell**
11:1 14:4,14,18
19:24 23:16,23
54:22,25 55:7,14
57:2 58:11,23 59:5
59:10 60:20 62:4,4
76:18 81:21 84:5
94:15 106:8 124:19
127:6 128:10,23
129:17,19 142:5
160:24 165:17
166:2,5,9,25 167:1
167:3 168:17
**telling**
36:22 37:12,24 44:21
49:6 87:8 108:15
137:9
**tells**
7:1 153:24
**ten**
87:13,13 105:14
108:13
**tends**
103:20
**ten-minute**
156:9,16
**term**
20:9 128:11
**termination**
50:21 101:20
**terms**
71:5 108:3
**terrible**
85:19 109:22
**test**
154:10,17
**testified**
5:4 167:8
**testify**
50:16,23 165:23
173:4
**testimony**
33:11 59:19 118:13
146:25 173:4
**text**


MAGNA
LEGAL SERVICES

3:11 35:20 40:16
41:15 42:5 43:1,6,6
43:15 44:20 45:25
48:19
**texts**
37:5 48:23
**than**
16:23 26:18 45:5
67:16 91:23 103:5
109:3 121:6 150:24
158:4 164:12
**thank**
5:1,8 63:2 113:21
137:2 141:21 172:5
**thankful**
141:8
**thanks**
37:5 44:9,11 63:21
64:9 102:18 131:22
160:3 171:7,18
**their**
4:19 14:13,13 51:1
55:15 82:21 83:1,1
104:18 112:22,25
116:13 128:11
136:15,15 149:3
**them**
14:12 59:23 63:6
67:5,20 70:8 76:22
77:7 88:1 110:6
114:24 115:7,10,18
116:8,16,18 118:17
128:10 129:25
130:1 139:9 144:8
152:13 154:7 167:7
170:2 172:4
**themselves**
14:10 115:19
**then**
8:15 9:1,16 10:6,9
15:7 27:23 31:20
34:8 35:19 38:24
39:9,21 41:13 42:9
42:10,19 43:15 44:2
44:7 45:6,24 47:6
48:16,22,25 59:14

59:25 64:6 65:14
70:16 78:6,13,15
79:1,21 81:24 83:13
83:25,25 84:13,16
85:4 86:12 88:10
89:14,24 90:5 91:14
99:17 101:9 105:15
108:11,14 112:13
121:16 123:22
124:20 141:10
147:25 149:8
157:20 158:10
161:10 163:14
165:2
**therapy**
78:1
**there**
7:8,10 8:2,10 10:6,24
10:25 12:15 18:16
19:21 23:9,24 26:9
26:12,16 27:12 29:4
34:4,10 36:24 37:24
43:5 45:17 46:12
52:2,19 54:14,23
71:12 73:11 92:25
93:7,9 96:14,15
97:5,18 98:3,12
103:10 109:2,9
111:24 124:7
128:11 130:6
133:11 136:17
137:23 143:9,20
144:3 146:22
148:12,18,19
151:15 153:22
154:16 155:20,20
157:9 163:13
165:25 169:22
**thereafter**
173:7
**therein**
13:11
**thereof**
173:8
**there's**
19:19 42:10 47:6

84:3,4 85:10 93:9
94:10 95:4 96:2
101:4 103:19 116:5
121:11 154:6,9
155:9 158:3,5
159:13,14
**these**
8:22 26:15 27:6
41:15,18,20,20
57:22 58:10 70:4,21
77:18 78:11,19 80:5
84:7 85:17,17 87:7
88:7 91:6 92:14,20
93:1,20 95:8 96:16
97:13 101:13,13
111:2,19 113:14
124:10 125:14,15
132:15 135:7
139:14 140:14
152:23,25 154:15
**they**
4:19 14:9,12 15:20
21:5 33:8,10,19
40:2 41:6 47:1,2
50:2,5,8,12 51:6,15
52:1 66:25,25 72:9
77:7 78:14,15 87:25
88:4,6 96:25 97:6
110:6 111:22 113:3
113:5 115:5,5,12,13
115:18,19,21 116:2
116:2,2,4,7,11,11
118:12 119:3,13
127:13 128:1
138:21 144:2 149:4
154:6 157:24 158:5
158:13,15 162:9,11
170:4
**they're**
87:9 94:9 95:17 97:9
108:7 129:8 139:16
152:12 153:25
154:23 155:24
157:23 159:2
169:15
**they've**

