IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-01921-NYW-MDB

_____

DR. ANUJ PEDDADA,

    Plaintiff,

vs.

CATHOLIC HEALTH INITIATIVES COLORADO D/B/A CENTURA
HEALTH-PENROSE-ST. FRANCIS HEALTH SERVICES; and,
COMMONSPIRIT HEALTH FOUNDATION D/B/A COMMONSPIRIT HEALTH,

    Defendants.

_____

DEPOSITION OF JASON TACHA

_____


Friday, August 30, 2024

10:17 a.m.


PURSUANT TO NOTICE and the Federal Rules of Civil
Procedure, the above-entitled deposition was taken on
behalf of Plaintiff at 2170 Lawrence Street, Denver,
Colorado, before K. Michelle Dittmer, Registered
Professional Reporter and Notary Public within Colorado.



Page 2

APPEARANCES:
ON BEHALF OF THE PLAINTIFF:
    IRIS HALPERN, ESQ.
    CRIST WHITNEY, ESQ.
    Rathod Mohamedbhai LLC
    2701 Lawrence Street, Suite 100
    Denver, Colorado 80205
    303-578-4400
    jh@rmlawyers.com

ON BEHALF OF THE DEFENDANT:
    LINDSAY McMANUS, ESQ.
    MARK SABEY, ESQ.
    Hall, Render, Killian, Heath & Lyman, P.C.
    999 17th Street, Suite 800D
    Denver, Colorado 80202
    303-802-1299
    lmcmanus@hallrender.com
    marksabey@hallrender.com

Page 3

I N D E X
EXAMINATION                          PAGE
August 30, 2024

By Ms. Halpern                          4

                    INITIAL
EXHIBITS                          REFERENCE
Exhibit 8    Exclusive Professional Services        87
             Agreement for Radiation Oncology
             Services
             (PSF-Peddada-0046 - 74)

Exhibit 9    Email chain, top email 5/11/22 to       112
             Jennifer England and Samuel Weller
             from Eric Koval
             (PSF-Peddada-0223N - 226 )

Page 4

P R O C E E D I N G S
* * *
JASON TACHA,
having been first duly sworn, was examined and testified as follows:

EXAMINATION
BY MS. HALPERN:

Q.  So, hi there.  My name is Iris Halpern. We introduced ourselves before this deposition.

Could you state your full name for the record.

A.  Jason Tacha.

Q.  Jason "Tacha"?

A.  Uh-huh.

Q.  I just want to make sure I'm pronouncing it right.

Have you ever been deposed before this time?

A.  I haven't.  No.  First time.

Q.  Okay.  Well, that will reduce my questioning then.

Okay.  So I'm just going to go through some rules of the deposition, and if you have any questions, let me know.

The big one is to articulate your answers

Page 5

so that the court reporter can hear them.  No, like, shaking of the head because that doesn't show up --

A.  Sure.

Q.  -- on that.

The other one is -- and I feel like both of us might have some problems with this today -- waiting for each other to finish before we jump in over each other.  My whole family tends to talk over each other. It's just, like, how I grew up culturally.  But that's just to create a cleaner record.

You can take breaks, just ask.

Your attorneys can object during the deposition if they don't like a question that I ask, which sometimes does happen, you know, not even sometimes, maybe even more than a few times, just because it's confusing or whatever and they're just preserving their objection for trial.  But you can still go ahead and answer, unless they instruct you not to do so.

Okay?

And then I'm going to -- you can ask for clarification if you don't understand something, feel free to just let me know.  I will try to rephrase it or reask it if you didn't hear it, et cetera.  But if you don't do that, I'm going to assume you understood the question.  I assume that is fair for me to assume if you




Page 6

don't ask me to clarify.

Are we on board there?

A. Sounds good.

Q. Okay. Any other questions at all about this since this is your first time?

A. I don't think so.

Q. Okay. Are you on any medications that impair your memory at all?

A. I am not.

Q. Okay. Any reason you can think of where you can't answer fully today, any memory issues or anything like that?

A. No.

Q. Okay. So you just took an oath, right? Do you understand what that oath meant?

A. I do.

Q. Okay. And what did it mean?

A. That I --

Q. This is how it's going to be all day today, so . . .

A. To tell the truth.

Q. Okay. So what did you do to prepare for today's deposition, if anything?

A. I had a couple meetings with my attorneys.

Q. All right. So one of the things that

Page 7

might happen today is when I'm asking about meetings that attorneys might be present at, I'm not intending for you to divulge any of the information they actually shared with you or spoke about with you. It will be more just, you know, did you meet with them, et cetera.

So just -- that's kind of an attorney-client issue, okay?

A. Yes.

Q. So you said you met a couple times. Could you tell me a little bit more about that. When did you meet with them?

A. Gosh, it was probably in the last two weeks. For an hour each time, max.

Q. Okay. Where did you meet?

A. It was via Zoom, Teams meeting.

Q. Okay. And -- so that's twice.

Did you talk to anyone else in order to prepare for this deposition?

A. I have not.

Q. Okay. Did you review any documents?

A. I did. There were some documents that were sent to me.

Q. Okay. Do you recall what those documents were?

A. They were -- it was emails in there.

Page 8

There was the actual employment agreement. There was my letter. Yeah.

Q. Okay. The letter that you signed when you rescinded the job offer from Dr. Peddada?

A. That's correct.

Q. Okay. Emails, what emails were you referring to?

A. That's a good question. They were just some emails between operators within the Colorado Springs market. Our attorney for Centura was on those emails as well.

Q. And that would be Jennifer England?

A. Correct.

Q. Okay. I think I -- we probably have a copy of those.

A. Yeah.

Q. They might come out later.

Any other documents that you reviewed?

A. No.

Q. And did you talk to anyone else about this deposition or in preparation?

A. I have not.

Q. Okay. Have you talked to anyone else about this case, other than attorneys?

A. I have not.

Page 9

Q. Okay. I'm going to just get a little bit of background.

A. You bet.

Q. Okay?

A. Uh-huh.

Q. So could you give me a little bit of your educational background?

A. Sure.

Undergrad here at University of Denver, biology major. Then I went to CU-Denver for graduate school, MBA, and then a master's of science in health administration.

Q. Okay. Without going into significant detail, could you walk me through your employment history before starting your work for Centura.

A. Sure.

You know, coming out of grad school, I did a fellowship, administrative fellowship, with Kaiser Permanente. I was --

Q. Okay. Where was that?

A. Here in Colorado.

Q. Okay.

A. In Denver. I was employed with them for 20 years, various leadership roles.

And then went to Centura Health, was

3 (Pages 6 to 9)




MAGNA
LEGAL SERVICES

Page 10

employed with them, I'd say about 4 1/2 years, before we -- before the disaffiliation of Centura between CommonSpirit and AdventHealth. And upon disaffiliation, I joined AdventHealth in my current role.

Q. Great.

So you kind of -- you beat me to it because I was going to ask some boring administrative questions about this disaffiliation --

A. Sure.

Q. -- I believe is what you called it, because I believe you have some insight on that.

So you worked at Kaiser for 20 years. What position did you have at Centura and when did you start that?

A. I had a vice president of operations role at Centura -- gosh, I'm horrible with dates -- but I want to say it was in '99, is when I started there -- no, excuse me, '19, 2019. Not '99, 2019. It was right before COVID, about six months before COVID.

So I was in that role for, gosh, probably two years. And then I was asked to serve in an interim role as president and CEO for Centura Health Medical Group and fulfilled that, I would say, probably about 16 months, I was in the interim role.

Q. Can you describe to me the difference

Page 11

between Centura and the Centura Health Medical Group?

A. Oh, you bet.

So Centura Health, that's the system, the health system made up of the hospitals plus the physician group. And so I specifically -- my role was within the medical group, so not -- I didn't -- I didn't have any responsibilities for any of the hospital operations; it was purely around our employed, as well as aligned medical practices.

Q. And that is when you became the interim president of the Centura Health Medical Group?

A. I -- it was at that point in time, yeah.

Q. Well, I'm just trying -- the job duties you described, is that when you were the VP of operations or when you were the president of the Centura Health Medical Group?

A. So the VP was narrowed to primary care services.

Q. Okay.

A. As the interim president, it was all the services for medical group: specialty and primary care. Yep.

Q. And then, just, why -- if you know, why is there a Centura Health Medical Group operating within Centura or why was there?

Page 12

A. So --

MS. McMANUS: Object to -- object to foundation.

You can answer.

Q. (By Ms. Halpern) Right. You know how I said that they were going to object?

A. Yes.

Q. Okay. But you can still --

A. So --

Q. -- answer the question.

A. -- can you just restate your question?

Q. Sure.

If you know, why was there, like, a Centura Health Medical Group operating within the overall Centura? Why was that, like, a separate entity?

A. You know, a lot of health systems will have an employee group as part of the broader health system, and so, yeah, strategically, many health systems will have employee medical groups.

Q. Is that the same now for Advent?

A. It is, yep, yep. It's AdventHealth Medical Group, which I work for today, yeah.

Q. I'm going to ask you a little bit more about your duties in a minute.

And what did you say your position was at

Page 13

AdventHealth after the disaffiliation?

A. Chief operating officer for AdventHealth Medical Group.

Q. Okay. Could you explain the relationship to me between what was Centura CommonSpirit and AdventHealth --

A. Yeah.

Q. -- when -- when -- before the disaffiliation?

A. So Centura was a management -- was the management company of the two sponsors, so AdventHealth and CommonSpirit. So each of those entities own their own assets, even under the Centura management operating agreement.

And so Centura purely was -- was just that, was a management company of those -- of those individual sponsors' assets, is how I would describe it.

Q. Sure.

And when you say that they "owned their own assets," CommonSpirit and AdventHealth, what exactly does that mean?

A. Yeah. So the hospitals -- so each of the hospitals that were a part of Centura Health either were owned by AdventHealth or CommonSpirit and the associated practices, medical group practices, that rolled up to

4 (Pages 10 to 13)



Page 14

each of those facilities.  So -- so AdventHealth, we use the -- you know, so Porter Adventist Hospital, right, the -- at the time of this affiliation went to AdventHealth because they were -- those were AdventHealth assets.

Then within that market where Porter resides, there are a number of outpatient practices that the medical group -- those are medical group practices.  Those two are assets of AdventHealth, so those assets, at the time of disaffiliation, just continued on obviously with the sponsor for which -- for which owned those assets.

And so CommonSpirit had, you know, a number of hospitals here in the Denver metro market, Kansas as well at the time, and Utah, actually, that, upon disaffiliation those, you know, remained under CommonSpirit, and Adventist remained under AdventHealth.

Q.  And when you were the VP of operations at Centura, like -- did you work directly for Centura, the management company?

A.  I did, yep.

Q.  Okay.  So --

A.  I did.

Q.  -- you didn't work for CommonSpirit or AdventHealth?

Page 15

A.  I did not.

Q.  Okay.  And could you explain to me a little bit about what, if any, relationship exists between CommonSpirit and AdventHealth after the disaffiliation?

A.  There is no relationship, yeah.

Q.  And how did they operate as entities -- did they operate as separate entities when they were affiliated because they own their own assets?

A.  Yeah.

Q.  How did that work?

A.  Yeah.  So AdventHealth, yeah, there was -- I -- and I wasn't a part of -- in my role within Centura, I didn't participate in any of the combined board meetings that they had.

So -- but, yeah, so all the assets, again, were separate, separate entities.  I think there -- again, I -- I don't have direct knowledge of the board structure, but I -- yeah, under Centura, I believe, there was a board structure that had, you know, AdventHealth and CommonSpirit.

Q.  And so who did you report to when you were the VP of operations at Centura?

A.  Scott -- well, two people.  So initially, it was Vance McLarren, and then after he left the

Page 16

organization, it was Scott Lichtenberger.

Q.  And who did they work for?

A.  So at the time, Vance actually reported to Scott Lichtenberger before he left the organization, and then Scott Lichtenberger reported to Peter Banko.

Q.  And what entity did those individuals work for?

A.  They were a part of the medical group as well.

Q.  And the medical group was, like, a Centura entity?

A.  That's correct, yeah.  Correct.

Q.  And do you know anything about the relationship between Catholic Health Initiatives Colorado and Centura?  How did that work?

A.  Not -- not -- yeah, no.

Q.  Okay.

A.  Just that they were a sponsor.

Q.  That was an okay --

A.  Yeah.

Q.  -- answer.

Do you know anything -- I mean, did you understand the relationship between Colorado -- Catholic Health Initiatives Colorado and CommonSpirit?  What do you know about that?

Page 17

A.  Just, again, that -- the assets we were -- that we talked about.  I -- I wasn't -- I never interacted directly with CommonSpirit --

Q.  Okay.

A.  -- or with AdventHealth at the time.  So I really don't have a lot of working knowledge of CommonSpirit.

Now I do more so now that I'm a part of AdventHealth.  But, you know, under the time that I was with Centura, it was -- it was just Centura that I worked directly with.

Q.  And did you have any understanding of the difference between Catholic Health Initiatives Colorado and CommonSpirit?

A.  No.

Q.  All right.  What was your -- when you were the VP of operations, you did that between 2019 and approximately 2021?

A.  Correct, yep.  Yep.

Q.  Could you describe your duties when you were the VP --

A.  Sure.

Q.  -- of operations?

A.  Yeah, so I -- I -- and at that point in time, had accountability for primary care operations,

MAGNA
LEGAL SERVICES

Page 18

so -- so all of our clinical operations, I had the accountability for.

So anything that was happening within our primary care clinics, so from, you know, employment of physicians to management of staff, accountability for all outcomes as it relates to the quality of patient experience, engagement, our, you know, finances. Basically P&L accountability for primary care operations.

Q. Profit and loss?

A. Yes, yeah.

Q. You said kind of management of staff.

How many -- could you describe that a little bit more? I can't imagine that you singlehandedly oversaw every person --

A. No.

Q. -- under you?

A. No. No, I didn't.

Q. But could you just talk about that structure of management.

A. Yeah.

So under -- under my structure, I had directors of operations.

Q. Okay.

A. Then they had practice leaders. And those practice leaders were responsible for, of course, the

Page 19

day-to-day operations within the clinic.

And so scopewise, you know, I'd be guessing a little bit, but it was probably north of 1,000 employees at that point in time. Gosh, and physician count for primary care was, I don't know, probably 150.

Q. Physicians?

A. Yeah, physicians and VPPs, I should say, which are our advanced practice providers, PAs and nurse practitioners.

Q. And was this --

A. And that was primary care.

Q. Was this in, like, a certain geography, or was it all of Colorado?

A. Yeah, all of Colorado and Kansas for primary care, yep.

Q. I'm going to test your memory.

Do you know what the facilities you oversaw were, the operations?

A. Oh, gosh.

Q. And if it's like a 500-entity list --

A. Yeah, it was --

Q. -- you can tell me.

A. Yeah, for -- for primary care services, we had, gosh, near 30 clinics.

Q. Okay.

Page 20

A. Distributed, again, through the Denver metro area, Colorado Springs, Pueblo, Canon City, Durango, and Southwest Kansas.

Q. And was that CommonSpirit and AdventHealth --

A. That's correct.

Q. -- assets?

A. That's correct, yep.

Q. And can you -- who was -- if anyone, who did you report to when you were the VP of operations?

A. So that was Vance McLarren that --

Q. That was Vance --

A. -- I reported to.

Q. -- and then Scott?

A. When Vance left, which actually -- so Vance was our president and CEO of the medical group. And so when he left is when I was asked to fulfill the interim role, and that directly reported to Scott.

Q. Okay. So the president of the medical group is a position above the VP of operations?

A. That is correct, yep.

Q. Okay. And when you were the interim president of Centura Health, what were your duties -- Centura Health Medical Group, what were your duties?

A. So similar to those duties under my vice

Page 21

president role of primary care, but the scope expanded to all service lines. So primary care and specialty care was my scope at that point.

Q. And you said you were with Centura, I think 4 1/2 years, approximately, total, until the disaffiliation?

A. Correct.

Q. So you did the interim president of the Centura --

A. It was about a year and a half, is when I was in that role.

Q. In the president of --

A. In the interim, yep.

Q. Could you describe your duties when you were the interim president of the Centura Health Medical Group as well?

A. Yeah.

So, again, accountabilities. My accountabilities were for all operations of all clinics at that point in time, specialty and primary care.

So similar to my role as VP of primary care operations, now I had -- in addition to those directors from primary care, I actually had the vice president now of specialty care that reported to me. And she, again, had a downline of directors and practice



Page 22

leaders that managed all of the specialty care services.

In addition to the day-to-day operations, I had an accountability or responsibility then to work with -- with our vice presidents that had the relationship, the accountability for nonemployed practices as well. So those are practices that are, again, not employed but there is a financial relationship, we call them a PSA agreement, and so --

Q. What does PSA stand for?

A. Provider service agreement.

Q. Okay.

A. So, again, not employed but there is a contractual relationship, financial relationship with those independent practices. And so we had vice -- we had two vice presidents that actually oversaw those relationships, and then -- so I had accountability for those as well.

Q. And who are those two individuals who oversaw those relationships?

A. Kevin Jackson. He was for the Denver metro market. And then Sam Weller for the -- for markets outside of Denver, so he had the Springs, the Canon City, Pueblo, Durango, and Southwest Kansas.

Q. Okay. And that was during the entire duration that you were the interim president of Centura

Page 23

Health Medical Group?

A. That's correct, yep.

Q. And so what kind of responsibilities -- I think you went through, when you were talking about the VP of operations, the kind of primary care operations. And you talked about kind of, you know, overseeing clinical operations, employment management, like quality control, finances, basically the profit and loss of operations.

A. Uh-huh.

Q. Any additional major job duties when you were the interim president of Centura Health Medical Group?

A. No. I think the main difference was just the extension of now having more involvement with our provider service agreements.

The other -- the other main -- main responsibility that was different from my vice president role was I would sign all employment agreements. That was the responsibility of the -- the president and CEO. So all -- again, all employed agreements would come to me for signature and execution of those agreements.

Q. Okay. And how about these PSAs; did you have to sign those as well when you were the interim president?

Page 24

A. I did not. So Scott Lichtenberger usually would be the -- the signature on the -- the PSA agreements, so . . .

Q. This is just a chronological question.

A. Yeah.

Q. So what was Scott's position when you were the interim president at Centura Health Medical Group?

A. I think the official is like senior vice president for physician enterprise, I think was his title.

Q. And what other kind of duties did you have in terms of employment; did you make decisions to hire, to terminate when you were the interim president?

A. Yeah, I would -- yeah, both.

Q. I mean, did --

A. Hiring --

Q. -- this decision have to go through you?

A. So all of the -- no, in fact -- I mean, most of the decisions to hire or terminate were below me.

Now, for hire, I had to sign all the agreements, all the physician agreements.

Any -- of course, any of the other care team members, our APP's, which are -- they're not on contract, and then any other care team members, I obviously was not directly involved in hiring or firing

Page 25

of those individuals.

Q. So why did you have to sign all of the hiring agreements?

And that's just for -- I'm sorry, could you reiterate who that --

A. Just for --

Q. -- was for?

A. -- physician.

Q. Physicians?

A. Yep, physician agreement, employment agreements. Yeah.

Q. Why did you have to sign all of those?

A. That was part of the contract in terms of stipulation of an executed agreement, is that the CEO of the medical group had to sign off on those before they became fully executed.

Q. Okay. And what was typically your role in terminations, if any, of physicians?

A. Really wasn't, I mean, directly involved in the terms. I was made aware of them, but it wasn't necessarily a decision directed by me.

It's usually our -- you know, our either directors of operations or medical directors that would be directly involved in those -- in those decisions.

Q. So you're just kind of like a rubber stamp



Page 26

on those?

MS. McMANUS: Objection to form of the question and foundation.

Q. (By Ms. Halpern) What would --

MS. HALPERN: I asked what his position was. What's the objection to that form?

MS. McMANUS: I said the -- I'm sorry?

MS. HALPERN: What was the objection to the form or foundation? I said, Why did you.

MS. McMANUS: No, I'm sorry.

MR. SABEY: You just used the word "rubber stamp."

MS. McMANUS: Yeah.

MS. HALPERN: It's an imprecise term.

MS. McMANUS: Yeah.

Q. (By Ms. Halpern) Okay. Do you understand what I'm saying when I say "rubber stamp"?

A. Yeah, my -- my role in actually signing off the agreement was to ensure from a fair market value perspective, you know, that the contract was either commercially reasonable or that it met fair market value from a compensation standpoint, is usually -- I mean, is why I would review the agreements and sign off on those.

Q. Sure. I was asking about the terminations, but that is helpful information to know.

Page 27

So when it comes to hiring physicians, that was your role, to make sure that it was -- kind of met market standards?

A. Yeah, from an employment agreement standpoint, yeah.

Q. Okay. Now, for terminations, you said you weren't directly involved typically?

A. Huh-uh.

Q. But you had to sign when physicians were terminated --

A. No.

Q. -- or no?

A. There was no -- yeah.

Q. All right.

A. No signature of the -- of the term, per se.

Q. Okay. So what was your role in terminations of physicians when you were the interim president?

A. There really wasn't an official role for terminations. I was usually made aware of them, but it wasn't -- it wasn't -- there wasn't a requirement on, you know, an action on my part to term a physician.

Q. Okay. What about any other types of HR or personnel functions; did you have any other ones when you

Page 28

were the interim president?

A. I mean, for my direct reports, I did, right, yeah. So -- so any of my downline that I had a direct reporting relationship with, I had responsibilities there. Hire, fire, performance evaluations. But beyond that, no.

Q. Okay. So who were you involved -- when you were the interim president, who did -- for whom did you give input in terms of evaluations, performance evaluations?

A. My direct reports.

Q. And those were?

A. Gosh, there were numerous at the time. Do you want names, or do you want roles?

Q. Let's go with positions for now.

A. Yeah.

It was vice president.

Q. Okay.

A. I had two medical directors, one for primary and one for specialty. They were VP roles as well.

And then in my primary -- in the primary care space, because we didn't backfill my VP roll of primary care, I still had the directors for primary care that were part of my dealing.

Page 29

Q. So how many, approximately, was that, how many individuals?

A. Oh, gosh, probably ten. Yep.

Q. And did Centura have -- when you were the interim president of the Centura Health Medical Group, did it have any criteria, like criteria policies, in terms of evaluations?

A. So -- of employees or --

Q. Yeah.

A. -- physicians?

Q. Let's break it up.

Of your -- of the individuals that you -- that were your direct reports.

A. They did not have a -- I'm trying to think because it did evolve over time -- did not have a formal evaluation process. There -- there were obviously things that we evaluated in terms of performance, but it wasn't a, you know, annual -- annual review, per se.

Q. Okay.

A. Right?

And then physicians, no. There was not an annual process for performance review. Again, you know, throughout the year, we look at quality metrics, we look at productivity, you know, and if there's concerns associated with those performance domains, we would have



MAGNA
LEGAL SERVICES

Page 30

conversations. But there wasn't a formal evaluation process annually.

Q. Okay. And when you were the VP of operations, is that the same?

A. Yeah, yeah.

Q. Did you have any role in evaluations when you were the VP of operations?

A. Again, in my direct line, yeah.

Q. Okay. How about physicians?

A. Not a direct responsibility, no.

Q. So there was no kind of annual evaluation for physicians.

How did you provide feedback on performance when you were the interim president at Centura Health Medical Group for physicians?

A. Yeah, similar to what it was when I was vice president. Again, so we have -- there's multiple different forums that you would review performance data.

Whether that was at a, you know, operational leadership meeting, whether it was in a town hall, obviously not reviewing individual performance in those broader forums.

If there were issues at an individual level, those would usually be reviewed by the direct leader of that individual or -- so for a physician, as an

Page 31

example, medical director, ops director for that service, for that practice, would be directly involved in providing that feedback.

Q. And -- I mean, is that feedback documented anywhere, or was it verbal?

A. Only -- I would say it was only documented in the case where there was the potential for corrective action that needed to take place, and there was a formal process for -- for corrective action.

Q. What did that process for corrective action look like?

A. Usually --

Q. For -- let me specify.

Is it the same for your direct reports when you were the interim president as physicians, or was there a difference between the two?

A. Well, I would say that the corrective action process is more spelled out for care team members, so non- -- nonphysicians.

So it's usually -- it's a progressive disciplinary action process where there's a coaching, there's a documented conversation, there is -- and -- and I wouldn't be able to tell you offhand if there's one, two, or three levels of corrective action before you would get to a point of termination, but there is a

Page 32

progressive process by which you would --

Q. Okay.

A. -- follow.

Q. And how did that differ from physicians and corrective action?

A. It probably wasn't as formal in terms of those specific steps, but when we got to a point where -- again, that there was probably a trend in performance, you would start to document those conversations, right? Whether there was a specific improvement plan in place, that would be documented. Yeah.

Q. Was it -- was it -- let me rephrase this.

Do you have any examples off the top of your head? I don't need the name of the actual physician or anything:

But do you recall any instances where you are aware of -- when you were the interim president at Centura Health, that you were aware of a physician getting -- going through the process of corrective action?

A. I don't. Yeah.

Q. Would you have been involved in that at all?

A. Likely no.

Q. Okay.

Page 33

A. Yeah, yeah. Only if it had been my vice presidents, medical directors, but there was no --

Q. Okay. Let me ask about your direct hires, then.

Have you ever been involved -- or -- "ever" is a bad term.

How about when you were interim president of Centura Health Medical Group; do you recall a process when you had to put someone on corrective action that was your direct report?

A. I did not have to.

Q. Okay. How about when you were the VP of operations?

A. I do not recall ever having to put somebody on a corrective action, of my direct reports, yeah.

Q. So how did you know what the process was when you were the interim president for corrective action for your direct reports or physicians --

A. Yeah --

Q. -- which seems --

A. -- that's something that --

Q. -- a little different?

A. Yeah, that was something that we would obviously educate our leaders on, our HR team would

9 (Pages 30 to 33)



Page 34

educate our leaders on. So through that education and being -- I mean, just being familiar with it, yeah.

Q. Did you ever get any training on it from HR?

A. Yeah, there -- there is training on -- on the progressive action disciplinary process, correct, yep.

Q. What do you recall about that training from HR?

A. Again, just the different steps, like I mentioned. You know, coaching session, documented conversation.

And it varies, depending on what the performance issue is, whether it's an attendance issue, whether it's behavior issue, in terms of the specific requirements that you would follow, you know, from a disciplinary action process.

So, for example, with attendance, it's -- it's clear-cut in terms of the number of times you're late or no show, that would dictate then the next level of corrective action, which would be a little different than a behavioral performance issue in terms of that process. Still -- still the documentation, the performance improvement plan and that progressive nature, but that was the general education that we received.

Page 35

Q. Okay. So the progressive discipline policy or practice applied to physicians and your direct reports as well?

A. Yeah, correct.

Q. Did you have any other kind of personnel or human resource functions when you were the interim president at Centura Health?

