Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-01921-NYW-MDB

_____

RECORDED VIDEO-CONFERENCE DEPOSITION OF:  SAM WELLER
DECEMBER 13, 2024

_____

DR. ANUJ PEDDADA,

Plaintiff,

v.

CATHOLIC HEALTH INITIATIVES COLORADO D/B/A CENTURA
HEALTH-PENROSE-ST. FRANCIS HEALTH SERVICES,

Defendants.

_____

            PURSUANT TO NOTICE AND AGREEMENT, the
deposition of SAM WELLER, was taken via video
conferencing per stipulation of all parties on behalf
of the Plaintiff on December 13, 2024, at 10:03 a.m.,
before Patricia "Annie" Burnett-Anderson, Professional
Court Reporter and Notary Public within Colorado.



Page 2

APPEARANCES
For the Plaintiff:    IRIS HALPERN, ESQ.
(Via Video Conference)  Rathod | Mohamedbhai LLC
2701 Lawrence Street
Suite 100
Denver, CO 80202
For the Defendant:    MARK SABEY, ESQ.
(Via Video Conference)  LINDSAY McManus, ESQ.
Hall, Render, Killian, Heath &
Lyman, P.C.
999 17th Street
Suite 800
Denver, CO 80202
Videographer:        Paul Johnson

Page 3

INDEX
EXAMINATION OF SAM WELLER:                    PAGE
December 13, 2024
By Ms. Halpern

INITIAL
DEPOSITION EXHIBITS:              REFERENCE
Exhibit 80                45
Exhibit 81                79
Exhibit 82                94
Exhibit 83                153
Exhibit 84                197
Exhibit 85                208
Exhibit 86                214

(Deposition exhibits were retained by counsel)

Page 4

WHEREUPON, the following proceedings were taken pursuant to the Colorado Rules of Civil Procedure.

SAM WELLER, having been sworn to tell the truth, testified as follows:

EXAMINATION

BY MS. HALPERN:

Q. Good morning, Mr. Weller. Can you just state your full name for the record.

A. Samuel K. Weller.

Q. Okay. And my name is Iris Halpern. I'm an attorney for Dr. Anuj Peddada.

I just want to ask you if you've been deposed before?

A. Not -- no.

Q. Okay. So you've never been involved in any kind of litigation or anything like that even as a witness?

A. As a witness, yes. Not deposition.

Q. So what was that? What was the case that you were a witness in?

A. Anesthesia services.

Q. Uh-huh. But you never got deposed or -- did you go to trial in that case?

A. No.

Page 5

Q. Okay. Rules of a deposition are -- obviously we have to articulate out load. The court reporter is taking all our answers and questions down. She is going to create a transcript of that.

So articulate your answers. Don't just shake your head. This part I struggle with more than other folks, wait for each other to finish speaking. So, you know, wait to give your answer until I finish my question or vice versa.

It's, like, not a normal cadence thing for conversation but try to keep that in mind.

You know, if you need a restroom break, it's okay as well. Obviously, you know, if you answer a question, I'm going to assume you understood it, but you're free to ask for clarification if you are having any problems understanding what I'm asking. Okay?

A. Yes.

Q. Are you under any medication or anything of that type that would impair your memory today?

A. No.

Q. Do you have any medical conditions that would do so?

A. No.

Q. Any reason you cannot fully truthfully answer all of my questions today?

2  (Pages 2 to 5)



MAGNA
LEGAL SERVICES

Page 6

A. No.

Q. Okay. One other last-minute thing. Your attorneys may object during the deposition -- unless they instruct you not to answer -- that's just because they're preserving the record for court, so you can still answer even if they object. Okay?

A. Okay.

Q. So you're under oath today, so you understand you're obligated to tell the truth; right?

A. Yes.

Q. Okay. What did you do to prepare for today's deposition?

A. Prepared notes of history of what I recall, reviewed documents that were provided by my attorney, and got some sleep.

Q. You wrote some notes down?

A. Yes.

Q. Do you have those with you?

A. No, I don't.

Q. Do you have anything that -- in the room with you?

Because this happened last time. I found out someone was reading something, not intentionally, but I didn't realize it was in front of them because we're not all in the same room.

Page 7

A. Not -- no.

Q. Okay. Just checking. So you took some notes. When did you -- so do you know what documents you reviewed that your lawyer sent you?

A. My deposition that was provided to you all -- excuse me. Wrong term. My Declaration. Sorry.

Q. No, that's okay. Any other documents that you reviewed?

A. No.

Q. How did you meet with your attorneys?

A. Via -- via electronic, like we're doing today.

Q. And when did you do that?

A. I don't have the date recorded. We met two weeks ago or prior to our originally scheduled meeting that was ultimately not done and then rescheduled for today.

Q. Oh, the deposition, you mean?

A. Yeah.

Q. Okay. Sorry about that. We really apologize. So you met about two weeks ago to get prepared. Do you remember for how long?

A. About an hour.

Q. Any other preparations? Did you talk to

Page 8

anyone at -- so are you still at CommonSpirit?

A. No.

Q. Did you talk to anyone at CommonSpirit or Catholic Health Initiatives of Colorado to prepare for this deposition?

A. No.

MS. HALPERN: I assume -- just to get on the record -- Mark and Lindsay, that you are taking the position that you represent Mr. Weller?

MS. MCMANUS: That's correct.

MS. HALPERN: Okay.

Q. (BY MS. HALPERN) Mr. Weller, I'm going to turn a little bit to just kind of get some background information from you about kind of your education and your work experience. Can you walk me through your educational background, please.

A. Yes. I have a Bachelor's of Business Finance with a clustered Healthcare Administration; a Master's in Health Policy and Administration; and I did an administrative fellowship at Centura Health.

Q. What is an administrative fellowship?

A. It's a one-year program designed for training of healthcare executives.

Q. Okay. And where are you working now?

A. I work for Renown Health in Reno,

Page 9

Colorado -- sorry. Reno, Nevada.

Q. Okay. So you're out of state right now?

A. Correct.

Q. Okay. And you said that you did kind of a fellowship at Centura. When did you start working, you know, in the healthcare industry?

A. I started with Centura in 2012.

Q. And what was your position then? Can you walk me through your positions at Centura?

A. Administrative fellowship, group manager of business development --

MS. HALPERN: Can I take a quick pause?

(Pause in the proceedings.)

Q. (BY MS. HALPERN) I'm sorry. You were saying that in 2012 you started with Centura on the fellowship. And then if you can walk me through the rest of the history you had there, that would be great.

A. Yep. After fellowship, I was a group manager of business development and then became director of strategy and operations and then became the group vice president of physician alignment.

Q. And can you give me the approximate years of each of those positions?

A. Yes. Administrative fellowship just less

3 (Pages 6 to 9)



Page 10

than a year.  Then for group manager of business development, about a year.  So -- and then --

Q.   Is that, like, 2013 to 2014?

A.   Correct.

Q.   Okay.

A.   And then director of strategy and ambulatory operations at St. Anthony Summit Medical Center in '16 to '18, so two-and-a-half years.

Q.   Okay.

A.   And then group VP of physician alignment from 2018 to when I left Centura.

Q.   And when did you leave Centura?

A.   2022.

Q.   Do you know what month in 2022?

A.   I left in December.

Q.   Okay.  Where did you go after you left Centura?

A.   I came here to Renown Health.

Q.   Why did you leave Centura?  Was it because of the separating of the two entities under Centura, CommonSpirit?

A.   Restructuring of leadership responsibilities and I decided to leave.

Q.   Okay.  Could you tell me a little bit more about that?

Page 11

A.   They were consolidating the role for which I was in.  I was invited to interview for the position -- consolidated role -- and I chose not to and left the organization.

Q.   Okay.  And what was your position in -- it's Renown?

A.   Correct.

Q.   What's your position there?

A.   I'm the CEO of Renown South Meadows Medical Center and Rehab Hospital.

Q.   And have you held that position the whole entire time through present?

A.   Correct.

Q.   And can you tell me about what your job duties were as a group manager when you were at Centura?

A.   Group manager?

Q.   Yes, please.

A.   In 2013 time frame, I was reviewing working on strategy for our ambulatory network looking at both primary care development and specialty care development, emergency services, urgent care services for our six-hospital market.

Q.   Okay.  And what does that exactly entail?  Did you have any subordinates that you managed or is

Page 12

this more of a policy position?

A.   This is more of business development position to where managed business plans, projects, and ultimately the deployment of those services into the community, but I did not have subordinates.

Q.   Okay.  And how much did you interact with actual, like, physicians for that?

A.   Fairly often.

Q.   Okay.

A.   We -- yeah.  We --

Q.   In what capacity?

A.   In what capacity.  As planning purposes.  So discussing of the floor plans and development of the building, interacting with them, getting their perspective, what their needs would be, and ultimately helping to design the overall plan.

Q.   Okay.  And who -- who actually employed you at that point in time?  Was your paycheck cut by Centura?

A.   Correct.

Q.   What were your job responsibilities as the director between 2017 and 2018?

A.   I was overseeing the strategic vision of our mountain services; working with local physicians; working with community hospitals in the surrounding

Page 13

areas; working with community members; working and ultimately overseeing several departments within St. Anthony Summit Medical Center in Frisco, Colorado; facilities, security, safety, and our physician practices.

Q.   Okay.  And it's my understanding that your work with kind of local physicians and, you know, other, like, stakeholders more, you know, receiving input, et cetera.  You didn't manage any kind of care or anything like that?

A.   I managed the services of our employed physician practices.

Q.   Okay.  What is that -- what did that entail?

A.   We had primary care services.  We had rotating specialists rotating to our community and some employed physicians, cardiology, that were dedicated in the community.  And I managed the day-to-day practices of those.

Q.   And were you living in Frisco at that time?

A.   Yes.

Q.   And what other job duties did you have as director?

A.   Nothing that I haven't stated.

4 (Pages 10 to 13)



Page 14

Q. Okay. And then you went on to work as a group vice president in physician alignment; is that right?

A. Correct.

Q. If can you describe your job responsibilities there, that would be helpful.

A. Really trying to align our network of hospitals and physician partners, both employed and independent physicians; medical staff members; to ensure that we had coverage and ultimately services in our community for that community need of that specialty.

Q. And did you have any subordinates you managed in that position as the group VP?

A. Yes.

Q. How many?

A. At least 13.

Q. And who did you report to when you were the group VP physician -- group VP position of physician alignment?

A. At the time of my departure, Dr. Scott Lichtenberger.

Q. Did that change throughout the time you were the group VP?

A. Yes.

Page 15

Q. Who preceded Dr. Scott Lichtenberger, I think you said it was?

A. Yes. And I -- sorry. There was three individuals that I reported to directly during that period: Predominantly Dr. Lichtenberger. Dr. Scott Ellner was the first, Dr. Scott Lichtenberger being the second, and ultimately Dr. Shawna Goldie.

But, again, I said in my departure Dr. Lichtenberger. I need to correct that. Dr. Shawna Goldie at the time of departure.

Q. Okay. And what kind of was your day-to-day interactions? You said you kind of made sure there was coverage between contracted physicians and employee physicians, right, to make sure there was coverage.

Is this across the whole state? What was your geographic scope of management?

A. Geographic scope was our Greater Colorado/Kansas operating group, which was a portion of the state and Western Kansas.

Q. And how -- how often when you were the director of VP did you interact with physicians who are contractors versus physicians who are employees?

A. Daily.

Q. So both categories?

Page 16

A. Correct.

Q. How were your interactions different between physicians who were employees and physicians who were contractors, if at all?

A. The only difference in my interactions is how we could work with them legally and contractually --

Q. Okay.

A. -- to point to Stark and Antikickback. Other than that, I interacted with them in the same way.

Q. Can you expand that a little bit? What do you mean contractually and legally and how to work with them?

A. As independent physicians, I had to abide by legal and Stark and Antikickback rules and laws, and I had to ensure that I complied with those in my interactions with independent physicians.

Q. Okay. So let me take a step back. You mean in terms of determining compensation for independent physicians?

A. In all conversations.

Q. Okay. Can you explain that a little bit? Let me take a step back and ask you kind of what was your role, I guess, when you're at Centura as a group

Page 17

VP in terms of, like, ensuring compliance with Stark or Kickback?

A. Ensuring that all contracts and relationships with those physicians, independent and employed, remained within Stark and Antikickback rules and regulations.

Q. And how did that come up on a day-to-day basis with contracted physicians?

A. With contracted physicians we would look at their specific contract to provide services for specific hospitals. We would work with them to ensure that they were compensated fairly for the service rendered while maintaining a relationship -- collegial relationship within the market to provide the services.

Q. Okay. And just in a practical sense, what did that look like? Let me see if I'm getting it right. What you are saying is you had to kind of set compensation, made sure it didn't violate these Stark laws; right?

A. Right.

Q. How did that come up in your day-to-day interactions with a given physician?

A. Many times physicians would come to us looking for additional support; working -- again for



Page 18

the services that they are providing to the hospital or community for which we're partnering -- and, ultimately, would look to the hospital to, again, support them either financially or through compensation, through various means; and ultimately working within the bounds of those laws. That we would educate as well as communicate what we could and could not do based on law.

Q. Okay. Any other differences between how you interacted with the contracted physicians and the employee physicians?

A. No.

Q. Did you have any role in, like, managing, like, patient care when you were a group VP?

A. No.

Q. What other ways did you interact with physicians on a day-to-day basis? Was it getting input? It was directing their work in any way?

A. Similar to what I said or shared earlier, just ultimately working with them for planning, long-terms visioning together partnership, and how contractual relationships would work within that.

Q. So how do you go about showing that there was coverage between contracted physicians and employee physicians at Centura in the region?

Page 19

A. Every market typically will -- what's the correct term -- deploy a market study to where there will be identified supply and demand of services by specialty, and ultimately both looking at employed and independent physicians within the community to understand, again, what those gaps are based on supply and demand.

Based on also volumes of patients coming through the hospital, and ultimately what our need is to sustain and ensure that we have coverage. And ultimately on all of those factors, determining what our needs are both through employment of the medical group of the health system or working with the independent physicians to support that gap.

Q. Okay. And did you have any kind of HR function at all when you were the VP? Or was that different department, different individual?

A. No. I did not have any.

Q. Do you know who did?

A. Can you clarify that question a little bit more?

Q. Sure. Do you know -- did you ever refer, like, a physician to human resources department or something along those lines if you had a question that really didn't fall in your purview?

Page 20

A. I referred back to the practice managers and directors that oversaw the day-to-day operations for the medical group.

Q. For the physician contractors?

A. For the physician contractors, no. We would not advise them for HR purposes.

Q. Okay. I'm just getting confused on who you were referring to.

A. For our employed physicians, if they had HR specific questions for which we managed the practice, I would refer them.

Because I did not have oversight of the day-to-day of the practice, I would refer to those directors of the practice for which it is managed. For the independent contractors, we did not refer them to HR as we do not manage the practice.

Q. Okay. So let me just parrot that back to you. If there was an employee who had a problem, you would refer them to the physician group that you were contracting with, that they were working with?

A. No. I'm sorry. If they are employed by the medical group, by Centura Health --

Q. Okay.

A. -- if they had an HR-specific question, I would refer them back to the practice management;

Page 21

right --

Q. Centura's management?

A. -- of our -- Centura's management.

Q. Okay. That's where the confusion was coming from. I thought you were talking about, like, the contractors.

A. Oh, no. But, yeah, for the independent contractors, I would not -- they managed their own practice and ultimately refer them to management within the group -- their group.

Q. Right. So that was my question. For the employees who were physicians -- that they were employees -- who did you refer them to when there was an HR issue?

A. Employed physician when they are employed by Centura, I would refer them to their day-to-day practice managers and directors.

Q. In a hospital, let's say?

A. In a medical group. Our employed physicians are employed by and managed by the medical group -- or excuse me. They were managed by the medical group within the health system.

Q. And when you refer to "medical group," what are you referring to?

A. Centura Health Physician Group.

6 (Pages 18 to 21)



Page 22

Q. Okay. So this whole time while we've been talking -- just to clarify for the record -- when you said, "practice group," you meant Centura Medical Group?

A. Depending. Again, my role was intended to ensure that we worked with both independent and employed physicians within the market.

The employed physicians would be represented and managed by Centura Health Physician Group.

Q. May I just ask you as a favor, to the extent that you can remember, to refer to that practice group as Centura or Centura Health?

A. Yeah.

Q. Because otherwise I'm just getting confused by who you're talking about.

A. Yeah.

Q. Okay. So Centura Health Medical Group is how you referred to that, to the --

A. Yeah. Centura Health Physician Group or we called it CHPG.

Q. CHPT. Got it.

A. P-G, group. So that is just an acronym of the medical group.

Q. Okay. That is helpful. CHPG.

Page 23

So just to clarify the record a little bit, for independent contractor physicians, you would not refer them to CHPG, you would just refer them to their own medical group?

A. Yes.

Q. Okay. And for physicians that were employees, if they had a personnel issue, you would refer them to CHPG?

A. Correct.

Q. Okay. And how often did you interact when you were the group VP with CHPG? Did you ever have any interactions with that department?

A. Almost daily.

Q. How so?

A. I -- the medical group president would run the day-to-day operations of the employed medical, and I would interact and discuss with he and his -- he or she -- his direct reports about what our needs are within the CHPG or the Centura Medical Group versus the needs within the market, discuss how can we service the community through the medical group or, again, how would we interact with and work in tandem with independent physicians in the market with our employed medical group.

Q. Okay. And how did you ensure coverage,

Page 24

whether with the contracted physicians or in-house -- sorry -- or in-house physician employees?

A. Can you help clarify that question a little bit more?

Q. Sure. If you noticed there was a gap, I think you were referring to gaps. So how did you go about ensuring that there was coverage?

A. I think initially would be a discussion with the physicians in the market for that so-called specialty; ultimately identify what that gap is; identify if it makes sense to work with an independent physician group in that market; or does it make more sense for the health system to work with -- through the employment of Centura Medical Group to fill that gap.

Q. So hire someone directly?

A. Correct.

Q. Okay. But did you have any role at all in ensuring kind of day-to-day coverage or is yours more of a macro?

A. More macro.

Q. Okay. Who would be in charge of ensuring there is literally day-to-day coverage?

A. Typically the hospital executives for hospital services for day-to-day coverage.

Page 25

Q. Okay. Any other kind of, you know, duties or -- any other duties that you performed as a group VP?

A. No.

Q. Did you have any role in kind of discipline, discharge?

A. No.

Q. How about hiring?

A. Hiring, yes.

Q. And typically, what was your role in hiring when you were a group VP?

A. I -- I led our alignment committee for the Greater Colorado and Kansas operating group to which we reviewed all contracts, both independent and employed medical group physicians, to where I would review employed physician contracts before they were signed.

Q. Okay. Any other role in hiring? Did you ever provide input on who to hire?

A. Yes.

Q. Tell me a little bit about that. Was that kind of -- did -- was your approval needed, you know, before hiring? Or did you just kind of offer input through interviews, cetera?

A. I would offer -- I was part of some, not

7 (Pages 22 to 25)



Page 26

all, every physician interview panel to where -- with a -- typically a large panel of interviewees for specialty within the market and ultimately would provide input of my opinion of the physician to ultimately make a group decision for employment.

Q. Was that -- I think you mentioned that you participated in that capacity both for independent contractor physicians and employee physicians?

A. Correct.

Q. Were there different -- were the same group of people involved in both decisions when it was independent contractor physicians and employee physicians? Or was there a change in who was involved in either making the decision to hire a contract?

A. There typically was the same job position in the decision-making that ultimately went into the decision of who we hire and/or how do we contract with the independent physician group to service the need.

Q. And what was your role in terms of -- I think you said in terms of kind of drafting contracts. Were you kind of primarily responsible for these hiring or employment contracts?

A. I was -- I would work with our compliance team and did not oversee them, but I worked with our compliance and our contracting team to process and

Page 27

ensure the proper documentation was within the contracts before they would go to physicians for signature.

Q. When you say "compliance team and contracting team," is that the same team or two different teams?

A. Two different teams.

Q. What's the compliance team?

A. Compliance team is ensuring that all the terms within the agreement are, again, compliant to Stark and the Kickback laws and regulations, and ensuring that we had the proper documentation, the proper support, working with fair market value, external contractors to develop the supporting documentation, et cetera.

Where the contracting team really was to process the paperwork.

Q. And who did you comp- -- primarily when you were group VP, work with in the compliance team, like names? Was there one person or two people? Or it was just kind of constantly changing?

A. There was the compliance team. There was many people on the overall team for Centura Health.

Q. So it wasn't, like, you worked with one or two people regularly?

Page 28

A. There was several people on the team of -- the head of compliance for Centura to -- to -- at the time, her whole team. So a variety of people we would work with based on the contract.

Q. Would you let me know her name? I think you referred to a "her" or was that just me?

A. I can't even remember her name. She was listed on the website.

Q. Okay. Do you remember the name of anyone -- so how was the compliance team structured? There was just kind of, like, a manager, and then individuals who were subordinates and worked for her?

A. Correct.

Q. Okay. If you recall her name or see it on a document, if you would let me know today, that would be great.

A. Yes.

Q. Okay. And so other -- were there any other laws or regulations that you had to comply with other than Stark/Kickback when you were working with the compliance team and drafting contracts, employment contracts or hire contracts?

A. Nothing comes to my mind.

Q. What is your background training in Stark and Kickback laws?

Page 29

A. Regular training from our legal team and ensuring and, again, cross education with our compliance team and ensuring that we have all the structures in place to -- to review and abide by.

Q. Okay. And what did the typical review process look like when you were looking at a contract?

A. The typical review process would come through physician alignment committee, reviewing all the terms for which we will imbedded within the contract.

Based on group decision within that committee, the contract terms would be, if approved, moved to drafting, and ultimately a secondary review of that draft. A contract would be reviewed by myself and, I believe, the contracting team -- or excuse me -- the compliance team. And then ultimately sent out for -- for signatures of either the independent or Centura Medical Group physician.

Q. And did you have a set of template terms that you picked or chose from? How did you draft contracts and then go through this review process when you were looking for compliance?

A. I did not draft any contracts myself, I relied on our contracting team and our legal team to draft those.

**MAGNA**
LEGAL SERVICES

Page 30

Q. Do you recall -- was it typically kind of the same buffet of provisions? Or do you recall any particular contract standing out at some point in time?

A. We had a typical employment contract that was a standard terms across the board and then would be tailored to the specific specialty for which we would be employing within the medical group.

Q. And that would be the same for kind of in-house employee physicians and ones you were contracting with?

A. Separate. The employed medical group would be an employed contract, where independent contractors would have -- there -- there is a variety and many different ways to contract with an independent physician.

And ultimately, there would be a template that would be provided by the legal and contracting team, and then we would tailor based on that specific contract and the specialty.

Q. And that's for the contracted physicians?

A. Correct.

Q. That you just described. Okay. So you talked about getting kind of Stark or Kickback law compliance training at Centura. How often did you get

Page 31

that?

A. Annually.

Q. Okay. And did you get any kind of other managerial training when you were at Centura?

A. We typically had an annual leadership retreat discussing the organization, training of what we're focusing on, and ultimately annual learnings -- e-learnings -- electronic learnings that we would review on an annual basis.

Q. Okay. And those e-electronic learnings, do you recall the topics at all?

A. A variety of topics based on the position within the organization and ultimately the -- I don't -- there was a laundry list of different topics, so I can't pinpoint one.

Q. Do you recall getting any training on, like, antidiscrimination laws?

A. We would -- within Centura, we -- yes, that was part of the annual training, e-learnings, ensuring that that was uniform across the organization.

Q. Okay. Do you remember anything in specific about the Americans with Disabilities Act?

A. I can't recall the specific training and material that was -- that I reviewed two-plus years

Page 32

ago.

Q. Have you -- do you have an understanding of what might be required under the Americans with Disabilities Act as a manager?

A. General concepts, yes, as I -- I'm currently in a management position myself.

Q. Okay. So even now, do you have, you know, what are your understandings about what the Americans with Disabilities Act requires?

A. That we work with and interact and treat all people the same.

Q. Okay. Any training on accommodation?

A. A lot of variety around accommodation with regard for facilities and need for ADA within a facility, et cetera. So that's what I'll reference as yes, training around that, though, as we comply with code and ADA compliance, that ultimately we're -- in all new developments and building, we are accommodating those needs.

Q. For patients to be able to access the hospital, you mean?

A. No. Patients and staff.

Q. So your understanding is training around -- I just don't want to use, like, legal-technical terms, like public accommodation, for

Page 33

lack of a better term --

A. Correct.

Q. -- to make sure things are accessible?

A. Correct.

Q. Okay. So any other -- you're saying you don't recall the training at Centura, but did you have any role in accommodating employees when you were at Centura as a group VP?

A. I -- no.

Q. Did anyone ever ask you -- did any employee or contracted physician ever ask you for an accommodation --

A. No.

Q. -- when you were -- sorry. Let me just finish the question.

A. Oh. Sorry.

Q. I'm going to be worse than you on this, just trust me. I always talk over people.

But -- so did any employee, when you were working at Centura as a group VP, ask you for an accommodation.

A. Not that I recall.

Q. How about when you were the director between 2016 and 2018, do you recall any employee asking you for an accommodation?



Page 34

A.  I do not recall.

Q.  You don't recall one asking you for accommodation?

A.  Correct.

Q.  How about when you were group manager, do you recall any employee talking to you about the need for accommodation?

A.  I did not manage any employees as group manager.

Q.  That is true.  I did ask you that, and I'm sorry.

So -- and then to clarify the record, when you were group VP you do not recall anyone speaking with you about the need for accommodation?

A.  Correct.

Q.  Okay.  Do you know what Centura's medical leave policy was when you were the group VP?

A.  I don't recall.

Q.  If you saw it, would you recognize it?  Do you know?  Not sure?

A.  Not sure.

Q.  Okay.  Let me -- did you ever take a medical leave while you were at Centura?

A.  No.

Q.  Okay.  How did you know where -- how did

Page 35

you access personnel policies when you were at Centura as the group VP?

A.  There was a centralized data base of policies for the organization.

Q.  Okay.  If I put something in the chat, can everyone download it?  This has been previously introduced, and I'm just trying to figure out a convenient way to share documents.

(Deposition Exhibit 12 was referenced.)

Q.  (BY MS. HALPERN)  Everyone see that in the chat?  You're making a funny face, Mr. Weller.

A.  Sorry.  Yeah, I -- it's asking me -- yeah, to download.

Q.  I can also email if it is necessary, if that's easier.

A.  I'm wondering -- I have it.

Q.  If you click on it, it should just open up.

A.  Yep.  I got it.  It was asking -- it said it previously existed, and I don't -- it was a weird comment from my computer.  So I apologize.

Q.  That's okay.

All right.  Mr. Weller, I have -- I have just sent you what has been previously introduced as Exhibit 12 in these depositions.  If you would flip to

Page 36

the second page of Exhibit 12, let me know if you've ever seen this before.

A.  No, I have not seen this.

Q.  If you take a second to skim it, do you know if that was the medical leave policy in place when you were at Centura as the VP?

A.  I -- I can't confirm outside of the letterhead and the date.

Q.  Okay.  So is it safe to say that you just weren't familiar with the medical leave policies when you were the group VP at Centura?

MR. SABEY:  Object to the form.

Q.  (BY MS. HALPERN)  Does looking at Exhibit 12, the second page, refresh your recollection at all, Mr. Weller?

A.  This was a medical staff document from the medical staff president.

Q.  Okay.  Could you explain that further?

A.  That --

Q.  What do you mean by that?

A.  This was a -- from what I see, this is coming from the medical staff as -- and from the medical staff president, for which I was not part of the medical staff.

Q.  Okay.  Well, what -- I guess my question

Page 37

was:  Do you know if that was the medical leave policy in place at Centura when you were the VP?

A.  I cannot confirm that.

Q.  Okay.  Do you have any independent recollection of what the medical leave policies were when you were the VP at Centura?

A.  I do not.

Q.  And seeing Exhibit 12, page 2, doesn't refresh your recollection at all?

A.  I've never seen this document from the medical staff.

Q.  But the content of it, do you know if that comports to what your understanding was of the request for medical leave process?  Or you just do not have any idea?

A.  I'm not familiar with it.

Q.  Okay.  Did you have any familiarity at all with the medical leave policies at Centura when you were the VP?

A.  For the medical staff, no.

Q.  And who is included in the medical staff?

A.  All employed and independent physicians that contract and apply for privileges at any specific hospital.

Q.  Okay.  Did you have a different set of



Page 38

personnel policies that maybe apply to you? I'm just wondering.

A. Centura Health employees would -- and for which I would review for the direct reports that reported to me had -- we had separate leave or HR bylaws and documents. This is a -- I would assume -- this is a medical staff as is stated there, and I am not familiar with it.

Q. Okay. And for your team, was anyone medical staff? What were you considered when --

A. No.

Q. -- there were 13 people that worked for you, I think you said it was, that were you direct reports?

A. Correct.

Q. So you just had a different set of policies that applied to all of you?

A. Correct.

Q. Okay. I'm going to ask you a little bit about any information you have about kind of the corporate structure at Centura when you were there as a VP in 2022.

Do you know what relationship Centura had to CommonSpirit?

A. I -- I'm not aware of a relationship with

Page 39

CommonSpirit with Centura.

Q. Okay. What about Catholic Health Initiatives of Colorado?

A. Catholic Health Initiatives of Colorado and Advent Health were the sponsors of the organization.

Q. By "the organization, who do you mean?

A. Centura. Excuse me.

Q. Okay. And do you know what the relationship with each other was?

A. I do not.

Q. And did you work with both -- both Catholic Health Initiatives of Colorado facilities and Advent Health facilities?

A. No. I worked within Catholic Health Initiatives Colorado facilities.

Q. Okay. So when you said you were the VP of Colorado, and I think it was Western Kansas; right?

A. Correct.

Q. Was that just Colorado Health Initiatives of Colorado facilities?

A. Yes.

Q. And at Centura, was there different managers responsible for Advent Health facilities?

A. Yes.

Page 40

Q. And did they have, like, similar titles or positions as you, but they were just kind of delegated to oversee that part of the operations?

A. Correct.

Q. Okay. So there was kind of like two similar board charts, but just over --

A. The two operating groups within that system, the Greater Colorado/Kansas operating group and the Denver operating group.

Q. Do you know why that was? Do you have any idea?

A. Primarily geography and management and the scope of management of a large organization.

Q. Okay. And do you -- you said there was an organizational restructuring and that's why you did not interview and left to become CEO in Reno, Nevada; is that right?

A. Correct.

Q. Can you tell me about that organization restructuring a little bit?

A. Within the organization for which I was employed, they were consolidating roles and responsibilities to where it would move that VP position to oversee and narrow the scope for which -- scope of responsibility.

Page 41

And based on my career and interests and growth, I did not want to pursue a narrowed-scope role to where I decided to leave the organization.

Q. Were you provided any explanation about that consolidation of responsibilities was taking place?

A. No.

Q. What else do you know about the restructuring? Did you have any conversations with anyone about why the restructuring was happening?

A. I was not privy to those conversations.

Q. Was any information shared with you about the separating of Advent Health and CHIC into two distinct -- I don't know what else to call it -- organizations?

A. I was not aware of it.

Q. Did you leave before -- before the separation took place?

A. Yes.

Q. Okay. What did you refer to that as? How would you refer to that separation?

A. I mean, the -- to probably just use the separation term, I don't know. Yeah.

Q. Okay. And do you have any kind of knowledge of what CommonSpirit's operations after that

11 (Pages 38 to 41)



Page 42

point in time?

A. No.

Q. I don't know if you ever, like, go to conferences or share industry internal use. Is there anything that described or discussed the -- it's hard for me to talk about mergers and stuff like that -- the advent of CommonSpirit as kind of the public face of the chain of hospitals?

A. Nothing substantive. I sat in on one conference lecture from Lassiter Wright, who is the CEO of CommonSpirit, discussing his vision of CommonSpirit.

Q. Okay. And do you have any understanding of the relationship between Catholic Health Initiatives of Colorado and CommonSpirit?

A. No. I'm not privy to that.

Q. Okay. With what was -- what was CHIC's -- when I refer to CHIC, do you know who I'm talking about?

A. Yes.

Q. Do you have an understanding of what their relationship was to Penrose when you were working there as the VP?

A. I do not know the overall business arrangement of CHIC and the hospitals.

Page 43

Q. Okay.

A. I do know that it was considered a Catholic organization. Under that umbrella, I do not know the terms of that arrangement and the structure of it.

Q. Okay. Since you kind of overlooked the whole region, was there any difference in how Catholic Health Initiatives of Colorado worked with Penrose versus other hospitals under its purview?

A. Not that I'm aware of, any differences.

Q. Okay. Could you explain to me kind of that organization structure between hospitals and Catholic Health Initiatives of Colorado and Centura, if you know?

A. I cannot speak to Catholic Health Initiatives oversight. I can speak to the Centura structure and organization as mentioned.

Q. Okay.

A. Two operating groups that would oversee the day-to-day management of those particular hospitals under that purview.

Q. Okay. And do you know anything about, like, the financial arrangement between Catholic Health Initiatives of Colorado and Centura?

A. No.

Page 44

Q. And you were -- your paycheck was issued by Centura?

A. Correct.

Q. Did you have kind of a centralized human resources that you contact for pay or benefits? A centralized portal? How did that work?

A. Yes. Centralized --

Q. Okay.

A. -- for Centura.

Q. And where was that located?

A. At the corporate headquarters in Denver.

Q. Okay. Do you know what happened with Centura once the separation between Advent Health and Catholic Health Initiatives of Colorado took place?

A. I'm not privy to that. I was no longer with the organization.

MS. HALPERN: Okay. And when you were -- I'm going to go back a little bit and jump around unless you need a break.

I was going to ask you a little bit more about some of the, like, the compensation analysis that had to do with contract and analysis.

Do you need a break or are you good to go?

THE DEPONENT: Maybe five minutes and

Page 45

then we can take a break.

MS. HALPERN: Okay. All right. We'll come back.

(Recess taken, 11:02 a.m. to 11:11 a.m.)

Q. (BY MS. HALPERN) Okay. I'm going to ask you stuff that is going to be easier for you to explain, but very difficult for me to talk about. So if I word things backwardly, I'm not an expert in physician compensation --

A. Okay.

Q. -- but I will do my best.

So I want to share with you what has now, I believe, is going to be designated as Exhibit 80.

(Deposition Exhibit 80 was marked.)

Q. (BY MS. HALPERN) I'm going to put it in the chat again. Do you see that, Mr. Weller?

A. Yeah. I'm pulling -- okay. Got it.

Q. Mr. Weller, we are providing you with what is going to be designated as Exhibit 80. Have you -- you've opened up Exhibit 80 on your computer. Have you seen exhibit 80 before?

A. Yes, but it's been a while.

Q. Okay. I just -- I want to ask you, what is Exhibit 80?



Page 46

A. Is Centura Health Physician Group compensation plan for the medical group, the employee medical group of Centura.

Q. Did you refer to or use Exhibit 80 when you were the group VP at Centura?

A. Yes.

Q. Okay. This is where it is going to start getting awkward.

So what exactly -- how exactly did you use this physician compensation plan that was in -- that is found in Exhibit 80?

A. This gave us guardrails for which we would structure and have consistency around our compensation models for physician groups.

Again, the idea and the intent was to create fairness and equitability among physicians across our organization. This document and, ultimately, our policy around compensation was to create consistency.

Q. Okay. And was this enforced when you were -- in 2021 and 2022 when you were the group VP at Centura?

A. This was developed and implemented during that period of time.

Q. And do you know who developed or

Page 47

implemented the -- what did you call this? Guidelines?

A. Yeah. Yeah, that's fair. It was the Centura Health Physician Group executive leadership team.

Q. Were you part of that executive leadership team?

A. I was -- kind of hard to explain, so I share your awkwardness of this. I did not have direct oversight of day-to-day operations of the Centura Health Physician Group, but I participated in the physician enterprise leadership team.

Q. Okay.

A. Yeah.

Q. This would be analysis on making sure that the contracts that you were reviewing complied with Stark or Kickback laws. What role do the guidelines in Exhibit 80 -- what role do they play, if any?

A. Roles of the -- of these guidelines allowed us to have guardrails and protections in place to be able to set compensation in an appropriate way to abide by that, the rules and regulations.

Q. Did you ever refer to Exhibit 80, the guidelines in Exhibit 80?

Page 48

A. Portions of it, yes.

Q. So is Exhibit 80, like, a document you referred to? Or is it, like, a PowerPoint that you had training on?

A. Both. And the reason I say that is obviously it's a large document; right? This was provided to appropriate folks within the medical group. Ultimately portions of it were provided to educate physicians on how their compensation model is structured to where we would set compensation guardrails based on the model and be able to use this material to educate them on how and why their compensation is derived in the way that it was on their monthly and biweekly paychecks.

Q. Okay. And is that the case for both contract physicians and employee, like, in-house physicians?

A. This would be strictly for employed physicians for -- within the Centura Health Physician Group.

Q. Okay. So just direct hires?

A. Correct.

Q. Okay. I guess that leaves two questions, which aren't terribly related.

So how would the guidelines differ for

Page 49

contracting physicians than what is in Exhibit 80 for kind of in-house employee physicians?

A. For external contracts that we were developing, we would look to create consistency around the type of contract that we're executing.

And by specialty, we would typically work with an outside agency or consulting group to identify what market trends are, what market compensation rates are, and fair market value for the service that the independent physician group was rendering.

Q. So it really depended on, like, the type of medicine they practiced?

A. Correct.

Q. Okay. And second question. On page 2 of Exhibit 80. So that would also be, if you look in the right-hand bottom corner, there is numbers there.

A. Yep.

Q. PSF Peddada 0164.

A. 64?

Q. Yes. Do you see on the bottom 0164?

A. Yes, now I see it. It has page 1 on my document.

Q. Yes. I apologize.

The very beginning of Exhibit 80 indicates that there was a change in how Centura was

13 (Pages 46 to 49)


MAGNA
LEGAL SERVICES

Page 50

analyzing compensation, if I'm reading that correctly. Could you shed any light on that change?

A. Sorry. I -- can you be more specific on which section you're referencing?

Q. Right at the top, it says: "Introduction: A: Rational for change. In an effort..."

And in the first paragraph it says: "In an effort to develop a compensation plan that supports a high-performance physician enterprise, Centura Health Physician Group, CHPG, leadership is exploring alternative compensation models."

Do you have any insight on what that change was and why it took place?

A. The change in developing this document in our overall compensation philosophy as an organization was to create fair and consistency around our -- at the time -- 18 hospital markets to ensure that, again, equitable and fair compensation was occurring based on the services rendered by our employed physicians within the medical group.

There are -- as you can see in the document, there are a variety of models for -- and not specific to a specialty -- but the intent was to apply that particular specialty based on the model to

Page 51

provide equitable compensation for that service.

So, as an example, if a high-producing and high-income individual and we were to say "Hey, you're actually going to be compensated that this," but it's not actually recognized as what they're actually performing, would be inequitable and unfair.

Vice versa, if we're paying someone above market in what they're actually providing service-wise, it would be inequitable and unfair to someone else.

So the intent was to create consistency, be able to apply a consistency and adaptability for the markets and the specialty for which we're providing so there is consistency around communication, education, and ultimately understanding of our physicians and how they are compensated.

Q. And how did that differ from the preceding model, though?

A. I can't recall a preceding model, per se.

Q. Okay.

A. As I believe there were many, many types of compensation models throughout the organization, and this is intended to bring into one consistent model for the organization.

Page 52

Q. Okay. Okay. So this was -- what we're looking at in Exhibit 80 is when they first standardized it, you said, across 18, I believe, hospitals?

A. It has been up and down, so at the time I believe there was around 18 hospitals, but there was acquisitions at the time. So I say 18, but it's approximately that throughout the organization.

Q. And after implementation of Exhibit 80, were there any other guidelines you relied on? Or was it just this? Or were there other guidelines as well?

A. For our employed physician group, we relied --

Q. For the employee physician group -- sorry.

A. For the employee physician group, we relied heavily on our -- to have consistency with this employed framework -- or employee compensation framework.

Q. But you weren't referencing anything else other than this Exhibit 80 as it was implemented?

A. Not that I recall.

Q. Okay. And you said it was to ensure that there wasn't kind of underpayment or overpayment of in-house physicians for purposes of just creating

Page 53

equitable circumstances; right?

A. Correct.

Q. Were there any ramifications for, like, underpaying a physician legally?

A. I can't recall any -- anything specific ramifications. The intent was to never undercompensate or overcompensate. The intent was to have fair competition across the board.

Q. Okay. And same question for overcompensation. What were kind of the ramifications other than just equity if a physician was overcompensated compared to his peers?

A. I'm not privy to any ramifications for which that happened within the organization. Again, our intent has always -- was always to create consistency around how we compensated and having and ensuring fair market value. Documentation was outlined in supporting the model for which we were contracting.

Q. Okay. And how -- do you know who provided input into these guidelines in Exhibit 80? I think you vaguely talked bought this executive group, but do you know who?

A. The structure within the organization was a CEO of the medical group, CFO of the medical group,

14 (Pages 50 to 53)

MAGNA
LEGAL SERVICES

Page 54

several VPs within the medical group. Again, compliance, those were all the -- obviously a group president of the physician enterprise.

But who I directly reported to, as I outlined earlier -- and ulti- -- ultimately approved by the collaborative, which was the senior executives of Centura Health.

Q. Okay. And the guidelines in Exhibit 80, how exactly, if at all, do -- do they interact with kind of your -- your training on Stark or Antikickback laws? Do they incorporate that in there or no?

A. Sorry. Can you repeat that a little bit?

Q. Yeah. This is where it is going to get hard for me. Well, let me try to break that down differently.

So the guidelines here in Exhibit 80 that we looked for compensation, and we were talking about undercompensating and overcompensating physicians.

Do you recall that?

A. Yep.

Q. So what are the legal -- are there any legal ramifications that you're aware of for undercompensating an in-house, you know, physician? Are there any legal ramifications for that?

MR. SABEY: Object to foundation.

Page 55

Q. (BY MS. HALPERN) That you're aware of?

A. I'm not aware of any, as I stated earlier.

Q. And kind of same question for overcompensation, and I'm just trying to see if there is any overlap with what you know about Stark or Kickback?

A. As stated, we developed this to ensure that we were staying within the parameters of Stark and Antikickback to have fair market value support of our compensation models across the board.

Q. But what are the potential ramifications if a physician is not -- is overpaid at market? What were the ramifications? Because it sounds like you implemented Exhibit 80 to standardize things, but what were the potential ramifications if an in-house physician was being paid above what you've analyzed as market value?

MR. SABEY: Object to foundation.

THE REPORTER: I'm not sure if Mr. Weller is frozen on my end.

THE DEPONENT: Oh. I'm sorry.

THE REPORTER: I'm sorry.

THE DEPONENT: No, you are good.

A. The Stark and Antikickback rules are

Page 56

established for when there is variation of compensation standards above and paid for above.

Again, I mean, what I know is outlined there. That we developed that plan to ensure and that everything was supported by fair market value for all of our compensation structures within our employed medical group.

Q. Okay. Prior to that point of the implementation of Exhibit 80, did you ever have a compliance issue with Stark or Kickback laws while you were at Centura?

A. I'm not aware.

Q. You're not aware of any?

A. I'm not aware.

Q. How about after implementing this physician compensation plan on Exhibit 08, was anything ever raised to your attention in terms of violation of those laws or potential violation?

A. I'm not aware of any.

Q. Looking at this compensation guide is like reading another language to me, so I may not ask you too many more questions about it.

I mean, I'm understanding the overall structures that you're -- the compensation is being laid out by the type of difficulty; right? The

Page 57

different compensation models? Let me rephrase this.

You know, how -- how did -- how did you employ these guidelines when you were trying to figure out a contract for a physician who was in-house who was an employee? Is it identifying, like, the -- it's not identifying it 100 percent based on the type of work they're doing, so what exactly is it oriented on?

A. There is -- as you can see, there is model types on page 4. The different models basically outline what they're intended to do and service within the different markets of the health system.

So, again, the intent was to have a framework and an outline of where we would apply these models based on specialty type as outlined in that overview of --

Q. And you are referring to the primary care model, high-volume, high-risk model, low-volume, low-risk model and capacity model?

A. Correct.

Q. So there were four primary models?

A. Correct.

Q. Okay. Continue. Sorry. I was just getting some clarification.

So you are talking about these models depending on what the physician -- the type of work

15 (Pages 54 to 57)



Page 58

the physician did?

A. Correct. And the -- correct.

Q. Okay. Can you explain RVUs to me?

A. wRVU is --

Q. wRVUs?

A. Yeah. wRVU is Work Relative Value Unit for which it is basically a score for the amount of work performed by a given physician with an interaction with a patient.

Q. And how is the wRVU calculated? Where -- where is the -- where is the calculations coming from?

A. The calculation -- I don't know how wRVUs are fully calculated by specialty, by care type. They are -- wRVUs is an industry-wide model used in all physician practices to measure the overall amount of service that they're providing in their practice.

Q. Yeah. My understanding is that it is supposed to measure productivity. Is it coming from reimbursement rates, is it coming from -- how is it measuring productivity, if you know?

A. Basically, again, based on the specialty and based on the type of documentation and service provided by the physician to the patient, that score or the value -- the unit, it has a specific value,

Page 59

again, based on the documentation provided, that ulti- --

Q. Documentation provided of what?

A. From the physician on what care was provided to the patient.

Q. Okay.

A. Ultimately that interaction or visit or procedure or whatever, again, was the interaction between a physician and a patient, would be given that value and ultimately can establish benchmarking of the productivity of the physician.

So, again, they see more patients with more complexity of the patient, typically a higher wRVU, versus a physician that does not see very many patients and/or very low acuity of patients, ultimately a very low productivity.

Q. Okay. So the more wRVU units typically means the more productive physician?

A. Correct.

Q. Does it also can correlate with how much, like, financial gain the hospital obtains based on those services?

A. The wRVU only speaks to the productivity of the physician and what the services rendered between the physician and the patient.

Page 60

Q. Okay. Does that correlate typically, though, with how much, you know, how many -- how much financial benefit they bring to the hospital?

A. It's not correlated to payment to the hospital.

Q. Okay. So does payment to the hospital have anything to do with wRVUs?

A. wRVUs are specific to the interaction of the patient and the physician and the encounter.

Q. Okay. So why is productivity measured? Why doesn't Centura measure productivity then?

A. That is a standard practice among all physician practices both independent and employed physicians across the country.

Q. Okay. Other than the relationship between the doctor and the services that he is performing for patients, does wRVU calculate in any other way in the -- the -- is it considered -- did Centura consider wRVUs in any other way other than determining compensation? Did they ever discuss it in any other capacity?

A. wRVUs -- no. It is specific to productivity of a physician and a benchmarking tool used for compensation models.

Q. Okay. And you're not familiar personally

Page 61

with how wRVUs are calculated across the industry? You don't know what information is inputted into it other than if it is more complex or more patients?

A. Correct. I mean, it is such a complex equation that I can't speak to the details of that.

Q. Okay. Do you know where that information might be?

A. Centers of Medicare and Medicaid.

Q. Okay. So do you have any understanding between the relationship for Medicare and Medicaid and their role in determining the values of wRVUs?

A. I do not.

Q. It does come from some sort of calculation by the Center for Medicare and Medicaid?

A. Correct. I believe so, to be honest. I'm not intimately aware of all the processes that go into it.

Q. Okay. But that's your understanding. Okay.

Flipping through this a little bit. So when you implemented Exhibit 80 when you were at Centura, did that impact any currently employed physicians' salaries? Was there, like, an adjustment that was done?

A. Each individual physician was calculated,

16 (Pages 58 to 61)



Page 62

identified which model they would be moved to, and ultimately their compensation structure going forward. I can't speak to which or how many physicians compensation structures were adjusted or effects on their overall compensation, but ultimately every physician that I'm aware of was moved to one of these types of models.

Q. Okay. And did you have to then reissue, like, contracts?

A. I can't remember.

Q. Do you recall if you had to kind of revise anyone's contracts or issue contracts for adjustments?

A. What I can speak to is we adjusted the template framework over our employed physician contracts to point to this compensation model.

Q. Okay. If I have any other questions about Exhibit 80, I will ask you. It was helpful to understand what this was.

I'm going to flip around now. We may revisit the compensation issue afterwards, but let me ask a couple of final questions.

When you were the group VP at Centura in 2018 and 2022, what other organizations were providing similar services in the Colorado Springs area?

Page 63

A. Sorry. I apologize. Can you repeat that question one more time?

Q. Yeah. Are there other large hospital chains in the Colorado Springs area?

A. University of Colorado Health System.

Q. Okay. They have facilities in Colorado Springs?

A. Yes.

Q. Do you know if their pay structures were at all different? Do you have any of that information?

A. I'm not familiar with any of their compensation models.

Q. Okay. Does each -- is there a different compensation model where you work now in Reno?

A. Yes.

Q. What is the compensation -- what's the compensation guidelines that you are working currently with in Reno for Renown Health?

A. We use similar benchmarking using fair market value tools to establish compensation models by specialty with using wRVU as a framework for productivity of the physician.

Q. So it is fairly similar? Do you have a standardized kind of set of guidelines too for Renown?

Page 64

A. I'm not as familiar with our processes as I don't work within the medical group of the organization.

Q. So because you are CEO, you don't have that role anymore?

A. I am CEO of the hospital, not medical group.

Q. I meant CEO of the hospital, sorry.

A. Correct.

Q. Do you know if Centura hired kind of -- how did they get the data for their -- for the guidelines? Did they do any sort of outside research? Did they hire somebody to do research on markets?

A. They -- typically, there are several large firms that analyze compensation benchmarks and ultimately a survey of, again, where compensation is across the industry by specialty. Ultimately, we utilized a -- a blended model of support between three different surveys.

MGMA -- please don't ask me what the acronyms are. MGMA, AGMA, and SullivanCotter as three survey companies that, again, assess industry compensations by specialty and give us that framework for fair market value analysis.

Q. Okay. I'm going to change topics a

Page 65

little bit, but I'm sure some of this more technical stuff will probably come up again.

But in your time at Centura when you were the group VP, did you know Dr. Anuj Peddada?

A. Yes.

Q. How did you know him?

A. As the group VP of the physician alignment for Centura and my interactions with his contract with the health system.

Q. How often did you interact with Dr. Peddada when you were the group VP?

A. Every few months.

Q. And in what capacity? How did you interact with him every few months when you were the group VP?

A. Typically discussing the vision of radiation oncology for the market, discussing what services they're providing, and how -- and ultimately, if contracts and/or additional services needed to be rendered, how would we structure that to provide the service.

Q. And how long did you -- or how many years did you interact with Dr. Peddada in that way?

A. I was in the role for five years -- four years, excuse me, four years.

17 (Pages 62 to 65)



Page 66

Q. So it overlapped with the -- when you were the director -- no, the group VP. Did you interact with Dr. Peddada prior to 2018?

A. No.

Q. And did you ever have an opportunity to personally observe Dr. Peddada's work?

A. I did not oversee his practice.

Q. Okay. Did you hear anything about Dr. Peddada's work performance?

A. I mean, we talked -- we spoke about the overall practice and the service that they were providing for the oncology program, we would speak about it in that detail.

Q. And what services did Dr. Peddada provide? What services did Dr. Peddada provide that you discussed?

A. Radiation oncology.

Q. And were you -- did you have any role in kind of continuing the contract with ROPC?

A. In the sense that contracts would come through or -- the physician or -- physician alignment committee, I would be understanding and knowing of what the services were that were being rendered, what the compensation structure would be for that service, and ultimately interaction through the service line.

Page 67

Q. Okay. But did you have any other role other than that kind of compliance/contractor role that you're discussing? Did you ever have any conversations about whether services should be continued or not?

A. Sorry. Can you maybe rephrase? Services continued or not?

Q. Yeah. You know, if the contract should be considered -- should be continued with ROPC, did you ever weigh in on whether ROPC's services were needed anymore?

A. As discussed earlier, I -- we would talk about what was the makeup of the -- based on the specialty -- what was the makeup of the independent physicians within the market, if there was any employed physicians in the market, and ultimately what we need to do to stabilize the service in the market for our community.

Q. But do you recall having any discussion about, like, gap filling or whether it should go in house or not, et cetera, with respect specifically to ROPC or Dr. Peddada?

A. We initially spoke about adding a physician to his practice as the continued service was getting -- we were expanding radiation oncology within

Page 68

the market and ultimately needed additional support of radiation oncologists. And we discussed the recruitment assistance to bring in additional physician within the practice.

Q. Is there any reason you decided not to hire an in-house physician to do radiation oncology at that time?

A. At that time, it was decided by the group that we would support the group and bringing on a third physician.

Q. Okay. Why was Centura thinking about expanding its radiation oncology services?

A. Looking at the volume of one facility, the community in the area was growing more predominantly in the north market of Colorado Springs, to which we had a facility, St. Francis Hospital. And we were looking to expand radiation oncology to St. Francis Medical Center and ultimately, again, expanding the footprint of radiation oncology.

Q. Okay. I don't know if there is a slight misspeaking, but you had services at St. Francis or thinking about expanding them there?

A. We were looking to expand. At that time, recalling the conversations, we were expanding our services to St. Francis Medical Center.

Page 69

Q. And where was Centura providing services at that time before it expanded?

A. Penrose.

Q. And did you ever have any cause to discuss Dr. Anuj Peddada's actual performance as a radiation oncologist while you were VP at Centura?

A. Can you clarify "performance"?

Q. Productivity performance, complaints, just the whole package.

A. We spoke about the overall practice with regard to, again, the volumes within the practice and ultimately the need to expand our radiation oncology footprint, yes.

Q. Did you have any concerns with -- with Dr. Peddada's productivity?

A. Not that I recall.

Q. His capacity to do the work as Centura expanded?

A. No. Not that I recall.

Q. Did anyone raise any complaints to you at about Dr. Peddada while you were the Centura VP of physician alignment?

A. The -- the only expressed concern was the interactions between the two partners of ROPC and their willingness to work together on the go-forward.



Page 70

Q. Can you tell me about the conversations you had about that?

A. That -- I never -- I never had direct conversations with Dr. Peddada or Monroe about that. It was discussed that they would not meet with our team together, that they would not sit in the same room together, and ultimately how would you provide radiation oncology services in the same practice together.

So ultimately there was conversations with various individuals of the executive team with individual conversations of Dr. Peddada and his frustration and concerns with his partner.

Q. Okay. But did you talk to Dr. Peddada directly about those frustrations or concerns or you heard about them?

A. Heard about them.

Q. Okay. Did you hear about why there was a dispute between Dr. Peddada and Dr. Monroe?

A. No.

Q. So do you have any understanding today what the two of them were having a disagreement over?

A. No.

Q. And did you have any role in managing the decisions to bring Dr. Peddada and Dr. Monroe

Page 71

in-house?

A. Yes.

Q. Could you tell me about that role?

A. Again, through the conversations of the committee leadership teams that ultimately they were not willing to continue as partners within ROPC, and ultimately that they will look to dissemble the group and service the community as partners.

The decision and discussion was to employ them to avoid the partnership business arrangement and ultimately separate the two between the two facilities. The intent was to have Dr. Peddada at Penrose -- Penrose Hospital, and Dr. Monroe at St. Francis to separate them based on their interactions.

Q. Okay. Why did Centura decide to put Dr. Peddada at Penrose and Dr. Monroe at St. Francis?

A. Based on discussions with that committee based on their inputs of the physicians and their requests, ultimately the decision occurred that that's how we were going to separate them.

Q. What do you mean by, "based on their inputs"?

A. Base under their -- why they were bringing their -- their reasonings why -- they both

Page 72

wanted to be at Penrose Hospital.

So ultimately it was decided to -- based on their reasoning for being at Penrose, it was decided that Dr. Peddada would be placed at Penrose.

Q. What do you recall about those reasonings?

A. I can't recall those -- all of the reasonings. I can't recall.

Q. Do you recall any of the reasonings?

A. Not at this time.

Q. Do you recall any discussion about why Centura decided to place Dr. Peddada at Penrose and Dr. Monroe at St. Francis, notwithstanding that they both wanted to be at Penrose?

A. I know it was a group decision to decide to move Dr. Peddada -- or keep Dr. Peddada there and have Dr. Monroe at St. Francis.

Q. Were you part of that group decision?

A. Yes.

Q. And you recall nothing at all about why that decision was made?

A. I honestly can't recall.

Q. Anything?

(Simultaneous speakers.)

A. The biggest part of that conversation is

Page 73

that we had to separate them. They were not able to work in tandem at one location. I do recall Dr. Monroe being frustrated by that decision, but I don't recall all the reasonings that they brought forward why they should and should not.

Obviously, they advocated for themselves, but I don't remember the exact inputs of that.

Q. Do you remember generally what the inputs were even if you don't remember the exact inputs?

A. Just that they were both were strong physicians, that they are respected within the medical staff, and that they wanted to continue to do their work at Penrose as the longstanding facility, not the expanded new facility.

Q. And what would the -- what would the benefit be of practicing at Penrose as the longstanding facility verse St. Francis?

A. A new service, trying to bring -- startup a new service in a new community. Albeit it Colorado Springs is not large, but it also is 20 minutes apart from each other, so the concern is this is more of a startup than an established practice.

Q. And what would the impact of it being a startup be?

A. The operational processes, development of

19 (Pages 70 to 73)

MAGNA
LEGAL SERVICES

Page 74

new processes within the practice, new equipment, any concerns with just the overall bumps of starting up a new service.

Q. Would it -- do you understand if it might impact wRVUs?

A. Potentially. With not having -- knowing -- the patients not knowing where the practice is, the promotion of the practice, the referral patterns and all of that, that could affect ultimately the volume for which a physician would see in that practice.

Q. And who was part of the conversations with you about determining where Dr. Peddada would work versus Dr. Monroe?

A. There was a committee of the hospital executive team at Penrose Medical Group and ultimately the service line leaders.

Q. Do you recall any names?

A. Service line leaders being Eric Koval and Dr. Jeff. I can't recall his last name offhand.

Q. "Dr. Jeff," did you say?

A. Yeah.

Q. Okay. Anyone else you recall discussing the placements of Dr. Peddada and Dr. Monroe?

Page 75

A. Dr. Bill Plauth, CMO of the hospital, was part of those conversation as well.

Q. Okay. Anyone else that you recall?

A. Those are that I recall offhand.

Q. And what else do you recall about the -- I want to say "application process." Was there an open application process for the physicians at Penrose or St. Francis or was that fairly predetermined that Centura was going to hire Dr. Monroe and Dr. Peddada?

A. The -- the -- it was certain that we were going to move forward with Dr. Peddada and Dr. Monroe as the established physicians within the market. The third physician, there was concerns of her leaving the market, and ultimately we did not open up a third position until that occurred.

Q. Until that -- sorry. I just didn't hear you.

A. Until that occurred, Dr. Kathpal leaving the market.

Q. Did anyone raise any concerns while you were going through the transition of bringing Dr. Peddada or Dr. Monroe in house as employees? Did anyone raise any concerns working with them moving forward as in-house employees?

A. The only concerns raised were the

Page 76

interactions they had between the two of them.

Q. Any other concerns with Dr. Monroe and Dr. Peddada?

A. At that time of interaction and working on the contract, no.

Q. How about Dr. Monroe?

A. No.

Q. And you said there was a concern with Dr. Kathpal leaving the market. Can you tell me about that?

A. The feeling was that there needed to be three physicians in the market, and there was raised concerns that she did not want to stay within the practice and ultimately going to leave the community.

Q. And did you -- did Centura -- do you know if they posted a position for another -- for a third -- a third physician? Did they ever post that for radiation oncology?

A. They posted positions for radiation oncologist in the market.

Q. Was that before or after -- was that a third position or was that to replace Dr. Peddada?

A. I don't know.

Q. Okay. And what else do you remember about -- other than the dispute between the two of

Page 77

them -- about bringing Drs. Peddada and Monroe as in-house physicians?

A. Sorry. Someone -- I'm on my work computer. Someone pinged me right as you were asking me that question, so if you wouldn't mind rephrasing or --

Q. I just asked, other than the dispute between the two of them, what else do you recall about the process of bringing Drs. Peddada and Monroe in house, if anything?

A. That they were interested in employment at that time given the frustration with each other.

Q. And did you discuss compensation at all?

A. We outlined what the compensation terms would be in an employment structure.

Q. And by "we," who are you referring to?

A. Service line leaders that I referenced earlier.

Q. Okay. And what was your role in extending contracts for in-house employment to Drs. Peddada and Dr. -- to Drs. Peddada and Monroe?

A. I'm just going to rephrase to make sure I understand.

Q. Sure.

A. What was my role in extending the offers



Page 78

to them of employment; correct?

Q.   Yes.

A.   My role was establishing the fair market value compensation based on the structures, which we outlined earlier in that framework for radiation oncology.  Ultimately establishing, again, what the framework would look like and ultimately provided the overall structure and the process -- the paperwork and ultimately proposed to our physician alignment committee the need to employ radiation oncologists within the market, Colorado Springs, with the recommendation that we employ both Dr. Peddada and Monroe into those positions.

Q.   Okay.  And do you have any independent recollection of working on those contracts?

A.   Yeah.  I -- I do.  Again, working with both compliance and team and ultimately submitting the request through our centralized process for physician approvals.  Again, what I reference is the physician alignment committee.

I processed and submitted that "application" or submittal for that to start that comp -- or that employment contract process.

Q.   Okay.  I'm going to share with you what has been mark -- what will be designated as

Page 79

Exhibit 81, I believe.

(Deposition Exhibit 81 was marked.)

Q.   (BY MS. HALPERN)  Mr. Weller, can you please open what has been designated as Exhibit 81.

A.   Yes, I have it now.

Q.   Okay.  What is Exhibit 81, if you know?

A.   So I will reference page -- or 0109. This is the intake form, a central input of request for contract or position approval to what was considered a PAC, P-A-C, physician alignment committee for which I chaired.

Ultimately, obviously, my request or name being there, again, the operating group being the Greater Colorado and Kansas Operating Group and, ultimately, summary of request to employ both Dr. Monroe and Dr. Peddada.  This was the submittal to that -- for those physician approvals.

Q.   Is that the intake you were just referring to?

A.   Yes.

Q.   That's what I assumed, so I just want to make sure we're talking about what you had been referring to.

And do you -- I wanted to ask you to go to the first page of Exhibit 1, which is PSF Peddada

Page 80

0107.

A.   Yep.

Q.   Who is Stephanie Dalton?

A.   She was our contract -- well, title being contract -- physician contract coordinator.  Reference her as, again, that -- the part of the contract team that just processes these requests and keeps the -- I guess, the legal contracts in motion.

Q.   Okay.  And can you tell me who some of these other folks are that are CC'd to this?  Was any of these individuals the woman you were referring to at the beginning of the deposition that you couldn't remember her name, like, the head of compliance?

A.   No.  Caitlin Potter was the manager of the contract team, Juanita Dixon, Matthew Devine, I think they were all physician recruiters, which was part of the process.  They had to post the position for which the physician would then apply initially, and then we would provide them with an employment contract.

Q.   So no one on this email is part of the compliance group in Exhibit 81?

A.   No.  These were just to formally let them know these requests were coming.  Our intent was to allow for people to be informed of what the requests

Page 81

are and ultimately speed up the process other than people not being part of the know and what's happening.

Q.   And I want to ask you about this normal, urgent, critical on page 1 of Exhibit 81.  Do you know what your requests were coded as for Drs. Monroe and Peddada?

A.   Yeah.  I mean, let me -- can I just look at the intake form real quick?

Q.   Yeah.  Sure.

A.   So if you look at page 0110:  "Emergency Status Time Frame:  Urgent.  Less than two weeks to one month after approval date."

So the intent was to outline to the team of "Hey, normal, versus urgent, versus critical of -- to ensure that we can prioritize contracts on where they are in the process and how fast would we need them to ensure that we have coverage and services within our community.

Q.   Okay.  So were you the one that designated it as urgent --

A.   Correct.

Q.   -- in Exhibit 81?

A.   Sorry?

Q.   In Exhibit 81, were you the one who

21 (Pages 78 to 81)



Page 82

designated it as urgent?

A.  With input from others based on all the conversations we had, I submitted it as urgent.  Yes.

Q.  And why is that?

A.  That -- I can't recall all the details that went into that request of urgency versus time frames.  But from what you can tell from the document, that we needed to have contracts out to the groups within the month period.

Q.  And let me ask you to look at PSF Peddada 0109.

A.  0109?

Q.  Yeah.  It's the third page of Exhibit 81.

A.  Yep.

Q.  You say "Monroe, 81st percentile; Peddada 90th percentile.  What is that referring to?

A.  Based on their specialty, radiation oncology, based on their overall volume and complexity in the wRVUs produced by each of them, they're at the 81st percentile in overall productivity in the nation.

Q.  Monroe?  Dr. Monroe was?

A.  Correct.

Q.  And Dr. Peddada was at the 90th percentile?

A.  Correct.

Page 83

Q.  Would that somehow impact how you applied guidelines to them that we spoke about in Exhibit 80 in formulating compensation?

A.  Yeah.  That would indicate that these are highly productive physicians; therefore, that next sentence says:  "The physicians will go onto a high volume or updated compensation plan for radiation oncology."

High volume was one of the types of models that we had.

Q.  And how did you determine that Monroe was in the 81st percentile and Peddada was in the 90th percentile?  Is that for productivity?

A.  Correct.  So --

Q.  How did you determine that?

A.  Based on the wRVUs that the group provided to us of what they see in practice, we then look at those benchmarking tools that I referenced earlier of where the total wRVU on a year was landing with overall benchmark to the nation for radiation oncology.

Q.  How do you get that data about the nation?

A.  Through those --

Q.  Those three surveys?

Page 84

A.  Yes; correct.

Q.  Okay.  So that's for the whole county?  wRVUs for the whole country, averages?

A.  Yes.  I -- the only thing I would say is it might be reference to a certain region.  I can't tell you if -- I can't recall if it was national versus regional, but nonetheless it was a credible and statistical survey based on region or nation.

Q.  Okay.  And if you can scroll to PSF Peddada 0113.

A.  0113?

Q.  0113.  What does path to 300 physician, question mark, yes, mean?

A.  We, as a Centura Health, had an overall strategic plan to align and/or grow our aligned physicians throughout our system by 300 physicians, as a goal; right?  Ultimately ensuring that we can grow our aligned and partnered physician practices within our communities for our health system to keep care appropriately and easily within the overall market and health system.

Q.  So by "align," do you mean that applies to both in-house positions and contracted positions or just in-house positions?

A.  Both.

Page 85

Q.  Okay.  Both.  Now, ROPC had been working for, you know, kind of exclusively providing services for Centura for several decades before that.  So how did the hiring of Drs. Monroe and Peddada as direct employees, how did that count towards the path to 300 physicians?

A.  We had a definition of what was considered an aligned physician per se of certain metrics that would be considered as aligned.  And at that point by moving into an employment, that immediately brings you into truly aligned.

The services rendered would remain and stay within the community -- or stay within the health system --

Q.  Within Centura Health System?

A.  Within Centura Health System.  And ultimately the intent -- or reasoning for that is to ensure the services actually provided, that the patients have a continuity of care between primary care, specialty care, et cetera, for our community.

Q.  Okay.  And then if you could go to the last page of Exhibit 81.

A.  0114?

Q.  Yes.  0114.  Can you just walk me through what this means --



Page 86

A. Yeah.

Q. -- just line by line what you are referring to and what it means? Like, physician FTs, revenue, wRVUs, and then at the bottom it says EBITDA, et cetera. If you could walk through those so I understand what I'm looking at, that would be helpful.

A. Physician FT: Two full-time equivalents, two physicians.

Revenue: The total wRVUs produced or anticipated by those two FTE, 31,000 between the two of them.

The Net Present -- or Net Patient Service Revenue per wRVU would be $66 for which we would be reimbursed. So a total net -- net patient service revenue of $2,048,000.

Expenses: Physician productivity compensation. Between the two of them on that high model -- high compensation model would be 1.7 million.

Physician Sign On: Year one of 52,608; 5 percent of median total cash compensation 26,000.

Physician Benefits: We assumed always a 12 percent based on physician, so a total of $210,000 for anticipated costs of their benefits.

Staff Salaries: We already -- the salaries of the staff, supplies, rent already rolls up

Page 87

so it is nothing new and added to the cost of the organization.

Continuing Medical: Part of the benefits of being employed by the medical group is that we allow for continued educational education up to 3,000 per physician per year.

Purchase Services: I can't recall what was -- why the total amount of purchase service fees and such. But, again, just outlining -- basically trying to outline all the potential costs of employing a physician: Malpractice, billing and coding costs that we have to now bill and collect for these services within the medical costs.

IT costs; CHGO overhead; hospital managed. So this is a department of the hospital and managed by the hospital versus the medical group. But, again, how the health system functions, so the total cost was around 2.2 million.

With earnings before interest, tax, appreciation, amortization or EBITDA, would be a loss of $152,000 for this service.

Q. Okay. Are you comparing that to when they were contractors by bringing them in house? Is that where the loss for service -- is that what the -- that calculation is?

Page 88

A. Yeah. Basically, it's saying that now that we are bringing them into an employed structure with having both their salaries and benefits and all the costs associated with employment of a physician, based on the reimbursement that we will have -- we will lose for the professional services rendered, we will lose $152,000 for this service for radiation oncology.

Q. Okay. And so for this page in Exhibit 81 -- I just want to back up. Is everything here annual?

A. Correct.

Q. Was it anticipated to change beyond the first year?

A. Based on established run rate of existing physicians, likely not.

Q. What's a "run rate"?

A. Sorry. Run rate, meaning that they were existing physicians, so nothing should have changed year over year for the run rate of the year.

Whereas, if you're starting a new practice, you start it completely from scratch, you're going to probably improve volumes, improve reimbursements, improve that year over year with typically anticipated at three-year ramp up of the new

Page 89

practice.

Where this is employing existing physicians, established practice, and ultimately this is what we anticipated as the cost annually.

Q. Okay. And PSR was the total annual revenue their services were supposed to bring?

A. Correct. And that's Patient Service Revenue.

Q. Okay. And what's this cost: Center Mercy Durango Cancer Center?

A. We -- the only area within the organization that we built for radiation oncology was Mercy Durango Cancer Center. That was at one of our hospitals in Durango to where we reference that as what do we typically get reimbursed based on our rates within our health system per wRVU. So we would receive $66.04 per wRVU for all radiation oncology services.

Q. Okay. And then what does "Net New" mean next to expenses? Just because that's what we were talking about before that they were contractors and now you are bringing them in house?

A. Sorry. Which one are you asking about?

Q. Next to expenses (Net New).

A. Oh, yes. So Net New means these are all

23 (Pages 86 to 89)



Page 90

new expenses that we don't currently have within our run rate or our current cost structure.

So, again, we did not compensate the physicians. They billed separately. Physicians sign-on bonus was that first-year cost, obviously. And then physician benefits and all that ongoing.

So, again, those were all new costs that we anticipated with this employment of the physician.

Q. And the physician sign on for year one, that was kind of just for this first year, a sign on, like, bonus?

A. Yes. And that's typical to our -- that was typical to our compensation model.

Q. And what do the benefits include for the physician benefits?

A. The standard health medical. Kind of medical, dental, vision.

Q. Is there any -- is any -- 401 -- did Centura have a 401k?

A. Yes.

Q. Did it have a match?

A. Yeah. I can't tell you what it was.

Q. Okay. I was going to ask you if you recall what it was.

All right. So what happened after you

Page 91

submitted this application in Exhibit 81 for Dr. Monroe and Dr. Peddada?

A. The physician alignment committee would meet weekly and ultimately review the request. There was a presentation made to that committee based on who submitted it.

So I shared all the exact details that I just walked through with you of the why, what, and what it will look like going forward, and ultimately discuss, and ultimately approve or deny the request.

Q. Okay. And who is part of that committee to approve or deny the request?

A. There was myself. There was typically representation from the hospital executive teams. There was representation from the medical group. There was typically, again, the business unit leaders that -- that ultimately would represent and/or that would ultimately -- so Penrose, St. Francis, the medical group, myself, as trying to be the -- create consistency and ensure that we're staying with regard to fair market value process and review, they would have representation from the hospital, the medical group, and our health system leadership.

Q. Do you recall the conversation that you had with those individuals about either accepting or

Page 92

rejecting this proposal?

A. At the physician alignment committee?

Q. Yeah.

A. I can't recall the details or questions asked. I do recall that it was approved.

Q. Do you recall why it was approved?

A. Based on the need and the continued desire to further radiation oncology within the market, that we needed to have the high-functioning physicians within the community with Dr. Monroe and Dr. Peddada being established physicians there.

Q. Why did Centura want to expand its radiation oncology department?

A. Based on -- obviously, you can see based on Dr. Monroe and Dr. Peddada's overall productivity, high volume, and Colorado Springs at that time -- and I would assume that continues -- that high-population growth.

Again, the intent was to grow its footprint to St. Francis to meet that demand in the north of Colorado Springs as well.

Q. Would that change the NPSR number then if St. Francis expanded?

A. If there was new volume, yes.

Q. And why did -- why did Centura want to

Page 93

hire a third -- for the same reason, a third physician? Same reason, they wanted to expand radiation oncology?

A. Yeah.

Q. To increase volume?

A. Correct. Increase volume and ultimately ensure that Dr. Peddada and Dr. Monroe, obviously, as they established a third within their practice and came to us with a request to add a third, we wanted to maintain that growing footprint and working with them for coverage models.

Q. And you don't remember anything else about the conversation about accepting and rejected, just other than what you told me?

A. Other that it was approved. That we move forward with the contracting prowess.

Q. Okay. That we happened after that, after it was approved, what do you recall?

A. That we started moving down that process to where it went to contracting, to where it entered the legal queue to be able to be drafted, these employment agreements, and it be tailored to the radiation oncology need within the market.

Q. Okay. And more financial stuff and I'm going to -- I'm going to -- sorry.



Page 94

A. I'm good.

Q. Your depo is probably putting you to sleep here.

Can I show you what will be designated, I believe, as Exhibit 82. One minute.

(Deposition Exhibit 82 was marked.)

A. Yes, I have it.

Q. (BY MS. HALPERN) Mr. Weller, I just provided you a copy of what has been designated as Exhibit 82. Can you take a look at it and see if you've seen it before?

A. Yeah. It was emailed communication between myself and several others within Centura.

Q. Okay. And if you scroll to the last page of Exhibit 82, just to kind of frame it, is this -- in the last page and second to last page -- is this the process you were just referencing where you started, I guess, working on the contracts for Dr. Monroe and Dr. Peddada?

A. Can I read it over?

Q. Yep. Absolutely.

A. (Complied.) Can you repeat the question now that I --

Q. Yeah. You just said you guys -- sorry. You guys, that was informal.

Page 95

You just testified, I believe, that after submitting the application, the next step you recall is trying to put together the contracts for Dr. Monroe and Dr. Peddada?

A. Correct.

Q. Is this conversation in Exhibit 81 is this what you were referring to starting to put the process -- starting the process of drafting the contracts for Dr. Peddada and Dr. Monroe?

A. This was email communication between myself, Jeff Albert, Eric Koval discussing really where -- where is the contract? Obviously, physicians approved. Can we get this moving?

So as I stated in that -- that -- my email back to Jeff, "Yes." Basically we're working on it, but we need to include loan forgiveness, so we need to adjust and tailor this agreement to this particular situation and ultimately part of the drafting process, yes.

Q. Okay. And who is JB?

A. JB is part of the compliance team.

Q. Is this who you primarily worked with in terms of drafting the contracts for Drs. Monroe and Peddada at the compliance team?

A. I -- he was the compliance -- I don't

Page 96

remember his title, but ultimately, yes, that is who I worked with in compliance for this contract.

Q. Okay. Because you referenced, like, a woman at the beginning. I'm still trying to figure out if you remember her name.

A. No.

Q. It will come. I'm sure it will come.

But the -- I'm sorry. JB stands for John Byron? You can scroll up all the way to the first page of Exhibit 81 and see if that refreshes your recollection.

A. Yes, that's JB. That is short for John Byron. He always went by JB.

Q. Okay. JB. And he was in compliance?

A. Correct.

Q. Okay. And why were you discussing -- in Exhibit 81 at the bottom of it -- why were you discussing the contracts with Jeffery Albert and Eric Koval? Do they have some kind of role in the contracts?

A. They were the service line leaders in oncology. Jeff being, as stated there, enterprise medical director of radiation oncology; and Eric Koval, who was director of oncology at Penrose/St. Francis, if I recall.

Page 97

Q. And what deadline are you referring to or do you know what deadline he is -- Mr. Albert is referring to in his email at the bottom of Exhibit 81?

A. I don't recall specific deadline or timeline.

Q. Okay. Do you know what PSF stands for in that email?

A. Penrose/St. Francis.

Q. As a single entity. Can you explain that to me?

A. Yeah. Penrose Hospital and St. Francis Medical Center are two distinct facilities under the same tax ID.

Q. Okay.

A. But that's why sometimes referenced as Penrose/St. Francis Health Services, but they are distinct hospitals and separated by 20 minutes.

Q. And do you know why Mr. Albert was asking about just identifying, I guess, the facility as Penrose/St. Francis and what it has to do with payment?

A. Well, it's referenced, as you can see below: "If not, please specify Penrose for Dr. Peddada and St. Francis to Dr. Monroe."

What he was referencing was basically,



Page 98

can we singularize the contract Penrose/St. Francis to give us the flexibility.  But the decision was made: If we can't do that, let's just put Penrose for Dr. Peddada and Dr. Monroe for St. Francis as decided and discussed earlier.

Q.  Okay.  And then we were referencing on the third page of Exhibit 82, you said:  "We're waiting on a response from JB at this point."

What is that referring to?

A.  I don't -- I don't recall.  Yeah.  I mean, it's in reference to loan forgiveness and outlining those terms, but I don't recall what was going on at that time.

Q.  Just maybe if you read the -- both sentences together and see if it doesn't refresh your recollection.

It says:  "Yes.  The only issue is that it would not include anything regarding the loan forgiveness if we are able to do so.  Waiting on response from JB at this point."

Did you ask to be able to forward the employment contracts without the loan forgiveness?

A.  Yeah.  As just stated there, "Can we get that process going in draft?"

I said, "Yes, but it will not include

Page 99

anything regarding the loan forgiveness," which we had to imbed as considered compensation.

So what we were waiting on a response from JB with that outline of loan forgiveness and the structure of it.

Q.  Okay.  Did you get an email from JB at all referencing this issue about moving forward with not including anything regarding the loan forgiveness if we were able to do so?

A.  I can't recall all my emails.

Q.  Okay.  Do you recall having a conversation with JB about that?

A.  That we discussed including and outlining the terms for the loan forgiveness for Dr. Kathpal into both Dr. Peddada and Dr. Monroe's contracts, yes. We had to consider that as overall compensation to the physicians.

Q.  And when did you have that conversation? Do you recall if it was now or at a later point on March 11th?

A.  Within the overall processing, I don't recall the date.  I know that that was discussed.

Q.  But you don't recall when?

A.  No.

Q.  Okay.  And if you move up to the message

Page 100

above, so page 3 of Exhibit 81, PSF Peddada 0117.

Q.  Do you recall -- because I asked you this earlier -- but reading this email, do you recall why Centura wanted to move quickly in forwarding the employment contracts to Dr. Monroe and Dr. Peddada?

A.  Sorry.  I got distracted trying to look for the number.  What number again?

Q.  It's the third page, it's 0117.

A.  Okay.  What --

Q.  It's what we were just looking at.

A.  What I recall is that them as partners was starting to deteriorate pretty quickly.  And now that I remember, the PSA or the contract for which we had with them was -- I think that was the deadline for which was outlined by Jeff -- ultimately was coming up and the deterioration of the partnership, we said "We need to get this moving."

That's why Jeff had said "Can we draft it up now and add that later?"

We have done that several times where a physician can review a contract to understand the general terms of an employment contract with outlining that we would be adding an addendum later.

Q.  Okay.  And do you recall that the PSA was extended by a month?  Do you recall that?

Page 101

A.  I can't recall whether it was extended or not.  I know that was a request to do so.

Q.  Uh-huh.  And are you aware of any ramifications that would have harmed Centura in any way if the PSA was just extended again for another month after that?

A.  I can't recall.

Q.  I mean, are you aware of any ramifications that would have occurred if the PSA was just extended further?

A.  Not that I recall.

Q.  Okay.  And then I'm going to ask you about these numbers because I don't know what I'm looking at.

A.  Yeah.

Q.  So if you look at page 2 of Exhibit 82, PSF Peddada 0116.  Could you walk me through these charts that you provided to John, JB?

A.  These charts were provided from him to me.

Q.  Okay.

A.  The first part isn't -- we're talking about section 2 of that radiation oncology.

But basically JB's response was:  "Yes. Okay to add five-year, $100,000 forgivable loan to

26 (Pages 98 to 101)



Page 102

ensure that we have fair market value perspective and stay within those guardrails."

The "Analysis Done" is basically a --

Q. I'm sorry. I feel really bad. Could you just tell me where you're --

A. In the red Number 1, right at the bottom of 0115.

Q. Okay.

A. So based on the need to ensure that we outlined the -- the loan forgiveness, we had to outline that that is -- and within fair market value -- to be able to imbed that, which he stated that yes, based on fair market value, we can do that, and ultimately imbedded that within the -- the compensation model.

So the modeling in Number 2 with the blue line oncology compensation modeling specific to Dr. Peddada and obviously Dr. Monroe, below, as we said: "You're salary guarantee,' ultimately base salary, 'would be 531,911."

This is under the column of year one.

Estimated wRVUs, again, we -- based on where we were today, what we -- we typically do a ramp up and conservative ramp up when we said "Okay. let's -- let's put some conservative nature on this."

Page 103

Where the threshold is basically saying is once you go over you salary guarantee how much we would pay for wRVUs above that threshold, so you can see that instead of wRVU -- or the threshold was 9,471; the incentive wRVUs was 4,700; add in incentive rate of $56 per wRVU. So total incentive compensation was $268,000 with a start bonus of 40,000.

And ultimately, recruitment -- liquidated Damages, I believe, is LD, of 100,000; and then total compensation being $940,000.

And then just outlines total guarantee comp, 571; clinical compensation, 940,000.

Q. Okay. That was helpful. Can you explain to me a little bit the difference between the numbers between Dr. Peddada and Dr. Monroe, why it says clinical comp is 940,000 for Dr. Peddada and 733,000 for Dr. Monroe?

A. Yep. So it is really in the incentive wRVUs. So you can see -- and if you recall the reference to 80th percentile versus 90th percentile per activity, Dr. Peddada did see and produce -- is more productive. And ultimately that -- the estimated wRVUs -- the threshold remains the same, but it's the incentive wRVUs that are less and paid out less.

So the incentive compensation is 61,000

Page 104

for Dr. Monroe versus $268,000 for Dr. Peddada. And ultimately that guaranteed comp is identical, inclusive of the start bonus. And then ultimately the clinical compensation was based on the services performed, and it was based on that -- the difference is truly the incentive wRVU above the threshold.

Q. And would the wRVU incentive threshold -- the estimated -- sorry. The estimated wRVUs, it was estimated that Dr. Peddada over the next five years would be, I guess, earning, for lack of a better term, more wRVUs each year?

A. Yeah. Term of "producing." Yes.

Q. Producing. Thank you.

A. Producing more wRVUs per year than Dr. Monroe.

Q. Okay. And then for Number 2 above in red, you're kind of -- I think JB is explaining information to you or what his assumptions are; is that right?

A. Correct.

Q. So he says: "I ramped him up at 80 percent in year one; 90 percent in year two; and 100 percent in year three."

Is that what you were referring to earlier that you thought that, like, I guess, for it

Page 105

to come to full fruition -- like a doctor's full level of productivity usually takes about three years?

A. Yeah. And although albeit an established practice, we still took a conservative measure and a discount off the current, what I call run rate. Again, the typical trend.

So that's where in year three you will see an additive of that 17,809. Dr. Peddada produced wRVUs at 13,205; where Dr. Monroe, that would sum up to that 31,000 in total and collected from the group.

Q. Okay. And do you know what the 100k forgivable loan from an F&V perspective, where the 100k came from?

A. That was for -- to ensure that that -- that since we had compensated the group with loan -- or recruitment assistance loan, that we would have to ensure that we are accounting for that non-payback of the group into their overall compensation.

So they are not giving us cash compensation back for the -- or the loan. They are not paying us back with direct dollars. That they would -- year over year on an amortized basis over the next five years, that they would be paying off with service into the community.

And we had to ensure that that was



MAGNA
LEGAL SERVICES

Page 106

accounted for as compensation and ultimately stated within fair market value.

Q. And it says: "Maybe instead you waive the repayment via addendum to the recruitment agreement with five-year obligation such that it wouldn't be considered compensation to the providers (would need check be legal HR) but just a thought?"

Do you know what JB is referring to?

A. I'm just reading it. Hold on.

MR. SABEY: I'll object to foundation.

A. Obviously, he needed to check with legal and HR. That was his thought around it.

Q. (BY MS. HALPERN) I just need to know what it is.

What does he mean by "waive the repayment via addendum such that it wouldn't be considered compensation to the providers"?

I just don't have an understanding of what that is referring. Do you have an understanding of what that is referring to?

A. I think that -- we were -- again, we had to ensure that we were accounting for the loan for that recruitment assistance that was provided for Dr. Peddada and Dr. Monroe, and we had to contractually include that within our contract with

Page 107

the group -- or excuse me -- within the contract of the individuals.

Q. But what was -- do you know what "repayment via addendum" means?

A. I can't recall.

Q. Okay. And do you know what -- how that might not be considered compensation of the providers? How would that repayment addendum not be considered compensation to the providers?

A. I don't know.

Q. Okay. Do you recall any conversations -- I guess, JB on the first page in Exhibit 82 follows up with you. Do you recall having a conversation with him after receiving this email on the top of Exhibit 82?

A. Not specifically.

Q. Okay. Seeing what you remember.

Did you work with anybody else other than JB on the compliance team for the contracts for Drs. Monroe and Peddada?

A. There is several others within the compliance team.

Q. Do you know what the review process within the compliance team is for a contract before it is issued?

Page 108

A. As outlined, just looking at overall fair market values support by those benchmarking tools and ultimately review of compensation terms and how do they align with fair market value analysis.

Q. Is compliance different than the legal team?

A. Yes.

Q. Okay. Can you discuss what role legal team has in contracts, if any, for bringing -- for the hiring of either employee physicians or contracted physicians?

A. Legal team was owners of all contracts. The structure of the contracts the compliance team reviewed, at least for the employment of individuals, the contractual terms and/or the compensation structure to ensure that it is within and compliant with fair market value.

Q. Is it typical for legal to look at these employment contracts for physicians? Was it typical for them to also review them before they were issued? Or did compliance usually just do that?

A. No. It goes through a legal queue as well.

Q. Okay. So that was just standard. Before it got issued, it would go through compliance and

Page 109

legal?

A. Yep. So both legal and compliance had to sign off on it as a balance, a checked balance to ensure that we're meeting all fair market value and legal obligations.

Q. How did they sign off on it? Was it ever, like, a physical sign off? Or is it just you received it, it had been reviewed, and then you could sign off?

A. Yeah. It was within our electronic system that they would review it and ultimately sign it off and move -- move for review and ultimately signatures to the group.

Q. When you say "electronic system," is there like -- what does that look like? Is there some sort of, like, portal where, like, steps were cracked or --

A. Yeah. Their -- the legal team owned the portal and the contracting system --

Q. Okay.

A. -- for which they have all -- at the time -- had all employment agreements, all contracts for Centura imbedded within that.

Q. And did you have to -- to review that portal and make sure all the steps were taken before


MAGNA
LEGAL SERVICES

Page 110

you sent the contract out?

A. Yes.

MS. HALPERN: Okay. Do you want to take a short lunch break before you go to another topic or how do you want to handle this because it's going to be 1 o'clock?

THE DEPONENT: That works for me.

MS. HALPERN: How much time would you like, Mr. Weller?

THE DEPONENT: I could go anyway that we want. What is typical? 30 minutes, 45?

MS. HALPERN: I'm fine with whatever, Mark, it is up to you. What is your desire? Do you want just 30 minutes so we can get this guy out of here on a Friday?

MR. SABEY: Yeah. I'm fine with 30 minutes.

(Recess taken, 12:09 p.m. to 1:32 p.m.)

Q. (BY MS. HALPERN) Mr. Weller, we just took a lunch break. Is there anything you would like to revise or change about your testimony from earlier today?

A. No, just clarification. Emma was the VP of compliance.

Q. Oh. The one we were trying to remember.

Page 111

A. Yeah. I can't remember her last name, though.

Q. We could probably Google that.

A. Yeah. You probably could.

Q. "Emma," you said?

A. Yeah.

Q. Centura is not around anymore, which makes it harder. The usual doesn't work.

All right. Well, Emma is a good start. Thank you. I will figure that out there. Okay. So she was the head of contract compliance.

Did you ever directly speak with her or talk with her about the -- the contract for Drs. Peddada and Monroe?

A. I don't recall.

Q. Okay. You mostly remember working with JB?

A. Yes.

Q. Okay. Okay. I'm just trying to pick up.

So we had talked about onboarding, hiring them. What do you recall next about attempting to get signatures on Dr. Monroe -- Dr. Monroe and Dr. Peddada's contracts, if anything?

A. I recall allowing for the contracts to be printed and provided to Dr. Monroe and Dr. Peddada as

Page 112

an initial draft of terms of the larger components of it just to not hold things up while we waited for that additional addendum.

Q. Okay. And --

A. So we --

Q. Go ahead.

A. So that was a typical -- a deviation process to allow for initial review, again, while we were working for the special circumstances, and ultimately Eric Koval providing that to them for review and allowing them to review an initial draft without all terms.

Q. Okay. And did you ever talk about that contract with Dr. Peddada directly?

A. Not directly.

Q. How about with Dr. Monroe?

A. Not directly.

Q. Okay. And so tell me about the conversation that you're referring to where you authorized -- sorry. Let me step back.

Who authorized sharing the contract as a draft with Dr. Peddada and Dr. Monroe, if you know?

A. I will take accountability for that, of saying hey, we -- as stated in those previous addendums and documents of the request to allow

Page 113

Dr. Peddada and Dr. Monroe to review those documents ahead of time without that addendum.

And that was outlined and articulated to say "Hey, we'll -- we can allow them to do that, but we need to let them know that an additional addendum will come."

Q. Okay. And were you the one who articulated that? You said it was articulated?

A. Yeah. I -- I shared that with Eric Koval and Jeff, and as outlined in that email to them as well as a reference point and documented, but the conversations were "Hey, we can give them an initial draft while we wait for final terms and final draft."

Q. Where do you recall having these conversations? Was it in email? Was it in person?

A. I -- I mean, I -- you can see in the email of the request to provide an initial --

Q. Which one are you referring to? What page?

A. I don't have exhibit numbers. It was the -- the last one that you provided.

Q. Would that be Exhibit 82? It should be the last one in the chat.

A. Yep. Last one in the chat. It was the email correspondence with the -- between the three of



Page 114

us and where Jeff had stated: "Can we please start the process of drafting the contracts?"

And then I stated: "Yes. The only issue is that we do not -- it would not include anything regarding the loan forgiveness if we're able to do so. Waiting on a response from JB."

So that was the initial interaction of which when the draft -- the initial draft of those contracts were there and we said: "Yes, go ahead and allow them to review the material terms without that remaining loan forgiveness portion of it."

Q. Okay. Let me just cut -- break that down a little bit. So you're referring to Exhibit 82. I see where you're referring to: "The only issue is that it would not include anything regarding loan forgiveness if we are able to do so."

You just read that.

Now, did you have a subsequent conversation? Or did you talk that day with Mr. Koval and Mr. Albert about proceeding to share the terms of the agreement without the loan forgiveness language in it with Drs. Monroe and Peddada?

A. Yes. As shown in that next email where Jeff asked the question: "Would it save any time to draft it up now and add the addendum later," which we

Page 115

then discussed via phone that yes, we can show them and share with them the draft of the agreement to be able to see the material terms and then add the addendum later.

Q. So this was the same day as the email, March 11, 2022?

A. I can't speak to the time, exact time.

Q. Do you know around about when this was, even if you can't speak to the exact day?

A. My assumption is is it's close to that or within a day or two.

Q. And this was by phone?

A. Yes.

Q. Were both Mr. Albert and Mr. Koval on it? Or was only one of them on it?

A. I can't recall.

Q. Who was on the phone call? Do you recall any of those two individuals specifically being on the call?

A. I remember we discussed it. I say "we." I -- I -- my assumption is Jeff and Eric, but I think I spoke with one of them directly.

Since we didn't conference call in or set up a meeting or anything, I just likely called Jeff Albert directly based on this email.

Page 116

Q. Okay. But you don't remember the actual conversation because you said, "likely"?

A. I can rephrase. Stating that -- that we had routine conversation around this of what we were doing with this contract and -- but usually individual conversations.

Q. So you don't -- I'm just trying to get this straight. You said you were generally discussing it, but do you recall having a conversation on or around March 11th saying that you can move on and show Drs. Peddada and Monroe a draft and we will add the addendum later?

Do you recall having that particular conversation with one or both of those individuals?

A. I remember having a conversation. Whether it was directly with Eric or Jeff, I can't recall which.

Q. Okay. And what do you recall happening after that?

A. That Eric provided that draft term or draft agreement to them to, again, speed up the process. The next thing I knew, Eric said "Hey, Dr. Peddada took that agreement, physically signed it, and gave it back to me. Great news."

And I replied to him saying "Hey, great

Page 117

that we're moving things along, but that's not the agreement to execute. We still need to include the addendum for recruitment assistance."

And I know we discussed a subsequent contract will come that we would have electic- -- electronically signed by all parties.

Q. Okay. And did Mr. Koval tell you anything about this conversation with Dr. Peddada when you obtained the signature from Dr. Peddada?

A. I can't recall.

Q. You can't recall him telling you anything about that conversation?

A. I had just -- I remember the email for which he mentioned that he signed it, here is the attachment. My reply was "That's not how this works nor is it -- nor is it the finalized drafted."

Q. Okay. And do you recall this email because you've viewed it since the time you've left Centura?

A. I recall that email and I've received that since.

Q. Okay. And -- but you don't recall having a conversation at that time about what Mr. Koval said to Dr. Peddada when obtaining his signature?

A. Correct.



Page 118

Q. You don't have any first-hand knowledge of that?

A. I don't recall the conversations between Dr. -- between Eric and Dr. Peddada.

Q. And you did not reach out to Dr. Peddada and tell him that it was not the final agreement?

A. Correct. Eric was to follow up with him on that.

Q. Okay. I'm going to ask you about another exhibit. This has been previously introduced as Exhibit 43. I'm sending it. Okay. Mr. Weller, can you open Exhibit 43, please.

(Deposition Exhibit 43 was referenced.)

A. Yes.

Q. (BY MS. HALPERN) Take a few moment to look at that document and let me know if you have seen it before.

A. Yes.

Q. Where did you see Exhibit 43?

A. Provided by our attorney as -- or part of it. I'm reviewing it now.

Q. So you've seen Exhibit 43 since you left Centura, but do you recall Exhibit 43 -- the email chain in Exhibit 43 from the time you were at Centura? It probably helps to start from the bottom and move

Page 119

up.

A. Yeah. That's true. Thank you. I'm used to going from top to bottom.

Okay. I recall.

Q. Do you recall this from -- do you recall the email conversation here --

A. Generally, yeah.

Q. -- in Exhibit 43? Let me just walk through from the bottom up. So we'll start at PSF Peddada 0859.

A. Yeah.

Q. So this is an email from you to Jennifer Wootton. Who is Jennifer Wootton?

A. Jennifer Wootton was a team -- she was the compensation analyst. There was a new law within the State of Colorado that we had to show that everybody had the same compensation structure for equal pay for equal work.

So part of that process within Centura was to have compensation analysts review all physician agreements and ensure that there is consistency for that specialty. And so we outlined those terms to her as an additional sign off.

Now you understand the processes that we have to go through for regulatory. But...

Page 120

Q. Is she -- I'm sorry. What team was she on, compliance or legal?

A. She is HR.

Q. Okay. She is HR. Okay. And Caitlin Potter was contract; right?

A. Yes.

Q. Okay. Go ahead.

A. That was to bring her into view from an HR and compensation perspective and staying within equal pay for equal work, and outlining those terms and the structure, everything highlighted in that blue and yellow, what the terms were, as we've already reviewed.

As stated in that email on 0857: "Jennifer, please confirm. We need HR compensation to sign off. This should not be a deviation to the standard compensation plan. I would like to get these processed today."

And you can see --

Q. Yeah.

A. You can see here it says they are both Colorado Springs. I did not include a relocation. So she provided her summary and so we moved through the process.

Q. And above that PSF Peddada 0856, it

Page 121

says -- you tell Caitlin, "Thank you."

I assume you are thanking Jennifer Wootton?

A. Yeah.

Q. And then, "Looks like you have everything you need to move it forward."

What did you mean by that?

A. To move the contract through the process now that HR compensation approved.

Q. And then it went to Dr. Lichtenberger, who was your supervisor; right?

A. Correct Dr. Lichtenberger -- Scott Lichtenberger at the time, Tom Gessel were the two group presidents for all physician contracts were signed up and approved by them as well.

Q. Okay. And then, above that, you're also carbon copying JB again; right?

A. Yeah. Because once the group presidents sign off, it goes to JB.

Q. And what do you mean by when you say: "We're just looking at standard agreements. We are not easily identified or recruitment assistance options"?

Were you just forwarding the standard agreement to Drs. Monroe and Peddada?



Page 122

A. Yeah. Basically, as outlined, I was saying "Hey, we're trying to get them to be able to review the standard language within an agreement, the terms in which we've outlined, and just the -- the typical contract and language.

And -- and again, as we -- because we didn't want to hold everything up for this recruitment assistance, and -- and ultimately wanted to get their eyes on something to review quickly.

Q. Was it standard procedure to have all of these letters reviewed before you sent a draft out for even, like, a draft out to review to physicians that you were hiring?

A. Sorry. One more time.

Q. Was it standard for, like, Dr. Lichtenberger, and Tom Gessel, I believe you said his name was?

A. Yeah.

Q. And for HR to review and approve contracts before they went out just for review, not even the final contracts?

A. Yeah. They had to review all terms prior to a draft -- a contract being drafted.

Q. Okay. And then, I assume above that, Wednesday, March 23rd, that Scott is Scott

Page 123

Lichtenberger -- on Monday when he said he was going to approve?

A. Sorry. Which page -- or 0855?

Q. Uh-huh; yes.

A. Yes. Still waiting on ' Dr. Lichtenberger's approval. Tom approved. So it hasn't hit JB's.

I was texting with Scott, who would be Dr. Scott Lichtenberger. On Monday he said he was going to approve. Sometimes we had done it where he wouldn't necessarily approve it in the system, but I just have a text from him saying, "Approved." And then ultimately Caitlin would take that text, imbed it within our system, and then it would move through the queue.

Q. Let me ask: Does that have to happen again if there is a change to the contract after the physicians? Or is it just more generally speaking?

Does that whole process start again after you get feedback from an actual physician that Centura was hiring? Like, let's say, a term got changed.

A. Yes.

Q. So just repeat the process again if a term got changed?

A. Yes. If a material change to the

Page 124

contract was changed, we would have to bring it through the queue.

Q. What counts as material change to the contract?

A. Typically financial terms.

Q. But if it was nonfinancial terms, then it wouldn't have to go through the process again?

A. We didn't make any contractual term adjustments to our employment contract.

Q. So you think that just never happened?

A. No. I mean, I can't tell you definitively 100 percent it never happened.

Q. In your experience? In your experience?

A. Right. In my experience, we said we will have -- we have a standard contract that everybody -- all employed physicians will sign and approve.

Q. And the only thing that might change is the compensation?

A. Correct.

Q. And if you go above, now we're on PSF 0855 at the top and it goes to PSF Peddada 0854; there is an email from JB to you.

A. Yep.

Q. And it -- he states that the descriptions

Page 125

did not include anything about the productivity components. The recruitment damages we had discussed. My recollection was the latter would be handled down the road, so I added language about the productivity mechanics to the workspace and approved.

Do you know what he is referring to there?

A. Basically, sometimes it -- going from one hand to the other, not all of the -- so this is our checks and balances process; right?

So if those productivity, again, recruitment damages, all those components were not imbedded within the contract or the review and summary, that's where those checks and balances where compliance reviewed that as well, imbedded it.

So that's why he said, "My recollection was the latter, it would be handled down the road, so I added language to the summary to be able to be imbedded within the contract about productivity mechanics, to the workspace, and approved."

Q. Okay. So is that the wRVUs that he is talking about below?

A. Yes. "Please make sure the legal folks understand that these physicians will be eligible for productivity incentive. Produced of that, the model



Page 126

was not in the standard CHPG comp plan documents. We are not sure how to best message those terms other than the EAS."

EAS, I can't remember the acronym, but it's basically a summary.

Q. Okay. And recruitment damages, what is that referring to? What is JB referring to there?

A. The loan for Dr. Kathpal.

Q. So was it standard for a contract to go through the process of getting all of this approval when -- well, let me back up.

Did you ever work on another contract that had recruitment loans in it when you brought a physician in house?

A. I worked on many recruitment assistance contracts with independent physicians.

Q. Uh-huh.

A. But this is the one that we moved from independent physician to employment.

Q. Okay. And it says -- it looks to me when I read this, that JB is referring to recruitment damages because he talks about the latter would be handled down the road. Do you see that?

A. Yeah. I -- I don't --

Q. Did you have a discussion -- sorry. Go

Page 127

ahead.

A. Sorry. I didn't mean to cut you off.

Q. No. Go ahead. What were you going to say?

A. I don't know what he means by "handled down the road."

Q. Do you recall having a conversation with JB that the recruitment damages would be handled in a separate contract, not part of the employment contract?

A. There were conversations with legal and compliance of how to imbed that. That's where the ambiguity came from of do we have a separate contract or do we imbed it and have a cross-pointing contract -- employment agreement to that loan forgiveness.

That's what we were waiting on, and that's where there's some discrepancies. The decision that ultimately the contract as outlined was the decision to imbed it within the employment contract as well.

Q. Do you recall having a conversation with him, though? Because it says: "My recollection was the latter."

It seems to be referring to a

Page 128

conversation. Do you recall ever talking to JB about handling the recruitment damages in a separate agreement later?

A. I don't recall a conversation about a separate agreement later, that's why I don't understand what he means by "would be handled down the road."

Rather, as emailed in previous attachment exhibit, we emailed about where and how we would account for those recruitment damages.

Q. You recall discussing it with him, though, like a verbal conversation, not just emails?

A. I can't remember an exact conversation.

Q. Because just chronologically, the email you're referring to happened before this one. So did you speak with him at all? Does looking at this email refresh your recollection? Did you speak with him at all about handling recruitment damages down the road?

A. I can't recall.

Q. And, I guess, scroll further up on page PSF Peddada 0584. You asked, I believe, Caitlin Potter to get these out today.

What are you referring to? The contracts?

A. Correct.

Page 129

Q. Okay. And above that, what are you referring to? You say you're still determining next steps for Kathpal. Is that because you weren't sure if Centura was going to hire her or if she was going to stay in the market?

A. Correct.

Q. Okay. And what are you referring to when you say, "I recommend that we send to Jeff once complete rather than sending out for e-signatures. Jeff can hand to each of them to review"?

A. Meaning, let's send it to Jeff to be able to have those conversations with the physicians. Our standard process was to send out for e-signatures once the contract was complete and signed off, but since we didn't have all -- everything outlined for the loan forgiveness, it stated, let's send to Jeff once this -- again, the material terms of the contract are done while we work on the other addendum to this contract.

Q. Okay. But what do you mean by "rather then sending out for e-signature here"? Were you intending to send it out for e-signature at that point? Or...

A. Our standard process is once a contract is ready and sending out to physicians is that it's

MAGNA
LEGAL SERVICES

Page 130

not a psychical printout and handing to them. Rather it is sent via electronic signature -- or DocuSign, per se. I don't recall the formal program, but a DocuSign-type of send out where here is your agreement, sign electronically here, and then it would be routed to the next signature.

Q. Okay. And have -- are you aware of any other time where you have printed versus emailed a copy of a --

A. No.

Q. -- contract to a -- sorry. Let me just finish.

A. Sorry.

Q. -- physician to review?

A. No.

Q. So you typically send them for review just not through e-signature for doctors to review?

A. Typically, it was sent for -- as a DocuSign to them. They can review it, have their legal team review it, however they would like, and then e-signature would be there available for them to sign, and then it would be routed to CHPG president for signature.

Q. So when it went out, typically speaking for e-signature finalized, there wasn't going to be

Page 131

any changes to it?

A. Correct. As stated, just up in that top -- on 0853 top email from Caitlin Potter: " Our Centura policy is that these need to be signed electronically."

Q. Okay. Do you know why she is saying that in this email chain?

A. Because the intent was to have that routed to the docs outside of typical process. Again, physical copies for them to review general terms, and to avoid a -- a wet signature.

Again, she stated that this is our policy, that it needs to be signed electronically.

Q. Do you have an understanding of why she is saying, "They will need to be signed electronically"? The actual contracts that were attached to this email?

A. To ensure that everybody was on the same page of our policy that a wet signature would not be valid, that our policy states that it needs to be electronically signed.

Q. Okay. And where -- do you know where that policy is? Just this -- this email?

A. Our policy was in PolicyTech within Centura, I think is what it was called. But our

Page 132

central policy database for all policies within Centura.

Q. Okay. And how -- do you have access to those policies?

A. At the time, yes.

Q. Who else had access to those policies?

A. Most leaders within Centura.

Q. Okay. So this was for management, policies for management?

A. I will track that as I don't know the depth of all and the level of authority of which policies and which not. But I know for me, I had access to the that management system, the policy dataset.

Q. Do you know if just every physician had access to it?

A. I -- I don't know.

Q. Do you know if Caitlin Potter was aware that these were -- let me rephrase that.

Did you have any conversations with Caitlin Potter about whether these were draft contracts or final contracts?

A. I can't recall if that conversation occurred or not.

Q. But she doesn't reference here that it is

Page 133

a draft contract. She indicates that they're supposed to be electronically signed.

Did you follow up with her about that?

A. I can't recall.

Q. Did you have any conversations with her about this -- these contracts that she sent out not being the final contract?

A. Everything that I stated thus far in these emails has stated that these were not finalized.

Q. Where does it say that?

A. Once complete --

Q. Will you just point that out to me.

A. Sorry. What page is that? I was looking at that comment on 0854.

Q. 0854. Go ahead.

A. On my -- that first email string said that we'll -- again, the reference was to send it to Jeff -- that once these contracts were complete, rather than sending directly to the physicians, to have that conversation related to that. We're still figuring out and determining next steps for Dr. Kathpal.

Q. Yeah. But you didn't say these weren't the final contracts; right? You said you're still determining what to do with Kathpal?



Page 134

MR. SABEY: I object to the form.

Q. (BY MS. HALPERN) You can go ahead and --

A. Sorry. I'm a little bit confused by object to the form versus what --

Q. That's just him preserving objections for the Court, like I said. Unless he instructs you not to answer, go ahead and answer.

MR. SABEY: It's an objection to the form of the question, not anything about this document.

A. Right. Again, as stated in the outline here, again, we are deviating from that process to be able to provide them with an initial review of the contract.

Q. Okay. Where does it says "initial review of the contract versus"? I mean, where does it say initial review?

MR. SABEY: I object. It feels like you're badgering the witness. He has told you what was intended there.

MS. HALPERN: I'm not asking what was intended. I'm asking what's been written.

A. The intent was, again, deviate from process to provide them with initial review to expedite the process.

Q. So you don't recall having any

Page 135

conversation with Ms. Potter about whether the contracts were final or not; is that right?

A. I --

Q. How about with JB?

A. I can't speak to a specific conversation, but I recall having that conversation with him.

Q. Okay. What do you recall about that?

A. I remember having conversations with both he and Jennifer, who is the lead attorney, about where the -- where should this --

MR. SABEY: Let me stop you there. You're communications with your attorney are privileged.

MS. HALPERN: I mean, in preparation for litigation. Not every communication.

MR. SABEY: Well, I think it's -- I think it's okay to describe your communications with people other than the attorneys.

THE DEPONENT: Okay.

A. I had internal conversations related to when and where the outline of the recruitment assistance and loan forgiveness should be. To where once that was finalized, we would send out for e-signatures and finalized contracts to the physicians.

Page 136

Q. You recall having these conversations with John Byron. I'm asking you about your conversations with individuals, not generally.

A. I know he was part of those conversations.

Q. Okay. Do you recall when you had that conversation with John Byron? Was it before or after the email chain in Exhibit 43?

A. I can't tell you. I mean, I can't remember.

Q. Okay. Do you recall having conversations about providing both Drs. Monroe and Dr. Peddada with physical hard copies?

A. Yes.

Q. And why did you decide it had to be a physical hard copy? Was that your instruction or someone else's?

A. I don't recall if I received instruction from someone else or not. Again, the intent was for them to have an initial review of the contract to expedite the process.

Q. Okay. How many other physicians were you involved with providing contracts to other than -- approximately? A lot? A little? I don't need an exact number.

Page 137

A. I managed all physician contracts for 11 hospitals. I -- I couldn't even tell you how many contracts I dealt with throughout the four years I worked in that position.

Q. Okay. You're aware of no other time where a doctor was actually provided a hard physical copy of the contract?

A. I can't speak to a specific time that we did that.

Q. So do you recall any times where a nonfinal version of a contract was emailed to a physician to review?

A. I -- I can't recall.

Q. How did physicians typically, when you were the VP at Centura, review nonfinal copies of their...

A. Typically we would no not provide them with a non-finalized agreement. We would provide them with terms of such an agreement, meaning a summary of agreed upon outlined terms that would be imbedded within a contract at a later point, but no contract was typically sent prior to.

The intent was "Hey, this is the finalized agreement," that it would be eligible for signature, and either they would sign or decline.



Page 138

A. Okay.

Q. So is the only time you can think of -- while you were the VP at Centura -- is the only time that a nonfinal version of the agreement -- was the only time that a nonfinal version of employment agreement sent to a physician the time when you provided it to Drs. Peddada and Monroe?

A. I can't think of any other time.

Q. What do you recall -- I know you referenced a -- so do you recall any other communications or conversations before Dr. Peddada signed a hard copy of his employment agreement?

A. Nothing outside of whatever I stated.

Q. Do you recall ever emailing anyone that the agreement was -- was not final before it was shown to Dr. Peddada and Monroe other than what we just discussed in the last exhibit?

A. I can't recall all my emails at this point.

Q. Fair enough. I'm just seeing if you do remember, but if one -- if you don't remember one, I get that.

Do you recall specifically emailing, say, Dr. Peddada and Monroe that these were not final contracts?

Page 139

A. I did not have direct communication with Drs. Monroe and Peddada related to this.

Q. Okay. I'm going to share with you what has been previously designated as Exhibit 37.

(Deposition Exhibit 37 was referenced.)

Q. (BY MS. HALPERN) Do you see Exhibit 37 before you, Mr. Weller?

A. I don't know if I've seen this.

Q. Is that your email address @CenturaHealth on the -- in the metadata top on the first page at the top of Exhibit 37? So that would be PSF Peddada 0999.

A. Yeah. Likely, at that time, I did receive this. Obviously it's to my email address. I just couldn't recall this specific email from Eric.

Q. Okay. It's to Dr. Peddada@Centura.org -- AnujPeddada@Centura.org, and you're CC'd; is that right?

A. Correct.

Q. Do you know what this is referring to here in Exhibit 37, what document is attached?

A. This would be with reference to extension of the PSA between ROPC and Centura Health.

Q. And your email address on the second page is who they're supposed to talking to, Dr. Monroe and Peddada, if they have any questions?

Page 140

A. Yeah. If they have any questions, they can reach out to me related to --

Q. Why did this -- do you know why -- I'll ask about it based on your knowledge.

Do you know why this agreement was sent out to Dr. Peddada on April 20th, 2022?

A. To extend the PSA for an additional month.

Q. Okay. Were you a part of any conversations about why that needed to take place?

A. That while we were working towards the employment structure; that we need to maintain, due to compliance, a legal and binding contract. So, therefore, we had request and agreed to extend the PSA for one month.

Q. Was there -- were there any complications to extending it further? Like if you needed to extend it for another month that you're aware of?

A. Not that I'm aware of.

Q. Or two months even?

A. Not that I'm aware of.

MR. SABEY: Object to foundation.

MS. HALPERN: I asked what he was aware of.

Q. (BY MS. HALPERN) Were you a part of any

Page 141

conversations with -- did Dr. Peddada contact you about this? Do you have any conversations with him about the extension?

A. No.

Q. How about Dr. Monroe?

A. No.

Q. Okay. What do you recall happening next? I think you referred to an email, which I'm trying to find. There we go. I'm going to share Exhibit 42 with you, Mr. Weller.

(Deposition 42 was referenced.)

A. Okay. I have it pulled up.

Q. (BY MS. HALPERN) Take a look at Exhibit 42. Have you seen Exhibit 42 before? It's probably easier to start from the bottom and go up.

A. Okay.

Q. Okay.

A. I'm familiar.

Q. Have you seen the email exchange in Exhibit 42 before, Mr. Weller?

A. Yes.

Q. Okay. And if you go to PSF Peddada 0987 at the bottom, do you see that last message?

A. Yep.

Q. Do you recall if you spoke with Dr. Koval



MAGNA
LEGAL SERVICES

Page 142

about Dr. Peddada printing and signing his employment contract on or around April 12?

A. Yeah. One correction too. Eric is -- he's not a physician.

Q. Sorry. I did that a couple times during his deposition. Mr. Koval.

A. One more time on the question.

Q. Yeah. Do you -- I think you described your response earlier when you got the email right here at the end of Exhibit 42 on PSF Peddada 0987.

A. Yes. I received the email from Eric stating and ultimately attaching a PDF scan of the wet signature. I said, "Hey,' as reference there, 'great news as, again, we're excited to bring Dr. Peddada into the medical group," but it was not the finalized agreement.

We were finalizing the loan forgiveness and recruitment assistance. Obviously there was miscommunication.

Q. Right. And I was going to ask you about that. Do you -- were you surprised when you got this email from Mr. Koval --

A. Very much.

Q. -- that he had gotten Dr. Peddada to sign the employment contract?

Page 143

A. Yes.

Q. Okay. And did you talk to Mr. Koval about that at all other than the email message about it?

A. I can't recall a conversation.

Q. So you don't recall having a conversation with him?

A. No. I just -- I can't point to a specific conversation that outlined that discussion.

Q. There may not have been one?

A. I don't know.

Q. I know you sent this email, but I'm just asking if you recall any other conversations around obtaining a signature on Dr. Peddada's employment contract on April 12th? Did you have a conversation outside of this email chain with anybody?

A. I -- I don't know.

Q. You don't recall having a conversation?

A. I don't know if I did or not.

Q. But from your memory today, you don't recall if you had one?

A. I may or may not have. I don't know.

Q. Okay. Who is Timothy Osterholm?

A. He was the -- he was the -- I don't even know what his title was.

Page 144

Q. What team was he part of?

A. Oncology service line.

Q. Okay. Kathryn Bishop, who is she?

A. Part of the service line.

Q. Okay. So I'll shortcut it. Are Brian Erling and Dennis Kraus also part of service line?

A. Dennis Kraus was a physician leader of the service line. Brian Erling is the CEO of Penrose/St. Francis. Jeff was the physician leader of radiation oncology.

Q. And then as you discussed on PSF Peddada 0986 through 0987, you said, "Great news with one caveat."

The message you just referred to; right?

A. Right.

Q. Okay. Were you part of any discussions about executing the loan forgiveness agreement in a separate agreement as well? Did you talk about that or was that handled by someone else?

A. The discussion -- I was part of the conversations to include -- to adjust the employment agreement to include language, as stated there, and have them execute a loan forgiveness agreement as well. So, yes, I was part of that conversation.

Q. And who did you have those conversations

Page 145

with? Have we discussed all of those earlier? Or was there --

A. That was discussed earlier.

(Simultaneous speakers.)

A. No. That was discussed earlier.

Q. Was there any other conversations other than the ones that we've already discussed?

A. No.

Q. Okay. Who is Jennifer England?

A. Attorney.

Q. So she was part of the legal team?

A. Yes.

Q. Okay. And then above that, Mr. Koval says that he was under the impression it would be a separate agreement from employment.

Do you recall having a conversation with him saying that it was going to be a separate agreement from the employment agreement, the loan forgiveness agreement?

A. I -- I can't recall a specific conversation with Eric related to that. As he stated, his impression was it was a separate agreement as we were working with our attorneys on what is the best path forward with this.

Q. Do you know where he might have gotten

37 (Pages 142 to 145)



Page 146

that impression from?

A.   Since we were working on a separate agreement, that -- that would be the sole agreement. But we -- we decided to imbed that into the employment contract.

Q.   He only CC's you on that email there when he says he was under the impression that would be a separate agreement from employment.

Do you remember having a conversation with Mr. Koval about that?

A.   I can't recall.

Q.   Okay.

A.   It's outlined in that email.

Q.   Well, other than the emails that we have before us, do you recall having any conversation with him around the topic that he was talking about that it is going to be a separate agreement from the employment agreement?

MR. SABEY:  I'm going to object.  You're asking the same questions, and he has already told about the conversations they had numerous times.

MS. HALPERN:  I'm referring to the email. I'm just trying to refresh his memory.  I'm just saying, other than the emails in front of him, did he have a conversations.

Page 147

MR. SABEY:  Yeah.  But do you want him to keep repeating the conversation he has already talked about?

MS. HALPERN:  I don't know.  If there is another one, let me know.  He didn't -- I'm just asking if he had one about this is topic, and I don't feel believe he answered it.

And he may not recall having them, and that's fine, I'm just trying to summarize that.

A.   I know there was conversations specific to we want Dr. Peddada to sign; we need to make sure that this contract is finalized with the loan forgiveness in the employment agreement as well as the separate agreement.  And ultimately that was -- that process was deviated.

Q.   (BY MS. HALPERN)  Did you have -- do you recall if you had that specific conversation with Mr. Koval before or after Tuesday, April 12, 2022?

A.   I believe it was after to ensure that the next steps were followed that we need Dr. Peddada to sign, as per policy, e-signature.  And second, we need to update the employment contract to include that language.

Q.   Okay.  And you believe that conversation happened with Mr. Koval in specific after

Page 148

April 12, 2022?

A.   Yes.

Q.   Okay.  And on PSF Peddada 0985, Mr. Koval tells -- emails you at the bottom of it, and says, "I should let Dr. Monroe know the edit is coming."

So do you know whether Dr. Koval also told Dr. Monroe that this was the final contract?  Did you have a conversation with him about that?

A.   As stated, I have -- in follow-up, he stated, "I will let it Dr. Monroe know of this edit for this employment agreement, and ultimately wait for e-signature," which he later signed.

Q.   But other than this email, did you have a conversation with Mr. Koval finding out what he told Dr. Monroe about the version of the contract that he had sent him?

A.   The -- as stated earlier, there wasn't specific conversations related to Dr. Monroe or Dr. Peddada.  It was the two of them as intended employed physicians.

Q.   Yeah.  My question is a little different. I understand you were sending the same contracts to Dr. Monroe and Dr. Peddada, but do you know what Mr. Koval said to Dr. Monroe --

A.   I was not -- sorry.

Page 149

Q.   That's okay.  When he gave him a copy of the agreement that Dr. Peddada signed?

A.   I was not part of those conversation.

Q.   And same, I think we established earlier with Dr. Peddada, you were not part of those conversations?

A.   Correct.

Q.   So you don't know what was told to either Dr. Monroe or Dr. Peddada about the status of the contracts that they were shown?

A.   I -- I was not part of those conversations, so I -- I don't know.

Q.   Okay.  What do you recall happening after you sent the emails in or after the email chain in Exhibit 42?  What do you recall happening next with respect to Dr. Peddada?

A.   After this email chain?

Q.   Yes.  What do you next remember happening?

A.   I remember that we updated the contract with language that spoke to loan forgiveness.  We then -- once updated, sent to the physicians for signature as a finalized copy.  And I recall that no communication back related to that from Dr. Peddada, and Dr. Monroe had signed the agreement.


MAGNA
LEGAL SERVICES

Page 150

Q. Okay. Were you part of the decision to rescind Dr. Peddada's employment offer?

A. I was part of it, yes.

Q. And what do you recall in terms of conversations around that?

A. That we had sent him the agreement -- an updated agreement, he would not communicate with us related to the agreement, nor had he -- we saw that he reviewed it, but did not sign it and would not communicate with us. We weren't sure whether he was intending to sign the agreement or not.

Q. Okay. Were you aware that Dr. Peddada was on medical leave at the time?

A. From the medical staff, yes.

Q. Who told you?

A. Dr. Bill Plauth.

Q. I'm sorry, I didn't hear you.

A. Dr. Bill Plauth.

Q. When did he tell you this?

A. I don't have a specific date.

Q. Do you recall being part of any conversations before Dr. Peddada went on medical leave about his request for medical leave?

A. I was not privy to those conversations. If there were, I do not know.

Page 151

Q. Okay. Did you know that he requested medical leave prior to his taking it?

A. I --

MR. SABEY: Object to the form of the question.

MS. HALPERN: Go ahead.

A. I don't know. I don't know if -- I was notified of his request for leave from the medical staff from Dr. Bill Plauth. I do not have a date in my mind where -- when that was.

Q. (BY MS. HALPERN) Okay. Do you recall that conversation with Bill Plauth?

A. He -- yes.

Q. What do you recall from that conversation?

A. That he had shared that Dr. Peddada was going to take a medical leave of absence from the medical staff, that he -- his request to communicate related to his employment status, and ultimately Dr. Peddada said he will follow up with Eric or Jeff Albert, and that they hung up.

Q. That they hung up?

A. That was the end of the conversation.

Q. Okay. Do you know why he was on medical leave?

Page 152

A. To the extent, I don't.

Q. That wasn't disclosed to you?

A. That he -- he used a term that -- that he was burnt out.

Q. And that's what Plauth told you?

A. Correct.

Q. Okay. And what did you make of that?

A. I don't -- I don't know what to make of that. We were working with him on an employment agreement to which we were trying to solve a myriad of issues at the oncology program and ultimately looking to communicate with him to ultimately sign the agreement and move into employment status.

Q. Are you familiar with a medical or doctor/physician burnout at all? Have you ever heard the term?

A. That's a general term in the industry.

Q. Okay. What does it mean to you?

A. That a physician -- again, to me it's a general term for a myriad of terms within a physician practice.

Q. Did anyone express an opinion on Dr. Peddada requesting medical leave for burnout to you?

A. No.

Page 153

Q. Did anyone mention to you whether they thought their request for medical leave was legitimate or not that Dr. Peddada had requested?

A. As -- as reviewed earlier in the exhibit, the request was granted by the medical staff president.

Q. Sure. I'm just asking you about your conversations with folks.

Did anyone talk to you about their opinion on his asking for medical leave?

A. I did not have any conversations related to approval or assumptions of his medical leave request.

Q. Okay. But did you hear anything from anyone else about assumptions or approval?

A. I just said I didn't have any conversations about that.

Q. Okay. I'm going to ask you about this exhibit. I believe it's going to be Exhibit 83.

(Deposition Exhibit 83 was marked.)

MR. SABEY: Iris, we've been going for about an hour. Can we take a short break?

MS. HALPERN: Sure. Five minutes?

MR. SABEY: Yeah, that's fine.

MS. HALPERN: Okay.



Page 154

(Recess taken, 2:40 p.m. to 2:47 p.m.)

Q. (BY MS. HALPERN) All right. Mr. Weller, if you're ready, we'll go back on the record.

We just took a short break. Is there anything you want to change about your testimony earlier?

A. No. I -- I know you went through a lot of questions related to conversations that I can't speak to and look to a specific conversation and specific details, but every conversation we had with Eric and/or Jeff team is "Hey, we need to have -- go back with Dr. Peddada and get him to understand what we're missing, and that contract, and what the next steps were with regard to that electrical -- electronic signature for process and ultimately have everything documented."

Q. Okay. Anything else? I think you probably did say that a couple times in the past, so I don't think that's changing much.

A. No.

Q. Okay. I was about to show you what has been designated as Exhibit 83.

Let me just check because someone came in. Did you talk to anyone over this break at all?

A. No. I was just getting water. Sorry.

Page 155

One of my assistants was just bringing me water.

Q. That's okay. That was very nice of her.

A. Agreed.

Q. Okay. I just had introduced before the break what is being designated as Exhibit 83.

Mr. Weller, have you seen the email exchange in Exhibit 83 before?

A. Yes, I believe so.

Q. Okay. Where did you see the emails found in Exhibit 83?

A. From -- from my attorney.

Q. Did you recall being part of this email exchange when you were at Centura?

A. Yes. My email is listed.

Q. Your email is listed and that's, obviously, SamuelWeller@Centura.org; is that right?

A. Correct.

Q. Okay. So these were emails that you were CC'd to, Mr. Weller?

A. Correct.

Q. Can I bring your attention to PSF Peddada 00305, which is the second page of Exhibit 38.

A. Yes.

Q. Do you recall -- and I'm asking

Page 156

contemporaneously now -- your impression when you read the email at the end of Exhibit 83?

A. I'll read through this point.

Q. Sure.

A. Okay. I recall my feelings were, wow, interesting interaction, and, ultimately, I mean, concern around his willingness to communicate with us related to his potential employment.

Q. Okay. And I think you said -- I didn't catch the beginning of that answer. I got the second part of that, but what was the beginning of the answer?

A. Concern about how that interaction on his communication to Dr. Plauth and concerned about him.

Q. And what were your concerns about Dr. Peddada?

A. That was a very abrasive way and approach to the interaction with Dr. Plauth.

Q. Okay. Any other thoughts when you saw this email when you saw it on April 27, 2022?

A. Not that I can recall.

Q. Okay. Did it register to you that he said he was following the advice of his doctor when -- when he said he was not able to speak with Centura?

A. I'm not quite sure I understand your

Page 157

question.

Q. Sure. Did -- what did you think about the language in the email where Mr. Plauth says, "He is acting on the advice of his physician"?

A. Like I shared earlier, that it -- that we needed to have conversations about his potential employment, for which we did not have a signed agreement at the time.

Q. Okay. Notwithstanding that his doctor had said not to talk to you about this?

MR. SABEY: Object to form and foundation.

MS. HALPERN: I'm asking about his response, his thoughts.

A. I don't think I had a response to that specific question at that point or I can't recall.

Q. (BY MS. HALPERN) All right. Do you now have any thoughts about the fact that she was acting on advice of his physician? Would that have changed your response to this email if you had registered that?

MR. SABEY: Again, object to foundation.

A. It doesn't really change.

Q. (BY MS. HALPERN) Okay. It doesn't change your thoughts on his response to Centura



Page 158

reaching out to him?

A.  Again, no.

Q.  Would you have the same concerns if someone had -- was in the hospital on medical leave versus for mental health reasons?

A.  I take all mental health and physical ailments similarly, obviously a concern.  I mean, our intent was to work with him to ensure and provide a better option with him like we discussed previously.

Q.  So if Dr. Peddada had been hospitalized, like in a car accident, for example, would you have still found it wrong for him to say he could not speak with you?

A.  I don't know.

Q.  Are there any medical conditions that in your mind would have made it appropriate for him to not speak with Centura while he was on medical leave?

A.  I don't know.

Q.  Do you know if anyone at Centura got a second opinion from a doctor about how to accommodate Dr. Peddada on his request for medical leave?

A.  Not aware.

Q.  Did anyone in your conversations at all discuss the fact that he had asked for medical leave as an accommodation for burnout?

Page 159

MR. SABEY:  Object to the form.

A.  Can you rephrase the question?

Q.  (BY MS. HALPERN)  Sure.  Did any of the individuals who are carbon copied to this email that you're carbon copied to on April 27, 2022, at 5:25 p.m., did anyone raise a red flag to say "Well, wait a minute.  His doctor is telling him to not communicate with us because he needs this medical leave for his medical condition.  We need to figure out what to do with that"?

Q.  That -- the request from Dr. Peddada was that he was to take a leave of absence from the medical staff for which the next steps was to pursue appropriately the process for that leave within the medical staff of the hospital, which I was not a part of that conversation.

Q.  That's right.  My question is a little bit different.  Did anyone, after receiving this email that you're CC'd to, that we just discussed, did anyone say "Well, hold on.  Before we insist that he communicate with us about his contract, his doctor has placed him on medical leave and told him not to communicate with us."

Did anyone raise a concern on that?

MR. SABEY:  Same objection.  Form and

Page 160

foundation.

Q.  (BY MS. HALPERN)  That you're aware of?

A.  I'm not aware of any.

Q.  And in the email above that goes between PSF Peddada 0304 and 0305, I believe Mr. Albert says that he was disappointed by how Dr. Peddada is handling this.

Do you recall having any conversations with Mr. Albert or anyone else about how you thought Dr. Peddada should have handled communicating while he was on medical leave?

A.  There was general discussion of that we would like to communicate with him about his employment status; not about practicing medicine.

Q.  Okay.  Who did you have that conversation with and when, if you recall?

A.  I believe Dr. Plauth, Jeff, and Eric, relating to that we do not have a contract in place for employment with Centura Health Physician Group, so therefore to be able to make -- to continue to proceed and provide services when he would return from that leave, we would need to have an executed agreement and have routine conversations about the processing of credentialing and privileging as an employed physician.

Page 161

Q.  And did you have a conversation -- did you personally have a conversation with Dr. Peddada about that before he went on medical leave?

A.  No.

(Simultaneous speakers.)

A.  I was not aware before he went on medical leave.

Q.  Okay.  Do you know if anyone else did?

A.  No.

Q.  And while you were having these conversations about saying he needed to be in communication with Centura about his employment contract and credentialing, I believe you said, and some other topics, did anyone say "Well, he is on medical leave and his doctor advised us not to talk with us"?

Did anyone discuss that issue --

MR. SABEY:  Object to form and foundation.

Q.  (BY MS. HALPERN) -- that you're aware of?

A.  We had conversation related to he had requested and was granted medical leave from the medical staff and providing service, but, again, we were -- we tried to reach out and discuss his employment with the Centura Health Physician Group,



Page 162

for which is different, and there was no communication back.

Q. Okay. So you felt that that was different, that the medical leave didn't cover any of your communications with him, just the medical staff communications?

A. Correct.

Q. And then I'm going to ask about the message above that in Exhibit 83 just to see if you are aware of the meaning of a few things. You may or may not be.

But above the message we just spoke about, Mr. Plauth says, "This is fine. We should separate out the wellness and the practice/employment."

Is that what you're referring to right now, just now when we were talking that you felt it was -- that you all felt like it was different, that the wellness and medical staff was separate from the practice and employment communications while Dr. Peddada was on medical leave?

A. Correct. His request for her -- for medical leave was specific to medical staff services and the medical staff of the hospital.

Q. Okay. Where did you get that impression

Page 163

or understanding that it was separate?

A. That's how it functions within a hospital. Medical staff services within a hospital is a contracting body for a hospital for all physicians that operate within a hospital. Physicians, when requesting a leave of absence or service, goes through the medical staff for which it is governed by physicians.

That was what the request was to the CMO, and ultimately granted by Dr. Baldauf, the president of the medical staff. There wasn't an ability for him to request a leave of absence because he was not employed by the medical group at that point in time.

Q. Okay. But how should he have gone about -- is there a written policy somewhere that required him to ask for separate medical leave of absence from the practice/employment obligations?

A. He -- he wasn't employed.

Q. Okay. So I'm going to then have to ask you for clarification again because I think I didn't understand your earlier answer.

It said, "We should separate out the wellness/med staff and the practice/employment."

Do you know what that is referring to?

A. Correct. So med staff is the medical

Page 164

staff, and specific bylaws for hospitals to operate and manage and govern physicians governing physicians within a hospital. There is specific bylaws, services, and commitments that are required from each physician to be privileged by a hospital.

So that request for -- as an independent physician for leave of absence would apply to the medical staff. So, again, wellness and med staff being one. The practice, i.e., the Centura Health Physician Group and employment would be separate.

Q. How would he have asked for a medical leave of absence from the latter, for the medical group?

A. He would have to be employed.

Q. So you're saying there was no way for him to ask for medical leave from the practice/employment division of Centura, only the wellness med staff?

A. He wasn't employed by Centura at that time. I didn't -- we never received a signed contract or ever start as an employed physician of the medical group.

Q. Okay. So how could he have done that? Or would it have been impossible?

A. The only thing that could have occurred would be that he communicate with us that his

Page 165

intentions would be to be employed, that he sign the agreement, and we talk about when his start date would occur for that practice of employment.

Q. Is there a written policy somewhere that indicates that he has to ask for a separate medical leave of absence from the practice/employment?

A. It's as if you're asking me to take leave from your practice for medical leave.

Q. He had to ask that from the wellness med staff; right?

A. Right. Which is a completely separate body for which he is contracted and obligated to under the bylaws as an independent physician at Penrose Hospital. Every physician credential in a hospital has to maintain credentialing and privileges at the hospital to provide services at so-called hospital within any hospital within the US.

Q. Okay. So, for example, how would an applicant who was pregnant and needed three months before she started her employment as a physician, how would she ask for those three months from the practice/employment group?

MR. SABEY: Object to form and foundation. You can answer, if you know.

A. They would have to show commitment that

MAGNA
LEGAL SERVICES

Page 166

they intend to be employed by first and foremost signing a contract with a specific date of start, and, ultimately, communication with a practice of "I can't make that start date. When can I start based on my current situation?"

And there was many of times within the medical group that we intended to start someone at a specific time, and due to various reasons that we granted a different start date for their practice to start within the medical group.

Q. (BY MS. HALPERN) Give me some examples of that.

A. We would send over a contract to a physician, they would --

Q. A specific example. I don't need generally.

A. Again, I -- I don't have something specific right off the top of my head. I can tell you general terms if you would like, that we accommodated many times for which, again, we sent over a contract, the terms for which that agreement was outlined with a start date of that individual, that the individual would say "Hey, I can't -- I would like to start at this particular time."

Or we would adjust that particular time,

Page 167

we would make the adjustment, and the contract was executed.

Q. But you can't think of a specific instance where that actually happened?

A. It happened many of times, so I...

Q. Can you think of one time?

A. It was two years ago that I left the organization. I can't think of anything specific.

Q. Okay. So what if someone was just an applicant? How -- how -- what was your understanding of how an applicant could ask for an accommodation even if they were not employed yet?

MR. SABEY: I object. He has already answered that question. You can't keep asking the same questions.

MS. HALPERN: Yeah. In fact, I can. In fact, you do it all the time, Mark. So...

Q. (BY MS. HALPERN) I am trying to understand the situation. What I think you're saying is there is no way for an applicant to say -- unless they already signed a contract -- there is no way for them to say "Hey --

A. No.

Q. -- I'm interviewing for this job right now, but I can't start for three months"?

Page 168

A. I didn't say that.

Q. I am asking you what you did say. Mark just said I wasn't allowed to, so go ahead and answer it.

A. As I stated, we would send over the contract, they would review the terms of that agreement for which a start date is outlined.

If they push back on that start date without signing that agreement, we would look at where and when -- excuse me, not where -- when it would be appropriate for both parties for that individual to start and ultimately identify the start date for which that person can accommodate, and we can accommodate, of which we would adjust that contract.

And then, ultimately, we would sign and hold accountability to that start date of that individual.

Q. But they had to have already signed a contract?

A. No. As stated, we wouldn't send the contract to them for review with all terms outlined in that contract. If they could not meet that obligation of that start date, communication would occur, saying, "Hey, can we adjust the start date?"

We would adjust the start date, we would

Page 169

send a revised agreement to them to which it would be executed and then start on that particular date.

Q. Okay. So can I ask if that option was discussed with reference to Dr. Peddada because he had reviewed the earlier terms and signed the hard copy, but now was saying he could not start at that date. Why wasn't -- why wasn't the start date adjusted?

MR. SABEY: Object to the form and foundation.

A. We tried to communicate with him. He did not communicate back.

Q. (BY MS. HALPERN) You tried to communicate with him about a different start date?

A. We tried to communicate with his overall contract.

Q. Did it include a different start date since he said he was going to need three months off?

A. He did not reply to our reach out.

Q. That's not what I asked. Did anyone discuss starting him at a different date?

A. We can't discuss with him if he is not going to respond to us.

So you're -- you are asking if he was communicating with us, and that is not accurate. He was not communicating with us about his start date.



MAGNA
LEGAL SERVICES

Page 170

Q.  So you discussed that internally.  Did anyone offer him a different start date?

A.  We tried to reach out with him to discuss all terms of the agreement and educate him on the adjustment to the contract, for which he did not respond.

Q.  The adjustment to the contract in what way?

A.  The recruitment assistance.

Q.  But not the start date?

A.  He didn't respond.

Q.  He signed a contract before that, which would be no different than reviewing under your hypothesis, so why didn't any of you guys discuss starting him at a later date?

MR. SABEY:  Object.  This is argumentative and it is an improper foundation.

A.  We had reached out to him to discuss all terms of the agreement.  He did not respond.

Q.  (BY MS. HALPERN)  Did you internally discuss starting him at a different day?

A.  We discussed all terms of the agreement and reached out to him to review those terms of the agreement.  He did not respond.

Q.  You're not answering my question.  Any

Page 171

conversations about accommodating his medical leave and adjusting the date of when he could start employment that you were part of.  It's a yes/no question.

A.  I am not aware.

Q.  You did not have any of those conversations?

A.  I don't know.

Q.  You don't know if you had a conversation about changing his start date?

A.  I just shared -- we had talked about all the contract terms and tried to reach out to him around his contract terms.

Q.  Not all of them, but the loan assistance is that what you just said.  I'm asking about the date of beginning of employment.

MR. SABEY:  Same objection.  This is just argumentative.  He has already --

MS. HALPERN:  He hasn't answered my question yet.

Q.  (BY MS. HALPERN)  What conversations were you part of where you discussed changing the start of Dr. Peddada's employment date?

MR. SABEY:  Iris, you've seen the emails where they said he is going to start on August 1st.

Page 172

MS. HALPERN:  I'm asking about his conversations.  Don't coach the witness, please.

A.  As stated, we discussed all terms of the contract.  We reached out to him and, ultimately, he did not respond to discuss.

Q.  What did he say about the start date?

A.  That's part of the terms of the contract.

Q.  But you're not telling me what you spoke about.

A.  You --

Q.  You're obviously avoiding answering this question.  Can you please just answer it?

A.  We didn't know what to expect from him at that point.  He would not communicate with us, so we didn't say specifically "What can we do to accommodate?"

We said -- we want to discuss this option with him because we had the intent of employing Dr. Peddada every step of the way.  We ultimately did not and declined because he would not communicate with us.

And we did not know if he could fulfill the obligation of August 1st or anywhere beyond because there was no communication back to us.

Q.  And the option that you reached out to

Page 173

talk with him about was not his start date but about the loan recruitment assistance.  That was the one change in the contract; right?

MR. SABEY:  Object to the form and foundation.

A.  We reached out to discuss the details of his contract.

Q.  (BY MS. HALPERN)  Why did you have to do it right then?

A.  I'm not sure I understand your question.

Q.  Why did you need to reach him at the beginning of May?

A.  Because to be able to move towards an August 1st start date, it takes several months for credentialing and privileging as an employed physician within the medical group to be able to start on that date.

If he was not intending to pursue that date, we would need to adjust that date, and ultimately he was not communicating with us to be able to satisfy the terms of the agreement.

Q.  What would have happened if you had to adjust the August 1st start date?

A.  It would have started at whatever date we agreed on as a collective with Dr. Peddada.



Page 174

Q.  Okay.  And what would have been the difficulty in starting at a later date?

A.  Outside of patients not being cared for and have access to a radiation oncologist for one, we would have to bring in interim support of physicians to be able to fill that gap and/or an additional burden to Dr. Monroe during that period of extended leave.

At the same -- again, as stated, our intent was to employ Dr. Peddada.  Our intent was to work with him on a start date, but there was no communication back from Dr. Peddada for us to do so.

Q.  I ask if it would have been possible for Dr. Peddada to return from medical leave and work as a contractor until the employment contract was in place?

A.  I don't know.  We didn't discuss that at the time.

Q.  Would that have been an option knowing what you did know?

A.  At that -- we needed -- at that point we were moving down an employment path.  We had employed Dr. Monroe.  We were bringing in temporary and recruiting for physicians within our employed group to satisfy the needs and fill the gap in service, and ultimately we were going to move down an employment

Page 175

path.

Q.  Ultimately, but could you have paid Dr. Peddada on a 1099 or through some other means while you got an employment contract in place?

MR. SABEY:  Object to form and foundation.

A.  We didn't typically do that.

Q.  (BY MS. HALPERN)  But could you have?

MR. SABEY:  Same objection.

A.  If there was communication back to where -- how -- fulfilling those needs and communication of what his interest was, we could work on options of providing that service, but there was no communication back.

Q.  I was just asking if you in your position as the VP, would that have been possible.  Not did you --

MR. SABEY:  This has been asked and answered.  I instruct the witness not to answer the same question again.

MS. HALPERN:  No.  You can't do that.  It's not -- the only basis for instruction is privilege on not to answer.  He can answer it because he didn't answer it the way I asked.

MR. SABEY:  I am not going to sit here

Page 176

and let you badger him asking the same questions again and again.

MS. HALPERN:  I am not badgering.  My -- you cannot instruct him not to answer.  That is improper.  Are you actually going to write a brief and submit that for protective order?

Because that's what you're going to have to do.  Or you can just let him answer.

MR. SABEY:  He has answered the question.

MS. HALPERN:  No, he hasn't.  I didn't say "Did you communicate that and work on that with Dr. Peddada?"

That wasn't my question, so you are not listening.  Now, cut it out.  Let us finish this.  You're doing this intently.

MR. SABEY:  No, I'm not.  I'm just --

MS. HALPERN:  Are you filing for protective order under Rule 26 on this?

MR. SABEY:  No.

MS. HALPERN:  Because you have to file a brief --

MR. SABEY:  No.  I am just telling you that you need to stop badgering him.  He has --

MS. HALPERN:  I'm asking the question, Mark, and I don't want to have this side dispute with

Page 177

you.  Okay?

THE DEPONENT:  Is it okay if we have a break?

MS. HALPERN:  That is not the proper form for objection.

What?

THE DEPONENT:  Can we have a break?

MS. HALPERN:  Can we answer this one question:

Q.  (BY MS. HALPERN)  Just in your position -- in your position as the VP, I'm asking not whether you negotiated this with Dr. Peddada.  I'm asking:  Would it have been possible to have a later start date of employment by employing him as a contractor in the interim?

A.  As I answered, I didn't -- well, I did not have that authority to look at a different and alternative model in my sole discretion.

We were moving down an employment path.  We had the ability to move and adjust his start date for which we would need to communicate with him about, and he was unable to communicate with us.  Or not willing to communicate with us.

MS. HALPERN:  Okay.  You can take a break now if you still want one.



Page 178

THE DEPONENT:  Thank you.

(Recess taken, 3:21 p.m. to 3:25 p.m.)

Q.  (BY MS. HALPERN)  Mr. Weller, we have taken a short break.  Anything you want to change with your testimony?

A.  No.

Q.  All right.  I am going to move on and ask you about what Mr. Plauth might have meant in Exhibit 83.

A.  Is that the last one?

Q.  Yeah.  That's the one we were looking at just now before you took a break.

A.  Okay.

Q.  Where Mr. Plauth -- same message, says, "Overall, unless suicidal, which he is not, this is the wrong way to approach this and not supported."

Do you have any idea what that means?

A.  I don't.  As mentioned, as the chief medical officer of the hospital, he could be referencing the bylaws of the medical staff in which, again, the discussion of suicidal, et cetera.  But I don't know what he was referring to.

Q.  Okay.  So you're speculating.  You don't know if there is any, like, policy that talks about someone being suicidal?

Page 179

A.  No.  Not from the bylaws for the medical staff at Penrose.

Q.  Okay.  So you don't know what he is referring to there.  How about, "We will offer different approaches"?

Do you know what he might be referring to there?  In that sentence, "We will offer different approaches, but he lacks the insight to likely consider it."

Do you know what he is referring to there?

A.  Just in reference to the above.  So Dr. Dee Thompson was a representative of wellness services for Penrose medical staff and Dr. Plauth, chief of staff for the medical staff, so I think he was referencing that hey, we'll have Dr. Thompson offer her services to him, and also Dr. Baldauf as chief of staff, what his options are for medical staff.

Q.  Did you have any conversations with anyone about different approaches that is CC'd to this email?

A.  No.  That's handled at medical staff.

Q.  Okay.  So you're saying that you had some, I guess, input into the decision to rescind

Page 180

Dr. Peddada's employment offer; is that right?

A.  Correct.

Q.  So what do you -- what conversations do you recall around that?

A.  General intent was, let's reach out to him, discuss options for employment in the terms of that contract.  Upon no return communication, the concern was that at that point there was -- there was not consideration from Dr. Peddada of employment, and ultimately, at that point we would rescind the offer.

Q.  Okay.  And who made the decision to rescind the offer?  Who made the final decision?

A.  If I recall correctly, the letter and communication came from the interim CEO at the time, Jason Tacha, of the medical group.

Q.  And did you speak with Jason Tacha at all directly, have any conversations about rescinding the offer or not?

A.  It was by committee and discussion of what was the best path forward with service line leadership, myself, medical group, and ultimately, Jason sending that communication.

Q.  Okay.  Can you tell me who was part of that committee you just spoke about?

A.  Jeff Albert, Eric, Dr. Plauth, myself,

Page 181

Jason Tacha, and ultimately, the decision was made that way.

Q.  And this was a meeting with all five of you or a phone call?

A.  I -- I'm trying to remember if it was in person or virtual, but likely virtual given the geography for which we --

Q.  Okay.  So what do you recall about this likely virtual meeting to rescind Dr. Peddada's employment offer?  What did you say?

A.  I don't recall specific comments beings made, but I was supportive of the decision to move forward with rescinding the offer.

Q.  Do you recall what anyone else said in this virtual -- potentially virtual meeting to rescind Dr. Peddada's job offer?

A.  We discussed general timeline, and ultimately, communications with Dr. Peddada.  The outline of the timeline of times that we've reached out to him.  Ultimately, the -- all the discussions to date, and ultimately, did not take that decision lightly, again, as -- as the intent had always been that we were looking to employ Dr. Peddada.

And -- and the discussion of -- of currency practice, what our needs were, and



Page 182

ultimately, the decision was to rescind the offer at this point -- or at that point.

Q.  You're saying this -- how was this reached?  Was there a consensus and everyone agreed?

A.  Yes.

Q.  And there were five of you at that meeting?

A.  That I recall.

Q.  There may have been more?

A.  Could have been.

Q.  And you said "The intent was always to hire Dr. Peddada"?

A.  Because he was an established physician within the practice, that we had been working with him from that day in discussion of -- that we would move from an independent practice to employed.

There was conversations directly with him of that approach and plan.  Obviously, everybody was working towards that, that was always the intent until communication was dropped.  And ultimately, at that point we didn't know what the intentions of Dr. Peddada were.

Q.  Did anyone call into question the intentions of Dr. Peddada during this meeting?

A.  What do you mean by "call into question"?

Page 183

Q.  Like, you're saying that people didn't understand what his intentions were.  What do you mean by that?

A.  When we sent him a revised contract to sign, which as you stated, he already signed a wet copy of a draft agreement.  We did not execute that.  We tried to communicate to him about that.  Attempted to reach out about that, and he declined to discuss, and ultimately, move towards employment.

There was no further communication at that point.

Q.  So why -- I guess, why -- what was said about -- what was said in this meeting about why people were doubting his intentions?  Do you mean people thought he wasn't going to sign and come back to work?

A.  Correct.  That's exactly what was happening.  He wasn't willing to communicate with us, and he did not sign his agreement.

Q.  So were there discussions during this meeting where the collective decision to rescind his employment offer took place, was there discussions that people thought he wasn't going to ever come back from leave?

A.  We didn't know.

Page 184

Q.  But what did you discuss about that?

A.  That we didn't know.  We didn't know what his intentions were.  His plans were as he would -- up until that day, up until a time there was the discussion of starting August 1st; there was the discussions of the contract; there was discussing about what were next steps.

Ultimately, as there was a deviation that was -- and had planned and communicated with him about the plan and change to the contract, and then he stopped communicating with us.  So we didn't know what his intentions were.

Our commitment as a not-for-profit community hospital was to remain and provide services for radiation and oncology patients in that community.  And our intent was to fulfill those needs with or without Dr. Peddada depending on what his desires were.

Our intent was to employ him as a medical staff, long-standing medical staff physician, and ultimately, bring him into the medical group.  That was our intention.

Q.  Have you had any indication prior to this meeting where you all collectively decided to rescind his job offer, had you had any indications from

Page 185

Dr. Peddada before that that you thought he was not going to return to work at Centura, you personally?

A.  All actions were to move forward with employment and the offering of the contract to him, but doing it in an appropriate and fai- -- in an appropriate way with all -- everything documented.

My -- my intentions were to employ Dr. Peddada, outline the terms that were appropriate, that were fair market value.  Because ultimately I would be accountable if we were to -- myself, Centura others, that we be in breach of Stark and Kickback rules if we were to offer compensation without proper documentation and fair market value support.

Q.  Okay.  And did you -- who did you speak to about -- or let me back up.

You said there was always intention to hire him.  Any other reason other than his lack of communication while he was on medical break come up during this collective decision to rescind his job offer as a reason for rescinding the job offer?

A.  The only thing additionally discussed was the behavior between Dr. Peddada and Dr. Monroe and their interaction between the two of them as partners that was concerning.

That said, we understood the situation

47 (Pages 182 to 185)



MAGNA
LEGAL SERVICES

Page 186

and we looked to take measures to be able to mitigate those concerns by separating the two by site.

Q. Were those concerns equal for Dr. Peddada and Dr. Monroe?

A. Yeah.

Q. So it wasn't specific to Dr. Peddada, it was a dispute between the two of them?

A. Correct.

Q. Anything else at this meeting that was discussed as the reason to rescind the job offer other than lack of his lack of communication while on medical leave and the mutual dispute between Dr. Peddada and Dr. Monroe?

A. No.

Q. And the decision to rescind Dr. Peddada's job offer was not predicated on the dispute between Dr. Peddada and Dr. Monroe?

A. No.

Q. Just the only reason was this lack of communication while he was on medical leave?

A. Correct.

Q. Do you recall any other statements or comments that were made by anyone in this meeting where you collectively decided to rescind Dr. Peddada's job offer?

Page 187

A. No. Can I clarify one of my corrections?

Q. Sure.

A. Because you keep stating "his lack of communication on medical leave."

His medical leave was from the medicine staff. That was not medical leave from the employment of Centura.

Q. He was not -- I understand your position on it. There was no medical leave from --

A. There was no medical leave when he is not employed by the medical group.

Q. Okay. And we discussed that before; right? Your -- your understanding of it?

A. Yeah.

Q. Okay. So did you, during this collective meeting where you all collectively decided to rescind the employment agreement, did you discuss anything around kind of the Stark or Kickback or anything like that with the other folks in this meeting?

A. At that -- the documentation needed to be imbedded within the contract and a separate agreement signed for the recoupment of that recruitment assistance.

Q. And what did you say about that topic during this meeting?

Page 188

A. At that point in time, that was already imbedded within the employment agreement. But up until that date, that absolutely had to be a must, that we had to have a separate agreement signed, and ultimately, a position in the employment agreement point to that that they had that obligation to fulfill that responsibility.

Q. Okay. So let me just clarify. Was this something you said during this meeting where all of you decided to rescind Dr. Peddada's job offer together, or was that conversations you had before where you had described to myself that you needed to include that language in the employment contract?

A. Yeah. Primarily, yeah. I mean, it was up until that date it was always discussed that we have to have this agreement in place. And then ultimately, the discussion was, is in that -- in that group is that -- that's absolutely a must to have in this contract.

We're not sure if that's his intention of not signing that agreement, that he is not willing to fulfill that. There was a part of that conversation contract. So to your point, that was one other thing I failed to mention.

Page 189

Q. So was that leading up to this final conversation or was that during this conversation you're saying the five of you plus some others may have met and made this collective decision together?

A. Both.

Q. So you recall actually talking about that in this collective meeting to rescind the employment offer?

A. Yeah. A conversation of: Is that the reason why he is not willing to communicate with us with regard to this contract? Is this why he was not willing to sign it now?

Because he was really quick to sign the draft agreement without that language in there. this is change, and now he is not willing to sign it.

Q. Okay. So you remember saying that during this collective meeting to rescind Dr. Peddada's employment offer?

A. It was a discussion point by all parties.

Q. Yeah. I'm trying to figure out when. Not if, but when. Was that in this conversation or earlier conversations leading up to this conversation, according to your memory of events?

A. Primarily in that conversation with some -- those comments prior to as well.

48 (Pages 186 to 189)



Page 190

Q. Did anyone say other than that he hadn't signed -- did anyone say why they thought that that might be the case?

A. That was the only thing that changed in the contract.

Q. Okay. But what did people say about that? Is that your opinion or did someone say something about that?

A. That was a discussion point. Again, I can't speak to a specific conversation. But that was the general conversation up until that date, and ultimately, part of that final conversation as well.

Q. Okay. Had you had any conversations with Dr. Peddada prior to his -- his leave? Did you have any conversations with him about loan forgiveness, you personally?

A. Me personally, no.

Q. Do you know if anyone did?

A. From my recollection and my conversations, Eric Koval and/or both Jeff, I told them, have to settle that recruitment assistance."

Q. Yeah. I understand you had that conversation with them. Do you know what they said -- do you know what conversations happened with Dr. Peddada?

Page 191

A. I know conversations occurred, but I was not there present.

Q. So do you know what the content of those conversations were or did you hear that secondhand?

A. That we would have to include a contract that referenced and that there would need to be fulfillment of that loan forgiveness either -- either through payment or through service to the community.

Q. Okay. How do you know what was communicated to Dr. Peddada about loan forgiveness?

A. I was not present in those conversations. That was my correction.

Q. That's what I'm trying to clarify. Do you know what was actually said to him? I know you're saying that it had to happen, but do you know what conversations actually happened with Dr. Peddada about loan forgiveness leading up to his?

MR. SABEY: Object to the question because first you asked him about secondhand knowledge and now your changing it to firsthand knowledge. So just be clear about what you're asking.

A. I was not present as part of those conversations.

Q. (BY MS. HALPERN) So I think we have established that you didn't have those conversations.

Page 192

You don't have any firsthand conversations with Dr. Peddada about that?

A. Correct.

Q. Do you have any information about what was communicated to him about loan forgiveness by Eric Koval?

A. Eric Koval -- I explained to him that we would need to have an agreement in place on speaking to the responsibility of that loan forgiveness, which he understood. He explained to me that he had communicated to both Dr. Peddada and Dr. Monroe about that. Again, was not their firsthand, and my communications from him back that were -- that that occurred.

Q. Okay. And what did he say? Did he ever report back to you about how those conversations went with Dr. Monroe and Dr. Peddada?

A. That generally, they -- they understand -- again, when you're asking for a physician for pretty significant dollars amount it's not coming with a lot of excitement.

But generally speaking that they understood the situations and that we were looking for a way to figure it out. Again, we were trying to vet it as a loan forgiveness as service within the medical

Page 193

group over time.

Q. Did Mr. Koval tell you anything else about either what Dr. Monroe or Dr. Peddada said about their conversations with him about loan repayment?

A. Nothing that I haven't already restated.

Q. Same set of questions with Jeff Albert. Do you know if he spoke with Dr. Monroe or Dr. Peddada? To your knowledge, do you know if he spoke with them about loan forgiveness?

A. I believe so as well because, again, there was conversations between Jeff and the docs and Eric with the docs as well. So it was a lot of conversation between the two of them with that individually.

Q. Did Mr. Albert ever report back to you what Dr. Peddada or Dr. Monroe said in these conversations about loan forgiveness?

A. That I recall generally saying that they understand the situation. They're not thrilled about it, but that they understand.

Q. Any further -- anyone else that you know about that -- that you know about that spoke to Dr. Peddada and Dr. Monroe about loan forgiveness?

A. No.

Q. And do you recall either Mr. Koval or

49 (Pages 190 to 193)


MAGNA
LEGAL SERVICES

Page 194

Mr. Albert reporting back to you kind of any -- any different response from Dr. Monroe than Dr. Peddada? Or is it just generally what you described now?

A. I don't recall a specific variation between the two.

Q. And anything else you remember anyone speaking about during this collective meeting where you were all present and deciding to rescind Dr. Peddada's job offer?

A. No.

Q. You told me everything you remember about that meeting?

A. That I recall.

Q. And what do you recall happening next?

A. As stated earlier, the communication -- sorry. The last thing that was communicated in that meeting is: What were next steps?

So to answer that question of who was it going to come from was the CEO of the medical group, which at that time was Jason Tacha. And that communication went out to Dr. Peddada.

Q. And I'm just going to ask -- I'm going to show you what has been designated as Exhibit 13 in the past. While I review, do you have Exhibit 13 before you?

Page 195

(Deposition Exhibit 13 was referenced.)

A. Yeah. Sorry. Yep. I have it now.

Q. Do you want to scroll through Exhibit 13 and see if you recognize it?

A. Yes.

Q. What is Exhibit 13?

A. Exhibit 13 is -- or Peddada 06 was an official communication to Dr. Peddada related to his employment offer and status of that.

Q. And on the following page, there is -- is that an email from you?

A. That is.

Q. And was this -- what was this email? Was this the communication of the letter above to Dr. Peddada?

A. Yes. This is -- the attached letter was the reference above, again, the official communication from Jason Tacha as the president of the medical group. And ultimately, the part of the discussion was that I would send it as a familiar face of -- to Dr. Peddada and -- but the official communication came from him.

Q. So that's a new part of the conversation, I think. Was this part of the conversation where you

Page 196

all collectively decided to rescind his job offer, that you would send it?

A. I'm sorry. That -- the official communication was coming from Jason Tacha, to your point. Because -- yeah, I delivered the message as a reference to what it was.

Q. Right.

A. But the official communication was Jason.

Q. And who made the decision that you should be the one to email Dr. Peddada with Tacha's letter?

A. That was that group, as referenced earlier, and obviously CC'ing Jeff and Eric as service line points of contact.

Q. So this was a collective decision that you would be the one emailing him?

A. Yeah.

Q. Do you remember when the meeting took place, this meeting where all of you either met in person or virtually, probably to, like --

A. I don't have a date.

Q. -- to rescind his offer. Sorry. Go ahead.

A. I don't have a specific date.

Q. Do you know if it was, like, a day before this one, a couple days before it?

Page 197

A. I -- I don't have access to a calendar.

Q. Okay. I don't know if this is going to refresh your recollection at all. It may or may not. I think this is going to be introduced as Exhibit 84.

(Deposition Exhibit 84 was marked)

Q. (BY MS. HALPERN) Mr. Weller, do you have open before you what is going to be designated as Exhibit 84?

A. Sorry. It comes up as "pages from," and that's all I can see.

Q. Yes. That's because I extracted from a larger number of documents and that's how my computer automatically names them.

A. I'm look for Peddada 0209?

Q. Yes, 0209. Do you have that open?

A. Yes.

Q. My guess is you haven't seen this before, but have you seen this before?

A. I have not seen this before.

Q. Okay. It indicates that you were emailed this new CHPG employment agreement for Dr. Anuj Peddada. It has several entries for you there. And then it says, "Document canceled by Robin Lane on May 5th. Do you see that?

A. Yep.



Page 198

Q.  Does that help you at all situate when that five or more of you met to collectively rescind Dr. Peddada's employment agreement or employment offer?

A.  Honestly, I don't.

Q.  It's not helping you ring a bell?

A.  No.

Q.  Do you have any idea how long Dr. Peddada was on leave before you met -- before all of you met?

A.  I don't.

Q.  Okay.

A.  That was, again, two years ago.  I don't have a fresh memory.

Q.  Okay.  Who is Robin Lane?

A.  She is the director of contracting.

Q.  She is director of contracting?

A.  Yeah.  I think it was -- she was part of -- the lead of the contracting team.

Q.  Okay.  So you sent Dr. -- you sent Mr. Tacha's letter out.  And we're going back to Exhibit 13 here.

What efforts did you personally make to contract Dr. Peddada before you emailed him Mr. Tacha's letter on May 10th?

A.  The communication was occurring by Eric

Page 199

and Jeff and then the continued -- a reach out by them occurred.  I did not personally reach out to Dr. Peddada at that time.

Q.  I'm not asking about their reach out efforts, I'm asking you about yours.  Did you make any efforts to reach out to Dr. Peddada before you sent him this letter rescinding his job offer on May 10, 2022?

A.  No.  I think I answered.

Q.  And then below that, in Exhibit 13, Dr. Peddada responds to your email?

A.  Correct.

Q.  What did you make of Dr. Peddada's response to your email when he said there was a clear mistake regarding his executed contract?  What flashed through your mind?

A.  That I -- I don't recall my -- my initial reaction to this.  Again, we had reached out post his -- post his initial reply, and he would not respond.  When I say "we," I mean Eric and Jeff reached out it.

Q.  Do you think that Dr. Peddada was lying about believing he already executed his contract?

A.  I don't know what to believe.  He wouldn't communicate to us.

Page 200

Q.  Well, in this email is what I'm referring to, when he emailed you back?

A.  To that date, he was not communicating us.  Until we rescinded the offer, he was not communicating with us.

Q.  Okay.  But I'm asking you about your opinion about this email he did receive.  I understand you're saying he did not communicate with you.  But when you got this email, do you have any recollection of what you did?

A.  My opinion was that if he wanted to be employed, he would communicate with us.

Q.  But when you got to this email on May 10th in response to your email with the letter, what did you do?

A.  I -- I mean, I don't know.

Q.  Do you recall doing anything when you received Dr. Peddada's response on May 10, 2022, to your email that you had sent earlier in the day rescinding Dr. Peddada's job offer?

A.  I -- I responded with that -- part of that attachment that is on May 11th.

Q.  Okay.  Do you recall having any conversations before formulating that response to Dr. Peddada's email?

Page 201

A.  We, again, outlined -- we outlined that email as a response to Dr. Peddada's email.

Q.  What conversations did you have with anyone while formulating that response?

A.  I met with my attorney at the time to discuss what our options were and what should be outlined in that email.

Q.  Okay.  Did you talk with anyone else, other than an attorney, before responding to Dr. Peddada's email of May 10, 2022?

A.  I can't recall.

Q.  You don't recall if you spoke with Mr. Koval?

A.  I can't recall.

Q.  Or Mr. Tacha?

A.  Again, I can't recall.

Q.  Or Mr. Albert?

A.  I can't recall any other conversations outside of with my attorney.

Q.  So when did you get this information about how -- since you had made efforts to reach out to Dr. Peddada while he was on leave?

A.  Like I said, all communicated in previous meetings as well.  We outlined the timelines and events leading up to that.



Page 202

Q. So that's where you got the information from? I'm just seeing if you had any conversations before sending this email out, in Exhibit 13 on Peddada 0009?

A. Again, can't recall.

Q. Only the attorney is the one you recall?

A. As a multiple response, correct.

Q. Okay. Did you -- did you recall speaking to an attorney prior to sending your letter rescinding Dr. Peddada's job offer on May 10th? Did you have a conversation?

A. I -- I honestly don't recall.

Q. So the only conversation you recall having is with an attorney prior to sending out a response to Dr. Peddada's email on your response on May 11, 2022?

A. Correct.

Q. And other than the efforts described in Peddada 00009, which is the last page of Exhibit 13, are you aware of any other efforts to reach Dr. Peddada to talk to him about this new contract before you all collectively made the decision to rescind his employment offer?

A. Not aware.

Q. You're not aware of any?

Page 203

A. I -- I'm not aware.

Q. Any additional efforts?

A. Again, I'm not aware.

Q. You're not -- I'm just trying to finish a sentence.

You're not aware of any additional --

A. Correct.

Q. You're not aware of any additional efforts?

A. Correct.

Q. Okay. And if you go to the first page of Exhibit 84 --

A. Sorry. 84. Which one is that?

Q. Sorry. Exhibit 13. The one we were looking at.

A. Oh, okay.

Q. So that's going to be Peddada 000006.

A. Okay. Got it.

Q. It says, "The hospital is not extending a revised offer of employment."

Do you recall any conversations taking place about that? Is it just because you were ending employment, he had no way to work for Centura ever again?

A. This is specific to working with the

Page 204

medical group.

Q. Okay.

A. So to clarify, he was on the medical staff --

Q. Right.

A. -- at the hospital, which is part of Centura. This is employment with the medical group.

Q. Okay. So is it -- did you recall discussing at all with anyone else the fact that Dr. Peddada could no longer seek employment with the medical group?

A. That's -- that was outlined in that letter.

Q. Even if he got back, as he did, there was no chance that the medical it group was willing to reconsider?

A. At that point, the decision was made not to extend a revised offer.

Q. And we've discussed the reason for that when we discussed the meeting where you all collectively decided to rescind his job offer?

A. Correct.

Q. And it was -- the decision was also made that even if he got back to you, there would be no extended offer regardless of what he said when he got

Page 205

back to you?

A. It is stated in that letter.

Q. I'm sorry. I didn't hear you. You're leaning a little further away.

A. Sorry. As it stated in that letter: "The hospital is not extending a revised offer of employment."

That was part of the decision outlined in that letter.

Q. Under any circumstances?

A. It doesn't say that. It says, "Hospital is not offering a revised offer of employment."

Q. Did you discuss that?

A. I don't recall. But I'm not agreeing with your comment of "under any circumstances," because that's not what it says.

Q. Okay. I'm asking you what you recall about a conversation around that specific --

A. I get it. I just don't want to agree to something that is not accurate. So...

Q. Okay. Would you have considered employing Dr. Peddada in the medical group if a third position had been posted for a -- if that third physician that was posted for Kathpal -- and I don't know if that happened?



Page 206

MR. SABEY: Object to form and foundation.

MS. HALPERN: What?

MR. SABEY: I said, "I object to form and foundation."

A. I can't speculate that he did not apply.

Q. (BY MS. HALPERN) Would you have considered it? Would you have considered the application personally?

A. I consider all things. Whether it is a yes or no answer, I consider all things. But at that time, we were not extending a revised offer as stated, and he never applied so the option was not considered.

Q. Okay. Did anyone follow up with Dr. Peddada, other than the email at the bottom of Exhibit 13 that you're aware of to talk to him about why he was -- his job offer was rescinded?

A. Not that I'm aware of.

Q. And do you recall discussing with anyone -- I'm going to actually -- okay. So you are not aware of any of those conversations. Okay.

And at bottom of Exhibit 13, you say that as a result of your lack of communication on executing the employment/installment agreement, Centura provided notification concerning the status of your job offer.

Page 207

That was the letter from Tacha; right.

A. Correct.

Q. Was there any -- you -- that was the only reason, the reason you provided in this email for resending Dr. Peddada's employment offer?

MR. SABEY: Object to the form of the question. It mischaracterizes what has been previously testified to.

Q. (BY MS. HALPERN) Go ahead.

A. Can you rephrase the question again?

Q. Sure. I'm reading the last sentence of your email in Peddada 00009.

A. Okay.

Q. It says, "As a result of your lack of communication and not executing the employment/installment agreement, Centura provided notification concerning the status of your job offer."

Those were the reasons for rescinding Dr. Peddada's job offer; right?

A. Yeah.

Q. And what do you recall after -- what other communications do you recall happened with Dr. Peddada after Exhibit 13?

A. I don't recall any communication with Dr. Peddada.

Page 208

Q. Did you have any subsequent emails with him that you recall?

A. Not that I recall.

Q. Did you email Dr. Peddada about any further communication about loan repayment or settlement?

A. This is the last communication that I recall. If there was, I don't have any recollection.

Q. Okay. Do you -- do you -- well, I'll show you some documents to see if they refresh your recollection at all. But do you recall any conversation the about following up with Dr. Peddada about either loan repayment or settlement?

A. Sorry. You said you were going to share with me.

Q. Yeah. I'm just seeing if you have any independent recollection before I do.

A. No.

Q. Okay. Mr. Weller, I believe this email chain is going to be designated as Exhibit 85.

(Deposition Exhibit 85 was marked.)

Q. (BY MS. HALPERN) Do you have Exhibit 58 opened before you?

A. Was it the same exhibit that we already reviewed?

Page 209

Q. No. This is a new one. I just put it in the chat.

A. Oh. Sorry. I have to download it, and save it, and then open it again. I have it open again now.

Q. And I would, you know, recommend this time maybe starting from the top and going down. And this may not refresh your recollection that much. I understand that. I'm just showing it to you to see what it pull up.

A. Honestly, I was on that email from -- my name is listed there. I don't -- I don't recall what it says. Obviously, the response from Dr. Peddada is outlined, at which point I recall and assumed all communications would go through our attorney at that point.

Q. Okay. Other than with an attorney, did you at all talk -- does this help refresh your recollection if you spoke to anyone about loan repayment, any of your colleagues about the loan repayment or settlement?

A. Just that, again, the next step is -- was that -- that since we were -- he was not moving into employment, that the recruitment assistance obligation and loan repayment would still need to be satisfied,



Page 210

which that agreement outlines. And that was forwarded to him by Robin Lane.

Q. And this was on May 13th, three days after you guys rescinded his job offer, and still no one discussed the fact that he was on medical leave. You still didn't consider him to be on medical leave?

A. Again, to clarify, he was on medical leave from a hospital medical staff at his employment with -- he was never employed by Centura Health Physician Group.

Q. Did any of you discuss his allegations that you see on the first page of PSF Peddada 0228? Did you -- not with an attorney -- did any of you discuss, outside of the presence of an attorney, his allegations of discrimination and retaliation?

A. I don't recall any conversations outside of my conversations with our attorney.

Q. Did anybody -- outside of the presence of your attorney -- did anyone discuss the fact that at that time Dr. Peddada complained that he was being retaliated against for requesting medical leave?

A. Can you repeat the question?

Q. Sure. It says in Dr. Peddada's email here in the third paragraph, second sentence: "As you know, the hospital has revoked my offer of employment

Page 211

in retaliation for my request for a short leave of absence as strongly recommended by my primary care physician through August 1, 2022, for reasons, among other things exhaustion."

Did anybody discuss that outside the presence of an attorney? Did you discuss that with anybody?

A. At that point, I let all communications go from attorney to attorney.

Q. Sure. I mean, I think -- with Dr. Peddada. I'm just talking about: Did you have any internal conversations not with an attorney present, discussing Dr. Peddada's response here on May 13th, with, like Mr. Koval or Mr. Albert or any of the other ones, Plauth?

A. I can't recall a conversation.

Q. You didn't have a conversation that you recall talking about his claim for retaliation for requesting medical leave?

A. Not that I recall.

Q. Okay. And you didn't have a conversation about his allegation of discrimination and retaliation that are in this email on May 3 -- on the 13th?

A. Sorry. What? I'm a little bit confused. Is that a different question?

Page 212

Q. Yeah. There is another sentence following the one I just read to you. Dr. Peddada says in the following sentence, "I'm considering filing a lawsuit for unlawful discrimination or retaliation. The fact of the matter is that by doing so, the hospital has created significant financial hardship for me."

Did anyone -- outside of the presence of an attorney -- did you talk to anyone about those allegations?

A. Not that I can recall.

Q. Did anyone discuss, you know, the Family Medical Leave Act or the Americans with Disabilities Act? Did anyone talk about that outside of the presence of an attorney?

A. No. He was not employed by the medical group, nor did we have a signed agreement with the medical group.

Q. I'm just asking if you remember any conversations about those?

A. Not that I'm aware.

Q. Okay. And I wanted to -- and probably goes without saying, but you did not draft the agreement that is attached to the emails that you were CC'd to in Exhibit 85; right?

Page 213

A. I did not draft that.

Q. You didn't review it before it went out?

A. No. This was the agreement for which was discussed. If I recall correctly, this was the agreement for loan forgiveness for Dr. Kathpal that the employment agreement references.

Q. Okay. Is this the one? I'm just -- I don't know what your familiarity with this particular -- I don't know if you've read it or not.

A. I haven't. I mean, I -- I --

Q. Because we have several different versions, so I just want to make sure you're not talking about -- I just want to make sure you know which one you are talking about.

Is that -- does this seem right to you, that this was the agreement that -- did you have any role at any point in time in drafting a loan forgiveness agreement for Dr. Monroe or Dr. Peddada?

A. As stated, we needed to ensure that proper documentation was outlined in both the employment agreement as well as a loan forgiveness agreement, you know, which this is, I believe, referenced right here.

So my portion act in doing so was to facilitate, but I did not prepare and draft this



Page 214

agreement.

Q.  That is what I'm asking.  So you didn't prepare or draft the agreement.  You didn't -- did you review it -- did you review the agreement after it was drafted?

A.  Likely, yes.

Q.  Likely, yes.  Okay.  So you would have some reason to be familiar with it is what I'm trying to establish?

A.  Right.

Q.  And you think that's what this is?

A.  Yes.

Q.  Okay.  And I'm going to introduce Exhibit 86.  Mr. Weller, if you could please open Exhibit 86.

(Deposition Exhibit 86 was marked.)

Q.  (BY MS. HALPERN)  Do you recognize Exhibit 86, Mr. Weller?

A.  No.  I haven't seen it until now, but it's obviously my email.

Q.  Okay.  I'll give you a minute to look at it.  So you -- are you saying you didn't send this email?  Or are you just --

A.  No.  I could -- again, I can't recall every email that I sent two-and-a-half years ago.  So...

Page 215

Q.  It's just you said you never seen it, so I was double-checking if it is just you don't recall it or --

A.  Since then.  Sorry.  Because I know I stated earlier that I don't recall any communications after the fact.  Again, I can't recall all the emails that were sent, so I...

Q.  Okay.  Is this refreshing your recollection at all about any post rescinding of job offer conversations you had about loan forgiveness or -- sorry -- loan repayment or settlement with Dr. Peddada?

A.  I just -- obviously, the communications that he did not reply to here or that I don't recall him replying to that we sent out requesting the settlement of the situation.

Obviously, as stated, we provided remuneration to the group, and our concern was that we took every step to be able to satisfy and ultimately recoup those dollars as a loan.

And that -- obviously, again, I've seen it and recollecting that I reached out to provide him those agreements, and ultimately circled back on a revised agreement.  I don't recall the outcome of that.

Page 216

Q.  This is a revised agreement.  Did you have any role in reviewing or drafting the revised agreement?

A.  I review, yes, but I'm not an attorney. That was always referred to our attorney.

Q.  Sure.  I'm trying to figure out which ones you actually had a review role in and which ones you may not have.

A.  Again --

Q.  This one is just Dr. Peddada, not with both Dr. Monroe and Peddada.

A.  Right.  Which would have been that this was specific to Dr. Peddada because he was not employed.  We were satisfying Dr. Monroe in a different way through employment.

Q.  Okay.  Do you know if you recall reviewing this particular agreement in Exhibit 86?

A.  I don't.  I can't recall a specific time reviewing this.  I know I did.

Q.  Okay.  Sorry.  Go ahead.

A.  I know I did, I just can't recall the iteration.

Q.  Okay.  Is there a reason that you're CC -- you're communicating with Dr. Peddada without CC'ing anyone else in these emails?

Page 217

A.  I can't tell you why.  I don't recall.

Q.  Was there any conversations that you recall or do you recall why you were the person who is communicating with Dr. Peddada at this time?

A.  Because I was the VP of physician alignment for the Greater Colorado and Kansas operating group, which all contracts did come through me, and ultimately, I provided this to him.

Q.  So it was just like a function of your position?

A.  Correct.

Q.  Okay.  Any other conversations you recall about trying to resolve the dispute with Dr. Peddada that don't involve an attorney?

A.  No.

Q.  You didn't talk about Dr. Peddada's potential claims with anyone -- with any of your colleagues, potential legal claims?

A.  Once his email stating he was going to be engaging with his attorney in a legal action, we -- our policy was to refrain from and work directly with our attorney in our privileged conversations.

Q.  Okay.  So there was no conversations outside of the presence of an attorney?

A.  Correct.



Page 218

Q.  Okay.  And chronologically, I assume that legal sent you a draft of this.  You didn't draft this settlement agreement?

A.  I -- sorry.  I've stated that many times. I did not draft that.

Q.  Did it come from legal?

A.  Correct.

Q.  Correct.  Okay.  Any other conversations or communications that you recall either with Dr. Peddada following the end of his employment with Centura?

A.  I don't understand the question.

Q.  I'm just asking an all encompassing one since this is the last time I get to talk to you.  Are you remembering anything else in terms of conversations about his request for medical leave, his disclosure that he had burn out, his -- the rescinding of his job offer or any communications to try to resolve his dispute, essentially, or after his end of employment with Centura?  Any other conversations that you haven't described to me that you were part of?

A.  No.

Q.  Okay.  And how about the original decision to hire Dr. Peddada and Dr. Monroe, any conversations we haven't discussed that you recall

Page 219

that might be pertinent?

A.  Just to reiterate our intent was to move forward and employ Dr. Peddada and Dr. Monroe. Obviously looking at separating them between entities to mitigate their frustration and concern with each other as business partners, but our intent was always to move down that path until communication lapsed and it ultimately went down this path.

Q.  So up until the lack of communication while he was on leave, it was always the intent to move forward.  Did anyone say that you should not -- that Centura should not move forward in hiring Dr. Peddada prior to that point?

A.  They outlined, obviously, their expressed concern of how they professionally act -- interact with each other.  Ultimately, we moved past that to pursue employment.

Q.  Any other concerns, though, with hiring either Dr. Peddada?

A.  No.

Q.  How about Dr. Monroe?

A.  We -- Dr. Monroe was hired.

Q.  I know, I'm just saying if anyone voiced any concerns because you're say it was always the intent to hire Dr. Peddada.  I'm just making sure I

Page 220

get everything you remember.

A.  No.  Same situation with Dr. Peddada, same comments.

MS. HALPERN:  I think that's all the questions I have, Mr. Weller for you.  I don't know if your lawyer has any, but I think we are finished, so I just want to thank you for your time.

MR. SABEY:  Nope.

THE REPORTER:  I need to get the orders for the transcript on the record really quickly, please.

MS. HALPERN:  Sure.  We just want electronic.  We don't need paper, just a digital.

MR. SABEY:  E-tran for me too.

THE REPORTER:  And signature?

MR. SABEY:  Send that to me.

WHEREUPON, the within proceedings were concluded at the approximate hour of 4:30 p.m. on the 13th day of December, 2024.

*    *    *    *    *    *

Page 221

CERTIFICATION OF DEPONENT

I, SAM WELLER, do hereby certify that I have read the above and foregoing deposition and that the same is a true and accurate transcription of my testimony, except for attached amendments, if any.

Amendments attached    ( ) Yes    ( ) No

_____
SAM WELLER

The signature above of SAM WELLER, was subscribed and sworn to before me in the county of _____, state of Colorado, this _____ day of _____, 2025.

_____
Notary Public
My commission expires



Page 222

Page 223

REPORTER'S CERTIFICATE

STATE OF COLORADO        )

                         )    ss.

CITY AND COUNTY OF DENVER )

I, PATRICIA BURNETT-ANDERSON, Professional Court Reporter and Notary Public, State of Colorado, do hereby certify that previous to the commencement of the examination, the said SAM WELLER was duly sworn by me to testify to the truth in relation to the matters in controversy between the parties hereto; that the said deposition was taken in machine shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form, consisting of 223 pages herein; that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.  I further certify that I am not employed by, related to, nor of counsel for any of the parties herein, nor otherwise interested in the outcome of this litigation.

IN WITNESS WHEREOF, I have affixed my signature and seal this 5th day of January, 2025.

My commission expires August 1, 2027.

_____

Patricia Burnett-Anderson
Professional Court Reporter

57 (Pages 222 to 223)



## A

**a.m**
1:14 45:4,4
**abide**
16:15 29:4 47:23
**ability**
163:11 177:20
**able**
32:20 47:22 48:11
51:13 73:1 93:21
98:19,21 99:9
102:12 114:5,16
115:3 122:2 125:18
129:11 134:12
156:24 160:20
173:13,16,20 174:6
186:1 215:19
**abrasive**
156:17
**absence**
151:17 159:12 163:6
163:12,17 164:7,12
165:6 211:2
**absolutely**
94:21 188:3,19
**accepting**
91:25 93:13
**access**
32:20 35:1 132:3,6
132:13,16 174:4
197:1
**accessible**
33:3
**accident**
158:11
**accommodate**
158:20 168:13,13
172:16
**accommodated**
166:19
**accommodating**
32:19 33:7 171:1
**accommodation**
32:12,13,25 33:12,21
33:25 34:3,7,14

158:25 167:11
**account**
128:10
**accountability**
112:23 168:16
**accountable**
185:10
**accounted**
106:1
**accounting**
105:17 106:22
**accurate**
169:24 205:20 221:5
**acquisitions**
52:7
**acronym**
22:23 126:4
**acronyms**
64:21
**act**
31:23 32:4,9 212:13
212:14 213:24
219:15
**acting**
157:4,18
**action**
1:3 217:20
**actions**
185:3
**activity**
103:21
**actual**
12:7 69:5 116:1
123:20 131:16
**acuity**
59:15
**ADA**
32:14,17
**adaptability**
51:13
**add**
93:9 100:19 101:25
103:5 114:25 115:3
116:11
**added**
87:1 125:4,18

**addendum**
100:23 106:4,16
107:4,8 112:3 113:2
113:5 114:25 115:4
116:12 117:3
129:18
**addendums**
112:25
**adding**
67:23 100:23
**additional**
17:25 65:19 68:1,3
112:3 113:5 119:23
140:7 174:6 203:2,6
203:8
**additionally**
185:21
**additive**
105:8
**address**
139:9,13,23
**adjust**
95:17 144:21 166:25
168:14,24,25
173:19,23 177:20
**adjusted**
62:4,14 169:7
**adjusting**
171:2
**adjustment**
61:23 167:1 170:5,7
**adjustments**
62:13 124:9
**Administration**
8:18,19
**administrative**
8:20,21 9:10,25
**advent**
39:5,14,24 41:13
42:7 44:13
**advice**
156:23 157:4,19
**advise**
20:6
**advised**
161:15

**advocated**
73:6
**affect**
74:9
**affixed**
223:20
**aforesaid**
223:13
**agency**
49:7
**AGMA**
64:21
**ago**
7:16,22 32:1 167:7
198:12 214:24
**agree**
205:19
**agreed**
137:20 140:14 155:3
173:25 182:4
**agreeing**
205:14
**agreement**
1:13 27:10 95:17
106:5 114:21 115:2
116:21,23 117:2
118:6 121:25 122:3
127:15 128:3,5
130:5 137:18,19,24
138:4,6,12,15 140:5
142:16 144:17,18
144:22,23 145:15
145:18,18,19,22
146:3,3,8,17,18
147:13,14 148:11
149:2,25 150:6,7,8
150:11 152:10,13
157:8 160:22 165:2
166:21 168:7,9
169:1 170:4,19,22
170:24 173:21
183:6,19 187:17,21
188:2,4,5,16,22
189:14 192:8
197:21 198:3
206:24 207:16



MAGNA
LEGAL SERVICES

210:1 212:17,24
213:3,5,6,16,18,21
213:22 214:1,3,4
215:24 216:1,3,17
218:3
**agreements**
93:22 109:22 119:21
121:21 215:23
**ahead**
112:6 113:2 114:9
120:7 127:1,3
133:15 134:2,7
151:6 168:3 196:22
207:9 216:20
**ailments**
158:7
**albeit**
73:19 105:3
**Albert**
95:11 96:18 97:2,18
114:20 115:14,25
151:21 160:5,9
180:25 193:6,15
194:1 201:17
211:14
**align**
14:7 84:15,22 108:4
**aligned**
84:15,18 85:8,9,11
**alignment**
9:22 10:10 14:2,20
25:12 29:8 65:8
66:21 69:22 78:9,20
79:10 91:3 92:2
217:6
**allegation**
211:22
**allegations**
210:11,15 212:10
**allow**
80:25 87:5 112:8,25
113:4 114:10
**allowed**
47:21 168:3
**allowing**
111:24 112:11

**alternative**
50:12 177:18
**ambiguity**
127:13
**ambulatory**
10:7 11:20
**amendments**
221:6,7
**Americans**
31:23 32:3,9 212:13
**amortization**
87:20
**amortized**
105:22
**amount**
58:7,16 87:8 192:20
**analysis**
44:21,22 47:15 64:24
102:3 108:4
**analyst**
119:15
**analysts**
119:20
**analyze**
64:15
**analyzed**
55:17
**analyzing**
50:1
**and/or**
26:17 59:15 65:19
84:15 91:17 108:15
154:11 174:6
190:20
**Anesthesia**
4:22
**Annie**
1:15
**annual**
31:5,7,9,19 88:11
89:5
**annually**
31:2 89:4
**answer**
5:8,13,25 6:4,6 134:7
134:7 156:10,12

163:21 165:24
168:3 172:12
175:19,23,23,24
176:4,8 177:8
194:18 206:11
**answered**
147:7 167:14 171:19
175:19 176:9
177:16 199:9
**answering**
170:25 172:11
**answers**
5:3,5
**Anthony**
10:7 13:3
**anticipated**
86:10,23 88:13,25
89:4 90:8
**antidiscrimination**
31:17
**Antikickback**
16:9,16 17:5 54:10
55:10,25
**Anuj**
1:6 4:12 65:4 69:5
197:21
**AnujPeddada@Ce...**
139:16
**anybody**
107:18 143:16
210:18 211:5,7
**anymore**
64:5 67:11 111:7
**anyone's**
62:12
**anyway**
110:10
**apart**
73:20
**apologize**
7:22 35:21 49:23
63:1
**applicant**
165:19 167:10,11,20
**application**
75:6,7 78:22 91:1

95:2 206:9
**applied**
38:17 83:1 206:13
**applies**
84:22
**apply**
37:23 38:1 50:24
51:13 57:13 80:18
164:7 206:6
**appreciation**
87:20
**approach**
156:17 178:16
182:18
**approaches**
179:5,8,21
**appropriate**
47:22 48:7 158:16
168:11 185:5,6,8
**appropriately**
84:20 159:14
**approval**
25:22 79:9 81:13
123:6 126:10
153:12,15
**approvals**
78:19 79:17
**approve**
91:10,12 122:19
123:2,10,11 124:17
**approved**
29:12 54:5 92:5,6
93:15,18 95:13
121:9,15 123:6,12
125:5,20
**approximate**
9:23 220:18
**approximately**
52:8 136:24
**April**
140:6 142:2 143:15
147:18 148:1
156:20 159:5
**area**
62:25 63:4 68:14
89:11



**areas**
 13:1
**argumentative**
 170:17 171:18
**arrangement**
 42:25 43:4,23 71:10
**articulate**
 5:2,5
**articulated**
 113:3,8,8
**asked**
 77:7 92:5 100:2
   114:24 128:21
   140:23 158:24
   164:11 169:19
   175:18,24 191:19
   223:15
**asking**
 5:16 33:25 34:2
   35:12,19 77:4 89:23
   97:18 134:20,21
   136:2 143:13
   146:20 147:6 153:7
   153:10 155:25
   157:13 165:7
   167:14 168:2
   169:23 171:15
   172:1 175:15 176:1
   176:24 177:11,13
   191:21 192:19
   199:4,5 200:6
   205:17 212:19
   214:2 218:13
**assess**
 64:22
**assistance**
 68:3 105:16 106:23
   117:3 121:22 122:8
   126:15 135:22
   142:18 170:9
   171:14 173:2
   187:23 190:21
   209:24
**assistants**
 155:1
**associated**

 88:4
**assume**
 5:14 8:7 38:7 92:17
   121:2 122:24 218:1
**assumed**
 79:21 86:21 209:14
**assumption**
 115:10,21
**assumptions**
 104:18 153:12,15
**attached**
 131:17 139:20
   195:16 212:24
   221:6,7
**attaching**
 142:12
**attachment**
 117:15 128:8 200:22
**Attempted**
 183:7
**attempting**
 111:21
**attention**
 56:17 155:21
**attorney**
 4:12 6:15 118:20
   135:9,12 145:10
   155:11 201:5,9,19
   202:6,9,14 209:15
   209:17 210:13,14
   210:17,19 211:6,9,9
   211:12 212:9,15
   216:4,5 217:14,20
   217:22,24
**attorneys**
 6:3 7:11 135:18
   145:23
**August**
 171:25 172:23
   173:14,23 184:5
   211:3 223:22
**authority**
 132:11 177:17
**authorized**
 112:20,21
**automatically**

 197:13
**available**
 130:21
**averages**
 84:3
**avoid**
 71:10 131:11
**avoiding**
 172:11
**aware**
 38:25 41:16 43:10
   54:22 55:1,2 56:12
   56:13,14,19 61:16
   62:6 101:3,8 130:7
   132:18 137:5
   140:18,19,21,23
   150:12 158:22
   160:2,3 161:6,20
   162:10 171:5
   202:20,24,25 203:1
   203:3,6,8 206:16,18
   206:21 212:21
**awkward**
 46:8
**awkwardness**
 47:9

_____
**B**
_____
**Bachelor's**
 8:17
**back**
 16:19,24 20:1,17,25
   44:18 45:3 88:10
   95:15 105:20,21
   112:20 116:24
   126:11 149:24
   154:3,12 162:2
   168:8 169:11
   172:24 174:12
   175:10,14 183:15
   183:23 185:15
   192:13,16 193:15
   194:1 198:20 200:2
   204:14,24 205:1
   215:23
**background**

 8:14,16 28:24
**backwardly**
 45:8
**bad**
 102:4
**badger**
 176:1
**badgering**
 134:18 176:3,23
**balance**
 109:3,3
**balances**
 125:10,14
**Baldauf**
 163:10 179:17
**base**
 35:3 71:24 102:19
**based**
 18:8 19:6,8 28:4
   29:11 30:19 31:12
   41:1 48:11 50:19,25
   57:6,14 58:22,23
   59:1,21 67:13 71:14
   71:18,19,22 72:2
   78:4 82:2,17,18
   83:16 84:8 86:22
   88:5,15 89:15 91:5
   92:7,14,14 102:9,13
   102:22 104:4,5
   115:25 140:4 166:4
**basically**
 57:9 58:7,22 87:9
   88:1 95:15 97:25
   101:24 102:3 103:1
   122:1 125:8 126:5
**basis**
 17:8 18:17 31:9
   105:22 175:22
**beginning**
 49:24 80:12 96:4
   156:10,11 171:16
   173:12
**behalf**
 1:14
**behavior**
 185:22


MAGNA
LEGAL SERVICES

**beings**
181:11
**believe**
29:15 45:13 51:22
52:3,6 61:15 79:1
94:5 95:1 103:9
122:16 128:21
147:7,19,24 153:19
155:8 160:5,17
161:13 193:10
199:24 208:19
213:22
**believing**
199:23
**bell**
198:6
**benchmark**
83:20
**benchmarking**
59:10 60:23 63:20
83:18 108:2
**benchmarks**
64:15
**benefit**
60:3 73:16
**benefits**
44:5 86:21,23 87:3
88:3 90:6,14,15
**best**
45:11 126:2 145:23
180:20
**better**
33:1 104:10 158:9
**beyond**
88:13 172:23
**biggest**
72:25
**bill**
75:1 87:12 150:16,18
151:9,12
**billed**
90:4
**billing**
87:11
**binding**
140:13

**Bishop**
144:3
**bit**
8:13 10:24 16:12,23
19:21 23:2 24:4
25:21 38:19 40:20
44:18,20 54:12
61:20 65:1 103:14
114:13 134:3
159:18 211:24
**biweekly**
48:14
**blended**
64:18
**blue**
102:16 120:11
**board**
30:6 40:6 53:8 55:11
**body**
163:4 165:12
**bonus**
90:5,11 103:7 104:3
**bottom**
49:16,20 86:4 96:17
97:3 102:6 118:25
119:3,9 141:15,23
148:4 206:15,22
**bought**
53:22
**bounds**
18:6
**breach**
185:11
**break**
5:12 44:19,23 45:1
54:14 110:4,20
114:12 153:22
154:4,24 155:5
177:3,7,24 178:4,12
185:18
**Brian**
144:5,8
**brief**
176:5,21
**bring**
51:24 60:3 68:3

70:25 73:18 89:6
120:8 124:1 142:14
155:21 174:5
184:21
**bringing**
68:9 71:25 75:21
77:1,9 87:23 88:2
89:22 108:9 155:1
174:22
**brings**
85:11
**brought**
73:4 126:13
**buffet**
30:2
**building**
12:14 32:18
**built**
89:12
**bumps**
74:2
**burden**
174:7
**burn**
218:17
**Burnett-Anderson**
1:15 223:5,24
**burnout**
152:15,23 158:25
**burnt**
152:4
**business**
8:17 9:11,20 10:1
12:2,3 42:24 71:10
91:16 219:6
**bylaws**
38:6 164:1,3 165:13
178:20 179:1
**Byron**
96:9,13 136:2,7

_____ C _____

**C**
2:1
**cadence**
5:10

**Caitlin**
80:14 120:4 121:1
123:13 128:21
131:3 132:18,21
**calculate**
60:17
**calculated**
58:10,14 61:1,25
**calculation**
58:13 61:14 87:25
**calculations**
58:11
**calendar**
197:1
**call**
41:14 47:1 105:5
115:17,19,23 181:4
182:23,25
**called**
22:21 115:24 131:25
**canceled**
197:23
**Cancer**
89:10,13
**capacity**
12:11,12 26:7 57:18
60:21 65:13 69:17
**car**
158:11
**carbon**
121:17 159:4,5
**cardiology**
13:17
**care**
11:21,21,22 13:9,15
18:14 57:16 58:14
59:4 84:19 85:19,20
85:20 211:2
**cared**
174:3
**career**
41:1
**case**
4:20,24 48:15 190:3
**cash**
86:20 105:19



catch
156:10
categories
15:25
Catholic
1:9 8:4 39:2,4,13,15
42:14 43:3,7,13,15
43:23 44:14
cause
69:4
caveat
144:13
CC
216:24
CC'd
80:10 139:16 155:19
159:19 179:21
212:25
CC'ing
196:12 216:25
CC's
146:6
Center
10:8 11:10 13:3
61:14 68:18,25 89:9
89:10,13 97:12
Centers
61:8
central
79:8 132:1
centralized
35:3 44:4,6,7 78:18
Centura
1:9 8:20 9:5,7,9,15
10:11,12,17,19,21
11:16 12:19 16:25
18:25 20:22 21:16
21:25 22:3,9,13,13
22:18,20 23:19
24:14 27:23 28:2
29:18 30:25 31:4,18
33:6,8,20 34:23
35:1 36:6,11 37:2,6
37:18 38:3,21,23
39:1,8,23 43:13,16
43:24 44:2,9,13

46:1,3,5,22 47:4,10
48:19 49:25 50:10
54:7 56:11 60:11,19
61:22 62:23 64:10
65:3,8 68:11 69:1,6
69:17,21 71:16
72:12 75:9 76:15
84:14 85:3,15,16
90:19 92:12,25
94:13 100:4 101:4
109:23 111:7
117:19 118:23,24
119:19 123:20
129:4 131:4,25
132:2,7 137:15
138:3 139:22
155:13 156:24
157:25 158:17,19
160:19 161:12,25
164:9,17,18 185:2
185:10 187:7
203:23 204:7
206:24 207:16
210:9 218:11,20
219:12
Centura's
21:2,3 34:16
CenturaHealth
139:9
CEO
11:9 40:16 42:11
53:25 64:4,6,8
144:8 180:14
194:19
certain
75:10 84:5 85:8
CERTIFICATE
223:1
CERTIFICATION
221:1
certify
221:3 223:7,17
cetera
13:9 25:24 27:15
32:15 67:21 85:20
86:5 178:21

CFO
53:25
chain
42:8 118:24 131:7
136:8 143:16
149:14,17 208:20
chains
63:4
chaired
79:11
chance
204:15
change
14:23 26:13 49:25
50:2,6,14,15 64:25
88:13 92:22 110:21
123:17,25 124:3,18
154:5 157:23,25
173:3 178:4 184:10
189:15
changed
88:19 123:21,24
124:1 157:19 190:4
changes
131:1
changing
27:21 154:19 171:10
171:22 191:20
charge
24:22
charts
40:6 101:18,19
chat
35:6,11 45:17 113:23
113:24 209:2
check
106:7,11 154:23
checked
109:3
checking
7:2
checks
125:10,14
CHGO
87:14
CHIC

41:13 42:18,25
CHIC's
42:18
chief
178:18 179:15,18
chose
11:3 29:20
CHPG
22:21,25 23:3,8,11
23:19 50:11 126:1
130:22 197:21
CHPT
22:22
chronologically
128:14 218:1
circled
215:23
circumstances
53:1 112:9 205:10,15
CITY
223:4
Civil
1:3 4:2
claim
211:18
claims
217:17,18
clarification
5:15 57:23 110:23
163:20
clarify
19:20 22:2 23:1 24:3
34:12 69:7 187:1
188:8 191:13 204:3
210:7
clear
191:21 199:14
click
35:17
clinical
103:12,16 104:4
close
115:10
clustered
8:18
CMO



75:1 163:9
**coach**
 172:2
**code**
 32:17
**coded**
 81:6
**coding**
 87:11
**collaborative**
 54:6
**colleagues**
 209:20 217:18
**collect**
 87:12
**collected**
 105:10
**collective**
 173:25 183:21
  185:19 187:15
  189:4,7,17 194:7
  196:14
**collectively**
 184:24 186:24
  187:16 196:1 198:2
  202:22 204:21
**collegial**
 17:13
**Colorado**
 1:2,9,15 4:2 8:4 9:1
  13:3 25:13 39:3,4
  39:13,16,18,20,21
  42:15 43:8,13,24
  44:14 62:25 63:4,5
  63:6 68:15 73:19
  78:11 79:14 92:16
  92:21 119:16
  120:22 217:6
  221:15 223:2,7
**Colorado/Kansas**
 15:19 40:8
**column**
 102:21
**come**
 17:7,22,24 29:7 45:3
  61:13 65:2 66:20

96:7,7 105:1 113:6
 117:5 183:15,23
 185:18 194:19
 217:7 218:6
**comes**
 28:23 197:9
**coming**
 19:8 21:5 36:22
  58:12,19,20 80:24
  100:15 148:5
  192:21 196:4
**commencement**
 223:8
**comment**
 35:21 133:14 205:15
**comments**
 181:11 186:23
  189:25 220:3
**commission**
 221:19 223:22
**commitment**
 165:25 184:13
**commitments**
 164:4
**committee**
 25:12 29:8,12 66:22
  71:5,18 74:15 78:10
  78:20 79:10 91:3,5
  91:11 92:2 180:19
  180:24
**CommonSpirit**
 8:1,3 10:21 38:24
  39:1 42:7,11,12,15
**CommonSpirit's**
 41:25
**communicate**
 18:7 150:7,10 151:18
  152:12 156:7 159:8
  159:21,23 160:13
  164:25 169:10,11
  169:13,14 172:14
  172:20 176:11
  177:21,22,23 183:7
  183:18 189:10
  199:25 200:8,12
**communicated**

184:9 191:10 192:5
 192:11 194:16
 201:23
**communicating**
 160:10 169:24,25
  173:20 184:11
  200:3,5 216:24
  217:4
**communication**
 51:16 94:12 95:10
  135:15 139:1
  149:24 156:14
  161:12 162:1 166:3
  168:23 172:24
  174:12 175:10,12
  175:14 180:7,14,22
  182:20 183:10
  185:18 186:11,20
  187:4 194:15,21
  195:8,14,17,22
  196:4,8 198:25
  206:23 207:15,24
  208:5,7 219:7,9
**communications**
 135:12,17 138:11
  162:5,6,20 181:18
  192:13 207:22
  209:15 211:8 215:5
  215:13 218:9,18
**communities**
 84:19
**community**
 12:5,25 13:1,16,18
  14:11,11 18:2 19:5
  23:21 67:18 68:14
  71:8 73:19 76:14
  81:19 85:13,20
  92:10 105:24
  184:14,15 191:8
**comp**
 78:23 103:12,16
  104:2 126:1
**comp-**
 27:18
**companies**
 64:22

**compared**
 53:12
**comparing**
 87:22
**compensate**
 90:3
**compensated**
 17:12 51:4,17 53:16
  105:15
**compensation**
 16:20 17:19 18:5
  44:21 45:9 46:2,10
  46:14,18 47:22 48:9
  48:10,13 49:8 50:1
  50:9,12,16,19 51:1
  51:23 52:18 54:17
  55:11 56:2,6,16,20
  56:24 57:1 60:20,24
  62:2,4,5,16,21
  63:13,15,17,18,21
  64:15,16 66:24
  77:13,14 78:4 83:3
  83:7 86:17,18,20
  90:13 99:2,16
  102:15,17 103:6,10
  103:12,25 104:4
  105:18,20 106:1,6
  106:17 107:7,9
  108:3,15 119:15,17
  119:20 120:9,15,17
  121:9 124:19
  185:12
**compensations**
 64:23
**competition**
 53:8
**complained**
 210:20
**complaints**
 69:8,20
**complete**
 129:9,14 133:11,18
**completely**
 88:22 165:11
**complex**
 61:3,4



complexity
59:13 82:18
compliance
17:1 26:23,25 27:4,8
27:9,19,22 28:2,10
28:21 29:3,16,22
30:25 32:17 54:2
56:10 78:17 80:13
80:22 95:21,24,25
96:2,14 107:19,22
107:24 108:5,13,21
108:25 109:2
110:24 111:11
120:2 125:15
127:12 140:13
compliance/contra...
67:2
compliant
27:10 108:16
complications
140:16
complied
16:17 47:16 94:22
comply
28:19 32:16
components
112:1 125:2,12
comports
37:13
computer
35:21 45:21 77:4
197:12
concepts
32:5
concern
69:23 73:21 76:8
156:7,13 158:7
159:24 180:8
215:18 219:5,15
concerned
156:14
concerning
185:24 206:25
207:17
concerns
69:14 70:13,15 74:2

75:13,20,23,25 76:2
76:13 156:15 158:3
186:2,3 219:18,24
concluded
220:18
condition
159:9
conditions
5:21 158:15
conference
2:2,5 42:10 115:23
conferences
42:4
conferencing
1:14
confirm
36:7 37:3 120:15
confused
20:7 22:16 134:3
211:24
confusion
21:4
consensus
182:4
conservative
102:24,25 105:4
consider
60:19 99:16 179:9
206:10,11 210:6
consideration
180:9
considered
38:10 43:2 60:18
67:9 79:10 85:8,9
99:2 106:6,16 107:7
107:8 205:21 206:8
206:8,13
considering
212:3
consistency
46:13,19 49:4 50:17
51:12,13,15 52:17
53:16 91:20 119:21
consistent
51:24
consisting

223:14
consolidated
11:3
consolidating
11:1 40:22
consolidation
41:5
constantly
27:21
consulting
49:7
contact
44:5 141:1 196:13
contemporaneously
156:1
content
37:12 191:3
continue
57:22 71:6 73:12
160:20
continued
67:5,7,9,24 87:5 92:7
199:1
continues
92:17
continuing
66:19 87:3
continuity
85:19
contract
17:10 26:14,17 28:4
29:6,10,12,14 30:3
30:5,13,15,20 37:23
44:22 48:16 49:5
57:4 65:9 66:19
67:8 76:5 78:23
79:9 80:4,5,5,6,15
80:20 95:12 96:2
98:1 100:13,21,22
106:25 107:1,24
110:1 111:11,13
112:14,21 116:5
117:5 120:5 121:8
122:5,23 123:17
124:1,4,9,15 125:13
125:19 126:9,12

127:9,10,13,15,19
127:20 129:14,17
129:19,24 130:11
133:1,7 134:13,15
136:20 137:7,11,21
137:21 140:13
142:2,25 143:15
146:5 147:12,22
148:7,15 149:20
154:13 159:21
160:18 161:13
164:19 166:2,13,20
167:1,21 168:6,14
168:19,21,22
169:15 170:5,7,12
171:12,13 172:4,7
173:3,7 174:15
175:4 180:7 183:4
184:6,10 185:4
187:21 188:13,20
188:24 189:11
190:5 191:5 198:23
199:15,23 202:21
contracted
15:13 17:8,9 18:10
18:24 24:1 30:21
33:11 84:23 108:10
165:12
contracting
20:20 26:25 27:5,16
29:15,24 30:11,18
49:1 53:19 93:16,20
109:19 163:4
198:15,16,18
contractor
23:2 26:8,12 174:15
177:15
contractors
15:23 16:4 20:4,5,15
21:6,8 27:14 30:14
87:23 89:21
contracts
17:3 25:14,16 26:20
26:22 27:2 28:21,22
28:22 29:21,23
47:16 49:3 62:9,12



MAGNA
LEGAL SERVICES

62:12,16 65:19
66:20 77:20 78:15
80:8 81:16 82:8
94:18 95:3,9,23
96:18,20 98:22
99:15 100:5 107:19
108:9,12,13,19
109:22 111:23,24
114:2,9 121:14
122:20,21 126:16
128:24 131:16
132:22,22 133:6,18
133:24 135:2,24
136:23 137:1,3
138:25 148:22
149:10 217:7

**contractual**
18:22 108:15 124:8

**contractually**
16:7,13 106:25

**controversy**
223:10

**convenient**
35:8

**conversation**
5:11 72:25 75:2
91:24 93:13 95:6
99:12,18 107:13
112:19 114:19
116:2,4,9,14,15
117:8,12,23 119:6
127:7,22 128:1,4,12
128:13 132:23
133:20 135:1,5,6
136:7 143:5,6,9,15
143:18 144:24
145:16,21 146:9,15
147:2,17,24 148:8
148:14 149:3
151:12,15,23 154:9
154:10 159:16
160:15 161:1,2,21
171:9 188:23 189:2
189:2,9,21,22,24
190:10,11,12,23
193:13 195:24,25

202:11,13 205:18
208:12 211:16,17
211:21

**conversations**
16:22 41:9,11 67:4
68:24 70:1,4,10,12
71:4 74:12 82:3
107:11 113:12,15
116:6 118:3 127:11
129:12 132:20
133:5 135:8,20
136:1,3,5,11 138:11
140:10 141:1,2
143:13 144:21,25
145:6 146:21,25
147:10 148:18
149:6,12 150:5,22
150:24 153:8,11,17
154:8 157:6 158:23
160:8,23 161:11
171:1,7,21 172:2
179:20 180:3,17
182:17 188:11
189:22 190:13,15
190:20,24 191:1,4
191:11,16,23,25
192:1,16 193:4,11
193:17 200:24
201:3,18 202:2
203:21 206:21
210:16,17 211:12
212:20 215:10
217:2,12,22,23
218:8,16,20,25

**coordinator**
80:5

**copied**
159:4,5

**copies**
131:10 136:13
137:15

**copy**
94:9 130:9 136:16
137:7 138:12 149:1
149:23 169:5 183:6

**copying**

121:17

**corner**
49:16

**corporate**
38:21 44:11

**correct**
8:10 9:3 10:4 11:7,13
12:20 14:4 15:9
16:1 19:2 23:9
24:17 26:9 28:13
30:22 33:2,4 34:4
34:15 38:15,18
39:19 40:4,18 44:3
48:22 49:13 53:2
57:19,21 58:2,2
59:19 61:4,15 64:9
78:1 81:22 82:22,25
83:14 84:1 88:12
89:7 93:6 95:5
96:15 104:20
117:25 118:7
121:12 124:20
128:25 129:6 131:2
139:18 149:7 152:6
155:17,20 162:7,22
163:25 180:2
183:17 186:8,21
192:3 199:12 202:7
202:17 203:7,10
204:22 207:2
217:11,25 218:7,8

**correction**
142:3 191:12

**corrections**
187:1

**correctly**
50:1 180:13 213:4

**correlate**
59:20 60:1

**correlated**
60:4

**correspondence**
113:25

**cost**
87:1,18 89:4,9 90:2,5

**costs**

86:23 87:10,11,13,14
88:4 90:7

**counsel**
3:14 223:18

**count**
85:5

**country**
60:14 84:3

**counts**
124:3

**county**
84:2 221:14 223:4

**couple**
62:22 142:5 154:18
196:25

**court**
1:1,15 5:2 6:5 134:6
223:6,24

**cover**
162:4

**coverage**
14:10 15:13,15 18:24
19:10 23:25 24:7,19
24:23,25 81:18
93:11

**cracked**
109:17

**create**
5:4 46:16,19 49:4
50:17 51:12 53:15
91:19

**created**
212:6

**creating**
52:25

**credential**
165:14

**credentialing**
160:24 161:13
165:15 173:15

**credible**
84:7

**critical**
81:5,15

**cross**
29:2


MAGNA
LEGAL SERVICES

**cross-pointing**
127:14
**currency**
181:25
**current**
90:2 105:5 166:5
**currently**
32:6 61:22 63:18
90:1
**cut**
12:18 114:12 127:2
176:14

**D**

**D**
3:1
**D/B/A**
1:9
**daily**
15:24 23:13
**Dalton**
80:3
**damages**
103:9 125:2,12 126:6
126:22 127:8 128:2
128:10,18
**data**
35:3 64:11 83:22
**database**
132:1
**dataset**
132:14
**date**
7:15 36:8 81:13
99:22 150:20 151:9
165:2 166:2,4,9,22
168:7,8,12,16,23,24
168:25 169:2,6,7,13
169:16,20,25 170:2
170:10,15 171:2,10
171:15,23 172:6
173:1,14,17,19,19
173:23,24 174:2,11
177:14,20 181:21
188:3,15 190:11
196:20,23 200:3

**day**
114:19 115:5,9,11
170:21 182:15
184:4 196:24
200:19 220:19
221:15 223:21
**day-to-day**
13:19 15:12 17:7,22
18:17 20:2,13 21:16
23:16 24:19,23,25
43:20 47:10
**days**
196:25 210:3
**deadline**
97:1,2,4 100:14
**dealt**
137:3
**decades**
85:3
**December**
1:5,14 3:2 10:15
220:19
**decide**
71:16 72:15 136:15
**decided**
10:23 41:3 68:5,8
72:2,4,12 98:4
146:4 184:24
186:24 187:16
188:10 196:1
204:21
**deciding**
194:8
**decision**
26:5,14,17 29:11
71:9,20 72:15,18,21
73:3 98:2 127:18,20
150:1 179:25
180:11,12 181:1,12
181:21 182:1
183:21 185:19
186:15 189:4 196:9
196:14 202:22
204:17,23 205:8
218:24
**decision-making**

26:16
**decisions**
26:11 70:25
**Declaration**
7:6
**decline**
137:25
**declined**
172:20 183:8
**dedicated**
13:18
**Dee**
179:13
**Defendant**
2:5
**Defendants**
1:11
**definition**
85:7
**definitively**
124:12
**delegated**
40:3
**delivered**
196:5
**demand**
19:3,7 92:20
**Dennis**
144:6,7
**dental**
90:17
**Denver**
2:4,8 40:9 44:11
223:4
**deny**
91:10,12
**department**
19:17,23 23:12 87:15
92:13
**departments**
13:2
**departure**
14:21 15:8,10
**depended**
49:11
**depending**

22:5 57:25 184:17
**deploy**
19:2
**deployment**
12:4
**depo**
94:2
**DEPONENT**
44:25 55:22,24 110:7
110:10 135:19
177:2,7 178:1 221:1
**deposed**
4:14,23
**deposition**
1:4,13 3:6,14 4:19
5:1 6:3,12 7:5,19
8:5 35:9 45:15 79:2
80:12 94:6 118:13
139:5 141:11 142:6
153:20 195:1 197:5
208:21 214:15
221:4 223:11
**depositions**
35:25
**depth**
132:11
**derived**
48:13
**describe**
14:5 135:17
**described**
30:23 42:5 142:8
188:12 194:3
202:18 218:21
**descriptions**
124:25
**design**
12:16
**designated**
45:13,20 78:25 79:4
81:21 82:1 94:4,9
139:4 154:22 155:5
194:23 197:7
208:20
**designed**
8:22



desire
92:8 110:13
desires
184:17
detail
66:13
details
61:5 82:5 91:7 92:4
154:10 173:6
deteriorate
100:12
deterioration
100:16
determine
83:11,15
determining
16:20 19:11 60:20
61:11 74:13 129:2
133:21,25
develop
27:14 50:9
developed
46:23,25 55:8 56:4
developing
49:4 50:15
development
9:11,20 10:2 11:21
11:22 12:2,13 73:25
developments
32:18
deviate
134:22
deviated
147:15
deviating
134:11
deviation
112:7 120:16 184:8
Devine
80:15
differ
48:25 51:18
difference
16:5 43:7 103:14
104:5
differences

18:9 43:10
different
16:2 19:17,17 26:10
27:6,7 30:15 31:14
37:25 38:16 39:23
57:1,9,11 63:10,14
64:19 108:5 148:21
159:18 162:1,4,18
166:9 169:13,16,20
170:2,13,21 177:17
179:5,7,21 194:2
211:25 213:11
216:15
differently
54:15
difficult
45:7
difficulty
56:25 174:2
digital
220:13
direct
23:18 38:4,13 47:9
48:21 70:3 85:4
105:21 139:1
directing
18:18
directly
15:4 24:16 54:4
70:15 111:12
112:14,15,17
115:22,25 116:16
133:19 180:17
182:17 217:21
director
9:21 10:6 12:22
13:24 15:22 33:23
66:2 96:23,24
198:15,16
directors
20:2,14 21:17
Disabilities
31:23 32:4,9 212:13
disagreement
70:22
disappointed

160:6
discharge
25:6
discipline
25:6
disclosed
152:2
disclosure
218:17
discount
105:5
discrepancies
127:18
discretion
177:18
discrimination
210:15 211:22 212:4
discuss
23:17,20 60:20 69:5
77:13 91:10 108:8
158:24 161:17,24
169:20,21 170:3,14
170:18,21 172:5,17
173:6 174:16 180:6
183:8 184:1 187:17
201:6 205:13
210:11,14,19 211:5
211:6 212:12
discussed
42:5 66:16 67:12
68:2 70:5 98:5
99:13,22 115:1,20
117:4 125:2 138:17
144:11 145:1,3,5,7
158:9 159:19 169:4
170:1,22 171:22
172:3 181:17
185:21 186:10
187:12 188:15
204:19,20 210:5
213:4 218:25
discussing
12:13 31:6 42:11
65:16,17 67:3 74:24
95:11 96:16,18
116:8 128:11 184:6

204:9 206:19
211:13
discussion
24:8 67:19 71:9
72:11 126:25 143:9
144:20 160:12
178:21 180:19
181:24 182:15
184:5 188:17
189:19 190:9
195:19
discussions
71:18 144:16 181:20
183:20,22 184:6
dispute
70:19 76:25 77:7
176:25 186:7,12,16
217:13 218:19
dissemble
71:7
distinct
41:14 97:12,17
distracted
100:6
DISTRICT
1:1,2
division
164:17
Dixon
80:15
docs
131:9 193:11,12
doctor
60:16 137:6 156:23
157:9 158:20 159:7
159:21 161:15
doctor's
105:1
doctor/physician
152:15
doctors
130:17
document
28:15 36:16 37:10
46:17 48:2,6 49:22
50:15,23 82:7


MAGNA
LEGAL SERVICES

118:16 134:9
139:20 197:23
**documentation**
27:1,12,15 53:17
58:23 59:1,3 185:13
187:20 213:20
**documented**
113:11 154:16 185:6
**documents**
6:14 7:3,8 35:8 38:6
112:25 113:1 126:1
197:12 208:10
**DocuSign**
130:2,19
**DocuSign-type**
130:4
**doing**
7:12 57:7 116:5
176:15 185:5
200:17 212:5
213:24
**dollars**
105:21 192:20
215:20
**double-checking**
215:2
**doubting**
183:14
**download**
35:6,13 209:3
**Dr**
1:6 4:12 14:21 15:1,5
15:5,6,7,9,10 65:4
65:11,23 66:3,6,9
66:14,15 67:22 69:5
69:15,21 70:4,12,14
70:19,19,25,25
71:12,13,17,17 72:4
72:12,13,16,16,17
73:3 74:13,14,20,22
74:25,25 75:1,9,9
75:11,11,18,22,22
76:2,3,6,9,22 77:21
78:12 79:16,16
82:21,23 91:2,2
92:10,11,15,15 93:7

93:7 94:18,19 95:3
95:4,9,9 97:24,24
98:4,4 99:14,15,15
100:5,5 102:18,18
103:15,15,16,17,21
104:1,1,9,15 105:8
105:9 106:24,24
111:22,22,23,25,25
112:14,16,22,22
113:1,1 116:23
117:8,9,24 118:4,4
118:5 121:10,12
122:16 123:6,9
126:8 133:22
136:12 138:11,16
138:24 139:15,24
140:6 141:1,5,25
142:1,14,24 143:14
147:11,20 148:5,6,7
148:10,15,18,19,23
148:23,24 149:2,5,9
149:9,16,24,25
150:2,12,16,18,22
151:9,16,20 152:23
153:3 154:12
156:14,16,18
158:10,21 159:11
160:6,10,17 161:2
162:21 163:10
169:4 171:23
172:19 173:25
174:7,10,12,14,22
175:3 176:12
177:12 179:13,14
179:16,17 180:1,9
180:25 181:9,16,18
181:23 182:12,22
182:24 184:17
185:1,8,22,22 186:3
186:4,6,13,13,15,17
186:17,25 188:10
189:17 190:14,25
191:10,16 192:2,11
192:11,17,17 193:3
193:3,7,8,16,16,23
193:23 194:2,2,9,21

195:8,15,22 196:10
197:21 198:3,8,19
198:23 199:3,6,11
199:13,22 200:18
200:20,25 201:2,10
201:22 202:10,15
202:21 204:10
205:22 206:15
207:5,19,22,25
208:4,12 209:13
210:20,23 211:11
211:13 212:2 213:5
213:18,18 215:12
216:10,11,13,14,24
217:4,13,16 218:10
218:24,24 219:3,3
219:13,19,21,22,25
220:2
**draft**
29:14,20,23,25 98:24
100:18 112:1,11,22
113:13,13 114:8,8
114:25 115:2
116:11,20,21
122:11,12,23
132:21 133:1 183:6
189:14 212:23
213:1,25 214:3
218:2,2,5
**drafted**
93:21 117:16 122:23
214:5
**drafting**
26:20 28:21 29:13
95:8,19,23 114:2
213:17 216:2
**dropped**
182:20
**Drs**
77:1,9,21,21 81:6
85:4 95:23 107:20
111:14 114:22
116:11 121:25
136:12 138:7 139:2
**due**
140:12 166:8

**duly**
223:9
**Durango**
89:10,13,14
**duties**
11:15 13:23 25:2,2

_____
E
_____

**E**
2:1,1 3:1
**e-electronic**
31:10
**e-learnings**
31:8,19
**e-signature**
129:21,22 130:17,21
130:25 147:21
148:12
**e-signatures**
129:9,13 135:24
**E-tran**
220:14
**earlier**
18:19 54:5 55:3
67:12 77:18 78:5
83:19 98:5 100:3
104:25 110:21
142:9 145:1,3,5
148:17 149:4 153:4
154:6 157:5 163:21
169:5 189:22
194:15 196:12
200:19 215:5
**earning**
104:10
**earnings**
87:19
**EAS**
126:3,4
**easier**
35:15 45:6 141:15
**easily**
84:20 121:22
**EBITDA**
86:4 87:20
**edit**



148:5,10
**educate**
18:7 48:9,12 170:4
**education**
8:15 29:2 51:16 87:5
**educational**
8:16 87:5
**effects**
62:4
**effort**
50:7,9
**efforts**
198:22 199:5,6
201:21 202:18,20
203:2,9
**either**
18:4 26:14 29:17
91:25 108:10
137:25 149:8 191:7
191:7 193:3,25
196:18 208:13
218:9 219:19
**electic-**
117:6
**electrical**
154:14
**electronic**
7:12 31:8 109:10,14
130:2 154:15
220:13
**electronically**
117:6 130:5 131:5,13
131:16,21 133:2
**eligible**
125:24 137:24
**Ellner**
15:6
**else's**
136:17
**email**
35:14 80:21 95:10,15
97:3,7 99:6 100:3
107:14 113:10,15
113:17,25 114:23
115:5,25 117:13,17
117:20 118:23

119:6,12 120:14
124:23 128:14,16
131:3,7,17,23
133:16 136:8 139:9
139:13,14,23 141:8
141:19 142:9,11,22
143:3,12,16 146:6
146:13,22 148:13
149:14,17 155:6,12
155:14,15 156:2,20
157:3,20 159:4,18
160:4 179:22
195:11,13 196:10
199:11,14 200:1,7,9
200:13,14,19,25
201:2,2,7,10 202:3
202:15 206:15
207:4,12 208:4,19
209:11 210:23
211:23 214:19,22
214:24 217:19
**emailed**
94:12 128:8,9 130:8
137:11 197:20
198:23 200:2
**emailing**
138:14,23 196:15
**emails**
99:10 128:12 133:9
138:18 146:14,24
148:4 149:14 155:9
155:18 171:24
208:1 212:24 215:6
216:25
**emergency**
11:22 81:11
**Emma**
110:23 111:5,9
**employ**
57:3 71:9 78:10,12
79:15 174:10
181:23 184:19
185:7 219:3
**employed**
12:17 13:11,17 14:8
17:5 19:4 20:9,21

21:15,15,19,20 22:7
22:8 23:16,24 25:15
25:16 30:12,13
37:22 40:22 48:18
50:20 52:12,18 56:6
60:13 61:22 62:15
67:16 87:4 88:2
124:16 148:20
160:24 163:13,18
164:14,18,20 165:1
166:1 167:12
173:15 174:21,23
182:16 187:11
200:12 210:9
212:16 216:14
223:17
**employee**
15:14 18:11,25 20:18
26:8,12 30:10 33:11
33:19,24 34:6 46:2
48:16 49:2 52:14,16
52:18 57:5 108:10
**employees**
15:23 16:3 21:12,13
23:7 24:2 33:7 34:8
38:3 75:22,24 85:5
**employing**
30:8 87:10 89:2
172:18 177:14
205:22
**employment**
19:12 24:14 26:5,22
28:21 30:5 77:11,15
77:20 78:1,23 80:19
85:10 88:4 90:8
93:22 98:22 100:5
100:22 108:14,19
109:22 124:9
126:19 127:9,15,20
138:5,12 140:12
142:1,25 143:14
144:21 145:15,18
146:4,8,18 147:13
147:22 148:11
150:2 151:19 152:9
152:13 156:8 157:7

160:14,19 161:12
161:25 162:20
164:10 165:3,20
171:3,16,23 174:15
174:21,25 175:4
177:14,19 180:1,6,9
181:10 183:9,22
185:4 187:6,17
188:2,5,13 189:7,18
195:9 197:21 198:3
198:3 202:23
203:20,23 204:7,10
205:7,12 207:5
209:24 210:8,25
213:6,21 216:15
218:10,20 219:17
**employment/instal...**
206:24 207:16
**encompassing**
218:13
**encounter**
60:9
**enforced**
46:20
**engaging**
217:20
**England**
145:9
**ensure**
14:10 16:17 17:11
19:10 22:6 23:25
27:1 50:18 52:23
55:8 56:4 81:16,18
85:18 91:20 93:7
102:1,9 105:14,17
105:25 106:22
108:16 109:4
119:21 131:18
147:19 158:8
213:19
**ensuring**
17:1,3 24:7,19,22
27:9,12 29:2,3
31:20 53:17 84:17
**entail**
11:24 13:14



entered
93:20
enterprise
47:12 50:10 54:3
96:22
entire
11:12
entities
10:20 219:4
entity
97:9
entries
197:22
equal
119:18,18 120:10,10
186:3
equation
61:5
equipment
74:1
equitability
46:16
equitable
50:19 51:1 53:1
equity
53:11
equivalents
86:7
Eric
74:20 95:11 96:18,23
112:10 113:9
115:21 116:16,20
116:22 118:4,7
139:14 142:3,11
145:21 151:20
154:11 160:17
180:25 190:20
192:5,7 193:12
196:12 198:25
199:20
Erling
144:6,8
ESQ
2:2,5,5
essentially
218:19

establish
59:10 63:21 214:9
established
56:1 73:22 75:12
88:15 89:3 92:11
93:8 105:3 149:4
182:13 191:25
establishing
78:3,6
estimated
102:22 103:22 104:8
104:8,9
et
13:9 27:15 32:15
67:21 85:20 86:5
178:21
events
189:23 201:25
everybody
119:17 124:16
131:18 182:18
exact
73:7,9 91:7 115:7,9
128:13 136:25
exactly
11:24 46:9,9 54:9
57:7 183:17
examination
3:1 4:6 223:8
example
51:2 158:11 165:18
166:15
examples
166:11
exchange
141:19 155:7,13
excited
142:14
excitement
192:21
exclusively
85:2
excuse
7:6 21:21 29:16 39:8
65:25 107:1 168:10
execute

117:2 144:23 183:6
executed
160:22 167:2 169:2
199:15,23
executing
49:5 144:17 206:23
207:15
executive
47:4,6 53:22 70:11
74:16 91:14
executives
8:23 24:24 54:6
exhaustion
211:4
exhibit
3:7,8,9,10,11,12,13
35:9,25 36:1,14
37:8 45:14,15,20,21
45:22,25 46:4,11
47:18,24,25 48:2
49:1,15,24 52:2,9
52:21 53:21 54:8,16
55:15 56:9,16 61:21
62:18 79:1,2,4,6,25
80:22 81:5,23,25
82:13 83:2 85:22
88:10 91:1 94:5,6
94:10,15 95:6 96:10
96:17 97:3 98:7
100:1 101:16
107:12,15 113:20
113:22 114:13
118:10,11,12,13,19
118:22,23,24 119:8
128:9 136:8 138:17
139:4,5,6,11,20
141:9,14,14,20
142:10 149:15
153:4,19,19,20
154:22 155:5,7,10
155:23 156:2 162:9
178:9 194:23,24
195:1,3,6,7 197:4,5
197:8 198:21
199:10 202:3,19
203:12,14 206:16

206:22 207:23
208:20,21,22,24
212:25 214:13,14
214:15,17 216:17
exhibits
3:6,14
existed
35:20
existing
88:15,19 89:2
expand
16:12 68:17,23 69:12
92:12 93:2
expanded
69:2,18 73:14 92:23
expanding
67:25 68:12,19,22,24
expect
172:13
expedite
134:24 136:21
expenses
86:16 89:20,24 90:1
experience
8:15 124:13,13,14
expert
45:8
expires
221:19 223:22
explain
16:23 36:18 43:11
45:7 47:8 58:3 97:9
103:13
explained
192:7,10
explaining
104:17
explanation
41:4
exploring
50:11
express
152:22
expressed
69:23 219:14
extend



140:7,14,17 204:18
**extended**
 100:25 101:1,5,10
   174:7 204:25
**extending**
 77:20,25 140:17
   203:19 205:6
   206:12
**extension**
 139:21 141:3
**extent**
 22:12 152:1
**external**
 27:14 49:3
**extracted**
 197:11
**eyes**
 122:9

— F —

**F&V**
 105:12
**face**
 35:11 42:7 195:21
**facilitate**
 213:25
**facilities**
 13:4 32:14 39:13,14
   39:16,21,24 63:6
   71:12 97:12
**facility**
 32:15 68:13,16 73:13
   73:14,17 97:19
**fact**
 157:18 158:24
   167:16,17 204:9
   210:5,19 212:5
   215:6
**factors**
 19:11
**fai-**
 185:5
**failed**
 188:25
**fair**
 27:13 47:3 49:9

50:17,19 53:8,17
55:10 56:5 63:20
64:24 78:3 91:21
102:1,11,13 106:2
108:1,4,17 109:4
138:20 185:9,13
**fairly**
 12:8 17:12 63:24
   75:8
**fairness**
 46:16
**fall**
 19:25
**familiar**
 36:10 37:16 38:8
   60:25 63:12 64:1
   141:18 152:14
   195:21 214:8
**familiarity**
 37:17 213:8
**Family**
 212:12
**far**
 133:8
**fast**
 81:17
**favor**
 22:11
**feedback**
 123:20
**feel**
 102:4 147:7
**feeling**
 76:11
**feelings**
 156:5
**feels**
 134:17
**fees**
 87:8
**fellowship**
 8:20,21 9:5,10,16,19
   9:25
**felt**
 162:3,17,18
**figure**

35:7 57:3 96:4
 111:10 159:9
   189:20 192:24
   216:6
**figuring**
 133:21
**file**
 176:20
**filing**
 176:17 212:4
**fill**
 24:14 174:6,24
**filling**
 67:20
**final**
 62:22 113:13,13
   118:6 122:21
   132:22 133:7,24
   135:2 138:15,24
   148:7 180:12 189:1
   190:12
**finalized**
 117:16 130:25 133:9
   135:23,24 137:24
   142:15 147:12
   149:23
**finalizing**
 142:17
**Finance**
 8:18
**financial**
 43:23 59:21 60:3
   93:24 124:5 212:6
**financially**
 18:4
**find**
 141:9
**finding**
 148:14
**fine**
 110:12,16 147:9
   153:24 162:13
**finish**
 5:7,8 33:15 130:12
   176:14 203:4
**finished**

220:6
**firms**
 64:15
**first**
 15:6 50:8 52:2 79:25
   88:14 90:10 96:9
   101:22 107:12
   133:16 139:10
   166:1 191:19
   203:11 210:12
**first-hand**
 118:1
**first-year**
 90:5
**firsthand**
 191:20 192:1,12
**five**
 44:25 65:24 104:9
   105:23 153:23
   181:3 182:6 189:3
   198:2
**five-year**
 101:25 106:5
**flag**
 159:6
**flashed**
 199:15
**flexibility**
 98:2
**flip**
 35:25 62:20
**Flipping**
 61:20
**floor**
 12:13
**focusing**
 31:7
**folks**
 5:7 48:7 80:10
   125:23 153:8
   187:19
**follow**
 118:7 133:3 151:20
   206:14
**follow-up**
 148:9



followed
147:20
following
4:1 156:23 195:10
208:12 212:2,3
218:10
follows
4:5 107:12
footprint
68:19 69:13 92:20
93:10
foregoing
221:4 223:15
foremost
166:1
forgivable
101:25 105:12
forgiveness
95:16 98:11,19,22
99:1,4,8,14 102:10
114:5,11,16,21
127:16 129:16
135:22 142:17
144:17,23 145:19
147:13 149:21
190:15 191:7,10,17
192:5,9,25 193:9,17
193:23 213:5,18,21
215:10
form
36:12 79:8 81:9
134:1,4,8 151:4
157:11 159:1,25
161:18 165:23
169:8 173:4 175:5
177:4 206:1,4 207:6
223:14
formal
130:3
formally
80:23
formulating
83:3 200:24 201:4
forward
62:2 73:5 75:11,24
91:9 93:16 98:21

99:7 121:6 145:24
180:20 181:13
185:3 219:3,11,12
forwarded
210:1
forwarding
100:4 121:24
found
6:22 46:11 155:9
158:12
foundation
54:25 55:19 106:10
140:22 157:12,22
160:1 161:19
165:24 169:9
170:17 173:5 175:6
206:2,5
four
57:20 65:24,25 137:3
frame
11:19 81:12 94:15
frames
82:7
framework
52:18,19 57:13 62:15
63:22 64:23 78:5,7
Francis
1:10 68:16,18,21,25
71:14,17 72:13,17
73:17 75:8 91:18
92:20,23 96:25 97:8
97:11,16,20,24 98:1
98:4 144:9
free
5:15
fresh
198:13
Friday
110:15
Frisco
13:3,20
front
6:24 146:24
frozen
55:21
fruition

105:1
frustrated
73:3
frustration
70:13 77:12 219:5
frustrations
70:15
FT
86:7
FTE
86:10
FTs
86:3
fulfill
172:22 184:16 188:6
188:23
fulfilling
175:11
fulfillment
191:7
full
4:9 105:1,1
full-time
86:7
fully
5:24 58:14
function
19:16 217:9
functions
87:17 163:2
funny
35:11
further
36:18 92:8 101:10
128:20 140:17
183:10 193:21
205:4 208:5 223:16

_____

**G**
_____

gain
59:21
gap
19:14 24:5,10,15
67:20 174:6,24
gaps
19:6 24:6

general
32:5 100:22 131:10
152:17,20 160:12
166:19 180:5
181:17 190:11
generally
73:8 116:8 119:7
123:18 136:3
166:16 192:18,22
193:18 194:3
geographic
15:17,18
geography
40:12 181:7
Gessel
121:13 122:16
getting
12:14 17:17 18:17
20:7 22:15 30:24
31:16 46:8 57:23
67:25 126:10
154:25
give
5:8 9:23 64:23 98:2
113:12 166:11
214:20
given
17:23 58:8 59:9
77:12 181:6 223:16
giving
105:19
go
4:24 10:16 18:23
24:6 27:2 29:21
42:3 44:18,24 61:16
67:20 79:24 83:6
85:21 103:2 108:25
110:4,10 112:6
114:9 119:25 120:7
124:7,21 126:9,25
127:3 133:15 134:2
134:7 141:9,15,22
151:6 154:3,11
168:3 196:21
203:11 207:9
209:15 211:9



216:20
**go-forward**
69:25
**goal**
84:17
**goes**
108:22 121:19
124:22 160:4 163:6
212:23
**going**
5:4,14 8:12 33:17
38:19 44:18,20 45:5
45:6,13,16,20 46:7
51:4 54:13 62:2,20
64:25 71:21 75:9,11
75:21 76:14 77:22
78:24 88:23 90:23
91:9 93:25,25 98:13
98:24 101:12 110:5
118:9 119:3 123:1
123:10 125:8 127:3
129:4,4 130:25
139:3 141:9 142:20
145:17 146:17,19
151:17 153:18,19
153:21 162:8
163:19 169:17,22
171:25 174:25
175:25 176:5,7
178:7 183:15,23
185:2 194:19,22,22
197:2,4,7 198:20
203:17 206:20
208:14,20 209:7
214:13 217:19
**Goldie**
15:7,10
**good**
4:8 44:23 55:24 94:1
111:9
**Google**
111:3
**gotten**
142:24 145:25
**govern**
164:2

**governed**
163:7
**governing**
164:2
**granted**
153:5 161:22 163:10
166:9
**great**
9:18 28:16 116:24,25
142:13 144:12
**Greater**
15:18 25:13 40:8
79:14 217:6
**group**
9:10,19,22 10:1,10
11:15,17 14:2,14,19
14:19,24 15:19
16:25 18:14 19:13
20:3,19,22 21:10,10
21:19,21,22,23,25
22:3,4,10,13,18,20
22:23,24 23:4,11,15
23:19,21,24 24:12
24:14 25:3,11,13,15
26:5,11,18 27:19
29:11,18 30:8,12
33:8,20 34:5,8,13
34:17 35:2 36:11
40:8,9 46:1,2,3,5,21
47:4,11 48:8,20
49:7,10 50:11,21
52:12,14,16 53:22
53:25,25 54:1,2
56:7 62:23 64:2,7
65:4,7,11,15 66:2
68:8,9 71:7 72:15
72:18 74:16 79:13
79:14 80:22 83:16
87:4,16 91:15,19,23
105:10,15,18 107:1
109:13 121:14,18
142:15 160:19
161:25 163:13
164:10,13,21
165:22 166:7,10
173:16 174:23

180:15,21 184:21
187:11 188:18
193:1 194:19
195:19 196:11
204:1,7,11,15
205:22 210:10
212:17,18 215:18
217:7
**groups**
40:7 43:19 46:14
82:8
**grow**
84:15,17 92:19
**growing**
68:14 93:10
**growth**
41:2 92:18
**guarantee**
103:2,11
**guarantee,'**
102:19
**guaranteed**
104:2
**guardrails**
46:12 47:21 48:11
102:2
**guess**
16:25 36:25 48:23
80:8 94:18 97:19
104:10,25 107:12
128:20 179:25
183:12 197:17
**guide**
56:20
**guidelines**
47:2,18,20,25 48:25
52:10,11 53:21 54:8
54:16 57:3 63:18,25
64:12 83:2
**guy**
110:14
**guys**
94:24,25 170:14
210:4

———————
**H**
———————

**Hall**
2:6
**Halpern**
2:2 3:3 4:7,11 8:7,11
8:12 9:12,14 35:10
36:13 44:17 45:2,5
45:16 55:1 79:3
94:8 106:13 110:3,8
110:12,19 118:15
134:2,20 135:14
139:6 140:23,25
141:13 146:22
147:4,16 151:6,11
153:23,25 154:2
157:13,17,24 159:3
160:2 161:20
166:11 167:16,18
169:12 170:20
171:19,21 172:1
173:8 175:8,21
176:3,10,17,20,24
177:4,8,10,24 178:3
191:24 197:6 206:3
206:7 207:9 208:22
214:16 220:4,12
**hand**
125:9 129:10
**handing**
130:1
**handle**
110:5
**handled**
125:3,17 126:23
127:5,8 128:6
144:19 160:10
179:23
**handling**
128:2,18 160:7
**happen**
123:16 191:15
**happened**
6:22 44:12 53:14
90:25 93:17 124:10
124:12 128:15
147:25 167:4,5
173:22 190:24


MAGNA
LEGAL SERVICES

**191:16 205:25**
**207:22**
**happening**
41:10 81:3 116:18
141:7 149:13,15,19
183:18 194:14
**hard**
42:5 47:8 54:14
136:13,16 137:6
138:12 169:5
**harder**
111:8
**hardship**
212:7
**harmed**
101:4
**head**
5:6 28:2 80:13
111:11 166:18
**headquarters**
44:11
**health**
1:9,10 8:4,19,20,25
10:18 19:13 20:22
21:22,25 22:9,13,18
22:20 24:13 27:23
38:3 39:2,4,5,13,14
39:15,20,24 41:13
42:14 43:8,13,15,24
44:13,14 46:1 47:4
47:11 48:19 50:11
54:7 57:11 63:5,19
65:9 84:14,19,21
85:13,15,16 87:17
89:16 90:16 91:23
97:16 139:22 158:5
158:6 160:19
161:25 164:9 210:9
**HEALTH-PENRO...**
1:10
**healthcare**
8:18,23 9:6
**hear**
66:8 70:18 75:16
150:17 153:14
191:4 205:3

**heard**
70:16,17 152:15
**Heath**
2:6
**heavily**
52:17
**held**
11:11
**help**
24:3 198:1 209:18
**helpful**
14:6 22:25 62:18
86:6 103:13
**helping**
12:16 198:6
**helps**
118:25
**hereto**
223:11
**hey**
51:3 81:15 112:24
113:4,12 116:22,25
122:2 137:23
154:11 166:23
167:22 168:24
179:16
**Hey,'**
142:13
**high**
83:6,9 86:17,18
92:16
**high-functioning**
92:9
**high-income**
51:3
**high-performance**
50:10
**high-population**
92:17
**high-producing**
51:2
**high-risk**
57:17
**high-volume**
57:17
**higher**

**59:13**
**highlighted**
120:11
**highly**
83:5
**hire**
24:16 25:19 26:14,17
28:22 64:13 68:6
75:9 93:1 129:4
182:12 185:17
218:24 219:25
**hired**
64:10 219:22
**hires**
48:21
**hiring**
25:8,9,11,18,23
26:22 85:4 108:10
111:20 122:13
123:21 219:12,18
**history**
6:13 9:17
**hit**
123:7
**hold**
106:9 112:2 122:7
159:20 168:16
**honest**
61:15
**honestly**
72:22 198:5 202:12
209:11
**hospital**
11:10 18:1,3 19:9
21:18 24:24,25
32:21 37:24 50:18
59:21 60:3,5,6 63:3
64:6,8 68:16 71:13
72:1 74:15 75:1
87:14,15,16 91:14
91:22 97:11 158:4
159:15 162:24
163:3,3,4,5 164:3,5
165:14,14,16,17,17
178:19 184:14
203:19 204:6 205:6

**205:11 210:8,25**
**212:6**
**hospitalized**
158:10
**hospitals**
12:25 14:8 17:11
42:8,25 43:9,12,21
52:4,6 89:14 97:17
137:2 164:1
**hour**
7:24 153:22 220:18
**house**
67:21 75:22 77:10
87:23 89:22 126:14
**HR**
19:15 20:6,10,16
21:14 38:5 106:7,12
120:3,4,9,15 121:9
122:19
**HR-specific**
20:24
**human**
19:23 44:4
**hung**
151:21,22
**hypothesis**
170:14

**I**

**i.e**
164:9
**ID**
97:13
**idea**
37:15 40:11 46:15
178:17 198:8
**identical**
104:2
**identified**
19:3 62:1 121:22
**identify**
24:10,11 49:7 168:12
**identifying**
57:5,6 97:19
**imbed**
99:2 102:12 123:13



127:12,14,20 146:4

**imbedded**
29:9 102:14 109:23
125:13,15,19
137:20 187:21
188:2

**immediately**
85:11

**impact**
61:22 73:23 74:5
83:1

**impair**
5:19

**implementation**
52:9 56:9

**implemented**
46:23 47:1 52:21
55:15 61:21

**implementing**
56:15

**impossible**
164:23

**impression**
145:14,22 146:1,7
156:1 162:25

**improper**
170:17 176:5

**improve**
88:23,23,24

**in-house**
24:2,2 30:10 48:16
49:2 52:25 54:23
55:16 57:4 68:6
71:1 75:24 77:2,20
84:23,24

**incentive**
103:5,5,6,18,24,25
104:6,7 125:25

**include**
90:14 95:16 98:18,25
106:25 114:4,15
117:2 120:22 125:1
144:21,22 147:22
169:16 188:13
191:5

**included**

37:21

**including**
99:8,13

**inclusive**
104:3

**incorporate**
54:11

**increase**
93:5,6

**independent**
14:9 16:15,18,21
17:4 19:5,14 20:15
21:7 22:6 23:2,23
24:11 25:14 26:7,12
26:18 29:18 30:13
30:16 37:4,22 49:10
60:13 67:14 78:14
126:16,19 164:6
165:13 182:16
208:17

**indicate**
83:4

**indicates**
49:25 133:1 165:5
197:20

**indication**
184:23

**indications**
184:25

**individual**
19:17 51:3 61:25
70:12 116:5 166:22
166:22 168:11,17

**individually**
193:14

**individuals**
15:4 28:12 70:11
80:11 91:25 107:2
108:14 115:18
116:14 136:3 159:4

**industry**
9:6 42:4 61:1 64:17
64:22 152:17

**industry-wide**
58:15

**inequitable**

51:6,10

**informal**
94:25

**information**
8:14 38:20 41:12
61:2,6 63:11 104:18
192:4 201:20 202:1

**informed**
80:25

**initial**
3:5 112:1,8,11
113:12,17 114:7,8
134:12,14,16,23
136:20 199:17,19

**initially**
24:8 67:23 80:18

**Initiatives**
1:9 8:4 39:3,4,13,16
39:20 42:15 43:8,13
43:16,24 44:14

**input**
13:9 18:18 25:19,24
26:4 53:21 79:8
82:2 179:25

**inputs**
71:19,23 73:7,8,9

**inputted**
61:2

**insight**
50:13 179:8

**insist**
159:20

**instance**
167:4

**instruct**
6:4 175:19 176:4

**instruction**
136:16,18 175:22

**instructs**
134:6

**intake**
79:8,18 81:9

**intend**
166:1

**intended**
22:5 51:24 57:10

134:19,21 148:19
166:7

**intending**
129:22 150:11
173:18

**intent**
46:15 50:24 51:12
53:6,7,15 57:12
71:12 80:24 81:14
85:17 92:19 131:8
134:22 136:19
137:23 158:8
172:18 174:10,10
180:5 181:22
182:11,19 184:16
184:19 219:2,6,10
219:25

**intention**
184:22 185:16
188:21

**intentionally**
6:23

**intentions**
165:1 182:21,24
183:2,14 184:3,12
185:7

**intently**
176:15

**interact**
12:6 15:22 18:16
23:10,17,22 32:10
54:9 65:10,14,23
66:3 219:15

**interacted**
16:10 18:10

**interacting**
12:14

**interaction**
58:9 59:7,8 60:8
66:25 76:4 114:7
156:6,13,18 185:23

**interactions**
15:12 16:2,5,18
17:23 23:12 65:8
69:24 71:15 76:1

**interest**



87:19 175:12
**interested**
77:11 223:19
**interesting**
156:6
**interests**
41:1
**interim**
174:5 177:15 180:14
**internal**
42:4 135:20 211:12
**internally**
170:1,20
**interview**
11:2 26:1 40:16
**interviewees**
26:2
**interviewing**
167:24
**interviews**
25:24
**intimately**
61:16
**introduce**
214:13
**introduced**
35:7,24 118:10 155:4
197:4
**Introduction**
50:6
**invited**
11:2
**involve**
217:14
**involved**
4:16 26:11,13 136:23
**Iris**
2:2 4:11 153:21
171:24
**issue**
21:14 23:7 56:10
62:12,21 98:17 99:7
114:3,14 161:17
**issued**
44:1 107:25 108:20
108:25

**issues**
152:11
**iteration**
216:22

———————— **J** ————————

**January**
223:21
**Jason**
180:15,16,22 181:1
194:20 195:18
196:4,8
**JB**
95:20,21 96:8,12,13
96:14 98:8,20 99:4
99:6,12 101:18
104:17 106:8
107:12,19 111:17
114:6 121:17,19
124:23 126:7,21
127:8 128:1 135:4
**JB's**
101:24 123:7
**Jeff**
74:20,22 95:11,15
96:22 100:15,18
113:10 114:1,24
115:21,24 116:16
129:8,10,11,16
133:18 144:9
151:20 154:11
160:17 180:25
190:20 193:6,11
196:12 199:1,20
**Jeffery**
96:18
**Jennifer**
119:12,13,14 120:15
121:2 135:9 145:9
**job**
11:14 12:21 13:23
14:5 26:15 167:24
181:16 184:25
185:19,20 186:10
186:16,25 188:10
194:9 196:1 199:7

200:20 202:10
204:21 206:17,25
207:17,19 210:4
215:9 218:18
**John**
96:8,12 101:18 136:2
136:7
**Johnson**
2:9
**Juanita**
80:15
**jump**
44:18

———————— **K** ————————

**K**
4:10
**Kansas**
15:20 25:13 39:18
79:14 217:6
**Kathpal**
75:18 76:9 99:14
126:8 129:3 133:22
133:25 205:24
213:5
**Kathryn**
144:3
**keep**
5:11 72:16 84:19
147:2 167:14 187:3
**keeps**
80:7
**Kickback**
17:2 27:11 28:25
30:24 47:17 55:7
56:10 185:11
187:18
**Killian**
2:6
**kind**
4:17 8:13,14 9:4 13:7
13:9 15:11,12 16:24
17:18 19:15 24:19
25:1,5,22,23 26:20
26:21 27:21 28:11
30:1,9,24 31:3

38:20 40:2,5 41:24
42:7 43:6,11 44:4
47:8 49:2 52:24
53:10 54:10 55:4
62:11 63:25 64:10
66:19 67:2 85:2
90:10,16 94:15
96:19 104:17
187:18 194:1
**knew**
116:22
**know**
5:8,12,13 7:3 9:6
10:14 13:7,8 19:19
19:22 25:1,23 28:5
28:15 32:8 34:16,20
34:25 36:1,5 37:1
37:12 38:23 39:9
40:10 41:8,14,23
42:3,18,24 43:2,4
43:14,22 44:12
46:25 53:20,23
54:23 55:6 56:3
57:2 58:13,21 60:2
61:2,6 63:9 64:10
65:4,6 67:8 68:20
72:15 76:15,23 79:6
80:24 81:2,5 85:2
97:2,6,18 99:22
101:2,13 105:11
106:8,13 107:3,6,10
107:23 112:22
113:5 115:8 117:4
118:16 125:6 127:5
131:6,22 132:10,12
132:15,17,18 136:4
138:9 139:8,19
140:3,5 143:11,12
143:17,19,22,25
145:25 147:4,5,10
148:5,6,10,23 149:8
149:12 150:25
151:1,7,7,24 152:8
154:7 158:14,18,19
161:8 163:24
165:24 171:8,9



172:13,22 174:16
174:19 178:22,24
179:3,6,10 182:21
183:25 184:2,2,11
190:18,23,24 191:1
191:3,9,14,14,15
193:7,8,21,22
196:24 197:2
199:24 200:16
205:25 209:6
210:25 212:12
213:8,9,13,22 215:4
216:16,19,21
219:23 220:5
**knowing**
66:22 74:7,7 174:18
**knowledge**
41:25 118:1 140:4
191:19,20 193:8
**Koval**
74:20 95:11 96:19,24
112:10 113:9
114:19 115:14
117:7,23 141:25
142:6,22 143:2
145:13 146:10
147:18,25 148:3,6
148:14,24 190:20
192:6,7 193:2,25
201:13 211:14
**Kraus**
144:6,7

——————— **L** ———————

**lack**
33:1 104:10 185:17
186:11,11,19 187:3
206:23 207:14
219:9
**lacks**
179:8
**laid**
56:25
**landing**
83:19
**Lane**

197:23 198:14 210:2
**language**
56:21 114:21 122:3,5
125:4,18 144:22
147:23 149:21
157:3 188:13
189:14
**lapsed**
219:7
**large**
26:2 40:13 48:6 63:3
64:15 73:20
**larger**
112:1 197:12
**Lassiter**
42:10
**last-minute**
6:2
**laundry**
31:14
**law**
18:8 30:24 119:15
**Lawrence**
2:3
**laws**
16:16 17:20 18:6
27:11 28:19,25
31:17 47:17 54:11
56:10,18
**lawsuit**
212:4
**lawyer**
7:4 220:6
**LD**
103:9
**lead**
135:9 198:18
**leader**
144:7,9
**leaders**
74:17,19 77:17 91:16
96:21 132:7
**leadership**
10:22 31:5 47:4,7,12
50:11 71:5 91:23
180:21

**leading**
189:1,22 191:17
201:25
**leaning**
205:4
**learnings**
31:7,8,10
**leave**
10:12,19,23 34:17,23
36:5,10 37:1,5,14
37:18 38:5 41:3,17
76:14 150:13,22,23
151:2,8,17,25
152:23 153:2,10,12
158:4,17,21,24
159:9,12,14,22
160:11,22 161:3,7
161:15,22 162:4,21
162:23 163:6,12,16
164:7,12,16 165:6,7
165:8 171:1 174:8
174:14 183:24
186:12,20 187:4,5,6
187:9,10 190:14
198:9 201:22 210:5
210:6,8,21 211:1,19
212:13 218:16
219:10
**leaves**
48:23
**leaving**
75:13,18 76:9
**lecture**
42:10
**led**
25:12
**left**
10:11,15,16 11:4
40:16 117:18
118:22 167:7
**legal**
16:16 29:1,24 30:18
54:21,22,24 80:8
93:21 106:7,11
108:5,8,12,18,22
109:1,2,5,18 120:2

125:23 127:11
130:20 140:13
145:11 217:18,20
218:2,6
**legal-technical**
32:25
**legally**
16:6,13 53:4
**legitimate**
153:2
**let's**
21:18 98:3 102:25,25
123:21 129:11,16
180:5
**letter**
180:13 195:14,16
196:10 198:20,24
199:7 200:14 202:9
204:13 205:2,5,9
207:1
**letterhead**
36:8
**letters**
122:11
**level**
105:1 132:11
**Lichtenberger**
14:22 15:1,5,6,9
121:10,12,13
122:16 123:1,9
**Lichtenberger's**
123:6
**light**
50:2
**lightly**
181:22
**Lindsay**
2:5 8:8
**line**
66:25 74:17,19 77:17
86:2,2 96:21 102:17
144:2,4,6,8 180:20
196:13
**lines**
19:24
**liquidated**


MAGNA
LEGAL SERVICES

103:8

**list**
31:14

**listed**
28:8 155:14,15
209:12

**listening**
176:14

**literally**
24:23

**litigation**
4:17 135:15 223:19

**little**
8:13 10:24 16:12,23
19:20 23:1 24:4
25:21 38:19 40:20
44:18,20 54:12
61:20 65:1 103:14
114:13 134:3
136:24 148:21
159:17 205:4
211:24

**living**
13:20

**LLC**
2:2

**load**
5:2

**loan**
95:16 98:11,18,22
99:1,4,8,14 101:25
102:10 105:12,15
105:16,20 106:22
114:5,11,15,21
126:8 127:15
129:15 135:22
142:17 144:17,23
145:18 147:12
149:21 171:14
173:2 190:15 191:7
191:10,17 192:5,9
192:25 193:4,9,17
193:23 208:5,13
209:19,20,25 213:5
213:17,21 215:10
215:11,20

**loans**
126:13

**local**
12:24 13:7

**located**
44:10

**location**
73:2

**long**
7:23 65:22 198:8

**long-standing**
184:20

**long-terms**
18:21

**longer**
44:15 204:10

**longstanding**
73:13,17

**look**
17:9,17 18:3 29:6
49:4,15 71:7 78:7
81:8,11 82:10 83:18
91:9 94:10 100:6
101:16 108:18
109:15 118:16
141:13 154:9 168:9
177:17 197:14
214:20

**looked**
54:17 186:1

**looking**
11:20 17:25 19:4
29:6,22 36:13 52:2
56:20 68:13,17,23
86:6 100:10 101:14
108:1 121:21
128:16 133:13
152:11 178:11
181:23 192:23
203:15 219:4

**looks**
121:5 126:20

**lose**
88:6,7

**loss**
87:20,24

**lot**
32:13 136:24 154:7
192:21 193:12

**low**
59:15,16

**low-risk**
57:18

**low-volume**
57:17

**lunch**
110:4,20

**lying**
199:22

**Lyman**
2:6

---

**M**

**machine**
223:12

**macro**
24:20,21

**maintain**
93:10 140:12 165:15

**maintaining**
17:13

**makeup**
67:13,14

**making**
26:14 35:11 47:15
219:25

**Malpractice**
87:11

**manage**
13:9 20:16 34:8
164:2

**managed**
11:25 12:3 13:11,18
14:14 20:10,14 21:8
21:20,21 22:9 87:15
87:16 137:1

**management**
15:17 20:25 21:2,3,9
32:6 40:12,13 43:20
132:8,9,13

**manager**
9:10,20 10:1 11:15

11:17 28:11 32:4
34:5,9 80:14

**managerial**
31:4

**managers**
20:1 21:17 39:24

**managing**
18:13 70:24

**March**
99:20 115:6 116:10
122:25

**mark**
2:5 8:8 78:25 84:13
110:13 167:17
168:2 176:25

**marked**
45:15 79:2 94:6
153:20 197:5
208:21 214:15

**market**
11:23 17:14 19:1,2
22:7 23:20,23 24:9
24:12 26:3 27:13
49:8,8,9 51:9 53:17
55:10,13,18 56:5
63:21 64:24 65:17
67:15,16,17 68:1,15
75:12,14,19 76:9,12
76:20 78:3,11 84:20
91:21 92:9 93:23
102:1,11,13 106:2
108:2,4,17 109:4
129:5 185:9,13

**markets**
50:18 51:14 57:11
64:13

**Master's**
8:19

**match**
90:21

**material**
31:25 48:12 114:10
115:3 123:25 124:3
129:17

**matter**
212:5



matters
223:10
Matthew
80:15
McManus
2:5 8:10
Meadows
11:9
mean
7:19 16:13,20 32:21
36:20 39:7 41:22
56:3,23 61:4 66:10
71:22 81:8 84:13,22
89:19 98:11 101:8
106:15 113:16
121:7,20 124:11
127:2 129:20
134:15 135:14
136:9 152:18 156:6
158:7 182:25 183:2
183:14 188:14
199:20 200:16
211:10 213:10
meaning
88:18 129:11 137:19
162:10
means
18:5 59:18 85:25
86:3 89:25 107:4
127:5 128:6 175:3
178:17
meant
22:3 64:8 178:8
measure
58:16,19 60:11 105:4
measured
60:10
measures
186:1
measuring
58:21
mechanics
125:5,20
med
163:25 164:8,17
165:9

median
86:20
Medicaid
61:8,10,14
medical
5:21 10:7 11:10 13:3
14:9 19:12 20:3,22
21:19,20,22,23 22:3
22:18,24 23:4,15,16
23:19,21,24 24:14
25:15 29:18 30:8,12
34:16,23 36:5,10,16
36:17,22,23,24 37:1
37:5,11,14,18,20,21
38:7,10 46:2,3 48:7
50:21 53:25,25 54:1
56:7 64:2,6 68:18
68:25 73:11 74:16
87:3,4,13,16 90:16
90:17 91:15,19,22
96:23 97:12 142:15
150:13,14,22,23
151:2,8,17,18,24
152:14,23 153:2,5
153:10,12 158:4,15
158:17,21,24 159:8
159:9,13,15,22
160:11 161:3,6,15
161:22,23 162:4,5
162:19,21,23,23,24
163:3,7,11,13,16,25
164:8,11,12,16,20
165:5,8 166:7,10
171:1 173:16
174:14 178:19,20
179:1,14,15,18,23
180:15,21 184:19
184:20,21 185:18
186:12,20 187:4,5,6
187:9,10,11 192:25
194:19 195:18
204:1,3,7,11,15
205:22 210:5,6,7,8
210:21 211:19
212:13,16,18
218:16

Medicare
61:8,10,14
medication
5:18
medicine
49:12 160:14 187:5
meet
7:11 70:5 91:4 92:20
168:22
meeting
7:17 109:4 115:24
181:3,9,15 182:7,24
183:13,21 184:24
186:9,23 187:16,19
187:25 188:9 189:7
189:17 194:7,12,17
196:17,18 204:20
meetings
201:24
members
13:1 14:9
memory
5:19 143:20 146:23
189:23 198:13
mental
158:5,6
mention
153:1 188:25
mentioned
26:6 43:17 117:14
178:18
Mercy
89:10,13
mergers
42:6
message
99:25 126:2 141:23
143:3 144:14 162:9
162:12 178:14
196:5
met
7:15,22 189:4 196:18
198:2,9,9 201:5
metadata
139:10
metrics

85:9
MGMA
64:20,21
million
86:18 87:18
mind
5:11 28:23 77:5
151:10 158:16
199:16
minute
94:5 159:7 214:20
minutes
44:25 73:20 97:17
110:11,14,17
153:23
mischaracterizes
207:7
miscommunication
142:19
missing
154:13
misspeaking
68:21
mistake
199:15
mitigate
186:1 219:5
model
48:9,11 50:25 51:19
51:20,25 53:18 57:9
57:17,17,18,18
58:15 62:1,16 63:15
64:18 86:18,18
90:13 102:15
125:25 177:18
modeling
102:16,17
models
46:14 50:12,23 51:23
55:11 57:1,9,14,20
57:24 60:24 62:7
63:13,21 83:10
93:11
Mohamedbhai
2:2
moment



118:15
**Monday**
123:1,9
**Monroe**
70:4,19,25 71:13,17
72:13,17 73:3 74:14
74:25 75:9,11,22
76:2,6 77:1,9,21
78:13 79:16 81:6
82:15,21,21 83:11
85:4 91:2 92:10,15
93:7 94:18 95:3,9
95:23 97:24 98:4
100:5 102:18
103:15,17 104:1,15
105:9 106:24
107:20 111:14,22
111:22,25 112:16
112:22 113:1
114:22 116:11
121:25 136:12
138:7,16,24 139:2
139:24 141:5 148:5
148:7,10,15,18,23
148:24 149:9,25
174:7,22 185:22
186:4,13,17 192:11
192:17 193:3,7,16
193:23 194:2
213:18 216:11,14
218:24 219:3,21,22
**Monroe's**
99:15
**month**
10:14 81:13 82:9
100:25 101:6 140:8
140:15,18
**monthly**
48:14
**months**
65:12,14 140:20
165:19,21 167:25
169:17 173:14
**morning**
4:8
**motion**

80:8
**mountain**
12:24
**move**
40:23 72:16 75:11
93:15 99:25 100:4
109:12,12 116:10
118:25 121:6,8
123:14 152:13
173:13 174:25
177:20 178:7
181:12 182:15
183:9 185:3 219:2,7
219:11,12
**moved**
29:13 62:1,6 120:23
126:18 219:16
**moving**
75:23 85:10 93:19
95:13 99:7 100:17
117:1 174:21
177:19 209:23
**multiple**
202:7
**mutual**
186:12
**myriad**
152:10,20

—————————
**N**
—————————
**N**
2:1 3:1
**name**
4:9,11 28:5,7,9,14
74:20 79:12 80:13
96:5 111:1 122:17
209:12
**names**
27:20 74:18 197:13
**narrow**
40:24
**narrowed-scope**
41:2
**nation**
82:20 83:20,23 84:8
**national**

84:6
**nature**
102:25
**necessarily**
123:11
**necessary**
35:14
**need**
5:12 14:11 15:9 19:9
26:18 32:14 34:6,14
44:19,23 67:17
69:12 78:10 81:17
92:7 93:23 95:16,17
100:17 102:9 106:7
106:13 113:5 117:2
120:15 121:6 131:4
131:15 136:25
140:12 147:11,20
147:21 154:11
159:9 160:22
166:15 169:17
173:11,19 176:23
177:21 191:6 192:8
209:25 220:9,13
**needed**
25:22 65:19 67:11
68:1 76:11 82:8
92:9 106:11 140:10
140:17 157:6
161:11 165:19
174:20 187:20
188:12 213:19
**needs**
12:15 19:12 23:18,20
32:19 131:13,20
159:8 174:24
175:11 181:25
184:16
**negotiated**
177:12
**net**
86:12,12,14,14 89:19
89:24,25
**network**
11:20 14:7
**Nevada**

9:1 40:16
**never**
4:16,23 37:10 53:6
70:3,3 124:10,12
164:19 206:13
210:9 215:1
**new**
32:18 73:14,18,19,19
74:1,1,3 87:1 88:21
88:25 89:19,24,25
90:1,7 92:24 119:15
195:24 197:21
202:21 209:1
**news**
116:24 142:14
144:12
**nice**
155:2
**non-finalized**
137:18
**non-payback**
105:17
**nonfinal**
137:11,15 138:4,5
**nonfinancial**
124:6
**Nope**
220:8
**normal**
5:10 81:4,15
**north**
68:15 92:21
**not-for-profit**
184:13
**Notary**
1:15 221:19 223:6
**notes**
6:13,16 7:3
**NOTICE**
1:13
**noticed**
24:5
**notification**
206:25 207:17
**notified**
151:8



Page 24

**notwithstanding**
72:13 157:9
**NPSR**
92:22
**number**
92:22 100:7,7 102:6
102:16 104:16
136:25 197:12
**numbers**
49:16 101:13 103:14
113:20
**numerous**
146:21

---
**O**
---

**o'clock**
110:6
**oath**
6:8
**object**
6:3,6 36:12 54:25
55:19 106:10 134:1
134:4,17 140:22
146:19 151:4
157:11,22 159:1
161:18 165:23
167:13 169:8
170:16 173:4 175:5
191:18 206:1,4
207:6
**objection**
134:8 159:25 171:17
175:9 177:5
**objections**
134:5
**obligated**
6:9 165:12
**obligation**
106:5 168:22 172:23
188:6 209:24
**obligations**
109:5 163:17
**observe**
66:6
**obtained**
117:9

**obtaining**
117:24 143:14
**obtains**
59:21
**obviously**
5:2,13 48:6 54:2 73:6
79:12 90:5 92:14
93:7 95:12 102:18
106:11 139:13
142:18 155:16
158:7 172:11
182:18 196:12
209:13 214:19
215:13,17,21 219:4
219:14
**occur**
165:3 168:23
**occurred**
71:20 75:15,18 101:9
132:24 164:24
191:1 192:14 199:2
**occurring**
50:19 198:25
**offer**
25:23,25 150:2 170:2
179:4,7,17 180:1,10
180:12,18 181:10
181:13,16 182:1
183:22 184:25
185:12,20,20
186:10,16,25
188:10 189:8,18
194:9 195:9 196:1
196:21 198:4 199:7
200:4,20 202:10,23
203:20 204:18,21
204:25 205:6,12
206:12,17,25 207:5
207:17,19 210:4,25
215:10 218:18
**offering**
185:4 205:12
**offers**
77:25
**offhand**
74:21 75:4

**officer**
178:19
**official**
195:8,17,22 196:3,8
**Oh**
7:19 21:7 33:16
55:22 89:25 110:25
203:16 209:3
**okay**
4:11,16 5:1,13,16 6:2
6:6,7,11 7:2,8,21
8:11,24 9:2,4 10:5,9
10:16,24 11:5,24
12:6,9,17 13:6,13
14:1 15:11 16:8,19
16:23 17:16 18:9
19:15 20:7,17,23
21:4 22:1,18,25
23:6,10,25 24:18,22
25:1,18 28:9,14,18
29:5 30:23 31:3,10
31:22 32:7,12 33:5
34:16,22,25 35:5,22
36:9,18,25 37:4,17
37:25 38:9,19 39:2
39:9,17 40:5,14
41:20,24 42:13,17
43:1,6,11,18,22
44:8,12,17 45:2,5
45:10,18,24 46:7,20
47:13 48:15,21,23
49:14 51:21 52:1,1
52:23 53:9,20 54:8
56:8 57:22 58:3
59:6,17 60:1,6,10
60:15,25 61:6,9,18
61:19 62:8,17 63:6
63:14 64:25 66:8
67:1 68:11,20 70:14
70:18 71:16 74:24
75:3 76:24 77:19
78:14,24 79:6 80:9
81:20 84:2,9 85:1
85:21 87:22 88:9
89:5,9,19 90:23
91:11 93:17,24

94:14 95:20 96:3,14
96:16 97:6,14 98:6
99:6,11,25 100:9,24
101:12,21,25 102:8
102:24 103:13
104:16 105:11
107:6,11,17 108:8
108:24 109:20
110:3 111:10,16,19
111:19 112:4,13,18
113:7 114:12 116:1
116:18 117:7,17,22
118:9,11 119:4
120:4,4,7 121:16
122:24 125:21
126:6,20 129:1,7,20
130:7 131:6,22
132:3,8 134:14
135:7,17,19 136:6
136:11,22 137:5
138:1 139:3,15
140:9 141:7,12,16
141:17,22 143:2,23
144:3,5,16 145:9,13
146:12 147:24
148:3 149:1,13
150:1,12 151:1,11
151:24 152:7,18
153:14,18,25
154:17,21 155:2,4,9
155:18 156:5,9,19
156:22 157:9,24
160:15 161:8 162:3
162:25 163:14,19
164:22 165:18
167:9 169:3 174:1
177:1,2,24 178:13
178:23 179:3,24
180:11,23 181:8
185:14 187:12,15
188:8 189:16 190:6
190:13 191:9
192:15 197:2,20
198:11,14,19 200:6
200:23 201:8 202:8
203:11,16,18 204:2


MAGNA
LEGAL SERVICES

204:8 205:17,21 206:14,20,21 207:13 208:9,19 209:17 211:21 212:22 213:7 214:7 214:13,20 215:8 216:16,20,23 217:12,23 218:1,8 218:23

**onboarding**
111:20

**once**
44:13 103:2 121:18 129:8,13,16,24 133:11,18 135:23 149:22 217:19

**oncologist**
69:6 76:20 174:4

**oncologists**
68:2 78:10

**oncology**
65:17 66:12,17 67:25 68:6,12,17,19 69:12 70:8 76:18 78:6 82:18 83:8,21 88:8 89:12,17 92:8,13 93:3,23 96:22,23,24 101:23 102:17 144:2,10 152:11 184:15

**one-year**
8:22

**ones**
30:10 145:7 211:15 216:7,7

**ongoing**
90:6

**open**
35:17 75:7,14 79:4 118:12 197:7,15 209:4,4 214:14

**opened**
45:21 208:23

**operate**
163:5 164:1

**operating**

15:19 25:13 40:7,8,9 43:19 79:13,14 217:7

**operational**
73:25

**operations**
9:21 10:7 20:2 23:16 40:3 41:25 47:10

**opinion**
26:4 152:22 153:10 158:20 190:7 200:7 200:11

**opportunity**
66:5

**option**
158:9 169:3 172:17 172:25 174:18 206:13

**options**
121:23 175:13 179:18 180:6 201:6

**order**
176:6,18

**orders**
220:9

**organization**
11:4 31:6,13,21 35:4 39:6,7 40:13,19,21 41:3 43:3,12,17 44:16 46:17 50:16 51:23,25 52:8 53:14 53:24 64:3 87:2 89:12 167:8

**organizational**
40:15

**organizations**
41:15 62:24

**oriented**
57:7

**original**
218:23

**originally**
7:16

**Osterholm**
143:23

**outcome**

215:24 223:19

**outline**
57:10,13 81:14 87:10 99:4 102:11 134:10 135:21 181:19 185:8

**outlined**
53:18 54:5 56:3 57:14 77:14 78:5 100:15 102:10 108:1 113:3,10 119:22 122:1,4 127:19 129:15 137:20 143:9 146:13 166:21 168:7,21 201:1,1,7 201:24 204:12 205:8 209:14 213:20 219:14

**outlines**
103:11 210:1

**outlining**
87:9 98:12 99:13 100:22 120:10

**outside**
36:7 49:7 64:12 131:9 138:13 143:16 174:3 201:19 210:14,16 210:18 211:5 212:8 212:14 217:24

**overall**
12:16 27:23 42:24 50:16 56:23 58:16 62:5 66:11 69:10 74:2 78:8 82:18,20 83:20 84:14,20 92:15 99:16,21 105:18 108:1 169:14 178:15

**overcompensate**
53:7

**overcompensated**
53:12

**overcompensating**
54:18

**overcompensation**
53:10 55:5

**overhead**
87:14

**overlap**
55:6

**overlapped**
66:1

**overlooked**
43:6

**overpaid**
55:13

**overpayment**
52:24

**oversaw**
20:2

**oversee**
26:24 40:3,24 43:19 66:7

**overseeing**
12:23 13:2

**oversight**
20:12 43:16 47:10

**overview**
57:15

**owned**
109:18

**owners**
108:12

---

**P**

**P**
2:1,1

**P-A-C**
79:10

**P-G**
22:23

**P.C**
2:6

**p.m**
110:18,18 154:1,1 159:6 178:2,2 220:18

**PAC**
79:10

**package**



69:9
**page**
 3:1 36:1,14 37:8
    49:14,21 57:9 79:7
    79:25 81:5,11 82:13
    85:22 88:9 94:14,16
    94:16 96:10 98:7
    100:1,8 101:16
    107:12 113:19
    123:3 128:20
    131:19 133:13
    139:10,23 155:22
    195:10 202:19
    203:11 210:12
**pages**
 197:9 223:14
**paid**
 55:17 56:2 103:24
    175:2
**panel**
 26:1,2
**paper**
 220:13
**paperwork**
 27:17 78:8
**paragraph**
 50:8 210:24
**parameters**
 55:9
**parrot**
 20:17
**part**
 5:6 25:25 31:19
    36:23 40:3 47:6
    72:18,25 74:12 75:2
    80:6,17,21 81:2
    87:3 91:11 95:18,21
    101:22 118:20
    119:19 127:9 136:4
    140:9,25 144:1,4,6
    144:16,20,24
    145:11 149:3,5,11
    150:1,3,21 155:12
    156:11 159:15
    171:3,22 172:7
    180:23 188:23

 190:12 191:22
 195:19,24,25
 198:17 200:21
 204:6 205:8 218:21
**participated**
 26:7 47:11
**particular**
 30:3 43:20 50:25
    95:18 116:13
    166:24,25 169:2
    213:9 216:17
**parties**
 1:14 117:6 168:11
    189:19 223:11,18
**partner**
 70:13
**partnered**
 84:18
**partnering**
 18:2
**partners**
 14:8 69:24 71:6,8
    100:11 185:23
    219:6
**partnership**
 18:21 71:10 100:16
**path**
 84:12 85:5 145:24
    174:21 175:1
    177:19 180:20
    219:7,8
**patient**
 18:14 58:9,24 59:5,9
    59:13,25 60:9 86:12
    86:14 89:7
**patients**
 19:8 32:20,22 59:12
    59:15,15 60:17 61:3
    74:7 85:19 174:3
    184:15
**Patricia**
 1:15 223:5,24
**patterns**
 74:9
**Paul**
 2:9

**pause**
 9:12,13
**pay**
 44:5 63:9 103:3
    119:18 120:10
**paycheck**
 12:18 44:1
**paychecks**
 48:14
**paying**
 51:8 105:21,23
**payment**
 60:4,6 97:21 191:8
**PDF**
 142:12
**Peddada**
 1:6 4:12 49:18 65:4
    65:11,23 66:3,14,15
    67:22 69:21 70:4,12
    70:14,19,25 71:12
    71:17 72:4,12,16,16
    74:13,25 75:9,11,22
    76:3,22 77:1,9,21
    77:21 78:12 79:16
    79:25 81:7 82:10,15
    82:23 83:12 84:10
    85:4 91:2 92:11
    93:7 94:19 95:4,9
    95:24 97:24 98:4
    99:15 100:1,5
    101:17 102:18
    103:15,16,21 104:1
    104:9 105:8 106:24
    107:20 111:14,25
    112:14,22 113:1
    114:22 116:11,23
    117:8,9,24 118:4,5
    119:10 120:25
    121:25 124:22
    128:21 136:12
    138:7,11,16,24
    139:2,11,25 140:6
    141:1,22 142:1,10
    142:14,24 144:12
    147:11,20 148:3,19
    148:23 149:2,5,9,16

 149:24 150:12,22
 151:16,20 152:23
 153:3 154:12
 155:22 156:16
 158:10,21 159:11
 160:5,6,10 161:2
 162:21 169:4
 172:19 173:25
 174:10,12,14 175:3
 176:12 177:12
 180:9 181:18,23
 182:12,22,24
 184:17 185:1,8,22
 186:3,6,13,17
 190:14,25 191:10
 191:16 192:2,11,17
 193:3,8,16,23 194:2
 194:21 195:7,8,15
 195:22 196:10
 197:14,22 198:8,23
 199:3,6,11,22
 201:22 202:4,19,21
 203:17 204:10
 205:22 206:15
 207:12,23,25 208:4
 208:12 209:13
 210:12,20 211:11
 212:2 213:18
 215:12 216:10,11
 216:13,24 217:4,13
 218:10,24 219:3,13
 219:19,25 220:2
**Peddada's**
 66:6,9 69:5,15 92:15
    111:23 143:14
    150:2 171:23 180:1
    181:9,16 186:15,25
    188:10 189:17
    194:9 198:3 199:13
    200:18,20,25 201:2
    201:10 202:10,15
    207:5,19 210:23
    211:13 217:16
**Peddada@Centur...**
 139:15
**peers**



53:12

**Penrose**
42:22 43:8 69:3
71:13,13,17 72:1,3
72:4,12,14 73:13,16
74:16 75:7 91:18
97:11,23 98:3
165:13 179:2,14

**Penrose/St**
96:25 97:8,16,20
98:1 144:9

**people**
26:11 27:20,23,25
28:1,3 32:11 33:18
38:12 80:25 81:2
135:17 183:1,14,15
183:23 190:6

**percent**
57:6 86:20,22 104:22
104:22,23 124:12

**percentile**
82:15,16,20,24 83:12
83:13 103:20,20

**performance**
66:9 69:5,7,8

**performed**
25:2 58:8 104:5

**performing**
51:6 60:17

**period**
15:5 46:24 82:9
174:7

**person**
27:20 113:15 168:13
181:6 196:19 217:3

**personally**
60:25 66:6 161:2
185:2 190:16,17
198:22 199:2 206:9

**personnel**
23:7 35:1 38:1

**perspective**
12:15 102:1 105:12
120:9

**pertinent**
219:1

**philosophy**
50:16

**phone**
115:1,12,17 181:4

**physical**
109:7 131:10 136:13
136:16 137:6 158:6

**physically**
116:23

**physician**
9:22 10:10 13:4,12
14:2,8,19,20 17:23
19:23 20:4,5,19
21:15,25 22:9,20
24:2,12 25:16 26:1
26:4,18 29:8,18
30:16 33:11 45:9
46:1,10,14 47:4,11
47:12 48:19 49:10
50:10,11 52:12,14
52:16 53:4,11 54:3
54:23 55:13,17
56:16 57:4,25 58:1
58:8,16,24 59:4,9
59:11,14,18,24,25
60:9,13,23 61:25
62:6,15 63:23 65:7
66:21,21 67:24 68:4
68:6,10 69:22 74:10
75:13 76:17 78:9,18
78:19 79:10,17 80:5
80:16,18 84:12,18
85:8 86:3,7,16,19
86:21,22 87:6,11
88:4 90:6,8,9,15
91:3 92:2 93:2
100:21 119:20
121:14 123:20
126:14,19 130:14
132:15 137:1,12
138:6 142:4 144:7,9
152:19,20 157:4,19
160:19,25 161:25
164:5,7,10,20
165:13,14,20
166:14 173:15

182:13 184:20
192:20 205:24
210:10 211:3 217:5

**physicians**
12:7,24 13:7,17 14:9
15:13,14,22,23 16:3
16:3,15,18,21 17:4
17:8,9,24 18:10,11
18:17,24,25 19:5,14
20:9 21:12,20 22:7
22:8 23:2,6,23 24:1
24:9 25:15 26:8,8
26:12,13 27:2 30:10
30:21 37:22 46:16
48:9,16,17,19 49:1
49:2 50:20 51:17
52:25 54:18 60:14
62:3 67:15,16 71:19
73:11 75:7,12 76:12
77:2 83:5,6 84:16
84:16 85:6 86:8
88:16,19 89:3 90:4
90:4 92:10,11 95:12
99:17 108:10,11,19
122:12 123:18
124:16 125:24
126:16 129:12,25
133:19 135:25
136:22 137:14
148:20 149:22
163:4,5,8 164:2,2
174:5,23

**physicians'**
61:23

**pick**
111:19

**picked**
29:20

**pinged**
77:4

**pinpoint**
31:15

**place**
29:4 36:5 37:2 41:6
41:18 44:14 47:21
50:14 72:12 140:10

160:18 174:15
175:4 183:22
188:16 192:8
196:18 203:22
223:12

**placed**
72:4 159:22

**placements**
74:25

**Plaintiff**
1:7,14 2:2

**plan**
12:16 46:2,10 50:9
56:4,16 83:7 84:15
120:17 126:1
182:18 184:10

**planned**
184:9

**planning**
12:12 18:20

**plans**
12:3,13 184:3

**Plauth**
75:1 150:16,18 151:9
151:12 152:5
156:14,18 157:3
160:17 162:13
178:8,14 179:14
180:25 211:15

**play**
47:18

**please**
8:16 11:18 64:20
79:4 97:23 114:1
118:12 120:15
125:23 172:2,12
214:14 220:11

**plus**
189:3

**point**
12:18 16:9 30:3 42:1
56:8 62:16 85:10
98:8,20 99:19
113:11 129:23
133:12 137:21
138:19 143:8 156:3



157:16 163:13 172:14 174:20 180:8,10 182:2,2,21 183:11 188:1,6,24 189:19 190:9 196:5 204:17 209:14,16 211:8 213:17 219:13

**points**
196:13

**policies**
35:1,4 36:10 37:5,18 38:1,17 132:1,4,6,9 132:12

**policy**
8:19 12:1 34:17 36:5 37:1 46:18 131:4,13 131:19,20,23,24 132:1,13 147:21 163:15 165:4 178:24 217:21

**PolicyTech**
131:24

**portal**
44:6 109:16,19,25

**portion**
15:19 114:11 213:24

**portions**
48:1,8

**position**
8:9 9:8 11:3,5,8,11 12:1,3 14:14,19 26:15 31:12 32:6 40:24 75:15 76:16 76:22 79:9 80:17 137:4 175:15 177:11,11 187:8 188:5 205:23 217:10

**positions**
9:9,24 40:2 76:19 78:13 84:23,23,24

**possible**
174:13 175:16 177:13

**post**

76:17 80:17 199:18 199:19 215:9

**posted**
76:16,19 205:23,24

**potential**
55:12,16 56:18 87:10 156:8 157:6 217:17 217:18

**potentially**
74:6 181:15

**Potter**
80:14 120:5 128:22 131:3 132:18,21 135:1

**PowerPoint**
48:3

**practical**
17:16

**practice**
20:1,11,13,14,16,25 21:9,17 22:3,13 58:17 60:12 66:7,11 67:24 68:4 69:10,11 70:8 73:22 74:1,7,8 74:11 76:14 83:17 88:22 89:1,3 93:8 105:4 152:21 162:20 164:9 165:3 165:8 166:3,9 181:25 182:14,16

**practice/employme...**
162:15 163:17,23 164:16 165:6,22

**practiced**
49:12

**practices**
13:5,12,19 58:16 60:13 84:18

**practicing**
73:16 160:14

**preceded**
15:1

**preceding**
51:19,20

**predetermined**
75:8

**predicated**
186:16

**predominantly**
15:5 68:15

**pregnant**
165:19

**preparation**
135:14

**preparations**
7:25

**prepare**
6:11 8:4 213:25 214:3

**prepared**
6:13 7:23

**presence**
210:14,18 211:6 212:8,15 217:24

**present**
11:12 86:12 191:2,11 191:22 194:8 211:13

**presentation**
91:5

**preserving**
6:5 134:5

**president**
9:22 14:2 23:15 36:17,23 54:3 130:22 153:6 163:10 195:18

**presidents**
121:14,18

**pretty**
100:12 192:20

**previous**
112:24 128:8 201:23 223:7

**previously**
35:7,20,24 118:10 139:4 158:9 207:8

**primarily**
26:21 27:18 40:12 95:22 188:14 189:24

**primary**

11:21 13:15 57:16,20 85:19 211:2

**printed**
111:25 130:8

**printing**
142:1

**printout**
130:1

**prior**
7:16 56:8 66:3 122:22 137:22 151:2 184:23 189:25 190:14 202:9,14 219:13

**prioritize**
81:16

**privilege**
175:23

**privileged**
135:13 164:5 217:22

**privileges**
37:23 165:15

**privileging**
160:24 173:15

**privy**
41:11 42:16 44:15 53:13 150:24

**probably**
41:22 65:2 88:23 94:2 111:3,4 118:25 141:15 154:18 196:19 212:22

**problem**
20:18

**problems**
5:16

**procedure**
4:2 59:8 122:10

**proceed**
160:20

**proceeding**
114:20

**proceedings**
4:1 9:13 220:17 223:16

**process**



26:25 27:17 29:6,7
29:21 37:14 75:6,7
77:9 78:8,18,23
80:17 81:1,17 91:21
93:19 94:17 95:8,8
95:19 98:24 107:23
112:8 114:2 116:22
119:19 120:24
121:8 123:19,23
124:7 125:10
126:10 129:13,24
131:9 134:11,23,24
136:21 147:15
154:15 159:14
**processed**
78:21 120:18
**processes**
61:16 64:1 73:25
74:1 80:7 119:24
**processing**
99:21 160:23
**produce**
103:21
**produced**
82:19 86:9 105:8
125:25
**producing**
104:12,13,14
**productive**
59:18 83:5 103:22
**productivity**
58:19,21 59:11,16,23
60:10,11,23 63:23
69:8,15 82:20 83:13
86:16 92:15 105:2
125:1,4,11,19,25
**professional**
1:15 88:6 223:6,24
**professionally**
219:15
**program**
8:22 66:12 130:3
152:11
**projects**
12:3
**promotion**

74:8
**proper**
27:1,12,13 177:4
185:12 213:20
**proposal**
92:1
**proposed**
78:9
**protections**
47:21
**protective**
176:6,18
**provide**
17:10,14 25:19 26:4
51:1 65:20 66:15,15
70:7 80:19 113:17
134:12,23 137:17
137:18 158:8
160:21 165:16
184:14 215:22
**provided**
6:14 7:5 30:18 41:4
48:7,8 53:21 58:24
59:1,3,5 78:7 83:17
85:18 94:9 101:18
101:19 106:23
111:25 113:21
116:20 118:20
120:23 137:6 138:7
206:24 207:4,16
215:17 217:8
**providers**
106:6,17 107:7,9
**providing**
18:1 45:19 51:9,15
58:17 62:24 65:18
66:12 69:1 85:2
112:10 136:12,23
161:23 175:13
**provisions**
30:2
**prowess**
93:16
**PSA**
100:13,24 101:5,9
139:22 140:7,14

**PSF**
49:18 79:25 82:10
84:9 97:6 100:1
101:17 119:9
120:25 124:21,22
128:21 139:11
141:22 142:10
144:12 148:3
155:22 160:5
210:12
**PSR**
89:5
**psychical**
130:1
**public**
1:15 32:25 42:7
221:19 223:6
**pull**
209:10
**pulled**
141:12
**pulling**
45:18
**purchase**
87:7,8
**purposes**
12:12 20:6 52:25
**pursuant**
1:13 4:2
**pursue**
41:2 159:13 173:18
219:17
**purview**
19:25 43:9,21
**push**
168:8
**put**
35:5 45:16 71:16
95:3,7 98:3 102:25
209:1
**putting**
94:2

**Q**

**question**
5:9,14 19:20,24

20:24 21:11 24:3
33:15 36:25 49:14
53:9 55:4 63:2 77:5
84:13 94:22 114:24
134:9 142:7 148:21
151:5 157:1,16
159:2,17 167:14
170:25 171:4,20
172:12 173:10
175:20 176:9,13,24
177:9 182:23,25
191:18 194:18
207:7,10 210:22
211:25 218:12
**questions**
5:3,25 20:10 48:23
56:22 62:17,22 92:4
139:25 140:1
146:20 154:8
167:15 176:1 193:6
220:5 223:15
**queue**
93:21 108:22 123:15
124:2
**quick**
9:12 81:9 189:13
**quickly**
100:4,12 122:9
220:10
**quite**
156:25

**R**

**R**
2:1
**radiation**
65:17 66:17 67:25
68:2,6,12,17,19
69:6,12 70:8 76:18
76:19 78:5,10 82:17
83:7,20 88:7 89:12
89:17 92:8,13 93:3
93:23 96:23 101:23
144:10 174:4
184:15
**raise**



69:20 75:20,23
159:6,24
**raised**
56:17 75:25 76:12
**ramifications**
53:3,6,10,13 54:22
54:24 55:12,14,16
101:4,9
**ramp**
88:25 102:23,24
**ramped**
104:21
**rate**
88:15,17,18,20 90:2
103:6 105:5
**rates**
49:8 58:20 89:15
**Rathod**
2:2
**Rational**
50:6
**reach**
118:5 140:2 161:24
169:18 170:3
171:12 173:11
180:5 183:8 199:1,2
199:4,6 201:21
202:20
**reached**
170:18,23 172:4,25
173:6 181:19 182:4
199:18,21 215:22
**reaching**
158:1
**reaction**
199:18
**read**
94:20 98:14 114:17
126:21 156:1,3
212:2 213:9 221:4
**reading**
6:23 50:1 56:21
100:3 106:9 207:11
**ready**
129:25 154:3
**real**

81:9
**realize**
6:24
**really**
7:21 14:7 19:25
27:16 49:11 95:11
102:4 103:18
157:23 189:13
220:10
**reason**
5:24 48:5 68:5 93:1,2
185:17,20 186:10
186:19 189:10
204:19 207:4,4
214:8 216:23
**reasoning**
72:3 85:17
**reasonings**
71:25 72:6,8,9 73:4
**reasons**
158:5 166:8 207:18
211:3
**recall**
6:14 28:14 30:1,2
31:11,16,24 33:6,22
33:24 34:1,2,6,13
34:18 51:20 52:22
53:5 54:19 62:11
67:19 69:16,19 72:5
72:7,8,9,11,20,22
73:2,4 74:18,20,24
75:3,4,5 77:8 82:5
84:6 87:7 90:24
91:24 92:4,5,6
93:18 95:2 96:25
97:4 98:10,12 99:10
99:11,19,22,23
100:2,3,11,24,25
101:1,7,11 103:19
107:5,11,13 111:15
111:21,24 113:14
115:16,17 116:9,13
116:17,18 117:10
117:11,17,20,22
118:3,23 119:4,5,5
127:7,22 128:1,4,11

128:19 130:3
132:23 133:4
134:25 135:6,7
136:1,6,11,18
137:10,13 138:9,10
138:14,18,23
139:14 141:7,25
143:5,6,13,18,21
145:16,20 146:11
146:15 147:8,17
149:13,15,23 150:4
150:21 151:11,14
155:12,25 156:5,21
157:16 160:8,16
180:4,13 181:8,11
181:14 182:8
186:22 189:6
193:18,25 194:4,13
194:14 199:17
200:17,23 201:11
201:12,14,16,18
202:5,6,8,12,13
203:21 204:8
205:14,17 206:19
207:21,22,24 208:2
208:3,8,11 209:12
209:14 210:16
211:16,18,20
212:11 213:4
214:23 215:2,5,6,14
215:24 216:16,18
216:21 217:1,3,3,12
218:9,25
**recalling**
68:24
**receive**
89:17 139:13 200:7
**received**
109:8 117:20 136:18
142:11 164:19
200:18
**receiving**
13:8 107:14 159:18
**Recess**
45:4 110:18 154:1
178:2

**recognize**
34:19 195:4 214:16
**recognized**
51:5
**recollecting**
215:22
**recollection**
36:14 37:5,9 78:15
96:11 98:16 125:3
125:16 127:23
128:17 190:19
197:3 200:9 208:8
208:11,17 209:8,19
215:9
**recommend**
129:8 209:6
**recommendation**
78:12
**recommended**
211:2
**reconsider**
204:16
**record**
4:9 6:5 8:8 22:2 23:1
34:12 154:3 220:10
**recorded**
1:4 7:15
**recoup**
215:20
**recoupment**
187:22
**recruiters**
80:16
**recruiting**
174:23
**recruitment**
68:3 103:8 105:16
106:4,23 117:3
121:22 122:7 125:2
125:12 126:6,13,15
126:21 127:8 128:2
128:10,18 135:21
142:18 170:9 173:2
187:22 190:21
209:24
**red**



102:6 104:17 159:6
**reduced**
 223:13
**refer**
 19:22 20:11,13,15,19
   20:25 21:9,13,16,23
   22:12 23:3,3,8
   41:20,21 42:18 46:4
   47:24
**reference**
 3:6 32:15 78:19 79:7
   80:5 84:5 89:14
   98:11 103:20
   113:11 132:25
   133:17 139:21
   142:13 169:4
   179:12 195:17
   196:6
**referenced**
 35:9 77:17 83:18
   96:3 97:15,22
   118:13 138:10
   139:5 141:11 191:6
   195:1 196:11
   213:23
**references**
 213:6
**referencing**
 50:4 52:20 94:17
   97:25 98:6 99:7
   178:20 179:16
**referral**
 74:8
**referred**
 20:1 22:19 28:6 48:3
   141:8 144:14 216:5
**referring**
 20:8 21:24 24:6
   57:16 77:16 79:19
   79:23 80:11 82:16
   86:3 95:7 97:1,3
   98:9 104:24 106:8
   106:19,20 112:19
   113:18 114:13,14
   125:6 126:7,7,21
   127:25 128:15,23

129:2,7 139:19
   146:22 162:16
   163:24 178:22
   179:4,6,10 200:1
**refrain**
 217:21
**refresh**
 36:14 37:9 98:15
   128:17 146:23
   197:3 208:10 209:8
   209:18
**refreshes**
 96:10
**refreshing**
 215:8
**regard**
 32:14 69:11 91:20
   154:14 189:11
**regarding**
 98:18 99:1,8 114:5
   114:15 199:15
**regardless**
 204:25
**region**
 18:25 43:7 84:5,8
**regional**
 84:7
**register**
 156:22
**registered**
 157:20
**Regular**
 29:1
**regularly**
 27:25
**regulations**
 17:6 27:11 28:19
   47:23
**regulatory**
 119:25
**Rehab**
 11:10
**reimbursed**
 86:14 89:15
**reimbursement**
 58:20 88:5

**reimbursements**
 88:24
**reissue**
 62:8
**reiterate**
 219:2
**rejected**
 93:13
**rejecting**
 92:1
**related**
 48:24 133:20 135:20
   139:2 140:2 145:21
   148:18 149:24
   150:8 151:19
   153:11 154:8 156:8
   161:21 195:8
   223:17
**relating**
 160:18
**relation**
 223:10
**relationship**
 17:13,14 38:23,25
   39:10 42:14,22
   60:15 61:10
**relationships**
 17:4 18:22
**Relative**
 58:6
**relied**
 29:24 52:10,13,17
**relocation**
 120:22
**remain**
 85:12 184:14
**remained**
 17:5
**remaining**
 114:11
**remains**
 103:23
**remember**
 7:23 22:12 28:7,9
   31:22 62:10 73:7,8
   73:9 76:24 80:13

93:12 96:1,5 100:13
   107:17 110:25
   111:1,16 115:20
   116:1,15 117:13
   126:4 128:13 135:8
   136:10 138:21,21
   146:9 149:18,20
   181:5 189:16 194:6
   194:11 196:17
   212:19 220:1
**remembering**
 218:15
**remuneration**
 215:18
**Render**
 2:6
**rendered**
 17:13 50:20 59:24
   65:20 66:23 85:12
   88:6
**rendering**
 49:10
**Reno**
 8:25 9:1 40:16 63:15
   63:19
**Renown**
 8:25 10:18 11:6,9
   63:19,25
**rent**
 86:25
**repayment**
 106:4,15 107:4,8
   193:4 208:5,13
   209:20,21,25
   215:11
**repeat**
 54:12 63:1 94:22
   123:23 210:22
**repeating**
 147:2
**rephrase**
 57:1 67:6 77:22
   116:3 132:19 159:2
   207:10
**rephrasing**
 77:5



**replace**
76:22
**replied**
116:25
**reply**
117:15 169:18
199:19 215:14
**replying**
215:15
**report**
14:18 192:16 193:15
**reported**
15:4 38:5 54:4
**reporter**
1:15 5:3 55:20,23
220:9,15 223:6,24
**REPORTER'S**
223:1
**reporting**
194:1
**reports**
23:18 38:4,14
**represent**
8:9 91:17
**representation**
91:14,15,22
**representative**
179:13
**represented**
22:9
**request**
37:14 78:18 79:8,12
79:15 82:6 91:4,10
91:12 93:9 101:2
112:25 113:17
140:14 150:23
151:8,18 153:2,5,13
158:21 159:11
162:22 163:9,12
164:6 211:1 218:16
**requested**
151:1 153:3 161:22
**requesting**
152:23 163:6 210:21
211:19 215:15
**requests**

71:20 80:7,24,25
81:6
**required**
32:3 163:16 164:4
**requires**
32:9
**rescheduled**
7:18
**rescind**
150:2 179:25 180:10
180:12 181:9,15
182:1 183:21
184:24 185:19
186:10,15,24
187:16 188:10
189:7,17 194:8
196:1,21 198:2
202:23 204:21
**rescinded**
200:4 206:17 210:4
**rescinding**
180:17 181:13
185:20 199:7
200:20 202:9
207:18 215:9
218:17
**research**
64:12,13
**resending**
207:5
**resolve**
217:13 218:19
**resources**
19:23 44:5
**respect**
67:21 149:16
**respected**
73:11
**respond**
169:22 170:6,11,19
170:24 172:5
199:20
**responded**
200:21
**responding**
201:9

**responds**
199:11
**response**
98:8,20 99:3 101:24
114:6 142:9 157:14
157:15,20,25 194:2
199:14 200:14,18
200:24 201:2,4
202:7,15,15 209:13
211:13
**responsibilities**
10:23 12:21 14:6
40:23 41:5
**responsibility**
40:25 188:7 192:9
**responsible**
26:21 39:24
**rest**
9:17
**restated**
193:5
**restroom**
5:12
**restructuring**
10:22 40:15,20 41:9
41:10
**result**
206:23 207:14
**retained**
3:14
**retaliated**
210:21
**retaliation**
210:15 211:1,18,22
212:5
**retreat**
31:6
**return**
160:21 174:14 180:7
185:2
**revenue**
86:4,9,13,15 89:6,8
**review**
25:16 29:4,5,7,13,21
31:9 38:4 91:4,21
100:21 107:23

108:3,20 109:11,12
109:24 112:8,11,11
113:1 114:10
119:20 122:3,9,12
122:19,20,22
125:13 129:10
130:14,16,17,19,20
131:10 134:12,14
134:16,23 136:20
137:12,15 168:6,21
170:23 194:24
213:2 214:4,4 216:4
216:7
**reviewed**
6:14 7:4,9 25:14
29:14 31:25 108:14
109:8 120:13
122:11 125:15
150:9 153:4 169:5
208:25
**reviewing**
11:19 29:8 47:16
118:21 170:13
216:2,17,19
**revise**
62:12 110:21
**revised**
169:1 183:4 203:20
204:18 205:6,12
206:12 215:24
216:1,2
**revisit**
62:21
**revoked**
210:25
**right**
6:9 9:2 14:3 15:14
17:18,20,21 21:1,11
35:23 39:18 40:17
45:2 48:6 50:5 53:1
56:25 77:4 84:17
90:25 102:6 104:19
111:9 120:5 121:11
121:17 124:14
125:10 133:24
134:10 135:2


MAGNA
LEGAL SERVICES

139:17 142:9,20 144:14,15 154:2 155:16 157:17 159:17 162:16 165:10,11 166:18 167:24 173:3,9 178:7 180:1 187:13 196:7 204:5 207:1 207:19 212:25 213:15,23 214:10 216:12

**right-hand**
49:16

**ring**
198:6

**road**
125:4,17 126:23 127:6 128:7,18

**Robin**
197:23 198:14 210:2

**role**
11:1,3 16:25 18:13 22:5 24:18 25:5,10 25:18 26:19 33:7 41:2 47:17,18 61:11 64:5 65:24 66:18 67:1,2 70:24 71:3 77:19,25 78:3 96:19 108:8 213:17 216:2 216:7

**roles**
40:22 47:20

**rolls**
86:25

**room**
6:20,25 70:7

**ROPC**
66:19 67:9,22 69:24 71:6 85:1 139:22

**ROPC's**
67:10

**rotating**
13:16,16

**routed**
130:6,22 131:9

**routine**

116:4 160:23

**Rule**
176:18

**rules**
4:2 5:1 16:16 17:5 47:23 55:25 185:12

**run**
23:16 88:15,17,18,20 90:2 105:5

**RVUs**
58:3

_____

**S**

**S**
2:1

**SABEY**
2:5 36:12 54:25 55:19 106:10 110:16 134:1,8,17 135:11,16 140:22 146:19 147:1 151:4 153:21,24 157:11 157:22 159:1,25 161:18 165:23 167:13 169:8 170:16 171:17,24 173:4 175:5,9,18,25 176:9,16,19,22 191:18 206:1,4 207:6 220:8,14,16

**safe**
36:9

**safety**
13:4

**salaries**
61:23 86:24,25 88:3

**salary**
102:19,20 103:2

**SAM**
1:4,13 3:1 4:3 221:3 221:11,13 223:8

**Samuel**
4:10

**SamuelWeller@C...**
155:16

**sat**

42:9

**satisfied**
209:25

**satisfy**
173:21 174:24 215:19

**satisfying**
216:14

**save**
114:24 209:4

**saw**
34:19 150:8 156:19 156:20

**saying**
9:15 17:18 33:5 88:1 103:1 112:24 116:10,25 122:2 123:12 131:6,15 145:17 146:24 161:11 164:15 167:19 168:23 169:6 179:24 182:3 183:1 189:3,16 191:15 193:18 200:8 212:23 214:21 219:23

**says**
50:5,8 83:6 86:4 98:17 103:15 104:21 106:3 120:21 121:1 126:20 127:23 134:14 145:14 146:7 148:4 157:3 160:5 162:13 178:14 197:23 203:19 205:11,16 207:14 209:13 210:23 212:3

**scan**
142:12

**scheduled**
7:16

**scope**
15:17,18 40:13,24,25

**score**

58:7,24

**Scott**
14:21 15:1,5,6 121:12 122:25,25 123:8,9

**scratch**
88:22

**scroll**
84:9 94:14 96:9 128:20 195:3

**se**
51:20 85:8 130:3

**seal**
223:21

**second**
15:7 36:1,4,14 49:14 94:16 139:23 147:21 155:22 156:10 158:20 210:24

**secondary**
29:13

**secondhand**
191:4,19

**section**
50:4 101:23

**security**
13:4

**see**
17:17 28:14 35:10 36:21 45:17 49:20 49:21 50:22 55:5 57:8 59:12,14 74:10 83:17 92:14 94:10 96:10 97:22 98:15 103:4,19,21 105:8 113:16 114:14 115:3 118:19 120:19,21 126:23 139:6 141:23 155:9 162:9 195:4 197:10 197:24 208:10 209:9 210:12

**seeing**
37:8 107:17 138:20 202:2 208:16



MAGNA
LEGAL SERVICES

**seek**
204:10
**seen**
36:2,3 37:10 45:22
94:11 118:16,22
139:8 141:14,19
155:6 171:24
197:17,18,19
214:18 215:1,21
**send**
129:8,11,13,16,22
130:4,16 133:17
135:23 166:13
168:5,20 169:1
195:21 196:2
214:21 220:16
**sending**
118:11 129:9,21,25
133:19 148:22
180:22 202:3,9,14
**senior**
54:6
**sense**
17:16 24:11,13 66:20
**sent**
7:4 29:17 35:24
110:1 122:11 130:2
130:18 133:6
137:22 138:6 140:5
143:12 148:16
149:14,22 150:6
166:20 183:4
198:19,19 199:6
200:19 214:24
215:7,15 218:2
**sentence**
83:6 179:7 203:5
207:11 210:24
212:1,3
**sentences**
98:15
**separate**
30:12 38:5 71:11,14
71:21 73:1 127:9,13
128:2,5 144:18
145:15,17,22 146:2

146:8,17 147:14
162:14,19 163:1,16
163:22 164:10
165:5,11 187:21
188:4
**separated**
97:17
**separately**
90:4
**separating**
10:20 41:13 186:2
219:4
**separation**
41:18,21,23 44:13
**service**
17:12 23:21 26:18
49:9 51:1 57:10
58:17,23 65:21
66:11,24,25 67:17
67:24 71:8 73:18,19
74:3,17,19 77:17
86:12,14 87:8,21,24
88:7 89:7 96:21
105:24 144:2,4,6,8
161:23 163:6
174:24 175:13
180:20 191:8
192:25 196:12
**service-wise**
51:10
**services**
1:10 4:22 11:22,22
12:4,24 13:11,15
14:10 17:10,15 18:1
19:3 24:25 50:20
59:22,24 60:16
62:25 65:18,19
66:14,15,23 67:4,6
67:10 68:12,21,25
69:1 70:8 81:18
85:2,12,18 87:7,13
88:6 89:6,18 97:16
104:4 160:21
162:23 163:3 164:4
165:16 179:14,17
184:14

**set**
17:18 29:19 37:25
38:16 47:22 48:10
63:25 115:23 193:6
**settle**
190:21
**settlement**
208:6,13 209:21
215:11,16 218:3
**shake**
5:6
**share**
35:8 42:4 45:12 47:9
78:24 114:20 115:2
139:3 141:9 208:14
**shared**
18:19 41:12 91:7
113:9 151:16 157:5
171:11
**sharing**
112:21
**Shawna**
15:7,10
**shed**
50:2
**short**
96:12 110:4 153:22
154:4 178:4 211:1
**shortcut**
144:5
**shorthand**
223:12
**show**
94:4 115:1 116:10
119:16 154:21
165:25 194:23
208:10
**showing**
18:23 209:9
**shown**
114:23 138:15
149:10
**side**
176:25
**sign**
86:19 90:9,10 109:3

109:6,7,9,11 119:23
120:16 121:19
124:16 130:5,22
137:25 142:24
147:11,21 150:9,11
152:12 165:1
168:15 183:5,15,19
189:12,13,15
**sign-on**
90:5
**signature**
27:3 117:9,24 130:2
130:6,23 131:11,19
137:25 142:13
143:14 149:23
154:15 220:15
221:13 223:21
**signatures**
29:17 109:13 111:22
**signed**
25:17 116:23 117:6
117:14 121:15
129:14 131:4,13,15
131:21 133:2
138:12 148:12
149:2,25 157:7
164:19 167:21
168:18 169:5
170:12 183:5
187:22 188:4 190:2
212:17
**significant**
192:20 212:6
**signing**
142:1 166:2 168:9
188:22
**similar**
18:19 40:1,6 62:25
63:20,24
**similarly**
158:7
**Simultaneous**
72:24 145:4 161:5
**single**
97:9
**singularize**



98:1

**sit**
70:6 175:25

**site**
186:2

**situate**
198:1

**situation**
95:18 166:5 167:19
185:25 193:19
215:16 220:2

**situations**
192:23

**six-hospital**
11:23

**skim**
36:4

**sleep**
6:15 94:3

**slight**
68:20

**so-called**
24:9 165:16

**sole**
146:3 177:18

**solve**
152:10

**somebody**
64:13

**sorry**
7:7,21 9:1,14 15:3
20:21 24:2 33:14,16
34:11 35:12 50:3
52:15 54:12 55:22
55:23 57:22 63:1
64:8 67:6 75:16
77:3 81:24 88:18
89:23 93:25 94:24
96:8 100:6 102:4
104:8 112:20 120:1
122:14 123:3
126:25 127:2
130:11,13 133:13
134:3 142:5 148:25
150:17 154:25
194:16 195:2 196:3

196:21 197:9
203:13,14 205:3,5
208:14 209:3
211:24 215:4,11
216:20 218:4

**sort**
61:13 64:12 109:16

**sounds**
55:14

**South**
11:9

**speak**
43:15,16 61:5 62:3
62:14 66:12 111:12
115:7,9 128:16,17
135:5 137:8 154:9
156:24 158:12,17
180:16 185:14
190:10

**speakers**
72:24 145:4 161:5

**speaking**
5:7 34:14 123:18
130:24 192:8,22
194:7 202:8

**speaks**
59:23

**special**
112:9

**specialists**
13:16

**specialty**
11:21 14:12 19:4
24:10 26:3 30:7,20
49:6 50:24,25 51:14
57:14 58:14,22
63:22 64:17,23
67:14 82:17 85:20
119:22

**specific**
17:10,11 20:10 30:7
30:19 31:23,24
37:23 50:3,24 53:5
58:25 60:8,22 97:4
102:17 135:5 137:8
139:14 143:9

145:20 147:10,17
147:25 148:18
150:20 154:9,10
157:16 162:23
164:1,3 166:2,8,15
166:18 167:3,8
181:11 186:6
190:10 194:4
196:23 203:25
205:18 216:13,18

**specifically**
67:21 107:16 115:18
138:23 172:15

**specify**
97:23

**speculate**
206:6

**speculating**
178:23

**speed**
81:1 116:21

**spoke**
66:10 67:23 69:10
83:2 115:22 141:25
149:21 162:12
172:8 180:24 193:7
193:9,22 201:12
209:19

**sponsors**
39:5

**Springs**
62:25 63:4,7 68:15
73:20 78:11 92:16
92:21 120:22

**ss**
223:3

**St**
10:7 13:3 68:16,18
68:21,25 71:14,17
72:13,17 73:17 75:8
91:18 92:20,23
97:11,24 98:4

**stabilize**
67:17

**staff**
14:9 32:22 36:16,17

36:22,23,24 37:11
37:20,21 38:7,10
73:12 86:24,25
150:14 151:9,18
153:5 159:13,15
161:23 162:5,19,23
162:24 163:3,7,11
163:23,25 164:1,8,8
164:17 165:10
178:20 179:2,14,15
179:15,18,19,23
184:20,20 187:6
204:4 210:8

**stakeholders**
13:8

**standard**
30:6 60:12 90:16
108:24 120:17
121:21,24 122:3,10
122:15 124:15
126:1,9 129:13,24

**standardize**
55:15

**standardized**
52:3 63:25

**standards**
56:2

**standing**
30:3

**stands**
96:8 97:6

**Stark**
16:9,16 17:1,5,19
27:11 28:24 30:24
47:17 54:10 55:6,9
55:25 56:10 185:11
187:18

**Stark/Kickback**
28:20

**start**
9:5 46:7 78:22 88:22
103:7 104:3 111:9
114:1 118:25 119:9
123:19 141:15
164:20 165:2 166:2
166:4,4,7,9,10,22


MAGNA
LEGAL SERVICES

166:23 167:25 168:7,8,12,12,16,23 168:24,25 169:2,6,7 169:13,16,25 170:2 170:10 171:2,10,22 171:25 172:6 173:1 173:14,16,23 174:11 177:14,20

**started** 9:7,15 93:19 94:17 165:20 173:24

**starting** 74:2 88:21 95:7,8 100:12 169:20 170:15,21 174:2 184:5 209:7

**startup** 73:18,22,24

**state** 4:9 9:2 15:16,20 119:16 221:15 223:2,6

**stated** 13:25 38:7 55:2,8 95:14 96:22 98:23 102:12 106:1 112:24 114:1,3 120:14 129:16 131:2,12 133:8,9 134:10 138:13 144:22 145:21 148:9,10,17 168:5 168:20 172:3 174:9 183:5 194:15 205:2 205:5 206:12 213:19 215:5,17 218:4

**statements** 186:22

**states** 1:1 124:25 131:20

**stating** 116:3 142:12 187:3 217:19

**statistical** 84:8

**status** 81:12 149:9 151:19 152:13 160:14 195:9 206:25 207:17

**stay** 76:13 85:13,13 102:2 129:5

**staying** 55:9 91:20 120:9

**step** 16:19,24 95:2 112:20 172:19 209:22 215:19

**Stephanie** 80:3

**steps** 109:16,25 129:3 133:21 147:20 154:14 159:13 184:7 194:17

**stipulation** 1:14

**stop** 135:11 176:23

**stopped** 184:11

**straight** 116:8

**strategic** 12:23 84:15

**strategy** 9:21 10:6 11:20

**Street** 2:3,7

**strictly** 48:18

**string** 133:16

**strong** 73:10

**strongly** 211:2

**structure** 38:21 43:4,12,17 46:13 53:24 62:2

65:20 66:24 77:15 78:8 88:2 90:2 99:5 108:13,16 119:17 120:11 140:12

**structured** 28:10 48:10

**structures** 29:4 56:6,24 62:4 63:9 78:4

**struggle** 5:6

**study** 19:2

**stuff** 42:6 45:6 65:2 93:24

**submit** 176:6

**submittal** 78:22 79:16

**submitted** 78:21 82:3 91:1,6

**submitting** 78:17 95:2

**subordinates** 11:25 12:5 14:13 28:12

**subscribed** 221:14

**subsequent** 114:18 117:4 208:1

**substantive** 42:9

**suicidal** 178:15,21,25

**Suite** 2:3,7

**SullivanCotter** 64:21

**sum** 105:9

**summarize** 147:9

**summary** 79:15 120:23 125:14 125:18 126:5 137:19

**Summit** 10:7 13:3

**supervisor** 121:11

**supplies** 86:25

**supply** 19:3,6

**support** 17:25 18:4 19:14 27:13 55:10 64:18 68:1,9 108:2 174:5 185:13

**supported** 56:5 178:16

**supporting** 27:14 53:18

**supportive** 181:12

**supports** 50:9

**supposed** 58:19 89:6 133:1 139:24

**sure** 15:13,14 17:19 19:22 24:5 33:3 34:20,21 47:15 55:20 65:1 77:22,24 79:22 81:10 96:7 109:25 125:23 126:2 129:3 147:11 150:10 153:7,23 156:4,25 157:2 159:3 173:10 187:2 188:21 207:11 210:23 211:10 213:12,13 216:6 219:25 220:12

**surprised** 142:21

**surrounding** 12:25

**survey** 64:16,22 84:8

**surveys**


MAGNA
LEGAL SERVICES

64:19 83:25
**sustain**
19:10
**sworn**
4:4 221:14 223:9
**system**
19:13 21:22 24:13
40:8 57:11 63:5
65:9 84:16,19,21
85:14,15,16 87:17
89:16 91:23 109:11
109:14,19 123:11
123:14 132:13

**T**

**Tacha**
180:15,16 181:1
194:20 195:18
196:4 201:15 207:1
**Tacha's**
196:10 198:20,24
**tailor**
30:19 95:17
**tailored**
30:7 93:22
**take**
9:12 16:19,24 34:22
36:4 45:1 94:10
110:3 112:23
118:15 123:13
140:10 141:13
151:17 153:22
158:6 159:12 165:7
177:24 181:21
186:1
**taken**
1:13 4:1 45:4 109:25
110:18 154:1 178:2
178:4 223:11
**takes**
105:2 173:14
**talk**
7:25 8:3 33:18 42:6
45:7 67:12 70:14
111:13 112:13
114:19 143:2

144:18 153:9
154:24 157:10
161:15 165:2 173:1
201:8 202:21
206:16 209:18
212:9,14 217:16
218:14
**talked**
30:24 53:22 66:10
111:20 147:2
171:11
**talking**
21:5 22:2,16 34:6
42:19 54:17 57:24
79:22 89:21 101:22
125:22 128:1
139:24 146:16
162:17 189:6
211:11,18 213:13
213:14
**talks**
126:22 178:24
**tandem**
23:22 73:2
**tax**
87:19 97:13
**team**
26:24,25 27:4,5,5,8,9
27:16,19,22,23 28:1
28:3,10,21 29:1,3
29:15,16,24,24
30:19 38:9 47:5,7
47:12 70:6,11 74:16
78:17 80:6,15 81:14
95:21,24 107:19,22
107:24 108:6,9,12
108:13 109:18
119:14 120:1
130:20 144:1
145:11 154:11
198:18
**teams**
27:6,7 71:5 91:14
**technical**
65:1
**tell**

4:4 6:9 10:24 11:14
25:21 40:19 70:1
71:3 76:9 80:9 82:7
84:6 90:22 102:5
112:18 117:7 118:6
121:1 124:11 136:9
137:2 150:19
166:18 180:23
193:2 217:1
**telling**
117:11 159:7 172:8
176:22
**tells**
148:4
**template**
29:19 30:17 62:15
**temporary**
174:22
**term**
7:6 19:2 33:1 41:23
104:10,12 116:20
123:21,24 124:8
152:3,16,17,20
**terms**
16:20 17:1 26:19,20
27:10 29:9,12,19
30:6 32:25 43:4
56:17 77:14 95:23
98:12 99:14 100:22
108:3,15 112:1,12
113:13 114:10,20
115:3 119:22
120:10,12 122:4,22
124:5,6 126:2
129:17 131:10
137:19,20 150:4
152:20 166:19,21
168:6,21 169:5
170:4,19,22,23
171:12,13 172:3,7
173:21 180:6 185:8
218:15
**terribly**
48:24
**testified**
4:4 95:1 207:8

**testify**
223:9
**testimony**
110:21 154:5 178:5
221:6 223:16
**text**
123:12,13
**texting**
123:8
**thank**
104:13 111:10 119:2
121:1 178:1 220:7
**thanking**
121:2
**thing**
5:10 6:2 84:4 116:22
124:18 164:24
185:21 188:24
190:4 194:16
**things**
33:3 45:8 55:15
112:2 117:1 162:10
206:10,11 211:4
**think**
15:2 24:6,8 26:6,20
28:5 38:13 39:18
53:22 80:16 100:14
104:17 106:21
115:21 124:10
131:25 135:16,16
138:2,8 141:8 142:8
149:4 154:17,19
156:9 157:2,15
163:20 167:3,6,8,19
179:15 191:24
195:25 197:4
198:17 199:9,22
211:10 214:11
220:4,6
**thinking**
68:11,22
**third**
68:10 75:13,14 76:17
76:17,22 82:13 93:1
93:1,8,9 98:7 100:8
205:22,23 210:24



Page 38

Thompson
179:13,16
thought
21:5 104:25 106:7,12
153:2 160:9 183:15
183:23 185:1 190:2
thoughts
156:19 157:14,18,25
three
15:3 64:18,21 76:12
83:25 104:23 105:2
105:7 113:25
165:19,21 167:25
169:17 210:3
three-year
88:25
threshold
103:1,3,4,23 104:6,7
thrilled
193:19
time
6:22 11:12,19 12:18
13:21 14:21,23
15:10 22:1 28:3
30:4 42:1 46:24
50:18 52:5,7 63:2
65:3 68:7,8,23 69:2
72:10 76:4 77:12
81:12 82:6 92:16
98:13 109:22 110:8
113:2 114:24 115:7
115:7 117:18,23
118:24 121:13
122:14 130:8 132:5
137:5,8 138:2,4,5,6
138:8 139:12 142:7
150:13 157:8
163:13 164:19
166:8,24,25 167:6
167:17 174:17
180:14 184:4 188:1
193:1 194:20 199:3
201:5 206:12 209:7
210:20 213:17
216:18 217:4
218:14 220:7

223:12
timeline
97:5 181:17,19
timelines
201:24
times
17:24 100:20 137:10
142:5 146:21
154:18 166:6,20
167:5 181:19 218:4
Timothy
143:23
title
80:4 96:1 143:25
titles
40:1
today
5:19,25 6:8 7:13,18
28:15 70:21 102:23
110:22 120:18
128:22 143:20
today's
6:12
told
93:14 134:18 146:20
148:7,14 149:8
150:15 152:5
159:22 190:20
194:11
Tom
121:13 122:16 123:6
tool
60:23
tools
63:21 83:18 108:2
top
50:5 107:14 119:3
124:22 131:3,3
139:10,11 166:18
209:7
topic
110:4 146:16 147:6
187:24
topics
31:11,12,15 64:25
161:14

total
83:19 86:9,14,20,22
87:8,18 89:5 103:6
103:9,11 105:10
track
132:10
training
8:23 28:24 29:1
30:25 31:4,6,16,19
31:24 32:12,16,23
33:6 48:4 54:10
transcript
5:4 220:10 223:15
transcription
221:5
transition
75:21
treat
32:10
trend
105:6
trends
49:8
trial
4:24
tried
161:24 169:10,12,14
170:3 171:12 183:7
true
34:10 119:2 221:5
223:15
truly
85:11 104:6
trust
33:18
truth
4:4 6:9 223:9
truthfully
5:24
try
5:11 54:14 218:18
trying
14:7 35:7 55:5 57:3
73:18 87:10 91:19
95:3 96:4 100:6
110:25 111:19

116:7 122:2 141:8
146:23 147:9
152:10 167:18
181:5 189:20
191:13 192:24
203:4 214:8 216:6
217:13
Tuesday
147:18
turn
8:13
two
7:16,22 10:20 27:5,7
27:20,25 40:5,7
41:13 43:19 48:23
69:24 70:22 71:11
71:11 76:1,25 77:8
81:12 86:7,8,10,10
86:17 97:12 104:22
115:11,18 121:13
140:20 148:19
167:7 185:23 186:2
186:7 193:13 194:5
198:12
two-and-a-half
10:8 214:24
two-plus
31:25
type
5:19 49:5,11 56:25
57:6,14,25 58:14,23
types
51:22 57:9 62:7 83:9
typewritten
223:13
typical
29:5,7 30:5 90:12,13
105:6 108:18,19
110:11 112:7 122:5
131:9
typically
19:1 24:24 25:10
26:2,15 30:1 31:5
49:6 59:13,17 60:1
64:14 65:16 88:25
89:15 91:13,16


MAGNA
LEGAL SERVICES

102:23 124:5
130:16,18,24
137:14,17,22 175:7

**U**

**Uh-huh**
4:23 101:3 123:4
126:17
**ulti-**
54:5 59:2
**ultimately**
7:17 12:4,15 13:2
14:10 15:7 18:3,5
18:20 19:4,9,11
21:9 24:10 26:3,5
26:16 29:13,16
30:17 31:7,13 32:17
46:18 48:8 51:16
54:5 59:7,10,16
62:2,5 64:16,17
65:18 66:25 67:16
68:1,18 69:12 70:7
70:10 71:5,7,11,20
72:2 74:9,16 75:14
76:14 78:6,7,9,17
79:12,15 81:1 84:17
85:17 89:3 91:4,9
91:10,17,18 93:6
95:18 96:1 100:15
102:14,19 103:8,22
104:2,3 106:1 108:3
109:11,12 112:10
122:8 123:13
127:19 142:12
147:14 148:11
151:19 152:11,12
154:15 156:6
163:10 166:3
168:12,15 172:4,19
173:20 174:25
175:2 180:10,21
181:1,18,20,21
182:1,20 183:9
184:8,21 185:9
188:5,17 190:12
195:19 215:19,23

217:8 219:8,16
**umbrella**
43:3
**unable**
177:22
**undercompensate**
53:7
**undercompensating**
54:18,23
**underpaying**
53:4
**underpayment**
52:24
**understand**
6:9 19:6 62:19 74:4
77:23 86:6 100:21
119:24 125:24
128:6 148:22
154:12 156:25
163:21 167:19
173:10 183:2 187:8
190:22 192:19
193:19,20 200:7
209:9 218:12
**understanding**
5:16 13:6 32:2,23
37:13 42:13,21
51:16 56:23 58:18
61:9,18 66:22 70:21
106:18,19 131:14
163:1 167:10
187:13
**understandings**
32:8
**understood**
5:14 185:25 192:10
192:23
**unfair**
51:7,10
**uniform**
31:20
**unit**
58:6,25 91:16
**UNITED**
1:1
**units**

59:17
**University**
63:5
**unlawful**
212:4
**update**
147:22
**updated**
83:7 149:20,22 150:7
**urgency**
82:6
**urgent**
11:22 81:5,12,15,21
82:1,3
**use**
32:24 41:22 42:4
46:4,10 48:11 63:20
**usual**
111:8
**usually**
105:2 108:21 116:5
**utilized**
64:18

**V**

**v**
1:8
**vaguely**
53:22
**valid**
131:20
**value**
27:13 49:9 53:17
55:10,18 56:5 58:6
58:25,25 59:10
63:21 64:24 78:4
91:21 102:1,12,13
106:2 108:4,17
109:4 185:9,13
**values**
61:11 108:2
**variation**
56:1 194:4
**variety**
28:3 30:14 31:12
32:13 50:23

**various**
18:5 70:11 166:8
**verbal**
128:12
**versa**
5:9 51:8
**verse**
73:17
**version**
137:11 138:4,5
148:15
**versions**
213:12
**versus**
15:23 23:19 43:9
59:14 74:14 81:15
81:15 82:6 84:7
87:16 103:20 104:1
130:8 134:4,15
158:5
**vet**
192:24
**vice**
5:9 9:22 14:2 51:8
**video**
1:13 2:2,5
**VIDEO-CONFER...**
1:4
**Videographer**
2:9
**view**
120:8
**viewed**
117:18
**violate**
17:19
**violation**
56:18,18
**virtual**
181:6,6,9,15,15
**virtually**
196:19
**vision**
12:23 42:11 65:16
90:17
**visioning**



18:21

**visit**
59:7

**voiced**
219:23

**volume**
68:13 74:10 82:18
83:7,9 92:16,24
93:5,6

**volumes**
19:8 69:11 88:23

**VP**
10:10 14:14,19,19,24
15:22 17:1 18:14
19:16 23:11 25:3,11
27:19 33:8,20 34:13
34:17 35:2 36:6,11
37:2,6,19 38:22
39:17 40:23 42:23
46:5,21 62:23 65:4
65:7,11,15 66:2
69:6,21 110:23
137:15 138:3
175:16 177:11
217:5

**VPs**
54:1

_____
**W**
_____

**wait**
5:7,8 113:13 148:11
159:7

**waited**
112:2

**waiting**
98:8,19 99:3 114:6
123:5 127:17

**waive**
106:3,15

**walk**
8:15 9:9,16 85:24
86:5 101:17 119:8

**walked**
91:8

**want**
4:13 32:24 41:2

45:12,24 75:6 76:13
79:21 81:4 88:10
92:12,25 110:3,5,11
110:14 122:7 147:1
147:11 154:5
172:17 176:25
177:25 178:4 195:3
205:19 213:12,13
220:7,12

**wanted**
72:1,14 73:12 79:24
93:2,9 100:4 122:8
200:11 212:22

**wasn't**
27:24 52:24 130:25
148:17 152:2
163:11,18 164:18
168:3 169:7,7
176:13 183:15,18
183:23 186:6

**water**
154:25 155:1

**way**
16:11 18:18 35:8
47:22 48:13 60:18
60:19 65:23 96:9
101:5 156:17
164:15 167:20,21
170:8 172:19
175:24 178:16
181:2 185:6 192:24
203:23 216:15

**ways**
18:16 30:15

**we'll**
45:2 113:4 119:9
133:17 154:3
179:16

**we're**
6:25 7:12 18:2 31:7
32:17 49:5 51:8,14
52:1 79:22 91:20
95:15 98:7 101:22
109:4 114:5 117:1
121:21 122:2
124:21 133:20

142:14 154:13
188:21 198:20

**we've**
22:1 120:12 122:4
145:7 153:21
181:19 204:19

**website**
28:8

**Wednesday**
122:25

**weekly**
91:4

**weeks**
7:16,22 81:12

**weigh**
67:10

**weird**
35:20

**Weller**
1:4,13 3:1 4:3,8,10
8:9,12 35:11,23
36:15 45:17,19
55:20 79:3 94:8
110:9,19 118:11
139:7 141:10,20
154:2 155:6,19
178:3 197:6 208:19
214:14,17 220:5
221:3,11,13 223:8

**wellness**
162:14,19 164:8,17
165:9 179:13

**wellness/med**
163:23

**went**
14:1 26:16 82:6
93:20 96:13 121:10
122:20 130:24
150:22 154:7 161:3
161:6 192:16
194:21 213:2 219:8

**weren't**
36:10 52:20 129:3
133:23 150:10

**Western**
15:20 39:18

**wet**
131:11,19 142:12
183:5

**WHEREOF**
223:20

**willing**
71:6 177:23 183:18
188:22 189:10,12
189:15 204:15

**willingness**
69:25 156:7

**witness**
4:18,19,21 134:18
172:2 175:19
223:20

**woman**
80:11 96:4

**wondering**
35:16 38:2

**Wootton**
119:13,13,14 121:3

**word**
45:8

**work**
8:15,25 13:7 14:1
16:6,13 17:11 18:18
18:22 23:22 24:11
24:13 26:23 27:19
28:4 32:10 39:12
44:6 49:6 57:7,25
58:6,8 63:15 64:2
66:6,9 69:17,25
73:2,13 74:14 77:3
107:18 111:8
119:18 120:10
126:12 129:18
158:8 174:11,14
175:12 176:11
183:16 185:2
203:23 217:21

**worked**
22:6 26:24 27:24
28:12 38:12 39:15
43:8 95:22 96:2
126:15 137:4

**working**



8:24 9:5 11:20
12:24,25 13:1,1
17:25 18:6,20 19:13
20:20 27:13 28:20
33:20 42:23 63:18
75:23 76:4 78:15,16
85:1 93:10 94:18
95:15 111:16 112:9
140:11 145:23
146:2 152:9 182:14
182:19 203:25
**works**
110:7 117:15
**workspace**
125:5,20
**worse**
33:17
**wouldn't**
77:5 106:6,16 123:11
124:7 168:20
199:25
**wow**
156:5
**Wright**
42:10
**write**
176:5
**written**
134:21 163:15 165:4
**wrong**
7:6 158:12 178:16
**wrote**
6:16
**wRVU**
58:4,6,10 59:14,17
59:23 60:17 63:22
83:19 86:13 89:16
89:17 103:4,6 104:6
104:7
**wRVUs**
58:5,13,15 60:7,8,19
60:22 61:1,11 74:5
82:19 83:16 84:3
86:4,9 102:22 103:3
103:5,19,23,24
104:8,11,14 105:9

125:21

---
**X**
---
**X**
3:1

---
**Y**
---
**yeah**
7:20 12:10 21:7
22:14,17,20 35:12
35:13 41:23 45:18
47:3,3,14 54:13
58:6,18 63:3 67:8
74:23 78:16 81:8,10
82:13 83:4 86:1
88:1 90:22 92:3
93:4 94:12,24 97:11
98:10,23 101:15
104:12 105:3
109:10,18 110:16
111:1,4,6 113:9
119:2,7,11 120:20
121:4,18 122:1,18
122:22 126:24
133:23 139:12
140:1 142:3,8 147:1
148:21 153:24
167:16 178:11
186:5 187:14
188:14,14 189:9,20
190:22 195:2 196:5
196:16 198:17
207:20 208:16
212:1
**year**
10:1,2 83:19 86:19
87:6 88:14,20,20,20
88:24,24 90:9,10
102:21 104:11,14
104:22,22,23 105:7
105:22,22
**years**
9:23 10:8 31:25
65:22,24,25,25
104:9 105:2,23
137:3 167:7 198:12

214:24
**yellow**
120:12
**Yep**
9:19 35:19 49:17
54:20 80:2 82:14
94:21 103:18 109:2
113:24 124:24
141:24 195:2
197:25
**yes/no**
171:3

---
**Z**
---
**0**
---
**000006**
203:17
**00009**
202:19 207:12
**0009**
202:4
**00305**
155:22
**0107**
80:1
**0109**
79:7 82:11,12
**0110**
81:11
**0113**
84:10,11,12
**0114**
85:23,24
**0115**
102:7
**0116**
101:17
**0117**
100:1,8
**0164**
49:18,20
**0209**
197:14,15
**0228**
210:12

**0304**
160:5
**0305**
160:5
**0584**
128:21
**06**
195:7
**08**
56:16
**0853**
131:3
**0854**
124:22 133:14,15
**0855**
123:3 124:22
**0856**
120:25
**0857**
120:14
**0859**
119:10
**0985**
148:3
**0986**
144:12
**0987**
141:22 142:10
144:12
**0999**
139:11

---
**1**
---
**1**
49:21 79:25 81:5
102:6 110:6 211:3
223:22
**1.7**
86:18
**1:23-cv-01921-NY...**
1:3
**1:32**
110:18
**10**
199:7 200:18 201:10
**10:03**



1:14
**100**
2:3 57:6 104:22
124:12
**100,000**
101:25 103:9
**100k**
105:11,13
**1099**
175:3
**10th**
198:24 200:14
202:10
**11**
115:6 137:1 202:16
**11:02**
45:4
**11:11**
45:4
**11th**
99:20 116:10 200:22
**12**
35:9,25 36:1,14 37:8
86:22 142:2 147:18
148:1
**12:09**
110:18
**12th**
143:15
**13**
1:5,14 3:2 14:17
38:12 194:23,24
195:1,3,6,7 198:21
199:10 202:3,19
203:14 206:16,22
207:23
**13,205**
105:9
**13th**
210:3 211:14,23
220:19
**152,000**
87:21 88:7
**153**
3:10
**16**

10:8
**17,809**
105:8
**17th**
2:7
**18**
10:8 50:18 52:3,6,7
**197**
3:11
**1st**
171:25 172:23
173:14,23 184:5

_____
**2**
_____

**2**
37:8 49:14 101:16,23
102:16 104:16
**2,048,000**
86:15
**2.2**
87:18
**2:40**
154:1
**2:47**
154:1
**20**
73:20 97:17
**2012**
9:7,15
**2013**
10:3 11:19
**2014**
10:3
**2016**
33:24
**2017**
12:22
**2018**
10:11 12:22 33:24
62:24 66:3
**2021**
46:21
**2022**
10:13,14 38:22 46:21
62:24 115:6 140:6
147:18 148:1

156:20 159:5 199:8
200:18 201:10
202:16 211:3
**2024**
1:5,14 3:2 220:19
**2025**
221:16 223:21
**2027**
223:22
**208**
3:12
**20th**
140:6
**210,000**
86:22
**214**
3:13
**223**
223:14
**23rd**
122:25
**26**
176:18
**26,000**
86:20
**268,000**
103:7 104:1
**27**
156:20 159:5
**2701**
2:3

_____
**3**
_____

**3**
100:1 211:23
**3,000**
87:5
**3:21**
178:2
**3:25**
178:2
**30**
110:11,14,16
**300**
84:12,16 85:5
**31,000**

86:10 105:10
**37**
139:4,5,6,11,20
**38**
155:23

_____
**4**
_____

**4**
57:9
**4,700**
103:5
**4:30**
220:18
**40,000**
103:7
**401**
90:18
**401k**
90:19
**42**
141:9,11,14,14,20
142:10 149:15
**43**
118:11,12,13,19,22
118:23,24 119:8
136:8
**45**
3:7 110:11

_____
**5**
_____

**5**
86:20
**5:25**
159:6
**52,608**
86:19
**531,911**
102:20
**56**
103:6
**571**
103:12
**58**
208:22
**5th**
197:24 223:21



**6**

**61,000**
 103:25
**64**
 49:19
**66**
 86:13
**66.04**
 89:17

**7**

**733,000**
 103:16
**79**
 3:8

**8**

**80**
 3:7 45:14,15,20,21
   45:22,25 46:4,11
   47:18,24,25 48:2
   49:1,15,24 52:2,9
   52:21 53:21 54:8,16
   55:15 56:9 61:21
   62:18 83:2 104:21
**800**
 2:7
**80202**
 2:4,8
**80th**
 103:20
**81**
 3:8 79:1,2,4,6 80:22
   81:5,23,25 82:13
   85:22 88:10 91:1
   95:6 96:10,17 97:3
   100:1
**81st**
 82:15,20 83:12
**82**
 3:9 94:5,6,10,15 98:7
   101:16 107:12,15
   113:22 114:13
**83**
 3:10 153:19,20
   154:22 155:5,7,10

 156:2 162:9 178:9
**84**
 3:11 197:4,5,8
   203:12,13
**85**
 3:12 208:20,21
   212:25
**86**
 3:13 214:14,14,15,17
   216:17

**9**

**9,471**
 103:5
**90**
 104:22
**90th**
 82:16,23 83:12
   103:20
**94**
 3:9
**940,000**
 103:10,12,16
**999**
 2:7

