# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-01921-NYW-MDB

DR. ANUJ PEDDADA,

       Plaintiff,

v.

CATHOLIC HEALTH INITIATIVES COLORADO d/b/a
CENTURA HEALTH-PENROSE-ST. FRANCIS HEALTH SERVICES; and
COMMONSPIRIT HEALTH,

       Defendants.

---

# RESPONSE IN OPPOSITION TO
# PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

---

Defendants Catholic Health Initiatives Colorado d/b/a Centura Health-Penrose-St. Francis Health Services and CommonSpirit Health (collectively "Penrose"), by and through counsel, hereby submit their Response in Opposition to Plaintiff's Motion for Partial Summary Judgment and, as grounds therefor, state as follows:

### INTRODUCTION AND FACTUAL ALLEGATIONS

Penrose is hopeful that the issue of damages will never be reached in this case, because it is confident that no liability exists, as a matter of law, for the reasons described in its pending motion for summary judgment. Even so, while the question of liability has not yet been decided, Penrose is unwilling to give up its failure to mitigate defense, because it is a meritorious defense supported by abundant evidence. This is a case where the plaintiff is claiming tens of millions of dollars of damages based on assumed full-time employment at Penrose through a potentially late retirement—yet the evidence shows that the plaintiff has rejected or failed to pursue opportunities for full time work that he evidently would have considered suitable except that, after his mental health break from work, he decided (and repeatedly conveyed to potential employers) that he only wished to work part time.

### I.    Response to Statement of Undisputed Material Facts

1.    Admit.

2.    Admit.

3.    Admit that ROPC (not Peddada) had an exclusive contract with Penrose. ECF No. 104 (First Amended Complaint) at ¶ 25 ("ROPC contracted exclusively to provide services to Centura at Penrose Cancer Center, in Colorado Springs.")

4.    Admit.

5.    Admit.

6.    Admit.

1

7.    Admit.

8.    Deny, because the statement erroneously implies it was a complete offer whose acceptance could create a binding contract, but a material term (loan repayment) was not yet agreed upon (and no employment agreement had been signed by either party, let alone, both parties). ECF No. 208 (Centura MSJ), SUMF ¶¶ 4, 6.

9.    Deny, because the statement erroneously implies Peddada accepted a complete offer whose acceptance could create a binding contract when a material term (loan repayment) was not yet agreed upon (and no employment agreement had been signed by either party, let alone, both parties). *Id.* Peddada was well-aware that this issue still needed to be resolved "as part of the contract or a separate addendum later." Ex. A (text messages) at p. 1. See also ¶ 10 below.

10.    Deny, because the statement erroneously implies Peddada signed an employment agreement that constituted a binding contract, because a material term (loan repayment) was not yet agreed upon. In fact, the very email Peddada cites as evidence was responded to in less than one hour with the following, which Peddada conveniently left out of his statement of facts: "Great news with one caveat. We are just finalizing the loan forgiveness for the recruit assistance for Dr. Kathpal. Jennifer with outside counsel has finalized and we were planning to adjust the employment agreement to include language within the employment agreement and then have them execute the loan forgiveness agreement as well." See ECF No. 63-24; *See also* ECF No. 208-25 (communicating the same thing the same day to Dr. Monroe); ECF No. 208-50 at 221:14—223:2 (Koval testifying that he told both Drs. Peddada and Monroe that loan repayment needed to be added to the agreements); PD1 53:4-10 (Peddada admitting: "Q: So you would agree with me that one party sign[ing] an agreement does not make it effective unless both parties are in full agreement with the terms? . . . A: I guess that's

2

correct, yeah.")

11.     Deny. Dr. Peddada was not entitled to anything under the incomplete version of the agreement that was initially sent for his review.

12.     Admit that it was estimated that he would have earned that amount if he had accepted the complete version of the agreement.

13.     Deny. The "History of Present Illness" cited in support of this assertion merely summarizes Dr. Peddada's own statements about his condition. It does not constitute an independent medical determination as implied. Setty Depo 12:15-19.

14.     Deny. Dr. Setty has confirmed that it was Peddada, not she, who suggested the duration of 3 months for his leave. Setty Depo. 13:9—14:13. Peddada also testified that "[s]he agreed with [him]" that he "needed some time off." PD1 35:5-8.

