**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:23-cv-01921-NYW-MDB

DR. ANUJ PEDDADA

      Plaintiff,

v.

CATHOLIC HEALTH INITIATIVES COLORADO D/B/A CENTURA HEALTH-
PENROSE-ST. FRANCIS HEALTH SERVICES; and,
COMMONSPIRIT HEALTH,

      Defendants.

---

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR SUMMARY JUDGMENT [ECF NO. 208]**

---

Defendants Catholic Health Initiatives Colorado d/b/a Centura Health–Penrose-St. Francis Health Services ("Centura") and CommonSpirit Health ("CommonSpirit") begin their Renewed Motion for Summary Judgment with irrelevant discussion of Dr. Anuj Peddada's retirement accounts rather than the material facts—emblematic of the motion as a whole. Viewed in Dr. Peddada's favor, the record shows Defendants terminated him without notice just days after he began approved medical leave following two decades treating their cancer patients. A reasonable jury could therefore find civil rights violations, among a myriad of other harms, precluding summary judgment.

## I.    <u>RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS</u>

1.    Admit with clarification. Dr. Peddada held medical staff privileges at Penrose beginning in 1999 and provided services through ROPC. In February 2022, he applied for a Centura position created for him, accepted it on April 5, and signed the Physician Employment Agreement ("PEA") on April 11. Ex. 42, PSF 109-113; Ex. 1, Peddada 1035; Ex. 2, PSF 959-60 ("Great news! Anuj Peddada has accepted"); Ex. 3, PSF 962-72. Whether he became an employee during this period is a legal question. *Infra* Sec. (IV)(B).

2.    Admit with clarification. The communication breakdown was mutual. Samuel Weller, Centura's VP of Physician Alignment, testified that concerns about the breakdown "were equal for Dr. Peddada and Dr. Monroe" and confirmed, "it wasn't specific to Dr. Peddada, it was a dispute between the two of them." Ex. 4, W. Dep. at 186:3-8.

3.    Admit in part; deny in part. Admit Dr. Kathpal's departure triggered a loan repayment obligation under the Physician Recruitment Agreement ("PRA"). Deny Centura needed to resolve the loan repayment obligation to comply with Stark and Anti-Kickback laws or that Dr. Peddada "knew" the loan "had to be resolved" for compliance reasons.

1

Troy Barsky, a former senior official at the Centers for Medicare & Medicaid Services ("CMS"), opines that "there was no need, based on legal requirements under [Stark Law and Anti-Kickback Statute], to incorporate the resolution of the Outstanding Debt [under the PRA] into Dr. Peddada's employment agreement with the Defendant in order to protect against fraud and abuse risk." Ex. 5, Barsky Report at 15. Dr. Peddada was not aware Centura believed, if it truly did so, that it could not legally sign the employment agreement until the repayment issue was resolved, nor did anyone tell him so. Ex. 6, P. Dep. V1 at 30:5-11. The PRA was executed in January 2021 and already contained a repayment obligation, with the first payment due July 1, 2023, more than a year after Dr. Peddada's termination. Ex. 7, Peddada 346-365, at 350 (Art. 3).

4.      Admit with clarification. The PRA already obligated repayment of the loan, and there was no compliance reason to incorporate that obligation into Dr. Peddada's employment agreement. RSUMF 3. The spring 2022 negotiations therefore did not concern whether repayment was required, but whether the parties would modify the PRA by (a) converting the obligation into a loan-forgiveness arrangement tied to Dr. Peddada's employment or (b) crediting ROPC's goodwill against the balance owed. Ex. 6, P. Dep. V1 at 28:8-18. Those proposals were not legal requirements, but potential benefits that themselves apparently raised compliance concerns. Centura's Manager of Physician Contract Compliance, J.B. Durishin, wrote that he was "[n]ot sure how HR will feel from an equal pay perspective" and suggested that waiving repayment through a standalone PRA addendum—rather than incorporating it into the PEA—might be preferable because it "wouldn't be considered compensation to the providers." Ex. 8, PSF 115-16. Had the PRA remained unchanged, its repayment terms would have governed and Dr. Peddada's

2

employment could have proceeded without any compliance concerns.[1]

5.     Admit in part; deny in part. Admit Defendants sent PEAs to Drs. Peddada and Monroe on April 5, 2022. Deny the PEA's start date is dispositive of employment status. *Infra* Sec. (IV)(B). Deny the PEA was a "discussion draft" sent "for review and discussion, but not for signature." Koval sent the PEA on April 5, facilitated Dr. Peddada's signature in person on April 11, and "believed this was the employment contract that Dr. Peddada had to sign for Centura"—nobody at Centura told him before Dr. Peddada signed "that this was not the final employment contract." Ex. 9, K. Dep. at 132:9-15, 136:12-16; Ex. 2, PSF 0959-0960 (Koval urging Dr. Peddada to sign the "contract … as quickly as possible" and scheduling a meeting for that purpose on April 11). On April 12, Koval reported internally that Dr. Peddada had signed "the final employment contract." Ex. 9, K. Dep., at 156:11-23; Ex. 10, M. Dep. at 239:3-8 (Dr. Monroe believing the same).

6.     Deny. The loan repayment did not need to be part of the PEA; the PEA was not a "discussion draft"; and Dr. Peddada was not on notice of any alleged incompleteness. RSUMF 3-5. Whatever uncertainty Dr. Albert expressed on April 5 was resolved by April 11, when Koval came to Dr. Peddada's office and facilitated signature. RSUMF 5.

7.     Admit in part; deny in part. RSUMF 3-6.[2] Admit Centura did not countersign the PEA even though Centura was the one who extended the offer. Deny Defendants "informed Peddada that he would be receiving the complete PEA by email for electronic

---

[1] Although the PRA *was* in effect, Defendants' subsequent unlawful conduct, failure to mitigate, and unclean hands bar enforcement of the repayment obligation, and Dr. Peddada may recover as damages any amounts previously paid on the balance. *See* ECF 104 ¶¶ 148-149; *see generally* ECF 113.

[2] Where Defendants' paragraphs restate earlier assertions, Plaintiff often summarizes and incorporates his prior responses rather than repeat them in full.

signature." RSUMF 3; Ex. 11, P. Dep. V2 at 115:10-11 ("I've already signed it and I thought it was finished.") Defendants' own cited evidence is an email informing *Dr. Monroe* not *Dr. Peddada* that a new PEA was incoming. Defs.' Ex. 25 at 1. **No corresponding written communication to Dr. Peddada exists anywhere in the record**. Dr. Peddada believed he had executed the final PEA. Ex. 12, Peddada 6-9, at 8 ("There is a clear mistake regarding *my executed contract.* I reviewed the contract and all my questions addressed by [Koval] on 4/11/22, at 12:30 pm. . . [Koval] came by my office and I signed the contract on 4/12/22 with [Koval]'s assistance. … Why was *a second attempt at signing the contract* sent when my automatic reply was turned on?").

