**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Nina Y. Wang**

Civil Action No. 23-cv-01921-NYW-MDB

DR. ANUJ PEDDADA,

Plaintiff,

v.

CATHOLIC HEALTH INITIATIVES COLORADO, and
COMMON SPIRIT HEALTH,

Defendants.

---

CATHOLIC HEALTH INITIATIVES COLORADO, and
COMMON SPIRIT HEALTH,

Counterclaimants,

v.

DR. ANUJ PEDDADA,

Counter-Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

This matter is before the Court on the following:

(1) Plaintiff's Motion for Partial Summary Judgment [Doc. 203, filed February 19, 2026];

(2) Defendants' Renewed Motion for Summary Judgment [Doc. 208, filed February 19, 2026];

(3) Plaintiff's Motion for Sanctions [Doc. 257, filed April 21, 2026]; and

(4) Defendants' Motion for Clarification [Doc. 261, filed August 14, 2026].

These Motions are fully briefed, *see* [Doc. 228; Doc. 240; Doc. 244; Doc. 258; Doc. 259; Doc. 262], and the Court finds that oral argument will not materially assist in the resolution. For the reasons set forth below, this Court respectfully **GRANTS in part** Defendant's Renewed Motion for Summary Judgment; **DENIES as moot** Plaintiff's Motion for Partial Summary Judgment; **DENIES as moot** Plaintiff's Motion to Strike; and **DENIES as moot** Defendants' Motion for Clarification.

## BACKGROUND

This case arises from a failed employment relationship between Plaintiff Dr. Anuj Peddada ("Plaintiff" or "Dr. Peddada") and Defendants Catholic Health Initiatives Colorado d/b/a Centura Health-Penrose-St. Francis Health Services ("CHIC" or "Penrose") and CommonSpirit Health Foundation d/b/a CommonSpirit Health ("CommonSpirit" and together, "Defendants"). Dr. Peddada initiated this action against Defendants on July 27, 2023, bringing ten claims for relief against Defendants. [Doc. 1].[1]

On April 9, 2024, Plaintiff sought leave to amend, [Doc. 50], which the Court granted on October 31, 2024, [Doc. 102]. In his Amended Complaint, Dr. Peddada asserted the same ten claims for relief. *See* [Doc. 104]. Specifically, Claims 1, 2, and 3 assert that Defendants denied Dr. Peddada employment opportunities because (1) of his disability, (2) because they regarded him as disabled,[2] and/or (3) because of the need to

---

[1] When referring to documents filed in this action, this court uses the convention [Doc. __], referring to the docket and page number assigned by the court's Electronic Court Files ("ECF") System. In citing to deposition transcripts, this court uses the convention of citing to the document number assigned by the ECF system, but page and line number from the original deposition transcript for consistency purposes.

[2] Plaintiff does not assert that he is disabled based upon a record of impairment. [Doc. 240 at 19 n.13].

provide reasonable accommodation for his disabilities, in violation of the Americans with Disabilities Act ("ADA"). [*Id.* at ¶¶ 159–66]. Claim 4 asserts that Defendants failed to provide Dr. Peddada reasonable accommodation and denied him employment opportunities because of his request for reasonable accommodation, in violation of 42 U.S.C. § 12111(8)–(10). [*Id.* at ¶¶ 167–79]. Claims 5 and 6 assert that Defendants retaliated against Dr. Peddada for engaging in protected activity by requesting reasonable accommodation and interfered with his exercise of rights under the ADA. [*Id.* at ¶¶ 180–90]. Claim 7 asserts a violation of Section 504 of the Rehabilitation Act. [*Id.* at ¶¶ 191–97]. Claim 8, 9, and 10 assert state law claims for wrongful discharge in violation of public policy, unjust enrichment, and civil conspiracy, respectively. [*Id.* at ¶¶ 198–226]. Plaintiff invoked 28 U.S.C. §§ 1331, 1337,[3] and 1343 as the basis of this Court's federal question subject matter jurisdiction, and 28 U.S.C. § 1367(a) as the basis for pendent jurisdiction over Claims 8, 9, and 10. [*Id.* at ¶¶ 8–9]. As relief, Dr. Peddada seeks a declaration that Defendants violated his state and federal rights, compensatory damages, punitive damages, front pay in lieu of reinstatement, pre-judgment and post-judgment interest, and attorneys' fees and costs.

On November 15, 2024, Defendants filed their Answer to Amended Complaint and Counterclaim ("Answer and Counterclaim"). [Doc. 113]. Defendants denied liability as to all Plaintiff's causes of action, [*id.* at 15–18]; asserted affirmative defenses including but

[3] After Congress broadened the scope of § 1331 by eliminating the amount in controversy requirement, § 1337 and similar specific statutes granting federal jurisdiction have become unnecessarily redundant. *See also Dutcher v. Matheson*, 733 F.3d 980, 985 (10th Cir. 2013) ("[B]ecause the phrase 'arising under' has the same meaning in both statutes, § 1337 is superfluous." (quoting 13D Charles Alan Wright, et al., Federal Prac. & Proc. § 3574 (3d ed., April 2013 update))).

not limited to the failure to mitigate damages, [*id.* at 18–19]; and asserted a Counterclaim seeking a loan repayment obligation under a Physician Recruitment Agreement and Promissory Note,[4] [*id.* at 19]. Plaintiff then sought to dismiss Defendants' Counterclaim [Doc. 117], which the Court denied, [Doc. 178].

The Parties have proceeded through discovery, and on February 19, 2026, Plaintiff filed his Motion for Partial Summary Judgment, seeking judgment in his favor as to Defendants' failure to mitigate defense. [Doc. 203]. That same day, Defendants filed their renewed Motion for Summary Judgment, seeking judgment in their favor on all of Dr. Peddada's claims. Specifically, Defendants argue that Defendant CommonSpirit should be dismissed because it had no role in the actions at issue in this case. [*Id.* at 21]. Further, Defendants contend that all Plaintiff's disability claims fail because (1) he "did not have a disability and certainly not any impairment that inhibited him from communicating;" (2) he never committed to employment, so he was not a "qualified individual" under the ADA; and (3) Defendants had a legitimate, non-discriminatory reason to withdraw their offer of employment. [*Id.* at 23–30 (emphasis omitted)]. Defendants further contend that they are entitled to judgment in their favor on Claim 8 for wrongful discharge because Dr. Peddada was never employed or discharged, [*id.* at 30], and Claim 9 for unjust enrichment because "it is not unjust to decline to hire an applicant who refuses to communicate" about the terms of employment and because Plaintiff "was already compensated—through his employment with ROPC—for his prior efforts that he claims resulted in enrichment to Pensorse, which defeats his claim for further reimbursement," [*id.* at 31]. Finally,

[4] Defendants do not actually identify a specific cause of action in their Counterclaim. *See* [Doc. 113 at 19–20]. And in seeking to dismiss the Counterclaim, Plaintiff likewise does not characterize the cause of action. [*See* Doc. 117]

Defendants argue that Plaintiff's claim for conspiracy also fails because Dr. Peddada fails to establish that he is disabled, and he admitted during his deposition that there was no conspiracy between Defendants and Dr. Alan Monroe, his former medical practice partner. [*Id.* at 31–32].