128:9,9
**thing**
8:4 36:16 39:18
42:12 47:13 57:14
61:25 75:15 77:17
79:14 86:14 90:25
100:8 103:6 120:2
120:12,22,25
121:14 122:9
127:19 151:14
154:20,20 156:16
160:23 164:21
**things**
33:1 69:17 85:4
87:10 90:7 101:13
105:12 111:13,20
120:23 124:22
132:14 137:18
140:14 142:10
156:14 157:9
160:25 165:24
**think**
5:10 6:22 10:10
13:24 18:25 19:1,16
23:4,4 27:22 28:9
30:2,22 38:7 41:2
45:16 48:2 62:3
64:7 67:24,25 68:3
69:23 71:2 72:11
78:14 82:1 89:4
91:3 94:12 96:12
100:4,13 103:10
104:9 105:11,24
106:12 108:2,24
110:17 111:7 112:3
115:17 116:9
117:11 125:18
127:17 128:18
129:11,12 137:21
137:22 140:3
144:15 157:14
160:14,23 161:10
163:2,5 168:6
169:22 171:2
**thinking**
24:13 34:14 35:2


MAGNA
LEGAL SERVICES

77:19 117:19 120:1
145:1 168:11
**thinks**
137:23
**third**
17:3 20:2 34:17
167:15
**Thompson**
16:2,2,3 17:17 18:4
18:16,22,22 46:1,7
47:9 93:17,20 94:16
96:11,13 97:24
125:20 133:7
135:17 138:1 139:9
142:5 161:12
163:16 165:7,8
169:4 171:16
**Thompson's**
138:18
**those**
10:13 12:17 19:14
21:6 25:5,8 41:24
43:3 49:5 53:8 60:2
77:24 79:6,19 81:4
82:10 89:7 90:7,23
91:14 92:24,25 94:8
96:9 97:2 100:21
101:3 102:25 106:5
108:4,6 110:11
113:4,24 120:23
121:21,22 122:21
124:21 128:8
132:14 138:10
141:13 142:9 143:4
156:14 157:8 162:5
170:9
**though**
66:10 92:23 93:5
102:24 103:16
169:15
**thought**
45:11 49:20 66:6
79:17 84:11 106:6
106:10 121:14
123:9,13 125:2
139:12 152:10,14

**thoughts**
34:4 66:25 106:19
**threatened**
32:25
**three**
13:13,18,19,23 14:4
14:15,19 26:18 40:5
43:6 49:22 53:12
58:24 59:7 95:9
147:1,4 157:15
158:22 159:7 164:6
**three-month**
13:9 38:10 39:2,6,10
39:18,22 137:11
160:10
**threw**
157:21 158:23
**through**
18:2 27:3 29:18
51:13 64:16,19
65:24 70:21 86:7,7
97:7,9 99:5 110:6
112:3 119:12
121:14 122:11
140:25 147:24
161:5 171:3
**ties**
143:3
**times**
22:5,10 42:2 50:15
77:17 104:7 120:5
146:25
**tired**
87:7 91:6
**today**
4:10 5:17 11:6 43:21
63:3 65:13,24 68:7
68:25 114:19,23
115:14 120:11
121:12 124:9
137:15 141:7
145:22
**today's**
172:8
**together**
69:7 94:9

**told**
9:23 17:24 18:19
55:4 58:12 59:6,20
61:6 63:3,5 77:6
99:19 108:1 129:21
157:21 158:19
165:25 166:1,3,4,8
166:8,14,20,23
167:4,7
**too**
66:10 75:24 78:4
91:12 92:4 102:15
115:16 125:13
132:22 156:15
164:19 165:5
**took**
17:23 65:20 73:12,13
82:10 161:16
**top**
7:19 8:3,12 11:10
12:21 20:12 34:4,17
48:3 52:19 80:2
90:3 93:25 137:19
145:6 148:9,9
**topic**
111:1
**total**
71:5 76:11 86:17
107:13 108:3
110:10 111:6
140:12 141:9
**totally**
122:2 132:9
**towards**
81:17
**town**
98:25 144:3
**track**
49:5
**trade**
3:9 27:24
**trail**
38:13
**trained**
69:13
**transcriber**