A. I did not. Outside what I've shared --

Q. Yeah.

A. -- no.

Q. And same for VP of operations?

A. Correct.

Q. Okay.

A. Yep.

Q. Let me ask you a little bit about how human resources functions were carried out when Centura was in place before the disaffiliation.

A. Okay.

Q. Okay?

How exactly did that work? Was that just separately managed by Centura, or did CommonSpirit or AdventHealth have any role in it?

A. It was Centura, yeah, yeah. No --

Q. For all of the facilities?

A. It was, yeah. I mean, there was no -- to

Page 36

my knowledging, any resource that was specifically AdventHealth or CommonSpirit. It was hired under Centura, so HR, finance, operations was Centura, yeah.

Q. And how did, if you know, the financial relationship between Centura and AdventHealth and CommonSpirit work? Did they pay Centura to manage the facilities?

You might not know that.

A. I don't know.

Q. I said, "if you know."

A. Yeah.

Q. Okay.

A. That was above my pay grade.

Q. All right.

A. But, yeah.

Q. Who cut your paycheck, though?

A. Centura.

Q. Centura --

A. Yeah.

Q. -- did, okay.

A. Always.

Q. All right. And you said when you were interim president at the -- I'm going to have -- I wish -- is there an acronym for Centura Health --

A. CHPG.

Page 37

Q. -- Medical Group? Okay.

A. Yeah.

Q. I was like, I'm going to have to say that a lot.

A. Yeah, CHPG.

Q. CH --

A. PG.

Q. PG.

A. Centura Health Physician Group, yeah.

Q. Okay, thank you.

A. Yeah.

Q. I'm going to try and remember that.

You said you were involved with signing contracts with providers?

A. Uh-huh.

Q. What about employees that were kind of direct in-house hires?

A. No, there was no contract for -- are you talking nonphysicians, just to clarify, employees?

Q. Let's go with the physicians.

A. Yeah. So all physicians would have an employment agreement.

Q. Right.

A. And those would all come to me for signature and to execute, correct.


MAGNA
LEGAL SERVICES

Page 38

Q. And I think what you were trying to say is that nonphysicians didn't have --

A. That's right.

Q. -- contracts?

A. That's right.

Q. Okay. They were just kind of subject to --

A. HR.

Q. -- policies --

THE COURT REPORTER: You guys are talking together.

MS. HALPERN: We did. I knew that was going to happen.

Go ahead.

A. Maybe just reframe your question. Sorry.

Q. (By Ms. Halpern) Sure.

I think I just said -- I was talking about the nonphysician employees. They're just subject to, like, HR policies; they didn't have individual contracts?

A. That's correct.

Q. Okay. And you didn't have a role in that, nonphysician employment policies?

A. The only role I had was if I was hiring a direct report --

Q. Okay.

Page 39

A. -- then yes.

But by and large, no. Nothing outside of my direct line or downline that I'm hiring that reported to me would I be involved in.

Q. Okay. And you said that you were kind of in charge of profit and loss and financial management.

Could you describe that a little more to me --

A. Sure.

Q. -- what role did you have?

A. Sure.

So, of course, every -- every fiscal year --

Q. And this was when you were an interim president --

A. Yeah.

Q. -- let me just --

A. Yeah.

Q. Correct?

A. And it -- and it would be -- it would be the same, just on a broader scale, so I still have the same --

Q. When you were a --

A. -- responsibilities as the --

Q. -- VP of operations?

Page 40

A. -- vice president, yeah, so -- so for every --

MS. HALPERN: We did it again, sorry.

Okay. Go ahead.

THE WITNESS: We're just trying to be efficient here.

A. So every year, set a budget that is inclusive of, as you can imagine, obviously, salary, wages and benefits, and, you know, other operating expenses outside of that.

And so it is the accountability of the operational leader to manage to that budget. And so every month, we would have -- obviously, we get our income -- income/our operating report, financial report, and that is what we manage to.

And so, you know, whether it's -- you know, you've got too much overtime, you know, than what you have a budget for, you manage to that. If supply costs are out of -- out of what you would expect or what you expect from the target, you manage that.

So that's the accountability, at the end of the day, is -- is really to budget.

Q. (By Ms. Halpern) Okay. And you said you had to sign every physician and provider agreement when you were the interim president of CHPG?

Page 41

A. Physician.

Q. Just physician?

A. (Witness nodded head up and down.)

Q. And it was Samuel Weller who signed the provider; was that it? Am I just --

A. Oh.

Q. -- mixing that up?

A. No, so let me clarify.

So there are what we call the PSA, so --

Q. Right.

A. -- provider service agreements.

Q. Right.

A. So those are not individual employment agreements.

Q. Right.

A. Those are an agreement with a practice around how we would compensate them and other -- other, you know, contractual terms.

I did not sign the provider service agreements. Those were nonemployed.

As the CHPG president, I had the accountability to sign all employee agreements.

Q. Okay.

A. Yeah.

Q. When you were the interim president and

11 (Pages 38 to 41)


MAGNA
LEGAL SERVICES

Page 42

you're signing physician agreements, what kind of review process did you go through?

A. Sure.

We have a -- we have -- when I say "we," we have, because we still have a very similar process --

Q. At AdventHealth?

A. Yeah, at AdventHealth today.

But under Centura, we had what we called a -- I may not get the exact acronym. It was basically a contract review committee, so any employed agreement would come to that committee for review. And individuals that are part of that review committee include -- included hospital leadership, medical group leadership, compliance, legal, finance.

And so any employee agreement would be submitted to that committee for review to ensure that, again, from a fair market value, from a commercial reasonableness perspective, that -- and just operationally, that it was supported. Sometimes it was in the budget, sometimes it wasn't.

So it was really that committee, it was that committee that reviewed all employment agreements and where the final approv- -- when I say the approval, happened. From there, agreements get drafted.

And this is, again, for employment.

Page 43

And then -- and then they would get distributed for signature to the individual physician, plus, once it's signed by the individual physician, then I would get -- get a copy of that agreement to sign as well.

Q. And so this committee, this contract review committee, you said it involved hospital leadership, compliance. What do you mean by "compliance"?

A. So we have -- so we have a team -- we did, we do -- that was all about the compliance from a compensation standpoint.

So there's -- there's clear regulatory or -- or guardrails around fair market value that -- that you need to be within. And so they review those terms, the financial terms of those agreements, to ensure that it's not falling outside of fair market value or commercial reasonableness. That's really their role.

Q. Okay. Where these -- are these -- I don't know what you referred to them as, I'm sorry -- like rules in terms of compliance, you said there's, like, pretty strict standards.

What did you mean by that?

A. There's really three things that -- I mean, there's multiple things that we look at. We look

Page 44

at, you know, total cash compensation.

There's national benchmarks relative to total cash compensation, relative to productivity. It's work RVUs so a unit of work, it's a certain value.

And then also a conversion factor, which is a rate-per-work RVU, and I'm not the expert, but there -- we look at all of those relative to national benchmarks to determine what we're offering falls within an appropriate range.

And it probably varied a little bit under CHPG versus AdventHealth versus University in terms of kind of what they use as their guardrails to say what you're offering is within fair market value, what you're offering is commercially reasonable in terms of what someone else in the market would offer the physician.

That's the review that they do. They're much closer to it than -- than necessarily an operator is, but that is the review that occurs to make sure that we're compliant.

Q. And why do those guardrails matter? Is it just kind of self-imposed, or is there some sort of outside --

A. Oh, no, there's --

Q. -- reasons?

A. -- there's --

Page 45

MS. McMANUS: Objection to foundation of the question.

MS. HALPERN: Go ahead.

A. There are -- there are -- there's a lot of case -- cases out there where, again, what we want to ensure is that the compensation that we are establishing or paying a physician is not perceived as for referrals.

Q. (By Ms. Halpern) Okay.

A. And so there's -- yeah, there's laws around that that -- when you are in violation of that, there's penalties associated with that.

Q. Okay. And what do you mean by "for referrals"?

A. So -- so a physician that -- we use primary care as an example.

Q. Sure.

A. Obviously, they -- they make -- place a lot of referrals to specialty care. That can end up in a hospital for a procedure, and it's those referrals that I'm referring to.

Q. Okay. And kind of any other criteria or considerations that you considered when you were the interim president at CHPG in terms of, I guess, market rates or standards for physicians?

A. Not in my role, yeah.

12 (Pages 42 to 45)


MAGNA
LEGAL SERVICES

Page 46

Q. Okay. And you said legal was also involved.

Can you tell me about that; was that separate than compliance?

A. That was separate from compliance, yeah.

Q. And this is on the contract review committee:

What role did legal have?

A. It was, again, reviewing the -- the agreements themselves, that they were -- most of our agreements were pretty standard. We had a standard employment agreement.

What varied, obviously, was -- you know, from specialty to specialty, was compensation, but if there were certain terms of the employment agreement that deviated from our standard, they would review those to provide counsel around.

Q. Okay. And you said it was a "standard" agreement.

What did you mean by that?

A. The employment agreement itself has standard language that we would try to -- and most -- and I would say, probably 99 percent of the time, would adhere to is where we would have -- it would just be that standard language of the employment agreement for all

Page 47

physicians. Again, what varied was obviously the compensation terms.

But generally, any of the language -- you know, restricted covenants as an example, noncompetes, that was standard language that was in all of our agreements. From time to time, we might modify that, but that was usually, again, when there would be counsel from legal around some of those changes and those terms.

Q. And with physician agreements, how common was it to veer from the standard agreement --

A. Not --

Q. -- language?

MS. McMANUS: Go ahead.

A. Not -- not common.

Q. (By Ms. Halpern) Can you think of any times when that happened while you were the interim president?

A. I can think of a time that comes to mind. It was in our Pueblo market. It was around noncompetes. Noncompetes are usually defined as a certain amount of distance from where they practiced.

In that scenario, we modified that -- the parameters of that -- that distance, yeah.

Q. For a physician that you were hiring?

A. Correct, yeah, yeah.

Page 48

Q. Any other specific instances that you can recall when you were interim president where standard employment agreement for a physician was modified?

A. I can't. You know, it's usually -- it was usually when it was -- and, again, it was very rare. Just administratively, it's challenging to modify those.

But it was usually around that noncompete.

Q. Okay.

A. Yeah.

Q. And then finance, I think you said there was -- is that separate than compliance, finance --

A. Yes.

Q. -- on a contract review committee?

A. Correct.

Q. What -- what's -- what role is that?

A. They really -- they would do pro formas, would draft a pro forma around an individual employment agreement. So that was a requirement.

So as you were bringing forward a physician agreement, just, what are the -- what was the practice financials around that? They would develop those pro formas. It was part of the -- the required submission for a requested position.

Q. Okay. And then this contract review committee, when did it get involved in the hiring process

Page 49

of a physician?

A. At the time that it was submitted for review. So recruitment, you know, having conversations around terms with a physician, all of those were usually set, right, in terms of what the -- what the agreement would be -- look like.

Q. Because the agreement was fairly standard?

A. Yeah. It's, like I said, the common terms, is really the main thing. So they would -- we had an intake form, it was an electronic submission. You would submit the request for the physician, and then -- and that's what would initiate that review at that committee.

Q. Okay. And what was the step -- what was the next step after the review by the committee when you were the interim president at CHPG?

A. Yeah. Once it was approved, the agreement, it would go to drafting. Legal would draft the actual employment agreement. We had a contract manager that would help facilitate that agreement then being sent off for execution, both -- signatures to the physician, as well as then, ultimately, to me to sign.

Q. Okay. And --

A. In my role --

Q. Sure.



Page 50

A.  -- as the interim president.

Q.  And what happened after that?  Just signatures and that was the end of it?

A.  Well, no, that triggers a whole --

Q.  Okay.

A.  -- host of --

Q.  Tell me --

A.  -- onboarding.

Q.  -- about it.

A.  Payer credentialing, hospital credentialing gets initiated subsequent to that -- the execution of those agreements.

Q.  Before the individual can start employment?

A.  Before they actually can start work, yeah.

Q.  The physicians?

A.  Yeah.  Yeah, we want to make sure that they're part of the payer's roster such that as they begin to perform procedures or services, we can get reimbursed for them.

Q.  And I think I remember seeing something about a third -- was it a third-payer system?  It's in here.

MR. SABEY:  Can we take a break for a second?

Page 51

MS. HALPERN:  Sure.

(Recess taken from 11:07 a.m. until 11:27 a.m.)

Q.  (By Ms. Halpern)  Anything you need to change from your earlier testimony?

A.  No.

Q.  I don't totally remember where I was, so I will just start -- I was asking lots of boring questions.  But I'm going to keep doing it, I'm not done.

All right.  I think I was asking -- so I was asking about the physician hiring process.  I think we had finished that.

PSA, I'll just go with the PSA agreements.

Do you have any insight on how that process might differ than the contract process for physicians?

A.  I was not directly involved in the PSA negotiations --

Q.  Okay.

A.  -- so . . .

Yeah, they're just different terms than employment agreements.

Q.  All right.

A.  But that was negotiated by somebody else on our team, so . . .

Page 52

Q.  Okay.  Are you familiar with that role at all -- or that process at all?  I'm sorry.

A.  No, not directly involved with it, yeah.

Q.  Okay.  And how about in your role kind of managing finances; did you have any involvement in extending loans to any physicians or outside providers?

A.  Not directly.  I mean, I'm familiar with those agreements where we would do loans that -- and there's various loan types, but, yeah.

Q.  Could --

A.  Yeah.

Q.  -- you tell me a little bit more about that?

A.  In the employment agreements, we will have -- and I say "loan."  It's a -- it's a sign-on bonus.

Q.  Okay.

A.  Where there -- it is forgivable if you -- over a period of time, so up-front, you know, payment, and usually it's a -- usually it's a three-year type of payback, and they can vary, but -- that if you are employed with us for a period of time, that period of time, then that is forgiven.

If you were to -- to leave before, then there's usually a prorated amount that you would be

Page 53

liable to repay.

Q.  Okay.  And that's in the physician employment agreement?

A.  That's correct, yeah.

Q.  And it's, like, just a sign-on bonus?

A.  That's correct.

Q.  What about other -- you said there was various types of loan agreements.  Could you explain that a little bit?

A.  The one that -- that I'm familiar with, that I wasn't necessarily directly involved in my role as the interim president was if there is a community lead identified for a particular physician service, the hospital system can provide a loan, recruitment assistance, to that practice to bring on a provider as long, again, as there's an identified community need.

So that's the loan I'm referring to.

Q.  Okay.

A.  Yeah.

Q.  And with this recruitment assistance, what was your role, if any, in those agreements?

A.  I didn't have a specific role.

Q.  Okay.

A.  Yeah.

Q.  Were you ever, as the interim, involved in

14 (Pages 50 to 53)



Page 54

those agreements -- president?

A. No.

Q. Okay. Who was?

A. That's where -- and those usually -- because those were -- fall outside of our employed providers, that's where our vice president, Sam and Kevin Jackson for the Denver metro area, would be more involved in establishing those loans.

Q. Okay. And when you were the VP, did you have any role in those recruitment assistance agreements?

A. I did not.

Q. Okay. And what's your familiarity with them?

A. It's pretty limited except -- just that, again, it -- and there is a -- a review of a service area, geography -- and, again, I don't know the specifics -- but if it is determined that there is a gap or a need in -- in that community as defined by the service area, that there is the ability of the health system to provide recruitment assistance for recruiting and a physician to fulfill that need.

But that's really the extent of my understanding of it.

Q. Okay. How -- if you know, how is it ascertained by Centura that recruitment assistance would

Page 55

be appropriate?

A. Yeah, I -- I don't know.

Q. Okay.

A. I'm just not close enough to it.

Q. Okay. So you didn't have any role in ascertaining when those could be extended?

A. That's right.

Q. Okay.

A. Yeah.

Q. How about how recruitment assistance would be paid back; did you have any role in that?

A. I did not.

Q. Do you know anything about it?

A. Just that there is -- there usually is a term associated with fulfilling a certain period of time.

But, yeah, I'm not -- was not involved in directly establishing what those loans would look like.

Q. How about at AdventHealth; did you have any role in recruitment assistance?

A. Pretty limited today, but -- and since I've been in my role, we haven't provided any recruitment assistance.

Q. Okay. How long have you been with --

A. One year.

Q. -- AdventHealth?

Page 56

A. One year.

Q. Okay. Let me just -- did you have -- okay. Let me scratch that.

Are you aware of any recruitment assistance agreements that were entered into by Centura when you were the interim president?

A. I was not directly involved in any of those, yeah.

Q. Okay. Were you kept abreast of it at all?

A. No.

Q. Okay. All right. Well, if you think of anything, let me know. I may come back to that. It doesn't sound like you have a ton of information, but . . .

Okay. Any other loans that you're aware of that -- when you were interim president or VP of Centura or -- and CHPG --

A. CHPG.

Q. I'm going to write that on the top of each page, all right.

A. No.

Q. -- when you were the interim president of CHPG?

A. No.

Q. Okay. How about the vice president of --

Page 57

I'm going to forget that -- VP of operations --

A. No.

Q. -- at Centura?

Okay. So those were the two kind of basic loan agreements --

A. Yeah.

Q. -- that you were aware of when --

A. Yeah.

Q. -- you were there? Okay.

Did you -- how closely did you work with -- and I'm going to switch topics a little bit.

How closely did you work with physicians when you were the interim president?

A. Close.

Q. Close.

A. Yeah.

Q. What does that mean? Were you --

A. So I -- I mean, I had physicians on my team.

Q. Okay.

A. We had medical directors, so I worked with them daily.

Obviously, the employed -- and this is all on the employed side. You know, I rounded clinics, meet with physicians routinely.

15 (Pages 54 to 57)


MAGNA
LEGAL SERVICES

Page 58

Q. Okay. And did you travel, or did you spend most of your time in certain locations?

A. I did travel, not a ton. Most of our operations were in Denver metro. But in Southwest Kansas, would -- would go there, and then, of course, you know, in Southern Colorado and then Durango.

Q. Okay.

A. But it was -- I would say 80-plus percent of the time was Denver metro.

Q. And how many physicians -- I know you said something about 1,000 employees before, but I didn't know if that was physicians or just total --

A. That --

Q. -- workforce?

A. -- those were -- those were employees. Physicians all in at Centura, gosh, I would say -- and, again, and this is employed and PSA -- I would say around 1,000.

Q. You said employees and PSAs?

A. Yeah, so just all the -- those that we have either an employment agreement with or a financial alignment with.

Q. Okay. And did you know Dr. Anuj Peddada?

A. I did not.

Q. Have you ever met Dr. Anuj Peddada?

Page 59

A. I have not.

Q. Hear anything about his performance?

A. I did not.

Q. Okay. So no personal observations of his performance?

A. No.

Q. Do you know who he is now?

A. I know who he is now, yes.

Q. Yes. Is that just because of this lawsuit?

A. Yes.

Q. Okay. Do you recall having interacted with him at all prior to this lawsuit when you were, for example, the interim president at --

A. I --

Q. -- CHPG?

A. -- did not.

Q. Do you recall having any conversations with anyone about his performance?

A. No.

Q. How about his hire as a physician?

A. Was I aware of his hire as a physician?

Q. Okay.

A. Sorry. Yeah, maybe just restate.

Q. I'll --

Page 60

A. Yeah.

Q. -- rephrase that.

A. Yeah.

Q. Tell me what you recall about extending a job offer to Dr. Anuj Peddada, if anything, when you were the interim president?

A. I do -- I was not involved in the extension of the job offer to Dr. Peddada.

Q. Okay.

A. Yeah.

Q. Do you know who was?

A. Eric and Sam.

Q. Could you do that for full names, just for the record.

A. It's Kovar.

Q. Yeah.

A. And then Sam Weller.

Q. Okay.

MR. SABEY: Koval.

MS. McMANUS: Koval.

A. Koval.

Q. (By Ms. Halpern) And what position did --

A. Don't know him that well.

Q. -- you hold at the time, if you recall?

A. It would be interim --

Page 61

Q. You were --

A. -- president.

Q. -- the interim?

A. Yeah.

Q. Did you hear any feedback or anything to that extent from Eric or Sam about Dr. Peddada?

A. I did not.

Q. Okay. Was it unusual that you had no involvement in the decision to hire Dr. Peddada?

A. No.

Q. Okay. Now, I thought you said earlier that you had to sign every employment contract?

A. I did, yeah.

Q. At what juncture did you typically get involved in the decision to hire a physician when you were the interim president?

A. When -- it was either at our contract review committee --

Q. Okay.

A. -- that we referenced, which I would attend, not all, but I would attend so I was aware of which agreements were coming through or being requested. But usually it was, I would receive a DocuSign of the agreement --

Q. Okay.

16 (Pages 58 to 61)



Page 62

A. -- is when I would be made aware that we were hiring a physician.

Q. Okay. Could I just distinguish really quickly, were you always involved in the committee?

A. Not always -- I mean, I didn't always attend, no.

Q. Okay. Did you attend any committee meetings when it came to the decision to extend an offer of employment to Dr. Peddada as a physician?

A. I don't recall. I mean, there was -- I mean, we -- we had those weekly --

Q. Okay.

A. -- is the frequency.

So I don't recall specifically his agreement coming to the committee for review.

Q. So you don't recall whether you were present or not in that --

A. I don't.

Q. -- committee? Okay.

And you don't recall anything anybody said to the extent that you were present?

A. Correct.

Q. Okay. Do you recall ever receiving an agreement to extend an employment offer to Dr. Peddada?

A. No.

Page 63

Q. Okay. Let me take a step back.

When you were contemplating hiring a physician when you were the interim president, what kind of background kind of research typically occurred in terms of performance at, say, other hospitals or something like that?

MS. McMANUS: Object to foundation of the question.

A. So when I'm directly involved --

Q. (By Ms. Halpern) Right.

A. -- if I was -- so, like, an example:

When I was in my vice president role of operations, so hiring direct for the physician, it's usually -- it's an interview. Obviously, there -- you know, we review their CV, their credentials, and then any references that we would check. That was really the extent of it.

Q. Okay.

A. Yeah.

Q. Okay. Don't recall doing any of that when it came to Dr. Peddada because you weren't involved?

A. Correct.

Q. Okay. Do you know if anyone did do that?

A. I don't.

Q. Okay. Did you have any role -- I think

Page 64

you said you did when you were interim president in kind of maintaining performance standards, quality care, et cetera?

A. Yeah, at an enterprise level, I would. So again, roll-up of, you know, whether it was quality outcomes or financial outcomes.

Engagement scores, as an example, I would --

Q. What's an engagement score?

A. Employee satisfaction.

Q. Okay.

A. Yeah.

So I -- I, in my interim role, that's the level that I would review performance at and be, obviously, accountable to -- to those results, so . . .

Q. Macro level?

A. Yeah.

Q. So this probably goes without saying, but you never gave any feedback or criticism to Dr. Peddada?

A. I did not.

Q. Do you know anything about his history of working at Penrose-St. Francis?

A. I do not.

Q. Anything at all?

A. Only as a result of this case.

Page 65

Q. Okay. I will distinguish this time period from when --

A. Yeah.

Q. -- you were actually working --

A. As the interim.

Q. -- at Centura?

A. No, no.

Q. But as -- or the VP?

A. No.

Q. Never heard about Dr. Peddada, never heard his name?

A. (Witness shook head from side to side.)

Q. Gave no feedback?

A. No.

Q. No criticism?

A. No criticism.

Q. No role in evaluating him at any point in time?

A. Zero.

Q. No role in the decision to hire Dr. Peddada?

A. No.

Q. Do you recall any feedback or criticism at the time you were employed by Centura of Dr. Peddada's performance that you heard from someone else?

17 (Pages 62 to 65)



Page 66

A. I do not.

Q. So you did not receive any feedback or criticism about Dr. Peddada from someone else?

A. I did not.

Q. And you have no ability to comment on his performance or quality of care?

A. No.

Q. Do you even know what Dr. Peddada's specialty was, where he practiced?

A. Radiation oncology.

Q. Okay.

A. Yes.

Q. And did you know that at the time you were at Centura?

A. At the time that the letter that I had -- that I had written to him, yes, that is when I was aware of his specialty.

Q. How about before you wrote that letter to him, which is the termination -- I'm going to -- how do you want to call it? You can rephrase it. What's the letter; how did you call it?

A. The rescinding of the offer.

Q. Rescinding of the offer --

A. Yeah.

Q. -- letter. Okay.

Page 67

A. But prior to that, no.

Q. So you didn't even know he did radiation oncology prior to rescinding his offer of employment?

A. Correct.

Q. Did you have any awareness of kind of the work he was doing for Penrose-St. Francis?

A. I wasn't directly involved, no.

Q. Okay. And you had no role in recruiting Dr. Peddada to work in-house?

A. No.

Q. Okay. How about Dr. Alan Monroe; do you know who he is?

A. I don't. I mean --

Q. Except --

A. -- from this --

Q. -- from this litigation?

A. Yeah.

Q. Let me -- I will try to clarify and ask you about the contemporaneous time period, right, when you were actually working --

A. No.

Q. -- at Centura? Okay.

A. Yeah, thank you.

Q. So you had -- same kind of set of questions.

Page 68

Did you even know what Dr. Alan Monroe practiced?

A. No.

Q. When you were the interim president or VP, had you ever heard anything about Dr. Monroe's performance?

A. No.

Q. Did you hear anything from anyone else, any criticism, feedback, positive -- you know, positive pronouncements about Dr. Alan Monroe from anyone else while you were at Centura?

A. No.

Q. Did you have any role in his employment contract, physician employment contract for Mr. Monroe?

A. I did not.

Q. Do you recall signing Dr. Monroe's physician employment contract?

A. I don't.

Q. Okay. How about committee -- committee, the recruitment -- what was it -- the hiring committee, do you recall any conversations about Dr. Alan Monroe from that?

A. I do not.

Q. You don't even recall if you were part of those committee meetings?

Page 69

A. When I was presented or when it would have been presented, no.

Q. Okay. And you provided no input into the hiring of Dr. Alan Monroe as a physician?

A. No.

Q. Just trying to make sure I've asked every possible angle on this.

Okay. Well, so you can't tell anything about the offer to extend Dr. Alan Monroe or Dr. Anuj Peddada employment with Centura as physicians?

A. Correct. No.

Q. Okay. That was fast.

Okay. Well, this chapter is probably going to be fast, too.

Okay. So other than -- I'll break this down into two different time periods again.

A. Uh-huh.

Q. So when you were at Centura as the interim president, did you hear anything about why Dr. Monroe or Dr. Peddada were being extended offers of employment as physicians in-house at Centura?

A. What I -- obviously, what I had learned as we were -- during that period of time was that their -- their agreement with us or their alignment with us was dissolving, and I don't know the specifics around that,

18 (Pages 66 to 69)



Page 70

but that that precipitated then the -- the employment agreements to -- to the providers of that group.