15.     Admit that he sent this email but deny that it accurately characterizes Di Thompson's role or opinions. Thompson Depo. 67:22—68:3 ("Q: Okay. Did you yourself determine that he was suffering from burnout? A: So, I wasn't acting as a psychiatrist at that point, so I would not be making a diagnosis … And burnout is not a psychiatric diagnosis. It's not in the DSM-5-TR.") and 71:14-21 ("A: He explained to me that he was taking leave, because he felt burnt out … Q: And you agreed with him? A: I didn't agree with him. He said what he said was the problem, and, then he actually came up with the solution.")

16.     Admit.

17.     Admit that the complete employment agreement was electronically cancelled on May 5, 2022. However, according to Peddada's MSJ, the offer wasn't officially rescinded until May 10, 2022. *See* SUMF ¶ 18. Recall that Dr. Peddada (and Dr. Monroe) was immediately advised that the initial draft was incomplete when he attempted to accept it without the repayment provisions that were undisputedly missing from that

draft. Further recall that Peddada admitted he told Penrose on April 27, 2022—13 days before his offer was withdrawn—that he would not speak about the employment agreement or repayment agreement for the duration of his three month medical leave. PD2 118:14-25; *see also* ECF No. 208-14 at p. 2 ([Peddada] reached out to me to say that he did not need to talk. He is acting on the advice of his physician who said that he was hypertensive and severely stressed and needed to take a break. He was quite aggressive in "not needing to talk" as he is following her advice . . . I shared that not talking with us is not an option as it impacts the practice and his potential employment . . . He also stated that while still a private physician he would not be obligated to talk.").

18.    Admit. However, this assertion leaves out the crucial fact that Peddada had insisted he would not communicate about or commit to the agreement until after his leave.

19.    Admit.

20.    Admit.

21.    Deny that Defendants claim that Dr. Peddada was silent in *all* respects for three months, but Dr. Peddada admits that he insisted that he would not communicate about his potential employment until after the entire three month period of his leave was over. PD2 118:14-25. Admit that Peddada signed an incomplete discussion draft on April 11, 2022 and that he communicated with Centura about his desire for a sabbatical or break (rather than about "his disability and medical leave"). ECF No. 164, p. 6 at ¶ 21. Otherwise deny, and specifically deny that he had a disability. *See* Centura's pending MSJ, ECF No. 208, pp. 18-21.

22.    Deny. First, Peddada never had a tenure with Centura if "tenure" implies employment. PD1 36:18-37:4. Secondly, he began looking for other job opportunities *before* he stopped working at Penrose. PD1 58:10-24; Chitra Depo. 96:6-13 ("Q: In April of 2022, you said [Anuj] was looking in Denver. Where was he looking to work in April of 2022 in

4

Denver? A. Oh, my goodness, so many. He looked at Swedish. He looked at wherever Eugene works, Rose, UCHealth. He talked to so many people.")

23.    Deny. Peddada's text message with Joe Hegarty states that as of September 27, 2022, he had "[t]urned down 2 jobs Ucla, and city of hope in La" and that he thought he was "done. Maybe part time or Locums." Statement of Additional Disputed Facts ("SADF") ¶ 31 (citing Ex. A at p. 12).

24.    Deny. As shown by the text message just mentioned, he had turned down two full-time offers. Further, the absence of any documentation showing applications for full-time work confirm that if he received no *additional* full-time offers, it was because he was not applying for full-time work. SADF ¶ 14.

25.    Admit.

26.    Admit.

27.    Deny that this accurately describes Penrose's response to this Interrogatory, because it omits mention of Penrose's Second Supplemental Answer. *See* SADF ¶ 16 (citing Ex. I).

28.    Admit.

29.    Admit.

30.    Admit. However, Plaintiff had not yet disclosed mitigation documents.

31.    Admit. However, Plaintiff had not yet disclosed mitigation documents.

32.    Deny. To question someone about an active job search is, by implication, to also question them about the existence of other suitable positions. In the cited portion of Peddada's deposition, he claimed implicitly that he wanted a full-time position but had never been offered one—a position that was later contradicted by his text messages stating he had turned down two apparently full-time positions, evidently not because they were not suitable but because he thought he "deserve[d] some time off." SADF ¶ 24.

33.    Admit that Defendants determined not to further pursue reopening of Peddada's deposition (in exchange for Plaintiff determining to forgo reopening Penrose's 30(b)(6) deposition), the right of which only existed due to Peddada's untimely production of documents. ECF No. 120. The documents produced by Peddada spoke for themselves, and Peddada's testimony on this issue had already proven to be untrustworthy based on such production. SADF ¶¶ 4, 14, 18-34.