8.      Admitted with clarification. Dr. Monroe signed his PEA on May 16, 2022, six days after Centura terminated Dr. Peddada, and did not sign his Loan Settlement Agreement ("LSA") until May 24, 2022, two weeks after Centura terminated Dr. Peddada. Ex. 13, PSF 3357-3370, at 3370; Ex. 14, PSF 670-676, at 673.

9-11.  Admitted.

12.    Admitted with clarification. Dr. Peddada does not recall opening the email, and certainly did not read the agreement. Ex. 6, P. Dep. V1, 54:6-55:12.

13.    Admit in part; deny in part. Deny Dr. Setty is "his wife's colleague … whom he was seeing for cosmetic PRP treatments." Dr. Setty has been Dr. Peddada's primary care physician since 2011. Ex. 15, S. Dep. at 9:10-15. Deny Dr. Setty had "zero physician burnout experience." Dr. Setty, a board-certified internist, has practiced medicine for decades and frequently encounters and treats patients with a variety of mental health conditions. Ex. 15, S. Dep. at 74:8-75:14. Deny Dr. Peddada called Dr. Setty "to explore whether she could support a diagnosis of physician burnout." Dr. Peddada "went to see

4

her as a doctor because [he] had an emergency crisis," and never asked her to diagnose him with burnout. Ex.11, P. Dep. V2, at 135:13-14; 135:13-136:12. Instead, Dr. Setty exercised her "independent medical judgment" to diagnose Dr. Peddada based on the symptoms he presented. Ex. 15, S. Dep., at 65:19-69:20.

14.    Admit in part; deny in part. Deny Dr. Peddada "asked Dr. Setty to diagnose him" with anything. RSUMF 13. Deny the excerpt is merely "notes from the office visit." The excerpt is from a medical record documenting Dr. Peddada's presentation via "emergency call," his symptoms,[3] and Dr. Setty's diagnoses of "moderately severe burn out," "adjustment disorder with mixed anxiety and depressed mood," and "moderately severe situational anxiety disorder." Ex. 16, Peddada 378-382 at 381-82; Ex. 15, S. Dep., at 90:18-91:1 (explaining that burnout, anxiety, and depression were "all one big, beautiful diagnosis"); 136:25-137:1 ("He was anxious and depressed as you can see. That was what I have documented"). Deny Dr. Peddada suggested the three-month duration. Ex. 11, P. Dep. V2 at 132:24-133:12 ("I didn't diagnose myself"). Dr. Setty prescribed: "**I would strongly recommend patient to take the next 3 months off**."[4] Ex. 16, Peddada 378-382, at 381. Admit Dr. Setty is not a "lie detector" or a mental health professional (*i.e.*, a psychologist). *But see* RSUMF 13. Deny she "simply trusted Dr. Peddada." RSUMF 13. Admit Dr. Setty referred Dr. Peddada to Dr. Thompson but deny Dr. Peddada

---

[3] Ex. 16 documents numerous symptoms and clinical observations, including "severe anxiety [and] unable to think," feeling "completely 'burnt out' due to work-related issues," that "the last 10 months have proven to be the most challenging time in his 22 years of practice at Penrose," fearing this could "hurt the care he gives his patients," reporting he "no longer has the enthusiasm…to go to work," and appearing "extremely anxious, agitated, with pressured speech," among others.

[4] Regardless, Defendants' suggestion that Dr. Peddada dictated the leave duration misunderstands how mental health treatment works. Eliciting a patient's subjective experience is standard clinical practice. Ex. 15, S. Dep., at 147:3-9; 95:7-96:5.

"never pursued" the referral. Dr. Peddada spoke with Dr. Thompson by telephone on or about May 2, 2022, and she encouraged him to "take a break" if needed and referred him to Colorado Health Physicians Program ("CPHP"). Ex. 17, DT Dep. 62:11-22, 70:22-24, 73:4-7. Peddada contacted CPHP on May 4, attended intake on May 26, and participated in monitoring through August 2022. Ex. 18, Peddada 466-509, at 469, 472, 507.

15.     Admit in part; deny in part. Admit on April 25, 2022, Dr. Peddada requested a three-month medical leave through August 1, and ROPC approved the leave on April 26, and Centura approved it on May 5. Deny Defendants' characterization that the May 5 approval was from "Penrose Medical Staff," not Centura. Dr. Peddada sent an email, copying Koval and Dr. Plauth on April 25, notifying them he would be "absent from work on disability for reasons of health"—Dr. Plauth forwarded that email to Centura's President & CEO Dr. Brian Erling. Ex. 19, PSF 1535-37. In response, Dr. Plauth (the only Centura employee who responded to the email) instructed Dr. Peddada to "submit a formal request" to Dr. Baldauf and arranged a meeting for May 2. Ex. 20, PSF 1411-1413. Dr. Peddada attended the meeting and sent a formal request the same day. Ex. 21, PSF 1634. On May 5, Dr. Baldauf, a Centura employee, approved the request using her Centura.Org email address and Centura letterhead. Ex. 22, PSF 1644-1647. Nobody ever mentioned any other process for leave. Deny characterization of the disability at issue. RSUMF 14.

16.     Deny in part; admit in part. Deny Centura "proceeded with [Dr. Peddada's] offer of employment" after his leave request. Centura had already extended an offer of employment Dr. Peddada earlier accepted. RSUMF 1. Admit Centura sent Dr. Peddada a new PEA, the LSA, and a credentialing packet for signature. Admit Dr. Peddada never signed the new PEA or the LSA, with the clarification that he was never informed that

executing these documents were a necessary part of employment. RSUMF 3-7.

17.     Deny. Dr. Peddada's "refusal" presupposes that he knew of these agreements or any purported need to sign them. RSUMF 3-7.

18.     Admit in part; deny in part. Admit Koval texted Dr. Peddada on April 27, 2022, just asking for a call—Koval never mentioned the new PEA or any associated career-ending deadlines. Defs.' Ex. 12. Deny Dr. Peddada was just "on vacation" when the text arrived. He was on medical leave with ROPC, and had already requested medical leave from Centura, which Centura would grant a few days later. RSUMF 15.

19.     Admit in part; deny in part. Admit Dr. Peddada responded to Koval regarding the interview. Deny Koval initiated any discussion of the new PEA, the LSA, or any related deadlines. RSUMF 18. Deny Dr. Peddada was merely "on vacation." RSUMF 15.