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way. A fact is material if under the substantive law it is essential to the proper disposition of the claim." *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (cleaned up). "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

At summary judgment, a movant that does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant must only point the Court to a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 671 (10th Cir. 1998). Once this movant has met its initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In order for there to be a genuine issue for trial, there must be more than "the mere existence of a scintilla of evidence in support of the plaintiff's position." *Id.* at 252.

When considering the evidence in the record, the Court cannot and does not weigh the evidence or determine the credibility of witnesses. *See id.* at 255; *Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008). At all times, the Court views the record in the light most favorable to the nonmoving party. *Banner Bank v. First Am. Title Ins. Co.*, 916 F.3d 1323, 1326 (10th Cir. 2019).

**UNDISPUTED MATERIAL FACTS**

The following undisputed material facts are drawn from the record before the Court.

1. Dr. Anuj Peddada is a board-certified radiation oncologist. [Doc. 104 at ¶ 16; Doc. 113 at ¶ 16].

2. Dr. Peddada and Dr. Alan Monroe were partners in a practice group called Radiation Oncology, P.C. ("ROPC"). [Doc. 104 at ¶ 24; Doc. 113 at ¶ 24].

3. ROPC contracted exclusively to provide services to Centura at Penrose Cancer Care Center, in Colorado Springs from approximately 1999 to 2022. [Doc. 104 at ¶¶ 25–26; Doc. 113 at ¶¶ 25–26; Doc. 208 at ¶ 1; Doc. 240 at 2 ¶ 1; Doc. 208-1 at 3–25].

4. The Exclusive Professional Services Agreement for Radiation Oncology Services executed between Dr. Peddada and Centura Health-Penrose-St. Francis Health Services expressly classifies ROPC as an independent contractor in all capitals and bold font. [Doc. 208-1 at 10 § 3.01].

5. Between January 2019 and August 2023, Common Spirit had essentially no involvement in the day-to-day decision-making of running Penrose or St. Francis Medical Center, was not involved in managing or operating those facilities, and did not exercise

any direct oversight or control over Dr. Peddada's employment negotiations. [Doc. 208-48 at 154:9–23].

6. In 2020, CHIC requested that ROPC to provide services at St. Francis Medical Center beginning in July 2021. [Doc. 104 at ¶ 65; Doc. 113 at ¶ 65].

7. Centura facilitated the hiring of a third physician, Dr. Madeera Kathpal, through a Physician Recruitment Agreement. [Doc. 104 at ¶ 66; Doc. 113 at ¶ 66; Doc. 208-1].

8. Near the end of 2021, the relationship between Drs. Peddada and Monroe became irretrievably broken. [Doc. 208 at ¶ 2; Doc. 240 at 2 ¶ 2]. By that time, Drs. Peddada and Monroe had not spoken for approximately eight months. [Doc. 208 at ¶ 2; Doc. 240 at 2 ¶ 2; Doc. 208-54 at 158:17–19].

9. Around the same time, Dr. Kathpal left ROPC, triggering a loan repayment obligation under the Physician Recruitment Agreement. [Doc. 208 at ¶ 3; Doc. 240 at 2 ¶ 3]. [redacted] [Doc. 241-4 at 16].

10. [redacted] [Doc. 241-6; Doc. 241-7; Doc. 241-8]. [redacted] [Doc. 241-5].

11. In December 2021, Centura informed ROPC that it would not renew the exclusive contract for ROPC to perform medical services at Penrose and St. Francis once

the contract expired on June 1, 2022. [Doc. 104 at ¶ 74; Doc. 113 at ¶ 74]. Therefore, as of April–May 2022, Dr. Peddada was still a partner in ROPC and was not an active employee of Defendants. *See* [Doc. 104 at ¶ 74; Doc. 113 at ¶ 74].

12. Penrose offered to hire Drs. Peddada and Monroe as employees, and then separate them at two different hospitals after the expiration of the Exclusive Professional Services Agreement for Radiation Oncology Services. [Doc. 208 at ¶ 2; Doc. 240 at 2 ¶ 2].

13. On December 2, 2021, Dr. Peddada told his brother that the termination of the ROPC contract was the result was "what I hoped for. . . . But they want to employ both of us at separate locations. I'm not sure I want to be employed." [Doc. 208-37 at 1].

14. On April 5, 2022, Penrose sent Dr. Peddada a draft of a Physician Employment Agreement. [Doc. 208 at ¶ 5; Doc. 240 at 4 ¶ 5].

15. On April 16 and 19, 2022, there were communications between Dr. Peddada and the cancer team about Dr. Peddada's need for a recharge break or leave before starting employment. [Doc. 208 at ¶ 10; Doc. 240 at 5 at ¶ 10]. As of April 27, 2022, Dr. Peddada had communicated to Dr. Jeffrey Albert ("Dr. Albert"), the Enterprise Medical Director of Radiation Oncology and Integrative Cancer Care, that he would like to take some time off before starting as an employee at Penrose. [Doc. 208 at ¶ 10; Doc. 240 at 5 ¶ 10; Doc. 208-21].

16. During this same time period, Dr. Peddada was consulting with his attorney about taking disability leave under the ROPC contract. [Doc. 208 at ¶ 11; Doc. 240 at 5 ¶ 11; 208-54 at 144:16–24].

17. [redacted] [Doc. 241-3]. [redacted] [*id.* at 3–4].

18. [redacted] [*Id.* at 1].

19. [redacted] [*Id.* at 4]. Dr. Peddada's own retained expert, Dr. Michael F. Myers, MD ("Dr. Myers"), concurred with the health professionals whom he consulted that his burnout was entirely work-related. [Doc. 240-36 at 11].

20. Dr. Setty did not have any concerns regarding Dr. Peddada's physical health, memory, or cognition. [Doc. 208-57 at 21:25–22:3]. From her clinical evaluation, she did not believe that his condition interfered with his ability to perform major life activities such as breathing, sleeping, walking, working, communicating, or thinking. [*Id.* at 24:9–14]. Nor did she feel like he needed, or did she order, any restrictions on normal life activities. [*Id.* at 24:2–8, 15–20].

21. [redacted] [Doc. 241-4 at 38; Doc. 208-57 at 20:19–25].

[5] The Parties, and thus this Court, refers to Dr. Selagamsetty as Dr. Setty. *See* [Doc. 208 at ¶ 13; Doc. 240 at 5 ¶ 13].

22. On April 25, 2022, Dr. Peddada informed his ROPC partner, Dr. Monroe, that he would be taking leave beginning on May 1, 2022, for a period of three months. [Doc. 208-7]. He later took issue with Dr. Monroe's characterization of his leave request as being based on a mental health condition. [Doc. 208-53 at 65:2–66:4; Doc. 208-13].