67:25 68:2,4
**transcribing**
69:5
**transcript**
171:22 172:1,13
173:8
**transition**
138:7
**transitioned**
157:16
**transitions**
129:4
**transpired**
62:15 96:14 161:13
**treat**
26:14 29:4 134:20
**treated**
66:7 71:18 94:2,3,5
94:16
**treating**
22:6,11 66:1 67:3
75:6 87:14
**treatment**
17:11 133:14 147:8
162:5 165:6
**treats**
27:5
**trial**
127:24
**tried**
158:10 165:22
**trigger**
88:8,15,15 97:12,23
98:2,3,11 101:4,6
101:11,12,13
102:20,25 103:19
135:24
**triggered**
86:10
**trouble**
64:24 107:18
**true**
16:20 31:13 52:1
66:3,4 69:18 75:2,8
80:14 95:16 96:5
112:17,18 122:2



124:24 126:3
145:21 151:23,23
156:23 160:25
163:21 164:7
169:22 173:7
**truly**
81:9 109:23 134:16
**trust**
155:3 156:6
**trusted**
161:6
**trusts**
160:21
**truth**
64:14 123:20 153:24
168:20 173:5
**truthful**
67:7
**truthfully**
67:20
**try**
15:19 20:10 64:13,18
64:20 91:8,19,22
92:7 93:10 119:24
143:6 147:23
**trying**
39:20 45:25 47:8
84:21 85:17 90:11
109:25 110:4
127:22 142:5,15
157:23 159:2 160:9
164:23 165:23
169:10
**turn**
7:14 10:17 16:4
20:12 41:13 52:17
59:12 103:19
**turned**
140:4
**two**
26:22 76:22 82:18
89:7 100:25 124:21
138:8
**two-month**
27:3
**type**

24:3
**typewritten**
173:7

————————————
**U**
————————————
**uh-huh**
9:4,18 12:22 19:20
34:16 35:5,7 37:17
38:23 42:7 43:18
44:17 46:2,8 48:6
48:18 52:22 53:10
70:25 73:19 79:12
105:19
**ultimate**
147:7
**ultimately**
64:14 76:12 119:13
119:24 134:11
147:3
**unable**
71:2 100:4 108:2
111:7
**uncommon**
91:25
**under**
9:2,7,7 12:16 14:20
16:7 20:2 21:2
24:22,23 28:8 84:24
85:4 88:21 130:12
157:21 158:23
159:18 162:22
163:2,20 167:15,16
167:16
**underlying**
88:23
**understand**
5:16 23:10 41:19
44:21 74:21 79:21
98:10 101:11 110:1
111:2 113:19
115:17 140:24
**understanding**
30:15 48:11 60:1
111:18 117:7
**understands**
167:23

**understood**
80:18 84:2 102:1
117:10 143:15
144:5 168:21
**undertaking**
138:15
**unenthusiasm**
110:16
**unfamiliar**
94:10
**unfortunate**
101:19
**unfortunately**
55:11,22 58:6 64:1
116:24
**unimpaired**
24:19
**unique**
151:13
**United**
1:1 4:8
**universal**
89:21
**unlawful**
127:24
**Unless**
61:4
**unreasonable**
61:17 62:3 139:1
140:8,17
**unsafe**
152:10
**until**
46:11,15,15,25 47:4
57:18,20 58:1,15
62:7 87:17 122:8
151:6 152:3 153:14
153:18 157:1
158:19 165:9
**untrue**
51:23
**unusual**
26:4
**unwilling**
57:16
**up**