Q. All right. So tell me -- do you recall who told you that that agreement was dissolving?

A. Sam would have been my -- would have been the individual that would have shared that.

Q. Do you recall a specific conversation with Sam Weller around the agreement dissolving?

A. I don't recall a specific agreement -- or a discussion around that.

Q. Okay.

A. Just that, again, through this process and, obviously, the drafting of that letter, that's where my awareness was with the group and . . .

Q. Okay. Let me break it down even further in time -- time period.

A. Uh-huh.

Q. We're going to talk about when you drafted the letter.

A. Uh-huh.

Q. But were you aware of -- and when you say "agreement dissolving," what are you referring to?

A. Oh, as far as the group, the group of Peddada and Monroe.

Q. So they had a PSA agreement with Centura

Page 71

prior to them being recruited to come in-house?

A. Yeah, they --

MS. McMANUS: Objection --

Sorry.

THE WITNESS: Yeah.

MS. McMANUS: Object to the form.

MS. HALPERN: Go ahead.

A. I -- there was an align- -- I don't -- I'm not -- I'm not knowledgeable of the specific agreement around that, but there was an alignment with that group in terms of them providing services. But I don't know the details of the --

Q. (By Ms. Halpern) Okay.

A. -- that agreement.

Q. And what do you mean by "an alignment"?

A. Identified as -- when I say "aligned," is providing services to the hospital.

Q. Okay. And at that time, did you know what services they were providing?

A. The radiation oncology, yeah.

Q. And the radiation oncology, were you aware that those were the services that group was providing prior to drafting that termination letter?

MS. McMANUS: Object to the form of the question.

Page 72

A. At the time of that letter is when I was aware of the --

Q. (By Ms. Halpern) Okay.

A. -- rad onc services, yeah.

Q. So I'm going to try to break it down even further.

When the agreement was dissolving and Centura was recruiting them in-house, were you aware --

A. No.

Q. -- that they were providing radiation oncology services?

A. I was not a part of those discussions, yeah.

Q. Okay. And at the time that the practice was dissolving, what did you know about that?

MS. McMANUS: Object to the form.

A. Just to the extent it was dissolving, yeah. I wasn't -- didn't have any direct involvement in that, yeah.

Q. (By Ms. Halpern) Did you hear why it was dissolving, why their practice was dissolving?

A. I did not.

Q. Okay. Do you recall sharing any thoughts at that time with Mr. Weller about their practice group dissolving?

Page 73

A. No.

Q. Okay. Do you recall why Mr. Weller was telling you that that agreement was dissolving?

A. It was just awareness around the situation and, of course, the employment agreements for Dr. Peddada.

Q. Okay. And what do you recall in terms of discussing the employment agreements for Peddada; is this when you originally extended it or when you terminated him?

MS. McMANUS: Object to foundation.

Q. (By Ms. Halpern) Not terminated -- whatever -- rescinded --

MS. McMANUS: I'm sorry for --

A. Yeah, at the time of --

Q. (By Ms. Halpern) -- the employment?

A. -- rescinding the offer is when I was aware, yeah.

Q. So you weren't aware that -- were you aware that employment offers had been extended to Dr. -- (outside noises) --

THE COURT REPORTER: I'm sorry, could you repeat that?

(Discussion off the record.)

Q. (By Ms. Halpern) Were you aware that a --



MAGNA
LEGAL SERVICES

Page 74

that physician employment agreements were extended to Dr. Peddada or Dr. Monroe?

MS. McMANUS: Object to the form.

A. I was aware that they had been extended at the time we were having the discussion around the rescinding of the offer.

Q. (By Ms. Halpern) But before that --

A. No.

Q. -- point in time?

A. No.

Q. So the first time you learned that Centura had extended physician employment offers to Dr. Monroe and Dr. Peddada was when you were rescinding the job offer for Dr. Peddada?

A. Correct.

MS. McMANUS: Object to the form.

MS. HALPERN: What was wrong with that question?

MS. McMANUS: Just your use of -- it's just vague, it's imprecise.

MS. HALPERN: Okay.

Q. (By Ms. Halpern) Did you understand my question?

A. Yes.

Q. All right. Did you hear anything about

Page 75

the relationship between Dr. Peddada and Dr. Monroe at the time that Centura extended job offers to them?

A. No.

Q. How about at the time that you authored the letter to rescind Dr. Peddada's employment offer?

A. No.

Q. Did you hear anything at all about their relationship other than in this litigation, if even then?

A. No.

Q. Some of these chapters, you just cut yourself a break because you didn't know about those, so you're probably going to zip through some this stuff.

All right. I was going to ask you about their practice group and if you were familiar with the practice group's relationship to Centura prior to Dr. Peddada and Dr. Monroe being extended offers of employment?

A. No.

Q. So, I mean -- you're probably going to say no, so --

A. I -- I was -- no.

Q. So let me just kind of step back a little bit because I think I got some of this.

But you weren't really involved with, you know, the provider service agreements?

Page 76

A. No.

Q. And -- when you were the interim president or vice president, right?

A. Correct.

Q. And you -- when you were at Centura, you -- you didn't have any role in kind of evaluating or assessing provider services -- or I think maybe you said you had one?

A. Yeah, clarify, when you say "provider services" --

Q. Like --

A. -- the actual agreement?

Q. -- if they were -- if they were actually -- I'll break it down.

Like if they were actually performing up to the standards at the macro level that you were reviewing?

A. For employment, yes.

Q. Correct.

A. Yeah, for any of the nonemployment PSA'd agreements --

Q. Right.

A. -- yeah.

Q. That's -- I'm trying to --

A. Yeah.

Page 77

Q. So how would you refer to them? I keep -- now I'm -- I'm using "provider services" to refer to those outside individuals, not the actual physicians.

Would that make sense to you? No?

A. Yeah, not necessarily. I mean --

Q. Okay.

A. -- so -- so the delineation that -- for my role was really on the employment side.

Q. Right.

A. So for any provider service agreements that fell outside of the employment space, I was not directly involved in.

Does that help?

Q. It does make sense, but I just want to make sure I'm creating a clean record.

A. Yeah.

Q. So I was referring to those as "physicians," like "in-house physicians" or "physician employment contracts," when they were in-house employment.

A. So if they were in-house --

Q. Yeah.

A. -- they would be considered an employed physician, yeah.

Q. Right.

20 (Pages 74 to 77)


MAGNA
LEGAL SERVICES

Page 78

A. If we're talking about nonemployed where --

Q. Right.

A. -- we have an agreement --

Q. That's --

A. -- those would --

Q. -- the PSA?

A. PSA, yeah.

Q. So when I refer to "provider services," I'm trying to refer to the first two letters of PSA, it's "provider service agreements."

What did you call them, contractors? What did you call them?

A. The -- the --

Q. The third parties that weren't employees.

A. Those are -- so the -- those groups --

Q. Right.

A. -- that are nonemployed, when we have a financial relationship or an agreement with them, other than employment, that's where the -- that's -- that would be considered a PSA. So that is the provider service agreement.

Q. Right.

A. Yeah.

Q. Yes. No, I got that, and I think I've

Page 79

been using that terminology.

I'm just --

A. Right.

Q. -- asking, other than with the agreements, the PSA agreements, which you did not have a role in --

A. Correct.

Q. -- did you have any role in kind of overseeing third-party group provider services when you were the interim president?

A. No.

Q. Okay. Okay. That would be Mr. Weller?

A. Yeah.

Q. Okay. And I know you said you had kind of some macro level, like, role in terms of ensuring efficiency, quality of care, et cetera?

A. (Witness nodded head up and down.)

Q. Who would be the person who kind of analyzed performance of groups that were subject to PSAs on a day-to-day basis?

A. That would be Sam and Kevin --

Q. Okay.

A. -- together, yeah.

Q. And did they ever report to you at all about those third-party services?

A. Rarely.

Page 80

Q. Okay.

A. It was -- yeah. Again, my focus and scope was employment side, so rarely did they -- those two paths collide.

Q. Okay. Okay. And then what was Kevin's last name again?

A. Jackson.

Q. Jackson.

And what was his --

A. Same role as Sam but for Denver metro.

Q. Okay.

A. Sam was --

Q. I think you --

A. -- for outside Denver metro.

Q. So who did they report to, Kevin and Sam?

A. Scott Lichtenberger.

Q. Okay.

A. Yeah.

Q. And do you have any idea at all how performance of the groups that were subject to PSAs were tracked?

A. I don't.

Q. Okay.

A. Yeah.

Q. Any idea like what would happen if a

Page 81

patient complained about a service provider, a third-party service provider?

A. There likely would -- well, I guess it -- it depends.

Q. Okay.

A. It depends on where the complaint, was it in the hospital, was it in the clinic, because there's different pathways for which complaints would be managed.

Q. Okay. So what is the path at the hospital?

A. There is a -- and I don't know the exact term -- patient advocate that, normally, a complaint -- because there's a formal process, that a complaint is registered, and then there is -- there's rules around the -- how quickly we would reply and respond to those.

When they're in the hospital, when the complaint is for the -- associated with the hospital, it's managed within the hospital.

On the medical group side, we have a similar role and similar expectations around complaint resolution in terms of timeliness to respond. But there are specific accountabilities and individuals that manage that process.

Q. Okay. And how is that different than the clinic process?



Page 82

A. You know, I'm not as familiar with the hospital --

Q. Okay.

A. -- process, yeah.

Q. Okay.

A. I just know that there are -- there's a structure that helps to resolve those complaints or addresses those complaints.

Q. All right. So just to -- safe to say you didn't play any role in kind of patient complaints or responding to those?

A. I did not.

Q. Okay.

A. Not for the hospital.

Q. And what about for clinic?

A. I -- I would, if it got escalated to me.

Q. Okay.

A. Yeah. I mean, it's rare, but on occasion, a complaint that did get escalated would come to me to help support resolution around. But like I said, it's pretty rare.

Usually our patient advocate that is facilitating resolution around those complaints would work directly with practice leadership, work directly with the physician or the provider that's in question.

Page 83

They usually don't escalate beyond that.

Q. And what's the difference between "hospital" and "clinic"? How are you using those two terms?

A. Sure.

There are -- so, obviously, the hospital, being services that are provided within the hospital, there may be clinics within a hospital, but they're designated as an outpatient department of the hospital. So all of that reports up through the hospital.

For the clinic side, there is no designation of being a clinic of the hospital, so different regulatory requirements in terms of oversight and expectations for an outpatient clinic than that of a hospital.

So in my purview, I had the clinic space, nothing in the hospital.

Q. And that was when you were the interim president?

A. Correct, yeah.

Q. Okay. So am I correct in understanding that you had no role in kind of enforcing PSAs?

A. Correct.

Q. How about in kind of scheduling or ensuring coverage at Penrose-St. Francis, like in terms

Page 84

of employment physicians?

MS. McMANUS: Object to the form.

Q. (By Ms. Halpern) I can rephrase that.

A. Yeah, rephrase, please, yeah.

Q. What role did you have in terms of scheduling, if any, physicians at -- when you were interim president?

A. I had no role directly scheduling physicians, yeah.

Q. Okay. Do you know who did?

A. The practice leadership, yeah.

Q. Anyone in specific? Is it the leads?

A. Practice managers. It -- it varies depending on the size of the clinic. We have practice managers, supervisors, but one of those roles would be responsible.

Q. And that's for physicians who are in-house at Centura?

A. Employee?

Q. Employees, yeah.

A. Correct.

Q. That's, I think, what --

A. Yeah.

Q. -- I mean when I say --

A. When you say --

Page 85

Q. -- "in-house."

A. -- "in-house."

Q. Yeah.

A. Correct.

Q. I'll try --

A. Yeah.

Q. I was trying to distinguish between them.

A. Yeah.

Q. Do you know kind of who is responsible for those same functions with groups that provided services under a PSA?

A. Usually there's an office manager of that group that is not part of the medical group that would manage them because they're not employed, so usually it's a resource within that independent practice that would manage.

Q. And how familiar are you with kind of the terms of PSAs?

A. I'm -- I'm familiar.

Q. Okay. Were they fairly standardized in the same way that physician employment agreements were?

A. Yeah. So there's -- I mean, there's -- what I'm more familiar with are compensation terms of them, so there's usually a per-work RVU rate that is paid.



Page 86

Oftentimes that work RVU rate is just for the clinical, and then there's a separate stipend that would cover benefits, malpractice. Sometimes the -- the stipend would be rolled into the actual work RVU rate itself, and so that would cover the benefits and malpractice.

But, yeah, that's really the -- I mean, they're pretty -- fairly straightforward.

Q. Okay. And what is RVU rate?

A. So a work RVU, a relative value unit, it's, you know, for care that you provide as a physician or an APP, there is a value that CMS designates for that service --

Q. I know what CMS is, but for the record, could you say that?

A. For -- oh, yeah, for -- Centers for Medicare & Medicaid Services.

Q. Thank --

A. Yeah.

Q. -- you. Go ahead.

A. Yeah.

And so there -- again, there's a certain reimbursement for each one of those units, and each of the care that's provided is assigned a unit. And so when you establish what your reimbursement is, it, at least

Page 87

under PSA agreements, is usually tied to that relative value unit, what we are going to say we're going to pay you per unit.

Q. So did -- when you were the interim president at Centura, did you evaluate or determine the RVU rate in the PSAs?

A. I did not.

Q. Okay. Who did that?

A. That was Sam, Kevin, and probably -- I mean, I would imagine it was probably in coordination with Scott then, between the three of them.

Q. Okay. And the stipend benefits, was that also determined by Sam and Scott?

A. Correct.

Q. Okay. Do you know anything about how groups providing services pursuant to PSA were managed while you were at Centura?

A. I did not -- directly involved.

Q. Okay. I'm just going to show you -- it's going to be . . .

MS. HALPERN: I think we're on Exhibit 8, so . . .

(Deposition Exhibit 8 was marked.)

Q. (By Ms. Halpern) The court reporter has handed you what has been designated as Exhibit 8.

Page 88

Take a look at it. Have you seen Exhibit 8 or something like it before?

A. I have not seen -- I'm not familiar with this PSA agreement.

Q. In Exhibit 8?

A. In Exhibit 8.

Q. Okay. Have you seen a similar PSA exhibit -- PSA before the one in Exhibit 8?

A. While at Centura?

Q. While at Centura?

A. No.

Q. What?

A. No.

MS. McMANUS: Object to the form. Sorry.

MS. HALPERN: What was wrong with that question? I asked if he had seen one.

MS. McMANUS: Well, you said "similar," and, I mean --

MS. HALPERN: That was the first question. I asked if he had seen a similar one, and then he said no.

Q. (By Ms. Halpern) Did you understand what I was asking?

MS. McMANUS: So let me just say, similar to, like, with Dr. Peddada, RBC, similar to other PSAs

Page 89

more generally?

Q. (By Ms. Halpern) Exhibit 8. You said they were fairly standardized, I believe, the professional service agreements.

Is that correct; that was your testimony earlier?

A. The standardized agreement that I think I was referring to earlier was, our employment agreements are standardized.

Q. Uh-huh.

A. These are -- the PSA agreements are different than a physician employment agreement.

Q. That is correct.

A. Yeah.

Q. I think you said you have seen PSA agreements for their compensation before?

A. I'm familiar with the terms --

Q. Okay.

A. -- of how they set those for PSA, but I -- I was not involved in -- when I was at Centura of doing any PSA agreements.

Q. Okay.

A. Yeah.

Q. Did you ever review a PSA agreement?

A. I did not.

23 (Pages 86 to 89)





MAGNA
LEGAL SERVICES

Page 90

Q. You did not see any PSA agreements while you were at Centura?

A. I do not recall reviewing any PSA agreements while at Centura.

Q. Okay. How about at AdventHealth?

MR. SABEY: Object to the relevancy.

MS. HALPERN: Okay. I mean, that's only form.

MR. SABEY: What's that?

MS. HALPERN: I didn't find 99 percent of what you asked relevant during your deposition.

Q. (By Ms. Halpern) Go ahead, you can answer.

A. Can you just restate your question.

Q. Sure.

Have you seen PSAs at AdventHealth?

A. Yes.

Q. Okay. And what is your role then with the -- in AdventHealth with PSA agreements, if any?

A. Today, I do participate in the negotiation of PSA agreements --

Q. Okay.

A. -- in my role.

Q. And were you -- are you aware of how the PSA agreements operated when you were at Centura; you had no role in that?

Page 91

A. I did not have a role in that, yeah.

Q. Do you know what -- do you know if they were all exclusive?

A. I do not know --

Q. Okay.

A. -- if they were, yeah.

Q. Do you know if groups that provided services pursuant to a PSA were subject to any Centura policies or practices?

A. I believe they are.

Q. Okay.

A. But, again, not firsthand negotiation of any of those, but I -- it's my understanding that some of the policies and procedures do extend to our PSAs as well.

Q. Okay. Which ones when you were at Centura?

A. Yeah, I -- some of our HR policies, I believe would, but I'm not -- I wasn't, again, directly involved in the negotiation of those, so . . .

Q. Yeah. So putting aside the actual --

A. Yeah.

Q. -- PSAs, I'm trying to refer to the groups that were subject to PSAs.

Do you know what policies, when they were

Page 92

providing services for Centura, they were subject to?

A. I don't.

Q. Okay.

A. No.

Q. Do you know if they were subject to any bylaws, Centura bylaws?

A. I -- I don't.

Q. Do you know --

A. Yeah.

Q. -- who would?

A. Sam would be -- you know, Kevin, that -- were the ones that were directly negotiating these would, yeah.

Q. Okay. How about any policies that -- groups providing services through a PSA, policies for leave; do you know if they were subject to any of those?

A. I don't.

Q. Okay. I'm trying to ask it more broadly.

Do you have any understanding of how groups providing services pursuant to PSA were integrated into Centura?

A. Can you clarify, "integrated into Centura"?

Q. Yeah.

In terms of day-to-day operations. Like

Page 93

how were they managed --

A. I don't --

Q. -- regulated?

A. -- have any idea, yeah.

Q. Okay. No understanding of how they're, you know, evaluated, their services are evaluated or how -- I'll break it up -- evaluated?

A. No.

Q. How about whether there's a decision to renew a PSA; any understanding of that process?

A. No, I was not involved in the renewals.

Q. Okay. Any knowledge of how groups providing services subject to a PSA were -- you know, why their contracts were terminated?

A. I was not involved in those, yeah. I don't . . .

Q. Had you -- did you have any interactions at all with those -- with any -- while you were at Centura, with any groups that provided services through a PSA?

A. No.

Q. Did -- don't even know who those groups were?

A. I would know who some of the groups are.

Q. Okay.



MAGNA
LEGAL SERVICES

Page 94

A.  But I wasn't involved with them.

Q.  Okay.  Can you tell me what groups you recall providing services while you were at Centura through a PSA?

A.  Yeah.  The one that comes to my mind there at Centura was South Denver Cardiology Associates --

Q.  Okay.

A.  -- SDCA, just because it was our -- our largest PSA that we have.

The other one that I'm familiar with was NSO, Neuro- -- Neuro- -- what is it, Neuroscience -- or Neurosurgery One, I guess, is the name of that one.

Those were the two main ones that I'm familiar with, and it was really just because of the size of those groups.

Q.  Okay.

A.  Plus, of course, you know, as -- as primary care ops, you know, a lot of our docs would refer to those individuals, so that was really my familiarity with those PSA groups.

Q.  So kind of -- so was that because of the compensation terms for those two groups?

A.  No.  Just that they were part of our network.

Q.  Okay.

Page 95

A.  And our employed docs would utilize those services, but that was the extent of --

Q.  You just kind of heard that they were a referral?

A.  Yeah, I never interacted with --

Q.  Okay.

A.  -- those groups.

Q.  Okay.  And have you seen their PSA agree- --

A.  No.

Q.  -- the PSAs or --

A.  No, ma'am.

Q.  Any other groups that provided services through PSA?

A.  While at Centura, those were the two main ones that I was familiar with.  And again --

Q.  Okay.

A.  -- just because of their size, scope.

Q.  Okay.  All right.  Zipped through this chapter, too.

Okay.  So I'm going to change topics a little bit.  I'm going back to Dr. Peddada.

Did you ever hear that he requested medical leave while you were at Centura?

A.  No.

Page 96

Q.  Did you hear while you were at Centura that Dr. Peddada had disclosed that he was suffering from burnout?

A.  No.

Q.  Did you, while you were at Centura, hear anything about -- you already said you didn't hear anything about Dr. Peddada's performance, right?

A.  No.

Q.  Okay.  Any complaints about Dr. Peddada?

A.  No.

Q.  Were you aware, when you authored the letter to rescind his offer of employment, that he was on medical leave?

A.  No.

Q.  Did you hear that he had provided any medical documentation to Centura prior to taking that medical leave?

A.  No, ma'am.

Q.  Can you tell me what you recall about authoring the letter to rescind Dr. Peddada's employment offer?

A.  What was shared with me was that we had extended an employment offer to Dr. Peddada and that they were unable to get signature from him for that employment agreement and, as a result of that, they wanted to

Page 97

rescind the offer to Dr. Peddada.

Q.  Okay.  Who's the "they" that you recall talking to?

A.  Talking to Sam.

Q.  Did you speak with anyone else about rescinding a job offer for Dr. Peddada?

A.  I did.  Sam.  Our legal counsel, Jennifer.  I don't recall if Eric was on those conversations, but those two in particular, recall having a conversation.

Q.  All right.  So let me unpack that a little bit.

Could you walk me through the chronology of the conversations that you had?

Obviously, you don't have to tell me what the actual attorney said.  But what -- who contacted you first?

A.  Sam contacted me, as I recall.  And again, given that this was associated with the employment agreement, shared again that they were unable to, again, get signature from Dr. Peddada for that employment agreement and that they wanted to rescind the offer.

Q.  Okay.  Do you recall when Sam contacted you -- let me rephrase that.

Do you recall how many days before you authored the letter rescinding Dr. Peddada's employment

25 (Pages 94 to 97)



Page 98

offer, how many days before that Sam contacted you?

A. I don't recall the -- yeah --

Q. Was it --

A. -- specific timing.

Q. -- a day, two days?

A. I don't recall.

Q. Okay. Without talking about specific days, was it soon after that you authored that letter or was there a significant passage of time?

A. Yeah, I -- again, I would be speculating a little bit on the timeline. I can't imagine it was an extended period of time, but I don't know specifically the timing of when my conversation was -- with Sam and the specific timing of authoring that letter.

Q. Do you recall how Sam contacted you? Was it in person or by phone, email?

A. Probably in all -- email. I know we would have talked by phone, yeah.

Q. You're talking kind of more generally.

Do you recall in specific in this case how Sam first reached out to you about rescinding Dr. Peddada's job offer?

A. I don't know how he contacted me first. I remember having a conversation, again, given where he worked, by phone, but also by email as well.

Page 99

Q. Okay. Did you meet in person at all?

A. I don't recall meeting in person.

Q. Okay.

A. Yeah.

Q. And what do you recall about the conversation you had with --

And this is Mr. Weller, right?

A. Uh-huh.

Q. -- with Mr. Weller about rescinding Dr. Peddada's job offer?

A. Only --

MS. McMANUS: Can I just interject, just briefly.

I'm just going to instruct you if an attorney was involved in those conversations, just instruct you not to answer as to attorney-client privilege.

THE WITNESS: Fair.

A. The only thing that I recall is -- specifically speaking with Sam was that, again, the particular offer that was extended, they were just having a difficult time getting a response from Dr. Peddada. That was the extent.

Q. (By Ms. Halpern) Did he tell you what efforts they had made to reach Dr. Peddada?

Page 100

A. Not specifically, no.

Q. Did he tell you how many attempts they made to reach Dr. Peddada to sign the agreement?

A. No.

Q. Did Mr. Weller tell you that Dr. Peddada had already signed an employment agreement?

A. What he shared with me, that there was a -- a draft agreement that was provided to Dr. Peddada that was not complete with the financial terms. But it's not -- in that -- in that they had, you know, redrafted an agreement with specifically the loan terms, but I had not seen the original draft that was distributed to Dr. Peddada originally.

Q. What did -- exactly -- did he -- what exactly did he tell you about the draft agreement?

A. That it was incomplete, that it did not include, you know, the specific term around loan, was -- was the extent of it.

Q. Do you recall anything else about the conversation about the draft agreement?

A. I don't, yeah.

Q. Did he tell you that Dr. Peddada had been notified that it was a draft agreement?

A. He did not share with me what was -- what was actually articulated to Dr. Peddada, just that he

Page 101

had -- there was an agreement that was provided to him that was not complete.

Q. Okay. Did he -- did Mr. Weller describe -- okay. Let me rephrase that.

Now, you said that it was not complete because it didn't have financial terms.

What did you mean by that?

A. Specifically the terms around the recruitment assistance loan.

Q. Is it typical for that term to be in a physician employment agreement?

A. Typical, no, just because this scenario is probably very much nuanced from just a normal employment agreement.

But in the instance that we do have a situation where we have an individual or group that we're moving to employment that there is a loan, there is the -- obviously, a requirement to address that loan. And so while it's not, you know, what I would say is, you know, the normal employment agreement, it is consistent with -- in this scenario, that would be in a part of that agreement to address that -- that loan.

Q. So you're now talking background and not what Mr. Weller said.

Could you talk to me about other

26 (Pages 98 to 101)



Page 102

employment agreements where you said that loan -- that those loan financial terms were included?  Did you have any specific examples other than Dr. Peddada's?

A.  I don't have any other examples.

Q.  Can you recall any other physician employment agreement that included loan repayment provisions?

A.  Not that is consistent with this.  Yeah, I mean, outside of the bonus payments that I referenced earlier.  But not -- not similar to this situation, no.

Q.  Okay.  Do you know if Dr. Monroe had similar provisions in his physician employment agreement?

A.  I don't.

Q.  Okay.  What else did Mr. Weller tell you about the incompleteness of the agreement that -- the draft agreement that Centura had sent Dr. Peddada?

A.  That was the extent of it, that it was -- it didn't include the -- the loan provision or the language specific to the loan, was -- was it.

Q.  How long was this conversation with Mr. Weller?

A.  Oh, my gosh, I couldn't tell you.

Q.  Was it short --

A.  Yeah.

Q.  -- long?

Page 103

A.  Yeah, it would have been -- I don't recall it being an extended conversation.

Q.  Like a minute or two?

A.  Oh, I'm sure it was probably longer than one minute, but, yeah.

Q.  Five minutes?

A.  I'd be speculating.  I don't know.

Q.  What did you say in return to Mr. Weller when he said that he wanted you to rescind the job offer?

A.  What did I say specifically to Sam?

Q.  Uh-huh, yeah.

A.  That I would draft the letter and send to Dr. Peddada.

Q.  Okay.  Did you ask any questions at all about why he was suggesting to rescind the job offer?

A.  No.  I mean, he shared with me that, again, lack of responsiveness in the -- in signing the agreement was the reason.