34.    Admit. However, see response to ¶ 33 above.

35.    Deny. Defendants referenced Peddada's belated production of evidence related to mitigation in a Second Supplemental Answer. *See* SADF ¶ 16 (citing Ex. I).

36.    Deny. Dr. Albert is endorsed on the following pertinent subjects: "Plaintiff's potential employment . . . and related issues that are the basis of this lawsuit."

37.    Admit. All documents that are evidence on this subject are Peddada's.

38.    Deny. Norman Kur's expert opinion contains a strong statistical basis for his assumptions relative to mitigation, including the availability of suitable replacement work. SADF ¶¶ 44-45.

39.    Admit.

40.    Admit.

41.    Deny. Defendants referenced Peddada's belated production of evidence related to mitigation in a Second Supplemental Answer. *See* SADF ¶ 16 (citing Ex. I).

## II.    Statement of Additional Disputed Facts

1.    After his job offer was rescinded, Peddada relocated to California, not wishing to remain in a location where he experienced so much anxiety. PD2 192:12-23; *see also* Ex. B (Correspondence) at p. 21 ("Chitra and [I] are now empty nesters and would like to return to L.A.").

2.    Peddada has maintained his California medical license at all times since he

was initially licensed there in 1991. Ex. B at p. 21 and Ex. C (Curriculum Vitae) at p. 1; Chitra Depo. 61:9—62:2.

3.     He has worked, and continues working, only in a locum tenens capacity (temporary, fill-in work), and does so in various cities in the United States. Ex. B at p. 34 (Kona, Hawaii); Ex. B at p. 40 (Lubbock, TX).

4.     On January 19, 2023, and again on December 10, 2024, Penrose took Peddada's deposition, in which he claimed that he had wanted to work full-time, PD2 12:10, and implied that he had actively sought for full-time employment, but had simply had no offers. PD2 194:3-5 ("Q: Have you received any offers for full-time employment? A: No.").

5.     He testified that he "applied for many jobs in California." PD1 87:21.

6.     He also expressed an intention to return to Colorado, accompanying his wife who had received a full-time job offer. PD2 193:14 – 194:2; Chitra Depo. 94:13-23.

7.     He testified that since his job offer was rescinded in May 2022, the primary location where he had worked in a locum tenens capacity was in the Denver metro area—specifically at the Anova Cancer Center, where he worked "about a week a month on average." PD2 29:15 – 30:3.

8.     On September 5, 2024, three months before Peddada's most recent deposition date on December 10, 2024, Penrose issued the following discovery requests:

> RFP No. 8: "Produce all Documents and Communications involving or related to any potential opportunity You explored, were offered, applied to, or accepted to provide medical services or patient care as an employee, independent contractor, consultant, advisor, locum tenens, or in any other capacity from January 1, 2021 through the present."

> RFP No. 14: "Produce all Documents and Communications that reflect Your attempts or efforts to mitigate Your damages in this lawsuit."

Ex. D (Penrose's First Set of Discovery Requests to Plaintiff) at pp. 6-7.

9.      On October 11, 2024, Peddada did not provide any documents in response to RFP No. 14. He responded to RFP No. 8 with only the following: his tax documents from 2022 and 2023, which solely reflected locum tenens work. Not one application, interview appointment, text message, or other document was produced, let alone documentation demonstrating that he had explored or applied to any full-time position. *See* Ex. E (Plaintiff's First Supp. Objections and Responses to Defendant's Interrogatories and Requests for Production of Documents) at pp. 4-6.

10.     It was not until December 9, 2024, the day before Peddada's second deposition, that Peddada produced a few additional documents in response to Penrose's RFPs. Specifically, he produced one text message with Dennis Carter dated June 6, 2022 (Ex. 12), two emails dated 2 years later on April 24, 2024 with Mike Steinberg, in which he was only seeking locums tenens opportunities (Ex. B at pp. 1-2), a Texas Standardized Credentialing Application signed on 01/11/2024 (Ex. F, Texas Credentialing Application), and one application for per diem (i.e., temporary) coverage with Kaiser Permanente, dated 09/20/2022 (Ex. G, Kaiser Permanente Employment Application; Ex. B at p. 30, clarifying the "per diem" nature of the role).

11.     It was not until mid-January 2025 that Peddada followed up with production of most of the remaining responsive documents that have been produced. Ex. H (Plaintiff's Eight Supplemental Disclosures, dated 1/10/2025).