20.     Admit in part; deny in part. Admit Dr. Plauth emailed Dr. Peddada about the request for medical leave on April 27, 2022—again, the email contains no discussion of the new PEA, the LSA, or any associated career-ending deadlines. Deny Dr. Plauth texted Dr. Peddada asking to discuss the new PEA.[5]

21.     Admit in part; deny in part. Admit Dr. Peddada called Dr. Plauth on April 27, 2022. Deny Dr. Peddada made statements "forcefully," or that Dr. Plauth's email is an accurate characterization of the call.[6] Ex. 6, P. Dep. V1 at 61:17-20 (denying email an accurate summary). Instead, Dr. Plauth wanted Dr. Peddada to talk to Dr. Thompson about his

---

[5] Defendants cite only the FAC to support the existence of that text. Discovery revealed that Mr. Koval (not Dr. Plauth) sent a text on April 27, 2022. SUMF 18. The record contains no text messages on any topic, at any time, between Drs. Plauth and Peddada.
[6] Even Dr. Plauth's own self-serving memorialization of the phone call once again says nothing about Dr. Peddada having apparently signed a "discussion draft" PEA or Dr. Peddada needing to sign a new PEA or LSA on any specific timeline.

condition, a request Dr. Peddada complied with. *Id*. at 62:1-7.

22.    Admit in part; deny in part. Admit Dr. Peddada received an automated DocuSign reminder on May 1. Deny Defendants' characterization that "Penrose gave him additional time to reconsider and sign the agreement." The email was an automatically generated Adobe reminder, not a Centura communication explaining the PEA was incomplete, that a new PEA was required, or that any deadlines existed—let alone were being extended. Ex. 23, PSF 3074-76. Deny there was any agreement to "reconsider." RSUMF 3-7.

23.    Admit with clarification. Admit Dr. Peddada acted on his doctor's advice while on medical leave, but clarify he believed he had already accepted employment, was unaware of any additional agreements, and was not notified of any signature deadlines. RSUMF 3-7, 13-15. Admit Dr. Setty did not specifically instruct him "not to review and sign legal documents," but clarify she recommended leave from "work," not just patient care,[7] which Dr. Peddada understood to include "reviewing and signing legal documents" and "communicat[ing] with Penrose about the loan repayment obligation while on medical leave." Ex. 11, P. Dep. V2, at 115:17-20, 116:4-9.

24.    Deny. Deny the characterization of Dr. Plauth's April 27 call as a "warning" regarding the new PEA. RSUMF 21; *see also* RSUMF 3-7, 13-15.

25.    Admit in part; deny in part. Deny Dr. Peddada "refused to communicate and commit to employment." RSUMF 3-7, 13-15. Admit Centura cancelled the new PEA in AdobeSign on May 5 (the exact same day it ostensibly granted him medical leave), and

---

[7] Dr. Setty knew nothing of the particulars at work, so she would have no reason to make these specific instructions. Ex. 15, S. Dep., at 128:15-129:7. However, Dr. Setty clearly understood "work" to mean all aspects of the job, including patientcare, administrative work, coding, dealing with the hospitals and insurance companies *Id.* at 101:7-102:14.

formally withdrew the employment offer on May 10, 2022. RSUMF 15.

26-27. Deny. RSUMF 3-7, 13-15, 23.

28.     Deny in part; admit in part. Admit when Centura withdrew the offer, Dr. Peddada's response noted he was on pre-planned vacation April 23-30 with his auto-reply on, and that he does not recall opening the new PEA. Deny the remainder. RSUMF 3-7, 13-15.

29.     Deny. The audit trail does not show he read, understood, or was required to act on the new PEA while on approved medical leave. RSUMF 3-7, 12-15, 23. Defendants' outreach during these two-to-three weeks—a text from Koval and a call with Dr. Plauth—mentioned neither the new PEA nor any signing deadline. RSUMF 18, 20-21.

30.     Admit with clarification. The credentialing packet Dr. Peddada completed on April 26, 2022, is a routine form physicians commonly complete; his doing so was consistent with moving forward with employment and his belief the PEA was finalized. RSUMF 3-7, 23. By executing it, Dr. Peddada agreed to abide by Centura's Integrity Standards, authorized a background investigation, executed a Confidentiality Agreement subjecting him to "corrective action up to and including termination," and agreed to use Centura's IT systems under Centura policies. Defs.' Ex. 3 at 14, 17-22, 24.

31.     Admit in part; deny in part. Admit Dr. Peddada was on approved medical leave, making it unreasonable to expect him to review multiple contracts and respond. Deny Defendants' characterization of Dr. Myers's testimony. He testified that at the height of burnout, "you generally shouldn't be having conversations like that, period," and that such matters are "very high-level stuff to be trying to negotiate on or make decisions on." Ex. 24, My. Dep. at 180:14-17; 181:18-25.

32.     Deny. Dr. Myers was responding to a hypothetical about communicative

9

incapacity—whether Dr. Peddada's disability "prevented" him from communicating at all. *See also* Ex. 24, My. Dep. at 178:12-23.

33.    Admit in part; deny in part. Admit Dr. Peddada declined medication and instead attempted self-relaxation techniques. Admit Dr. Peddada did not return to Dr. Setty for follow-up; rather, he followed Dr. Setty's *referral* to Dr. Thompson and subsequently Dr. Thompson's referral to CPHP. RSUMF 14. Deny the remainder. Dr. Setty diagnosed Dr. Peddada with anxiety, depression, and burnout and recommended leave. RSUMF 13-14. When she evaluated Dr. Peddada in April 2022 he was experiencing an "acute mental health issue" and had never previously presented with such symptoms, reflecting a departure from his normal functioning. Ex. 15, S. Dep. at 87:13-17, 105:4-7, 104:4-6 (not merely stress). According to Dr. Setty, Dr. Peddada's conduct—calling a physician for help at 9:00 p.m.—was consistent with someone in crisis and raised concern for suicidal ideation. *Id*. at 104:7-22. In her medical opinion, the diagnosed conditions impaired Dr. Peddada's thought processes—causing racing and clouded thinking—made it difficult for him to get out of bed and carry out daily personal and professional responsibilities, produced apathy and profound sadness affecting his functioning as a physician and family member, and led to social withdrawal and fear-driven interactions; the condition also manifested physically, including elevated blood pressure. *Id*. at 106:4-7, 108:1-10, 109:1-16, 110:15-24, 111:18-112:4, 112:5-10, 112:19-114:8, 125:3-5.

34.    Object. Dr. Peddada's lay view of whether he was "disabled" within the legal definition is inadmissible and irrelevant.[8]

---

[8] *Felkins v. City of Lakewood*, 774 F.3d 647, 651 (10th Cir.2014) (plaintiff's lay statements are inadmissible and thus cannot be used to oppose summary judgment).