23. Dr. Peddada informed Defendants that he was out of the office for his scheduled vacation from April 23–30, 2022.[6] [Doc. 208-15 at 3].

24. On April 26, 2022, Defendants emailed Dr. Peddada a Physician Employment Agreement, including a provision for loan repayment, and also sent a payor credentialing packet for signature. [Doc. 208 at ¶ 16; Doc. 240 at 7 ¶ 16]. Dr. Peddada viewed that email that same day. [Doc. 208-4 at ¶ 16; *id.* at 8]. During his deposition, Dr. Peddada conceded that he had no factual basis to dispute that he viewed the email, despite disputing that he had. [Doc. 208-53 at 56:10–15].

25. Dr. Peddada did not execute the April 26 Physician Employment Agreement. [Doc. 208 at ¶ 17; Doc. 240 at 8 ¶ 17; Doc. 208-53 at 57:7–9].[7] Nor did Dr. Peddada communicate with Defendants regarding the proposed Physician Employment Agreement. [Doc. 208-53 at 56:25–57:17].

26. Around the same time, Defendants also sent Dr. Peddada a Loan Settlement Agreement. [Doc. 208 at ¶ 12; Doc. 240 at 5 ¶ 12]. Dr. Peddada did not execute the Loan Settlement Agreement. [Doc. 208-53 at 30:15–21, 31:4–6].

---

[6] While Dr. Peddada testified at his deposition that he was placed on medical leave as soon as he saw Dr. Setty, this Court respectfully disagrees that this later testimony can create a genuine issue of material fact that he informed Defendants that he was on vacation from April 23–30, 2022.

[7] While Dr. Peddada denied Defendants' proposed undisputed fact, Dr. Peddada did not deny that he did not execute the April 26 Physician Employment Agreement or communicate with Defendants regarding any of the terms of his employment.

27. Dr. Peddada also did not return Mr. Koval's text message requesting to speak on April 27, 2022. [Doc. 208-2 at ¶ 18; Doc. 208-53 at 57:18–58:7].

28. On or about April 27, 2022, Dr. Peddada spoke with Dr. William Plauth, Chief Medical Officer at CHIC, who stated that Dr. Peddada declined to speak about the Physician Employment Agreement. [Doc. 208-14 at 2; Doc. 208 at ¶¶ 20–21; Doc. 240 at 8 ¶¶ 20–21]. Dr. Peddada further informed Dr. Plauth that he was unwilling to discuss the Physician Employment Agreement during the entirety of his leave which was anticipated to last until August 1, 2022. [Doc. 208-54 at 114:8–13].

29. Because physician credentialing with payors takes 90 to 100 days and cannot be started without a signed agreement, it was urgent that Dr. Peddada commit to employment and sign the agreements so that Penrose could move forward with its plans. [Doc. 208 at ¶ 9; Doc. 240 at 5 ¶ 9; Doc. 208-2 at ¶ 21].

30. On May 2, 2022, Dr. Peddada discussed with and formally requested medical leave from Dr. Caryn Baldouf, CHIC Medical Staff President. [Doc. 203-7; Doc. 203-8].

31. Dr. Monroe executed his Physician Employment Agreement on May 16, 2022 and his Loan Settlement Agreement on May 24, 2022. [Doc. 240-13; Doc. 241-2].

32. [redacted] [Doc. 241-4 at 17, 33]. [redacted] [*Id.* at 21–22]. [redacted]

[redacted] [*Id*. at 23].

33. [redacted] [*Id.* at 25]. [redacted]

34. [redacted] [*Id.* at 17].

35. [redacted] [*Id.* at 35].

36. [redacted] [*Id.* at 37]. [redacted] [*Id.*].

37. By letter dated May 9, 2022, Defendants told Mr. Peddada that they were "treating [his] failure to execute the Employment Agreement as a rejection of its offer of employment," and indicated that they would not be extending a revised offer of

employment. [Doc. 208-15 at 1]. This letter was transmitted to Dr. Peddada by email dated May 10, 2022. [*Id.* at 2–3].

38. [redacted] [Doc. 241-4 at 39]. [redacted] [*Id.* at 40]. [redacted] [*Id.*].

39. [redacted] [*Id.* at 41].

40. [redacted] *See generally* [*id.* at 30–43]. [redacted] [*Id.*]. [redacted] [*Id.* at 33].

41. [redacted] [*Id.* at 39].

**ANALYSIS**

Dr. Peddada invokes both the ADA and the Rehabilitation Act as bases for his claims for disability discrimination by Defendants based on their denial of "employment opportunities," "retract[ion] [of employment] offer," and "exclu[sion] . . . from employment." [Doc. 104 at ¶¶ 162, 172, 194].[8] By enacting the ADA and Rehabilitation Act, Congress

[8] Title I of the ADA prohibits qualified employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring,

sought to ensure that disabled individuals received full and equal opportunities to participate in society by prohibiting discrimination based on an individual's disability. *See* 42 U.S.C. §§ 12111(a)–(b); 29 U.S.C. § 701(a)–(b). The ADA makes it unlawful for a covered employer to discriminate against any "qualified individual on the basis of disability." 42 U.S.C. § 12112(a). Likewise, § 504 of the Rehabilitation Act prohibits exclusion of a disabled individual from "any program or activity receiving Federal financial assistance" because of that individual's disability. 29 U.S.C. § 794(a). To remedy alleged discrimination, both statutes allow private citizens to sue for damages for alleged statutory violations. *See Guttman v. Khalsa*, 669 F.3d 1101, 1109 (10th Cir. 2012) (citing 42 U.S.C. § 12133 (incorporating by reference 29 U.S.C. § 794(a))). Because the ADA and Rehabilitation Act "involve the same substantive standards, [courts] analyze them together." *Miller ex rel. S.M. v. Bd. of Educ. of Albuquerque Pub. Sch.*, 565 F.3d 1232, 1245 (10th Cir. 2009). Accordingly, the Court's analysis of these issues largely focuses on the ADA, but this analysis applies equally to the Rehabilitation Act. *See Rivero v. Bd. of Regents of Univ. of N.M.*, 950 F.3d 754, 758 (10th Cir. 2020) (recognizing that courts apply the same standards to the Rehabilitation Act claims and ADA claims).

Because there is no direct evidence of disability discrimination, Dr. Peddada's claims for disability discrimination proceed under the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See* [Doc. 240 at 25; Doc. 258 at 12]; *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1141 (10th Cir. 2011). Under that approach, Dr. Peddada bears the initial burden of establishing a prima facie case of

---

advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

discrimination by demonstrating that (1) he was a disabled person as defined by the ADA; (2) he was qualified, with or without reasonable accommodation, to perform the essential functions of his job; and (3) he was denied employment with Defendants because of his disability. *Carter*, 662 F.3d at 1142. If he is able to do so, then the burden shifts to Defendants to offer a legitimate, non-discriminatory reason for their employment action. *See Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1193 (10th Cir. 2018). If the employer articulates a satisfactory reason, the burden shifts back to the plaintiff to demonstrate that the employer's stated reason is a pretext for discrimination. *Id.* (citing *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017)).