6:17 7:22 10:21 20:9
20:17 27:12 36:11
40:12 52:15 68:8
69:22 73:21 74:2
75:16,18 76:10 81:8
81:22 82:11 83:2,4
85:10 96:6 98:17,19
100:12 105:1,5
107:2 108:16,20
109:13 110:8,12
114:16 117:6,22
123:24 124:22
125:19 129:22
143:7,10 150:12
151:14 154:7
161:18 163:11
167:13 168:23
**upshot**
37:24
**urgency**
140:2
**us**
5:9 8:17 19:24 32:3,5
62:17 64:21 65:9
66:25 87:8 91:20
102:15 117:5 126:4
153:3,6 154:16
157:24 166:1
**use**
20:7 67:24,24 68:1
85:17 89:10 100:3
100:25 108:12
110:16 120:2
146:12,13
**used**
25:5 89:12 100:3
119:8 128:9 143:6
143:14
**using**
68:12 129:8
**usual**
73:14 109:4
**usually**
15:20 45:4 82:25
126:2 146:5



## V

**V**
1:9
**vacation**
59:24 156:24 157:4,6
**valid**
154:15
**variety**
75:4
**various**
19:10
**vendor**
84:22
**versus**
4:7
**very**
23:5 37:6 38:1 46:10
72:2 73:17 77:3,13
80:2 82:17 95:11
103:13 117:7 124:3
138:5 143:25 148:9
149:23 150:14,19
154:15 167:19
**via**
4:13 68:9
**video**
4:5 171:22 172:1,10
**VIDEOCONFER...**
1:4
**videographer**
2:16 4:4,15 5:1 62:20
62:24 126:22 127:1
171:21,25 172:7
**VIDEOTAPED**
1:4
**view**
66:14 71:8 120:1
**viewed**
109:23
**visit**
10:18 15:3 21:25
22:4,9,16 23:7
25:20,23 30:1 31:22
35:22 37:2 39:8
70:13,18 71:20,23

79:8 114:7 127:19
149:14 150:19
151:6,10,13,22
166:11 167:12
168:15,18,19
**vitals**
82:10,18
**voice**
68:9
**Volume**
3:19
**voluntarily**
29:19
**volunteered**
149:2 165:1
**vulnerable**
81:9 131:24

## W

**wait**
57:20 68:18 152:13
**waited**
136:9
**waiting**
44:8
**waking**
73:21 74:2 75:16
108:16
**walk**
80:23
**walked**
82:15 83:6 95:24
**walking**
24:13 45:9 112:6
113:7
**walks**
80:21 82:22
**want**
13:2 34:5 40:19,20
43:21 47:2 51:13
52:2 62:17 64:10,16
64:21 65:10,16
69:21 70:20 90:10
92:7 93:6 98:6
102:17,18 103:9
105:8,9,12 108:15

109:18,23 117:15
117:21 119:23
121:11 124:19
127:4,5,6 131:2
144:6 158:12,15
172:4,13
**wanted**
7:24 42:1 57:20 61:4
91:10,11,19 134:25
156:24,25 159:6,17
163:16 169:6
**wanting**
111:13
**wants**
106:17 160:13
**wash**
78:15
**wasn't**
14:22 78:21 83:5
98:21 101:10
118:21 121:4
131:10 136:17
148:18 156:19
157:1,12 160:5
166:21
**way**
6:15 14:1 33:1 39:16
65:19 71:11 72:24
82:21 108:23 112:7
112:16 114:3 116:5
117:19 119:22
130:17,18,19
134:15 136:21
142:16 155:23
**ways**
142:3 156:20
**weaned**
78:13
**website**
27:13 143:11
**weeks**
20:10,16,21 35:3
37:6 38:1 39:23
40:4 92:3 96:7,10
96:17 98:7 140:10
146:23