Q.  But he didn't tell you that Dr. Peddada was on medical leave?

A.  No.

Q.  Would you have still sent that letter out if you had known that Dr. Peddada was on preapproved medical leave?

A.  Yeah.

Page 104

(Whereupon Mr. Crist left the deposition room.)

Q.  (By Ms. Halpern)  Why?

A.  Largely, I mean, it's -- we needed an understanding of where we were going in terms of that service and -- and who was going to provide that, so it wouldn't have delayed understanding how we were going to staff that, simply because if someone was out on leave, still would have connected with that individual.

Q.  Okay.  Did you do any investigation, independent investigation, before authoring the letter to rescind Dr. Peddada's employment offer?

A.  Did I do any investigation?

Q.  That's correct.

A.  No, ma'am.

Q.  Did you try to reach out to Dr. Peddada?

A.  I did not.

Q.  Did you know when his start date was?

A.  No.

Q.  So you didn't know whether he was starting in a week or three months?

A.  Well, whenever the -- whenever we would get an executed agreement, because usually once you have an executed agreement, there's a 90-day period by which you can pay your credentialing and the onboarding by

Page 105

which he would start, but I didn't know the specific start date.

Q.  Did you ask Mr. Weller the start date before authoring the letter?

A.  No.

Q.  Why not?

A.  Again, I -- I didn't think that was necessarily important to the conversation, in that, you know, Sam was sharing, again, that we were not getting a response from Dr. Peddada so it wasn't -- I -- obviously, we needed to have services covered as quickly as we could, so I -- I didn't explicitly ask when the start date was.

Q.  Okay.  I'm going to introduce what has previously been designated as --

MS. HALPERN:  You don't have the exhibits, right?

THE COURT REPORTER:  No.  Sorry.

MS. HALPERN:  I might have to take a break because I thought there would be an exhibit binder here.

Just a photocopy, that's for you guys.

THE WITNESS:  Sure.

MS. HALPERN:  All right.  You want to take like a -- well, let me finish this, and then I can maybe do this afterwards.

27 (Pages 102 to 105)



Page 106

Q. (By Ms. Halpern) It's the employment agreement.

A. Okay.

Q. Obviously, but -- or the employment offer --

A. Yeah.

Q. -- for Dr. Peddada, but I need extra copies of that.

So let me ask you this:

If it had been several months until Dr. Peddada's start date, would that have made a difference to you in terms of the decision to rescind that job offer?

A. Just clarify the question, several months before his start date?

Q. Correct.

A. No.

Q. Why not?

A. Because, I mean, what we needed was confirmation from Dr. Peddada that he was going to sign his employment agreement. That's really what triggers then all the necessary pair credentialing and onboarding. And so a delay in signature was, again, a delay in ensuring that we had coverage for that service. So . . .

Q. And what did Mr. Weller tell you, if

Page 107

anything, about Dr. Peddada having problems -- having problems with Dr. Peddada signing the agreement, the employment agreement?

A. Just that they couldn't get a response from him. I mean, that they -- they were trying to connect with him and that they were unable to -- to get clarity of whether or not he was going to sign the agreement.

Q. And he didn't tell you that Dr. Peddada had already signed an agreement that he was told was the final agreement?

MS. McMANUS: Object to --

A. No.

MS. McMANUS: -- the form.

A. I don't recall that it was -- no.

What -- what Sam shared with me was that the -- the draft agreement that was shared with him didn't include those terms that I referenced in terms of the loan, but it was not presented as that was a final agreement to him.

Q. (By Ms. Halpern) Is it common to send draft agreements to physicians?

A. It is.

Q. And how are those designated as drafts?

A. There's usually no signatures on them. I

Page 108

mean, they're not executed agreements, so . . .

Q. But a final agreement would also not yet be executed. How -- how, in your -- in your experience, was an incomplete agreement designated as such when sent to a physician?

A. I don't think -- I mean, the intent is when we share a draft agreement, that it is the terms of the agreement.

Q. Could you explain that?

A. So when we send out an agreement to someone to review -- and I don't know, in this situation, what conversations occurred with Dr. Peddada -- it's generally, it's the agreement that they would sign upon employ- -- you know, to -- to execute.

Q. Okay.

A. So . . .

Q. Was it common to send more than one draft of an agreement to a physician?

A. If the -- if the original draft that was sent was incorrect, we would send another draft, yes.

Q. And how would you, in your experience, notify a physician of that?

A. That the draft was incorrect?

Q. Yes.

A. It would be in direct conversation with

Page 109

them.

Q. Okay. Can you come up with examples other than with Dr. Peddada, any that you recall?

A. Not that I recall. Yeah, there's none that come top of mind, yeah, where I was directly involved, no.

Q. Okay. So you were not involved in any similar situation?

A. No.

Q. During your entire time at Centura?

A. Similar situation as this one, no.

Q. Can you recall a single other physician who was sent an agreement to sign that was incorrect?

A. I would be hard-pressed to give you an example, yeah. No.

Q. So you don't recall --

A. No.

Q. -- any others?

A. No.

Q. Okay. Do you recall ever having a conversation with a physician, other than Dr. Peddada, about an incorrect draft agreement for an employment contract?

A. I -- yes, and it's usually around compensation terms, where we might have incorrectly



Page 110

stated something on their -- in their agreement is usually where, if there was a miscommunication, realizing that the language is fairly standard, it was usually in a -- around a comp term that we would need to clarify.

Q. Do you recall any actual instances of this, because it sounds like you're talking in a generality?

A. Yeah, more a generality. I don't have a specific example. I couldn't give you a physician name, per se.

Q. Okay. Do you recall, even without a name, a specific time where you corrected an agreement and spoke with a physician about that when you were at Centura?

A. Yeah, I don't know a specific time. I just -- in my time at Centura, it -- you know, while -- while you likely -- which you would like to avoid, there is -- there was times where perhaps there was a lack of clarity around a comp term or needed to be clarified, that you would have a direct conversation with a physician, yeah.

Q. But you don't recall having an actual specific example of that?

A. No.

Q. Okay. What else did you talk to

Page 111

Mr. Weller about in this conversation where he suggested rescinding Dr. Peddada's job offer?

A. I mean, really, it was subsequent to that, initiating that conversation, having some communication with legal, which was --

Q. Wait --

A. -- privileged --

Q. -- hold on, I will ask quickly about that.

A. Uh-huh.

Q. In the timing and sequence of events, without telling me what legal said, when -- who did you contact in the legal department?

A. I don't recall directly contacting them.

Q. Okay.

A. Jennifer was pulled into our -- into a discussion around Dr. Peddada's agreement.

Q. And that was after you sent the letter rescinding the offer?

A. No. That -- that would have been in advance of sending the letter.

Q. All right. Let me just --

A. Sure, yep.

Q. Because these, I think, are the emails you were maybe talking about.

A. Yeah.

Page 112

Q. Is that what you're talking about --

A. Yeah.

Q. -- the emails where --

A. Correct, yeah.

(Deposition Exhibit 9 was marked.)

THE COURT REPORTER: Exhibit 9.

MS. McMANUS: Has it been marked?

THE COURT REPORTER: 9.

THE WITNESS: It's 9.

MS. McMANUS: Thank you.

Q. (By Ms. Halpern) Mr. Tacha, if you -- the court reporter has just handed you what's been designated as Exhibit 9.

Have you seen Exhibit 9 before?

A. It was presented to me in preparation, yeah. I had seen -- I mean, I saw the redacted version that you're presenting here.

Q. Okay. Now, did you see an unredacted version -- without telling me the content, did you see an unredacted version prior to preparing for this deposition?

A. I don't believe I -- I saw -- I believe I just saw the redacted version. I don't recall seeing the --

Q. Do you recall the emails in Exhibit 9,

Page 113

participating in that email chain?

A. I don't recall the specific content, no. Yeah.

Q. Is -- what was your email address at Centura?

A. Jason.tacha@centura.org.

Q. Was there a dot?

A. I thought there was. Maybe there isn't. Maybe I'm thinking of my current one. I can give you my current one: jason.tacha.com.

Q. We look at Exhibit --

A. Yeah.

Q. -- 9?

A. It appears as though there's not a period in there.

Q. It doesn't seem like any --

A. No.

Q. -- of them have periods in them.

A. Yeah.

Q. Does this refresh your recollection on what your email address was, Exhibit 9, the first page, @centurahealth?

A. It does now, yeah.

Q. Okay. And if you want to turn to the last page, it says, "PCF-Paddada 0226"?



Page 114

A. Okay.

Q. Of Exhibit 9.

If you read it from reverse order, so from 0226 to 0223, can you just let me know if -- when you said, "Jennifer England got pulled in," if this is what you were referring to? Or were you referring to something else?

A. This -- this is what I was referring to in terms of my -- in terms of engagement with Jennifer.

Q. Okay.

A. Yeah.

Q. And on PSF-Peddada 0226 -- 0226, yes -- is the letter regarding employment with Centura Health.

Was that the -- is that referring to the letter that you authored to rescind Dr. Peddada's employment offer?

A. I don't know. I suspect so, but I -- I don't know definitively if that's what Sam is referring to here.

Q. Okay. If you look at the email message from Dr. Peddada above that?

A. Uh-huh.

Q. Which spans 0226 to 0225.

Do you recall receiving that email from Dr. Peddada on May 10 at 6:01 p.m.?

Page 115

A. I don't -- no. Outside of receiving this through the preparation, no.

Q. Okay.

A. Yeah.

Q. Do you recall any conversations about Dr. Peddada's email with any of the other individuals carbon copied to this message?

A. I do not.

Q. Did you have any conversations with any of the individuals carbon-copied in these emails, prior to May 11, 2022, about Dr. Peddada's response to your letter?

A. I don't, no, recall -- yeah, in response -- to --

Q. You didn't --

A. -- this email? Yeah.

Q. So you didn't have any conversations?

A. No.

Q. Okay. Does looking at the dates and times of the message in Exhibit 9 refresh your recollection at all on whether you spoke with Ms. England before or after authoring the letter to rescind Dr. Peddada's employment offer?

A. So the question is, did I have a conversation with Jennifer prior to this email?

Page 116

Q. Or communications prior to May 11, 2022. That's what it says --

A. Yeah.

Q. -- there at 6:39 a.m., is when she got pulled in.

A. Yeah, I don't recall having any other conversations with her in advance of the -- this email string. I don't recall any.

Q. So you did not speak with Ms. England prior to authoring the letter to rescind Dr. Peddada's job offer?

A. I believe it was just through the communication that -- that is here. Yeah, I don't recall a specific conversation with Jennifer and me independently.

Q. Yeah. I'm just trying to figure it out chronologically.

So you didn't have even email communications with Ms. England prior to that letter going out rescinding the job offer to Dr. Peddada?

And I'm asking you to look at --

A. Yeah.

Q. -- the dates and times to see if it refreshes your recollection. I'm asking --

A. Yeah.

Page 117

Q. -- you to recall.

A. Yeah. Again, timing of the letter being sent and my conversation with Jennifer, I don't -- I don't recall the exact time that I had -- would have had conversations or other emails with Jennifer associated with this, outside of what's presented here.

Q. Do you recall having any communications with Ms. England outside of Exhibit 9?

A. I don't.

Q. Did you have any conversations or emails with Ms. England outside of Exhibit 9?

A. I don't recall having any other communications with her, yeah.

Q. Okay. Is there any reason to think the dates and times are wrong in Exhibit 9 of the messages, email messages?

A. No.

Q. So you spoke with Mr. Weller.

Who else did you speak to, if anyone, before authoring the letter to rescind Dr. Peddada's employment offer?

A. Jennifer would have been involved in those discussions, yeah.

Q. Do you recall actually communicating with Ms. England prior --

30 (Pages 114 to 117)



Page 118

A. Prior to this, no.

Q. -- to --

A. Yeah, to the exchange here.

Q. To Exhibit 9?

A. Yeah, to Exhibit 9, no.

Q. And it appears on page PSF-Peddada 0225 -- Those are the Bates Numbers in the corner. I'm sure you figured that out.

A. Uh-huh.

Q. -- that she was first brought into the conversation on Wednesday, May 11, 2022 at 6:39:26 a.m.; is that right?

A. Yeah, I mean, to my recollection, yes.

Q. And --

A. Yeah.

Q. -- so --

A. Based off of this email.

Q. There's no reason to think this email is wrong --

A. Right.

Q. -- in Exhibit 9?

A. Yeah.

Q. Or that the dates or times are wrong?

A. Correct.

Q. So you don't recall any emails or

Page 119

conversations with Ms. England prior to Wednesday, May 11, 2022 at 6:39:26 a.m.?

A. I don't recall, no.

Q. You didn't have any?

A. I don't recall them, no.

Q. Okay. Who else did you talk to or email about rescinding Dr. Peddada's job offer, other than Sam Weller, before authoring the letter doing so?

MR. SABEY: Object. It's been asked and answered repeatedly.

You can ask it again.

Q. (By Ms. Halpern) I'm just saying if there's anybody else?

A. No. I mean, again, conversations with Jennifer and Sam.

Q. Was there anyone else you spoke with?

A. I don't recall, no.

Q. Or email?

A. No.

Q. So you did not talk to your supervisors or anyone else?

A. I don't recall, yeah, talking to Scott, yeah.

Q. Did you talk to -- who is Cathy Roberts?

A. Cathy was a HR business partner.

Page 120

Q. Okay. Okay. Did you speak with her before authoring the letter rescinding Dr. Peddada's employment?

A. I don't recall, yeah, having any specific conversations with her. Obviously, she's part of this communication, but I don't -- any direct --

Q. And by "this communication" --

A. -- conversation.

Q. -- you mean Exhibit 9?

A. Exhibit 9, yeah.

Q. How about Eric Koval?

A. Never spoke with Eric.

Q. How about Jeffrey Albert?

A. Never spoke with Dr. Albert.

Q. So the only person you spoke with was Dr. Weller prior to the -- authoring the letter to rescind Dr. Peddada's employment?

A. And the communication that's -- those that are cc'd here or carbon-copied on this are obviously aware, but I don't recall any direct conversations with them, yeah.

Q. Yeah. I'm just asking chronologically, because it appears that the letter went out on May 10, if you look at the last page of Exhibit 9.

Page 121

A. Yeah, I don't -- again, I don't recall any specific conversations, outside of Sam and -- and this exchange here --

Q. And is --

A. -- if there were.

Q. -- the only conversation you had with Mr. Weller the brief conversation you described to me about not being able to reach Dr. Peddada about -- to find --

A. To rescind, correct.

Q. Did you -- after you had that conversation with Dr. Weller, what did you do next?

MR. SABEY: Object to the form. He's not a doctor.

MS. HALPERN: Oh. Mister.

A. Sam, yeah.

Q. (By Ms. Halpern) My apologies. Mr. Weller?

A. Can you restate your question? Sorry.

Q. Yeah. What did you do after you had that phone conversation with Mr. Weller, what did you do next?

A. My -- I -- I don't recall specifically. I mean, obviously, there was conversation with -- with Sam and Jennifer relating to the drafting of the letter,



Page 122

yeah.

Q. Okay. So let me ask you this:

With respect to the letter, who drafted the letter? And I again have this problem.

MS. HALPERN: You know what, I'm going to take a quick break, because this has already been introduced and I don't have copies of it.

MR. SABEY: Okay.

MS. HALPERN: I do have copies.

(Recess taken from 12:49 p.m. until 1:05 p.m.)

Q. (By Ms. Halpern) Okay. Who drafted the letter?

A. Yeah, I -- in -- in terms of who developed the content, it would have been myself, Sam, Jennifer. I mean, in terms of reviewing the content of that letter, it would have been us -- and Jennifer as well.

Q. All right. Let me break that down really quickly.

And if you need to see it, it's fine. It was previously entered as Exhibit 7.

A. Okay. Do you need this?

Q. No.

A. Okay.

Q. It's already been . . .

Page 123

So I have just handed you what has been previously designated as Exhibit 7.

Can you turn to the second page of Exhibit 7.

A. Uh-huh.

Q. Is this the letter we have been referring to throughout this deposition?

A. Correct.

Q. All right. It's authored May 9, 2022.

Is that -- is that when you -- is there -- is that when you -- okay. I'll back up.

Who typed Exhibit -- the letter in Exhibit 8 --

MR. SABEY: Object to the --

Q. (By Ms. Halpern) -- or 7?

MR. SABEY: I mean, you don't get to determine who -- what input an attorney --

MS. HALPERN: I didn't ask for the attorney's input yet. I said, Who typed it.

A. I don't recall who explicitly typed it.

Q. (By Ms. Halpern) Okay.

A. Yeah.

Q. You didn't type it?

A. I didn't type it.

Q. Okay. That's what I was trying to figure

Page 124

out.

So you don't know who typed Exhibit 7 --

A. Correct.

Q. -- the letter in Peddada 000399. That's the Bates Number in the corner.

A. Yep.

Q. Okay. Who do you recall discussing the letter in Exhibit 7 with, just who?

A. Yeah. Jennifer, Sam, and our HR, Cathy, would have been involved in -- and myself.

Q. Yeah. My only question is, you keep saying "would have been involved."

Do you recall them actually being involved?

A. I don't -- I don't recall a specific meeting where all of us were --

Q. Okay.

A. -- sitting around --

Q. Okay.

A. -- reviewing this, no.

Q. Okay. Do you recall reviewing this letter?

A. I do, yeah.

Q. Before signing it?

A. I do.

Page 125

Q. Okay. How soon before sending it do you recall reviewing this letter --

A. It --

Q. -- in Exhibit 7?

A. Yeah, I don't know the exact time, but it would have been likely within a week of sending the letter, be my guess.

Q. Okay. Do you remember if it was the day of or a few days before you sent the letter in Exhibit 7 that you reviewed the letter, approximately?

A. I don't recall, yeah.

Q. Do you think it might have been within a week?

MR. SABEY: Object. It's been asked and answered.

A. I don't know. Yeah, I don't recall the exact timing of when I would have reviewed prior to sending.

Q. (By Ms. Halpern) Okay. Other than with Ms. England, do you recall discussing the content of the letter in Exhibit 7, Peddada 000399, with anyone?

MR. SABEY: Object to the extent that it calls for an attorney-client communication with more than one person.

MS. HALPERN: Okay.

32 (Pages 122 to 125)


MAGNA
LEGAL SERVICES

Page 126

Q. (By Ms. Halpern) Outside of the presence of an attorney?

A. I don't recall specifically, outside of the presence of the attorney, reviewing this content.

Q. Okay. And I guess I'm going to try to get some clarification really quickly.

Do you recall just having a meeting with the attorney before sending -- before sending this letter out in Exhibit 7?

A. I do recall that we had a discussion around this letter in advance of sending it out --

Q. And --

A. -- yes.

Q. -- is this -- in Exhibit 7, the letter, is this all of the reasons -- does it capture all the reasons that you rescinded Dr. Peddada's offer of employment?

A. Yes.

Q. Are there any other reasons that Dr. Peddada's offer of employment was rescinded?

A. No.

Q. And you told me about all the conversations you had with Mr. Weller or anyone other than the attorney about the reasons for rescinding Dr. Peddada's job offer?

Page 127

A. Yes.

Q. And you did not know that he was on medical leave when you signed Exhibit 7?

A. I did not.

Q. And would you have still signed Exhibit 7 if, for example, Dr. Peddada was in the hospital; like, let's say, he was in a car accident?

A. I would have still signed the letter, yes.

Q. How -- what about if his wife had died; still would have signed this letter in Peddada 000399?

A. Yes.

Q. How about if you were told that Mr. Weller had only tried to reach out for Dr. -- to Dr. Peddada for two or three days before you signed the letter rescinding the agreement; you still would have signed this letter?

A. Yeah, from failure to execute the agreement, yes.

Q. Okay. Even if there had only been a few days of attempts to reach him?

A. Correct.

Q. And even if you had known that he had already signed an agreement he thought was the final agreement?

A. Correct, correct.

Q. And what training have you had on the

Page 128

Americans with Disabilities Act?

A. I don't know that I've had any specific training, yeah.

Q. Okay. How about the Family Medical Leave Act?

A. Oh, I have to believe so, in the past. I don't recall specifically what it --

Q. Do you recall getting any training at Centura on the Family Medical Leave Act?

A. Not specific to FMLA, no.

Q. How about Colorado's leave laws?

A. No.

Q. Okay. How about any EEO training at all, equal employment opportunity training, at Centura?

A. No, ma'am.

Q. Okay. In Exhibit 7, Peddada 000399, what concerns did you personally have before authoring this letter about the inability of Centura to reach Dr. Peddada to sign his employment agreement?

MR. SABEY: Object to the form.

MS. HALPERN: I'm sorry, who's objecting? I mean, I don't mind because I know you're new and so I've been letting it go, but you guys have both indiscriminately been doing that. Okay? I don't mind, because I -- it's fine, but I'm just trying to -- you've

Page 129

been the only person objecting, so I'm just -- okay. Go ahead. It's fine. It's --

MR. SABEY: Sorry. It's a reflex.

MS. HALPERN: It's okay, it's a habit. It's a habit.

MR. SABEY: It's a reflex for me.

MS. HALPERN: I understand. I have not been complaining, I get it. It's very nice and supportive, so I'm not --

MR. SABEY: Okay, thanks.

MS. HALPERN: I'm not trying to, like, create too many problems, but --

MR. SABEY: I appreciate it.

MS. HALPERN: Go ahead.

A. Can you restate the question?

Q. (By Ms. Halpern) Sure. What were your concerns with not being able to reach Dr. Peddada before you signed this letter in Exhibit 7?

A. I didn't have specific concerns.

Q. Okay.

A. Just that what was expressed to me as the concern was the lack of responsiveness to -- to signing the agreement.

Q. Okay.




Page 130

A. That was the only concern that I had, was that, again, we've got an employment agreement, that we know we need to fill the position, and there was a lack of responsiveness to signing that agreement. That was my concern.

Q. Okay.

A. Yeah.

Q. And why was that a problem to you, in your mind?

A. Yeah, for me, it's -- it's just, you know, securing a physician in the services that he would be providing and not having clarity to how we were going to do that is the main reason --

Q. Any --

A. -- yeah.

Q. -- other reasons?

A. No, ma'am.

Q. Anything involving that financial language provision that you said needed to be included in the employment agreement?

A. No. As far as a reason to rescind the offer?

Q. Right.

A. Yeah.

Q. So you weren't concerned about the actual

Page 131

provisions in the employment agreement, just that Mr. Weller told you that he couldn't reach Dr. Peddada?

A. Correct.

Q. And your concern was just making sure you could fill the services at Centura?

A. Correct.

Q. And you didn't know when Dr. Peddada's start day was?

A. No.

Q. Any conversation with Mr. Weller about his concerns around revising the draft employment agreement for Dr. Peddada?

A. Sam's concerns about --

Q. Yeah. Did he -- what were the concerns he expressed to you about --

A. Oh, just that that provision needed to be a part of the agreement.

Q. And why did he say that provision had to be part of the agreement?

A. As a result of -- I mean, it's a compliance issue of not actually addressing the repayment of that -- of that loan. So that was the -- that was the rationale or the reason. The concern was that it wasn't present.

Q. Okay.

Page 132

A. Yeah.

Q. And you had said earlier that you can't think of other times where loan repayment's actually in the employment contract?

A. I don't, no.

Q. Okay.

A. Yeah.

Q. And what did you mean by "compliance issue"?

A. Just in terms of any physician remuneration that we -- that we provide, particularly in the -- in the loans, that there is a repayment of that or an accounting for those dollars. And so in this case, with the recruitment assistance that was provided, we needed to account for the -- for the repayment of that.

Q. And what did you discuss about that with Mr. Weller before signing the letter in Exhibit 7?

A. Just to that extent, that it wasn't a part of the -- the agreement previously that we then included in the -- the final draft.

Q. Are you talking at all about compliance issues or anything like that, or just that we need to add that language?

A. Need to add that language, yeah.

Q. No further conversation?

Page 133

A. Correct.

Q. Okay. Did you discuss with anyone why it didn't need to be included in the actual employment agreement versus a side agreement?

A. No, not explicitly, no.

Q. Okay.

A. Yeah.

Q. And typically, the loan repayment agreements are side agreements; they're not in the employment contracts, right?

MS. McMANUS: Object to foundation.

Q. (By Ms. Halpern) That you've seen?

A. That I've seen, yes. There's recruitment assistance agreements, yeah, but they're not associated necessarily with employment like this situation.

Q. Okay. And what do you know about compliance with debt repayment? What laws regulate that?

A. Stark Laws. I mean, I'm not an expert in them and that's -- I usually rely on our corporate responsibility and compliance team to -- to inform that, but, yeah.

Q. Okay. So, yeah, what does Stark Law stand for?

A. What does it stand for?

Q. Or what -- yeah, what are they?

34 (Pages 130 to 133)



Page 134

A. Laws that, again, govern kind of the relationship between physician and -- speaks to, again, remuneration and referrals. Again, I'm not necessarily an expert in it.

Q. Okay. Have you received any training on these laws, these Stark Laws?

A. Not explicitly, no. I have not been -- no.

Q. Okay. Do you know why Dr. Weller was concerned at all with compliance with these law repayment laws with respect to Dr. Peddada's contract?

A. Again, just that it was a form of remuneration to the physician, and accounting for all dollars that we would pay for physicians and ensuring that it's, you know, within fair market value is really the consideration.

Q. Did he talk to you about that, or is that just kind of your general --

A. Yes --

Q. -- background knowledge?

A. -- my general background knowledge, correct.

Q. But did you have any conversations with him about that?

A. Not specifically, no.

Page 135

Q. Okay. Before --

A. Right.

Q. -- authoring the letter in Exhibit 7? Okay.

Have you been trained at all at Centura -- were you trained at all at Centura on Stark Laws?

A. No.

Q. How about AdventHealth?

A. Not since I've been at Advent, no.

Q. Have you had any other compliance issues with any physicians or any concerns about compliance with Stark Laws with any physicians at -- when you were at Centura?

A. No.

Q. None?

A. That's why we -- I love our compliance people.

Q. Okay. So did you --

A. Keeps us out of trouble.

Q. And by "compliance people," who do you mean by that?

A. Our corporate responsibility team --

Q. Okay.

A. -- so -- yeah.

Q. Did you talk to anyone in the corporate

Page 136

responsibility team prior to rescinding --

A. No.

Q. -- Dr. Peddada's offer?

A. Not this one.

Q. Do you have an understanding of how Centura would not have been in compliance with Stark Laws -- that's going to come out weird. Scratch that.

Do you have any knowledge of how Centura may have violated Stark Laws by hiring Dr. Peddada without the loan payment language in his employment contract?

A. Not explicitly, no. Just that -- again, by providing that, again, compensation in terms of a recruitment assistance, there is an expectation or requirement to repay that or work through that, so . . .