12.     It was not until extensive conferrals, briefing, hearings, and Court involvement that Peddada followed up with production of other responsive documents from his cell phone. *See, e.g.*, Ex. A at pp. 4-7 (produced on March 21, 2025).

13.     The produced documents include no job applications for full-time positions, though they include part-time and locum tenens job applications. Sabey Decl. ¶ 2.

14.     By the time these documents had been produced, Peddada's deposition

8

had already been taken—twice—along with Penrose's 30(b)(6) deposition and every other deposition in the case, and discovery had been closed for seventy (70) days. ECF Nos. 122 and 124.

15.    Nevertheless, on January 10, 2025, Penrose issued a Second Supplemental Answer to Plaintiff's Interrogatory No. 9 (requesting the factual basis for every affirmative defense), stating, "See the information provided by Dr. Peddada in response to Penrose's request for all documents reflecting his efforts to find replacement employment and mitigate his damages. The grounds for this affirmative defense are that there is insufficient evidence of mitigation efforts." Ex. I (Defendant's Second Supp. Objections and Answers to Plaintiff's Second Set of Interrogatories) at p. 4 (including supplemental responses to Interrogatory Nos. 1 and 9).

16.    The belatedly produced documents that were incorporated in Penrose's Second Supplemental Answer include highly significant evidence, some of which contradicts Peddada's deposition testimony related to mitigation, especially his testimony that he wanted full-time work, as described as follows. SADF ¶¶ 18-36.

17.    The belatedly produced documents show that on May 17, seven days after his offer was withdrawn, he emailed a colleague named Tim to explore opportunities at UCHealth, and stated, "I'm interested in a part-time position." Ex. A at p. 2.

18.    They show that on May 27, 2022, Peddada sent his CV and bio to Weatherby Healthcare, a locum tenens company and received a link to start an application. Ex. B at pp. 19-20.

19.    They further show that on June 22, 2022, he signed a Professional Services Agreement for Locum Tenens Services with Weatherby. Ex. J (Weatherby Locum Tenens Agreement).

20.    They show that on June 17, 2022, just over a month after his offer was

9

rescinded, Peddada emailed a colleague in Los Angeles, Mike Steinberg, stating "Chitra and [I] are now empty nesters and would like to return to LA. I want to get your valued advice on potential opportunities for me in the LA area." Ex. B at p. 21.

21.    They show that on August 2, 2022, he texted a contact named Rocardo, "I only want part time or pool." Ex. A at p. 3.

22.    They show that on August 23, 2022, he texted Ariel, a nuclear medicine tech, that "I think I want part time work only. I've done enough full-time work for two lifetimes." Ex. A at p. 8.

23.    They show that on August 25, 2022, he texted Danyon Anderson and informed him that he "Was offered a job at Ucla but I'm not ready to make the big move. I'm just enjoying some time off. You know the way I worked, I guess I deserve some time off." Ex. A at p. 9.

24.    They show that on September 6, 2022, Peddada emailed Meghan Stecki at CompHealth stating "I'm interested in Locums rad onc opportunities." Ex. B at p. 22.

25.    They also show on September 6, 2022 that Dr. Williams from City of Hope emailed Peddada asking to discuss "position opportunities in City of Hope's Radiation Oncology Network" noting that they "have an opening." Ex. B at p. 23.

26.    They show that on September 12-15, 2022, Peddada corresponded with St. Mary's Medical Center in Grand Junction, Colorado, about a radiation oncology job opportunity regarding which there appeared to be mutual interest—but he apparently never applied for the job. Ex. B at pp. 25-27.

27.    They show that on September 14, 2022, Peddada was copied on an email to Stu Tsjuji at Queens Health Systems in Hawaii stating "Stu, Anuj is an experienced radiation oncologist we discussed who recently retired from private practice in Colorado Springs, who is interested in locums opportunities. Attached is Anuj's CV." Ex. B at p. 24.

10

28.     On September 18, 2022, Peddada emailed Naomi Knight, the Operations Manager of Cancer and Chronic Conditions at Waikato Hospital in New Zealand stating he is "interested in the fixed term sabbatical coverage." Ex. B at p. 28. Two days later, he sent another email to Naomi, stating "I have recently decided to not work full time after 26 years of full time practice. I'm excited about the opportunity to work part time or covering a practice for a finite period of time, such as your opportunity." Ex. B at p. 31.

29.     Peddada made similar statements in other correspondence he sent to potential work opportunities. See, e.g., Ex. B at p. 39 ("After taking some time to reflect and explore possibilities, I have decided that I would like to work-part time… .")