35.     Admit in part; deny in part. Admit Dr. Peddada submitted an intake form on May 5, 2022, and checked those particular boxes. Deny the form reflected his medical condition on the date he completed it. Dr. Peddada completed the click-through form while "suffering from [his] conditions," and "was trying to do it rapidly **because I really wanted to talk to a psychiatrist**." Ex. 11, P. Dep. V2 at 90:5-10, 214:23-215:1, 213:6-11 ("just a quick inventory to get you to talk to the psychiatrist"), 213:18-21; 214:23-216:10 (disputing accuracy and that he understood the questions).

36.     Object in part; admit in part with clarification. Dr. Chitra Peddada's[9] lay view regarding whether Dr. Peddada was "disabled" within the legal definition is inadmissible and irrelevant. Admit Dr. C. Peddada confirmed the accuracy of the CPHP record, but clarify that in the record, Dr. C. Peddada believed her husband "was more worried," that he has been "going full force and is exhausted," and that he had "burnout."[10] Ex. 18, Peddada 466-509, at 500; Ex. 25, CP Dep., at 117:12-14.

37.     Admit in part; deny in part. Admit Dr. Peddada performed a procedure at 1 pm on April 22, 2022, interviewed Dr. Wernick on April 23, and texted Mr. Koval about the interview on April 25. Deny that these activities demonstrate "no restriction on work-related communication or patient care for that matter." These were pre-existing commitments Dr. Peddada felt obligated to complete before going on leave.[11] *See, e.g.*,

---

[9] Plaintiff's wife, Dr. Chitra Peddada, is referred to as "Dr. C. Peddada" to avoid confusion.
[10] Dr. C. Peddada confirmed the accuracy of the CPHP record in response to an extremely general question about the document as a whole. Her response to the question focused entirely on the negative aspects of Dr. Peddada's condition: "He rarely came home in time for dinner and worked on the computer at home. He always answered calls on the weekends. And I forgot he did answer calls on vacation too. Absolutely he did that, unfortunately." Ex. 25, CP Dep. 132:16-22. She was never asked whether specific line items—such as whether she "reported no concerns"—were accurate.
[11] Although not documented in the record, a reasonable inference is that the surgery had

PSF 1589 (the interview was prescheduled).

38.    Admit with clarification. Dr. Myers made this statement in response to a hypothetical premised on a text message Dr. Peddada sent a month after his termination.

39.    Admit with clarification. Defendants knew Dr. Peddada expressed hesitation about employment in December 2021, and was exploring other opportunities because, as reflected in the exhibit they cite, *Dr. Peddada told them as much directly*. Defendants also knew those concerns were resolved by April 2022. RSUMF 3-7.

40-42. Admit in part; deny in part. Admit Dr. Peddada sent these messages. Deny there was a discussion draft. RSUMF 3-7.

43.    Admit Dr. Peddada sent these messages. Deny Dr. Peddada was refusing to communicate about employment.[12] RSUMF 3-7. Defendants' reliance on isolated texts and emails mischaracterizes the record. These were casual, passing communications, not formal communications about employment terms or contract negotiations (like the PEA and credentialing application he had signed for Centura).

44.    Admit in part with clarification; deny in part. Admit Dr. Peddada listed his home on May 5, 2022, but he did so to downsize the house since his children left home. Even after termination, he continued searching for smaller homes in Colorado Springs where his wife still worked. Ex. 6, P. Dep. V1 at 77:16; Ex. 25, CP Dep. at 80:12, 81:5-6, 99:1-25. Deny Dr. Peddada was "unwilling to commit to employment." RSUMF 1, 5, 22.

---

been scheduled well before his visit with Dr. Setty. In hindsight, given his condition, canceling would likely have been the safest course.

[12] Defendants' footnote 7 cites communications from May 17, May 26-27, and June 2, 2022—after they withdrew the offer on May 10. Defendants did not know about these communications when making their termination decision, and the post-termination job search activity is unsurprising and irrelevant: after being terminated while on medical leave, Dr. Peddada sought alternative employment.

45.     Deny. RSUMF 3-7; *infra* Sec. (IV)(b).

46.     Admit.

47.     Deny. Defendants do not define what "well within" means but Dr. Peddada stated that his symptoms had gotten better at the end of July to the beginning of August. Ex. 11, P. Dep. V2 at 33:1-8. Occasional, informal communication is not the same as the ability to engage in sustained, substantive employment negotiations.

48.     Deny. The contemporaneous termination letter cites a single basis: Dr. Peddada's failure to execute the new PEA and the modification to the PRA, which were pending while he was on approved medical leave. Ex. 12, Peddada 6. Tacha confirmed under oath that the letter captured all reasons for rescinding the offer and that there were no additional reasons. Ex. 26, T. Dep. at 126:14-21; Ex. 4, W. Dep. at 207:3-19 (same).

49.     Deny. Tacha, Centura Interim CEO, authored the letter terminating Dr. Peddada in May 2022, when "there were CommonSpirit leaders on the Centura board to whom our CEO answered." Ex. 27, 30(b)(6) Dep. Tr. 154:12-19. That board controlled "decision-making" and could presumably fire Tacha, among other customary powers. Ex. 27, 30(b)(6) Dep. 155:12-156:16. Notably, Tacha did not even know the difference between CHIC and CommonSpirit. Ex. 26, T. Dep. at 17:12-15.

50.     Deny. Dr. Myers' testimony was based on a hypothetical unsupported by the record. Ex. 24, My. Dep. at 111:1-112:4. Immediately after the hypothetical, Dr. Myers also testified: "if an individual is not well, then I can see them, you know, saying 'but I had, you know, medical support, that I can't engage in employment negotiation or whatever until the end of my medical leave and I get clearance.'" *Id.* at 112:9-14.

51.     Admit in part; deny in part. Admit Judge Braswell found violations of Rule 37(e)(2)

and recommended that this Court decide whether to issue any sanctions beyond fees. ECF 195. Deny Judge Braswell found dismissal appropriate. ECF 195 at 12.

## II.    STATEMENT OF ADDITIONAL DISPUTED FACTS

1.    Dr. Peddada is a board-certified radiation oncologist specializing in advanced radiation therapies. Ex. 28, Peddada 420-427. In December 1999, he joined Penrose in Colorado Springs, where he practiced for the next twenty-two years. *Id*. During that time, he founded ROPC, which contracted exclusively with Centura to provide radiation oncology services at Penrose, and served as Medical Director of the department for more than fifteen years. *Id*. Dr. Peddada helped establish several treatment programs at Penrose, including prostate and breast brachytherapy, stereotactic radiosurgery, and stereotactic radiotherapy, and presented at more than forty national and international conferences while publishing nearly twenty-five peer-reviewed articles. *Id*. He also helped secure a National Cancer Institute grant supporting a community cancer nurse navigator program and contributed to the center becoming the first program in Colorado certified by the American College of Radiology. *Id*. Over his tenure, Dr. Peddada received multiple professional honors, including the American Cancer Society's Sword of Hope Award and recognition as a Top Doctor by *Colorado Springs Magazine*. *Id*.