## I. Summary Judgment in Favor of CommonSpirit Based On Corporate Form Is Warranted.

Defendants first argue that Common Spirit should be dismissed because "it had no involvement in in any decision involving Dr. Peddada and exercised no control over the entities or individuals involved in those decisions." [Doc. 208 at 21]. In support of this argument, Defendants cite to authority that a parent corporation is not liable for the acts of its subsidiaries and testimony by its administrators. [*Id.*]. Plaintiff argues that "there is sufficient evidence that Defendants are jointly liable as joint employers and/or an integrated enterprise, both of which turn on control over employment conditions."[9] [Doc. 240 at 29].

The Court first notes that most of the witness testimony cited by Defendants does not state that no one associated with CommonSpirit had any involvement in any decision

[9] Dr. Peddada does not make any different arguments with respect to Claims 8–10, which assert state law claims for wrongful discharge; unjust enrichment; and civil conspiracy, and thus, this Court treats all of the claims collectively as the Parties do.

involving Dr. Peddada. *See* [Doc. 208 at 21 (citing Doc. 208-49 at 134:21–135:18; Doc. 208-48 at 153:19–154:23; Doc. 208-56 at 97:10–100:8; Doc. 208-58 at 16:22–17:11; Doc. 208-59 at 23:22–24:8; Doc. 208-60 at 44:1–9; Doc. 208-50 at 38:15–40:19; 41:12–14)]. But Dr. Albert, in his capacity as the corporate designee of CHIC, testified that CHIC was result of a joint operating agreement between Common Spirit and Advent Health, and that Common Spirit was considered a parent, or "sponsor" organization that owned the assets for certain hospitals. [Doc. 208-48 at 153:19–154:2]. He further testified that CHIC operated these hospitals on behalf of Common Spirit and Advent Health. [*Id.* at 154:4-8]. Importantly, Dr. Albert testified that Common Spirit had "essentially no involvement, you know, in the day-to-day decision-making, the processes around this" or in the day-to-day operations of the Penrose and St. Francis hospitals, and that Common Spirit "would not have been exercising any direct oversight or control over this situation." [*Id.* at 154:9–23]. In response, Dr. Peddada simply argues that Defendants "are jointly liable as joint employer and/or an integrated enterprise, both of which turn on control over employment conditions," without pointing to any specific facts to support his theory. [Doc. 240 at 29–30].

"The doctrine of limited liability creates a strong presumption that a parent company is not the employer of its subsidiary's employees, and the courts have found otherwise only in extraordinary circumstances." *Bowles v. Grant Trucking, LLC*, 842 F. App'x 236, 242 (10th Cir. 2021) (quoting *Frank v. U.S. W., Inc.*, 3 F.3d 1357, 1362 (10th Cir. 1993)). While Dr. Peddada invokes the joint employer and/or integrated enterprise theories, and cites *Bristol v. Bd. of Cnty. Comm'rs of Clear Creek*, 312 F.3d 1213, 1218 (10th Cir. 2002) and *Frank*, 3 F.3d at 1362, he fails entirely to engage in any legal

analysis—including but not limited to differentiating between the two theories or identifying the factual evidence that supports his argument. [Doc. 240 at 29]. It is not the place, nor the obligation, of this Court to make argument on behalf of any party, particularly one that has been represented by able counsel since the inception of this action. *See United States v. Yelloweagle*, 643 F.3d 1275, 1284 (10th Cir. 2011); *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 800 n.10 (10th Cir. 2001) (observing that a court has no obligation to make arguments or perform research on behalf of litigants).

The only evidence that Dr. Peddada appears to offer to support his claim that Common Spirit and CHIC were joint employers, or a single, integrated enterprise, is testimony by Dr. Albert that there were Common Spirit leaders on the CHIC Board of Directors, and by Jason Tacha, the Chief Operating Officer for AdventHealth Medical Group—who was testifying as an individual—that he did not have an understanding of the difference between CHIC and Common Spirit. [Doc. 240 at 14 at ¶ 49 (citing Doc. 240-26 at 17:12–15); Doc. 240-26 at 17:1–15]. Even construing this evidence in Dr. Peddada's favor, this testimony is insufficient to create a genuine issue of material fact that Common Spirit shared or co-determined those matters governing the essential terms and conditions of Dr. Peddada's employment as joint employers. *Bristol*, 312 F.3d at 1218. Nor is there any evidence that Common Spirit exercised significant control over CHIC employees generally. *Id.*

Similarly, Dr. Peddada points to no evidence that demonstrates that Common Spirit exercised control over CHIC that exceeded control normally exercised by a parent corporation to justify a finding of a single, integrated entity. *See Frank*, 3 F.3d at 1362. Indeed, the *Frank* court expressly rejected Dr. Peddada's contention that the fact that Mr.

Tacha ultimately reported to a Board of Directors comprised of some Common Spirit leaders created a genuine issue of material fact, because "[t]o hold otherwise would mean that there would always be a material factual dispute as to this prong because the top officer of a subsidiary is, at some point, always held accountable to an officer of the parent corporation." *Id.* Rather, *Frank* court posited that "[t]he critical question is, what entity made the final decisions regarding employment matters related to the person claiming discrimination?" *Id.* at 1363 (cleaned up). There is simply no evidence in the record that Common Spirit was such entity as to the employment actions related to Dr. Peddada.

Accordingly, this Court respectfully concludes that Defendant Common Spirit is entitled to summary judgment in its favor against Dr. Peddada as to all claims.[10]

## II. Dr. Peddada Fails To Satisfy His Prima Facie Burden That He Is Actually Disabled.

The ADA defines a disability as, inter alia, "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). "To satisfy this definition, a plaintiff must (1) have a recognized impairment, (2) identify one or more appropriate major life activities, and (3) [allege] the impairment substantially limits one or more of those activities." *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1142 (10th Cir. 2011) (quotation omitted).

Plaintiff incorrectly argues that Defendants do not challenge Dr. Peddada's prima facie case of disability discrimination. [Doc. 240 at 25]. Defendants expressly argue that

[10] For ease of reference, the Court continues to use "Defendants" because the Motion for Summary Judgment was filed on behalf of both CHIC and Common Spirit, though CHIC remains the only remaining defendant as to certain claims, and because, to the extent that this Court is incorrect about whether Common Spirit is an appropriate defendant, the remainder of its analysis applies equally to Common Spirit.

Dr. Peddada was not "disabled," an element of the prima facie case of disability discrimination. [Doc. 208 at 24, 27, 32; Doc. 258 at 14]. Indeed, Dr. Peddada concedes that "the relevant question is whether Dr. Peddada's impairments substantially limited a major life activity," and he asserts that there is a genuine issue of material fact as to whether he is disabled, because his expert who was hired in anticipation of litigation, concluded that his condition substantially impaired his major life activities such as sleeping, thinking, concentrating, and communicating. [Doc. 240 at 16 ¶ 6 (citing Doc. 240-36 at 12–14); *id.* at 21]. Looking at the relevant regulation from the Equal Employment Opportunity Commission, "major life activities" includes "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working." *See* 29 C.F.R. § 1630.2(i); *Carter*, 662 F.3d at 1142–43. "An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(ii).