**well**
7:20 14:8 17:16 20:2
31:12 32:9 35:17
42:21 73:4 78:16
82:1 83:16 86:5
103:17 108:1
111:10 114:14
120:22 121:4 123:6
126:9 145:23,25
150:9 156:8,13,22
159:25 163:19
165:10 166:19
168:12
**wellness**
19:6,7 94:19
**well-developed**
167:20
**well-nourished**
167:20
**went**
39:4 44:24 45:13
74:9 84:17 96:17
107:1 125:19 127:9
133:20,21 152:24
153:14,17
**were**
5:22 6:2,6 16:22
20:19 24:19 32:21
32:25 33:1,5 41:4
50:2,2,6 51:11
57:15,15 64:20 65:5
68:12 71:12,13
72:22,24 84:21 88:5
94:20,22 101:14
104:21 105:6 109:9
116:2 119:8 128:15
129:6,23 130:2,24
131:16,18 132:13
137:5 143:2 144:20
146:14 152:1 164:3
165:13,23 168:11
170:13 173:8
**weren't**
163:23 164:23,24
170:11,19
**Werner**



MAGNA
LEGAL SERVICES

**we'll**
2:16 4:25 64:7
11:3 42:1 59:14 78:3
85:20 92:4 118:24
120:1 125:1 147:25

**we're**
6:15 8:14 10:16 11:5
13:2 26:6 57:13
59:13 62:5 68:21
83:12 85:16,17 87:7
109:19,20 118:19
127:22 141:7,8
151:10 171:2 172:9

**we've**
18:1 35:18 65:1,12
68:7 69:3 103:24
137:15

**whatever**
41:6 68:21 78:1
135:21 140:4

**what's**
6:14 17:25 36:10
42:11 69:14 77:19
85:12 87:2,5,23
102:4 110:6 117:8
118:6,8 149:10
153:5,16

**when**
6:6 11:22,22 15:13
25:23 29:13 31:2,23
31:23 32:16 33:4
39:5,6 40:12 41:21
44:21 46:23 52:25
53:1 58:20 65:20
66:1 67:3,15,19
68:15 69:7 73:3
77:20,23 78:18
80:21 81:8,17 84:18
86:7 99:3 102:20
103:2,18 106:12,22
107:1 108:4 110:2
113:8 114:14,15
115:1,17 116:20,22
117:21 118:17,25
119:8 121:20
123:20 126:9,12

128:18 129:9 130:5
130:23 131:14,23
132:18 133:4 134:3
137:13,20 140:10
143:6,18 144:2
145:25 146:25
153:24 162:8,11,16
163:6 164:3 168:8
168:10

**where**
13:3 16:6,12 18:15
20:14 32:7 84:4,9
84:14 89:14 93:25
94:13 96:25 105:16
124:23 130:8
137:16 143:12,23
156:9

**Whereas**
95:24

**WHEREOF**
173:11

**whether**
25:9 42:13 44:24
48:24 53:8 58:8
77:6,7 92:14 96:1
97:22 104:8 109:1
111:14,22 116:1
126:1 139:11
140:15,15 147:6
155:24,24 159:15
159:17 160:8,9
166:2,4

**which**
8:3,24 10:18 34:9
41:2 48:12 79:23
109:10 113:13,14
125:15 144:21
153:8 155:5 157:3
166:17 167:12

**while**
23:25 53:14 56:1
57:4 60:7 140:11

**who**
8:18 9:8 12:6 16:1
18:3,7 21:1 28:4
50:8 64:5,6 66:24

88:21 92:6 105:5
114:12,19 115:12
115:13,19 116:2,2
116:12 127:25
130:22 131:3
160:21 161:2 162:5
169:14,23

**whole**
79:14 127:19 133:6
133:14 158:4,5
168:17

**whom**
4:19 114:23

**whose**
106:13

**who's**
55:14 114:12 160:11

**why**
13:25 14:7,14 39:20
40:25 66:5,8,20
67:10 88:20 94:18
98:8,10 100:24
104:13 108:9 117:6
117:9 122:25
126:18 133:19
134:5 135:16 136:7
138:9,17 142:4
156:15 164:22
169:3 170:18,24
171:13