Q. But I meant with his employment contract in specific?

A. No.

Q. And -- are you familiar with any other physicians who have had to pay back loans to Centura?

A. I am not, no. Yeah.

Q. For the recruitment assistance?

A. No. I was not directly involved in that.

Q. In any other case?

A. Where I was involved in the --

Page 137

Q. Correct.

A. -- recruitment system, no.

Q. Or that you have any knowledge of?

A. No.

Q. So Dr. Peddada was the only one?

A. Yeah.

Q. And how about with physicians and their sign-on bonuses?

A. Absolutely, yep.

Q. Okay. With the sign-on bonuses, have you ever fired anyone because they failed to agree to pay back a bonus?

A. Never have terminated someone for failure to agree to repay, no.

Q. Okay. What was -- have you ever had any role in kind of forgiving a sign-on bonus --

A. I have --

Q. -- for a physician?

A. No. We -- we have not forgiven sign-on bonuses. Those -- again, it's pretty -- pretty clearly articulated in their agreement in terms of the repayment if they were not to work out the term of that repayment period. So if somebody does leave in advance, we would recuperate those dollars, a prorated amount of those dollars.

35 (Pages 134 to 137)




Page 138

Q. How about if they managed to remain employed for a sufficient amount of time; I think you said it was like three years or --

A. Yeah.

Q. -- something like that?

A. Then -- yeah. Then those are -- and then if they were to leave subsequent to that period of time, there's not a repayment.

Q. Okay.

A. Necessary.

Q. Why would that -- do you have any idea why that would not violate Stark Laws?

A. Yeah. So what we -- what we will do is we will look at their total cash compensation to be inclusive of a sign-on bonus.

Q. Okay.

A. And then amortize that over the period of that term. And like I said, it's usually two to three years.

And so we are assessing fair market value in the context of what that amortized amount is plus their clinical pay, any other additional remuneration to the physician, to make sure that, again, it falls within fair market value.

Q. And are you -- do you know if there's any

Page 139

difference with how recruitment loans work at Centura --

A. Not --

Q. -- or worked?

A. -- explicitly, the difference between those two, no.

Q. Do you know if any other recruitment loans were forgiven by Centura to -- for any other PSA?

A. I am not familiar, no.

Q. You don't have any knowledge of that?

A. I don't have any knowledge, no.

Q. So you did not receive any training on Stark when you were at Centura or AdventHealth?

MS. McMANUS: Asked and answered.

A. No.

Q. (By Ms. Halpern) Okay. Any other reasons that you rescinded Dr. Peddada's job offer, other than your concern of filling the position or role?

A. No.

Q. I'm just going to ask you to look at the email chain that I introduced at Exhibit 9 again.

Do you recall any other emails, other than those in Exhibit 9, that you exchanged with any of these other individuals about rescinding Dr. Peddada's job offer?

A. I do not recall, no.

Page 140

Q. How about authoring the letter in Exhibit 7?

A. Can you rephrase -- what do you mean, "how about"? As far as --

Q. Do you --

A. -- just conversations?

Q. -- recall any other emails? I mean, I --

A. No.

Q. -- I will back up and say, This is what I'm trying to get at.

I'm just trying to see if there's any other documents out there that we should be requesting?

A. I'm not -- yeah, I'm not aware of any other email exchanges.

Q. You don't recall any --

A. No.

Q. -- other email exchanges?

A. Yeah. No.

Q. Okay. Do you recall seeing drafts of the letter in Exhibit 7, or was that just: You reviewed it, that was the final one that you at least saw, and you signed it?

A. Correct. That's the one I recall reviewing.

Q. Okay. And then want to --

Page 141

MS. HALPERN: We'll be finished pretty soon.

Okay. I did take the opportunity to photocopy. I had another copy, now I can't find it. You guys don't have copies from the old exhibits?

MR. SABEY: No.

MS. HALPERN: Okay. All right.

MR. SABEY: Yeah, we can all three --

MS. HALPERN: Can you share?

MR. SABEY: Yeah.

Q. (By Ms. Halpern) This has been previously designated as Exhibit 3, Mr. Tacha.

MS. HALPERN: I really thought I had another one of those. I don't know what . . .

MR. SABEY: It's probably in the documents.

MS. HALPERN: Yeah, it should be in here somewhere.

Ah, got it.

MS. McMANUS: Found it. Thanks.

MS. HALPERN: Yeah.

Q. (By Ms. Halpern) All right. I just handed you what's previously been introduced in this litigation as Deposition Exhibit 3.

A. Uh-huh.



Page 142

MS. HALPERN: I understand it's confidential, so I'm not going to ask about the actual content so much, but if you guys want to designate anything as confidential. That's fine.

MR. SABEY: No.

Q. (By Ms. Halpern) Can you please take a look at Exhibit 3, Mr. Tacha.

A. Yeah.

Q. Have you seen Exhibit 3 before?

A. Through this -- through the preparation for this.

Q. For the deposition today?

A. Correct, yeah.

Q. Did you see it at any point in time --

A. No.

Q. -- prior to preparation --

A. No, ma'am.

Q. Might you have seen it and you just don't recall?

A. No. I -- I would -- I'm just looking at the signature --

Q. Sure.

A. -- pages here.

Q. Yeah.

A. I would -- I would not receive this

Page 143

signature page until it --

Q. Could you --

A. -- came through --

Q. -- read the Bates number out, just for --

A. Yeah.

Q. -- the record, to make it clear.

A. It's 000438.

Q. Okay.

A. This is an agreement that would not come to me through DocuSign.

Q. Okay.

A. The brackets are removed. I mean, it's just the -- this is a draft that I would not have seen.

Q. Okay.

A. Yeah.

Q. Have you seen an agreement similar to Exhibit 3, a physician employment agreement similar to Exhibit 3?

A. No. I mean, again, for my role, I always would see them on the back end, that did not have -- this is -- this is unusual, that you would have -- in fact, I'm saying "unusual," I don't know that I've seen another situation where I've had a physical copy signature of an agreement. It's all electronic.

Q. Okay.

Page 144

A. So I don't --

Q. Yeah.

A. Wouldn't see these, no.

Q. Let me back up --

A. Yeah.

Q. -- a little bit.

I mean, substantively or contentwise, not just the final signature page?

A. Substantively, yeah. This is our standard agreement.

Q. Okay. Sorry.

A. It's our standard employment --

Q. I mean --

A. -- agreement.

Q. Yeah.

A. Yeah.

Q. So this is the standard employment agreement?

A. Uh-huh.

Q. Are there any terms in it that are different than Centura's standard employment agreement?

MS. McMANUS: Object to foundation.

Q. (By Ms. Halpern) That you've seen since -- how many of these have you seen --

A. Many --

Page 145

Q. -- employment agreements?

A. -- many, many.

Q. Would you say hundreds?

A. Yeah.

Q. Okay. Okay. Can you take a look at Exhibit 3.

Are there any terms in it that are different than Centura's standard employment agreement?

A. You know, the structure of the agreement is similar. Where you see nuance -- or not nuance -- but where you see differences is compensation --

Q. Okay.

A. -- as well as what we call the EAS, the last page of the agreement.

Q. Okay.

A. Which, again, just details out the specialty and the financial terms for that specific physician.

Q. Is that 439 -- Peddada --

A. Yeah, it's --

Q. -- 000439?

A. Yeah, 000439, correct.

So those would be -- those, obviously, vary from agreement to agreement. But the standard language --



Page 146

Q. The rest of the provisions are the same?

A. Yeah.

Q. Okay. Let me ask, then, about this. What did you call this last page?

A. The employment agreement summary.

Q. Yes.

A. Uh-huh.

Q. Is that typically where you would change the compensation, where the compensation would be --

MS. McMANUS: Object --

Q. (By Ms. Halpern) -- different at Centura?

MS. McMANUS: Object to foundation.

A. There's two places for where --

Q. (By Ms. Halpern) Okay.

A. -- compensation would reside: Either in the actual agreement itself under Article 2, I believe it is.

Q. Okay.

A. And then the EAS.

Q. All right. So Article 2 on Peddada 000430, "Compensation," what would usually change about that language, if anything?

A. Sometimes you'll see actual terms listed here in --

Q. Like --

Page 147

A. -- under --

Q. -- the salary?

A. -- Article 2 -- Yeah. Or -- or in the EAS.

Q. Okay.

A. Yeah.

Q. At the end, that last page?

A. Correct.

Q. Okay. Can you keep looking at Exhibit 3 before I let you out of here?

A. Sure.

Q. And look at the other substantive terms. Anything -- you know, is this the standard agreement that you saw when you were at Centura?

A. This looks similar. I mean, I -- I'll -- transparently, don't memorize every --

Q. All right.

A. -- every word on here so there may be some nuance there, but, generally, the articles that are in the employment agreement are consistent.

Q. Okay.

A. Or standard.

Q. And just to make sure, you don't know anything about Dr. Monroe's, like, loan forgiveness?

A. I don't --

Page 148

Q. Terms, agreement, anything like that?

A. Yeah.

Q. Or his employment agreement?

A. I don't recall it. It's not to say --

Q. Sure.

A. -- I didn't sign his employment agreement.

Q. Okay.

A. But I don't remember the specifics of his agreement, so . . .

Q. Any reason to think it would be any different than the offer extended to Dr. Peddada in Exhibit 3?

A. I mean, I would suspect there's some -- it would be consistent, but I -- again, I -- without -- yeah. Yeah.

Q. No reason to think that was not the agreement?

A. Right.

Q. Any other conversations you had about rescinding job offer of Dr. Peddada that you haven't already told me about that don't involve a lawyer?

A. No.

Q. Were you involved at all in responding to any of Dr. -- of Dr. Peddada's Charge of Discrimination?

A. No.

Page 149

Q. Did you know he had even filed a charge with the Colorado Civil Rights Division or the Equal Employment Opportunity Commission?

A. I was not.

Q. Prior to this litigation, did anyone ask you to supply any information to -- or let me rephrase that. Prior to deposition, has -- did you supply any information to any -- no. All right. When is the first time you found out that Dr. Peddada was pursuing legal action?

A. When I was contacted for the deposition.

Q. Okay. So you did not know he filed a lawsuit before?

A. I did not.

Q. You did not know he filed charges of discrimination before?

A. No, ma'am.

Q. You did not know he hired attorneys before?

A. I did not.

Q. And have you told me everything you recall about rescinding his job offer?

A. I have.

MS. HALPERN: I don't think I have any

38 (Pages 146 to 149)


MAGNA
LEGAL SERVICES

Page 150

more questions for you, but your attorneys may have some questions.

MR. SABEY:  No, no questions.

MS. HALPERN:  Okay.  Get you out of here.

THE WITNESS:  Thank you.

MR. SABEY:  Thank you.

THE COURT REPORTER:  Are you going to handle signature and order a copy?

MR. SABEY:  Yes.

MS. HALPERN:  I do not want a paper copy.  Just electronic.

(WHEREUPON, the within proceedings were concluded at 1:38 p.m. on the 30th day of August, 2024.)

* * * * *

Page 152

REPORTER'S CERTIFICATE

I, K. MICHELLE DITTMER, Registered Professional Reporter and Notary Public, State of Colorado, do hereby certify that previous to the commencement of the examination, the deponent was duly sworn by me to testify to the truth in relation to the matters in controversy between the parties hereto; that the said deposition was taken in machine shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form; that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.  I further certify that I am not employed by, related to, nor counsel for any of the parties herein, nor otherwise interested in the outcome of this litigation.

IN WITNESS WHEREOF, I have affixed my signature this 13th day of September, 2024.

My commission expires April 15, 2028.

_____

K. MICHELLE DITTMER
Registered Professional Reporter

Page 151

I, JASON TACHA, hereby certify that I have read the foregoing transcript and that the same and accompanying correction sheets, if any, constitute a true and complete record of my testimony.

PAGE  LINE      NOW READS         SHOULD READ

_____
JASON TACHA
Subscribed and sworn to before me this _____
day of _____, 20____.

My Commission expires: _____

_____
Notary Public
Address:  _____

_____



**A**

**a.m**
1:14 51:2,3 116:4
118:11 119:2
**ability**
54:19 66:5
**able**
31:23 121:8 129:18
**above-entitled**
1:16
**abreast**
56:9
**Absolutely**
137:9
**accident**
127:7
**accompanying**
151:2
**account**
132:15
**accountabilities**
21:18,19 81:22
**accountability**
17:25 18:2,5,8 22:3,5
22:16 40:11,21
41:22
**accountable**
64:15
**accounting**
132:13 134:13
**acronym**
36:24 42:9
**Act**
128:1,5,9
**action**
1:2 27:23 31:8,9,11
31:18,21,24 32:5,20
33:9,15,18 34:6,17
34:21 149:11
**actual**
8:1 32:14 49:19
76:12 77:3 86:4
91:21 97:15 110:5
110:22 130:25
133:3 142:2 146:16

146:23
**add**
132:22,24
**addition**
21:22 22:2
**additional**
23:11 138:22
**address**
101:18,22 113:4,21
151:23
**addresses**
82:8
**addressing**
131:21
**adhere**
46:24
**administration**
9:12
**administrative**
9:18 10:7
**administratively**
48:6
**advance**
111:20 116:7 126:11
137:23
**advanced**
19:8
**Advent**
12:20 135:9
**AdventHealth**
10:3,4 12:21 13:1,2,6
13:11,20,24 14:1,4
14:4,9,17,25 15:4
15:12,20 17:5,9
20:5 35:22 36:2,5
42:6,7 44:11 55:18
55:25 90:5,15,18
135:8 139:12
**Adventist**
14:2,17
**advocate**
81:12 82:22
**affiliated**
15:9
**affiliation**
14:3

**affixed**
152:16
**aforesaid**
152:10
**agree**
137:11,14
**agree-**
95:9
**agreement**
3:8 8:1 13:14 22:8,10
25:10,14 26:19 27:4
37:22 40:24 41:16
42:10,15 43:4 46:12
46:15,19,21,25
47:10 48:3,18,20
49:5,7,18,19,20
53:3 58:21 61:24
62:15,24 69:24 70:4
70:8,9,22,25 71:9
71:14 72:7 73:3
76:12 78:4,19,22
88:4 89:7,12,24
96:25 97:19,21
100:3,6,8,11,15,20
100:23 101:1,11,14
101:20,22 102:6,12
102:15,16 103:18
104:23,24 106:2,21
107:2,3,8,10,11,17
107:20 108:2,4,7,8
108:10,13,18
109:13,22 110:1,12
111:16 127:15,17
127:22,23 128:19
129:24 130:2,4,20
131:1,11,17,19
132:19 133:4,4
137:21 143:9,16,17
143:24 144:10,14
144:18,21 145:8,9
145:14,24,24 146:5
146:16 147:14,20
148:1,3,6,9,17
**agreements**
23:16,19,21,22 24:3
24:21,21 25:3,11

26:23 41:11,14,20
41:22 42:1,22,24
43:16 46:10,11 47:6
47:9 50:12 51:13,22
52:8,14 53:8,21
54:1,10 56:5 57:5
61:22 70:2 73:5,8
74:1 75:25 76:21
77:10 78:11 79:4,5
85:21 87:1 89:4,8
89:11,16,21 90:1,4
90:18,20,24 102:1
107:22 108:1 133:9
133:9,14 145:1
**Ah**
141:19
**ahead**
5:17 38:14 40:4 45:3
47:13 71:7 86:20
90:12 129:2,14
**Alan**
67:11 68:1,10,21
69:4,9
**Albert**
120:13,14
**align-**
71:8
**aligned**
11:8 71:16
**alignment**
58:22 69:24 71:10,15
**Americans**
128:1
**amortize**
138:17
**amortized**
138:21
**amount**
47:20 52:25 137:24
138:2,21
**analyzed**
79:18
**angle**
69:7
**annual**
29:18,18,22 30:11



**annually**
30:2
**answer**
5:18 6:11 12:4,10
16:21 90:12 99:16
**answered**
119:10 125:15
139:13
**answers**
4:25
**Anuj**
1:4 58:23,25 60:5
69:9
**anybody**
62:20 119:13
**apologies**
121:17
**APP**
86:12
**APP's**
24:23
**APPEARANCES**
2:1
**appears**
113:14 118:6 120:24
**applied**
35:2
**appreciate**
129:13
**appropriate**
44:9 55:1
**approv-**
42:23
**approval**
42:23
**approved**
49:17
**approximately**
17:18 21:5 29:1
125:10
**April**
152:18
**area**
20:2 54:7,16,19
**Article**
146:17,20 147:3

**articles**
147:19
**articulate**
4:25
**articulated**
100:25 137:21
**ascertained**
54:25
**ascertaining**
55:6
**aside**
91:21
**asked**
10:21 20:17 26:5
69:6 88:16,20 90:11
119:9 125:14
139:13 152:12
**asking**
7:1 26:24 51:8,10,11
79:4 88:23 116:21
116:24 120:23
**assessing**
76:7 138:20
**assets**
13:13,17,20 14:5,9,9
14:12 15:9,16 17:1
20:7
**assigned**
86:24
**assistance**
53:15,20 54:10,20,25
55:10,19,22 56:5
101:9 132:14
133:14 136:14,22
**associated**
13:24 29:25 45:11
55:15 81:17 97:18
117:5 133:14
**Associates**
94:6
**assume**
5:24,25,25
**attempts**
100:2 127:19
**attend**
61:21,21 62:6,7

**attendance**
34:14,18
**attorney**
8:10 97:15 99:15
123:17 126:2,4,8,24
**attorney's**
123:19
**attorney-client**
7:7 99:16 125:23
**attorneys**
5:12 6:24 7:2 8:24
149:19 150:1
**August**
1:13 3:3 150:13
**authored**
75:4 96:11 97:25
98:8 114:15 123:9
**authoring**
96:20 98:14 104:11
105:4 115:22
116:10 117:20
119:8 120:2,16
128:17 135:3 140:1
**avoid**
110:17
**aware**
25:20 27:21 32:17,18
56:4,15 57:7 59:22
61:21 62:1 66:16
70:21 71:21 72:2,8
73:18,19,20,25 74:4
90:23 96:11 120:20
140:13
**awareness**
67:5 70:14 73:4

---
**B**
---
**back**
55:11 56:12 63:1
75:22 95:22 123:11
136:20 137:12
140:9 143:20 144:4
**backfill**
28:23
**background**
9:2,7 63:4 101:23

134:20,21
**bad**
33:6
**Banko**
16:5
**Based**
118:17
**basic**
57:4
**basically**
18:8 23:8 42:9
**basis**
79:19
**Bates**
118:7 124:5 143:4
**beat**
10:6
**behalf**
1:17 2:2,7
**behavior**
34:15
**behavioral**
34:22
**believe**
10:10,11 15:19 89:3
91:10,19 112:22,22
116:12 128:6
146:17
**benchmarks**
44:2,8
**benefits**
40:9 86:3,5 87:12
**bet**
9:3 11:2
**beyond**
28:6 83:1
**big**
4:25
**binder**
105:20
**biology**
9:10
**bit**
7:10 9:1,6 12:23 15:3
18:13 19:3 35:15
44:10 52:12 53:9



57:11 75:23 95:22
97:11 98:11 144:6
**board**
6:2 15:14,18,20
**bonus**
52:16 53:5 102:9
137:12,16 138:15
**bonuses**
137:8,10,20
**boring**
10:7 51:8
**brackets**
143:12
**break**
29:11 50:24 69:15
70:15 72:5 75:11
76:14 93:7 105:19
122:6,18
**breaks**
5:11
**brief**
121:7
**briefly**
99:13
**bring**
53:15
**bringing**
48:19
**broader**
12:17 30:22 39:21
**broadly**
92:18
**brought**
118:10
**budget**
40:7,12,18,22 42:20
**burnout**
96:3
**business**
119:25
**bylaws**
92:6,6

─────────────
C
─────────────

**C**
4:1

**call**
22:8 41:9 66:20,21
78:12,13 145:13
146:4
**called**
10:10 42:8
**calls**
125:23
**Canon**
20:2 22:22
**capture**
126:15
**car**
127:7
**carbon**
115:7
**carbon-copied**
115:10 120:19
**Cardiology**
94:6
**care**
11:17,21 17:25 18:4
18:8 19:5,11,15,23
21:1,2,2,20,22,23
21:24 22:1 23:5
24:22,24 28:23,24
28:24 31:18 45:15
45:18 64:2 66:6
79:15 86:11,24
94:18
**carried**
35:16
**case**
8:24 31:7 45:5 64:25
98:20 132:13
136:24
**cases**
45:5
**cash**
44:1,3 138:14
**Catholic**
1:7 16:14,23 17:13
**Cathy**
119:24,25 124:9
**cc'd**
120:19

**Centers**
86:16
**Centura**
1:7 8:10 9:15,25 10:2
10:13,16,22 11:1,1
11:3,11,15,24,25
12:14,15 13:5,10,13
13:15,23 14:19,19
15:13,19,23 16:10
16:15 17:10,10
20:23,24 21:4,9,15
22:25 23:12 24:7
29:4,5 30:15 32:18
33:8 35:7,16,21,23
36:3,3,5,6,17,18,24
37:9 42:8 54:25
56:5,17 57:3 58:16
65:6,24 66:14 67:22
68:11 69:10,18,21
70:25 72:8 74:11
75:2,15 76:5 84:18
87:5,17 88:9,10
89:20 90:2,4,24
91:8,17 92:1,6,21
92:23 93:19 94:3,6
95:15,24 96:1,5,16
102:16 109:10
110:14,16 113:5
114:13 128:9,14,18
131:5 135:5,6,13
136:6,8,20 139:1,7
139:12 146:11
147:14
**Centura's**
144:21 145:8
**centurahealth**
113:22
**CEO**
10:22 20:16 23:20
25:14
**certain**
19:12 44:4 46:15
47:20 55:15 58:2
86:22
**CERTIFICATE**
152:1

**certify**
151:1 152:5,13
**cetera**
5:23 7:5 64:3 79:15
**CH**
37:6
**chain**
3:10 113:1 139:20
**challenging**
48:6
**change**
51:5 95:21 146:8,21
**changes**
47:8
**chapter**
69:13 95:20
**chapters**
75:10
**charge**
39:6 148:24 149:1
**charges**
149:16
**check**
63:16
**Chief**
13:2
**CHPG**
36:25 37:5 40:25
41:21 44:11 45:23
49:16 56:17,18,23
59:16
**chronological**
24:4
**chronologically**
116:17 120:23
**chronology**
97:12
**City**
20:2 22:22
**Civil**
1:2,16 149:2
**clarification**
5:21 126:6
**clarified**
110:19
**clarify**



6:1 37:19 41:8
67:18 76:9 92:22
106:14 110:4
**clarity**
107:7 110:19 130:12
**clean**
77:15
**cleaner**
5:10
**clear**
43:13 143:6
**clear-cut**
34:19
**clearly**
137:20
**clinic**
19:1 81:7,25 82:15
83:3,11,12,14,16
84:14
**clinical**
18:1 23:7 86:2
138:22
**clinics**
18:4 19:24 21:19
57:24 83:8
**close**
55:4 57:14,15
**closely**
57:10,12
**closer**
44:17
**CMS**
86:12,14
**coaching**
31:21 34:11
**collide**
80:4
**Colorado**
1:1,7,17,18 2:4,9 8:9
9:21 16:14,23,24
17:13 19:13,14 20:2
58:6 149:2 152:4
**Colorado's**
128:11
**combined**
15:14

**come**
8:17 23:21 37:24
42:11 56:12 71:1
82:19 109:2,5 136:7
143:9
**comes**
27:1 47:18 94:5
**coming**
9:17 61:22 62:15
**commencement**
152:5
**comment**
66:5
**commercial**
42:17 43:18
**commercially**
26:21 44:14
**commission**
149:3 151:21 152:18
**committee**
42:10,11,12,16,21,22
43:6,7 46:7 48:13
48:25 49:13,15
61:18 62:4,7,15,19
68:19,19,20,25
**common**
47:9,14 49:8 107:21
108:17
**CommonSpirit**
1:8,8 10:3 13:5,12,20
13:24 14:13,17,24
15:4,21 16:24 17:3
17:7,14 20:4 35:21
36:2,6
**communicating**
117:24
**communication**
111:4 116:13 120:6,7
120:18 125:23
**communications**
116:1,19 117:7,13
**community**
53:12,16 54:18
**comp**
110:4,19
**company**

13:11,16 14:20
**compensate**
41:17
**compensation**
26:22 43:12 44:1,3
45:6 46:14 47:2
85:23 89:16 94:22
109:25 136:13
138:14 145:11
146:9,9,15,21
**complained**
81:1
**complaining**
129:8
**complaint**
81:6,12,13,17,20
82:19
**complaints**
81:8 82:7,8,10,23
96:9
**complete**
100:9 101:2,5 151:2
**compliance**
42:14 43:8,9,11,21
46:4,5 48:11 131:21
132:8,21 133:17,20
134:10 135:10,11
135:16,20 136:6
**compliant**
44:19
**concern**
129:23 130:1,5 131:4
131:23 139:17
**concerned**
130:25 134:10
**concerns**
29:24 128:17 129:17
129:20 131:11,13
131:14 135:11
**concluded**
150:13
**confidential**
142:2,4
**confirmation**
106:20
**confusing**

5:16
**connect**
107:6
**connected**
104:9
**consideration**
134:16
**considerations**
45:22
**considered**
45:22 77:23 78:21
**consistent**
101:20 102:8 147:20
148:14
**constitute**
151:2
**contact**
111:12
**contacted**
97:15,17,22 98:1,15
98:23 149:12
**contacting**
111:13
**contemplating**
63:2
**contemporaneous**
67:19
**content**
112:19 113:2 122:15
122:16 125:20
126:4 142:3
**contentwise**
144:7
**context**
138:21
**continued**
14:10
**contract**
24:24 25:13 26:20
37:18 42:10 43:6
46:6 48:13,24 49:19
51:15 61:12,17
68:14,14,17 109:23
132:4 134:11
136:11,16
**contractors**


**MAGNA**
LEGAL SERVICES

**contractors**
78:12
**contracts**
37:14 38:4,19 77:19
  93:14 133:10
**contractual**
22:13 41:18
**control**
23:8
**controversy**
152:7
**conversation**
31:22 34:12 70:7
  97:9 98:13,24 99:6
  100:20 102:20
  103:2 105:8 108:25
  109:21 110:20
  111:1,4 115:25
  116:14 117:3
  118:11 120:8 121:6
  121:7,11,22,24
  131:10 132:25
**conversations**
30:1 32:9 49:3 59:18
  68:21 97:8,13 99:15
  108:12 115:5,9,17
  116:7 117:5,10
  119:1,14 120:5,20
  121:2 126:23
  134:23 140:6
  148:19
**conversion**
44:5
**coordination**
87:10
**copied**
115:7
**copies**
106:8 122:7,9 141:5
**copy**
8:15 43:4 141:4
  143:23 150:8,10
**corner**
118:7 124:5
**corporate**
133:19 135:22,25