30.     They show that on September 27, 2022, in response to Joe Hegarty's text stating "hope you come back to work soon," he texted, "I think I'm done. Maybe part time or Locums. Turned down 2 jobs Ucla, and city of hope in La." Ex. A at p. 12. This was (at least) the second time he mentioned turning down the UCLA job. See SADF ¶ 24.

31.     They show that on November 9 and 10, 2022, he informed two different contacts that "I'm no longer at Penrose I'm looking for a part-time position." Ex. A at pp. 10-11 ("I … [am] now looking for a part time opportunity").

32.     They show that throughout 2023 and 2024, Peddada began sending cover letters to various physician practices and health care facilities offering to provide coverage 12-24 weeks per year directly through his LLC, as opposed to using a locums agency. Ex. B at pp. 2, 36-38.

33.     They show that on June 14, 2024, Peddada went so far as acknowledging a post for a full-time position that impliedly would have been of interest if it were not full time (evidencing the existence of a suitable full-time position), but asking instead for part-time or temporary work. Ex. A at p. 13 ("I saw you guys are posting for a new full time doc. Any chance there's interest in a part-time doc like me or even consistent

11

comprehensive coverage for all vacations or other needs? Just checking.")

34.    They show that Peddada signed up for and received notices of temporary/locums work. Ex. B at pp. 3-18, 41-46.

35.    These notices sometimes also included regular full-time employment opportunities. See, e.g., Ex. B at pp. 15-18.

36.    As a matter fit for judicial notice, the professional association for radiation oncologists, American Society for Radiation Oncology (ASTRO), maintains a website (careers.astro.org/jobs) on which, at any given moment, thousands of radiation oncology jobs are posted.

37.    As of July 2025, by visiting careers.astro.org/jobs and filtering for Physician/Surgeons jobs in the state of California (where Peddada lived from shortly after the withdrawal of his employment offer until 2025), there are four full-time positions posted, of which three would seem to be substantially equivalent to the job at Penrose that Dr. Peddada did not receive: Radiation Oncologist for Interventional Radiation Oncology of California Inc; Newport Beach Medical Director or Clinical Lead at the University of Southern California; and Radiation Oncologist at Community Health Partners in Clovis, California. Sabey Decl. ¶ 3.

38.    Similarly, by filtering for Physician/Surgeons jobs in the state of Colorado (where Peddada lived from 2025 to the present), there was, as of July 2025, a full-time Radiation Oncologist position available with Colorado Urology in Lafayette, Colorado, with a starting salary in the $450,000-$550,000 range. Sabey Decl. ¶ 4.

39.    As of March 6, 2026, the same website identifies an additional full time Radiation Oncologist position at The Specialty Alliance in Denver, Colorado. On the same day, there was one Radiation Oncologist position posted for Valor Oncology in Redding California, in addition to three postings for Chair of Radiation Oncology at various other

locations in California. Sabey Decl. ¶ 5.

40.    Further, as of March 6, 2026, Indeed.com was advertising an additional full time job for Intermountain Health as a radiation oncologist in Denver that was not posted on ASTRO's website. Sabey Decl. ¶ 6.

41.    Peddada was well aware of ASTRO, as produced emails show that he attended ASTRO conferences and read ASTRO publications. *See, e.g.*, Ex. B at p. 21. In addition, Peddada's text messages reveal he was reviewing ASTRO's job postings. Ex. A at pp. 6-7 ("I saw a job advertised at Carson city… [the hospital] advertised [it] in ASTRO.").

42.    Indeed, peer reviewed journal articles suggest that ASTRO is relied upon and accepted by the field generally as a source for data on the availability of radiation oncology positions. Shumway, et al., *Prospective 5-Year Analysis of the United States Radiation Oncology Job Market Using the ASTRO Career Center Website*, INTERNATIONAL JOURNAL OF RADIATION ONCOLOGY*BIOLOGY*PHYSICS 115:4, p. 828-835 (2023), https://www.sciencedirect.com/science/article/pii/S0360301622034484 (using the ASTRO website to evaluate the number of radiation oncology jobs relative to the number of graduates in the specialty of radiation oncology, and projecting a "small surplus" of jobs relative to graduates in the West).

43.    Norm Kur, an economic expert retained and disclosed by Penrose, opined that Peddada's claimed inability to find full-time work "does not align with his apparently extraordinary background and experience." Ex. K (Kur Final Report) at p. 10.