2.    Patients and peers consistently praised Dr. Peddada both as a physician and as a person. Ex. 29, Peddada 512-536 (declarations of several patients and peers).

3.    As early as August 2021, Defendants became aware of Dr. Peddada's deteriorating mental health, as reflected in several complaints he received regarding abrupt behavior with staff and patients. Ex. 30, PSF 546 (August 2021 complaints); Ex. 31, PSF 1526-1527 (December 2021 same); Ex. 32, PSF 661-663 ("**stressed to the**

14

**max** … **he will burn out very soon**"); Ex. 33, PSF 664 (Dr. Monroe: "I need to hear [from Defendants] what the plan is for rehabilitating his behavior").

4.      By April 2022—when Dr. Peddada sought medical care and leave—rumors circulated that he was having a "nervous breakdown," prompting Defendants to direct employees to use only "neutral" descriptors when discussing him. Ex. 6, P. Dep. V1 at 50:6-52:5; Ex. 11, P. Dep. V2 at 221:20-25; Ex. 34, PSF 3740.

5.      By April 27, Centura was aware Dr. Peddada was reporting a mental health condition and had "no reason to believe" the diagnosis was untruthful. Ex. 27, 30(b)(6) Dep. 108:19–25; Ex. 35, PSF 0248 ("[w]e are very sensitive to physician mental health").

6.      Dr. Myers found Dr. Peddada's condition substantially impaired major life activities—sleeping, thinking, concentrating, and communicating—documenting fatigue, reduced ability to perform tasks carefully, diminished motivation to get out of bed, impaired concentration reflected in two clinical near-misses and ruminative worry about his medical judgment, as well as irritability, strained staff interactions, and withdrawal from family, with symptoms beginning as early as February 2021. Ex. 36, My. Report 12-14.

7.      These conditions made it difficult for Dr. Peddada to manage routine daily activities; he often did not want to get out of bed, and the extreme stress diminished the happiness he once found in his work. Ex. 11, P. Dep. V2 41:7–14; 210:2–11.

8.      Dr. Peddada's work requires delicate procedures placing needles between a patient's rectum and prostate, demanding extraordinary concentration because even slight errors can seriously harm the patient. Ex. 11, P. Dep. V2 at 71:15-19.

9.      According to Dr. Thompson, physician burnout involves "lack of empathy, fatigue, cynicism, and loss of joy of the practice of medicine," can increase stress and cause

15

"more errors," and should be taken seriously when reported. Ex. 17, DT Dep. at 44:23-45:2; 46:10-25; 51:1-6.

10.    According to Dr. Plauth, physician burnout involves "significant stress related to the practice of medicine," detachment from "all parts of work," and impairments where physicians "could be less attentive, not do as well," and "might communicate just differently…they might be more short." Ex. 37, WP. Dep. 33:14-34:15; 37:9-38:18.

11.    Defendants' May 5, 2022 letter granting medical leave directed CPHP providers to evaluate "when [Dr. Peddada] can safely return," or whether he would need "additional therapy," acknowledging there was no precise bookend to the leave. Ex. 38, Peddada 4.

12.    Dr. Baldauf rejected the judgment of Dr. Peddada's treating physician regarding the leave required for his burnout. Ex. 39, B. Dep. at 100:17-25.

13.    The ROPC–Centura agreement provided that upon termination Dr. Peddada would vacate the premises and relinquish his medical privileges. Ex. 40, PSF 46-68, at 47. He was never able to have his privileges reinstated. Ex. 6, P. Dep. V1 83:8-13.

14.    The ROPC-Centura agreement further provided that upon termination, Dr. Peddada was subject to a twelve-month noncompete, and all patients "are patients of [Centura]." Ex. 40, PSF 46-68, at 55-56. Indeed, patients were left calling him "in distress," one was falsely informed of a "nervous breakdown," and another received no notice of his departure at all. Ex. 18, Peddada 466-509, at 504; Ex. 29, Peddada 512-536, at 535.

15.    When Defendants agreed to employ Drs. Peddada and Monroe, they placed Dr. Peddada at Penrose (and Dr. Monroe at St. Francis) because Dr. Peddada "saw more patients," generated more RVUs, and his history warranted placing him at "the perceived more desirable site." Ex. 41, PSF 2470-71; Ex. 27, 30(b)(6) Dep. at 66:21-67:10.

16.     Dr. Monroe was disappointed because he specifically applied to Penrose and was not interested in St. Francis. Ex. 10, M. Dep. at 150:7-18.

17.     On or around April 27, 2022, Dr. Monroe informed Defendants he would not agree to employment if Defendants planned to keep Dr. Peddada. Ex. 35, PSF 248.

18.     After he started working for Defendants in-house, Dr. Monroe ended up caring for and treating "quite a few" of Dr. Peddada's patients. Ex. 10, M. Dep. 77:24-78:3.

19.     Dr. Peddada describes the termination as "almost a PTSD experience"—feeling "like [he's] being punished for doing the right thing"; that "it's so painful and depressing"; and that he is "grieving what once was." Ex. 36, My. Report at 12; *id*. at 13 (even two years later, Dr. Peddada still "describes deep disappointment in what has happened to his career"); Ex. 25, CP Dep., at 139:14-16, 139:21-22.

## III.    <u>LEGAL STANDARD</u>

On summary judgment, the Court must "view the facts in the light most favorable to [Dr. Peddada] and resolve all factual disputes and reasonable inferences in [his] favor." *Duda v. Elder*, 7 F.4th 899, 905 (10th Cir. 2021). Summary judgment is "[n]ot a replacement for the trial as the preferred means for resolving disputes." *Walton v. Powell*, 821 F.3d 1204, 1212 (10th Cir. 2016). The Court must also "disregard all evidence favorable to the moving party that the jury is not required to believe," including controverted testimony from interested witnesses. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 151 (2000); *see Flitton v. Primary Residential Mortg., Inc.*, 238 Fed. Appx. 410, 419 (10th Cir. 2007) (remanding dismissal because, *inter alia*, district court relied on testimony from an interested witness).

IV.    **ARGUMENT**

Defendants seek summary judgment on all ten claims based on a few disputed issues: that Dr. Peddada was not disabled, that he was not a qualified individual because he was neither an employee nor an applicant, and that Defendants acted for legitimate reasons. The record, viewed in his favor, creates genuine disputes on each point.