"Whether the plaintiff has identified a major life activity is normally a question of law for the court, while the degree of substantial limitation is ordinarily a question of fact for the jury." *Freeman v. City of Cheyenne*, 660 F. Supp. 3d 1155, 1162 (D. Wyo. 2023) (citing *Crowell v. Denver Health & Hosp. Auth.*, 572 F. App'x 650, 657 (10th Cir. 2014); *Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1216 (10th Cir. 2007)), *aff'd,* No. 23-8022, 2024 WL 464069 (10th Cir. Feb. 7, 2024). Based on the record before it, this Court concludes that Dr. Peddada does not adduce sufficient evidence to establish a genuine

issue of material fact that he has a disability that substantially impairs his major life activities of sleeping, thinking, concentrating, and communicating.

***Sleeping.*** As an initial matter, contrary to his assertion at [Doc. 240 at 16 ¶ 6], Dr. Peddada's expert, Dr. Michael F. Myers, MD ("Dr. Myers"), does not conclude that Dr. Peddada's condition substantially impaired his sleeping. Rather, he simply states that Dr. Peddada's responses to the CPHP Intake Form "suggest that Dr. Peddada's sleep may not have been as restful or restorative as usual." [Doc. 240-36 at 12]. Dr. Peddada points to no contemporaneous reports of a substantial impairment to his ability to sleep, and indeed, does not argue it within the substance of the Response. *See* [Doc. 240 at 21]. The citation to which Dr. Peddada points for the assertion that he often did not want to get out of bed does not substantiate that assertion. *See* [Doc. 240 at 16 ¶ 7 (citing Doc. 240-11 at 41:7–14; 210:2–11)].[11] Dr. Setty also testified that she did not believe Dr. Peddad's condition interfered with his ability to perform major life activities such as breathing, sleeping, walking, working, communicating, or thinking and believed that Dr. Peddada was fully capable of conducting all normal life activities without interference and that all of his normal bodily functions were unimpaired. [Doc. 208-57 at 24:9–20]. And while it is Dr. Peddada's—not the Court's—responsibility to identify evidence in the record to support his claim of disability, *see Alvariza v. Home Depot*, 506 F. Supp. 2d 451, 459 (D. Colo. 2007) ("Judges are not like pigs, hunting for truffles buried in the record."

[11] Dr. Peddada did not even attach page 210 as part of his Exhibit 11. *See* [Doc. 240-11]. Although it was not required to do so, this Court cross-referenced the citation to Dr. Peddada's deposition transcript as submitted by Defendants. [Doc. 208-54]. While Dr. Peddada testified that "I quit going to tumor boards some because I just didn't want to wake up to go to tumor board," [Doc. 208-54 at 210:3–5], this testimony does not support the proposition that he "often did not want to get out of bed."

(cleaned up) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991)), even viewing the facts in the light most favorable to Plaintiff, this Court does not find sufficient evidence that rises to more than a scintilla that would allow a jury to conclude that Dr. Peddada's sleeping was substantially impaired to justify a finding of disability under the ADA and Rehabilitation Act.

***Thinking, Concentrating, and Communication.*** As discussed above, Dr. Setty did not believe that Dr. Peddada's condition impaired—let alone substantially impaired—his major life activities, including thinking and communicating, even after clinically examining him contemporaneously with his complaints. [Doc. 208-57 at 24:9–14]. Even accepting Dr. Peddada and Dr. Myers's contentions that Dr. Peddada's condition substantially impaired the major life function of thinking, concentrating, and communication, both implicitly concede that these functions were only impaired as to the performance of his specific job of being a radiation oncologist.

It is undisputed that [redacted] [Doc. 241-3 at 4] (emphasis added). And Dr. Myers expressly stated: "I agree with the health professionals whom he consulted that this [burnout] was <u>entirely work-related</u>." [Doc. 240-36 at 11 (emphasis added)]. Plaintiff points to no evidence within the record that outside of performing his professional duties, Dr. Peddada's thinking or concentrating was impaired at all. *See Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1131 (10th Cir. 2003) (holding that plaintiff failed to show that her activities were significantly limited for purposes of the ADA because plaintiff had failed to demonstrate that her impairments substantially impaired her ability to interact with people in general on a regular basis).

[redacted] [Doc. 241-3 at 4]. And Dr. Peddada himself took issue with Dr. Monroe's characterization of any impairment as a mental health issue. [Doc. 208-53 at 65:2–66:4; Doc. 208-13]. Similarly, Plaintiff has failed to point to sufficient evidence to create a genuine issue of material fact that his communication was substantially impaired outside of work. *See Steele v. Thiokol Corp.*, 241 F.3d 1248, 1255 (10th Cir. 2001). Even Dr. Myers does not opine that Dr. Peddada's condition substantially limits him to think, concentrate or communicate as compared to most people in the general population. *Compare* [Doc. 240-36] *with* 29 C.F.R. § 1630.2(j)(ii).

As reflected in the EEOC regulation, work is considered a major life activity. 29 C.F.R. § 1630.2(i)(i). But courts consider the major life activity of working only as a last resort, *Carter*, 662 F.3d at 1146, and a person is only substantially limited in his ability to work if he is significantly restricted to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities, *see EEOC v. Heartway Corp.*, 466 F.3d 1156, 1162 (10th Cir. 2006). But Dr. Peddada does not argue that his major life activity of working is substantially impaired, or adduce evidence that he is significantly restricted to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities. *See generally* [Doc. 240]. Dr. Myers

does not opine that Dr. Peddada's major life activity of working was substantially impaired. [Doc. 240-36 at 12–13]. [redacted] [Doc. 241-4 at 33]. Moreover, Dr. Peddada cites no legal authority, and this Court could find none, where a court has concluded that work-induced stress qualified as a disability under either the ADA or the Rehabilitation Act.[12] And this Court again respectfully declines to make or consider an argument not made by Plaintiff himself (beyond what it already has), particularly given the fact that Dr. Peddada has been represented by able counsel since the inception of this case. *See Yelloweagle*, 643 F.3d at 1284; *Phillips*, 244 F.3d at 800 n.10.