**wife**
111:15

**will**
4:18 5:1 10:10 13:11
17:1 20:9 30:3
47:12 50:23 96:25
131:11 163:11

**William**
18:3

**willing**
43:23 77:2

**wish**
49:18 100:13 115:8
115:23 117:2
140:23,24

**withdrawn**

112:22

**within**
1:19 173:3

**without**
24:18 164:13

**witness**
5:2 42:18,19 49:25
50:2,3,7,17 51:3,6,8
51:11 132:5 160:12
173:11

**wonder**
125:16

**wondering**
26:2 43:23 48:24

**won't**
115:12

**word**
90:9 110:17 146:12
146:13

**words**
44:4 90:9 95:8 100:3
135:7

**work**
10:9 13:10,12 14:16
16:17,23 17:2 21:2
21:20 22:13 35:3
42:9 43:22 46:11,15
47:1,2,4 53:13 61:7
71:5,13 73:21 74:3
75:16,18 76:10,19
76:22 84:21,23,24
88:19 95:11 97:3,13
97:23 98:3 101:6,14
101:25 102:20,24
102:25 103:2,5
107:24 108:2,3,5,7
108:10,17 110:19
111:4,7,25 113:8
120:2 122:6 125:19
125:21,23,24
126:11,12 130:23
133:8,16,21 134:21
135:1,24,25 137:11
137:14,17,21
140:12,14 142:4
146:4 152:11,25



146:4 152:11,25 153:17 163:8 169:15

**worked**
46:15,24 73:8 98:22 99:14 122:7 152:3 153:18

**working**
8:19 23:21 24:13 97:18 98:21 99:3,18 127:14 129:2 136:3 150:2 153:14 165:20

**works**
121:7

**work-related**
59:22 60:5,21 61:15 63:16

**world**
92:19 96:4 102:17

**worried**
88:14,23 89:6 104:21 104:23,24 105:6 106:16

**worries**
16:15

**Worry**
89:5

**worsened**
134:2

**wouldn't**
26:20 31:11 58:20,21 61:10 62:15 100:15 139:3 140:9 142:9 146:17 152:11,15 156:20,20 159:9 167:4,6,6

**wow**
7:15 89:22

**write**
19:13 128:20

**written**
32:4 106:9

**wrong**
16:8 53:3 85:21 105:12 106:9

117:12,17,18 124:20

**wrongdoing**
64:25

**wrote**
14:1 35:9 76:5,6

---
**X**

**X**
3:1 134:1,2

**x-rays**
84:15

---
**Y**

**Y**
134:1,2

**year**
41:2 78:20 80:12 97:17 118:22 128:1

**years**
49:22 65:7,8 67:14 67:16 72:1,10 87:13 87:14 105:14 108:13 113:15 115:7 127:14 130:19 143:17

**yellow**
89:10

**Yep**
72:4 87:12 148:22 149:2

**yesterday**
27:14

**yet**
92:8

**yours**
10:19 102:18

**yourself**
160:13

**you'd**
5:10 7:14 43:23 48:16 52:17 95:25 112:16 136:14

**you'll**
6:17

**you're**

5:16 8:2 14:23 30:20 45:5 49:6 52:18 64:24 69:7,8,12 74:20 77:19 80:14 80:15 90:11,15 94:10,24 95:3 111:2 112:6 117:11,15,16 117:16 119:25 121:10,17 124:12 124:19 126:1,5,9 130:11 132:5 137:16 141:6,7,8 142:20 143:19 149:18 154:5 156:4 160:20 168:18