**correct**
8:5,13 16:12,12
  17:19 20:6,8,21
  21:7 23:2 34:6 35:4
  35:12 37:25 38:20
  39:19 47:25 48:14
  53:4,6 62:22 63:22
  67:4 69:11 74:15
  76:4,19 79:6 83:20
  83:21,23 84:21 85:4
  87:14 89:5,13
  104:14 106:16
  112:4 118:24
  121:10 123:8 124:3
  127:20,24,24 131:3
  131:6 133:1 134:22
  137:1 140:23
  142:13 145:22
  147:8
**corrected**
110:12
**correction**
151:2
**corrective**
31:7,9,10,17,24 32:5
  32:19 33:9,15,18
  34:21
**costs**
40:19
**counsel**
46:17 47:7 97:7
  152:14
**count**
19:5
**couple**
6:24 7:9
**course**
18:25 24:22 39:12
  58:5 73:5 94:17
**court**
1:1 5:1 38:10 73:22
  87:24 105:18 112:6
  112:8,12 150:7
**covenants**
47:4
**cover**

86:3,5
**coverage**
83:25 106:24
**covered**
105:11
**COVID**
10:19,19
**create**
5:10 129:12
**creating**
77:15
**credentialing**
50:10,11 104:25
  106:22
**credentials**
63:15
**Crist**
2:3 104:1
**criteria**
29:6,6 45:21
**criticism**
64:19 65:15,16,23
  66:3 68:9
**CU-Denver**
9:10
**culturally**
5:9
**current**
10:4 113:9,10
**cut**
36:16 75:10
**CV**
63:15

_____
**D**

**D**
3:1 4:1
**D/B/A**
1:7,8
**daily**
57:22
**data**
30:18
**date**
104:18 105:2,3,13
  106:11,15

**dates**
10:16 115:19 116:23
  117:15 118:23
**day**
6:19 40:22 98:5
  125:8 131:8 150:13
  151:20 152:17
**day-to-day**
19:1 22:2 79:19
  92:25
**days**
97:24 98:1,5,8 125:9
  127:14,19
**dealing**
28:25
**debt**
133:17
**decision**
24:17 25:21 61:9,15
  62:8 65:20 93:9
  106:12
**decisions**
24:12,19 25:24
**DEFENDANT**
2:7
**Defendants**
1:9
**defined**
47:20 54:18
**definitively**
114:18
**delay**
106:23,23
**delayed**
104:7
**delineation**
77:7
**Denver**
1:17 2:4,9 9:9,23
  14:14 20:1 22:20,22
  54:7 58:4,9 80:10
  80:14 94:6
**department**
83:9 111:12
**depending**
34:13 84:14



**depends**
81:4,6
**deponent**
152:6
**deposed**
4:17
**deposition**
1:10,16 4:9,23 5:13
6:23 7:18 8:21
87:23 90:11 104:1
112:5,21 123:7
141:24 142:12
149:8,12 152:8
**describe**
10:25 13:17 17:20
18:12 21:14 39:7
101:4
**described**
11:14 121:7
**designate**
142:3
**designated**
83:9 87:25 105:15
107:24 108:4
112:12 123:2
141:12
**designates**
86:12
**designation**
83:12
**detail**
9:14
**details**
71:12 145:16
**determine**
44:8 87:5 123:17
**determined**
54:17 87:13
**develop**
48:21
**developed**
122:14
**deviated**
46:16
**dictate**
34:20

**died**
127:9
**differ**
32:4 51:15
**difference**
10:25 17:13 23:14
31:16 83:2 106:12
139:1,4
**differences**
145:11
**different**
23:18 30:18 33:23
34:10,21 51:21
69:16 81:8,24 83:13
89:12 144:21 145:8
146:11 148:11
**difficult**
99:22
**direct**
15:18 28:2,4,11
29:13 30:8,10,24
31:14 33:3,10,15,19
35:2 37:17 38:24
39:3 63:13 72:18
108:25 110:20
120:6,20
**directed**
25:21
**directly**
14:19 17:3,11 20:18
24:25 25:19,24 27:7
31:2 51:17 52:3,7
53:11 55:17 56:7
63:9 67:7 77:12
82:24,24 84:8 87:18
91:19 92:12 109:5
111:13 136:23
**director**
31:1,1
**directors**
18:22 21:23,25 25:23
25:23 28:19,24 33:2
57:21
**Disabilities**
128:1
**disaffiliation**

10:2,3,8 13:1,9 14:10
14:16 15:5 21:6
35:17
**disciplinary**
31:21 34:6,17
**discipline**
35:1
**disclosed**
96:2
**discrimination**
148:24 149:17
**discuss**
132:16 133:2
**discussing**
73:8 124:7 125:20
**discussion**
70:10 73:24 74:5
111:16 126:10
**discussions**
72:12 117:23
**dissolving**
69:25 70:4,8,22 72:7
72:15,17,21,21,25
73:3
**distance**
47:21,23
**distinguish**
62:3 65:1 85:7
**distributed**
20:1 43:2 100:12
**DISTRICT**
1:1,1
**Dittmer**
1:17 152:3,21
**Division**
149:2
**divulge**
7:3
**docs**
94:18 95:1
**doctor**
121:14
**document**
32:9
**documentation**
34:23 96:16



**documented**
31:4,6,22 32:11
34:11
**documents**
7:20,21,23 8:18
140:12 141:16
**DocuSign**
61:24 143:10
**doing**
51:9 63:20 67:6
89:20 119:8 128:24
**dollars**
132:13 134:14
137:24,25
**domains**
29:25
**dot**
113:7
**downline**
21:25 28:3 39:3
**Dr**
1:4 8:4 58:23,25 60:5
60:8 61:6,9 62:9,24
63:21 64:19 65:10
65:21,24 66:3,8
67:9,11 68:1,5,10
68:16,21 69:4,9,9
69:19,20 73:6,20
74:2,2,12,13,14
75:1,1,5,16,16
88:25 95:22 96:2,7
96:9,20,23 97:1,6
97:20,25 98:22
99:10,22,25 100:3,5
100:8,13,22,25
102:3,11,16 103:13
103:19,23 104:12
104:16 105:10
106:7,11,20 107:1,2
107:9 108:12 109:3
109:21 111:2,16
114:15,21,25 115:6
115:11,22 116:10
116:20 117:20
119:7 120:2,14,16
120:17 121:8,12


MAGNA
LEGAL SERVICES

126:16,20,25 127:6
127:13,13 128:19
129:18 131:2,7,12
134:9,11 136:3,9
137:5 139:16,23
147:24 148:11,20
148:24,24 149:11
**draft**
 48:17 49:18 100:8,12
 100:15,20,23
 102:16 103:12
 107:17,22 108:7,17
 108:19,20,23
 109:22 131:11
 132:20 143:13
**drafted**
 42:24 70:18 122:3,12
**drafting**
 49:18 70:13 71:23
 121:25
**drafts**
 107:24 140:19
**duly**
 4:4 152:6
**Durango**
 20:3 22:23 58:6
**duration**
 22:25
**duties**
 11:13 12:24 17:20
 20:23,24,25 21:14
 23:11 24:11

---

**E**

**E**
 3:1 4:1,1
**earlier**
 51:5 61:11 89:6,8
 102:10 132:2
**EAS**
 145:13 146:19 147:4
**educate**
 33:25 34:1
**education**
 34:1,25
**educational**

9:7
**EEO**
 128:13
**efficiency**
 79:15
**efficient**
 40:6
**efforts**
 99:25
**either**
 13:23 25:22 26:20
 58:21 61:17 146:16
**electronic**
 49:10 143:24 150:11
**email**
 3:10,10 98:16,17,25
 113:1,4,21 114:20
 114:24 115:6,16,25
 116:7,18 117:16
 118:17,18 119:6,18
 139:20 140:14,17
**emails**
 7:25 8:6,6,9,10
 111:23 112:3,25
 115:10 117:5,10
 118:25 139:21
 140:7
**employ-**
 108:14
**employed**
 9:23 10:1 11:8 22:7
 22:12 23:21 42:10
 52:22 54:5 57:23,24
 58:17 65:24 77:23
 85:14 95:1 138:2
 152:13
**employee**
 12:17,19 41:22 42:15
 64:10 84:19
**employees**
 19:4 29:8 37:16,19
 38:18 58:11,15,19
 78:15 84:20
**employment**
 8:1 9:14 18:4 23:7,19
 24:12 25:10 27:4

37:22 38:22 41:13
42:22,25 46:12,15
46:21,25 48:3,17
49:19 50:14 51:22
52:14 53:3 58:21
61:12 62:9,24 67:3
68:13,14,17 69:10
69:20 70:1 73:5,8
73:16,20 74:1,12
75:5,17 76:18 77:8
77:11,19,20 78:20
80:3 84:1 85:21
89:8,12 96:12,20,23
96:24 97:18,20,25
100:6 101:11,13,17
101:20 102:1,6,12
104:12 106:1,4,21
107:3 109:22
114:13,16 115:22
117:21 120:3,17
126:17,20 128:14
128:19 130:2,20
131:1,11 132:4
133:3,10,15 136:10
136:16 143:17
144:12,17,21 145:1
145:8 146:5 147:20
148:3,6 149:3
**enforcing**
 83:22
**engagement**
 18:7 64:7,9 114:9
**England**
 3:11 8:12 114:5
 115:21 116:9,19
 117:8,11,25 119:1
 125:20
**ensure**
 26:19 42:16 43:16
 45:6
**ensuring**
 79:14 83:25 106:24
 134:14
**entered**
 56:5 122:21
**enterprise**

24:9 64:4
**entire**
 22:24 109:10
**entities**
 13:12 15:7,8,17
**entity**
 12:15 16:6,11
**equal**
 128:14 149:2
**Eric**
 3:11 60:12 61:6 97:8
 120:11,12
**escalate**
 83:1
**escalated**
 82:16,19
**ESQ**
 2:2,3,7,8
**establish**
 86:25
**establishing**
 45:6 54:8 55:17
**et**
 5:23 7:5 64:2 79:15
**evaluate**
 87:5
**evaluated**
 29:17 93:6,6,7
**evaluating**
 65:17 76:6
**evaluation**
 29:16 30:1,11
**evaluations**
 28:6,9,10 29:7 30:6
**events**
 111:10
**evolve**
 29:15
**exact**
 42:9 81:11 117:4
 125:5,17
**exactly**
 13:20 35:20 100:14
 100:15
**examination**
 3:2 4:6 152:6



examined
4:4
example
31:1 34:18 45:15
47:4 59:14 63:11
64:7 109:15 110:9
110:23 127:6
examples
32:13 102:3,4 109:2
exchange
118:3 121:3
exchanged
139:22
exchanges
140:14,17
exclusive
3:8 91:3
excuse
10:18
execute
37:25 108:14 127:16
executed
25:14,16 104:23,24
108:1,3
execution
23:22 49:21 50:12
exhibit
3:8,10 87:21,23,25
88:2,5,6,8,8 89:2
105:20 112:5,6,13
112:14,25 113:11
113:21 114:2
115:20 117:8,11,15
118:4,5,21 120:9,10
120:25 122:21
123:2,4,12,13 124:2
124:8 125:4,9,21
126:9,14 127:3,5
128:16 129:19
132:17 135:3
139:20,22 140:2,20
141:12,24 142:7,9
143:17,18 145:6
147:9 148:12
exhibits
3:7 105:16 141:5

exists
15:3
expanded
21:1
expect
40:19,20
expectation
136:14
expectations
81:20 83:14
expenses
40:10
experience
18:7 108:3,21
expert
44:6 133:18 134:4
expires
151:21 152:18
explain
13:4 15:2 53:8 108:9
explicitly
105:12 123:20 133:5
134:7 136:12 139:4
expressed
129:22 131:15
extend
62:8,24 69:9 91:14
extended
55:6 69:20 73:9,20
74:1,4,12 75:2,16
96:23 98:12 99:21
103:2 148:11
extending
52:6 60:4
extension
23:15 60:8
extent
54:22 61:6 62:21
63:17 72:17 95:2
99:23 100:18
102:17 125:22
132:18
extra
106:7

———————————
———— **F** ————
———————————

facilitate
49:20
facilitating
82:23
facilities
14:1 19:17 35:24
36:7
fact
24:18 143:21
factor
44:5
failed
137:11
failure
127:16 137:13
fair
5:25 26:19,21 42:17
43:14,17 44:13
99:18 134:15
138:20,24
fairly
49:7 85:20 86:8 89:3
110:3
fall
54:5
falling
43:17
falls
44:8 138:23
familiar
34:2 52:1,7 53:10
75:14 82:1 85:17,19
85:23 88:3 89:17
94:10,14 95:16
136:19 139:8
familiarity
54:12 94:19
family
5:8 128:4,9
far
70:23 130:21 140:4
fast
69:12,14
Federal
1:16
feedback

30:13 31:3,4 61:5
64:19 65:13,23 66:2
68:9
feel
5:5,21
fell
77:11
fellowship
9:18,18
figure
116:16 123:25
figured
118:8
filed
149:1,13,16
fill
130:3 131:5
filling
139:17
final
42:23 107:11,19
108:2 127:22
132:20 140:21
144:8
finance
36:3 42:14 48:10,11
finances
18:7 23:8 52:5
financial
22:7,13 36:4 39:6
40:14 43:16 58:21
64:6 78:19 100:9
101:6 102:2 130:18
145:17
financials
48:21
find
90:10 121:9 141:4
fine
122:20 128:25 129:2
142:4
finish
5:7 105:24
finished
51:12 141:1
fire


MAGNA
LEGAL SERVICES

28:5
**fired**
 137:11
**firing**
 24:25
**first**
 4:4,19 6:5 74:11
   78:10 88:19 97:16
   98:21,23 113:21
   118:10 149:10
**firsthand**
 91:12
**fiscal**
 39:12
**Five**
 103:6
**FMLA**
 128:10
**focus**
 80:2
**follow**
 32:3 34:16
**follows**
 4:5
**foregoing**
 151:1 152:11
**forget**
 57:1
**forgivable**
 52:18
**forgiven**
 52:23 137:19 139:7
**forgiveness**
 147:24
**forgiving**
 137:16
**form**
 26:2,6,9 49:10 71:6
   71:24 72:16 74:3,16
   84:2 88:14 90:8
   107:14 121:13
   128:20 134:12
   152:10
**forma**
 48:17
**formal**

29:15 30:1 31:8 32:6
   81:13
**formas**
 48:16,22
**forums**
 30:18,22
**forward**
 48:19
**found**
 141:20 149:11
**foundation**
 1:8 12:3 26:3,9 45:1
   63:7 73:11 133:11
   144:22 146:12
**Francis**
 1:7 64:22 67:6 83:25
**free**
 5:22
**frequency**
 62:13
**Friday**
 1:13
**fulfill**
 20:17 54:21
**fulfilled**
 10:23
**fulfilling**
 55:15
**full**
 4:10 60:13
**fully**
 6:11 25:16
**functions**
 27:25 35:6,16 85:10
**further**
 70:15 72:6 132:25
   152:12

_____ **G** _____

**G**
 4:1
**gap**
 54:17
**general**
 34:25 134:18,21
**generality**

110:7,8
**generally**
 47:3 89:1 98:19
   108:13 147:19
**geography**
 19:12 54:16
**getting**
 32:19 99:22 105:9
   128:8
**give**
 9:6 28:9 109:14
   110:9 113:9
**given**
 97:18 98:24 152:12
**go**
 4:22 5:17 24:17
   28:15 37:20 38:14
   40:4 42:2 45:3
   47:13 49:18 51:13
   58:5 71:7 86:20
   90:12 128:23 129:2
   129:14
**goes**
 64:18
**going**
 4:22 5:20,24 6:19 9:1
   9:13 10:7 12:6,23
   19:16 32:19 36:23
   37:3,12 38:13 51:9
   56:19 57:1,11 66:19
   69:14 70:18 72:5
   75:12,13,19 87:2,2
   87:19,20 95:21,22
   99:14 104:5,6,7
   105:14 106:20
   107:7 116:20 122:5
   126:5 130:12 136:7
   139:19 142:2 150:7
**good**
 6:3 8:8
**gosh**
 7:12 10:16,20 19:4
   19:19,24 28:13 29:3
   58:16 102:22
**govern**
 134:1

**grad**
 9:17
**grade**
 36:13
**graduate**
 9:10
**Great**
 10:5
**grew**
 5:9
**group**
 10:23 11:1,5,6,11,16
   11:21,24 12:14,17
   12:22 13:3,25 14:8
   14:8 16:8,10 20:16
   20:20,24 21:16 23:1
   23:13 24:7 25:15
   29:5 30:15 33:8
   37:1,9 42:13 70:2
   70:14,23,23 71:10
   71:22 72:24 75:14
   79:8 81:19 85:13,13
   101:16
**group's**
 75:15
**groups**
 12:19 78:16 79:18
   80:20 85:10 87:16
   91:7,23 92:15,20
   93:12,19,22,24 94:2
   94:15,20,22 95:7,13
**guardrails**
 43:14 44:12,20
**guess**
 45:23 81:3 94:12
   125:7 126:5
**guessing**
 19:3
**guys**
 38:10 105:21 128:23
   141:5 142:3

_____ **H** _____

**habit**
 129:4,5
**half**



21:10
**hall**
2:8 30:21
**Halpern**
2:2 3:5 4:7,8 12:5
26:4,5,8,14,16
38:12,16 40:3,23
45:3,8 47:15 51:1,4
60:22 63:10 71:7,13
72:3,20 73:12,16,25
74:7,17,21,22 84:3
87:21,24 88:15,19
88:22 89:2 90:7,10
90:12 99:24 104:3
105:16,19,23 106:1
107:21 112:11
119:12 121:15,17
122:5,9,12 123:15
123:18,21 125:19
125:25 126:1
128:21 129:4,7,11
129:14,16 133:12
139:15 141:1,7,9,11
141:13,17,21,22
142:1,6 144:23
146:11,14 149:25
150:4,10
**handed**
87:25 112:12 123:1
141:22
**handle**
150:8
**happen**
5:14 7:1 38:13 80:25
**happened**
42:24 47:16 50:2
**happening**
18:3
**hard-pressed**
109:14
**head**
5:2 32:14 41:3 65:12
79:16
**health**
1:7,7,8,8 9:11,25
10:22 11:1,3,4,11

11:15,24 12:14,16
12:17,18 13:23
16:14,24 17:13
20:23,24 21:15 23:1
23:12 24:7 29:5
30:15 32:18 33:8
35:7 36:24 37:9
54:19 114:13
**HEALTH-PENRO...**
1:7
**hear**
5:1,23 59:2 61:5 68:8
69:19 72:20 74:25
75:7 95:23 96:1,5,6
96:15
**heard**
65:10,10,25 68:5
95:3
**Heath**
2:8
**help**
49:20 77:13 82:20
**helpful**
26:25
**helps**
82:7
**hereto**
152:8
**hi**
4:8
**hire**
24:12,19,20 28:5
59:21,22 61:9,15
65:20
**hired**
36:2 149:19
**hires**
33:3 37:17
**hiring**
24:16,25 25:3 27:1
38:23 39:3 47:24
48:25 51:11 62:2
63:2,13 68:20 69:4
136:9
**history**
9:14 64:21

**hold**
60:24 111:8
**horrible**
10:16
**hospital**
11:7 14:2 42:13 43:7
45:19 50:10 53:14
71:17 81:7,10,16,17
81:18 82:2,14 83:3
83:6,7,8,9,10,12,15
83:17 127:6
**hospitals**
11:4 13:22,23 14:14
63:5
**host**
50:6
**hour**
7:13
**HR**
27:24 33:25 34:4,9
36:3 38:8,19 91:18
119:25 124:9
**Huh-uh**
27:8
**human**
35:6,16
**hundreds**
145:3

---

**I**

**idea**
80:19,25 93:4 138:11
**identified**
53:13,16 71:16
**imagine**
18:13 40:8 87:10
98:11
**impair**
6:8
**important**
105:8
**imprecise**
26:14 74:20
**improvement**
32:10 34:24
**in-house**

37:17 67:9 69:21
71:1 72:8 77:18,19
77:21 84:17 85:1,2
**inability**
128:18
**include**
42:12 100:17 102:18
107:18
**included**
42:13 102:2,6 130:19
132:19 133:3
**inclusive**
40:8 138:15
**income**
40:14
**income/our**
40:14
**incomplete**
100:16 108:4
**incompleteness**
102:15
**incorrect**
108:20,23 109:13,22
**incorrectly**
109:25
**independent**
22:14 85:15 104:11
**independently**
116:15
**indiscriminately**
128:24
**individual**
13:17 30:21,23,25
38:19 41:13 43:2,3
48:17 50:13 70:6
101:16 104:9
**individuals**
16:6 22:18 25:1 29:2
29:12 42:11 77:3
81:22 94:19 115:6
115:10 139:23
**inform**
133:20
**information**
7:3 26:25 56:13
149:6,9


MAGNA
LEGAL SERVICES

**INITIAL**
3:6
**initially**
15:24
**initiate**
49:12
**initiated**
50:11
**initiating**
111:4
**Initiatives**
1:7 16:14,24 17:13
**input**
28:9 69:3 123:17,19
**insight**
10:11 51:14
**instance**
101:15
**instances**
32:16 48:1 110:5
**instruct**
5:18 99:14,16
**intake**
49:10
**integrated**
92:20,22
**intending**
7:2
**intent**
108:6
**interacted**
17:3 59:12 95:5
**interactions**
93:17
**interested**
152:15
**interim**
10:21,24 11:10,20
20:18,22 21:8,13,15
22:25 23:12,24 24:7
24:13 27:18 28:1,8
29:5 30:14 31:15
32:17 33:7,18 35:6
36:23 39:14 40:25
41:25 45:23 47:16
48:2 49:16 50:1

53:12,25 56:6,16,22
57:13 59:14 60:6,25
61:3,16 63:3 64:1
64:13 65:5 68:4
69:18 76:2 79:9
83:18 84:7 87:4
**interject**
99:12
**interview**
63:14
**introduce**
105:14
**introduced**
4:9 122:7 139:20
141:23
**investigation**
104:10,11,13
**involve**
148:21
**involved**
24:25 25:19,24 27:7
28:7 31:2 32:22
33:5 37:13 39:4
43:7 46:2 48:25
51:17 52:3 53:11,25
54:7 55:16 56:7
60:7 61:15 62:4
63:9,21 67:7 75:24
77:12 87:18 89:20
91:20 93:11,15 94:1
99:15 109:6,7
117:22 124:10,12
124:14 136:23,25
148:23
**involvement**
23:15 52:5 61:9
72:18
**involving**
130:18
**Iris**
2:2 4:8
**issue**
7:7 34:14,14,15,22
131:21 132:9
**issues**
6:11 30:23 132:22

135:10

_____
**J**
_____
**Jackson**
22:20 54:7 80:7,8
**Jason**
1:10 4:3,12,13 151:1
151:18
**jason.tacha.com**
113:10
**Jason.tacha@cent...**
113:6
**Jeffrey**
120:13
**Jennifer**
3:11 8:12 97:7
111:15 114:5,9
115:25 116:14
117:3,5,22 119:15
121:25 122:15,17
124:9
**jh@rmlawyers.com**
2:5
**job**
8:4 11:13 23:11 60:5
60:8 74:13 75:2
97:6 98:22 99:10
103:9,15 106:13
111:2 116:11,20
119:7 126:25
139:16,23 148:20
149:23
**joined**
10:4
**jump**
5:7
**juncture**
61:14

_____
**K**
_____
**K**
1:17 152:3,21
**Kaiser**
9:18 10:12
**Kansas**
14:15 19:14 20:3

22:23 58:5
**keep**
51:9 77:1 124:11
147:9
**Keeps**
135:19
**kept**
56:9
**Kevin**
22:20 54:6 79:20
80:15 87:9 92:11
**Kevin's**
80:5
**Killian**
2:8
**kind**
7:6 10:6 18:11 23:3,5
23:6 24:11 25:25
27:2 30:11 35:5
37:16 38:6 39:5
42:1 44:12,21 45:21
52:4 57:4 63:3,4
64:1 67:5,24 75:22
76:6 79:7,13,17
82:10 83:22,24 85:9
85:17 94:21 95:3
98:19 134:1,18
137:16
**knew**
38:12
**know**
4:24 5:14,22 7:5 9:17
11:23 12:5,13,16
14:2,13,16 15:20
16:13,22,25 17:9
18:4,7 19:2,5,17
23:6 25:22 26:20,25
27:23 29:18,22,24
30:19 33:17 34:11
34:16 36:4,8,9,10
40:9,16,17,17 41:18
43:20 44:1 46:13
47:4 48:4 49:3
52:19 54:16,24 55:2
55:13 56:12 57:24
58:6,10,11,23 59:7



59:8 60:11,23 63:15
63:23 64:5,21 66:8
66:13 67:2,12 68:1
68:9 69:25 71:11,18
72:15 75:11,25
79:13 81:11 82:1,6
84:10 85:9 86:11,14
87:15 91:2,2,4,7,25
92:5,8,11,16 93:6
93:13,22,24 94:17
94:18 98:12,17,23
100:10,17 101:19
101:20 102:11
103:7 104:18,20
105:1,9 108:11,14
110:15,16 114:4,17
114:18 122:5 124:2
125:5,16 127:2
128:2,22 130:3,10
131:7 133:16 134:9
134:15 138:25
139:6 141:14
143:22 145:9
147:13,23 149:1,13
149:16,19

**knowledge**
15:18 17:6 93:12
134:20,21 136:8
137:3 139:9,10

**knowledgeable**
71:9

**knowledging**
36:1

**known**
103:23 127:21

**Koval**
3:11 60:19,20,21
120:11

**Kovar**
60:15

---

**L**

**lack**
103:17 110:18
129:23 130:3

**language**

46:22,25 47:3,5,12
102:19 110:3
130:18 132:23,24
136:10 145:25
146:22

**large**
39:2

**Largely**
104:4

**largest**
94:9

**late**
34:20

**law**
133:22 134:10

**Lawrence**
1:17 2:4

**laws**
45:9 128:11 133:17
133:18 134:1,6,6,11
135:6,12 136:7,9
138:12

**lawsuit**
59:10,13 149:14

**lawyer**
148:21

**lead**
53:12

**leader**
30:25 40:12

**leaders**
18:24,25 22:1 33:25
34:1

**leadership**
9:24 30:20 42:13,13
43:8 82:24 84:11

**leads**
84:12

**learned**
69:22 74:11

**leave**
52:24 92:16 95:24
96:13,17 103:20,24
104:8 127:3 128:4,9
128:11 137:23
138:7

**left**
15:25 16:4 20:15,17
104:1

**legal**
42:14 46:1,8 47:8
49:18 97:7 111:5,11
111:12 149:11

**let's**
28:15 29:11 37:20
127:7

**letter**
8:2,3 66:15,18,21,25
70:13,19 71:23 72:1
75:5 96:12,20 97:25
98:8,14 103:12,22
104:11 105:4
111:17,20 114:13
114:15 115:12,22
116:10,19 117:2,20
119:8 120:2,16,24
121:25 122:3,4,13
122:16 123:6,12
124:4,8,22 125:2,7
125:9,10,21 126:8
126:11,14 127:8,10
127:14,15 128:18
129:18 132:17
135:3 140:1,20