44.    Kur also cited the Current Population Survey sponsored by the U.S. Census Bureau and the U.S. Bureau of Labor Statistics to show that of the 136 physicians who were part of the survey and unemployed, experienced workers at the time, the duration of continuous unemployment ranged from zero weeks to 119 weeks, with a median

duration of 8.5 weeks for all unemployed physicians during the years 2019-2024. *Id.* p. 14-15. During each of these years, the physician employment rate was between 99.3% and 99.7%. *Id.* This strongly suggests the availability of work for the vast majority of physicians who wish to become reemployed, with employment available within 2-3 months for most and within two years for nearly all physicians. On the basis of this strong statistical evidence, for purposes of calculating lost earnings, Kur "assumed very conservatively that Dr. Peddada could have found a similar replacement position in 26 weeks, or six months, after not having been extended an employment offer by CHIC." *Id.*

45.    Dr. Albert attests as follows: "I presently serve as the Executive Medical Director of Oncology, CommonSpirit Mountain Region (which, simplifying slightly, was formerly Centura until August 1, 2023)." Albert Decl. ¶ 1.

46.    "Since the time that Dr. Peddada's job offer was rescinded in May 2022, Centura/CommonSpirit has posted numerous full-time job positions for radiation oncologist roles in the Denver metro area, where I understand Dr. Peddada has primarily worked since leaving Colorado Springs, and where I understand he now lives." Albert Decl. ¶ 2.

47.    "Dr. Peddada was and is eligible to apply to radiation oncology positions at Centura/Common Spirit." Albert Decl. ¶ 3.

48.    "These positions, compared to the job offer at Penrose that was rescinded, would have offered substantially identical pay, benefits, promotional opportunities, job responsibilities, working conditions, hours, and status." Albert Decl. ¶ 4.

49.    "During the relevant time period (May 2022 to the present), we had a candidate who initially verbally agreed to join us in the Denver market, signed an engagement letter, and subsequently changed his mind to take a job that had been long open with UC Health in Colorado Springs. Thus, I am also aware of at least one full-time

14

radiation oncology job posting during that time in Colorado Springs, outside of CommonSpirit." Albert Decl. ¶ 5.

50.     "CommonSpirit does not necessarily advertise every radiation oncology job on ASTRO's website, particularly when a good candidate is identified without posting." Albert Decl. ¶ 6.

51.     Despite an ongoing duty to supplement his discovery responses with any evidence of ongoing efforts to mitigate his damages, Peddada has produced no further evidence of mitigation since January 10, 2025. Sabey Decl. ¶ 7.

52.     It is unclear where (and if) Peddada has worked since December of 2024 because no documentation has been provided of the same and Peddada's own Motion for Partial Summary Judgment only goes as far as December 10, 2024. *See* ECF No. 203 (Peddada's MSJ) at p. 7, ¶ 23.

## ARGUMENT

Peddada has a duty in this case "to mitigate damages **by seeking substantially equivalent employment**." *Hillman v. U.S. Postal Service*, No. 97–4041–SAC, 2000 WL 1863363, at *10 (D. Kan. Oct. 11, 2000) (citing *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231–32 (1982)) (emphasis added). "The trial court may exercise its discretion in determining whether a claimant should have or could have exercised more diligence in reasonably seeking other employment." *United States v. Lee Way Motor Freight, Inc.*, 625 F.2d 918, 938 (10th Cir. 1979). In *Ford Motor Co.*, the Supreme Court clarified that a claimant "need not go into another line of work, accept a demotion, or take a demeaning position, [but] he forfeits his right to backpay if he refuses a job substantially equivalent to the one he was denied." *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231-32 (1982). "Mitigation of damages is a fact-intensive issue and summary judgment is rarely appropriate." *Carrasco v. Centura Health Corp.*, No. 19-CV-00357-LTB-KMT, 2021 WL

15

4913983, at *5 (D. Colo. June 18, 2021).

In this case, failure to mitigate is offered only as a partial, not a complete, defense, because there was appropriately a period of unemployment, and it is for expert opinion, trial evidence, and a jury's deliberation to determine how promptly and how completely Peddada should have been able to mitigate his claimed damages. But it is patently unjust and unreasonable that Dr. Peddada should be permitted to obtain back pay based on an assumption of full-time employment when he has not only failed to pursue full-time work, but has repeatedly turned down full-time work as a Radiation Oncologist based on his own decision to work only part-time or temporary jobs. None of the full-time jobs mentioned in Defendants' SADFs constitute "another line of work," "a demotion," or "a demeaning position," *Ford Motor Co.*, 458 U.S. at 231-32, and the Tenth Circuit's holding should not be expanded to prevent consideration of opportunities for full-time employment in the same physician specialty (as a Radiation Oncologist) when Dr. Peddada voluntarily removed himself from the full-time job market and has not applied for full-time employment since rejecting two full-time radiation oncology jobs in Los Angeles, where he claimed at the time he was intending to relocate.