**A. There are Genuine Disputes Regarding Dr. Peddada's Disability Status under the ADA and Section 504 (Claims 1-4, 7)**

Under the ADA and Section 504, "disability" means a physical or mental impairment that substantially limits one or more major life activities, or being regarded as having such impairment.[13] 42 U.S.C. § 12102(1); *McGeshick v. Principi*, 357 F.3d 1146, 1150 (10th Cir. 2004) (holding both statutes share the same definition of disability). The term is construed "in favor of broad coverage of individuals…to the maximum extent permitted [by the ADA]." 42 U.S.C. § 12102(4)(A). Moreover, disability status is not required for Dr. Peddada's retaliation and interference claims, which require only a reasonable, good-faith belief of disability. *See Foster v. Mountain Coal Co.*, LLC, 830 F.3d 1178, 1186 (10th Cir. 2016). Defendants' argument that the absence of a disability defeats "all disability-related claims" is therefore incorrect.[14]

**i. Dr. Peddada was disabled within the meaning of the ADA and Section 504.**

With respect to actual disability, Defendants argue that Dr. Peddada's only alleged disability is burnout. (Mot. at 18.) But Dr. Peddada suffered from depression, anxiety, and burnout—"one [] diagnosis," in his provider's words—not just burnout. RSUMF 14, 32-33.

Defendants also contend that conditions "created or exacerbated by a particular

---

[13] Dr. Peddada does not maintain a "record of" claim.
[14] Defendants make no argument that Dr. Peddada did not have a reasonable, good faith belief he was disabled.

18

work environment" cannot qualify as disabilities. Mot. at 18. That is incorrect. The ADA requires an "individualized assessment," and categorical exclusions from disability do not exist. 29 C.F.R. § 1630.2(j)(3)(ii). Accepting Defendants' view would effectively exclude workplace injuries from ADA protection, contrary to the statute. Courts routinely analyze ADA claims arising from workplace injuries. *See Adair v. City of Muskogee*, 823 F.3d 1297, 1305-07 (10th Cir. 2016); *Freeman v. City of Cheyenne*, 660 F. Supp. 3d 1155, 1159-64 (D. Wyo. 2023), *aff'd*, 2024 WL 464069 (10th Cir. Feb. 7, 2024).

Defendants stretch cases holding that a plaintiff was not qualified to perform a job's essential functions. That is how they use *Gonzagowski*, for example. Mot. at 18, n. 8. In that pre-ADAAA decision, the Tenth Circuit held that even assuming the plaintiff's stress qualified as a disability (which it might), he could not sustain his claim because he "ceased to adequately perform the essential functions" of his job and sought an accommodation to work indefinitely in a less stressful environment free from criticism. 115 F.3d 744, 747-48 (10th Cir. 1997). *Gonzagowski* did not hold that work-related stress or anxiety can never qualify as a disability; to the contrary, it noted that work-related stress "may in some cases be legitimate targets of accommodation," employed need not "create a work environment free of stress and criticism." *Id.*; *see also Rooks v. Youth Dev., Inc.*, 1999 WL 35809378, at *3 (D.N.M. July 9, 1999) (cited by Defendants (Mot. at 18, n.8) but noting, "stress and depression qualify as ADA impairments only if they result from a documented physiological or mental disorder, disorders defined by the EEOC as, once again, conditions that 'substantially limit the individual in one of the major life activities'"); *Freeman*, 660 F. Supp. at 1163-64, 1167 (jury question where work-related mental conditions affected sleep, work, and interactions with coworkers).

Admittedly, courts disfavor requests to work under nicer managers, to be treated with kid gloves, or to work permanently free from stress. But this case is different. Dr. Peddada performed his job for decades and later returned to full-duty physician work in similar settings. He requested only three months of leave—no duty reduction, change in supervision, or permanent stress relief. Such finite leave is presumptively reasonable, particularly where it mirrors leave available under state and federal law. Because Dr. Peddada remained capable of performing the essential functions of his job, cases like *Gonzagowski* are inapposite. *See Rascon v. US W. Commc'ns, Inc.*, 143 F.3d 1324, 1334 (10th Cir. 1998) (four months for PTSD reasonable); *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 967 (10th Cir. 2002) (no longer than FMLA reasonable).

The relevant question is whether Dr. Peddada's impairments substantially limited a major life activity. 42 U.S.C. § 12102(2)(A), (4)(C). The impairment need only restrict an activity compared to most people in the general population; it need not prevent or severely restrict performance. 29 C.F.R. § 1630.2(j). The analysis should not require "scientific, medical, or statistical analysis." 29 C.F.R. § 1630.2(j)(1)(v). Defendants do not meaningfully engage that analysis. In any event, the record contains ample evidence that Dr. Peddada's impairments substantially limited his concentration, thinking, communication, work, and neurological functioning, including Dr. Peddada's self-reporting (RSUMF 14, n. 3; SADF 7); Dr. Setty's diagnoses, clinical findings, and testimony (RSUMF 13-14, 33); Dr. Myers' expert opinions (SADF 6); and testimony from Defendants' own employees (SADF 9,10). In short, a jury could find that most people can concentrate without feeling "unable to think," can work without fear of harming patients, and can communicate without dreading routine interactions.

20

### ii. Defendants also regarded Dr. Peddada as disabled.

With respect to the "regarded as" prong, Defendants correctly note the ADAAA's "transitory and minor" exception but are wrong that it applies here. Mot. at 20. Defendants knew of Dr. Peddada's deteriorating mental health as early as August 2021. SADF 3. By April 2022—amid workplace rumors of a nervous breakdown, Dr. Peddada's reports, his physician-directed request for three months of medical leave, as well as Defendants' reluctance to set a firm end date for the leave—a jury could reasonably infer that Defendants believed Dr. Peddada's condition would cloud his professional future well beyond six months and pose continuing risks of medical errors and workplace disruptions.[15] RSUMF 14-15, SADF 4-5, 9-11. This case resembles *Doebele v. Sprint/United Management Co.*, 342 F.3d 1117, at 1134 (10th Cir. 2003), a pre-ADAAA case applying a stricter standard, where the Tenth Circuit reversed summary judgment on a "regarded as" claim because the employer knew of mental health issues "even before she was diagnosed"; "expressed concern with productivity, attendance and [liability]"; and disregarded the treating physician when deciding its course of action. *Id*. at 1133-35.

### B. Dr. Peddada Was a Qualified Individual Within the Meaning of the ADA and Section 504 (Claims 1-7)

A "qualified individual" is one who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Defendants do not dispute that Dr. Peddada had the requisite skill and could perform the essential functions of a radiation oncologist, a role he had performed at Penrose for two decades. *Lincoln v. BNSF Railway Company*, 900

---

[15] Whether he actually and fully healed in a shorter period is irrelevant. Only the perception of impairment matters. *See, e.g., Adair*, 823 F.3d at 1306.

21

F.3d 1166, 1192 (10th Cir. 2018). Instead, they argue that he was not an employee and, alternatively, not an applicant because he did not "desire" the position. Mot. at 21–22, 26.