---

[12] Defendants cite a number of cases for the proposition that "[a] host of cases unitedly declare that work-related stress or anxiety, or any other potential impairment that is created or exacerbated by a particular work environment or a specific work situation does not qualify as a disability under the ADA, even if it results in work-related limitations," including *Gonzagowski v. Widnall*, 115 F.3d 744, 746–47 (10th Cir. 1997). *See* [Doc. 208 at 22 & n.8]. Plaintiff takes issue with Defendants' interpretation of this case law, arguing that these cases were determined on a different prong of the analysis, i.e., whether the plaintiff was "otherwise qualified" and could perform the essential functions of the job, with or without accommodation. *See* [Doc. 240 at 19–20]. Plaintiff is correct that the Tenth Circuit did not decide *Gonzagowski* based on whether the plaintiff was disabled under the Rehabilitation Act. Instead, it assumed, without deciding, that the anxiety disorder alleged by Gonzagowski was a disability under the Rehabilitation Act while observing that a mental impairment limited to and arising out of a specific stressful work situation would not qualify as a disability. *Gonzagowski*, 115 F.3d at 746-47. While the proposition of law appears to remain sound, the EEOC regulation upon which it relies was amended effective 2012 and no longer includes the language that "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *See* 29 C.F.R. § 1630.2. Therefore, this Court does not consider *Gonzagowski* dispositive, but finds the principle articulated by the Ninth Circuit that the temporary inability to work based upon acute work-related stress without evidence of a long-term or permanent impairment due to that stress does not qualify as a disability under the Rehabilitation Act or the ADA. *See Hosea v. Donley*, 584 F. App'x 608, 611 (9th Cir. 2014) (citing *Sanders v. Arneson Prods., Inc.*, 91 F.3d 1351, 1354 (9th Cir. 1996)).

### III. There Is No Genuine Issue of Material Fact as to Whether Defendant Regarded Plaintiff as Disabled.

The ADA also includes within its definition of a "disabled person," inter alia, an individual who is regarded as having an impairment. 42 U.S.C. § 12102(1)(C). A person is regarded as having an impairment if he has been subjected to an action because of a perceived physical or mental impairment. *Id.* at § 12102(3)(A). But a perceived impairment does not meet this definition if it is "transitory and minor," i.e., if others perceive the person of having an impairment with an actual or expected duration of six months or less. *Id.* at § 12102(3)(B). Thus, in order to survive summary judgment, Dr. Peddada must first adduce sufficient evidence that: (1) Defendants perceived him as having an impairment, (2) the impairment had a duration of more than six months, (3) Defendants perceived the impairment when they terminated his offer of employment, and (4) Defendants terminated his offer of employment because of this perceived impairment. *Manna v. Phillips 66 Co.*, 820 F. App'x 695, 704 (10th Cir. 2020) (citing § 12102(3)(A); *Adair v. City of Muskogee*, 823 F.3d 1297, 1306 (10th Cir. 2016)). The Court focuses on the second element, as it finds it dispositive.

Defendants argue that Dr. Peddada cannot survive summary judgment on his disability discrimination claims because any impairment was transitory and minor because it had a duration of less than six months. [Doc. 208 at 23]. Dr. Peddada concedes that the ADA has an exception for impairments that are "transitory and minor." [Doc. 240 at 22]. But he insists that he has adduced enough evidence such that "a jury could reasonably infer that Defendants believed Dr. Peddada's condition would cloud his professional future well beyond six months and pose continuing risks of medical errors and workplace disruptions." [*Id.*]. In doing so, Dr. Peddada cites his responses to

Defendants' proposed Undisputed Material Disputed Facts ("UMDF") 14–15, his proposed Supplemental Additional Disputed Facts ("SADF") 4–5 and 9–11, and certain exhibits. [*Id.*]. Even viewing these facts in the light most favorable to Plaintiff, this Court concludes that Dr. Peddada has failed to adduce sufficient evidence to establish that there is a genuine issue of material fact that his condition was not transitory.

First, with respect to Dr. Peddada's reliance on deposition testimony by Drs. Thompson and Plauth, *see* [Doc. 240 at 21–22 (citing SADF 9–10)], this testimony relates to general opinions regarding physician burnout, not specific to their perceptions of Dr. Peddada. *See* [Doc. 240-17 at 44:23–45:2, 46:10–25, 51:1–6; Doc. 240-37 at 33:14–34:15, 37:9–38:18]. In their respective testimony, neither physician connects these opinions regarding burn-out to the Defendants' perception of Dr. Peddada specifically. [*Id.*]. Nor does the letter cited in SADF 11 reflect Defendants' perception that Dr. Peddada had an impairment that had a duration of greater than six months. [Doc. 240-38]. Rather, the letter requests that Dr. Peddada engage with CPHP for an assessment within the first 30 days and allow Defendants access to that information. [*Id.*].

Significantly, none of the evidence in the record to which Dr. Peddada points creates a genuine issue of material fact that Defendants' decisionmakers perceived that his condition would extend beyond six months as of May 9, 2022 when they terminated his offer of employment. Nor does any of the evidence cited by Dr. Peddada factually support the conclusion that Defendants believed Dr. Peddada's condition would cloud his professional future and pose continuing risks of medical errors and workplace disruptions. [redacted]

[redacted] *See* [*id.* at 31–32].

Dr. Peddada's testimony that there were "rumors" circulating that he was having a "nervous breakdown," [Doc. 240 at 16 ¶ 4], do not persuade this Court otherwise. First, some of the cited evidence make no mention of these alleged rumors of a "nervous breakdown" at all. [Doc. 240-6 at 50:6–52:6; Doc. 240-34]. Second, to the extent that this Court even considers the hearsay-upon-hearsay-upon-hearsay offered by Dr. Peddada in his deposition regarding Dr. Chris Oliver telling Dr. Peddada that Dr. Monroe "volunteered to this patient that I had a nervous breakdown,"[13] [Doc. 240-11 at 221:1–25], this testimony does not constitute evidence of a widespread rumor or any perception by Defendants that his "condition would cloud his professional future well beyond six months and pose continuing risks of medical errors and workplace disruptions." Without more factual evidence, Dr. Peddada's argument does not rise beyond mere speculation, and it is well-settled that "mere speculation, conjecture, or surmise cannot defeat a summary-judgment motion, because unsubstantiated allegations carry no probative weight in

[13] Inadmissible hearsay may not be relied upon at the summary judgment stage. *See Herrera v. United Airlines, Inc.*, 300 F. Supp. 3d 1284, 1295 (D. Colo. 2017) (citing *Thomas v. Int'l Bus. Mach.*, 48 F.3d 478, 485 (10th Cir. 1995)), *aff'd*, 754 F. App'x 684 (10th Cir. 2018). It is unclear how this statement by Dr. Peddada would be admissible at trial, and Dr. Peddada offers no other competent evidence that Dr. Monroe made this statement or was otherwise spreading rumors about him having a "nervous breakdown." But Defendants do not raise this argument, and like with Plaintiff, this Court respectfully declines to make one on their behalf. *See Yelloweagle*, 643 F.3d at 1284; *Phillips*, 244 F.3d at 800 n.10.

summary judgment proceedings." *Alcala v. Ortega*, 128 F.4th 1298, 1306 (10th Cir. 2025) (cleaned up).