**you've**
9:11 30:10,13 40:12 63:5 65:4,12 74:12 75:9,12 87:14 94:3 94:5 105:16 128:10 145:21 160:25

---
**Z**

**Z**
134:1,3

**zoom**
4:14 83:13 114:23 123:16 127:4

---
**0**

**0.5**
20:8

**000**
7:15

**000466**
7:12

**000503**
7:25 8:8

**00053**
7:14,16

**01/16/2026**
1:5

**02/19/2003**
3:10

**04/13/2026**
173:20

**04/25/22**
3:15

---
**1**

**1**
40:15 57:18

**1st**
9:13 58:1,15 62:8 158:20

**1:00**
44:10,16,20 45:18 46:14 47:4 152:2 153:13,18

**1:23-cv-01921-NY...**
1:2

**10**
142:22

**10/07/21**
3:12

**10:00**
46:11,16,25 48:22 122:8 152:3 153:14 153:18

**10:04**
48:23 49:10,13

**10:30**
42:9

**100**
2:6

**105**
3:9 27:8,9

**105-109**
173:8

**106**
3:11 40:8,9 43:1 48:17

**107**
3:14 47:19,21

**108**
3:18,20 52:11,12 117:25

**109**
3:20 118:1,2,6

**11**
120:3 164:9

**11/21/24**



3:21
**11:10**
43:16,19
**11:33**
44:3
**116**
52:17,21
**118**
57:11 82:13,16,22
   83:2
**119**
59:13
**12**
45:4
**12/10/2024**
3:19
**12:06**
44:8
**12:10**
35:23 151:7
**123-CV-01921-NY...**
4:10
**14**
57:13
**147**
3:4
**15**
45:2 72:1 128:23
   142:22 165:16
**150/100**
83:16
**16**
1:17 3:2 4:1
**16th**
4:11 149:18 164:13
   172:9
**17th**
2:11
**171**
3:5
**18th**
145:14,15
**1996**
28:9

---
**2**

**2**
10:25 12:20,25 34:9
   43:1 69:23
**2A**
10:25
**2C**
10:18,25 11:4,5
   69:23 167:12
**2:03**
1:17
**2:06**
4:1
**2:07**
4:11
**20**
113:15 127:14
   130:19 149:20
**2003**
11:20 28:10,13
**2011**
9:13 71:18
**2022**
10:20 11:25 30:1
   51:21 57:18 58:1
   59:20 73:17 95:12
   105:23 108:15
   120:6 121:21 168:7
**2023**
41:3
**2024**
29:14 31:24 32:14
   68:4 118:14
**2026**
1:17 3:2 4:1,11 172:9
   173:12
**21st**
36:1 118:14
**22**
120:6 121:21
**22nd**
10:20 11:25 23:6
   30:1 35:23 36:14,23
   36:25 38:17 39:5,21
   51:20 59:20 145:16
   149:15,20 168:7
**23**

59:14
**25**
150:17,24
**25th**
38:24 39:5,22
**27**
3:9
**2701**
2:6
**28th**
25:15
**29th**
48:7 49:17 173:12

---
**3**

**3**
43:1
**3-1-11**
9:8
**3:24**
62:21,22
**3:39**
62:23,25
**30**
143:17
**303-801-3535**
2:12
**38**
7:20 148:8,9

---
**4**

**4**
16:5 19:18 53:5
**4-22**
43:9 46:13,20
**4-22-2022**
43:3,4
**4-25**
46:1,5
**4-28**
47:11
**4-29**
48:19,20
**4:04**
49:7,8
**4:29**

49:7
**4:51**
126:23,24
**40**
3:11
**46**
36:11
**464**
173:17
**47**
3:14
**483**
7:18

---
**5**

**5**
3:3 20:13 54:2
**5:00**
43:23,25 44:3,4
**5:04**
126:25 127:2
**5:10**
43:17
**50**
43:20
**50s**
82:22 83:1
**50-year**
101:20
**500**
7:24
**503**
7:16 8:3
**52**
3:18
**54**
44:19
**55**
6:15,16 148:2
**57-year-old**
12:6
**5956**
8:6 9:2
**5956's**
10:8



| 6 | | | |
|---|---|---|---|
| **6:09**<br> 172:8,10,16<br>**6:38**<br> 36:14<br>**6:39**<br> 37:1,16 38:21<br>**63**<br> 3:4<br>**67**<br> 33:23 145:8,9 | | | |
| **7** | | | |
| **7:21**<br> 25:19 | | | |
| **8** | | | |
| **800**<br> 2:11<br>**80202**<br> 2:6,12<br>**80459**<br> 173:17 | | | |
| **9** | | | |
| **9**<br> 130:9<br>**9:00**<br> 12:8,12 35:11,25<br>   36:7,9 37:20 38:6<br>   65:14 78:6 104:15<br>   104:19<br>**9:30**<br> 42:11<br>**9:57**<br> 48:8,21 49:12<br>**911**<br> 107:13 164:16<br>**96**<br> 28:12<br>**99**<br> 155:6<br>**999**<br> 2:11 | | | |


MAGNA
LEGAL SERVICES