**letters**
78:10

**letting**
128:23

**level**
30:24 34:20 64:4,14
64:16 76:16 79:14

**levels**
31:24

**liable**
53:1

**Lichtenberger**
16:1,4,5 24:1 80:16

**limited**
54:14 55:20

**LINDSAY**
2:7

**line**

30:8 39:3 151:4

**lines**
21:2

**list**
19:20

**listed**
146:23

**litigation**
67:16 75:8 141:23
149:5 152:15

**little**
7:10 9:1,6 12:23 15:3
18:13 19:3 33:23
34:21 35:15 39:7
44:10 52:12 53:9
57:11 75:22 95:22
97:10 98:11 144:6

**LLC**
2:3

**lmcmanus@hallre...**
2:10

**loan**
52:9,15 53:8,14,17
57:5 100:11,17
101:9,17,18,22
102:1,2,6,18,19
107:19 131:22
132:3 133:8 136:10
147:24

**loans**
52:6,8 54:8 55:17
56:15 132:12
136:20 139:1,6

**locations**
58:2

**long**
53:16 55:23 102:20
102:25

**longer**
103:4

**look**
29:23,23 31:11 43:25
43:25 44:7 49:6
55:17 88:1 113:11
114:20 116:21
120:25 138:14



139:19 142:7 145:5 147:12

**looking**
115:19 142:20 147:9

**looks**
147:15

**loss**
18:9 23:8 39:6

**lot**
12:16 17:6 37:4 45:4 45:18 94:18

**lots**
51:8

**love**
135:16

**Lyman**
2:8

**M**

**ma'am**
95:12 96:18 104:15 128:15 130:17 142:17 149:18

**machine**
152:9

**macro**
64:16 76:16 79:14

**main**
23:14,17,17 49:9 94:13 95:15 130:13

**maintaining**
64:2

**major**
9:10 23:11

**making**
131:4

**malpractice**
86:3,6

**manage**
36:6 40:12,15,18,20 81:22 85:14,16

**managed**
22:1 35:21 81:8,18 87:16 93:1 138:1

**management**
13:10,11,13,16 14:20

18:5,11,19 23:7 39:6

**manager**
49:20 85:12

**managers**
84:13,15

**managing**
52:5

**MARK**
2:8

**marked**
87:23 112:5,7

**market**
8:10 14:6,14 22:21 26:19,21 27:3 42:17 43:14,17 44:13,15 45:23 47:19 134:15 138:20,24

**markets**
22:21

**marksabey@hallr...**
2:11

**master's**
9:11

**matter**
44:20

**matters**
152:7

**max**
7:13

**MBA**
9:11

**McLarren**
15:25 20:11

**McMANUS**
2:7 12:2 26:2,7,10,13 26:15 45:1 47:13 60:20 63:7 71:3,6 71:24 72:16 73:11 73:14 74:3,16,19 84:2 88:14,17,24 99:12 107:12,14 112:7,10 133:11 139:13 141:20 144:22 146:10,12

**mean**

6:17 13:21 16:22 24:15,18 25:19 26:22 28:2 31:4 34:2 35:25 43:8,23 43:25 45:12 46:20 52:7 57:17,18 62:5 62:10,11 67:13 71:15 75:19 77:5 82:18 84:24 85:22 86:7 87:10 88:18 90:7 101:7 102:9 103:16 104:4 106:19 107:5 108:1 108:6 111:3 112:16 118:13 119:14 120:9 121:24 122:16 123:16 128:22 131:20 132:8 133:18 135:21 140:3,7 143:12,19 144:7,13 147:15 148:13

**meant**
6:15 136:16

**Medicaid**
86:17

**medical**
10:22 11:1,6,9,11,16 11:21,24 12:14,19 12:22 13:3,25 14:8 14:8 16:8,10 20:16 20:19,24 21:15 23:1 23:12 24:7 25:15,23 28:19 29:5 30:15 31:1 33:2,8 37:1 42:13 57:21 81:19 85:13 95:24 96:13 96:16,17 103:20,24 127:3 128:4,9

**Medicare**
86:17

**medications**
6:7

**meet**
7:5,11,14 57:24 99:1

**meeting**

7:15 30:20 99:2 124:16 126:7

**meetings**
6:24 7:1 15:15 62:8 68:25

**members**
24:23,24 31:18

**memorize**
147:16

**memory**
6:8,11 19:16

**mentioned**
34:11

**message**
114:20 115:7,20

**messages**
117:15,16

**met**
7:9 26:21 27:3 58:25

**metrics**
29:23

**metro**
14:14 20:2 22:21 54:7 58:4,9 80:10 80:14

**Michelle**
1:17 152:3,21

**mind**
47:18 94:5 109:5 128:22,24 130:9

**minute**
12:24 103:3,5

**minutes**
103:6

**miscommunication**
110:2

**Mister**
121:15

**mixing**
41:7

**modified**
47:22 48:3

**modify**
47:6 48:6

**Mohamedbhai**
2:3


MAGNA
LEGAL SERVICES

**Monroe**
 67:11 68:1,10,14,21
   69:4,9,19 70:24
   74:2,12 75:1,16
   102:11
**Monroe's**
 68:5,16 147:24
**month**
 40:13
**months**
 10:19,24 104:21
   106:10,14
**moving**
 101:17
**multiple**
 30:17 43:25

**N**

**N**
 3:1 4:1
**name**
 4:8,10 32:14 65:11
   80:6 94:12 110:9,11
**names**
 28:14 60:13
**narrowed**
 11:17
**national**
 44:2,7
**nature**
 34:24
**near**
 19:24
**necessarily**
 25:21 44:17 53:11
   77:5 105:8 133:15
   134:3
**necessary**
 106:22 138:10
**need**
 32:14 43:15 51:4
   53:16 54:18,21
   106:7 110:4 122:20
   122:22 130:3
   132:22,24 133:3
**needed**

 31:8 104:4 105:11
   106:19 110:19
   130:19 131:16
   132:15
**negotiated**
 51:24
**negotiating**
 92:12
**negotiation**
 90:19 91:12,20
**negotiations**
 51:18
**network**
 94:24
**Neuro-**
 94:11,11
**Neuroscience**
 94:11
**Neurosurgery**
 94:12
**never**
 17:2 64:19 65:10,10
   95:5 120:12,14
   137:13
**new**
 128:22
**nice**
 129:8
**nodded**
 41:3 79:16
**noises**
 73:21
**non-**
 31:19
**noncompete**
 48:7
**noncompetes**
 47:4,19,20
**nonemployed**
 22:5 41:20 78:1,18
**nonemployment**
 76:20
**nonphysician**
 38:18,22
**nonphysicians**
 31:19 37:19 38:2

**normal**
 101:13,20
**normally**
 81:12
**north**
 19:3
**Notary**
 1:18 151:23 152:4
**NOTICE**
 1:16
**notified**
 100:23
**notify**
 108:22
**NSO**
 94:11
**nuance**
 145:10,10 147:19
**nuanced**
 101:13
**number**
 14:7,14 34:19 124:5
   143:4
**Numbers**
 118:7
**numerous**
 28:13
**nurse**
 19:8

**O**

**O**
 4:1
**oath**
 6:14,15
**object**
 5:12 12:2,2,6 63:7
   71:6,24 72:16 73:11
   74:3,16 84:2 88:14
   90:6 107:12 119:9
   121:13 123:14
   125:14,22 128:20
   133:11 144:22
   146:10,12
**objecting**
 128:21 129:1

**objection**
 5:17 26:2,6,8 45:1
   71:3
**observations**
 59:4
**obviously**
 14:10 24:25 29:16
   30:21 33:25 40:8,13
   45:17 46:13 47:1
   57:23 63:14 64:15
   69:22 70:13 83:6
   97:14 101:18
   105:10 106:4 120:5
   120:19 121:24
   145:23
**occasion**
 82:18
**occurred**
 63:4 108:12
**occurs**
 44:18
**offer**
 8:4 44:15 60:5,8 62:8
   62:24 66:22,23 67:3
   69:9 73:17 74:6,14
   75:5 96:12,21,23
   97:1,6,21 98:1,22
   99:10,21 103:9,15
   104:12 106:5,13
   111:2,18 114:16
   115:23 116:11,20
   117:21 119:7
   126:16,20,25
   130:22 136:3
   139:16,24 148:11
   148:20 149:23
**offering**
 44:8,13,14
**offers**
 69:20 73:20 74:12
   75:2,16
**offhand**
 31:23
**office**
 85:12
**officer**



MAGNA
LEGAL SERVICES

13:2
**official**
 24:8 27:20
**Oftentimes**
 86:1
**oh**
 11:2 19:19 29:3 41:6
    44:23 70:23 86:16
    102:22 103:4
    121:15 128:6
    131:16
**okay**
 4:20,22 5:19 6:4,7,10
    6:14,17,22 7:7,14
    7:16,20,23 8:3,6,14
    8:23 9:1,4,13,20,22
    11:19 12:8 13:4
    14:22 15:2 16:17,19
    17:4 18:23 19:25
    20:19,22 22:11,24
    23:23 25:17 26:16
    27:6,17,24 28:7,18
    29:19 30:3,9 32:2
    32:25 33:3,12 35:1
    35:13,18,19 36:12
    36:20 37:1,10 38:6
    38:21,25 39:5 40:4
    40:23 41:23 43:19
    45:8,12,21 46:1,18
    48:8,24 49:14,23
    50:5 51:19 52:1,4
    52:17 53:2,18,23
    54:3,9,12,24 55:3,5
    55:8,23 56:2,3,9,11
    56:15,25 57:4,9,20
    58:1,7,23 59:4,12
    59:23 60:9,18 61:8
    61:11,19,25 62:3,7
    62:12,19,23 63:1,18
    63:20,23,25 64:11
    65:1 66:11,25 67:8
    67:11,22 68:19 69:3
    69:8,12,13,15 70:11
    70:15 71:13,18 72:3
    72:14,23 73:2,7
    74:21 77:6 79:11,11

79:13,21 80:1,5,5
    80:11,17,23 81:5,9
    81:24 82:3,5,13,17
    83:21 84:10 85:20
    86:9 87:8,12,15,19
    88:7 89:18,22 90:5
    90:7,17,21 91:5,11
    91:16 92:3,14,18
    93:5,12,25 94:2,7
    94:16,25 95:6,8,17
    95:19,21 96:9 97:2
    97:22 98:7 99:1,3
    101:3,4 102:11,14
    103:14 104:10
    105:14 106:3
    108:15 109:2,7,20
    110:11,25 111:14
    112:18 113:24
    114:1,10,20 115:3
    115:19 117:14
    119:6 120:1,1 122:2
    122:8,12,22,24
    123:11,21,25 124:7
    124:17,19,21 125:1
    125:8,19,25 126:5
    127:18 128:4,13,16
    128:24 129:1,4,10
    129:21,25 130:6
    131:25 132:6 133:2
    133:6,16,22 134:5,9
    135:1,4,18,23
    137:10,15 138:9,16
    139:15 140:19,25
    141:3,7 143:8,11,14
    143:25 144:11
    145:5,5,12,15 146:3
    146:14,18 147:5,9
    147:21 148:7
    149:13 150:4
**old**
 141:5
**onboarding**
 50:8 104:25 106:22
**onc**
 72:4
**once**

43:3 49:17 104:23
**oncology**
 3:8 66:10 67:3 71:20
    71:21 72:11
**ones**
 27:25 91:16 92:12
    94:13 95:16
**operate**
 15:7,8
**operated**
 90:24
**operating**
 11:24 12:14 13:2,13
    40:9,14
**operational**
 30:20 40:12
**operationally**
 42:19
**operations**
 10:15 11:7,14 14:18
    15:23 17:17,23,25
    18:1,8,22 19:1,18
    20:10,20 21:19,22
    22:2 23:5,5,7,9
    25:23 30:4,7 33:13
    35:11 36:3 39:25
    57:1 58:4 63:13
    92:25
**operator**
 44:17
**operators**
 8:9
**opportunity**
 128:14 141:3 149:3
**ops**
 31:1 94:18
**order**
 7:17 114:3 150:8
**organization**
 16:1,4
**original**
 100:12 108:19
**originally**
 73:9 100:13
**outcome**
 152:15

**outcomes**
 18:6 64:6,6
**outpatient**
 14:7 83:9,14
**outside**
 22:22 35:8 39:2
    40:10 43:17 44:22
    52:6 54:5 73:21
    77:3,11 80:14 102:9
    115:1 117:6,8,11
    121:2 126:1,3
**overall**
 12:14
**oversaw**
 18:14 19:18 22:15,19
**overseeing**
 23:6 79:8
**oversight**
 83:13
**overtime**
 40:17
**owned**
 13:19,24 14:11

---
**P**

**P**
 4:1
**P&L**
 18:8
**P.C**
 2:8
**p.m**
 114:25 122:10,11
    150:13
**page**
 3:2 56:20 113:21,25
    118:6 120:25 123:3
    143:1 144:8 145:14
    146:4 147:7 151:4
**pages**
 142:23
**paid**
 55:11 85:25
**pair**
 106:22
**paper**



150:10
**parameters**
 47:23
**part**
 12:17 13:23 15:13
   16:8 17:8 25:13
   27:23 28:25 42:12
   48:22 50:18 68:24
   72:12 85:13 94:23
   101:21 120:5
   131:17,19 132:18
**participate**
 15:14 90:19
**participating**
 113:1
**particular**
 53:13 97:9 99:21
**particularly**
 132:11
**parties**
 78:15 152:8,14
**partner**
 119:25
**PAs**
 19:8
**passage**
 98:9
**path**
 81:9
**paths**
 80:4
**pathways**
 81:8
**patient**
 18:6 81:1,12 82:10
   82:22
**pay**
 36:6,13 87:2 104:25
   134:14 136:20
   137:11 138:22
**payback**
 52:21
**paycheck**
 36:16
**Payer**
 50:10

**payer's**
 50:18
**paying**
 45:7
**payment**
 52:19 136:10
**payments**
 102:9
**PCF-Paddada**
 113:25
**Peddada**
 1:4 8:4 58:23,25 60:5
   60:8 61:6,9 62:9,24
   63:21 64:19 65:10
   65:21 66:3 67:9
   69:10,20 70:24 73:6
   73:8 74:2,13,14
   75:1,16 88:25 95:22
   96:2,9,23 97:1,6,20
   99:22,25 100:3,5,8
   100:13,22,25
   102:16 103:13,19
   103:23 104:16
   105:10 106:7,20
   107:1,2,9 108:12
   109:3,21 114:21,25
   116:20 121:8 124:4
   125:21 127:6,10,13
   128:16,19 129:18
   131:2,12 136:9
   137:5 145:19
   146:21 148:11,20
   149:11
**Peddada's**
 65:24 66:8 75:5 96:7
   96:20 97:25 98:22
   99:10 102:3 104:12
   106:11 111:2,16
   114:15 115:6,11,22
   116:10 117:20
   119:7 120:2,17
   126:16,20,25 131:7
   134:11 136:3
   139:16,23 148:24
**penalties**
 45:11

**Penrose-St**
 64:22 67:6 83:25
**people**
 15:24 135:17,20
**per-work**
 85:24
**perceived**
 45:7
**percent**
 46:23 58:8 90:10
**perform**
 50:19
**performance**
 28:5,9 29:17,22,25
   30:14,18,21 32:8
   34:14,22,24 59:2,5
   59:19 63:5 64:2,14
   65:25 66:6 68:6
   79:18 80:20 96:7
**performing**
 76:15
**period**
 52:19,22,22 55:15
   65:1 67:19 69:23
   70:16 98:12 104:24
   113:14 137:23
   138:7,17
**periods**
 69:16 113:18
**Permanente**
 9:19
**person**
 18:14 79:17 98:16
   99:1,2 120:15
   125:24 129:1
**personal**
 59:4
**personally**
 128:17
**personnel**
 27:25 35:5
**perspective**
 26:20 42:18
**Peter**
 16:5
**PG**

 37:7,8
**phone**
 98:16,18,25 121:21
**photocopy**
 105:21 141:4
**physical**
 143:23
**physician**
 11:4 19:4 24:9,21
   25:8,10 27:23 30:25
   32:14,18 37:9 40:24
   41:1,2 42:1 43:2,3
   44:15 45:7,14 47:9
   47:24 48:3,20 49:1
   49:4,11,22 51:11
   53:2,13 54:21 59:21
   59:22 61:15 62:2,9
   63:3,13 68:14,17
   69:4 74:1,12 77:18
   77:24 82:25 85:21
   86:11 89:12 101:11
   102:5,12 108:5,18
   108:22 109:12,21
   110:9,13,21 130:11
   132:10 134:2,13
   137:18 138:23
   143:17 145:18
**physicians**
 18:5 19:6,7 25:9,18
   27:1,9,18 29:10,21
   30:9,12,15 31:15
   32:4 33:19 35:2
   37:20,21 45:24 47:1
   50:16 51:16 52:6
   57:12,18,25 58:10
   58:12,16 69:10,21
   77:3,18,18 84:1,6,9
   84:17 107:22
   134:14 135:11,12
   136:20 137:7
**place**
 31:8 32:10 35:17
   45:17 152:9
**places**
 146:13
**Plaintiff**



1:5,17 2:2
**plan**
32:10 34:24
**play**
82:10
**please**
84:4 142:6
**plus**
11:4 43:3 94:17
138:21
**point**
11:12 17:24 19:4
21:3,20 31:25 32:7
65:17 74:9 142:14
**policies**
29:6 38:9,19,22 91:9
91:14,18,25 92:14
92:15
**policy**
35:2
**Porter**
14:2,6
**position**
10:13 12:25 20:20
24:6 26:5 48:23
60:22 130:3 139:17
**positions**
28:15
**positive**
68:9,9
**possible**
69:7
**potential**
31:7
**practice**
18:24,25 19:8 21:25
31:2 35:2 41:16
48:21 53:15 72:14
72:21,24 75:14,15
82:24 84:11,13,14
85:15
**practiced**
47:21 66:9 68:2
**practices**
11:9 13:25,25 14:7,8
22:6,6,14 91:9

**practitioners**
19:9
**preapproved**
103:23
**precipitated**
70:1
**preparation**
8:21 112:15 115:2
142:10,16
**prepare**
6:22 7:18
**preparing**
112:20
**presence**
126:1,4
**present**
7:2 62:17,21 131:24
**presented**
69:1,2 107:19 112:15
117:6
**presenting**
112:17
**preserving**
5:16
**president**
10:15,22 11:11,15,20
20:16,19,23 21:1,8
21:12,15,24 22:25
23:12,18,20,25 24:7
24:9,13 27:19 28:1
28:8,17 29:5 30:14
30:17 31:15 32:17
33:7,18 35:7 36:23
39:15 40:1,25 41:21
41:25 45:23 47:17
48:2 49:16 50:1
53:12 54:1,6 56:6
56:16,22,25 57:13
59:14 60:6 61:2,16
63:3,12 64:1 68:4
69:19 76:2,3 79:9
83:19 84:7 87:5
**presidents**
22:4,15 33:2
**pretty**
43:22 46:11 54:14

55:20 82:21 86:8
137:20,20 141:1
**previous**
152:5
**previously**
105:15 122:21 123:2
132:19 141:11,23
**primary**
11:17,21 17:25 18:4
18:8 19:5,11,15,23
21:1,2,20,21,23
23:5 28:20,22,22,24
28:24 45:15 94:18
**prior**
59:13 67:1,3 71:1,23
75:15 96:16 112:20
115:10,25 116:1,10
116:19 117:25
118:1 119:1 120:16
125:17 136:1
142:16 149:5,8
**privilege**
99:17
**privileged**
111:7
**pro**
48:16,17,22
**probably**
7:12 8:14 10:20,23
19:3,5 29:3 32:6,8
44:10 46:23 64:18
69:13 75:12,19 87:9
87:10 98:17 101:13
103:4 141:15
**problem**
122:4 130:8
**problems**
5:6 107:1,2 129:12
**procedure**
1:16 45:19
**procedures**
50:19 91:14
**proceedings**
150:12 152:12
**process**
29:16,22 30:2 31:9

31:10,18,21 32:1,19
33:8,17 34:6,17,23
42:2,5 48:25 51:11
51:15,15 52:2 70:12
81:13,23,25 82:4
93:10
**productivity**
29:24 44:3
**professional**
1:18 3:8 89:3 152:3
152:21
**profit**
18:9 23:8 39:6
**progressive**
31:20 32:1 34:6,24
35:1
**pronouncements**
68:10
**pronouncing**
4:15
**prorated**
52:25 137:24
**provide**
30:13 46:17 53:14
54:20 86:11 104:6
132:11
**provided**
55:21 69:3 83:7
85:10 86:24 91:7
93:19 95:13 96:15
100:8 101:1 132:14
**provider**
22:10 23:16 40:24
41:5,11,19 53:15
75:25 76:7,9 77:2
77:10 78:9,11,21
79:8 81:1,2 82:25
**providers**
19:8 37:14 52:6 54:6
70:2
**providing**
31:3 71:11,17,19,22
72:10 87:16 92:1,15
92:20 93:13 94:3
130:12 136:13
**provision**



102:18 130:19
131:16,18
**provisions**
102:7,12 131:1 146:1
**PSA**
22:8,9 24:2 41:9
51:13,13,17 58:17
70:25 78:7,8,10,21
79:5 85:11 87:1,16
88:4,7,8 89:11,15
89:19,21,24 90:1,3
90:18,20,24 91:8
92:15,20 93:10,13
93:20 94:4,9,20
95:8,14 139:7
**PSA'd**
76:20
**PSAs**
23:23 58:19 79:18
80:20 83:22 85:18
87:6 88:25 90:15
91:14,23,24 95:11
**PSF-Peddada**
114:12 118:6
**PSF-Peddada-0046**
3:9
**PSF-Peddada-0223N**
3:12
**Public**
1:18 151:23 152:4
**Pueblo**
20:2 22:23 47:19
**pulled**
111:15 114:5 116:5
**purely**
11:8 13:15
**pursuant**
1:16 87:16 91:8
92:20
**pursuing**
149:11
**purview**
83:16
**put**
33:9,14
**putting**

91:21

___
**Q**
___

**quality**
18:6 23:7 29:23 64:2
64:5 66:6 79:15
**question**
5:13,25 8:8 12:10,11
24:4 26:3 38:15
45:2 63:8 71:25
74:18,23 82:25
88:16,19 90:13
106:14 115:24
121:19 124:11
129:15
**questioning**
4:21
**questions**
4:24 6:4 10:8 51:8
67:25 103:14 150:1
150:2,3 152:11
**quick**
122:6
**quickly**
62:4 81:15 105:11
111:8 122:19 126:6

___
**R**
___

**R**
4:1
**rad**
72:4
**radiation**
3:8 66:10 67:2 71:20
71:21 72:10
**range**
44:9
**rare**
48:5 82:18,21
**rarely**
79:25 80:3
**rate**
85:24 86:1,4,9 87:6
**rate-per-work**
44:6
**rates**

45:24
**Rathod**
2:3
**rationale**
131:23
**RBC**
88:25
**reach**
99:25 100:3 104:16
121:8 127:13,19
128:18 129:18
131:2
**reached**
98:21
**read**
114:3 143:4 151:1,4
**READS**
151:4
**realizing**
110:2
**really**
17:6 25:19 27:20
40:22 42:21 43:18
43:24 48:16 49:9
54:22 62:3 63:16
75:24 77:8 86:7
94:14,19 106:21
111:3 122:18 126:6
134:15 141:13
**reask**
5:23
**reason**
6:10 103:18 117:14
118:18 130:13,21
131:23 148:10,16
**reasonable**
26:21 44:14
**reasonableness**
42:18 43:18
**reasons**
44:24 126:15,16,19
126:24 130:16
139:15
**recall**
7:23 32:16 33:8,14
34:8 48:2 59:12,18

60:4,24 62:10,14,16
62:20,23 63:20
65:23 68:16,21,24
70:3,7,9 72:23 73:2
73:7 90:3 94:3
96:19 97:2,8,9,17
97:22,24 98:2,6,15
98:20 99:2,5,19
100:19 102:5 103:1
107:15 109:3,4,12
109:16,20 110:5,11
110:22 111:13
112:23,25 113:2
114:24 115:5,13
116:6,8,13 117:1,4
117:7,12,24 118:25
119:3,5,17,22 120:4
120:20 121:1,23
123:20 124:7,13,15
124:21 125:2,11,16
125:20 126:3,7,10
128:7,8 139:21,25
140:7,15,19,23
142:19 148:4
149:22
**receive**
61:23 66:2 139:11
142:25
**received**
34:25 134:5
**receiving**
62:23 114:24 115:1
**Recess**
51:2 122:10
**recollection**
113:20 115:20
116:24 118:13
**record**
4:11 5:10 60:14
73:24 77:15 86:14
143:6 151:2
**recruited**
71:1
**recruiting**
54:20 67:8 72:8
**recruitment**


MAGNA
LEGAL SERVICES

recruitment
49:3 53:14,20 54:10
  54:20,25 55:10,19
  55:21 56:4 68:20
  101:9 132:14
  133:13 136:14,22
  137:2 139:1,6
recuperate
137:24
redacted
112:16,23
redrafted
100:10
reduce
4:20
reduced
152:10
refer
77:1,2 78:9,10 91:23
  94:18
REFERENCE
3:7
referenced
61:20 102:9 107:18
references
63:16
referral
95:4
referrals
45:7,13,18,19 134:3
referred
43:20
referring
8:7 45:20 53:17
  70:22 77:17 89:8
  114:6,6,8,14,18
  123:6
reflex
129:3,6
reframe
38:15
refresh
113:20 115:20
refreshes
116:24
regarding

114:13
registered
1:17 81:14 152:3,21
regulate
133:17
regulated
93:3
regulatory
43:13 83:13
reimbursed
50:20
reimbursement
86:23,25
reiterate
25:5
related
152:13
relates
18:6
relating
121:25
relation
152:7
relationship
13:4 15:3,6 16:14,23
  22:5,8,13,13 28:4
  36:5 75:1,8,15
  78:19 134:2
relationships
22:16,19
relative
44:2,3,7 86:10 87:1
relevancy
90:6
relevant
90:11
rely
133:19
remain
138:1
remained
14:16,17
remember
37:12 50:21 51:7
  98:24 125:8 148:8
removed