I.    **The Foregoing Evidence Of Peddada's Failure To Mitigate Is Sufficient To Permit A Jury To Find That He Should Not Be Awarded Back Pay Based On Assumed Full-Time Employment.**

### A. Peddada does not want and has not sought full-time employment.

As discussed in the SADFs, Dr. Peddada actually received two job offers (though he later falsely claimed he had received none). In a text message that mentioned this fact, he informed a friend that he thought he was "done" but might continue with part time or temporary work: "Maybe part time or Locums." Ex. A at p. 12.

After rejecting the two job offers, Peddada has failed to produce any job applications, emails, text messages, or other documentary evidence showing any attempt

16

to find full-time work. He has produced only evidence of lukewarm efforts to find part-time or locum tenens work. *See,* SADF ¶¶ 18-36.

### B. There is evidence of substantially equivalent full-time positions.

First, the suitability of the rejected job offers, SADF ¶¶ 24, 31, and the full time position he acknowledged on his way to asking whether there was anything available for "a part-time doc like me," SADF ¶ 34, are jury questions. Penrose has had no opportunity to conduct discovery to determine the precise terms of employment for these three positions—which, in any event, would have been subject to negotiation as a legally-required employment agreement was finalized. But Peddada clearly identified these positions as work that he himself considered suitable by applying for them, or, in the case of the full-time position related to his "part-time doc like me" comment, by inquiring about the availability of the same work on a part-time or fill-in basis.

Furthermore, in all three of these cases, there is an apparent reason that he rejected the job offers or did not apply for the full-time position. "You know the way I worked, I guess I deserve some time off." SADF ¶ 24. "I think I'm done. Maybe part time or Locums." SADF ¶ 31. "[A] part-time doc like me." SADF ¶ 34. Never in any of the evidence Peddada has produced of his mitigation efforts, and never in his deposition, is there any indication that he considered the two full-time opportunities for which he applied (and then rejected) or the numerous ones for which he did not apply to be unsuitable other than with respect to their full-time nature or his need for "time off." By suggesting that he forfeits full time damages going forward by failing to pursue these opportunities, Penrose is not implying that his duty to mitigate required him to engage in "another line of work, accept a demotion, or take a demeaning position[.]" *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231-32 (1982). Therefore, even before looking at his other opportunities to work as a full-time radiation oncologist, a reasonable jury would be free to conclude that

17

these three rejected opportunities already constituted "substantially equivalent" work, *id.*, satisfying Penrose's burden to show that such work existed.

But there are a host of other opportunities to work full time as a radiation oncologist that the evidence shows existed. The email notices Peddada received for locum tenens work sometimes included full-time opportunities. SADF ¶ 36 (Ex. B at pp. 15-18, 41-46). He failed to pursue the presumably full-time radiation oncology opportunity at St. Mary's Medical Center despite their interest in hiring him. SADF ¶ 27 (Ex. B at pp. 25-27). ASTRO's website is a generally accepted source of information about radiation oncology jobs that likewise shows that such opportunities existed, including in California, where Peddada lived until recently, and near the Denver area, where he lives now. SADF ¶¶ 37-43. Norm Kur's expert report used publicly available data published by the government, combined with Peddada's own description of his background and experience, to make a very strong case that nearly all physicians who want to be employed can be, and, especially given Peddada's extraordinary career, it is reasonable to assume for purposes of calculating his damages that he could have found full-time work after six months of unemployment. SADF ¶¶ 44-45. Finally, Dr. Albert testifies that numerous full-time positions with terms of employment substantially identical to the job at Penrose that Peddada was initially offered have been posted within the same health system, for jobs in the Denver Metro area. SADF ¶¶ 36-51. Clearly, at a minimum, there is abundant evidence from which a reasonable jury could conclude that substantially equivalent opportunities existed for Peddada.

Regarding ASTRO's website, "The court may judicially notice a fact that is not subject to reasonable dispute because it: … (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. "It is common practice for courts to take judicial notice of factual information found on the

internet." *O'Tooele v. Northrop Grumman Corp*., 499 F.3d 1218, 1225 (10th Cir. 2007). That ASTRO has numerous jobs in the radiation oncology field posted at any given moment is such a fact.