Whether Dr. Peddada was an employee when Defendants withdrew the offer, and thus terminated him, is a fact-intensive inquiry under common-law agency principles. *See Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 449-50 (2003) (endorsing the EEOC's sixteen-factor test). Courts routinely deny summary judgment where the moving party fails to engage the factors. *Peace v. Panorama Orthopedics & Spine Center, Inc.*, 2025 WL 35585, at *12 (D. Colo. Jan. 6, 2025) (collecting cases). Defendants make no mention of the factors,[16] relying only on the lack of a countersignature on the PEA and its July 2022 start date—formalities that "should not necessarily be used to determine whether [a worker] is an employee." *Id.*

The record shows multiple indicia of an employment relationship in the period between Dr. Peddada's April 5 acceptance and Defendants' May 10 withdrawal: he signed the PEA on April 11, completed the credentialing application on April 26, and sought and obtained Centura-approved medical leave by May 5. RSUMF 1, 30. As part of credentialing, Dr. Peddada agreed to Centura's Integrity Standards, confidentiality obligations, background screening, and IT-use policies. RSUMF 30. Nothing in the ADA requires an employee to have already performed services before the relationship begins; absent medical leave, Dr. Peddada would have been working exclusively at Centura's hospital under these restrictions. At minimum, these facts present the type of totality-of-the-circumstances inquiry reserved for the factfinder, and because Defendants "[did] not

---

[16] "[A]rguments raised for the first time in a reply brief are waived." *Cruz v. City & Cnty. of Denver*, 2024 WL 1346471, at *17 (D. Colo. Mar. 29, 2024) (citations omitted).

provide undisputed evidence that would allow the Court to engage in the necessary inquiry," summary judgment should be denied. *Peace*, 2025 WL 35585, at *12.

Even if Dr. Peddada was not yet an employee, the ADA independently protects applicants. *See* 42 U.S.C. § 12112(a). Defendants argue he was not even an applicant because he did not "desire" the position, pointing to his failure to sign the new PEA and LSA. Mot. at 21-22. But that argument rests on Defendants' version of events. Defendants created the position specifically for Dr. Peddada. RSUMF 1. He accepted the position on April 5, signed the PEA on April 11, completed Centura's credentialing materials on April 26, and took medical leave, believing the employment arrangement was finalized. RSUMF 1, 16, 30. He was never told that executing additional agreements during leave was required to secure the position (nor was he even aware of them). RSUMF 18. Saying he did not want the position because he did not sign the new PEA and LSA ignores that he took the steps *he believed* Centura required to accept the job.[17] A reasonable jury could therefore conclude that Dr. Peddada intended to take the job and remained, at minimum, an ADA-protected applicant. *See also Vivos Therapeutics, Inc. v. Ortho-Tain, Inc.*, 142 F.4th 1262, 1268 n.3 (10th Cir. 2025) ("party's state of mind (such as knowledge or intent) is a question of fact for the factfinder") (citation omitted).

### C. Defendants' Reason for Terminating/Refusing to Hire Dr. Peddada is Pretext for Discrimination, Retaliation, and Interference (Claims 1-3, 5-7)

Section C addresses causation for Dr. Peddada's disparate-treatment, retaliation, and interference claims. Other elements—such as disability status and whether he was

---

[17] Defendants' reliance on *EEOC v. North Memorial Health Care*, 908 F.3d 1098 (8th Cir. 2018), is misplaced. In *North Memorial*, the applicant expressly refused to comply with a clearly communicated condition of employment—working weekends and night shifts—and therefore declined the job as offered. *Id.* at 1100-02. Unlike the applicant in *North Memorial*, Dr. Peddada did not expressly reject a known condition of employment.

a qualified individual—are addressed above. The narrower question here is whether Defendants' stated reason for withdrawing the offer was genuine or a pretext for unlawful discrimination, retaliation, or interference. *See* 42 U.S.C. §§ 12112(a), 12203(a), (b). Absent direct evidence, the claims proceed under the *McDonnell Douglas* framework: the plaintiff establishes a prima facie case, the employer offers a legitimate reason, and the plaintiff must show pretext. *See* Lincoln, 900 F.3d at 1192-93.

Evidence supporting an inference of discrimination or pretext may include actions or remarks made by decisionmakers that could be viewed as discriminatory animus, preferential treatment of similarly situated employees, timing, or evidence that the employer's stated reasons are false. *Plotke v. White*, 405 F.3d 1092, 1101-02 (10th Cir. 2005). A plaintiff may show falsity if the employer's explanation is "contrived" or "grossly exaggerated," *id*. at 1106, or that the employer has offered "shift[ing] rationales," *Johnson v. Norton Cnty. Hosp.*, 550 F. Supp. 3d 937, 959 (D. Kan. 2021); *see also Jaramillo v. Colorado Jud. Dep't*, 427 F.3d 1303, 1311 (10th Cir. 2005) ("A change in position also supports a finding of pretext when the new rationale is unsupported by the evidence."). Temporal proximity alone may support causation in retaliation cases. *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999); *Ramirez v. Oklahoma Dep't of Mental Health*, 41 F.3d 584, 596 (10th Cir. 1994) (same). "[D]isbelief of the reasons put forward by the defendant," especially with "a suspicion of mendacity," may suffice to show intentional discrimination or retaliation. *Plotke*, 405 F.3d at 1102.

Defendants do not challenge Dr. Peddada's prima facie case—they concede "that the adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination." *Id*. at 1100. Instead, they proceed directly to step

24

two of *McDonnell Douglas*, asserting a purported "legitimate" reason for withdrawing the offer: Dr. Peddada refused to communicate about the proposed agreements. Mot. at 22-25. But multiple categories of evidence support an inference of pretext:

**Falsity.** A jury could find Defendants' central claim that Dr. Peddada "refused" to communicate about the agreements to be simply false, as he was never told signing the revised PEA or LSA was a prerequisite. The record instead shows he accepted the position on April 5, signed the PEA on April 11, and completed credentialing on April 26 before taking medical leave. *See* RSUMF 16, 30.

**Shifting rationales.** The contemporaneous letter cited only Dr. Peddada's failure to execute the agreements, a reason CEO Tacha confirmed. RSUMF 48. In this litigation, Defendants added new justifications, including commitment concerns, potential Stark Law issues, and his relationship with Dr. Monroe (RSUMF 2, 3, 41-44), which a jury could label litigation inventions, not legitimate reasons.

**Gross exaggeration.** Even accepting Defendants' claim that they wanted prompt signatures, a jury could find the urgency contrived. Dr. Peddada had already completed the credentialing packet and the proposed start date was months away. RSUMF 30; SUMF 16 n.2. Meanwhile, Dr. Monroe signed his PEA on May 16 and his LSA on May 24, days and weeks after Centura terminated Dr. Peddada. RSUMF 8.