Because Plaintiff has failed to carry his burden to establish a genuine issue of material fact as to being disabled pursuant the ADA or Rehabilitation Act, any portions of Claims 1, 2, 3, 4, and 7 that rely upon the theory that Defendants failed to provide reasonable accommodation necessarily fails. *See* 42 U.S.C. § 12201(h). Accordingly, this Court respectfully **GRANTS** summary judgment in favor of Defendants and against Plaintiff on Claims 1, 2, 3, 4 and 7. In so doing, this Court respectfully makes clear that such a ruling should not be construed as a conclusion that professional burn-out can never, as a matter of law, be found as a disability; rather, this conclusion is driven by this particular factual record.

## IV. Plaintiff Adduces Insufficient Evidence to Create a Genuine Issue of Material Fact as to Pretext.

The Court next turns to Claims 5 and 6, Dr. Peddada's retaliation claims. As an initial matter, the Court observes that the Parties do not meaningfully engage with these claims. *See generally* [Doc. 208; Doc. 240; Doc. 258]. Indeed, Defendants' Motion for Summary Judgment fails to include the terms "retaliate" or "retaliation" at all, fails to set forth the distinct legal standard for retaliation claims under the ADA and Rehabilitation Act, and in turn fails to engage in any type of meaningful discussion of the elements of such a claim. *See generally* [Doc. 208]. Instead, each side generally extends their arguments with respect to pretext to Claims 5 and 6.

The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any

manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). But an individual need not be disabled or perceived as disabled in order to bring a claim for retaliation under the ADA or Rehabilitation Act.[14] Rather, a plaintiff need only show that he had a reasonable, good-faith belief that he was disabled. *See Foster v. Mountain Coal Co.*, 830 F.3d 1178, 1186 (10th Cir. 2016). To establish a prima facie case of retaliation, Dr. Peddada must prove that: (1) he engaged in a protected activity, (2) he was subjected to an adverse employment action subsequent to or contemporaneous with the protected activity, and (3) there was a causal connection between the protected activity and the adverse employment action. *Id.* at 1187. Dr. Peddada is correct, in the specific context of his retaliation claims, that Defendants do not challenge whether he has satisfied his burden to establish a prima facie case. *See generally* [Doc. 208; Doc. 258].[15]

Given the lack of direct evidence of discrimination, the application of the *McDonnell Douglas* test then shifts the burden to Defendants to articulate a legitimate, non-discriminatory reason for withdrawing Dr. Peddada's offer of employment—the focus of Defendants' arguments. Defendants contend that Dr. Peddada's offer of employment was withdrawn on May 10, 2022, due to his lack of communication with them regarding the

[14] Like for disability discrimination claims, the standard for retaliation claims under the Rehabilitation Act is the same as the standard for retaliation claims under the ADA. *Reinhardt v. Albuquerque Pub. Schs. Bd. of Educ.*, 595 F.3d 1126, 1131 (10th Cir. 2010).

[15] Defendants' lone, unsupported header, that "There Is No Prima Facie Inference of Discrimination/Retaliation," [Doc. 258 at 11], is simply insufficient to mount a substantive challenge. Further, this Court notes that there is at least a genuine issue of material fact as to whether Dr. Peddada had a good faith belief that he was disabled; that he requested leave based on that good faith belief; that his offer of employment was retracted after he requested disability leave; and there is a sufficient temporal proximity of a few weeks between his protected activity of requesting leave and when Defendants retracted his employment offer.

Physician Employment Agreement; the need to have a signed Physician Employment Agreement and resolution of loan repayment or forgiveness to proceed with credentialing and resolve compliance concerns; and their concerns regarding Dr. Peddada's commitment to the practice after finding out that he had placed his house in Colorado Springs on the market for sale. [Doc. 208 at ¶ 48; *id.* at 26–30]. Without Dr. Peddada's willingness to communicate, Defendants were unable to resolve their questions or concerns with him in the time frame that they believed was necessary. [*Id.*; Doc. 208-2 at ¶¶ 20–22, 24, 26]. In addition, Defendants had concerns regarding his professionalism, given his refusal to communicate. [Doc. 208-2 at ¶ 20]. This Court finds, and Dr. Peddada does not dispute, that these are legitimate, non-discriminatory reasons, and the burden shifts back to Dr. Peddada to adduce sufficient evidence to create a genuine issue of material fact as to pretext. When reviewing Dr. Peddada's contention of pretext, this Court examines the facts as they appeared to Defendants as they made their determination terminate the offer of employment to Dr. Peddada. *See Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017).

As an initial matter, the close temporal proximity between Dr. Peddada's request for disability leave and Defendants' decision to withdraw the offer of employment, standing alone, is insufficient to create a genuine issue of material fact as to pretext. *See Annett v. Univ. of Kansas*, 371 F.3d 1233, 1241 (10th Cir. 2004) (observing that while temporal proximity can establish causation for the purposes of a prima face case, it was not permitted to act as a proxy for evidence of pretext). Thus, the operative inquiry is whether Dr. Peddada's evidence of temporal proximity combined with other factors demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions" in the Defendants' proffered reasons for their failure to hire him such that "a reasonable factfinder could rationally find them unworthy of credence." *Id.* at 1241 (quotations omitted).

Dr. Peddada first argues that a jury could find Defendants' claim that he refused to communicate to be false. [Doc. 240 at 26]. In the April 27, 2022 timeframe, Dr. Peddada was still a principal of ROPC, [Doc. 104 at ¶ 74; Doc. 113 at ¶ 74], and had advised Defendants that he was on vacation, [Doc. 208-15 at 3]. He had also advised Dr. Monroe that his medical leave would begin on May 1. [Doc. 208-7]. Whether or not Defendants told Dr. Peddada that he had to sign the April 26 Physician Employment Agreement by a date certain, it is undisputed that Dr. Peddada did not do so by May 10, 2022, when Defendants transmitted the letter withdrawing his offer of employment. It is further undisputed that Dr. Peddada either ignored Defendants' overtures or expressly declined to discuss this Agreement when Defendants reached out to him prior to May 10. Dr. Peddada did not return Mr. Koval's text message requesting to speak on April 27, 2022. [Doc. 208-2 at ¶ 18; Doc. 208-53 at 57:24–58:7]. Around the same time, Dr. Peddada spoke with Dr. Plauth and declined to speak about the agreements. [Doc. 208-14 at 2; Doc. 208 at ¶ 21; Doc. 240 at 8 ¶ 21]. In their letter dated May 9, 2022, Defendants accurately stated that their attempts to reach Dr. Peddada had not been successful. [Doc. 208-15]. And Dr. Peddada does not dispute that he declined to speak with Defendants about his employment arrangement until after his leave was complete on August 1, 2022, or that without such communication, Defendants could not unilaterally resolve their issues.