143:12
remuneration
132:11 134:3,13
  138:22
Render
2:8
renew
93:10
renewals
93:11
repay
53:1 136:15 137:14
repayment
102:6 131:21 132:12
  132:15 133:8,17
  134:10 137:21,22
  138:8
repayment's
132:3
repeat
73:23
repeatedly
119:10
rephrase
5:22 32:12 60:2
  66:20 84:3,4 97:23
  101:4 140:3 149:6
reply
81:15
report
15:22 20:10 33:10
  38:24 40:14,14
  79:23 80:15
reported
16:3,5 20:13,18
  21:24 39:3
reporter
1:18 5:1 38:10 73:22
  87:24 105:18 112:6
  112:8,12 150:7
  152:4,21
REPORTER'S
152:1
reporting
28:4
reports

28:2,11 29:13 31:14
  33:15,19 35:3 83:10
request
49:11
requested
48:23 61:22 95:23
requesting
140:12
required
48:22
requirement
27:22 48:18 101:18
  136:15
requirements
34:16 83:13
rescind
75:5 96:12,20 97:1
  97:21 103:9,15
  104:12 106:12
  114:15 115:22
  116:10 117:20
  120:17 121:10
  130:21
rescinded
8:4 73:13 126:16,20
  139:16
rescinding
66:22,23 67:3 73:17
  74:6,13 97:6,25
  98:21 99:9 111:2,18
  116:20 119:7 120:2
  126:24 127:14
  136:1 139:23
  148:20 149:23
research
63:4
reside
146:15
resides
14:7
resolution
81:21 82:20,23
resolve
82:7
resource
35:6 36:1 85:15



**resources**
35:16
**respect**
122:3 134:11
**respond**
81:15,21
**responding**
82:11 148:23
**response**
99:22 105:10 107:4
115:11,14
**responsibilities**
11:7 23:3 28:5 39:24
**responsibility**
22:3 23:18,20 30:10
133:20 135:22
136:1
**responsible**
18:25 84:16 85:9
**responsiveness**
103:17 129:23 130:4
**rest**
146:1
**restate**
12:11 59:24 90:13
121:19 129:15
**restricted**
47:4
**result**
64:25 96:25 131:20
**results**
64:15
**return**
103:8
**reverse**
114:3
**review**
7:20 26:23 29:18,22
30:18 42:1,10,11,12
42:16 43:7,15 44:16
44:18 46:6,16 48:13
48:24 49:3,12,15
54:15 61:18 62:15
63:15 64:14 89:24
108:11
**reviewed**

8:18 30:24 42:22
125:10,17 140:20
**reviewing**
30:21 46:9 76:17
90:3 122:16 124:20
124:21 125:2 126:4
140:24
**revising**
131:11
**right**
4:16 6:14,25 10:18
12:5 14:2 17:16
27:14 28:3 29:20
32:9 36:14,22 37:23
38:3,5 41:10,12,15
49:5 51:10,23 55:7
56:11,20 63:10
67:19 70:3 74:25
75:13 76:3,22 77:9
77:25 78:3,17,23
79:3 82:9 95:19
96:7 97:10 99:7
105:17,23 111:21
118:12,20 122:18
123:9 130:23
133:10 135:2 141:7
141:22 146:20
147:17 148:18
149:10
**Rights**
149:2
**Roberts**
119:24
**role**
10:4,15,20,22,24
11:5 15:13 20:18
21:1,11,21 23:19
25:17 26:18 27:2,17
27:20 30:6 35:22
38:21,23 39:10
43:18 45:25 46:8
48:15 49:24 52:1,4
53:11,21,22 54:10
55:5,11,19,21 63:12
63:25 64:13 65:17
65:20 67:8 68:13

76:6 77:8 79:5,7,14
80:10 81:20 82:10
83:22 84:5,8 90:17
90:22,25 91:1
137:16 139:17
143:19
**roles**
9:24 28:14,20 84:15
**roll**
28:23
**roll-up**
64:5
**rolled**
13:25 86:4
**room**
104:2
**roster**
50:18
**rounded**
57:24
**routinely**
57:25
**rubber**
25:25 26:11,17
**rules**
1:16 4:23 43:21
81:14
**RVU**
44:6 85:24 86:1,4,9
86:10 87:6
**RVUs**
44:4

———————————
S
———————————

**S**
4:1
**SABEY**
2:8 26:11 50:24
60:19 90:6,9 119:9
121:13 122:8
123:14,16 125:14
125:22 128:20
129:3,6,10,13 141:6
141:8,10,15 142:5
150:3,6,9
**safe**

82:9
**salary**
40:8 147:2
**Sam**
22:21 54:6 60:12,17
61:6 70:5,8 79:20
80:10,12,15 87:9,13
92:11 97:4,7,17,22
98:1,13,15,21 99:20
103:10 105:9
107:16 114:18
119:7,15 121:2,16
121:24 122:15
124:9
**Sam's**
131:13
**Samuel**
3:11 41:4
**satisfaction**
64:10
**saw**
112:16,22,23 140:21
147:14
**saying**
26:17 64:18 119:12
124:12 143:22
**says**
113:25 116:2
**scale**
39:21
**scenario**
47:22 101:12,21
**scheduling**
83:24 84:6,8
**school**
9:11,17
**science**
9:11
**scope**
21:1,3 80:2 95:18
**scopewise**
19:2
**score**
64:9
**scores**
64:7



**Scott**
 15:24 16:1,4,5 20:14
   20:18 24:1 80:16
   87:11,13 119:22
**Scott's**
 24:6
**scratch**
 56:3 136:7
**SDCA**
 94:8
**se**
 27:16 29:18 110:10
**second**
 50:25 123:3
**securing**
 130:11
**see**
 90:1 112:18,19
   116:23 122:20
   140:11 142:14
   143:20 144:3
   145:10,11 146:23
**seeing**
 50:21 112:23 140:19
**seen**
 88:1,3,7,16,20 89:15
   90:15 95:8 100:12
   112:14,16 133:12
   133:13 142:9,18
   143:13,16,22
   144:23,24
**self-imposed**
 44:21
**send**
 103:12 107:21
   108:10,17,20
**sending**
 111:20 125:1,6,18
   126:8,8,11
**senior**
 24:8
**sense**
 77:4,14
**sent**
 7:22 49:21 102:16
   103:22 108:4,20

 109:13 111:17
   117:3 125:9
**separate**
 12:15 15:8,17,17
   46:4,5 48:11 86:2
**separately**
 35:21
**September**
 152:17
**sequence**
 111:10
**serve**
 10:21
**service**
 21:2 22:10 23:16
   31:1 41:11,19 53:13
   54:15,19 75:25
   77:10 78:11,21 81:1
   81:2 86:13 89:4
   104:6 106:24
**services**
 1:7 3:8,9 11:18,21
   19:23 22:1 50:19
   71:11,17,19,22 72:4
   72:11 76:7,10 77:2
   78:9 79:8,24 83:7
   85:10 86:17 87:16
   91:8 92:1,15,20
   93:6,13,19 94:3
   95:2,13 105:11
   130:11 131:5
**session**
 34:11
**set**
 40:7 49:5 67:24
   89:19
**shaking**
 5:2
**share**
 100:24 108:7 141:9
**shared**
 7:3 35:8 70:6 96:22
   97:19 100:7 103:16
   107:16,17
**sharing**
 72:23 105:9

**sheets**
 151:2
**shook**
 65:12
**short**
 102:23
**shorthand**
 152:9
**show**
 5:2 34:20 87:19
**side**
 57:24 65:12,12 77:8
   80:3 81:19 83:11
   133:4,9
**sign**
 23:19,24 24:20 25:2
   25:12,15 26:23 27:9
   40:24 41:19,22 43:4
   49:22 61:12 100:3
   106:20 107:7
   108:13 109:13
   128:19 148:6
**sign-on**
 52:15 53:5 137:8,10
   137:16,19 138:15
**signature**
 23:22 24:2 27:15
   37:25 43:2 96:24
   97:20 106:23
   142:21 143:1,23
   144:8 150:8 152:16
**signatures**
 49:21 50:3 107:25
**signed**
 8:3 41:4 43:3 100:6
   107:10 127:3,5,8,10
   127:14,15,22
   129:18 140:22
**significant**
 9:13 98:9
**signing**
 26:18 37:13 42:1
   68:16 103:17 107:2
   124:24 129:23
   130:4 132:17
**similar**

 20:25 21:21 30:16
   42:5 81:20,20 88:7
   88:17,20,24,25
   102:10,12 109:8,11
   143:16,17 145:10
   147:15
**simply**
 104:8
**single**
 109:12
**singlehandedly**
 18:13
**sitting**
 124:18
**situation**
 73:4 101:16 102:10
   108:11 109:8,11
   133:15 143:23
**six**
 10:19
**size**
 84:14 94:14 95:18
**somebody**
 33:15 51:24 137:23
**soon**
 98:8 125:1 141:2
**sorry**
 25:4 26:7,10 38:15
   40:3 43:20 52:2
   59:24 71:4 73:14,22
   88:14 105:18
   121:19 128:21
   129:3 144:11
**sort**
 44:21
**sound**
 56:13
**sounds**
 6:3 110:6
**South**
 94:6
**Southern**
 58:6
**Southwest**
 20:3 22:23 58:4
**space**



28:23 77:11 83:16
**spans**
114:23
**speak**
97:5 116:9 117:19
120:1
**speaking**
99:20
**speaks**
134:2
**specialty**
11:21 21:2,20,24
22:1 28:20 45:18
46:14,14 66:9,17
145:17
**specific**
32:7,10 34:15 48:1
53:22 70:7,9 71:9
81:22 84:12 98:4,7
98:14,20 100:17
102:3,19 105:1
110:9,12,15,23
113:2 116:14 120:4
121:2 124:15 128:2
128:10 129:20
136:17 145:17
**specifically**
11:5 36:1 62:14
98:12 99:20 100:1
100:11 101:8
103:10 121:23
126:3 128:7 134:25
**specifics**
54:17 69:25 148:8
**specify**
31:13
**speculating**
98:10 103:7
**spelled**
31:18
**spend**
58:2
**spoke**
7:4 110:13 115:21
117:18 119:16
120:12,14,15

**sponsor**
14:11 16:18
**sponsors**
13:11
**sponsors'**
13:17
**Springs**
8:9 20:2 22:22
**staff**
18:5,11 104:8
**stamp**
25:25 26:12,17
**stand**
22:9 133:22,24
**standard**
46:11,11,16,18,22,25
47:5,10 48:2 49:7
110:3 144:9,12,17
144:21 145:8,24
147:13,22
**standardized**
85:20 89:3,7,9
**standards**
27:3 43:22 45:24
64:2 76:16
**standpoint**
26:22 27:5 43:12
**Stark**
133:18,22 134:6
135:6,12 136:6,9
138:12 139:12
**start**
10:14 32:9 50:13,15
51:8 104:18 105:1,2
105:3,12 106:11,15
131:8
**started**
10:17
**starting**
9:15 104:20
**state**
4:10 152:4
**stated**
110:1
**STATES**
1:1

**step**
49:14,15 63:1 75:22
**steps**
32:7 34:10
**stipend**
86:2,4 87:12
**stipulation**
25:14
**straightforward**
86:8
**strategically**
12:18
**Street**
1:17 2:4,9
**strict**
43:22
**string**
116:8
**structure**
15:19,20 18:19,21
82:7 145:9
**stuff**
75:12
**subject**
38:6,18 79:18 80:20
91:8,24 92:1,5,16
93:13
**submission**
48:23 49:10
**submit**
49:11
**submitted**
42:16 49:2
**Subscribed**
151:19
**subsequent**
50:11 111:3 138:7
**substantive**
147:12
**substantively**
144:7,9
**suffering**
96:2
**sufficient**
138:2
**suggested**

111:1
**suggesting**
103:15
**Suite**
2:4,9
**summary**
146:5
**supervisors**
84:15 119:20
**supply**
40:18 149:6,8
**support**
82:20
**supported**
42:19
**supportive**
129:9
**sure**
4:15 5:3 9:8,16 10:9
12:12 13:18 17:22
26:24 27:2 38:16
39:9,11 42:3 44:18
45:16 49:25 50:17
51:1 69:6 77:15
83:5 90:14 103:4
105:22 111:22
118:8 129:16 131:4
138:23 142:22
147:11,23 148:5
**suspect**
114:17 148:13
**switch**
57:11
**sworn**
4:4 151:19 152:6
**system**
11:3,4 12:18 50:22
53:14 54:20 137:2
**systems**
12:16,18

---

**T**

**Tacha**
1:10 4:3,12,13
112:11 141:12
142:7 151:1,18



**take**
 5:11 31:8 50:24 63:1
   88:1 105:19,23
   122:6 141:3 142:6
   145:5
**taken**
 1:16 51:2 122:10
   152:9
**talk**
 5:8 7:17 8:20 18:18
   70:18 101:25
   110:25 119:6,20,24
   134:17 135:25
**talked**
 8:23 17:2 23:6 98:18
**talking**
 23:4 37:19 38:10,17
   78:1 97:3,4 98:7,19
   101:23 110:6
   111:24 112:1
   119:22 132:21
**target**
 40:20
**team**
 24:23,24 31:18 33:25
   43:10 51:25 57:19
   133:20 135:22
   136:1
**Teams**
 7:15
**tell**
 6:21 7:10 19:22
   31:23 46:3 50:7
   52:12 60:4 69:8
   70:3 94:2 96:19
   97:14 99:24 100:2,5
   100:15,22 102:14
   102:22 103:19
   106:25 107:9
**telling**
 73:3 111:11 112:19
**ten**
 29:3
**tends**
 5:8
**term**

 26:14 27:15,23 33:6
   55:15 81:12 100:17
   101:10 110:4,19
   137:22 138:18
**terminate**
 24:13,19
**terminated**
 27:10 73:9,12 93:14
   137:13
**termination**
 31:25 66:19 71:23
**terminations**
 25:18 26:25 27:6,18
   27:21
**terminology**
 79:1
**terms**
 24:12 25:13,20 28:9
   29:7,17 32:6 34:15
   34:19,22 41:18
   43:15,16,21 44:11
   44:14 45:23 46:15
   47:2,8 49:4,5,9
   51:21 63:5 71:11
   73:7 79:14 81:21
   83:4,13,25 84:5
   85:18,23 89:17
   92:25 94:22 100:9
   100:11 101:6,8
   102:2 104:5 106:12
   107:18,18 108:7
   109:25 114:9,9
   122:14,16 132:10
   136:13 137:21
   144:20 145:7,17
   146:23 147:12
   148:1
**test**
 19:16
**testified**
 4:4
**testify**
 152:6
**testimony**
 51:5 89:5 151:2
   152:12

**thank**
 37:10 67:23 86:18
   112:10 150:5,6
**thanks**
 129:10 141:20
**thing**
 49:9 99:19
**things**
 6:25 29:16 43:24,25
**think**
 6:6,10 8:14 15:17
   21:5 23:4,14 24:8,9
   29:14 38:1,17 47:15
   47:18 48:10 50:21
   51:10,11 56:11
   63:25 75:23 76:7
   78:25 80:13 84:22
   87:21 89:7,15 105:7
   108:6 111:23
   117:14 118:18
   125:12 132:3 138:2
   148:10,16 149:25
**thinking**
 113:9
**third**
 50:22 78:15
**third-party**
 79:8,24 81:2
**third-payer**
 50:22
**thought**
 61:11 105:20 113:8
   127:22 141:13
**thoughts**
 72:23
**three**
 31:24 43:24 87:11
   104:21 127:14
   138:3,18 141:8
**three-year**
 52:20
**tied**
 87:1
**time**
 4:18,19 6:5 7:13
   11:12 14:3,10,15

 16:3 17:5,9,25 19:4
   21:20 28:13 29:15
   46:23 47:6,6,18
   49:2 52:19,22,23
   55:15 58:2,9 60:24
   65:1,18,24 66:13,15
   67:19 69:16,23
   70:16,16 71:18 72:1
   72:14,24 73:15 74:5
   74:9,11 75:2,4 98:9
   98:12 99:22 109:10
   110:12,15,16 117:4
   125:5 138:2,7
   142:14 149:10
   152:9
**timeline**
 98:11
**timeliness**
 81:21
**times**
 5:15 7:9 34:19 47:16
   110:18 115:19
   116:23 117:15
   118:23 132:3
**timing**
 98:4,13,14 111:10
   117:2 125:17
**title**
 24:10
**today**
 5:6 6:11,20 7:1 12:22
   42:7 55:20 90:19
   142:12
**today's**
 6:23
**told**
 70:4 107:10 126:22
   127:12 131:2
   148:21 149:22
**ton**
 56:13 58:3
**top**
 3:10 32:13 56:19
   109:5
**topics**
 57:11 95:21



**total**
21:5 44:1,3 58:12
138:14
**totally**
51:7
**town**
30:20
**tracked**
80:21
**trained**
135:5,6
**training**
34:3,5,8 127:25
128:3,8,13,14 134:5
139:11
**transcript**
151:1 152:11
**transparently**
147:16
**travel**
58:1,3
**trend**
32:8
**trial**
5:17
**tried**
127:13
**triggers**
50:4 106:21
**trouble**
135:19
**true**
151:2 152:11
**truth**
6:21 152:7
**try**
5:22 37:12 46:22
67:18 72:5 85:5
104:16 126:5
**trying**
11:13 29:14 38:1
40:5 69:6 76:24
78:10 85:7 91:23
92:18 107:5 116:16
123:25 128:25
129:11 140:10,11

**turn**
113:24 123:3
**twice**
7:16
**two**
7:12 10:21 13:11
14:9 15:24 22:15,18
28:19 31:16,24 57:4
69:16 78:10 80:3
83:3 94:13,22 95:15
97:9 98:5 103:3
127:14 138:18
139:5 146:13
**type**
52:20 123:23,24
**typed**
123:12,19,20 124:2
**types**
27:24 52:9 53:8
**typewritten**
152:10
**typical**
101:10,12
**typically**
25:17 27:7 61:14
63:4 133:8 146:8

—————————
**U**
—————————
**Uh-huh**
4:14 9:5 23:10 37:15
69:17 70:17,20
89:10 99:8 103:11
111:9 114:22 118:9
123:5 141:25
144:19 146:7
**ultimately**
49:22
**unable**
96:24 97:19 107:6
**Undergrad**
9:9
**understand**
5:21 6:15 16:23
26:16 74:22 88:22
129:7 142:1
**understanding**

17:12 54:23 83:21
91:13 92:19 93:5,10
104:5,7 136:5
**understood**
5:24
**unit**
44:4 86:10,24 87:2,3
**UNITED**
1:1
**units**
86:23
**University**
9:9 44:11
**unpack**
97:10
**unredacted**
112:18,20
**unusual**
61:8 143:21,22
**up-front**
52:19
**use**
14:1 44:12 45:14
74:19
**usually**
24:1 25:22 26:22
27:21 30:24 31:12
31:20 47:7,20 48:4
48:5,7 49:4 52:20
52:20,25 54:4 55:14
61:23 63:14 82:22
83:1 85:12,14,24
87:1 104:23 107:25
109:24 110:2,3
133:19 138:18
146:21
**Utah**
14:15
**utilize**
95:1

—————————
**V**
—————————
**vague**
74:20
**value**
26:19,21 42:17 43:14

43:17 44:4,13 86:10
86:12 87:2 134:15
138:20,24
**Vance**
15:25 16:3 20:11,12
20:15,16
**varied**
44:10 46:13 47:1
**varies**
34:13 84:13
**various**
9:24 52:9 53:8
**vary**
52:21 145:24
**veer**
47:10
**verbal**
31:5
**version**
112:16,19,20,23
**versus**
44:11,11 133:4
**vice**
10:15 20:25 21:23
22:4,14,15 23:18
24:8 28:17 30:17
33:1 40:1 54:6
56:25 63:12 76:3
**violate**
138:12
**violated**
136:9
**violation**
45:10
**VP**
11:14,17 14:18 15:23
17:17,21 20:10,20
21:21 23:5 28:20,23
30:3,7 33:12 35:11
39:25 54:9 56:16
57:1 65:8 68:4
**VPPs**
19:7
**vs**
1:6



## W

**wages**
40:9
**Wait**
111:6
**waiting**
5:6
**walk**
9:14 97:12
**want**
4:15 10:16 28:14,14
45:5 50:17 66:20
77:14 105:23
113:24 140:25
142:3 150:10
**wanted**
96:25 97:21 103:9
**wasn't**
15:13 17:2 25:19,20
27:20,22,22,22
29:17 30:1 32:6
42:20 53:11 67:7
72:18 91:19 94:1
105:10 131:23
132:18
**way**
85:21
**We'll**
141:1
**we're**
40:5 44:8,19 70:18
78:1 87:2,21 101:16
**we've**
130:2
**Wednesday**
118:11 119:1
**week**
104:21 125:6,13
**weekly**
62:11
**weeks**
7:13
**weird**
136:7
**Weller**

3:11 22:21 41:4
60:17 70:8 72:24
73:2 79:11 99:7,9
100:5 101:3,24
102:14,21 103:8
105:3 106:25 111:1
117:18 119:8
120:16 121:7,12,18
121:22 126:23
127:12 131:2,10
132:17 134:9
**went**
9:10,25 14:3 23:4
120:24
**weren't**
27:7 63:21 73:19
75:24 78:15 130:25
**WHEREOF**
152:16
**WHITNEY**
2:3
**wife**
127:9
**wish**
36:24
**Witness**
40:5 41:3 65:12 71:5
79:16 99:18 105:22
112:9 150:5 152:16
**word**
26:11 147:18
**work**
9:15 12:22 14:19,24
15:11 16:2,6,15
22:3 35:20 36:6
44:4,4 50:15 57:10
57:12 67:6,9 82:24
82:24 86:1,4,10
136:15 137:22
139:1
**worked**
10:12 17:10 57:21
98:25 139:3
**workforce**
58:14
**working**

17:6 64:22 65:4
67:20
**wouldn't**
31:23 104:7 144:3
**write**
56:19
**written**
66:16
**wrong**
74:17 88:15 117:15
118:19,23
**wrote**
66:18

## X

**X**
3:1

## Y

**yeah**
8:2,16 11:12 12:18
12:22 13:7,22 15:6
15:10,12,12,16,19
16:12,16,20 17:24
18:10,20 19:7,14,21
19:23 21:17 24:5,14
24:14 25:11 26:13
26:15,18 27:4,5,13
28:3,16 29:9 30:5,5
30:8,16 32:11,21
33:1,1,16,20,24
34:2,5 35:4,9,23,23
35:25 36:3,11,15,19
37:2,5,9,11,21
39:16,18 40:1 41:24
42:7 45:9,25 46:5
47:23,25,25 48:9
49:8,17 50:15,17,17
51:21 52:3,9,11
53:4,19,24 55:2,9
55:16 56:8 57:6,8
57:16 58:20 59:24
60:1,3,10,16 61:4
61:13 63:19 64:4,12
64:17 65:3 66:24
67:17,23 71:2,5,20

72:4,13,18,19 73:15
73:18 76:9,20,23,25
77:5,16,22,24 78:8
78:24 79:12,22 80:2
80:18,24 82:4,18
83:20 84:4,4,9,11
84:20,23 85:3,6,8
85:22 86:7,16,19,21
89:14,23 91:1,6,18
91:21,22 92:9,13,24
93:4,15 94:5 95:5
98:2,10,18 99:4
100:21 102:8,24
103:1,5,11,25 106:6
109:4,5,15 110:8,15
110:21 111:25
112:2,4,16 113:3,12
113:19,23 114:11
115:4,13,16 116:3,6
116:13,16,22,25
117:2,13,23 118:3,5
118:13,15,22
119:22,23 120:4,10
120:21,22 121:1,16
121:20 122:1,14
123:22 124:9,11,23
125:5,11,16 127:16
128:3 130:7,10,15
130:24 131:14
132:1,7,24 133:7,14
133:21,22,25
135:24 136:21
137:6 138:4,6,13
140:13,18 141:8,10
141:17,21 142:8,13
142:24 143:5,15
144:2,5,9,15,16
145:4,20,22 146:2
147:4,6 148:2,15,15
**year**
21:10 29:23 39:13
40:7 55:24 56:1
**years**
9:24 10:1,12,21 21:5
138:3,19
**yep**



11:22 12:21,21
14:21 17:19,19
19:15 20:8,21 21:13
23:2 25:10 29:3
34:7 35:14 111:22
124:6 137:9

**Z**

**Zero**
65:19
**zip**
75:12
**Zipped**
95:19
**Zoom**
7:15

**0**

**000399**
124:4 125:21 127:10
128:16
**000430**
146:21
**000438**
143:7
**000439**
145:21,22
**0223**
114:4
**0225**
114:23 118:6
**0226**
113:25 114:4,12,12
114:23

**1**

**1,000**
19:3 58:11,18
**1/2**
10:1 21:5
**1:05**
122:11
**1:23-cv-01921-NY...**
1:2
**1:38**
150:13

**10**
114:25 120:24
**10:17**
1:14
**100**
2:4
**11**
115:11 116:1 118:11
119:2
**11:07**
51:2
**11:27**
51:3
**112**
3:10
**12:49**
122:10
**13th**
152:17
**15**
152:18
**150**
19:5
**16**
10:24
**17th**
2:9
**19**
10:18

**2**

**2**
146:17,20 147:3
**20**
9:24 10:12 151:20
**2019**
10:18,18 17:17
**2021**
17:18
**2022**
115:11 116:1 118:11
119:2 123:9
**2024**
1:13 3:3 150:13
152:17
**2028**

152:18
**2170**
1:17
**226**
3:12
**2701**
2:4

**3**

**3**
141:12,24 142:7,9
143:17,18 145:6
147:9 148:12
**30**
1:13 3:3 19:24
**303-578-4400**
2:5
**303-802-1299**
2:10
**30th**
150:13

**4**

**4**
3:5 10:1 21:5
**439**
145:19

**5**

**5/11/22**
3:10
**500-entity**
19:20

**6**

**6:01**
114:25
**6:39**
116:4
**6:39:26**
118:11 119:2

**7**

**7**
122:21 123:2,4,15
124:2,8 125:4,9,21

126:9,14 127:3,5
128:16 129:19
132:17 135:3 140:2
140:20
**74**
3:9

**8**

**8**
3:8 87:21,23,25 88:2
88:5,6,8 89:2
123:13
**80-plus**
58:8
**800D**
2:9
**80202**
2:9
**80205**
2:4
**87**
3:8

**9**

**9**
3:10 112:5,6,8,9,13
112:14,25 113:13
113:21 114:2
115:20 117:8,11,15
118:4,5,21 120:9,10
120:25 123:9
139:20,22
**90-day**
104:24
**99**
10:17,18 46:23 90:10
**999**
2:9