**II.      Even If The Foregoing Evidence Were Insufficient, Peddada's Failure To Timely Disclose His Mitigation Evidence, His Dishonesty During His Deposition, And His Spoliation Of Evidence Would Estop Him From Prevailing Based On Defendant's Failure To Adduce Sufficient Evidence Of Substantially Equivalent Employment Opportunities.**

The Federal Rules of Civil Procedure provide sanctions for failure to comply with discovery duties, such as the duty to timely and honestly answer questions at depositions and produce responsive documents. Appropriate sanctions include "prohibiting the disobedient party from supporting or opposing designated claims or defenses." FRCP 37(b)(2)(A)(ii); FRCP 37(c)(1)(C). A related but lesser sanction that seems appropriate here would be disallowing the disobedient party from relying on the absence of evidence that was likely caused by the disobedience.

Peddada's testimony that he wanted to be working full time created a reasonable expectation that, when he finally disclosed his evidence related to mitigation, the evidence would include job applications for full-time employment, which would constitute admissible evidence of the existence of positions that he himself considered to be suitable replacement employment. To be clear, as discussed above, the evidence Peddada disclosed does reveal certain full-time positions, including two job offers, but Penrose was unable to question him on this subject in either of his depositions as a direct result of the untimeliness of his disclosure. Penrose urges that it should have that opportunity at trial, should the case survive Penrose's pending motions. The belated disclosures did not include the volume of evidence related to full-time positions that Penrose reasonably expected based on his deposition statements—precisely because what they *actually* showed was that he *did not want* full-time employment. *Contra* SADF ¶ 4 (PD2 12:10 ("I

19

prefer full-time if I can get it.")).

On January 6, 2026, the Court granted in part Penrose's spoliation motion, finding that Peddada intentionally deprived Penrose of missing text messages by deleting them despite believing them to be relevant. ECF No. 195, p. 11. The spoliated evidence likely includes evidence that he either failed to apply for or rejected suitable full-time employment opportunities, among other evidences relevant to the mitigation defense. Should the Court decline dismissal of the case as a sanction, it should at least refuse to grant Peddada's partial motion for summary judgment for the additional reason that a spoliation instruction would permit a jury to find that the spoliated evidence would have shown that suitable alternative employment existed and that he unreasonably failed to mitigate.

**CONCLUSION**

Penrose believes that it has abundantly satisfied its burden to show a reasonable dispute of fact as to both the existence of substantially equivalent positions and Dr. Peddada's failure to use reasonable efforts to obtain replacement work. Penrose also urges, under FRCP 37 and principles of equity, that Peddada should not be permitted to prevail based on arguing that Penrose has no evidence of the existence of substantially equivalent positions when the fundamental reasons Penrose does not have more evidence than it does include his dishonestly during his deposition (claiming he wanted full-time work when he didn't), his belated production of evidence of mitigation (showing the opposite), and his spoliation of evidence.

Respectfully submitted this 19th day of March, 2026.

HALL, RENDER, KILLIAN, HEATH & LYMAN, P.C.

By:___s/ Mark L. Sabey_____
Melvin B. Sabey
Mark L. Sabey
Lindsay K. McManus
999 17th Street, Suite 800, Denver, CO 80202
(303) 801-3535 / melsabey@hallrender.com
(303) 801-3538 / marksabey@hallrender.com
(303) 802-1293 / lmcmanus@hallrender.com

ATTORNEYS FOR DEFENDANTS

## Certification Re: Use of Generative Artificial Intelligence for Drafting

The undersigned counsel certifies/certify that generative artificial intelligence was not used to draft this pleading.

HALL, RENDER, KILLIAN, HEATH & LYMAN, P.C.

By: s/ Mark L. Sabey_____
Mark L. Sabey

By: s/ Lindsay K. McManus_____
Lindsay K. McManus

21

# CERTIFICATE OF SERVICE

The undersigned certifies that on March 19, 2026, the foregoing was electronically filed with the Clerk of the Court via CM/ECF, which will send notification of such filing to the parties on record:

Iris Halpern ih@rmlawyers.com
Qusair Mohamedbhai qm@rmlawyers.com
Omeed Azmoudeh oa@rmlawyers.com
Crist Whitney cw@rmlawyers.com
Matthew Cron mc@rmlawyers.com

*s/ Crystal J. Sebastiani*
Crystal J. Sebastiani, Paralegal

22