**Disparate treatment.** Defendants did not apply this urgency to the only other physician in the transition who was not disabled or requesting accommodation. Dr. Monroe executed his agreements weeks after Dr. Peddada's offer was withdrawn. *Id*. If immediate execution were truly required for employment or credentialing, Defendants would have enforced it consistently, regardless of disability.

Dr. Peddada's case resembles many others where plaintiffs survive summary judgment: denial of a work opportunity shortly after disclosing a medical condition and requesting leave as an accommodation. For example, in *Smith v. Diffee Ford-Lincoln-Mercury, Inc.,* the Tenth Circuit reinstated ADA and FMLA claims, recognizing the suspicious nature of terminating an employee while on medical leave and confirming that requesting leave is protected activity. 298 F.3d 955, 967 (10th Cir. 2002). The court emphasized the "timing of [plaintiff's] dismissal," her "long years of service," the employer's "failure to subject her to discipline before her FMLA leave," and the employer's "lack of formal emphasis" on the alleged violations. *Id.* at 961; *see also Smothers v. Solvay Chemicals, Inc.*, 740 F.3d 530, 541-44, 46 (10th Cir. 2014) (reversing summary judgment where employer claimed plaintiff violated safety rules and "quarreled" with coworkers, but the plaintiff—who had just requested FMLA leave—presented evidence of pretext, including disparate treatment, inadequate investigation of the alleged "quarreling," and managers' complaints about his leave).

### D. Defendants' Passing Arguments Regarding the Interactive Process and Accommodation are Not a Basis for Summary Judgment (Claim 4)

Defendants' "legitimate justification" argument does not address the core element of Dr. Peddada's failure-to-accommodate claim: whether they denied a reasonable accommodation. *See Exby-Stolley v. Board of County Commissioners*, 979 F.3d 784, 796 (10th Cir. 2020) (holding failure to accommodate is discriminatory "irrespective of whether the employer harbored invidious intent (or discriminatory animus)"). On that element, they make only two points: (1) they accommodated Dr. Peddada because they sent the revised PEA after granting medical leave; and (2) Dr. Peddada "violated the interactive process." Mot. 24-25, n.12. Neither supports summary judgment. Defendants admit they withdrew

26

the employment offer within five days of formally approving his medical leave. SUMF 10. Labeling leave "approved" and ending employment days later is not an accommodation.

Defendants are correct that if the revised PEA and Loan Settlement Agreement required attention during leave, a continuing interactive process would have been necessary. But Defendants—not Dr. Peddada—failed to engage in it. *Aubrey v. Koppes*, 975 F.3d 995, 1008 (10th Cir. 2020) ("Neither party may create or destroy liability by causing a breakdown of the interactive process."). Defendants cannot identify a single communication explaining that execution of those agreements was required during leave, why such a timeline was necessary, or why accommodating a true medical leave—one that did not require ongoing negotiations—would impose an undue hardship. Instead, the record shows only a few vague communications, followed shortly by withdrawal of the offer. RSUMF 18, 48. A reasonable jury could therefore conclude that Defendants did not engage in the interactive process at all. They simply ended it. *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1171–72 (10th Cir. 1999) (summary judgment is "premature if there is a genuine dispute regarding whether [the defendant] participated in good faith").

### E.  Defendants' State Law Arguments Fail (Claims 8-10)

Defendants argue Dr. Peddada's state-law claims fail if their asserted justification is accepted. But that justification is pretext for withdrawing the offer (or terminating him) based on disability, as explained in Section C. They also argue the wrongful-discharge claim fails because he was never employed, but as shown in Section B, he was.

On unjust enrichment, Defendants' prior payments (Mot. at 26) do not account for benefits they retained after discriminating against Dr. Peddada, including patients they prevented him from seeing and left believing he could no longer provide their care. SADF 13–14. Dr. Monroe, while in-house for Defendants, later treated "quite a few" of Dr.

27

Peddada's former patients. SADF 18. A jury could find it inequitable for Defendants to retain the resulting patient revenue, as well as the benefits of the referral network and reputation Dr. Peddada generated for the hospital over two decades. *See* Salzman v. Bachrach, 996 P.2d 1263, 1266 (Colo. 2000) (finding unjust enrichment where a party retained the benefit of improvements to shared property).

Defendants argue Dr. Peddada lacks evidence for his civil conspiracy claim, relying only on his knowledge. But the record shows Dr. Monroe expressed negative views about Dr. Peddada's mental health while simultaneously expressing interest in Dr. Peddada's Penrose position and stating he would not become an employee if Dr. Peddada did. SADF 4, 14-17. A jury could therefore infer that the "plan to rehabilitate [Dr. Peddada's] behavior" (SADF 3) was an agreement with Defendants to oust him because of his mental health. *See, e.g.*, *Oaster Development, LLC v. WD Consulting,.* 2025 WL 1191779, at *8-9 (D. Colo. Apr. 24, 2025) (denying SJ where co-conspirator was not a defendant and civil conspiracy appeared "superfluous" to other claims, because communications suggested participants shared the same unlawful objective).

### F. CommonSpirit Is a Proper Defendant (All Claims)

There is sufficient evidence that Defendants are jointly liable as joint employers and/or an integrated enterprise, both of which turn on control over employment conditions. *Bristol v. Bd. Of Cty. Comm'rs of Clear Creek,* 312 F.3d 1213, 1218 (10th Cir. 2002); *Frank v. U.S. W., Inc.*, 3 F.3d 1357, 1362 (10th Cir. 1993). Through its position on the Centura board—with customary powers over hiring, firing, and strategy—CommonSpirit exercised sufficient control over the Centura decisionmakers who terminated Dr. Peddada for the issue to go to a jury.

28

Respectfully submitted March 31, 2026

RATHOD | MOHAMEDBHAI LLC

*s/ Crist Whitney*
Crist Whitney
Iris Halpern
Qusair Mohamedbhai
Matthew Cron
Omeed Azmoudeh
2701 Lawrence Street, Suite 100
Denver, Colorado 80205
(303) 578-4400
cw@rmlawyers.com
ih@rmlawyers.com
qm@rmlawyers.com
mc@rmlawyers.com
oa@rmlawyers.com

*Attorney for Plaintiff*

29

## **AI CERTIFICATION**

In accordance with the Court's Standing Order Regarding the Use of Generative Artificial Intelligence in Court Filings, undersigned counsel certifies that generative AI—specifically, Eve Legal—was used to review the record in this case and assist with drafting portions of the factual sections. Any factual citations to the record generated by Eve were manually reviewed for accuracy by undersigned counsel. Eve was not used to conduct legal research, access legal databases, or retrieve legal authority.

*s/ Crist Whitney*

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 31, 2026 the foregoing motion was filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*s/ Crist Whitney*
Crist Whitney
Attorney for Plaintiff

30