Next, Dr. Peddada argues that the jury could find that Defendants' claim that they wanted prompt execution of the Physician Employment Agreement was contrived because Dr. Peddada had already completed the credentialing packet and the proposed start date was months away on August 1, 2022, and that Dr. Monroe executed his agreements after Dr. Peddada's offer was withdrawn. [Doc. 240 at 26; Doc. 240-13; Doc. 241-2]. But Dr. Peddada does not dispute that because physician credentialing with payors takes 90 to 100 days and cannot be started without a signed agreement, it was urgent that Dr. Peddada commit to employment and sign the agreements so that Penrose could move forward with its plans. [Doc. 208 at ¶ 9; Doc. 240 at 5 ¶ 9; Doc. 208-2 at ¶ 21]. Given this timing, even if Dr. Peddada executed the agreements on August 1, 2022, he may not have been credentialed until December 2022. And while Dr. Monroe signed his paperwork on May 16 and May 24 after Defendants rescinded Dr. Peddada's offer of employment, Dr. Peddada points to no evidence that indicated that Dr. Monroe declined to discuss his respective Physician Employment Agreement or the Loan Settlement Agreement with Defendants at any time—let alone before August 1, 2022—or that the timing of the execution of Dr. Monroe's agreements jeopardized their ability to properly credential him in time for his start date as Defendants' employee.

With respect to Defendants' articulated concerns regarding commitment concerns and Dr. Peddada's prior interpersonal issues with Dr. Monroe, Dr. Peddada does not specifically address these with disputed facts. [Doc. 240 at 26]. Nor does he address Defendants' articulated concerns regarding his prior difficulties with interactions with other colleagues that dated back to at least one incident in 2012—well before his self-reported onset of burnout. It is undisputed that Dr. Peddada had not communicated with Dr.

Monroe for months, [Doc. 208 at ¶ 2; Doc. 240 at 2 ¶ 2; Doc. 208-54 at 158:17–19]; [redacted], [Doc. 241-4 at 16]; [redacted], [Doc. 241-4 at 17; Doc. 241-6; Doc. 241-7; Doc. 241-8]. Dr. Peddada does not satisfy his obligations to establish a genuine dispute of material fact as to whether these reasons were unworthy of belief. *See DePaula*, 859 F.3d at 977–78.

Instead, Dr. Peddada simply argues that the jury could label these issues as "litigation inventions, not legitimate reasons," and generally, that the jury could simply not believe Defendants' various explanations of their reasons for rescinding their offer of employment. [Doc. 240 at 26]. It is axiomatic that this Court cannot weigh evidence or credibility at the summary judgment stage. *See Fogarty*, 523 F.3d at 1165 (observing that "[o]n summary judgment, a district court may not weigh the credibility of the witnesses"). But "[t]he general rule is that specific facts must be produced in order to put credibility in issue so as to preclude summary judgment. Unsupported allegations that credibility is in issue will not suffice." Wright & Miller, Fed. Prac. & Proc. Civ. § 2726 (4th ed.). Conclusory statements or those based on speculation, conjecture, or surmise provide no probative value on summary judgment. *See Nichols v. Hurley*, 921 F.2d 1101, 1113 (10th Cir. 1990).

And this Court does not inquire as to whether Defendants' reasons "were wise, fair or correct," but rather whether Defendants "honestly believed" that Dr. Peddada's ongoing issues with colleagues coupled with his refusal to communicate about his Physician Employment Agreement and Loan Settlement Agreement jeopardized their ability to move forward his employment, "and acted in good faith upon those beliefs." *DePaula*, 859 F.3d at 971 (quotations omitted). Applying this framework, this Court respectfully concludes

that Dr. Peddada has failed to adduce sufficient facts to demonstrate that Defendants did not honestly believe that Dr. Peddada's lack of communication coupled with his prior treatment of colleagues were sufficient grounds to rescind his offer of employment.

Based on the record before it, this Court respectfully concludes that Plaintiff has failed to adduce sufficient evidence to create a genuine issue of material fact as to pretext. Accordingly, summary judgment in favor of Defendants is appropriate as to Claims 5 and 6.

## V. This Court Respectfully Declines to Exercise Supplemental Jurisdiction Over the State Law Claims and Counterclaim, and the Remaining Pending Motions are Moot.

Having found summary judgment in favor of Defendants on all of Plaintiff's federal claims, this Court respectfully declines to exercise supplemental jurisdiction over Claims 8–10 that arise from state law. *See Wittner v. Banner Health*, 720 F.3d 770, 781 (10th Cir. 2013) (noting that the court has discretion to dismiss supplemental state law claims once it dismisses federal claims); *see also Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 30 (2025) ("With the loss of federal-question jurisdiction, the court loses as well its supplemental jurisdiction over the state claims"). As a result, the Court does not reach the Parties' substantive arguments related to Claims 8–10. The Court also declines to exercise supplemental jurisdiction over Defendant's Counterclaim that also appears to arise under Colorado state law, though the precise legal basis, e.g., breach of contract and/or unjust enrichment, is not articulated. [Doc. 113 at 19–20 (alleging "Plaintiff is in violation of his share of the repayment obligation and will be unjustly enriched" and "Under the terms of the Promissory Note, Plaintiff must reimburse Penrose for the associated attorneys' fees")].

In addition, because no claims remain against Defendants, Plaintiff's Motion for Partial Summary Judgment with respect to the affirmative defense of failure to mitigate [Doc. 203], Plaintiff's Motion for Sanctions [Doc. 257], and Defendants' Motion for Clarification [Doc. 261] are all **DENIED as moot**. The issue of reasonable fees as contemplated by the Order dated January 6, 2026 [Doc. 195; Doc. 200] **REMAINS PENDING** before the Honorable Maritza Dominguez Braswell and will be subject to separate order. *Cf. Budinich v. Becton Dickinson & Co.*, 486 U.S. 196 (1988) (observing that the determination of attorney's fees may remain pending after an order ending the litigation on the merits and does not impact the finality of judgment).

## CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that:

(1) Plaintiff's Motion for Partial Summary Judgment [Doc. 203] is **DENIED as moot**;

(2) Defendants' Renewed Motion for Summary Judgment [Doc. 208] is **GRANTED in part**;

(3) The Clerk of the Court shall **ENTER** judgment in favor of Defendant Common Spirit Health and against Plaintiff Dr. Anuj Peddada as to all claims;

(4) The Clerk of the Court shall **ENTER** judgment in favor of Defendants Catholic Health Initiatives Colorado as to Claims 1–7;

(5) Claims 8–10 are **DISMISSED without prejudice** pursuant to 28 U.S.C. § 1367(c);

(6) Defendants' Counterclaim is **DISMISSED without prejudice** pursuant to 28 U.S.C. § 1367(c);

(7) Plaintiff's Motion for Sanctions [Doc. 257] is **DENIED as moot;**

(8) Defendants' Motion for Clarification [Doc. 261] is **DENIED as moot**;

(9) Defendants, as the prevailing party, are **AWARDED** their costs pursuant to Rule 54(d) of the Federal Rules of Civil Procedure and Local Rule 54.1;

(10) The issue of reasonable fees as contemplated by the Order dated January 6, 2026 [Doc. 195; Doc. 200] **REMAINS PENDING** before the Honorable Maritza Dominguez Braswell; and

(11) The Clerk of the Court is **DIRECTED** to **TERMINATE** this case.

DATED: September 16, 2026

BY THE COURT:

Nina Y. Wang
United States District Judge